David W. Affeld, State Bar No. 123922
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:     (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY, | Case No. CV 17-7357 JCS |
| Plaintiff, | <u>Assigned to:</u><br>The Honorable Richard G. Seeborg |
| vs. | **DECLARATION OF MICHAEL ZELENY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION OF NEW ENTERPRISE ASSOCIATES TO QUASH SUBPOENA** |
| EDMUND G. BROWN, Jr., *et al.*, | |
| Defendants. | Date:  March 7, 2019<br>Time: 1:30 p.m.<br>Courtroom:  3 (17th Floor) |
| | [Filed Concurrently:<br>1.  Opposition<br>2.  Declaration of Michael Zeleny;<br>3.  Declaration of Larry Berliner] |
| | Action Filed:  December 28, 2017<br>Trial Date:     November 18, 2019 |

- 1 -

I, Michael Zeleny, declare:

1.     I am the plaintiff in this action.  I have personal knowledge of the facts below, except those on information and belief, which I am informed and believe to be true for the reasons stated.  I could testify competently to these facts if called upon to do so.

**A.     Discovery of Min Zhu's Rape of Erin Zhu and NEA's Collaboration.**

2.     In the 1990s, I was business partners and had a personal relationship with Erin Zhu, the daughter of Min Zhu, founder of WebEx Communications.

3.     Erin Zhu confided in me that in the summer of 1988, while her mother was away on travel, her father had repeatedly raped and sexually abused her.

4.     Erin Zhu complained about her father's sexual abuse in a series of online posts to the Usenet group alt.sexual.abuse.recovery, some of which are still online (https://groups.google.com/forum/#!search/erin$20zhu$20sexual$20abuse), and in a series of emails to a personal friend of hers, which she shared with me.

5.     In 1999, Erin Zhu retained counsel, and requested my financial assistance, to pursue claims against her father, Min Zhu.   She asked me to sit in on some of her meetings with counsel in which she detailed Min Zhu's repeated rapes.  This resulted in a draft complaint, which detailed the sexual abuse.  A true copy of the draft complaint is attached as **Exhibit 1**.

6.     To the best of my knowledge, Min Zhu has never denied the allegations.  He settled with Erin Zhu for a confidential sum in 2000.

7.     In 2003, Erin Zhu sat for a deposition in related litigation, in which she testified about Min Zhu's conduct.  A video of a relevant portion of the deposition is online at: https://youtu.be/QgmWMGG3qgE.

8.     Starting in 2005, I sent a series of emails to executives at NEA notifying them of Erin Zhu's credible allegations that Min Zhu raped her.  I directed them to Erin Zhu's videotaped deposition testimony, her Usenet postings, and her emails, as entered in evidence in previous litigation.

9.     NEA did not respond.  Instead, in 2011, during one of NEA's lawsuits against me, I received in discovery a number of confidential documents confirming that NEA had received my communications and was well aware of Erin Zhu's allegations.

10.     I am informed and believe that NEA and its executives have continued to partner with Min Zhu and financially back his projects despite knowing of Erin Zhu's credible allegations of child rape.  It has been publicly reported that (a) NEA invested in two venture funds raised by Northern Light Capital, a Chinese venture capital firm started by Min Zhu (https://www.pionline.com/article/20080218/PRINT/844507768/firms-use-old-strategyfor-china-entry); and (b) that NEA's former chairman, C. Richard Kramlich, moved to China to collaborate with Min Zhu after Min Zhu fled the United States for China.

### B.     Protests Against NEA and Min Zhu

11.     I began publicly protesting Min Zhu and NEA in 2005.

12.     The protests have been based on my sincere, firmly-held belief that (a) child rapists should not be placed in positions of public trust, *e.g.*, as executives of public companies such as WebEx; and (b) that it is morally and ethically abhorrent for NEA to continue to fund the business ventures of a child rapist and to collaborate with him on those ventures.

13.     In May 2005, I protested Min Zhu at the WebEx user conference in San Francisco.  WebEx then cancelled its user conference indefinitely.  Shortly thereafter, WebEx reported that Min Zhu was "retiring" and relocating to China.

14.     I continued to protest Min Zhu and his financial backers, including NEA, after Min Zhu's supposed "retirement".

15.     These protests spanned from October 2007 through 2009.   During this time, I also engaged in online protests, including by creating the website www.subrah.com, named after Min Zhu's co-founder of WebEx and its Chief Executive Officer, Subrah Iyar, detailing Min Zhu's child rape and corporate sponsorship of him by NEA.

