Pages 1 – 32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG, JUDGE

```
MICHAEL ZELENY,                  )
                                 )
             Plaintiff,          )
                                 )
   VS.                           ) NO. C 17-7357 RS
                                 )
EDMUND G. BROWN, JR., et al.,    )
                                 )  San Francisco, California
             Defendants.         )
_____  )
```

Thursday, June 13, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

                    AFFELD GRIVAKES LLP
                    2049 Century Park East
                    Suite 2460
                    Los Angeles, California  90067
            BY:  **DAMION D. ROBINSON, ESQ.**


For Defendant New Enterprise Associates, Inc.:
                    FOLEY & LARDNER, LLP
                    111 Huntington Avenue
                    Suite 2500
                    Boston, Massachusetts  02199
            BY:  **ROGER A. LANE, ESQ.**



**Reported By:  BELLE BALL, CSR 8785, CRR, RDR
            Official Reporter, U.S. District Court**

**<u>Thursday - June 13, 2019</u>**                                    **<u>1:42 p.m.</u>**

                        P R O C E E D I N G S

          **THE CLERK:**  Calling Case C-17-7357, Zeleny versus

Brown.  Counsel, please come forward and state your

appearances.

          **MR. ROBINSON:**  Good morning, Your Honor.  Damion

Robinson for plaintiff Michael Zeleny.

          **THE COURT:**  Good afternoon.

          **MR. ROBINSON:**  Good afternoon; I apologize.

          **MR. LANE:**  Good afternoon, Your Honor.  I'm Roger

Lane of Foley & Lardner for the moving party on defendant New

Enterprise Associates.

          **THE COURT:**  Good afternoon.

          **MR. LANE:**  Good afternoon, Your Honor.

          **THE COURT:**  So this matter is on for the motion to

dismiss the first amended complaint, and against -- to the

extent it's against NEA in its claims, I believe, 6 and 7.

     It appeared there were three issues we really need to talk

about, or at least this comes down to.  The statute of

limitations question; the Noerr-Pennington issue with respect

to the sixth claim, the 1983 claim; and then whether or not

we've got a protected class properly identified for purposes of

the 1985 claim.

     So, I can tell you that I have read through your papers.

I can give you a little bit of an indication of how I think it

1    shakes out.  But certainly, you can address all of these

2    things.

3        The statute of limitations question kind of boils down at

4    the end to delayed discovery, and whether or not there is a --

5    an argument here that there was some basis to claim delayed

6    discovery.  Because on its face, there's some -- there doesn't

7    appear to be any overt act after March 29th of 2017, when --

8    which would be kind of the triggering event.

9        That said, I'm not -- right now, as I sit here, I'm not

10   inclined to think the statute of limitations is the -- is a

11   basis to grant the motion.

12       That said, on the other two I am more inclined to -- the

13   notion that granting the motion is appropriate.  On the

14   Noerr-Pennington claim, I think the bulk of that, the NEA is

15   right, with respect to Noerr-Pennington.

16       The one question I have, and you will -- perhaps can ask,

17   focus on this, counsel for NEA, is the argument that NEA

18   falsely told the police that Mr. Zeleny was using drugs to --

19   according to the complaint, to justify the seizure of his

20   weapon.  Whether or not that would have any kind of

21   Noerr-Pennington protection to it, or why that otherwise isn't

22   something I have to worry about.

23       Finally, with respect to the 1985 claim, I do think there

24   is a problem on the seventh claim for relief, to the extent

25   that there really isn't a suspected -- suspect classification

that's identified.  I don't know lawful gun owner or those who

protest violence against women are protected classes.  And so,

I think the 1985 claim has a real problem.

     So the defendant NEA is the moving party, so I'll let you

begin.  So Mr. Lane?

          **MR. LANE:**  Thank you, Your Honor.  I appreciate your

 providing time for us to be heard.

     Let me start with the Noerr-Pennington question that you

have, if you wish.

          **THE COURT:**  Sure.

          **MR. LANE:**  And I'm just trying to find very quickly

 where that arises in the pleading.

          **THE COURT:**  Well, I had it noted in my notes, but I

don't have a cite reference --

          **MR. LANE:**  Okay.

          **THE COURT:**  -- for you.  I do think -- and so as an

initial matter, is it your understanding, you don't think that

that is -- that averment is made?

          **MR. LANE:**  I do not think that averment is made.

          **THE COURT:**  Okay.

          **MR. LANE:**  And in fact, I think when you look at it,

what you see is that an averment is made that false

information was reported.  Sort of passive voice.  It's not

alleged that NEA did it.  NEA didn't do it.  I can tell you

that.

1          And that's not here on a pleadings motion, but it caught

2     my eye because -- it caught my eye that it was not actually

3     averred that NEA did that.

4          Now, if Mr. Robinson can point me to the paragraph, I

5     could be more concisely responsive to Your Honor, more directly

6     responsive.

7               **THE COURT:**  And you're now talking about the question

8      that I had about --

9               **MR. LANE:**  That's right.

