David W. Affeld, State Bar No. 123922
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:      (310) 979-8700

Attorneys for Plaintiff Michael Zeleny

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

MICHAEL ZELENY,

     Plaintiff,

          vs.

GAVIN NEWSOM, *et al.*,

     Defendants.

Case No. CV 17-7357 JCS

<u>Assigned to:</u>
The Honorable Richard G. Seeborg

<u>Discovery Matters:</u>
The Honorable Thomas S. Hixson

**OPPOSITION TO MOTION TO DISMISS
SECOND AMENDED COMPLAINT BY
DEFENDANT NEW ENTERPRISE
ASSOCIATES**

Date:  November 15, 2019
Time: 1:30 p.m.
Courtroom:  3, 17th Floor

Action Filed:  December 28, 2017
Trial Date:     November 18, 2019

- 1 -

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL ALLEGATIONS ..................................................................................2

        A.      Zeleny's Protests ........................................................................................2

        B.      NEA Conspires with the City to Silence Zeleny ........................................3

        C.      NEA's Pattern of Frivolous Lawsuits .......................................................4

        D.      The City and NEA Stifle Zeleny's Protests through Harassment ..............4

        E.      The City Manufactures False Charges Against Zeleny...............................6

        F.      NEA Participates in the Sham Prosecution ................................................7

        G.      California Changes Its Gun Laws ...............................................................7

        H.      The City Draws Zeleny into a Sham Permitting Process ............................7

III.    LEGAL STANDARD .............................................................................................9

IV.     ARGUMENT ..........................................................................................................9

        A.      NEA Is Liable for the Acts of the City and Bertini.....................................9

                1.      Zeleny Need Not Allege Overt Acts by NEA ..................................9

                2.      The Court Need Not Reach the Issue of *Noerr-Pennington* Immunity Because NEA Remains Liable for the Conduct of Its Co-Conspirators......................10

        B.      Zeleny Plausibly Alleges a Conspiracy......................................................12

                1.      Conspiracy May Be Established through Circumstantial Evidence..............12

                2.      Zeleny Adequately Alleges a Meeting of the Minds....................12

        C.      NEA's Conduct Is Not Protected under *Noerr*-Pennington ......................14

                1.      Conducting Round-the-Clock Surveillance and Hiring a Private, Armed Security Force Are Not Petitioning Activity....................15

                2.      Calling the Police in Bad Faith Is Not Protected Conduct ...........16

                        a.      Calling the Police to Harass Zeleny Is Not Protected .......16

                        b.      Making False Police Reports Is Not Protected...................17

                3.      Active Participation in a Sham Criminal Prosecution Is Not Protected........19

                4.      Filing a Series of Sham Lawsuits Is Not Protected .......................20

                        a.      NEA's Baseless TRO Applications Amounted to

- i -

Sham Conduct ....................................................................20

b.  NEA's Lawsuits, on the Whole, Were Baseless and Improper ..........20

5.  Denying Zeleny Access to a Fair Permitting Process Is Not Protected .........22

D.  Dismissal on the Pleadings Is Not Appropriate ...........................................23

V.  CONCLUSION .....................................................................................................24

OPPOSITION TO MOTION BY DEFENDANT NEA TO DISMISS

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Adickes v. S.H. Kress & Co.,*
    398 U.S. 144 (1970) ................................................................................. 12

*In re Airport Car Rental Antitrust Litig.,*
    693 F.2d 84 (9th Cir. 1982) ...................................................................... 15

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
    486 U.S. 492 ............................................................................................. 17

*In re Animation Workers Antitrust Litig.,*
    123 F. Supp. 3d 1175 (N.D. Cal. 2015) ................................................... 11

*Askew v. Millerd,*
    191 F.3d 953 (8th Cir. 1999) .................................................................... 10

*Avalos v. Baca,*
    517 F. Supp. 2d 1156 (C.D. Cal. 2007) ................................................... 12

*Aydelotte v. Town of Skykomish,*
    2015 WL 3965790 (W.D. Wash. June 29, 2015) ..................................... 10

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................... 9

*Beltz Travel Service v. Int'l Air Transport Ass'n,*
    620 F.2d 1360 (9th Cir. 1980) ............................................................. 10, 11

*Brady v. Maryland,*
    373 U.S. 83 (1963) ............................................................................ 1, 7, 19

*In re Burlington N'ern, Inc.,*
    822 F.2d 518 (5th Cir. 1987) .................................................................... 19

*Burns v. City of Concord,*
    99 F. Supp. 3d 1007 (N.D. Cal. 2015) ..................................................... 10

*Cal. Motor Transp. Co. v. Trucking Unltd.,*
    404 U.S. 508 (1972) ............................................................................. 18, 23

*Caltex Plastics, Inc. v. Lockheed Martin Corp.,*
    824 F.3d 1156 (9th Cir. 2016) .............................................................. 9, 18

*Clipper Exxpress v. Rocky Mtn. Motor Tariff Bureau,*
    690 F.2d 1240 (9th Cir. 1982) .................................................................. 23

- iii -

*Columbia v. Omni Outdoor Advertising, Inc.*,
    499 U.S. 365 (1991) ........................................................................................ 21

*Crowe v. Cnty. of San Diego*,
    608 F.3d 406 (9th Cir. 2010) ..................................................................... 10, 12

*Davis v. Powell*,
    901 F. Supp. 2d 1196 (S.D. Cal. 2012) ........................................................ 10

*Elec. Constr. & Maint. Co. v. Maeda Pac. Corp.*,
    764 F.2d 619 (9th Cir. 1985) ........................................................................ 24

*Fonda v. Grey*,
    707 F.3d 435 (9th Cir. 1983) ........................................................................ 12

*Freeman v. Lasky, Haas & Cohler*,
    410 F.3d 1180 (9th Cir. 2005) ...................................................................... 20

*Gibson v. United States*,
    781 F.2d 1334 (9th Cir. 1986) ........................................................................ 9

*Gilligan v. Jamco Dev. Corp.*,
    108 F.3d 246 (9th Cir. 1997) .......................................................................... 9

*Hall v. Cty. of Santa Barbara*,
    833 F.2d 1270 (9th Cir. 1986) ........................................................................ 9

*Hernandez v. City of Napa*,
    781 F. Supp. 2d 975 (N.D. Cal. 2011) .......................................................... 14

*Holmes v. Harris*,
    2019 WL 2895632 (C.D. Cal. May 15, 2019) ............................................... 16

*Jordan v. Echo Rural Fire Prot. Dist. #7-403*,
    2007 WL 892971 (D. Or. Mar. 20, 2007) ..................................................... 17

*Kearney v. Foley & Lardner, LLP*,
    590 F.3d 638 (9th Cir. 2009) ................................................................... 15, 19

*Klein v. Williams*,
    714 F. App'x 631 (9th Cir. 2017) .................................................................. 14

*Kottle v. N.W. Kidney Ctrs.*,
    146 F.3d 1056 (9th Cir. 1998) ................................................................. 18, 20

*Lacey v. Maricopa County*,
    693 F.3d 896 (9th Cir. 2012) ................................................................... 10, 13

*Mark Aero, Inc. v. Trans World Airlines, Inc.*,
    580 F.2d 288 (8th Cir. 1978) ........................................................................ 18

OPPOSITION TO MOTION BY DEFENDANT NEA TO DISMISS

*McGary v. City of Portland,*
  386 F.3d 1259 (9th Cir. 2004) ............................................................................ 24

*Mendocino Env. Ctr. v. Mendocino Cnty.,*
  192 F.3d 1283 (9th Cir. 1999) ...................................................................... 12, 23

*N.Y. Jets LLC v. Cablevision Sys. Corp.,*
  2005 WL 26459330 (S.D.N.Y. Oct. 17, 2005) ................................................ 18

*Noerr-Pennington. Tisdale v. Cty. of L.A.,*
  617 F. Supp. 2d 1003 (C.D. Cal. 2009) ..................................................... *passim*

*Ryan v. Salisbury,*
  382 F. Supp. 3d 1062 (D. Hawai'i 2019) ......................................................... 10

*S. Union Co. v. S.W. Gas Corp.,*
  165 F. Supp. 2d 1010 (D. Ariz. 2001) ........................................................ 17, 23

*Schneider v. Cty. of Sacramento,*
  2014 WL 4187364 (E.D. Cal. Aug. 21, 2014) ................................................. 17

*Shroyer v. New Cingular Wireless Servs., Inc.,*
  622 F.3d 1035 (9th Cir. 2010) ............................................................................ 9

