1  THOMAS S. BROWN, CA Bar No. 178620
2   tsbrown@foley.com
   NICHOLAS P. HONKAMP, CA Bar No. 261299
3   nhonkamp@foley.com
   **FOLEY & LARDNER LLP**
4  555 CALIFORNIA STREET
   SUITE 1700
5  SAN FRANCISCO, CA 94104-1520
   TELEPHONE: 415.434.4484
6  FACSIMILE:  415.434.4507

7  ROGER A. LANE (admitted *pro hac vice*)
8   rlane@foley.com
   COURTNEY WORCESTER (admitted *pro hac vice*)
9   cworcester@foley.com
   **FOLEY & LARDNER LLP**
10 111 HUNTINGTON AVENUE
11 BOSTON, MA 02199
   TELEPHONE: 617.342.4000
12 FACSIMILE:  617.342.4001

13 Attorneys for New Enterprise Associates, Inc.

14

15

16

17              **UNITED STATES DISTRICT COURT**

18            **NORTHERN DISTRICT OF CALIFORNIA**

19

20 Michael Zeleny,                          Case No. 17-cv-07357-RS

21                          Plaintiff,     **DECLARATION OF ROGER A. LANE IN**
                                           **SUPPORT OF NEA'S REPLY ISO NEA'S**
22           vs.                           **MOTION TO DISMISS PLAINTIFF'S**
                                           **SECOND AMENDED COMPLAINT**
23 Edmund G. Brown, Jr., et al.,
                                           Date:      November 14, 2019
24                          Defendants.    Time:      1:30 p.m.
                                           Courtroom: 3, 17th Floor
25

26

27

28                                         DECLARATION OF ROGER A. LANE ISO NEA'S REPLY
                                           Case No. 17-cv-07357-RS

I, Roger A. Lane, declare and state as follows:

1.     I am an attorney licensed to practice in Massachusetts, and a partner with Foley & Lardner LLP, counsel for New Enterprise Associates, Inc. ("NEA").  I make this declaration based on my own personal knowledge, except as to those matters stated on information and belief, which I believe to be true.  If called as a witness, I could competently testify to the matters stated herein.

1.     Attached as **Exhibit 1** is a true and correct copy of WebEx Communications, Inc.'s Notice and Proxy Statement, dated April 14, 2004, available at www.sec.gov.

2.     Attached as **Exhibit 2** is a true and correct copy of WebEx Communications, Inc.'s Notice and Proxy Statement, dated April 15, 2002, available at www.sec.gov.

3.     Attached as **Exhibit 3** is a true and correct copy of the Order on Scott Sandell's Request for Orders to Stop Harassment from the Superior Court of California, County of San Mateo.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 25th day of October, 2019 at Boston, Massachusetts.

October 25, 2019                                    By _____
                                                   Roger A. Lane

DECLARATION OF ROGER A. LANE ISO NEA'S REPLY
Case No. 17-cv-07357-RS

2

1

**PROOF OF SERVICE**

2      I hereby certify that on October 25, 2019, I electronically filed the foregoing document using the
Court's CM/ECF system.  I am informed and believe that the CM/ECF system will send a notice of

3      electronic filing to the interested parties.

4

5                                                            /s/ Roger A. Lane
                                                             Roger A. Lane

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                                        DECLARATION OF ROGER A. LANE ISO NEA'S MOTION TO DISMISS
                                                                      Case No. 17-cv-07357-RS
27                                                       3

28

4846-5196-0491.1

4846-5196-0491.1

# EXHIBIT 1

DEF 14A 1 ddef14a.htm NOTICE & PROXY STATEMENT

## SCHEDULE 14A INFORMATION

Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934
(Amendment No. ___ )

Filed by the Registrant  ☒
Filed by a Party other than the Registrant  ☐

Check the appropriate box:

☐   Preliminary Proxy Statement
☐   Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
☒   Definitive Proxy Statement
☐   Definitive Additional Materials
☐   Soliciting Material Pursuant to Section 240.14a-11(c) or Section 240.14a-12

# WEBEX COMMUNICATIONS, INC.

**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☒   No fee required.
☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

   (1)   Title of each class of securities to which transaction applies:

   (2)   Aggregate number of securities to which transaction applies:

   (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

   (4)   Proposed maximum aggregate value of transaction:

   (5)   Total fee paid:

☐   Fee paid previously with preliminary materials.
☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

   (1)   Amount Previously Paid:

   (2)   Form, Schedule or Registration Statement No.:

(3)   Filing Party:

_____

(4)   Date Filed:

_____



**WEBEX COMMUNICATIONS, INC.**

**307 WEST TASMAN DRIVE**
**SAN JOSE, CALIFORNIA 95134**
**(408) 435-7000**

April 14, 2004

Dear Stockholder:

You are cordially invited to attend the Annual Meeting of Stockholders of WebEx Communications, Inc. that will be held on May 19, 2004, at 10:00 A.M., at the Company's principal executive offices at 307 West Tasman Drive, San Jose, California 95134.

The formal notice of the Annual Meeting and the Proxy Statement have been made a part of this invitation.

After reading the Proxy Statement, please mark, date, sign and return, at an early date, the enclosed proxy in the enclosed prepaid envelope, to ensure that your shares will be represented. **YOUR SHARES CANNOT BE VOTED UNLESS YOU SIGN, DATE AND RETURN THE ENCLOSED PROXY OR ATTEND THE ANNUAL MEETING IN PERSON.** Your vote is important, so please return your proxy promptly.

The Proxy Statement and the related proxy form, as well as a copy of the Company's 2003 Annual Report to Stockholders, are being mailed to stockholders entitled to vote at the meeting on or about April 14, 2004.

The Board of Directors and management look forward to seeing you at the meeting.

Sincerely yours,

/s/ Subrah S. Iyar

Subrah S. Iyar
Chairman and Chief Executive Officer

## WEBEX COMMUNICATIONS, INC.
## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### TO BE HELD MAY 19, 2004

To the Stockholders of WebEx Communications, Inc.:

The Annual Meeting of Stockholders of WebEx Communications, Inc., a Delaware corporation (the "Company"), will be held at the principal executive offices of the Company at 307 West Tasman Drive, San Jose, California 95134 on Wednesday, May 19, 2004, at 10:00 A.M., Pacific Daylight Time, for the following purposes:

1) To elect two Class I directors to serve until the 2007 Annual Meeting of Stockholders and thereafter until their successors are duly elected and qualified;

2) To ratify the appointment of KPMG LLP as the Company's independent auditors for the fiscal year ending December 31, 2004; and

3) To transact such other business as may properly come before the Annual Meeting and any adjournment or postponement of the Annual Meeting.

Stockholders of record as of the close of business on March 31, 2004 are entitled to notice of and to vote at the Annual Meeting and any adjournment or postponement thereof. A complete list of stockholders entitled to vote at the Annual Meeting will be available at the Secretary's office, 307 West Tasman Drive, San Jose, California 95134, for ten days before the meeting.

It is important that your shares are represented at this meeting. **EVEN IF YOU PLAN TO ATTEND THE MEETING, WE HOPE THAT YOU WILL PROMPTLY MARK, SIGN, DATE AND RETURN THE ENCLOSED PROXY. THIS WILL NOT LIMIT YOUR RIGHT TO ATTEND OR VOTE AT THE MEETING.**

By Order of the Board of Directors

David Farrington
*Secretary*

April 14, 2004

# WEBEX COMMUNICATIONS, INC.
### 307 WEST TASMAN DRIVE
### SAN JOSE, CALIFORNIA 95134

# PROXY STATEMENT

## INFORMATION CONCERNING SOLICITATION AND VOTING

**General**

This Proxy Statement is furnished in connection with the solicitation by the Board of Directors of WebEx Communications, Inc., a Delaware corporation (which we will refer to as the "Company" or "WebEx" throughout this Proxy Statement), of proxies in the accompanying form to be used at the Annual Meeting of Stockholders of the Company to be held at the principal executive offices of the Company at 307 West Tasman Drive, San Jose, California 95134, on Wednesday, May 19, 2004, at 10:00 A.M., Pacific Daylight Time, and any postponement or adjournment thereof (the "Annual Meeting"). The Company's telephone number is (408) 435-7000.

This Proxy Statement, the accompanying form of proxy and the Company's Annual Report on Form 10-K, containing financial statements and financial statement schedules required to be filed for the fiscal year ended December 31, 2003, are being mailed to stockholders entitled to vote at the meeting on or about April 14, 2004.

**The Company will provide copies of exhibits to the Annual Report on Form 10-K to any requesting stockholder upon payment of a reasonable fee and upon request of the stockholder made in writing to WebEx Communications, Inc., 307 West Tasman Drive, San Jose, California 95134, Attn: David Farrington, General Counsel. The request must include a representation by the stockholder that, as of March 31, 2004, such stockholder was entitled to vote at the Annual Meeting.**

**Record Date; Voting Securities**

Stockholders of record at the close of business on March 31, 2004 (which we will refer to as the "Record Date" throughout this Proxy Statement) are entitled to vote at the Annual Meeting. As of the close of business on that date, the Company had approximately 43,525,536 shares of common stock, $0.001 par value (the "Common Stock"), issued and outstanding and entitled to vote.

**How You Can Vote**

Stockholders of record may vote their shares at the Annual Meeting either in person or by proxy. To vote by proxy, stockholders should mark, date, sign and mail the enclosed proxy form in the prepaid envelope. Returning a proxy form will not affect a stockholder's right to vote if the stockholder attends the Annual Meeting and wants to vote in person. Stockholders holding shares through a bank or broker should follow the voting instructions on the proxy form received.

**Revocability of Proxies**

The shares represented by the proxies received in response to this solicitation and not properly revoked will be voted at the Annual Meeting in accordance with the instructions therein. A stockholder who has given a proxy may revoke it at any time before it is exercised by (a) filing with the Secretary of the Company (i) a written revocation or (ii) a duly executed proxy bearing a later date or (b) by voting in person at the Annual Meeting.

**Required Vote**

Each holder of Common Stock is entitled to one vote for each share held as of the Record Date. Directors are elected by a plurality vote. The two nominees for Class I directors who receive the most votes cast in their

favor will be elected to serve as a director. In order to be adopted, the proposal to ratify the Company's appointment of the designated independent auditors will require the affirmative vote of a majority of the shares present in person or represented by proxy at the Annual Meeting and entitled to vote on such proposal.

**Quorum; Abstentions; Broker Non-Votes**

Votes cast by proxy or in person at the Annual Meeting ("Votes Cast") will be tabulated by the Inspector of Elections (the "Inspector"), with the assistance of the Company's transfer agent. The Inspector will also determine whether or not a quorum is present. Except in certain specific circumstances, the affirmative vote of a majority of shares present in person or represented by proxy at a duly held meeting at which a quorum is present is required under Delaware law for approval of proposals presented to stockholders. In general, Delaware law provides that a quorum consists of a majority of shares entitled to vote and present or represented by proxy at the meeting.

The Inspector will treat shares that are voted "**Withheld**" or "**Abstain**" as being present and entitled to vote for purposes of determining the presence of a quorum but will not be treated as votes in favor of approving any matter submitted to the stockholders for a vote. When proxies are properly dated, executed, returned and not properly revoked, the shares represented by such proxies will be voted at the Annual Meeting in accordance with the instructions of the stockholder. If no specific instructions are given, the shares will be voted (i) "**FOR**" the election of the two nominees for Class I directors set forth herein; (ii) "**FOR**" the ratification of KPMG LLP, as independent public auditors of the Company for the fiscal year ending December 31, 2004; and (iii) upon such other business as may properly come before the Annual Meeting or any postponement or adjournment thereof in accordance with the discretion of the proxyholder, but will not otherwise be voted in the election of directors. Proxies that are not returned will not be counted in determining the presence of a quorum and will not be counted toward any vote.

If a broker indicates on the enclosed proxy form or its substitute that such broker does not have discretionary authority as to certain shares to vote on a particular matter (broker non-votes), those shares will not be considered as present with respect to that matter. The Company believes that the tabulation procedures to be followed by the Inspector are consistent with the general statutory requirements in Delaware concerning voting of shares and determination of a quorum.

**Solicitation of Proxies**

The expense of printing, mailing proxy materials and soliciting proxies will be borne by the Company. The Company will reimburse brokerage firms and others for their reasonable expenses in forwarding solicitation materials to beneficial owners of the Common Stock. The Company may conduct further solicitation personally, telephonically or by facsimile or e-mail through its officers, directors or employees, none of whom will receive additional compensation for assisting with such solicitation.

**IMPORTANT**

**PLEASE MARK, SIGN AND DATE THE ENCLOSED PROXY AND RETURN IT AT YOUR EARLIEST CONVENIENCE IN THE ENCLOSED POSTAGE-PREPAID RETURN ENVELOPE SO THAT, WHETHER YOU INTEND TO BE PRESENT AT THE ANNUAL MEETING OR NOT, YOUR SHARES CAN BE VOTED. THIS WILL NOT LIMIT YOUR RIGHTS TO ATTEND OR VOTE AT THE ANNUAL MEETING.**

2

## PROPOSAL 1
## ELECTION OF DIRECTORS

**Number of Directors and Terms**

The Company's Certificate of Incorporation and Bylaws authorize up to nine (9) members of the Board of Directors, and the current size is set at seven (7) board members. The Company's Certificate of Incorporation and Bylaws provide that the Board of Directors shall be divided into three classes with the number of directors in each class to be as nearly equal as possible. The first class, Class I, currently consists of three (3) directors. The second class, Class II, currently consists of two (2) directors. The third class, Class III, currently consists of two (2) directors. The term of office for Class I expires at the annual meeting of stockholders to be held on May 19, 2004, the term of office for Class II expires at the annual meeting of stockholders to be held in 2005 and the term of office for Class III expires at the annual meeting of stockholders to be held in 2006. The term of each of these three classes will then expire at the third annual meeting following the date of expiration described in the previous sentence. A director elected to fill a vacancy (including a vacancy created by an increase in the Board of Directors) will serve for the remainder of the term of the class of directors in which the vacancy occurred and until his or her successor is elected and qualified.

There are three (3) directors in the class, Class I, whose term of office expires in 2004. The nominees for director are Michael T. Flynn and Casimir Skrzypczak. The third director in Class I, Somshankar Das, will retire from the Board of Directors effective at the time of the Annual Meeting. Since each of the nominees for election was appointed to the Board of Directors pursuant to the Company's Bylaws as a result of a vacancy in Class I arising since the Company's annual meeting of stockholders held in 2001, neither of the nominees was previously elected by the stockholders. If elected at the Annual Meeting, both of the nominees would serve until the 2007 Annual Meeting and until his successor is elected and has qualified, or until his earlier death, resignation or removal. If any nominee is unable or declines to serve as director at the time of the Annual Meeting, an event not now anticipated, proxies will be voted for any nominee recommended by the Company's Nominating and Governance Committee and approved by the Board of Directors to fill the vacancy.

Set forth below is biographical information for each person nominated and each director whose term of office will continue after the Annual Meeting.

**Nominees for Election for a Three-Year Term Expiring at the 2007 Annual Meeting**

*Michael T. Flynn*, age 55, has served as a director of WebEx since January 2004. Prior to his retirement in March 2004, Mr. Flynn served as an officer of ALLTEL Corporation, an integrated telecommunications provider of wireless, local telephone, long-distance, competitive local exchange, Internet and high-speed data services to business and residential customers. From May 2003 to March 2004, Mr. Flynn served as Assistant to the Chief Executive Officer of ALLTEL Corporation. From April 1997 to May 2003, Mr. Flynn served as Group President of Communications of ALLTEL. From June 1994 to April 1997, Mr. Flynn served as President of the Telephone Group of ALLTEL. Mr. Flynn serves on the board of Airspan Networks Inc., a provider of fixed wireless DSL equipment, and Taqua Systems, a privately-held telecommunications switching products and services company. Mr. Flynn holds a B.S. in Industrial Engineering from Texas A&M University.

