David W. Affeld, State Bar No. 123922
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:      (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

MICHAEL ZELENY,

    Plaintiff,

       vs.

GAVIN NEWSOM, *et al.*,

    Defendants.

Case No. CV 17-7357 RS

Assigned to:
The Honorable Richard G. Seeborg

~~SECOND~~ [PROPOSED] THIRD
AMENDED COMPLAINT; DEMAND FOR
JURY TRIAL

Date:  August 8, 2018
Time: 1:30 p.m.
Courtroom:  3, 17th Floor

Action Filed:   December 28, 2017
Trial Date:      November 18, 2019

Plaintiff Michael Zeleny ("Plaintiff" or "Zeleny') alleges for his ~~Second~~ Third Amended Complaint against Defendants Xavier Becerra, in his official capacity ("Becerra"), the City of Menlo Park (the "City"), and Police Chief Dave Bertini ("Bertini"~~;), and New Enterprise Associates ("NEA";~~ collectively, "Defendants"), as follows.

- 1 -

1.     This case is brought to challenge the constitutionality of California statutes restricting Plaintiff's rights to bear arms under the Second Amendment while engaging in, and as part of, entertainment events and media productions of peaceful, public speech on matters of public concern or matters of political, social, or other concerns to the community, or issues of significant importance to the public as a whole, as protected by the First Amendment. This case also challenges the application, by the City of Menlo Park (the "City"), of California statutes restricting Plaintiff's rights to bear arms under the Second Amendment while engaging in, and as part of, entertainment events and media productions of peaceful, public speech on matters of public concern or matters of political, social, or other concerns to the community, or issues of significant importance to the public as a whole, as protected by the First Amendment.  Lastly, this case challenges state statutes and municipal policies that have been seized upon by the City, which has imposed unlawful, content-based prior restraints, backed by the threat of criminal prosecution, to stifle Plaintiff's Constitutionally protected speech.

2.     Plaintiff Michael Zeleny ("Zeleny" or "Plaintiff") has been making lawful public protests in an effort to expose grave wrongdoing by a prominent Silicon Valley executive, Min Zhu, and those individuals and entities who have willingly continued to do business with Min Zhu despite knowing about his misconduct.  Min Zhu's cohorts include New Enterprise Associates, Inc. ("NEA"), present and former members of NEA's senior management, WebEx Communications, Inc. ("WebEx"), and present and former members of its senior management. The point of Zeleny's protests is to express the view that Min Zhu's wrongdoing, and the conduct of NEA and WebEx senior management in turning a blind eye to it, should disqualify them from any involvement in publicly traded companies.

3.     Zeleny's protests have sought to publicize allegations that Min Zhu repeatedly raped his daughter Erin Zhu when she was 14 years old.  Other Silicon Valley executives and investors, including NEA, WebEx, and their senior management, became aware of Min Zhu's incestuous, pedophilic assaults, but have nevertheless continued to do business with him.  Zeleny has been protesting to expose Min Zhu's despicable conduct and the

1   corruption of Min Zhu's cohorts for condoning it.

2          4.    To amplify his message, Zeleny previously conducted protests at which he
3   lawfully carried unloaded firearms.  Zeleny also used simulated, non-explicit images and videos
4   of Min Zhu's heinous conduct. In compliance with entertainment event and film and video
5   production exemptions to recently enacted California bans on the carrying of unloaded firearms,
6   Zeleny has created, and intends to continue creating, multimedia video and live entertainment
7   events to disseminate his message.

8          5.    The targets of Zeleny's protests have attempted to sweep Min Zhu's
9   misdeeds and NEA's and WebEx's knowledge of them under the rug.  They have enlisted the
10   help of local law enforcement to suppress Zeleny's speech.  In 2012, they responded to Zeleny's
11   protests by having him arrested and criminally prosecuted for supposed violations of California
12   open and/or concealed carry laws.  Zeleny was acquitted after a bench trial.  Since that time, at
13   the behest of NEA, the City has circumvented and subverted its own policies to deprive Zeleny
14   of access to the permitting process so that he can resume his protests.

15          6.    Despite having failed in the earlier prosecution, the City continues to
16   threaten further prosecution if Zeleny resumes his protests.  The City asserts that Zeleny is
17   required to have a permit from the City for his events in order to qualify for state law exemptions
18   to the firearm carry ban.  Yet, the City refuses to grant Zeleny a permit for his entertainment
19   events, even though he is willing to comply with lawful time, place, and manner restrictions.
20   Indeed, the City refuses even to advise Zeleny *what the requirements* are for seeking a permit.
21   Instead, the City has made clear that it will not grant Zeleny a permit because it considers his
22   message offensive, and that if he continues his protests, the City will prosecute him for violating
23   California's obscenity laws and its open and/or concealed carry statutes.

24          7.    Zeleny files this action to seek a declaration that the California statutes
25   invoked against him are unconstitutional.  Zeleny also seeks a declaration that the California
26   statutes as applied against him by the City are unconstitutional.  Zeleny contends that the People
27   of the State of California and the Menlo Park Police Department have violated and threaten
28   further violation of Zeleny's rights under the First, Second, and Fourteenth Amendments to the

- 3 -

United States Constitution and provisions of the California State Constitution.  Furthermore, Zeleny's exercise of his Constitutional rights arises in connection with a public issue or an issue of public interest.  Thus, Zeleny sues under 42 U.S.C. § 1983 for violation of his civil rights.

8.      Zeleny challenges the facial validity of California statutes restricting the public display of unloaded firearms, California Penal Code §§ 26400 and 26350. Plaintiff also challenges the interpretation of California Penal Code §§ 25510, 26400, 26405, 26350, and 26375 by local authorities in the City of Menlo Park, as applied to Plaintiff under the particular circumstances of this case, and to the City's adoption and enforcement of municipal policy as content-based restrictions on his protected speech.

## JURISDICTION AND VENUE

9.      This action arises under the United States Constitution, particularly the First, Second, and Fourteenth Amendments, and the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

10.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

11.     This Court has authority to grant the requested declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

12.     This Court has authority to issue the requested injunctive relief pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65.

13.     This Court has authority to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

14.     This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a), and it is authorized to award attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

15.     Each of Defendant's unlawful acts alleged herein occurred in the State of California and within the Northern District of California.

16.     Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the

instant action occurred in Menlo Park, California.

**THE PARTIES**

17.     Zeleny is a citizen and resident of Los Angeles, California.  Zeleny is an internationally renowned researcher of the history and technology of firearms, and a holder of a California Certificate of Eligibility (COE), which certifies that the California Department of Justice (DOJ) has checked its records and determined that he is not prohibited from acquiring or possessing firearms at the time the firearms eligibility criminal background check was performed. A COE is a prerequisite licensing/permit requirement for all prospective licensed firearms dealers, licensed ammunition vendors, manufacturers, certified instructors, gun show promoters, explosive permit holders, and other firearm-related employment activities, including any agent or employee of a vendor who handles, sells, or delivers firearms and ammunition. Zeleny has never been convicted of a felony or misdemeanor offense.

18.     Defendant Xavier Becerra (hereinafter "Becerra") is the Attorney General of the State of California.  Plaintiff is informed and believes, and on that basis alleges, that Becerra is a citizen and resident of the State of California.

19.     Defendant City of Menlo Park (hereinafter "City") is a municipal corporation duly organized and existing under the laws of the State of California and located within the Northern District of California.

20.     Defendant Dave Bertini (hereinafter "Bertini") is and was at all relevant times the Commander of the Menlo Park Police Department.  He committed the acts complained of herein while acting in his official capacity as Police Commander.  Plaintiff is informed and believes, and on that basis alleges, that Bertini is a citizen and resident of the state of California and the Northern District of California.

21.     In all of their actions and omissions alleged below, the foregoing Defendants were acting under color of state law and are being sued in their official capacities pursuant to *Ex Parte Young*, 209 U.S. 123 (1908).

22.     Defendant New Enterprise Associates, Inc. (hereinafter, "NEA") is a Delaware corporation with its principal place of business in Menlo Park, California.  NEA bills

- 5 -

itself as the largest and most prominent venture capital firm in the world.

23.    At all relevant times alleged herein, Defendant NEA conspired with defendants City and Bertini for the purpose of violating Zeleny's constitutional rights under the First, Second, and Fourteenth Amendments to the United States Constitution.

**FACTS**

**Min Zhu's Heinous Conduct**

24.    Min Zhu was a prominent Silicon Valley executive who worked in the high-tech industry in California from the late 1980's until May 2005.  He was a founder, President, and Chief Technology Officer of WebEx, an Internet technology company that became publicly traded on NASDAQ in 2000.

25.    Plaintiff is informed and believes, and on that basis alleges, that since May 2005, Min Zhu has continued to work in the high-tech industry based out of the People's Republic of China, and that Silicon Valley executives, including current and former NEA senior management, continue to fund him and collaborate with him in his ventures.

26.    Plaintiff is informed and believes, and on that basis alleges, that in or about August and September of 1988, Min Zhu repeatedly raped his daughter Erin Zhu, who was 14 years old at the time.  At the time, Erin Zhu had been cut off from contact with anyone outside the home.  Her mother was away undergoing medical treatment in China.  While Erin Zhu was isolated and helpless, Min Zhu raped her for a period of four weeks, until his wife returned to California in September of 1988.

