**TODD H. MASTER [SBN 185881]**
tmaster@hrmrlaw.com
**ROBERT J. GUNDERT [SBN 104486]**
rgundert@hrmrlaw.com
**HOWARD ROME MARTIN & RIDLEY LLP**
1900 O'Farrell Street, Suite 280
San Mateo, CA 94403
Telephone:   (650) 365-7715
Facsimile:   (650) 364-5297

Attorneys for Defendants
CITY OF MENLO PARK and DAVE BERTINI

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO

| | |
|---|---|
| MICHAEL ZELENY, an individual,<br><br>        Plaintiff,<br><br>    vs.<br><br>EDMUND G. BROWN, JR., an individual, in his official capacity, et al.<br><br>        Defendants. | Case No. 17-cv-07357-RS (TSH)<br><br>**NOTICE OF MOTION OF DEFENDANTS CITY OF MENLO PARK AND DAVE BERTINI FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**<br><br>**Date:  February 25, 2021**<br>**Time:  1:30 p.m.**<br>**Dept.:  Courtroom 3**<br>**Judge: Hon. Richard Seeborg**<br><br>**Trial Date: None** |

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

1

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

2

**PLEASE TAKE NOTICE** that on Thursday, February 25, 2021, at 1:30 p.m. or as soon

3

thereafter as the matter may be heard, Defendants CITY OF MENLO PARK ("City") and DAVE

4

BERTINI ("Bertini") will move the Court for summary judgment or, in the alternative, for

5

partial summary judgment, on the grounds that:

6
7

A.      The City did not violate Plaintiff's rights by denying him a permit to conduct
activities on property that was not within the City's jurisdiction or control;

8
9

B.      Plaintiff is not entitled to injunctive relief to force the City to issue him a permit to
conduct activities on property that is not within the City's jurisdiction or control;

10
11

C.      Plaintiff was not denied a permit or prohibited from protesting based on the content
of his message;

12
13
14

D.      Plaintiff's special event permit application was properly denied pursuant Penal Code
§§ 26350 and 26400 and because of the significant public safety issues presented by
his application;

15
16

E.      Plaintiff's film permit application was never denied, such that any issue relating
thereto is not ripe;

17
18

F.      The City's special event permit process is valid and plaintiff's challenge to that
process is also moot;

19

G.      The City's film permit process is constitutionally appropriate;

20
21

H.      Defendant Bertini did not violate plaintiff's rights and is entitled to qualified
immunity; and

22
23

I.      Since Defendant Bertini was sued in his official capacity and is no longer a City
employee, the injunctive relief sought as to him is moot.

24

Defendants' motion is based on this notice, the accompanying memorandum of points and

25

authorities, the declarations with exhibits of Dave Bertini, Nicolas A. Flegel and Todd H. Master,

26

the proposed order submitted herewith, the anticipated oral presentation of counsel, the pleadings,
records and files herein, including any related papers filed hereafter, and such other and further

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

1    matters that the court may consider in order to rule on the motion.

2    Date: January 21, 2021                    HOWARD ROME MARTIN & RIDLEY LLP

3

4                                             By:  /s/ Robert J. Gundert
                                                   Todd H. Master
5                                                  Robert J. Gundert
                                                   Attorneys for Defendants
6                                                  CITY OF MENLO PARK and
                                                   DAVE BERTINI
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

## **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION      ………………………………………………   1

II.     FACTS      ………………………………………………………   3

     A.  Plaintiff's Past Armed Protests and the California Open Carry Prohibitions      …………………………………………   3

     B.  Zeleny Applies for a Special Event Permit ("SEP")    ………   3

     C.  Zeleny Applies for a Film Permit …………………………….   7

III.    LEGAL ARGUMENT      ……………………………………….   9

     A.  The City Had No Authority to Issue the Requested SEP Permit ..   9

     B.  Plaintiff Was Not Prohibited from Protesting on Obscenity Grounds      ……………………………………………….   10

     C.  The City Had Valid Time, Place and Manner Reasons for Denying an SEP      ………………………………………….   12

     D.  The Open Carry Exemptions Were Not Applicable to Plaintiff's SEP Application      ………………………………….   16

     E.  Plaintiff's As-Applied Film Permit Claim is Not Ripe    ……….   18

     F.  The City's SEP Process is Valid and the Facial Challenge to it Is Moot      ………………………………………………..   19

     G.  The City's Film Permit Process is Constitutionally Appropriate …   20

     H.  The Fourth Count of the Complaint Adds Nothing New   ………..   22

     I.  Defendant Bertini is Entitled to Summary Judgment    …………   23

IV.    CONCLUSION      …………………………………………………   24

## **TABLE OF AUTHORITIES**

**Page**

*Abbott Labs. v. Gardner*, 387 U.S. 136, 148-149 (1967)    …………………    19

*Brown v. Cal. Dep. of Transp.*, 321 F.3d 1217, 1222 (9th Cir. 2003)  ……….    13

*Califano v. Sanders*, 430 U.S. 99 (1977)    …………………………………    19

*Center for Bio-Ethical Reform, Inc. v. City & County of Honolulu,*
455 F.3d 958, 966 (9th Cir. 2006)    ……………………………………….    12, 13

*Cornelius v. NAACP Legal Defense & Educational Fund, Inc.,*
473 U.S. 788 (1985)   ……………………………………………………….    13

*Cox v. New Hampshire,* 312 U.S. 569, 574-575 (1941)    …………………    15

*DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,*
196 F.3d 958, 965 (9th Cir. 1999)    ……………………………………….    12

*Doe v. Madison School District No. 321*, 177 F.3d 789, 797-98 (9th Cir. 1999) …    10, 20

*Edwards v. City of Coeur D'Alene,* 262 F.3d 856, 862 (9th Cir. 2001)  ……….    14

*Frisby v. Schultz,* 487 U.S. 474, 486 (1988)  …………………………………...    16

*Gallinger v. Beccerra,* 898 F.3d 1012, 1021 (9th Cir. 2018) ……………………    14

*Guatay Christian Fellowship v. County of San Diego,*
670 F.3d 957 (9th Cir. 2011) …………………………………………………    19

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)    ……………………………    24

*Hotel & Motel Ass'n of Oakland v. City of Oakland,*
344 F.3d 959, 971 (9th Cir. 2003)    ……………………………………….    19

*Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of Los Angeles*,
764 F.3d 1044, 1049 (9th Cir. 2014) ……………………………………….    14

*Jacobsen v. Bonine*, 123 F.3d 1272, 1273-74 (9th Cir. 1997)    …………….    13

*Jones v. Dovery,* No. 06cv1979, 2009 U.S. Dist. LEXIS 126104,
at *30 (S.D. Cal. 2009)    …………………………………………………….    24

*Lee*, 505 U.S. at 679  ……………………………………………………….    13

*Manufactured Home Communities, Inc. v. City of San Jose,*
420 F.3d 1022 (9th Cir. 2005) ………………………………………… 19

*McCullen v. Coakley,* 573 U.S. 464, 466 (2014) …………………………… 14

*Preminger v. Principi*, 422 F.3d 815, 823 (9th Cir.2005),
422 F.3d at 823 ……………………………………………………… 12

*Saucier v. Katz*, 533 U.S. 194 (2001) ………………………………………… 24

*Southern California Roads Co. v. McGuire* (1934) 2 Cal. 2d 115 ……………… 10

*Thomas v. Anchorage Equal Rights Commission,* 220 F.3d 1134 (9th Cir. 2000) .. 19

