**TODD H. MASTER [SBN 185881]**
**tmaster@hrmrlaw.com**
**ROBERT J. GUNDERT [SBN 104486]**
**rgundert@hrmrlaw.com**
**HOWARD ROME MARTIN & RIDLEY LLP**
1900 O'Farrell Street, Suite 280
San Mateo, CA  94403
Telephone:     (650) 365-7715
Facsimile:     (650) 364-5297

Attorneys for Defendants
CITY OF MENLO PARK and DAVE BERTINI

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| MICHAEL ZELENY, an individual<br><br>Plaintiff,<br><br>vs.<br><br>EDMUND G. BROWN, JR., an individual, in his official capacity, et al.<br><br>Defendants. | Case No. 17-cv-07357-RS (TSH)<br><br>**DECLARATION OF TODD H. MASTER IN SUPPORT OF MOTION OF DEFENDANTS CITY OF MENLO PARK AND DAVE BERTINI FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>**Date:  February 25, 2021**<br>**Time:  1:30 p.m.**<br>**Dept.: Courtroom 3**<br>**Judge: Hon. Richard Seeborg**<br><br>**Trial Date: None** |

I , TODD H. MASTER, declare:

1.    I am an attorney at law licensed to practice before this Court, and a principal in the

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA  94403
TELEPHONE (650) 365-7715

1   law firm Howard, Rome, Martin & Ridley LLP, counsel of record for defendants City of Menlo

2   Park and Dave Bertini, herein. I am a competent adult, with personal knowledge of the matters

3   set forth in this declaration. If called as a witness, I could and would competently testify to such

4   matters.

5         2.     Attached hereto as Exhibit "A" are true and correct copies of excerpts from the

6   March 18, 2019 deposition transcript of plaintiff Michael Zeleny. I took the deposition of Mr.

7   Zeleny and was present during the entirety of the deposition. Condensed copies of the pages from

8   the transcript of Mr. Zeleny's deposition and other depositions are submitted in order to preserve

9   space and for efficiency. If the Court prefers full page copies we would be glad to provide same.

10         3.     Attached hereto as Exhibit "B" are true and correct copies of excerpts from the

11   transcripts for the March 19, 2019, August 7, 2020 and December 10, 2020 deposition sessions of

12   Dave Bertini. I attended and was present during the entirety of each session.

13         4.     Attached hereto as Exhibit "C" are true and correct copies of excerpts from the

14   March 5, 2020 deposition transcript of Matthew Milde. I attended and was present during the entire

15   deposition of this witness.

16         5.     Attached hereto as Exhibit "D" are true and correct copies of excerpts from the July

17   31, 2020 deposition transcript of Alex McIntyre. I attended and was present during the entire

18   deposition of this witness.

19         6.     Attached as Exhibit "E" for the Court's convenience is an unofficial transcript of the

20   Menlo Park City Manager's de novo hearing regarding plaintiff's appeal of the denial of his special

21   event permit application. This transcript is provided only to assist the Court in its review of any

22   relevant portions of the audio recording of that hearing. Links to the audio recording of that hearing

23   can be found in the accompanying memorandum of points and authorities and in the Declaration of

24   Dave Bertini.

25

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

26   DECLARATION OF TODD H. MASTER IN IN SUPPORT OF MOTION OF DEFENDANTS CITY OF MENLO
PARK AND DAVE BERTINI FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT; Case No.
17-cv-07357-RS (TSH)         2

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

7.     Attached as Exhibit "F" for the Court's convenience is an unofficial transcript of the Menlo Park City Council's hearing regarding plaintiff's appeal of the denial of his special event permit application. This transcript is provided only to assist the Court in its review of any relevant portions of the video recording of that hearing. Links to the video recording of that hearing can be found in the accompanying memorandum of points and authorities and in the Declaration of Dave Bertini.

8.     Attached hereto as Exhibit "G" is the Declaration of Michael Tristano, which was produced by plaintiff's counsel pursuant to F.R.C.P. 26. in this litigation. Mr. Tristano has been designated as one of plaintiff's expert witnesses.

9.     During the course of discovery in this matter, interrogatories were propounded upon and answered by plaintiff. Interrogatory No. 16 of the City of Menlo Park's first set of special interrogatories asked plaintiff to "state all facts upon which YOU base YOUR First Count/Claim of Relief (Violation of the First Amendment to the United States Constitution) against the CITY OF MENLO PARK." That interrogatory was propounded on or about November 20, 2018, at which time the plaintiff's initially filed Complaint [Document 1] was the operative complaint. The allegations of the First Count of plaintiff's initially filed Complaint are the same as the allegations of the First Count of plaintiff's Second Amended Complaint [Document 99].

10.     Attached hereto as Exhibit "H" are the cover page, second page, signature page and pages 10 and 11 from plaintiff's response to defendant City of Menlo Park's first set of special interrogatories. Pages 10 and 11 contain plaintiff's response to the City's Interrogatory No. 16, which is referenced in the immediately preceding paragraph.

11.     Interrogatory No. 25 of the City's first set of special interrogatories propounded on plaintiff asked plaintiff to "state all facts upon which YOU base YOUR Fourth Count/Claim of Relief (Violation of 42 U.S.C. § 1983) against the CITY OF MENLO PARK." That interrogatory was propounded on or about November 20, 2018, at which time the plaintiff's initially filed

1    Complaint was the operative complaint. The allegations of the Fourth Count of plaintiff's initially

2    filed Complaint are the same as the allegations of the Fourth Count of plaintiff's Second Amended

3    Complaint.

4              12.      Attached hereto as Exhibit "I" are the cover page, second page and 16th page

5    (which is also the signature page) from plaintiff's response to defendant City of Menlo Park's first

6    set of special interrogatories. Page 16 contains plaintiff's response to the City's Interrogatory No.

7    25, which is referenced in the immediately preceding paragraph.

8              13.      Special interrogatories were also propounded upon plaintiff on behalf of defendant

9    Bertini at the same time that defendant City propounded its special interrogatories. Chief Bertini's

10   Interrogatory Nos. 10, 13, 16 and 19 asked plaintiff to state all facts supporting the allegations of

11   the First, Second, Third and Fourth Counts of the Complaint insofar as they were being alleged

12   against defendant Bertini.  As previously mentioned, the plaintiff's initially filed Complaint was

13   the operative complaint at the time these interrogatories were propounded. The allegations of the

14   First, Second, Third and Fourth Counts of plaintiff's initially filed Complaint are the same as the

15   allegations of the First, Second, Third and Fourth Counts of plaintiff's Second Amended

16   Complaint.

17             14.      Attached hereto as Exhibit "J" are the cover page, second page and signature page

18   from plaintiff's response to defendant Bertini's first set of special interrogatories propounded upon

19   plaintiff, along with Pages 6 through 11 thereof.  Pages 6 through 11 contains plaintiff's responses

20   to the Interrogatories 10, 13, 16 and 19, which are referenced in the immediately preceding

21   paragraph.

22             15.      The Caltrans documents referenced at Page 3, Lines 6-12 (Paragraph 8) of the

23   Declaration of Nicolas A. Flegel, and which are attached thereto as Exhibit "C," were produced by

24   my office to plaintiff's counsel during the course of discovery in this matter on or about March 6,

     //

25

26   DECLARATION OF TODD H. MASTER IN IN SUPPORT OF MOTION OF DEFENDANTS CITY OF MENLO
     PARK AND DAVE BERTINI FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT; Case No.
     17-cv-07357-RS (TSH)                               4

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

1 | 2020.

2 |     I declare under penalty of perjury under the laws of the State of California and the United

3 | States of America that the foregoing is true and correct and that this declaration was executed on

4 | this 20th day of January 2021, at Burlingame, California.

6 | _Todd H. Master_ (signature)

7 | _____

         Todd H. Master

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

26 | DECLARATION OF TODD H. MASTER IN IN SUPPORT OF MOTION OF DEFENDANTS CITY OF MENLO PARK AND DAVE BERTINI FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT; Case No. 17-cv-07357-RS (TSH)

Exhibit A

Deposition of MICHAEL ZELENY, March 18, 2019

Madeleine M. Freda, Inc.

Page 1 to Page 220

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

MADELEINE M. FREDA, INC.
2000 Broadway
P. O. Box 3119
Redwood City, CA     94064-3119
Phone:   (650) 365-6152
FAX:   (650) 365-1303

BSA                        **Deposition of MICHAEL ZELENY, March 18, 2019**                        XMAX(1/1)

**Page 1**

( 1)                    UNITED STATES DISTRICT COURT
( 2)              FOR THE NORTHERN DISTRICT OF CALIFORNIA
( 3)                          SAN FRANCISCO
( 4) MICHAEL ZELENY, an individual,
( 5)          Plaintiff,
( 6)      vs.                          No. 17-cv-07357-RS
( 7) EDMUND G. BROWN, JR., an
( 8) individual, in his official
( 9) capacity, et al.,
(10)          Defendants.
(11)                              /
(12)          DEPOSITION OF MICHAEL ZELENY
(13)              Monday, March 18, 2019
(14)          1100 Alma Street, Suite 210
(15)            Menlo Park, California
(16)          MADELEINE M. FREDA, INC.
(17)          Certified Shorthand Reporters
(18) Reported by:          2000 Broadway
(19)   Judy Brennan          P.O. Box 3119
(20)   CSR No. 5138          Redwood City, CA 94064
(21) Our File No.            (650) 365-6152
(22)
(23)
(24)
(25)

**Page 2**

( 1)                      I N D E X
( 2) Examinations                              Page
( 3) MR. MASTER                                  7
( 4) AFTERNOON SESSION                          95
( 5)
( 6)                    ---oOo---
( 7)
( 8)
( 9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**Page 3**

| ( 1) | No. | E X H I B I T S Description | Page |
|------|-----|------------------------------|------|
| ( 2) | | | |
| ( 3) | 1 | 2-page 10-26-16 email from larvatus@gmail.com to Bruce Goitia (MP000002-000003) | 40 |
| ( 4) | | | |
| ( 5) | 2 | 2-page 7-10-15 email from Michael Zeleny to William McClure, Scott Sandell, Matt Milde and Police Chief; 5-page attachment (MP000234-000240) | 95 |
| ( 6) | | | |
| ( 7) | | | |
| | 3 | 1-page photograph of Browning M1919A4 | 95 |
| ( 8) | | | |
| | 4 | 4-page still depiction of animation taken off LiveJournal | 95 |
| ( 9) | | | |
| (10) | 5 | 5-page email chain, the top one from Michael Zeleny to William McClure, dated 7-28-15 (MP000290-294); 1-page photograph | 125 |
| (11) | | | |
| (12) | 6 | 2-page 9-21-15 letter to Michael Zeleny from William L. McClure; 2-page attachment (MP000352-000355) | 129 |
| (13) | | | |
| (14) | 7 | 5-page email chain, the top one from Matt Milde to Cherise Brandell and Robert Jonsen dated 4-15-16; 12-page attachment (MP000435-000439, 000439A, 000440-000450) | 131 |
| (15) | | | |
| (16) | | | |
| | 8 | 3-page 5-4-16 letter to Michael Zeleny from William L. McClure (MP000463-000465) | 140 |
| (17) | | | |
| (18) | 9 | 2-page email chain, the top one from Michael Zeleny to Mr. McClure dated 5-27-16 (MP004890-004891) | 141 |
| (19) | | | |
| (20) | 10 | 1-page email chain, the top one from Matt Milde to Michael Zeleny, William McClure, Robin Riggins and Cherise Brandell dated 6-16-16; 3-page attachment (MP000473-000476) | 144 |
| (21) | | | |
| (22) | | | |
| (23) | 11 | 2-page email chain, the top one from Cherise Brandell to Michael Zeleny dated 6-24-16 (MP000477-000478) | 147 |
| (24) | | | |
| (25) | | | |

**Page 4**

| ( 1) | No. | E X H I B I T S (Cont'd) Description | Page |
|------|-----|--------------------------------------|------|
| ( 2) | 12 | 2-page 6-24-16 letter to Michael Zeleny from Cherise Brandell (MP000479-000480) | 147 |
| ( 3) | | | |
| | 13 | 1-page email chain, the top one from Michael Zeleny to Cherise Brandell dated 7-1-16 (MP000481) | 149 |
| ( 4) | | | |
| ( 5) | | | |
| | 14 | 1-page 7-12-16 letter to Michael Zeleny from Matt Milde on behalf of Cherise Brandell (MP000486) | 149 |
| ( 6) | | | |
| ( 7) | | | |
| | 15 | 1-page email chain, the top one from Michael Zeleny to Matt Milde dated 7-13-16; 4-page attachment (MP004898-004902) | 151 |
| ( 8) | | | |
| ( 9) | | | |
| (10) | 16 | 1-page photograph of Entertainment Firearms Permit issued to Michael Zeleny 7-13-16; 2-page attachment (MP000946-000948) | 156 |
| (11) | | | |
| (12) | 17 | 1-page email from Nicole Casados to David Bertini dated 8-22-17; 117-page attachment (MP000947-001064) | 161 |
| (13) | | | |
| (14) | 18 | 1-page 9-5-17 email from Jelena Harada to Michael Zeleny; 2-page attachment (MP001218-001220) | 174 |
| (15) | | | |
| (16) | 19 | 2-page email chain, the top one from Michael Zeleny to Jelena Harada dated 9-7-17 (MP001221-001222) | 175 |
| (17) | | | |
| (18) | 20 | 3-page email chain, the top one from Ivan Toews to Michael Zeleny dated 9-28-17; 5-page attachment (MP001231-001238) | 176 |
| (19) | | | |
| (20) | 21 | 5-page email chain, the top one from Michael Zeleny to Ivan Toews dated 10-6-17; 3-page attachment (MP001242-001249) | 177 |
| (21) | | | |
| (22) | 22 | 1-page email chain, the top one from Michael Zeleny to Ivan Toews, Jelena Harada, William McClure, David Bertini, Alex McIntyre, Nicolas Flegel, Subrah Iyar, Scott Sandell dated 11-3-17 (MP001208... | 185 |
| (23) | | | |

## Page 5

```
            E X H I B I T S (Cont'd)
 23    5-page email chain, the top one from Ivan      190
       Toews to Michael Zeleny, Jelena Harada,
       William McClure, David Bertini, Alex
       McIntyre, Nicolas Flegel, Subrah Iyar,
       Scott Sandell dated 11-6-17
       (MP001279-001283)

 24    9-page email chain, the top one from           190
       Michael Zeleny to Ivan Toews dated
       11-9-17; 2-page attachment
       (MP001290-001300)

 25    11-page email chain, the top one from          190
       Nicolas Flegel to Michael Zeleny and Ivan
       Toews dated 11-22-17 (MP001331-001341)

 26    12-page email chain, the top one from          190
       Michael Zeleny to Nicolas Flegel dated
       12-21-17 (MP001415-001426)

 27    10-page Defendant City of Menlo Park's         190
       Special Interrogatories to Plaintiff (Set
       One); 16-page Plaintiff Michael Zeleny's
       Responses to Defendant City of Menlo
       Park's Special Interrogatories (Set One):
       2-page Proof of Service

 28    9-page Defendant Dave Bertini's Special        190
       Interrogatories to Plaintiff (Set One);
       12-page Plaintiff Michael Zeleny's
       Responses to Defendant Dave Bertini's
       Special Interrogatories (Set One): 2-page
       Proof of Service

                   ---oOo---
```

## Page 6

```
            A P P E A R A N C E S
For the Plaintiff:    AFFELD GRIVAKES LLP
                      BY:  DAMION ROBINSON, Esquire
                      2049 Century Park East, Suite 2460
                      Los Angeles, California 90067
                      (310) 979-8700
                      dr@agzlaw.com

For the Defendants City of Menlo Park and David Bertini:

                      HOWARD ROME MARTIN & RIDLEY, LLP
                      BY:  TODD H. MASTER, Esquire
                      1900 O'Farrell Street, Suite 280
                      San Mateo, California 94403
                      (650) 365-7715
                      tmaster@hrmrlaw.com


        BE IT REMEMBERED that pursuant to Notice of
Taking Deposition, and on Monday, March 18, 2019,
commencing at the hour of 10:11 a.m., at 1100 Alma
Street, Suite 210, Menlo Park, California, before me,
JUDY BRENNAN, a Certified Shorthand Reporter duly
licensed by the State of California, there personally
appeared

                MICHAEL ZELENY,

called as a witness by the Defendants herein, who, being
by me first duly sworn, was examined and interrogated as
is hereinafter set forth.
```

## Page 7

```
(1) MICHAEL ZELENY,
(2) being first duly sworn by the Certified Shorthand
(3) Reporter to tell the truth, the whole truth and nothing
(4) but the truth, testified as follows:
(5)
(6) EXAMINATION BY MR. MASTER
(7)    MR. MASTER: Q.   Good morning.
(8)    A.   Good morning.
(9)    Q.   Would you please state your full name for the
(10) record.
(11)   A.   My name is Michael Zeleny. That's Z-e-l-e-n-y.
(12)   Q.   And you pronounce it Zeleny?
(13)   A.   Yeah. But you're free to modify.
(14)   Q.   What's your date of birth?
(15)   A.   February 26, 1958.
(16)   Q.   Have you ever been deposed before?
(17)   A.   Yes, several times.
(18)   Q.   When was the last time?
(19)   A.   I think 2012. No, maybe 2010. Sorry.
(20)   Q.   Okay. And in 2010 what was the general
(21) substance of that deposition?
(22)   A.   It was a lawsuit that NEA filed against me for
(23) trespass. NEA, New Enterprise Associates.
(24)   Q.   And you were being deposed in your capacity as
(25) a party in that case?
```

## Page 8

```
(1)    A.   Yeah.
(2)    Q.   And how many other times have you been deposed
(3) prior to that one?
(4)    A.   It would have been in 2002. At least once. I
(5) think that's about it.
(6)    Q.   So you recall being deposed at least two
(7) times --
(8)    A.   At least two times, yes.
(9)    Q.   -- prior to today?
(10)   A.   Yes.
(11)   Q.   And in 2002 what was the general nature of that
(12) deposition?
(13)   A.   It was a business dispute with the Zhus and
(14) WebEx.
(15)   Q.   Is that Min Zhu?
(16)   A.   Yeah. Min and Erin.
(17)   Q.   Did you have some business relationship with
(18) Mr. Zhu and WebEx?
(19)   A.   I had a business relationship with WebEx, not
(20) with Min.
(21)   Q.   Generally what was your business relationship
(22) with WebEx?
(23)   A.   We were supposed to be a partner with them
(24) using their technology in a different market.
(25)   Q.   When you say "we," who do you mean?
```

Page 49

(1)  Q.   And that was 2005?

(2)  A.   Yeah. He was a very enthusiastic participant.

(3)  Q.   And that was the 2005 –

(4)  A.   That's right.

(5)  Q.   – protest?

(6)  Just slow down. Wait for me to finish my

(7)  question. Otherwise you're going to drive her crazy and

(8)  we won't have a very clean record. Okay?

(9)  A.   (Nods.)

(10)  Q.   You know exactly where I'm going with the

(11)  question, but just –

(12)  A.   Okay.

(13)  MR. ROBINSON:   When you're at a stopping point,

(14)  I think now would be a good time to –

(15)  MR. MASTER:   Why don't we just finish this

(16)  little bit, like two minutes, and we'll take a break.

(17)  MR. ROBINSON:   Sure.

(18)  MR. MASTER:   I just want to talk about this

(19)  2006 protest and we'll take a break.

(20)  Q.   So in addition to the placards and flyers at

(21)  this protest in Menlo Park in 2006'ish, did you bring

(22)  firearms with you to that protest?

(23)  A.   Not that I recall.

(24)  MR. MASTER:   Okay. We can take a break now.

(25)  (Recess from 11:07 to 11:14 a.m.)

Page 50

(1)  MR. MASTER:   Back on the record.

(2)  Q.   Mr. Zeleny, we finished now talking about the

(3)  2006 protest in Menlo Park, correct?

(4)  A.   Yes.

(5)  Q.   Okay.

(6)  A.   It's up to you, though.

(7)  Q.   Well, but in terms of what else you brought

(8)  with you in addition to the placards and flyers, that's

(9)  what you brought with you and you thought those were

(10)  pretty effective in getting your message out against

(11)  Mr. Zhu?

(12)  A.   Yes.

(13)  Q.   Okay. And you indicated in 2008 you also did

(14)  protests in Menlo Park?

(15)  A.   Yes.

(16)  Q.   And I know you don't recall specifically where

(17)  you were in 2006 or that 2006'ish protest. Do you

(18)  recall where you protested in 2008 in the City of Menlo

(19)  Park?

(20)  A.   That was in front of NEA's offices in the

(21)  Rosewood Complex.

(22)  Q.   And if you look at Exhibit 1, the first

(23)  paragraph of that, you referred – in the second line

(24)  you indicate "in front of NEA, 2855 Sand Hill Road,

(25)  Menlo Park"; is that correct?

Page 51

(1)  A.   Yes.

(2)  Q.   When you say in front of NEA in 2008, was that

(3)  the same location that you were intending to protest by

(4)  way of the email that's attached as Exhibit 1?

(5)  A.   Yes.

(6)  Q.   Okay. And on how many occasions did you

(7)  protest out in front of NEA on Sand Hill Road in 2008?

(8)  A.   I believe I did it only once, but it may have

(9)  been more than that.

(10)  Q.   As you sit here today, you recall one

(11)  occurrence, but it's possible there could have been

(12)  more?

(13)  A.   There was one occurrence in which I made a

(14)  video and posted it. You may consult it on YouTube.

(15)  It's entitled "Child Rape Tools."

(16)  Q.   When you say I can look at it on YouTube –

(17)  A.   Yes.

(18)  Q.   – is there a particular link?

(19)  A.   I can give it to you once I look it up. But if

(20)  you search for "Child Rape Tools," three words, you will

(21)  find it.

(22)  Q.   So you made a video of that protest in front of

(23)  the NEA in 2008, correct?

(24)  A.   Yes.

(25)  Q.   Where was physically the protest located?

Page 52

(1)  A.   Right in front of NEA's office.

(2)  Q.   So was it in front of the specific building of

(3)  NEA or was it, for example –

(4)  A.   I believe they have a – I believe they have

(5)  part of a building there. And there's a single entrance

(6)  there, and I was circulating back and forth in front of

(7)  that entrance.

(8)  Q.   So would it be fair to say you weren't on the

(9)  sidewalk on Sand Hill Road; you were inside the

(10)  development area making those protests?

(11)  A.   Sand Hill Road is the boundary of the Rosewood

(12)  Complex. I was inside the complex, yes.

(13)  Q.   Okay. Gotcha.

(14)  A.   Between the parking lot and the building.

(15)  Q.   Thank you.

