**TODD H. MASTER [SBN 185881]**
**tmaster@hrmrlaw.com**
**ROBERT J. GUNDERT [SBN 104486]**
**rgundert@hrmrlaw.com**
**HOWARD ROME MARTIN & RIDLEY LLP**
1900 O'Farrell Street, Suite 280
San Mateo, CA 94403
Telephone: (650) 365-7715
Facsimile: (650) 364-5297

Attorneys for Defendants
CITY OF MENLO PARK and DAVE BERTINI

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

MICHAEL ZELENY, an individual

Plaintiff,

vs.

EDMUND G. BROWN, JR., an individual, in his official capacity, et al.

Defendants.

Case No. 17-cv-07357-RS (TSH)

**EXHIBITS B THROUGH J TO DECLARATION OF TODD H. MASTER IN SUPPORT OF MOTION OF DEFENDANTS CITY OF MENLO PARK AND DAVE BERTINI FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

**Date: February 25, 2021**
**Time: 1:30 p.m.**
**Dept.: Courtroom 3**
**Judge: Hon. Richard Seeborg**

**Trial Date: None**

# Exhibit B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE MATTER OF:

MICHAEL ZELENY,

Plaintiff,

vs.

EDMUND G. BROWN, JR., et al.,

Defendant.

CASE NO. CV 17-7357 JCS

VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

VOLUME I

Menlo Park, California

Tuesday, March 19, 2019

Stenographically Reported by:

HEATHER J. BAUTISTA, CSR, CRR, RPR

VIDEOTAPED DEPOSITION of CHIEF DAVE BERTINI, taken before Heather J. Bautista, CSR No. 11600, a Certified Shorthand Reporter for the State of California, with principal office in the County of Santa Clara, commencing on Tuesday, March 19, 2019, 10:07 a.m., at 1100 Alma Street, Suite 210, Menlo Park, California 94025.

APPEARANCES OF COUNSEL:

For the Plaintiff:

Affeld Grivakes LLP
BY: DAMION ROBINSON, ESQ.
2049 Century Park East
Suite 2460
Los Angeles, California 90067
Phone: (310) 979-8700 / Fax: (310) 979-8701
dr@agzlaw.com

For the Defendant:

Howard Rome Martin & Ridley LLP
BY: TODD H. MASTER, ESQ.
1900 O'Farrell Street
Suite 280
San Mateo, California 94403
Phone: (650) 365-7715 / Fax: (650) 364-5297
tmaster@hrmrlaw.com

ALSO PRESENT:

Nick Perry, Videographer

Michael Zeleny, Plaintiff

INDEX OF EXAMINATION

| | PAGE |
|---|---|
| CHIEF DAVE BERTINI | |
| EXAMINATION BY MR. ROBINSON | 7 |

--o0o--

Instructed Not to Answer

| Page | Line |
|---|---|
| 11 | 15 |
| 13 | 9 |
| 138 | 16 |
| 202 | 4 |

INDEX OF EXHIBITS

| Exhibit No. | Description | Page |
|---|---|---|
| Exhibit 29 | Notice of Deposition | 9 |
| Exhibit 30 | special event permit flow chart | 46 |
| Exhibit 31 | E-mail Bates marked MP1381 through 1385 | 84 |
| Exhibit 32 | E-mail Bates marked MP1437 | 88 |
| Exhibit 33 | Special Event Permit Application Frequently Asked Questions | 106 |
| Exhibit 34 | Printout from special event permit website | 106 |
| Exhibit 35 | Frequently Asked Questions | 114 |
| Exhibit 36 | Film permit application | 125 |
| Exhibit 37 | Photocopy of Penal Code 313.1 | 136 |
| Exhibit 38 | Still image of animation | 136 |
| Exhibit 39 | Printout of a portion of Mr. Zeleny's website | 143 |
| Exhibit 40 | E-mail Bates marked MP214 | 149 |
| Exhibit 41 | E-mail Bates marked MP261 | 161 |
| Exhibit 42 | E-mail with daily police log attached, Bates marked MP55-MP58 | 164 |
| Exhibit 43 | Policy 467 - Menlo Park Police Department Policy Manual | 167 |
| Exhibit 44 | E-mail exchange Bates marked MP41 | 178 |
| Exhibit 45 | E-mail thread Bates marked MP226-228 | 178 |
| Exhibit 46 | Menlo Park Police Department report Bates marked MP1895-1898 | 184 |
| Exhibit 47 | Menlo Park Police Department report Bates marked MP1871-1873 | 187 |

INDEX OF EXHIBITS - CONTINUED

| Exhibit No. | Description | Page |
|---|---|---|
| Exhibit 48 | E-mail with daily police log Bates marked MP61-65 | 188 |
| Exhibit 49 | Menlo Park Police Department report Bates marked MP151-154 | 191 |
| Exhibit 50 | Document Bates marked MP120-124 | 202 |
| Exhibit 51 | Police Management Staff Meeting Minutes dated 08/07/12 Bates marked MP206-210 | 203 |
| Exhibit 52 | Menlo Park Police Department management staff meeting minutes dated 04/03/12 Bates marked MP88-94 | 205 |
| Exhibit 53 | E-mail Bates marked MP00004 | 210 |
| Exhibit 54 | E-mail Bates marked MP60 | 214 |
| Exhibit 55 | Memo from the San Mateo County District Attorney's Office to San Mateo County police officers regarding the open carry of firearm in 2010 - Bates marked MP5397 | 220 |

Page 14

lawsuit?
A. Well, yes. A lot of the documents were from many years ago, so they refreshed my recollection as to the events that were occurring at that time.
10:17 Q. And without getting into the substance of any communications you've had with counsel, were you given any information by counsel that was necessary for you to prepare to be the person most qualified on the topics listed?
10:17 A. No. The only thing -- well, without going into what we specifically talked about, basically, just asking me whether I knew of these issues.
Q. Fair enough.
A. Yeah.
10:18 Q. Let's start with Topic No. 1.
You understand that Mr. Zeleny, in the past, has protested within the city of Menlo Park; correct?
A. Yes.
Q. What is your best understanding of the nature
10:18 of his protests? What does he do during the protests?
MR. MASTER: Object. It's vague and ambiguous. Overbroad. You can answer.
THE WITNESS: One of the things I think that -- I've been here since 2011. Since 2011, there has been
10:18 numerous protests by Mr. Zeleny in which he stands at a

Page 15

certain location in the city of Menlo Park, protesting a certain business in the city of Menlo Park with both sign boards and weapons. Those protests have gone on for up to a day at a time.
10:19 Q. (By Mr. Robinson) In your experience with -- strike that.
Both in your experience with Mr. Zeleny individually and as the person most qualified on behalf of the City, you understand that Mr. Zeleny's protests
10:19 involve the carrying of unloaded firearms; true?
A. They involve the right to carry?
Q. No. That they involve him carrying firearms?
A. Yes. In the past, some of the protests, he has been armed; correct.
10:19 Q. Is Mr. Zeleny permitted to protest in the city of Menlo Park currently while carrying unloaded firearms?
MR. MASTER: Subject it's vague and ambiguous and overbroad. Calls for a legal conclusion and,
10:19 therefore, speculation.
THE WITNESS: Anyone is able to protest in the city of Menlo Park. It's a First Amendment right anybody has, as long as they do so in a nonviolent manner and they conform to all municipal codes, county
10:20 ordinances, and state laws.

Page 16

Q. (By Mr. Robinson) My question was more specific than that, though. If Mr. Zeleny -- as the person most qualified on behalf of the City of Menlo Park, in relation to these protests, if Mr. Zeleny wants
10:20 to go today and protest against NEA and carry unloaded firearms openly, is he allowed to do that within the city of Menlo Park?
MR. MASTER: Same objections.
You can answer.
10:20 THE WITNESS: Our -- the interpretation of the Penal Code is no, he would not be. It is illegal to openly carry unloaded weapons in the state of California.
Q. (By Mr. Robinson) What would the consequences
10:20 be if Mr. Zeleny undertook his protests carrying open, unloaded firearms?
A. We would look at the situation. We would determine whether we believed a crime was occurring, and if we established that probable cause that a crime was
10:21 occurring, an arrest could be made.
Q. Who would be the person on the behalf of the City of Menlo Park Police Department to decide whether or not to make an arrest in that situation?
A. Police officer.
10:21 Q. So assuming that Mr. Zeleny went to NEA today

Page 17

or some other day and resumed his protests while openly carrying unloaded firearms, he would be subject to arrest; true?
A. That's true.
10:21 Q. Is there any way in which Mr. Zeleny can engage in that protest through permits or some other process where he could do those protests while openly carrying firearms and not be subject to a risk of arrest?
A. There is an exception to the Penal Code that
10:22 allows someone who is in an authorized production to carry weapons and if Mr. Zeleny had a authorized production permit from the City, then -- and as long as he fulfilled the rest of the requirements in that permitting process, he would be allowed to do so.
10:22 Q. When you're talking about a production permit, is that a film production permit?
A. Correct.
Q. Other than getting a film production permit from the City, are there any other circumstances in
10:22 which Mr. Zeleny could conduct his protests involving the use of firearms without being subject to arrest?
A. I'm not aware of any.
Q. So the film production permit is basically the only option within the city?
10:23 A. Well, it seems to be one of the exceptions to

Page 18

the Penal Code.
Q. Just for practical purposes, if Mr. Zeleny wants to protest and he wants to carry unloaded firearms during the protests, aside from getting a film production permit, is there any other way for him to do that within Menlo Park?
MR. MASTER: I'll subject to the extent it goes outside the scope of this deposition. It calls for speculation, lacking foundation and a legal conclusion.
But you can answer.
THE WITNESS: I'm not aware of any -- there's no such thing as an open carry permit for the city.
Q. (By Mr. Robinson) So you're not aware of any other means by which Mr. Zeleny could resume his protest, other than getting a permit?
A. Well, there are other exceptions to the Penal Code. You'd have to look at that. I mean, if he was a retired military and going -- doing a parade down the street, he could have a weapon.
There's other -- there's other -- if he was a police officer, he could have a weapon. There's other exceptions.
Q. Are you aware of any other exceptions that would apply in the situation of Mr. Zeleny's protests, other than the film permit exception?

Page 19

A. I don't know. I don't know what his background is.
Q. Is it your understanding that Mr. Zeleny is a retired military officer?
A. I don't know that.
Q. Do you believe him to be a retired police officer?
A. I don't know that either.
Q. Has he ever conducted parades within the city of Menlo Park?
A. Not to my knowledge.
Q. Let's be a little bit more specific about it. Are there any other -- I understand that the statute has exceptions. We'll get into the statute a little bit later.
Are there any other mechanisms within the city of Menlo Park, other than getting a film permit, that would ensure that Mr. Zeleny could conduct his protests without being arrested?
A. None that I'm aware of.
Q. Are you familiar with the process for special events permits within the city of Menlo Park?
A. Yes.
Q. What is a special event?
A. A special event is defined by the City as any

Page 20

event that is one that would cause the applicants to encroach upon the public right-of-way to block streets that have a number of people, more than 100, that would require police presence and/or response or would require or would deal with the noise ordinance if it was very noisy and those things that are, you know, special by their very nature; they're not a normal day-to-day occurrence.
Q. Is that the City's -- strike that.
Was that the City's definition, to the best of your knowledge, of a special event?
A. To the best of my recollection.
Q. Is that definition of a special event written down anywhere?
A. There is a form on the website that gives a frequently asked questions, and it outlines some of the factors that would cause one to need a special event permit.
Q. Other than the frequently asked questions portion of the City's website, is there any other place where the definition of a special event is written down?
A. Not that I'm aware of.
Q. One part of your answer was that the event is special by its very nature. Do you recall saying that?
A. I do.

Page 21

Q. What does that mean?
A. What that means is someone would not need a special event for something that is -- that they're doing in the course of the business or is covered by some other business permit or other type of permit that's allowing them to do what they're doing.
Q. Approximately how many -- strike that.
That portion of the deposition -- that portion of the definition of special event relating to something that's special by its very nature, is that piece of it written down anywhere?
A. No.
Q. Is there any way for the public to learn of that requirement?
A. If they were to apply for one or call and ask a question.
Q. So this special-by-its-very-nature requirement is not part of the City's website?
A. That's correct. If someone already had a permit or an encroachment permit for something else, they would not need a special events permit on top of that.
Q. So if I'm understanding right, is it your testimony that this criteria, that the event be special by its very nature, means an event that doesn't have a

Page 22

different kind of permit?

A. That is -- that's correct. That is outside the permission that an entity or a person already had.

Q. Other than being something outside of the permission that a person or entity already has, does the portion of the definition relating to an event being special by its very nature mean anything else?

A. No.

Q. So the special-by-its-very-nature requirement just means you don't have another kind of permit that lets you do this.

A. Correct.

Q. You understood that Mr. Zeleny applied for a special events permit?

A. Yes.

Q. Were you aware at the time Mr. Zeleny applied for his special events permit that he had some other kind of permit that would allow his protests?

A. No.

Q. So by the definition you just gave me, Mr. Zeleny's protest was special by its very nature; true?

MR. MASTER: Objection. Vague and ambiguous. Overbroad.

You can answer.

Page 23

THE WITNESS: Repeat it.

Q. (By Mr. Robinson) By the definition you just gave me, Mr. Zeleny's special event that he was proposing, because he didn't have some other kind of permit, would meet your definition of an event that was special by its very nature; true?

A. Believe the City's -- as I stated, I believe the City's stats on that was that you don't need a special events permit to, in fact, protest.

Q. At this point -- let me step back a second. You understand that there is an exception to the California Penal Code sections about open carry for entertainment events; true?

A. For an authorized production; correct.

Q. Are you aware of the exception that applies to authorized participants in entertainment events?

A. An authorized event, yes.

Q. Okay.

Is there any other mechanism by which the City of Menlo Park authorizes events, other than the special event permit process?

A. The film permit.

Q. Okay.

So the two options, essentially, are film permit and special events permit for events; true?

Page 24

MR. MASTER: I'll just object to the extent that you're asking him to potentially answer questions that go beyond the scope of his designation.

But to the extent he has an understanding, he may.

THE WITNESS: I'm sorry.

Q. (By Mr. Robinson) Let me step back for a second. It's the City's view -- and I'm asking about Item 4 on Attachment 1, the defendant's interpretation of the California statutes.

It's the City's position that in order to be an authorized participant either in a video production or an entertainment event, the City has to authorize the event itself?

A. That's correct.

Q. And the way in which the City would authorize an event of the type that Mr. Zeleny was seeking to conduct would be either through a special events permit or a film permit; right?

A. Those are the only two that I'm aware of.

Q. Okay.

And at the time Mr. Zeleny applied for the special events permit, you're aware that he didn't have a film permit; correct?

A. Correct.

Page 25

Q. So by your definition of an event that is special by its very nature, I think you told me that means an event that isn't otherwise permitted in some way; right?

A. Correct.

Q. So Mr. Zeleny's event, when he applied for a special events permit, he didn't have a film permit; true?

MR. MASTER: Objection. Asked and answered. You just asked that two questions ago. We're going to be here all day if you continue that.

You can answer it one more time.

THE WITNESS: Yes.

Q. (By Mr. Robinson) So by your definition of an event that's special by its very nature, because Mr. Zeleny didn't have a film permit, his event would have met the definition of a special event; true?

MR. MASTER: Objection. Asked and answered. Argumentative.

Q. (By Mr. Robinson) You can go ahead and answer.

MR. MASTER: Go ahead.

THE WITNESS: Yes, but there's, obviously, other criteria besides just that.

Q. (By Mr. Robinson) This special-by-its-very-nature criteria, you said, is not on

Page 26

the website; correct?
A. Well, I would assume -- yeah. It's not.
Q. Is there any reason why it's not on the website?
10:33 A. Because it's commonsense. If someone had a permit or the permission in some other fashion to do something, they wouldn't need a special event permit on top of that unless it went beyond their current permissions.
10:33 Q. Other than this criteria that we've just talked about, the special by its very nature, what are the criteria that the City uses to decide whether or not to grant a special event permit?
A. The criteria to grant one?
10:33 Q. To grant or deny. What's the decision based on?
A. Well, there is an entire process that is in place for the permit to basically marticulate [sic] throughout the City and touch every department that 10:34 would be affected, and there is a person who's designated in every department to examine the permit to see whether or not what is being requested to be done is, number one, feasible; and, number two, what would be required as controls of that event. In other words, 10:34 would they need police presence? Would they need street

Page 27

closures, et cetera?
Q. Are there -- are there any written -- is there any written list of criteria or requirements or factors that are considered by the various City departments in 10:34 deciding whether or not to grant a special events permit?
A. The event permit itself has, basically, a list of criteria that's needed, and the departments would look at that criteria to see whether or not the permit 10:35 would either be denied or granted or if it was granted with conditions such as, you know, police presence, closures of streets, sound provisions, number of people; things as mundane as, you know, if they needed porta-potties. There's many different types of factors 10:35 that would be looked at by different departments.
Q. Are all of the factors that would be looked at by the various departments listed on the permit application itself?
A. I'm not sure if every single factor is listed.
10:35 Q. Is there any list, written list of factors?
A. Well, the -- if you look at the actual application, it does have some factors that are listed on it.
Q. The factors that are not listed on the
10:35 application, are those listed somewhere else?

Page 28

A. I'm not sure.
Q. Is there someone else within the City of Menlo Park who would know whether the factors for granting or denying a special events permit that are not included on 10:36 the application itself are written down?
A. No.
Q. Nobody within the City of Menlo Park is aware of whether these additional factors are written down?
MR. MASTER: Objection. Asked and answered.
10:36 Argumentative.
Q. (By Mr. Robinson) You can answer.
A. The answer would be every department has its own list of requirements of what they're looking at specifically to their department, and I assume that 10:36 every department -- or I know every department would have somebody who would be making that determination.
Q. Are the lists maintained by the various departments within the City written down?
A. I don't know the answer to that for every 10:36 department.
Q. Are the factors considered by the police department written down?
A. They are on a checklist on the application process, but there is no, like, you know, codified list 10:36 of you must do X, Y, Z, because every situation, every

Page 29

event, is going to be different.
Q. When you refer to a checklist, are you referring to the checklist on the permit application itself?
10:37 A. Correct.
Q. Okay.
Beyond completing the checklist on the permit application itself, are there other factors that the police department considers in deciding whether or not 10:37 to approve a special events permit?
A. It would depend on what the special event was asking to do.
Q. So the factors that you would consider vary event by event?
10:37 A. From the police department specifically, it would be public -- mostly -- almost all public safety factors.
Q. What public safety factors are considered?
MR. MASTER: Objection. Vague and ambiguous.
10:37 Overbroad. Incomplete hypothetical.
You can answer.
THE WITNESS: Traffic control, crowd control, noise ordinances, safety to the general public; things of that nature.
10:38 Q. (By Mr. Robinson) When you say "things of that

Page 30

nature," are there other factors beyond traffic, crowd control, and safety to the general public?

A. As far as the -- what the police department is looking for, those are pretty much what we're looking for.

10:38

Q. Are there any objective standards that you follow, or is it sort of a case-by-case decision about whether it would impact traffic or safety?

MR. MASTER: Objection. Vague and ambiguous. Unintelligible.

10:38

THE WITNESS: I can't answer that question.

Q. (By Mr. Robinson) Okay.

Are there objective standards that you, as the police department, apply in deciding whether or not to approve a special events permit?

10:38

MR. MASTER: Objection. Asked and answered. Vague and ambiguous.

THE WITNESS: The answer is yes.

Q. (By Mr. Robinson) What are the objective criteria that you consider?

10:39

A. What I already stated. It would depend on whether -- and it's difficult to answer your question, because without a hypothetical of what it was -- because every special event is going to be different. Some special events want to close streets; others want

10:39

Page 31

to close sidewalks; others want to have a large gathering in a front lawn of a house.

It would depend on the actual event itself on what we -- the criteria we would be using to either -- to deny and/or approve.

10:39

Q. Do the criteria change depending on the event?

A. Yes, they -- no. The criteria don't, but it depends on what part of the -- what criteria we are using to examine it depends on what the event is asking to do. In other words, a foot race down downtown is much different than a block party.

10:39

Q. And beyond the criteria of traffic, crowd control, and safety to the general public, there are no other criteria that would apply in the police department to approval or denial of a special event permit?

10:40

MR. MASTER: Objection. Asked and answered. Argumentative.

Go ahead.

THE WITNESS: Obviously, the -- what was going on during this event would have to follow local municipal code ordinances, county ordinances, state law, federal law.

10:40

Q. (By Mr. Robinson) Are the factors or criteria that you've described to me, which now include compliance with law, in addition to the others that you

10:40

Page 32

mentioned, are those all of the factors that the police department considers in deciding whether to approve or deny a special event permit?

A. Yes.

10:41

Q. Let's start with the traffic. How do you decide -- you generally said that traffic control is one of the things that you consider. Can you expand on what you mean by "traffic control."

A. Traffic impact.

10:41

Q. Is there some level of traffic impact that would cause an event to be denied a permit?

A. Perhaps.

Q. What is the level?

MR. MASTER: I'm just going to object. The question is vague and ambiguous. It's an incomplete hypothetical and, therefore, calls for speculation.

10:41

You can answer.

THE WITNESS: It would depend on where the event was planning to be held and the type of street or location that it was trying to be held on. It's impossible to say exactly without some more to your question to answer it.

10:41

Q. (By Mr. Robinson) What I'm trying to get at is whether there's an objective standard. So you have this traffic impact and, therefore, your permit is denied.

10:42

Page 33

Is there some objective standard in assessing the traffic impact?

MR. MASTER: Object. Vague and ambiguous. Overbroad.

THE WITNESS: So it would depend, again, on what was being requested, where it was being requested. We would work with other departments, such as our Public Works traffic division, and there would have to be a discussion within the City on whether or not traffic control was needed, could an event be done in this location without a major -- major impact into traffic.

10:42

10:42

Q. (By Mr. Robinson) The considerations that you just talked about regarding traffic impact, are those considerations written down anywhere?

A. Well, they are mentioned in the application for special event permit.

10:43

Q. Other than being mentioned in the special event permit -- strike that.

Other than what's written in the permit application itself, are the factors that the City would consider relating to traffic control or traffic impact written down anywhere?

10:43

A. No.

Q. Do the factors that you consider vary from event to event?

10:43

Page 34

A. Yes.
Q. In working with the other City departments to assess the traffic impact of a proposed event, is there any level of discretion within the City to decide
10:43 whether it would have too much of a traffic impact?
A. Yes, there's discretion.
Q. You mentioned before a major impact.
What is a major impact on traffic?
A. It's not quantifiable.
10:44 Q. Is that an assessment that's also in the discretion of the City personnel who consider the application, whether it's a major impact or not?
A. In discussions with other departments, yes.
Q. And what -- moving to crowd control.
10:44 Is crowd control another of those factors that varies event to event?
A. Yes.
Q. And the criteria that you would use to assess the event depends on what type of event it is; correct?
10:44 A. Certainly.
Q. Is that also true of safety to the general public?
A. That it depends on the --
Q. That the criteria you consider in analyzing
10:45 whether an event poses a safety risk to the general

Page 35

public depend on what type of event it is?
A. Of course.
Q. And is it accurate that those other factors, crowd control and safety to the general public, also
10:45 involve some level of discretion on the part of the police department and other City entities that are involved in processing the application?
A. Certainly, because we could put conditions to mitigate those issues, if necessary.
10:45 Q. How long has the City had a special events permitting process in place?
A. The -- there was a process prior to me arriving in the City in 2011, but I am aware that in 2012 and the beginning of 2013, a new process was put into place.
10:46 Q. Is the process that you've been describing up until this point the process that was put in place in 2012 or 2013?
A. Yes.
Q. Could you estimate the number of special event
10:46 permit applications the City has received since it put this process in place in 2012 or 2013.
A. I would estimate -- and this is just by looking at the discovery, you know, over a hundred.
Q. How many of those -- if you could estimate, how
10:46 many of those were denied?

Page 36

A. I don't -- I actually don't have an estimation how many were denied.
Q. Did you see any documents in your review of the files of any other than Mr. Zeleny's that were denied?
10:47 A. Yes.
Q. You just can't estimate how many?
A. Correct. I don't -- I don't remember how many exactly were.
Q. What was the general nature of the events that
10:47 you recall being denied?
A. I don't know.
Q. Of those hundred or so special event permit applications, how many were you directly involved with?
A. Me, directly?
10:47 Q. Correct.
A. Maybe half a dozen to a dozen.
Q. You were directly involved in Mr. Zeleny's permit application; right?
A. Correct.
10:47 Q. What are some of the others that you were directly involved with?
A. When I was a patrol commander, I was involved in some of the permitting process for bicycle races, foot races, parades, block parties.
10:48 Q. So at some point, you were promoted to police

Page 37

chief; right?
A. Correct.
Q. When did that happen?
A. In January of 2018.
10:48 Q. What was your position before you were promoted to police chief?
A. Police commander.
Q. Is that different than patrol commander?
A. Well, police commander is the general rank.
10:48 Patrol commander is the division that I was assigned to.
Q. Before moving on, we talked about the criteria for special event permits that are used within the police department. Are you aware of any criteria that are used by other City departments in assessing whether
10:49 to grant or deny a special event permit?
A. I'm aware of some of the criteria that are used by other departments.
Q. What are those criteria?
A. For Community Services, who is the department
10:49 that spearheads the entire process, one of the criteria they're looking for is that it is an event for the public, not a private event; for a special event that is for the good of the public.
From the Department of Public Works, they're
10:49 looking for things such as: Are barricades needed?

Would they have to have extra personnel on during this event?

They would be -- also be looking for hygiene issues or personal hygiene such as porta-potties and/or trash collection; things of those nature --

(Reporter interruption.)

MR. MASTER: Slow down.

THE WITNESS: The Public Works Department and the Transportation Department would specifically be looking for traffic issues.

Q. (By Mr. Robinson) So we've covered a lot there, but in general categories, we have Community Service and the requirement of a public event; Public Works, which considers barricades, staffing, and hygiene issues, such as porta-potties; and then Traffic, which considers traffic issues.

Are there any other criteria that you're aware of for granting or denying a special event permit by the other departments?

A. Community service also deals with the rental -- sorry -- the rentals of City facilities.

THE VIDEOGRAPHER: Just a quick reminder to turn off cell phones while we're on the record. I'm picking up some low-level static.

Q. (By Mr. Robinson) Aside from the criteria

considered by the police department and the criteria you've just listed for the other departments, are you aware of any other criteria that are considered?

A. Not that I'm aware of.

Q. Are the criteria that you just mentioned regarding the other departments written down anywhere?

A. There is a checklist on the application.

Q. Aside from the checklist on the permit application, are those criteria that you mentioned for the other departments written down anywhere?

A. I don't know.

Q. Is there someone else on behalf of the City who would know?

A. I would assume that whoever is the contact person in that department may have something written. I don't know the answer to that.

Q. Is there anything written that's accessible to the public about the criteria that are considered?

A. I believe everything that's on the website is what is accessible. I'm not sure if there's anything other than that.

Q. One of the factors you mentioned was whether the event is for the good of the public.

Do you recall saying that?

A. Yes.

Q. What does that mean?

A. What that means is the genesis of this creation of this permitting process came specifically because there were residents who were attempting to close down entire streets for private birthday parties, et cetera. So one of the criteria is you could close down your street if it was, for instance, a block party that everybody was invited to, but not for just for a private party or a private event.

Q. Is there -- to your knowledge, both individually and as the person most knowledgeable on behalf of Menlo Park, is there any objective standard that the City uses to measure whether an event is for the good of the public or not?

MR. MASTER: Objection. Asked and answered, vague and ambiguous, and overbroad.

You can answer.

THE WITNESS: If it's -- if the public is invited, and it is a community-type event where it is not just for the private use of one person or one resident.

Q. (By Mr. Robinson) Who makes the decision about whether an event is for the good of the public in terms of considering a special event permit?

A. Community Services.

Q. Is there a particular person at Community Services?

A. It would vary, depending on who is currently there when the intake of the permit comes in.

Q. The standard that you mentioned in your previous answer about an event being open to the public, comprising a community event, do you know if that standard is written down somewhere?

A. That is specifically stated in the application process.

Q. When you refer to the application process, you're referring to the application that someone fills out; right?

A. Yes.

Q. How long is a special event allowed to last within the city of Menlo Park?

A. That would depend on the event.

Q. Is there any fixed time limit? Events can be 10 days or 20 days or two months? Is there any objective limit on how long it can last?

A. No. It would depend on the event.

Q. How does the City decide what kind of time frame to impose on an event?

MR. MASTER: Objection. Vague. Ambiguous. Incomplete hypothetical. Calls for speculation.

Page 42

You can answer.
THE WITNESS: It would depend on the type of event. Time, place, and manner is one of the things that we are looking at, and it depends -- it would depend on whether the event had a large-scale impact or not. And so it would -- it would -- again, it's difficult to answer your question without having a specific event that you're asking about.
Q. (By Mr. Robinson) Is the length of time an event will be allowed determined on an event-by-event basis?
A. Yes.
Q. Is there any objective standard that you're aware of for deciding how long an event can last?
MR. MASTER: Objection. Vague, ambiguous, and overbroad.
You can answer.
THE WITNESS: Go back to the time, place, and manner requirements that we're looking at, depending on what the impact of everything else that I've already talked about would be.
Q. (By Mr. Robinson) What I'm trying to get at is if I'm a citizen and I want to put on a special event, is there anywhere that I could go to figure out what the criteria that the City is using are so that I can

Page 43

satisfy the criteria and have my permit application granted?
MR. MASTER: It's a different question. It's vague and ambiguous and overbroad.
You can answer.
THE WITNESS: You would have to tell us what kind of event and where you were doing it before we could answer that question.
Q. (By Mr. Robinson) So the criteria that would be used depend on what type of event and where; is that accurate?
A. And how long; correct.
Q. But is that -- okay.
So the criteria that the City would use in assessing an event depend on what type of event, where it's going to be conducted, and how long; correct?
A. And you would have to include all the impacts that I've already talked about; that would also be what we would be looking at.
Q. Okay.
So my question is just whether the factors that are considered by the City vary based on the type of event, the location, and the time.
A. And the factors I've already discussed: The impact on public safety, traffic, crowd control;

Page 44

everything else that I've already talked about, yes.
Q. So the factors that you consider vary based on the factors that you consider that you just told me?
MR. MASTER: Whoa. Objection. Vague, ambiguous, unintelligible.
I don't understand the question.
If you understand it, go ahead.
THE WITNESS: I don't.
Q. (By Mr. Robinson) Okay.
We talked for quite a while about factors that the City considers in deciding whether to grant or deny a permit application; correct?
A. Yes.
Q. You recall our discussion about that?
A. Yes.
Q. We talked about a number of factors and various departments; right?
A. Correct.
Q. And my question to you just now was: The factors that you consider vary based on where the event is, what type of event it is, and how long it's going to last?
And I think your response was: They vary based on that and all the other factors that I just told you.
And I agree that's unintelligible. I'm just

Page 45

trying to figure out what your answer meant.
So maybe we can just start from the factors considered by the City vary based on the nature of the event, the location, and the timeline of the event; is that accurate?
A. Yes.
Q. And the factors that may be considered are the factors that you've told me for the various departments a few minutes ago; right?
A. Yes.
Q. And those factors are discretionary factors that are considered in consultation with the various departments; right?
A. In some cases, yes.
Q. Which of the factors are, other than discretionary factors, considered in consultation with the various departments?
A. Well, there are the factors that are specifically listed on the application.
Q. Okay.
I see. So some of the factors, like you have to have insurance and those types of factors are not discretionary.
A. Correct.
Q. The other factors that we've talked about

Page 46

previously in your deposition, those are discretionary factors discussed or addressed among the various departments?

MR. MASTER: Object. It's vague, ambiguous, and it's overbroad.

You can answer.

THE WITNESS: And it would be -- yes, based on time, manner, and place. That's what we would have to look at.

MR. ROBINSON: Why don't we mark this as Exhibit 30, please.

(Exhibit 30 was marked for identification.)

Q. (By Mr. Robinson) For the record, Exhibit 30 is two pages, Bates marked in the bottom right corner MP1822 to 1823; correct?

A. Was that to me?

Q. Yes.

A. Yes.

Q. Do you recognize Exhibit 30?

A. I do.

Q. What is it?

A. It's a special event permit flow chart that was -- that is placed on the website.

Q. Does it generally describe the process of processing a permit application for a special event

Page 47

permit?

A. Yes.

Q. So the event application initially goes to Matt Milde?

A. He no longer works for the City of Menlo Park, so I'm not sure who it would go to now, but it would go to somebody at Community Services.

Q. And does that person generally conduct an initial screening process?

A. Yes.

Q. They decide if the application is complete as part of the job; right?

A. That's part of the job, yes.

Q. And they would then -- if it was not complete, the Community Services person would write back to the applicant and say it's not complete; true?

A. Yes.

Q. In the ordinary process of handling a permit application.

A. Yes.

Q. And assuming that the application makes it through that first stage, then it would be circulated to the various departments listed; correct?

A. Correct.

Q. On behalf of the police department, I'm looking

Page 48

at Step C, staff internal review. Let me step back a second.

Is that the collaborative process that you talked about just a few minutes ago where the departments talk to each other and decide whether it has an impact for their department?

A. Yes.

Q. So that's Step C of this flow chart.

A. If you're -- if that's the way you're putting it in order, yes.

Q. I'm just referring to where it says Step C --

A. Yes.

Q. -- staff internal --

A. You're correct.

Q. -- internal review. Got it.

And for the police department, it lists Matt Ortega.

Do you see that?

A. I do.

Q. Who is Sergeant Ortega? Is he -- sorry. Go ahead.

A. He is now a retired police officer.

Q. Is there someone else who's taken over this role in handing special event permit applications?

A. Yes.

Page 49

Q. Who is it?

A. Sergeant Jaime Romero, R-o-m-e-r-o.

Q. Who was the person in that role who handled the special event permit applications in 2015?

A. I believe it was still Sergeant Ortega. I'm not sure. I don't recall when exactly he retired.

Q. You weren't, generally, the person who handled special event permit applications?

MR. MASTER: Objection. Vague and ambiguous.

Q. (By Mr. Robinson) In the 2015 time frame, were you the person who ordinarily would handle special event permit applications for the police department?

A. No. I would be advised of them and get involved if assistance was needed.

Q. How did you decide whether assistance was needed?

A. It was requested.

Q. Was your assistance requested in processing Mr. Zeleny's permit application in 2015 and 2016?

A. Yes.

Q. Who requested your assistance?

A. Originally, Mr. Milde, and then Sergeant Ortega.

Q. Did Mr. Milde relate to you why he was requesting your assistance?

the public safety issue, and then there's the legal issue.

Q. Okay.

So we've covered the public safety issue; you've testified about -- what is the legal issue that you're talking about?

A. It's against the law to openly carry weapons in the state of California.

Q. And that's the case unless the person carrying the weapons has the appropriate type of permit; true?

It's illegal to openly carry firearms except that if you have a special events permit or a film production permit, then it's legal; correct?

A. Well, there's many exceptions to the Penal Code section.

Q. And those are two of them; right? An authorized film production event?

A. Authorized film production; correct.

Q. And a special event -- and entertainment.

A. And an authorized entertainment event.

Q. Right. So if Mr. Zeleny had the special event permit or the film permit from the City of Menlo Park, it would no longer be illegal for him to carry his firearm.

MR. MASTER: I subject it calls for a legal

conclusion, speculation.

But you can answer.

THE WITNESS: That's correct, but there are controls that could be made by the City depending on any permit that's issued.

Q. (By Mr. Robinson) What are those controls?

A. It depends on the permit.

Q. In what way does it depend on the permit?

A. It goes back to what we spoke of earlier; depends on what they're asking, what they're contemplating doing, and we have the right to deal with time, place, and manner and public safety issues. It could be that we'll only let you do this during certain times of the day. You have to have police presence to block off the street. There's -- it depends on what is being contemplated.

Q. Those restrictions that you mentioned. are there any criteria that you use to decide whether to impose those types of restrictions? Things like police presence or only certain times of day or -- what you're referring to as time. place. and manner, are there criteria that you use to decide whether to impose time, place, and manner restrictions?

A. It would depend on what is being contemplated.

Q. Are there objective criteria?

MR. MASTER: Objection. Vague and ambiguous and overbroad.

Q. (By Mr. Robinson) You can answer.

A. There are criteria that are in the application process, and then there are municipal code sections, county ordinances, state laws, federal laws.

Q. What municipal ordinances bear on the time, place, and manner restrictions relating to special events of the type that Mr. Zeleny applied for?

MR. MASTER: Wow. Objection. Vague, ambiguous, and overbroad. Calls for a legal conclusion. Lacks foundation.

Q. (By Mr. Robinson) Are you aware of any city ordinances that apply to Mr. Zeleny's proposed special event?

MR. MASTER: Same objection.

You can answer.

THE WITNESS: There is a city ordinance that was produced during discovery that deals with the open carry of weapons.

Q. (By Mr. Robinson) Aside from the open carry of weapons, are there any other city ordinances that you're aware of that apply to Mr. Zeleny's permit application for a special event permit?

A. It would depend on whether or not the special

event allowed noise. There are ordinances regarding noise. There are ordinances regarding, you know, blocking sidewalks, et cetera.

Q. Were any of those ordinances produced, to your knowledge?

A. Not that I'm aware of.

Q. Are you aware of any other -- you're familiar with Mr. Zeleny's permit application; right?

A. Yes.

Q. You were one of the people involved in processing that application.

MR. MASTER: Talking about the special event now?

MR. ROBINSON: Correct.

THE WITNESS: I was -- yes, I was involved in examining the application.

Q. (By Mr. Robinson) And so you're aware of the nature of the protest or the event that Mr. Zeleny was contemplating in his application?

A. Yes.

Q. What municipal ordinances would apply. other than the one relating to open carry of firearms?

MR. MASTER: Same objection. Lacks foundation. calls for speculation. You can answer.

THE WITNESS: The ones I spoke about. We

actually did discuss, you know, the noise level from the proposed generator that was going to be placed, and also the fact that the -- you know, the sidewalk would have to still be passable. So those type of issues were discussed and/or contemplated.

11:30

Q. (By Mr. Robinson) Was Mr. Zeleny's contemplated event somehow in violation of the noise ordinance?

A. Well, we wouldn't know. It would depend on what kind of generator he brought.

11:30

Q. At some point, Mr. Zeleny told you the kind of generator that he was going to bring; right?

A. Correct.

Q. Was it in violation of the noise ordinance?

A. I don't know.

11:30

Q. Was potential violation of the noise ordinance one of the reasons that Mr. Zeleny's permit was -- permit application was denied?

A. Not that I'm aware of, no.

Q. The other issue you mentioned was obstructing the sidewalk; correct?

11:30

A. Correct.

Q. Based on your familiarity with Mr. Zeleny's application, you understood that he was planning to conduct his special event in the median strip; correct?

11:31

A. Correct.

Q. Not on the sidewalk?

A. Correct.

Q. How would conducting an event on the median strip obstruct the sidewalk?

11:31

A. The -- and that's -- these are the questions that were asked: Were there other vehicles that would be parked there? Would there be a crowd of people? Those type of questions were asked.

Q. Was Mr. Zeleny's permit application denied, in any part, because of obstruction of the sidewalk?

11:31

A. No.

Q. Aside from the noise ordinance and ordinances related to obstruction of the sidewalk, are you aware of any other municipal ordinances that were implicated by Mr. Zeleny's proposed special event?

11:31

A. Not city municipal codes.

Q. Were you aware of any county ordinances, rules, or regulations of any kind that were implicated by Mr. Zeleny's protest -- his special event that he proposed to put on?

11:32

A. Not county ordinances.

Q. At the City level, are you aware of any policies, procedures, rules, anything other than ordinances, that were implicated by Mr. Zeleny's

11:32

proposed special event?

MR. MASTER: Can you read that back. I'm sorry.

(Record read.)

THE WITNESS: The special events policy and procedure.

11:32

Q. (By Mr. Robinson) Other than the special events policy and procedure, are you aware of any other municipal policies, procedures, rules, guidelines, regulations, or any other municipal authority that was implicated by Mr. Zeleny's protest -- his special event?

11:33

A. No.

Q. The special event policy is the policy listed on the City's website and in the frequently asked questions and on the application; right?

11:33

A. Correct.

Q. Is there any other written indication of the City's special event policy, other than what's on the website and the permit application?

A. Not that I'm aware of.

11:33

Q. So the entirety of the policy is the website, the FAQ, the permit application itself, and this flow chart?

A. Well, the website is just the medium in which you access it. They're documents, but yes.

11:33

Q. Okay.

So the website is not the policy; it just has the policy posted to it?

A. Correct.

Q. So the policy's comprised of this flow chart, right, Exhibit 30? The permit application itself; correct?

11:34

A. Correct.

Q. And the frequently asked questions; correct?

A. Correct.

11:34

Q. Other than those three documents: The flow chart, the permit application, and the frequently asked questions, are there any other documents that reflect the City's special event policy that you're aware of?

A. The website itself does have some -- some information on it that basically is educating people on how to go about getting a special event permit, but that's it.

11:34

Q. Okay.

So let's include that. So those four things: Website, flow chart, FAQ posting, and the permit application itself. those four things are the entirety of the City's special event policy; correct?

11:34

A. And procedures. yes.

Q. Are the procedures contained in those four

11:35

Page 66

documents, or are they a separate item?
A. They're contained in those documents.
Q. I just want to make sure that there's not some written document out there, other than those four things, but I think we're on the same page that those four documents are the entirety of the City's special event policy; true?
A. Well, not necessarily. As I stated earlier today, I'm not sure whether other departments have something -- some checklist that they have themselves that is written down.
Q. Did you see any documents of that nature in the production that the City made to us?
A. I did not.
Q. You understand that you are designated as the person most knowledgeable on Topic 15 in Exhibit 29, which is "rules, regulations, guidelines, guidance, policies, or procedures applicable to plaintiff's permit applications with protests."
A. Yes.
Q. You understood that you were designated in that capacity; right?
A. Yes.
Q. So in your capacity as the person most knowledgeable on behalf of the City of Menlo Park, are

Page 67

there any other written documents reflecting the City's policy relating to special event permits other than the four documents you just mentioned to me?
MR. MASTER: Objection. Asked and answered. Argumentative.
You can answer.
THE WITNESS: As I stated I'm not sure if some other department may have, again, a checklist that I'm not aware of; whether it's, you know, work product that they use. I don't know.
Q. (By Mr. Robinson) If there is a person with knowledge of that issue in the City of Menlo Park, who would it be?
A. I would assume it would be the person who is handling the special event application review for each department.
Q. Are any of these potential checklists maintained by the departments published in any way to the public?
MR. MASTER: Objection. Calls for speculation. Lacks foundation.
THE WITNESS: I don't know.
Q. (By Mr. Robinson) Is there someone at the City of Menlo Park who would know?
MR. MASTER: Same objection.

Page 68

You can answer.
THE WITNESS: Again, I assume it would be the person who was actually reviewing this.
Q. (By Mr. Robinson) Reviewing it, meaning reviewing the permit application?
A. Correct.
Q. Going back to Exhibit 30, we talked about, before, the legal issues related to open carry, the safety issues related to Mr. Zeleny's open carry of firearms, and then the indefinite nature of the protest. Were there any other factors that caused you to refer Mr. Zeleny's permit application to the city manager and city attorney?
A. Yes.
Q. What were the other factors?
A. The fact that he was also contemplating and/or requesting to use a center median, which is prohibited by the California Vehicle Code; the fact that in order to get to that center median, anybody who wanted to attend this event would have to do something that is prohibited in jaywalking to that center median.
MR. MASTER: You're talking fast.
THE WITNESS: Yeah. Sorry.
Q. (By Mr. Robinson) Okay.
So we have the safety and legal issues related

Page 69

to open carry, we have the indefinite nature, and we have the use of the median strip. Any other factors that caused you to refer Mr. Zeleny's permit application to the city attorney and city manager?
A. Also, the fact that what was contemplated was a device that would be displaying some kind of lighted animation or something that may, in fact, again, also be in violation of the Vehicle Code.
Q. Anything else?
A. No.
Q. Any other reasons?
A. For referring it?
Q. For referring it.
A. No.
Q. Going through the Exhibit 30, I understand that this exhibit reflects the ordinary process of handling a permit application; correct?
A. Yes.
Q. In the ordinary process, the permit application would not be referred to you; correct?
A. Referred to me or would I be advised of it?
Q. You wouldn't be the person considering the permit application on behalf of the police department in ordinary circumstances.
MR. MASTER: Objection. Misstates his

Chief Dave Bertini. We are now going back on the record. The time is 1:07 p.m.

Q. (By Mr. Robinson) Okay.

We're back on the record. Chief Bertini, you understand you're under the same oath you took this morning; correct?

A. I do.

Q. In the ordinary permit process, who makes the ultimate decision about whether to grant or deny a permit?

THE VIDEOGRAPHER: I got some interference -- one second, Counsel.

Everybody's phone is turned off; right?

THE WITNESS: I have to leave mine on. I'm sorry.

MR. MASTER: Airplane.

THE WITNESS: Okay.

THE VIDEOGRAPHER: I think we're clear for now. So yeah. We just experienced some audio interference, but the record is still going. So if it happens again, I'll let you know.

MR. ROBINSON: Okay.

Could we just read back the last question.

(Record read.)

MR. MASTER: Objection. Vague and ambiguous as

to which permit.

But go ahead.

Q. (By Mr. Robinson) Let me clarify. In the ordinary special event permit process as it was in effect in 2015, who made the ultimate decision about whether to grant or deny a permit?

A. In the ordinary process, it is a collaborative decision, and approval has to be made by every department that is involved.

Q. Does the City of Menlo Park have a special events committee?

A. Yes, they do. It is -- yes.

Q. Who is currently on the special events committee?

A. It is the designated person from each department.

THE VIDEOGRAPHER: Excuse me, Chief. Is it possible to just move your phone just a little bit away from you? That may help in the future, if something --

MR. MASTER: Does it vibrate or something if it goes?

THE WITNESS: Yeah.

MR. MASTER: Is that better?

THE VIDEOGRAPHER: Okay. Thank you.

Q. (By Mr. Robinson) Is the special event

committee different from the staff internal review group that's listed on Exhibit 30?

A. So I need to go back and correct the committee. The committee was created specifically to come up with the process back in 2011, 2012. The special application review is different than the actual committee, which no -- does not exist anymore.

Q. So there's no longer a committee?

A. The committee was in place just to come up with the new process.

Q. The committee is not the entity that decides whether or not to grant an application.

A. That's correct.

Q. The -- okay.

Has there been a special events committee at any point after the adoption of the current special event process?

A. No.

Q. Did the police department handle Mr. Zeleny's permit application for a special events permit?

MR. MASTER: Objection. Vague and ambiguous.

THE WITNESS: We were part of the City departments that looked at it.

Q. (By Mr. Robinson) Of -- strike that.

Did any of the other City departments, besides

the police department, decide to deny the application?

A. I believe the application was denied through the City Attorney's Office.

Q. Did the police department make a decision to deny the application?

A. It was not the police department's decision.

Q. Why wasn't it the police department's decision?

A. The ultimate decision was made by the city attorney, based on input by all the departments.

Q. Of the permit applications -- speaking specifically about special events permits.

Of the applications that you're aware of since 2012 or 2013, how many of those were denied by the city attorney?

A. As requested, two.

Q. When you say "as requested," do you mean that one of the City entities requested that the city attorney review it, and then the city attorney made a decision?

A. No. By requested, I mean that the application was put in one form, and then when it was denied, it was revamped in a way that was acceptable to the City departments.

Q. What -- was one of the applications that was denied by the city attorney Mr. Zeleny's application?

Page 102

A. Yes.
Q. What was the other one?
A. The bicycle race I mentioned before.
Q. In the situation of the bicycle race, was the application submitted and then revised in some way and resubmitted?
A. Yes.
Q. And the -- was the resubmitted application denied?
A. No.
Q. So the resubmitted application was granted?
A. Correct. In a different format, a different form.
Q. Mr. Zeleny's resubmitted application was denied; true?
A. The -- I'm not sure he ever resubmitted an application. He made some -- he answered some questions, I believe, but not to the satisfaction of the departments and the City Attorney's Office.
Q. And so despite the revisions to the application, Mr. Zeleny's application was, again, denied; true?
A. Eventually, yes.
Q. Was that denial by the City Attorney's Office?
A. It was through the City Attorney's Office, yes.

Page 103

Q. Before Mr. Zeleny made the revisions to his application -- so now talking about the original application before he gave more information or revised it in some way. The original application, was that denied through the City Attorney's Office?
A. No, I don't believe so. The original application was originally denied through the Community Services Department.
Q. Who made the decision to deny it?
A. That was -- at that time, it was made by Matt Milde.
Q. Did the City departments listed in Step C of Exhibit 30 provide input to Mr. Milde to make his decision?
A. Yes.
Q. Did you provide input on behalf of the police department?
A. I -- yes, I did.
Q. What was your input to Mr. Milde?
A. My input was the concerns that have already been discussed regarding the Vehicle Code sections, Municipal Code sections that would be violated, the Penal Code sections that would be violated, and then on -- along with the public safety issues: Traffic, crowd control, et cetera; things I've talked about this

Page 104

morning.
Q. Did you make a directive or recommendation to Mr. Milde about whether to grant or deny the application?
A. I said as far -- from the police department perspective, from our department, that the -- as stated or as the -- as the application was written, that it should be denied.
Q. Do you know whether any other departments indicated -- strike that.
Do you know whether any other departments within the City suggested to Mr. Milde that the application should be denied?
A. Yes. I understand that there was also concerns from Transportation, which is in Public Works, regarding the -- the issue.
Q. Are you aware of any departments, other than police department and Transportation -- strike that.
The City Transportation Department is not one of the City entities listed, is it?
A. PW means Public Works, so Public Works engineering would be -- Transportation would be under that.
Q. So the -- you, on behalf of the police department, suggested that the application, in its

Page 105

original form, be denied, and the Public Works-Engineering department also suggested concerns; is that accurate?
A. Correct.
Q. Other than those two City entities, are you aware of any other entities that suggested that the application be denied?
MR. MASTER: You mean departments.
MR. ROBINSON: City departments.
Q. (By Mr. Robinson) Are you aware of any departments, other than those two, that suggested that the application be denied?
A. Not necessarily denied, but there was others that had concerns.
Q. In general, is it the process that the City departments provide input, and then Mr. Milde, at that time, at least, would make the ultimate decision?
A. Based on the department input, yes.
Q. If a department recommended that the permit be denied, would that cause the permit to be denied?
A. In most cases, yes.
Q. Were you the primary person, at the time of Mr. Zeleny's original application, responsible for the application in the police department?
A. I shared that responsibility with Sergeant

Ortega, but, eventually, I became the primary person.
Q. Why was that?
A. He retired.
Q. At that time, did Sergeant Ortega report to you?
A. At what time?
Q. At the time that Mr. Zeleny submitted his application in 2015.
A. 2015? Yes.
Q. You were his boss?
A. Yes.
Q. The reasons that you suggested to Mr. Milde that the application be denied are the same reasons we discussed this morning; correct?
A. Correct.
Q. When, in the process in dealing with Mr. Zeleny's permit application, did you refer it to the city attorney?
A. Not quite sure exactly when I sent it, but I think the -- I think by nature of Mr. Zeleny's mass e-mail, it may have been right away, because I believe he may have copied the city attorney.
(Exhibits 33 and 34 were marked for identification.)
Q. (By Mr. Robinson) Let's start with Exhibit 33.

And I'm just going to ask you, for the record, it's Bates marked MP1817 through 1821; correct?
A. Correct.
Q. Do you recognize Exhibit 33?
A. I do.
Q. What is it?
A. It is a Special Event Permit Application Frequently Asked Questions that I spoke about earlier.
Q. When -- going to the first page of this, under the heading "What Qualifies as a Special Event," when you received Mr. Zeleny's special event permit application, did you understand that it incorporated the use of a city street, sidewalk, or other right-of-way?
A. Well, it was the median. I'm not sure that would be considered a -- perhaps, maybe, the right-of-way.
Q. You discussed before the potential of people either obstructing the sidewalk or walking out -- jaywalking over the street to get to the median; correct?
A. Correct.
Q. Both of those things would involve either the use of a sidewalk or the use of a street; true?
A. Correct.
Q. So the permit application that Mr. Zeleny

submitted, in your view, would it satisfy the requirement of use of a city street, sidewalk, or other right-of-way?
A. Yes.
Q. We also talked about Mr. Zeleny's event being for an indefinite duration. Do you recall that?
A. Yes.
Q. Did you understand, based on the application, that Mr. Zeleny intended to stay at the site for multiple days?
A. I did not know what his intent was, but it said "indefinite."
Q. When you received it, did you understand the reference to "indefinite" to refer to more than one day?
MR. MASTER: Objection. This lacks foundation. Calls for speculation.
You can answer.
THE WITNESS: Indefinite means there's no ending time. That's the definition of indefinite.
Q. (By Mr. Robinson) Okay.
So we're on the same page that interpreting the term "indefinite," in your view, it means multiple days with no fixed end day?
A. It means forever to me.
Q. Okay.

So if you go down to the second-to-last bullet point, "Events occurring for more than one day," Mr. Zeleny's proposed event would satisfy that criteria --
A. Yes.
Q. -- true?
It would require a permit on that basis; right?
A. Yes.
Q. You were familiar with Mr. Zeleny's protests prior to his filing a permit application.
A. Yes.
Q. Those protests involved carrying of unloaded firearms; correct?
A. In the past, yes.
Q. In your view, as an official with the Police Department of the City of Menlo Park, did you believe that a police presence was necessary during Mr. Zeleny's previous protests?
A. Yes.
Q. Did you think a police presence was required for the entertainment event or the special event that he proposed putting on through his permit application?
A. If it was -- yes, there would have been a police presence.
Q. So the last bullet point there, "Events needing

police regulation, monitoring, or control," in your view, the event that Mr. Zeleny filed his application for satisfied that criteria; correct?

A. Yes.

13:23 Q. So to summarize, at least three of these bullet points would be triggered by Mr. Zeleny's proposed special event permit; correct?

A. Yes.

Q. And under the definition set out in the FAQ, if 13:24 an event meets any one of these criteria, it qualifies as a special event requiring a permit; true?

A. Requires you to complete a special event application.

Q. Is the City -- is the definition in this FAQ of 13:24 what qualifies as a special event the City's definition of a special event?

A. Yes.

Q. So under this -- at least under the published FAQ, Mr. Zeleny's event would qualify as a special event 13:24 on at least three criteria; correct?

A. Yes.

Q. Let me have you turn to the page that's marked MP1820. There's the section titled "What would cause a permit to get denied?"

13:25 Do you see that?

A. Yes.

Q. Under that heading, are the criteria listed some of the criteria that would be considered in granting or denying a special event permit?

13:25 A. I'm sorry. Say that again.

Q. Are the criteria listed or the factors listed under the heading "What would cause a permit to get denied?" the factors that the City considers in deciding whether to grant or deny a permit application?

13:25 A. Well, it's answering the question: What would cause a permit to get denied? and gives some examples of common factors why permits would be denied.

Q. Are the factors listed there, in your knowledge and experience as the person most qualified on behalf of 13:25 the City, some of the factors that would cause a permit to be denied?

A. Yes.

Q. Are there other factors?

A. Yes.

13:26 Q. What are the other factors?

A. Other factors would be those that had to deal with already-in-place municipal codes, county ordinances, state laws, federal laws, et cetera.

Q. Other than the factors listed here and 13:26 compliance with laws and regulations and ordinances, are

there any other factors that you're aware of that could cause a permit to be denied?

A. From the police department's perspective, public safety would also be a reason why it could be 13:27 denied.

Q. Does the police department determine, in connection with permit applications, whether the proposed event poses a risk to public safety?

A. Correct.

13:27 Q. Beyond public safety in general, are there any specific criteria that you consider?

A. Other than what's been discussed, none that I could recall right now.

Q. Other than the permit application itself and 13:27 this FAQ that we're looking at, are you aware of any other written document available to the public that lists the factors considered in granting or denial of an application?

MR. MASTER: Objection. Asked and answered.

13:28 Go ahead.

THE WITNESS: There's the application itself on the website, and what the website says itself, which I see is Exhibit 34.

Q. (By Mr. Robinson) You anticipated my next 13:28 question. Exhibit 34 is two pages, MP1830 and 1831;

correct?

A. Yes.

Q. This is the special event permit website?

A. That is correct.

13:28 Q. Does the website accurately describe the process and qualifications for special events?

A. Yes.

Q. If you could turn to the last page, please. There's a reference at the very bottom -- maybe it's not 13:29 the bottom; about a third of the way down the physical page, there's a reference to "film permits."

Do you see that?

A. Yes.

Q. To your knowledge, does -- strike that.

13:29 As the person most qualified on behalf of the City of Menlo Park, does the City have any written criteria for grant or denial of film permits?

A. Yes.

Q. Where are those criteria?

13:29 A. They are available from the Department of Public Works in the form of an FAQ, frequently asked questions, and also an encroachment permit.

MR. ROBINSON: Sorry. Could we go off for 30 seconds.

13:29 THE VIDEOGRAPHER: We are now going off the

Page 114

record. The time is 1:29 p.m.
(Recess taken from 1:29 p.m. to 1:30 p.m.)
THE VIDEOGRAPHER: We are now going back on the record. The time is 1:30 p.m.
13:30 MR. ROBINSON: Okay.
Why don't we go ahead and mark that as Exhibit 35, please.
(Exhibit 35 was marked for identification.)
**Q.** (By Mr. Robinson) Chief Bertini, do you
13:31 recognize Exhibit 35?
**A.** I do.
**Q.** For the record, it's two pages, MP5241 and 5242; correct?
**A.** Correct.
13:31 **Q.** Is this the FAQ that you just mentioned?
**A.** Yes.
**Q.** We'll get into the encroachment permit later on, but this -- basically, this document that we're looking at, Exhibit 35 and then the encroachment permit,
13:31 those are the two documents that are available that list the criteria considered by the City in granting or denying a film permit; correct?
**A.** Correct.
**Q.** Are there any other criteria that you're aware
13:32 of, beyond what's set out in Exhibit 35 or in the

Page 115

encroachment application?
**A.** No.
**Q.** How many film permits -- strike that.
When did the City put a film permit process in
13:32 place?
**A.** In the time frame of 2006, 2007.
**Q.** How many film permit applications have been filed since 2006, 2007?
**A.** I don't know the exact number.
13:33 **Q.** Is it in the hundreds?
**A.** For the last --
**Q.** Why don't we narrow the time frame. Let's say from 2013 to today, approximately how many permits?
**A.** I would say two dozen.
13:33 **Q.** Is that applications or issued permits?
**A.** Applications.
**Q.** Of those approximately two dozen, could you estimate how many were denied?
**A.** I don't know.
13:33 **Q.** Have you been involved in the grant or denial of any -- strike that.
Have you been involved in the process of considering film permit applications?
**A.** Yes.
13:34 **Q.** On how many occasions?

Page 116

**A.** Probably, maybe, six or seven times.
**Q.** Is that in the same time frame, from 2013 to today?
**A.** Correct.
13:34 **Q.** Why -- why do you become involved in film permit application processing?
**A.** The Public Works Department, when they receive a film permit application, circulates it to -- just like the special events, circulates to all the departments
13:34 that may be affected. One of those is the police department. And, normally, the film permit and encroachment permit is forwarded to the police department, along with other departments, to determine whether or not the permit is something that is -- can
13:35 be -- can be done, can be approved, and if so, would there be any mitigating circumstances that would need to be in place.
**Q.** Who makes the ultimate decision for the City about whether to grant or deny a film permit?
13:35 **A.** The Public Works Department.
**Q.** Stepping back for a second, did the police department handle Mr. Zeleny's request for a special events permit?
MR. MASTER: Objection. Asked and answered.
13:35 Vague and ambiguous as to "handled."

Page 117

You can answer.
THE WITNESS: We were one of the departments that had a hand in examining the permit.
**Q.** (By Mr. Robinson) Did you have a hand, the
13:36 police department, in the ultimate decision?
MR. MASTER: Of what? Hold on. Decision of what?
**Q.** (By Mr. Robinson) You can go ahead and answer.
MR. MASTER: No. It's vague and ambiguous.
13:36 It's overbroad. It's also been asked and answered.
Why are we going through this again?
MR. ROBINSON: Counsel, I've asked you a number of times before we broke to stop giving speaking objections and speeches on the record. I'm going to
13:36 renew my request that you stop giving speaking objections and speeches on the record.
MR. MASTER: And I'm going to renew my request for you to stop repeating the same questions over and over again, as the record will clearly demonstrate.
13:36 You can answer. But sometime soon, we're going to stop this. Go ahead.
THE WITNESS: Are you speaking of the special event permit?
**Q.** (By Mr. Robinson) Correct.
13:36 **A.** Okay.

have no knowledge of exactly where or when.

Q. At any point, are you aware of any instance during Mr. Zeleny's protests where he engaged in any form of violence against anyone?

14:00 A. In Menlo Park?

Q. Ever. In any of the protests that you're aware of?

A. I'm not aware.

Q. You're not aware of any instance?

14:00 A. I'm not aware of it being -- I'm not aware of it personally, no.

Q. Are you aware, through any other source, of Mr. Zeleny ever behaving in a violent manner in any of his protests?

14:00 A. I'm not aware of any, no.

Q. What types of materials do you keep in your file on Mr. Zeleny?

A. Copies of police reports; many times, I would print out copies of e-mails that were sent back and

14:01 forth between Mr. Zeleny and the City; relevant statutes that applied, correspondence I may have received from other -- other law enforcement agencies or government agencies.

Q. Did you produce your personal file on

14:01 Mr. Zeleny in this litigation?

A. Yes.

Q. Does your personal file on Mr. Zeleny contain a copy of California Penal Code 313.1?

A. Yes.

14:01 Q. Is that one of the statutes that you considered might apply to Mr. Zeleny's protests?

A. Yes.

Q. Was that consideration based on the cartoons or animations that Mr. Zeleny had displayed or suggested

14:01 that he would display?

A. Yes. That were later -- yeah. That was later sent to us, yes.

Q. We're talking about the animation of cartoons having sex with each other; right?

14:02 A. Yes.

Q. And you believed that Penal Code 313.1 might apply to that animation; correct?

A. I believe that it may apply, yes.

Q. Why did you believe that it could apply -- may

14:02 apply to that animation?

A. Because if a -- if the display or if the image was displayed, and there was a complaining victim, in other words, a child observed it and a parent reported it to us, then it could, in fact, be a violation of the

14:02 Penal Code.

Q. Are you still of the view that that animation that we're talking about could be a violation of the Penal Code if there were a child present and a complaining victim? You still believe that?

14:02 A. It could be. That would be a -- that would be a question of the Courts.

MR. ROBINSON: Why don't I ask that we mark this as 37.

(Exhibit 37 was marked for identification.)

14:03 Q. (By Mr. Robinson) For the record, Exhibit 37 is two pages, MP5277 to 5278; correct?

A. Yes.

Q. Is this a copy of Penal Code 313.1 that was in your file on Mr. Zeleny?

14:03 A. Yes.

MR. ROBINSON: And why don't we go ahead and mark this as Exhibit 38.

(Exhibit 38 was marked for identification.)

Q. (By Mr. Robinson) For the record, Exhibit 38

14:04 is one page MP5282; correct?

A. Yes.

Q. This is another document that was contained in your file on Mr. Zeleny; correct?

A. Yes.

14:04 Q. This is a still image of -- Exhibit 38 is a

still image of the animation that we've just been talking about; right?

A. Correct.

Q. And was it your view, at the time that

14:04 Mr. Zeleny filed his permit application for a special event permit, that the image reflected -- the animation that's shown in Exhibit 38 could be obscene as to minors?

A. It could be.

14:04 Q. Did you take that position in a public hearing related to Mr. Zeleny's permit application?

A. Yes. I stated it could be.

Q. Do you have a view, one way or another, at this point, about whether it is obscene as to minors or not?

14:05 A. It is actually -- as a police officer, I'm unable to have my peace disturbed, nor be offended, so I have no personal -- I have -- personally, I can't be offended, so it would not be up to me whether it's offensive or not. It would be up to a Court.

14:05 Q. When you say you can't be offended, what do you mean?

A. In other words, I can't be the victim.

Q. Okay.

In your capacity as an individual witness, is

14:05 the image offensive? Not asking in your capacity as a

Page 138

police officer, but as an individual witness in this case, is the animation that's reflected in Exhibit 38 offensive?
MR. MASTER: Objection. Vague. Ambiguous.
14:05 Confusing. Overbroad. Calls for speculation.
If you can answer it.
THE WITNESS: For an adult, perhaps not; for a child, yeah.
Q. (By Mr. Robinson) Have you received feedback
14:06 from anyone, either in the government in the City of Menlo Park or the community of Menlo Park, that the animation reflected in Exhibit 38 is offensive?
MR. MASTER: Same objection. Vague and ambiguous.
14:06 THE WITNESS: No.
Q. (By Mr. Robinson) Do you personally find it offensive?
MR. MASTER: Objection. Asked and answered.
Don't answer that.
14:06 We're done with this. He's already answered that question.
MR. ROBINSON: You're instructing him not to answer?
MR. MASTER: Absolutely.
14:06 Q. (By Mr. Robinson) Are you going to follow your

Page 139

attorneys instruction not to answer?
A. Yes.
Q. In Mr. Zeleny's permit application process, you acted as a spokesperson for the City in the hearing with
14:06 the city manager; correct?
A. For the special events permit?
Q. Correct.
A. Yes.
Q. And one of the issues that you raised in that
14:07 application process was that this image and the associated animation might be obscene as to minors; correct?
A. It could be, yes.
Q. Have you formed any view, in your capacity as
14:07 the Chief of Police of Menlo Park, about whether the image is offensive?
MR. MASTER: Objection. Asked and answered.
Go ahead one more time.
THE WITNESS: As I stated, no.
14:07 Q. (By Mr. Robinson) Who would make the decision about whether to charge Mr. Zeleny with obscenity as to minors related to the animation?
A. District Attorney's Office.
Q. Is there someone in the City of Menlo Park that
14:07 would make a decision about whether to refer it for

Page 140

prosecution?
A. Any police officer.
Q. Looking at Exhibit 37, in Clause A, there's a reference to "harmful matter to the minor."
14:08 Do you see that?
A. Yes.
Q. What is your understanding of material that would be considered harmful as to the minor? Is there any more concrete definition than that?
14:08 MR. MASTER: Just object to the extent it calls for a legal conclusion and speculation.
You can answer.
THE WITNESS: I believe if you were to look up the jury instruction, there would be another definition
14:08 of that.
Q. (By Mr. Robinson) It refers to matter that is summarized -- "invokes the prurient interests"; correct?
A. That's one of the criteria.
Q. But did the City of Menlo Park ever reach a
14:08 determination about whether the animation associated with Exhibit 38 appeals to a prurient interest?
A. That's -- that's not our purview. That's not our job to do, so the answer is no.
MR. MASTER: Damion, is now a good time for a
14:09 break? We've been going about an hour.

Page 141

MR. ROBINSON: Yeah.
MR. MASTER: Is now a good time?
THE VIDEOGRAPHER: We're now going off the record. The time is 2:08 p.m.
14:20 (Recess taken from 2:08 p.m. to 2:20 p.m.)
THE VIDEOGRAPHER: We are now going back on the record. The time is 2:20 p.m.
Q. (By Mr. Robinson) Was the possibility of Mr. Zeleny's animation being obscene as to minors a
14:20 factor that was considered by the City in connection with his special event permit application?
A. It did not come up until the appeal, because that's when we were looking -- we found the animation that he was proposing to use.
14:21 Q. And in the appeal process, was it considered a factor in deciding whether or not to uphold the denial of the permit application?
A. My understanding, that it was not one of the denial points that was made by the city manager's
14:21 decision.
Q. It was a factor that was raised in the city manager meeting; correct?
A. Yes.
Q. It was raised by you; right?
14:21 A. Yes.

Q. At the point that you raised it in that meeting, you had not reached a determination about whether it was actually obscene as to minors?
A. I cannot reach that determination.
14:21 Q. And you hadn't reached such a determination at the time you raised it as a potential reason to uphold the denial; correct?
MR. MASTER: Objection. Asked and answered.
THE WITNESS: I cannot make that determination.
14:22 That would have to be made by a jury.
Q. (By Mr. Robinson) I understand that you can't make the determination. My question was whether, at the time you raised it as a possible basis to uphold the denial of Mr. Zeleny's permit application, you had no
14:22 view about whether it was or was not obscene as to minors? I'm just trying to verify that that's accurate.
A. Yes.
Q. So you raised it as a basis to uphold the denial, despite the fact you had no view about whether
14:22 it was obscene as to minors or not; correct?
A. I am -- it's not my purview to say whether it's going to be obscene or not; it's a jury. But I raised it as a factor for the city manager to consider.
Q. The reason that you raised it as a factor is
14:22 that you believed it was a factor that could support

affirming the denial of his permit application; correct?
A. That it could go towards the city manager's decision-making process in the situation.
Q. Did you think it was a factor in favor of
14:23 granting him a special event permit?
A. No.
Q. Did you think it was a factor that potentially weighed in favor of denying his special event permit application?
14:23 A. Yes.
MR. MASTER: Sorry. It beeped, so I'm just showing him the phone.
THE WITNESS: Okay. Thank you.
MR. ROBINSON: Okay.
14:23 Why don't we mark this as Exhibit 39?
(Exhibit 39 was marked for identification.)
Q. (By Mr. Robinson) For the record, Exhibit 39 is three pages, MP5141 through 5143; correct?
A. Yes.
14:24 Q. Do you recognize Exhibit 39?
A. I have seen it, yes.
Q. Is it part of your personal file on Mr. Zeleny?
A. Yes.
Q. Do you recognize it to be a printout of a
14:24 portion of Mr. Zeleny's website; true?

A. Yes.
Q. Subrah.com. You're aware of that website; right?
A. I'm not.
14:24 Q. How did you -- strike that.
How did Exhibit 39 make its way into Mr. Zeleny's file?
A. I'm not sure.
Q. Do other people have access to your personal
14:24 file on Mr. Zeleny?
A. No.
Q. When you looked at your personal file for purposes of producing documents in this case, Exhibit 39 was in your file; right?
14:24 A. Yes.
Q. You just don't know how it got there.
A. Correct.
Q. Had you seen it before collecting documents for production in this case?
14:25 A. I don't have independent recollection, as I sit here today, that I saw it before, but it was in my file, so I assume that I'd seen it before.
Q. Have you, as part of your work for the City of Menlo Park Police Department, looked at Mr. Zeleny's
14:25 website?

A. I have not.
Q. Has someone else, to your knowledge, at the City of Menlo Park done that?
A. Yes.
14:25 MR. MASTER: Whoa, whoa, whoa. Time out. Question-answer.
THE WITNESS: Got it. Sorry.
Q. (By Mr. Robinson) Has someone else, within the City of Menlo Park, looked at Mr. Zeleny's website for
14:25 job-related purposes?
A. Yes.
Q. Who is that person?
A. There were several detectives that did open source research into Mr. Zeleny while he was conducting
14:25 his protests in Menlo Park.
Q. By "open source research," you mean research of publicly available information; correct?
A. Yes.
Q. Did you direct anyone within the City of Menlo
14:26 Park to do that type of research?
A. No.
Q. To the best of your knowledge, how many detectives have been involved in investigative activities to Mr. Zeleny?
14:26 A. I would say four to five, four to six.

is 4:29 p.m.

(Whereupon, the videotaped deposition of CHIEF DAVE BERTINI, Volume I, concluded at 4:29 p.m.)

DECLARATION OF WITNESS

I hereby declare I am the deponent in the within matter; that I have read the foregoing deposition and know the contents thereof, and I declare that the same is true of my knowledge except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe them to be true.

I declare under the penalties of perjury of the State of California that the foregoing is true and correct.

Executed this ______ day of ________________,

201___, at ______________________, _________.
(City) (State)

I, HEATHER J. BAUTISTA, CSR No. 11600, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness declared under penalty of perjury; that the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed under my direction and supervision;

That the foregoing is a full, true, and correct transcript of my shorthand notes so taken and of the testimony so given;

( ) Reading and signing was requested.

( ) Reading and signing was waived.

(XX) Reading and signing was not requested.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated: March 31, 2019

HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

MICHAEL ZELENY,

Plaintiff,

vs. Case No. CV 17-7357 JCS

GAVIN NEWSOM, et al.,

Defendants.

______________________________/

Pages 278 - 286 ARE CONFIDENTIAL AND BOUND SEPARATELY

Pages 310 - 324 ARE CONFIDENTIAL AND BOUND SEPARATELY

CONTINUED VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

BY VIDEOCONFERENCE

(Volume II - Pages 229 to 534

Taken before DENISE M. LOMBARDO, CSR No. 5419

RPR, RMR, RDR, CRR

August 7, 2020

INDEX

PAGE

EXAMINATION BY MR. ROBINSON 236

WHEREUPON, THE DEPONENT WAS INSTRUCTED NOT TO ANSWER THE FOLLOWING QUESTIONS:

| PAGE | LINE |
|---|---|
| 237 | 11 |
| 262 | 17 |
| 273 | 10 |
| 273 | 16 |
| 274 | 3 |
| 449 | 18 |

Page 230

EXHIBITS

PLAINTIFF'S PAGE

Exhibit 250 City of Menlo Park Special Event Application, Bates No. MP 1938 through MP 1950 247

Exhibit 251 Defendant Dave Bertini's Second Supplemental Response to Plaintiff's Interrogatories 260

Exhibit 252 Agreement for Maintenance of State Highway in the City of Menlo Park, Bates No. MP 6656 through MP 6673 265

Exhibit 253 Test messages, Bates No. MP 6683 through MP 6688 269

Exhibit 254 Menlo Park Police Department letter dated January 1, 2010, Bates No. MP 5382 through MP 5388 287

Exhibit 255 E-mail correspondence, Bates No. MP 51 through MP 52 298

Exhibit 256 E-mail correspondence, Bates No. MP 5380 through MP 5381 301

Exhibit 257 (Confidential document) ---

Exhibit 258 Menlo Park Police Department CAD Incident Report, dated 2/27/2019, Bates No. MP 5095 through MP 5096 345

Exhibit 259 Menlo Park Police Department Felony Report 12-1825, Bates No. MP 170 through MP 179 354

Exhibit 260 Menlo Park Police Department General Case Report 12-1596, Bates No. MP 1858 through MP 1866 360

Page 231

EXHIBITS (cont'd)

PLAINTIFF'S PAGE

Exhibit 261 E-mail correspondence, Bates No. MP 219 through MP 221 365

Exhibit 262 E-mail correspondence, Bates No. MP 258 through MP 260 385

Exhibit 263 E-mail correspondence, Bates No. MP 296 through MP 300 399

Exhibit 264 Menlo Park Police Department Agenda Items, September 2, 2015, Bates No. 5326 through MP 5337 405

Exhibit 265 E-mail correspondence, Bates No. 345 through MP 350 411

Exhibit 266 E-mail correspondence, Bates No. NEA_Subpoena 37 416

Exhibit 267 E-mail correspondence, Bates No. MP 451 through MP 456 435

Exhibit 268 E-mail correspondence, Bates No. MP 473 through MP 476 457

Exhibit 269 Letter dated September 12, 2016, Bates No. MP 948 through MP 951 466

Exhibit 270 E-mail correspondence, Bates No. MP 883 through MP 886 470

Exhibit 271 E-mail correspondence, Bates No. MP 1195 through MP 1205 471

Exhibit 272 E-mail correspondence, Bates No. MP 1290 through MP 1299 501

Exhibit 273 E-mail correspondence, Bates No. 1415 through MP1426 507

Page 232

CONTINUED VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

BE IT REMEMBERED, that pursuant to Notice, and on the 7th day of August 2020, commencing at the hour of 10:05 a.m., before me, DENISE M. LOMBARDO, a Certified Shorthand Reporter, appeared by videoconference CHIEF DAVE BERTINI, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

---o0o---

APPEARANCES:

Appearing on behalf of the Plaintiff:

DAMION ROBINSON (by Zoom)
DAVID MARKEVITCH (by Zoom)
Affeld Grivakes LLP
2049 Century Park East, Suite 2460
Los Angeles, California 90067
(310) 979-8700

Page 233

Q. Was there a team within the City of Menlo Park responsible for putting in place this new special event process?
A. Yes.
Q. Who was on that team, to your knowledge? 02:14
A. The people that are listed in the e-mail.
Q. So you were on the team that was involved in developing the new process?
A. I was on the -- I wasn't on the team per se, but I was asked for opinions about the process, 02:14 as I had brought up issues about past permits that had been given for certain events, like birthday parties that were closing down streets. So I was -- although not on the committee per se, I was asked for my opinion as the police commander. 02:15
Q. Was Sergeant Kaufman on the committee?
A. Yes. She was our representative on the committee.
Q. Was Mr. Zeleny ever discussed in connection with setting up this new special event 02:15 process?
A. No, never.
Q. Do you know when the new special events process was first published on the City's website?
A. I don't recall. 02:15

Q. Are you aware of any changes to the City's website, as related to special events permits, during Mr. Zeleny's prosecution?
A. Not that I'm aware of.
Q. I'm going to go ahead and take a look 02:15 at -- I'm copying a document to the "Marked Exhibits" folder. The document name is "Special Events Flowchart," Exhibit 30.
A. I see it.
Q. This was previously marked at your prior 02:16 session of the deposition. But you recognize this to be the flowchart for how special events permits are handled within the City of Menlo Park; correct?
A. Correct.
Q. And it looks like this version, if you go 02:17 to the last page at the very bottom, was updated July 24, 2014?
A. That's what the document says.
Q. Has the process reflected in this flowchart been the process in place since 2014? 02:17
A. I don't know.
Q. Reviewing this document, is it consistent with how the process is handled currently?
A. I don't know the answer to that. Many of these people who are on here don't work for the 02:17

City of Menlo Park anymore.
Q. Was this the process that was in place when the City was processing Mr. Zeleny's permit application?
A. To the best of my recollection, it was. 02:17
Q. I'm going to -- I'm going to now open another previously marked exhibit. So I've added a new document, "Special Events Permit FAQ." It looks like this was previously marked as Exhibit 33 in your prior deposition. 02:18
A. It's at the bottom of the list. I do see it now.
Q. Is this the City's published frequently asked questions for the special events permit process? 02:19
A. As of the time it was printed, yes.
Q. Was this the FAQ at the time of Mr. Zeleny's application?
A. To the best of my recollection -- well, this document was updated July of 2016. So I'm not 02:19 sure which document -- FAQs were up on the website at the time of the -- of his application.
Q. So let's go to MP 1820, if you could.
A. Okay.
Q. Under the section "What if my permit is 02:19

denied," it says, "Determination of the approval or denial of any application is at the discretion of the special event permit committee."
Do you see that?
A. Are you talking, like, the last paragraph? 02:20 "What if my permit is denied?"
Q. Correct.
A. I see that.
Q. Was it true, at the time that Mr. Zeleny applied for a special event permit, that the 02:20 approval or denial of his permit was at the discretion of the special event permit committee?
A. Yes.
Q. What limits were there on the discretion of the special event permit committee to approve or 02:20 deny Mr. Zeleny's application?
MR. MASTER: Objection. Vague and ambiguous. Overbroad. Lacks foundation. Calls for speculation.
You can answer. 02:21
THE WITNESS: If I -- you need to repeat that question. I didn't get it.
BY MR. ROBINSON:
Q. Let me ask a slightly different question.
Were there any written policies that 02:21

you're aware of that governed how the special event permit committee would exercise its discretion on permit applications?

MR. MASTER: Objection. Vague and ambiguous. Overbroad. 02:21

You can answer.

THE WITNESS: The documents all speak for themselves. We've provided all the documents that would be involved in this decision-making process.

BY MR. ROBINSON: 02:21

Q. Are there any -- other than the documents you've provided, are there any other guidelines governing how the special event permit committee would exercise discretion as to special event permits during the period that Mr. Zeleny was 02:21 applying for a permit?

A. Well, certainly there would be other -- other laws, whether they be local, state, federal laws, that could impact whether or not the special events committee were to deny or approve, and those 02:22 would be, you know, written. There's no unwritten rules as far as this goes, but, again, it's really based on a case-by-case basis.

Q. When this -- this document refers to a special events permit committee. What was that 02:22

committee?

A. It was -- it's a representative from each department in the City.

Q. And how are the representatives selected to serve on that committee? 02:22

A. By the departments themselves, by the department head or me.

Q. Were you ever on the special events permit committee?

A. As I stated already, I was not on the 02:23 committee itself, but I was -- I did give input to the original committee that was putting together the criteria for special events permits.

Q. We talked a lot last time about what qualifies as a special event. Do you recall that? 02:23

A. I do.

Q. Who makes the decision, in reviewing a permit application, about whether the event is a special event?

A. Normally, it would be the special events 02:23 committee.

Q. That's the group of people from each department?

A. Correct.

Q. Who in that group, if anyone, decided that 02:23

Mr. Zeleny didn't qualify for special events?

MR. MASTER: Objection. Vague and ambiguous.

MR. ROBINSON: Let me ask you a different question. 02:23

BY MR. ROBINSON:

Q. At some point, the City determined that Mr. Zeleny's permit didn't qualify as a special event; correct?

A. Correct. 02:24

Q. Who made that determination for the City?

A. That was the city attorney's office.

Q. How did the city attorney's office get involved in Mr. Zeleny's permit application?

A. Because they are also a City department, 02:24 and there were legal questions that needed to be answered and legal advice that needed to be given. So we went to the -- our legal advisors, who are the city attorneys.

Q. Are you aware of any other permit 02:24 applications where the city attorney's office has been consulted?

A. I'm aware of a few.

Q. Can you estimate how many?

A. Less than six. 02:24

Q. Let's take a look at -- before we go on, actually, do you know who first contacted the city attorney's office to get feedback on Mr. Zeleny's permit application?

A. I don't recall who contacted them first. 02:25

Q. So I've added a previously marked exhibit. The name is 1507170 Zeleny Initial Application, 95. It's a document that was previously marked as Exhibit 95.

Has it come up on your screen yet? 02:26

A. Not yet. Okay. I got it. 1507170?

Q. Correct.

A. Okay.

Q. For the record, it's multiple pages, MP 234 through MP 240; correct? 02:26

A. Yes.

Q. Do you recognize this?

A. I recognize it as an e-mail with a special events application attached.

Q. The e-mail is an e-mail from Mr. Zeleny; 02:26 correct?

A. Well, I don't know who that e-mail address belongs to, but it says "on behalf of Michael Zeleny."

Q. Okay. And if you go to page MP 236, it 02:27

Q. More than five?
A. I don't know.
Q. Let's focus on the second paragraph, the second substantive paragraph of the letter here. The second two -- the last two sentences -- there's 03:46 a paragraph starting at 352 at the bottom, carrying over to 353.
Mr. McClure writes: "To the contrary, you are proposing a 'media production' of a one-man protest." 03:47
Do you see that?
A. Yes.
Q. Is there any written policy or guideline or criteria at the City of Menlo Park that a media production of a one-man protest does not qualify as 03:47 a special event?
A. I'm not aware of any.
Q. In granting or denying special event permits, is the City allowed to consider factors outside of the specific written policy? 03:47
A. Time, manner, place.
Q. Is it permitted to consider time, manner and place requirements outside of the written policy?
A. Yes. 03:47

Q. Are those time, place and manner requirements catalogued anywhere?
A. They would have to do with applicable laws that needed to be followed. As I stated before, whether they be local, state or federal, numerous 03:48 laws may apply to these type of situations, and that's one of the things that would have to be looked at.
Q. So if -- in the next paragraph down from there, Mr. McClure writes at the end: "Another 03:48 concern is that it is illegal to open carry a firearm in the State of California. As you've described the proposed event, there does not appear to be any logical nexus for legitimate purpose of carrying a firearm." 03:48
Do you see that?
A. Yes.
Q. Is that one of the factors that the City considered in denying Mr. Zeleny's permit application? 03:48
A. I believe the document speaks for itself. That's what the city attorney wrote.
Q. Was that one of the bases for denying the application?
A. I don't know. I don't believe it was a 03:49

basis for denying it, but it was a concern because the laws had changed, and you could no longer openly carry rifles and handguns in the state of California.
Q. How does the City determine whether 03:49 there's a logical nexus to the event?
MR. MASTER: Objection. Vague and ambiguous. Overbroad. Calls for a legal conclusion.
Go ahead. 03:49
THE WITNESS: As I did not author this letter, I don't know.
BY MR. ROBINSON:
Q. Does the City have a written or unwritten standard for determining whether there's a logical 03:49 nexus between carrying firearms and the event?
A. No, except that it's illegal to do so.
Q. I don't want to cover ground that we covered last time, but if Mr. Zeleny were given the permit that he was asking for, it would have been 03:50 legal to carry the firearms; correct?
A. Well, that's the question we were trying to get answered through the Department of Justice, the district attorney's office, et cetera. Because that law is very vague, we were trying to determine 03:50

whether that's true or not. And as it stands today, our reading of that exception is, yes, if he was permitted under the -- under the special events or film permit, then he could openly carry weapons.
Q. When did you come to that view, that he 03:50 could openly carry with a permit?
A. After -- after having discussions, again, with the Department of Justice, with the DA's office and the city attorney's office.
Q. Who at the City decides whether there's a 03:50 logical nexus between the carrying of firearms and the event?
A. Again, I did not author that. I did not say those words, so I don't know what he meant by that. 03:51
Q. Okay. Is it the city attorney's call about whether there's a logical nexus?
A. I don't know.
Q. Who at the City determines whether there was a legitimate purpose in carrying the firearm? 03:51
A. Again, I did not authorize this letter. I did not say those words. So I don't have an answer for you.
Q. As a matter of policy at the City of Menlo Park, was Zeleny required to have a logical nexus 03:51

between the carrying of firearms and his protest in order to get a permit?

MR. MASTER: I'll object. The question calls for a legal conclusion. Lacks foundation. Calls for speculation. It's also vague and ambiguous and overbroad. 03:51

If you know.

THE WITNESS: Again, you could ask it as many ways as you would like, Counselor. I don't know the answer. I did not write this statement. I don't know what he meant by that. 03:52

BY MR. ROBINSON:

Q. My question was directed towards the City's policies and whether this logical-nexus issue is in the City's policy, whether written or unwritten. 03:52

A. I did not see that, but the only thing from my perspective in reading this, it had to do with state law more than City policy.

Q. Now, the last paragraph of Mr. McClure's letter says, "If you wish to appeal this denial of your application, you must appeal the denial to the City's Special Event Permit Committee." 03:52

Do you see that?

A. I do. 03:52

Q. In the ordinary course of a permit application, the special events permit committee makes the initial decision; right?

A. In the normal course for a typical application, certainly. 03:53

Q. And appeals -- the special event permit committee doesn't hear appeals; does it?

A. The special event committee -- no, they would hear an appeal, and then it would go to the department director of the community services division or department. 03:53

Q. Okay. So Mr. Zeleny appealed the denial of his permit; right?

A. Was that a question, did he?

Q. Did he. 03:53

A. Yes.

Q. And he went through all of the layers of the City appeals process; correct?

A. As far as I recollect, yes.

Q. What are the layers of the City appeals process? 03:53

A. From the permit committee to the director of the community services department to the city manager to the city council.

Q. Let's focus on the first level of review 03:54

that you're talking about, the first level of appeal to the permit committee. What is the -- what is the standard that they apply to review it? Do they make an independent decision or do they consider the decision made by the original person? How does that work? 03:54

A. Of course, they would look at all the factors involved, just like any appeal, to see whether there was more information that could be gleaned from the applicant or whether they wanted to overturn the appeal. And then they would render the decision. 03:54

Q. All right. Do they have hearings at that level of appeal --

A. No. 03:55

Q. -- special permits?

A. No.

Q. Do they -- do they take in evidence at that level of appeal?

A. Aside from the documents that are already submitted -- it's not a formal judicial hearing. It's just a group that is looking at an application denial. 03:55

Q. Is any of this appeal process written down anywhere, in City ordinance, in the policies or 03:55

anywhere else?

A. To the best of my recollection, I believe it is in City ordinances, the appeal process, because ultimately the city council is the final arbiter at the City level. 03:55

Q. Are you aware of any appeals of denial of the special events permits that occurred before Mr. Zeleny's appeal?

A. No.

Q. Let's talk about the second layer, so the appeal to the director of community service. In the ordinary process, how did the director of community service review an appeal? Is it independent consideration, or is it limited to review of the materials that were submitted originally? 03:56

A. Again, it would be something very informal. It's not a judicial hearing. The director would look at the information. If the director wished to recontact the applicant, they could do that. And then they would make their decision based on the information they have. 03:56

Q. The next level of appeal is the city manager; is that right?

A. Correct. 03:56

Q. And that level of appeal involves a hearing; right?
A. That's correct, an informal hearing.
Q. And both the City staff and the applicant participate in that hearing? 03:57
A. Correct.
Q. And then there's an appeal to the city council; right?
A. That's correct.
Q. And that also involves a hearing? 03:57
A. Informal hearing, yes.
Q. And that's a public hearing, correct, at a city council meeting?
A. That's correct.
MR. ROBINSON: We've been going almost 03:57 another hour. Why don't we take a quick, like, five-minute break here.
MR. MASTER: How much time do you have left, Damion?
MR. ROBINSON: It's a good question. I'm 03:57 going to probably use the full time that we have available. There's still a lot to cover.
THE VIDEOGRAPHER: Going off the record. The time now is 3:58.
(Off the record.) 03:58

THE VIDEOGRAPHER: Back on the record. The time now is 4:06.
(Plaintiff's Exhibit 267 marked for Identification.)
BY MR. ROBINSON: 04:06
Q. So I just introduced another exhibit. Let me know if that one has shown up for you.
A. Which number?
Q. So it's marked as 267. Has that shown up yet? 04:06
A. Yes.
Q. So as you'll see on the first page, this was previously marked as 103. Do you see that, Milde 103?
A. I do. 04:07
Q. So let's refer to it as Exhibit 103 for consistency. Exhibit 103 is Bates marked MP 451 through MP 456; correct?
A. Yes.
Q. This is a series of e-mails relating to 04:07 Mr. Zeleny's special events permit; right?
A. Correct.
Q. And the very top e-mail, the last e-mail in this chain, was from you to Matt Milde, Cherise Brandell and -- is it Robert Jonsen? 04:07

A. Yes. He was the police chief at the time.
Q. Okay. So in your -- in this e-mail -- go ahead and review it, but it relates to Mr. Zeleny's appeal of his denial of his permit application; correct? 04:08
A. Yes.
Q. And Mr. Milde was in the community services department; right?
A. Yes.
Q. And the community services department is 04:08 primarily responsible for handling special event permits; right?
A. Right.
Q. And in your e-mail, you instructed Mr. Milde not to respond to Mr. Zeleny; correct? 04:08
A. Correct.
Q. When you said "stand by for our response," who is the "our" that you were referring to?
A. That would be a response in conjunction with the city attorney's office so we could, in 04:08 fact, correctly give the -- Mr. Zeleny the appeals process and how it would go forward.
Q. Did you consult with the city attorney's office at that time?
A. Yes. 04:09

Q. Did the City eventually respond to Mr. Zeleny?
A. To my recollection, yes.
Q. In his e-mail -- in Mr. Zeleny's e-mail, appealing the denial of his permit application, it 04:09 starts on 451 and carries over through the end of the document. I want to focus on the third paragraph of that e-mail.
A. The one about the First Amendment?
Q. No. "As to your claim that my application 04:09 is incomplete."
A. Okay.
Q. So Mr. Zeleny says he is attaching a map of the area in question. Do you see that?
A. Yes. 04:10
Q. Do you recall seeing a map of the area that Mr. Zeleny planned for his event?
A. I recall a map, but I don't remember whether it was involving the special events permit or the preliminary permit. 04:10
Q. Do you recall whether the city believed, after receiving this e-mail from Mr. Zeleny, that his application was still incomplete?
A. I would just refer to the documents that were -- that were submitted, that stated each of 04:10

Q. Does the city attorney have authority to approve or deny permit applications?
A. Certainly.
Q. Did you believe that Mr. Zeleny's renewed permit application should be denied? 04:27
A. My -- my belief was that the concern -- I'm sorry. Was there something else?
Q. No.
A. My belief was that the concern that we had originally regarding the time, place, manner of 04:28 this permitted special event was still a concern as far as location, still the confusion regarding the exception to the open carry, the traffic -- the traffic issues, the public safety issues both for Mr. Zeleny, himself, and for the public at large. 04:28
So all those -- all those were still concerns of the police department that I, in fact, did let the city attorney know.
Q. Do you know if Mr. Milde had a view about whether this -- what was treated as a renewed 04:28 application should be denied?
A. I don't know the answer to that.
Q. Did you talk to Mr. Milde about it?
A. Not about this second application, no.
Q. Did the city attorney make the ultimate 04:29

decision about whether to deny this application?
MR. MASTER: Objection. Vague and ambiguous. Overbroad.
Go ahead.
THE WITNESS: Yes. I believe the document 04:29 speaks for itself. That is the city attorney making that determination.
BY MR. ROBINSON:
Q. Is there any policy or procedure that you're aware of, a written policy or procedure, 04:29 that gives the city attorney's office authority to grant or deny special event permit applications?
A. As counsel -- legal counsel for the City, it is within their purview to deny an application of this nature. I'm not sure whether it's written 04:29 anywhere, but they are legal counsel for the City.
Q. And what gives you the impression that the legal counsel for the City in that capacity has authority to deny permit applications?
MR. MASTER: Again, the question is vague, 04:30 ambiguous and overbroad. Calls for a legal conclusion and speculation.
Go ahead.
THE WITNESS: The city attorney's office is the department that is our legal advisors. In 04:30

some cases, the city attorney's office becomes involved in city business or issues, and they have the authority to make decisions. They work -- the city attorney's office works directly for the city council. 04:30
BY MR. ROBINSON:
Q. Are you aware of any other permit application that was denied by the city attorney's office, for a special event permit?
A. I'm not aware of any, no. 04:30
Q. Do you know if, before denying this -- what was considered a revised application, the city attorney attempted to contact Mr. Zeleny to address some of the issues raised here, any of the issues raised here? 04:31
A. I don't -- as I sit here today, I don't have a recollection of that, whether they did or not.
Q. Between Mr. Zeleny filing his notice of appeal or e-mailing his notice of appeal and the 04:31 city attorney deciding to deny it, do you know if anyone at the City contacted Mr. Zeleny to try to get more information about his permit application?
A. I don't know. I don't have a recollection of that. 04:31

Q. Going on to page 2 of this document, the first full paragraph, it starts: "Also, the revised application."
A. Yes.
Q. It talks about the essential element of 04:31 community participation. Do you see that?
A. I do.
Q. Is a requirement of community participation anywhere in the written policies of the City of Menlo Park related to special events 04:32 applications?
A. Yes. It's in the FAQ.
Q. What is the standard for deciding if an event requires or allows community participation?
A. This goes back to when this committee got 04:32 together to address special events permits, because the main issues that were going on were that private families, single families were attempting to block off entire streets for a birthday party for their family member, and that caused a great 04:32 deal of consternation in the neighborhoods.
So one of the criteria was that if you're going to be getting a special events permit and blocking off, whether they be streets or sidewalks or something to that effect, that it would be a 04:32

Veritext Legal Solutions
866 299-5127

community event and not just a private event for one entity, one family, one household, et cetera.
Q. What type of community participation qualifies an event as a special event?
A. I don't -- your question doesn't -- 04:33 doesn't make sense, because it doesn't make it qualify. It's one of the criteria for allowing a permit. So, in other words, if a family wanted to close down a street just to put their birthday party on, it would be denied because it is not an 04:33 event for the community.
Q. Who decides whether it's an event for the entire community or not? Let me rephrase that.
In considering whether to approve or deny a special event permit, who at the City makes the 04:33 decision of whether the event has community participation?
A. That would be community services, on whether or not the entire community is invited to participate in this -- in this event. 04:33
Q. Who made the decision of whether Mr. Zeleny's event had the essential elements of community participation?
A. In this case, with the letter, with the document that we see in front of us? 04:34

Q. Right.
A. The city attorney.
Q. Is the elements of community participation assessed case by case?
A. It would have to be. Every application is 04:34 going to be different. So, yes, it's case by case.
Q. Is it a discretionary decision, on the part of whoever is deciding the application, whether the event had sufficient community participation to qualify as a special event? 04:34
MR. MASTER: Objection. The question is vague, ambiguous and overbroad.
Go ahead.
THE WITNESS: Repeat the question.
BY MR. ROBINSON: 04:35
Q. Does the person making the decision on a special event permit application have discretion to determine whether the application has enough of a community participation element to qualify as a special event? 04:35
A. I would disagree in the way the question is even asked. Discretion in what way? What they're looking for is, is the public invited to this or is it for one single entity that is impacting other public members and they cannot 04:35

participate. That's the issue.
Q. Does the event have to be open to anyone who shows up?
A. For a public event, yes.
Q. For a special event. 04:35
A. For a special event, it has to be for the community if, in fact, it is impacting other community members. Now, obviously, if somebody wants to -- as a hypothetical, if somebody wanted to rent a park for a wedding, that doesn't 04:35 necessarily mean that everybody in the community is invited, but, of course, they could go watch if they wanted to. You can't stop them from doing that. But it is -- that would be more of a limited impact on the community, if they're at a park, as 04:36 opposed to closing down streets, et cetera.
Q. Would that qualify as a special event?
A. A wedding?
Q. Right.
A. It certainly would, yes. 04:36
Q. What about a block party; if a community wanted to have a block party, that would be a special event; right?
A. As long as all the members on that -- all the residents on that block signed an agreement, 04:36

yes. If they said, yes, we're okay with this and we're also invited to this block party, yes.
Q. In order to qualify, would they have to allow people who are not part of that residential community to the event? 04:36
A. They -- it's not required that they allow other people from the community, but the people who would be affected on that block would be invited.
Q. So I'm going to introduce another exhibit. This one is 268. 04:37
(Plaintiff's Exhibit 268 marked for Identification.)
BY MR. ROBINSON:
Q. The e-mail is a bit hard to read, but let's go -- for the record, Exhibit 268 is four 04:37 pages, MP 473 through MP 476; correct?
A. Yes.
MR. MASTER: Damion, I believe this was marked in at least two other depositions. The whole purpose of doing these continuing exhibits is 04:38 so we don't have duplicative exhibits. Is there any way you guys can actually do that?
MR. ROBINSON: With respect to this document, though, there's not, particularly since it's already been marked in this deposition. So 04:38

denied Mr. Zeleny's permit application?
MR. MASTER: You mean the film permit; correct?
THE WITNESS: You're talking about the film permit; correct? 06:39
BY MR. ROBINSON:
Q. Film permit, right.
A. The answer is, it's done neither. It's incomplete.
Q. How is it incomplete? 06:39
A. The -- the film permit has the questions that were asked -- and there's been several e-mails, not just this one, between the city attorney's office and Mr. Zeleny, and it hasn't been cleared yet. There's been no further 06:40 communication with Mr. Zeleny regarding this permitting process.
Q. My question to you is, in what way is it incomplete? What's missing from the application?
A. A final determination. 06:40
Q. Other than a final determination, what is missing about the application? What does Mr. Zeleny need to do to get it ruled on?
A. I would have -- I would have to look at the most recent e-mail that was sent from the city 06:40

attorney's office to Mr. Zeleny. The documents speak for themselves. It says right on there what is missing or what information that we need more of.
Q. As the person most qualified on behalf of 06:40 the City, do you have any understanding at all about what information is missing from Mr. Zeleny's application that's required before the City will make a decision?
MR. MASTER: Objection. Asked and 06:41 answered.
Go ahead.
THE WITNESS: As I sit here today, I don't remember what exactly -- where we left off in the process or what questions hadn't been answered, 06:41 without looking at the document. The documents speak for themselves. It would be on the final -- the most recent document that was exchanged with Mr. Zeleny.
MR. ROBINSON: Okay. I don't have any 06:41 further questions for you, Chief Bertini.
Todd, do you have any questions?
MR. MASTER: I do not.
MR. ROBINSON: I couldn't hear you.
MR. MASTER: We're done. 06:41

THE WITNESS: He said "no."
MR. ROBINSON: Okay. I think we'll just handle the record per Code.
David, anything else we need to do?
MR. MARKEVITCH: No, not at this time. 06:42
MR. ROBINSON: Okay. Thank you, everyone.
THE VIDEOGRAPHER: Let's go off the record. Going off the record. The time now is 6:42.
THE REPORTER: Mr. Master, do you want a 06:42 copy of the transcript?
MR. MASTER: Yes, I do. Thank you.
(Whereupon, the deposition concluded at 6:42 p.m.)
06:42

SIGNATURE OF DEPONENT

I, the undersigned, DAVE BERTINI, do hereby certify that I have read the foregoing deposition and find it to be a true and accurate transcription of my testimony, with the following corrections, if any:

PAGE LINE CHANGE
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________

____________________________
DAVE BERTINI Date

REPORTER'S CERTIFICATE

I, DENISE M. LOMBARDO, do hereby certify:

That DAVE BERTINI, in the foregoing deposition named, was present by videoconference and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

And that the aforementioned 306-page transcript meets the California minimum transcript format standards.

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 3rd day of September, 2020.

Denise M. Lombardo

DENISE M. LOMBARDO, CSR No. 5419

State of California

Page 534

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL ZELENY, )
PLAINTIFF, )
V. ) CASE NO.
GAVIN NEWSOM, ET AL., ) CV 17-7357 JCS
DEFENDANTS. )

VOLUME THREE

DEPOSITION OF CHIEF DAVE BERTINI

REMOTE VIDEOCONFERENCE

DECEMBER 10, 2020

WATSON COURT REPORTERS

FILE NO. 57178

with a protester could be for other reasons, for -- to see whether there is criminality going on, so in that case, the policy would not be violated.

Q. In terms of -- in terms of -- so my question is a bit narrower than that. I want to focus specifically on assembly or demonstration related discussion. And my question was just can you think of any examples where pulling over driver to ask questions about a protest would be anything other than assembly or demonstration related discussion. I don't want to get into whether it's a violation of policy or not.

MR. MASTER: Objection. Vague, ambiguous, and overbroad.

THE DEPONENT: In -- in -- my answer would stand, if -- obviously if you are stopping a vehicle legally for reasonable suspicion, and you ask them about a protester that they were just with, that would be a discussion regarding a protester.

BY MR. ROBINSON:

Q. Okay. Let's move on from there. I am going to go ahead and pull up on the screen Exhibit 38. So I am showing you on the screen what's been previously designated as Exhibit 38 at the first session of your deposition. Do you see that?

A. I do.

Q. Do you recall this image?

A. I do.

Q. It's part of -- this image is part of the protest that Mr. Zeleny was planning to conduct in the City of Menlo Park when he filed a permit application. Correct?

A. Correct.

Q. Let me show you -- I am going to show you, if I can -- you understood that image to be part of an animation. Correct?

A. Yes.

Q. And on the screen should be an animation. Do you see that?

A. I do.

Q. You recognize this to be the animation that Mr. Zeleny proposed to show as part of the event that he applied for a special events permit for?

A. Yes.

Q. Do you find the animation offensive?

A. I personally?

Q. Correct.

A. No.

Q. Do you understand the subject matter of the animation? Do you understand it to relate to child rape?

A. No --

MR. MASTER: -- hold on. Objection. Lacks foundation, calls for speculation.

If you know.

BY MR. ROBINSON:

Q. You understood the subject matter of Mr. Zeleny's protest to be related to allegations of child rape. Correct?

A. I understood the subject of him having some animosity towards somebody dealing -- or somebody having involvement with the company that he was protesting and an allegation of some kind of child abuse of his daughter.

Q. In the public hearings on Mr. Zeleny's special events permit application, you took the position that this animation that we just looked at was potentially obscene as to minors. Correct?

A. No, I raised the issue as far as along with several other issues having to do with public safety and the proposed application, and the issue I raised was the fact that if that animation was seen by someone who was under 18 and a parent were to complain, it could be a violation of the Penal Code.

Q. And the Penal Code violation you were referring to was for material that's obscene as to minors.

Correct?

A. Yes.

Q. Did you understand at the time that you raised that issue that in order to be obscene as to minors, the material had to be patently offensive?

A. Yes.

Q. And you raised that issue; at the time did you find the material offensive?

MR. MASTER: Did he personally, Counsel?

BY MR. ROBINSON:

Q. Right.

A. And the answer is no, it's not my decision whether it's patently offensive or not.

Q. So despite not personally finding the material offensive, you raised the issue that it could be obscene as to minors. Correct?

A. Counselor, I think it would be common sense for someone who's 10 years old to be watching that animation, it could be patently obscene to them and their parent, yes, but to me, no, it's not obscene, but I'm not the judge of that.

Q. Sir, my question was a lot simpler than that. Despite your personal feeling that it was not offensive to you, you nonetheless raised the issue at the public hearing that the material could be considered obscene as

to minors. Correct?

A. Yes.

MR. ROBINSON: Okay. No further questions from me.

MR. MASTER: Thank you. We are done. Thank you.

MR. ROBINSON: Okay. Thank you.

COURT REPORTER: Do you need a copy of the transcript, Mr. Master?

MR. MASTER: Yes, please. Thank you.

[REPORTER CLARIFICATION ABOUT GOING OFF THE RECORD.]

[DEPOSITION REMOTE SESSION ENDED AT 10:32 A.M.]

--oOo--

PENALTY OF PERJURY

I, CHIEF DAVE BERTINI, HAVING REMOTELY APPEARED FOR MY DEPOSITION ON DECEMBER 10, 2020, DO THIS DATE CERTIFY (OR DECLARE) UNDER PENALTY OF PERJURY PURSUANT TO THE LAWS OF THE STATE OF CALIFORNIA THAT I HAVE READ THE FOREGOING DEPOSITION, AND THAT I HAVE MADE ANY CORRECTIONS, ADDITIONS, OR DELETIONS THAT I HAVE DEEMED NECESSARY TO MAKE IN ORDER TO RENDER THE WITHIN TRANSCRIPT A TRUE AND CORRECT TRANSCRIPT OF MY DEPOSITION TESTIMONY UNDER OATH.

EXECUTED ______________________ ON ______________.

(PLACE) (DATE)

______________________________

CHIEF DAVE BERTINI

STATE OF CALIFORNIA )
) SS
COUNTY OF SAN BERNARDINO )

I, JOYCE WOGAN, A CERTIFIED SHORTHAND REPORTER FOR THE STATE OF CALIFORNIA, CERTIFICATE NUMBER 11666, DO HEREBY CERTIFY:

THAT PRIOR TO BEING EXAMINED, THE DEPONENT NAMED IN THE FOREGOING PROCEEDINGS WAS BY ME REMOTELY DULY SWORN TO TESTIFY TO THE TRUTH;

THAT SAID PROCEEDINGS WERE TAKEN BEFORE ME REMOTELY AT THE TIME AND DATE THEREIN SET FORTH, AND WERE TAKEN DOWN BY ME IN SHORTHAND TO THE BEST OF MY ABILITY AND THEREAFTER REDUCED INTO TEXT VIA COMPUTER-AIDED TRANSCRIPTION UNDER MY DIRECTION;

I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR NOR RELATED TO ANY PARTY TO SAID PROCEEDINGS, NOR IN ANYWISE INTERESTED IN THE OUTCOME THEREOF.

REVIEW AND SIGNATURE WAS NOT REQUESTED.

IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED MY NAME.

DATED: DECEMBER 17, 2020

______________________________

JOYCE WOGAN, CSR 11666

# CITY OF MENLO PARK

## Special Event Permit Application FAQs

701 Laurel Street, Menlo Park, CA 94025 Ph: 650-330-2223 Fax: 650-330-2242

CITY OF
MENLO
PARK

### SPECIAL EVENTS IN MENLO PARK

Thank you for your interest in holding a special event in Menlo Park. Special events play an important role in building community and creating vibrancy within Menlo Park. Our goal is to help event organizers plan a safe and successful event creating minimal impacts to the surrounding neighborhoods. Depending on the nature of your event, additional permits or approvals may be needed so please allow adequate time for processing. Please read all of the materials thoroughly and carefully to ensure the Special Event Permit can be processed in a timely manner.

### WHAT QUALIFIES AS A SPECIAL EVENT?

If your event meets **one** or more of these criteria, you will need to complete a Special Event Application (attached):

- Attendance is expected to exceed 150 people and you will be using outdoor public space
- Use of any City street, sidewalk, or other right-of-way
- Any City street or lane closures
- Any event impacting traffic or intersections
- Any noise exceeding the City's noise ordinance (Municipal Code 8.06.030: Sound measured from subject site to any residential property: 10 p.m. to 7 a.m. - 50 dBA and 7a.m. to 10p.m. - 60 dBA)
- Parking needs that will exceed the capacity of the venue
- Generate a crowd of spectators sufficient in size to obstruct, delay or interfere with the normal flow of pedestrian, vehicular traffic, or city facilities
- Community Events (i.e. Block Parties - not for private or exclusive residential use)
- Events occurring for more than 1 day
- Events needing Police regulation, monitoring or control

### WHAT IS A SPECIAL EVENT APPLICATION?

A Special Event Application is a detailed questionnaire to gather all critical information about your event. Instead of completing multiple permit applications, the single application is reviewed internally by each City department to determine which permits or approvals are required. All Special Events Applications are due to the City by the established deadlines (listed below). The acceptance of the application should, in no way, be interpreted as approval of your request. For larger events, we strongly encourage you to submit the application roughly 6-months in advance.

### WHAT IS THE PROCESS FOR OBTAINING A SPECIAL EVENT PERMIT?

1. Submit your completed application with a check made payable to City of Menlo Park for $125 for minor events/$250 for major events (non-refundable). Applications can be emailed to mlmilde@menlopark.org or delivered to:

*Mailed:*
City of Menlo Park
ATTN: Special Events – Matt Milde
701 Laurel Street
Menlo Park, CA 94025

*Drop Off:*
Arrillaga Family Gymnasium
ATTN: Special Events – Matt Milde
600 Alma Street
Menlo Park, CA 94025

For any questions regarding the application, fees, or application process please contact Matt Milde at 650-330-2223. Incomplete applications will not be processed and you will be asked to submit the additional information in order to start the application process

EXHIBIT 33
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

2. You will be sent an email acknowledgement that your application has been received. Your application will then be reviewed by City staff, which may take up to three weeks. During this time, you may be contacted by City staff for clarification of your event details or to schedule a meeting to review the application.

3. After a full review of your application, you will receive either a denial letter or a conditions-of-approval letter. The conditions-of-approval will outline requirements for your event, such as necessary permits, approvals and/or additional application fees. This may include, but not limited to, the following:
   - Certificate of Liability Insurance
   - Country of San Mateo Temporary Event Food Permit
   - Facility Reservation Confirmation
   - Fire Department Approval or Permits
   - Proof of Menlo Park Business License
   - Proof of 501c3 Non-profit status
   - Public Notification Requirements

4. Public Notification will be required for some permits based on your application. If, in the Planning Division's opinion, the proposed event could exceed the noise ordinance limits, the Planning Division will prepare a public notice to be mailed to all addresses within 300 feet of the subject property. The notice will state the decision of the City and will serve as the noise permit unless the request is appealed. The Planning Division will mail the notices on the decision date, which starts the 10-day appeal period. If the Planning Division does not receive an appeal in writing, the decision will be become effective on the 11th day. If the decision is appealed, the item will be scheduled for the next available Planning Commission meeting. The Planning Commission generally meets on the first and third Mondays of every month. The minimum lead-time between an appeal and a Planning Commission meeting is approximately three weeks. The Planning Commission's decision will also be posted at the Civic Center and on the City's web page: http://www.menlopark.org/371/Planning-Commission. The Planning Commission's decision on the noise permit also contains a 15 day appeal period before it becomes active, and the decision can be appealed to the City Council. If the project is appealed to the City Council, the processing time generally would take more than 60 days, due to scheduling and additional public noticing requirements. For projects that require public notification, it is recommended that the application be submitted more than 60 days in advance of the planned event date.

5. Once all of the conditions-of-approval have been met, a Special Event Permit will be issued by the City. You will be required to have this permit in your possession during your event.

## WHEN ARE THE APPLICATION DEADLINES?

Please pay close attention to the following application deadlines:

- 30-days for Block Parties not required to have a noise permit
- 60-days for Block Parties required to have a noise permit
- 60-days for all Minor Events that are not considered Block Parties
- 90-days for all Major Events

Applications are accepted up to 12-months in advance of the proposed event date. Applicants are encouraged to apply early to ensure permit is received in a timely fashion. Once an application is submitted you many not receive confirmation that your event has been approved until 30 to 60-days after submission. Please allow yourself ample time for permit processing. Applications that do not meet their required deadline **will not** be processed.

**CAN MY EVENT BE A FUNDRAISER?**

If the event is a fundraiser, you will be required to fill out the Fundraising Form and provide a copy of the organization 501c3 status. Please inquire about the Fundraising Form with Matt Milde when submitting Special Event application.

**WHAT ARE THE SPECIAL EVENT PERMIT FEES?**

**Special Event Application Fee:**  $125 (minor); $250 (major)

**Noise Permit Fee:** $135

**Police Services Fees:** Fee based on staff hourly billing rate. 50% of the estimated Police services must be paid prior to a permit being issued.

**Barricade Rental Fees:** 3' barricade - $3/day & 12' barricade - $8/day (Permit required for pick-up)

**Park Rental Fees:**  Varies (see below) – Park fees are also listed in the City of Menlo Park's Master Fee Schedule.

**WHAT IS THE DIFFERENCE BETWEEN A "MINOR" AND "MAJOR" EVENT?**

The difference between a minor and major event depends on the nature of the event and its impact on city services. For example, most block parties closing a single road would fall under a "minor" event, while most fun runs requiring the closure of many roads would be considered a "major" event. Please contact the permit coordinator, Matt Milde, at (650) 330-2223 if you have questions on how your event would be categorized.

**CAN I POST SIGNAGE?**

All signs posted before and during the event shall be approved by staff prior to issuance of the permit. If the event requires, "No Parking" signage, 72-hour notification is required. Road signage can be rented from the Menlo Park Corporation Yard with an approved permit.

**WHO CAN I CONTACT REGARDING WASTE REMOVAL?**

For larger events where additional garbage removal will be needed, please contact Recology at www.recologysanmateocounty.com or call (650) 595-3900. Failure to remove trash from event will result in a $250 fine and may result in the inability to obtain a Special Event Permit in the future.

**HOW DO I GET A FOOD PERMIT?**

If serving food outside, San Mateo County Temporary Event Food permits are issued by County of San Mateo Environmental Health Services (2000 Alameda de las Pulgas #100, San Mateo, CA 94403 or (650) 372-6200). Documents are available online - smchealth.org. Costs vary depending on the nature of the event, but applications need to be submitting within 2-3 weeks prior to the event. A food permit is not required to receive your approved permit from the City of Menlo Park, but you are responsible for obtaining the necessary San Mateo County permits when serving food publically.

**WHAT IS THE BELLE HAVEN MINI-GRANTS PROGRAM?**

The City of Menlo Park Community Services Department has partnered with the Silicon Valley Community Foundation and the Belle Haven Community Development Fund to initiate the Belle Haven Mini-Grants Program. If you live in the Belle Haven neighborhood and are planning a community event, you might be eligible for a grant to help subsidize your special event application fees. For more details, contact Juanita Croft at (650) 450-5484 or BHaven@siliconvalleycf.org.

**HOW CAN I GET A BUSINESS LICENSE?**

Business License shall be obtained for all outdoor sales. Business License applications can be found online at www.menlopark.org under the Finance Department. Completed forms can be dropped off at the front desk in City Hall (701 Laurel Street).

**CAN I SERVE ALCOHOL?**

If serving or selling alcohol, ABC licenses can be obtained by California Department of Alcohol Beverage Control. More information can be found at www.abc.ca.gov or by calling (415) 356-6500.

**CAN I OBTAIN A PERMIT FOR PRIVATE USE?**

Yes, a permit may be issued for private events on City facilities where a rental reservation can be issued (ie. Burgess Park, Nealon Park, Bedwell-Bayfront Park, etc.) provided the event is aligned with the current use policies of that park/facility. Permits requiring road closures will **NOT** be approved for private functions / reserved use (ie. Birthday Parties, Weddings, Reunions, etc.). Any applicant who wants to close off a public right-of-way for private use will be directed to other City facilities (ie. Arrillaga Family Recreation Center, Onetta Harris Community Center, picnic/park facilities, etc).

**DO I NEED TO MAKE A RESERVATION FOR PARK SPACE BEFORE I APPLY?**

For renting sports fields, picnic areas, or park space, you are welcome to contact the Community Services Department at 650-330-2223 for rates and availability or inquire within at the Front Desk of the Arrillaga Family Gymnasium (600 Alma Street). Facility availability can also be viewed at www.menlopark.org. However, you are not required to make a reservation prior to the submission of your permit application. Please review the additional rental and use policies of the facilities you intend to utilize for your event.

**IS INSURANCE REQUIRED FOR MY EVENT?**

Yes. To apply for City of Menlo Park special event permit, one must provide a *Certificate of Liability Insurance* along with their Special Event Application and payment. A Certificate of Liability Insurance can be issued by the renter's homeowner's insurance or other insurance carrier. In order for the certificate to be valid, it must contain the following:

- The renter's name must be listed as the one "insured."
- The policy must not expire before the planned event date.
- The policy must be for $1,000,000.
- The "description" should list the rental location, day, and event planned.
- The City of Menlo Park at 701 Laurel Street, Menlo Park, CA 94025 must be noted as "additional insured."

A special event permit **will not** be issued until the required application fees, insurance, and other supplementary materials, as indicated in the Special Event Application, have been received. A special event permit issued for a private function on private property is not required to submit proof of liability insurance to the City.

**WHAT WOULD CAUSE A PERMIT TO GET DENIED?**

Approval or denial of applications are based upon several factors including: size (number of people), scale, location, route to be closed, community impact, impact on City services, past practices/experiences with issued permits, intended use, non-payment of fees, poor articulation of event as reflected in the application and site map, etc.

**WHAT IF MY PERMIT IS DENIED?**

Any applicant is welcome to re-apply provided they meet the 60-day deadline and pay appropriate fees; however, depending on the application details we cannot always issue a permit. Determination of the approval or denial of any application is at the discretion of the Special Event Permit Committee. Final decisions are appealable to the Community Services Director, please contact Matt Milde at mlmilde@menlopark.org to seek an appeal for a denied permit.

### WHERE CAN I FIND INFORMATION ON INSURANCE CARRIERS?

Below you will find a number of resources if you need to purchase special event insurance for your event. Please note: These resources are not provided as a recommendation or sole insurers for special events, but is provided here as a tool to aid you in your research in obtaining a Certificate of Liability for your event.

| Company Name | Website | Phone |
|---|---|---|
| AAA Homeowners | www.aaa.com | 800-922-8228 |
| Allied Brokers | www.alliedbrokers.com | 650-328-1000 |
| Event Helper | www.eventhelper.com | n/a |
| Hub International | www.eventinsure.hubinternational.com | 650-964-8000 |
| K&K Insurance | www.kandkinsurance.com | 877-648-6404 |
| Markel American Insurance Co. | www.markeleventinsurance.com | 800-236-4252 |
| Private Event Insurance | www.privateeventinsurance.com | 877-723-3933 |
| RVNA Event Insurance | www.specialeventinsurance.com | 800-364-2433 |
| Specialty Risk Insurance LLC | http://www.specialtyriskinc.com | 928-772-0844 |

### WHERE DO I PICK-UP BARRICADES?

You may pick-up barricades/street signage by going to the **City of Menlo Park Corp Yard** at 333 Burgess Drive on Mon-Fri 8am-4pm; please ask for Irv Meachum. The Menlo Park Corp Yard is closed every other Friday, please contact the number above if you wish to pick-up barricades on a Friday to verify if the Corp Yard will be open. Rental fees apply as articulated in the Special Event Permit Information packet. Please contact (650) 330-6780 with any questions regarding the pick-up/drop-off of your rented barricades and/or street signage. Your approved Special Event Permit and payment is required for pick-up of any barricade/street sign. Depending on events/projects throughout the year we may not be able to accommodate the precise signage you've requested on your Special Event Permit. Every attempt will be made to provide you adequate signage for your event purposes. Please note: Only approved barricades can be used to block city streets; hay bales, sawhorses, jump houses, motor vehicles, etc. are not permitted. If the event requires, "No Parking" notification, 72-hour notification is required. Below are additional resources for renting traffic signage:

D&M Traffic Services Inc.
408-436-1127

Interstate Traffic Control
408-279-1588

### WHAT IF I STILL HAVE QUESTIONS?

Please contact the permit coordinator, Matt Milde, at (650) 330-2223 or mlmilde@menlopark.org with any questions. If requested, appointments to discuss your application in-person a may be made in advance. Please note that we may not be able to discuss your permit if you walk-in without an appointment; scheduling an appointment in advance is strongly advised.

Select Language | ▼

# Special event permits

## 2016 special event permit updates

- 2016 - Notice to Block Party Organizers
- 2016 - Notice to Special Event Permit Applicants

Thank you for your interest in holding a special event in Menlo Park. Special events play an important role in building community and creating vibrancy within Menlo Park. Our goal is to help event organizers plan a safe and successful event creating minimal impacts to the surrounding neighborhoods. Depending on the nature of your event, additional permits or approvals may be needed so please allow adequate time for processing. Please pay close attention to the following application deadlines:

- 30-days for Block Parties not required to have a noise permit
- 60-days for Block Parties required to have a noise permit
- 60-days for all Minor Events that are not considered Block Parties
- 90-days for all Major Events

## Special event qualifications

If your event meets one or more of these criteria, you will need to complete a Special Event Application:

- Any city street or lane closures
- Any event impacting traffic or intersections
- Any noise exceeding Municipal Code 8.06.030 (noise ordinance): Sound measured from subject site to any residential property:
  - 10:00 pm - 7:00 am - 50 dBA
  - 7:00 am - 10:00 pm - 60 dBA
- Attendance is expected to exceed 150 people and you will be using outdoor public space
- Community Events (i.e. Block Parties - not for private or exclusive residential use)
- Events needing Police regulation, monitoring or control
- Events occurring for more than 1 day
- Generate a crowd of spectators sufficient in size to obstruct, delay or interfere with the normal flow of pedestrian, vehicular traffic, or city facilities
- Parking needs that will exceed the capacity of the venue
- Use of any city street, sidewalk, or other right-of-way

## Permit application submittal

Submit your completed application before your established deadline (indicated above) with your application fee. Check should be made payable to City of Menlo Park for $125 for minor events and $250 for major events (non-refundable). Application can be delivered or mailed to:

Mailed
City of Menlo Park
ATTN: Special Events - Matt Milde
701 Laurel St.

EXHIBIT 34
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

Menlo Park, CA 94025

Select Language | ▼

Drop Off
Arrillaga Family Gymnasium
ATTN: Special Events - Matt Milde
600 Alma St.
Menlo Park, CA 94025

Incomplete applications will not be processed and you will be asked to submit the additional information in order to start the application process.

## Film permits

Please contact Development Services Technician, Janice Dong Sample, in the Community Development Department to obtain a film permit. She can be reach via e-mail or by calling 650-330-6716.

## Contact Us

**Matt Milde**
Recreation Coordinator
Email

650-330-2223

## Related documents

- Application
- Flowchart
- Insurance Requirements
- Permit FAQs
- Primary Response Routes

Government Websites by CivicPlus®

**Film Production in Menlo Park**

Film production in the City of Menlo Park must comply with following conditions:

1. Permittee shall submit in writing all pertinent details regarding the filming including the date(s) and times of the filming including time needed for set-up and take down; a description of the nature of the filming; the location of the filming; a list of all equipment involved in the filming, including cars and other vehicles; the proposed location for the parking and storage of all such vehicles and equipment; the number of cast and crew members involved in the filming; and an indication of any special needs, such as amplified noise, etc. If granted, the permit's approval will be confined to such activities, locations and time schedules as submitted and approved.

2. Three days prior to the beginning of filming, permittee shall provide written notice to residents and businesses within 200 feet of the proposed filming.

3. Permittee shall obey all City Ordinances, rules and the guidance of City supervisory employees pertaining to the use of City property, including the location, parking and storage of vehicles and equipment, crowd and traffic control, and the restoration of premises to their original condition after use for filming purposes.

4. Permittee will comply with the City of Menlo Park noise ordinance. Filming will be limited to the hours between 8:00 a.m. and 6:00 p.m. and will result in low to no noise levels. The use of any explosive, fireworks, or pyrotechnic devices is strictly prohibited.

5. Permittee shall make arrangements for traffic control satisfactory to the Menlo Park Police Department prior to filming on City streets and in other public areas. Permittee will be charged to recover the cost of traffic control provided by the City. Permittee will legally park vehicles and will not require street closure or traffic control other than what is approved.

6. Permittee shall covenant and agree to indemnify and hold harmless the City from any and all loss, cost, damages and expenses of any kind, including attorney fees, on account of personal injury or property damage resulting from any activity of Permittee on municipal property or in connection with its use of municipal property.

7. Liability insurance in no way limits the indemnity agreement above, Permittee will furnish the City a Certificate of Liability Insurance acceptable to its Risk Management office showing combined single limit coverage for bodily injury and property damage, or the equivalent of such coverage, not less than $1 million. The City, including its officials, employees and agents, shall be named as additional insured in the Liability Policy. Contractual liability coverage insuring the obligations of this Agreement is also required. The insurance may not be canceled or substantially modified without ten (10) days written notice to the City Manager's Office.

EXHIBIT 35
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

8. Permittee shall pay, with a valid check, money order, credit card or cashier's check, a **filming permit application fee of $150.00 in addition to the daily permit fees of $50 per day for still photography and short subject, $100 per day for industrials, and $150 per day for features, TV, music videos and commercials.**

9. Permittee shall apply for a one-time Business License and pay, with a valid check, money order, credit card or cashiers check. See **Guide to Annual Business Licensee Fee Calculation** for the fee schedule.

10. Permittee will adhere to the provisions and conditions set forth in the permit. If Menlo Park Police Department or other City personnel are required to correct, mitigate, or provide any service not consented to under this permit, permittee will be required to pay for all services rendered. Payment shall be made in the form of *a valid check, money order, credit card or cashiers check* immediately upon demand made by the City.

*PROJECT ADDRESS:*______________________________________

Read and agreed on:

Date:____________________

______________________________ __________________________
Signature Print name



City of Menlo Park
Engineering Division
701 Laurel Street
Menlo Park, CA 94025
Telephone (650) 330-6740

**PERMIT NO.:**_______________
**Keep this permit at the work site at all times**

**Call 24 hours in advance of working in the public right of way AND for each Inspection request.**
***Uninspected work will be rejected.***

# ENCROACHMENT PERMIT APPLICATION

☐ Major Encroachment ☐ Temporary Encroachment ☒ Other FILM PERMIT
☐ Minor Encroachment ☐ Debris or Container Box ☐ City-Mandated Repairs

## ONE PERMIT PER ADDRESS

| Location of Work | Applicant Represents | | | | Applicant e-mail: / Applicant fax: |
|---|---|---|---|---|---|
| 2825 Sand Hill Rd, Menlo Park, CA 94025 | ☐ Contractor ☒ Owner | | | | zeleny@post.harvard.edu |
| **Name of Applicant (person)** | **Address** | **City** | **State** | **Zip** | **Telephone** |
| Michael Zeleny | 7576 Willow Glen Road | Los Angeles | CA | 90046 | 323-363-1860 |
| **Name of Contractor** | **Address** | **City** | **State** | **Zip** | **Telephone** |
| n/a | | | | | |
| **California Construction License No.** | **Menlo Park Business License No.** | | | **Est. Start Date** | **Est. Complete Date** |
| n/a | n/a | | | 30 October 2017 | 29 December 2017 |
| **Estimated Construction Cost** (Estimate work in city R/W only. Do not include value of utility.) | **Bond or Deposit *** | **Bond or Deposit provided by:** | | | |
| $ 0 | $ to be furnished | ☐ Contractor ☒ Owner ☐ Other (provide name, company, address) | | | |

Description of work to be done:

Making a multimedia presentation and filming public responses thereto.

Applicant submits the following:
- ☐ 3 copies of sketch or plans
- ☐ 3 copies of traffic control plans
- ☐ insurance certificate

***Call Underground Service Alert (USA) at 1-800-227-2600 before you dig***

GENERAL CONDITIONS OF PERMIT ATTACHED.
**Signature below acknowledges that special working hours may apply – check the approved traffic control plan.**

I hereby acknowledge that I have read this permit and the attached conditions, that the information given by me is correct, that I am the owner or the duly authorized agent of the owner, and that I agree to comply with the conditions and all applicable provisions of state laws, city ordinances, and the rules of any governmental agency involved.

| [signature] | Principal | 6 October 2017 |
|---|---|---|
| Signature of Applicant (Owner or authorized agent) | Title | Date |

## DO NOT WRITE BELOW THIS LINE -- CITY STAFF USE ONLY

| Approved by Engineering Division | Date | Permit expires | Fees (retained by City) | $ |
|---|---|---|---|---|
| | | Total Due to City | ☐ Paid | $ |

** Bond or deposit requests must originate from the bond/deposit provider. A ... receipt must accompany the refund request. All deposits or bonds are subject to forfeiture to c... d Ordinances.*

MP001248



# GENERAL CONDITIONS OF PERMIT

**Engineering Division**
**701 Laurel Street**
**Menlo Park, CA 94025**
**Notification of Work or Inspection Requests: (650) 330-6740**

1. This permit, regardless of when dated, shall not be in effect until the applicant has obtained all licenses and other permits required by law.
2. This permit is declared null and void if work has not commenced three (3) months after the date of permit issuance.
3. Traffic control plan is required for work that will block public right-of-way. Plan shall include re-routing of vehicles, bicycles and pedestrians.
4. Any damages to existing facilities and improvements above ground or below ground, shall be promptly repaired or replaced at the permittee's expense, and claims for damage to City property must be promptly paid.
5. Applicant is responsible for determining exact locations or depths of existing utilities or other facilities. Call Underground Service Alert (USA) at 1-800-227-2600 a minimum of 48 hours prior to performing work.
6. Applicant carries sufficient insurance to work in the public right of way, and names City of Menlo Park as additional insured. Applicant agrees to keep insurance active for the duration of the project.
7. All work shall comply with the City and Caltrans Standards, including traffic control.
8. Street Opening, Sidewalk, Curb and Gutter, and Driveway Permits. Permittee shall notify the Public Works Inspector at least 24 hours prior to: beginning work, inspection requests, or concrete placement. The number and type of inspections required, and any tests that may be required will be as directed by the Public Works Inspector. The Public Works Inspector may be contacted by calling (650) 330-6740.
9. All trench plates used in the public right of way must have a non-skid surface.
10. Construction activities are restricted to Monday through Friday (City holidays excepted) between the hours of 8:00 AM and 5:00 PM, unless otherwise approved in writing by the Engineering Services Division.
11. A faithful performance bond or a cash deposit in an amount equal to the estimated cost of the proposed work is required for curb and gutter, driveway, or street opening permits
12. This grant of permission does not constitute a deed or grant of easement by the City, is not transferable or assignable and is revocable at any time at the will of the City.
13. This permit does not authorize tree trimming or tree removal.
14. The traffic control plan as attached must be adhered to at all times. *Note that the traffic control plan may have restricted working hours for working in the public right of way, which supersedes the standard encroachment permit working hours.*
15. The use of City property by permittee shall be limited to the purposes set forth by this permit and no structures of any kind, except those expressly permitted shall be erected or placed thereon.
16. Debris boxes/storage containers shall have reflectors so that they can be seen at night. This permit must be taped to the outside of debris boxes in a visible location.
17. This permit does not include overnight street parking for any vehicles. A separate parking permit can be obtained from the Police Department.
18. All stormwater BMP's must be in place between October 15th and April 15th, or as directed by the Public Works Inspector.
19. Additional conditions (if any) are attached to this permit and shall be followed accordingly.

**Additional Conditions:**

**From:** Toews, Ivan J
**To:** Sohrabi, Ebby
**Subject:** FW: Notice re Menlo Park City Council Decision
**Date:** Friday, October 06, 2017 9:02:00 AM
**Attachments:** Encroachment Permit- Film Permit. - signed.pdf
image002.png

---

**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Friday, October 06, 2017 3:02 AM
**To:** Toews, Ivan J <IJToews@menlopark.org>
**Cc:** Harada, Jelena V <jvharada@menlopark.org>; McClure, William <wlm@jsmf.com>; McIntyre, Alex D <admcintyre@menlopark.org>; Bertini, David C <dcbertini@menlopark.org>; dwa@agzlaw.com; Flegel, Nicolas A. <naf@jsmf.com>
**Subject:** Re: Notice re Menlo Park City Council Decision

Dear Mr Toews,

Attached please find a completed application for a film permit.

Starting on 30 October 2017 and continuing through 27 December 2017, I shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu. I shall be present in the vicinity of 2825 Sand Hill Road from 08:00 till 18:00 every weekday, served by a support staff of one personal assistant and one cinematographer. My props are to include fully operational, exposed and unloaded military grade firearms and loaded ammunition feeding devices therefor, including without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a 7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed semiautomatic Browning M1919a4, in full compliance with all applicable laws. A 55" portable media display powered by a portable gas generator will display videos featuring explicit representations of sexual violence committed by NEA's publicly disgraced protégé. A sample image can be found at http://larvatus.livejournal.com/371973.html. Two tripod-mounted cameras will be placed on either side of Sand Hill Road, focusing on public reactions to my display. One of them will be attended by a cinematographer. I will operate the other one remotely. All their footage, complemented by output of body cams, will be live streamed on the Internet.

A site map can be found at https://www.google.com/maps/@37.4197308,-122.2137188,17z/. All placements of equipment and personnel will be determined to avoid interference with automotive and foot traffic, in consultation with the Menlo Park City authorities. All media aspects of this event will be subject to content-neutral regulation negotiated with Menlo Park City authorities. My fundamental rights under the First and Second Amendments of the Constitution of the United States are reserved and non-negotiable.

Please note that my standing and circumstances require accommodations not anticipated by your application format and requirements. As an individual engaged in a non-profit endeavor of public interest, I hereby apply for a waiver of all applicable fees. I will furnish all requisite liability waivers and procure the appropriate insurance coverage upon your conditional approval of this application.

Please address all legal inquiries and requests to David W. Affeld, Affeld Grivakes LLP, 2049 Century Park East, Suite 2460, Los Angeles, CA 90067, voice:310.979.8700, fax:310.979.8701.

-----

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com

7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Thu, Sep 28, 2017 at 1:00 PM, Toews, Ivan J <IJToews@menlopark.org> wrote:

> Dear Mr. Zeleny,
>
> Please see attached film permit application and film permit conditions. Application can be submitted via email. Thank you.
>
> **Ivan Toews- Land Development Engineer**
> **City of Menlo Park |**
> 701 Laurel St. | Menlo Park, CA 94025
> Direct (650)-330-6712 | | Fax 650-327-5497
> ijtoews@menlopark.org
>
> 
> 
>
> **From:** Nicolas A. Flegel [mailto:naf@jsmf.com]
> **Sent:** Wednesday, September 27, 2017 11:35 AM
> **To:** michael@massmeans.com
> **Cc:** Harada, Jelena V <jvharada@menlopark.org>; McClure, William <wlm@jsmf.com>; McIntyre, Alex D <admcintyre@menlopark.org>; Bertini, David C <dcbertini@menlopark.org>; dwa@agzlaw.com; Toews, Ivan J <IJToews@menlopark.org>
> **Subject:** RE: Notice re Menlo Park City Council Decision
>
> Dear Mr. Zeleny,
>
> Thank you for your email of September 7, 2017, requesting that the City of Menlo Park reconsider your special events permit application as a film permit application. The City has asked that I respond to your email. The City has a film permit application process, and therefore you should submit a film permit application to staff. This is a different permit than a special event permit, so you will need to follow/comply with the film permit requirements. I am copying Ivan Toews of the Public Works Department, who handles film permits, and am requesting Ivan by this email to forward you the necessary application and information. Ivan's contact information is:
>
> Ivan Toews- Land Development Engineer
> City of Menlo Park |
> 701 Laurel St. | Menlo Park, CA 94025
> Direct (650)-330-6712 | | Fax 650-327-5497
> ijtoews@menlopark.org

Thank you for your attention to this matter.

Nick Flegel
(650) 324-9300

**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Thursday, September 7, 2017 2:28 AM
**To:** Harada, Jelena V <jvharada@menlopark.org>
**Cc:** William L. McClure <wlm@jsmf.com>; grubens@adcl.com; McIntyre, Alex D <admcintyre@menlopark.org>; Bertini, David C <dcbertini@menlopark.org>; David W. Affeld <dwa@agzlaw.com>
**Subject:** Re: Notice re Menlo Park City Council Decision

Thank you for your email. In keeping with the substance of our exchanges in last week's hearing, and in the mutual interests of efficiency, I would like the City of Menlo Park to reconsider my special event permit mitapplication as requesting a film permit.

The salient points of my request are as follows:

- The videography is to take place alongside 2855 Sand Hill Road, Menlo Park, CA 94025, and continue indefinitely, Monday through Friday, from 8 a.m. to 7 p.m.;
- All participants, cameras, and props will be placed so as to avoid any interference with automotive and foot traffic;
- The City will recognize all participants in the film production that are so authorized in advance by myself, as exempt from sanctions for carrying a concealed firearm or openly carrying an unloaded handgun or a long gun under California Penal Code Sections 25400 (a) (2), 26350 (a) (1), and 26400 (a), pursuant to the relevant exemptions under P.C. Sections 25510, 26375, and 26405, as applicable to authorized participants in a motion picture, television or video production, or entertainment event.

I remain open to reasonable time, place, and manner regulations.

Please let me know how to proceed in order to ensure an expeditious determination from the City authorities.

—
Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373
http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No matter. Try again. Fail again. Fail better." — Samuel Beckett

On Sep 5, 2017, at 10:14 PM, Harada, Jelena V <jvharada@menlopark.org> wrote:

Mr. Zeleny,

Attached is correspondence informing you of the Menlo Park City Council's decision made at the City Council special meeting of August 29, 2017, related to your Appeal of Denial of Special Event Permit Application. This item is also being sent to you via US mail.

Sincerely,

**Jelena Harada**
Deputy City Clerk
City of Menlo Park
701 Laurel St., Menlo Park, CA 94025
650-330-6612 | jvharada@menlopark.org
<image001.jpg>

<Zeleny Letter - city council action.pdf>



STATE OF CALIFORNIA
AUTHENTICATED

**State of California**

**PENAL CODE**

**Section 313.1**

313.1. (a) Every person who, with knowledge that a person is a minor, or who fails to exercise reasonable care in ascertaining the true age of a minor, knowingly sells, rents, distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by any means, including, but not limited to, live or recorded telephone messages, any harmful matter to the minor shall be punished as specified in Section 313.4.

It does not constitute a violation of this section for a telephone corporation, as defined by Section 234 of the Public Utilities Code, to carry or transmit messages described in this chapter or to perform related activities in providing telephone services.

(b) Every person who misrepresents himself or herself to be the parent or guardian of a minor and thereby causes the minor to be admitted to an exhibition of any harmful matter shall be punished as specified in Section 313.4.

(c) (1) Any person who knowingly displays, sells, or offers to sell in any coin-operated or slug-operated vending machine or mechanically or electronically controlled vending machine that is located in a public place, other than a public place from which minors are excluded, any harmful matter displaying to the public view photographs or pictorial representations of the commission of any of the following acts shall be punished as specified in Section 313.4: sodomy, oral copulation, sexual intercourse, masturbation, bestiality, or a photograph of an exposed penis in an erect and turgid state.

(2) Any person who knowingly displays, sells, or offers to sell in any coin-operated vending machine that is not supervised by an adult and that is located in a public place, other than a public place from which minors are excluded, any harmful matter, as defined in subdivision (a) of Section 313, shall be punished as specified in Section 313.4.

(d) Nothing in this section invalidates or prohibits the adoption of an ordinance by a city, county, or city and county that restricts the display of material that is harmful to minors, as defined in this chapter, in a public place, other than a public place from which minors are excluded, by requiring the placement of devices commonly known as blinder racks in front of the material, so that the lower two-thirds of the material is not exposed to view.

(e) Any person who sells or rents video recordings of harmful matter shall create an area within his or her business establishment for the placement of video recordings of harmful matter and for any material that advertises the sale or rental of these video recordings. This area shall be labeled "adults only." The failure to create and label the area is an infraction, punishable by a fine not to exceed one hundred dollars ($100). The failure to place a video recording or advertisement, regardless of its content, in

EXHIBIT 37
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

this area shall not constitute an infraction. Any person who sells or distributes video recordings of harmful matter to others for resale purposes shall inform the purchaser of the requirements of this section. This subdivision shall not apply to public libraries as defined in Section 18710 of the Education Code.

(f) Any person who rents a video recording and alters the video recording by adding harmful material, and who then returns the video recording to a video rental store, shall be guilty of a misdemeanor. It shall be a defense in any prosecution for a violation of this subdivision that the video rental store failed to post a sign, reasonably visible to all customers, delineating the provisions of this subdivision.

(g) It shall be a defense in any prosecution for a violation of subdivision (a) by a person who knowingly distributed any harmful matter by the use of telephones or telephone facilities to any person under the age of 18 years that the defendant has taken either of the following measures to restrict access to the harmful matter by persons under 18 years of age:

(1) Required the person receiving the harmful matter to use an authorized access or identification code, as provided by the information provider, before transmission of the harmful matter begins, where the defendant previously has issued the code by mailing it to the applicant after taking reasonable measures to ascertain that the applicant was 18 years of age or older and has established a procedure to immediately cancel the code of any person after receiving notice, in writing or by telephone, that the code has been lost, stolen, or used by persons under the age of 18 years or that the code is no longer desired.

(2) Required payment by credit card before transmission of the matter.

(h) It shall be a defense in any prosecution for a violation of paragraph (2) of subdivision (c) that the defendant has taken either of the following measures to restrict access to the harmful matter by persons under 18 years of age:

(1) Required the person receiving the harmful matter to use an authorized access or identification card to the vending machine after taking reasonable measures to ascertain that the applicant was 18 years of age or older and has established a procedure to immediately cancel the card of any person after receiving notice, in writing or by telephone, that the code has been lost, stolen, or used by persons under the age of 18 years or that the card is no longer desired.

(2) Required the person receiving the harmful matter to use a token in order to utilize the vending machine after taking reasonable measures to ascertain that the person was 18 years of age or older.

(i) Any list of applicants or recipients compiled or maintained by an information-access service provider for purposes of compliance with paragraph (1) of subdivision (g) is confidential and shall not be sold or otherwise disseminated except upon order of the court.

(Amended by Stats. 1994, Ch. 38, Sec. 1. Effective January 1, 1995.)

arvatus prodeo - the origins of webex http://larvatus.livejournal.com/371973.h

FIND MORE SHOP HELP LOGIN JOIN ENGLISH (EN)

LARVATUS

# larvatus prodeo - the origins of webex

## December 14th, 2012

*04:10 pm*

[Link] the origins of webex.

As [illegible] are wont to observe, victory has a hundred fathers but defeat is an orphan. The progenitors of WebEx number four: h [illegible], salesman extraordinary [illegible], brilliant engineer [illegible], and his bodacious daughter [illegible]. Here is a gr [illegible] of their relationship:

IPO
POWERED BY

(4 comments)

## Comments

From: [illegible]
Date: December 15th, 2012 10:58 pm (UTC)

EXHIBIT 38
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

of 2 7/21/2015 4:04 PN

MP005282

# Exhibit C

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY, an individual,<br>Plaintiff,<br>vs.<br>EDMUND G. BROWN, JR., an individual, in his official capacity; XAVIER BECERRA, an individual, in his official capacity; CITY OF MENLO PARK, a municipal corporation; and DAVE BERTINI, an individual, in his official capacity,<br>Defendants. | Case No.:<br>CV 17-7357 JS |

VIDEOTAPED DEPOSITION OF MATTHEW L. MILDE
San Francisco, California
Thursday, March 5, 2020
Volume I

Reported by:
CHRIS TE SELLE
CSR No. 10836
Job No. 3985719

PAGES 1 - 217

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL ZELENY, an individual,
Plaintiff,
vs.
Case No.: CV 17-7357 JS
EDMUND G. BROWN, JR., an individual, in his official capacity; XAVIER BECERRA, an individual, in his official capacity; CITY OF MENLO PARK, a municipal corporation; and DAVE BERTINI, an individual, in his official capacity,
Defendants.

Videotaped Deposition of MATTHEW L. MILDE, Volume I, taken on behalf of Plaintiff, at the Offices of Veritext Legal Solutions, 101 Montgomery Street, Suite 450, San Francisco, California, beginning at 10:03 a.m. and ending at 5:04 p.m., on Thursday, March 5, 2020, before Chris Te Selle, Certified Shorthand Reporter No. 10836.

Page 2

APPEARANCES:

For Plaintiff:
MARKEVITCH LAW FIRM
BY: DAVID MARKEVITCH, ESQ.
1261 Lincoln Avenue, Suite 208
San Jose, California 95125
(408) 463-6802
dmarkevitch@markevitchlaw.com

For City of Menlo Park, Dave Bertini, and the Witness:
HOWARD ROME MARTIN & RIDLEY
BY: TODD H. MASTER, ESQ.
1900 O'Farrell Street, Suite 280
San Mateo, California 94403
(650) 365-7715
tmaster@hrmrlaw.com

Also Present:
Jefree Anderson, videographer

Page 3

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| MATTHEW L. MILDE Volume I | | |
| | BY MR. MARKEVITCH | 7 |

EXHIBITS

| EXHIBIT NUMBER | | PAGE |
|---|---|---|
| Exhibit 90 | Plaintiff Michael Zeleny's Amended Notice of Depositions, marked prior to the deposition start, 7 pp. | |
| Exhibit 91 | flowchart for special event permit, Bates MP001822 to 1823, prior marked on 3/19/2019 at Chief Dave Bertini deposition as Exhibit 30 | 56 |
| Exhibit 92 | e-mails, Bates MP000219 to MP000221 | 56 |
| Exhibit 93 | e-mail from Matt Milde to All Employees, 6/6/2013, Bates MP000218 | 70 |
| Exhibit 94 | document entitled Special Event Permits, Bates MP001830 to 1831 | 73 |
| Exhibit 95 | e-mail, attachment, Bates MP000234 to MP000240 | 118 |
| Exhibit 96 | printout of map, 1 p. | 124 |
| Exhibit 97 | e-mails, Bates MP000243 to 245 | 145 |
| Exhibit 98 | e-mails, Bates MP000246 to 248 | 150 |
| Exhibit 99 | e-mails, Bates MP000258 to 260 | 151 |
| Exhibit 100 | e-mail, attachment, Bates MP000283 to 289 | 157 |
| Exhibit 101 | e-mails, Bates MP000290 to 000294 | 158 |
| Exhibit 102 | e-mail and correspondence, Bates MP000351 to 355 | 161 |

Page 4

EXHIBITS (Cont'd)

| EXHIBIT NUMBER | | PAGE |
|---|---|---|
| Exhibit 103 | e-mails, Bates MP000451 to 456 | 177 |
| Exhibit 104 | e-mails, Bates MP000435 to 444 | 179 |
| Exhibit 105 | May 4, 2016 letter from William McClure to Mr. Zeleny, appeal of denial of special event permit application, Bates MP000463 to 465 | 182 |
| Exhibit 106 | e-mails, Bates MP000484 to 486 | 182 |
| Exhibit 107 | e-mails, Bates MP000487 to 488 | 197 |
| Exhibit 108 | e-mails, attachment, Bates MP004893 to 4897 | 199 |

PRIOR MARKED EXHIBIT REFERENCED
EXHIBIT NUMBER 33 PAGE 93

QUESTIONS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 30 | 18 |
| 46 | 19 |
| 135 | 22 |
| 157 | 7 |

MOTION TO STRIKE

| PAGE | LINE |
|---|---|
| 171 | 9 |

Page 5

MR. MASTER: Object. Vague and ambiguous. 12:09:57
Overbroad. You can answer.
THE WITNESS: I don't remember if I did or not.
BY MR. MARKEVITCH:
Q. Now, logistically, did you have access to 12:10:03
whatever portal there was to actually post
information on the website?
A. Yes.
Q. So, if you needed to post something, you
would do it yourself? 12:10:14
A. Yes.
Q. You didn't have to go to IT and ask them
to do it.
A. No. No. I believe I was always a
publisher of the website. 12:10:35
Q. Let's go back to Exhibit 91, please.
Is this, does this flowchart represent the
general process for special event permit
application, as it exists today?
MR. MASTER: I'm just going to object. Lacks 12:11:16
foundation, calls for speculation, as of today.
He's no longer with the city.
MR. MARKEVITCH: Thank you.
BY MR. MARKEVITCH:
Q. As it existed as of the time when you left 12:11:22

the City of Menlo Park. 12:11:24
A. Generally, yes.
Q. Okay. When you say, generally, could you
specify why you are qualifying your answer.
A. Yes. The first thing that jumps to my 12:11:39
mind is the days indicated is not necessarily set.
It was general. Depending on the complexity of the
application, it might have been reviewed by our --
I'm only speculating.
MR. MASTER: Don't. You're not speculating. 12:12:14
BY MR. MARKEVITCH:
Q. So, let's look at step A, initial contact.
It looks like in this step you, at least
at the time of this flowchart, you would send the
application to the applicant in response to, I 12:12:41
presume, an inquiry, correct?
A. That's correct.
Q. Would you then at that time speak with the
applicant?
A. Not always. 12:13:00
Q. Under what circumstances would you speak
to an applicant?
A. If they called me on the phone.
Q. And can you generalize what kind of
questions applicants would ask at that point, if you 12:13:43

can. 12:13:47
MR. MASTER: That is very vague and ambiguous.
Overbroad. Go ahead, you can answer.
THE WITNESS: I mean, it, that is a, it's a
loaded question. Depending on the complexity and 12:13:56
details of every event, every event's a little
different.
Basically, making sure that they understood
everything in the permit, so they can fill it out
completely, so then I can then route it to the 12:14:15
permit committee.
BY MR. MARKEVITCH:
Q. Were you required to initiate that call,
or did you simply take calls, if the applicant had
some questions? 12:14:31
A. I was not required to take calls.
Q. It looks like step B is when the
application is actually submitted to the city,
correct?
A. That's correct. 12:14:49
Q. And who would be the initial reviewer of
the application?
A. I would.
Q. And what would that review entail?
A. Again, I would look at the dates of the 12:15:01

permit, make sure it was filled out completely, that 12:15:04
I understood what the applicant was trying to host,
or do.
Q. When you say, filled out completely, what
exactly are you talking about? 12:15:23
A. There were no omissions of boxes, all the
narrative portions were completely filled out, they
included a map detailing where the proposed event
was to take place, and they signed it.
Q. Now, when you are talking about the 12:15:43
narrative portions, did you review the substance of
those portions at this level of the application
review?
A. I did.
Q. To what extent? 12:15:55
MR. MASTER: Object. Vague and ambiguous.
Go ahead.
THE WITNESS: To the extent that there was
information present, not necessarily the content of
the information. 12:16:06
BY MR. MARKEVITCH:
Q. You mentioned a map detailing the event,
correct?
A. That's correct.
Q. Can you explain specifically what you were 12:16:20

looking for in terms of the detailing of an event on 12:16:22 a map.
A. The special event permit application included a checklist that the applicant needed to identify certain features, such as tents, road 12:16:35 closures, first aid stations, and the like.
It was, I would look to make sure that that information was complete to the event. I would, if the applicant included that they had a road closure, I would look to see if it was on a 12:17:05 primary response route or not, and where the location of the closure was.
Q. Anything else?
A. I would confirm that the map was clear, so that when it was photocopied and sent to the permit 12:17:34 committee, it was legible.
Q. Anything else?
A. That's all I can recall.
Q. Now, if there were any deficiencies in the application, what would you do, generally? 12:17:47
MR. MASTER: Objection. Vague and ambiguous. Overbroad. Go ahead.
THE WITNESS: Generally, I would contact the event permit organizer and detail a listing of the items that they needed to exchange or modify or 12:18:08

include, depending on the event permit, and have 12:18:13 them resubmit.
BY MR. MARKEVITCH:
Q. And then what would happen?
MR. MASTER: Same objections. Go ahead. 12:18:28
THE WITNESS: That depended on the person, the applicant, whether or not they wanted to resubmit or not.
BY MR. MARKEVITCH:
Q. If they resubmitted, what would you do 12:18:38 with that application?
A. Follow the same process by providing an initial review of the application.
Q. And if you found the application to be complete to your satisfaction, what would you do 12:19:02 next?
A. I would scan the documents and forward them to our permit committee.
Q. Now, you were part of the permit committee that would then again review the application for 12:19:27 substance, correct?
A. That's correct.
Q. So now we're talking about step C, staff internal review, correct?
A. That's correct. 12:19:38

Q. Going back to step B, in the title there, 12:19:40 it says, application received, in parentheses, three days.
What is the significance of this three days that are noted here? 12:19:49
A. Just a general guideline of the time it could potentially take, ideally. Every application was different.
Q. So, how often would application review process deviate from this three day estimate? 12:20:15
A. I couldn't say for sure.
Q. Can you think of any instances where it took you more than three days to review a submitted application?
A. I'm sure there were, but I can only 12:20:39 speculate.
Q. Well, when you say you are sure, what are you basing that statement on?
A. Based on the amount of permits that we received in the years I worked for the City of Menlo 12:20:53 Park, there must have been a time where I was away at a conference, or vacation, or was too busy with other responsibilities to provide a response within three days. That wouldn't have been abnormal, I don't think. 12:21:15

Q. Assuming the rollout of this process was 12:21:24 in March of 2013, do you remember how many applications you reviewed before the end of the year?
A. I don't recall. 12:21:39
Q. Was it 100?
A. Less than 100.
Q. Was it one?
A. More than one.
Q. What's your best estimate? 12:21:53
A. I just don't recall. It would be a large estimate.
Q. Was it 10?
A. More than 10.
Q. Was it 50? 12:22:11
A. I couldn't say.
Q. So somewhere between 10 and 50?
A. I'd say between 25 to 80. I don't recall how many we received that first year.
Q. Now, you continued reviewing these 12:22:37 applications from 2013 until 2018, when you left the city, correct?
A. That's correct.
Q. Now, are you aware of an average number of applications per year that was calculated by someone 12:22:52

MR. MASTER: Thank you. 01:19:01

MR. MARKEVITCH: -- generally, as a response, so, whenever I have an exhibit that's actually been marked, and I'm reusing it again, certainly, we will do this. 01:19:09

MR. MASTER: Yeah.

MR. MARKEVITCH: But, if I have an exhibit that happens to be something that was used previously, but the version that I'm using has not been marked, for example, whatever I was using day and a half 01:19:15 ago, I don't have the marked exhibit, we're just going to have some duplicates.

MR. MASTER: That's fine.

MR. MARKEVITCH: Okay, very well.

BY MR. MARKEVITCH: 01:19:24

Q. Mr. Milde, please, take a look at this Exhibit 33 and tell me if you have seen this document before.

A. I have.

Q. What is this document? 01:19:55

A. This is a special event permit application FAQs for the City of Menlo Park.

Q. Did you draft this document?

A. I compiled the information and put into a single document, yes. 01:20:11

Q. Do you remember when you completed the 01:20:12 first version of this document?

A. I don't recall.

Q. Were there any updates to the initial version of the document? 01:20:20

A. I believe so.

Q. Now, if you go to the last page, which is, for the record, is marked as MP001821, there is a date in the lower right corner on the last page, and it says 7/13/2016, do you see that? 01:20:59

A. Yes.

Q. So, this was a version that was updated on 7/13/2016, based on that notation, correct?

A. It appears to be, yes.

Q. Were there other versions that were in 01:21:09 existence prior to this date?

A. I believe there were. I just can't call them out specifically when those were.

Q. Do you remember when this FAQ was posted on the website? 01:21:21

A. I don't.

Q. Do you have any recollection with regard to when it was posted in relation to the launch in March of 2013? And, again, what I'm asking for is, was it two days, was it 10, because you were on 01:21:36

vacation, or was it two years, for whatever other 01:21:39 reason.

A. I couldn't recall if it was something that we put out immediately or if it was something that was done later. I can't recall for sure. 01:21:47

Q. So, you do not know when this became available to the public through the website.

A. No.

Q. Can you go to page 1820. It's the second-to-last page in this document. At the very 01:22:14 bottom, there is a section called, what if my permit is denied. Do you see that?

A. Yes.

Q. And on the third line, there's a sentence that states, determination of the approval or denial 01:22:31 of any application is at the discretion of the special event permit committee.

Do you see that?

A. Yes.

Q. Is that an accurate statement? 01:22:42

A. I would say, initially, yes.

Q. What do you mean by, initially?

A. There was a appeal process, so a permit could, theoretically, be approved, if it was appealed. 01:23:09

Q. But the initial review was done at the 01:23:09 discretion of the special event permit committee, correct?

A. Maybe I'm unclear on the question.

I provided the initial review of any 01:23:25 permit that came through, and forward it to the permit committee.

Q. What would the permit committee do with the application?

A. I can't say specifically what each one 01:23:48 did, but the understanding was that they were reviewing it, looking at their department's policies, city codes, and general practice with approving permits in the city. Each department had their own method. 01:24:18

Q. Let's start with your department. Under step C, there's your name listed in a box. And under it, in parentheses, it says, CSD.

Do you see that?

A. Correct. Yes. 01:24:48

Q. What does CSD stand for?

A. Community services department.

Q. Now, did you review, in the capacity of a liaison of a community services department, every application that came through the city's desk? 01:25:01

A. Yes, that is correct. 01:25:05
Q. What was the scope of your review?
A. I looked at, in that capacity, events being held in public parks to confirm availability, to confirm how the applicant wished to use our field 01:25:27 turf, to look at other events that were occurring nearby that might provide impacts, and I was looking at our park city ordinance to make sure that the event complied with our park, our local law.
Q. So, the park city ordinance would be a 01:26:05 written guideline for your review, am I correct?
A. That is correct.
Q. Did you have any other written guidelines for the reviews that you performed?
A. Not that I can recall. 01:26:22
Q. Now, if you go to page one of Exhibit 33, that's the FAQs.
A. Uh-huh.
Q. Second section there is titled, what qualifies as a special event. 01:26:45
Do you see that section?
A. Yes.
Q. Was it your responsibility to review permits and determine whether or not the requested event would qualify as a special event? 01:26:58

A. No. 01:27:05
Q. Did you ever review any permit for the purpose of determining whether or not the underlying event qualified as a special event?
A. No. 01:27:18
Q. Who drafted the criteria for a special event?
A. I don't know specifically. I do know it came from the permit, the original permit committee team. 01:27:35
Q. Did you come up with any of these criteria for a special event definition?
A. Not that I remember.
Q. Are you familiar with the criteria for the special event definition? 01:27:47
MR. MASTER: Objection. Vague and ambiguous.
THE WITNESS: I wouldn't say we treated this as a way to define a special event. I would say we treated this as a way, is, if you fall, if you fell under one of these bullet points, you needed to 01:28:04 submit a permit application, not necessarily defining what a special event was. That's how we treated it.
BY MR. MARKEVITCH:
Q. If someone is asked to submit an 01:28:27

application under a special event permit process, 01:28:29 that is because they are proposing to hold a special event; is that correct?
A. Repeat the question.
(The pending question was read.) 01:28:50
MR. MASTER: Object. Vague and ambiguous. Overbroad. You can answer.
THE WITNESS: I can't say that in every case that was the case.
BY MR. MARKEVITCH: 01:29:18
Q. For any specific event application, was there a point where somebody determined whether or not it was a special event that could be approved?
A. To my recollection, I don't recall looking at any permit that came through where we looked at 01:29:59 defining it a special event, specifically; not to say that didn't happen. We were more interested in the criteria of whether or not you needed to submit the paperwork, as far as I was concerned.
Q. Could an application be denied because the 01:30:53 proposed event would be deemed not to be a special event?
MR. MASTER: Objection. Vague and ambiguous. Overbroad.
THE WITNESS: I can only speculate. 01:31:10

BY MR. MARKEVITCH: 01:31:13
Q. Okay. Going back to step C on Exhibit 91, so, looking at the boxes, the first one lists Sergeant Matt Ortega, and, in parentheses, it says, police. 01:31:59
Does that mean that Sergeant Ortega is the liaison for the police department for the committee?
A. That is correct.
Q. Did Sergeant Ortega review every single permit that came through the city? 01:32:15
MR. MASTER: Objection. Lacks foundation. Calls for speculation.
THE WITNESS: I can't say that he did, no.
BY MR. MARKEVITCH:
Q. What was your procedure for routing permit 01:32:29 applications after you were satisfied that they were complete pursuant to step B in terms of deciding who to send it to?
A. Can you repeat the question.
(The pending question was read.) 01:32:48
THE WITNESS: I believe, as I mentioned before, that I would scan it and send it to the permit committee. Not in every case did everyone from the permit committee get a copy at every, for every instance of a permit that we had application. 01:33:23

BY MR. MARKEVITCH: 01:33:27
Q. Were you done with the answer?
A. Yeah.
Q. Who decided, for any given application, on which individuals on the committee would receive a 01:33:34 copy?
A. Typically, that was me.
Q. What were the criteria for you making that decision?
A. It depended on the permit. 01:33:49
Q. What criteria did you apply to decide whether or not a given permit would have to go to one department rather than another?
A. For instance, if the permit did not require amplified sound, it did not go to, it may 01:34:09 not have gotten to the planning committee, planning department.
Q. That is one criteria?
A. Correct.
Q. How many criteria are there, total? 01:34:31
A. I couldn't say.
Q. Is there a list of criteria that is written down somewhere?
MR. MASTER: I'll just object. The question is vague and ambiguous and overbroad. 01:34:41

THE WITNESS: I don't remember. 01:34:45
BY MR. MARKEVITCH:
Q. In your, for any given application, as you were sitting there, or standing, and deciding what you were going to do in terms of forwarding it to 01:34:57 various individuals, did you have a written reference that you would look at in making that decision?
A. I don't remember.
Q. Are you aware of an existence of any such 01:35:09 written reference material that anyone in your position would use to decide where to send the application?
A. I don't believe so. I'm just not sure.
Q. Do you remember a single instance of 01:35:34 taking an application and forwarding it to the committee?
A. I don't understand the question. Could you repeat it.
(The pending question was read.) 01:35:59
THE WITNESS: Only vaguely. No.
BY MR. MARKEVITCH:
Q. So, pick an instance of the approximately 600, or whatever it was, during your tenure, that you remember the most. Can you pick one for me. 01:36:15

A. I couldn't. We did so many, it would all 01:36:23 jumble together.
Q. Is there any one particular one that you remember, for whatever reason?
MR. MASTER: Objection. Asked and answered. 01:36:35 Argumentative.
THE WITNESS: As I sit here today, I cannot.
BY MR. MARKEVITCH:
Q. Do you remember Mr. Zeleny's application?
A. Vaguely. 01:36:49
Q. Do you remember forwarding that application to the committee?
A. I don't recall that I did.
Q. You don't think you forwarded that application to the committee? 01:37:13
A. I don't remember if I did or not.
Q. Now, once an application is in the hands of the police department, do you know what criteria the police department applies to its review?
A. No. 01:37:28
Q. Once the application is in the hands of, what does PW stand for again?
A. Public works.
Q. Once an application is in the hands of public works maintenance, do you remember what 01:37:40

criteria they apply to deciding whether or not an 01:37:43 application should be approved or denied?
A. No.
Q. Same question for public works engineering. 01:37:52
A. No.
Q. What about planning?
A. Can you repeat the question for planning.
Q. Once you send an application to planning, do you know what criteria the planning department 01:38:11 would apply in reviewing that application?
A. I don't know for certain.
Q. Do you know if criteria exist that a planning department would apply to review an application? 01:38:31
MR. MASTER: Lacks foundation. Calls for speculation.
If you know.
THE WITNESS: I know they would look at the city ordinance, and, if there was amplified sound, 01:38:39 they'd take it to city counsel for approval.
BY MR. MARKEVITCH:
Q. How do you know that they look at the city ordinance?
A. That would be the only way to take it to 01:38:59

A. I don't recall. 05:00:47

Q. Do you recall any discussion of any proposed modifications to his proposal that would potentially allow the city to approve his application for a special event permit? 05:01:02

A. I don't recall.

Q. Do you know if it would be proper for Mr. Zeleny to open carry weapons if he received a permit from the city?

MR. MASTER: Objection. Vague and ambiguous. 05:01:30 Overbroad. Calls for a legal conclusion. And speculation. Go ahead.

THE WITNESS: I don't know.

BY MR. MARKEVITCH:

Q. Do you know anything about open carry 05:01:38 laws?

MR. MASTER: Objection. Vague and ambiguous.

BY MR. MARKEVITCH:

Q. Anything?

MR. MASTER: Same objection. 05:01:46

THE WITNESS: No.

BY MR. MARKEVITCH:

Q. Do you know what I mean when I say, open carry?

A. Yes. 05:01:55

Page 214

Q. What is your understanding? 05:01:56

A. A person can carry a gun in plain view, is my understanding.

Q. Anything else?

A. No. 05:02:29

Q. Do you have any understanding how the open carry matter ties into Mr. Zeleny's permit application?

A. No.

Q. Did you ever apply for a special event 05:03:01 permit yourself, with the City of Menlo Park?

A. I can't remember.

Q. Did you ever organize any events in the City of Menlo Park?

A. Yes. That was my job. 05:03:40

Q. Did you ever organize any events in the City of Menlo Park in your individual capacity?

MR. MASTER: As a noncity employee?

MR. MARKEVITCH: Correct.

MR. MASTER: Okay. 05:03:52

THE WITNESS: Not that I recall.

MR. MARKEVITCH: So, I don't have any further questions at this point. For the record, I have to say that it is my assessment that there were a number of questions that were not answered, and, 05:04:23

Page 215

therefore, we reserve the right to seek an order 05:04:27 requiring Mr. Milde to come back and answer some of those questions, or all of them.

MR. MASTER: Okay. Agree to disagree on that. Thank you. 05:04:41

MR. MARKEVITCH: Thank you.

THE VIDEOGRAPHER: This marks the end of the deposition of Matt Milde. Going off the record. The time is 5:04.

THE COURT REPORTER: Copy? 05:04:51

MR. MASTER: Yes, please. Thank you.

(Time noted: 5:04 p.m.)

Page 216

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: March 19, 2020.

CHRIS TE SELLE
CSR No. 10836

Page 217

DECLARATION

I hereby declare I am the deponent in the within matter; that I have read the foregoing transcript and know the contents thereof; and I declare that the same is true of my knowledge except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe them to be true.

I declare under the penalties of perjury under the laws of the United States that the foregoing is true and correct.

This declaration is executed this _______ day of ______________________, 20___, at ______________________________, ____________.

______________________________
MATTHEW L. MILDE

Page 218

# CITY OF MENLO PARK

Special Event Permit Application FAQs

701 Laurel Street, Menlo Park, CA 94025 Ph: 650-330-2223 Fax: 650-330-2242

## SPECIAL EVENTS IN MENLO PARK

Thank you for your interest in holding a special event in Menlo Park. Special events play an important role in building community and creating vibrancy within Menlo Park. Our goal is to help event organizers plan a safe and successful event creating minimal impacts to the surrounding neighborhoods. Depending on the nature of your event, additional permits or approvals may be needed so please allow adequate time for processing. Please read all of the materials thoroughly and carefully to ensure the Special Event Permit can be processed in a timely manner.

## WHAT QUALIFIES AS A SPECIAL EVENT?

If your event meets **one** or more of these criteria, you will need to complete a Special Event Application (attached):

- Attendance is expected to exceed 150 people and you will be using outdoor public space
- Use of any City street, sidewalk, or other right-of-way
- Any City street or lane closures
- Any event impacting traffic or intersections
- Any noise exceeding the City's noise ordinance (Municipal Code 8.06.030: Sound measured from subject site to any residential property: 10 p.m. to 7 a.m. - 50 dBA and 7a.m. to 10p.m. - 60 dBA)
- Parking needs that will exceed the capacity of the venue
- Generate a crowd of spectators sufficient in size to obstruct, delay or interfere with the normal flow of pedestrian, vehicular traffic, or city facilities
- Community Events (i.e. Block Parties - not for private or exclusive residential use)
- Events occurring for more than 1 day
- Events needing Police regulation, monitoring or control

## WHAT IS A SPECIAL EVENT APPLICATION?

A Special Event Application is a detailed questionnaire to gather all critical information about your event. Instead of completing multiple permit applications, the single application is reviewed internally by each City department to determine which permits or approvals are required. All Special Events Applications are due to the City by the established deadlines (listed below). The acceptance of the application should, in no way, be interpreted as approval of your request. For larger events, we strongly encourage you to submit the application roughly 6-months in advance.

## WHAT IS THE PROCESS FOR OBTAINING A SPECIAL EVENT PERMIT?

1. Submit your completed application with a check made payable to City of Menlo Park for $125 for minor events/$250 for major events (non-refundable). Applications can be emailed to mlmilde@menlopark.org or delivered to:

***Mailed:***
City of Menlo Park
ATTN: Special Events – Matt Milde
701 Laurel Street
Menlo Park, CA 94025

***Drop Off:***
Arrillaga Family Gymnasium
ATTN: Special Events – Matt Milde
600 Alma Street
Menlo Park, CA 94025

For any questions regarding the application, fees, or application process please contact Matt Milde at 650-330-2223. Incomplete applications will not be processed and you will be asked to submit the additional information in order to start the application process.

EXHIBIT 33
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

MP001817

2. You will be sent an email acknowledgement that your application has been received. Your application will then be reviewed by City staff, which may take up to three weeks. During this time, you may be contacted by City staff for clarification of your event details or to schedule a meeting to review the application.

3. After a full review of your application, you will receive either a denial letter or a conditions-of-approval letter. The conditions-of-approval will outline requirements for your event, such as necessary permits, approvals and/or additional application fees. This may include, but not limited to, the following:
    - Certificate of Liability Insurance
    - Country of San Mateo Temporary Event Food Permit
    - Facility Reservation Confirmation
    - Fire Department Approval or Permits
    - Proof of Menlo Park Business License
    - Proof of 501c3 Non-profit status
    - Public Notification Requirements

4. Public Notification will be required for some permits based on your application. If, in the Planning Division's opinion, the proposed event could exceed the noise ordinance limits, the Planning Division will prepare a public notice to be mailed to all addresses within 300 feet of the subject property. The notice will state the decision of the City and will serve as the noise permit unless the request is appealed. The Planning Division will mail the notices on the decision date, which starts the 10-day appeal period. If the Planning Division does not receive an appeal in writing, the decision will be become effective on the 11th day. If the decision is appealed, the item will be scheduled for the next available Planning Commission meeting. The Planning Commission generally meets on the first and third Mondays of every month. The minimum lead-time between an appeal and a Planning Commission meeting is approximately three weeks. The Planning Commission's decision will also be posted at the Civic Center and on the City's web page: http://www.menlopark.org/371/Planning-Commission. The Planning Commission's decision on the noise permit also contains a 15 day appeal period before it becomes active, and the decision can be appealed to the City Council. If the project is appealed to the City Council, the processing time generally would take more than 60 days, due to scheduling and additional public noticing requirements. For projects that require public notification, it is recommended that the application be submitted more than 60 days in advance of the planned event date.

5. Once all of the conditions-of-approval have been met, a Special Event Permit will be issued by the City. You will be required to have this permit in your possession during your event.

**WHEN ARE THE APPLICATION DEADLINES?**

Please pay close attention to the following application deadlines:

- 30-days for Block Parties not required to have a noise permit
- 60-days for Block Parties required to have a noise permit
- 60-days for all Minor Events that are not considered Block Parties
- 90-days for all Major Events

Applications are accepted up to 12-months in advance of the proposed event date. Applicants are encouraged to apply early to ensure permit is received in a timely fashion. Once an application is submitted you many not receive confirmation that your event has been approved until 30 to 60-days after submission. Please allow yourself ample time for permit processing. Applications that do not meet their required deadline **will not** be processed.

**CAN MY EVENT BE A FUNDRAISER?**

If the event is a fundraiser, you will be required to fill out the Fundraising Form and provide a copy of the organization 501c3 status. Please inquire about the Fundraising Form with Matt Milde when submitting Special Event application.

**WHAT ARE THE SPECIAL EVENT PERMIT FEES?**

**Special Event Application Fee:** $125 (minor); $250 (major)

**Noise Permit Fee:** $135

**Police Services Fees:** Fee based on staff hourly billing rate. 50% of the estimated Police services must be paid prior to a permit being issued.

**Barricade Rental Fees:** 3' barricade - $3/day & 12' barricade - $8/day (Permit required for pick-up)

**Park Rental Fees:** Varies (see below) – Park fees are also listed in the City of Menlo Park's Master Fee Schedule.

**WHAT IS THE DIFFERENCE BETWEEN A "MINOR" AND "MAJOR" EVENT?**

The difference between a minor and major event depends on the nature of the event and its impact on city services. For example, most block parties closing a single road would fall under a "minor" event, while most fun runs requiring the closure of many roads would be considered a "major" event. Please contact the permit coordinator, Matt Milde, at (650) 330-2223 if you have questions on how your event would be categorized.

**CAN I POST SIGNAGE?**

All signs posted before and during the event shall be approved by staff prior to issuance of the permit. If the event requires, "No Parking" signage, 72-hour notification is required. Road signage can be rented from the Menlo Park Corporation Yard with an approved permit.

**WHO CAN I CONTACT REGARDING WASTE REMOVAL?**

For larger events where additional garbage removal will be needed, please contact Recology at www.recologysanmateocounty.com or call (650) 595-3900. Failure to remove trash from event will result in a $250 fine and may result in the inability to obtain a Special Event Permit in the future.

**HOW DO I GET A FOOD PERMIT?**

If serving food outside, San Mateo County Temporary Event Food permits are issued by County of San Mateo Environmental Health Services (2000 Alameda de las Pulgas #100, San Mateo, CA 94403 or (650) 372-6200). Documents are available online - smchealth.org. Costs vary depending on the nature of the event, but applications need to be submitting within 2-3 weeks prior to the event. A food permit is not required to receive your approved permit from the City of Menlo Park, but you are responsible for obtaining the necessary San Mateo County permits when serving food publically.

**WHAT IS THE BELLE HAVEN MINI-GRANTS PROGRAM?**

The City of Menlo Park Community Services Department has partnered with the Silicon Valley Community Foundation and the Belle Haven Community Development Fund to initiate the Belle Haven Mini-Grants Program. If you live in the Belle Haven neighborhood and are planning a community event, you might be eligible for a grant to help subsidize your special event application fees. For more details, contact Juanita Croft at (650) 450-5484 or BHaven@siliconvalleycf.org.

**HOW CAN I GET A BUSINESS LICENSE?**

Business License shall be obtained for all outdoor sales. Business License applications can be found online at www.menlopark.org under the Finance Department. Completed forms can be dropped off at the front desk in City Hall (701 Laurel Street).

**CAN I SERVE ALCOHOL?**

If serving or selling alcohol, ABC licenses can be obtained by California Department of Alcohol Beverage Control. More information can be found at www.abc.ca.gov or by calling (415) 356-6500.

**CAN I OBTAIN A PERMIT FOR PRIVATE USE?**

Yes, a permit may be issued for private events on City facilities where a rental reservation can be issued (ie. Burgess Park, Nealon Park, Bedwell-Bayfront Park, etc.) provided the event is aligned with the current use policies of that park/facility. Permits requiring road closures will **NOT** be approved for private functions / reserved use (ie. Birthday Parties, Weddings, Reunions, etc.). Any applicant who wants to close off a public right-of-way for private use will be directed to other City facilities (ie. Arrillaga Family Recreation Center, Onetta Harris Community Center, picnic/park facilities, etc).

**DO I NEED TO MAKE A RESERVATION FOR PARK SPACE BEFORE I APPLY?**

For renting sports fields, picnic areas, or park space, you are welcome to contact the Community Services Department at 650-330-2223 for rates and availability or inquire within at the Front Desk of the Arrillaga Family Gymnasium (600 Alma Street). Facility availability can also be viewed at www.menlopark.org. However, you are not required to make a reservation prior to the submission of your permit application. Please review the additional rental and use policies of the facilities you intend to utilize for your event.

**IS INSURANCE REQUIRED FOR MY EVENT?**

Yes. To apply for City of Menlo Park special event permit, one must provide a *Certificate of Liability Insurance* along with their Special Event Application and payment. A Certificate of Liability Insurance can be issued by the renter's homeowner's insurance or other insurance carrier. In order for the certificate to be valid, it must contain the following:

- The renter's name must be listed as the one "insured."
- The policy must not expire before the planned event date.
- The policy must be for $1,000,000.
- The "description" should list the rental location, day, and event planned.
- The City of Menlo Park at 701 Laurel Street, Menlo Park, CA 94025 must be noted as "additional insured."

A special event permit **will not** be issued until the required application fees, insurance, and other supplementary materials, as indicated in the Special Event Application, have been received. A special event permit issued for a private function on private property is not required to submit proof of liability insurance to the City.

**WHAT WOULD CAUSE A PERMIT TO GET DENIED?**

Approval or denial of applications are based upon several factors including: size (number of people), scale, location, route to be closed, community impact, impact on City services, past practices/experiences with issued permits, intended use, non-payment of fees, poor articulation of event as reflected in the application and site map, etc.

**WHAT IF MY PERMIT IS DENIED?**

Any applicant is welcome to re-apply provided they meet the 60-day deadline and pay appropriate fees; however, depending on the application details we cannot always issue a permit. Determination of the approval or denial of any application is at the discretion of the Special Event Permit Committee. Final decisions are appealable to the Community Services Director, please contact Matt Milde at mlmilde@menlopark.org to seek an appeal for a denied permit.

## WHERE CAN I FIND INFORMATION ON INSURANCE CARRIERS?

Below you will find a number of resources if you need to purchase special event insurance for your event. Please note: These resources are not provided as a recommendation or sole insurers for special events, but is provided here as a tool to aid you in your research in obtaining a Certificate of Liability for your event.

| Company Name | Website | Phone |
|---|---|---|
| AAA Homeowners | www.aaa.com | 800-922-8228 |
| Allied Brokers | www.alliedbrokers.com | 650-328-1000 |
| Event Helper | www.eventhelper.com | n/a |
| Hub International | www.eventinsure.hubinternational.com | 650-964-8000 |
| K&K Insurance | www.kandkinsurance.com | 877-648-6404 |
| Markel American Insurance Co. | www.markeleventinsurance.com | 800-236-4252 |
| Private Event Insurance | www.privateeventinsurance.com | 877-723-3933 |
| RVNA Event Insurance | www.specialeventinsurance.com | 800-364-2433 |
| Specialty Risk Insurance LLC | http://www.specialtyriskinc.com | 928-772-0844 |

## WHERE DO I PICK-UP BARRICADES?

You may pick-up barricades/street signage by going to the **City of Menlo Park Corp Yard** at 333 Burgess Drive on Mon-Fri 8am-4pm; please ask for Irv Meachum. The Menlo Park Corp Yard is closed every other Friday, please contact the number above if you wish to pick-up barricades on a Friday to verify if the Corp Yard will be open. Rental fees apply as articulated in the Special Event Permit Information packet. Please contact (650) 330-6780 with any questions regarding the pick-up/drop-off of your rented barricades and/or street signage. Your approved Special Event Permit and payment is required for pick-up of any barricade/street sign. Depending on events/projects throughout the year we may not be able to accommodate the precise signage you've requested on your Special Event Permit. Every attempt will be made to provide you adequate signage for your event purposes. Please note: Only approved barricades can be used to block city streets; hay bales, sawhorses, jump houses, motor vehicles, etc. are not permitted. If the event requires, "No Parking" notification, 72-hour notification is required. Below are additional resources for renting traffic signage:

D&M Traffic Services Inc.
408-436-1127

Interstate Traffic Control
408-279-1588

## WHAT IF I STILL HAVE QUESTIONS?

Please contact the permit coordinator, Matt Milde, at (650) 330-2223 or mlmilde@menlopark.org with any questions. If requested, appointments to discuss your application in-person a may be made in advance. Please note that we may not be able to discuss your permit if you walk-in without an appointment; scheduling an appointment in advance is strongly advised.

# Exhibit D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MICHAEL ZELENY, )
)
Plaintiff, )
)
vs. ) No. CV 17-7357 JCS
)
GAVIN NEWSOM, et al., )
)
Defendants. )
)

REMOTE VIDEO-RECORDED DEPOSITION OF ALEX D. McINTYRE

San Francisco, California

Friday, July 31st, 2020

Reported by:

DAWN A. STARK

CSR No. 7847

Job No. 4195014

Pages 1 - 197

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL ZELENY, )
)
Plaintiff, )
)
vs. ) No. CV 17-7357 JCS
)
GAVIN NEWSOM, et al., )
)
Defendants. )
)

Remote video-recorded deposition of ALEX D. McINTYRE, taken on behalf of Plaintiff, at 2395 45th Avenue, San Francisco, California, beginning at 10:07 a.m. and ending at 3:37 p.m., on Friday, July 31st, 2020, before DAWN A. STARK, Certified Shorthand Reporter No. 7847.

APPEARANCES:

For Plaintiff (Appearing Remotely):

AFFELD GRIVAKES LLP
BY: DAVID MARKEVITCH
Attorney at Law
2049 Century Park East, Suite 2460
Los Angeles, California 90067
310.979.8700
dmarkevitch@markevitchlaw.com

For Defendants City of Menlo Park, et al. (Appearing Remotely):

HOWARD ROME MARTIN & RIDLEY LLP
BY: TODD H. MASTER
Attorney at Law
1900 O'Farrell Street, Suite 280
San Mateo, California 94403
650.365.7715
tmaster@hrmrlaw.com

Appearances (Continued):

For Defendants Javier Becerra, et al. (Appearing Remotely):

OFFICE OF THE ATTORNEY GENERAL
BY: JOHN KILLEEN
Attorney at Law
1300 I Street, Suite 125
Post Office Box 944255
Sacramento, California 94244
916.210.6045
john.killeen@doj.ca.gov

Also Present:

KIMBERLEE DECKER, Videographer

INDEX

| WITNESS | EXAMINATION |
|---|---|
| ALEX D. McINTYRE | |
| BY MR. MARKEVITCH | 12 |

| NUMBER | DESCRIPTION | PAGES |
|---|---|---|
| Exhibit 150 | Plaintiff Michael Zeleny's Combined Amended Notice of Depositions, dated July 22, 2020, with attachment | 10 |
| Exhibit 151 | Email from Greg Rubens to Michael Zeleny, dated July 20, 2016 | 37 |
| Exhibit 152 | Letter from Gregory J. Rubens to Michael Zeleny, dated July 20, 2016 | 39 |

INDEX (Continued)

| NUMBER | DESCRIPTION | PAGES |
|---|---|---|
| Exhibit 153 | Letter from Alex D. McIntyre to Michael Zeleny, dated September 12, 2016, Bates Nos. MP000948 through MP000951 | 78 |
| Exhibit 154 | Letter from Alex D. McIntyre to Michael Zeleny, dated September 12, 2016, Bates Nos. MP000948 through MP000951 | 78 |
| Exhibit 155 | Email from Pamela I. Aguilar to Agenda Staff, dated September 29, 2016, with attachment, Bates Nos. MP000537 through MP000543 | 131 |
| Exhibit 156 | Email from Pamela I. Aguilar to Agenda Staff, dated October 6, 2016, with attachment, Bates Nos. MP000544 through MP000549 | 140 |

Page 6

INDEX (Continued)

| NUMBER | DESCRIPTION | PAGES |
|---|---|---|
| Exhibit 157 | Email from Pamela I. Aguilar to Alex D. McIntyre and William McClure, dated October 12, 2016, with attachment, Bates Nos. MP000569 through MP000571 | 142 |
| Exhibit 158 | Email from Nicole Casados to Pamela I. Aguilar, dated February 27, 2017, with attachment, Bates Nos. MP000717 through MP000722 | 144 |
| Exhibit 159 | Email from Pamela I. Aguilar to Alex D. McIntyre, et al., dated July 20, 2017 | 146 |
| Exhibit 160 | Email from Pamela I. Aguilar to Michael Zeleny and David Affeld, dated June 20, 2017, with attachment, Bates Nos. MP000879 through MP000881 | 146 |

Page 7

INDEX (Continued)

| NUMBER | DESCRIPTION | PAGES |
|---|---|---|
| Exhibit 161 | Email from David C. Bertini to Jelena V. Harada and Clay J. Curtin, dated August 29, 2017, with attachment, Bates Nos. MP001195 through MP001205 | 148 |
| Exhibit 162 | Email from Jelena V. Harada to Michael Zeleny, dated September 5, 2017, with attachment, Bates Nos. MP001218 through MP001220 | 162 |
| Exhibit 163 | Email from David C. Bertini to David Tresmontan, et al., dated August 27, 2015, with attachment, Bates Nos. MP000321 through MP000324 | 169 |

Page 8

INDEX (Continued)

PREVIOUSLY MARKED EXHIBITS

| NUMBER | PAGE |
|---|---|
| 62 | 64 |
| 63 | 66 |
| 67 | 167 |
| 77 | 183 |
| 78 | 151 |
| 79 | 151 |
| 80 | 151 |
| 91 | 113 |
| 95 | 55 |
| 99 | 155 |
| 102 | 173 |
| 103 | 173 |
| 104 | 173 |
| 105 | 173 |
| 106 | 30 |

Page 9

I don't know if you can confirm that, but if you can, please do.

A. (Witness reviewing screen.)

I am not seeing that.

MR. MASTER: Just for the record, this appears to be a very poor copy.

THE WITNESS: Yeah.

I can barely read this.

MR. MARKEVITCH: All right. Well, let's go back to the letter itself.

Q. So it looks like Mr. Zeleny is being informed here that you will be reviewing a certain level of appeal for a Special Permit; correct?

A. Yes.

Q. Okay. What -- could you please describe what this level of appeal entails?

A. I'm -- I don't understand the question.

Q. It's a general question regarding the appeal process that was in place at the City of Menlo Park in 2016.

And the question is: What was the appeal process and what was your involvement in that process?

A. So in order for Mr. Zeleny's due process to be meted out, I was the final step in that administrative hearing process.

And between -- my understanding is the Community Services Director had denied the appeal as it appeared before her, and I was the final step on the administrative process before an appeal would go to the City Council.

Q. Okay. Now, you mentioned that it was for due-process purposes.

Could you please elaborate on that statement?

A. I can't elaborate much more, other than through, I think, counsel -- legal counsel's advice, we needed to follow a set of rules in order to make sure Mr. Zeleny's due process was properly served.

Q. Are you familiar with that set of rules that you were advised to follow?

MR. MASTER: Objection. Vague and ambiguous.

Go ahead.

THE WITNESS: I -- I'm sorry.

Can you -- I -- I don't understand the question.

BY MR. MARKEVITCH:

Q. Do you know what the source is for the set of rules that you've described?

A. No, I do not.

Q. Was there a written process outlining the various steps for an appeal related to a Special Event Permit Application?

A. I don't know.

Q. How many times, during your tenure with the City of Menlo Park, did you have an opportunity to participate in an appeal process related to any Permit Application?

A. Once.

Q. Was that Mr. Zeleny's matter?

A. Yes.

Q. Do you remember what you did for the appeal process in Mr. Zeleny's matter?

A. I retained legal counsel, and held an appeal hearing for Mr. Zeleny and his legal counsel to provide the testimony for me to make a decision on the appeal.

Q. Did you also review all of the preceding decisions by the city personnel?

A. I believe I did, yes.

Q. Did you also review the application and subsequent communications by Mr. Zeleny to the City of Menlo Park?

A. I don't recall.

Q. Do you have an understanding of whether or not you would have to do that in order to complete the appeal process?

A. Yes.

Q. Do you have any reason to think that you did not, at that time, go back and look at the submissions by Mr. Zeleny to the city?

A. I do not have a reason to believe I would not have done that.

Q. All right.

MR. MARKEVITCH: So I'm going to now introduce the next exhibit -- I'm sorry.

Can we go off the record for a minute here?

THE VIDEOGRAPHER: We are off the record at 10:40 a.m.

(Remarks outside the record.)

THE VIDEOGRAPHER: We are on the record at 10:41 a.m.

MR. MARKEVITCH: I'm introducing the next exhibit in the sequence.

It's Exhibit No. 151.

(Deposition Exhibit No. 151 was marked.)

BY MR. MARKEVITCH:

Q. Mr. McIntyre, could you please take a look at the exhibit once it comes through on your side?

A. (Witness reviewing screen.)

I see it.

Q. Okay. Do you recognize this email?

A. (Witness reviewing screen.)

I recognize what it is. I don't recall the email.

Q. Could you describe what it is?
A. I think it's informing Mr. Zeleny that I've retained Greg Rubens as legal counsel for myself.
Q. What was the function of Mr. Rubens?
A. To provide me legal advice on the -- this hearing matter that was before me.
Q. Did Mr. Rubens provide procedural advice?
A. I don't recall.
Q. Do you recall if Mr. Rubens' advice involved substantive decision making with regard to the facts of the Permit Application itself?
MR. MASTER: Counsel, let me just assert an objection to attorney-client privilege.
I'll allow him to answer that very generally, but I want to ensure that we don't get into specific communications Mr. McIntyre had with his attorney, based on that privilege.
Go ahead.
THE WITNESS: Can you ask the question again, please?
MR. MARKEVITCH: Can we have the question read back, actually?
(Record read.)
THE WITNESS: I'm afraid I don't understand the question.

MR. MARKEVITCH: Let me rephrase the question.
Q. Do you have an understanding of what a -- a distinction would be between procedural matters on appeal versus substantive matters on appeal?
A. Could you explain, please?
Q. Certainly.
"Procedural matters" would be whether or not hearings should be held, what evidence must be considered, the extent to which a decision maker has to be a neutral, etc.
"Substantive matters" would be actual matters that deal with the -- the substance of the appeal, meaning whether or not the denial was proper, whether or not a permit can or should be issued, etc.
Do you understand that?
A. I do.
Q. Was -- very generally, was Mr. Rubens' advice to you pertaining to the procedure of the appeal or the substantive of the appeal or both?
A. Both.
Q. Okay.
MR. MARKEVITCH: I'm introducing Exhibit 152.
(Deposition Exhibit No. 152 was marked.)
BY MR. MARKEVITCH:
Q. Mr. McIntyre, please let me know once you see

the exhibit on your side.
A. (Witness reviewing screen.)
I see it.
Q. Do you recognize this document?
A. (Witness reviewing screen.)
I recognize what it is. I don't recall it, though.
Q. Okay. Is it your understanding that this is a letter from Mr. Rubens to Mr. Zeleny, setting the date of the hearing --
A. Yes.
Q. -- for the appeal? Okay.
Now, do -- do you remember who decided on when the appeal hearing will be held?
A. I don't recall, but I believe it was being mutually set for all parties.
Q. Do you remember what your function was at this hearing?
A. I was -- I was the Hearing Officer for the appeal.
Q. What were your responsibilities as the Hearing Officer for the appeal?
A. To listen to both sides of the argument and make a decision on the merits of the appeal.
Q. Do you remember the scope of your

decision-making process?
Answer this question, if you understand it; we can get into more detail if not.
MR. MASTER: I'm just going to object it is vague and ambiguous.
But you can answer.
THE WITNESS: The scope of my -- I'm sorry.
Could you repeat the question?
MR. MARKEVITCH: Let's -- let me withdraw that question.
Q. In your decision-making process, did you review the entirety of the application as if it was being first presented to you by Mr. Zeleny?
A. Yes.
Q. What was the level of review of the city employees' prior decision-making process, as part of your appeal review?
MR. MASTER: I'll also object. Vague and ambiguous. Confusing.
You can answer.
THE WITNESS: Yeah.
I -- I'm not sure I understand. Can you be -- can you elaborate, please?
MR. MARKEVITCH: Certainly.
Q. Before the matter of Mr. Zeleny's permit came

across your desk, there were several levels of application denial.
Am I correct?
A. Yes.
Q. Were these made by various levels of city officials?
A. Yes.
Q. And you were next in line, to determine whether or not the permit should be granted, in the hierarchy within the city; correct?
A. Correct.
Q. Did you give any consideration to the decisions and the rationale of the city employees at the lower levels of the decision-making process?
A. I believe that certainly informed my decision making, but ultimately, the hearing was where I took in all the information.
Q. Okay. At the hearing, were various employees of the city, who had looked at the application previously, presenting to you the reasons for why the permit should not be approved?
A. Repeat the question.
MR. MARKEVITCH: Let's have it read and see -- see if it's -- it could be understood that way.
(Record read.)

THE WITNESS: Yes, I believe I -- I had an understanding of the prior decisions and why they were made.
MR. MARKEVITCH: Okay.
Q. Was it -- was it done -- procedurally, was it done in a setting where prior levels of decision making -- let me -- let me withdraw that.
Was the hearing procedurally an adversary hearing, where employees of the city were trying to convince you that a permit should not be granted?
A. During the appeal hearing before me?
Q. That is correct.
A. There was Mr. -- Mr. Zeleny's representative who made a certain argument on behalf of Mr. Zeleny's position.
And Commander -- then-Commander Bertini at the time provided the city's position on why the city -- why the Commander and/or the city's prior decisions were made.
Q. Okay. Do you remember what the arguments were presented by Commander Bertini at the time of the hearing?
A. Generally, yes; not specifically.
Q. Could you describe what the arguments were, to the best of your recollection as you sit here?

A. Certainly.
I believe the Commander pointed out several aspects of the Special Event Permit that were of concern.
One had, basically and generally, allotted under the umbrella of "public safety."
The site, I believe, that Mr. Zeleny hoped to use -- to have his Special Event Permit was problematic from, I believe, a traffic safety point of view.
We -- there were concerns that Mr. -- Commander Bertini brought up with regards to weapons and ammunition being present on the site.
I believe Commander Bertini also referenced -- sorry; I'm not -- I'm not recalling the bounds of the argument for the moment.
Q. Okay. At the time of the hearing, did anyone other than Commander Bertini present any arguments to you from the city side?
A. No.
Q. Do you have an understanding as to why it was Commander Bertini who was speaking for the city at the hearing?
A. No.
Q. Were there any other individuals present from the side of the city at that hearing?

A. Just Mr. Rubens and myself and -- and Commander Bertini.
Q. Was -- was Mr. Milde involved in the appeal process in the context of that specific matter that we are discussing here?
A. I'm sorry.
In the memo?
Q. Let me withdraw that.
Did you -- did Mr. Milde participate in that appeal hearing in any way?
A. I don't -- I don't believe so, no.
Q. He was not present there; correct?
A. No, he was not.
Q. And did you interview him before making your decision?
A. No.
Q. Did you review any memos from Mr. Milde before making your decision?
A. I don't recall.
Q. Now, at the time, Mr. Milde was in charge of reviewing the Special Event Permit Applications for the city.
Am I correct?
A. Correct.
Q. Do you have a recollection as to why you did not

"yes" or "no" question.
Does the same objection apply, Mr. Master?
MR. MASTER: Yes, it does, because as the question is framed, it does call for a substantive response.
MR. MARKEVITCH: Okay. I am introducing Exhibit No. 154.
(Remarks outside the record.)
(Deposition Exhibit Nos. 153 and 154 were marked.)
BY MR. MARKEVITCH:
Q. So Exhibits 153 -- do you see Exhibit 154, Mr. McIntyre?
A. (Witness reviewing screen.)
I do.
Q. For the record, Exhibit 153 and Exhibit 154 are identical documents; it's just a matter of logistical issues that I'm having here on my side.
So could you please open No. 154, and we'll discuss that exhibit.
A. (Witness reviewing screen.)
I've opened it.
Q. Okay. Do you recognize this document?
A. I do.
Q. Can you describe generally what it is?

A. It's my denial -- the letter of -- informing Mr. Zeleny -- Mr. Zeleny of my denial of his appeal.
Q. Did you write this letter yourself?
A. In concert with the -- my legal counsel.
Q. And that would be Mr. Rubens?
A. Sorry.
Mr. Rubens.
Q. Who made the ultimate decisions with regard to the denial generally and the specific reasons for the denial?
A. I did.
Q. Can you, at least in general terms, set forth the reasons for the denial as stated in this letter?
A. Certainly.
As stated in the letter, basically the concerns were around the display of firearms, the use of the public rights-of-way, and what -- what's characterized here as "practical aspects," and for public safety concerns.
Q. Okay. So starting with the first one, which is the display of firearms, do you have a recollection of the specific concerns and reasons for the denial?
And if you need to, take a look at page 3, if you need to refresh your recollection.
A. Okay.

(Witness reviewing screen.)
So I apologize; the question again?
Q. So the question is, if you could, in your own words as you sit here today, to the best of your recollection, explain what the basis for denial was, in terms of the display of firearms.
MR. MASTER: Above and beyond what's stated in the letter, Counsel?
MR. MARKEVITCH: Both.
MR. MASTER: You want him to read what's in the letter or do you want him to say something above and beyond what's in the letter?
I guess that's my question.
MR. MARKEVITCH: Well, so -- so the question is general.
To the extent that the letter is in front of the deponent and -- he's welcome to cite to it and use it to refresh his recollection.
But to the extent that there are some additional issues or matters that are not necessarily written down here, that are also pertaining to this question, I would like to hear that, as well.
THE WITNESS: So to my recollection, you know, these Penal Code citations were provided by Mr. Rubens with regards to the concerns about brandishing and

displaying firearms and weapons, loaded or unloaded, and just the concerns that they present in that -- in that -- basically in that display.
BY MR. MARKEVITCH:
Q. Did you have an understanding that Mr. Zeleny was proposing brandishing a weapon in the context of his protests?
A. I did have that understanding, yes.
Q. Do you -- do you have -- what is your understanding of the meaning of the term "brandishing"?
A. Showing, displaying, holding in a way that's potentially threatening.
Q. Did you make a determination as to whether or not the way Mr. Zeleny was proposing to hold and display the firearms were indeed threatening?
A. Repeat the question.
Q. Did you make a determination as to whether or not the way Mr. Zeleny was proposing to hold and display the firearms were indeed threatening to anybody?
A. Yes.
Q. Could you explain that, please.
A. Certainly.
The -- just the general appearance of a person standing in a public right-of-way with a weapon, that may or may not be loaded, and passersby, whether they're

MR. MASTER: Is there an exhibit, David, sorry, that you're referring to?
MR. MARKEVITCH: I -- you know, I'm trying to introduce an exhibit. I'm waiting for the menu where it allows me to agree to the number assignment.
And we're going to have to -- let's go off the record for a minute.
THE VIDEOGRAPHER: We are off the record at 2:38 p.m.
(Remarks outside the record.)
(Deposition Exhibit No. 162 was marked.)
THE VIDEOGRAPHER: We are on the record at 2:39 p.m.
MR. MARKEVITCH: I just introduced Exhibit No. 162.
It should be in your exhibits folder, Mr. McIntyre, 162.
THE WITNESS: (Reviewing screen.)
Yes.
BY MR. MARKEVITCH:
Q. Could you please open it and take a look at it.
A. (Witness reviewing screen.)
Q. Do you recognize this document?
A. No, but I know what it is.
Q. Okay. What is it? Could you please describe it

for the record?
A. I think it's the official written indication that Mr. Zeleny -- that Council denied Mr. Zeleny's appeal to them.
Q. Now, I've asked you this question, but now that we have discussed some of the events of the day, including your likely discussion in the Closed Session, do you know now have a recollection of being present during the hearing Mr. Zeleny's matter?
A. I don't.
Q. Now, you are copied on this email.
Could you explain why you are copied on this email?
A. As the City Manager, I would -- I would have been copied on the email because the Council's decision is now final, and it's just a way of closing out a file.
Q. Okay. If you go to page 1, it states there, in the first paragraph, that the Council's decision was to uphold your decision.
Am I correct in that?
MR. MASTER: Are you referring to the letter or the email?
THE WITNESS: I apologize.
Maybe I was on the wrong document.
MR. MARKEVITCH: No.

It's the second physical --
THE WITNESS: Sorry, okay.
MR. MARKEVITCH: -- page.
Q. Do you -- do you see that?
A. Let me back up.
I was referencing the email from Jelena Harada to michael@massmeans.com.
I -- I'm sorry, I failed to realize the letter was attached; my apologies.
Q. Okay. For the record, the letter that's referenced in the email is attached to the email and is part of this exhibit; correct?
A. It is, it is.
I apologize.
Q. No need to apologize, please.
So if you take a look at the second physical page of this document, it's the first page of this letter, first paragraph in the letter, could you please read that to yourself -- please review it, and let me know when you have.
A. (Witness reviewing screen.)
Okay.
Q. So am I correct in understanding that the City Council was reviewing your decision, and in this case, upheld your decision?

A. Correct.
Q. And again, I have -- we've broached this subject previously.
But the Staff Report went through your office, but it was not submitted on behalf of your office.
Am I correct in understanding that?
A. That would be a correct characterization.
Q. So the City Staff was, in fact, defending their decision in front of the Council.
Am I correct?
A. Yes.
Q. And your office made no direct presentation to the City Council on this subject whatsoever.
Am I correct on --
A. That is correct; my office did not make a presentation to the Council on this topic.
Q. Now, you've mentioned earlier that you're familiar with the Film Permit Application; correct?
A. Yes.
Q. Is it your understanding that Mr. Zeleny was, at some point, directed to apply for a Film Permit rather than a Special Events Permit?
A. I believe he was -- it was suggested to him to apply for a Film Permit.
Q. Do you remember if he did apply for a Film

I'll reassert my same objections.

You're asking an individual to answer a question about a document he did not prepare and had not seen before today and is not copied on this.

So it lacks foundation. Calls for speculation. It's vague, ambiguous, and overbroad.

Go ahead.

THE WITNESS: Based on the document by itself, at the time, if I had seen it, I don't know what I would have done, candidly, because there wasn't enough information at that time.

Today, in hindsight, seeing this, clearly Commander Bertini seemed to have been wrong on this particular statement.

MR. MARKEVITCH: I have no further questions.

MR. MASTER: Anything from the State?

MR. KILLEEN: Nothing today from me.

MR. MASTER: Okay. Thank you very much.

Are we done?

MR. MARKEVITCH: Thank you.

MR. MASTER: Thank you.

THE VIDEOGRAPHER: We are off the record at 3:37 p.m., and this conclude today's testimony by Alex McIntyre.

The total number of Media Units used was eight

and will be retained by Veritext Legal Solutions.

(Remarks outside the record.)

MR. MASTER: I would like a copy.

MR. KILLEEN: I would like a copy today, as well.

(Proceedings adjourned at 3:37 p.m.)

DECLARATION UNDER PENALTY OF PERJURY

I, ALEX D. McINTYRE, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

Executed this _______ day of _______________, 20__, at ____________________, ____________________.

______________________________

ALEX D. McINTYRE

STATE OF CALIFORNIA )
)
COUNTY OF SAN FRANCISCO )

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: September 10, 2020

DAWN A. STARK
CSR No. 7847



City Manager's Office

CITY OF
MENLO PARK

September 12, 2016

VIA First Class Mail and Email
Michael Zeleny
7576 Willow Glen Road
Los Angeles, CA 90046

**RE: Special Event Permit Application Appeal Decision**

Dear Mr. Zeleny,

This correspondence serves as final determination of the City of Menlo Park's denial of your appeal of a prior decision to deny a Special Events Permit.

**Background**

The Appeal of the administrative decision denying the application of Michael Zeleny for a special event permit ("SEP") was heard on August 11, 2016 at the Menlo Park City Hall.

Mr. Zeleny first applied for a SEP on June 3, 2015 to conduct a protest in the median on Sand Hill Road near the entrance and exits of Interstate 280 in Menlo Park. The application (Exhibit A) included, but was not limited to, a request to:

- park a truck on the median;
- display loaded and unloaded firearms;
- distribute literature to the public; and
- run a generator to operate a 55-inch digital video monitor.

The protest was to be video recorded and, since the event was to extend into the evening, requested high-intensity lighting. This request was denied by staff on September 21, 2015 (Exhibit B).

On April 15, 2016, a revised application for a SEP was submitted to the City (Exhibit C). This application was treated as a new application. The April 2016 application was denied by staff on May 4, 2016 (Exhibit D). This denial was then appealed by Mr. Zeleny to the Community Services Department on or about May 27, 2016 (Exhibit E). The appeal was again denied by letter dated June 16, 2016 (Exhibit F). That decision was appealed to the Community Services Director (Exhibit G), which was again denied on June 24, 2016 (Exhibit H). Appellant then appealed to the City Manager. The City sent out a notice of appeal hearing on July 20 to the appellant, setting August 11, 2016 at 2:00 pm as the hearing date (Exhibit I).

As Menlo Park City Manager, I acted as the hearing officer for the appeal hearing and was represented by Gregory J. Rubens, Esq.. Appearing on behalf of the City was Police Commander David Bertini of the Menlo Park Police Department. The Appellant was represented by David Affeld, Esq. Also in attendance was Michael Zeleny (Appellant) and Kimberly Chu, Esq. from Gregory J. Rubens' office.

The Appeal was conducted as a de novo hearing. The City admitted the above described documents and e-mails from staff and Mr. Zeleny from June 2015 to July 2016 (Exhibit J). In addition, Mr. Zeleny provided an electronic copy of the Entertainment Firearms permit dated July 13, 2016 issued by the Office of the Attorney General (Exhibit K). On its face, the permit allows firearms loaned to the permittee for use as props in motion picture, television, video, theatrical or other entertainment productions.

The appellant and his attorney presented their appeal and requested that the Special Events Permit be granted based on constitutional and statutory grounds.

The City staff present argued that the Appeal be denied for the reasons stated in the prior denials.

**Decision**

The appeal is denied. As stated previously, no permit is required for first amendment protected activity. Filming or digitally recording a protest in traditional public forum areas in the City is allowed provided they comply with all laws. SEPs are not intended to regulate protests or filming of protests in the public forum areas of the City. Special events are also time limited and not of an ongoing nature.

You are free to conduct a protest in compliance with laws. However, the City has an obligation to protect public safety. To that end, your protest cannot occur in the center median under State law, cannot block pedestrian access on the sidewalk, and cannot accommodate camping or sleeping on the sidewalk or any portion of the right-of-way.

A City may impose reasonable time, place and manner restrictions on first amendment rights in a content-neutral manner, by a narrowly tailored regulation to serve a significant public interest.

The regulations cited in this decision clearly allow a protest to occur in compliance with the City and State content neutral laws. Protests are not allowed in the median, but would in traditional public forum areas, such as sidewalks and City parks and plaza's.

Your protest described in your SEP application and subsequent documents implicates a number of laws. These laws include but are not limited to:

Display of Firearms

- Display of unloaded firearms could be considered a violation of Penal Code. State law prohibits display of unloaded firearms with the exception of using firearms loaned to the permittee as props as defined in Penal Code 29500-29530.
- Brandishing and display of unloaded firearms is illegal, except as provided in Penal Code Section 29500 et seq.
- Under Penal Code Section 25850, having possession of a loaded firearm is also illegal. Under this section possession of a loaded firearm even with a film entertainment permit is illegal.
- Under Penal Code Section 28500(b), persons who display unloaded firearms are subject to the additional requirement that allows peace officers to examine any firearm. Failure to allow examination is a violation of the law.

Public Rights-of-Way

Public use of rights-of-way and medians are subject to the California Vehicle Code and the Menlo Park Municipal Code. These legitimate and content-neutral regulations that serve a significant government interest include parking and time limits, obstruction of sidewalks, and obscenity laws. Cities have been granted clear authority under state law over their rights-of-way.

- Vehicle Code Section 22507 provides broad discretion to cites over parking on public rights-of-way (in this case, there is no parking on Sand Hill Road in the proposed area of your protest).
- The proposed monitor and related equipment cannot impair a driver's vision block the sidewalk under Vehicle Code Section 21466.5. The proposed lights, and video display also have the potential to impair a driver's vision.
- Driving upon or parking a vehicle or conducting in the median violates Vehicle Code Section 21651.

From a practical aspect and for public safety concerns,

- The lighting at night would be highly distracting to motorists, cyclists and pedestrians.
- City medians are not traditional public forum areas and are inappropriate and unsafe.
- The proposed location encourages the public to cross a busy arterial on to a median area that is without sidewalks and are encouraged to cross traffic and view your monitor and view hand-outs with high speed and high volume traffic

justifies this prohibition from a public safety standpoint.

- The median you propose is adjacent to the entrances and exits of Interstate 280, making the location unsafe and dangerous to pedestrians, cyclists and vehicles.  Such a display or protest in the median could also block vehicular sight lines and impair public safety for pedestrians, cyclists and automobiles under Municipal Code section 11.44.030.

This is not an exhaustive list of the laws with which you must comply.  Accordingly, if you attempt to conduct your protest in the medians anywhere in Menlo Park, the City will consider all appropriate remedies.

**Conclusion**

Based on the record and findings above, which are incorporated by this reference, your application for an SEP is denied.   No permit to conduct a protest is required. Any protest you conduct must comply with all laws, include those set forth above which are described above.

Denial of the SEP does not violate any first amendment rights.  The lack of need for a permit shows the City is not preventing your protest or prevented you from displaying your message.  The City is using its police power and common sense to regulate the time, place and manner of your proposed free speech protest.  The City has a compelling interest in public safety and a protest in the median would place the vehicular, cyclists, pedestrians and you in danger.

To appeal this decision to the City Council you must provide notice of your appeal to the City Clerk within ten days of the date of this letter.

Please be advised that, to the extent that the City can accommodate your request to protest safely and lawfully, we are willing to work with you.

Sincerely,

Alex D. McIntyre
City Manager

Enclosures

Cc:   <u>Via Email only</u>
       David W. Affeld, Esq.
       Greg Rubens, Esq.

**From:** Harada, Jelena V
**To:** michael@massmeans.com
**Cc:** McClure, William; "grubens@adcl.com"; McIntyre, Alex D; Bertini, David C
**Subject:** Notice re Menlo Park City Council Decision
**Date:** Tuesday, September 05, 2017 10:14:46 PM
**Attachments:** Zeleny Letter - city council action.pdf

---

Mr. Zeleny,

Attached is correspondence informing you of the Menlo Park City Council's decision made at the City Council special meeting of August 29, 2017, related to your Appeal of Denial of Special Event Permit Application. This item is also being sent to you via US mail.

Sincerely,

**Jelena Harada**
Deputy City Clerk
City of Menlo Park
701 Laurel St., Menlo Park, CA 94025
650-330-6612 | jvharada@menlopark.org

CITY OF
MENLO PARK

EXHIBIT
0162

City Clerk



CITY OF
MENLO PARK

September 5, 2017

VIA EMAIL: michael@massmeans.com
AND U.S. MAIL

Michael Zeleny
7576 Willow Glen Road
Los Angeles, CA 90046

**RE: City Council Decision: Appeal of Denial of Special Event Permit Application**

Dear Mr. Zeleny,

On August 29, 2017, the Menlo Park City Council considered the appeal of staff's administrative decision to deny your Special Events Permit application. The City Council voted 4-0 to uphold the City Manager's decision to uphold staff's denial of your application. The City Council relied on the presentation of staff, your presentation and response to questions, and the staff report for the August 29, 2017, meeting, which consisted of a staff report and a letter from the City Manager's Office dated September 12, 2016, including Exhibits A through K, which consisted of correspondence between you and staff with respect to your application.

Please take notice that the City Council's decision on August 29, 2017, is a final administrative decision. Any challenge to this decision in the appropriate court of competent jurisdiction must be made within ninety (90) days of August 29, 2017, pursuant to California Code of Civil Procedure Section 1094.6, unless a shorter time is required by State or Federal law.

If you believe the City Council's decision involved speech or expressive conduct entitled to protection by the First Amendment, any petition must be served on the City of Menlo Park no later than twenty-one (21) calendar days following the City Council's decision of August 29, 2017, pursuant to California Code of Civil Procedure Section 1094.8.

Thank you for your attention to this matter.

Sincerely,

Jelena Harada
Deputy City Clerk

cc: Via email only
William L. McClure, Esq.
Greg Rubens, Esq.
Alex D. McIntyre, City Manager
Dave Bertini, Commander

# Exhibit E

**Alex McIntyre**: Alright let me start. I think all parties have made introductions to each other. So we know who we all are in the room. I am Alex McIntyre, I am the City Manager for the City of Menlo Park and I'll be acting as the hearing officer for this hearing. And to just repeat what I said earlier, all parties have agreed to be recorded for this hearing.

**David Affeld:** Yes. Why don't we go around the table and identify ourselves.

**Alex McIntyre:** Sure. Absolutely. So I am Alex McIntyre, the City Manager, and I will be acting as the hearing officer.

**Greg Rubens:** Greg Rubens. I am the legal counsel for Alex McIntyre for this hearing

**David Affeld**: And you consent to be recorded?

**Greg Rubens:** And I consent to be recorded.

**Dave Bertini:** My name is Dave Bertini, I am a commander with the Menlo Park police department on behalf of the City of Menlo Park.

**David Affeld:** And you consent to the recording?

**Dave Bertini:** I do.

**Kimberly Chu:** I am Kimberly Chu, Gregory Rubens associate. I consent to the recording.

**David Affeld:** I'm David Affeld, counsel for Michael Zeleny. I consent to the recording.

**Michael Zeleny:** I'm Michael Zeleny. I consent to being recorded.

**Alex McIntyre:** Fantastic. Alright because we are being recorded I would like to just read into the record sort of some comments just so we are all clear where were going and what we're doing here. So as the City Manager I am acting as the hearing officer for this event and this is to

hear the appeal of a discretionary decisions from the city staff in regards to permits. This is the time and place for the administrative appeal of Michael Zeleny for a special events permit first applied for on or about June 3, 2015 which was denied on September 21, 2015, April 15, 2016 and the revised application was submitted which the city treated as a new application for the same location. That application was denied on May 4, 2016 and the request was then appealed to the community services department on or about May 27, 2016. The appeal was denied by letter dated on June 16, 2016. This decision as then appealed to the community services director and denied on June 24, 2016. Appellant then appealed to the city manager by email dated July 1, 2015. And just so you know we have allocated about two hours for this hearing, hopefully that will be sufficient. We have all made the introductions of who is in the room. We have several documents I believe that are pertinent to this that the city has in its possession. One is the actual application dated June, 2015. Two is email and written correspondence concerning special event permit applications and appeals from city and appellant. Three we have a California fire arms law dated from 2016. And fourth we have the notice of the appeal hearing. Those are the four documents I have. So moving on. The applications, appeals, and correspondence are part of the administrative record for this appeal. It is my intention to receive all of these documents as evidence unless there are any objections by either side.

**David Affeld:** No objections

**Michael Zeleny:** No objections.

**Alex McIntyre:** Next, this is an informal proceeding which means the formal rules of evidence do not apply. As the hearing officer I may be able to consider anything that may be an assistance to me making my decision.  Procedurally the parties are going to proceed as follows: First the city is going to have an opportunity to present its evidence and present its case. I'm not going to

require that the witnesses be sworn. After that the appellant may have an opportunity to cross examine which will be limited to what was presented in their testimony, which is reasonably related top their testimony regarding this matter. Then the appellant will have an opportunity to present his or her case. Counsel for the city will have an opportunity to cross examine any witnesses presented by appellant. At the conclusion there will be an opportunity for both sides to present oral arguments. So we are going to begin the testimony offered by the city which is commander Bertini. Do you understand procedurally with what I have just laid out?

**Dave Bertini:** Yes, sir.

**Alex McIntyre:** Fantastic. Commander….

**Dave Bertini:** Thank you. As the city manager and hearing officer has already stated there were several correspondences that went back and forth regarding this application for a special permit. The first being around June-July 2015 on which case this application an email was sent to the city attorney, Rec Supervisor Matt Milde, and the police chief. And on or about July 24 an email response from the city attorney was sent to Mr. Zeleny and I'm not sure if his attorney was copied on it or not but the initial response from the city attorney was a denial of the application based on the fact that the application was incomplete for several reasons. It was not complete as far as the duration, because there was no ending date; and the location and what exactly was the event that this person wanted to put on. There was a response from Mr. Zeleny around the end of July 2015 and in which he indicated this was going to be some type of multi media event and a letter was again sent. And at that point I believe it was a deemed an appeal to the original letter sent from the city attorney. On or about September 21, 2015 another letter was sent to Mr. Zeleny from the city attorney with a denial of permit for the specific reasons of the application was incomplete, the exact location was still missing, the event did not meet the definition of a

special event for the city. And to that letter was also attached a film permit application because he indicated that he wanted to make this some type of multimedia film production. The letter also talked about the vehicle code violations that would be committed if this permit were to be approved. On or about April 15, 2016, several months later, and email was sent from Mr. Zeleny appealing this initial denial from September of 2015. In this updated application there was a new map attached that indicated the area he wanted to use was a center divide on Sand Hill Road. On or about May 4 a letter from the city attorney to Mr. Zeleny was again sent and this was a denial of that appeal. It was denied again based on the fact that it still was incomplete for the application. The event was not open to the public and there was no community participation, which is one of the definitions of what a special event is. There was no defined term. He was also advised that the display of firearms, whether loaded or unloaded, is prohibited by California penal code. And the fact that the location he indicated would present a traffic and safety hazard. And he was also advised that any further appeal should go through the community services director, Cherise Brandell. On or around May 26, 2016 an email was sent from Mr. Zeleny to the city attorney regarding the denial, again he resubmitted the map. At that point he advised he was just going to use a pickup truck and drive it up on the center divide medium and that all activities would be in the bed and cab of that vehicle parked on the center medium and he planned it to be there for 24 hours a day. On June 15, 2016 Mr. Zeleny sent another email to the city attorney requesting an answer from his previous email and the next day on June 16, 2016 an email was sent to Mr. Zeleny from Matt Milde on behalf of the community services again denying the permit due to the fact it was an incomplete application still, the fact that it did not meet the criteria for a special event, there was no defined term, the fact that exhibition of firearms are illegal in the State of California, it also indicated there was traffic and safety concerns, and

vehicle code violations in what he was planning or what he indicated he wanted to do. On June 17, we received an email from Mr. Zeleny advising that he wished to appeal or file a 1983 lawsuit in federal court. On June 24, an email and denial letter to Mr. Zeleny was sent from Cherise Brandell, the Community Services Director, and for the exact same reasons that had been outlined in the past. On July 1, 2016, we received, or I should say Cherise Brandell received and there were several people copied on these emails of course, a demand or an email demanding an appeal and on July 12 an email letter was sent by Matt Milde on behalf of Cherise Brandell who was out of the office advising of his right to appeal to the City Manager. And between August 8 and 10, I am aware that there are apparently have been correspondence between the City, or the hearing officer's attorney, Greg Rubens, and Mr. Zeleny's attorney regarding this specific hearing. A few things that I would like to put into the record are number one, a copy of Penal Code Section 25850 which clearly indicates that it is illegal to carry a loaded firearm in the State of California unless that person is either a peace officer or has a concealed weapons permit. The second Penal Code Section I'd like to enter is Section 2640 which is in layman's term, the unloaded, open carry prohibition. This is a Penal Code section that makes it illegal to carry any unloaded firearm that is not a handgun. So that would be a rifle or any other non-handgun in public. And the third section, Penal Code section, is 26350 which is the carrying of, openly carrying an unloaded handgun which is prohibited by the California Penal Code and is a crime in the State of California. Other sections that I'd also like to introduce are the Vehicle Code sections that were used. (Buzzing)

_______: Sorry.

**Dave Bertini:** It is a little construction going on. Vehicle sections that have been.

**Gregory Rubens:** Why don't you just wait a second because the tape won't pick up your voice probably.

**Dave Bertini:** Alright.

**Gregory Rubens:** Thank you.

**Dave Bertini:** The Vehicle Code sections that were listed as other reasons for the denial, including 23332 of the California Vehicle Code, 214 (buzzing)…21466 of the California Vehicle Code and 21466.5 of the Vehicle Code. Something else I would like to place into the record is we also received a copy of what Mr. Zeleny (buzzing)…a copy of what Mr. Zeleny proposed to be displaying. Whether this has changed or not, I don't know. And based on this, I would also argue besides the, all the Penal Code and Vehicle Code sections that I've already indicated, that if Mr. Zeleny were to in fact display this openly, if any children were present, he may be in violation of 313.1 of the Penal Code, displaying harmful material where children can view it. Based on all of these factors, it was the City's decision to deny the special permit as it is written. (buzzing)

**Alex McIntyre:** I am going to deal with this. Hold on, please.

**Gregory Rubens:** We are trying to get the, you are trying to get the work stopped while we conduct the hearing.

**Alex McIntyre:** Yes. I will do that. So in the meantime, okay. Commander, is that the end of your presentation?

**Dave Bertini:** That is.

**Alex McIntyre:** Okay. Mr. Affeld, do you want to ask the Commander any questions?

**David Affeld:** I do.  We do have that problem.  I don't anticipate we are going to need all 2 hours for today.  So I am willing to be patient to see if there is something we can do to stop the noise.

**Alex McIntyre:** I texted.  Someone is going to come down in a second.

**Gregory Rubens:** Should we recess until we see what happens?

**David Affeld:** Why don't we do that.

**Alex McIntyre:** Okay.  That's fine.

**Gregory Rubens:** I am going to turn of the tape recording while we do that.

**Alex McIntyre:** I am only going to need 3 minutes.  I'll be right back.  (Tape turned off)

**David Affeld:** How about we do it this way?  I think we are all in agreement we can resume recording.  If anybody feels otherwise, say so now and otherwise you are deemed that your previous consent is still operative.  Okay?

**Gregory Rubens:** Okay.

**Alex McIntyre:** Yeah.

**David Affeld:** Commander, I want to start where you ended.  You showed us Penal Code Section 313.1?

**Dave Bertini:** Correct.

**David Affeld:** And you also have a graphic from Mr. Zeleny's live journal.?

**Dave Bertini:** Correct.

**David Affeld:** The page, in the lower right hand corner, there is a print date of July 21, 2015, at 4:04 p.m.?

**Dave Bertini:** Correct.

**David Affeld:** Is that the date that you printed this out?

**Dave Bertini:** Yes.

**David Affeld:** And did you personally do that or somebody else at the City?

**Dave Bertini:** No, I did.

**David Affeld:** Was this something that you included or anybody else on behalf of the City included in any of the previous denials at the first instance or on any of the other layers of appeal?

**Dave Bertini:** No.

**David Affeld:** You were aware of this for more than a year, but it didn't find its way into any of the appellate record until today?

**Dave Bertini:** That is correct.

**David Affeld:** Okay.  And your point in including this graphic, it is dated December 14, 2012. Do you see that?

**Dave Bertini:** Yes.

**David Affeld:** And it depicts some individuals and some sexual activity?

**Dave Bertini:** Correct.

**David Affeld:** Your point is that a display of this kind in public might harm minors?

**Dave Bertini:** My point is that if it were to be displayed in public and we had a complaining parent of a minor who was exposed to it, that 313.1 could be a section that could be used to make an arrest or prosecution.

**David Affeld:** And again, so did Mr. Zeleny tell you that this graphic that is depicted from December 14, 2012, was going to be part of the protest?

**Dave Bertini:** My understanding was that this was the graphic that he was proposing to display on the video screen.

**David Affeld:** Okay.  So it was the content of this graphic that you found as part of the grounds for denying Mr. Zeleny's application?

**Dave Bertini:** No.  I just, I bring that up now as another reason why.  It was never, it was never brought up before.  It was not in the record before.

**David Affeld:** Okay.  The new reason today regarding this graphic has to do with the content of the graphic, is that right?

**Dave Bertini:** That is correct.

**David Affeld:** Do you know if there has been any determination as to whether this graphic is obscene?

**Dave Bertini:** That would have to be determined in a court of law.

**David Affeld:** Has that happened?

**Dave Bertini:** Well, there have been no arrest.  I am talking about a criminal case.

**David Affeld:** Okay.

**Dave Bertini:** And it hasn't been displayed yet, so no arrest has been made.  So we can't have gone to court.

**David Affeld:** So as of today, there has been no adjudication that you are aware of to the effect that this graphic is obscene, am I right?

**Dave Bertini:** That is correct.

**David Affeld:** What is the definition of a special event, for purposes of Mr. Zeleny's application?

**Dave Bertini:** A special event is one in which a person or group is requesting special consideration from the City for an event that is of community nature, for people to come together, or to have some kind of event within the City of Menlo Park that would require a permit.  So which would require a permit if there were to be any kind of police required for street closures, if there was to be any kind of music or any kind of display or entertainment that would be displayed.  I mean, I don't have the definition in front of me, but I could certainly find it.

**David Affeld:** Where do we find that definition?

That would be on the website.

**David Affeld:** Which website?

The City of Menlo Park's website under special permits.

**David Affeld:** Have you ever seen Mr. Zeleny before?

**Dave Bertini:** Yes, I have.

**David Affeld:** You saw him when he protested previously in 2012 and 2013, am I right?

**Dave Bertini:** Correct.

**David Affeld:** When you did that, you saw him interacting with the public in the course of his protest, right?

**Dave Bertini:** I did not personally see that, no.

**David Affeld:** Did you ever see him talk to anybody?

**Dave Bertini:** I did not see him talk to, besides the officers? No.

**David Affeld:** How much time did you spend observing Mr. Zeleny?

**Dave Bertini:** The only time I believe I've actually seen him were in photographs during the protest. I think I may have gone up to the scene once, if I remember correctly. I don't recall how many times I actually went to the scene of his protest.

**David Affeld:** The graphic dated December 14, 2012, is something that you found on Mr. Zeleny's live journal, right?

**Dave Bertini:** I don't remember. Again, I don't remember whether he sent it to me or I located it. I believe it was sent in one of the email exchanges.

**David Affeld:** The live journal account, you know that is available online, right?

**Dave Bertini:** I don't know that.

**David Affeld:** You printed this page, right?

**Dave Bertini:** That is correct, but I am not sure if it came from Mr. Zeleny attached to an email or whether it came from a link that was attached to an email.

**David Affeld:** You know that Mr. Zeleny made videos of his previous protests in 2012 and 2013?

**Dave Bertini:** I did not know that.

**David Affeld:** This is the first you've ever heard of that?

**Dave Bertini:** Yes.

**David Affeld:** Did you testify at a criminal trial in which Mr. Zeleny was accused of violating open and close carry statutes?

**Dave Bertini:** It was a violation of carrying a concealed weapon. Correct.

**David Affeld:** You testified in that trial, right?

**Dave Bertini:** I did.

**David Affeld:** And Mr. Zeleny was found not guilty, right?

**Dave Bertini:** Correct.

**David Affeld:** Yeah. One of the defenses asserted in that trial was that Mr. Zeleny was involved in video productions, right?

**Dave Bertini:** I don't remember which the defenses were.

**David Affeld:** Have you made any technical determinations of any kind as to how Mr. Zeleny's proposed protest activity would affect the driving public?

**Dave Bertini:** Based on, yes. Based on where he is requesting to have this vehicle parked, it is not, from the perspective of the community services and from the police department, that would be a dangerous place to have a vehicle parked. First of all, it is illegal to be on a median.

**David Affeld:** You are going a little farther than my question.  The question was just have you made any technical determinations and let's do it in baby steps.  You can just say yes or no to that.  Then I can follow up with the next question.  Because you are going in a direction different from the one I have in mind.

**Dave Bertini:** I see.  Yes.

**David Affeld:** Alright.  Have you done things like take measurements of any kind with respect to the location Mr. Zeleny proposed?

**Dave Bertini:** No.

**David Affeld:** Have you done any surveys of any impact on drivers with regard to that location?

**Dave Bertini:** No.

**David Affeld:** Have you done anything to test whether the luminosity of the flat screen that Mr. Zeleny was proposing to use would affect drivers?

**Dave Bertini:** No.

**David Affeld:** Have you taken any kind of scientific measurements of any kind with respect to Mr. Zeleny's application?

**Dave Bertini:** What kind of scientific measurements would you be talking about, sir?

**David Affeld:** Any.  Any.

**Dave Bertini:** No.

**David Affeld:** Are you aware of whether in response to Mr. Zeleny's application the City engaged in any kind of negotiation process where it offered to accommodate him if he agreed to certain modifications of what he proposed?

**Dave Bertini:** I believe the letters that were exchanged with the City Attorney's office indicated what the issues were with the application.

**David Affeld:** Right.

**Dave Bertini:** I am not privy to any negotiations.

**David Affeld:** Okay.  Do you know if there was any, any interaction in which the City offered to compromise in any way?

**Dave Bertini:** To what end?

**David Affeld:** With regard to Mr. Zeleny's application. For example, to suggest a different location or suggest a particular timeframe or…

**Dave Bertini:** Well, I don't believe that is the City's part, place to suggest where he wants to do his event.  No.

**David Affeld:** Okay.  So in answering my question, did the City make any proposals of any kind that you are aware of to try to reach some sort of compromise with Mr. Zeleny?

**Dave Bertini:** No.

**David Affeld:** You identified a number of statutes for us.  Vehicle Code statutes and Penal Code statutes.  There is one that I didn't hear from you.  Are you familiar with Penal Code Section 25510?

**Dave Bertini:** No. Perhaps if you refresh my recollection.

**David Affeld:** That is the one about a, an exception or an exemption from the open carry and close carry statutes for somebody who is an authorized participant in and among other things an entertainment event or a video production.

**Dave Bertini:** I am aware of that section.

**David Affeld:** Okay. Did you happen to bring a copy of that statute?

**Dave Bertini:** I did not.

**David Affeld:** You did read the record regarding Mr. Zeleny's application, the denial and the appeals, right?

**Dave Bertini:** Correct.

**David Affeld:** And you saw in Mr. Zeleny's materials that he referred to that statute, right?

**Dave Bertini:** Correct.

**David Affeld:** Is there a reason you didn't include that statute in the materials you brought today?

**Dave Bertini:** It is not my place to defend Mr. Zeleny in his request for this. It is my opinion, and of course this would be something for a court of law to decide on, is that unless Mr. Zeleny can produce some kind of permit from the State or some other governing agency that shows that he is an authorized person in a motion picture, that is a moot point.

**David Affeld:** You are not a lawyer, right?

**Dave Bertini:** No, I am not.

**David Affeld:** Have you been to law school?

**Dave Bertini:** I have not.

**David Affeld:** Did you do any legal research regarding Penal Code Section 25510?

**Dave Bertini:** I did.

**David Affeld:** Did you read cases on it?

**Dave Bertini:** Yes, I did.

**David Affeld:** Did you read any definition of what the phrase "authorized participant" means?

**Dave Bertini:** Perhaps you can refresh my recollection.

**David Affeld:** I am asking, before we get to that, I am asking did you do any research in that respect?

**Dave Bertini:** I did.

**David Affeld:** Okay. Did you find anything that provided a definition for the phrase "authorized participant"?

**Dave Bertini:** Not that I recall.

**David Affeld:** So did you find any authority of any kind regarding who does the authorizing of an authorized participant?

**Dave Bertini:** I did not.

**David Affeld:** That statute, let me ask you something. You've seen the Die Hard movies, Bruce Willis movies?

**Dave Bertini:** I don't know how this is relevant.

**Gregory Rubens:** Yeah…

**David Affeld:** Well, I want to, bear with me. This is an informal proceeding. Have you seen those movies?

_________: (Whispering) You can sort of direct if you think it is that…

**Alex McIntyre:** Go ahead, David.

**Dave Bertini:** Yes.

**David Affeld:** You've seen other action movies in which the actors go around with firearms, right?

**Dave Bertini:** Correct.

**David Affeld:** And those kinds of activities where people make feature films of action movies of actors and make believe gun fights, those are certainly the kind of things that would fall within Penal Code Section 25510, would you agree?

**Dave Bertini:** I don't know the answer to that.

**David Affeld:** An authorized participant? Let me read the statute to you and see if this refreshes your memory of the research you say you did regarding the statute. Are you familiar with Section 25400 I think you brought that one with us right? 25400 does that apply to or affect any of the following (a) the possession of a firearm by an authorized participant in a motion picture, television, or video production or an entertainment event when the participant lawfully uses that firearm as part of that production or event. And some other language that's not pertinent right now. Are you familiar with that?

**Dave Bertini:** Yes.

**David Affeld:** Keep that language in mind. You would agree that if Bruce Willis is acting in a Die Hard movie and he's carrying a gun for the purpose of using it in a motion picture or television or video production or entertainment event that would fall in this section right?

**Dave Bertini:** I don't know the answer to that.

**David Affeld:** Okay. Is it your view that the City of Menlo Park decides whether Bruce Willis is the person who is authorized to participate in that movie?

**Dave Bertini:** I believe if he were to be making a movie within our City limits, yes.

**David Affeld:** So if a movie is being filmed in the City limits, the City is going to decided casting decisions? Is that right?

**Dave Bertini:** That's not what you asked. You asked me can they carry guns.

**David Affeld:** Here's what I'm asking. If Bruce Willis is going to be an actor in a movie filmed in the City of Menlo Park, the City can decide whether he is allowed to carry a gun in that movie?

**Dave Bertini:** No.  The City can decide whether live weapons can be used in the movie.

**David Affeld:** Well the statute applies to unloaded guns right?

**Dave Bertini:** That's correct.

**David Affeld:** So the City can decide whether guns can be used in a movie shot within its limits?

**Dave Bertini:** Yes.

**David Affeld:** Okay and if the City decides guns can be used, the City can also decide which person is allowed? Which actor is allowed to carry a gun?

**Dave Bertini:** I am not sure what you are asking. I don't think the City is going to go in and say "well person A can carry a weapon but person B cannot." Now obviously there other laws that would be applicable, if person A was a felon he could not carry a gun.

**David Affeld:** Let's assume we are talking about non-felon actors. Non-felons, you would agree the City isn't going to decide whether person A or person B is authorized to use the unloaded weapon in a video production or movie or television production or entertainment event right?

**Dave Bertini:** That's correct.

**David Affeld:** The person who decides whether the person is authorized is whoever is in charge of making the video production or entertainment event or motion picture or television right?

**Dave Bertini:** I would disagree with that.

**David Affeld:** Okay. Who decides who gets to be the person carrying the gun?

**Dave Bertini:** Either by a state permit for making a motion picture or the municipality in which the motion picture is being made.

**David Affeld:** We are talking a little bit past each other. Assume that the production, entertainment event, the movie, the TV show, the video production. Assume that that event is one in which a firearm can be used if its unloaded and otherwise complies with statute. You agree don't you? That it's not up to the City to decide which actor is the one to hold the firearm right?

**Dave Bertini:** I believe it's up to the City to decide whether not the person is authorized by the state to have some kind of permission from the state, maybe the attorney general's office, or if there is a division of motion pictures that allows that person to be an authorized person to carry a weapon.

**David Affeld:** So let me show you, let me see if I understand you right. So for example, what I am going to show the witness for the sake of the audio record is a PDF an electronic copy of a thing called entertainment firearms permit issued to Michael Zeleny dated issue 7-13-16 issued by the State of California Department of Justice Bureau of Firearms. Is that the kind of permit you are talking about?

**Dave Bertini:** It would be.

**David Affeld:** And this is the small kind that's wallet size right? You're familiar with this kind of permit?

**Dave Bertini:** It looks wallet size.

**David Affeld:** And let me show you another kind of permit. Here is a letter dated July 12, 2016. On the letterhead of Kamala D. Harris, Attorney General State of California Department of Justice, to Michael Zeleny stating the California Department of Justice has approved your application for an entertainment firearm's permit. That's the kind of permit you are talking about right?

**Dave Bertini:** That's correct.

**David Affeld:** Mr. City Manager, I will show you the same document I am showing the witness, counsel.

**Gregory Rubens:** Are you putting that into evidence?

**David Affeld:** Yes.

**________:** Do you have copies?

**David Affeld:** I don't. I forgot to bring some paper with me. We'll email copies of these PDF's to you. And then here's a third one, this is on the letterhead of the State of California Department of Justice Bureau of Firearms. A document entitled entertainment firearms permit, permit # 12-380 issued to Michael Zeleny date of issue July 13, 2016. This is likewise the kind of permit you're talking about right?

**Dave Bertini:** Correct.

**David Affeld:** You can see the signature of the issuing officer there right?

**Dave Bertini:** Yes, I see a signature, I am not sure who that is.

**David Affeld:** So if an actor has a permit of this kind issued by the Department of Justice of the State of California and there's a video production or entertainment event going on. It's not up to the city to decide casting issues right? it's the production that authorizes.

**Dave Bertini**: It's up to the City to decide whether or not they are allowed in the city to film their production. Casting is irrelevant.

**David Affeld:** You agree the City has no role in the casting decisions right?

**Dave Bertini:** That's correct.

**David Affeld:** Now let's talk about, do you believe the City has the authority to deny someone the ability to exercise first amendment right of protest within the City limits?

**Dave Bertini:** Counselor, in no way are we attempting to deny the right of Mr. Zeleny to protest in many years, I think almost a decade now, he has been protesting here. And there's a location where he would go and because of some legal action that was taken against him and also because the property owner's requirements that he not be on their property. That there was a public easement that he could certainly protest. There's nothing here that we are attempting to infringe on Mr. Zeleny's first amendment right.

**David Affeld:** Okay and you would agree that if Mr. Zeleny was exercising his first amendment of protest within the city limits of the City of Menlo Park; he's entitled to video record that protest right?

**Dave Bertini:** I don't know the answer to that.

**David Affeld:** Okay can you think of any reason he's not permitted to?

**Dave Bertini:** Well if he's making a motion picture or entertainment he has to get a special permit from the City.

**David Affeld:** If he is just making a video production you think that is something the City can prohibit him from doing?

**Dave Bertini:** I am not quite sure about that.

**David Affeld:** You think any time he wants to make a video recording of a protest; he needs a special event permit?

**Dave Bertini:** It depends on; I believe it probably would depend on what he plans on doing with the video. Like you said, if it's for entertainment purposes or if he is planning on selling it or doing whatever he needs to do with it. He may need a motion picture permit from the city.

**David Affeld:** And it's just a discretionary decision on the party of the City whether to allow him to make a video recording of his protest. Is that your view?

**Dave Bertini:** Again I'm not sure 100% whether or not he would need a motion picture permit or not.

**David Affeld:** Okay and what if he just wants a record in case he needs to defend himself against a unfounded criminal prosecution. Does he need to get a permit to do that?

**Dave Bertini:** No certainly no. there is certainly no prohibition against filming yourself.

**David Affeld:** And if he wanted to film a protest. Would you agree he can make the casting decision that he is the person to make the protest that will be video recorded?

**Dave Bertini:** I don't understand what you are saying Counselor because now you're talking about casting and productions versus a protest.

**David Affeld:** I'm getting at whether he can authorize himself to be the authorized participant making his protest that he makes a video recording of. And you believe he can make that choice?

**Dave Bertini:** And that makes no sense to me. I can't answer that question. That makes no sense whatsoever.

**David Affeld:** Let me simplify it then. Otherwise that might have been too complicated for you. In terms of whether he is an authorized participant-

**Gregory Rubens:** Counsel, I know I am not representing the City but try not to be argumentative with him. I mean he's a witness, he's cooperating and he's trying to answer the best he can.

**David Affeld:** My sense of it is there is a little bit of push back here. That there's a partisan loyalty, that's contrary to Mr. Zeleny. I also cross-examined the commander at the trial, three years ago.

**Gregory Rubens:** So you know each other, I wasn't aware of that.

**David Affeld:** Sir, in terms of the definition of authorized participant you would agree Mr. Zeleny can authorize himself to be the star of the video of his protest right? That's not the City's decision who stars in that video?

**Dave Bertini:** I think in my mind you are conflating the two, a production and some kind of casting role with a protest. So either he is making a movie or he is a doing a protest. Which one are you speaking of Counselor?

**David Affeld:** You've heard of documentaries right?

**Dave Bertini:** Of course.

**David Affeld:** And people who make real time videos for purposes of documentaries.

**Dave Bertini:** And it would be my opinion that if he was making a documentary that he should get a motion picture or film permit from this city.

**David Affeld:** What if he just wants to make a video production for use in defense of an unfounded criminal prosecution. Does he have to get a permit?

**Dave Bertini:** And I've already answered that.

**David Affeld:** But you are now focusing on a different question and I want to stay focused on the authorized participant part. Who does the authorizing? Is it up to the city to decide whether Mr. Zeleny can be the star of his protest?

**Dave Bertini:** Again. That makes no sense. A star, so now you're talking a star…

**David Affeld:** I'll rephrase. Does the city get to decide who is the person making the protest? Or can Mr. Zeleny decide he wants to do it?

**Dave Bertini:** Does the city get to decide who gets to protest?

**David Affeld:** Yeah.

**Dave Bertini:** No.

**David Affeld:** And does the city get to decide who is the person being video recorded making that protest?

**Dave Bertini:** Does the city get to decide who is video recording?

**David Affeld:** No. Let's go real slow. Does the city get to decide whether Mr. Zeleny can be the person making the protest that he video records? Does the city have the ability to tell him "No not you, you must use someone else."?

**Dave Bertini:** Counselor, I don't know what angle you're going for but I don't understand the question. The question that I am hearing is, can the city tell him that he can't be the authorized person to make a film of himself?

**David Affeld:** To be the person in…. Okay. If Mr. Zeleny is making a protest, somebody else will be running the camera right?

**Dave Bertini:** I don't know if that's for sure or not. He can set up a camera and film yourself.

**David Affeld:** Mr. Zeleny will be the person who is on camera right?

**Dave Bertini:** If he's protesting?

**David Affeld:** Yeah.

**Dave Bertini:** And someone is filming him?

**David Affeld:** Whoever is doing the filming.

**Dave Bertini:** Sure.

**David Affeld:**  He is the person who is on camera.

**Dave Bertini:** Correct.

**David Affeld:** Does the city have the ability to tell him he's not allowed to be the person who's on camera, it has to be someone else?

**Dave Bertini:** No.

**David Affeld:** He's the person who gets to decide whether he's the one on camera opposed to someone else right?

**Dave Bertini:** Certainly.

**David Affeld:** He's the one who decides who is the authorized participant in the video he does?

**Dave Bertini:** I would disagree with that.

**David Affeld:** Okay. So what I'm hearing from you, tell me if I have this right.  Is you're thinking, you are not focusing on the authorized participant. You're talking about whether the video event itself is allowed. Is that what you're saying?

**Dave Bertini:** That is correct.

**David Affeld:** Okay. That is a different question. Baby steps. Let's do one topic at a time. Right now I am just focusing on the authorized participant part. You agree Mr. Zeleny gets to make the decision of who is authorized, right? Assume that the video production is okay.

**Dave Bertini:** Authorized person is the language used in the exception to the open carry law.

**David Affeld:** Authorized participant actually.

**Dave Bertini:** It has nothing to do with somebody who is protesting. Where do you find language that there are authorized people that can protest and that the City or anybody else has a right to tell a person whether or not they can protest? I don't understand what you are saying.

**David Affeld:** You know, I think we've probably made the factual record that I wanted to make and the rest of this is going to be more in the nature of oral argument about statutory construction. So is there any location in the vicinity of the place where Mr. Zeleny proposed that you think would be an acceptable place for Mr. Zeleny to conduct his protest?

**Dave Bertini:** This exact same location that he has used before.

**David Affeld:** Okay. If he were to do that there, would you have a problem with him using a flatscreen monitor?

**Dave Bertini:** Depends.

**David Affeld:** Depends on what?

**Dave Bertini:** Depends on size, depends on what he is going to use to run it. Is it going to be something that is going to be blocking the sidewalk? Is it going to be visually impairing for vehicles? So it would really depend on the situation. In the past he has used signs.

**David Affeld:** Okay.  If he placed the flatscreen monitor in approximately the same location as the signs, would you be okay with that?

**Dave Bertini:** Again, it would depend.  Again, power, size, is it blocking the public right-of-way?

**David Affeld:** Okay.  Assume it doesn't block the public right-of-way any more than the signs did.  Are we okay so far?  You identified several factors.  I want to take them one at a time.  The first one blocking the sidewalk.  If he put his flatscreen monitor in the same place as where he put his signs previously, are you okay with that?

**Dave Bertini:** If they don't block the sidewalk.

**David Affeld:** If the power generator isn't blocking the sidewalk, are you okay with that?

**Dave Bertini:** It would depend on the noise level.

**David Affeld:** If Mr. Zeleny had a, what is the maximum size of a flatscreen that you would be okay with?

**Dave Bertini:** I can't answer that.  I don't know the, I don't know the dimensions of the sidewalk.

**David Affeld:** You know the dimensions that Mr. Zeleny put in his application regarding the flatscreen.

**Dave Bertini:** 55 inches.

**David Affeld:** Is that okay?

**Dave Bertini:** I don't know.  I just told you I don't know the sidewalk.

**David Affeld:** Does Mr. Zeleny need to get approval from the City regarding the content of his protest ahead of time?

**Dave Bertini:** No.

**David Affeld:** Have you ever met with anybody from NEA regarding the criminal prosecution of Mr. Zeleny?

**Dave Bertini:** Not regarding the criminal prosecution of Mr. Zeleny, no.

**David Affeld:** Have you met with NEA in any other capacity?

**Dave Bertini:** Yes.

**David Affeld:** In what capacity?

**Dave Bertini:** I met with the, all the stakeholders that were complaining about Mr. Zeleny's protests on two or three occasions.

**David Affeld:** Who were the stakeholders?

**Dave Bertini:** I don't know exactly who was involved, but I know it was the property owners at Stanford. It was NEA. Rosewood property. I know the Sheriff's Department was there. The DA's office. And I am not quite sure who else was there.

**David Affeld:** That was when Mr. Zeleny was protesting within that compound where NEA is, right?

**Dave Bertini:** Correct.

**David Affeld:** He moved from the front door to the parking lot when asked to do so by the City of Menlo Park Police Department?

**Dave Bertini:** That was before I was employed at the City.

**David Affeld:** You have seen the records that indicate that?

**Dave Bertini:** Correct.

**David Affeld:** Then Mr. Zeleny moved from the parking lot to outside of the compound, right?

**Dave Bertini:** Correct.

**David Affeld:** And have you ever seen any indication from Mr. Zeleny that he was not willing to cooperate regarding reasonable time, place and manner restrictions on his protest?

**Dave Bertini:** I don't believe anybody put any time restraints on his protest.

**David Affeld:** Well there were location…

**Dave Bertini:** That is correct.

**David Affeld:** And he…

**Dave Bertini:** He couldn't trespass and he couldn't also block the public right-of-way.

**David Affeld:** Right. So he cooperated when you had location issues with him, right?

**Dave Bertini:** Correct.

**David Affeld:** He also proposed to use amplified music and you told him not to.

**Dave Bertini:** I don't recall that.

**David Affeld:** You've seen that in the records?

**Dave Bertini:** I don't recall that.

**David Affeld:** You know that he proposed to use acoustic music, right?

**Dave Bertini:** I do not know that.

**David Affeld:** Okay.  Do you know whether Mr. Zeleny, have you seen from the records that Mr. Zeleny cooperated in every respect with regard to music issues?

**Dave Bertini:** I can't answer that.

**David Affeld:** The appeal denials referred to something where a special event can't be open-ended.  What is the reason for that?

**Dave Bertini:** Well, I think it is just pretty much logical that if you have a special event, how can the City respond to it if it is indefinite?  Special events by the very nature are finite.  There is a start time and there is an end time.

**David Affeld:** Where do you say that?  Is that defined in an ordinance somewhere?

**Dave Bertini:** No.

**David Affeld:** Where did you get that idea?  Is this something you have invented or did you get it from somewhere?

**Dave Bertini:** Counselor, I didn't invent anything.  This is coming from the special permits committee which I am not part of.

**David Affeld:** So is there something in writing that says that a special event has to be for a defined term?

**Dave Bertini:** I am not sure.

**David Affeld:** Well, you are here to speak for the City and saying that one reason for Mr., for denying Mr. Zeleny's application is that there is no defined term, right?  So on behalf of the City,

can you tell me where in any ordinance or other source of authority there is a definition that states that a special event has to be of defined term?

**Dave Bertini:** No.

**David Affeld:** Are you aware of anything that indicates the City isn't just making that up?

**Dave Bertini:** I believe the City has the ability to regulate the activities of people who are coming in who wish to get a special permit for the safety, for security and for the general welfare of the citizens of this City.

**David Affeld:** Do you know when the ordinance regarding special events was adopted?

**Dave Bertini:** No.

**David Affeld:** Are you aware of any evidence that indicates it was adopted in 2014 during the prosecution of Mr. Zeleny and applied retroactively to his protest activity from a year and two years before?

**Dave Bertini:** I have no idea what you are talking about.

**David Affeld:** You would agree it is not fair to pass an ordinance and apply it retroactively, right?

**Dave Bertini:** I believe we live in a society of laws and there are ex post facto law, but I am not sure what you are talking about.

**David Affeld:** I think that is all we need for now.

___________: Thank you.

**Gregory Rubens:** Okay. So are you going to proceed with your presenting evidence to the Hearing Officer?

**David Affeld:** Yes.

**Gregory Rubens:** Okay.

**David Affeld:** Alright. So I will email copies of the permits that Mr. Zeleny has that I've shown to the witness and to counsel and to the City Manager.

**Gregory Rubens:** Thank you.

**David Affeld:** Mr. Zeleny, the video productions that you previously made, did you authorize yourself to appear in them?

**Michael Zeleny:** I certainly did.

**David Affeld:** The firearms that you depicted in those video productions, were they loaded or unloaded.

**Michael Zeleny:** Unloaded.

**Gregory Rubens:** Just for quick, was there a video production?

**Michael Zeleny:** Yes.

**Gregory Rubens:** Okay. There was something that has already been produced?

**Michael Zeleny:** Multiple.

**David Affeld:** We are talking about this permit prospectively is what this application is about. This is just for historical reference.

**Gregory Rubens:** Okay.

**David Affeld:** Mr. Zeleny, you did make some video productions previously?

**Michael Zeleny:** Yes.

**David Affeld:** When you did that, you depicted firearms?

**Michael Zeleny:** Yes.

**David Affeld:** They were unloaded?

**Michael Zeleny:** Yes.

**David Affeld:** What was the duration of your protest?

**Michael Zeleny:** Uh typically about 7-8 hours each day.

**David Affeld:** And did this go on for years at a time?

**Michael Zeleny:** Um, it occurred on several years. The last one was 2012. Before there was one in 2010 I believe. Actually, there were two in 2012. 2008, 2006, 2004.

**David Affeld:** And when you did this, were you protesting 365 days a year?

**Michael Zeleny:** No.

**David Affeld:** How many days a year are we talking about?

**Michael Zeleny:** The most maybe 20 in 2012.

**David Affeld:** Are you wedded to the location that you identified in the application?

**Michael Zeleny:** I prefer that location because that is where NEA is and that is where people that do business with NEA come and go.

**David Affeld:** You prefer it. Do you require it or could you live with a different location?

**Michael Zeleny:** Uh, I am not adamant about it by any means.

**David Affeld:** Did the City ever contact you to discuss negotiating a different location?

**Michael Zeleny:** No.

**David Affeld:** Did the City ever discuss maybe allowing that location or some other location as long as you didn't park your truck on the median?

**Michael Zeleny:** No.

**David Affeld:** Did the City ever discuss any specific proposed duration the City would be willing to accept regarding your protest?

**Michael Zeleny:** No.

**David Affeld:** Did the City ever communicate any accommodation of any kind to you regarding your permit application?

**Michael Zeleny:** None whatsoever.

**David Affeld:** Did you get more reaction from the intended audience for your protests when you used unloaded firearms as opposed to not using them?

**Michael Zeleny:** Oh very much so.

**David Affeld:** Is there something about the content of your protests that relates to firearms?

**Michael Zeleny:** Well, I am responding to death threats, multiple death threats independently witnessed and recorded, made against me and my family in the course of a business dispute that involved a corporation sponsored and funded by NEA. And even after I exposed unlawful

behavior on part of the principals of the corporation and caused its second in command to be fired from the company and exiled effectively from the country. NEA went ahead and funded him to the tune of hundreds of millions of dollars in full knowledge of his background as a man accused of molestation by his own daughter under oath. So the firearms relate to the kind of dispute resolution that NEA's protégés consider par for the course. Death threats, threatening to kill a man that has a dispute with them, threatening to kill his family, threatening to kill his dogs.

**David Affeld:** So there is symbolic meaning to having firearms in the…

**Michael Zeleny:** Very much so.

**David Affeld:** And they amplify your message by drawing attention?

**Michael Zeleny:** Yes.

**David Affeld:** The City has indicated disapproval of the content of some of your boards in the past. There is something about the content of the boards that relates to your protest.

**Michael Zeleny:** Uh-hm.

**David Affeld:** What is that?

**Michael Zeleny:** Yes. They objected to stick figures that were depicted on a set of signs. They considered those to be too provocative for public consumption and exhibition so I withdrew them.

**David Affeld:** Are you still willing to negotiate with the City to change the parameters of your protest?

**Michael Zeleny:** Absolutely. I made that offer in writing.

**David Affeld:** Once or more than once?

**Michael Zeleny:** Several times.

**David Affeld:** Okay. No further questions.

**Dave Bertini:** Okay. Are we allowed to question?

**Gregory Rubens:** Um yeah.

**Dave Bertini:** Mr. Zeleny, when you protested in the past with unloaded firearms, isn't it true that you had ammunition in close proximity to those firearms?

**Michael Zeleny:** Yes.

**Dave Bertini:** And how many rounds would you estimate that you had close to those firearms?

Anywhere between 12 and 24 I guess.

**Dave Bertini:** 12 and 2400?

**Michael Zeleny:** No.

**Dave Bertini:** Just 12 rounds or 2400 or 24 rounds?

**Michael Zeleny:** Right.

**Dave Bertini:** Wasn't there one time when there was a bag full of ammunition?

**Michael Zeleny:** Yeah, but all the magazines in the state are limited to 10 rounds.

**Dave Bertini:** I am talking about loose in boxes or loose ammunition.

**Michael Zeleny:** Um, I didn't really bring a stock of ammunition. Maybe there was about two in a case somewhere on display.

**Dave Bertini:** I believe there is a lot more ammunition that what you are telling us, 12 or 24 rounds.  So what is the purpose of having, if your display of unloaded firearms are just to have a shock value or somehow are involved in your protest, what is the reason for having live ammunition so close in proximity to those weapons?

**Michael Zeleny:** A gun is useless without ammunition.  What is the point of displaying something that is useless?

**Dave Bertini:** Well, if the display of the unloaded firearm is just that, a display, are you saying that you'd be willing to load the weapon and use it if necessary?

**Michael Zeleny:** I believe that California statutes allow me to do so when I reasonably consider myself to be in danger and I would certainly do so if it were to come to that.

**Dave Bertini:** I see.  So you would be willing to just load those weapons and begin to fire them?

**Michael Zeleny:** If I felt that I had to defend myself within the statutory limits I would do so.

**Dave Bertini:** And who are you threatened by while you are protesting at that location?

**Michael Zeleny:** Well, actually, I was physically confronted by a few people.  In the course of that, I was able to talk myself out of it. But as I said, I received multiple death threats.  I have recorded some of them.  They have been presented in court on several occasions.  Police reports exist to that affect which you are more than welcome to look up. And I give my permission to do that.

**Dave Bertini:** And these death threats came from whom?

**Michael Zeleny:** Hm?

**Dave Bertini:** The death threats came from whom?

**Michael Zeleny:** I don't know whom, from whom they came. They were made on behalf and presumably at the behest of entities that were sponsored by NEA, WebEx and its principals.

**Dave Bertini:** And is it true that you are attempting to use the City of Menlo Park to circumvent the California Penal Code by trying to make your protest actually a video production?

**Michael Zeleny:** I don't believe I am circumventing anything. I am using a statutory exemption __________ and there is nothing under handed about it. But yes, I want to fit myself within the meaning of law. I want to abide by law.

**Dave Bertini:** Okay. So basically you've just admitted to me that, this is your goal, is to use this ploy or whatever you want to call it to get a special permit so that you will be allowed to carry weapons in your protest which are now illegal because of the new statutes that came into effect the last few years.

**David Affeld:** Just a second. That is a fairly argumentative question. I realize we have informality here, but the witness just said his intention is to comply with law, including these statutory exemptions and if Commander has an issue with that statute, as a remedy in Sacramento.

**Dave Bertini:** Well, and I would say the same for Mr. Zeleny. But I believe the nature of my question is just trying to clarify what Mr. Zeleny said.

**David Affeld:** When you use words like ploy and you've just admitted to me, those are kind of loaded words.

**Dave Bertini:** I would disagree with you, Counselor.  So Mr. Zeleny, your intention is to use a permit from the City of Menlo Park in order for you to bring weapons that would be illegal at a protest to this protest, isn't that correct?

**David Affeld:** Let me object.  That is not an accurate characterization.  Well, belt and suspenders he is trying to do this, but we believe that he is already within the law.  This is just an additional step to make it even more abundantly clear.

**Dave Bertini:** He can certainly say no to the question.  It seems to me, and basically what you've just said, is that you are using this as a way to get around the California Penal Code by allowing you now to carry weapons at a protest.

**Michael Zeleny:** Allow me to answer that.  It is not my intent to get around anything.  It is my intent to abide by the letter and the spirt of the law.  The law makes a specific explicit exemption for authorized participants in entertainment events and from video production.  The purpose of this meeting is to establish that I am empowered by law to authorize myself in my own production.

**Dave Bertini:** I disagree.  I don't think the purpose of the meeting is that.  The purpose of the meeting is to have the hearing officer make a decision on whether this permit…

**Michael Zeleny:** That's right.  I am talking about my purpose.

**Dave Bertini:** Right.  Your purpose maybe.

**Michael Zeleny:** Correct.

**Dave Bertini:** Yes.  So my question to you, Mr. Zeleny, is do you, is your intention to protest or to make a video and film?  What is your intention?

**Michael Zeleny:** It is both actually. I have been recording my protests for as long as I have been conducting them. You can find them online.

**Dave Bertini:** And what is the…

**Michael Zeleny:** It is not an exclusive choice by any means.

**Dave Bertini:** Right and have you ever applied for a special permit before?

**Michael Zeleny:** No. I didn't have to because as my counsel has indicated, that special permit actually, according to my research, came to be only in the course of my prosecution for carrying, allegedly carrying a concealed weapon.

**Dave Bertini:** But there was, there were special event permits in the past.

**Michael Zeleny:** No.

**Dave Bertini:** There has been.

**Michael Zeleny:** But not prior to, oh I can prove that very easily. Not prior to 2014.

**Dave Bertini:** No. There was a process prior. There was a process prior to 2014 for people to get permits for special events that would block streets, etc., that would require police presence, etc.

**Michael Zeleny:** Allow me to amend my response.

**Dave Bertini:** Certainly.

**Michael Zeleny:** There was no evidence of such permitting process that I could find at the time I was conducting my protests. There was no such evidence online that I can find retroactively

with historical searches.  There may well have been a process at that time and been advertised and didn't come to my attention.

**Dave Bertini:** Okay.

**Michael Zeleny:** I will concede that.

**Dave Bertini:** And so again, I go back to the question.  Why did you now request a special permit when you don't need a permit to protest?

**Michael Zeleny:** That is correct.  I need a permit to protest within the same parameters that I have been using before, owing to the new statutes that have been enacted.

**Dave Bertini:** That is not true.

**Michael Zeleny:** With the exemptions.

**Dave Bertini:** But that is not true, Mr. Zeleny.  You could walk up there today and protest as long as you are within the law and you don't have any weapons with you.

**Michael Zeleny:** Yes.

**Dave Bertini:** And have the signs that you have…

**Michael Zeleny:** As long as I don't have weapons with me.

**Dave Bertini:** That is correct.

**Michael Zeleny:** I do intend to have weapons with me as allowed by law.

**Dave Bertini:** So your intention for applying for the special permit is so that you can carry weapons?

**Michael Zeleny:** Yes.

**Dave Bertini:** That is your, that is the reason why you've asked for the special permit?

**Michael Zeleny:** Yes.

**Dave Bertini:** Thank you. I have no further questions.

**Alex McIntyre**: Mr. Rubens, do you have anything?

**Gregory Rubens:** No. If you need to talk with me…

**Alex McIntyre**: No. No. Can I ask a few questions, please, for clarity?

By all means.

**Alex McIntyre**: In no particular order. I am not even sure who I am asking this to, but I am going to ask the question anyways. Mr. Affeld, you characterized something earlier as being a protest activity or a special event and my question is are they the same or are they in your mind different?

**David Affeld:** They overlap. I think, as I'll make clear in closing argument, I don't believe Mr. Zeleny needs any of this. He doesn't need a special event permit. I think he is entitled to protest. I think he is entitled to video the protest and when he does that he complies with Penal Code Section 25510 and its counterpart for open carry. But once he does, or for closed carry. Once he does that though, he puts himself at risk. So in a manner of belt and suspenders over caution, he is also applying for a special event permit to buttress and make even more clear that he is entitled to what he wants to do.

**Alex McIntyre**: And can I enter to your point earlier about, can you sort of restate something for my benefit? Is there a distinction between protest activity and a special event?

**Dave Bertini:** Yes, because you do not need a permit to protest.

**Alex McIntyre**: Second question. Is it everyone's understanding that film permits are completely discretionary by the Menlo Park City Council?

**Dave Bertini:** That is correct.

**David Affeld:** No. That is not our, I don't believe the City has unfettered discretion from the basis of content to deny the ability to make a video recording of a protest event.

**Alex McIntyre**: Maybe I asked a different question. I asked are film permits discretionary by the City Council of Menlo Park? A permit for a production company to come in and film Die Hard 12. Does the production company have a right to come into Menlo Park and set up camp and do 20 days of filming? Is that something in your opinion that Council, the Menlo Park law does not allow for discretion?

**David Affeld:** I don't know. I suspect that probably is a matter of discretion with the discretion bounded by a certain constitutional limits for example. A commercial production of a feature film would be a different thing from a First Amendment protest for example. I don't think that the City has discretion to deny a protest and I don't think it has discretion to deny making a video of the protest.

**Alex McIntyre**: It still hasn't, that is not my question. So to your point earlier, Commander wouldn't answer your question, all I am asking is a film permit is an understood concept that is, in my mind I believe, may have some, the municipality holds a discretion to allow it or to not allow it. A film permit.

**David Affeld:** And my point is I suspect that discretion is the standard with discretion limited by constitutional rights.

**Alex McIntyre**: Thank you.

**David Affeld:** There is an arbitrary discretion in other words.

**Alex McIntyre**: Okay. Third question. And I am sorry because you didn't offer these in evidence yet. I mean, you have, but they are not in my possession. The three permits that Mr. Zeleny apparently received from the State of California, what were the dates on those again?

**David Affeld:** July 12, 2016.

**Alex McIntyre**: Which was about a month ago?

**David Affeld:** Right.

**Alex McIntyre**: Okay.

**Gregory Rubens:** There weren't three permits. There was one permit and three ___________.

**Alex McIntyre**: I'm sorry. Three…

**David Affeld:** Yes.

**Alex McIntyre**: It sounds like three documents. I'm sorry.

**Gregory Rubens:** Yes.

**David Affeld:** Yes.

**Alex McIntyre**: Okay. So there is a July 12, 2016 date, not 2015?

**David Affeld:** Right.

**Alex McIntyre**: I just want to be clear what year these were acquired.

**David Affeld:** Right.

**Alex McIntyre**: And Commander, do you know, and I will ask Mr. Affeld next. Do you know when a completed application was submitted for the event, for the special events permit?

**Dave Bertini:** It was in 2015.

**Alex McIntyre**: A completed application.

**Dave Bertini:** What do you mean by completed?

**Alex McIntyre**: I thought I had read in some of the exhibits that the City had that the City Attorney kept sending back requests for information for the application to be complete.

**Dave Bertini:** Right.

**Alex McIntyre**: Because I think they were sometimes missing information. Is that, do you know, and actually Mr. Rubens, maybe you know the answer to the question. When was a completed application deemed submitted?

**Gregory Rubens:** Let me see what the last…

**Alex McIntyre**: Actually let me back up. Has a completed application been deemed submitted? Maybe that is a better question.

**Gregory Rubens:** I just want to see. I want to look at this, the last…

**Alex McIntyre**: So Mr. Rubens, why don't you search for that for a quick second. No actually, that was going to be my last question.

**David Affeld:** That exchange actually highlights our point of view. We think that the application was complete and that there was a, kind of a pretexual stumbling block raised to say that the application was incomplete. But certainly by the time the appeal process reached this point, all of the information that needed to be supplied has been supplied.

**Gregory Rubens:** I think we will, when we review the information together, we will look at the June 24th denial which is the denial being appealed from.

**Alex McIntyre**: Okay.

**Gregory Rubens:** I don't think it has that as a ground in it, that it was incomplete.

**Alex McIntyre**: Okay. Mr. Affeld, can I ask you to clarify something for me?

**David Affeld:** Yes.

**Alex McIntyre**: The three documents dated July 12th?

**David Affeld:** Yup.

**Alex McIntyre**: Can you remind me what their relevance is with regards to this conversation?

**David Affeld:** Yes. The Commander said that he felt that for somebody to qualify as an authorized participant it had to be permitted by some governmental agency and he ran through a list of examples and then I showed him the three different formats of the permit that Mr. Zeleny had and I asked is this the kind of thing you had in mind and he said yes.

**Alex McIntyre**: The question I have then is again, and maybe it is rhetorical, but I will ask it anyway is since those weren't in hand until July 16th, all the applications that have come in previously he did not have the benefit of those permits from the State. Is that a true statement?

**David Affeld:** Uh, yes.

**Alex McIntyre**: Okay.

**David Affeld:** Before we leave the topic though, I'd suggest that to the extent that, we don't think that the objection is right. We don't think the statute call, requires any kind of permitting, but to the extent there had been any merit to that argument, it is now gone.

**Alex McIntyre**: I don't believe I have any more questions. Does anymore, for the sake of clarity for anyone, want to offer anymore comments or closing statements?

**David Affeld:** Yes. But I want to email the…

**Gregory Rubens:** I had one thing I wanted to say just about the, what I handed out. I received this information from the City and looking at it today, I see that there might be some attorney-client privileged minor communications in here. I just want to preserve that privilege.

**David Affeld:** We will deem them, you can claw them back. Identify them in some, in the next 10 days can you let us know?

**Gregory Rubens:** Alright. I will.

**David Affeld:** I need an email address. I have Mr. Rubens' address. Anybody else?

**Alex McIntyre**: Mr. Rubens is fine.

**David Affeld:** Okay.

**Alex McIntyre**: So who closes first? I'm sorry. Does it matter?

**Gregory Rubens:** You know, it is usually the appellant gets the last word. So it is up…

**Alex McIntyre**: Commander, do you want to, have any closing statements?

**Dave Bertini:** Yeah. I'll just submit it as…

**Alex McIntyre**: Okay. As a stand. Okay. Mr. Affeld?

**David Affeld:** Okay. One second. Before I do that, I want to send off this email. Okay. I have now emailed to Mr. Rubens the three different vresions of the permit.

**Gregory Rubens:** Okay.

**David Affeld:** Okay. So the floor has been yielded to me?

**Alex McIntyre**: Yes.

**David Affeld:** Our goal is to find an agreement with the City so that Mr. Zeleny can conduct his protest in a lawful way to avoid litigation, Section 1983 litigation, to avoid as much controversy as is possible so that the focus is just on his protest and the targets of the protest and the First Amendment virtues can be achieved. So I just want to say we are amenable to negotiations about time, place, manner restrictions. We will modify this. The truck doesn't have to be on a mediation, on the median, and the location doesn't have to be the median. It would be appropriate and I think it is not used and I don't think it would cause a problem, but if the City feels strongly, Mr. Zeleny can agree to relocate. We do have a sticking point on the firearm aspect. That goes to the content. It has symbolic meaning and it amplifies the message. There is constitutional authority to the effect that it is lawful for somebody to amplify the message and to draw attention. That is in fact the purpose of speech that some people might regard as unpleasant. Mr. Zeleny is not looking to do any kind of end run or skirt any kind of statutory scheme. He is trying to invoke, specifically, the laws of which legislature seems fit to adopt. So we believe he has compliance with the letter and the spirt of Section 25510 and its counterpart. The statute just requires somebody to be an authorized participant, in and among other things, an

entertainment event or a video production. That is disjunctive. So the special permit goes to whether this is an entertainment event. If a special event permit issues, it is pretty clearly an entertainment event but it doesn't have to be. It doesn't have to be permitted. It is enough if Mr. Zeleny is making a video production. It is not up to the City to decide who is authorized. That is not what the statute means. It is pretty clearly not. The City is not in the business of making casting decisions. It is the producers of the video production, the promoters of the entertainment event who make the decision about who will be on camera. So if Mr. Zeleny authorizes himself to be an authorized participant, he is the person who makes that decision, not the City of Menlo Park. And if he is an authorized participant, it is strictly a matter of whether that event, his protest that is being video recorded, is a video production and complies to the statute if that happens and whether it is an entertainment event. In which case he likewise complies with the statute and I don't believe that the City has discretion to deny Mr. Zeleny the ability to record his protest. There is nothing in the ordinance nor can there be to say that there has to be a finite duration of his protest. The Civil Rights Movement didn't have any such limitations. Historically, the First Amendment has never been construed that way and it is not even a practical worry. Mr. Zeleny has never spent 365 days a year in his protest. He has done it for approximately 10 or 11 or 12 days in any given year. The City's concern is they don't want him round the clock living on the median. That can be accommodated. Just give us some reasonable time, place, manner restrictions and he'll comply. The duration, we can negotiate that. We can agree if it is no more than 10 days a month or X days a month or something along those lines. That is negotiable. What the City can't do is deny him any days a month. I don't think that is a lawful constitutional exercise. That is not within the discretion of the City. The criteria for special event are unconstitutionally vague to the extent that those criteria would be used to

impinge on Mr. Zeleny's First Amendment exercise and the use of firearms as a means of making the First Amendment protest.  That is just a combination of First and Second Amendment rights to achieve the First Amendment goal.  So I think it would be prudent for us to work something out so that we don't wind up in expensive protracted litigation.  Let's get to a sensible resolution.

**Alex McIntyre**: Great.  So is this matter deemed submitted?

**David Affeld:** Yes.

**Alex McIntyre**: Okay.  I'll take this under submission.  Probably take about 3 weeks for us to get an answer back to you.

**David Affeld:** Oh.  Maybe one other thing.  We would be willing to stipulate that the City Council will come to whatever conclusion you come to and bypass that so that we don't take up the City Council's time over this.  We are just going to have to run through the whole same production and I have a feeling whatever you do, they will go along with.  So we make that offer. You don't have to do it.  We just offer it as a way to spare wasting valuable public resources.

**Alex McIntyre**: Alright.  Appreciate that.  Anything else or anyone else?

**Gregory Rubens:** Okay.  Thank you.

**Alex McIntyre**: Thank you.  I appreciate the time.

**Michael Zelany:** We are off the record.

# Exhibit F

**TRANSCRIPT OF**

**MENLO PARK CITY COUNCIL MEETING**

**DATE RECORDED: 2016**

**<u>A PUBLIC HEARING TO CONSIDER AN APPEAL OF ADMINISTRATIVE DECISION TO DENY A SPECIAL EVENTS PERMIT SOUGHT BY THE APPLICANT, MICHAEL ZELANY</u>**

DATE OF TRANSCRIPTION: JANUARY 18, 2021

TRANSCRIPT PROVIDED BY:

MCDANIEL COURT REPORTERS

TRANSCRIBED BY:

PADDY KARP

**APPEARANCES**

MS. KIRSTEN KEITH,
MAYOR, CITY OF MENLO PARK

MR. DAVE BERTINI,
POLICE COMMANDER, CITY OF MENLO PARK

MR. MICHAEL ZELANY,
APPELLANT

MR. RICH CLINE,
CITY COUNCIL MEMBER, CITY OF MENLO PARK

MS. CATHERINE CARLTON,
CITY COUNCIL MEMBER, CITY OF MENLO PARK

MR. PETER OHTAKL,
VICE MAYOR, CITY OF MENLO PARK

MR. GREG RUBENS,
SPECIAL COUNSEL, CITY OF MENLO PARK

MS. JELENA HARADA,
CITY CLERK, CITY OF MENLO PARK

**MAYOR KIRSTEN KEITH:** WELCOME EVERYONE TO OUR SPECIAL MEETING OF THE MENLO PARK CITY COUNCIL. MY NAME IS KIRSTEN KEITH. I'M THE MAYOR OF MENLO PARK. AND WE HAVE FOUR COUNCIL MEMBERS WITH US TODAY. TO MY FAR RIGHT, WE HAVE COUNCIL MEMBER CATHERINE CARLTON. AND TO MY RIGHT HERE, WE HAVE COUNCIL MEMBER RICH CLINE. AND TO MY LEFT, WE HAVE VICE MAYOR PETER OHTAKI. AND RAY MUELLER IS -- HE'S NOT ON PHONE; HE'S IN WASHINGTON D.C. I BELIEVE. SO HE WON'T BE JOINING US FOR THIS PART OF THE MEETING. I'D LIKE TO STAND AND SAY THE PLEDGE OF ALLEGIANCE.

***[PLEDGE OF ALLEGIANCE RECITED IN UNISON]***

I'M GOING TO INTRODUCE SOME OF THE PEOPLE WHO ARE HERE TODAY. AND WE HAVE OUR CITY MANAGER, ALEX MCINTYRE. HELLO, ALEX. AND WE HAVE OUR ASSISTANT CITY ATTORNEY, NICK FLEGEL. HELLO. WE HAVE SPECIAL COUNSEL, GREG RUBENS TO THE FAR LEFT. HELLO, GREG. AND WE HAVE DEPUTY CITY CLERK, JELENA HARADA TO MY RIGHT.

THIS IS A PUBLIC HEARING. AND WE ARE CONSIDERING AN APPEAL OF ADMINISTRATIVE DECISION TO DENY A SPECIAL EVENTS PERMIT SOUGHT BY THE APPLICANT, MICHAEL ZELANY. WE HAVE POLICE COMMANDER, DAVE BERTINI WHO WILL INTRODUCE THE ITEM AND MAKE A PRESENTATION. AND THEN I WILL CALL THE APPELLANT TO MAKE A PRESENTATION. AND THEN THE COUNCIL MEMBERS WILL HAVE AN OPPORTUNITY TO ASK QUESTIONS. I WILL THEN OPEN THE PUBLIC HEARING AND TAKE PUBLIC COMMENT. AND THEN WE WILL BRING IT BACK UP HERE.

I WANT TO SAY A FEW OTHER THINGS ABOUT THIS. THIS ITEM IS

AGENIZED AS A PUBLIC HEARING TO CONSIDER THE APPEAL, AS I SAID, AT THE DISCRETIONARY DECISION OF THE CITY MANAGER DATED SEPTEMBER 21ST, 2016 AS SET FORTH IN THE STAFF REPORT. THE STAFF REPORT INCLUDES THE RELEVANT DOCUMENTS FORMING THE BASIS OF THE CITY MANAGER'S DECISION. THE APPLICATIONS, APPEALS, CORRESPONDENCE, STAFF REPORT, AND EVIDENCE PRESENTED AT THIS APPEAL CONSTITUTE THE EVIDENCE AND ADMINISTRATIVE RECORD FOR THIS APPEAL.

THERE ARE SEVERAL RULES FOR THE PROCEEDING THAT I'M GOING TO OUTLINE. THIS IS AN INFORMAL PROCEEDING, WHICH MEANS THAT THE FORMAL RULES OF EVIDENCE DO NOT APPLY. THE CITY COUNCIL MAY CONSIDER ANYTHING THAT MAY BE OF ASSISTANCE TO IT IN MAKING ITS DECISION. THE PROCEEDING, AS I MENTIONED BEFORE, WE WILL START WITH OUR POLICE COMMANDER, DAVE BERTINI TO INTRODUCE THE ITEM. SO WELCOME, COMMANDER BERTINI.

**COMD. DAVE BERTINI:** THANK YOU, MADAM MAYOR, CITY COUNCIL MEMBERS. GOOD AFTERNOON. MY NAME IS DAVE BERTINI. I'M A COMMANDER WITH THE POLICE DEPARTMENT. AND I'M HERE TO PRESENT THE STAFF REPORT ON THIS APPEAL. AS YOU KNOW, WE ARE HERE CONSIDERING THE APPEAL OF MR. -- OF THE APPELLANT, MICHAEL ZELANY, FOR A SPECIAL EVENTS PERMIT. THE CITY COUNCIL IS THE FINAL ARBITER OF THIS CASE WHERE A SPECIAL EVENTS PERMIT HAS BEEN DENIED, AS IN THIS CASE. THE CITY COUNCIL SHOULD CONSIDER WHETHER TO UPHOLD OR OVERTURN THE DENIAL OF THE SPECIAL EVENTS PERMIT SUBMITTED BY THE APPELLANT, MICHAEL ZELANY.

WHAT I'D LIKE TO DO NOW IS GO THROUGH SOME BACKGROUND ABOUT THIS SITUATION. ON JULY 10TH, 2015, THE APPELLANT ZELANY SUBMITTED A SPECIAL EVENTS APPLICATION WITH A STATED PURPOSE OF, QUOTE, "OUTING NEW ENTERPRISE ASSOCIATES AS THE CORPORATE SPONSORS OF INCESTUOUS CHILD RAPIST, MIN ZHU." ONE OF THE -- THE LOCATION THAT WAS LISTED ON THIS APPLICATION WAS THE MEDIAN STRIP, WHICH IS THE CENTER STRIP, ON SAND HILL ROAD IN FRONT OF 2825 SAND HILL, WHICH IS AT THE TOP OF SAND HILL ROAD VERY CLOSE TO INTERSTATE 280. THE TERM OF THE EVENT THAT WAS ORIGINALLY SUBMITTED WAS DESCRIBED AS INDEFINITE. IT WAS LATER CHANGED IN LATER DOCUMENTS TO A TERM OF 31 DAYS FOR 13 HOURS A DAY FOR THIS SPECIAL EVENT TO GO ON. THE EVENT WAS TO HAVE A MULTI-MEDIA SHOWING IMAGES ON A PORTABLE MONITOR OR SCREEN. THE APPLICANT FURTHER STATED THAT HE WOULD BE PRESENT AND I QUOTE, "EQUIPPED WITH FULLY OPERATIONAL, EXPOSED, AND LOADED FIREARMS IN FULL COMPLIANCE WITH ALL APPLICABLE LAWS."

THE APPELLANT LATER PROVIDED SAMPLE IMAGES HE INTENDED TO DISPLAY ALONG WITH THE TYPE OF WEAPONS HE INTENDED TO POSSESS. AND THIS IS THE DISPLAY -- ONE OF THE DISPLAYS HE INTENDED TO SHOW AND ONE OF THE WEAPONS THAT HE INTENDED TO BRING WITH HIM.

THE -- AS THE CITY COUNCIL IS PROBABLY AWARE, WE DO HAVE A PROCESS HERE IN MENLO PARK OF LOOKING AT EVERY SINGLE APPLICATION THAT COMES IN FOR SPECIAL EVENTS. IT GOES THROUGH A VERY SPECIFIC PROCESS WHERE IT'S INTAKED (SIC) BY THE COMMUNITY

SERVICES DIVISION. IT IS THEN LOOKED AT BY A COMMITTEE ON THE COMMUNITY SERVICES DIVISION, WHO EITHER ASKS FOR MORE INFORMATION OR THEY -- APPROVE IT OR THEY DENY IT. THAT WAS DONE IN THIS CASE. IT WAS DENIED ORIGINALLY BY THE COMMUNITY SERVICES DIVISION. AN APPEAL WAS THEN AUTHORIZED TO THE COMMUNITY SERVICES DIRECTOR, WHO ALSO IS ABLE TO LOOK AT THE APPEAL.

ONE OF THE MAIN ISSUES THAT WE HAD WITH THIS AT THE TIME OF THE PERMIT BEING DENIED WAS CLEARLY THE LOCATION. AS I STATED, THE PERMIT WAS DENIED BY THE SPECIAL EVENTS PERMIT COMMITTEE AND EVENTUALLY THE COMMUNITY SERVICES DIRECTOR FOR THE FOLLOWING REASONS.

NUMBER ONE; THERE WASN'T A TERM ATTACHED TO THIS, QUOTE, UNQUOTE, "SPECIAL EVENT." ONE OF THE OTHER ISSUES THAT WE HAD WAS A PUBLIC SAFETY AND TRAFFIC CONCERN, WHICH I WILL GET INTO LATER REGARDING THE EXACT LOCATION. IT'S ALSO NOTED THAT THE OPEN CARRY OR CONCEALED CARRYING OF FIREARMS IN A PUBLIC PLACE IS STRICTLY PROHIBITED BY LAW. AND THE CITY HAD NOT AUTHORIZED THE APPELLANT AS AN AUTHORIZED PARTICIPANT IN A MOTION PICTURE OR ENTERTAINMENT EVENT, NOR HAS THE APPELLANT SOUGHT A FIRM -- A FILM PRODUCTION PERMIT.

APPELLANT ZELANY WAS ADVISED THAT THE DENIAL DID NOT INFRINGE UPON HIS FIRST AMENDMENT RIGHT TO PROTEST AS LONG AS HE WAS COMPLIANT WITH THE LAW. ACTUALLY, HE WAS TOLD SEVERAL TIMES THAT HE COULD PROTEST JUST LIKE ANYONE ELSE COULD WITHOUT A

SPECIAL EVENTS PERMIT. HE WAS ALSO ADVISED OF HIS RIGHT TO APPEAL TO THE CITY MANAGER.

AS A LITTLE BIT OF HISTORY WITH THE APPELLANT, MR. ZELANY, HE HAS IN THE PAST DECADE PERFORMED SEVERAL PROTESTS IN THE LOCATION SIMILAR TO WHERE HE WANTS TO HAVE THIS SPECIAL EVENT. BUT NO -- IN THE PAST, THEY HAVE BEEN ON THE CORNER IN FRONT OF 2825 SAND HILL, NOT IN THE CENTER DIVIDE. IN THOSE PAST EVENTS, HE WAS OPENLY CARRYING UNLOADED FIREARMS, AS WAS HIS RIGHT AT THE TIME TO DO SO BECAUSE IT HAD NOT BEEN PROHIBITED BY LAW.

SEVERAL CHANGES TO THE CALIFORNIA PENAL CODE HAVE BEEN MADE SINCE HIS LAST PROTEST IN 2011. THE OPEN CARRY OF HANDGUNS, UNLOADED HANDGUNS, WAS DEEMED ILLEGAL AND PROHIBITED. AND THEN IN 2012, THE OPEN CARRY OF UNLOADED LONG GUNS, AND THAT'S RIFLE, SHOTGUNS, AND THOSE TYPE OF WEAPONS, WAS ALSO PROHIBITED BY CALIFORNIA PENAL CODE. AND SINCE THOSE LAWS CAME INTO EFFECT, WE HAVE SEEN NO PROTESTS FROM THE APPELLANT, MR. ZELANY.

THERE IS AN EXCEPTION TO THE PENAL CODE RULE, WHICH STATES, THE DISPLAY OF FIREARMS IS -- IS PROHIBITED IF THEY ARE LOANED AS PROPS FOR MOTION PICTURES OR PUBLIC -- PUBLIC ENTERTAINMENT ACTIVITIES. MR. ZELANY -- THE APPELLANT, MR. ZELANY, DECIDED THAT HE DID, IN FACT, WISH TO APPEAL TO THE CITY MANAGER, WHICH HE DID.

ON AUGUST 11TH, 2016, THERE WAS AN IN-PERSON HEARING CONDUCTED BY THE CITY MANAGER. I WAS PRESENT FOR THE STAFF, AND

THE CITY MANAGER WAS PRESENT. THE APPELLANT ZELANY, AT THAT TIME, PRODUCED AN ENTERTAINMENT FIREARMS PERMIT FROM THE DEPARTMENT OF JUSTICE. THIS PERMIT IS NOW EXPIRED; IT EXPIRED JULY 12TH OF 2017. I HAVE BEEN IN CONTACT WITH THE DEPARTMENT OF JUSTICE FOR THE -- FOR A YEAR NOW TALKING ABOUT THIS PERMIT. WHAT THEY ADVISED ME IS THE INTENTION OF THAT PERMIT, IF IT WERE TO BE -- IN FACT, ALLOWS A PERSON WHO IS A PROP MASTER OF A FILM TO LOAN HIS OR HER WEAPONS TO AN ACTOR TO USE DURING A FILMING OF A MOTION PICTURE. THAT'S WHAT THE INTENT OF THE PERMIT IS. WHEN I ADVISED THE DEPARTMENT OF JUSTICE, YOU KNOW, WHAT -- THE APPELLANT, MR. ZELANY, WAS INTENDING TO DO WITH THIS PERMIT, THEY SAID THAT'S NOT WHAT THE INTENT IS OF THIS PERMIT.

THE APPELLANT RAISED AN ARGUMENT DURING THE APPEAL TO THE CITY MANAGER THAT SINCE HE WAS RECORDING HIS ACTIVITIES, HE'S -- HE'S THEREFORE PRODUCING AN ENTERTAINMENT EVENT, AND PURSUANT TO THE PERMIT, HE WAS ALLOWED TO CARRY FIREARMS, WHICH WE DISAGREED WITH.

ONCE THE HEARING WAS OVER ON SEPTEMBER 12TH, 2016, THE APPEAL WAS, IN FACT, DENIED, AND A LETTER WAS TRANSMITTED TO THE APPELLANT, MR. ZELANY, AND THE APPEAL WAS DENIED FOR THE FOLLOWING REASONS. NUMBER ONE; SPECIAL EVENTS PERMITS ARE NOT INTENDED TO REGULATE PROTESTS OR FILMING OF PROTESTS. THAT'S NOT WHAT THE INTENT OF THE SPECIAL EVENT IS. THE DISPLAY OF LOADED OR UNLOADED FIREARMS IN PUBLIC IS PROHIBITED BY LAW, AS I STATED IN A

PRIOR SLIDE. PUBLIC RIGHTS OF WAY WOULD BE COMPROMISED, AND THE INTENDED DISPLAY WOULD VIOLATE SEVERAL VEHICLE AND MUNICIPAL CODE SECTIONS.

SOME OF THE SECTIONS THAT WERE CITED THAT WOULD BE VIOLATED BY THIS -- BY THIS EVENT ARE 21466 OF THE CALIFORNIA VEHICLE CODE, WHICH STATES, "NO PERSON SHALL PLACE, OR MAINTAIN, OR DISPLAY UPON OR IN VIEW OF ANY HIGHWAY ANY LIGHTS IN SUCH A POSITION AS TO PREVENT THE DRIVER OF THE VEHICLE FROM READILY RECOGNIZING ANY OFFICIAL TRAFFIC CONTROL DEVICE." THE LOCATION THAT WAS LISTED ON THIS SPECIAL EVENTS PERMIT IS, IN FACT, RIGHT AFTER THE OFF RAMP TO INTERSTATE 280 AND RIGHT IN FRONT OF A CONTROLLED INTERSECTION WITH SIGNAL LIGHTS.

ANOTHER SECTION THAT WOULD BE VIOLATED WOULD BE 23332 OF THE CALIFORNIA VEHICLE CODE WHICH STATES, "IT IS UNLAWFUL FOR ANY PERSON TO BE UPON ANY PORTION OF THE VEHICULAR CROSSING, WHICH IS NOT INTENDED FOR PUBLIC USE, WITHOUT THE PERMISSION OF THE DEPARTMENT OF TRANSPORTATION." THE CENTER MEDIAN IS NOT FOR PUBLIC USE. IT IS NOT AN AREA THAT EVEN CAN BE ACCESSED LEGALLY IN THAT AREA.

ANOTHER SECTION THAT WOULD BE VIOLATED WOULD BE 24 -- EXCUSE ME, 21466.5 OF THE CALIFORNIA VEHICLE CODE WHICH STATES, "NO PERSON SHALL PLACE, OR MAINTAIN, OR DISPLAY UPON OR IN VIEW OF ANY HIGHWAY ANY LIGHT OF ANY COLOR OF SUCH BRILLIANCE AS TO IMPAIR THE VISION OF DRIVERS UPON THE HIGHWAY. A LIGHT SOURCE SHALL BE

CONSIDERED A VISUAL -- VISION IMPAIRING WHEN ITS BRILLIANCE EXCEEDS THE VALUES LISTED BELOW." AND THE VEHICLE CODE GOES ON TO LIST SEVERAL VALUES OF LIGHTING. PER THE APPLICATION, THE APPELLANT, MR. ZELANY, WISHED TO PLACE A -- SOME KIND OF MONITOR SCREEN -- ORIGINALLY IT WAS LISTED AS A 55-INCH MONITOR WITH THESE DISPLAYS -- LIGHTED DISPLAYS BEING SHOWN INDEFINITELY 24 HOURS A DAY DURING THIS, QUOTE, UNQUOTE, "SPECIAL EVENT."

ANOTHER REASON FOR THE DENIAL WAS THE PUBLIC SAFETY CONCERN, INCLUDING THE PLACEMENT OF THAT VIDEO DISPLAY AS I'VE DESCRIBED, THAT WOULD INTERFERE WITH THE TRAFFIC. AND USING THE MEDIUM OF A BUSY ARTERIAL NEAR A MULTI-LANE FREEWAY TO GATHER WOULD BE UNSAFE. IT WOULD NOT BE A SAFE PLACE FOR ANYBODY TO GO TO -- TO VIEW THIS, QUOTE, UNQUOTE, "SPECIAL EVENT."

APPELLANT ZELANY WAS, AGAIN, ADVISED THAT NO PERMIT IS NECESSARY AS LONG -- FOR A LAWFUL PROTEST. HE WAS ACTUALLY ADVISED THAT IF HE COULD -- WISHED TO CONTINUE HIS PROTESTS HE HAD DONE BEFORE, HE WAS PERFECTLY -- HAD EVERY RIGHT TO DO THAT AS LONG AS IT WAS WITHIN THE LAWS, INCLUDING THE NO OPEN CARRY OF FIREARMS.

AT THIS POINT, THE STAFF RECOMMENDS THAT THE CITY COUNCIL DENY THE APPEAL AND THEREFORE UPHOLD THE CITY MANAGER'S DECISION TO UPHOLD THE STAFF'S DENIAL OF THE SPECIAL EVENTS PERMIT. APPLICANT -- SORRY, APPELLANT ZELANY HAS BEEN NOTIFIED THAT NO PERMIT IS NECESSARY FOR A PEACEFUL PROTEST AS LONG AS ALL

APPLICABLE LAWS AND ORDINANCES ARE FOLLOWED. THANK YOU.

**MAYOR KEITH:** THANK YOU, COMMANDER BERTINI. AND NOW WE WOULD LIKE TO GIVE THE APPELLANT AN OPPORTUNITY TO MAKE A PRESENTATION. AND MR. ZELANY, YOU HAVE UP TO AN HOUR TO DO SO. JELENA, WOULD YOU MIND TIMING IT? THANK YOU. WELCOME. YOU CAN COME UP HERE TO THE MICROPHONE.

**MR. MICHAEL ZELANY:** MY NAME IS MICHAEL ZELANY. I AM THE APPELLANT IN THIS MATTER. THERE HAS BEEN SUBSTANTIAL CORRESPONDENCE IN THIS MATTER CITED --

**MAYOR KEITH:** MR. ZELANY, WOULD YOU MIND MOVING THE MICROPHONE CLOSER SO WE CAN HEAR? YEAH. YOU CAN PULL IT FORWARD.

**MR. ZELANY:** VERY GOOD. WE HAVE EXCHANGED SUBSTANTIAL CORRESPONDENCE THAT HAS CITED ALL THE LEGAL AUTHORITIES THAT ARE GERMAINE TO THIS CASE. SO I AM NOT GOING TO BORE YOU WITH REPEATING THEM. THE CRUX OF THE MATTER HERE IS THAT THE POLICE DEPARTMENT AND THE CITY ARE ENGAGING, OR ATTEMPTING TO ENGAGE IN CONTENT DISCRIMINATION. THE STATUTE THAT BANS OPEN CARRY OF UNLOADED FIREARMS MAKES CLEAR EXCEPTIONS FOR AUTHORIZED PARTICIPANTS IN FILM AND VIDEO PRODUCTIONS AND ENTERTAINMENT EVENTS.

I HAVE CHARACTERIZED MY PROPOSED APPEARANCE AS AN ENTERTAINMENT EVENT, AND SINCE IT'S ALSO BEING FILMED FOR NON-PROFIT PURPOSES AS A FILM PRODUCTION. WHAT THE POLICE DEPARTMENT

AND THE CITY WANT TO HANG THEIR HAT ON IN THIS MATTER IS THAT, ACCORDING TO THEM, I AM NOT AN AUTHORIZED PARTICIPANT. IN FACT, AND QUITE OPENLY, THE POLICE DEPARTMENT AND THE PERSON OF DAVID BERTINI HAS CLAIMED THE AUTHORITY TO DECIDE WHO IS AUTHORIZED AND AUTHORIZED PARTICIPANT IN A FILM OR ENTERTAINMENT EVENT.

THIS IS CLEAR CONTENT DISCRIMINATION AND IT WILL NOT WITHSTAND SCRUTINY UNDER THE FIRST AMENDMENT. I HAVE CITED IN CORRESPONDENCE LEGAL AUTHORITY THAT REQUIRES THE PAYMENT OF LEGAL FEES TO THE PREVAILING PARTY IN MATTERS OF THIS KIND. I AM APPEARING HERE IN ORDER TO MAKE ONE LAST ATTEMPT TO FORCE NO LITIGATION THAT WILL BE COSTLY FOR THE CITY AND VERY, VERY EMBARRASSING.

THE REASON FOR EMBARRASSMENT WILL BE MUCH GREATER THAN ANY COST THE CITY WILL SUFFER. THE CITY IN THIS MATTER HAS BEEN RALLYING BEHIND NEW ENTERPRISE ASSOCIATES, NEA, THE VENTURE CAPITAL FIRM WHOSE BEHAVIOR I HAVE BEEN PROTESTING. NEW ENTERPRISE ASSOCIATES HAS SPONSORED MR. MIN ZHU, WHO IS A MAN WHO -- THE FIRST TIME I RAISED THIS MATTER IN PUBLIC, OUTING HIM AS A VIOLENT, INCESTUOUS CHILD RAPIST, TURNED AROUND AND FLED THE COUNTRY. IN HIS CAPACITY AS A FOUNDER OF A PUBLICLY TRADED COMPANY, AS A PRESIDENT AND CEO, HE DID NOT ONCE DENY THE ACCUSATIONS. HE DID NOT ONCE ADDRESS THEM. AND THE ACCUSATIONS IN THIS MATTER HAVE BEEN MADE BY HIS DAUGHTER REPEATEDLY FROM 1991 TO 2003 IN A SWORN DEPOSITION.

I HAVE INFORMED ANY -- AFTER MR. ZHU DEPARTED THE COUNTRY, OF ALL THE CRIMINAL BACKGROUND OF THIS MAN. AND HE CHOSE IN TURN TO FUND HIM IN CHINA WITH SOME HUNDREDS OF MILLIONS OF DOLLARS TO CONTINUE HIS VENTURES. MR. ZHU IS APPARENTLY THE GOOSE THAT LAYS GOLDEN EGGS, AND HIS PERSONAL ETHICS IS OF NO CONCERN TO HIS FOUNDERS.

IN 2012, THE DISTRICT ATTORNEY OFFICE PROSECUTED ME FOR CARRYING, ALLEGEDLY, A CONCEALED FIREARM, A HANDGUN THAT WAS CARRIED IN AN OPENLY EXPOSED HOLSTER (INAUDIBLE) WAS. I WAS ACQUITTED IN THIS CASE FOR OBVIOUS REASONS. IT WAS A NO BRAINER. THE INTERESTING THING IS THAT THE PROSECUTOR IN THAT CASE NAMED ON THE OFFICIAL RECORD NEA, NEW ENTERPRISE ASSOCIATES, AS HER CLIENT. SHE WAS PROSECUTING ME ON BEHALF OF A PUBLIC ENTITY THAT WAS EMBARRASSED BY MY PUBLIC DISCLOSURE OF ITS SUPPORT OF A VIOLENT, INCESTUOUS CHILD RAPIST.

THE POSITION THAT THE CITY IS TAKING IN THIS MATTER THAT THE CITY ALONE AND ITS POLICE, ITS AUTHORITIES, HAS THE AUTHORITY TO NAME, DESIGNATE, AUTHORIZED PARTICIPANTS IN PRODUCTIONS EXEMPTED FROM THE BAN ON OPEN CARRY IS PREPOSTEROUS. IF THE CITY CONTINUES TO INSIST ON ITS RIGHT TO ENGAGE IN THIS KIND OF WONTON DISCRIMINATION, I WILL HAVE NO ALTERNATIVE TO LITIGATION. I WOULD LIKE TO MAKE, AT THIS TIME, ONE LAST APPEAL TO CONSIDER THE AUTHORITIES THAT WE HAVE CITED AND TO COME TO THE RIGHT DECISION IN THIS MATTER. YOUR QUESTIONS, PLEASE?

**MAYOR KEITH:** THANK YOU VERY MUCH FOR YOUR PRESENTATION. AT THIS TIME, DO ANY COUNCIL MEMBERS HAVE QUESTIONS, OR WOULD YOU LIKE ME TO OPEN UP THE PUBLIC HEARING FIRST?

**MR. RICH CLINE:** LET'S DO THAT FIRST.

**MAYOR KEITH:** YEAH. SO YOU CAN TAKE A SEAT, AND WE'LL JUST OPEN THE PUBLIC HEARING, WHICH I BELIEVE, BASED ON THE PUBLIC HERE WILL BE VERY SHORT, IF NON-EXISTENT. WOULD ANYBODY LIKE TO SPEAK FROM THE PUBLIC? OKAY. IS THERE A MOTION TO CLOSE THE PUBLIC HEARING?

**MR. CLINE:** SO MOVED.

**MS. CATHERINE CARLTON:** SECOND.

**MAYOR KEITH:** OKAY. ALL THOSE IN FAVOR?

**MS. CARLTON:** AYE.

**MAYOR KEITH:** AYE. THAT'S UNANIMOUS. NOW WE CAN BRING IT UP HERE AND DISCUSS THE ITEM. COUNCIL MEMBER CARLTON?

**MS. CARLTON:** I THINK -- WERE YOU FIRST?

**MR. CLINE:** GO AHEAD.

**MS. CARLTON:** OKAY. I WOULD LIKE TO ASK YOU A FEW QUESTIONS, IF I MIGHT. IT'S KIND OF THE OBVIOUS QUESTION, SO I HAVE TO ASK. YOU'VE BEEN ADVISED THAT YOU CAN PROTEST, BUT WITHOUT THE GUNS; YES?

**MR. ZELANY:** YES.

**MS. CARLTON:** WHY GUNS? I -- I DON'T UNDERSTAND.

**MR. ZELANY:** WHAT I FOUND TO BE THE CASE IS THAT NOBODY PAYS

ATTENTION TO AN UNARMED MAN. AND THE FIRST TIME THAT I PROTESTED THIS MATTER PUBLICLY IN SAN FRANCISCO IN 2005 THAT WAS AGAINST A COMPANY NAMED WEBEX AND RICHMOND. MR. ZHU WAS SECOND IN COMMAND. I DID NOT HAVE GUNS ON ME. WHAT HAPPENED, THOUGH, WAS WEBEX VIGOROUSLY PROTESTED AGAINST MY PEACEFUL PROTEST, AND THE MANAGEMENT OF THE HOTEL IN WHICH I WAS STAYING BROKE INTO MY CAR AND FOUND IN THE TRUNK A LEGALLY CARRIED RIFLE, UNLOADED.

THAT WAS THEN USED AS A PRETEXT BY WEBEX FIRST, TO HAVE ME ARRESTED, THEN TO SUBJECT ME TO PSYCHIATRIC EVALUATION, WHICH I PASSED. I WAS RELEASED. THE NEXT DAY, WHEN I CAME TO THE SAME LOCATION TO CONTINUE THE PROTEST, THE CONFERENCE HAD BEEN CANCELLED. A WEEK LATER, MR. ZHU DEPARTED THE COUNTRY. WEBEX CITED ITS REASON FOR CANCELLATION AS RESPONDING TO A PROTESTOR WITH A RIFLE. I TOOK NOTE OF THAT. APPARENTLY, PEOPLE DO PAY ATTENTION.

**MS. CARLTON:** SO YOU THINK -- I'M -- I'M JUST MAKING SURE I UNDERSTAND -- THAT BY CARRYING A GUN IT ADDS LEGITIMACY TO WHAT YOU ARE PROTESTING SO THAT PEOPLE PAY ATTENTION? OR I -- I -- CAN YOU EXPLAIN A LITTLE BIT FURTHER WHY YOU HAVE --

**MR. ZELANY:** I'M TRYING TO ATTRACT ATTENTION TO THE SUBJECT MATTER OF MY PROTEST. AND IF YOU WISH TO KNOW MORE DETAILS, I HAVE BEEN INVOLVED IN BUSINESS WITH WEBEX. AND THE BUSINESS (INAUDIBLE) SOUTH, THEN COMPANY RENEGED ON ITS PROMISES. WHEN I BEGAN LITIGATION, I RECEIVED DEATH THREATS IN THE NAME OF THE COMPANY.

**MS. CARLTON:** YOU KNOW, I -- I DON'T WANT TO GET INVOLVED IN THE WEBEX -- ANYTHING --

**MR. ZELANY:** OKAY. SO WHAT -- WHAT ARE YOU ASKING THEN?

**MS. CARLTON:** THAT'S KIND OF A SEPARATE ISSUE. THE -- THE ISSUE I'M AT HAND IS -- IS STANDING ON THE STREETS OF MENLO PARK WITH GUNS; WHY IS THIS NECESSARY TO COMMUNICATE WHAT YOU'RE TRYING TO COMMUNICATE?

**MR. ZELANY:** I'M PROTESTING PEOPLE THAT USE DEATH THREATS AS A MODE OF RESOLVING BUSINESS DISPUTES. I AM DEMONSTRATING MY READINESS AND ABILITY TO DEFEND MYSELF WITH THE TOOLS AVAILABLE TO ME. I AM DOING IT UNDER ALL APPLICABLE LAWS. THE LAWS CONTAIN A SPECIFIC EXEMPTION FOR PEOPLE WHO ARE ENGAGED IN FILM OR VIDEO PRODUCTION OR ENTERTAINMENT EVENTS. IT IS NOT THE PART OF THE CITY TO DEFINE WHAT CONSTITUTES FILM OR VIDEO PRODUCTION OR AN ENTERTAINMENT EVENT. NOBODY HAS APPOINTED THE CITY, OR ITS AUTHORITIES, OR ITS POLICE DEPARTMENT AS CRITICS OF ENTERTAINMENT, OR FILM, OR VIDEO. THIS IS A FIRST AMENDMENT ISSUE. AGAIN, ALL THE LEGAL CITATIONS ARE IN THE CORRESPONDENCE. YOU HAVE YOUR COUNCIL HERE. YOU HAVE HAD AMPLE TIME TO REVIEW THEM. AND YOU HAVE CERTAINLY A LOT MORE TIME, AS MUCH AS YOU WISH TO TAKE. BUT IT IS NOT, FRANKLY, ANY OF YOUR BUSINESS TO ASK ME WHY I THINK IT'S NECESSARY TO CARRY GUNS. IT IS MY RIGHT TO DO SO WITHIN THE CONTEXT OF AN ENTERTAINMENT EVENT, WHICH I AM PROPOSING.

**MS. CARLTON:** I -- I AM ALL FOR FREEDOM OF SPEECH. HOWEVER,

THERE WAS A PROVISO BY THE FOREFATHERS THAT -- THAT LAID THAT OUT ABOUT YELLING FIRE IN A THEATER, THAT THERE'S FREE SPEECH UP UNTIL THE POINT THAT YOU CAUSE PANIC AND FEAR I SUPPOSE, FOR LACK OF A BETTER WAY. I'M FROM TEXAS. I GREW UP IN --

**MR. ZELANY:** ARE YOU REFERRING TO SCHENCK V. UNITED STATES, THE -- THE -- THE HOLMES OPINION?

**MS. CARLTON:** I'M SORRY?

**MR. ZELANY:** FALSELY CRYING FIRE IN A CROWDED THEATER; IS THAT WHAT YOU'RE REFERRING TO?

**MS. CARLTON:** YES.

**MR. ZELANY:** FIRST OF ALL, THAT WAS OVERRULED. SECOND OF ALL --

**MS. CARLTON:** I -- I'M NOT DEBATED THE LEGALITY, I'M -- I'M JUST SAYING, AS A PHILOSOPHY, I THINK IT'S A GOOD ONE TO FOLLOW IN TERMS OF --

**MR. ZELANY:** OKAY. WELL, I -- I'M -- I USED TO BE A PHILOSOPHER. I'M NOT A PHILOSOPHER ANYMORE --

**MS. CARLTON:** OKAY. I'M -- I'M NOT -- I'M SORRY, I'M ASKING THE QUESTIONS.

**MR. ZELANY:** PLEASE.

**MS. CARLTON:** I HAVE TO -- I HAVE TO -- I'LL -- I'LL -- I'LL OPEN UP AND SHARE WITH YOU, I'M FROM TEXAS. I GREW UP SHOOTING GUNS. I SHOT COMPETITIVELY. I SHOT PISTOL MARKSMANSHIP, TRAP AND SKEET WHEN I WAS IN COLLEGE. I'M NOT A WILTING ROSE WHEN IT COMES TO GUNS BY

ANY STRETCH OF THE IMAGINATION. BUT I HAVE TO SHARE WITH YOU THAT I WAS IN MY CAR ON SAND HILL ROAD AND SAW YOU ON THE CORNER WHEN I WAS AT THE STOP SIGN AND HAD TO DRIVE BY. AND I FIND IT -- I FOUND IT TERRIFYING BECAUSE YOU NEVER KNOW WHEN SOMEONE IS STANDING OUTSIDE THESE DAYS WITH A GUN WHAT THEY'RE GOING TO DO. AND I DON'T UNDERSTAND -- I GUESS -- TAKE IT AS YOU WILL. YOU KNOW, IT'S TOTALLY UP TO YOU. BUT I -- I FEEL THAT HAVING THE GUN TAKES AWAY, MAYBE, FROM WHAT YOU'RE TRYING TO COMMUNICATE BECAUSE THEN IT BECOMES ALL ABOUT THE GUN. AND IT TERRIFIES PEOPLE WHEN THEY'RE DRIVING BY WHEN YOU SEE SOMEBODY WITH A GUN.

**MR. ZELANY:** UH-HUH. UH-HUH.

**MS. CARLTON:** AND AS AN ELECTED OFFICIAL, I'M CONCERNED ABOUT THE RESIDENTS OF MENLO PARK BEING TERRIFIED.

**MR. ZELANY:** OKAY.

**MS. CARLTON:** AND -- AND YOU -- YOU UNDERSTAND WHERE I'M COMING FROM?

**MR. ZELANY:** I THINK I UNDERSTAND. I DON'T UNDERSTAND YOUR QUESTION. IT SEEMS TO ME THAT YOU'RE TRYING TO DICTATE WHAT KIND OF CONTENT OF MY SPEECH IS ALLOWED ON THE STREETS.

**MS. CARLTON:** NO, NOT AT ALL. YOU CAN SAY -- THAT'S -- THAT'S NOT -- THAT'S NOT IT.

**MR. ZELANY:** WELL, THE GUN IS PART OF THE CONTENT. THERE'S PRETTY CLEAR AUTHORITY ON PART OF THE SUPREME COURT'S SAGGY PANTS FOR CONTENT.

**MS. CARLTON:** BUT AS YOU SAY, I'M NOT A JUDGE, AND I'M NOT AN EXPERT ON THAT LAW. THEREFORE, I WILL PASS IT TO MY COLLEAGUES TO CONTINUE THE QUESTIONS.

**MAYOR KEITH:** THANK YOU.

**MR. ZELANY:** WELL, DON'T YOU THINK WE SHOULD TRY TO ABIDE BY THE LAW EVEN IF WE ARE NOT THE AUTHORITY.

**MS. CARLTON:** ABSOLUTELY.

**MAYOR KEITH:** THANKS, COUNCIL MEMBER CARLTON.

**MS. CARLTON:** WE'LL -- WE'LL -- WE'LL GET TO THAT.

**MAYOR KEITH:** AND I THINK COUNCIL MEMBER CLINE HAS SOME QUESTIONS.

**MR. CLINE:** I DO. THANK YOU FOR BEING HERE TODAY. MY -- MY -- MY FIRST QUESTION IS IT'S -- I'M TRYING TO RELATE THIS ALL BACK. SO I -- I -- ALL I'M DOING IS TAKING FACTUAL BREAKDOWN OF WHAT YOU HAVE PRESENTED OVER TIME. YOU HAVE PRESENTED A HIST- -- A HISTORIC, YOU KNOW, BREAKDOWN OF YOUR DISSENTION WITH THE FORMER SECOND IN COMMAND OF WEBEX AND NEA, RAINMAKER. AND -- AND YOU HAVE -- AND THIS HAS BEEN GOING ON FOR 13 OR 14 YEARS, SOMETHING IN THAT PERIOD OF TIME.

**MR. ZELANY:** UH-HUH.

**MR. CLINE:** THROUGHOUT THAT PERIOD OF TIME, I -- I'M WONDERING WHAT HAVE YOU -- WHAT CHANNELS HAVE YOU TAKEN TO DEAL WITH THE ACTUAL INCIDENT THAT HAS CONCERNED YOU IN THE PERSON BEFORE NOW? I -- I FEEL LIKE THIS IS GOING TO TURN INTO -- RATHER IT BEING NEA, NOW

IT'S GOING TO BE THE MENLO PARK -- MENLO PARK POLICE. AND I -- I -- WE HAVE NOTHING TO DO WITH THE 2004, '05, '06, '07 -- ALL THOSE -- NOW WE'RE IN THE SPOTLIGHT FOR SOMETHING THAT, BY ASSOCIATION, BECAUSE OF OUR LAWS AND OUR LOCAL LEGISLATION, YOU HAVE NOW PUT US IN THE SAME BUCKET WITH ALL OF THE PEOPLE THAT HAVE WRONGED YOU. I -- I HAVE -- I'M -- I'M HAVING A TOUGH TIME DRAWING THAT LOGIC. EVEN YOUR LANGUAGE, THAT WE HAVE RALLIED BEHIND THE ORGANIZATIONS. I WENT TO WORK TODAY LIKE A NORMAL PERSON, MY FRIEND. I DID NOT RALLY ANYTHING. I CAME HERE. I DID AS MUCH RESEARCH AS I COULD. I'M TRYING TO UNDERSTAND WHY WE ARE NOW THE CHANNEL FOR THIS WHEN THERE'S BEEN 13 YEARS. AND I DON'T HAVE ANY RECORD OF YOU TAKING THE APPROPRIATE STEPS TO GO AFTER SOMEBODY WHO HAS DONE WHAT YOU SAY IS A HORRIBLE CRIME. I DON'T UNDERSTAND. AND I'M TRYING TO PUT THAT TOGETHER BECAUSE THAT'S THE FIRST STEP FOR ME TO PUT LOGIC BEHIND THIS.

**MR. ZELANY:** OKAY. FAIR ENOUGH. IT IS NOT MY PART TO GO AFTER A SEX OFFENDER. MY PART IN THIS MATTER IS TO EXPOSE THE ONGOING, AND I DO MEAN ONGOING -- PEOPLE AT NEA ARE QUITE OPENLY BRAGGING ABOUT THEIR CONNECTION WITH MIN ZHU, ABOUT THEIR FUNDING OF MIN ZHU IN CHINA -- ONGOING SUPPORT OF THIS MAN. AS FAR AS MY PERSONAL ISSUES ARE CONCERNED, YOU MAY CONSIDER THEM, OR YOU MAY SET THEM ASIDE. THAT'S -- THAT DOESN'T REALLY ENTER INTO THE EQUATION. WHAT IS OF RELEVANCE, HOWEVER, IS THAT YOU HAVE ON YOUR MAIN THOROUGHFARE, A COMPANY WHICH BUILDS ITSELF AS THE WEALTHIEST

AND MOST IMPORTANT VENTURE CAPITAL FIRM IN THE WORLD, WHICH IS SUPPORTING SOMEBODY THAT DOESN'T PASS THE MOST ELEMENTARY SMELL TEST. I'M TRYING TO BRING THIS TO THE ATTENTION OF THE PUBLIC. AND CONSIDER THIS FOR COMPARISON PURPOSES; THE BIGGEST SEX SCANDAL IN SILICON VALLEY TO DATE, AS FAR AS I KNOW, WAS THE LAWSUIT THAT ELLEN PAO BROUGHT AGAINST ANOTHER VENTURE CAPITAL FIRM. THE SUBSTANCE -- THE LAWSUIT WAS THAT ONE OF THE PARTNERS GAVE HER A BOOK OF POEMS BY LEONARD COHEN, A BOOK A LONGING. THAT APPEARED ON THE FRONT PAGE OF THE NEW YORK TIMES AND PLAYED OUT AS IT DID. THIS PARTICULAR MATTER HAS BEEN INVESTIGATED BY JOURNALISTS WHO HAVE APPROACHED ME WHO HAVE -- WHO I KNOW HAVE APPROACHED NEA, AND I CAN ONLY GUESS WHAT KIND OF PRESSURE HAS BEEN EXERTED ON THEM TO KEEP THIS UNDER WRAP. HOWEVER, THE LONGER I AM HERE, THE LONGER I BRING THIS TO THE PUBLIC ATTENTION, THE LESS OF A CHANCE OF MAINTAINING THIS CONE OF SILENCE.

BASICALLY, YOUR CHOICE RIGHT NOW IS THIS; SOONER OR LATER YOU'RE GOING TO BE PLAYING PART, OR YOUR COUNTERPARTS ARE GOING TO BE PLAYING PART IN AN EPISODE OF HBO SHOW, SILICON VALLEY. YOU CAN MAKE IT SOONER OR YOU CAN MAKE IT LATER. YOU CAN MAKE YOUR POSITION THERE AS APOLOGISTS OF A VIOLENT INCESTUOUS CHILD RAPIST, OR PEOPLE THAT -- THAT SAID, ENOUGH, WE NO LONGER SUPPORT THIS KIND OF COVER UP. AND THAT'S YOUR CHOICE.

**MR. CLINE:** OKAY. OKAY. AND -- AND WITH THAT THEN, CAN YOU SHED SOME LIGHT INTO THE PERMIT THAT YOU SHOWED OFFICER BERTINI

THAT -- THAT EXPIRED?

**MR. ZELANY:** OH, YEAH. HERE --

**MR. CLINE:** WHAT -- WHAT -- WHAT TYPE OF PERMIT WAS THAT AND -- AND --

**MR. ZELANY:** IT'S -- IT'S A -- IT'S SOMETHING THAT, ACTUALLY, I -- I DO IN CONNECTION WITH MY OTHER VOCATION. I -- I DO FIREARMS VIDEOS. THE PERMIT EXPIRED. THE RENEWAL APPLICATION IS CURRENTLY PENDING. IT WAS SUBMITTED AS IN PART OF RESPONSE TO THIS ARGUMENT THAT THE CITY WAS MAKING THAT I WAS NOT AN AUTHORIZED PARTICIPANT. BUT THE PERMIT IS REALLY -- IT'S -- IT'S THE ISSUE OF A PUBLIC PERMIT IS A RED HERRING. THE AUTHORIZATION CAN -- IS NOT AND CANNOT BE PART OF THE POWER OF THE CITY OF ANY GOVERNMENT BODY BECAUSE IF IT WERE OTHERWISE, YOU WOULD HAVE A LICENSE TO ENGAGE IN -- IN CONTENT DISCRIMINATION, WHICH IS UNCONSTITUTIONAL. YOU CAN'T -- WHEN -- WHEN A -- WHEN A FILM PRODUCTION COMES TO TOWN -- AND THAT, BY THE WAY, IS SOMETHING THAT PLAYED OUT IN THE PREVIOUS MEETING, AND I WILL BE VERY HAPPY TO -- TO SHARE MY AUDIO RECORDING WITH YOU -- WHEN -- WHEN A CITY CREW -- WHEN A FILM CREW COMES TO TOWN, IT'S NOT UP TO THE CITY TO -- TO DECIDE WHICH ACTOR IS GOING TO BE HANDLING FIREARMS IN ITS OWN PRODUCTION. YOU CAN'T AGGREGATE THE -- THE AUTHORITY TO -- TO AUTHORIZE A PARTICIPANT. THAT -- THAT IS THE PART OF THE PRODUCER.

**MR. CLINE:** IF -- IF I -- IF I START VIDEOTAPING MY DOGS, AND I WANT TO GET A PERMIT, CAN I GET A PERMIT AND BE CONSIDERED A PRODUCER IN -

- IN THE FILM INDUSTRY?

**MR. ZELANY:** I'M NOT AWARE -- I CAN'T ANSWER THOSE QUESTIONS. BUT --

**MR. CLINE:** I -- I DON'T KNOW OF THE PROCESS, SO I'M ASKING --

**MR. ZELANY:** I WOULD LIKE TO BRING SOMETHING TO YOUR ATTENTION. WHILE THIS -- THIS PROSECUTION, MY PROSECUTION BY THE DISTRICT ATTORNEY FOR CARRYING A -- A PISTOL IN OPEN -- IN A (INAUDIBLE) HOLSTER AS CONCEALED, WHILE THAT WAS TAKING PLACE, THE CITY CREATED THIS -- THIS PERMIT. THAT IS ACTUALLY ATTESTED TO BY THE GOOGLE DATE FUNCTION, WHICH I WOULD BE PERFECTLY HAPPY TO SHARE WITH YOU. IT APPEARS THAT THE ENTIRE PERMIT SYSTEM WAS CREATED ON AN AD HOC BASIS FOR -- FOR MY BENEFIT. SO IF YOU'RE ASKING ME ABOUT THE PERMIT, I CAN'T REALLY ANSWER. YOU SHOULD REALLY ADDRESS YOUR QUESTIONS TO WHOEVER CREATED IT IN THE FIRST PLACE.

**MR. CLINE:** OKAY. THAT'S ALL I HAVE RIGHT NOW. THANKS.

**MAYOR KEITH:** OKAY. THANK YOU. VICE MAYOR OHTAKI?

**MR. PETER OHTAKI:** THANK YOU. THANK YOU, MR. ZELANY. I -- I GUESS I -- I CERTAINLY HAVE NO ISSUES WITH YOU PROTESTING NEA. YOU KNOW, I HAVE RECEIVED NO CORRESPONDENCE FROM ANYONE AT NEA. I HAVE NO INTEREST IN PROTECTING NEA. YOU HAVE EVERY RIGHT, IN MY OPINION, TO PROTEST NEA. I -- I THINK THE CONCERN THAT I HAVE IS -- IS THAT, AS A CITY COUNCIL MEMBER, WE ARE RESPONSIBLE FOR THE SAFETY OF OUR RESIDENTS AND MAKING SURE THAT PROTESTS ARE DONE IN A WAY

THAT IS SAFE. AND I THINK THE CONCERN THAT I -- THAT I HAVE AND -- AND I BELIEVE WHAT OUR STAFF HAS IS THAT, FIRST OF ALL, THE LOCATION ON THE MEDIAN IS -- IS VERY DISRUPTIVE TO -- TO THE TRAFFIC THERE. WHILE ON THE SIDES OF THE STREET, YOU HAVE EVERY RIGHT TO PROTEST. AS I THINK IN ONE OF YOUR CORRESPONDENCE YOU -- I THINK YOU ACKNOWLEDGE THAT THAT IS DEFINITELY PUBLIC USE, YOU KNOW, THE SIDEWALKS, THE AREAS ON --ON SAND HILL. I ALSO UNDERSTAND AND -- AND AM CONCERNED ABOUT THE VISIBLE DISPLAY OF FIREARMS, WHETHER THEY'RE LOADED OR UNLOADED, AND THE -- AND THE EFFECT THAT THAT HAS ON DRIVERS, FAMILIES THAT ARE DRIVING UP AND DOWN SAND HILL ROAD AND THAT THAT COULD CAUSE CAR CRASHES AND -- AND ACCIDENTS. AND I DO KNOW -- I MEAN, EVEN THIS LAST WEEKEND UP IN SAN FRANCISCO, AS YOU KNOW, THERE WERE -- THERE WERE SOME PROTESTS THAT WERE PLANNED TO TAKE PLACE. I KNOW THAT WHAT THEY DID UP THERE WAS THEY HAD -- AT CRISSY FIELD, THEY HAD TWO DIFFERENT SECTIONS, EACH WITH METAL DETECTORS, TO -- TO ENSURE THAT PROTESTS COULD TAKE PLACE, AND COUNTER PROTESTS COULD TAKE PLACE, BUT WITHOUT -- WITHOUT FIREARMS, WITHOUT ANY -- ANY SORT OF WEAPONS IN ORDER TO ALLOW THAT FIRST AMENDMENT RIGHT OF FREE SPEECH, BUT TO MAKE SURE THAT THERE WASN'T GOING TO BE ANY -- ANYBODY GETTING HURT, OR SCARED, OR -- OR WHAT HAVE YOU. SO I BELIEVE THAT THE CITY DOES HAVE A RESPONSIBILITY TO MAKE SURE THAT THE PROTEST -- THAT YOU HAVE THE RIGHT TO PROTEST, BUT IT'S DONE IN A WAY THAT'S SAFE AND -- AND DOESN'T SCARE FOLKS. IS THERE ANY WAY THAT -- THAT YOU CAN FIND A

WAY TO -- TO PROTEST NEA AND -- SUCH AS ON THE SIDE WITHOUT FIREARMS IN A WAY THAT, I THINK, WOULD -- WOULD ALLOW US TO ALLOW YOU TO, YOU KNOW, CONTINUE TO PROTEST, BUT IN A WAY THAT DOESN'T SCARE PEOPLE AND CAUSE TRAFFIC ACCIDENTS? THAT'S --

**MR. ZELANY:** THANK YOU FOR YOUR QUESTION. MY ANSWER IS A EUPHORIC YES AND NO. AND I'LL NEED TO ELABORATE. FIRST OF ALL, WE HAVE OFFERED IN CORRESPONDENCE AND IN OUR PREVIOUS APPEARANCE ALL SORTS OF MODIFICATION OF TIME, PLACE, AND MANNER. IF THE MEDIAN STRIP IS NOT ACCEPTABLE TO THE CITY, I WOULD BE HAPPY TO MOVE TO THE SIDE OF THE ROAD, PROVIDED THAT THERE IS ENOUGH SPACE THERE FOR ME AND MY TELEVISION SCREEN. AS FAR AS FIREARMS ARE CONCERNED, I FASHIONED THE CONTENT OF MY EXPRESSION IN STRICT COMPLIANCE WITH THE STATE LAW. THE STATE LAW CARVES OUT THE ALLOWANCE FOR DISPLAY OF FIREARMS NOTWITHSTANDING THE GENERAL BAN. AND I INTEND TO AVAIL MYSELF -- MYSELF OF THIS ALLOWANCE. WHAT YOU'RE SAYING AND WHAT THE POLICE HAVE BEEN SAYING IN THIS MATTER IS THAT YOU WANT TO -- TO RESERVE THE RIGHT TO IMPOSE A BAN THAT GOES BEYOND THE STATE STATUTES. I CANNOT CONSENT TO THAT. I WILL NEGOTIATE TIME, PLACE, AND MANNER AS REQUIRED AND AS ALLOWED BY THE JURIS PRUDENCE UNDER THE FIRST AMENDMENT. I WILL NOT CONSENT TO CONTENT-BASED DISCRIMINATION, WHICH IS WHAT EXCLUSION OF FIREARMS COMES TO.

**MR. OHTAKI:** I'M ASSUMING -- I THINK YOU HAD MENTIONED IN YOUR STATEMENT THAT -- THAT YOU WOULD -- YOU WOULD TAKE IT TO

LITIGATION AND LET THE COURTS DECIDE IS IT -- THAT'S A --

**MR. ZELANY:** OH, ABSOLUTELY. ABSOLUTELY. AND CONSIDER WHAT WOULD HAPPEN IN LITIGATION. THE CITY HAS THREATENED ME WITH ARREST FOR DISPLAYING THE IMAGE THAT HAS BEEN DISPLAYED ON THE SCREEN, BUT THERE IS AN ALLOWANCE IN CONSTITUTIONAL LAW FOR DISPLAYING IMAGES OF A SEXUAL NATURE PROVIDED THAT THEY HAVE REDEEMING SOCIAL OR POLITICAL VALUE. LET'S GO THERE. LET'S DEPOSE THE -- THE PEOPLE THAT ARE RESPONSIBLE FOR FUNDING MR. ZHU AND FIND OUT IF MY IMAGES COMPORT WITH THE REALITY OF THEIR ACCORDING BEHAVIOR. I'M HAPPY TO DO THAT.

**MAYOR KEITH:** I'M GOING TO ASK A COUPLE OF QUESTIONS, AND THANKS. THANK YOU FOR YOUR PRESENTATION AND -- AND TO COMMANDER BERTINI AS WELL.

**MR. ZELANY:** THANK YOU.

**MAYOR KEITH:** I JUST HAVE A COUPLE OF QUESTIONS ALSO ON THIS. AND COMMANDER BERTINI, WOULD YOU MIND JUST PUTTING BACK UP THE SLIDE AFTER APPEAL TO CITY MANAGER? YEAH. SEPTEMBER 12TH, 2016. JUST GO BACK --

**COMD. BERTINI:** THE APPEAL WAS THE NINTH SLIDE?

**MAYOR KEITH:** IT STARTS, APPEAL WAS DENIED.

**COMD. BERTINI:** RIGHT.

**MAYOR KEITH:** UH-HUH. THANK YOU. SO I'M GOING TO ASK A COUPLE OF QUESTIONS, PROBABLY, TO BOTH OF YOU. BUT I'M GOING TO START WITH -- I -- I UNDERSTAND THE CITY, AT ONE POINT, SAID HE WAS NOT

AN AUTHORIZED PARTICIPANT FOR A MOTION PICTURE. AND -- CAN YOU JUST EXPLAIN THAT?

**COMD. BERTINI:** YES. THERE -- THE APPELLANT DID NOT REQUEST A FILM PERMIT, ALTHOUGH WE GAVE HIM THE OPTION THAT HE COULD -- HE COULD CERTAINLY APPLY FOR A FILM PERMIT. BUT THIS IS NOT A FILM PERMIT; IT'S A SPECIAL EVENTS PERMIT.

**MAYOR KEITH:** AND THEN WAS THAT MODIFIED?

**COMD. BERTINI:** NO.

**MAYOR KEITH:** OKAY. SO THAT ISSUE IS STILL OUTSTANDING?

**COMD. BERTINI:** CORRECT.

**MAYOR KEITH:** OKAY. AND WHAT IS THE DEFINITION OF THE AUTHORIZED PARTICIPANT IN A MOTION PICTURE?

**COMD. BERTINI:** WELL, ACCORDING TO THE DEPARTMENT OF JUSTICE, WHO I, AGAIN -- I'VE BEEN SPOKEN -- SPEAKING TO FOR A YEAR, THE -- THAT -- THAT PORTION OF THE RULES AND REGULATIONS OF THE DEPARTMENT OF JUSTICE IS VERY AMALGAMOUS (SIC). IT'S NOT -- IT'S NOT REALLY -- SET IN STONE FOR WHAT -- WHAT THEY'RE CONSIDERING.

**MAYOR KEITH:** IS IT VAGUE?

**COMD. BERTINI:** IT'S VERY VAGUE. AND SO THEY -- I WAS -- WHAT I'VE BEEN ASKING FROM THE DEPARTMENT OF JUSTICE, WHICH THEY HAVE YET TO PROVIDE, IS A LETTER BASICALLY EXPLAINING WHAT THEY CONSIDER, YOU KNOW, AN AUTHORIZED PARTICIPANT, WHAT -- WHAT AN ENTERTAINMENT FIREARMS PERMIT IS AND WHAT IT MEANS. BUT THEY HAVE YET TO PROVIDE THAT OUT TO ME.

**MAYOR KEITH:** OKAY. SO WE HAVE NEVER RECEIVED ANYTHING THAT IS A DEFINITION OF THIS?

**COMD. BERTINI:** CORRECT.

**MAYOR KEITH:** AND YOU REQUESTED IN WRITING?

**COMD. BERTINI:** YES.

**MAYOR KEITH:** OKAY. MR. ZELANY, DO YOU HAVE ANYTHING WITH THE DEFINITION?

**MR. ZELANY:** WHAT IS YOUR QUESTION, I'M SORRY?

**MAYOR KEITH:** DO YOU HAVE ANYTHING INDICATING WHAT THE DEFINITION OF AN AUTHORIZED PARTICIPANT IN A MOTION PICTURE IS?

**MR. ZELANY:** NOTHING BUT WHAT THE LAW SAYS --

**MAYOR KEITH:** OKAY.

**MR. ZELANY:** -- WHICH IS EXACTLY AS YOUR POLICE --

**MAYOR KEITH:** HAVE STATED.

**MR. ZELANY:** -- OFFICER HAS -- HAS CHARACTERIZED.

**MAYOR KEITH:** THAT'S FINE. I JUST WANTED TO GIVE YOU AN OPPORTUNITY IF, PERHAPS, YOU SAID, YES, I HAVE IT RIGHT HERE, I'D BE INTERESTED.

**MR. ZELANY:** AS FAR AS I'M CONCERNED, I'M THE PRODUCER OF THE ENTERTAINMENT EVENT, AND I'M AUTHORIZING MYSELF.

**MAYOR KEITH:** NO. I UNDERSTAND THAT --

**MR. ZELANY:** AN ALTERNATIVE INTERPRETATION THAT THE CITY HAS THE POWER TO AUTHORIZE SOMEBODY, THAT DOESN'T --

**MAYOR KEITH:** MR. ZELANY, I'M GOING TO ASK ANOTHER QUESTION.

**MR. ZELANY:** OKAY.

**MAYOR KEITH:** AND I APPRECIATE YOUR COMMENTS. AND I ALSO APPRECIATE DEFINITIONS FROM THE DOJ, WHICH ISSUES THE PERMITS.

**MR. ZELANY:** OKAY.

**MAYOR KEITH:** SO THAT'S WHY I'M ASKING THOSE QUESTIONS. AND THEN JUST GOING TO -- I KNOW YOU TALKED ABOUT THE SLIDE, APPEAL IS DENIED, AND YOU LISTED SEVERAL DIFFERENT CODE SECTIONS. AND YOU'VE JUST HEARD MR. ZELANY SAY THAT, WELL, I WON'T DO THIS IN THE MEDIAN; I COULD DO IT ON THE SIDE. WHAT'S YOUR RESPONSE TO THAT, COMMANDER BERTINI?

**COMD. BERTINI:** WELL, JUST A COUPLE THINGS. I KNOW COUNCIL MEMBER OHTAKI ALSO BROUGHT UP, AND I WANT TO MAKE SURE WITH THAT WE'RE NOT CONFUSING THE -- THE -- THE ISSUE HERE.

**MAYOR KEITH:** YES.

**COMD. BERTINI:** THIS IS -- THE -- THE CITY COUNCIL IS HEARING AN APPEAL TO A SPECIAL EVENTS PERMIT, NOT A PROTEST. HE -- MR. ZELANY, THE APPELLANT, HAS BEEN TOLD NUMEROUS TIMES, HE CAN HAVE A PROTEST. MR. ZELANY --

**MAYOR KEITH:** AND I WAS GOING TO GO THERE A LITTLE BIT LATER.

**COMD. BERTINI:** OKAY. RIGHT.

**MAYOR KEITH:** BUT SINCE YOU'RE BRINGING THAT UP, JUST TELL US THE DEFINITION OF THAT.

**COMD. BERTINI:** I'M SORRY?

**MAYOR KEITH:** OF A PEACEFUL PROTEST.

**COMD. BERTINI:** RIGHT. WELL, A PEACEFUL PROTEST IS -- IS -- IS A GATHERING OF FIRST AMENDMENT -- YOU KNOW, YOUR FIRST AMENDMENT RIGHT TO GATHER PEACEABLY, TO -- FOR THE ADDRESS OF -- OF -- OF ISSUES. AND HE'S BEEN TOLD THAT HE CAN DO THAT, AND HE CAN -- HE CAN USE THE EXACT SAME LOCATION HE'S USED IN THE PAST, BUT HE HAS TO FOLLOW ALL APPLICABLE LAWS.

**MAYOR KEITH:** WHICH MEANS NO GUNS.

**COMD. BERTINI:** IN -- IN CALIFORNIA THAT -- THOSE LAWS NOW -- THERE'S LAWS THAT PROHIBIT THE OPEN DISPLAY OF FIREARMS.

**MAYOR KEITH:** UNLESS YOU HAVE THIS SPECIAL ENTERTAINMENT PERMIT.

**COMD. BERTINI:** AND -- THAT'S ONE OF THE EXCEPTIONS, YES. I MEAN, BUT THERE'S EXCEPTIONS FOR POLICE OFFICERS, OR EXCEPTIONS FOR PEOPLE THAT HAVE CONCEALED CARRY PERMITS. I MEAN, THERE'S EXCEPTIONS IN -- IN THE LAW. BUT THE ONE THAT I KNOW THAT HAS BEEN BROUGHT UP BY THE APPELLANT IS THIS MOTION PICTURE EXCEPTION.

**MAYOR KEITH:** AND WOULD YOUR -- IF HE PRODUCED THIS DOCUMENT, THIS PERMIT THAT HAS LAPSED, WOULD THAT CHANGE YOUR OPINION IN THIS CASE?

**COMD. BERTINI:** NO.

**MAYOR KEITH:** AND TELL ME WHY.

**COMD. BERTINI:** BECAUSE BASED ON WHAT THE DEPARTMENT OF JUSTICE TOLD ME OVER THE PHONE IN SEVERAL CONVERSATIONS, THAT'S NOT THE INTENT OF WHAT THAT PERMIT IS FOR. THAT PERMIT IS

SPECIFICALLY SO THAT A -- NORMALLY, IT IS ILLEGAL FOR YOU TO GIVE YOUR GUN TO SOMEBODY; YOU'RE NOT SUPPOSED TO DO THAT. YOU, AS THE REGISTERED OWNER OF THE GUN, IS SUPPOSED TO KEEP THAT GUN. WHAT THIS ALLOWS A PROP MASTER TO DO IS LEND THAT GUN TO SOMEBODY FOR THE EXPRESSED PURPOSES OF -- OF FILMING A MOTION PICTURE.

**MAYOR KEITH:** OKAY. SO IF MR. ZELANY GOT THAT PERMIT AND SOMEBODY LOANED HIM A GUN, THEN HE COULD DO IT?

**COMD. BERTINI:** NO. THE PERMIT IS FOR THE PERSON DOING THE LOANING, NOT THE PERSON POSSESSING.

**MAYOR KEITH:** OH, OKAY. THE PERSON DOING THE LOANING?

**COMD. BERTINI:** YES. HAS A SPECIAL PERMIT TO LOAN. THE PERSON WHO WOULD POSSESS IT, IF -- IF IT WAS, IN FACT, A PARTICIPANT IN A MOTION PICTURE THAT HAS BEEN DULY AUTHORIZED, THEN THEY COULD POSSESS IT FOR THE PURPOSES OF THAT MOTION PICTURE. BUT THE PERMIT ITSELF IS FOR THE LOANING OF THE -- THE WEAPONS, NOT THE POSSESSION OF IT.

**MAYOR KEITH:** SO THIS PERMIT IS IRRELEVANT HERE?

**COMD. BERTINI:** CORRECT.

**MAYOR KEITH:** OKAY. AND THEN YES, MR. RUBENS?

**MR. GREG RUBENS:** THE -- THE ACTUAL PERMIT THAT'S EXPIRED IS IN YOUR STAFF REPORT AT PAGE 123. AND BECAUSE OF THE WAY THIS LAW IS WRITTEN, I THINK YOU COULD INTERPRET THE -- THE PERMIT -- THE PERMIT, IN THIS CASE, IS TO MR. ZELANY. SO HE'S EITHER PROPOSING TO SAY THAT HE, AS THE PERMITTEE, HAS THE RIGHT TO LOAN HIMSELF THE FIREARM; OR

HE HAS THE RIGHT TO LOAN SOMEONE ELSE THE FIREARM UNDER THIS PERMIT. BUT THE -- THE POINT THAT I THINK THAT YOU'RE CONSIDERING THIS AFTERNOON IS THE SPECIAL EVENTS PERMIT. SO THAT -- AND THE DECISION OF THE CITY MANAGER IN HEARING THE APPEAL THAT WENT ON FOR SEVERAL HOURS WAS THAT THIS IS NOT A SPECIAL EVENT PERMIT. WHAT HE'S TALKING ABOUT IS A PROTEST. AND IT'S A MULTI-LAYERED ISSUE. HE'S SAYING, WELL, I AM ALLOW- -- HE WANTS TO GET THE SPECIAL EVENT PERMIT SO THAT HE CAN DISPLAY THE -- AT HIS EVENT, HIS FILMING EVENT. AND THEN HE HAS ANOTHER LAYER THAT HE -- THAT HE'S TALKING ABOUT, THE ABILITY TO HAVE FIREARMS AS PART OF MY DISPLAY. BUT THERE'S A STATE LAW THAT SAYS YOU CAN'T DISPLAY UNLOADED OR LOADED FIREARMS IN PUBLIC. YOU CAN'T DO THAT.

**MAYOR KEITH:** UNLESS AN EXCEPTION APPLIES.

**MR. RUBENS:** UNLESS AN EXCEPTION APPLIES. SO HE'S ARGUING THAT UNDER THIS PERMIT, THAT HE'S ENTITLED TO LOAD HIMSELF A FIREARM TO GET AROUND THAT EXCEPTION. BUT THAT'S NOT WHAT YOU'RE HEARING TODAY, BECAUSE THAT WOULD BE A CASE IF HE'S HAVING A PROTEST AND HE'S DISPLAYING FIREARMS, THEN THAT WOULD BE UP TO THE POLICE DEPARTMENT TO DECIDE WHETHER HE'S BREAKING THE LAW AT THAT POINT. THE SPECIAL EVENT PERMIT DOES NOT GRANT SOMEONE THE RIGHT TO DISPLAY FIREARMS; THERE'S A STATE LAW THAT SAYS IT CAN'T. SO THE STATE LAW SAYS NO DISPLAY OF FIREARMS. SO IT'S KIND OF A SIDE ISSUE TO WHAT HE'S TRYING TO DO IN HIS PROTEST. SO SPECIAL EVENT PERMIT IS WHAT YOU'RE DECIDING ON TODAY. WHAT WE TRIED TO MAKE

CLEAR IN THE LETTER THAT THE CITY SENT IN THE DECISION ON THE APPEAL TO THE CITY MANAGER WAS THAT YOU -- THIS IS NOT A SPECIAL EVENT PERMIT. YOU CAN HAVE YOUR PROTEST, YOU JUST HAVE TO COMPLY WITH THE LAWS. SO THE DECISION OF THE CITY MANAGER WAS NOT MAKING A CALL ON WHETHER OR NOT HE CAN HAVE A FIREARM IN HIS PROTEST. BUT THE LETTER ALSO WAS ATTEMPTING TO INFORM MR. ZELANY THERE IS THIS LAW OUT THERE, AND IF YOU HAVE YOUR PROTEST, AND YOU'RE DISPLAYING A FIREARM, YOU COULD BE BREAKING THE LAW. SO I'M TRYING -- I'M TRYING TO BE CLEAR OF WHERE THE PROGRESSION IS ON THIS. SO --

**MAYOR KEITH:** I REALLY APPRECIATE THAT. YEAH.

**MR. RUBENS:** THANK YOU.

**MAYOR KEITH:** SO BASICALLY, THE SPECIAL EVENT PERMIT DOESN'T ALLOW THE DISPLAY OF FIREARMS, PERIOD.

**MR. RUBENS:** IT'S NOT -- IT'S -- IT WOULD BE A VIOLATION OF STATE LAW FOR US TO ISSUE A SPECIAL EVENT PERMIT THAT ALLOWS THE DISPLAY OF FIRE- -- FIREARMS. WHAT MR. ZELANY, I THINK, IS TRYING TO ARGUE IS, WELL, I HAD THE -- IF -- IF HE DID HAVE A VALID FILM PERMIT, THAT HE COULD HAVE A PROTEST AND FILM IT, MAKE IT AN ENTERTAINMENT EVENT, AND THEN I CAN HAVE FIREARMS UNDER THIS EXCEPTION. I THINK THE CITY STAFF HAS MADE IT CLEAR THAT THEY DISAGREE WITH THAT INTERPRETATION. BUT YOU'RE NOT DECIDING THAT TODAY. YOU'RE NOT DECIDING WHETHER OR NOT THAT ACT WOULD BE A VIOLATION OF THE LAW.

**MAYOR KEITH:** NO. WE'RE JUST DECIDING WHETHER A SPECIAL EVENTS PERMIT DENIAL IS APPROPRIATE IN THE CASE OR NOT. OKAY. AND

BASED ON WHAT YOU JUST SAID, IT SOUNDS LIKE IT WAS VERY APPROPRIATE. ALL RIGHT. AND ARE THERE -- THERE ARE NO OTHER QUESTIONS? WE CAN -- COUNCIL MEMBER CLINE?

**MR. CLINE:** (INAUDIBLE) I THINK THERE ARE. AND I DO APPRECIATE, MR. RUBENS, THAT -- THE ARTICULATION SEPARATED THE TWO -- I MEAN, TO -- IT'S NOT WITHOUT COMPLICATIONS, THE -- THE ARGUMENT. SO I -- I -- DO BELIEVE THAT MR. ZELANY AND ANYBODY ELSE SHOULD HAVE FULL RIGHT TO PROTEST. AND -- AND I DO, FROM A PERSONAL NOTE, THINK THERE ARE PROBABLY MORE EFFECTIVE WAYS TO GO AFTER THE ORGANIZATION YOU WANT TO GO AFTER. BUT THAT'S NOT -- THAT'S NOT MY RULING. THAT'S -- YEAH. I THINK THAT YOU'RE OBVIOUSLY PASSIONATE ABOUT THIS. AND -- AND I RESPECT THAT, 100 PERCENT RESPECT ON THAT PASSION. AND IN MY CASE, MY JOB IS TO -- TO, I THINK, MAKE SURE THAT EVERYBODY HAS THE -- THE RIGHTS THAT ARE UNDERNEATH YOUR -- YOUR -- UNALIENABLE RIGHTS. AND ONE OF THOSE IS TO PROTEST AND EXPRESS YOURSELF. THROUGH THE SPECIAL EVENTS PERMIT, IT GETS TANGLED WITH A NUMBER OF DIFFERENT STATE LAWS, AND IT CREATES POTENTIAL UNSAFE SCENARIOS FOR OUR CITY. THERE ARE OTHER THINGS, I THINK, THAT YOU NEED TO ADDRESS AT A HIGHER LEVEL THAN THIS PERMIT ITSELF BEFORE I'M COMFORTABLE GIVING YOU THE PERMIT. BECAUSE I THINK, RIGHT NOW, THIS PERMIT IS GOING TO BE USED AS YOUR LEVERAGE AGAINST ALL THE OTHERS, AND I DON'T THINK THAT'S WHAT THIS PERMIT WAS -- WAS -- WAS CREATED FOR AT ALL. IT WAS CREATED TO ALLOW YOU TO -- TO HAVE A SPECIAL EVENT, IN THIS CASE IT'S A PROTEST. AND YOU ALREADY HAVE YOUR RIGHT TO PROTEST. AND I

THINK I -- I'M IN AGREEMENT RIGHT NOW WHERE STAFF IS BECAUSE OF THESE THINGS THAT HAVE SEPARATED OUT. THERE ARE A COUPLE OF OTHER ARGUMENTS THAT I DON'T THINK RELATE TO US, FRANKLY; DOJ PERMIT, DEFINITION OF WHAT THAT IS, WHETHER YOU'RE CREDENTIALED AS SOMEBODY IN THE FILM INDUSTRY OR NOT AND HOW THAT FITS IN. THAT'S NOT EVEN A PART OF OUR, I DON'T THINK, JURISDICTION. AND SO THIS IS GOING AHEAD OF THAT, AND SO I'M NOT COMFORTABLE GRANTING THAT UNTIL THERE'S MORE CLARITY. I JUST DON'T SEE HOW I COULD -- OUT OF RESPECT, I DO RESPECT THE PASSION AND WHERE YOU'RE GOING WITH IT AND YOUR RIGHT TO ABSOLUTELY HAVE A VOICE.

**MAYOR KEITH:** COUNCIL MEMBER CARLTON?

**MR. ZELANY:** MAY I RESPOND TO THAT?

**MAYOR KEITH:** CERTAINLY.

**MR. ZELANY:** I APPLIED FOR THE SPECIAL EVENT PERMIT BECAUSE I WANT MY APPEARANCE TO BE RECOGNIZED AS AN ENTERTAINMENT EVENT. I'M PROPOSING TO BRING PROPS. I'M PROPOSING TO BRING A TELEVISION SCREEN. I'M PROPOSING TO DISPLAY IMAGES AND COMMENTARY TO PEOPLE. AND I'M PROPOSING TO FILM THEIR REACTION. IN FACT, WE ARE HAVING A FILM EVENT RIGHT NOW. THERE ARE SEVERAL CAMERAS HERE. THIS IS PART OF MY FILM PRODUCTION. UNDER STATE LAW, I WOULD BE ALLOWED TO HAVE AN EXPOSED FIREARMS HERE, WHICH I, OF COURSE, DON'T BECAUSE I CHOOSE NOT TO. BUT THE INTERPRETATION OF THE STATE LAW IS NOT UP TO YOU OR ME; IT'S A BLACK LETTER MATTER. AND IT'S PRETTY CLEAR. AM I OR AM I NOT AN AUTHORIZED PARTICIPANT? THAT'S FOR YOU TO DECIDE.

YOU COULD SAY THE CITY RESERVES THE RIGHT TO DECLARE WHO IS AUTHORIZED, AND THEN WE GO TO THE NEXT LEVEL; WE LET THE COURT DECIDE. MY POSITION IS THAT I AUTHORIZE MYSELF. AND AS FAR AS ENTERTAINMENT EVENT OR FILM PRODUCTION, YES, I HAVE NOT APPLIED FOR A FILM PERMIT. IT IS MY POSITION THAT A NON-PROFIT FILM PRODUCTION DOES NOT REQUIRE A PERMIT, BUT WE CAN TALK ABOUT THAT TOO. THE POINT I'M TRYING TO MAKE HERE IS THAT THE CITY AUTHORITIES HAVE REFUSED TO DISCUSS ANY SORT OF ACCOMMODATIONS; THEY ISSUED A FLAT DENIAL OF MY RIGHT TO CARRY FIREARMS UNDER THE CLEAR CUT EXEMPTIONS TO THE STATE LAW. AND THAT IS REALLY THE ISSUE HERE. WHEN YOU HEAR THE -- YOUR -- YOUR -- YOUR POLICE OFFICERS TELL YOU ABOUT THE BAN, WHAT YOU ARE NOT HEARING IS THAT THERE IS AN ACCOMMODATION FOR PEOPLE LIKE ME. AND WHAT WE ARE REALLY DISCUSSING HERE IS WHETHER OR NOT I FIT UNDER THAT ACCOMMODATION. SO I URGE YOU TO -- TO TAKE THAT INTO CONSIDERATION AND TO BASE YOUR DECISION ACCORDINGLY.

**MAYOR KEITH:** THANK YOU VERY MUCH. AND COUNCIL MEMBER CARLTON, BEFORE I GO TO YOU, I'M GOING TO GO TO OUR ATTORNEY, GREG RUBENS.

**MS. CARLTON:** PLEASE.

**MAYOR KEITH:** MR. RUBENS, COULD YOU JUST RESPOND TO THAT?

**MR. RUBENS:** WELL, I STILL THINK THE -- THE APPELLANT HERE IS CONFUSING A SPECIAL EVENTS PERMIT WITH HIS PROTEST. SO WHAT -- AND I'M JUST GOING TO HAVE TO GO BACK TO THE ISSUE, IS -- IS HE -- THE SPECIAL

EVENT PERMIT RECOMMENDATION FROM STAFF AS DOCUMENTED IN THE STAFF REPORT IS FOR -- TO DENY THE APPEAL AND UPHOLD THE STAFF DECISION. TO BE VERY -- JUST TO BE VERY CLEAR, THE STAFF -- CITY MANAGER IN THE LETTER -- DECISION ON THE -- ON THE LOWER LEVEL APPEAL SAID THAT YOU DO NOT NEED A PERMIT TO CONDUCT A LAWFUL PROTEST. SO WHAT I THINK MR. ZELANY IS DOING IS TRYING TO HAVE THE -- THE CITY COUNCIL THROUGH A SPECIAL EVENTS PERMIT PREJUDGE THE ENTITLEMENT TO HAVE A FIREARM AS PART OF HIS PROTEST AND CALL IT A SPECIAL EVENT. STAFF HAS SAID IN THE STAFF REPORT PRETTY CLEARLY THAT IT'S NOT A SPECIAL EVENT; IT HAS UNLIMITED DURATION, IT'S -- IT'S NOT AN EVENT THAT'S CONTEMPLATED BY THE LAW. SO ON THAT BASIS AND THE OTHER BASES IN THE REPORT ABOUT PUBLIC SAFETY AND -- AND TIME, PLACE, AND MANNER RESTRICTIONS, IT -- THE -- THE -- THE APPEAL WAS DENIED. AND THAT'S WHY THERE'S A RECOMMENDATION FOR YOU TO DENY THE APPEAL. BUT I THINK IT'S -- I JUST DON'T THINK IT'S IN YOUR JURISDICTION TO DECIDE WHETHER OR NOT IT'S LEGAL TO HAVE A FIREARM AS -- AS PART OF A SPECIAL EVENT PERMIT BECAUSE WE HAVE A BODY OF STATE LAW THAT TALKS ABOUT WHAT IS PERMISSIBLE AS FAR AS HAVING AN UNLOADED OR LOADED WEAPON. AND IT'S UP TO MR. ZELANY TO ARGUE IF HE INTENDS TO HAVE A PROTEST THAT INCLUDES WEAPONS TO DECIDE WHETHER OR NOT HE WANTS TO MAKE HIS STAND, AT THAT POINT, THAT HE'S ENTITLED TO HAVE WEAPONS, AND IF HE'S -- IF THERE'S A CRIMINAL PROSECUTION OF HIM DISPLAYING WEAPONS. BUT THAT'S NOT BEFORE YOU BECAUSE THIS IS A SPECIAL EVENT PERMIT APPEAL. SO --

**MAYOR KEITH:** RIGHT. AND AS YOU WERE SAYING, MR. RUBENS, IF MR. ZELANY WANTS TO TAKE A STAND ON THIS, HE CAN ALSO CHOOSE TO DO THAT THROUGH THE COURT SYSTEM WITHOUT BEING ARRESTED FOR THIS; HE CAN DO IT CIVILLY AS WELL.

**MR. RUBENS:** THAT'S RIGHT. AND -- AND IF HE CHOOSES TO TAKE THIS MATTER AFTER THE FINAL DECISION OF THE COUNCIL, AND SHOULD YOU DECIDE TO DENY THE APPEAL, AND HE DECIDES TO FILE AN ACTION AGAINST THE CITY, THAT'S WHERE HE -- THAT'S WHERE THIS ISSUE WOULD ALSO BE DECIDED, WHETHER OR NOT YOU COULD, THROUGH THE SPECIAL EVENT PERMIT PROCESS, APPROVE WHAT HE'S PROPOSING.

**MAYOR KEITH:** AND THAT WOULD BE APPEALED WHERE?

**MR. RUBENS:** IT WOULD GO TO -- IT WOULD BE A WRIT TO THE SUPERIOR COURT AT FIRST, AND THEN IF --

**MAYOR KEITH:** IN SAN MATEO COUNTY?

**MR. RUBENS:** YES.

**MAYOR KEITH:** RIGHT. SO THEN A JUDGE COULD DECIDE THAT BASED ON THE LAW.

**MR. RUBENS:** UH-HUH.

**MAYOR KEITH:** WITH AN EVIDENTIARY HEARING. OKAY. THANK YOU, MR. RUBENS, FOR THAT. AND COUNCIL MEMBER CARLTON?

**MS. CARLTON:** THANK YOU, MR. RUBENS. I -- I APPRECIATE YOUR -- YOUR INPUT, AND -- AND I APPRECIATE YOU TAKING THE TIME AS -- AS COUNCIL MEMBER CLINE SAID, I RESPECT YOUR OPINION, AND I RESPECT YOUR PASSION. AS I SEE THIS, CORRECT ME IF I'M WRONG, REALLY WHAT

WE'RE HERE TO DO WITH -- THERE'S SO MANY STRINGS ATTACHED TO THIS, WE COULD END UP IN THE WEEDS. THIS IS SPECIFICALLY THE -- THE SPECIAL EVENTS PERMIT AND NO OTHER ASPECT OF THIS.

**MR. RUBENS:** THAT'S CORRECT. WE'RE NOT -- YOU'RE NOT MAKING A DECISION ON HOW HE CAN CONDUCT HIS PROTEST. WE'VE ADVISED HIM THAT THERE ARE -- WE DO HAVE A RIGHT AS THE CITY TO -- OR THE CITY HAS THE RIGHT TO TIME, PLACE, AND MANNER OF RESTRICTIONS -- AND INFORMED HIM OF WHERE THE PROTEST COULDN'T TAKE PLACE.

**MS. CARLTON:** OKAY.

**MR. RUBENS:** BUT TODAY BEFORE YOU IS HIS APPEAL OF YOUR -- OF THE SPECIAL EVENT PERMIT.

**MS. CARLTON:** OKAY. BECAUSE OF THE -- THE DETAILS AND THE ISSUES WITH THIS SPECIFIC PERMIT THAT YOU HAVE JUST OUTLINED, AND THE MISSING NECESSARY SUPPORTING PERMITS, DOJ, AND THE OTHER PERMITS THAT WOULD BE NECESSARY TO -- TO SEE THIS SPECIAL EVENT THROUGH, AND THE UNSAFE SCENARIOS THAT, I THINK, MY COLLEAGUES HAVE OUTLINED. I ALSO WORRY ABOUT TRAFFIC ACCIDENTS AND -- AND THE FACT THAT IT'S -- SPECIFIC SPECIAL EVENT LIKE THIS WOULD ENTAIL FURTHER THINGS, I -- I'M GOING TO DECLINE THE SPECIAL EVENT PERMIT. I, AGAIN -- I REALLY WANT TO IMPRESS UPON YOU, WE ABSOLUTELY SUPPORT YOUR -- YOUR PROTEST. IN FACT, IT SOUNDS LIKE YOU HAVE A VERY GOOD REASON FOR PROTESTING. AND I WANT YOU TO BE VERY CLEAR THAT IN NO WAY -- I SPEAK -- I SHOULDN'T SAY WE; I'M SPEAKING FOR ME. I SAY, IN NO WAY DO I WANT TO IMPINGE IN ANY WAY ON YOUR PROTESTING OR YOUR

TAKING ACTION AS NECESSARY. BECAUSE IT SOUNDS LIKE SOMETHING REALLY HORRIBLE DID HAPPEN. AND PLEASE, DON'T THINK IN ANY WAY THAT WE'RE TRYING TO -- TO PREVENT THAT. I'M JUST WORRIED ABOUT MAKING SURE THAT WE GET THE -- THE DETAILS CORRECT TO MAKE SURE THAT EVERYONE IS SAFE AND EVERYTHING IS DONE APPROPRIATELY.

**MAYOR KEITH:** MR. ZELANY, I'M JUST GOING TO MAKE A COUPLE OF COMMENTS AS WELL. AND I THINK IN THIS CASE, WE ARE LOOKING AT ONE VERY SMALL ISSUE, WHICH IS JUST THE DENIAL OF THE SPECIAL EVENTS PERMIT. AND BASED ON THE INFORMATION THAT I'VE BEEN PROVIDED BY OUR COUNSEL TODAY, AND BY OUR COMMANDER, BUT PRIMARILY BY LEGAL COUNSEL HERE, IS THAT THE DENIAL IS APPROPRIATE. AND I THINK YOU DO HAVE AVENUES TO PROTEST. AND I WILL ALSO SAY THAT I THINK PROTESTING IS YOUR RIGHT, YOUR ABSOLUTE RIGHT, AND YOU CAN PROTEST WITHOUT ANY PERMIT WHATSOEVER IF YOU FOLLOW THE PROTEST -- THE LAWS THAT WE HAVE, AND I KNOW YOU'VE SPOKEN WITH OUR POLICE CHIEF AND COMMANDER BERTINI ABOUT. SO I WOULD ENCOURAGE YOU TO PROTEST. IF YOU -- I DON'T KNOW WHERE THIS IS GOING; WE'LL TAKE A VOTE IN A MOMENT. IF THE SPECIAL EVENTS PERMIT IS DENIED, I NOW UNDERSTAND YOU CAN TAKE THAT TO THE SAN MATEO COUNTY SUPERIOR COURT, AND A JUDGE CAN LOOK AT THIS AND DECIDE WHETHER OR NOT WE SHOULD NOT DENY IT OR WE SHOULD DENY IT. AND THAT'S YOUR RIGHT. AND YOU HAVE MANY RIGHTS. AND SO YOU CAN EXERCISE THOSE RIGHTS.

**MR. ZELANY:** THANK YOU (INAUDIBLE) SO THE COURT WOULD BE A FEDERAL VENUE, BUT I WOULD LIKE TO MAKE A CORRECTION --

**MAYOR KEITH:** ACTUALLY, MR. ZELANY, I'M JUST GOING TO FINISH, THOUGH.

**MR. ZELANY:** OH, I'M SORRY.

**MAYOR KEITH:** YEAH. THAT'S OKAY. SO WHEREVER IT IS THAT -- WHATEVER COURT HOUSE THAT YOU DECIDE TO APPEAL, SHOULD THIS BE DENIED, THAT'S YOUR RIGHT, AND I WOULD ENCOURAGE YOU TO FOLLOW ALL YOUR RIGHTS. I KNOW YOU ARE WELL VERSED ON WHAT YOUR RIGHTS ARE AND THAT YOU WILL BE ABLE TO DO WHATEVER IT IS YOU FEEL THAT YOU NEED TO DO. BUT IN THIS CASE, BASED ON THE INFORMATION THAT I'VE BEEN GIVEN BY OUR COUNCIL, I WOULD ACCEPT THE STAFF RECOMMENDATION TO DENY THE SPECIAL EVENTS PERMIT, AND I WOULD ENCOURAGE YOU TO GO AHEAD AND DO ANY PROTESTING YOU WANT. AND AGAIN, YOU'VE BEEN ADVISED THAT NO PERMIT IS NECESSARY FOR A LAWFUL PROTEST. AND I APPRECIATE YOUR RIGHT TO PROTEST AS WELL. SO IS THERE A MOTION? YEAH -- ONE MOMENT, PLEASE?

**MR. ZELANY:** MAY -- MAY I MAKE A FINAL STATEMENT NOW?

**MAYOR KEITH:** NO. JUST ONE MOMENT, PLEASE? VICE MAYOR OHTAKI? DID YOU HAVE -- OH, YOU TURNED YOUR LIGHT OFF.

**MR. OHTAKI:** I -- YES. I JUST SIMPLY WANTED TO -- TO ECHO, I THINK, WHAT'S BEEN SAID, THAT -- THAT YOU HAVE THE RIGHT TO PROTEST ANY -- WE ARE NOT MAKING ANY JUDGEMENTS ON THAT. WE'VE IN FACT -- I -- I CAN SAY THAT YOU HAVE, YOU KNOW -- I FEEL THAT UNDER YOUR RIGHTS OF FREEDOM OF SPEECH, YOU ABSOLUTELY DO HAVE THE RIGHT TO PROTEST NEA. THE -- I THINK MY CONCERN IS, AS A COUNCIL MEMBER, PUBLIC

SAFETY, AND -- AND TRYING TO MAKE SURE THAT -- THAT IT'S DONE IN A WAY THAT'S --THAT'S PEACEFUL AND LAWFUL AND -- AND DOESN'T SCARE, YOU KNOW, OUR -- OUR RESIDENTS. AND SO PLEASE UNDERSTAND THAT THAT'S THE BASIS IN WHICH I'M VIEWING THIS SPECIAL EVENTS PERMIT. BUT THAT I -- I DO, YOU KNOW, ENCOURAGE YOU. YOU DO HAVE THE RIGHT TO PROTEST. SO IT'S NOT MEANT TO IN ANY WAY TO ABRIDGE THAT; IT IS MEANT TO MAKE SURE THAT OUR RESIDENTS ARE SAFE. SO THAT'S -- AND I DON'T KNOW IF YOU'D LIKE ME TO MAKE A --

**MAYOR KEITH:** YES. IF YOU MAKE A MOTION, THAT WOULD BE FINE.

**MR. OHTAKI:** -- MAKE A MOTION TO UPHOLD THE DENIAL OF THE SPECIAL EVENTS PERMIT. I THINK THAT'S --

**MAYOR KEITH:** OKAY. AND IT LOOKS LIKE WE HAVE A SECOND BY COUNCIL MEMBER CARLTON. SHALL WE VOTE?

**MR. RUBENS:** JUST BEFORE YOU VOTE, MADAM.

**MAYOR KEITH:** YES.

**MR. ZELANY:** BEFORE YOU -- YOU MAKE YOUR FINAL DETERMINATION --

**MAYOR KEITH:** OH, YES.

**MR. ZELANY:** -- MAY I MAKE A FINAL STATEMENT?

**MAYOR KEITH:** YES, PLEASE.

**MR. ZELANY:** THROUGHOUT THIS HEARING AND THE PREVIOUS EXCHANGES, THE CITY AND ITS AGENTS HAVE BEEN PUTTING WORDS IN MY MOUTH. I'M NOT TALKING ABOUT A PROTEST. THIS IS NOT ABOUT A PROTEST. I APPLIED FOR A SPECIAL EVENT PERMIT BECAUSE I AM PROPOSING

AN ENTERTAINMENT EVENT, WHICH IS INCIDENTALLY BEING FILMED. IN THIS CAPACITY, I FIT UNDER THE STATUTORY EXEMPTIONS FROM THE FIREARMS CARRY BAN. TALKING ABOUT A PROTEST IS NOT HELPFUL. I UNDERSTAND THAT YOU'RE NOT TRYING TO STIFLE MY -- MY RIGHT TO PROTEST. I ALSO HAVE A RIGHT TO -- TO ENTERTAIN. AND IT IS MY POSITION THAT ENTERTAINMENT IS WHATEVER I SAY IT IS. IF I PUT ON RIGHT NOW A RED NOSE AND SAY I'M A CLOWN, I MAY BE A BAD CLOWN, BUT I'M AN ENTERTAINER. WHAT THE CITY IS DOING IN THIS MATTER IS IT'S AGGREGATING THE RIGHT TO SAY, THIS IS NOT ENTERTAINMENT. THIS DOES NOT FIT UNDER THE STATUTORY EXEMPTION. AND THAT IS CONTENT DISCRIMINATION. AND THAT IS UNCONSTITUTIONAL. SO THAT IS THE GOVERNMENT HERE. LET'S NOT WASTE ANY MORE WORDS ON WHETHER OR NOT YOU'RE TRYING TO STIFLE A PROTEST. I UNDERSTAND THAT YOU'RE NOT. IT'S ENTERTAINMENT AND IT'S A FILM PRODUCTION, LOOK AT THE CAMERAS.

**MAYOR KEITH:** THANK YOU. AND I'M JUST GOING TO GO BACK TO OUR ATTORNEY, GREG RUBENS, FOR A RESPONSE, PLEASE.

**MR. RUBENS:** IT -- WELL, I -- I THINK THE RECORD IS PRETTY CLEAR ON -- ON WHAT I'VE BEEN SAYING AND WHAT THE -- STAFF REPORT IS SAYING ON THE ISSUE THAT'S BEFORE THE COUNCIL. I JUST WANT TO MAKE IT CLEAR ON THE -- ON THE MOTION -- AND THE ACTION IS ALSO NOT ONLY TO DENY THE APPEAL, THE RECOMMENDED ACTION, BUT TO UPHOLD THE CITY MANAGER'S DECISION BECAUSE THAT'S THE BASIS AND HAS THE REASONS FOR -- FOR THE DENIAL, AND I WANTED TO MAKE SURE THAT'S PART OF

WHAT THE CITY COUNCIL IS DOING.

**MAYOR KEITH:** OKAY. I'M SURE WE CAN AMEND THAT MOTION. THANK YOU. COU- -- VICE MAYOR OHTAKI, DO YOU WANT TO AMEND THAT MOTION?

**MR. OHTAKI:** YES. AS -- AS AMENDED.

**MAYOR KEITH:** OKAY. TO INCLUDE THE RECOMMENDATION FROM THE CITY MANAGER, ALEX MCINTYRE, TO UPHOLD IT. OKAY. AND AS THE SECONDER OF THE MOTION, COUNCIL MEMBER CARLTON, IS THAT ACCEPTABLE TO YOU?

**MS. CARLTON:** YES.

**MAYOR KEITH:** ALL RIGHT. MR. RUBENS, IS THERE ANY OTHER DISCUSSION THAT NEEDS TO TAKE PLACE BEFORE WE VOTE?

**MR. RUBENS:** NO.

**MAYOR KEITH:** THANK YOU. OH --

**MS. JELENA HARADA:** THE MOTION PASSES --

**MAYOR KEITH:** WELL, ACTUALLY, WE NEED TO GO BACK TO THE SCREEN. I THINK WE NEED ONE MORE VOTE. I THINK (INAUDIBLE).

**MS. HARADA:** THE MOTION PASSED FOUR TO ZERO. COUNCIL MEMBER MUELLER IS ABSENT.

**MAYOR KEITH:** OKAY. AND JUST FOR THE RECORD, I BELIEVE , I'M GOING TO ASK OUR ATTORNEY, MR. RUBENS, COUNCIL MEMBER MUELLER IS ABSENT, BUT HE IS ALSO CONFLICTED OUT IN THIS MATTER; IS THAT CORRECT?

**MR. RUBENS:** THAT'S MY UNDERSTANDING, THAT HE'S -- DECIDED HE

HAS A CONFLICT.

**MAYOR KEITH:** THAT HE DECIDED HE HAS A CONFLICT?

**MR. RUBENS:** YES.

**MAYOR KEITH:** YEAH. OKAY. ALL RIGHT. THANK YOU, MR. ZELANY.

**MR. ZELANY:** THANK YOU.

**MAYOR KEITH:** AND WE WILL STAND IN ADJOURNMENT UNTIL -- WELL, WE HAVE CLOSED SESSION AT 6:00.

***(END OF RECORDING)***

TRANSCRIBER'S CERTIFICATE

I, PATRICIA KARP, DO HEREBY CERTIFY:

THAT THE TAPE – RECORDED STATEMENT WAS TRANSCRIBED BY ME ON

I CERTIFY THAT I AM NEITHER COUNSEL FOR NOR RELATED TO ANY PARTY TO SAID ACTION, NOR IN ANYWISE INTERESTED IN THE OUTCOME THEREOF.

IN WITNESS THEREOF, I HAVE HEREUNTO SUBSCRIBED MY NAME THIS DAY OF

PATRICIA KARP
TRANSCRIBER

# Exhibit G

David W. Affeld, State Bar No. 123922
Brian R. England, State Bar No. 211355
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

MICHAEL ZELENY,

Plaintiff,

vs.

GAVIN NEWSOM, *et al.*,

Defendants.

Case No. CV 17-7357 RS

Assigned to:
The Honorable Richard G. Seeborg

**EXPERT DECLARATION OF MICHAEL TRISTANO**

Action Filed: December 28, 2017
Trial Date: None Set

I, Michael Tristano, declare as follows:

1. I have been retained by Affeld Grivakes LLP on behalf of Michael Zeleny, as an expert in the above-referenced litigation.

2. As an independent expert, I have been asked to give my opinion on the issue of permitting for film, television, and other video projects, and, specifically, the permitting and use of firearms on such projects.

3. For my work on this case, I am being compensated at a rate of $500 per hour, plus expenses. I have not received and will not receive any other compensation related to this case. No part of my compensation depends on the outcome of this case.

**PROFESSIONAL BACKGROUND AND EXPERIENCE**

4. I have been a professional Armorer and Special Effects Technician for more than 30 years. I have worked on more than 500 feature films, television shows and video projects, most of which are listed on the Internet Movie Database (imdb.com). These projects include: 3:10 to Yuma, The Purge, Medal of Honor, I Am Still Here, and Enron: The Smartest Guys in the Room.

5. Most of my work is done in the State of California, and my licenses and permits to do this work include:

1) A California DOJ Entertainment Firearms Permit;

2) A Federal Firearms License (FFL);

3) The four California Dangerous Weapon Permits, which include permits for assault weapons and .50 caliber weapons, machine guns, short-barrel rifles and shotguns, and destructive devices; and

4) The California Certificate of Eligibility.

6. Besides providing on-set armorer services and training of actors, actresses, extras, and stunt people (collectively "Authorized Persons") for proper and safe use of blank-firing firearms on set, my company also rents and provides non-firing replica and rubber guns.

7. I have also been an on-camera weapons expert on shows for The History Channel, The Discovery Channel and A&E.

8. When I am involved in any project using firearms on the set of a motion picture, TV show or video project, I advise the production on what firearms I think they should use in their show and what permitting we will require regarding the use of firearms during the project.

9. Based on my extensive career as a professional, licensed motion picture and television Armorer, I believe that I am qualified to address the questions presented to me.

**INFORMATION CONSIDERED**

10. In preparing this expert report, I have reviewed the relevant applications and standards regarding permitting for film, television and video projects in the State of California, and the use of firearms on set.

11. My analysis of the information relevant to this case is ongoing, and I expect to continue receiving information and questions as they are presented to me, and it is possible that new information may affect certain conclusions in this report. I therefore reserve the right to supplement it.

**OPINIONS**

12. If called upon to testify, I would explain the following facts and opinions regarding permitting for film, television and video productions, and the inclusion of proper permitting for the use of firearms on these productions.

13. When I am contacted by a production to provide their show with Armorer services and the rental of blank-firing guns, non-firing replicas and rubber guns, I am involved with the production company in the process of obtaining the necessary permits. I always insist that productions get the proper permitting and cover all of the requirements in the specific area and jurisdiction they are filming in.

14. In the State of California, although rules and regulations may vary somewhat from county to county and city to city, the general state policies are the same:

1) The production must apply for a permit for all of the days and at each location where the filming will be taking place through the offices in

charge of filming in the respective jurisdictions. In Los Angeles, for example, permits are applied for and obtained from FilmLA.

2) If there is going to be blank-firing weapons used and blanks fired, both the permit application and the permit must include this information, with a description of the type of gunfire (such as single shot, semiautomatic, fully automatic, or black powder blanks) and the load size of the blanks (1/4 load, 1/2 load, or full load) so the proper notifications can be made to the surrounding area.

3) Is the blank gunfire to take place in the interior or exterior of the location? If there is gunfire in the exterior of the location, or in any area open to the public view, at least one Police Officer is usually required to be assigned to the location by the permitting office. A Fire Marshall or FSO (Fire Safety Officer) may also be assigned by the permitting office if the location is located in a fire zone, or if there are possible flammable elements at the location.

4) If there is no blank gunfire, but replica or rubber guns are brandished in an exterior part of the location, or an area open to view by the public, this must also be on the permit application and the permit and a Police Officer will still be assigned to the location to deal with civilians to make sure everyone knows this is not an active shooter situation.

5) Whenever any real or blank-firing firearms are present on a set, a licensed Armorer must be present to handle blank-firing weapons and a licensed Prop Master for non-firing replica guns and rubbers. This is so proper safety protocols are always followed.

6) Permitting offices do not inquire about the names or identities of the Authorized Participants using the weapons, as such information is neither necessary nor relevant for the permitting process. In fact, when the permit applications are being prepared, submitted, and considered, often times the

specific names and identities of the Authorized Participants are not known or finalized. In particular, the names and identities of extras serving as Authorized Participants may well not be known until the actual day of the shoot and can change throughout the day in the director's discretion. In my experience, during the permitting process, I have never been asked to provide, and have not provided, the names and identities of the anticipated Authorized Participants to any permitting office or agency.

7) In contrast to the permitting offices and agencies, licensed Armorers are required to ensure that none of the Authorized Participants using the real and/or blank-firing weapons is a felon or a person prohibited from possessing a firearm. Such "prohibited persons" may use replica or rubber weapons only.

8) While any blank-firing, replica or rubber weapons are on set, they remain in the charge of the Armorer and/or Prop Master, until they are needed to be placed in the hands of the Authorized Participants and/or on the set. After the shots are completed, the firearms are taken back and remain in the charge of the Armorer and/or Prop Master.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed October 9, 2020 at Los Angeles, California.

Michael Tristano
Declarant

# Exhibit H

David W. Affeld, State Bar No. 123922
Damion D. D. Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Tel. (310) 979-8700
Fax (310) 979-8701

Attorneys for Plaintiff
Michael Zeleny

RECEIVED
DEC 27 2018
HOWARD, ROME, MARTIN & RIDLEY, LLP

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

MICHAEL ZELENY, an individual

Plaintiff,

vs.

EDMUND G. BROWN, JR., an individual, in his official capacity, et al.

Defendants.

Case No. 17-cv-07357-RS

**PLAINTIFF MICHAEL ZELENY'S RESPONSES TO DEFENDANT CITY OF MENLO PARK'S SPECIAL INTERROGATORIES (SET ONE)**

PROPOUNDING PARTY: Defendant City of Menlo Park

RESPONDING PARTY: Plaintiff Michael Zeleny

SET NUMBER: One

Plaintiff Michael Zeleny ("Plaintiff" or "Zeleny") hereby responds to the Special Interrogatories, Set One, issued by defendant the City of Menlo Park, pursuant to Federal Rule of Civil Procedure 33.

## I. PRELIMINARY STATEMENT

Plaintiff objects to the Interrogatories, Set One, and each individual interrogatory therein (collectively, the "Interrogatories"; each an "Interrogatory") to the extent that the same, including any instructions and definitions, seek to impose obligations beyond those contemplated by the Federal Rules of Civil Procedure. Plaintiff does not agree to undertake any obligations beyond those required by the Federal Rules of Civil Procedure.

Discovery and investigation are ongoing. Plaintiff responds to the Interrogatories to the best of his ability based on the information currently available to him. Plaintiff reserves the right to amend or supplement his responses to correct inadvertent errors or omissions, or as additional information comes to light.

Plaintiff objects generally to the extent that the Interrogatories, or any of them, are vague, ambiguous, or unintelligible. To the extent any of the Interrogatories are ambiguous, Plaintiff has interpreted them in good faith and has responded based upon his good faith interpretation.

Plaintiff objects to the extent any of the Interrogatories call for disclosure of information protected by the attorney-client privilege, the work-product doctrine, the spousal privilege, or other applicable privileges and legal protections from disclosure. By responding to any given Interrogatory, Plaintiff does not intend to waive any applicable privileges or protections. Each response should be interpreted as incorporating an objection on the grounds of all applicable privileges or protections.

By responding to the following Interrogatories, Plaintiff does not concede the relevance or the admissibility of any Interrogatory or response, or any documents referenced. Plaintiff reserves all objections to admissibility, including, but not limited to, foundation, personal knowledge, hearsay, authentication, relevance, and undue prejudice.

## II. RESPONSES

Plaintiff responds to the individual Interrogatories as follows:

**Response to Interrogatory No. 1.**

Plaintiff objects to the extent this Interrogatory seeks information protected by

and an unlawful infringement of his right to bear arms under the Second Amendment.

**Response to Interrogatory No. 14.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond. Plaintiff further objects to the extent this Interrogatory calls for information more readily available to Defendant.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the individuals identified in his Initial Disclosures pursuant to Federal Rule of Civil Procedure 26. Plaintiff further identifies Plaintiff, Defendant, representatives of the City of Menlo Park, Min Zhu, Subrah Iyar, C. Richard Kramlich, David Farrington, Sharon Kaufman, Ron Pickett, Jenna Johansson, the San Mateo District Attorney's Office, Alex McIntyre, William McClure.

**Response to Interrogatory No. 15.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond. Plaintiff further objects to the extent this Interrogatory calls for information more readily available to Defendant.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the documents identified in his Initial Disclosures pursuant to Federal Rule of Civil Procedure 26. Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff will produce all relevant documents in response to Defendant's Requests for Admission, Set One.

**Response to Interrogatory No. 16.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the facts set forth in Plaintiff's Complaint in this matter, which set forth the facts supporting Plaintiff's claims. Plaintiff further states that Plaintiff has sought for several years to conduct peaceful protests in the City of Menlo Park, exercising his First Amendment right to free speech. Plaintiff intends to, and has requested permission of the City of Menlo Park, to use unloaded firearms in connection with his protests. Defendant, by and through Dave Bertini and others, has made clear to Plaintiff that if he continues his protests without obtaining a permit, which is not reasonably available to Plaintiff, Plaintiff will be arrested and/or charged with a crime. Defendant, through Bertini, has also informed Plaintiff that if Plaintiff displays a non-obscene piece of artwork in connection with his protests, Plaintiff will be arrested for and/or charged with obscenity as to minors. This conduct, orchestrated by Defendant, amounts to a content-based prior restraint on Zeleny's right to free speech. These restrictions on Zeleny's exercise of his right to free speech are part of a pattern, custom, and practice on the part of local authorities of Defendant to silence Zeleny's messages, which has included threats or prosecution and a sham prosecution of Zeleny at the behest of business interests in the City of Menlo Park, including, but not limited to, New Enterprise Associates, WebEx/Cisco, and their officers and executives.

**Response to Interrogatory No. 17.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work

**Response to Interrogatory No. 25.**

Plaintiff objects to the extent this Interogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the facts set forth in Plaintiff's Complaint in this matter, which set forth the facts supporting Plaintiff's claims. Plaintiff is informed and believes that the decision to deny Plaintiff a permit to conduct his protests using unloaded firearms, and the decision to prohibit him from displaying non-obscene artwork, were decisions of the ultimate decision makers on behalf of Defendants. The lack of discernable, concrete standards for permits amounts to official policy of Defendants, and plaintiff is informed and believes that the refusal to provide him reasonable criteria sufficient to obtain a permit is also pursuant to official policy. Plaintiff is further informed and believes that the decision to deny him permits was made pursuant to an official policy of Defendant, or an established custom and practice amounting to an official policy.

Dated: December 20, 2018

Respectfully submitted,

By: ______________________
David W. Affeld
Damion D. D. Robinson
Affeld Grivakes LLP

Attorneys for Plaintiff Michael Zeleny

# Exhibit I

David W. Affeld, State Bar No. 123922
Damion D. D. Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Tel. (310) 979-8700
Fax (310) 979-8701

Attorneys for Plaintiff
Michael Zeleny

RECEIVED
DEC 27 2018
HOWARD, ROME, MARTIN & RIDLEY, LLP

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

MICHAEL ZELENY, an individual

Plaintiff,

vs.

EDMUND G. BROWN, JR., an individual, in his official capacity, et al.

Defendants.

Case No. 17-cv-07357-RS

**PLAINTIFF MICHAEL ZELENY'S RESPONSES TO DEFENDANT CITY OF MENLO PARK'S SPECIAL INTERROGATORIES (SET ONE)**

PROPOUNDING PARTY: Defendant City of Menlo Park

RESPONDING PARTY: Plaintiff Michael Zeleny

SET NUMBER: One

Plaintiff Michael Zeleny ("Plaintiff" or "Zeleny") hereby responds to the Special Interrogatories, Set One, issued by defendant the City of Menlo Park, pursuant to Federal Rule of Civil Procedure 33.

## I. PRELIMINARY STATEMENT

Plaintiff objects to the Interrogatories, Set One, and each individual interrogatory therein (collectively, the "Interrogatories"; each an "Interrogatory") to the extent that the same, including any instructions and definitions, seek to impose obligations beyond those contemplated by the Federal Rules of Civil Procedure. Plaintiff does not agree to undertake any obligations beyond those required by the Federal Rules of Civil Procedure.

Discovery and investigation are ongoing. Plaintiff responds to the Interrogatories to the best of his ability based on the information currently available to him. Plaintiff reserves the right to amend or supplement his responses to correct inadvertent errors or omissions, or as additional information comes to light.

Plaintiff objects generally to the extent that the Interrogatories, or any of them, are vague, ambiguous, or unintelligible. To the extent any of the Interrogatories are ambiguous, Plaintiff has interpreted them in good faith and has responded based upon his good faith interpretation.

Plaintiff objects to the extent any of the Interrogatories call for disclosure of information protected by the attorney-client privilege, the work-product doctrine, the spousal privilege, or other applicable privileges and legal protections from disclosure. By responding to any given Interrogatory, Plaintiff does not intend to waive any applicable privileges or protections. Each response should be interpreted as incorporating an objection on the grounds of all applicable privileges or protections.

By responding to the following Interrogatories, Plaintiff does not concede the relevance or the admissibility of any Interrogatory or response, or any documents referenced. Plaintiff reserves all objections to admissibility, including, but not limited to, foundation, personal knowledge, hearsay, authentication, relevance, and undue prejudice.

## II. RESPONSES

Plaintiff responds to the individual Interrogatories as follows:

**Response to Interrogatory No. 1.**

Plaintiff objects to the extent this Interrogatory seeks information protected by

**Response to Interrogatory No. 25.**

Plaintiff objects to the extent this Interogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the facts set forth in Plaintiff's Complaint in this matter, which set forth the facts supporting Plaintiff's claims. Plaintiff is informed and believes that the decision to deny Plaintiff a permit to conduct his protests using unloaded firearms, and the decision to prohibit him from displaying non-obscene artwork, were decisions of the ultimate decision makers on behalf of Defendants. The lack of discernable, concrete standards for permits amounts to official policy of Defendants, and plaintiff is informed and believes that the refusal to provide him reasonable criteria sufficient to obtain a permit is also pursuant to official policy. Plaintiff is further informed and believes that the decision to deny him permits was made pursuant to an official policy of Defendant, or an established custom and practice amounting to an official policy.

Dated: December 20, 2018

Respectfully submitted,

By: ______________________

David W. Affeld
Damon D. D. Robinson
Affeld Grivakes LLP

Attorneys for Plaintiff Michael Zeleny

# Exhibit J

David W. Affeld, State Bar No. 123922
Damion D. D. Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Tel. (310) 979-8700
Fax (310) 979-8701

Attorneys for Plaintiff
Michael Zeleny

RECEIVED
DEC 27 2018
HOWARD, ROME
MARTIN & RIDLEY, LLP

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

MICHAEL ZELENY, an individual

Plaintiff,

vs.

EDMUND G. BROWN, JR., an individual, in his official capacity, et al.

Defendants.

Case No. 17-cv-07357-RS

**PLAINTIFF MICHAEL ZELENY'S RESPONSES TO DEFENDANT DAVE BERTINI'S SPECIAL INTERROGATORIES (SET ONE)**

PROPOUNDING PARTY: Defendant Dave Bertini

RESPONDING PARTY: Plaintiff Michael Zeleny

SET NUMBER: One

Plaintiff Michael Zeleny ("Plaintiff" or "Zeleny") hereby responds to the Special Interrogatories, Set One, issued by defendant Dave Bertini, pursuant to Federal Rule of Civil Procedure 33.

## I. PRELIMINARY STATEMENT

Plaintiff objects to the Interrogatories, Set One, and each individual interrogatory therein (collectively, the "Interrogatories"; each an "Interrogatory") to the extent that the same, including any instructions and definitions, seek to impose obligations beyond those contemplated by the Federal Rules of Civil Procedure. Plaintiff does not agree to undertake any obligations beyond those required by the Federal Rules of Civil Procedure.

Discovery and investigation are ongoing. Plaintiff responds to the Interrogatories to the best of his ability based on the information currently available to him. Plaintiff reserves the right to amend or supplement his responses to correct inadvertent errors or omissions, or as additional information comes to light.

Plaintiff objects generally to the extent that the Interrogatories, or any of them, are vague, ambiguous, or unintelligible. To the extent any of the Interrogatories are ambiguous, Plaintiff has interpreted them in good faith and has responded based upon his good faith interpretation.

Plaintiff objects to the extent any of the Interrogatories call for disclosure of information protected by the attorney-client privilege, the work-product doctrine, the spousal privilege, or other applicable privileges and legal protections from disclosure. By responding to any given Interrogatory, Plaintiff does not intend to waive any applicable privileges or protections. Each response should be interpreted as incorporating an objection on the grounds of all applicable privileges or protections.

By responding to the following Interrogatories, Plaintiff does not concede the relevance or the admissibility of any Interrogatory or response, or any documents referenced. Plaintiff reserves all objections to admissibility, including, but not limited to, foundation, personal knowledge, hearsay, authentication, relevance, and undue prejudice.

## II. RESPONSES

Plaintiff responds to the individual Interrogatories as follows:

**Response to Interrogatory No. 1.**

protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff will produce all documents bearing upon this Interrogatory in connection with Defendant's Requests for Production to Plaintiff.

**Response to Interrogatory No. 10.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the facts set forth in Plaintiff's Complaint in this matter, which set forth the facts supporting Plaintiff's claims. Plaintiff further states that Plaintiff has sought for several years to conduct peaceful protests in the City of Menlo Park, exercising his First Amendment right to free speech. Plaintiff intends to, and has requested permission of the City of Menlo Park, to use unloaded firearms in connection with his protests. Defendant has made clear to Plaintiff that if he continues his protests without obtaining a permit from the City of Menlo Park, which is not reasonably available to Plaintiff, Plaintiff will be arrested and/or charged with a crime. Defendant has also informed Plaintiff that if Plaintiff displays a non-obscene piece of artwork in connection with his protests, Plaintiff will be arrested for and/or charged with obscenity as to minors. This conduct, orchestrated by Defendant and the City of Menlo Park, amounts to a content-based prior restraint on Zeleny's right to free speech. These restrictions on Zeleny's exercise of his right to free speech are part of a pattern, custom, and practice on the part of local authorities to silence Zeleny's messages, which has included threats or prosecution and a sham prosecution of Zeleny at the behest of business interests in the City of Menlo Park,

including, but not limited to, New Enterprise Associates, WebEx/Cisco, and their officers and executives.

**Response to Interrogatory No. 11.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond. Plaintiff further objects to the extent this Interrogatory calls for information equally or more readily available to Defendant.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the individuals identified in his Initial Disclosures pursuant to Federal Rule of Civil Procedure 26. Plaintiff further identifies Plaintiff, Defendant, representatives of the City of Menlo Park, Min Zhu, Subrah Iyar, C. Richard Kramlich, David Farrington, Sharon Kaufman, Ron Pickett, Jenna Johansson, the San Mateo District Attorney's Office, Alex McIntyre, William McClure.

**Response to Interrogatory No. 12.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond. Plaintiff further objects to the extent this Interrogatory calls for information equally or more readily available to Defendant.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the documents identified in his Initial Disclosures pursuant to Federal Rule of Civil Procedure 26. Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff will produce all relevant documents in response to Defendant's Requests for Admission, Set One.

**Response to Interrogatory No. 13.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the facts set forth in Plaintiff's Complaint in this matter, which set forth the facts supporting Plaintiff's claims. Plaintiff further states that Plaintiff has sought for several years to utilize loaded and/or unloaded firearms in connection with peaceful protests within the City of Menlo Park. Defendant and others within the City of Menlo Park have made clear to Plaintiff that if Plaintiff utilizes firearms in connection with his protests, without a permit, which is not reasonably available to Plaintiff, Plaintiff will be arrested and/or charged with a crime. Plaintiff is informed and believes that the City of Menlo Park has no fixed or ascertainable standard for issuance of permits, and has denied Plaintiff's requests for permits on content-based grounds. Plaintiff is further informed and believes that the City of Menlo Park has refused him a permit on content-based grounds, or because Defendants will not authorize a permit for the type of protest and film production that Plaintiff intends to conduct. Defendants' conduct, in which Bertini has actively participated, is a violation of Plaintiff's Second Amendment right to bear arms.

**Response to Interrogatory No. 14.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond. Plaintiff further objects to the extent this Interrogatory calls for information equally or more readily available to Defendant.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the individuals identified in his Initial Disclosures pursuant to Federal Rule of Civil Procedure 26. Plaintiff further identifies Plaintiff, Defendant, representatives of the City of Menlo Park, Min Zhu, Subrah Iyar, C. Richard Kramlich, David Farrington, Sharon Kaufman, Ron Pickett, Jenna Johansson, the San Mateo District Attorney's Office, Alex McIntyre, William McClure.

**Response to Interrogatory No. 15.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond. Plaintiff further objects to the extent this Interrogatory calls for information equally or more readily available to Defendant.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the documents identified in his Initial Disclosures pursuant to Federal Rule of Civil Procedure 26. Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff will produce all relevant documents in response to Defendant's Requests for Admission, Set One.

**Response to Interrogatory No. 16.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the facts set forth in Plaintiff's Complaint in this matter, which set forth the facts supporting Plaintiff's claims. Plaintiff further states that Plaintiff has sought for several years to utilize loaded and/or unloaded

firearms in connection with peaceful protests within the City of Menlo Park. Defendant and others within the City of Menlo Park have made clear to Plaintiff that if Plaintiff utilizes firearms in connection with his protests, without a permit, which is not reasonably available to Plaintiff, Plaintiff will be arrested and/or charged with a crime. Plaintiff is informed and believes that the City of Menlo Park has no fixed or ascertainable standard for issuance of permits, and has denied Plaintiff's requests for permits arbitrarily, capriciously, and without basis. Plaintiff is further informed and believes that the City of Menlo Park has refused him a permit on content-based grounds, or because Defendants will not authorize a permit for the type of protest and film production that Plaintiff intends to conduct. Defendants' conduct, in which Bertini has actively participated, is a violation of Plaintiff's second amendment right to bear arms.

**Response to Interrogatory No. 17.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond. Plaintiff further objects to the extent this Interrogatory calls for information equally or more readily available to Defendant.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the individuals identified in his Initial Disclosures pursuant to Federal Rule of Civil Procedure 26. Plaintiff further identifies Plaintiff, Defendant, representatives of the City of Menlo Park, Min Zhu, Subrah Iyar, C. Richard Kramlich, David Farrington, Sharon Kaufman, Ron Pickett, Jenna Johansson, the San Mateo District Attorney's Office, Alex McIntyre, William McClure.

**Response to Interrogatory No. 18.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or

protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond. Plaintiff further objects to the extent this Interrogatory calls for information equally or more readily available to Defendant.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the documents identified in his Initial Disclosures pursuant to Federal Rule of Civil Procedure 26. Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff will produce all relevant documents in response to Defendant's Requests for Admission, Set One.

**Response to Interrogatory No. 19.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the facts set forth in Plaintiff's Complaint in this matter, which set forth the facts supporting Plaintiff's claims. Plaintiff is informed and believes that the decision to deny Plaintiff a permit to conduct his protests using unloaded firearms, and the decision to prohibit him from displaying non-obscene artwork, were decisions of the ultimate decision makers on behalf of the City of Menlo Park. Plaintiff is further informed and believes that the decision to deny him permits was made pursuant to an official policy, custom, pattern, and/or practice of the City of Menlo Park. Defendant actively participated in the violations of Plaintiff's civil rights, including by directly threatening Plaintiff with arrest and/or prosecution if Plaintiff, and by participating in the decision to silence Plaintiff's protests.

**Response to Interrogatory No. 20.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-

client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond. Plaintiff further objects to the extent this Interrogatory calls for information equally or more readily available to Defendant.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the individuals identified in his Initial Disclosures pursuant to Federal Rule of Civil Procedure 26. Plaintiff further identifies Plaintiff, Defendant, representatives of the City of Menlo Park, Min Zhu, Subrah Iyar, C. Richard Kramlich, David Farrington, Sharon Kaufman, Ron Pickett, Jenna Johansson, the San Mateo District Attorney's Office, Alex McIntyre, William McClure.

**Response to Interrogatory No. 21.**

Plaintiff objects to the extent this Interrogatory seeks information protected by privilege or other protections from disclosure, including, but not limited to, the attorney-client privilege, the work product doctrine, the spousal privilege, or other privileges or protections. Plaintiff further objects to the extent that the Interrogatory calls for the work product of counsel in order to respond. Plaintiff further objects to the extent this Interrogatory calls for information equally or more readily available to Defendant.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Plaintiff incorporates by reference the documents identified in his Initial Disclosures pursuant to Federal Rule of Civil Procedure 26. Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff will produce all relevant documents in response to Defendant's Requests for Admission, Set One.

Dated: December 20, 2018

Respectfully submitted,

By: ______________________

David W. Affeld
Damion D. D. Robinson
Affeld Grivakes LLP

Attorneys for Plaintiff Michael Zeleny