1   XAVIER BECERRA
    Attorney General of California
2   ANTHONY R. HAKL
    Supervising Deputy Attorney General
3   JOHN W. KILLEEN
    Deputy Attorney General
4   State Bar No. 258395
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone: (916) 210-6045
     Fax: (916) 324-8855
7    E-mail: John.Killeen@doj.ca.gov
    *Attorneys for Defendant Xavier Becerra*

8

9                 IN THE UNITED STATES DISTRICT COURT

10               FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| **MICHAEL ZELENY, an individual,** | 3:17-cv-07357 RS (NC) |
| Plaintiff, | **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT BY CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| **GAVIN NEWSOM, an individual, in his official capacity; XAVIER BECERRA, an individual, in his official capacity; CITY OF MENLO PARK, a municipal corporation; and DAVE BERTINI, in his official capacity,** | Date:       February 25, 2021<br>Time:       1:30 p.m.<br>Dept:       Courtroom 3, 17th Floor<br>Judge:      The Honorable Richard G. Seeborg |
| Defendants. | Trial Date: None set<br>Action Filed: 12/28/2017 |

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

Page

3   Notice of Motion and Motion for Summary Judgment.................................................... 1

4   Memorandum of Points and Authorities ......................................................................... 2

5       I.      Introduction ................................................................................................. 2

        II.     Statement of Issues to Be Decided .............................................................. 3

6       III.    Relevant Facts .............................................................................................. 3

7               A.      Zeleny's Relationship with the Zhu Family.................................... 3

                B.      Zeleny's Public Campaign Against WebEx and NEA...................... 4

8               C.      Zeleny's Use of Firearms to Amplify His Protests ....................... 5

9               D.      California's Open Carry Laws ......................................................... 6

10              E.      Zeleny's Desire to Restart His Protests......................................... 8

                F.      Zeleny's Complaint ........................................................................ 9

11      IV.     Legal Standard for Summary Judgment....................................................... 9

12      V.      Argument ..................................................................................................... 9

13              A.      California's Restrictions on the Open Carry of Unloaded Firearms
                        Do Not Violate the First Amendment on Their Face ..................... 10

14                      1.      Legal Standard for Facial First Amendment Challenge............... 10

15                      2.      Carrying an Unloaded Firearm Is Not Expressive Conduct
                                That Is Protected by the First Amendment ................................. 10

16                      3.      Even if Openly Carrying an Unloaded Firearm Amounted to
                                Expressive Conduct Under the First Amendment,
17                              California's Unloaded Open Carry Restrictions Would
                                Withstand Intermediate Scrutiny................................................. 13

18              B.      California's Restrictions on the Open Carry of Unloaded Firearms
                        Do Not Violate the Second Amendment on Their Face ................. 16
19
                        1.      Legal Standard .............................................................................. 16
20                      2.      There Is No Right Under the Second Amendment to Carry
                                Unloaded Firearms for the Purpose of "Amplifying" One's
21                              Protest............................................................................................ 17

22                      3.      Zeleny Did Not Plead That He Intended to Bear Loaded
                                Firearms for Self-Defense, and Has Therefore Waived an
23                              Argument Based on Self-Defense................................................. 18

24                      4.      To the Extent That Zeleny Asserts a Second Amendment
                                Right to Loaded Open Carry Based on Self-Defense,
25                              California's Restrictions on Loaded Open Carry Do Not
                                Violate the Second Amendment................................................... 20

26                              a.      Level of Scrutiny............................................................. 21

27                              b.      The Government's Stated Objective ................................ 21

                                c.      Reasonable Fit................................................................. 22
28

i

**TABLE OF CONTENTS**
(continued)

Page

C.   California's Restrictions on the Open Carry of Firearms Do Not Violate the Equal Protection Clause ............................................................ 22

D.   Zeleny's Eligibility for a Statutory Exception Is Irrelevant to His Constitutional Claims .................................................................................... 24

VI.   Conclusion ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

C ASES

*Baird v. Becerra*
  No. 2:19-cv-00617-KJM-AC, 2020 WL 5107614 (E.D. Cal. Aug. 31, 2020) ........................20

*Baker v. Schwarb*
  40 F.Supp. 3d 881 (E.D. Mich. 2014)................................................................12, 13

*Bauer v. Becerra*
  858 F.3d 1216 (9th Cir. 2017)......................................................................17, 21

*Burgess v. Wallingford*
  No. 11-CV-112, 2013 WL 4494481 (D. Conn. May 15, 2013).................................12

*Celotex Corp. v. Catrett*
  477 U.S. 317 (1986)............................................................................................10

*Chesney v. City of Jackson*
  171 F.Supp.3d 605 (E.D. Mich. 2016).......................................................................13

*City of Cleburne v. Cleburne Living Ctr.*
  473 U.S. 432 (1985)............................................................................................23

*Deffert v. Moe*
  111 F. Supp. 3d 797 (W.D. Mich. 2015) ...................................................................13

*Flanagan v. Harris*
  No. LA CV16-06164 JAK, 2018 WL 2138462 (C.D. Cal. May 7, 2018)..............15, 16, 21, 22

*Gallinger v. Becerra*
  898 F.3d 1012 (9th Cir. 2018)...........................................................................23, 24

*Jackson v. City & Cty. of San Francisco*
  746 F.3d 953 (9th Cir. 2014)............................................................................17, 20

*Knox v. Brnovich*
  907 F.3d 1167 (9th Cir. 2018)...........................................................................11, 12

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
  475 U.S. 574 (1986)............................................................................................10

*Nichols v. Harris*
  17 F. Supp. 3d 989 (C.D. Cal. 2014) ................................................................. *passim*

*Nordyke v. King*
  319 F.3d 1185 (9th Cir. 2003)......................................................................11, 12, 13

iii

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Nordyke v. King*
    644 F.3d 776 (9th Cir. 2011).......................................................................................14, 16

4

5

*Nordyke v. King*
    681 F.3d 1041 (9th Cir. 2012)................................................................................................14

6

*Nordyke v. King*
    No. C99-04389 MJJ (Mar. 31, 2007) (N.D. Cal. 2007) 2007 WL 9657916...........................13

7

8

*Northrup v. City of Toledo Police Div.*
    58 F.Supp.3d 842 (N.D. Ohio 2014)................................................................................12, 13

9

10

*People v. Flores*
    169 Cal. App. 4th 568 (2008).................................................................................................6

11

*Roulette v. City of Seattle*
    97 F.3d 300 (9th Cir. 1996)..................................................................................................11

12

13

*Silvester v. Harris*
    843 F.3d 816 (9th Cir. 2016)...................................................................................... *passim*

14

15

*Spence v. Wash.*
    418 U.S. 405 (1974)............................................................................................................11

16

*Suever v. Connell*
    No. C 03-00156 RS, 2020 WL 3076299................................................................................19

17

18

*Teixeira v. Cnty. of Alameda*
    873 F.3d 670 (9th Cir. 2017)...........................................................................................18, 20

19

20

*United States v. Albertini*
    472 U.S. 675 (1985)............................................................................................................15

21

*United States v. O'Brien*
    391 U.S. 367 (1968)..................................................................................................14, 15, 16

22

23

*Wortman v. United States*
    No. 5:14-CV-04567-PSG, 2015 WL 2251168 (N.D. Cal. May 13, 2015) .............................12

24

STATUTES

25

Cal. Stats. 2011, c. 725........................................................................................................6

26

Cal. Stats. 2012, c. 700........................................................................................................6

27

California Penal Code § 12031 ..............................................................................................6

28

## TABLE OF AUTHORITIES
### (continued)

**Page**

California Penal Code § 16840 ....................................................................................19

California Penal Code § 25400. ............................................................................ *passim*

California Penal Code § 25850. ............................................................................ *passim*

California Penal Code § 26350 .............................................................................6, 7, 9

California Penal Code § 26350(a) ................................................................................7

California Penal Code § 26350 *et seq.* .................................................................. *passim*

California Penal Code § 26365 ...................................................................................25

California Penal Code § 26369 ...................................................................................25

California Penal Code § 26375 ...................................................................................23

California Penal Code § 26400 ...............................................................................6, 9

California Penal Code § 26400(a) ................................................................................7

California Penal Code § 26400 *et seq.* .................................................................. *passim*

California Penal Code § 26405 ........................................................................6, 16, 23

