1  David W. Affeld, State Bar No. 123922
   Brian R. England, State Bar No. 211335
2  Damion Robinson, State Bar No. 262573
   Affeld Grivakes LLP
3  2049 Century Park East, Ste. 2460
   Los Angeles, CA 90067
4  Telephone:    (310) 979-8700

5  Attorneys for Plaintiff Michael Zeleny

6

7

8                 UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10

11  MICHAEL ZELENY,                    Case No. CV 17-7357 JCS

12        Plaintiff,                   Assigned to:
                                       The Honorable Richard G. Seeborg
13             vs.
                                       Discovery Matters:
14  GAVIN NEWSOM, *et al.*,            The Honorable Thomas S. Hixson

15        Defendants.                  **PLAINTIFF MICHAEL ZELENY'S
                                       NOTICE OF MOTION AND MOTION
16                                     FOR PARTIAL SUMMARY JUDGMENT
                                       AGAINST THE CITY OF MENLO PARK
17                                     AND POLICE CHIEF DAVE BERTINI**

18                                     [Filed concurrently:
                                       1. Declaration of Michael Zeleny;
19                                     2. Declaration of Damion Robinson;
                                       3. Declaration of Gabrielle Bruckner;
20                                     4. Proposed Order]

21                                     Date:       February 25, 2021
                                       Time:       1:30 p.m.
22                                     Courtroom: 3, 17th Floor

23
                                       Action Filed:  December 28, 2017
24                                     Trial Date:    TBD

25

26

27

28
                                  - 1 -
MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CITY OF MENLO PARK AND
                               BERTINI

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on February 25, 2021, at 1:30 p.m., or as soon thereafter as the matter may be heard before the Honorable Richard Seeborg in Courtroom 3 of the above-entitled Court, Plaintiff Michael Zeleny ("Zeleny") will and hereby does move for an Order granting Partial Summary Judgment[1] against Defendants the City of Menlo Park and Police Chief Dave Bertini ("Defendants") pursuant to Federal Rule of Civil Procedure 56.

This Motion is made on the grounds that there are no issues of material fact and that Zeleny is entitled to judgment as a matter of as to his First, Second, Third, and Fourth Causes of Action against these specific Defendants.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points & Authorities, the Declarations of Michael Zeleny, Damion Robinson, and Gabrielle Bruckner filed concurrently, the records and files herein, and such other matters as the Court may consider.

Dated:  January 21, 2021                    Respectfully submitted,

                                            s/ Brian R. England
                                            David W. Affeld
                                            Brian R. England
                                            Damion D. D. Robinson
                                            Affeld Grivakes LLP

                                            Attorneys for Plaintiff Michael Zeleny

---

[1] This is styled as a Motion for Partial Summary Judgment because it is not directed at Zeleny's claim against the California Attorney General for violating his rights under the Second and Fourteenth Amendment.  Zeleny is concurrently filing a Motion for Partial Summary Judgment against the California Attorney General.  Taken together, both motions would resolve all issues and claims in the litigation.

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CITY OF MENLO PARK AND BERTINI

# **Table of Contents**

I.    INTRODUCTION ............................................................................................ 1

II.   STATEMENT OF UNDISPUTED FACTS ................................................... 3

    A.   Zeleny's Protests Against NEA ........................................................... 3

        1.   NEA and the City Stop Zeleny from Protesting. ....................... 4

        2.   California Enacts Its "Open Carry" Bans. ................................. 5

        3.   The City Employs a Sham Permit Process to Stymie Zeleny. ... 6

            a.   The City's Permitting Process Has No Objective Criteria. .......................................................................... 6

            b.   The City Circumvents Its Special Event Process. .......... 8

                i.    Bertini and the City Attorney Take Over the Permitting Process and Unilaterally Deny the Application. ........................................................... 8

                ii.   The Kafkaesque Review Process. ..................... 9

            c.   The City Shelves the Film Permit Application for Three Years. ...................................................................... 10

        4.   The Permitting Process is a Subterfuge for Content Discrimination. ........................................................................ 11

III.  LEGAL STANDARD ................................................................................. 12

IV.   ARGUMENT ............................................................................................. 12

    A.   Zeleny is Entitled to Declaratory Relief that Defendants Violated His Constitutional Rights. ...................................................................... 12

    B.   Zeleny's Protests are Protected, First Amendment Activity. ............. 13

    C.   The City's Permitting Process Is Facially Unconstitutional Under *Epona* ............................................................................................... 14

        1.   A Facial Challenge Is Appropriate ........................................ 14

        2.   The Permitting Process Amounts to an Unlawful Prior Restraint. ................................................................................. 15

            a.   A Permitting Process Must Have Objective Criteria and Adequate Procedural Safeguards. ............................... 15

            b.   The City "Special Events" Permitting Process Lacks Objective or Definite Standards. ................................. 16

|   |   |   | **i.** | No Objective Criteria for Grant or Denial......................16 |

|   |   |   | **ii.** | Ability to Add Factors *Ad Hoc*........................................18 |

|   |   |   | **iii.** | Unbridled Discretion to Decide if an Event Is "Special"..........................................................................19 |

|   |   |   | **iv.** | No Definitive Time Limits. ..............................................19 |

|   |   | **c.** | The City Film Permitting Process Lacks any Objective or Definite Standards and Has No Time Limit............................20 |

|   | D. | Defendants Have Violated Zeleny's Constitutional Rights as Applied. .............21 |

|   |   | **1.** | The City Failed to Follow Its Own Permitting Guidelines, Specifically Targeting Zeleny. ....................................................21 |

|   |   |   | **a.** | The City Circumvented Its Own Published Procedures...............21 |

|   |   |   | **b.** | The City Improperly Considered Content-Based Factors. ......................................................................22 |

|   |   |   | **c.** | The City's Failure to Have A Proper Film Permit Process Further Specifically Harmed Zeleny. ..............................23 |

|   | E. | Zeleny Has Established That Defendants' Conduct Violated Section 1983 and He Is Entitled to Relief on his Fourth Cause of Action.......................24 |

|   |   | **1.** | Defendants Violated Section 1983 as a Matter of Law............................24 |

|   |   | **2.** | Zeleny Is Entitled to an Award of Nominal Damages and Attorneys' Fees Under Section 1983......................................................25 |

V. | CONCLUSION ..........................................................................................................25

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CITY OF MENLO PARK AND
BERTINI

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Federal Cases**

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970) ............................................................................................. 25

*Baby Tam & Co., Inc. v. City of Las Vegas*,
  154 F.3d 1097 (9th Cir.1998) ............................................................................. 15

*Carey v. Piphus*,
  435 U.S. 247 (1978) ............................................................................................. 25

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................. 12

*Countrywide Home Loans, Inc. v. Mortgage Guar. Ins. Corp.*,
  642 F.3d 849 (9th Cir.2011) ............................................................................... 12

*Desert Outdoor Advert., Inc. v. City of Moreno Valley*,
  103 F.3d 814 (9th Cir. 1996) ............................................................................... 17

*Epona, LLC v. County of Ventura*,
  876 F.3d 1214 (9th Cir. 2017) ...................................................................*passim*

*Farrar v. Hobby*,
  506 U.S. 103 (1992) ............................................................................................. 25

*Flagg Bros., Inc. v. Brooks*,
  436 U.S. ................................................................................................................ 25

*Floyd v. Laws*,
  929 F.2d 1390 (9th Cir. 1991) ............................................................................. 25

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990) ........................................................................... 15, 16, 20, 21

*Global Telemedia Int'l, Inc. v. Doe 1*,
  132 F. Supp. 2d 1261 (C.D. Cal. 2001) ............................................................. 13

*Gomez v. Toledo*,
  446 U.S. 635 (1980) ............................................................................................. 24

*Grossman v. City of Portland*,
  33 F.3d 1200 (9th Cir.1994) ............................................................................... 15

*Klein v. City of Laguna Beach,*
  810 F.3d 693 (9th Cir. 2016)...........................................................................25

*Lefemine v. Wideman,*
  568 U.S. 1 (2012)..............................................................................................25

*Long Beach Area Peace Network v. City of Long Beach,*
  574 F.3d 1011 (9th Cir. 2009).................................................................13, 15

*Md. Cas. Co. v. Pac. Coal & Oil Co.,*
  312 U.S. 270 (1941).........................................................................................13

*Monroe v. Pape,*
  365 U.S. 167 (1961).........................................................................................24

*Monell v. New York City Dept. of Social Services,*
  ,436 U.S. 658, 695–701 (1978)).....................................................................24