16.     Beginning in 2010, I directed my protests primarily to NEA.  In September and

- 3 -

October 2010, I protested for two weeks outside of the corporate headquarters of NEA on Sand Hill road in Menlo Park.

17.   NEA sued me for trespass based on these protests.  In response, in 2011, I moved the protests to a public easement near the entrance to the "Rosewood Sand Hill" complex, which houses NEA's corporate headquarters.

18.   I continued to protest at the same location in February, June, and July of 2012. I also protested at various other locations in the Bay Area.

19.   My protests have included, among other things:

a.   Posters "calling out" specific NEA executives, including Scott Sandell, for collaborating with Min Zhu despite their knowledge of his sexual abuse of Erin Zhu;

b.   Graphic, but non-obscene cartoon images and animations of Min Zhu's conduct and NEA's support for Min Zhu;

c.   Large posters with portraits of Min Zhu, Subrah Iyar, and NEA executive Scott Sandell;

d.    Live musicians playing accordions, trumpets, and bagpipes;

e.   An offering of free food "in honor of Min Zhu" to registered sex offenders, sex workers, and adult industry performers.

20.   Beginning in or around late 2009, I began carrying unloaded firearms as part of my protests.  The purpose of doing so was to amplify the message of the protests and to draw attention to them in the manner of the peaceful armed protests of the 1960s.

21.   Each time, I have advised local police of my plans and allowed them to inspect all firearms.  I have complied with all time, place, and manner restrictions imposed by the City of Menlo Park, although I did not believe that they were constitutionally valid.

**C.   NEA's Use of Law Enforcement and Local Governments to Stifle Protests**

22.   In the early 2000s, WebEx sued me in Santa Clara Superior Court for online posts I had made about Min Zhu and his rape of Erin Zhu in the case *WebEx Communications Inc. v. Zeleny*, Los Angeles County Superior Court Case No. BC324927.  WebEx ultimately

1   paid over $16,000 in sanctions and attorney's fees for filing their suit in the wrong venue and

2   violating California's Anti-SLAPP (Strategic Lawsuit Against Public Participation) statute.

3        23.     WebEx had me arrested for my peaceful protests at the WebEx user conference

4   in 2005.  I was forced to undergo a psychiatric exam, and after passing it, was released

5   without charges on the same day.

6        24.     In 2009, Scott Sandell sought a temporary restraining order against me.  I was

7   never served.  I learned about this application when NEA disclosed it in a later suit against

8   me.  I understand that the court rejected Mr. Sandell's application without opposition or an

9   appearance on my part.

10        25.     In October 2010, NEA sued me for trespass at its Menlo Park headquarters and

11   sought a temporary restraining order.  The court summarily rejected NEA's application for a

12   restraining order without opposition.   NEA's lawsuit, captioned *New Enterprise Associates,*

13   *Inc. v. Zeleny*, San Mateo County Superior Court Case No. 499465, continued until

14   September 2011 when we reached a settlement.

15        26.     After I moved my protest to the public easement adjacent to the Rosewood

16   Sand Hill complex in 2011, the City began placing increasing restrictions on the protests,

17   dictating when, where, and how I could protest.  Although I disagreed with these restrictions,

18   I complied with them so that I would be allowed to continue.

19        27.     On July 19, 2012, the San Mateo County District Attorney's office filed

20   criminal charges against me for carrying a concealed firearm in the course of my protests.

21   The supposedly "concealed" firearm was a handgun that I prominently carried in a padlocked

22   military belt holster that was designed and manufactured for it, in full compliance with all

23   relevant statutes.

24        28.     The prosecution lasted from 2012 through December 2014.

25        29.     Representatives of NEA sat in the courtroom throughout my trial.

26        30.     The Deputy District Attorney who conducted the criminal trial, Jenna

27   Johansson ("Johansson"), met frequently with NEA representatives during breaks.

28        31.     This pattern became so pronounced that I began taking photos of these

meetings between the prosecutor and NEA.   One such photo is attached hereto as **Exhibit 2**.

32.    Johansson repeatedly referred to NEA as "the client" or "her client" during court proceedings.  For example, in response to directives from the judge, Johansson would state that she "needed to talk to [her] client".  She made similar comments throughout the trial.   It was very disturbing to me that the public prosecutor responsible for my criminal case appeared and claimed to be acting in concert with, and on behalf of, the private entity that I was protesting.