10              **THE COURT:**  -- advising the police with respect to

11     the claim of drug -- drug use.

12              **MR. ROBINSON:**  It's 139(a), Your Honor.  And it

13     alleges NEA falsely accused Zeleny of using drugs.

14              **THE COURT:**  Okay.  Does it say anything about it --

15     then telling the police of that?

16              **MR. ROBINSON:**  Yes.  Well, NEA falsely accused Zeleny

17     of using drugs, which the City believed it could use to seize

18     Zeleny's firearms.

19              **MR. LANE:**  I see that now averred, so I stand

20     corrected.  Thank you for that.

21          Your Honor, under the Noerr-Pennington doctrine, if a

22     private party calls on police out of concern, to report a

23     concern that they have, whether it's well-founded or

24     ill-founded, that's classic petitioning activity.

25              **THE COURT:**  How about, though, if it's -- in this

```
 1    instance, it's averred that it's just deceptive.  I mean, is

 2    there any Noerr-Pennington protection if you intentionally lie

 3    to the police?

 4         MR. LANE:  That, I -- Your Honor, with your leave,

 5    that, I would have to research.  Because I don't think we

 6    focused on that particular issue.

 7         THE COURT:  You didn't interpret that averment to be

 8    making that claim.

 9         MR. LANE:  No.  We interpret it to be there was a

10    report of drug use by Zeleny that the police used for this

11    reason.

12         THE COURT:  Well, let me ask.  Go to Mr. Robinson.

13     Are you -- is the nature of your averment that NEA had no

14    reason to believe Mr. Zeleny was engaging in drug use, but they

15    so advised -- tipped off -- the police, and apparently for the

16    reason that they wanted the police to seize his weapon?

17         MR. ROBINSON:  Yes, Your Honor.  And, and to be a bit

18    careful, I have not looked at the email that that stems from,

19    before today's hearing.  But, yes.  The context and the

20    substance of what was being said is:  Here is -- you know,

21    Zeleny is using drugs; you can use this to take his firearms

22    away.

23         THE COURT:  And your claim is that NEA had no reason

24    to believe that to be true.

25         MR. ROBINSON:  No legitimate reason, Your Honor.
```

1          **THE COURT:**  Okay.  Well, let's stay with the sixth

2     claim for relief.  And that was a -- that was a particular

3     question I had with respect to Noerr-Pennington.  But more

4     generally, if you wanted to talk about Noerr-Pennington, go

5     ahead, Mr. Lane.

6          **MR. LANE:**  I'm happy to do so, Your Honor.  And allow

7     me just a moment to flip to my notes.

8          (Reporter interruption)

9          **MR. LANE:**  Oh, forgive me.  Am I too quiet?  I've

10    been accused of that.

11         **THE COURT:**  That's seldom something that people get

12    accused of in this courtroom.

13         **MR. LANE:**  And counsel.

14         **THE COURT:**  So, I don't mind if counsel is too quiet.

15    Go ahead.

16         **MR. LANE:**  Your Honor, the Noerr-Pennington doctrine

17    applies to any concerted effort to sway public officials, as

18    the Court knows.  And this is so, regardless of the private

19    citizen's motive or intent.  And it includes advocating one's

20    point of view regarding one's business or economic interests.

21    It is not limited to political issues.

22         So in this case, submitting information to a legislative

23    committee or advocating that the City do so, meeting with City

24    personnel to air grievances, to express concerns, to seek to

25    have them take action as to matters with which you take issue

1    is all core First-Amendment petitioning activity.

2           THE COURT:   Then we have the sham exception.

3           MR. LANE:   And then we have the sham exception.   And

4    here, plaintiff -- pardon me, defendant -- or plaintiff,

5    that's right.   I'm all confused.

6           There are two key points here, Your Honor.   Contrary to

7    plaintiff's suggestion, where Noerr-Pennington immunity is at

8    issue, a plaintiff's complaint must contain specific

9    allegations that Noerr does not apply.   It is not a

10   notice-pleading kind of issue.   And that's in our law.

11          Here, the plaintiff specifically seeks to invoke the

12   judicial sham exception, as you noted.   And that requires

13   pleading one of three things.   Advocacy before a tribunal.   Or,

14   a pattern of submitting multiple petitions without regard to

15   their merit.

16          THE COURT:   I suppose the first one is the one that

17   would cover the argument, if such is being made, that you --

18   you don't know that someone is a drug user, and you just claim

19   it just to get the governmental entity to do something.

20          MR. LANE:   And that's what I would seek leave to

21   further look into and focus authority on that, if you wish,

22   Your Honor.

23          THE COURT:   Okay.

24          MR. LANE:   I'd be happy to do that.   And the -- and

25   the final one is:   Misrepresentations that deprive the

1  proceedings of their legitimacy.  That is, untruths that led

2  the tribunal astray.