*Soo Park v. Thompson,*
  851 F.3d 910 (9th Cir. 2017) ........................................................................... 13

*Spencer v. Peters,*
  966 F. Supp. 2d 1146 (W.D. Wash. 2013) ....................................................... 10

*ST Microelectronics, Inc. v. Avago Techs. U.S., Inc.,*
  2011 WL 13621653 (N.D. Cal. Apr. 11, 2011) ............................................... 22

*Starr v. Baca,*
  652 F.3d 1202 (9th Cir. 2011) ............................................................................ 9

*Steel v. City of San Diego,*
  726 F. Supp. 2d 1172 (S.D. Cal. 2010) ........................................................... 14

*Sure-Tan, Inc. v. N.L.R.B.,*
  467 U.S. 883 (1984) .......................................................................................... 17

*Theofel v. Farey-Jones,*
  359 F.3d 1066 (9th Cir. 2004) ......................................................................... 20

*Tuosto v. Phillip Morris USA, Inc.,*
  2007 WL 2398507 (S.D.N.Y. Aug. 21, 2007) ................................................ 18

*United States v. Sokolow,*
  490 U.S. 1 (1989) ...................................................................................... 5, 6, 7

OPPOSITION TO MOTION BY DEFENDANT NEA TO DISMISS

*United Steelworkers v. Phelps Dodge Corp.,*
 865 F.3d 1539 ...................................................................................... 12, 14, 16

*Venetian Casino Resort, LLC v. NLRB,*
 793 F.3d 85 (D.C. Cir. 2015) ................................................................... 17

*Villa v. Heller,*
 885 F. Supp. 2d 1042 (S.D. Cal. 2012) ................................................... 18

**California Cases**

*Landmark Holding Group, Inc. v. Superior Court,*
 193 Cal.App.3d 525 (1987) ...................................................................... 20

*United Farm Workers of Am., AFL-CIO v. Superior Court,*
 14 Cal. 3d 902 (1975) .............................................................................. 20

**Statutes**

42 U.S.C. § 1983 ..........................................................................................*passim*

Cal. Pen. Code § 26375 ...................................................................................... 7

Cal. Pen. Code § 26405(r) .................................................................................. 7

California Changes Its Gun Laws ....................................................................... 7

- vi -

OPPOSITION TO MOTION BY DEFENDANT NEA TO DISMISS

1  I.    **INTRODUCTION**

2          The Motion to Dismiss of defendant New Enterprise Associates ("NEA") should be denied.

3  NEA does not dispute that plaintiff Michael Zeleny ("Zeleny") has adequately alleged a conspiracy

4  to violate his constitutional rights under 42 U.S.C. § 1983.  Because Zeleny has properly alleged a

5  conspiracy, NEA is liable for the acts of its co-conspirators – *i.e.*, the City of Menlo Park (the

6  "City") and police chief Dave Bertini ("Bertini"; collectively with the City and NEA, "Defendants")

7  – which are not protected by the *Noerr-Pennington* doctrine.  Zeleny has also stated sufficient facts

8  to bring NEA's conduct outside of the *Noerr-Pennington* protection, at least at the pleading stage.

9          NEA improperly seeks to short-circuit this case on the pleadings, before discovery,

10 dispositive motions, or trial.  This effort must fail.  The complaint is extremely detailed, containing

11 235 paragraphs, and citing to specific evidence of the conspiracy and resulting unlawful conduct.  It

12 is more than sufficient to proceed to discovery.  NEA's opposition merely underscores that there are

13 abundant factual disputes, which cannot be resolved on the pleadings.

14         This case involves a 10-year coordinated effort by Defendants to prevent Zeleny from

15 protesting NEA's ongoing financial support of child rapist Min Zhu.  When Zeleny started protesting

16 in 2009, Defendants resorted to coordinated harassment, including round-the-clock surveillance,

17 armed guards, and unlawful police stops.  When this failed to dissuade Zeleny, NEA escalated its

18 conduct, filing a succession of frivolous lawsuits and TRO applications against Zeleny.  When that

19 tactic also failed, the City had Zeleny falsely prosecuted—with NEA's direct participation—while

20 hiding obvious *Brady* material that demonstrated that Zeleny was innocent.  After Zeleny's acquittal,

21 the City has seized upon new "open carry" laws to stifle Zeleny, demanding that he obtain permits,

22 and then entangling him in a bogus permitting process that has never been applied to anyone else.

23         Zeleny alleges in great detail that this conduct was all undertaken pursuant to a conspiracy

24 among the Defendants.  He alleges specific facts showing how the conspiracy was formed, when it

25 was formed, why it was formed, and by whom.  He has stated a claim against all Defendants for

26 violation of 42 U.S.C. § 1983.  NEA's motion fails for three independently sufficient reasons.

27         *First*, NEA is liable for all of the conduct undertaken pursuant to this conspiracy, including

28 the conduct of the City and Bertini.  NEA does not argue, and could not argue, that the City's

campaign of police harassment, false prosecution, and depriving Zeleny basic administrative process is somehow immune under *Noerr-Pennington*. Settled law holds that, even if all of NEA's overt acts are immune—and they are not—it remains liable for the acts of the City.

**Second**, NEA's actions are not immune from liability. Many of those actions, such as monitoring Zeleny's whereabouts at all times, are simply outside of the scope of *Noerr-Pennington* immunity. The remainder of its actions, such as making bad faith police reports, taking over Zeleny's criminal proceeding, and filing several frivolous TRO applications, fall squarely within the "sham exception" to *Noerr*. Zeleny has pled sufficient facts to get past the pleading stage.

**Third**, and finally, NEA's arguments raise a host of disputed factual issues that are not proper for resolution on a motion to dismiss. It asks the Court to parse inferences to be drawn from individual emails, and to determine whether its conduct was well founded and in good faith. This is not the stuff of a motion to dismiss.

There is no dispute that this is a novel case, which raises complex and untested issues under 42 U.S.C. § 1983. Zeleny has stated more than enough facts to allow him to take discovery and develop a full record. The Court should not cut off his claim prematurely.

## II.   FACTUAL ALLEGATIONS

NEA bills itself as the largest and most prominent venture capital firm in the world. It has consistently backed entrepreneur Min Zhu, and his ventures, including WebEx. FAC ¶ 32.

In 2005, Zeleny brought to light that Min Zhu had repeatedly raped his daughter, Erin Zhu, when she was 14. *Id.* ¶ 33. As a result, Min Zhu fled to China. *Id.* ¶¶ 36-40.

NEA is well aware of the credible allegations against Min Zhu. *Id.* ¶ 30. It has never denied those allegations or disavowed Min Zhu or his conduct. *Id.* ¶ 40. Instead, NEA has continued to fund Min Zhu's ventures. *Id.*

### A.   Zeleny's Protests.

Zeleny began his protests against Min Zhu, WebEx, and NEA in the early 2000s. FAC ¶ 42. After giving NEA the opportunity to address Erin Zhu's claims, and having NEA refuse to acknowledge those claims, Zeleny expanded his protects to NEA and its senior managers. *Id.*

Zeleny firmly believes that anyone who would continue doing business with Min Zhu is

1     categorically unfit to serve in a position involving the public trust. *Id.*

2         Zeleny's protests are intentionally provocative acts of public performance. *Id.* ¶ 44. He has

3 worn sandwich boards, handed out fliers, and displayed graphic and provoking images. *Id.* He has

4 also enlisted musicians as well as a food truck. *Id.*

5         Zeleny's protests have also included the peaceful display of unloaded firearms, in exercise of

6 his Second Amendment rights. FAC ¶¶ 46-48. Zeleny is among a number of "open carry"

7 protestors, who have historically carried firearms to draw attention to their message. *Id.* He has

8 always been cooperative with police, even when he believed they were acting unlawfully. *Id.* ¶ 48.

9         Zeleny's protests took place until 2012, when the San Mateo County District Attorney

10 prosecuted him falsely for carrying a "concealed firearm." SAC ¶ 42, 93. Despite being fully

11 acquitted, he has been unable to resume his protests as discussed in detail below. *Id.* ¶ 117.