*Casimir Skrzypczak*, age 63, has served as a director of WebEx since August 2002 and Lead Director since April 2003. Since July 2001, Mr. Skrzypczak has been a general partner in Global Asset Capital Investment, an investment company. From October 1999 to July 2001, Mr. Skrzypczak was Senior Vice President at Cisco Systems, Inc., a provider of networking products and services. From July 1997 to October 1999, Mr. Skrzypczak served as Corporate Vice President and Group President of Professional Services at Telcordia Technologies, Inc., a provider of operations support systems, network software and consulting services to the telecommunications industry. Prior to joining Telecordia, Mr. Skrzypczak served as Chief Technical Officer of Nynex, a regional telecommunications equipment and services provider and one of the entities which through merger became the global telecommunications equipment and services company Verizon Communications. Mr. Skrzypczak serves

3

on the boards of Sirenza Microdevices Inc., a supplier of integrated circuits for the wireless and wireline telecommunications markets, ECI Telecom Ltd., a provider of telecommunications networking solutions, JDS Uniphase Corporation, a manufacturer of optical products for communications and industrial, commercial and consumer applications, and Somera Communications, Inc., a provider of new and refurbished telecommunications equipment and services. Mr. Skrzypczak holds a B.S. in Mechanical Engineering from Villanova University and an M.S. in Operations Research from Hofstra University.

**Required Vote**

The two (2) nominees for Class I directors receiving the highest number of affirmative votes of the shares of the Company's Common Stock present at the Annual Meeting in person or by proxy and entitled to vote shall be elected as Class I directors. Unless marked to the contrary, proxies received will be voted **"FOR"** management's nominees.

**The Board of Directors recommends a vote "FOR" the election of Michael T. Flynn and Casimir Skrzypczak as the Class I directors of the Company.**

**Directors Continuing in Office until the 2005 Annual Meeting**

*Jan Baan*, age 58, has served as a director of WebEx since January 2000. Since December 1999, Mr. Baan has served as Chairman and Chief Executive Officer of Vanenburg Group B.V., a Dutch venture capital and technology consulting company, and since April 2000 as a director of Vanenburg Capital Management I B.V., a private limited liability company whose main activities include providing venture capital funding for technology companies worldwide. Mr. Baan is also a director of several investment companies affiliated with Vanenburg. Prior to joining Vanenburg Group B.V., Mr. Baan in 1978 founded Baan Company N.V., a publicly held enterprise applications software company.

*Anthony R. Muller*, age 61, has served as a director of WebEx since February 2002. From January 1998 until his retirement in February 2003, Mr. Muller was Executive Vice President and Chief Financial Officer of JDS Uniphase Corporation, a manufacturer of optical products for communications and industrial, commercial and consumer applications. From September 1996 to January 1998, he served as Senior Vice President and Chief Financial Officer of Micro Focus Group Plc., a supplier of software tools. Mr. Muller also serves as a member of the board of directors of Silicon Graphics, Inc., a manufacturer of high performance computing systems, and Time Warner Telecom, a provider of broadband networks and services. Mr. Muller holds a B.A. degree from the University of Pennsylvania and an M.B.A. degree from Stanford University.

**Directors Continuing in Office until the 2006 Annual Meeting**

*Subrah S. Iyar*, age 46, is a co-founder of WebEx and has served as its Chairman and Chief Executive Officer since January 1997. Prior to founding WebEx, Mr. Iyar served as Vice President and General Manager of the Northern California Internet Business division of Quarterdeck Corporation, a software company, from October 1995 until November 1996. From 1983 to 1995, Mr. Iyar held several senior positions in Business Development, Marketing and Sales management at Apple Computer, Inc., a computer hardware company, and Intel Corporation, a semiconductor company. Mr. Iyar holds a B.S. in Electrical Engineering from the Indian Institute of Technology and an M.S. in Computer Engineering from the University of Southwestern Louisiana.

*Min Zhu*, age 55, is a co-founder of WebEx and has served as its President and Chief Technical Officer since February 1997. Prior to founding WebEx, Mr. Zhu in 1991 co-founded Future Labs, a real-time collaboration software company which was subsequently sold to Quarterdeck in 1996. Mr. Zhu holds an M.S. in Engineering Economic Systems from Stanford University.

**Board Meetings and Committees**

The Board of Directors held eight meetings during 2003. All directors attended at least 75% of the aggregate number of meetings of the Board of Directors and of the committees on which such directors serve except

4

(i) Vivek Ranadivé who resigned in May 2003 and who attended none of the Board meetings and 50% of the Compensation Committee meetings occurring during the portion of 2003 that he was a director, (ii) Mark Leslie who resigned in June 2003 and who attended 67% of the Board meetings occurring during the portion of 2003 that he was a director, (iii) Jan Baan who attended 67% of the Nominating and Governance Committee meetings, and (iv) Anthony R. Muller who attended one of the two, or 50%, of the Nominating and Governance Committee meetings held after he became a committee member during the latter part of 2003. In January 2004, the Company appointed Michael T. Flynn to the Board of Directors.

The Board of Directors has appointed a Compensation Committee, an Audit Committee and a Nominating and Governance Committee.

*Compensation Committee*

| | |
|---|---|
| Number of Members: | Four |
| Members: | Mr. Baan<br>Mr. Das (since May 2003, and not standing for re-election to the Board)<br>Mr. Flynn (since January 2004)<br>Mr. Skrzypczak (since July 2003, and serves as chairman) |
| Number of Meetings: | Seven |
| Functions: | Assists in the implementation of, and provides recommendations with respect to, general and specific compensation policies and practices of the Company for directors, officers, other employees and consultants, administers the various incentive compensation and benefit plans and recommends policies relating to such plans. Reviews the performance of and establishes the compensation of the Company's executive officers including the chief executive officer. |

*Audit Committee*

| | |
|---|---|
| Number of Members: | Four |
| Members: | Mr. Das (not standing for re-election to the Board)<br>Mr. Flynn (since January 2004)<br>Mr. Muller (chairman)<br>Mr. Skrzypczak |
| Number of Meetings: | Seven |
| Functions: | Reviews the scope of the annual audit, monitors the independent auditor's relationship with the Company, reviews the Company's internal accounting procedures and financial management practices and processes with the Company's independent auditors and management, selects, compensates, evaluates and, when appropriate, replaces the independent auditors engaged to audit the Company's books and records, and pre-approves non-audit services provided by the independent auditors. |

5

*Nominating and Governance Committee*

| | |
|---|---|
| Number of Members: | Three |
| Members: | Mr. Baan<br>Mr. Muller (since July 2003)<br>Mr. Skrzypczak (chairman) |
| Number of Meetings: | Three |
| Functions: | Identifies individuals qualified to become members of the Company's Board of Directors, recommends the director nominees to be considered for election at the annual meeting of stockholders, develops and recommends to the Company's Board of Directors a set of corporate governance principles and codes of ethics to be applicable to the Company, evaluates the performance of the Company's management, and performs such other duties and responsibilities as set forth in the charter of the committee. The Nominating and Governance Committee will consider nominees for the Company's Board of Directors recommended by the Company's stockholders. |

**Compensation of Directors**

Directors who are employees of the Company do not receive any cash or other compensation for service on the Board of Directors. Effective January 1, 2004, the Board adopted a new non-employee director compensation plan which reduced the initial option grants awarded to outside directors by 50%, reduced the annual grants given to non-employee directors by 60% and eliminated stock option grants for committee service. In addition, the new compensation plan provided for cash compensation consisting of an annual retainer fee and fees for Board and committee meeting attendance, as described below. Finally, the plan provided for forfeiture of both cash and non-cash compensation in the calendar year following any year in which the non-employee director does not attend at least 75% of the Board meetings. Prior to implementation, the new non-employee director compensation plan was reviewed by, and found to be consistent with the recommendations of, an independent executive compensation consulting firm.

Subject to the forfeiture provisions set forth in the last paragraph of this "Compensation of Directors" section, non-employee directors now receive the following cash compensation for service on the Board of Directors: (i) an annual retainer fee of ten thousand dollars ($10,000), (ii) a board meeting attendance fee of two thousand five hundred dollars ($2,500) for each board meeting attended, (iii) a committee meeting attendance fee of one thousand dollars ($1,000) for each committee meeting attended, and (iv) for committee chairmen only, an additional committee meeting attendance fee of five hundred dollars ($500) for each committee meeting attended. In addition, and subject to forfeiture under the conditions set forth in the last paragraph of this "Compensation of Directors" section, the Board's Lead Director receives a lead director annual retainer fee of five thousand dollars ($5,000). The Company's Lead Director is the non-employee director designated by the Board of Directors to serve as the principal liaison between the Company and the other non-employee directors, to preside at executive sessions of the non-employee directors, to coordinate the activities of the non-employee directors, to work with the Board chairman and his designees to finalize information flow to the entire Board, and to set meeting agendas. The Company's Lead Director is Casimir Skrzypczak. The Company's Lead Director is "independent" as defined by the listing standards of the Nasdaq Stock Market and the rules of the Securities and Exchange Commission.

6

One quarter of the annual retainer fees described in the preceding paragraph are paid at the commencement of each calendar quarter. The Company also reimburses each non-employee director for out-of-pocket expenses incurred in connection with attending Board meetings.

In addition, non-employee directors also receive non-cash compensation for service on the Board of Directors, subject to the forfeiture conditions set forth in the last paragraph of this "Compensation of Directors" section. Pursuant to the Company's 2000 Stock Incentive Plan ("2000 Plan"), non-employee directors of the Company are automatically granted options to purchase shares of the Company's Common Stock. Under an amendment to the 2000 Plan effective as of January 1, 2004 and relating solely to Board of Director option grants, each non-employee director who joins the Board on or after January 1, 2004 is granted an option to purchase 30,000 shares of Common Stock on the date on which he or she first becomes a director. Also under the amendment to 2000 Plan, and subject to the forfeiture conditions set forth in the last paragraph of this "Compensation of Directors" section, on the first business day following the conclusion of each regular annual meeting of the Company's stockholders, each non-employee director is automatically granted an additional option to purchase 10,000 shares of Common Stock if, as of the annual meeting date, he or she has served as a director for at least six months and, on such date, he or she will continue to serve on the Company's Board of Directors. In addition, and subject to the forfeiture conditions set forth in the last paragraph of this "Compensation of Directors" section, the Lead Director will automatically receive an option to purchase 5,000 shares of Common Stock on the first business day following the conclusion of each regular annual meeting of the Company's stockholders, if, as of the annual meeting date, he or she has served as a director for at least six months and, on such date, he or she will continue to serve as Lead Director.

Prior to an amendment of the 2000 Plan in August 2002, option grants to non-employee directors vested in four installments in each anniversary of the date of grant. As amended in August 2002, the 2000 Plan provides that options granted to non-employee directors now vest in forty-eight (48) equal monthly installments on each monthly anniversary of the date of such option grant. Options granted under the 2000 Plan have an exercise price equal to the fair market value of the Company's Common Stock on the date of grant, have a maximum term of ten (10) years, and become fully vested in the event of a change in control of the Company.

Certain elements of the cash and non-cash compensation payable to a non-employee director in a given calendar year will be forfeited if the director is absent from more than twenty-five percent (25%) of Company Board meetings held during the prior year. A non-employee director who fails to attend at least seventy-five percent (75%) of the Board meetings in a calendar year will not, in the following year, be paid annual retainer fees. In addition, under the amendment to the 2000 Plan effective as of January 1, 2004, a non-employee director who fails to attend at least seventy-five percent (75%) of the Board meetings in a calendar year will not, in the following year, be given the automatic additional annual option grant in such following year.

**Compensation Committee Interlocks and Insider Participation**

During 2003, the Compensation Committee consisted of three non-employee directors, Mr. Baan, Mr. Das, and Mr. Skrzypczak. In January 2004, Mr. Flynn was appointed to the Board and the Compensation Committee. Mr. Das is not standing for re-election to the Board of Directors. None of the Compensation Committee members serves as a member of the board of directors or compensation committee of any entity that has one or more other executive officers serving as a member of the Company's Board of Directors or Compensation Committee.

**Audit Committee Financial Expert**

The Audit Committee of our Board of Directors contains at least one "audit committee financial expert". The name of the Audit Committee financial expert is Anthony Muller, and the Board of Directors has determined that he is "independent" as that term is defined Item 7(d)(3)(iv) of Section 14A of the Securities and Exchange Act, as amended (the "Exchange Act").

7

Case 3:17-cv-07357-RS    Document 110-1    Filed 10/25/19    Page 16 of 61

## Director Nomination Process

In February 2003, our Board of Directors adopted the Company's Corporate Governance Policies, the text of which is posted, along with the charter of our Governance and Nominating Committee, on our website located at www.webex.com on the "Investors" webpage. The information contained on the website is not incorporated into this Proxy Statement.

Our Governance and Nominating Committee consists of three non-employee directors, Casimir Skrzypczak, Jan Baan and Anthony Muller, each of whom has been determined by the Board to be independent as defined by the listing standards of the Nasdaq Stock Market and the rules of the Securities and Exchange Commission. The Governance and Nominating Committee, among its other duties, identifies and evaluates individuals qualified to become members of the Board of Directors, recommends the director nominees of the Company to be considered for election at the annual meeting of stockholders, and recommends potential directors for the filling of Board vacancies. The Board nominates directors for election at each annual meeting and elects new directors to fill vacancies as they arise.

The Governance and Nominating Committee will also consider proposals by stockholders of qualified nominees to be director. Stockholders wishing to propose qualified nominees may do so by submitting the names of such nominees together with other required information to the Company's Secretary according to the procedures set forth in the Company's Bylaws. A copy of the Bylaws may be obtained from the Company directly through written request to the Company's Secretary sent to our principal executive office at 307 W. Tasman Drive, San Jose, CA 95134, or the Bylaws may be found in the Company's filings with the Securities and Exchange Commission available at www.sec.gov.

Qualifications that a nominee for director should possess are set forth in our Corporate Governance Policies and include relevant executive-level experience, relevant industry experience, a high level of honesty and integrity, the ability to work with the other members of the Board and Company management in fulfilling Board responsibilities, and availability of and willingness to commit the time necessary to serve as an active member of the Board including service on the Board's committees. Other than verification of the nominating stockholder's compliance with the proper nominating procedures, and verification of the nominating person's status as a stockholder, a candidate for director nominated by a stockholder is evaluated like any other candidate, according to the criteria set forth in the preceding sentence and in our Corporate and Governance Policies.

Both of the director candidates recommended for election at this year's Annual Meeting pursuant to this Proxy Statement, Casimir Skrzypczak and Michael T. Flynn, are existing directors seeking re-election to the Board. No other nominees for seats on the Board of Directors in connection with the 2004 Annual Meeting were submitted to the Company in accordance with applicable procedures. Mr. Skrzypczak has been a director since August 2002, when he was elected by the Board to fill a vacancy. Mr. Flynn has been a director since January 2004, when he was elected by the Board to fill a vacancy. Mr. Skrzypczak was initially recommended to the Board by a non-management director as a candidate to fill a vacancy, and Mr. Flynn was initially recommended to the Corporate Governance and Nominating Committee by a non-management director as a candidate to fill a vacancy.

## Stockholder Communications with the Board of Directors

The Company has a process by which its stockholders can communicate with the Board of Directors. If you wish to communicate with the Board of Directors, you may send your communication in writing to: Secretary, WebEx Communications, Inc., 307 W. Tasman Drive, San Jose, CA 95134. You must include your name and address in the written communication and indicate whether you are a stockholder of the Company. The Secretary will review any communication received from a stockholder, and all material communications from stockholders will be forwarded to the appropriate director or directors or committee of the Board based on subject matter.