27.    Erin Zhu testified about these events under oath in 2003.  Min Zhu was afforded multiple opportunities to deny her testimony, but he has never disputed it.  In early 2000, Erin Zhu successfully pursued a claim against her father, Min Zhu, for childhood sexual abuse.  Erin Zhu settled her claim against Min Zhu on confidential terms.

**Zeleny Becomes Aware of Min Zhu's Conduct**

28.    Zeleny became aware of Min Zhu's monstrous conduct when he developed a personal and professional relationship with Erin Zhu from the early 1990s to 2000.  During the time that Erin Zhu and Zeleny were involved, romantically and in business, Erin Zhu told Zeleny

about the horrific abuse she suffered at the hands of her father, Min Zhu.

29.     Erin Zhu also told Zeleny about posts she had made on the Usenet newsgroup alt.sexual.abuse.recovery in 1991 and 1992.  Erin Zhu's posts corroborated what she had told Zeleny.  The posts can be found at:   https://groups.google.com/forum/?hl=en#!search//erin$20zhu$20sexual$20abuse

30.     Erin Zhu also testifed about these events under oath in deposition.  Her deposition testimony can be found at: https://youtu.be/QgmWMGG3qgE/.

31.     Erin Zhu requested that Zeleny help her pursue claims against her father for childhood sexual abuse.  Zeleny is informed and believes, and on that basis alleges, that Min Zhu paid Erin Zhu a substantial sum of money as part of a confidential settlement to resolve her claims in April 2000.

**NEA's Support of Min Zhu Despite Knowledge of the Allegations of His Conduct**

32.     NEA provided venture capital support to WebEx from its early stages, through and beyond its initial public offering in 2000.

33.     NEA continued to do business with Min Zhu through 2005, when Zeleny began his public protests.  On May 2, 2005, during a WebEx Experience conference in San Francisco, Zeleny protested against the coverup of Min Zhu's rape of his daughter.  The next day, WebEx cancelled its conference.  It never held another user conference.

34.     According to Breaking News, posted on ConferencingNews.com on May 3, 2005, WebEx shut down its user conference in response to Zeleny's protest outside the Westin St. Francis in San Francisco the day before. The archived posting reporting this event can be found at https://web.archive.org/web/20050507090846/http:/www.conferencingnews.com/breakingnews/11

35.     A week later, this report was corroborated by another conference attendee, who stated "that the conference was cancelled because a protestor with guns was outside the event and was consequently arrested Monday night."  The archived posting of this attendee's report can be found at http://web.archive.org/web/20070225101509/conferblog.com/public/item/91268.

36.     On May 13, 2005, after failing to get a restraining order against future protests by Zeleny, WebEx announced Min Zhu's sudden "retirement" and his relocation to China. The archived posting of this document can be found at https://web.archive.org/web/20051109144958/http:/www.webex.com:80/pr/pr340.html

37.     Zeleny is informed and believes, and on that basis alleges, that the management of WebEx encouraged Min Zhu to "retire" as a result of Zeleny's public disclosure of Min Zhu's heinous conduct.

38.     On September 23, 2005, Private Equity Week announced the formation of Northern Light, a venture capital fund co-founded in China by Min Zhu, in partnership with Scott Sandell of NEA.  In commenting on this announcement on the same day, China Venture News reported: "What's missing in the PrivateEquityOnline article or any NEA release is any mention of the previous controversy surrounding NEA's venture partner, Min Zhu, who joined NEA in 2004, after his forced resignation as WebEx President and Director."  The archived posting of this report can be found at https://web.archive.org/web/20110314194905/http://www.chinaventurenews.com/50226711/nea_invests_in_china_vc_firm_northern_light.php

39.     Following Min Zhu's departure from WebEx and his flight from the United States, Zeleny emailed various senior management of NEA to put them and NEA on direct, personal notice of Min Zhu's abuse of Erin Zhu.

40.     NEA refused to disavow Min Zhu.  Zeleny is informed and believes, and on that basis alleges, that NEA has continued to do business with Min Zhu, who is now ensconced in the Peoples' Republic of China.  In particular, C. Richard "Dick" Kramlich, a former Chairman and Co-Founder of NEA, moved to Shanghai in January 2008 to collaborate with Min Zhu, long after Zeleny brought the facts of Min Zhu's sexual depravity to the attention of NEA.  See the report published in San Francisco Business Times on June 29, 2008, at https://www.bizjournals.com/sanfrancisco/stories/2008/06/30/focus1.html?page=all. Zeleny is informed and believes, and on that basis alleges, that NEA has sought to suppress media reports concerning the causes and circumstances of Min Zhu's departure from WebEx and the United States.

**Zeleny's Protests Against Min Zhu and His Enablers**

41.    Because of the foregoing, Zeleny believed that Min Zhu was categorically unfit to serve as an officer of a publicly traded company.  Zeleny also believed that anyone who would do business with Min Zhu despite knowledge of Min Zhu's monstrous conduct was similarly unfit for any position involving the public trust.

42.    Between 2005 and 2012, Zeleny conducted a series of public protests. Initially, Zeleny's protests were directed only against Min Zhu.  Zeleny later broadened his protests after NEA senior management refused to acknowledge or address Erin Zhu's claims. He expanded his protests to include the officers and directors of WebEx and investors in WebEx who had knowledge of Min Zhu's conduct, yet willingly continued to do business with him, including NEA and certain of its senior management such as Scott Sandell and Dick Kramlich. Zeleny's public protests were intended to expose Min Zhu's conduct and the moral bankruptcy of Min Zhu's cohorts for condoning it.

43.    The protests have taken the form of in-person demonstrations, musical performances, and multimedia posts on YouTube as well as Zeleny's Internet-based LiveJournal blog, at http://larvatus.livejournal.com/tag/webex.

44.    Zeleny's protests were intended to be provocative.  They included flyers and posters containing graphic but non-obscene images reflecting Min Zhu's conduct.  They also included flyers and posters calling out specific individuals, including WebEx's Chief Executive Officer Subrah Iyar and NEA's Scott Sandell and Dick Kramlich, for being enablers of Min Zhu. To draw attention to Zeleny's message, some of Zeleny's protests involved music played on accordions, trumpets, and bagpipes, and offers of free food to sex workers, registered sex offenders, and adult industry performers.

45.    Zeleny made video recordings of his demonstrations and posted them on the Internet.  He created a website, www.subrah.com, summarizing the contents of these protest activities.  On the website, Zeleny states that executives who raped family members and their knowing enablers have no place in positions of public trust.

46.     In a further effort to draw attention to his First Amendment protests, Zeleny eventually moved to lawfully exercising his Second Amendment rights, openly carrying and displaying unloaded weapons in compliance with state law.

47.     Zeleny always notified public officials and peace officers in advance of his plans for demonstrations.  He always complied with any peace officer's request to inspect his weapons.  Zeleny complied with all time, place, or manner restrictions on his protests requested by the City authorities, even when he believed that such restrictions were unlawful.

48.     Zeleny's exercise of his Second Amendment rights has been part and parcel of his exercise of his First Amendment right to protest against Min Zhu and Min Zhu's cohorts.  By incorporating a display of unloaded weapons, Zeleny intended to dramatize his protests, attract attention to them, and amplify his message.

**The Attempts to Stifle Zeleny's Protests**

49.     Min Zhu and his cohorts have persistently tried to stifle Zeleny's protests.

50.     In 2005, WebEx unsuccessfully sued Zeleny over truthful posts he made on the Yahoo! message board pertaining to WebEx.  The case was styled WebEx Communications, Inc. v. Zeleny, Santa Clara County Superior Court Case No. 104CV024062, later Los Angeles County Superior Court Case No. BC324927.  WebEx was eventually made to pay over $16,000 in attorney's fees and sanctions to Zeleny, first for filing in an improper venue, and subsequently after its complaint was stricken under California's anti-SLAPP (Strategic Lawsuit Against Public Participation) statute.

51.     When WebEx was unsuccessful in its efforts to silence Zeleny through civil litigation, it then enlisted law enforcement to attempt to silence him on its behalf.

52.     On May 2, 2005, Zeleny began a campaign of street protests against WebEx and Min Zhu at a WebEx user conference at the Westin St. Francis hotel in San Francisco.  Zeleny also protested against Subrah Iyar, another co-founder of WebEx and its CEO, and against Scott Sandell, a venture capitalist with NEA who had funded WebEx.

53.     Zeleny's protest was peaceful.  He did not threaten anyone or brandish any weapons.  He did not use abusive language.  Zeleny stood peacefully in front of the hotel, in a business suit, holding a two-foot by three-foot board, and distributing flyers.

54.     WebEx nevertheless called the San Francisco Police Department and had Zeleny arrested.  Because the arrest was unlawful, later that same day, May 2, 2005, the San Francisco Police department released Zeleny without charges.

55.     He resumed his protest the following morning, May 3, 2005.  WebEx then abruptly canceled its user conference.  Ten days later, Min Zhu resigned from WebEx and left the United States for China.

56.     In October 2009 and September 2010, Zeleny conducted protests in front of NEA's headquarters in Menlo Park to protest its ongoing support of Min Zhu.