*Thomas v. City of Chicago,* 534 U.S. 316 (2002) …………………………… 22

*United States v. Albertini,* 472 U.S. 675, 689 …………………………………… 16

*United States v. Kokinda,* 497 U.S. 720, 725 (1990) …………………………… 12, 13

*United States v. Torres,* 911. F.3d 1253, 1263-1264 (9th Cir. 2016) …………… 14

*United States Postal Service v. Council of Greenburgh Civic Assns.,*
453 U.S. 114, 129 (1981) ……………………………………………….. 12

*Valson v. Cate,* 14-cv-01420, 2018 U.S. Dist. LEXIS 112827,
at *8 (E.D. Cal. 2018) ……………………………………………………….. 24

*Ward v. Rock Against Racism* 491 U.S. 791 (1989) …………………………….. 13, 14, 16

*Young v. Hawaii,* 896 F.3d 1044 (9th Cir. 2018) ……………………………….. 24


**Constitutional Provisions and Statutes**
California Constitution, Article XI, section 7 …………………………….. 14
California Streets & Highways Code section 90 …………………………….. 10
Penal Code section 313 ……………………………………………………. 11
Penal Code section 313.1 ………………………………………………….. 10, 11, 12, 23
Penal Code sections 26350 and 26400 …………………………………….. 17, 23, 24
Penal Code sections 26375 and 26405(r) …………………………………….. 17
Vehicle Code section 21651 …………………. …………………………………….. 13
Vehicle Code section 21651(a)(1) …………………………………………….. 15
Vehicle Code section 21719 ………………………………………………………... 13

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

This lawsuit arises out of plaintiff's request for a permit to allow him to openly carry and display military grade firearms and ammunition on the median of a busy city roadway, for an indefinite period of time, as part of a protest of a local business, despite the open carry prohibitions of California Penal Code §§ 26350 and 26400.[1]  Plaintiff MICHAEL ZELENY ("Zeleny") sought such a permit from the CITY OF MENLO PARK ("City"). Zeleny contends that under an exemption to these statutory prohibitions he is entitled to authorize himself to openly carry unloaded firearms and ammunition, since he characterized his protest as an "entertainment event." The City denied Zeleny's application for a Special Event Permit ("SEP") because his described activities would violate the Penal Code and presented significant public safety issues.

After this lawsuit was filed the City learned that the median where Zeleny sought to conduct his activities is actually owned by the State of California, not the City. Accordingly, the City had no authority to grant a permit for any activity on the median in the first place. That fact alone derails Zeleny's request for declaratory and injunctive relief, as well as his claim that the City's denial of his SEP application violated his civil rights.

After the City denied his SEP application, Zeleny sought a film permit from the City to stage and film his armed protest on either side of the roadway rather than on the median. The City

---

[1] **Penal Code Section 26350** reads, in pertinent part, as follows:

(a)(1) A person is guilty of openly carrying an unloaded handgun when that person carries upon his or her person an exposed and unloaded handgun outside a vehicle while in or on any of the following: (A)  A public place or public street in an incorporated city or city and county. . .

(2) A person is guilty of openly carrying an unloaded handgun when that person carries an exposed and unloaded handgun inside or on a vehicle, whether or not on his or her person, while in or on any of the following: (A)  A public place or public street in an incorporated city or city and county. . .

**Penal Code Section 26400** reads, in pertinent part, as follows:
(a)  A person is guilty of carrying an unloaded firearm that is not a handgun when that person carries upon his or her person an unloaded firearm that is not a handgun outside a vehicle while in any of the following areas: (1)  An incorporated city or city and county. . .

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA  94403
TELEPHONE: (650) 365-7715

1   responded to the application by asking Zeleny for additional information in order to evaluate the

2   proposed activity for public safety and traffic control purposes. Zeleny repeatedly declined to

3   provide the requested information and instead filed this suit for declaratory and injunctive relief,

4   claiming that the City (and its former Police Commander, defendant DAVE BERTINI ("Bertini")),

5   violated his First and Second Amendment rights by not issuing him an SEP or a film permit. In

6   addition, Zeleny has sued the State of California, arguing that the State's restriction on the open

7   carry of unloaded firearms in public is unconstitutional.

8       The City and Bertini seek summary judgment herein since:

9   A.  The City did not violate Zeleny's rights by denying him a SEP to conduct activities on

10      property not within its control. Similarly, Zeleny is not entitled to injunctive relief to

11      force the City to issue him such a permit.

12  B.  Zeleny was not denied a permit or prohibited from protesting based on the content of

13      his message. In fact, he was told repeatedly that he did not even need a permit to protest

14      so long as he did so lawfully and peaceably.

15  C.  Zeleny's SEP application was properly denied pursuant to Penal Code §§ 26350 and

16      26400 and because of the significant public safety issues presented by his application.

17  D.  Zeleny's film permit application was never denied; his as-applied claim is thus not ripe.

18  E.  The City's SEP application process is valid and plaintiff's challenge to it is also moot.

19  F.  The City's film permit application process is constitutionally appropriate.

20  G.  Bertini did not deny Zeleny SEP application. As a City employee, he simply provided

21      input for the ultimate decision maker, which was reasonable and appropriate. To the

22      extent applicable, entitled to qualified immunity.

23  H.  Moreover, since Bertini was sued in his official capacity and is no longer a City

24      employee, the injunctive relief sought as to him is moot.

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

## II.    FACTS

### A.    Plaintiff's Past Armed Protests and the California Open Carry Prohibitions

For approximately six years prior to submitting his special event permit (SEP) application in 2015, Zeleny conducted "at least several dozen" public protests within the City. *See* Zeleny Deposition at 67:1-11 (Exh. A to Declaration of Todd Master ("Master Decl.").  Starting in 2008, in order to draw attention to his activities, "dramatize his protests" and "amplify his message," he began displaying firearms while protesting. Second Amended Complaint ("Complaint") at ¶¶ 46-48 [Document 99]; Zeleny Depo at 52:15-20; 57:7-58:12; 59:20-61:11; 67:1-68:19.  During that period, the City allowed him to protest with unloaded firearms. Zeleny Depo at 52:15-53:25; 67:1-68:10; 69:9-71:5; 79:17-80:2; Bertini Depo at 15:5-14, attached as Exh. B to Master Decl.

In 2011, California enacted Penal Code § 26350, which prohibits the open carry of an unloaded handgun in a public place or public street within an incorporated city. At the same time, the California Legislature enacted Penal Code § 26375, which provides that this restriction does not apply to an authorized participant in a motion picture, television, video production or entertainment event, when that person is participating in or rehearsing for such, or while at such a production, event or rehearsal. In 2012, Penal Code §26400 was enacted. It expanded the open carry prohibition to include unloaded firearms other than handguns. Penal Code § 26405 was also passed. Subpart (r) thereof contains an exemption identical to § 26375, except that it applies to firearms other than handguns.

### B.    Zeleny Applies for a Special Event Permit ("SEP")

On 7/10/15, Zeleny sent an email to the City with an attached application for an SEP. Zeleny Depo at 95:19-97:1; Exhibit 2.  Persons wishing to hold a special event within the City are required to apply for an SEP. Milde Depo at 94:16-25, Exh. 33 Exh. C to Master Decl.); Bertini Depo at 19:21-20:18.  Generally speaking, a special event is a community-oriented event that is scheduled to occur on public property, which is not a normal day-to-day occurrence, and for which the applicant does not already have a permit. Bertini Depo at 19:21-21:6, 453:1-454:11, 455:3-457:8.  Examples of past special events include run/walk events, concerts, block parties, large

birthday parties on public property, car shows, movie nights, small parades and fundraisers. Nicolas Flegel Decl. at 9:5-8.

The City's SEP process is found on the City's website, in links to various documents referenced on the website, in the FAQs published by the City, in a flow chart, and within the SEP application itself. Bertini Depo at 63:23-66:11; Bertini Decl. at 3:7-17.