(16)  And what tools did you have with you when you

(17)  conducted that protest directly in front of the NEA

(18)  building in 2008?

(19)  A.   I had a handgun and a belt holster and a video

(20)  camera. That's about it. I may have had some flyers.

(21)  Q.   And did you have any communications with anyone

(22)  you understood to be associated with the Menlo Park

(23)  Police Department during that protest in 2008?

(24)  A.   I am very certain that I cleared it with Menlo

(25)  Park Police, and that involves having had communications

Page 53

(1) with them. I do not recall who I spoke to on that
(2) occasion.
(3)    Q.    Okay. So on the occasions that you protested
(4) in Menlo Park in 2006'ish and the one we just discussed
(5) in 2008, did the City of Menlo Park or its police
(6) department prevent you from doing what you wanted to do
(7) in terms of those protests?
(8)    A.    I believe in 2006 they interrupted my protest.
(9) I don't recall how that came about, but I do recall
(10) having had to cut it short. In 2008 I don't recall them
(11) having interfered at all.
(12)    Q.    In 2006 you recall your protesting being cut
(13) short in some fashion; is that what you're saying?
(14)    A.    Yes.
(15)    Q.    Do you have any specifics as we sit here today
(16) as to how it was cut short?
(17)    A.    I recall that there was an intervention by the
(18) constabulary. I don't recall the jurisdiction and I
(19) don't even recall -- I mean, they took me aside and they
(20) talked to me. I think they let me come back afterwards,
(21) but by then the person I had hired to assist me has fled
(22) because I paid her in advance. So I had to cut it short
(23) because it was too much work for one man.
(24)    Q.    Okay.
(25)    A.    That's my best recollection.

Page 54

(1)    Q.    Okay. And then turning back to Exhibit 1,
(2) which is your October 26, 2009 email --
(3)    A.    Yes.
(4)    Q.    -- do you recall conducting any other protests
(5) within the City of Menlo Park other than the ones we've
(6) just discussed prior to sending this email out to the
(7) chief of police and copying WebEx and NEA?
(8)    A.    As we just discussed, the year prior, I think
(9) that was the only appearance since 2006 or thereabouts
(10) that I made in Menlo Park prior to this email.
(11)    Q.    Okay. That's the 2008 one that we talked
(12) about?
(13)    A.    Yes.
(14)    Q.    Okay.
(15)    A.    Does that answer your question?
(16)    Q.    Yes, it does. Thank you.
(17) Now, you referenced -- still on Exhibit 1 here,
(18) if you go approximately half-way into your email -- and
(19) it's not really separated by paragraphs -- but there's a
(20) sentence that begins kind of right in the middle that
(21) reads, "Additionally, owing to death threats."
(22) Do you see that?
(23)    A.    Yes, sir.
(24)    Q.    You indicate here that there was police and
(25) hotel management misconduct at a previous event.

Page 55

(1)    A.    Yes.
(2)    Q.    What are you referring to with that part of
(3) that sentence? What police misconduct are you referring
(4) to there?
(5)    A.    In my first public protest on May 2nd of 2005
(6) in San Francisco at Union Square in front of the
(7) St. Francis Hotel, I was at the time a guest of the
(8) hotel. And I had brought two firearms with me, and none
(9) of them were in my possession at the time. One of them
(10) was in the trunk of my car, which was parked in the
(11) St. Francis parking lot. Another was in a locked case
(12) that I entrusted to the hotel management.
(13) After I started my protest, I had an assistant
(14) that I had hired stand in front of the hotel with a
(15) placard and I had my dog as well, and I stood there on
(16) the other side of the entrance and handed out flyers.
(17) While that was going on, the management of the hotel
(18) with the San Francisco Police Department broke into my
(19) car and found a rifle, unloaded and properly encased in
(20) the trunk, and they also found a CD of Eminem that was a
(21) commemorative edition that included sort of a comic book
(22) type presentation of Eminem's appearance in a nightclub,
(23) at the end of which he shoots the audience members with
(24) a gun to his temple and a flag comes out saying "Bang."
(25) So on the pretext of having found that in my

Page 56

(1) car, San Francisco police took custody of my firearms
(2) and arrested me and had me undergo a psychiatric
(3) evaluation, which I passed. That was -- I guess there
(4) was a threat of a lawsuit that David made in that case,
(5) and the hotel management settled with us and I think
(6) they fired the parties involved.
(7) I think you understand what the misconduct was.
(8) There was no probable cause, for instance, for breaking
(9) into my car.
(10)    Q.    Thank you very much for that. I guess what I
(11) want to make clear of because this email just generally
(12) refers to police misconduct at a previous event.
(13)    A.    Yes.
(14)    Q.    Now the way I understand it is what you're
(15) referring to is the San Francisco Police Department and
(16) the St. Francis Hotel management misconduct. Is that
(17) correct?
(18)    A.    That is right.
(19)    Q.    Continuing on in that same sentence towards the
(20) end, you indicate that owing to these death threats you
(21) received. Are these death threats the same ones that
(22) you referenced earlier in your testimony in 2002?
(23)    A.    Yeah. There was a series -- the first series
(24) started in 1999 and continued through the first half of
(25) January of 2000. There was also a series of calls that

Page 57

(1) I received in 2008, and there is a police report in
(2) Hollywood that you may consult. I'll be able to give
(3) you the particulars.
(4)    Q.   Have you received any death threats since the
(5) 2008 time period?
(6)    A.   No.
(7)    Q.   My question, once again referring back to
(8) Exhibit 1, is it indicates that, additionally, owing to
(9) death threats you had received and this incident that
(10) occurred in San Francisco, that you intend to bring with
(11) you exposed unloaded firearms accompanied by loaded
(12) magazines and speedloaders. Is that correct?
(13)    A.   Yes.
(14)    Q.   Okay. And the purpose of bringing the firearms
(15) and the loaded magazines and speedloaders, is that in
(16) terms of self-defense in that particular instance?
(17)    A.   Two reasons. Going back to 2005, I conducted
(18) my protest on May 2nd and May 3rd, the next day. The
(19) conference was supposed to continue. WebEx, however,
(20) canceled it, and in their official notice to the
(21) attendees they said that they were canceling it because
(22) a protester was found to have had firearms. That made
(23) me understand that the mere presence of a firearm makes
(24) my message much more effective. And that was one of the
(25) inspirations.

Page 58

(1) Another one was, of course, self-protection.
(2)    Q.   So in your mind, it served the two purposes.
(3) Self-protection and scaring the people you're protesting
(4) or just – what do you mean by that?
(5)    A.   I object to the term "scaring." I never
(6) brandished a firearm in my life unless I was being
(7) assaulted, which hasn't happened in the course of any of
(8) these protests. I do not intend to produce fear in
(9) any – anybody observing my protest.
(10) I do, however, want to attract their attention.
(11) And experience has taught me that nothing attracts
(12) attention as much as a gun displayed publicly.
(13)    Q.   Can you understand – asking you to kind of
(14) step back and look back and look upon what you do, do
(15) you have an understanding as to why people might be
(16) fearful to see someone either protesting in
(17) San Francisco or in Menlo Park or Los Angeles with
(18) firearms on them? Do you understand how people could be
(19) fearful of seeing something like that?
(20)    A.   Yes, I do.
(21)    MR. ROBINSON:   Object that it calls for
(22) speculation.
(23) You can answer.
(24)    THE WITNESS:   I did answer. Yes, I understand
(25) that.

Page 59

(1)    MR. MASTER: Q.   Okay. And is there anything
(2) that you do or you try to do when you have arrived –
(3) and we haven't gone through all the episodes yet where
(4) you protested with the handguns aside from the 2005
(5) protest, which you didn't have on you – did you do
(6) anything to kind of respond to that fear that people
(7) might have with your guns? Anything you tried to do to
(8) allay that fear and focus more on using them to just
(9) garner attention to your message?
(10) Do you understand my question?
(11)    A.   I think I do. And to the extent that I
(12) understand it, first and foremost, I always kept the gun
(13) pointed in a safe direction, generally toward the ground
(14) next to my foot.
(15) Secondly, if somebody addresses me and voices
(16) that sort of concern, which has happened in the past, I
(17) try to explained my situation to them. And I stress
(18) that under no circumstances will I initiate any kind of
(19) violence with or without firearms.
(20)    Q.   Once again referring to Exhibit 1, did you, in
(21) fact, conduct a protest after sending this October 26,
(22) 2009 email in front of NEA?
(23)    A.   Yes, I did.
(24)    Q.   And did you bring those unloaded firearms
(25) accompanied by loaded magazines and speedloaders?

Page 60

(1)    A.   Yes.
(2)    Q.   And when you say loaded magazines and
(3) speedloaders, I'm not a gun person. You're the expert
(4) here. That means, in my mind, with live ammunition.
(5)    A.   Yes.
(6)    Q.   Okay. And that would be live ammunition in the
(7) magazines, which is something you would put into a gun,
(8) correct?
(9)    A.   Yes. But it's not inserted in the gun. That's
(10) what makes the gun unloaded.
(11)    Q.   And then speedloaders, what does that refer to?
(12)    A.   It's a device for loading a revolver that holds
(13) six or more rounds together for rapid insertion. It's a
(14) revolver cylinder.
(15)    Q.   And so the purpose of carrying the loaded
(16) magazines and speedloaders is for self-defense?
(17)    A.   In part, yes. In another part, it also makes
(18) the display much more authentic.
(19)    Q.   And how does it make it more authentic having
(20) live ammunition with you than simply just having an
(21) unloaded gun with you? Is there something in your mind
(22) that's differentiated between those two?
(23)    A.   A gun without ammunition is useless. And if I
(24) ever am called upon to use a gun in self-defense, I
(25) would have to have ammunition accessible to me.

Page 61

(1)  Q.   So, then, the purpose of having the loaded
(2)  magazines and speedloaders was primarily in case you had
(3)  to use a gun, you didn't want to have just unloaded guns
(4)  with you, correct?
(5)  MR. ROBINSON:   Objection. Asked and answered.
(6)  Misstates his prior testimony.
(7)  You can answer.
(8)  THE WITNESS:   Yes. And that also comported
(9)  with at the time the most recent ruling in an appellate
(10)  court that pertained to the legality of carrying a
(11)  firearm in California.
(12)  MR. MASTER: Q.   And which case is that?
(13)  A.   I don't have it right here. I can send you the
(14)  information afterwards.
(15)  Q.   Okay. When did you last conduct a protest in
(16)  the City of Menlo Park?
(17)  A.   2012.
(18)  Q.   And that would be about June?
(19)  A.   Yes.
(20)  Q.   So between the 2006'ish time period and
(21)  June 2012, were all those protests concerning the same
(22)  general subject matter? And what I mean by that is
(23)  Mr. Zhu and the allegations against him as related to
(24)  Erin Zhu.
(25)  A.   That is correct, yes.

Page 62

(1)  Q.   Okay.
(2)  A.   And as related to NEA.
(3)  Q.   And I understand that -- from your complaint
(4)  that NEA financially supported or contributed to WebEx,
(5)  and WebEx you associate with Mr. Zhu. Is that general
(6)  statement, is that accurate?
(7)  A.   Well, there were two stages. NEA was
(8)  responsible for funding WebEx initially and in large
(9)  part for taking it public. And, secondly, after 2005,
(10)  after Min fled the country as a result of my exposure,
(11)  NEA funded -- initiated and funded a venture in China
(12)  with him.
(13)  Q.   Okay. So let me rephrase that.
(14)  So the protests that you've conducted within
(15)  the City of Menlo Park, they all relate to the general
(16)  subject matter pertaining to Mr. Zhu and the allegations
(17)  against him as they relate to his daughter and NEA's,
(18)  for lack of a better word, financial support or support
(19)  of Mr. Zhu?
(20)  A.   That's correct.
(21)  Q.   Okay. And why have you not protested in the
(22)  City of Menlo Park -- strike that.
(23)  Have you desired to protest in the City of
(24)  Menlo Park since June of 2012?
(25)  A.   Yes.

Page 63

(1)  Q.   And it's again related to Mr. Zhu and NEA?
(2)  A.   That's correct.
(3)  Q.   And why have you not protested within the City
(4)  of Menlo Park since June of 2012?
(5)  A.   It took me over two years, almost
(6)  two-and-a-half years to deal with the criminal
(7)  prosecution that was initiated against me at the
(8)  ostensible behest of NEA. After I got acquitted at the
(9)  end of 2014, a few months later I contacted the City and
(10)  I tried to work out the terms of my next appearance in
(11)  Menlo Park. We have gone back and forth about these
(12)  terms for almost another two-and-a-half years. And then
(13)  at the end of that exchange was the filing of my
(14)  lawsuit.
(15)  Q.   Okay.
(16)  A.   So the reason I didn't engage -- I hadn't
(17)  engaged in any additional protests since 2012 is Menlo
(18)  Park government's refusal to accommodate my lawful
(19)  requirements and their refusal to spell out the terms
(20)  under which they would permit me to appear in their
(21)  jurisdiction.
(22)  Q.   You said the City refused to accommodate your
(23)  lawful requirements. What lawful requirements are you
(24)  referring to?
(25)  A.   California statutes afford a carveout from the

Page 64

(1)  ban on carrying firearms in the course of what the law
(2)  calls an entertainment event and/or film or video
(3)  production.
(4)  Q.   And that's spelled out in the complaint.
(5)  A.   Yes.
(6)  Q.   And that's the allegation that this exception
(7)  to the open carry ban, how that applies, that's what
(8)  you're focused on with that statement, correct?
(9)  A.   Yes.
(10)  Q.   Okay. So let me back up. There are a couple
(11)  other things you said in response to my question about
(12)  why you haven't protested since June of 2012. You
(13)  indicate there was a criminal prosecution -- I can't
(14)  read my notes -- initiated by NEA against him? Is that
(15)  what you said?
(16)  A.   Well, it was initiated by the public
(17)  prosecutor's office, but their communication with NEA
(18)  before and during my trial have indicated that they were
(19)  prosecuting me on behalf of NEA. And, in fact, the
(20)  prosecutor had referred to NEA as her clients before a
(21)  judge.
(22)  Q.   Okay.
(23)  A.   So that counts, I think, as pretty strong
(24)  evidence that NEA was behind that prosecution.
(25)  Q.   Do you have personal knowledge of this?

## Page 65

(1)   A.   I personally took a photograph of – several
(2)   photographs of the prosecutor conferring in the
(3)   courthouse with people who appeared to be and acted as
(4)   employees of NEA.
(5)   Q.   Okay. You indicated – so you were focused on
(6)   the criminal prosecution, right?
(7)   A.   That's right.
(8)   Q.   And you were acquitted in 2014, correct?
(9)   A.   Yes. December.
(10)   Q.   December. Was there anything that the City did
(11)   during that time period to prohibit you from going out
(12)   in front of NEA and protesting?
(13)   A.   Not that I can think of, that matter. I
(14)   didn't – I didn't revive this matter until the criminal
(15)   prosecution had completed.
(16)   Q.   Okay. So, then, after the criminal prosecution
(17)   completed in, I think you said, December of 2014, after
(18)   that is when you contacted the City?
(19)   A.   Yes.
(20)   Q.   And was that contact in writing or was it in
(21)   person or was it over the phone?
(22)   A.   Always in writing.
(23)   Q.   Always in writing.
(24)   A.   Emails.
(25)   Q.   Okay. So all of your communications with the

## Page 66

(1)   City concerning your protests within the City of Menlo
(2)   Park would it be fair to say are documented in emails?
(3)   A.   Yes. And you have the entire kit and caboodle.
(4)   Q.   I just want to make sure I'm not missing
(5)   something. For example, did you ever contact anybody at
(6)   the police department over the phone to follow up with
(7)   an email exchange you might have had with the City?
(8)   A.   No. Because my experience in various lawsuits
(9)   has told me it's better to create a record. There's no
(10)   ambiguity.
(11)   Q.   So just to be clear, any and all communications
(12)   you had with the City of Menlo Park concerning your
(13)   protests out in front of NEA on Sand Hill Road and/or
(14)   your applications for a special event permit or a film
(15)   permit are documented in writing from yourself?
(16)   A.   That's correct.
(17)   Q.   Okay.
(18)   A.   There have been no phone calls, no personal
(19)   appearances.
(20)   Q.   This is one of those questions where it might
(21)   be an estimate, but I'll ask.
(22)   Prior to the filing of this lawsuit – or
(23)   strike that.
(24)   You haven't protested since June 2012, correct?
(25)   A.   That's right.

## Page 67

(1)   Q.   Okay. So between the 2006 time period when you
(2)   first protested in Menlo Park and until June of 2012 how
(3)   many times would you say that you protested against NEA
(4)   within the City of Menlo Park?
(5)   A.   If by times you mean an appearance on a
(6)   particular day –
(7)   Q.   Yes.
(8)   A.   – at least several dozen. I can't give you a
(9)   better estimate, I'm afraid.
(10)   Q.   So several dozen. Are we between 25 and 50?
(11)   A.   Something like that, yes.
(12)   Q.   Something like that, okay.
(13)   During any of those – strike that.
(14)   With the exception of the 2006 appearance
(15)   where, as you sit here today, you don't recall
(16)   specifically where that occurred, did all the other
(17)   protests against NEA either occur directly in front
(18)   of the NEA building within the complex or on Sand Hill Road
(19)   in front of the main entrance of that complex?
(20)   A.   That is correct.
(21)   Q.   Because I understand as a result of the NEA
(22)   lawsuit against you for trespassing, you were moved
(23)   outside of that complex onto the public right-of-way on
(24)   Sand Hill Road. Is that correct?
(25)   A.   Yeah, that's right.

## Page 68

(1)   Q.   And after that settlement was made between you
(2)   and NEA, you resumed protests on the public sidewalk in
(3)   front of NEA, that entrance there?
(4)   A.   That is correct.
(5)   Q.   Okay. So since your 2008 protest where you
(6)   walked between the parking lot and the entrance to the
(7)   NEA building, have you always had on you or in your
(8)   possession firearms when you were doing your protests in
(9)   Menlo Park?
(10)   A.   As far as I can recall, that is true.
(11)   Q.   And, again, when we reference the 2009 emails,
(12)   Exhibit 1, in all those occasions when you were carrying
(13)   unloaded firearms as part of your protests against NEA,
(14)   whether that initially be within the private property
(15)   where NEA is housed and then subsequently within the
(16)   public right-of-way on the sidewalk on Sand Hill Road,
(17)   did you always carry with you live ammunition for those
(18)   said firearms?
(19)   A.   Yes.
(20)   Q.   And we have the police reports that –
(21)   (Coughing interruption.)
(22)   A.   Excuse me. Sorry. Went the wrong way.
(23)   Q.   It happens. Are you okay?
(24)   A.   I'm good.
(25)   Q.   Have you read through all of the police reports

### Page 69

(1) that the City produced in this litigation?

(2)   A.  **That's correct.**

(3)   Q.  Not yet? Okay.

(4) Do you recall reading through any of the

(5) reports that identify the particular types of firearms

(6) that you had with you when you were protesting in the

(7) City of Menlo Park?

(8)   A.  **I saw several reports with such identification.**

(9)   Q.  Okay. And would it be fair to say, Mr. Zeleny,

(10) that between, let's say, 2008 and June of 2012 when you

(11) were protesting either on the private property or within

(12) the public right-of-way on Sand Hill Road, that when

(13) police officers responded, that they would make contact

(14) with you?

(15)   A.  **Yes. Either me or in the 2009 and I think 2010**

(16) **occasions they made contact with some of my associates**

(17) **and contract employees.**

(18)   Q.  Brian Wong, for example?

(19)   A.  **Michael Wong.**

(20)   Q.  Michael Wong, I'm sorry.

(21)   A.  **And Paul Mitchell, yes.**

(22)   Q.  And during those contacts they made with you,

(23) did they ask to look at your guns?

(24)   A.  **Yes.**

(25)   Q.  And did you understand why they were asking to

### Page 70

(1) look at your guns?

(2)   A.  **Yes, I understood that.**

(3)   Q.  What was your understanding of why they asked

(4) you?

(5)   MR. ROBINSON:  Objection. Calls for

(6) speculation.

(7) You can answer.

(8)   THE WITNESS:  They wanted to check that the

(9) guns were unloaded. And, in fact, in the course of one

(10) such check the police officer apparently inadvertently

(11) loaded the gun and was about to fire it when I stopped

(12) him.

(13)   MR. MASTER: Q.  Okay. Well, good. I'm glad

(14) you did that.

(15) So they told you or did they ask you,

(16) "Mr. Zeleny, may we look at your firearms to make sure

(17) they're unloaded?" Is that correct?

(18)   A.  **Yes.**

(19)   Q.  And your response to them was?

(20)   A.  **Yes. In the affirmative. Always.**

(21)   Q.  Always. So during the entirety of your protest

(22) within the City of Menlo Park when police officers came

(23) and asked you to inspect your weapons, you were always

(24) very forthcoming saying, "Yes, you may take a look at my

(25) weapons to confirm they're unloaded," correct?

### Page 71

(1)   A.  **That's correct.**

(2)   Q.  And after they confirmed that they were

(3) unloaded, did they let you continue to do your protests?

(4)   A.  **Generally, yes. Sometimes they engaged me in**

(5) **conversation.**

(6)   Q.  And the conversation they engaged you in was

(7) what?

(8)   A.  **As to the purposes of my protest and various**

(9) **background facts. There was one particular occasion in**

(10) **which a female officer has attempted to interview me,**

(11) **and I cooperated with that attempt.**

(12)   Q.  Did the Menlo Park Police Department at any

(13) time prevent you from continuing your protests when they

(14) made contact with you?

(15)   A.  **On numerous occasions I was asked to modify the**

(16) **area of my appearances, to change or to lower the volume**

(17) **of the music that my associates were playing at the**

(18) **time, to move around the placards, that sort of thing.**

(19)   Q.  Okay.

(20)   A.  **So requests like that were made. And for a**

(21) **time until I could cooperate with them in full, we had**

(22) **to interrupt what we were doing.**

(23)   Q.  Okay. And when you say you had to interrupt

(24) what you were doing, for example, if an officer asked

(25) you to modify the volume of the music, you had live

### Page 72

(1) music out there, correct?

(2)   A.  **Yes.**

(3)   Q.  And you understood that the individual or

(4) businesses within the business complex did not

(5) appreciate the volume of the music?

(6)   A.  **That's as it has been communicated to me. I**

(7) **did not really believe it because all of the musicians**

(8) **that I had hired, of all of them, none used any kind of**

(9) **amplification.**

(10)   Q.  What kind of instruments were they using?

(11)   A.  **There was an accordion player, there was a**

(12) **trumpet player. I guess the bagpipes player might have**

(13) **been a bit loud. It's in the nature of the instrument.**

(14)   Q.  And that's the purpose of using the

(15) instruments, correct?