California Penal Code § 26405(r) .................................................................7, 8, 23, 25

**CONSTITUTIONAL PROVISIONS**

U.S. Constitution, First Amendment........................................................................ *passim*

U.S. Constitution, Second Amendment .................................................................. *passim*

U.S. Constitution, Equal Protection Clause ........................................................... *passim*

**COURT RULES**

Fed. R. Civ. P. 56(a)....................................................................................................9

**OTHER AUTHORITIES**

Patrick McGreevy & Nicholas Riccardi, *Brown bans open carrying of handguns,*
    L.A. Times (Oct. 10, 2011) ...................................................................................14

1    **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

2         PLEASE TAKE NOTICE that, on February 25, 2021, at 1:30 p.m., or as soon thereafter as

3    the matter may be heard, before the Honorable Richard G. Seeborg, U.S. District Judge, in

4    Courtroom 3, 17th Floor of the U.S. District Court for the Northern District of California, located

5    at 450 Golden Gate Avenue, San Francisco, California, 94102, Defendant Xavier Becerra, sued in

6    his official capacity as Attorney General of the State of California ("Defendant"), will move this

7    Court for summary judgment on the August 30, 2019 second amended complaint (the

8    "Complaint" or "SAC") of Plaintiff Michael Zeleny, under Federal Rule of Civil Procedure 56.

9         The Complaint is largely directed at Defendants City of Menlo Park and its former police

10   chief.  SAC, ¶¶ 194-224 (Causes of Action 1 through 4).  But within these allegations, Plaintiff

11   contends that California Penal Code sections 26400 *et seq.* and 26350 *et seq.*—which regulate the

12   open carry of *unloaded* firearms within California—are unconstitutional on their face because

13   they violate the First and Second Amendments to the U.S. Constitution.  SAC, ¶¶ 8, 188-190,

14   p. 41 (Prayer for Relief, ¶ (A)).  Plaintiff also contends that the same sections of the Penal Code

15   violate the Equal Protection Clause of the U.S. Constitution.  SAC, ¶¶ 225-229.  Defendant seeks

16   summary judgment on the basis that there is no genuine issue of material as to whether California

17   Penal Code sections 26400 *et seq.* and 26350 *et seq.*, on their face, violate (1) the First

18   Amendment; (2) the Second Amendment; or (3) the Equal Protection Clause.  They do not.

19        This motion is based on this notice, the accompanying memorandum of points and

20   authorities, the request for judicial notice and attached exhibits, the declaration of John W.

21   Killeen and attached exhibits, the papers and pleadings already on file in this action, and such

22   matters as may be presented to the Court at the hearing.

23   Dated:  January 21, 2020                              Respectfully Submitted,

                                                           XAVIER BECERRA
24                                                         Attorney General of California

25                                                         /s/ *John W. Killeen*
                                                           JOHN W. KILLEEN
26                                                         Deputy Attorney General
                                                           *Attorneys for Defendant Xavier Becerra*

27

28

1

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.  INTRODUCTION**

3   For the last 20 years, Michael Zeleny has been embroiled in personal, business, legal, and

4   public disputes with the family of his former girlfriend, the company her father worked with, and

5   the City of Menlo Park.  Zeleny expressed his anger by staging colorful protests in Menlo Park.

6   In 2015, he asked Menlo Park for permission to stage a protest in the center median of Sand Hill

7   Road, at the I-280 off-ramp, ensuring maximum exposure to drivers exiting the freeway and

8   drivers traversing Sand Hill Road.  In the median, Zeleny proposed to set up a large animated

9   screen depicting scenes of sexual violence, smaller illuminated posters, and several guns to

10  "amplify" his protest.  Zeleny asked to park a truck and set up a portable toilet in the median so

11  that he could remain there around the clock.  Perhaps cognizant of the impact such a display

12  might have on its visitors and residents, Menlo Park denied Zeleny's permit, which sparked his

13  dispute with the City about its time-place-manner restrictions under the First Amendment.

14  California Attorney General Xavier Becerra's office was not involved in Zeleny's dispute

15  with Menlo Park.  But one reason Menlo Park denied Zeleny's request was that California law

16  (Cal. Pen. Code § 26350 *et seq.* and Cal. Pen. Code § 26400 *et seq.*) allows the open carry of

17  unloaded firearms in only several dozen enumerated situations; otherwise, individuals are not

18  allowed to openly carry unloaded firearms in incorporated areas like Menlo Park.  Zeleny

19  challenges the facial constitutionality of these restrictions, alleging that he has a constitutional

20  right to use unloaded firearms as he sees fit.

21  Summary judgment should be entered in favor of the Attorney General because California's

22  restrictions on unloaded open carry are constitutional.  First, restrictions on unloaded open carry

23  do not violate the First Amendment because, on their face, they regulate nonexpressive conduct,

24  not speech or expressive conduct; and even if expression were involved, California's restrictions

25  would survive scrutiny.  Second, restrictions on unloaded open carry do not violate the Second

26  Amendment because using *unloaded* firearms for the purpose of amplifying a protest is conduct

27  that has not traditionally fallen within the protection of the Second Amendment, the core of which

28  is armed self-defense of "hearth and home"; and even if it did, California's restrictions would be

2

justified based on California's strong interests in public safety, including in preventing violent encounters and the diversion of law enforcement resources to unloaded open carry situations. Third, restrictions on unloaded open carry do not violate the Equal Protection Clause because the statutory exceptions to the general prohibition are rationally related to the purposes underlying the general prohibition; for example, a movie company using an unloaded firearm as a prop on a movie set is exempt from the general prohibition because it is unlikely to provoke a strong community reaction or require a law enforcement presence, while an individual walking into a grocery store with a firearm would likely provoke such a reaction.

For all of these reasons, the Attorney General's motion should be granted.

## II.   STATEMENT OF ISSUES TO BE DECIDED

Whether California's decision to allow the open carry of unloaded firearms in only certain situations (*see* Cal. Pen. Code § 26350 *et seq.* and Cal. Pen. Code § 26400 *et seq.*) facially violates the First Amendment, the Second Amendment, or the Equal Protection Clause of the United States Constitution.

## III.   RELEVANT FACTS

### A.   Zeleny's Relationship with the Zhu Family

In the 1990s, Zeleny and Erin Zhu were in a romantic relationship.  SAC, ¶ 28.  After their personal relationship ended, they continued to be business partners.  *Id.*; Decl., of John Killeen, Ex. 1 (ZEL0075), Ex. 2[1] at 211:25-213:3.  They performed work for Erin's father Min Zhu and his company WebEx Communications.  Ex. 1 (ZEL0075); Ex. 2 at 8:21-9:15.

In early 2000, Erin Zhu successfully pursued a claim against her father Min Zhu for childhood sexual abuse.  SAC, ¶¶ 27, 31.

At around the same time, Zeleny and Erin Zhu's business relationship soured.  Ex. 2 at 211:25-213:3.  Zeleny and Erin Zhu dissolved their business relationship through a written agreement.  Ex. 2 at 212:21-25.  Zeleny then sued Erin, her parents, and WebEx for breaching the dissolution agreement and other conduct related to their business dealings; among other things,

---

[1] Throughout this brief, all citations to "Ex. _" refer to the Killeen Declaration and all statutory citations ("§_") refer to the California Penal Code, unless noted otherwise.

3

1    Zeleny alleged that WebEx used 5,000 shares of its stock "that it owed to Zeleny's company to

2    pay hush money to Min Zhu's daughter Erin for her childhood rape by Min Zhu."  Ex. 3; Ex. 1

3    [ZEL0075]; Ex. 2 at 15:9-16:13.  Zeleny pursued this litigation against his former lover and

4    business partner until 2004, when he entered into a settlement with Erin.  Ex. 2 at 15:9-16:13.

5         **B.    Zeleny's Public Campaign Against WebEx and NEA**

6         Zeleny alleges that while he was involved in litigation with the Zhu family, he received a

7    series of anonymous threats of violence against himself and his family.  Ex. 1 [ZEL0075].  On

8    February 11, 2004, Zeleny's father suffered fatal injuries in an apartment fire.  *Id.*  Zeleny

9    believes that the Zhu family may have had something to do with the fire.  Ex. 4 [ZEL002].