*Newman v. Piggie Park Enterprises Inc.,*
  390 U.S. 400 (1968).........................................................................................25

*Parratt v. Taylor,*
  451 U.S. ...........................................................................................................25

*Shell Gulf of Mexico Inc. v. Center for Biological Diversity, Inc.*
  771 F.3d 632 (9th Cir. 2014)...........................................................................13

*Shuttlesworth v. City of Birmingham,*
  394 U.S. 147 (1969).........................................................................................15

*Snyder v. Phelps,*
  562 U.S. 443 (2011).........................................................................................13

*Teitelbaum v. Sorenson,*
  648 F.2d 1248 (9th Cir.1981)..........................................................................25

*Texas v. Johnson,*
  491 U.S. 397 (1989) ..........................................................................................1

*United States v. Baugh,*
  187 F.3d 1037 (9th Cir. 1999).........................................................................13

*United States v. Classic,*
  313 U.S. 299 (1941).........................................................................................24

*United States v. Grace,*
  461 U.S. 171 (1983).........................................................................................13

*Vivid Entertainment, LLC v. Fielding,*
  965 F.Supp.2d 1113 (C.D. Cal. 2013)...........................................14, 15, 17, 18

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ................................................................................... 23

*Weaver v. City of Montebello,*
    370 F.Supp.3d 1130 (C.D. Cal. 2019) ...................................................... 16

*West v. Atkins,*
    487 U.S. 42 (1988) ..................................................................................... 24

**Federal Statutes**

28 U.S.C.§ 2201(a) ........................................................................................... 12

42 U.S.C.§ 1983 ......................................................................................... 24, 25

**California Statutes**

Cal. Pen. Code § 313 ........................................................................................ 11

Cal. Pen. Code § 23650 ...................................................................................... 5

Cal. Pen. Code § 26375 ............................................................................ 5, 6, 23

Cal. Pen. Code § 26405 .................................................................................. 6, 23

Cal. Pen. Code § 26500 ...................................................................................... 5

Cal. Pen. Code § 29500 ...................................................................................... 6

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CITY OF MENLO PARK AND
BERTINI

1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2    "If there is a bedrock principle underlying the First Amendment, it is that the government

3  may not prohibit the expression of an idea simply because society finds the idea itself offensive or

4  disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

5  **I.      INTRODUCTION**

6    The Court should grant summary judgment in favor of Plaintiff Michael Zeleny ("Zeleny")

7  on a single, narrow issue, which is dispositive of his claims against the City of Menlo Park (the

8  "City") and Chief Dave Bertini ("Bertini").  The City's policies for issuing film permits and Special

9  Events permits do not pass constitutional muster, either facially or as applied to Zeleny.  There is no

10  dispute of fact.  The relevant facts are confirmed by the policies themselves, the public record of

11  Zeleny's permitting process, and Bertini's testimony as the City's Rule 30(b)(6) designee.

12    This case arises from Zeleny's exercise of his First Amendment rights in protesting against

13  New Enterprise Associates ("NEA"), a prominent venture capital firm based in Menlo Park.  He

14  protests NEA for its financial backing of a Silicon Valley executive, Min Zhu, known to NEA to

15  have been credibly accused of being an incestuous child rapist.

16    NEA took Min Zhu's company, WebEx, public.  It also funded other ventures of Min Zhu's.

17  Zeleny sought to protest NEA's collaboration with a character as vile as Min Zhu regarding publicly

18  traded companies.  To draw attention to his protests and thereby amplify his message, Zeleny

19  combined the exercise of his First Amendment rights with the exercise of his Second Amendment

20  rights: he displayed lawful, unloaded firearms while demonstrating near NEA's headquarters with

21  placards denouncing NEA.  Zeleny videoed himself protesting, and uploaded the videos to the

22  Internet.  In the course of his protests, at all times Zeleny sought to comply with all laws.  Despite

23  Zeleny's Constitutional rights, and his cooperation at all times with law enforcement, the City

24  nevertheless stifled his protests to protect an important constituent, NEA.

25    As pertinent here, Zeleny applied for permits from the City to confirm the time, place, and

26  manner of his protests.  He sought a film permit and a Special Events permit.  The City arbitrarily

27  denied his permit applications.  The City lacked required clear guidelines or procedures for either

28  permit.  Both were left to the unbridled discretion of local authorities.  Nothing in the permitting

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CITY OF MENLO PARK AND
BERTINI

process provided Zeleny with neutral, non-arbitrary standards to ensure that permits were issued without regard to content discrimination.

Rather than process Zeleny's applications in the ordinary course—as it does for scores of applications each year—the City stifled Zeleny's protests under the guise of bureaucratic red tape. The City gave Zeleny the run-around for years. It failed to follow its own policies. Worse, it denied Zeleny's applications on content-based grounds, all while working with the target of Zeleny's protests, NEA. This is the opposite of the objective, content-neutral process required by law.

On this motion, the Court only needs to decide whether the permitting process itself was unconstitutional. The Ninth Circuit's recent decision in *Epona, LLC v. County of Ventura*, 876 F.3d 1214 (9th Cir. 2017) is controlling. Under *Epona*, to pass constitutional scrutiny, a permitting process must apply **objective**, **definite**, and **content-neutral** criteria, and it must have fixed time limits. These safeguards are essential to prevent a facially neutral process from being used as a subterfuge for content-based discrimination. Permitting decisions cannot be left to the unbridled discretion of permitting authorities precisely to prevent the infringement on Constitutional liberties that the City perpetrated here against Zeleny.

Both of the City's permitting processes fall woefully short of the *Epona* standard.

City policy is clear that Special Events permits are issued "at the discretion of the Special Events permit Committee." The only formal "criteria" for a decision are in a one-paragraph "FAQ" on the City's website. The "FAQ" includes a set of potential, amorphous factors, such as "community impact," "intended use," and "past experience." The City can and does consider other factors as it sees fit. It is not required to make an evidentiary showing or identify specific findings. Indeed, the City has discretion to decide whether an event is "special" enough even to be considered in the first place. It also has discretion to add new criteria on an *ad hoc* basis. A policy that allows authorities to make up the rules as they go along is not constitutional as a matter of law.

Even if the City's amorphous policy for Special Events permits somehow passed muster, it is hard science compared to the policy for film permits. There is literally no governing standard. Permitting decisions are "*completely discretionary.*" The closest the City comes to a standard— according to a two-page flyer it gives to applicants—is that applicants must follow the law and the

"guidance of City supervisory employees." There are also no time limits—the City has been sitting on Zeleny's film permit application since 2017.

Worst of all, the City failed to follow even the illusory procedures it does proclaim when processing Zeleny's applications. It made up an entirely new process from whole cloth, specially for him. Bertini and the City Attorney, who ordinarily have no involvement, intercepted Zeleny's applications and denied them—all while Bertini was working with NEA to develop a "combined response" to Zeleny's events. The City ignored its own interactive process, circumvented the normal decisionmaker, and ruled based on grounds nowhere in its policy. Bertini later revealed that the denial was based on the content of Zeleny's protests against NEA, which the City and Bertini deemed *potentially* "obscene" and "pornographic."

The City's policies do not comport with *Epona*. Even if they did, the City and Bertini failed to follow them. None of these facts are disputed. Summary judgment is appropriate.

## II.   STATEMENT OF UNDISPUTED FACTS

Zeleny is a published author, an internationally renowned blogger, an accomplished scholar in logic, history, literature, and technology, and an independent performance artist and film-maker. Declaration of Michael Zeleny ("Zeleny Decl.") ¶ 2. He is also a historian and author on firearms history and design. *Id.*

### A.   Zeleny's Protests Against NEA.

Since 2004, Zeleny has been protesting Min Zhu based on credible allegations by his victim, and never denied anywhere, that Min Zhu raped his then-teenaged daughter repeatedly over a period of six weeks. Zeleny has also protested Min Zhu's financial backer, NEA, for its ongoing support of Min Zhu. His protests seek to expose Min Zhu's misconduct and NEA's financial backing of Min Zhu despite its knowledge of Min Zhu's conduct. *Id.* at ¶ 4.

Zeleny started protesting outside of NEA's headquarters in Menlo Park in 2008. *Id.* at ¶ 11. His protests were intentionally provocative. In addition to signs, placards, and flyers, Zeleny used videos and explicit (though non-obscene) images. To further draw attention to his protests, he also hired musical performers, and offered free food to sex workers and adult industry performers "in

honor of Min Zhu".  *Id*. at ¶¶ 14-15.