33.    On December 8, 2014, Judge Joseph E. Bergeron acquitted me of all charges following a bench trial.  A true copy of the verdict is attached hereto as **Exhibit 3**.

### D.    The City of Menlo Park Halts the Protests

34.    While my criminal proceeding was ongoing, the California Legislature enacted a number of laws that prohibit the "open carrying" of unloaded firearms.  The statutes exempt film production and "entertainment events" from the prohibition on open carry.

35.    In the course of litigation, my counsel argued that I was allowed to carry the firearm, in part, because I was participating in an entertainment event. Johansson responded that I needed a "Special Events" permit from the City of Menlo Park in order for this exemption to apply.

36.    I then discovered through date-restricted Google searches that the relevant page of the City of Menlo Park website setting a requirement for "Special Events" permits was created during the pendency of criminal case, after my counsel argued the entertainment event exception.

37.    A true copy of the search results at issue is attached hereto as **Exhibit 4**.

38.    After I was acquitted, I sought to resume my videographed protests against NEA outside its headquarters on Sand Hill Road.

39.    Fearing that I would be arrested and charged with illegally carrying firearms, I sought "Special Events" and video production permits.

40.    The City denied my application at each stage of the permitting process.  The

City has never given time, place, or manner requirements for a permit, or advised me of the criteria for successfully applying for one.

41.     The City has repeatedly taken the position that I "do not need" a permit to protest, but that I will be arrested if I carry firearms as part of the protest without one.

42.     Excerpts of the administrative records of the permitting process are attached hereto as **Exhibit 5**.

43.     As part of the permitting process, I attended a public meeting on August 11, 2016 with Alex MacIntyre, then city manager of Menlo Park, police chief Dave Bertini, and my counsel, David Affeld.

44.     During this meeting, Chief Bertini stated that he and the community considered my protests offensive.  He took particular issue with one of the cartoons of Min Zhu engaged in sexual activity.  Chief Bertini stated that if I continued to display this artwork, he would have me arrested for "obscenity as to minors".

45.     I firmly believe that NEA is behind the denial of my applications for permits. This is consistent with its past practices of using the legal system, law enforcement, and political influence to silence me and other critics.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 8th day of February, 2019 at Los Angeles, California.

Michael Zeleny

ZELENY DECLARATION IN OPP. TO MOT. TO QUASH

**Exhibit 1**

**Exhibit 2**



**Exhibit 3**

1   SUPERIOR COURT OF
    CALIFORNIA
2   San Mateo County

3
    Honorable Joseph E. Bergeron
4   400 County Center, 2B
    Redwood City, CA 94063
5

**FILED**
SAN MATEO COUNTY

DEC  5 2014

Clerk of the Superior Court
By _____
        DEPUTY CLERK

6              SUPERIOR COURT FOR THE STATE OF CALIFORNIA

7                      FOR THE COUNTY OF SAN MATEO

8

9   THE PEOPLE OF THE STATE OF              CASE NO. SM382036A
    CALIFORNIA
10

11          Plaintiff.

12      V.                                  **VERDICT IN COURT TRIAL**

13      Michael Zeleny,

14          Defendant

15

16   _____

17

18      I find the Defendant, Michael Zeleny, NOT GUILTY of PC 25400.

19      His weapon was properly holstered in the holster which was manufactured for

20   that very weapon.

21

22

23

24   Dated:  December 5, 2014

25                                          HON. JOSEPH E. BERGERON

26

27

28

**AFFIDAVIT OF MAILING**

DOCUMENT TITLE:     VERDICT IN COURT TRIAL
CASE NAME:          PEOPLE   VS MICHAEL ZELENY
CASE NO.            SM382036A


__X___ I declare under penalty of perjury that I am over the age
       of 18 and I am not a party this action and on the
       following date I caused to be deposited in the United
       States Post Office mailbox at Redwood City, a true copy of
       the foregoing document, enclosed in an envelope, with the
       proper and necessary postage prepaid thereon, and
       addressed as follows:


Affeld Grivakes Zucker LLP
David w. Affeld
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067


Ryan J. King
1934 Divisadero Street
San Francisco, CA 94115


Jenna Johansson
Steve Wagstaffe
400 County Center, 4th Floor
Redwood City, CA 94063


     Executed on December 5, 2014, at Redwood City, California.

                   John C. Fitton, Executive
                   Officer/Clerk


                   By: _____
                      Deputy

-1-

**Exhibit 4**

site:menlopark.org "Events occurring for more than 1 day"

+Michael          Share

Web    News    Images    Shopping    Videos    More ▾    Search tools

Before Apr 21, 2014 ▾    Sorted by relevance ▾    All results ▾    Clear

No results found for **site:menlopark.org "Events occurring for more than 1 day"**.