3       Now, plaintiff's allegations do not even approach these

4  criteria, we respectfully submit.  There's no allegation that

5  NEA even appeared at or participated in any quasi-judicial

6  proceedings.  And the allegations that NEA behind the scenes

7  allegedly advocated for its interests with the City and others

8  is classifying protected activity.

9       There's no allegation NEA ever appeared before the City

10  Council, which is the relevant tribunal here; ever presented a

11  paper; or advocated of anything to the City Council.  So we

12  don't see how the sham judicial exception could apply in these

13  circumstances.  It just doesn't fit, we submit.

14       **THE COURT:**  Why don't I have Mr. Robinson talk about

15  Noerr-Pennington.

16       **MR. LANE:**  Very well.

17       **THE COURT:**  And then we will go to the other issues.

18       **MR. LANE:**  Thank you.

19       **MR. ROBINSON:**  Thank Your Honor.  I want to take up

20  where Mr. Lane left off, which is the assertion that NEA did

21  not engage in any advocacy before the tribunal.  That's

22  correct.  NEA never engaged in any advocacy.  I won't read you

23  from the brief, because Mr. Lane just said the same thing.

24  Never appeared at the City Council, never took part in the

25  proceedings.

1      Noerr-Pennington depends on the exercise of a First

2   Amendment petitioning right.  The reason there is a

3   Noerr-Pennington doctrine is to protect people who do things

4   like go to city council meetings and advocate their position.

5   Without a protected First Amendment activity, Noerr-Pennington

6   does not apply.

7      Stepping a little bit further, the suggestion that what we

8   are arguing about is NEA advocating to the City to do certain

9   things in private meetings is not completely accurate.

10      What we have alleged, and I think -- I would suggest that

11   we could further allege, based on the evidence, is that NEA and

12   the City agreed to derail the permitting process.  Not that

13   they said:  We're going to advocate for our position; you

14   should deny the permit.  There are good bases to do that.

15      What happened was that NEA and particularly Chief Bertini

16   agreed:  We're not going to let Zeleny make his way through

17   the ordinary process of permitting.  It's an attack on the

18   process, not the outcome.

19      And Noerr-Pennington is designed to let people, whether

20   it's commercial interests, very bad interests, whatever

21   interests you want, to go in and advocate for a position, and

22   use an official proceeding for its intended purpose.  And you

23   have extensive latitude to do that.  You can take ridiculous

24   positions, racist positions, some of the case law suggests.

25   Whatever the motive is is not at issue.  But what is at issue

1    is that the party claiming Noerr-Pennington immunity has to be

2    using the proceedings to reach an outcome.  Not subverting the

3    proceedings, which is what occurred here.

4         And I want to take --

5         **THE COURT:**  Well, but isn't the -- if I'm reading the

6    averments correctly, part of what NEA is doing is they don't

7    want open display of firearms near their offices.  And so they

8    are -- they are sincerely trying to have your client stop

9    doing that.

10        Isn't that petitioning the governmental officials to, you

11   know, take his permit away, or don't give him a permit, or --

12   isn't that kind of the heart of Noerr-Pennington?

13        **MR. ROBINSON:**  So I think it's correct that they

14   don't want Zeleny protesting outside their offices.  There's

15   no dispute about that.

16        **THE COURT:**  But further than that, it's not just they

17   don't like him.  They don't want him -- they don't want people

18   with -- openly displaying firearms near their facility.

19        **MR. ROBINSON:**  I have no doubt that would be NEA's

20   position.  I -- I -- our focus is that it's the content of the

21   message that's at issue.  It's what Zeleny is protesting

22   about.  And NEA may disagree, and the City may disagree.  But

23   for Noerr-Pennington purposes I want to just focus on the

24   first prong.  So advocacy as part of a governmental process

25   that's baseless and an attempt to stifle.

1      The permitting process was used to stifle Zeleny.  It's

2 not as though Zeleny went through an ordinary appeal process

3 with the City.  The process was delayed.  The process was

4 intercepted by Chief Bertini, who had these meetings and

5 agreements with NEA, where they talk about finding a solution

6 to Zeleny.

7          **THE COURT:**  Well, the permitting issue, though, would

8 only go the firearm, right?  I know that, from what I've read

9 here, his, his beef, if you will, with NEA is related back to

10 this notion of someone who he thinks was associated with NEA

11 that then abused that person's daughter.  Right?

12          **MR. ROBINSON:**  Right.

13          **THE COURT:**  So the substance of that protest is

14 separate and apart from firearm carriage.  Isn't it?

15          **MR. ROBINSON:**  It's the same protest.  Meaning

16 Zeleny -- Mr. Zeleny is protesting, carrying the firearms.

17 And he's been doing that since 2010.  That is part of his

18 protest.  And --

19          **THE COURT:**  Yeah, but I guess where I was going,

20 where my question was going was I thought you were suggesting

21 that NEA was conspiring with the government officials, sort of

22 using the -- the gun-carrying question as a pretext, but what

23 they are really trying to do is to stop this protest about

24 this person and the person's daughter and that connection to

25 NEA.

1          **MR. ROBINSON:**  That's correct, Your Honor.  The --

2          **THE COURT:**  Which is correct?