12        **B.**      **NEA Conspires with the City to Silence Zeleny.**

13         Zeleny began protesting NEA in earnest in October 2009. FAC ¶ 56.

14         Almost immediately, the City and NEA entered into an agreement to stop Zeleny's protests.

15 *Id.* ¶ 57. The conspiracy was initially formed through a series of in-person meetings and phone calls

16 between NEA security personnel and City police, including Sergeant Sharon Kaufman and now-

17 Chief Dave Bertini ("Bertini"). *Id.* ¶ 59.

18         Zeleny's SAC specifically alleges that the City and NEA have developed and fostered the

19 conspiracy through numerous meetings and phone calls each time Zeleny engages in protests. FAC

20 ¶ 60. These meetings and calls have included October 2009, September 2010, October 2010, April

21 2011, October 2011, February 2012, June 2012, March 2013, April 2013, and September 2015. *Id.*

22 The City has reported being in "close contact with security from NEA" to address the protests, and

23 to having "worked collaboratively" with NEA in connection with the protests. FAC ¶ 61.

24         The object of the conspiracy has been to stifle, delay, and ultimately shut down the protests

25 using harassing police tactics, false prosecution, baseless legal proceedings, and a sham City

26 permitting process. SAC ¶ 57. As described internally, the City was attempting to find a "firm

27 solution to ending [Zeleny's] protests." *Id.* Because it could not find any lawful way of barring

28 protected First and Second Amendment activity, the City resorted to the conduct described below.

### C.     NEA's Pattern of Frivolous Lawsuits.

NEA, a primary investor in WebEx, caused WebEx to sue Zeleny over his protests in 2004. SAC ¶ 64.  The court sanctioned WebEx more than $16,000, including for filing a frivolous suit in violation of Zeleny's First Amendment rights.  *Id.* ¶ 66.  WebEx quickly dropped its suit in exchange for Zeleny's agreement not to sue for malicious prosecution.  *Id.* ¶ 67.

Long-time NEA executive Scott Sandell then sought a temporary restraining order against Zeleny due to Zeleny's protests, again with NEA's encouragement and assistance.  Sandell and NEA had no legitimate belief that they could prevail on the merits.  *Id.* ¶ 68.  Instead, the purpose of the application was to delay Zeleny's protests short term, and to cause a temporary forfeiture of his firearms.  *Id.* ¶ 70.  The application was frivolous, and was denied without opposition.  *Id.* ¶¶ 68-70.

On October 5, 2010, NEA filed another frivolous TRO application against Zeleny arising from his protests.  *Id.* ¶ 71.  Once again, NEA had no legitimate belief that the TRO would result in a permanent order.  It sought a TRO purely to interfere with Zeleny's ongoing protests short term.  *Id.* Once again, NEA's application was baseless and the court summarily denied it.  *Id.* ¶¶ 71-72.[1]

In each of these cases, NEA and its agents engaged in litigation conduct designed solely to distract and intimidate Zeleny, such as filing suit in the wrong forum and refusing to produce evidence.  *Id.* ¶ 65, 73.

### D.     The City and NEA Stifle Zeleny's Protests through Harassment.

The City has repeatedly confirmed that Zeleny's protesting activities are not criminal and that he was fully cooperative with police at all times.  SAC ¶ 78.  Nonetheless, the City and NEA engaged in an extensive pattern of harassment, designed to interfere with his protests.

For its part, NEA hired private contractors to conduct round-the-clock surveillance on Zeleny, both online and in person.  *Id.* ¶ 80.  These investigators followed Zeleny, tracking his whereabouts and online activity at all times.  *Id.*

NEA also hired armed security staff to remain visibly on site whenever Zeleny was expected. *Id.* ¶ 81.  The City did not attempt to dissuade NEA from escalating the situation, but encouraged

---

[1] Zeleny was forced to settle the case because he lacked resources to defend himself against NEA.  *Id.* ¶ 74.

NEA to keep its firearms-bearing security on site at all times.  *Id.*

As part of the conspiracy, the City and NEA set up a process to interfere with Zeleny's protests using police harassment.  *Id.* ¶ 82.  The City and NEA well knew that Zeleny was not committing any crimes, and there was no possibility of a lawful arrest or prosecution.  *Id.* ¶ 83.  Nonetheless, City police gave NEA their private cell phone numbers so that NEA could contact them without using official channels.  *Id.* ¶ 82.  Pursuant to this plan, NEA would contact police any time Zeleny appeared, triggering an immediate police response and harassment.  *Id.*

NEA's reporting was false and misleading.  *Id.* ¶ 84.  Among other things, NEA continued to report that Zeleny was an "on-going threat to NEA and its employees" even when Zeleny had not appeared at NEA's offices in nearly a year and had never threatened anyone.  *Id.*  NEA also made additional false reports, which Zeleny intends to identify during discovery.  *Id.*

When NEA would call, City police would appear on scene, not to investigate or prevent crime, but to interfere with Zeleny's protests.  *Id.* ¶ 85.  Among other harassing and intimidating conduct:

- City police would stop and question Zeleny and his supporters without any reasonable belief that a crime had been committed, in violation of City policy and established law.  *Id.* ¶¶ 86-87[2]; *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) (holding that investigatory stop is permitted only if the officer has "a reasonable suspicion supported by articulable facts that criminal activity may be afoot").

- City police followed Zeleny and his supporters, in both marked cars and undercover, even after they left the City.  They also engaged in pretextual "enforcement stops" simply to question Zeleny's supporters about their affiliation to him.  *Id.* ¶¶ 88-89.

- City police directly interfered with Zeleny's protests, also in violation of written policy.  They made up reasons to require Zeleny to move his signage or lower the volume of his musical performances, even when this was not required by City ordinance or policy.  *Id.* ¶ 90.

---

[2] In one instance, City police stopped and interrogated one of Zeleny's supporters who was an off-duty Sheriff's Deputy.  SAC ¶ 88.  They questioned this individual extensively about his affiliation with the Sheriff's Department in an undisguised effort to intimidate and dissuade him from continuing the protests.  *Id.*

• In violation of City policy, the police maintained an extensive "informational" surveillance file on Zeleny, even though Zeleny had never committed (or been suspected of committing) a crime. *Id.* ¶ 91. Bertini kept his own "Zeleny file" with tabs on Zeleny's activities and ideas for how to end his protests. *Id.*

Much or all of this conduct was in direct violation of written policy, applied only to Zeleny, and was justified by unilaterally deeming Zeleny a "security risk." *Id.* ¶ 92.

**E.     The City Manufactures False Charges Against Zeleny.**

NEA's series of lawsuits and the City's harassment did not deter Zeleny, who continued his protests into 2012. SAC ¶ 93. Because they could not dissuade Zeleny, the City worked on a "firm solution" to end Zeleny's protests. FAC ¶ 57.

Police repeatedly checked Zeleny and cataloged his firearms, but found no crime. *Id.* ¶¶ 47, 83. Instead, City police simply made one up. As part of the conspiracy, Bertini falsely referred Zeleny for felony prosecution for carrying a "concealed" firearm. *Id.* ¶¶ 93-96.[3]

On June 13, 2012, City police responded to Zeleny's protests as usual. One of the officers assigned was Jeremy Foy ("Foy"), who had interacted with Zeleny previously. *Id.* ¶¶ 94-95. On a previous occasion, officer Foy had observed Zeleny carrying a handgun in a tan leather holster, and documented in a police report that he was readily visible. *Id.* ¶ 97.

During the June 13, 2012 stop, officer Foy also determined that Zeleny had not committed a crime. Zeleny was carrying the same firearm openly, in the same tan holster. In internal police logs Officer Foy noted that his interactions with Zeleny were "informational only." *Id.* ¶ 95. He did not cite or arrest Zeleny or suggest that any crime had been committed. *Id.*

Later that evening, however, officer Foy spoke with Bertini and Kaufman—two participants in the conspiracy. *Id.* ¶ 96. Officer Foy then changed his mind, and generated a felony police report accusing Zeleny of carrying a "concealed firearm." Although Officer Foy had seen the same holster on multiple occasions, and readily determined that it contained a firearm, in his modified report,

---

[3] Before doing so, the City and NEA worked together on preparing an Emergency Protective Order application, which would have resulted in a seizure of his firearms. FAC ¶¶ 75-76. They abandoned this idea, presumably because Zeleny did not meet any of the elements for an EPO.

OPPOSITION TO MOTION BY DEFENDANT NEA TO DISMISS

Officer Foy claimed that he could not tell if the if it contained a firearm.  *Id.*  As a result, Officer Foy reported that Zeleny had carried a concealed firearm—a felony.  *Id.*

Based on Officer Foy's new report, Bertini referred Zeleny to the County of San Mateo District Attorney.  *Id.* ¶ 96.  Officer Foy's false report was the sole basis for the prosecution.  *Id.*

### F.    NEA Participates in the Sham Prosecution.

The criminal prosecution wore on for more than two years, preventing Zeleny from protesting in the interim.  SAC ¶ 101.