8

### Director Attendance at the Annual Meeting of Stockholders

In 2003 two of our seven directors then serving on the Board of Directors attended the Company's annual meeting of stockholders. The Company's policy on director attendance at the annual meeting of stockholders is set forth in the Company's Corporate Governance Policies, which can be found on the "Investors" webpage on our website.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

From January 2000 through February 2003, the Company had contracts for engineering services with three companies in China owned by Mr. Min Zhu, our President and Chief Technical Officer, a member of our Board of Directors and a major stockholder, together with his wife. Under these contracts, the Chinese companies performed development projects, assigned ownership of the work performed to the Company, and invoiced the Company for services rendered based on a monthly fee per employee working on the Company's projects. These companies provided a significant amount of quality assurance testing and software development activities for the Company. The Company paid approximately $300,000 for these services in the January – February 2003 time period. In February 2003, the Company acquired substantially all of the assets of these companies, principally computer equipment and office furniture, for $200,000 and hired most of the employees of these companies. The $200,000 purchase price was approved by the Company's Board of Directors and was based upon an independent third-party appraisal of the value of the purchased assets. The appraised value of the assets at the time of the acquisition was $200,492, the individual assets were acquired between six months and three years prior to the acquisition, and the aggregate acquisition cost of the assets was approximately $354,000.

During 2003, the Company entered into a software license agreement with Cordys USA, a subsidiary of Cordys Company BV, whereby the Company licenses from Cordys certain "pre-release" platform software. Pre-release software is software that is still being evaluated by the software developer, with or without the help of outside parties, and which is not yet generally commercially available. The pre-release software licensed from Cordys is being used by the Company in its development of certain internal network operations management and customer order processing applications. The license agreement does not provide for the payment of any cash consideration from the Company to Cordys. Rather, the Company has compensated Cordys in a non-monetary fashion by providing to Cordys evaluations and recommended improvements to the software. Jan Baan, a member of the Company's Board of Directors, is managing director of the sole shareholder of Cordys. The Company is aware that in certain other instances in which Cordys pre-release software is licensed to a licensee, Cordys does charge the user a license fee, though at a discounted rate compared to Cordys' general commercial licensing fee rate. The Company believes it is difficult to quantify the fair market value of the licensing arrangement, since the Company is not making a monetary payment to the licensor, but the Company believes that such value if quantified may exceed $60,000.

9

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth certain information as of February 27, 2004 as to shares of Common Stock beneficially owned by: (i) each person who is known by the Company to own beneficially more than 5% of the Common Stock, (ii) each of the Company's executive officers named under "Executive Compensation and Related Information—Summary Compensation Table," (iii) each of the Company's directors, and (iv) all directors and executive officers of the Company as a group. Ownership information is based upon information furnished by the respective individuals or entities, as the case may be. Applicable percentage ownership is based on 43,334,902 shares of Common Stock outstanding as of February 27, 2004.

Unless otherwise indicated, the address for the following stockholders is c/o WebEx Communications, Inc., 307 West Tasman Drive, San Jose, California 95134.

| Name and Address of Beneficial Owner: | Shares Beneficially Owned(1) | Percentage Beneficially Owned |
|---|---|---|
| **5% Stockholders:** | | |
| Vanenburg Capital Management I B.V.(2) | 4,927,133 | 11.4% |
| RS Investment Management Co. LLC(3) | 2,181,666 | 5.0 |
| **Executive Officers and Directors:** | | |
| Subrah S. Iyar(4) | 4,434,205 | 10.1 |
| Min Zhu(5) | 4,254,262 | 9.7 |
| Michael Everett(6) | 62,500 | * |
| Rob Farris(7) | 8,638 | * |
| Shawn Farshchi(8) | 36,250 | * |
| Walt Weisner(9) | 15,674 | * |
| Jan Baan(2)(10) | 5,021,424 | 11.6 |
| Somshankar Das(11) | 82,749 | * |
| Michael T. Flynn(12) | 1,250 | * |
| Anthony R. Muller(13) | 51,604 | * |
| Casimir Skrzypczak(14) | 41,812 | * |
| All directors and executive officers as a group(12 persons)(15) | 14,167,687 | 31.6% |

\*   Less than 1% of the outstanding shares of the Company's Common Stock.

(1)   To the Company's knowledge, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them, subject to community property laws where applicable and the information contained in the notes to this table. Beneficial ownership is determined in accordance with the rules and regulations of the Securities and Exchange Commission. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, shares of Common Stock subject to options held by that person that are currently exercisable or exercisable within 60 days of February 27, 2004 are deemed outstanding. These shares, however, are not deemed outstanding for the purposes of computing ownership of any other person.

(2)   Principal address is Vanenburgerallee 13, P.O. Box 231, 3880 AE Putten, The Netherlands. Stock ownership based solely on an Amendment to Schedule 13G filed jointly by Vanenburg Capital Management I B.V., Vanenburg Capital Management Holding B.V., Vanenburg Group B.V. and Jan Baan on February 13, 2004, and on various Form 4 filings by Vanenburg Capital Management I B.V. between February 9, 2004 and February 27, 2004. Vanenburg Capital Management I B.V. is the record holder of 4,927,133 shares of Common Stock as of February 27, 2004. By virtue of its relationship as Vanenburg Capital Management I B.V.'s sole stockholder, Vanenburg Capital Management Holding B.V. may be deemed to own beneficially the shares held by Vanenburg Capital Management I B.V. By virtue of its

10

relationship as Vanenburg Capital Management Holdings B.V.'s sole stockholder, Vanenburg Group B.V. may be deemed to own beneficially the shares held by Vanenburg Capital Management I B.V. As the sole director of Vanenburg Capital Management I B.V., Jan Baan may be deemed to own beneficially the shares held by Vanenburg Capital Management I B.V. Each of Vanenburg Capital Management I B.V., Vanenburg Capital Management Holding B.V., Vanenburg Group B.V. and Jan Baan disclaim beneficial ownership of these shares, except to the extent of each person's pecuniary interest therein.

(3) Principal address is 388 Market Street, Suite 200, San Francisco, CA 94111. Stock ownership based solely on a Schedule 13G filed jointly by RS Investment Management Co LLC, RS Investment Management, L.P., and G. Randall Hecht on February 18, 2004. According to the Schedule 13G filing, RS Investment Management Co LLC is the parent company of registered investment advisers whose clients have the right to receive or the power to direct the receipt of dividends from, or the proceeds from the sale of, the stock. According to the Schedule 13G filing, RS Investment Management, L.P. is a registered investment adviser and the managing member of registered investment advisers. RS Investment Management Co. LLC is the general partner of RS Investment Management, L.P. According to the Schedule 13G filing, G. Randall Hecht is a control person of RS Investment Management Co. LLC and RS Investment Management, L.P.

(4) Includes 479,755 shares issuable under immediately exercisable options. Includes 4,000 shares held in trust for Mr. Iyar's family for which Mr. Iyar is the trustee.

(5) Includes 479,755 shares issuable under immediately exercisable options or options exercisable within 60 days of February 27, 2004.

(6) Includes 62,500 shares issuable under immediately exercisable options or options exercisable within 60 days of February 27, 2004.

(7) Mr. Farris, the Company's Vice President of Worldwide Sales during a portion of 2003, was not an executive officer of the Company as of December 31, 2003 and is no longer employed by the Company.

(8) Includes 36,250 shares issuable under immediately exercisable options or options exercisable within 60 days of February 27, 2004.

(9) Includes 15,674 shares issuable under immediately exercisable options or options exercisable within 60 days of February 27, 2004.

(10) Includes 92,291 shares issuable under immediately exercisable options or options exercisable within 60 days of February 27, 2004.

(11) Includes 81,249 shares issuable under immediately exercisable options or options exercisable within 60 days of February 27, 2004.

(12) Includes 1,250 shares issuable under immediately exercisable options or options exercisable within 60 days of February 27, 2004.

(13) Includes 50,104 shares issuable under immediately exercisable options or options exercisable within 60 days of February 27, 2004.

(14) Includes 41,812 shares issuable under immediately exercisable options or options exercisable within 60 days of February 27, 2004.

(15) Includes 1,476,027 shares issuable under immediately exercisable options or options exercisable within 60 days of February 27, 2004.

11

## EXECUTIVE COMPENSATION AND RELATED INFORMATION

The following table summarizes all compensation paid, for the fiscal years ended December 31, 2003, 2002, and 2001, to the Company's Chief Executive Officer, each of the Company's other four (4) most highly compensated executive officers and one (1) former executive officer whose total salary and bonus exceeded $100,000 for services rendered in all capacities to the Company during 2003. These individuals are referred to as the "named executive officers". Other than the salary and bonus described below, the Company did not pay any named executive officer in the Summary Compensation Table any fringe benefits, perquisites or other compensation in excess of 10% of that executive officer's salary and bonus during each of 2003, 2002 and 2001.

### Summary Compensation Table

| Name and Principal Position | Year | Annual Compensation | | Long Term Compensation |
| | | Salary ($) | Bonus ($)(1) | Securities Underlying Options (#) |
| --- | --- | --- | --- | --- |
| Subrah S. Iyar | 2003 | 232,500 | 125,000 | — |
| Chief Executive Officer | 2002 | 184,400 | — | 500 |
| | 2001 | 180,000 | — | 469,880 |
| Min Zhu | 2003 | 232,500 | 125,000 | — |
| President and Chief Technical Officer | 2002 | 180,000 | — | 500 |
| | 2001 | 180,000 | — | 469,880 |
| Shawn Farshchi(2) | 2003 | 181,923 | 44,977 | 120,000 |
| Chief Information Officer and VP, Technical Operations | | | | |
| Michael Everett(3) | 2003 | 161,805 | 49,361 | 250,000 |
| Chief Financial Officer | | | | |
| Walt Weisner(4) | 2003 | 164,167 | 46,230 | 40,000 |
| Vice President, Customer Care | 2002 | 110,475 | 17,000 | 80,000 |
| Rob Farris(5) | 2003 | 242,538 | 85,528 | — |
| Former Vice President, Worldwide Sales | 2002 | 89,407 | 37,620 | 150,000 |

(1) Amounts paid as bonuses for services rendered are reported for the year in which they were earned even if they were paid in the following fiscal year.

(2) Mr. Farshchi joined the Company in January 2003 and became an executive officer in May 2003.

(3) Mr. Everett joined the Company in April 2003 and became an executive officer in May 2003.

(4) Mr. Weisner joined the Company in April 2002 and became an executive officer in October 2003.

(5) Mr. Farris was not an executive officer of the Company as of December 31, 2003 and is no longer employed by the Company.

12

## Stock Options

The following tables set forth information regarding stock options granted to and exercised by the individuals named in the Summary Compensation Table above during 2003, and the number and value of the options held by each individual as of December 31, 2003. All options listed below were granted under the 2000 Stock Incentive Plan. The percent of total options granted is based on a total of 3,444,432 options granted to employees during 2003. All options were granted at the fair market value on the date of grant.

### Option Grants in 2003

| | Individual Grants | | | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term(3) | |
| | Number of Securities Underlying Options Granted(1) | % of Total Options Granted to Employees in Fiscal Year | Exercise Price ($/Sh) | Expiration Date(2) | | |
| Name | | | | | 5%($) | 10%($) |
|---|---|---|---|---|---|---|
| Shawn Farshchi | 100,000 | 2.90 | $11.32 | 2/27/13 | $ 711,909 | $1,804,116 |
| | 20,000 | 0.58 | 10.55 | 4/23/13 | 132,697 | 336,280 |
| Michael Everett | 250,000 | 7.26 | 10.16 | 4/21/13 | 1,597,392 | 4,048,106 |
| Walt Weisner | 40,000 | 1.16 | 17.97 | 12/16/13 | 452,049 | 1,145,582 |

(1)  Options were granted by the Compensation Committee and generally vest monthly over a 4-year period. All of the options granted in 2003 were granted under the Company's 2000 Stock Incentive Plan.

(2)  The options have a term of 10 years, subject to earlier termination in certain events related to termination of employment.

(3)  Amounts represent hypothetical gains that could be achieved for the respective options if exercised at the end of the option term. These gains are based on assumed rates of stock appreciation of five percent (5%) and ten percent (10%) compounded annually from the date the respective options were granted to their expiration date and are not presented to forecast possible future appreciation, if any, in the price of our Common Stock. The gains shown are net of the option exercise price, but do not include deductions for taxes or other expenses associated with the exercise of the options or the sale of the underlying shares of Common Stock. The actual gains, if any, on the stock option exercises will depend on the future performance of our Common Stock, the optionee's continued employment through applicable vesting periods and the date on which the options are exercised.

### Aggregated Option Exercises in Last Fiscal Year and 2003 Year End Option Values

| | Shares Acquired on Exercise(#) | Value Realized($)(1) | Number of Securities Underlying Unexercised Options at December 31, 2003(#) Exercisable/Unexercisable | Value of Unexercised In-the-Money Options at December 31, 2003($)(2) Exercisable/Unexercisable |
|---|---|---|---|---|
| Name | | | | |
| Subrah S. Iyar | — | — | 441,431/178,949 | $ 1,472,429/9,113 |
| Min Zhu | — | — | 441,431/178,949 | 1,472,429/9,113 |
| Shawn Farshchi | — | — | —/120,000 | —/1,073,800 |
| Michael Everett | — | — | —/250,000 | —/2,495,000 |
| Walt Weisner | 575 | $ 3,822 | 29,945/89,480 | 200,063/414,920 |
| Rob Farris(3) | — | — | 53,125/96,875 | 403,750/736,250 |

(1)  Calculated based on the fair market value of the underlying securities at the exercise date minus the exercise price, multiplied by the number of shares underlying the option.

(2)  Calculated based on the fair market value of the underlying securities at December 31, 2003 ($20.14 per share) minus the exercise price, multiplied by the number of shares underlying the option.

(3)  Mr. Farris' employment with the Company terminated in January 2004, and pursuant to the terms of his option agreement Mr. Farris had thirty (30) days following the date of termination in which to exercise any then vested options. To the extent that any vested options as of the termination date were not exercised within such thirty (30) day period, such options were cancelled.

**Employment Agreements and Change in Control Arrangements**

The Company does not have formal written employment agreements with any of the named executive officers, but does have change in control arrangements with certain of the named executive officers.

Pursuant to the terms of Mr. Everett's option agreement, the vesting of 33% of the unvested shares under such agreement will be accelerated upon a change in control of the Company. In addition, in the event of a change in control of the Company all remaining unvested shares will be accelerated in connection with such change in control in the event (i) Mr. Everett is not offered comparable employment with the surviving entity in the San Francisco Bay Area or other agreed-to location, and (ii) Mr. Everett agrees to remain an employee of the surviving entity to provide transition assistance for as long a period as desired by the surviving entity, with such period not to extend beyond the six-month anniversary date of the change in control.

Pursuant to the terms of both of Mr. Farshchi's, and two of Mr. Weisner's three, option agreements, the vesting of 25% of the unvested shares subject to such agreements will be accelerated upon a change in control of the Company occurring during the first year of such person's employment, in the event that such person is not offered comparable employment with the surviving entity. If the change in control occurs after the first year of such person's employment, the vesting of 33% of the unvested shares subject to such agreements will be accelerated in the event that (i) such person is employed by the surviving entity following the change in control, and (ii) if such person desires to voluntarily terminate his employment with the surviving entity during the first six months following the change in control, such person nevertheless remains an employee of the surviving entity to provide transition assistance for as long a period as desired by the surviving entity, with such period not to extend beyond the six-month anniversary date of the change in control. Mr. Weisner's other option agreement provides that, upon a change of control of the Company, 25% of the unvested shares will vest immediately.

14

## REPORT OF THE COMPENSATION COMMITTEE
## OF THE BOARD OF DIRECTORS ON EXECUTIVE COMPENSATION

The Compensation Committee of the Company's Board of Directors sets and administers the policies governing annual compensation of executive officers, considers their performance and determines their cash compensation and stock options. The Compensation Committee will, pursuant to its charter, periodically review its approach to executive compensation and make changes as competitive conditions and other circumstances warrant, and will seek to ensure the Company's compensation philosophy is consistent with the Company's best interests and is properly implemented.

From January 2003 to May 2003, the Compensation Committee consisted of three non-employee directors, Jan Baan, Mark Leslie, and Vivek Ranadivé. Mr. Ranadivé left the Board and the Compensation Committee in May 2003. Mr. Leslie left the Board and the Compensation Committee in June 2003. From July 2003 through December 2003, the Compensation Committee consisted of Jan Baan, Somshankar Das and Casimir Skrzypczak. None of the Board members who served on the Compensation Committee in 2003 had interlocking relationships as defined by the Securities and Exchange Commission. In January 2004, non-employee director Michael T. Flynn joined the Compensation Committee.