**NEA and the City Conspire to Derail Zeleny's Protests**

57.     In the midst of Zeleny's protests, the City and NEA entered into an agreement to stifle, restrict, frustrate, interfere with and ultimately stop Zeleny's protests by any available means.  The City explained in internal documents the desire to develop a "firm solution to ending his protests."  The object of this conspiracy was to delay and ultimately shut down Zeleny's protests using, among other things, harassing police tactics, false criminal prosecution, baseless legal proceedings, and later a sham permitting process.

58.     The reason for the conspiracy was NEA's, the City's, and Bertini's disagreement with the content of Zeleny's protected speech and his exercise of lawful Second Amendment rights.  The object of the conspiracy was illegal.  At no time has the City or NEA legitimately believed or expected that they could stop Zeleny's protected based on its content.  Instead, they have used unlawful and fraudulent actions as a weapon to directly interfere with Zeleny's protests through delay, distraction, and interference in violation of his First, Second, and Fourteenth Amendment rights.

59.     Zeleney is informed and believes that the City and NEA first entered into this conspiracy and reached a meeting of the minds in or about 2009 through a series of phone calls and in-person communications between representatives of NEA and the City police

department, including Sergeant Sharon Kaufman and Bertini.  NEA representatives involved in reaching and implementing the agreement included NEA security head David Tesmontan and his predecessors.

60.     On information and belief, the conspiracy has later expanded to include other individuals and other tactics, but the general object and nature of the conspiracy has remained the same.  Among other communications, Zeleny is informed and believes that the City and NEA developed and fostered the conspiracy through numerous meetings and phone calls, corresponding to Zeleny's protests, including in October 2009, September 2010, October 2010, April 2011, October 2011, February 2012, June 2012, March 2013, April 2013, and September 2015.  In addition, NEA and the City have routinely emailed one another regarding Zeleny throughout the period of his protests.

61.     The conspiracy between the City and NEA has continued to date.  The City and NEA have remained in regular contact since forming the conspiracy to develop ways, both explicit and tacit, to perpetually stifle, delay, frustrate, and interfere with Zeleny's protected activity.  According to the City, it remained in "close contact with security from NEA" to address Zeleny and has "worked collaboratively" with NEA to address Zeleny's protests.

62.     Each of NEA and the City have taken overt acts in furtherance of the conspiracy, including, without limitation, those alleged below.

**Baseless Legal Proceedings Against Zeleny**

63.     NEA and its executives and affiliates have filed a series of baseless legal proceedings against Zeleny pursuant to the conspiracy.  The campaign by NEA and its affiliates began with the WebEx lawsuit in 2004.  On information and belief, each of these lawsuits was brought with NEA's assistance and encouragement, pursuant to a policy of starting litigation against Zeleny without regard to its merit, solely for the purpose of interfering directly with his protests by seeking frivolous emergency relief, intimidating Zeleny, and sapping his resources.

64.     In 2004, NEA affiliate WebEx frivolously sued Zeleny for defamation in the case styled *WebEx Communications, Inc. v. Michael Zeleny*, Santa Clara Superior Court, Case No. 1-04-CV 024062.  On information and belief, NEA encouraged and assisted WebEx in

this suit.  The lawsuit was objectively baseless and was filed for the sole purpose of using litigation to temporarily stifle Zeleny's speech.

65.     WebEx also engaged in other bad faith conduct to protract the litigation and disadvantage Zeleny, using the litigation to sap his resources and interfere with his protests. It filed suit in the wrong venue in clear violation of California law.  WebEx was made to pay $4,316.30 in sanctions for frivolously suing in the wrong venue.

66.     The trial court then struck the majority of WebEx's compliant under the California Anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16, finding that had no likelihood of success on the merits.  As a result, WebEx was made to pay another $12,000.00 in sanctions to Zeleny for filing frivolous claims in an effort to stifle his First Amendment rights.

67.     WebEx dropped the remainder of its case in exchange for a waiver of malicious prosecution claims and Zeleny's agreement not to file an Anti-SLAPP motion in other contemplated litigation.

68.     Zeleny is informed and believes that in 2009, with the encouragement and assistance of NEA and the City, NEA executive Scott Sandell filed a frivolous application in the San Mateo Superior Court for a temporary restraining order against Zeleny.  This application was based on Zeleny's protests.

69.     This application was objectively baseless and known by NEA, Sandell, and the City to be baseless.  Zeleny had not engaged in any conduct offering a basis for a restraining order under California law.  The TRO application was also untenable under established law as violative of Zeleny's First Amendment rights.

70.     On information and belief, the TRO application was filed to directly interfere with Zeleny's protests despite knowledge of NEA and Sandell they could not prevail on the merits and that the TRO would be dissolved at a merits hearing.[1]  NEA and Sandell

---

[1] Under California procedures, a party may seek a temporary restraining order against "harassment" on an *ex parte* basis by simply filing a form.  If the court grants the restraining order, it will then set a merits hearing to determine whether the order can continue in effect.  In the interim, the TRO requires a forfeiture of all firearms owned by the person subject to the order.

SECOND THIRD AMENDED COMPLAINT

intentionally used this baseless TRO filing in an effort to delay and interfere with Zeleny's protests. The TRO application was denied without opposition or notice to Zeleny.

71. On October 5, 2010, NEA again filed another baseless TRO application against Zeleny in the case styled *New Enterprise Associates v. Zeleny,* San Mateo County Superior Court Case No. CIV499465. Once again, NEA knew that the TRO application was objectively baseless and would not withstand a merits hearing. Nonetheless, NEA filed the baseless application solely to interfere with Zeleny's protests and to temporarily delay the protests.

72. The court summarily denied the TRO application.

73. During this litigation, NEA engaged in other sham litigation conduct designed to entangle Zeleny in frivolous and costly litigation to directly interfere with his protests, and to distract and intimidate him. Among other things, NEA withheld and refused to disclose evidence, necessitating repeated motions to compel for basic discovery and depositions.

74. In late 2011, after the lawsuit had been pending for more than a year, Zeleny was forced to settle as he could not bear the ongoing expenses of defending himself.

75. In early 2012, in response to resumed protests, with the City's active encouragement and assistance, NEA worked with the City to prepare an application for an Emergency Protective Order ("EPO") against Zeleny. This was apparently the City's idea, but the City required assistance from NEA to act as the complaining party.

76. The contemplated EPO was also objectively baseless. Under California law, an EPO is available at the request of law enforcement to protect against domestic violence, child abuse, abduction, or elder abuse. No grounds existed for the issuance of an EPO. Nonetheless, as with the sham TRO applications, an EPO requires a turn over of all firearms until the merits hearing. On information and belief, the purpose of preparing the EPO was to directly interfere with Zeleny's protests without any hope of securing merits relief.

77. As described in more detail below, rather than file the EPO application, the City, pursuant to its conspiracy with NEA, had Zeleny falsely prosecuted for carrying a concealed firearm.

**Harassing Police Conduct and Surveillance**

78.     In internal writings, including in police reports and in internal memo of May 2012, the City confirmed that Zeleny was not in violation of any laws in connection with his protected protesting activity.

79.     Nonetheless, NEA and the City continued to harass Zeleny pursuant to the conspiracy in order to dissuade him from protesting and to disrupt his protests.  None of this conduct was intended as legitimate law-enforcement activity, designed to result in arrest or prosecution.  All of it was designed to directly interfere with the protests and to dissuade Zeleny from protesting.

80.     Pursuant to the conspiracy, NEA took it upon itself—with encouragement from the City—to engage in daily surveillance of Zeleny including in-person and online monitoring.  On information and belief, this surveillance was designed, in large part, as an effort to harass and intimidate.  NEA's private contractors followed Zeleny and tracked his whereabouts and online activity at all times for a period of years.

81.     NEA, with the encouragement of the City, also retained armed security staff when Zeleny was expected.   The City encouraged NEA to have armed security personnel remain on location through the duration of Zeleny's protests.

82.     As part of the conspiracy with the City, NEA would report Zeleny to the police each time Zeleny appeared, regardless of whether Zeleny had engaged in any wrongdoing and although NEA knew that Zeleny had not committed any crimes.  City police gave NEA representatives their personal cell phone numbers so that NEA could contact them to address the Zeleny situation without using official channels.

83.     NEA had no expectation that calling the police on Zeleny would result in a lawful arrest or prosecution and well knew that he had not committed any crimes.    Internal police records show that Zeleny was not engaged in any criminal activity and was extremely cooperative at all times.  NEA reported Zeleny solely to trigger a response by police officers who would then harass and disrupt Zeleny's protests.

SECOND THIRD AMENDED COMPLAINT

84.     Much of NEA's reporting to the police was false or, at minimum, highly misleading.  For example, despite Zeleny not being at NEA's headquarters in close to a year, NEA security reported to the City police (as well as the FBI, ATF, and the U.S. DOJ) that Zeleny was an "on-going threat to NEA and its employees."   On information and belief, NEA made other false and misleading reports to law enforcement authorities, solely for the purpose of causing them to harass Zeleny and not to secure any genuine law enforcement action such as arrest or prosecution.  NEA's reporting was routinely based solely on the content of Zeleny's lawful First Amendment activity.

85.     Consistent with the conspiracy, the City engaged in extensive harassing conduct towards Zeleny in violation of its own written policies.  It would uniformly respond to NEA's reports by appearing on site and harassing Zeleny and his supporters.