SEP applications are basically questionnaires and checklists that elicit the information needed by City staff to understand and evaluate the applicant's proposed event. Milde Depo at 76:17-79:2; Zeleny Depo at 95:19-97:1; Exhibit 2. The information on the application is initially reviewed for completeness and if there are any deficiencies the applicant is contacted and advised of the details that need to be modified or included. Milde Depo at 78:19-79:2. Once the application is deemed complete enough for review it is circulated to those City departments whose input is needed. Milde Depo at 78:19-79:18, 101:15-102:17; Bertini Depo at 26:15-27:1, 47:3-24, 99:3-9, 105:15-21. Special event proposals vary, but each of the reviewing departments evaluates an application to determine whether the activities described comply with department policies, the municipal code, state and federal law and whether any particular time, place and manner issues are raised, such as those pertaining to public safety, traffic control and hygiene. Bertini Depo at 26:10-35:9, 37:11-42:21, 45:7-46:9, 58:21-61:3, 107:4-113:7, Exhibits 33 & 34, 368:23-371:7, 426:18-427:8. If an application is denied the City has an appeal process, which starts at the departmental level and proceeds to a de novo hearing before the City Manager and thereafter, if necessary, a final hearing before the City Council. Bertini Depo at 431:1-434:14.

Zeleny's 7/10/15 submittal stated that he intended to begin protesting on 10/1/15 on the median of Sand Hill Road and that his protest would last for an "indefinite" period. His protest was directed at venture capital firm New Enterprise Associates ("NEA"). Zeleny Depo at 95:19 – 98:18; 104:17-106:2; 117:18-121:1; Exhibit 2. Zeleny stated he would be equipped with "fully operational, exposed and unloaded military grade firearms and loaded ammunition feeding devices therefor, including without limitation, a 9mm Para semiautomatic SIG pistol, and a 7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed Browning M1919a4. . ." Zeleny

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

Depo at 105:22-110:10; Exh. 2. An image of the belt-fed Browning M1919a4 that Zeleny intended to display on the center median (albeit with a different tripod) can be seen at Exhibits 3 and 5 of Zeleny's deposition. Zeleny Depo at 112:10 – 24; 128:4-129:16; Exhs. 3 & 5.

Zeleny's proposed event was also to include a 55-inch portable media display showing videos "featuring explicit representations of sexual violence." He included a web link to a "sample image," which is an animated depiction of an NEA client raping his minor daughter while NEA representatives watched approvingly. The still version of the moving image that Zeleny planned to display is attached as part of Exhibit 4 to his deposition transcript. Zeleny Depo at 113:20-114:8; 115:17-117:5; Exhibit 4.

Zeleny intended to sleep in his truck on the median until the cessation of his protest, the end date of which would be whenever NEA submitted to his demands. Zeleny Depo at 104:17-107:18; Exhibit 2. His application and accompanying email also indicated that he intended to use amplified sound, a portable toilet, and temporary lighting (spotlights focusing on his display) on the median. Zeleny Depo at 121:15-18; 123:5-23; Exhibit 2. Despite the foregoing, Zeleny's application stated that he did not need a traffic control plan or crowd control since "no stopping [is] allowed on the Sand Hill roadside." However, he later stated that his activities would include passing out handouts and souvenirs and engaging in discussion with those passing by. Zeleny Depo at 141:21-142:7; Exhibit 9 (third paragraph of 5/27/16 email).

Zeleny's submittal curiously stated that he "assumes full personal responsibility for the lawful defense of the site." Exhibit 2 to Zeleny Depo (2nd page of application). He intended to hire an armed guard "for nighttime protection." Zeleny Depo at 106:9-107:18; 121:19-122:3. He also disclosed in subsequent e-mails and in deposition testimony that one reason he wished to have guns and ammunition on site was because he had received death threats from persons "sponsored and supported by NEA" and that "a gun without ammunition is useless." Zeleny Depo at 59:20-61:11; 131:17-133:7; Exhibit 7 (April 15, 2016 e-mail, pp. 1-2). Zeleny was thus preparing for the possibility that he would need to defend himself on the Sand Hill Road median with his "fully operational . . . military grade firearms and loaded ammunition feeding devices therefor."

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA  94403
TELEPHONE (650) 365-7715

1    After an exchange of e-mails with Zeleny, the City denied the SEP application via letter

2    sent by City Attorney William L. McClure. Zeleny Depo at 129: 17-130:16; Exhibit 6.  The

3    application was denied for various reasons, including that it was incomplete, proposed carrying

4    firearms openly in violation of state law, and created significant public safety concerns. Id.

5    On 4/15/16, Zeleny submitted what he characterized as an appeal of the denial of his SEP

6    application. Zeleny Depo at 132:15-133:7; 135:24-137:1; Exhibit 7. The e-mail was accompanied

7    by a revised SEP Application dated 6/3/15 (i.e. pre-dating his initial application). The revised

8    application modified the initial one in that it a) stated that the event would no longer last for an

9    indefinite amount of time but would be limited to the month of October 2015 (even though the

10    accompanying e-mail indicated otherwise) and b) that instead of unloaded firearms plaintiff would

11    have "fully operational, exposed and **loaded** firearms." (Emphasis added.) Id.

12    The City treated the submittal as a revised application rather than an appeal, since it

13    "outline[d] several modifications and provide[d] additional information to supplement [the]

14    original application." Zeleny Depo at 140:10-24; Exhibit 8.  The City denied Zeleny's revised

15    application. Traffic safety issues were cited and additional information was requested in that

16    regard. The City also stated that plaintiff's proposal to carry loaded or unloaded weapons was

17    illegal. Id.

18    Thereafter, Zeleny and the City engaged in further written communications and proceeded

19    through the City's appeal process. In a 5/27/16 e-mail he stated that if his application were to be

20    approved he would be carrying unloaded rather than loaded firearms. He also stated that he would

21    be interacting with those passing by, distributing flyers and souvenirs and providing people with an

22    opportunity "to engage me in real-time discussion, broadcast via a live Internet linkage." He did

23    not specify whether this would involve motorists stopping in the middle of Sand Hill Road, driving

24    up onto the median or something else. In addition, he expressed disagreement with the City's view

25    concerning the exemptions to the statutory open carry prohibitions. Zeleny Depo at 141:19-142:17,

26    (Exh. 9), 145:8-147:4 (Exh. 10), 147:8-148:24 (Exhs. 11 and 12).

On 8/11/16, City Manager Alex McIntyre conducted a de novo hearing on Zeleny's appeal

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA  94403
TELEPHONE (650) 365-7715

1   of the City's denial of his SEP application. Testimony and exhibits were presented and the hearing

2   was recorded by audiotape. Plaintiff was represented by counsel as was the hearing officer. Zeleny

3   Depo at 152:22-155:19; McIntyre Depo at 36:8-37:3, 40:17-43:3 43:13-15. The audiotape of the

4   hearing can be accessed at https://spaces.hightail.com/space/k7r5s5Uj6Z. An unofficial transcript is

5   attached to the Declaration of Todd H. Master for the court's convenience.

6        Following the hearing, the City Manager issued a letter dated 9/12/16, denying Zeleny's

7   SEP application. McIntyre Depo at 78:9-79:11, Exh. 154; Zeleny Depo at 161:14-164:20, Exh. 17.

8   City Manager McIntyre stated that the application did not describe a special event, presented public

9   safety concerns, that the open carry of firearms would violate state law, and that the use of lights,

10  monitor and a display had the potential to distract drivers and/or to impair a motorist's vision.

11  Additionally, the letter stated that driving a vehicle on the median would be a violation of Vehicle

12  Code § 21651. McIntyre Depo at 78:9-79:11, Exh. 154; Zeleny Depo at 161:14-164:1, Exh. 17.

13  McIntyre also noted that the subject median is "adjacent to the entrances and exits of Interstate

14  280, making the location unsafe and dangerous to pedestrians, cyclists and vehicles and Zeleny had

15  not submitted a specific sit plan addressing these concerns." Id.