(16)   A.  **The purpose is to attract attention.**

(17)   Q.  And where were the musicians stationed when

(18) they did play music as part of your protests?

(19)   A.  **Inside the Rosewood Complex around the corner**

(20) **of the building partially occupied by NEA.**

(21)   Q.  So when they were performing the music and you

(22) were inside the complex, was that before you and NEA

(23) entered into a settlement regarding their trespass

(24) claim?

(25)   A.  **That was actually before they filed that**

Page 77

(1) holster itself was padlocked.

(2) Q. Padlocked with a combination or a key?

(3) A. Key, I believe.

(4) Q. So it was a secured handgun.

(5) A. Yes.

(6) Q. Okay. And these five guns that are referenced

(7) in this particular report, they identify two SIG P210's,

(8) both 9mm?

(9) A. Sounds about right. I don't recall having two

(10) of them, but if they say so, it might be that was the

(11) case.

(12) Q. Okay. Let's see the other ones here.

(13) In a police report 12-596 dated May 24th of

(14) 2012 they reference two LRB rifles, each chambered with

(15) .308 caliber. Does that sound accurate to you?

(16) A. I don't recall there being two, but it's

(17) entirely possible that there may have been.

(18) Q. Do you have two such rifles?

(19) A. At one time I did. I only have one now.

(20) Q. Okay. Then there was reference to one

(21) Winchester pump action 12-gauge shotgun.

(22) A. Yeah.

(23) Q. Did you have that with you?

(24) A. I probably did. That was the one I also used

(25) in 2010.

Page 78

(1) Q. Then there's reference to a number of pistols.

(2) One SIG 9mm semi-automatic?

(3) A. Yes.

(4) Q. A .357 mag revolver?

(5) A. Two of them presumably, Korth and Manurhin.

(6) Q. A .45 ACP pump action pistol?

(7) A. Yes.

(8) Q. What is that?

(9) A. Semmerling.

(10) Q. That's the Semmerling?

(11) A. M-hm.

(12) Q. And a 9mm semi-automatic pistol with markings

(13) in Farsi, a Luger style type?

(14) A. Yeah.

(15) Q. Are those all the types of guns that you had

(16) with you when you protested in 2012?

(17) A. That sounds about right.

(18) Q. Okay.

(19) A. I probably should stress that all but one of

(20) them were locked in a case. The reason I had them with

(21) me in that case is because I didn't want to leave them

(22) in the apartment that I was renting.

(23) Q. Okay. And when you say case, you're talking

(24) about the pistols or handgun?

(25) A. The handguns were all packed, all but one,

Page 79

(1) packed in a luggage-type case and locked.

(2) Q. So the reason you brought those with you is you

(3) didn't want to leave them alone in your apartment?

(4) A. That's right.

(5) Q. And you had an apartment in the Bay Area at

(6) that time?

(7) A. Yeah.

(8) Q. Where in the Bay Area?

(9) A. In Menlo Park, I believe, or on the border. It

(10) may have been in Palo Alto. It was a – God, one of

(11) those executive suite-type things. I forget.

(12) Q. Okay. And what was the purpose of your renting

(13) a place there?

(14) A. I wanted to make a series of appearances in

(15) front of Rosewood, and it made more sense for me to do

(16) that rather than to stay in a hotel. Also more secure.

(17) Q. Okay. Did the City of Menlo Park or its police

(18) department ever take any of those firearms away from you

(19) during any of your protests?

(20) A. No.

(21) Q. Did the City of Menlo Park allow you to carry

(22) those firearms or have them with you as part of your

(23) protests up to and including your last protest in June

(24) of 2012?

(25) A. I'm not sure what the verb "allow" is here.

Page 80

(1) They hadn't interfered with my doing so is what I would

(2) say.

(3) Q. Okay. You referenced some placards earlier

(4) that you would use as part of your protests. Placards

(5) are posters, they're kind of like hard – hard posters,

(6) if you will?

(7) A. Yes. Right.

(8) Q. Hard-backed posters so you wouldn't have to –

(9) A. I think three of them are metal. They're

(10) pretty large.

(11) Q. Okay.

(12) A. And I think we have furnished or, if not, we

(13) shall furnish, digital files that comprise the

(14) appearance.

(15) Q. Okay. And I think, without getting into them

(16) now, there's a photograph of Mr. Zhu, probably some

(17) information about him, a photograph of Mr. Sandell, and

(18) some others?

(19) A. And Iyar, yes.

(20) Q. And Iyar. Did the City of Menlo Park or any of

(21) its police officers ever force you to take any of those

(22) down as part of your protests?

(23) A. Yes, as a matter of fact. Curiously enough,

(24) one series of signs featured a wooden marionette

(25) contorted in various unnatural positions. It's the kind

## Page 93

(1)   **A.   No. The closest thing I had to a television**
(2) **screen was a viewfinder on my film camera. I purchased**
(3) **an outdoor television set subsequently to my acquittal.**
(4) **And I featured -- I mentioned it in the correspondence**
(5) **that I had with Menlo Park City authorities starting in**
(6) **2015 with reference to my intent to display it in future**
(7) **appearances.**
(8)   Q.   *I appreciate that. I guess just to be*
(9) *abundantly clear, I'm talking about -- you have not*
(10) *protested out there since June 2012, correct?*
(11)   **A.   That's correct.**
(12)   Q.   *So at any time when you've been on-site, either*
(13) *on NEA's property or within that complex or on Sand Hill*
(14) *Road within the public right-of-way on the sidewalk, did*
(15) *you ever use a television screen to promote any of your*
(16) *theories or ideas as part of your protest?*
(17)   **A.   I have to say no. I may have used an iPad, but**
(18) **I'm only mentioning it because it's the only thing**
(19) **similar to a television that I had available at the time**
(20) **and I had it configured for that. I don't believe that**
(21) **I brought it ever.**
(22)   Q.   *Okay.*
(23)   **A.   So the answer again, to emphasize, is no.**
(24)   Q.   *So you say you had a portable battery --*
(25)   **A.   Yes.**

## Page 94

(1)   Q.   *-- for your laptop computer?*
(2)   **A.   That's correct.**
(3)   Q.   *So that's something you brought on-site with*
(4) *you, correct?*
(5)   **A.   Yeah.**
(6)   Q.   *Did you ever need to have a portable generator*
(7) *on-site when you were doing any of your protests on*
(8) *Sand Hill Road?*
(9)   **A.   Not to date, no. I do have a generator like**
(10) **that that I intend to use in future appearances.**
(11)   Q.   *And that's what we're going to talk about next.*
(12) *We're going to get into the 2015 time period.*
(13) *So just to be clear, and then we can take a*
(14) *brief break for lunch here, between the date of your*
(15) *last protest in Menlo Park in June 2012 and the time*
(16) *that you contacted the City with your application for a*
(17) *special event permit, did you have any communications*
(18) *with the City?*
(19)   **A.   No.**
(20)   MR. MASTER:   Okay. With that, why don't we
(21) take a lunch break, if that's okay with you, Damion.
(22)   MR. ROBINSON:   Sure. How long do you want to
(23) take?
(24)   MR. MASTER:   Forty-five minutes, something like
(25) that. Does that work?

## Page 95

(1)   MR. ROBINSON:   That will work.
(2)   (Lunch recess from 12:26 to 1:40 p.m.)
(3)   --oOo--
(4) AFTERNOON SESSION - 1:40 P.M.
(5)   (Defendants' Exhibits 2, 3 and 4 were
(6)   marked for identification.)
(7)   MR. MASTER:   We're back on the record.
(8)   Q.   *Mr. Zeleny, you understand you're still under*
(9) *oath, under penalty of perjury?*
(10)   **A.   I sure do.**
(11)   Q.   *Okay. And is there anything about your prior*
(12) *testimony before we took a lunch break that you need to*
(13) *or would like to revise or amend?*
(14)   **A.   Well, as I said, I thought I only had one LRB**
(15) **rifle. Apparently it looks like I had two at the time.**
(16)   Q.   *I think you clarified that already. So that's*
(17) *fair enough.*
(18)   **A.   That's about it.**
(19)   Q.   *We went ahead and marked three documents that*
(20) *are in front of you. They're marked as Exhibits 2, 3,*
(21) *and 4. What I'd like to first do is call your attention*
(22) *to Exhibit 2 and then we'll get to the other ones.*
(23)   **A.   Yes.**
(24)   Q.   *Why don't you take a moment to kind of leaf*
(25) *through or read at your leisure the contents of*

## Page 96

(1) *Exhibit 2.*
(2)   **A.   Yeah. All done.**
(3)   Q.   *So just for the record, Exhibit 2 is an email*
(4) *and an attachment and it is Bates numbered MP234 through*
(5) *and including MM240.*
(6) *Mr. Zeleny, do you recognize this exhibit?*
(7)   **A.   Yes.**
(8)   Q.   *And is this a document or documents that you*
(9) *prepared?*
(10)   **A.   Yes.**
(11)   Q.   *Okay. And when I say documents, I'm kind of*
(12) *referring to the email and then attached to the email is*
(13) *something called City of Menlo Park Special Event*
(14) *Application.*
(15) *Do you see that?*
(16)   **A.   Yes.**
(17)   Q.   *And you prepared both the email and the*
(18) *application?*
(19)   **A.   That is right.**
(20)   Q.   *Okay. And the email is dated July 10, 2015; is*
(21) *that correct?*
(22)   **A.   Yes.**
(23)   Q.   *And that's the date that you sent it?*
(24)   **A.   M-hm.**
(25)   Q.   *Is that a yes?*

Page 97

(1)  A.   That is a yes, yes.

(2)  Q.   I only ask that because you said "m-hm" and we

(3)  need you to say yes or no. So I appreciate that.

(4)  A.   Sorry.

(5)  Q.   You're fine.

(6)  And you sent that email to – well, in the "To"

(7)  field there are three individuals there. William

(8)  McClure, who is the City Attorney, correct?

(9)  A.   M-hm. Yes, sorry.

(10)  Q.   Scott Sandell, who we've discussed earlier.

(11)  A.   Yes.

(12)  Q.   He's with NEA, correct?

(13)  A.   Yes.

(14)  Q.   And then Matt Milde, correct?

(15)  A.   That is actually four parties. The last one is

(16)  police chief.

(17)  Q.   I see that. I see that now, you're correct.

(18)  Okay.

(19)  And then in the CC portion of your email

(20)  there's your attorney and there's a gentleman named

(21)  Peter Shimamoto. Who is Mr. Shimamoto?

(22)  A.   He was at the time an associate of David

(23)  Affeld.

(24)  Q.   Okay. Gotcha.

(25)  So going back to Mr. Sandell, why did you copy

Page 98

(1)  Mr. Sandell on this email?

(2)  A.   He is the principal party whose actions I'm

(3)  protesting. He spearheaded support of WebEx and Min Zhu

(4)  at NEA. And that is based on reliable information that

(5)  I have in my possession. And he is the one –

(6)  (Reporter clarification.)

(7)  MR. MASTER:   I didn't understand either.

(8)  MR. ROBINSON:   I think it started with "he is

(9)  the one."

(10)  THE WITNESS:   I started saying and he is the

(11)  one that would have to make amends to the general public

(12)  for financially and politically supporting a child

(13)  rapist.

(14)  MR. MASTER: Q.   Okay. And this email, the

(15)  application that I referred to, the special event

(16)  application, that was actually attached to this email,

(17)  correct?

(18)  A.   Yes.

(19)  Q.   Okay. Why did you apply for a special event

(20)  permit to the City of Menlo Park?

(21)  A.   In the course of my criminal prosecution I

(22)  discovered that the City of Menlo Park retroactively

(23)  created a procedure for approving or denying special

(24)  events, and they created this procedure ostensibly in

(25)  response to and certainly after my assertion in the

Page 99

(1)  course of my prosecution that my use of firearms was

(2)  covered on the premises of me conducting an

(3)  entertainment event and video production.

(4)  Q.   Let me ask you – I'm sorry. Are you finished?

(5)  A.   I'm not done.

(6)  Q.   Okay.

(7)  A.   No. The reason I applied for a special event

(8)  permit is in response to this procedure that City of

(9)  Menlo Park instituted sometime around late 2013, if

(10)  memory serves.

(11)  Q.   And what factual evidence do you have that the

(12)  City retroactively created this procedure for special

(13)  event permits?

(14)  MR. ROBINSON:   I'm just going to object that it

(15)  is an improper contention question.

(16)  Go ahead and answer, Michael.

(17)  THE WITNESS:   Okay. I looked at the web pages

(18)  on which the relevant information was displayed on the

(19)  City of Menlo Park's website. I researched the date of

(20)  their creation with parameterized Google search and I

(21)  established with a great deal of certainty that

(22)  sometime – I don't recall exactly when in 2013, but I

(23)  do have a record of that – sometime in 2013 is when the

(24)  City created these records.

(25)  MR. MASTER: Q.   When you say created these

Page 100

(1)  records, are you referring to creating the requirement

(2)  that people apply for –

(3)  A.   Apply.

(4)  Q.   – apply for special event permits?

(5)  A.   That's correct, yeah.

(6)  Q.   And why do you believe that the City created

(7)  the special event permit process because of your

(8)  actions?

(9)  A.   In the course of defending myself against

(10)  criminal charges, I, through my lawyers, have asserted

(11)  an exemption from the relevant statutes on the grounds

(12)  of being an authorized participant in a video production

(13)  and an entertainment event. After that is when the City

(14)  apparently created those applications.

(15)  Q.   Created the special event permit process; is

(16)  that what you mean?

(17)  A.   As evidenced by their website.

(18)  Q.   Okay. And that's based on research you did on

(19)  the website?

(20)  A.   That's right.

(21)  Q.   And so aside from the timing of the City's

(22)  supposed creation of the special event permit process,

(23)  do you have any information to suggest that the City

(24)  instituted that process because of your actions?

(25)  A.   No, I don't.

Page 101

(1)     Q.   Okay. So basically it's based on the fact that
(2) you were criminally charged with carrying a concealed
(3) weapon and the City created a special event permit
(4) process after that occurred? That's your basis for your
(5) allegation that the City created this process because of
(6) you?
(7)     MR. ROBINSON:   No, no. Hold on. I'm going to
(8) renew the objection. It's an improper contention
(9) question and also it misstates his prior testimony.
(10) But you can answer.
(11)     MR. MASTER: Q.   Go ahead.
(12)     A.   What I said actually was that, according to my
(13) research, the City created this process after my counsel
(14) has asserted a defense. One of the defenses against the
(15) charges brought against me was that I was an authorized
(16) participant in my own video production and my own
(17) entertainment event.
(18)     Q.   So that's referring to, in the criminal matter,
(19) the exemption for carrying a concealed unloaded weapon?
(20)     A.   That's right.
(21)     Q.   Okay. Did anyone associated with the City of
(22) Menlo Park, to your knowledge, whether they're an
(23) employee, an agent, or someone that you believe to be
(24) somehow associated with the City, ever contact you and
(25) tell you that you needed to apply for a special event

Page 102

(1) permit to do the actions that are referenced in
(2) Exhibit 2?
(3)     A.   My answer is no, and I will amplify it. In all
(4) my communications with the City of Menlo Park I was the
(5) one to initiate them.
(6)     Q.   Okay. Had you ever applied for a special event
(7) permit with the City of Menlo Park prior to the
(8) July 10th, 2015 application?
(9)     A.   If memory serves, that was the first occasion
(10) on which I submitted such application.
(11)     Q.   Okay. So how did you come up with the idea
(12) that you needed to apply for a special event permit to
(13) do the activities that are referenced within Exhibit 2?
(14)     A.   In hindsight, based on the documents that your
(15) client has served, it appears that my protest, my
(16) lawfully armed protest, I should say, was a large factor
(17) in the enactment of the California ban on open carry of
(18) long arms at the behest of Menlo Park, specific behest.
(19) Because California law, even after this ban,
(20) allowed the open and concealed carry of any kind of
(21) firearms in the course of an entertainment event and/or
(22) a film or video production by authorized participants in
(23) that kind of action, I wished to avail myself of these
(24) exemptions in order to be able to carry long arms and
(25) handguns in the course of my process.

Page 103

(1)     Q.   So just so I understand it, the purpose in
(2) applying for the special event permit in your mind was
(3) that it would support your belief that you had an
(4) exemption from the open carry and concealed carry ban in
(5) the State of California?
(6)     A.   That's not how I would phrase it. It was my
(7) attempt to comply with black letter law that allowed an
(8) exemption to the ban on carrying concealed – open or
(9) concealed firearms.
(10)     Q.   Now, you referenced a few moments ago – and
(11) correct me if I'm wrong. I just want to make sure I
(12) understand. Do you believe that the State of California
(13) created the open carry ban at the behest of the City of
(14) Menlo Park because of you?
(15)     A.   In part, yes.
(16)     Q.   Why?
(17)     A.   And that is supported by the documents that
(18) your client has served to us.
(19)     Q.   Which particular documents?
(20)     A.   I can't identify them at this moment. But if
(21) you wish, I can get back to you with a specific Bates
(22) number.
(23)     Q.   As you sit here today, what do you recall about
(24) the contents of those documents that supports your
(25) opinion that the City –

Page 104

(1)     A.   There were some –
(2)     Q.   Hold on.
(3)     – that the City or, strike that, that the
(4) State of California adopted the open carry ban at the
(5) behest of the City because of you? What do you recall
(6) factually about those documents that supports that?
(7)     A.   I saw some communications between Menlo Park
(8) Police that referenced – and, actually, I don't know
(9) whom they were addressed to, but there was a
(10) multi-agency discussion apparently of my particular
(11) case. And the overall thrust of the discussion was that
(12) this sort of thing cannot be allowed to proceed.
(13)     Q.   And was that information that you're referring
(14) to, was that all communications prior to the State's
(15) adoption of the open carry ban?
(16)     A.   That was my understanding.
(17)     Q.   Okay. Now, if you could turn to the first page
(18) of Exhibit 2. Do you have that in front of you?
(19)     A.   Yes.
(20)     Q.   In the fourth line of the first paragraph, the
(21) paragraph that begins, "Starting in October 2015," do
(22) you see that?
(23)     A.   Yes.
(24)     Q.   And by the way, you wrote the entirety of this
(25) email and the attached permit application by yourself;

Page 105

(1) *is that correct?*

(2) **A.   That's right.**

(3) *Q.   Okay. So the fourth line, it indicates that*

(4) *you shall be present on-site around the clock. Did I*

(5) *read that correctly?*

(6) **A.   Yes.**

(7) *Q.   And so does that mean that you planned to –*

(8) *first of all, on-site, where are you referring to?*

(9) **A.   That would have been the location on Sand Hill**

(10) **Road that appeared in a photograph – in several of the**

(11) **photographs that you previously exhibited to me.**

(12) *Q.   Let me ask you this. In continuing down in the*

(13) *email, I believe it's also in the application, if you*

(14) *look at the second paragraph on Exhibit 2 that begins,*

(15) *"A site map." Do you see that?*

(16) **A.   Yes.**

(17) *Q.   The second sentence there indicates that your*

(18) *display would be confined to the median strip on*

(19) *Sand Hill Road directly across the NEA headquarters. Do*

(20) *you see that?*

(21) **A.   Yes, I do.**

(22) *Q.   So am I reading this correctly that when you*

(23) *say, "I shall be present on site around the clock," by*

(24) *way of this application you intended to be present on*

(25) *the center median on Sand Hill Road 24 hours a day*

Page 106

(1) *pursuant to this application?*

(2) **A.   That was the idea.**

(3) *Q.   Okay. So this would, in fact, be in a*

(4) *different location than where you had been previously,*

(5) *which would have been on the sidewalk along Sand Hill*

(6) *Road; would that be correct?*

(7) **A.   That is right. You're right. I have to**

(8) **correct my previous response.**

(9) *Q.   That's fine. I'm not tricking you. I just*

(10) *want to make sure I understand it.*

(11) *In continuing on, now I'm on the fifth line of*

(12) *the first paragraph on page 234 on Exhibit 2, you'd be*

(13) *served by support staff. When you say support staff,*

(14) *how many individuals are you referring to?*

(15) **A.   I don't recall the exact number. I don't**

(16) **believe that I have specified that to the Menlo Park**

(17) **authorities in the course of this application. I was**

(18) **contemplating hiring two or three people to assist me in**

(19) **this endeavor.**

(20) *Q.   And that's what my question was. I wasn't sure*

(21) *what that meant in terms of number.*

(22) **A.   That was the intent, yes. And I didn't spell**

(23) **out the number.**

(24) *Q.   So if your intent was hiring two or three*

(25) *people, what was your intent on what that support staff*

Page 107

(1) *would be doing for you in reference to this part of*

(2) *Exhibit 2?*

(3) **A.   Essentially all aspects of supporting my**

(4) **presence on-site 24/7.**

(5) *Q.   Can you give me some examples of what you were*

(6) *envisioning by needing to have someone there to support*

(7) *you?*

(8) **A.   Oh, for example, just for one example, I would**

(9) **have to have a porta-potty there. So somebody would**

(10) **have to manage that. Somebody would have to provide me**

(11) **with meals. Maybe assist with guarding the site at**

(12) **night. That is the general thrust of it.**

(13) *Q.   So assist with guarding the site at night.*

(14) *This would consist of, for example, you getting some*

(15) *sleep and someone guarding the center median to protect*

(16) *your weapons?*

(17) **A.   Something like that. An armed guard, yes, that**

(18) **I would hire.**

(19) *Q.   And this porta-potty and the staff, they would*

(20) *also be on-site in the center median with you?*

(21) **A.   That was the intent, yes.**

(22) *Q.   Okay.*

(23) **A.   I was intending to employ the bed of my truck**

(24) **for most of the equipment.**

(25) *Q.   With the exception of the porta-potty.*

Page 108

(1) **A.   That's correct, right.**

(2) *Q.   Okay. And how were you envisioning getting*

(3) *onto the center median with your truck?*

(4) **A.   I was requesting that the City allow me to**

(5) **drive onto it.**

(6) *Q.   Did you have a particular plan on how you would*

(7) *access the center median?*

(8) **A.   I know how to get over a curb with my truck. I**

(9) **have equipment for that. So yes. And the answer is in**

(10) **the affirmative.**

(11) *Q.   So in the center median there's a curb there;*

(12) *is that correct?*

(13) **A.   I believe so.**

(14) *Q.   So your idea was that you would use your*

(15) *vehicle and get up over the curb and park on the center*

(16) *median?*

(17) **A.   Yes.**

(18) *Q.   And in the center median, in addition to your*

(19) *truck, the staff, and the porta-potties, that would*

(20) *include – and I'm referring to Exhibit 2 here, it's*

(21) *line 5 – exposed and unloaded military grade firearms;*

(22) *is that correct?*

(23) **A.   That is correct.**

(24) *Q.   And it also indicates loaded ammunition feeding*

(25) *devices for those specific firearms; is that correct?*

Page 109

(1)  A.  Yes.