10        After his father's death, Zeleny began a campaign of protests "to express the view that Min

11   Zhu's wrongdoing, and the conduct of NEA and WebEx senior management in turning a blind

12   eye to it, should disqualify them from any involvement in publicly traded companies."  SAC, ¶ 2

13   *see id.*, ¶¶ 33, 41, 52-56.  Zeleny targeted NEA because it had "provided venture capital support

14   to WebEx from its early stages, through and beyond its initial public offering in 2000."  SAC, ¶

15   32.  In 2005, Zeleny protested outside the WebEx user conference at the St. Francis hotel in San

16   Francisco.  SAC, ¶¶ 33-35; Ex. 2 at 44:10-17.

17        Shortly thereafter, Min Zhu retired from WebEx and returned to his native country of

18   China.  SAC, ¶¶ 36-38, 55.  Nevertheless, Zeleny continued to stage protests against NEA

19   because he believed that "NEA has continued to do business with Min Zhu."  SAC, ¶¶ 40-42.

20   Between 2006 and 2012, Zeleny held "several dozen protests" at NEA's office in Menlo Park.

21   Ex. 2 at 67:1-25; SAC, ¶¶ 42, 56, 60.

22        Zeleny's "protests were intended to be provocative."  SAC, ¶ 44.  They featured "graphic

23   but non-obscene images reflecting Min Zhu's conduct" and "flyers calling out" certain WebEx

24   and NEA officers "for being enablers of Min Zhu"; some also involved "accordions, trumpets,

25   and bagpipes, and offers of free food to sex workers, registered sex offenders, and adult industry

26   performers."  SAC, ¶¶ 43-44; Ex. 2 at 72:10-16.

27   / / /

28

                                         4

### C.   Zeleny's Use of Firearms to Amplify His Protests

Zeleny's protests were also provocative because he regularly displayed firearms to "amplify his message."  SAC, ¶ 4; *see id.*, ¶¶ 35, 46-48.  When WebEx cancelled its conference in response to Zeleny's presence in 2005, "[t]hat made [Zeleny] understand that the mere presence of a firearm makes my message much more effective."  Ex. 2 at 57:14-58:12.  His protests began to incorporate the "exposed and conspicuous carry of firearms because [he] found through experience that that attracts the most attention." Ex. 2 at 217:3-7, 73:21-74:3 (listing firearms).  Though he used firearms to attract attention, Zeleny claims that his firearms were always unloaded, and he represents he wants to use only unloaded firearms in his future protests in Menlo Park.  Ex. 2 at 69:9-70:20; SAC, ¶¶ 4 ("unloaded"), 46, 48, 112, 114, 120, 188-90, 192, 210, 217(a), 221-22, 233, p. 41 (Prayer for Relief ¶¶ (B), (C), & (G).

A news reporter captured the following picture of Zeleny at one of his protests:



Ex. 5 (ZEL0249).  Perhaps not surprisingly, the presence of a man standing on a street corner in full tactical gear carrying a gun, live ammunition, and a poster depicting a scene of sexual violence, provoked calls to the police department. Ex. 6 at 56:3-19, 302:19-303:13, 305:8-306:4.

At his deposition, Zeleny testified that his last public protest was in June 2012.  Ex. 2 at 93:8-11; *but see* SAC, ¶ 60 (identifying protests that may have occurred in March 2013, April 2013, and September 2015).  This pause in Zeleny's activities may have been due to changes in the law related to the open carry of unloaded firearms.

**D.    California's Open Carry Laws**

California has long regulated the open (or "public") carry of *loaded* firearms in public.  *See* § 25850 *et seq.* (formerly § 12031); *People v. Flores*, 169 Cal. App. 4th 568, 576 (2008) (describing prior version of the prohibition).  California has also long regulated the carriage of *concealed* firearms.  *See* Cal. §§ 25400 *et seq.*  The complaint does not challenge either of these restrictions.  Instead, Zeleny challenges only California's relatively new restrictions on the open carry of *unloaded* firearms in public.  SAC, ¶¶ 8, 188-190, & p. 41 (seeking declaration that "California Penal Code §§ 26400 and 26350 unconstitutional")

"Prior to January 1, 2012, it was legal to openly carry an unloaded firearm in public in California." SAC, ¶ 103.  In 2011, the California Legislature enacted and the Governor signed AB 144, which regulated the open carry of unloaded handguns.  *See* Cal. Stats. 2011, c. 725; § 26350 *et seq.*  A year later, California enacted AB 1527, which regulated the open carry of unloaded firearms other than handguns.  *See* Cal. Stats. 2012, c. 700; § 26400 *et seq.*

AB 114 and AB 1527 allow individuals to openly carry unloaded firearms in dozens of situations, including at home or at one's business, for certain self-defense purposes, hunting, target shooting, target shooting and firearms training.  §§ 26361-26392, 26405.  Other than in the situations enumerated in the statutes, a California resident may not openly carrying an unloaded firearm outside of a vehicle in an "incorporated" city or county, or a "prohibited area" of an unincorporated area of a city or county.  §§ 26350(a), 26400(a).

"[T]he Legislative Histories discussing Sections 26350 (unloaded handguns) and 26400 (unloaded firearms) explain in identical language that these statutes were enacted because:

> The absence of a prohibition on "open carry" has created an increase in problematic instances of guns carried in public, alarming unsuspecting individuals causing issues for law enforcement.

6

> Open carry creates a potentially dangerous situation. In most cases when a person is openly carrying a firearm, law enforcement is called to the scene with few details other than one or more people are present at a location and are armed.
>
> In these tense situations, the slightest wrong move by the gun carrier could be construed as threatening by the responding officer, who may feel compelled to respond in a manner that could be lethal. In this situation, the practice of 'open carry' creates an unsafe environment for all parties involved: the officer, the gun-carrying individual, and for any other individuals nearby as well.
>
> Additionally, the increase in "open carry" calls placed to law enforcement has taxed departments dealing with under-staffing and cutbacks due to the current fiscal climate in California, preventing them from protecting the public in other ways."

*Nichols v. Harris*, 17 F. Supp. 3d 989, 1004-05 (C.D. Cal. 2014) (citing RJN, Exs 1 & 2)

(legislative history materials).

One of the many exceptions to the general prohibition on unloaded open carry is for "an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television, or video production or entertainment event, when the participant lawfully uses that firearm as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event." § 26405(r).  The legislative history of Penal Code section 26405(r) indicated that this exemption was for "props," consistent with an existing procedure (the Entertainment Firearms Permit) under which television and movie companies use unloaded weapons as props under the auspices of a single permit.  RJN, Ex. 1 – 50; *see* § 29500 *et seq.*

**E.     Zeleny's Desire to Restart His Protests[2]**

In 2015, 15 years after he sued Erin Zhu and 10 years after Min Zhu had left the country, Zeleny decided to resume his protests.  Zeleny never considered protesting without firearms.  Ex. 2 at 165:10-14.  To avoid restrictions on the open carry of unloaded firearms, Zeleny figured that if he brought a video camera, he would fall within the statutory exception for the use of unloaded firearms as props in "a motion picture, television, or video production or entertainment event."

---

[2] Zeleny also alleges that the City, WebEx, and NEA conspired against him in various ways.  *See* SAC, ¶¶ 57-101; Zeleny does not allege that the Attorney General or any other State entity participated in this alleged conspiracy.

7

§ 26405(r); SAC, ¶¶ 109-16, 190-91; Ex. 2 at 181:20-185:20.  And rather than simply appearing in the street, as he had done in the past, Zeleny decided to "appl[y] to the City for entertainment and/or film permits accommodating his videotaped, armed protests."  SAC, ¶ 124.

Zeleny initially applied for a "special event permit."  SAC, ¶ 138.  Zeleny sought to park a truck in the center median of Sand Hill Road (across from NEA's building), at the intersection of the northbound I-280 off-ramp and Sand Hill Road.  Ex. 7 (ZEL0181); Ex. 2 at 119:14-120:4, 136:6-11.  Zeleny proposed that he be allowed to install a portable toilet, so that he could be there "around the clock."  Ex. 7 (ZEL181); Ex. 8 (MP000236); Ex. 2 at 107:19-108:1, 121:15-18.  Zeleny proposed that he be allowed to mount on the back of his truck a "55-inch portable media display powered by a portable gas generator."  Ex. 7 (ZEL0181); Ex. 9 (ZEL0167); Ex. 2 at 123:9-124:5.  This screen would display "videos featuring explicit representations of sexual violence."  Ex. 7 (ZEL1081); Ex. 2 at depo. ex. 4, 113:17-25, 116:9-117:5.  Zeleny proposed that he be allowed to install portable lighting illuminating placards.  Ex. 2 at 123:9-124:5.  Additionally, Zeleny proposed that he be allowed to display "fully operational, exposed and unloaded military grade firearms and loaded ammunition feeding devices therefor, including without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a 7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed Browning M1919a."  Ex. 7 (ZEL181); Ex. 2 at depo. ex. 3, 112:10-24; 128:25-129:16.