During his protests, Zeleny received a series of credible death threats on behalf of Min Zhu. In order to increase the visibility of his protests, and amplify his message, Zeleny began lawfully carrying unloaded firearms, harkening to the peaceful but armed protests of the 1960s, such as the Black Panther protests.  *Id*. at ¶ 17.  *See also* Declaration of Damion Robinson ("Robinson Decl."), Ex. A, ¶¶ 28-32.[2]  In doing so, he intended to send a clear message that he will not be coerced into silence by threats from NEA and its associates.  Zeleny Decl., at ¶ 18.

Zeleny has never broken any laws in connection with his protests.  He always gave advance written notice of his plans to protest to City and police officials.  He pledged to comply with all reasonable time, place, and manner restrictions.  He always complied with all directives of law enforcement and has allowed officers to inspect his firearms at any time.  Police reports reveal that Zeleny was consistently cooperative and polite, even when officers violated written protocol and imposed unnecessary restrictions.  The officers' internal reports are almost comical in noting Zeleny's courtesy and cooperation, and the officers' confoundment at trying to find something wrong in what Zeleny was doing.  Zeleny Decl., ¶¶ 20-22; Robinson Decl., Ex. B at ¶ 13; *id.*, Ex. H; *see also* Robinson Decl., Ex. E at p. 186; Ex. F at p. 290.

### 1.    NEA and the City Stop Zeleny from Protesting.

In 2010, NEA enlisted the Menlo Park Police Department ("MPPD") to stop Zeleny's protests.  Robinson Decl., Exs. I, J.  The City worked with NEA to find a "firm solution" to his protests.  *Id*., Ex. K at MP-93.  The City has maintained constant contact with NEA regarding Zeleny's protests, which it characterizes as a "very touchy and political" issue.  *Id*., Ex. L.

In its efforts to develop a "firm solution," the City violated its own written policies.  Policy provides that the MPPD must not "unreasonably interfere with, harass, intimidate or discriminate against persons engaged in the lawful exercise of their [First Amendment] rights."  *Id*., Ex. M. Among other things, City policy prohibits the police from engaging protestors in discussions about

---

[2] The City acknowledges that Zeleny's carrying of firearms is an expressive part of his protest, akin to "open carry" advocates.  Robinson Decl., Ex. E at p. 57.

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CITY OF MENLO PARK AND BERTINI

1   the subject of their protests, "harass[ing], contront[ing], or intimidat[ing]" participants, or keeping

2   surveillance on participants "unless such information directly relates to an investigation of criminal

3   activities" and the police have "reasonable suspicion" of a crime. *Id.*

4          The City violated each of these policies.  MPPD officers repeatedly engaged Zeleny in

5   discussions about the subject matter of his protests and his motivations. *Id.*, Ex. O; *see also* Zeleny

6   Decl. ¶¶ 20-21.  They approached and questioned Zeleny's supporters about their affiliation with

7   Zeleny and support of him.  Robinson Decl., Exs. O, P.   To this day, Chief Bertini maintains a

8   "Zeleny file" in his office with surveillance on Zeleny collected by the MPPD *and private*

9   *contractors engaged by NEA to follow Zeleny.*  *Id*. at Ex. F at pp. 271-72.  Bertini has no reasonable

10  suspicion of a crime.  *Id*. at pp. 289-90.

11         The City's efforts to stop Zeleny's protests culminated in a false prosecution in 2012.

12  Zeleny Decl. ¶¶ 24-30.  At the instance of the City and NEA, the San Mateo County District

13  Attorney explored prosecuting Zeleny for openly carrying a firearm before realizing that it could

14  not establish the elements of that crime, whereupon it prosecuted Zeleny instead for "concealed"

15  carry of the very same firearm.  *Id*. & Ex. 2 at pp. 15-16.  Zeleny was carrying the firearm openly in

16  a belt holster on his hip.[3]   The court acquitted Zeleny after a bench trial.  Zeleny Decl., Ex. 4.

17                    **2.      California Enacts Its "Open Carry" Bans.**

18         In 2012, California banned the "open carry" of unloaded firearms.  Cal. Pen. Code §

19  23650(a)(1)(A) and (B); Cal. Penal Code § 26500(a)(1) and (2).  Zeleny's protests were used to

20  support the new legislation.  Robinson Decl., Ex. K at MP-93.  On their face, these laws would

21  prohibit Zeleny from openly carrying unloaded firearms during his protests, directly infringing his

22  freedom of speech and violating historical tradition.

23         Both statutes provide for exceptions, including the carrying of firearms "by an authorized

24  participant in [...] a motion picture, television or video production, or entertainment event, when the

25  participant lawfully uses the [firearm] as part of that production or event."  Cal. Pen. Code § 26375;

26

27  _____
    [3] The same officer who referred the matter for prosecution was recorded at the time saying that the
    firearm was <u>not</u> concealed.  Zeleny Decl., Ex. 2 at pp. 15-16.

28

Cal. Penal Code § 26405(r).  No definitions of any of these terms were provided in the statutory scheme.  The City interprets these ill-defined exceptions to require Zeleny to obtain either a Special Events permit or else a film permit from the City, which turn out to be constantly moving targets.

### 3.    The City Employs a Sham Permit Process to Stymie Zeleny.

After being acquitted of the City's false charge of concealed carry, Zeleny sought to resume his protests.  Zeleny Decl. ¶ 34.  The City asserted that if he carried unloaded firearms without a city-issued permit, he would be subject to prosecution for violating the open carry statutes.  Robinson Decl., Ex. E at pp. 18-19.  The City and Bertini claimed that for Zeleny to fall within the video production or entertainment exceptions, the City would have to approve his activities by issuing a Special Events or film permit.  *Id*. at pp. 85-86; *see also* Ex. Q.[4]

This interpretation created a Catch-22.  According to the City, for Zeleny to be an "authorized participant," Zeleny had to obtain a City permit; but Zeleny could not get a permit if his purpose was to carry a firearm, because that would violate the statute whose exception Zeleny was trying to qualify for.  Zeleny Decl., Ex. 8 at pp. 20-21, 34, 49.

### a.    The City's Permitting Process Has No Objective Criteria.

The City has no set criteria for issuance or denial of permits, granting unbridled discretion to City bureaucrats.  Robinson Decl., Exs. R, U.

A Special Events permit is required for any event that will (a) have attendance of more than 150 people in an outdoor public space, (b) use any street or sidewalk, require street closures, or impact traffic; (c) exceed the City noise ordinance; (d) generate a crowd of spectators that will obstruct vehicle or pedestrian traffic; (e) constitute a "Community Event[]"; or (f) require Police presence.  Robinson Decl., Ex. R.  According to the City, before issuing a permit, the City must determine whether the event is "special by its very nature."  *Id*.; Ex. E at pp. 19-20.

---

[4] In recent discovery, the State now interprets the statutory language "an individual who has a valid 'entertainment firearms permit' issued pursuant to Penal Code § 29500 means an 'authorized participant' within the meaning of Penal Code §§26375 and 26405(r) for the narrow purpose of having a defense against a prosecution of open carry laws."  Robinson Decl., ¶¶ 28, 29; Exs. DD, EE.  The State's interpretation is circular, and yet it cannot be squared with the City's interpretation.

1    The City has no objective standards for granting or denying a permit.  Its entire permitting

2    policy is a two-page flowchart, a short "FAQ," and a web-page covering the same information.

3    Robinson Decl., Exs. R, S, T; E at pp. 19-21.  These materials make explicit: "Determination of the

4    approval or denial of any application *is at the discretion of the Special Events permit Committee*."

5    Robinson Decl., Ex. R. at MP-1820.

6        The only official factors governing the decision are a one-paragraph "FAQ," including a non-

7    exhaustive list under the heading "what would cause a permit to get denied?"

8        Approval or denial of applications are based upon several factors including: size
     (number of people), scale, location, route to be closed, *community impact*, impact on
9        City services, *past practices/experiences* with issued permits, *intended use*, non-
     payment of fees, *poor articulation of event* as reflected in the application and site
10       map, etc.

11   *Id.*  The City provides no additional guidance.  Bertini, testifying as the City's Rule 30(b)(6)

12   designee, confirmed that the City also considers other factors, which are not written down or

13   otherwise disclosed.  Robinson Decl., Ex. E at p. 21; Ex. G at 74-83.  Permit applications are

14   decided *ad hoc* using these and other subjective, abstract criteria invented on a case-by-case basis by

15   the permitting authorities.  *Id.*, Ex. E at pp. 19-21; Ex. F at pp. 369-70; Ex. G at pp. 74-83.