Results for **site:menlopark.org Events occurring for more than 1 day** (without quotes):

[PDF] **Association MOU, July 1, 2011 – June 30, 2013 (pdf)**
www.menlopark.org/DocumentCenter/View/1547 ▾   Menlo Park ▾
Jun 30, 2013 - cost, or attorneys' fees in the **event** of any action in which the City is named as a .... 5.1.1 Designation of which **one** full **day** on either December 24 or December .... An officer shall be allowed regular pay for not **more than** three (3) working **days** when ..... **day** payroll cycle **occurring** closest to June 1, October 1 and February 1.

**Special Events | Menlo Park, CA - Official Website**
www.menlopark.org/241/Special-**Events** ▾   Menlo Park ▾
Dec 28, 2005 - See what special **events** and concerts are going on in and around Menlo Park. ... **1**. Trevor Tyler. 105 points. 2. Thierry Depeyrot. 105 points. 3. Karen. 9 points ... **More than** providing residents with venues for fun, play and celebration, ... Kite **Day** Saturday, May 2, 2015 - Noon to 3 p.m.. Bring your own kite or buy a kite from ...

[PDF] **2014 Mini & Menlo Madness Camp Brochure - City of Me…**
www.menlopark.org/DocumentCenter/View/3925 ▾   Menlo Park ▾
Jan 3, 2012 - Page **1** ... Campers **days** will be filled with outdoor and team games, arts & crafts, field trips, sports, gymnastics, special **events**, swimming, cooking, and much more! ... Are you wondering why holidays can't come **more than** once a year?

[PDF] **Team Sheeper Lease Agreement 2011 - City of Menlo Park**
www.menlopark.org/DocumentCenter/Home/View/1058 ▾   Menlo Park ▾
Mar 24, 2011 - State of California, as **more** particularly shown in Exhibit A, attached hereto and incorporated ... Pool on the first **day** of each month for the first year of the Term. .... In the **event** of a third party dispute or conflict arising out of or related to this. Lease .... failure or damage where the cost is less **than** One Thousand Five Hundred.

[PDF] **4.10 Noise - City of Menlo Park**
www.menlopark.org/DocumentCenter/View/414 ▾   Menlo Park ▾
Apr 15, 2011 - Background noise levels change throughout a typical **day**, but do so gradually, ... The addition of short duration single **event** noise sources (e.g., aircraft flyovers, motor vehicles, sirens) ... increases in A-weighted noise level, the following relationships **occur**: .... considered **more** sensitive to ambient noise levels **than** others.

[PDF] **Minutes - City of Menlo Park**
www.menlopark.org/AgendaCenter/.../01132014-1289 ▾   Menlo Park ▾
Jan 13, 2014 - (FAL) for a parcel with less than 5,000 square feet of lot area in the R-1-U (Single Family .... that **day**, requested landscaping at the back of the lot to include fast growing trees with .... Mr. Satvatmanesh said he paid $300,000 **more than** the asking price for this property and he .... The **event** would **occur** on Wednesday.

[PDF] **3.8 NOISE - City of Menlo Park**
www.menlopark.org/DocumentCenter/View/2652 ▾   Menlo Park ▾
Dec 13, 2011 - does not depend on the time of **day** during which the noise **occurs**. .... Vibration acceptable only if there an infrequent number of **events** per **day**. ..... permanent increase in roadway traffic noise levels of **more than** 1 dBA over baseline ...

[PDF] **Association MOU, July 1, 2011 – June 30, 2013 (pdf)**
www.menlopark.org/DocumentCenter/View/1544 ▾   Menlo Park ▾
Jul 1, 2011 - the Chief of Police or his or her designee prior to the first **day** of class. .... pay for a period not less than four weeks nor **more than one** (**1**) year, during which ....

7.1.2 In the **event** that any of the aforementioned **days**, except December 24 or 31. ....
reduction in pay for change in assignment which **occurs** in the course of regular.

**[PDF]** Transportation Impact Analysis Guidelines - City of Menlo …

www.menlopark.org/DocumentCenter/Home/View/302 ▾   Menlo Park ▾

Aug 5, 2006 - **1**. A Project is considered to have a potentially "significant" traffic impact if
the addition of ... the addition of project traffic causes an increase of **more than** 0.8
seconds of .... or more. ADT becomes. 1,350 veh / **day** or more. Potentially. Significant
... may **occur** as a result of the addition of project traffic (provide table comparing.