3          **MR. ROBINSON:**  That the -- the firearm-open-carry ban

4    is being used for a content-based prohibition on Zeleny.  It's

5    being used to prevent him from protesting this activity by --

6          **THE COURT:**  Why can't he then -- I mean, that's where

7    I'm -- the disconnect, I'm not quite seeing it.  If they --

8    they don't -- you agree with me that maybe one of the

9    motivations is:  We don't want people with -- carrying

10   firearms around our building.  Mr. Zeleny can still protest.

11   He can stand out there with a big sign that says:  These

12   people are terrible because they harbor someone who abuses

13   their -- their daughter.  They're not trying to stop him from

14   doing that.  They're only trying to stop him from carrying the

15   weapon.

16         **MR. ROBINSON:**  I -- that's not what we have alleged,

17   Your Honor.  What we've alleged is that they are trying to

18   stop him from carrying the signs and getting out his message.

19   And --

20         **THE COURT:**  But his not getting a permit wouldn't

21   stop him from -- he could still go out there with a big sign,

22   couldn't he?

23         **MR. LANE:**  (Nods head)

24         **MR. ROBINSON:**  That's the City's position.  But, with

25   one caveat which is the City -- Chief Bertini has said:  I

1  find your big sign offensive, and I'm going to prosecute you

2  for obscenity if you bring your big sign.

3          **THE COURT:**  That's a different issue.

4          **MR. ROBINSON:**  It's all the within the context of the

5  same protest.  The carrying of firearms is part of his

6  protest.  He is carrying firearms to draw attention to the

7  protest.

8          **THE COURT:**  Well, okay.  I understand that.  But what

9  I'm trying to focus on is -- is you sort of can't have it both

10  ways.  If your suggestion is NEA is -- doesn't -- is -- NEA is

11  not acting in its sincere effort to stop firearms from being

12  displayed around their building, what they're really doing is

13  they're trying to silence Mr. Zeleny, but at the same time

14  what they -- you say they are doing wouldn't silence him, it's

15  a bit of the -- or at least, it wouldn't stop him from

16  protesting; it's -- there's a disconnect there in my mind.

17      Now, I understand you somehow think they are inextricably

18  interlinked, the firearm and the protest about this person.

19  And I'm having trouble understanding the linkage.  The linkage

20  to the extent that you're suggesting, if I'm reading the

21  averments right, that there's this pretext of what they're

22  really -- what NEA is complaining about.

23      And that's what I don't -- because I think at the end of

24  the day, when I read your averments, and it says:  NEA is

25  engaged in petitioning the government officials because -- to

1   -- to not allow this person to display openly firearms around

2   their building, that seems to me to be a legitimate protest --

3   or a legitimate petition.

4       And you sort of indicate:  Yeah, they can take that

5   position.  But that's not -- then you're saying:  But that's

6   not what they are doing here.  They're really trying to stop

7   something different by using that tack.

8       Do you understand what I'm -- I know it was a garbled

9   question, I apologize.

10      **MR. ROBINSON:**  No, I understand Your Honor's

11  question.  And it's a fair point.  And so what we've suggested

12  is -- and what we allege in the pleading is that NEA's desire

13  is to stop Zeleny's protest, based on the content.  That's the

14  allegation.

15      **THE COURT:**  And the content being the dispute about

16  this fellow and his daughter.

17      **MR. ROBINSON:**  Correct.

18      **THE COURT:**  Okay.

19      **MR. ROBINSON:**  And so, rather than petition the City

20  and say, you know:  Stop him from protesting, what's happened

21  is that the -- the NEA and the City have essentially subverted

22  the permitting process, itself.  That's the allegation.  So

23  the way that this -- and have done so, in order to stop Zeleny

24  because of the content of his message.

25      So that's the allegation, is that -- and the ways that

1    this happened were -- it wasn't as though NEA came to the City

2    Council and said:  Don't do this, or went to Bertini and said:

3    Don't let him do this.  What happened was that Bertini

4    intercepted Zeleny's permit application.  The City sat on it

5    for an extended period of time, rather than processing it in

6    the ordinary course.  The City continued to pepper him with

7    requests for information.

8        And I should say, sat on it for a length of time in order

9    to allow other permits that Mr. Zeleny had to expire, so that

10   he couldn't do the protest.  Peppered him with questions and

11   requests for information to -- that are never required.

12       People get these kind of permits by submitting a

13   hand-drawn map that says:  We'll have -- my favorite one was:

14   We'll have yoga or some other activity.  And the City

15   rubber-stamped that.  So it peppers him with questions:  What

16   kind of generator are you using?  What kind of screen?  How are

17   you going to set this up?  What kind of truck do you bring?

18   And then uses that to create a set of excuses to delay, defer,

19   and ultimately, deny.