The City and the County prosecutor concealed from Zeleny and his counsel, as well as the trial court, the prior police reports from officer Foy, which directly contradicted the report used to charge Zeleny.  *Id.* ¶ 97; *see Brady v. Maryland*, 373 U.S. 83, 87 (1963).

The sham prosecution was also at NEA's behest.  *Id.* ¶ 100.  NEA inserted itself into and exercised control over the criminal prosecution, although it had no standing to participate.  *Id.*  The prosecutor made clear that she was taking strategic direction from NEA, which she referred to as "her client," and could not make major decisions without NEA's input.  *Id.*  She received NEA's directions through a series of meeting with NEA personnel throughout Zeleny's case.  *Id.*

In the end, the trial court fully acquitted Zeleny, finding that his weapon was "properly holstered" and not concealed.  *Id.* ¶ 101.

### G.    California Changes Its Gun Laws.

Prior to 2012, California law permitted "open carry" – *i.e.*, the open carrying of unloaded firearms.  SAC ¶ 103.  In 2012 and 2013, California enacted bans on open carry, prohibiting the open carrying of unloaded firearms in public.  *Id.* ¶¶ 104, 106.

The "open carry" statutes contain an exception for "authorized participant[s] in . . . a motion picture, television, or video production, or entertainment event."  *Id.* ¶¶ 105, 107; Cal. Pen. Code §§ 26375, 26405(r).

### H.    The City Draws Zeleny into a Sham Permitting Process.

Following Zeleny's acquittal, the City and NEA have used the new "open carry" ban to stop Zeleny from protesting.  SAC ¶¶ 117-118.  The City has threatened Zeleny with arrest if he protests without a City-issued permit.  *Id.* ¶ 119.  The City has taken the position that Zeleny must be

authorized by the City to fall within the entertainment exception to the "open carry" ban.  *Id.* ¶ 119.

Zeleny has tried since 2015 to comply with the City's requirements, only to have his permit applications sabotaged, derailed and delayed.  Paragraphs 133 to 186 of the SAC allege in exhaustive detail how the City, pursuant to its conspiracy with NEA, has deprived Zeleny of the ordinary permitting process dictated by City policy and required by law.

Bertini, a primary participant in the conspiracy with NEA, has intercepted all of Zeleny's permit applications, and processed them on his own, rather than allowing them to be acted upon by the city departments responsible for permit applications.  *Id.* ¶¶ 143, 177.

Bertini unilaterally decided to deny Zeleny's permit applications within days of receiving them, and without notifying Zeleny or engaging in the interactive process required by City policy.  *Id.* ¶ 145.  Bertini notified NEA immediately of his decision—before telling Zeleny—but that the City intended to demand more information before issuing the preordained denial.  *Id.* ¶ 147.

The City gave Zeleny the runaround for more than two years, rather than simply acting upon his applications.  It has repeatedly demanded more information than it has ever required from any other applicant, with no bearing on the applications, simply to stall the process.  *Id.* ¶¶ 149, 151.  At one point, the City referred Zeleny to a non-existent City department to process his application.  *Id.* ¶ 148.  At another, Bertini and the City intentionally delayed Zeleny's permit appeals by more than a year to allow a California state firearm's permit that Zeleny had to expire.  *Id.* ¶¶ 161-172.

The City refuses to provide Zeleny with any time, place, manner, or other objective criteria to assess his application.  *Id.* ¶¶ 124, 154.  Bertini and others at the City made up a series of pretextual excuses for their refusal to process the permit applications.  A primary theory is that Zeleny's event does not constitute an "entertainment event" within the City's definition.  *Id.* ¶ 155.

Bertini has since admitted that this explanation is false, and that Zeleny's event qualifies under multiple grounds.  *Id.*  He also admitted that one of the reasons he has denied Zeleny's initial permit application is that he finds the content of Zeleny's protests offensive.  *Id.* ¶ 126.

The City issued its final denial of Zeleny's first permit application in September 2017, two years after he filed.  *Id.* ¶ 175.  Zeleny has filed two other applications.  Rather than make a decision, the City has held these applications in limbo, refusing to act on them.  SAC ¶¶ 176-186.

OPPOSITION TO MOTION BY DEFENDANT NEA TO DISMISS

III.    **LEGAL STANDARD**

"It is axiomatic that the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Hall v. Cty. of Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir. 1986) (citation omitted), overruled on other grounds in *Yee v. City of Escondido*, 503 U.S. 519 (1992).  The federal notice pleading standard "contains a powerful presumption against rejecting pleadings for failure to state a claim." *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (citation omitted).

A complaint may only be dismissed if it fails to articulate a cognizable legal theory or to plead sufficient facts to support such a theory. *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016) (citation omitted).  The Court must "accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Id.* (citation omitted).  The plaintiff is not required "to plead his evidence" or to state "specific factual details not ascertainable in advance of discovery." *Gibson v. United States*, 781 F.2d 1334, 1340 (9th Cir. 1986).

In order to survive a motion to dismiss, the claim only needs to be plausible. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ahcroft v. Iqbal*, 556 U.S. 662 (2009)).  The plausibility standard is not a basis to consider the factual merit of a claim at the pleading stage. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  "Asking for plausible grounds to infer the existence of a claim for relief does not impose a probability requirement." *Id.*  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts is improbable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

IV.    **ARGUMENT**

A.    **NEA Is Liable for the Acts of the City and Bertini.**

The entire focus of NEA's motion is its contention that its own overt acts in furtherance of the conspiracy are immune from liability under *Noerr-Pennington*.  NEA misses the point.  Because Zeleny has properly alleged a conspiracy, NEA is liable for the unconstitutional acts of its co-conspirators, *i.e.*, Bertini and the City, which it does not contend are subject to *Noerr-Pennington*.

1.    **Zeleny Need Not Allege Overt Acts by NEA.**

Zeleny is not required to allege any overt acts by NEA, much less overt acts unprotected by *Noerr-Pennington*.  To hold a private actor liable under 42 U.S.C. § 1983, the plaintiff need only

- 9 -

1  allege (a) an agreement to violate civil rights, (b) "that *at least one of the alleged co-conspirators*

2  engaged in an overt act in furtherance of the conspiracy," and (c) that the overt act injured the

3  plaintiff.  *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999) (collecting cases) (emphasis added);

4  *see also Aydelotte v. Town of Skykomish*, 2015 WL 3965790, at *2 (W.D. Wash. June 29, 2015),

5  *rev'd in part on other grounds* 767 F. App'x 582 (2018); *Davis v. Powell*, 901 F. Supp. 2d 1196,

6  1217 (S.D. Cal. 2012); *Spencer v. Peters*, 966 F. Supp. 2d 1146, 1166 (W.D. Wash. 2013).

7        Due to the state action requirement, the overt acts that qualify as violations under 42 U.S.C. §

8  1983 are those of the state actors – *i.e.*, the City and Bertini.  A conspiracy count "does not enlarge

9  the nature of the claims asserted by the plaintiff." *Lacey v. Maricopa County*, 693 F.3d 896, 935 (9th

10  Cir. 2012).  The plaintiff must allege an underlying constitutional violation, which must be conduct

11  by a state actor.  *Id.* ("[c]onspiracy is not itself a constitutional tort under § 1983").  Conspiracy

12  claims serve to "enlarge the pool of responsible defendants by demonstrating their causal connection

13  to the violation" by the state actor "with whom [the private actor] has conspired."  *Id.*  A private

14  actor may be liable for the "unconstitutional acts committed by the other defendants" if it enters into

15  a conspiracy with them.  *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (citing

16  *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002).

17        Zeleny need not show that NEA committed any overt acts itself, as long as he plausibly

18  alleges that NEA was part of the conspiracy.  "[A] conspiracy defendant need not have personally

19  committed a predicate act, or even an overt act." *Ryan v. Salisbury*, 382 F. Supp. 3d 1062, 1085 (D.

20  Hawai'i 2019); *see also Burns v. City of Concord*, 99 F. Supp. 3d 1007, 1024-25 (N.D. Cal. 2015)

21  (holding that plaintiff had adequately alleged a conspiracy even where private party was not alleged

22  to have directly participated in the use of excessive force).  Conspirators are "liable for the acts of all

23  members of the conspiracy in furtherance of the conspiracy, regardless of the nature of [their] own

24  actions."  *Beltz Travel Service v. Int'l Air Transport Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980).