**Compensation Philosophy and Review**

In July 2000, the Company completed the initial public offering of its Common Stock and became a reporting company at that time. During the first years of the Company's existence, the compensation of the executive officers reflected a private "start-up" company model with the salary component at lower levels and the stock component at higher levels than would be applicable in a more established company environment. As the Company continues to grow and develop, the Company is shifting its compensation plans to mirror those of other publicly traded companies in its sector and to reflect the size and value of the Company.

The Compensation Committee believes that compensation of the Company's executive officers should (a) encourage creation of stockholder value and achievement of certain corporate objectives, (b) integrate compensation with the Company's annual and long-term corporate objectives and strategy, and focus executive behavior on the fulfillment of those objectives, (c) provide a competitive total compensation package that enables the Company to attract and retain, on a long-term basis, high-caliber personnel and (d) align the interests of executive officers with the long-term interests of the Company's stockholders.

To meet these objectives, executive compensation is comprised of three elements (i) base salary, (ii) variable bonus awards payable in cash and (iii) long-term stock-based incentive awards. The Company's policy is generally to qualify and structure such compensation arrangements so as to qualify for deductibility under Section 162(m) of the Internal Revenue Code. However, the Company reserves the discretion to pay compensation to its executive officers that may not be deductible.

The summary below describes in more detail the factors which the Board considers in establishing each of the three primary components of the compensation package provided to the Company's executive officers.

**Key Elements of Executive Compensation**

The Compensation Committee determined the base salaries and bonuses of the executive officers for fiscal 2003. The Company provides its executive officers with a compensation package consisting of base salary, cash bonus awards and participation in benefit plans generally available to other employees.

15

*Base Salary*.   The Compensation Committee reviews salaries recommended by the Chief Executive Officer for executive officers other than the Chief Executive Officer. The Compensation Committee sets the salary and bonus potential of each executive officer on a case by case basis. Final decisions on base salary adjustments of executive officers other than the Chief Executive Officer are made with the Chief Executive Officer's involvement. In determining the appropriate salary levels for the executive officers, the Compensation Committee considers, among other factors, each executive officer's relative position, scope of responsibility, and historical and expected contributions to the Company.

*Cash Bonus Awards*.   The cash bonus awards vary for each of the executive officers. The bonus award depends on the extent to which business and individual performance objectives are achieved. The Company's objectives consist of operating, strategic and financial goals that are considered to be critical to its fundamental long-term goal of building stockholder value. In July 2003, the Compensation Committee approved an Executive Bonus Plan which set forth criteria for awarding executive bonuses and the manner in which bonuses for the executives would be calculated.

*Stock-based Incentive Awards*.   Grants of stock options to executive officers are based upon each executive officer's relative position, scope of responsibility, historical and expected contributions to the Company, and the executive officer's existing stock ownership and previous option grants. The Compensation Committee strives to align the interests of the Company's executive officers with the long-term interests of stockholders through stock option grants such that grants of stock options should relate the performance of the executive to the market perception of the performance of the Company.

**Chief Executive Officer Compensation**

The Compensation Committee meets without the presence of the Chief Executive Officer to evaluate his performance and uses the same procedures described above in setting his annual compensation package. On July 23, 2001, the Compensation Committee made a determination to increase Mr. Iyar's annual salary to $300,000 from $180,000, the amount set forth in his original employment agreement with the Company, and to provide for an annual target bonus of $200,000. However, Mr. Iyar declined at the time to take any increase in cash compensation until the Company reached certain financial milestones. On December 17, 2002, the Compensation Committee approved an increase in Mr. Iyar's salary from $180,000 to $250,000, with an annual target bonus for 2003 of $100,000, to become effective on April 1, 2003. On July 29, 2003, the Compensation Committee approved an increase in Mr. Iyar's target bonus to $250,000, to be based upon the Company's financial performance. The bonus paid to Mr. Iyar for 2003 was $125,000. In each of the decisions regarding Mr. Iyar's compensation, the Compensation Committee considered Mr. Iyar's many accomplishments in helping the Company to grow, in helping the Company achieve profitability, and in expanding the depth of the Company's senior management team as the Company's business expanded in scope and grew in size. The Compensation Committee also considered Mr. Iyar's expected contributions to the Company in the future.

Submitted by the Compensation Committee of the
Company's Board of Directors

Jan Baan
Somshankar Das
Michael T. Flynn
Casimir Skrzypczak

16

## STOCK PRICE PERFORMANCE GRAPH

The following graph illustrates a comparison of the cumulative total stockholder return (change in stock price plus reinvested dividends) of the Company's Common Stock with the Nasdaq Composite Index and a peer group chosen by the Company (the "Peer Group"), assuming an investment of $100 in each on July 28, 2000 (the date of the Company's initial public offering). No cash dividends have been declared or paid on the Company's Common Stock. The Company's Common Stock has been traded on the Nasdaq National Market from July 28, 2000. The Peer Group is comprised of the following two companies: Centra Software, Inc. and Raindance Communications, Inc. The comparisons in the table are required by the Securities and Exchange Commission and are not intended to forecast or be indicative of possible future performance of the Company's Common Stock.

### COMPARISON OF YEARLY PERCENTAGE CHANGE IN THE CUMULATIVE TOTAL STOCKHOLDERS RETURN ON THE COMPANY'S COMMON STOCK SINCE JULY 28, 2000 WITH THE NASDAQ COMPOSITE INDEX AND PEER GROUP INDEX



### CUMULATIVE TOTAL RETURN AT PERIOD END

|  | 07/28/00 | 09/29/00 | 12/29/00 | 03/30/01 | 06/29/01 | 09/28/01 | 12/31/01 | 03/28/02 | 06/28/02 | 09/30/02 | 12/31/02 | 03/31/03 | 06/30/03 | 09/30/03 | 12/31/03 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WEBX | $ 100 | 264 | 149 | 79 | 191 | 151 | 177 | 118 | 114 | 80 | 107 | 76 | 99 | 135 | 144 |
| Peer Group | $ 100 | 77 | 33 | 47 | 108 | 63 | 81 | 49 | 45 | 25 | 25 | 20 | 33 | 37 | 39 |
| NASDAQ | $ 100 | 100 | 67 | 50 | 059 | 41 | 53 | 50 | 40 | 32 | 36 | 37 | 44 | 40 | 55 |

The information contained above under the captions "Report of the Compensation Committee of the Board of Directors on Executive Compensation" and "Stock Price Performance Graph" shall not be deemed to be soliciting material or to be filed with the Securities and Exchange Commission, nor shall such information be incorporated by reference into any future filings under the Securities Act of 1933, as amended (the "Securities Act"), or the Exchange Act, except that the Company specifically incorporates it by reference into such filing.

17

## REPORT OF THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS(1)

The Audit Committee of the Company's Board of Directors oversees the Company's financial reporting process on behalf of the Board of Directors. In addition, the Audit Committee provides independent, objective oversight of the Company's accounting functions and controls. The Audit Committee operates under a written charter adopted by the Board of Directors and which was amended by the Board of Directors and the Audit Committee most recently in November 2002.

Throughout 2003, the Audit Committee consisted of three non-employee directors, Somshankar Das, Anthony R. Muller and Casimir Skrzypczak, each of whom was determined by the Board to be independent as defined by the listing standards of the Nasdaq Stock Market and the rules of the Securities and Exchange Commission. In January 2004, non-employee director Michael T. Flynn joined the Audit Committee. The Board has determined that Mr. Flynn is independent as defined by the listing standards of the Nasdaq Stock Market and the rules of the Securities and Exchange Commission. In connection with his retirement from the Board, Mr. Das will step down from the Audit Committee.

In performing its functions, the Audit Committee acts only in an oversight capacity and necessarily relies on the work and assurances of the Company's management and of the independent auditors. Management is responsible for the Company's internal controls and the financial reporting process. The independent auditors are responsible for performing an independent audit of the Company's consolidated financial statements in accordance with generally accepted accounting principles and to issue a report thereon.

In this context, the Audit Committee has met and held discussions with management and the independent auditors regarding the Company's audited financial statements as of and for the year ended December 31, 2003. In its discussions, management represented to the Audit Committee that the Company's financial statements were prepared in accordance with generally accepted accounting principles. The Audit Committee met privately with the independent auditors and discussed with the independent auditors matters required to be discussed by Statement on Auditing Standards No. 61.

In addition, the Company's independent auditors provided to the Audit Committee the written disclosure required by Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees." The Committee discussed with the independent auditors that firm's independence and considered whether the non-audit services provided by the independent auditors are compatible with maintaining its independence. Upon consideration, the Audit Committee determined that the provision of the services other than the audit services is compatible with maintaining KPMG LLP's independence.

Based on the Audit Committee's discussion with management and the independent auditors, the Audit Committee's review of the representations of management, including the collection of managerial-level employee disclosure certificates, and the report of the independent auditors to the Audit Committee, the Audit Committee recommended to the Board of Directors that the audited consolidated financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2003, for filing with the Securities and Exchange Commission.

Submitted by the Audit Committee of the
Company's Board of Directors

Somshankar Das
Michael T. Flynn
Anthony R. Muller
Casimir Skrzypczak

(1) The material in this report is not "soliciting material," is not deemed "filed" with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of the Company under the Securities Act or the Exchange Act, whether made before or after the date hereof and irrespective of any general incorporation language contained in such filing.

18

## PROPOSAL 2
### RATIFICATION OF INDEPENDENT AUDITORS

The Audit Committee has appointed the firm of KPMG LLP as the Company's independent auditors for the year ending December 31, 2004. KPMG LLP has audited the Company's financial statements since 1997. Representatives of KPMG LLP are expected to be present at the Company's Annual Meeting. They will have an opportunity to make a statement, if they desire to do so, and will be available to respond to appropriate questions.

Stockholder ratification of the selection of KPMG LLP as our independent auditor is not required by our bylaws or otherwise. However, the board is submitting the selection of KPMG LLP to stockholders for ratification to permit stockholders to participate in this important decision.

### Audit and Non-Audit Fees

*Audit Fees.*   The aggregate fees billed by KPMG LLP for professional services rendered for the audit of the Company's annual financial statements for 2003 and 2002 and the reviews of the financial statements included in the Company's Forms 10-Q and Form 10-K, during and for the years ended December 31, 2003 and 2002 were $550,000 and $475,000, respectively. All hours expended on the engagement to audit the Company's financial statements were attributed to work performed by KPMG LLP's full-time, regular employees.

*Audit Related Fees.*   The aggregate fees billed for 2002 and 2003 for assurance and related services by KPMG LLP that were reasonably related to the performance of the audit or review of the Company's financial statements and are not reported above as "Audit Fees" during 2003 and 2002 were $0 and $22,000, respectively. These fees related to an audit of the Company's employee benefit plan.

*Tax Fees.*   The aggregate fees billed for services rendered by KPMG LLP for tax consultation and tax compliance services during 2003 and 2002 were $172,000 and $151,000, respectively.

*All Other Fees.*   The aggregate fees billed for services rendered by KPMG LLP other than for the services described above during 2003 and 2002 were $73,000 and $40,000, respectively. These fees related to attestation services relating to the quality of the internal controls governing the Company's computer network security.

All of the services set forth in the first four paragraphs of this section entitled "Audit and Non-Audit Fees" were approved by the Audit Committee. The Company's policy on auditor independence does not permit the employment of its independent auditor for material non-audit related services, except for the following: services which are incidental and directly related to audit activities, tax related activities and tax planning on behalf of the Company.

### Pre-Approval Policies and Procedures

It is the Company's policy that all non-audit services to be performed by the Company's independent auditor be approved in advance by the Audit Committee. The Company's policy on auditor independence requires that, prior to engaging the independent auditor in any non-audit related activity other than that specifically authorized by the Company's policy on auditor independence, Company management report to the Audit Committee the nature of the proposed activity, including the reasons why (i) it is necessary or beneficial to the Company to use the independent auditor to engage in such activity, and (ii) the steps being taken to ensure that the engagement of the independent auditor in such activity will not, among other things, violate applicable laws or regulations of the United States and applicable states, or the rules and regulations of the exchanges on which the Company's securities are listed. In order for the Company to engage the independent auditor in the proposed activity, the Company must obtain Audit Committee approval.

19

**Required Vote**

Ratification will require the affirmative vote of a majority of the shares present and voting at the meeting in person or by proxy. In the event ratification is not provided, the Audit Committee will review its future selection of the Company's independent auditors but will not be required to select different independent auditors for the Company.

**The Board of Directors recommends a vote "FOR" ratification of KPMG LLP
as the Company's independent auditors.**

### DEADLINE FOR RECEIPT OF STOCKHOLDER PROPOSALS FOR THE 2005 ANNUAL MEETING

Proposals of stockholders of the Company that are intended to be presented by such stockholders at the Company's 2005 Annual Meeting must be received by the Secretary of the Company no later than December 15, 2004 in order that they may be included in the Company's proxy statement and form of proxy relating to that meeting.

A stockholder proposal not included in the Company's proxy statement for the 2005 Annual Meeting will be ineligible for presentation at the meeting unless the stockholder gives timely notice of the proposal in writing to the Secretary of the Company at the principal executive offices of the Company and otherwise complies with the provisions of the Company's Bylaws. To be timely, the Company's Bylaws provide that the Company must have received the stockholder's notice not less than 50 days nor more than 75 days prior to the scheduled date of such meeting. However, if notice or prior public disclosure of the date of the annual meeting is given or made to stockholders less than 65 days prior to the meeting date, the Company must receive the stockholder's notice by the earlier of (i) the close of business on the 15th day after the earlier of the day the Company mailed notice of the annual meeting date or provided such public disclosure of the meeting date and (ii) two days prior to the scheduled date of the annual meeting.

### SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Under the securities laws of the United States, the Company's directors, executive officers and any persons holding more than 10% of the Company's Common Stock are required to report their initial ownership of the Company's Common Stock and any subsequent changes in that ownership to the Securities and Exchange Commission. Specific due dates for these reports have been established and the Company is required to identify in this Proxy Statement those persons who failed to timely file these reports. To the Company's knowledge, based solely on a review of Forms 3, 4 and 5 and any amendments thereto furnished to the Company pursuant to Rule 16a-3(e) of Exchange Act, the Company believes that all of the Section 16 filing requirements were satisfied for 2003.

### OTHER MATTERS

The Company knows of no other business that will be presented at the Annual Meeting. If any other business is properly brought before the Annual Meeting, it is intended that proxies in the enclosed form will be voted in accordance with the judgment of the persons voting the proxies. Whether you intend to be present at the Annual Meeting or not, we urge you to return your signed proxy promptly.

By order of the Board of Directors

/s/ Subrah S. Iyar

Subrah S. Iyar
Chairman and Chief Executive Officer

April 14, 2004

20

## PROXY

## WEBEX COMMUNICATIONS, INC.

### THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

The undersigned hereby authorizes SUBRAH IYAR or DAVID FARRINGTON, as Proxies with full power in each to act without the other and with the power of substitution in each, to represent and to vote all the shares of stock the undersigned is entitled to vote at the Annual Meeting of Stockholders of WebEx Communications, Inc. (the "Company") to be held at the Company's offices at 307 West Tasman Drive, San Jose, California 95134 on May 19, 2004 at 10:00 a.m., Pacific Daylight Time, or at any postponement or adjournment thereof, and instructs said Proxies to vote as follows:

Shares represented by this proxy will be voted as directed by the stockholder. **IF NO SUCH DIRECTIONS ARE INDICATED, THE PROXIES WILL HAVE THE AUTHORITY TO VOTE FOR THE ELECTION OF DIRECTORS, FOR PROPOSAL 2, AND IN ACCORDANCE WITH THE DISCRETION OF THE PROXIES ON ANY OTHER MATTERS AS MAY PROPERLY COME BEFORE THE ANNUAL MEETING.**

☑   Please mark votes as in this example.

THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE ELECTION OF DIRECTORS AND FOR PROPOSAL 2.

1.   Proposal to elect Michael T. Flynn and Casimir Skrzypczak as the Class I Directors of the Company to serve until the 2007 Annual Meeting of Stockholders or until their successors are duly elected and qualified.

FOR all nominees ☐         ☐ Withheld from all nominees

Instruction:   To withhold authority to vote for any individual nominee, write that nominee's name in the space provided below:

☐ _____

For all nominees except as noted above.

2.   Proposal to confirm the appointment of KPMG LLP as the Company's Independent Auditors.

FOR ☐         AGAINST ☐         ABSTAIN ☐

*(CONTINUED ON OTHER SIDE)*

*(CONTINUED FROM OTHER SIDE)*

3.   In their discretion, the Proxies are authorized to vote upon such other business as may properly come before the meeting or any adjournments thereof.

**This proxy when properly executed will be voted in the manner directed herein by the undersigned stockholder. If no direction is given, this proxy will be voted "FOR" the election of directors and "FOR" Proposal 2.**

☐  Mark here for address change and note below.

Date:_____

_____
Signature

Date:_____

_____
Signature

Please sign where indicated below. When shares are held by joint tenants, both should sign. When signing as attorney, executor, administrator, trustee or guardian, please give full title as such. If a corporation, please sign in full corporate name by an authorized officer. If a partnership, please sign in full partnership name by an authorized person.

**PLEASE MARK, SIGN, DATE AND RETURN THE PROXY PROMPTLY USING
THE ENCLOSED ENVELOPE.**

# EXHIBIT 2

DEF 14A 1 ddef14a.htm DEFINITIVE NOTICE & PROXY STATEMENT

**SCHEDULE 14A INFORMATION**

**Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934**
**(Amendment No.      )**

Filed by the Registrant      ☒

Filed by a Party other than the Registrant      ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))

☒   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material Pursuant to Section 240.14a-11(c) or Section 240.14a-12

**WEBEX COMMUNICATIONS, INC.**
**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☒   No fee required.

☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

   1)   Title of each class of securities to which transaction applies:

   2)   Aggregate number of securities to which transaction applies:

   3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

   4)   Proposed maximum aggregate value of transaction:

   5)   Total fee paid:

☐   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

   1)   Amount Previously Paid:

   2)   Form, Schedule or Registration Statement No.:

   3)   Filing Party:

   4)   Date Filed:



# WEBEX COMMUNICATIONS, INC.

**307 WEST TASMAN DRIVE**
**SAN JOSE, CALIFORNIA 95134**
**(408) 435-7000**

April 15, 2002

Dear Stockholder:

You are cordially invited to attend the Annual Meeting of Stockholders of WebEx Communications, Inc. that will be held on May 15, 2002, at 10:00 A.M., at the Company's principal executive offices at 307 West Tasman Drive, San Jose, California.

The formal notice of the Annual Meeting and the Proxy Statement have been made a part of this invitation.

After reading the Proxy Statement, please mark, date, sign and return, at an early date, the enclosed proxy in the enclosed prepaid envelope, to ensure that your shares will be represented. **YOUR SHARES CANNOT BE VOTED UNLESS YOU SIGN, DATE AND RETURN THE ENCLOSED PROXY OR ATTEND THE ANNUAL MEETING IN PERSON**. Your vote is important, so please return your proxy promptly.

The Proxy Statement and the related proxy form, as well as a copy of the Company's 2001 Annual Report to Stockholders, are being mailed to stockholders entitled to vote at the meeting on or about April 15, 2002.

The Board of Directors and management look forward to seeing you at the meeting.

Sincerely yours,

Subrah S. Iyar
Chief Executive Officer

Prepared by R.R. Donnelley Financial -- Definitive Notice & Proxy Statement                         Page 3 of 23

# WEBEX COMMUNICATIONS, INC.
## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### TO BE HELD MAY 15, 2002

To the Stockholders of WebEx Communications, Inc.:

The Annual Meeting of Stockholders of WebEx Communications, Inc., a Delaware corporation (the "Company"), will be held at the principal executive offices of the Company at 307 West Tasman Drive, San Jose, California, on Wednesday, May 15, 2002, at 10:00 A.M., Pacific Daylight Time, for the following purposes:

1) To elect three Class II Directors to serve until the 2005 Annual Meeting of Stockholders and thereafter until their successors are elected and qualified;

2) To ratify the appointment of KPMG LLP as the Company's independent auditors for the fiscal year ending December 31, 2002; and

3) To transact such other business as may properly come before the Annual Meeting and any adjournment of the Annual Meeting.

Stockholders of record as of the close of business on March 20, 2001 are entitled to notice of and to vote at the Annual Meeting and any adjournment thereof. A complete list of stockholders entitled to vote at the Annual Meeting will be available at the Secretary's office, 307 West Tasman Drive, San Jose, California, for ten days before the meeting.

It is important that your shares are represented at this meeting. **EVEN IF YOU PLAN TO ATTEND THE MEETING, WE HOPE THAT YOU WILL PROMPTLY MARK, SIGN, DATE AND RETURN THE ENCLOSED PROXY. THIS WILL NOT LIMIT YOUR RIGHT TO ATTEND OR VOTE AT THE MEETING.**

By Order of the Board of Directors

David Farrington
*Secretary*

April 15, 2002

# WEBEX COMMUNICATIONS, INC.

### 307 WEST TASMAN DRIVE
### SAN JOSE, CALIFORNIA 95134

---

## PROXY STATEMENT

---

### INFORMATION CONCERNING SOLICITATION AND VOTING

**General**

This Proxy Statement is furnished in connection with the solicitation by the Board of Directors of WebEx Communications, Inc., a Delaware corporation (which we will refer to as the "Company" or "WebEx" throughout this Proxy Statement), of proxies in the accompanying form to be used at the Annual Meeting of Stockholders of the Company to be held at the principal executive offices of the Company at 307 West Tasman Drive, San Jose, California, on Wednesday, May 15, 2002, at 10:00 A.M., Pacific Daylight Time, and any postponement or adjournment thereof (the "Annual Meeting"). The Company's telephone number is (408) 435-7000.

This Proxy Statement, the accompanying form of proxy and the Company's Annual Report on Form 10-K, containing financial statements and financial statement schedules required to be filed for the fiscal year ended December 31, 2001, are being mailed to stockholders entitled to vote at the meeting on or about April 15, 2002.

**The Company will provide copies of exhibits to the Annual Report on Form 10-K to any requesting stockholder upon payment of a reasonable fee and upon request of the stockholder made in writing to WebEx Communications, Inc., 307 West Tasman, San Jose, California, 95134, Attn: David Farrington, General Counsel. The request must include a representation by the stockholder that, as of March 20, 2002, the stockholder was entitled to vote at the Annual Meeting.**

**Record Date; Voting Securities**

Stockholders of record at the close of business on March 20, 2002 (which we will refer to as the "Record Date" throughout this Proxy Statement), are entitled to vote at the Annual Meeting. As of the close of business on that date, the Company had approximately 40,245,324 shares of common stock, $0.001 par value (the "Common Stock"), issued and outstanding and entitled to vote.

**How You Can Vote**

Stockholders of record may vote their shares at the Annual Meeting either in person or by proxy. To vote by proxy, stockholders should mark, date, sign and mail the enclosed proxy form in the prepaid envelope. Returning a proxy form will not affect a stockholder's right to vote if the stockholder attends the Annual Meeting and wants to vote in person. Stockholders holding shares through a bank or broker should follow the voting instructions on the proxy form received.

**Revocability of Proxies**

The shares represented by the proxies received in response to this solicitation and not properly revoked will be voted at the Annual Meeting in accordance with the instructions therein. A stockholder who has given a proxy may revoke it at any time before it is exercised by filing with the Secretary of the Company a written revocation or a duly executed proxy bearing a later date or by voting in person at the Annual Meeting.

**Required Vote**

Each holder of Common Stock is entitled to one vote for each share held as of the Record Date. Directors are elected by a plurality vote. The three nominees for Class II Director who receive the most votes cast in their favor will be elected to serve as a director. In order to be adopted, the proposal to ratify the Company's appointment of the designated

independent auditors will require the affirmative vote of a majority of the shares present in person or represented by proxy at the Annual Meeting and entitled to vote on such proposal.

1

**Quorum; Abstentions; Broker Non-Votes**

Votes cast by proxy or in person at the Annual Meeting ("Votes Cast") will be tabulated by the Inspector of Elections (the "Inspector"), with the assistance of the Company's transfer agent. The Inspector will also determine whether or not a quorum is present. Except in certain specific circumstances, the affirmative vote of a majority of shares present in person or represented by proxy at a duly held meeting at which a quorum is present is required under Delaware law for approval of proposals presented to stockholders. In general, Delaware law provides that a quorum consists of a majority of shares entitled to vote and present or represented by proxy at the meeting.

The Inspector will treat shares that are voted **"Withheld"** or **"Abstain"** as being present and entitled to vote for purposes of determining the presence of a quorum but will not be treated as votes in favor of approving any matter submitted to the stockholders for a vote. When proxies are properly dated, executed and returned, the shares represented by such proxies will be voted at the Annual Meeting in accordance with the instructions of the stockholder. If no specific instructions are given, the shares will be voted (i) **"FOR"** the election of the three nominees for Class II directors set forth herein; (ii) **"FOR"** the ratification of KPMG LLP, as independent public auditors of the Company for the fiscal year ending December 31, 2002; and (iii) upon such other business as may properly come before the Annual Meeting or any adjournment thereof in accordance with the discretion of the proxyholder but will not be voted in the election of directors. Proxies that are not returned will not be counted in determining the presence of a quorum and will not be counted toward any vote.

If a broker indicates on the enclosed proxy form or its substitute that such broker does not have discretionary authority as to certain shares to vote on a particular matter (broker non-votes), those shares will not be considered as present with respect to that matter. The Company believes that the tabulation procedures to be followed by the Inspector are consistent with the general statutory requirements in Delaware concerning voting of shares and determination of a quorum.

In a 1988 Delaware case, *Berlin v. Emerald Partners*, the Delaware Supreme Court held that while broker non-votes may be counted for purposes of determining the presence or absence of a quorum for the transaction of business, broker non-votes should not be counted for purposes of determining the number of votes cast with respect to the particular proposal on which the broker has expressly not voted. Broker non-votes with respect to proposals set forth in this Proxy Statement will therefore not be considered "Votes Cast" and, accordingly, will not affect the determination as to whether the requisite majority of Votes Cast has been obtained with respect to a particular matter.

**Solicitation of Proxies**

The expense of printing, mailing proxy materials and solicitation of proxies will be borne by the Company. The Company will reimburse brokerage firms and others for their reasonable expenses in forwarding solicitation materials to beneficial owners of the Common Stock. The Company may conduct further solicitation personally, telephonically or by facsimile through its officers, directors and employees, none of whom will receive additional compensation for assisting with the solicitation.

**IMPORTANT**

**PLEASE MARK, SIGN AND DATE THE ENCLOSED PROXY AND RETURN IT AT YOUR EARLIEST CONVENIENCE IN THE ENCLOSED POSTAGE-PREPAID RETURN ENVELOPE SO THAT, WHETHER YOU INTEND TO BE PRESENT AT THE ANNUAL MEETING OR NOT, YOUR SHARES CAN BE VOTED. THIS WILL NOT LIMIT YOUR RIGHTS TO ATTEND OR VOTE AT THE ANNUAL MEETING.**

2

## PROPOSAL 1

### ELECTION OF DIRECTORS

**Number of Directors and Terms**

The Company's Certificate of Incorporation and Bylaws authorize up to nine (9) members of the Board of Directors and the current size is set at eight (8) board members. The Company's Certificate of Incorporation and Bylaws provide that the Board of Directors shall be divided into three classes. The first class currently consists of two (2) directors, the second class currently consists of three (3) directors and the third class currently consists of three (3) directors. The term of office for the first class expires at the annual meeting to be held in 2004, the term of office for the second class expires at the annual meeting of stockholders to be held May 15, 2002 and the term of office for the third class expires at the annual meeting of stockholders to be held in 2003. The term of each of these three classes will then expire at the third annual meeting following the date of expiration described in the previous sentence. A director elected to fill a vacancy (including a vacancy created by an increase in the Board of Directors) will serve for the remainder of the term of the class of directors in which the vacancy occurred and until his or her successor is elected and qualified.

There are three (3) directors in the class whose term of office expires in 2002. The nominees for director are Jan Baan, Anthony R. Muller and Mark Leslie. One of the nominees for election is currently a member of the Board of Directors who was previously elected by the stockholders. The other nominees were appointed by the Board of Directors in February 2002. If elected at the Annual Meeting, all three of the nominees would serve until the 2005 Annual Meeting and until his successor is elected and has qualified, or until his earlier death, resignation or removal. If any nominee is unable or declines to serve as director at the time of the Annual Meeting, an event not now anticipated, proxies will be voted for any nominee designated by the Board of Directors to fill the vacancy.

Set forth below is biographical information for each person nominated and each director whose term of office will continue after the Annual Meeting.

**Nominees for Election for A Three-Year Term Expiring at the 2005 Annual Meeting**

**Jan Baan**, age 56, has served as a director of WebEx since January 2000. Since December 1999, Mr. Baan has served as the Chairman and Chief Executive Officer of the Vanenburg Capital Management I, B.V., a private limited liability company, whose main activities include providing venture capital funding for technology companies worldwide. Prior to joining the Vanenburg Capital Management I, B.V., Mr. Baan founded Baan Company N.V., a publicly held enterprise applications software company, in 1978.

**Anthony R. Muller**, age 59, has served as a director of WebEx since February 2002. Since January 1998, Mr. Muller has been the Executive Vice President and Chief Financial Officer of JDS Uniphase Corporation, a manufacturer of component and modules for fiber optic communications. From September 1996 to January 1998, he served as Senior Vice President and Chief Financial Officer for Micro Focus Group Plc., a supplier of software tools. Mr. Muller has held senior financial and operations positions with manufacturers of telecommunications systems, lasers and optics, and semiconductor equipment. Mr. Muller holds a B.A. degree from the University of Pennsylvania and an M.B.A. degree from Stanford University.

**Mark Leslie**, age 57, has served as a director of WebEx since February 2002. Mr. Leslie served as the Chief Executive Officer of Veritas Software, Inc., a software company, from 1990 to 2000 and as Chairman of the Board from 1997 until January 2002. Mr. Leslie currently serves on the boards of Veritas, Brocade Communications, a supplier of storage area network software, Keynote Systems, a supplier of Internet performance services, Avaya Corporation, a supplier of enterprise communications solutions and services. Mr. Leslie holds a B.A. in physics and mathematics from New York University and completed Harvard Business School's program for management development.

3

**Required Vote**

The three (3) nominees receiving the highest number of affirmative votes of the shares of the Company's Common Stock present at the Annual Meeting in person or by proxy and entitled to vote shall be elected as Class II Directors. Unless marked to the contrary, proxies received will be voted **"FOR"** management's nominees.

**The Board of Directors recommends a vote "FOR" the election of Jan Baan, Anthony R. Muller and Mark Leslie as the Class II Directors of the Company.**

**Directors Continuing in Office until the 2003 Annual Meeting**

*Subrah S. Iyar*, age 44, is a co-founder of WebEx and has served as its Chairman and Chief Executive Officer since January 1997. Prior to founding WebEx, Mr. Iyar served as the Vice President and General Manager of the Northern California Internet Business division of Quarterdeck Corporation, a software company, from October 1995 until November 1996. From February 1983 to 1995, Mr. Iyar held several senior positions in Business Development, Marketing and Sales management at Apple Computer, Inc., a computer hardware company, and Intel Corporation, a semiconductor company. Mr. Iyar holds a B.S. in Electrical Engineering from the Indian Institute of Technology and an M.S. in Computer Engineering from the University of Southwestern Louisiana.