86.     City police remained on scene at all times when Zeleny was present, despite repeatedly acknowledging that Zeleny was fully cooperative and had not committed any crime.  While present, City police stopped and questioned Zeleny and his supports extensively without any reasonable suspicion of criminal activity.

87.     In violation of written City policy, police questioned Zeleny and his supporters about the content of their protests and their motivations for protesting.

88.     City police would also follow and question Zeleny's supporters extensively about their affiliations with Zeleny and their involvement in his protests.  In one instance, in an effort to dissuade Zeleny's supporters, City police extensively questioned an off-duty Sheriff's Deputy attending the protests about his relationship to Zeleny and his status with the Sheriff's department where he worked.  They followed and stopped other supporters merely to question them about their affiliation with Zeleny and why they were supporting him, using sham "enforcement stops" for this purpose.

89.     Also in violation of written policy, City police followed Zeleny and his supporters in both marked and unmarked cars and using undercover officers.  City police followed Zeleny even after he left the City limits and kept tabs on where he was staying.

90.     City police interfered with Zeleny's protests, requiring him to lower the volume of musical performances and to move his signage, even when this was not required by City ordinance or policy.  Doing so was also a violation of the City's written policy.

91.     The City kept extensive surveillance on Zeleny, again in violation of City policy, which prohibits City staff from keeping surveillance on protestors when there is no reasonable suspicion of a crime being committed.  City police were given an express directive to issue "[d]etailed reports regarding any contact with Zeleny."  In addition to generating numerous "informational" reports on Zeleny, Bertini kept his own personal "Zeleny file."

92.     During Zeleny's protests, Bertini unilaterally deemed Zeleny as a "security risk," and used this as a basis to ignore City policy prohibiting the above conduct.

**Frivolous Criminal Prosecution**

93.     In July 2012, pursuant to its conspiracy with NEA, the City frivolously referred Zeleny to the County of San Mateo District Attorney's Office[2] for a sham prosecution for carrying a "concealed" handgun.  This prosecution was also objectively baseless and a sham based on misrepresentations and the suppression of exculpatory evidence required to be disclosed to Zeleny under *Brady v. Maryland,* 373 U.S. 83 (1963).  The City and NEA's aim was, again, to directly interfere with Zeleny's protests rather than to achieve a legitimate outcome through the criminal process.

94.     The City's referral of the criminal case was fraudulent and based on the willful withholding and misrepresentation of evidence.  Initially, the officers who responded to Zeleny's protests on the date in question, June 13, 2012, found no evidence of criminal activity.  Nonetheless, Bertini made the decision to refer Zeleny for prosecution.

95.     The City referred Zeleny for prosecution based on the written report of Officer Jeremy Foy.  Initially, Officer Foy reported his interaction with Zeleny as informational only.  Neither Officer Foy, nor any of the other officers on site, arrested Zeleny, cited him, or suggested that he was committing a crime.

---

[2] The District Attorney's Office is not a City agency, but an agency of San Mateo County.

96.     Later, apparently after speaking with Sharon Kaufman and Bertini(participants in the conspiracy), Officer Foy generated a felony policy report against Zeleny, which Bertini used to make the criminal referral, and which the County used to prosecute Zeleny.  In this sham report, Officer Foy asserted that he had observed Zeleny carrying a "concealed" firearm in a belt holster.  According to Officer Foy, the holster was such that he could not determine whether it contained a weapon.  This was the entire basis for the City's referral for prosecution and the County of San Mateo's prosecution.

97.     The City and the County District Attorney's office concealed from Zeleny—in violation of his constitutional rights under *Brady*—and from the trial court, that in a prior report Officer Foy had documented the same firearm in the same holster and reported that he was able to immediately see that the holster contained a firearm.  As a result, the firearm was not "concealed."  Officer Foy made the prior report for informational purposes, concluding that no crime had been committed.  On information and belief, the City and the County intentionally concealed this clearly-exculpatory evidence to support the sham prosecution.

98.     The fraudulent basis for the criminal prosecution, and the wrongful withholding of evidence, was such that it deprived the entire proceeding of its legitimacy.

99.     The City and the County engaged in further sham conduct in connection with the criminal proceeding.  Among other things, the Deputy District Attorney in charge of the case claimed at different stages of the proceeding that Zeleny had violated the law by carrying a "concealed" weapon, and through the same conduct violated the law by "openly" carrying a weapon.  When Zeleny argued that he fell within an exception to the firearms statutes because he was taking part in an entertainment event or video production, the City made retroactive changes to the policies posted on its website for such events, which the County prosecutor then relied upon to argue that Zeleny needed a permit for these activities so could not fall within the exception.

100.    On information and belief, the City and County pursued the sham prosecution at NEA's behest and with its active encouragement and participation.  Despite having no standing to participate in the criminal proceeding, NEA inserted itself into that

proceeding, ultimately controlling prosecutorial decisions.  In the course of the prosecution, NEA's representatives monitored Zeleny's trial, gave *ex parte* strategic input to both Bertini and the District Attorney's Office, and met frequently with Deputy District Attorney.  The Deputy District Attorney regularly referred to NEA as "her client" or "the client," and indicated that she needed NEA's approval before making significant decisions.

101.    More than two years the District Attorney filed the frivolous criminal charges, the trial court acquitted Zeleny, holding:  "His weapon was properly holstered in the holster which was manufactured for that very weapon."  The criminal prosecution had its intended effect, however, of stopping Zeleny's protests for two years under the threat of criminal prosecution.

102.    While the criminal prosecution was ongoing, California enacted new restrictions on the "open carry" of firearms, described below.  The City immediately seized on these new laws to stop Zeleny from protesting.   California Adopts "Open Carry" Restrictions for Handguns and Non-Handgun Firearms

103.    Prior to January 1, 2012, it was legal to openly carry an unloaded firearm in public in California.  On October 10, 2011, Governor Brown signed a bill that modified the law on openly carrying an unloaded handgun to match the existing restrictions for openly carrying a loaded weapon.

104.    California Penal Code section 26350 now prohibits the open carrying of an unloaded handgun, outside of a vehicle, in public, in an incorporated city or city and county.

105.    Section 26375 exempts from section 26350, "the open carrying of an unloaded handgun by an authorized participant in . . . a motion picture, television or video production, or entertainment event, when the participant lawfully uses the handgun as part of that production or event."

106.    A year later, in 2012, California adopted similar restrictions on open carry of firearms other than handguns.  Penal Code section 26400, which became effective on January 1, 2013, makes it a crime for a person to "carry[ ] an unloaded firearm that is not a handgun in an incorporated city or city and county when that person carries upon his or her person an

unloaded firearm that is not a handgun outside a vehicle while in the incorporated city or city and county."

107.   Section 26405(r) contains a similar exemption for "an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television, or video production or entertainment event, when the participant lawfully uses that firearm as part of that production or event."

108.   Section 25510  contains a similar exemption from sanctions under Section 25400 for carrying a concealed firearm for "an authorized participant in a motion picture, television, or video production, or an entertainment event, when the participant lawfully uses the firearm as part of that production or event, or while going directly to, or coming directly from, that production or event."   Zeleny's Efforts to Engage in Protected First and Second Amendment Activity

109.   Since the enactment of Penal Code sections 26350 and 26400, Zeleny has attempted to continue his peaceful protests as part of a video production, exercising his rights under sections 25510, 26375, and 26405 to film his protests, and then distributing the videos online.

110.   Zeleny's protests are part of a rich history of peaceful, but armed, protests, many drawing inspiration from the Black Panthers.  Protests of this nature are common across the country in states that have not completely banned the open carry of unloaded firearms.  The conspicuous bearing of loaded and unloaded arms in connection with a public or political issue is an effective form of political speech and public demonstration.

111.   Zeleny's protests are protected activity under both the First and Second Amendments to the United States Constitution.

112.   The First Amendment protects non-verbal forms of communication as well as verbal speech.  Zeleny's protests, which combine pure speech, flyers, signs, posters, video, and the peaceful carrying of unloaded firearms, are constitutionally protected activity.

113.   Zeleny is equally entitled to the benefit of sections 25510, 26375, and 26405 of the Penal Code as would be a large movie studio or production company. "Liberty of

- 20 -

the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods." *Branzburg v. Hayes*, 408 U.S. 665, 704 (1972).  While Zeleny was not engaged in the production of feature films intended for national and international distribution, he did create his video content for the purpose of publishing it on the Internet, in connection with a matter of significant public interest.

114.    Zeleny's right to openly carry unloaded firearms is also protected by the Second Amendment.  The right to bear arms enshrined in the Second Amendment includes the right to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket for the purpose of being armed and ready . . . in case of conflict with another person."  *District of Columbia v. Heller*, 554 U.S. 570, 584 (2008).  The motivating principle of the Second Amendment is self-defense.  *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

115.    The First and Second Amendment are made applicable to municipalities pursuant to the Due Process Clause of the Fourteenth Amendment.

116.    The Defendants, however, acting under color of law and in their official capacities, have either suppressed or threatened to suppress Plaintiff's lawful exercise of his Constitutional rights pursuant to official policies, customs, or practices.  The Defendants interpret certain California statutes in such a way that Plaintiff's protests are completely foreclosed by California's prohibition on the carriage of exposed firearms.