16       Zeleny then appealed to the City Council, which also held a hearing with live testimony and

17  presentations. Zeleny Depo at 168:5-170:7. The City Council upheld the City Manager's denial of

18  Zeleny's SEP application and Zeleny was so advised. Zeleny Depo at 174:16-175:9, Exh. 18;

19  McIntyre Depo at 162:14-163:4, Exh. 162; City Council Hearing Transcript at 42:9-44:19 (Exh. G

20  to Master Decl.). The City Councilmembers repeatedly stated that they respected the protest Zeleny

21  wished to undertake and advised him numerous times that he did not need a permit to protest, so

22  long as he does so lawfully and peaceably. CC Hrg. Transcript at 23:18-25:4, 34:4-35,10, 39:19-

23  40:21, 41:4-42:8. They also expressed concerns about his open display of weapons on the median,

24  which could easily frighten the public and result in traffic accidents. Id. and 18:12-13. The video of

25  the City Council can be accessed at https://spaces.hightail.com/space/dSShowqqgY.

26      **C.**   **Zeleny Applies for a Film Permit**

     Zeleny responded to the City Council's denial of his SEP application by requesting a film

permit. He asked that the City "reconsider [his] special event permit application as requesting a film permit." Flegel Decl. at 4:4-18, Exhs. D & E. He was advised that the process for a film permit is different from an SEP and was asked to complete an encroachment permit application, which is what the City uses for film projects and other activities within a public right-of-way. Id.

Zeleny submitted an e-mail with a film permit application on 10/6/17. The description of his proposed activities was similar to his initial SEP application, in that he intended to carry and display firearms. However, there were some changes: Zeleny planned to conduct his activities from 10/30/17 through 12/29/17 (per his application)) from 8 a.m. to 6 p.m. every weekday with cameras placed on each side of Sand Hill Road, focusing on public reactions with footage streamed live on the internet. Zeleny Depo at 177:12-180:21; Exhibit 21; Flegel Decl. at 4:18-21, Exh. F.

In an 11/6/17 email, the City asked Zeleny various questions about his application. Zeleny sent a response on 11/9/17 & 11/13/17. Flegel Decl. at 4:22-5:9, Exhs. G, H & I; Zeleny Depo at 198:1-199:1; Exhs. 23 & 24. In his 11/13/17 response Zeleny asked the City to agree that he would be legally within his rights to openly carry firearms in connection with his filming. Id.

On 11/22/17 Assistant City Attorney Nicolas Flegel replied since Zeleny had raised that legal issue. Mr. Flegel replied that "[O]nce you obtain a film permit from the City, you will be allowed (by the City) to possess an unloaded gun(s) to the extent you are using it as part of the film production." Mr. Flegel stated that the "City is willing to work with you in coming to agreeable terms for the filming to take place, so please do not take the approach that a denial of your application is in any way predetermined. However, we need additional information from you so that the City is comfortable in its understanding of what you are proposing and so the City can be satisfied that it will be done in a way that is safe and acceptable." Flegel Decl. at 5:9-17, Exh. J.

Zeleny was asked to be specific about where he planned to place his items so that the City could better analyze for safety and traffic control purposes, the guns to be used and how they were to be used, and the directions they would face, since brandishing weapons at those passing by to film their reactions would not be acceptable. Mr. Flegel also asked Zeleny about his intentions of having "loaded ammunition feeding devices with you." Zeleny was asked to confirm the guns

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS CITY OF MENLO PARK AND DAVE BERTINI FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; Case No. 17-cv-07357-RS (TSH)

-8-

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

would be used for film production purposes, and whether he intended to use fake props or live ammunition. If the latter, Mr. Flegel remarked that "it is unclear why live ammunition would in any way be necessary for your film production." Citing the many mass shootings around the country, he stated that "I think you can understand the concern regarding this issue." He invited Zeleny to provide legal authority to support his position that the open carry exemptions allowed the use of live ammunition for a film project. Flegel Decl. at 5:18-4:6, Exh. J.  In closing Mr. Flegel emphasized that the City was working with plaintiff in good faith so that he could proceed with his film production but they needed his cooperation because of his application raised numerous safety considerations. Id.

On 12/7/17, Mr. Flegel again wrote Zeleny since he had not responded to the requests for additional information. Flegel Decl. at 6:7-17, Exhs. K & L. Plaintiff sent two letters thereafter, neither of which responded to the questions he had been asked. Flegel Decl. at 6:18-7:2, Exhs. M & N.

Mr. Flegel again wrote on 12/21/17, renewing the City's request for information and asking if plaintiff still wanted a film permit. Flegel Decl. at 7:3-8, Exh. O.  Zeleny responded without providing the requested information whereupon Mr. Flegel wrote one last time on 12/22/17. Flegel Decl. at 7:20-8:21, Exhs. P & Q. Plaintiff's response was to file this lawsuit.

### III. LEGAL ARGUMENT

#### A. The City Had No Authority to Issue the Requested SEP Permit

In each count of his Complaint, Zeleny claims that he was wrongly denied the SEP that he sought from the City. While it surely would have been better if those processing the SEP application had known it at the time, it was not until after this lawsuit was filed that the City discovered the median in question is owned by the State of California and thus not subject to the City's jurisdiction. The State's ownership and control of the median was discovered by Assistant City Attorney Nicolas A. Flegel while handling another lawsuit involving the City. Flegel Decl. at 2:12-4:2, Exhs. A-C. Zeleny and his counsel were informed of this fact through the City's discovery responses. Master Decl. at 4:23-5:1; Flegel Decl. at 2:12-4:2.  The fact that the State owns and

1   controls the median effectively dispenses with Zeleny's claim that the City violated his rights by

2   not issuing the requested SEP. Since the City had no authority to issue a permit to anyone to engage

3   in activities on the median, it stands to reason that it did not violate Zeleny's rights by declining to

4   issue such an improper permit and cannot be ordered to issue such a permit for State property.

5        California Streets & Highways Code § 90 provides that the State of California, through its

6   Department of Transportation, has "full possession and control of all state highways and all

7   property and rights in property acquired for state highway purposes." A municipality has no control

8   over property that is dedicated to state highway purposes except as may be granted by the state. See

9   *Southern California Roads Co. v. McGuire* (1934) 2 Cal. 2d 115.

10       Long before this controversy arose the City and the State entered into a maintenance

11   agreement that included the median in question. Nothing in that agreement gives the City authority

12   to issue the SEP demanded by Zeleny. *See* Flegel Decl. at 2:12-4:2. Because the City had (and has)

13   no authority to issue such a permit, there is no longer a "live controversy" relating to the non-

14   issuance of the SEP or the request for an injunction to compel the issuance of such a permit. As

15   stated in *Doe v. Madison School District No. 321*, 177 F.3d 789, 797-98 (9th Cir. 1999), "If an

16   action or a claim loses its character as a live controversy, then the action or claim becomes 'moot,'

17   and [the court] lacks jurisdiction to resolve the underlying dispute."

18       Plaintiff's rights were not violated by non-issuance of the SEP.  He was not and is not

19   entitled to an SEP from the City for his proposed activities on the Sand Hill Road median.