(2)  Q.  Okay. And then you indicate -- you identify

(3)  some of those firearms; is that correct?

(4)  A.  That is right.

(5)  Q.  And you reference a 9mm Para semi-automatic SIG

(6)  P210 pistol?

(7)  A.  That's right.

(8)  Q.  And you would have associated live ammunition

(9)  separate and apart from that weapon, correct?

(10)  A.  That is right.

(11)  Q.  Then you would have a 7.65 x 51mm NATO,

(12)  N-A-T-O, all caps, semi-automatic LRB M25 rifle as well;

(13)  is that correct?

(14)  A.  That is correct.

(15)  Q.  And is that the same LRB rifle that we

(16)  referenced in prior photographs this morning?

(17)  A.  It is one of them.

(18)  Q.  Okay. And, in addition, you would have a

(19)  tripod-mounted belt-fed Browning, capital

(20)  B-r-o-w-n-i-n-g, M1919A4; is that correct?

(21)  A.  Semi-automatic modifies both LRB M25 rifle and

(22)  belt-fed -- tripod-mounted belt-fed Browning M1919A4.

(23)  They're not machine guns. The actual military issue are

(24)  fully automatic.

(25)  Q.  They're fully automatic.

Page 110

(1)  A.  These are semi-automatic, both of them.

(2)  Q.  Okay. Now, in my doing quick research -- and

(3)  by no means am I the historian; you're the expert when

(4)  it comes to history so I'll let you correct me if I'm

(5)  wrong -- the belt-fed Browning M1919, is that a .30

(6)  caliber machine -- medium machine gun?

(7)  A.  In this particular instance it's a highly

(8)  modified version of that weapon designed to fire in

(9)  semi-automatic mode only and to make it well-nigh

(10)  impossible to convert it to full automatic operation.

(11)  Q.  So, forgive me, but being converted to

(12)  semi-automatic, is that something you did to this

(13)  particular firearm?

(14)  A.  No, that's how they're sold. It's a particular

(15)  popular firearm for that purpose.

(16)  Q.  And how many rounds a minute can you shoot with

(17)  the semi-automatic version of the Browning?

(18)  A.  Quite frankly, I never even fired that thing

(19)  and I don't know if I intend to. I'm more of a rifle

(20)  man.

(21)  Q.  Okay. And do you have a permit associated with

(22)  the Browning? Is it registered to you or do you have a

(23)  permit for it?

(24)  A.  It is registered to me. There is no permit

(25)  required in this state to own a semi-automatic weapon.

Page 111

(1)  Q.  Where is it registered to you, what database?

(2)  A.  That would be with California Department of

(3)  Justice.

(4)  Q.  Okay. Did you ever -- I'm sorry. Go ahead.

(5)  A.  If you wish, I can explain the process of

(6)  registration.

(7)  Q.  Please do. That would be helpful.

(8)  A.  The way you acquire firearms in this state, as

(9)  of now, there used to be some exemptions, but all modern

(10)  firearms made post-1898 have to be transferred to the

(11)  end user by a federal licensed dealer.

(12)  At the time of this transfer the end user

(13)  completes a 4473 form that basically answers the

(14)  questions of his eligibility under federal law to own

(15)  modern firearms. And he makes these assertions,

(16)  checking the relevant boxes on the form, under penalty

(17)  of perjury.

(18)  Ten days later -- there's a waiting period

(19)  mandatory in California. Ten days later, assuming the

(20)  Department of Justice running the checks with the FBI

(21)  comes back and indicates to the dealer, transferring

(22)  dealer, that there is no reason to prevent the transfer,

(23)  the end user may appear at the dealer and pick up his

(24)  weapon.

(25)  That is what happened with every weapon that I

Page 112

(1)  own in this state, exclusive of those that I brought

(2)  with me upon moving here in 1983, having purchased them

(3)  in a different jurisdiction.

(4)  Q.  Okay. Thank you very much.

(5)  Now, if you refer to Exhibit 3, which is in

(6)  that stack in front of you --

(7)  A.  Oh, sorry.

(8)  Q.  It's a separate document.

(9)  A.  Right.

(10)  Q.  If you look at Exhibit 3, I'll represent to you

(11)  this is a photograph that I pulled off the web -- I'm

(12)  not saying this is your gun -- when I searched for

(13)  belt-fed Browning M1919A4.

(14)  Does Exhibit 3, at least to your knowledge and

(15)  given your history and experience with these weapons,

(16)  does this accurately depict the type of weapon that you

(17)  were intending to bring with you as part of your special

(18)  event permit application?

(19)  A.  That is right. The only exception in this case

(20)  being that I would have used a different tripod.

(21)  Q.  Okay. So but for the tripod, the firearm

(22)  itself in Exhibit 3 is an accurate depiction of what you

(23)  described in your special event permit application?

(24)  A.  That is right.

(25)  Q.  Okay. Thank you.

Page 113

(1) Had you ever brought this belt-fed Browning
(2) M1919A4 to any of your prior protests in Menlo Park?
(3) A.   No. I purchased this specifically for the next
(4) round that hasn't commenced yet.
(5) Q.   When did you purchase the firearm?
(6) A.   If memory serves, I bought it in early 2015. I
(7) can check that.
(8) Q.   Would it be fair to say sometime between your
(9) acquittal in the criminal matter and the filing of your
(10) special event permit application on July 10, 2015?
(11) A.   This would make sense to me. That's why I'm
(12) guessing as to the date.
(13) Q.   I don't want you to guess. That's always a
(14) word that lawyers don't like. But is that a fair
(15) estimate of a time frame?
(16) A.   It is a fair estimate, yes. Sorry about that.
(17) Q.   That's fine.
(18) Okay. I'm done with Exhibit 3 for the time
(19) being. You can tuck that away.
(20) You also reference in Exhibit 2, and I'm
(21) looking at your email here in the first full paragraph,
(22) that you intended to bring a 55-inch portable media
(23) display powered by a portable gas generator; is that
(24) correct?
(25) A.   That is right.

Page 114

(1) Q.   And my understanding through subsequent
(2) correspondence with the City is that you intended to
(3) display that television – and that's a television,
(4) correct?
(5) A.   Yes.
(6) Q.   You intended to display that television from
(7) the bed of your truck; is that correct?
(8) A.   That is right.
(9) Q.   And what direction would it be pointed to or
(10) how would it be angled or configured vis-a-vis Sand Hill
(11) Road?
(12) A.   Well, I should make a very general statement
(13) here. I was asking the City for the parameters that it
(14) would consider acceptable. I did not indicate any
(15) particular direction. What I tried to do instead was to
(16) elicit the City's requirements for approving the permit
(17) and to comply with them. No such requirements were
(18) furnished to me so that matter of orientation, along
(19) with many other matters, was left undetermined.
(20) Q.   Did you actually specifically write in an email
(21) or correspondence to the City asking the City which
(22) direction of orientation the TV could be used?
(23) A.   I recall asking the City for its requirements
(24) for approving an application like this. I recall asking
(25) the City several times for these requirements. I never

Page 115

(1) received any sort of response to that inquiry.
(2) Q.   And pursuant to our prior discussion here and
(3) your prior testimony today, to the extent that there
(4) was, for lack of a better term, give and take between
(5) you and the City with regard to either your special
(6) event permit application or your subsequent film
(7) application, that would be documented in writing?
(8) A.   Yes, indeed. And the only amendment I would
(9) make to your characterization, it was all give on my
(10) part. It would have been all take on the part of the
(11) City.
(12) Q.   Okay.
(13) A.   I in this particular case, as on prior
(14) occasions, have resolved to humor your client in any
(15) requests that they make, to the extent that I'm capable,
(16) without putting the kibosh on my entire performance.
(17) Q.   Okay. Now, the portable media display on this
(18) 55-inch television, you indicate here – again, I'm
(19) referring to Exhibit 2, the first page, the first
(20) paragraph – that it would display, quote, videos
(21) featuring explicit representations of sexual violence
(22) committed by NEA's publicly disgraced protg, end of
(23) quote.
(24) Did I read that correctly?
(25) A.   That's right.

Page 116

(1) Q.   Okay. And then you refer to a sample image.
(2) Do you see that?
(3) A.   Yes.
(4) Q.   And that's from your LiveJournal?
(5) A.   Yes.
(6) Q.   And if you'd turn to Exhibit 4, which is in
(7) front of you. Do you have that in front of you?
(8) A.   I got it.
(9) Q.   And is Exhibit 4 a document, as far as you
(10) understand in looking at it, that is taken from your
(11) LiveJournal?
(12) A.   Yes. Except this would have been an animation,
(13) not a still.
(14) Q.   Thank you. That's what I wanted to ask you.
(15) So contained within Exhibit 4 is an animation,
(16) i.e., a cartoon, correct?
(17) A.   That's right.
(18) Q.   And I understand what you're telling me is that
(19) when you go on your LiveJournal and you get to this
(20) portion of it, it's not a still image. It's an image
(21) that moves, correct?
(22) A.   That is right.
(23) Q.   Okay. Obviously I can't attach that here
(24) today, so I'm giving you the still image version of it.
(25) Right?

Page 117

(1)  A.   That's right.

(2)  Q.   Okay. And so that's the sample of what you

(3)  wanted to display on the television monitor in the back

(4)  of your truck.

(5)  A.   It is indeed one of the centerpieces.

(6)  Q.   Okay. And that particular image that's

(7)  contained within Exhibit 4 to your deposition, had you

(8)  ever displayed that image in any of your prior protests

(9)  within the City of Menlo Park?

(10)  A.   No.

(11)  Q.   And why not?

(12)  A.   It hadn't been created then. This posting

(13)  dates to December 14, 2012. Based on the date, I would

(14)  make my best recollection of the production of this

(15)  animation to date back to November, in November of that

(16)  year. So that would have been after my last appearance

(17)  in Menlo Park.

(18)  Q.   Thank you.

(19)  Sir, if you could please turn to, it's the

(20)  third page within Exhibit 2, so I'm jumping around back

(21)  to Exhibit 2. Set Exhibit 4 aside. It's actually the

(22)  first page of the actual special event application.

(23)  Have you had a chance to look over this

(24)  application here today?

(25)  A.   I'm looking at it right now.

Page 118

(1)  Q.   Okay. Go ahead.

(2)  A.   But I would like to do it more thoroughly.

(3)  Q.   Take your time.

(4)  A.   Yes, we're done.

(5)  Q.   Okay. I think you testified previously that

(6)  you prepared this application yourself, correct?

(7)  A.   Yes.

(8)  Q.   And that's your signature on the last page of

(9)  this exhibit, on Bates number MP240?

(10)  A.   Yes, it is.

(11)  Q.   Okay. Turning back to the first page of the

(12)  application that's Bates number 236, there's the

(13)  applicant name, which is yourself. I'm sorry.

(14)  MR. ROBINSON:   Bottom right.

(15)  THE WITNESS:   Okay.

(16)  MR. MASTER: Q.   I'm sorry. When I refer to

(17)  Bates number, I'm referring to the number on the bottom

(18)  right.

(19)  The applicant name is yourself, correct?

(20)  A.   M-hm.

(21)  Q.   Yes?

(22)  A.   Yes.

(23)  Q.   And then organization name, Mass Means, Inc.,

(24)  is this a -- this event was going to be sponsored by

(25)  your company?

Page 119

(1)  A.   The company at that time was already a

(2)  suspended corporation. I was trying at the time to

(3)  reincorporate. So that was a bit of a hopeful

(4)  designation.

(5)  Q.   Okay. And the name of your event was Child

(6)  Rape Tools; is that correct?

(7)  A.   That is right.

(8)  Q.   Okay. And then continuing down in these

(9)  various blocks here, we have the section the Purpose of

(10)  Event. We've already talked about that, correct?

(11)  A.   That's right.

(12)  Q.   And it's described there, correct?

(13)  A.   Yes.

(14)  Q.   The next box, if you will, is called Location

(15)  of Event. And that identifies the median strip on

(16)  Sand Hill Road at 2825 Sand Hill Road, correct?

(17)  A.   Yes.

(18)  Q.   Now, the way I understand it is 2855 Sand Hill

(19)  Road is actually the address of NEA within the complex.

(20)  Is that your understanding?

(21)  A.   Yes.

(22)  Q.   And the center median is actually right in the

(23)  middle of Sand Hill Road, correct?

(24) · A.   That's right.

(25)  Q.   And my understanding is that NEA's building

Page 120

(1)  does not have a front or an entrance directly to

(2)  Sand Hill Road at the center median, correct?

(3)  A.   That is right. That is why I specified this at

(4)  the median strip.

(5)  Q.   Gotcha. Then continuing down under Event

(6)  Timeline, are you there?

(7)  A.   Yes.

(8)  Q.   We have the set-up and preparation, which you

(9)  indicate would begin on September 30th, 2015 at

(10)  9:00 a.m. and then end at 10:00 p.m.

(11)  Do you see that?

(12)  A.   Yes.

(13)  Q.   So 13 hours for set-up and preparation?

(14)  A.   Yes.

(15)  Q.   So did you envision taking an entire day to set

(16)  up your vehicle and put everything you need to put in

(17)  the center median to begin the event the following day?

(18)  Is that kind of the idea?

(19)  A.   That was the idea, yes.

(20)  Q.   And then the event itself would have begun the

(21)  following day, on October 1st, 2015 at 7:00 a.m.; is

(22)  that correct?

(23)  A.   That is correct.

(24)  Q.   And it would have been ongoing an indefinite

(25)  time period.

**Page 121**

(1) A. That was my request.

(2) Q. *Okay. If you continue to go down the*

(3) *application, there's the -- next to the question that*

(4) *reads, "Any City streets closed"; do you see that?*

(5) A. Yes.

(6) Q. *And you said no.*

(7) A. Yes.

(8) Q. *And did you do any analysis yourself to come to*

(9) *that conclusion?*

(10) A. Yes, I did.

(11) Q. *And what was that?*

(12) A. I wouldn't be impeding any traffic on Sand Hill

(13) Road, certainly not anywhere else. So there would be no

(14) need for the City to close any streets.

(15) Q. *And how would you get -- because you're saying*

(16) *that you'd be essentially living on that center median*

(17) *because you have a porta-potty there, correct?*

(18) A. That's a fair characterization, yes.

(19) Q. *And how would the support staff -- would they*

(20) *be living with you, was that your intention, or would*

(21) *they be coming and going, relieving each other, if you*

(22) *will?*

(23) A. They would be coming and going.

(24) Q. *And how did you envision them accomplishing*

(25) *that?*

**Page 122**

(1) A. I was contemplating hiring a security guard for

(2) nighttime protection. Other people would come and

(3) attend to the daily needs.

(4) Q. *I guess my question is, physically how would*

(5) *you envision them getting there? How would they get to*

(6) *and from the center median? For example, how would they*

(7) *get to the event?*

(8) A. They would cross at a pedestrian crossing. I

(9) believe the center median extends all the way from the

(10) intersection. They would walk the center median to my

(11) location and do whatever it is they have to do.

(12) Q. *And then obviously the reverse to leave.*

(13) A. Yes.

(14) Q. *And where were they going to be parking their*

(15) *vehicles? Where did you envision that occurring?*

(16) A. I didn't really get that far. They could have

(17) had one person driving a car or truck around, another

(18) person descending and going to the median. It would

(19) have been up for grabs. Maybe we could have negotiated

(20) a parking space in the complex on the other side of

(21) Sand Hill Road. I was contemplating that. There were

(22) some contingency plans, in other words.

(23) Q. *Did you actually communicate with the folks on*

(24) *the opposite side of Sand Hill Road to talk to them*

(25) *about the idea of renting out or leasing some parking*

**Page 123**

(1) *spaces during your event?*

(2) A. No, I didn't. Because my first priority on

(3) which everything else was contingent was to get to an

(4) approval point with the City of Menlo Park.

(5) Q. *Continuing down on page Bates number 236, the*

(6) *first page of your application, there's a section*

(7) *entitled Temporary lighting. Do you see that?*

(8) A. Yes.

(9) Q. *And you indicate that there would be temporary*

(10) *lighting, correct?*

(11) A. Yes.

(12) Q. *And that would consist of portable spotlights*

(13) *focused on display.*

(14) A. That is right.

(15) Q. *When you say display, what are you referring*

(16) *to?*

(17) A. The 55-inch television screen.

(18) Q. *So there would be -- now, the television screen*

(19) *is self-illuminating, correct?*

(20) A. Yes, but around it I intended to display the

(21) same kind of signage that you have shown to me in the

(22) photographs.

(23) Q. *The placards?*

(24) A. Yes.

(25) Q. *So you envisioned having the television monitor*

**Page 124**

(1) *in the back of the bed of your truck and then displaying*

(2) *those posters or placards that we previously looked at*

(3) *along the center median as well, and you envisioned*

(4) *having portable spotlights focused on the placards?*

(5) A. That is correct.

(6) Q. *Okay.*

(7) A. If I may, if you wish to think, if you wish to

(8) understand what I had in mind, as you are driving, say,

(9) on 280 you will see some billboards, some animations

(10) even. That was the kind of thing I was trying to

(11) achieve.

(12) Q. *So you were trying not just to catch the*

(13) *attention of the folks working and/or driving along*

(14) *Sand Hill Road, but to catch the eye, if you will, of*

(15) *folks driving either north or south on 280?*

(16) A. No. I mentioned 280 in order to give you a

(17) reference point.

(18) Q. *Yeah. Of where this would be occurring.*

(19) A. No. What kind of display it would be.

(20) Q. *Okay.*

(21) A. It would be just like some kinds of

(22) advertisement that you see when you drive along the

(23) freeway.

(24) Q. *I see those more on 101 than I do on 280.*

(25) *That's why I was questioning.*

Page 125

(1)   A.   You're right. I haven't been here in a couple
(2)  of years. Yes, 101 it is.
(3)   Q.   So basically advertising on the road, that kind
(4)  of thing.
(5)   A.   Yes.
(6)   Q.   Okay. Thank you for clarifying that.
(7)  And I don't want to go through this entire
(8)  application, but would it be fair and correct that when
(9)  you filled this out, this was an accurate representation
(10)  of what you intended to do out there?
(11)   A.   With the caveat that my whole attitude in this
(12)  process was to comply with any reasonable requirement
(13)  that the City might impose. And I believe I have
(14)  articulated that repeatedly in my emails.
(15)   Q.   Okay.
(16)   MR. MASTER:   Go ahead and mark this next. I'm
(17)  sorry.
(18)   (Defendants' Exhibit 5 marked for
(19)  identification.)
(20)   MR. MASTER: Q.   So I'm showing you,
(21)  Mr. Zeleny, what's been marked as Exhibit 5. The other
(22)  copy is the same thing. This is for your attorney, if
(23)  he wants it.
(24)   A.   Yes.
(25)   Q.   I'll ask you just to take a moment or take as

Page 126

(1)  much time as you'd like to look through what's been
(2)  marked as Exhibit 5, which I will reference is an email
(3)  chain Bates numbered MP290 through 294 and then –
(4)  actually, it's 295, with the last page being a
(5)  black-and-white photocopy of a photograph.
(6)   A.   Right.
(7)   Q.   Have you seen what's been marked as Exhibit 5
(8)  prior to today?
(9)   A.   I have composed it so, yes, I have seen it.
(10)   Q.   And would it be fair to say, without getting
(11)  into each of the emails, that this is a true and correct
(12)  copy or representation of communications that you had
(13)  with Menlo Park, either the City and/or Bill McClure,
(14)  the City Attorney, between the date of your application
(15)  dated July 10th, 2015 and July 28, 2015, which is the
(16)  email on the first page of Exhibit 5?
(17)   A.   To answer with the utmost precision that I can
(18)  muster, I'm not in a position at this time to judge
(19)  whether or not any kind of editing has been performed on
(20)  this particular document. What I see appears to me to
(21)  be a true and correct printout of the email, but I
(22)  cannot vouch for it not having been modified by
(23)  somebody.
(24)   Q.   Why don't you go ahead and take the time to
(25)  read through the email just to confirm. Because the

Page 127

(1)  only thing I want to make sure of is that we're on the
(2)  same page and that I am showing you a true and correct
(3)  copy of emails that you have prepared and that have not
(4)  been edited. Okay?
(5)   A.   The only way I could do that would be to look
(6)  at my email client and compare this document to that. I
(7)  don't think that's practicable.
(8)   Q.   Okay.
(9)   A.   So let's say for the sake of argument that I
(10)  concede that there's a very high probability that this
(11)  hasn't been tampered with.
(12)   Q.   Well, what I'd like you to do, sir, so we don't
(13)  have to argue one way or the other on that is to take an
(14)  opportunity to read through your emails that are
(15)  attached within Exhibit 5 and, to your point, to the
(16)  best of the your ability indicate whether or not it
(17)  appears to be an email that you prepared, to the best of
(18)  your knowledge, and/or whether or not there is something
(19)  in here in one of your emails that clearly in your
(20)  opinion does not exemplify something that you would have
(21)  written. Okay?
(22)   A.   Again, I'm not in a position to vouch for every
(23)  word here having been composed by me. Like I say, the
(24)  best I can – I can tell you at this time without
(25)  looking at my copy that is on my clients – we have a

Page 128

(1)  computer here that I can compare it to, if you wish –
(2)  again, this does not appear to have been tampered with,
(3)  but I can't vouch for it.
(4)   Q.   I'll represent to you that these are emails
(5)  that the City IT team, if you will, pulled off of the
(6)  City's server and were sent to me, which I printed out
(7)  and gave to you and which are in front of you today.
(8)  So with that being said, let me ask you this.
(9)  Looking at your email dated – let me ask you, the first
(10)  page of Exhibit 5, does this appear to be an email that
(11)  you prepared?
(12)   A.   As I said, yes, it has that appearance.
(13)   Q.   Okay. And it's dated July 28, 2015. Do you
(14)  see that?
(15)   A.   I see that.
(16)   Q.   And do you recall sending an email to
(17)  Mr. McClure and the individuals identified in the CC on
(18)  or about that date in response to the City's initial
(19)  response to your special event permit?
(20)   A.   I do.
(21)   Q.   Okay. Now, in your email at the top there it
(22)  refers to attachments and it reads Browning
(23)  M1919A4.jpeg. Do you see that?
(24)   A.   That is right.
(25)   Q.   And if you look to the last page of Exhibit 5,