As a goal, Zeleny "fully expected [NEA] to implode" within 30 days of him starting his protest.  Ex. 2 at 143:22-144:14.

After considering his request to set up an illuminated animated screen displaying scenes of sexual violence, flanked by what would appear to a casual observer to be a "belt-fed" machinegun, planted in the median of Sand Hill Road, at the I-280 freeway juncture, around the clock (with a portable toilet), the City of Menlo Park denied Zeleny's special event permit.  Ex. 2 at 130:14-16; SAC, ¶¶ 124, 155, 161, 166, 175.

Subsequently, Zeleny "requested that the City reconsider the denial of his permit and treat his application as one for a film permit under the separate process the City maintains for film permits."  SAC, ¶ 176; Ex. 2 at 175:23-176:7.  As part of his film permit, Zeleny apparently

8

1   changed the proposed location of his anticipated protest from the median of Sand Hill Road to the

2   side of the road, and restricted it to daylight hours.  Ex. 2 at 209:10-210:7, depo. ex. 21.

3   According to Zeleny, the "film" aspect of the demonstration would consist of Zeleny setting up

4   his guns, posters, and images of sexual violence on a busy road and then "film[ing] the responses

5   of the drivers that pass by that display on Sand Hill Road."  Ex. 2 at 208:19-24, 185:13-20.

6        Zeleny's "permit application still remains 'pending'" and is "in permanent limbo."  SAC,

7   ¶¶ 185-86.

8        **F.    Zeleny's Complaint**

9        In late 2017, Zeleny filed this lawsuit.  The operative second amended complaint alleges

10  that Zeleny "seeks to exercise his First and Second Amendment rights by engaging in peaceful

11  protests while carrying unloaded firearms."  SAC, ¶ 188.  The complaint alleges that the City's

12  denial of Zeleny's permit(s), and other actions, have violated the First Amendment as applied to

13  Zeleny's specific situation.  *Id.*, ¶¶ 194-224.  The complaint also alleges that "California Penal

14  Code sections 26350 and 26400 . . . are unconstitutional on their face, as applied to Zeleny's

15  display of unloaded firearms as a means of protest."  *Id.*, ¶ 190.  Finally, the complaint alleges

16  that California's open carry statutes violate the Equal Protection Clause.  *Id.*, ¶¶ 227-28.

17  **IV.   LEGAL STANDARD FOR SUMMARY JUDGMENT**

18       Summary judgment is proper where no genuine issue of material fact exists and the moving

19  party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In considering a motion

20  for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving

21  party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "[T]he

22  plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who

23  fails to make a showing sufficient to establish the existence of an element essential to that party's

24  case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477

25  U.S. 317, 322 (1986).

26  **V.    ARGUMENT**

27       Zeleny alleges that the City is engaged in a long-running conspiracy against him to deny

28  him the ability to demonstrate as he sees fit.  Zeleny does not allege that the Attorney General is

9

1   involved in that conspiracy, has taken any other action against Zeleny, or has applied any laws to

2   Zeleny.  The Attorney General is a party here only because Zeleny challenges the facial

3   constitutionality of California Penal Code sections 26400 *et seq.* and 26350 *et seq.*, which

4   generally limit the open carry of unloaded firearms to certain situations.  Zeleny alleges that these

5   restrictions on unloaded open carry violate the First Amendment, Second Amendment, and Equal

6   Protection Clauses of the United States Constitution.  SAC, ¶¶ 1, 7, 8, 188-190.  Zeleny alleges

7   that these restrictions are unconstitutional on their face, i.e., in all or nearly all of their

8   applications, not just as applied in his specific case.  SAC, ¶ 190.

9      **A.**   **California's Restrictions on the Open Carry of Unloaded Firearms Do Not**
             **Violate the First Amendment on Their Face**

10

11   Zeleny contends that California's ban on openly carrying an unloaded firearm violates the

12   First Amendment by infringing on his ability to protest. SAC, ¶¶ 8, 109-112, 188-90.  Zeleny's

13   facial challenge fails because possessing or carrying a firearm does not amount to expressive

14   conduct protected by the First Amendment. And even if the carrying of an unloaded firearm

15   amounted to expressive conduct, California's open carry laws would be consistent with the First

16   Amendment; any infringement on Zeleny's ability to communicate his message is at most

17   minimal, and is strongly outweighed by the State's interest in public safety.

18      **1.**   **Legal Standard for Facial First Amendment Challenge**

19   To prevail on a facial challenge in the First Amendment context, Zeleny must demonstrate

20   that "a substantial number of [a law's] applications are unconstitutional, judged in relation to the

21   statute's plainly legitimate sweep."  *Knox v. Brnovich*, 907 F.3d 1167, 1180 (9th Cir. 2018).

22      **2.**   **Carrying an Unloaded Firearm Is Not Expressive Conduct That Is**
             **Protected by the First Amendment**

23

24   The First Amendment is not implicated at all here because California's restrictions on

25   unloaded open carry, on their face, regulate the possession of firearms, not speech or expressive

26   conduct.

27   "The First Amendment protects not only the expression of ideas through printed or spoken

28   words, but also symbolic speech—nonverbal activity . . . sufficiently imbued with elements of

communication." *Roulette v. City of Seattle*, 97 F.3d 300, 302 (9th Cir. 1996) (quoting *Spence v. Wash.*, 418 U.S. 405, 409 (1974)).  For such expressive conduct to receive the protection of the First Amendment, it must "convey a particular message" that is likely to be understood in the surrounding circumstances.  *Spence*, 418 U.S. at 409-11.

"[P]ossession of a gun is not commonly associated with expression."  *Nordyke v. King*, 319 F.3d 1185, 1190 (9th Cir. 2003) ("*Nordyke I*").  In *Nordyke I*, the plaintiffs challenged Alameda County's ban on possessing firearms on county property.  *Id.* at 1187-88.  The plaintiffs alleged that the ban, on its face, restricted their ability to speak or express themselves by holding a gun show in the County.  *Id.*  After the district court denied the plaintiffs' application for a temporary restraining order, the Ninth Circuit affirmed, on the basis that plaintiffs could not prevail on their facial First Amendment challenge.  *Id.* at 1189.

The court held that while "[g]un possession can be speech where there is an intent to convey a particularized message, and the likelihood [is] great that the message would be understood by those who viewed it.," *id.* at 1190 (citing *Spence*, 418 U.S. at 410–11), "typically a person possessing a gun has no intent to convey a particular message, nor is any particular message likely to be understood by those who view it," *id.*  The Nordykes' facial challenge failed "because possession of a gun is not commonly associated with expression"—which meant that Plaintiffs could not carry their burden of proving that the ordinance was facially unconstitutional in all or most circumstances.  *Id.* at 1190 (citing *Roulette*, 97 F.3d at 305); *see also Wortman v. United States*, No. 5:14-CV-04567-PSG, 2015 WL 2251168, at *4 (N.D. Cal. May 13, 2015) ("gun possession itself is not speech"); *Northrup v. City of Toledo Police Div.*, 58 F.Supp.3d 842, 848 (N.D. Ohio 2014), *rev'd on other grounds*, 785 F.3d 1128 (6th Cir. 2015) (rejecting argument that "gun possession alone conveys any message at all"); *Baker v. Schwarb*, 40 F.Supp. 3d 881, 895 (E.D. Mich. 2014) (Plaintiffs' conduct of walking on a sidewalk while openly carrying guns did not "constitute speech protected by the First Amendment"); *Burgess v. Wallingford*, No. 11-CV-112, 2013 WL 4494481, at *9 (D. Conn. May 15, 2013), *aff'd sub nom. Burgess v. Town of Wallingford*, 569 F. App'x 21 (2d Cir. 2014) ("Carrying a weapon alone is generally not associated with expression.").