16       The process for film permits is even less objectively defined by neutral and stated criteria.

17   The entire City policy consists of a two-page flyer.  *See* Robinson Decl., Ex. U.  According to the

18   City, grant or denial is "completely discretionary."  Zeleny Decl., Ex. 9 at p. 36.  There are no

19   published criteria.  The closest the City comes is a requirement that applicants comply with "all City

20   Ordinances, rules and the guidance of City supervisory employees."  Robinson Decl., Ex. U; *see also*

21   Ex. F at p. 488.  No elaboration on the type of "guidance" is provided.  The City has no other

22   policies.  *Id.*

23       Consistent with the lack of objective standards, the City refused to tell Zeleny what standard

24   governed its permitting processes.  Zeleny Decl. ¶ 37.  It declined to tell him what lawful time,

25   place, or manner restrictions would apply despite multiple requests.  *See, e.g.*, Zeleny Decl. ¶ 37 &

26   Exs. 7, 8 at pp. 24, 46; *id.*, Ex. 11, 13.  It refused to tell Zeleny what he needed to do for his permit

27   to be approved, while serially denying his permit applications, at least in part, because it deemed

28   them "incomplete".  Zeleny Decl., Ex. 8 at pp. 20-21.

1

**b.      The City Circumvents Its Special Event Process.**

2        Zeleny applied for both a Special Events permit and a film permit from the City.  He began

3   the process in July 2015.  Zeleny Decl., Ex. 6.  The City finally denied his Special Event application

4   in September 2017.  *Id.*, Ex. 10.  It has not yet acted on his film permit application, which he filed in

5   2017.  *Id.*, Exs. 11.  The City concedes this point in its Motion for Summary Judgement.

6                              **i.      Bertini and the City Attorney Take Over the Permitting**

7                                   **Process and Unilaterally Deny the Application.**

8        The City's purported policy required a review of permit applications by a representative of

9   the Community Services Department, and then by a Special Events Permit Committee, including

10  representatives of various departments.  Robinson Decl., Ex. S.  At the time of Zeleny's application,

11  the representative of the MPPD was Sergeant Matt Ortega.  *Id.*; Ex. E at p. 49; Ex. G at p. 39.

12  Bertini was not on the committee, nor was the City Attorney.  *Id.*

13       Nonetheless, the Community Services Department addressed Zeleny's application to

14  Bertini, who then handled it with the City Attorney.  *Id.*, Ex. E at pp. 50-51; Ex. G at p. 154; *see*

15  *also* Robinson Decl., Ex. V ("Do not reply and stand by for our response").  Rather than submit the

16  application to the committee, Bertini and the City Attorney denied it.  *Id.*, Ex. F at p. 372; Ex. G at

17  p. 154.  Within days of receiving the application—before even confirming receipt, as policy

18  required—Bertini emailed *NEA* that the City "intend[ed] to deny [the] application on several

19  grounds (predominately that this is not a "special event" as defined by the City)."  Robinson Decl.,

20  Ex. W.  In short, the City completely disregarded its purported protocol, and communicated through

21  a back channel with NEA as if NEA were being protected by the City against Zeleny's exercise of

22  his Constitutional rights.

23       Bertini stated that the City planned to request more information from Zeleny before it

24  notified him of its decision.  *Id.*  The City failed to follow its published interactive process in

25  seeking this information.  *Id.*, Ex. F at pp. 376-77; Ex.G at pp. 177-78.  It declined to set up an in-

26  person meeting with Zeleny, allegedly for "Zeleny's convenience."  *Id.*  Instead, the City Attorney

27  peppered Zeleny with requests for information via email, ignored Zeleny's efforts to answer the

28  questions put to him, and then denied the application as "incomplete." Zeleny Decl. ¶ 39, Ex. 7.

1    Throughout the permitting process, the City demanded far more information from Zeleny

2    than is required from any other applicant.  For example, the City demanded that Zeleny provide,

3    among other things, (i) make and model of his generators; (ii) specific layout of his equipment; (iii)

4    specific types of screens he intends to use; (iv) specific graphics (even though the City claims the

5    process is "content-neutral"); (v) the identity of participants in his events; (vi) the serial numbers of

6    Zeleny's firearms and "who will be supplying them"; and (vii) "pictures of what props" Zeleny

7    proposes.  Zeleny Decl., Ex. 7 at pp. 33-34; *id.*, Exs. 11, 13; Robinson Decl., Ex. Q at MP-1384 to

8    1385.  The City does not request this information from anyone else.  None of this information relates

9    to the City's published criteria for granting or denying a permit.[5]

10              **ii.        The Kafkaesque Review Process.**

11    City policy requires a decision by the Special Events Permit Committee.  Robinson Decl.,

12    Ex. S.  On September 21, 2015, the City Attorney denied Zeleny's application without input from

13    the committee.  *See* Zeleny Decl., Ex. 8 at pp. 20-21; Robinson Decl. Ex. G at p. 154.  The City now

14    claims that the City Attorney has authority to grant or deny any permit application—although this

15    authority is not codified and is inconsistent with written policy.  Robinson Decl., Ex. F at p. 448.

16    The City Attorney denied Zeleny's application, among other reasons, based on the

17    conclusion that Zeleny's event "is not an event that meets the City's definition of a special event"

18    because it is not a "community-type event."  Zeleny Decl., Ex. 8 at p. 21.  The City Attorney also

19    concluded that "it is illegal to open carry a firearm in the State of California. …. [T]here does not

20    appear to be any logical nexus or legitimate purpose of carrying a firearm."  *Id.*  The decision did

21    not cite any of the factors in the FAQ, make any findings on them, or present any evidence of

22    impact.  *Id.*; *see also* Zeleny Decl., Ex. 9 at p. 12.

23    Bertini has since conceded in his deposition that Zeleny's event plainly meets the City's

24    official definition of a "special event" on multiple grounds.  Robinson Decl., Ex F at p. 387.

25

26    [5] In contrast, the City granted the producers of the television show "Billions" a permit to film on the same stretch of Sand Hill Road as Zeleny sought to protest.  The producers proposed driving a 30-foot camera rig up and down the street.  The City issued a film permit eight days after the producers

27    requested it, with less documentation than that requested of Zeleny.  Robinson Decl., Ex. Y.

28

- 9 -

After the initial denial, the City rejected Zeleny application at various levels of review through an appeal process that the City apparently made up as it went along.  *See generally* Zeleny Decl., Ex. 8; Robinson Decl., Ex. F at pp. 430-434.  Rather than simply grant or deny Zeleny's application, the City delayed and circumvented its own processes, causing the appeal process to take **two years**.  Zeleny Decl., Ex. 10.  The City Attorney deemed Zeleny's appeal as a new application and proceeded to deny the "new" application.  *Id.*, Ex. 8 at pp. 25-35.  When Zeleny sought to appeal the denial of his "new" application, Bertini repeatedly delayed the hearing.  He first delayed Zeleny's appeal while asking the California Department of Justice to revoke Zeleny's Entertainment Firearms Permit.  Robinson Decl., Ex. Z.  When the DOJ would not, Bertini simply deferred the hearing until after Zeleny's permit expired.  *Id.*

The City has offered a shifting series of excuses for the refusal to issue a permit.  In addition to falsely claiming that Zeleny's event does not meet the definition of a "Special Event," it has also denied the application, finding that Zeleny "does not need" a permit to conduct his protests, and that a permit is unavailable, but that carrying firearms without a permit is illegal.  Zeleny Decl., Ex. 8 at pp. 10-11, 20-21, 33-34, 49.

At no point in this process has the City made any findings on the published factors listed in the "FAQ" or presented any evidence of impact.  Instead, during the appellate process, the City confirmed that "[d]etermination of the approval or denial of any application is at the discretion of the Special Events permit Committee." Zeleny Decl., Ex. 8 at p. 41.

### c.     The City Shelves the Film Permit Application for Three Years.

Unable to secure a Special Events permit, at the City's suggestion, Zeleny also applied for a film permit.  Zeleny Decl., Exs. 11, 12.  Once again, the City circumvented its own processes.

Bertini is not ordinarily involved in the film-permitting process.  Nonetheless, in Zeleny's case he made an exception and took it upon himself to contact and meet with the City staff responsible for film permits.  Robinson Decl., Exs. AA, BB.  Rather than process the application in the ordinary course, once again, Bertini and the City Attorney took charge of the application themselves.  *Id.*; Zeleny Decl., Exs. 11, 13.

1    And, once again, the City Attorney demanded a host of irrelevant, content-based

2    information that is not requested of other applicants—*e.g.*, the names of Zeleny's cast and crew, the

3    people who supplied him with firearms, and the relevance of certain elements of his presentation.