**[PDF]** EIR Addendum - City of Menlo Park

www.menlopark.org/DocumentCenter/View/2622 ▾   Menlo Park ▾

Feb 15, 2013 - Figure 3.3-3 Viewpoint **1**: View of Revised Project with Temporary Tent
**Event** . .... are substantially different **than** assumed or described in the EIR. ..... 210 trips
per **day**, with the **most** trips **occurring** during the grading stage when soil would be ...

○ Los Angeles, CA - From your phone (Location History) - Use precise location - Learn more

Help     Send feedback     Privacy & Terms

site:menlopark.org "Events occurring for more than 1 day"

+Michael        4        Share

Web      News      Images      Shopping      Videos      More ▾      Search tools

Before Apr 22, 2014 ▾      Sorted by relevance ▾      All results ▾      Clear

**Special Event Permits | Menlo Park, CA - Official Website**
menlopark.org/292/Special-Event-Permits ▾      Menlo Park ▾
Apr 22, 2014 - ... Events needing Police regulation, monitoring or control; **Events occurring for more than 1 day**; Generate a crowd of spectators sufficient in size to obstruct, ...
You visited this page on 9/12/14.

◯ Los Angeles, CA - From your phone (Location History) - Use precise location - Learn more

Help      Send feedback      Privacy & Terms

**Exhibit 5**

ATTACHMENT A

City Manager's Office



CITY OF
MENLO PARK

September 12, 2016

**VIA First Class Mail and Email**
Michael Zeleny
7576 Willow Glen Road
Los Angeles, CA 90046

**RE: Special Event Permit Application Appeal Decision**

Dear Mr. Zeleny,

This correspondence serves as final determination of the City of Menlo Park's denial of your appeal of a prior decision to deny a Special Events Permit.

**Background**

The Appeal of the administrative decision denying the application of Michael Zeleny for a special event permit ("SEP") was heard on August 11, 2016 at the Menlo Park City Hall.

Mr. Zeleny first applied for a SEP on June 3, 2015 to conduct a protest in the median on Sand Hill Road near the entrance and exits of Interstate 280 in Menlo Park. The application (Exhibit A) included, but was not limited to, a request to:

- park a truck on the median;
- display loaded and unloaded firearms;
- distribute literature to the public; and
- run a generator to operate a 55-inch digital video monitor.

The protest was to be video recorded and, since the event was to extend into the evening, requested high-intensity lighting. This request was denied by staff on September 21, 2015 (Exhibit B).

On April 15, 2016, a revised application for a SEP was submitted to the City (Exhibit C). This application was treated as a new application. The April 2016 application was denied by staff on May 4, 2016 (Exhibit D). This denial was then appealed by Mr. Zeleny to the Community Services Department on or about May 27, 2016 (Exhibit E). The appeal was again denied by letter dated June 16, 2016 (Exhibit F). That decision was appealed to the Community Services Director (Exhibit G), which was again denied on June 24, 2016 (Exhibit H). Appellant then appealed to the City Manager. The City sent out a notice of appeal hearing on July 20 to the appellant, setting August 11, 2016 at 2:00 pm as the hearing date (Exhibit I).

2

As Menlo Park City Manager, I acted as the hearing officer for the appeal hearing and was represented by Gregory J. Rubens, Esq..  Appearing on behalf of the City was Police Commander David Bertini of the Menlo Park Police Department.  The Appellant was represented by David Affeld, Esq.  Also in attendance was Michael Zeleny (Appellant) and Kimberly Chu, Esq. from Gregory J. Rubens' office.

The Appeal was conducted as a de novo hearing.  The City admitted the above described documents and e-mails from staff and Mr. Zeleny from June 2015 to July 2016 (Exhibit J).  In addition, Mr. Zeleny provided an electronic copy of the Entertainment Firearms permit dated July 13, 2016 issued by the Office of the Attorney General (Exhibit K).  On its face, the permit allows firearms loaned to the permittee for use as props in motion picture, television, video, theatrical or other entertainment productions.

The appellant and his attorney presented their appeal and requested that the Special Events Permit be granted based on constitutional and statutory grounds.

The City staff present argued that the Appeal be denied for the reasons stated in the prior denials.

**Decision**

The appeal is denied.  As stated previously, no permit is required for first amendment protected activity.  Filming or digitally recording a protest in traditional public forum areas in the City is allowed provided they comply with all laws.  SEPs are not intended to regulate protests or filming of protests in the public forum areas of the City.  Special events are also time limited and not of an ongoing nature.