20       That is not Noerr-Pennington.  That is not somebody going

21   and advocating for a body, publicly, privately or in any other

22   capacity.  It is NEA speaking with City officials, conspiring

23   with City officials to use the process, rather than the outcome

24   of that process, to stifle Zeleny's protest.

25       It's not a:  We've advocated and we made

1  misrepresentations, or we got it wrong somehow and that

2  resulted in an outcome that was wrong.  That's not what we're

3  arguing about.  What we're arguing about is that the process

4  has been conscripted as a tool to delay, defer, and ultimately,

5  stop Zeleny, which is the object of the conspiracy that we

6  allege, based in 2009, when the conspiracy started.  And we

7  have emails indicating that that was the aim of the conspiracy.

8       So the process is not being used as a legitimate

9  administrative process to reach an outcome.  It's being used to

10  delay and defer and deny, on content-based grounds, to

11  forestall Zeleny from resuming his protest.  And that falls

12  within the first prong of the Noerr-Pennington sham exception.

13       And in fairness, when we initially filed the first amended

14  complaint, we didn't include all of the allegations about, you

15  know, how the process specifically was subverted, and how the

16  City officials didn't comply with standard procedures, and how

17  things were completely outside of the bounds of the ordinary

18  permitting process.  The reason for that is that we were making

19  the amendment by stipulation, so couldn't amend the substance

20  of the allegations against the City.  But I think we have more

21  than sufficient facts to be able to do that.

22       And if Your Honor is inclined to rule based on the sham

23  exception, I would suggest:  Let us put all the facts in.

24            **THE COURT:**  Okay.  Mr. Lane.

25            **MR. LANE:**  Your Honor, if I heard Mr. Robinson

1    correctly, the assertions he's now making about NEA's

2    participation in the permit process are not in the pleading.

3    And they are not.

4         The pleading does not allege that NEA did anything in the

5    permitting process.  It only alleges, I believe at the end of

6    Paragraph 139(d), that NEA participated in meetings that

7    resulted in a plan to try to deny Zeleny's application or

8    appeal through the appeal process.  Something to that effect.

9    That's just an allegation that the conspiracy continued.  It's

10   generic and conclusory.  It is not an allegation of any

11   actionable overt act by NEA.

12        And so on its face --

13             THE COURT:  So that's a statute-of-limitations issue.

14             MR. LANE:  It is a statute-of-limitations issue.

15   It's also a failure-to-state-a-claim issue.  Because if -- in

16   the absence of an overt act, a general allegation that the

17   conspiracy continued not only can't save it under the statute

18   of limitations, but you've not alleged any actionable conduct

19   on the part of NEA.  All that's implicit in that is that there

20   were discussions and meetings with the City.  Or the police

21   department, as the case may be.  And that's classic immunized

22   conduct, for NEA to go in and say, in words or substance:

23   There's been a fella outside our door who has enough ammo to

24   shoot through our plate glass and kill everybody here.  We

25   would like that issue addressed in this environment of fatal

1    workplace and school violence.

2        Nothing that is unprotected under *Noerr* is alleged in this

3    complaint.  Nor, we submit, can it be.

4            **THE COURT:**  On that last piece, Mr. Robinson is sort

5    of saying, if I heard him correctly:  Well, if you are

6    inclined to go with the NEA side on that, he wants leave to

7    amend.

8            **MR. LANE:**  (Nods head)

9            **THE COURT:**  And you're suggesting that he shouldn't

10   be allowed to do that?

11           **MR. LANE:**  I submit -- I know that this Court often

12   gives the plaintiffs one chance to amend.  Plaintiff here has

13   already amended once.  Granted, it was to add the claims

14   against NEA for the first time.

15       What's unusual here, Your Honor, is plaintiff has had

16   discovery from the City.  The City produced its documents.

17   Hundreds, thousands of pages.  Mr. Zeleny's counsel deposed

18   Commander Bertini.  We produced NEA's documents under the terms

19   of Judge -- Magistrate Judge Hixson's order.  And those were

20   turned over.  And yet, all we see in this amended complaint is

21   inadequate.

22       If the plaintiffs wanted to -- having had not just a

23   chance to plead, but also to get pre-complaint discovery, it

24   seems to us that that could be and should be the end of the

25   story.

1        And when you add to that things like -- which we haven't

2    come to yet, granted -- the 1985 issues, the

3    statute-of-limitations issues, it -- this case needs to move

4    forward.  And we respectfully submit it would be appropriate if

5    it moved forward without NEA.  Because the core allegations are

6    that the City denied Mr. Zeleny his permits, and that he did

7    not prevail on appeals of that activity.

8        And after all this time, there's no allegation that NEA

9    had its fingers on the scales in any inappropriate way.  Other

10   than expressing its concern for its people.

11        **THE COURT:**  Okay.  On the 1985 claim, the

12   identification of a suspect class, I gave you sort of my

13   tentative view that you've got a problem on that claim.  So

14   I'll give you an opportunity to address that one.

15        **MR. ROBINSON:**  Your Honor, I think the case that

16   we -- we cite, there is a Ninth Circuit case, *Life Insurance*

17   *Company versus Reichert* (Phonetic), which suggests that -- it

18   cites, with approval, I believe, a Sixth Circuit decision

19   defining a class as people engaged in political protest.