25         **2.**    **The Court Need Not Reach the Issue of *Noerr-Pennington* Immunity
26                 Because NEA Remains Liable for the Conduct of Its Co-Conspirators.**

27        NEA does not argue that Bertini and the City's conduct is immune under *Noerr-Pennington*.

28  Nor could it.  Accordingly, even if all of NEA's conduct is immune, it remains liable for the non-

1   immune conduct of the City and Bertini.

2     The Ninth Circuit's decision in *Beltz* is directly on point.   The District Court granted

3   summary judgment finding that certain defendants had shown that their own "overt acts" were

4   immune from liability.  620 F.2d at 1366.  The Ninth Circuit reversed.  It noted that the District

5   Court erred in focusing only on the over acts of the immune defendants.  *Id.*

6      This overlooks the allegation in the complaint that the appellees were part of the
7      overall conspiracy agreement. To put the matter more plainly, had the appellees sat
      around a table with the [non-immune defendants] and agreed upon a course of action
8      to drive [plaintiff] out of business, the appellees as co-conspirators would be
      chargeable with the [other defendants'] acts in furtherance of that conspiracy. ***The***
9      ***appellees would not be immune from liability as co-conspirators even though the***
      ***appellees' specific acts in furtherance of the conspiracy could be found to be***
10     ***immune.***

11  *Id.*  The court went on to note that "the acts of the [other defendants], which are not asserted to be

12  immune . . ., must be considered as acts of appellees."  *Id.*  "[A] conspiracy is not to be judged by

13  dismembering it and viewing its separate parts, but only looking at it as a whole."  *Id.* (quoting

14  *United States v. Patten*, 226 U.S. 525, 544 (1913).  The court went on to summarize:

15     The immunity of appellees for their specific actions is thus not the determinant issue
      at this point in the case. The issue on the appeal of this summary judgment is whether
16     appellees were members of the alleged conspiracy, for if they were, any immunity for
      the acts they performed could not protect them from liability for the actions, and
17     attendant consequences, of the [other defendants], whose actions were not immune
      from antitrust liability.
18

19  *Id.*; *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1207-08 (N.D. Cal. 2015)

20  (noting "fundamental principle of conspiracy law, conspirators are liable for the acts of all members

21  of the conspiracy in furtherance of the conspiracy, regardless of the nature of the coconspirators'

22  own actions") (*quoting Beltz*; brackets omitted).

23    NEA's argument runs directly counter to *Beltz*.  NEA argues that it cannot be liable because

24  *its own overt acts* are immune.  As the court noted in *Beltz*, however, this argument "overlooks" the

25  critical point.  Zeleny plausibly alleges that NEA entered into the conspiracy.  NEA is liable for the

26  City's acts as a participant in the conspiracy.  "[A]ny immunity for the acts [NEA] performed could

27  not protect [it] from liability for the actions, and attendant consequences, of the [City and Bertini],

28  whose actions [are] not immune."  *Beltz*, 620 F.2d at 1367.

OPPOSITION TO MOTION BY DEFENDANT NEA TO DISMISS

**B.    Zeleny Plausibly Alleges a Conspiracy.**

NEA does not seriously contend that Zeleny has failed to properly allege the existence of a conspiracy to violate his civil rights.  Nor could it.

**1.    Conspiracy May Be Established through Circumstantial Evidence.**

Courts have long recognized that a private actor may be liable for conspiring with a state actor to violate civil rights.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-58 (1970) (reversing summary judgment where fact issue existed as to whether restaurant staff conspired with police to refuse service to black customers); *Fonda v. Grey*, 707 F.3d 435, 438 (9th Cir. 1983).  To show that NEA conspired with city officials, Zeleny needs only to allege an agreement or "meeting of the minds" to violate his constitutional rights.  *Fonda*, 707 F.3d at 438 (citing *Adickes*); *Crowe*, 608 F.3d at 440.  "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy."  *United Steelworkers v. Phelps Dodge Corp.*, 865 F.3d 1539, 1540-41 (citing *Fonda*, 707 F.3d at 438).

"A formal agreement is not necessary; an agreement may be inferred from the defendant's acts pursuant to this scheme or other circumstantial evidence."  *Avalos v. Baca*, 517 F. Supp. 2d 1156, 1170 (C.D. Cal. 2007) (citing *United States v. Clevenger*, 733 F. 2d 1356, 1358 (9th Cir. 1984)).  "Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives."  *Mendocino Env. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301-02 (9th Cir. 1999).  "Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants."  *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 440 (9th Cri. 2010) (citing *Mendocino*) (reversing summary judgment on conspiracy claim).  Recognizing that parties usually do not conspire out in the open, a plaintiff may establish a conspiracy by "showing that the alleged conspirators have committed acts that are unlikely to have been undertaken without an agreement."  *Mendocino*, 192 F.3d at 1301.

**2.    Zeleny Adequately Alleges a Meeting of the Minds.**

Courts relax pleading requirements where the facts "are peculiarly within the possession and

- 12 -

control of the defendant." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (reversing dismissal of claim for conspiracy to violate section 1983). The plead a conspiracy to violate 42 U.S.C. § 1983, the complaint only needs to contain allegations "suggestive of an agreement to engage in illegal conduct." *Id.* (quoting *Twombly*, 550 U.S. at 564 n.8; internal quotation marks omitted). Courts consider the the "entire factual context" alleged in the complaint. *Id.*

Zeleny has satisfied this standard and plausibly alleged a conspiracy, particularly at the pleading stage. Zeleny alleges that NEA security representatives and the City formed a conspiracy starting with his first series of protests in 2009. SAC ¶¶ 56-60. He identifies a at least 10 in-person and phone conversations, as well as constant email communications, used to develop and maintain the conspiracy. *Id.* He also points to specific admissions by the City in which it represented that it was in "close contact" with NEA regarding Zeleny's protests, and had "worked collaboratively" with NEA to address the protests. *Id.* ¶ 61.

Circumstantial evidence also points to a conspiracy. NEA was the target of the protests, and had every reason to want to stop them. NEA admittedly worked with the City by reporting on Zeleny's whereabouts, contacting police on their private cell phones. *See Lacey*, 693 F.3d at 936 (reversing dismissal and holding that allegations of conspiracy were properly supported by prior relationship between parties to conspiracy and allegations of the motive to conspire). It also engaged in concerted activity, including filing frivolous TRO applications, and working with the City to develop a frivolous Emergency Protective Order (EPO) application—all of which would have led to an immediate seizure of Zeleny's firearms. SAC ¶¶ 71, 75-76, 82, 84. NEA also took charge of Zeleny's criminal prosecution directing the activities of the County prosecutor. *Id.* ¶ 100.

In connection with the conspiracy, the City has disregarded its express, written police department policies, as well as its published guidelines and customary practice. *Id.* ¶¶ 85, 87, 89, 90, 91, 134-137. Perhaps most telling, within days of receiving Zeleny's first permit application, Bertini preemptively contacted NEA, before denying the application, to assure NEA that the City had decided to deny the application. Bertini also filled NEA in on his plan to "request[] more information from Zeleny" before "notify[ing] him of our decision." *Id.* ¶ 147. The same day, Bertini contacted NEA security staff for information he could use to deny the permit. *Id.* ¶ 147.

- 13 -

During the same period, Bertini was trying to set up a meeting with NEA to "coordinate [a] response" to Zeleny's protests.  *Id.* ¶ 140; *see also id.* ¶ 141 ("[t]hroughout the process, Bertini previewed the City's proposed course of action to NEA before any official decision").  Without a tacit or explicit agreement, Bertini would have had no reason to preemptively keep NEA apprised of the City's planned actions, including its intention to give Zeleny the run-around, much less to set up meetings with NEA and other law enforcement agencies to "coordinate" a response.

Courts have consistently found less detailed and probative allegations sufficient.  *Klein v. Williams*, 714 F. App'x 631, 636-37 (9th Cir. 2017) (finding sufficient allegation that principal of private correctional school could not have learned about grievance without being told by prison officials, and subsequently threatened to fire plaintiff, in violation of First Amendment right to file grievance); *Hernandez v. City of Napa*, 781 F. Supp. 2d 975, 997 (N.D. Cal. 2011) (denying summary judgment on conspiracy claim where police officer referred to private individual as "brother" and talked about his "team" and "teamwork" after selectively arresting plaintiff rather than individual); *Steel v. City of San Diego*, 726 F. Supp. 2d 1172, 1185 (S.D. Cal. 2010) (denying motion to dismiss where plaintiff alleges that private investigators conspired with police to arrange a traffic stop in hopes of identifying incriminating information for use in divorce proceedings).