*Min Zhu*, age 52, is a co-founder of WebEx and has served as its President and Chief Technical Officer since February 1997. Prior to founding WebEx, Mr. Zhu co-founded Future Labs, a real-time collaboration software company, in 1991, which was subsequently sold to Quarterdeck in 1996. Mr. Zhu holds an M.S. in Engineering Economics Systems from Stanford University.

*Vivek Ranadivé*, age 44, has served as a director of WebEx since June 2000. Mr. Ranadivé has been the President, Chief Executive Office and Chairman of the Board of TIBCO Software, Inc., a software company, since its inception in January 1997. From 1985 to 1997, Mr. Ranadivé served as the Chairman and CEO of Teknekron Software Systems, Inc., a software company. Mr. Ranadivé holds a B.S. in Electrical Engineering and Computer Science and an M.S. in Engineering from the Massachusetts Institute of Technology and an M.B.A. from Harvard University.

**Directors Continuing in Office until the 2004 Annual Meeting**

*Somshankar Das*, age 51, has served as a director of WebEx since December 1999. Mr. Das has served as Chief Executive Officer of e4e, Inc., an investment company, since May 2000. From June 1997 until May 2000, Mr. Das served as a partner with Walden International Investment Group, an investment firm. Prior to joining Walden International Investment Group, Mr. Das served as Director for Worldwide Business Development at VLSI Technology, Inc., a semiconductor company, from July 1985 to May 1997. Mr. Das holds an M.S. in Physics and Mathematics and an M.B.A. from Stanford University.

*David Ure*, age 54, has served as a director of WebEx since January 2001. Since 1968, Mr. Ure has held several positions at Reuters Group PLC, a news company, and since July 2000, has served as Strategic Advisor to the Board of Directors of Reuters. Mr. Ure also serves on the Board of Directors of TIBCO Software, Inc. Mr. Ure was educated at Glasgow Academy, and Merton College Oxford.

**Board Meetings and Committees**

The Board of Directors held nine meetings during 2001. All directors attended at least 75% of the aggregate number of meetings of the Board of Directors and of the committees on which such directors serve except (i) Vivek Ranadivé who attended 66% of the board meetings (ii) David Ure who attended 55% of the board meetings and 50% of the audit committee meetings and (iii) Scott Sandell who attended 66% of the board

Case 3:17-cv-07357-RS   Document 110-1   Filed 10/25/19   Page 41 of 61

meetings and 50% of the audit committee meetings. In February 2002, Mr. Sandell resigned from the Company's Board of Directors, and the Company appointed Mr. Anthony R. Muller and Mr. Mark Leslie to the Company's Board of Directors.

The Board of Directors has appointed a Compensation Committee, an Audit Committee and a Non-Executive Compensation Committee. It does not have a nominating committee or a committee performing the functions of a nominating committee.

*Compensation Committee*

| | |
|---|---|
| Number of Members: | Two (until February 2002), Three (since February 2002) |
| Members: | Mr. Das (until February 2002)<br>Mr. Sandell (until February 2002)<br>Mr. Baan (since February 2002)<br>Mr. Leslie (since February 2002)<br>Mr. Ranadivé (since February 2002) |
| Number of Meetings: | Three |
| Functions: | Assists in the implementation of, and provides recommendations with respect to, general and specific compensation policies and practices of the Company for directors, officers and other employees, administers the various incentive compensation and benefit plans and recommends policies relating to such plans. |

*Audit Committee*

| | |
|---|---|
| Number of Members: | Three |
| Members: | Mr. Das<br>Mr. Ure<br>Mr. Sandell (until February 2002)<br>Mr. Muller (since February 2002) |
| Number of Meetings: | Three |
| Functions: | Reviews the scope of the annual audit, monitors the independent auditor's relationship with the Company, review the Company's internal accounting procedures and financial management practices with the Company's independent auditors and selects independent auditors to audit the Company's books and records, subject to approval of the Board of Directors and ratification by the stockholders. |

*Non-Executive Compensation Committee*

| | |
|---|---|
| Number of Members: | One |
| Member: | Mr. Iyar |
| Functions: | Determines salaries and incentive compensation for the Company's non-executive employees and consultants. |

5

## Compensation of Directors

Directors who are employees of the Company do not receive any fees for service on the Board of Directors. We reimburse each member of the Board of Directors who is not an employee of the Company for out-of-pocket expenses incurred in connection with attending board meetings. Pursuant to the Company's 2000 Stock Incentive Plan (the "2000 Incentive Plan"), non-employee directors of the Company are automatically granted options to purchase shares of the Company's Common Stock. Under the 2000 Incentive Plan, each non-employee director will be granted an option to purchase 60,000 shares of Common Stock on the date on which he or she first becomes a non-employee director (the "First Option"). Thereafter, on the first business day following the conclusion of each regular annual meeting of the Company's stockholders, each non-employee director is automatically granted an additional option to purchase 25,000 shares of Common Stock (a "Subsequent Option") if, on such date, he or she continues to serve on the Company's Board of Directors. The First Option and each Subsequent Option are exercisable in installments of twenty-five percent (25%) of the total number of shares subject to the First Option or the Subsequent Option on each anniversary of the date of such option grant. Options granted under the 2000 Incentive Plan have an exercise price equal to the fair market value of the Company's Common Stock on the date of grant, a term of ten (10) years and, if held for more than six months, become fully exercisable in the event of a change in control of the Company. In January 2001, the Company granted nonstatutory stock options to purchase 50,000 shares of Common Stock to David Ure at an exercise price of $24.00 per share. In April 2001, the Company granted nonstatutory stock options to David Ure to purchase 10,000 shares of Common Stock at an exercise price of $10.77 per share.

## Compensation Committee Interlocks and Insider Participation

The Compensation Committee consists of three non-employee directors, Mr. Baan, Mr. Leslie and Mr. Ranadivé. None of the Compensation Committee members serve as a member of the board of directors or compensation committee of any entity that has one or more other executive officers serving as a member of the Company's Board of Directors or Compensation Committee.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

The Company has contracts for engineering services with two companies in China owned by the spouse of Mr. Min Zhu, our President and Chief Technical Officer, a member of our Board of Directors and a major stockholder. The Company has contracts with these companies under which they perform development projects, assign ownership of the work performed to the Company, and invoice the Company for services rendered based on a monthly fee per employee working on the Company's projects. These companies provide a significant amount of quality assurance testing and software development activities for the Company. The Company paid approximately $2,220,000 for these services in 2001.

On May 18, 2001, the Company entered into stock purchase agreements with Vanenburg Capital Management I, B.V., a major stockholder, and certain other investors. Jan Baan, a member of the Company's Board of Directors, is the Chief Executive Officer and Chairman of the Board of Directors of Vanenburg Capital Management I, B.V. Pursuant to these stock purchase agreements, Vanenburg purchased 465,000 shares of the Company's Common Stock at a price per share equal to 93.886% of the average daily closing prices of the Common Stock on the Nasdaq Stock Market over the ten day trading period ending on the trading day immediately preceding the date of these agreements or $10.75 per share.

In April 2000, the Company loaned $3.6 million to Subrah Iyar, the Company's Chief Executive Officer and Chairman of the Board of Directors. The loan is for a two-year term and bears interest at a rate of 6.5% per year. The loan is secured by Mr. Iyar's residence and 1,000,000 shares of Common Stock. In 2001, the largest aggregate amount outstanding under this loan was approximately $3,884,646. Mr. Iyar made two principal payments on this loan of $1,200,000 on June 28, 2001 and $1,300,000 on December 28, 2001. On March 26, 2002, Mr. Iyar paid the remaining balance and all remaining interest under the loan.

6

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth certain information as of March 1, 2002 as to shares of Common Stock beneficially owned by: (i) each person who is known by the Company to own beneficially more than 5% of the Common Stock, (ii) each of the Company's executive officers named under "Executive Compensation and Related Information—Summary Compensation Table," (iii) each of the Company's directors, and (iv) all directors and executive officers of the Company as a group. Ownership information is based upon information furnished by the respective individuals or entities, as the case may be. Applicable percentage ownership is based on 40,162,067 shares of Common Stock outstanding as of March 1, 2002.

Unless otherwise indicated, the address for the following stockholders is c/o WebEx Communications, Inc., 307 West Tasman, San Jose, California 95134.

| Name and Address of Beneficial Owner: | Shares Beneficially Owned | Percentage Beneficially Owned |
| --- | --- | --- |
| **5% Stockholders:** | | |
| Vanenburg Capital Management I B.V(2) | 7,114,533 | 17.7% |
| TCW Group, Inc.(3) | 2,894,387 | 7.2 |
| **Executive Officers and Directors:** | | |
| Subrah S. Iyar(4) | 4,763,153 | 11.7 |
| Min Zhu(5) | 4,681,010 | 11.5 |
| Craig Klosterman(6) | 413,858 | 1.0 |
| Jim Moise(7) | 141,755 | * |
| David Farrington(8) | 157,042 | * |
| Leo Jolicoeur(9) | 314,748 | * |
| Jan Baan(2)(10) | 7,191,533 | 17.9 |
| Somshankar Das(11) | 46,500 | * |
| Vivek Ranadivé(12) | 62,000 | * |
| David Ure | 15,000 | * |
| Mark Leslie | — | — |
| Anthony R. Muller | — | — |
| All directors and executive officers as a group(12 persons)(13) | 17,786,599 | 42.5% |

\* Less than 1%.

(1)   To the Company's knowledge, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them, subject to community property laws where applicable and the information contained in the notes to this table. Beneficial ownership is determined in accordance with the rules and regulations of the Securities and Exchange Commission. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, shares of Common Stock subject to options held by that person that are currently exercisable or exercisable within 60 days of March 1, 2002 are deemed outstanding. These shares, however, are not deemed outstanding for the purposes of computing ownership of any other person.

(2)   Principal address is Postbus 231, 3880 AE Putten The Netherlands. Stock ownership based solely on Schedule 13G filed jointly by Vanenburg Capital Management I, B.V., Vanenburg Capital Management Holdings B.V., Vanenburg Group B.V. and Jan Baan on February 14, 2002. Vanenburg Capital Management I, B.V., Vanenburg Capital Management Holding B.V., Vanenburg Group B.V. and Jan Baan report shared voting and shared dispositive power with respect to 7,114,533 shares as of December 31, 2001. Mr. Baan disclaims beneficial ownership of these shares, except to the extent of his pecuniary interest in Vanenburg Capital Management I, B.V.

7

(3)   Principal address is 865 South Figueroa Street, Los Angeles, California 90017. Stock ownership based solely on an Amendment to Schedule 13G filed jointly by The TCW Group, Inc. and Robert Day on February 3, 2002. The TCW Group, Inc. reports shared voting and shared dispositive power with its direct and indirect subsidiaries and Societe General, S.A., the TCW Group's ultimate parent company, with respect to 2,894,387 shares as of December 31, 2001. Societe Generale, S.A. disclaims beneficial ownership of these shares. As a result of the acquisition of the TCW Group, Inc. by Societe Generale, S.A., Robert Day is no longer deemed to share voting or dispositive power with the TCW Group, Inc. and is therefore no longer the beneficial owner of any of these shares.

(4)   Includes 658,204 shares issuable under immediately exercisable options of which 75,000 are subject to the Company's right of repurchase. Includes 566,500 shares held in trust for Mr. Iyar's family for which Mr. Iyar is the trustee.

(5)   Includes 658,204 shares issuable under immediately exercisable options of which 75,000 shares are subject to the Company's right of repurchase.

(6)   Includes 144,111 shares which are subject to the Company's right of repurchase.

(7)   Includes 83,332 shares which are issuable under immediately exercisable options of which 74,999 shares are subject to the Company's right of repurchase.

(8)   Includes 130,056 shares issuable under immediately exercisable options of which 95,332 shares are subject to the Company's right of repurchase.

(9)   Includes 114,585 shares which are subject to the Company's right of repurchase.

(10)   Includes 50,000 shares issuable under immediately exercisable options.

(11)   Includes 45,000 shares issuable under immediately exercisable options of which 27,084 shares are subject to the Company's right of repurchase.

(12)   Includes 60,000 shares of Common Stock issuable under immediately exercisable options.

(13)   Includes 258,696 shares of Common Stock subject to the Company's right of repurchase and 1,684,796 shares issuable under immediately exercisable options of which 347,415 shares are subject to the Company's right of repurchase.

8

## EXECUTIVE COMPENSATION AND RELATED INFORMATION

The following table summarizes all compensation paid to the Company's Chief Executive Officer and each of the Company's other five (5) most highly compensated executive officers for the fiscal years ended December 31, 2001, 2000, and 1999 whose total salary and bonus exceeded $100,000, for services rendered in all capacities to the Company during 2001. These individuals are referred to as the named executive officers. Other than the salary and bonus described below, the Company did not pay any named executive officer in the Summary Compensation Table any fringe benefits, perquisites or other compensation in excess of 10% of that executive officer's salary and bonus during each of 2001, 2000 and 1999.

### Summary Compensation Table

| Name and Principal Position | Year | Annual Compensation | | Long Term Compensation |
| --- | --- | --- | --- | --- |
| | | Salary($) | Bonus($) | Securities Underlying Options (#) |
| Subrah S. Iyar | 2001 | 180,000 | — | 469,880 |
| Chief Executive Officer | 2000 | 180,000 | — | 150,000 |
| | 1999 | 180,000 | — | |
| Min Zhu | 2001 | 180,000 | — | 469,880 |
| President and Chief Technical Officer | 2000 | 180,000 | — | 150,000 |
| | 1999 | 127,500 | — | — |
| Craig Klosterman(1) | 2001 | 180,000 | — | |
| Chief Financial Officer | 2000 | 157,500 | — | 400,000 |
| Jim Moise(2) | 2001 | 144,000 | 19,313 | — |
| Vice President, World Wide Sales | | | | |
| David Farrington(3) | 2001 | 150,000 | — | 52,000 |
| General Counsel and Vice President, Corporate Development | | | | |
| Leo Jolicoeur(2) | 2001 | 150,000 | — | 104,000 |
| Vice President, Platform Management | | | | |

(1) Mr. Klosterman joined the Company in February 2000.

(2) Messrs. Moise and Jolicoeur became executive officers on May 1, 2001.

(3) Mr. Farrington became an executive officer on August 1, 2001.

9

**Stock Options**

The following tables set forth information regarding stock options granted to and exercised by the individuals named in the Summary Compensation Table above during fiscal 2001. All options listed below were granted under the Company's 2000 Stock Incentive Plan. The percent of total options granted is based on a total of 4,096,538 options granted to employees and consultants during 2001. Options granted to Messrs. Farrington and Jolicoeur were granted at the fair market value as determined by the Company's Board of Directors on the date of grant and options granted to Messrs. Iyar and Zhu were granted at 110% of the fair market value as determined by the Company's Board of Directors on the date of grant.

**Option Grants in 2001**

| | Individual Grants | | | | Potential Realizable Value At Assumed Annual Rates of Stock Price Appreciation for Option Term(3) | |
|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Options Granted(1) | % of Total Options Granted to Employees in Fiscal Year | Exercise Price ($/Sh) | Expiration Date(2) | 5%($) | 10%($) |
| Subrah S. Iyar | 9,880 | 0.24% | $ 9.08 | 4/17/06 | $ 14,376 | $ 41,634 |
| | 10,000 | 0.24 | 25.57 | 7/26/06 | 40,977 | 118,670 |
| | 450,000 | 10.98 | 25.57 | 7/26/06 | 1,843,985 | 5,340,166 |
| Min Zhu | 9,880 | 0.24 | 9.08 | 4/17/06 | 14,376 | 41,634 |
| | 10,000 | 0.24 | 25.57 | 7/26/06 | 40,977 | 118,670 |
| | 450,000 | 10.98 | 25.57 | 7/26/06 | 1,843,985 | 5,340,166 |
| Craig Klosterman | — | — | — | — | — | — |
| Jim Moise | — | — | — | — | — | — |
| David Farrington | 52,000 | 1.27 | 15.46 | 6/6/11 | 505,581 | 1,281,241 |
| Leo Jolicoeur | 104,000 | 2.54 | 15.46 | 6/6/11 | 1,011,161 | 2,562,483 |

(1) Options were granted by the Board of Directors and generally vest monthly over a 4 year period. All of the options granted in 2001 were granted under the Company's 2000 Stock Incentive Plan.