**The City Threatens Further Prosecution in an Effort to Chill Zeleny's Protected Speech**

117.    The City, invoking the power of the State of California, continues to threaten Zeleny with further prosecution if he resumes his protests.  The City police have candidly confirmed that their threatened prosecution is based in part on the content of Zeleny's message, which they find to be offensive.

118.    On March 15, 2013, following a meeting with NEA, the City noted that open carry is "now illegal," referring to the Penal Code sections discussed above, such that Zeleny would no longer be allowed to carry guns in his protests.

119.     In order to ensure that Zeleny cannot rely on the express exceptions to the "open carry" ban, acting at the behest of NEA, the City has developed an artificial and defective interpretation of the statutes for the sole purpose of interfering with Zeleny's protests. According to the City, in order to fall within the exceptions, Zeleny must have City approval through an opaque permitting process, described in more detail below, in order to carry weapons as part of his protests.

120.     Between June 2015 and the present, Zeleny has attempted to exercise his rights under sections 25510, 26375, and 26405 by engaging in videotaped protests while carrying unloaded firearms, including handguns and rifles.

121.     Contrary to the plain language of the Penal Code, however, the City has interpreted it to require authorization from the City both for the video production itself, and for the carrying of unloaded firearms as part of that production.

122.     Shortly after the adoption of section 26405, the City adopted a municipal policy, which purportedly requires a Special Event Permit for Zeleny's protests.

123.     The City informed Zeleny that if he engages in his protests without a permit under its Special Event Permit policy and/or a film permit from the City, he will be prosecuted for violation of California's open and/or concealed carry laws, including California Penal Code §§ 25400, 26400, and 26350.

124.     In an effort to comply with the City's requirements, between 2015 and present, Zeleny has repeatedly applied to the City for entertainment and/or film permits accommodating his videotaped, armed protests.  Despite his offers to accommodate all reasonable time, place, and manner restrictions on his proposed events, the City has denied all of Zeleny's applications without explanation.  It has expressly declined to formulate conditions for approval or to provide Zeleny with any lawful time, place, or manner restrictions that he could satisfy in order to secure permits.

125.     Zeleny has repeatedly requested that the City identify the conditions or criteria Zeleny must satisfy to receive a permit, and the City has failed and refused to do so.

126.   During an appeal of one of Zeleny's requests for a permit, Bertini testified that the City had denied Zeleny's requests, among other reasons, because they found the content of his protests offensive and "obscene as to minors."  Evidence uncovered in discovery demonstrates that the City has attempted (largely unsuccessfully) to use obscenity and similar content-based statutes to stop Zeleny's protests since at least 2010.

127.   Plaintiff is informed and believes, and on that basis alleges, that the City has continually denied and refused to process Zeleny's requests for permits because it disagrees with the substance of his message, and does not believe that his statement about Min Zhu's conduct or WebEx's and NEA's tacit approval of that conduct are true.

128.   The requirement that Zeleny obtain a permit, and refusal to approve Zeleny's permits or processes them in the ordinary course, is an unlawful, content-based restriction on Zeleny's speech protected by the First Amendment.  Plaintiff is informed and believes, and on that basis alleges, that the content-based refusal to approve Zeleny's requests for permits was undertaken pursuant to an official policy, custom, or practice of the City.

129.   In August 2016, Zeleny met with Menlo Park City Manager Alex McIntyre and Police Commander David Bertini in seeking a permit.  At that time, Commander Bertini took issue with a piece of non-obscene artwork that Zeleny was proposing to display as part of his protests. An accurate depiction of the artwork is attached hereto as Exhibit A.

130.   Commander Bertini threatened that if Zeleny displayed the artwork, he would be arrested for violation of California Penal Code, section 313.1(a), which prohibits the distribution of harmful content to minors.  Commander Bertini also threatened Zeleny with criminal sanctions for carrying firearms in the course of his videotaped protests.

131.   Zeleny is informed and believes, and on that basis alleges, that the foregoing conduct of the City and City officials was pursuant to an official policy, custom, or practice of the City.

132.   Zeleny continues to exercise his right to free speech under the Constitution, in connection with this issue of public interest.  Zeleny tried many different ways of accommodating the City and NEA, but their demands kept escalating unreasonably, from

objections to the volume and nature of unamplified musical performances, to demands to relocate the protests outside of the Rosewood complex that houses NEA. Ultimately, what the process revealed was content-based discrimination.

**The City and NEA Entangle Zeleny in a Sham Permitting Process**

133.    Evidence uncovered during discovery demonstrates that the City and Bertini, with the assistance and encouragement of NEA, developed a strategy to apply sham permitting procedures to Zeleny's permit applications, with the specific purpose of depriving him of access to the ordinary administrative process. The purpose of this conduct was not to reach a legitimate outcome on Zeleny's permit applications, but to complicate, frustrate, and perpetually delay the process to interfere with Zeleny's ability to protest. To date, Zeleny's most recent permit application remains in limbo and the City refuses to process it even now.

**The Published Permitting Process**

134.    The City publishes on its website a series of procedures governing the process for seeking Special Events Permits within the City.

135.    The process is designed to be an interactive process between the citizen and the City to develop a permit application that will be approved by the City. As specified by published City policy, the process is supposed to involve the following steps:

a)      The City Community Services Director communicates with the applicant to secure a permit application, and then screens the initial application for completeness. If the application is incomplete, within 48 hours, the Community Services Director will communicate with the applicant regarding any deficiencies.

b)      The application is then forwarded to six internal City departments for a collaborative review. Bertini is not ordinarily involved in this process. Within 10 days, the internal staff review and either conditionally approve or disapprove the decision.

c)      If internal staff need more information, the Community Services Director sets up an in-person meeting with the applicant to address this information with the goal of securing a complete application.

d)      Once the information is provided, the City will then send Conditions of Approval or Denial to the applicant.  Once these items are completed, the permit will be conditionally approved subject to public notice.

e)      If the application is denied, it is then subject to a two-stage appeal process, first with the City Manager, and then with the City Council.  At both stages of appeal, both the applicant and the City are allowed to present evidence and argument, and examine and cross-examine witnesses, all in a public hearing on the record.  Final denials are subject to review in court pursuant to California Code of Civil Procedure § 1094.8.

136.    In the ordinary course, special event permits are generally given conditional approval within a matter of days or weeks based on a very basic description of the date, time, and location of the event and the expected activities and setup.

137.    The City has a separate permitting process for film permits.  A different City department handles film permits.  In practice, they are issued based on a cursory application, again with minimal information required.  The City approves most film permits within a day or a few days of a request.

**The City and NEA Conspire to Derail Zeleny's Permit Applications**

138.    On or about July 10, 2015, in an effort to comply with the City's interpretation of the firearms statutes, Zeleny submitted a Special Events Permit application.  He stated that he planned to start on October 1, 2015.  Without telling Zeleny, the City (at Bertini's direction) then circumvented the permit process entirely, and subjected Zeleny's permit to ad hoc processes that have never applied to any application before or after.

139.    As part of the ongoing conspiracy, Bertini took action to stymie and deprive Zeleny of a valid process.  Bertini intercepted and unilaterally processed and denied Zeleny's application himself on content-based grounds, without ever submitting it through the ordinary process of approval.  Bertini did not allow the Community Services Director nor the six-department group to review Zeleny's permit application.[3]

---

[3] NEA was never directly involved in the permitting process.  It made no appearance at any of the hearings.  It did not submit any materials.

140.   The City did not immediately respond to Zeleny and failed to respond to or process his application on its published timeline.  Instead, according to internal City communications, Bertini set up a meeting with NEA "so we can coordinate our response."

141.   Bertini stayed in regular contact with NEA throughout the permitting process, including this in-person meeting, which took place on September 2, 2015, as well as phone calls and emails with David Tresmontan, NEA's security officer.  Throughout the process, Bertini previewed the City's proposed course of action to NEA before any official decision.

142.   Pursuant to this conspiracy, with NEA's encouragement, Bertini developed a strategy to continually delay and frustrate Zeleny's permit applications rather than allowing them to be resolved through the ordinary process.  This conduct was designed not to achieve a legitimate outcome, but to use the process itself to stifle Zeleny's ability to protest by drawing him into an endless, Kafkaesque process that did not follow established City policies or procedures.  Neither the City nor NEA have a reasonable, good faith belief that the City can properly deny Zeleny's permits on content-based grounds, and the City continues to acknowledge that it cannot legitimately stop Zeleny from protesting.

**Bertini Unilaterally Processes and Denies the Application, Depriving Zeleny of Access to the Ordinary Administrative Process**

143.   Rather than submit the application through the ordinary process, Bertini, in consultation with the City Attorney, unilaterally processed Zeleny's application himself.  On information and belief, this has never before occurred in the permitting program.  City staff referred to Zeleny's permit application as "the one PD [i.e., the Police Department] handled[.]"

144.   Bertini applied no objective criteria to the permit application.

145.   The City never engaged in an interactive process with Zeleny.  It never attempted to set up an in-person meeting as its policy requires to "complete" the application.

146.   Instead, the denial of Zeleny's application was preordained due to the ongoing conspiracy and efforts to stifle Zeleny's protests.