20   **B.  Plaintiff Was Not Prohibited from Protesting on Obscenity Grounds**

21       The first count of the Complaint is asserted against the City and Bertini, alleging that

22   they prohibited Zeleny from engaging in his protests by threatening to prosecute him under Penal

23   Code § 313.1 if he were to display videos featuring explicit representations of sexual violence.

24   Penal Code § 313.1 relates to the exhibition of harmful matter to a minor. When asked by

25   interrogatory to state all facts supporting the allegations of the first count of his initially filed

26   complaint (which are identical to the allegations in the Second Amended Complaint), Zeleny

     responded, in pertinent part: "Defendant [City], through Bertini, has also informed Plaintiff that if

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA  94403
TELEPHONE (650) 365-7715

1  Plaintiff displays a non-obscene piece of artwork in connection with his protests, Plaintiff will be

2  arrested for and/or charged with obscenity as to minors." Master Decl. at 3:11-22.

3      In deposition, Zeleny testified that the only occasion on which he and Bertini were in

4  personal contact was at the appeal hearings before the City Manager and the City Council. Zeleny

5  Depo at 172:12-174:15.  Other than those two occasions the only way that he communicated with

6  the City about his SEP application was through email. Id. Consequently, those were the only

7  occasions on which Bertini could have threatened to arrest Zeleny. He did not so threaten Zeleny,

8  however. Two things should be noted about Bertini's testimony at those hearings.

9      First, Bertini did not state that Zeleny would be arrested or charged if he were to display the

10  image in question. Rather, Bertini stated that "*if* Mr. Zeleny were to in fact display this [image]

11  openly, *if* any children were present, he *may* be in violation of 313.1 of the Penal Code, displaying

12  harmful material where children can view it." [Italics added] City Manager Hrg. Audio; Pp. 6-10 of

13  transcript. On cross-examination, Bertini explained that "*if* [the image] were to be displayed in

14  public *and* we had a complaining parent of a minor who was exposed to it, 313.1 is a section that

15  *could* be used to make an arrest or prosecution." [Italics added.] Id.

16      Bertini was also asked about this testimony in deposition. He testified that he personally

17  does not find the image patently offensive but a judgment would have to be made by an officer

18  and/or the District Attorney whether display of the image would violate Penal Code § 313.1 if a

19  complaint were made. Bertini Depo at 135:2-144:1, Exhs. 37 & 38, 556:20-560:2. Exh. 38. Such

20  testimony was not made as a threat but simply an offered opinion that the parent of a minor child

21  may take offense at Zeleny's "explicit representations of sexual violence" and complain to the City,

22  at which point a determination would have to be made as to whether such material constituted

23  "harmful matter" within the meaning of Penal Code §§ 313 and 313.1.

24      Penal Code § 313.1 makes it a crime to knowingly exhibit "any harmful matter" to a minor.

25  "Harmful matter" is defined in Penal Code § 313 as "matter, taken as a whole, which to the average

26  person, applying contemporary statewide standards, appeals to the prurient interest, and is matter

  which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which,

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

1   taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." As the

2   court can see, a determination in this regard can be a judgment call.  The ultimate determination

3   turns on various questions of fact, the parameters of which are not easy to delineate.

4          Next, contrary to Zeleny's contention, he was not "prohibited" by Bertini or the City from

5   protesting or using the image as part of his protest. The proposed display of the image was not a

6   basis for denying plaintiff an SEP. Neither the City Manager nor the City Council referenced the

7   image or Section 313.1 in their decisions.  Thus, Zeleny's claim that statements made by Bertini at

8   the City Manager hearing "prohibited" him from protesting is simply not true.

9          **C.**      **The City Had Valid Time, Place and Manner Reasons for Denying an SEP**

10         One of the primary concerns raised by the City in its denial of the SEP application was the

11  proposed location, i.e. the median on a busy arterial roadway. Zeleny appears to assume that the

12  median is a public forum because it is publicly owned. But, as stated in the plurality decision of

13  *United States v. Kokinda,* 497 U.S. 720, 725 (1990), "The Government's ownership of property

14  does not automatically open that property to the public." *United States Postal Service v. Council of*

15  *Greenburgh Civic Assns.,* 453 U.S. 114, 129 (1981)." A sidewalk is typically regarded as a classic

16  public forum. Yet in *Kokinda* the Court noted that not every sidewalk is a public forum. *Kokinda,*

17  *supra* at 728. The City submits that this median is not a public forum either.

18         As the court stated in *Center for Bio-Ethical Reform, Inc. v. City & County of Honolulu,* 455

19  F.3d 958, 966 (9th Cir. 2006), "For purposes of First Amendment analysis, public property fits into

20  one of three main categories: (1) a public forum, (2) a designated public forum, or (3) a nonpublic

21  forum. *Preminger*, 422 F.3d at 823. Any public property that is neither a public nor a designated

22  public forum is considered a nonpublic forum. *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*,

23  196 F.3d 958, 965 (9th Cir. 1999)."

24         The court elaborated on the first category, stating that "Public fora are places 'that have

25  traditionally been devoted to expressive activity,' such as public parks and sidewalks. *Preminger [v.*

26  *Principi*, 422 F.3d 815, 823 (9th Cir.2005)]." As the declarations of Nicolas A. Flegel and Dave

HOWARD ROME MARTIN & RIDLEY LLP
1900 OFARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA  94403
TELEPHONE (650) 365-7715

1   Bertini indicate, this median has no history or tradition of use as a public forum. Flegel Decl. at

2   8:23-9:9; Bertini Decl. at 2:9-3:2.

3       As for the second category, the State has not designated medians as public fora. Rather than

4   designating medians as public fora, the State *restricts* activities on medians, as indicated by Vehicle

5   Code §§ 21651 (prohibiting driving on a median) and 21719 (which even restricts tow truck drivers

6   from using a median in an emergency situation unless specific conditions are met).

7       That leaves the third category – a nonpublic forum. When a court evaluates the regulation of

8   expressive activity in a non-public forum, the standard is reasonableness. *Kokinda, supra* at 727.

9   See also *Center for Bio-Ethical Reform, Inc., supra* at 966, where the court said that "[a]reas not

10  traditionally or explicitly opened to expressive activity are deemed nonpublic fora, which are

11  subject to a more lenient standard of scrutiny — restrictions on nonpublic fora need only be

12  reasonable and viewpoint neutral. Id. Examples of nonpublic fora include airport terminals, *Lee*,

13  505 U.S. at 679, highway overpass fences, *Brown v. Cal. Dep. of Transp.*, 321 F.3d 1217, 1222 (9th

14  Cir. 2003), and interstate rest stop areas (including perimeter walkways), *see Jacobsen v. Bonine*,

15  123 F.3d 1272, 1273-74 (9th Cir. 1997)."

16      Accordingly, any regulation of expressive activity on the subject median should be analyzed

17  under a reasonableness standard. Under such a test, "'The Government's decision to restrict access

18  to a nonpublic forum need only be *reasonable;* it need not be the most reasonable or the only

19  reasonable limitation.' 473 U.S. at 808." *Kokinda, supra* at 730, quoting *Cornelius v. NAACP Legal

20  Defense & Educational Fund, Inc.,* 473 U.S. 788 (1985). The open display of military grade

21  firearms and ammunition on the center median of busy Sand Hill Road would undoubtedly create

22  significant confusion, fear, alarm, disruption and delay for motorists and others. It is submitted that

23  the denial of a permit to conduct such activity in such a context satisfies the reasonableness

24  standard as a matter of law.

25      Even if, for the sake of argument, the median were to be deemed a public forum, a public

26  entity may regulate expressive activities in a content-neutral manner on appropriate time,

    place and manner grounds in a public forum. See *Ward v. Rock Against Racism* 491 U.S. 791

(1989). A public entity may impose reasonable time, place, and manner restrictions on speech in a public forum if the restrictions are (1) content neutral; (2) narrowly tailored to serve a significant governmental interest; and (3) leave open ample alternative channels of communication." *Ward v. Rock Against Racism* 491 U.S. 781, 791 (1989); *Edwards v. City of Coeur D'Alene,* 262 F.3d 856, 862 (9th Cir. 2001); and *Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of Los Angeles*, 764 F.3d 1044, 1049 (9th Cir. 2014). Those criteria are satisfied here.