Page 129

(1) *there is a black-and-white photocopy. Is this*
(2) *a photocopy of the attachment that was included with*
(3) *your email of July 28, 2015?*
(4) **A. That is it, yes.**
(5) *Q. And is this the actual Browning that you*
(6) *intended to bring with you to the event that's described*
(7) *in Exhibit 2?*
(8) **A. From the tripod's head up it is the actual**
(9) **weapon. The tripod would have been different. It would**
(10) **have been much taller.**
(11) *Q. Much taller, okay.*
(12) **A. I do have this tripod as well. I didn't intend**
(13) **to use it.**
(14) *Q. So the photograph that's attached to Exhibit 5,*
(15) *is that a photograph of your actual Browning?*
(16) **A. That is right.**
(17) *Q. Okay.*
(18) *Let's go ahead and mark the next.*
(19) *(Defendants' Exhibit 6 marked for*
(20) *identification.)*
(21) *MR. MASTER: Q. So I went ahead and marked as*
(22) *Exhibit 6 to your deposition a September 21, 2015 letter*
(23) *from the Office of the City Attorney of Menlo Park,*
(24) *William McClure, City Attorney, addressed to you via*
(25) *email and Bates numbered MP000352 through MP000355.*

Page 130

(1) *Have you seen this correspondence before today?*
(2) **A. Yes, I have.**
(3) *Q. Okay. And the email address that's identified*
(4) *on the first page of Exhibit 6, is that your email*
(5) *address?*
(6) **A. Yes, it is, michael@massmeans.com.**
(7) *Q. Do you recall receiving an email of this*
(8) *correspondence on or about September 21st, 2015?*
(9) **A. Yes, I do.**
(10) *Q. And did you understand this to be the City's*
(11) *response or initial response to your special event*
(12) *permit application?*
(13) **A. I did.**
(14) *Q. And you understood the City to be denying your*
(15) *application and the reasons are explained herein?*
(16) **A. Yes.**
(17) *Q. And attached to this correspondence is a*
(18) *two-page document entitled Film Production in Menlo*
(19) *Park. Do you see that?*
(20) **A. Yes.**
(21) *Q. Do you recall this attachment being included*
(22) *with this email that you received?*
(23) **A. Yes.**
(24) *Q. And at that point in time did you have any*
(25) *desire to apply to the City for permission to do a film*

Page 131

(1) *production in the City pursuant to the two pages that*
(2) *were attached to this letter?*
(3) **A. My intention was to exhaust every opportunity**
(4) **at getting my special event permit approved. The**
(5) **application for a film permit would have followed if my**
(6) **application were deemed unsuccessful.**
(7) *Q. So the idea was to exhaust the special event*
(8) *permit process first. If that –*
(9) **A. Yes. Sorry.**
(10) *Q. That's all right.*
(11) *If that didn't succeed, in your mind, then you*
(12) *would pursue the film permit?*
(13) **A. That's right.**
(14) *Q. Okay.*
(15) *Sorry. We're going to keep doing this for a*
(16) *while here. Another document marked next in order.*
(17) *(Defendants' Exhibit 7 marked for*
(18) *identification.)*
(19) *MR. MASTER: Q. Mr. Zeleny, I'm showing you*
(20) *what's been marked Exhibit 7, which I'll represent to*
(21) *you is an email chain, a chain of emails in two*
(22) *thousand – bear with me – 2015 to 2016. The Bates*
(23) *numbers are MP435 through MP450. And I'll give you a*
(24) *moment to kind of look through that or read it at your*
(25) *leisure, and then I'll ask you a couple questions.*

Page 132

(1) MR. ROBINSON: It looks like we have a couple
(2) of emails attached.
(3) THE WITNESS: Yeah.
(4) MR. MASTER: Yeah, there's several.
(5) MR. ROBINSON: Okay.
(6) MR. MASTER: I believe, just so the record is
(7) clear, that there are – there's July 28, 2015, which I
(8) believe was included in our last exhibit in here, but
(9) these all kind of came together. So there are multiple
(10) emails in here.
(11) THE WITNESS: The first thing is April 15th,
(12) the Ides of April, and the second thing is
(13) September 21st. Yes. Gosh, I submitted some graduate
(14) papers that were less substantive than this.
(15) MR. MASTER: Q. All right. So first I want to
(16) refer you to an email on the first page of Exhibit 7
(17) that's dated April 15th, 2016. Do you see that? It's
(18) the one purportedly from you to William McClure, et al.
(19) **A. I do.**
(20) *Q. Okay. And it's a fairly lengthy email. It*
(21) *concludes on Bates number 439. Do you see that?*
(22) **A. Yes.**
(23) *Q. It appears to be in response to Exhibit 6,*
(24) *which is the September 21st, 2015 email from*
(25) *Mr. McClure. And you can see that on the bottom of*

Page 133

(1) *page 439 on Exhibit 7. Do you see that?*

(2) **A.   Yes.**

(3) *Q.   Okay. So in looking at the April 15th email*

(4) *from you to Mr. McClure, do you recall sending this*

(5) *email to him and these other folks on that day and time?*

(6) **A.   I sure do. I even recall having expended quite**

(7) **a bit of effort in composing it.**

(8) *Q.   I can say that you probably spent more than*

(9) *20 minutes or so doing it; didn't you?*

(10) **A.   You can say that.**

(11) *Q.   Okay. And there are a number of individuals*

(12) *cc'd on your April 15, 2016 email. Do you see that?*

(13) **A.   Yes.**

(14) *Q.   And we've covered a couple of those people*

(15) *previously. For example, Scott Sandell and Subrah Iyar,*

(16) *right?*

(17) **A.   Yes.**

(18) *Q.   Who is Dick Kramlich or Kramlich,*

(19) *K-r-a-m-l-i-c-h?*

(20) **A.   I have no idea how he pronounces his last name,**

(21) **but he is, I believe, the founder of NEA. And he's also**

(22) **somebody that has gone on record in paper and online**

(23) **publications as having moved to China in order to be**

(24) **next to Min.**

(25) *Q.   Next to Min Zhu?*

Page 134

(1) **A.   Yes.**

(2) *Q.   And I know who Mr. Affeld is. Who are the*

(3) *other individuals? Who is Dan Primack?*

(4) **A.   Dan Primack is a journalist. I believe he is**

(5) **contracted with Fortune magazine. He is somebody that**

(6) **has been expressing interest in this story, and I know**

(7) **him to be working on the story on this matter. So**

(8) **that's why I copied him.**

(9) *Q.   When did you first talk to Dan Primack? When*

(10) *you say the story, the story about what?*

(11) **A.   The story about NEA and the Zhus, I believe.**

(12) *Q.   So when you say story, you're referring to your*

(13) *allegations with Mr. Zhu and NEA's support of Mr. Zhu,*

(14) *correct?*

(15) **A.   I should qualify that. When you deal with**

(16) **journalists, you have to reconcile yourself to the fact**

(17) **that they are going to write whatever they write. You**

(18) **are just a source. I can't vouch for Dan Primack's**

(19) **specific focus in the story he was working on. I do**

(20) **know that he was interested in my position on the**

(21) **matter. He was interested in Min Zhu's story from**

(22) **founding WebEx to fleeing to China and being funded**

(23) **there by NEA. I understand from previous discovery in**

(24) **previous cases that NEA has actually furnished some**

(25) **information to Dan. That's pretty much all I know about**

Page 135

(1) *that.*

(2) *Q.   Okay. And by the way, why did you copy Scott*

(3) *Sandell, Subrah Iyar, and Dick Kramlich on this email to*

(4) *the City?*

(5) **A.   For the same reason that I have identified**

(6) **previously. They're the people most fundamentally**

(7) **involved with sponsoring Min Zhu after his flight from**

(8) **the United States in disgrace.**

(9) *Q.   So you purposely copied them on this email?*

(10) **A.   That is right.**

(11) *Q.   Okay. Who is Louis Citron, C-i-t-r-o-n?*

(12) **A.   I believe him to be or to have been at the time**

(13) **at least NEA's in-house counsel.**

(14) *Q.   What about Forest Baskett, B-a-s-k-e-t-t?*

(15) **A.   Baskett, Seawell, Sonsini, and Garland and Nunn**

(16) **and Van Bladel, they were all at the time at least**

(17) **senior partners in NEA. So they would have had an**

(18) **interest in this matter.**

(19) *Q.   And what about the last two individuals, Robert*

(20) *Hawk and Arno Penzias, P-e-n-z-i-a-s?*

(21) **A.   Penzias, I believe, was another one of those**

(22) **senior partners. Robert Hawk had previously represented**

(23) **NEA as outside counsel.**

(24) *Q.   And if you turn to page – within Exhibit 7*

(25) *it's Bates numbered MP439A. Do you see that? I'll give*

Page 136

(1) *you a minute to get there.*

(2) **A.   439A. Yes, I do.**

(3) *Q.   Are you familiar with what's depicted on this*

(4) *page of Exhibit 7?*

(5) **A.   Yes, I am.**

(6) *Q.   And what's depicted in this Google map, or map,*

(7) *if you will?*

(8) **A.   It is a depiction of the median strip of**

(9) **Sand Hill Road extending to the intersection and back to**

(10) **280 and beyond. And the dark rectangle is where I was**

(11) **proposing to park my truck.**

(12) *Q.   Okay. And is this a Google map that you*

(13) *prepared?*

(14) **A.   It's a Google map that I prepared to the extent**

(15) **of putting a black rectangle there required preparation.**

(16) *Q.   Right. And did you put the address points, or*

(17) *whatnot, for where New Enterprise Associates is located?*

(18) *Is that something you did in your search to create this?*

(19) **A.   No, that's all from Google except for the black**

(20) **rectangle.**

(21) *Q.   Let me show you – if you continue on within*

(22) *Exhibit 7, the next page appears to be your special*

(23) *event application.*

(24) **A.   440?**

(25) *Q.   Yes, 440.*

Page 137

(1) **A.   Yes.**
(2) Q.   And then if you continue on to the application
(3) on the last page, which is page 444 –
(4) **A.   Yes.**
(5) Q.   – the signature line is a little different
(6) than the one contained in Exhibit 2.
(7) **A.   Oh, yeah, it doesn't look like – either I**
(8) **didn't sign it or the signature didn't print out.**
(9) Q.   Well, it also appears to be a different date.
(10) And feel free to look at Exhibit 2.
(11) **A.   3 June. Okay.**
(12) Q.   Here's Exhibit 2, sir. I'm just going to help
(13) you out here. That's 7, here's 2.
(14) **A.   Oh, okay.**
(15) Q.   So the last page of Exhibit 2 is the signature
(16) page of the application that you submitted on July –
(17) **A.   10 July. Yeah.**
(18) Q.   And I'm just curious. I'm more curious, or
(19) just so I'm not confused, as to this special event
(20) permit application that's included within Exhibit 7, is
(21) this the original kind of draft before you finalized it
(22) and sent it on July 10, 2015?
(23) **A.   So it appears. But in order to confirm**
(24) **definitively, I would have to spend some time studying**
(25) **it.**

Page 138

(1) Q.   Well, feel free without looking at the emails
(2) attached to it. Looking at the applications themselves,
(3) the actual application, they appear, at least based on
(4) my review, they appear to be identical but for the
(5) signature line. And that's why I was curious if this
(6) was just –
(7) **A.   That may well be the case. If you want me to**
(8) **spend time confirming that, I can do that.**
(9) Q.   If you wouldn't mind.
(10) MR. ROBINSON:   Just for the record, I don't
(11) think that's accurate.
(12) MR. MASTER:   It's not? Okay.
(13) MR. ROBINSON:   No. Can we go off for two
(14) seconds?
(15) MR. MASTER:   Sure.
(16) (Off the record.)
(17) THE WITNESS:   So one change here that took
(18) place between these two applications was curtailing the
(19) indefinite run of the special event to 31 days.
(20) MR. MASTER: Q.   And that's contained –
(21) **A.   That was – I'm sorry. I'm not done.**
(22) That was in response to the City's objection.
(23) Indefinite special events were not acceptable to them.
(24) Q.   Okay. And so by doing that, if you'd turn to
(25) page 440 of Exhibit 7, that's where you've changed under

Page 139

(1) the Special Event Timeline under Total Hours, originally
(2) it was indefinite and now you say 31 days?
(3) **A.   That is right. That's the first change.**
(4) Q.   Okay. That was the first change. Any other
(5) changes?
(6) **A.   If you look at the subsequent page in each**
(7) **application –**
(8) Q.   Okay.
(9) **A.   – the event narrative has been modified.**
(10) Q.   And that's under Event Description?
(11) **A.   Right.**
(12) Q.   And what's been modified?
(13) **A.   Well, for instance, the earlier application**
(14) **says starting in October 2015, and so on and so forth,**
(15) **to run indefinitely. And the later application says**
(16) **throughout October 2015. So that is limited to the**
(17) **month. That's a starting point.**
(18) **I believe that is the long and short of it for**
(19) **this particular thing.**
(20) Q.   And was that a change that you made or a
(21) modification that you made in response to Mr. McClure's
(22) September 21st, 2015 email denying the original
(23) application?
(24) **A.   Yes.**
(25) Q.   Okay. Thank you. I'm done with that one for

Page 140

(1) now.
(2) Let's go to Exhibit 8.
(3) **A.   Are you done with 7?**
(4) Q.   Yes. Yeah, we're done. I'm sorry.
(5) **A.   There's also another email from me I wanted**
(6) **to cover. But if you don't want to cover it, that's**
(7) **fine.**
(8) MR. ROBINSON:   It's the same.
(9) MR. MASTER:   We already covered that.
(10) (Defendants' Exhibit 8 marked for
(11) identification.)
(12) MR. MASTER: Q.   Have you seen Exhibit 8 before
(13) today?
(14) **A.   Yes, I have.**
(15) Q.   And do you recall when you last saw the
(16) document?
(17) **A.   About three months ago as I was reviewing the**
(18) **documents in this matter.**
(19) Q.   Do you recall receiving or first seeing this
(20) document in or about May 4th, 2016?
(21) **A.   I do.**
(22) Q.   What do you understand this document to be?
(23) **A.   It's another one in the series of denials of my**
(24) **application.**
(25) Q.   Okay. And on the first page of Exhibit 8 –

Page 141

(1)  and this exhibit ranges from Bates numbers MP463 through
(2)  465 – in the second paragraph of Mr. McClure's letter
(3)  he references your April 16th email including a Google
(4)  map with a red box showing the proposed location of the
(5)  event. Do you see that?
(6)  A.   No.
(7)  MR. ROBINSON:   This right here (indicating).
(8)  THE WITNESS:   Yes. Yes, I do.
(9)  MR. MASTER: Q.   Okay. The Google map with the
(10) red box, is that referring to the Google map that we
(11) were discussing earlier which is Bates stamped MP439A
(12) with the understanding that this is a black-and-white
(13) copy, not a color copy?
(14) A.   Yes. So that must have been red.
(15) MR. MASTER:   We're going to fly through these
(16) relatively quickly. Mark the next.
(17) THE WITNESS:   Are we done with 8?
(18) MR. MASTER: Q.   Yeah, for now.
(19) (Defendants' Exhibit 9 marked for
(20) identification.)
(21) MR. MASTER: Q.   Mr. Zeleny, I'm showing you
(22) what's been marked as Exhibit 9, which is an email chain
(23) Bates numbered MP4890 through MP4891.
(24) Do you recognize the email chain?
(25) A.   It's a quoted email.

Page 142

(1)  Q.   I'm sorry?
(2)  A.   It's a quoted email. What you see here is a
(3)  quote. That's what this bar means.
(4)  Q.   Okay. Do you see on the first page it reads on
(5)  Friday, May 27, 2016 at 12:21 p.m. you wrote the
(6)  following: Dear Mr. McClure?
(7)  A.   Yes.
(8)  Q.   Do you recall writing an email to Mr. McClure
(9)  on or about May 27, 2016 in response to his May 4th,
(10) 2016 email to you which we discussed in Exhibit 8?
(11) A.   I do.
(12) Q.   Okay. And this indicates that this is your
(13) second appeal; is that correct? It's in the first
(14) paragraph.
(15) A.   Yeah.
(16) Q.   Is that correct?
(17) A.   Yes.
(18) Q.   Okay. And in the following paragraph, the
(19) second paragraph, it describes what that red rectangle
(20) on that Google map refers to?
(21) A.   Yes.
(22) Q.   Okay. And you continue to write that, quote,
(23) All my activities and all my equipment will be confined
(24) to its bed – "its" being your Dodge Ram –
(25) A.   Yes.

Page 143

(1)  Q.   – bed and cabin, as driven to and parked at
(2)  the designated location?
(3)  A.   Yes.
(4)  Q.   The designated location is the area that you
(5)  identify with the – well, it's a red rectangle, but we
(6)  have a black-and-white copy of that in the prior
(7)  exhibit?
(8)  A.   Yes.
(9)  Q.   And that's in the center median, correct?
(10) A.   Yes.
(11) Q.   And you continue to write in that paragraph
(12) that you will remain on-site around the clock until NEA
(13) publicly acknowledges its wrongdoing, et cetera; is that
(14) correct?
(15) A.   Yes.
(16) Q.   Okay. So you indicated earlier that your
(17) application, you had modified it so that you would be
(18) there throughout October 2015 rather than starting
(19) October 15 and going indefinitely.
(20) Do you remember that?
(21) A.   Yes.
(22) Q.   By way of this email are you now suggesting
(23) that you're going to be there until NEA publicly
(24) acknowledges what they're doing, whether that occurs in
(25) one day or 31 days or 60 days, or whatever days?

Page 144

(1)  A.   Okay. My expectation based on my previous
(2)  appearances was that once I started that, NEA would not
(3)  exist in its present form for longer than 30 days from
(4)  the start.
(5)  Q.   So you thought you could get done what you
(6)  needed to get done and get them to acknowledge their
(7)  wrongdoing within the month of October?
(8)  A.   If you recall, 2016 was when the Me Too
(9)  Movement started getting prominent. My expectation
(10) would have been based on previous disclosures by NEA
(11) that they're not exactly on a very firm footing in this
(12) matter, and I would have fully expected their company to
(13) implode within – well before the 31-day term would have
(14) ran out.
(15) MR. MASTER:   Okay. Let's mark this.
(16) And you can put that here, sir. These are
(17) always here if you need to reference them.
(18) Let's mark that next. Forgive me, I'm not sure
(19) why I printed it out so small, but we'll do our best
(20) here.
(21) (Defendants' Exhibit 10 marked for
(22) identification.)
(23) MR. ROBINSON:   This is 10?
(24) MR. MASTER:   Yeah.
(25) MR. ROBINSON:   Todd, whenever you get to a

Page 145

(1) stopping point, let's –
(2)   MR. MASTER:   Let's finish this one and then
(3) we'll take a break.
(4)   Q.   Okay. Mr. Zeleny, we previously looked at
(5) Exhibit Number 9, which references your May 27, 2016
(6) email to Mr. McClure. Do you recall that?
(7)   A.   That's right.
(8)   Q.   Okay. So I'm showing you Exhibit Number 10.
(9) And if you look towards the middle of that exhibit, you
(10) continue to find that same May 27, 2016 email?
(11)   A.   Yes.
(12)   Q.   Okay. So above that it looks like you
(13) responded on June 15, 2016 to Mr. McClure; is that
(14) correct?
(15)   A.   It looks like it.
(16)   Q.   Okay. And basically you're following up on
(17) what the status of your application is.
(18)   A.   Yes.
(19)   Q.   Okay. And then you follow up again on, it
(20) appears to be June 15, 2016. Do you see that at the top
(21) of page 473 in Exhibit 10? I think that reads June 15,
(22) 2016. It could be June 16, 2016.
(23)   A.   It's June 15, I believe. And yes.
(24)   Q.   And it refers to an email from Matt Milde with
(25) the City to yourself, correct?

Page 146

(1)   A.   Yes.
(2)   Q.   And it looks like he's copying all the same
(3) people you copied on your prior emails?
(4)   A.   Yes.
(5)   Q.   And, in fact, it's June 16, 2016 because if you
(6) look at the last two pages –
(7)   A.   Yes.
(8)   Q.   – they're attached and this is the email you
(9) received from Mr. Milde, the recreation coordinator with
(10) the City, on or about June 16, 2016, correct?
(11)   A.   Yes.
(12)   Q.   And this is the City's application denial of
(13) your special event permit, correct?
(14)   A.   That's right.
(15)   Q.   And this describes the reasons for the denial,
(16) correct?
(17)   A.   Yes.
(18)   Q.   And you received this letter from Mr. Milde on
(19) or about June 16, 2016? It looks like it was sent to
(20) you via email and U.S. Mail.
(21)   A.   Yeah.
(22)   Q.   So is it fair to say you got it on or about
(23) June 16, 2016?
(24)   A.   Yes. I read my email promptly.
(25)   Q.   Okay. Is that a common practice, you check

Page 147

(1) your email pretty regularly?
(2)   A.   Yes.
(3)   Q.   Is that on a daily basis you check it?
(4)   A.   More like hourly.
(5)   MR. MASTER:   Okay. All right. We'll take a
(6) five-minute break.
(7)   (Recess from 2:50 to 3:00 p.m.)
(8)   (Defendants' Exhibits 11 and 12 were
(9) marked for identification.)
(10)   MR. MASTER:   Back on the record.
(11)   Q.   While we were off the record, Mr. Zeleny, I had
(12) marked two additional exhibits, 11 and 12. Exhibit 11
(13) is an email chain and attachment which looks to be
(14) familiar to you, Bates numbered MP477 through 478.
(15) And Exhibit 12 is a June 24, 2016 letter to
(16) you from Cherise Brandell, Bates numbered MP479 through
(17) 480. My assumption is that this Exhibit 12 was actually
(18) attached to Exhibit 11, and I come to that conclusion by
(19) looking at the top email at the top of Exhibit 11.
(20) Do you see that?
(21)   A.   Yes.
(22)   Q.   Do you recall receiving either Exhibit 11 or
(23) Exhibit 12?
(24)   A.   Both of them.
(25)   Q.   So you recall receiving both?

Page 148

(1)   A.   Yes.
(2)   Q.   Okay.
(3)   A.   Simultaneously.
(4)   Q.   And that was on or about June 24, 2016?
(5)   A.   That is right.
(6)   Q.   And you understand that, or did you understand
(7) that Exhibit 12 constituted the City's response to your
(8) initial appeal denying your application for a special
(9) event permit?
(10)   A.   Yes.
(11)   Q.   Okay. And it included some of the City's
(12) rationale – I'm not saying you agree with it, but it
(13) included the City's rationale, correct?
(14)   A.   Yes.
(15)   Q.   Okay. And it appears that a week prior to
(16) that, if you turn to Exhibit 11, you sent an email to
(17) Mr. Milde and Bill McClure and a whole host of others in
(18) CC responding to Mr. Milde's June 16, 2016
(19) correspondence regarding your special event permit
(20) application; is that correct?
(21)   A.   That's right.
(22)   Q.   And a true and correct copy of that is included
(23) in this email chain in Exhibit 11, correct?
(24)   A.   Yes.
(25)   MR. MASTER:   This is next.