1    The same is true here.  On their face, Penal Code sections 26350 *et seq.* and 26400 *et seq.*

2    do not restrict speech or expressive conduct.  In the vast majority of cases, the open carry laws

3    restrict non-expressive conduct—the carrying of a firearm—with no communicative element at

4    all.  Thus, Zeleny's facial First Amendment claim fails because Zeleny cannot demonstrate that

5    "a substantial number of [a law's] applications are unconstitutional."  *Knox*, 907 F.3d at 1180.

6    Even if the Court were to examine Zeleny's particular circumstances in the context of his

7    facial challenge, *see, e.g.*, *Knox*, 907 F.3d at 1180 n.10, Zeleny's carrying of firearms is not

8    expressive because it does not "convey a particularized message" that would "be understood by

9    those who viewed it."  *Nordyke I*, 319 F.3d at 1190 (9th Cir. 2003) (citing as hypothetical

10   examples of expressive conduct a "gun protestor burning a gun" or a "gun supporter waving a

11   gun at an anti-gun control rally").

12   First, Zeleny does not allege that he seeks to convey a particularized message by his display

13   of guns; he is not a "gun protestor burning a gun" or a "gun supporter waving a gun at an anti-gun

14   control rally."  *Nordyke I*, 319 F.3d at 1190.  He alleges only that he displays his firearm to

15   "dramatize" and draw attention to his *non-gun-related* protests relating to the conduct of Min

16   Zhu, NEA, and the City.  SAC, ¶ 48.  Because Zeleny's messages "could have been clearly

17   communicated without the use of a gun at all"—through his posters, flyers, and animations—

18   there is no nexus between the act of carrying a gun and a particularized message that the carrying

19   of a gun is intended to communicate.  *Nordyke v. King*, No. C99-04389 MJJ (Mar. 31, 2007)

20   (N.D. Cal. 2007) 2007 WL 9657916, *3 ("*Nordyke II*"), *aff'd in relevant part*, 644 F.3d 776 (9th

21   Cir. 2011), *aff'd in relevant part*, 681 F.3d 1041, 1043 n. 1 (9th Cir. 2012) (en banc); *contra id.* at

22   *3 (determining that "Plaintiffs had sufficiently articulated an intent to convey a particularized

23   message that would be understood by those who viewed it"), *5 (same).

24   Second, even if Zeleny subjectively intended to convey a particular message by carrying

25   firearms, there is no evidence that such a message "[is] likely to be understood by those who

26   view" it.  *Nordyke I*, 319 F.3d at 1190.  Zeleny's protests against NEA and the local defendants

27   revolve around the alleged treatment of Erin Zhu by Min Zhu, and the alleged efforts of NEA and

28   the City to "stifle Zeleny's protests."  SAC, ¶ 49.  These protests consisted of "in-person

12

demonstrations, musical performances, and multimedia posts on YouTube as well as Zeleny's

Internet-based LiveJournal blog."  SAC, ¶ 43.  They included "flyers and posters containing

graphic but non-obscene images reflecting Min Zhu's conduct," "flyers and posters calling out

specific individuals," "music played on accordians, trumpets, and bagpipes, and offers of free

food to sex workers, registered sex offenders, and adult industry performers."  SAC, ¶ 44.

Given the subject matter and style of Zeleny's protests, no reasonable observer would

discern a connection between Zeleny's message about NEA, Min Zhu, and the City, and a man

walking through Menlo Park wearing tactical gear and carrying a plainly visible rifle.  *Baker*, 40

F. Supp. 3d at 895 ("Instead of perceiving Plaintiffs as open carry activists demonstrating their

First or Second Amendment rights, passer-byes were simply alarmed and concerned for their

safety and that of their community"); *Chesney v. City of Jackson*, 171 F.Supp.3d 605, 617 (E.D.

Mich. 2016) (noting no evidence of any "activity that could have clarified or lent additional

support to his alleged advocacy for the right to openly carry a firearm"); *Deffert v. Moe*, 111 F.

Supp. 3d 797, 814 (W.D. Mich. 2015) (holding that, even assuming the Plaintiff's intent of

carrying a gun was to raise awareness about gun control, there was not "a great likelihood that the

message would be understood by those who viewed Plaintiff"); *Northrup*, 58 F.Supp.3d at 848

(same).  There is no evidence that anyone in the community understood Zeleny to be

communicating about anything related to guns, or that Zeleny's guns communicated any message

at all.  *See, e.g.*, Ex. 2 at 183:7-184:1.

For these reasons, summary judgment should be granted in favor of the Attorney General

on the complaint's First Amendment claims on the basis that California's unloaded open carry

laws do not regulate speech or expressive conduct in the majority of cases, and are therefore not

facially unconstitutional.  Nor do these laws restrict Zeleny's own speech or expressive conduct.

> **3.      Even if Openly Carrying an Unloaded Firearm Amounted to Expressive Conduct Under the First Amendment, California's Unloaded Open Carry Restrictions Would Withstand Intermediate Scrutiny**

Even if Zeleny's carrying of an unloaded firearm amounted to expressive conduct (which it

does not), § 26350 *et seq.* and § 26400 *et seq.* would withstand scrutiny under the First

13

1   Amendment.  Once a court determines that particular conduct is protected by the First

2   Amendment, it must then determine what level of scrutiny to apply to the challenged policy. "The

3   level of scrutiny depends on whether the [challenged policy] is related to the suppression of free

4   expression." *Nordyke v. King*, 644 F.3d 776, 792 (9th Cir. 2011), *aff'd in relevant part*, 681 F.3d

5   1041, 1043 n. 1 (9th Cir. 2012) (en banc) ("*Nordyke III*") (citing *Texas v. Johnson*, 491 U.S. 397,

6   407 (1989)) (internal quotation marks omitted).[3]  "That is, the government may not proscribe

7   particular conduct because it has expressive elements." *Id.* (citing *Johnson*, 491 U.S. at 406)

8   (internal quotation marks omitted).  "If a law hits speech because it aimed at it, then courts apply

9   strict scrutiny; but if it hits speech without having aimed at it, then courts apply the *O'Brien*

10  intermediate scrutiny standard." *Id.* (referring to *United States v. O'Brien*, 391 U.S. 367 (1968)).

11      Here, even if Penal Code sections 26350 *et seq.* and 26400 *et seq.*, regulated speech or

12  expressive conduct, *O'Brien* scrutiny would apply because California's open carry laws are not

13  "related to the suppression of free expression."   *Nordyke III*, 644 F.3d at 792 (applying *O'Brien*

14  to Alameda County's regulation of gun shows).  There is no evidence that the unloaded open

15  carry laws were in any way intended to suppress speech.  Rather, the laws were passed in order to

16  conserve law enforcement resources so as to more effectively promote public safety.  *See Nichols,*

17  17 F. Supp. 3d at 1004-05 (discussing legislative history); *Flanagan v. Harris*, No. LA CV16-

18  06164 JAK, 2018 WL 2138462, at *7 (C.D. Cal. May 7, 2018) (reviewing legislative history:

19  "[t]he legislative history of California's open-carry laws clearly provides that their purpose is to

20  promote public safety") (citing RJN, Exs. 1, 2); *see also* Patrick McGreevy & Nicholas Riccardi,

21  *Brown bans open carrying of handguns*, L.A. Times (Oct. 10, 2011),

22  <https://www.latimes.com/archives/la-xpm-2011-oct-10-la-me-brown-guns-20111011-

23  story.html> (last accessed January 21, 2021) ("Police chiefs and sheriffs complained that

24  panicked customers' calls were diverting them from chasing real criminals.").

25      Under *O'Brien* intermediate scrutiny, "when 'speech' and 'nonspeech' elements are

26  combined in the same course of conduct, a sufficiently important governmental interest in

---

27      [3] The panel's First Amendment holdings were affirmed *en banc*. *Nordyke v. King*, 681
    F.3d 1041, 1043 (9th Cir. 2012) ("We affirm the district court's ruling on the First Amendment
28  for the reasons given by the three-judge panel.").