4    Zeleny Decl., Ex. 13 at MP-1425 to 1426.  When Zeleny declined to provide irrelevant content-

5    related information, the City decided not to move forward.  *Id.*  The City ignored Zeleny's requests

6    to address appropriate time, place, and manner requirements.  Zeleny Decl., Exs. 11 at MP-1317,

7    1320, Ex. 13 at MP-1415, 1420,

8    The City has refused to process Zeleny's film permit application to this day.  According to

9    the City, that application is still under review.

### 4. The Permitting Process is a Subterfuge for Content Discrimination.

11    In public meetings, Bertini confirmed that the permitting process was not content-neutral as

12    applied to Zeleny.  He urged the City Manager and the City Council to affirm the denial because the

13    imagery Zeleny used could be deemed "harmful" or "obscene as to minors."  Robinson Decl., Ex. F

14    at pp. 472-73.  Zeleny Decl., Ex. 9 at pp. 6, 8, 9; *id.*, Ex. 8 at 33-34 (noting "display of a

15    pornographic image along a major roadway"); *see also* Robinson Decl., Ex. CC at p. 4.[6]

16    The City admits that it *added* this item of consideration for the permitting process,

17    specifically targeting Zeleny, which has never been asked of anyone else before.  It also paid lip

18    service to content neutrality while acting on the exact opposite motivation:

19
20    Q:    I mean, was this a factor – the exact image or images, was this a factor
            that was part of the City's policy before Mr. Zeleny applied for a film
21          permit, or was it a factor that was decided upon based on the
            application he submitted?
22
23    A:    *This was a factor because of what Mr. Zeleny stated he wanted to do.*
            So because he stated he wanted to have a display with some kind of
24          images on it, from a public safety perspective, we don't care about the
            content; we couldn't care less about what it is, but we need to know
25

_____

26    [6] The City has not advanced the position that Zeleny's materials are "obscene as to minors" in this
      case for good reason.  To be obscene, material must "appeal[] to the prurient interest" and be
27    "patently offensive."  Cal. Pen. Code § 313(a).  In nearly a decade of controversy now, the City has
      never charged Zeleny under this statute.

28

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CITY OF MENLO PARK AND
BERTINI

1
2

> whether it's going to be something very distracting to drivers.
> So again, from a public safety/common-sense perspective, we wanted to know what kind of image are you displaying to people to get a reaction from them so that you can film it.

3

*Id.* Ex. F at p. 521.  In other words, Bertini admits that it added a new factor when considering

4

Zeleny's film permit based explicitly on the content of Zeleny's protests.

5

Bertini's self-serving explanation that he "couldn't care less" about the content is

6

undermined by the record.  Bertini did not urge the City Manager or City Council to deny Zeleny's

7

application because the images created a distraction to drivers.  He did so, expressly, because he

8

believed the materials *might* be considered obscene, without actually making any such finding.  *Id.*;

9

Ex. F at pp. 472-73; *see also* Zeleny Decl., Ex. 9 at pp. 6, 8, 9.  This is a content-based rationale.

10

In fact, Bertini testified that he showed the image to the City Council and the City Manager

11

because it was "***important, salient information that the city council should know***" before making a

12

decision.  Robinson Decl., Ex. F at p. 476.  The City's decision was anything but content-neutral.

13

## III.   LEGAL STANDARD

14

A moving party is entitled to summary judgment where he can show there is no genuine issue

15

of material fact and he is entitled to judgment as a matter of law.  Fed. R. Civ. Proc. 56.  Summary

16

judgment follows where the non-moving party fails to "make a showing sufficient to establish the

17

existence of an element essential to that party's case and on which the party will bear the burden of

18

proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

19

## IV.   ARGUMENT

20
21

### A.   Zeleny is Entitled to Declaratory Relief that Defendants Violated His Constitutional Rights.

22

The City's permitting process represents an unconstitutional infringement on Zeleny's First,

23

Second, and Fourteenth Amendment rights.  He brings both a facial and an as-applied challenge to

24

the City's unconstitutional processes.  Zeleny seeks a judicial declaration regarding the scope of his

25

rights and a finding that the actions by the City and Bertini violated those rights.

26

"[A]ny court of the United States ... may declare the rights and other legal relations of any

27

interested party seeking such declaration." 28 U.S.C. § 2201(a).  This statute does not create

28

substantive rights, but expands the remedies available in federal courts. *Countrywide Home Loans,*

- 12 -

1  *Inc. v. Mortgage Guar. Ins. Corp.*, 642 F.3d 849, 853 (9th Cir.2011).  To determine whether a

2  declaratory judgment is proper, courts consider "whether the facts alleged, under all the

3  circumstances, show that there is a substantial controversy, between parties having adverse legal

4  interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md.*

5  *Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *Shell Gulf of Mexico Inc. v. Center for*

6  *Biological Diversity, Inc.* 771 F.3d 632, 635 (9th Cir. 2014).

7        Here, there is a justiciable case or controversy regarding the scope of Zeleny's constitutional

8  rights.  The City has refused and continues to refuse to grant Zeleny a permit.  There is a live

9  controversy over whether the denial of a permit is constitutionally valid, and whether the process

10  used by the City passes constitutional scrutiny.

11        **B.**    **Zeleny's Protests are Protected, First Amendment Activity.**

12        The First Amendment protects the right of individuals to peaceably protest.  The Amendment

13  provides that the government may not "abridge the freedom of speech … or the right of the people

14  peaceably to assemble."  U.S. Const. Amend 1.

15        "There is no doubt that as a general matter peaceful picketing and leafleting are expressive

16  activities involving 'speech' protected by the First Amendment."  *United States v. Grace*, 461 U.S.

17  171, 176 (1983).  *See generally Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("Speech on public

18  issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to

19  special protection.") (*quoting Connick v. Myers*, 461 U.S. 138, 145 (1983)).  Further, the First

20  Amendment "applies with particular force" to "marches and other protest activities."  *United States*

21  *v. Baugh*, 187 F.3d 1037, 1042 (9th Cir. 1999); *Long Beach Area Peace Network v. City of Long*

22  *Beach*, 574 F.3d 1011, 1021 (9th Cir. 2009) (same).

23        Zeleny's protests are constitutionally protected.  He is seeking to peaceably protest in a

24  public area about an issue of public concern—*i.e.*, the unsuitability of a senior executive of a

25  publicly traded company because of a history of child sexual abuse; and the impropriety of a

26  venture capital firm to bankroll such a person's activities despite knowledge of the allegations

27  against him.  *See, e.g.*, *Global Telemedia Int'l, Inc. v. Doe 1*, 132 F. Supp. 2d 1261, 1265 (C.D.

28  Cal. 2001) (defamation action, noting that information affecting "a publicly traded company with

- 13 -

1    many thousands of investors is of public concern"). This is core First Amendment activity.

2         **C.      The City's Permitting Process Is Facially Unconstitutional Under *Epona*.**

3         The court in *Epona* considered whether a zoning permit scheme violated the First

4    Amendment where it prevented an applicant from holding weddings on agricultural property. *Id.* at

5    1218-19. The Ninth Circuit held that a facial challenge was appropriate because the permitting

6    process had a sufficient nexus to First Amendment activity and because it vested "broad discretion"

7    in officials. *Id.* at 1221-22. It went on to find the scheme impermissibly granted "unbridled

8    discretion" because it lacked "specific and objective" criteria governing the decision. *Id.* at 1222-25.

9         *Epona* is dispositive here. The City's permitting process fails this test.

10              **1.      A Facial Challenge Is Appropriate**

11        The Supreme Court has allowed facial challenges to permitting schemes (1) where restraints

12   may have a "chilling effect on protected speech" because speakers may refrain from seeking a

13   permit or risking sanctions by not having one; and (2) "where a regulation lacks clear standards for

14   the issuance of a permit, an as-applied challenge may fail to provide sufficient protection against

15   content-based censorship." *Epona*, 876 F.3d at 1222 (*citing City of Lakewood v. Plain Dealer

16   Publ'g Co.*. 486 U.S. 750, 757-59 (1988)). Facial challenges are appropriate if a permitting scheme

17   has "a close enough nexus to expression, or to a conduct commonly associated with expression, to

18   pose a real and substantial threat that proposed speech or conduct will be suppressed." *Id.* (*quoting

19   City of Lakewood* at 759).

20        A facial challenge is appropriate here. Zeleny challenges the City's permitting process on

21   the grounds that it lacks clear standards; it gives City officials unbridled discretion sufficient to

22   suppress his speech; and an as-applied challenge alone would not provide sufficient protection.