You are free to conduct a protest in compliance with laws.  However, the City has an obligation to protect public safety.  To that end, your protest cannot occur in the center median under State law, cannot block pedestrian access on the sidewalk, and cannot accommodate camping or sleeping on the sidewalk or any portion of the right-of-way.

A City may impose reasonable time, place and manner restrictions on first amendment rights in a content-neutral manner, by a narrowly tailored regulation to serve a significant public interest.

The regulations cited in this decision clearly allow a protest to occur in compliance with the City and State content neutral laws.  Protests are not allowed in the median, but would in traditional public forum areas, such as sidewalks and City parks and plaza's.

3

Your protest described in your SEP application and subsequent documents implicates a number of laws.  These laws include but are not limited to:

Display of Firearms

- Display of unloaded firearms could be considered a violation of Penal Code. State law prohibits display of unloaded firearms with the exception of using firearms loaned to the permittee as props as defined in Penal Code 29500-29530.
- Brandishing and display of unloaded firearms is illegal, except as provided in Penal Code Section 29500 et seq.
- Under Penal Code Section 25850, having possession of a loaded firearm is also illegal.  Under this section possession of a loaded firearm even with a film entertainment permit is illegal.
- Under Penal Code Section 28500(b), persons who display unloaded firearms are subject to the additional requirement that allows peace officers to examine any firearm. Failure to allow examination is a violation of the law.

Public Rights-of-Way

Public use of rights-of-way and medians are subject to the California Vehicle Code and the Menlo Park Municipal Code.  These legitimate and content-neutral regulations that serve a significant government interest include parking and time limits, obstruction of sidewalks, and obscenity laws.  Cities have been granted clear authority under state law over their rights-of-way.

- Vehicle Code Section 22507 provides broad discretion to cites over parking on public rights-of-way (in this case, there is no parking on Sand Hill Road in the proposed area of your protest).
- The proposed monitor and related equipment cannot impair a driver's vision block the sidewalk under Vehicle Code Section 21466.5.  The proposed lights, and video display also have the potential to impair a driver's vision.
- Driving upon or parking a vehicle or conducting in the median violates Vehicle Code Section 21651.

From a practical aspect and for public safety concerns,

- The lighting at night would be highly distracting to motorists, cyclists and pedestrians.
- City medians are not traditional public forum areas and are inappropriate and unsafe.
- The proposed location encourages the public to cross a busy arterial on to a median area that is without sidewalks and are encouraged to cross traffic and view your monitor and view hand-outs with high speed and high volume traffic

4

justifies this prohibition from a public safety standpoint.
- The median you propose is adjacent to the entrances and exits of Interstate 280, making the location unsafe and dangerous to pedestrians, cyclists and vehicles. Such a display or protest in the median could also block vehicular sight lines and impair public safety for pedestrians, cyclists and automobiles under Municipal Code section 11.44.030.

This is not an exhaustive list of the laws with which you must comply. Accordingly, if you attempt to conduct your protest in the medians anywhere in Menlo Park, the City will consider all appropriate remedies.

**Conclusion**

Based on the record and findings above, which are incorporated by this reference, your application for an SEP is denied.  No permit to conduct a protest is required. Any protest you conduct must comply with all laws, include those set forth above which are described above.

Denial of the SEP does not violate any first amendment rights. The lack of need for a permit shows the City is not preventing your protest or prevented you from displaying your message. The City is using its police power and common sense to regulate the time, place and manner of your proposed free speech protest. The City has a compelling interest in public safety and a protest in the median would place the vehicular, cyclists, pedestrians and you in danger.

To appeal this decision to the City Council you must provide notice of your appeal to the City Clerk within ten days of the date of this letter.

Please be advised that, to the extent that the City can accommodate your request to protest safely and lawfully, we are willing to work with you.

Sincerely,

Alex D. McIntyre
City Manager

Enclosures

Cc:     <u>Via Email only</u>
        David W. Affeld, Esq.
        Greg Rubens, Esq.

1

## **PROOF OF SERVICE**

2

      I hereby certify that on February 8, 2019, I electronically filed the foregoing document using the Court's CM/ECF system.  I am informed and believe that the CM/ECF system will send a notice of electronic filing to the interested parties.

3

4

                            s/ Damion Robinson
                            Damion Robinson

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 19 -

PLAINTIFF'S OPP. TO MOT. TO QUASH