20        And so that is --

21        **THE COURT:**  Well, there's a problem with that being

22   the support here for your position, because I think that case

23   predated the -- what's developed in terms of the requirement

24   on identifying the suspect class in the way it's now required.

25   I would have to go back and look.  But I'm pretty sure that

 1  there's a timing problem with *Reichert* being the state of the

 2  law in the Circuit.

 3      **MR. ROBINSON:**  So the -- the Circuit has deviated

 4  from that view.  It is -- *Reichert* is still on the books, it's

 5  still --

 6      **THE COURT:**  Well, *Reichert* is, but the -- what you're

 7  saying -- I mean, you're suggesting some earlier cases that

 8  we're talking about -- I think you relied on that *Portland*

 9  *Feminist Women's Center* case, Ninth Circuit case.  And those

10  cases have been more or less put aside, haven't they?  I mean,

11  they don't --

12      **MR. ROBINSON:**  The recent authority is -- is to the

13  effect that it needs to be a suspect class.  The more recent

14  authority goes that way.  And I think we have -- you know, we

15  put it in; we have our argument.  I understand --

16      **THE COURT:**  A candid argument.  I appreciate that.

17  Okay.  All right.  And you, would you agree that if -- if that

18  does apply, if you are required to identify a suspect class,

19  you know, I admire your effort.  But we really don't have that

20  here.  I mean, lawful gun owner group is not a suspect --

21  whatever one may say about that group, they're not a suspect

22  class.  And, and those -- you know, carving out a group that

23  says people who protest against violence against women, you

24  know, a good cause, but it's not a suspect class.

25      **MR. ROBINSON:**  I'm trying to find a way, Your Honor,

1  to gracefully submit on the tentative.

2          **THE COURT:**  Okay.  That's fine.  You just did.

3  That's good.  I will -- I will accept your gracious

4  submission.  I'll look at it again.  But I think I understand

5  the arguments.

6      So the only thing we haven't covered yet is statute of

7  limitations.

8          **MR. LANE:**  Yes.

9          **THE COURT:**  So go ahead, Mr. Lane.

10          **MR. LANE:**  And Your Honor, would you like me to

11  address a particular issue, like the discovery order?

12          **THE COURT:**  Well, delayed discovery seemed to be this

13  safe harbor, if you will, for Mr. Robinson.  I mean, there's

14  some -- I had some question about -- you know, you attached --

15  I'm looking at my notes when I went over this.

16      You attached as an exhibit the denial of Mr. Zeleny's last

17  appeal.  And that was back August 29th, 2017.  And do you want

18  me to -- I assume that's what you want me to take judicial

19  notice of.

20          **MR. LANE:**  Yes.  Forgive me, Your Honor.

21          **THE COURT:**  Okay, so --

22          **MR. LANE:**  We actually weren't requesting judicial

23  notice; we just offered it to the Court for clarity because

24  the dates were all -- but we're fine with the Court taking

25  judicial notice.

1          **THE COURT:**  Okay.  Fine.  Actually, are you asking

2     me, Mr. Robinson, to take judicial notice of this?  Because

3     you made reference to it too, according to my notes.

4          **MR. ROBINSON:**  Yes, Your Honor.  We would ask that

5     you do take judicial notice of that.

6          **THE COURT:**  Okay.  So, and you don't have an

7     objection to my taking judicial notice.

8          **MR. LANE:**  We do not, Your Honor.  Public record.

9          **THE COURT:**  All right.  So we've all got August 29th,

10    2017 as the last -- as the date for the denial.

11         So the delayed discovery idea, according to what I read,

12    Mr. Zeleny is indicating that he didn't learn of this

13    conspiracy that he's identified or averred between the City and

14    NEA until much later.  Although, you did make an allegation

15    against NEA in your case management conference statement in

16    back June of 2018.  So as of then, you were already focused on

17    NEA being one of the bad actors here.

18         **MR. ROBINSON:**  So to address that, I want to raise

19    two points.  The first point is under conspiracy doctrine, the

20    statute of limitations runs from the last overt act in

21    connection with the conspiracy.  NEA admits in its reply brief

22    that we've alleged at least one overt act that's occurred

23    within the statute of limitations period.  Namely, the hearing

24    and denial of Mr. Zeleny's application the final time.  And

25    this is another of those issues where we are confronted with

1     an affirmative defense that we don't think we need to plead

2      around, but I'm happy to fill in the facts.

3          Zeleny's permit application for a special events permit

4     was denied in this proceeding on August 29th.  He submitted a

5     film application in September of 2017, well within the statute

6     of limitations period.  Again, Chief Bertini, pursuant to, in

7     our view, the conspiracy with NEA, intercepted his permit

8     application, and has now sat on it since September of 2017.  As

9     recently as the deposition and written discovery, the City

10    says: Oh, that's still under consideration; we just don't have

11    enough information to process it.