*United Steelworkers* is analogous.  There, the Ninth Circuit reversed summary judgment on a claim for conspiracy to violate civil rights of protestors.  865 F.3d at 1543-47.  The primary evidence was a meeting between representatives of the business and local police in which the business requested that the police arrest protestors to "keep them off the streets," and suggested that the city set a "high bail" for them.  *Id.* at 1546.  Several weeks after the meeting, the police began arresting protestors, and a justice of the peace set a high bail as requested.  *Id.*  The court found this evidence "unusually probative" of an agreement between the business and local authorities to violate protestors' civil rights by "punishing" them for protesting.  *Id.*

These are the same types of factual allegations that Zeleny makes here.  They are more than sufficient to get past a pleading challenge.

## C.     NEA's Conduct Is Not Protected under *Noerr-Pennington*.

Even if the Court were required to rule on whether NEA's conduct is immune—and it is

- 14 -

not—much of NEA's conduct falls outside of the scope of *Noerr-Pennington*.[4]

Courts engage in a three-part analysis to determine whether *Noerr-Pennington* applies: "(1) identify whether the lawsuit imposes a burden on petitioning rights, (2) decide whether the alleged activities constitute protected petitioning activity, and (3) analyze whether the statutes at issue may be construed to preclude that burden on the protected petitioning activity."  *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 644 (9th Cir. 2009).  "In order to determine whether *Noerr-Pennington* protects a particular activity," courts "must evaluate whether exempting it [from liability] would further" the interests motivating *Noerr-Pennington*.  *In re Airport Car Rental Antitrust Litig.*, 693 F.2d 84, 86 (9th Cir. 1982).  If the Court determines that the activity does fall under *Noerr*, it then considers whether that activity falls within the "sham" exception.  *Kearney*, 590 F.3d at 644.

The conduct alleged in the SAC, taken together, amounts to a pattern of behavior that is not protected under *Noerr-Pennington*.  All of that conduct is either identical to or closely akin to conduct found to be unprotected or within the sham exception.  None of it furthers the interests motivating the doctrine.  On the whole, NEA fails to show that its activity is protected.

> **1.    Conducting Round-the-Clock Surveillance and Hiring a Private, Armed Security Force Are Not Petitioning Activity.**

Zeleny alleges that NEA had him followed on a daily basis by private contractors and hired armed security staff to remain on site during his protests, escalating the danger of the situation. Neither of these activities constitutes petitioning.  These are actions, not communications.  Neither seeks official action in any meaningful sense.  Where activities "cross[] the line from communication to conduct," they are not protected by *Noerr-Pennington*.  *Tisdale v. Cty. of L.A.*, 617 F. Supp. 2d 1003, 1007-08 (C.D. Cal. 2009) (holding citizen's arrest was not protected conduct).

NEA tries to sidestep this point by asserting that Zeleny has shifted focus to the "purported *rationale* for NEA's actions," to avoid *Noerr-Pennington* immunity.  Mot. at p. 15.  This is a mischaracterization of the SAC.  Zeleny agrees that NEA's "rationale" for conducting the

---

[4] Solely for purposes of preserving the record, Zeleny reiterates his argument that conduct designed to stifle protected speech is not subject to protection under *Noerr-Pennington*.  *See* Opp. to Mot. to Dismiss, Dkt. No. 87 at pp. 15-17.

surveillance and hiring armed guards is not relevant to *Noerr-Pennington*.  The focus of the SAC is on NEA's *conduct*, not its motivation.

NEA's own conduct, having nothing to do with its supposed petitioning, is not subject to *Noerr-Pennington*.  NEA cites no case for the idea that conducting surveillance is petitioning conduct, much less hiring armed guards.   Instead, it misleadingly cites to the First Amended Complaint for the idea that its surveillance was sometimes used to make police reports.  Mot. at p. 15 (citing First Am. Compl. ¶ 139(a)).  Whether this is so, NEA's conduct in independently surveilling Zeleny and hiring armed guards is not petitioning.

**2.      Calling the Police in Bad Faith Is Not Protected Conduct.**

NEA, however, ignores an important caveat to the rule announced in *Forro Precision, Inc. v. IBM Corp.*, that contact with the police may constitute petitioning activity:

> The sham exception permits the imposition of antitrust liability on those seeking action from government agencies only when the activity in question can serve no useful purpose, and is undertaken for purely anti-competitive reasons. If, in the case before us, IBM had provided the police with deliberately false information, ***solely for the purpose of harassing Forro or of achieving other ends unrelated to law enforcement, its conduct would unquestionably come within the sham exception.***

673 F.2d 1045, 1060 (9th Cir. 1982).  This is precisely what Zeleny alleges.

**a.      Calling the Police to Harass Zeleny Is Not Protected.**

Zeleny specifically alleges that NEA's communications with the police were not intended to achieve legitimate law-enforcement ends – *i.e.*, arrest or prosecution – but "solely to trigger a response by police officers who would then harass and disrupt Zeleny's protests."  SAC ¶¶ 82-83. He further alleges—as confirmed in numerous police reports—that NEA knew that he had not committed a crime and was extremely cooperative at all times.  *Id.* ¶ 83 ("Internal police reports show that Zeleny was not engaged in any criminal activity and was extremely cooperative at all times"); *see also id.* ¶ 86 ("fully cooperative and had not committed any crime").  Calling the police simply so that they will harass a lawful protestor is exactly the type of conduct that gives rise to conspiracy liability.  *See United Steelworkers*, 865 F.3d at 1540-41.

The *Noerr-Pennington* sham exception applies to this conduct.  It "applies to cases involving bad faith reports to law enforcement."  *Holmes v. Harris*, 2019 WL 2895632, at *8 (C.D.

- 16 -

Cal. May 15, 2019).  Calls to law enforcement are not protected unless they are legitimate efforts to seek law enforcement assistance to protect the caller from illegal conduct.  *E.g.*, *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 886-88 (1984) (holding that reporting employees to INS to prevent them from exercising labor rights was not protected; "Petitioners did not invoke the INS administrative process in order to seek the redress of any wrongs committed against them"); *cf. Schneider v. Cty. of Sacramento*, 2014 WL 4187364, at *9-10 (E.D. Cal. Aug. 21, 2014) (conduct of litigation consultants and experts not protected unless it is in connection with contemplated litigation); *Jordan v. Echo Rural Fire Prot. Dist. #7-403*, 2007 WL 892971, at *5 (D. Or. Mar. 20, 2007) (mere participation in an investigation is not protected conduct).

NEA's conduct is closely akin to the conduct found to be a sham in other contexts.  The hallmark of sham activity is that it is not designed to secure "genuine" government action, but to use the governmental process itself as a weapon.  *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 n.4 (noting that sham activity involves actions "not genuinely aimed at procuring favorable government action").  "A petition is a sham if it is 'objectively baseless' and is 'brought with the specific intent to further wrongful conduct through the use of governmental process.'"  *Venetian Casino Resort, LLC v. NLRB*, 793 F.3d 85, 92 (D.C. Cir. 2015) (remanding to determine in the first instance whether police reports were a sham).[5] Conduct amounts to a sham if it invokes governmental processes "with no expectation of obtaining legitimate government action." *S. Union Co. v. S.W. Gas Corp.*, 165 F. Supp. 2d 1010, 1042 (D. Ariz. 2001) (finding allegations sufficient where defendants attempted to block competitor from access to administrative process).

### b.  Making False Police Reports Is Not Protected.

Zeleny also specifically alleges that NEA made false reports to the law enforcement.  As an example, Zeleny points to a communication in which NEA reported to law enforcement that Zeleny was an "ongoing threat" to NEA when he had not protested NEA in close to a year, and had never threatened NEA.  SAC ¶ 84.  As *Forro* recognizes, "deliberately false" reporting is

---

[5] In contrast to this case, the defendant in *Venetian Casino* summoned police to stop protestors from trespassing on its property.  793 F.3d at 87.  In contrast, Zeleny was not protesting or violating any other laws.

"unquestionably" within the sham exception.  673 F.2d at 1060.