(2) The options granted to Messrs. Iyar, and Zhu have a term of 5 years, and the options granted to Messrs. Farrington and Jolicoeur have a term of 10 years, subject to earlier termination in certain events related to termination of employment.

(3) Amounts represent hypothetical gains that could be achieved for the respective options if exercised at the end of the option term. These gains are based on assumed rates of stock appreciation of five percent (5%) and ten percent (10%) compounded annually from the date the respective options were granted to their expiration date and are not presented to forecast possible future appreciation, if any, in the price of our Common Stock. The gains shown are net of the option exercise price, but do not include deductions for taxes or other expenses associated with the exercise of the options or the sale of the underlying shares of Common Stock. The actual gains, if any, on the stock option exercises will depend on the future performance of our Common Stock, the optionee's continued employment through applicable vesting periods and the date on which the options are exercised.

10

The following tables set forth information regarding stock option exercises by the individuals named in the Summary Compensation Table above during fiscal 2001 and options outstanding at the end of fiscal 2001.

**Aggregated Option Exercises in Last Fiscal Year and 2001 Year End Option Values**

| Name | Shares Acquired on Exercise (#) | Value Realized($) (1) | Number of Securities Underlying Unexercised Options at December 31, 2001(#) Exercisable/ Unexercisable | Value of Unexercised In-the-Money Options at December 31, 2001($)(2) Exercisable/ Unexercisable |
|---|---|---|---|---|
| Subrah S. Iyar(3) | — | $ — | 210,991/408,889 | $ 2,142,430/90,927 |
| Min Zhu(3) | — | — | 210,991/408,889 | 2,142,430/90,927 |
| Craig Klosterman | — | — | —/— | —/— |
| Jim Moise(3) | — | — | 83,332/— | 2,041,634/— |
| David Farrington(3) | 19,944 | 594,092 | 136,556/45,500 | 3,097,843/427,245 |
| Leo Jolicoeur(3) | 8,000 | 75,325 | 18,868/91,000 | 265,836/854,490 |

(1) Calculated based on the fair market value of the underlying securities at the exercise date minus the exercise price, multiplied by the number of shares underlying the option.

(2) Calculated based on the fair market value of the underlying securities at December 31, 2001 ($24.85 per share) minus the exercise price, multiplied by the number of shares underlying the option.

(3) A portion of the shares exercisable are subject to the Company's right of repurchase if the optionee is terminated, which right lapses over time.

**Indebtedness of Management**

In April 2000, the Company loaned $3.6 million to Subrah Iyar, the Company's Chief Executive Officer and Chairman of the Board of Directors. The loan is for a two-year term and bears interest at a rate of 6.5% per year. The loan is secured by Mr. Iyar's residence and 1,000,000 shares of the Company's Common Stock. In 2001, the largest aggregate amount outstanding under this loan was $3,884,646. Mr. Iyar made two principal payments on this loan of $1,200,000 on June 28, 2001 ad $1,300,000 on December 28, 2001. On March 26, 2002, Mr. Iyar paid the remaining balance and all remaining interest under the loan.

**Employment Agreements and Change in Control Arrangements**

We currently do not have formal written employment agreements with any of our named executive officers. However, Subrah Iyar, the Company's Chief Executive Officer and Chairman of the Board of Directors, and Min Zhu, the Company's President, Chief Technical Officer and member of the Board of Directors, were employed under the terms of two-year employment agreements which expired in August 2000. Under the terms of those agreements, Messrs. Iyar and Zhu were each entitled to an initial salary of $180,000 and bonuses tied to criteria established by the Board of Directors. Although those agreements have expired, there have been no material changes in the employment relationships between the Company and Mr. Iyar or Mr. Zhu.

Pursuant to the terms of his option agreement, the vesting of up to 75% of the options held by Mr. Klosterman may be accelerated upon, among other things, a change in control of the Company. Pursuant to the terms of his option agreement, the vesting of 80% of the options held by Mr. Farrington may be accelerated upon a change in control of the Company. Pursuant to the terms of their option agreements, the vesting of 33% of the options held by Mr. Jolicoeur and Mr. Moise may be accelerated upon a change in control of the Company.

11

## REPORT OF THE COMPENSATION COMMITTEE
## OF THE BOARD OF DIRECTORS ON EXECUTIVE COMPENSATION

The compensation committee of the Company's Board of Directors (the "Compensation Committee") consisted during the fiscal year 2001, of two non-employee directors, Somshankar Das and Scott Sandell, neither of whom have interlocking relationships as defined by the Securities and Exchange Commission. The Compensation Committee sets and administers the policies governing annual compensation of executive officers, considers their performance and makes recommendations regarding their cash compensation and stock options to the full Board of Directors. The Compensation Committee was recently established in connection with the Company's initial public offering and therefore the Compensation Committee has a limited history. The Compensation Committee expects, pursuant to its charter, to periodically review the approach to executive compensation and make changes as competitive conditions and other circumstances warrant and will seek to ensure the Company's compensation philosophy is consistent with the Company's best interests and is properly implemented. In February 2002, Jan Baan, Mark Leslie and Vivek Ranadivé were appointed as a member of the Company's Compensation Committee and Scott Sandell and Somshankar Das resigned as members of the Company's Compensation Committee.

### Compensation Philosophy and Review

In July 2000, the Company completed the initial public offering of its Common Stock and became a reporting company at that time. During the first years of the Company's existence, the compensation of the executive officers has reflected a private "start-up" company model with the salary component at lower levels and the stock component at higher levels than would be applicable in a more established company environment. As we continue to grow and develop, we are shifting our compensation plans to mirror those of other publicly traded companies in our sector and to reflect the size and value of the Company.

The Compensation Committee believes that compensation of the Company's executive officers should (a) encourage creation of stockholder value and achievement of certain corporate objectives, (b) integrate compensation with the Company's annual and long-term corporate objectives and strategy, and focus executive behavior on the fulfillment of those objectives, (c) provide a competitive total compensation package that enables the Company to attract and retain, on a long-term basis, high caliber personnel and (d) align the interests of executive officers with the long-term interests of stockholders.

To meet these objectives, executive compensation is comprised of three elements (i) base salary, (ii) variable bonus awards payable in cash and (iii) long-term stock-based incentive awards. The Company's policy is generally to qualify and structure such compensation arrangements so as to qualify for deductibility under Section 162(m) of the Internal Revenue Code. However, the Company reserves the discretion to pay compensation to its executive officers that may not be deductible.

The summary below describes in more detail the factors which the Board considers in establishing each of the three primary components of the compensation package provided to the executive officers.

### Key Elements of Executive Compensation

The Compensation Committee determined the base salaries and bonuses of the executive officers for fiscal 2002. The Company provides its executive officers with a compensation package consisting of base salary, cash bonus awards and participation in benefit plans generally available to other employees.

*Base Salary.* The Compensation Committee reviews salaries recommended by the Chief Executive Officer for executive officers other than the Chief Executive Officer. The Compensation Committee set the salary and bonus potential of each executive officer on a case by case basis. Final decisions on base salary adjustments of executive officers other than the Chief Executive Officer are made with the Chief Executive Officer's

12

involvement. In determining the appropriate salary levels for the executive officers, the Compensation Committee considers, among other factors, each executive officer's relative position, scope of responsibility and historical and expected contributions to the Company.

*Cash Bonus Awards.* The cash bonus awards vary for each of the executive officers. The bonus award depends on the extent to which business and individual performance objectives are achieved. The Company's objectives consist of operating, strategic and financial goals that are considered to be critical to its fundamental long-term goal of building stockholder value.

*Stock-based Incentive Awards.* Grants of stock options to executive officers are based upon each executive officer's relative position, scope of responsibility, historical and expected contributions to the Company, and the executive officer's existing stock ownership and previous option grants. The Committee strives to align the interests of the Company's executive officers with the long-term interests of stockholders through stock option grants such that grants of stock options should relate the performance of the executive to the market perception of the performance of the Company.

**Chief Executive Officer Compensation**

The Compensation Committee meets without the presence of the Chief Executive Officer to evaluate his performance and uses the same procedures described above in setting his annual compensation package. On July 23, 2001, the Compensation Committee made a determination to increase Mr. Iyar's annual salary to $300,000 from $180,000, the amount set forth in his original employment agreement with the Company. The Compensation Committee considered Mr. Iyar's many accomplishments in helping to grow the Company, increase the Company's senior management team as the Company's business expanded in scope and grew in size, as well as Mr. Iyar's expected contributions to the Company in the future. However, Mr. Iyar declined to take any increase in cash compensation until the Company reached certain financial milestones. Subsequently, the Compensation Committee decided to grant Mr. Iyar an option to purchase 10,000 shares of the Company's Common Stock in lieu of an increase in his salary. On April 17, 2001, the Board of Directors approved a grant to Mr. Iyar of 9,880 shares of the Company's Common Stock at an exercise price of $9.07 (110% of the closing price per share as listed on the Nasdaq National Market on that day). These options vest ratably over a 36 month period. On July 23, 2001, the Board of Directors approved a grant to Mr. Iyar of 10,000 shares of the Company's Common Stock at an exercise price of $25.57 (110% of the closing price per share on the Nasdaq National Market on that day), to compensate Mr. Iyar for five months of salary increase not accepted by Mr. Iyar. The options vested over the last five months of fiscal year 2001. In addition, on July 26, 2001, Mr. Iyar received an option to purchase 450,000 share of the Company's Common Stock at an exercise price of $25.57 (110% of the closing price per share on the Nasdaq National Market on that day), 1/48th of the shares subject to the option vest monthly for each full month of service. Mr. Iyar did not receive a bonus in 2001. The Company loaned Mr. Iyar $3.6 million on April 2000 under a two year loan. The loan bears interest at a rate of 6.5% per year. On March 26, 2002, Mr. Iyar paid the remaining balance and all remaining interest under the loan.

Submitted by the Compensation Committee of
the Company's Board of Directors

Jan Baan
Mark Leslie
Vivek Randivé

13

## STOCK PRICE PERFORMANCE GRAPH

The following graph illustrates a comparison of the cumulative total stockholder return (change in stock price plus reinvested dividends) of the Company's Common Stock with the Nasdaq Composite Index and a peer group chosen by the Company (the "Peer Group"), assuming an investment of $100 in each on July 28, 2000 (the date of the Company's initial public offering). No cash dividends have been declared or paid on the Company's Common Stock. The Company's Common Stock has been traded on the Nasdaq National Market from July 28, 2000. The Peer Group is comprised of the following two companies: Centra Software, Inc. and Evoke Communications, Inc. The comparisons in the table are required by the Securities and Exchange Commission and are not intended to forecast or be indicative of possible future performance of the Company's Common Stock.

**COMPARISON OF YEARLY PERCENTAGE CHANGE IN THE CUMULATIVE TOTAL STOCKHOLDERS RETURN ON THE COMPANY'S COMMON STOCK SINCE JULY 28, 2000 WITH THE NASDAQ COMPOSITE INDEX AND PEER GROUP INDEX**



**CUMULATIVE TOTAL RETURN AT PERIOD END**

| | July 28, 2000 | Sept. 29, 2000 | Dec. 29, 2000 | Mar. 30, 2001 | June 29 2001 | Sept. 28 2001 | Dec. 31 2001 |
|---|---|---|---|---|---|---|---|
| WebEx Communications, Inc. | $ 100 | $ 264 | $ 149 | $ 79 | $ 191 | $ 151 | $ 177 |
| Peer Group | $ 100 | $ 77 | $ 33 | $ 47 | $ 108 | $ 63 | $ 81 |
| Nasdaq Composite Index | $ 100 | $ 100 | $ 67 | $ 50 | $ 59 | $ 41 | $ 53 |

The information contained above under the captions "Report of the Compensation Committee of the Board of Directors on Executive Compensation" and "Stock Price Performance Graph" shall not be deemed to be soliciting material or to be filed with the Securities and Exchange Commission, nor shall such information be incorporated by reference into any future filings under the Securities Act of 1933, as amended, or the Exchange Act, except that the Company specifically incorporates it by reference into such filing.

14

## REPORT OF THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS(1)

The audit of the Company's Board of Directors (the "Audit Committee") oversees the Company's financial reporting process on behalf of the Board of Directors. In addition, the Audit Committee provides independent, objective oversight of the Company's accounting functions and controls. During the fiscal year 2001, the Audit Committee consisted of three non-employee directors, Somshankar Das, Scott Sandell and David Ure, each of whom has been determined to be independent as defined by the Nasdaq Marketplace Rules. The Audit Committee operates under a written charter adopted by the Board of Directors. In February 2002, Anthony R. Muller was appointed as a member of the Audit Committee and replaced Scott Sandell who resigned as a member of the Company's Board of Directors and in his capacity as a member of the Company's committees.

In performing its functions, the Audit Committee acts only in an oversight capacity and necessarily relies on the work and assurances of the Company's management and of the independent auditors. Management is responsible for the Company's internal controls and the financial reporting process. The independent auditors are responsible for performing an independent audit of the Company's consolidated financial statements in accordance with generally accepted accounting principles and to issue a report thereon.

In this context, the Audit Committee has met and held discussions with management and the independent auditors regarding the Company's audited financial statements as of and for the year ended December 31, 2001. In its discussions, management represented to the Audit Committee that the Company's financial statements were prepared in accordance with generally accepted accounting principles. The Audit Committee also discussed with the independent auditors matters required to be discussed by Statement on Auditing Standards No. 61.

In addition, the Company's independent auditors provided to the Audit Committee the written disclosure required by Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees." The Committee discussed with the independent auditors that firm's independence and considered whether the non-audit services provided by the independent auditors are compatible with maintaining its independence.

Based on the Audit Committee's discussion with management and the independent auditors, and the Audit Committee's review of the representation of management and the report of the independent auditors to the Audit Committee, the Audit Committee recommended that the Board of Directors include the audited consolidated financial statements in the Company's Annual Report on Form 10-K for the year ended December 31, 2001 filed with the Securities and Exchange Commission. The Audit Committee and the Board have also recommended, subject to stockholder approval, the selection of the Company's independent auditors.

Submitted by the Audit Committee of the
Company's Board of Directors

Somshankar Das
Anthony R. Muller
David Ure

(1) The material in this report is not "soliciting material," is not deemed "filed" with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date hereof and irrespective of any general incorporation language contained in such filing.

15

## PROPOSAL 2

## RATIFICATION OF INDEPENDENT AUDITORS

Upon the recommendation of the Audit Committee, the Board of Directors has appointed the firm of KPMG LLP as the Company's independent auditors for the fiscal year ending December 31, 2002, subject to ratification by the stockholders. KPMG LLP has audited the Company's financial statements since 1997. Representatives of KPMG LLP are expected to be present at the Company's Annual Meeting. They will have an opportunity to make a statement, if they desire to do so, and will be available to respond to appropriate questions.

**Audit and Non-Audit Fees**

*Audit Fees.*   The aggregate fees billed by KPMG LLP for professional services rendered for the audit of the Company's annual financial statements for fiscal year 2001 and the reviews of the financial statements included in the Company's Forms 10-Q and Form 10-K was $339,000. All hours expended on the engagement to audit the Company's financial statements for fiscal year 2001 were attributed to work performed by KPMG LLP's full-time, permanent employees.

*Financial Information Systems Design and Implementation Fees.*   No fees were billed for professional services rendered for information technology services related to financial information systems design and implementation by KPMG LLP for fiscal year 2001.

*All Other Fees.*   The aggregate fees billed for services rendered by KPMG LLP other than for the services described above during fiscal year 2001 was $65,900. These fees related to tax compliance and tax consultation.

Upon consideration, the Audit Committee determined that the provision of the services other than the audit services is compatible with maintaining KPMG LLP's independence.

**Required Vote**

Ratification will require the affirmative vote of a majority of the shares present and voting at the meeting in person or by proxy. In the event ratification is not provided, the Board of Directors will review its future selection of the Company's independent auditors.