147.   On July 21, 2015, Bertini emailed NEA and others about Zeleny's permit application.  The City had not responded or provided feedback to Zeleny at that time.  He

advised that the City had already decided to deny the application, but would still request more

information from Zeleny before notifying him of the denial:

> Although we intend to deny this application on several grounds (predominately that this is not a 'special event' as defined by the City), we are in the process of requesting more information from him on the exact location he was intending as it was not clear on his application. Once we have gone through the formal information gathering process, we will notify him of our decision on his application.

The same day, Bertini emailed NEA security officer David Tesmontan to ask if NEA

was still conducting surveillance on Zeleny, apparently to obtain information to

justify the re-determined denial of the permit.

148.   Although Bertini was effectively processing the permit application himself,

the City referred Zeleny to the "Special Events Permit Committee."  In one of its denial letters,

the City stated that the decision was made by this committee.  ***There is no such committee and***

***never has been.***  Bertini admitted at his deposition that the City has not had a special events

committee at any point since the program has been in effect.

**The City Frustrates Zeleny's Application with Needless Demands for**

**Information Having Already Decided to Deny the Permit.**

149.   Consistent with this plan, although the City had already decided to deny

Zeleny's application, it continued to pepper Zeleny with requests for more information, to

"complete" the application.  Bertini confirmed that the City had firmly decided to deny the

application, but would not notify Zeleny until "after completing the appropriate due diligence" –

i.e., requesting extensive, unnecessary information.

150.   On July 24, 2015, the City Attorney emailed Zeleny demanding extensive

information supposedly needed to "process" the application.  The City Attorney claimed that the

City could not "further process [the] application" without this information, although Bertini had

already decided to deny it.  He also claimed that there was no urgency to Zeleny's application

because the event was not contemplated until late September or October.

151.   The City demanded far more extensive information from Zeleny that it has

ever required from any other applicant.  The City did not need this information to complete a

decision.  Instead, on information and belief, the City simply made these demands on Zeleny to make the permitting process more difficult and to use the supposed lack of information, or an information Zeleny provided, as a pretext to deny or refuse to process the application.

152.    The City engaged in the same conduct with respect to Zeleny's later film permit application, as discussed below.

**Bertini Generates Pretextual Reasons for Denying the Permit Application**

153.    Bertini made up pretextual and circular reasons for denying the permit application, which were unsupported by City policy, when in fact the denial was purely content based.  At each stage of the permitting process, the City has offered a changing series of pretextual grounds for denying Zeleny's permit application to conceal content-based restrictions.

154.    The City has no objective criteria that it applies to permit applications either in terms of completeness or the ultimate permitting decision.

155.    On September 21, 2015 – i.e., nine days before his protest was set to start – the City sent Zeleny its official denial of his permit application.  The City gave two primary reasons for the initial denial of Zeleny's permit application:  (1) the application being "incomplete"; and (2) the application not meeting the criteria for a "special event."

156.    Both of these were pretextual.  The application was not incomplete. Zeleny had provided far more information than was required to process such an application.  As Bertini's communications make clear, no matter what information Zeleny submitted, his permit was going to be denied.

157.    Similarly, the City cannot specify any objective criteria for what constitutes a "special event as defined by the City."  Instead, as Bertini has since admitted, Zeleny's activity qualifies as a special event under at least three categories in the City's published guidelines:

> Q.    Is the City -- is the definition in this FAQ of what qualifies as a special event the City's definition of a special event?
>
> A.    Yes.
>
> Q.    So under this -- at least under the published FAQ, Mr. Zeleny's event would qualify as a special event on at least three criteria; correct?

A.   Yes.

158.   After the initial denial, the City gave a series of shifting reasons for the denial.  Later, the City refused to process Zeleny's application claiming that Zeleny does not need a permit to engage in protected First Amendment protests[4] and because "open carry" is unlawful under the new firearms statutes.  These assertions were equally pretextual and circular, designed to prevent Zeleny's application from being processed.

159.   The City has admitted that unless Zeleny has a permit, he will be arrested for carrying firearms in his protests.  It has acknowledged that it knows he is seeking approval so that he can carry firearms in those protests.  If Zeleny has a permit, the City acknowledges that he can carry firearms as part of the protest without facing a risk of arrest.

160.   Bertini finally admitted at an August 11, 2016 hearing that the reasons for denial of Zeleny's permits include the content of Zeleny's protests.  During that hearing, Bertini threatened Zeleny with prosecution under Penal Code § 313(1)(a), obscenity as to minors, due to the content of his proposed presentation, including the use of suggestive cartoon images.  Bertini admitted that the alleged "obscenity" of Zeleny's protest was one of the grounds for denial of Zeleny's permits, although this ground has never been documented in the proceedings.

### Bertini Intentionally Delays Zeleny's Appeals

161.   Zeleny appealed the initial denial of his permit application in April 2016.  The City affirmed the initial denial.

162.   Zeleny promptly appealed in May 2016.

163.   In June 2016, the City sent Zeleny a letter denying his appeal, reiterating ertini's pretextual grounds.  In this letter the City claimed that "[d]etermination of the approval or denial of any application is at the discretion of the Special Event Permit Committee," although the City did not have such a committee.

164.   Zeleny again appealed and requested a hearing before the City Manager.  The hearing was eventually set for August 11, 2016.  In advance of the hearing, Zeleny's

---

[4] The City has continued to maintain this frivolous position throughout this lawsuit as well.

counsel asked basic procedural questions of the attorney the City had retained to oversee and conduct the hearing as well as the City Attorney.  They refused to respond or explain the procedures.

165.    At the hearing, Zeleny presented a valid, California Entertainment Firearm Permit issued by the California Department of Justice.

166.    The City nonetheless upheld the decision on appeal in September 2016.  It again asserted the same pretextual grounds and new ones, such as traffic issues and distraction of passersby.  The City admitted at the hearing that it has no objective basis for establishing the grounds used to deny the permit application.

167.    Shortly after this denial, Bertini then undertook to have Zeleny's Entertainment Firearms Permit revoked by the California Department of Justice.  When the Department of Justice would not revoke the permit, the City delayed Zeleny's further appeal until the permit expired.

168.    Zeleny timely appealed the denial to the City Council on September 16, 2016.   His appeal was originally scheduled for November 15, 2016.

169.    On October 12, 2016 the City emailed Zeleny notifying him that his hearing would happen on October 26 – *i.e.*, in two weeks.  Zeleny's counsel promptly notified the City that Zeleny had undergone emergency surgery, and asked to postpone to mid-November.  Rather than simply revert to the original schedule, Bertini and other City staff decided not to hold a hearing until the next year, 2017.

170.    Eventually the City unilaterally rescheduled the hearing for April 4, 2017.  When Zeleny asked to advance the hearing due to his wife being due to give birth, the City refused.  It eventually rescheduled the hearing for August 29, 2017.

171.    In the interim, Bertini repeatedly contacted the California Department of Justice to seek revocation of Zeleny's firearms permit.  In a June 1, 2017 email to the Department of Justice as part of these efforts, Bertini noted:  "We have been postponing Zeleny's appeal."  He urged the Department of Justice to revoke the permit immediately.

172.   When the Department of Justice would not do so, the City successfully postponed Zeleny's hearing until August 29, 2017, after his permit expired.

**The City Council Denies the Appeal Without Explanation**

173.   The results of the August 29, 2017 appeal hearing were determined in advance.  Before the hearing took place, the City had already scheduled a closed-session meeting with counsel to address potential civil litigation by Zeleny.

174.   Bertini appeared on behalf of City staff and argued to uphold the denial.

175.   In September 2017, the City issued its final decision, simply incorporating the prior pretextual justifications.

**Bertini Intercepts Zeleny's Film Permit Application and Unilaterally Processes that Application as Well**

176.   On September 7, 2017, Zeleny requested that the City reconsider the denial of his permit and treat his application as one for a film permit under the separate process the City maintains for film permits.  Like his special events permit application, the City did not submit his film application through the ordinary process, did not apply any objective criteria, and simply delayed and refused to process that application.

177.   Pursuant to the City's ongoing course of conduct and its conspiracy with NEA, Bertini also intercepted Zeleny's film permit application.  Bertini is not involved in the City's film permitting process.  Nonetheless, after learning of Zeleny's request, Bertini immediately contacted and met with staff in the City department that processes film permits to ensure a denial of the application.  On information and belief, pursuant to this meeting, Bertini dictated the film permit process as well to ensure that Zeleny would not get a permit.

178.   On September 27, 2017, after Bertini had met with staff, the City Attorney then emailed Zeleny directing him to submit his film application to this same staff.

179.   Once again, the City persistently delayed the application and refused to process it.

180.   After a month of delay, City staff demanded extraordinary detail about Zeleny's proposed filming, which it did not need to process the application.  They requested far

- 31 -

more detailed information than had been requested for other applications.  On information and belief, City staff did this at the direction of Bertini and the City Attorney's office.  Three days later, Zeleny provided the requested details.

181.    On November 22, 2017, the City Attorney then emailed Zeleny directly, demanding even more unnecessary, extremely-detailed information about the proposed filming, including, among other things:  exactly where Zeleny planned to place various items as part of his film, the names of participants and crew, the expected brightness of the display Zeleny intended to use, the types of guns, serial numbers, who will be supplying them, and other minute details.