### The City's Denial of Plaintiff's SEP Application Was Not Based on Content

With regard to the first question of whether the City's restrictions were content-neutral, in *Ward, supra*, the Court stated that "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.' [Citations.]" *Ward, supra* at pp. 791-792. This test is clearly met here since the City's denial of plaintiff's SEP application was based on California statutory law prohibiting the open carry of firearms and on stated public safety grounds, not the content of Zeleny's message.

### The City Had Legitimate Interests in Enforcing State Law and in Public Safety

Turning to the second, two-part *Ward* requirement (i.e. that there be a narrow tailoring of a significant government interest), the first task is to identify the governmental interest. Here, the City had two interests: compliance with state law and public safety.

There can be no doubt that a municipality has a significant interest in upholding and enforcing state laws. See, for example, California Constitution, Article XI, § 7, which states that "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cities may enact their own local laws, but those laws must not be inconsistent with the laws of the State.

Cities also have a significant interest in public safety. *See McCullen v. Coakley,* 573 U.S. 464, 466 (2014) (Massachusetts' "legitimate interests in maintaining public safety on streets and sidewalks"); *United States v. Torres,* 911. F.3d 1253, 1263-1264 (9th Cir. 2016) ("the important government interest of ensuring the safety of both the public and its police officers."); *Gallinger v. Beccerra,* 898 F.3d 1012, 1021 (9th Cir. 2018) (public safety). Similarly, the right of a municipality

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

1    to ensure the safe and undisturbed movement of traffic throughout its jurisdiction has been

2    recognized for decades. *See Cox v. New Hampshire,* 312 U.S. 569, 574-575 (1941).

3           The City's significant, legitimate law enforcement and public safety interests were called to

4    the fore in this case. The City Councilmembers repeatedly acknowledged their responsibility to

5    keep members of the public safe and free from undue fear and panic. It was quite reasonable to

6    expect that people coming upon this scene and seeing a heavily armed individual would not know

7    whether his guns were loaded, nor would they be able to discern his intentions. All of this would

8    undoubtedly cause fear, as Zeleny himself acknowledged in deposition. Zeleny Depo at 58:13-

9    59:19. Fearful people panic and fearful drivers, perceiving a threat may drive erratically to avoid the

10   perceived danger and may even try to defend themselves with their own firearms, vehicles or

11   otherwise. The activities described by plaintiff presented a ***significant*** threat to public safety.

12          Adding to the City's concerns was the fact that Zeleny anticipated that he might need to ***use***

13   his weapons. He testified about death threats he had received, and that he needed to have

14   ammunition in case he would have to use his guns, stating that "a gun without ammunition is

15   useless." Zeleny Depo at 57:7-58:12; 59:20-61:11. If he were ever to use his guns in self-defense on

16   the median of Sand Hill Road, casualties could be expected. Furthermore, the threat to public safety

17   would be present 24/7 while Zeleny occupied the median. He planned to sleep in his truck on the

18   median and intended to hire an **armed guard** to protect his weapons while he slept. Zeleny Depo at

19   106:9-107:18; 121:19-122:3. This shows that he anticipated the potential for danger at all hours.

20          In addition to these legitimate concerns, there were also Vehicle Code issues. One concern

21   was that Zeleny's large, spotlighted displays and weapons in the middle of a busy arterial would

22   distract or obscure the vision of drivers as they motored along at high speeds. Additionally, Vehicle

23   Code § 21651(a)(1) prohibits driving over, upon or across the dividing section (i.e. median) of a

24   divided roadway and Zeleny planned to drive his truck onto the median. Zeleny Depo at 108:2-17.

25          Zeleny's SEP application presented significant legitimate legal and public safety concerns.

26          ***The City's Denial Was as Narrowly Tailored as it Could Be***

As to the question of whether a restriction is "narrowly tailored," the Supreme Court has stated that while "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests[,] it need not be the least restrictive or least intrusive means of doing so." *Ward v. Rock Against Racism,* 491 U.S. 781, 798 (1989). A content-neutral regulation will be deemed narrowly tailored "'so long as the. . .regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" (*Ward, supra* at p. 799, quoting *United States v. Albertini,* 472 U.S. 675, 689.)

The Court has also stated that "the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Id. at 800. Even a complete ban can be found to be narrowly tailored if "it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz,* 487 U.S. 474, 486 (1988).

The denial of Zeleny's request was as narrowly tailored as it could be given his insistence on openly carrying firearms and ammunition in an illegal and dangerous manner on the median of a busy arterial roadway. Zeleny Depo at 165:10-166:1.

### *Alternative Channels of Communication Were Available to Plaintiff*

Finally, the City left open ample alternative channels of communication for Zeleny. He had been able to protest on the sidewalk in the past and the City repeatedly informed him that he did not need a permit to conduct lawful protests within the City so long as he did so legally and peaceably. CC Hrg. Transcript, *supra*; Zeleny Depo at 163:13-16422. The City even suggested that he apply for a film permit so that he may possibly fit within the exceptions to the State's open carry ban. Zeleny Depo at 129:18-130:23, Exh. 6. In fact, following the denial of his SEP application, the City was in the process of evaluating Zeleny's film permit application when he simply declined to respond to the City's inquiries and filed suit instead.

### D. The Open Carry Exemptions Were Not Applicable to Plaintiff's SEP Application

In the second and third counts of the Complaint Zeleny alleges that the City misinterpreted

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

1   the exemptions to Penal Code §§ 26350 and 26400. The City submits that the issue of how to

2   interpret the open carry exemptions is irrelevant to the SEP application, since a) the City could not

3   have issued the SEP in the first place and b) the City denied Zeleny's SEP application on valid time,

4   place and manner grounds.

5      The issue is also not relevant with regard to the film permit application since Zeleny never

6   completed that process. Assistant City Attorney Flegel informed Zeleny that if a film permit were

7   issued he would be allowed to openly carry his firearms for his film project, but in order to issue

8   such a permit the City needed information so the City could evaluate the public safety and traffic

9   control issues raised by his application. Plaintiff was asked various questions, such as why he

10  needed live ammunition for a film project and he was asked for legal authority to support his

11  apparent claim that the exemptions to the open carry prohibitions would permit him to use

12  ammunition for a film. He declined to respond and left the issue hanging and unresolved. Despite

13  these circumstances, the issue is addressed below.

14     Each of the exemptions to the open carry ban reads virtually the same. Penal Code §§ 26375

15  and 26405(r) exempt an "authorized participant" in a motion picture, television or video production,

16  or an entertainment event from the open carry prohibitions of Penal Code §§26350 and 26400 while

17  the authorized participant is lawfully using a firearm "as part of that production or event, as part of

18  rehearsing or practicing for participation in that production or event, or while the participant . . . is

19  at that production or event, or rehearsal or practice for that production or event." Zeleny interprets

20  these exemptions as allowing him to openly carry his unloaded firearms in public so long as he

21  authorizes himself as a participant in his own one-person film event. Zeleny Depo at 165:10-

22  167:12.  The City interprets the exemptions as requiring its authorization since the activities would

23  be occurring on public property. Bertini Depo at 24:7-20; Flegel Decl. at 5:9-10, 6:11-12, Exhs. J &

24  L. If one could simply authorize oneself then the exemption loses its meaning and effectively

25  swallows the prohibition. Any person with a GoPro or a cell phone capable of recording video

26  images could simply authorize himself or herself to carry an unloaded firearm while taking selfies

    and calling them "entertainment events." It is doubtful the California Legislature had that in mind

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

1    when it enacted the exemptions.