Page 149

(1) (Defendants' Exhibit 13 marked for
(2) identification.)
(3) MR. ROBINSON: This is 13?
(4) THE REPORTER: 13.
(5) MR. MASTER: Yes.
(6) Q. Showing you what's been just marked as
(7) Exhibit 13, which is an email chain Bates numbered
(8) MP481, do you recognize – there appears to be an email
(9) at the top dated July 1, 2015; do you see that? I'm
(10) sorry, 2016?
(11) A. Yes.
(12) Q. And that appears to be your email response to
(13) Dr. Brandell's denial of your appeal of the special
(14) event permit application; is that correct?
(15) A. That's right.
(16) Q. And this is basically your notice of appeal to
(17) the City Council?
(18) A. M-hm.
(19) Q. Is that correct?
(20) A. Yes.
(21) Q. Okay. We're going to fly through some of these
(22) here.
(23) (Defendants' Exhibit 14 marked for
(24) identification.)
(25) MR. MASTER: Q. Mr. Zeleny, I've just marked

Page 150

(1) Exhibit 14, a July 12th, 2016 letter to you. And it
(2) doesn't appear to be emailed or at least there's no "Via
(3) Email" at the top of it. It's a single-page letter from
(4) Mr. Milde on behalf of Dr. Brandell to yourself dated
(5) July 12, 2016, Bates number MP486.
(6) Do you recall receiving this letter on or about
(7) mid July 2016 from Mr. Milde?
(8) A. I believe the only way I received it was via
(9) paper copy, and that would have been like later in July.
(10) Q. Okay. Sometime in July 2016?
(11) A. That's right.
(12) Q. Okay. And do you recall the purpose of this
(13) letter basically being to explain to you that the next
(14) step in the appeal process was not to go to the City
(15) Council but to go to the City Manager?
(16) MR. ROBINSON: I object that it calls for
(17) speculation.
(18) MR. MASTER: Q. Well, just read the document.
(19) A. Yes.
(20) Q. Okay. So by way of this letter, you learned
(21) that your next step in dealing with your special event
(22) permit application was not to go to the City Council but
(23) to go to the City Manager?
(24) A. Yes.
(25) MR. MASTER: Okay. Let's mark that next.

Page 151

(1) (Defendants' Exhibit 15 marked for
(2) identification.)
(3) MR. MASTER: Q. I've just marked as Exhibit 15
(4) an email exchange between you and Mr. Milde dated July
(5) of 2016, and it's Bates numbered MP4898 through MP4902.
(6) The July 12, 2016 at the bottom of the first page of
(7) Exhibit 15 appears to refer to Exhibit 14; am I correct?
(8) A. Yes.
(9) Q. So it does look like it was emailed, although
(10) it doesn't say "Email"; is that fair?
(11) A. It's fair as to what it says. I'm not sure I
(12) received it via email.
(13) Q. Okay. That's fine.
(14) You did receive a July 12, 2016 email from Matt
(15) Milde?
(16) A. July what?
(17) Q. 12th, 2016. If you look at the first page of
(18) Exhibit 15.
(19) A. Yes.
(20) Q. Okay. And you responded on July 13, 2016,
(21) correct?
(22) A. That's right.
(23) Q. And that email is at the top of Exhibit 15, the
(24) first page?
(25) A. That's right.

Page 152

(1) Q. And by way of that email you asked to schedule
(2) a hearing on your appeal of the denial of your special
(3) event permit application with the City Manager, correct?
(4) A. That's right.
(5) Q. And in the second paragraph you reference some
(6) attachments to your email, including your current
(7) criminal history issued by the California Department of
(8) Justice; is that correct?
(9) A. That's right.
(10) Q. And there are four pages attached to this
(11) email. My initial question, sir, is, why did you attach
(12) the information that's included within Exhibit 15? Why
(13) did you send that to the City?
(14) A. I wanted to reassure the City that I was a man
(15) of no convictions.
(16) Q. Okay.
(17) A. So to speak.
(18) Q. And so what's attached within Exhibit 15 to
(19) your email, these are documents that you provided to the
(20) City, correct?
(21) A. That's right.
(22) Q. Okay. Now, do you recall attending a hearing
(23) before the City Manager on the appeal of the denial of
(24) your special event permit application?
(25) A. I do.

Page 153

(1) Q. And you were represented by Mr. Affeld at the
(2) time, correct?
(3) A. That's correct.
(4) Q. And Mr. McClure was there as the City Manager,
(5) Alex McIntyre?
(6) A. I think so, yes.
(7) Q. You recall the City Manager being there; you
(8) just don't recall his name?
(9) A. Actually, I recall both his name and his
(10) presence.
(11) Q. And that was Alex McIntyre?
(12) A. Yes.
(13) Q. And Dave Bertini was also present for the City;
(14) is that correct?
(15) A. He certainly was, yes.
(16) Q. Okay. And that hearing was audio recorded; is
(17) that correct?
(18) A. That's right.
(19) Q. And you understood that, correct –
(20) A. Yes.
(21) Q. – at the time?
(22) A. Yes.
(23) Q. And everybody in the room understood that it
(24) was being audio recorded at the time, correct?
(25) A. Yes. I recorded it as well.

Page 154

(1) Q. Okay. And did you turn over your recording of
(2) that hearing to the City after the hearing?
(3) A. I did.
(4) Q. And have you listened to the recording of that
(5) hearing since the hearing occurred?
(6) A. Yes.
(7) Q. And the copy of the hearing recording that you
(8) provided, that's a true and correct copy of your
(9) recording of the hearing?
(10) A. Yes.
(11) Q. In other words, you didn't modify it in any
(12) way, correct?
(13) A. No modification at all.
(14) Q. Okay. How many times have you listened – or
(15) strike that.
(16) When did you last listen to the audio recording
(17) of the City Manager hearing?
(18) A. Maybe about a year ago.
(19) Q. Okay. And do you recall that meeting occurring
(20) on or about August 11, 2016? Does that sound right to
(21) you?
(22) A. In that neighborhood.
(23) Q. Okay. And do you recall answering some
(24) questions at that hearing?
(25) A. I think so. I think I answered some questions,

Page 155

(1) yes.
(2) Q. Do you recall your attorney, David Affeld,
(3) asking you some questions at that hearing?
(4) A. I think so.
(5) Q. Do you recall Dave Bertini asking you some
(6) questions at that hearing?
(7) A. Yes, I do.
(8) Q. And do you remember Alex McIntyre asking you
(9) some questions at that hearing?
(10) A. I'm not sure about that.
(11) Q. Okay. Would it be fair to say that your
(12) answers to any questions posed to you, whether they be
(13) from Mr. Affeld, your attorney, or Mr. Bertini or
(14) Mr. McIntyre, that your responses to those questions
(15) were true and correct?
(16) A. Yes.
(17) Q. There would be no reason for you not to testify
(18) truthfully in that situation; is that correct?
(19) A. That's right.
(20) MR. MASTER: Okay. Let's go ahead and mark
(21) these next.
(22) (Defendants' Exhibit 16 marked for
(23) identification.)
(24) MR. MASTER: Q. Mr. Zeleny, I'd ask you to
(25) take a look at Exhibit 16 –

Page 156

(1) A. Yes.
(2) Q. – which is three pages of documents Bates
(3) stamped MP496 through 498.
(4) Do you recognize the contents of this exhibit?
(5) A. Yes.
(6) Q. And what's depicted in this exhibit?
(7) A. It's a copy of the Entertainment Firearms
(8) Permit that I had at the time.
(9) Q. And "at the time" meaning between July 13, 2016
(10) and July 12, 2017?
(11) A. That's correct.
(12) Q. And at the time you were probably also
(13) referring to the City Manager hearing?
(14) A. Yes, that would have covered it.
(15) Q. Do you recall your attorney, Mr. Affeld,
(16) showing these documents at the hearing with the City
(17) Manager on or about August 11, 2016?
(18) A. I do.
(19) Q. Okay. And I'll represent to you that he
(20) submitted these to the City after the hearing via email
(21) because he didn't bring copies.
(22) Does that ring a bell to you?
(23) A. Yes.
(24) Q. Okay. And the way I understand it is the first
(25) and third pages of Exhibit 16 are essentially the same

Page 161

(1) of that permit, which is one reason I didn't bother to
(2) renew it. It didn't really apply to my case and
(3) certainly it did not satisfy your client as to my
(4) authorization.
(5)    Q.   So, in other words, this permit basically would
(6) allow you to be able to obtain loaned firearms for use
(7) as props. In your mind, that wasn't going to apply to
(8) you here, fair?
(9)    A.   That's right. I had no such plans, and the
(10) City wasn't moved by my having this permit. So there
(11) was no point in renewing it.
(12)    MR. MASTER:   Okay. I'm done with that. This
(13) is the next.
(14)    (Defendants' Exhibit 17 marked for
(15) identification.)
(16)    MR. MASTER: Q.   Mr. Zeleny, you're welcome to
(17) look over your Counsel's shoulder, but you have your own
(18) there, too.
(19)    A.   Okay.
(20)    Q.   So I'm going to go ahead and just state for the
(21) record what it is and I'll give you as much time as you
(22) need to look at it.
(23)    What I've marked as Exhibit 17, it starts with
(24) an email, it's actually a forward of an email from
(25) Nicole Mariano, who works for the City of Menlo Park, to

Page 162

(1) yourself dated September 12, 2016. It attaches a letter
(2) of the same date from the City Manager, Alex McIntyre,
(3) with a number of enclosures. And I will represent to
(4) you that the entirety of Exhibit 17 is Bates numbered
(5) MP947 – MP947 through MP1064. Take your time looking
(6) through it, and I'll ask you a couple questions.
(7)    A.   I'm familiar with this document.
(8)    Q.   Okay. And by the document, what I care about
(9) is the September 12, 2016 email from Mr. McIntyre
(10) explaining his decision on your appeal of the denial of
(11) your special event permit application, correct?
(12)    A.   Yes.
(13)    Q.   Okay. And did you receive this packet of
(14) information on or about September 12, 2016?
(15)    A.   I received some of it via email, at least some
(16) of it. I'm pretty sure I received a bunch of these
(17) papers via postal mail. So, yeah, I've had it for a
(18) while and I have reviewed it.
(19)    Q.   So you've seen Exhibit 17 prior to today,
(20) correct?
(21)    A.   That's right.
(22)    Q.   And you would have seen it sometime, fair to
(23) say, in September 2016?
(24)    A.   If not earlier, yes.
(25)    Q.   Okay. Well, it wouldn't have been earlier

Page 163

(1) because the date of the letter is –
(2)    A.   No, it wouldn't have been. Yeah, you're right.
(3) Yeah. This is – oh, I see. It's forwarded. Yeah,
(4) that would have been -- would have been mid or late
(5) September.
(6)    Q.   And you received it, and did you read through
(7) the letter and the enclosures at that time?
(8)    A.   Yes.
(9)    Q.   And my understanding is your response to this
(10) communication from the City Manager was to give notice
(11) of a further appeal to the City Council, correct?
(12)    A.   Yes.
(13)    Q.   And turning to Mr. McIntyre's actual letter,
(14) which is within Exhibit 17 at pages 948 through 951, and
(15) I'll refer you to page 949 where the decision is
(16) referenced.
(17)    A.   949?
(18)    Q.   Yes.
(19)    A.   Yes.
(20)    Q.   Midway down its captioned Decision.
(21)    A.   Yes.
(22)    Q.   And then at that point in time Mr. McIntyre
(23) explains that your appeal has been denied and then gives
(24) you the explanation for his denial of your appeal; is
(25) that correct?

Page 164

(1)    A.   Yes.
(2)    Q.   And under Decision there on page 949, you were
(3) aware at this time, at least as of this time, mid
(4) September 2016, that the City's position was that no
(5) permit was required for First Amendment protected
(6) activity?
(7)    A.   Yes.
(8)    Q.   And he also states, the second line under
(9) Decision, that "filming or digitally recording a protest
(10) in traditional public forum areas in the City is allowed
(11) provided they comply with all laws," correct?
(12)    A.   Yes.
(13)    Q.   And then the second paragraph under Decision he
(14) specifically tells you that "you are free to conduct a
(15) protest in compliance with laws," correct?
(16)    MR. ROBINSON:   Objection. The document speaks
(17) for itself.
(18)    MR. MASTER: Q.   Correct? I'm just referring
(19) to page 949.
(20)    A.   Yes.
(21)    Q.   It's the second full paragraph under Decision.
(22)    A.   Yes.
(23)    Q.   And you understood at least as of mid
(24) September 2016 that you were free to conduct a protest
(25) in compliance with laws, correct?

Page 165

(1)  A.  No, that is not correct.

(2)  Q.  What's incorrect about it?

(3)  A.  I requested the City to recognize my exemption
(4)  from a ban on open and concealed carry of firearms
(5)  pursuant to my acting as an authorized participant in a
(6)  video production. The City declined to recognize my
(7)  status like that based on their interpretation of
(8)  authorization lying exclusively with the City and not
(9)  with any member of the production itself.

(10)  Q.  Okay. Let me ask you a question about that, a
(11)  couple questions about that. Number one, did you ever
(12)  have any intention to conduct your protest without
(13)  firearms?

(14)  A.  No.

(15)  Q.  Why not?

(16)  A.  As I said before, I found firearms, conspicuous
(17)  display of firearms to be the best way of attracting
(18)  attention to my cause. I also found that the State of
(19)  California has carved out exemptions to the ban on open
(20)  and concealed carry of firearms that apply to authorized
(21)  participants in entertainment events and/or film or
(22)  video productions.

(23)  Pursuant to these statutes, I intended to hold
(24)  myself out as an authorized participant, not requiring
(25)  authorization from anybody but the parties conducting

Page 166

(1)  the entertainment event and/or film or video production.

(2)  Q.  So let me ask you this. So is it your opinion
(3)  based on what you just told me that anyone participating
(4)  in an entertainment event or a film or a movie can
(5)  authorize themselves to carry an unloaded firearm and be
(6)  legally allowed to do so?

(7)  MR. ROBINSON:  Objection. Calls for a legal
(8)  conclusion and it's an improper contention question.
(9)  You can answer it.

(10)  THE WITNESS:  No, that's not how I understand
(11)  the law. I believe that authorization lies with the
(12)  parties responsible –

(13)  MR. MASTER: Q.  For what?

(14)  A.  – overall for the event or production. For
(15)  instance, to give an example where it wouldn't apply, if
(16)  I were filming some kind of public event and somebody
(17)  were to walk in the frame of my video, that would be a
(18)  random passerby and he wouldn't count as anybody
(19)  authorized by me specifically to carry a firearm.
(20)  On the other hand, if I had employed somebody
(21)  to carry a firearm in an event or a video production,
(22)  that authorization would lie specifically with me as the
(23)  party responsible for the overall production or event.

(24)  Q.  Okay. Just so I can move on, so hypothetically
(25)  if you were to film a movie and you were to authorize me

Page 167

(1)  to be a participant in that film, whether it be fiction,
(2)  non-fiction, a protest, whatever the case may be –

(3)  A.  Yes.

(4)  Q.  – and you were to authorize me to be in it, I
(5)  could openly carry a firearm and be legally allowed to
(6)  within the State of California based on what your belief
(7)  is?

(8)  MR. ROBINSON:  Same objections.

(9)  THE WITNESS:  With the understanding that
(10)  California restricts possession of firearms to their
(11)  owners of record.

(12)  MR. MASTER: Q.  Right.

(13)  A.  It would be my understanding that if I were to
(14)  authorize you as a participant in an entertainment event
(15)  or a film or video production that I was undertaking, we
(16)  would be, you and I, within our rights to have you
(17)  display a firearm that you owned publicly and
(18)  conspicuously.

(19)  Q.  So as long as I lawfully owned it, wasn't a
(20)  felon, it actually was registered to me, then I could
(21)  carry it?

(22)  A.  Among other things. As I said, the caveat here
(23)  has to do with California restrictions on transfer of
(24)  firearms.

(25)  Q.  Gotcha. So assuming I was lawfully in

Page 168

(1)  possession of the firearm, I could lawfully carry it as
(2)  long as it was unloaded in a film event so long as you
(3)  authorized me to participate in it?

(4)  A.  That's my understanding of the law.

(5)  Q.  Okay. So I'm not going to go through all the
(6)  documentation, but needless to say, after you advised
(7)  the City that you wanted to appeal the City Manager's
(8)  denial of your special event permit application to the
(9)  City Council, some period of time passed between the
(10)  time that you made your notice of appeal and the appeal
(11)  actually occurred, correct?

(12)  A.  Yes.

(13)  Q.  I think part of it had to do with your wife
(14)  giving birth?

(15)  A.  Yes.

(16)  Q.  And I think you had some medical emergency as
(17)  well in that process?

(18)  A.  Yes, I did.

(19)  Q.  But notwithstanding all that, approximately a
(20)  year after the City Manager hearing there was actually a
(21)  City Council special hearing on your appeal; is that
(22)  correct? That would have been on August 29, 2017?

(23)  A.  Yes. And I appeared at that hearing.

(24)  Q.  Did anyone appear with you on behalf of you?

(25)  A.  I had a videographer team recording the event.

Page 169

(1)    Q.    Okay. And have you watched the video
(2)  recording, either the City's version – not version –
(3)  the City's recording of it or your videographer's
(4)  recording of it, have you watched that hearing since –
(5)    A.    I have not –
(6)    Q.    Hold on.
(7)    – since the date of the hearing?
(8)    A.    I haven't received anything from the City, no
(9)  kind of recording. I made a recording that I have
(10)  watched. I still haven't finalized the process with the
(11)  videographer, whom I intend to employ in other related
(12)  ventures. So I haven't watched that.
(13)    Q.    Okay.
(14)  Damion, has that video been produced to us?
(15)    MR. ROBINSON:    Has the video been produced?
(16)    THE WITNESS:    I don't have it yet is what I'm
(17)  saying.
(18)    MR. MASTER: Q.    You don't have it yet?
(19)    A.    No.
(20)    Q.    Okay.
(21)    A.    No, we haven't finished dealing with this guy.
(22)    Q.    Okay. Do you recall making a presentation to
(23)  the City Council at that time?
(24)    A.    I do.
(25)    Q.    Okay. Standing up at the podium and providing

Page 170

(1)  your opinion, your position on the permit application,
(2)  correct?
(3)    A.    That's right.
(4)    Q.    And do you recall some of the City Council
(5)  members -- I'm not sure some or all of them – asking
(6)  you some questions at that hearing?
(7)    A.    I do.
(8)    Q.    And would it be fair to say that what you told
(9)  the City Council, whether it be in your initial
(10)  presentation to them or in response to their questions,
(11)  was true and correct and accurate?
(12)    A.    Yes.
(13)    Q.    Okay. There would be no reason for you to lie
(14)  to them, correct?
(15)    A.    There's no reason for me to lie to anyone at
(16)  any time.
(17)    Q.    Okay. Do you recall – and I appreciate you
(18)  have not watched that video at all, correct?
(19)    A.    That's right.
(20)    Q.    Okay. So it's been a year-and-a-half, I guess,
(21)  since the hearing. But do you recall in that hearing
(22)  alleging that the City was engaging in, quote unquote,
(23)  content discrimination?
(24)    A.    I made that allegation, yes, I believe out in
(25)  the open, yes.