14

1   regulating the nonspeech element can justify incidental limitations on First Amendment

2   freedoms." *O'Brien*, 391 U.S. 367 at 376. Furthermore, "a government regulation is sufficiently

3   justified if it is within the constitutional power of the Government; if it furthers an important or

4   substantial governmental interest; if the governmental interest is unrelated to the suppression of

5   free expression; and if the incidental restriction on alleged First Amendment freedoms is no

6   greater than is essential to the furtherance of that interest." *Id.* at 377.  Finally, "an incidental

7   burden on speech is no greater than is essential, and therefore is permissible under *O'Brien*, so

8   long as the neutral regulation promotes a substantial government interest that would be achieved

9   less effectively absent the regulation." *United States v. Albertini*, 472 U.S. 675, 689 (1985).

10       The unloaded open carry statutes clearly satisfy each prong of *O'Brien*'s intermediate

11   scrutiny test.  To the extent that Zeleny's nonspeech element of displaying an unloaded firearm is

12   mixed with the speech element of the communication of his ideas, the government's restriction on

13   the use of firearms is incidental—Zeleny can still speak, display, and use other demonstratives to

14   convey his messages about the Zhus and NEA, whether or not he has a gun—and it is justified by

15   important government interests: the need to preserve law enforcement resources that would be

16   absorbed in responding to calls about Zeleny's conduct, as well as the need to prevent

17   unanticipated conflicts between Zeleny, members of the community, and law enforcement, if

18   anyone involved makes the "slightest wrong move." *Flanagan*, 2018 WL 2138462, at *7; *see* Ex.

19   6 at pp. 190:15-191:3 (reflecting similar concerns of Menlo Park police department).  These

20   important government interests are neutral and not related to the suppression of free expression—

21   the unloaded carry laws reach no more conduct than the carriage of firearms, and there is no less

22   restrictive way to achieve these important purposes absent the regulation; indeed, the Legislature

23   thoughtfully tailored its restrictions by identifying dozens of scenarios in which unloaded open

24   carry is allowed, despite the incidental risk of raising some of the same policy concerns arising.

25   *See* §§ 26361-26392, 26405.  Just as Alameda County's ban of guns on county property was a

26   "straightforward response" to the danger of firearms on county property, so was California's ban

27   on open carry of unloaded firearms in certain circumstances a straightforward response to the

28

15

1    diversion of law enforcement resources away from threats to public safety.  *Nordyke*, 644 F.3d at

2    794.  The unloaded open carry laws clearly withstand *O'Brien* intermediate scrutiny.

3          For all of these reasons, Zeleny's claim that 26350 *et seq.* and 26400 *et seq.* violate the First

4    Amendment fail, and summary judgment should be entered in favor of the Attorney General on

5    these claims.

6          **B.     California's Restrictions on the Open Carry of Unloaded Firearms Do Not
               Violate the Second Amendment on Their Face**

7

8          Zeleny next contends that California's limitations on openly carrying an unloaded firearm

9    violate the Second Amendment by infringing on his ability to carry an unloaded firearm as he

10   sees fit. SAC, ¶¶ 8, 109-112.  Zeleny's facial challenge again fails.

11         **1.     Legal Standard**

12         The Ninth Circuit uses a two-step inquiry for Second Amendment claims: "first, the court

13   asks whether the challenged law burdens conduct protected by the Second Amendment; and if so,

14   the court must then apply the appropriate level of scrutiny."  *Silvester v. Harris*, 843 F.3d 816,

15   821 (9th Cir. 2016)

16         The first step considers whether the challenged law burdens conduct protected by the

17   Second Amendment, based on a "historical understanding of the scope of the right."  *Silvester*,

18   843 F.3d at 820 (quoting *Heller*, 554 U.S. at 625).  If the law falls outside the historical scope of

19   the Second Amendment, then that law "may be upheld without further analysis."  *Id.*, 843 F.3d at

20   821 (citation omitted).

21         "If the regulation is subject to Second Amendment protection . . . the court then proceeds to

22   the second step of the inquiry to determine the appropriate level of scrutiny to apply," and then to

23   apply that level of scrutiny.  *Silvester*, 843 F.3d at 821 (citation omitted).  This process requires

24   the court to consider "(1) how close the challenged law comes to the core of the Second

25   Amendment right, and (2) the severity of the law's burden on that right."  *Id.* (citation omitted).

26   If the law either does not come close to the core or otherwise does not "substantially" burden the

27   right, then intermediate scrutiny applies.  *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953,

28   961 (9th Cir. 2014)

16

The core of the Second Amendment, as described in *Heller*, is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *See Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017) (quoting *Heller*, 554 U.S. at 635).  "A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny," whereas a "law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny.  Otherwise, intermediate scrutiny is appropriate."  *Bauer*, 858 F.3d at 1222 (internal quotation marks and citations omitted).

The Ninth Circuit's test for intermediate scrutiny has two requirements:  "(1) the government's stated objective must be significant, substantial, or important; and (2) there must be a 'reasonable fit' between the challenged regulation and the asserted objective."  *Silvester*, 843 F.3d at 821-22 (citation omitted).

## 2.   There Is No Right Under the Second Amendment to Carry Unloaded Firearms for the Purpose of "Amplifying" One's Protest

Zeleny's facial challenge to Penal Code sections 26400 *et seq.* and 26350 *et seq.* fails under step one of *Heller* because these laws do not burden conduct protected by the Second Amendment.  *Silvester*, 843 F.3d at 820 (quoting *Heller*, 554 U.S. at 625); *id.* at 821 (if the law falls outside the historical scope of the Second Amendment, then that law "may be upheld without further analysis."); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) (limiting the ability to open new gun stores did not burden conduct protected by Second Amendment).

The Second Amendment protects "the core right to possess a firearm for self-defense," as well as "ancillary rights necessary to" realize that core right.  *Teixeira*, 873 F.3d at 677.  Starting with the language of the Second Amendment, the phrase "'bear arms' is naturally read to mean 'wear, bear, or carry . . . upon the person . . . for the purpose of . . . being armed and ready for offensive or defensive action in case of conflict with another person.'"  *Id.* at 683 (quoting *Heller*, 554 U.S. at 584).  "[T]he right to bear arms, under both earlier English law and American law at the time the Second Amendment was adopted, was understood to confer a right upon individuals

17

1   to have and use weapons for the purpose of self-protection, at least in the home." *Teixeira*, 873

2   F.3d at 686.

3        Within this historical framework, restrictions on the open carry of *loaded* firearms might

4   burden an individual's ability to be "armed and ready for offensive or defensive action," though it

5   is an open question to what extent that ability extends beyond the home.  But restrictions on the

6   open carry of *unloaded* firearms that are being used to amplify a demonstration are different.

7   Such restrictions do not burden the individual's ability to be "armed and ready for offensive or

8   defensive action," because an unloaded firearm is essentially useless as a weapon of self-defense.

9   Zeleny does not allege that there is a historical tradition in England or America of individuals

10  using *unloaded firearms* for self-defense.

11       Not surprisingly, there is also no historical tradition in England or America of individuals

12  using unloaded firearms to amplify their protests.  When asked, Zeleny's own expert witness on

13  the history of firearms regulations could not "think of any" "history in this country of people

14  carrying unloaded firearms while participating in peaceful protests."  Ex. 10 at 82:1-4.  In the

15  Civil Rights movement of the 1960s, it was not uncommon for participants to carry firearms, but

16  they were generally loaded.  Ex. 10 at 80:23-81:24.  Zeleny's expert was not aware of "any

17  instances when civil rights protesters would have deliberately carried only unloaded weapons to

18  amplify their protests."  Ex. 10 at 82:24-83:5.

19       Thus, there is no evidence of a free-standing constitutional or historical right to openly

20  carry unloaded firearms for the purpose of amplifying a protest.  California's regulation of such

21  unloaded firearms thus falls outside the scope of the Second Amendment and "may be upheld

22  without further analysis."  *Silvester*, 843 F.3d at 820.

23       **3.    Zeleny Did Not Plead That He Intended to Bear Loaded Firearms for
            Self-Defense, and Has Therefore Waived an Argument Based on Self-
24          Defense**

25       In his complaint, Zeleny repeatedly alleged that he seeks to use *unloaded* firearms to

26  amplify his protests, not loaded firearms.  SAC, ¶¶ 4 ("unloaded"), 46, 48, 112, 114, 120, 188-90,

27  192, 210, 217(a), 221-22, 233, p. 41 (Prayer for Relief ¶¶ (B), (C), & (G).  And the complaint

28  clearly challenges only California's prohibitions on unloaded open carry, not its prohibitions on

18

1    loaded carry or concealed carry.  SAC, ¶¶ 8, 188-190, p. 41 (Prayer for Relief, ¶ (A)).  As the

2    Attorney General demonstrated above, the State's regulation of unloaded firearms at protests does

3    not implicate either the First Amendment or the Second Amendment: without his unloaded

4    firearms, Zeleny is just as able to express his message, and his ability to defend himself is not

5    materially impaired—the central concerns of the First and Second Amendments, respectively.