23        Both the Special Event and the film permitting schemes have a "nexus" to First Amendment

24   activity. Filming is plainly a First Amendment activity, as is public speech. *See*, *e.g.*, *Vivid

25   Entertainment, LLC v. Fielding*, 965 F.Supp.2d 1113, 1127-30 (C.D. Cal. 2013) (granting

26   preliminary injunction against permitting process for adult films as unlawful prior restraint). The

27   City's Special Events permit process governs any public event that exceeds the sound ordinance,

28

- 14 -

uses any sidewalk or street, or generates a "crowd of spectators."  This encompasses all manner of First Amendment activity such as parades, outdoor concerts, movie showings,  rallies, weddings, or even Civil War reenactments in outdoor spaces, as the City acknowledges in its own Motion for Summary Judgment.  Robinson Decl., Ex. F at pp. 20-24 (parades); Zeleny Decl., Ex. 9 at p. 9 (defining special events as those with "any kind of music or any kind of display, or [] entertainment that would be displayed"); Robinson Decl., Ex. R at p. 3 (weddings).

### 2.    The Permitting Process Amounts to an Unlawful Prior Restraint.

Prior restraints on speech are subject to exacting scrutiny.  *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d at 1023.  A permitting process amounts to a prior restraint where it requires a permit prior to allowing the activity at issue.  *See Epona*, 875 F.3d at 1225 (treating permitting process as prior restraint); *Vivid Entertainment*, 965 F. Supp. 2d at 1127-28, 36.  The permitting processes of the City amount to prior restraints because they preclude Zeleny from engaging in his events without a permit.

"A prior restraint exists when the enjoyment of protected expression is contingent upon the approval of government officials." *Baby Tam & Co., Inc. v. City of Las Vegas*, 154 F.3d 1097, 1100 (9th Cir.1998).  Prior restraints, which suppress expression before it occurs, carry a heavy presumption of invalidity.  *Long Beach Area Peace Network*, 574 F.3d at 1023; *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990).  This is because they "are the most serious and the least tolerable infringement on First Amendment rights." *Grossman v. City of Portland*, 33 F.3d 1200, 1204 (9th Cir.1994) (*quoting Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1975)).

### a.    A Permitting Process Must Have Objective Criteria and Adequate Procedural Safeguards.

"[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without ***narrow, objective, and definite standards*** to guide the licensing authority, is unconstitutional."  *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969) (emphasis added). "[A]bsent definite and objective guiding standards, permit requirements present a 'threat of content-based, discriminatory enforcement.'"  *Epona*, 876 F.3d at 1222 (citing *G.K. Ltd. Travel v. City of*

*Lake Oswego*, 436 F.3d 1064, 1082 (9th Cir. 2006)).  In addition to having "narrow, objective, and definite standards," permitting requirements "must be sufficiently specific and objective so as to effectively place some 'limits on the authority of City officials to deny a permit[.]" *Id.* (quoting *Desert Outdoor Advert., Inc. v. City of Moreno Valley*, 103 F.3d 814, 819 (9th Cir. 1996) (hereinafter "*Moreno Valley*")).

If a permitting process grants officials "an impermissible degree of discretion, then the regulation fails to qualify as a valid time, place, and manner restriction on speech." *Epona*, 876 F.3d at 1222 (*quoting Kaahuma*, 682 F.3d at 806-7).  A scheme granting excess discretion is not content neutral as a matter of law because it allows for content-based decision making. *Id.* at 1225.

The process must also have procedural safeguards to "ensure expeditious decision making":

> (1) any prior restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of proof once in court.

*Weaver v. City of Montebello*, 370 F.Supp.3d 1130, 1136 (C.D. Cal. 2019) (*quoting FW/PBS, Inc.* 493 U.S. at 215).  The process must have definite time limits.  "A law that fails to confine the time within which the licensor must make a decision contains the same vice as a statute delegating excessive administrative discretion." *FW/PBS, Inc.* at 226-27.

### b.    The City "Special Events" Permitting Process Lacks Objective or Definite Standards.

As the City's written materials establish, the decision to grant or deny a Special Events Permit rests entirely within the "discretion of the Special Events permit Committee."  There are no meaningful limits on this discretion, nor appropriate procedural safeguards.

### i.    No Objective Criteria for Grant or Denial.

As *Epona* makes clear, the touchstone of a valid permitting process is "narrow, objective, and definite standards."  876 F.3d at 1222 (quoting *Shuttlesworth*, 394 U.S. at 150-51).  The City has none.  Its published policy contains a vague, non-exhaustive list of *potential* factors that "could" result in a denial in the exercise of City discretion:

size (number of people), scale, location, route to be closed, community impact,

- 16 -

impact on City services, past practices/experiences with issued permits, intended use, non-payment of fees, poor articulation of event as reflected in the application and site map, *etc.*

Robinson Decl., Ex. R. at p. 2.  None of these factors are subject to definite standards.

Although some of the factors are phrased in somewhat objective terms—*e.g.*, number of people, scale, location—the City provides no objective standards for assessing them—*e.g.*, how many people, what locations are appropriate, what routes may be closed, and what types or level of impact on City services are necessary to deny a permit.  *See Vivid Entertainment*, 965 F.Supp.2d at 1130 (finding impermissible, unbridled discretion where statute allowed permit revocation based on potential for transmission of disease without "guidance as to what types of diseases or what types of transmission").  Nor are there any set criteria for assessing or quantifying these factors, which are all assessed case-by-case.  Robinson Decl., Ex. F at pp. 369-70.  The City is not required to offer evidence of a public impact, nor to make express findings on the factors.  *See* Zeleny Decl., Ex. 9 at p. 12; *see also Moreno Valley*, 103 F.3d at 818 (finding process unconstitutional where it lacked definitive standards and allowed officials to "deny a permit without offering any evidence to support the conclusion" as to public impact); *Epona*, 876 F.3d at 1224 (expressing concern with abstract standard combined with "the lack of a requirement that permitting officials support their decision with objective evidence") (citing *Moreno Valley*).

The City's remaining factors do not even purport to be objective—*i.e.*, "community impact," "intended use" (without elaboration), "past practices/experiences," and "poor articulation." These are exactly the types of "ambiguous and subjective" factors the Ninth Circuit has found impermissible.  *Moreno Valley*, 103 F.3d at 818 (reversing summary judgment in favor of city and directing summary judgment in favor of plaintiff).  The Ninth Circuit has consistently struck down permitting schemes that included similarly amorphous criteria such as "harmful effect upon the health or welfare of the general public." *Epona*, 876 F.3d at 1224; *Moreno Valley*, 103 F.3d at 818 ("will not be detrimental to the aesthetic quality of the community"); *see also Vivid Entertainment*, 965 F.Supp.3d at 1129 ("unnamed, undescribed 'standards affecting public health.'")  There is no difference between this and and the City's amorphous factors.  A permitting policy that allows an official to deny an application based on general "community impact," "intended use," or "past

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CITY OF MENLO PARK AND BERTINI

1  practice/experience" does not limit discretion.[7]

2              **ii.      Ability to Add Factors *Ad Hoc*.**

3          In addition to the vague published factors, the City has made clear, both in its "FAQ" and in

4  this case, that it also considers factors not on this list.  *Id*., Ex. E at p. 21; Ex. G. at 104-105, 202.

5  Not only does each City department have its own unwritten factors, but the City has allowed itself to

6  add new factors for consideration depending on the application itself.  *Id.*

7          Bertini testified that the City routinely considers factors beyond those listed in the policy:

8       Q.     In granting or denying special event permits, is the City allowed to consider
               factors outside of the specific written policy?
9
        A.     Time, manner, place.
10
        Q.     Is it permitted to consider time, manner and place requirements outside of
11             the written policy?

12      A.     Yes.

13  *Id*. Ex. F at pp. 426-27.  He confirmed a lack of written, objective standards that would govern, or

14  even inform, the inquiry, other than general compliance with applicable laws and ordinances.  *Id*.

15  Intoning the magic words "time, place, manner" does not render the permitting process

16  constitutional in the absence of objective standards for time, place, or manner.

17          Bertini could not specify any objective standard even under his self-serving rubric.  *Id*. Ex. F

18  at p. 242.  There are: (i) no set time limits for special events or even written guidance on how to set

19  limits; (ii) no written schedule of hours where special events are allowed; and (iii) no unwritten

20  policy about limits.  *Id*. Ex. F at pp. 241-42. With respect to "manner," Bertini pointed to the

21  references in the application to sanitation and crowd control, but again reverted to a "case-by-case"

22  decision.  *Id*. at pp. 246-47.  The City also has no set criteria for the "place" or location of special

23  events—but allowed other applicants to operate in the same place Zeleny sought to.  *Id*. at p. 491.