12         So it's not only an issue of the ongoing conspiracy.  It's

13    an issue of a participant in the conspiracy continuing to take

14    overt acts even after this action was filed.

15         So it's -- NEA has conflated the idea of last overt act

16    with the idea of last overt act by NEA.  If NEA is a party to a

17    conspiracy, the statute against NEA runs from any overt act by

18    any co-conspirator until NEA withdraws.  And there's no

19    allegation that it has withdrawn.  So the City's continuing to

20    engage in overt acts continues to move the statute of

21    limitations.

22         And NEA concedes that the August 19 through 29th -- not

23    entirely clear on what date -- but the permit denial that they

24    requested judicial notice of is an overt act, and occurred

25    within the statutory period.  So --

1          **THE COURT:**  Okay.  Mr. Lane?

2          **MR. LANE:**  Your Honor, let me start here, if I may.

3     The plaintiff has known of his core injury here, that NEA is

4     allegedly coordinating with the City to curtail or stop

5     Mr. Zeleny's protests or least stop them as long as they have

6     guns, for years.  Years.  In 2011 -- and this is attached to

7     our request -- our request for judicial notice -- NEA

8     disclosed to Mr. Zeleny they had surveilled him.  And they had

9     given the City pictures from that surveillance.

10         Mr. Zeleny in his June, 2018, case management conference

11    which the Court referred to said since at least 2005, NEA has

12    enlisted the help of local authorities, including City, County

13    and Commander Bertini to silence him.

14         It goes beyond a CMC.  In February, 2019, in seeking to

15    support his subpoena to NEA, the plaintiff said under oath that

16    he's been aware of NEA's (As read):

17              "...alleged past practices of using the legal system,

18              law enforcement and political influence to silence

19              me."

20         Again --

21         **THE COURT:**  So that tells us how long, from your

22    perspective, Mr. Zeleny has had it in his mind that NEA is --

23    is out to get him.  But then, according to Mr. Robinson, that

24    conduct continues all the way through; NEA's, in some form or

25    another, complicit in leading up to the denial of

1   Mr. Zeleny's -- the appeal of his denial, which takes us,

2   according to Mr. Robinson, all the way up through August 29 of

3   2017.

4        **MR. LANE:**  So here, Your Honor, I think we need to

5   distinguish between the discovery rule for tolling and the

6   continuing violation rule.

7        We submit, under the discovery rule, Zeleny has said under

8   oath that he's been aware of NEA trying to work with local

9   authorities to shut him down for years.

10       **THE COURT:**  Okay, that's the discovery side.  And

11  then the continuing violation side, how come -- or why is

12  August of 2017 not another act on a continuum?

13       **MR. LANE:**  Yes.  And the reason is that in 2002, in

14  the *Morgan* case, the U.S. Supreme Court drastically limited

15  the continuing violation doctrine.  It used to be under that

16  doctrine that serial violations against an individual by

17  different people and institutions at different times would

18  toll the running of the statute.  *Morgan* rejected that.  And a

19  year later, the Ninth Circuit in *Carpinteria* applied the

20  *Morgan* rule to 1983 cases.

21       And so under that rule, the plaintiff must plead -- to use

22  the continuing violation doctrine at all, the plaintiff must

23  plead a systemic policy or practice of discrimination before

24  and after the limitations period, which must be discriminatory

25  conduct that is widespread throughout a company -- *Morgan* was

an employment case -- or a routine and regular part of the
workplace.

     Going on (As read):

          "Discrete discriminatory acts by different people at
          different times and at different institutions do not
          fall within this doctrine."

     And in no way, shape -- and plaintiff's complaint pleads
exactly such discrete discriminatory acts.

     So under *Morgan*, absent a systemic policy or practice of
discrimination within an institution, since we no longer have
serial violation doctrine, the continuing violation doctrine
has no application under Section 1983.  And that is why the
plaintiff here cannot use it.  Again, quoting *Morgan*:

          "Untimely retaliatory or discriminatory acts cannot
          bootstrap onto timely allegations that are properly
          before the Court."

     **THE COURT:**  Okay, Mr. Robinson.

     **MR. ROBINSON:**  Yes, Your Honor.  We don't get to the
continuing violation doctrine.  And the reason we don't get
there is the overt act doctrine is a separate doctrine that
governs when the cause of action accrues.  It's not tolling;
it's not a continuing violation.  It's:  When does the cause
of action on a conspiracy claim accrue?  And under Federal law
under the *Gibson* case in the Ninth Circuit, the cause of
action accrues from the last overt act by any of the

1    conspirators.

2         What that means is if you are part of a conspiracy, it

3    could well be that overt acts occurred 15 years ago.  But if

4    there are continuing overt acts, a new cause of action runs

5    from each overt act that's part of the conspiracy.  If there

6    are overt acts -- this is NEA's argument from its opening

7    brief.  Zeleny alleges no overt acts that occurred after March

8    of 2017.