NEA's response is to recharacterize Zeleny's allegations.  Mot. at 14.  According to NEA, the email on which this allegation is based, should not be construed as asserting that Zeleny was an "ongoing threat"—despite using those words exactly.  Instead, NEA characterizes this email as inviting law enforcement to hear a presentation, by a consultant retained by NEA, about his assessment of whether Zeleny was a threat.  Not only is NEA's argument absurd based on the email itself, but this is not an appropriate argument at the pleading stage.[6]  The Court must accept "all reasonable inferences" in favor of Zeleny.  *Caltex Plastic*, 824 F.3d at 1159.

NEA's secondary argument that lying to the police is protected activity fails under *Forro*.  None of NEA's cases support this theory.  Most of NEA's cases are out-of-circuit (unpublished) cases dealing with political activities, not police contact.  *See Tuosto v. Phillip Morris USA, Inc.*, 2007 WL 2398507, at *5 (S.D.N.Y. Aug. 21, 2007) (false statements in petitioning Congress); *N.Y. Jets LLC v. Cablevision Sys. Corp.*, 2005 WL 26459330, at *7 (S.D.N.Y. Oct. 17, 2005) (publicity campaign); *Mark Aero, Inc. v. Trans World Airlines, Inc.*, 580 F.2d 288, 296 (8th Cir. 1978) (pre-*Forro* case dealing with publicity campaign).  The types of misstatements accepted in purely political proceedings are not similarly protected in adjudicative or executive proceedings.  *Cal. Motor Transp. Co. v. Trucking Unltd.*,  404 U.S. 508, 513 (1972); *Kottle v. N.W. Kidney Ctrs.*, 146 F.3d 1056, 1061 (9th Cir. 1998) (noting that sham exception is "extraordinarily narrow" in legislative proceedings).

NEA's only other case, *Villa v. Heller*, 885 F. Supp. 2d 1042, 1050 (S.D. Cal. 2012), did not hold that false police reports are protected.  It held that the plaintiff failed to offer evidence *at summary judgment* that the defendant's reporting was actually false.  None of these cases overcome

---

[6] NEA also misconstrues the City's communications.  *See* Mot. at 13 n. 9; *see also* Lane Decl., Ex. C.  NEA points to an email referring to efforts to "coordinate [a] response" to Zeleny, and claims that the "plain reading" of this email is that it refers to coordinating a response among law enforcement.  *Id.*  The email itself specifically refers to NEA's security head Dave Tresmontan, who is "available to provide additional background and assistance.  Lane Decl., Ex. C.  Moreover, the email is one in a series of emails at the same time, describing the same meeting, specifically written to law enforcement *and NEA*.  In one such email, Bertini notes that "[a]t this meeting we can discuss our combined response in case Zeleny decides to proceed without a permit."  *See* Robinson Decl., Ex. A.  Parsing the inferences to be drawn from cherry-picked emails is not proper on a motion to dismiss.

the clear statement in *Forro* that false reporting is unprotected.

### 3. Active Participation in a Sham Criminal Prosecution Is Not Protected.

NEA relegates discussion of the criminal action against Zeleny to a footnote, without a single citation. Inserting itself into Zeleny's sham criminal prosecution was not protected conduct.

*Noerr-Pennington* applies to litigation activity *by litigants*. It does not apply to non-parties who insert themselves into legal proceedings without standing. "[A] bystander to a controversy who either knows he has no standing or who has no reasonable basis for asserting standing but who nonetheless files or joins in a lawsuit cannot claim the protection *Noerr-Pennington* extends to genuine attempts to influence judicial decisionmaking." *In re Burlington N'ern, Inc.*, 822 F.2d 518, 529-31 (5th Cir. 1987).

NEA inserted itself into Zeleny's criminal proceedings, without any standing to do so, by overseeing and taking control of the prosecution. SAC ¶ 100. NEA had no basis to insert itself into a criminal proceeding. It certainly had no basis to govern the discretion of a public prosecutor, although the prosecutor apparently allowed NEA to assert such control. As a non-litigant, NEA's conduct is not immune under *Noerr*.

Moreover, the criminal proceeding falls directly within the sham exception applied in *Kearney v. Foleny & Lardner*, 590 F.3d at 646-47. A case is a sham where the litigant "mak[es] intentional misrepresentations to the court," which go to the core of the proceeding, and "deprive the litigation of its legitimacy." *Id.* In *Kearny*, the Ninth Circuit reversed a dismissal where the plaintiff alleged that opposing counsel intentionally hid critical test results during discovery. *Id.* The court characterized this as "fraud upon the court through suppression of evidence." *Id.*

The City and the prosecutor hid clear *Brady* material from Zeleny and the trial court, and falsely represented that Zeleny carried a concealed handgun when they knew—based on prior reports from the same officer—that the gun was not concealed at all. SAC ¶ 93-97. The hidden materials revealed that officer Foy, on at least two occasions, had stated or strongly implied that the handgun was obvious and visible. *Id.* ¶¶ 95, 97. While withholding this evidence, the prosecutor and City police, acting at NEA's behest, represented to the trial court that Zeleny was carrying a concealed handgun that was not visible. *Id.* ¶¶ 98-100. If hiding clear *Brady* material and

representing the opposite to the court does not infect a proceeding, it is unclear what possibly could.

### 4. Filing a Series of Sham Lawsuits Is Not Protected.

Zeleny alleges that NEA filed or caused to be filed at least three frivolous lawsuits. These suits were filed by (a) WebEx, a portfolio company of NEA; (b) Scott Sandell, an NEA executive and subject of Zeleny's protests; and (c) NEA itself. SAC ¶¶ 63-73. In connection with these proceedings NEA and Sandell filed two frivolous TRO applications. This amounts to sham conduct.

### a. NEA's Baseless TRO Applications Amounted to Sham Conduct.

The TRO applications constitute litigation activity that may be deemed a sham. Conduct associated with litigation may amount to a sham, even if the lawsuit itself is not a sham. *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005) ("the sham exception[] also applies to defensive pleadings, because asking a court to deny one's opponent's petition is also a form of petition; thus, we may speak of a 'sham defense' as well as a 'sham lawsuit'"); *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078-79 (9th Cir. 2004) (noting that serving a "transparently and egregiously overbroad" subpoena may constitute sham litigation).

Under California law, a TRO application is a separate and incidental proceeding, unrelated to the merits of the underlying lawsuit. *Landmark Holding Group, Inc. v. Superior Court*, 193 Cal.App.3d 525, 529 (1987) ("an incidental matter not affecting the merits"). An application is usually filed *ex parte* with a hearing held "with no more than a 24 hour telephonic notice." *Id.*

Litigation activity is a sham if it is "objectively baseless" and "a concealed attempt to interfere" directly with the plaintiff, rather than to achieve a legitimate outcome in litigation. *See Kottle*, 146 F.3d at 1060. Zeleny properly alleges that the TRO applications were baseless and filed merely to temporarily stall his ongoing protests at the time they were filed.

Zeleny specifically alleges that the TRO applications filed in the Sandell lawsuit and in NEA's lawsuit were objectively baseless. SAC ¶¶ 69-70. Both the California Supreme Court and the United States Supreme Court have long held that temporary restraining orders involving "substantial free speech interests" cannot be issued *ex parte* as a matter of law. *United Farm Workers of Am., AFL-CIO v. Superior Court*, 14 Cal. 3d 902, 904-05 (1975) (citing *Carroll v. Princess Anne*, 393 U.S. 175 (1968)). Due to their patently frivolous nature, the applications were

1  both summarily denied—one without opposition—which NEA does not dispute. SAC ¶¶ 70, 72.

2       Zeleny also alleges that the TRO applications were in bad faith—without any prospect of

3  actually prevailing on the merits—and were designed only to temporarily derail and delay his

4  protests.  SAC ¶¶ 70-71.  As stated in the SAC, and uncontroverted by NEA, the effect of a TRO

5  would be a temporary forfeiture of all of Zeleny's firearms until a ruling on the merits.  *Id.* ¶ 70 n.1.

6  Zeleny alleges that NEA well knew that it had no hope of prevailing on the merits, but filed the

7  applications simply to result in a temporary deprivation of Zeleny's rights.  Attempting to gain an

8  incidental benefit through a frivolous application is quintessential sham conduct. *See Columbia v.*

9  *Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991) (sham litigation exists where "persons

10  use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive

11  weapon") (emphasis in original).