**The Board of Directors Recommends A Vote "FOR" Ratification of KPMG LLP as the Company's independent auditors.**

16

Prepared by R.R. Donnelley Financial -- Definitive Notice & Proxy Statement                    Page 21 of 23

### DEADLINE FOR RECEIPT OF STOCKHOLDER PROPOSALS FOR THE 2003 ANNUAL MEETING

Proposals of stockholders of the Company that are intended to be presented by such stockholders at the Company's 2003 Annual Meeting must be received by the Secretary of the Company no later than December 16, 2002 in order that they may be included in the Company's proxy statement and form of proxy relating to that meeting.

A stockholder proposal not included in the Company's proxy statement for the 2003 Annual Meeting will be ineligible for presentation at the meeting unless the stockholder gives timely notice of the proposal in writing to the Secretary of the Company at the principal executive offices of the Company and otherwise complies with the provisions of the Company's Bylaws. To be timely, the Company's Bylaws provide that the Company must have received the stockholder's notice not less than 50 days nor more than 75 days prior to the scheduled date of such meeting. However, if notice or prior public disclosure of the date of the annual meeting is given or made to stockholders less than 65 days prior to the meeting date, the Company must receive the stockholder's notice by the earlier of (i) the close of business on the 15th day after the earlier of the day the Company mailed notice of the annual meeting date or provided such public disclosure of the meeting date and (ii) two days prior to the scheduled date of the annual meeting.

### SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Under the securities laws of the United States, the Company's directors, executive officers and any persons holding more than 10% of the Company's Common Stock are required to report their initial ownership of the Company's Common Stock and any subsequent changes in that ownership to the Securities and Exchange Commission. Specific due dates for these reports have been established and the Company is required to identify in this Proxy Statement those persons who failed to timely file these reports. Based solely on a review of Forms 3, 4 and 5 and any amendments thereto furnished to the Company pursuant to Rule 16a-3(e) of the Securities Exchange Act of 1934, as amended, for 2001, the Company believes that all of the Section 16 filing requirements were satisfied for 2001, except for the following: Mr. Min Zhu and Mr. Subrah Iyar were each late in filing their respective Form 4 with respect to one transaction, which was subsequently reported on a Form 4.

### OTHER MATTERS

The Company knows of no other business that will be presented at the Annual Meeting. If any other business is properly brought before the Annual Meeting, it is intended that proxies in the enclosed form will be voted in accordance with the judgment of the persons voting the proxies. Whether you intend to be present at the Annual Meeting or not, we urge you to return your signed proxy promptly.

By order of the Board of Directors.

Subrah S. Iyar
Chairman and Chief Executive Officer

April 15, 2002

17

## PROXY
# WEBEX COMMUNICATIONS, INC.
### THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

The undersigned hereby authorizes SUBRAH IYAR or DAVID FARRINGTON, as Proxies with full power in each to act without the other and with the power of substitution in each, to represent and to vote all the shares of stock the undersigned is entitled to vote at the Annual Meeting of Stockholders of WebEx Communications, Inc. (the "Company") to be held at the Company's offices at 307 West Tasman Drive, San Jose, California on May 15, 2002 at 10:00 A.M., or at any postponement or adjournment thereof, and instructs said Proxies to vote as follows:

Shares represented by this proxy will be voted as directed by the stockholder. **IF NO SUCH DIRECTIONS ARE INDICATED, THE PROXIES WILL HAVE THE AUTHORITY TO VOTE FOR THE ELECTION OF DIRECTORS, FOR PROPOSAL 2, AND IN ACCORDANCE WITH THE DISCRETION OF THE PROXIES ON ANY OTHER MATTERS AS MAY PROPERLY COME BEFORE THE ANNUAL MEETING.**

☑   Please mark votes as in this example.

THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE ELECTION OF DIRECTORS AND FOR PROPOSAL 2.

    1.   To elect Jan Baan, Anthony R. Muller and Mark Leslie as Class II Directors of the Company to serve until the 2005 Annual Meeting of Stockholders or until their successors are duly elected and qualified.

          FOR all nominees ☐      ☐ Withhold from all nominees

Instruction:   To withhold authority to vote for any individual nominee, write that nominee's name in the space provided below:

☐ _____   For all nominees except as noted to the left.

    2.   To ratify the appointment of KPMG LLP as the Company's Independent Auditors.

          FOR ☐      AGAINST ☐      ABSTAIN ☐

*(CONTINUED ON OTHER SIDE)*

Case 3:17-cv-07357-RS   Document 110-1   Filed 10/25/19   Page 55 of 61

*(CONTINUED FROM OTHER SIDE)*

3.   In their discretion, the Proxies are authorized to vote upon such other business as may properly come before the meeting or any adjournment thereof.

**This proxy when properly executed will be voted in the manner directed herein by the undersigned stockholder. If no direction is given, this proxy will be voted "FOR" the election of directors and "FOR" Proposal 2.**

☐ Mark here for address change and note below.

Date:_____

_____
Signature

Date:_____

_____
Signature

Please sign where indicated above. When shares are held by joint tenants, both should sign. When signing as attorney, executor, trustee or guardian, please give full title as such. If a corporation, please sign in full corporate name by an authorized officer. If a partnership, please sign in full partnership name by an authorized person.

**PLEASE MARK, SIGN, DATE AND RETURN THIS PROXY PROMPTLY USING
THE ENCLOSED RETURN ENVELOPE.**

# EXHIBIT 3

**CH-100**   **Request for Orders to Stop Harassment**

*DENIED*
*THIS DOES NOT MEET THE*
*CRITERIA SET FORTH UNDER*
*CCP see 527.6.*
*SH*
*PETITIONERS ARE FREE TO*
*PURSUE ANY CIVIL REMEDIES*
*OR ACTIONS THEY FEEL ARE*
*JUST AND Appropriate .*

① Your name *(person asking for protection):*
Scott Sandell

Your address *(skip this if you have a lawyer): (If you want your address to be private, give a mailing address instead):*
_____

City: _____ State: _____ Zip: _____
Your telephone number *(optional):* ( ____ ) _____
Your lawyer *(if you have one): (Name, address, telephone number, and State Bar number):*
Harry P. Weitzel, Pepper Hamilton, LLP
4 Park Plaza, Suite 1200, Irvine, CA 92614-5955
949-567-3500; SBN: 149934

*Clerk stamps date here when form is filed.*

*Fill in court name and street address:*
Superior Court of California, County of San Mateo
Main Courthouse, Hall of Justice
400 County Center
Redwood City, CA 94063

② Name of person you want protection from:
Michael Zeleny

Describe the person: Sex: ☑ M ☐ F Weight: 185
Height: 5'11"  Race: white  Hair Color: _____
Eye Color: _____ Age: 51  Date of Birth: _____
Home Address *(if you know):* 7576 Willow Glen Road
City: Los Angeles _____ State: CA Zip: 90046
Work Address *(if you know):* _____
City: _____ State: _____ Zip: _____

*Court fills in case number when form is filed.*
**Case Number:**

③ Besides you, who needs protection? *(Family or household members)*

| Full Name | Sex | Age | Lives with you? | How are they related to you? |
|-----------|-----|-----|-----------------|------------------------------|
| _____ | ___ | ___ | ☐ Yes ☐ No | _____ |
| _____ | ___ | ___ | ☐ Yes ☐ No | _____ |
| _____ | ___ | ___ | ☐ Yes ☐ No | _____ |
| _____ | ___ | ___ | ☐ Yes ☐ No | _____ |

☐ *Check here if you need more space. Attach a sheet of paper and write "CH-100, item 3—Describe Protected Persons" at the top of the page.*

④ Why are you filing in this court? *(Check all that apply):*
☐ The person in ② lives in this county.
☐ I was hurt (physically or emotionally) by the person in ② here.
☑ Other *(specify):* I live in this county and have been the victim of Mr. Zeleny's harassment here.

⑤ How do you know the person in ②? *(Describe):*
I am a general partner of NEA, a venture capital firm, which invested in WebEx nearly a decade ago, between 1997 and 2000. Mr. Zeleny has made disparaging accusations against Min Zhu, one of the founders of WebEx. I understand that Mr. Zeleny had previously been involved in a relationship with Mr. Zhu's daughter, Erin. Mr. Zeleny has harassed and continues to harass me and my firm because my firm

**This is not a Court Order.**

Judicial Council of California, www.courtinfo.ca.gov
Revised July 1, 2007, Mandatory Form
Code of Civil Procedure, §§ 527.6 and 527.9
**Request for Orders to Stop Harassment**
(Civil Harassment)
CH-100, Page 1 of 4
→
American LegalNet, Inc.
www.FormsWorkflow.com

Your name: Scott Sandell

Case Number:

**(6)** Describe how the person in ② has harassed you:

a. Date of most recent harassment: October 26, 2009

b. Who was there? The harassment was done on the internet, and by e-mail sent to Bruce Goitia, Subrah Iyar, David Affeld and me.

c. Did the person in ② commit any acts of violence or threaten to commit any acts of violence against you?
☑ Yes  ☐ No

*If yes, describe those acts or threats:* In the e-mail, Mr. Zeleny informs me and others that he will protest with others in front of my office carrying firearms, "accompanied by loaded magazines and speedloaders..."  I view this e-mail as a direct threat to me and my employees.

d. Did the person in ② engage in a course of conduct that harassed you and caused substantial emotional distress?  ☑ Yes  ☐ No
*If yes, describe:* Mr. Zeleny has threatened to appear with firearms at NEA's offices and has posted messages on web sites labeling me a "Child Rape Tool" because my firm previously invested in WebEx.  He writes: "Venture capitalist Scott Sandell has knowingly funded

e. Did the conduct of the person in ② described above seriously alarm, annoy, or harass you? ☑ Yes  ☐ No

☑ *Check here if you need more space. Attach a sheet of paper and write "CH-100, item 6—Describe Harassment" at the top of the page.*

## Check the orders you want ☑

**(7)** ☑ **Personal Conduct Orders**

I ask the court to order the person in ② to **not** do the following things to me or anyone listed in ③ :

a. ☑ Harass, attack, strike, threaten, assault (sexually or otherwise), hit, follow, stalk, destroy personal property, keep under surveillance, or block movements.

b. ☑ Contact (either directly or indirectly), or telephone, or send messages or mail or e-mail.

The person in ② will also be ordered not to take any action to get the addresses or locations of any protected persons, their family members, or their caretakers unless the court finds good cause not to make the order.

**(8)** ☑ **Stay-Away Orders**

I ask the court to order the person in ② to stay at least *(specify):* 1000 yards away from me and the people listed in ③ and the places listed below: *(Check all that apply):*

a. ☑ My home                     d. ☑ My vehicle
b. ☑ My job or workplace         e. ☐ Other *(specify):* _____
c. ☑ My children's school or child care

If the court orders the person in ② to stay away from all the places listed above, will that person still be able to get to his or her home, school, or job? ☑ Yes  ☐ No
*If no, explain:* _____

_____
_____
_____

**This is not a Court Order.**

Your name: Scott Sandell

Case Number:

**(9)** ☐ **Others to Be Protected**

Should the other people listed in ③ also be covered by the orders described above?

☐ Yes      ☐ No      ☑ Does not apply

*If yes, explain:* _____

_____

_____

**(10)** **Order About Guns or Other Firearms**

I ask the court to order the person in ② to be prohibited from owning, possessing, purchasing, or receiving, or attempting to purchase or receive firearms and to sell or turn in any guns or firearms that he or she controls.

**(11)** ☑ **Other Orders**

I ask the court to order the person in ② to *(specify):* take down all internet postings by him mentioning or referring to me or my firm, NEA; refrain from posting any other references about me or my firm on the internet; and refrain from transmitting any writings, either paper or electronic referring to me or my firm that refer or relate to Min Zhu, Erin Zhu, Subrah Iyar or WebEx.

**(12)** ☑ **Temporary Orders**

Do you want the court to make orders now on the matters listed in ⑦, through ⑪ that will last until the hearing? ☑ Yes  ☐ No

*If yes, explain why you need these orders right now:* Mr. Zeleny has informed me and others in the e-mail he intends to be outside my office with others carrying guns and "speedloaders." I need these orders now to insure my safety and the safety of my employees. In addition, every day I am falsely labeled a "Child Rape Tool" on the internet irreparably harms and harasses me and my firm.

☐ *Check here if you need more space. Attach a sheet of paper and write "CH-100, item 12—Temporary Orders" at the top of the page.*

**(13)** **Delivery of Orders to Law Enforcement**

My lawyer or I will give copies of the orders to the following law enforcement agencies:

a. Name of Agency: San Mateo Police Dept.

Address: 701 Laurel Street

City: Menlo Park                    State:  CA   Zip: 94025

b. Name of Agency: San Mateo County Sheriff's Dept.

Address: 400 County Center

City: Redwood City                  State:  CA   Zip: 94063

**(14)** ☐ **Other Court Cases**

Have you ever asked any court for other restraining orders against the person in ②? ☐ Yes   ☑ No

*If yes, specify the counties and case numbers if you know them:* _____

_____

---

**This is not a Court Order.**

**Request for Orders to Stop Harassment**
(Civil Harassment)
→

Your name: Scott Sandell

Case Number:

**(15)** ☑ **Time for Service**

You must have your papers personally served on (notify) the person in ② at least 5 days before the hearing, unless the court orders a different time for service. *(Form CH-135 explains "What Is Proof of Service?" Form CH-130 may be used to show the court that the papers have been served.)* If your papers cannot be served at least 5 days before the hearing and you need more time, explain why:

I received the e-mail on October 26 that he intends to carry firearms outside my office on October 27. I cannot wait 5 days to get the order.

**(16)** ☐ **No Fee for Filing**

I ask the court to waive the filing fee because the person in ② has used or threatened to use violence against me, has stalked me, or has acted or spoken in some other way that makes me reasonably fear violence. I am asking for a restraining order to stop this conduct.

**(17)** ☐ **No Fee to Serve Orders**

I ask the court to order the sheriff or marshal to serve (notify) the person in ② about the orders for free because:

a. ☐  My request for orders is based on stalking; or

b. ☐  My request for orders is based on a credible threat of violence; or

c. ☐  I am entitled to a fee waiver.

*(If you are requesting free service of the orders based on a fee waiver, you must complete and file the Application for Waiver of Court Fees and Costs (Form FW-001).)*

**(18)** ☑ **Lawyer's Fees and Costs**

I ask the court to order payment of my:

a. ☑  Lawyer's fees

b. ☐  Out-of-pocket expenses

The amounts requested are:

| Item | Amount | Item | Amount |
|---|---|---|---|
| Attorneys fees | $ 5,000.00 | | $ |
| | $ | | $ |
| | $ | | $ |

☐  *Check here if you need more space. Attach a sheet of paper and write "CH-100, item 18—Lawyer's Fees and Costs" at the top of the page.*

**(19)** **Additional Relief**

I ask the court for additional relief as may be proper.

**(20)** Number of pages attached to this form, if any: ____1____

Date: October 27

Harry P. Weitzel
_____
Lawyer's name                                        ▶  _____
                                                              Lawyer's signature

I declare under penalty of perjury under the laws of the State of California that the information above and on all attachments is true and correct.

Date: _____

Scott Sandell
_____
Type or print your name                        ▶  _____
                                                              Sign your name

**This is not a Court Order.**

## Attachment 5

had previously invested in WebEx.  My firm has no current association with Mr. Zhu or with WebEx, which since 2007 has been owned by Cisco Systems.

## CH-100, item 6 Describe Harassment

6d.  violent, incestuous paedophile Min Zhu….."

Mr. Zeleny has repeatedly harassed me and others via the web and by "demonstrating" and threatening to "demonstrate" outside NEA's offices and at various locations in California at which representatives of NEA or WebEx have been scheduled to appear.  I have attached true and correct copies of various postings to this application.  For examples, see his postings on the following websites:  http://larvatus.livejournal.com/.  He also blogs about guns.  See http://luger.gunboards.com/showthread.php?p=128400 and http://www.calguns.net/calgunforum/showthread.php?t=148820&page=2.