182.    None of this information is required in the ordinary process.  On information and belief, it was demanded solely to delay the process and use Zeleny's declining to provide the unnecessary information as a basis to refuse to process his application.

183.    Once again, the City refused to address any time, place, or manner criteria or to tell Zeleny the criteria for submitting a satisfactory application.  It simply refused to process his application until he complied with the changing series of information demands.

184.    The City also delayed the process extensively.  Although most permit applications are processed within days, the City continued to dither and demand unnecessary details well into December 2017.  On information and belief, the City intentionally delayed its processing of Zeleny's application in order to prevent him from protesting.

185.    The City has continued to this day to refuse to process Zeleny's permit as "incomplete."  According to the City, Zeleny's permit application still remains "pending" and cannot be processed.

186.    Once again, at Bertini's instance, the City has taken Zeleny's film permit out of the ordinary administrative process and placed it in permanent limbo.

**DECLARATORY RELIEF**

187.    An actual, substantial, justiciable, and continuing controversy exists between Plaintiff and Defendants.

188.   Plaintiff seeks to exercise his First and Second Amendment rights by engaging in peaceful protests while carrying unloaded firearms.  Due to the statutes, municipal requirements, and official acts identified herein, Zeleny has been prohibited from exercising those rights, and the exercise of his First and Second Amendment rights has been chilled due to the ongoing threat of criminal prosecution.

189.   A declaration of rights is necessary and proper to clarify Plaintiff's rights to engage in constitutionally protected activity and to govern the parties' conduct. \

190.   California Penal Code sections 26350 and 26400, on their face, prohibit Zeleny from exercising his right to carry firearms in peaceful protest.  Zeleny seeks a declaration that these statutes are unconstitutional on their face, as applied to Zeleny's display of unloaded firearms as a means of protest.

191.   California Penal Code sections 25510, 26375, and 26405 allow "authorized participants" in video productions to carry unloaded firearms in connection with such productions.  On their face, these statutes permit Zeleny to carry unloaded firearms in filmed protests as part of a video production.  The City has taken the position, however, that City approval is required both of the video production itself and of the "authorized participants" allowed to carry firearms.

192.   The City has required the issuance of film permits to Zeleny as a condition of recognizing his statutory and Constitutional right to lawfully carry unloaded firearms as part of his videographed public entertainment events protesting ongoing municipal and corporate sponsorship of an incestuous child rapist.  Zeleny contends that he does not need the City's permission or approval to do so, and that the City has refused its permission and approval as an unlawful content-based restraint on his right to free speech.  A declaration is necessary that the City's policy requiring such approval is unconstitutional, or that the City cannot condition approval on the content of the video production or entertainment event.

193.   The City has prohibited Zeleny from exercising his right to free speech based on the content of his protests.  A declaration is necessary that Zeleny's protests and the materials used by him in those protests are not obscene as a matter of law, and do not violate

- 33 -

California Penal Code section 313.1(a), or in the alternative, that section 313.1(a) is unconstitutional as applied to Zeleny's protesting activities.

## FIRST COUNT

**(Violation of the First Amendment to the United States Constitution)**

**(Against Defendants the City of Menlo Park and Bertini)**

194.    Plaintiff incorporates by reference all allegations in each of the preceding paragraphs, as if fully set forth herein.

195.    The First Amendments to the United States Constitution is made applicable to the City through the Due Process Clause of the Fourteenth Amendment.

196.    The City of Menlo Park and Bertini have, under threat of criminal prosecution, prohibited Zeleny from engaging in his lawful protests based on the content of his speech, claiming that they will prosecute Zeleny for obscenity as to minors.

197.    Zeleny's protests are not obscene as to minors under established law.

198.    The City's unwarranted threats to prosecute Zeleny for obscenity as to minors constitute an unlawful prior restraint and violate Zeleny's rights under the First Amendment.

199.    Plaintiff seeks a declaration as follows:

a)    That Plaintiff's conduct and materials used in his protests are not "obscene as to minors" under the California Penal Code, or generally "obscene" under applicable law.

b)    That Plaintiff's protests are protected First Amendment activity.

c)    That Defendants' prohibition on Plaintiff's protests violates Plaintiff's rights under the First Amendment to the United States Constitution.

## SECOND COUNT

**(Violation of the First and Fourteenth Amendments to the United States Constitution)**

**(Against Defendants the City of Menlo Park and Bertini)**

200.    Plaintiff incorporates by reference all allegations in each of the preceding paragraphs, as if fully set forth herein.

201.   The First Amendments to the United States Constitution is made applicable to the City through the Due Process Clause of the Fourteenth Amendment.

202.   The City of Menlo Park has improperly interpreted the exceptions to California's firearms carry bans, California Penal Code §§ 25510, 26375, and 26405, as applicable to authorized participants in a motion picture, television or video production, or entertainment event, to require the City's approval of the production or event itself, and the use of firearms and "authorized participants" in that production or event.

203.   The City has applied its misinterpretation of California law to give the City unfettered discretion to refuse permits for a motion picture, television or video production, or entertainment event, and participants in said production or event, including based on impermissible factors, such as the content of the production or event.

204.   Plaintiff is informed and believes, and on that basis alleges, that the City has distinguished between commercial motion picture, television or video production, or entertainment events, and independent political productions, film and video productions of protests, and film and video productions involving matters of public concern.

205.   As a result of the City's misinterpretation and misapplication of the California Penal Code, the City has refused to recognize the exceptions to California's firearms carry bans, California Penal Code §§ 25510, 26375, and 26405, as applicable to authorized participants in a motion picture, television or video production, or entertainment event, as applying to Zeleny.

206.   Plaintiff seeks a declaration as follows:

a)   That California Penal Code §§ 25510, 26375, and 26405 do not require the City's approval of the motion picture, television or video production, or entertainment event involved, or the use of firearms or the authorized participants in that production or event.

b)   That the City's policies and practices regarding permits for motion picture, television or video production, or entertainment event are unconstitutional as applied to Zeleny.

## THIRD COUNT

**(Violation of the First and Second Amendments to the United States Constitution)**

**(Against Defendants the City of Menlo Park and Bertini)**

207.   Plaintiff incorporates by reference all allegations in each of the preceding paragraphs, as if fully set forth herein.

208.   The First and Second Amendments to the United States Constitution are made applicable to the City through the Due Process Clause of the Fourteenth Amendment.

209.   Menlo Park's Special Event Permit and Film Permit policies violate the First and Second Amendments to the United States Constitution, either facially, or as applied to Zeleny's peaceful protests.

210.   The City has misinterpreted California Penal Code §§ 25510, 26375, and 26405 as giving the City the right, not only to approve motion picture, television or video productions, or entertainment events within City limits pursuant to customary permitting, but also to approve the individual participants in those productions or events who may lawfully use unloaded firearms.  As a result, the City has asserted that it has the ability, on threat of criminal prosecution, to prohibit the lawful use of firearms in video productions as a result of non-compliance with City rules relating to motion picture, television or video production, or entertainment event permits.

211.   Pursuant to its unlawful construction of §§ 25510, 26375, and 26405, the City has adopted a municipal policy that gives it unfettered discretion to prohibit protected First Amendment and Second Amendment activity, including on the grounds that the City does not approve of the content or message conveyed by that activity.

212.   The City's Special Event Permit and Film Permit policies violate the First and Second Amendments of the United States Constitution on their face in that they allow the City to wholly prohibit the exercise of rights to free speech and to bear arms, or to condition the exercise of those rights on improper factors.

213.   Plaintiff is informed and believes, and on that basis alleges, that the City has imposed no definite standards on its Special Event Permit and Film Permit decisions, nor

- 36 -

any limitation on the time period within which such permits must be approved, thus arrogating

unbridled discretion on behalf of its permitting officials in violation of the First Amendment.

214.    The City's Special Event Permit and Film Permit policies are void as

unconstitutionally vague, in that the prohibitive terms are not clearly defined such that a person

or ordinary intelligence can readily identify the applicable standard for inclusion and exclusion.

The requirements impose no restrictions on the discretion of City officials to deny permits

arbitrarily, capriciously, or based on unlawful factors, such as the content of protected speech.

215.    In the alternative, the City's Special Event Permit and Film Permit policies

violate the First and Second Amendments as applied to Zeleny, because the City has enforced

their provisions to bar Zeleny's peaceful film and video productions and entertainment events,

which comply with California state law, due to the content of his productions and events.  This

amounts to an unlawful, content-based prior restraint on Zeleny's protected speech activity.

216.    The City has also applied its Special Event Permit and Film Permit

requirements in such a way that it amounts to an outright prohibition against Zeleny bearing

arms within City limits.

217.    Plaintiff seeks a declaration as follows:

a)    That Penal Code §§ 25510, 26375, and 26405 do not require the

approval by a municipality in order for a person to be an "authorized participant" in a motion

picture, television or video production, or entertainment event, exempted from California's

prohibition on carrying unloaded firearms.

b)    That the City's Special Event Permit and Film Permit requirements

are unconstitutional under the First and Second Amendments to the United States Constitution

on its face, as improper restrictions of the rights to free speech and to bear arms.

c)    In the alternative, that the City's Special Event Permit and Film

Permit requirements, as applied to bar Zeleny's peaceful entertainment events and film

productions, amounts to an unlawful prior restraint on Zeleny's First Amendment right to free

speech, and an unlawful restriction on his Second Amendment right to bear arms.