2         In addition, Zeleny's application of the term "entertainment event" to his protest is

3    questionable. There is a meaningful distinction between an entertainment event and a protest.

4    Zeleny claims that by his protest he wished to bring to light certain criminal and immoral conduct.

5    According to Zeleny virtually anything could be considered an "entertainment event," including the

6    most solemn speech or eulogy, even if that was not its purpose.

7         Even if one could legally authorize oneself to carry an unloaded firearm in virtually any

8    situation while calling it entertainment, Zeleny also wanted to carry **ammunition** for his guns,

9    which presents a much different situation than one where unloaded firearms are used as props in a

10   movie, television show or some other form of entertainment.

11        Zeleny has designated Michael Tristano as one of his firearm experts in this litigation. In his

12   Rule 26 declaration (Exh. "H" to Master Decl.), Tristano declares that he is an armorer, and "on-

13   camera weapons expert" for the movie and television industries. He trains actors, actresses, extras,

14   and stunt people "for proper and safe use of blank-firing firearms on set, [and that his] company

15   also rents and provides non-firing replica and rubber guns." He discusses his experience with the

16   use of such blank-firing guns, non-firing replicas and rubber guns in the entertainment industry.

17   Nowhere does he indicate that live ammunition is used.

18        What Zeleny was proposing was a protest. He wanted to carry firearms to attract attention

19   not to entertain, and he wanted to have live ammunition for self-defense. That is a much different

20   situation than the use of firearms, without live ammunition, for entertainment purposes.

21        Finally, Zeleny stated in his SEP submittals that he would be occupying the median on a

22   24/7 basis. It is fair to say that when Zeleny would be asleep in his truck on the center median, there

23   would be no "entertainment event" occurring. Thus, even under his own view of the exemptions his

24   weapons would be onsite illegally at such times, further justifying denial of his SEP application.

     **E.  Plaintiff's As-Applied Film Permit Claim is Not Ripe**

25        Zeleny never completed the application process. After he submitted his film permit

26   application the City asked him several questions so that it could better understand and evaluate the

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

1    traffic and safety issues raised by the description of his proposed film event. He responded partially,

2    but when he was asked for more information about where he specifically planned to place his

3    equipment, the guns to be used, how they were to be used and why he would need live ammunition

4    for a film project his response was to file this lawsuit. Zeleny's failure to complete the film permit

5    application process precludes his claim that the City violated his rights by not issuing him a film

6    permit. His claim is not ripe since he did not complete the process and thus never obtained a

7    decision from the City. *See Manufactured Home Communities, Inc. v. City of San Jose,* 420 F.3d

8    1022 (9th Cir. 2005); *Guatay Christian Fellowship v. County of San Diego,* 670 F.3d 957 (9th Cir.

9    2011); and *Thomas v. Anchorage Equal Rights Commission,* 220 F.3d 1134 (9th Cir. 2000).

10          Referring to the ripeness doctrine in a manner that applies here, the Supreme Court has

11   stated that "its basic rationale is to prevent the courts, through avoidance of premature adjudication,

12   from entangling themselves in abstract disagreements over administrative policies, and also to

13   protect the agencies from judicial interference until an administrative decision has been formalized

14   and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S.

15   136, 148-149 (1967), abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977).

16          In addition, by failing to respond to the City's inquiries the record is not complete.  How

17   Zeleny would have responded and what the City would have done at that point is speculative and

18   therefore not justiciable. Id. *at* 148.

19          **F.  The City's SEP Process is Valid and the Facial Challenge to It is Moot**

20          The Complaint's third count asserts that the City's SEP process is vague and lacks definite

21   standards. When a vagueness challenge is raised, the court should first determine if the challenged

22   process reaches a substantial amount of constitutional activity. If it does not, the court should

23   uphold the challenge "only if the enactment is impermissibly vague in all of its applications." *Hotel

24   & Motel Ass'n of Oakland v. City of Oakland,* 344 F.3d 959, 971 (9th Cir. 2003).

25          The City's SEP process does not substantially reach or regulate constitutional activity.

26   Permits have typically been issued for events such as fun runs/walks, block parties, car shows,

     concerts, movie nights and large birthday parties. Flegel Decl. at 9:5-8. The City's website, FAQ

1    document and Notice to Special Event Permit Applicants all describe special events as playing "an

2    important role in building community and creating vibrancy within the City." Exhs. C, E & G to

3    Bertini Decl.

4         The SEP application (Exh. D to Bertini Decl.) is focused on logistics, safety, compliance

5    with the Noise Ordinance and similar considerations. The SEP FAQs (Exh. E to Bertini Decl.)

6    address the question of "What would cause a permit to get denied?" The factors listed involve "size

7    (number of people), scale, location, route to be closed, community impact, impact on City services,

8    past practices/experiences with issued permits, intended use, non-payment of fees, poor articulation

9    of event as reflected in the application and site map, etc."

10        It is apparent from these documents that describe the City's SEP policy (Bertini Depo at

11   63:23-66:2) that the SEP process was designed for community-related activities of a social and/or

12   recreational nature. Consistent with that, plaintiff was told repeatedly that the SEP process did not

13   apply to his proposed protest and that he did not need a permit to protest. Accordingly, it is

14   submitted that the City's SEP process does not substantially regulate free speech and that plaintiff

15   must therefore show that the City's permit issuing process "is impermissibly vague in all of its

16   applications." But that is not the case. These very same documents show that the SEP process

17   validly regulates the types of activities for which it was designed. Just because plaintiff wants to

18   crash the party and shoehorn his protest into this process is no reason to apply First Amendment

19   requirements where they are not applicable.

20        In addition, Zeleny's facial challenge to the City's SEP process "does not present a live

21   controversy for adjudication." *Doe v. Madison School District No. 321*, 177 F.3d 789, 797-98 (9th

22   Cir. 1999). He sought a special event permit that the City had no authority to grant and there is

23   nothing in his Complaint that states he intends to seek another SEP. Accordingly, the issues

24   regarding the City's SEP process are academic at best.

25        **G. The City's Film Permit Process is Constitutionally Appropriate**

26        The City's film permit process is straightforward and content-neutral. It is found in Chapter

13.18 ("Use of Public Rights-of-Way") of the City's Municipal Code. A copy of that chapter is

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

attached to the Flegel Declaration as Exhibit R. The entire chapter is content-neutral and applies to any type of work "in or upon any real property in which the City has an interest. . ."

Section 13.18.110 ("Regulations") states that those who obtain an encroachment permit must conduct operations "in compliance with all laws and practices affecting such facilities. This shall include, but not be limited to applicable City standards, including safety precautions (warning signs, barricades, lights) and all applicable zoning and safety codes, construction standards, noise regulations, regulations for providing notice to persons that may be affected by such facilities construction, and such directives or additional conditions placed on the encroachment permit by the Director of Public Works governing the time, place and manner in which facilities may be installed in the public rights-of-way, including but not limited to, the following: . . ." What then follows are various standards for activities, including hours of operation and requirements that mostly relate to construction operations.

Subpart (b) requires those working in the public rights-of-way to exercise reasonable care and to use commonly accepted methods and devices for preventing accidents. Subpart (c) states that the Director of Public Works may require temporary disconnection, relocation or removal of facilities in the public right-of-way when "required by the City in exercise of its governmental or proprietary powers by reason of traffic conditions, public safety, public rights-of-way construction and repair, or any other purpose where the work involved would be aided by the removal and relocation of the facilities in the public right-of-way."

These sections reflect the City's regulation of projects that require an encroachment permit on a legitimate time, place and manner basis. This is also reflected in Section 13.18.030, which describes the application one must submit in order to obtain an encroachment permit.