Page 171

(1)    Q.    What did you mean when you said that to the
(2)  City Council?
(3)    A.    At least one and probably more of the members
(4)  of the City Council repeatedly interrogated me in the
(5)  course of that hearing on why I wouldn't consent to just
(6)  running my event or production without firearms. To my
(7)  mind, their insistence that they were not interfering
(8)  with my rights under the First and Second Amendments,
(9)  that amounted to an unlawful content discrimination in
(10)  the sense of carving out a part of the expressive
(11)  activity that the laws of the State and the United
(12)  States Constitution expressly authorized me to do.
(13)  Anytime the government puts a restriction on
(14)  expressive activity amounts prima facia to unlawful
(15)  content discrimination. That is my understanding of the
(16)  law, but I'm not a lawyer so I could be wrong.
(17)    Q.    Okay.
(18)    A.    But I'm not.
(19)    Q.    Okay. So when you were referring to content
(20)  discrimination at the City Council meeting, you were
(21)  specifically referring to the fact that the City was not
(22)  allowing you to have guns?
(23)    A.    The City through its officials and its agents
(24)  has repeatedly stressed to me that they were fine with
(25)  me conducting occasions that at least their policy,

Page 172

(1)  their published policy characterized as entertainment
(2)  events and my private film and video productions. Let's
(3)  say mounting a GoPro on my shoulder or something like
(4)  that, they were fine with that, according to them and
(5)  their agents, provided that I didn't avail myself of the
(6)  exemption to the ban on open carry of firearms under
(7)  such circumstances.
(8)  I'm not sure if that answers your question, but
(9)  that was my understanding. And that is the basis of my
(10)  interpretation that the City engaged in unlawful content
(11)  discrimination.
(12)    Q.    Okay. There's a – strike that. Do you have
(13)  any – strike that.
(14)  Dave Bertini, who is the current Chief of
(15)  Police for Menlo Park, he was present at both the City
(16)  Manager hearing and the City Council hearing, correct?
(17)    A.    He was certainly present at the former, and I
(18)  pretty firmly recall him being there at the latter.
(19)    Q.    Okay. So in those two instances, then, you
(20)  would have at least been in the same building, the same
(21)  room with Chief Bertini, correct?
(22)    A.    The first instance same room. The second
(23)  instance, well, it's a pretty big room but still same
(24)  room.
(25)    Q.    Had you ever met with Dave Bertini in person

Page 173

(1) *outside of the City Manager hearing or outside of the*
(2) *City Council hearing?*
(3) **A.   I'm not sure if Officer Bertini was one of the**
(4) **Menlo Park police officers that previously interviewed**
(5) **me in my prior occasions. So I can't really answer that**
(6) **question.**
(7)    *Q.   So you don't recall whether Dave Bertini was*
(8) *one of the officers who came out to Sand Hill Road to,*
(9) *for example, check your weapons during your protest?*
(10) **A.   2008, 2010, 2012.**
(11)    *Q.   Okay.*
(12) **A.   I don't recall seeing him one way or another.**
(13)    *Q.   So as you sit here today, you don't recall one*
(14) *way or the other?*
(15) **A.   Yeah.**
(16)    *Q.   Let's be a little more specific.*
(17) *Aside from the City Manager hearing and the*
(18) *City Council hearing where you discussed obviously the*
(19) *application for your special event permit, had you ever*
(20) *discussed that in person with Dave Bertini outside of*
(21) *those two instances?*
(22) **A.   As I said before, my only communication with**
(23) **Menlo Park City officials prior to my appearance at the**
(24) **City Manager's office and then subsequent appearance in**
(25) **the City hearing, all prior communications have been via**

Page 174

(1) **email and the officers mostly, I'm not sure if any other**
(2) **City personnel, appearing at my protests starting in**
(3) **2006 and ending in 2012.**
(4)    *Q.   So would it be fair to say, then, since both –*
(5) *well, in fact, you recorded both the City Manager*
(6) *hearing and the City Council hearing – that any*
(7) *communications that you were present for with Dave*
(8) *Bertini concerning the rationale behind denying the*
(9) *special event permit application, that would be on*
(10) *record on recording, correct?*
(11) **A.   That would be on record either in the email**
(12) **chain or in the recording.**
(13)    *Q.   Okay.*
(14) **A.   Actually, it's not either/or. It's and/or,**
(15) **sorry.**
(16)    MR. MASTER:   Okay. This is next in order.
(17)    (Defendants' Exhibit 18 marked for
(18)    identification.)
(19)    MR. MASTER: Q.   Mr. Zeleny, I just went ahead
(20) *and have shown you what's been marked as Exhibit 18,*
(21) *which is an email forwarding a letter, both dated*
(22) *September 5th, 2017 and Bates stamped MP1218 through*
(23) *1220.*
(24) *The initial question is, do you recognize these*
(25) *documents?*

Page 175

(1) **A.   Yes.**
(2)    *Q.   And did you receive each of these documents on*
(3) *or about September 5, 2017?*
(4) **A.   I did.**
(5)    *Q.   And you understood this to be the City Council*
(6) *advising you or the City advising you of the City*
(7) *Council's decision to deny the appeal of your special*
(8) *event permit application; is that correct?*
(9) **A.   Yes.**
(10)    MR. MASTER:   Okay. I've got the next one.
(11)    (Defendants' Exhibit 19 marked for
(12)    identification.)
(13)    MR. MASTER: Q.   Mr. Zeleny, do you recognize
(14) *what's been marked as Exhibit 19?*
(15) **A.   Yes.**
(16)    *Q.   And just for the record, Exhibit 19 is a*
(17) *two-page email exchange Bates numbered MP1221 through*
(18) *1222. And this appears to be your response to the*
(19) *City's September 5th, 2017 denial of your special event*
(20) *permit application dated September 7, 2017; is that*
(21) *correct?*
(22) **A.   Yes.**
(23)    *Q.   And by way of your email to Ms. Harada, who is*
(24) *the City Clerk, you're requesting that Menlo Park*
(25) *reconsider your special event permit application as*

Page 176

(1) *requesting a film permit?*
(2) **A.   That's correct.**
(3)    *Q.   Okay. And we discussed that earlier today*
(4) *whereby you wanted to run the course of the special*
(5) *event permit and, depending on what happened there, you*
(6) *would then proceed with the film permit, correct?*
(7) **A.   Yes.**
(8)    MR. MASTER:   Let's go ahead and mark this next.
(9)    (Defendants' Exhibit 20 marked for
(10)    identification.)
(11)    MR. MASTER: Q.   Mr. Zeleny, I'm showing you
(12) *what's been marked as Exhibit 20, which is an email*
(13) *chain including a, it looks like your application for*
(14) *the film – strike that – along with some information*
(15) *from the City concerning your desire to seek a film*
(16) *permit.*
(17) **A.   Yeah.**
(18)    *Q.   It's Bates numbered 1231 through 1238.*
(19) *My question to you is, do you recall receiving*
(20) *either the email from Mr. Milde or, sorry, Mr. Toews,*
(21) *T-o-e-w-s, dated September 28, 2017?*
(22) **A.   That's how you pronounce it.**
(23)    *Q.   Yeah.*
(24) **A.   Yes, I do.**
(25)    *Q.   And by way of his September 28, 2017 email he*

Page 177

(1) attached what he says here, film permit application and
(2) film permit conditions. And it advises you you can fill
(3) out the application online, via email, correct?
(4) A.   Yes.
(5) Q.   And what he sent you are the documents that are
(6) attached to this exhibit as Bates numbers MP1234 through
(7) 1238; is that correct?
(8) A.   Yes.
(9) Q.   Okay. You can put that aside.
(10) (Defendants' Exhibit 21 marked for
(11) identification.)
(12) MR. MASTER: Q.   I went ahead and marked as
(13) Exhibit 21 a continuing email chain here, Bates numbered
(14) MP1242 through MP1249. I'll give you a moment to look
(15) through it.
(16) A.   Yes, I have a very clear recollection of this
(17) email.
(18) Q.   And the email you're referring to is your
(19) October 6, 2017 email to Ivan Toews?
(20) A.   Yes.
(21) Q.   Okay. And that's on the top of the first page
(22) of Exhibit 21, correct?
(23) A.   Yes.
(24) Q.   Okay. And by way of this email, you are
(25) purporting to provide a completed application for a film

Page 178

(1) permit, correct?
(2) A.   Yes.
(3) Q.   Okay. And just a couple of things. Within the
(4) first – well, the second full paragraph of your email,
(5) the one that reads, "Starting on 30 October 2017" –
(6) A.   Yes.
(7) Q.   – about three-quarters of the way down there's
(8) a sentence that starts reading, "A sample image." Do
(9) you see that?
(10) A.   Yes.
(11) Q.   A sample image of what you intend to display
(12) can be found at this LiveJournal location. And that is,
(13) in fact, the same animation we discussed earlier and
(14) which is a part of Exhibit 4?
(15) A.   371973. That would be, yes.
(16) Q.   Okay. Thank you.
(17) A.   The numbers agree.
(18) Q.   Okay. And going down to the third paragraph of
(19) your email, it refers to a site map?
(20) A.   Yes.
(21) Q.   I'll be candid with you. I tried to pull this
(22) up and I was unable to do so. It's probably my error
(23) more so than – certainly not yours.
(24) Can I ask you to explain for the record the
(25) site location that you're contending to do this

Page 179

(1) production. Are we still talking about the center
(2) median on Sand Hill Road?
(3) A.   No. May I ask you, you actually tried to go to
(4) this URL and you couldn't see it?
(5) Q.   Yeah.
(6) A.   It's possible that Google would have changed
(7) its protocol. What it was was a standard Google Map
(8) view of the intersection of Sand Hill Road and entrance
(9) to the Rosewood Complex.
(10) Q.   Okay. So you're talking about the public
(11) sidewalk at the entrance off Sand Hill Road into
(12) Rosewood.
(13) A.   Yes, as depicted in the photographs of – the
(14) particular photograph of me that we previously
(15) discussed.
(16) Q.   And those are the photographs we looked at when
(17) you had your ballistic vest on, or whatever you want to
(18) call it?
(19) A.   Yes.
(20) Q.   That location.
(21) A.   Yes.
(22) Q.   Okay. If you turn – still within Exhibit 21,
(23) if you'd turn to page MP1248.
(24) A.   Yes.
(25) Q.   This is – and go down about three-quarters of

Page 180

(1) the way, the signature line, Signature of Applicant. Do
(2) you see that?
(3) A.   Yes.
(4) Q.   Is that your signature?
(5) A.   Yes.
(6) Q.   And you prepared this on or about October 6,
(7) 2017?
(8) A.   Yes.
(9) Q.   Okay. And this is your film permit
(10) application, correct?
(11) A.   That's correct.
(12) Q.   Okay. And under "Description of work to be
(13) done" you indicate that you'll be making a multimedia
(14) presentation. When you say multimedia presentation, are
(15) you referring to what you describe in your email of
(16) October 6, 2017?
(17) A.   Animations displayed on television, placards,
(18) like we have discussed. Some sound, I guess, was
(19) contemplated. That counts as multimedia. And having
(20) cameras directed at the public that pass by and observe
(21) this and react to it.
(22) Q.   Okay. So I want to follow up on a couple of
(23) those points.
(24) What sound did you envision using as part of
(25) your multimedia presentation?

Page 197

(1)  Q.   And as part of your response here you indicate
(2)  on line 21 that you further respond that, quote, at one
(3)  or more meetings between defendant and plaintiff,
(4)  defendant, through Dave Bertini, informed plaintiff that
(5)  defendant found certain non-obscene images used in
(6)  plaintiff's protests to be offensive, and that plaintiff
(7)  would be arrested and/or prosecuted for obscenity as to
(8)  minors if plaintiff displayed such images as part of his
(9)  protests, end of quote; is that correct?
(10) A.   Yes.
(11) Q.   You said at one or more meetings. Do you
(12) recall any meeting where, in effect, Mr. Bertini made
(13) such threats to you?
(14) A.   Only one is my recollection.
(15) Q.   Which meeting was that?
(16) A.   That was the meeting with the City Manager.
(17) Q.   Okay. And that meeting was recorded, correct?
(18) A.   Yes.
(19) Q.   Okay.
(20) MR. ROBINSON:   I think Michael is just asking
(21) if we can take a quick break.
(22) MR. MASTER:   Oh, okay.
(23) MR. ROBINSON:   Thank you.
(24) (Recess from 4:36 to 4:41 p.m.)
(25) MR. MASTER:   We're back on the record.

Page 198

(1)  Q.   Mr. Zeleny, I'm going to hand you now as kind
(2)  of a group documents that have been marked as
(3)  Exhibits 23 through 26. I will represent to you that
(4)  these are various email exchanges between you and
(5)  representatives of the City concerning your film permit
(6)  application, okay, and ask you to just look through
(7)  these. They're, believe it or not, somewhat in
(8)  chronological order. I tried to do it that way.
(9)  A.   Okay.
(10) Q.   Just familiarize yourself. Take your time.
(11) A.   I have a very clear recollection of these
(12) exchanges.
(13) Q.   Okay. And do the exchanges depicted in
(14) Exhibits 23 and 26, to your mind, include the totality
(15) of the exchanges between you and the City vis-a-vis the
(16) film permit application?
(17) A.   Prior to the filing of the lawsuit, yes.
(18) Q.   Okay. So let me just call your – look at
(19) Exhibit 24. And so this – excuse me a second. Oh,
(20) yeah, okay. This is an email from you to Ivan Toews in
(21) response to his email, which is Exhibit 23, asking you
(22) for some additional information; is that correct?
(23) A.   That's right.
(24) Q.   Okay. So you there by Exhibit 24 go to answer
(25) some of those questions, correct?

Page 199

(1)  A.   Yes.
(2)  Q.   Okay. And just briefly, you number the
(3)  paragraphs on the first page of Exhibit 24. You have
(4)  paragraph 5; do you see that?
(5)  A.   M-hm.
(6)  Q.   Yes?
(7)  A.   Yes.
(8)  Q.   And that's "As to the traffic control plan"; do
(9)  you see that?
(10) A.   Yes.
(11) Q.   You state there that, quote, since our proposed
(12) filming location does not encroach on any sidewalks or
(13) roads, there will be no need to divert pedestrians or
(14) automobiles around it, end quote.
(15) Did I read that right?
(16) A.   That's right.
(17) Q.   Now, the film permit location, I believe you
(18) actually attach it to this email and it's Bates stamped
(19) MP1299. That's a Google Earth street view shot; is that
(20) correct?
(21) A.   Yes.
(22) Q.   And that's where you intend to do the event
(23) that's part of this film permit, correct?
(24) A.   That is right.
(25) Q.   Okay. And so my question is, if that's going

Page 200

(1)  to be the location, how does that not encroach on the
(2)  sidewalk?
(3)  A.   Because there is no sidewalk there.
(4)  Q.   There's no sidewalk there?
(5)  A.   No.
(6)  Q.   You don't see one on page 1299?
(7)  A.   It starts at the elbow. There's no sidewalk
(8)  crowning along –
(9)  Q.   Sand Hill Road?
(10) A.   – Sand Hill Road.
(11) Q.   So based on that, it was your understanding
(12) that you would not be encroaching on anything, any
(13) sidewalks?
(14) A.   That's right. I would stay away from that
(15) particular part of the pavement that was reserved for
(16) people that would cross Sand Hill Road and walk into the
(17) Rosewood Compound.
(18) Q.   Okay.
(19) A.   That is a sidewalk, yes.
(20) Q.   Okay.
(21) A.   Further away from it, nothing.
(22) Q.   If you could turn to Exhibit 25. And this is
(23) an email exchange you had with Nicolas Flegel?
(24) A.   Yes.
(25) Q.   And you understand Mr. Flegel to be with the

## Page 217

(1) right for the most effective way of exposing this
(2) horrendous conduct.
(3)   Q.   Okay.
(4)   A.   That does, in fact, as I said previously,
(5) involve exposed and conspicuous carry of firearms
(6) because I found through experience that that attracts
(7) the most attention.
(8)   Q.   Okay. And have you been told by the City that
(9) if you complete your application for a film permit, that
(10) you would be permitted to carry, openly carry unloaded
(11) weapons as part of an issued film permit?
(12)   A.   That is what the City said. But at the same
(13) time, the City declined to spell out the conditions that
(14) it imposed on approving the permits.
(15)   Q.   Okay.
(16)   A.   And the Ninth Circuit case that I previously
(17) cited identified that kind of behavior as impermissible
(18) violation of the First Amendment.
(19)   Q.   Did the City ever tell you that your film
(20) permit was actually denied or did the City tell you that
(21) your film permit was incomplete?
(22)   A.   The City told me that my film permit was
(23) incomplete. The City also told me – invited me to
(24) complete it, while declining to spell out the criteria
(25) under which it would be considered.

## Page 218

(1)   Q.   Okay. And all the communications you had with
(2) the City concerning your film permit are documented in
(3) the emails that are referenced in the exhibits to your
(4) deposition?
(5)   A.   That is correct. I never made any phone calls
(6) or personal appearances prior to that meeting with the
(7) City Manager and then subsequent at the City hearing.
(8)   Q.   Okay. And aside from the rights that you
(9) referenced that you're entitled to, is there anything
(10) else you want by way of this lawsuit?
(11)   A.   I believe that relevant law authorizes the
(12) court to impose sanctions on the defendants in the case
(13) of my prevailing and have them cover my attorney's fees.
(14)   Q.   Okay. So aside from attorney's fees under the
(15) United States Code, are you claiming any monetary
(16) damages –
(17)   A.   No.
(18)   Q.   – as a result of either the actions of the
(19) City or Chief Bertini in this matter?
(20)   A.   No, not at all.
(21)   MR. MASTER:   Okay. Let's take two minutes. I
(22) think I'm done. Take a break.
(23)   (Brief recess.)
(24)   MR. MASTER:   Okay. We're done. Thanks very
(25) much.

## Page 219

(1)   MR. ROBINSON:   Okay. Thank you.
(2)   THE WITNESS:   Thank you.
(3)   (Whereupon the deposition was
(4) adjourned at 5:15 p.m.)
(5)
(6) MICHAEL ZELENY
(7)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 220

(1)   I, JUDY BRENNAN, a Certified Shorthand Reporter
(2) duly licensed by the State of California, do hereby
(3) certify:
(4)   That MICHAEL ZELENY, the witness in the
(5) foregoing deposition, was by me duly sworn to testify
(6) the truth, the whole truth, and nothing but the truth,
(7) in the within-entitled cause;
(8)   That said deposition was reported at the time
(9) and place therein stated by me, and thereafter
(10) transcribed under my direction;
(11)   That when so transcribed, the witness was
(12) afforded the opportunity to read, correct and sign the
(13) deposition.
(14) I further certify that I am not interested in
(15) the outcome of said action, nor connected with, nor
(16) related to, any of the parties in said action or to
(17) their respective Counsel.
(18) IN WITNESS WHEREOF, I have hereunto set my hand
(19) this      day of April, 2019.
(20)
(21)
          JUDY BRENNAN, CSR NO. 5138
(22)
(23)
(24)
(25)

| From: | larvatus@gmail.com on behalf of Michael Zeleny |
|---|---|
| To: | McClure, William; Scott Sandell; Milde, Matt L; Police Chief |
| Cc: | David W. Affeld; Peter Shimamoto |
| Subject: | Special Event Permit Application |
| Date: | Friday, July 10, 2015 11:05:37 AM |
| Attachments: | Special Event Permits - Completed Application - signed.pdf |

Michael Zeleny
michael@massmeans.com
zeleny@post.harvard.edu
7576 Willow Glen Road, Los Angeles, CA 90046
voice:323.363.1860
fax:323.410.2373

City of Menlo Park
Matt Milde
Recreation Program Coordinator
mlmilde@menlopark.org
701 Laurel Street
Menlo Park, CA 94025
voice:650.330.2223
fax:650.330.2242

By email, fax, and postal mail.

Starting in October 2015, we shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu, and continuing until NEA publicly acknowledges its wrongdoing and severs its relationship with Min Zhu, Scott Sandell, and Dick Kramlich. I shall be present on site around the clock, served by support staff and equipped with fully operational, exposed and unloaded military grade firearms and loaded ammunition feeding devices therefor, including without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a 7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed Browning M1919a4, in full compliance with all applicable laws. A 55" portable media display powered by a portable gas generator will display videos featuring explicit representations of sexual violence committed by NEA's publicly disgraced protégé. A sample image can be found at http://larvatus.livejournal.com/371973.html. All media aspects of this event will be subject to content-neutral regulation negotiated with Menlo Park authorities. My fundamental rights under the First and Second Amendments of the Constitution of the United States are reserved and non-negotiable.

A site map can be found at https://www.google.com/maps/@37.4197308,-122.2137188,17z/. My display will be confined to the median strip on Sand Hill Road directly across the NEA headquarters. No obstruction of automotive or foot traffic will take place. Please contact me to arrange for the payment of the special event fee and discuss any organizational matters. Please address all legal inquiries and requests to David W. Affeld, Affeld Grivakes Zucker LLP, 2049 Century Park East, Suite 2460, Los Angeles, CA 90067, voice:310.979.8700, fax:310.979.8701.

cc:



Ex. No. 2
Pltf.□ Deft.☑ Pet.□ Rsp.□
Wit: Zeleny
Date: 3.18.19
Judy Brennan, CSR #5138

MP000234

Bill McClure
Menlo Park City Attorney
wlm@jsmf.com voice:650-330-6610
Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA 94025
voice:650.324.9300
fax:650.324.0227

Robert Jonsen
Menlo Park Police Chief
policechief@menlopark.org
701 Laurel St.
Menlo Park, CA 94025
voice:650.330.6600

Scott Sandell
New Enterprise Associates
ssandell@nea.com
2855 Sand Hill Road
Menlo Park, CA 94025
United States
voice:650.854.9499
fax:650.854.9397

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los
Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373
http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No
matter. Try again. Fail again. Fail better." — Samuel Beckett

MP000235

# CITY OF MENLO PARK
Special Event Application
701 Laurel Street, Menlo Park, CA 94025  Ph: 650-330-2223  Fax: 650-330-2242



| | |
|---|---|
| Applicant Name:  Michael Zeleny | |
| Organization Name:  Mass Means, Inc. | |
| Name of Event:  Child Rape Tools | |

| Address: 7576 Willow Glen Rd | City: Los Angeles | State: CA | Zip: 90046 |
|---|---|---|---|

| | |
|---|---|
| Home Phone: 323-363-1860 | Alternate Phone:  none |
| E-mail Address: zeleny@post.harvard.edu | Fax: 323-410-2373 |
| Estimated Attendance:  drive-by only | Event open the public: Yes ☒ No ☐ |
| Number of Event Staff: 1 | Number of Event Volunteers:  5 |

Purpose of Event:  Outing New Enterprise Associates as the corporate sponsors of incestuous child rapist Min Zhu.

Location of Event (please be specific and attach map): 2825 Sand Hill Rd, Menlo Park, CA 94025, at the median strip, per the attached.

| Event Timeline | Day | Date | Start Time | End Time | Total Hours |
|---|---|---|---|---|---|
| Set up/Preparation | Wed | 9/30/2015 | 9 a.m. | 10 p.m. | 13 hours |
| Special Event | Thu | 10/1/2015 | 7 a.m. | ongoing | indefinite |
| Tear down/Clean up | | | | | |

| | | |
|---|---|---|
| Do you plan to use a City building or park? Yes ☐ No ☒ <br> City Facility Reservation Permit Included: <br> Yes ☐ No ☒  Pending ☐ | Do you plan to use Private Property: Yes ☐ No ☒ <br> If yes, provide address of location: | If yes, do you have written approval from Private Property owner: <br> Yes ☐ No ☐ |
| Any City streets closed? Yes ☐ No ☒      Any sidewalks blocked? Yes ☐ No ☒ <br> Name of streets: | | Traffic Control Plan Included: <br> Yes ☐ No ☐  N/A ☒ |
| Renting barricades from City: Yes ☐ No ☒ | Park sprinklers turned off: Yes ☐ No ☒ | |
| Amplified sound (i.e. Music, PA system): Yes ☒ No ☐  Time of use: 7 a.m. to 9 p.m. | | |
| Temporary lighting: Yes ☒ No ☐  Please describe: Portable spotlights focused on display. | | |
| Charge for event: Yes ☐ No ☒ $____/person | Event is reoccurring more than annually?: Yes ☐ No ☐ | |
| Is this event a fundraiser: Yes ☐ No ☒ | Proof of 501c3: Yes ☐ No ☒ | |
| Will alcohol be served: Yes ☐ No ☒ <br> Will you be selling alcohol: Yes ☐ No ☒ | ABC Permit Attached: Yes ☐ No ☐ Pending ☐ | |
| Will food be served: Yes ☐ No ☒ <br> Will you be selling food: Yes ☐ No ☒ | I will apply for San Mateo County Temporary Event Food Permit:  Yes ☐ No ☒ Pending ☐ | |
| Selling any other items: Yes ☐ No ☒ <br> Describe: | Menlo Park Business License: <br> Yes ☐ No ☒ | |
| Will portable rest rooms be provided: <br> Yes ☒ No ☐ | No. of portable toilets ___1___ <br> No. of ADA compliant portable toilets ___0___ | |
| Will you be using a tent, canopy, or other temporary structure? Yes ☒ No ☐ | Please describe: Canopy to be erected at the median strip of Sand Hill Rd. | |

MP 000236

## SECTION 2: EVENT NARRATIVE

**Event Description**
Briefly provide a description of the event, including activities, timeline, and sequence of events:
Starting in October 2015, we shall maintain a portable multimedia presentation
illustrating ongoing corporate support of New Enterprise Associates (NEA) for
incestuous child rapist Min Zhu. I shall be present on site around the clock,
equipped with fully operational, exposed and unloaded firearms and loaded
ammunition feeding devices therefor, in full compliance with all applicable
laws. All media aspects of this event will be subject to content-neutral
regulation negotiated with Menlo Park authorities.