6         However, at his deposition, Zeleny testified that, in addition to using unloaded firearms to

7    dramatize his protests, in his earlier protests he kept live ammunition nearby in case he needed to

8    load his firearms and use them quickly for self-defense.  Ex. 2 at 57:14-58:1; 60:15-61:11 ("a gun

9    without ammunition is useless").  Were Zeleny to follow this practice in the future, he would not

10   be subject to prosecution under the unloaded carry statutes that he has challenged.  Instead, he

11   would be subject to prosecution under the loaded open carry statutes, which he has not

12   challenged.  *See* § 16840 (defining "loaded" firearm as a firearm with ammunition in the

13   "immediate possession of the same person"); § 25850 et seq. (loaded open carry laws).

14        To the extent that Zeleny responds to this motion by arguing that he has a Second

15   Amendment right to carry a loaded firearm openly, based on a right to self-defense, that argument

16   has been waived because it was not pleaded in the complaint.  *See Suever v. Connell*, No. C 03-

17   00156 RS, 2020 WL 3076299, at *1 ("a plaintiff may not avoid summary judgment by relying on

18   claims not pleaded in the complaint") (citing *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435

19   F.3d 989, 992 (9th Cir. 2006)).  Nowhere in Zeleny's complaint is there any allegation that he

20   intends, or would like, to use his firearms for self-defense.  Nor does the complaint challenge

21   California's restrictions on loaded open carry.  The complaint clearly only challenges California's

22   restrictions on unloaded open carry, on the theory that they interfere with Zeleny's right to

23   protest, not his right to self-defense.

24   **4.   To the Extent That Zeleny Asserts a Second Amendment Right to
       Loaded Open Carry Based on Self-Defense, California's Restrictions**
25   **on Loaded Open Carry Do Not Violate the Second Amendment**

26        Even if the Court determines that Zeleny has pleaded a claim challenging California's

27   *loaded* open carry laws (he has not), California's open carry regime should still be upheld as

28   being consistent with the Second Amendment.

1    "If the regulation is subject to Second Amendment protection [step one of *Heller*] . . . the

2    court then proceeds to the second step of the inquiry to determine the appropriate level of scrutiny

3    to apply," and then to apply that level of scrutiny.  *Silvester*, 843 F.3d at 821 (citation omitted).

4    This process requires the court to consider "(1) how close the challenged law comes to the core of

5    the Second Amendment right, and (2) the severity of the law's burden on that right."  *Id.* (citation

6    omitted).  If the law either does not come close to the core or otherwise does not "substantially"

7    burden the right, then intermediate scrutiny applies.  *Jackson*, 746 F.3d at 961.

8         Neither the Supreme Court nor the Ninth Circuit has yet "decided the degree to which the

9    Second Amendment protects the right to bear arms outside the home."  *Teixeira*, 873 F.3d at 686

10   n.19.  But that question is the subject of three pending Ninth Circuit cases: *Young v. Hawaii*,

11   which was heard by an *en banc* panel on September 24, 2020 (9th Cir. No. 12-17808 [involving

12   similar challenge to Hawaii's carry laws]); *Nichols v. Harris* (9th Cir. No. 14-55873, ECF 119

13   [stayed pending disposition of *Young*]); and *Flanagan v. Harris* (9th Cir. No. 18-55717, ECF 57

14   [stayed pending disposition of *Young*]).  *See Baird v. Becerra*, No. 2:19-cv-00617-KJM-AC, 2020

15   WL 5107614, at *3 (E.D. Cal. Aug. 31, 2020) (in another challenge to California's open carry

16   laws, describing the status of the Ninth Circuit matters).[4]

17        In *Nichols* and *Flanagan*, the district courts upheld California's open carry laws.  *See*

18   *Nichols v. Brown*, 17 F. Supp. 3d 989 (C.D. Cal. 2014); *Flanagan v. Harris*, No. LA CV16-06164

19   JAK, 2018 WL 2138462 (C.D. Cal. May 7, 2018).  To the extent that the Court reaches the issue

20   of whether the Second Amendment provides a general right to loaded open carry (despite

21   Zeleny's failure to plead such a right), it should uphold California's open carry regime:

**a.    Level of Scrutiny**

23        Assuming *arguendo* that restrictions on loaded open carry burden the Second Amendment

24   right in some way, "a law that imposes such a severe restriction on the fundamental right of self

25

26        [4] Because the Ninth Circuit may "clarify the scope of the Second Amendment as it applies
     to plaintiffs' claims, in the relatively near future,"  *Baird*, 2020 WL 5107614, at *4, should the
27   Court see the need to reach the question of whether California's restriction on loaded carry are
     constitutional, and if the Ninth Circuit has not ruled in *Young* by the hearing date, it may preserve
28   Court resources to stay or continue the hearing on the parties' motions until after the *en banc*
     court issues its opinion.

1   defense of the home that it amounts to a destruction of the Second Amendment right is

2   unconstitutional under any level of scrutiny," whereas a "law that implicates the core of the

3   Second Amendment right and severely burdens that right warrants strict scrutiny.  Otherwise,

4   intermediate scrutiny is appropriate." *Bauer*, 858 F.3d at 1222 (internal quotation marks and

5   citations omitted).

6        Here, California's restrictions on the *open* carry of firearms neither severely restricts nor

7   severely burdens "the right of self-defense in the home."  Instead, they "limit the open carrying of

8   such arms in public, *i.e.*, outside the home." *Flanagan*, 2018 WL 2138462, at *6.  Therefore, at

9   most intermediate scrutiny applies.

10        The Ninth Circuit's test for intermediate scrutiny has two requirements:  "(1) the

11   government's stated objective must be significant, substantial, or important; and (2) there must be

12   a 'reasonable fit' between the challenged regulation and the asserted objective." *Silvester*, 843

13   F.3d at 821-22 (citation omitted).  California's open carry laws survives under both prongs:

14           **b.**     **The Government's Stated Objective**

15        First, California's interest in enacting its open carry laws is to promote public safety and

16   reduce gun violence.  Judge Kronstadt summarized relevant legislative history demonstrating the

17   Legislature's motives in enacting the open carry laws:

18        The legislative history of California's open-carry laws clearly provides that their
     purpose is to promote public safety. Cal. Penal Code § 26350 generally prohibits
19        individuals from openly carrying unloaded handguns in public. Its legislative history
     includes the statement that "the absence of a prohibition on 'open carry' has created
20        an increase in problematic instances of guns carried in public, alarming unsuspecting
     individuals and causing issues for law enforcement. Simply put, open carry creates a
21        potentially dangerous situation for the Citizens of California." Ex. 1 to California's
     RJN, Dkt. 45–16 at 30, 41, 58; cf. Ex. 2 to California's RJN, Dkt. 45–17 at 21, 30, 43,
22        55, 60, 64, 66, 72.

23        Additionally, in connection with their review of California Assembly Bill No. 144,
     various committees in the California legislature considered that "[i]n most cases when
24        a person is openly carrying a firearm, law enforcement is called to the scene with few
     details other than one or more people are present at a location and are armed," which
25        can escalate quickly if the armed person makes "the slightest wrong move" once law
     enforcement arrives on the scene. Ex. 1 to California's RJN at 19, 30–31, 42, 49, 50,
26        57. These committees also considered that "the increase in 'open carry' calls placed
     to law enforcement has taxed departments dealing with under-staffing and cut
27        backs ... preventing them from protecting the public in other ways." Id. For these
     reasons, the California legislature sought to address the "surge in problematic
28        instances of guns carried in public" by generally prohibiting open carry. Id. at 50.

1   *Flanagan*, 2018 WL 2138462, at *7 (citing RJN, Exs. 1&2); *see also Nichols*, 17 F. Supp. 3d at

2   1004-05 (describing legislative reasons behind open carry legislation).  "The Ninth Circuit has

3   recognized that promoting public safety and reducing violent crime are important government

4   interests."  *Flanagan*, 2018 WL 2138462, at *7.