24  _____

25  [7] The *Epona* court emphasized that abstract standards could be salvaged if they were subject to more
    definitive official guidance, but the City has none here.  876 F.3d at 1224 (noting that abstract
    standards "are not defend elsewhere by a limited and objective set of criteria"); id. at 1225 (noting
26  the absence of a "binding interpretation … [or] well-established practices governing the exercise of
    official discretion") (citation omitted).  Each permit is decided case by case, based on the factors the
27  decisionmaker arbitrarily chooses at the time.

28

**MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CITY OF MENLO PARK AND BERTINI**

1    The City does not even limit itself to considering "time, place, and manner" factors.  The

2    City indulges itself discretion to consider other factors it deems appropriate on an ad hoc basis, such

3    as the content of Zeleny's protests—a factor nowhere to be found in the permitting policy.  As a

4    matter of law, the permitting process cannot be governed by "definite," "objective" criteria if the

5    City gives itself discretion to add or ignore criteria arbitrarily.

6                          **iii.      Unbridled Discretion to Decide if an Event Is "Special"**

7         The City also gives itself unbridled discretion to determine whether an event constitutes a

8    "Special Event."  As Bertini testified, a Special Event includes events that are "special by their very

9    nature; they're not a normal day-to-day occurrence."  Robinson Decl., Ex. E at 19-20.  In other

10   words, the FRCP 30(b)(6) witness designated by the City defined a "special event" something that

11   was "special by [its] very nature."  This circular definition cannot possibly qualify as an objective

12   standard.  Even if it were permissible, Zeleny's protests certainly were not common.

13        When Bertini was asked to explain what the circular definition of "special" could mean, his

14   response highlighted the lack of detailed, objective standards:

15        Q:    That portion of the definition of special event relating to something that's
                special by its very nature, is that piece written down anywhere?

16        A:    No.

17        Q:    Is there any way for the public to learn of that requirement?

18        A:    If they were to apply for one or call and ask a question.

19   *Id*. Ex. E at p. 21.  Rather than apply a definite standard, a constituent wanting to know whether his

20   or her event qualified could either (i) apply for a permit (and pay a fee) to find out; or (ii) could call

21   and ask.  The response to a constituent would depend on who answered the phone call.

22        What the foregoing proves is that the City *will always have an excuse to deny a permit* based

23   on malleable factors that defy precise definition and others made up on the fly.  That is the exact

24   opposite of what the law requires, which is to put citizens on notice up front of the standards

25   governing the exercise of their constitutional rights.  The City's process is unconstitutional.

26                          **iv.      No Definitive Time Limits.**

27        Bertini also confirmed that there is no mandatory time frame for the City to accept or deny a

28   special event permit.

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CITY OF MENLO PARK AND
BERTINI

1

Q:     Is there a standard time limit in place for approval or denial of a special events permit?

2

A:     There is a general timeline in place, but, again, as I think I've testified before, that would depend on the specific situation and the specific application that's being contemplated.

3

4

Q:     Is there any – is there any mandatory time limit on how long it takes to process a special event application?

5

A.     Not that I am aware of.

6

7

*Id*. Ex. F at p. 247; *see also* Ex. G at 75.  The lack of fixed time period for deciding an application

8

runs afoul of Supreme Court precedent.  *FW/PBS, Inc.* at 226-27; *Epona*, 876 F.3d at 1225-26.

9

**c.     The City Film Permitting Process Lacks any Objective or Definite Standards and Has No Time Limit.**

10

11

Even if the City's purported policies for a Special Events permit satisfied *Epona*, and they do

12

not, the film permit process is worse.  To the extent that the City has any "policy," that policy has no

13

standard for grant or denial, and is "completely discretionary."  Zeleny Decl., Ex. 9 at p. 36.

14

The "policy" consists entirely of two pages.  Robinson Decl., Ex. U.  Bertini confirmed that

15

there are no other "written policies, procedures, or guidelines in the City of Menlo Park about

16

issuing film permits," nor any unwritten policies other than generally-applicable law. Robinson

17

Decl., Ex. F at pp. 480-82.   The two pages describe what written submissions and other

18

arrangements have to be made, such as insurance, notice to neighbors, and indemnification.

19

Robinson Decl., Ex. U.  Not a single substantive criterion governing the decision is mentioned.

20

Nor are there any specified procedures for handling an application.  Indeed, the City

21

apparently made up the procedures in response to Zeleny's application.  Robinson Decl., Ex. BB.

22

A permitting process that provides no guidance to the decisionmaker cannot possibly pass

23

muster.  There are no objective or definite standards—there are no standards at all.  Precedent

24

requires standards that are "sufficiently specific and objective so as to effectively place some 'limits

25

on the authority of City officials[.]"  *Epona*, 876 F.3d at 1126.

26

Finally, nowhere in the two-page film permit guidance is any mention of any time limit for a

27

decision.  As Bertini confirmed:

28

Q:     Does the City have a set time frame for approval or denial of film permits?

A:     Not that I am aware of.

- 20 -

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CITY OF MENLO PARK AND BERTINI

1  *Id.* Ex. F at p. 495.  As noted above, "[a] law that fails to confine the time within which the licensor
2  must make a decision contains the same vice as a statute delegating excessive administrative
3  discretion."  *FW/PBS, Inc.* at 226-27.  The City's process fails this critical test as well.

### D.    Defendants Have Violated Zeleny's Constitutional Rights as Applied.

#### 1.    The City Failed to Follow Its Own Permitting Guidelines, Specifically Targeting Zeleny.

7       Assuming solely for the sake of argument that the City's permitting process *facially*
8  complied with minimal constitutional standards, the permitting process was unconstitutional as
9  applied to Zeleny.  The City failed to follow its purported process.  Its handling of Zeleny's
10 applications bears out the very concerns expressed in *Epona* and similar cases—*i.e.*, the use of a
11 permitting process to facilitate content-based discrimination.

##### a.    The City Circumvented Its Own Published Procedures.

13      The City utterly ignored its purported procedures when handling Zeleny's application – *ie.*,
14 initial review by the Community Services Department, followed by a decision from the Special
15 Events Permit Committee.  Robinson Decl., Ex. S.  The City followed none of these written
16 procedures in Zeleny's case.
17      Rather than forward Zeleny's application to the committee as required, the Community
18 Services representative, Matt Milde ("Milde"), let Bertini and the City Attorney handle it.  *Id.* Ex. E
19 at p. 51; Ex. G. at 38, 53-54, 104.  Bertini forwarded it to the City Manager and City Attorney and
20 the three made the decision.  Zeleny's application was ***the only one*** Bertini ever forwarded to the
21 City Manager and City Attorney.  *Id.*, Ex. E at p. 51.
22      As Milde confirmed, this process was applicable to Zeleny only.  The City had no procedure
23 for "processing an application the way [it] decided to do" with Zeleny's.  *Id.*, Ex. G at 150.
24      The Special Events Committee never made a decision.  Instead, the City Attorney's office
25 unilaterally denied Zeleny's application:

26   Q:    At some point, the City determined that Mr. Zeleny's permit didn't qualify as
27         a special event, correct?
     A:    Correct.
28   Q:    Who made that determination for the City?

- 21 -

A:      That was the city attorney's office.

*Id*. Ex. F at p. 372.  Bertini was unaware of any other application decided by the City Attorney, who has no role in the process under written policy.  *Id*.

Rather than engage in the information gathering process as policy required, the City cozied up to the target of Zeleny's protests.  Eleven days after receiving Zeleny's application, Bertini forwarded Zeleny's application to NEA.  Robinson Decl., Ex. W.  Far from seeking input or help with the deliberative process, Bertini let NEA know that denial was a foregone conclusion:

> Although we intend to deny this application on several grounds (predominantly that this is not a "special event" as defined by the City), we are in the process of requesting more information from him on the exact location he was intending as it was not clear on his application.  Once we have gone through the formal information gathering process, we will notify him of our decision on his application.

*Id*.  The City had **already decided to deny Zeleny's application** before it had even gone through the information gathering process—or even confirmed receipt of the application.  *Id*.