9         In fact, he does.  He alleges the permit denial which we

10   have discussed.  He alleges the interception of his film permit

11   in September of 2017.  So if there are overt acts within the

12   statutory period, we may not be able to recover for acts

13   outside of the statutory period, but that's not a dismissal

14   issue.  That's a what acts come in at trial or on motions.

15   It's not a ground to dismiss the complaint, if we have timely

16   overt acts.  And NEA admits in its reply brief there is at

17   least one timely overt act, namely the permit denial.  We could

18   allege more.

19        Frankly, under Ninth Circuit authority, we're not required

20   to plead around their defenses, but they've raised it.  We can

21   plead overt acts going into September and beyond.

22        So the fact that there are overt acts within the statute

23   of limitations period which NEA acknowledges means that we

24   don't get to continuing violation.  We don't get to tolling.

25   We can recover based on those overt acts, even if everything

 1  else is barred.  And those acts are sufficient to state a
 2  claim.  It's not a dismissal issue.
 3              **THE COURT:**  Okay.
 4          **MR. LANE:**  Your Honor, if I may?
 5          **THE COURT:**  Final comments, go ahead.
 6          **MR. LANE:**  Yeah, thank you.
 7      So if I heard Mr. Robinson correctly, he's saying that all
 8  that the plaintiff could proceed on with respect to statute of
 9  limitations issues are overt acts that occurred from and after
10  March 29, 2017.
11              **THE COURT:**  Which is the permit denial, and one other
12   thing.
13          **MR. LANE:**  It's only -- the permits were denied in
14   2015 and 2016.
15          **THE COURT:**  The appeal.
16          **MR. LANE:**  That's just the appeal.  And then
17   plaintiff claims there's some ongoing issue with his film
18   permit, which we don't understand.
19      But Your Honor, here is what I want to be clear about,
20  because Mr. Robinson was also right when he said: We argue that
21  there is no overt act after that magic date pled in this
22  complaint.  And that is true.  139(d) says there were ongoing
23  actions -- there were ongoing discussions that led to a plan.
24  As I said, that just means there's a continuing conspiracy.
25  That's not an actionable overt act.

1          The plaintiff seeks to amend, he says, to allege that

2     Commander Bertini delayed his appeal period -- his appeal

3     hearing, forgive me -- so that it went into this later period,

4     post-March, 2017.  It went to August, 2017.  So now it's

5     actionable.

6          Well, I've attached to our reply brief the public record

7     which says that Commander Bertini didn't do that.  There was a

8     hearing scheduled for September, 2016, to get this over with.

9     And it says that Mr. Zeleny's counsel -- not Mr. Robinson,

10    Mr. Affeld -- called to postpone it.  That's on the public

11    record.  And then, for whatever reason, the parties went

12    through forever to get it rescheduled for August 17th.

13         I don't know how the plaintiff can plead that in good

14    faith, that that was Bertini's action when the public record

15    says otherwise, or base any possible claim on it.  They had a

16    scheduling snafu.  The appeal was denied.  That was by the City

17    Council, not a defendant here.  It doesn't add up to a claim,

18    Your Honor.

19              **THE COURT:**  Okay.

20         **MR. ROBINSON:**  Can I very briefly address that?

21              **THE COURT:**  One final-final, yes.

22         **MR. LANE:**  The nets are getting smaller.

23         **MR. ROBINSON:**  Your Honor can take judicial notice of

24     a government action, like a denial.  The Court can't take

25     judicial notice of facts asserted by a defendant.

1          **THE COURT:**  That's true.  That is true.  So --

2          **MR. LANE:**  It's in the public record, Your Honor.

3     It's not something --

4          **THE COURT:**  Well, something in the public record

5     doesn't mean everything in a document that's a public record,

6     I can take judicial notice of.  I can take judicial notice of

7     a public record being filed on -- that this document was filed

8     on this date, and that type of thing.

9          But it is an overuse of judicial notice to say -- you

10    know, find some 20-page public document, take judicial notice

11    of it and everything that's in there is somehow judicially

12    noticeable, which it is not.

13         Now, in this instance, I'll go back and take a look at.

14    So to the extent that Mr. Robinson is suggesting that, for

15    example, your point seemed to be who was the party that was

16    prompting the continuance --

17         **MR. LANE:**  The delay, yes.

18         **THE COURT:**  -- I'm not sure -- I'll go back and look

19    at it -- that that is something that -- if there's a dispute

20    as to who was responsible for that, that is the kind of thing

21    that I might have some trouble taking judicial notice of.  As

22    opposed to:  Was there a hearing on X date, I can take

23    judicial notice of that.  But, okay.

24         **MR. LANE:**  Okay.

25         **THE COURT:**  I will take the matter under submission,

1    and give you an order.

2              **MR. ROBINSON:**  Thank you, Your Honor.

3              **MR. LANE:**  Thank Your Honor.

4              **THE COURT:**  Thank you.

5         (Conclusion of Proceedings)

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Wednesday, June 26, 2019