12       Corroborating Zeleny's allegations that NEA filed its lawsuits as a sham to directly interfere

13  with his protests and "sap his resources," SAC ¶ 63, NEA and its cohorts engaged in other improper

14  conduct designed to increase the costs, burden and distraction.  At NEA's behest, WebEx filed suit

15  in what was plainly the wrong forum, resulting in $4,316.30 in sanctions against it.  *Id.* ¶ 65.  It

16  quickly dropped its suit when Zeleny put up resistance, prevailing on an anti-SLAPP motion.  *Id.* ¶

17  67.  In its individual lawsuit, NEA withheld central evidence, necessitating repeated and costly

18  motion practice, until Zeleny could no longer afford to defend himself.  *Id.* ¶ 73.

19              **b.**    **NEA's Lawsuits, on the Whole, Were Baseless and Improper.**

20       NEA asserts that it filed only "*one* lawsuit" itself, Mot. at p. 10, but neglects the specific

21  allegations in the SAC that the plaintiffs in these suits were closely affiliated[7] with NEA, and filed

22  the lawsuits at NEA's behest.  SAC ¶¶ 63, 68.  It cites no authority for the proposition that it can

23  avoid liability by having others file suit at its behest.

24  ───────────────

[7] NEA gripes that Zeleny alleges in a "conclusory" manner that WebEx was an affiliate of NEA, and that

25  Zeleny did not allege in his prior First Amended Complaint that WebEx was an affiliate.  "Affiliate" is not a
conclusory allegation, it is a term of art meaning a parent, subsidiary, or sister company.  *See* Black's Law

26  Dictionary, affiliate ("A corporation that is related to another corporation by shareholdings or other means of
control; a subsidiary, parent, or sibling corporation").  Zeleny specifically alleges the relationship between

27  NEA and WebEx, including that NEA "provided venture capital support to WebEx from its early stages," is
an investor in WebEx, and a funder of WebEx.  SAC ¶¶ 32, 42, 52.  Zeleny alleged the same in his First

28  Amended Complaint.  *See* Corrected First Am. Compl. ¶¶ 32, 41, 51.

NEA also attempts to avoid the detailed factual allegations in the SAC by focusing on the fact that Zeleny settled *one* of the three lawsuits.  This effort fails for two reasons.

*First*, it ignores the results in the other two lawsuits.  WebEx dropped its NEA-sponsored lawsuit for effectively no consideration.  SAC ¶ 66.  After losing his TRO application without opposition, Sandell apparently dropped his lawsuit as well, without ever serving Zeleny.  SAC ¶ 70.  These outcomes are fully consistent with sham litigation.

*Second*, NEA's reliance on the settlement is misplaced.  NEA suggests that a settlement establishes as a matter of law that the underlying suit was was not "objectively baseless."  None of its cases support this broad assertion.  Instead, courts consider the resolution of a lawsuit as "evidence of the merits of the case."  *ST Microelectronics, Inc. v. Avago Techs. U.S., Inc.*, 2011 WL 13621653, at *2 (N.D. Cal. Apr. 11, 2011).  The parties are not at the evidence stage; they are at the pleading stage.  The Court cannot disregard the detailed allegations in the complaint.  It is sufficient for Zeleny to allege that he settled, not due to the merits, but because he "could not bear the ongoing expenses of defending himself."  SAC ¶ 74.  Allowing NEA—the largest venture capital fund in the world—to bludgeon Zeleny into a settlement using its vast resources, and then to rely on that nominal settlement to avoid liability, would defeat the purpose of the sham exception.

### 5.   Denying Zeleny Access to a Fair Permitting Process Is Not Protected.

NEA's argument about the permitting process is puzzling.  In one breath, NEA argues that Zeleny has not said enough about its involvement in the permitting process.  In the next, in order to shoehorn the claim into *Noerr-Pennington*, it argues that what Zeleny really means is that NEA sought "to sway the City to deny Zeleny's permit."  Mot. at 8.  None of this is what Zeleny alleges.[8]

In reality, Zeleny alleges that *the City* deprived Zeleny of a constitutionally-required administrative process pursuant to the conspiracy.  SAC ¶ 139 ("As part of the ongoing conspiracy, Bertini took action to stymie and deprive Zeleny of a valid process.")  The section rarely mentions

---

[8] To support this theory, NEA seizes on the allegation that Bertini "emailed NEA . . . apparently to obtain information to justify the pre-determined denial of the permit."  (Mot. at p. 8 n.2 (quoting SAC ¶ 147) (emphasis in Mot.)).  The complaint nowhere suggests that NEA responded to this inquiry from Bertini or provided any information.  In fact, the SAC alleges the opposite – i.e., that NEA was never directly involved and did not "submit any materials."  SAC p. 25 n.3).  The allegation that NEA has fixated on simply corroborates the existence of a conspiracy by showing that NEA and the City were consulting one another.

NEA, Mot. at 8, because it focuses on the City's overt acts, not NEA's.  As discussed above, NEA is liable for the City's acts in furtherance of the conspiracy.

Moreover, even if NEA did take specific acts in connection with the City's circumvention of the ordinary permitting process, these acts would not be immune.  Conduct falls within the sham exception if it seeks "to bar [] competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process." *Cal. Motor Transp. Co.*, 404 U.S. at 511 (reversing grant of motion to dismiss).  A party that uses its "power, strategy, and resources" in order to "deny [another] of free and unlimited access" to administrative and judicial processes is not entitled to immunity.  *Id.*  Thus, Courts have recognized that "[a] conspiracy to prevent a [party] from obtaining meaningful access to an adjudicative body falls within the 'sham exception.'"  *S'ern Union Co.*, 165 F. Supp. 2d at 1041 (citing *Hospital Build. Co. v. Trustees of Rex Hospital*, 691 F.2d 678, 687 (4th Cir. 1982), *cert denied* 464 U.S. 890 (1983)).

Zeleny alleges in great detail how, pursuant to the conspiracy between NEA and the City, he was deprived of access to ordinary administrative channels.  This is quintessential sham conduct.

### D.    Dismissal on the Pleadings Is Not Appropriate.

NEA's argument raises significant, factual issues, which must be resolved on a full record.  Each of the issues it raises are fundamentally questions of fact that must be resolved on the merits after discovery.  "Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury," often based on circumstantial evidence.  *Mendocino Env. Ctr.*, 192 F.3d at 1301-02.  Likewise, "[w]hether something is a genuine effort to influence government action, or a mere sham, is a question of fact."  *Clipper Exxpress v. Rocky Mtn. Motor Tariff Bureau*, 690 F.2d 1240, 1253 (9th Cir. 1982).

Through the limited discovery he has taken thus far, Zeleny has developed far more probative evidence than is usually available, including internal communications admitting to coordinated conduct.  As a result, he has alleged in extensive detail (a) actions taken pursuant to this conspiracy, and (b) actions falling directly within recognized exceptions to *Noerr-Pennington*, and actions closely akin to those clearly established as unprotected.  Zeleny should be allowed to develop his theories through a complete record.

1     "Rule 12(b)(6) dismissals 'are especially disfavored in cases where the complaint sets for a

2  novel legal theory that can best be assessed after factual development.'" *McGary v. City of*

3  *Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004) (quoting *Baker v. Cuomo*, 58 F.3d 814, 818-19 (2d

4  Cir. 1995)) (reversing dismissal).  "The court should be especially reluctant to dismiss on the basis

5  of the pleadings when the asserted theory of liability is novel or extreme, since it is important that

6  new legal theories be explored and assayed in light of the actual facts rather than a pleader's

7  suppositions."  *Elec. Constr. & Maint. Co. v. Maeda Pac. Corp.*, 764 F.2d 619, 623 (9th Cir. 1985).

8  **V.      CONCLUSION**

9        NEA identifies no legitimate basis to cut this case off at the pleading stage.  Zeleny has more

10 than satisfied the standard to state a plausible claim.  NEA's fact-intensive arguments should be

11 resolved at an appropriate stage on the merits.  Its motion should be denied.

12 Dated:  October 16, 2019                    Respectfully submitted,

13                                                            s/ Damion Robinson
                                                              David W. Affeld
14                                                            Damion D. D. Robinson
                                                              Affeld Grivakes LLP
15
                                                              Attorneys for plaintiff Michael Zeleny
16

17

18

19

20

21

22

23

24

25

26

27

28

1

**PROOF OF SERVICE**

2

     I hereby certify that on October 16, 2019, I electronically filed the foregoing document

3

using the Court's CM/ECF system.  I am informed and believe that the CM/ECF system will send
a notice of electronic filing to the interested parties.

4

                          s/ Damion Robinson

5

                          Damion Robinson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION BY DEFENDANT NEA TO DISMISS