1

2

3

## **FOURTH COUNT**

### **(Violation of 42 U.S.C. § 1983)**

### **(Against Defendants the City of Menlo Park and Bertini)**

4      218.    Plaintiff incorporates by reference all allegations in each of the preceding

5    paragraphs, as if fully set forth herein.

6      219.    The City, through Bertini and other employees and agents, has violated

7    Zeleny's constitutional rights under the First, Second, and Fourteenth Amendments to the United

8    States Constitution, under color of state law, pursuant to official policies, customers, and

9    practices.

10      220.    The City has imposed unlawful prior restraints on Zeleny's protected

11    speech activity by requiring him to unnecessarily seek permits to engage in constitutionally

12    protected activity, and by refusing to grant any such permits based on the content of Zeleny's

13    speech.  Forbidding Plaintiff to exercise his right to free speech does not bear any relationship to

14    protecting the public health, safety, or welfare.

15      221.    The City and Bertini have violated Zeleny's rights to engage in protected

16    speech by threatening him with criminal prosecution for engaging in protected activity,

17    including threatening criminal prosecution based on the content of Zeleny's speech and his

18    peaceful use of unloaded firearms as part of that speech.

19      222.    The City and Bertini have violated Zeleny's right to bear arms by

20    threatening him with criminal prosecution for exercising his Second Amendment right to

21    peacefully bear unloaded firearms, in compliance with state law, and through enforcement of

22    unconstitutional laws.

23      223.    Defendants' true purpose was and is to silence the viewpoint expressed by

24    Zeleny's speech and his mode of expression.  Consequently, Defendants true purpose was and is

25    to silence disfavored viewpoints in violation of the Free Speech Clause of the First Amendment.

26      224.    As a direct and proximate result of Defendants' violation of the Free

27    Speech Clause of the First Amendment and the Second Amendment, Plaintiff has suffered

28    irreparable harm, including the loss of his constitutional rights, entitling him to declaratory and

injunctive relief, and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

**FIFTH COUNT**

**(Violation of the Fourteenth Amendment to the United States Constitution)**

**(Against Defendant Becerra)**

225.    Plaintiff incorporates by reference all allegations in each of the preceding paragraphs, as if fully set forth herein.

226.    The government bears the burden of justifying restrictions on the exercise of fundamental rights by a particular class or classes of individuals.

227.    All law-abiding, competent adults are similarly situated in that they are equally entitled to exercise the constitutional right to publicly bear arms in furtherance of their right to free speech under the United States and California Constitution in connection with a public issue or an issue of public interest, whether as an authorized participant in an entertainment event or motion picture, television, or video production, or pursuant to an entertainment event permit or motion picture, television, or video production permit, or otherwise.

228.    Because California's comprehensive firearms carry restrictions bar law-abiding California residents from publicly carrying a firearm in any manner in furtherance of their right to free speech under the United States and California Constitution in connection with a public issue or an issue of public interest, while allowing other law-abiding citizens to carry a firearm for motion picture, television or video productions, or entertainment events, Defendants have created a classification of persons, including Plaintiff, who are treated unequally through the denial of their First and Second Amendment rights to publicly bear arms for expressive purposes.  Because the 'authorized participant' exception to the ban on publicly carrying a firearm lacks sufficient definiteness to notify ordinary persons what conduct is permitted and prohibited, and to avoid arbitrary or discriminatory enforcement, it is vague and void under the Fourteenth Amendment.

229.    As the proximate result of the Defendants' procedures and policies,

- 39 -

conducted under color of state law, Plaintiff has been deprived of his rights pursuant to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## SIXTH COUNT

### (Conspiracy to Violate Civil Rights under 42 U.S.C. § 1983)

### (Against Defendant NEA)

230.     Plaintiff repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

231.     Plaintiff is informed and believes, and thereon alleges, that in or about 2009, NEA entered into an agreement with the City to discourage, restrict, stifle, and ultimately halt Zeleny's exercise of his First Amendment right to protest and his Second Amendment right to bear arms.  The agreement was to use whatever means were available to defer, disrupt, and interfere with Zeleny's protesting activity.  These means included intimidating and harassing daily surveillance and monitoring, sham litigation, baseless, false and frivolous police reports, police harassment and intimidation, fraudulent criminal proceedings, and deprivation of Zeleny's access to the administrative permitting process, as alleged above.

232.     This conspiracy was developed through a series of meetings and other communications between representatives of NEA, including its security staff, and representatives of the City, including, among others, Sharon Kauffman, and then-Commander Bertini.

233.     During these meetings and communications, the City agreed to use its authority under state law to restrict, limit, and ultimately stop Zeleny's protests, and to stop him from lawfully carrying unloaded firearms within the City limits.  NEA agreed, either tacitly or explicitly, to assist the City in its efforts to hamper and end Zeleny's protests and lawful carrying of firearms.  Internal City documents reflect that as early as 2010, the City was devoted to developing a "firm solution" to end Zeleny's protests of NEA altogether.

234.     NEA, the City, and Bertini engaged in overt acts in furtherance of the conspiracy as alleged above.

235.     This conspiracy, and the acts of defendants NEA, the City, and Bertini, in furtherance of the conspiracy, injured Zeleny by preventing him from exercising his First and

Second Amendment rights as alleged herein, and also violated his Fourteenth Amendment rights, as alleged in more detail above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff sues for relief as set forth below:

A.     Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, binding on all Defendants, that California Penal Code §§ 26400 and 26350 are unconstitutional;

B.     Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, binding on all Defendants, that California Penal Code §§ 25510, 26375, and 26405 do not require municipal approval of "authorized participants" in an entertainment event or film or video production, and that Zeleny is legally permitted to carry unloaded firearms in connection with his entertainment events and/or his film or video productions, without the need for City approval, subject to compliance with other applicable laws;

C.     Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, binding on all Defendants, that Zeleny's peaceful carrying of unloaded firearms in the course of his speech  on matters of public concern or matters of political, social, or other concerns to the community or issues of significant importance to the public as a whole, is constitutionally protected; in the alternative, enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, binding on all Defendants, that Zeleny's peaceful carrying of unloaded firearms in the course of his entertainment events and/or his film or video productions, is constitutionally protected;

D.     Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, binding on the City and Bertini, that Zeleny's speech activity concerning the child rape cover-up by the Zhus and their associates is constitutionally protected and not obscene or "obscene as to minors" within the meaning of the California Penal Code, and that their public display would not violate Penal Code §§ 311.2, 313.1 (a), and 313.4, in virtue of its serious literary, artistic, political, and social value;

E.  Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the City of Menlo Park's Special Event Permit requirement is unconstitutional on its face, or in the alternative, as applied to Zeleny's protests;

F.  Enter an injunction against Defendants prohibiting them from enforcing Penal Code §§ 26400 and 26350 against Zeleny in connection with his peaceful protests, from enforcing the City of Menlo Park's Special Event Permit requirement, and from refusing to grant Zeleny required permits based on the content of his speech activity;

G.  Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, construing California Penal Code §§ 25510, 26405, and 26375 and enter a declaratory judgment stating that these sections exempt from sanctions under California Penal Code §§ 25400, 26400, and 26350 for the carrying of an unloaded handgun and of an unloaded firearm that is not a handgun, any individual who acts and/or holds himself out as an authorized participant in, or serves as an authorized employee or agent of a supplier of firearms for, a motion picture, television or video production, or entertainment event, when the participant lawfully uses that firearm as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event. Relevant actions and representations include, without limitation, displaying ornamental signs or multimedia artworks; reciting slogans, speeches, or poetry; playing trumpets, accordions, bagpipes, or other musical instruments; and/or wearing conspicuous costumes, makeup, wigs, clown noses, or other decorative prostheses;

H.  Award nominal damages against Defendant NEA and punitive damages in an amount to be proven at trial.

I.  Award attorneys fees pursuant to 42 U.S.C. § 1988 and California Code of Civil Procedure § 1021.5, and costs as provided by law; and

J.  Award such other and further relief as the Court deems just and proper.

Dated:  ~~August 30, 2019~~September 24, 2020                    Respectfully submitted,

                                            s/ Damion Robinson
                                            _____
                                            David W. Affeld
                                            Damion D. D. Robinson
                                            Affeld Grivakes LLP

Attorneys for Plaintiff Michael Zeleny

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff demands a jury trial on all matters so triable.

Dated:  ~~August 30~~September 24, 2020~~, 2019~~                Respectfully submitted,

                                  s/ Damion Robinson
                                  David W. Affeld
                                  Damion D. D. Robinson
                                  Affeld Grivakes LLP

                                  Attorneys for Plaintiff Michael Zeleny

1

## **PROOF OF SERVICE**

2

I hereby certify that on September 24, 2020, I electronically filed the foregoing
document using the Court's CM/ECF system.  I am informed and believe that the CM/ECF
3  system will send a notice of electronic filing to the interested parties.

4
                                              s/ Gabrielle Bruckner
5                                             Gabrielle Bruckner

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND THIRD AMENDED COMPLAINT