When Zeleny informed the City that he wished to obtain a film permit he was sent an encroachment permit application and an information sheet. Flegel Decl. at 4:14-18, Exh. E. The written criteria for determining whether to issue an encroachment permit, including a film permit, are found in the permit application and in an informational document provided to applicants. Bertini Depo at 113:15-115:2, Exhibit 35, 125:6-16, Exhibit 36. Both documents require the applicant to

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

1   comply with City ordinances, which includes Chapter 13.18 of the Municipal Code.

2       Chapter 13.18 of the Municipal Code, the encroachment permit application (with General

3   Conditions) and the "Film Production in Menlo Park" document are all content neutral. Their

4   requirements are similar to and consistent with the situation described in *Thomas v. City of*

5   *Chicago,* 534 U.S. 316 (2002).  The *Thomas* case involved permit applicants who wished to

6   conduct rallies advocating the legalization of marijuana in a public park. *Thomas, supra* at 319-320.

7   The court found that the Chicago city ordinance involved regulation of the use of city property in a

8   content-neutral manner. Swapping out "Park District" for "City" and "picnicker and soccer-player"

9   for "general contractor and filmmaker," the following language from *Thomas* applies here:

> The Park District's ordinance does not authorize a licensor to pass judgment on the content
> of speech: None of the grounds for denying a permit has anything to do with what a speaker
> might say. Indeed, the ordinance (unlike the classic censorship scheme) is not even directed
> to communicative activity as such, but rather to all activity conducted in a public park. The
> picnicker and soccer-player, no less than the political activist or parade marshal, must apply
> for a permit if the 50-person limit is to be exceeded. And the object of the permit system (as
> plainly indicated by the permissible grounds for permit denial) is not to exclude
> communication of a particular content, but to coordinate multiple uses of limited space, to
> assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or
> impermissible under the Park District's rules, and to assure financial accountability for
> damage caused by the event. As the Court of Appeals well put it: "To allow unregulated
> access to all comers could easily reduce rather than enlarge the park's utility as a forum for
> speech." 227 F.3d 921, 924 (CA7 2000).  (*Thomas, supra* at 322.)

The passage above refers to Chicago's "permissible grounds for permit denial" which

included: "(8) the proposed use or activity is prohibited by or inconsistent with the classifications

and uses of the park or part thereof designated pursuant to this chapter . . .; (9) the use or activity

intended by the applicant would present an unreasonable danger to the health or safety of the

applicant, or other users of the park, of Park District Employees or of the public; . . . (11) the use or

activity intended by the applicant is prohibited by law, by this Code and ordinances of the Park

District, or by the regulations of the General Superintendent . . . ." These are the same grounds for

denial that the City uses in determining whether to issue an encroachment permit, as shown by

Section 13.18.110, the encroachment permit application and the City's information sheet

### H.   The Fourth Count of the Complaint Adds Nothing New

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA  94403
TELEPHONE (650) 365-7715

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

1    Zeleny was asked by interrogatory for all facts supporting the fourth count of his

2    Complaint. His response, which is attached as Exhibit I to the Master Declaration, reiterates the

3    same claims that have been addressed above, with the added allegation that the City's actions were

4    undertaken by "the ultimate decision makers . . . pursuant to an official policy . . . or an established

5    custom and practice amounting to an official policy." He claims that there was a lack of

6    discernable, concrete standards for permits, despite what is noted above about the film and SEP

7    permit processes and despite the fact that he was provided detailed information at each step about

8    what the City found deficient or problematic with his applications. In all respects, the fourth count

9    of the Complaint adds nothing new and has been addressed above.

10    ## I.  Defendant Bertini is Entitled to Summary Judgment

11    Zeleny was asked by interrogatory to list all facts supporting his claims against defendant

12    Bertini. He responded that at one or more meetings Bertini informed him that a) a piece of artwork

13    involved in his protests was offensive and that if he were to display it he would be arrested and

14    charged with "obscenity as to minors," and b) that if he continued his protests with firearms, he

15    would be arrested and/or prosecuted. Master Decl. at 4:9-22, Exhibit K.  In all other respects,

16    Zeleny's responses were non-specific and vague. He echoed his claims against the City and added

17    that Bertini actively participated in the City's actions.

18    Zeleny's claim that Bertini threatened to arrest or charge him with "obscenity as to minors"

19    is addressed in Section III.B., above. As stated therein, Bertini did no such thing. He simply stated

20    that Zeleny's proposed display of "explicit representations of sexual violence" could result in a

21    complaint from the parent of a minor who viewed the image(s), in which case a determination

22    would have to be made whether Zeleny had violated Penal Code § 313.1.

23    Similarly, Zeleny claims that Bertini's testimony at the City Manager hearing constituted a

24    threat to arrest him if he openly carried firearms. But Bertini's testimony that carrying unloaded

25    firearms may violate Penal Code §§ 26350 and/or 26400 was likewise not a threat but an

26    appropriate expression of opinion based on a fair reading of those statutes. There is no clearly

1    established law that indicates the open carry prohibitions of Penal Code §§ 26350 and 26400 in

2    this context or any other are unconstitutional or otherwise invalid. At this very moment the Ninth

3    Circuit Court of Appeals is reviewing *en banc* the case of *Young v. Hawaii,* 896 F.3d 1044 (9th

4    Cir. 2018), which relates to Hawaii's open carry prohibition and exceptions thereto. Similarly,

5    there is no clearly established law that indicates Zeleny's construction of the exemptions to the

6    statutory open carry prohibitions are to be construed as he claims.  While it appears from the

7    Complaint that Zeleny does not seek damages, Bertini would be entitled to qualified immunity.

8    See *Saucier v. Katz*, 533 U.S. 194 (2001) and its progeny. Bertini's statements about the potential

9    application of Penal Code sections were reasonable and there was no clearly established law that

10   was inconsistent with his testimony. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

11        As for Zeleny's claim that Bertini "actively participated" in denying his SEP and film

12   permit applications, those claims are also addressed above. The SEP application was properly

13   denied because the activities described violated the law and presented significant public safety

14   issues. Moreover, because the State owns the median, his rights were not violated since the SEP

15   could not have been issued by the City in any event. The film permit was never denied. Rather,

16   Zeleny declined to respond to the City's appropriate questions and opted to sue rather than

17   complete the process. In addition, Bertini was not a decision maker but simply provided input with

18   regard to Zeleny's applications. Bertini Decl. at 3:18-4:2.

19        Finally, to the extent Zeleny seeks injunctive relief against Bertini, the request is moot.

20   Bertini has only been sued in his official capacity and has retired. Complaint at Para. 20, Pg. 5;

21   Bertini Decl. at 2:5-8. Although no citable Ninth Circuit Court of Appeals decisions could be

22   found on this point, the courts in *Jones v. Dovery,* No. 06cv1979, 2009 U.S. Dist. LEXIS 126104,

23   at *30 (S.D. Cal. 2009) and *Valson v. Cate,* 14-cv-01420, 2018 U.S. Dist. LEXIS 112827, at *8

24   (E.D. Cal. 2018) ruled that a request for injunctive relief was moot due to a defendant's retirement.

### IV.  CONCLUSION

25        For the reasons set forth herein, defendants are entitled to summary judgment. The City had

26   no authority to grant plaintiff an SEP for the State-owned median. Moreover, the City had valid

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

time, place and manner grounds for denying the request. Zeleny did not complete the film permit process such that his as-applied claim is not ripe. The City's permit processes are proper, and Bertini should not be found liable for simply testifying in a proper, reasonable manner.

Date: January 21, 2021                    HOWARD ROME MARTIN & RIDLEY LLP


                                          By:  /s/ Robert J. Gundert
                                               Todd H. Master
                                               Robert J. Gundert
                                               Attorneys for Defendants
                                               CITY OF MENLO PARK and
                                               DAVE BERTINI

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715