**Parking**
Describe where event participants are expected to park their vehicles:

Off-site parking only; all on-site transportation to be provided to drop off and
pick up the participants.

**Security / Emergency Action Plan**
Describe the security plan, including crowd control (including the security company name, contact information,
and the amount of security personnel):

No need for crowd control is anticipated, owing to the lack of sidewalks and no
stopping allowed on the Sand Hill roadside. Participant assumes full personal
responsibility for the lawful defense of the site.

**Americans with Disabilities (ADA) compliance**
Describe how the event will be accessible to people with disabilities (such as parking, restrooms, and
accessible path of travel to all event functions):

N/A.

**Recyclables and garbage handling**
Describe the plan for cleanup and removal of recyclable goods and garbage during and after the event (include
if additional street sweeping will be arranged).

All garbage generated by the event will be picked up promptly and removed from
the site daily for sanitary and lawful disposal.

*Please note:* For larger events where additional garbage removal will be needed, please contact Recology
at www.recologysanmateocounty.com or call (650) 595-3900.  Failure to remove trash from event will
result in a $250 fine.

**SECTION 3: SITE MAP CHECKLIST**
Please provide a __detailed__ site plan/route map of the event on a separate sheet.  If site map is larger than 11x17 size paper, please provide SIX (6) copies of this map in application packet. The map should include the following information:

| Yes | N/A | |
|-----|-----|---|
| ☒ | ☐ | Outline of event site, including names of streets or areas that are a part of the venue and surrounding area.  If the event includes a moving route (i.e. parade or run), indicate the direction of travel and start/finish locations. |
| ☐ | ☒ | Any street or lane closures |
| ☐ | ☒ | The locations of fencing, barriers or barricades. |
| ☐ | ☒ | Location of first-aid facilities |
| ☒ | ☐ | Location of all stages, platforms, booths, food areas, trash containers, tents, etc (include dimensions) |
| ☒ | ☐ | Generator locations and/or source of electricity |
| ☐ | ☒ | Placement of vehicles or trailers used for the event (include dimensions) |
| ☐ | ☒ | Anticipated parking locations and number of parking (include ADA parking) |
| ☒ | ☐ | Placement of promotional signs or banners |
| ☒ | ☐ | Placement of portable restrooms (including labeling ADA restrooms) |
| ☐ | ☒ | Exit locations for events with fences |
| ☒ | ☐ | Location of all event activities |
| ☒ | ☐ | Location of temporary lighting |
| ☒ | ☐ | Location of sound system |
| ☒ | ☐ | Fire truck access to existing building/structures shall remain clear and unobstructed (20 feet minimum) |
| ☒ | ☐ | Fire equipment shall remain clear and unobstructed (25 feet minimum) |
| ☐ | ☒ | For large event, traffic impact and traffic handling plan including re-routing of vehicles, bicycles, and pedestrians. |

**Note:** Incomplete and vague site maps will delay the permit process.


**SECTION 4: INSURANCE INFORMATION**
A Certificate of Liability Insurance must be provided and must contain the following:
* The special event permit name must be listed as the one "insured."
* The policy must not expire before the planned event date.
* The policy must be for a minimum of $1,000,000 unless otherwise specified.
* The "description" should list the rental location, day, and event planned.
* The City of Menlo Park at 701 Laurel Street, Menlo Park, CA 94025 must be noted as "additional insured."

A special event permit __will not__ be issued until the required application fees, insurance, and other supplementary materials, as indicated in the Special Event Application, have been received. A special event permit issued for a private function on private property is not required to submit proof of liability insurance to the City.

MP000238

## SECTION 5: PUBLIC NOTIFICATION

Public Notification will be required for some permits based on your application. If noise ordinance is exceeded, the Planning Division will prepare a public notice to be mailed to all property owners, residents, and businesses within 300 feet of the subject property. The notice will state the decision of the City and will serve as the noise permit unless the request is appealed. The Planning Division will mail the notices on the decision date, which starts the 10-day appeal period. If the Planning Division does not receive an appeal in writing, the decision will be become effective on the 11th day. If the decision is appealed, the item will be scheduled for the next available Planning Commission meeting. The Planning Commission generally meets on the first and third Mondays of every month. The minimum lead-time between an appeal and a Planning Commission meeting is approximately 3-weeks. The decision will also be posted at the Civic Center and on the City's web page: www.menlopark.org.

## SECTION 6: FIRE DISTRICT NOTIFICATION

If necessary, you will be asked to seek approval of the Menlo Park Fire Protection District. They will be informed of any street closures and other impacts to emergency services. Please keep in mind that there are several streets within Menlo Park that cannot be closed because they are deemed primary response routes. You must receive Conditional of Approval from the City prior to contacting the Fire District.

## SECTION 7: POLICE STAFFING

For events requiring Police assistance, the Police Department will review the application and be involved in the initial meeting with the applicant. Based on the details for the event, the Police Department will provide an estimate of costs based on the number of officers needed and hours needed at the event (payment of 50% of estimated Police services is due before your permit can be issued). Post event, an invoice will be provided by the to the applicant for Police services (based on incurred costs, minus any pre-paid amount). Any additional costs incurred that were not anticipated such as extra staffing or longer hours will be billed to the applicant. All payments are due to the Menlo Park Police Department by contacting Sgt. Matt Ortega at (650) 330-6347. Non-payment for Police assistance after the event will result in the inability to apply for a special event permit in the future, until any balance is paid in full.

## SECTION 8: PARK USAGE

Rental fees for special events held on city parkland, picnic areas, or tennis courts may be applied and are subject to availability. Please review the city's Master Fee Schedule for current park usage fees. Additionally, the organizing party of an event held in these areas is responsible for following all park rules, usage guidelines, and city ordinances. Sharon Park is reserved for weddings only.

## SECTION 9: SOUND

Approval of a Special Event permit does not necessarily exempt the planned event from the requirements of Chapter 8.06 (Noise) of the Menlo Park Municipal Code. All sources of sound measured from any residential property shall not exceed 50 dBA during the "Nighttime" hours, or 60 dBA during the "Daytime" hours. Nighttime hours are considered the period between 10 p.m. and 7 a.m. daily. If you believe your planned event could exceed the noise limitations set by Chapter 8.06 of the Municipal Code, please discuss the noise permitting requirements with a member of the Planning Division. A noise permit can be obtained as part of the Special Events permit application, subject to review and action by the Planning Division and the public notification and appeal process set forth in Section 5. The Planning Division can be reached at (650) 330-6702 or by email at planning@menlopark.org.

## SECTION 10: CONFIRMATION

Please check all that apply:

- ☒ I have read all policies regarding the Special Event Application process.
- ☒ I have reviewed the Special Event Permit FAQs.
- ☒ I have read and will abide by all Sections as written and described herein.
- ☒ I am submitting the most current version of the Special Event Permit Application found at: www.menlopark.org/eventpermits
- ☒ I am providing the correct payment with my application.
- ☒ I have filled out all portions of this application completely and to the best of my knowledge.

MP000239

I hereby certify and agree that I shall be personally responsible on behalf of myself/organization for any damage sustained by the facility, property, or equipment, as a result of the occupancy of said facility or property by my group/organization. I hereby waive, release, discharge and agree to indemnify, defend and hold harmless the City, its officers, employees, and agents from and against any and all claims by any person or entity, demands, causes of action or judgments for personal injury, death, damage or loss of property, or any other damage and/or liability occasioned by, arising out of out of the event for the actions (active or passive) of invitees', event participants, event sponsors, and event spectators while on the property, or resulting from this reservation of the facilities or use or property. I hereby declare that I have read and understand and agree to abide by and to enforce the rules, regulations, and policies affecting the use of the facilities or property. If any portion of the Special Event is held on non-city owned property I have included letters of approval for each respective property owner.

_____          10 July 2015
Signature of Applicant                                                    Date

**Payment Information:**

☐ Cash    ☒ Check    ☐ Visa    ☐ Mastercard     Amount  $250_____ ($125 minor / $250 major)

Account # _____ Exp. _____ Account Holder Name _____

I agree to pay the above charges and authorize the City of Menlo Park to charge these costs to my credit card. Checks payable to: City of Menlo Park.

Authorized Signature: _____

*Note: There is a $30 charge for returned checks. Additional fees from other city departments may be required before permit maybe issued, please refer to the Master Fee Schedule for updates on current fees.*

---

**Office Use Only:**

Date Permit Submitted _____          Project No. _____
Permit Payment: $ _____ Date _____    Processed By _____

| Approval: | Department | Received | Fee | Paid | Signature | Date |
|---|---|---|---|---|---|---|
| | Police | | (50% Est.) | ☐ | | |
| | Planning | | | ☐ | | |
| | Public Works Engineering | | | ☐ | | |
| | Public Works Maintenance | | | ☐ | | |
| | CSD/Recreation | | | ☐ | | |
| REQUIRED: Yes ☐ No ☐ | Fire District | | | ☐ | | |

**Event Permit Coordinator:**
☐ Application Initial Review Complete
☐ E-mail Acknowledgement Sent to Applicant        (Date: _____)
☐ Application Sent to Permit Committee
☐ Site Map Complete
☐ Insurance Certificate Provided
☐ Other Agencies Permits Included
☐ Public Notification Complete
☐ Approved to exceed noise ordinance  ☐ Yes  ☐ No
☐ Staff Approvals Complete
☐ Traffic Control Plan Approved (Street closures only)
☐ Conditions of Approval or Denial Letter Sent      (Date: _____)
☐ Other Department Fees Paid
☐ Barricade Rental Information (Requesting _____ 3' barricades and _____ 12' barricades)
☐ Final Copies Sent to Approving Staff

**Special Event Permit Application Approval:**

_____          _____
Signature of Permit Coordinator                  Date

Updated: 07/24/14

MP000240





FIND MORE     SHOP    HELP                                LOGIN     CREATE BLOG     ENGLISH (EN)      🔍

LARVATUS      SUBSCRIBE                                                                    ⊡ READABILITY

# the origins of webex - larvatus prodeo

[Recent Entries][Archive][Friends][Profile]

## December 14th, 2012

*04:10 pm*



[Link] **the origins of webex**

As <u>savvy politicians</u> are <u>wont to observe</u>, victory has a hundred fathers but defeat is an orphan. The progenitors of <u>WebEx</u> number four: high-powered financier <u>Scott Sandell</u>, salesman extraordinary <u>Subrah Iyar</u>, brilliant engineer <u>Min Zhu</u>, and his bodacious daughter <u>ErinYierBargeld</u>. Here is a graphic <u>representation of their relationship</u>:



Ex. No. 4
Pln.☐ Deft.☑ Pet.☐ Rsp.☐
Wit: Zeleny
Date: 3.18.19
Judy Brennan, CSR #5138



**Tags:** business, degenerates, ethics, sex, tasteless, webex

(4 comments | Leave a comment)

3/14/2019                                                                  the origins of webex - larvatus prodeo

<u>Log in to stop seeing ads in this journal</u>

# Comments

**From:** ⚲ **hyok_kim**
**Date:** December 15th, 2012 10:58 pm (UTC)

(**Link**)

**The reason.........**

Why did she leave you? I am sorry if you're affronted by my question.

I did notice about photos and how people smile in their photos. All three gents you mentioned smile in a particular fashion in their photos.

I don't like that kind of smile and do not trust people who smile like that in their photos.

I do like how you portray your face in your photos and your parents as well.

I never smile in photos.
(<u>Reply</u>) (<u>Thread</u>)



**From:** ⚲ **larvatus**
**Date:** December 19th, 2012 11:09 pm (UTC)

(**Link**)

**Re: The reason.........**

Love is evanescent. A better question to ask is why she stayed with my business after leaving me. The wench is desperate for approval. As her subsequent career suggests, she sells herself as a <u>serial entrepreneur</u>.
(<u>Reply</u>) (<u>Parent</u>) (<u>Thread</u>)

**From:** ⚲ **hyok_kim**
**Date:** December 20th, 2012 12:54 am (UTC)

3/14/2019                                                     the origins of webex - larvatus prodeo

**Re: The reason.........**                                                                    (Link)

"Love is evanescent."

Now, that is the most beautiul, accurate, and concise definition of 'love' I've read. I didn't even know the word, 'evanescent' even existed.

I can see why you consider yourself a poet.

For some reason, it reminds me of the last scene in the movie, 'Once upon a time in America', where 'Noodles' drifted into opium drenched sleep/melancholia where the camera focuses into his face and smile from the ceiling.

(Reply) (Parent) (Thread)



**From:** Ⴍ larvatus
**Date:** December 20th, 2012 08:45 pm (UTC)
                                                                                               (Link)
**Re: The reason.........**

Poets make things. I consider myself an assclown.
(Reply) (Parent) (Thread)

Subrah Iyar Appreciation Society   Powered by LiveJournal.com

| From: | larvatus@gmail.com on behalf of Michael Zeleny |
|---|---|
| To: | McClure, William |
| Cc: | David W. Alfeld; Peter Shimamoto; Scott Sandell; Milde, Matt L; Bertini, David C; Ortega, Matthew K; Jonsen, Robert |
| Subject: | Re: Special Event Permit Application |
| Date: | Tuesday, July 28, 2015 12:58:45 AM |
| Attachments: | Browning M1919A4.jpg |

Dear Mr McClure,

Thank you for your response. I am hoping we can continue this conversation in a constructive and conclusive fashion. As a reminder to your clients and colleagues, I am publicizing and protesting death threats against me and my family, received in the course of a business dispute with, and in the names and on behalves of, WebEx Communications its daughter-raping co-founder Min Zhu. These threats were implicitly endorsed and expressly ratified after the fact by their erstwhile board members and ongoing investors, New Enterprise Associates (NEA). The object of my exercise is to educate and entertain, combining remedial instruction of NEA personnel and associates in business ethics with amusing exposure of its ongoing breach to the passerby. All onsite interactions will be subject to audiovisual recording, live webcast, and eventual incorporation into a feature documentary. You may think of this project as an application of disruptive technology to venture capitalist business as usual. Please note its nature of a video production in the course of an entertainment event, which give rise to clearly established statutory exemptions from California law regulating the possession of firearms in public.

To answer specific questions:

1. As stated, my display will be confined to the median strip on Sand Hill Road directly across the NEA headquarters. I assure you that it will be bounded with a safe margin for automotive and foot traffic and no obstructive or threatening acts or displays of any kind will take place. Beyond that, I do not believe that you can require me to lay out my location and its dimensions down to the last inch. In this, and many other matters to follow, reasonable men can disagree. Any and all residual disagreement between us will be subject to an application for declaratory relief in the United States District Court for the Northern District of California.

2. As stated, I intend to occupy the site of my performance around the clock until NEA publicly acknowledges its wrongdoing and severs all its relations with Min Zhu, Scott Sandell, and Dick Kramlich. As to the lighting and audiovisual display parameters, I will accommodate any reasonable restrictions you and your colleagues put forth as the authors of Menlo Park regulations, ostensibly constructed for my benefit in the course of previous litigation. It would be unproductive of me to second-guess you in this matter, and you, to demand the minute details of my proposal only to deter it with *ad hoc* obstacles. I specifically invite you to consider the matter of videos featuring explicit representations of sexual violence, in the context of their "serious literary, artistic, political, or scientific value" as per *Miller v. California*, 413 U.S. 15 (1973). If you are unable to determine this value by consulting NEA, we shall gladly establish it through testimony to be elicited in the ensuing litigation. In this connection, please bear in mind *Terminiello v. City of Chicago*, 337 U.S. 1 (1949), wherein the United States Supreme Court held speech that "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance" to be protected under the First and Fourteenth Amendments to the United States Constitution.

3. Lastly, my assumption of full personal responsibility for the lawful defense of the site is meant to allay a concern expressed by Menlo Park Police on previous occasions, justifying its presence on site by positing that my firearms might come to be stolen from me in the course of my peaceful public protests. In this regard, please note that lawfully carrying a firearm does not constitute "reasonable suspicion" justifying a Terry stop. This applies in the context of California statutes that specifically allow the possession of a firearm "by an authorized participant in a motion picture, television, or video production, or an entertainment event, when the participant lawfully uses the firearm as part of that production or event, or while going directly to, or coming directly from, that production or event." In this regard, I expect you to observe all legal constraints on police action. As per *Kolender v. Lawson*, 461 U.S. 352 (1983), "a person who is stopped on less than probable cause cannot be punished for failing to identify himself." Also see *Arizona v. Hicks*, 480 U.S. 321 (1987) ("Warrants only issue upon a showing of probable cause; thus, probable cause to believe an item in plain view is contraband or evidence of criminal activity must be required.") Please note that an anonymous tip that a person is carrying a gun is not sufficient to justify a police officer's stop and frisk of that person, even where descriptive detail regarding the subject has been corroborated. Thus in *Florida v. J.L.*, 529 U.S. 266 (2000), the United States Supreme Court declined to adopt the "firearms exception" to Terry's requirement of reasonable suspicion. Similarly, in *Pennsylvania v. D.M.*, 529 U.S.



Ex. No. 5
Plf.☐ Deft.☐ Pet.☐ Rsp.☐
Wit: Zeleny
Date: 3.18.19
Judy Brennan, CSR #5138

MP000290

1126 (2000), the Court ruled that an anonymous tip with a physical description and location that a person had a gun was not enough for reasonable suspicion, absent anything else to arouse the officer's suspicion. I bring all this to your attention in connection with adequate notice given herewith that my carrying of firearms is undertaken in the course and furtherance of a video production and an entertainment event, by an authorized participant therein. Attached please find a photo of a representative firearm to be displayed onsite.

I am hoping that the above will suffice to resolve the concerns that you voiced to date. In light of the legal complexity of this matter, I am giving you and your colleagues adequate lead time to come to a mutual accommodation.

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373
http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No matter. Try again. Fail again. Fail better." — Samuel Beckett

On Fri, Jul 24, 2015 at 2:27 PM, William L. McClure <wlm@jsmf.com> wrote:

Michael – apologies for the delay in getting back to you on this. The application has been circulated to various departments, including me as the City Attorney, for review and comment. The City tries to process applications as quickly as possible, but it is not always possible to do so and since this event is not planned for 4 months, there is/was no urgency in response, so things that require more urgent reply have taken priority. In reviewing your application, it is not complete in that it does not clearly show/delineate the location where you intend to have "stages, platforms, booths, food areas, trash containers, tents, etc., including dimensions" nor does it show "generator locations", nor "location of event activities" nor "location of temporary lighting" nor "location of sound system". While you included a Google map of the area and you have referenced "at the median strip" – we don't know what you mean or where or the size of space you propose to use. It is your obligation to be precise in your application as to the location, including dimensions of the area proposed to be utilized. Further, it is not clear whether you are proposing set up on one day and then occupying the site for one additional day, or you are intending to occupy the site for multiple days, weeks or months. We need a clearer statement of your intent/plans, including whether you intend to have audio and lighting all night long, or until some specific hour, or what? Further, what do you mean by "participant assumes full personal responsibility for *the lawful defense of the site*? At this point, we cannot further process your application without your providing further clarification as noted above.

Regards,

William L. McClure, City Attorney

City of Menlo Park

1100 Alma Street, Suite 210

Menlo Park, CA 94025

650-324-9300 Ofc

650-324-0227 Fax

wlm@jsmf.com

 Please consider the environment before printing this email 🌳

**From:** larvatus@gmail.com [mailto:larvatus@gmail.com] **On Behalf Of** Michael Zeleny
**Sent:** Friday, July 24, 2015 1:19 PM
**To:** William L. McClure <wlm@jsmf.com>; Scott Sandell <ssandell@nea.com>; Matt Milde <mlmilde@menlopark.org>; Bruce Goitia <policechief@menlopark.org>
**Cc:** David W. Affeld <dwa@agzlaw.com>; Peter Shimamoto <ps@agzlaw.com>
**Subject:** Re: Special Event Permit Application

Dear Menlo Park authorities,

Your website promises an initial response to a Special Event Permit Application within three days. It has been two weeks since our submission of the attached application, with no response forthcoming. I have repeatedly attempted to contact Matt Milde by phone, to no avail. Your continued non-responsiveness is setting us on a pathway to Constitutional litigation. Speak up or suffer the consequences.

—

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373

http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No matter. Try again. Fail again. Fail better." — Samuel Beckett

On Fri, Jul 10, 2015 at 11:04 AM, Michael Zeleny <zeleny@post.harvard.edu> wrote:

Michael Zeleny
michael@massmeans.com
zeleny@post.harvard.edu

MP000292

7576 Willow Glen Road, Los Angeles, CA 90046
voice:323.363.1860
fax:323.410.2373

City of Menlo Park
Matt Milde
Recreation Program Coordinator
mlmilde@menlopark.org
701 Laurel Street
Menlo Park, CA 94025
voice:650.330.2223
fax:650.330.2242


By email, fax, and postal mail.

Starting in October 2015, we shall maintain a portable multimedia presentation illustrating
ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist
Min Zhu, and continuing until NEA publicly acknowledges its wrongdoing and severs its
relationship with Min Zhu, Scott Sandell, and Dick Kramlich. I shall be present on site
around the clock, served by support staff and equipped with fully operational, exposed
and unloaded military grade firearms and loaded ammunition feeding devices therefor,
including without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a
7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed Browning
M1919a4, in full compliance with all applicable laws. A 55" portable media display
powered by a portable gas generator will display videos featuring explicit representations
of sexual violence committed by NEA's publicly disgraced protégé. A sample image can
be found at http://larvatus.livejournal.com/371973.html. All media aspects of this event
will be subject to content-neutral regulation negotiated with Menlo Park authorities. My
fundamental rights under the First and Second Amendments of the Constitution of the
United States are reserved and non-negotiable.


A site map can be found
at https://www.google.com/maps/@37.4197308,-122.2137188,17z/. My display will be
confined to the median strip on Sand Hill Road directly across the NEA headquarters. No
obstruction of automotive or foot traffic will take place. Please contact me to arrange for
the payment of the special event fee and discuss any organizational matters. Please
address all legal inquiries and requests to David W. Affeld, Affeld Grivakes Zucker
LLP, 2049 Century Park East, Suite 2460, Los Angeles, CA 90067, voice:310.979.8700,
fax:310.979.8701.


cc:


Bill McClure

Menlo Park City Attorney

wlm@jsmf.com voice:650-330-6610

Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA 94025
voice:650.324.9300
fax:650.324.0227


Robert Jonsen
Menlo Park Police Chief
policechief@menlopark.org
701 Laurel St.
Menlo Park, CA 94025
voice:650.330.6600


Scott Sandell

New Enterprise Associates

ssandell@nea.com
2855 Sand Hill Road
Menlo Park, CA 94025
United States

voice:650.854.9499
fax:650.854.9397


Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los
Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373

http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No
matter. Try again. Fail again. Fail better." — Samuel Beckett

MP000294