5                           **c.      Reasonable Fit**

6           Judge Kronstadt also determined that "the State reasonably could have inferred that there

7   was a relationship between prohibiting individuals from carrying firearms openly in public and

8   promoting and achieving the important governmental objective of public safety," based on expert

9   testimony,[5] materials provided by the Peace Officer Research Association, and the experience of

10   other states.  *Flanagan*, 2018 WL 2138462, at *9-10.  The same is true here.  And, as

11   demonstrated above, the Legislature carefully tailored the open carry laws to achieve its

12   legitimate objectives while still allowing open carry in dozens of circumstances where the State's

13   public safety concerns could be addressed.  *See supra* Section (A)(3).

14           For all of these reasons, Zeleny's claim that 26350 *et seq.* and 26400 *et seq.* (or any other

15   open carry statutes) violate the Second Amendment on their face, and summary judgment should

16   be entered in favor of the Attorney General on these claims.

17   **C.    California's Restrictions on the Open Carry of Firearms Do Not Violate
        the Equal Protection Clause**

18

19           As described above, California Penal Code sections 26350 *et seq.* and 26400 *et seq.* contain

20   a general prohibition on the open carriage of unloaded firearms in incorporated or sensitive areas,

21   followed by an enumerated list of dozens of exceptions to the general prohibition (§§ 26361-

22   26392, 26405).  Zeleny alleges that, by creating an exception for entertainment productions that

23   use unloaded firearms as props, California has violated equal protection principles by treating

24   individuals who qualify for the exception better than individuals who do not, and who are subject

25   to the general prohibition on unloaded open carry.  SAC, ¶¶ 225-229; *see* §§ 26375, 26405(r).

26

27           [5] Defendants did not generate the same expert reports in this case because they were not
    on notice from the complaint that Zeleny might be challenging California's loaded open carry
28   laws.

1   The Equal Protection Clause "is essentially a direction that all persons similarly situated

2   should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

3   The first step in analyzing an Equal Protection claim is "to identify the state's classification of

4   groups." *Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018). "If the two groups are

5   similarly situated, we determine the appropriate level of scrutiny and then apply it." *Id.*

6   First, an individual walking down a public sidewalk, entering a retail establishment, or

7   attending a public protest while carrying an unloaded firearm is not similarly situated to an entity

8   responsible for a "motion picture, television or video production, or entertainment event."

9   § 26375. Generally speaking, "event" suggests a level of control over a specified area for a

10   specific amount of time, such that it is far less likely for the public to be confused or react

11   violently to an entertainment company's use of an unloaded firearm as a prop. Entertainment

12   productions are rarely completely open to the public; rather, they are filmed on a lot or in

13   enclosed production area within a public street, for example. When they see an unloaded firearm

14   being used in this context, passerby and the police are far more likely to immediately discern that

15   it is not a threat to them, as opposed to a lone individual wandering around in fatigues and

16   carrying a long gun.

17   Second, even if individuals like Zeleny were similarly situated to entertainment production

18   companies, the exception for entertainment events using firearms as props would not violate the

19   Equal Protection Clause. Rational basis is the correct standard to use because, as detailed above,

20   California's restrictions on unloaded firearms implicate neither the First Amendment nor the

21   Second Amendment, nor any suspect classification. *Gallinger*, 898 F.3d 1016. But under any

22   level of scrutiny, an exception for entertainment companies would survive (just as exceptions for

23   hunters, target shooters, and many others would survive): Given how often movies use firearms

24   as props, it was logical for the Legislature to exempt them from the general prohibition on openly

25   carrying unloaded firearms  The Legislature could have rationally concluded that firearms being

26   used in entertainment productions would be unlikely to create confusion or provoke violent

27   confrontations (the concerns underlying the legislation), for several reasons: (1) entertainment

28   productions must obtain a separate permit from the Department of Justice that requires them to

23

1    provide information about the nature of their production, *see* § 29500 *et seq.*; (2) as Zeleny's

2    expert explains, it is long-standing entertainment industry practice for firearms to be handled

3    carefully and professionally under the supervision of trained personnel, *see* Ex. 11 (Decl. of

4    Robert Brown), ¶ 65 (describing "highly regulated" environment) and (3) as another of Zeleny's

5    experts acknowledges, production companies often have to obtain local permits, which puts local

6    agencies on notice of their activities and enables them to mitigate any potential adverse responses

7    from the public, the very sort of regulation Zeleny is resisting here. Ex. 12 (Decl. of Michael

8    Tristano), ¶ 13 ("I always insist that productions get the proper permitting . . . in the specific area

9    and jurisdiction they are filming in"), ¶ 14.  Thus, it was not illogical or arbitrary to exclude

10   production and entertainment events from the general prohibition on unloaded open carry.  *See*

11   *also Nichols*, 17 F. Supp. 3d at 1012 (rejecting similar challenge to another statutory exception).

12
         **D.    Zeleny's Eligibility for a Statutory Exception Is Irrelevant to His**
13             **Constitutional Claims**

14          Finally, Zeleny alleges that by setting up a camera and pointing it at passerby, he qualifies

15   as a "motion picture, television, or video production or entertainment event" that is exempt from

16   the general prohibition on open carry of unloaded firearms.  § 26405(r); SAC, ¶¶191-92, 202-06;

17   Ex. 2 at 208:19-24, 185:13-20.  He then contends that because he is an "authorized participant" in

18   such an "event," the City cannot require a permit or impose any conditions on his activities;

19   according to Zeleny, so long as he brings his camera with him, he can carry his gun whenever,

20   wherever, and however he pleases.  SAC, ¶¶ 191-92, 202-06.

21          The Court need not reach questions of state law raised by Zeleny because, even if Zeleny

22   qualified as an "authorized participant" in a "production or entertainment event," that would not

23   prevent the City from imposing reasonable conditions on the conditions of that event; the

24   exception to the ban on unloaded open carry is a limited defense to criminal prosecution, not

25   something that immunizes the holder of the exception from any other regulation.  Indeed, one of

26   Zeleny's own experts recognizes that entertainment events must obtain municipal approval, *in*

27   *addition to* falling within the exception to the unloaded open carry laws. Ex. 12 (Decl. of

28

                                                    24

1   Michael Tristano), ¶¶ 13 ("I always insist that productions get the proper permitting . . . in the

2   specific area and jurisdiction they are filming in"), 14.

3       Were the Court to reach the issue of state law raised by Zeleny, while the Attorney General

4   was not involved in the dispute between Zeleny and City, Zeleny's interpretation of state law

5   seems implausible because it creates an exception that would easily swallow the whole rule.  If

6   anyone could create a "motion picture, television or video production" or "entertainment event"

7   merely by filming themselves in a public place (including with their smartphone), with no

8   meaningful limitation on the visibility or timing of the firearms display, such an exception would

9   swallow the general prohibition on open carrying of firearms and be inconsistent with the

10   California Legislature's intent to minimize potentially dangerous interactions in public.  The more

11   plausible interpretation is that the relevant exception appears to be analogous to similar

12   exceptions for gun shows (§ 26369) or target ranges (§ 26365)—defined spaces in which the

13   firearm being carried is not easily visible or accessible to the public, as opposed to an individual

14   carrying an unloaded firearm in an unconfined, uncontrolled area, fully visible to the public, and

15   for an indefinite period of time.  Indeed, the fact that this is the generally understood meaning of a

16   "production or entertainment event" is corroborated by Zeleny's expert, who describes in detail

17   his professional experience in this "highly regulated" environment.  Ex. 11 (Decl. of Robert

18   Brown), ¶ 65.

19   **VI.   CONCLUSION**

20       For all of these reasons, the Attorney General requests that the Court grant his motion and

21   grant summary judgment in favor of the Attorney General.

22   Dated:  January 21, 2020               Respectfully Submitted,

23                                       XAVIER BECERRA

Attorney General of California

24                                     ANTHONY R. HAKL

Supervising Deputy Attorney General

25

26                                     /s/ *John W. Killeen*

JOHN W. KILLEEN

27                                     Deputy Attorney General

*Attorneys for Defendant Xavier Becerra*

28   SA2018100019 34757794_3.docx

25