During his deposition, Bertini tried to walk back his email, claiming that the denial was limited to the current application and would be reevaluated if Zeleny provided additional information.  But Bertini's after-the-fact justification for his violation of written policy, which was directed solely and personally at Zeleny, is belied by the last main paragraph of his email:

> In the meantime, I will be clearing up several legal issues with the District Attorney's Office and then scheduling a meeting with entities involved (NEA, Rosewood Hotel, Menlo Park Police and City Attorney's Office, SMCO Sherriff's Office and the District Attorney's Office).  At this meeting we can discuss our combined response **in case Zeleny decides to proceed without a permit.**

*Id*. (emphasis added); *see also id.*, Ex. X at MP-309 (MPPD document noting that permit "is in the process of being denied").  Bertini made no mention of following up if the City decided to approve the application.  His language is clear.  Zeleny's application was being denied, and the City had no intention of reconsidering.  The only discussion was how to respond if Zeleny protested anyway.

**b.      The City Improperly Considered Content-Based Factors.**

Aside from circumventing the procedures dictated by City policy, the City and Bertini also expressly relied on content-based factors having no basis in written policy.  Bertini specifically argued that the City Manager and City Council should affirm the denial of Zeleny's permit because

- 22 -

1  his protests could be deemed as "harmful" to minors or "obscene as to minors."  Zeleny Decl., Ex. 9

2  at pp. 6, 8, 9.  In Bertini's PowerPoint presentation to the City Council, he included an image of one

3  of Zeleny's animations, depicting cartoons engaged in sexual activity.  Robinson Decl., Ex. CC.

4  The inclusion of the content of Zeleny's planned protests belies the City's claim that its

5  decisions were content-neutral, or that the City limited its consideration to appropriate "time, place,

6  and manner" restrictions.

7  Our cases make clear, however, that even in a public forum the government may
impose reasonable restrictions on the time, place, or manner of protected speech,

8  provided the restrictions "are justified *without reference to the content of the
regulated speech*, that they are narrowly tailored to serve a significant governmental

9  interest, and that they leave open ample alternative channels for communication of
the information."

10

11  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (*quoting Clark v. Community for Creative*

12  *Non-Violence*, 468 U.S. 288, 293 (1984)) (emphasis added).

13  Far from justifying the City's decision on content-neutral grounds, Bertini chose to include

14  the content of Zeleny's planned protests and admitted that the content was "*important, salient*

15  *information that the city council should know*."  Id., Ex. F at p. 476.  Consideration of the content

16  of Zeleny's protests renders the decision content-based.

17  **c.    The City's Failure to Have A Proper Film Permit Process Further
Specifically Harmed Zeleny.**

18

19  In addition to being unconstitutional, the city's non-existent process for issuing film permits

20  specifically harmed Zeleny and directly led to the infringement of his constitutional rights.

21  As noted above, California's Open Carry Ban contains two relevant exceptions.  Under Penal

22  Code Sections 26375 and 26405(r), the Open Carry Ban does not apply to authorized participants

23  carrying guns during the filming or production of an entertainment event.

24  The exceptions themselves are vague and do not define the principal terms, but both the City

25  and the State have acknowledged that Zeleny would qualify as an "authorized participant" if he had

26  been able to successfully obtain either a Special Event or film permit from the City.

27  Q:    I don't want to cover ground that we covered last time, but if Mr. Zeleny were
given the permit he was asking for, it would have been legal to carry the

28  firearms, correct?

- 23 -

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CITY OF MENLO PARK AND
BERTINI

A:    Well, that's the question we were trying to get answered through the Department of Justice, the district attorney's office, et cetera. Because the law is very vague, we were trying to determine whether that's true or not. *As it stands today, our reading of that exception is, yes, if he was permitted under the – under the special events or film permit, then he could openly carry weapons.*

*Id.*, Ex. F at pp. 428-29 (emphasis added). Rather than apply these statutory exceptions in protection of Zeleny's constitutional rights, Defendants used the permitting process—or lack thereof—to prevent Zeleny from exercising his rights. Bertini admitted as much:

Q:    You understood in – the City understood in denying Mr. Zeleny's permit on the grounds that his event contemplated carrying firearms, that it was denying him the permit he needed in order to legally carry the firearms, right?

A:    That was one of the factors.

*Id.*, Ex. E at p. 80. The Defendants' conduct has directly deprived Zeleny of his rights.

**E.    Zeleny Has Established That Defendants' Conduct Violated Section 1983 and He Is Entitled to Relief on his Fourth Cause of Action.**

**1.    Defendants Violated Section 1983 as a Matter of Law.**

To recover 42 U.S.C. § 1983, a plaintiff must show: (i) that a right secured by the Constitution was violated, (ii) by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). As established above, Defendants' conduct violated Zeleny's rights under the First, Second, and Fourteenth Amendments. There can be little doubt that the Defendants did so while acting under the color of state law.

***First***, as detailed above, the City violated Zeleny's constitutional rights by (a) failing to have a constitutionally adequate permitting process; and (b) by circumventing its official processes at Bertini's instance.

***Second***, there can be no dispute that the City and Bertini were acting under color of law. A person acts under color of law when he or she exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classic*, 313 U.S. 299, 326 (1941). A defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State. *Monroe v. Pape*, 365 U.S. 167, 172 (1961) (overruled in part on other grounds, *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 695–701 (1978)). Thus, generally, a public employee acts under color of state law while acting in

1   his official capacity.  *See, e.g.*, *Parratt v. Taylor*, 451 U.S. at 535–536; *Adickes v. S.H. Kress & Co.*,

2   398 U.S. 144, 152 (1970).  *See also Flagg Bros., Inc. v. Brooks*, 436 U.S., at 157, n. 5.

3        The permitting process is official policy of the City.  The permitting decisions in this case

4   were made by City officials acting in their official capacity, *i.e.*, Chief Bertini, the City Attorney, the

5   City Manager, and the City Council.  Bertini acted as a representative of City staff in handling the

6   applications in his capacity as Police Chief.  Defendants were acting under color of state law.

7            **2.**     **Zeleny Is Entitled to an Award of Nominal Damages and Attorneys' Fees**

8                       **Under Section 1983.**

9        Nominal damages are available in section 1983 actions.  "By making the deprivation of . . .

10  rights actionable for nominal damages without proof of actual injury, the law recognizes the

11  importance to organized society that those rights be scrupulously observed." *Carey v. Piphus*, 435

12  U.S. 247, 266 (1978).  Even where actual damages are not proven, nominal damages are mandated.

13  *Floyd v. Laws*, 929 F.2d 1390, 1403 (9th Cir. 1991) ("The trier of fact must award nominal damages

14  to the plaintiff "as a symbolic vindication of her constitutional right.").

15       A plaintiff who recovers nominal damages or injunctive relief is the prevailing party under

16  section 1983, entitled to fees.  *Farrar v. Hobby*, 506 U.S. 103, 112 (1992); *Lefemine v. Wideman*,

17  568 U.S. 1 (2012); *Klein v. City of Laguna Beach*, 810 F.3d 693, 699–700 (9th Cir. 2016) (holding

18  that plaintiff who recovers nominal damages but invalidates challenged ordinance is prevailing

19  party).  To act as an effective incentive for injured parties to vindicate civil rights, "fee awards

20  should be the rule rather than the exception." *Teitelbaum v. Sorenson*, 648 F.2d 1248, 1251 (9th

21  Cir.1981); *see also Newman v. Piggie Park Enterprises Inc.*, 390 U.S. 400, 402 (1968).

22       Zeleny brought this action to challenge the City's sham permitting process, which has

23  deprived him of his right to engage in constitutionally-protected activity.  Although he only seeks

24  nominal damages, as discussed above, the City's policies should be invalidated, achieving his goal.

25  Zeleny is entitled to nominal damages and fees, which he will seek by separate motion.

26  **V.**    **CONCLUSION**

27       The City lacks constitutionally adequate permitting policies.  It failed to apply those policies

28  it does have to Zeleny.  None of these facts are disputed.  Summary judgement should be granted.

Dated:  January 21, 2021

Respectfully submitted,

s/ Brian R. England
David W. Affeld
Brian R. England
Damion D. D. Robinson
Affeld Grivakes LLP

Attorneys for Plaintiff Michael Zeleny

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CITY OF MENLO PARK AND
BERTINI

1

## **PROOF OF SERVICE**

2

     I hereby certify that on January 21, 2021, I electronically filed the foregoing document

3

using the Court's CM/ECF system.  I am informed and believe that the CM/ECF system will send a notice of electronic filing to the interested parties.

4

                             s/ Gabrielle Bruckner

5

                             Gabrielle Bruckner

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CITY OF MENLO PARK AND BERTINI