David W. Affeld, State Bar No. 123922
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:    (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY,<br><br>    Plaintiff,<br><br>        vs.<br><br>GAVIN NEWSOM, *et al.*,<br><br>    Defendants. | Case No. CV 17-7357 RS<br><br><u>Assigned to:</u><br>The Honorable Richard G. Seeborg<br><br><u>Discovery Matters:</u><br>The Honorable Thomas S. Hixson<br><br>**DECLARATION OF DAMION ROBINSON IN SUPPORT OF PLAINTIFF MICHAEL ZELENY'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST THE CITY OF MENLO PARK AND POLICE CHIEF DAVE BERTINI**<br><br>Date:        February 25, 2021<br>Time:        1:30 p.m.<br>Courtroom: 3, 17th Floor<br><br>Action Filed:  December 28, 2017<br>Trial Date:     TBD |

ROBINSON DECL. ISO MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Damion Robinson, declare:

1.  I and my law firm are counsel of record to Plaintiff Michael Zeleny ("Zeleny"). I have personal knowledge of these facts or knowledge based on a review of the records and files of my firm regularly maintained in the ordinary course of business. I could testify competently to these facts if called upon to do so.

2.  Attached hereto and marked as **Exhibit A**, is a true and correct copy of the Expert Declaration of David Hardy.

3.  Attached hereto and marked as **Exhibit B**, is a true and correct copy of the Expert Declaration of Greg Block.

4.  Attached hereto and marked as **Exhibit C**, is a true and correct copy of the Expert Declaration of Robert Latham Brown.

5.  Attached hereto and marked as **Exhibit D**, is a true and correct copy of the Expert Declaration of Michael Tristano.

6.  Attached hereto as **Exhibit E** is a true copy of Volume I of the transcript of the deposition of Chief Dave Bertini ("Bertini") testifying in his individual capacity and as the Rule 30(b)(6) designee of the City of Menlo Park (the "City"). For completeness, Bertini's deposition transcript is submitted in full with the relevant excerpts highlighted and noted in the moving papers.

7.  Attached hereto as **Exhibit F** is a true copy of Volume II of the transcript of the deposition of Bertini, individually and as the Rule 30(b)(6) designee of the City.

8.  Attached hereto as **Exhibit G** is true copy of excerpts of the transcript of the deposition of Matt Milde taken in this matter.

9.  Attached as **Exhibit H** is a true copy of a series of police reports and "activity logs" produced in this matter by the City of Menlo Park (the "City"). As noted, certain of these reports were marked as Exhibits 46, 47, 48, and 50 to Volume I of Bertini's deposition.

10. Attached as **Exhibit I** is a true copy of an email exchange dated April 27, 2011 produced by the City in this matter.

11. Attached as **Exhibit J** is a true copy of an email exchange dated February 9, 2012 produced by the City in this matter and marked as Exhibit 54 to Volume I of Bertini's deposition.

12.     Attached as **Exhibit K** is a true copy of an email produced by the City in this matter attaching Management Staff Meeting Minutes dated April 3, 2012.  This document was marked as Exhibit 52 to Volume I of Bertini's deposition.

13.     Attached as **Exhibit L** is a true copy of an email exchange dated October 24, 2011, produced by the City in this matter, and marked as Exhibit 256 to Volume II of Bertini's deposition.

14.     Attached as **Exhibit M** is a true copy of a policy manual section entitled "First Amendment Assemblies," produced by the City in this matter and marked as Exhibit 43 to Volume I of Bertini's deposition.

15.     Attached as **Exhibit O** is a true copy of a police report dated May 24, 2012 produced by the City in this matter, and designated as Exhibit 260 to Volume II of Bertini's deposition.

16.     Attached as **Exhibit P** is a true copy of a police report dated February 9-10, 2012, produced by the City in this matter and designated as Exhibit 49 to Volume I of Bertini's deposition.

17.     Attached as **Exhibit Q** is a true copy of an email exchange dated December 7, 2017, produced by the City in this matter, and marked as Exhibit 31 to Volume I of Bertini's deposition.

18.     Attached as **Exhibits R**, **S**, and **T**, respectively, are true copies of the City's (a) Special Event Permit Application FAQs, (b) Special Event Permit Flow Chart; and (c) Special Event website in effect at the time of Zeleny's applications.  All of these documents were produced by the City in this matter and they were marked as Exhibits 33, 30, and 34, respectively, to Volume I of Bertini's deposition.

19.     Attached as **Exhibit U** is a true copy of a document entitled Film Production in Menlo Park, which was produced by the City in this matter and marked as Exhibit 35 to Volume I of Bertini's deposition.

20.     Attached as **Exhibit V** is a true copy of an email dated April 15, 2016, produced by the City in this matter, and marked as Exhibit 267 to Volume II of Bertini's deposition.

21.     Attached as **Exhibit W** is a true copy of an email from Bertini dated July 21, 2015, produced by the City in this matter, and marked as Exhibit 262 to Volume II of Bertini's deposition.

22.     Attached as **Exhibit X** is a true copy of an email attaching Management Staff Meeting Notes dated August 4, 2015, produced by the City in this matter.

ROBINSON DECL. ISO MOTION FOR PARTIAL SUMMARY JUDGMENT

23. Attached as **Exhibit Y** is a true copy of film permit produced by the City in this matter. This document was marked as Exhibit 74 in the deposition of Nicholas Flegel and subsequently discussed in Volume II of Bertini's deposition at pages 490-91.

24. Attached as **Exhibit Z** is a true copy of an email exchange dated June 20, 2017, produced by the City in this matter, and marked as Exhibit 270 to Volume II of Bertini's deposition.

25. Attached hereto as **Exhibit AA** is a true copy of an email exchange dated September 19, 2017, produced by the City in this matter, and marked as Exhibit 65 to the deposition of Nicholas Flegel. The document was also addressed in Volume II of Bertini's deposition at pages 496-97.

26. Attached hereto as **Exhibit BB** is a true copy of an email exchange dated September 20, 2017 and produced by the City in this matter.

27. Attached hereto as **Exhibit CC** is a true copy of an email dated August 29, 2017, attaching a PowerPoint Presentation, produced by the City in this matter, and marked as Exhibit 271 to Volume II of Bertini's deposition.

28. Attached hereto as **Exhibit DD** is a true and correct copy of Defendant Attorney General Xavier Becerra's Second Amended Responses to Michael Zeleny's Interrogatories, Set Two.

29. Attached hereto as **Exhibit EE** is a true and correct copy of Defendant Attorney General Xavier Becerra's Second Amended Responses to Michael Zeleny's First Set of Interrogatories.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed January 21, 2021 at Los Angeles, California

s/ Damion Robinson
Damion Robinson

Exhibit A

David W. Affeld, State Bar No. 123922
Brian R. England, State Bar No. 211355
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:     (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY,<br><br>     Plaintiff,<br><br>        vs.<br><br>GAVIN NEWSOM, *et al.*,<br><br>     Defendants. | Case No. CV 17-7357 RS<br><br>Assigned to:<br>The Honorable Richard G. Seeborg<br><br>**EXPERT DECLARATION OF DAVID HARDY**<br><br>Action Filed:  December 28, 2017<br>Trial Date:     None Set |

EXPERT DECLARATION

I, David Hardy, declare as follows:

1.      I am an attorney in private practice. I am admitted to the bars of the U.S. Supreme Court, the Second, Fifth, and Ninth Circuits, and the District Courts of Arizona, Colorado, and the District of Columbia.

2.      I have been researching Second Amendment issues for nearly 50 years, including much research at the Library of Congress. I published my first law review article on the subject 47 years ago, while I was still in law school. I have published a book and 19 law review articles on the American right to arms and on firearms legislation. My writings have twice been cited by the United States Supreme Court, and by eleven U.S. Circuit Courts of Appeals. I have testified before the Judiciary Committee of the U.S. Senate, and several other legislative committees.

3.      I have been asked to give an opinion on: (i) how a ban on the open carry of firearms comports with the history, text, and tradition of the Second Amendment; and (ii) on the history and tradition of carrying firearms while participating in peaceful protests.

4.      For my work on this case I am being compensated at $150 per hour. I have received and will receive no other form of compensation in relation to this case. My compensation is not dependent on the outcome of this case.

5.      The materials I have considered in reaching my opinion are primarily my personal files on the subject of the right to arms, which span nine shelf-feet of documents, reflecting 46 years of research. I have also reviewed the California Attorney General's Responses to Plaintiff Michael Zeleny's Interrogatories, Sets One and Two.

**Pre-Independence English Common Law**

6.      A proper understanding of the Second Amendment must start with the Statute of Northampton, enacted in 1328. In translation from the original "Law French," it forbade subjects to "go or ride armed by night of day, in fairs, markets, nor in the presence of the Justices, nor in no part elsewhere." 2 Edw. II, ch. 3.

7.      This presents a paradox: at the time, a sword and dagger was part of every gentleman's formal attire, tournaments were popular outdoor sports, and the Statute did not repeal the various statutes and royal proclamations that required subjects to practice with the

EXPERT DECLARATION

longbow, and indeed outlawed all sports save archery. 35 years later, Edward III ordered his sheriffs "you shall cause to be proclaimed in the shire that, on festival days when he has holiday, shall learn himself in the art of archery, and use for his games bows and arrows, or crossbows and bolts, forbidding all and single, on our orders, to meddle or toy in any way with these games of throwing stones, wood or iron, playing handball, football, "stick ball" or hockey…." 4 English Historical Documents 1327-1485, at 1182. Later, Henry VIII ordered all able-bodied subjects under 60 years of age to "use and exercise shooting in longbows." To that end, every town was commanded to establish "butts," target areas, "and that the inhabitants and dwellers in every one of them be compelled to make and continue such butts and exercise themselves in the longbow in shooting at them on holidays and other times convenient." 3 Hen. VIII, c. 3) (1512) (spelling modernized). These measures did not repeal the Statute of Northampton or reflect any consideration that carrying a longbow and arrows to the shooting range would be going "armed" in public.

8. Historians are exploring this paradox. One possible explanation is that in 1328, in Law French or the English of the translator, "armed" did not mean carrying weapons, but wearing armor. Carrying a dagger or a sword was customary: wearing armor meant the wearer was looking for trouble. This is borne out by the penalty clause of the statute: "upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." There is no mention of forfeiting their weapons, only their armor. This reading is supported by some Elizabethan Age usages I have found. For example, a 1560 translation of Machiavelli's The Art of War. In it, the author discusses the Dutch pikemen of his time, who carried pikes (long spears) and a sword for close-in defense, but no armor. The book describes how they fared against the armored Swiss pikemen: "The Duchemen (as a little before I saied unto you) as it were unarmed, to defend themselves, have to offende [use offensively] the pike and the swearde [sword]…. They being unarmed, and having against thym an enemie, that is all armed." Nicolo Machiavelli, the Arte of Warre 67 (Edward Dacres, trans., 1560, reprinted 1905). That the Netherlanders carried an 18-foot spear and a sword did not stop the English translator from describing them as "unarmed."

9. Whatever its original meaning, the Statute of Northampton was first construed by King's Bench in 1687, 350 years after its enactment. *Sir John Knight's Case*, 87 Eng. Rep. 75, 90 Eng. Rep. 330. There are two reports on the decision. In one report, the court noted that the statue was "almost gone in desuetudinem" (the civil, not common law, doctrine that an unenforced statute lapses). The court ruled that carrying arms would come within the Statute if "in malo anino." In the other report, the court is described as stating that the statue was meant "to punish people who go armed to terrify the King's subjects." The court thus construed the statute to prohibit only carrying weapons with the criminal intent to terrify others.

**The Framing of the Bill of Rights**

10. There is little to be drawn from this period; the Framers discussed the Bill of Rights, but left no record as to concealed vs. open carry. One thing should be obvious, however. When the Framers and the Framing Generation chose to guarantee a right to "bear" arms, they could not have been ignorant of the fact that most arms were then borne in the open. Muskets and rifles were too large to conceal (muskets commonly had overall lengths exceeding five feet). Pistol likewise were large, and carried in saddle holsters. They were common, but if carried in the pocket the ball tended to fall out of the downward-facing barrel. "Pocket pistols," with screw-on barrels that solved this problem, were known (Jefferson owned one) but were rare and expensive. Asked to image in his mind what he was protecting with the Second Amendment, an American of the Framing generation would certainly have envisioned a person carrying in the open.

**The Early American Experience**

11. The earliest American restrictions upon arms-bearing came in states of the then-Southwest, and focused upon concealed carry. The view was that open carry was normal, concealed carry the exception. One who carried openly and did not mind who saw his arm was presumably not up to anything suspicious. One who carried concealed might be.

12. The first of these statutes was enacted in Kentucky in 1813. It forbade citizens to "wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey…." Nine years later, the enactment came before the state's highest court,

the Court of Appeals, which struck it down. *Bliss v. Commonwealth*, 12 Ky. 90 (1822). The Court noted:

> It was not, however, contended by the attorney for the commonwealth, that it would be competent for the legislature, by the enactment of any law, to prevent the citizens from bearing arms either in defence of themselves or the state; but a distinction was taken between a law prohibiting the exercise of the right, and a law merely regulating the manner of exercising that right; and whilst the former was admitted to be incompatible with the constitution, it was insisted, that the latter is not so, and under that distinction, and by assigning the act in question a place in the latter description of laws, its consistency with the constitution was attempted to be maintained.

> That the provisions of the act in question do not import an entire destruction of the right of the citizens to bear arms in defence of themselves and the state, will not be controverted by the court; for though the citizens are forbid wearing weapons concealed in the manner described in the act, they may, nevertheless, bear arms in any other admissible form. But to be in conflict with the constitution, it is not essential that the act should contain a prohibition against bearing arms in every possible form--it is the *right* to bear arms in defence of the citizens and the state, that is secured by the constitution, and whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution.

> If, therefore, the act in question imposes any restraint on the right, immaterial what appellation may be given to the act, whether it be an act regulating the manner of bearing arms or any other, the consequence, in reference to the constitution, is precisely the same, and its collision with that instrument equally obvious.

> And can there be entertained a reasonable doubt but the provisions of the act import a restraint on the right of the citizens to bear arms? The court apprehends not. The right existed at the adoption of the constitution; it had then no limits short of the moral power of the citizens to exercise it, and it in fact consisted in nothing else but in the liberty of the citizens to bear arms. Diminish that liberty, therefore, and you necessarily restrain the right; and such is the diminution and restraint, which the act in question most indisputably imports, by prohibiting the citizens wearing weapons in a manner which was lawful to wear them when the constitution was adopted. In truth, the right of the citizens to bear arms, has been as directly assailed by the provisions of the act, as though they were forbid carrying guns on their shoulders, swords in scabbards, or when in conflict with an enemy, were not allowed the use of bayonets; and if the act be consistent with the constitution, it cannot

> be incompatible with that instrument for the legislature, by successive enactments, to entirely cut off the exercise of the right of the citizens to bear arms. For, in principle, there is no difference between a law prohibiting the wearing concealed arms, and a law forbidding the wearing such as are exposed; and if the former be unconstitutional, the latter must be so likewise.

13.     The Kentucky Court thus considered both open and concealed carry to be constitutionally protected. The Court's ruling was overridden in 1850 by a constitutional amendment, which expressly permitted the legislature to regulate the carrying of concealed arms. Ky Const. of 1850, art. XIII, §25. That the amendment only abrogated the ruling as to concealed carry is noteworthy; Americans of the time apparently felt nothing exceptional about a ruling that held open carry was completely beyond the reach of a legislature.

14.     Alabama next ruled upon the permissibility of bans on concealed carry, and upheld its law, but at the same time made it clear that its rationale would not extend to a ban on open carry. In *State v. Reid*, 1 Ala. 612 (1840), the Court took the position that a law which prohibited concealed carry, while allowing open carry, constituted a regulation of the manner of exercising the right to arms, rather than a deprivation of that right.

> The constitution in declaring that, "Every citizen has the right to bear arms in defence of himself and the State," has neither expressly nor by implication, denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne. The right guaranteed to the citizen, is not to bear arms upon all occasions and in all places, but merely "in defence of himself and the State." The terms in which this provision is phrased seems to us, necessarily to leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals. The statute of 1 Wm. and M. while it declares the right of the subject, it refers to Parliament to determine what arms shall be borne and how; while our constitution being silent as to the action of the Legislature, does not divest it of a power over the subject, which pertained to it independent of an express grant.

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.

EXPERT DECLARATION

15. Louisiana banned concealed carry the same year that Kentucky did, punishing any person found with "a concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or any other place about him, that does not appear in full view." The statute came up for review in *State v. Chandler*, 5 La. App.489, 52 Am. Dec. 599 (1850). Chandler had been convicted of manslaughter, and appealed the Court's refusal to give a jury instruction stating that it was lawful to carry a weapon whether openly or concealed. The Louisiana Court of Appeals upheld the refusal to so instruct, reasoning that:

> This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. It interfered with no man's right to carry arms (to use its words) "in full open view," which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.

16. The Louisiana Court thus rejected the Kentucky Court's position that any limitation of the right to arms was unconstitutional: concealed carry could be banned so long as open carry was allowed.

17. A third case, from Tennessee, involved a law that did ban open carrying ("wearing"), but only of a few weapons—"any bowie knife, or Arkansas tooth-pick" or similar knife. *Ayamette v. State,* 21 Tenn. 154 (1840) dealt with a challenge under the state constitution, which guaranteed a right to arms "for the common defense." The court used that qualifier to hold that the guarantee only related to arms suitable for military or militia duty. The people, it argued, "need not, for such a purpose, the use of those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin. These weapons would be useless in war. They could not be employed advantageously in the common defence of the citizens."

18. I thus conclude that at the time of the proposal and ratification of the Second Amendment (1789-1791) and of the Fourteen Amendment (1866-1868), restrictions on open

carry of weapons were almost unknown. By the latter period, courts had sustained prohibitions on concealed carry, but had made clear that their rationale was premised upon open carry not being prohibited.

19.      Restrictions upon open carry were enacted in the period after 1870, but two points are worthy of mention prior to discussing them. First, handguns of this period were commonly divided into three classes based on size. The largest were "holster pistols," so large and heavy that they were not easily carried on the person, and were usually transported in saddle holsters. The 4 ¼ pound Colt Dragoon fell into this class. Below these in size were the "belt pistols," suitable for wearing in a holster on the belt. The Colt 1860 Army revolver (2 ¾ pounds) illustrates this class. The smallest handguns were "pocket pistols," small enough for pocket carry. The Colt 1849 illustrates this type, as do derringers. "Holster pistols" and "belt pistols" were sometimes lumped together as "Army pistols," because unlike pocket pistols they were military issue.

20.      Second, the rulings sustaining restrictions on open carry came in states where the relevant constitutional protection had a limitation: the right to keep and bear arms "for the common defense." This enabled their courts to take a militia-related view of the guarantee. In the case of the Federal Second Amendment, an amendment to add "for the common defense" was proposed in the First Senate, but voted down. Journal of the First Session of the Senate 77 (1820). *Heller* and *McDonald*, of course, repudiated a militia-centric view of the Second Amendment.

21.      *Tennessee*. An 1870 amendment to the Tennessee Constitution gave its legislature the power "to regulate the wearing of arms with a view to prevent crime." *Tenn. Const*., art. I, §26 (1870). The legislature then forbade the carrying of, *inter alia*, "any belt or pocket pistol or revolver," whether "publicly or privately." In *Andrews v. State*, 50 Tenn. 165 (1871), the Tennessee Supreme Court relied upon the "common defense" limitation to hold that its right to arms applied only to arms suited for militia use.

> We hold, then, that the Act of the Legislature in question, so far as it prohibits the citizen "either publicly or privately to carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol," is constitutional.

EXPERT DECLARATION

> As to the pistol designated as a revolver, we hold this may or may not be such a weapon as is adapted to the usual equipment of the soldier, or the use of which may render him more efficient as such, and therefore hold this to be a matter to be settled by evidence as to what character of weapon )is included in the designation "revolver." We know there is a pistol of that name which is not adapted to the equipment of the soldier, yet we also know that the pistol known as the repeater is a soldier's weapon—skill in the use of which will add to the efficiency of the soldier. If such is the character of the weapon here designated, then the prohibition of the statute is too broad to be allowed to stand, consistently with the views herein expressed.

22.     *Andrews* drew upon *Ayamette v. State* for this approach. Later cases which adopted this approach include *English v. State*, 35 Tex. 475 (1872) and *Fife v. State*, 31 Ark. 455 (1876). It is noteworthy that both Texas and Arkansas' constitutions contained variants of the "for the common defense" language.

23.     There were also a few nineteenth century "outliers." For example, Idaho in 1889 banned all carrying of weapons in incorporated cities, towns and villages; its Supreme Court struck down the measure as unconstitutional. *In re Brickey*, 8 Ida. 597, 70 P. 609 (1902). Arizona Territory permitted incorporated cities and towns to ban carrying of weapons; the measure lapsed when the first state code was adopted in 1913. It should be noted that, at this time period, in Arizona the incorporated cities and towns made up a few square miles of the state's area, and Idaho was probably the same.

24.     The starting point of "strict gun regulation" in this country is generally considered New York's 1911 "Sullivan Act." That statute forbade the carrying of certain non-firearm weapons such as clubs, forbade the carrying of knives with the intent to use them against another person, and forbade the carrying of a concealed firearm without a permit. Open carrying of firearms was unregulated. I have traced the statute's amendments in session laws to 1919, and it remained in this form. N.Y. Session Laws, 1919, ch. 413.

25.     The rival to the Sullivan Act was the Uniform Pistol Act, later retitled the Uniform Firearms Act. This was first proposed in 1924, with updated versions issued through 1930. It was adopted (often with modifications) in a number of states. All versions of the

Uniform Firearms Act required a permit to carry a weapon concealed or in a vehicle, but not for open carry. §§5, 7.

26.     Based on this research, I believe that regulation of openly-carried firearms began sometime after the 1920s or 1930s. As new firearm regulations were relatively infrequent during the 1940s and 1950s, I believe most restrictions on open carry would likely date to the 1960s or later, and were by no means universal even then.

27.     In sum, it appears that regulation of open carrying of arms of any type was unknown in America prior to the ratification of the Second Amendment. Regulation of open carrying of all classes of arms (as opposed to regulating a few types of arms) was almost unknown—Tennessee being the sole exception I have found—prior to the ratification of the Fourteenth Amendment. Regulation of open carry of military or militia suitable firearms seems to originate sometime after the 1930s, and probably in the 1960s.

**There Is A Rich History Of Carrying Firearms At Peaceful Protests.**

28.     There is also historical precedent associating peaceful protests with bearing arms, openly or concealed. Professor Nicholas Johnson's book, Negroes and the Gun: The Black Tradition of Arms (2014), spends three chapters (one, seven, and eight) discussing at length the role of arms in the civil rights movement of the 1960s. He points out that the leadership of the movement largely was armed. Even Martin Luther King, while being unarmed personally, did not object to armed volunteers protecting him, and was understanding of others being armed for self-defense. The 1966 March Against Fear in Mississippi was escorted by armed members of the Deacons for Defense. Professor Johnson describes the event:

> When the march recommenced, armed Deacons were in the wings. At night they guarded the campsites. In the mornings, while the marchers were assembling, the Deacons were in the vanguard, checking along the road and in adjacent woodlots for threats and questioning whites who lingered too long at the edges of the route…. But the Deacons were not invisible. And some of the reporting of their participation confirmed the worries of Roy Wilkins and Whitney Young. For the marchers on the ground, though, the Deacons were a comfort. Cleveland Sellers recorded that the marchers dismissed the media criticism of the Deacons and made their own practical assessment. "Everyone realized that

without them, our lives would have been much less secure." pp. 266-67.

29.    A friend, Prof. Joe Olson (*Emeritus*, Hamline Law), was a civil rights worker at this period of time and assigned to North Carolina. I have spoken at length with Professor Olson about his experiences. He recounted to me that, at the outset of his work, he was surprised to find that all of his fellow workers were armed, down to the receptionist in the office. When they discovered that he was unarmed, one of them loaned him a spare firearm, until he could buy his own. He recounted that he, along with the other civil rights workers, would carry their firearms with them throughout the day and their activities.

30.    Charles L. Cobb's book, This Nonviolent Stuff'll Get You Killed: How Guns Made the Civil Rights Movement (2015), recounts the history from the standpoint of a participant: Cobb was an organizer for the Student Nonviolent Coordinating Committee. Cobb relates how the possession of arms was a factor in resistance to the Klan during the Reconstruction:

> Years later, reflecting on this reign of terror from the ruins of Reconstruction, Frederick Douglass wrote that gaining genuine freedom in the South would require "the ballot-box, the jury-box and the cartridge-box." Similarly, the forceful antilynching crusader Ida B. Wells-Barnett wrote in 1892, "A Winchester rifle should have a place of honor in every black home, and it should be used for that protection which the law refuses to give." Most blacks had come to the same conclusion long before and had begun to fight back. The Reconstruction era is full of examples of black people raising their voices—and brandishing weapons—to express their intention to fight for the rights due them as free citizens. In Lowndes County, Alabama, in 1868, armed black men gathered in front of the county courthouse demanding that Democrats vacate their local offices as required by the recently passed Reconstruction Acts. In Macon, Georgia, a group of black men threatened to burn down the city if one more black man was murdered (leading the city council to call a "meeting of reconciliation.") In the same city, in response to threats from the Klan, an armed guard of 150 men protected the homes of Jeffrey Long … and AME bishop Henry McNeal Turner."

Chapter 1.

31. During the 1960s, Cobb describes the rise of the Deacons for Defense and Justice, men who took up arms to protect the civil rights workers, and claimed 55 local chapters. Chapter 6. Actual shoot-outs were "remarkably few," since "few if any white terrorists were prepared to die for the cause of white supremacy." One activist for the Congress on Racial Equality explained the Deacons' role:

> If we had a picket line, these guys were standing on the corner, on both sides of the street. Any time we were having a demonstration these guys would be standing there on both sides of the street. Wherever we went it was like a caravan; these guys in their pickup trucks with those high-powered rifles up in the back.

Chapter 6.

32. There is considerable historical precedent for the possession of firearms during peaceful protest in the United States. At times, exercising the Second Amendment was a necessary predicate to exercising the First Amendment. Over time, this has been especially true in instances where the protester who is attempting to exercise his or her First Amendment rights is doing so in favor of a cause or issue that incites anger, hatred, and potential violence in opponents. In such instances, the protester may want to carry a firearm, exercising his or her rights under Second Amendment, in order to provide protection and to deter disruption to their otherwise peaceful protest.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed October 9, 2020 at Tucson, Arizona.

David Hardy
Declarant

Exhibit B

David W. Affeld. State Bar No. 123922
Brian R. England. State Bar No. 211355
Damion Robinson. State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East. Ste. 2460
Los Angeles. CA 90067
Telephone:     (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY, | Case No. CV 17-7357 RS |
| Plaintiff, | Assigned to: The Honorable Richard G. Seeborg |
| vs. | **EXPERT DECLARATION OF GREG BLOCK** |
| GAVIN NEWSOM, *et al.*, | |
| Defendants. | Action Filed:  December 28, 2017<br>Trial Date:     None Set |

EXPERT DECLARATION

I, Greg Block, declare as follows:

1. I, Greg Block, have been retained by the law firm Affeld Grivakes LLP, on behalf of Michael Zeleny, as an expert in this litigation.

2. For my work in this case, I am being compensated at the hourly expert rate of $250.00 per hour, plus expenses. I receive no other form of compensation related to this case. No part of my compensation depends upon the outcome of this case.

**Professional Background.**

3. Since 1983, I have been a law enforcement instructor. I teach City, County, State and Federal Agencies, plus the Military in Use of Force and Firearms.

4. I have over 100 instructor credentials, from the NRA Law Enforcement side, the NRA Civilian side, the Federal Department of Justice, California Department of Justice, the FBI, and ATF.

5. Over 45 firearms manufacturers have certified me to teach their weapons systems to Law Enforcement.

6. Several state agencies have also certified me: CA-POST which stands for Peace Officer Standards and Training, the other agency is STC, Standards and Training for Corrections. CA-POST oversees sworn law enforcement and STC oversees Probation, Corrections, Prisoner Transport and Bailiffs.

7. I am both a certified instructor and certified presenter for both CA-POST and STC, and I am authorized to provide training for them. With STC I am the only non-government affiliated individual to have this distinction. With CA-POST who has over 700 presenters, all but three are the agencies themselves, Police Departments, Sheriff's Office, State Investigative Agencies and County Investigative Agencies. The other two entrepreneurs are law firms that teach officers how to testify in court. There are 58 counties in California. Since 1999, I have been CA-POST's Use Of Force instructor in 36 of those counties.

8. With CA-POST, I am also a "SME", which stands for Subject Matter Expert. I deal with the Learning Domains ("LD") in the police academy. I am an SME for twelve of the forty-eight LDs taught in the Basic Police academy, including Use of Force, Firearms, Chemical

Agents, Electronic Weapons, Impact Weapons, Impact Weapons, Defensive Tactics, Projectile Less Lethal Weapons, Force Option Simulator, Tactical Firearms, Dangerous Weapons Laws, Crowd Control, Vehicle Operations and Patrol Operations. As needed, as the California Penal Code is amended and additional court decisions are rendered, SME's will work together to update the LDs. The revised LDs are then sent to CA-POST in Sacramento and distributed to the 39 Police Academies throughout California. LD 40 is the Dangerous Weapons Law for Law Enforcement, which represents California's gun laws.

9. In January 1999, a new Carry Concealed Weapon ("CCW"), law went into effect in California. It was Assembly Bill (AB) 2022, also called the Wright CCW Bill. It took California from a 1-year CCW to a 2-year CCW, plus it changed the residency requirements needed to apply for a CCW. It also mandated training every two years; a minimum of 4 hours for renewal, and a maximum of 16 hours for first time applicants. I was asked by the Orange County Sheriff to be a part of a group, which included Captain Gage, the head of Professional Standards Division (PSD), which oversees the CCW Licensing Bureau, Lieutenant Hogbin, the head of the CCW Licensing Bureau, to create Orange Counties policies and procedures for the new California CCW law. Those policies and procedures were widely recognized and approved and I presented them to all 58 California County Sheriffs. In June of 1999, I attended the bi-annual meeting of the California State Sheriffs Association (CSSA) in Sacramento. I made a presentation on these policies and procedures, and they subsequently became the state standard.

**Information Considered**

10. In preparing this expert report, I have reviewed the following material:

a. MPPD Reports_Redacted MP1843-1901

b. CAD Reports MP 5084-5099

c. 100929 Police Report – Cooperation w Signage and Noise

d. 101004 Police Report – 'Cooperation'

e. 120210 Police Log – Zeleny Cooperative; No

f. 120210 Police Report Re Zeleny – Harassment of Supporters

g. 120410 Meeting Minutes re Zeleny Used at Legislative Committee

h.      120524 Critical Reach Info on MZ

i.      100525 Police Report

j.      120613 Log Of Contact with Mr. Zeleny

k.      120620 Log Documenting Mr. Zeleny Cooperation

l.      20628 Incident Report – Zeleny Cooperates

m.      Audio Recording of Police Interaction with Mr. Zeleny

n.      Photographs of Mr. Zeleny's Belt Holster

o.      Chief Dave Bertini's Deposition Transcripts

p.      Deputy Jeremy Foy Deposition Transcripts

q.      Photos MP5521-5529

r.      Mr. Zeleny's Deposition Transcript

s.      Meeting with Michael Zeleny, looking at his setup he was carrying/using at the time. Evaluating it to make sure he was in compliance with California Penal Code.

t.      Discussing California Penal Code covering owning, transporting and the carry of firearms with Mr. Zeleny.

**Mr. Zeleny Demonstrated Exceptional Gun Safety And Knowledge of Applicable Law.**

11.     Mr. Zeleny showed up at my office with two cases. One case contained a semi-automatic pistol and the other contained a semi automatic rifle. The handgun was unloaded in a locked container per California Penal Code 25610. The actual container was also in compliance with California Penal Code 16850. The rifle was transported in compliance with California Penal Code 25400. A long gun does not need to be locked up; it does need to be unloaded and enclosed in a case, which of course it was. Once he unlocked the handgun container, I inspected both guns to make sure they were both properly unloaded; they were.

12.     I spent quite a bit of time talking to Mr. Zeleny about his two firearms, as they are both considered rare. His knowledge about those firearms was exceptional. He demonstrated safe handling and was conscious of the muzzle at all times. His knowledge of firearms laws at the State level and the Federal level was well above average for a gun owner.

- 4 -

**Mr. Zeleny's Interactions With Law Enforcement Were Respectful.**

13.     In reviewing all police reports, I found Mr. Zeleny complied with all orders and requests given to him by law enforcement. His knowledge of the law far exceeded theirs. In my experience, Law Enforcement officers do not have extensive training in the proper interpretation and application of California's firearms laws. The training they receive is contained in Learning Domain 40 ("LD 40").   LD 40 is California's Dangerous Weapon and Control Laws teaching module. This is a 6-hour segment taught in the Basic Police Academy. There is no required or mandated training on these laws for the rest of a peace officer's career.  Law Enforcement officers do not make the decision to arraign or charge individuals with violations of the firearm laws; Deputy District Attorneys make those decisions.

**In Los Angeles County, A Concealed Weapons Permit Is Nearly Impossible To Obtain And Does Not Represent A Meaningful Avenue For A Resident To Lawfully Possess A Firearm Outside Of His Or Her Home.**

14.     Currently 41 states are shall issue, constitutional carry, or a combination of both. "Shall issue" means the permit must be issued to the applicant unless he or she is a convicted felon. "Constitutional Carry" means that it is the applicant's Second Amendment Constitutional right to carry without a permit. California is one of eight "may issue" states. In California, with very limited exceptions, "may issue" means that the issuance of a concealed carry permit is at the sole discretion of the local sheriff in the county where the applicant resides. The local county sheriff has broad discretion whether to issue a CCW or not. In effect, there are 58 counties in the State of California and an equal number of potential interpretations of what constitutes "good cause" for the issuance of a CCW permit. The interpretation of "good cause" is left to the broad discretion of the local county sheriff and is not an objective standard defined in the law.

15.     Although there are 58 different potential interpretations, they can be loosely grouped into two categories; (i) a strict interpretation employed in the 12 urban counties; and (ii) a far more broad interpretation employed in the 46 rural counties. Nineteen of the top twenty CCW issuing counties in California are rural counties, where a far more permissive interpretation is used in evaluating a CCW application. In California's twelve urban counties,

EXPERT DECLARATION

with the exception of Orange County, the standard for obtaining a CCW permit is exceedingly strict, and in many cases, practically impossible to meet. For example, San Francisco County has issued exactly zero CCW permits to the general public.

16.    As a resident of an urban county, specifically Los Angeles, in my professional opinion, Mr. Zeleny has zero likelihood of successfully obtaining a CCW Permit. As of 2019, there were approximately 10.04 million residents of Los Angeles County. As of March 2020, when the Los Angeles County Sheriff's Department published the most recent report, there were only 158 CCW permits issued in Los Angeles County. The overwhelming majority of people interested in applying for a CCW permit in Los Angeles either are: (i) dissuaded from ever submitting an application; or (ii) are turned away by the LA County Bureau of Licensing.  As a practical consequence, under current California law, a resident of Los Angeles County has no reasonably available legal ability to carry a firearm outside of his or her residence.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed October 9, 2020 at Huntington Beach, California.

Greg Block
Declarant

- 6 -

EXPERT DECLARATION

Exhibit C

David W. Affeld, State Bar No. 123922
Brian R. England, State Bar No. 211355
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:     (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY, | Case No. CV 17-7357 RS |
| Plaintiff, | Assigned to: |
| vs. | The Honorable Richard G. Seeborg |
| GAVIN NEWSOM, *et al.*, | **EXPERT DECLARATION OF ROBERT LATHAM BROWN** |
| Defendants. | Action Filed:  December 28, 2017 |
| | Trial Date:    None set. |

EXPERT DECLARATION

I, Robert Latham Brown, declare as follows:

1.     I have been asked to provide my expert opinion and experience regarding the permitting process involved in filming a motion picture or television production that includes the use of firearms in the State of California.

2.     For my work on this case, I am being compensated at the hourly rate of $200/hour for the preparation of this report, and $300/hour for deposition or court testimony. I received no other form of compensation related to this case. No part of my compensation depends upon the outcome of this case.

3.     **Information Considered:** In preparing this expert report, I have reviewed and considered the following material:

    a.   The American Entertainment Armorers Association Amicus Brief in support of Plaintiffs and Petitioners (Proposed); Superior Court Case No. CPF-05-505960, (https://michellawyers.com/wp-content/uploads/2013/01/Fiscal_American-Entertainment-Armorers-Association-Amicus-Brief-In-Support-of-Plaintiffs-and-Petitioners-Proposed.pdf);

    b.   California Penal Code Sections 26350, 26375, and 25510;

    c.   FilmLA Permit website (https://www.filmla.com/for-filmmakers/permits/);

    d.   California Film Commission website (https://film.ca.gov/);

    e.   The Producers Guild Code of Credits (https://www.producersguild.org/page/code_of_credits); and

    f.   The Directors Guild of America Basic Agreement (https://www.dga.org/Contracts/~/link.aspx?_id=CC4363E3-BC29-443C-9E34-88F7A534F982&_z=z).

4.  **Education:**

    a.   Bachelor of Arts degree from Tulane University awarded in September 1969.

    b.   Two years of study for an MFA degree from The University of California, Los Angeles (1972 – 1974). Left before completion to enter the AMPTP/DGA Training Program.

EXPERT DECLARATION

c. Association of Motion Picture and Television Producers / Directors Guild of America (AMPTP/DGA) Training Program (1974-1976).

5. **Teaching:** I have been an adjunct professor at the USC School of Cinematic Arts since the fall of 1996. The main course I teach is Production Planning, which covers the methods a Producer uses from when he receives a script through to the point of when the film is delivered. This includes, but is not limited to, scheduling the shoot, budgeting the picture, selecting the locations, procuring required permits, hiring the crew, casting the picture, and all logistical arrangements.

6. **Author:** I wrote *Planning the Low-Budget Film* as the textbook for my USC class. The book covers all the basic steps to mounting a film production. It is now used as a text in film schools beyond USC and is currently ranked by Amazon.com at 1,152 in Film & Television.

7. **Film Production Experience:** I have worked as a Producer, Co-Producer, Production Manager, Unit Production Manager, First Assistant Director, and Second Assistant Director on over 40 motion picture and television productions, and generally all but the Assistant Director positions involved obtaining location filming permits. At times I did this on my own and other times were with the aid of a Location Manager. With or without a Location Manager, I was the person ultimately responsible for obtaining the filming permits. This occurred in many different cities and towns in California, numerous other states, and in other countries. The following paragraphs will give a brief description of my involvement with those productions and whether or not firearms were used in them. The dates in parentheses were when the pictures were released.

8. Position or Credit Definitions: **The** duties **of the positions mentioned in the above paragraph are briefly described below. For a more comprehensive list of duties, see the sources listed.**

    a. **Producer:** "Subject to the control of the Owner, the individual receiving Produced By credit shall have final responsibility for all business and creative aspects of the production of the motion picture, with direct participation in making decisions concerning a major portion of the producing functions (see Producers Code of Credits Section 1 for comprehensive list)." Source: Producers Guild of America Code of Credits (https://www.producersguild.org/page/coc_tmp_2)

EXPERT DECLARATION

b. **Co-Producer / Line Producer:** "The Co-Producer / Line Producer is the single individual who has the primary responsibility for the logistics of the production, from pre-production through completion of production; all Department Heads report to the Co-Producer / Line Producer." Source: Producers Guild of America Code of Credits (https://www.producersguild.org/page/coc_tmp_2)

c. **Production Manager / Unit Production Manager:** "The UPM, under the supervision of the Employer, is required to coordinate, facilitate and oversee the preparation of the production unit or units (to the extent herein provided) assigned to him or her, all off-set logistics, day-to-day production decisions, locations, budget, schedules and personnel." Source: The Directors Guild of America Basic Agreement, pp. 14-5, sec. 1-302, (https://www.dga.org/Contracts/~/link.aspx?_id=CC4363E3-BC29-443C-9E34-88F7A534F982&_z=z)

d. **Assistant Director:** "The First Assistant Director, alone or in conjunction with the UPM, organizes pre-production, including organizing the crew, securing equipment, breaking down the script, preparing the stripboard and a shooting schedule. During production, he assists the Director with respect to on-set production details, coordinates and supervises crew and cast activities and facilitates an organized flow of production activity." Source: The Directors Guild of America Basic Agreement, p. 16, sec. 1-303, (https://www.dga.org/Contracts/~/link.aspx?_id=CC4363E3-BC29-443C-9E34-88F7A534F982&_z=z)

9. **Multiple Television and Feature Film Productions (1976-1979):** Credits – First Assistant Director, Second Assistant Director. After completing the AMPTP/DGA Training Program, I worked on multiple television and feature film productions. My duties on these productions generally did not include obtaining film permits.

10. **The Big Fix (1978):** Credit - Second Assistant Director. When the production department at Universal Studios realized the Unit Production Manager (UPM) was having difficulty keeping up with the pace of the production, they offered me a raise in pay to stick close to the UPM

- 4 -

and make sure nothing slipped through the cracks. At the time, Universal did not assign Location Managers to feature productions, so it was left up to me to obtain all the film permits.

11. **The Concorde: Airport 79 (1979):** Credit – Unit Production Manager. This was my first job as a UPM. The film was shot in Paris, France; Washington, DC; Alta, UT; and Los Angeles. As the 2nd UPM, I was responsible for the Washington, DC and Alta, UT locations. In Washington, permits were obtained from the National Park Service for the scenes shot at the Lincoln Memorial and the National Mall. In Utah, our filming was confined to the areas above the Alta ski runs, simulating the Alps where the Concorde crash lands in the story.

12. **The Nude Bomb (1980):** Credit – Unit Production Manager. This was my first picture as the sole UPM. The film was shot entirely in Los Angeles on local locations and on stages at Universal Studios. It simulated locations in and around Washington, DC. Some weapons were used which mainly involved .38 caliber revolvers.

13. **The Blues Brothers (1980):** Credit – Unit Production Manager. This picture was shot mostly in Chicago, IL and surrounding suburbs, with some stage work done at Universal Studios in Los Angeles. Although I did have the assistance of a Location Manager, I handled most of the interaction with Mayor Jane Byrne. There were scenes with a lot of weapons firing, mostly police .38 caliber revolvers. The weapons were all handled by the Prop Master, Michael Milgrom.

14. **All Night Long (1981):** Credit – Unit Production Manager. This picture was shot in and around the Los Angeles area including locations in Pasadena and Valencia. No weapons were involved. There was no Location Manager.

15. **Bustin' Loose (1981):** Credit – Unit Production Manager. I was brought on to oversee the shooting of additional scenes after Richard Pryor had recovered from an accident in which his face was badly burned. These scenes were shot on stage at Universal and no permits were required.

16. **Ghost Story (1981):** Credit – Unit Production Manager. This picture was shot in Saratoga, NY; Woodstock, VT; Philadelphia, PA; and New York, NY. No weapons were involved.

17. **The Thing (1981):** Credit – Unit Production Manager. This picture was shot on stage at Universal Studios with locations outside Juneau, AK and Stewart, BC. I acquired all the location

permissions required. On an ice field outside of Juneau, we shot a scene involving an actor firing a rifle from a hovering helicopter. We also used pistols and rifles in Stewart, BC and on stage at Universal Studios in California. The Prop Master, John Zemansky, handled them.

18. **Star Wars: Episode VI – Return of the Jedi (1983):** Credit – Production Executive. I was unable to accept a UPM credit because Lucasfilm Ltd. was not a signatory to the Directors Guild of America (DGA) Basic Agreement, so I was not able to perform DGA covered work. I supervised two unit managers who were not members of the DGA. Although the majority of the film was largely shot in England and Tunisia, my responsibilities covered the shoots at the Kerner Facility in San Rafael, CA; the Jedediah Smith Redwoods State Park outside Crescent City, CA; and Buttercup Valley, outside Yuma, AZ. Buttercup Valley is actually in California, but Yuma is the nearest town with motels. All weapons were futuristic inventions of the prop department. No actual weapons were used.

19. **Iceman (1984):** Credit – Unit Production Manager. This picture was shot in Vancouver, BC and Stewart, BC. I don't recall any weapons being used. If they had been the Canadian UPM, Justis Greene, would have sought the appropriate permits if needed.

20. **Indiana Jones and the Temple of Doom ((1984):** Credit – Production Manager. My responsibilities on this picture were the shoots on the Tuolomne River east of Modesto, CA; Mammoth Mountain, CA; and Marin County, CA. No weapons were used.

21. **Best Defense (1984):** Credit – Unit Production Manager. This picture was shot in Los Angeles, CA and the area around Jericho, Israel. All weapons use took place in Israel.

22. **The Goonies (1985):** Credit – Unit Production Manager. I was brought in to manage additional scenes during postproduction, so I am not listed in the credit crawl. These were shot in Los Angeles, CA, both on stage and on local location. No weapons were used.

23. **Warning Sign (1985):** Credit – Associate Producer / Unit Production Manager. The film was shot on location in La Crescenta, CA and Payson, UT. Semi-automatic pistols and a revolver were used. These were handled by the Prop Master, Larry Byrd.

EXPERT DECLARATION

24. **Blue City (1986):** Credit – Unit Production Manager. This picture was shot in and around Los Angeles, CA. Revolvers and semi-automatic pistols were used in filming. All the weapons were controlled by the Prop Master, Jack Marino.

25. **Howard the Duck (1986):** Credit – Co-Producer / Unit Production Manager. This picture was shot in Northern California consisting of locations in San Francisco, Petaluma, Napa, San Rafael, Black Point, Modesto, Nicasio, Oakland, Herald, Rio Vista, and Sacramento. No firearms were used.

26. **One Crazy Summer (1986):** Credit – Unit Production Manager. This picture was shot in Cape Cod and Nantucket, MA. There were rifles present in a scene, but they were never fired. The Prop Master, Art Lipschultz handled the weapons.

27. **Spaceballs (1987):** Credit – Production Manager. This picture did shoot on location in Buttercup Valley, CA but was mostly shot on stage at what is now Sony Studios in Culver City, CA. At that time, it was still MGM Studios. I was assisted by a Location Manager, Michael Meehan. All weapons were products of the prop department.

28. **Clean and Sober (1988):** Credit – Unit Production Manager. This picture was shot in Pennsylvania, Delaware, and New Jersey, with stage work being done at Burbank, CA. No weapons were used.

29. **Elvira: Mistress of the Dark (1988):** Credit – Production Manager. I was brought in to do additional scenes in post-production. Most of our filming took place on stage at the Burbank Studios except for a 2nd unit in Las Vegas, NV which I directed. No firearms were used.

30. **Child's Play (1988):** Credit – Unit Production Manager. The portion of picture I was involved with was filmed in and around Los Angeles. I replaced the original UPM who had left the film. Handguns were used in some scenes. These were under the supervision of the Prop Master, Art Shippee. I was assisted in obtaining film permits by a Location Manager, Michael Malone.

31. **The War of the Roses (1989):** Credit – Unit Production Manager. This picture was mostly shot on stage and local locations in Los Angeles, with a few scenes being shot at Whidbey Island, WA. No firearms were used.

32. **Child's Play 2 (1990):** Credit – Executive Producer. This picture was shot mostly in Pasadena, Long Beach, and Los Angeles, CA. There were police officers portrayed who were wearing holstered side arms. These were probably rubber props.

33. **Child's Play 3 (1991):** Credit – Producer / 2nd Unit Director. This picture was shot mostly in Southern California with the military academy exteriors shot at Kemper Military School in Boonville, MO. Handguns and M1 rifles were used in both California and Missouri. The weapons were all under the custody and supervision of the Prop Master, Jack Marino. Location filming permits were obtained by a Location Manager, William Bowling. No special permits were required for the use of the weapons.

34. **Babylon 5: The Gathering (1993):** Credit – Producer / Unit Production Manager. This was the pilot episode for a television episodic series. It was shot on stage in Santa Clarita, CA at the Santa Clarita Studios. No actual firearms were used.

35. **Robin Hood: Men in Tights (1993):** Credit – Executive in Charge of Production / Production Manager. This picture was shot in and around Los Angeles, CA. All weapons were medieval. No firearms were involved. William Bowling was the Location Manager.

36. **Showgirls (1995):** Credit – Unit Production Manager. This picture was shot in Los Angeles, CA; Lake Tahoe, NV; and Las Vegas, NV. No firearms were used.

37. **Dracula: Dead and Loving It (1995):** Credit – Associate Producer / Production Manager. This picture was shot in and around Los Angeles, CA. No firearms were used.

38. **Starship Troopers (1997):** Credit – Production Manager. This picture was shot in Southern California; Hell's Half Acre outside of Casper, WY; and Kadoka, SD. William Bowling was the Location Manager. During the shoot in Hell's Half Acre, we used futuristic prop weapons built on real automatic rifles, plus real Browning .50 caliber machine guns, all of which were fired using blank cartridges. Since the Federal Firearms Act of 1938, automatic weapons have been strictly controlled. These prohibitions were renewed in the Gun Control Act of 1968. I hired Robert "Rock" Galotti as our Weapons Coordinator/Armorer. Mr. Galotti is a Federal Firearms Licensee (FFL) and he was legally authorized to be in possession of such weapons and to arrange their transportation. He maintained strict control over the weapons. At the end of each shooting day, Mr.

1  Galotti caused the weapons to be secured at the Casper, WY Police Department. No permits were

2  required for our use of these weapons because Mr. Galotti had control of them.

3      39.    **The Parent Trap (1998):** Credit – Production Manager. My involvement with this

4  picture was for the shooting sequences in the western United States. This included locations in

5  California such as San Francisco, Camp Seely in Crestline, Lake Gregory, Long Beach Airport,

6  Napa Valley, RMS Queen Mary Long Beach, Santa Clarita, and Los Angeles. No weapons were

7  used.

8      40.    **Hollow Man (2000):** Credit – Production Manager. This picture was shot in

9  Washington, DC and Los Angeles, CA. There were handguns used but I believe they were non-

10 functional replicas.

11     41.    **Ali (2001):** Credit – Production Manager. I am not listed in the credit crawl since I

12 was only involved in prepping the picture to shoot after which I handed the picture over to another

13 UPM. My work included scheduling the shoot, budgeting the picture, hiring the crew, arranging to

14 transport the crew and equipment to Uganda, and tracking costs during the prep period.

15     42.    **Spider-Man (2002):** Credit – Production Manager. I am not listed in the credit crawl

16 since I was brought in to oversee the shooting of additional scenes and to manage the postproduction

17 period. No firearms were used for these additional scenes.

18     43.    **The Anarchist Cookbook (2002):** Credit – Producer. This was a low budget

19 production shot in and around Plano, TX with a day at the Fort Worth Stockyards. There was a

20 handgun used which was obtained by the Prop Master, Jason Hammond.

21     44.    **Vampires: Los Muertos (2002):** Credit – Line Producer / Unit Production Manager.

22 I am not listed in the credit crawl since I was brought in to manage a few added scenes. The picture

23 was filmed entirely in Mexico except for the added scenes which I supervised. These were shot in

24 Los Angeles. There were handguns and a shotgun used. These were obtained by the Prop Master,

25 Richard Blake Wester. No special permits were required.

26     45.    **The Santa Clause 2 (2002):** Credit – Production Manager. This picture was shot

27 entirely in Canada. I was on the film only for the prep period during which I scheduled and budgeted

28 the movie.

EXPERT DECLARATION

46. **Charlie's Angels: Full Throttle (2003):** Credit – Unit Production Manager. I was brought in to manage the additional scenes, so I am not listed in the credit crawl. No firearms were used.

47. **S.W.A.T. (2003):** Credit – Unit Production Manager. This picture was shot in and around Los Angeles and at Mojave Airport. Many firearms were used including automatic weapons. There were large shoot-outs staged in Burbank and downtown Los Angeles. All weapons were under the control of our Armorer, Michael Papac who is an FFL. Our main concern was how the noise would affect residents and businesses in the surrounding areas.

48. **A Lot Like Love (2005):** Credit – Unit Production Manager. This picture was shot in and around Los Angeles and in New York, NY. No firearms were used.

49. **Lords of Dogtown (2005):** Credit – Unit Production Manager. I was brought in to manage the additional scenes, so I am not listed in the credit crawl. It was shot mostly in Venice, CA and other Los Angeles areas. No firearms were used.

50. **Local Color (2006):** Credit – Co-Producer / Unit Production Manager. This was a low budget picture shot in New Orleans and Covington, LA. No firearms were used.

51. **The Holiday (2006):** Credit – Unit Production Manager. I was brought in to supervise additional scenes, so I am not listed in the credit crawl. These were shot in and around Los Angeles.

52. **Hard Breakers (2010):** Credit – Producer / Production Manager. This was a low budget independent feature shot in and around Los Angeles. No firearms were used.

53. **1982 (2013):** Credit – Co-Producer. This was a low budget short film. It was shot in Los Angeles. No firearms were used.

54. **Love is Not Love (2019):** Credit – Line Producer. This was a low budget independent feature shot in and around Los Angeles. No firearms were used.

55. **Current Productions:** Credit – Producer. I am currently involved in the development of four films, two of which will involve firearms.

EXPERT DECLARATION

56. **Planning for the use of firearms in a scene:** When I am employed as a Co-Producer, Line Producer, or Unit Production Manager, there are discrete steps that I follow when planning a film shoot in which firearms are used. These are outlined in the following paragraphs.

57. **Read the script.** The first step is to read the script and note any scenes in which firearms are used.

58. **Create the breakdown sheets.** A breakdown sheet is created for each scene in the script. In the top half of this sheet are listed the scene numbers, whether the scene is exterior, interior, or both, the set name, the time of day, how long the scene is in terms of pages and eighths of a page, a brief but unique synopsis of the scene, the page of the script the scene starts on, the story day of the scene, what filming unit will be shooting the scene, and the locations of the shoot.

a. **Filling in the breakdown sheet:** The bottom half of the breakdown sheet is where all the specific elements that are needed to shoot the scene are listed. These would include cast members; background actors (extras); stunt players; picture cars or other vehicles appearing in front of camera; props; camera equipment; special effects that occur in the scene such as fire, rain, or explosions; costume notes; makeup and hair notes; animals; animal wranglers; music notes; sound notes; art department notes; set dressing; greenery; special equipment; security; additional labor; visual effects notes and personnel; and miscellaneous notes.

b. **Props.** Props are any objects which are handled by the actors or extras. Jewelry, eyeglasses, and watches are also included in props, as are weapons of various sorts. These can be replicas of weapons, for example they may be an airsoft or plastic gun, or they can be real weapons such as knives, swords, or firearms.

c. **Firearms.** Motion pictures and television productions usually use Title 1 firearms. These are firearms that are available to the general public, such as rifles from bolt action to semi-automatic, revolvers, and semi-automatic handguns. On occasion, we also use firearms that are prohibited to the general public in so far as they require a special federal permit and license to possess them. For more complex or higher

EXPERT DECLARATION

1  volume of firearms or other weapons, we employ an Armorer who has a federal

2  firearms license.

3      d. **Title 1 Firearms.** In California, absent a statutory exemption, if a Prop Master or

4      Armorer wanted to rent a Title 1 firearm to use in a motion picture or television

5      production, the Prop Master or Armorer would need to undergo a background check

6      every time he or she rented a firearm. Then when the Prop Master or Armorer wanted

7      to turn the firearm over to an actor to use in a scene, the actor would have to go

8      through a background check as well. Legislated waiting periods would also apply in

9      each of these transfers. This would be unworkable in the making of a motion picture

10      or television production and would severely impact the filmmakers.

11      e. **The California Entertainment Firearms Permit.** The California Legislature passed

12      amendments to California's firearms restrictions creating the Entertainment Firearms

13      Permit ("EFP"). This is a California specific permit that a Prop Master or any other

14      nonprohibited person can register for and can be used in place of the repeated

15      background checks. It also allows an EFP holder to give the firearm to an actor or

16      other Authorized Participant and take it back after the scene is over, without doing

17      background checks or requiring a waiting period. For purposes of California's ban on

18      the open carry of weapons, the actor or participant to whom the firearm is loaned is

19      an "Authorized Participant" as that term is used in California Penal Code Sections

20      26375 and 25510.

21      f. **Federal Firearm License.** In order to possess, transport, rent, or transfer firearms

22      that are prohibited by the Federal Firearms Act and succeeding laws, a Prop Master or

23      Armorer must have a Federal Firearms License ("FFL").

24      59.     **Create the shooting schedule.** Once the breakdown sheets are completed, the

25  database of breakdown sheets is viewed in the form of a strip board, where each scene is individually

26  displayed on a strip. These strips can be rearranged and sorted on the board with day markers to

27  create a shooting schedule. It's at this point that I would consult with a Prop Master or Armorer if

28  the motion picture or television production requires operational firearms.

60. **Prop Master or Armorer.** The decision whether to hire a Prop Master or an Armorer rests on the type and the number of weapons needed. On a movie such as STARSHIP TROOPERS, I had a complete department headed by an Armorer to handle all weapons. In that film, we were using many prohibited weapons including two Browning .50 caliber machine guns. Once the Prop Master or Armorer is hired, I would discuss with him or her the weapons we needed and solicit his/her recommendations. At that time, we would not know the names of all the people who might be handling the firearms in any given scene. This is because we would not necessarily have the motion picture or television production completely cast and would not yet have hired the stunt players. Any extras who would be given firearms in the scenes might not be hired until the day of shooting. In addition, on any shooting day, the Director may change his or her mind as to who will be firing the weapons. In my experience, neither a Prop Master nor an Armorer are concerned with or request the names or identities of the specific actors and extras who will be Authorized Participants. With respect to the Authorized Participants, the only concern a Prop Master or Armorer has is to make sure that the Authorized Participants are not legally prohibited from possessing a firearm and are capable of safely handling the firearm. The Prop Master or Armorer will then arrange for the procurement of the prop weapons and are responsible for the transport, storage, and safe use of the firearms.

61. **Film permits.** One to two weeks prior to the filming of a scene, the production company's designee will apply for the location filming permits. The application asks for information related to the logistics of the shoot, including for example; what will take place in the scene, how long we expect to be at the location, whether we will be firing weapons, the approximate size of the crew, whether we will be using pyrotechnics, where we will be parking our equipment, and whether we will need traffic control on public streets. It's not that different from applying for a permit to perform street maintenance. At no time during the permitting process, have I ever been asked to provide the names or identities of the actors, stunt players, and extras who will be using the firearms in any specific scene, and I have never volunteered that information. In fact, often at this stage of the process, that information is not yet known or finalized.

EXPERT DECLARATION

62. The film permit will be issued with certain restrictions such as how many policemen we must hire and whether we need a fire safety officer with us during the shoot. We will also be required to notify residents and businesses within a 500-foot radius of our location about the upcoming shoot. If it's a residential area, we will be restricted to certain hours of the day (e.g. we can't arrive before 7:00 am and must be gone by 10:00 pm). The film permit does not identify or reference the names or the identities of the Authorized Participants in the shoot. Obviously, any notification to residents or businesses likewise does not include the names or identities of the Authorized Participants.

63. **On the day of filming.** The call sheet for that day will have a notice that there will be gunfire on the set. We do the same if there will be explosions or if there will be anything similar the crew should be aware of. During the set up of the shot, a mandatory safety meeting will be held by the First Assistant Director in conjunction with the Prop Master and/or Armorer attended by the Director, actors, stunt players, extras, and crew. Hearing protection is issued to the crew. Cast members, stunt players, and extras will be issued foam ear plugs that won't be visible to the camera.

64. Before each take, the weapons are checked, loaded with blank cartridges, and handed to the Authorized Participants (the actors, stunt players, and extras) by the Prop Master/Armorer. After each take, the weapons are secured by the Prop Master/Armorer, cleared, and reloaded with blank cartridges if there is to be another take.

65. The use of firearms in motion pictures and television productions is highly regulated, especially in California. It would be more so if not for the special exemptions from the state firearm laws that are granted to the motion picture and television industry. Without those exemptions, it would be impossible to make certain types of productions in California.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed October 9, 2020 at Westlake Village, California

Robert Latham Brown
Declarant

Exhibit D

David W. Affeld, State Bar No. 123922
Brian R. England, State Bar No. 211355
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:      (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY,<br><br>     Plaintiff,<br><br>        vs.<br><br>GAVIN NEWSOM, *et al.*,<br><br>     Defendants. | Case No. CV 17-7357 RS<br><br>Assigned to:<br>The Honorable Richard G. Seeborg<br><br>**EXPERT DECLARATION OF**<br>**MICHAEL TRISTANO**<br><br>Action Filed:  December 28, 2017<br>Trial Date:     None Set |

EXPERT DECLARATION

I, Michael Tristano, declare as follows:

1. I have been retained by Affeld Grivakes LLP on behalf of Michael Zeleny, as an expert in the above-referenced litigation.

2. As an independent expert, I have been asked to give my opinion on the issue of permitting for film, television, and other video projects, and, specifically, the permitting and use of firearms on such projects.

3. For my work on this case, I am being compensated at a rate of $500 per hour, plus expenses. I have not received and will not receive any other compensation related to this case. No part of my compensation depends on the outcome of this case.

**PROFESSIONAL BACKGROUND AND EXPERIENCE**

4. I have been a professional Armorer and Special Effects Technician for more than 30 years. I have worked on more than 500 feature films, television shows and video projects, most of which are listed on the Internet Movie Database (imdb.com). These projects include: 3:10 to Yuma, The Purge, Medal of Honor, I Am Still Here, and Enron: The Smartest Guys in the Room.

5. Most of my work is done in the State of California, and my licenses and permits to do this work include:

    1) A California DOJ Entertainment Firearms Permit;

    2) A Federal Firearms License (FFL);

    3) The four California Dangerous Weapon Permits, which include permits for assault weapons and .50 caliber weapons, machine guns, short-barrel rifles and shotguns, and destructive devices; and

    4) The California Certificate of Eligibility.

6. Besides providing on-set armorer services and training of actors, actresses, extras, and stunt people (collectively "Authorized Persons") for proper and safe use of blank-firing firearms on set, my company also rents and provides non-firing replica and rubber guns.

7. I have also been an on-camera weapons expert on shows for The History Channel, The Discovery Channel and A&E.

8.      When I am involved in any project using firearms on the set of a motion picture, TV show or video project, I advise the production on what firearms I think they should use in their show and what permitting we will require regarding the use of firearms during the project.

9.      Based on my extensive career as a professional, licensed motion picture and television Armorer, I believe that I am qualified to address the questions presented to me.

**INFORMATION CONSIDERED**

10.     In preparing this expert report, I have reviewed the relevant applications and standards regarding permitting for film, television and video projects in the State of California, and the use of firearms on set.

11.     My analysis of the information relevant to this case is ongoing, and I expect to continue receiving information and questions as they are presented to me, and it is possible that new information may affect certain conclusions in this report. I therefore reserve the right to supplement it.

**OPINIONS**

12.     If called upon to testify, I would explain the following facts and opinions regarding permitting for film, television and video productions, and the inclusion of proper permitting for the use of firearms on these productions.

13.     When I am contacted by a production to provide their show with Armorer services and the rental of blank-firing guns, non-firing replicas and rubber guns, I am involved with the production company in the process of obtaining the necessary permits.  I always insist that productions get the proper permitting and cover all of the requirements in the specific area and jurisdiction they are filming in.

14.     In the State of California, although rules and regulations may vary somewhat from county to county and city to city, the general state policies are the same:

        1)      The production must apply for a permit for all of the days and at each

                location where the filming will be taking place through the offices in

charge of filming in the respective jurisdictions. In Los Angeles, for example, permits are applied for and obtained from FilmLA.

2) If there is going to be blank-firing weapons used and blanks fired, both the permit application and the permit must include this information, with a description of the type of gunfire (such as single shot, semiautomatic, fully automatic, or black powder blanks) and the load size of the blanks (1/4 load, 1/2 load, or full load) so the proper notifications can be made to the surrounding area.

3) Is the blank gunfire to take place in the interior or exterior of the location? If there is gunfire in the exterior of the location, or in any area open to the public view, at least one Police Officer is usually required to be assigned to the location by the permitting office. A Fire Marshall or FSO (Fire Safety Officer) may also be assigned by the permitting office if the location is located in a fire zone, or if there are possible flammable elements at the location.

4) If there is no blank gunfire, but replica or rubber guns are brandished in an exterior part of the location, or an area open to view by the public, this must also be on the permit application and the permit and a Police Officer will still be assigned to the location to deal with civilians to make sure everyone knows this is not an active shooter situation.

5) Whenever any real or blank-firing firearms are present on a set, a licensed Armorer must be present to handle blank-firing weapons and a licensed Prop Master for non-firing replica guns and rubbers. This is so proper safety protocols are always followed.

6) Permitting offices do not inquire about the names or identities of the Authorized Participants using the weapons, as such information is neither necessary nor relevant for the permitting process. In fact, when the permit applications are being prepared, submitted, and considered, often times the

- 4 -

specific names and identities of the Authorized Participants are not known or finalized. In particular, the names and identities of extras serving as Authorized Participants may well not be known until the actual day of the shoot and can change throughout the day in the director's discretion. In my experience, during the permitting process, I have never been asked to provide, and have not provided, the names and identities of the anticipated Authorized Participants to any permitting office or agency.

7)  In contrast to the permitting offices and agencies, licensed Armorers are required to ensure that none of the Authorized Participants using the real and/or blank-firing weapons is a felon or a person prohibited from possessing a firearm. Such "prohibited persons" may use replica or rubber weapons only.

8)  While any blank-firing, replica or rubber weapons are on set, they remain in the charge of the Armorer and/or Prop Master, until they are needed to be placed in the hands of the Authorized Participants and/or on the set. After the shots are completed, the firearms are taken back and remain in the charge of the Armorer and/or Prop Master.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed October 9, 2020 at Los Angeles, California.

Michael Tristano
Declarant

- 5 -

EXPERT DECLARATION

Exhibit E

1                    UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE MATTER OF:              )
                                   )
5                                  )
                                   )
6    MICHAEL ZELENY,               )
                                   )
7              Plaintiff,          )
                                   )
8        vs.                       )    CASE NO. CV 17-7357 JCS
                                   )
9    EDMUND G. BROWN, JR., et al., )
                                   )
10             Defendant.          )
                                   )
11

12

13        VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

14                         VOLUME I

15                  Menlo Park, California

16                 Tuesday, March 19, 2019

17

18

19

20

21

22
     Stenographically Reported by:
23
     HEATHER J. BAUTISTA, CSR, CRR, RPR
24

25

                     1          VIDEOTAPED DEPOSITION of CHIEF DAVE BERTINI,

 2   taken before Heather J. Bautista, CSR No. 11600, a

 3   Certified Shorthand Reporter for the State of

 4   California, with principal office in the County of Santa

 5   Clara, commencing on Tuesday, March 19, 2019, 10:07

 6   a.m., at 1100 Alma Street, Suite 210, Menlo Park,

 7   California 94025.

 8

 9   APPEARANCES OF COUNSEL:

10

11        For the Plaintiff:

12             Affeld Grivakes LLP
               BY:  DAMION ROBINSON, ESQ.
13             2049 Century Park East
               Suite 2460
14             Los Angeles, California 90067
               Phone:  (310) 979-8700 / Fax:  (310) 979-8701
15             dr@agzlaw.com

16
          For the Defendant:
17
               Howard Rome Martin & Ridley LLP
18             BY:  TODD H. MASTER, ESQ.
               1900 O'Farrell Street
19             Suite 280
               San Mateo, California 94403
20             Phone:  (650) 365-7715 / Fax:  (650) 364-5297
               tmaster@hrmrlaw.com
21

22   ALSO PRESENT:

23             Nick Perry, Videographer

24             Michael Zeleny, Plaintiff

25

```
1                    INDEX OF EXAMINATION

2                                                    PAGE

3   CHIEF DAVE BERTINI

4      EXAMINATION BY MR. ROBINSON                    7

5

6

7                       --o0o--

8

9

10                Instructed Not to Answer

11                    Page Line

12                    11   15

13                     13    9

14                    138  16

15                     202   4

16

17

18

19

20

21

22

23

24

25
```

1    INDEX OF EXHIBITS

2    Exhibit No.  Description                              Page

3    Exhibit 29   Notice of Deposition                     9

4    Exhibit 30   special event permit flow chart          46

5    Exhibit 31   E-mail Bates marked MP1381 through       84
                  1385
6
     Exhibit 32   E-mail Bates marked MP1437               88
7
     Exhibit 33   Special Event Permit Application         106
8                 Frequently Asked Questions

9    Exhibit 34   Printout from special event permit       106
                  website
10
     Exhibit 35   Frequently Asked Questions               114
11
     Exhibit 36   Film permit application                  125
12
     Exhibit 37   Photocopy of Penal Code 313.1            136
13
     Exhibit 38   Still image of animation                 136
14
     Exhibit 39   Printout of a portion of Mr. Zeleny's    143
15                website

16   Exhibit 40   E-mail Bates marked MP214                149

17   Exhibit 41   E-mail Bates marked MP261                161

18   Exhibit 42   E-mail with daily police log             164
                  attached, Bates marked MP55-MP58
19
     Exhibit 43   Policy 467 - Menlo Park Police           167
20                Department Policy Manual

21   Exhibit 44   E-mail exchange Bates marked MP41         178

22   Exhibit 45   E-mail thread Bates marked MP226-228      178

23   Exhibit 46   Menlo Park Police Department report       184
                  Bates marked MP1895-1898
24
     Exhibit 47   Menlo Park Police Department report       187
25                Bates marked MP1871-1873

```
 1                    INDEX OF EXHIBITS - CONTINUED

 2     Exhibit No.  Description                        Page

 3     Exhibit 48   E-mail with daily police log Bates  188
                    marked MP61-65
 4
       Exhibit 49   Menlo Park Police Department report  191
 5                  Bates marked MP151-154

 6     Exhibit 50   Document Bates marked MP120-124      202

 7     Exhibit 51   Police Management Staff Meeting      203
                    Minutes dated 08/07/12 Bates marked
 8                  MP206-210

 9     Exhibit 52   Menlo Park Police Department         205
                    management staff meeting minutes
10                  dated 04/03/12 Bates marked MP88-94

11     Exhibit 53   E-mail Bates marked MP00004          210

12     Exhibit 54   E-mail Bates marked MP60             214

13     Exhibit 55   Memo from the San Mateo County       220
                    District Attorney's Office to San
14                  Mateo County police officers
                    regarding the open carry of firearm
15                  in 2010 - Bates marked MP5397

16

17

18

19

20

21

22

23

24

25
```

```
              1                    Tuesday, March 19, 2019

              2                         10:07 a.m.

              3                          --oOo--

              4           THE VIDEOGRAPHER:  Good morning.  My name is

10:07         5    Nick Perry.  I am the videographer for today.  I

              6    represent Watson Court Reporters in Los Angeles,

              7    California.  I am not financially interested in this

              8    action, nor am I a relative or employee of any attorneys

              9    or of any of the parties.

10:08        10           Today's date is Tuesday, March 19th, 2019.  The

             11    time is approximately 10:07 a.m.

             12           This deposition is taking place at 1100 Alma

             13    Street, Suite 210, in Menlo Park, California.

             14           The case number is CV177357JCS.  In the United

10:08        15    States District Court, Northern District of California.

             16           The case is entitled Zeleny versus Brown, Jr.

             17    This deposition is being taken on behalf of the

             18    plaintiff.

             19           Here begins Media No. 1 of the deposition of

10:08        20    Chief Dave Bertini.

             21           The court reporter is Heather Bautista.  Okay.

             22           Will the -- will the attorneys please introduce

             23    themselves, starting with the questioning attorney.

             24           MR. ROBINSON:  Damion Robinson for plaintiff,

10:09        25    Michael Zeleny.
```

MR. MASTER:  Todd Master for Defendant City of

         2   Menlo Park and Chief Dave Bertini.

         3            THE VIDEOGRAPHER:  Will the court reporter

         4   please swear in the witness.

10:09    5                     CHIEF DAVE BERTINI,

         6   having been first duly sworn, was examined and testified

         7                      as follows:

         8            MR. ROBINSON:  And just to note on the record

         9   that we've agreed that this deposition will be a

10:09   10   combined deposition of Chief Bertini individually and in

        11   his capacity as a person most knowledgeable for the City

        12   of Menlo Park.

        13            MR. MASTER:  That's correct.

        14                      EXAMINATION

10:09   15   BY MR. ROBINSON:

        16       Q.   Chief Bertini, we haven't been introduced

        17   before.   My name is Damion Robinson.  I'm an attorney

        18   representing Michael Zeleny, who's present.  And, today,

        19   we're going to be taking your deposition, both

10:09   20   individually and as the person most knowledgeable

        21   designated by the City of Menlo Park.

        22            Do you understand that?

        23       A.   I do.

        24       Q.   Have you ever had your deposition taken before?

10:09   25       A.   I have.

| | | |
|---|---|---|
| | 1 | **Q.** Approximately how many times? |
| | 2 | **A.** Approximately half a dozen. |
| | 3 | **Q.** Have you ever testified in court? |
| | 4 | **A.** Yes. |
| 10:10 | 5 | **Q.** I assume you're familiar with the basic ground |
| | 6 | rules of testifying in a deposition or in court. |
| | 7 | **A.** I am. |
| | 8 | **Q.** Have you ever had any training relating to |
| | 9 | giving testimony, either in court or in depositions? |
| 10:10 | 10 | **A.** I have. |
| | 11 | **Q.** What type of training was that? |
| | 12 | **A.** Training in the basic police academy, along |
| | 13 | with when Prop 115 was enacted, training on how to |
| | 14 | testify to hearsay in preliminary hearings. |
| 10:10 | 15 | **Q.** I assume, as part of your training, you |
| | 16 | understand that it's very important that the answer to a |
| | 17 | question connects to the question that's being asked; |
| | 18 | correct? |
| | 19 | **A.** Yes. |
| 10:10 | 20 | **Q.** Okay. |
| | 21 | And you understand today that you're under |
| | 22 | oath; right? |
| | 23 | **A.** Correct. |
| | 24 | **Q.** Although we're in an informal setting of a |
| 10:10 | 25 | conference room, it's the same effect as it would have |

1   at trial.

2        **A.**   I understand.

3        **Q.**   And I won't give you the admonitions about how

4   to keep a clear record.  I assume those you know.

10:10   5        Is there anything that would prevent you from

6   giving full and accurate testimony today?

7        **A.**   No.

8        **Q.**   Okay.

9        We have in front of you Exhibit 29.

10:11   10       It's a multiple-page document.  The first page

11  is Notice of Deposition of the City of Menlo Park; is

12  that accurate?

13       **A.**   Yes.

14       **Q.**   Have you seen Exhibit 29 before?

10:11   15       **A.**   I have.

16       **Q.**   When did you see it?

17       **A.**   When it was forwarded to me by our attorneys.

18       **Q.**   And if I could have you please turn to

19  Attachment 1.  Attachment 1 is a list of topics for

10:11   20  deposition testimony.  I'm just going to ask you to look

21  through them and verify that you're the person who's

22  been designated by the City to testify on these topics.

23  If there are any that you have not been designated on,

24  either you or counsel can let me know.

10:12   25       MR. MASTER:  I will say, Counselor, that the

1   City does not have a designated individual to respond to

         2   Topic No. 25, which pertains to all actions or other

         3   legal proceedings between Plaintiff --

         4        (Reporter interruption.)

10:12    5        MR. MASTER:  -- and NEA.  It's short for New

         6   Enterprise Associates, I believe.

         7        MR. ROBINSON:  Sounds right.

         8        THE WITNESS:  And aside from Number 25, yes, to

         9   your question.

10:13   10   **Q.**   (By Mr. Robinson)  So you are the person most

        11   qualified on behalf of the City to testify as to 1

        12   through 24 and then No. 26?

        13   **A.**   Correct.

        14   **Q.**   What have you done to prepare for your

10:13   15   deposition?

        16   **A.**   I've researched all the areas that have been

        17   listed in Attachment 1.

        18   **Q.**   Okay.

        19        And how did you go about researching those?

10:13   20   **A.**   I went back and looked at all the documents

        21   that we produced pursuant to this lawsuit.

        22   **Q.**   Were you involved in the process of collecting

        23   documents to be produced in this lawsuit?

        24   **A.**   Those documents that pertain to me

10:13   25   specifically, yes.

1    **Q.**    I assume there were other people within the

2    City who also collected documents.

3    **A.**    That's correct.

4    **Q.**    What were the documents that you collected that

10:14    5    pertain to you specifically?

6    **A.**    Specifically, police related files,

7    computer-aided dispatch reports, files that I had

8    personal possession of, and, in some cases, e-mails.

9    **Q.**    So in preparation for today, you reviewed the

10:14    10    files that the City has produced; correct?

11    **A.**    That is correct.

12    **Q.**    Did you do anything other than reviewing the

13    files that the City has produced?

14    **A.**    I also met with my attorney.

10:14    15    **Q.**    Without getting into the substance of any

16    meeting with your attorney, when did that meeting

17    happen?

18    MR. MASTER:  I'll just object it's not relevant

19    for purposes of this questioning.  Instruct him not to

10:14    20    answer under attorney-client privileged communication.

21    **Q.**    (By Mr. Robinson)  You're going to follow your

22    attorney's instruction not to answer?

23    **A.**    Correct.

24    **Q.**    Let's start here.  Did you talk with anyone

10:15    25    else in preparation for your deposition, other than

1  Counsel?

2  **A.**  Yes.

3  **Q.**  Who else did you talk to?

4  I spoke to our city manager to advise her of

10:15  5  the deposition, I spoke to the assistant city manager to

6  advise him of the deposition, and I also spoke to Janice

7  Dong from the Public Works Department regarding,

8  specifically --

9  (Reporter interruption.)

10:15  10  THE WITNESS:  -- film permits.

11  **Q.**  (By Mr. Robinson)  Is it -- is it accurate that

12  your communications with the city manager and the

13  assistant city manager were to notify them that the

14  deposition was going to occur?

10:15  15  **A.**  Correct.

16  **Q.**  Those weren't information gathering?

17  **A.**  No.

18  **Q.**  And you spoke to Ms. Dong, it sounds like,

19  about information related to film permits; correct?

10:15  20  **A.**  Yes.

21  **Q.**  Did you talk to anyone else at the City in an

22  information-gathering capacity in preparation for the

23  deposition?

24  **A.**  I believe I did ask some detectives in my

10:16  25  police department whether they had any documents that

1　may have been discoverable pursuant to this lawsuit.

2　**Q.**　So aside from speaking with Ms. Dong about film

3　permits and asking detectives for documents that might

4　be discoverable, did you speak to anyone else to prepare

10:16　5　for your deposition?  And from that, I'm excluding just

6　telling people that you were going to be deposed.

7　**A.**　No.

8　**Q.**　I assume your counsel's going to object.

9　How long did you meet with Counsel for

10:16　10　purposes of preparing?

11　MR. MASTER:  You are correct.  It goes to

12　attorney-client privileged communication, attorney work

13　product, and it's not relevant to the litigation, so I'm

14　instructing him not to answer.

10:17　15　**Q.**　(By Mr. Robinson)  Are you going to follow your

16　attorney's instruction not to answer?

17　**A.**　Yes.

18　MR. MASTER:  You can certainly ask him how long

19　it took him to prepare for deposition but not in terms

10:17　20　of any length of communications with me.

21　MR. ROBINSON:  We can -- we can take it up

22　after, but --

23　**Q.**　(By Mr. Robinson)  In preparing for your

24　deposition, did you review any documents that refreshed

10:17　25　your recollection about any pertinent events to this

1   lawsuit?

2     **A.**   Well, yes.  A lot of the documents were from

3   many years ago, so they refreshed my recollection as to

4   the events that were occurring at that time.

10:17   5     **Q.**   And without getting into the substance of any

6   communications you've had with counsel, were you given

7   any information by counsel that was necessary for you to

8   prepare to be the person most qualified on the topics

9   listed?

10:17   10     **A.**   No.  The only thing -- well, without going into

11   what we specifically talked about, basically, just

12   asking me whether I knew of these issues.

13     **Q.**   Fair enough.

14     **A.**   Yeah.

10:18   15     **Q.**   Let's start with Topic No. 1.

16       You understand that Mr. Zeleny, in the past,

17   has protested within the city of Menlo Park; correct?

18     **A.**   Yes.

19     **Q.**   What is your best understanding of the nature

10:18   20   of his protests?  What does he do during the protests?

21       MR. MASTER:  Object.  It's vague and ambiguous.

22   Overbroad.  You can answer.

23       THE WITNESS:  One of the things I think that --

24   I've been here since 2011.  Since 2011, there has been

10:18   25   numerous protests by Mr. Zeleny in which he stands at a

certain location in the city of Menlo Park, protesting a

certain business in the city of Menlo Park with both

sign boards and weapons.  Those protests have gone on

for up to a day at a time.

5     **Q.**  (By Mr. Robinson)  In your experience with --

6  strike that.

7          Both in your experience with Mr. Zeleny

8  individually and as the person most qualified on behalf

9  of the City, you understand that Mr. Zeleny's protests

10  involve the carrying of unloaded firearms; true?

11     **A.**  They involve the right to carry?

12     **Q.**  No.  That they involve him carrying firearms?

13     **A.**  Yes.  In the past, some of the protests, he has

14  been armed; correct.

15     **Q.**  Is Mr. Zeleny permitted to protest in the city

16  of Menlo Park currently while carrying unloaded

17  firearms?

18          MR. MASTER:  Subject it's vague and ambiguous

19  and overbroad.  Calls for a legal conclusion and,

20  therefore, speculation.

21          THE WITNESS:  Anyone is able to protest in the

22  city of Menlo Park.  It's a First Amendment right

23  anybody has, as long as they do so in a nonviolent

24  manner and they conform to all municipal codes, county

25  ordinances, and state laws.

1    **Q.**   (By Mr. Robinson)  My question was more

        2    specific than that, though.  If Mr. Zeleny -- as the

        3    person most qualified on behalf of the City of Menlo

        4    Park, in relation to these protests, if Mr. Zeleny wants

10:20   5    to go today and protest against NEA and carry unloaded

        6    firearms openly, is he allowed to do that within the

        7    city of Menlo Park?

        8            MR. MASTER:  Same objections.

        9            You can answer.

10:20  10            THE WITNESS:  Our -- the interpretation of the

       11    Penal Code is no, he would not be.  It is illegal to

       12    openly carry unloaded weapons in the state of

       13    California.

       14    **Q.**   (By Mr. Robinson)  What would the consequences

10:20  15    be if Mr. Zeleny undertook his protests carrying open,

       16    unloaded firearms?

       17    **A.**   We would look at the situation.  We would

       18    determine whether we believed a crime was occurring, and

       19    if we established that probable cause that a crime was

10:21  20    occurring, an arrest could be made.

       21    **Q.**   Who would be the person on the behalf of the

       22    City of Menlo Park Police Department to decide whether

       23    or not to make an arrest in that situation?

       24    **A.**   Police officer.

10:21  25    **Q.**   So assuming that Mr. Zeleny went to NEA today

1    or some other day and resumed his protests while openly

2    carrying unloaded firearms, he would be subject to

3    arrest; true?

4        A.    That's true.

10:21    5        Q.    Is there any way in which Mr. Zeleny can engage

6    in that protest through permits or some other process

7    where he could do those protests while openly carrying

8    firearms and not be subject to a risk of arrest?

9        A.    There is an exception to the Penal Code that

10:22   10    allows someone who is in an authorized production to

11    carry weapons and if Mr. Zeleny had a authorized

12    production permit from the City, then -- and as long as

13    he fulfilled the rest of the requirements in that

14    permitting process, he would be allowed to do so.

10:22   15        Q.    When you're talking about a production permit,

16    is that a film production permit?

17        A.    Correct.

18        Q.    Other than getting a film production permit

19    from the City, are there any other circumstances in

10:22   20    which Mr. Zeleny could conduct his protests involving

21    the use of firearms without being subject to arrest?

22        A.    I'm not aware of any.

23        Q.    So the film production permit is basically the

24    only option within the city?

10:23   25        A.    Well, it seems to be one of the exceptions to

1 the Penal Code.

2 **Q.** Just for practical purposes, if Mr. Zeleny

3 wants to protest and he wants to carry unloaded firearms

4 during the protests, aside from getting a film

10:23 5 production permit, is there any other way for him to do

6 that within Menlo Park?

7 MR. MASTER: I'll subject to the extent it goes

8 outside the scope of this deposition. It calls for

9 speculation, lacking foundation and a legal conclusion.

10:23 10 But you can answer.

11 THE WITNESS: I'm not aware of any -- there's

12 no such thing as an open carry permit for the city.

13 **Q.** (By Mr. Robinson) So you're not aware of any

14 other means by which Mr. Zeleny could resume his

10:23 15 protest, other than getting a permit?

16 **A.** Well, there are other exceptions to the Penal

17 Code. You'd have to look at that. I mean, if he was a

18 retired military and going -- doing a parade down the

19 street, he could have a weapon.

10:23 20 There's other -- there's other -- if he was a

21 police officer, he could have a weapon. There's other

22 exceptions.

23 **Q.** Are you aware of any other exceptions that

24 would apply in the situation of Mr. Zeleny's protests,

10:24 25 other than the film permit exception?

1     **A.**   I don't know.  I don't know what his background

          2     is.

          3     **Q.**   Is it your understanding that Mr. Zeleny is a

          4     retired military officer?

10:24     5     **A.**   I don't know that.

          6     **Q.**   Do you believe him to be a retired police

          7     officer?

          8     **A.**   I don't know that either.

          9     **Q.**   Has he ever conducted parades within the city

10:24    10     of Menlo Park?

         11     **A.**   Not to my knowledge.

         12     **Q.**   Let's be a little bit more specific about it.

         13     Are there any other -- I understand that the statute has

         14     exceptions.  We'll get into the statute a little bit

10:24    15     later.

         16          Are there any other mechanisms within the city

         17     of Menlo Park, other than getting a film permit, that

         18     would ensure that Mr. Zeleny could conduct his protests

         19     without being arrested?

10:24    20     **A.**   None that I'm aware of.

         21     **Q.**   Are you familiar with the process for special

         22     events permits within the city of Menlo Park?

         23     **A.**   Yes.

         24     **Q.**   What is a special event?

10:25    25     **A.**   A special event is defined by the City as any

1    event that is one that would cause the applicants to

        2    encroach upon the public right-of-way to block streets

        3    that have a number of people, more than 100, that would

        4    require police presence and/or response or would require

10:25   5    or would deal with the noise ordinance if it was very

        6    noisy and those things that are, you know, special by

        7    their very nature; they're not a normal day-to-day

        8    occurrence.

        9        Q.    Is that the City's -- strike that.

10:26  10              Was that the City's definition, to the best of

       11    your knowledge, of a special event?

       12        A.    To the best of my recollection.

       13        Q.    Is that definition of a special event written

       14    down anywhere?

10:26  15        A.    There is a form on the website that gives a

       16    frequently asked questions, and it outlines some of the

       17    factors that would cause one to need a special event

       18    permit.

       19        Q.    Other than the frequently asked questions

10:26  20    portion of the City's website, is there any other place

       21    where the definition of a special event is written down?

       22        A.    Not that I'm aware of.

       23        Q.    One part of your answer was that the event is

       24    special by its very nature.  Do you recall saying that?

10:27  25        A.    I do.

1      Q.   What does that mean?

          2      A.   What that means is someone would not need a

          3  special event for something that is -- that they're

          4  doing in the course of the business or is covered by

10:27     5  some other business permit or other type of permit

          6  that's allowing them to do what they're doing.

          7      Q.   Approximately how many -- strike that.

          8           That portion of the deposition -- that portion

          9  of the definition of special event relating to something

10:27    10  that's special by its very nature, is that piece of it

         11  written down anywhere?

         12      A.   No.

         13      Q.   Is there any way for the public to learn of

         14  that requirement?

10:28    15      A.   If they were to apply for one or call and ask a

         16  question.

         17      Q.   So this special-by-its-very-nature requirement

         18  is not part of the City's website?

         19      A.   That's correct.  If someone already had a

10:28    20  permit or an encroachment permit for something else,

         21  they would not need a special events permit on top of

         22  that.

         23      Q.   So if I'm understanding right, is it your

         24  testimony that this criteria, that the event be special

10:28    25  by its very nature, means an event that doesn't have a

1 different kind of permit?

2    **A.**    That is -- that's correct.  That is outside the

3 permission that an entity or a person already had.

4    **Q.**    Other than being something outside of the

10:28    5 permission that a person or entity already has, does the

6 portion of the definition relating to an event being

7 special by its very nature mean anything else?

8    **A.**    No.

9    **Q.**    So the special-by-its-very-nature requirement

10:29   10 just means you don't have another kind of permit that

11 lets you do this.

12    **A.**    Correct.

13    **Q.**    You understood that Mr. Zeleny applied for a

14 special events permit?

10:29   15    **A.**    Yes.

16    **Q.**    Were you aware at the time Mr. Zeleny applied

17 for his special events permit that he had some other

18 kind of permit that would allow his protests?

19    **A.**    No.

10:29   20    **Q.**    So by the definition you just gave me,

21 Mr. Zeleny's protest was special by its very nature;

22 true?

23         MR. MASTER:  Objection.  Vague and ambiguous.

24 Overbroad.

10:29   25         You can answer.

1        THE WITNESS:  Repeat it.

2        **Q.**   (By Mr. Robinson)  By the definition you just

3    gave me, Mr. Zeleny's special event that he was

4    proposing, because he didn't have some other kind of

10:29   5    permit, would meet your definition of an event that was

6    special by its very nature; true?

7        **A.**   Believe the City's -- as I stated, I believe

8    the City's stats on that was that you don't need a

9    special events permit to, in fact, protest.

10:30   10       **Q.**   At this point -- let me step back a second.

11   You understand that there is an exception to the

12   California Penal Code sections about open carry for

13   entertainment events; true?

14       **A.**   For an authorized production; correct.

10:30   15       **Q.**   Are you aware of the exception that applies to

16   authorized participants in entertainment events?

17       **A.**   An authorized event, yes.

18       **Q.**   Okay.

19           Is there any other mechanism by which the City

10:30   20   of Menlo Park authorizes events, other than the special

21   event permit process?

22       **A.**   The film permit.

23       **Q.**   Okay.

24           So the two options, essentially, are film

10:30   25   permit and special events permit for events; true?

1          MR. MASTER:  I'll just object to the extent

2    that you're asking him to potentially answer questions

3    that go beyond the scope of his designation.

4          But to the extent he has an understanding, he

10:31    5    may.

6          THE WITNESS:  I'm sorry.

7     **Q.**   (By Mr. Robinson)  Let me step back for a

8    second.  It's the City's view -- and I'm asking about

9    Item 4 on Attachment 1, the defendant's interpretation

10:31   10    of the California statutes.

11          It's the City's position that in order to be an

12    authorized participant either in a video production or

13    an entertainment event, the City has to authorize the

14    event itself?

10:31   15    **A.**   That's correct.

16    **Q.**   And the way in which the City would authorize

17    an event of the type that Mr. Zeleny was seeking to

18    conduct would be either through a special events permit

19    or a film permit; right?

10:31   20    **A.**   Those are the only two that I'm aware of.

21    **Q.**   Okay.

22          And at the time Mr. Zeleny applied for the

23    special events permit, you're aware that he didn't have

24    a film permit; correct?

10:32   25    **A.**   Correct.

1     **Q.**   So by your definition of an event that is

2     special by its very nature, I think you told me that

3     means an event that isn't otherwise permitted in some

4     way; right?

10:32   5     **A.**   Correct.

6     **Q.**   So Mr. Zeleny's event, when he applied for a

7     special events permit, he didn't have a film permit;

8     true?

9            MR. MASTER:  Objection.  Asked and answered.

10:32  10            You just asked that two questions ago.  We're

11    going to be here all day if you continue that.

12            You can answer it one more time.

13            THE WITNESS:  Yes.

14    **Q.**   (By Mr. Robinson)  So by your definition of an

10:32  15    event that's special by its very nature, because

16    Mr. Zeleny didn't have a film permit, his event would

17    have met the definition of a special event; true?

18            MR. MASTER:  Objection.  Asked and answered.

19    Argumentative.

10:32  20    **Q.**   (By Mr. Robinson)  You can go ahead and answer.

21            MR. MASTER:  Go ahead.

22            THE WITNESS:  Yes, but there's, obviously,

23    other criteria besides just that.

24    **Q.**   (By Mr. Robinson)  This

10:33  25    special-by-its-very-nature criteria, you said, is not on

```
 1    the website; correct?

 2        A.    Well, I would assume -- yeah.  It's not.

 3        Q.    Is there any reason why it's not on the

 4    website?

10:33    5        A.    Because it's commonsense.  If someone had a

 6    permit or the permission in some other fashion to do

 7    something, they wouldn't need a special event permit on

 8    top of that unless it went beyond their current

 9    permissions.

10:33   10        Q.    Other than this criteria that we've just talked

11    about, the special by its very nature, what are the

12    criteria that the City uses to decide whether or not to

13    grant a special event permit?

14        A.    The criteria to grant one?

10:33   15        Q.    To grant or deny.  What's the decision based

16    on?

17        A.    Well, there is an entire process that is in

18    place for the permit to basically marticulate [sic]

19    throughout the City and touch every department that

10:34   20    would be affected, and there is a person who's

21    designated in every department to examine the permit to

22    see whether or not what is being requested to be done

23    is, number one, feasible; and, number two, what would be

24    required as controls of that event.  In other words,

10:34   25    would they need police presence?  Would they need street
```

1   closures, et cetera?

2     **Q.**   Are there -- are there any written -- is there

3   any written list of criteria or requirements or factors

4   that are considered by the various City departments in

10:34  5   deciding whether or not to grant a special events

6   permit?

7     **A.**   The event permit itself has, basically, a list

8   of criteria that's needed, and the departments would

9   look at that criteria to see whether or not the permit

10:35  10   would either be denied or granted or if it was granted

11   with conditions such as, you know, police presence,

12   closures of streets, sound provisions, number of people;

13   things as mundane as, you know, if they needed

14   porta-potties.  There's many different types of factors

10:35  15   that would be looked at by different departments.

16     **Q.**   Are all of the factors that would be looked at

17   by the various departments listed on the permit

18   application itself?

19     **A.**   I'm not sure if every single factor is listed.

10:35  20     **Q.**   Is there any list, written list of factors?

21     **A.**   Well, the -- if you look at the actual

22   application, it does have some factors that are listed

23   on it.

24     **Q.**   The factors that are not listed on the

10:35  25   application, are those listed somewhere else?

1     **A.**    I'm not sure.

          2     **Q.**    Is there someone else within the City of Menlo

          3     Park who would know whether the factors for granting or

          4     denying a special events permit that are not included on

10:36     5     the application itself are written down?

          6     **A.**    No.

          7     **Q.**    Nobody within the City of Menlo Park is aware

          8     of whether these additional factors are written down?

          9            MR. MASTER:  Objection.  Asked and answered.

10:36    10     Argumentative.

         11     **Q.**    (By Mr. Robinson)  You can answer.

         12     **A.**    The answer would be every department has its

         13     own list of requirements of what they're looking at

         14     specifically to their department, and I assume that

10:36    15     every department -- or I know every department would

         16     have somebody who would be making that determination.

         17     **Q.**    Are the lists maintained by the various

         18     departments within the City written down?

         19     **A.**    I don't know the answer to that for every

10:36    20     department.

         21     **Q.**    Are the factors considered by the police

         22     department written down?

         23     **A.**    They are on a checklist on the application

         24     process, but there is no, like, you know, codified list

10:36    25     of you must do X, Y, Z, because every situation, every

1   event, is going to be different.

2   **Q.**   When you refer to a checklist, are you

3   referring to the checklist on the permit application

4   itself?

5   **A.**   Correct.

6   **Q.**   Okay.

7        Beyond completing the checklist on the permit

8   application itself, are there other factors that the

9   police department considers in deciding whether or not

10   to approve a special events permit?

11   **A.**   It would depend on what the special event was

12   asking to do.

13   **Q.**   So the factors that you would consider vary

14   event by event?

15   **A.**   From the police department specifically, it

16   would be public -- mostly -- almost all public safety

17   factors.

18   **Q.**   What public safety factors are considered?

19        MR. MASTER:   Objection.  Vague and ambiguous.

20   Overbroad.  Incomplete hypothetical.

21        You can answer.

22        THE WITNESS:   Traffic control, crowd control,

23   noise ordinances, safety to the general public; things

24   of that nature.

25   **Q.**   (By Mr. Robinson)  When you say "things of that

1  nature," are there other factors beyond traffic, crowd

          2  control, and safety to the general public?

          3      **A.**  As far as the -- what the police department is

          4  looking for, those are pretty much what we're looking

10:38     5  for.

          6      **Q.**  Are there any objective standards that you

          7  follow, or is it sort of a case-by-case decision about

          8  whether it would impact traffic or safety?

          9          MR. MASTER:  Objection.  Vague and ambiguous.

10:38    10  Unintelligible.

         11          THE WITNESS:  I can't answer that question.

         12      **Q.**  (By Mr. Robinson)  Okay.

         13          Are there objective standards that you, as the

         14  police department, apply in deciding whether or not to

10:38    15  approve a special events permit?

         16          MR. MASTER:  Objection.  Asked and answered.

         17  Vague and ambiguous.

         18          THE WITNESS:  The answer is yes.

         19      **Q.**  (By Mr. Robinson)  What are the objective

10:39    20  criteria that you consider?

         21      **A.**  What I already stated.  It would depend on

         22  whether -- and it's difficult to answer your question,

         23  because without a hypothetical of what it was --

         24  because every special event is going to be different.

10:39    25  Some special events want to close streets; others want

1    to close sidewalks; others want to have a large

2    gathering in a front lawn of a house.

3         It would depend on the actual event itself on

4    what we -- the criteria we would be using to either --

10:39  5    to deny and/or approve.

6    **Q.**   Do the criteria change depending on the event?

7    **A.**   Yes, they -- no.  The criteria don't, but it

8    depends on what part of the -- what criteria we are

9    using to examine it depends on what the event is asking

10:39  10   to do.  In other words, a foot race down downtown is

11   much different than a block party.

12   **Q.**   And beyond the criteria of traffic, crowd

13   control, and safety to the general public, there are no

14   other criteria that would apply in the police department

10:40  15   to approval or denial of a special event permit?

16        MR. MASTER:  Objection.  Asked and answered.

17   Argumentative.

18        Go ahead.

19        THE WITNESS:  Obviously, the -- what was going

10:40  20   on during this event would have to follow local

21   municipal code ordinances, county ordinances, state law,

22   federal law.

23   **Q.**   (By Mr. Robinson)  Are the factors or criteria

24   that you've described to me, which now include

10:40  25   compliance with law, in addition to the others that you

1   mentioned, are those all of the factors that the police

2   department considers in deciding whether to approve or

3   deny a special event permit?

4   **A.**   Yes.

5   **Q.**   Let's start with the traffic.  How do you

6   decide -- you generally said that traffic control is one

7   of the things that you consider.  Can you expand on what

8   you mean by "traffic control."

9   **A.**   Traffic impact.

10   **Q.**   Is there some level of traffic impact that

11   would cause an event to be denied a permit?

12   **A.**   Perhaps.

13   **Q.**   What is the level?

14   MR. MASTER:  I'm just going to object.  The

15   question is vague and ambiguous.  It's an incomplete

16   hypothetical and, therefore, calls for speculation.

17   You can answer.

18   THE WITNESS:  It would depend on where the

19   event was planning to be held and the type of street or

20   location that it was trying to be held on.  It's

21   impossible to say exactly without some more to your

22   question to answer it.

23   **Q.**   (By Mr. Robinson)  What I'm trying to get at is

24   whether there's an objective standard.  So you have this

25   traffic impact and, therefore, your permit is denied.

1          Is there some objective standard in assessing

2     the traffic impact?

3          MR. MASTER:  Object.  Vague and ambiguous.

4     Overbroad.

10:42     5          THE WITNESS:  So it would depend, again, on

6     what was being requested, where it was being requested.

7     We would work with other departments, such as our Public

8     Works traffic division, and there would have to be a

9     discussion within the City on whether or not traffic

10:42     10    control was needed, could an event be done in this

11    location without a major -- major impact into traffic.

12         Q.   (By Mr. Robinson)  The considerations that you

13    just talked about regarding traffic impact, are those

14    considerations written down anywhere?

10:43     15    A.   Well, they are mentioned in the application for

16    special event permit.

17         Q.   Other than being mentioned in the special event

18    permit -- strike that.

19         Other than what's written in the permit

10:43     20    application itself, are the factors that the City would

21    consider relating to traffic control or traffic impact

22    written down anywhere?

23         A.   No.

24         Q.   Do the factors that you consider vary from

10:43     25    event to event?

1    **A.**    Yes.

2    **Q.**    In working with the other City departments to

3    assess the traffic impact of a proposed event, is there

4    any level of discretion within the City to decide

5    whether it would have too much of a traffic impact?

6    **A.**    Yes, there's discretion.

7    **Q.**    You mentioned before a major impact.

8         What is a major impact on traffic?

9    **A.**    It's not quantifiable.

10    **Q.**    Is that an assessment that's also in the

11    discretion of the City personnel who consider the

12    application, whether it's a major impact or not?

13    **A.**    In discussions with other departments, yes.

14    **Q.**    And what -- moving to crowd control.

15         Is crowd control another of those factors that

16    varies event to event?

17    **A.**    Yes.

18    **Q.**    And the criteria that you would use to assess

19    the event depends on what type of event it is; correct?

20    **A.**    Certainly.

21    **Q.**    Is that also true of safety to the general

22    public?

23    **A.**    That it depends on the --

24    **Q.**    That the criteria you consider in analyzing

25    whether an event poses a safety risk to the general

1    public depend on what type of event it is?

2         **A.**   Of course.

3         **Q.**   And is it accurate that those other factors,

4    crowd control and safety to the general public, also

10:45    5    involve some level of discretion on the part of the

6    police department and other City entities that are

7    involved in processing the application?

8         **A.**   Certainly, because we could put conditions to

9    mitigate those issues, if necessary.

10:45   10         **Q.**   How long has the City had a special events

11    permitting process in place?

12         **A.**   The -- there was a process prior to me arriving

13    in the City in 2011, but I am aware that in 2012 and the

14    beginning of 2013, a new process was put into place.

10:46   15         **Q.**   Is the process that you've been describing up

16    until this point the process that was put in place in

17    2012 or 2013?

18         **A.**   Yes.

19         **Q.**   Could you estimate the number of special event

10:46   20    permit applications the City has received since it put

21    this process in place in 2012 or 2013.

22         **A.**   I would estimate -- and this is just by looking

23    at the discovery, you know, over a hundred.

24         **Q.**   How many of those -- if you could estimate, how

10:46   25    many of those were denied?

1      A.    I don't -- I actually don't have an estimation
2  how many were denied.
3      Q.    Did you see any documents in your review of the
4  files of any other than Mr. Zeleny's that were denied?
10:47  5      A.    Yes.
6      Q.    You just can't estimate how many?
7      A.    Correct.  I don't -- I don't remember how many
8  exactly were.
9      Q.    What was the general nature of the events that
10:47  10  you recall being denied?
11      A.    I don't know.
12      Q.    Of those hundred or so special event permit
13  applications, how many were you directly involved with?
14      A.    Me, directly?
10:47  15      Q.    Correct.
16      A.    Maybe half a dozen to a dozen.
17      Q.    You were directly involved in Mr. Zeleny's
18  permit application; right?
19      A.    Correct.
10:47  20      Q.    What are some of the others that you were
21  directly involved with?
22      A.    When I was a patrol commander, I was involved
23  in some of the permitting process for bicycle races,
24  foot races, parades, block parties.
10:48  25      Q.    So at some point, you were promoted to police

1 chief; right?

2 **A.** Correct.

3 **Q.** When did that happen?

4 **A.** In January of 2018.

10:48 5 **Q.** What was your position before you were promoted

6 to police chief?

7 **A.** Police commander.

8 **Q.** Is that different than patrol commander?

9 **A.** Well, police commander is the general rank.

10:48 10 Patrol commander is the division that I was assigned to.

11 **Q.** Before moving on, we talked about the criteria

12 for special event permits that are used within the

13 police department. Are you aware of any criteria that

14 are used by other City departments in assessing whether

10:49 15 to grant or deny a special event permit?

16 **A.** I'm aware of some of the criteria that are used

17 by other departments.

18 **Q.** What are those criteria?

19 **A.** For Community Services, who is the department

10:49 20 that spearheads the entire process, one of the criteria

21 they're looking for is that it is an event for the

22 public, not a private event; for a special event that is

23 for the good of the public.

24 From the Department of Public Works, they're

10:49 25 looking for things such as: Are barricades needed?

1      Would they have to have extra personnel on during this

2      event?

3            They would be -- also be looking for hygiene

4      issues or personal hygiene such as porta-potties and/or

10:50   5      trash collection; things of those nature --

6            (Reporter interruption.)

7            MR. MASTER:  Slow down.

8            THE WITNESS:  The Public Works Department and

9      the Transportation Department would specifically be

10:50  10      looking for traffic issues.

11      **Q.**   (By Mr. Robinson)  So we've covered a lot

12      there, but in general categories, we have Community

13      Service and the requirement of a public event; Public

14      Works, which considers barricades, staffing, and hygiene

10:50  15      issues, such as porta-potties; and then Traffic, which

16      considers traffic issues.

17            Are there any other criteria that you're aware

18      of for granting or denying a special event permit by the

19      other departments?

10:50  20      **A.**   Community service also deals with the rental --

21      sorry -- the rentals of City facilities.

22            THE VIDEOGRAPHER:  Just a quick reminder to

23      turn off cell phones while we're on the record.  I'm

24      picking up some low-level static.

10:51  25      **Q.**   (By Mr. Robinson)  Aside from the criteria

1    considered by the police department and the criteria

2    you've just listed for the other departments, are you

3    aware of any other criteria that are considered?

4         A.    Not that I'm aware of.

10:51    5         Q.    Are the criteria that you just mentioned

6    regarding the other departments written down anywhere?

7         A.    There is a checklist on the application.

8         Q.    Aside from the checklist on the permit

9    application, are those criteria that you mentioned for

10:51   10    the other departments written down anywhere?

11         A.    I don't know.

12         Q.    Is there someone else on behalf of the City who

13    would know?

14         A.    I would assume that whoever is the contact

10:52   15    person in that department may have something written.  I

16    don't know the answer to that.

17         Q.    Is there anything written that's accessible to

18    the public about the criteria that are considered?

19         A.    I believe everything that's on the website is

10:52   20    what is accessible.  I'm not sure if there's anything

21    other than that.

22         Q.    One of the factors you mentioned was whether

23    the event is for the good of the public.

24               Do you recall saying that?

10:52   25         A.    Yes.

1    Q.   What does that mean?

2    A.   What that means is the genesis of this creation

3    of this permitting process came specifically because

4    there were residents who were attempting to close down

10:52    5    entire streets for private birthday parties, et cetera.

6    So one of the criteria is you could close down your

7    street if it was, for instance, a block party that

8    everybody was invited to, but not for just for a private

9    party or a private event.

10:53    10    Q.   Is there -- to your knowledge, both

11    individually and as the person most knowledgeable on

12    behalf of Menlo Park, is there any objective standard

13    that the City uses to measure whether an event is for

14    the good of the public or not?

10:53    15        MR. MASTER:  Objection.  Asked and answered,

16    vague and ambiguous, and overbroad.

17        You can answer.

18        THE WITNESS:  If it's -- if the public is

19    invited, and it is a community-type event where it is

10:53    20    not just for the private use of one person or one

21    resident.

22    Q.   (By Mr. Robinson)  Who makes the decision about

23    whether an event is for the good of the public in terms

24    of considering a special event permit?

10:54    25    A.   Community Services.

1    **Q.**    Is there a particular person at Community

2    Services?

3    **A.**    It would vary, depending on who is currently

4    there when the intake of the permit comes in.

10:54    5    **Q.**    The standard that you mentioned in your

6    previous answer about an event being open to the public,

7    comprising a community event, do you know if that

8    standard is written down somewhere?

9    **A.**    That is specifically stated in the application

10:54    10    process.

11    **Q.**    When you refer to the application process,

12    you're referring to the application that someone fills

13    out; right?

14    **A.**    Yes.

10:55    15    **Q.**    How long is a special event allowed to last

16    within the city of Menlo Park?

17    **A.**    That would depend on the event.

18    **Q.**    Is there any fixed time limit?  Events can be

19    10 days or 20 days or two months?  Is there any

10:55    20    objective limit on how long it can last?

21    **A.**    No.  It would depend on the event.

22    **Q.**    How does the City decide what kind of time

23    frame to impose on an event?

24        MR. MASTER:  Objection.  Vague.  Ambiguous.

10:55    25    Incomplete hypothetical.  Calls for speculation.

1        You can answer.

                2        THE WITNESS:  It would depend on the type of

                3    event.  Time, place, and manner is one of the things

                4    that we are looking at, and it depends -- it would

10:55           5    depend on whether the event had a large-scale impact or

                6    not.  And so it would -- it would -- again, it's

                7    difficult to answer your question without having a

                8    specific event that you're asking about.

                9    Q.  (By Mr. Robinson)  Is the length of time an

10:56          10    event will be allowed determined on an event-by-event

               11    basis?

               12    A.  Yes.

               13    Q.  Is there any objective standard that you're

               14    aware of for deciding how long an event can last?

10:56          15        MR. MASTER:  Objection.  Vague, ambiguous, and

               16    overbroad.

               17        You can answer.

               18        THE WITNESS:  Go back to the time, place, and

               19    manner requirements that we're looking at, depending on

10:56          20    what the impact of everything else that I've already

               21    talked about would be.

               22    Q.  (By Mr. Robinson)  What I'm trying to get at is

               23    if I'm a citizen and I want to put on a special event,

               24    is there anywhere that I could go to figure out what the

10:56          25    criteria that the City is using are so that I can

1   satisfy the criteria and have my permit application

2   granted?

3           MR. MASTER:  It's a different question.  It's

4   vague and ambiguous and overbroad.

10:56   5           You can answer.

6           THE WITNESS:  You would have to tell us what

7   kind of event and where you were doing it before we

8   could answer that question.

9       Q.   (By Mr. Robinson)  So the criteria that would

10:57   10  be used depend on what type of event and where; is that

11  accurate?

12      A.   And how long; correct.

13      Q.   But is that -- okay.

14           So the criteria that the City would use in

10:57   15  assessing an event depend on what type of event, where

16  it's going to be conducted, and how long; correct?

17      A.   And you would have to include all the impacts

18  that I've already talked about; that would also be what

19  we would be looking at.

10:57   20      Q.   Okay.

21           So my question is just whether the factors that

22  are considered by the City vary based on the type of

23  event, the location, and the time.

24      A.   And the factors I've already discussed:  The

10:57   25  impact on public safety, traffic, crowd control;

everything else that I've already talked about, yes.

**Q.** So the factors that you consider vary based on the factors that you consider that you just told me?

MR. MASTER: Whoa. Objection. Vague,

ambiguous, unintelligible.

I don't understand the question.

If you understand it, go ahead.

THE WITNESS: I don't.

**Q.** (By Mr. Robinson) Okay.

We talked for quite a while about factors that the City considers in deciding whether to grant or deny a permit application; correct?

**A.** Yes.

**Q.** You recall our discussion about that?

**A.** Yes.

**Q.** We talked about a number of factors and various departments; right?

**A.** Correct.

**Q.** And my question to you just now was: The

factors that you consider vary based on where the event is, what type of event it is, and how long it's going to last?

And I think your response was: They vary based on that and all the other factors that I just told you.

And I agree that's unintelligible. I'm just

1   trying to figure out what your answer meant.

2        So maybe we can just start from the factors

3   considered by the City vary based on the nature of the

4   event, the location, and the timeline of the event; is

5   that accurate?

6        **A.**   Yes.

7        **Q.**   And the factors that may be considered are the

8   factors that you've told me for the various departments

9   a few minutes ago; right?

10       **A.**   Yes.

11       **Q.**   And those factors are discretionary factors

12  that are considered in consultation with the various

13  departments; right?

14       **A.**   In some cases, yes.

15       **Q.**   Which of the factors are, other than

16  discretionary factors, considered in consultation with

17  the various departments?

18       **A.**   Well, there are the factors that are

19  specifically listed on the application.

20       **Q.**   Okay.

21       I see.  So some of the factors, like you have

22  to have insurance and those types of factors are not

23  discretionary.

24       **A.**   Correct.

25       **Q.**   The other factors that we've talked about

1   previously in your deposition, those are discretionary

         2   factors discussed or addressed among the various

         3   departments?

         4           MR. MASTER:  Object.  It's vague, ambiguous,

10:59    5   and it's overbroad.

         6           You can answer.

         7           THE WITNESS:  And it would be -- yes, based on

         8   time, manner, and place.  That's what we would have to

         9   look at.

11:00   10           MR. ROBINSON:  Why don't we mark this as

        11   Exhibit 30, please.

        12           (Exhibit 30 was marked for identification.)

        13      Q.   (By Mr. Robinson)  For the record, Exhibit 30

        14   is two pages, Bates marked in the bottom right corner

11:00   15   MP1822 to 1823; correct?

        16      A.   Was that to me?

        17      Q.   Yes.

        18      A.   Yes.

        19      Q.   Do you recognize Exhibit 30?

11:01   20      A.   I do.

        21      Q.   What is it?

        22      A.   It's a special event permit flow chart that

        23   was -- that is placed on the website.

        24      Q.   Does it generally describe the process of

11:01   25   processing a permit application for a special event

1    permit?

2       **A.**    Yes.

3       **Q.**    So the event application initially goes to Matt

4    Milde?

11:01   5       **A.**    He no longer works for the City of Menlo Park,

6    so I'm not sure who it would go to now, but it would go

7    to somebody at Community Services.

8       **Q.**    And does that person generally conduct an

9    initial screening process?

11:01  10       **A.**    Yes.

11       **Q.**    They decide if the application is complete as

12    part of the job; right?

13       **A.**    That's part of the job, yes.

14       **Q.**    And they would then -- if it was not complete,

11:02  15    the Community Services person would write back to the

16    applicant and say it's not complete; true?

17       **A.**    Yes.

18       **Q.**    In the ordinary process of handling a permit

19    application.

11:02  20       **A.**    Yes.

21       **Q.**    And assuming that the application makes it

22    through that first stage, then it would be circulated to

23    the various departments listed; correct?

24       **A.**    Correct.

11:02  25       **Q.**    On behalf of the police department, I'm looking

1    at Step C, staff internal review.  Let me step back a

                    2    second.

                    3            Is that the collaborative process that you

                    4    talked about just a few minutes ago where the

11:02               5    departments talk to each other and decide whether it has

                    6    an impact for their department?

                    7        **A.**   Yes.

                    8        **Q.**   So that's Step C of this flow chart.

                    9        **A.**   If you're -- if that's the way you're putting

11:02              10    it in order, yes.

                   11        **Q.**   I'm just referring to where it says Step C --

                   12        **A.**   Yes.

                   13        **Q.**   -- staff internal --

                   14        **A.**   You're correct.

11:02              15        **Q.**   -- internal review.  Got it.

                   16            And for the police department, it lists Matt

                   17    Ortega.

                   18            Do you see that?

                   19        **A.**   I do.

11:03              20        **Q.**   Who is Sergeant Ortega?  Is he -- sorry.  Go

                   21    ahead.

                   22        **A.**   He is now a retired police officer.

                   23        **Q.**   Is there someone else who's taken over this

                   24    role in handing special event permit applications?

11:03              25        **A.**   Yes.

```
 1    Q.   Who is it?

 2    A.   Sergeant Jaime Romero, R-o-m-e-r-o.

 3    Q.   Who was the person in that role who handled the

 4  special event permit applications in 2015?

 5    A.   I believe it was still Sergeant Ortega.  I'm

 6  not sure.  I don't recall when exactly he retired.

 7    Q.   You weren't, generally, the person who handled

 8  special event permit applications?

 9         MR. MASTER:  Objection.  Vague and ambiguous.

10    Q.   (By Mr. Robinson)  In the 2015 time frame, were

11  you the person who ordinarily would handle special event

12  permit applications for the police department?

13    A.   No.  I would be advised of them and get

14  involved if assistance was needed.

15    Q.   How did you decide whether assistance was

16  needed?

17    A.   It was requested.

18    Q.   Was your assistance requested in processing

19  Mr. Zeleny's permit application in 2015 and 2016?

20    A.   Yes.

21    Q.   Who requested your assistance?

22    A.   Originally, Mr. Milde, and then Sergeant

23  Ortega.

24    Q.   Did Mr. Milde relate to you why he was

25  requesting your assistance?
```

11:03  (line 5)
11:03  (line 10)
11:04  (line 15)
11:04  (line 20)
11:04  (line 25)

1      **A.**   Yes.

2      **Q.**   What did he tell you?

3      **A.**   That the application was extremely unusual, and

4  he had no experience in dealing with an application of

11:05   5  this type.

6      **Q.**   Were there more senior people in the Community

7  Services division of the City at that time?  People more

8  senior than Matt Milde.

9      **A.**   Yes.

11:05  10      **Q.**   Do you have any understanding of why Mr. Milde

11  didn't ask someone who was more senior in that

12  department?

13          MR. MASTER:  Objection.  Asks -- it assumes

14  facts not in evidence.  Calls for speculation.

11:05  15          You can answer.

16          THE WITNESS:  I don't know whether he did or

17  not.

18      **Q.**   (By Mr. Robinson)  Did Mr. Milde tell you that

19  he was reaching out to you, in part, because the police

11:05  20  department had experience dealing with Mr. Zeleny?

21      **A.**   Yes.  He asked whether we knew who Mr. Zeleny

22  was and whether we had experience with him, and the

23  answer was yes.

24      **Q.**   So what was your role in dealing with

11:06  25  Mr. Zeleny's special event permit application in 2015

1    and 2016?

2        **A.**    My role was to forward it to the city manager's

3    office and the city attorney's office.

4        **Q.**    Other than Mr. Zeleny's permit application,

11:06    5    have you ever forwarded another special event permit

6    application to the city manager and city attorney?

7        **A.**    No.

8        **Q.**    Okay.

9        Why did you forward Mr. Zeleny's permit

11:06    10    application to the city manager and city attorney?

11        **A.**    Based on the nature of the application and what

12    was being contemplated by Mr. Zeleny as far as the open

13    carry of weapons and the public safety issues that would

14    ensue.

11:07    15        **Q.**    Are you aware of any -- excuse me.

16        Are you aware of any other permit application

17    in the history of the permit application process that

18    was forwarded to the city manager and the city attorney

19    before an appeal other than Mr. Zeleny's?

11:07    20        **A.**    Yes.

21        **Q.**    How many?

22        **A.**    Me, personally?  At least one.

23        **Q.**    What did that relate to?

24        **A.**    To a bicycle race through the city.

11:07    25        **Q.**    And that was before any appeal?

1      **A.**     Correct.

           2      **Q.**     Why did you forward the bicycle race to the

           3    city manager and city attorney?

           4      **A.**     Because of the nature of the route they were

11:07      5    proposing and the major impact to traffic and road

           6    closures.

           7      **Q.**     And the -- I don't want to answer for you, so

           8    let me just ask you:  The reason that you forwarded

           9    Mr. Zeleny's application was what?

11:08     10           MR. MASTER:  Objection.  Asked and answered.

          11    You literally just asked him that question.

          12           MR. ROBINSON:  I'd appreciate it if we keep the

          13    speaking objections to a minimum.  I understand your

          14    objections, and I understand that you have every right

11:08     15    to make them as often as you want, but they're getting

          16    lengthy, and they're taking time.

          17           MR. MASTER:  That wasn't a lengthy one.  I just

          18    told you, I'm not instructing him not to answer, but you

          19    literally just asked him that question two minutes ago.

11:08     20           I'm giving you every opportunity to take his

          21    deposition in both capacities.  Let's limit the

          22    duplicative questions.

          23           Go ahead.

          24      **Q.**     (By Mr. Robinson)  You can answer.

11:08     25      **A.**     I'm sorry.  Say it again.

1    **Q.**   Why did you forward Mr. Zeleny's permit

2    application?

3    **A.**   Because of the nature -- the unusual nature of

4    the application and the fact that the request was to

11:08    5    openly carry weapons in public and the public safety

6    issues that would be present.

7    **Q.**   In what way was Mr. Zeleny's permit application

8    unusual?

9    **A.**   I've never seen a permit of that nature -- I'm

11:09    10    sorry -- permit application of that nature.

11    **Q.**   When you say "application of that nature," what

12    do you mean?

13    **A.**   The event contemplated by Mr. Zeleny was

14    indefinite and requested the carry of open weapons, and

11:09    15    I've never seen a permit asking for the -- or requesting

16    the carrying of open weapons.

17    **Q.**   You mentioned public safety.  What were the

18    public safety issues that caused you to forward the

19    application to the city manager and city attorney?

11:09    20    **A.**   Because of our experience with Mr. Zeleny and

21    the fact that he has had openly carried weapons before

22    and numerous rounds of ammunition.  It would not take

23    very long for him to load a weapon and begin shooting.

24    **Q.**   How many times, to your knowledge, has the

11:10    25    police department interacted with Mr. Zeleny in the

1   course of his protests?

2       **A.**   I would have to estimate.  I don't know for --

3   exactly.

4       **Q.**   Dozens of times?

11:10   5       **A.**   Perhaps a dozen is more accurate.

6       **Q.**   In all those dozens of times, have your

7   officers reported that Mr. Zeleny threatened anyone with

8   his weapons?

9       **A.**   I said dozen, not dozens.

11:10   10      **Q.**   In the dozen times that you've estimated, have

11  your officers ever reported that Mr. Zeleny threatened

12  anyone?

13      **A.**   No.

14      **Q.**   Have they ever reported that he did anything

11:10   15  that was inconsistent with public safety?

16          MR. MASTER:  Objection.  Vague and ambiguous.

17          THE WITNESS:  I don't -- that's a difficult

18  question to answer.

19      **Q.**   (By Mr. Robinson)  Have there been any police

11:10   20  reports that you're aware of -- strike that.

21          Are you aware of any instance during

22  Mr. Zeleny's protests where he did anything that you

23  would consider unsafe?

24      **A.**   Me personally?  Or professionally?

11:11   25      **Q.**   Why don't we say on behalf of the City of Menlo

1    Park.

2        **A.**    All right.

3            The -- professionally, from the City's

4    perspective, the open carry of weapons with numerous

11:11   5    rounds of ammunition already in magazines ready to be

6    loaded, yes, that would be unsafe.

7        **Q.**    Part of the reason that you referred

8    Mr. Zeleny's permit application to the City of Menlo

9    Park is because you -- or to the city manager and the

11:11  10    city attorney is because you considered the practice of

11    carrying unloaded weapons and many rounds of ammunition

12    unsafe; is that accurate?

13        **A.**    That was one of the reasons.

14        **Q.**    Other than carrying the unloaded weapons and

11:11  15    many rounds of ammunition, is there anything else that

16    you're aware of that Mr. Zeleny has done during any of

17    his protests that would be unsafe?

18            MR. MASTER:  Objection.  Vague, ambiguous, and

19    overbroad.

11:12  20            You can answer.

21            THE WITNESS:  Not that I'm aware of.

22        **Q.**    (By Mr. Robinson)  I want to make sure that the

23    only thing that Mr. Zeleny did that created a public

24    safety concern on your part was the carrying of unloaded

11:12  25    guns and many rounds of ammunition.

1     **A.**    Are you speaking --

          2           MR. MASTER:   Is that a question?

          3     **Q.**    (By Mr. Robinson)   I'm asking you to -- I'm

          4     asking you to clarify that that's the only thing, in

11:12     5     your view, that he's done that's unsafe, as the person

          6     most knowledgeable on behalf of the City of Menlo Park.

          7     **A.**    In -- when he was protesting?

          8     **Q.**    Correct.

          9     **A.**    When we speak of the broader public safety

11:12    10     realm, we are also speaking of the impact on passersby.

         11     We receive numerous 9-1-1 calls and complaints about an

         12     armed man standing at a corner of a street, which

         13     obviously impacts public safety, it impacts our

         14     resources, et cetera, and could, in fact, cause a safety

11:13    15     concern based on a driver driving by and seeing an armed

         16     man.

         17     **Q.**    That's something related to Mr. Zeleny carrying

         18     the unloaded weapons; right?

         19     **A.**    Yes.

11:13    20     **Q.**    So other than Mr. Zeleny carrying unloaded

         21     weapons and ammunition, is there anything else that he's

         22     done that the City of Menlo Park considers unsafe?

         23           MR. MASTER:   I'll just object as to relevance,

         24     "safety"; but vague and ambiguous.

11:13    25           You can answer.

```
 1              THE WITNESS:  No.

 2        Q.  (By Mr. Robinson)  I didn't hear your answer.

 3        A.  No.

 4              MR. MASTER:  We've been going for a little over

11:13    5    an hour.  Why don't we take a five-minute break.

 6              MR. ROBINSON:  Sure.

 7              THE VIDEOGRAPHER:  We are now going off the

 8    record.  The time is 11:13 a.m.

 9              (Recess taken from 11:13 a.m. to 11:24 a.m.)

11:24   10              THE VIDEOGRAPHER:  We are now going back on the

11    record.  The time is 11:24 a.m.

12        Q.  (By Mr. Robinson)  I want to take up what we

13    were just talking about before, which is the public

14    safety concern related to Mr. Zeleny having unloaded

11:24   15    firearms and ammunition with him.

16              You mentioned another factor in your decision

17    to refer Mr. Zeleny's permit application to the city

18    manager and city attorney being the open carry nature of

19    the protest.

11:25   20              You recall saying that?

21        A.  Yes.

22        Q.  Does that also relate to Mr. Zeleny openly

23    carrying firearms as well as ammunition?  The same

24    issue; right?

11:25   25        A.  Well, no.  There's a different issue.  There's
```

1    the public safety issue, and then there's the legal

2    issue.

3        **Q.**   Okay.

4            So we've covered the public safety issue;

11:25    5    you've testified about -- what is the legal issue that

6    you're talking about?

7        **A.**   It's against the law to openly carry weapons in

8    the state of California.

9        **Q.**   And that's the case unless the person carrying

11:25    10    the weapons has the appropriate type of permit; true?

11            It's illegal to openly carry firearms except

12    that if you have a special events permit or a film

13    production permit, then it's legal; correct?

14        **A.**   Well, there's many exceptions to the Penal Code

11:26    15    section.

16        **Q.**   And those are two of them; right?  An

17    authorized film production event?

18        **A.**   Authorized film production; correct.

19        **Q.**   And a special event -- and entertainment.

11:26    20    **A.**   And an authorized entertainment event.

21        **Q.**   Right.  So if Mr. Zeleny had the special event

22    permit or the film permit from the City of Menlo Park,

23    it would no longer be illegal for him to carry his

24    firearm.

11:26    25            MR. MASTER:  I subject it calls for a legal

1    conclusion, speculation.

2         But you can answer.

3         THE WITNESS:  That's correct, but there are

4    controls that could be made by the City depending on any

11:26    5    permit that's issued.

6    **Q.**   (By Mr. Robinson)  What are those controls?

7    **A.**   It depends on the permit.

8    **Q.**   In what way does it depend on the permit?

9    **A.**   It goes back to what we spoke of earlier;

11:27   10    depends on what they're asking, what they're

11    contemplating doing, and we have the right to deal with

12    time, place, and manner and public safety issues.  It

13    could be that we'll only let you do this during certain

14    times of the day.  You have to have police presence to

11:27   15    block off the street.  There's -- it depends on what is

16    being contemplated.

17    **Q.**   Those restrictions that you mentioned, are

18    there any criteria that you use to decide whether to

19    impose those types of restrictions?  Things like police

11:27   20    presence or only certain times of day or -- what you're

21    referring to as time, place, and manner, are there

22    criteria that you use to decide whether to impose time,

23    place, and manner restrictions?

24    **A.**   It would depend on what is being contemplated.

11:27   25    **Q.**   Are there objective criteria?

1        MR. MASTER:  Objection.  Vague and ambiguous

2   and overbroad.

3        **Q.**   (By Mr. Robinson)  You can answer.

4        **A.**   There are criteria that are in the application

11:27  5   process, and then there are municipal code sections,

6   county ordinances, state laws, federal laws.

7        **Q.**   What municipal ordinances bear on the time,

8   place, and manner restrictions relating to special

9   events of the type that Mr. Zeleny applied for?

11:28  10       MR. MASTER:  Wow.  Objection.  Vague,

11   ambiguous, and overbroad.  Calls for a legal conclusion.

12   Lacks foundation.

13       **Q.**   (By Mr. Robinson)  Are you aware of any city

14   ordinances that apply to Mr. Zeleny's proposed special

11:28  15   event?

16       MR. MASTER:  Same objection.

17       You can answer.

18       THE WITNESS:  There is a city ordinance that

19   was produced during discovery that deals with the open

11:28  20   carry of weapons.

21       **Q.**   (By Mr. Robinson)  Aside from the open carry of

22   weapons, are there any other city ordinances that you're

23   aware of that apply to Mr. Zeleny's permit application

24   for a special event permit?

11:28  25       **A.**   It would depend on whether or not the special

1    event allowed noise.  There are ordinances regarding

        2    noise.  There are ordinances regarding, you know,

        3    blocking sidewalks, et cetera.

        4        Q.   Were any of those ordinances produced, to your

11:29   5    knowledge?

        6        A.   Not that I'm aware of.

        7        Q.   Are you aware of any other -- you're familiar

        8    with Mr. Zeleny's permit application; right?

        9        A.   Yes.

11:29   10        Q.   You were one of the people involved in

        11    processing that application.

        12            MR. MASTER:  Talking about the special event

        13    now?

        14            MR. ROBINSON:  Correct.

11:29   15            THE WITNESS:  I was -- yes, I was involved in

        16    examining the application.

        17        Q.   (By Mr. Robinson)  And so you're aware of the

        18    nature of the protest or the event that Mr. Zeleny was

        19    contemplating in his application?

11:29   20        A.   Yes.

        21        Q.   What municipal ordinances would apply, other

        22    than the one relating to open carry of firearms?

        23            MR. MASTER:  Same objection.  Lacks foundation,

        24    calls for speculation.  You can answer.

11:29   25            THE WITNESS:  The ones I spoke about.  We

1    actually did discuss, you know, the noise level from the

                    2    proposed generator that was going to be placed, and also

                    3    the fact that the -- you know, the sidewalk would have

                    4    to still be passable.  So those type of issues were

11:30           5    discussed and/or contemplated.

                    6         Q.    (By Mr. Robinson)  Was Mr. Zeleny's

                    7    contemplated event somehow in violation of the noise

                    8    ordinance?

                    9         A.    Well, we wouldn't know.  It would depend on

11:30          10    what kind of generator he brought.

                   11         Q.    At some point, Mr. Zeleny told you the kind of

                   12    generator that he was going to bring; right?

                   13         A.    Correct.

                   14         Q.    Was it in violation of the noise ordinance?

11:30          15         A.    I don't know.

                   16         Q.    Was potential violation of the noise ordinance

                   17    one of the reasons that Mr. Zeleny's permit was --

                   18    permit application was denied?

                   19         A.    Not that I'm aware of, no.

11:30          20         Q.    The other issue you mentioned was obstructing

                   21    the sidewalk; correct?

                   22         A.    Correct.

                   23         Q.    Based on your familiarity with Mr. Zeleny's

                   24    application, you understood that he was planning to

11:31          25    conduct his special event in the median strip; correct?

1    **A.**    Correct.

2    **Q.**    Not on the sidewalk?

3    **A.**    Correct.

4    **Q.**    How would conducting an event on the median

11:31    5    strip obstruct the sidewalk?

6    **A.**    The -- and that's -- these are the questions

7    that were asked:  Were there other vehicles that would

8    be parked there?  Would there be a crowd of people?

9    Those type of questions were asked.

11:31    10    **Q.**    Was Mr. Zeleny's permit application denied, in

11    any part, because of obstruction of the sidewalk?

12    **A.**    No.

13    **Q.**    Aside from the noise ordinance and ordinances

14    related to obstruction of the sidewalk, are you aware of

11:31    15    any other municipal ordinances that were implicated by

16    Mr. Zeleny's proposed special event?

17    **A.**    Not city municipal codes.

18    **Q.**    Were you aware of any county ordinances, rules,

19    or regulations of any kind that were implicated by

11:32    20    Mr. Zeleny's protest -- his special event that he

21    proposed to put on?

22    **A.**    Not county ordinances.

23    **Q.**    At the City level, are you aware of any

24    policies, procedures, rules, anything other than

11:32    25    ordinances, that were implicated by Mr. Zeleny's

1   proposed special event?

2        MR. MASTER:  Can you read that back.  I'm

3   sorry.

4        (Record read.)

11:32   5        THE WITNESS:  The special events policy and

6   procedure.

7        **Q.**  (By Mr. Robinson)  Other than the special

8   events policy and procedure, are you aware of any other

9   municipal policies, procedures, rules, guidelines,

11:33  10   regulations, or any other municipal authority that was

11   implicated by Mr. Zeleny's protest -- his special event?

12        **A.**  No.

13        **Q.**  The special event policy is the policy listed

14   on the City's website and in the frequently asked

11:33  15   questions and on the application; right?

16        **A.**  Correct.

17        **Q.**  Is there any other written indication of the

18   City's special event policy, other than what's on the

19   website and the permit application?

11:33  20        **A.**  Not that I'm aware of.

21        **Q.**  So the entirety of the policy is the website,

22   the FAQ, the permit application itself, and this flow

23   chart?

24        **A.**  Well, the website is just the medium in which

11:33  25   you access it.  They're documents, but yes.

1    **Q.**   Okay.

2         So the website is not the policy; it just has

3    the policy posted to it?

4    **A.**   Correct.

11:34   5    **Q.**   So the policy's comprised of this flow chart,

6    right, <mark>Exhibit 30</mark>?  The permit application itself;

7    correct?

8    **A.**   Correct.

9    **Q.**   And the frequently asked questions; correct?

11:34   10   **A.**   Correct.

11   **Q.**   Other than those three documents:  The flow

12   chart, the permit application, and the frequently asked

13   questions, are there any other documents that reflect

14   the City's special event policy that you're aware of?

11:34   15   **A.**   The website itself does have some -- some

16   information on it that basically is educating people on

17   how to go about getting a special event permit, but

18   that's it.

19   **Q.**   Okay.

11:34   20        So let's include that.  So those four things:

21   Website, flow chart, FAQ posting, and the permit

22   application itself, those four things are the entirety

23   of the City's special event policy; correct?

24   **A.**   And procedures, yes.

11:35   25   **Q.**   Are the procedures contained in those four

documents, or are they a separate item?

**A.** They're contained in those documents.

**Q.** I just want to make sure that there's not some

written document out there, other than those four

things, but I think we're on the same page that those

four documents are the entirety of the City's special

event policy; true?

**A.** Well, not necessarily. As I stated earlier

today, I'm not sure whether other departments have

something -- some checklist that they have themselves

that is written down.

**Q.** Did you see any documents of that nature in the

production that the City made to us?

**A.** I did not.

**Q.** You understand that you are designated as the

person most knowledgeable on Topic 15 in ==Exhibit 29==,

which is "rules, regulations, guidelines, guidance,

policies, or procedures applicable to plaintiff's permit

applications with protests."

**A.** Yes.

**Q.** You understood that you were designated in that

capacity; right?

**A.** Yes.

**Q.** So in your capacity as the person most

knowledgeable on behalf of the City of Menlo Park, are

1   there any other written documents reflecting the City's

2   policy relating to special event permits other than the

3   four documents you just mentioned to me?

4           MR. MASTER:  Objection.  Asked and answered.

11:36   5   Argumentative.

6           You can answer.

7           THE WITNESS:  As I stated I'm not sure if some

8   other department may have, again, a checklist that I'm

9   not aware of; whether it's, you know, work product that

11:36   10   they use.  I don't know.

11      **Q.**   (By Mr. Robinson)  If there is a person with

12   knowledge of that issue in the City of Menlo Park, who

13   would it be?

14      **A.**   I would assume it would be the person who is

11:37   15   handling the special event application review for each

16   department.

17      **Q.**   Are any of these potential checklists

18   maintained by the departments published in any way to

19   the public?

11:37   20          MR. MASTER:  Objection.  Calls for speculation.

21   Lacks foundation.

22          THE WITNESS:  I don't know.

23      **Q.**   (By Mr. Robinson)  Is there someone at the City

24   of Menlo Park who would know?

11:37   25          MR. MASTER:  Same objection.

1           You can answer.

        2           THE WITNESS:  Again, I assume it would be the

        3    person who was actually reviewing this.

        4      Q.   (By Mr. Robinson)  Reviewing it, meaning

11:37   5    reviewing the permit application?

        6      A.   Correct.

        7      Q.   Going back to Exhibit 30, we talked about,

        8    before, the legal issues related to open carry, the

        9    safety issues related to Mr. Zeleny's open carry of

11:38  10    firearms, and then the indefinite nature of the protest.

       11    Were there any other factors that caused you to refer

       12    Mr. Zeleny's permit application to the city manager and

       13    city attorney?

       14      A.   Yes.

11:38  15      Q.   What were the other factors?

       16      A.   The fact that he was also contemplating and/or

       17    requesting to use a center median, which is prohibited

       18    by the California Vehicle Code; the fact that in order

       19    to get to that center median, anybody who wanted to

11:38  20    attend this event would have to do something that is

       21    prohibited in jaywalking to that center median.

       22           MR. MASTER:  You're talking fast.

       23           THE WITNESS:  Yeah.  Sorry.

       24      Q.   (By Mr. Robinson)  Okay.

11:39  25           So we have the safety and legal issues related

1    to open carry, we have the indefinite nature, and we

2    have the use of the median strip.  Any other factors

3    that caused you to refer Mr. Zeleny's permit application

4    to the city attorney and city manager?

5    **A.**   Also, the fact that what was contemplated was a

6    device that would be displaying some kind of lighted

7    animation or something that may, in fact, again, also be

8    in violation of the Vehicle Code.

9    **Q.**   Anything else?

10    **A.**   No.

11    **Q.**   Any other reasons?

12    **A.**   For referring it?

13    **Q.**   For referring it.

14    **A.**   No.

15    **Q.**   Going through the ==Exhibit 30==, I understand that

16    this exhibit reflects the ordinary process of handling a

17    permit application; correct?

18    **A.**   Yes.

19    **Q.**   In the ordinary process, the permit application

20    would not be referred to you; correct?

21    **A.**   Referred to me or would I be advised of it?

22    **Q.**   You wouldn't be the person considering the

23    permit application on behalf of the police department in

24    ordinary circumstances.

25           MR. MASTER:  Objection.  Misstates his

1   testimony.

2      **Q.**   (By Mr. Robinson)  You can go ahead and answer.

3      **A.**   It would depend on the process -- on the

4   application.

5      **Q.**   I think you said out of the hundred or so

6   applications since 2012, 2013, you reviewed half a dozen

7   to a dozen yourself?  Or you handled between half a

8   dozen and a dozen of them; correct?

9          MR. MASTER:  Which one is it?  It's compound.

10          You can answer.

11     **Q.**   (By Mr. Robinson)  How many of the permit

12  applications processed by the City since 2012, 2013 --

13  of those applications, how many of them were you the

14  person responsible for addressing the application on

15  behalf of the police department?

16     **A.**   Perhaps half a dozen.

17     **Q.**   Of those half a dozen -- sorry.  Okay.  So we

18  have half a dozen.  The other 96 -- 94 or so

19  applications, you weren't the person who processed on

20  behalf of the police department; is that accurate?

21  Somebody else did.

22     **A.**   Processed or was advised of?

23     **Q.**   Processed.

24     **A.**   Processed.  No.

25     **Q.**   Someone else handled the other 94 or so;

1  correct?

2        MR. MASTER:  Vague and ambiguous.

3        You can answer.

4        THE WITNESS:  For those that came to the police

11:41  5  department, yes.

6      Q.   (By Mr. Robinson)  So you were the person to

7  process, on behalf of the police department,

8  approximately 6 percent of the applications, based on

9  your estimate; correct?

11:41  10        MR. MASTER:  Objection.  It's vague and

11  ambiguous.  Overbroad.  It's vague.

12        Yeah.  Go ahead, if you can answer.

13        THE WITNESS:  You mean six out of a hundred?

14  Is that what you're trying to say?

11:42  15      Q.   (By Mr. Robinson)  That's what I'm trying to

16  say.

17      A.   That's an estimation on the total amount, yes.

18      Q.   So it was relatively unusual, in the course of

19  permit applications, for you to be the person who

11:42  20  processed the application on behalf of the police

21  department; correct?

22        MR. MASTER:  Vague and ambiguous.

23  Argumentative.

24        You can answer.

11:42  25        THE WITNESS:  Yes.

1    **Q.**    (By Mr. Robinson)  And out of those six

2    applications that you processed, you referred two of

3    them to the city manager and city attorney; correct?

4    **A.**    Two that I recall, yes; the two that I've

11:42    5    already talked about.

6    **Q.**    So of the applications that you processed on

7    behalf of the police department, it was also relatively

8    unusual for you to refer it to the city manager and city

9    attorney; correct?

11:42    10    **A.**    Unusual in that I've only -- only two out of

11    the six?  Yes.

12    **Q.**    In the ordinary process of handling a permit

13    application in the City of Menlo Park, you are generally

14    not the person who handles it on behalf of the police

11:43    15    department; and, generally, it's not referred to the

16    city manager and city attorney; is that fair?

17    **A.**    Unless it's extraordinary; correct.

18    **Q.**    And Mr. Zeleny's permit application was

19    extraordinary for the four reasons you've mentioned to

11:43    20    me previously; correct?

21    **A.**    Correct.

22    **Q.**    One of the reasons that you mentioned was the

23    open carrying of firearms; true?

24    **A.**    Yes.

11:43    25    **Q.**    And you were aware, when you were processing

1    Mr. Zeleny's permit application, that his open carrying

2    of firearms would be complying with California law if he

3    had the permit he was requesting; true?

4        **A.**    At what time, are you saying?

5        **Q.**    In 2015.  If Mr. Zeleny had the permit that he

6    was asking for, the special events permit, he would fall

7    within the exception to the Penal Code that prohibits

8    carrying of unloaded firearms; right?

9            MR. MASTER:  Objection.  Calls for legal

10    conclusion.  Lacks foundation.  Speculation.

11            You can answer.

12            THE WITNESS:  That's why I sent it to the city

13    attorney to determine whether or not the interpretation

14    of the exception would be that if a person had a special

15    event permit or -- an entertainment permit or an

16    entertainment event, that the exception would apply.

17        **Q.**    (By Mr. Robinson)  Did you ever reach a view,

18    in your own mind, both individual -- well, let's do it

19    this way:  As the person most knowledgeable on behalf of

20    the City of Menlo Park, do you have an opinion on

21    whether Mr. Zeleny would be compliant with California

22    law in carrying firearms if he got the special events

23    permit?

24        **A.**    If he was -- if he had received a special event

25    permit for an entertainment event in the city of Menlo

1    Park, then the exception would apply.

2        Q.    And if the exception would apply, Mr. Zeleny

3    would be allowed to openly carry unloaded firearms;

4    correct?

11:45   5        A.    Yes, but there could be -- depending on what

6    the controls were that would be put on by different city

7    departments, including the police department.

8        Q.    What types of controls was the city police

9    department allowed to put on Mr. Zeleny's carrying of

11:45  10    firearms?

11        A.    The ones I've already mentioned.  It could be

12    blocking off of streets, confirming that the firearms

13    are, in fact, unloaded and safe; you know, whether or

14    not police presence needed to be made.  So all these

11:45  15    different factors would come into play at that time.

16        Q.    Are those -- so it's your understanding that

17    the City of Menlo Park Police Department would have the

18    right to impose these requirements or restrictions on

19    Mr. Zeleny's carrying of firearms?

11:46  20        A.    Time, manner, place, yes.

21        Q.    And that's in connection with his special

22    events permit; right?

23        A.    If he were to -- if he were to get a -- if a

24    special events permit were to be approved, any of the

11:46  25    departments involved could, in fact, put controls on

1    what criteria needed to be met in order for the -- for

         2    the event to go on.

         3        **Q.**   How does the City of Menlo Park come up with

         4    those criteria?

11:46    5             MR. MASTER:  Objection.  Asked and answered.

         6             THE WITNESS:  Again, it would depend on the

         7    actual event; and going back to traffic impact, public

         8    safety, crowd control, the -- everything else that I've

         9    already talked about.

11:47   10        **Q.**   (By Mr. Robinson)  Are the criteria decided on

        11    a permit-by-permit basis?

        12             MR. MASTER:  Objection.  Asked and answered.

        13             THE WITNESS:  Yes.

        14             MR. MASTER:  At some point, I'm going to stop

11:47   15    this.  He's answered that at least three or four times.

        16        **Q.**   (By Mr. Robinson)  Looking at ==Exhibit 30== again,

        17    Step D under the flow chart, it looks like if more

        18    information is needed from the applicant, Matt Milde is

        19    supposed to set up a meeting with the applicant; is that

11:47   20    accurate?

        21        **A.**   According to the document, yes.

        22        **Q.**   This is one of the City's published policies on

        23    handling special events permits; right?

        24        **A.**   Yes.

11:47   25        **Q.**   All right.

1          And it describes how the process is supposed to
2     work, right, in ordinary circumstances?
3     **A.**   Yes.
4     **Q.**   So if, after review by the City staff, it's
11:48  5     decided that more information is needed, then Matt Milde
6     or his successor sets up a meeting with the applicant;
7     correct?
8     **A.**   Yes.
9     **Q.**   Did the City ever set up a meeting with
11:48  10    Mr. Zeleny?
11    **A.**   I'm not sure if a meeting was requested or the
12    more information requested was via e-mail.
13    **Q.**   Who generally decides whether to request a
14    meeting?  Is it the City or the applicant?
11:48  15    **A.**   It would be the -- it could be either.
16    **Q.**   In the general process, who, typically,
17    requests a meeting with the applicant?
18          MR. MASTER:  Objection.  Asked and answered.
19    It's vague and ambiguous.
11:48  20          Go ahead.
21          THE WITNESS:  It would be the person who is
22    representing Community Services.
23    **Q.**   (By Mr. Robinson)  So it would typically be
24    Mr. Milde or his successor?
11:48  25    **A.**   Yes.

1    **Q.**   Do you know whether Mr. Milde or anyone else in

2    his role ever requested a meeting with Mr. Zeleny in

3    connection with the permit?

4    **A.**   I don't recall if he requested a meeting or

11:49    5    stated they could meet or whether the e-mail that was

6    sent was the one requesting more information.

7    **Q.**   Was there any reason, that you're aware of, to

8    request more information from Mr. Zeleny via e-mail as

9    opposed to setting up a meeting?

11:49    10    Was there any reason not to set up a meeting

11    with Mr. Zeleny that you're aware of?

12    **A.**   Well, yes.  My understanding is Mr. Milde said

13    that because he lived in Los Angeles, that it probably

14    would not be feasible to have an in-person meeting, and

11:49    15    it would be easier for Mr. Zeleny to do it via e-mail.

16    **Q.**   Do you know whether anyone ever asked

17    Mr. Zeleny whether he'd like to attend a meeting?

18    **A.**   At that time?

19    **Q.**   Correct.

11:49    20    **A.**   I don't know.

21    **Q.**   Is there someone within the City who would

22    know?

23    **A.**   Perhaps Mr. Milde, but he's no longer with the

24    City.

11:50    25    **Q.**   Was -- in your experience, dealing with permit

1 applications -- strike that.

2 As the person most knowledgeable for the City

3 of Menlo Park about permit applications, is it typical

4 for the City to elect to correspond with the applicant

11:50  5 via e-mail as opposed to setting up a meeting.

6 MR. MASTER: Objection. Vague and ambiguous.

7 You can answer.

8 THE WITNESS: I think, in some cases, yes,

9 depending on where the applicant lives. And I know of

11:50  10 several where it was not done in person. But if the

11 person is local and it is convenient for them to meet in

12 person, then the meeting could be in person.

13 **Q.** (By Mr. Robinson) Okay.

14 To the best of your knowledge, the reason for

11:51  15 communicating with Mr. Zeleny via e-mail, rather than

16 setting up an in-person meeting was for Mr. Zeleny's

17 convenience?

18 **A.** Yes.

19 **Q.** Was Mr. Zeleny ever given a conditional

11:51  20 approval or conditional denial of his permit

21 application?

22 MR. MASTER: Objection. Compound. Vague and

23 ambiguous.

24 **Q.** (By Mr. Robinson) Was he ever given a

11:51  25 conditional approval of his permit application?

|          | 1  | **A.**   No. |
|          | 2  | **Q.**   Was he ever given a conditional denial of his |
|          | 3  | permit application? |
|          | 4  | **A.**   Yes. |
| 11:51    | 5  | **Q.**   What were the conditions? |
|          | 6  | **A.**   The denial -- the conditions that were on the |
|          | 7  | e-mail that were -- regarding his denial was the fact |
|          | 8  | that he could not have it on the median; that there |
|          | 9  | would be some controls over the display on how bright it |
| 11:51    | 10 | would be; that the -- anyway, going back to the -- a new |
|          | 11 | location. |
|          | 12 | Originally, the location contemplated was |
|          | 13 | somewhat vague and had to be -- it had to be more |
|          | 14 | accurately described, and the fact that he was |
| 11:52    | 15 | contemplating openly carrying weapons. |
|          | 16 | **Q.**   The fact that he was contemplating openly |
|          | 17 | carrying weapons was one of the grounds for the |
|          | 18 | conditional denial; true? |
|          | 19 | **A.**   Yes. |
| 11:52    | 20 | **Q.**   Were you aware at the time of the city's |
|          | 21 | conditional denial that if Mr. Zeleny obtained the |
|          | 22 | permit he was asking for, he would have been legally |
|          | 23 | permitted to carry unloaded firearms? |
|          | 24 | MR. MASTER:  Objection.  Asked and answered. |
| 11:52    | 25 | **Q.**   (By Mr. Robinson)  You can answer. |

1     **A.**   That could have been an exception to the Penal

2     Code, yes.

3     **Q.**   So you were aware that you were denying

4     Mr. Zeleny the permit he needed in order to allow him to

11:53   5   legally carry his firearms during his event; correct?

6           MR. MASTER:  Objection.  Argumentative.  Asked

7     and answered.

8     **Q.**   (By Mr. Robinson)  You can answer.

9     **A.**   I'm sorry?

11:53   10   **Q.**   You understood in -- the City understood in

11    denying Mr. Zeleny's permit on the grounds that his

12    event contemplated carrying firearms, that it was

13    denying him the permit he needed in order to legally

14    carry the firearms; right?

11:53   15   **A.**   That was one of the factors.

16    **Q.**   But --

17    **A.**   It wasn't the only factor that was used to

18    deny --

19    **Q.**   I didn't ask -- sorry to interrupt you.

11:53   20         I didn't ask if it was one of the factors.  It

21    was a yes-or-no question.

22          The question was:  Was the City of Menlo Park

23    aware, at the time it conditionally denied Mr. Zeleny's

24    permit that the permit would have allowed him to legally

11:53   25   carry unloaded firearms during this event?

1          MR. MASTER:  Okay.

2          Now you're being argumentative.  That's not the

3  question you just asked him.  It's a different question.

4          So I'd appreciate it if you're professional

11:54  5  towards the chief.  He answered your question.  If you

6  want to go back to the question you asked previously,

7  the reporter can read that back or ask it differently.

8          MR. ROBINSON:  And, again, I have asked you to

9  keep the speaking objections to a minimum.  I'm trying

11:54  10  to make it through the deposition as quickly as I can,

11  but the speaking objections and talk on the record is

12  not helpful too.

13     **Q.**   (By Mr. Robinson)  So why don't we do this:  At

14  the time the City conditionally denied Mr. Zeleny's

11:54  15  permit, was the City aware that the permit, had it been

16  granted, would have allowed Mr. Zeleny to openly carry

17  unloaded firearms?

18          MR. MASTER:  Objection.  Asked and answered.

19  He just answered that question.

11:54  20          Go ahead.  One more time.

21          THE WITNESS:  And the answer is:  That could

22  have been one of the exceptions, yes.

23     **Q.**   (By Mr. Robinson)  It could have been one of

24  the exceptions to what?

11:55  25     **A.**   To the prohibition to open carry of weapons.

1      **Q.**   Did you have a position at the time -- did the

          2   City have a position at the time it conditionally denied

          3   Mr. Zeleny's permit about whether granting the permit

          4   would have allowed him to legally carry unloaded

11:55     5   firearms during his event?

          6          MR. MASTER:  Objection.  Vague and ambiguous.

          7   Confusing.  Unintelligible.

          8      **Q.**   (By Mr. Robinson)  You can answer.

          9      **A.**   You need to be a little bit more clear about

11:55    10   the -- what you're asking.  Sorry.

         11          MR. ROBINSON:  Can we read back the last

         12   question, please.

         13          (Record read.)

         14          MR. MASTER:  Also say it's asked and answered.

11:56    15   But go ahead.

         16          THE WITNESS:  Again, the City's position was

         17   that a special entertainment event could have, perhaps,

         18   allowed him, under one of the exceptions, but there was

         19   no legal firm decision on that, if that's what you're

11:56    20   asking.

         21      **Q.**   (By Mr. Robinson)  There was no firm legal

         22   decision by the City at the time it conditionally denied

         23   the permit?

         24      **A.**   On the question of whether or not the exception

11:56    25   would apply.

```
 1      Q.   So the City didn't have a firm view in -- when

 2   it denied the permit about whether granting the permit

 3   would cause the exception to apply?

 4          MR. MASTER:  Objection.  Asked and answered.

 5          THE WITNESS:  The -- the City's view was that

 6   the -- if Mr. Zeleny had gotten a valid permit for an

 7   entertainment event, the exception could apply, but

 8   there still needed to be review of that.

 9      Q.   (By Mr. Robinson)  Review of what?

10      A.   Review of the exception.

11      Q.   You understood -- the City understood, in

12   processing Mr. Zeleny's permit application, that one of

13   the reasons he was requesting a permit was that so he

14   could fall within the exception; right?

15          MR. MASTER:  Objection.  Asked and answered

16   three or four times in the past ten minutes, Counselor.

17   I don't want to have to instruct him not to answer, but

18   let you do it one more time, and then we're going to

19   stop that and move on to a different topic.

20          He's answered it repeatedly.

21          Go ahead.

22          MR. ROBINSON:  Hold on.  Before you answer.

23          You've been giving numerous speaking objections

24   and speeches on the record.  I'm trying to make it

25   through the deposition.  I've asked you repeatedly to
```

stop doing it.  If it continues, I will stop the

2 deposition myself, and we'll go in for an order

3 compelling a further deposition without improper

4 instructions.

11:58　5　　　　　MR. MASTER:  Counselor, I'm happy to do what I

6 need to do, but at the end of the day, you're not

7 entitled to badger the witness with the same question

8 over and over and over again.

9　　　　　Go ahead.  I'll let you answer that question

11:58　10　one last time.

11　　　　　MR. ROBINSON:  Let's just read back the last

12 question, please.

13　　　　　(Record read.)

14　　　　　MR. MASTER:  Also calls for speculation.  Lacks

11:58　15　foundation.

16　　　　　Go ahead.

17　　　　　THE WITNESS:  I don't know what was in his

18 mind.

19　　　　　MR. ROBINSON:  Why don't we mark this Exhibit

11:58　20　31, please.

21　　　　　(Exhibit 31 was marked for identification.)

22　　**Q.**　(By Mr. Robinson)  Just for the record, Exhibit

23 31 is multiple pages.  The Bates numbers are MP1381

24 through 1385; correct?  The numbers in the bottom

12:00　25　right-hand corner.

1    **A.**    You're asking me?

                    2    **Q.**    Yes.

                    3    **A.**    Yes.

                    4    **Q.**    Do you recognize ==Exhibit 31==?

12:00        5    **A.**    I recognize it as an e-mail.

                    6    **Q.**    Was it an e-mail that was sent to you?

                    7            MR. MASTER:  Which e-mail are you referring to,

                    8    just so we're clear?

                    9    **Q.**    (By Mr. Robinson)  Mr. Bertini, you use e-mail

12:00      10    in the course of your work; true?

                   11    **A.**    Yes.

                   12    **Q.**    You have received e-mails, from time to time,

                   13    that contain an e-mail followed by a series of other

                   14    e-mails behind it?

12:01      15    **A.**    Also known as a thread.

                   16    **Q.**    Fair enough.

                   17            You receive e-mail threads; right?

                   18    **A.**    Correct.

                   19    **Q.**    You're familiar with what they look like?

12:01      20    **A.**    I am.

                   21    **Q.**    Generally, in an e-mail thread, the first

                   22    e-mail at the top of the tread contains all the prior

                   23    e-mails; is that your experience?

                   24    **A.**    Correct.

12:01      25    **Q.**    Does this appear to be an e-mail thread that

1    you received from Nicholas Flegel?

         2        A.   It wasn't directed to me, but I was copied on

         3    it, yes.

         4        Q.   Okay.

12:01    5             When you received it, did it contain all of the

         6    prior e-mails, as e-mail threads tend to do?

         7        A.   Yes.

         8        Q.   Who is Mr. Flegel?

         9        A.   He is one of the city attorneys.

12:01   10        Q.   And I'm just going to ask you, at this point,

        11    about a sentence in the first paragraph of Mr. Flegel's

        12    e-mail. It states, "Without a special event permit or

        13    film permit, it is inappropriate and illegal for you to

        14    possess guns as part of your entertainment event/film

12:02   15    production."

        16             Do you see that?

        17        A.   Yes.

        18        Q.   Does that represent the -- strike that.

        19             Does that accurately reflect the City of Menlo

12:02   20    Park's position on Mr. Zeleny's carrying of unloaded

        21    weapons during his event?

        22        A.   Yes.

        23        Q.   He couldn't do it without one of those two

        24    permits.

12:02   25        A.   The -- yes.  The exception would not apply

1    without one of the permits.

 2        Q.   Was that the City's position at the time it

 3    conditionally denied Mr. Zeleny's permit originally in

 4    2015?

12:02    5        MR. MASTER:  Objection.  Asked and answered.

 6        THE WITNESS:  Yes.  The City -- I'm sorry.  I

 7    hate to ask you to repeat it, but --

 8        Q.   (By Mr. Robinson)  Was that -- the position

 9    reflected in Mr. Flegel's e-mail, was that the position

12:02   10    of the City at the time it conditionally denied

11    Mr. Zeleny's permit in 2015?

12        A.   Only as it pertained to the firearms, yes.

13        Q.   It's a fair clarification.  So I want to make

14    sure we get a clear question and answer.

12:03   15        As it pertained to firearms, the City's

16    position reflected in Mr. Flegel's e-mail of December 7,

17    2017, was also the City's position at the time it

18    conditionally denied Mr. Zeleny a special events permit;

19    correct?

12:03   20        A.   Yes.

21        Q.   One of the reasons that the City denied

22    Mr. Zeleny a special events permit was to prevent him

23    from falling within the exception to the ban on openly

24    carrying unloaded firearms; correct?

12:03   25        MR. MASTER:  Objection.  Asked and answered.

1    Argumentative.

                    2            THE WITNESS:  And the answer would be no.

                    3    There was many -- there were several reasons why the

                    4    special events permit was denied; not just the weapons.

12:03       5    **Q.**   (By Mr. Robinson)  That was among the reasons;

                    6    right?

                    7    **A.**   One of them.

                    8    **Q.**   Why don't we take a look at what I'll hand

                    9    you -- ask our reporter to hand you as ==Exhibit 32==.

12:04      10            (==Exhibit 32== was marked for identification.)

                   11            THE WITNESS:  I've examined ==Exhibit 32==.

                   12    **Q.**   (By Mr. Robinson)  For the record, it's a

                   13    one-page document Bates marked MP1437; correct?

                   14    **A.**   Yes.

12:04      15    **Q.**   The top e-mail -- first of all, the top e-mail

                   16    is an e-mail from Derek --

                   17    **A.**   Schweigart.

                   18    **Q.**   Schweigart?

                   19    **A.**   S-c-h-w-e-i-g-a-r-t.

12:05      20    **Q.**   Thank you.

                   21            Who is Derek Schweigart?

                   22    **A.**   At the -- oh.  Now, this is 2019; he is the

                   23    Community Services director.

                   24    **Q.**   And I'll just -- is this one of the documents

12:05      25    that you reviewed in preparing for your deposition?

1      **A.**   Yes.

2      **Q.**   It relates to a public records request;

3   correct?

4      **A.**   Yes.

12:05   5      **Q.**   And Mr. Schweigart asks, in his top e-mail,

6   "I'm wondering if this is the one that PD handled."

7         Do you see that?

8      **A.**   Yes.

9      **Q.**   Was Mr. Zeleny's permit application handled by

12:05   10   the police department?

11      **A.**   We were one of the departments.

12      **Q.**   Are you familiar with any other permit

13   application that could be characterized as one that the

14   police department handles?

12:06   15      **A.**   We would be --

16         MR. MASTER:  Hold on.  Objection.  Lacks

17   foundation.  Calls for speculation.

18         You can answer.

19         THE WITNESS:  We would be involved in almost

12:06   20   every permitting.  The -- there are types of events that

21   are very heavily handled by the police department by

22   their very nature.

23      **Q.**   (By Mr. Robinson)  As the person most qualified

24   on behalf of the City of Menlo Park, is Mr. Zeleny's

12:06   25   permit application the permit application that

1   Mr. Schweigart is referring to as the one that PD

2   handled?

3          MR. MASTER:  Objection.  Lacks foundation.

4   Calls for speculation.

12:06   5          You can answer.

6          THE WITNESS:  At the time of the application,

7   Mr. Schweigart was not the director, so I'm not sure

8   what his level of knowledge was about how this entire

9   process happened.

12:07  10     Q.   (By Mr. Robinson)  All I'm asking you is as the

11   person who's been designated as most qualified for the

12   City of Menlo Park to testify about the documents that

13   were produced, is the reference in the document to the

14   permit that PD handled a reference to Mr. Zeleny's

12:07  15   permit application?

16          MR. MASTER:  Calls for speculation.  Lacks

17   foundation.

18          Why don't you lay some foundation for him.

19          If you can answer.

12:07  20          THE WITNESS:  Again, I'm not -- Mr.

21   Schweigart -- I'm not sure what his level of awareness

22   was of the entire process.  I assume this is the -- I

23   can assume --

24          MR. MASTER:  Don't assume.  If you know, he's

12:07  25   entitled to it, but don't guess as to what he's saying.

1    If you know, he's entitled to an answer.

2        THE WITNESS:  No.  I don't know.

3    **Q.**  (By Mr. Robinson)  Is there someone else at the

4    City of Menlo Park who would be better able to answer

12:07    5    that question?

6    **A.**  I assume Mr. Schweigart, since he wrote -- he

7    authored the e-mail.

8        MR. ROBINSON:  Counsel, are you prepared to

9    designate Mr. Schweigart as a PMK?

12:07    10        MR. MASTER:  For what purpose?

11        MR. ROBINSON:  To testify about whether this is

12    the application that the police department handled.

13        MR. MASTER:  No.  He was not the PMK, no.

14        MR. ROBINSON:  Okay.

12:08    15        MR. MASTER:  You're asking -- if you want to

16    talk about it, I'm happy to talk about it.  We can do it

17    here on the record or off the record.

18        MR. ROBINSON:  Why don't we just -- why don't

19    we finish my line of questioning, and then we can talk

12:08    20    about it.

21        MR. MASTER:  Absolutely.

22    **Q.**  (By Mr. Robinson)  Regardless of what

23    Mr. Schweigart knew or didn't know, is Mr. Zeleny's

24    permit application a permit application that the Police

12:08    25    Department of Menlo Park handled?

1          MR. MASTER:  Objection.  Asked and answered.

2          THE WITNESS:  We were one of the departments

3    that dealt with it.

4      Q.   (By Mr. Robinson)  Do you have any

12:08   5    understanding of why Mr. Schweigart characterized some

6    application, whether it's Mr. Zeleny's or someone

7    else's, as the one that PD handled?

8          MR. MASTER:  Objection.  Lacks foundation.

9    Calls for speculation.

12:08  10          THE WITNESS:  No.

11      Q.   (By Mr. Robinson)  Okay.

12          We have about ten minutes left on this tape, so

13    why don't we take a break here, and I'm happy to meet

14    and confer with you about this.

12:09  15          Do you want to have Mr. Bertini present, or do

16    you want to --

17          MR. MASTER:  No.  He can take a break.

18          MR. ROBINSON:  Okay.

19          Let's take a break.

12:09  20          THE VIDEOGRAPHER:  This now marks the end of

21    disk labeled No. 1 in the videotaped deposition of Chief

22    Dave Bertini.  We're now going off the record.  The time

23    is 12:08 p.m.

24          MR. ROBINSON:  Could we actually stay on the

12:09  25    written record just for purposes of setting up lunch and

```
         1    then doing a quick meet and confer with Counsel?

         2              MR. MASTER:  Are we doing that off the record

         3    or on the record?

         4              MR. ROBINSON:  Let's do it on the record.

12:09    5              MR. MASTER:  Okay.

         6              MR. ROBINSON:  I don't think we --

         7              MR. MASTER:  Go for it.  I'm happy to.

         8              MR. ROBINSON:  Okay.

         9              MR. MASTER:  You can go outside.

12:09   10              MR. ROBINSON:  So, first of all, do you want to

        11    take till 1:00 for lunch?  It's about ten after.

        12              MR. MASTER:  Yeah.  That's fine.

        13              MR. ROBINSON:  Okay.

        14              Michael, do you want to give us a minute?

12:09   15              MR. ZELENY:  Yeah.

        16              MR. ROBINSON:  So Chief Bertini has testified

        17    that he's not aware of, including among other things,

        18    whether this is the application that the police

        19    department handled.  He's not aware of the policies of

12:10   20    other City departments.  He's not aware of a number of

        21    things that go directly to the topics that he's here on,

        22    most importantly of which is the special event permit.

        23              MR. MASTER:  I would disagree with that

        24    characterization.

12:10   25              MR. ROBINSON:  You're welcome to do that, but
```

1    are we going to have witnesses that can, for example --

2              MR. MASTER:  What do you want, specifically?

3              MR. ROBINSON:  I want a witness who can tell me

4    what the criteria are for a special events permit.

12:10   5              MR. MASTER:  He's already told you that.

6              MR. ROBINSON:  I don't think so.  He said there

7    are potentially criteria for other departments that he's

8    not aware of.

9              MR. MASTER:  He's -- no.  That's not what he

12:10  10    said, Counselor.  He said the criteria -- your question

11    was:  Did they have a written list of that criteria

12    somewhere?  That was your question.

13              He answered:  I don't know if they have a

14    written list.

12:10  15              We have looked.  I will tell you on the record

16    that we don't have any written documents like that.

17              MR. ROBINSON:  Okay.

18              MR. MASTER:  So he is the person most

19    knowledgeable.

12:10  20              MR. ROBINSON:  He's the person most

21    knowledgeable about unwritten policies of other

22    departments?

23              MR. MASTER:  Yes.  He just told you that.

24              MR. ROBINSON:  Okay.

12:11  25              I disagree with that, but we can take it up --

we can explore his level of knowledge about these issues

2     and then take it up, but I think we've met and conferred

3     about his --

4          MR. MASTER:  Hold on.  We're not trying to hide

12:11     5     anything.  Okay?  The bottom line is Mr. Milde is no

6     longer with the City anymore.

7          You understand that; correct?

8          MR. ROBINSON:  I do.

9          MR. MASTER:  Okay.

12:11     10          The chief of police was the person involved

11     with this special event permit application with your

12     client.  He's also been involved with numerous other

13     special event permits, given his history.  We have

14     designated him, and he has been educated to the extent

12:11     15     possible that -- to testify on those issues.

16          The law isn't that we are required to give you

17     every single person who has knowledge about everything.

18     The law requires us to give you the person who is most

19     knowledgeable about those things.  That doesn't mean he

12:11     20     has to have knowledge about everything.

21          And to the extent he doesn't have knowledge

22     about something, then you can take it as you see fit.

23          MR. ROBINSON:  Okay.

24          MR. MASTER:  If there's specific questions you

12:12     25     have on other departments, I'm happy to understand what

1   those are and determine how we can get you that

2   information that you need, but what I don't appreciate

3   on the record is you hounding my client over an e-mail

4   that he was not copied on, that he did not author, about

5   what someone meant by their e-mail.  That's what I do

6   not appreciate, and if that continues, I'm going to stop

7   it.

8          MR. ROBINSON:  Your client is designated as the

9   person most knowledgeable on behalf of the City.  He's

10  been -- hold on.  Let me finish what I'm -- I let you

11  finish.  Now let me finish.

12         MR. MASTER:  I'm not stopping you.

13         MR. ROBINSON:  He's been designated as the

14  person most qualified, among other things, on the

15  documents produced in this case.  He can't lack

16  foundation about what is meant by a document produced in

17  this case.  If he needs to contact someone to ask what

18  it's about, he needs to do that, but he has to have a

19  foundation to testify about the topics that he's been

20  designated on.

21         MR. MASTER:  I objected to that topic because

22  that topic, quite frankly, is overbroad and ridiculous.

23  He is not going to testify as to the nature of what

24  someone else wrote to two other people.  We aren't going

25  to designate someone to do that.  And this one, quite

1   frankly, has nothing to do with what you're talking

                2   about in the case.  He's already testified about his

                3   involvement in the special event permit application.

                4        Okay?

12:13           5             MR. ROBINSON:  I'm sorry.  This is an e-mail

                6   about a FOIA request for documents related to Mr. Zeleny

                7   that was served in the context of this lawsuit.

                8             MR. MASTER:  No.

                9             MR. ROBINSON:  You're telling me an e-mail

12:13          10   about a FOIA request served in connection with this

               11   lawsuit is not relevant to the lawsuit?

               12             MR. MASTER:  Yeah.  How?

               13             MR. ROBINSON:  Because we'd like to know if

               14   Mr. Zeleny's application was transferred to the police

12:13          15   department for handling, which it apparently was.  And I

               16   don't understand why the person most qualified on behalf

               17   of the City can't answer that question.

               18             MR. MASTER:  He did answer the question, and

               19   we're done.

12:13          20             MR. ROBINSON:  Okay.

               21             MR. MASTER:  Go off the record.  We're done.

               22             (Lunch recess taken from 12:13 p.m. to 1:07

               23   p.m.)

               24             THE VIDEOGRAPHER:  This now marks the beginning

13:07          25   of disk labeled No. 2 in the videotaped deposition of

1    Chief Dave Bertini.  We are now going back on the

         2    record.  The time is 1:07 p.m.

         3        **Q.**   (By Mr. Robinson)  Okay.

         4             We're back on the record.  Chief Bertini, you

13:07    5    understand you're under the same oath you took this

         6    morning; correct?

         7        **A.**   I do.

         8        **Q.**   In the ordinary permit process, who makes the

         9    ultimate decision about whether to grant or deny a

13:07   10    permit?

        11             THE VIDEOGRAPHER:  I got some interference --

        12    one second, Counsel.

        13             Everybody's phone is turned off; right?

        14             THE WITNESS:  I have to leave mine on.  I'm

13:08   15    sorry.

        16             MR. MASTER:  Airplane.

        17             THE WITNESS:  Okay.

        18             THE VIDEOGRAPHER:  I think we're clear for now.

        19    So yeah.  We just experienced some audio interference,

13:08   20    but the record is still going.  So if it happens again,

        21    I'll let you know.

        22             MR. ROBINSON:  Okay.

        23             Could we just read back the last question.

        24             (Record read.)

13:08   25             MR. MASTER:  Objection.  Vague and ambiguous as

1   to which permit.

2          But go ahead.

3     **Q.**   (By Mr. Robinson)  Let me clarify.  In the

4   ordinary special event permit process as it was in

13:08   5   effect in 2015, who made the ultimate decision about

6   whether to grant or deny a permit?

7     **A.**   In the ordinary process, it is a collaborative

8   decision, and approval has to be made by every

9   department that is involved.

13:09   10    **Q.**   Does the City of Menlo Park have a special

11   events committee?

12    **A.**   Yes, they do.  It is -- yes.

13    **Q.**   Who is currently on the special events

14   committee?

13:09   15    **A.**   It is the designated person from each

16   department.

17          THE VIDEOGRAPHER:  Excuse me, Chief.  Is it

18   possible to just move your phone just a little bit away

19   from you?  That may help in the future, if something --

13:09   20          MR. MASTER:  Does it vibrate or something if it

21   goes?

22          THE WITNESS:  Yeah.

23          MR. MASTER:  Is that better?

24          THE VIDEOGRAPHER:  Okay.  Thank you.

13:09   25    **Q.**   (By Mr. Robinson)  Is the special event

1    committee different from the staff internal review group

         2    that's listed on Exhibit 30?

         3        A.    So I need to go back and correct the committee.

         4    The committee was created specifically to come up with

13:10    5    the process back in 2011, 2012.  The special application

         6    review is different than the actual committee, which

         7    no -- does not exist anymore.

         8        Q.    So there's no longer a committee?

         9        A.    The committee was in place just to come up with

13:10   10    the new process.

        11        Q.    The committee is not the entity that decides

        12    whether or not to grant an application.

        13        A.    That's correct.

        14        Q.    The -- okay.

13:11   15              Has there been a special events committee at

        16    any point after the adoption of the current special

        17    event process?

        18        A.    No.

        19        Q.    Did the police department handle Mr. Zeleny's

13:11   20    permit application for a special events permit?

        21              MR. MASTER:  Objection.  Vague and ambiguous.

        22              THE WITNESS:  We were part of the City

        23    departments that looked at it.

        24        Q.    (By Mr. Robinson)  Of -- strike that.

13:11   25              Did any of the other City departments, besides

1   the police department, decide to deny the application?

2   **A.**   I believe the application was denied through

3   the City Attorney's Office.

4   **Q.**   Did the police department make a decision to

13:11   5   deny the application?

6   **A.**   It was not the police department's decision.

7   **Q.**   Why wasn't it the police department's decision?

8   **A.**   The ultimate decision was made by the city

9   attorney, based on input by all the departments.

13:12   10   **Q.**   Of the permit applications -- speaking

11   specifically about special events permits.

12       Of the applications that you're aware of since

13   2012 or 2013, how many of those were denied by the city

14   attorney?

13:12   15   **A.**   As requested, two.

16   **Q.**   When you say "as requested," do you mean that

17   one of the City entities requested that the city

18   attorney review it, and then the city attorney made a

19   decision?

13:13   20   **A.**   No.  By requested, I mean that the application

21   was put in one form, and then when it was denied, it was

22   revamped in a way that was acceptable to the City

23   departments.

24   **Q.**   What -- was one of the applications that was

13:13   25   denied by the city attorney Mr. Zeleny's application?

1    **A.**    Yes.

2    **Q.**    What was the other one?

3    **A.**    The bicycle race I mentioned before.

4    **Q.**    In the situation of the bicycle race, was the

13:13    5    application submitted and then revised in some way and

6    resubmitted?

7    **A.**    Yes.

8    **Q.**    And the -- was the resubmitted application

9    denied?

13:13    10    **A.**    No.

11    **Q.**    So the resubmitted application was granted?

12    **A.**    Correct.  In a different format, a different

13    form.

14    **Q.**    Mr. Zeleny's resubmitted application was

13:14    15    denied; true?

16    **A.**    The -- I'm not sure he ever resubmitted an

17    application.  He made some -- he answered some

18    questions, I believe, but not to the satisfaction of the

19    departments and the City Attorney's Office.

13:14    20    **Q.**    And so despite the revisions to the

21    application, Mr. Zeleny's application was, again,

22    denied; true?

23    **A.**    Eventually, yes.

24    **Q.**    Was that denial by the City Attorney's Office?

13:14    25    **A.**    It was through the City Attorney's Office, yes.

1    **Q.**   Before Mr. Zeleny made the revisions to his

2    application -- so now talking about the original

3    application before he gave more information or revised

4    it in some way.  The original application, was that

13:14    5    denied through the City Attorney's Office?

6    **A.**   No, I don't believe so.  The original

7    application was originally denied through the Community

8    Services Department.

9    **Q.**   Who made the decision to deny it?

13:15    10    **A.**   That was -- at that time, it was made by Matt

11    Milde.

12    **Q.**   Did the City departments listed in Step C of

13    Exhibit 30 provide input to Mr. Milde to make his

14    decision?

13:15    15    **A.**   Yes.

16    **Q.**   Did you provide input on behalf of the police

17    department?

18    **A.**   I -- yes, I did.

19    **Q.**   What was your input to Mr. Milde?

13:15    20    **A.**   My input was the concerns that have already

21    been discussed regarding the Vehicle Code sections,

22    Municipal Code sections that would be violated, the

23    Penal Code sections that would be violated, and then

24    on -- along with the public safety issues:  Traffic,

13:16    25    crowd control, et cetera; things I've talked about this

1    morning.

                    2        Q.    Did you make a directive or recommendation to

                    3    Mr. Milde about whether to grant or deny the

                    4    application?

13:16               5        A.    I said as far -- from the police department

                    6    perspective, from our department, that the -- as stated

                    7    or as the -- as the application was written, that it

                    8    should be denied.

                    9        Q.    Do you know whether any other departments

13:16              10    indicated -- strike that.

                   11            Do you know whether any other departments

                   12    within the City suggested to Mr. Milde that the

                   13    application should be denied?

                   14        A.    Yes.  I understand that there was also concerns

13:16              15    from Transportation, which is in Public Works, regarding

                   16    the -- the issue.

                   17        Q.    Are you aware of any departments, other than

                   18    police department and Transportation -- strike that.

                   19            The City Transportation Department is not one

13:17              20    of the City entities listed, is it?

                   21        A.    PW means Public Works, so Public Works

                   22    engineering would be -- Transportation would be under

                   23    that.

                   24        Q.    So the -- you, on behalf of the police

13:17              25    department, suggested that the application, in its

1  original form, be denied, and the Public

2  Works-Engineering department also suggested concerns; is

3  that accurate?

4      **A.**   Correct.

13:17   5      **Q.**   Other than those two City entities, are you

6  aware of any other entities that suggested that the

7  application be denied?

8          MR. MASTER:  You mean departments.

9          MR. ROBINSON:  City departments.

13:17   10     **Q.**   (By Mr. Robinson)  Are you aware of any

11  departments, other than those two, that suggested that

12  the application be denied?

13     **A.**   Not necessarily denied, but there was others

14  that had concerns.

13:17   15     **Q.**   In general, is it the process that the City

16  departments provide input, and then Mr. Milde, at that

17  time, at least, would make the ultimate decision?

18     **A.**   Based on the department input, yes.

19     **Q.**   If a department recommended that the permit be

13:18   20  denied, would that cause the permit to be denied?

21     **A.**   In most cases, yes.

22     **Q.**   Were you the primary person, at the time of

23  Mr. Zeleny's original application, responsible for the

24  application in the police department?

13:18   25     **A.**   I shared that responsibility with Sergeant

1    Ortega, but, eventually, I became the primary person.

2        **Q.**   Why was that?

3        **A.**   He retired.

4        **Q.**   At that time, did Sergeant Ortega report to

13:18  5    you?

6        **A.**   At what time?

7        **Q.**   At the time that Mr. Zeleny submitted his

8    application in 2015.

9        **A.**   2015?  Yes.

13:19  10       **Q.**   You were his boss?

11       **A.**   Yes.

12       **Q.**   The reasons that you suggested to Mr. Milde

13   that the application be denied are the same reasons we

14   discussed this morning; correct?

13:19  15       **A.**   Correct.

16       **Q.**   When, in the process in dealing with

17   Mr. Zeleny's permit application, did you refer it to the

18   city attorney?

19       **A.**   Not quite sure exactly when I sent it, but I

13:19  20   think the -- I think by nature of Mr. Zeleny's mass

21   e-mail, it may have been right away, because I believe

22   he may have copied the city attorney.

23           (Exhibits 33 and 34 were marked for

24   identification.)

13:20  25       **Q.**   (By Mr. Robinson)  Let's start with ==Exhibit 33==.

1    And I'm just going to ask you, for the record, it's

2    Bates marked MP1817 through 1821; correct?

3        **A.**    Correct.

4        **Q.**    Do you recognize ==Exhibit 33==?

13:20   5        **A.**    I do.

6        **Q.**    What is it?

7        **A.**    It is a Special Event Permit Application

8    Frequently Asked Questions that I spoke about earlier.

9        **Q.**    When -- going to the first page of this, under

13:21   10   the heading "What Qualifies as a Special Event," when

11   you received Mr. Zeleny's special event permit

12   application, did you understand that it incorporated the

13   use of a city street, sidewalk, or other right-of-way?

14       **A.**    Well, it was the median.  I'm not sure that

13:21   15   would be considered a -- perhaps, maybe, the

16   right-of-way.

17       **Q.**    You discussed before the potential of people

18   either obstructing the sidewalk or walking out --

19   jaywalking over the street to get to the median;

13:21   20   correct?

21       **A.**    Correct.

22       **Q.**    Both of those things would involve either the

23   use of a sidewalk or the use of a street; true?

24       **A.**    Correct.

13:21   25       **Q.**    So the permit application that Mr. Zeleny

1    submitted, in your view, would it satisfy the

                2    requirement of use of a city street, sidewalk, or other

                3    right-of-way?

                4        **A.**   Yes.

13:22           5        **Q.**   We also talked about Mr. Zeleny's event being

                6    for an indefinite duration.  Do you recall that?

                7        **A.**   Yes.

                8        **Q.**   Did you understand, based on the application,

                9    that Mr. Zeleny intended to stay at the site for

13:22          10    multiple days?

               11        **A.**   I did not know what his intent was, but it said

               12    "indefinite."

               13        **Q.**   When you received it, did you understand the

               14    reference to "indefinite" to refer to more than one day?

13:22          15            MR. MASTER:  Objection.  This lacks foundation.

               16    Calls for speculation.

               17            You can answer.

               18            THE WITNESS:  Indefinite means there's no

               19    ending time.  That's the definition of indefinite.

13:22          20        **Q.**   (By Mr. Robinson)  Okay.

               21            So we're on the same page that interpreting the

               22    term "indefinite," in your view, it means multiple days

               23    with no fixed end day?

               24        **A.**   It means forever to me.

13:22          25        **Q.**   Okay.

1    So if you go down to the second-to-last bullet

2    point, "Events occurring for more than one day,"

3    Mr. Zeleny's proposed event would satisfy that

4    criteria --

13:22    5    **A.**    Yes.

6    **Q.**    -- true?

7    It would require a permit on that basis; right?

8    **A.**    Yes.

9    **Q.**    You were familiar with Mr. Zeleny's protests

13:23    10    prior to his filing a permit application.

11    **A.**    Yes.

12    **Q.**    Those protests involved carrying of unloaded

13    firearms; correct?

14    **A.**    In the past, yes.

13:23    15    **Q.**    In your view, as an official with the Police

16    Department of the City of Menlo Park, did you believe

17    that a police presence was necessary during Mr. Zeleny's

18    previous protests?

19    **A.**    Yes.

13:23    20    **Q.**    Did you think a police presence was required

21    for the entertainment event or the special event that he

22    proposed putting on through his permit application?

23    **A.**    If it was -- yes, there would have been a

24    police presence.

13:23    25    **Q.**    So the last bullet point there, "Events needing

1   police regulation, monitoring, or control," in your

2   view, the event that Mr. Zeleny filed his application

3   for satisfied that criteria; correct?

4   **A.**   Yes.

13:23   5   **Q.**   So to summarize, at least three of these bullet

6   points would be triggered by Mr. Zeleny's proposed

7   special event permit; correct?

8   **A.**   Yes.

9   **Q.**   And under the definition set out in the FAQ, if

13:24   10   an event meets any one of these criteria, it qualifies

11   as a special event requiring a permit; true?

12   **A.**   Requires you to complete a special event

13   application.

14   **Q.**   Is the City -- is the definition in this FAQ of

13:24   15   what qualifies as a special event the City's definition

16   of a special event?

17   **A.**   Yes.

18   **Q.**   So under this -- at least under the published

19   FAQ, Mr. Zeleny's event would qualify as a special event

13:24   20   on at least three criteria; correct?

21   **A.**   Yes.

22   **Q.**   Let me have you turn to the page that's marked

23   MP1820.  There's the section titled "What would cause a

24   permit to get denied?"

13:25   25   Do you see that?

1      **A.**   Yes.

2      **Q.**   Under that heading, are the criteria listed

3      some of the criteria that would be considered in

4      granting or denying a special event permit?

13:25  5      **A.**   I'm sorry.  Say that again.

6      **Q.**   Are the criteria listed or the factors listed

7      under the heading "What would cause a permit to get

8      denied?" the factors that the City considers in deciding

9      whether to grant or deny a permit application?

13:25  10     **A.**   Well, it's answering the question:  What would

11     cause a permit to get denied? and gives some examples of

12     common factors why permits would be denied.

13     **Q.**   Are the factors listed there, in your knowledge

14     and experience as the person most qualified on behalf of

13:25  15     the City, some of the factors that would cause a permit

16     to be denied?

17     **A.**   Yes.

18     **Q.**   Are there other factors?

19     **A.**   Yes.

13:26  20     **Q.**   What are the other factors?

21     **A.**   Other factors would be those that had to deal

22     with already-in-place municipal codes, county

23     ordinances, state laws, federal laws, et cetera.

24     **Q.**   Other than the factors listed here and

13:26  25     compliance with laws and regulations and ordinances, are

1    there any other factors that you're aware of that could

2    cause a permit to be denied?

3        A.   From the police department's perspective,

4    public safety would also be a reason why it could be

13:27   5    denied.

6        Q.   Does the police department determine, in

7    connection with permit applications, whether the

8    proposed event poses a risk to public safety?

9        A.   Correct.

13:27  10        Q.   Beyond public safety in general, are there any

11   specific criteria that you consider?

12        A.   Other than what's been discussed, none that I

13   could recall right now.

14        Q.   Other than the permit application itself and

13:27  15   this FAQ that we're looking at, are you aware of any

16   other written document available to the public that

17   lists the factors considered in granting or denial of an

18   application?

19            MR. MASTER:   Objection.   Asked and answered.

13:28  20            Go ahead.

21            THE WITNESS:   There's the application itself on

22   the website, and what the website says itself, which I

23   see is Exhibit 34.

24        Q.   (By Mr. Robinson)   You anticipated my next

13:28  25   question.   Exhibit 34 is two pages, MP1830 and 1831;

1   correct?

2        **A.**   Yes.

3        **Q.**   This is the special event permit website?

4        **A.**   That is correct.

5        **Q.**   Does the website accurately describe the

6   process and qualifications for special events?

7        **A.**   Yes.

8        **Q.**   If you could turn to the last page, please.

9   There's a reference at the very bottom -- maybe it's not

10   the bottom; about a third of the way down the physical

11   page, there's a reference to "film permits."

12        Do you see that?

13        **A.**   Yes.

14        **Q.**   To your knowledge, does -- strike that.

15        As the person most qualified on behalf of the

16   City of Menlo Park, does the City have any written

17   criteria for grant or denial of film permits?

18        **A.**   Yes.

19        **Q.**   Where are those criteria?

20        **A.**   They are available from the Department of

21   Public Works in the form of an FAQ, frequently asked

22   questions, and also an encroachment permit.

23        MR. ROBINSON:  Sorry.  Could we go off for 30

24   seconds.

25        THE VIDEOGRAPHER:  We are now going off the

```
 1   record.  The time is 1:29 p.m.

 2              (Recess taken from 1:29 p.m. to 1:30 p.m.)

 3              THE VIDEOGRAPHER:  We are now going back on the

 4   record.  The time is 1:30 p.m.

 5              MR. ROBINSON:  Okay.

 6              Why don't we go ahead and mark that as Exhibit

 7   35, please.

 8              (Exhibit 35 was marked for identification.)

 9       Q.   (By Mr. Robinson)  Chief Bertini, do you

10   recognize Exhibit 35?

11       A.   I do.

12       Q.   For the record, it's two pages, MP5241 and

13   5242; correct?

14       A.   Correct.

15       Q.   Is this the FAQ that you just mentioned?

16       A.   Yes.

17       Q.   We'll get into the encroachment permit later

18   on, but this -- basically, this document that we're

19   looking at, Exhibit 35 and then the encroachment permit,

20   those are the two documents that are available that list

21   the criteria considered by the City in granting or

22   denying a film permit; correct?

23       A.   Correct.

24       Q.   Are there any other criteria that you're aware

25   of, beyond what's set out in Exhibit 35 or in the
```

13:30  (line 5)
13:31  (line 10)
13:31  (line 15)
13:31  (line 20)
13:32  (line 25)

```
 1    encroachment application?

 2         A.    No.

 3         Q.    How many film permits -- strike that.

 4               When did the City put a film permit process in

 5    place?

 6         A.    In the time frame of 2006, 2007.

 7         Q.    How many film permit applications have been

 8    filed since 2006, 2007?

 9         A.    I don't know the exact number.

10         Q.    Is it in the hundreds?

11         A.    For the last --

12         Q.    Why don't we narrow the time frame.  Let's say

13    from 2013 to today, approximately how many permits?

14         A.    I would say two dozen.

15         Q.    Is that applications or issued permits?

16         A.    Applications.

17         Q.    Of those approximately two dozen, could you

18    estimate how many were denied?

19         A.    I don't know.

20         Q.    Have you been involved in the grant or denial

21    of any -- strike that.

22               Have you been involved in the process of

23    considering film permit applications?

24         A.    Yes.

25         Q.    On how many occasions?
```

13:32 (line 5)
13:33 (line 10)
13:33 (line 15)
13:33 (line 20)
13:34 (line 25)

1     A.    Probably, maybe, six or seven times.

          2     Q.    Is that in the same time frame, from 2013 to

          3   today?

          4     A.    Correct.

13:34     5     Q.    Why -- why do you become involved in film

          6   permit application processing?

          7     A.    The Public Works Department, when they receive

          8   a film permit application, circulates it to -- just like

          9   the special events, circulates to all the departments

13:34    10   that may be affected.  One of those is the police

         11   department.  And, normally, the film permit and

         12   encroachment permit is forwarded to the police

         13   department, along with other departments, to determine

         14   whether or not the permit is something that is -- can

13:35    15   be -- can be done, can be approved, and if so, would

         16   there be any mitigating circumstances that would need to

         17   be in place.

         18     Q.    Who makes the ultimate decision for the City

         19   about whether to grant or deny a film permit?

13:35    20     A.    The Public Works Department.

         21     Q.    Stepping back for a second, did the police

         22   department handle Mr. Zeleny's request for a special

         23   events permit?

         24          MR. MASTER:  Objection.  Asked and answered.

13:35    25   Vague and ambiguous as to "handled."

1          You can answer.

2          THE WITNESS:  We were one of the departments

3     that had a hand in examining the permit.

4     **Q.**   (By Mr. Robinson)  Did you have a hand, the

13:36    5     police department, in the ultimate decision?

6          MR. MASTER:  Of what?  Hold on.  Decision of

7     what?

8     **Q.**   (By Mr. Robinson)  You can go ahead and answer.

9          MR. MASTER:  No.  It's vague and ambiguous.

13:36   10     It's overbroad.  It's also been asked and answered.

11          Why are we going through this again?

12          MR. ROBINSON:  Counsel, I've asked you a number

13     of times before we broke to stop giving speaking

14     objections and speeches on the record.  I'm going to

13:36   15     renew my request that you stop giving speaking

16     objections and speeches on the record.

17          MR. MASTER:  And I'm going to renew my request

18     for you to stop repeating the same questions over and

19     over again, as the record will clearly demonstrate.

13:36   20          You can answer.  But sometime soon, we're going

21     to stop this.  Go ahead.

22          THE WITNESS:  Are you speaking of the special

23     event permit?

24     **Q.**   (By Mr. Robinson)  Correct.

13:36   25     **A.**   Okay.

And as I stated, we were one of the departments

2     that made recommendations regarding that permit

3     application.

4          Q.   Was the police department the ultimate

13:37   5     decision-maker on that application?

6               MR. MASTER:  Objection.  Asked and answered.

7     We ask -- we answered this, literally, 20 minutes ago.

8     Want to go back and read the record?

9               MR. ROBINSON:  Again, I would appreciate if you

13:37  10     would stop giving speeches on the record and speaking

11     objections.

12               MR. MASTER:  I'm going to stop -- hold on,

13     Counselor.  I'm going to stop you from repeating the

14     same questions over and over again.  I'd like to go back

13:37  15     on the record now before we go further and see if that

16     question had been asked 20 minutes ago to prove my

17     point, because my client's time is valuable.  He has to

18     run a police department, and you're here asking him

19     question after question, which is fine, but when you

13:37  20     repeat them over and over again, it gets a little

21     burdensome and harassing.

22               So that's my objection to this.  I'm not going

23     to instruct him not to answer now, but very shortly, I

24     will if you ask this question one more time.

13:37  25               MR. ROBINSON:  You are welcome to make any

1  objection you want to make, and you're welcome to

2  instruct him not to answer if you believe that's proper,

3  and we'll have our remedies based on your instruction

4  not to answer.  What's not appropriate is for you to

13:37  5  continue making speeches on the record.

6       I've asked you multiple times today to stop

7  doing that.  If you want to instruct him not to answer,

8  by all means, instruct him not to answer and we'll take

9  it up with the Court and you can make your argument.

13:38  10      The time to make your argument is not on the

11  record while I'm conducting a deposition.

12      MR. MASTER:  Okay.

13      Go ahead.  You can answer the question.

14      And this will be the last time today or any

13:38  15  time he'll be answering it.

16      Go ahead.  You need a readback?

17      THE WITNESS:  Please.

18      (Record read.)

19      THE WITNESS:  No.

13:38  20  **Q.**  (By Mr. Robinson)  Has the police department

21  been the ultimate decision-maker on any permit

22  application for a special events permit?

23  **A.**  No.

24      THE VIDEOGRAPHER:  Again, I'd like to make

13:39  25  another request that all cell phones are turned off when

```
         1   we are on the record.  I can hear static, low-level

         2   static.

         3            MR. MASTER:  His phone's on.

         4            MR. ZELENY:  This is airplane mode.

13:39    5            THE VIDEOGRAPHER:  Yeah, but if you're using --

         6   if you're on the internet, you're not on airplane mode.

         7            MR. ZELENY:  Okay.  I'll do that.

         8            THE VIDEOGRAPHER:  Yeah.  I need them turned

         9   off.  It's affecting the record.

13:39   10            MR. MASTER:  He can't turn his off.

        11            THE VIDEOGRAPHER:  I understand.  If it's away

        12   from the microphone, it usually stops what I can hear.

        13            MR. ROBINSON:  Do we have static now?

        14            THE VIDEOGRAPHER:  Not right now, but it's low

13:39   15   level interference that comes in when there's a

        16   connection with the cell phone.  So, yeah, just to

        17   preserve the record, if we can keep that going.

        18            MR. MASTER:  Why don't we go off for just a

        19   second.  Maybe I can log off of wi-fi.

13:39   20            THE VIDEOGRAPHER:  Okay.

        21            Wi-fi usually doesn't affect it.  It's the cell

        22   phone communication, just to let you know.

        23            We are now going off the record.  The time is

        24   1:39 p.m.

13:40   25            (Recess taken from 1:39 p.m. to 1:40 p.m.)
```

1              THE VIDEOGRAPHER:  We are now going back on the

          2    record.  The time is 1:40 p.m.

          3        Q.   (By Mr. Robinson)  Of the six and seven film

          4    permit applications that you've been involved in, what

13:40     5    was the nature of -- strike that.

          6              What was the reason that the police department

          7    got involved?

          8        A.   The police department is always advised of a

          9    film permit, but our involvement would occur if the film

13:41    10    production was a -- became a traffic issue, crowd

         11    control issue, public safety issue.

         12        Q.   I assume that Mr. Zeleny's permit application

         13    for a film permit was one of the ones in which the

         14    police department got involved; is that correct?

13:41    15        A.   The incomplete process, yes.

         16        Q.   When you say "the incomplete process," what do

         17    you mean?

         18        A.   There has been no decision on a film permit as

         19    of yet.

13:41    20        Q.   What is the City's ordinary timeline for

         21    granting or denying a film permit?

         22        A.   I don't know what the ordinary time limit is.

         23        Q.   How long has Mr. Zeleny's film permit

         24    application been pending?

13:42    25        A.   I would have to see the date of when he

1   switched his special events permit into a film permit

2   request.

3   **Q.**  On average, in the past five years, how long

4   does it generally take the City to process a film permit

13:42   5   application?

6   **A.**  I'm not aware of the average time it would take

7   for the permit to go through the process.  It would

8   depend on the type of production that was asked for;

9   whether mitigating circumstances; whether there was more

13:42   10   information requested.  There's a lot of mitigating

11   factors as to how long it would take.

12   **Q.**  Of the six or seven permit applications that

13   you've been involved with, how long, on average, did

14   those take?

13:42   15   **A.**  Well, the police department time varied,

16   depending on the application.  As far as the final

17   application time from start, when it was received, to

18   when it was approved or denied, I don't know.

19   **Q.**  How long was the police department's time, on

13:43   20   average, in those six or seven applications?

21   **A.**  It varied from immediate, depending on, you

22   know, what the issue was, to several weeks, several

23   months.

24   **Q.**  How many of the permit applications that the

13:43   25   police department has been involved in took several

1    months to process?

         2        A.    Not too many.  That would be those that

         3    required more mitigation as to the production and the

         4    application as far as the issues that the police

13:43    5    department would be looking at.

         6        Q.    How many of them do you recall?

         7        A.    Maybe one or two.

         8        Q.    Is one of them Mr. Zeleny's application?

         9        A.    Yes.

13:43   10        Q.    Can you recall any others?

        11        A.    Yes.  There was an application for a film

        12    permit that was going to affect a major artery, so that

        13    took a little longer.

        14        Q.    How long did that one take?

13:44   15        A.    Probably a couple of months of back-and-forth

        16    with the producers to come to a -- come to a --

        17    compromise as to what they could and could not do.

        18        Q.    Was a compromise ultimately reached on that?

        19        A.    Yes.

13:44   20        Q.    Did they receive a film permit?

        21        A.    Yes.

        22        Q.    When you referred before to Mr. Zeleny's film

        23    permit application as "incomplete," was there anything

        24    else about the application that is incomplete, other

13:44   25    than the lack of a decision one way or the other?

1    **A.**    There was -- my understanding -- my

2    recollection is that the last correspondence from the

3    Public Works Department asked for several -- asked

4    several questions and several mitigating factors of

13:45    5    Mr. Zeleny, which were never answered.

6    **Q.**    Is there anything else, aside from the fact

7    that the City hasn't acted on the permit application and

8    the lack of answers to that last round of e-mail

9    questions, that makes the application incomplete?

13:45    10    **A.**    I would argue that what you said about the City

11    not acting is not correct.  We've acted.  It's a two-way

12    street.  We act, we ask questions, we expect a response,

13    and we have not yet received a response.

14    **Q.**    Let me rephrase the question.  Aside from there

13:45    15    not being an ultimate decision of whether to grant or

16    deny the application and the fact that Mr. Zeleny hasn't

17    responded to the last round of questions e-mailed to

18    him, is there anything else about the application that

19    makes it incomplete?

13:46    20    **A.**    No.  That pretty much makes it incomplete.

21    **Q.**    The application itself is a form that you fill

22    out; correct?

23    **A.**    Correct.

24    **Q.**    Was the form filled out completely?

13:46    25    **A.**    Actually, I don't believe he ever filled out a

1    specific form for a film permit.  He just used the

2    special event permit and said "I would like this to now

3    be a film permit."

4         MR. ROBINSON:  Why don't we mark this as

13:47    5    Exhibit 36.

6              (Exhibit 36 was marked for identification.)

7         **Q.**  (By Mr. Robinson)  For the record, Exhibit 36

8    is MP1248 through MP1253; correct?

9         **A.**  Yes.

13:47   10    **Q.**  Have you seen this document before?

11        **A.**  Now that I see it in front of me, yes, I do

12    recall seeing it.

13        **Q.**  It's one of the documents that the City

14    produced during discovery in this case; correct?

13:47   15    **A.**  Correct.

16        **Q.**  It's a film permit application; correct?

17        **A.**  Correct.

18        **Q.**  In review of this Exhibit 36, is there anything

19    about it that, in your view, is incomplete?

13:48   20    **A.**  As far as this application itself?

21        **Q.**  Correct.

22        **A.**  No.

23        **Q.**  This is the ordinary application that someone

24    would use to request a film permit from the City of

13:48   25    Menlo Park; correct?

1    **A.**   Yes.

2    **Q.**   Within the City of Menlo Park, do you have a

3    policy for dealing with carrying of firearms?

4         Citizens or people within the City, other than

13:49   5    police officers, carrying firearms, is there a municipal

6    policy of some kind?

7    **A.**   There is a municipal code about open -- carry

8    of firearms.

9    **Q.**   Is there any other municipal policy, other than

13:49   10   what's written in the municipal code?

11   **A.**   No.

12   **Q.**   Does the police department have any policy in

13   dealing with citizens that are openly carrying unloaded

14   firearms?

13:49   15        MR. MASTER:  Make an objection, vague and

16   ambiguous as to time.

17        Go ahead.

18        THE WITNESS:  There -- I know there -- in fact,

19   there has been a training -- a training bulletin, and

13:49   20   there, generally, are policies on how to handle calls

21   for service.  There's policies on how to process a

22   concealed carry permit; things of that nature.

23   **Q.**   (By Mr. Robinson)  To your knowledge -- let's

24   start at the time frame of 2012 and then go to present.

13:50   25        So from 2012 to present, are you aware of any

1    training within the police department about how to

2    handle people who are openly carrying unloaded firearms?

3        A.    There was no specific training on that,

4    although I know there was a training bulletin that was

13:50   5    issued regarding the prohibition of open carry once the

6    new law came into effect.

7        Q.    Was the training bulletin a document that

8    attached a news article about the change in the law?

9        A.    Yes.

13:50   10    Q.    Are there any other training documents that

11    you're aware of, other than that training bulletin?

12        A.    No.

13        Q.    Is open carry -- I'm going to refer to open

14    carry as the open carrying of unloaded firearms; is that

13:51   15    okay?  It will speed the deposition along.

16        A.    Certainly.

17        Q.    Aside -- are there any other trainings that may

18    not be specific to open carry but that cover the topic

19    of open carry that you've had within the police

13:51   20    department in the past five years?

21        A.    No.

22        Q.    Has there been any training within the police

23    department in the past five years about dealing with

24    protests or demonstrations?

13:51   25    A.    Specifically about protests or demonstrations?

1  No.

2  **Q.**  What about in the past ten years?

3  **A.**  Yes.

4  **Q.**  What training was that?

13:51  5  **A.**  Well, not at this police department.

6  MR. MASTER:  Who are you talking about?  Why

7  don't you rephrase the question.

8  **Q.**  (By Mr. Robinson)  Has the City of Menlo --

9  strike that.

13:51  10  Has the City of Menlo Park Police Department,

11  to your knowledge, had training about how to handle

12  protests or demonstrations at any point in the past ten

13  years?

14  MR. MASTER:  I'll just object.  It lacks

13:52  15  foundation.  Calls for speculation.

16  But you can answer.

17  THE WITNESS:  So I can only speak to the last

18  eight years; right?

19  **Q.**  (By Mr. Robinson)  Why don't we start there.

13:52  20  **A.**  Okay.

21  And there has been -- there has been some

22  training on riot control, which would sometimes be

23  necessary for those type of events.

24  **Q.**  Other than training on riot control, to your

13:52  25  knowledge, has there been any training within the City

|   | 1  | of Menlo Park Police Department in the past eight years |
|   | 2  | about protests or demonstrations? |
|   | 3  | **A.**   No. |
|   | 4  | **Q.**   Has there been any training related to |
| 13:52 | 5 | Mr. Zeleny? |
|   | 6  | **A.**   Specifically? |
|   | 7  | **Q.**   Correct. |
|   | 8  | **A.**   No. |
|   | 9  | **Q.**   Have there been any other protests or |
| 13:53 | 10 | demonstrations within the City that you're aware of, |
|   | 11 | other than Mr. Zeleny's? |
|   | 12 | **A.**   Yes. |
|   | 13 | **Q.**   How many, if you could estimate? |
|   | 14 | **A.**   In -- |
| 13:53 | 15 | MR. MASTER:  Hold on.  I was going to object as |
|   | 16 | to time frame.  Vague and ambiguous. |
|   | 17 | **Q.**   (By Mr. Robinson)  In the same time frame. |
|   | 18 | Since you've been -- you've been with the City for 8 |
|   | 19 | years, you said? |
| 13:53 | 20 | **A.**   Correct. |
|   | 21 | **Q.**   During your time with the City, have there been |
|   | 22 | other protests or demonstrations aside from |
|   | 23 | Mr. Zeleny's? |
|   | 24 | **A.**   Numerous. |
| 13:53 | 25 | **Q.**   If you could estimate how many. |

1     A.    Upwards of 50.

2     Q.    In general terms, how does the Menlo Police --

3     Menlo Park Police Department respond to protests or

4     demonstrations?

5          MR. MASTER:  Just object.  Vague and ambiguous.

6     Overbroad.  Incomplete hypothetical.

7          You can answer.

8          THE WITNESS:  That would depend on what kind of

9     protest it is.  Initially, we would go out and assess.

10    Q.    (By Mr. Robinson)  What do you assess for?

11    A.    Assess the type of protest, the size of

12    protest, the -- either violence occurring or the

13    possibility of violence, the impact on city resources,

14    impact on traffic, impact on the normal flow of

15    residents and/or business people, the impact to public

16    safety.

17    Q.    What types of factors does the City of Menlo

18    Park Police Department generally consider when assessing

19    the type of protest?

20    A.    That's the list I just went through.

21    Q.    So by type, am I right on understanding that

22    you're referring to the size, violence or potential for

23    violence, et cetera; that list of factors?

24    A.    Correct.

25    Q.    Does it matter where the protest is taking

1  place?

2      **A.**   Yes.

3      **Q.**   Does it matter the nature of the protest

4  activity?  For example, musicians or amplified sound or

5  things of that nature?  Are those factors that you

6  consider?

7      **A.**   If they are in violation of the law, yes.

8      **Q.**   Does the City of Menlo Park maintain a file on

9  Mr. Zeleny?

10          MR. MASTER:  Objection.  Vague and ambiguous.

11          You can go ahead.

12          THE WITNESS:  There are police files that

13  are -- have his name on it that would be maintained by

14  the police department.  The -- I would assume that --

15  or --

16          MR. MASTER:  Don't assume.  Do you know?

17          THE WITNESS:  Sorry.  I know that the City

18  Attorney's Office has a file on Mr. Zeleny based on this

19  case, and I know that I have a file on Mr. Zeleny.

20      **Q.**   (By Mr. Robinson)  Why do you have a file on

21  Mr. Zeleny?

22      **A.**   This file was created when I first arrived in

23  Menlo Park, and it included the information on his

24  activities that we were made aware of.

25      **Q.**   Was it your decision to maintain that file?

1    **A.**    My personal file?

2    **Q.**    Correct.

3    **A.**    Yes.

4    **Q.**    Do you maintain file -- personal files on any

5    other individuals who've had contact with the Menlo Park

6    Police Department?

7    **A.**    Yes.

8    **Q.**    How many?

9    **A.**    I'd say maybe two dozen.

10    **Q.**    Other than Mr. Zeleny, are the other files on

11    individuals who've committed criminal acts within the

12    city?

13    **A.**    Both -- that's one of the reasons, yes.

14    **Q.**    What are the other reasons?

15    **A.**    If they have made complaints against officers,

16    if they have become unusually active for the police

17    department and there is some extraordinary reason why we

18    would need to have information readily available on

19    those persons.

20    **Q.**    Is there an extraordinary reason why you would

21    need readily available information on Mr. Zeleny?

22    **A.**    Yes.

23    **Q.**    What is that reason?

24    **A.**    Public safety.

25    **Q.**    When you refer to "public safety," are you

1    referring to Mr. Zeleny carrying unloaded firearms and

         2    ammunition?

         3        **A.**   Yes.

         4        **Q.**   Are you referring to anything else?

13:59    5        **A.**   That's -- that would be the extraordinary

         6    situation that would cause him to be a public safety

         7    concern.

         8        **Q.**   How many years, to your knowledge, has

         9    Mr. Zeleny been protesting NEA?

13:59   10        **A.**   No idea.

        11        **Q.**   Has he been doing it since you started?

        12        MR. MASTER:  Objection.  Vague and ambiguous as

        13    to where.  You're just asking generally?

        14        **Q.**   (By Mr. Robinson)  You can go ahead and answer.

13:59   15        MR. MASTER:  Okay.

        16        THE WITNESS:  Are you speaking Menlo Park?

        17        **Q.**   (By Mr. Robinson)  Has Mr. Zeleny been

        18    protesting NEA, to your knowledge, since you started in

        19    your role with the City of Menlo Park Police Department?

13:59   20        **A.**   In Menlo Park?

        21        **Q.**   Sure.  In Menlo Park.

        22        **A.**   Yes.

        23        **Q.**   Are you aware of his protests anywhere other

        24    than Menlo Park?

13:59   25        **A.**   I'm aware that there has been protests, but I

1    have no knowledge of exactly where or when.

                    2         Q.   At any point, are you aware of any instance

                    3    during Mr. Zeleny's protests where he engaged in any

                    4    form of violence against anyone?

5         A.   In Menlo Park?

                    6         Q.   Ever.  In any of the protests that you're aware

                    7    of?

                    8         A.   I'm not aware.

                    9         Q.   You're not aware of any instance?

10         A.   I'm not aware of it being -- I'm not aware of

                   11    it personally, no.

                   12         Q.   Are you aware, through any other source, of

                   13    Mr. Zeleny ever behaving in a violent manner in any of

                   14    his protests?

15         A.   I'm not aware of any, no.

                   16         Q.   What types of materials do you keep in your

                   17    file on Mr. Zeleny?

                   18         A.   Copies of police reports; many times, I would

                   19    print out copies of e-mails that were sent back and

20    forth between Mr. Zeleny and the City; relevant statutes

                   21    that applied, correspondence I may have received from

                   22    other -- other law enforcement agencies or government

                   23    agencies.

                   24         Q.   Did you produce your personal file on

25    Mr. Zeleny in this litigation?

1    **A.**   Yes.

                2    **Q.**   Does your personal file on Mr. Zeleny contain a

                3    copy of California Penal Code 313.1?

                4    **A.**   Yes.

14:01           5    **Q.**   Is that one of the statutes that you considered

                6    might apply to Mr. Zeleny's protests?

                7    **A.**   Yes.

                8    **Q.**   Was that consideration based on the cartoons or

                9    animations that Mr. Zeleny had displayed or suggested

14:01          10    that he would display?

               11    **A.**   Yes.  That were later -- yeah.  That was later

               12    sent to us, yes.

               13    **Q.**   We're talking about the animation of cartoons

               14    having sex with each other; right?

14:02          15    **A.**   Yes.

               16    **Q.**   And you believed that Penal Code 313.1 might

               17    apply to that animation; correct?

               18    **A.**   I believe that it may apply, yes.

               19    **Q.**   Why did you believe that it could apply -- may

14:02          20    apply to that animation?

               21    **A.**   Because if a -- if the display or if the image

               22    was displayed, and there was a complaining victim, in

               23    other words, a child observed it and a parent reported

               24    it to us, then it could, in fact, be a violation of the

14:02          25    Penal Code.

1    Q.   Are you still of the view that that animation

2    that we're talking about could be a violation of the

3    Penal Code if there were a child present and a

4    complaining victim?  You still believe that?

14:02    5    A.   It could be.  That would be a -- that would be

6    a question of the Courts.

7         MR. ROBINSON:  Why don't I ask that we mark

8    this as 37.

9         (Exhibit 37 was marked for identification.)

14:03    10   Q.   (By Mr. Robinson)  For the record, Exhibit 37

11   is two pages, MP5277 to 5278; correct?

12   A.   Yes.

13   Q.   Is this a copy of Penal Code 313.1 that was in

14   your file on Mr. Zeleny?

14:03    15   A.   Yes.

16        MR. ROBINSON:  And why don't we go ahead and

17   mark this as Exhibit 38.

18        (Exhibit 38 was marked for identification.)

19   Q.   (By Mr. Robinson)  For the record, Exhibit 38

14:04    20   is one page MP5282; correct?

21   A.   Yes.

22   Q.   This is another document that was contained in

23   your file on Mr. Zeleny; correct?

24   A.   Yes.

14:04    25   Q.   This is a still image of -- Exhibit 38 is a

1    still image of the animation that we've just been

2    talking about; right?

3         A.    Correct.

4         Q.    And was it your view, at the time that

14:04   5    Mr. Zeleny filed his permit application for a special

6    event permit, that the image reflected -- the animation

7    that's shown in Exhibit 38 could be obscene as to

8    minors?

9         A.    It could be.

14:04  10        Q.    Did you take that position in a public hearing

11    related to Mr. Zeleny's permit application?

12        A.    Yes.  I stated it could be.

13        Q.    Do you have a view, one way or another, at this

14    point, about whether it is obscene as to minors or not?

14:05  15        A.    It is actually -- as a police officer, I'm

16    unable to have my peace disturbed, nor be offended, so I

17    have no personal -- I have -- personally, I can't be

18    offended, so it would not be up to me whether it's

19    offensive or not.  It would be up to a Court.

14:05  20        Q.    When you say you can't be offended, what do you

21    mean?

22        A.    In other words, I can't be the victim.

23        Q.    Okay.

24             In your capacity as an individual witness, is

14:05  25    the image offensive?  Not asking in your capacity as a

1  police officer, but as an individual witness in this

2  case, is the animation that's reflected in Exhibit 38

3  offensive?

4       MR. MASTER:  Objection.  Vague.  Ambiguous.

14:05  5  Confusing.  Overbroad.  Calls for speculation.

6            If you can answer it.

7            THE WITNESS:  For an adult, perhaps not; for a

8  child, yeah.

9    Q.  (By Mr. Robinson)  Have you received feedback

14:06  10  from anyone, either in the government in the City of

11  Menlo Park or the community of Menlo Park, that the

12  animation reflected in Exhibit 38 is offensive?

13           MR. MASTER:  Same objection.  Vague and

14  ambiguous.

14:06  15           THE WITNESS:  No.

16    Q.  (By Mr. Robinson)  Do you personally find it

17  offensive?

18           MR. MASTER:  Objection.  Asked and answered.

19           Don't answer that.

14:06  20           We're done with this.  He's already answered

21  that question.

22           MR. ROBINSON:  You're instructing him not to

23  answer?

24           MR. MASTER:  Absolutely.

14:06  25    Q.  (By Mr. Robinson)  Are you going to follow your

1    attorneys instruction not to answer?

2        **A.**    Yes.

3        **Q.**    In Mr. Zeleny's permit application process, you

4    acted as a spokesperson for the City in the hearing with

14:06    5    the city manager; correct?

6        **A.**    For the special events permit?

7        **Q.**    Correct.

8        **A.**    Yes.

9        **Q.**    And one of the issues that you raised in that

14:07    10    application process was that this image and the

11    associated animation might be obscene as to minors;

12    correct?

13        **A.**    It could be, yes.

14        **Q.**    Have you formed any view, in your capacity as

14:07    15    the Chief of Police of Menlo Park, about whether the

16    image is offensive?

17            MR. MASTER:  Objection.  Asked and answered.

18            Go ahead one more time.

19            THE WITNESS:  As I stated, no.

14:07    20        **Q.**    (By Mr. Robinson)  Who would make the decision

21    about whether to charge Mr. Zeleny with obscenity as to

22    minors related to the animation?

23        **A.**    District Attorney's Office.

24        **Q.**    Is there someone in the City of Menlo Park that

14:07    25    would make a decision about whether to refer it for

1    prosecution?

2        **A.**    Any police officer.

3        **Q.**    Looking at ==Exhibit 37==, in Clause A, there's a

4    reference to "harmful matter to the minor."

14:08    5        Do you see that?

6        **A.**    Yes.

7        **Q.**    What is your understanding of material that

8    would be considered harmful as to the minor?  Is there

9    any more concrete definition than that?

14:08    10        MR. MASTER:  Just object to the extent it calls

11    for a legal conclusion and speculation.

12        You can answer.

13        THE WITNESS:  I believe if you were to look up

14    the jury instruction, there would be another definition

14:08    15    of that.

16        **Q.**    (By Mr. Robinson)  It refers to matter that is

17    summarized -- "invokes the prurient interests"; correct?

18        **A.**    That's one of the criteria.

19        **Q.**    But did the City of Menlo Park ever reach a

14:08    20    determination about whether the animation associated

21    with ==Exhibit 38== appeals to a prurient interest?

22        **A.**    That's -- that's not our purview.  That's not

23    our job to do, so the answer is no.

24        MR. MASTER:  Damion, is now a good time for a

14:09    25    break?  We've been going about an hour.

```
 1              MR. ROBINSON:  Yeah.

 2              MR. MASTER:  Is now a good time?

 3              THE VIDEOGRAPHER:  We're now going off the

 4     record.  The time is 2:08 p.m.

14:20  5              (Recess taken from 2:08 p.m. to 2:20 p.m.)

 6              THE VIDEOGRAPHER:  We are now going back on the

 7     record.  The time is 2:20 p.m.

 8         Q.   (By Mr. Robinson)  Was the possibility of

 9     Mr. Zeleny's animation being obscene as to minors a

14:20 10     factor that was considered by the City in connection

11     with his special event permit application?

12         A.   It did not come up until the appeal, because

13     that's when we were looking -- we found the animation

14     that he was proposing to use.

14:21 15         Q.   And in the appeal process, was it considered a

16     factor in deciding whether or not to uphold the denial

17     of the permit application?

18         A.   My understanding, that it was not one of the

19     denial points that was made by the city manager's

14:21 20     decision.

21         Q.   It was a factor that was raised in the city

22     manager meeting; correct?

23         A.   Yes.

24         Q.   It was raised by you; right?

14:21 25         A.   Yes.
```

1    **Q.**   At the point that you raised it in that

2    meeting, you had not reached a determination about

3    whether it was actually obscene as to minors?

4    **A.**   I cannot reach that determination.

14:21    5    **Q.**   And you hadn't reached such a determination at

6    the time you raised it as a potential reason to uphold

7    the denial; correct?

8         MR. MASTER:  Objection.  Asked and answered.

9         THE WITNESS:  I cannot make that determination.

14:22    10    That would have to be made by a jury.

11    **Q.**   (By Mr. Robinson)  I understand that you can't

12    make the determination.  My question was whether, at the

13    time you raised it as a possible basis to uphold the

14    denial of Mr. Zeleny's permit application, you had no

14:22    15    view about whether it was or was not obscene as to

16    minors?  I'm just trying to verify that that's accurate.

17    **A.**   Yes.

18    **Q.**   So you raised it as a basis to uphold the

19    denial, despite the fact you had no view about whether

14:22    20    it was obscene as to minors or not; correct?

21    **A.**   I am -- it's not my purview to say whether it's

22    going to be obscene or not; it's a jury.  But I raised

23    it as a factor for the city manager to consider.

24    **Q.**   The reason that you raised it as a factor is

14:22    25    that you believed it was a factor that could support

1  affirming the denial of his permit application; correct?

2  **A.**   That it could go towards the city manager's

3  decision-making process in the situation.

4  **Q.**   Did you think it was a factor in favor of

14:23   5  granting him a special event permit?

6  **A.**   No.

7  **Q.**   Did you think it was a factor that potentially

8  weighed in favor of denying his special event permit

9  application?

14:23  10  **A.**   Yes.

11        MR. MASTER:  Sorry.  It beeped, so I'm just

12  showing him the phone.

13        THE WITNESS:  Okay.  Thank you.

14        MR. ROBINSON:  Okay.

14:23  15        Why don't we mark this as Exhibit 39?

16        (Exhibit 39 was marked for identification.)

17  **Q.**   (By Mr. Robinson)  For the record, Exhibit 39

18  is three pages, MP5141 through 5143; correct?

19  **A.**   Yes.

14:24  20  **Q.**   Do you recognize Exhibit 39?

21  **A.**   I have seen it, yes.

22  **Q.**   Is it part of your personal file on Mr. Zeleny?

23  **A.**   Yes.

24  **Q.**   Do you recognize it to be a printout of a

14:24  25  portion of Mr. Zeleny's website; true?

```
 1      A.    Yes.

 2      Q.    Subrah.com.  You're aware of that website;

 3  right?

 4      A.    I'm not.

14:24   5      Q.    How did you -- strike that.

 6            How did Exhibit 39 make its way into

 7  Mr. Zeleny's file?

 8      A.    I'm not sure.

 9      Q.    Do other people have access to your personal

14:24  10  file on Mr. Zeleny?

11      A.    No.

12      Q.    When you looked at your personal file for

13  purposes of producing documents in this case, Exhibit 39

14  was in your file; right?

14:24  15      A.    Yes.

16      Q.    You just don't know how it got there.

17      A.    Correct.

18      Q.    Had you seen it before collecting documents for

19  production in this case?

14:25  20      A.    I don't have independent recollection, as I sit

21  here today, that I saw it before, but it was in my file,

22  so I assume that I'd seen it before.

23      Q.    Have you, as part of your work for the City of

24  Menlo Park Police Department, looked at Mr. Zeleny's

14:25  25  website?
```

1     **A.**   I have not.

2     **Q.**   Has someone else, to your knowledge, at the

3     City of Menlo Park done that?

4     **A.**   Yes.

14:25   5         MR. MASTER:  Whoa, whoa, whoa.  Time out.

6     Question-answer.

7             THE WITNESS:  Got it.  Sorry.

8     **Q.**   (By Mr. Robinson)  Has someone else, within the

9     City of Menlo Park, looked at Mr. Zeleny's website for

14:25  10     job-related purposes?

11     **A.**   Yes.

12     **Q.**   Who is that person?

13     **A.**   There were several detectives that did open

14     source research into Mr. Zeleny while he was conducting

14:25  15     his protests in Menlo Park.

16     **Q.**   By "open source research," you mean research of

17     publicly available information; correct?

18     **A.**   Yes.

19     **Q.**   Did you direct anyone within the City of Menlo

14:26  20     Park to do that type of research?

21     **A.**   No.

22     **Q.**   To the best of your knowledge, how many

23     detectives have been involved in investigative

24     activities to Mr. Zeleny?

14:26  25     **A.**   I would say four to five, four to six.

1    **Q.**    What is the purpose of that investigative work?

         2    **A.**    They were instructed by their -- the detective

         3    sergeant at the time to look into Mr. Zeleny's open

         4    source and to attempt to determine his -- what his

14:26    5    motivations were to openly carry weapons in the city of

         6    Menlo Park, and if there was any public safety issues

         7    that we need to be concerned of, including threats;

         8    things of that nature.

         9    **Q.**    To your knowledge, at any point in his

14:27   10    protests, has Mr. Zeleny committed a crime?

        11    **A.**    Yes.

        12    **Q.**    What crime did he commit?

        13    **A.**    He was, one time, prosecuted for possession of

        14    a concealed weapon.

14:27   15    **Q.**    Other than the prosecution for possession of a

        16    concealed weapon, are you aware of any other occasion in

        17    which -- in which Mr. Zeleny committed a crime in the

        18    course of his protests?

        19    **A.**    Not that I am aware of.

14:27   20    **Q.**    Would the answer to that change if I asked you

        21    in your capacity as the person most knowledgeable for

        22    Menlo Park?  I want to make clear that we've exhausted

        23    both your personal knowledge and the City of Menlo

        24    Park's knowledge, having designated you as the person

14:27   25    most knowledgeable.

```
 1          So in your individual capacity, are you aware

 2   of any crime, other than the incident where Mr. Zeleny

 3   was prosecuted for carrying a concealed weapon?

 4      A.   I am not aware of any other crime.

 5      Q.   And in your capacity as the person most

 6   knowledgeable for Menlo Park, are you aware of any crime

 7   that Mr. Zeleny committed during his protests, other

 8   than the one incident where he was prosecuted for

 9   carrying a concealed weapon?

10      A.   No.

11      Q.   Mr. Zeleny was acquitted of carrying a

12   concealed weapon; correct?

13      A.   Yes.

14      Q.   Your testimony, I take it, you disagree with

15   the acquittal?

16      A.   I neither disagree nor agree.

17      Q.   So aside from the time that Mr. Zeleny was

18   prosecuted and acquitted, you're not aware of any other

19   crime -- the incident that resulted in Mr. Zeleny being

20   prosecuted and acquitted is the only crime that you're

21   aware of that he ever committed in the course of his

22   protests.

23          MR. MASTER:  Objection.  Asked and answered.

24          THE WITNESS:  That's the only incident where

25   probable cause arose to have a criminal Complaint filed.
```

1    **Q.**   (By Mr. Robinson)  Does the City of Menlo Park

2    still have detectives conducting open source

3    investigation into Mr. Zeleny?

4    **A.**   No.

14:29    5    **Q.**   When did that stop?

6    **A.**   That stopped after the open carry laws changed

7    and he no longer came to the City of Menlo Park.

8    **Q.**   Would have been 2013, approximately?

9    **A.**   '14.

14:29    10    **Q.**   Is there any other person you can think of who

11    has not committed any crime within the city of Menlo

12    Park that has more than one detective conducting open

13    source investigation?

14          MR. MASTER:  Objection.  Vague and ambiguous as

14:29    15    to time.

16    **Q.**   (By Mr. Robinson)  Fair enough.  In the time

17    frame that the City of Menlo Park was -- had detectives

18    conducting open source investigation into Mr. Zeleny,

19    was there anyone else who had never been convicted of

14:30    20    any crime for whom the City was conducting that type of

21    research?

22          MR. MASTER:  Objection.  Vague and ambiguous.

23    Go ahead.

24          THE WITNESS:  Yes, but you have to understand

14:30    25    that when I said four to six detectives, that's over the

```
         1   time frame, because detectives rotate in and out of

         2   detective division.  So it wasn't six people at one time

         3   doing -- it was one or two, and then they would rotate

         4   in and out, and the same thing.

14:30    5           But the answer to your question is yes.  There

         6   is other people that open source investigation is being

         7   done by numerous detectives.

         8       Q.   (By Mr. Robinson)  How many people?

         9       A.   I don't know.

14:31   10           MR. ROBINSON:  Why don't we go ahead and mark

        11   that as Exhibit 40.

        12           (Exhibit 40 was marked for identification.)

        13       Q.   (By Mr. Robinson)  For the record, Exhibit 40

        14   is one page Bates marked MP214; correct?

14:31   15       A.   Yes.

        16       Q.   Do you recognize Exhibit 40?

        17       A.   I recognize it as an e-mail.

        18       Q.   Is it an e-mail that the City of Menlo Park

        19   produced in connection with this lawsuit?

14:31   20       A.   Yes.

        21       Q.   It's one of the e-mails you reviewed in

        22   reviewing the production?

        23       A.   Yes.

        24       Q.   Who is -- is it Jaime Romero?

14:31   25       A.   Correct.
```

```
 1      Q.   Who is that?

 2      A.   He's a sergeant.

 3      Q.   Within the Menlo Park Police Department?

 4      A.   Yes.

 5      Q.   And who is Timothy Brackett?

 6      A.   He's a sergeant in the Menlo Park Police

 7   Department.

 8      Q.   This e-mail relates to Mr. Zeleny; correct?

 9      A.   Yes.

10      Q.   In the -- I guess it's the third e-mail down

11   the chain, so the very bottom e-mail, there's a

12   reference to Mr. Zeleny's mother passing away and, to

13   summarize, that potentially triggering him to conduct

14   more protests.

15           Do you see what I'm talking about?

16      A.   Yes.

17      Q.   How did the City of Menlo Park get the

18   information that Mr. Zeleny's mother had passed away?

19      A.   From the head of security at NEA.

20           MR. MASTER:  Mr. Zeleny, I'd appreciate it if

21   you could be quiet during the deposition.  Thank you.

22      Q.   (By Mr. Robinson)  Do you know how the head of

23   security of NEA got that information?

24      A.   No.

25      Q.   Were you aware that NEA was conducting
```

14:31 (line 5)
14:32 (line 10)
14:32 (line 15)
14:32 (line 20)
14:32 (line 25)

1    surveillance on Mr. Zeleny?

2        **A.**    Yes.

3        **Q.**    How did you become aware of that?

4        **A.**    The head of security advised me.

5        **Q.**    What type of surveillance was NEA conducting on

6    Mr. Zeleny?

7        **A.**    My understanding was it was open source, and

8    that sometimes physical surveillance.

9        **Q.**    To your knowledge, how long did that go on?

10       **A.**    I don't know.

11       **Q.**    In the 2013 -- let's start at 2012 to 2013.

12   You worked with the City of Menlo Park; correct?

13       **A.**    Correct.

14       **Q.**    How often did you communicate with

15   representatives of NEA during that time period about

16   Mr. Zeleny?

17       **A.**    Only around the times of his protests.

18       **Q.**    Let's say in the two years, 2012 and 2013,

19   estimate how many times you met with or communicated

20   with representatives of NEA?

21       **A.**    I'd say maybe four or five times.

22       **Q.**    The bottom e-mail in <mark>Exhibit 40</mark> describes a

23   meeting with representatives of NEA.

24            Do you see that?

25       **A.**    Yes.

1     **Q.**   Who attended that meeting?

2     **A.**   I did, Chief Bob Johnson, and I believe it was

3     the head of security, Mr. Tresmontan from NEA.

4     **Q.**   In the 2012 to 2013 time frame, were you the

14:34   5     primary person in the City of Menlo Park Police

6     Department dealing with Mr. Zeleny's protests?

7     **A.**   No.  I wasn't the primary person, but I was

8     overseeing the primary people who were, in fact, dealing

9     with it.

14:34  10     **Q.**   What was your -- you were commander at this

11     point, apparently; is that correct?

12     **A.**   Yes.

13     **Q.**   And as a commander, a part of your job was to

14     ensure public safety; right?

14:35  15     **A.**   Yes.

16     **Q.**   Part of your job was to investigate crime;

17     right?

18     **A.**   Not specifically me, but I have -- to direct

19     people to investigate crime, yes.

14:35  20     **Q.**   Part of your role was to enforce the state law;

21     right?

22     **A.**   Correct.

23     **Q.**   What did you talk about during this meeting

24     with NEA?

14:35  25     **A.**   Exactly what is in the e-mail; that the concern

1   from NEA was because of the information they had

2   received that, perhaps, he could -- it could trigger

3   Mr. Zeleny to come back to do more protests.

4        Q.   Anything else that you recall discussing,

14:35   5   either you saying or NEA saying or anyone else at that

6   meeting saying?

7        A.   Just they were reiterating their concerns for

8   the safety of their staff.

9        Q.   At the time of that meeting, was Mr. Zeleny

14:36   10   actively engaging in protests?

11        A.   I'm not sure if, exactly in 2013, whether or

12   not he was, in fact -- yeah.  I don't know for a fact

13   when his last protest was.

14        Q.   In the last paragraph of the last e-mail, it

14:36   15   notes that "Zeleny has openly carried firearms in the

16   past to bring attention to his cause."

17             Do you see what I'm referring to?

18        A.   Yes.

19        Q.   Was that your understanding of Mr. Zeleny's

14:36   20   motivation in carrying unloaded firearms during his

21   protests?  Was that consistent with your understanding

22   of why Mr. Zeleny was carrying the unloaded firearms; to

23   bring attention to his cause?

24        A.   I suppose.

14:36   25             MR. MASTER:  Well, don't suppose.  Hold on.

1    Time out.

                    2           He's entitled -- if you have an answer and you

                    3    know the answer, he's entitled to it.  If you don't know

                    4    the answer, then --

14:36               5           THE WITNESS:  Right.  I don't know -- I can't

                    6    speculate as to what Mr. Zeleny's issues in his head

                    7    are.  I don't know what it is that is causing him to do

                    8    this.  I don't know.

                    9       Q.   (By Mr. Robinson)  Did you have any opinion, as

14:37              10    a police commander at the City of Menlo Park, about why

                   11    Mr. Zeleny might be doing it?

                   12       A.   My opinion was that he had some kind of issue

                   13    with NEA.

                   14       Q.   Referring specifically to carrying the unloaded

14:37              15    firearms, did you have an understanding, either based on

                   16    discussion with your officers or discussion with

                   17    Mr. Zeleny, or review of his online materials, about why

                   18    he was carrying the unloaded firearms during his

                   19    protests?

14:37              20       A.   Mr. Zeleny actually spoke to that in his

                   21    hearing in front of the City Council that he did -- he

                   22    said that he did it to bring attention to himself.

                   23       Q.   Let's take another look at ==Exhibit 39==, if we

                   24    could.  Actually, before I get into 39, are you aware of

14:38              25    any other instances in your work with the City of Menlo

Park Police Department where a private entity was

2    conducting open source investigation into someone that

3    was shared with the City of Menlo Park?

4        **A.**    Yes.

14:38    5        **Q.**    How many occasions has that occurred, if you

6    can estimate?

7        **A.**    Probably 30 or 40.

8        **Q.**    Turning to <mark>Exhibit 39</mark>, Mr. Zeleny's website

9    describes a number of allegations against Min Zhu; is

14:39    10    that a fair description of what it says?

11        **A.**    To be perfectly honest with you, Counselor, I

12    did not read this.  So I could see what it says right

13    there, so I would assume -- sorry.  I'm not assuming --

14    that what is -- it is alleging this person did these

14:39    15    things.

16        **Q.**    Based on your familiarity with Mr. Zeleny's

17    protests, regardless of -- let's leave aside the website

18    for a second.  Based on your understanding of

19    Mr. Zeleny's protests, what was the nature of the issue

14:39    20    that he was protesting about?

21            MR. MASTER:  Objection.  Lacks foundation.

22    Calls for speculation.

23            You can answer if you know.

24            THE WITNESS:  I have never researched, nor read

14:39    25    into, nor looked into the reasons why Mr. Zeleny has a

1    problem with NEA besides the fact of what I've seen,

                2    obviously, in his protests about this person and some

                3    allegation of a sexual misconduct with his daughter.

                4    That's the extent of what I know about his reasoning

14:40           5    into these protests.

                6        **Q.**    (By Mr. Robinson)  You understand that the

                7    protests involve an allegation of child rape or child

                8    molestation; correct?

                9        **A.**    That is what is alleged, yes.

14:40          10        **Q.**    And you understand that the protests involve

               11    some connection between NEA and the individual who

               12    committed the alleged child rape or child molestation;

               13    correct?

               14        **A.**    Apparently, that's what the issue is, yes.

14:40          15        **Q.**    Well, you read Mr. Zeleny's permit application;

               16    right?

               17        **A.**    Yes.

               18        **Q.**    And you've been copied on a number of e-mails

               19    where Mr. Zeleny goes back and forth with City officials

14:40          20    about the nature of his protests; correct?

               21        **A.**    Yes.

               22        **Q.**    And officers have gone out and talked to

               23    Mr. Zeleny from time to time during his protests;

               24    correct?

14:40          25        **A.**    Yes.

```
 1      Q.    And there are signs in the protests that
 2  include some description of what Mr. Zeleny's protesting
 3  about.
 4      A.    Yes.
 5      Q.    Based on that body of information, you're aware
 6  that Mr. Zeleny has accused the individual in that
 7  picture, Min Zhu, of raping his daughter; right?
 8      A.    Apparently.
 9      Q.    Have you done anything to investigate whether
10  the allegation is true?
11      A.    Nothing.
12      Q.    Have you done anything to investigate whether
13  NEA has supported the individual who's accused of raping
14  his daughter?
15      A.    No.
16      Q.    Do you consider it part of your duties as a
17  chief of police of Menlo Park to investigate crimes like
18  child rape?
19      A.    If we had a victim, yes.
20      Q.    In this case, you don't have a victim?
21      A.    We have no -- I have not received, nor has the
22  Police Department received, any criminal Complaint,
23  allegation of anything of that nature involving these
24  people.
25      Q.    Do you recall receiving e-mails where
```

14:40

14:41

14:41

14:41

14:42

1   Mr. Zeleny summarized and provided websites or other

2   information to access records reflecting the substance

3   of the allegations of child rape?

4   **A.**   No.

14:42   5   **Q.**   Other than not receiving any criminal Complaint

6   of any kind, is there any other reason that the City of

7   Menlo Park -- well, let me broaden it a little bit.

8   Do you know whether the City of Menlo Park has

9   ever investigated the allegations of child rape?

14:42   10   MR. MASTER:  Against?

11   MR. ROBINSON:  Against Min Zhu.

12   THE WITNESS:  No.

13   **Q.**   (By Mr. Robinson)  I'm sorry.  You don't know

14   whether it has or it has not?

14:42   15   **A.**   It has not.

16   **Q.**   Is there any reason that the City of Menlo Park

17   has never investigated those allegations, other than the

18   lack of a criminal Complaint?

19   **A.**   In order to investigate a crime, we have to

14:43   20   have someone report it to us, we have to have a victim,

21   and we have to determine jurisdiction.

22   **Q.**   Which of those are reasons why the City of

23   Menlo Park hasn't investigated the allegations of child

24   rape?

14:43   25   **A.**   All of them.

1    **Q.**   When you say you don't have a victim, what do

2  you mean?

3    **A.**   In order to prosecute a rape, we have to have a

4  victim, the victim of that rape, and be able to speak to

14:43    5  the victim of that rape.

6    **Q.**   So when you say you don't have a victim, do you

7  mean that you don't have a victim who's come forward to

8  speak with you?

9    **A.**   Correct.

14:44   10    **Q.**   If the allegations are true, there is, in fact,

11  a victim; right?  There's someone who was raped, so the

12  lack of a victim just means a person hasn't come

13  forward; correct?

14    MR. MASTER:  Objection.  Compound.

14:44   15  Argumentative.

16    **Q.**   (By Mr. Robinson)  I mean, is it the position

17  of the City of Menlo Park that there was no victim in

18  this case?

19    MR. MASTER:  Objection.  Lacks foundation.

14:44   20  Calls for speculation.

21    Go ahead.

22    THE WITNESS:  How can we -- Counselor, how can

23  we investigate a crime if we have no victim and no

24  information coming forward besides, you know, what

14:44   25  Mr. Zeleny is alleging?  We have to have a victim.

1          There is a process in order to do criminal

         2   investigations.  Part of that is having credible

         3   information from the victim that a crime occurred.

         4   Unless we have that, we cannot initiate a -- an

14:44    5   investigation based on unsubstantiated rumors or e-mails

         6   that are sent by random people.

         7       Q.   (By Mr. Robinson)  My question was directed to

         8   what you mean when you say "We don't have a victim."

         9          What do you mean by "We don't have a victim"?

14:45   10          MR. MASTER:  Objection.  Asked and answered.

        11          THE WITNESS:  The victim has not come forward

        12   to make a criminal Complaint about being raped.

        13       Q.   (By Mr. Robinson)  Have you done anything --

        14   has the City of Menlo Park done anything to look into

14:45   15   the materials that Mr. Zeleny submitted via e-mail or in

        16   connection with his permit applications corroborating

        17   the allegations?

        18       A.   No.

        19       Q.   Is there any reason why the City hasn't looked

14:45   20   into that information?

        21          MR. MASTER:  Objection.  Asked and answered.

        22          You want to answer it again?

        23          THE WITNESS:  I'd rather not.

        24          MR. MASTER:  Well, do it one more time.

14:45   25          THE WITNESS:  Because we continue -- as I said,

1    in order to investigate a crime, we have to have a

          2    complaining victim, someone to come forward and tell us

          3    that they were a victim of a crime, and then we would,

          4    in fact, do that.  At this point, this alleged victim

14:46     5    has not come forward, has not made any police reports

          6    that I know of anywhere, and definitely not at Menlo

          7    Park PD.

          8         MR. ROBINSON:  Why don't we mark this as

          9    Exhibit 41.

14:46    10         (Exhibit 41 was marked for identification.)

         11    Q.   (By Mr. Robinson)  For the record, Exhibit 41

         12    is one page, MP261; correct?

         13    A.   Yes.

         14    Q.   Do you recognize it?

14:47    15    A.   I do.

         16    Q.   Is it an e-mail from you to a representative of

         17    NEA?

         18    A.   Yes.

         19    Q.   Could you just pronounce the gentleman's name.

14:47    20    A.   It's Dave Tresmontan, T-r-e-s-m-o-n-t-a-n.

         21    Q.   In Mr. Tresmontan's e-mail, he's asking you

         22    about your -- at the bottom of the page, he's asking you

         23    about your availability for a meeting regarding Zeleny.

         24         Do you see that?

14:47    25    A.   Yes.

1    **Q.**   Do you recall a discussion about setting up a

2    meeting in the July 2015 time frame about Mr. Zeleny?

3    **A.**   Yes.

4    **Q.**   What was the context of that meeting?  Why were

14:47   5    you setting it up?

6    **A.**   This was a meeting that included numerous

7    stakeholders dealing with Mr. Zeleny in case he were to

8    resume his armed protests and included numerous

9    government and non-government stakeholders.

14:48   10   **Q.**   NEA was among the non-government stakeholders?

11   **A.**   Yes.

12   **Q.**   In your experience with the City of Menlo Park,

13   how many times have you met with a group of government

14   and non-government stakeholders about an issue related

14:48   15   to your work as a police officer?

16   **A.**   Numerous.

17   **Q.**   What types of issues do you generally meet with

18   with non-government stakeholders?

19   **A.**   It could -- it varies anywhere from

14:48   20   homelessness to issues with traffic around certain

21   locations.  It runs the gamut of different concerns that

22   people have where we would meet with government and

23   non-government officials.

24   **Q.**   Have you ever met with government and

14:48   25   non-government officials about a protest, other than

1    Mr. Zeleny's protests?

2        **A.**    Several.

3        **Q.**    In your e-mail reply on Exhibit 41, you ask

4    whether NEA still has investigators checking open

14:49    5    sources on Zeleny.

6        **A.**    That's correct.

7        **Q.**    What was the response?

8        **A.**    I don't believe he responded.  He didn't

9    respond.

14:49    10        **Q.**    At any point after this e-mail, did you get any

11    information from NEA or its representatives about

12    Mr. Zeleny's movements?

13        **A.**    I believe, during the meeting that you spoke

14    of, that Mr. Tresmontan did, in fact, give some

14:49    15    information about, you know, his -- his whereabouts.

16        **Q.**    His whereabouts, meaning Mr. Zeleny's

17    whereabouts?

18        **A.**    Correct.

19        **Q.**    And that was information that NEA apparently

14:50    20    obtained through its investigation?

21        **A.**    I don't know how they obtained it.

22        **Q.**    Aside from information about Mr. Zeleny's

23    whereabouts, what other information did you receive from

24    NEA's investigative efforts at any point in its

14:50    25    investigation of Mr. Zeleny?

1    A.    We received open source information from,
        2 apparently, websites that he was either active on or
        3 authoring.   That's about it.
        4    Q.    How frequently did you receive information from
14:50   5 NEA about either Mr. Zeleny's whereabouts or his online
        6 activity?
        7    A.    Only around the time of his protests.
        8          MR. ROBINSON:   Why don't we mark this as
        9 Exhibit 42.
14:52  10          (Exhibit 42 was marked for identification.)
       11    Q.    (By Mr. Robinson)   For the record, Exhibit 42
       12 is multiple pages, MP55 through MP58; correct?
       13    A.    Correct.
       14    Q.    Do you recognize Exhibit 42?
14:52  15    A.    I do.
       16    Q.    What is it?
       17    A.    It is an e-mail with a daily police log
       18 attached.
       19    Q.    Is this the type of document that would
14:52  20 ordinarily be circulated in the Menlo Park Police
       21 Department?
       22    A.    On a daily basis.
       23    Q.    Is it sent to all police department staff?
       24    A.    Yes.
14:52  25    Q.    Were you employed with the Menlo Park Police

1    Department on October 22nd, 2011?

                2        **A.**    I believe I started on at the 20th, so yes.

                3        **Q.**    Okay.

                4              If you could turn to Page 2, so the page that's

14:53     5    marked MP56.  And there's a line under "training

                6    other" -- you're at the right place.

                7              That says "Zeleny/point of view-arrests for

                8    recording police activity."

                9              Do you see that?

14:53    10       **A.**    Yes.

               11       **Q.**    What is the reference to "Zeleny/point of

               12    view"?

               13       **A.**    That is -- you're conflating the two.  It's

               14    training and then other.  The point of view is a

14:53    15    training bulletin that gets sent every month, and this

               16    training bulletin, obviously, was about arrests for

               17    recording police activity.  Zeleny was a separate issue.

               18       **Q.**    Was Zeleny in the other category or the

               19    training category?

14:53    20       **A.**    The way we use this is not a hundred percent

               21    formal, so it could have been either.

               22       **Q.**    Do you know what the -- what the reference to

               23    Zeleny in that section refers to?

               24       **A.**    No.  I had only been there a day.  No.

14:54    25       **Q.**    Has the City of Menlo Park Police Department

```
         1   ever had any formal meetings relating to Mr. Zeleny?

         2            MR. MASTER:  Objection.  Vague and ambiguous.

         3            You can answer.

         4            THE WITNESS:  Yes.

14:54    5     Q.    (By Mr. Robinson)  How many?  Let's say in your

         6   time with the City of Menlo Park Police Department, how

         7   many times has the police department met regarding

         8   Mr. Zeleny?

         9     A.    The entire police department?

14:54   10     Q.    Sure.

        11     A.    None.

        12     Q.    Has -- how many times has Mr. Zeleny been

        13   raised at meetings of the entire department?

        14     A.    Zero.

14:54   15     Q.    Have there been meetings of less than the

        16   entire department relating to Mr. Zeleny?

        17     A.    Where he has been mentioned?

        18     Q.    Sure.

        19     A.    Yes.

14:54   20     Q.    On approximately how many occasions?

        21     A.    Probably upwards of 20 times.

        22     Q.    Have there been any meetings specifically to

        23   discuss Mr. Zeleny and his protests?

        24     A.    With the entire police department?

14:55   25     Q.    No.  With any subset of the police department.
```

1      **A.**    Yes.

                2      **Q.**    Approximately how many meetings, during your

                3      time with the City of Menlo Park Police Department, have

                4      there been specifically to address Mr. Zeleny or his

14:55           5      protests?

                6      **A.**    Probably upwards of ten.

                7      **Q.**    What was the general nature of those meetings?

                8      What -- go ahead.

                9      **A.**    Sorry.  Our response.

14:55          10      **Q.**    Your response to Mr. Zeleny's protests?

               11      **A.**    Yes.

               12      **Q.**    Any other reasons why meetings were called

               13      regarding Mr. Zeleny?

               14      **A.**    No.

14:56          15      **Q.**    Why don't I hand you what we'll mark as Exhibit

               16      43.

               17             (Exhibit 43 was marked for identification.)

               18      **Q.**    (By Mr. Robinson)  For the record, Exhibit 43

               19      is multiple pages, and the top left-hand corner of the

14:56          20      first page is "Policy 467."  To the right of that,

               21      "Menlo Park Police Department Policy Manual"; correct?

               22      **A.**    Yes.

               23      **Q.**    Do you recognize Exhibit 43?

               24      **A.**    I do.

14:57          25      **Q.**    Is it part of the City of Menlo Park Police

1    Department Policy Manual?

2        **A.**    It is.

3        **Q.**    It's a policy that relates to First Amendment

4    assemblies; true?

14:57    5        **A.**    Yes.

6        **Q.**    This would be the policy that governs how the

7    City is supposed to deal with protests?

8        **A.**    Correct.

9        **Q.**    Going down to 467.3, "General Considerations."

14:57    10        Do you see where I'm referring to?

11        **A.**    Yes.

12        **Q.**    There's a reference to individuals congregating

13    in streets or walkways.

14        Do you see that?

14:57    15        **A.**    Yes.

16        **Q.**    And the policy appears to recognize that

17    individuals have the right to congregate on public

18    rights-of-way such as streets and walkways; correct?

19        **A.**    Limited, but yes.

14:57    20        **Q.**    What limitations are there, in your view, on

21    the right of protestors to congregate on public

22    walkways?

23        **A.**    Limited by laws --

24        (Reporter interruption.)

14:58    25        THE WITNESS:  Limited by laws or ordinances

1   regulating such matters as the obstruction of individual

2   or vehicle access or egress, trespass, noise, picketing,

3   distribution of handbills and leaflets, and loitering.

4       Q.   (By Mr. Robinson)  What are the Menlo Park

14:58  5   laws, regulations, or ordinances that govern protestors

6   assembling on public sidewalks?

7           MR. MASTER:  Objection.  Lacks foundation.

8   Calls for speculation.

9           If you know, you can answer.

14:58  10          THE WITNESS:  As long as they are peaceably

11  assembling and they are following laws and ordinances

12  and not blocking a sidewalk, egress, or entrance, then

13  they are allowed to peaceably assemble.

14      Q.   (By Mr. Robinson)  If a group of people

14:59  15  assembled on a sidewalk and pedestrians could still walk

16  by but there was a group assembled, would that violate

17  any rule or regulation of the City of Menlo Park?

18          MR. MASTER:  Objection.  Lacks foundation.

19  Calls for speculation.  Incomplete hypothetical.  Calls

14:59  20  for a legal conclusion.

21          THE WITNESS:  It would depend on their other

22  behavior, but if they were not blocking, they would not

23  be blocking.

24      Q.   (By Mr. Robinson)  Would they be allowed to

14:59  25  assemble in protest if they left a path for pedestrians

1   to pass by?

2        MR. MASTER:  Same objection.  Asked and

3   answered.

4        THE WITNESS:  As long as they did not violate

14:59   5   any of the other ordinances and/or laws.

6        Q.   (By Mr. Robinson)  Would protesters be allowed

7   to assemble and demonstrate on the street in the city of

8   Menlo Park?

9        MR. MASTER:  Objection.  Vague.  Ambiguous.

15:00   10  Overbroad.  Lacks foundation.  Incomplete hypothetical.

11  Calls for legal conclusion.

12        If you can answer, go ahead.

13        THE WITNESS:  The answer would be no, if they

14  were blocking traffic.

15:00   15  Q.   (By Mr. Robinson)  Is there any area of the

16  street of Menlo Park where protestors are allowed to

17  demonstrate on the street?

18        MR. MASTER:  Same objections.

19        THE WITNESS:  We don't have a -- a protest map

15:00   20  as a side.  So the answer is no.  We don't have that

21  ability to say, "You may protest on this street but not

22  on that street."

23        Q.   (By Mr. Robinson)  So protestors are not

24  allowed to protest on the street anywhere in the city of

15:00   25  Menlo Park; is that accurate?

1   **A.**   That's not accurate.

2   **Q.**   Where are they allowed to protest on the

3   street?

4   **A.**   As long as they are not interfering with

5   egress, vehicle access, et cetera.

6   **Q.**   In your experience with the police department

7   of the City of Menlo Park, has there ever been an

8   occasion where protestors protested on the street and

9   were allowed to remain assembled and protesting on the

10  actual street?

11  **A.**   Yes.

12  **Q.**   What was that occasion?

13  **A.**   There -- well, it was -- they transited a

14  street; they didn't remain on the street.  And that was

15  an antigun protest from the Menlo Atherton High School

16  where students walked from the school to a location.

17  **Q.**   So they didn't stay on the street?

18  **A.**   Correct.

19  **Q.**   They were allowed to pass over a street to get

20  from one location to another?

21  **A.**   They transited through the street, yes.

22  **Q.**   Other than that occasion, are you familiar with

23  any other occasion where protestors were allowed to

24  access and assemble on the street?

25  **A.**   Not that I'm aware of.

1    **Q.**   Can Mr. Zeleny protest on the street in the

2    city of Menlo Park?

3          MR. MASTER:  Objection.  Vague.  Ambiguous.

4    Overbroad.  Incomplete hypothetical.  Calls for legal

15:02   5    conclusion.  Speculation.

6          You can answer.

7          THE WITNESS:  It would depend on what type of

8    protest and if he was following all the laws and whether

9    he was blocking vehicle access or not.

15:02   10    **Q.**   (By Mr. Robinson)  Is there any written policy

11   or procedure or ordinance of the City of Menlo Park that

12   relates to protesting on the street?

13    **A.**   I think we're discussing one right now, Policy

14   467.

15:02   15    **Q.**   Aside from the police department manual, is

16   there any other policy, procedure, ordinance, rule,

17   regulation, or authority within the City of Menlo Park

18   regarding protesting on the street?

19    **A.**   The Vehicle Code.

15:03   20    **Q.**   What -- what Vehicle Code -- I'm not going to

21   ask you the section numbers, but what are the Vehicle

22   Code regulations, in general, that govern protesting on

23   the street?

24    **A.**   The Vehicle Code regulates when a pedestrian

15:03   25   can be in the street.

```
 1    Q.   How does that apply -- go ahead.

 2    A.   And when they cannot be in the street.

 3    Q.   How does that apply to protests?

 4    A.   If a protestor was in the street illegally,

15:03  5  they would be breaking the law.  That would be a Vehicle

 6  Code violation.

 7    Q.   I assume that a group of protestors walking

 8  down the street, other than in a crosswalk, would

 9  violate the Vehicle Code; right?

15:03 10   A.   Yes.

11    Q.   The group of antigun protestors from the high

12  school walked down the street; right?

13    A.   Correct.

14    Q.   They violated the Vehicle Code; right?

15:03 15   A.   Yes.

16    Q.   They were allowed to do that.

17    A.   Yes.

18    Q.   You're familiar with the area Mr. Zeleny

19  protested in the past; right?

15:04 20   A.   Yes.

21    Q.   Sidewalk outside of the Rosewood Complex on

22  Sand Hill Road?

23    A.   Yes.

24    Q.   Is Mr. Zeleny allowed to protest on that area

15:04 25  of the sidewalk?
```

1       **A.**    As long as he lawfully does so, yes.

         2       **Q.**    Is -- let's -- we'll save that for later.

         3             Let's go to Page 2 of Policy 467.  And I'm

         4       going to ask you about Paragraph 2 of 467.3.1.

15:05    5             Does the second photograph of 467.3.1 reflect

         6       the policy of the City of Menlo Park Police Department

         7       relating to maintenance of photographs and video

         8       recordings?

         9       **A.**    Yes.

15:05    10      **Q.**    The substance of the policy is that you aren't

         11      to maintain photographs or video recordings unless it

         12      relates directly to investigation of a crime and there's

         13      reasonable suspicion of criminal activity; true?

         14      **A.**    Correct.

15:05    15      **Q.**    And the City's policy, at least, is that you

         16      won't maintain photographs or videos simply to maintain

         17      information about the views or activities of any

         18      individual, group, association, et cetera; correct?

         19      **A.**    That's not exactly what it says.

15:06    20      **Q.**    How is that inaccurate?

         21             MR. MASTER:  Document speaks for itself.  Do

         22      you want him to read the document?

         23             MR. ROBINSON:  No.  I'd like him to answer my

         24      question.

15:06    25      **Q.**    (By Mr. Robinson)  How is that inaccurate?

1      **A.**    I was going to read the document.

         2      **Q.**    Go ahead and read it.

         3      **A.**    "Photographs and videos will not be used or

         4      retained for the sole purpose of collecting or

15:06    5      maintaining information about the political, religious,

         6      or social views of associations or the activities of any

         7      individual, group, association, organization,

         8      corporation, business, or partnership unless such

         9      information directly relates to an investigation of

15:06   10      criminal activities and there is reasonable suspicion

        11      that the subject of the information is involved in

        12      criminal conduct."

        13      **Q.**    Is the City currently investigating Mr. Zeleny

        14      for criminal activity?

15:07   15      **A.**    Not currently investigating him, no.

        16      **Q.**    Other than the concealed carry issue for which

        17      Mr. Zeleny was acquitted, did the City ever investigate

        18      Mr. Zeleny for criminal activity?

        19      **A.**    No.

15:07   20      **Q.**    Other than that issue related to the concealed

        21      carry for which Mr. Zeleny was acquitted, did the City

        22      ever have a reasonable suspicion that he was engaged in

        23      criminal conduct?

        24      **A.**    No.

15:07   25      **Q.**    Does maintaining a file on Mr. Zeleny, despite

1   the absence of an investigation or any reasonable

2   suspicion of criminal conduct violate the City's written

3   policy related to First Amendment activities?

4       A.   No.

15:08   5       Q.   Why not?

6       A.   Because he -- the issue of Mr. Zeleny openly

7   carrying weapons, as a public safety concern, and the

8   fact that there was concerns on our part and reasonable

9   suspicion that he may come back and attempt to protest

15:08   10   with openly carried weapons, which are now illegal.

11       Q.   What was that reasonable suspicion based on?

12       A.   Based on the information that Mr. Zeleny

13   himself provided to us.

14       Q.   What about the information that Mr. Zeleny

15:08   15   provided suggested to you that he would violate the law

16   and openly carry firearms without a permit?

17       A.   Based on the information that he provided in

18   which he said he had every right to designate himself as

19   a person who was able to do a entertainment event and

15:09   20   carry weapons.  He said so during the open meeting with

21   the City Council, where he told them if he wished, he

22   could have been armed at that time.

23       Q.   So based on Mr. Zeleny's assertion that he had

24   the right to openly carry firearms, you believe that

15:09   25   supported a reasonable suspicion on the part of the

1    police department to believe that Mr. Zeleny might

2    engage in criminal activity?

3        **A.**    Yes.

4        **Q.**    Mr. Zeleny filed his permit application in

15:09  5    2015; correct?

6        **A.**    Correct.

7        **Q.**    And he was prosecuted from 2012 to 2014;

8    correct?

9        **A.**    Prosecuted?

15:09  10        **Q.**    For the concealed carry issue for which he was

11    acquitted?

12        **A.**    I don't remember the exact time frame when he

13    was prosecuted.

14        **Q.**    You were the officer in charge of recommending

15:10  15    that for prosecution; right?

16        **A.**    That's incorrect.

17        **Q.**    Who was the individual, on behalf of the police

18    department, responsible for referring the concealed

19    carry issue for prosecution?

15:10  20        **A.**    I believe the investigating officer was Officer

21    Foy.

22            MR. ROBINSON:  It looks like we have about ten

23    minutes left, so why don't we take a quick break.

24            THE VIDEOGRAPHER:  This now marks the end of

15:10  25    Disk labeled No. 2 in the videotaped deposition of Chief

1   Dave Bertini.  We are now going off the record.  The

          2   time is 3:10 p.m.

          3          (Recess taken from 3:10 p.m. to 3:23 p.m.)

          4          THE VIDEOGRAPHER:  This now begins the

15:24     5   beginning of disk labeled No. 3 in the videotaped

          6   deposition of Chief Dave Bertini.  We are now going back

          7   on the record.  The time is 3:23 p.m.

          8          (Exhibits 44 and 45 were marked for

          9   identification.)

15:25    10      **Q.**   (By Mr. Robinson)  I'm going to start with a

         11   few questions about 45 and then work backwards to 44.

         12          <mark>Exhibit 45</mark> is a three-page document, Bates

         13   marked MP226 through 228; correct?

         14      **A.**   Correct.

15:25    15      **Q.**   The top e-mail in this e-mail thread is one

         16   from you to David Trestman -- I'm sorry.  Pronounce it

         17   again.

         18      **A.**   Tresmontan.

         19      **Q.**   Tresmontan?

15:25    20      **A.**   Tresmontan.

         21      **Q.**   Got it.

         22          -- Mr. Tresmontan at NEA; correct?

         23      **A.**   The top e-mail is my reply to him, yes.

         24      **Q.**   So he e-mailed you, and then you e-mailed him

15:25    25   back.

1     **A.**   Correct.

          2     **Q.**   In your e-mail to him, there is the statement

          3     at the end of the paragraph there, "I was the person who

          4     made the decision to send the case over for

15:26     5     prosecution."

          6          Do you see that?

          7     **A.**   Yes.

          8     **Q.**   Does that refresh your recollection that you

          9     were the person who made the decision to send

15:26    10     Mr. Zeleny's case for prosecution?

         11     **A.**   Ultimately, I have to sign off on all cases.

         12     **Q.**   You signed off on Mr. Zeleny's case; correct?

         13     **A.**   Correct.

         14     **Q.**   Officer Foy wasn't permitted to refer

15:26    15     Mr. Zeleny's case for prosecution on his own, was he?

         16     **A.**   It has to go through levels of the police

         17     department.  It goes through a sergeant, and then it

         18     goes through the commander before it gets sent off to

         19     the D.A.'s Office.

15:26    20     **Q.**   You were the commander responsible for

         21     Mr. Zeleny's case; true?

         22     **A.**   Correct.

         23     **Q.**   So you were the person who made the ultimate

         24     decision about whether to send it for prosecution; true?

15:26    25     **A.**   Correct.  I signed off on it.

1    **Q.**   And in your e-mail, you are advising a

2    representative of NEA that you were the person who made

3    that decision; true?

4    **A.**   Yes.

15:27    5    **Q.**   Did you testify in Mr. Zeleny's criminal case?

6    **A.**   I did.

7    **Q.**   Was your testimony, in part, that Mr. Zeleny

8    had a concealed firearm?

9    **A.**   The record would speak for itself.  I don't

15:27    10    remember exactly what I said in that hearing.

11    **Q.**   Did you ever observe the holster that was at

12    issue in Mr. Zeleny's criminal prosecution?

13    **A.**   In photographs.

14    **Q.**   Did you have a view about whether carrying a

15:27    15    weapon in that holster would be a concealed carry?

16    **A.**   In that configuration, yes.

17    **Q.**   Why don't we take a look at Exhibit 44.  For

18    the record, it's MP41 and it's one page; correct?

19    **A.**   Yes.

15:27    20    **Q.**   This is an e-mail exchange between two

21    representatives of the City of Menlo Park; correct?

22    **A.**   Yes.

23    **Q.**   And is Brian Roberts an individual at the

24    police department?

15:28    25    **A.**   He was the -- this occurred about six months --

1   seven, eight months before I was hired by the Menlo Park

         2   Police Department, but I know that Brian Roberts was the

         3   chief of police at the time.

         4      **Q.**   And in Mr. Romero's e-mail to Mr. Roberts, he

15:28    5   references Mr. Zeleny and says he likes to engage in

         6   conversations and --

         7          (Reporter interruption.)

         8      **Q.**   (By Mr. Robinson)  -- manipulate as much as

         9   possible, satisfying his need for attention.

15:28   10          Do you see where I'm referring to?

        11      **A.**   Yes.

        12      **Q.**   Do you share the view that Mr. Zeleny likes to

        13   engage in conversations and manipulate as much as

        14   possible?

15:28   15      **A.**   I'm not -- I don't know of any conversations

        16   Mr. Zeleny has.  As far as his manipulation, yes, it is

        17   my opinion that he's manipulating the Penal Code to

        18   attempt to be able to legally protest while armed.

        19      **Q.**   In what way is he manipulating the Penal Code,

15:29   20   in your view?

        21      **A.**   Although he has asserted that he has a right to

        22   designate himself as an active participant in an event

        23   and -- and carry weapons during his protests, he is

        24   attempting to go through the City's process to get these

15:29   25   permits in order to do that.  And that is what we are

1 attempting to come to a conclusion with as far as his

2 second permit.

3 **Q.** Part of your answer related to Mr. Zeleny

4 asserting that he has the right to engage in the

15:30 5 protests without -- or to engage in an entertainment

6 event or to film his protests as part of a video

7 production without the City's authorization; is that

8 accurate?

9 **A.** That is my understanding of what he has alleged

15:30 10 or he has said.

11 **Q.** As the person most qualified on behalf of the

12 City of Menlo Park, is he correct in that assertion?

13 **A.** In the assertion -- no; that he can't -- hold

14 on.

15:30 15 Go back and tell me the assertion again.

16 **Q.** Sure. Is it accurate that Mr. Zeleny can

17 engage in his activities with unloaded firearms without

18 some kind of permit from the City?

19 **A.** That is not correct.

15:30 20 **Q.** Okay.

21 So you disagree with his assertion?

22 **A.** That's correct.

23 **Q.** And assuming that he did that, we've talked

24 about this before, and I don't want to belabor it.

15:30 25 Assuming that he did that, he would be subject to

1    prosecution?

2        **A.**    He may be subject to arrest and prosecution.

3        **Q.**    And if I understood you correctly, Mr. Zeleny

4    is manipulating the process by applying for the permits;

15:31    5    is that correct?

6        **A.**    Yes.

7        **Q.**    Okay.

8            So the City disagrees with him -- strike that.

9            In the City's view, Mr. Zeleny needs the

15:31    10    permits in order to use the guns in the protests -- in

11    the entertainment event, the protests, the video,

12    whatever it is, he needs a permit; correct?

13        **A.**    In order for the exception to be applicable, he

14    has to be involved in a permitted activity, yes.

15:31    15    **Q.**    And in your view, Mr. Zeleny is manipulating

16    the process by applying for the permits he needs to

17    engage in that activity?

18        **A.**    Based on his own words, yes.

19        **Q.**    Going on to the next paragraph in ==Exhibit 44==,

15:32    20    there is a reference to continuing to be in close

21    contact with security from NEA.

22            Do you see that?

23        **A.**    I do.

24        **Q.**    Do you have an understanding of how -- for what

15:32    25    period of time the City of Menlo Park was in contact

1   with security from NEA regarding Mr. Zeleny?

         2       **A.**   Not before I became an employee there.

         3       **Q.**   Throughout the entire period of time that you

         4   were an employee, has the City been in close contact

15:32    5   with security from NEA?

         6       **A.**   I would not characterize it as close contact.

         7       **Q.**   How would you characterize it?

         8       **A.**   I would characterize it as contact when

         9   warranted, when Mr. Zeleny was coming to do a protest.

15:33   10           MR. ROBINSON:   Why don't we go ahead and mark

        11   this as the next in order, please.

        12           (Exhibit 46 was marked for identification.)

        13       **Q.**   (By Mr. Robinson)   For the record, Exhibit 46

        14   is a four-page document, MP1895 through 1898; correct?

15:33   15       **A.**   Correct.

        16       **Q.**   Do you recognize it, Exhibit 45?

        17       **A.**   I recognize it as a police report from the

        18   Menlo Park Police Department.

        19       **Q.**   Is this one of the documents that was collected

15:34   20   and produced in this litigation?

        21       **A.**   Yes.

        22           (Reporter interruption.)

        23       **Q.**   (By Mr. Robinson)   I'm sorry.

        24           Exhibit 46 is a Menlo Park Police report;

15:34   25   correct?

1      **A.**   Yes.

2      **Q.**   And Exhibit 46 is one of the documents that was

3  collected and produced by the City of Menlo Park in this

4  lawsuit.

15:34   5      **A.**   Yes.

6      **Q.**   This police report relates to Mr. Zeleny's

7  protests; correct?

8      **A.**   One of them.

9      **Q.**   And is it your understanding that this was a

15:34  10  protest that involved Mr. Zeleny carrying unloaded

11  firearms?

12      **A.**   Based on what I read in the report, yes.  But

13  this, again, occurred two -- a year before I was

14  employed there.

15:34  15      **Q.**   If you go under the narrative section on 1897,

16  the second paragraph discusses signs being placed for

17  Mr. Zeleny's protest.

18          Do you see that?

19      **A.**   Yes.

15:35  20      **Q.**   It would appear, based on the police report,

21  that Mr. Zeleny cooperated with police officers'

22  requests to rearrange the signs; true?

23      **A.**   Yes.

24      **Q.**   If you go down to the second paragraph -- third

15:35  25  paragraph from the bottom, there is a discussion of

1    Mr. Zeleny having a firearm and being compliant with a

2    request to check whether it was loaded; correct?

3         **A.**    Yes, a 12-gauge shotgun.

4         **Q.**    Based on that paragraph, Mr. Zeleny was also

15:35    5    cooperative with officers' requests to inspect his

6    weapon; true?

7         **A.**    Based on the report, yes.

8         **Q.**    In any of your experience with Mr. Zeleny, has

9    he been anything other than cooperative with officers'

15:36    10    requests to inspect his firearms?

11         **A.**    No.

12         **Q.**    Has he been uncooperative with officers in any

13    way, to your knowledge?

14         **A.**    Not to my knowledge.

15:36    15         **Q.**    Going down to the next paragraph, second up

16    from the bottom, is a reference to a bagpiper.

17              And my question is:  It appears, based on the

18    report, that Mr. Zeleny cooperated with the officers'

19    request to relocate the bagpiper so that the noise was

15:36    20    at an acceptable level; correct?

21         **A.**    Yes.

22         **Q.**    And in the next paragraph, Mr. Zeleny

23    cooperated with a request to have a trumpet player play

24    music at an acceptable level; true?

15:36    25         **A.**    Yes.

1          MR. ROBINSON:  Let's go on to Exhibit 47.

2          (Exhibit 47 was marked for identification.)

3     Q.   (By Mr. Robinson)  For the record, Exhibit 47

4  is three pages, MP1871 through 1873; correct?

15:37  5     A.   Correct.

6     Q.   Do you recognize Exhibit 47?

7     A.   It's a Menlo Park Police report.

8     Q.   It is one of the documents collected and

9  produced in this lawsuit by the City of Menlo Park;

15:37  10  true?

11     A.   Yes.

12     Q.   And in the narrative section of this police

13  report, it discusses an inspection of one of

14  Mr. Zeleny's firearms; correct?

15:38  15     A.   Again, this was a year before I was employed

16  with the Menlo Park Police Department, but yes, it does.

17     Q.   And in this report, the officer notes that

18  Mr. Zeleny voluntarily offered to allow the officer to

19  inspect his firearm; correct?

15:38  20     A.   Yes, a shotgun.

21     Q.   And the officer apparently thanked Mr. Zeleny

22  for his cooperation.

23     A.   According to the police report, he did.

24     Q.   Is that consistent with your understanding of

15:38  25  Mr. Zeleny's behavior throughout his protests; that he

1    was cooperative with the requests made by police

         2    officers?

         3        **A.**    Yes.

         4        **Q.**    His cooperation included the location of

15:39    5    various parts of his protest; right?

         6        **A.**    In the one case that I read, yes.

         7        **Q.**    And it also included cooperation regarding

         8    inspection of his firearms; true?

         9        **A.**    Yes.

15:39   10              MR. ROBINSON:  Let's mark this as 48, please.

        11              (Exhibit 48 was marked for identification.)

        12        **Q.**    (By Mr. Robinson)  For the record, Exhibit 48

        13    is multiple pages, MP61 through 65; correct?

        14        **A.**    Yes.

15:40   15        **Q.**    Do you recognize Exhibit 48?

        16        **A.**    It is an e-mail with a daily police log

        17    attached.

        18        **Q.**    And this is an e-mail that you would have

        19    received in your capacity as -- strike that.

15:40   20              In February of 2012, what was your title with

        21    the Menlo Park Police Department?

        22        **A.**    Patrol commander.

        23        **Q.**    Okay.

        24              Did you receive this e-mail and attachment in

15:40   25    that capacity on the date listed here?

|       |    |                                                    |
|-------|----|----------------------------------------------------|
|       |  1 | **A.**   Yes.                                       |
|       |  2 | **Q.**   Could you please take a look at           |
|       |  3 | problem-solving.                                   |
|       |  4 | **A.**   Okay.                                      |
| 15:41 |  5 | **Q.**   This problem-solving item relates to another |
|       |  6 | day of Mr. Zeleny's protests outside of NEA's offices; |
|       |  7 | correct?                                           |
|       |  8 | **A.**   Correct.                                  |
|       |  9 | **Q.**   And, once again, Mr. Zeleny was cooperative; |
| 15:41 | 10 | true?                                              |
|       | 11 | **A.**   Yes.                                       |
|       | 12 | **Q.**   And the officer noted that no crimes were |
|       | 13 | committed.                                         |
|       | 14 | **A.**   Correct.                                  |
| 15:41 | 15 | **Q.**   And Mr. Zeleny was legally carrying unloaded |
|       | 16 | rifles; correct?                                   |
|       | 17 | **A.**   At the time, yes.                         |
|       | 18 | **Q.**   Why was Mr. Zeleny's protest listed under the |
|       | 19 | heading of problem-solving?                        |
| 15:41 | 20 | **A.**   Again, this is not a formal document that is |
|       | 21 | made public.  It is an internal document, and the |
|       | 22 | sergeants who create this document can put any    |
|       | 23 | information they believe for the good of the order that |
|       | 24 | everybody else in the police department -- would be |
| 15:42 | 25 | useful for them to know, so I don't know why it was put |

1    under problem-solving; could have been put under other

2    parts.  It's really not formal as to where it goes.

3        **Q.**   Was Mr. Zeleny's protest considered a problem

4    by the City of Menlo Park in 2012?

15:42   5        **A.**   Yes.

6        **Q.**   Why was it considered a problem?

7        **A.**   Because, as it states here, both subjects were

8    wearing military style uniforms, Level 3A tactical

9    vests, one with a ceramic trauma plate.  The rifles

15:42  10    carried by the subjects were M1A type .308 caliber, and

11    they each had several loaded ten-round magazines on

12    their person but not loaded in the rifles.

13        That is why it was a problem for the Menlo Park

14    Police Department.

15:43  15        **Q.**   What about that is a problem?

16        **A.**   These two men were a public safety concern,

17    both because of the fact that, very easily, they could

18    load those weapons and become active shooters, number

19    one.

15:43  20        Number two, they created a visual hazard for

21    people who are passing by.  And both men put themselves

22    in very dangerous, precarious positions, because if a

23    passerby saw these men in the society we live in today,

24    with active shooters and mass shootings permeating the

15:43  25    world, that a person who happened to have a gun legally

1    may consider them a threat, and who knows what could

         2    have happened.

         3         So, yes, this was a problem.

         4    Q.    At the time that the City -- in the 2012 time

15:43    5    frame, when the City of Menlo Park apparently considered

         6    Mr. Zeleny's activities a problem, Mr. Zeleny was not

         7    doing anything illegal; correct?

         8    A.    No, he was not doing anything illegal.

         9    Q.    He was exercising his constitutional right to

15:44   10    bear arms; true?

        11    A.    Certainly.

        12    Q.    And Mr. Zeleny's exercise of his constitutional

        13    right to bear arms was a problem for the City of Menlo

        14    Park?

15:44   15         MR. MASTER:  Objection.  Argumentative.  Asked

        16    and answered.

        17         THE WITNESS:  It caused a public safety issue.

        18    Q.    (By Mr. Robinson)  So his exercise of his

        19    constitutional right to bear arms was a problem for the

15:44   20    City of Menlo Park because, in your view, it created a

        21    public safety issue; is that accurate?

        22    A.    That is accurate.

        23         MR. ROBINSON:  Let's take a look at Exhibit 49.

        24         (Exhibit 49 was marked for identification.)

15:46   25    Q.    (By Mr. Robinson)  Do you recognize Exhibit 49?

1     **A.**   I recognize it as a Menlo Park Police report.

          2     **Q.**   And, for the record, it's MP151 through 154;

          3   correct?

          4     **A.**   Yes.

15:46     5     **Q.**   ==Exhibit 49== describes another of Mr. Zeleny's

          6   protests at NEA and the police response to it; correct?

          7     **A.**   Correct.

          8     **Q.**   And, among other things, during this protest,

          9   Officer Poirier --

15:46    10     **A.**   Poirier.

         11     **Q.**   Poirier.  -- followed a vehicle that had

         12   stopped to give assistance to Mr. Zeleny; correct?

         13     **A.**   Yes.  Poirier is spelled P-o-i-r-i-e-r.

         14     **Q.**   He followed a vehicle that had stopped to give

15:47    15   assistance to Mr. Zeleny until it stopped at the

         16   Stanford Shopping Mall; is that accurate?

         17     **A.**   Yes.

         18     **Q.**   Is there some -- strike that.

         19           Do you know whether anyone directed Officer

15:47    20   Poirier to follow that vehicle?

         21     **A.**   No.

         22     **Q.**   Is there some policy or procedure at the City

         23   of Menlo Park Police Department about when an officer

         24   will follow a vehicle like that?

15:47    25     **A.**   No.

```
           1      Q.    So it's up to the officer's individual

           2   discretion?

           3      A.    That's correct.

           4      Q.    Do the officers receive any training about

15:47      5   whether or not to follow participants in demonstrations?

           6      A.    They receive training as to typical and routine

           7   police practice.

           8      Q.    Is following a vehicle that stops to render

           9   assistance to a protest consistent with typical police

15:48     10   practice?

          11      A.    Yes.

          12      Q.    Is interviewing individuals who stop to render

          13   assistance to protestors a part of typical police

          14   practice for the City of Menlo Park?

15:48     15      A.    Yes.  And in this case, it was a consensual

          16   encounter.

          17      Q.    Are officers in the City of Menlo Park trained

          18   to do that as part of their training on typical police

          19   practice?

15:48     20           MR. MASTER:  Objection.  Vague and ambiguous.

          21      Q.    (By Mr. Robinson)  Let me rephrase.

          22           Are officers in the City of Menlo Park trained

          23   to follow individuals who stop to render assistance to

          24   protestors as part of their training on typical police

15:48     25   practice?
```

1          MR. MASTER:  Same objection.  Incomplete

2     hypothetical.

3          Go ahead.

4          THE WITNESS:  There is no training that

15:48   5     specifically says, "You should stop or follow certain

6     vehicles."

7          The training states that we may follow any

8     vehicle we choose, as it is discretionary, on a public

9     road.  And in this case, and in cases where there may be

15:49  10     some kind of public safety concern, it would be totally

11     appropriate and expected for an officer to take

12     investigative steps to try to determine who was involved

13     in this public safety issue.

14     Q.   (By Mr. Robinson)  That's true, despite the

15:49  15     fact that no crime was being committed; correct?

16     A.   Correct.

17     Q.   Let's go on to the next page.  And the second

18     paragraph, which is one sentence, a Menlo Park Police

19     undercover unit followed the green -- cream GMC to the

15:49  20     Quality Inn in Palo Alto.

21          Do you see that?

22     A.   I do.

23     Q.   Is that also consistent with typical police

24     practice in the City of Menlo Park, to follow a

15:50  25     protestor's vehicle, until it stops?

```
 1    A.    It is a common investigative technique to

 2   follow vehicles with unmarked vehicles in numerous types

 3   of cases.  And in this case, we're dealing with a public

 4   safety issue, yes.

 5    Q.    What were you investigating?

 6    A.    I wasn't investigating anything.

 7    Q.    What was the City of Menlo Park investigating

 8   in this situation?

 9    A.    In this case, they were dealing with a public

10   safety concern with a man who was armed with hundreds of

11   rounds who could pose a public safety threat.

12    Q.    Were they investigating for a crime, criminal

13   activity?

14    A.    One that could possibly occur.

15    Q.    Are you familiar with any other instances where

16   the City of Menlo Park has engaged undercover vehicles

17   to investigate public safety concerns that don't involve

18   criminal activity?

19    A.    Hundreds.

20    Q.    What other types of public safety issues do

21   officers investigate in unmarked vehicles?

22          MR. MASTER:  Just object.  Vague and ambiguous.

23   Overbroad.  Calls for a narrative.

24          Go ahead.

25          THE WITNESS:  There are numerous cases where
```

15:50  5
15:50  10
15:50  15
15:50  20
15:51  25

1  detectives or undercover vehicles follow people who have

2  not yet committed crimes that we're able to make an

3  arrest for or have probable cause for.

4         We have investigative techniques where people

15:51    5  are followed on numerous occasions for a myriad of

6  crimes that I could -- that I'd have to list of the

7  types of crimes that detectives and/or narcotics units

8  or gang officers would be investigating or criminal

9  activity that may be occurring.

15:51   10         MR. ROBINSON:  Could we read back the last

11  question.

12         (Record read.)

13     **Q.**  (By Mr. Robinson)  What other types of public

14  safety issues that don't involve criminal activity or

15:52   15  suspected criminal activity do officers investigate

16  using unmarked vehicles in the city of Menlo Park?

17         MR. MASTER:  Same objections.

18         You can answer.

19         THE WITNESS:  Unmarked vehicles?

15:52   20     **Q.**  (By Mr. Robinson)  Correct.

21     **A.**  Could be gang activity.  It could be following

22  people who we suspect may be armed, may be dangerous,

23  may be about to commit a crime.  There is numerous times

24  where a vehicle -- unmarked vehicles and marked vehicles

15:52   25  can be used to follow people.

1      **Q.**   And in your understanding, it is consistent

            2    with typical police practice of the City of Menlo Park

            3    to use investigative resources, such as unmarked

            4    vehicles, to follow individuals who are not suspected of

15:52       5    committing a crime of any kind?

            6           MR. MASTER:  Objection.  Misstates his

            7    testimony.

            8      **Q.**   (By Mr. Robinson)  You can answer.

            9      **A.**   That's not what I said.

15:53      10      **Q.**   Okay.

           11           Let me ask you:  Is it consistent, in your

           12    opinion, with typical police practice of the City of

           13    Menlo Park to use undercover vehicles to follow people

           14    who are not suspected of committing a crime?

15:53      15      **A.**   It is typical to use undercover vehicles and

           16    even marked vehicles to investigate possible public

           17    safety issues, whether they be a crime that is suspected

           18    or a crime may be occurring or a crime is about to

           19    occur.  So that is typical.

15:53      20           MR. ROBINSON:  Could we read back the last

           21    question, please.

           22           (Record read.)

           23      **Q.**   (By Mr. Robinson)  And I'm going to ask you to

           24    answer that question.  That's a yes-or-no question.

15:53      25           Is it typical police practice to use undercover

1  vehicles to follow people who aren't suspected of

2  committing a crime?

3           MR. MASTER:  Objection.  Asked and answered.

4  Argumentative.

15:54   5           THE WITNESS:  I can't answer without qualifying

6  it as I did.

7       **Q.**   (By Mr. Robinson)  Is the answer a qualified

8  yes or a qualified no?

9           MR. MASTER:  Same objection.  Argumentative.

15:54  10           THE WITNESS:  It's a qualified yes.

11      **Q.**   (By Mr. Robinson)  Going down to the second --

12  I guess it's the third paragraph from the bottom on Page

13  154 of Exhibit 49.  There's a reference to following a

14  vehicle that was nearby Mr. Zeleny's protest and

15:54  15  engaging in an enforcement stop.

16           Do you see that?

17      **A.**   I do.

18      **Q.**   During the enforcement stop, the officers asked

19  the driver of the vehicle whether he was associated with

15:55  20  Mr. Zeleny; true?

21      **A.**   Yes.

22      **Q.**   Was that consistent with typical police

23  enforcement practice -- strike that.

24           Was that consistent with typical police

15:55  25  practice of the City of Menlo Park?

1    **A.**    The officer clearly had reasonable suspicion to

2    detain this vehicle for having no front plate.

3    **Q.**    Was following the vehicle and making an

4    enforcement stop and then asking the driver questions

15:55    5    about association with Mr. Zeleny consistent with

6    typical police practice of the City of Menlo Park?

7         MR. MASTER:  Objection.  Vague and ambiguous.

8    Incomplete hypothetical.

9         THE WITNESS:  I can't answer that question the

15:55    10    way you stated it.  I told you that the officer,

11    obviously, had a reasonable suspicion.  That's all we

12    need to detain somebody.  That is the level of proof

13    necessary to make a Fourth Amendment detention on a

14    person, and that's what was happening -- what occurred

15:56    15    here.

16    **Q.**    (By Mr. Robinson)  So as the person most

17    qualified for the City of Menlo Park, you can't answer

18    whether it's consistent with typical police practice to

19    follow a vehicle, engage in an enforcement stop, and

15:56    20    then to question the driver about association with

21    Mr. Zeleny; is that accurate?

22    **A.**    It is typical to have reasonable suspicion to

23    stop a vehicle, and you can ask any questions you want.

24    The driver doesn't have to answer those questions;

15:56    25    doesn't matter what you ask them.

1      **Q.**    That wasn't my question, Chief Bertini.

                2             My question was:  Is it typical police practice

                3    for the City of Menlo Park, in your capacity as the

                4    person most qualified designated by the City of Menlo

15:56     5    Park, to follow a driver, make an enforcement stop, and

                6    then question the driver about his association with a

                7    protestor?

                8             Is that typical police practice?

                9             MR. MASTER:  First of all, I'm going to object

15:57   10    to the question as being vague and ambiguous.

              11             I'm also going to object to your client

              12    laughing at the question demonstrably.

              13             I'd ask you to act professionally, Mr. Zeleny.

              14    Otherwise, I'm going to have to ask you to leave.

15:57   15             MR. ROBINSON:  I'm going to object.

              16             A, I don't need you to consult with my client.

              17    If you have an issue with my client's behavior during

              18    the deposition, you can tell me, and I'll relay it to

              19    him.

15:57   20             MR. MASTER:  I do have an issue.

              21             MR. ROBINSON:  Okay.

              22             You've just expressed it on the record.

              23             MR. MASTER:  Thank you.

              24             So you've heard my objection to it.  If you can

15:57   25    answer it, he's answered it, but go ahead.

1          THE WITNESS:  The answer is that it is -- as

2     long as the officer had reasonable suspicion to stop the

3     vehicle, he could stop and ask about his association

4     with anybody.

15:57     5     Q.   (By Mr. Robinson)  I'm not asking whether it

6     was right or wrong for the officer to stop the vehicle.

7     I'm asking if this conduct of following a vehicle,

8     engaging in an enforcement stop, and --

9          (Reporter interruption.)

15:57    10     Q.   (By Mr. Robinson)  -- questioning the driver

11     about his association with a protestor is consistent

12     with typical police practice in the city of Menlo Park.

13          MR. MASTER:  I'm going to continue to object to

14     that question as being vague and ambiguous.  It's also

15:58    15     argumentative, and I'd like to tell you why, if you'd

16     let me.

17          MR. ROBINSON:  I would appreciate it if you

18     don't.

19          MR. MASTER:  Okay.

15:58    20          Well, then, he can answer it one more time.

21     And when he's done with that, he's done with that

22     question, and we'll move on.

23          THE WITNESS:  So long as the officer had

24     reasonable suspicion to stop the vehicle, he could ask

15:58    25     any questions, whether it's about a protestor, whether

```
         1    it's about a drug deal he just saw, whether it's about a

         2    gang membership he has or a gang person he just spoke

         3    to.  That can happen.

         4        Q.  (By Mr. Robinson)  Is there any reason you're

15:58    5    unable to answer my question about whether it's typical

         6    police practice to follow a car like this?

         7            MR. MASTER:  Objection.  Argumentative.  Asked

         8    and answered.

         9            Don't answer that question.

15:58   10            Move on.

        11        Q.  (By Mr. Robinson)  Are you going to follow your

        12    attorney's instruction not to answer that question?

        13        A.  I am.

        14            MR. ROBINSON:  Could we mark the record, then.

15:59   15            Let's take a look at Exhibit 50, please.

        16            (Exhibit 50 was marked for identification.)

        17        Q.  (By Mr. Robinson)  Do you recognize Exhibit 50?

        18        A.  I do.

        19        Q.  It's a -- for the record, a multiple-page

16:00   20    document, MP120 to 124; correct?

        21        A.  Yes.

        22        Q.  If I could have you turn to MP122, please.

        23    There is a reference in the document, about halfway down

        24    this page, to contact with Michael Zeleny.

16:00   25            Do you see that?
```

1      **A.**    I do.

          2      **Q.**    The officer notes, again, that Mr. Zeleny was

          3    very cooperative.

          4             Do you see that?

16:00     5      **A.**    I do.

          6      **Q.**    That's consistent with your understanding of

          7    Mr. Zeleny's behavior during all of his protests.

          8      **A.**    Certainly.

          9             MR. ROBINSON:  Why don't we mark this as

16:01    10    ==Exhibit 51==, please.

         11                (==Exhibit 51== was marked for identification.)

         12      **Q.**    (By Mr. Robinson)   ==Exhibit 51== is multiple pages

         13    from MP206 to 210; correct?

         14      **A.**    Correct.

16:02    15      **Q.**    Do you recognize ==Exhibit 51==?

         16      **A.**    I do.

         17      **Q.**    What is it?

         18      **A.**    It is the minutes from a management -- police

         19    management staff meeting on August 7th, 2012.

16:02    20      **Q.**    You attended that meeting; correct?

         21      **A.**    I did.

         22      **Q.**    If you could turn to Page 210, please.  There

         23    is a reference to Zeleny.

         24             Do you see where I'm referring to, middle of

16:02    25    the page?

1      **A.**   Yes.

2      **Q.**   In that reference, it talks about "It has been

3   recently discovered that he," meaning Mr. Zeleny, "may

4   be using marijuana."

16:02   5           Do you see that?

6      **A.**   I do.

7      **Q.**   How was that recently discovered?

8      **A.**   No idea.

9      **Q.**   It goes on to discuss how if it's proven that

16:02  10   he's using marijuana, his weapons can be taken away.

11           Do you see that?

12      **A.**   That's what it says.

13      **Q.**   At this point in time, August of 2012, is it

14   the City's desire to have Mr. Zeleny's weapons taken

16:03  15   away?

16      **A.**   No.

17      **Q.**   Why was there a discussion during the City

18   Police Department meeting about taking away Mr. Zeleny's

19   weapons?

16:03  20      **A.**   This is something that Sergeant Kaufman brought

21   up during the meeting, obviously, since it's under her

22   name.  And my understanding is that she had had contact

23   with the Santa Clara D.A.'s Office and Palo Alto Police

24   Department, so I assume that that information came from

16:03  25   them.

1      Q.   What was Sergeant Kaufman's role regarding

          2   Mr. Zeleny's protests?

          3      A.   She was the detective sergeant at the time.

          4      Q.   Was she the detective sergeant that was in

16:03     5   charge of addressing Mr. Zeleny's protests?

          6      A.   I'm sorry.  Let me correct myself.  She wasn't

          7   the detective sergeant yet.  At this time, she was the

          8   special events sergeant, so she was in charge of dealing

          9   with all the protests that Mr. Zeleny had during that

16:04    10   time.

         11          MR. ROBINSON:  Why don't we mark this as

         12   Exhibit 52, please.

         13          (Exhibit 52 was marked for identification.)

         14      Q.   (By Mr. Robinson)  For the record, Exhibit 52

16:04    15   is multiple pages from MP88 to MP94; correct?

         16      A.   Yes.

         17      Q.   Do you recognize Exhibit 52?

         18      A.   I do.

         19      Q.   It's more staff meeting minutes from the City

16:05    20   of Menlo Park Police Department; true?

         21      A.   April 3rd, 2012.

         22      Q.   And it's meeting minutes from a management

         23   staff meeting; correct?

         24      A.   Correct.

16:05    25      Q.   Did you attend this meeting?

1     **A.**    I did.

2     **Q.**    If I could have you look at Page 93, please.

3     Under the heading "Sergeant Kaufman," does that reflect

4     something that Sergeant Kaufman presented at the

16:05     5     meeting?

6     **A.**    Yes.

7     **Q.**    To the best of your recollection, does that

8     fairly summarize Sergeant Kaufman's presentation at the

9     time?

16:05     10     **A.**    I have -- I can only go off what's written

11     here.  I don't remember this meeting from that many

12     years ago.

13     **Q.**    In the statement in the minutes, Sergeant

14     Kaufman is noted as saying there seems to be no firm

16:06     15     solution to ending his protests.

16          Do you see that?

17     **A.**    I see that.

18     **Q.**    That's a reference to Mr. Zeleny's protests;

19     true?

16:06     20     **A.**    Yes.

21     **Q.**    Was the City looking for a firm solution to end

22     Mr. Zeleny's protests at the time of this meeting?

23     **A.**    I don't know what she meant by that.  In the

24     preceding sentence, she talks about having met with a

16:06     25     captain from the Sheriff's Office.

1          And my understanding, at the time, is that

2    there were also protests outside of Menlo Park, so I'm

3    not --

4        Q.   Go ahead.

16:06   5        A.   So I'm not sure what she's -- what she's

6    referring to.

7        Q.   There's a protest outside of Menlo Park that

8    you just referenced.  Those are protests by Mr. Zeleny;

9    correct?

16:06  10        A.   Yes.

11        Q.   Did you have any discussions with Mark Weiss

12    about ending Mr. Zeleny's protests?

13        A.   I did not.

14        Q.   The last sentence of the section under Sergeant

16:07  15    Kaufman's name relates to a legislative committee

16    meeting.

17          Do you see that?

18        A.   I do.

19        Q.   Is it your understanding that a -- that one or

16:07  20    more photos of Mr. Zeleny were presented to a

21    legislative committee considering the ban on open carry

22    of long guns?

23        A.   That's my understanding.

24        Q.   How did you gain that understanding?

16:07  25        A.   I don't remember whether it was through

1    Sergeant Kaufman or through some other avenue.

2    **Q.**    These photos were photos taken by the City of

3    Menlo Park; true?

4    **A.**    Yes.

16:07    5    **Q.**    And they were provided to some other agency to

6    submit in a legislative committee meeting; correct?

7    **A.**    That's my understanding.

8    **Q.**    Purpose of submitting them was to get

9    legislation enacted prohibiting the open carry of long

16:07    10    guns; correct?

11    **A.**    I believe the purpose was to show what a

12    protest using long guns looked like.  I'm not sure that

13    that was the reason why.  I don't know the -- the

14    reasoning why they used those photos.

16:08    15    **Q.**    Do you have an understanding of the reasoning

16    that the City of Menlo Park submitted them for inclusion

17    in that meeting?

18    **A.**    I believe they were requested.

19    **Q.**    Requested by whom?

16:08    20    **A.**    I don't know.

21    **Q.**    Is there someone else within the City that

22    would know?

23    **A.**    No.

24    **Q.**    Why not?

16:08    25    **A.**    Because she's retired.

1    **Q.**   That would be Sergeant Kaufman?

        2    **A.**   Correct.

        3    **Q.**   Was the ban on open carry of long guns enacted

        4    following that legislative committee meeting?

16:08   5    **A.**   I don't know the timing.  I don't know the

        6    timing of when the meeting was and when it was enacted.

        7    I assume it was after the legislative -- well --

        8            MR. MASTER:  Don't assume.  If you don't

        9    know --

16:08   10           THE WITNESS:  I don't know.

        11   **Q.**   (By Mr. Robinson)  In your experience with the

        12   City of Menlo Park, are there other instances where the

        13   City submitted materials to be used in legislative

        14   meetings?

16:09   15           MR. MASTER:  Objection just to the extent it

        16   lacks foundation and calls for speculation and falls

        17   outside of his expertise.

        18           But go ahead.

        19           THE WITNESS:  As far as legislation in the

16:09   20   state?

        21   **Q.**   (By Mr. Robinson)  Are there other instances

        22   that you're aware of where the Menlo Park Police

        23   Department has submitted information to be included in

        24   legislative proceedings for state legislation?

16:09   25   **A.**   I believe so, but I -- I believe so with some

1    local legislators who asked for information because they

2    were -- they were considering authoring a bill.

3        **Q.**   Other than that instance, are you aware of any

4    other instances where the Menlo Park Police Department

16:09   5    submitted information for consideration by a state

6    legislative body?

7        **A.**   Besides those instances, no.

8        **Q.**   It's a relatively unusual occurrence at the

9    City of Menlo Park Police Department; true?

16:10  10        **A.**   Yes.

11        **Q.**   Other than the photos being requested, are you

12   aware of any other reason why the City submitted those

13   photos of Mr. Zeleny?

14        **A.**   I'm not aware of any.

16:10  15            MR. ROBINSON:  Let's mark that as Exhibit 53.

16            (Exhibit 53 was marked for identification.)

17        **Q.**   (By Mr. Robinson)  For the record, Exhibit 53

18   is one page.  It's MP00004; correct?

19        **A.**   Yes.

16:11  20        **Q.**   Do you recognize Exhibit 53?

21        **A.**   I recognize it as an e-mail.

22        **Q.**   It's before your time at the City of Menlo

23   Park?

24        **A.**   It is.

16:11  25        **Q.**   This -- the bottom e-mail on this chain refers

1   to working collaboratively with NEA and Mr. Zeleny, as

2   well as contact with the legal counsel of NEA; is that a

3   fair characterization?

4         MR. MASTER:  Objection.  Document speaks for

   5   itself.

6         THE WITNESS:  The originating e-mail on this

7   thread is from Chief Brian Roberts to Glen Rojas,

8   R-o-j-a-s, who was the city manager at that time.  CC'ed

9   on this e-mail are Sergeant Sharon Kaufman and, at that

   10   time, Commander Lacey Burt, and it does speak about a

11   protest Mr. Zeleny did.  I assume -- sorry.

12         It's dated on the 28th, and that the chief

13   states that NEA is aware of the latest developments and

14   that they have -- and that the police department and NEA

   15   have participated in conference calls with their legal

16   counsel.

17   **Q.**  (By Mr. Robinson)  Is it accurate, in your

18   experience, that the Menlo Park Police Department has

19   worked collaboratively with NEA in connection with

   20   Mr. Zeleny's protests?

21         MR. MASTER:  Object.  Can you just read that

22   back.  I'm sorry.  I missed it.

23         (Record read.)

24         THE WITNESS:  We have -- as a stakeholder, we

   25   have worked with them.  I'm not sure.  It depends on

1   what your definition of "collaboratively" is.  We have,

2   in fact, as a stakeholder and as the organization that

3   is the focus of Mr. Zeleny's protests, they have asked

4   us for assistance, and they are a business in our city,

16:13   5   so we provided assistance.

6       **Q.**   (By Mr. Robinson)  In your time at the City of

7   Menlo Park Police Department, what has the City done to

8   work collaboratively with NEA as a stakeholder?

9           MR. MASTER:  Objection.  Vague and ambiguous.

16:13   10  Overbroad.

11          You can answer.

12          THE WITNESS:  We have responded to their

13  requests when Mr. Zeleny has shown up armed and

14  protesting.  We have met with them, when they have had

16:13   15  concerns, to address their concerns about the safety

16  issues with the armed protests.  We have invited them to

17  be in the meeting with all the stakeholders regarding

18  Mr. Zeleny's protests and answering any questions that

19  we legally could of them.

16:14   20      **Q.**   (By Mr. Robinson)  You've met personally with

21  NEA, true, in connection with Mr. Zeleny's protests?

22      **A.**   Well, NEA is a company.

23      **Q.**   Thank you.

24          You've met personally with representatives of

16:14   25  NEA in connection with Mr. Zeleny's protests; true?

1    **A.**   I've met with a representative.

2    **Q.**   That's the security individual?

3    **A.**   Tresmontan.

4    **Q.**   Have you ever met personally with Mr. Zeleny in

16:14    5    connection with his protests before the special event

6    permit process?

7    **A.**   No.

8    **Q.**   Do you know whether any officer of the City of

9    Menlo Park Police Department ever met with Mr. Zeleny,

16:14    10    other than contacting him during the protests?

11    **A.**   Not that I'm aware of.

12    **Q.**   Was Mr. Zeleny invited to be at any meeting

13    with the City of Menlo Park Police Department prior to

14    the special events permit application?

16:15    15    **A.**   No.

16    **Q.**   Fair enough.

17    Were any of Mr. Zeleny's questions, to your

18    knowledge, about the protests answered by the City of

19    Menlo Park, other than in connection with the special

16:15    20    events or film permit?

21    MR. MASTER:  I'm sorry.  Can you read that

22    back.

23    (Record read.)

24    **Q.**   (By Mr. Robinson)  Let me rephrase that.

16:15    25    Prior to Mr. Zeleny applying for the special

1 events permit in 2015, did the City of Menlo Park have

2 any dialogue with him about his protests, other than

3 through officers contacting him during those protests?

4    **A.**   I believe Mr. Zeleny sent several e-mails, and

16:15   5 I'm not sure when he sent them, but they were in -- they

6 were advising us and numerous other people he blanketed

7 about protests or the issues he had.

8        So he did e-mail -- send e-mails prior to some

9 of his protests.

16:16   10        MR. ROBINSON:  Mark this as ==Exhibit 54==.

11        (==Exhibit 54== was marked for identification.)

12    **Q.**   (By Mr. Robinson)  For the record, ==Exhibit 54==

13 is one page marked MP60; correct?

14    **A.**   Yes.

16:16   15        (Reporter interruption.)

16    **Q.**   (By Mr. Robinson)  Do you recognize ==Exhibit 54==?

17    **A.**   I do.

18    **Q.**   It's an e-mail exchange between you and Timothy

19 Brackett; correct?

16:17   20    **A.**   Who is a sergeant with the police department.

21    **Q.**   And it's an e-mail exchange; correct?

22    **A.**   Correct.

23    **Q.**   In the very bottom e-mail on this exchange,

24 there's a reference, in Mr. Brackett's e-mail, to they,

16:17   25 which is -- strike that.

1            In the sentence that reads "They are now in the

2    process of working on an EPO," who is the "they"

3    referenced in that sentence?

4        **A.**    If you read that entire paragraph, "I have

5    spoken with reps associated with Rosewood and NEA.  They

6    are now in the process of working on an EPO.  I will

7    keep you posted with any additional info as it arises.

8    I don't feel comfortable with leaving Zeleny and his

9    partner Wong without officers on scene.  Thanks.  Tim."

10            The "they" are Rosewood and NEA.

11        **Q.**    What's an EPO?

12        **A.**    Emergency protective order.

13        **Q.**    What is the purpose of an emergency protective

14    order?

15        **A.**    An emergency protective order is an order that

16    is sought by a police officer based on a victim or

17    reporting party who believes they are in immediate

18    danger and that they do not have the time or the danger

19    is so great that the time it would take to go to court

20    and file a TRO, a temporary restraining order, would be

21    too long, so a person could request the police

22    department to seek an emergency protective order.

23        **Q.**    Did NEA request that the City seek an emergency

24    protective order?

25        **A.**    No.

1    **Q.** Did the City propose seeking an emergency

2    protective order?

3    **A.** No.

4    **Q.** How did the issue of a potential emergency

16:18    5    protective order come up?

6    **A.** They -- the Rosewood -- the representatives

7    from Rosewood and NEA brought it up to Tim Brackett.

8    **Q.** When you say "brought it up," what do you mean?

9    **A.** Well, I'm just reading what the e-mail says.

16:19    10    **Q.** Do you know whether it was the idea of Rosewood

11    and NEA or the idea of Mr. Brackett?

12    **A.** I don't know who -- where the idea initiated --

13    or originated, I should say.

14    **Q.** Did the City, in or about February of 2012,

16:19    15    assist NEA in preparing an EPO application?

16    **A.** No.

17    **Q.** Did the City offer to assist NEA in preparing

18    an EPO application?

19    **A.** I'm not sure if Sergeant Brackett did or not.

16:19    20    There is a process for getting an EPO. A person can't

21    do it on their own. It has to be -- it has to be filled

22    out by a police officer, sought by a police officer.

23    **Q.** In your e-mail response to Officer Brackett,

24    you refer to -- you say, "If they request it, we would

16:20    25    fill out the application for it."

1          Do you see that?

2     **A.**   I do.

3     **Q.**   In February of 2012, were you willing to seek

4     an EPO on behalf of NEA?

16:20   5     **A.**   This e-mail exchange was me correcting the

6     sergeant in that the police department, if they

7     requested an EPO, we would have to fill out the form.

8     It doesn't -- not the other way around.

9          So the purpose of this e-mail, what you see

16:20   10    there, is me correcting the sergeant in his either

11    incorrect assumption or a typo, and maybe he meant

12    temporary restraining order.

13    **Q.**   Have you ever communicated with anyone at NEA

14    about preparing an EPO?

16:20   15    **A.**   No.

16    **Q.**   Do you know whether any officer of the City of

17    Menlo Park has communicated with NEA about preparing an

18    EPO regarding Mr. Zeleny?

19    **A.**   Besides what you see in front of you?  No.

16:21   20    **Q.**   Are you aware that NEA unsuccessfully sought a

21    temporary restraining order against Mr. Zeleny?

22    **A.**   Unsuccessfully?

23    **Q.**   Correct.

24    **A.**   I was under the impression that there was, in

16:21   25    fact, a restraining order.

1    **Q.**   Are you aware of NEA or representatives of NEA

2    unsuccessfully seeking a temporary restraining order?

3    **A.**   No.

4    **Q.**   Have you had any discussion, other than that

16:21   5    e-mail, within the City of Menlo Park Police Department

6    about getting an EPO against Mr. Zeleny?

7    **A.**   I'm sorry.  Say that again.

8    **Q.**   Other than this e-mail exchange, has there been

9    any discussion within the City of Menlo Park about

16:21   10   getting an EPO against Mr. Zeleny?

11   **A.**   No.

12   **Q.**   Did you tell Officer Brackett that you didn't

13   think an EPO would be a good idea?

14   **A.**   Sergeant Brackett.

16:21   15   **Q.**   Did you tell Sergeant Brackett that you didn't

16   think an EPO would be a good idea?

17   **A.**   The subject matter of EPO did not come up aside

18   from this e-mail, so I never spoke to him about it

19   again.

16:22   20   **Q.**   So the sum total of your communications with

21   Sergeant Brackett were he talked about NEA and Rosewood

22   filling out an EPO application, you sent an e-mail which

23   you understood to be correcting him about who fills it

24   out, and that was the end of the question?

16:22   25   **A.**   Correct.

1    **Q.**   Do you know whether Sergeant Kaufman and

2    Sergeant Brackett further discussed the EPO?

3    **A.**   I don't know.

4    **Q.**   You mentioned before that in order for a

16:22   5    criminal prosecution to take place, there needs to be a

6    victim.

7         Do you recall that?

8    **A.**   Correct.

9    **Q.**   Who was the victim in the criminal prosecution

16:22   10   of Mr. Zeleny?

11   **A.**   State of California.

12   **Q.**   The State of California was not a reporting

13   victim, I assume.

14   **A.**   That's correct.

16:23   15   **Q.**   Did you have discussions with the district

16   attorney about prosecuting Mr. Zeleny?

17   **A.**   Yes.

18   **Q.**   What was discussed?

19   **A.**   The discussion was whether or not the gun and

16:23   20   holster, in the configuration that it was found in and

21   photos were taken of, would constitute a violation of

22   that Penal Code section for carrying a concealed

23   firearm.

24   **Q.**   What was your view of that?

16:23   25   **A.**   My view, that it was, in fact, unlawful to

|       | 1  | carry it in that configuration.                        |
|-------|----|--------------------------------------------------------|
|       | 2  | **Q.**   Did anyone at the District Attorney's Office  |
|       | 3  | agree with you or disagree with you about that?        |
|       | 4  | **A.**   Not that I'm aware of.                        |
| 16:24 | 5  | MR. ROBINSON:  Can we mark this as 55, please.         |
|       | 6  | (Exhibit 55 was marked for identification.)            |
|       | 7  | **Q.**   (By Mr. Robinson)  For the record, Exhibit 55 |
|       | 8  | is a one-page document, MP5397; correct?               |
|       | 9  | **A.**   Correct.                                      |
| 16:24 | 10 | MR. MASTER:  And, Counsel, for the record, I           |
|       | 11 | believe this is a -- this is the front page of multiple |
|       | 12 | documents, is it not?  Multiple pages?                 |
|       | 13 | MR. ROBINSON:  I'd rather not get into how             |
|       | 14 | documents were produced.                               |
| 16:24 | 15 | MR. MASTER:  Well, I'm just trying to make -- I        |
|       | 16 | just want to make sure the record is clear that I think |
|       | 17 | this appears to be a front page of multiple pages of   |
|       | 18 | documents.  It's an incomplete document.               |
|       | 19 | You can ask questions about this.  I'm not             |
| 16:25 | 20 | going to prevent you from doing that.  I just want the |
|       | 21 | record to reflect that this is an incomplete set.      |
|       | 22 | MR. ROBINSON:  We have five minutes left of the        |
|       | 23 | deposition, and I'd appreciate no more speeches on the |
|       | 24 | record, as I've told you throughout the day, but --    |
| 16:25 | 25 | MR. MASTER:  Just go.  Just go.  All right?            |

1          Just do it.

                2     **Q.**   (By Mr. Robinson)  Do you recognize what we've

                3   marked as ==Exhibit 55==?

                4     **A.**   Yes.

16:25           5     **Q.**   What is it?

                6     **A.**   This is a memo from the San Mateo County

                7   District Attorney's Office to San Mateo County police

                8   officers regarding the open carry of firearm in 2010.

                9     **Q.**   You believe that there's more to this document?

16:25          10     **A.**   Yes.

               11     **Q.**   Do you have an understanding of whether the

               12   City has produced the remainder of this document?

               13     **A.**   Yes.

               14     **Q.**   Where is it in the City's production?

16:25          15     **A.**   I don't know.

               16     **Q.**   Is it in Mr. -- so I'll represent to you that

               17   this page of the document is in Mr. Zeleny's file that's

               18   been produced.  I'm trying to figure out where the rest

               19   of it is, since I haven't seen it in the production

16:25          20   anywhere.

               21     **A.**   I don't know the answer to that.

               22     **Q.**   Okay.

               23          So let's just take the page we have.  This is

               24   guidance from the District Attorney's Office; correct?

16:26          25     **A.**   Correct.

1    **Q.**   It's guidance relating to the open carry of

2  firearms; true?

3    **A.**   The open carry of unconcealed, unloaded

4  firearms in 2010.

16:26   5    **Q.**   And part of the guidance is that a person may

6  carry an unconcealed, unloaded firearm worn openly in a

7  belt holster in a public place or on a public street; is

8  that true?

9    **A.**   This is the law as it was in 2010.  That is

16:26  10  correct.

11    **Q.**   Did the law change between 2010 and 2012

12  related to the carrying of concealed firearms?

13    **A.**   Concealed firearms?

14    **Q.**   Correct.

16:26  15    **A.**   No.

16    **Q.**   So when Mr. Zeleny was prosecuted for carrying

17  a concealed firearm --

18         MR. MASTER:  Go ahead.

19    **Q.**   (By Mr. Robinson)  When Mr. Zeleny was

16:26  20  prosecuting -- prosecuted for carrying a concealed

21  firearm, was this document, ==Exhibit 55==, representative

22  of the policy of the City of Menlo Park on that issue?

23         MR. MASTER:  Objection.  Vague, ambiguous,

24  confusing, unintelligible, lacks foundation, calls for

16:27  25  speculation, and really seeks information that's not

1  relevant to this litigation.

2      That being said, he can answer the question.

3  Okay?

4      THE WITNESS:  This memo is a memo of

16:27  5  information from the D.A.'s Office to each police

6  department regarding the open carry as we defined it

7  this morning, if you recall --

8      **Q.**  (By Mr. Robinson)  Sure.

9      **A.**  -- of firearms which were openly carried, which

16:27  10  was legal at the time.  This does not -- this does not

11  talk about a concealed firearm, which was still illegal

12  in 2010.

13      **Q.**  Okay.

14      Was it your understanding, in 2012 when you

16:27  15  made the decision to refer Mr. Zeleny's case for

16  prosecution, that a person could carry an unloaded

17  firearm in a belt holster without violating California

18  law?

19      MR. MASTER:  Objection.  Vague and ambiguous.

16:28  20  Incomplete hypothetical.  Calls for a legal conclusion.

21  Also has no relevance to this litigation.

22      You can answer.

23      THE WITNESS:  Unconcealed, yes.

24      **Q.**  (By Mr. Robinson)  The device that Mr. Zeleny

16:28  25  carried the allegedly concealed weapon in was a belt

1 holster; correct?

2   **A.**   It was a covered leather brown holster with a

3 padlock on it -- or a small padlock.  I'm not sure what

4 you call it; a lock on it.

16:28   5   **Q.**   It was a belt holster; correct?

6         It was a holster that he wore on his belt;

7 correct?

8   **A.**   It was a holster that you would typically wear

9 on your belt; that's correct.

16:29   10   **Q.**   In your understanding, did it fit the

11 definition of a belt holster?

12   **A.**   Yes.

13   **Q.**   And in Mr. Zeleny's criminal case, the Court

14 ultimately found that he carried the weapon in a holster

16:29   15 designed for that purpose; you're aware of that; right?

16         MR. ROBINSON:  Objection.  Lacks foundation.

17 Calls for speculation.  It's completely irrelevant to

18 this litigation.  Harassing and argumentative.

19         You can answer.

16:29   20         THE WITNESS:  I'm not aware of that.

21   **Q.**   (By Mr. Robinson)  Did you ever see the order

22 acquitting Mr. Zeleny of the concealed weapons charge?

23   **A.**   I don't believe I ever read the actual order.

24   **Q.**   Did you ever become aware of the reasons that

16:29   25 Mr. Zeleny was acquitted of that charge?

1     **A.**   No.

2     **Q.**   Did you ever seek out information about why

3   Mr. Zeleny was acquitted?

4     **A.**   No.

16:29   5     **Q.**   Did the acquittal change the City of Menlo

6   Park's practices or policies in any way?

7     **A.**   No.

8           MR. ROBINSON:  I think we're at 4:30.  If you'd

9   like to quit at 4:30, we can do that now.

16:30   10          MR. MASTER:  Well, as we discussed off the

11   record, you're not going to finish today, and I have an

12   obligation I'd like to attend to this evening.

13          So in light of that fact, why don't we stop

14   now, and we can return at a mutually convenient date to

16:30   15   complete the chief's deposition.

16          MR. ROBINSON:  That works.  Why don't we go off

17   for just a second to figure out a stipulation.

18          MR. MASTER:  We just did, didn't we?

19          MR. ROBINSON:  A stipulation for the record.

16:30   20          (Reporter interruption.)

21          MR. MASTER:  I guess the record will be handled

22   per code.  Thank you.

23          THE VIDEOGRAPHER:  This now concludes the

24   videotaped deposition of Chief Dave Bertini on March

16:30   25   19th, 2019.  We are now going off the record.  The time

1    is 4:29 p.m.

2              (Whereupon, the videotaped deposition of CHIEF

3    DAVE BERTINI, Volume I, concluded at 4:29 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    DECLARATION OF WITNESS

2

3          I hereby declare I am the deponent in the
   within matter; that I have read the foregoing deposition
4  and know the contents thereof, and I declare that the
   same is true of my knowledge except as to the matters
5  which are therein stated upon my information or belief,
   and as to those matters, I believe them to be true.
6          I declare under the penalties of perjury of the
   State of California that the foregoing is true and
7  correct.

8

           Executed this _____ day of _____,
9
   201___, at _____, _____.
10              (City)                          (State)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      I, HEATHER J. BAUTISTA, CSR No. 11600, Certified

2  Shorthand Reporter, certify:

3      That the foregoing  proceedings were taken before

4  me at the time and place therein set forth, at which

5  time the witness declared under penalty of perjury; that

6  the testimony of the witness and all objections made at

7  the time of the examination were recorded

8  stenographically by me and were thereafter transcribed

9  under my direction and supervision;

10      That the foregoing is a full, true, and correct

11  transcript of my shorthand notes so taken and of the

12  testimony so given;

13      (  ) Reading and signing was requested.

14      (  ) Reading and signing was waived.

15      (XX) Reading and signing was not requested.

16      I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties, nor of any of

19  the parties.

20      I declare under penalty of perjury under the laws

21  of California that the foregoing is true and correct.

22      Dated:  March 31, 2019

23

24      _____

        HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR
25

Exhibit F

1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                     ---oOo---

4    MICHAEL ZELENY,

5         Plaintiff,

6    vs.                    Case No.  CV 17-7357 JCS

7    GAVIN NEWSOM, et al.,

8         Defendants.
     _____/

9    Pages 278 - 286 ARE CONFIDENTIAL

10   AND BOUND SEPARATELY

11

12   Pages 310 - 324 ARE CONFIDENTIAL

13   AND BOUND SEPARATELY

14

15    CONTINUED VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

16                 BY VIDEOCONFERENCE

17            (Volume II - Pages 229 to 534

18

19       Taken before DENISE M. LOMBARDO, CSR No. 5419

20                 RPR, RMR, RDR, CRR

21                 August 7, 2020

22

23

24

25

                                    Page 229

```
 1                    I N D E X

 2                                                    PAGE

 3   EXAMINATION BY MR. ROBINSON                       236

 4

 5

 6

 7

 8

 9     WHEREUPON, THE DEPONENT WAS INSTRUCTED NOT TO ANSWER

10              THE FOLLOWING QUESTIONS:

11                    PAGE      LINE

12                    237       11

13                    262       17

14                    273       10

15                    273       16

16                    274        3

17                    449       18

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

```
 1                    E X H I B I T S
 2   PLAINTIFF'S                                    PAGE
 3   Exhibit 250    City of Menlo Park Special      247
                    Event Application, Bates
 4                  No. MP 1938 through MP 1950
 5   Exhibit 251    Defendant Dave Bertini's        260
                    Second Supplemental Response
 6                  to Plaintiff's Interrogatories
 7   Exhibit 252    Agreement for Maintenance of    265
                    State Highway in the City of
 8                  Menlo Park, Bates No. MP 6656
                    through MP 6673
 9   Exhibit 253    Test messages, Bates No. MP     269
10                  6683 through MP 6688
11   Exhibit 254    Menlo Park Police Department    287
                    letter dated January 1, 2010,
12                  Bates No. MP 5382 through MP
                    5388
13   Exhibit 255    E-mail correspondence, Bates    298
14                  No. MP 51 through MP 52
15   Exhibit 256    E-mail correspondence, Bates    301
                    No. MP 5380 through MP 5381
16   Exhibit 257    (Confidential document)         ---
17   Exhibit 258    Menlo Park Police Department    345
18                  CAD Incident Report, dated
                    2/27/2019, Bates No. MP 5095
19                  through MP 5096
20   Exhibit 259    Menlo Park Police Department    354
                    Felony Report 12-1825, Bates
21                  No. MP 170 through MP 179
22   Exhibit 260    Menlo Park Police Department    360
                    General Case Report 12-1596,
23                  Bates No. MP 1858 through MP
24                  1866
25

                                         Page 231
```

```
 1                    E X H I B I T S (cont'd)
 2    PLAINTIFF'S                                    PAGE
 3    Exhibit 261   E-mail correspondence, Bates    365
                    No. MP 219 through MP 221
 4    Exhibit 262   E-mail correspondence, Bates    385
 5                  No. MP 258 through MP 260
 6    Exhibit 263   E-mail correspondence, Bates    399
                    No. MP 296 through MP 300
 7    Exhibit 264   Menlo Park Police Department     405
 8                  Agenda Items, September 2,
                    2015, Bates No. 5326 through
 9                  MP 5337
10    Exhibit 265   E-mail correspondence, Bates    411
                    No. 345 through MP 350
11    Exhibit 266   E-mail correspondence, Bates    416
12                  No. NEA_Subpoena 37
13    Exhibit 267   E-mail correspondence, Bates    435
                    No. MP 451 through MP 456
14    Exhibit 268   E-mail correspondence, Bates    457
15                  No. MP 473 through MP 476
16    Exhibit 269   Letter dated September 12,      466
                    2016, Bates No. MP 948 through
17                  MP 951
18    Exhibit 270   E-mail correspondence, Bates    470
                    No. MP 883 through MP 886
19    Exhibit 271   E-mail correspondence, Bates    471
20                  No. MP 1195 through MP 1205
21    Exhibit 272   E-mail correspondence, Bates    501
                    No. MP 1290 through MP 1299
22    Exhibit 273   E-mail correspondence, Bates    507
23                  No. 1415 through MP1426
24
25

                                         Page 232
```

```
 1    CONTINUED VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

 2

 3         BE IT REMEMBERED, that pursuant to Notice, and on

 4    the 7th day of August 2020, commencing at the hour of

 5    10:05 a.m., before me, DENISE M. LOMBARDO, a Certified

 6    Shorthand Reporter, appeared by videoconference CHIEF

 7    DAVE BERTINI, produced as a witness in said action, and

 8    being by me first duly sworn, was thereupon examined as

 9    a witness in said cause.

10

11                        ---o0o---

12    APPEARANCES:

13

14    Appearing on behalf of the Plaintiff:

15         DAMION ROBINSON (by Zoom)

16         DAVID MARKEVITCH (by Zoom)

17         Affeld Grivakes LLP

18         2049 Century Park East, Suite 2460

19         Los Angeles, California 90067

20         (310) 979-8700

21

22

23

24

25
```

```
1    Appearing on behalf of the Defendant City of Menlo Park;
2    and the Deponent, Chief Dave Bertini:
3            TODD H. MASTER (by Zoom)
4            Howard, Rome, Martin & Ridley LLP
5            1900 O'Farrell Street, Suite 280
6            San Mateo, California 94403
7            (650) 365-7715
8            tmaster@hrmrlaw.com
9
10   Appearing on behalf of the Defendant Attorney General
11   Xavier Becerra:
12           JOHN W. KILLEEN (by Zoom)
13           Deputy Attorney General
14           Office of the Attorney General
15           (916) 210-6045
16           john.killeen@doj.ca.gov
17
18   ALSO PRESENT:
19           Ted Hoppe, Videographer (by Zoom)
20           Veritext Legal Solutions
21
22           Michael Zeleny (by Zoom)
23
24
25
```

```
 1          THE VIDEOGRAPHER:  Good morning.  We are

 2   going on the record.  The time now is -- the time

 3   now on the video monitor is 10:05 on August 7th,

 4   2020.  This is media unit 1, Volume II, in the

 5   deposition of Chief Dave Bertini in the matter of      10:05

 6   Michael Zeleny vs. Gavin Newsome, et al., filed in

 7   the United States District Court, Northern District

 8   of California, case No. CV 17-7357 JCS.

 9          This video deposition is being held via

10   remote proceedings, hosted by Veritext.                10:06

11          My name is Ted Hoppe.  I'm from the firm

12   Veritext.  I'm the videographer.  The court

13   reporter today is Denise Lombardo, also from

14   Veritext.

15          Counsel, could you please voice identify        10:06

16   yourselves and state whom you represent.

17          MR. ROBINSON:  Damion Robinson, taking the

18   deposition on behalf of Michael Zeleny.

19          MR. MARKEVITCH:  David Markevitch for

20   Plaintiff Michael Zeleny.                              10:06

21          MR. MASTER:  Todd Master for Defendant

22   City of Menlo Park and the witness.

23          MR. KILLEEN:  John Killeen for Defendant

24   Attorney General Xavier Becerra.

25          MR. ROBINSON:  We should note for the           10:07
```

Veritext Legal Solutions
866 299-5127

```
 1    record that Michael Zeleny is on, but on mute.

 2            THE VIDEOGRAPHER:  So would you like us to

 3    re-swear the witness, then?

 4            MR. ROBINSON:  Yeah, why don't we do that.

 5                    CHIEF DAVE BERTINI,

 6                    sworn as a witness,

 7                    testified as follows:

 8            THE VIDEOGRAPHER:  Please proceed.

 9    EXAMINATION BY MR. ROBINSON:

10        Q.  Good morning, Chief Bertini.                  10:07

11        A.  Good morning.

12        Q.  So we're resuming your deposition from one

13    that was taken about a year ago, maybe a little

14    more than a year ago.

15            Do you recall the admonitions that were      10:07

16    given last time?

17        A.  Yes.

18        Q.  All right.  You understand that you're

19    under oath; correct?

20        A.  I do.                                         10:07

21        Q.  And you understand that you're testifying

22    both in your individual capacity and as a

23    representative of the City of Menlo Park?

24        A.  I do.

25        Q.  Have you done any additional prep for         10:08
```

1    today's session of the deposition?

2        A.   I have.

3        Q.   When did that take place?

4        A.   Probably the last month or so.

5        Q.   Did you meet with anyone to prep?                10:08

6        A.   I did.

7        Q.   Who did you meet with?

8        A.   My attorney, Todd Master.

9        Q.   Approximately how many times?

10       A.   Once.                                            10:08

11       Q.   For how long?

12           MR. MASTER:   I'd going to object.   The

13   question is not relevant.   It violates the

14   attorney-client privilege and work product, so I'll

15   instruct him not to answer that question.             10:08

16   BY MR. ROBINSON:

17       Q.   Are you going to follow your attorney's

18   instruction not to answer?

19       A.   Yes.

20       Q.   Did you do anything, other than meeting         10:08

21   with Mr. Master, to prep for the deposition today?

22       A.   I did.

23       Q.   What else did you do?

24       A.   I reviewed transcripts of my own

25   deposition, which was, like you said, over a year       10:08

Page 237

```
 1   ago, and the depositions of the other witnesses,

 2   along with reviewing some of the items that were

 3   marked as evidence.

 4       Q.  Did you review all of the other deposition

 5   transcripts?                                           10:09

 6       A.  Yes, I did review all the other deposition

 7   transcripts.

 8       Q.  And what documents did you review, aside

 9   from deposition transcripts?

10       A.  Just the documents that were referred to     10:09

11   in the depositions of the other witnesses.  I

12   couldn't tell you exactly which ones they were.

13   There were lots of them.

14          MR. MASTER:  Just briefly, a belated

15   objection to the fact that he reviewed all of the     10:09

16   witnesses.  I'm not sure he knows every witness who

17   was deposed necessarily.  You might want to lay

18   some foundation for that.

19          MR. ROBINSON:  Probably not important

20   enough to spend time on.  Okay.                       10:09

21   BY MR. ROBINSON:

22       Q.  Why don't we get started where we left off

23   last time, which is the special events program

24   process.

25          Are there any city ordinances that govern     10:10
```

Page 238

1  the special events program process?

2      A.  I'm not sure of any specific ordinances

3  that exist.  There are procedures within the city.

4  There are ordinances that deal with associated

5  factors for special events, such as noise levels,    10:10

6  blocking sidewalks, traffic, things of that nature,

7  but nothing specifically about the special events

8  program that I'm aware of.

9      Q.  When you talk about procedures, are there

10 ordinances governing the procedures that are         10:10

11 followed?

12             MR. MASTER:  Objection.

13             THE WITNESS:  They're not --

14             THE REPORTER:  Excuse me.

15 BY MR. ROBINSON:

16     Q.  Sorry, Chief Bertini.  Let's start that

17 again so we have a clean question.

18         Are you aware of any ordinances that

19 govern the procedures that are followed in

20 connection with special event permit applications?   10:11

21     A.  I am not aware of any city ordinances that

22 govern the procedure.  These are just procedures

23 that are created by the city itself.

24     Q.  Is that part of the special events process

25 materials that we talked about last time?           10:11

Veritext Legal Solutions
866 299-5127

```
 1        A.  Yes.
 2        Q.  Okay.  Are there any ordinances governing
 3   film permits that you're aware of?
 4        A.  I'm not aware of any specific ordinances
 5   governing film permits.                              10:11
 6        Q.  Would the film permiting process also be
 7   governed by the written materials, including the
 8   film permit guidelines?
 9        A.  Yes.
10        Q.  In the last deposition, we talked about   10:11
11   whether there were written policies for the various
12   departments regarding approval or denial of special
13   events permits.
14            Do you recall that?
15        A.  I do.                                       10:12
16        Q.  Have you identified any other written
17   policies for the approval or denial of special
18   events permits, other than the ones we went over
19   last time?
20        A.  There are no other written policies or     10:12
21   procedures.
22        Q.  Could you identify any criteria that are
23   not identified in the written policies, criteria
24   for approval or denial?
25            MR. MASTER:  I'll just object.  Vague and  10:12
```

Page 240

1    ambiguous and overbroad.

2         You can answer.

3         THE WITNESS:  You are speaking of the

4    special events permit process --

5         MR. ROBINSON:  Correct.                        10:12

6         THE WITNESS:  -- or the film?  Okay.

7    The special events.  The -- the criteria are on the

8    FAQs and they're on the application.  What the city

9    is really looking for is dealing with time, manner

10   and place, essentially, and what -- the criteria    10:13

11   that are listed are the things that we are looking

12   for.

13   BY MR. ROBINSON:

14        Q.  So you mentioned time, manner and place.

15   Let's start with time.  What are the time            10:13

16   limitations on a special event?

17        A.  That would depend on what kind of event is

18   being contemplated.  I think I testified to that

19   prior.  It really depends on what kind of event is

20   being contemplated.  If there is an event at, for    10:13

21   instance, say, 3:00 o'clock in the morning that's

22   going to create a lot of noise, that probably would

23   be a time that we would have some issues with and

24   may want to work with the person who is requesting

25   that event.  So time is a -- one of the things that  10:13

1  we would look at.

2      Q.  Is there a schedule of hours where special

3  events are allowed?

4      A.  I'm not aware of any set schedule of

5  hours.                                              10:13

6      Q.  Are there time limits on the length of

7  time a special event can last?

8      A.  I'm not aware of anything that is written

9  about time limits.

10     Q.  Are you aware of any unwritten policy      10:14

11  about time limits?

12     A.  No.  I think it would be up to the City to

13  determine whether or not a permitted event, if it

14  were to be contemplated to go on, let's say,

15  indefinitely, that perhaps there would be some     10:14

16  issue with that that we would want to discuss with

17  the permit requester.

18     Q.  Is the appropriate time limit for an event

19  considered on a case-by-case basis?

20     A.  Correct.                                   10:14

21     Q.  Let's talk about place.  That was the

22  second item.  What -- is there any written policy

23  about the place for special events?

24     A.  Not specifically about places that are

25  disallowed or allowed, but there are criteria      10:14

```
 1   for -- if you're going to do it in a place that is
 2   going to create a traffic hazard, there would need
 3   to be mitigation involved.  There may be extra
 4   insurance that's necessary.  So the place is
 5   something else that is a criteria that is looked      10:15
 6   at, but it's also listed on the application.
 7        Q.   What places would create a traffic hazard?
 8             MR. MASTER:  Vague and ambiguous and
 9   overbroad.
10             Go ahead.                                   10:15
11   BY MR. ROBINSON:
12        Q.   Let me clarify that.  In connection with
13   the place requirements for a special events permit,
14   are there any places within the city that are
15   specifically allowed or disallowed for special       10:15
16   events?
17             MR. MASTER:  Objection.  Vague and
18   ambiguous and overbroad.
19             Go ahead.
20             THE WITNESS:  I believe I've answered       10:15
21   that.  I said there is no list of places where it's
22   disallowed or allowed.  But it is something --
23   depending on the location that is requested or that
24   is being contemplated, the place does -- does
25   matter when it comes to, you know, the permitting     10:15
```

Page 243

1    process.

2    BY MR. ROBINSON:

3        Q.  How do you determine at the City of Menlo

4    Park whether a special event creates or could

5    potentially create a traffic hazard?                    10:16

6        A.  Well, it would be common sense.  If the

7    requestee is requesting the special event to occur

8    down El Camino Real or some other major

9    thoroughfare, that's going to create traffic.  We

10   historically know what our traffic flows are, which    10:16

11   streets are busier than others and have more

12   traffic issues on them.  So it would be based on

13   the location contemplated and, also, our experience

14   with that location.

15       Q.  And focusing on the first layers, not the      10:16

16   appellate layers but the first layer of the special

17   event permit process, who decides whether the event

18   creates a traffic hazard?

19       A.  Well, that would be a combined opinion

20   with both the public works/transportation             10:16

21   department, public works planning and the police

22   department.  And that would be a recommendation

23   back to the community services person, who is in

24   charge of the permitting process, to say these are

25   the issues that we would have with this permit as      10:17

1  it is requested, and we would request some

2  mitigation for those issues.

3      Q.  Are there any traffic increases or

4  traffic -- strike that.

5          Is there a particular volume of traffic      10:17

6  interference that would be required to have a

7  permit denied?

8      A.  I couldn't answer that question.  I have

9  no idea what that -- there's no -- there's no

10  criteria for -- if it's -- that's like saying if      10:17

11  traffic is disrupted 20 percent, it's no good.

12  That doesn't make any sense.  I don't know how to

13  answer that.

14      Q.  The traffic hazard factor, is that also

15  determined case by case?                              10:18

16      A.  Well, yes.  It would be dependent upon

17  where -- the place that is contemplated in the

18  application.

19      Q.  Okay.  The last thing you mentioned was

20  manner restrictions.  What are manner requirements?   10:18

21  What are the criteria for determining whether the

22  manner of a special event is appropriate?

23      A.  Certainly.  I think I testified to this a

24  year ago, also.

25          The manner would be, as long as all          10:18

Page  245

```
 1   applicable laws are being followed, whether they're

 2   local, state, federal laws, are being followed.  So

 3   the manner in which this would occur.  Make sure

 4   there are safety considerations.  If there are --

 5   if there's a danger of someone perhaps getting          10:18

 6   injured, that there's safety.  Then there's

 7   sanitation.  There are -- there are criteria for

 8   that.  So that would be the manner criteria.

 9       Q.  And those criteria that you mentioned,

10   following up with applicable laws, safety               10:19

11   considerations, sanitation considerations, is there

12   a written list of factors anywhere?

13       A.  Those are actually --

14       Q.  Sorry.  Go ahead.

15           THE REPORTER:  Excuse me.  Excuse me.           10:19

16           MR. ROBINSON:  Let me start again.

17           THE REPORTER:  Mr. Master, your last

18   statement, I couldn't hear it.  And I'm getting

19   interference from Mr. Robinson's line.  It's not

20   exactly clear.  Go ahead.                               10:19

21   BY MR. ROBINSON:

22       Q.  Let me rephrase the question.

23           Is there any written list of the manner

24   requirements for a special event permit?

25       A.  There are some of the manner requirements       10:20
```

Veritext Legal Solutions
866 299-5127

1    that are reflected in the application dealing with

2    crowd control, sanitation, you know, noise.  Those

3    type of manner restrictions are, in fact, on the

4    application process, but it is a case-by-case

5    basis.                                          10:20

6        Q.  So under the general category of safety

7    considerations, would the safety considerations

8    vary based on the type of event?

9        A.  Yes.

10       Q.  Is there a standard time limit in place   10:20

11   for approval or denial of a special events permit?

12       A.  There is a general timeline in place, but,

13   again, as I think I've testified before, that would

14   depend on the specific situation and the specific

15   application that's being contemplated.         10:21

16       Q.  Is there any -- is there any mandatory

17   time limit on how long it takes to process a

18   special event application?

19       A.  Not that I'm aware of, no.

20       Q.  Why don't we mark this as Exhibit 250.   10:21

21           (Plaintiff's Exhibit 250 marked

22            for Identification.)

23           MR. ROBINSON:  Does everyone have access to

24   the document share?

25           THE WITNESS:  This folder says "empty."   10:21

Page 247

1    MR. MASTER:  Just click on the folder.

        2    THE WITNESS:  I did.

        3    MR. ROBINSON:  It's still loading on my

        4  end.  There we go.

        5    For the record, I've marked as Exhibit 250    10:22

        6  a multiple-page document.

        7  BY MR. ROBINSON:

        8    Q.  The exhibit tag is covering the Bates

        9  number on the first page, but the second page is

       10  Bates MP 1939 continuing to MP 1950.  Is that    10:22

       11  accurate?

       12    A.  This is Exhibit 250; correct?  So it would

       13  be 1938 to what?

       14    Q.  To 1950.

       15    A.  Yes.                                       10:23

       16    Q.  Do you recognize Exhibit 250?

       17    A.  I recognize it as a filled-out special

       18  event application, but I do not recognize the

       19  event.

       20    Q.  So starting on the first page of Exhibit    10:23

       21  250, this is the application form that an applicant

       22  fills out to get a special event permit?

       23    A.  Yes.

       24    Q.  And that carries over onto the next two

       25  pages after that?                                10:23

                                              Page  248

```
 1      A.  Correct.

 2      Q.  Let's go on to the page that's marked

 3   1942.  It looks like this is where the applicant

 4   signs the permit application?

 5      A.  That's correct.                          10:24

 6      Q.  All right.  I think you've got --

 7           THE REPORTER:  Mr. Robinson, you cut out.

 8           (Telephonic interruption.)

 9           MR. ROBINSON:  Let's take a two-minute

10   break and I'll dial back in.                     10:24

11           THE REPORTER:  Thank you.

12           THE VIDEOGRAPHER:  Going off the record.

13   The time now is 10:24.

14             (Off the record.)

15           THE VIDEOGRAPHER:  Back on the record.   10:39

16   The time now is 10:39.

17   BY MR. ROBINSON:

18      Q.  Chief Bertini, before we broke, we were

19   looking at Exhibit 250 and we were on page MP 1942.

20   There's an "Official Use Only" section that's      10:39

21   grayed out at the bottom of the page.

22           Do you see that?

23      A.  I do.

24      Q.  Is that section filled in by City staff as

25   the application is being processed?               10:39
```

Page 249

```
 1      A.  That is -- yes, that is filled in by the

 2   City staff at community services.

 3      Q.  Do you see the signature at the bottom

 4   there?

 5      A.  I do.                                    10:40

 6      Q.  Is that Matt Milde's signature?

 7      A.  I couldn't be a hundred percent sure, but

 8   it looks like Matt Milde.

 9      Q.  So in the approval -- under the heading of

10   "Approval" over on the left-hand side, there's a    10:40

11   series of departments:  police, planning, et

12   cetera.  Do you see that?

13      A.  I do.

14      Q.  Would whoever the permit coordinator is

15   circulate the application to all of those           10:40

16   departments in the ordinary process?

17          MR. MASTER:  Objection.  Vague and

18   ambiguous.  Overbroad.

19          You can answer.

20          THE WITNESS:  Yes.                          10:40

21   BY MR. ROBINSON:

22      Q.  And would approval be required by each of

23   those departments that were applicable before the

24   permit would be approved?

25      A.  Yes.  There would be -- every department     10:41
```

Veritext Legal Solutions
866 299-5127

```
 1    would have input into the application, as far as

 2    their department and what their -- their concerns

 3    or their issues would be.

 4        Q.  If any of the departments declined to

 5    approve the permit, would the permit be rejected in    10:41

 6    the ordinary process?

 7        A.  Not necessarily.

 8        Q.  In what situations would a department

 9    refuse to approve a permit, but it would still be

10    approved?                                              10:41

11        A.  Did you say "department"?

12        Q.  A department, correct.

13        A.  I think what would happen is, the -- each

14    department would look at the application from its

15    own -- its own function; obviously, the police from    10:41

16    police matters; public works with public works

17    matters, et cetera, and if there was an issue that

18    that department had with the contemplated event,

19    they would go back to Matt Milde, or whoever it was

20    in community services, and explain, well, this is      10:42

21    the issue we have.  We would like to ask questions,

22    clarifying questions, or have some kind of

23    mitigation in place for whatever the issue would

24    be.

25            It's hard to just talk about these in --       10:42
```

Veritext Legal Solutions
866 299-5127

1    you know, without having specific examples.

2        Q.  And the clarifications that you would need

3    or the mitigation that you would need would depend

4    on the type of event; correct?

5        A.  Correct.                                    10:42

6        Q.  Let's go down to the next section on the

7    left-hand column, "Event Permit Coordinator."  Do

8    you see that?

9        A.  Below the "Approval" boxes?

10       Q.  Correct.                                     10:43

11       A.  Yes.

12       Q.  And then below -- beneath that are a

13   series of check boxes.  Do you see what I'm talking

14   about?

15       A.  I do.                                        10:43

16       Q.  Do those check boxes represent the

17   ordinary steps in the permit process?

18       A.  It certainly is what is looked at by staff

19   for the ordinary special event.

20       Q.  So, for example, the permit coordinator    10:43

21   would conduct an initial application with you?

22       A.  Yes, but I -- this is not -- I'm not quite

23   sure when that happens, whether this is the final

24   approval or -- or this is at the initial.  I don't

25   know at which step that would happen.               10:43

                                                Page  252

```
 1      Q.  Got it.
 2          But at some point in the process before a
 3   permit is approved, all of these steps need to
 4   happen; correct?
 5      A.  Yes.                                    10:43
 6      Q.  Let's go on to the page that's marked MP
 7   1947.
 8      A.  Okay.
 9      Q.  Do you recognize this form?
10      A.  I do not.                               10:44
11      Q.  Have you seen forms in this format at the
12   police department?
13      A.  No.
14      Q.  So let's go down to MP 1950, the last
15   page.                                          10:44
16      A.  Okay.
17      Q.  It looks like this one is -- has the
18   authorized signature of Matthew Ortega.  Do you see
19   that?
20      A.  I do.                                    10:45
21      Q.  And there's the comment up here:  The
22   application is conditionally approved, with a check
23   next to it.  And general comments:  No police
24   issues.
25          Do you see what I'm referring to?       10:45
```

1      A.  I do.

2      Q.  Do you know -- do you have an

3   understanding of what this is specifically with

4   respect to the police department?

5      A.  Well, the document speaks for itself, but      10:45

6   it's just not a document that I've used or I'm

7   familiar with.

8      Q.  Do you know if any documents of this

9   format were used in connection with Mr. Zeleny's

10  special event permit application?                      10:45

11     A.  I don't know.  As I sit here today, I

12  don't recall.

13     Q.  Do you know if the permit application that

14  Michael Zeleny submitted in 2015 was circulated to

15  the various city departments, specifically the         10:45

16  departments listed on MP 1942?

17     A.  It is my understanding that the

18  application was, in fact, circulated.

19     Q.  How was it circulated?

20     A.  I don't know.  That would be something         10:46

21  Matt Milde would have to answer.

22     Q.  Why do you believe it was circulated?

23     A.  Because I know that there was discussion

24  from other departments, also, and the only way they

25  could be aware of the application is if it had been    10:46

                                          Page 254

1    circulated.

2        Q.  How did you become aware of the

3    application?

4        A.  It was e-mailed to me via the chief's

5    secretary.                                        10:46

6        Q.  "The chief" meaning the chief of police at

7    the time of the application?

8        A.  Chief Bob Johnson.  That's correct.

9        Q.  Do you have an understanding of why Chief

10   Johnson's secretary circulated it to you?          10:47

11       A.  She circulated it to the chief and both

12   commanders, and I was a commander.

13       Q.  After you received it, what did you do

14   next?

15       A.  I read it.                                 10:47

16       Q.  Okay.  And after you read it, what did you

17   do with respect to the permit application?

18       A.  I don't -- as I sit here today, I don't

19   remember exactly what I did, but eventually I had a

20   discussion with the chief of police about it.      10:47

21       Q.  And what did you discuss with the chief of

22   police?

23       A.  I discussed the application and what was

24   being contemplated in the -- in the application.

25       Q.  Were there any particular aspects of the   10:47

Veritext Legal Solutions
866 299-5127

1    application that you discussed?

2         A.   As I sit here today, I don't recall

3    exactly what was discussed.  There was an overall

4    discussion about the application.

5         Q.   And did the chief at that time give you        10:47

6    any directions about what to do regarding the

7    application?

8         A.   The only direction he gave me is to handle

9    it.

10        Q.   Okay.  What did you do after that with        10:48

11   respect to the application?

12        A.   Again, I don't recall exactly what I did

13   after that.  I know eventually, I had a discussion

14   with Matt Milde, who was the coordinator at the

15   time, and Sergeant Kaufman, who was a special        10:48

16   events sergeant at the time, to discuss the

17   application.

18        Q.   In general terms, what did you talk about

19   with Sergeant Kaufman and Mr. Milde?

20        A.   We just discussed what was being        10:48

21   contemplated and how we would go about trying to

22   get the information that we needed and also deal

23   with some of the -- on its face, the application

24   presented some safety concerns, whether it was the

25   traffic safety, public safety.  Those are the        10:49

1    things that we discussed.

2        Q.  At that time, did you discuss whether the

3    application would be approved or denied?

4        A.  No.  It was more the due diligence and

5    fact finding, trying to figure out what exactly was    10:49

6    being contemplated.  The original application had

7    some parameters in it that didn't seem typical.

8    They were very atypical.  So we were -- we were

9    discussing those things, such as the indefinite

10   timeline and what was being asked or contemplated    10:49

11   in the application.

12       Q.  What did you do to try to get more

13   information about the application, personally?

14       A.  Personally, I didn't do anything.

15       Q.  Do you know if anyone at the City of Menlo    10:50

16   Park did anything to try to get more information

17   about the application during the time frame after

18   it was submitted?

19       A.  Yes.

20       Q.  And what did -- who did something to get    10:50

21   more information?

22       A.  I know Matt Milde was trying to get

23   further information, and we also brought in our

24   city's legal counsel, the city attorney's office,

25   and I know that the city attorney attempted to get    10:50

Veritext Legal Solutions
866 299-5127

1    further information, also.

2        Q.  What did Mr. Milde do, to your

3    knowledge -- strike that.

4            What did Mr. Milde do to try to get more

5    information?                                    10:50

6        A.  I'm not a hundred percent sure, but I know

7    there was some communication back and forth

8    regarding the application.

9        Q.  Communication with whom?

10       A.  With the city attorney's office and, I      10:51

11   believe, even at one point with Mr. -- the

12   applicant.

13       Q.  What additional information, to your

14   knowledge, did Mr. Milde try to get from the city

15   attorney's office?                              10:51

16           MR. MASTER:  I'm going to object to the

17   extent it calls for him to disclose communications

18   between City staff and the City's attorney.  That

19   is attorney-client-privileged communication.

20           MR. ROBINSON:  Let me rephrase.          10:51

21   BY MR. ROBINSON:

22       Q.  Did the city attorney's office have

23   factual information about the application, other

24   than the information that you and Mr. Milde had?

25       A.  I don't quite understand what you're       10:51

1    asking.  What factual information are you -- are

2    you saying?

3        Q.  Let me ask it a different way.

4            Mr. Milde was trying to get additional

5    information from the city attorney; correct?          10:52

6        A.  Correct.

7        Q.  Was it your understanding at that time

8    that the city attorney's office had factual

9    information about the application and the intended

10   event that you and Mr. Milde didn't have?            10:52

11       A.  Well, what Mr. Milde was looking for is

12   legal advice from our legal counselors regarding

13   some of the things that were contemplated in the

14   permit application.

15       Q.  And the other thing you mentioned was, at   10:52

16   some point, the city attorney's office contacted

17   Mr. Zeleny; is that correct?

18       A.  Correct.

19       Q.  Do you know if that was before or after a

20   decision had been made to deny the application?      10:52

21       A.  I don't know when that -- when exactly

22   that was.

23       Q.  Do you know if anyone at the City

24   attempted to contact Mr. Zeleny about the

25   application before the decision was made to deny     10:53

1    the application?

 2         A.  It is my recollection that there was some

 3    e-mails asking for clarification, based on the

 4    application, from the city attorney's office.

 5         Q.  Was that before or after the City had made      10:53

 6    a decision to deny the permit application?

 7         A.  I don't know.

 8         Q.  Let's shift gears a little bit.

 9              I'm going to mark -- just give me a second

10    here.                                                     10:53

11              (Plaintiff's Exhibit 251 marked

12               for Identification.)

13    BY MR. ROBINSON:

14         Q.  We marked as Exhibit 251 a multiple-page

15    document.  The first page has a case caption on it,       10:54

16    and in the right-hand column of the case caption,

17    Defendant Dave Bertini's Second Supplemental

18    Response to Plaintiff's Interrogatories.

19              Do you see that?

20         A.  (No response.)                                   10:55

21         Q.  I couldn't hear the answer, Chief Bertini.

22         A.  I do.

23         Q.  Good.  Thank you.

24              Do you recognize this document?

25         A.  I do.                                            10:55

                                              Page  260

1      Q.  If you could please turn to the page that

2  has the caption "Verification," near the very end

3  of the document.

4      A.  Okay.

5      Q.  Is that your signature?                    10:55

6      A.  It is.

7      Q.  You reviewed this document before you

8  signed it?

9      A.  I did.

10     Q.  Let's go to page 3, please.  Actually,     10:55

11  let's start on page 2 and carrying over to page 3.

12  There's interrogatory No. 1 and supplemental

13  response to interrogatory No. 1.  Read those, if

14  you would.

15     A.  (Witness complying.)                        10:56

16     Q.  I want to focus on the paragraph that

17  starts:  "In addition, the City has recently

18  discovered."  Do you see that?

19     A.  I do.

20     Q.  How did the City discover that it never     10:56

21  had legal authority to issue a permit?

22     A.  I'm not -- I'm not 100 percent sure.  My

23  understanding, from discussions with the city

24  attorney's office --

25          MR. MASTER:  Hold on.  If they're          10:56

1    discussions with the city attorney's office, then

2    it's attorney-client-privileged communication.  If

3    you have any understanding outside of what you've

4    been told by an attorney, you're certainly entitled

5    to answer.                                    10:57

6              THE WITNESS:  Then I have no -- nothing

7    else, aside from what I was discussing with the

8    city attorney.

9    BY MR. ROBINSON:

10       Q.  All right.  Let's -- taking that paragraph   10:57

11   as a whole that discusses the City's legal

12   authority and ownership of the median, do you have

13   any basis for knowledge about that -- the

14   information in that paragraph, other than what

15   you've been told by an attorney?                10:57

16       A.  No.

17       Q.  For purposes of our record, Chief Bertini,

18   what were you told by an attorney concerning that

19   information?

20              MR. MASTER:  Again, just for the record,   10:57

21   you're asking Chief Bertini to disclose what he was

22   told by the city attorney's office, the city

23   attorney being the attorney for the City and the

24   staff.  Therefore, it calls for him to disclose

25   attorney-client-privileged communications, and I'll   10:58

1    instruct him not to answer.
 2              MR. ROBINSON:  I didn't quite hear you,
 3    Todd.  Are you instructing him not to answer?
 4              MR. MASTER:  Yes.
 5    BY MR. ROBINSON:                                    10:58
 6         Q.  Chief Bertini, are you going to follow
 7    your attorney's instruction not to answer?
 8         A.  I am.
 9         Q.  As the chief of police of the City of
10    Menlo Park, are Menlo Park police officers          10:58
11    authorized to enforce the laws on that median strip
12    on Sand Hill Road?
13         A.  Yes.
14         Q.  Does the city police department have
15    jurisdiction over the median strip on Sand Hill     10:58
16    Road?
17              MR. MASTER:  Objection.  Calls for a legal
18    conclusion.  Vague and ambiguous.
19              You can answer.
20              THE WITNESS:  The City of Menlo Park has   10:59
21    jurisdictional boundaries, but to be technical with
22    you, Counselor, police officers in the state of
23    California can actually use their police power
24    anywhere in the state.  So, yes, they have police
25    power over that median.                             10:59

Veritext Legal Solutions
866 299-5127

BY MR. ROBINSON:

    Q.  If Mr. Zeleny goes out and protests on the
median strip on Sand Hill Road with unloaded
firearms, is he subject to arrest by the Menlo Park
Police Department?                             10:59

        MR. MASTER:  Objection.  Vague and
ambiguous and overbroad.  Incomplete hypothetical.
Calls for a legal conclusion.

        Go ahead.

        THE WITNESS:  The situation would be      10:59
assessed by whatever law enforcement entity was
called, whether it was the Menlo Park Police
Department, the CHP, the California Highway Patrol,
or the San Mateo County Sheriff's Office.  And an
assessment would be made, and if there was probable  10:59
cause to make an arrest, then an arrest could be
made.

BY MR. ROBINSON:

    Q.  If the City of Menlo Park Police
Department were called and went to the median strip  11:00
on Sand Hill Road that's referenced in your
interrogatory response and observed Mr. Zeleny
openly carrying an unloaded firearm as part of a
protest, would he be subject to arrest?

    A.  As I stated, any agency -- any police     11:00

```
 1    agency would be able to assess the situation, and

 2    if probable cause was present to make an arrest, an

 3    arrest could be made.

 4        Q.  The median strip that's referred to in

 5    your response to interrogatory No. 1, it's within      11:00

 6    the city limits of Menlo Park; correct?

 7        A.  That is my understanding.

 8        Q.  Let me go ahead and mark as Exhibit 252 --

 9            (Plaintiff's Exhibit 252 marked

10            for Identification.)

11    BY MR. ROBINSON:

12        Q.  For the record, Exhibit 252 is a

13    multiple-page document.  It looks like it starts at

14    MP 6656 and carries through to MP 6673; is that

15    correct?                                               11:01

16        A.  It's still loading up on my computer.

17    Exhibit 252?

18        Q.  Correct.

19        A.  And what were the numbers you said it went

20    from?                                                  11:02

21        Q.  MP 6656 through -- I'm sorry.  Let me

22    start that again.  MP 6656 through MP 6673.

23        A.  Okay.  I have it now.

24        Q.  Do you recognize this?

25        A.  I do not.                                      11:02
```

Page 265

1     Q.  Have you seen any documents relating to

2     the ownership of that median strip?

3     A.  No.

4     Q.  Let's mark another one.

5          Are you familiar with an entertainment          11:03

6     firearms permit issued by the State of California?

7          MR. MASTER:  Objection.  Vague and

8     ambiguous as to "familiar."

9          Go ahead.

10         THE WITNESS:  Are you speaking of a          11:03

11    specific one or are you speaking --

12    BY MR. ROBINSON:

13    Q.  In general, do you know what that is?

14    A.  I do now, yes.

15    Q.  What is it, in your understanding?          11:03

16    A.  My understanding, through a conversation

17    with the California Department of Justice, the

18    entertainment firearms permit is a permit that is

19    given to a prop master, who is able to then loan

20    weapons, live weapons, real weapons, that would be          11:04

21    subject to the DOJ's jurisdiction, to actors and/or

22    participants in a motion picture or entertainment

23    event.

24    Q.  If Mr. Zeleny -- you're aware that at some

25    point, Mr. Zeleny had an entertainment firearms          11:04

```
 1   permit; correct?

 2       A.  That's correct.

 3       Q.  If Mr. Zeleny renewed his entertainment

 4   firearms permit, would he be allowed to protest on

 5   that median strip with unloaded firearms without        11:04

 6   being subject to arrest by the City of Menlo Park?

 7           MR. MASTER:  Object.  The question is

 8   compound and vague and ambiguous and overbroad.

 9   It's an incomplete hypothetical.  Calls for a legal

10   conclusion and speculation.                             11:04

11           With all that being said, if you can

12   answer, go ahead.

13           THE WITNESS:  My understanding, from my

14   discussion with the representative from the

15   Department of Justice, that permit only allows a        11:05

16   prop master to loan a live firearm to someone.  It

17   does not give any other ability to use and/or -- or

18   get -- or be permitted to carry a loaded firearm

19   during a protest event.  That was my understanding

20   from the Department of Justice.                         11:05

21   BY MR. ROBINSON:

22       Q.  Who did you speak to at the Department of

23   Justice about that?

24       A.  I spoke to several people, but I don't

25   recall the name of the -- I think it was a              11:05
```

Veritext Legal Solutions
866 299-5127

1  woman who eventually gave me that information over

2  the phone.

3      Q.  Was it Eileen McKee?  Is that the name of

4  the person?

5      A.  Yeah, that name sounds very familiar.  So    11:05

6  it could have been her.

7      Q.  And so the communication relayed from DOJ,

8  the Department of Justice, was that the

9  entertainment firearms permit only allows a person

10  to loan firearms to someone as a prop master; is    11:06

11  that correct?

12      A.  That was my understanding from the

13  Department of Justice, yes.

14      Q.  So the permit would not allow someone to

15  carry unloaded firearms during a protest; correct?    11:06

16      A.  Correct.  She told me that was beyond the

17  scope of this permit.

18      Q.  Let's go ahead and mark another one.

19          Was that discussion with DOJ in connection

20  with Mr. Zeleny's special event permit application?    11:07

21      A.  Was -- that discussion was had when it was

22  presented the first time, the entertainment

23  firearms permit was presented, and I was unfamiliar

24  with the permit, so I called the DOJ to get

25  clarification.    11:07

Page 268

1    Q.  The permit was presented by Mr. Zeleny in

2    connection with his permit application; correct?

3    A.  No.  My understanding was it was during

4    the appeal of the denial during the city manager's

5    care.  So, yes, it was -- it was connected to the        11:07

6    permit.

7    Q.  So Mr. Zeleny submitted the entertainment

8    firearms permit in that appeal process, and you

9    contacted DOJ to get more information about it?

10   A.  That's correct.                                     11:07

11   Q.  And the information DOJ provided you, in

12   substance, was it doesn't apply to this situation;

13   correct?

14   A.  That's correct.

15   Q.  Did that document load on your screen,             11:08

16   Chief Bertini?

17   A.  253?

18   Q.  253, correct.

19   A.  Yes.

20        (Plaintiff's Exhibit 253 marked

21         for Identification.)

22   BY MR. ROBINSON:

23   Q.  So we've marked as Exhibit 253 a series of

24   pages that appear to be text messages, and they're

25   Bates marked MP 6683, which is covered by the          11:08

Page 269

1   exhibit stamp, through MP 6688; correct?

2       A.  Correct.

3       Q.  These texts or text messages are between

4   you and Sergeant Kaufman; correct?

5       A.  Let me scroll through them.  Yes.          11:08

6       Q.  Sergeant Kaufman is no longer with the

7   Menlo Park Police Department; correct?

8       A.  As of the day of this text, she was

9   retired.

10      Q.  Is she back at the department now?          11:09

11      A.  No.  She's a reserve officer, but I

12  haven't seen her in a year.

13      Q.  If you look at the first and second page

14  of Exhibit 253, there's a white -- it looks like a

15  large three-ring binder.  Do you see that?          11:09

16      A.  I do.

17      Q.  With a picture of Mr. Zeleny on the cover

18  and "Michael Zeleny & Associates"?

19      A.  I see that.

20      Q.  The last time, we talked about what was     11:09

21  referred to as your "Zeleny file."  Do you recall

22  that?

23      A.  Yes.

24      Q.  Is this three-ring binder that we're

25  looking at in Exhibit 253 your Zeleny file?         11:10

Veritext Legal Solutions
866 299-5127

```
 1       A.  No.

 2       Q.  What is this three-ring binder?

 3       A.  This is a binder of

 4  law-enforcement-sensitive information that was

 5  given to me when I came to Menlo Park around 2011,    11:10

 6  2012.

 7       Q.  What's contained in that binder?  What is

 8  the substance of the information?

 9       A.  Law-enforcement-sensitive information that

10  we have obtained from other law enforcement          11:10

11  agencies regarding Mr. Zeleny.

12           MR. ROBINSON:  Has the information in that

13  binder been produced in this case?

14           MR. MASTER:  I believe it has.  This was

15  the subject of the motion and I believe the subject  11:10

16  of a protective order.  It's been produced with

17  confidential Bates numbers, is my recollection.

18           MR. ROBINSON:  So I'm looking specifically

19  at the "Post-Aurora, Colorado Briefing,"

20  San Francisco, and I don't believe that's been       11:11

21  produced.  But we can certainly verify.

22  BY MR. ROBINSON:

23       Q.  Why don't we do this:  Chief Bertini, has

24  this binder been provided to whoever was collecting

25  documents for the City in connection with the case?  11:11
```

Page 271

MR. MASTER:  Did you do that in my office?

1        MR. MASTER:  Did you do that in my office?

2        THE WITNESS:  Yes.  Yeah.

3   BY MR. ROBINSON:

4        Q.  And you have -- separately from this

5   three-ring binder, you have your Zeleny file;          11:11

6   correct?

7        A.  That's correct.

8        Q.  And the Zeleny file is a set of materials

9   that you collected over the course of your work

10  with the Menlo Park Police Department?               11:11

11       A.  That's correct.

12       Q.  Why do you maintain a binder of law

13  enforcement sensitive information about Mr. Zeleny?

14       A.  Are you speaking of my specific file or

15  this white binder we're looking at?                  11:12

16       Q.  Let's start with this white binder.  Do

17  you still have the white binder?

18       A.  It is in the office at the police

19  department.

20       Q.  Why does the police department maintain a   11:12

21  binder of law enforcement sensitive information

22  about Mr. Zeleny?

23       A.  The police department, in the course of

24  doing police work, sometimes will get information

25  from other law enforcement sources that is historic  11:12

```
1    information, that is good information to keep.
2              Certainly this binder that deals with
3    Mr. Zeleny is not the only binder or documents that
4    police departments keep for historical data and/or
5    for ready reference depending on the situation.        11:13
6        Q.  Do you have any other similar binders of
7    law enforcement sensitive information about other
8    protesters?
9        A.  Yes.
10       Q.  Which other protesters?                         11:13
11           MR. MASTER:  Objection.  How is that
12   relevant?  And it goes to invasion of privacy.  I'm
13   not sure how it's relevant.  Invades privacy of
14   third parties.
15   BY MR. ROBINSON:                                        11:13
16       Q.  Chief Bertini, you can go ahead and answer
17   the question unless you're instructed not to.
18           MR. MASTER:  Well, I'm going to instruct
19   him not to answer that question, Damion, because it
20   goes to third parties that are not pertinent or         11:13
21   relevant to this litigation.
22           You can ask him if they are, but,
23   otherwise, I'm going to instruct him not to answer
24   that because it goes to the official information
25   privilege, the legal law and motion privilege and
```

Page 273

1    the designation privilege.

2    BY MR. ROBINSON:

3        Q.  Chief Bertini, I'm not asking you about

4    the content of any of your materials.  All I'm

5    asking is, do you have -- which other protesters do      11:14

6    you maintain binders about?

7            MR. MASTER:  Well, it's the same

8    objection, Damion, because you're asking him to

9    identify individuals by name.  So you can ask him

10   for approximate numbers, something like that, but      11:14

11   if you're identifying third parties, we are, by its

12   very nature, violating those privileges that I

13   mentioned before.

14           MR. ROBINSON:  I'm not going to argue the

15   issue with you.  You can either instruct or don't      11:14

16   instruct, and we'll reserve our rights.

17           MR. MASTER:  Okay.  I'm instructing him

18   not to answer that.

19   BY MR. ROBINSON:

20       Q.  Chief Bertini, are you going to follow      11:14

21   your counsel's instruction not to answer?

22       A.  Yes.

23       Q.  How many binders does the City of Menlo

24   Park -- strike that.

25           How many binders or other files does the      11:14

Page 274

1    City of Menlo Park maintain on protesters?

2         A.  I can't speak to other -- other commanders

3    or other, you know, folks who work in detectives,

4    but I know for a fact that I, personally, have

5    maybe three or four different files on prospective     11:15

6    protests.

7              You may be aware, in the last couple of

8    months, we've had a lot of protests in the region

9    and in the United States, and some of those we

10   needed to deal with as they became violent.  So we     11:15

11   would have these ready-reference files for either

12   protests that are coming up or protests that have

13   happened.

14        Q.  How did the City of Menlo Park deal with

15   the recent protest that became violent?               11:15

16        A.  We staffed up the police department, and

17   we answered calls for mutual aid from the county

18   and the region.  We dispatched officers to

19   different cities, along with the mobile field

20   force, that were needed for some of these protests.    11:16

21            The protests that actually came into the

22   city of Menlo Park, we had police officers

23   monitoring them to make sure that there was no --

24   no outside agitators or violence that was

25   occurring, and we assisted them in transiting          11:16

Page 275

```
 1   through the city of Menlo Park and allowed them to

 2   carry out their First Amendment rights to protest,

 3   as long as they were not committing any criminal

 4   acts.

 5       Q.  When they transited through Menlo Park,      11:16

 6   were they blocking the street?

 7       A.  In some cases, they were in the street,

 8   and in other cases, they were on the sidewalk.

 9       Q.  And were they allowed to transit Menlo

10   Park on the street?                                 11:16

11       A.  Yes.  If there was a large number of them

12   and they couldn't fit on the sidewalk, then they

13   were, in fact, marching in the street.

14           MR. MASTER:  Damion, we've been going for

15   a little over an hour.  Can we take a five-minute    11:17

16   break?

17           MR. ROBINSON:  Sure.  That's fine.

18           MR. MASTER:  Thank you.

19           THE VIDEOGRAPHER:  Going off the record.

20   The time now is 11:17.                              11:17

21           (Off the record.)

22           THE VIDEOGRAPHER:  Back on the record.

23   The time now is 11:29.

24   BY MR. ROBINSON:

25       Q.  Chief Bertini, we're back on the record.    11:29
```

Page 276

```
1    You understand you're still under oath; right?
2        A.  I do.
3        Q.  Let's flip in that same exhibit to MP
4    6687.  There's a page entitled "Post-Aurora,
5    Colorado Briefing, San Francisco."  Do you see          11:29
6    that?
7        A.  I do.
8        Q.  Is that included in that white three-ring
9    binder regarding Mr. Zeleny?
10       A.  It is.                                          11:29
11           (Page 278 through page 286 are
12            marked confidential and are
13            bound under separate cover.  The
14             non-confidential portion of this
15            transcript continues on page 287.)
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
866 299-5127

1     UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3       ---oOo---

4 MICHAEL ZELENY,

5   Plaintiff,

6 vs.       Case No. CV 17-7357 JCS

7 GAVIN NEWSOM, et al.,

8   Defendants.

9 _____/

10

11       CONFIDENTIAL

12

13 CONTINUED VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

14      BY VIDEOCONFERENCE

15    (Volume II - Pages 278 to 286)

16

17

18   Taken before DENISE M. LOMBARDO, CSR No. 5419

19      RPR, RMR, RDR, CRR

20      August 7, 2020

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

1                    I N D E X

2                                          PAGE

3    EXAMINATION BY MR. ROBINSON              282

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 279

1    CONTINUED VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

2

3          BE IT REMEMBERED, that pursuant to Notice,

4    and on the 7th day of August 2020, commencing at

5    the hour of 10:05 a.m., before me, DENISE M.

6    LOMBARDO, a Certified Shorthand Reporter, appeared

7    by videoconference CHIEF DAVE BERTINI, produced as

8    a witness in said action, and being by me first

9    duly sworn, was thereupon examined as a witness in

10   said cause.

11

12                      ---o0o---

13

14   APPEARANCES:

15

16   Appearing on behalf of the Plaintiff:

17          DAMION ROBINSON (by Zoom)

18          DAVID MARKEVITCH (by Zoom)

19          Affeld Grivakes LLP

20          2049 Century Park East, Suite 2460

21          Los Angeles, California 90067

22          (310) 979-8700

23

24

25

1   Appearing on behalf of the Defendant City of Menlo

2   Park; and the Deponent, Chief Dave Bertini:

3           TODD H. MASTER (by Zoom)

4           Howard, Rome, Martin & Ridley LLP

5           1900 O'Farrell Street, Suite 280

6           San Mateo, California 94403

7           (650) 365-7715

8           tmaster@hrmrlaw.com

9

10  Appearing on behalf of the Defendant Attorney

11  General Xavier Becerra:

12          JOHN W. KILLEEN (by Zoom)

13          Deputy Attorney General

14          Office of the Attorney General

15          (916) 210-6045

16          john.killeen@doj.ca.gov

17

18  ALSO PRESENT:

19          Ted Hoppe, Videographer (by Zoom)

20          Veritext Legal Solutions

21

22          Michael Zeleny (by Zoom)

23

24

25

                                        Page 281

```
 1                    CHIEF DAVE BERTINI,

 2                    called as a witness,

 3                    testified as follows:

 4    EXAMINATION BY MR. ROBINSON:

 5        Q.  What is the content of that document?      11:29

 6    What's it about?

 7            MR. MASTER:  Counsel, I believe this was

 8    the discussion that we had previously and was

 9    subject to court order concerning the official

10    information privilege.  I recall the Court did      11:30

11    order us to produce the documents.  We did.  But

12    they were pursuant to protective order, which I

13    believe is still in place.

14            You can certainly answer those questions,

15    but I request that we seal this portion of the      11:30

16    deposition in conjunction with that protective

17    order, if you want to get into that.

18            MR. ROBINSON:  That's fine.  Let's seal

19    this portion.  We can mark it confidential.

20    BY MR. ROBINSON:                                    11:30

21        Q.  What is that document about?

22        A.  My only knowledge of the document is what

23    I actually saw in it.  I did not attend this

24    briefing and I'm not sure who did, but it was the

25    PowerPoint from a briefing that was done regarding  11:30
```

1    the Aurora, Colorado, shooting.

2        Q.  Did the briefing relate to Mr. Zeleny?

3        A.  I wasn't at the briefing.  I don't know.

4        Q.  Does the PowerPoint relate to Mr. Zeleny?

5        A.  I don't recall if Mr. Zeleny was mentioned    11:31

6    in the PowerPoint.  I don't believe so.

7        Q.  Do you recall, either from discussion --

8    strike that.

9            Do you know if the Stanford professor came

10   into the department to talk about Mr. Zeleny, as      11:31

11   referenced in Sergeant Kaufman's text message to

12   you?

13       A.  Not while I was employed there.

14       Q.  As the designated representative of the

15   City of Menlo Park, do you know if that happened?     11:31

16       A.  I do not.

17       Q.  Does the City of Menlo Park have a profile

18   on Mr. Zeleny?

19       A.  I'm not sure what that means.

20       Q.  So Sergeant Kaufman's text message refers     11:32

21   to a profile comparison.  Do you see that?

22       A.  I do.

23       Q.  What is a profile comparison?

24       A.  I have no idea what she meant by that.

25       Q.  Did you ask her?                              11:32

Page 283

```
 1      A.  I did not.

 2      Q.  Have you had any discussions with Sergeant

 3   Kaufman about this case, other than the text

 4   messages that we're looking at?

 5      A.  No.                                         11:32

 6      Q.  I'm going to go ahead and mark --

 7          Are we up to 254 now?

 8          THE REPORTER:  Yes.

 9          MR. MASTER:  Damion, are we still on seal

10   here?                                              11:33

11          MR. ROBINSON:  No.  Let's go off the

12   sealed record.

13          (This ends the confidential portion

14           of the transcript.  The deposition

15           continues on page 287.)                    11:33

16

17

18

19

20

21

22

23

24

25
```

Page 284

1        SIGNATURE OF DEPONENT

2

3        I, the undersigned, CHIEF DAVE BERTINI, do

4   hereby certify that I have read the foregoing

5   deposition and find it to be a true and accurate

6   transcription of my testimony, with the following

7   corrections, if any:

8

9   PAGE     LINE                CHANGE

10  _____    _____   _____

11  _____    _____   _____

12  _____    _____   _____

13  _____    _____   _____

14  _____    _____   _____

15  _____    _____   _____

16  _____    _____   _____

17  _____    _____   _____

18  _____    _____   _____

19  _____    _____   _____

20  _____    _____   _____

21  _____    _____   _____

22  _____    _____   _____

23  _____    _____   _____

24

         _____

25       CHIEF DAVE BERTINI              Date

                                   Page 285

1                REPORTER'S CERTIFICATE

2

3

4     I, DENISE M. LOMBARDO, do hereby certify:

5     That CHIEF DAVE BERTINI, in the foregoing

6 deposition named, was present by videoconference

7 and by me sworn as a witness in the above-entitled

8 action at the time and place therein specified;

9     That said deposition was taken before me at

10 said time and place, and was taken down in

11 shorthand by me, a Certified Shorthand Reporter of

12 the State of California, and was thereafter

13 transcribed into typewriting, and that the

14 foregoing transcript constitutes a full, true and

15 correct report of said deposition and of the

16 proceedings that took place;

17     And that the aforementioned 9-page transcript

18 meets the California minimum transcript format

19 standards.

20     IN WITNESS WHEREOF, I have hereunder

21 subscribed my hand this day 3rd of September 2020.

22

23      *Denise M. Lombardo*

24     DENISE M. LOMBARDO, CSR No. 5419

25     State of California

                                   Page 286

```
 1              (Plaintiff's Exhibit 254 marked

 2              for Identification.)

 3   BY MR. ROBINSON:

 4       Q.  I've gone ahead and marked as Exhibit 254

 5   a multiple-page document from MP 5382 through MP      11:33

 6   5388.  Do you see that?

 7       A.  Yes.

 8       Q.  Do you recognize Exhibit 254?

 9       A.  I only recognize it as a memorandum from

10   inside the Menlo Park Police Department prior to      11:33

11   when I was employed.

12       Q.  Is this one of the documents that was

13   produced by the City of Menlo Park in discovery?

14       A.  Yes.

15       Q.  Is it -- first of all, it's a memorandum    11:33

16   about California open carry; correct?

17       A.  That is the subject matter on the memo,

18   yes.

19       Q.  During the period of time that open carry

20   had not been prohibited by California law, was this   11:34

21   the department of -- the Menlo Park Police

22   Department's policy on open carry?

23       A.  I cannot definitely answer that.  To me,

24   it looks like it was information that was given to

25   the department, but it was by a sergeant.            11:34
```

Veritext Legal Solutions
866 299-5127

```
 1    Normally, policy is made by either a chief or a
 2    command staff member.
 3        Q.  Was it the policy of the City of Menlo
 4    Park, before open carry was prohibited by
 5    California law, that individuals had a              11:34
 6    constitutional right to openly carry unloaded
 7    firearms?
 8        A.  That's correct.
 9        Q.  Before the open-carry ban, was it the
10    position of the City of Menlo Park that Mr. Zeleny  11:34
11    had a constitutional right to openly carry
12    firearms?
13        A.  Yes.
14        Q.  In openly carrying firearms in connection
15    with Mr. Zeleny's protest before the open-carry    11:35
16    ban, was he exercising his constitutional rights?
17        A.  Yes.
18        Q.  Was he doing anything illegal?
19            MR. MASTER:  Objection.  Vague and
20    ambiguous as to time.  Lacks foundation.  Calls for 11:35
21    speculation.
22            You can answer.
23            THE WITNESS:  I couldn't answer whether he
24    was doing anything illegal.  He was never arrested;
25    I know that.  There was a case that was sent to the 11:35
```

Veritext Legal Solutions
866 299-5127

1   district attorney's office regarding a holstered

2   weapon that was possibly concealed.

3   BY MR. ROBINSON:

4       Q.  Other than the one incident where he was

5   carrying the holstered weapon that was possibly      11:35

6   concealed, are you aware of anything else that

7   Mr. Zeleny did in the course of his protest in

8   Menlo Park that was illegal?

9       A.  I answered that.  I wasn't there.  I don't

10  know what he did during his protest.  What I can     11:36

11  tell you is that we never arrested him.

12      Q.  Were officers in the Menlo Park Police

13  Department on site during Mr. Zeleny's protest?

14      A.  In some protests, yes, they were.

15      Q.  During a protest where Mr. Zeleny was        11:36

16  carrying unloaded firearms, were there police on

17  site the entire time?

18      A.  I don't recall whether they were there the

19  entire time, but I know that when we were notified

20  he was there, officers did respond at least          11:36

21  initially.

22      Q.  Did -- aside from the incident, the one

23  incident where there was a firearm in a holster

24  that could be considered concealed, did officers

25  that observed Mr. Zeleny's protest ever report that  11:36

Veritext Legal Solutions
866 299-5127

1    he had committed a crime?

2         A.   As I've stated, Counselor, we never

3    arrested him for a crime.

4         Q.   Did the officers ever report that a crime

5    had occurred?                                        11:37

6         A.   No.

7         Q.   Do you recall the officers reporting on

8    multiple occasions that no crime had occurred?

9         A.   I'm not sure they used those words, so I

10   would say no.                                        11:37

11        Q.   Do you recall officers reporting on

12   various occasions that Mr. Zeleny was cooperative?

13        A.   That, I recall, yes.

14        Q.   Was Mr. Zeleny cooperative consistently

15   during his protest until the time that he was        11:37

16   prosecuted?

17        A.   From my understanding, based on what the

18   officers reported, yes.

19        Q.   Let's go ahead and mark another exhibit.

20   So this one has been previously marked.  So I'm      11:38

21   just going to move it to the "Marked Exhibits"

22   folder.

23             Chief Bertini, could you open up in the

24   "Marked Exhibits" folder -- the file name is

25   101004 - Police Report - Cooperation.  It's a        11:38

```
 1   document that has previously been marked as Exhibit
 2   47.
 3          Do you have that one open in front of you?
 4       A.  I do.
 5       Q.  Is this a police report generated by the        11:39
 6   Menlo Park Police Department?
 7       A.  It is, prior to my employment with the
 8   Menlo Park Police Department.
 9       Q.  This is the format of the police
10   department -- police report from Menlo Park; right?    11:39
11       A.  Correct.
12       Q.  Are these police reports filled out by
13   officers either contemporaneously or soon after the
14   events covered by the police report?
15       A.  Yes.                                            11:39
16       Q.  Are they based on personal observation by
17   the officers?
18       A.  Yes.
19       Q.  Are they kept in the ordinary course of
20   business?                                              11:39
21       A.  Correct.
22       Q.  Is it part of the regular practice of the
23   Menlo Park Police Department to keep these types of
24   police reports?
25       A.  That is correct.                               11:39
```

Page 291

```
 1        Q.  Is that true of all of the police reports
 2   that were produced in connection with this case?
 3        A.  Is it correct that they were all kept in
 4   the normal course of business?  Is that the
 5   question?                                          11:40
 6        Q.  Right.
 7        A.  The answer is yes.  Yes.
 8        Q.  You mentioned last time in your deposition
 9   that Mr. Zeleny was a safety concern.  Do you
10   recall saying that?                                11:40
11        A.  I do.
12        Q.  Why is Mr. Zeleny a safety concern?
13        A.  Because when he would be protesting,
14   openly carrying numerous firearms with fully loaded
15   magazines that had rounds in them, it would only    11:40
16   take a split second for him to load one of those
17   weapons and become an active shooter.
18        Q.  Did Mr. Zeleny ever do anything, to your
19   knowledge, that indicated that he had any intention
20   of loading the weapons?                            11:40
21        A.  Aside from having thousands of rounds and
22   fully loaded magazines next to the weapons, no.
23        Q.  Did Mr. Zeleny ever do anything, to your
24   knowledge, to indicate that he intended to shoot
25   anyone with the weapons?                           11:41
```

Veritext Legal Solutions
866 299-5127

```
 1        A.  I -- not to my recollection.  I know there
 2    were some statements that he made that had the air
 3    of possibly being angry and having -- and making a
 4    threat, but as I sit here today, I can't recall
 5    specifically.                                      11:41
 6        Q.  Can you estimate how many times Mr. Zeleny
 7    protested in Menlo Park, during your tenure there,
 8    with unloaded weapons?
 9        A.  I would estimate approximately 10, 10 to
10    15.                                                11:41
11        Q.  And that was over the course of a couple
12    of years; right?
13        A.  Correct.
14        Q.  During those 10 or 15 protests over the
15    course of a couple of years, was Mr. Zeleny ever   11:42
16    violent?
17        A.  Not that I'm aware of.
18        Q.  Did he ever threaten anyone during the
19    protest?
20        A.  Aside from the statements that I just made 11:42
21    about some statements that were made in -- either
22    angry or threatening in some way, no.
23        Q.  When you refer to statements that were
24    angry or threatening in some way, what are you
25    referring to?  What were the statements?          11:42
```

Page 293

1    A.  As I sit here today, I don't recall

2    exactly what they were, but I do recall getting

3    information, and I don't remember from whom it was,

4    but there were -- my recollection is that they were

5    posts on some social media site that indicated some    11:42

6    kind of anger and even somewhat of a threatening

7    tone.

8        Q.  Aside from indicating some kind of anger

9    and a threatening tone, do you recall anything else

10   about these statements that Mr. Zeleny made?          11:42

11       A.  Other than what I just said, no.

12       Q.  Did you get the statements from NEA?

13       A.  As I sit here today, I don't recall who I

14   got them from, whether they were from law

15   enforcement, from an outside entity, or from my own    11:43

16   police department.  I don't recall.

17       Q.  You do recall getting some social media

18   content from NEA, correct, about Mr. Zeleny?

19       A.  I believe we did receive some content from

20   NEA regarding the possibility of him coming back to    11:43

21   the site to protest.

22       Q.  You recall NEA conducting public source

23   surveillance on Mr. Zeleny; right?

24       A.  Yes.

25       Q.  And NEA, from time to time, would send you    11:43

1   the results of their public source surveillance of

2   Mr. Zeleny; correct?

3       A.  Yes.

4       Q.  You were aware that NEA was also

5   conducting physical surveillance of Mr. Zeleny at      11:44

6   the time; correct?

7       A.  I don't recall exactly whether they were

8   doing physical surveillance or not.  I don't

9   recall.

10      Q.  Do you recall NEA reporting to you about      11:44

11  Mr. Zeleny's whereabouts?

12      A.  Yes.

13      Q.  Do you recall NEA reporting to you at

14  certain times that Mr. Zeleny was still in

15  Los Angeles?                                           11:44

16      A.  Yes.

17      Q.  During some of the anticipated protest

18  dates, NEA reported to you that Mr. Zeleny was seen

19  still in Los Angeles at the time; correct?

20      A.  I don't recall them saying he was seen,       11:44

21  and I don't know whether they were physically

22  surveilling him or just based on his posts.  I

23  don't know how they knew he was still there.

24      Q.  They did provide information to you,

25  though, that Mr. Zeleny was still in Los Angeles;      11:44

Page 295

1  correct?

2      A.  I do remember them providing that

3  information to us, yes.

4      Q.  And they also provided you information

5  about Mr. Zeleny's mother passing away.  Do you      11:45

6  recall that?

7      A.  I recall receiving that information.  I

8  just don't recall, without producing the e-mail,

9  who it came from.

10     Q.  Do you know why NEA was conducting      11:45

11  surveillance on Mr. Zeleny?

12     A.  From my understanding, in speaking to

13  Mr. Tresmontan, they were concerned for the safety

14  of their staff.

15     Q.  When Mr. Zeleny would protest, every time      11:45

16  he would do that, it would require some police

17  officers to respond; correct?

18     A.  I would object to the word "require."  I

19  mean, if somebody called the police about an armed

20  person, we would have, of course, dispatched      11:45

21  officers.  And once they determined it was

22  Mr. Zeleny, then, you know, they would assess the

23  situation.

24     Q.  And officers did respond every time that

25  someone reported Mr. Zeleny was protesting with      11:46

1  firearms; correct?

2      A.  I believe they responded every time there

3  was a call of a man with a gun or a person with

4  guns.  I'm not sure if he was actually identified

5  by these reporting parties.                           11:46

6      Q.  When Mr. Zeleny was protesting with the

7  guns, what was the volume of calls that the City

8  would receive about that?

9          MR. MASTER:  I'm going to object.  The

10  question is vague, ambiguous and overbroad.          11:46

11          Go ahead.

12          THE WITNESS:  I don't know.  I don't

13  recall, nor if I ever knew how many calls each

14  incident produced.

15  BY MR. ROBINSON:                                      11:46

16      Q.  Was it generally more than one call?

17      A.  I don't know.

18      Q.  Was it more than a hundred calls?

19      A.  I don't know.

20      Q.  Do you recall any incident where           11:46

21  Mr. Zeleny's protest prompted more than a hundred

22  calls to the police department?

23      A.  I don't know.

24      Q.  Can you recall any incident where his

25  protest prompted more than one call to the police    11:47

                                           Page  297

```
 1   department?
 2       A.  I don't know.
 3       Q.  Do you have an estimate about the cost of
 4   police officers responding to Mr. Zeleny's protest?
 5       A.  I do not.                                    11:47
 6       Q.  So I've introduced Exhibit 255.
 7           (Plaintiff's Exhibit 255 marked
 8            for Identification.)
 9   BY MR. ROBINSON:
10       Q.  For the record, Exhibit 255 is two pages,   11:48
11   Bates numbered MP 51 and 52; correct?
12       A.  Correct.
13       Q.  It's a series of e-mails, starting with an
14   e-mail from Mr. Zeleny to various people, an e-mail
15   from Sharon Kaufman to Burt Lacey and Jaime Romero   11:48
16   and then a reply; is that correct?
17       A.  Jaime, Jaime Romero.  But, yes.
18       Q.  Got it.
19           Was Sergeant Kaufman -- in September 2011,
20   was Sergeant Kaufman a commander in the -- oh, she   11:48
21   was a sergeant at the time; correct?
22       A.  So this -- yes.  This occurred prior --
23   like a week or two prior to me coming to work in
24   Menlo Park.  At the time, Jaime Romero was an
25   acting commander, and that's the position I took     11:49
```

```
 1    when I got hired.  And so the acting commander,

 2    Jaime Romero, was speaking to Sergeant Sharon

 3    Kaufman.

 4        Q.  Did Sergeant Kaufman report to you after

 5    you became the commander?                         11:49

 6        A.  As I recall, yes.  She was the special

 7    events sergeant.  So, yes, she would have reported

 8    to me as the patrol commander.

 9        Q.  Would Sergeant Kaufman -- before you

10    started at the City of Menlo Park, was Sergeant    11:49

11    Kaufman -- strike that.

12            At the time you started, was Sergeant

13    Kaufman the primary person at the City of Menlo

14    Park who dealt with Michael Zeleny?

15        A.  I believe, in essence, yes, because it had  11:49

16    to do with special events, and that was the purview

17    of the special events sergeant.  So anything out of

18    the ordinary of regular patrol would be dealt with

19    by the special events sergeant.

20        Q.  In her e-mail, Sergeant Kaufman -- to       11:50

21    Mr. Lacey and Mr. Romero, Sergeant Kaufman says,

22    The celebration was short-lived.

23            Do you see that?

24        A.  I do.

25        Q.  Do you recall Sergeant Kaufman ever         11:50
```

Page 299

```
1    expressing to you that she wished Zeleny would stop

2    coming out and protesting?

3        A.  I don't recall that.

4        Q.  Do you recall her ever complaining about

5    Mr. Zeleny's protests?                              11:50

6        A.  Not that I recall.

7        Q.  Do you recall any communications from

8    Sergeant Kaufman about finding a way to stop

9    Mr. Zeleny's protests?

10       A.  As I sit here today, I don't recall.        11:50

11       Q.  Do you recall ever discussing with anyone

12   in Menlo Park the displeasure with the fact that

13   Mr. Zeleny was protesting with firearms?

14       A.  Not necessarily displeasure.  It was a

15   discussion at police management staff meetings,      11:51

16   which I know we've discussed in the past, where

17   Mr. Zeleny was brought up, that it was a public

18   safety concern and that it was a drain on our

19   resources whenever he would come and protest.

20       Q.  So being a drain on the resources, was it    11:51

21   expressed at those meetings or any other time that

22   it would be preferable if Mr. Zeleny were no longer

23   protesting?

24       A.  I don't recall that specifically being

25   said by anybody.                                     11:51
```

Page 300

```
 1      Q.  Do you recall anyone saying that they
 2   wished Mr. Zeleny would stop protesting, or words
 3   to that effect?
 4      A.  I don't recall specifically that, no.
 5      Q.  Let's mark as the next in order -- so I'm      11:51
 6   marking Exhibit 256.
 7           (Plaintiff's Exhibit 256 marked
 8            for Identification.)
 9   BY MR. ROBINSON:
10      Q.  For the record, it's two pages, MP 5380 to    11:52
11   5381.
12           Do you see that?
13      A.  Yes.
14      Q.  Do you recognize this document?
15      A.  I don't see it yet.  I recognize it as an     11:52
16   e-mail.
17      Q.  Is it an e-mail that Bryan Roberts sent to
18   you?
19      A.  Yes.  Bryan Roberts was the police chief
20   at the time.                                          11:53
21      Q.  Do you have an understanding of why Chief
22   Roberts sent you this e-mail?
23      A.  It was prompted by -- I had just started
24   with the Menlo Park Police Department, so I was
25   totally unaware of Mr. Zeleny and his activities.     11:53
```

Page 301

```
 1   And Sergeant Kaufman sent an e-mail that was

 2   forwarded to me, via the chief, to bring me up to

 3   speed about what his -- what Mr. Zeleny's

 4   activities were prior to me being employed.

 5       Q.  How did he describe Mr. Zeleny's              11:53

 6   activities?

 7       A.  How did Chief Roberts describe it?

 8       Q.  Correct.

 9       A.  He just -- he gave me a background of the

10   fact that Mr. Zeleny would come to protest a          11:53

11   company called NEA, which I had never heard of

12   before, and that in the past, he had actually gone

13   on the property with weapons and caused quite a

14   disturbance and that since that time, there had

15   been some kind of either stay-away order or a         11:54

16   trespass order instructing him to stay off the

17   property and that he continued his protest on the

18   public right-of-way.

19       Q.  Did you have any understanding or did you

20   ever develop an understanding of what Chief Roberts   11:54

21   meant by "It's very touchy and political"?

22       A.  All I could -- no.  The only thing that he

23   spoke about is the fact that whenever Mr. Zeleny

24   appeared with all his weapons, we would be

25   inundated with phone calls, both by residents but     11:54
```

Veritext Legal Solutions
866 299-5127

```
1    also by the companies and the organizations and the

2    entities that were in that shopping -- or that --

3    that's not a shopping center -- in that complex.

4         Q.  Sir, you said something to the effect that

5    the department would be inundated with phone calls;    11:55

6    right?

7         A.  He said in the past, they had been

8    inundated with phone calls, yes.

9         Q.  Did the department stop being inundated

10   with phone calls after you started?                    11:55

11        A.  As I told you, there were phone calls.  I

12   could not estimate how many were received for each

13   instance that he showed up.

14        Q.  And beyond the effect on the police

15   department and the level of calls, did he say          11:55

16   anything else about why the situation was touchy

17   and political?

18        A.  No.

19        Q.  Do you see the handwriting on Exhibit 256?

20        A.  I do.                                          11:55

21        Q.  Do you know whose handwriting that is?

22        A.  That's mine.

23        Q.  The top note here says, "NEA Rosewood."

24   Do you see that?

25        A.  No.  It says, "Near Rosewood."  That's my     11:55
```

Veritext Legal Solutions
866 299-5127

1     handwriting.

2          Q.  Near Rosewood?

3          A.  Correct.

4          Q.  Got it.  What does the handwriting at the

5     bottom say?                                          11:56

6          A.  "Special operations" I think I wrote.

7          Q.  Separate from any discussion -- strike

8     that.

9              After Chief Roberts sent you this e-mail,

10    did you speak to Sergeant Kaufman or Sergeant        11:56

11    Romero about Michael Zeleny?

12         A.  Yes.

13         Q.  What did you talk about?

14         A.  Again, they were bringing me up to speed.

15    I was brand-new as a commander.  I had never heard   11:56

16    of Michael Zeleny nor NEA nor any of these issues

17    in the past.  So they were just basically bringing

18    me up to speed about what has happened in the past

19    and what our response would normally be so that I

20    would have some historical perspective about how     11:57

21    the police department handled these in the past.

22         Q.  There was a period of time when you were a

23    commander and Zeleny continued to protest; right?

24         A.  (No response.)

25         Q.  Let me rephrase that a little bit.          11:57

```
 1              Mr. Zeleny continued protesting at NEA

 2     after you became employed with the City of Menlo

 3     Park; right?

 4          A.  That's correct.

 5          Q.  During that time period, he continued to      11:57

 6     protest with unloaded firearms; right?

 7          A.  Yes.

 8          Q.  Did you wish that he would stop

 9     protesting?

10          A.  I had no personal opinion, other than as a    11:57

11     police commander, my concern is resources, public

12     safety and having to deal with folks who are

13     calling the police department saying, There's an

14     armed person, why aren't you doing anything about

15     this.  There were several calls of that nature.  So   11:58

16     it was something we had to deal with.

17          Q.  Those were negative factors in terms of

18     managing the police department; right?  The drain

19     on resources, inundation with calls, those weren't

20     good things; were they?                                11:58

21              MR. MASTER:  Objection.  Vague and

22     ambiguous.  Overbroad.

23              MR. ROBINSON:  You can answer.

24              THE WITNESS:  I'm not quite sure what

25     you're getting at.  But this is part of our job.       11:58
```

1   We have to deal with this.  Now, obviously, it

2   would be easier from a resource perspective that if

3   he wasn't there with guns, those resources could be

4   used somewhere else.

5   BY MR. ROBINSON:                                    11:58

6        Q.  As a police commander, were you glad that

7   Michael Zeleny was using up the resources of the

8   department?

9            MR. MASTER:  Objection.  Vague and

10  ambiguous.  Overbroad.                              11:58

11           THE WITNESS:  Was I happy and glad?  Is

12  that what you're asking me?

13           MR. ROBINSON:  Correct.

14           THE WITNESS:  No.

15  BY MR. ROBINSON:                                    11:59

16       Q.  Okay.  So it wasn't good for the

17  department that Mr. Zeleny was using up resources

18  for his protests; was it?

19       A.  Again, this is -- this is what the police

20  department is there for.  I'm not sure what exactly  11:59

21  you are asking.  You know, we have to give up

22  resources for all -- a myriad of calls, and this is

23  just one of them.

24       Q.  How about being inundated with calls; were

25  you happy or glad that the police department was     11:59

1    inundated with calls when Michael Zeleny would show

2    up and protest?

3            MR. MASTER:  Objection.  Vague and

4    ambiguous.  Argumentative.

5            Go ahead.                                    11:59

6            THE WITNESS:  I don't know what my

7    emotional state was about the fact that we were

8    getting phone calls.  It's something that we have

9    to handle and we handled.

10   BY MR. ROBINSON:                                     11:59

11       Q.  Do you think it was a good thing for the

12   department to be inundated with calls about Michael

13   Zeleny?

14           MR. MASTER:  Objection.  Vague and

15   ambiguous.  Overbroad.  Argumentative.              11:59

16           Go ahead.

17           THE WITNESS:  I don't -- anytime we get

18   numerous calls about situations, it is not a good

19   thing.

20   BY MR. ROBINSON:                                     12:00

21       Q.  Was it a bad thing for the department to

22   be inundated with calls about Michael Zeleny?

23           MR. MASTER:  Objection.  Vague and

24   ambiguous as to what you mean by "bad thing."  It's

25   also irrelevant.  Argumentative.                    12:00

Page 307

1          Go ahead.

2          THE WITNESS:  I don't know how to answer

3     your question.  I'm sorry.

4     BY MR. ROBINSON:

5          Q.  It's just a "yes" or "no" question.  Was          12:00

6     it a bad thing for the department to be inundated

7     with calls about Michael Zeleny?

8          MR. MASTER:  Same objections.

9          If you can answer, go ahead.

10          THE WITNESS:  Again, I don't know how to          12:00

11     answer that question, whether it's good or bad.

12     That is subjective.

13     BY MR. ROBINSON:

14          Q.  In your view as a police commander, was it

15     bad for the department to be inundated with calls          12:00

16     about Michael Zeleny?

17          MR. MASTER:  Objection.  Vague and

18     ambiguous.  Overbroad.  Now it's really

19     argumentative, Counsel.

20          If you can answer, go ahead.          12:00

21          THE WITNESS:  I can't answer that.

22     BY MR. ROBINSON:

23          Q.  In your view as a police commander, was it

24     bad for the department that Mr. Zeleny put a drain

25     on resources, as you characterized it?          12:01

1          MR. MASTER:  Same objection.  Misstates

2    his testimony.

3          Go ahead.

4          THE WITNESS:  Again, I can't answer that.

5    When we're dealing with a limited number of          12:01

6    resources, anytime there is a drain, no matter what

7    it is, it's going to be a concern, and it's

8    something that we have to deal with.  Whether that

9    means calling in people on overtime or reallocating

10   resources, that is a decision that's made on a       12:01

11   daily, if not hourly basis in a police department.

12          MR. MASTER:  Are you uploading a new

13   document?

14          MR. ROBINSON:  Yes.

15          MR. MASTER:  Just let us know when you do     12:02

16   it.

17          (Page 310 through are 324

18          marked confidential and are

19          bound under separate cover

20          The non-confidential portion of

21          this transcript continues on page

22          325.)

23

24

25

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3              ---oOo---

4 MICHAEL ZELENY,

5     Plaintiff,

6 vs.                   No.  CV 17-7357 JCS

7 GAVIN NEWSOM, et al.,

8     Defendants.

9 _____/

10

11              CONFIDENTIAL

12

13 CONTINUED VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

14         BY VIDEOCONFERENCE

15      (Volume II - Pages 310 - 324)

16

17

18    Taken before DENISE M. LOMBARDO, CSR No. 5419

19         RPR, RMR, RDR, CRR

20          August 7, 2020

21

22

23

24

25

1              I N D E X

2                                          PAGE

3    EXAMINATION BY MR. ROBINSON          314

4

5

6

7

8

9

10              E X H I B I T S

11   PLAINTIFF'S                           PAGE

12   Exhibit 257    E-mail correspondence,      314
                    Bates No. Confidential 34
13                  And Confidential 35

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

1   CONTINUED VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

2

3        BE IT REMEMBERED, that pursuant to Notice, and

4   on the 7th day of August 2020, commencing at the

5   hour of 10:05 a.m., before me, DENISE M. LOMBARDO,

6   a Certified Shorthand Reporter, appeared by

7   videoconference CHIEF DAVE BERTINI, produced as a

8   witness in said action, and being by me first duly

9   sworn, was thereupon examined as a witness in said

10  cause.

11

12                      ---o0o---

13

14  APPEARANCES:

15

16  Appearing on behalf of the Plaintiff:

17          DAMION ROBINSON (by Zoom)

18          DAVID MARKEVITCH (by Zoom)

19          Affeld Grivakes LLP

20          2049 Century Park East, Suite 2460

21          Los Angeles, California 90067

22          (310) 979-8700

23

24

25

Veritext Legal Solutions
866 299-5127

1    Appearing on behalf of the Defendant City of Menlo

2    Park; and the Deponent, Chief Dave Bertini:

3

4            TODD H. MASTER (by Zoom)

5            Howard, Rome, Martin & Ridley LLP

6            1900 O'Farrell Street, Suite 280

7            San Mateo, California 94403

8            (650) 365-7715

9            tmaster@hrmrlaw.com

10

11   Appearing on behalf of the Defendant Attorney

12   General Xavier Becerra:

13           JOHN W. KILLEEN (by Zoom)

14           Deputy Attorney General

15           Office of the Attorney General

16           (916) 210-6045

17           john.killeen@doj.ca.gov

18

19

20   ALSO PRESENT:

21           Ted Hoppe, Videographer (by Zoom)

22           Veritext Legal Solutions

23

24           Michael Zeleny (by Zoom)

25

1   EXAMINATION BY MR. ROBINSON:

2       Q.  I've marked Exhibit 257.  Let me know when

3   you see it.

4           (Plaintiff's Exhibit 257 marked

5           for Identification.)                          12:02

6           THE WITNESS:  Yes.

7   BY MR. ROBINSON:

8       Q.  For the record, Exhibit 257 is Bates

9   marked Confidential 34 and Confidential 35.  It's

10  two pages.  Correct?                                 12:02

11          MR. MASTER:  Counsel, we need to put this

12  under seal, then, this portion of this exhibit,

13  this testimony.

14          MR. ROBINSON:  Okay.  We can seal this.

15          MR. MASTER:  So this exhibit and any        12:03

16  testimony about it.

17          MR. ROBINSON:  Let's mark this portion of

18  the record "Confidential."

19  BY MR. ROBINSON:

20      Q.  This is -- the top e-mail is not from you  12:03

21  or to you, but the e-mail starting about a third of

22  the way down the first page is from you to Matthew

23  Ortega and to Timothy Brackett and Charlene

24  Manning; correct?

25      A.  Correct.                                    12:03

                                              Page 314

1      Q.  And your e-mail refers to Zeleny; right?

2      A.  Yes.

3      Q.  And you mentioned in your e-mail, But

4   crazy people can be a bit erratic and not stick to

5   their schedule, so -- dot, dot, dot, dot, dot.  Do      12:03

6   you see that?

7      A.  I do.

8      Q.  The crazy people you're referring to there

9   is Mr. Zeleny?

10     A.  Yes.                                             12:03

11     Q.  Did you have an opinion, at the time you

12  sent this e-mail in June of 2013, that Mr. Zeleny

13  was crazy?

14     A.  This is an internal communication between

15  other police officers, and based on his activity       12:04

16  and the open carry of weapons and thousands of

17  rounds of ammunition, it was my opinion that that

18  was not something that was normally done.

19         MR. ROBINSON:  I'm going to object to the

20  answer and move to strike as nonresponsive.            12:04

21  BY MR. ROBINSON:

22     Q.  At the time you sent this e-mail on June

23  9th, 2013, was it your opinion that Mr. Zeleny was

24  crazy?

25         MR. MASTER:  Objection.  Asked and              12:04

1    answered.

2          THE WITNESS:  As I stated, at the time, we

3    believed -- I believed, based on his activity, that

4    this was not normal.  Now, the term "crazy" was

5    used very, very loosely in this internal e-mail.          12:04

6    And because of his activities, it was something

7    that was not, in my opinion, as a police commander

8    and as a police officer for, at that time, 25

9    years, that was not normal activity.

10   BY MR. ROBINSON:                                          12:05

11      Q.  So when you referred to Mr. Zeleny in your

12   e-mail as "crazy people," what you meant is he's

13   engaging in activity that's not normal activity?

14          MR. MASTER:  Objection.  Asked and

15   answered.                                                 12:05

16          Go ahead.

17          THE WITNESS:  Yeah.  It was not normal and

18   created an issue, again, that I've already

19   described, the public safety issues, especially in

20   this time frame when we had had numerous active          12:05

21   shooters, school shootings, mall shootings, et

22   cetera.  So this was not, in my opinion, not normal

23   behavior by someone.

24          MR. ROBINSON:  I'm going to object again

25   and move to strike as nonresponsive.                     12:05

                                                   Page 316

BY MR. ROBINSON:

Q.  The question is just, when you referred to
Mr. Zeleny as "crazy people" in this e-mail, did
you mean he was engaging in activity that was not
normal?                                              12:05

MR. MASTER:  Objection.  Asked and
answered.  Argumentative.  He answered the
question.

Go ahead.  You can answer it again.

THE WITNESS:  As I stated, I used the term  12:06
"crazy" very loosely in this situation.  He was not
acting, in my opinion, in a normal manner, and
that's why I said what I said.

BY MR. ROBINSON:

Q.  In the Menlo Park Police Department, do   12:06
you ever deal with civil commitments?

A.  Are you talking about 5150 of the Welfare
and Institutions Code commitment, 72 hours?

Q.  Correct.

A.  Yes.                                       12:06

Q.  And in order to do a commitment, you have
to determine if the person is at risk of harm to
himself or to others; correct?

A.  Actually, there's a third criteria.  It's
with a harm to self, harm to others, or gravely    12:06

1   disabled based on a mental illness.

2     Q.  In dealing with civil commitments of that

3   type, you have to make a determination about mental

4   illness; correct?

5     A.  No, you don't make a determination about   12:07

6   mental illness.  You just make a determination

7   whether it is possibly mental illness causing this

8   person to be a danger to himself, to others, or

9   gravely disabled.

10     Q.  Did you ever consider trying to civilly   12:07

11   commit Mr. Zeleny?

12     A.  No.

13     Q.  Do you know if the department ever

14   considered that?

15     A.  I don't know specifically, but any officer   12:07

16   that --

17        THE REPORTER:  Excuse me.  This is the

18   court reporter.  There is some kind of

19   interference.  Your whole answer cut out.

20        (Record read by the Reporter.)   12:07

21        MR. ROBINSON:  Let me rephrase it.

22   BY MR. ROBINSON:

23     Q.  Did the department, the police department

24   of the City of Menlo Park ever consider attempting

25   to civilly commit Mr. Zeleny?   12:08

1      A.  Not that I'm not aware of.

2           MR. ROBINSON:  Could we hear that on the

3      court reporter's side?

4           THE REPORTER:  Yes.  For whatever reason,

5      somehow there is now interference on his line.      12:08

6           MR. ROBINSON:  So maybe we should take a

7      quick break and try to figure that out.

8           Chief Bertini, you're coming through, but

9      it's very, very garbled.

10          THE VIDEOGRAPHER:  Going off the record.      12:08

11     The time now is 12:09.

12          (Off the record.)

13          THE VIDEOGRAPHER:  Back on the record.

14     The time now is 12:10.

15     BY MR. ROBINSON:                                    12:10

16     Q.  Chief Bertini, we're back on the record.

17          I think the question before we had

18     technical difficulties was:  Did the City of Menlo

19     Park Police Department ever consider civilly

20     committing Mr. Zeleny?                              12:11

21     A.  Not that I am aware of.

22     Q.  Do you know if any psychological or

23     psychiatric analysis was performed on Mr. Zeleny?

24     A.  I have no personal knowledge of that.

25     Q.  Do you have knowledge of that, whether or      12:11

1    not it's personal?

2       A.  No, I have no knowledge myself of that, as

3    I sit here today.

4       Q.  Could you estimate the number of times

5    that you've communicated -- "you" meaning the          12:11

6    department -- have communicated with NEA about

7    Mr. Zeleny?

8       A.  I cannot answer -- well, I don't know how

9    many times prior to my -- my beginning in Menlo

10   Park.  So from the time I started at Menlo Park,       12:11

11   there probably was maybe a dozen communications, 12

12   to 15.  That would be my best estimate.

13      Q.  How many times have you -- you,

14   personally, met with NEA in connection with

15   Mr. Zeleny and his protests?                           12:12

16      A.  Personally met with them, I think just

17   twice.  Just twice.

18      Q.  NEA has consistently expressed concerns to

19   the City of Menlo Park Police Department about

20   Mr. Zeleny and his protests; correct?                  12:12

21      A.  Yes.

22      Q.  I'm going to try to figure out how to do

23   this.

24          Have you reviewed any of the audio files

25   that the City produced in connection with this        12:12

                                            Page 320

case?

A. I did review a couple of audio files that
were contacts with the -- with Mr. Zeleny and an
audio file of some meeting that occurred. I did
not know who the participants were.                    12:13

Q. Was it the audio file that was marked at
the NEA deposition, the meeting audio file that
you're referring to?

A. Yes.

Q. So I'm going to try to make this work so    12:13
that you can hear the audio file. It may or may
not work, but let me try it.

So -- what I'm going to do is, I'm pulling
up an audio file that was produced by the City of
Menlo Park under the folder Audio, subfolder        12:13
12-495, subfolder Brackett with two Ts.

Have you seen the folders of audio files
that the City produced?

A. I don't recall. There was a great many
documents. I don't recall which ones I saw.         12:14

Q. Okay. So let me try to play this and see
if it's the same one you listened to.

THE REPORTER: I will not be reporting
what you're playing on that audio; is that correct?

MR. ROBINSON: That's fine. I'm just        12:14

1  trying to figure out if there's a technical way to

2  do this.

3         Yeah, I think -- we're going to have to

4  skip this for now.  It's not going to work.

5         Let me mark another exhibit here.          12:15

6         MR. MASTER:  We sealed part of this

7  "Confidential."  We're not in that anymore;

8  correct?

9         MR. ROBINSON:  No.  So let's get off the

10  confidential record again.                        12:15

11         (This ends the confidential portion

12          of the transcript.  The deposition

13          continues on page 325.)

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

1       SIGNATURE OF DEPONENT

2

3          I, the undersigned, CHIEF DAVE BERTINI, do

4    hereby certify that I have read the foregoing

5    deposition and find it to be a true and accurate

6    transcription of my testimony, with the following

7    corrections, if any:

8

9    PAGE      LINE                    CHANGE

10   _____     _____    _____

11   _____     _____    _____

12   _____     _____    _____

13   _____     _____    _____

14   _____     _____    _____

15   _____     _____    _____

16   _____     _____    _____

17   _____     _____    _____

18   _____     _____    _____

19   _____     _____    _____

20   _____     _____    _____

21   _____     _____    _____

22   _____     _____    _____

23   _____     _____    _____

24

                       _____

25                     CHIEF DAVE BERTINI              Date

                                            Page 323

1        REPORTER'S CERTIFICATE

2

3

4        I, DENISE M. LOMBARDO, do hereby certify:

5        That CHIEF DAVE BERTINI, in the foregoing

6   deposition named, was present by videoconference

7   and by me sworn as a witness in the above-entitled

8   action at the time and place therein specified;

9        That said deposition was taken before me at

10  said time and place, and was taken down in

11  shorthand by me, a Certified Shorthand Reporter of

12  the State of California, and was thereafter

13  transcribed into typewriting, and that the

14  foregoing transcript constitutes a full, true and

15  correct report of said deposition and of the

16  proceedings that took place;

17       And that the aforementioned 14-page transcript

18  meets the California minimum transcript format

19  standards.

20       IN WITNESS WHEREOF, I have hereunder

21  subscribed my hand this 3rd day of September, 2020.

22

23
         *Denise M. Lombardo*

24       DENISE M. LOMBARDO, CSR No. 5419

25       State of California

                                          Page 324

BY MR. ROBINSON:

Q.  This one has been previously marked as Exhibit 52.  So I'm going to just move it into the "Marked Exhibits" folder now.  And the file name is 120416 - Meeting Minutes (52).                    12:15

Do you see that file, Mr. Bertini?

A.  Not yet.  Can you give me page numbers, please?

Q.  Sure.  So it's multiple pages, MP 88 through MP 94 and, again, previously marked as     12:16 Exhibit 52.

A.  I have it.  I have it.

Q.  If you could turn to the section -- I'm trying to find the section just now.  There we go. So on MP 93, there's a section at the bottom of the   12:16 page under "Sergeant Kaufman."

Do you see that?

A.  Yes.

Q.  Let me ask you a background question. These are minutes from a management meeting of the   12:16 Menlo Park Police Department; correct?

A.  That is correct.

Q.  And this meeting took place in October of 2012; correct?  Excuse me.  April of 2012?

A.  Yes.                                      12:17

```
 1        Q.  Did you participate in this meeting?

 2        A.  Yes.

 3        Q.  Do you recall Sergeant Kaufman talking

 4   about the lack of a firm solution to ending

 5   Mr. Zeleny's protests?                              12:17

 6        A.  I don't have any recollection as I sit

 7   here today, aside from what the document states.

 8        Q.  Was there ever a point in time, to your

 9   knowledge, at the City of Menlo Park where the

10   police department was trying to find a solution to  12:17

11   end Mr. Zeleny's protests?

12        A.  No.

13        Q.  Do you have any understanding of why

14   Sergeant Kaufman indicated there seems to be no

15   firm solution to ending this protest?               12:17

16        A.  No.

17        Q.  Was the sentiment at this meeting in April

18   of 2012 that the City of Menlo Park Police

19   Department would prefer if Mr. Zeleny not continue

20   protesting?                                         12:18

21        A.  I don't remember what the tenor of the

22   meeting was.  I had only been employed there for

23   six months at this point.  So I had very little

24   historical knowledge, aside from what they already

25   told me about it.                                   12:18
```

Page 326

```
 1       Q.  Do you recall discussion about the photo

 2   of Mr. Zeleny being featured in a legislative

 3   committee meeting?

 4       A.  I do.

 5       Q.  What was that about?                    12:18

 6       A.  Aside from what's in the document, I don't

 7   know.

 8       Q.  Do you know why the City -- do you know if

 9   the City of Menlo Park submitted that photo of

10   Michael Zeleny to the legislative committee?      12:18

11       A.  It was my understanding that somehow they

12   received a photo.  I'm not sure who it came from.

13       Q.  Did the Menlo Park Police Department

14   support the open-carry ban in the legislative

15   process in the state of California?               12:19

16       MR. MASTER:  Object.  It's vague and

17   ambiguous and overbroad.

18       Go ahead.

19       THE WITNESS:  We don't -- at that point, I

20   don't know -- I'm not sure whether the police      12:19

21   department supported it or not.  Again, I had been

22   there for six months.  We don't normally get

23   involved in the political aspects of the creation

24   of laws unless we're asked.

25       MR. ROBINSON:  Why don't we take a break       12:19
```

Page 327

```
 1    here.  We're at a stopping point, I think.

 2            THE VIDEOGRAPHER:  Going off the record.

 3    The time now is 12:20.

 4            (Lunch recess taken.)

 5            THE VIDEOGRAPHER:  Back on the record.      01:10

 6    The time now is 1:10.

 7    BY MR. ROBINSON:

 8        Q.  So why don't we go ahead and start with

 9    the audio file.  And let's go to the file that's --

10    and this is from the folder Audio 12-495, Brackett,   01:10

11    and let's open up the file 14750141-1.

12            (Playing audio recording.)

13    BY MR. ROBINSON:

14        Q.  Chief Bertini, I'm just going to ask you

15    first, is that the audio recording that you          01:12

16    mentioned listening to before?

17        A.  No.

18        Q.  Okay.  Do you recognize the voice on that

19    audio recording, the woman who was just talking

20    before we stopped?                                   01:12

21            MR. MASTER:  Hold on.  Hold on.

22            Damion, I just want to object because he

23    didn't identify the -- it looks like you ran from

24    the start time of zero to one minute and eight

25    seconds.  It looks like the audio is close to 40     01:12
```

1     minutes long.  So I just want to make sure the

2     record is clear in terms of what portion was played

3     back for the witness.

4               MR. ROBINSON:  Okay.  So we played from

5     zero to one minute and eight seconds.                    01:12

6     BY MR. ROBINSON:

7        Q.  Do you recognize the voice that was

8     speaking when we stopped the video?

9        A.  I recognize one voice.

10       Q.  Which voice is that?                              01:12

11       A.  Sergeant Sharon Kaufman.

12       Q.  Was that the voice that was just speaking

13    from about one minute to a minute eight?

14       A.  Yes.

15       Q.  The voices were saying, Aside from making      01:13

16    your lives miserable, Mr. Zeleny hadn't committed

17    any crime?

18       A.  I'm sorry.  Was that a question?

19       Q.  Yes.  Was that Sergeant Kaufman who made

20    those statements in the recording we just listened   01:13

21    to?

22       A.  Yes.

23       Q.  Let's go ahead and -- let's go ahead,

24    David, and if you could play -- if you go back to

25    the audio files.  There should be -- yeah.  So       01:13

```
 1   let's start with 1471553 and let me just identify

 2   it.

 3         I'm going to have David open the file that

 4   was produced to us by the City of Menlo Park under

 5   the folder Audio, subfolder 12-1824 and subfolder     01:14

 6   Foy.

 7         Chief Bertini, how does the City of Menlo

 8   Park store audio files related to cases?

 9      A.  Well, you have to be more specific about

10   the date.                                             01:14

11      Q.  Okay.  So in the June 2013 time frame, how

12   were audio files related to either information or

13   criminal cases stored by the City of Menlo Park?

14      A.  I'm sorry.  There was interference.  Did

15   you say June 2013?                                    01:14

16      Q.  Correct.

17      A.  Yeah.  At the time, the officers were

18   required to carry digital recorders called Puma

19   devices, P-U-M-A, and every time they had a contact

20   with anybody, they were required by policy to turn    01:14

21   on their recorders.  And those recordings would be

22   uploaded at the end of the shift to a server in the

23   police department.

24      Q.  And were they stored by case number?

25      A.  It only -- only if a case number was taken     01:15
```

```
 1   would they be stored by case number.  The officers

 2   would have the ability to go in and add notes to

 3   any audio file.  And if a case number had been

 4   taken, a case number would have been attached to

 5   the audio files.                                      01:15

 6       Q.  Okay.  So let's take -- well, let's

 7   actually start with the audio recording.  So if an

 8   audio recording was in a folder or file associated

 9   with a case number, would it then be categorized by

10   which officer made the recording, meaning which      01:15

11   officer's device it was?

12       A.  That's -- the officer would have signed in

13   with their ID number, and it would prompt the

14   system to understand that came from a certain

15   officer.  Then the officer would upload the          01:15

16   individual files, and if there were notes that

17   needed to be attached, they would -- they would

18   input those into the computer system.

19           And if a case had been taken, then a case

20   number would be attached, but if there was no case   01:16

21   taken, then it would just be a file, date, time and

22   the officer identified.

23           MR. ROBINSON:  So, David, let's start with

24   14771553.

25           (Playing audio recording.)                   01:16
```

```
 1          MR. ROBINSON:  So let's start that at

 2    three minutes, 11 seconds.

 3          MR. MASTER:  What did you say, Damion?

 4          MR. ROBINSON:  Three minutes, 11 seconds.

 5    There we go.                                    01:16

 6          (Playing audio recording.)

 7          MR. ROBINSON:  So, for the record, we've

 8    listened to three minutes, seven seconds through

 9    four minutes, 13 seconds.

10    BY MR. ROBINSON:

11        Q.  Chief Bertini, do you recognize the voices

12    on that recording?

13        A.  Yes.

14        Q.  Who are they?

15        A.  Officer Foy, F-O-Y, and Sergeant Soares,    01:18

16    S-O-E-R-S (sic).

17        Q.  Do you recall the incident that they're

18    referring to in that audio recording?

19        A.  I do.

20        Q.  What incident was that?                     01:18

21        A.  That was the incident where Mr. Zeleny

22    came to the location to protest with weapons and

23    had what we believed was a concealed weapon on his

24    person.

25        Q.  When you say "we believed," who are you     01:18
```

Veritext Legal Solutions
866 299-5127

1   referring to as "we"?

2       A.  The police department.

3       Q.  Did you believe that he had a concealed

4   weapon?

5       A.  After doing the research that we did and      01:19

6   asking -- looking up the Penal Code section and

7   also asking advice from the district attorney's

8   office, we believed it could be, although we wanted

9   to be 100 percent sure.  So in this case, we did

10  not, as Officer Foy had said, make an arrest.        01:19

11  Instead, we sent the case to the district

12  attorney's office for review.

13      Q.  In the conversation we just listened to,

14  was it Officer Soares who said that Bertini would

15  be doing research?  Do you recall that statement?    01:19

16      A.  That's Sergeant Soares and --

17      Q.  Was he referring to --

18      A.  He said -- the audio kind of speaks for

19  itself.  He said he was going to ask me my advice

20  since I was his immediate supervisor.                01:20

21      Q.  And did he ask you for advice?

22      A.  Yes.

23      Q.  Did you give him advice?

24      A.  Well, I did research before I gave him

25  advice.  But, yes, eventually, I did give him        01:20

1  advice.

2      Q.  What research did you do, you, personally?

3      A.  As I just stated, I looked up the Penal

4  Code section.  I e-mailed the DA's office.  I sent

5  a picture along with it to get their -- their       01:20

6  opinion on it, because it was really an

7  interpretation of the Penal Code.

8          And based on the research I did, as I've

9  already stated, instead of making an arrest of

10  Mr. Zeleny, I instructed them just to write a      01:20

11  report, and it would be forwarded to the DA's

12  office for review.

13      Q.  Did you communicate with the DA's office

14  that same day?

15      A.  Yes.                                        01:20

16      Q.  And you sent them some information, it

17  sounds like?

18      A.  Correct.

19      Q.  How did you send it to them?

20      A.  E-mail.                                      01:21

21      Q.  Do you know if that e-mail has been

22  produced in this case?

23      A.  It has.

24      Q.  So did the DA respond to you?

25      A.  Yes.  The DA responded to me, but I don't    01:21

                                        Page 334

```
 1    recall, as I sit here today, whether they responded
 2    via e-mail or phoned me.  I believe it was e-mail.
 3        Q.  Did they respond the same day?
 4        A.  I'm not 100 percent sure, but I think so.
 5        Q.  What was their response?                      01:21
 6        A.  Just as -- the advice that I gave.  Based
 7    on their objective looking at it, that they would
 8    have to make a decision based on the entire
 9    totality of the circumstances.  So if we were to
10    send a report up for their review, they would then   01:21
11    make a charging decision.
12        Q.  And did you relate to the officers on
13    scene that they should just take a report and not
14    make an arrest that day?
15        A.  No.                                           01:22
16        Q.  Did you relay that to anyone?
17        A.  Yes.
18        Q.  Who did you relay that to?
19        A.  Sergeant Soares.
20        Q.  And what was Sergeant Soares' response to    01:22
21    that?
22        A.  He said he would relay it to the officers
23    on scene.
24        Q.  Let's go to the next audio file from the
25    same folder, Audio, 12-1824-4.                       01:22
```

Page 335

```
 1              (Playing audio recording.)

 2          MR. MASTER:  Stop the recording, please.

 3     For the record, before we play it, can you

 4     identify, other than the incident report or case

 5     report number, what the audio file is that we're      01:23

 6     playing and what portion we're playing?

 7          MR. ROBINSON:  Yes.  So we're playing the

 8     audio file 14771554.  And let's start at 14:29 and

 9     go to 19 minutes.

10              (Playing audio recording.)                    01:23

11     BY MR. ROBINSON:

12        Q.  So we've listened to 14:29 through 19:05

13     on the audio recording.

14              Chief Bertini, do you recognize the voices

15     in that audio recording?                                01:28

16        A.  I only recognize one voice.

17        Q.  Which voice is that?

18        A.  Officer Foy.

19        Q.  And the person who said that isn't a

20     concealed carry violation, that was Officer Foy?       01:28

21        A.  I don't recall whether -- what exactly he

22     just said.  Ask the question again.

23        Q.  The voice that said, It's not a concealed

24     carry violation, was that Officer Foy?

25        A.  I don't believe he exactly said that, but      01:29
```

Veritext Legal Solutions
866 299-5127

```
 1    I think that's what he intimated.  It was an
 2    open-carry issue, yes.
 3       Q.  So we can listen to it again.  My question
 4    is, the person who is on the recording saying, in
 5    substance, this isn't a concealed carry violation        01:29
 6    was Officer Foy; is that right?
 7            MR. MASTER:  Asked and answered.
 8    Argumentative.  It's vague and ambiguous.
 9            If you want to play back the exact
10    statement that you're saying and identify it for         01:29
11    the record at what time frame, then he can answer
12    more directly, if you'd like, but, otherwise,
13    you're asking about five minutes.  He can answer
14    the question.
15            Go ahead.                                        01:29
16            MR. ROBINSON:  You can go ahead and
17    answer, Chief Bertini.
18            THE WITNESS:  It was Officer Foy who said
19    something to the effect of concealed carry versus
20    open carry, yes.                                         01:29
21    BY MR. ROBINSON:
22       Q.  Okay.  So there were two voices on the
23    call; correct?
24       A.  That's correct.
25       Q.  And one of the voices, which was more            01:30
```

Veritext Legal Solutions
866 299-5127

1  faint, was asking questions about whether the

2  holster with the gun in it could be considered a

3  concealed carry; correct?

4      A.  It was hard to discern what that other

5  voice was saying.  It sounds like it was a phone      01:30

6  call.  But, yeah, they were -- he was asking

7  questions of Officer Foy, yes.

8      Q.  And Officer Foy was answering those

9  questions in the negative; correct?

10          MR. MASTER:  Objection.  Vague and          01:30

11  ambiguous.  Compound.

12          THE WITNESS:  I think the audio recording

13  speaks for itself.  I don't know verbatim what was

14  just said.  I generally listened to it and I heard

15  the conversation, and there was conversation about   01:30

16  the weapon and the holster and whether it was a

17  concealed weapon or not.

18  BY MR. ROBINSON:

19      Q.  Did you understand the substance of what

20  was being said in the conversation?                  01:30

21      A.  Yes.

22      Q.  Did you understand the substance of what

23  Officer Foy was saying in the conversation to be

24  the weapon was not a concealed weapon?

25          MR. MASTER:  Objection.  Misstates the       01:31

```
 1   testimony.  The document and the record speaks for
 2   itself.  It's argumentative.
 3        You can answer.
 4        MR. ROBINSON:  You can answer the
 5   question.                                          01:31
 6        THE WITNESS:  And as I stated to you, just
 7   generally, it was a discussion about.  I don't know
 8   whether he said exactly those words, so I'm not
 9   going to say "yes" to that.
10   BY MR. ROBINSON:                                   01:31
11        Q.  So when I ask you about the substance of a
12   conversation, do you understand what that means?
13        A.  (No response.)
14        Q.  I didn't hear your answer.
15        A.  I understand what "substance of a          01:31
16   conversation" is.
17        Q.  What do you understand the substance of
18   what Officer Foy was saying to be?
19        MR. MASTER:  Objection.  Vague and
20   ambiguous.  It's a five-minute recording.  Is there 01:31
21   a particular part of the recording you're referring
22   to, Counsel?
23        MR. ROBINSON:  No.  I'm referring to the
24   whole recording.
25   BY MR. ROBINSON:                                   01:32
```

Veritext Legal Solutions
866 299-5127

1     Q.  What was the substance of what Officer Foy

2   was saying?

3          MR. MASTER:  Also compound.  The document

4   speaks for itself.

5          Go ahead.  Lacks foundation.  Calls for        01:32

6   speculation as well.

7          THE WITNESS:  As I was not a party to this

8   conversation -- I just heard what everybody else

9   just heard.  It sounded to me that Officer Foy was

10  describing the situation to some other person who     01:32

11  was asking questions to clarify whether or not this

12  met the criteria for the Penal Code section that he

13  mentioned.  That's the substance of the call.

14  BY MR. ROBINSON:

15    Q.  From listening to the recording, do you        01:32

16  have an understanding of what Officer Foy's view at

17  the time was, at the time the recording was made,

18  about whether this was a concealed weapon?

19         MR. MASTER:  Objection.  Lacks foundation.

20  Calls for speculation.                                01:32

21         Go ahead.

22         THE WITNESS:  Based on what the call --

23  based on what the recording was is they were trying

24  to determine whether or not this weapon in a

25  holster with a small lock on it was applicable for   01:32

                                              Page 340

```
1   the Penal Code section that he actually quoted
2   about whether or not this person could have this
3   weapon and whether it was concealed or not.
4   BY MR. ROBINSON:
5       Q.  Okay.  How long did you work with Officer    01:33
6   Foy?
7       A.  Two or three years.
8       Q.  Did you have communications with him?
9       A.  Just informal.  The most communication we
10  had is when he was a recruit training officer at   01:33
11  the police academy and I was an instructor there.
12      Q.  You knew him, though; right?
13      A.  Yes.  He was a police officer in a very
14  small police department.
15      Q.  And you were commander at that time;        01:33
16  right?
17      A.  Correct.
18      Q.  So based on your experience with Officer
19  Foy in your role within the Menlo Park Police
20  Department and hearing the audio recording we just 01:33
21  listened to, is it accurate that Officer Foy
22  conveyed in the audio recording that he did not
23  believe that Mr. Zeleny was carrying a concealed
24  weapon at the time?
25          MR. MASTER:  Objection.  Again, lacks       01:34
```

Page 341

```
 1    foundation.  You're being argumentative, Counsel.
 2    And it also is vague and ambiguous and overbroad
 3    and compound.  The record speaks for itself.
 4          Go ahead.  You can answer one more time.
 5          THE WITNESS:  As I stated, I will not          01:34
 6    answer in the affirmative to that specific quote
 7    you just said.  I would refer you back to the
 8    recording.  And the recording speaks for itself.  I
 9    don't know whether he said those exact words or
10    not.                                                 01:34
11    BY MR. ROBINSON:
12       Q.  Did you speak to Officer Foy about
13    whether, during this June 2013 -- strike that.
14          Did you speak to Officer Foy about
15    whether, during this June 2012 incident, Mr. Zeleny  01:34
16    was carrying a concealed weapon?
17       A.  No.
18       Q.  Did you talk to Officer Foy at all about
19    this incident in June of 2012?
20       A.  Not that I recall.                            01:34
21       Q.  Did you talk to anyone about the incident
22    in 2012, other than Sergeant Soares and the DA's
23    office?
24       A.  Yes.  I spoke to the police chief --
25       Q.  Sorry.                                        01:35
```

Veritext Legal Solutions
866 299-5127

```
 1              MR. MASTER:  Is there a question?

 2              MR. ROBINSON:  Let me rephrase.

 3     BY MR. ROBINSON:

 4         Q.  Before the case was referred to the DA's

 5     office for prosecution, did you speak to anyone        01:35

 6     other than the DA's office and Sergeant Soares?

 7         A.  I spoke to many people.  Are you asking

 8     specifically about a certain subject?

 9         Q.  Yeah.  Did you speak to them about this

10     June 2012 incident that resulted in Mr. Zeleny's      01:35

11     prosecution?

12         A.  Yes.  I spoke to my immediate supervisor,

13     who was the chief of police.

14         Q.  What did you tell the chief of police?

15         A.  I brought him up to speed on what was         01:35

16     happening.

17         Q.  This was before it was referred to -- for

18     prosecution?

19         A.  It was probably contemporaneous, because

20     that happened within a couple of days.                01:36

21         Q.  And what did the chief of police say about

22     it?

23         A.  Nothing -- nothing that I recall.  Nothing

24     remarkable.

25         Q.  Whose decision was it to refer it to the      01:36
```

Veritext Legal Solutions
866 299-5127

```
 1    DA's office for potential prosecution?
 2        A.  It was a decision made by the entire -- by
 3    the police department through the officer --
 4    Officer Foy, Sergeant Soares, myself and the advice
 5    that we had been given from the DA's office.  So it    01:36
 6    was a collective decision, in essence.
 7        Q.  But you didn't -- strike that.
 8            You talked -- did you talk to Officer
 9    Soares about the incident after -- after you had
10    spoken to the DA's office?                             01:36
11        A.  Sergeant Soares?
12        Q.  Sure.  Did you talk to Sergeant Soares
13    about the incident after you had spoken to the DA's
14    office?
15        A.  Yes.  As I stated earlier, I gave him the      01:36
16    opinion of the DA's office, and collectively we
17    decided to take the course of action that was, in
18    fact, taken.
19        Q.  When you say "collectively," you're
20    referring to yourself and Officer -- Sergeant          01:37
21    Soares?
22        A.  And the DA's office.
23        Q.  And the DA's office.
24            Was Officer Foy involved in any of those
25    discussions?                                           01:37
```

```
 1       A.  No.  He was only involved as far as

 2   getting direction from Sergeant Soares.

 3       Q.  Did you give any input into Officer Foy's

 4   report that he generated that day in June of

 5   2012?                                          01:37

 6       A.  No.

 7       Q.  Do you know if Sergeant Soares gave any

 8   input?

 9       A.  I don't know.

10       Q.  Did you speak to Sergeant Kaufman about  01:37

11   the incident before Mr. Zeleny's case was referred

12   for prosecution?

13       A.  As I sit here today, I don't recall

14   if I had any conversations with Sergeant Kaufman.

15       Q.  I'm marking as Exhibit 258 a document    01:38

16   produced by the City of Menlo Park Police

17   Department.  It's MP 1595 through 1596.  Let me

18   know when it pops up.

19           (Plaintiff's Exhibit 258 marked

20            for Identification.)                    01:38

21       MR. MASTER:  Bear with me.  I got booted

22   out, for some reason.

23       THE WITNESS:  I'm sorry.  Did you say

24   Exhibit 258?

25       MR. ROBINSON:  258, correct.                 01:38
```

Page 345

```
 1              THE WITNESS:  Okay.  I have it up.
 2    BY MR. ROBINSON:
 3        Q.  Do you recognize --
 4              MR. MASTER:  Time-out.  Time-out.  I got
 5    booted out.  Hold on a second.  I'm getting back      01:39
 6    in.  Hold on one second.
 7              Okay.  258, Damion?
 8              MR. ROBINSON:  Right.
 9              MR. MASTER:  Thank you.  I'm in.  Thank
10    you.                                                  01:39
11    BY MR. ROBINSON:
12        Q.  Do you recognize this document?
13        A.  Yes.
14        Q.  What is it?
15        A.  It's a CAD, or a computer-aided dispatch,     01:39
16    incident report.
17        Q.  Is this the incident report that relates
18    to the concealed carry case against Mr. Zeleny?
19        A.  It is the computer-aided dispatch incident
20    that is associated with the police report 12-1824.   01:39
21        Q.  And that case number, 12-1824, is the case
22    that resulted in the criminal prosecution of
23    Mr. Zeleny?
24        A.  That's correct.
25        Q.  So let's go down the right -- or the left     01:40
```

Veritext Legal Solutions
866 299-5127

1 column on the first page of the document.  There's
2 a -- it looks like it says "Unit Times" and next to
3 that "Officers."  Do you see that?
4      A.  I do.
5      Q.  The numbers there, are those identifying          01:40
6 numbers for each of the officers that were involved
7 in the incident?
8      A.  Those are called "call signs."
9      Q.  Okay.  And those identify the officers
10 involved?                                               01:40
11      A.  They identify the officers at the time of
12 this incident, yes.
13      Q.  Okay.  Let's go to the first one.  So
14 14778, does that refer to a particular officer
15 involved in this incident?                              01:40
16      A.  That is an ID number of an officer.
17      Q.  Do the ID numbers stay the same from
18 incident to incident or do they change?
19      A.  ID numbers stay the same.  Their call
20 signs will change based on seniority.                   01:41
21      Q.  So the numbers in the column here under
22 "Officers" that we're looking at that starts with
23 14778, are those numbers that change based on
24 seniority?
25      A.  They do not.  The other numbers change        01:41

Page 347

```
 1   based on seniority, the B numbers and S numbers.
 2       Q.  Got it.
 3           So going -- starting with the one that's
 4   14778, there's a "Dispatch" and that looks like a
 5   time; is that right?                              01:41
 6       A.  Yes.
 7       Q.  Does that refer to the time that that
 8   officer was dispatched to the incident?
 9       A.  Yes.
10       Q.  And "On Scene" is the time that the      01:42
11   officer arrived on the scene of the incident?
12       A.  Yes.
13       Q.  What is "Clear"?
14       A.  That's when the officer said that they
15   were finished with their handling of the incident.  01:42
16       Q.  Let's go over to the next column, "Disp-on
17   Scene."  What does that mean?
18       A.  Dispatched on the scene means how long it
19   took them to be dispatched till when they're on
20   scene.                                            01:42
21       Q.  Understood.
22           And "On Scene to Clear," that's the amount
23   of time that they were actually on the scene before
24   they were clear?
25       A.  Correct.                                  01:42
```

Page 348

```
 1        Q.  Let's go down to the "Time," "Event" and

 2   "By" section of it.  So there's an entry No. 2.  It

 3   refers to, "Incident type changed from info to

 4   area."

 5            Do you see that?                      01:42

 6        A.  Yes.

 7        Q.  What does "info" mean?

 8        A.  Information.

 9        Q.  What types of incidents are covered by

10   "Info" incident type?                           01:43

11        A.  Info incident types are just that.  They

12   were information for police officers, beat

13   information.

14        Q.  And what about "Area"; what does the area

15   incident type refer to?                         01:43

16        A.  An area check for something, any type

17   of -- something suspicious that they would call in.

18        Q.  Let's go down to the next page.  There's

19   an entry No. 24 at 1400:41.

20        A.  Okay.                                 01:43

21        Q.  It says, Closed - Disposition Type RT.  Do

22   you see that?

23        A.  I do.

24        Q.  Or Disposition RT.  What does "Disposition

25   RT" refer to?                                   01:43
```

                                        Page 349

1      A.  Report taken.

2      Q.  So -- and the time there on the left is

3  the time that the report was taken?

4      A.  No, not necessarily.  It's just when the

5  disposition was entered into CAD.                    01:44

6      Q.  So by 2:00 o'clock p.m. on the date of

7  this incident, June 13th, 2012, there had been a

8  report taken.  Is that accurate?

9      A.  Correct.

10     Q.  And then the next entry down has the date    01:44

11  June 14th, 2012, the next day.  Do you see that?

12     A.  Yes.

13     Q.  At 1:06 a.m.?

14     A.  Yes.

15     Q.  "Incident type changed from area to         01:44

16  12020."  Do you see that?  What is 12020?

17     A.  12020 refers to a Penal Code section,

18  which is a weapons violation.

19     Q.  So this reflects the change of the

20  incident type from an area -- an area incident to a   01:44

21  criminal-case incident; right?

22     A.  Yes.

23     Q.  Do you have an understanding of why the

24  incident type was changed at 1:00 in the morning

25  the next morning?                                     01:45

                                              Page 350

1      A.  It's typical when the graveyard dispatches

2    are -- after the reports are generated, they will

3    go in and correct CAD incidents, if a report

4    reflects something other than what the CAD says.

5    In this case, it was originally entered as an area      01:45

6    check, and then when the police report was started,

7    it was started as a 12020 PC, Penal Code section.

8    So it would be a common practice for them to change

9    the CAD incident type.

10     Q.  When was the report started?                      01:45

11     A.  I don't know.

12     Q.  Do you know what -- how do you know what

13   the incident type was on the report when it was

14   started?

15     A.  Because I've seen the police report.             01:45

16     Q.  Can the incident type change on a police

17   report?

18     A.  On the CAD or the police report?

19     Q.  On the police report.

20     A.  Certainly.  The charges can be changed           01:46

21   until the report is completed and locked.

22     Q.  Have you seen any version of the report

23   relating to this incident before it was completed

24   and locked?

25     A.  No.                                              01:46

Veritext Legal Solutions
866 299-5127

1      Q.  Do you have any way of knowing what the

2  incident type was listed before it was completed

3  and locked?

4      A.  No.

5      Q.  So it's possible that it started out as an        01:46

6  informational report; correct?

7      A.  I have no idea.  Anything is possible.  I

8  don't have any recollection or knowledge of that.

9      Q.  At some point, the incident report -- the

10  police report was finalized as a criminal report;     01:46

11  right?

12      A.  Well, based on the CAD screen I see right

13  here, by 1:00 o'clock the next morning, it had

14  already been made to be a 12020.  That's why the

15  CAD call type was changed.                            01:47

16      Q.  Do you know if the report was finalized

17  before 2:00 p.m. on June 13th, 2012?

18      A.  I have no idea.

19      Q.  At any point in time between the time that

20  Officer Foy arrived on the scene that morning and     01:47

21  1:06 a.m. the next morning, do you know when he

22  started preparing the report?

23      A.  No idea.

24      Q.  Do you have any idea when he finalized the

25  report?                                               01:47

Page 352

1     A.  No.

2     Q.  Do you have any idea of whether he made

3  changes to the report after the first draft?

4     A.  No.

5     Q.  Do you have any idea if anyone other than     01:47

6  Officer Foy made changes to the report?

7     A.  No.

8     Q.  Is there any way to tell, in looking at

9  the report, whether changes were made by Officer

10 Foy or any other person?                            01:48

11    A.  When it's in draft form, no, but in order

12 to enter into the report-writing part of the

13 system, it's password protected.  So only the

14 officer that had his own password would be able to

15 go and make changes.  Now, other officers could     01:48

16 attach supplemental reports, but no other officer

17 would be able to go into his actual report and

18 change it.

19    Q.  But there's no way -- aside from Officer

20 Foy having to be the person to make changes to the  01:48

21 report, is there any way to tell whether he made

22 changes to the report?

23    A.  I don't believe there is.  I don't know.

24    Q.  So I'm going to go ahead and mark Exhibit

25 259.                                                01:49

                                        Page 353

```
 1              (Plaintiff's Exhibit 259 marked

 2              for Identification.)

 3    BY MR. ROBINSON:

 4         Q.  Let me know when it pops up.

 5         A.  I have it.                                01:49

 6         Q.  So for the record, Exhibit 259 is multiple

 7    pages.  It's Bates marked MP 170 through MP 179;

 8    correct?

 9         A.  Yes.

10         Q.  Do you recognize Exhibit 259?            01:49

11         A.  I recognize it as a police report.

12         Q.  Is this the police report that resulted in

13    referral of Mr. Zeleny's case for prosecution?

14         A.  Yes.

15         Q.  And if you go down to the page that's     01:49

16    marked MP 172, it says, "Prepared by Foy, Jeremy."

17              Do you see that?

18         A.  I do.

19         Q.  Does that indicate that Officer Foy

20    prepared this report?                             01:50

21         A.  Yes.

22         Q.  And "Approved By," it's Sergeant Kaufman

23    there.  Do you see that?

24         A.  I do.

25         Q.  Does that indicate that Sergeant Kaufman  01:50
```

Page 354

1    approved the report?

2        A.   Yes.

3        Q.   Do you have an understanding of why

4    Sergeant Kaufman approved it rather than Sergeant

5    Soares?                                          01:50

6        A.   Sergeant Soares was the detective sergeant

7    at the time, and Sergeant Kaufman was patrol.  So

8    it would be logical that it would be Sergeant

9    Kaufman who was the watch commander to approve the

10   report of the patrol officer.                    01:50

11       Q.   Do you know whether, based on your

12   personal observation or any research you have done

13   or anything else, whether Sergeant Kaufman

14   suggested to Officer Foy anything to include in his

15   report?                                          01:51

16       A.   I have no idea.

17       Q.   Keeping on the same page, MP 172, two

18   paragraphs above "Crime Scene," there's the

19   statement:  "Based on the evidence observed, I

20   believe that Zeleny was in violation of PC         01:51

21   25400(a)(2), carrying a concealed firearm on his

22   person."

23            Do you see that?

24       A.   I do.

25       Q.   Do you know what caused Officer Foy to     01:51

1   come to that conclusion?

2       A.  Not specifically, no.

3       Q.  Do you know generally?

4       A.  Well, obviously, it had to do with the gun

5   that Mr. Zeleny was wearing in the holster that was      01:51

6   concealed, the discussions he had with Sergeant

7   Soares, the discussion I had with the DA's office,

8   and the ultimate decision collectively made to send

9   the case over, as the DA requested, for review.

10  And this would be the appropriate section that was      01:52

11  used.

12      Q.  So in your understanding, part of the

13  reason that Officer Foy believed that Zeleny was in

14  violation of Penal Code 25400 is because of a

15  collective decision that was made between you,          01:52

16  Officer Foy and Officer -- or Sergeant Soares to

17  refer this case for prosecution?

18      A.  And the DA's office and their input, yes.

19      Q.  In the ordinary course of police work for

20  the City of Menlo Park, does the officer on the         01:52

21  scene make the call about whether something should

22  be cited as a crime or not?

23      A.  Sometimes.  Sometimes they ask for help

24  from their supervisors or even the command staff

25  depending on the situation.  If they have -- if         01:53

Veritext Legal Solutions
866 299-5127

1      it's a situation that may have different
2      interpretations -- sometimes laws are not written
3      very clear, and it's up to us, as the police
4      department, police officers, to interpret those
5      laws.  And sometimes it's difficult to interpret        01:53
6      those laws, so there is many times where other
7      people are asked their opinion about the law.
8      Sometimes even the DA's office is asked their
9      opinion.
10         Q.  Did you testify in Michael Zeleny's case,        01:53
11     his criminal case?
12         A.  This specific -- in this criminal case
13     that we're speaking of, yes.
14         Q.  Did Officer Foy testify, to your
15     knowledge?                                                01:53
16         A.  I believe he was the investigating
17     officer.  And I don't know whether he testified or
18     not.
19         Q.  You understand that Zeleny was acquitted;
20     right?                                                    01:54
21         A.  Yes.
22         Q.  You understand the Court found that the
23     weapon was not concealed; right?
24         A.  Yes.
25         Q.  Did you accept the Court's determination          01:54

Veritext Legal Solutions
866 299-5127

1  that Mr. Zeleny hadn't committed a crime in this
2  instance?
3      A.  My acceptance is irrelevant.  I have no
4  opinion whatsoever.
5      Q.  So, to your knowledge, has Mr. Zeleny ever      01:54
6  committed a crime in the city of Menlo Park?
7      A.  I don't know.
8      Q.  Do you have any knowledge of Mr. Zeleny
9  committing a crime in the city of Menlo Park?
10     A.  I do not have any personal knowledge of      01:54
11  him committing a crime.
12     Q.  Do you have any secondhand knowledge of
13  him committing a crime in the city of Menlo Park?
14     A.  Aside from the concealed weapon, no.
15     Q.  The acquittal established as a matter of      01:54
16  law that the concealed weapon was not a crime;
17  right?
18         MR. MASTER:  Argumentative, Counsel.
19  Calls for a legal conclusion.  He's not a lawyer.
20  Come on.  Move on.                                  01:55
21         THE WITNESS:  Acquitted and not guilty are
22  two different things, Counsel.
23  BY MR. ROBINSON:
24     Q.  After Mr. Zeleny -- after Mr. Zeleny's
25  criminal case was over, did you still believe he      01:55

Page 358

1   committed a crime in connection with the

2   concealed-carry incident that we've been talking

3   about?

4           MR. MASTER:  That's completely irrelevant

5   and calls for a legal conclusion.  Argumentative.   01:55

6           Go ahead.

7           THE WITNESS:  I have no -- I have no

8   opinion.

9           MR. ROBINSON:  All right.  Why don't we

10  take a five-minute break here.                      01:55

11          THE VIDEOGRAPHER:  Going off the record.

12  The time now is 1:56.

13          (Off the record.)

14          THE VIDEOGRAPHER:  Back on the record.

15  The time now is 2:04.                               02:04

16          MR. ROBINSON:  So why don't we start with

17  John.  You wanted to -- I guess you're leaving us,

18  John.  So --

19          MR. KILLEEN:  At least temporarily.  So,

20  for the record, I will be dropping off the          02:04

21  deposition for some period of time.  If you've

22  concluded in that time, we will waive our right

23  to ask the chief any questions.  If I return, I

24  will let you know, if the deposition is still going

25  on.

```
1            (Plaintiff's Exhibit 260 marked

2            for Identification.)

3   BY MR. ROBINSON:

4       Q.  Okay.  So I just marked another exhibit,

5   Exhibit 260.  And it's multiple pages.  It's MP

6   1858 through MP 1866.  Is that accurate?

7       A.  Yes.

8       Q.  Do you recognize this to be a police

9   report as generated by the Menlo Park Police

10  Department?

11      A.  Yes.

12      Q.  After Mr. Zeleny's criminal case for

13  concealed carry was resolved, did you have any

14  discussions with the DA about that case, or the

15  DA's office?

16      A.  About which one?  The one I'm looking at

17  right now or the prior?

18      Q.  No.  No.  The one we were talking about

19  earlier.  So the criminal case against Mr. Zeleny

20  for concealed carry, after that case was resolved,

21  did you have any discussion with the DA's about it?

22      A.  I did not.

23      Q.  Did you have any discussions with anybody

24  about it?

25      A.  Not that I recall.
```

Page 360

```
 1          THE REPORTER:  Excuse me.  This is the
 2     court reporter.  Technical difficulties.  Just give
 3     me two minutes, please.
 4          (Off the record.)
 5          THE REPORTER:  Thank you.  Go ahead.        02:07
 6     BY MR. ROBINSON:
 7        Q.  Has Mr. Zeleny conducted any protests in
 8     the city of Menlo Park that you're aware of since
 9     his criminal case was resolved?
10        A.  Not that I recollect.                     02:08
11        Q.  Has Mr. Zeleny, to your knowledge, carried
12     any -- openly carried any unloaded firearms in the
13     City of Menlo Park since his criminal case
14     resolved?
15        A.  I don't -- I'm unsure of the date of the  02:08
16     criminal case resolving, and if he continued after
17     that or not, I don't recall.
18        Q.  When is the last time that you're aware of
19     that Mr. Zeleny has carried a firearm of any kind
20     in the city of Menlo Park?                       02:08
21        A.  I don't recall.  It would have to be an
22     estimate.  It would be prior to the legislation
23     about open carry of long guns.  So I think that was
24     2014, if I remember correctly.
25        Q.  So in approximately the past six years,   02:09
```

1   you're not aware of Mr. Zeleny ever carrying a

2   firearm in the city of Menlo Park.  Is that

3   accurate?

4       A.  I can't be specific about the dates.  Like

5   six years, it could be five years and a half, it      02:09

6   could be five, six and a half, but, yes.

7       Q.  Do you -- at the current time, do you

8   suspect Mr. Zeleny of committing any crime?

9       A.  No.

10      Q.  I'm sorry.  I didn't catch that.              02:09

11      A.  No.

12      Q.  When is the last time that you suspected

13  Mr. Zeleny of committing or being about to commit a

14  crime?

15      A.  I believe the situation that we just          02:09

16  discussed with the concealed weapon.

17      Q.  Do you still have your Zeleny file, your

18  personal file?

19      A.  It still exists in the chief's office.

20      Q.  And the Menlo Park Police Department still    02:10

21  maintains that binder of sensitive information

22  about Mr. Zeleny; correct?

23      A.  Yes.

24      Q.  And that's the case, even though he's not

25  been suspected of committing a crime in five years    02:10

Veritext Legal Solutions
866 299-5127

```
 1   or more; correct?

 2       A.  Correct.

 3       Q.  Why don't we mark -- I'm going to mark

 4   another exhibit here.

 5           Before I do that, is it consistent with      02:10

 6   the policy of the Menlo Park Police Department to

 7   maintain a file on a protester who has not

 8   protested in the city for more than five years?

 9       A.  When we're being sued in federal court, it

10   is; we don't destroy anything.                       02:11

11       Q.  And you continued to maintain the file

12   between 2014 and 2017; correct?

13       A.  Correct.

14       Q.  And during that time, you were not being

15   sued, were you, by Mr. Zeleny?                       02:11

16       A.  No, but there was a process of trying to

17   obtain a special events permit and then a film

18   permit during that time.

19       Q.  Did your personal file about Mr. Zeleny

20   pertain to the film permit or the special events    02:11

21   permit?

22       A.  There was documents, e-mails that I

23   printed out, and that would go into that file.

24       Q.  Did your past interactions with and

25   knowledge about Mr. Zeleny impact the special       02:12
```

Veritext Legal Solutions
866 299-5127

```
 1   events permitting process?

 2          MR. MASTER:  Objection.  Vague and

 3   ambiguous and overbroad.

 4          Go ahead.

 5          THE WITNESS:  I never had any face-to-face    02:12

 6   contact with Mr. Zeleny prior to the hearing at the

 7   city managers's level.  And I have no feelings at

 8   all regarding Mr. Zeleny.

 9   BY MR. ROBINSON:

10      Q.  Okay.  Did your past knowledge of            02:12

11   Mr. Zeleny and the past dealings with the Menlo

12   Park Police Department with Mr. Zeleny impact his

13   special events permit process?

14      A.  Only from the perspective of historical

15   knowledge of what he has done in the past and to     02:12

16   put that into perspective as a special event, what

17   was contemplated in the special event permit.

18      Q.  How did your historical knowledge of what

19   Mr. Zeleny had done in the past put into context

20   the special event permit application?                02:13

21      A.  It went towards trying to understand what

22   it was that he was attempting to do.  Many of his

23   e-mails were somewhat convoluted and rambling, and

24   it was sometimes difficult to understand him.  So

25   using the historical perspective, it was easier to   02:13
```

Veritext Legal Solutions
866 299-5127

```
 1   put into perspective what exactly was he looking to
 2   get the permit to do.
 3           (Plaintiff's Exhibit 261 marked
 4            for Identification.)
 5   BY MR. ROBINSON:                                    02:13
 6       Q.  All right.  So I've marked as Exhibit 261
 7   a multiple-page document, three pages, MP 219
 8   through 221.  Is that accurate?
 9       A.  Yes.
10       Q.  Do you recognize this document?            02:13
11       A.  I recognize it.  I recognize it as an
12   e-mail.
13       Q.  It's a chain of e-mails, including you;
14   right?
15           MR. MASTER:  Which e-mail are you looking   02:14
16   at?
17           MR. ROBINSON:  I'm looking at the chain of
18   e-mails that we've marked as Exhibit 261.
19           THE WITNESS:  It is a thread of e-mails,
20   that's correct.                                     02:14
21   BY MR. ROBINSON:
22       Q.  And these e-mails relate to launching a
23   new special event permit process within the City of
24   Menlo Park; correct?
25       A.  That's correct.                             02:14
```

Veritext Legal Solutions
866 299-5127

1     Q. Was there a team within the City of Menlo

2 Park responsible for putting in place this new

3 special event process?

4     A. Yes.

5     Q. Who was on that team, to your knowledge?   02:14

6     A. The people that are listed in the e-mail.

7     Q. So you were on the team that was involved

8 in developing the new process?

9     A. I was on the -- I wasn't on the team per

10 se, but I was asked for opinions about the process,   02:14

11 as I had brought up issues about past permits that

12 had been given for certain events, like birthday

13 parties that were closing down streets. So I

14 was -- although not on the committee per se, I was

15 asked for my opinion as the police commander.   02:15

16     Q. Was Sergeant Kaufman on the committee?

17     A. Yes. She was our representative on the

18 committee.

19     Q. Was Mr. Zeleny ever discussed in

20 connection with setting up this new special event   02:15

21 process?

22     A. No, never.

23     Q. Do you know when the new special events

24 process was first published on the City's website?

25     A. I don't recall.   02:15

Veritext Legal Solutions
866 299-5127

1      Q.  Are you aware of any changes to the City's

2   website, as related to special events permits,

3   during Mr. Zeleny's prosecution?

4      A.  Not that I'm aware of.

5      Q.  I'm going to go ahead and take a look        02:15

6   at -- I'm copying a document to the "Marked

7   Exhibits" folder.  The document name is "Special

8   Events Flowchart," Exhibit 30.

9      A.  I see it.

10      Q.  This was previously marked at your prior      02:16

11   session of the deposition.  But you recognize this

12   to be the flowchart for how special events permits

13   are handled within the City of Menlo Park; correct?

14      A.  Correct.

15      Q.  And it looks like this version, if you go     02:17

16   to the last page at the very bottom, was updated

17   July 24, 2014?

18      A.  That's what the document says.

19      Q.  Has the process reflected in this

20   flowchart been the process in place since 2014?     02:17

21      A.  I don't know.

22      Q.  Reviewing this document, is it consistent

23   with how the process is handled currently?

24      A.  I don't know the answer to that.  Many of

25   these people who are on here don't work for the     02:17

Veritext Legal Solutions
866 299-5127

1    City of Menlo Park anymore.

2        Q.  Was this the process that was in place

3    when the City was processing Mr. Zeleny's permit

4    application?

5        A.  To the best of my recollection, it was.        02:17

6        Q.  I'm going to -- I'm going to now open

7    another previously marked exhibit.  So I've added a

8    new document, "Special Events Permit FAQ."  It

9    looks like this was previously marked as Exhibit 33

10   in your prior deposition.                              02:18

11       A.  It's at the bottom of the list.  I do see

12   it now.

13       Q.  Is this the City's published frequently

14   asked questions for the special events permit

15   process?                                               02:19

16       A.  As of the time it was printed, yes.

17       Q.  Was this the FAQ at the time of

18   Mr. Zeleny's application?

19       A.  To the best of my recollection -- well,

20   this document was updated July of 2016.  So I'm not   02:19

21   sure which document -- FAQs were up on the website

22   at the time of the -- of his application.

23       Q.  So let's go to MP 1820, if you could.

24       A.  Okay.

25       Q.  Under the section "What if my permit is       02:19

```
 1    denied," it says, "Determination of the approval or
 2    denial of any application is at the discretion of
 3    the special event permit committee."
 4            Do you see that?
 5       A.  Are you talking, like, the last paragraph?    02:20
 6    "What if my permit is denied?"
 7       Q.  Correct.
 8       A.  I see that.
 9       Q.  Was it true, at the time that Mr. Zeleny
10    applied for a special event permit, that the        02:20
11    approval or denial of his permit was at the
12    discretion of the special event permit committee?
13       A.  Yes.
14       Q.  What limits were there on the discretion
15    of the special event permit committee to approve or 02:20
16    deny Mr. Zeleny's application?
17            MR. MASTER:  Objection.  Vague and
18    ambiguous.  Overbroad.  Lacks foundation.  Calls
19    for speculation.
20            You can answer.                              02:21
21            THE WITNESS:  If I -- you need to repeat
22    that question.  I didn't get it.
23    BY MR. ROBINSON:
24       Q.  Let me ask a slightly different question.
25            Were there any written policies that         02:21
```

Veritext Legal Solutions
866 299-5127

```
1    you're aware of that governed how the special event
2    permit committee would exercise its discretion on
3    permit applications?
4            MR. MASTER:  Objection.  Vague and
5    ambiguous.  Overbroad.                          02:21
6            You can answer.
7            THE WITNESS:  The documents all speak for
8    themselves.  We've provided all the documents that
9    would be involved in this decision-making process.
10   BY MR. ROBINSON:                                02:21
11       Q.  Are there any -- other than the documents
12   you've provided, are there any other guidelines
13   governing how the special event permit committee
14   would exercise discretion as to special event
15   permits during the period that Mr. Zeleny was     02:21
16   applying for a permit?
17       A.  Well, certainly there would be other --
18   other laws, whether they be local, state, federal
19   laws, that could impact whether or not the special
20   events committee were to deny or approve, and those  02:22
21   would be, you know, written.  There's no unwritten
22   rules as far as this goes, but, again, it's really
23   based on a case-by-case basis.
24       Q.  When this -- this document refers to a
25   special events permit committee.  What was that     02:22
```

Page 370

```
 1   committee?

 2        A.  It was -- it's a representative from each

 3   department in the City.

 4        Q.  And how are the representatives selected

 5   to serve on that committee?                         02:22

 6        A.  By the departments themselves, by the

 7   department head or me.

 8        Q.  Were you ever on the special events permit

 9   committee?

10        A.  As I stated already, I was not on the      02:23

11   committee itself, but I was -- I did give input to

12   the original committee that was putting together

13   the criteria for special events permits.

14        Q.  We talked a lot last time about what

15   qualifies as a special event.  Do you recall that?  02:23

16        A.  I do.

17        Q.  Who makes the decision, in reviewing a

18   permit application, about whether the event is a

19   special event?

20        A.  Normally, it would be the special events   02:23

21   committee.

22        Q.  That's the group of people from each

23   department?

24        A.  Correct.

25        Q.  Who in that group, if anyone, decided that 02:23
```

```
 1   Mr. Zeleny didn't qualify for special events?

 2         MR. MASTER:  Objection.  Vague and

 3   ambiguous.

 4         MR. ROBINSON:  Let me ask you a different

 5   question.                                    02:23

 6   BY MR. ROBINSON:

 7      Q.  At some point, the City determined that

 8   Mr. Zeleny's permit didn't qualify as a special

 9   event; correct?

10      A.  Correct.                              02:24

11      Q.  Who made that determination for the City?

12      A.  That was the city attorney's office.

13      Q.  How did the city attorney's office get

14   involved in Mr. Zeleny's permit application?

15      A.  Because they are also a City department,  02:24

16   and there were legal questions that needed to be

17   answered and legal advice that needed to be given.

18   So we went to the -- our legal advisors, who are

19   the city attorneys.

20      Q.  Are you aware of any other permit         02:24

21   applications where the city attorney's office has

22   been consulted?

23      A.  I'm aware of a few.

24      Q.  Can you estimate how many?

25      A.  Less than six.                            02:24
```

Veritext Legal Solutions
866 299-5127

```
1        Q.  Let's take a look at -- before we go on,
2    actually, do you know who first contacted the city
3    attorney's office to get feedback on Mr. Zeleny's
4    permit application?
5        A.  I don't recall who contacted them first.      02:25
6        Q.  So I've added a previously marked exhibit.
7    The name is 1507170 Zeleny Initial Application, 95.
8    It's a document that was previously marked as
9    Exhibit 95.
10         Has it come up on your screen yet?              02:26
11       A.  Not yet.  Okay.  I got it.  1507170?
12       Q.  Correct.
13       A.  Okay.
14       Q.  For the record, it's multiple pages, MP
15   234 through MP 240; correct?                          02:26
16       A.  Yes.
17       Q.  Do you recognize this?
18       A.  I recognize it as an e-mail with a special
19   events application attached.
20       Q.  The e-mail is an e-mail from Mr. Zeleny;      02:26
21   correct?
22       A.  Well, I don't know who that e-mail address
23   belongs to, but it says "on behalf of Michael
24   Zeleny."
25       Q.  Okay.  And if you go to page MP 236, it       02:27
```

Veritext Legal Solutions
866 299-5127

1 appears to be a special event application; is that

2 correct?

3     A.  That is correct.

4     Q.  And the applicant name there is Michael

5 Zeleny?                                                02:27

6     A.  Correct.

7     Q.  Do you recognize this to be Mr. Zeleny's

8 special event permit application from 2015?

9     A.  Yes.

10     Q.  And if you go through the application        02:27

11 itself, it appears that Mr. Zeleny has filled in

12 all of the boxes and questions on the permit

13 application; correct?

14         MR. MASTER:  Read through the entire

15 document.                                             02:27

16         THE WITNESS:  I'm going to have to read

17 through the entire document.

18         MR. ROBINSON:  That's fine.

19 BY MR. ROBINSON:

20     Q.  The question is just, are all the boxes      02:28

21 filled out and all the questions answered?

22     A.  Then my answer would be it's not 100

23 percent completely filled out.

24     Q.  What is missing?

25     A.  Teardown, cleanup.                           02:28

1     Q.  Okay.  Other than teardown, cleanup, is it

2  missing any other required information?

3     A.  The question, "Event is recurring more

4  than annually" is not checked yes or no.

5     Q.  Okay.  Anything else?            02:29

6     A.  And I don't see a detailed outline of the

7  event site.  On page Bates No. MP 238 at the top,

8  Section 3, it specifies, "Please provide a detailed

9  site plan route map of the event on a separate

10  sheet."  And I don't see that attached to this.    02:29

11  Aside from that, it's completely filled out.

12     Q.  In 2015, if an applicant for a special

13  event permit submitted an incomplete application,

14  what was the process for getting more information?

15     A.  That would be something that community    02:30

16  services -- whoever is in charge of the process

17  would have to request that information.

18     Q.  And how would they go about requesting

19  more information?

20     A.  Any way they could contact the person,    02:30

21  e-mail, phone, in person.  It depends on the

22  situation.

23     Q.  Let's take a look at Exhibit 30 again in

24  the same "Marked Exhibits" folder.

25     A.  Okay.                       02:30

Veritext Legal Solutions
866 299-5127

1          MR. MASTER:  What was that one called,

         2   again; Exhibit 30?

         3          MR. ROBINSON:  Special Event Flowchart.

         4          THE WITNESS:  Yes.

         5   BY MR. ROBINSON:                              02:31

         6      Q.  So under the section "More Information

         7   Needed," do you see that?

         8      A.  Yes.

         9      Q.  So let's actually go up to "Application

        10   Received, Step B."  If it's an incomplete      02:31

        11   application, Mr. Milde is supposed to respond to

        12   the applicant, correct, under the ordinary process

        13   as it was in effect in 2015?

        14      A.  I don't believe it actually says that.  It

        15   says whether it's approved or not approved.  I   02:31

        16   don't see "More Information Needed" until down --

        17   the first time you had me look for it.  I don't see

        18   "More Information Needed" on the bottom.

        19      Q.  All right.  Fair enough.

        20          So in the "More Information Needed"        02:32

        21   section, if more information is needed, the

        22   flowchart suggests that Matt Milde will confirm a

        23   meeting time with the applicant.

        24          Do you see that?

        25      A.  Yes.                                     02:32

                                                Page 376

1     Q.  Was that the ordinary process for

2  requesting more information from an applicant in

3  2015?

4     A.  Yes.

5     Q.  Was that process followed in Mr. Zeleny's   02:32

6  case?

7     A.  To the best of my recollection, it was.

8  Someone from the City requested more information.

9  I'm not sure who it was.

10     Q.  Did Mr. Milde, to your knowledge, reach   02:32

11  out to Mr. Zeleny to set up a meeting?

12     A.  I don't know.

13     Q.  Did you participate in any meeting?

14     A.  With whom?

15     Q.  With Mr. Zeleny and Mr. Milde.   02:32

16     A.  No.

17     Q.  Do you know if anyone else at the police

18  department participated in a meeting with Mr. Milde

19  and Mr. Zeleny?

20     A.  No.   02:33

21     Q.  Do you know whether anyone at the City of

22  Menlo Park tried to set up a meeting with

23  Mr. Zeleny to get more information about his

24  application?

25     A.  I believe the request for more information   02:33

```
 1    was done via e-mail.
 2        Q.   Okay.  Do you know if anyone tried to set
 3    up a meeting with Mr. Zeleny to get more
 4    information?
 5        A.   I don't know.                              02:33
 6        Q.   Part of the ordinary process to get more
 7    information is to set up a meeting; right?
 8        A.   According to the flowchart, yes.
 9        Q.   According to the written flowchart,
10    Mr. Milde is supposed to confirm a meeting time    02:33
11    with the applicant to get more information;
12    correct?
13            MR. MASTER:  Objection.  That misstates
14    the document.
15            THE WITNESS:  There's a detailed --        02:34
16    according to this flowchart, there's a detailed
17    review of the application, and it says "Matt Milde
18    confirms the meeting time with the applicant."  The
19    documents speak for itself.
20    BY MR. ROBINSON:                                   02:34
21        Q.   Does the document describe the ordinary
22    process for permit applications in 2015 when
23    Mr. Zeleny applied for a permit?
24            MR. MASTER:  Objection.  Asked and
25    answered.  Argumentative.  Vague and ambiguous.    02:34
```

Veritext Legal Solutions
866 299-5127

```
 1    Overbroad.

 2          Go ahead.

 3          THE WITNESS:  Yes.

 4    BY MR. ROBINSON:

 5       Q.  And part of the ordinary process of        02:34

 6    processing a permit application when Mr. Zeleny

 7    applied was if more information was needed,

 8    Mr. Milde would confirm a meeting time with the

 9    applicant; correct?

10          MR. MASTER:  Objection.  Vague and          02:34

11    ambiguous and overbroad.  Misstates the document.

12           Go ahead.

13          THE WITNESS:  Somehow, if more information

14    was needed, someone would have to recontact the

15    applicant in some fashion or manner and get that   02:34

16    information.  And that's what I believe this

17    document is saying on its face.

18    BY MR. ROBINSON:

19       Q.  The section there is headed "Meeting With

20    Applicant"; correct?                              02:35

21       A.  I see that.  Yes.

22       Q.  Does that suggest to you that the written

23    policy of the City of Menlo Park, if more

24    information was needed, was to set up a meeting

25    with the applicant?                               02:35
```

                                              Page 379

```
1      A.  I disagree.  No.  A meeting in and of

2   itself could be on the phone.  It could be -- it

3   could be via e-mail.  It doesn't necessarily have

4   to be a face-to-face meeting, no.

5      Q.  So your interpretation of the flowchart      02:35

6   published by the City of Menlo Park is that

7   "meeting with applicant" could mean a phone call or

8   e-mail?

9      A.  Certainly.  It's gathering more

10  information.  That's what the whole purpose of      02:35

11  "more information needed" means.

12     Q.  And when it says "Mr. Milde confirms

13  meeting time with applicant" under the box below

14  that, that means he confirms the meeting time of an

15  in-person meeting or a phone call or an e-mail?     02:36

16     A.  If more information is needed, Matt Milde

17  is the person who is going to get that information.

18  Yes, it would be Matt Milde in most cases that

19  would be asking for more information, whether it be

20  in person, by phone, via e-mail or any other method  02:36

21  of communication.

22     Q.  And the next bullet point, "Team meets

23  with applicant to review details."  In your view of

24  this policy of the City of Menlo Park, that could

25  mean an in-person meeting, a phone call or an       02:36
```

Page 380

1   e-mail?

2        A.  Correct.

3        Q.  Did the special events permitting team

4   meet with Mr. Zeleny under any of those mechanisms,

5   to your knowledge?                                    02:36

6        A.  Yes.  There was numerous exchanges of

7   e-mails with Mr. Zeleny, requesting more

8   information, by both the community services

9   department and the city attorney's office.

10       Q.  Did the other city departments that are    02:37

11  part of the special events permit team participate

12  in this?

13       A.  Not that I'm aware of.

14       Q.  Are you aware of any phone calls with

15  Mr. Zeleny, prior to the initial denial of this      02:37

16  permit, about the permit?

17       A.  I don't know -- I don't know of any phone

18  calls.

19       Q.  And are you aware of any attempts to

20  arrange phone calls or in-person meetings with       02:37

21  Mr. Zeleny before the denial of his permit?

22       A.  Based on the fact that he was in Southern

23  California, no.

24       Q.  Is -- okay.  Do you know if anyone at the

25  City of Menlo Park asked Mr. Zeleny if he'd like to  02:37

```
 1    attend an in-person or telephone meeting?
 2        A.  I don't know if anybody asked that
 3    question.
 4        Q.  When those e-mail meetings took place, had
 5    the City determined whether to grant or deny       02:38
 6    Mr. Zeleny's application?
 7        A.  I don't know.  I don't know the timing of
 8    it.
 9            MR. MASTER:  Vague and ambiguous.
10    BY MR. ROBINSON:                                   02:38
11        Q.  Do you recall the City requesting more
12    information from Mr. Zeleny after having already
13    made a determination to deny his application?
14        A.  I don't recall.
15        Q.  Do you recall any reason for asking        02:38
16    Mr. Zeleny for more information after the City had
17    already decided to deny his application?
18        A.  I believe that based on the application as
19    it stood, it would have been -- it was going to be
20    denied, but if Mr. Zeleny answered the questions   02:39
21    that were asked via e-mail by the city attorney's
22    offices and community services department, then the
23    application could be modified or mitigation could
24    be put into it that would allow it to be, in fact,
25    permitted or approved.                             02:39
```

Page 382

1      Q.  What information could Mr. Zeleny have

2  provided to you that would have caused the City to

3  grant his permit application?

4      A.  Nothing, to me.  I am not the decision

5  maker on whether a permit is approved or denied.      02:39

6  It was the city attorney's office that was asking

7  for more specific details that can be found in the

8  e-mail exchange with Mr. Zeleny.  I don't have

9  independent recollection, as I sit here today,

10  about every single piece of information that was     02:39

11  asked.

12      Q.  Did the city attorney's office make the

13  decision to deny Mr. Zeleny's permit application?

14      A.  No.  Originally, it was the community

15  services department that made that decision.         02:39

16      Q.  How did the community services department

17  make that decision?

18      A.  You would have to go back to the document

19  that was written, the letter that was written to

20  Mr. Zeleny and review that document.                 02:40

21      Q.  Did Mr. Milde make the decision?

22      A.  I think -- I believe Mr. Milde is the one

23  who communicated the decision to Mr. Zeleny.

24      Q.  So not who communicated it.  Who made the

25  decision?                                            02:40

Veritext Legal Solutions
866 299-5127

1     A.  That would be a collective decision with

2  the city attorney's office and the special events

3  coordinator, who is Matt Milde.

4     Q.  Were you involved in that discussion?

5     A.  I was not involved in the discussion of          02:40

6  the decision to be made, no.  From the police

7  department's perspective, I gave our concern, as I

8  testified last time we spoke, and then the city

9  attorney asked their follow-up questions and spoke

10  with Matt Milde, and the decision was made to deny     02:41

11  it as the permit was submitted.

12     Q.  Are you aware of any information -- as the

13  designated person most qualified for the City of

14  Menlo Park to testify about Zeleny's permit

15  application, are you aware of any information that     02:41

16  Zeleny could have submitted in connection with his

17  initial application that would have caused it to be

18  granted?

19     A.  Yes.  If he had answered the questions

20  that were posed to him by the city attorney in a      02:41

21  way that satisfied them, then the permit would have

22  been issued.

23     Q.  All right.  I'm going to go ahead and mark

24  another exhibit.

25        What are we up to now?                          02:41

```
 1          THE REPORTER:  The next one will be 262.

 2          (Plaintiff's Exhibit 262 marked

 3          for Identification.)

 4   BY MR. ROBINSON:

 5      Q.  Let me know when that pops up on your        02:42

 6   screen.  It looks like it's a marked version.

 7   That's fine.

 8          MR. MASTER:  Hold on a second, guys.  Mine

 9   is taking longer to open up.

10   BY MR. ROBINSON:                                   02:42

11      Q.  Okay.  So we've marked as Exhibit 262 a

12   three-page document, MP 258 to 260.  Is that

13   accurate?

14      A.  Yes.

15      Q.  Do you recognize this document?             02:43

16      A.  It is an e-mail.

17      Q.  An e-mail that you sent; right?

18      A.  Correct.

19      Q.  It's an e-mail that you sent, among other

20   people, to David Tresmontan at NEA; correct?       02:43

21      A.  Yes.

22      Q.  And to a representative of the Rosewood

23   Hotel?

24      A.  Correct.

25      Q.  In the second paragraph of this e-mail,     02:43
```

Veritext Legal Solutions
866 299-5127

```
 1    it's circled or boxed in red.  You write:
 2    "Although we intend to deny this application on
 3    several grounds..."
 4          Do you see that?
 5       A.  I do.                                    02:43
 6       Q.  When you wrote this e-mail to NEA and to
 7    the Rosewood Hotel and others, the City of Menlo
 8    Park intended to deny Zeleny's permit application;
 9    correct?
10       A.  Well, that was information I was given    02:43
11    from the city attorney's office based on the
12    application as it was written.  If Mr. Zeleny had
13    not given responses to the questions that were
14    asked, it would be denied, that's correct.
15          MR. ROBINSON:  So I'm going to object and   02:44
16    move to strike everything, other than "correct," as
17    nonresponsive.
18    BY MR. ROBINSON:
19       Q.  The intention of the City of Menlo Park,
20    when you wrote this e-mail, was to deny the        02:44
21    application; correct?
22       A.  This is information I received from the
23    city attorney's office.
24       Q.  The information you received from the city
25    attorney's office was that the City of Menlo Park   02:44
```

Veritext Legal Solutions
866 299-5127

1    intended to deny the application; correct?

2        A.  Intended to deny the application as it

3    stood at that time.

4        Q.  Okay.  So in parentheses, following that

5    statement, you say "Predominantly, this is not a          02:44

6    special event, as defined by the City."  Do you see

7    that?

8        A.  I do.

9        Q.  What additional information about his

10   event could Mr. Zeleny have provided to make it a         02:44

11   special event, as defined by the City?

12       A.  This was something that came from the city

13   attorney's office.  This is one of the things that

14   they stated about it.  So this was their

15   determination, not mine.                                  02:45

16       Q.  Do you know what they relied on to decide

17   that it wasn't a special event?

18       A.  No.

19       Q.  Do you agree that it wasn't a special

20   event?                                                    02:45

21           MR. MASTER:  Objection.  Asked and

22   answered last time, Counsel.  Argumentative.

23           Go ahead.

24           THE WITNESS:  Based on the criteria of the

25   FAQs, technically, it would be a special event.           02:45

```
1    The only concern or the issue, in my opinion, would
2    be the initial application that made it indefinite.
3    If it's indefinite ongoing, then we're selling this
4    person land to do whatever they want for the rest
5    of time.  So in that case, it would be difficult to    02:45
6    describe it as a, quote, unquote, special event.
7    BY MR. ROBINSON:
8       Q.  Is that factor, limited time duration, set
9    out in any City policy or procedure?
10           MR. MASTER:  Objection.  Asked and              02:45
11   answered.
12           THE WITNESS:  Time, place and manner are
13   the things that the City would be looking at, and
14   when you're talking about time, indefinite --
15   although there's nothing written specifically about    02:46
16   how long a special event can occur, indefinite, in
17   my opinion, is not appropriate.  That would be
18   forever.
19   BY MR. ROBINSON:
20      Q.  Whether an event is indefinite, is that         02:46
21   one of the written factors anywhere in the City's
22   determination of special event permits?
23      A.  As I stated today and the last time we
24   spoke, there is nothing written about how long a
25   special event may go on.  The point is that when it    02:46
```

Veritext Legal Solutions
866 299-5127

```
 1    is, in fact, being indefinite, that creates a whole
 2    other issue regarding whether or not this permit
 3    could be, in fact, allowed.
 4        Q.  In the same paragraph, you note, Although
 5    we, meaning the City, intend to deny this              02:46
 6    application on several grounds, we were in the
 7    process of requesting more information from him on
 8    the exact location he was intending, as it is not
 9    clear on the application.
10        Do you see that?                                   02:47
11        A.  Yes.
12        Q.  Is this consistent with your understanding
13    at the time, that the City intended to deny the
14    application but was going to request additional
15    information from Mr. Zeleny about the location?        02:47
16        A.  The City was going to deny the application
17    based on the application as it stood at that time,
18    with the caveat that they were going to be asking
19    for further information that if Mr. Zeleny
20    provided, we could go forward with the application     02:47
21    process.
22        Q.  Would the exact location of the event make
23    it a special event somehow?
24        MR. MASTER:  Confusing and unintelligible.
25    Vague and ambiguous.                                   02:47
```

Page 389

```
 1            THE WITNESS:  I don't understand what
 2      you're asking there.
 3      BY MR. ROBINSON:
 4         Q.  Okay.  So the intention on the part of the
 5      City at this point was to deny the application      02:47
 6      because it wasn't a special event; right?
 7            MR. MASTER:  Misstates his testimony.
 8            Go ahead.
 9            THE WITNESS:  That was one issue.  The
10      rest of the issues were communicated to Mr. Zeleny.  02:48
11      BY MR. ROBINSON:
12         Q.  Would the exact location of the event
13      change whether or not it met the definition of a
14      special event?
15         A.  The exact location of the event is           02:48
16      required by the permit.  It doesn't matter whether
17      it's a special event or not.  It's one of the
18      things we need to know, is exactly where it's going
19      to occur, or we cannot process the permit
20      correctly.                                          02:48
21         Q.  So regardless of with how much specificity
22      Mr. Zeleny advised of his location, he still
23      wouldn't qualify as a special event; correct?
24            MR. MASTER:  Vague and ambiguous and
25      overbroad.  Confusing and unintelligible.          02:48
```

Veritext Legal Solutions
866 299-5127

1         THE WITNESS:  I don't know how to answer

 2    that.  I don't know how to answer that.

 3    BY MR. ROBINSON:

 4       Q.  So what information could Mr. Zeleny have

 5    given you in July of 2015 about the exact location    02:49

 6    of his event that would have made it qualify as a

 7    special event?

 8         MR. MASTER:  Objection.  Confusing.

 9    Unintelligible.  Vague and ambiguous and overbroad.

10         THE WITNESS:  The location or lack of           02:49

11    specific location does not correlate to whether

12    it's a special event or not.  I don't understand

13    where you're going with this, what you're asking.

14    We're asking for specific -- specific location, as

15    is required by the application, so we can take       02:49

16    steps to determine whether or not we could approve

17    the permit.  That has nothing to do as to whether

18    it's a special event or not.  So I'm not sure why

19    you're trying to equate those.

20    BY MR. ROBINSON:                                     02:49

21       Q.  At this point in July of 2015, the City

22    already intended to deny Mr. Zeleny's permit

23    application; correct?

24         MR. MASTER:  Objection.  Asked and

25    answered, Counsel.  Enough.                          02:50

                                            Page 391

1        One more time, answer it, and we're done

2     with that question.

3            MR. ROBINSON:  You can go ahead and

4     answer.

5            MR. MASTER:  One more time and we're done      02:50

6     with that question, Counsel.

7            THE WITNESS:  As I've stated several times

8     now, that at the time, the city attorney, based on

9     how the application stood at that moment, was

10    planning on denying it but was asking for further      02:50

11    information, that if that information had come in

12    and we could continue it, then the permit could

13    have gone on.

14    BY MR. ROBINSON:

15       Q.  If Mr. Zeleny had provided the information      02:50

16    that you're referring to in this e-mail, about the

17    exact location he was intending, would the permit

18    have been granted?

19       A.  Again, I don't understand how you're

20    trying to equate the location with it being a          02:51

21    special event.  The specific location was one piece

22    of information, just one, that was being requested

23    by the city attorney's office.

24            There was other information that was also

25    requested.  It just so happens that I said            02:51

                                               Page 392

1  something about it in this e-mail, but that was

2  just one piece of information that was being

3  requested because we needed to know, if we were

4  going to grant a permit to him, the exact location

5  of where he wants to do what he wants to do.          02:51

6      Q.  What information could -- at this time in

7  July 2015, what information could Mr. Zeleny have

8  given the City that would have resulted in his

9  application being granted?

10     A.  The information that the city attorney's      02:51

11  office asked him for in -- I believe it was an

12  e-mail or letter.

13     Q.  If Mr. Zeleny had given the city attorney

14  the information that the city attorney asked for,

15  would his application have been approved?            02:52

16     A.  It may have been.  I don't know.  I

17  can't -- I can't speculate as to what information

18  he'd give us.

19     Q.  In the first paragraph of this e-mail, you

20  start out by saying, "As you are aware, Michael      02:52

21  Zeleny is submitting an application."  Do you see

22  that?

23     A.  Yes.

24     Q.  Did you have any previous communications

25  with the people on this e-mail about Mr. Zeleny's    02:52

Page 393

```
 1    application?
 2        A.  I didn't.  Mr. Zeleny did.
 3        Q.  Why did you contact the people on this
 4    e-mail thread to -- strike that.
 5            Why did you advise the people on this      02:52
 6    e-mail thread that the City intended to deny the
 7    application?
 8        A.  Because that is what I was told by the
 9    city attorney's office at the time.
10            MR. MASTER:  Hold on.  I'll move to         02:52
11    strike.  It's attorney-client-privileged
12    communication.  Move to strike that testimony as
13    attorney-client-privileged communication.  Any
14    communication he received from the city attorney's
15    office is barred and confidential.                 02:53
16    BY MR. ROBINSON:
17        Q.  So without telling me anything that the
18    city attorney told you -- and I'm not concerned
19    about the substance of your communications with the
20    city attorney -- why did you decide to send this   02:53
21    e-mail that we're looking at, Exhibit 262?
22        A.  Because these are the people who were
23    stakeholders in the original issues with
24    Mr. Zeleny, both at NEA, Rosewood, who were the two
25    largest entities that had concerns about him coming 02:53
```

1    to the property and protesting armed.

2         The other folks are all law enforcement

3    folks who also would deal with Mr. Zeleny because

4    his protests went outside of Menlo Park.  So there

5    are representatives from the sheriff's office, the      02:54

6    district attorney's office and also my other

7    command staff members, the commander and a chief.

8        Q.  I'm going to move in an exhibit now that's

9    been previously marked.  This is Exhibit -- so the

10   file name is 150722, Bertini Meeting, 81.              02:55

11       A.  Okay.

12       Q.  For the record, it's MP 266 through 274;

13   right?

14       A.  Correct.

15       Q.  And this is an e-mail you sent out to          02:55

16   various people with the subject line "Open Carry

17   Suspect - Michael Zeleny"?

18       A.  Yes.  I sent the e-mail.  The recipients

19   are the District Attorney Steve Wagstaffe,

20   Assistant District Attorney Karen Guidotti and         02:55

21   Assistant District Attorney Al Serrato, along with

22   the city attorney, Bill McClure, and my police

23   chief, Robert Jonsen, at the time.

24       Q.  So I want to talk about the third

25   paragraph.  Strike that.                               02:56

                                              Page 395

```
 1            In this e-mail, you refer to an open-carry
 2     suspect.  Do you see that?
 3         A.  Yes.
 4         Q.  What was Mr. Zeleny suspected of at the
 5     time of this e-mail?                              02:56
 6         A.  Nothing that I was aware of.
 7         Q.  In the third paragraph of this e-mail, it
 8     starts off with, "In discussions with our City
 9     Attorney Bill McClure, we are sure we are on solid
10     ground to deny his application."                  02:56
11            Do you see that?
12         A.  I do.
13         Q.  Had the City made a decision at this point
14     that it was going to deny Mr. Zeleny's application?
15         A.  At the time of the writing of this e-mail,  02:57
16     as the application stood, the answer is yes.
17         Q.  And the reason, again, is because it did
18     not comply with the City definition of a special
19     event; correct?
20         A.  That was one -- one reason that the city   02:57
21     attorney -- city attorney's office had, but there
22     were several other reasons, also.
23         Q.  And in this e-mail, you notified this
24     group that you will complete appropriate due
25     diligence and notify him, meaning Zeleny, of the   02:57
```

                                                  Page 396

1  denial; right?

2     A.  Where does it say that?

3     Q.  In the same paragraph.  "After completing

4  the appropriate due diligence, we will notify him

5  of the denial."                    02:57

6     A.  Yes.

7     Q.  So the plan at this point for the City was

8  to do what would be considered appropriate due

9  diligence and then notify Mr. Zeleny of the denial

10  of his application; correct?          02:58

11     A.  No.  The plan was to ask the questions

12  that were asked of him in subsequent e-mails to

13  Mr. Zeleny from the city attorney's office, and if

14  the answers were not provided, then it would be a

15  denial, as the application stood at this time.   02:58

16     Q.  Let's look at the third bullet point under

17  that paragraph.  You asked, "Could you review the

18  image Zeleny intends to display, and in case he

19  does not have any openly carried guns, would this

20  image be illegal?"  And then you cite some Penal   02:58

21  Code sections.

22       Do you see that?

23     A.  I do.

24     Q.  What were the images that you were

25  referring to there?                02:58

Veritext Legal Solutions
866 299-5127

1      A.  It was an animation of a sexual act.

2      Q.  Did you think that the animation of the

3  sexual act was relevant to your determination about

4  whether to grant or deny the permit application?

5      A.  No.  It was just a legal question I was          02:59

6  asking the DA's office.

7      Q.  Why were you asking the DA's office that

8  legal question?

9      A.  Because I didn't know the answer to it.

10      Q.  For what purpose did you need an answer to       02:59

11  that question?

12      A.  Because if he intended to display

13  something and we had a victim who reported that

14  their child was somehow harmed or exposed to this,

15  we would need to know how to act from the DA's        02:59

16  perspective.

17          This is not something that we, as police

18  officers, come across every day.  So we were asking

19  for legal advice from our DA's office, who would be

20  the final arbiter of whether charges were filed or    02:59

21  not.

22      Q.  Did the DA's office respond to your

23  question?

24      A.  It did.

25      Q.  What did they say?                              02:59

Veritext Legal Solutions
866 299-5127

```
 1       A.  They basically said it would have to be a

 2   case-by-case basis, and if a case was submitted to

 3   them, they would review it.

 4       Q.  Did they tell you that in their opinion,

 5   it wasn't illegal, in all likelihood?                03:00

 6       A.  I don't -- I don't recall exactly what

 7   they said.

 8       Q.  Did they say words to the effect -- say or

 9   write words to the effect that their view was that

10   it was probably not illegal?                          03:00

11       A.  I don't recall that.

12       Q.  I'm going to go ahead and mark the next in

13   order.

14           (Reporter clarification.)

15           (Plaintiff's Exhibit 263 marked

16            for Identification.)

17   BY MR. ROBINSON:

18       Q.  I've marked Exhibit 263.  It's a

19   multiple-page document, MP 296 through MP 300;

20   correct?                                              03:01

21       A.  Correct.

22       Q.  This is from Al Serrato to you and others;

23   right?

24       A.  Yes.

25       Q.  It appears to be a response to your e-mail    03:01
```

Page 399

1    of July 22nd, 2015; right?

2        A.   That's correct.  It's dated July 28th.

3        Q.   So if you go down to the third paragraph

4    of Mr. Serrato -- Mr. Serrato was a deputy DA at

5    the time; correct?                                   03:02

6        A.   He was the assistant district attorney.

7        Q.   Assistant district attorney.  Okay.

8            And he says -- he's discussing your

9    question about the image in the fourth paragraph of

10   his e-mail.                                          03:02

11       A.   Yes.

12       Q.   And he suggests that whether the cartoon

13   would be encompassed by the Penal Code section you

14   cite is not entirely clear to me, but he suspects

15   it wouldn't; correct?                               03:02

16       A.   He says he suspects it would not down in

17   the paragraph, but at the beginning, he says

18   section 647(j)(4) is a relatively new law, and

19   there is not a lot of guidance as to the extent of

20   its application.                                    03:03

21           Again, another reason why we were asking

22   the DA's office for their opinion.

23       Q.   And the opinion relayed by Mr. Serrato in

24   this e-mail is that the image that you showed him

25   likely would not fall within Penal Code 647(j)(4);   03:03

```
 1   right?
 2       A.  No.
 3           MR. MASTER:  Objection.  That misstates
 4   the document.
 5           Go ahead.                                    03:03
 6           THE WITNESS:  I'm going to quote the
 7   document so I'm not misstating.  But it says,
 8   quote, But I suspect it would not, end quote.
 9   BY MR. ROBINSON:
10       Q.  Did you follow up with Mr. Serrato about    03:03
11   what he meant by this?
12       A.  It was pretty obvious what he meant by it.
13       Q.  What did he mean by it, in your
14   understanding?
15       A.  It speaks for itself.  By the document, he   03:03
16   suspects it would not be, but in the end, if we had
17   a victim who reported that they were somehow
18   injured by this image, being underage, that we
19   could write a report and send it to the DA, and
20   they would determine whether to prosecute or not.    03:04
21       Q.  Do you know if, at the time of July 22nd,
22   2015, the e-mail that we looked at a couple of
23   exhibits ago, whether the City had contacted
24   Mr. Zeleny in any way about his permit application?
25       A.  I don't know the timing of the contacts,     03:04
```

1    no.

2        Q.  Did you eventually have a meeting with

3    various stakeholders about the permit application?

4        A.  I don't recall whether it was specifically

5    about his permit application.  I recall having a        03:05

6    meeting with several stakeholders in case -- to

7    discuss what would happen in case he did appear

8    again and protest while armed.

9        Q.  Who participated in that meeting?

10       A.  I can't recall without looking at the        03:05

11   document itself.

12       Q.  Did a representative of NEA participate at

13   the meeting?

14       A.  I believe so.

15       Q.  And a representative of the Rosewood        03:05

16   Hotels?

17       A.  Yes.

18       Q.  Was Mr. Zeleny asked to participate in

19   that meeting?

20       A.  No.                                          03:05

21           MR. MASTER:  We've been going for about an

22   hour.  Can we take a five-minute break?

23           MR. ROBINSON:  Yeah.  Now is a good time.

24   So we'll go off the record for five minutes.

25           THE VIDEOGRAPHER:  Going off the record.    03:06

```
 1    The time now is 3:06.
 2            (Off the record.)
 3            THE VIDEOGRAPHER:  Back on the record.
 4    The time now is 3:13.
 5    BY MR. ROBINSON:                                    03:13
 6        Q.  Chief Bertini, how long have you been in
 7    the law enforcement profession?
 8        A.  Over 33 years.
 9        Q.  Throughout those 33 years, have you dealt
10    with district attorneys the entire time?           03:13
11        A.  Yes.
12        Q.  Have you consulted with district attorneys
13    for their input about legal matters from time to
14    time?
15        A.  I would say numerous times.                03:14
16        Q.  In the numerous times that you've
17    communicated with district attorneys or assistant
18    district attorneys about legal matters, have they
19    given you opinions?
20        A.  Yes.                                       03:14
21        Q.  Based on that experience, looking --
22    considering the e-mail exchange with the district
23    attorney's office that we just looked at, did you
24    form an opinion about or did you form a belief
25    about the district attorney's view of whether the  03:14
```

Veritext Legal Solutions
866 299-5127

1   image that Mr. Zeleny had used in his protest was

2   illegal?

3           MR. MASTER:  Objection.  Lacks foundation.

4   Calls for speculation.

5   BY MR. ROBINSON:

6       Q.  My question is, Chief Bertini, about your

7   own understanding, in your own mind, about what the

8   district attorney's e-mail meant.  Do you think the

9   e-mail, in your own mind, expressed a view about

10  whether the image was illegal?                    03:15

11          MR. MASTER:  I'm going to object.  It

12  lacks foundation and does call for speculation as

13  to what someone else means by what they wrote.  But

14  if he had a belief on his own interpretation, he

15  can answer.                                       03:15

16          THE WITNESS:  I believe that Al Serrato,

17  the DA in this e-mail, was basically giving his

18  opinion, but then the last line says, and I'll

19  quote, "We would of course review any case that was

20  submitted for filing, but those are my preliminary  03:15

21  thoughts on the viability of using this section."

22          So my opinion -- my opinion comes from

23  that statement.

24  BY MR. ROBINSON:

25      Q.  What was your view -- what was your        03:16

```
 1   understanding of Mr. Serrato's preliminary opinion

 2   of whether the image was illegal?

 3            MR. MASTER:  Objection.  The document

 4   speaks for itself.  Lacks foundation.  Calls for

 5   speculation.                                        03:16

 6            If you know.

 7            THE WITNESS:  Well, the document states he

 8   suspected it wouldn't be, but, again, what he said

 9   was, as I stated originally before we saw the

10   e-mail, is that if you send a case to us, submit    03:16

11   the case for us to review, and, of course, we will

12   review it based on the totality of their

13   circumstances.

14            (Plaintiff's Exhibit 264 marked

15            for Identification.)                        03:16

16   BY MR. ROBINSON:

17      Q.  Let's take a look at Exhibit 264, which

18   would be in the "Marked Exhibits" folder.  It's a

19   multiple-page document, MP 5326 through 5337.

20      A.  Okay.                                         03:17

21      Q.  Do you recognize this document?

22      A.  It an agenda for a meeting.

23      Q.  Did you participate in preparing this

24   agenda?

25      A.  Yes.                                          03:17
```

```
 1        Q.  Did you participate in selecting the

 2   materials to include with this agenda?

 3        A.  Yes.

 4        Q.  Did you select the materials to include?

 5        A.  Yes.                                    03:17

 6        Q.  One of the materials that you included was

 7   Mr. Zeleny's permit application; correct?

 8        A.  Correct.

 9        Q.  Let me step back a second.  This was the

10   meeting with NEA, the Rosewood Hotel and various    03:17

11   other stakeholders relating to Mr. Zeleny's

12   protests; right?

13        A.  There was numerous entities, including

14   Stanford, one of the other venture capitalist

15   companies in that complex and all the law           03:18

16   enforcement stakeholders.

17        Q.  And the participants in the meeting also

18   included NEA and the Rosewood Hotel; right?

19        A.  Correct.

20        Q.  At the time that you had this meeting with  03:18

21   those various stakeholders, was Mr. Zeleny's permit

22   application still pending?

23        A.  I don't recall exactly when the denial

24   letter went out, so I don't recall as I sit here

25   today.                                              03:18
```

Veritext Legal Solutions
866 299-5127

1      Q.  So let's go down to page 5331.  It looks
2  like an image from a website; is that right?
3      A.  I couldn't tell you where the image is
4  from, but it is an image, yes.
5      Q.  It's the same image that you were asking      03:19
6  the DA's office about?
7      A.  Yes.
8      Q.  Why did you include this image in the
9  materials for the meeting about Mr. Zeleny?
10     A.  Because that was what he intended to           03:19
11  display on the 55-inch display that he listed in
12  the application.
13     Q.  How do you know that?
14     A.  He told us.
15     Q.  In substance, what was discussed at the        03:19
16  meeting on September 2nd, 2015 relating to
17  Mr. Zeleny?
18     A.  To the best of my recollection, as I sit
19  here today, since this was five years ago, I know
20  the agenda was set to talk a little bit about       03:20
21  Mr. Zeleny's history of not only protests in Menlo
22  Park but protests around the area, both in Palo
23  Alto, Portola Valley, Menlo Park, even
24  San Francisco prior, and to discuss the application
25  for the special event and a response plan, if       03:20

1    Mr. Zeleny were to show up with his weapons during

2    this time in 2015, and to let the -- all the

3    stakeholders know, all the entities that were

4    involved, that we had an open line of

5    communication; if, in fact, that occurred, that          03:20

6    they were to call us immediately so we could assess

7    the situation.

8            And then we had a roundtable where

9    everybody spoke and asked any questions that they

10   had.  I don't recall exactly what was asked,           03:20

11   though.

12       Q.  In general, what did NEA's representative

13   say during the meeting?

14       A.  I honestly don't remember if they even

15   spoke at all.                                          03:21

16       Q.  Let's go to the previous page.  So it's

17   page MP 5330.  Do you know -- and I'm looking at

18   the "Official Use Only" box.  This is what we

19   looked at in the earlier application that we talked

20   about.                                                 03:21

21           Do you know if an initial review was ever

22   performed of Mr. Zeleny's application?

23       A.  I don't know.

24       Q.  Do you know if an e-mail acknowledgment

25   was ever sent to Mr. Zeleny's application?            03:21

```
 1       A.  To the best of my recollection, I believe
 2   there was, from Mr. Milde.
 3       Q.  Do you know whether the application was
 4   ever formally submitted to the permit committee for
 5   approval or denial?                                 03:22
 6       A.  I don't know.
 7       Q.  Do you know if any of the other -- or any
 8   of the departments filled out the approval section
 9   of Mr. Zeleny's permit application?
10       A.  Not that I'm aware of.                       03:22
11       Q.  Do you know if conditions of
12   approval or a denial letter was ever sent to
13   Mr. Zeleny?
14       A.  Yes.
15       Q.  He received a denial letter; right?          03:22
16       A.  Well, he received more than just a denial
17   letter.  I know there was e-mail exchanges with the
18   city attorney's office requesting further
19   information, and eventually a denial letter was
20   sent, that's correct.                               03:22
21       Q.  Stepping back for a second, we talked
22   about the various forms of meetings that could be
23   conducted with the applicant to get more
24   information about an application.  What is the
25   typical way that the meeting with the applicant     03:23
```

Veritext Legal Solutions
866 299-5127

1    occurs?

2         MR. MASTER:  Vague and ambiguous.

3    Overbroad.

4         THE WITNESS:  I don't know the answer to

5    that.                                           03:23

6    BY MR. ROBINSON:

7         Q.  Who would know the answer?

8         A.  Matt Milde or whoever is in that position

9    today.

10        Q.  I think last time, you said you had been   03:23

11   involved in about six permit applications yourself;

12   is that right?

13        A.  That's not what I said.

14        Q.  How many permit applications have you been

15   directly involved in yourself for special event   03:23

16   permits?

17        A.  Several.  Six was the number that I dealt

18   with the city attorney's office on, but I've been

19   involved in several applications for special

20   events.  I don't know the number.                 03:23

21        Q.  In those applications for special events

22   that you've dealt with, were meetings conducted

23   with the applicant?

24        A.  Not by me.

25        Q.  Do you know of meetings being conducted    03:23

                      Veritext Legal Solutions
                         866 299-5127

```
 1   with the applicant, whether you participated or

 2   not?

 3       A.  Yes.  There were meetings normally handled

 4   via phone and/or e-mail.

 5       Q.  What percentage of the meetings were          03:24

 6   handled via phone?

 7       A.  I don't know.

 8       Q.  Can you estimate?

 9       A.  I can't.  I didn't have those meetings.

10   That would be done by the sergeant in charge of       03:24

11   special events.

12       Q.  I'm going to go ahead and mark next in

13   order 263.

14           MR. MASTER:  I see a 264 and a 263.  Which

15   ones are we talking about?                            03:25

16           MR. ROBINSON:  I'm waiting for it to load.

17   Let's see what number is assigned to it.  So we're

18   at 265, it looks like.

19           THE WITNESS:  Okay.

20           (Plaintiff's Exhibit 265 marked

21            for Identification.)

22   BY MR. ROBINSON:

23       Q.  For the record, Exhibit 265 is multiple

24   pages, MP 345 through MP 350; correct?

25       A.  Correct.                                      03:26
```

Veritext Legal Solutions
866 299-5127

1      Q.  Do you recognize Exhibit 265?

 2      A.  It's an e-mail.

 3      Q.  It's an e-mail thread; right?

 4      A.  Yes.

 5      Q.  And the newest e-mail in the thread was        03:26

 6   copied to you; correct?

 7      A.  Yes, I'm one of several people it was

 8   copied to.

 9      Q.  And when the e-mail thread was copied to

10   you, you received the e-mails; correct?              03:26

11      A.  Correct.

12      Q.  If you go down to page MP 346, there's an

13   e-mail from William McClure starting with

14   "Michael."  Do you see that?

15      A.  I do.                                          03:26

16      Q.  In this e-mail, Mr. McClure asks for

17   foundational information related to Mr. Zeleny's

18   permit application; correct?

19      A.  Yes.

20      Q.  Are you aware of any other requests by        03:27

21   Mr. McClure for additional information about

22   Mr. Zeleny's permit application?

23          MR. MASTER:  Objection.  Vague and

24   ambiguous as to time.

25          Go ahead.                                      03:27

                                        Page 412

```
 1              THE WITNESS:  I don't know.

 2    BY MR. ROBINSON:

 3       Q.  Well, are you personally aware of that?

 4       A.  I don't know whether there were other

 5    e-mails or not.  You'd have to produce them for me    03:27

 6    to be able to recall.

 7       Q.  As you sit here, you can't recall any

 8    others.  Is that accurate?

 9       A.  That's correct.

10       Q.  If we go up to the first page of this and    03:27

11    then carrying over to the second, Mr. Zeleny

12    responds to Mr. McClure's questions; correct?

13       A.  I see there was some response to the

14    questions, yes.

15       Q.  Was the response to the questions          03:28

16    insufficient in some way?

17              MR. MASTER:  Objection.  Vague and

18    ambiguous.  Overbroad.  Compound.

19              THE WITNESS:  They -- that was not --

20    these answers did not come to me.  They came to the  03:28

21    city attorney.  You would have to ask the city

22    attorney.

23    BY MR. ROBINSON:

24       Q.  As the designated witness for the City of

25    Menlo Park, were Mr. Zeleny's responses to          03:28
```

Page 413

```
 1    questions incomplete?

 2          MR. MASTER:  Same objection.

 3          THE WITNESS:  I can't answer that.  I

 4    don't know.

 5    BY MR. ROBINSON:                              03:28

 6       Q.  Do you know if Mr. McClure followed up in

 7    any way for more information?

 8       A.  I don't recall, as I sit here today.

 9       Q.  Do you know if anyone else within the City

10    of Menlo Park followed up with Mr. Zeleny for more   03:28

11    information?

12       A.  I can't recall, as I sit here today.

13       Q.  In the very top e-mail in the exchange

14    that was copied to you, Mr. Zeleny refers to a

15    willingness to discuss time, place and manner       03:29

16    aspects of his performance.

17          Do you see that?

18       A.  I do.

19       Q.  Do you know if the City of Menlo Park ever

20    suggested any time, place or manner requirements    03:29

21    that would result in the approval of Mr. Zeleny's

22    application?

23       A.  I believe that the letter from the city

24    attorney's office was asking very specific

25    questions that needed to be answered, and if they   03:29
```

1    were answered satisfactorily to the city attorney,
2    then a permit could be, in fact, issued.
3        Q.  Do you know whether the City of Menlo Park
4    ever provided any guidance to Mr. Zeleny about the
5    time, place and manner requirements so that his      03:29
6    permit would be approved?
7        A.  Yes.
8        Q.  When did that happen?
9        A.  In the letter that came from the city
10   attorney's office to Mr. Zeleny.                      03:30
11       Q.  The letter denying his permit application?
12       A.  I don't know if that was the denial letter
13   or if there was a letter -- I don't recall whether
14   there was a letter prior to that, but I know there
15   was a letter that was generated by the city          03:30
16   attorney's office asking for specifics.
17       Q.  In the ordinary course of processing a
18   permit application, if the City needed specifics,
19   it could generally get those specifics by meeting
20   with the applicant; correct?                          03:30
21           MR. MASTER:  Objection.  Vague and
22   ambiguous.  Lacks foundation.  Calls for
23   speculation.  Incomplete hypothetical.
24           MR. ROBINSON:  Let me rephrase.
25   BY MR. ROBINSON:                                      03:30

```
 1       Q.  According to the City's written policy
 2   reflected in the flowchart that we looked at
 3   before, if additional information was needed from
 4   the applicant, it would be obtained through a
 5   meeting with the applicant; correct?              03:30
 6            MR. MASTER:  Same objections.
 7            THE WITNESS:  It would be information that
 8   would be obtained by the -- or obtained from the
 9   applicant in some fashion, whether it was a phone
10   call, an e-mail or an in-person meeting.          03:31
11   BY MR. ROBINSON:
12       Q.  Let me go ahead and introduce what I'm
13   marking as Exhibit 266.  Let me know when that pops
14   up for you.
15            (Plaintiff's Exhibit 266 marked         03:31
16            for Identification.)
17            THE WITNESS:  I see it.
18   BY MR. ROBINSON:
19       Q.  Exhibit 266 is one page.  It's Bates
20   marked NEA Subpoena 37; correct?                  03:32
21       A.  Yes.
22       Q.  This is an e-mail from you to David
23   Tresmontan at NEA?
24       A.  That's correct.
25       Q.  And Mr. Tresmontan is asking you if the   03:32
```

Veritext Legal Solutions
866 299-5127

1 permit denial has been sent out to Mr. Zeleny;

2 correct?

3     A.  Yes.

4     Q.  And at this point, as of September 21st,

5 2015, it had not yet been sent out; is that      03:32

6 correct?

7     A.  Based on my e-mail, it looked like it was

8 getting sent out that day, yes.

9     Q.  Did you keep Mr. Tresmontan up to date on

10 the progress of Mr. Zeleny's permit application?    03:32

11     A.  No.  I just answered his question.

12     Q.  So I'm going to introduce a previously

13 marked exhibit here, 150924, Update to NEA, Exhibit

14 102.  So this was previously marked Exhibit 102.

15 Let me know when it pops up.                  03:33

16     A.  I have it.

17     Q.  For the record, Exhibit 102 is MP 351

18 through MP 355; correct?

19     A.  Yes.

20     Q.  And this is an e-mail from you to NEA, the    03:33

21 Rosewood Hotel, and others about the denial of

22 Mr. Zeleny's special event permit; correct?

23     A.  This was an e-mail to almost a dozen

24 people of all entities that were at the meeting

25 that we had regarding Mr. Zeleny and the response,    03:34

Page 417

1    in case he were to come without a permit, and this

2    was just updating them on the permit decision.

3         Q.  The first person in the "to" line of the

4    e-mail is Mr. Tresmontan; correct?

5         A.  That's correct.                              03:34

6         Q.  He's a representative of NEA; correct?

7         A.  That's correct.

8         Q.  And the second person in the "to" line is

9    Jimmy Mazon; is that correct?

10        A.  Mazon, yes, from the Rosewood Hotel.         03:34

11        Q.  And at this point, the denial letter has

12   gone out; correct?

13        A.  That's correct.

14        Q.  Is the denial letter attached to this

15   e-mail the denial letter from the city attorney's     03:35

16   office?

17        A.  Yes.

18        Q.  Are you aware of any other denial letter

19   sent to Mr. Zeleny on the initial permit

20   application?                                          03:35

21        A.  I'm not aware or I don't recall any denial

22   letter, but I know there were e-mails exchanged

23   between the city attorney's office and Mr. Zeleny.

24        Q.  Okay.  Just focusing on the denial letter,

25   are you aware of any other denial letters going out   03:35

Page 418

```
 1   for Mr. Zeleny's original permit application?

 2        A.  Don't recall any other denial letters.

 3   Well, actually, I do recall -- I believe there was

 4   a denial letter that came from community services,

 5   by Matt Milde.                                        03:35

 6        Q.  Was that before or after this letter?

 7        A.  I don't remember.  I don't recall when

 8   that was sent.

 9        Q.  Do you recall there being one denial

10   letter from community services or multiple?          03:36

11        A.  I believe there was one initial and then a

12   second denial letter by the department director.

13        Q.  Okay.  Is this the letter that you're

14   referring to with Mr. McClure asking for additional

15   specific information?                                 03:36

16        A.  This was one of the requests for further

17   information, but this was also, I believe, the

18   point by point from the city attorney's office of

19   why it was being denied.  The questions were asked,

20   earlier than this letter going out, in e-mails.      03:37

21        Q.  Sir, we've looked at the one e-mail -- the

22   previous exhibit was an e-mail exchange between

23   Mr. McClure and Mr. Zeleny.  Are you aware of any

24   other requests by the city attorney for information

25   from Mr. Zeleny on his first permit application?      03:37
```

Veritext Legal Solutions
866 299-5127

1      A.  As I recall, there were more e-mail

2 exchanges.  I can't -- I don't remember exactly

3 when they were, but I know there were more e-mail

4 exchanges.

5      Q.  Have they been produced?                    03:37

6      A.  Yes.

7      Q.  Have all of the e-mail exchanges been

8 produced between the city attorney and Mr. Zeleny

9 regarding his permit application?

10     A.  To the best of my recollection, yes.        03:37

11     Q.  So the denial letter gives two reasons for

12 denial:  One is the lack of a complete application,

13 and the other is not meeting the criteria for a

14 special event.

15         Do you see that?                            03:38

16     A.  I would disagree with your analysis of

17 this letter.  There are more points than just that.

18     Q.  Do you know whether any -- anyone at the

19 City proposed or the city attorney's office

20 proposed to Mr. Zeleny ways in which his event      03:38

21 could be made to qualify as a special event within

22 the City's definition?

23     A.  The e-mail exchanges and the questions

24 that were being asked and the issues that the city

25 attorney brings up in this letter are basically     03:38

Veritext Legal Solutions
866 299-5127

```
 1   advising Mr. Zeleny that these are the issues that

 2   are present for this special events permit.

 3        It would be logical to assume that if the

 4   applicant were to answer these questions in a

 5   satisfactory way, then the permit could, in fact,    03:39

 6   go through the system and possibly be approved.

 7        Q.  When you say "answering in a satisfactory

 8   way," what do you mean by that?

 9        A.  If -- getting the information that was

10   requested, that in the first -- the second           03:39

11   paragraph of this letter, there are numerous points

12   there of information that the city attorney's

13   office were requesting.

14        Q.  So let's take a look at the prior exhibit.

15        A.  Which one?                                   03:39

16        Q.  265.

17        A.  Okay.

18        Q.  I'm going to focus on the e-mail from

19   Mr. Zeleny of July 28, 2015.  In what way are these

20   answers insufficient in your view as a               03:40

21   representative of the City of Menlo Park?

22        A.  You would have -- I believe that question

23   was answered by the denial letter, but you'd have

24   to ask specifically the city attorney.

25        Q.  You understand that in your deposition,     03:40
```

```
 1   you've been designated by the City of Menlo Park as

 2   the person qualified to give answers on its behalf

 3   regarding Mr. Zeleny's permit application; correct?

 4       A.  Yes, but I can't be expected to know every

 5   single thing that someone is thinking when they're    03:40

 6   reading an e-mail or making a decision in this

 7   respect.

 8       Q.  I'm not asking you to do that.

 9           What I'm asking you is, looking at these

10   e-mails, as the person designated by the City to      03:40

11   testify on its behalf, why are Mr. Zeleny's answers

12   insufficient?

13       A.  You'll have to ask the city attorney.

14       Q.  Do you have an opinion, as the

15   representative of the City of Menlo Park, about       03:41

16   whether these answers are sufficient?

17       A.  My personal opinion, no.  I would defer to

18   the legal opinion of our legal counselors, which

19   are the city attorney's office.

20       Q.  Do you have a view of what additional         03:41

21   information Mr. Zeleny could have provided in this

22   e-mail exchange that would have resulted in a grant

23   of his application?

24       A.  That information is what was indicated on

25   the denial letter.  All those points are the         03:41
```

Page 422

```
1   reasons why the permit was originally denied.

2       Q.  So let's turn back to Exhibit 102.

3       A.  What is that?

4       Q.  It's the -- the -- let's see.  The file

5   name is 150924, Bertini Update to NEA.              03:42

6       A.  Okay.

7       Q.  The denial letter is attached here; right?

8       A.  Correct.

9       Q.  And the issue that you're referring to are

10  the issues that are set out in the second paragraph  03:42

11  of this letter; correct?

12      A.  Correct.  Those are some of the issues,

13  but -- those are some of the issues but -- yeah.

14  The next two paragraphs also deal with more issues

15  besides that one paragraph.                         03:42

16      Q.  So I'm just referring to the incomplete

17  information.  With respect to this denial letter,

18  the incomplete information, what additional

19  information could Mr. Zeleny have provided about

20  the specific location that would have resulted in   03:43

21  the granting of his application?

22      A.  The only way I can answer that is reading

23  verbatim the letter that's in front of me.  I can

24  do that for you, Counselor, if you'd like.

25      Q.  No.  I'd like your view as the person most  03:43
```

Page 423

```
 1    qualified on behalf of the City of Menlo Park.

 2    What information did you want from Mr. Zeleny so

 3    that you would grant his application?

 4              MR. MASTER:  Objection.  Asked and

 5    answered.  Argumentative.  The document speaks for    03:43

 6    itself.

 7              If you have something above and beyond

 8    that, you can answer.

 9              THE WITNESS:  Aside from what the document

10    says, I have no other information.                    03:43

11    BY MR. ROBINSON:

12       Q.  Is any of the information requested in

13    this paragraph in any of the -- required by any of

14    the written policies of the City of Menlo Park?

15       A.  Yes.                                           03:43

16       Q.  Which information is required by the

17    written policies of the City of Menlo Park?

18       A.  Sound and lighting equipment, location of

19    the event, exact location of the proposed event,

20    how the setup will be, to analyze traffic control.    03:44

21    Other conditions necessary for the approval are the

22    hours and length of the event.  The tent --

23    location of tent, generator, video presentations,

24    portable restroom, temporary lighting, sound

25    system, et cetera, and the fact that there is no      03:44
```

Veritext Legal Solutions
866 299-5127

1    end time.

2          So all those -- all of those points are

3    points that were requested in the original

4    application, especially that one part that I

5    brought up that had to do with a specific schematic    03:44

6    of the location where he was going to be.

7          Q.  Do you have an understanding of why this

8    letter was sent by the city attorney rather than

9    Mr. Milde?

10         A.  No.                                          03:45

11         Q.  In the ordinary process, is the denial

12   letter sent by Mr. Milde?

13         A.  Ordinarily, for a typical permit

14   application, yes.

15         Q.  What leads you to believe that Mr. Milde    03:45

16   had input into the denial for the application?

17         A.  I don't believe I said that.

18         Q.  Did Mr. Milde have input into the denial

19   of the permit application?

20         A.  I don't know.                                03:46

21         Q.  How many applications are you aware of,

22   since 2013, where the city attorney issued the

23   denial?

24         A.  I don't know.  I have no recollection of

25   that.                                                  03:46

                                            Page 425

```
 1      Q.  More than five?

 2      A.  I don't know.

 3      Q.  Let's focus on the second paragraph, the

 4  second substantive paragraph of the letter here.

 5  The second two -- the last two sentences -- there's   03:46

 6  a paragraph starting at 352 at the bottom, carrying

 7  over to 353.

 8          Mr. McClure writes:  "To the contrary, you

 9  are proposing a 'media production' of a one-man

10  protest."                                            03:47

11          Do you see that?

12      A.  Yes.

13      Q.  Is there any written policy or guideline

14  or criteria at the City of Menlo Park that a media

15  production of a one-man protest does not qualify as   03:47

16  a special event?

17      A.  I'm not aware of any.

18      Q.  In granting or denying special event

19  permits, is the City allowed to consider factors

20  outside of the specific written policy?              03:47

21      A.  Time, manner, place.

22      Q.  Is it permitted to consider time, manner

23  and place requirements outside of the written

24  policy?

25      A.  Yes.                                         03:47
```

Page 426

```
 1      Q.  Are those time, place and manner
 2   requirements catalogued anywhere?
 3      A.  They would have to do with applicable laws
 4   that needed to be followed.  As I stated before,
 5   whether they be local, state or federal, numerous    03:48
 6   laws may apply to these type of situations, and
 7   that's one of the things that would have to be
 8   looked at.
 9      Q.  So if -- in the next paragraph down from
10   there, Mr. McClure writes at the end:  "Another      03:48
11   concern is that it is illegal to open carry a
12   firearm in the State of California.  As you've
13   described the proposed event, there does not appear
14   to be any logical nexus for legitimate purpose of
15   carrying a firearm."                                 03:48
16          Do you see that?
17      A.  Yes.
18      Q.  Is that one of the factors that the City
19   considered in denying Mr. Zeleny's permit
20   application?                                         03:48
21      A.  I believe the document speaks for itself.
22   That's what the city attorney wrote.
23      Q.  Was that one of the bases for denying the
24   application?
25      A.  I don't know.  I don't believe it was a       03:49
```

Page 427

```
1   basis for denying it, but it was a concern because
2   the laws had changed, and you could no longer
3   openly carry rifles and handguns in the state of
4   California.
5        Q.  How does the City determine whether          03:49
6   there's a logical nexus to the event?
7            MR. MASTER:  Objection.  Vague and
8   ambiguous.  Overbroad.  Calls for a legal
9   conclusion.
10           Go ahead.                                      03:49
11           THE WITNESS:  As I did not author this
12  letter, I don't know.
13  BY MR. ROBINSON:
14       Q.  Does the City have a written or unwritten
15  standard for determining whether there's a logical    03:49
16  nexus between carrying firearms and the event?
17       A.  No, except that it's illegal to do so.
18       Q.  I don't want to cover ground that we
19  covered last time, but if Mr. Zeleny were given the
20  permit that he was asking for, it would have been     03:50
21  legal to carry the firearms; correct?
22       A.  Well, that's the question we were trying
23  to get answered through the Department of Justice,
24  the district attorney's office, et cetera.  Because
25  that law is very vague, we were trying to determine   03:50
```

Veritext Legal Solutions
866 299-5127

1    whether that's true or not.  And as it stands

2    today, our reading of that exception is, yes, if he

3    was permitted under the -- under the special events

4    or film permit, then he could openly carry weapons.

5        Q.  When did you come to that view, that he          03:50

6    could openly carry with a permit?

7        A.  After -- after having discussions, again,

8    with the Department of Justice, with the DA's

9    office and the city attorney's office.

10       Q.  Who at the City decides whether there's a        03:50

11   logical nexus between the carrying of firearms and

12   the event?

13       A.  Again, I did not author that.  I did not

14   say those words, so I don't know what he meant by

15   that.                                                    03:51

16       Q.  Okay.  Is it the city attorney's call

17   about whether there's a logical nexus?

18       A.  I don't know.

19       Q.  Who at the City determines whether there

20   was a legitimate purpose in carrying the firearm?       03:51

21       A.  Again, I did not authorize this letter.  I

22   did not say those words.  So I don't have an answer

23   for you.

24       Q.  As a matter of policy at the City of Menlo

25   Park, was Zeleny required to have a logical nexus        03:51

Veritext Legal Solutions
866 299-5127

1    between the carrying of firearms and his protest in
2    order to get a permit?
3           MR. MASTER:  I'll object.  The question
4    calls for a legal conclusion.  Lacks foundation.
5    Calls for speculation.  It's also vague and          03:51
6    ambiguous and overbroad.
7           If you know.
8           THE WITNESS:  Again, you could ask it as
9    many ways as you would like, Counselor.  I don't
10   know the answer.  I did not write this statement.    03:52
11   I don't know what he meant by that.
12   BY MR. ROBINSON:
13      Q.  My question was directed towards the
14   City's policies and whether this logical-nexus
15   issue is in the City's policy, whether written or    03:52
16   unwritten.
17      A.  I did not see that, but the only thing
18   from my perspective in reading this, it had to do
19   with state law more than City policy.
20      Q.  Now, the last paragraph of Mr. McClure's     03:52
21   letter says, "If you wish to appeal this denial of
22   your application, you must appeal the denial to the
23   City's Special Event Permit Committee."
24           Do you see that?
25      A.  I do.                                          03:52

Veritext Legal Solutions
866 299-5127

```
 1        Q.  In the ordinary course of a permit
 2   application, the special events permit committee
 3   makes the initial decision; right?
 4        A.  In the normal course for a typical
 5   application, certainly.                            03:53
 6        Q.  And appeals -- the special event permit
 7   committee doesn't hear appeals; does it?
 8        A.  The special event committee -- no, they
 9   would hear an appeal, and then it would go to the
10   department director of the community services      03:53
11   division or department.
12        Q.  Okay.  So Mr. Zeleny appealed the denial
13   of his permit; right?
14        A.  Was that a question, did he?
15        Q.  Did he.                                   03:53
16        A.  Yes.
17        Q.  And he went through all of the layers of
18   the City appeals process; correct?
19        A.  As far as I recollect, yes.
20        Q.  What are the layers of the City appeals   03:53
21   process?
22        A.  From the permit committee to the director
23   of the community services department to the city
24   manager to the city council.
25        Q.  Let's focus on the first level of review  03:54
```

Veritext Legal Solutions
866 299-5127

```
 1    that you're talking about, the first level of
 2    appeal to the permit committee.  What is the --
 3    what is the standard that they apply to review it?
 4    Do they make an independent decision or do they
 5    consider the decision made by the original person?    03:54
 6    How does that work?
 7         A.  Of course, they would look at all the
 8    factors involved, just like any appeal, to see
 9    whether there was more information that could be
10    gleaned from the applicant or whether they wanted     03:54
11    to overturn the appeal.  And then they would render
12    the decision.
13         Q.  All right.  Do they have hearings at that
14    level of appeal --
15         A.  No.                                          03:55
16         Q.  -- special permits?
17         A.  No.
18         Q.  Do they -- do they take in evidence at
19    that level of appeal?
20         A.  Aside from the documents that are already    03:55
21    submitted -- it's not a formal judicial hearing.
22    It's just a group that is looking at an application
23    denial.
24         Q.  Is any of this appeal process written down
25    anywhere, in City ordinance, in the policies or      03:55
```

Page 432

1  anywhere else?

2      A.  To the best of my recollection, I believe

3  it is in City ordinances, the appeal process,

4  because ultimately the city council is the final

5  arbiter at the City level.                              03:55

6      Q.  Are you aware of any appeals of denial of

7  the special events permits that occurred before

8  Mr. Zeleny's appeal?

9      A.  No.

10     Q.  Let's talk about the second layer, so the    03:56

11  appeal to the director of community service.  In

12  the ordinary process, how did the director of

13  community service review an appeal?  Is it

14  independent consideration, or is it limited to

15  review of the materials that were submitted         03:56

16  originally?

17     A.  Again, it would be something very

18  informal.  It's not a judicial hearing.  The

19  director would look at the information.  If the

20  director wished to recontact the applicant, they    03:56

21  could do that.  And then they would make their

22  decision based on the information they have.

23     Q.  The next level of appeal is the city

24  manager; is that right?

25     A.  Correct.                                       03:56

                                                  Page 433

```
 1        Q.  And that level of appeal involves a
 2   hearing; right?
 3        A.  That's correct, an informal hearing.
 4        Q.  And both the City staff and the applicant
 5   participate in that hearing?                      03:57
 6        A.  Correct.
 7        Q.  And then there's an appeal to the city
 8   council; right?
 9        A.  That's correct.
10        Q.  And that also involves a hearing?        03:57
11        A.  Informal hearing, yes.
12        Q.  And that's a public hearing, correct, at a
13   city council meeting?
14        A.  That's correct.
15        MR. ROBINSON:  We've been going almost       03:57
16   another hour.  Why don't we take a quick, like,
17   five-minute break here.
18        MR. MASTER:  How much time do you have
19   left, Damion?
20        MR. ROBINSON:  It's a good question.  I'm     03:57
21   going to probably use the full time that we have
22   available.  There's still a lot to cover.
23        THE VIDEOGRAPHER:  Going off the record.
24   The time now is 3:58.
25             (Off the record.)                       03:58
```

```
 1              THE VIDEOGRAPHER:  Back on the record.

 2    The time now is 4:06.

 3              (Plaintiff's Exhibit 267 marked

 4              for Identification.)

 5    BY MR. ROBINSON:                              04:06

 6       Q.  So I just introduced another exhibit.  Let

 7    me know if that one has shown up for you.

 8       A.  Which number?

 9       Q.  So it's marked as 267.  Has that shown up

10    yet?                                          04:06

11       A.  Yes.

12       Q.  So as you'll see on the first page, this

13    was previously marked as 103.  Do you see that,

14    Milde 103?

15       A.  I do.                                  04:07

16       Q.  So let's refer to it as Exhibit 103 for

17    consistency.  Exhibit 103 is Bates marked MP 451

18    through MP 456; correct?

19       A.  Yes.

20       Q.  This is a series of e-mails relating to   04:07

21    Mr. Zeleny's special events permit; right?

22       A.  Correct.

23       Q.  And the very top e-mail, the last e-mail

24    in this chain, was from you to Matt Milde, Cherise

25    Brandell and -- is it Robert Jonsen?          04:07
```

```
 1        A.  Yes.  He was the police chief at the time.

 2        Q.  Okay.  So in your -- in this e-mail -- go

 3   ahead and review it, but it relates to Mr. Zeleny's

 4   appeal of his denial of his permit application;

 5   correct?                                          04:08

 6        A.  Yes.

 7        Q.  And Mr. Milde was in the community

 8   services department; right?

 9        A.  Yes.

10        Q.  And the community services department is   04:08

11   primarily responsible for handling special event

12   permits; right?

13        A.  Right.

14        Q.  And in your e-mail, you instructed

15   Mr. Milde not to respond to Mr. Zeleny; correct?    04:08

16        A.  Correct.

17        Q.  When you said "stand by for our response,"

18   who is the "our" that you were referring to?

19        A.  That would be a response in conjunction

20   with the city attorney's office so we could, in      04:08

21   fact, correctly give the -- Mr. Zeleny the appeals

22   process and how it would go forward.

23        Q.  Did you consult with the city attorney's

24   office at that time?

25        A.  Yes.                                        04:09
```

Veritext Legal Solutions
866 299-5127

```
 1        Q.  Did the City eventually respond to

 2   Mr. Zeleny?

 3        A.  To my recollection, yes.

 4        Q.  In his e-mail -- in Mr. Zeleny's e-mail,

 5   appealing the denial of his permit application, it      04:09

 6   starts on 451 and carries over through the end of

 7   the document.  I want to focus on the third

 8   paragraph of that e-mail.

 9        A.  The one about the First Amendment?

10        Q.  No.  "As to your claim that my application    04:09

11   is incomplete."

12        A.  Okay.

13        Q.  So Mr. Zeleny says he is attaching a map

14   of the area in question.  Do you see that?

15        A.  Yes.                                           04:10

16        Q.  Do you recall seeing a map of the area

17   that Mr. Zeleny planned for his event?

18        A.  I recall a map, but I don't remember

19   whether it was involving the special events permit

20   or the preliminary permit.                             04:10

21        Q.  Do you recall whether the city believed,

22   after receiving this e-mail from Mr. Zeleny, that

23   his application was still incomplete?

24        A.  I would just refer to the documents that

25   were -- that were submitted, that stated each of       04:10
```

Veritext Legal Solutions
866 299-5127

```
1    the reasons why the denial was -- or the permit was

2    denied.

3        Q.  In the same paragraph a little bit further

4    down, Mr. Zeleny says that his event will be

5    subject to ongoing mutual agreement on the time,        04:10

6    place and manner parameters.

7            Do you see that?

8        A.  Yes.

9        Q.  Did the City ever reach any agreement with

10   Mr. Zeleny about the time, place and manner of his      04:11

11   protest?

12       A.  Of his permit application?

13       Q.  Sure, of his permit application.

14       A.  Not that I'm aware of, no.

15       Q.  Are you aware of the City, at any point in      04:11

16   the appeals process, proposing time, place and

17   manner parameters for Mr. Zeleny's event?

18       A.  Yes.  I believe that the points of denial

19   are in the record, in the administrative record,

20   and every letter and/or e-mail that was sent to        04:11

21   Mr. Zeleny spoke about those.

22       Q.  So not the points of denial.  Did the City

23   ever propose to Mr. Zeleny parameters in which he

24   could conduct his event?

25       A.  In looking at the city attorney's denial,      04:11
```

Page 438

1    there were some examples in there about things he

2    could have done to try to complete the application

3    and to be able to obtain the permit.

4        Q.  So what were the time parameters that the

5    City proposed to Mr. Zeleny?                        04:12

6        A.  I believe that the document speaks for

7    itself.  It talked about the fact that we need to

8    have some more definite time as opposed to just

9    indefinite and having this go on forever as far as

10   time was concerned.                                04:12

11       Q.  Did the City ever propose any concrete

12   time parameters that would have resulted in

13   Mr. Zeleny's application being approved?

14       A.  No.  The City said pick a time, but

15   "indefinite" is not an appropriate time.           04:12

16       Q.  Did the City ever propose any place

17   parameters for a place where Mr. Zeleny could

18   conduct his event and have his application

19   approved?

20       A.  There was discussion about the location   04:12

21   that he was -- he had done his protests in

22   previously, which was a public right-of-way as

23   opposed to the median.  Yes, there was discussion

24   about that.

25       Q.  Did the City, at any point, suggest to     04:13

```
 1    Mr. Zeleny that if he protested in that area on the

 2    sidewalk, that his permit would be approved?

 3        A.  No, not necessarily just that, but there

 4    were other points that the document speaks about

 5    that were points of information that the City          04:13

 6    needed in order to go forward to approve the

 7    application.

 8        Q.  Okay.  So I'm not asking you about

 9    information that the City requested or needed from

10    Mr. Zeleny.  I'm asking you whether the City made      04:13

11    any proposal to Mr. Zeleny about circumstances in

12    which his event would be approved, meaning did the

13    City ever say, If you conduct your event during

14    this time and this location in this manner, it

15    could be approved?                                     04:13

16        A.  I believe there was language to that

17    extent, about being able to -- being amenable to

18    speaking to him about possible, specific locations

19    or specific issues, time, manner, location, but I

20    don't know -- I don't believe that that was           04:14

21    enumerated in an e-mail or a letter.

22        Q.  When did a discussion about that take

23    place?

24        A.  I don't recall whether it was in an e-mail

25    or in one of the letters.  It was in one of the       04:14
```

Page 440

1  documents that's in the record.

2     Q.  So in one of the documents in the

3  administrative record of Mr. Zeleny's permit

4  application, there is an invitation by the City to

5  discuss parameters that would allow Mr. Zeleny to     04:14

6  conduct his event; is that correct?

7     A.  Yes.

8        And I need to correct myself from earlier.

9  I was conflating the film permit process with this

10  special events process.  So I'm not sure in which     04:14

11  process of those two that discussion occurred.  And

12  the e-mails that I mentioned earlier I believe were

13  in the film permitting process, not necessarily the

14  special events process, if that makes sense.

15     Q.  It does.                                       04:15

16        Did the City -- aside from inviting

17  Mr. Zeleny to discuss time, place and manner in --

18  wherever those e-mails are, did the City, in

19  connection with Mr. Zeleny's special event permit,

20  ever make a proposal to Mr. Zeleny about time,        04:15

21  place and manner parameters?

22     A.  Other than what I already stated, not that

23  I'm aware of.

24     Q.  At any point in the special event permit

25  process all the way through the final appeal, did     04:15

1 the City ever tell Mr. Zeleny the conditions that

2 he could meet in order to approve his permit?

3     A.  Yes.  Those were enumerated in the

4 documents -- in the -- in the denials that he

5 received.  They were bullet points in -- sorry.    04:15

6     Q.  What were the conditions that the City

7 told Mr. Zeleny, If you satisfy these conditions,

8 we'll approve your permit?

9     A.  I have to look at the document itself.  If

10 the document was up, I would point to the document.    04:16

11     Q.  Which document are you talking about?

12     A.  Well, there were several documents.  There

13 was the document that was the letter of -- denial

14 letter that was sent by the city attorney

15 originally, by Matt Milde secondarily, by Cherise    04:16

16 Brandell thirdly, and then by the city manager's

17 office after the appeal, and then the city council.

18         So each one of those letters enumerated

19 issues or information or items that needed to be

20 changed in order to be able to allow this permit to    04:16

21 go forward.

22     Q.  But other than believing that it was

23 somewhere in the administrative record, can you

24 recall a specific time during the appeals process

25 when the City told Mr. Zeleny, Meet these criteria,    04:16

Veritext Legal Solutions
866 299-5127

```
 1    and we'll approve your permit?
 2        A.   I've already answered that, Counselor.
 3    It's in the -- it's in the denial letters that
 4    specifically state this is the information that is
 5    either missing, incomplete or that the City has a      04:17
 6    problem with.
 7        Q.   So I'm not asking about requests for more
 8    information at this point.  What I'm asking about
 9    is criteria for approving the permit.
10        Was Mr. Zeleny ever given by the City of          04:17
11    Menlo Park criteria for approving the permit, not
12    requests for information.  These are the time,
13    place and manner parameters.
14        MR. MASTER:  I'll object.  That's a
15    compound question.  It's vague and ambiguous.         04:17
16    Calls for a legal conclusion.  But it's also been
17    asked and answered numerous times.  It's
18    argumentative.
19        Go ahead.
20        THE WITNESS:  In each of the letters of          04:17
21    denial, there were points given on why it was
22    denied.  It would be logical to conclude that if
23    Mr. Zeleny addressed each of those points, then the
24    permit could be issued.
25    BY MR. ROBINSON:                                      04:18
```

Veritext Legal Solutions
866 299-5127

```
 1      Q.  Did the City ever tell Mr. Zeleny how he
 2   needed to address those points in order to get the
 3   permit issued?
 4          MR. MASTER:  Objection.  Asked and
 5   answered.  Did you not hear what he just said?      04:18
 6   Seriously.  It's argumentative.
 7          One more time.  Go ahead.
 8          THE WITNESS:  In each of the denial
 9   letters, specific points were dictated in the
10   letter that advised Mr. Zeleny that he was denied   04:18
11   for these reasons.  It would be logical to conclude
12   that if you address each of these points, then a
13   permit could be issued.
14   BY MR. ROBINSON:
15      Q.  So let's turn back to Exhibit 102.          04:18
16   It's -- the file name is 150924.  And I'm going to
17   the permit denial by the city attorney, starting on
18   page MP 352.
19      A.  Okay.
20      Q.  Where in this denial letter does it tell    04:19
21   Mr. Zeleny a location where he would be allowed to
22   conduct his protest?
23      A.   In this letter, it states that the
24   location that he is proposing is not a location
25   that would be a location that a permit could be     04:19
```

Veritext Legal Solutions
866 299-5127

```
 1   issued.
 2        So, logically, I would assume that you
 3   would take that information and come up with a new
 4   location.  In this letter itself, there is no
 5   specific direction to Mr. Zeleny saying you can do    04:19
 6   this event here but not here.  What it's saying in
 7   this letter is that you just can't do the event in
 8   the center of the median because it's illegal.
 9       Q.  At any point in time, did the City of
10   Menlo Park tell Mr. Zeleny, if you conduct your      04:20
11   protest at this location, we'll approve your
12   permit?
13       A.  Yes.  My recollection is that one time or
14   even more than one time, Mr. Zeleny was told that
15   if you were to use the location that you normally    04:20
16   would use, that you've used in the past, that would
17   be acceptable as far as place goes.
18       Q.  How was that information relayed to
19   Mr. Zeleny?
20       A.  I don't recall if it was an e-mail or in     04:20
21   one of the letters.  I don't recall.
22       Q.  Is it in something that's been produced in
23   this case?
24       A.  Yes.
25       Q.  At any point in time, was Mr. Zeleny told    04:20
```

Page 445

```
1    words to the effect of, if you conduct your event
2    during these time periods, we'll approve your
3    permit?
4        A.  Not that I'm aware of, no.
5        Q.  Was Mr. Zeleny ever told, during the          04:20
6    appeal process or during the permitting process, If
7    you conduct your protests within these manner
8    parameters, we'll approve your permit?
9            MR. MASTER:  Objection.  Vague and
10   ambiguous.  Overbroad.                               04:21
11           Go ahead.
12           THE WITNESS:  No, but, again, I would
13   refer back to the documents I received, the denial
14   documents that dealt with manner, that dealt with
15   time, they dealt with place.  And, again,            04:21
16   logically, you would say that if you were to
17   address each of those points that are in the denial
18   letters, then the permit could be issued or
19   approved.
20   BY MR. ROBINSON:                                     04:21
21       Q.  He would have to address the points to the
22   satisfaction of the City; correct?
23       A.  Correct.
24       Q.  So let's go back to Exhibit 103, which has
25   been marked in this deposition as 267.  We're        04:22
```

Veritext Legal Solutions
866 299-5127

```
 1   referring to it as 103.

 2           MR. MASTER:  Damion, just for clarity, can

 3   we either remove 267 or -- it's ridiculous to have

 4   two.

 5           MR. ROBINSON:  Well, we can't remove it.      04:22

 6   Veritext has to remove it.

 7           MR. MASTER:  So can we remove 267 and just

 8   call it 103, since you're referring to it as 103?

 9           MR. ROBINSON:  Yes, I'm referring to it as

10   103.  So let's refer to it as 103.                   04:22

11           MR. MASTER:  Okay.

12           THE WITNESS:  Okay.

13   BY MR. ROBINSON:

14       Q.  So in this response to the denial of his

15   permit and his appeal, Mr. Zeleny asked the City of  04:22

16   Menlo Park, If you have any specific requests in

17   this regard, meaning in terms of time, place or

18   manner, please make them with no further ado.

19           Do you see that?

20       A.  No.  Direct me to where that is.             04:23

21       Q.  It's in the third paragraph, the one that

22   starts out:  "As to your claim that my application

23   is incomplete."

24       A.  Okay.  I see it.

25       Q.  Do you know if the City did that, provided   04:23
```

Veritext Legal Solutions
866 299-5127

```
 1    specific requests to Mr. Zeleny as to the time,

 2    place or manner?

 3        A.  I do not believe that the City made

 4    specific time, place, manner suggestions to

 5    Mr. Zeleny, but I know there was an invitation to      04:23

 6    discuss those issues.

 7        Q.  Okay.  I'm going to go ahead and mark --

 8    I'm going to introduce what was previously marked

 9    as Exhibit 105.  It should pop up with the file

10    name 160504, Appeal Denial.                           04:24

11        A.  Okay.

12        Q.  Do you recognize this document?

13        A.  I recognize it as a letter.

14        Q.  A letter that was part of the

15    administrative record of Mr. Zeleny's permit          04:24

16    application and appeal?

17        A.  Yes.

18        Q.  Is it consistent with your recollection

19    that the City treated Mr. Zeleny's appeal as a new

20    permit application?                                   04:25

21        A.  I don't understand what you're asking.

22            MR. MASTER:  Read the document.

23            THE WITNESS:  Okay.  Let me read the

24    document.

25            MR. ROBINSON:  Okay.                          04:25
```

Veritext Legal Solutions
866 299-5127

```
 1            THE WITNESS:  Yes.  In reading the
 2    document, the answer is yes.  The city attorney's
 3    office was treating his appeal as a new
 4    application, as there were several modifications
 5    that he made to that application.              04:26
 6    BY MR. ROBINSON:
 7        Q.  And the new application was denied through
 8    this letter; correct?
 9        A.  Correct.
10        Q.  Do you know if anyone, other than the city   04:26
11    attorney's office, was involved in making the
12    decision to deny the renewed application or the new
13    application?
14        A.  Yes.  The city attorney's office, and I
15    spoke to the city attorney, and it is my           04:27
16    recollection that Matt Milde also spoke to the city
17    attorney.
18        Q.  What did you tell the city attorney?
19            MR. MASTER:  Objection.  Don't answer
20    that.  That's attorney-client-privileged           04:27
21    communication.
22    BY MR. ROBINSON:
23        Q.  Are you going to follow your attorney's
24    instruction not to answer?
25        A.  Yes.                                        04:27
```

                                    Page  449

1      Q.   Does the city attorney have authority to
2   approve or deny permit applications?
3      A.   Certainly.
4      Q.   Did you believe that Mr. Zeleny's renewed
5   permit application should be denied?                      04:27
6      A.   My -- my belief was that the concern --
7   I'm sorry.  Was there something else?
8      Q.   No.
9      A.   My belief was that the concern that we had
10  originally regarding the time, place, manner of          04:28
11  this permitted special event was still a concern as
12  far as location, still the confusion regarding the
13  exception to the open carry, the traffic -- the
14  traffic issues, the public safety issues both for
15  Mr. Zeleny, himself, and for the public at large.       04:28
16           So all those -- all those were still
17  concerns of the police department that I, in fact,
18  did let the city attorney know.
19     Q.   Do you know if Mr. Milde had a view about
20  whether this -- what was treated as a renewed            04:28
21  application should be denied?
22     A.   I don't know the answer to that.
23     Q.   Did you talk to Mr. Milde about it?
24     A.   Not about this second application, no.
25     Q.   Did the city attorney make the ultimate        04:29

```
 1    decision about whether to deny this application?
 2              MR. MASTER:  Objection.  Vague and
 3    ambiguous.  Overbroad.
 4              Go ahead.
 5              THE WITNESS:  Yes.  I believe the document    04:29
 6    speaks for itself.  That is the city attorney
 7    making that determination.
 8    BY MR. ROBINSON:
 9         Q.  Is there any policy or procedure that
10    you're aware of, a written policy or procedure,         04:29
11    that gives the city attorney's office authority to
12    grant or deny special event permit applications?
13         A.  As counsel -- legal counsel for the City,
14    it is within their purview to deny an application
15    of this nature.  I'm not sure whether it's written     04:29
16    anywhere, but they are legal counsel for the City.
17         Q.  And what gives you the impression that the
18    legal counsel for the City in that capacity has
19    authority to deny permit applications?
20              MR. MASTER:  Again, the question is vague,    04:30
21    ambiguous and overbroad.  Calls for a legal
22    conclusion and speculation.
23              Go ahead.
24              THE WITNESS:  The city attorney's office
25    is the department that is our legal advisors.  In      04:30
```

Page 451

```
1   some cases, the city attorney's office becomes
2   involved in city business or issues, and they have
3   the authority to make decisions.  They work -- the
4   city attorney's office works directly for the city
5   council.                                              04:30
6   BY MR. ROBINSON:
7       Q.  Are you aware of any other permit
8   application that was denied by the city attorney's
9   office, for a special event permit?
10      A.  I'm not aware of any, no.                      04:30
11      Q.  Do you know if, before denying this --
12  what was considered a revised application, the city
13  attorney attempted to contact Mr. Zeleny to address
14  some of the issues raised here, any of the issues
15  raised here?                                           04:31
16      A.  I don't -- as I sit here today, I don't
17  have a recollection of that, whether they did or
18  not.
19      Q.  Between Mr. Zeleny filing his notice of
20  appeal or e-mailing his notice of appeal and the      04:31
21  city attorney deciding to deny it, do you know if
22  anyone at the City contacted Mr. Zeleny to try to
23  get more information about his permit application?
24      A.  I don't know.  I don't have a recollection
25  of that.                                              04:31
```

Page 452

1    Q.  Going on to page 2 of this document, the
2  first full paragraph, it starts:  "Also, the
3  revised application."
4    A.  Yes.
5    Q.  It talks about the essential element of        04:31
6  community participation.  Do you see that?
7    A.  I do.
8    Q.  Is a requirement of community
9  participation anywhere in the written policies of
10  the City of Menlo Park related to special events     04:32
11  applications?
12    A.  Yes.  It's in the FAQ.
13    Q.  What is the standard for deciding if an
14  event requires or allows community participation?
15    A.  This goes back to when this committee got      04:32
16  together to address special events permits, because
17  the main issues that were going on were that
18  private families, single families were attempting
19  to block off entire streets for a birthday party
20  for their family member, and that caused a great     04:32
21  deal of consternation in the neighborhoods.
22       So one of the criteria was that if you're
23  going to be getting a special events permit and
24  blocking off, whether they be streets or sidewalks
25  or something to that effect, that it would be a      04:32

Veritext Legal Solutions
866 299-5127

1     community event and not just a private event for

2     one entity, one family, one household, et cetera.

3        Q.  What type of community participation

4     qualifies an event as a special event?

5        A.  I don't -- your question doesn't --        04:33

6     doesn't make sense, because it doesn't make it

7     qualify.  It's one of the criteria for allowing a

8     permit.  So, in other words, if a family wanted to

9     close down a street just to put their birthday

10    party on, it would be denied because it is not an   04:33

11    event for the community.

12       Q.  Who decides whether it's an event for the

13    entire community or not?  Let me rephrase that.

14           In considering whether to approve or deny

15    a special event permit, who at the City makes the   04:33

16    decision of whether the event has community

17    participation?

18       A.  That would be community services, on

19    whether or not the entire community is invited to

20    participate in this -- in this event.               04:33

21       Q.  Who made the decision of whether

22    Mr. Zeleny's event had the essential elements of

23    community participation?

24       A.  In this case, with the letter, with the

25    document that we see in front of us?                04:34

                                           Page 454

```
 1      Q.  Right.

 2      A.  The city attorney.

 3      Q.  Is the elements of community participation

 4   assessed case by case?

 5      A.  It would have to be.  Every application is    04:34

 6   going to be different.  So, yes, it's case by case.

 7      Q.  Is it a discretionary decision, on the

 8   part of whoever is deciding the application,

 9   whether the event had sufficient community

10   participation to qualify as a special event?        04:34

11          MR. MASTER:  Objection.  The question is

12   vague, ambiguous and overbroad.

13          Go ahead.

14          THE WITNESS:  Repeat the question.

15   BY MR. ROBINSON:                                     04:35

16      Q.  Does the person making the decision on a

17   special event permit application have discretion to

18   determine whether the application has enough of a

19   community participation element to qualify as a

20   special event?                                       04:35

21      A.  I would disagree in the way the question

22   is even asked.  Discretion in what way?  What

23   they're looking for is, is the public invited to

24   this or is it for one single entity that is

25   impacting other public members and they cannot       04:35
```

Veritext Legal Solutions
866 299-5127

```
 1   participate.  That's the issue.

 2        Q.  Does the event have to be open to anyone

 3   who shows up?

 4        A.  For a public event, yes.

 5        Q.  For a special event.                          04:35

 6        A.  For a special event, it has to be for the

 7   community if, in fact, it is impacting other

 8   community members.  Now, obviously, if somebody

 9   wants to -- as a hypothetical, if somebody wanted

10   to rent a park for a wedding, that doesn't           04:35

11   necessarily mean that everybody in the community is

12   invited, but, of course, they could go watch if

13   they wanted to.  You can't stop them from doing

14   that.  But it is -- that would be more of a limited

15   impact on the community, if they're at a park, as    04:36

16   opposed to closing down streets, et cetera.

17        Q.  Would that qualify as a special event?

18        A.  A wedding?

19        Q.  Right.

20        A.  It certainly would, yes.                     04:36

21        Q.  What about a block party; if a community

22   wanted to have a block party, that would be a

23   special event; right?

24        A.  As long as all the members on that -- all

25   the residents on that block signed an agreement,     04:36
```

                                              Page 456

1    yes.  If they said, yes, we're okay with this and

2    we're also invited to this block party, yes.

3       Q.  In order to qualify, would they have to

4    allow people who are not part of that residential

5    community to the event?                    04:36

6       A.  They -- it's not required that they allow

7    other people from the community, but the people who

8    would be affected on that block would be invited.

9       Q.  So I'm going to introduce another exhibit.

10   This one is 268.                         04:37

11        (Plaintiff's Exhibit 268 marked

12        for Identification.)

13  BY MR. ROBINSON:

14      Q.  The e-mail is a bit hard to read, but

15   let's go -- for the record, Exhibit 268 is four   04:37

16   pages, MP 473 through MP 476; correct?

17      A.  Yes.

18       MR. MASTER:  Damion, I believe this was

19   marked in at least two other depositions.  The

20   whole purpose of doing these continuing exhibits is  04:38

21   so we don't have duplicative exhibits.  Is there

22   any way you guys can actually do that?

23       MR. ROBINSON:  With respect to this

24   document, though, there's not, particularly since

25   it's already been marked in this deposition.  So   04:38

```
1   for this deposition, I'm going to refer to it as

2   268.

3   BY MR. ROBINSON:

4       Q.  Starting on the third page of Exhibit 268,

5   there is a letter from the City of Menlo Park to        04:38

6   Mr. Zeleny; correct?

7       A.  Correct.

8       Q.  And this is a further denial of an appeal

9   of the special events permit; correct?

10      A.  No.  That's incorrect.  It's not a denial    04:38

11  of an appeal.  It's a denial of an application, the

12  second application.

13      Q.  This is a denial of -- is the second

14  application -- what you referred to as the second

15  application the e-mail Mr. Zeleny sent asking to       04:39

16  appeal the denial of the first application?

17      A.  Yes.

18      Q.  And in the document we just looked at,

19  Exhibit 105, the city attorney's office had already

20  denied the new application; right?                     04:39

21      A.  That's correct.

22      Q.  And if you look at Mr. Zeleny's e-mail of

23  May 27, he starts out, "Dear Mr. McClure, I have

24  received your second denial, dated 4 May 2016, of

25  my amended application for a special event permit,     04:39
```

Page 458

```
 1   submitted on 15 April 2016.  My second appeal
 2   follows."
 3        Correct?  Do you see that?
 4        A.  Correct.  Yes.
 5        Q.  So Mr. Zeleny had submitted one          04:40
 6   application.  The City had denied it.  Mr. Zeleny
 7   attempted to appeal.  The City treated that as a
 8   new application and then denied it; right?
 9        A.  Yeah.  Now I see, based on the e-mail and
10   based on the dates, that this letter sent by Matt    04:40
11   Milde is, in fact, a denial of the second
12   application's appeal, if that makes sense.
13        Q.  In the ordinary process for permit
14   applications, does Mr. Milde himself resolve
15   appeals of permit applications?                 04:40
16        A.  He could, as the recreation coordinator,
17   and then it could be escalated to the community
18   services director.
19        Q.  In your previous testimony, I thought you
20   said that the permit committee decides appeals from  04:41
21   the initial denial.
22        A.  Right.  And Matt Milde was leading the
23   appeals committee -- I'm sorry -- the special
24   events committee at the time.
25        Q.  Do you know if this appeal was considered   04:41
```

Veritext Legal Solutions
866 299-5127

1    by the special events committee?

2        A.  I'm not sure who Matt Milde spoke to prior

3    to this denial.

4        Q.  Let's flip back to Exhibit 105 for just a

5    second.  It's 150504.                                04:41

6        A.  Okay.

7        Q.  In this letter, Mr. McClure directs

8    Mr. Zeleny to -- if he wishes to appeal, to provide

9    written notice to the community services director.

10          Do you see that?                              04:41

11       A.  I do.

12       Q.  Do you have an understanding of why, in

13   that case, Mr. Milde was directing the appeal

14   rather than the community services director?

15       A.  My recollection is that Mr. Zeleny         04:42

16   appealed via that e-mail, and as it was a new

17   application and a new appeal, it started back down

18   at the --

19          THE REPORTER:  Excuse me.  You're cutting

20   out.

21          (Record read by the Reporter.)

22          THE WITNESS:  That Mr. Zeleny was

23   appealing again to the second -- this is convoluted

24   because of all the documents that are here -- to

25   the second application.  So the initial appeal      04:42

                                              Page 460

1  would come from the special events committee that

2  Matt Milde chaired or headed.

3       So the initial denial of the appeal came

4  from him.  And then the next step in the appeal

5  would be the community services director.          04:43

6  BY MR. ROBINSON:

7     Q.  So when Mr. McClure, in his letter, told

8  Mr. Zeleny to contact the community services

9  director, that was an error.  Is that what you're

10 saying?                                            04:43

11    A.  I'm not sure it was an error, because that

12 is the logical -- the logical next step, but it's

13 my recollection that the letter from Matt Milde

14 came out immediately following this letter.

15    Q.  Do you know whether the community           04:43

16 services -- strike that.

17       Do you know whether the special event

18 permit committee provided input to Mr. Milde in

19 connection with this denial letter that's in

20 Exhibit 268?                                       04:44

21    A.  As I've already testified to today, I

22 don't know whether he talked to that other -- that

23 committee.

24    Q.  Okay.  In his letter, Mr. Milde told -- in

25 his letter of June 16th, 2016, Mr. Milde told      04:44

Page 461

```
 1    Mr. Zeleny that if he wanted to appeal further, he
 2    would appeal to the city manager, Alex McIntyre.
 3            Do you see that?
 4        A.  I'm on a different -- you need to give me
 5    the number of that.  Which one was that?              04:44
 6        Q.  Exhibit 268.
 7        A.  Yes.  Based on that paragraph in this
 8    letter, which reads:  "Determination of the
 9    approval or denial of any application is at the
10    discretion of the special event permit committee    04:45
11    acting on behalf of the community services
12    director.  If you feel this decision has been made
13    in error or warrants a permit outside of the
14    policies established by the City of Menlo Park, you
15    may appeal in writing to the city manager, Alex     04:45
16    McIntyre."
17        Q.  What does the reference to a "permit
18    outside of the policies established by the City of
19    Menlo Park" mean?  What policies are being referred
20    to?                                                  04:45
21        A.  The policies that are found in the
22    application process, the FAQs.
23        Q.  Any other policies that that could be
24    referring to, other than the four documents we
25    looked at last time?                                 04:45
```

```
 1      A.  Yes.  Outside of policies, we also have

 2   laws that would have to be addressed, also, whether

 3   they are local, state or federal.

 4      Q.  Can the city manager grant permit

 5   applications outside of the written policies          04:46

 6   established by the City?

 7      A.  Did you say can he?

 8      Q.  Does he have the authority to issue a

 9   permit outside of the policies established by the

10   City of Menlo Park?                                   04:46

11         MR. MASTER:  Object.  The question is

12   vague, ambiguous and overbroad.  Lacks foundation.

13   Calls for speculation.

14         You can answer, if you know.

15         THE WITNESS:  The city manager has the         04:46

16   right -- or has the ability and the right to

17   overturn a denial and issue a permit.  The city

18   manager is the -- basically, the CEO of the City.

19   BY MR. ROBINSON:

20      Q.  So can the city manager -- let's step          04:46

21   back.  In 2016, at the time this letter was

22   written, did the city manager have the authority to

23   issue a special events permit outside of the

24   policies established by the City of Menlo Park?

25      A.  The city manager was not involved in           04:47
```

Page 463

```
 1   issuing permits, period.  The city manager was
 2   involved in the appeal process and could overturn a
 3   denial of a permit, and if they -- if the city
 4   manager so wished, they could allow the permit to
 5   be issued.  Permit applications do not go straight    04:47
 6   to the city manager.
 7       Q.  Did the city manager have the right to --
 8   as part of the appeals process, to approve a permit
 9   outside of the policies established by the City of
10   Menlo Park?                                           04:47
11           MR. MASTER:  Objection.  Vague and
12   ambiguous and overbroad.  Lacks foundation.  Calls
13   for a legal conclusion and speculation.
14           THE WITNESS:  Again, the city manager
15   could, in fact, overturn a denial of a permit and    04:47
16   have the permit issued.
17   BY MR. ROBINSON:
18       Q.  Could he overturn the denial of a permit
19   outside the policies established by the City of
20   Menlo Park?                                           04:48
21       A.  Yes.
22       Q.  Okay.  I'm going to mark the next in
23   order.  So the document has been previously marked.
24   The file name and the folder is 160624, Further
25   Denial.                                               04:49
```

Page 464

```
 1      A.  What are the Bates numbers?

 2      Q.  MP 0477 through MP 000480.

 3      A.  Okay.  I see it.

 4      Q.  It was previously marked as Exhibit 77, on

 5   the first page.                                    04:49

 6      A.  Yes.

 7      Q.  And I'm going to ask you to take a look at

 8   the special event denial appeal letter of June 24,

 9   2016, starting on 479.

10      A.  Okay.                                       04:49

11      Q.  This was a letter by Cherise Brandell;

12   correct?

13      A.  Yes.

14      Q.  Ms. Brandell was the community services

15   director?                                          04:50

16      A.  At the time, yes.

17      Q.  Do you have an understanding of why

18   Mr. Zeleny's further appeal was routed to

19   Ms. Brandell instead of Mr. McIntyre?

20      A.  Well, that would be the logical next step   04:50

21   in the appeal.  So I'm not sure if Mr. Milde

22   perhaps made a mistake in giving the city manager

23   the next step in the appeal, but this would be the

24   logical next step in the appeal, as stated in the

25   application process.                               04:50
```

Q.  I'm going to -- let's mark a new exhibit.

              You're aware that Mr. Zeleny did appeal to

    the city manager following Ms. Brandell's letter;

    correct?

         A.  Yes.                                        04:51

         Q.  And there was a hearing regarding that

    appeal?

         A.  That's correct.

         Q.  Did you participate in the hearing?

         A.  I did.                                      04:51

         Q.  Did you represent City staff in the

    hearing?

         A.  I did.

         Q.  Did you argue in favor of upholding --

         A.  You broke.                                  04:52

              MR. MASTER:  Upholding what?

              MR. ROBINSON:  The denial of the permit to

    Mr. Zeleny.

              THE WITNESS:  Yes.

                 (Plaintiff's Exhibit 269 marked

                  for Identification.)

    BY MR. ROBINSON:

         Q.  So I marked Exhibit 269.  It's MP 948

    through MP 951.  Let me know when it loads.

         A.  I have it.                                  04:52

                                             Page 466

```
 1       Q.  Do you recognize this exhibit?

 2       A.  I'm sorry.  Do I recognize the document?

 3       Q.  Correct.

 4       A.  Yes.  It's a letter.

 5       Q.  Mr. McIntyre's letter denying Mr. Zeleny's    04:53

 6   appeal; correct?

 7       A.  Correct.

 8       Q.  Mr. McIntyre lists grounds for denial of

 9   the appeal, starting on page 3 and carrying over to

10   page 4.  Do you see that?                            04:53

11       A.  Yes.

12       Q.  Do any of those grounds appear in the

13   written policies of the City of Menlo Park

14   governing permit approval or denial?

15            MR. MASTER:  Vague and ambiguous and        04:54

16   overbroad.

17            THE WITNESS:  Most of these points have to

18   do with Penal Code violations and/or Vehicle Code

19   violations.  So, no, they would not be in the FAQs

20   of the special events permit process, as you're      04:54

21   required to follow the law.

22   BY MR. ROBINSON:

23       Q.  One of the uses that we talked about

24   before of special event permits are for block

25   parties; is that right?                              04:54
```

Veritext Legal Solutions
866 299-5127

```
 1        A.  Correct.

 2        Q.  In connection with block parties, people

 3   are allowed to block off a certain portion of a

 4   street to have the block party?

 5        A.  That's correct.                          04:54

 6        Q.  They're allowed to have the block party

 7   actually in the street?

 8        A.  The Vehicle Code allows a local

 9   municipality to block off portions of a street.

10   And the answer is yes.                            04:55

11        Q.  And in connection with special event

12   permit applications for block parties, residents

13   are allowed to block off the street and have the

14   party in the street; correct?

15        A.  That's correct.                          04:55

16        Q.  And that's true, even though the event

17   would interfere with the right-of-way; correct?

18        A.  As long as the entire block signed a

19   release saying they were okay with the block party,

20   yes.                                              04:55

21        Q.  Let's look at page -- starting on 950 and

22   carrying over to 951.  There are practical aspects

23   and public safety concerns.  One is the lighting at

24   night.

25            Do you see that?                         04:55
```

```
 1        A.  I do.

 2        Q.  Is the lighting at night contemplated by

 3   the City's written policy as to special events

 4   permits?

 5        A.  No.  By the Vehicle Code.                04:55

 6        Q.  The next sentence says, "City medians are

 7   not traditional public forum areas and are

 8   inappropriate and unsafe."

 9            Is that written into the City's policies

10   anywhere?                                         04:56

11        A.  That is common sense.

12        Q.  Okay.  Is it written into the City's

13   policies anywhere?

14        A.  No.

15        Q.  Whose decision is it about whether the   04:56

16   location of an event is a traditional public-forum

17   area?

18        A.  Again, it would be based on

19   transportation, the Department of Public Works, the

20   Vehicle Code and then, again, going back to what I  04:56

21   just said, common sense.  There are some places

22   that are probably not safe to be having a group of

23   people congregate on, including a median of a

24   well-traveled, high-speed road.

25        Q.  I'm going to mark as Exhibit --          04:57
```

```
 1          What's the next in order?

 2          THE REPORTER:   270.

 3          MR. ROBINSON:   So I'm going to mark as

 4   Exhibit 270 a multiple-page document, MP 883

 5   through MP 886.                                      04:57

 6          (Plaintiff's Exhibit 270 marked

 7           for Identification.)

 8   BY MR. ROBINSON:

 9      Q.  Let me know when it loads.

10      A.  I have it.                                    04:57

11      Q.  Do you recognize it?

12      A.  It's an e-mail.

13      Q.  It's an e-mail exchange between you and

14   individuals at the Department of Justice; right?

15      A.  That's correct, their firearms division.     04:58

16      Q.  What was the subject of these

17   communications?

18      A.  The subject was what I discussed this

19   morning regarding a request to the DOJ for

20   information on the entertainment firearms permit     04:58

21   that was produced by Mr. Zeleny.

22      Q.  What were you -- what were you seeking

23   from the Department of Justice?

24      A.  As I stated, again, this morning, I had

25   said I had never seen one before and I didn't know   04:58
```

Page 470

```
 1   what that permit allowed.  So I was asking them to
 2   give me clarification on it.
 3       Q.  Did they eventually -- they did eventually
 4   give you clarification; right?
 5       A.  Via the phone call that I testified about    04:58
 6   this morning with the female person from DOJ.
 7       Q.  Mr. Zeleny appealed from the city
 8   manager's decision to the city council regarding
 9   his special event permit; right?
10       A.  Correct.                                     04:59
11       Q.  And there was a hearing on Mr. Zeleny's
12   appeal of the city manager's decision; correct?
13       A.  Correct.
14       Q.  And you represented the City staff at that
15   hearing?                                             04:59
16       A.  Yes, myself and Nick Flegel from the city
17   attorney's office.
18       Q.  I've marked as Exhibit 271 -- it looks
19   like an 11-page document, MP 1195 to MP 1205.
20           (Plaintiff's Exhibit 271 marked            05:00
21            for Identification.)
22           THE WITNESS:  I have it.
23   BY MR. ROBINSON:
24       Q.  Do you recognize it?
25       A.  It's an e-mail with an attachment.          05:00
```

Page 471

1      Q.  It's an e-mail from you to, it looks like,

2  Jelena Herada and Clay Curtin; correct?

3      A.  Jelena Herada and Clay Curtin, that's

4  correct.  They are both employed by the City.

5      Q.  Attached to the e-mail is a PowerPoint     05:00

6  presentation.  Do you see that?

7      A.  I do.

8      Q.  We couldn't hear your answer.

9      A.  I do see the PowerPoint.

10     Q.  Is this the PowerPoint that you presented   05:01

11  at the hearing on Mr. Zeleny's permit appeal?

12     A.  Yes.

13     Q.  Did you put this PowerPoint together?

14     A.  I did.

15     Q.  Did you make the decision to include on    05:01

16  page 1199 the same image that we've discussed

17  earlier?

18     A.  Yes.

19     Q.  Did you think that it was relevant to the

20  city council's decision, to consider that image?   05:01

21     A.  Yes.  This is what Mr. Zeleny said himself

22  he'd be displaying.  So, yes, it was relevant.

23     Q.  At the hearing, it was suggested that this

24  image might be deemed obscene to minors; is that

25  right?                                        05:01

1    A.  I brought up the same concern I had that I

2    brought up during the city manager's hearing, in

3    that if there was a victim, a complaining victim,

4    that the Penal Code section that I discussed with

5    the DA could have been violated.  And, yes, there          05:02

6    was an issue with that.

7    Q.  In your mind, as a representative of City

8    staff, was that a reason to deny the application?

9    A.  Not -- not in and of itself, no, but it

10   was part of the entire record, that it was                 05:02

11   important for the city council to have all the

12   facts.

13   Q.  As part of the entire record, was it your

14   view that the image that Mr. Zeleny proposed to

15   display supported denial of the application?               05:02

16   A.  I believed it was part of the entire

17   record, and they had the final, ultimate decision

18   on whether to uphold or overturn the appeal.  And

19   this was part of the record, so that was put into

20   the PowerPoint.                                            05:02

21   Q.  When you were at the hearing, did you

22   argue that the image that Mr. Zeleny was using was

23   an additional basis to uphold the denial of the

24   appeal?

25   A.  Not that I -- as I sit here today, I don't             05:03

1    recall myself saying that it was a specific reason

2    to deny.  What I believe I said was it was of

3    concern, also.

4        Q.  So the PowerPoint presentation that you

5    put together does not contain the entire record of      05:03

6    Mr. Zeleny's application and appeal; does it?

7        A.  Not the entire record, no.  It gives

8    bullet points as to some of the timing and the

9    relevant, salient points in our -- basically, our

10   case to the city council.                               05:03

11       Q.  The image that Mr. Zeleny was displaying

12   was one of your salient points to the city council;

13   correct?

14          MR. MASTER:  Objection.  Vague and

15   ambiguous.  Overbroad.                                  05:03

16          Go ahead.

17          THE WITNESS:  That was the image that he,

18   himself, provided that was going to be displayed,

19   along with an image of a gun that he, himself,

20   provided that was going to be displayed.  So, yes,      05:04

21   they were salient because they came from the

22   applicant himself.

23   BY MR. ROBINSON:

24       Q.  In the appeal to the city council, you are

25   arguing in favor of upholding the denial of the         05:04

```
 1   permit; right?
 2        A.  That's correct.
 3        Q.  Your position, on behalf of the City
 4   staff, was that the city council should uphold the
 5   denial of the permit; true?                          05:04
 6        A.  That was my argument, yes.
 7        Q.  And you put together this presentation in
 8   order to support your argument the city council
 9   should deny -- should uphold the denial of the
10   permit; right?                                       05:04
11        A.  Well, that was part of it.  Part of it was
12   also to educate them as to the entire history of
13   this situation, with bullet points describing each
14   step that was taken, what was being contemplated in
15   the special event, et cetera.  So it was both        05:04
16   informational and also put together to bolster
17   my -- our case to the city council.
18        Q.  Was it your intention, at the time that
19   you put this presentation together, to include the
20   image to assist you in convincing the city council   05:05
21   to uphold the denial of Mr. Zeleny's permit?
22        A.  As I've already stated, the images that
23   were in the PowerPoint were provided by Mr. Zeleny
24   himself.  So they were put in because they were
25   provided by Mr. Zeleny as an example of what he      05:05
```

```
1    intended to do.  That is information that the city
2    council, in my opinion, needed to have, provided by
3    the applicant himself.
4        Q.  Some of the information that the city
5    council needed to have, in your view, was this          05:05
6    image that Mr. Zeleny proposed to display; is that
7    fair?
8            MR. MASTER:  Asked and answered.  You're
9    asking the same question over and over again.
10           One more time.                                  05:06
11           THE WITNESS:  Both images were provided by
12   Mr. Zeleny as to what he would plan to display as
13   part of his, quote, unquote, special event, and
14   that was important, salient information that the
15   city council should know.                               05:06
16   BY MR. ROBINSON:
17       Q.  Did you include the photo of the gun for
18   the same reason?
19       A.  I did just say that, Counsel; I did.  I
20   said both photos.                                       05:06
21           MR. MASTER:  We've been going for an hour.
22   Let's take a couple of minutes.
23           And then how much time do we have left?
24           MR. ROBINSON:  We can take a couple of
25   minutes.  We're -- there's a fair amount of             05:06
```

Page 476

```
1   information to go over.

2           How are we on time on the record?

3           THE VIDEOGRAPHER:  We've been on the

4   record for five hours and 20 minutes.

5           MR. ROBINSON:  Okay.  So I will try to        05:07

6   finish within the seven-hour limit provided.  I

7   think that's feasible at this point.

8           THE VIDEOGRAPHER:  Would you like to go

9   off the record?

10          MR. MASTER:  It will be feasible within       05:07

11  seven hours.  Without question, that will happen.

12          THE VIDEOGRAPHER:  Going off the record.

13  The time now is 5:07.

14          MR. ROBINSON:  Hold on, before we go off

15  the written record.                                   05:07

16          THE VIDEOGRAPHER:  Okay.

17          MR. ROBINSON:  So for purposes of the

18  record, as I said, I'm going to try to complete

19  this in a total of seven hours of on-the-record

20  time, as a courtesy.  We did not use up our seven     05:07

21  hours of on-the-record time at the first day of

22  deposition, and so we're entitled to complete a

23  total of 14 hours, two days, per our agreement with

24  the City.

25          So we'll take the time that we need.  And     05:08
```

Page 477

```
1    I would appreciate if my offer to try to complete
2    it in seven hours of on-the-record time today, as a
3    courtesy, were not misconstrued as some concession
4    that you can terminate the deposition before we are
5    done with our 14 hours.                              05:08
6            I guess Mr. Master is not on audio
7    anymore.
8            Okay.  We can go off the record.
9            THE VIDEOGRAPHER:  Going off the record.
10   The time now is 5:03.                                05:08
11           (Off the record.)
12           THE VIDEOGRAPHER:  Back on the record.
13   The time now is 5:15.
14   BY MR. ROBINSON:
15       Q.  Chief Bertini, I uploaded a document.  The   05:16
16   file name is 170829 - Staff Report, previously
17   marked as Exhibit 79.
18           Did you participate in -- did you
19   participate in preparing this report?
20       A.  Yes.  The city attorney, Nick Flegel, and    05:16
21   I prepared it.  I gave City Attorney Flegel
22   information that he requested for the staff report.
23       Q.  And was this presented to the city council
24   in connection with Mr. Zeleny's appeal?
25       A.  Yes.  All items that go to the city          05:16
```

Veritext Legal Solutions
866 299-5127

1  council have a staff report attached to it, and
2  this is a staff report.
3      Q.  The city council upheld the denial of
4  Mr. Zeleny's permit; right?
5      A.  Correct.                                    05:16
6      Q.  At any point in the process, from the date
7  that Mr. Zeleny submitted his permit application to
8  the date that the city council upheld the denial,
9  did the City make any offer or proposal to
10 Mr. Zeleny that he could have accepted that would   05:17
11 have allowed his permit to go -- his permit
12 application to be approved?
13     A.  I've already testified to that.  As I
14 stated, each letter of denial had points where the
15 City -- whether it was the city manager or          05:17
16 community services director or city manager and
17 city council -- stated that there were issues with
18 the permit and if Mr. Zeleny had addressed those
19 issues, logically, one could conclude that the
20 permit could have been granted.                     05:17
21     Q.  Did the City ever -- I understand that the
22 City raised issues, and I understand your testimony
23 that if Mr. Zeleny had addressed those issues, the
24 City may -- may have granted the permit.  My
25 question was a little different.                     05:18

                                             Page 479

```
 1            Was there ever a point in time, in this
 2   process where Mr. Zeleny was applying for a permit,
 3   that the City presented to him a comprehensive
 4   proposal that said, If you make these changes to
 5   your application, we will approve it?              05:18
 6       A.  No.  As I stated earlier, I believe --
 7   again, I'm -- my recollection is not 100 percent as
 8   to whether it was for the special event or the film
 9   permit, but I know there was some discussion about
10   if you just -- you know, we can discuss ways to be  05:18
11   able to accommodate you, but I don't remember
12   whether that was the special event or the film
13   permit.
14       Q.  So let's set aside an invitation to
15   discuss ways around it or ways to get it approved,  05:19
16   and let's set aside raising issues that Mr. Zeleny
17   needed to address.
18            Was there ever a time, in the special
19   events permit application process, that the City
20   made a suggestion to Mr. Zeleny along the lines of,  05:19
21   If you do these things, we'll approve your
22   application?
23       A.  Aside from what I've already testified to,
24   no.
25       Q.  I'm going to now copy another previously   05:19
```

Veritext Legal Solutions
866 299-5127

1   marked exhibit into the exhibit folder.  And the

2   file name is Film Permit Guidelines, previously

3   marked as Exhibit 35.

4          Let me ask you a couple of background

5   questions.                                        05:20

6          At some point, Mr. Zeleny, after the city

7   council denied the special events permit, he asked

8   that it be reconsidered as a film permit; correct?

9      A.  Yes.  I believe that suggestion came from

10  the city attorney's office.                       05:20

11     Q.  And Mr. Zeleny then commenced the process

12  of applying for a film permit instead of a special

13  events permit; right?

14     A.  Correct.

15     Q.  So please take a look at the exhibit I      05:20

16  mentioned, the Film Permit Guidelines, previously

17  marked as Exhibit 35.

18     A.  I see it.

19     Q.  It's a two-page document, MP 5241 and

20  5242; is that correct?                            05:21

21     A.  Correct.

22     Q.  Are these the City's written guidelines

23  for issuing film permits?

24     A.  Yes.

25     Q.  Aside from this document and the contents   05:21

1    of the actual film permit application itself, are
2    there any other written policies, procedures or
3    guidelines in the City of Menlo Park about issuing
4    film permits?
5        A.  No.                                        05:21
6        Q.  Were there any written guidelines at the
7    time that Mr. Zeleny applied, other than this
8    document and the contents of the application
9    itself?
10       A.  Well, it also speaks about having to get a   05:21
11   one-day business permit, too.
12       Q.  So let's leave that aside.  Aside from the
13   one-day business permit requirement, the total of
14   the written policies of the City of Menlo Park
15   concerning film production permits at the -- go     05:21
16   ahead.
17       A.  I didn't say anything.
18       Q.  There was feedback, I guess.
19           At the time Mr. Zeleny applied for a film
20   permit, leaving aside the business license issue,   05:22
21   this document that we're looking at, Exhibit 35,
22   and the permit application itself contained all of
23   the written policies of the City of Menlo Park;
24   correct?
25       A.  Correct.                                    05:22

                                        Page 482

```
1        Q.  Were there any unwritten policies at that

2    time?

3        A.  There are no unwritten policies, but,

4    again, just like the special event permit, laws are

5    still applicable, whether they be local, state or     05:22

6    federal.

7        Q.  In the ordinary course of processing film

8    permit applications, who makes the decision -- the

9    initial decision of whether to grant or deny?

10       A.  That is through the public works             05:22

11   department.

12       Q.  Is there a particular -- at the time

13   Mr. Zeleny applied, was there a particular person

14   in public works who made that decision?

15       A.  There was somebody assigned to that role,    05:23

16   and that was Ivan Toews, or Toews.  I'm not sure

17   how you pronounce it.

18       Q.  What criteria -- at the time that

19   Mr. Zeleny applied for a film permit, what criteria

20   did the City consider in whether to grant or deny a  05:23

21   film permit?

22       A.  The criteria that you see on the document

23   that we're discussing right now.

24       Q.  What criteria are you referring to on the

25   document?                                            05:23
```

Page 483

```
 1        A.  Nos. 1 through 10.

 2        Q.  So let's start with No. 1.  No. 1 requires

 3   the permit team to submit in writing all pertinent

 4   details.  Do you see that?

 5        A.  I do.                                    05:24

 6        Q.  Let me ask you a different way.

 7            If the person seeking a permit complies

 8   with all of these requirements, is the City

 9   required to grant a permit?

10            MR. MASTER:  Vague and ambiguous.        05:24

11   Overbroad.  It's an incomplete hypothetical and

12   calls for speculation.

13            Go ahead.

14            THE WITNESS:  No, I don't think the

15   City -- to my knowledge, the City is not required  05:24

16   to issue any permit.

17   BY MR. ROBINSON:

18        Q.  So if a person seeking a permit complies

19   with all of the requirements listed in this

20   document, how does the City decide whether or not  05:24

21   to grant the permit?

22            MR. MASTER:  Vague and ambiguous as to the

23   term "requirements."

24            Go ahead.

25            THE WITNESS:  These are the general        05:24
```

Page 484

```
 1   guidelines for a film permit in the City of Menlo
 2   Park.  Other guidelines would include applicable
 3   laws that would be in place, depending on what is
 4   being contemplated, and eventually the City would
 5   come to a conclusion on whether to issue a permit      05:25
 6   or not.
 7   BY MR. ROBINSON:
 8       Q.  What would the City consider in coming to
 9   a conclusion about whether they issue the permit or
10   not?                                                   05:25
11       A.  I don't understand your question.  What
12   does the City consider?
13       Q.  Right.  What does the City consider in
14   deciding whether to issue a permit?  What factors
15   does it consider?                                      05:25
16       A.  Well, just like the special events permit,
17   time, manner, place, and all the criteria you see
18   in the document that we're discussing right now are
19   things the City would consider, along with other --
20   other factors having to do with, again, traffic,      05:26
21   public safety, the impact on residents who may be
22   living near the area of the filming.  So there are
23   criteria that the City would have to look for.
24       Q.  So the criteria you mentioned, one is
25   traffic; right?                                        05:26
```

```
 1        A.  Yes.

 2        Q.  How did the City determine whether a

 3   proposed film production has a sufficient impact on

 4   traffic to require denial?

 5           MR. MASTER:  Objection.  Hold on.  Vague      05:26

 6   and ambiguous and overbroad.  Incomplete

 7   hypothetical.  Lacks foundation.

 8           Go ahead.

 9           THE WITNESS:  I don't understand that

10   question.                                             05:26

11   BY MR. ROBINSON:

12        Q.  Traffic impact is one of the things the

13   City considers; right?

14        A.  Yes.

15        Q.  Is there any particular level of traffic     05:26

16   impact that would cause a permit to be denied?

17        A.  There is -- it would be impossible to say

18   there's a level of traffic impact because I don't

19   even know what that means.

20        Q.  Is there a certain type of traffic impact    05:27

21   that would cause a permit to be denied?

22        A.  Every situation would be different.  If

23   someone wanted to close a major arterial for weeks

24   on end to film a movie where there was not a very

25   easy detour around that location, that would be       05:27
```

Veritext Legal Solutions
866 299-5127

```
 1    problematic.  So it would be a case-by-case basis.
 2        Q.  One of the things that you mentioned was
 3    public safety; right?
 4        A.  Correct.
 5        Q.  Are there any public safety criteria that      05:27
 6    would be applied to a film permit application, any
 7    specific criteria?
 8        A.  Section 4.
 9        Q.  You mean the noise ordinance?
10        A.  There's noise, explosions, pyrotechnics,       05:27
11    things of that nature.
12        Q.  Other than the criteria listed in point 4
13    of Exhibit 35, are there any other public safety
14    considerations that go into whether a permit
15    application for a film permit will be granted or       05:28
16    denied?
17            MR. MASTER:  I'll object to the question
18    as vague, ambiguous and overbroad.
19            Go ahead.
20            THE WITNESS:  And then point No. 3 on the      05:28
21    same document.
22    BY MR. ROBINSON:
23        Q.  So compliance with -- well, let's start
24    with this.  On point No. 3, it refers to guidance
25    of City supervisory employees pertaining to the use    05:28
```

Veritext Legal Solutions
866 299-5127

1    of city property.

2          Do you see that?

3      A.  Yes.

4      Q.  Is the guidance of City supervisory

5    employees pertaining to the use of city property    05:28

6    published somewhere?

7      A.  I don't quite understand what you're

8    talking about.  The guidance of City supervisory

9    employees.  In other words, the person who is

10   having the film needs to obey the guidance of the    05:29

11   City supervisory employee that would be on the

12   scene.

13     Q.  So the guidance is given on a case-by-case

14   basis?

15     A.  Correct.                                        05:29

16     Q.  Is the guidance in the discretion of the

17   city supervisory employee?

18     A.  Yes.

19     Q.  So other than what's listed in points 3

20   and 4 on Exhibit 35, are there any other public    05:29

21   safety considerations that go into the granting or

22   denial of a film permit?

23     A.  And point No. 1 in the same document.

24     Q.  Okay.  Other than point No. 1, 3 and 4,

25   are there any other public safety considerations?    05:29

Veritext Legal Solutions
866 299-5127

```
 1      A.  Five.

 2      Q.  Okay.  So under point 5, the City -- the

 3   permittee shall make arrangements for traffic

 4   controls satisfactory to Menlo Park Police

 5   Department.                                      05:30

 6          Is that what you're referring to?

 7      A.  I am.

 8      Q.  Are there any set criteria, definite

 9   criteria, for the arrangements satisfactory for

10   Menlo Park Police Department?                    05:30

11      A.  That would be on a case-by-case basis.  It

12   would depend on what kind of closures they're

13   anticipating.

14      Q.  So we've covered 1, 3, 4 and 5.

15          Why don't we do this:  Are there any      05:30

16   public safety criteria considered in connection

17   with film permit applications that are not listed

18   on this document that we're looking at?

19      A.  Only those dealing with other laws that

20   might be applicable, either local, state or       05:30

21   federal.

22      Q.  Other than state, federal or local laws

23   and the points listed on this Exhibit 35, are there

24   any other public safety criteria that go into a

25   film permit application?                          05:31
```

Page 489

1      A.  I believe that about covers it.

2      Q.  In some instances, the City will impose

3   conditions on the permit; right?

4      A.  The film permit?

5      Q.  Correct.                                    05:31

6      A.  Yes.

7      Q.  How does the City come up with the

8   conditions to impose on film permits?

9      A.  It depends on what the permit seeker is

10  contemplating doing.  It's case by case.           05:32

11     Q.  Is there an appeals process for film

12  permit decisions?

13     A.  The -- to the best of my recollection, the

14  appeal process is similar to the special events.

15  That goes through the department director to the    05:32

16  city manager to the city council.

17     Q.  So I'm going to introduce what we've

18  previously marked as Exhibit 74.  It may show up at

19  the bottom.  The file name is Film Permit -

20  Billions, 74.                                       05:33

21     A.  Okay.

22     Q.  It's, for the record, MP 1768 through --

23  it's a 12-page document, starting on MP 1768;

24  correct?

25     A.  MP 1779.  Yes.                               05:34

                                        Page 490

```
 1        Q.  Do you recognize Exhibit 74?

 2        A.  No.

 3        Q.  Does it appear to be the format of a film

 4    permit for the City of Menlo Park?

 5        A.  Yes.                                        05:34

 6        Q.  Does it appear that this film permit was

 7    approved?

 8        A.  I'd have to read the entire document.  I

 9    don't know.

10        Q.  On the first page of the document, it      05:34

11    says, Issued 11-29-2017.  Does that indicate to you

12    that it was issued?

13        A.  Sure.

14            MR. MASTER:  Well, don't guess.  Do you

15    know or not?                                        05:34

16            THE WITNESS:  It says it was issued, yeah.

17    BY MR. ROBINSON:

18        Q.  All right.  So let's go down to the page

19    that's MP 1770.  Is this the form of application

20    that the City of Menlo Park used in 2016 for film   05:35

21    permits?

22        A.  Yes.  It was a combination of the film

23    permit and the encroachment permit application.

24        Q.  And in this application, it appears that

25    the applicant is seeking to film a Tesla car        05:35
```

Veritext Legal Solutions
866 299-5127

```
 1  driving on Sand Hill Road?

 2      A.  Yes.

 3      Q.  And let's take a look at the very last

 4  page of this document, MP 1779.  It appears that

 5  the route that was being contemplated was along      05:36

 6  Sand Hill Road; correct?

 7      A.  Correct.

 8      Q.  And it went from Highway 280 to Alpine

 9  Road?

10      A.  That is part of the route I see on the      05:36

11  map, yes.

12      Q.  And that area from the 280 to Alpine Road,

13  does that cover the same section of Sand Hill Road

14  where Mr. Zeleny was proposing to protest?

15          MR. MASTER:  Objection.  Vague and          05:36

16  ambiguous.  Overbroad.

17          Go ahead.

18          THE WITNESS:  Well, you might want to

19  re-ask that because -- where he wanted to protest

20  or where he wanted to do a special event or film    05:36

21  permit?  Which one?

22  BY MR. ROBINSON:

23      Q.  Does it cover the same area of Sand Hill

24  Road that was contemplated on his film permit

25  application?                                         05:37
```

Veritext Legal Solutions
866 299-5127

```
 1        A.  Yes.

 2        Q.  Does it cover the same section of Sand

 3   Hill Road the City now claims it had no

 4   jurisdiction to issue permits for?

 5        A.  No.  This is the -- this is the actual      05:37

 6   roadway, not the center median.  So I would

 7   disagree with you.

 8        Q.  Is it your understanding that the City has

 9   jurisdiction over the roadway but not the center

10   median?                                              05:37

11        A.  I can't answer that question.  But most of

12   this is within the -- what is indicated here as

13   request No. 1, Menlo Park, is within our city

14   limits.

15        Q.  So one of the first documents we looked at  05:37

16   today were interrogatory responses.  Do you recall

17   that?

18        A.  Yes.

19        Q.  And you verified those interrogatory

20   responses?                                           05:37

21        A.  Yes.

22        Q.  And as part of your responses, you

23   indicated that the City had no jurisdiction to

24   issue permits for the area that Mr. Zeleny was

25   seeking permits; correct?                            05:38
```

Page 493

```
1      A.  For the center median, for --

2      Q.  I understand.  That was your response,

3  right, the City had no jurisdiction over the center

4  median; correct?

5      A.  Correct.                                    05:38

6      Q.  Is it your understanding that the City has

7  no jurisdiction over the center median but does

8  have jurisdiction over the surrounding roadway?

9          MR. MASTER:  Objection.  Asked and

10  answered.                                          05:38

11          Go ahead.  You can answer.

12          THE WITNESS:  It is within the city limits

13  of Menlo Park.  And the roadway that is being

14  contemplated in this application is all of Menlo

15  Park, then encroaching into CalTrans state         05:38

16  jurisdiction, but it's within the city limits of

17  Menlo Park.

18  BY MR. ROBINSON:

19      Q.  Is the median within the city limits of

20  Menlo Park?                                        05:39

21      A.  Yes.

22      Q.  So let's take a look -- I'm going to

23  upload a previously marked Exhibit 73.

24      A.  What's it called on the list?

25      Q.  It's Film Permit - Sand Hill, 73.          05:39
```

Veritext Legal Solutions
866 299-5127

```
 1      A.  Okay.

 2      Q.  For the record, 73 is MP 1772 through

 3  1728; correct?

 4      A.  Yes.

 5      Q.  This is also a film permit that was issued    05:40

 6  by the City of Menlo Park; correct?

 7      A.  Yes.

 8      Q.  And it also contemplates filming on Sand

 9  Hill Road in Menlo Park?

10      A.  Yes.                                          05:40

11      Q.  If you go to 1726, under the "Activities"

12  section, it refers to -- it says, If possible, we'd

13  like to potentially place a camera on the median,

14  if you're okay with it.

15          Do you see that?                              05:41

16      A.  Yes.

17      Q.  Do you know if this group was given

18  permission to place a camera on the median?

19      A.  I don't know.

20      Q.  Does the City have a set time frame for      05:41

21  approval or denial of film permits?

22      A.  Not that I'm aware of.

23      Q.  Is film permitting also a discretionary

24  decision by the City staff?

25      A.  Yes.                                          05:41
```

Page 495

1      Q.  Do the factors that City staff takes into

2   account depend on the specific filming being

3   contemplated?

4      A.  Yes.

5      Q.  Is there any list of specific requirements      05:41

6   that are -- other than the documents previously

7   looked at and the film permit application itself,

8   is there any list of criteria published anywhere

9   that need to be satisfied before a film permit is

10  issued?                                               05:42

11         MR. MASTER:  Objection.  Asked and

12  answered at least a half a dozen times.

13         One more time.

14         THE WITNESS:  As I stated before, the list

15  is the document that you showed me, the              05:42

16  application, and then any applicable local, state,

17  federal laws.  Aside from all that, there's no

18  other listed criteria.

19  BY MR. ROBINSON:

20     Q.  So I've uploaded a document previously         05:42

21  marked as Exhibit 65.  The file name is 170920,

22  Bertini Re Filming.

23         MR. MASTER:  What was that, again?

24         MR. ROBINSON:  170920.

25         THE WITNESS:  I recognize the e-mail.           05:43

                                        Page 496

BY MR. ROBINSON:

    Q.  For the record, it's MP 1125, one page; correct?

    A.  Correct.

    Q.  And starting about a third of the way down   05:43 the page, there's an e-mail from you, dated September 12th, 2017?

    A.  Correct.

    Q.  You are e-mailing various people within the City of Menlo Park about Mr. Zeleny's film   05:43 permit application; right?

    A.  Correct.

    Q.  And who is Arlinda Heineck?

    A.  She was the community development director at the time.   05:44

    Q.  Were you ever able to speak with Mr. Toews about Mr. Zeleny's permit application?

    A.  Yes, eventually.  During this time, I was out on -- I had shoulder surgery.  So a few weeks later when I came back to work is when I believe I   05:44 spoke to him.

    Q.  What did you talk about?

    A.  The film permit process.

    Q.  Did you talk to him about Mr. Zeleny's special permit application?   05:45

```
1       A.  Yes.  He was already aware that that had
2    kind of articulated through the system.
3       Q.  Did you talk to him about the concerns
4    that you expressed regarding Mr. Zeleny's special
5    event permit application?                              05:45
6       A.  Yes, I did speak to him about concerns
7    that we had in both the -- both permitting
8    processes.
9       Q.  Did you have concerns about Mr. Zeleny's
10   request for a film permit?                             05:45
11      A.  The concerns had to do with the same
12   public safety issues and the interpretation of the
13   exception to the open-carry law, based on what he
14   was proposing.
15      Q.  Did Mr. Toews agree with your concerns?        05:45
16      A.  I don't recall whether he agreed or
17   disagreed.  He just listened to what my concerns
18   were.
19      Q.  Let's take a look at an exhibit previously
20   marked as Exhibit 36.                                  05:46
21          MR. MASTER:  What's that one called?
22          MR. ROBINSON:  It's called 171006, Film
23   Permit.  I'm trying to track it down in the folder.
24          MR. MASTER:  Okay.
25          MR. ROBINSON:  It should show up in your       05:47
```

Page 498

```
 1   folder.

 2            MR. MASTER:  171006?

 3            MR. ROBINSON:  Correct.

 4   BY MR. ROBINSON:

 5       Q.  Are we on the same document, Chief      05:47

 6   Bertini?

 7       A.  I have 1248.

 8       Q.  MP 1248; right?

 9       A.  Yes.

10       Q.  Do you recognize that?                 05:47

11       A.  I recognize this as a film permit

12   application.

13       Q.  This is Mr. Zeleny's film permit

14   application; correct?

15       A.  Yes.                                    05:47

16       Q.  And if you look at the -- just the first

17   page of the application, are all of the boxes

18   filled in?

19       A.  No.

20       Q.  What's missing?                        05:48

21       A.  Halfway down under the description of work

22   to be done, applicant submits the following:  Three

23   copies of sketch or plans, three copies of traffic

24   control plans, insurance certificate.

25       Q.  Are those requirements of the issuance of  05:48
```

```
1    a film permit?
2        A.  Yes.
3        Q.  The applicant has to submit a sketch or
4    plans to have a film permit approved?
5        A.  For the anticipated location of the          05:48
6    filming, yes.
7        Q.  And does the applicant have to submit
8    traffic control plans?
9        A.  If traffic is affected, yes.
10       Q.  Who decides whether a traffic control plan   05:49
11   is going to be required?
12       A.  It depends on the application, what
13   they're applying to do.
14       Q.  The person who decides depends on the
15   application?  My question was, who decides          05:49
16   whether a traffic control plan is going to be
17   required?
18       A.  It's going to be -- it's going to be the
19   public works department, based on what is being
20   contemplated in the application.                    05:49
21       Q.  I'm going to introduce a new exhibit.   `
22           What number are we up to?
23           THE REPORTER:  272.
24           MR. ROBINSON:  So I'm going to introduce
25   Exhibit 272.                                        05:50
```

Page 500

```
 1              (Plaintiff's Exhibit 272 marked

 2              for Identification.)

 3   BY MR. ROBINSON:

 4        Q.  Let me know when it comes up.

 5        A.  Okay.                                    05:50

 6        Q.  So Exhibit 272 is a series of e-mails.  It

 7   runs from MP 1290 through MP 1299; correct?

 8        A.  Yes.

 9        Q.  It's a series of e-mails between

10   Mr. Zeleny and City staff about his film permit     05:51

11   application; correct?

12        A.  Yes.

13        Q.  Let's start with the page MP 1292, please.

14   These are questions that Mr. Toews asked Mr. Zeleny

15   in connection with his permit; right?               05:51

16            MR. MASTER:  Read the document.

17   BY MR. ROBINSON:

18        Q.  The e-mail starting two-thirds of the way

19   down 1291 --

20        A.  I'm reading it.

21        Q.  -- and carrying over to the next page.

22        A.  I'm reading it.

23        Q.  So the first question Mr. Toews asked was

24   related to film dates and times.  Do you see that?

25        A.  Yes.                                       05:52
```

```
 1        Q.  And if you go up to the top of this e-mail
 2    chain, Mr. Zeleny answered those questions; right?
 3        A.  He did, but in his answer, he stated he
 4    was going to not follow the direction, you know, if
 5    I'm reading this correctly.                         05:53
 6        Q.  So I'm not asking for an interpretation of
 7    whether his answer was sufficient or not at this
 8    point.  I'm just asking whether he answered the
 9    questions.
10        A.  He gave an answer.                          05:53
11        Q.  And the next question by Mr. Toews was
12    related to the make and model of Mr. Zeleny's
13    generator, as well as the decibel rating.
14            Do you see that?
15        A.  I do.                                       05:53
16        Q.  Mr. Zeleny answered that question also;
17    correct?
18        A.  Yes.
19        Q.  The next question was for a draft written
20    notice.                                             05:53
21        A.  And the question?
22        Q.  Mr. Zeleny answered the next question
23    which related to a draft written notice; correct?
24        A.  He gave an answer.
25        Q.  Did he give an answer to all of Mr. Toews'  05:54
```

Page 502

1   questions?

2       A.  Just a second.  I'll look.  He did not

3   answer No. 5.

4       Q.  He responded to -- strike that.

5           He responded to question 5 by saying he's      05:54

6   not going to encroach on any sidewalks or roads;

7   right?

8           MR. MASTER:  Objection.  The document

9   speaks for itself.  Are you asking him if it's

10  sufficient or if he just responded?                    05:55

11          MR. ROBINSON:  You can go ahead and

12  answer, if you understand the question.

13          THE WITNESS:  He responded by saying -- by

14  saying he's not going to respond.

15  BY MR. ROBINSON:                                       05:55

16      Q.  Did the City find -- strike that.

17          Under the City's guidelines for film

18  permits, a traffic control plan is required if

19  there is going to be a need to reroute traffic;

20  right?                                                 05:55

21      A.  Not only vehicular traffic but pedestrian

22  traffic.  This is what we asked in this specific

23  application.

24      Q.  So Mr. Zeleny's response was, I'm not

25  planning to divert any vehicular pedestrian           05:55

Veritext Legal Solutions
866 299-5127

```
 1   traffic, so I don't need a traffic control plan;
 2   correct?
 3       A.  That's what -- that's what he stated, yes.
 4       Q.  Did the City find that response
 5   insufficient in processing Mr. Zeleny's permit        05:56
 6   application?
 7       A.  Yes.
 8       Q.  Who made the decision that that was
 9   insufficient?
10       A.  Toews.                                        05:56
11       Q.  Is there any objective standard that
12   applies to whether a traffic control plan is
13   required?
14       A.  When traffic, either vehicular or
15   pedestrian, is affected by something encroaching      05:56
16   either on the roadway or the sidewalk, then some
17   kind of plan has to be submitted.
18       Q.  Who approves the plan that's submitted?
19       A.  Who approves the traffic plan?
20       Q.  Right.                                        05:56
21       A.  Well, that would be the Department of
22   Public Works in conjunction with the police
23   department.
24       Q.  Are there any specific criteria that are
25   considered in approving or denying that --            05:56
```

Veritext Legal Solutions
866 299-5127

```
1   approving or rejecting a traffic control plan?
2           MR. MASTER:  Objection.  Asked and
3   answered.
4           THE WITNESS:  Well, first, we have to have
5   a plan.  In this case, we didn't have a plan.        05:57
6   Generally speaking, it really depends on the --
7   what is being contemplated.  Again, it's a
8   case-by-case basis.
9   BY MR. ROBINSON:
10      Q.  So other than No. 5, Mr. Zeleny answered     05:57
11  all of the other questions posed by Mr. Toews;
12  correct?
13      A.  I'm still reading.  8 and 9 are not really
14  answers.  He's just stating that as soon as the
15  City does what he wants the City to do, then he      05:57
16  will provide the information requested, which is
17  not the way the application is set up.  And equally
18  is No. 10.
19      Q.  At some point, Mr. Zeleny's application
20  was forwarded to the city attorney's office;         05:58
21  correct?
22      A.  Yes.
23      Q.  Why was it forwarded to the city
24  attorney's office?
25      A.  Because Mr. Toews needed assistance in       05:58
```

Page 505

```
 1   dealing with the specific application here.
 2       Q.  Does the city attorney's office generally
 3   have authority to approve or deny filming permits
 4   within the city?
 5       A.  Certainly.                                    05:58
 6       Q.  What standards govern the city attorney's
 7   office's approval or denial of the filming permit?
 8           MR. MASTER:  Objection.  Vague and
 9   ambiguous.  Overbroad.  Calls for a legal
10   conclusion.                                          05:59
11           Go ahead.
12           THE WITNESS:  The city attorney's office
13   would take all the information, and, again, time,
14   place, manner, and dealing with the contemplated
15   disruption to the city and city services, and would  05:59
16   make a determination whether or not to grant a film
17   permit.  It does not require -- it's not a legal
18   requirement the City grant a film permit.
19   BY MR. ROBINSON:
20       Q.  Is it also a case-by-case determination?     05:59
21       A.  Yes.
22       Q.  And the factors that are relevant depend
23   on the specific filming project being proposed?
24       A.  Correct.
25       Q.  So I want to -- we've marked as Exhibit      05:59
```

Veritext Legal Solutions
866 299-5127

```
 1    273 a multiple-page document, MP 1415 through 1426.
 2            (Plaintiff's Exhibit 273 marked
 3            for Identification.)
 4    BY MR. ROBINSON:
 5        Q.  Do you see that?                              06:00
 6        A.  Yes.
 7        Q.  And starting -- starting at the very --
 8    the very end, so 1425 to 14 -- 1424 to 1426,
 9    there's an e-mail from Mr. Flegel to Mr. Zeleny.
10            Do you see that?                              06:00
11        A.  Yes.
12        Q.  This e-mail relates to Mr. Zeleny's film
13    permit application; right?
14        A.  Yes.
15        Q.  And Mr. Flegel asks a number of questions   06:01
16    about the film project, in addition to the
17    questions that were already asked by Mr. Toews;
18    correct?
19        A.  Correct.
20        Q.  This -- the first point -- bullet point A   06:01
21    asks for confirmation of where Mr. Zeleny plans to
22    place different items that he's going to use in the
23    filming.
24            Do you see that?
25        A.  Yes.                                         06:01
```

Veritext Legal Solutions
866 299-5127

1    Q.  Is that requirement listed anywhere in the

2  written guidance of the City of Menlo Park relating

3  to film permits?

4    A.  Yes.  It's on the application that I've

5  already discussed with you, on the box that was not  06:02

6  checked, the site schematic.

7    Q.  So we looked at two permit applications

8  before, right, that were approved, the Sand Hill?

9    A.  Yes.

10    Q.  Do either of those include a site  06:02

11  schematic?

12    A.  Yes.

13    Q.  Which one included a site schematic?

14    A.  The one that had the arrow on the roadway

15  that they planned to film on.  06:02

16    Q.  Mr. Zeleny provided a Google Maps image of

17  where he planned to film; right?

18    A.  To the best of my recollection, he did,

19  but I don't recall exactly what was on it or when

20  he submitted it.  06:02

21    Q.  So you can go ahead and refer back to the

22  previous exhibit.  Is it 272?

23    A.  Yes.  Mr. Zeleny provided a screenshot of

24  a Google map of the corner with nothing else on it,

25  just a screenshot of a Google map.  06:03

1    Q.  Okay.  And he indicated in his e-mail that
2    he intended to protest -- or to both protest and
3    film in that area; right?
4    A.  The application was for him to film
5    himself protesting in that area.                    06:03
6    Q.  Okay.  And in his e-mail, he explains that
7    he's going to put all of his equipment there and
8    film there.  Bullet point 4 of his e-mail on the
9    first page of 272.
10   A.  He writes about where he's going to put --   06:04
11   he basically writes that he's going to put all this
12   equipment in that area, but there's no specificity
13   to where he's putting it.
14   Q.  In your view, as the person designated as
15   most qualified by the City of Menlo Park, did       06:04
16   Mr. Zeleny's description of where he planned to
17   film have as much specificity as the two approved
18   applications that we've looked at?
19   A.  No.
20   Q.  So Mr. Zeleny taking a Google Maps photo      06:04
21   of a particular corner is less specificity than the
22   Billions permit application that said that it was
23   going to drive a 30-foot-truck over several city
24   blocks of Sand Hill Road?
25   A.  Yes.                                           06:05

                                            Page 509

1      Q.  And it had less specificity than the

2  Silicon Valley application, Exhibit 73, which said

3  that it was going to film over an entire city block

4  on Sand Hill Road?

5      A.  I did not see the attachment to that          06:05

6  document, whether there was a -- a schematic or

7  some kind of map in that.

8      Q.  So go ahead and pull up Exhibit 73 in the

9  folder.

10         MR. MASTER:  What's that one called?          06:05

11         MR. ROBINSON:  It's Film Permit - Sand

12  Hill.

13  BY MR. ROBINSON:

14      Q.  And I'm looking specifically at page 1726.

15      A.  Yeah, I see it.                              06:06

16      Q.  1726 has an aerial Google Maps image --

17  Google Earth image of a fairly large area of Sand

18  Hill Road and some adjoining streets; right?

19      A.  Yep.

20      Q.  And if you go to the Menlo Park location     06:06

21  section of the same page, it says they're going to

22  shoot on the sidewalk along Sand Hill Road between

23  Sharon Park Drive and Santa Cruz Avenue.

24         Do you see that?

25      A.  Yes.                                         06:06

                                        Page 510

1    Q.  So they're going to be filming along what
2  appears to be at least one city block of Sand Hill
3  Road on the sidewalk; right?

4    A.  According to the Google map where they
5  have overlaid some descriptions of where they're    06:06
6  going to be, yes.

7    Q.  Can you tell from this application where
8  within that city block on the sidewalk they were
9  planning to shoot?

10    A.  Between -- between Sharon Park and Santa    06:07
11  Cruz.

12    Q.  Is it your position, as the designated
13  representative of the City of Menlo Park, that the
14  location of filming in this application that we're
15  looking at for Silicon Valley that has an aerial    06:07
16  view of an entire city block is more specific than
17  Mr. Zeleny's picture of the specific corner on
18  which he planned to stage his filming?

19    A.  Yes.

20    Q.  How so?    06:07

21    A.  Mr. Zeleny did not -- if Mr. Zeleny had
22  put all the information he verbally -- or I should
23  say, he wrote into his e-mail, which was not -- no
24  specificity whatsoever.  He just said that the
25  camera is going to be in the near area, and this    06:08

Veritext Legal Solutions
866 299-5127

```
 1    item is going to be in this area where I previously
 2    protested.
 3          If he had just put some items, drawn some
 4    items into the map somehow, that would have
 5    provided more specificity, as far as to the          06:08
 6    question that was being asked about the setup,
 7    where are you going to put all this equipment,
 8    because that also goes to whether or not
 9    pedestrians are going to be -- have to be --
10    they're going to have to alter the path if they're   06:08
11    using the sidewalk.
12          So, yes, this map actually gives more
13    information than the one provided by Mr. Zeleny.
14       Q.  Do you know if the City required the
15    producers of the Silicon Valley show to point out    06:08
16    where on the sidewalk they were going to put
17    equipment?
18       A.  I don't know whether that question was
19    asked or not.
20       Q.  Is it -- go ahead and look at the             06:08
21    application.  Is that anywhere in the application?
22       A.  It's under the activity.
23       Q.  Are you referring to where it says,
24    "Camera on sidewalk only"?
25       A.  Correct.                                       06:09
```

Page 512

```
 1      Q.  Do you have an understanding -- strike

 2   that.

 3          Was there any indication, that you can see

 4   in this Exhibit 73, of where the ten members of the

 5   camera crew were going to be standing, aside from      06:09

 6   somewhere in this entire city block?

 7      A.  No.

 8      Q.  Any indication here of where they were

 9   going to park the camera -- or the one van that

10   they would be using, other than somewhere in this     06:10

11   vicinity?

12      A.  No.

13      Q.  What about the portable restroom; any

14   indication from this application where they

15   intended to put that?                                 06:10

16      A.  No.

17      Q.  Let's go to the next -- the last exhibit

18   we opened up.  So it's 273.

19      A.  Okay.

20      Q.  So we were going down the list of           06:10

21   questions -- we were going down the list of

22   questions that Mr. Flegel asked.  Question B is:

23   Provide the names of the participants or crew that

24   will be part of the filming and his or her role,

25   including cameramen.                                  06:10
```

Page 513

```
 1        Do you see that?
 2     A.  I do.
 3     Q.  Is that -- the requirement to list the
 4  names of participants, is that anywhere in the film
 5  permit guidelines?                                    06:11
 6     A.  Not that I'm aware of.
 7     Q.  The other two applications we've seen
 8  didn't list any names of crew or participants; did
 9  they?
10     A.  Well, not in that application that we've    06:11
11  seen.  I'm not sure what other communication that
12  occurred.
13     Q.  Is it a requirement of the City of Menlo
14  Park that a film permit applicant list the names of
15  the participants in the film?                         06:11
16     A.  That's certainly a question and a piece of
17  information that could be asked of someone.
18     Q.  For what purpose?
19     A.  So we can identify who is going to be
20  present at the filming of the -- of the -- whatever   06:11
21  the event is.
22     Q.  Is the identity of the individuals
23  participating in the film production relevant to
24  the City's determination of whether they grant a
25  permit or not?                                        06:11
```

```
1        A.   In this case, the city attorney believed

2    that it was.

3        Q.   Did the City's guidelines allow the City

4    to grant film permits to some people but not

5    others, depending on the participants in the film?    06:12

6        A.   It's discretionary for the City to either

7    grant or not grant the film permit.

8        Q.   Can the City exercise that discretion

9    based upon the identity of the participants?

10       A.   No.                                           06:12

11       Q.   Do you have any understanding of why

12   Mr. Flegel was asking for the identity of the

13   participants?

14       A.   No.

15       Q.   Let's go down to (d)(ii) on Mr. Flegel's      06:12

16   series of questions.  (d)(ii) is, "Please confirm

17   exactly what image or images you intend to show on

18   the display so staff can analyze for safety and

19   traffic control purposes."

20            Do you see that?                              06:12

21       A.   I do.

22       Q.   Were there particular image or images that

23   Mr. Zeleny intended to display relevant to whether

24   his permit application would be granted or denied?

25       A.   Yes.  It would depend on the brightness of    06:13
```

Veritext Legal Solutions
866 299-5127

1     the images that was being contemplated.  If you

2     read the entire (d), it indicates that.

3         Q.  Well, so there are two bullet points,

4     point -- romanette i and romanette ii; right?

5         A.  Correct.                                    06:13

6         Q.  Romanette i asks for the brightness of the

7     display so he can analyze for safety/traffic

8     control purposes; correct?

9         A.  Correct.

10        Q.  And romanette ii, a separate bullet point,   06:13

11    says, "Please confirm exactly what image or images

12    you intend to show so staff can analyze for

13    safety/traffic control purposes."

14            Do you see that?

15        A.  I see that.                                  06:13

16        Q.  That was a separate question from

17    brightness; right?

18        A.  Correct.

19        Q.  Do you have an understanding of how the

20    image or images were relevant to Mr. Zeleny's      06:13

21    permit application?

22            MR. MASTER:  Object to the extent it lacks

23    foundation.  Calls for speculation.  You already

24    deposed Mr. Flegel about this.

25            Go ahead.                                   06:13

                                               Page 516

```
 1          THE WITNESS:  The question is regarding
 2     traffic safety.  So there is both brightness,
 3     number one.  Number two, also, what exactly is
 4     being displayed and will that cause in and of
 5     itself a further traffic hazard.                    06:14
 6     BY MR. ROBINSON:
 7        Q.  Would the image that we looked at several
 8     times before with respect to the special events
 9     permit application be an image that could distract
10     the motorists?                                      06:14
11        A.  Any of this could distract the motorists,
12     certainly.
13        Q.  So let's take a look at Exhibit E.  Strike
14     that.
15          Does anything about the film permitting        06:14
16     guidelines or the application itself require the
17     applicant to identify exactly what image or images
18     he or she intends to show?
19        A.  That would be on a case-by-case basis.
20     Most film permits -- most production companies are  06:14
21     not showing an image while they're filming.
22     They're just filming.  This was a different
23     situation where Mr. Zeleny contemplated having some
24     kind of display and then filming people's reactions
25     to it.  So, naturally, the question would be, what  06:15
```

Veritext Legal Solutions
866 299-5127

```
 1    is it that you're displaying and will it have a
 2    negative effect on traffic going by.  Most
 3    productions do not display something.
 4         Q.  So this was --
 5              MR. MASTER:  We've been going about an        06:15
 6    hour, Counselor.  Can we have a break, please?
 7              MR. ROBINSON:  Yeah.  Let me ask a
 8    follow-up question or two and then we can break.
 9              MR. MASTER:  We're going to take a break
10    now, Damion.  I want to know how much time we have    06:16
11    left so I can call my family.  Do you have any
12    idea?
13              MR. ROBINSON:  We have maybe 20 minutes
14    left, 15, 20.
15              MR. MASTER:  All right.  Let's take a        06:16
16    two-minute break.  I need to use the restroom.
17              MR. ROBINSON:  Okay.
18              THE VIDEOGRAPHER:  Going off the record.
19    The time now is 6:16.
20              (Off the record.)                           06:16
21              THE VIDEOGRAPHER:  We're back on the
22    record.  The time now is 6:20.
23    BY MR. ROBINSON:
24         Q.  Before we broke, we were talking about --
25    I was asking you about the bullet point (d)(ii) in    06:20
```

Page 518

1    Mr. Flegel's e-mail, in particular, his request for
2    exactly what image or images Mr. Zeleny intended to
3    show.
4         Is that criteria anywhere in the written
5    guidelines of the City of Menlo Park?                    06:21
6        A.  That criteria, it would be asked for, for
7    public safety.  What we -- what would be logical to
8    want to know is, do you have bright, flashing
9    lights that are going to be distracting to drivers.
10   Is there going to be a lot of movement in these         06:21
11   images and what kind of images that would be
12   contemplated to be shown as people are driving by.
13        So those are the common-sense questions
14   you want to ask from a public safety perspective.
15        (Reporter clarification.)
16        (Record read by the Reporter.)
17        THE WITNESS:  Common-sense public safety
18   factors about what is it that is being shown to
19   people as they're driving by that is being filmed.
20   BY MR. ROBINSON:                                         06:22
21       Q.  Are those public safety factors that you
22   just testified about in any of the City's written
23   policies relating to film permit applications?
24       A.  No.
25       Q.  Are they factors that would be applied          06:22

                                           Page 519

1  depending on the specific film production that's

2  being contemplated?

3      A.  Correct.  As I stated prior, most film

4  productions do not have displays that are being

5  shown to the public or being filmed to find a          06:22

6  reaction.  So this is unusual and it's

7  extraordinary on its face.

8      Q.  Okay.  So is this factor, then, the

9  specific image or images, a factor that applied

10  only to Mr. Zeleny's permit application?                06:23

11      A.  Well, it would apply to anybody who wanted

12  to do what he wanted to do, to film the reaction of

13  people as he's showing some images on a display.

14  But as of today, I believe this is the only film

15  application that I've ever seen that indicates they     06:23

16  wanted to do that.

17      Q.  Does the City determine what the factors

18  are -- strike that.

19          In Mr. Zeleny's case, did the City decide

20  what factors were relevant to the application after     06:23

21  Mr. Zeleny submitted the application?

22          MR. MASTER:  Objection.  Vague, ambiguous

23  and overbroad.

24          Go ahead.

25          THE WITNESS:  I don't understand what you       06:23

1  mean.

2  BY MR. ROBINSON:

3      Q.  I mean, was this a factor -- the exact

4  image or images, was this a factor that was part of

5  the City's policy before Mr. Zeleny applied for a      06:24

6  film permit, or was it a factor that was decided

7  upon based on the application he submitted?

8      A.  This is a factor because of what

9  Mr. Zeleny stated he wanted to do.  So because he

10  stated he wanted to have a display with some kind     06:24

11  of images on it, from a public safety perspective,

12  we don't care about the content; we couldn't care

13  less about what it is, but we need to know whether

14  it's going to be something very distracting to

15  drivers.                                              06:24

16          So, again, from a public

17  safety/common-sense perspective, we wanted to know

18  what kind of image are you displaying to people to

19  get a reaction from them so that you can film it.

20      Q.  What kind of -- strike that.                  06:24

21          Are there any standards for what kind of

22  images can be displayed and what kind can't?

23      A.  Content is irrelevant.  Again, I will

24  reiterate.  It had to do with public safety.  As

25  far as the fact he was contemplating displaying       06:25

Page 521

```
 1    something to passing motorists that could be
 2    distracting -- what you are looking for is what
 3    exactly are you planning to display and will it be
 4    distracting, based on the movement of the display,
 5    whether there's flashing lights or whether it's a      06:25
 6    very dynamic kind of display that could, in fact,
 7    impact traffic safety.
 8       Q.  My question was whether there is any
 9    definite policy or guideline, from the City's point
10    of view, about what types of images, content or no     06:25
11    content, what types of images are acceptable.
12           MR. MASTER:  Asked and answered, Counsel.
13            It's late in the day.  Enough with the
14    nonsense.  Let's cut to the chase.  He's already
15    answered that question several times.                  06:25
16            You can answer it one last time if you
17    have something new to add.
18           THE WITNESS:  I have nothing new to add.
19    I've answered your question, and I can't give you a
20    specific, what is okay and what is not okay.  It       06:26
21    depends on what exactly it is that's being
22    displayed to passing motorists, that Mr. Zeleny
23    wanted to video their reaction to it.  And we had
24    no idea what that display was going to be.
25    BY MR. ROBINSON:                                       06:26
```

Veritext Legal Solutions
866 299-5127

1     Q.  So going down to bullet point E on MP

2    1425, Mr. Flegel requests:  "Please list the types

3    of guns, serial numbers, who will be supplying them

4    to you, how they will be used as part of the

5    production," et cetera.                              06:27

6         Do you see that?

7     A.  I do.

8     Q.  Is the factor of listing the serial

9    numbers of guns anywhere in the City's written

10   policies relating to the filming permits?           06:27

11    A.  No.  It has to do with the Penal Code.

12    Q.  Is specifying the serial numbers of guns

13   to be used in the filming part of the Penal Code?

14   Is that a requirement of the Penal Code?

15    A.  Well, you're only supposed to be in         06:27

16   possession of a gun that is registered to you, per

17   the Penal Code of California.

18    Q.  Is there any Penal Code section requiring

19   Mr. Zeleny to identify the serial numbers of guns

20   he intends to use in a film production, that you're  06:27

21   aware of?

22    A.  There's a Penal Code section that states

23   you can only be in possession of a gun that is

24   registered to you.

25    Q.  Is there any written City -- written or     06:28

Veritext Legal Solutions
866 299-5127

1   unwritten City guidelines that states that --
2   strike that.
3           Has any other film permit applicant, to
4   your knowledge, in the City of Menlo Park ever been
5   asked to provide serial numbers for guns?          06:28
6       A.  I've never seen a film permit that has
7   guns in it, besides this one.
8       Q.  Let's go down to bullet point H.
9   Mr. Flegel asks Mr. Zeleny to explain why live
10  ammunition would in any way be necessary for a film  06:28
11  production.
12          Do you see that?
13          MR. MASTER:  That's G, Counsel, not H.
14          THE WITNESS:  It's mentioned in both G and
15  H.
16          THE REPORTER:  Excuse me.  Can you repeat
17  your answer?  I didn't hear it.
18          MR. ROBINSON:  I don't think there was an
19  answer.  There was an answer to a comment that
20  Mr. Master made.  Let me just re-ask the question.  06:29
21  BY MR. ROBINSON:
22      Q.  In bullet point H, Mr. Flegel mentions --
23  he asks why live ammunition would in any way be
24  necessary for Mr. Zeleny's film production.
25          Do you see what I'm referring to?          06:29

                                        Page 524

```
 1          MR. MASTER:  No.  What page are you on?

 2          MR. ROBINSON:  1426, bullet point H.

 3          THE WITNESS:  Yes, I do.

 4   BY MR. ROBINSON:

 5      Q.  Is an explanation for why live ammunition    06:29

 6   would be necessary for the film production any part

 7   of the written policies of the City of Menlo Park

 8   relating to film permit applications?

 9      A.  No.  It would be California Penal Code.

10      Q.  Is it in any part of any unwritten policy    06:30

11   of the City of Menlo Park?

12      A.  No.  It would be the California Penal

13   Code.

14      Q.  But does the California Penal Code require

15   an applicant for a film permit to identify for the   06:30

16   film permitting authority why he intends to have

17   live ammunition in the film?

18      A.  No.  The California Penal Code states that

19   you cannot have live ammunition loaded into a

20   weapon.                                              06:30

21      Q.  Okay.  Does it ask why the live ammunition

22   is relevant to the film?

23      A.  Does what ask?

24      Q.  Does the Penal Code deal in any way

25   whatsoever with why live ammunition versus          06:30
```

Veritext Legal Solutions
866 299-5127

```
 1    ammunition that isn't live is part of the film
 2    production process?
 3              MR. MASTER:  I'm confused.
 4              If you understand the question --
 5              MR. ROBINSON:  Let me rephrase.              06:31
 6    BY MR. ROBINSON:
 7         Q.  Does the Penal Code require an applicant
 8    for a film permit to explain to the permitting
 9    authority why he intends to have live ammunition?
10         A.  No.  It's just illegal to carry a loaded   06:31
11    firearm without a permit, or one of the exceptions.
12         Q.  Okay.  Did Mr. Zeleny's film permit
13    request the City's permission to carry a loaded
14    firearm?
15         A.  My understanding was that he was going to   06:31
16    have live ammunition very close to the weapons that
17    he was going to have with him.
18         Q.  That wasn't my question, sir.
19              My question was whether Mr. Zeleny, in his
20    film permit, suggested that he was going to have     06:31
21    loaded weapons.
22         A.  Yes.  He stated, quote, loaded
23    ammunition-feeding devices.
24         Q.  Do you understand what an
25    ammunition-feeding device is, sir?                   06:31
```

Page 526

```
 1      A.  Yes.

 2      Q.  What is an ammunition-feeding device?

 3      A.  It is something that you can use to

 4   quickly load magazines with ammunition.

 5      Q.  Is an ammunition-feeding device the same      06:32

 6   thing as a loaded weapon, in your view, as the

 7   representative of the City of Menlo Park and a

 8   33-year law enforcement officer?

 9      A.  No.

10          MR. MASTER:  Objection.  You're being        06:32

11   argumentative, Counsel.  Be professional, please.

12          MR. ROBINSON:  You can go ahead and

13   answer.

14          THE WITNESS:  I answered "no."

15   BY MR. ROBINSON:                                    06:32

16      Q.  So I'm going to ask again, because I don't

17   think the question was answered before.

18          In connection with Mr. Zeleny's film

19   permit application, was he asking for a permit to

20   film using loaded weapons?                          06:32

21      A.  He was asking for a permit with weapons

22   and ammunition and live ammunition on site, also.

23      Q.  If the live ammunition is not loaded into

24   a weapon, Mr. Zeleny is allowed by the Penal Code

25   to have live ammunition; isn't he?                  06:33
```

Veritext Legal Solutions
866 299-5127

1      A.  It would depend on how close it is.
2  There's case law that talks about whether
3  ammunition in a magazine attached to a weapon is
4  considered loaded or not.  So it would depend on
5  the situation.                                06:33
6      Q.  Did -- okay.  Regardless of the proximity
7  of the ammunition to the weapon, is there any
8  requirement in the Penal Code that would require
9  Mr. Zeleny to explain to the City of Menlo Park why
10  he wanted to film with live ammunition versus some   06:33
11  other type of ammunition?
12      A.  No.
13      Q.  And there's no policy, written or
14  unwritten, in the City of Menlo Park that would
15  require Mr. Zeleny to explain that; is there?        06:33
16      A.  Again, aside from what I've already
17  discussed in the California Penal Code, no.
18      Q.  So this request by Mr. Flegel is outside
19  of the written and unwritten policy of the City of
20  Menlo Park; true?                                    06:34
21      A.  Yes.
22          MR. MASTER:  Objection.  That misstates
23  his testimony.
24          Go ahead.
25          THE WITNESS:  This is a question of public   06:34

                                        Page 528

```
 1  safety.
 2  BY MR. ROBINSON:
 3      Q.  It relates to a factor that is not
 4  anywhere listed in the factors for the City of
 5  Menlo Park; correct?                              06:34
 6      A.  If you think time, manner and place and
 7  the manner in which he's doing it, if there's a
 8  public safety concern, then it's appropriate to
 9  bring that public safety concern out.  And live
10  ammunition at a film shoot is a public safety     06:34
11  concern.
12      Q.  Is the City of Menlo Park allowed to
13  consider any public safety concern in considering a
14  film permit application?
15      A.  Certainly.                                 06:34
16          MR. ROBINSON:  Why don't we take a
17  two-minute break here.  Let me look at my notes.  I
18  think I'm about wrapped up here.
19          THE VIDEOGRAPHER:  Going off the record.
20  The time now is 6:35.                             06:35
21          (Off the record.)
22          THE VIDEOGRAPHER:  Back on the record.
23  The time now is 6:39.
24  BY MR. ROBINSON:
25      Q.  Has the City of Menlo Park granted or     06:39
```

Page 529

1  denied Mr. Zeleny's permit application?

2          MR. MASTER:  You mean the film permit;

3  correct?

4          THE WITNESS:  You're talking about the

5  film permit; correct?                           06:39

6  BY MR. ROBINSON:

7      Q.  Film permit, right.

8      A.  The answer is, it's done neither.  It's

9  incomplete.

10     Q.  How is it incomplete?                    06:39

11     A.  The -- the film permit has the questions

12  that were asked -- and there's been several

13  e-mails, not just this one, between the city

14  attorney's office and Mr. Zeleny, and it hasn't

15  been cleared yet.  There's been no further        06:40

16  communication with Mr. Zeleny regarding this

17  permitting process.

18     Q.  My question to you is, in what way is it

19  incomplete?  What's missing from the application?

20     A.  A final determination.                    06:40

21     Q.  Other than a final determination, what is

22  missing about the application?  What does

23  Mr. Zeleny need to do to get it ruled on?

24     A.  I would have -- I would have to look at

25  the most recent e-mail that was sent from the city   06:40

                                        Page 530

1    attorney's office to Mr. Zeleny.  The documents

2    speak for themselves.  It says right on there what

3    is missing or what information that we need more

4    of.

5        Q.  As the person most qualified on behalf of    06:40

6    the City, do you have any understanding at all

7    about what information is missing from Mr. Zeleny's

8    application that's required before the City will

9    make a decision?

10        MR. MASTER:  Objection.  Asked and              06:41

11   answered.

12        Go ahead.

13        THE WITNESS:  As I sit here today, I don't

14   remember what exactly -- where we left off in the

15   process or what questions hadn't been answered,      06:41

16   without looking at the document.  The documents

17   speak for themselves.  It would be on the final --

18   the most recent document that was exchanged with

19   Mr. Zeleny.

20        MR. ROBINSON:  Okay.  I don't have any          06:41

21   further questions for you, Chief Bertini.

22        Todd, do you have any questions?

23        MR. MASTER:  I do not.

24        MR. ROBINSON:  I couldn't hear you.

25        MR. MASTER:  We're done.                        06:41

```
 1            THE WITNESS:  He said "no."

 2            MR. ROBINSON:  Okay.  I think we'll just

 3   handle the record per Code.

 4            David, anything else we need to do?

 5            MR. MARKEVITCH:  No, not at this time.      06:42

 6            MR. ROBINSON:  Okay.  Thank you, everyone.

 7            THE VIDEOGRAPHER:  Let's go off the

 8   record.  Going off the record.  The time now is

 9   6:42.

10            THE REPORTER:  Mr. Master, do you want a      06:42

11   copy of the transcript?

12            MR. MASTER:  Yes, I do.  Thank you.

13            (Whereupon, the deposition concluded at

14            6:42 p.m.)

15                                                          06:42

16

17

18

19

20

21

22

23

24

25
```

Page 532

```
1                    SIGNATURE OF DEPONENT

2

3          I, the undersigned, DAVE BERTINI, do hereby

4   certify that I have read the foregoing deposition

5   and find it to be a true and accurate transcription

6   of my testimony, with the following corrections, if

7   any:

8

9   PAGE     LINE                CHANGE

10  _____    _____   _____

11  _____    _____   _____

12  _____    _____   _____

13  _____    _____   _____

14  _____    _____   _____

15  _____    _____   _____

16  _____    _____   _____

17  _____    _____   _____

18  _____    _____   _____

19  _____    _____   _____

20  _____    _____   _____

21  _____    _____   _____

22  _____    _____   _____

23  _____    _____   _____

24

            _____
25          DAVE BERTINI                        Date
```

Veritext Legal Solutions
866 299-5127

```
1              REPORTER'S CERTIFICATE

2

3

4        I, DENISE M. LOMBARDO, do hereby certify:

5        That DAVE BERTINI, in the foregoing deposition

6   named, was present by videoconference and by me

7   sworn as a witness in the above-entitled action at

8   the time and place therein specified;

9        That said deposition was taken before me at

10  said time and place, and was taken down in

11  shorthand by me, a Certified Shorthand Reporter of

12  the State of California, and was thereafter

13  transcribed into typewriting, and that the

14  foregoing transcript constitutes a full, true and

15  correct report of said deposition and of the

16  proceedings that took place;

17       And that the aforementioned 306-page

18  transcript meets the California minimum transcript

19  format standards.

20       IN WITNESS WHEREOF, I have hereunder

21  subscribed my hand this 3rd day of September, 2020.

22

23        *Denise M. Lombardo*

24        DENISE M. LOMBARDO, CSR No. 5419

25        State of California
```

Page 534

**&**

**&** 234:4 270:18 281:4 313:5

**0**

**000480** 465:2
**0477** 465:2

**1**

**1** 231:11 235:4 261:12,13 265:5 484:1,2,2 488:23 488:24 489:14 493:13
**10** 230:14 293:9,9 293:14 484:1 505:18
**100** 261:22 333:9 335:4 374:22 480:7
**101004** 290:25
**102** 417:14,14,17 423:2 444:15
**103** 435:13,14,16 435:17 446:24 447:1,8,8,10,10
**105** 448:9 458:19 460:4
**11** 230:12 332:2,4 471:19
**11-29-2017** 491:11
**1125** 497:2
**1195** 232:20 471:19
**1199** 472:16
**12** 232:16 320:11 490:23
**12-1596** 231:22
**12-1824** 330:5 346:20,21
**12-1824-4** 335:25

**12-1825** 231:20
**12-495** 321:16 328:10
**12020** 350:16,16 350:17 351:7 352:14
**120416** 325:5
**1205** 232:20 471:19
**1248** 499:7,8
**1290** 232:21 501:7
**1291** 501:19
**1292** 501:13
**1299** 232:21 501:7
**12:09** 319:11
**12:20** 328:3
**12th** 497:7
**13** 332:9
**13th** 350:7 352:17
**14** 324:17 477:23 478:5 507:8
**1400:41** 349:19
**1415** 232:23 507:1
**1424** 507:8
**1425** 507:8 523:2
**1426** 507:1,8 525:2
**1471553** 330:1
**14750141-1** 328:11
**14771553** 331:24
**14771554** 336:8
**14778** 347:14,23 348:4
**14:29** 336:8,12
**14th** 350:11
**15** 293:10,14 320:12 459:1 518:14
**150504** 460:5
**1507170** 373:7,11

**150722** 395:10
**150924** 417:13 423:5 444:16
**1595** 345:17
**1596** 345:17
**16** 230:15
**160504** 448:10
**160624** 464:24
**16th** 461:25
**17** 230:13
**17-7357** 229:6 235:8 278:6 310:6
**170** 231:21 354:7
**170829** 478:16
**170920** 496:21,24 499:2
**172** 354:16 355:17
**1726** 495:11 510:14,16
**1728** 495:3
**1768** 490:22,23
**1770** 491:19
**1772** 495:2
**1779** 490:25 492:4
**179** 231:21 354:7
**18** 230:17
**1820** 368:23
**1858** 231:23 360:6
**1866** 231:24 360:6
**19** 336:9
**1900** 234:5 281:5 313:6
**1938** 231:4 248:13
**1939** 248:10
**1942** 249:3,19 254:16
**1947** 253:7
**1950** 231:4 248:10 248:14 253:14

**1:00** 350:24 352:13
**1:06** 350:13 352:21
**1:10** 328:6
**1:56** 359:12

**2**

**2** 232:8 261:11 349:2 355:21 453:1
**2/27/2019** 231:18
**20** 245:11 477:4 518:13,14
**2010** 231:11
**2011** 271:5 298:19
**2012** 271:6 325:24 325:24 326:18 342:15,19,22 343:10 345:5 350:7,11 352:17
**2013** 315:12,23 330:11,15 342:13 425:22
**2014** 361:24 363:12 367:17,20
**2015** 232:8 254:14 374:8 375:12 376:13 377:3 378:22 391:5,21 393:7 400:1 401:22 407:16 408:2 417:5 421:19
**2016** 232:16 368:20 458:24 459:1 461:25 463:21 465:9 491:20
**2017** 363:12 497:7
**2020** 229:21 233:4 235:4 278:20

280:4 286:21
310:20 312:4
324:21 534:21
**2049** 233:18
280:20 312:20
**210-6045** 234:15
281:15 313:16
**21353** 286:23
324:23 534:23
**219** 232:3 365:7
**21st** 417:4
**221** 232:3 365:8
**229** 229:17
**22nd** 400:1 401:21
**234** 373:15
**236** 230:3 373:25
**237** 230:12
**238** 375:7
**24** 349:19 367:17
465:8
**240** 373:15
**2460** 233:18
280:20 312:20
**247** 231:3
**25** 316:8
**250** 231:3 247:20
247:21 248:5,12
248:16,21 249:19
**251** 231:5 260:11
260:14
**252** 231:7 265:8,9
265:12,17
**253** 231:9 269:17
269:18,20,23
270:14,25
**254** 231:11 284:7
287:1,4,8
**25400** 355:21
356:14
**255** 231:13 298:6,7
298:10

**256** 231:15 301:6,7
303:19
**257** 231:16 311:12
314:2,4,8
**258** 231:17 232:5
345:15,19,24,25
346:7 385:12
**259** 231:20 353:25
354:1,6,10
**260** 231:5,22 232:5
360:1,5 385:12
**261** 232:3 365:3,6
365:18
**262** 230:13 232:4
385:1,2,11 394:21
**263** 232:6 399:15
399:18 411:13,14
**264** 232:7 405:14
405:17 411:14
**265** 231:7 232:10
411:18,20,23
412:1 421:16
**266** 232:11 395:12
416:13,15,19
**267** 232:13 435:3,9
446:25 447:3,7
**268** 232:14 457:10
457:11,15 458:2,4
461:20 462:6
**269** 231:9 232:16
466:20,23
**27** 458:23
**270** 232:18 470:2,4
470:6
**271** 232:19 471:18
471:20
**272** 232:21 500:23
500:25 501:1,6
508:22 509:9
**273** 230:14,15
232:22 507:1,2

513:18
**274** 230:16 395:12
**278** 229:9 277:11
278:15
**28** 421:19
**280** 234:5 281:5
313:6 492:8,12
**282** 279:3
**286** 229:9 277:11
278:15
**287** 231:11 277:15
284:15
**28th** 400:2
**296** 232:6 399:19
**298** 231:13
**2:00** 350:6 352:17
**2nd** 407:16

**3**

**3** 230:16 261:10,11
375:8 467:9
487:20,24 488:19
488:24 489:14
**30** 367:8 375:23
376:2 509:23
**300** 232:6 399:19
**301** 231:15
**306** 534:17
**310** 229:12 233:20
280:22 309:17
310:15 312:22
**314** 311:3,12
**324** 229:12 309:17
310:15
**325** 309:22 322:13
**33** 368:9 403:8,9
527:8
**34** 311:12 314:9
**345** 231:17 232:10
411:24
**346** 412:12

**35** 311:13 314:9
481:3,17 482:21
487:13 488:20
489:23
**350** 232:10 411:24
**351** 417:17
**352** 426:6 444:18
**353** 426:7
**354** 231:20
**355** 417:18
**36** 498:20
**360** 231:22
**365** 232:3
**365-7715** 234:7
281:7 313:8
**37** 232:12 416:20
**385** 232:4
**399** 232:6
**3:00** 241:21
**3:06** 403:1
**3:13** 403:4
**3:58** 434:24
**3rd** 286:21 324:21
534:21

**4**

**4** 400:18,25 458:24
467:10 487:8,12
488:20,24 489:14
509:8
**40** 328:25
**405** 232:7
**411** 232:10
**416** 232:11
**435** 232:13
**449** 230:17
**451** 232:13 435:17
437:6
**456** 232:13 435:18
**457** 232:14
**466** 232:16

Veritext Legal Solutions
866 299-5127

**47** 291:2
**470** 232:18
**471** 232:19
**473** 232:15 457:16
**476** 232:15 457:16
**479** 465:9
**4:06** 435:2

**5**

**5** 489:2,14 503:3,5
  505:10
**501** 232:21
**507** 232:22
**5095** 231:18
**5096** 231:19
**51** 231:14 298:11
**5150** 317:17
**52** 231:14 298:11
  325:3,5,11
**5241** 481:19
**5242** 481:20
**5326** 232:8 405:19
**5330** 408:17
**5331** 407:1
**5337** 232:9 405:19
**534** 229:17
**5380** 231:15
  301:10
**5381** 231:15
  301:11
**5382** 231:12 287:5
**5388** 231:12 287:6
**5419** 229:19
  278:18 286:24
  310:18 324:24
  534:24
**55** 407:11
**5:03** 478:10
**5:07** 477:13
**5:15** 478:13

**6**

**647** 400:18,25
**65** 496:21
**650** 234:7 281:7
  313:8
**6656** 231:8 265:14
  265:21,22
**6673** 231:8 265:14
  265:22
**6683** 231:10
  269:25
**6687** 277:4
**6688** 231:10 270:1
**6:16** 518:19
**6:20** 518:22
**6:39** 529:23
**6:42** 532:9,14

**7**

**7** 229:21 278:20
  310:20
**72** 317:18
**73** 494:23,25 495:2
  510:2,8 513:4
**74** 490:18,20 491:1
**77** 465:4
**79** 478:17
**7th** 233:4 235:3
  280:4 312:4

**8**

**8** 505:13
**81** 395:10
**88** 325:9
**883** 232:18 470:4
**886** 232:18 470:5

**9**

**9** 286:17 505:13
**90067** 233:19
  280:21 312:21
**916** 234:15 281:15
  313:16

**93** 325:15
**94** 325:10
**94403** 234:6 281:6
  313:7
**948** 232:16 466:23
**95** 373:7,9
**950** 468:21
**951** 232:17 466:24
  468:22
**979-8700** 233:20
  280:22 312:22
**9th** 315:23

**a**

**a.m.** 233:5 280:5
  312:5 350:13
  352:21
**ability** 267:17
  331:2 463:16
**able** 265:1 266:19
  353:14,17 413:6
  439:3 440:17
  442:20 480:11
  497:16
**academy** 341:11
**accept** 357:25
**acceptable** 445:17
  522:11
**acceptance** 358:3
**accepted** 479:10
**access** 247:23
**accommodate**
  480:11
**account** 496:2
**accurate** 248:11
  285:5 323:5
  341:21 350:8
  360:6 362:3 365:8
  385:13 413:8
  533:5
**acknowledgment**
  408:24

**acquittal** 358:15
**acquitted** 357:19
  358:21
**act** 398:1,3,15
**acting** 298:25
  299:1 317:12
  462:11
**action** 233:7 280:8
  286:8 312:8 324:8
  344:17 534:7
**active** 292:17
  316:20
**activities** 301:25
  302:4,6 316:6
  495:11
**activity** 315:15
  316:3,9,13,13
  317:4 512:22
**actors** 266:21
**acts** 276:4
**actual** 353:17
  482:1 493:5
**add** 331:2 522:17
  522:18
**added** 368:7 373:6
**addition** 261:17
  507:16
**additional** 236:25
  258:13 259:4
  387:9 389:14
  412:21 416:3
  419:14 422:20
  423:18 473:23
**address** 373:22
  444:2,12 446:17
  446:21 452:13
  453:16 480:17
**addressed** 443:23
  463:2 479:18,23
**adjoining** 510:18

**administrative** 438:19 441:3 442:23 448:15
**admonitions** 236:15
**ado** 447:18
**advice** 259:12 333:7,19,21,23,25 334:1 335:6 344:4 372:17 398:19
**advise** 394:5
**advised** 390:22 444:10
**advising** 421:1
**advisors** 372:18 451:25
**aerial** 510:16 511:15
**affeld** 233:17 280:19 312:19
**affirmative** 342:6
**aforementioned** 286:17 324:17 534:17
**agencies** 271:11
**agency** 264:25 265:1
**agenda** 232:8 405:22,24 406:2 407:20
**agitators** 275:24
**ago** 236:13,14 238:1 245:24 401:23 407:19
**agree** 387:19 498:15
**agreed** 498:16
**agreement** 231:7 438:5,9 456:25 477:23

**ahead** 243:10,19 246:14,20 264:9 265:8 266:9 267:12 268:18 273:16 284:6 287:4 290:19 297:11 307:5,16 308:1,9,20 309:3 316:16 317:9 327:18 328:8 329:23,23 337:15 337:16 340:5,21 342:4 353:24 359:6 361:5 364:4 367:5 379:2,12 384:23 387:23 390:8 392:3 399:12 401:5 411:12 412:25 416:12 428:10 436:3 443:19 444:7 446:11 448:7 451:4,23 455:13 474:16 482:16 484:13,24 486:8 487:19 492:17 494:11 503:11 506:11 508:21 510:8 512:20 516:25 520:24 527:12 528:24 531:12
**aid** 275:17
**aided** 346:15,19
**air** 293:2
**al** 229:7 235:6 278:7 310:7 395:21 399:22 404:16
**alex** 462:2,15

**allow** 268:14 382:24 441:5 442:20 457:4,6 464:4 515:3
**allowed** 242:3,25 243:15,22 267:4 276:1,9 389:3 426:19 444:21 468:3,6,13 471:1 479:11 527:24 529:12
**allowing** 454:7
**allows** 267:15 268:9 453:14 468:8
**alpine** 492:8,12
**alter** 512:10
**alto** 407:23
**ambiguous** 241:1 243:8,18 250:18 263:18 264:7 266:8 267:8 288:20 297:10 305:22 306:10 307:4,15,24 308:18 327:17 337:8 338:11 339:20 342:2 364:3 369:18 370:5 372:3 378:25 379:11 382:9 389:25 390:24 391:9 410:2 412:24 413:18 415:22 428:8 430:6 443:15 446:10 451:3,21 455:12 463:12 464:12 467:15 474:15 484:10,22 486:6

487:18 492:16 506:9 520:22
**amenable** 440:17
**amended** 458:25
**amendment** 276:2 437:9
**ammunition** 315:17 524:10,23 525:5,17,19,21,25 526:1,9,16,23,25 527:2,4,5,22,22,23 527:25 528:3,7,10 528:11 529:10
**amount** 348:22 476:25
**analysis** 319:23 420:16
**analyze** 424:20 515:18 516:7,12
**angeles** 233:19 280:21 295:15,19 295:25 312:21
**anger** 294:6,8
**angry** 293:3,22,24
**animation** 398:1,2
**annually** 375:4
**answer** 230:9 237:15,18 241:2 245:8,13 250:19 254:21 260:21 262:5 263:1,3,7,19 267:12 273:16,19 273:23 274:18,21 282:14 287:23 288:22,23 292:7 305:23 308:2,9,11 308:20,21 309:4 315:20 317:9 318:19 320:8 337:11,13,17 339:3,4,14 342:4,6

367:24 369:20
370:6 374:22
391:1,2 392:1,4
396:16 398:9,10
404:15 410:4,7
414:3 421:4
423:22 424:8
429:22 430:10
449:2,19,24
450:22 463:14
468:10 472:8
493:11 494:11
502:3,7,10,24,25
503:3,12 522:16
524:17,19,19
527:13 530:8
**answered** 243:20
275:17 289:9
316:1,15 317:7,7
337:7 372:17
374:21 378:25
382:20 384:19
387:22 388:11
391:25 414:25
415:1 417:11
421:23 424:5
428:23 443:2,17
444:5 476:8
494:10 496:12
502:2,8,16,22
505:3,10 522:12
522:15,19 527:14
527:17 531:11,15
**answering** 338:8
421:7
**answers** 397:14
413:20 421:20
422:2,11,16
505:14
**anticipated** 295:17
500:5

**anticipating**
489:13
**anybody** 300:25
330:20 360:23
382:2 520:11
**anymore** 322:7
368:1 478:7
**anytime** 307:17
309:6
**appeal** 269:4,8
430:21,22 431:9
432:2,8,11,14,19
432:24 433:3,8,11
433:13,23 434:1,7
436:4 441:25
442:17 446:6
447:15 448:10,16
448:19 449:3
452:20,20 458:8
458:11,16 459:1,7
459:12,25 460:8
460:13,17,25
461:3,4 462:1,2,15
464:2 465:8,18,21
465:23,24 466:2,7
467:6,9 471:12
472:11 473:18,24
474:6,24 478:24
490:14
**appealed** 431:12
460:16 471:7
**appealing** 437:5
460:23
**appeals** 431:6,7,18
431:20 433:6
436:21 438:16
442:24 459:15,20
459:23 464:8
490:11
**appear** 269:24
402:7 427:13

467:12 491:3,6
**appearances**
233:12 280:14
312:14
**appeared** 233:6
280:6 302:24
312:6
**appearing** 233:14
234:1,10 280:16
281:1,10 312:16
313:1,11
**appears** 374:1,11
399:25 491:24
492:4 511:2
**appellate** 244:16
**applicable** 246:1
246:10 250:23
340:25 427:3
483:5 485:2
489:20 496:16
**applicant** 248:21
249:3 258:12
374:4 375:12
376:12,23 377:2
378:11,18 379:9
379:15,20,25
380:7,13,23
409:23,25 410:23
411:1 415:20
416:4,5,9 421:4
432:10 433:20
434:4 474:22
476:3 491:25
499:22 500:3,7
514:14 517:17
524:3 525:15
526:7
**application** 231:3
241:8 243:6
245:18 247:1,4,15
247:18 248:18,21

249:4,25 250:15
251:1,14 252:21
253:22 254:10,13
254:18,25 255:3,7
255:17,23,24
256:1,4,7,11,17,23
257:3,6,11,13,17
258:8,23 259:9,14
259:20,25 260:1,4
260:6 268:20
269:2 364:20
368:4,18,22 369:2
369:16 371:18
372:14 373:4,7,19
374:1,8,10,13
375:13 376:9,11
377:24 378:17
379:6 382:6,13,17
382:18,23 383:3
383:13 384:15,17
386:2,8,12,21
387:1,2 388:2
389:6,9,14,16,17
389:20 390:5
391:15,23 392:9
393:9,15,21 394:1
394:7 396:10,14
396:16 397:10,15
398:4 400:20
401:24 402:3,5
406:7,22 407:12
407:24 408:19,22
408:25 409:3,9,24
412:18,22 414:22
415:11,18 417:10
418:20 419:1,25
420:9,12 422:3,23
423:21 424:3
425:4,14,16,19
427:20,24 430:22
431:2,5 432:22

Veritext Legal Solutions
866 299-5127

436:4 437:5,10,23
438:12,13 439:2
439:13,18 440:7
441:4 447:22
448:16,20 449:4,5
449:7,12,13 450:5
450:21,24 451:1
451:14 452:8,12
452:23 453:3
455:5,8,17,18
458:11,12,14,15
458:16,20,25
459:6,8 460:17,25
462:9,22 465:25
473:8,15 474:6
479:7,12 480:5,19
480:22 482:1,8,22
487:6,15 489:25
491:19,23,24
492:25 494:14
496:7,16 497:11
497:17,25 498:5
499:12,14,17
500:12,15,20
501:11 503:23
504:6 505:17,19
506:1 507:13
508:4 509:4,22
510:2 511:7,14
512:21,21 513:14
514:10 515:24
516:21 517:9,16
520:10,15,20,21
521:7 527:19
529:14 530:1,19
530:22 531:8
**application's**
459:12
**applications**
239:20 370:3
372:21 378:22

410:11,14,19,21
425:21 450:2
451:12,19 453:11
459:14,15 463:5
464:5 468:12
483:8 489:17
508:7 509:18
514:7 519:23
525:8
**applied** 369:10
378:23 379:7
482:7,19 483:13
483:19 487:6
519:25 520:9
521:5
**applies** 504:12
**apply** 269:12
427:6 432:3
520:11
**applying** 370:16
480:2 481:12
500:13
**appreciate** 478:1
**appropriate**
242:18 245:22
356:10 388:17
396:24 397:4,8
439:15 529:8
**approval** 240:12
240:17,24 247:11
250:9,10,22 252:9
252:24 369:1,11
409:5,8,12 414:21
424:21 462:9
467:14 495:21
506:7
**approve** 251:5,9
355:9 369:15
370:20 391:16
440:6 442:2,8
443:1 445:11

446:2,8 450:2
454:14 464:8
480:5,21 506:3
**approved** 250:24
251:10 253:3,22
257:3 354:22
355:1,4 376:15,15
382:25 383:5
393:15 415:6
421:6 439:13,19
440:2,12,15
446:19 479:12
480:15 491:7
500:4 508:8
509:17
**approves** 504:18
504:19
**approving** 443:9
443:11 504:25
505:1
**approximate**
274:10
**approximately**
237:9 293:9
361:25
**april** 325:24
326:17 459:1
**arbiter** 398:20
433:5
**area** 349:4,14,14
349:16 350:15,20
350:20 351:5
407:22 437:14,16
440:1 469:17
485:22 492:12,23
493:24 509:3,5,12
510:17 511:25
512:1
**areas** 469:7
**argue** 274:14
466:14 473:22

**arguing** 474:25
**argument** 475:6,8
**argumentative**
307:4,15,25
308:19 317:7
337:8 339:2 342:1
358:18 359:5
378:25 387:22
424:5 443:18
444:6 527:11
**arlinda** 497:13
**armed** 296:19
305:14 395:1
402:8
**arrange** 381:20
**arrangements**
489:3,9
**arrest** 264:4,16,16
264:24 265:2,3
267:6 333:10
334:9 335:14
**arrested** 288:24
289:11 290:3
**arrived** 348:11
352:20
**arrow** 508:14
**arterial** 486:23
**articulated** 498:2
**aside** 238:8 262:7
289:22 292:21
293:20 294:8
326:7,24 327:6
329:15 353:19
358:14 375:11
424:9 432:20
441:16 480:14,16
480:23 481:25
482:12,12,20
496:17 513:5
528:16

| | | | |
|---|---|---|---|
| **asked** 257:10 | 515:12 518:25 | **attempts** 381:19 | 414:24 415:10,16 |
| 315:25 316:14 | 527:19,21 | **attend** 282:23 | 418:15,23 419:18 |
| 317:6 327:24 | **asks** 412:16 | 382:1 | 420:19 421:12 |
| 337:7 357:7,8 | 507:15,21 516:6 | **attorney** 234:10 | 422:19 428:24 |
| 366:10,15 368:14 | 524:9,23 | 234:13,14 235:24 | 429:9,16 436:20 |
| 378:24 381:25 | **aspects** 255:25 | 237:8,14 257:25 | 436:23 438:25 |
| 382:2,21 383:11 | 327:23 414:16 | 258:18,19 259:5 | 449:2,11,14,23 |
| 384:9 386:14 | 468:22 | 262:2,4,8,15,18,23 | 451:11,24 452:1,4 |
| 387:21 388:10 | **assess** 265:1 | 262:23,25 281:10 | 452:8 458:19 |
| 391:24 393:11,14 | 296:22 408:6 | 281:13,14 313:11 | 471:17 481:10 |
| 397:12,17 402:18 | **assessed** 264:11 | 313:14,15 384:9 | 505:20,24 506:2,6 |
| 408:9,10 419:19 | 455:4 | 384:20 392:8 | 506:12 530:14 |
| 420:24 424:4 | **assessment** 264:15 | 393:13,14 394:11 | 531:1 |
| 443:17 444:4 | **assigned** 411:17 | 394:13,18,20 | **attorneys** 372:19 |
| 447:15 455:22 | 483:15 | 395:19,20,21,22 | 403:10,12,17,18 |
| 476:8 481:7 494:9 | **assist** 475:20 | 396:9,21 400:6,7 | **atypical** 257:8 |
| 496:11 501:14,23 | **assistance** 505:25 | 413:21,22 415:1 | **audio** 320:24 |
| 503:22 505:2 | **assistant** 395:20 | 419:24 420:8,25 | 321:2,4,6,7,11,14 |
| 507:17 512:6,19 | 395:21 400:6,7 | 421:24 422:13 | 321:15,17,24 |
| 513:22 514:17 | 403:17 | 425:8,22 427:22 | 328:9,10,12,15,19 |
| 519:6 522:12 | **assisted** 275:25 | 442:14 444:17 | 328:25 329:25 |
| 524:5 530:12 | **associated** 239:4 | 449:15,17,18,20 | 330:5,8,12 331:3,5 |
| 531:10 | 331:8 346:20 | 450:1,18,25 451:6 | 331:7,8,25 332:6 |
| **asking** 259:1 | **associates** 270:18 | 452:13,21 455:2 | 332:18 333:18 |
| 260:3 262:21 | **assume** 421:3 | 478:20,21 515:1 | 335:24,25 336:1,5 |
| 274:3,5,8 306:12 | 445:2 | **attorney's** 237:17 | 336:8,10,13,15 |
| 306:21 333:6,7 | **attach** 353:16 | 257:24 258:10,15 | 338:12 341:20,22 |
| 337:13 338:1,6 | **attached** 331:4,17 | 258:22 259:8,16 | 478:6 |
| 340:11 343:7 | 331:20 373:19 | 260:4 261:24 | **august** 229:21 |
| 380:19 382:15 | 375:10 418:14 | 262:1,22 263:7 | 233:4 235:3 |
| 383:6 389:18 | 423:7 472:5 479:1 | 289:1 333:7,12 | 278:20 280:4 |
| 390:2 391:13,14 | 528:3 | 372:12,13,21 | 310:20 312:4 |
| 392:10 398:6,7,18 | **attaching** 437:13 | 373:3 381:9 | **aurora** 271:19 |
| 400:21 407:5 | **attachment** | 382:21 383:6,12 | 277:4 283:1 |
| 414:24 415:16 | 471:25 510:5 | 384:2 386:11,23 | **author** 428:11 |
| 416:25 419:14 | **attempted** 257:25 | 386:25 387:13 | 429:13 |
| 422:8,9 428:20 | 259:24 452:13 | 392:23 393:10 | **authority** 261:21 |
| 440:8,10 443:7,8 | 459:7 | 394:9,14 395:6 | 262:12 450:1 |
| 448:21 458:15 | **attempting** 318:24 | 396:21 397:13 | 451:11,19 452:3 |
| 471:1 476:9 502:6 | 364:22 453:18 | 403:23,25 404:8 | 463:8,22 506:3 |
| 502:8 503:9 | | 409:18 410:18 | 525:16 526:9 |

**authorize** 429:21
**authorized** 253:18
  263:11
**available** 434:22
**avenue** 510:23
**aware** 239:8,18,21
  240:3,4 242:4,8,10
  247:19 254:25
  255:2 266:24
  275:7 289:6
  293:17 295:4
  319:1,21 361:8,18
  362:1 367:1,4
  370:1 372:20,23
  381:13,14,19
  384:12,15 393:20
  396:6 409:10
  412:20 413:3
  418:18,21,25
  419:23 425:21
  426:17 433:6
  438:14,15 441:23
  446:4 451:10
  452:7,10 466:2
  495:22 498:1
  514:6 523:21

**b**

**b** 231:1 232:1
  311:10 348:1
  376:10 513:22
**back** 244:23
  249:10,15 251:19
  258:7 270:10
  276:22,25 294:20
  319:13,16 328:5
  329:3,24 337:9
  342:7 346:5
  359:14 383:18
  403:3 406:9
  409:21 423:2
  435:1 444:15

446:13,24 453:15
460:4,17 463:21
469:20 478:12
497:20 508:21
518:21 529:22
**background** 302:9
  325:19 481:4
**bad** 307:21,24
  308:6,11,15,24
**ban** 288:9,16
  327:14
**barred** 394:15
**based** 244:12
  247:8 260:3
  290:17 291:16
  295:22 315:15
  316:3 318:1 334:8
  335:6,8 340:22,23
  341:18 347:20,23
  348:1 352:12
  355:11,19 370:23
  381:22 382:18
  386:11 387:24
  389:17 392:8
  403:21 405:12
  417:7 433:22
  459:9,10 462:7
  469:18 498:13
  500:19 515:9
  521:7 522:4
**bases** 427:23
**basically** 304:17
  399:1 404:17
  420:25 463:18
  474:9 509:11
**basis** 242:19 247:5
  262:13 309:11
  370:23 399:2
  428:1 473:23
  487:1 488:14
  489:11 505:8

517:19
**bates** 231:3,8,9,12
  231:13,15,18,20
  231:23 232:3,4,6,8
  232:10,11,13,14
  232:16,18,19,21
  232:22 248:8,10
  269:25 271:17
  298:11 311:12
  314:8 354:7 375:7
  416:19 435:17
  465:1
**bear** 345:21
**beat** 349:12
**becerra** 234:11
  235:24 281:11
  313:12
**beginning** 320:9
  400:17
**behalf** 233:14
  234:1,10 235:18
  280:16 281:1,10
  312:16 313:1,11
  373:23 422:2,11
  424:1 462:11
  475:3 531:5
**behavior** 316:23
**belated** 238:14
**belief** 403:24
  404:14 450:6,9
**believe** 243:20
  254:22 258:11
  271:14,15,20
  282:7,13 283:6
  294:19 297:2
  299:15 333:3
  335:2 336:25
  341:23 353:23
  355:20 357:16
  358:25 362:15
  376:14 377:25

379:16 382:18
383:22 393:11
402:14 404:16
409:1 414:23
419:3,11,17
421:22 425:15,17
427:21,25 433:2
438:18 439:6
440:16,20 441:12
448:3 450:4 451:5
457:18 474:2
480:6 481:9 490:1
497:20 520:14
**believed** 316:3,3
  332:23,25 333:8
  356:13 437:21
  473:16 515:1
**believing** 442:22
**belongs** 373:23
**beneath** 252:12
**bertini** 229:15
  233:1,7 234:2
  235:5 236:5,10
  239:16 249:18
  260:21 262:17,21
  263:6 269:16
  271:23 273:16
  274:3,20 276:25
  278:13 280:1,7
  281:2 282:1 285:3
  285:25 286:5
  290:23 310:13
  312:1,7 313:2
  319:8,16 323:3,25
  324:5 325:6
  328:14 330:7
  332:11 333:14
  336:14 337:17
  395:10 403:6
  404:6 423:5
  478:15 496:22

499:6 531:21 533:3,25 534:5

**bertini's** 231:5 260:17

**best** 320:12 368:5 368:19 377:7 407:18 409:1 420:10 433:2 490:13 508:18

**beyond** 268:16 303:14 424:7

**bill** 395:22 396:9

**billions** 490:20 509:22

**binder** 270:15,24 271:2,3,7,13,24 272:5,12,15,16,17 272:21 273:2,3 277:9 362:21

**binders** 273:6 274:6,23,25

**birthday** 366:12 453:19 454:9

**bit** 260:8 304:25 315:4 407:20 438:3 457:14

**block** 453:19 456:21,22,25 457:2,8 467:24 468:2,3,4,6,9,12 468:13,18,19 510:3 511:2,8,16 513:6

**blocking** 239:6 276:6 453:24

**blocks** 509:24

**bob** 255:8

**bolster** 475:16

**booted** 345:21 346:5

**bottom** 249:21 250:3 304:5 325:15 367:16 368:11 376:18 426:6 490:19

**bound** 229:10,13 277:13 309:19

**boundaries** 263:21

**box** 380:13 408:18 508:5

**boxed** 386:1

**boxes** 252:9,13,16 374:12,20 499:17

**brackett** 314:23 321:16 328:10

**brand** 304:15

**brandell** 435:25 442:16 465:11,14 465:19

**brandell's** 466:3

**break** 249:10 276:16 319:7 327:25 359:10 402:22 434:17 518:6,8,9,16 529:17

**briefing** 271:19 277:5 282:24,25 283:2,3

**briefly** 238:14

**bright** 519:8

**brightness** 515:25 516:6,17 517:2

**bring** 302:2 529:9

**bringing** 304:14 304:17

**brings** 420:25

**broke** 249:18 466:15 518:24

**brought** 257:23 300:17 343:15

366:11 425:5 473:1,2

**bryan** 301:17,19

**bullet** 380:22 397:16 442:5 474:8 475:13 507:20 509:8 516:3,10 518:25 523:1 524:8,22 525:2

**burt** 298:15

**busier** 244:11

**business** 291:20 292:4 452:2 482:11,13,20

**c**

**cad** 231:18 346:15 350:5 351:3,4,9,18 352:12,15

**california** 229:2 233:19 234:6 235:8 263:23 264:13 266:6,17 278:2 280:21 281:6 286:12,18 286:25 287:16,20 288:5 310:2 312:21 313:7 324:12,18,25 327:15 381:23 427:12 428:4 523:17 525:9,12 525:14,18 528:17 534:12,18,25

**call** 297:3,16,25 337:23 338:6 340:13,22 347:8 347:19 349:17 352:15 356:21 380:7,15,25 404:12 408:6

416:10 429:16 447:8 471:5 518:11

**called** 264:12,20 268:24 282:2 296:19 302:11 330:18 347:8 376:1 494:24 498:21,22 510:10

**calling** 305:13 309:9

**calls** 258:17 262:24 263:17 264:8 267:9 275:17 288:20 297:7,13,18,22 302:25 303:5,8,10 303:11,15 305:15 305:19 306:22,24 307:1,8,12,18,22 308:7,15 340:5,20 358:19 359:5 369:18 381:14,18 381:20 404:4 405:4 415:22 428:8 430:4,5 443:16 451:21 463:13 464:12 484:12 506:9 516:23

**caltrans** 494:15

**camera** 495:13,18 511:25 512:24 513:5,9

**cameramen** 513:25

**camino** 244:8

**capacity** 236:22 451:18

**capitalist** 406:14

Veritext Legal Solutions
866 299-5127

**caption** 260:15,16
261:2
**car** 491:25
**care** 269:5 521:12
521:12
**carried** 361:11,12
361:19 397:19
**carries** 248:24
265:14 437:6
**carry** 267:18
268:15 276:2
287:16,19,22
288:4,6,9,11,15
315:16 327:14
330:18 336:20,24
337:2,5,19,20
338:3 346:18
359:2 360:13,20
361:23 395:16
396:1 427:11
428:3,21 429:4,6
450:13 498:13
526:10,13
**carrying** 261:11
264:23 288:14
289:5,16 292:14
341:23 342:16
355:21 362:1
413:11 426:6
427:15 428:16
429:11,20 430:1
467:9 468:22
501:21
**cartoon** 400:12
**case** 229:6 231:22
235:8 242:19,19
245:15,15 247:4,4
260:15,16 271:13
271:25 278:6
284:3 288:25
292:2 321:1

330:24,25 331:1,3
331:4,9,19,19,20
333:9,11 334:22
336:4 343:4
345:11 346:18,21
346:21 350:21
351:5 354:13
356:9,17 357:10
357:11,12 358:25
360:12,14,19,20
361:9,13,16
362:24 370:23,23
377:6 388:5
397:18 399:2,2,2
402:6,7 404:19
405:10,11 418:1
445:23 454:24
455:4,4,6,6 460:13
474:10 475:17
487:1,1 488:13,13
489:11,11 490:10
490:10 505:5,8,8
506:20,20 515:1
517:19,19 520:19
528:2
**cases** 276:7,8
330:8,13 380:18
452:1
**catalogued** 427:2
**catch** 362:10
**categorized** 331:9
**category** 247:6
**cause** 233:9
264:16 265:2
280:10 312:10
486:16,21 517:4
**caused** 302:13
355:25 383:2
384:17 453:20
**causing** 318:7

**caveat** 389:18
**celebration** 299:22
**center** 303:3 445:8
493:6,9 494:1,3,7
**century** 233:18
280:20 312:20
**ceo** 463:18
**certain** 295:14
331:14 343:8
366:12 468:3
486:20
**certainly** 245:23
252:18 262:4
271:21 273:2
282:14 351:20
370:17 380:9
431:5 450:3
456:20 506:5
514:16 517:12
529:15
**certificate** 286:1
324:1 499:24
534:1
**certified** 233:5
280:6 286:11
312:6 324:11
534:11
**certify** 285:4
286:4 323:4 324:4
533:4 534:4
**cetera** 250:12
251:17 316:22
424:25 428:24
454:2 456:16
475:15 523:5
**chain** 365:13,17
435:24 502:2
**chaired** 461:2
**change** 285:9
323:9 347:18,20
347:23,25 350:19

351:8,16 353:18
390:13 533:9
**changed** 349:3
350:15,24 351:20
352:15 428:2
442:20
**changes** 353:3,6,9
353:15,20,22
367:1 480:4
**characterized**
308:25
**charge** 244:24
375:16 411:10
**charges** 351:20
398:20
**charging** 335:11
**charlene** 314:23
**chase** 522:14
**check** 252:13,16
253:22 349:16
351:6
**checked** 375:4
508:6
**cherise** 435:24
442:15 465:11
**chief** 229:15 233:1
233:6 234:2 235:5
236:5,10 239:16
249:18 255:6,6,8,9
255:11,20,21
256:5 260:21
262:17,21 263:6,9
269:16 271:23
273:16 274:3,20
276:25 278:13
280:1,7 281:2
282:1 285:3,25
286:5 288:1
290:23 301:19,21
302:2,7,20 304:9
310:13 312:1,7

Veritext Legal Solutions
866 299-5127

313:2 319:8,16
323:3,25 324:5
328:14 330:7
332:11 336:14
337:17 342:24
343:13,14,21
359:23 395:7,23
403:6 404:6 436:1
478:15 499:5
531:21
**chief's** 255:4
362:19
**child** 398:14
**chp** 264:13
**circled** 386:1
**circulate** 250:15
**circulated** 254:14
254:18,19,22
255:1,10,11
**circumstances**
335:9 405:13
440:11
**cite** 397:20 400:14
**cited** 356:22
**cities** 275:19
**city** 231:3,7 234:1
235:22 236:23
238:25 239:3,21
239:23 241:8
242:12 243:14
244:3 249:24
250:2 254:15
257:15,24,25
258:10,14,18,22
259:5,8,16,23
260:4,5 261:17,20
261:23 262:1,8,22
262:22,23 263:9
263:14,20 264:19
265:6 267:6 269:4
271:25 274:23

275:1,14,22 276:1
281:1 283:15,17
287:13 288:3,10
297:7 299:10,13
305:2 313:1
318:24 319:18
320:19,25 321:14
321:18 326:9,18
327:8,9 330:4,7,13
345:16 356:20
358:6,9,13 361:8
361:13,20 362:2
363:8 364:7
365:23 366:1
367:13 368:1,3
371:3 372:7,11,12
372:13,15,19,21
373:2 377:8,21
379:23 380:6,24
381:9,10,25 382:5
382:11,16,21
383:2,6,12 384:2,8
384:13,20 386:7
386:11,19,23,24
386:25 387:6,11
387:12 388:9,13
389:5,13,16 390:5
391:21 392:8,23
393:8,10,13,14
394:6,9,14,18,20
395:22 396:8,13
396:18,20,21
397:7,13 401:23
409:18 410:18
413:21,21,24
414:9,19,23 415:1
415:3,9,15,18
418:15,23 419:18
419:24 420:8,19
420:19,24 421:12
421:21,24 422:1

422:10,13,15,19
424:1,14,17 425:8
425:22 426:14,19
427:18,22 428:5
428:14 429:9,10
429:16,19,24
430:19 431:18,20
431:23,24 432:25
433:3,4,5,23 434:4
434:7,13 436:20
436:23 437:1,21
438:9,15,22,25
439:5,11,14,16,25
440:5,9,10,13
441:4,16,18 442:1
442:6,14,16,17,25
443:5,10 444:1,17
445:9 446:22
447:15,25 448:3
448:19 449:2,10
449:14,15,16,18
450:1,18,25 451:6
451:11,13,16,18
451:24 452:1,2,4,4
452:8,12,21,22
453:10 454:15
455:2 458:5,19
459:6,7 462:2,14
462:15,18 463:4,6
463:10,15,17,18
463:20,22,24,25
464:1,3,6,7,9,14
464:19 465:22
466:3,11 467:13
469:6 471:7,8,12
471:14,16 472:4
472:20 473:2,7,11
474:10,12,24
475:3,4,8,17,20
476:1,4,15 477:24
478:20,21,23,25

479:3,8,9,15,15,16
479:17,21,22,24
480:3,19 481:6,10
482:3,14,23
483:20 484:8,15
484:15,20 485:1,4
485:8,12,13,19,23
486:2,13 487:25
488:1,4,5,8,11,17
489:2 490:2,7,16
490:16 491:4,20
493:3,8,13,23
494:3,6,12,16,19
495:6,20,24 496:1
497:10 501:10
503:16 504:4
505:15,15,20,23
506:2,4,6,12,15,15
506:18 508:2
509:15,23 510:3
511:2,8,13,16
512:14 513:6
514:13 515:1,3,6,8
519:5 520:17,19
523:25 524:1,4
525:7,11 527:7
528:9,14,19 529:4
529:12,25 530:13
530:25 531:6,8
**city's** 257:24
258:18 262:11
366:24 367:1
368:13 388:21
416:1 420:22
430:14,15,23
469:3,9,12 481:22
503:17 514:24
515:3 519:22
521:5 522:9 523:9
526:13

Veritext Legal Solutions
866 299-5127

civil 317:16 318:2
civilly 318:10,25
  319:19
claim 437:10
  447:22
claims 493:3
clarification 260:3
  268:25 399:14
  471:2,4 519:15
clarifications
  252:2
clarify 243:12
  340:11
clarifying 251:22
clarity 447:2
clay 472:2,3
clean 239:17
cleanup 374:25
  375:1
clear 246:20 329:2
  348:13,22,24
  357:3 389:9
  400:14
cleared 530:15
click 248:1
client 237:14
  258:19 262:2,25
  394:11,13 449:20
close 328:25 454:9
  486:23 526:16
  528:1
closed 349:21
closing 366:13
  456:16
closures 489:12
code 317:18 333:6
  334:4,7 340:12
  341:1 350:17
  351:7 356:14
  397:21 400:13,25
  467:18,18 468:8

469:5,20 473:4
523:11,13,14,17
523:18,22 525:9
525:13,14,18,24
526:7 527:24
528:8,17 532:3
collected 272:9
collecting 271:24
collective 344:6
  356:15 384:1
collectively 344:16
  344:19 356:8
colorado 271:19
  277:5 283:1
column 252:7
  260:16 347:1,21
  348:16
combination
  491:22
combined 244:19
come 300:19
  302:10 356:1
  358:20 373:10
  392:11 398:18
  413:20 418:1
  429:5 445:3 461:1
  485:5 490:7
comes 243:25
  404:22 501:4
coming 275:12
  294:20 298:23
  300:2 319:8
  394:25 485:8
command 288:2
  356:24 395:7
commander
  255:12 298:20,25
  299:1,5,8 304:15
  304:23 305:11
  306:6 308:14,23
  316:7 341:15

355:9 366:15
395:7
commanders
  255:12 275:2
commenced
  481:11
commencing
  233:4 280:4 312:4
comment 253:21
  524:19
comments 253:23
commit 318:11,25
  362:13
commitment
  317:18,21
commitments
  317:16 318:2
committed 290:1
  329:16 358:1,6
  359:1
committee 327:3
  327:10 366:14,16
  366:18 369:3,12
  369:15 370:2,13
  370:20,25 371:1,5
  371:9,11,12,21
  409:4 430:23
  431:2,7,8,22 432:2
  453:15 459:20,23
  459:24 460:1
  461:1,18,23
  462:10
committing 276:3
  319:20 358:9,11
  358:13 362:8,13
  362:25
common 244:6
  351:8 469:11,21
  519:13,17 521:17
communicate
  334:13

communicated
  320:5,6 383:23,24
  390:10 403:17
communication
  258:7,9,19 262:2
  268:7 315:14
  341:9 380:21
  394:12,13,14
  408:5 449:21
  514:11 530:16
communications
  258:17 262:25
  300:7 320:11
  341:8 393:24
  394:19 470:17
community
  244:23 250:2
  251:20 375:15
  381:8 382:22
  383:14,16 419:4
  419:10 431:10,23
  433:11,13 436:7
  436:10 453:6,8,14
  454:1,3,11,13,16
  454:18,19,23
  455:3,9,19 456:7,8
  456:11,15,21
  457:5,7 459:17
  460:9,14 461:5,8
  461:15 462:11
  465:14 479:16
  497:14
companies 303:1
  406:15 517:20
company 302:11
comparison
  283:21,23
complaining 300:4
  473:3
complete 396:24
  420:12 439:2

477:18,22 478:1
**completed** 351:21
351:23 352:2
**completely** 359:4
374:23 375:11
**completing** 397:3
**complex** 303:3
406:15
**compliance**
487:23
**complies** 484:7,18
**comply** 396:18
**complying** 261:15
**compound** 267:8
338:11 340:3
342:3 413:18
443:15
**comprehensive**
480:3
**computer** 265:16
331:18 346:15,19
**concealed** 289:2,6
289:24 332:23
333:3 336:20,23
337:5,19 338:3,17
338:24 340:18
341:3,23 342:16
346:18 355:21
356:6 357:23
358:14,16 359:2
360:13,20 362:16
**concern** 292:9,12
300:18 305:11
309:7 384:7 388:1
427:11 428:1
450:6,9,11 473:1
474:3 529:8,9,11
529:13
**concerned** 296:13
394:18 439:10

**concerning** 262:18
282:9 482:15
**concerns** 251:2
256:24 320:18
394:25 450:17
468:23 498:3,6,9
498:11,15,17
**concession** 478:3
**conclude** 443:22
444:11 479:19
**concluded** 359:22
532:13
**conclusion** 263:18
264:8 267:10
356:1 358:19
359:5 428:9 430:4
443:16 451:22
464:13 485:5,9
506:10
**concrete** 439:11
**conditionally**
253:22
**conditions** 409:11
424:21 442:1,6,7
490:3,8
**conduct** 252:21
438:24 439:18
440:13 441:6
444:22 445:10
446:1,7
**conducted** 361:7
409:23 410:22,25
**conducting** 294:22
295:5 296:10
**confidential** 229:9
229:12 231:16
271:17 277:12,14
278:11 282:19
284:13 309:18,20
310:11 311:12,13
314:9,9,18 322:7

322:10,11 394:15
**confirm** 376:22
378:10 379:8
515:16 516:11
**confirmation**
507:21
**confirms** 378:18
380:12,14
**conflating** 441:9
**confused** 526:3
**confusing** 389:24
390:25 391:8
**confusion** 450:12
**congregate** 469:23
**conjunction**
282:16 436:19
504:22
**connected** 269:5
**connection** 239:20
243:12 254:9
268:19 269:2
271:25 288:14
292:2 320:14,25
359:1 366:20
384:16 441:19
461:19 468:2,11
478:24 489:16
501:15 527:18
**consider** 318:10
318:24 319:19
426:19,22 432:5
472:20 483:20
485:8,12,13,15,19
529:13
**consideration**
433:14
**considerations**
246:4,11,11 247:7
247:7 487:14
488:21,25

**considered** 242:19
289:24 318:14
338:2 397:8
427:19 452:12
459:25 489:16
504:25 528:4
**considering**
403:22 454:14
529:13
**considers** 486:13
**consistency**
435:17
**consistent** 363:5
367:22 389:12
448:18
**consistently**
290:14 320:18
**consternation**
453:21
**constitutes** 286:14
324:14 534:14
**constitutional**
288:6,11,16
**consult** 436:23
**consulted** 372:22
403:12
**cont'd** 232:1
**contact** 259:24
330:19 364:6
375:20 394:3
452:13 461:8
**contacted** 259:16
269:9 373:2,5
401:23 452:22
**contacts** 321:3
401:25
**contain** 474:5
**contained** 271:7
482:22
**contemplated**
241:18,20 242:14

| | | | |
|---|---|---|---|
| 243:24 244:13 | **contrary** 426:8 | 268:11,15,16 | 416:5,20,24 417:2 |
| 245:17 247:15 | **control** 247:2 | 269:2,10,13,14,18 | 417:6,18,22 418:4 |
| 251:18 255:24 | 424:20 499:24 | 270:1,2,4,7 272:6 | 418:5,6,7,9,12,13 |
| 256:21 257:6,10 | 500:8,10,16 | 272:7,11 286:15 | 422:3 423:8,11,12 |
| 259:13 364:17 | 503:18 504:1,12 | 287:16 288:8 | 428:21 431:18 |
| 469:2 475:14 | 505:1 515:19 | 291:11,21,25 | 433:25 434:3,6,9 |
| 485:4 492:5,24 | 516:8,13 | 292:3 293:13 | 434:12,14 435:18 |
| 494:14 496:3 | **controls** 489:4 | 294:18 295:2,6,19 | 435:22 436:5,15 |
| 500:20 505:7 | **conversation** | 296:1,17 297:1 | 436:16 441:6,8 |
| 506:14 516:1 | 266:16 333:13 | 298:11,12,16,21 | 446:22,23 449:8,9 |
| 517:23 519:12 | 338:15,15,20,23 | 302:8 304:3 305:4 | 457:16 458:6,7,9 |
| 520:2 | 339:12,16 340:8 | 306:13 314:10,24 | 458:21 459:3,4 |
| **contemplates** | **conversations** | 314:25 317:19,23 | 465:12 466:4,8 |
| 495:8 | 345:14 | 318:4 320:20 | 467:3,6,7 468:1,5 |
| **contemplating** | **conveyed** 341:22 | 321:24 322:8 | 468:14,15,17 |
| 490:10 521:25 | **convincing** 475:20 | 324:15 325:21,22 | 470:15 471:10,12 |
| **contemporaneous** | **convoluted** 364:23 | 325:24 330:16 | 471:13 472:2,4 |
| 343:19 | 460:23 | 334:18 337:23,24 | 474:13 475:2 |
| **contemporaneou...** | **cooperation** | 338:3,9 341:17 | 479:5 481:8,14,20 |
| 291:13 | 290:25 | 345:25 346:24 | 481:21 482:24,25 |
| **content** 274:4 | **cooperative** | 348:25 350:9 | 487:4 488:15 |
| 282:5 294:18,19 | 290:12,14 | 351:3 352:6 354:8 | 490:5,24 492:6,7 |
| 521:12,23 522:10 | **coordinator** | 362:22 363:1,2,12 | 493:25 494:4,5 |
| 522:11 | 250:14 252:7,20 | 363:13 365:20,24 | 495:3,6 497:3,4,8 |
| **contents** 481:25 | 256:14 384:3 | 365:25 367:13,14 | 497:12 499:3,14 |
| 482:8 | 459:16 | 369:7 371:24 | 501:7,11 502:17 |
| **context** 364:19 | **copied** 412:6,8,9 | 372:9,10 373:12 | 502:23 504:2 |
| **continue** 326:19 | 414:14 | 373:15,21 374:2,3 | 505:12,21 506:24 |
| 392:12 | **copies** 499:23,23 | 374:6,13 376:12 | 507:18,19 512:25 |
| **continued** 229:15 | **copy** 480:25 | 378:12 379:9,20 | 516:5,8,9,18 520:3 |
| 233:1 278:13 | 532:11 | 381:2 385:18,20 | 529:5 530:3,5 |
| 280:1 302:17 | **copying** 367:6 | 385:24 386:9,14 | 534:15 |
| 304:23 305:1,5 | **corner** 508:24 | 386:16,21 387:1 | **corrections** 285:7 |
| 310:13 312:1 | 509:21 511:17 | 390:23 391:23 | 323:7 533:6 |
| 361:16 363:11 | **correct** 236:19 | 395:14 396:19 | **correctly** 361:24 |
| **continues** 277:15 | 241:5 242:20 | 397:10 399:20,21 | 390:20 436:21 |
| 284:15 309:21 | 248:12 249:1,5 | 400:2,5,15 406:7,8 | 502:5 |
| 322:13 | 251:12 252:4,5,10 | 406:19 409:20 | **correlate** 391:11 |
| **continuing** 248:10 | 253:4 255:8 259:5 | 411:24,25 412:6 | **correspondence** |
| 457:20 | 259:6,17,18 265:6 | 412:10,11,18 | 231:13,15 232:3,4 |
| | 265:15,18 267:1,2 | 413:9,12 415:20 | 232:6,10,11,13,14 |

Veritext Legal Solutions
866 299-5127

232:18,19,21,22
311:12
**cost** 298:3
**council** 431:24
433:4 434:8,13
442:17 452:5
471:8 473:11
474:10,12,24
475:4,8,17,20
476:2,5,15 478:23
479:1,3,8,17 481:7
490:16
**council's** 472:20
**counsel** 235:15
257:24 282:7
308:19 314:11
339:22 342:1
358:18,22 387:22
391:25 392:6
451:13,13,16,18
476:19 522:12
524:13 527:11
**counsel's** 274:21
**counselor** 263:22
290:2 423:24
430:9 443:2 518:6
**counselors** 259:12
422:18
**county** 264:14
275:17
**couple** 275:7
293:11,15 321:2
343:20 401:22
476:22,24 481:4
**course** 272:9,23
289:7 291:19
292:4 293:11,15
296:20 344:17
356:19 404:19
405:11 415:17
431:1,4 432:7

456:12 483:7
**court** 229:1 235:7
235:12 278:1
282:9,10 310:1
318:18 319:3
357:22 361:2
363:9
**court's** 357:25
**courtesy** 477:20
478:3
**cover** 270:17
277:13 309:19
428:18 434:22
492:13,23 493:2
**covered** 269:25
291:14 349:9
428:19 489:14
**covering** 248:8
**covers** 490:1
**crazy** 315:4,8,13
315:24 316:4,12
317:3,11
**create** 241:22
243:2,7 244:5,9
**created** 239:23
316:18
**creates** 244:4,18
389:1
**creation** 327:23
**crew** 513:5,23
514:8
**crime** 290:1,3,4,8
329:17 355:18
356:22 358:1,6,9
358:11,13,16
359:1 362:8,14,25
**criminal** 276:3
330:13 346:22
350:21 352:10
357:11,12 358:25
360:12,19 361:9

361:13,16
**criteria** 240:22,23
241:7,10 242:25
243:5 245:10,21
246:7,8,9 317:24
340:12 371:13
387:24 420:13
426:14 442:25
443:9,11 453:22
454:7 483:18,19
483:22,24 485:17
485:23,24 487:5,7
487:12 489:8,9,16
489:24 496:8,18
504:24 519:4,6
**crowd** 247:2
**crr** 229:20 278:19
310:19
**cruz** 510:23
511:11
**csr** 229:19 278:18
286:24 310:18
324:24 534:24
**current** 362:7
**currently** 367:23
**curtin** 472:2,3
**cut** 249:7 318:19
522:14
**cutting** 460:19
**cv** 229:6 235:8
278:6 310:6

**d**

**d** 230:1 279:1
311:1 515:15,16
516:2 518:25
**da** 334:24,25
356:9 360:14
400:4 401:19
404:17 473:5
**da's** 334:4,11,13
342:22 343:4,6

344:1,5,10,13,16
344:22,23 356:7
356:18 357:8
360:15,21 398:6,7
398:15,19,22
400:22 407:6
429:8
**daily** 309:11
**damion** 233:15
235:17 273:19
274:8 276:14
280:17 284:9
312:17 328:22
332:3 346:7
434:19 447:2
457:18 518:10
**danger** 246:5
318:8
**data** 273:4
**date** 285:25
323:25 330:10
331:21 350:6,10
361:15 417:9
479:6,8 533:25
**dated** 231:11,18
232:16 400:2
458:24 497:6
**dates** 295:18 362:4
459:10 501:24
**dave** 229:15 231:5
233:1,7 234:2
235:5 236:5
260:17 278:13
280:1,7 281:2
282:1 285:3,25
286:5 310:13
312:1,7 313:2
323:3,25 324:5
533:3,25 534:5
**david** 233:16
235:19 280:18

312:18 329:24
330:3 331:23
385:20 416:22
532:4
**day** 233:4 270:8
280:4 286:21
312:4 324:21
334:14 335:3,14
345:4 350:11
398:18 417:8
477:21 482:11,13
522:13 534:21
**days** 343:20
477:23
**deal** 239:4 256:22
275:10,14 305:12
305:16 306:1
309:8 317:16
395:3 423:14
453:21 525:24
**dealing** 241:9
247:1 309:5 318:2
489:19 506:1,14
**dealings** 364:11
**deals** 273:2
**dealt** 299:14,18
403:9 410:17,22
446:14,14,15
**dear** 458:23
**decibel** 502:13
**decide** 387:16
394:20 484:20
520:19
**decided** 344:17
371:25 382:17
521:6
**decides** 244:17
429:10 454:12
459:20 500:10,14
500:15

**deciding** 452:21
453:13 455:8
485:14
**decision** 259:20,25
260:6 309:10
335:8,11 343:25
344:2,6 356:8,15
370:9 371:17
383:4,13,15,17,21
383:23,25 384:1,6
384:10 396:13
418:2 422:6 431:3
432:4,5,12 433:22
449:12 451:1
454:16,21 455:7
455:16 462:12
469:15 471:8,12
472:15,20 473:17
483:8,9,14 495:24
504:8 531:9
**decisions** 452:3
490:12
**declined** 251:4
**deemed** 472:24
**defendant** 231:5
234:1,10 235:21
235:23 260:17
281:1,10 313:1,11
**defendants** 229:8
278:8 310:8
**defer** 422:17
**defined** 387:6,11
**definite** 439:8
489:8 522:9
**definitely** 287:23
**definition** 390:13
396:18 420:22
**denial** 240:12,17
240:24 247:11
269:4 369:2,11
381:15,21 397:1,5

397:9,15 406:23
409:5,12,15,16,19
415:12 417:1,21
418:11,14,15,18
418:21,24,25
419:2,4,9,12
420:11,12 421:23
422:25 423:7,17
425:11,16,18,23
430:21,22 431:12
432:23 433:6
436:4 437:5 438:1
438:18,22,25
442:13 443:3,21
444:8,17,20
446:13,17 447:14
448:10 458:8,10
458:11,13,16,24
459:11,21 460:3
461:3,19 462:9
463:17 464:3,15
464:18,25 465:8
466:17 467:8,14
473:15,23 474:25
475:5,9,21 479:3,8
479:14 486:4
488:22 495:21
506:7
**denials** 442:4
**denied** 245:7
257:3 369:1,6
382:20 383:5
386:14 419:19
423:1 438:2
443:22 444:10
449:7 450:5,21
452:8 454:10
458:20 459:6,8
481:7 486:16,21
487:16 515:24
530:1

**denise** 229:19
233:5 235:13
278:18 280:5
286:4,24 310:18
312:5 324:4,24
534:4,24
**deny** 259:20,25
260:6 369:16
370:20 382:5,13
382:17 383:13
384:10 386:2,8,20
387:1,2 389:5,13
389:16 390:5
391:22 394:6
396:10,14 398:4
449:12 450:2
451:1,12,14,19
452:21 454:14
473:8 474:2 475:9
483:9,20 506:3
**denying** 392:10
415:11 426:18
427:19,23 428:1
452:11 467:5
504:25
**department**
231:11,17,20,22
232:7 244:21,22
250:25 251:2,8,11
251:12,14,18
253:12 254:4
263:14 264:5,13
264:20 266:17
267:15,20,22
268:8,13 270:7,10
272:10,19,20,23
275:16 283:10
287:10,21,25
289:13 291:6,8,10
291:23 294:16
297:22 298:1

Veritext Legal Solutions
866 299-5127

301:24 303:5,9,15
304:21 305:13,18
306:8,17,20,25
307:12,21 308:6
308:15,24 309:11
317:15 318:13,23
318:23 319:19
320:6,19 325:21
326:10,19 327:13
327:21 330:23
333:2 341:14,20
344:3 345:17
357:4 360:10
362:20 363:6
364:12 371:3,7,23
372:15 377:18
381:9 382:22
383:15,16 419:12
428:23 429:8
431:10,11,23
436:8,10 450:17
451:25 469:19
470:14,23 483:11
489:5,10 490:15
500:19 504:21,23
**department's**
287:22 384:7
**departments**
240:12 250:11,16
250:23 251:4
254:15,16,24
273:4 371:6
381:10 409:8
**depend** 241:17
247:14 252:3
489:12 496:2
506:22 515:25
528:1,4
**dependent** 245:16
**depending** 243:23
273:5 356:25

485:3 515:5 520:1
**depends** 241:19
375:21 490:9
500:12,14 505:6
522:21
**deponent** 230:9
234:2 281:2 285:1
313:2 323:1 533:1
**deposed** 238:17
516:24
**deposition** 229:15
233:1 235:5,9,18
236:12 237:1,21
237:25 238:4,6,9
240:10 278:13
280:1 282:16
284:14 285:5
286:6,9,15 292:8
310:13 312:1
321:7 322:12
323:5 324:6,9,15
359:21,24 367:11
368:10 421:25
446:25 457:25
458:1 477:22
478:4 532:13
533:4 534:5,9,15
**depositions** 238:1
238:11 457:19
**deputy** 234:13
281:13 313:14
400:4
**describe** 302:5,7
378:21 388:6
**described** 316:19
427:13
**describing** 340:10
475:13
**description** 499:21
509:16

**descriptions** 511:5
**designated** 283:14
384:13 413:24
422:1,10 509:14
511:12
**designation** 274:1
**destroy** 363:10
**detailed** 375:6,8
378:15,16
**details** 380:23
383:7 484:4
**detective** 355:6
**detectives** 275:3
**determination**
318:3,5,6 357:25
369:1 372:11
382:13 387:15
388:22 398:3
451:7 462:8
506:16,20 514:24
530:20,21
**determine** 242:13
244:3 317:22
340:24 391:16
401:20 428:5,25
455:18 486:2
520:17
**determined**
245:15 296:21
372:7 382:5
**determines** 429:19
**determining**
245:21 428:15
**detour** 486:25
**develop** 302:20
**developing** 366:8
**development**
497:14
**device** 331:11
526:25 527:2,5

**devices** 330:19
526:23
**dial** 249:10
**dictated** 444:9
**different** 259:3
275:5,19 357:1
358:22 369:24
372:4 455:6 462:4
479:25 484:6
486:22 507:22
517:22
**difficult** 357:5
364:24 388:5
**difficulties** 319:18
361:2
**digital** 330:18
**diligence** 257:4
396:25 397:4,9
**direct** 447:20
**directed** 430:13
**directing** 460:13
**direction** 256:8
345:2 445:5 502:4
**directions** 256:6
**directly** 337:12
410:15 452:4
**director** 419:12
431:10,22 433:11
433:12,19,20
459:18 460:9,14
461:5,9 462:12
465:15 479:16
490:15 497:14
**directs** 460:7
**disabled** 318:1,9
**disagree** 380:1
420:16 455:21
493:7
**disagreed** 498:17
**disallowed** 242:25
243:15,22

discern 338:4
disclose 258:17
262:21,24
discover 261:20
discovered 261:18
discovery 287:13
discretion 369:2
369:12,14 370:2
370:14 455:17,22
462:10 488:16
515:8
discretionary
455:7 495:23
515:6
discuss 242:16
255:21 256:16
257:2 402:7
407:24 414:15
441:5,17 448:6
480:10,15
discussed 255:23
256:1,3,20 257:1
300:16 362:16
366:19 407:15
470:18 472:16
473:4 508:5
528:17
discusses 262:11
discussing 257:9
262:7 300:11
400:8 483:23
485:18
discussion 254:23
255:20 256:4,13
267:14 268:19,21
282:8 283:7
300:15 304:7
327:1 339:7 356:7
360:21 384:4,5
439:20,23 440:22
441:11 480:9

discussions 261:23
262:1 284:2
344:25 356:6
360:14,23 396:8
429:7
disp 348:16
dispatch 346:15
346:19 348:4
dispatched 275:18
296:20 348:8,18
348:19
dispatches 351:1
display 397:18
398:12 407:11,11
473:15 476:6,12
515:18,23 516:7
517:24 518:3
520:13 521:10
522:3,4,6,24
displayed 474:18
474:20 517:4
521:22 522:22
displaying 472:22
474:11 518:1
521:18,25
displays 520:4
displeasure
300:12,14
disposition 349:21
349:24,24 350:5
disrupted 245:11
disruption 506:15
distract 517:9,11
distracting 519:9
521:14 522:2,4
district 229:1,2
235:7,7 278:1,2
289:1 310:1,2
333:7,11 395:6,19
395:20,21 400:6,7
403:10,12,17,18

403:22,25 404:8
428:24
disturbance
302:14
divert 503:25
division 431:11
470:15
document 231:16
247:24 248:6
254:5,6 260:15,24
261:3,7 265:13
269:15 282:5,21
282:22 287:5
291:1 301:14
309:13 326:7
327:6 339:1 340:3
345:15 346:12
347:1 365:7,10
367:6,7,18,22
368:8,20,21
370:24 373:8
374:15,17 378:14
378:21 379:11,17
383:18,20 385:12
385:15 399:19
401:4,7,15 402:11
405:3,7,19,21
424:5,9 427:21
437:7 439:6 440:4
442:9,10,10,11,13
448:12,22,24
449:2 451:5 453:1
454:25 457:24
458:18 464:23
467:2 470:4
471:19 478:15
481:19,25 482:8
482:21 483:22,25
484:20 485:18
487:21 488:23
489:18 490:23

491:8,10 492:4
496:15,20 499:5
501:16 503:8
507:1 510:6
531:16,18
documents 238:8
238:10 254:8
266:1 271:25
273:3 282:11
287:12 321:20
363:22 370:7,8,11
378:19 432:20
437:24 441:1,2
442:4,12 446:13
446:14 460:24
462:24 493:15
496:6 531:1,16
doing 272:24
288:18,24 295:8
305:14 333:5,15
456:13 457:20
490:10 529:7
doj 268:7,19,24
269:9,11 470:19
471:6
doj's 266:21
doj.ca.gov 234:16
281:16 313:17
dot 315:5,5,5,5,5
dozen 320:11
417:23 496:12
draft 353:3,11
502:19,23
drain 300:18,20
305:18 308:24
309:6
drawn 512:3
drive 509:23
510:23
drivers 519:9
521:15

Veritext Legal Solutions
866 299-5127

**driving** 492:1
519:12,19
**dropping** 359:20
**due** 257:4 396:24
397:4,8
**duly** 233:8 280:9
312:8
**duplicative** 457:21
**duration** 388:8
**dynamic** 522:6

**e**

**e** 230:1 231:1,13
231:15 232:1,3,4,6
232:10,11,13,14
232:18,19,21,22
255:4 260:3 279:1
296:8 298:13,14
298:14 299:20
301:16,17,22
302:1 304:9 311:1
311:10,12 314:20
314:21 315:1,3,12
315:22 316:5,12
317:3 332:16
334:4,20,21 335:2
335:2 363:22
364:23 365:12,13
365:15,18,19,22
366:6 373:18,20
373:20,22 375:21
378:1 380:3,8,15
380:20 381:1,7
382:4,21 383:8
385:16,17,19,25
386:6,20 392:16
393:1,12,19,25
394:4,6,21 395:15
395:18 396:1,5,7
396:15,23 397:12
399:25 400:10,24
401:22 403:22

404:8,9,17 405:10
408:24 409:17
411:4 412:2,3,5,9
412:10,13,16
413:5 414:13
416:10,22 417:7
417:20,23 418:4
418:15,22 419:20
419:21,22 420:1,3
420:7,23 421:18
422:6,10,22
435:20,23,23
436:2,14 437:4,4,8
437:22 438:20
440:21,24 441:12
441:18 445:20
452:20 457:14
458:15,22 459:9
460:16 470:12,13
471:25 472:1,5
496:25 497:6,9
501:6,9,18 502:1
507:9,12 509:1,6,8
511:23 517:13
519:1 523:1
530:13,25
**earlier** 344:15
360:19 408:19
419:20 441:8,12
472:17 480:6
**earth** 510:17
**easier** 306:2
364:25
**east** 233:18 280:20
312:20
**easy** 486:25
**educate** 475:12
**effect** 301:3 303:4
303:14 337:19
376:13 399:8,9
446:1 453:25

518:2
**eight** 328:24 329:5
329:13
**eileen** 268:3
**either** 274:15
275:11 283:7
288:1 291:13
293:21 302:15
330:12 443:5
447:3 489:20
504:14,16 508:10
515:6
**el** 244:8
**element** 453:5
455:19
**elements** 454:22
455:3
**emotional** 307:7
**employed** 283:13
287:11 302:4
305:2 326:22
472:4
**employee** 488:11
488:17
**employees** 487:25
488:5,9
**employment** 291:7
**empty** 247:25
**encompassed**
400:13
**encroach** 503:6
**encroaching**
494:15 504:15
**encroachment**
491:23
**ends** 284:13
322:11
**enforce** 263:11
**enforcement**
264:11 271:4,9,10
272:13,21,25

273:7 294:15
395:2 403:7
406:16 527:8
**engaging** 316:13
317:4
**enter** 353:12
**entered** 350:5
351:5
**entertainment**
266:5,18,22,25
267:3 268:9,22
269:7 470:20
**entire** 289:17,19
335:8 344:2
374:14,17 403:10
453:19 454:13,19
468:18 473:10,13
473:16 474:5,7
475:12 491:8
510:3 511:16
513:6 516:2
**entirely** 400:14
**entities** 303:2
394:25 406:13
408:3 417:24
**entitled** 262:4
277:4 286:7 324:7
477:22 534:7
**entity** 264:11
294:15 454:2
455:24
**entry** 349:2,19
350:10
**enumerated**
440:21 442:3,18
**equally** 505:17
**equate** 391:19
392:20
**equipment** 424:18
509:7,12 512:7,17

erratic 315:4
error 461:9,11
  462:13
escalated 459:17
especially 316:19
  425:4
essence 299:15
  344:6
essential 453:5
  454:22
essentially 241:10
established 358:15
  462:14,18 463:6,9
  463:24 464:9,19
estimate 293:6,9
  298:3 303:12
  320:4,12 361:22
  372:24 411:8
et 229:7 235:6
  250:11 251:17
  278:7 310:7
  316:21 424:25
  428:24 454:2
  456:16 475:15
  523:5
event 231:3
  239:20 241:16,17
  241:19,20,25
  242:7,13,18 244:4
  244:7,17,17
  245:22 246:24
  247:8,18 248:18
  248:19,22 251:18
  252:4,7,19 254:10
  259:10 266:23
  267:19 268:20
  349:1 364:16,17
  364:20 365:23
  366:3,20 369:3,10
  369:12,15 370:1
  370:13,14 371:15

371:18,19 372:9
374:1,8 375:3,7,9
375:13 376:3
387:6,10,11,17,20
387:25 388:6,16
388:20,22,25
389:22,23 390:6
390:12,14,15,17
390:23 391:6,7,12
391:18 392:21
396:19 407:25
410:15 417:22
420:14,20,21
424:19,19,22
426:16,18 427:13
428:6,16 429:12
430:23 431:6,8
436:11 437:17
438:4,17,24
439:18 440:12,13
441:6,19,24 445:6
445:7 446:1
450:11 451:12
452:9 453:14
454:1,1,4,4,11,12
454:15,16,20,22
455:9,10,17,20
456:2,4,5,6,17,23
457:5 458:25
461:17 462:10
465:8 467:24
468:11,16 469:16
471:9 475:15
476:13 480:8,12
483:4 492:20
498:5 514:21
events 238:23
239:1,5,7,24
240:13,18 241:4,7
242:3,23 243:13
243:16 247:11

256:16 291:14
299:7,16,17,19
363:17,20 364:1
364:13 366:12,23
367:2,8,12 368:8
368:14 370:20,25
371:8,13,20 372:1
373:19 381:3,11
384:2 410:20,21
411:11 421:2
429:3 431:2 433:7
435:21 437:19
441:10,14 453:10
453:16,23 458:9
459:24 460:1
461:1 463:23
467:20 469:3
480:19 481:7,13
485:16 490:14
517:8
eventually 255:19
256:13 268:1
333:25 402:2
409:19 437:1
471:3,3 485:4
497:18
everybody 340:8
408:9 456:11
evidence 238:3
355:19 432:18
exact 337:9 342:9
389:8,22 390:12
390:15 391:5
392:17 393:4
424:19 521:3
exactly 238:12
246:20 255:19
256:3,12 257:5
259:21 294:2
295:7 306:20
336:21,25 339:8

365:1 390:18
399:6 406:23
408:10 420:2
508:19 515:17
516:11 517:3,17
519:2 522:3,21
531:14
examination 230:3
236:9 279:3 282:4
311:3 314:1
examined 233:8
280:9 312:9
example 252:20
475:25
examples 252:1
439:1
exception 429:2
450:13 498:13
exceptions 526:11
exchange 383:8
403:22 414:13
419:22 422:22
470:13
exchanged 418:22
531:18
exchanges 381:6
409:17 420:2,4,7
420:23
excuse 239:14
246:15,15 318:17
325:24 361:1
460:19 524:16
exercise 370:2,14
515:8
exercising 288:16
exhibit 231:3,5,7,9
231:11,13,15,16
231:17,20,22
232:3,4,6,7,10,11
232:13,14,16,18
232:19,21,22

247:20,21 248:5,8
248:12,16,20
249:19 260:11,14
265:8,9,12,17
269:20,23 270:1
270:14,25 277:3
287:1,4,8 290:19
291:1 298:6,7,10
301:6,7 303:19
311:12 314:2,4,8
314:12,15 322:5
325:3,11 345:15
345:19,24 353:24
354:1,6,10 360:1,4
360:5 363:4 365:3
365:6,18 367:8
368:7,9 373:6,9
375:23 376:2
384:24 385:2,11
394:21 395:8,9
399:15,18 405:14
405:17 411:20,23
412:1 416:13,15
416:19 417:13,13
417:14,17 419:22
421:14 423:2
435:3,6,16,17
444:15 446:24
448:9 457:9,11,15
458:4,19 460:4
461:20 462:6
465:4 466:1,20,23
467:1 469:25
470:4,6 471:18,20
478:17 481:1,1,3
481:15,17 482:21
487:13 488:20
489:23 490:18
491:1 494:23
496:21 498:19,20
500:21,25 501:1,6

506:25 507:2
508:22 510:2,8
513:4,17 517:13
**exhibits** 290:21,24
325:4 367:7
375:24 401:23
405:18 457:20,21
**exist** 239:3
**exists** 362:19
**expected** 422:4
**experience** 244:13
341:18 403:21
**explain** 251:20
524:9 526:8 528:9
528:15
**explains** 509:6
**explanation** 525:5
**explosions** 487:10
**exposed** 398:14
**expressed** 300:21
320:18 404:9
498:4
**expressing** 300:1
**extent** 258:17
400:19 440:17
516:22
**extra** 243:3
**extraordinary**
520:7

**f**

**f** 332:15
**face** 256:23 364:5
364:5 379:17
380:4,4 520:7
**fact** 238:15 247:3
254:18 257:5
275:4 276:13
300:12 302:10,23
307:7 344:18
381:22 382:24
389:1,3 408:5

415:2 421:5
424:25 436:21
439:7 450:17
456:7 459:11
464:15 521:25
522:6
**factor** 245:14
388:8 520:8,9
521:3,4,6,8 523:8
529:3
**factors** 239:5
246:12 305:17
388:21 426:19
427:18 432:8
485:14,20 496:1
506:22 519:18,21
519:25 520:17,20
529:4
**facts** 473:12
**factual** 258:23
259:1,8
**faint** 338:1
**fair** 376:19 476:7
476:25
**fairly** 510:17
**fall** 400:25
**familiar** 254:7
266:5,8 268:5
**families** 453:18,18
**family** 453:20
454:2,8 518:11
**faq** 368:8,17
453:12
**faqs** 241:8 368:21
387:25 462:22
467:19
**far** 251:1 345:1
370:22 431:19
439:9 445:17
450:12 512:5
521:25

**fashion** 379:15
416:9
**favor** 466:14
474:25
**feasible** 477:7,10
**featured** 327:2
**federal** 246:2
363:9 370:18
427:5 463:3 483:6
489:21,22 496:17
**feedback** 373:3
482:18
**feeding** 526:23,25
527:2,5
**feel** 462:12
**feelings** 364:7
**felony** 231:20
**female** 471:6
**field** 275:19
**figure** 257:5 319:7
320:22 322:1
**file** 270:21,25
272:5,8,14 290:24
321:4,6,7,11,14
325:4,6 328:9,9,11
330:3 331:3,8,21
335:24 336:5,8
362:17,18 363:7
363:11,19,23
395:10 423:4
444:16 448:9
464:24 478:16
481:2 490:19
496:21
**filed** 235:6 398:20
**files** 274:25 275:5
275:11 320:24
321:2,17 329:25
330:8,12 331:5,16
**filing** 404:20
452:19

**filled** 248:17
249:24 250:1
291:12 374:11,21
374:23 375:11
409:8 499:18
**fills** 248:22
**film** 240:3,5,6,8
241:6 363:17,20
429:4 441:9,13
480:8,12 481:2,8
481:12,16,23
482:1,4,15,19
483:7,19,21 485:1
486:3,24 487:6,15
488:10,22 489:17
489:25 490:4,8,11
490:19 491:3,6,20
491:22,25 492:20
492:24 494:25
495:5,21,23 496:7
496:9 497:10,23
498:10,22 499:11
499:13 500:1,4
501:10,24 503:17
506:16,18 507:12
507:16 508:3,15
508:17 509:3,4,8
509:17 510:3,11
514:4,14,15,23
515:4,5,7 517:15
517:20 519:23
520:1,3,12,14
521:6,19 523:20
524:3,6,10,24
525:6,8,15,16,17
525:22 526:1,8,12
526:20 527:18,20
528:10 529:10,14
530:2,5,7,11
**filmed** 519:19
520:5

**filming** 485:22
495:8 496:2,22
500:6 506:3,7,23
507:23 511:1,14
511:18 513:24
514:20 517:21,22
517:24 523:10,13
**final** 252:23
398:20 433:4
441:25 473:17
530:20,21 531:17
**finalized** 352:10
352:16,24
**find** 285:5 323:5
325:14 326:10
503:16 504:4
520:5 533:5
**finding** 257:5
300:8
**fine** 276:17 282:18
321:25 374:18
385:7
**finish** 477:6
**finished** 348:15
**firearm** 264:23
267:16,18 289:23
355:21 361:19
362:2 427:12,15
429:20 526:11,14
**firearms** 264:4
266:6,18,25 267:4
267:5 268:9,10,15
268:23 269:8
288:7,12,14
289:16 292:14
297:1 300:13
305:6 361:12
428:16,21 429:11
430:1 470:15,20
**firm** 235:11 326:4
326:15

**first** 233:8 244:15
244:16 248:9,20
260:15 268:22
270:13 276:2
280:8 287:15
312:8 314:22
328:15 347:1,13
353:3 366:24
373:2,5 376:17
393:19 413:10
418:3 419:25
421:10 431:25
432:1 435:12
437:9 453:2
458:16 465:5
477:21 491:10
493:15 499:16
501:23 505:4
507:20 509:9
**fit** 276:12
**five** 276:15 337:13
339:20 359:10
362:5,6,25 363:8
402:22,24 407:19
426:1 434:17
477:4 489:1
**flashing** 519:8
522:5
**flegel** 471:16
478:20,21 507:9
507:15 513:22
515:12 516:24
523:2 524:9,22
528:18
**flegel's** 515:15
519:1
**flip** 277:3 460:4
**flowchart** 367:8
367:12,20 376:3
376:22 378:8,9,16
380:5 416:2

**flows** 244:10
**focus** 261:16
421:18 426:3
431:25 437:7
**focusing** 244:15
418:24
**folder** 247:25
248:1 290:22,24
321:15 325:4
328:10 330:5
331:8 335:25
367:7 375:24
405:18 464:24
481:1 498:23
499:1 510:9
**folders** 321:17
**folks** 275:3 305:12
395:2,3
**follow** 237:17
263:6 274:20
384:9 401:10
449:23 467:21
502:4 518:8
**followed** 239:11
239:19 246:1,2
377:5 414:6,10
427:4
**following** 230:10
246:10 285:6
323:6 387:4
461:14 466:3
499:22 533:6
**follows** 236:7
282:3 459:2
**foot** 509:23
**force** 275:20
**foregoing** 285:4
286:5,14 323:4
324:5,14 533:4
534:5,14

**forever** 388:18
439:9
**form** 248:21 253:9
353:11 403:24,24
491:19
**formal** 432:21
**formally** 409:4
**format** 253:11
254:9 286:18
291:9 324:18
491:3 534:19
**forms** 253:11
409:22
**forth** 258:7
**forum** 469:7,16
**forward** 389:20
436:22 440:6
442:21
**forwarded** 302:2
334:11 505:20,23
**found** 357:22
383:7 462:21
**foundation** 238:18
288:20 340:5,19
342:1 369:18
404:3,12 405:4
415:22 430:4
463:12 464:12
486:7 516:23
**foundational**
412:17
**four** 275:5 332:9
457:15 462:24
**fourth** 400:9
**foy** 330:6 332:15
333:10 336:18,20
336:24 337:6,18
338:7,8,23 339:18
340:1,9 341:6,19
341:21 342:12,14
342:18 344:4,24

352:20 353:6,10
353:20 354:16,19
355:14,25 356:13
356:16 357:14
**foy's** 340:16 345:3
**frame** 257:17
316:20 330:11
337:11 495:20
**francisco** 271:20
277:5 407:24
**frequently** 368:13
**front** 291:3 423:23
454:25
**full** 286:14 324:14
434:21 453:2
534:14
**fully** 292:14,22
**function** 251:15
**further** 257:23
258:1 389:19
392:10 409:18
419:16 438:3
447:18 458:8
462:1 464:24
465:18 517:5
530:15 531:21

---

**g**

**g** 524:13,14
**garbled** 319:9
**gathering** 380:9
**gavin** 229:7 235:6
278:7 310:7
**gears** 260:8
**general** 231:22
234:10,13,14
235:24 247:6,12
253:23 256:18
266:13 281:11,13
281:14 313:12,14
313:15 408:12
484:25

**generally** 297:16
338:14 339:7
356:3 415:19
505:6 506:2
**generated** 291:5
345:4 351:2 360:9
415:15
**generator** 424:23
502:13
**getting** 246:5,18
294:2,17 305:25
307:8 345:2 346:5
375:14 417:8
421:9 453:23
**give** 256:5 260:9
267:17 306:21
325:7 333:23,25
345:3 361:2
371:11 393:18
422:2 436:21
462:4 471:2,4
502:25 522:19
**given** 236:16
266:19 271:5
287:24 344:5
366:12 372:17
386:10,13 391:5
393:8,13 403:19
428:19 443:10,21
488:13 495:17
**gives** 420:11
451:11,17 474:7
512:12
**giving** 404:17
465:22
**glad** 306:6,11,25
**gleaned** 432:10
**go** 242:14 243:10
243:19 246:14,20
248:4 249:2
251:19 252:6

253:6,14 256:21
261:10 264:9
265:8 266:9
267:12 268:18
273:16 284:6,11
290:19 297:11
307:5,16 308:1,9
308:20 309:3
316:16 317:9
325:14 327:18
328:8,9 329:23,23
329:24 331:2
332:5 335:24
336:9 337:15,16
340:5,21 342:4
346:25 347:13
348:16 349:1,18
351:3 353:15,17
353:24 354:15
359:6 361:5
363:23 364:4
367:5,15 368:23
373:1,25 374:10
375:18 376:9
379:2,12 383:18
384:23 387:23
388:25 389:20
390:8 392:3
399:12 400:3
401:5 402:24
407:1 408:16
411:12 412:12,25
413:10 416:12
421:6 428:10
431:9 436:2,22
439:9 440:6
442:21 443:19
444:7 446:11,24
448:7 451:4,23
455:13 456:12
457:15 464:5

474:16 477:1,8,14
478:8,25 479:11
482:15 484:13,24
486:8 487:14,19
488:21 489:24
491:18 492:17
494:11 495:11
502:1 503:11
506:11 508:21
510:8,20 512:20
513:17 515:15
516:25 520:24
524:8 527:12
528:24 531:12
532:7
**goes** 264:2 273:12
273:20,24 370:22
445:17 453:15
490:15 512:8
**going** 235:2
237:12,17 241:22
243:1,2 244:9
249:12 258:16
260:9 263:6
273:18,23 274:14
274:20 276:14,19
284:6 290:21
297:9 309:7
315:19 316:24
319:10 320:22
321:10,13 322:3,4
325:3 328:2,14
330:3 333:19
339:9 348:3
353:24 359:11,24
363:3 367:5 368:6
368:6 374:16
380:17 382:19
384:23 386:15
389:14,16,18
390:18 391:13

393:4 395:8
396:14 399:12
401:6 402:21,25
404:11 411:12
417:12 418:25
419:20 421:18
425:6 434:15,21
434:23 444:16
448:7,8 449:23
453:1,17,23 455:6
457:9 458:1
464:22 465:7
466:1 469:20,25
470:3 474:18,20
476:21 477:12,18
478:9 480:25
490:17 494:22
500:11,16,18,18
500:21,24 502:4
503:6,14,19
507:22 509:7,10
509:11,23 510:3
510:21 511:1,6,25
512:1,7,9,10,16
513:5,9,20,21
514:19 518:2,5,9
518:18 519:9,10
521:14 522:24
523:1 526:15,17
526:20 527:16
529:19 532:8
**good** 235:1 236:10
236:11 245:11
260:23 273:1
305:20 306:16
307:11,18 308:11
402:23 434:20
**google** 508:16,24
508:25 509:20
510:16,17 511:4

**govern** 238:25
239:19,22 506:6
**governed** 240:7
370:1
**governing** 239:10
240:2,5 370:13
467:14
**grant** 382:5 383:3
393:4 398:4
422:22 424:3
451:12 463:4
483:9,20 484:9,21
506:16,18 514:24
515:4,7,7
**granted** 384:18
392:18 393:9
479:20,24 487:15
515:24 529:25
**granting** 423:21
426:18 488:21
**gravely** 317:25
318:9
**graveyard** 351:1
**grayed** 249:21
**great** 321:19
453:20
**grivakes** 233:17
280:19 312:19
**ground** 396:10
428:18
**grounds** 386:3
389:6 467:8,12
**group** 371:22,25
396:24 432:22
469:22 495:17
**guess** 359:17
478:6 482:18
491:14
**guidance** 400:19
415:4 487:24
488:4,8,10,13,16

508:2
**guideline** 426:13
522:9
**guidelines** 240:8
370:12 481:2,16
481:22 482:3,6
485:1,2 503:17
514:5 515:3
517:16 519:5
524:1
**guidotti** 395:20
**guilty** 358:21
**gun** 297:3 338:2
356:4 474:19
476:17 523:16,23
**guns** 297:4,7 306:3
361:23 397:19
523:3,9,12,19
524:5,7
**guys** 385:8 457:22

| h |
|---|

**h** 231:1 232:1
234:3 281:3
311:10 313:4
524:8,13,15,22
525:2
**half** 362:5,6
496:12
**halfway** 499:21
**hand** 250:10 252:7
260:16 286:21
324:21 534:21
**handguns** 428:3
**handle** 256:8
307:9 532:3
**handled** 304:21
307:9 367:13,23
411:3,6
**handling** 348:15
436:11

**handwriting**
303:19,21 304:1,4
**happen** 251:13
252:25 253:4
402:7 415:8
477:11
**happened** 275:13
283:15 304:18
343:20
**happening** 343:16
**happens** 252:23
392:25
**happy** 306:11,25
**hard** 251:25 338:4
457:14
**harm** 317:22,25
317:25
**harmed** 398:14
**hazard** 243:2,7
244:5,18 245:14
517:5
**head** 371:7
**headed** 379:19
461:2
**heading** 250:9
**hear** 246:18
260:21 263:2
319:2 321:11
339:14 431:7,9
444:5 472:8
524:17 531:24
**heard** 302:11
304:15 338:14
340:8,9
**hearing** 341:20
364:6 432:21
433:18 434:2,3,5
434:10,11,12
466:6,9,12 471:11
471:15 472:11,23
473:2,21

**hearings** 432:13
**heineck** 497:13
**held** 235:9
**help** 356:23
**herada** 472:2,3
**hereunder** 286:20
324:20 534:20
**high** 469:24
**highway** 231:7
264:13 492:8
**hill** 263:12,15
264:3,21 492:1,6
492:13,23 493:3
494:25 495:9
508:8 509:24
510:4,12,18,22
511:2
**hired** 299:1
**historic** 272:25
**historical** 273:4
304:20 326:24
364:14,18,25
**historically**
244:10
**history** 407:21
475:12
**hold** 261:25
328:21,21 346:5,6
385:8 394:10
477:14 486:5
**holster** 289:23
338:2,16 340:25
356:5
**holstered** 289:1,5
**honestly** 408:14
**hoppe** 234:19
235:11 281:19
313:21
**hosted** 235:10
**hotel** 385:23 386:7
406:10,18 417:21

418:10
**hotels** 402:16
**hour** 233:4 276:15
280:5 312:5
402:22 434:16
476:21 477:6
518:6
**hourly** 309:11
**hours** 242:2,5
317:18 424:22
477:4,11,19,21,23
478:2,5
**household** 454:2
**howard** 234:4
281:4 313:5
**hrmrlaw.com**
234:8 281:8 313:9
**hundred** 250:7
258:6 297:18,21
**hypothetical**
264:7 267:9
415:23 456:9
484:11 486:7

**i**

**idea** 245:9 283:24
352:7,18,23,24
353:2,5 355:16
518:12 522:24
**identification**
247:22 260:12
265:10 269:21
287:2 298:8 301:8
314:5 345:20
354:2 360:2 365:4
385:3 399:16
405:15 411:21
416:16 435:4
457:12 466:21
470:7 471:21
501:2 507:3

**identified** 240:16
240:23 297:4
331:22
**identify** 235:15
240:22 274:9
328:23 330:1
336:4 337:10
347:9,11 514:19
517:17 523:19
525:15
**identifying** 274:11
347:5
**identity** 514:22
515:9,12
**ii** 229:17 235:4
278:15 310:15
515:15,16 516:4
516:10 518:25
**illegal** 288:18,24
289:8 397:20
399:5,10 404:2,10
405:2 427:11
428:17 445:8
526:10
**illness** 318:1,4,6,7
**image** 397:18,20
400:9,24 401:18
404:1,10 405:2
407:2,3,4,5,8
472:16,20,24
473:14,22 474:11
474:17,19 475:20
476:6 508:16
510:16,17 515:17
515:22 516:11,20
517:7,9,17,21
519:2 520:9 521:4
521:18
**images** 397:24
475:22 476:11
515:17,22 516:1

516:11,20 517:17
519:2,11,11 520:9
520:13 521:4,11
521:22 522:10,11
**immediate** 333:20
343:12
**immediately** 408:6
461:14
**impact** 363:25
364:12 370:19
456:15 485:21
486:3,12,16,18,20
522:7
**impacting** 455:25
456:7
**important** 238:19
473:11 476:14
**impose** 490:2,8
**impossible** 486:17
**impression** 451:17
**inappropriate**
469:8
**inch** 407:11
**incident** 231:18
289:4,22,23
297:14,20,24
332:17,20,21
336:4 342:15,19
342:21 343:10
344:9,13 345:11
346:16,17,19
347:7,12,15,18,18
348:8,11,15 349:3
349:10,11,15
350:7,15,20,20,21
350:24 351:9,13
351:16,23 352:2,9
359:2
**incidents** 349:9
351:3

**include** 355:14
406:2,4 407:8
472:15 475:19
476:17 485:2
508:10
**included** 277:8
406:6,18 508:13
**including** 240:7
365:13 406:13
469:23 513:25
**incomplete** 264:7
267:9 375:13
376:10 414:1
415:23 423:16,18
437:11,23 443:5
447:23 484:11
486:6 530:9,10,19
**incorrect** 458:10
**increases** 245:3
**indefinite** 257:9
388:2,3,14,16,20
389:1 439:9,15
**indefinitely**
242:15
**independent** 383:9
432:4 433:14
**indicate** 292:24
354:19,25 491:11
**indicated** 292:19
294:5 326:14
422:24 493:12,23
509:1
**indicates** 516:2
520:15
**indicating** 294:8
**indication** 513:3,8
513:14
**individual** 236:22
331:16
**individuals** 274:9
288:5 470:14

514:22
**info** 349:3,7,10,11
**informal** 341:9
433:18 434:3,11
**information**
256:22 257:13,16
257:21,23 258:1,5
258:13,23,24
259:1,5,9 262:14
262:19 268:1
269:9,11 271:4,8,9
271:12 272:13,21
272:24 273:1,1,7
273:24 282:10
287:24 294:3
295:24 296:3,4,7
330:12 334:16
349:8,12,13
362:21 375:2,14
375:17,19 376:6
376:16,18,20,21
377:2,8,23,25
378:4,7,11 379:7
379:13,16,24
380:10,11,16,17
380:19 381:8
382:12,16 383:1
383:10 384:12,15
386:10,22,24
387:9 389:7,15,19
391:4 392:11,11
392:15,22,24
393:2,6,7,10,14,17
409:19,24 412:17
412:21 414:7,11
416:3,7 419:15,17
419:24 421:9,12
422:21,24 423:17
423:18,19 424:2
424:10,12,16
432:9 433:19,22

440:5,9 442:19
443:4,8,12 445:3
445:18 452:23
470:20 476:1,4,14
477:1 478:22
505:16 506:13
511:22 512:13
514:17 531:3,7
**informational**
352:6 475:16
**initial** 252:21,24
373:7 381:15
384:17 388:2
408:21 418:19
419:11 431:3
459:21 460:25
461:3 483:9
**initially** 289:21
**injured** 246:6
401:18
**input** 251:1
331:18 345:3,8
356:18 371:11
403:13 425:16,18
461:18
**inside** 287:10
**instance** 241:21
303:13 358:2
**instances** 490:2
**institutions** 317:18
**instruct** 237:15
263:1 273:18,23
274:15,16
**instructed** 230:9
273:17 334:10
436:14
**instructing** 263:3
274:17 302:16
**instruction** 237:18
263:7 274:21
449:24

| instructor 341:11 | interrogatory | issuance 499:25 | j |
|---|---|---|---|
| **instructor** 341:11 | **interrogatory** | **issuance** 499:25 | **j** 400:18,25 |
| **insufficient** 413:16 | 261:12,13 264:22 | **issue** 242:16 | **jaime** 298:15,17 |
| 421:20 422:12 | 265:5 493:16,19 | 251:17,21,23 | 298:17,24 299:2 |
| 504:5,9 | **interruption** 249:8 | 261:21 274:15 | **january** 231:11 |
| **insurance** 243:4 | **intimated** 337:1 | 316:18 337:2 | **jcs** 229:6 235:8 |
| 499:24 | **introduce** 416:12 | 388:1 389:2 390:9 | 278:6 310:6 |
| **intend** 386:2 389:5 | 417:12 448:8 | 423:9 430:15 | **jelena** 472:2,3 |
| 515:17 516:12 | 457:9 490:17 | 456:1 463:8,17,23 | **jeremy** 354:16 |
| **intended** 259:9 | 500:21,24 | 473:6 482:20 | **jimmy** 418:9 |
| 292:24 386:8 | **introduced** 298:6 | 484:16 485:5,9,14 | **job** 305:25 |
| 387:1,2 389:13 | 435:6 | 493:4,24 | **john** 234:12 |
| 391:22 394:6 | **inundated** 302:25 | **issued** 266:6 | 235:23 281:12 |
| 398:12 407:10 | 303:5,8,9 306:24 | 384:22 415:2 | 313:13 359:17,18 |
| 476:1 509:2 | 307:1,12,22 308:6 | 425:22 443:24 | **john.killeen** |
| 513:15 515:23 | 308:15 | 444:3,13 445:1 | 234:16 281:16 |
| 519:2 | **inundation** 305:19 | 446:18 464:5,16 | 313:17 |
| **intending** 389:8 | **invades** 273:13 | 491:11,12,16 | **johnson** 255:8 |
| 392:17 | **invasion** 273:12 | 495:5 496:10 | **johnson's** 255:10 |
| **intends** 397:18 | **investigating** | **issues** 241:23 | **jonsen** 395:23 |
| 517:18 523:20 | 357:16 | 244:12,25 245:2 | 435:25 |
| 525:16 526:9 | **invitation** 441:4 | 251:3 253:24 | **judicial** 432:21 |
| **intention** 292:19 | 448:5 480:14 | 304:16 316:19 | 433:18 |
| 386:19 390:4 | **invited** 454:19 | 366:11 390:10 | **july** 367:17 368:20 |
| 475:18 | 455:23 456:12 | 394:23 420:24 | 391:5,21 393:7 |
| **interactions** | 457:2,8 | 421:1 423:10,12 | 400:1,2 401:21 |
| 363:24 | **inviting** 441:16 | 423:13,14 440:19 | 421:19 |
| **interfere** 468:17 | **involved** 243:3 | 442:19 448:6 | **june** 315:12,22 |
| **interference** 245:6 | 327:23 344:24 | 450:14,14 452:2 | 330:11,15 342:13 |
| 246:19 318:19 | 345:1 347:6,10,15 | 452:14,14 453:17 | 342:15,19 343:10 |
| 319:5 330:14 | 366:7 370:9 | 479:17,19,22,23 | 345:4 350:7,11 |
| **internal** 315:14 | 372:14 384:4,5 | 480:16 498:12 | 352:17 461:25 |
| 316:5 | 408:4 410:11,15 | **issuing** 464:1 | 465:8 |
| **interpret** 357:4,5 | 410:19 432:8 | 481:23 482:3 | **jurisdiction** |
| **interpretation** | 449:11 452:2 | **item** 242:22 512:1 | 263:15 266:21 |
| 334:7 380:5 | 463:25 464:2 | **items** 232:8 238:2 | 493:4,9,23 494:3,7 |
| 404:14 498:12 | **involves** 434:1,10 | 442:19 478:25 | 494:8,16 |
| 502:6 | **involving** 437:19 | 507:22 512:3,4 | **jurisdictional** |
| **interpretations** | **irrelevant** 307:25 | **ivan** 483:16 | 263:21 |
| 357:2 | 358:3 359:4 | | **justice** 266:17 |
| **interrogatories** | 521:23 | | 267:15,20,23 |
| 231:6 260:18 | | | |

Veritext Legal Solutions
866 299-5127

268:8,13 428:23
429:8 470:14,23

**k**

**karen** 395:20
**kaufman** 256:15
256:19 270:4,6
284:3 298:15,19
298:20 299:3,4,9
299:11,13,20,21
299:25 300:8
302:1 304:10
325:16 326:3,14
329:11,19 345:10
345:14 354:22,25
355:4,7,9,13
366:16
**kaufman's** 283:11
283:20
**keep** 273:1,4
291:23 417:9
**keeping** 355:17
**kept** 291:19 292:3
**killeen** 234:12
235:23,23 281:12
313:13 359:19
**kind** 241:17,19
251:22 294:6,8
302:15 318:18
333:18 361:19
489:12 498:2
504:17 510:7
517:24 519:11
521:10,18,20,21
521:22 522:6
**knew** 295:23
297:13 341:12
**know** 243:25
244:10 245:12
247:2 252:1,25
254:2,8,11,13,20
254:23 256:13

257:15,22,25
258:6 259:19,21
259:23 260:7
266:13 275:3,4
283:3,9,15 288:25
289:10,19 293:1
295:21,23 296:10
296:22 297:12,17
297:19,23 298:2
300:16 303:21
306:21 307:6
308:2,10 309:15
314:2 318:13,15
319:22 320:8
321:5 327:7,8,8,20
334:21 338:13
339:7 342:9 345:7
345:9,18 351:11
351:12,12 352:16
352:21 353:23
354:4 355:11,25
356:3 357:17
358:7 359:24
366:23 367:21,24
370:21 373:2,22
377:12,17,21
378:2,5 381:17,17
381:24 382:2,7,7
385:5 387:16
390:18 391:1,2
393:3,16 398:9,15
401:21,25 405:6
407:13,19 408:3
408:17,21,23,24
409:3,6,7,11,17
410:4,7,20,25
411:7 413:1,4
414:4,6,9,19 415:3
415:12,14 416:13
417:15 418:22
420:3,18 422:4

425:20,24 426:2
427:25 428:12
429:14,18 430:7
430:10,11 435:7
440:20 447:25
448:5 449:10
450:18,19,22
452:11,21,24
459:25 461:15,17
461:22 463:14
466:24 470:9,25
476:15 480:9,10
486:19 491:9,15
495:17,19 501:4
502:4 512:14,18
518:10 519:8
521:13,17
**knowing** 352:1
**knowledge** 258:3
258:14 262:13
282:22 292:19,24
319:24,25 320:2
326:9,24 352:8
357:15 358:5,8,10
358:12 361:11
363:25 364:10,15
364:18 366:5
377:10 381:5
484:15 524:4
**knows** 238:16

**l**

**lacey** 298:15
299:21
**lack** 326:4 391:10
420:12
**lacks** 288:20 340:5
340:19 341:25
369:18 404:3,12
405:4 415:22
430:4 463:12
464:12 486:7

516:22
**land** 388:4
**language** 440:16
**large** 270:15
276:11 450:15
510:17
**largest** 394:25
**late** 522:13
**launching** 365:22
**law** 264:11 271:4
271:9,10 272:12
272:21,25 273:7
273:25 287:20
288:5 294:14
357:7 358:16
395:2 400:18
403:7 406:15
428:25 430:19
467:21 498:13
527:8 528:2
**laws** 246:1,2,10
263:11 327:24
357:2,5,6 370:18
370:19 427:3,6
428:2 463:2 483:4
485:3 489:19,22
496:17
**lawyer** 358:19
**lay** 238:17
**layer** 244:16
433:10
**layers** 244:15,16
431:17,20
**leading** 459:22
**leads** 425:15
**leave** 482:12
**leaving** 359:17
482:20
**left** 238:22 250:10
252:7 346:25
350:2 434:19

Veritext Legal Solutions
866 299-5127

476:23 518:11,14
531:14
**legal** 234:20
257:24 259:12,12
261:21 262:11
263:17 264:8
267:9 273:25
281:20 313:22
358:19 359:5
372:16,17,18
398:5,8,19 403:13
403:18 422:18,18
428:8,21 430:4
443:16 451:13,16
451:18,21,25
464:13 506:9,17
**legislation** 361:22
**legislative** 327:2
327:10,14
**legitimate** 427:14
429:20
**length** 242:6
424:22
**letter** 231:11
232:16 383:19
393:12 406:24
409:12,15,17,19
414:23 415:9,11
415:12,13,14,15
418:11,14,15,18
418:22,24 419:4,6
419:10,12,13,20
420:11,17,25
421:11,23 422:25
423:7,11,17,23
425:8,12 426:4
428:12 429:21
430:21 438:20
440:21 442:13,14
444:10,20,23
445:4,7 448:13,14

449:8 454:24
458:5 459:10
460:7 461:7,13,14
461:19,24,25
462:8 463:21
465:8,11 466:3
467:4,5 479:14
**letters** 418:25
419:2 440:25
442:18 443:3,20
444:9 445:21
446:18
**level** 303:15 364:7
431:25 432:1,14
432:19 433:5,23
434:1 486:15,18
**levels** 239:5
**license** 482:20
**lighting** 424:18,24
468:23 469:2
**lights** 519:9 522:5
**likelihood** 399:5
**limit** 242:18
247:10,17 477:6
**limitations** 241:16
**limited** 309:5
388:8 433:14
456:14
**limits** 242:6,9,11
265:6 369:14
493:14 494:12,16
494:19
**line** 230:11 246:19
285:9 319:5 323:9
395:16 404:18
408:4 418:3,8
533:9
**lines** 480:20
**list** 243:21 246:12
246:23 368:11
494:24 496:5,8,14

513:20,21 514:3,8
514:14 523:2
**listed** 241:11
243:6 254:16
352:2 366:6
407:11 484:19
487:12 488:19
489:17,23 496:18
508:1 529:4
**listen** 337:3
**listened** 321:22
329:20 332:8
333:13 336:12
338:14 341:21
498:17
**listening** 328:16
340:15
**listing** 523:8
**lists** 467:8
**litigation** 273:21
**little** 236:13 260:8
276:15 304:25
326:23 407:20
438:3 479:25
**live** 266:20 267:16
524:9,23 525:5,17
525:19,21,25
526:1,9,16 527:22
527:23,25 528:10
529:9
**lived** 299:22
**lives** 329:16
**living** 485:22
**llp** 233:17 234:4
280:19 281:4
312:19 313:5
**load** 269:15
292:16 411:16
527:4
**loaded** 267:18
292:14,22 525:19

526:10,13,21,22
527:6,20,23 528:4
**loading** 248:3
265:16 292:20
**loads** 466:24 470:9
**loan** 266:19
267:16 268:10
**local** 246:2 370:18
427:5 463:3 468:8
483:5 489:20,22
496:16
**location** 243:23
244:13,14 332:22
389:8,15,22
390:12,15,22
391:5,10,11,14
392:17,20,21
393:4 423:20
424:18,19,23
425:6 439:20
440:14,19 444:21
444:24,24,25
445:4,11,15
450:12 469:16
486:25 500:5
510:20 511:14
**locations** 440:18
**lock** 340:25
**locked** 351:21,24
352:3
**logical** 355:8
421:3 427:14
428:6,15 429:11
429:17,25 430:14
443:22 444:11
461:12,12 465:20
465:24 519:7
**logically** 445:2
446:16 479:19
**lombardo** 229:19
233:5 235:13

Veritext Legal Solutions
866 299-5127

278:18 280:6 286:4,24 310:18 312:5 324:4,24 534:4,24

**long** 237:11 245:25 247:17 276:3 329:1 341:5 348:18 361:23 388:16,24 403:6 456:24 468:18

**longer** 270:6 300:22 385:9 428:2

**look** 242:1 251:14 270:13 367:5 373:1 375:23 376:17 397:16 405:17 421:14 432:7 433:19 442:9 458:22 465:7 468:21 481:15 485:23 492:3 494:22 498:19 499:16 503:2 512:20 517:13 529:17 530:24

**looked** 243:5 252:18 334:3 401:22 403:23 408:19 416:2 417:7 419:21 427:8 458:18 462:25 493:15 496:7 508:7 509:18 517:7

**looking** 241:9,11 249:19 259:11 270:25 271:18 272:15 284:4 333:6 335:7

347:22 353:8 360:16 365:1,15 365:17 388:13 394:21 402:10 403:21 408:17 422:9 432:22 438:25 455:23 482:21 489:18 510:14 511:15 522:2 531:16

**looks** 249:3 250:8 253:17 265:13 270:14 287:24 328:23,25 347:2 348:4 367:15 368:9 385:6 407:1 411:18 471:18 472:1

**loosely** 316:5 317:11

**los** 233:19 280:21 295:15,19,25 312:21

**lot** 241:22 275:8 371:14 400:19 434:22 519:10

**lots** 238:13

**lunch** 328:4

**m**

**m** 229:19 233:5 278:18 280:5 286:4,24 310:18 312:5 324:4,24 330:19 534:4,24

**magazine** 528:3

**magazines** 292:15 292:22 527:4

**mail** 231:13,15 232:3,4,6,10,11,13 232:14,18,19,21 232:22 296:8

298:14,14 299:20 301:16,17,22 302:1 304:9 311:12 314:20,21 315:1,3,12,22 316:5,12 317:3 334:20,21 335:2,2 365:12,15 366:6 373:18,20,20,22 375:21 378:1 380:3,8,15,20 381:1 382:4,21 383:8 385:16,17 385:19,25 386:6 386:20 392:16 393:1,12,19,25 394:4,6,21 395:15 395:18 396:1,5,7 396:15,23 399:25 400:10,24 401:22 403:22 404:8,9,17 405:10 408:24 409:17 411:4 412:2,3,5,9,13,16 414:13 416:10,22 417:7,20,23 418:4 418:15 419:21,22 420:1,3,7,23 421:18 422:6,22 435:23,23 436:2 436:14 437:4,4,8 437:22 438:20 440:21,24 445:20 457:14 458:15,22 459:9 460:16 470:12,13 471:25 472:1,5 496:25 497:6 501:18 502:1 507:9,12 509:1,6,8 511:23 519:1 530:25

**mailed** 255:4 334:4

**mailing** 452:20 497:9

**mails** 260:3 298:13 363:22 364:23 365:13,18 365:19,22 381:7 397:12 412:10 413:5 418:22 419:20 422:10 435:20 441:12,18 501:6,9 530:13

**main** 453:17

**maintain** 272:12 272:20 274:6 275:1 363:7,11

**maintains** 362:21

**maintenance** 231:7

**major** 244:8 486:23

**maker** 383:5

**making** 293:3 329:15 334:9 370:9 422:6 449:11 451:7 455:16

**mall** 316:21

**man** 297:3 426:9 426:15

**management** 300:15 325:20

**manager** 431:24 433:24 462:2,15 463:4,15,18,20,22 463:25 464:1,4,6,7 464:14 465:22 466:3 479:15,16 490:16

**manager's** 269:4
   442:16 471:8,12
   473:2
**managers's** 364:7
**managing** 305:18
**mandatory** 247:16
**manner** 241:9,14
   245:20,20,22,25
   246:3,8,23,25
   247:3 317:12
   379:15 388:12
   414:15,20 415:5
   426:21,22 427:1
   438:6,10,17
   440:14,19 441:17
   441:21 443:13
   446:7,14 447:18
   448:2,4 450:10
   485:17 506:14
   529:6,7
**manning** 314:24
**map** 375:9 437:13
   437:16,18 492:11
   508:24,25 510:7
   511:14 512:4,12
**maps** 508:16
   509:20 510:16
**marching** 276:13
**mark** 247:20
   260:9 265:8 266:4
   268:18 282:19
   284:6 290:19
   301:5 314:17
   322:5 353:24
   363:3,3 384:23
   399:12 411:12
   448:7 464:22
   466:1 469:25
   470:3
**marked** 238:3
   247:21 248:5

249:2 253:6
260:11,14 265:9
269:20,23,25
277:12 287:1,4
290:20,21,24
291:1 298:7 301:7
309:18 314:2,4,9
321:6 325:2,4,10
345:19 354:1,7,16
360:1,4 365:3,6,18
367:6,10 368:7,9
373:6,8 375:24
385:2,6,11 395:9
399:15,18 405:14
405:18 411:20
416:15,20 417:13
417:14 435:3,9,13
435:17 446:25
448:8 457:11,19
457:25 464:23
465:4 466:20,23
470:6 471:18,20
478:17 481:1,3,17
490:18 494:23
496:21 498:20
501:1 506:25
507:2
**markevitch**
   233:16 235:19,19
   280:18 312:18
   532:5
**marking** 301:6
   345:15 416:13
**martin** 234:4
   281:4 313:5
**master** 234:3
   235:21,21 237:8
   237:12,21 238:14
   239:12 240:25
   243:8,17 246:17
   248:1 250:17

258:16 261:25
262:20 263:4,17
264:6 266:7,19
267:7,16 268:10
271:14 272:1
273:11,18 274:7
274:17 276:14,18
281:3 282:7 284:9
288:19 297:9
305:21 306:9
307:3,14,23 308:8
308:17 309:1,12
309:15 313:4
314:11,15 315:25
316:14 317:6
322:6 327:16
328:21 332:3
336:2 337:7
338:10,25 339:19
340:3,19 341:25
343:1 345:21
346:4,9 358:18
359:4 364:2
365:15 369:17
370:4 372:2
374:14 376:1
378:13,24 379:10
382:9 385:8
387:21 388:10
389:24 390:7,24
391:8,24 392:5
394:10 401:3
402:21 404:3,11
405:3 410:2
411:14 412:23
413:17 414:2
415:21 416:6
424:4 428:7 430:3
434:18 443:14
444:4 446:9 447:2
447:7,11 448:22

449:19 451:2,20
455:11 457:18
463:11 464:11
466:16 467:15
474:14 476:8,21
477:10 478:6
484:10,22 486:5
487:17 491:14
492:15 494:9
496:11,23 498:21
498:24 499:2
501:16 503:8
505:2 506:8
510:10 516:22
518:5,9,15 520:22
522:12 524:13,20
525:1 526:3
527:10 528:22
530:2 531:10,23
531:25 532:10,12
**mateo** 234:6
   264:14 281:6
   313:7
**materials** 239:25
   240:7 272:8 274:4
   406:2,4,6 407:9
   433:15
**matt** 250:6,8
   251:19 254:21
   256:14 257:22
   376:22 378:17
   380:16,18 384:3
   384:10 410:8
   419:5 435:24
   442:15 449:16
   459:10,22 460:2
   461:2,13
**matter** 235:5
   243:25 287:17
   309:6 358:15
   390:16 429:24

| | | | |
|---|---|---|---|
| **matters** 251:16,17 403:13,18 | 264:3,20 265:4 266:2 267:5 | **memorandum** 287:9,15 | 443:11 445:10 447:16 453:10 |
| **matthew** 253:18 314:22 | 439:23 445:8 469:23 493:6,10 | **menlo** 231:3,8,11 231:17,20,22 | 458:5 462:14,19 463:10,24 464:10 |
| **mazon** 418:9,10 | 494:1,4,7,19 495:13,18 | 232:7 234:1 235:22 236:23 | 464:20 467:13 482:3,14,23 485:1 |
| **mcclure** 395:22 396:9 412:13,16 | **medians** 469:6 **meet** 237:5,7 | 244:3 257:15 263:10,10,20 | 489:4,10 491:4,20 493:13 494:13,14 |
| 412:21 414:6 419:14,23 426:8 | 381:4 442:2,25 **meeting** 237:20 | 264:4,12,19 265:6 267:6 270:7 271:5 | 494:17,20 495:6,9 497:10 508:2 |
| 427:10 458:23 460:7 461:7 | 321:4,7 325:5,20 325:23 326:1,17 | 272:10 274:23 275:1,14,22 276:1 | 509:15 510:20 511:13 514:13 |
| **mcclure's** 413:12 430:20 | 326:22 327:3 376:23 377:11,13 | 276:5,9 281:1 283:15,17 287:10 | 519:5 524:4 525:7 525:11 527:7 |
| **mcintyre** 462:2,16 465:19 467:8 | 377:18,22 378:3,7 378:10,18 379:8 | 287:13,21 288:3 288:10 289:8,12 | 528:9,14,20 529:5 529:12,25 |
| **mcintyre's** 467:5 | 379:19,24 380:1,4 380:7,13,14,15,25 | 291:6,8,10,23 293:7 298:24 | **mental** 318:1,3,6,7 **mentioned** 241:14 |
| **mckee** 268:3 **mean** 296:19 | 382:1 395:10 402:2,6,9,13,19 | 299:10,13 300:12 301:24 305:2 | 245:19 246:9 259:15 274:13 |
| 307:24 317:4 348:17 349:7 | 405:22 406:10,17 406:20 407:9,16 | 313:1 317:15 318:24 319:18 | 283:5 292:8 315:3 328:16 340:13 |
| 380:7,25 401:13 421:8 456:11 | 408:13 409:25 415:19 416:5,10 | 320:9,10,19 321:15 325:21 | 441:12 481:16 485:24 487:2 |
| 462:19 487:9 521:1,3 530:2 | 417:24 420:13 434:13 | 326:9,18 327:9,13 330:4,7,13 341:19 | 524:14 **mentions** 524:22 |
| **meaning** 255:6 320:5 331:10 | **meetings** 300:15 300:21 381:20 | 345:16 356:20 358:6,9,13 360:9 | **message** 283:11,20 **messages** 231:9 |
| 389:5 396:25 440:12 447:17 | 382:4 409:22 410:22,25 411:3,5 | 361:8,13,20 362:2 362:20 363:6 | 269:24 270:3 284:4 |
| **means** 283:19 309:9 339:12 | 411:9 **meets** 286:18 | 364:11 365:24 366:1 367:13 | **met** 320:14,16 340:12 390:13 |
| 348:18 380:11,14 404:13 486:19 | 324:18 380:22 534:18 | 368:1 377:22 379:23 380:6,24 | **method** 380:20 **michael** 229:4 |
| **meant** 283:24 302:21 316:12 | **member** 288:2 453:20 | 381:25 384:14 386:7,19,25 395:4 | 234:22 235:6,18 235:20 236:1 |
| 401:11,12 404:8 429:14 430:11 | **members** 395:7 455:25 456:8,24 | 407:21,23 413:25 414:10,19 415:3 | 254:14 270:18 278:4 281:22 |
| **mechanisms** 381:4 **media** 235:4 294:5 | 513:4 **memo** 287:17 | 421:21 422:1,15 424:1,14,17 | 299:14 304:11,16 306:7 307:1,12,22 |
| 294:17 426:9,14 **median** 262:12 | | 426:14 429:24 | 308:7,16 310:4 |
| 263:11,15,25 | | | |

Veritext Legal Solutions
866 299-5127

313:24 327:10
357:10 373:23
374:4 393:20
395:17 412:14
**milde** 250:8
251:19 254:21
256:14,19 257:22
258:2,4,14,24
259:4,10,11
376:11,22 377:10
377:15,18 378:10
378:17 379:8
380:12,16,18
383:21,22 384:3
384:10 409:2
410:8 419:5 425:9
425:12,15,18
435:14,24 436:7
436:15 442:15
449:16 450:19,23
459:11,14,22
460:2,13 461:2,13
461:18,24,25
465:21
**milde's** 250:6
**mind** 404:7,9
473:7
**mine** 303:22 385:8
387:15
**minimum** 286:18
324:18 534:18
**minors** 472:24
**minute** 249:9
276:15 328:24
329:5,13,13
339:20 359:10
402:22 434:17
518:16 529:17
**minutes** 325:5,20
329:1 332:2,4,8,9
336:9 337:13

361:3 402:24
476:22,25 477:4
518:13
**misconstrued**
478:3
**miserable** 329:16
**missing** 374:24
375:2 443:5
499:20 530:19,22
531:3,7
**misstates** 309:1
338:25 378:13
379:11 390:7
401:3 528:22
**misstating** 401:7
**mistake** 465:22
**mitigation** 243:3
245:2 251:23
252:3 382:23
**mobile** 275:19
**model** 502:12
**modifications**
449:4
**modified** 382:23
**moment** 392:9
**monitor** 235:3
**monitoring** 275:23
**month** 237:4
**months** 275:8
326:23 327:22
**morning** 235:1
236:10,11 241:21
350:24,25 352:13
352:20,21 470:19
470:24 471:6
**mother** 296:5
**motion** 266:22
271:15 273:25
**motorists** 517:10
517:11 522:1,22

**move** 290:21
315:20 316:25
325:3 358:20
386:16 394:10,12
395:8
**movement** 519:10
522:4
**movie** 486:24
**mp** 231:4,4,8,8,9
231:10,12,12,14
231:14,15,15,18
231:19,21,21,23
231:23 232:3,3,5,5
232:6,6,9,10,13,13
232:15,15,16,17
232:18,18,20,20
232:21,21 248:10
248:10 249:19
253:6,14 254:16
265:14,14,21,22
265:22 269:25
270:1 277:3 287:5
287:5 298:11
301:10 325:9,10
325:15 345:17
354:7,7,16 355:17
360:5,6 365:7
368:23 373:14,15
373:25 375:7
385:12 395:12
399:19,19 405:19
408:17 411:24,24
412:12 417:17,18
435:17,18 444:18
457:16,16 465:2,2
466:23,24 470:4,5
471:19,19 481:19
490:22,23,25
491:19 492:4
495:2 497:2 499:8
501:7,7,13 507:1

523:1
**mp1426** 232:23
**multiple** 248:6
260:14 265:13
287:5 290:8 325:9
354:6 360:5 365:7
373:14 399:19
405:19 411:23
419:10 470:4
507:1
**municipality**
468:9
**mute** 236:1
**mutual** 275:17
438:5
**myriad** 306:22

**n**

**n** 230:1 279:1
311:1
**name** 235:11
267:25 268:3,5
274:9 290:24
325:4 367:7 373:7
374:4 395:10
423:5 444:16
448:10 464:24
478:16 481:2
490:19 496:21
**named** 286:6
324:6 534:6
**names** 513:23
514:4,8,14
**naturally** 517:25
**nature** 239:6
274:12 305:15
451:15 487:11
**nea** 232:12 294:12
294:18,20,22,25
295:4,10,13,18
296:10 302:11
303:23 304:16

305:1 320:6,14,18
321:7 385:20
386:6 394:24
402:12 406:10,18
416:20,23 417:13
417:20 418:6
423:5
**nea's** 408:12
**near** 261:2 303:25
304:2 485:22
511:25
**necessarily** 238:17
251:7 300:14
350:4 380:3 440:3
441:13 456:11
**necessary** 243:4
424:21 524:10,24
525:6
**need** 243:2 252:2,3
253:3 314:11
369:21 390:18
398:10,15 439:7
441:8 462:4
477:25 496:9
503:19 504:1
518:16 521:13
530:23 531:3
532:4
**needed** 256:22
275:10,20 331:17
372:16,17 376:7
376:16,18,20,21
379:7,14,24
380:11,16 393:3
414:25 415:18
416:3 427:4 440:6
440:9 442:19
444:2 476:2,5
480:17 505:25
**needs** 488:10

**negative** 305:17
338:9 518:2
**neighborhoods**
453:21
**neither** 530:8
**never** 261:20
288:24 289:11
290:2 302:11
304:15 364:5
366:22 470:25
524:6
**new** 304:15 309:12
365:23 366:2,8,20
366:23 368:8
400:18 445:3
448:19 449:3,7,12
458:20 459:8
460:16,17 466:1
500:21 522:17,18
**newest** 412:5
**newsom** 229:7
278:7 310:7
**newsome** 235:6
**nexus** 427:14
428:6,16 429:11
429:17,25 430:14
**nick** 471:16
478:20
**night** 468:24 469:2
**noise** 239:5 241:22
247:2 487:9,10
**non** 277:14 309:20
**nonresponsive**
315:20 316:25
386:17
**nonsense** 522:14
**normal** 292:4
316:4,9,13,17,22
317:5,12 431:4
**normally** 288:1
304:19 315:18

327:22 371:20
411:3 445:15
**northern** 229:2
235:7 278:2 310:2
**nos** 484:1
**note** 235:25
303:23 389:4
**notes** 331:2,16
529:17
**notice** 233:3 280:3
312:3 452:19,20
460:9 502:20,23
**notified** 289:19
396:23
**notify** 396:25
397:4,9
**number** 248:9
276:11 309:5
320:4 330:24,25
331:1,3,4,9,13,20
336:5 346:21
347:16 410:17,20
411:17 435:8
462:5 500:22
507:15 517:3,3
**numbered** 298:11
**numbers** 265:19
271:17 274:10
325:7 347:5,6,17
347:19,21,23,25
348:1,1 465:1
523:3,9,12,19
524:5
**numerous** 292:14
307:18 316:20
381:6 403:15,16
406:13 421:11
427:5 443:17

| **o** |
|---|

**o** 332:15,16
**o'clock** 241:21
350:6 352:13
**o'farrell** 234:5
281:5 313:6
**o0o** 229:3 233:11
278:3 280:12
310:3 312:12
**oath** 236:19 277:1
**obey** 488:10
**object** 237:12
240:25 258:16
267:7 296:18
297:9 315:19
316:24 327:16
328:22 386:15
404:11 430:3
443:14 463:11
487:17 516:22
**objection** 238:15
239:12 243:17
250:17 263:17
264:6 266:7
273:11 274:8
288:19 305:21
306:9 307:3,14,23
308:17 309:1
315:25 316:14
317:6 338:10,25
339:19 340:19
341:25 364:2
369:17 370:4
372:2 378:13,24
379:10 387:21
388:10 391:8,24
401:3 404:3 405:3
412:23 413:17
414:2 415:21
424:4 428:7 444:4
446:9 449:19

Veritext Legal Solutions
866 299-5127

451:2 455:11
464:11 474:14
486:5 492:15
494:9 496:11
503:8 505:2 506:8
520:22 527:10
528:22 531:10
**objections** 308:8
416:6
**objective** 335:7
504:11
**obscene** 472:24
**observation**
291:16 355:12
**observed** 264:22
289:25 355:19
**obtain** 363:17
439:3
**obtained** 271:10
416:4,8,8
**obvious** 401:12
**obviously** 251:15
306:1 356:4 456:8
**occasions** 290:8,12
**occur** 244:7 246:3
388:16 390:19
**occurred** 290:5,8
298:22 321:4
408:5 433:7
441:11 514:12
**occurring** 275:25
**occurs** 410:1
**october** 325:23
**offer** 478:1 479:9
**office** 234:14
257:24 258:10,15
258:22 259:8,16
260:4 261:24
262:1,22 264:14
272:1,18 281:14
289:1 313:15

333:8,12 334:4,12
334:13 342:23
343:5,6 344:1,5,10
344:14,16,22,23
356:7,18 357:8
360:15 362:19
372:12,13,21
373:3 381:9 383:6
383:12 384:2
386:11,23,25
387:13 392:23
393:11 394:9,15
395:5,6 396:21
397:13 398:6,7,19
398:22 400:22
403:23 407:6
409:18 410:18
414:24 415:10,16
418:16,23 419:18
420:19 421:13
422:19 428:24
429:9,9 436:20,24
442:17 449:3,11
449:14 451:11,24
452:1,4,9 458:19
471:17 481:10
505:20,24 506:2
506:12 530:14
531:1
**office's** 506:7
**officer** 270:11
316:8 318:15
331:10,12,15,15
331:22 332:15
333:10,14 336:18
336:20,24 337:6
337:18 338:7,8,23
339:18 340:1,9,16
341:5,10,13,18,21
342:12,14,18
344:3,4,8,20,24

345:3 347:14,16
348:8,11,14
352:20 353:6,9,14
353:16,19 354:19
355:10,14,25
356:13,16,16,20
357:14,17 527:8
**officer's** 331:11
**officers** 263:10,22
275:18,22 289:12
289:20,24 290:4,7
290:11,18 291:13
291:17 296:17,21
296:24 298:4
315:15 330:17
331:1 335:12,22
347:3,6,9,11,22
349:12 353:15
357:4 398:18
**offices** 382:22
**official** 249:20
273:24 282:9
408:18
**oh** 298:20
**okay** 238:20 240:2
241:6 245:19
253:8,16 255:16
256:10 261:4
265:23 274:17
306:16 314:14
321:21 328:18
329:4 330:11
331:6 337:22
341:5 346:1,7
347:9,13 349:20
360:4 364:10
368:24 373:11,13
373:25 375:1,5,25
378:2 381:24
385:11 387:4
390:4 395:11

400:7 405:20
411:19 418:24
419:13 421:17
423:6 429:16
431:12 436:2
437:12 440:8
444:19 447:11,12
447:24 448:7,11
448:23,25 457:1
460:6 461:24
464:22 465:3,10
468:19 469:12
477:5,16 478:8
488:24 489:2
490:21 495:1,14
498:24 501:5
509:1,6 513:19
518:17 520:8
522:20,20 525:21
526:12 528:6
531:20 532:2,6
**once** 237:10
296:21
**ones** 238:12
240:18 321:20
411:15
**ongoing** 388:3
438:5
**open** 287:16,19,22
288:4,9,15 290:23
291:3 315:16
327:14 328:11
330:3 337:2,20
361:23 368:6
385:9 395:16
396:1 408:4
427:11 450:13
456:2 498:13
**opened** 513:18
**openly** 264:23
288:6,11,14

292:14 361:12
397:19 428:3
429:4,6
**operations** 304:6
**opinion** 244:19
305:10 315:11,17
315:23 316:7,22
317:12 334:6
344:16 357:7,9
358:4 359:8
366:15 388:1,17
399:4 400:22,23
403:24 404:18,22
404:22 405:1
422:14,17,18
476:2
**opinions** 366:10
403:19
**opposed** 439:8,23
456:16
**order** 271:16
282:9,11,12,17
301:5 302:15,16
317:21 353:11
399:13 411:13
430:2 440:6 442:2
442:20 444:2
457:3 464:23
470:1 475:8
**ordinance** 432:25
487:9
**ordinances** 238:25
239:2,4,10,18,21
240:2,4 433:3
**ordinarily** 425:13
**ordinary** 250:16
251:6 252:17,19
291:19 299:18
356:19 376:12
377:1 378:6,21
379:5 415:17

425:11 431:1
433:12 459:13
483:7
**organizations**
303:1
**original** 257:6
371:12 394:23
419:1 425:3 432:5
**originally** 351:5
383:14 405:9
423:1 433:16
442:15 450:10
**ortega** 253:18
314:23
**outline** 375:6
**outside** 262:3
275:24 294:15
395:4 426:20,23
462:13,18 463:1,5
463:9,23 464:9,19
528:18
**overall** 256:3
**overbroad** 241:1
243:9,18 250:18
264:7 267:8
297:10 305:22
306:10 307:15
308:18 327:17
342:2 364:3
369:18 370:5
379:1,11 390:25
391:9 410:3
413:18 428:8
430:6 446:10
451:3,21 455:12
463:12 464:12
467:16 474:15
484:11 486:6
487:18 492:16
506:9 520:23

**overlaid** 511:5
**overtime** 309:9
**overturn** 432:11
463:17 464:2,15
464:18 473:18
**ownership** 262:12
266:2

## p

**p** 330:19
**p.m.** 350:6 352:17
532:14
**page** 230:2,11
231:2 232:2 248:6
248:9,9,20 249:2
249:19,21 253:6
253:15 260:14,15
261:1,10,11,11
265:13 270:13
277:4,11,11,15
279:2 284:15
285:9 286:17
287:5 309:17,21
311:2,11 314:22
322:13 323:9
324:17 325:7,16
347:1 349:18
354:15 355:17
365:7 367:16
373:25 375:7
385:12 399:19
405:19 407:1
408:16,17 412:12
413:10 416:19
435:12 444:18
453:1 458:4 465:5
467:9,10 468:21
470:4 471:19
472:16 481:19
490:23 491:10,18
492:4 497:2,6
499:17 501:13,21

507:1 509:9
510:14,21 525:1
533:9 534:17
**pages** 229:9,12,17
248:25 269:24
278:15 298:10
301:10 310:15
314:10 325:9
354:7 360:5 365:7
373:14 411:24
457:16
**palo** 407:22
**paragraph** 261:16
262:10,14 369:5
385:25 389:4
393:19 395:25
396:7 397:3,17
400:3,9,17 421:11
423:10,15 424:13
426:3,4,6 427:9
430:20 437:8
438:3 447:21
453:2 462:7
**paragraphs**
355:18 423:14
**parameters** 257:7
438:6,17,23 439:4
439:12,17 441:5
441:21 443:13
446:8
**parentheses** 387:4
**park** 231:3,8,11
231:17,20,22
232:7 233:18
234:1 235:22
236:23 244:4
257:16 263:10,10
263:20 264:4,12
264:19 265:6
267:6 270:7 271:5
272:10 274:24

| | | | |
|---|---|---|---|
| 275:1,14,22 276:1 | 497:10 508:2 | 455:10,19 | 315:4,8 316:12 |
| 276:5,10 280:20 | 509:15 510:20,23 | **particular** 245:5 | 317:3 343:7 357:7 |
| 281:2 283:15,17 | 511:10,13 513:9 | 255:25 339:21 | 366:6 367:25 |
| 287:10,13,21 | 514:14 519:5 | 347:14 483:12,13 | 371:22 385:20 |
| 288:4,10 289:8,12 | 524:4 525:7,11 | 486:15 509:21 | 393:25 394:3,5,22 |
| 291:6,8,10,23 | 527:7 528:9,14,20 | 515:22 519:1 | 395:16 412:7 |
| 293:7 298:24 | 529:5,12,25 | **particularly** | 417:24 457:4,7,7 |
| 299:10,14 300:12 | **part** 239:24 | 457:24 | 468:2 469:23 |
| 301:24 305:3 | 264:23 291:22 | **parties** 273:14,20 | 497:9 515:4 |
| 312:20 313:2 | 305:25 322:6 | 274:11 297:5 | 519:12,19 520:13 |
| 317:15 318:24 | 339:21 353:12 | 366:13 467:25 | 521:18 |
| 319:19 320:10,10 | 356:12 378:6 | 468:2,12 | **people's** 517:24 |
| 320:19 321:15 | 379:5 381:11 | **party** 340:7 | **percent** 245:11 |
| 325:21 326:9,18 | 390:4 425:4 | 453:19 454:10 | 250:7 258:6 |
| 327:9,13 330:4,8 | 448:14 455:8 | 456:21,22 457:2 | 261:22 333:9 |
| 330:13 341:19 | 457:4 464:8 | 468:4,6,14,19 | 335:4 374:23 |
| 345:16 356:20 | 473:10,13,16,19 | **passing** 296:5 | 480:7 |
| 358:6,9,13 360:9 | 475:11,11 476:13 | 522:1,22 | **percentage** 411:5 |
| 361:8,13,20 362:2 | 492:10 493:22 | **password** 353:13 | **performance** |
| 362:20 363:6 | 513:24 521:4 | 353:14 | 414:16 |
| 364:12 365:24 | 523:4,13 525:6,10 | **path** 512:10 | **performed** 319:23 |
| 366:2 367:13 | 526:1 | **patrol** 264:13 | 408:22 |
| 368:1 377:22 | **participants** | 299:8,18 355:7,10 | **period** 287:19 |
| 379:23 380:6,24 | 266:22 321:5 | **pc** 351:7 355:20 | 304:22 305:5 |
| 381:25 384:14 | 406:17 513:23 | **pedestrian** 503:21 | 359:21 370:15 |
| 386:8,19,25 395:4 | 514:4,8,15 515:5,9 | 503:25 504:15 | 464:1 |
| 407:22,23 413:25 | 515:13 | **pedestrians** 512:9 | **periods** 446:2 |
| 414:10,19 415:3 | **participate** 326:1 | **penal** 333:6 334:3 | **permission** 495:18 |
| 421:21 422:1,15 | 377:13 381:11 | 334:7 340:12 | 526:13 |
| 424:1,14,17 | 402:12,18 405:23 | 341:1 350:17 | **permit** 239:20 |
| 426:14 429:25 | 406:1 434:5 | 351:7 356:14 | 240:8 241:4 |
| 443:11 445:10 | 454:20 456:1 | 397:20 400:13,25 | 242:17 243:13 |
| 447:16 453:10 | 466:9 478:18,19 | 467:18 473:4 | 244:17,25 245:7 |
| 456:10,15 458:5 | **participated** | 523:11,13,14,17 | 246:24 247:11 |
| 462:14,19 463:10 | 377:18 402:9 | 523:18,22 525:9 | 248:22 249:4 |
| 463:24 464:10,20 | 411:1 | 525:12,14,18,24 | 250:14,24 251:5,5 |
| 467:13 482:3,14 | **participating** | 526:7 527:24 | 251:9 252:7,17,20 |
| 482:23 485:2 | 514:23 | 528:8,17 | 253:3 254:10,13 |
| 489:4,10 491:4,20 | **participation** | **pending** 406:22 | 255:17 259:14 |
| 493:13 494:13,15 | 453:6,9,14 454:3 | **people** 267:24 | 260:6 261:21 |
| 494:17,20 495:6,9 | 454:17,23 455:3 | 298:14 309:9 | 266:6,18,18 267:1 |

Veritext Legal Solutions
866 299-5127

267:4,15 268:9,14
268:17,20,23,24
269:1,2,6,8 363:17
363:18,20,21
364:13,17,20
365:2,23 368:3,8
368:14,25 369:3,6
369:10,11,12,15
370:2,3,13,16,25
371:8,18 372:8,14
372:20 373:4
374:8,12 375:13
378:22,23 379:6
381:11,16,16,21
383:3,5,13 384:11
384:14,21 386:8
389:2 390:16,19
391:17,22 392:12
392:17 393:4
398:4 401:24
402:3,5 406:7,21
409:4,9 410:11,14
412:18,22 415:2,6
415:11,18 417:1
417:10,22 418:1,2
418:19 419:1,25
420:9 421:2,5
422:3 423:1
425:13,19 427:19
428:20 429:4,6
430:2,23 431:1,2,6
431:13,22 432:2
435:21 436:4
437:5,19,20 438:1
438:12,13 439:3
440:2 441:3,9,19
441:24 442:2,8,20
443:1,9,11,24
444:3,13,17,25
445:12 446:3,8,18
447:15 448:15,20

450:2,5 451:12,19
452:7,9,23 453:23
454:8,15 455:17
458:9,25 459:13
459:15,20 461:18
462:10,13,17
463:4,9,17,23
464:3,4,5,8,15,16
464:18 466:17
467:14,20 468:12
470:20 471:1,9
472:11 475:1,5,10
475:21 479:4,7,11
479:11,18,20,24
480:2,9,13,19
481:2,7,8,12,13,16
482:1,11,13,20,22
483:4,8,19,21
484:3,7,9,16,18,21
485:1,5,9,14,16
486:16,21 487:6
487:14,15 488:22
489:17,25 490:3,4
490:9,12,19 491:4
491:6,23,23
492:21,24 494:25
495:5 496:7,9
497:11,17,23,25
498:5,10,23
499:11,13 500:1,4
501:10,15 504:5
506:7,17,18
507:13 508:7
509:22 510:11
514:5,14,25 515:7
515:24 516:21
517:9 519:23
520:10 521:6
524:3,6 525:8,15
526:8,11,12,20
527:19,19,21

529:14 530:1,2,5,7
530:11
**permits** 240:3,5,13
240:18 366:11
367:2,12 370:15
371:13 388:22
410:16 426:19
432:16 433:7
436:12 453:16
464:1 467:24
469:4 481:23
482:4,15 490:8
491:21 493:4,24
493:25 495:21
503:18 506:3
508:3 515:4
517:20 523:10
**permitted** 242:13
267:18 382:25
426:22 429:3
450:11
**permittee** 489:3
**permitting** 240:6
243:25 244:24
364:1 381:3
441:13 446:6
495:23 498:7
517:15 525:16
526:8 530:17
**person** 241:24
244:23 268:4,9
296:20 297:3
299:13 305:14
317:22 318:8
332:24 336:19
337:4 340:10
341:2 353:10,20
355:22 375:20,21
380:15,17,20,25
381:20 382:1
384:13 388:4

416:10 418:3,8
422:2,10 423:25
432:5 455:16
471:6 483:13
484:7,18 488:9
500:14 509:14
531:5
**personal** 291:16
305:10 319:24
320:1 355:12
358:10 362:18
363:19 422:17
**personally** 257:13
257:14 275:4
320:14,16 334:2
413:3
**perspective**
304:20 306:2
364:14,16,25
365:1 384:7
398:16 430:18
519:14 521:11,17
**pertain** 363:20
**pertaining** 487:25
488:5
**pertinent** 273:20
484:3
**phone** 268:2
302:25 303:5,8,10
303:11 307:8
338:5 375:21
380:2,7,15,20,25
381:14,17,20
411:4,6 416:9
471:5
**phoned** 335:2
**photo** 327:1,9,12
476:17 509:20
**photos** 476:20
**physical** 295:5,8

**physically** 295:21
**pick** 439:14
**picture** 266:22
　270:17 334:5
　511:17
**piece** 383:10
　392:21 393:2
　514:16
**place** 237:3 241:10
　241:14 242:21,23
　243:1,4,13,24
　245:17 247:10,12
　251:23 282:13
　286:8,10,16 324:8
　324:10,16 325:23
　366:2 367:20
　368:2 382:4
　388:12 414:15,20
　415:5 426:21,23
　427:1 438:6,10,16
　439:16,17 440:23
　441:17,21 443:13
　445:17 446:15
　447:17 448:2,4
　450:10 485:3,17
　495:13,18 506:14
　507:22 529:6
　534:8,10,16
**places** 242:24
　243:7,14,21
　469:21
**plaintiff** 229:5
　233:14 235:20
　278:5 280:16
　310:5 312:16
**plaintiff's** 231:2,6
　232:2 247:21
　260:11,18 265:9
　269:20 287:1
　298:7 301:7
　311:11 314:4

345:19 354:1
360:1 365:3 385:2
399:15 405:14
411:20 416:15
435:3 457:11
466:20 470:6
471:20 501:1
507:2
**plan** 375:9 397:7
　397:11 407:25
　476:12 500:10,16
　503:18 504:1,12
　504:17,18,19
　505:1,5,5
**planned** 437:17
　508:15,17 509:16
　511:18
**planning** 244:21
　250:11 392:10
　503:25 511:9
　522:3
**plans** 499:23,24
　500:4,8 507:21
**play** 321:21
　329:24 336:3
　337:9
**played** 329:2,4
**playing** 321:24
　328:12 331:25
　332:6 336:1,6,6,7
　336:10
**please** 235:15
　236:8 261:1,10
　325:8 336:2 361:3
　375:8 447:18
　481:15 501:13
　515:16 516:11
　518:6 523:2
　527:11
**point** 253:2 258:11
　259:16 266:25

326:8,23 327:19
328:1 352:9,19
372:7 380:22
388:25 390:5
391:21 396:13
397:7,16 417:4
418:11 419:18,18
438:15 439:25
441:24 442:10
443:8 445:9,25
477:7 479:6 480:1
481:6 487:12,20
487:24 488:23,24
489:2 502:8
505:19 507:20,20
509:8 512:15
516:4,10 518:25
522:9 523:1 524:8
524:22 525:2
**points** 420:17
　421:11 422:25
　425:2,3 438:18,22
　440:4,5 442:5
　443:21,23 444:2,9
　444:12 446:17,21
　467:17 474:8,9,12
　475:13 479:14
　488:19 489:23
　516:3
**police** 231:11,17
　231:20,22 232:7
　244:21 250:11
　251:15,16 253:12
　253:23 254:4
　255:6,20,22 263:9
　263:10,14,22,23
　263:24 264:5,12
　264:19,25 270:7
　272:10,18,20,23
　272:24 273:4
　275:16,22 287:10

287:21 289:12,16
290:25 291:5,6,8,9
291:10,12,14,23
291:24 292:1
294:16 296:16,19
297:22,25 298:4
300:15 301:19,24
303:14 304:21
305:11,13,18
306:6,19,25
308:14,23 309:11
315:15 316:7,8
317:15 318:23
319:19 320:19
325:21 326:10,18
327:13,20 330:23
333:2 341:11,13
341:14,19 342:24
343:13,14,21
344:3 345:16
346:20 349:12
351:6,15,16,18,19
352:10 354:11,12
356:19 357:3,4
360:8,9 362:20
363:6 364:12
366:15 377:17
384:6 395:22
398:17 436:1
450:17 489:4,10
504:22
**policies** 240:11,17
　240:20,23 369:25
　424:14,17 430:14
　432:25 453:9
　462:14,18,19,21
　462:23 463:1,5,9
　463:24 464:9,19
　467:13 469:9,13
　482:2,14,23 483:1
　483:3 519:23

523:10 525:7
**policy** 242:10,22
287:22 288:1,3
330:20 363:6
379:23 380:24
388:9 416:1
426:13,20,24
429:24 430:15,19
451:9,10 469:3
521:5 522:9
525:10 528:13,19
**political** 302:21
303:17 327:23
**pop** 448:9
**pops** 345:18 354:4
385:5 416:13
417:15
**portable** 424:24
513:13
**portion** 277:14
282:15,19 284:13
309:20 314:12,17
322:11 329:2
336:6 468:3
**portions** 468:9
**portola** 407:23
**posed** 384:20
505:11
**position** 288:10
298:25 410:8
475:3 511:12
**possession** 523:16
523:23
**possibility** 294:20
**possible** 352:5,7
440:18 495:12
**possibly** 289:2,5
293:3 318:7 421:6
**post** 271:19 277:4
**posts** 294:5 295:22

**potential** 344:1
**potentially** 244:5
495:13
**power** 263:23,25
**powerpoint**
282:25 283:4,6
472:5,9,10,13
473:20 474:4
475:23
**practical** 468:22
**practice** 291:22
351:8
**predominantly**
387:5
**prefer** 326:19
**preferable** 300:22
**preliminary**
404:20 405:1
437:20
**prep** 236:25 237:5
237:21
**prepared** 354:16
354:20 478:21
**preparing** 352:22
405:23 478:19
**present** 234:18
265:2 281:18
286:6 313:20
324:6 421:2
514:20 534:6
**presentation**
472:6 474:4 475:7
475:19
**presentations**
424:23
**presented** 256:24
268:22,23 269:1
472:10 478:23
480:3
**pretty** 401:12

**previous** 393:24
408:16 419:22
459:19 508:22
**previously** 282:8
290:20 291:1
325:2,10 367:10
368:7,9 373:6,8
395:9 417:12,14
435:13 439:22
448:8 464:23
465:4 478:16
480:25 481:2,16
490:18 494:23
496:6,20 498:19
512:1
**primarily** 436:11
**primary** 299:13
**printed** 363:23
368:16
**prior** 241:19
287:10 291:7
298:22,23 302:4
320:9 360:17
361:22 364:6
367:10 368:10
381:15 407:24
415:14 421:14
460:2 520:3
**privacy** 273:12,13
**private** 453:18
454:1
**privilege** 237:14
273:25,25 274:1
282:10
**privileged** 258:19
262:2,25 394:11
394:13 449:20
**privileges** 274:12
**probable** 264:15
265:2

**probably** 237:4
238:19 241:22
320:11 343:19
399:10 434:21
469:22
**problem** 443:6
**problematic** 487:1
**procedure** 239:22
388:9 451:9,10
**procedures** 239:3
239:9,10,19,22
240:21 482:2
**proceed** 236:8
**proceedings**
235:10 286:16
324:16 534:16
**process** 238:24
239:1,24 240:6
241:4 244:1,17,24
247:4,17 250:16
251:6 252:17
253:2 269:8
327:15 363:16
364:1,13 365:23
366:3,8,10,21,24
367:19,20,23
368:2,15 370:9
375:14,16 376:12
377:1,5 378:6,22
379:5 389:7,21
390:19 425:11
431:18,21 432:24
433:3,12 436:22
438:16 441:9,10
441:11,13,14,25
442:24 446:6,6
459:13 462:22
464:2,8 465:25
467:20 479:6
480:2,19 481:11
490:11,14 497:23

Veritext Legal Solutions
866 299-5127

526:2 530:17
531:15
**processed** 249:25
**processes** 498:8
**processing** 368:3
379:6 415:17
483:7 504:5
**produce** 282:11
413:5
**produced** 233:7
271:13,16,21
280:7 287:13
292:2 297:14
312:7 320:25
321:14,18 330:4
334:22 345:16
420:5,8 445:22
470:21
**producers** 512:15
**producing** 296:8
**product** 237:14
**production** 426:9
426:15 482:15
486:3 514:23
517:20 520:1
523:5,20 524:11
524:24 525:6
526:2
**productions** 518:3
520:4
**profession** 403:7
**professional**
527:11
**professor** 283:9
**profile** 283:17,21
283:23
**program** 238:23
239:1,8
**progress** 417:10
**prohibited** 287:20
288:4

**project** 506:23
507:16
**prompt** 331:13
**prompted** 297:21
297:25 301:23
**pronounce** 483:17
**prop** 266:19
267:16 268:10
**property** 302:13
302:17 395:1
488:1,5
**proposal** 440:11
441:20 479:9
480:4
**propose** 438:23
439:11,16
**proposed** 420:19
420:20 424:19
427:13 439:5
473:14 476:6
486:3 506:23
**proposing** 426:9
438:16 444:24
492:14 498:14
**prosecute** 401:20
**prosecuted** 290:16
**prosecution** 343:5
343:11,18 344:1
345:12 346:22
354:13 356:17
367:3
**prospective** 275:5
**protected** 353:13
**protective** 271:16
282:12,16
**protest** 264:24
267:4,19 268:15
275:15 276:2
288:15 289:7,10
289:13,15,25
290:15 293:19

294:21 295:17
296:15 297:21,25
298:4 300:19
302:10,17 304:23
305:6 307:2
326:15 332:22
402:8 404:1
426:10,15 430:1
438:11 444:22
445:11 492:14,19
509:2,2
**protested** 293:7
363:8 440:1 512:2
**protester** 363:7
**protesters** 273:8
273:10 274:5
275:1
**protesting** 292:13
296:25 297:6
300:2,13,23 301:2
305:1,9 326:20
395:1 509:5
**protests** 264:2
275:6,8,12,12,20
275:21 289:14
293:14 300:5,9
306:18 320:15,20
326:5,11 361:7
395:4 406:12
407:21,22 439:21
446:7
**provide** 295:24
375:8 460:8
505:16 513:23
524:5
**provided** 269:11
271:24 296:4
370:8,12 383:2
387:10 389:20
392:15 397:14
415:4 422:21

423:19 447:25
461:18 474:18,20
475:23,25 476:2
476:11 477:6
508:16,23 512:5
512:13
**providing** 296:2
**proximity** 528:6
**psychiatric** 319:23
**psychological**
319:22
**public** 244:20,21
251:16,16 256:25
294:22 295:1
300:17 302:18
305:11 316:19
434:12 439:22
450:14,15 455:23
455:25 456:4
468:23 469:7,16
469:19 483:10,14
485:21 487:3,5,13
488:20,25 489:16
489:24 498:12
500:19 504:22
519:7,14,17,21
520:5 521:11,16
521:24 528:25
529:8,9,10,13
**published** 366:24
368:13 380:6
488:6 496:8
**pull** 510:8
**pulling** 321:13
**puma** 330:18
**purpose** 380:10
398:10 427:14
429:20 457:20
514:18
**purposes** 262:17
477:17 515:19

Veritext Legal Solutions
866 299-5127

516:8,13
**pursuant** 233:3
280:3 282:12
312:3
**purview** 299:16
451:14
**put** 308:24 314:11
364:16,19 365:1
382:24 454:9
472:13 473:19
474:5 475:7,16,19
475:24 509:7,10
509:11 511:22
512:3,7,16 513:15
**putting** 366:2
371:12 509:13
**pyrotechnics**
487:10

**q**

**qualified** 384:13
422:2 424:1
509:15 531:5
**qualifies** 371:15
454:4
**qualify** 372:1,8
390:23 391:6
420:21 426:15
454:7 455:10,19
456:17 457:3
**question** 237:13
237:15 239:17
245:8 246:22
267:7 273:17,19
292:5 297:10
308:3,5,11 317:2,8
319:17 325:19
329:18 336:22
337:3,14 339:5
343:1 369:22,24
372:5 374:20
375:3 382:3 392:2

392:6 398:5,8,11
398:23 400:9
404:6 417:11
421:22 428:22
430:3,13 431:14
434:20 437:14
443:15 451:20
454:5 455:11,14
455:21 463:11
476:9 477:11
479:25 485:11
486:10 487:17
493:11 500:15
501:23 502:11,16
502:19,21,22
503:5,12 512:6,18
513:22 514:16
516:16 517:1,25
518:8 522:8,15,19
524:20 526:4,18
526:19 527:17
528:25 530:18
**questions** 230:10
251:21,22 282:14
338:1,7,9 340:11
359:23 368:14
372:16 374:12,21
382:20 384:9,19
386:13 397:11
408:9 413:12,14
413:15 414:1,25
419:19 420:23
421:4 481:5
501:14 502:2,9
503:1 505:11
507:15,17 513:21
513:22 515:16
519:13 530:11
531:15,21,22
**quick** 319:7
434:16

**quickly** 527:4
**quite** 252:22
258:25 263:2
302:13 305:24
488:7
**quote** 342:6 388:6
401:6,8,8 404:19
476:13 526:22
**quoted** 341:1

**r**

**r** 332:16
**raised** 452:14,15
479:22
**raising** 480:16
**rambling** 364:23
**ran** 328:23
**rating** 502:13
**rdr** 229:20 278:19
310:19
**reach** 377:10
438:9
**reaction** 520:6,12
521:19 522:23
**reactions** 517:24
**read** 255:15,16
261:13 285:4
318:20 323:4
374:14,16 448:22
448:23 457:14
460:21 491:8
501:16 516:2
519:16 533:4
**reading** 422:6
423:22 429:2
430:18 449:1
501:20,22 502:5
505:13
**reads** 462:8
**ready** 273:5
275:11

**real** 244:8 266:20
**reallocating** 309:9
**really** 241:9,19
308:18 334:6
370:22 505:6,13
**reason** 319:4
345:22 356:13
382:15 396:17,20
400:21 473:8
474:1 476:18
**reasons** 396:22
420:11 423:1
438:1 444:11
**recall** 236:15
240:14 254:12
256:2,12 267:25
270:21 282:10
283:5,7 289:18
290:7,11,13
292:10 293:4
294:1,2,9,13,16,17
294:22 295:7,9,10
295:13,20 296:6,7
296:8 297:13,20
297:24 299:6,25
300:3,4,6,7,10,11
300:24 301:1,4
321:19,20 326:3
327:1 332:17
333:15 335:1
336:21 342:20
343:23 345:13
360:25 361:17,21
366:25 371:15
373:5 382:11,14
382:15 399:6,11
402:4,5,10 406:23
406:24 408:10
413:6,7 414:8,12
415:13 418:21
419:2,3,7,9 420:1

Veritext Legal Solutions
866 299-5127

437:16,18,21
440:24 442:24
445:20,21 474:1
493:16 498:16
508:19
**receive** 294:19
297:8
**received** 255:13
303:12 327:12
376:10 386:22,24
394:14 409:15,16
412:10 442:5
446:13 458:24
**receiving** 296:7
437:22
**recess** 328:4
**recipients** 395:18
**recognize** 248:16
248:17,18 253:9
260:24 265:24
287:8,9 301:14,15
328:18 329:7,9
332:11 336:14,16
346:3,12 354:10
354:11 360:8
365:10,11,11
367:11 373:17,18
374:7 385:15
405:21 412:1
448:12,13 467:1,2
470:11 471:24
491:1 496:25
499:10,11
**recollect** 361:10
431:19
**recollection** 260:2
271:17 293:1
294:4 326:6 352:8
368:5,19 377:7
383:9 407:18
409:1 420:10

425:24 433:2
437:3 445:13
448:18 449:16
452:17,24 460:15
461:13 480:7
490:13 508:18
**recommendation**
244:22
**reconsidered**
481:8
**recontact** 379:14
433:20
**record** 235:2
236:1 248:5
249:12,14,15
262:17,20 265:12
276:19,21,22,25
284:12 298:10
301:10 314:8,18
318:20 319:10,12
319:13,16 322:10
328:2,5 329:2
332:7 336:3
337:11 339:1
342:3 354:6
359:11,13,14,20
361:4 373:14
395:12 402:24,25
403:2,3 411:23
417:17 434:23,25
435:1 438:19,19
441:1,3 442:23
448:15 457:15
460:21 473:10,13
473:17,19 474:5,7
477:2,4,9,12,15,18
477:19,21 478:2,8
478:9,11,12
490:22 495:2
497:2 518:18,20
518:22 519:16

529:19,21,22
532:3,8,8
**recorders** 330:18
330:21
**recording** 328:12
328:15,19 329:20
331:7,8,10,25
332:6,12,18 336:1
336:2,10,13,15
337:4 338:12
339:20,21,24
340:15,17,23
341:20,22 342:8,8
**recordings** 330:21
**recreation** 459:16
**recruit** 341:10
**recurring** 375:3
**red** 386:1
**refer** 293:23 342:7
343:25 347:14
348:7 349:15,25
356:17 396:1
435:16 437:24
446:13 447:10
458:1 508:21
**reference** 273:5
275:11 462:17
**referenced** 264:21
283:11
**referral** 354:13
**referred** 238:10
265:4 270:21
316:11 317:2
343:4,17 345:11
458:14 462:19
**referring** 253:25
293:25 315:8
321:8 332:18
333:1,17 339:21
339:23 344:20
392:16 397:25

419:14 423:9,16
436:18 447:1,8,9
462:24 483:24
489:6 512:23
524:25
**refers** 283:20
315:1 349:3
350:17 370:24
414:14 487:24
495:12
**reflected** 247:1
367:19 416:2
**reflects** 350:19
351:4
**refuse** 251:9
**regard** 447:17
**regarding** 240:12
256:6 258:8
259:12 271:11
277:9 282:25
289:1 294:20
364:8 389:2
417:25 420:9
422:3 450:10,12
466:6 470:19
471:8 498:4 517:1
530:16
**regardless** 390:21
528:6
**region** 275:8,18
**registered** 523:16
523:24
**regular** 291:22
299:18
**reiterate** 521:24
**rejected** 251:5
**rejecting** 505:1
**relate** 283:2,4
335:12 365:22
**related** 330:8,12
367:2 412:17

453:10 501:24
502:12,23
**relates** 346:17
436:3 507:12
529:3
**relating** 266:1
351:23 406:11
407:16 435:20
508:2 519:23
523:10 525:8
**relatively** 400:18
**relay** 335:16,18,22
**relayed** 268:7
400:23 445:18
**release** 468:19
**relevant** 237:13
273:12,13,21
398:3 472:19,22
474:9 506:22
514:23 515:23
516:20 520:20
525:22
**relied** 387:16
**remarkable**
343:24
**remember** 255:19
294:3 296:2
326:21 361:24
408:14 419:7
420:2 437:18
480:11 531:14
**remembered**
233:3 280:3 312:3
**remote** 235:10
**remove** 447:3,5,6
447:7
**render** 432:11
**renewed** 267:3
449:12 450:4,20
**rent** 456:10

**repeat** 369:21
455:14 524:16
**rephrase** 246:22
258:20 304:25
318:21 343:2
415:24 454:13
526:5
**reply** 298:16
**report** 231:18,20
231:22 286:15
289:25 290:4,25
291:5,10,14 299:4
324:15 334:11
335:10,13 336:4,5
345:4 346:16,17
346:20 350:1,3,8
351:3,6,10,13,15
351:17,18,19,21
351:22 352:6,9,10
352:10,16,22,25
353:3,6,9,12,17,21
353:22 354:11,12
354:20 355:1,10
355:15 360:9
401:19 478:16,19
478:22 479:1,2
534:15
**reported** 290:18
295:18 296:25
299:7 398:13
401:17
**reporter** 233:6
235:13 239:14
246:15,17 249:7
249:11 280:6
284:8 286:11
312:6 318:17,18
318:20 319:4
321:23 324:11
361:1,2,5 385:1
399:14 460:19,21

470:2 500:23
519:15,16 524:16
532:10 534:11
**reporter's** 286:1
319:3 324:1 534:1
**reporting** 290:7
290:11 295:10,13
297:5 321:23
**reports** 291:12,24
292:1 351:2
353:16
**represent** 235:16
252:16 466:11
**representative**
236:23 267:14
283:14 366:17
371:2 385:22
402:12,15 408:12
418:6 421:21
422:15 473:7
511:13 527:7
**representatives**
371:4 395:5
**represented**
471:14
**request** 245:1
282:15 375:17
377:25 389:14
470:19 493:13
498:10 519:1
526:13 528:18
**requested** 243:23
245:1 356:9 377:8
392:22,25 393:3
421:10 424:12
425:3 440:9
478:22 505:16
**requestee** 244:7
**requester** 242:17
**requesting** 241:24
244:7 375:18

377:2 381:7
382:11 389:7
409:18 421:13
**requests** 412:20
419:16,24 443:7
443:12 447:16
448:1 523:2
**require** 296:16,18
486:4 506:17
517:16 525:14
526:7 528:8,15
**required** 245:6
250:22 330:18,20
375:2 390:16
391:15 424:13,16
429:25 457:6
467:21 484:9,15
500:11,17 503:18
504:13 512:14
531:8
**requirement**
453:8 482:13
506:18 508:1
514:3,13 523:14
528:8
**requirements**
243:13 245:20
246:24,25 414:20
415:5 426:23
427:2 484:8,19,23
496:5 499:25
**requires** 453:14
484:2
**requiring** 523:18
**reroute** 503:19
**research** 333:5,15
333:24 334:2,8
355:12
**reserve** 270:11
274:16

**residential** 457:4
**residents** 302:25
  456:25 468:12
  485:21
**resolve** 459:14
**resolved** 360:13
  360:20 361:9,14
**resolving** 361:16
**resource** 306:2
**resources** 300:19
  300:20 305:11,19
  306:3,7,17,22
  308:25 309:6,10
**respect** 254:4
  255:17 256:11
  422:7 423:17
  457:23 517:8
**respond** 289:20
  296:17,24 334:24
  335:3 376:11
  398:22 436:15
  437:1 503:14
**responded** 297:2
  334:25 335:1
  503:4,5,10,13
**responding** 298:4
**responds** 413:12
**response** 231:5
  260:18,20 261:13
  264:22 265:5
  304:19,24 335:5
  335:20 339:13
  399:25 407:25
  413:13,15 417:25
  436:17,19 447:14
  494:2 503:24
  504:4
**responses** 386:13
  413:25 493:16,20
  493:22

**responsible** 366:2
  436:11
**rest** 388:4 390:10
**restrictions**
  245:20 247:3
**restroom** 424:24
  513:13 518:16
**result** 414:21
**resulted** 343:10
  346:22 354:12
  393:8 422:22
  423:20 439:12
**results** 295:1
**resuming** 236:12
**retired** 270:9
**return** 359:23
**review** 238:4,6,8
  321:2 333:12
  334:12 335:10
  356:9 378:17
  380:23 383:20
  397:17 399:3
  404:19 405:11,12
  408:21 431:25
  432:3 433:13,15
  436:3
**reviewed** 237:24
  238:15 261:7
  320:24
**reviewing** 238:2
  367:22 371:17
**revised** 452:12
  453:3
**ridiculous** 447:3
**ridley** 234:4 281:4
  313:5
**rifles** 428:3
**right** 236:18 249:6
  260:16 262:10
  277:1 288:6,11
  291:10 292:6

293:12 294:23
302:18 303:6
304:23 305:3,6,18
315:1 337:6
341:12,16 346:8
346:25 348:5
350:21 352:11,12
357:20,23 358:17
359:9,22 360:17
365:6,14 376:19
378:7 384:23
385:17 390:6
395:13 397:1
399:23 400:1
401:1 406:12,18
407:2 409:15
410:12 412:3
423:7 431:3,13
432:13 433:24
434:2,8 435:21
436:8,12,13
439:22 455:1
456:19,23 458:20
459:8,22 463:16
463:16 464:7
467:25 468:17
470:14 471:4,9
472:25 475:1,10
479:4 481:13
483:23 485:13,18
485:25 486:13
487:3 490:3
491:18 494:3
497:11 499:8
501:15 502:2
503:7,20 504:20
507:13 508:8,17
509:3 510:18
511:3 516:4,17
518:15 530:7
531:2

**rights** 274:16
  276:2 288:16
**ring** 270:15,24
  271:2 272:5 277:8
**risk** 317:22
**rmr** 229:20 278:19
  310:19
**road** 263:12,16
  264:3,21 469:24
  492:1,6,9,12,13,24
  493:3 495:9
  509:24 510:4,18
  510:22 511:3
**roads** 503:6
**roadway** 493:6,9
  494:8,13 504:16
  508:14
**robert** 395:23
  435:25
**roberts** 301:17,19
  301:22 302:7,20
  304:9
**robinson** 230:3
  233:15 235:17,17
  235:25 236:4,9
  237:16 238:19,21
  239:15 241:5,13
  243:11 244:2
  246:16,21 247:23
  248:3,7 249:7,9,17
  250:21 258:20,21
  260:13 262:9
  263:2,5 264:1,18
  265:11 266:12
  267:21 269:22
  271:12,18,22
  272:3 273:15
  274:2,14,19
  276:17,24 279:3
  280:17 282:4,18
  282:20 284:11

Veritext Legal Solutions
866 299-5127

287:3 289:3
297:15 298:9
301:9 305:23
306:5,13,15
307:10,20 308:4
308:13,22 309:14
311:3 312:17
314:1,7,14,17,19
315:19,21 316:10
316:24 317:1,14
318:21,22 319:2,6
319:15 321:25
322:9 325:1
327:25 328:7,13
329:4,6 331:23
332:1,4,7,10 336:7
336:11 337:16,21
338:18 339:4,10
339:23,25 340:14
341:4 342:11
343:2,3 345:25
346:2,8,11 354:3
358:23 359:9,16
360:3 361:6 364:9
365:5,17,21
369:23 370:10
372:4,6 374:18,19
376:3,5 378:20
379:4,18 382:10
385:4,10 386:15
386:18 388:7,19
390:3,11 391:3,20
392:3,14 394:16
399:17 401:9
402:23 403:5
404:5,24 405:16
410:6 411:16,22
413:2,23 414:5
415:24,25 416:11
416:18 424:11
428:13 430:12

434:15,20 435:5
443:25 444:14
446:20 447:5,9,13
448:25 449:6,22
451:8 452:6
455:15 457:13,23
458:3 461:6
463:19 464:17
466:17,22 467:22
470:3,8 471:23
474:23 476:16,24
477:5,14,17
478:14 484:17
485:7 486:11
487:22 491:17
492:22 494:18
496:19,24 497:1
498:22,25 499:3,4
500:24 501:3,17
503:11,15 505:9
506:19 507:4
510:11,13 517:6
518:7,13,17,23
519:20 521:2
522:25 524:18,21
525:2,4 526:5,6
527:12,15 529:2
529:16,24 530:6
531:20,24 532:2,6
**robinson's** 246:19
**role** 341:19 483:15
513:24
**romanette** 516:4,4
516:6,10
**rome** 234:4 281:4
313:5
**romero** 298:15,17
298:24 299:2,21
304:11
**rosewood** 303:23
303:25 304:2

385:22 386:7
394:24 402:15
406:10,18 417:21
418:10
**rounds** 292:15,21
315:17
**roundtable** 408:8
**route** 375:9 492:5
492:10
**routed** 465:18
**rpr** 229:20 278:19
310:19
**rt** 349:21,24,25
**ruled** 530:23
**rules** 370:22
**runs** 501:7

**s**

**s** 231:1 232:1
311:10 332:16,16
348:1
**safe** 469:22
**safety** 246:4,6,10
247:6,7 256:24,25
256:25 292:9,12
296:13 300:18
305:12 316:19
450:14 468:23
485:21 487:3,5,13
488:21,25 489:16
489:24 498:12
515:18 516:7,13
517:2 519:7,14,17
519:21 521:11,17
521:24 522:7
529:1,8,9,10,13
**salient** 474:9,12,21
476:14
**san** 234:6 264:14
271:20 277:5
281:6 313:7
407:24

**sand** 263:12,15
264:3,21 492:1,6
492:13,23 493:2
494:25 495:8
508:8 509:24
510:4,11,17,22
511:2
**sanitation** 246:7
246:11 247:2
**santa** 510:23
511:10
**satisfaction**
446:22
**satisfactorily**
415:1
**satisfactory** 421:5
421:7 489:4,9
**satisfied** 384:21
496:9
**satisfy** 442:7
**saw** 282:23 321:20
405:9
**saying** 245:10
259:2 292:10
295:20 301:1
305:13 329:15
337:4,10 338:5,23
339:18 340:2
379:17 393:20
445:5,6 461:10
468:19 474:1
503:5,13,14
**says** 247:25
299:21 303:23,25
347:2 349:21
351:4 354:16
367:18 369:1
373:23 376:14,15
378:17 380:12
400:8,16,17 401:7
404:18 424:10

430:21 437:13
438:4 469:6
491:11,16 495:12
510:21 512:23
516:11 531:2
**scene** 335:13,23
348:10,11,17,18
348:20,22,23
352:20 355:18
356:21 488:12
**schedule** 242:2,4
315:5
**schematic** 425:5
508:6,11,13 510:6
**school** 316:21
**scope** 268:17
**screen** 269:15
352:12 373:10
385:6
**screenshot** 508:23
508:25
**scroll** 270:5
**se** 366:10,14
**seal** 282:15,18
284:9 314:12,14
**sealed** 284:12
322:6
**second** 231:5
242:22 248:9
260:9,17 270:13
292:16 346:5,6
385:8,25 406:9
409:21 413:11
418:8 419:12
421:10 423:10
426:3,4,5 433:10
450:24 458:12,13
458:14,24 459:1
459:11 460:5,23
460:25 503:2

**secondarily**
442:15
**secondhand**
358:12
**seconds** 328:25
329:5 332:2,4,8,9
**secretary** 255:5,10
**section** 249:20,24
252:6 325:13,14
325:15 333:6
334:4 340:12
341:1 349:2
350:17 351:7
356:10 368:25
375:8 376:6,21
379:19 400:13,18
404:21 409:8
473:4 487:8
492:13 493:2
495:12 510:21
523:18,22
**sections** 397:21
**see** 249:22 250:3
250:12 252:8,13
253:18,25 260:19
261:18 270:15,19
277:5 283:21
287:6 299:23
301:12,15 303:19
303:24 314:3
315:6 321:21
325:6,17 347:3
349:5,22 350:11
350:16 352:12
354:17,23 355:23
367:9 368:11
369:4,8 375:6,10
376:7,16,17,24
379:21 386:4
387:6 389:10
393:21 396:2,11

397:22 411:14,17
412:14 413:13
414:17 416:17
420:15 423:4
426:11 427:16
430:17,24 432:8
435:12,13 437:14
438:7 447:19,24
453:6 454:25
459:3,9 460:10
462:3 465:3
467:10 468:25
472:6,9 481:18
483:22 484:4
485:17 488:2
492:10 495:15
501:24 502:14
507:5,10,24 510:5
510:15,24 513:3
514:1 515:20
516:14,15 523:6
524:12,25
**seeing** 437:16
**seeker** 490:9
**seeking** 470:22
484:7,18 491:25
493:25
**seen** 253:11 266:1
270:12 295:18,20
321:17 351:15,22
470:25 514:7,11
520:15 524:6
**select** 406:4
**selected** 371:4
**selecting** 406:1
**self** 317:25
**selling** 388:3
**send** 294:25
334:19 335:10
356:8 394:20
401:19 405:10

**seniority** 347:20
347:24 348:1
**sense** 244:6 245:12
441:14 454:6
459:12 469:11,21
519:13,17 521:17
**sensitive** 271:4,9
272:13,21 273:7
362:21
**sent** 288:25 301:17
301:22 302:1
304:9 315:12,22
333:11 334:4,16
385:17,19 395:15
395:18 408:25
409:12,20 417:1,5
417:8 418:19
419:8 425:8,12
438:20 442:14
458:15 459:10
530:25
**sentence** 469:6
**sentences** 426:5
**sentiment** 326:17
**separate** 277:13
304:7 309:19
375:9 516:10,16
**separately** 229:10
229:13 272:4
**september** 232:8
232:16 286:21
298:19 324:21
407:16 417:4
497:7 534:21
**sergeant** 256:15
256:16,19 270:4,6
283:11,20 284:2
287:25 298:19,20
298:21 299:2,4,7,9
299:10,12,17,19
299:20,21,25

Veritext Legal Solutions
866 299-5127

300:8 302:1
304:10,10 325:16
326:3,14 329:11
329:19 332:15
333:16 335:19,20
342:22 343:6
344:4,11,12,20
345:2,7,10,14
354:22,25 355:4,4
355:6,6,7,8,13
356:6,16 366:16
411:10
**serial** 523:3,8,12
523:19 524:5
**series** 250:11
252:13 269:23
298:13 435:20
501:6,9 515:16
**seriously** 444:6
**serrato** 395:21
399:22 400:4,4,23
401:10 404:16
**serrato's** 405:1
**serve** 371:5
**server** 330:22
**service** 433:11,13
**services** 244:23
250:2 251:20
375:16 381:8
382:22 383:15,16
419:4,10 431:10
431:23 436:8,10
454:18 459:18
460:9,14 461:5,8
461:16 462:11
465:14 479:16
506:15
**session** 237:1
367:11
**set** 242:4 272:8
377:11,22 378:2,7

379:24 388:8
407:20 423:10
480:14,16 489:8
495:20 505:17
**setting** 366:20
**setup** 424:20
512:6
**seven** 332:8 477:6
477:11,19,20
478:2
**sexual** 398:1,3
**share** 247:24
**sharon** 298:15
299:2 329:11
510:23 511:10
**sheet** 375:10
**sheriff's** 264:14
395:5
**shift** 260:8 330:22
**shoot** 292:24
510:22 511:9
529:10
**shooter** 292:17
**shooters** 316:21
**shooting** 283:1
**shootings** 316:21
316:21
**shopping** 303:2,3
**short** 299:22
**shorthand** 233:6
280:6 286:11,11
312:6 324:11,11
534:11,11
**shoulder** 497:19
**show** 307:1 408:1
490:18 498:25
512:15 515:17
516:12 517:18
519:3
**showed** 303:13
400:24 496:15

**showing** 517:21
520:13
**shown** 435:7,9
519:12,18 520:5
**shows** 456:3
**sic** 332:16
**side** 250:10 319:3
**sidewalk** 276:8,12
440:2 504:16
510:22 511:3,8
512:11,16,24
**sidewalks** 239:6
453:24 503:6
**signature** 250:3,6
253:18 261:5
285:1 286:23
323:1 324:23
533:1 534:23
**signed** 261:8
331:12 456:25
468:18
**signs** 249:4 347:8
347:20
**silicon** 510:2
511:15 512:15
**similar** 273:6
490:14
**single** 383:10
422:5 453:18
455:24
**sir** 303:4 419:21
526:18,25
**sit** 254:11 255:18
256:2 293:4 294:1
294:13 300:10
320:3 326:6 335:1
345:13 383:9
406:24 407:18
413:7 414:8,12
452:16 473:25
531:13

**site** 289:13,17
294:5,21 375:7,9
508:6,10,13
527:22
**situation** 247:14
264:10 265:1
269:12 273:5
296:23 303:16
317:11 340:10
356:25 357:1
362:15 375:22
408:7 475:13
486:22 517:23
528:5
**situations** 251:8
307:18 427:6
**six** 326:23 327:22
361:25 362:5,6
372:25 410:11,17
**sketch** 499:23
500:3
**skip** 322:4
**slightly** 369:24
**small** 340:25
341:14
**soares** 332:15
333:14,16 335:19
335:20 342:22
343:6 344:4,9,11
344:12,21 345:2,7
355:5,6 356:7,16
**social** 294:5,17
**solid** 396:9
**solution** 326:4,10
326:15
**solutions** 234:20
281:20 313:22
**somebody** 296:19
456:8,9 483:15
**somewhat** 294:6
364:23

soon 291:13
505:14
sorry 239:16
246:14 265:21
308:3 329:18
330:14 342:25
345:23 362:10
442:5 450:7
459:23 467:2
sound 424:18,24
sounded 340:9
sounds 268:5
334:17 338:5
source 294:22
295:1
sources 272:25
southern 381:22
speak 267:22
275:2 304:10
342:12,14 343:5,9
345:10 370:7
378:19 497:16
498:6 531:2,17
speaking 241:3
266:10,11 272:14
296:12 299:2
329:8,12 357:13
440:18 505:6
speaks 254:5
333:18 338:13
339:1 340:4 342:3
342:8 401:15
405:4 424:5
427:21 439:6
440:4 451:6
482:10 503:9
special 231:3
238:23 239:1,5,7
239:20,24 240:12
240:17 241:4,7,16
242:2,7,23 243:13

243:15 244:4,7,16
245:22 246:24
247:11,18 248:17
248:22 252:19
254:10 256:15
268:20 299:6,16
299:17,19 304:6
363:17,20,25
364:13,16,17,20
365:23 366:3,20
366:23 367:2,7,12
368:8,14 369:3,10
369:12,15 370:1
370:13,14,19,25
371:8,13,15,19,20
372:1,8 373:18
374:1,8 375:12
376:3 381:3,11
384:2 387:6,11,17
387:19,25 388:6
388:16,22,25
389:23 390:6,14
390:17,23 391:7
391:12,18 392:21
396:18 407:25
410:15,19,21
411:11 417:22
420:14,21 421:2
426:16,18 429:3
430:23 431:2,6,8
432:16 433:7
435:21 436:11
437:19 441:10,14
441:19,24 450:11
451:12 452:9
453:10,16,23
454:4,15 455:10
455:17,20 456:5,6
456:17,23 458:9
458:25 459:23
460:1 461:1,17

462:10 463:23
465:8 467:20,24
468:11 469:3
471:9 475:15
476:13 480:8,12
480:18 481:7,12
483:4 485:16
490:14 492:20
497:25 498:4
517:8
specific 239:2
240:4 247:14,14
252:1 266:11
272:14 330:9
342:6 357:12
362:4 383:7
391:11,14,14
392:21 414:24
419:15 423:20
425:5 426:20
440:18,19 442:24
444:9 445:5
447:16 448:1,4
474:1 487:7 496:2
496:5 503:22
504:24 506:1,23
511:16,17 520:1,9
522:20
specifically 239:7
242:24 243:15
254:3,15 271:18
293:5 300:24
301:4 318:15
343:8 356:2
388:15 402:4
421:24 443:4
510:14
specificity 390:21
509:12,17,21
510:1 511:24
512:5

specifics 415:16
415:18,19
specified 286:8
324:8 534:8
specifies 375:8
specifying 523:12
speculate 393:17
speculation
267:10 288:21
340:6,20 369:19
404:4,12 405:5
415:23 430:5
451:22 463:13
464:13 484:12
516:23
speed 302:3
304:14,18 343:15
469:24
spend 238:20
split 292:16
spoke 267:24
302:23 342:24
343:7,12 384:8,9
388:24 408:9,15
438:21 449:15,16
460:2 497:21
spoken 344:10,13
staff 249:24 250:2
252:18 258:18
262:24 288:2
296:14 300:15
356:24 395:7
434:4 466:11
471:14 473:8
475:4 478:16,22
479:1,2 495:24
496:1 501:10
515:18 516:12
staffed 275:16
stage 511:18

Veritext Legal Solutions
866 299-5127

**stakeholders**
394:23 402:3,6
406:11,16,21
408:3
**stamp** 270:1
**stand** 436:17
**standard** 247:10
428:15 432:3
453:13 504:11
**standards** 286:19
324:19 506:6
521:21 534:19
**standing** 513:5
**stands** 429:1
**stanford** 283:9
406:14
**start** 239:16
241:15 246:16
261:11 265:22
272:16 328:8,24
330:1 331:7,23
332:1 336:8
359:16 393:20
484:2 487:23
501:13
**started** 238:22
299:10,12 301:23
303:10 320:10
351:6,7,10,14
352:5,22 460:17
**starting** 248:20
298:13 314:21
348:3 412:13
426:6 444:17
458:4 465:9 467:9
468:21 490:23
497:5 501:18
507:7,7
**starts** 261:17
265:13 347:22
396:8 437:6

447:22 453:2
458:23
**state** 231:7 235:16
246:2 263:22,24
266:6 286:12,25
307:7 324:12,25
327:15 370:18
427:5,12 428:3
430:19 443:4
463:3 483:5
489:20,22 494:15
496:16 534:12,25
**stated** 264:25
290:2 316:2
317:10 334:3,9
339:6 342:5
344:15 371:10
387:14 388:23
392:7 405:9 427:4
437:25 441:22
465:24 470:24
475:22 479:14,17
480:6 496:14
502:3 504:3 520:3
521:9,10 526:22
**statement** 246:18
333:15 337:10
355:19 387:5
404:23 430:10
**statements** 293:2
293:20,21,23,25
294:10,12 329:20
**states** 229:1 235:7
275:9 278:1 310:1
326:7 405:7
444:23 523:22
524:1 525:18
**stating** 505:14
**stay** 302:15,16
347:17,19

**step** 252:25 376:10
406:9 461:4,12
463:20 465:20,23
465:24 475:14
**stepping** 409:21
**steps** 252:17 253:3
391:16
**steve** 395:19
**stick** 315:4
**stood** 382:19
387:3 389:17
392:9 396:16
397:15
**stop** 300:1,8 301:2
303:9 305:8 336:2
456:13
**stopped** 328:20
329:8
**stopping** 328:1
**store** 330:8
**stored** 330:13,24
331:1
**straight** 464:5
**street** 234:5 276:6
276:7,10,13 281:5
313:6 454:9 468:4
468:7,9,13,14
**streets** 244:11
366:13 453:19,24
456:16 510:18
**strike** 245:4 258:3
274:24 283:8
299:11 304:7
315:20 316:25
342:13 344:7
386:16 394:4,11
394:12 395:25
461:16 503:4,16
513:1 517:13
520:18 521:20
524:2

**strip** 263:11,15
264:3,20 265:4
266:2 267:5
**subfolder** 321:15
321:16 330:5,5
**subject** 264:4,24
266:21 267:6
271:15,15 282:9
287:17 343:8
395:16 438:5
470:16,18
**subjective** 308:12
**submit** 405:10
484:3 500:3,7
**submits** 499:22
**submitted** 254:14
257:18 269:7
327:9 375:13
384:11,16 399:2
404:20 409:4
432:21 433:15
437:25 459:1,5
479:7 504:17,18
508:20 520:21
521:7
**submitting** 393:21
**subpoena** 232:12
416:20
**subscribed** 286:21
324:21 534:21
**subsequent** 397:12
**substance** 269:12
271:8 337:5
338:19,22 339:11
339:15,17 340:1
340:13 394:19
407:15
**substantive** 426:4
**sued** 363:9,15
**sufficient** 422:16
455:9 486:3 502:7

503:10
**suggest** 379:22
  439:25
**suggested** 355:14
  414:20 472:23
  526:20
**suggestion** 480:20
  481:9
**suggestions** 448:4
**suggests** 376:22
  400:12
**suite** 233:18 234:5
  280:20 281:5
  312:20 313:6
**supervisor** 333:20
  343:12
**supervisors**
  356:24
**supervisory**
  487:25 488:4,8,11
  488:17
**supplemental**
  231:5 260:17
  261:12 353:16
**supplying** 523:3
**support** 327:14
  475:8
**supported** 327:21
  473:15
**supposed** 376:11
  378:10 523:15
**sure** 238:16 239:2
  246:3 250:7
  252:23 258:6
  261:22 273:13
  275:23 276:17
  282:24 283:19
  290:9 297:4
  305:24 306:20
  325:9 327:12,20
  329:1 333:9 335:4

344:12 368:21
  377:9 391:18
  396:9 438:13
  441:10 451:15
  460:2 461:11
  465:21 483:16
  491:13 514:11
**surgery** 497:19
**surrounding**
  494:8
**surveillance**
  294:23 295:1,5,8
  296:11
**surveilling** 295:22
**suspect** 362:8
  395:17 396:2
  401:8
**suspected** 362:12
  362:25 396:4
  405:8
**suspects** 400:14,16
  401:16
**suspicious** 349:17
**swear** 236:3
**sworn** 233:8 236:6
  280:9 286:7 312:9
  324:7 534:7
**system** 331:14,18
  353:13 421:6
  424:25 498:2

**t**

**t** 231:1 232:1
  311:10
**tag** 248:8
**take** 237:3 249:9
  276:15 292:16
  319:6 327:25
  331:6 335:13
  344:17 359:10
  367:5 373:1
  375:23 391:15

402:22 405:17
  421:14 432:18
  434:16 440:22
  445:3 465:7
  476:22,24 477:25
  481:15 492:3
  494:22 498:19
  506:13 517:13
  518:9,15 529:16
**taken** 229:19
  236:13 278:18
  286:9,10 310:18
  324:9,10 328:4
  330:25 331:4,19
  331:21 344:18
  350:1,3,8 475:14
  534:9,10
**takes** 247:17 496:1
**talk** 239:9 242:21
  251:25 256:18
  283:10 304:13
  342:18,21 344:8
  344:12 395:24
  407:20 433:10
  450:23 497:22,24
  498:3
**talked** 239:25
  240:10 270:20
  344:8 371:14
  408:19 409:21
  439:7 461:22
  467:23
**talking** 252:13
  317:17 326:3
  328:19 359:2
  360:18 369:5
  388:14 411:15
  432:1 442:11
  488:8 518:24
  530:4

**talks** 453:5 528:2
**team** 366:1,5,7,9
  380:22 381:3,11
  484:3
**teardown** 374:25
  375:1
**technical** 263:21
  319:18 322:1
  361:2
**technically** 387:25
**ted** 234:19 235:11
  281:19 313:21
**telephone** 382:1
**telephonic** 249:8
**tell** 238:12 289:11
  343:14 353:8,21
  399:4 407:3 442:1
  444:1,20 445:10
  449:18 511:7
**telling** 394:17
**temporarily**
  359:19
**temporary** 424:24
**ten** 513:4
**tenor** 326:21
**tent** 424:22,23
**tenure** 293:7
**term** 316:4 317:10
  484:23
**terminate** 478:4
**terms** 256:18
  305:17 329:2
  447:17
**tesla** 491:25
**test** 231:9
**testified** 236:7
  241:18 245:23
  247:13 282:3
  357:17 384:8
  461:21 471:5
  479:13 480:23

Veritext Legal Solutions
866 299-5127

519:22
**testify** 357:10,14
  384:14 422:11
**testifying** 236:21
**testimony** 285:6
  309:2 314:13,16
  323:6 339:1 390:7
  394:12 459:19
  479:22 528:23
  533:6
**text** 269:24 270:3
  270:8 283:11,20
  284:3
**texts** 270:3
**thank** 249:11
  260:23 276:18
  346:9,9 361:5
  532:6,12
**thing** 245:19
  259:15 302:22
  307:11,19,21,24
  308:6 422:5
  430:17 527:6
**things** 239:6
  241:11,25 257:1,9
  259:13 305:20
  358:22 387:13
  388:13 390:18
  427:7 439:1
  480:21 485:19
  486:12 487:2,11
**think** 241:18
  242:12 245:23
  247:13 249:6
  251:13 267:25
  304:6 307:11
  319:17 320:16
  322:3 328:1 335:4
  337:1 338:12
  361:23 383:22
  398:2 404:8

410:10 472:19
477:7 484:14
524:18 527:17
529:6,18 532:2
**thinking** 422:5
**third** 273:14,20
  274:11 314:21
  317:24 395:24
  396:7 397:16
  400:3 437:7
  447:21 458:4
  497:5
**thirdly** 442:16
**thirds** 501:18
**thoroughfare**
  244:9
**thought** 459:19
**thoughts** 404:21
**thousands** 292:21
  315:16
**thread** 365:19
  394:4,6 412:3,5,9
**threat** 293:4
**threaten** 293:18
**threatening**
  293:22,24 294:6,9
**three** 270:15,24
  271:2 272:5 275:5
  277:8 332:2,4,8
  341:7 365:7
  385:12 499:22,23
**till** 348:19
**time** 235:2,2
  236:16 238:20,23
  239:25 240:19
  241:9,14,15,15,23
  241:25 242:6,7,9
  242:11,18 247:10
  247:17 249:13,16
  255:7 256:5,15,16
  257:2,17 259:7

268:22 270:20
276:20,23 286:8
286:10 287:19
288:20 289:17,19
290:15 292:8
294:25,25 295:6
295:19 296:15,24
297:2 298:21,24
299:12 300:21
301:20 302:14
304:22 305:5
315:11,22 316:2,8
316:20 319:11,14
320:10 324:8,10
326:8 328:3,6,24
330:11,17,19
331:21 337:11
340:17,17 341:15
341:24 342:4
346:4,4 347:11
348:5,7,10,23
349:1 350:2,3
352:19,19 355:7
359:12,15,21,22
361:18 362:7,12
363:14,18 368:16
368:17,22 369:9
371:14 376:17,23
378:10,18 379:8
380:13,14 384:8
387:3,22 388:5,8
388:12,14,23
389:13,17 392:1,5
392:8 393:6 394:9
395:23 396:5,15
397:15 400:5
401:21 402:23
403:1,4,10,13,14
406:20 408:2
410:10 412:24
414:15,20 415:5

425:1 426:21,22
427:1 428:19
434:18,21,24
435:2 436:1,24
438:5,10,16 439:4
439:8,10,12,14,15
440:14,19 441:17
441:20 442:24
443:12 444:7
445:9,13,14,25
446:2,15 447:17
448:1,4 450:10
459:24 462:25
463:21 465:16
475:18 476:10,23
477:2,13,20,21,25
478:2,10,13 480:1
480:18 482:7,19
483:2,12,18
485:17 495:20
496:13 497:15,18
506:13 518:10,19
518:22 522:16
529:6,20,23 532:5
532:8 534:8,10
**timeline** 247:12
  257:10
**times** 237:9 293:6
  295:14 320:4,9,13
  347:2 357:6 392:7
  403:15,16 443:17
  496:12 501:24
  517:8 522:15
**timing** 382:7
  401:25 474:8
**timothy** 314:23
**tmaster** 234:8
  281:8 313:9
**today** 235:13
  237:21 254:11
  255:18 256:2

Veritext Legal Solutions
866 299-5127

293:4 294:1,13
300:10 320:3
326:7 335:1
345:13 383:9
388:23 406:25
407:19 410:9
414:8,12 429:2
452:16 461:21
473:25 478:2
493:16 520:14
531:13
**today's** 237:1
**todd** 234:3 235:21
237:8 263:3 281:3
313:4 531:22
**toews** 483:16,16
497:16 498:15
501:14,23 502:11
502:25 504:10
505:11,25 507:17
**told** 262:4,15,18
262:22 268:16
303:11 326:25
394:8,18 407:14
442:7,25 445:14
445:25 446:5
461:7,24,25
**tone** 294:7,9
**top** 303:23 314:20
375:7 414:13
435:23 502:1
**total** 477:19,23
482:13
**totality** 335:9
405:12
**totally** 301:25
**touchy** 302:21
303:16
**track** 498:23
**traditional** 469:7
469:16

**traffic** 239:6 243:2
243:7 244:5,9,10
244:12,18 245:3,4
245:5,11,14
256:25 424:20
450:13,14 485:20
485:25 486:4,12
486:15,18,20
489:3 499:23
500:8,9,10,16
503:18,19,21,22
504:1,1,12,14,19
505:1 515:19
516:7,13 517:2,5
518:2 522:7
**training** 341:10
**transcribed**
286:13 324:13
534:13
**transcript** 277:15
284:14 286:14,17
286:18 309:21
322:12 324:14,17
324:18 532:11
534:14,18,18
**transcription**
285:6 323:6 533:5
**transcripts** 237:24
238:5,7,9
**transit** 276:9
**transited** 276:5
**transiting** 275:25
**transportation**
244:20 469:19
**traveled** 469:24
**treated** 448:19
450:20 459:7
**treating** 449:3
**tresmontan**
296:13 385:20
416:23,25 417:9

418:4
**trespass** 302:16
**tried** 377:22 378:2
**truck** 509:23
**true** 285:5 286:14
292:1 323:5
324:14 369:9
429:1 468:16
475:5 528:20
533:5 534:14
**try** 257:12,16
258:4,14 319:7
320:22 321:10,12
321:21 439:2
452:22 477:5,18
478:1
**trying** 256:21
257:5,22 259:4
318:10 322:1
325:14 326:10
340:23 363:16
364:21 391:19
392:20 428:22,25
498:23
**ts** 321:16
**turn** 261:1 325:13
330:20 423:2
444:15
**twice** 320:17,17
**two** 248:24 249:9
298:10,23 301:10
314:10 321:16
337:22 341:7
355:17 358:22
361:3 394:24
420:11 423:14
426:5,5 441:11
447:4 457:19
477:23 481:19
501:18 508:7
509:17 514:7

516:3 517:3 518:8
518:16 529:17
**type** 247:3,8 252:4
318:3 349:3,10,15
349:16,21 350:15
350:20,24 351:9
351:13,16 352:2
352:15 427:6
454:3 486:20
528:11
**types** 291:23 349:9
349:11 522:10,11
523:2
**typewriting**
286:13 324:13
534:13
**typical** 257:7
351:1 409:25
425:13 431:4

| u |
| --- |

**u** 330:19
**ultimate** 356:8
450:25 473:17
**ultimately** 433:4
**unaware** 301:25
**underage** 401:18
**undersigned** 285:3
323:3 533:3
**understand**
236:18,21 258:25
277:1 331:14
338:19,22 339:12
339:15,17 357:19
357:22 364:21,24
390:1 391:12
392:19 421:25
448:21 479:21,22
485:11 486:9
488:7 494:2
503:12 520:25
526:4,24

**understanding**
254:3,17 255:9
259:7 261:23
262:3 265:7
266:15,16 267:13
267:19 268:12
269:3 290:17
296:12 301:21
302:19,20 326:13
327:11 340:16
350:23 355:3
356:12 389:12
401:14 404:7
405:1 425:7
460:12 465:17
493:8 494:6 513:1
515:11 516:19
526:15 531:6
**understood**
348:21
**unfamiliar** 268:23
**unintelligible**
389:24 390:25
391:9
**unit** 235:4 347:2
**united** 229:1 235:7
275:9 278:1 310:1
**unloaded** 264:3,23
267:5 268:15
288:6 289:16
293:8 305:6
361:12
**unquote** 388:6
476:13
**unsafe** 469:8
**unsure** 361:15
**unusual** 520:6
**unwritten** 242:10
370:21 428:14
430:16 483:1,3
524:1 525:10

528:14,19
**update** 417:13
423:5
**updated** 367:16
368:20
**updating** 418:2
**upheld** 479:3,8
**uphold** 473:18,23
475:4,9,21
**upholding** 466:14
466:16 474:25
**upload** 331:15
494:23
**uploaded** 330:22
478:15 496:20
**uploading** 309:12
**use** 249:20 263:23
267:17 408:18
434:21 445:15,16
477:20 487:25
488:5 507:22
518:16 523:20
527:3
**uses** 467:23

**v**

**vague** 240:25
243:8,17 250:17
263:18 264:6
266:7 267:8
288:19 297:10
305:21 306:9
307:3,14,23
308:17 327:16
337:8 338:10
339:19 342:2
364:2 369:17
370:4 372:2
378:25 379:10
382:9 389:25
390:24 391:9
410:2 412:23

413:17 415:21
428:7,25 430:5
443:15 446:9
451:2,20 455:12
463:12 464:11
467:15 474:14
484:10,22 486:5
487:18 492:15
506:8 520:22
**valley** 407:23
510:2 511:15
512:15
**van** 513:9
**various** 240:11
254:15 290:12
298:14 395:16
402:3 406:10,21
409:22 497:9
**vary** 247:8
**vehicle** 467:18
468:8 469:5,20
**vehicular** 503:21
503:25 504:14
**venture** 406:14
**verbally** 511:22
**verbatim** 338:13
423:23
**verification** 261:2
**verified** 493:19
**verify** 271:21
**veritext** 234:20
235:10,12,14
281:20 313:22
447:6
**version** 351:22
367:15 385:6
**versus** 337:19
525:25 528:10
**viability** 404:21
**vicinity** 513:11

**victim** 398:13
401:17 473:3,3
**video** 235:3,9
329:8 424:23
522:23
**videoconference**
229:16 233:6
278:14 280:7
286:6 310:14
312:7 324:6 534:6
**videographer**
234:19 235:1,12
236:2,8 249:12,15
276:19,22 281:19
313:21 319:10,13
328:2,5 359:11,14
402:25 403:3
434:23 435:1
477:3,8,12,16
478:9,12 518:18
518:21 529:19,22
532:7
**videotaped** 229:15
233:1 278:13
280:1 310:13
312:1
**view** 308:14,23
340:16 380:23
399:9 403:25
404:9,25 421:20
422:20 423:25
429:5 450:19
473:14 476:5
509:14 511:16
522:10 527:6
**violated** 473:5
**violates** 237:13
**violating** 274:12
**violation** 336:20
336:24 337:5
350:18 355:20

| | | | |
|---|---|---|---|
| 356:14 | 521:10,17 522:23 | 357:23 358:14,16 | **wishes** 460:8 |
| **violations** 467:18 | 528:10 | 362:16 525:20 | **witness** 233:7,9 |
| 467:19 | **wants** 393:5,5 | 527:6,24 528:3,7 | 235:22 236:3,6 |
| **violence** 275:24 | 456:9 505:15 | **weapons** 266:20 | 238:16 239:13 |
| **violent** 275:10,15 | **warrants** 462:13 | 266:20,20 292:17 | 241:3,6 243:20 |
| 293:16 | **watch** 355:9 | 292:20,22,25 | 247:25 248:2 |
| **voice** 235:15 | 456:12 | 293:8 302:13,24 | 250:20 261:15 |
| 328:18 329:7,9,10 | **way** 254:24 259:3 | 315:16 332:22 | 262:6 263:20 |
| 329:12 336:16,17 | 293:22,24 300:8 | 350:18 408:1 | 264:10 266:10 |
| 336:23 338:5 | 302:18 314:22 | 429:4 526:16,21 | 267:13 272:2 |
| **voices** 329:15 | 322:1 352:1 353:8 | 527:20,21 | 280:8,9 282:2 |
| 332:11 336:14 | 353:19,21 375:20 | **wearing** 356:5 | 286:7,20 288:23 |
| 337:22,25 | 384:21 401:24 | **website** 366:24 | 297:12 305:24 |
| **volume** 229:17 | 409:25 413:16 | 367:2 368:21 | 306:11,14 307:6 |
| 235:4 245:5 | 414:7 421:5,8,19 | 407:2 | 307:17 308:2,10 |
| 278:15 297:7 | 423:22 439:22 | **wedding** 456:10 | 308:21 309:4 |
| 310:15 | 441:25 455:21,22 | 456:18 | 312:8,9 314:6 |
| **vs** 229:6 235:6 | 457:22 468:17 | **week** 298:23 | 316:2,17 317:10 |
| 278:6 310:6 | 484:6 497:5 | **weeks** 486:23 | 324:7,20 327:19 |
| | 501:18 505:17 | 497:19 | 329:3 337:18 |
| **w** | 524:10,23 525:24 | **welfare** 317:17 | 338:12 339:6 |
| **w** 234:12 281:12 | 530:18 | **went** 240:18 | 340:7,22 342:5 |
| 313:13 | **ways** 420:20 430:9 | 264:20 265:19 | 345:23 346:1 |
| **wagstaffe** 395:19 | 480:10,15,15 | 364:21 372:18 | 358:21 359:7 |
| **waiting** 411:16 | **we've** 269:23 | 395:4 406:24 | 364:5 365:19 |
| **waive** 359:22 | 275:8 276:14 | 431:17 492:8 | 369:21 370:7 |
| **want** 238:17 | 300:16 332:7 | **whatsoever** 358:4 | 374:16 376:4 |
| 241:24 242:16 | 336:12 359:2 | 511:24 525:25 | 378:15 379:3,13 |
| 261:16 282:17 | 365:18 370:8 | **whereabouts** | 387:24 388:12 |
| 328:22 329:1 | 385:11 402:21 | 295:11 | 390:1,9 391:1,10 |
| 337:9 388:4 | 419:21 434:15 | **whereof** 286:20 | 392:7 401:6 |
| 395:24 424:2 | 472:16 476:21 | 324:20 534:20 | 404:16 405:7 |
| 428:18 437:7 | 477:3 489:14 | **white** 270:14 | 410:4 411:19 |
| 492:18 506:25 | 490:17 506:25 | 272:15,16,17 | 413:1,19,24 414:3 |
| 518:10 519:8,14 | 509:18 514:7,10 | 277:8 | 416:7,17 424:9 |
| 532:10 | 518:5 | **william** 412:13 | 428:11 430:8 |
| **wanted** 333:8 | **weapon** 289:2,5 | **willingness** 414:15 | 443:20 444:8 |
| 359:17 432:10 | 332:23 333:4 | **wish** 305:8 430:21 | 446:12 447:12 |
| 454:8 456:9,13,22 | 338:16,17,24,24 | **wished** 300:1 | 448:23 449:1 |
| 462:1 486:23 | 340:18,24 341:3 | 301:2 433:20 | 451:5,24 455:14 |
| 492:19,20 520:11 | 341:24 342:16 | 464:4 | 460:22 463:15 |
| 520:12,16 521:9 | | | |

Veritext Legal Solutions
866 299-5127

464:14 466:19
467:17 471:22
474:17 476:11
484:14,25 486:9
487:20 491:16
492:18 494:12
496:14,25 503:13
505:4 506:12
517:1 519:17
520:25 522:18
524:14 525:3
527:14 528:25
530:4 531:13
532:1 534:7,20
**witnesses** 238:1,11
238:16
**woman** 268:1
328:19
**word** 296:18
**words** 290:9 301:2
339:8 342:9 399:8
399:9 429:14,22
446:1 454:8 488:9
**work** 237:14
241:24 272:9,24
275:3 298:23
321:10,12 322:4
341:5 356:19
367:25 432:6
452:3 497:20
499:21
**works** 244:20,21
251:16,16 452:4
469:19 483:10,14
500:19 504:22
**wrapped** 529:18
**write** 334:10 386:1
399:9 401:19
430:10
**writes** 426:8
427:10 509:10,11

**writing** 353:12
396:15 462:15
484:3
**written** 240:7,11
240:16,20,23
242:8,22 246:12
246:23 357:2
369:25 370:21
378:9 379:22
383:19,19 386:12
388:15,21,24
416:1 424:14,17
426:13,20,23
428:14 430:15
432:24 451:10,15
453:9 460:9 463:5
463:22 467:13
469:3,9,12 477:15
481:22 482:2,6,14
482:23 502:19,23
508:2 519:4,22
523:9,25,25 525:7
528:13,19
**wrote** 304:6 386:6
386:20 404:13
427:22 511:23

**x**

**x** 230:1 231:1
232:1 279:1 311:1
311:10
**xavier** 234:11
235:24 281:11
313:12

**y**

**y** 332:15
**yeah** 236:4 268:5
272:2 316:17
322:3 329:25
330:17 338:6
343:9 402:23

423:13 459:9
491:16 510:15
518:7
**year** 236:13,14
237:25 245:24
270:12 527:8
**years** 293:12,15
316:9 341:7
361:25 362:5,5,25
363:8 403:8,9
407:19
**yep** 510:19

**z**

**zeleny** 229:4
234:22 235:6,18
235:20 236:1
254:14 259:17,24
264:2,22 266:24
266:25 267:3
269:1,7 270:17,18
270:21,25 271:11
272:5,8,13,22
273:3 277:9 278:4
281:22 283:2,4,5
283:10,18 288:10
289:7,15 290:12
290:14 292:9,12
292:18,23 293:6
293:15 294:10,18
294:23 295:2,5,14
295:18,25 296:11
296:15,22,25
297:6 298:14
299:14 300:1,13
300:17,22 301:2
301:25 302:10,23
304:11,16,23
305:1 306:7,17
307:1,13,22 308:7
308:16,24 310:4
313:24 315:1,9,12

315:23 316:11
317:3 318:11,25
319:20,23 320:7
320:15,20 321:3
326:19 327:2,10
329:16 332:21
334:10 341:23
342:15 346:18,23
355:20 356:5,13
357:19 358:1,5,8
358:24 360:19
361:7,11,19 362:1
362:8,13,17,22
363:15,19,25
364:6,8,11,12,19
366:19 369:9
370:15 372:1
373:7,20,24 374:5
374:11 377:11,15
377:19,23 378:3
378:23 379:6
381:4,7,15,21,25
382:12,16,20
383:1,8,20,23
384:16 386:12
387:10 389:15,19
390:10,22 391:4
392:15 393:7,13
393:21 394:2,24
395:3,17 396:4,25
397:9,13,18
401:24 402:18
404:1 407:9,17
408:1 409:13
413:11 414:10,14
415:4,10 417:1,25
418:19,23 419:23
419:25 420:8,20
421:1,19 422:21
423:19 424:2
428:19 429:25

431:12 436:15,21
437:2,13,17,22
438:4,10,21,23
439:5,17 440:1,10
440:11 441:5,17
441:20 442:1,7,25
443:10,23 444:1
444:10,21 445:5
445:10,14,19,25
446:5 447:15
448:1,5 450:15
452:13,19,22
458:6,15 459:5,6
460:8,15,22 461:8
462:1 466:2,18
470:21 471:7
472:21 473:14,22
474:11 475:23,25
476:6,12 479:7,10
479:18,23 480:2
480:16,20 481:6
481:11 482:7,19
483:13,19 492:14
493:24 501:10,14
502:2,16,22
505:10 507:9,21
508:16,23 509:20
511:21,21 512:13
515:23 517:23
519:2 520:21
521:5,9 522:22
523:19 524:9
526:19 527:24
528:9,15 530:14
530:16,23 531:1
531:19

**zeleny's** 254:9
268:20 288:15
289:13,25 295:11
296:5 297:21
298:4 300:5,9

302:3,5 326:5,11
343:10 345:11
354:13 357:10
358:24 360:12
367:3 368:3,18
369:16 372:8,14
373:3 374:7 377:5
382:6 383:13
384:14 386:8
391:22 393:25
396:14 406:7,11
406:21 407:21
408:22,25 409:9
412:17,22 413:25
414:21 417:10,22
419:1 422:3,11
427:19 433:8
435:21 436:3
437:4 438:17
439:13 441:3,19
448:15,19 450:4
454:22 458:22
465:18 467:5
471:11 472:11
474:6 475:21
478:24 479:4
497:10,17,24
498:4,9 499:13
502:12 503:24
504:5 505:19
507:12 509:16
511:17 516:20
520:10,19 524:24
526:12 527:18
530:1 531:7

**zero** 328:24 329:5

**zoom** 233:15,16
234:3,12,19,22
280:17,18 281:3
281:12,19,22
312:17,18 313:4

Veritext Legal Solutions
866 299-5127

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Exhibit G

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3
    _____
 4                                  )
                                    )
 5   MICHAEL ZELENY, an individual, )
                                    )
 6           Plaintiff,             )
                                    )
 7       vs.                        ) Case No.:
                                    ) CV 17-7357 JS
 8   EDMUND G. BROWN, JR., an       )
     individual, in his official    )
 9   capacity; XAVIER BECERRA, an   )
     individual, in his official    )
10   capacity; CITY OF MENLO PARK,  )
     a municipal corporation; and   )
11   DAVE BERTINI, an individual,   )
     in his official capacity,      )
12                                  )
             Defendants.            )
13                                  )
    _____)
14
15
16       VIDEOTAPED DEPOSITION OF MATTHEW L. MILDE
17             San Francisco, California
18              Thursday, March 5, 2020
19                    Volume I
20
21   Reported by:
     CHRIS TE SELLE
22   CSR No. 10836
23   Job No. 3985719
24
25   PAGES 1 - 217
```

Page 1

| | | |
|---|---|---|
| 1 | Q. Do you remember the date of that letter? | 10:54:50 |
| 2 | A. No. | |
| 3 | Q. Do you remember if it was the denial of | |
| 4 | the initial application, or the appeal? | |
| 5 | A. I can't say. | 10:55:02 |
| 6 | Q. Do you think you will recognize that | |
| 7 | e-mail when I show it to you? | |
| 8 | A. Yes. | |
| 9 | Q. Did you see any other documents, other | |
| 10 | than the e-mail that you just described? | 10:55:16 |
| 11 | A. Not that I can remember. | |
| 12 | Q. Were there any other documents on the | |
| 13 | table in front of you? | |
| 14 | A. Yes. | |
| 15 | Q. Can you recall any of those documents more | 10:55:41 |
| 16 | specifically? | |
| 17 | A. I cannot. | |
| 18 | Q. How long have we been on record so far? | |
| 19 | THE VIDEOGRAPHER: 52 minutes. | |
| 20 | MR. MARKEVITCH: Do you need a break? | 10:56:13 |
| 21 | MR. MASTER: I'm okay. Are you okay? | |
| 22 | THE WITNESS: I'm okay. | |
| 23 | BY MR. MARKEVITCH: | |
| 24 | Q. Let's keep going then. | |
| 25 | Are you familiar with the special | 10:56:24 |

Page 34

```
 1    permitting process at the City of Menlo Park?        10:56:26

 2         A.   Yes.

 3         Q.   When was that process put in place?

 4         A.   I'm unsure.  I'm unsure exactly.

 5         Q.   Was it in existence before you started      10:56:43

 6    working for the City of Menlo Park?

 7         A.   No.

 8         Q.   Did you participate in the creation of the

 9    special permitting process at the City of Menlo

10    Park?                                                 10:57:11

11         A.   Yes.

12         Q.   What was your role in that regard?

13         A.   I sat on a committee of city staff,

14    provided my perspective on community

15    services-related needs, questions, and assisted with 10:57:57

16    how the process would be formulated.

17         Q.   What was the name of that committee?

18         A.   I don't recall it had a name.

19         Q.   Was that committee created specifically

20    for putting together a special permitting process?   10:58:27

21         A.   I believe it was.

22         Q.   Did that committee still exist when you

23    left the City of Menlo Park?

24         A.   Not in the form that it was in.

25         Q.   In what form did it exist?                  10:58:54
```

Veritext Legal Solutions
866 299-5127

```
 1        A.    That committee was specific to the        10:58:57

 2   creation of the permit process itself.

 3        Q.    Once the process was designed, was the

 4   committee terminated?

 5        A.    That committee, yes.                       10:59:18

 6        Q.    Was there a new committee formed?

 7        A.    Yes.

 8        Q.    What was the name of the new committee?

 9        A.    Special event permit committee.

10        Q.    What was the purpose of that committee?    10:59:31

11        A.    Those were individuals who represented

12   various departments in the city who could be the

13   liaison of their department to assist in the

14   approval of special event permits.

15        Q.    Was the police department one of the       10:59:51

16   departments involved in the committee?

17        A.    Yes.

18        Q.    Who was the liaison for the police

19   department in, well, during the year when the

20   process was just created?                             11:00:02

21        A.    When it was created, it was Sergeant Susan

22   Kaufman.

23        Q.    Is there any way you can identify the year

24   when the, when this process was created?

25        A.    I cannot.                                  11:00:17
```

Veritext Legal Solutions
866 299-5127

```
 1        Q.   Was it 2013?                          11:00:18

 2        A.   I can't say for sure.

 3        Q.   When you were leaving the City of Menlo

 4   Park, who was the liaison for the police department?

 5        A.   Sergeant Scott Mackdanz.               11:00:43

 6        Q.   Were there any other individuals who acted

 7   as liaisons between the time of Ms. Kaufman's tenure

 8   and, I'm sorry, what was the last name of the

 9   sergeant?

10        A.   Sergeant Mackdanz.                     11:00:57

11        Q.   And Sergeant Mackdanz's tenure?

12        A.   Yes.

13        Q.   Who?

14        A.   Sergeant Matt Ortega.

15        Q.   Anybody else?                          11:01:08

16        A.   No.

17        Q.   Was commander at the time Chief Bertini,

18   am I correct, was a commander?

19        A.   At that time, it was Commander Bertini.

20        Q.   Was he ever a liaison for the police    11:01:25

21   department with regard to the special permitting

22   process?

23        A.   Not directly.

24        Q.   What do you mean?

25        A.   If a committee member was not present or  11:01:36
```

Page 37

```
 1    on vacation, other members of the department would      11:01:41
 2    fill in as the department representative, and I
 3    recall times that Commander Bertini would take those
 4    responsibilities.
 5         Q.   Were those, were those needs-based            11:02:02
 6    temporary circumstances?
 7         A.   Yes.
 8         Q.   Can you think of any circumstances where
 9    Commander, or, as a chief, Bertini, took over the
10    special permitting process on behalf of the police      11:02:15
11    department?
12         A.   No.
13         Q.   Do you know what the role of, I'm going to
14    just call him Chief Bertini, because that's his
15    position today; is that correct?                        11:02:31
16         A.   I believe so, yes.
17         Q.   What was the role of Chief Bertini in the
18    review of Mr. Zeleny's permit application?
19         A.   I can't say exactly, but my understanding
20    at the time was that he was one of the primary          11:02:53
21    individuals formulating the city's response to Mr.
22    Zeleny's request.
23         Q.   Why was he the one involved in the
24    process, rather than the liaison who was in the
25    position of a liaison at the time?                      11:03:17
```

                                                    Page 38

1      MR. MASTER:  Objection.  Lacks foundation.      11:03:20

2  Calls for speculation.  If you know, you can answer.

3      THE WITNESS:  Can you repeat the question.

4      MR. MARKEVITCH:  Could you read the question,

5  please.                                             11:03:26

6          (The pending question was read.)

7      THE WITNESS:  I don't know.

8  BY MR. MARKEVITCH:

9      Q.  Who was the liaison at the time?  Let me

10  just specify; at the time when Mr. Zeleny's permit,  11:03:58

11  special permit application was pending.

12      A.  Sergeant Matt Ortega.

13      Q.  What about, was it Sergeant Kaufman?

14  Sergeant Kaufman, is that --

15      A.  Sergeant Kaufman.                          11:04:17

16      Q.  Was Sergeant Kaufman involved, or no?

17      A.  Not that I recall.

18      Q.  So, she was not a liaison at the time?

19      A.  I don't believe so, not to my knowledge.

20      Q.  Was Sergeant Ortega on vacation during the  11:04:29

21  entire time of Mr. Zeleny's special permit

22  application review?

23      MR. MASTER:  Objection.  Lacks foundation.

24  Calls for speculation.  If you know.

25      THE WITNESS:  I couldn't say.                  11:04:42

Page 39

```
 1   BY MR. MARKEVITCH:                              11:04:44

 2       Q.   Is it your testimony that he could have

 3   been?

 4       MR. MASTER:  Same objection.  You can answer,

 5   if you can.                                     11:04:52

 6       THE WITNESS:  It's likely that he was not on

 7   vacation the entire time.

 8   BY MR. MARKEVITCH:

 9       Q.   So, why was Chief Bertini reviewing the

10   application, rather than Sergeant Ortega?       11:05:01

11       MR. MASTER:  Objection.  Asked and answered.

12   Argumentative.  If you know.

13       THE WITNESS:  I don't know.

14   BY MR. MARKEVITCH:

15       Q.   Did you ever ask?                       11:05:10

16       A.   No.

17       Q.   Did that question ever cross your mind?

18       A.   No.

19       Q.   Were you ever told why Chief Bertini was

20   involved in the process of reviewing Mr. Zeleny's  11:05:21

21   special permit application?

22       MR. MASTER:  I will just assert an objection to

23   the extent that you received any communications from

24   the city attorney's office related to that topic,

25   instruct you not to answer.  Obviously, if you heard  11:05:39
```

Page 40

```
 1   flowchart?                                          11:35:39

 2        A.   Not that I believe.

 3        Q.   Do you have any knowledge of him doing

 4   that?

 5        A.   No.                                        11:35:49

 6        Q.   Do you know if the flowchart was ever

 7   reviewed by the legal counsel for the city?

 8        A.   Not to my knowledge.

 9        Q.   Who made the final version of the first

10   iteration of the flowchart?                         11:36:09

11        A.   I did.

12        Q.   Do you remember what year it was in?

13        A.   No.

14        Q.   Do you remember who decided to deny,

15   initially, Mr. Zeleny's application for a special   11:36:45

16   event permit?

17        A.   I'm sorry, can you repeat the question

18   there.

19             (The pending question was read.)

20        THE WITNESS:  I don't recall.                  11:37:16

21   BY MR. MARKEVITCH:

22        Q.   Do you remember how you came to find out

23   that the permit is being, the permit application is

24   being denied?

25        A.   I recall a conversation I had over the    11:37:34
```

Page 53

1    phone with Chief Bertini, who said that he had          11:37:38

2    discussed the city's response with the city's legal

3    counsel, and city manager, and that he would be

4    sending me a written response.

5         Q.   Did Chief Bertini tell you who               11:38:12

6    participated, participated in that decision to deny

7    the permit?

8         A.   Not specifically that I can recall at this

9    time.

10        Q.   Do you remember what your understanding      11:38:25

11   was as to who would have been the individuals

12   involved in that process?

13        MR. MASTER:  Lacks foundation.  Calls for

14   speculation.  If he has personal knowledge, then he

15   can answer.                                            11:38:41

16        Go ahead.  Sorry.

17        THE WITNESS:  Not entirely.

18   BY MR. MARKEVITCH:

19        Q.   Okay.  Well, do you have an understanding,

20   well, do you have a recollection of having an          11:38:50

21   understanding in any part of who was involved in the

22   process with Chief Bertini?

23        A.   It was my understanding at the time that

24   it was Chief Bertini, Alex McIntyre, and the city

25   attorney's office.  If there were others involved, I   11:39:12

Veritext Legal Solutions
866 299-5127

```
 1         MR. MASTER:  Object.  Vague and ambiguous.      12:09:57

 2    Overbroad.  You can answer.

 3         THE WITNESS:  I don't remember if I did or not.

 4    BY MR. MARKEVITCH:

 5         Q.   Now, logistically, did you have access to   12:10:03

 6    whatever portal there was to actually post

 7    information on the website?

 8         A.   Yes.

 9         Q.   So, if you needed to post something, you

10    would do it yourself?                               12:10:14

11         A.   Yes.

12         Q.   You didn't have to go to IT and ask them

13    to do it.

14         A.   No.  No.  I believe I was always a

15    publisher of the website.                           12:10:35

16         Q.   Let's go back to Exhibit 91, please.

17              Is this, does this flowchart represent the

18    general process for special event permit

19    application, as it exists today?

20              MR. MASTER:  I'm just going to object.  Lacks   12:11:16

21    foundation, calls for speculation, as of today.

22    He's no longer with the city.

23              MR. MARKEVITCH:  Thank you.

24    BY MR. MARKEVITCH:

25         Q.   As it existed as of the time when you left   12:11:22
```

Page 74

1   the City of Menlo Park.                                    12:11:24

2        A.   Generally, yes.

3        Q.   Okay.  When you say, generally, could you

4   specify why you are qualifying your answer.

5        A.   Yes.  The first thing that jumps to my          12:11:39

6   mind is the days indicated is not necessarily set.

7   It was general.  Depending on the complexity of the

8   application, it might have been reviewed by our --

9   I'm only speculating.

10       MR. MASTER:  Don't.  You're not speculating.         12:12:14

11  BY MR. MARKEVITCH:

12       Q.   So, let's look at step A, initial contact.

13            It looks like in this step you, at least

14  at the time of this flowchart, you would send the

15  application to the applicant in response to, I          12:12:41

16  presume, an inquiry, correct?

17       A.   That's correct.

18       Q.   Would you then at that time speak with the

19  applicant?

20       A.   Not always.                                     12:13:00

21       Q.   Under what circumstances would you speak

22  to an applicant?

23       A.   If they called me on the phone.

24       Q.   And can you generalize what kind of

25  questions applicants would ask at that point, if you   12:13:43

                                                        Page 75

```
 1    looking for in terms of the detailing of an event on    12:16:22

 2    a map.

 3         A.    The special event permit application

 4    included a checklist that the applicant needed to

 5    identify certain features, such as tents, road          12:16:35

 6    closures, first aid stations, and the like.

 7              It was, I would look to make sure that

 8    that information was complete to the event.  I

 9    would, if the applicant included that they had a

10    road closure, I would look to see if it was on a        12:17:05

11    primary response route or not, and where the

12    location of the closure was.

13         Q.    Anything else?

14         A.    I would confirm that the map was clear, so

15    that when it was photocopied and sent to the permit     12:17:34

16    committee, it was legible.

17         Q.    Anything else?

18         A.    That's all I can recall.

19         Q.    Now, if there were any deficiencies in the

20    application, what would you do, generally?              12:17:47

21         MR. MASTER:  Objection.  Vague and ambiguous.

22    Overbroad.  Go ahead.

23         THE WITNESS:  Generally, I would contact the

24    event permit organizer and detail a listing of the

25    items that they needed to exchange or modify or         12:18:08
```

Page 78

```
 1    include, depending on the event permit, and have        12:18:13

 2    them resubmit.

 3    BY MR. MARKEVITCH:

 4         Q.    And then what would happen?

 5         MR. MASTER:  Same objections.  Go ahead.           12:18:28

 6         THE WITNESS:  That depended on the person, the

 7    applicant, whether or not they wanted to resubmit or

 8    not.

 9    BY MR. MARKEVITCH:

10         Q.    If they resubmitted, what would you do       12:18:38

11    with that application?

12         A.    Follow the same process by providing an

13    initial review of the application.

14         Q.    And if you found the application to be

15    complete to your satisfaction, what would you do       12:19:02

16    next?

17         A.    I would scan the documents and forward

18    them to our permit committee.

19         Q.    Now, you were part of the permit committee

20    that would then again review the application for       12:19:27

21    substance, correct?

22         A.    That's correct.

23         Q.    So now we're talking about step C, staff

24    internal review, correct?

25         A.    That's correct.                             12:19:38
```

1    know if I could provide an estimate.  It was a lot.    12:24:24

2        Q.   Well, it's up to 100 every year, so,

3    potentially, up to 600, am I correct?

4        A.   Potentially, yes.

5        Q.   So, during your tenure at Menlo Park, can    12:24:58

6    you estimate how many applications, you know, took

7    more than a month to review, at the initial stage?

8        A.   Repeat the question.

9            (The pending question was read.)

10       THE WITNESS:  I can't recall for a number.    12:25:33

11   BY MR. MARKEVITCH:

12       Q.   Were there any applications that took more

13   than one month to review at the initial stage, where

14   that is estimated to be at three days?

15       A.   I couldn't recall.    12:25:45

16       Q.   Now, other than the reasons that you've

17   stated where you would have been away, or, perhaps,

18   busy, can you think of any other reasons why the,

19   the step B would take more than three days?

20       A.   I can only speculate.  I can't say for    12:26:26

21   sure.

22       Q.   Once an application is forwarded to staff

23   for internal review, is it fair to say that it has

24   been deemed complete and has now been submitted for

25   assessment?    12:26:56

Page 83

1      A.   No.                                          12:26:56

2      Q.   Why not?

3      A.   Because my role was that, at that stage,

4   an administrative one, I rely on the committee to be

5   the primary source of soaking in the information      12:27:12

6   pertaining to their department and providing

7   feedback, comment, approval, denial of the permit.

8      Q.   But, once the committee is looking at the

9   application, it has already been deemed, in quotes,

10  complete, as that terminology is used in steps A and   12:27:35

11  B, am I correct?

12      MR. MASTER:  Where is that?  I will just say

13  it's been asked and answered.  Vague and ambiguous.

14      Go ahead, you can answer.

15      THE WITNESS:  I wouldn't consider it complete,   12:27:52

16  no.

17  BY MR. MARKEVITCH:

18      Q.   So, how often would you take an incomplete

19  application and pass it on to the staff internal

20  review step?                                          12:28:03

21      A.   I would say that all applications I

22  submitted to the internal review staff were

23  incomplete.

24      Q.   Now, if you look at step A and step B, it

25  tells us that the incomplete applications revert      12:28:23

Page 84

```
 1        A F T E R N O O N    S E S S I O N

 2                   (1:08 p.m.)

 3

 4       THE VIDEOGRAPHER:  We're back on the record.

 5   The time is 1:08.                              01:08:51

 6

 7                   MATTHEW L. MILDE,

 8   having previously stated to tell the truth under

 9   penalty of perjury, was examined and testified

10   further as follows:

11

12                   EXAMINATION (Cont'd)

13   BY MR. MARKEVITCH:

14       Q.   Mr. Milde, looking at Exhibit number 91,

15   which is the flowchart for the special event permit,   01:09:04

16   I think it's time for us to move to step C, which is

17   staff internal review, and, in parentheses, it says,

18   10 days.

19            What is a staff internal review?

20       A.   The staff of the permit committee would   01:09:32

21   receive a copy of the permit, and they would provide

22   me any input, questions, comments, conditional items

23   that the applicant needed to complete before we

24   issued a approve permit.

25       Q.   What is the significance of these 10 days   01:10:05
```

Page 87

```
 1        A.   I couldn't.  We did so many, it would all      01:36:23

 2   jumble together.

 3        Q.   Is there any one particular one that you

 4   remember, for whatever reason?

 5        MR. MASTER:  Objection.  Asked and answered.      01:36:35

 6   Argumentative.

 7        THE WITNESS:  As I sit here today, I cannot.

 8   BY MR. MARKEVITCH:

 9        Q.   Do you remember Mr. Zeleny's application?

10        A.   Vaguely.                                      01:36:49

11        Q.   Do you remember forwarding that

12   application to the committee?

13        A.   I don't recall that I did.

14        Q.   You don't think you forwarded that

15   application to the committee?                           01:37:13

16        A.   I don't remember if I did or not.

17        Q.   Now, once an application is in the hands

18   of the police department, do you know what criteria

19   the police department applies to its review?

20        A.   No.                                           01:37:28

21        Q.   Once the application is in the hands of,

22   what does PW stand for again?

23        A.   Public works.

24        Q.   Once an application is in the hands of

25   public works maintenance, do you remember what         01:37:40
```

Page 104

1    criteria they apply to deciding whether or not an      01:37:43

2    application should be approved or denied?

3        A.    No.

4        Q.    Same question for public works

5    engineering.                                            01:37:52

6        A.    No.

7        Q.    What about planning?

8        A.    Can you repeat the question for planning.

9        Q.    Once you send an application to planning,

10   do you know what criteria the planning department       01:38:11

11   would apply in reviewing that application?

12       A.    I don't know for certain.

13       Q.    Do you know if criteria exist that a

14   planning department would apply to review an

15   application?                                            01:38:31

16       MR. MASTER:  Lacks foundation.  Calls for

17   speculation.

18       If you know.

19       THE WITNESS:  I know they would look at the

20   city ordinance, and, if there was amplified sound,      01:38:39

21   they'd take it to city counsel for approval.

22   BY MR. MARKEVITCH:

23       Q.    How do you know that they look at the city

24   ordinance?

25       A.    That would be the only way to take it to      01:38:59

```
 1         Q.   And do you know how the fire department        01:40:28

 2    assessed whether or not it was appropriate to close

 3    or not close certain roads?

 4         MR. MASTER:  To be clear, counsel, you are

 5    referring to the fire department as the fire          01:40:36

 6    district, just to be clear, so, just to make sure

 7    we're on the same page.  Go ahead.

 8         MR. MARKEVITCH:  Sure.

 9         THE WITNESS:  I do know that the fire district

10    was concerned with closures or events taking place    01:40:55

11    on primary response routes that are identified

12    routes in the city.  That's all I'm aware.

13    BY MR. MARKEVITCH:

14         Q.   Are you aware of any written policies or

15    lists of criteria that the fire department would use  01:41:18

16    specifically in the context of the special event

17    permit process?

18         A.   The fire district, no.

19         Q.   Going back to the police department, are

20    you aware of any specific written policies that the   01:41:35

21    police department would use in the context of

22    assessing the propriety of a special event permit

23    application?

24         A.   No.

25         Q.   Let's move on to the next page of           01:42:04
```

Veritext Legal Solutions
866 299-5127

now.                                                    01:57:50

2            (Exhibit 95 was marked for identification

3     by the court reporter and is attached hereto.)

4     BY MR. MARKEVITCH:

5            Q.   This one is going to be 95.  Mr. Milde,     01:58:11

6     please review this document and let me know if you

7     are familiar with it.

8            A.   It is my understanding that this is the

9     e-mail Mr. Zeleny sent to a number of people, I

10    believe, myself included, with his request for a      01:59:12

11    special event.

12           Q.   For the record, the first page is marked

13    as MP000234, and it ends on MP000240.

14           A.   Correct.

15           Q.   Mr. Milde, is this an application for a     01:59:51

16    special event permit submitted by Mr. Zeleny to the

17    City of Menlo Park?

18           A.   It appears to be.

19           Q.   Was this application sent to you?

20           A.   It was.                                     02:00:10

21           Q.   Did you perform an initial review of this

22    application pursuant to step B of the flowchart?

23           A.   I did at the time, yes.

24           Q.   And, for clarity, when I say, the

25    flowchart, I'm talking about Exhibit 91.               02:00:29

 1          Can we agree on that?                    02:00:31

 2     A.   Yeah.

 3     Q.   There is no other flowchart.

 4     A.   Correct.

 5     Q.   Do you remember what you determined with   02:00:43

 6  respect to the completeness of this application,

 7  pursuant to step B?

 8     A.   I did not make a determination.

 9     Q.   Why not?

10     A.   My recollection at the time was that the   02:01:01

11  application was complex, and, considering that the

12  city manager and police chief were cc'd on it, I

13  felt it was under their purview to provide me

14  direction on the city's response.

15     Q.   Now, you previously testified that your    02:01:35

16  job at the step B level was administrative, or am I

17  using the correct terminology?

18     A.   That's fair, yes.

19     Q.   Meaning that you simply looked at whether

20  or not the boxes were checked, correct?           02:01:52

21     MR. MASTER:  Objection.  Misstates his

22  testimony.  Go ahead.

23     THE WITNESS:  I would say there's more to it

24  than that, but --

25  BY MR. MARKEVITCH:                                02:02:03

                                            Page 119

```
 1        Q.   In part.                              02:02:03

 2        A.   But, ensuring that the application was

 3   completely filled out.

 4        Q.   But you did not perform that review on Mr.

 5   Zeleny's application, correct?                  02:02:16

 6        A.   Maybe I don't understand the question.

 7        Q.   You did not check if Mr. Zeleny's

 8   application that you have here in front of you was

 9   complete, pursuant to the step B process of the

10   flowchart.                                      02:02:35

11        A.   I reviewed the application.

12        Q.   Did you determine if it was complete?

13        A.   I didn't, don't recall making a

14   determination.

15        Q.   Did you contact Mr. Zeleny and tell him   02:02:49

16   that it was incomplete at any point?

17        A.   Not that I can recall at the moment.

18        Q.   Do you have a recollection of ever asking

19   Mr. Zeleny to complete any aspect of the application

20   within the context of a step B analysis?         02:03:20

21        A.   I don't recall contacting Mr. Zeleny for

22   that purpose.

23        Q.   Do you recall contacting Mr. Zeleny for

24   any other purpose, by telephone?

25        A.   I have never spoken to Mr. Zeleny via     02:03:45
```

Veritext Legal Solutions
866 299-5127

telephone, that I can recall.                02:03:48

2        Q.   Is the application that was submitted by

3    Mr. Zeleny on July 10, 2015 complete, per the

4    standards outlined in step B?

5        A.   I don't know.                        02:04:19

6        Q.   Can you determine that now?

7        A.   The first thing I notice, looking at this

8    very quickly, is that there is no attached map, and

9    we wouldn't deem that complete.

10       Q.   Anything else?                        02:04:48

11       A.   He doesn't identify if the event reoccurs

12   more than annually, based on the question asked of

13   him in the permit.

14       Q.   Where are you looking at, please?

15       A.   Event is reoccurring more than annually,   02:05:19

16   question mark, yes or no.  There is nothing filled

17   out.  I would need to know that answer in order to

18   route it.

19       Q.   In order to do what, sir?

20       A.   To route it to the permit committee.   02:05:29

21       Q.   So, and I apologize, can you please point

22   where it is, because there are many boxes there.

23       MR. MARKEVITCH:  Okay.  So, can I show this to

24   the camera, right here.  Event.  Can you see it?

25       THE VIDEOGRAPHER:  Don't bring it, put it back   02:05:50

                                        Page 121

```
 1        Q.   Was that before or after you passed the        02:33:55
 2   application down to the, or up to the staff internal
 3   review stage?
 4        A.   I just don't recall submitting the permit
 5   to the permit committee in this particular instance.    02:34:08
 6        Q.   Are you saying that it was never submitted
 7   to the permit committee?
 8        A.   I'm saying that I never submitted it to
 9   the permit committee.
10        Q.   Do you know if somebody else submitted it    02:34:23
11   to the permit committee?
12        A.   No.
13        Q.   You don't know?
14        A.   I don't know.
15        Q.   You mentioned that on page 1 of the          02:34:31
16   application there was a box that was not checked
17   pertaining to the question of whether event is
18   reoccurring more than annually; is that correct?
19        A.   That's correct.
20        Q.   And you previously testified that this       02:34:50
21   would have prevented routing; am I correct in
22   quoting you?
23        A.   That would have prevented it from being
24   routed, yes, I think so.
25        Q.   Now, pursuant to step B procedures,          02:35:08
```

Page 138

```
1    this process regardless.                        02:49:06

2         A.    Correct.

3         Q.    Pursuant to step C of the flowchart,

4    correct?

5         A.    Correct.                             02:49:13

6         Q.    Any other aspect of complexity that you

7    found in this application that prompted you to

8    forward it to your superiors?

9         A.    The fact that it was an event that was

10   being requested for a public median on a major   02:49:29

11   thoroughfare, there's a lot of safety implications

12   with that.  That was of concern.  We don't typically

13   get applications for community events on a public

14   median.  It just doesn't happen.  I haven't seen it.

15        Q.    Is it fair to say that this application  02:50:04

16   was, in your mind, different enough that you decided

17   to forgo the entirety of the process on this

18   flowchart?

19        A.    It definitely stood out.

20        Q.    But you did not follow the flowchart with  02:50:17

21   regard to Mr. Zeleny's application, correct?

22        A.    Well, I followed the flowchart in regards

23   to that I provided the initial review of it.  I did

24   look it over, and looked at it, but I felt that

25   before we moved forward with it that city leadership   02:50:31
```

Veritext Legal Solutions
866 299-5127

| 1 | also needed to review and weigh in and provide | 02:50:35 |
| 2 | direction to staff. | |

2     direction to staff.

3          Q.    Is there a procedure for processing an

4     application the way you decided to do it with Mr.

5     Zeleny's?                                              02:50:51

6          A.    Not that I recall, but, then again, we

7     have never gotten anything quite like this

8     application in before, so, it was an outlier.

9          Q.    Is there a reason why this application

10    could not be processed the way the flowchart         02:51:04

11    indicates an application should be processed?

12         A.    Again, due to the complexity of what was

13    submitted to me, I felt that it was necessary that

14    city leadership provide direction to staff.

15              (Exhibit 98 was marked for identification   02:51:58

16    by the court reporter and is attached hereto.)

17    BY MR. MARKEVITCH:

18         Q.    Do you recognize this chain of e-mails?

19         A.    Yes.

20         Q.    So, again, you forwarded this application  02:52:47

21    to Clay Curtin and Jim Cogan; is that correct?

22         A.    That's correct.

23         Q.    Why did you do that?

24         A.    They were the heads of the communication

25    team, and, as part of our responsibilities with the  02:53:03

Veritext Legal Solutions
866 299-5127

```
 1    the exact location he was intending, as it was not        02:57:00

 2    clear on his application.  Period.

 3              Do you recall being aware on July 21, 2015

 4    that the application was going to be denied?

 5        A.   I can't say if I was or not.                      02:57:18

 6        Q.   Do you recall at any point being aware

 7    that the application is being denied, though you

 8    were still collecting some information from Mr.

 9    Zeleny?

10        A.   I don't recall.                                   02:57:35

11        Q.   Do you recall the circumstances of how you

12    found out that the application is going to be

13    denied?

14        A.   I recall a telephone call with Commander

15    Bertini, who mentioned that he was working in         02:57:55

16    conjunction with the city attorney's office and the

17    city manager to prepare a city response to Mr.

18    Zeleny, and that the next step at that time was, I

19    would be given verbiage on a denial that I would

20    send to Mr. Zeleny.  That's how I found out.              02:58:31

21        Q.   Do you remember when this telephone call

22    took place?

23        A.   I don't.

24        Q.   Did Chief Bertini then tell you what the

25    reasoning was for why the denial was being issued?       02:58:45
```

```
 1              (Exhibit 103 was marked for identification    03:44:12

 2    by the court reporter and is attached hereto.)

 3    BY MR. MARKEVITCH:

 4         Q.    This is a chain of e-mails starting with

 5    MP000451.                                                03:45:20

 6              Mr. Milde, have you seen this e-mail

 7    before, or this chain of e-mails before?

 8         MR. MASTER:   Which?   Is there a specific

 9    e-mail?   There are multiple e-mails in here.

10    BY MR. MARKEVITCH:                                       03:45:48

11         Q.    The top e-mail on page 1, which is the

12    last e-mail, is addressed to you, Mr. Milde,

13    correct?

14         A.    Me and others, correct.

15         Q.    And it is from Chief Bertini, correct?        03:46:03

16         A.    Appears so, yes.

17         Q.    And Chief Bertini writes, Matt, we all

18    received the e-mail, period.   Do not reply.   Stand

19    by for our response.   Dot, dot, dot, dot.

20         A.    Okay.                                         03:46:22

21         Q.    Correct?

22         A.    That's what it says.

23         Q.    Was Chief Bertini referring to you in that

24    e-mail?

25         A.    Yes, I believe so.                            03:46:28
```

Page 177

```
1       Q.   So, he was telling you to not reply, and    03:46:31
2   stand by, correct?
3       A.   Correct.
4       Q.   Why was he saying that to you?
5       A.   I don't know.                               03:46:38
6       Q.   Did he ever explain to you why he wanted
7   you to stand by, rather than reply in any way?
8       A.   I recall a phone conversation with
9   Commander Bertini in which he had asked me to stand
10  by, and that the city would be drafting a response,  03:47:07
11  and that I would be hearing back from him.
12      Q.   Did he say why he wanted you to stand by,
13  and have somebody else draft a response?
14      A.   No, not that I can recall.
15      Q.   Do you have any recollection of any         03:47:25
16  explanation for why they were asking you to do
17  nothing?
18      A.   No.
19      Q.   How long was that phone call?
20      A.   Can't say exactly, but it was brief.        03:47:43
21      Q.   Was it on the same day when he e-mailed
22  you asking you to stand by?
23      A.   I don't recall.
24      Q.   Do you remember receiving this e-mail?
25      A.   I believe I do.                             03:48:04
```

```
1        A.   I don't.                                    04:27:20

2        Q.   Does it appear to you that at that point

3   you were still somehow involved in the process?

4        A.   Only by the fact that I'm cc'd here on the

5   e-mail by Mr. Zeleny.                                 04:27:43

6        Q.   Anything beyond that?

7        A.   No, not that I can tell.

8        MR. MARKEVITCH:  Why don't we go off record.

9        THE VIDEOGRAPHER:  Going off the record the

10  time is 4:27.                                         04:28:17

11           (Recess:  4:27 p.m. to 4:39 p.m.)

12       THE VIDEOGRAPHER:  We're back on the record.

13  The time is 439.

14  BY MR. MARKEVITCH:

15       Q.   Mr. Milde, have you participated in any     04:40:16

16  hearings related to Mr. Zeleny's permit application?

17       A.   No.

18       Q.   Did you provide any assistance to the city

19  manager with regard to any matter related to Mr.

20  Zeleny?                                               04:40:36

21       A.   No.

22       Q.   Let's go back to Exhibit number 33, which

23  is the one you have there, and on page 1820, so

24  that's the fourth page of the document.  Towards the

25  bottom, there is a section titled, what would cause   04:41:06
```

                                                    Page 200

```
 1    a permit to get denied.                                04:41:09

 2            Do you see that?

 3        A.    Yes.

 4        Q.    And this paragraph lists a number of

 5    factors.  Do you mind reading them out, just for the   04:41:19

 6    record.

 7        A.    Yeah.  Approval or denial of applications

 8    are based --

 9        MR. MASTER:    Slow.

10        THE WITNESS:    Sorry.                              04:41:32

11        -- upon several factors, including size, in

12    parentheses, number of people, scale, location,

13    route to be closed, community impact, impact on city

14    services, past event, as reflected in the

15    application, and site map, et cetera.                  04:41:56

16    BY MR. MARKEVITCH:

17        Q.    I apologize.  I think you missed a line

18    there.

19        MR. MASTER:    You skipped a line.

20        THE WITNESS:    Oh, did I?                          04:42:03

21        MR. MASTER:    You skipped a line.  Past

22    practices.

23        THE WITNESS:    Oh, I see.  I'm sorry.  That

24    makes sense.

25        Past practices, experiences with issued with       04:42:10
```

Page 201

1    permits, intended use, nonpayment of fees, poor         04:42:12
 2    articulation of event as reflected in the
 3    application and site map, et cetera.
 4    BY MR. MARKEVITCH:
 5         Q.   Is this an exhaustive list of factors for     04:42:23
 6    a denial of a permit?
 7         A.   Doesn't appear to be.
 8         Q.   What are other factors?
 9         MR. MASTER:  I will just object as vague and
10    ambiguous, overbroad, incomplete hypothetical, calls    04:42:42
11    for speculation.  You can answer.
12         THE WITNESS:  I couldn't say.
13    BY MR. MARKEVITCH:
14         Q.   Is there any guideline for identifying
15    other factors in reviewing an application?              04:42:54
16         A.   Not that I'm aware.
17         Q.   Now, looking at the factors more
18    specifically, size, number of people, is there a
19    guideline for what size is appropriate and what size
20    is not?                                                 04:43:19
21         MR. MASTER:  Objection.  Vague and ambiguous.
22    Overbroad.
23         THE WITNESS:  It would depend on the
24    application.
25    BY MR. MARKEVITCH:                                      04:43:37

                                                      Page 202

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were duly sworn; that a record

8     of the proceedings was made by me using machine

9     shorthand which was thereafter transcribed under my

10     direction; that the foregoing transcript is a true

11     record of the testimony given.

12          Further, that if the foregoing pertains to the

13     original transcript of a deposition in a Federal

14     Case, before completion of the proceedings, review

15     of the transcript [ ] was [ ] was not requested.

16          I further certify I am neither financially

17     interested in the action nor a relative or employee

18     of any attorney or party to this action.

19          IN WITNESS WHEREOF, I have this date subscribed

20     my name.

21

22     Dated: March 19, 2020.

23                              _Chris Te Selle_

24                              _____

                               CHRIS TE SELLE

25                             CSR No. 10836

Veritext Legal Solutions
866 299-5127

Exhibit H-1

# MENLO PARK POLICE DEPARTMENT

**701 LAUREL ST     MENLO PARK, CA 94025     650-330-6300**

## GENERAL CASE REPORT

Case
10-2678

### OFFENSES

| Offenses | Description | | Fel/Misd | Date Occurred | Time Occurred | Incident # |
|---|---|---|---|---|---|---|
| Info | General Information Case | | | 09/28/2010 | 0900 - 1600 | 1009270012 |

| Date Reported | Time Reported |
|---|---|
| 09/28/2010 | 0600 |

Related Cases
10-2666

| Date Printed | Time Printed | Printed By |
|---|---|---|
| 01/28/2019 | 13:38:38 | 15159 |

| Latitude | Longitude |
|---|---|
| 0.000000 | 0.000000 |

| Location | | Beat | Area | Disposition | | Dispo Date |
|---|---|---|---|---|---|---|
| Nea, 2855 Sand Hill Rd, Menlo Park, CA 94025 | | 1 | 30 | Closed | | 09/28/2010 |

| Location Type | Location of Entry | Method of Entry | Point of Entry | Alarm System | Means of Attack (Robbery) |
|---|---|---|---|---|---|
| Other Commercial | | | | | |

| Victim | | Drivers License | Cell Phone | Email | |
|---|---|---|---|---|---|
| Residence Address | | Notified of Victim Rights | Residence Phone | DOB | Age | Sex | Race |
| Business Name and Address | | | Business Phone | Height | Wt | Hair | Eyes |
| Assistance Rendered/Victim Disposition | | | Transporting Agency | Means of Attack (Assaults) | |
| Description of Injuries | | | Other Information | | |

| Party | | Drivers License | Cell Phone | Email | |
|---|---|---|---|---|---|
| Nea | | | | | |

| Residence Address | | Residence Phone | DOB | Age | Sex | Race |
|---|---|---|---|---|---|---|
| 2855 Sand Hill Rd, Menlo Park, CA 94025 | | 650-854-9499 | | | | |

| Business Name and Address | Business Phone | Height | Wt | Hair | Eyes |
|---|---|---|---|---|---|
| | | | | | |

| Suspect Name | Action Taken | Charges |
|---|---|---|
| | | |

| Residence Address | Residence Phone | DOB | Age | Sex | Race |
|---|---|---|---|---|---|
| | | | | | |

| Business Name and Address | Business Phone | Height | Wt | Hair | Eyes |
|---|---|---|---|---|---|
| | | | | | |

| Identifying Features | Cell Phone | Drivers License | Arrest Number |
|---|---|---|---|
| | | | |

Aliases

### VEHICLES

| Status | Vehicle Make and Model | License/State | VIN |
|---|---|---|---|
| | | | |

### OFFICERS

| Prepared By | Date | Assisted By | | Approved By | Date |
|---|---|---|---|---|---|
| 14749 - Apple, David | 09/28/2010 | | | 14757 - Brackett, Tim | 09/29/2010 |

| Routed To | Date | Routed To | Date | Notes |
|---|---|---|---|---|
| Stanford DPS | 05/21/2012 | | | |
| Sent to DA Kevin Collins | 06/28/2012 | | | |

CONTROLLED DOCUMENT - MPPD

**EXHIBIT 46**
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

MP001895



# MENLO PARK POLICE DEPARTMENT

**701 LAUREL ST    MENLO PARK, CA 94025    650-330-6300**

**GENERAL CASE REPORT**

Page 2

Case
10-2678

| Party<br>Zeleny, Michael | Drivers License<br>C4374887 CA | Cell Phone | Email | | | |
|---|---|---|---|---|---|---|
| Residence Address<br>7576 Willow Glen Rd, Los Angeles, CA 90046 | | Residence Phone<br>310-979-8700 | DOB<br>02/26/1958 | Age<br>52 | Sex<br>M | Race |
| Business Name and Address | | Business Phone | Height<br>5'11" | Wt<br>185 | Hair<br>BLK | Eyes<br>HZL |

## CONTROLLED DOCUMENT - MPPD

MP001896

## SYNOPSIS:

P/Michael Zeleny had a peaceful protest in front of NEA at 2855 Sand Hill Road. Zeleny had posters and reading information, that he handed out to passer-bys, regarding his protest. In attendance was a two man film crew, four people in support of Zeleny's protest, and two musicians.

## NARRATIVE:

On 9-28-2010, at approximately 0900 hours, I arrived at 2855 Sand Hill Road and met with P/Michael Zeleny regarding a planned protest of the company NEA. Zeleny was there to protest three individuals that were either current or former employees/associates with NEA. Zeleny stated that he was going to have music playing during his protest and I advised him that the music needed to be at a sound level so that it would not disrupt business.

As Zeleny and his supporters began to set up for the protest, he set up posters and signs along the walkway that led to front entrance to NEA. I overheard a supporter state that the signs be placed in a manner as to not block the pathway for any individual. At no time did I determine that any sign block the path or restricted the walkway to any individual at any time. However, the signs were placed in a way that any persons that walked the pathway would have to serpentine through the signs. It was later requested by Sergeant Prickett that Zeleny re-arrange the posters as to not be set up as a serpentine. Zeleny agreed and voluntarily moved the posters and re-arranged them. The signs and posters again were not blocking the pathway at any time.

Two of Zeleny's supporters had walked to the building next door to the Rosewood Hotel to use the restroom. The hotel staff requested that they leave the property, which they complied with. It was made clear to Zeleny and his supporters that they were not allowed onto the Rosewood Hotel property and they agreed to this request.

Zeleny then went inside his vehicle and retrieved a 12-gauge shotgun. I contacted Zeleny about the shotgun and he was compliant in my request to check the weapon to ensure that it was not loaded. The shotgun slide was open and I inspected the shotgun and observed that there were not rounds of ammunition located inside the gun. Zeleny had the shot gun in a sling around his shoulders. Zeleny also had a bandoleer with shotgun shells around his shoulders as well.

Zeleny then had a bagpiper arrive to play the bag pipe. The bagpiper began to play music that was audible from inside NEA. NEA employees requested that the music be quiet or moved to an area as to not disrupt business. Officers informed Zeleny of the issue with the music being to loud and had the bagpiper move to an area near the street and away from the building. After the bagpiper moved, the music was at an acceptable level.

The bagpiper then left and a trumpet player showed up and began to play. Again the music was at a level that it began to disrupt NEA business. The trumpet player was playing in the same location where the bagpiper was playing music at an acceptable level. Because the trumpet had a different tone and pitch, a request was made to the trumpet player to play at a lower volume. The trumpet player and Zeleny agreed to this request and the trumpet player continued to play music at an acceptable level.

CONTROLLED DOCUMENT - NEA

MP001897


The rest of the afternoon consisted of Zeleny and his supporters passing out fliers and literature. There was nothing further to note and Zeleny stopped his protest at 1600 hours.

## RECOMMENDATION:

I recommend this case be closed and used for informational purposes only.

CONTROLLED DOCUMENT - MPPD

| Prepared By: | | Date: | Approved By: | | Date: |
| :--- | :--- | :--- | :--- | :--- | :--- |
| 14749 | APPLE, DAVID | 09/29/2010 | 14757 | BRACKETT, TIM | 09/29/2010 |

Exhibit H-2

# MENLO PARK POLICE DEPARTMENT

**701 LAUREL ST    MENLO PARK, CA 94025    650-330-6300**

## GENERAL CASE REPORT

Case 10-2739

### OFFENSES

| Offenses | Description | | Fel/Misd | Date Occurred | Time Occurred | Incident # |
|---|---|---|---|---|---|---|
| Info | General Information Case | | | 10/04/2010 | 1321 | 1010040081 |

| | | Date Reported | Time Reported |
|---|---|---|---|
| | | 10/04/2010 | 1317 |

Related Cases

| Date Printed | Time Printed | Printed By |
|---|---|---|
| 01/28/2019 | 13:42:09 | 15159 |

| Latitude | Longitude |
|---|---|
| 0.000000 | 0.000000 |

| Location | Beat | Area | Disposition | Dispo Date |
|---|---|---|---|---|
| New Enterprise Associates, 2855 Sand Hill Rd. Menlo Park, CA 94025 | 1 | 30 | Closed | 10/04/2010 |

| Location Type | Location of Entry | Method of Entry | Point of Entry | Alarm System | Means of Attack (Robbery) |
|---|---|---|---|---|---|
| | | | | | |

| Reporting Party | Drivers License | Cell Phone | Email |
|---|---|---|---|
| Chandler, Robert Allen | | | |

| Residence Address | Notified of Victim Rights | Residence Phone | DOB | Age | Sex | Race |
|---|---|---|---|---|---|---|
| | | | 03/13/1951 | 59 | M | W |

| Business Name and Address | Business Phone | Height | Wt | Hair | Eyes |
|---|---|---|---|---|---|
| Concord, CA | 925-286-888 | 5`11" | 190 | BRO | BRN |

| Assistance Rendered/Victim Disposition | Transporting Agency | Means of Attack (Assaults) |
|---|---|---|
| | | |

| Description of Injuries | Other Information |
|---|---|
| | |

| Party | Drivers License | Cell Phone | Email |
|---|---|---|---|
| Zeleny, Michael | C4374887 CA | | |

| Residence Address | Residence Phone | DOB | Age | Sex | Race |
|---|---|---|---|---|---|
| | 310-979-8700 | 02/26/1958 | 52 | M | W |

| Business Name and Address | Business Phone | Height | Wt | Hair | Eyes |
|---|---|---|---|---|---|
| | | 5`11" | 185 | BLK | HZL |

| Suspect Name | Action Taken | Charges |
|---|---|---|
| | | |

| Residence Address | Residence Phone | DOB | Age | Sex | Race |
|---|---|---|---|---|---|
| | | | | | |

| Business Name and Address | Business Phone | Height | Wt | Hair | Eyes |
|---|---|---|---|---|---|
| | | | | | |

| Identifying Features | Cell Phone | Drivers License | Arrest Number |
|---|---|---|---|
| | | | |

| Aliases | Val Damaged |
|---|---|
| | |

### VEHICLES

| Status | Vehicle Make and Model | License/State | VIN |
|---|---|---|---|
| | | | |

### OFFICERS

| Prepared By | Date | Assisted By | Approved By | Date |
|---|---|---|---|---|
| 7128 - Keegan, Jeff | 10/04/2010 | | 14757 - Brackett, Tim | 10/07/2010 |

| Routed To | Date | Routed To | Date | Notes |
|---|---|---|---|---|
| Stanford DPS | 05/21/2012 | | | |
| Sent to DA Kevin Collins | 06/28/2012 | | | |

CONTROLLED DOCUMENT - MPPD

**EXHIBIT 47**
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR


| ID No. | Status/Disposition | Property Description | Value | Val Recovered | Val Damaged |
|---|---|---|---|---|---|
| 1 | Evidence/Digital Media | 1 MPPD Audio - Contact audio | | | |

CONTROLLED DOCUMENT - MPPD


**SYNOPSIS:** Contact with a civil protestor carrying an unloaded weapon outside a business.

**NARRATIVE:**

**10-04-2010 at approx. 1406 hrs.**

I responded to a report of a returned protestor trespassing on private property outside the business at 2855 Sand Hill Road. RP- Chandler called requesting police contact the armed protestor, P- Michael Zeleny, and determine if the shotgun he was carrying was unloaded. I was familiar with the individual from prior incidents at that address. I was aware he was carrying weapons during his protest, as "open carry" of unloaded weapons.

I arrived at approx. 1410 hrs. I saw Mr. Zeleny and two other men with him with video cameras standing in front of the entrance walk to 2855 San Hill Road. I noted they were video recording my contact and approach. I made a digital audio recording of the contact and I later downloaded the audio to the secure server at MPPD. I noted Mr. Zeleny had a shotgun and a separate bandolier with dozens of red unknown gauge shotgun shells slung over his torso.

I approached P- Zeleny, without asking him any questions, he immediately asked me if I wanted to inspect his shotgun and he voluntarily offered it to me to inspect. He took the sling over his head, handed me the weapon and instructed me how to open the action as I inspected the shotgun, per 12031 (e) PC, without incident. The shotgun was unloaded. I thanked Mr. Zeleny for his cooperation and left the scene shortly thereafter. No further information.

**PROPOSITION 9 COMPLIANT:** N/A

**RECOMMENDATION:**  None.

CONTROLLED DOCUMENT - MPPD

| Prepared By: | | Date: | Approved By: | | Date: |
| --- | --- | --- | --- | --- | --- |
| 7128 | KEEGAN, JEFF | 10/04/2010 | 14757 | BRACKETT, TIM | 10/07/2010 |

Exhibit H-3

**From:** Paugh, Kevin R
**To:** Police Department
**Subject:** DAILY ACTIVITY LOG 02-09-12
**Date:** Friday, February 10, 2012 5:58:00 AM
**Attachments:** DAILY ACTIVITY LOG 02-09-12.pdf



EXHIBIT 48
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

MP000061

# MENLO PARK POLICE

## DAILY ACTIVITY LOG
### B Side / February 09, 2012

**B Days**                                    Watch Commander: **Sergeant Brackett**

| OFFICER | HOURS | BEAT | VEH | A/C | AR/LL | PAS | CITES | CASES/SUPS |
|---------|-------|------|-----|-----|-------|-----|-------|------------|
| Brackett | 0600-1800 | WC | 24 | - | - | - | 0 | 0/0 |
| Trask | 0600-1800 | 1 | 3 | 19 | LL1 | - | 1 | 2/0 |
| Poirier/FTO | 0600-1800 | 1 | 19 | 5 | AR | - | 0 | 1/0 |
| Ordone/FTO | 0600-1800 | 1 | 19 | 5 | - | - | 2 | 1/0 |
| Baxter | 1000-1800 | 2 | 20 | 16 | LL2 | - | 0 | 0/0 |
| Hughes | 0600-1800 | 3 | 15 | 18 | LL1 | - | 1 | 0/2 |
| Adair | 0600-1800 | 3 | 17 | 15 | - | - | 3 | 0/0 |

\*Shift Adjust

| OFF-DUTY | REASON | REPLACEMENT |
|----------|--------|-------------|
| Byars | Training | Baxter |
| Solorzano | Vaca | None |
| - | - | None |

**TRAINING/OTHER**

BOL's, E-mails, TRAK flyers, Daily Training Bulletin-Use of Force to Effect an Arrest, Missing Person

---

**B Mids**                                    Watch Commander: **Sergeant Paugh**

| OFFICER | HOURS | BEAT | VEH | A/C | AR/LL | PAS | CITES | CASES/SUPS |
|---------|-------|------|-----|-----|-------|-----|-------|------------|
| Paugh | 1800-0600 | WC | 23 | Sgt | AR/LL | - | 3 | 0/0 |
| Swanson/Lacy | 1800-0600 | 1 | 14 | 3 | LL5 | 8 | 4 | 1/1 |
| Tommei | 1800-0600 | 1 | 4 | 2 | AR | 1 | 5 | 1 |
| Knopp | 1800-0600 | 2 | 8 | 8 | AR/LL8 | - | 4 | 1 |
| Weber | 1800-0600 | 2 | 17 | 9 | 40#1 | 7 | 4 | 1/1 |
| Perna | 1800-0600 | 3 | 15 | 18 | LL1 | 3 | 1 | 0/1 |
| Luevano | 1500-0600 | 3 | 7 | 16 | - | - | 3 | 0/2 |

\*Shift Adjust

| OFF-DUTY | REASON | REPLACEMENT |
|----------|--------|-------------|
| - | - | None |
| - | - | None |
| - | - | None |

**TRAINING/OTHER**

BOL's, E-mails, TRAK flyers, Prone Position Training video, Daily Training Bulletin-OIS representation

MP000062

## Major Incidents

None.

## Calls, Service, and Arrests

### Days

**12-482 / Officer Hughes**        *Gang Info*                                    **(Beat 3)**
During a consensual contact, a juvenile subject was found to be on active San Mateo County probation and admitted to being associated with the Norteno street gang. The subject was observed having gang related tattoos and wearing gang associated clothing.

**12-483 / Officer Ordone**        *1182*                                    **(Beat 2)**
P-1 was towing a trailer, eastbound on Marsh Road. P-1 drifted into the number 3 lane, where he collided with the side door of V-2.

**12-484 / Officer Sepulveda**        *484g(a) PC - Misd*                                    **(Beat 2)**
Unknown suspect(s) obtained the victim's credit card information by unknown means and made unauthorized purchases.

**12-485 / Officer Hughes**        *647.6(A) PC*                                    **(Beat 3)**
The suspect molested the juvenile confidential victim by kissing her repeatedly on and around her mouth.

**12-486 / Officer Hughes**        *243(e)(1) PC*                                    **(Beat 2)**
The Victim and the Suspect have a 4 year old daughter together. The Suspect struck the Victim several times, while he was driving his vehicle. The Suspect sustained no visible injury as a result of the assault. This incident took place in San Diego California 45 days prior to being reported to the Menlo Park Police Department. The Suspect in this incident lives in San Diego and has been named, although I was unable to find any record of her or her address in all data bases available to me.

**12-487 / Officer Sepulveda**        *488 PC*                                    **(Beat 2)**
Unknown suspect(s) took an iPhone cell phone from a teacher's desk. There are no leads at this time..

**12-488 / Officer Baxter**        *Prop Dest*                                    **(Beat 2)**
On 02-09-2012, at 1130 hours, P████ requested that her hand gun be destroyed. The handgun, a Sig Sauer P220 9mm was booked into property for destruction.

### Mids

**12-490 / Weber**        *240-242 PC*                                    **(Beat 2)**
A juvenile was assaulted by 4 unknown suspects in the carport area of ████████. The victim was struck multiple times with closed fists. The victim did not sustain any visible injuries. The suspects, described only as HMA's in their early 20's, wearing all black, and driving a black sedan with chrome rimes, are currently outstanding. (2001 hours)

**12-491 / Lacy**        *530.5(c) PC*                                    **(Beat 1)**
Victim reported a bank account and credit card fraudulently opened in their name. No known loss at this time. (2107 hours)

**12-492 / Tommei**        *Info Case*                                    **(Beat 1)**
On 2/8/11, Officers contacted intoxicated subjects leaving the Oak City Bar after hours. Today, the bar manager was

contacted and a bar check was conducted. During the check, several ABC violations were noted. Case taken for documentation. (2230 hours)

*12-493 / Knopp, team 12021, 12025, 496, 3056, 647(h), 11357(c), stored veh* ▓▓▓▓▓▓▓ *(Beat 2)*
While conducting burglary suppression, Officer Knopp observed a suspicious vehicle parked in the rear of a business located at ▓▓▓▓▓▓▓. Upon seeing the police, the occupants of the vehicle drove away and attempted to evade police by driving without their headlights illuminated. The subjects were then located behind ▓▓▓▓▓▓▓ and contacted. One occupant of the vehicle was found to be on Parole, and all had extensive H&S and burglary history. During a search of the vehicle, 188 grams of Marijuana was located in a truck bed toolbox. Concealed in storage container located in the engine compartment, officer located 3 loaded handguns (.40 cal, . Record checks on the weapons found that two had been stolen out of San Mateo. In one of the burglaries, Suspect ▓▓▓▓▓▓▓ was named as a suspect. ▓▓▓▓▓▓▓ (▓▓▓▓▓), ▓▓▓▓▓▓▓ (▓▓▓▓▓) and ▓▓▓▓▓▓▓ (▓▓▓▓▓ were all arrested on various charges and booked into County Jail. SMPD was contacted and advised. Their detectives will conduct further investigation into their burglary tomorrow. (0053 hours)

## Outside Assist

### *Mids*

PAPD sgt was contacted for Officer Safety reasons and advised of Zeleny's actions today, as well as the fact that Zeleny was staying in a hotel in their city.

MPPD was advised of a possible suicidal subject who had left Sequoia Hospital after advising a doctor that he wanted to injure himself. The subject was located at a residence in Menlo Park and was voluntarily transported to the hospital for treatment.

## Problem Solving

### *Days*

Officers responded to 2855 Sandhill Rd in regards to an open carry demonstration. Upon arrival two subjects, Michael Zeleny and Michael Wong were contacted and found to be legally carrying unloaded rifles. Both subjects were wearing military style uniforms, level IIIA tactical vests (one with a ceramic trauma plate). The rifles carried by the subjects were M1A type, .308 cal, and they each had several loaded 10 round magazines on their person, but not loaded in the rifles. The demonstration was targeted at a venture capital company, to discourage their business deals with an individual. No crimes were committed, both subjects were cooperative with police and the incident was peaceful. **Officers were on scene for approximately 6 hrs.**

## Community Outreach

None.

## Traffic Complaints

### *Mids*

Officers conducted cellphone enforcement at several locations in the city during evening commute.

## Parking Citations / Subpoena Service / FI's / Gang Validations

| | Parking Cites | Stored Vehicles | Subpoena Service | FIs / Gang Validations |
|---|---|---|---|---|
| *Days* | | 0 | 0 | 1/0 |
| *Mids* | 1 | 1 | 2 | 0/0 |

## Reported Stolen Vehicle

| Plate | Year | Make | Model | Color | Location |
|---|---|---|---|---|---|

## NET Investigations / Activity

None.

## Records / Parking Enforcement Activity

| | | Parking Cites | Stored Vehicles |
|---|---|---|---|
| *Days* | Dayharsh | 27 | 0 |
| | Sharma | 27 | 0 |
| *Mids* | Campos | 0 | 0 |
| | Urena | 25 | 0 |

| *REGISTRANTS* | 290 | 11590 | Arson | Gang |
|---|---|---|---|---|
| None | 0 | 0 | 0 | 0 |

Exhibit H-4

| From: | Ortega, Matthew K |
| To: | Police Department |
| Subject: | 06-20-12 DAILY ACTIVITY LOG |
| Date: | Wednesday, June 20, 2012 5:58:32 PM |
| Attachments: | 06-20-12 DAILY ACTIVITY LOG.pdf |



EXHIBIT 50
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

# MENLO PARK POLICE

## DAILY ACTIVITY LOG
### A Side / June 20, 2012

**A Days**      **Watch Commander: Sergeant Ortega**

| OFFICER | HOURS | BEAT | VEH | A/C | AR/LL | PAS | CITES | CASES/SUPS |
|---|---|---|---|---|---|---|---|---|
| Ortega | 0600-1800 | WC | 23 | Sgt | LL | - | 0 | 0/0 |
| Phu | 0600-1800 | 1 | 21 | 1 | AR | - | 6 | 2/1 |
| Solorzano | 0600-1800 | 1 | 19 | 13 | 5 | - | 0 | 1/0 |
| Byars | 0600-1800 | 2 | 13 | 12 | 15 | - | 1 | 1/1 |
| Igno | 0600-1800 | 3 | 2 | 5 | AR | - | 14 | 1/0 |
| Lacy | 0600-1800 | 3 | 4 | 14 | 2 | - | 5 | 0/1 |
| Ordone | 1100-2100 | CSO | 33 | - | - | - | 0 | 2/0 |
| Sepulveda | 1100-2100 | CSO | 49 | - | - | - | 0 | 1/0 |

*Shift Adjust

| OFF-DUTY | REASON | REPLACEMENT |
|---|---|---|
| Trask | ANW/Exp Aca | None |
| - | - | None |
| - | - | None |

**TRAINING/OTHER**

BOL's, E-mails, TRAK flyers, Daily Training Bulletin-Search & Seizure/Const. Rights, Secondary Firearm

---

**A Mids**      **Watch Commander: Sergeant Soares**

| OFFICER | HOURS | BEAT | VEH | A/C | AR/LL | PAS | CITES | CASES/SUPS |
|---|---|---|---|---|---|---|---|---|
| Ortega | 0600-1800 | WC | 23 | - | - | - | 0 | 0/0 |
| Simpson | 1800-0600 | 1 | 16 | - | - | - | 0 | 0/0 |
| Mackdanz | 1800-0600 | 1 | 25 | - | - | - | 0 | 0/0 |
| Igno | 1800-0600 | 2 | 2 | - | - | - | 0 | 0/0 |
| J. Venzon | 1800-0600 | 2 | 11 | - | - | - | 0 | 0/0 |
| Russell | 1800-0600 | 2 | 12 | - | - | - | 0 | 0/0 |
| Schuler | 1800-0600 | 3 | 6 | - | - | - | 0 | 0/0 |
| Mendoza | 1800-0600 | 3 | 13 | - | - | - | 0 | 0/0 |

*Shift Adju

| OFF-DUTY | REASON | REPLACEMENT |
|---|---|---|
| - | - | None |
| - | - | None |
| - | - | None |

**TRAINING/OTHER**

BOL's, E-mails, TRAK flyers, Daily Training Bulletin-Use of Force to Effect an Arrest, Missing Person

| Major Incidents |
| --- |

None.

| Calls, Service, and Arrests |
| --- |

## Days

**12-1900 / Igno**                          *Wrt Arr/MP-Misdemeanor*                    ████████████ *(Beat 3)*
SA-████████ was contacted during a traffic stop and found to have an outstanding warrant for 14601 CVC. He was cited and released.

**12-1901 / Solorzano**                     *460(a) PC*                    ████████████ *(Beat 1)*
RP gardener reported that client at this address had been burglarized. RP found jewelry on the ground in front of house and when checked front door it was open. RP then found that a rear yard window had been smashed. Residents have been out of town since 06/11/12. Burglary occurred between 06/13/12 and 06/20/12. Gardeners were last at this address on 06/13 and everything looked fine. Unknown what property was missing, residents will not be home until 06/22.

**12-1902 / Byars**                          *Missing Adult-At Risk*                    ████████*(Beat 2)*
MP-████████ voluntarily walked away from the Golden Years Manor care facility on 06/19/12. MP must take medication multiple times daily for paranoid schizophrenia.

**12-1903 / Phu**                          *Info Case/Zeleny*                    2825 Sand Hill Rd *(Beat 1)*
P-Michael Zeleny was contacted at the Rosewood Hotel and his weapons were checked and photographed for documentation. P-Zeleny was very cooperative.

**12-1904 / Ordone**                          *1182 Non Injury Accident*                    *ECR/Oak Grove Ave (Beat 1)*
Two-vehicle rear end collision, no injury.

**12-1905 / Ordone**                          *530.5(A) PC*                    ████████*(Beat 1)*
Unknown suspects used the victim's name and social security number to obtain a cellular phone account and generated a $1,359.00 bill.

**12-1906 / Sepulveda**                          *20002 CVC*                    ████████*(Beat 3)*
Unknown suspect driving a dark colored SUV possibly a Dodge turned into the victim's driveway and struck her parked car and fled.

**12-1907 / Phu**                          *594(b)(2)(A) PC*                    ████████ *(Beat 1)*
Unknown suspect(s) shot a BB or pellet through the victim's un occupied/parked vehicle. Occurred sometime between 1400 hr and 1600 hrs today.

**12-1908 / del Mundo NET**          *Wrt Arr/Outsid-Misdemeanor*                    ████████*(Beat 99)*
SA-████████████ was contacted during a traffic stop and found to have a $10,000 warrant out of SJPD and a $5,000 warrant out of SCCSO for $5,000, both for 14601 CVC. SA-████████ was arrested and booked into county jail.

## Mids

**12-0000 / Officer**                          *Charges*                    *Address (Beat)*
Case details.

*12-0000 / Officer*          *Charges*                                    *Address (Beat)*
Case details.

*12-0000 / Officer*          *Charges*                                    *Address (Beat)*
Case details.

*12-0000 / Officer*          *Charges*                                    *Address (Beat)*
Case details.

*12-0000 / Officer*          *Charges*                                    *Address (Beat)*
Case details.

*12-0000 / Officer*          *Charges*                                    *Address (Beat)*
Case details.

*12-0000 / Officer*          *Charges*                                    *Address (Beat)*
Case details.

## Outside Assist

None.

## Problem Solving

None.

## Community Outreach

Carolina Gaskin, CSO Ordone, CSO Sepulveda, and MPPD Explorers represented MPPD at a table during the city Downtown Block Party.

## Traffic Complaints

None.

## Parking Citations / Subpoena Service / FI's / Gang Validations

|        | Parking Cites | Stored Vehicles | Subpoena Service | FIs / Gang Validations |
|--------|---------------|-----------------|------------------|------------------------|
| *Days* | 4             | 0               | 0                | 0/0                    |
| *Mids* | 0             | 0               | 0                | 0/0                    |

## Reported Stolen Vehicle

| Plate | Year | Make | Model | Color | Location |
|-------|------|------|-------|-------|----------|

## NET Investigations / Activity

None.

| Records / Parking Enforcement Activity |
|---|

|  |  | Parking Cites | Stored Vehicles |
|---|---|---|---|
| *Days* | Dayharsh | 14 | 0 |
|  | Sharma | 0 | 0 |
|  |  |  |  |
| *Mids* | Campos | 0 | 0 |
|  | Urena | 0 | 0 |

| *REGISTRANTS* | **290** | **11590** | **Arson** | **Gang** |
|---|---|---|---|---|
| None | 0 | 0 | 0 | 0 |

MP000124

Exhibit H-5

**From:** Ortega, Matthew K
**To:** Police Department
**Subject:** 06-20-12 DAILY ACTIVITY LOG
**Date:** Wednesday, June 20, 2012 5:58:32 PM
**Attachments:** 06-20-12 DAILY ACTIVITY LOG.pdf

MP000120

# MENLO PARK POLICE

## DAILY ACTIVITY LOG
### A Side / June 20, 2012

| A Days | | | | | | | Watch Commander: Sergeant Ortega | |
|---|---|---|---|---|---|---|---|---|

| OFFICER | HOURS | BEAT | VEH | A/C | AR/LL | PAS | CITES | CASES/SUPS |
|---|---|---|---|---|---|---|---|---|
| Ortega | 0600-1800 | WC | 23 | Sgt | LL | - | 0 | 0/0 |
| Phu | 0600-1800 | 1 | 21 | 1 | AR | - | 6 | 2/1 |
| Solorzano | 0600-1800 | 1 | 19 | 13 | 5 | - | 0 | 1/0 |
| Byars | 0600-1800 | 2 | 13 | 12 | 15 | - | 1 | 1/1 |
| Igno | 0600-1800 | 3 | 2 | 5 | AR | - | 14 | 1/0 |
| Lacy | 0600-1800 | 3 | 4 | 14 | 2 | - | 5 | 0/1 |
| Ordone | 1100-2100 | CSO | 33 | - | - | - | 0 | 2/0 |
| Sepulveda | 1100-2100 | CSO | 49 | - | - | - | 0 | 1/0 |
| *Shift Adjust | | | | | | | | |

| OFF-DUTY | REASON | REPLACEMENT |
|---|---|---|
| Trask | ANW/Exp Aca | None |
| - | - | None |
| - | - | None |

**TRAINING/OTHER**

BOL's, E-mails, TRAK flyers, Daily Training Bulletin-Search & Seizure/Const. Rights, Secondary Firearm

| A Mids | | | | | | | Watch Commander: Sergeant Soares | |
|---|---|---|---|---|---|---|---|---|

| OFFICER | HOURS | BEAT | VEH | A/C | AR/LL | PAS | CITES | CASES/SUPS |
|---|---|---|---|---|---|---|---|---|
| Ortega | 0600-1800 | WC | 23 | - | - | - | 0 | 0/0 |
| Simpson | 1800-0600 | 1 | 16 | - | - | - | 0 | 0/0 |
| Mackdanz | 1800-0600 | 1 | 25 | - | - | - | 0 | 0/0 |
| Igno | 1800-0600 | 2 | 2 | - | - | - | 0 | 0/0 |
| J. Venzon | 1800-0600 | 2 | 11 | - | - | - | 0 | 0/0 |
| Russell | 1800-0600 | 2 | 12 | - | - | - | 0 | 0/0 |
| Schuler | 1800-0600 | 3 | 6 | - | - | - | 0 | 0/0 |
| Mendoza | 1800-0600 | 3 | 13 | - | - | - | 0 | 0/0 |
| *Shift Adjust | | | | | | | | |

| OFF-DUTY | REASON | REPLACEMENT |
|---|---|---|
| - | - | None |
| - | - | None |
| - | - | None |

**TRAINING/OTHER**

BOL's, E-mails, TRAK flyers, Daily Training Bulletin-Use of Force to Effect an Arrest, Missing Person

MP000121

## Major Incidents

None.

## Calls, Service, and Arrests

### *Days*

**12-1900 / Igno**                *Wrt Arr/MP-Misdemeanor*          ▇▇▇▇▇▇▇ *(Beat 3)*
SA-▇▇▇▇ was contacted during a traffic stop and found to have an outstanding warrant for 14601 CVC. He was cited and released.

**12-1901 / Solorzano**                *460(a) PC*          ▇▇▇▇▇▇ *(Beat 1)*
RP gardener reported that client at this address had been burglarized. RP found jewelry on the ground in front of house and when checked front door it was open. RP then found that a rear yard window had been smashed. Residents have been out of town since 06/11/12. Burglary occurred between 06/13/12 and 06/20/12. Gardeners were last at this address on 06/13 and everything looked fine. Unknown what property was missing, residents will not be home until 06/22.

**12-1902 / Byars**                *Missing Adult-At Risk*          ▇▇▇▇▇▇ *(Beat 2)*
MP-▇▇▇▇ voluntarily walked away from the Golden Years Manor care facility on 06/19/12. MP must take medication multiple times daily for paranoid schizophrenia.

**12-1903 / Phu**                *Info Case/Zeleny*          *2825 Sand Hill Rd (Beat 1)*
P-Michael Zeleny was contacted at the Rosewood Hotel and his weapons were checked and photographed for documentation. P-Zeleny was very cooperative.

**12-1904 / Ordone**                *1182 Non Injury Accident*          *ECR/Oak Grove Ave (Beat 1)*
Two-vehicle rear end collision, no injury.

**12-1905 / Ordone**                *530.5(A) PC*          ▇▇▇▇▇ *(Beat 1)*
Unknown suspects used the victim's name and social security number to obtain a cellular phone account and generated a $1,359.00 bill.

**12-1906 / Sepulveda**                *20002 CVC*          ▇▇▇▇ *(Beat 3)*
Unknown suspect driving a dark colored SUV possibly a Dodge turned into the victim's driveway and struck her parked car and fled.

**12-1907 / Phu**                *594(b)(2)(A) PC*          ▇▇▇▇▇▇ *(Beat 1)*
Unknown suspect(s) shot a BB or pellet through the victim's un occupied/parked vehicle. Occurred sometime between 1400 hr and 1600 hrs today.

**12-1908 / del Mundo NET**                *Wrt Arr/Outsid-Misdemeanor*          ▇▇▇▇▇▇ *(Beat 99)*
SA-▇▇▇▇▇ was contacted during a traffic stop and found to have a $10,000 warrant out of SJPD and a $5,000 warrant out of SCCSO for $5,000, both for 14601 CVC. SA-▇▇▇▇ was arrested and booked into county jail.

### *Mids*

**12-0000 / Officer**                *Charges*          *Address (Beat)*
Case details.

| *12-0000 / Officer* | *Charges* | *Address (Beat)* |
|---|---|---|
| Case details. | | |

| *12-0000 / Officer* | *Charges* | *Address (Beat)* |
|---|---|---|
| Case details. | | |

| *12-0000 / Officer* | *Charges* | *Address (Beat)* |
|---|---|---|
| Case details. | | |

| *12-0000 / Officer* | *Charges* | *Address (Beat)* |
|---|---|---|
| Case details. | | |

| *12-0000 / Officer* | *Charges* | *Address (Beat)* |
|---|---|---|
| Case details. | | |

| *12-0000 / Officer* | *Charges* | *Address (Beat)* |
|---|---|---|
| Case details. | | |

## Outside Assist

None.

## Problem Solving

None.

## Community Outreach

Carolina Gaskin, CSO Ordone, CSO Sepulveda, and MPPD Explorers represented MPPD at a table during the city Downtown Block Party.

## Traffic Complaints

None.

## Parking Citations / Subpoena Service / FI's / Gang Validations

| | Parking Cites | Stored Vehicles | Subpoena Service | FIs / Gang Validations |
|---|---|---|---|---|
| *Days* | 4 | 0 | 0 | 0/0 |
| *Mids* | 0 | 0 | 0 | 0/0 |

## Reported Stolen Vehicle

| Plate | Year | Make | Model | Color | Location |
|---|---|---|---|---|---|

## NET Investigations / Activity

None.

## Records / Parking Enforcement Activity

| | | Parking Cites | | Stored Vehicles | |
|---|---|---|---|---|---|
| **_Days_** | Dayharsh | 14 | | 0 | |
| | Sharma | 0 | | 0 | |
| | | | | | |
| **_Mids_** | Campos | 0 | | 0 | |
| | Urena | 0 | | 0 | |
| | | | | | |
| **_REGISTRANTS_** | | **290** | **11590** | **Arson** | **Gang** |
| None | | 0 | 0 | 0 | 0 |

MP000124

Exhibit I

No Sir, he has not.

As you know he has been sending correspondence back and forth between Stanford Attorneys and himself. This is par for course with him as he likes to engage in conversations and manipulate as much as possible satisfying his need for attention.

We continue to be in close contact with security from NEA and they will call my cell in the event Zeleny does show up.

--------------------------
Sent using BlackBerry

----- Original Message -----
From: Roberts, Bryan A
To: Romero, Jaime G
Sent: Wed Apr 27 07:53:16 2011
Subject: Zeleny Protest

Jaime,

Did he ever protest??

Bryan

MP000041

Exhibit J

No problem. Sharon is here now and we will work together on this.

Sent from my iPhone

On Feb 9, 2012, at 11:09 AM, "Bertini, David C" <dcbertini@menlopark.org> wrote:

> I agree. Lets keep someone there until we can resolve this....so who is working on the EPO? If they request it, we
would fill out the application for it. I spoke to Sharon about that. Can you get with her about it?
>
> Thanks.
>
> Sent from my iPad
>
> On Feb 9, 2012, at 11:08 AM, "Brackett, Timothy M" <TMBrackett@menlopark.org> wrote:
>
>> I have spoken with reps associated with Rosewood and NEA. They are now in the process of working on an
EPO. I will keep you posted with any additional info as it arises. I also don't feel comfortable with leaving Zeleny
and his partner Wong without officers on scene.
>>
>> Thanks
>>
>> Tim
>>
>> Sent from my iPhone



**EXHIBIT 54**
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

Exhibit K

**From:** O"Connor, Dani
**To:** Police Department
**Subject:** Meeting Minutes
**Date:** Monday, April 16, 2012 8:59:58 AM
**Attachments:** Management Staff Meeting Minutes 0412.docx

*Dani O'Connor*
*Administrative Assistant to the Chief of Police*
*Menlo Park Police Department*
*701 Laurel Street*
*Menlo Park, CA. 94025*
*650-330-6326*



EXHIBIT 52
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

MP000088

# Management Staff Meeting Minutes
## Tuesday, April 3, 2012

Attendance: Chief Roberts, Commander Burt, Commander Bertini, Sergeant Cowans, Sergeant Kaufman, Sergeant Dixon, Sergeant Romero, Sergeant Ortega, Sergeant, Paugh, Sergeant Soares, Sergeant Brackett, Susie Eldred, Charlie Manning, Nicole Acker, Meg Nee, Dani O'Connor

**Chief Roberts:**

Welcome Meg Nee who comes to us from Housing and will be taking over the budgeting and finance duties as Management Analyst.

**Commander Bertini:**
**Overtime:**

We are currently over budget through February. Overtime was reduced from $779K to $739K with the loss of RDA. Sergeants should know why officers are working overtime and approve the overtime before it is worked. Consistently, officers are working overtime to write reports which should take place during an officer's regular shift over the course of their work week.

**Transients:**

There was a recent meeting that took place with library staff members regarding the problem of transients using their facilities to bathe and sometimes sleep after hours. This has been a common problem for the library staff however they have been resistant to calling the police in the past so as not to inconvenience our officers. They have been advised to call when such incidents take place and they have issues with these individuals. Officers are to record information taken on the subjects while making contact so it can be forwarded to Officer Byars for CIT purposes.

**Commander Burt/Sergeant Dixon:**
**Vehicle Stops:**

Officers should make a concerted effort to explain the reason / violation necessitating the stop to the violator during each contact. While there is no legal requirement to do so it is a best practice.

In addition, officers should also document the reason for the stop in the notes section prior to going 10-8. Simply checking "warned" is not sufficient enough when an individual comes in regarding a complaint they have related to a vehicle stop.

MP000089

Digital audio recorders should be recording from the initial contact to the conclusion of an event. Often times the entire stop is not being recorded resulting in an incomplete reference source. Officers are expected to record the stop in its entirety.

**Digital Audio Recorders:**

There will be no longer be any latitude given to officers regarding digital recordings. There have been too many issues concerning recordings being cut-off or not started at all during an interaction as well as instances when contact or witness statements have not been recorded during canvases. Officers are required to record contacts taking place in the field. Sergeants are to review policy 450 with your teams to ensure the proper use of digital recorders.

**Commander Burt:**
**Penal Code 632 & 633:**

When having a conversation/interview with an individual, no recording should take place unless the other party is aware. Citizen complaints do not fall under the same guidelines as criminal investigations and should not be recorded unless the individual being interviewed knows they are being recorded.

**Sergeant Ortega:**
**FTO Update:**

Officer Brazier will enter Phase II with Officer Simpson in the next two weeks.

**Sergeant Paugh:**
**Occupy Symposium Overview:**

Several take away's which included the following:

- Occupy protestors are communicating via Twitter and Facebook
- There are several instances when officers are being recognized by means of social media. Do not post job related information on your personal pages.
- Protestors will change tactics based on what they see law enforcement doing
- Officers are changing their tactics / working in smaller groups
- Officers need to have a plan for these events instead of just reacting to the situation
- Batons and less lethal are not to be implemented to clear crowds, they are only to be used to affect an arrest
- There has been poor report writing and poor chain of custody resulting in fewer prosecutions
- There are times when it is unknown who the arresting officer was. Take a photo of the arresting officer with the subject being arrested for later reference

- Give unlawful assembly announcement allowing time parameters for peaceful protestors to clear the area
- Gigapixle – Panoramic photography allows for excellent quality when trying to locate individuals in large crowds
- Tactical Police Tables – iPhone/iPad application allowing sergeants to re-create perimeter of a scene using aerial satellite photos and specific police related icons that can be moved as new positions are assigned and officers arrive on scene to a critical incident.

**Beat Issues:**

**Beat One**
**Sergeant Brackett:**

Burglaries are not concentrated in any specific area of beat one. 70% of the burglaries taking place are in the early morning or afternoon hours that coincide with the time that j's would be walking to or from school.

**Beat Two**
**Sergeant Paugh:**

Burglaries are very wide spread with many non-forced entry style burglaries indicating many open doors and windows. Homes that have been burglarized have had high fences and overgrown bushes. The CPTED program should help to address some of these issues once it is regularly utilized. Neighboring communities seem to have success using their public personnel resources as the eyes and ears of their neighborhoods to combat crime.

All sergeants should have keys to Flood School.

Mike's Café is hosting private parties however; they have not completed the permit process. There have been recent underage drinking incidents and DUI's related to the establishment.

**Action Item: Sgt. Paugh to follow-up with city staff regarding permit.**

**Beat Three**
**Sergeant Soares:**

Officers have been assigned specific duties to combat crime in the area. Assignments include undercover details, probation searches, working with homeowners to record serial numbers, working with parole, working with surrounding agencies to identify common subjects, working to open dialog with those within the community, working with schools to

list truants, and attending neighborhood watch meetings. As weather improves, bicycle officers will also be utilized.

Recently, there has been a rise in members of the Yellow Tape Gang aligning with local Norteno's. GTF has been advised.

Residential Burglary Reduction Plan:

1. Due date of plan implementation sMay 1st.
2. Led by Commander Bertini

Each Beat Commander will be responsible for a side of the crime triangle:

Brackett – Location
Paugh – Victim
Soares – Suspect

This model can be used for any crime or problem on an officer's beat.

Officer Poirier is overseeing the CPTED (Crime Prevention through Environmental Design) program. Currently there is a checklist being created for all officers to complete with a resident or homeowner that has been burglarized. The checklist is meant to provide educational information preventing additional break-ins.

Department goals and strategies were reviewed. Most goals are on schedule.

**Roundtable:**

**Commander Bertini:**
**Inebriate Task Force:**

Effective April 2, 2012, Fire, AMR, and Police should be dispatched to all individuals who are in a public place and inebriated. The officer will complete San Mateo County Arrest Report/Booking Sheet. The Personal Data Section should be completed depending on the degree of intoxication of the individual. It will be important to complete the "Arresting Officer and Agency Section" and place the phone number of the department in the comments section. The Booking Sheet will be given to the American Medical Response crew who will transport the individual to the nearest hospital.

Once the individual is functionally sober (still intoxicated but able to walk and talk) and cleared by the E.D. doctor, the arresting agency will be called back to the hospital to take the individual back into custody and transport that individual either to First Chance or the jail. The hospital will give the transporting officer a Medical Clearance Form/Discharge Instructions ready for the officer of the arresting agency.

iPad beta testing is going well.

**Action Item: Issue an iPad to a patrol sergeant.**

This year's Torch Run will take place on June 15th.

**Nicole Acker:**
**Training:**

CPR/First Aid training will take place at fire station #77 on Chilco. Everyone has been signed up for their respective training dates and will be emailed as their training date nears.

SLI applications are currently being accepted until April 27th.

**Action item: Sergeant's Dixon, Paugh and Ortega to apply.**

Briefing training will be conducted for the following topics:

- Vehicle pursuit April 12th
- Human trafficking April 19th
- Temporary holding facility April 30th

Upcoming training:

- Domestic violence update
- Legal update
- CPTED

**Sergeant Soares:**

Officers Neumann, Venzon and Adair have just completed training with the Ca. Gang Investigators Assoc.

Officers Mendoza and Dixon are now providing testimony for gang enhancement.

**Sergeant Kaufman:**

Michael Zeleny was the topic of a recent meeting with Mark Weiss of the SMSO however, there seems to be no firm solution to ending his protest. Ken James, Police Chief of Emeryville, recently met with a legislative committee regarding open carry and the prohibition of long guns as well as hand guns. A photo of Michael Zeleny was prominently featured during the committee meeting which seemed to have a resounding impact on the participants.

**Sergeant Paugh:**

Firearms training will take place in May. There will be an open shoot and further information will be provided by Sergeant Paugh. For those interested in rifle training, please submit a letter of interest to Sergeant Paugh.

**Susie Eldred:**

Firearms are being taken as evidence however; they are not submitted with sufficient information to enter them into CLETS. Officers must complete the detailed information on the "Firearms" tab (tab two of the RIMS Property entry). Sergeants need to be certain the AFS entry is attached prior to approving the case.

Vehicle computers are required to be updated by officers in order to avoid using outdated codes.

**Sergeant Romero:**

When approving cases or supplements, sergeants are required to check the box "forward to investigations" if further investigation is necessary. Checking this box automatically forwards the case to Sergeant Romero.

**Commander Burt:**
**Policy Updates:**

It was recently discovered that policy updates are not always added to the binders leading command staff to believe that officers are likely using the policy manual on the police department intranet. In the future, binders will only be provided for management staff. The summary sheets will be given to sergeants who will review the new policies with their teams.

Exhibit L

| | |
|---|---|
| **From:** | Roberts, Bryan A |
| **Sent:** | Monday, October 24, 2011 5:31 PM |
| **To:** | Bertini, David C |
| **Subject:** | FW: Zeleny |

This is a long story with a lot of history, but very touchy and political. Sgt Romero and Kaufman are well versed.

**From:** Kaufman, Sharon A
**Sent:** Friday, October 21, 2011 4:54 PM
**To:** Roberts, Bryan A
**Cc:** Romero, Jaime G
**Subject:** Zeleny

Chief,

I met with several people this morning on the forecasted upcoming visit of Mr. Zeleney at NEA properties. Present were members of Stanford Properties, the Rosewood Hotel and Dan Siegel.

In a nutshell the judgment of the court gave specific instructions as to where Mr. Zeleney was and was not allowed. The Stay Away Letter issued to him by Stanford Properties last year, (which he acknowledged via email) essentially prevents him from all other areas on the property. His protest area will be the tiny public easement area that borders Sand Hill Rd and he will not be able to venture from that.

It was an understanding that the police department could not staff an overtime person indefinitely and both Rosewood and NEA were pursuing having their own on site security be vigilant in looking out for his arrival.

We did agree that when and if he shows up that a representative from the police department will meet with him and reiterate what the parameters are in regards to his protest. Personally, I have no idea where he intends to park his vehicle or any others that might decide to join him. Included in the discussion will be the re-affirmation of the stay away letter issued to him last year. In that letter it specifically states that if he ventures onto the property that he could possibly be subject to arrest for trespass.

We further discussed that if he does ignore the order and come onto the property that the act is somehow documented through recorded contact or a photograph of him on the grounds. Dan was in agreement it would fit the criteria for a cite and release, and he was going to telephone Morris Maya with the D.A. office on Tuesday to give him a heads up and get the D.A.'s position on the matter.

It was explained that he can have banners and signs as long as whatever he does with them does not impede vehicular, bicycle or pedestrian traffic.

Stanford believes that he might try something to push them to interact with him. They feel he will try to do something to draw them into a lawsuit and they are urging their people to not engage.

Please let me know if there is anything further you would like me to provide, as of right now all parties are informed and a good game plan is in place.

Sergeant Sharon Kaufman
Traffic Sergeant

1

**EXHIBIT**
**0256**

MP0

Menlo Park Police Department
(650)-330-6343
sakaufman@menlopark.org

MP005381

Exhibit M

# First Amendment Assemblies

## 467.1 PURPOSE AND SCOPE
This policy provides guidance for responding to public assemblies or demonstrations.

## 467.2 POLICY
The Menlo Park Police Department respects the rights of people to peaceably assemble. It is the policy of this department not to unreasonably interfere with, harass, intimidate or discriminate against persons engaged in the lawful exercise of their rights, while also preserving the peace, protecting life and preventing the destruction of property.

## 467.3 GENERAL CONSIDERATIONS
Individuals or groups present on the public way, such as public facilities, streets or walkways, generally have the right to assemble, rally, demonstrate, protest or otherwise express their views and opinions through varying forms of communication, including the distribution of printed matter. These rights may be limited by laws or ordinances regulating such matters as the obstruction of individual or vehicle access or egress, trespass, noise, picketing, distribution of handbills and leafleting, and loitering. However, officers shall not take action or fail to take action based on the opinions being expressed.

Participant behavior during a demonstration or other public assembly can vary. This may include, but is not limited to:

- Lawful, constitutionally protected actions and speech.

- Civil disobedience (typically involving minor criminal acts).

- Rioting.

All of these behaviors may be present during the same event. Therefore, it is imperative that law enforcement actions are measured and appropriate for the behaviors officers may encounter. This is particularly critical if force is being used. Adaptable strategies and tactics are essential. The purpose of a law enforcement presence at the scene of public assemblies and demonstrations should be to preserve the peace, to protect life and prevent the destruction of property.

Officers should not:

(a) Engage in assembly or demonstration-related discussion with participants.

(b) Harass, confront or intimidate participants.

(c) Seize the cameras, cell phones or materials of participants or observers unless an officer is placing a person under lawful arrest.

Supervisors should continually observe department members under their commands to ensure that members' interaction with participants and their response to crowd dynamics is appropriate.



EXHIBIT 43
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

### 467.3.1   PHOTOGRAPHS AND VIDEO RECORDINGS
Photographs   and video recording, when appropriate, can serve a number of purposes, including support of criminal prosecutions by documenting criminal acts; assistance in evaluating department performance; serving as training material; recording the use of dispersal orders; and facilitating a response to allegations of improper law enforcement conduct.

Photographs and videos will not be used or retained for the sole purpose of collecting or maintaining information about the political, religious or social views of associations, or the activities of any individual, group, association, organization, corporation, business or partnership, unless such information directly relates to an investigation of criminal activities and there is reasonable suspicion that the subject of the information is involved in criminal conduct.

### 467.4   UNPLANNED EVENTS
When responding to an unplanned or spontaneous public gathering, the first responding officer should conduct an assessment of conditions, including, but not limited to, the following:

- Location

- Number of participants

- Apparent purpose of the event

- Leadership (whether it is apparent and/or whether it is effective)

- Any initial indicators of unlawful or disruptive activity

- Indicators that lawful use of public facilities, streets or walkways will be impacted

- Ability and/or need to continue monitoring the incident

Initial assessment information should be promptly communicated to the Communications Center, and the assignment of a supervisor should be requested. Additional resources should be requested as appropriate. The responding supervisor shall assume command of the incident until command is expressly assumed by another, and the assumption of command is communicated to the involved members. A clearly defined command structure that is consistent with the Incident Command System (ICS) should be established as resources are deployed.

### 467.5   PLANNED EVENT PREPARATION
For planned events, comprehensive, incident-specific operational plans should be developed. The ICS should be considered for such events.

### 467.5.1   INFORMATION GATHERING AND ASSESSMENT
In order to properly assess the potential impact of a public assembly or demonstration on public safety and order, relevant information should be collected and vetted. This may include:

- Information obtained from outreach to group organizers or leaders.

- Information about past and potential unlawful conduct associated with the event or similar events.

- The potential time, duration, scope and type of planned activities.

- Any other information related to the goal of providing a balanced response to criminal activity and the protection of public safety interests.

Information should be obtained in a transparent manner, and the sources documented. Relevant information should be communicated to the appropriate parties in a timely manner.

Information will be obtained in a lawful manner and will not be based solely on the purpose or content of the assembly or demonstration, or the race, ethnicity, national origin or religion of the participants (or any other characteristic that is unrelated to criminal conduct or the identification of a criminal subject).

### 467.5.2 OPERATIONAL PLANS
An operational planning team with responsibility for event planning and management should be established. The planning team should develop an operational plan for the event.

The operational plan will minimally provide for:

(a)   Command assignments, chain of command structure, roles and responsibilities.

(b)   Staffing and resource allocation.

(c)   Management of criminal investigations.

(d)   Designation of uniform of the day and related safety equipment (e.g., helmets, shields).

(e)   Deployment of specialized resources.

(f)   Event communications and interoperability in a multijurisdictional event.

(g)   Liaison with demonstration leaders and external agencies.

(h)   Liaison with City government and legal staff.

(i)   Media relations.

(j)   Logistics: food, fuel, replacement equipment, duty hours, relief and transportation.

(k)   Traffic management plans.

(l)   First aid and emergency medical service provider availability.

(m)   Prisoner transport and detention.

(n)   Review of policies regarding public assemblies and use of force in crowd control.

(o)   Parameters for declaring an unlawful assembly.

(p)   Arrest protocol, including management of mass arrests.

(q)   Protocol for recording information flow and decisions.

(r)   Rules of engagement, including rules of conduct, protocols for field force extraction and arrests, and any authorization required for the use of force.

(s)   Protocol for handling complaints during the event.

(t)   Parameters for the use of body-worn cameras and other portable recording devices.

### 467.5.3 MUTUAL AID AND EXTERNAL RESOURCES
The magnitude and anticipated duration of an event may necessitate interagency cooperation and coordination. The assigned Incident Commander should ensure that any required memorandums of understanding or other agreements are properly executed, and that any anticipated mutual aid is requested and facilitated (see the Mutual Aid and Outside Agency Assistance Policy).

### 467.6 UNLAWFUL ASSEMBLY DISPERSAL ORDERS
If a public gathering or demonstration remains peaceful and nonviolent, and there is no reasonably imminent threat to persons or property, the Incident Commander should generally authorize continued monitoring of the event.

Should the Incident Commander make a determination that public safety is presently or is about to be jeopardized, he/she or the authorized designee should attempt to verbally persuade event organizers or participants to disperse of their own accord. Warnings and advisements may be communicated through established communications links with leaders and/or participants or to the group.

When initial attempts at verbal persuasion are unsuccessful, the Incident Commander or the authorized designee should make a clear standardized announcement to the gathering that the event is an unlawful assembly, and should order the dispersal of the participants. The announcement should be communicated by whatever methods are reasonably available to ensure that the content of the message is clear and that it has been heard by the participants. The announcement should be amplified, made in different languages as appropriate, made from multiple locations in the affected area and documented by audio and video. The announcement should provide information about what law enforcement actions will take place if illegal behavior continues and should identify routes for egress. A reasonable time to disperse should be allowed following a dispersal order.

### 467.7 USE OF FORCE
Use of force is governed by current department policy and applicable law (see the Use of Force, Handcuffing and Restraints, Control Devices and Techniques, and Conducted Energy Device policies).

Individuals refusing to comply with lawful orders (e.g., nonviolent refusal to disperse) should be given a clear verbal warning and a reasonable opportunity to comply. If an individual refuses to comply with lawful orders, the Incident Commander shall evaluate the type of resistance and adopt a reasonable response in order to accomplish the law enforcement mission (such as dispersal or arrest of those acting in violation of the law). Control devices and TASER® devices should be considered only when the participants' conduct reasonably appears to present the potential to harm officers, themselves or others, or will result in substantial property loss or damage (see the Control Devices and Techniques and the Conducted Energy Device policies).

Copyright Lexipol, LLC 2017/03/07, All Rights Reserved.
Published with permission by Menlo Park Police Department

Force or control devices, including oleoresin capsaicin (OC), should be directed toward individuals and not toward groups or crowds, unless specific individuals cannot reasonably be targeted due to extreme circumstances, such as a riotous crowd.

Any use of force by a member of this department shall be documented promptly, completely and accurately in an appropriate report. The type of report required may depend on the nature of the incident.

## 467.8 ARRESTS

The Menlo Park Police Department should respond to unlawful behavior in a manner that is consistent with the operational plan. If practicable, warnings or advisements should be communicated prior to arrest.

Mass arrests should be employed only when alternate tactics and strategies have been, or reasonably appear likely to be, unsuccessful. Mass arrests shall only be undertaken upon the order of the Incident Commander or the authorized designee. There must be probable cause for each arrest.

If employed, mass arrest protocols should fully integrate:

(a)    Reasonable measures to address the safety of officers and arrestees.

(b)    Dedicated arrest, booking and report writing teams.

(c)    Timely access to medical care.

(d)    Timely access to legal resources.

(e)    Timely processing of arrestees.

(f)    Full accountability for arrestees and evidence.

(g)    Coordination and cooperation with the prosecuting authority, jail and courts (see the Cite and Release Policy).

## 467.9 MEDIA RELATIONS

The Public Information Officer should use all available avenues of communication, including press releases, briefings, press conferences and social media to maintain open channels of communication with media representatives and the public about the status and progress of the event, taking all opportunities to reassure the public about the professional management of the event (see the News Media Relations Policy).

## 467.10 DEMOBILIZATION

When appropriate, the Incident Commander or the authorized designee should implement a phased and orderly withdrawal of law enforcement resources. All relieved personnel should promptly complete any required reports, including use of force reports, and account for all issued equipment and vehicles to their supervisors prior to returning to normal operational duties.

Copyright Lexipol, LLC 2017/03/07, All Rights Reserved.
Published with permission by Menlo Park Police Department

## 467.11 POST EVENT

The Incident Commander should designate a member to assemble full documentation of the event, to include the following:

(a) Operational plan

(b) Any incident logs

(c) Any assignment logs

(d) Vehicle, fuel, equipment and supply records

(e) Incident, arrest, use of force, injury and property damage reports

(f) Photographs, audio/video recordings, the Communications Center records/tapes

(g) Media accounts (print and broadcast media)

### 467.11.1 AFTER-ACTION REPORTING

The Incident Commander should work with City legal counsel, as appropriate, to prepare a comprehensive after-action report of the event, explaining all incidents where force was used including the following:

(a) Date, time and description of the event

(b) Actions taken and outcomes (e.g., injuries, property damage, arrests)

(c) Problems identified

(d) Significant events

(e) Recommendations for improvement; opportunities for training should be documented in a generic manner, without identifying individuals or specific incidents, facts or circumstances.

## 467.12 TRAINING

Department members should receive periodic training regarding this policy, as well as the dynamics of crowd control and incident management (Penal Code § 13514.5). The Department should, when practicable, train with its external and mutual aid partners.

Exhibit O

# MENLO PARK POLICE DEPARTMENT

Page 1

**701 LAUREL ST      MENLO PARK, CA 94025      650-330-6300**
**GENERAL CASE REPORT**

Case
12-1596

## OFFENSES

| Offenses | Description | | | Fel/Misd | Date Occurred | Time Occurred | Incident # |
|---|---|---|---|---|---|---|---|
| Info | General Information Case | | | | 05/24/2012 | 0935 | 1205240037 |

| Date Reported | Time Reported |
|---|---|
| 05/24/2012 | 0938 |

| Related Cases |
|---|
| |

| Date Printed | Time Printed | Printed By |
|---|---|---|
| 01/28/2019 | 13:43:01 | 15159 |

| Latitude | Longitude |
|---|---|
| 0.000000 | 0.000000 |

| Location | | Beat | Area | Disposition | | Dispo Date |
|---|---|---|---|---|---|---|
| Rosewood Sand Hill Resort And Sp, 2825 Sand Hill Rd, Menlo Park, CA 94025 | | 1 | 30 | Closed | | 05/24/2012 |

| Location Type | Location of Entry | Method of Entry | Point of Entry | Alarm System | Means of Attack (Robbery) |
|---|---|---|---|---|---|
| | | | | | |

| Reporting Party | | Drivers License | Cell Phone | Email | | |
|---|---|---|---|---|---|---|
| Casey, Michael | | | | | | |

| Residence Address | Notified of Victim Rights | Residence Phone | DOB | Age | Sex | Race |
|---|---|---|---|---|---|---|
| | | ███████ | | | | |

| Business Name and Address | Business Phone | Height | Wt | Hair | Eyes |
|---|---|---|---|---|---|
| | | | | | |

| Assistance Rendered/Victim Disposition | Transporting Agency | Means of Attack (Assaults) |
|---|---|---|
| | | |

| Description of Injuries | Other Information |
|---|---|
| | |

| Party | | Drivers License | Cell Phone | Email | | |
|---|---|---|---|---|---|---|
| Wong, David Kam Pui | | | | | | |

| Residence Address | Residence Phone | DOB | Age | Sex | Race |
|---|---|---|---|---|---|
| San Francisco, CA | | 11/04/1963 | 48 | M | |

| Business Name and Address | Business Phone | Height | Wt | Hair | Eyes |
|---|---|---|---|---|---|
| San Francisco Sheriffs Office | | | | | |

| Suspect Name | Action Taken | Charges | | |
|---|---|---|---|---|
| | | | | |

| Residence Address | Residence Phone | DOB | Age | Sex | Race |
|---|---|---|---|---|---|
| | | | | | |

| Business Name and Address | Business Phone | Height | Wt | Hair | Eyes |
|---|---|---|---|---|---|
| | | | | | |

| Identifying Features | Cell Phone | Drivers License | Arrest Number |
|---|---|---|---|
| | | | |

| Aliases | | | Val Damaged |
|---|---|---|---|
| | | | |

## VEHICLES

| Status | Vehicle Make and Model | License/State | VIN |
|---|---|---|---|
| Involved | 2004 Silver/Aluminum Hond | 5KNF700  CA | 1HGEM22124L082377 |
| Involved | 2011 Chev | 6SOM386  CA | 1GNSCJE02BR387381 |

## OFFICERS

| Prepared By | Date | Assisted By | Approved By | Date |
|---|---|---|---|---|
| 14048 - Byars, Felicia | 05/24/2012 | | 14757 - Brackett, Tim | 05/25/2012 |

| Routed To | Date | Routed To | Date | Notes |
|---|---|---|---|---|
| Sent to DA Kevin Collins | 06/28/2012 | | | |

**CONTROLLED DOCUMENT - MPPD**

EXHIBIT
0260

MP00



# MENLO PARK POLICE DEPARTMENT

**701 LAUREL ST     MENLO PARK, CA 94025     650-330-6300**
GENERAL CASE REPORT

Page 2

Case
12-1596

| Party | Drivers License | Cell Phone | Email | | | |
|---|---|---|---|---|---|---|
| Zeleny, Michael | C4374887 CA | | | | | |

| Residence Address | Residence Phone | DOB | Age | Sex | Race |
|---|---|---|---|---|---|
| 7576 Willow Glen Rd, Los Angeles, CA 90046 | 310-979-8700 | 02/26/1958 | 54 | M | W |

| Business Name and Address | Business Phone | Height | Wt | Hair | Eyes |
|---|---|---|---|---|---|
| | | 5`11" | 185 | BLK | HZL |

CONTROLLED DOCUMENT - MPPD


| ID No. | Status/Disposition | Property Description | Value | Val Recovered | Val Damaged |
|---|---|---|---|---|---|
| 1 | Evidence/Digital Media | 1 MPPD digital audio recording | | | |
| 2 | Evidence/Digital Media | 4 Photos - 4 photos of weapons | | | |

## CONTROLLED DOCUMENT - MPPD

**SYNOPSIS:**

Party Michael Zeleny arrived at the corner of 2825 Sand Hill Road to protest outside the business of NEA.

**NARRATIVE:**

On 05-24-12 I responded to assist with an area and welfare check at the business properties of Stanford Management where Party Michael Zeleny set up a visual protest in front of 2825 Sand Hill Road.

While Officer Poirier was conducting check of the weapons in the possession of Zeleny I made contact and began talking with Zeleny.  The conversation was recorded and booked into the Menlo Park secure server. A synopsis of the conversation follows:

Zeleny spoke about the various cameras he has and explained he is currently attempting to learn cinematography but prefers still shots. Zeleny has ordered a new tripod for the video camera he has to assist with capturing videos for production and placement on the internet.

Zeleny remarked that he recently moved to an apartment "down the street", pointing eastbound down Sand Hill, to "be near my friends."  I asked Zeleny if this was an instance of "keep your friends close and your enemies closer?"  Zeleny responded, "I don't like to the think that I have enemies" and went on to say, "I have no ill will towards anybody."

I asked Zeleny about the poster of a hand painted bear mixed in between the posters of the CEO's.  Zeleny explained the bear represented an international symbol for pedophiles and suggested I conduct a Google search of "pedobear" and read the Wikipedia article on it.  I asked Zeleny if he wrote the Wikipedia article himself and he replied, "No, I've been banned from Wikipedia."

Zeleny then began laughing and explained this was "why I have to develop my own social media...I don't uh, I don't play nice with others, you can see why."  Zeleny did state he has been using Facebook a lot recently to communicate with others.

Zeleny also spoke about prior employment, explaining he worked for approximately 6 1/2 years at various locations. I asked Zeleny where he worked and he stated he worked for the University of Chicago which he quickly corrected to the University of Illinois, then BlueCross-Blue Shield when they were non-profit, as well as the Illinois Law Enforcement Commission, and Inference.  Zeleny provided another location; however, I was unable to understand what he said. Later in the conversation, Zeleny explained he aided in the development of the CJIS software system around 1982 as well as automating police reports and incident reports.

While speaking with him, Zeleny stated he would be "taking the weekend off" while he spent the long holiday weekend with his girlfriend.  Zeleny explained his girlfriend was completing

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 14048 | BYARS, FELICIA | 05/24/2012 | 14757 | BRACKETT, TIM | 05/25/2012 |

MP001861

CONTROLLED DOCUMENT - MPPD

her PhD exams tomorrow and they would spend the long holiday weekend together afterwards, but he was not sure if she was coming to Palo Alto or if he was going to Los Angeles to meet her.

We then talked about his educational background. Zeleny explained he went to UCLA and then Harvard. Zeleny stated he started a PhD program in Philosophy, but he insulted his department head after they fired his advisor. I pointed out to Zeleny I saw a pattern in his behavior. Zeleny chuckled and nodded his head in agreement.

I asked Zeleny what his girlfriend was going to do when she finished and he laughed as he stated he hoped she would support him. I then asked Zeleny if he was going to marry his girlfriend and he stated he wanted to, but she would not marry him "until I finished this." Zeleny explained he was getting death threats via the phone which worried his girlfriend. Zeleny first explained he carried weapons with him because of the death threats; then he corrected himself and expanded his comments explaining he became more concerned after his father was killed in a fire in Los Angeles.

Zeleny went onto spontaneously state, "I told these people this, apologize, say you have nothing to do with that and everything will be forgotten...but uh, he chose to flee the country instead," referring to Min Zhu.

I asked Zeleny, "What's the goal of all this?" Zeleny answered, "I want an apology...I'm kind of old fashioned." When I told Zeleny I understood that, he explained further, "the only problem with me is, in order to apologize, he would have to admit a crime." I pointed out to Zeleny in the justice system people have the ability to plea no-contest without having to admit to a crime. Zeleny rationalized that this occurs when the District Attorney makes a deal and Zeleny could not do that because he is not a District Attorney. I asked Zeleny to confirm he wanted someone to admit, "I'm guilty, but I'm sorry." Zeleny responded, "I'll take any kind of acknowledgement" and a rescinding of the "death sentence" he believes is against him.

Zeleny explained he was certain the death threats were coming from people hired by Min Zhu, which started when he and Zhu had a "business dispute." Zeleny explained he was able to verify this because one of the phone calls came from a person who forgot to block his caller id. I asked Zeleny if he filed a case with the police department. Zeleny explained he did and the case was on file in Los Angeles, but nothing was being done because the person involved was under the federal government witness protection program for testifying against KPMG in a federal tax fraud prosecution case.

Zeleny went onto to explain he was able to succeed one time when he was a victim of fraud, but most police departments turned him away citing it was a civil matter. Zeleny stated he went to several police departments before he was able to find someone who would file a

CONTROLLED DOCUMENT - MPPD

| Prepared By: | Date: | Approved By: | Date: |
| 14048    BYARS, FELICIA | 05/24/2012 | 14757    BRACKETT, TIM | 05/25/2012 |

MP001862


criminal fraud case.  Zeleny explained the suspect pled guilty and received two years in his sentence and Zeleny walked away happy with the results and never filed a civil suit for damages and never contacted the suspect again.

I concluded my conversation with Zeleny and left the scene.

**RECOMMENDATIONS:**
This case is for information purposes only.

CONTROLLED DOCUMENT - MPPD

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 14048 | BYARS, FELICIA | 05/24/2012 | 14757 | BRACKETT, TIM | 05/25/2012 |

**Supplemental Report:**

On 05-24-2012, I responded to the 2800 block of Sandhill Rd to assist with this case. Upon arrival I saw Michael Zeleny, whom I recognized from previous contacts. I noted that Zeleny was wearing military style tactical clothing and equipment, including a ballistic helmet and vest, additionally he had a LRB (M1A style) rifle slung across his chest and a large fixed blade knife in a scabbard on his right hip. I made contact with Zeleny, and Sergeant Brackett arrived to assist.

I checked Zeleny's firearms, and obtained permission to search his belongings for additional firearms. Zeleny was compliant during my contact with him and notified me of the type, quantity and location of all of the firearms he had with him.

The firearms included
- 2, LRB rifles, each chambered in .308 cal, one with a standard wood stock, and the other with a synthetic tactical stock, a bipod and scope attached.
- 1, Winchester pump action 12 gauge shotgun.
- 1, Sig 9mm semi-automatic pistol
- 1, .357 Mag revolver
- 1, .45 ACP pump action pistol
- 1, 9mm semi-automatic pistol (with all markings in Farsi, of a Lugar style)

After running records checks on all the weapons (and contacting ATF regarding the weapon with Farsi markings) I found that all returned clear and or registered to Zeleny.

I then took a position across the street from Zeleny (parking lot at 2750 Sandhill) and observed him for some time. Approximately 90 minutes later, I saw a subject approach Zeleny and hand him a white "grocery" type plastic bag, and walk away. Moments later, I saw that same subject drive E/B on Sandhill Rd, stop his vehicle in front of Zeleny and get out of the vehicle and walk over to Zeleny. Zeleny then walked over to the vehicle and got into the driver's seat. I approached the area on foot and ran a records check on the vehicle (5KNF700).

MPPD Dispatch returned that the vehicle came back with confidential status, associated with San Francisco Sheriff's Office, to a David Wong.

Zeleny drove the vehicle E/B on Sandhill Rd, and I contacted the subject who had driven the vehicle to the scene and identified him by his California Driver's License (C0511776) as David Kam Pui Wong, the registered owner of the vehicle which Zeleny drove from the scene.

I asked Wong if he was associated with the SFSO, to which he replied yes. I asked Wong what his position was with the SFSO, and he informed me that he was a Deputy Sheriff. I asked Wong if he was armed, and he stated that he was not and that he was presently on Administrative Leave from SFSO. Wong refused to elaborate on why he was on Administrative Leave, but stated that he did not presently have the ability to carry a weapon concealed due to his status with SFSO.

Approximately 30 minutes later, Zeleny returned to the scene in Wong's vehicle. Zeleny exited the

CONTROLLED DOCUMENT - MPPD

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 14592 | POIRIER, JASON | 05/25/2012 | 14757 | BRACKETT, TIM | 05/25/2012 |

MP001864


vehicle, and Wong drove the vehicle E/B from the scene.

I was later relieved by Officer Tommei, who observed a subject matching the description of Wong, drive an SUV up to the area where Zeleny had been demonstrating.  Officer Tommei observed them load the SUV with Zeleny's items and drive away E/B on Sandhill Rd.  Officer Tommei ran a record check on the vehicle that he saw (6SOM386) which returned to EAN Holding Group, which he knew to be a rental agency.

**Recommendation:**
I recommend this be attached to the main case file.

CONTROLLED DOCUMENT - MPPD

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 14592 | POIRIER, JASON | 05/25/2012 | 14757 | BRACKETT, TIM | 05/25/2012 |

**NARRATIVE:**

**Thursday May 24, 2012**          **0935 hrs**          **(Initial Call)**

I responded to the 2800 block of Sand Hill Rd, Rosewood Hotel, to assist with this investigation.  Upon my arrival, I saw Michael Zeleny, whom I know from prior contacts speaking with Officer Poirier. Zeleny was wearing military tactical clothing and equipment.  He had a ballistic helmet, vest and multiple weapons.  (See Officer Poirier's supplemental report for more details regarding the weapons.)  As Officer Poirier continued to speak with Zeleny, I took 4 photographs of Zeleny's weapons and later booked them into the Menlo Park Police Department secure media server.

I then directed Officer Poirier to take a position and watch Zeleny throughtout the day to make sure Zeleny stays within the guidelines that have been expressed to him.

**EVIDENCE:**

The following items were booked into the Menlo Park Police Department secure media server:
- 4 digital photographs of Zeleny's firearms.

**RECOMMENDATIONS:**

Please attach this report to Officer Byars' original case, 12-1596.

CONTROLLED DOCUMENT - MPPD

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 14757 | BRACKETT, TIM | 05/25/2012 | 14437 | PHU, PAUL | 05/25/2012 |

Exhibit P



# MENLO PARK POLICE DEPARTMENT

**701 LAUREL ST    Menlo Park, CA 94025    650-330-6300**

## GENERAL CASE REPORT

Page 1

#12-495

Printed by 15022

| Offenses | Description | | Fel/Misd | Date Occurred 02/09/12-02/10/12 | Time Occurred 0920 - 1456 | Date Printed 02/17/2012 |
|---|---|---|---|---|---|---|
| Info | General Information Case | | | Date Reported 02/10/2012 | Time Reported 1246 | Time Printed 08:41:02 |
| | | | | Related Cases | | Incident # 120210034 |

| Location New Enterprise Associates, 2855 Sand Hill Rd, Menlo Park, CA 94025 | | | Beat 1 | Area 30 | Disposition Closed | | Dispo Date 02/10/2012 |
|---|---|---|---|---|---|---|---|

| Location Type Street | Location of Entry | Method of Entry | Point of Entry | | Alarm System | Means of Attack (Robbery) |
|---|---|---|---|---|---|---|

| Reporting Party / Victim | | Drivers License | Cell Phone | | Email | | |
|---|---|---|---|---|---|---|---|
| Residence Address | | | Residence Phone | DOB | Age | Sex | Race |
| Business Name and Address | | | Business Phone | Height | Wt | Hair | Eyes |
| Assistance Rendered/Victim Disposition | | | Transporting Agency | Means of Attack (Assaults) | | | |
| Description of Injuries | | | Other Information | | | | |

| PARTY Zeleny, Michael | | Drivers License C4374887 CA | Cell Phone | | Email | | |
|---|---|---|---|---|---|---|---|
| Residence Address 7576 Willow Glen Rd, Los Angeles | | | Residence Phone 310-979-8700 | DOB 02/26/1958 | Age 53 | Sex M | Race W |
| Business Name and Address | | | Business Phone | Height 5'11" | Wt 185 | Hair BLK | Eyes HZL |

| Suspect Name | | | Action Taken | Charges | | | |
|---|---|---|---|---|---|---|---|
| Residence Address | | | Cell Phone | DOB | Age | Sex | Race |
| Business Name and Address | | | Business Phone | Height | Wt | Hair | Eyes |
| Identifying Features | | | Residence Phone | Drivers License | | Arrest Number | |

| Status | Vehicle Make and Model | License/State | Vehicle Type |
|---|---|---|---|

| No. | Status/Disposition | Property Description | Value | Val Recovered | Val Damaged |
|---|---|---|---|---|---|

| Solvability Factors |
|---|

| Prepared By 13938 - Trask, Victoria | Date 02/10/2012 | Assisted By | Approved By 14757 - Brackett, Tim | | Date 02/11/2012 |
|---|---|---|---|---|---|
| Routed To | Date | Routed To | Date | Notes | |

**EXHIBIT 49**
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

MP000151



# MENLO PARK POLICE DEPARTMENT

**701 LAUREL ST     Menlo Park, CA 94025     650-330-6300**

## GENERAL CASE REPORT

Page 2

#12-495

Printed by 15022

| PARTY<br>Lonergan, Frank Xavier | Drivers License<br>C4901819 CA | Cell Phone | Email | | | |
|---|---|---|---|---|---|---|
| Residence Address<br>460 Summit Springs Rd, Woodside, CA 94062 | | Residence Phone | DOB<br>10/29/1968 | Age<br>43 | Sex<br>M | Race<br>W |
| Business Name and Address | | Business Phone | Height<br>5'10" | Wt<br>175 | Hair<br>BRO | Eyes<br>BLU |

| PARTY<br>Mitchell, Paul | Drivers License<br>N9696725 CA | Cell Phone | Email | | | |
|---|---|---|---|---|---|---|
| Residence Address<br>1315 Alma Ave #237, Walnut Creek, CA 94596 | | Residence Phone | DOB<br>12/25/1962 | Age<br>49 | Sex<br>M | Race |
| Business Name and Address | | Business Phone | Height<br>6'1" | Wt<br>190 | Hair<br>BRO | Eyes<br>HZL |

| PARTY<br>Wong, Michael | Drivers License<br>A9034771 | Cell Phone | Email | | | |
|---|---|---|---|---|---|---|
| Residence Address<br>W El Repetto Dr, Monterey Park, CA 91754 | | Residence Phone | DOB<br>01/03/1963 | Age<br>49 | Sex<br>M | Race<br>A |
| Business Name and Address | | Business Phone | Height<br>5'10" | Wt<br>180 | Hair<br>BLK | Eyes<br>BRN |



| **MENLO PARK POLICE DEPARTMENT** | Page 3 |
| --- | --- |
| 701 LAUREL ST    Menlo Park, CA 94025    650-330-6300 | |
| **NARRATIVE** | 12-495 |

SYNOPSIS:

Subjects Michael Zeleny and Michael Wong stood on the corner of Sand Hill Rd. and the entrance to the 2800 block of Sand Hill Rd in protest of an employee of New Enterprise Associates (NEA). Both subjects donned M1A rifles, 8 magazines full of rifle ammunition (approximately 80 rounds), bullet proof vests and military style looking clothing. Zeleny used his long-lens camera to take photographs of drivers and passengers entering the driveway of the 2800 block of Sand Hill Rd, unknowing if they were associated with NEA or other companies occupying the business park area. The subjects displayed three (3) large posters of pictures of NEA employees and of a subject they accuse of being a child rapist. They occupied the two south corners of the driveway entrance to 2800 block of Sand Hill Rd. This case was taken for informational purposes.


NARRATIVE:

On 02/09/12, Officer Poirier and I were dispatched to the 2800 block of Sand Hill Rd. for the report of two subjects protesting with rifles. Upon our arrival, we saw two individuals dressed in tan military clothing with rifles slung over their shoulders.

The subjects provided their California driver's licenses that identified them as Michael Zeleny and Michael Wong. The subjects allowed us to inspect their weapons to ensure they were unloaded. Officer Poirier inspected both rifles and confirmed the rifles were unloaded. Both subjects had magazines strapped to their bullet proof vests. Zeleny had six (6) magazines and Wong had two (2).

I reminded Zeleny he was only allowed to stay on the street corners and none of his signs were allowed on the Rosewood Hotel property or anywhere else within the private property of the businesses within the 2700 and 2800 blocks of Sand Hill Rd. Zeleny acknowledged my request and stated he understood. A few hours later staff from NEA provided Zeleny with a stay away order and advised him of the areas where he was allowed to protest. Zeleny acknowledged the stay away order.

Due to the ammunition being on Zeleny's person along with the unloaded rifle on his person and for the safety of the public, officers stayed on site observing Zeleny's actions.

During the day Wong had been picked up in a cream colored GMC SUV with license plate 4SOL455. The vehicle was registered to Enterprise Rental Car Company. Wong returned several hours later riding a fold up bicycle. A few hours after that, a silver Porsche with license plate 4KDS965 dropped off food for the two subjects.

Officer Poirier followed the vehicle until it stopped at the Stanford Shopping Mall. Officer Poirier told me he parked a few spaces away from the vehicle and then walked up to the driver asking if he could speak with him. The driver willingly provided his California driver's license to Officer Poirier which identified himself as Paul Mitchell out of Walnut Creek. Mitchell freely admitted he was helping Zeleny's cause although he doesn't feel as strongly about the topic as Zeleny does. He told Officer Poirier they were staying at the Quality Inn in Palo Alto, but he didn't know how long they were staying. Mitchell told Officer Poirier he feels Zeleny doesn't trust him with that information. Mitchell told Officer Poirier he has known Zeleny since 1987 when they worked together. Officer Poirier told me Mitchell was being vague with information, but still being truthful when answering Officer Poirier's questions. The silver Porsche came back later and picked up Wong.

| Prepared By: | | Date: | Approved By: | | Date: |
| --- | --- | --- | --- | --- | --- |
| 13938 | TRASK, VICTORIA | 02/10/2012 | 14757 | BRACKETT, TIM | 02/11/2012 |

MP000153


At approximately, 1547 hours the cream colored GMC from earlier in the day arrived, driven by Wong, and picked up Zeleny and his belongings. The silver Porsche was parked across the street in the business complex parking lot area observing Wong and Zeleny as they loaded their vehicle. Around the same time the silver Porsche had arrived, a black Porsche was seen driving around the business complex across the street from where Zeleny was protesting. It appeared the black Porsche was possibly related. Once Zeleny and Wong had the GMC packed with their belongings, the black Porsche left the business complex, followed by the silver Porsche. Wong, driving the cream GMC, pulled into the driveway of 2800 Sand Hill Rd. made a U-turn then went back out to Sand Hill Rd. and proceeded eastbound on Sand Hill Rd.

A Menlo Park Police undercover unit followed the cream GMC to the Quality Inn in Palo Alto.

The following day at approximately 1246 hours, Zeleny and Wong arrived at Sand Hill Rd. Officer Igno was already on site anticipating their arrival. Sergeant Brackett and Officer Igno inspected both subject's weapons again to ensure they were both unloaded. Both subjects were wearing the same clothing as the previous day. I arrived at 1315 hours. Zeleny told Sergeant Brackett he was planning on coming back in a few days and then would be staying up in the bay area indefinitely.

At approximately 1447 hours the cream GMC arrived to pick up Wong and Zeleny. Around the same time I noticed the black Porsche arrived and was again across the street in the business park parking lot from Zeleny and Wong. The black Porsche pulled into the left turn lane to prepare to pull onto eastbound Sand Hill Rd. The vehicle then backed up and pulled alongside the mailboxes in the business park parking lot area. I attempted to get a plate of the vehicle; however, it was missing a front plate. As Officer Igno watched the vehicle I pulled out to go across the street to get a plate of the vehicle. The driver of the black Porsche got out of his vehicle near the mailboxes and then got back inside his vehicle and when his light turned green to turn he left the business park driveway.

I followed the vehicle and made an enforcement stop, for no front plate, at Sand Hill Rd. and Branner Dr. The driver identified himself as Frank Lonergan with his California driver's license. I asked him if he was associated with Zeleny. He stated he didn't know who that guy was. He told me he has a business in the 2800 block of Sand Hill Rd. and that was where he was coming from.

While I was on my traffic stop Officer Igno continued to watch Zeleny. Officer Igno told me Zeleny watched me leave and follow the black Porsche. Zeleny made a U-turn and headed back towards interstate 280 and has not been scene since.


## RECOMMENDATION:

This case was taken for informational purposes.

| Prepared By: | Date: | Approved By: | Date: |
|---|---|---|---|
| 13938    TRASK, VICTORIA | 02/10/2012 | 14757    BRACKETT, TIM | 02/11/2012 |

MP000154

Exhibit Q

Dear Mr. Zeleny,

I am writing in response to your email of November 27th. In response to the first paragraph of your email, please be aware that the City of Menlo Park requires a special event permit if you are proposing to put on an entertainment event on public property or requires a film permit if you intend to put on a film production on public property. Without a special event permit or a film permit, it is inappropriate and illegal for you to possess guns as part of your entertainment event/film production. To remind you, you initially sought a Special Events Permit per your email in July 2015, proposing to put on an entertainment event in the median strip of Sand Hill Road near the entrances and exits of Interstate 280. That application was denied by staff and ultimately the City Manager, and the reasons for the denial were outlined in the letter dated September 12, 2016, signed by City Manager Alex D. McIntyre.

You appealed the City Manager's denial of your application to the City Council, which upheld the City Manager's decision. You received notice from the City Clerk on September 5, 2017, confirming that on August 29, 2017, the Menlo Park City Council upheld staff's administrative decision to deny your Special Events Permit application. That letter notified you that any challenge to the council's decision in the appropriate court of competent jurisdiction must be made within ninety (90) days of August 29, 2017, pursuant to California Code of Civil Procedure Section 1094.6, unless a shorter time is required by State or Federal law, and that if you believed the City Council's decision involved speech or expressive conduct entitled to protection by the First Amendment, any petition must have been served on the City of Menlo Park no later than twenty-one (21) calendar days following the City Council's decision of August 29, 2017, pursuant to California Code of Civil Procedure Section 1094.8.

Thereafter, on September 7th, you sent an email asking if your special event application could be reconsidered as a film permit. You were informed you could proceed with a film permit application, and you elected to proceed with a film permit application, which you submitted on October 6, 2017. It is your film permit application that is before us now. Staff, and then I, responded to your film permit application as we are attempting to process your application and trying to work with you in good faith to understand what you are proposing so you can put on your film production. However, this requires that the City is satisfied that filming occur in a safe and acceptable way. As I noted before, your application is an unusual one, and implicates numerous public safety considerations due to the props you have indicated you want to use while filming alongside a busy arterial roadway.

With respect to your second paragraph, at no time has the City of Menlo Park tried to regulate your content. If you wish to protest/promote a message regarding New Enterprises Associates, the City has no stance on that issue. However, it is essential that the City understand what event or film you are trying to put on so it can determine what if any impacts must be considered for traffic control and public safety. To that end, it is necessary for you to respond to the specific questions I posed to



EXHIBIT 31
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

MP001381

you in my email dated November 22, 2017, i.e. understanding information regarding the site set-up, participants, cameraman, display to be utilized, etc. Again, this is crucial for staff to have this information in order to analyze the impacts on the public right of way, traffic control, and public safety issues. This is why we have applicants submit film applications; so these details can be reviewed and a plan put in place. To that end, thank you for confirming that you will not be brandishing weapons at passing motorists, pedestrians or cyclists in order to incite a reaction.

At this point your application is incomplete because the City cannot analyze the public safety concerns, and if you wish to proceed with the film permit application please respond in detail to my email of November 22nd. If your goal, however, as stated in your email is to "rid your community of individual and corporate sponsors and enablers of incestuous child rape over the coming holidays," you may lawfully protest along Sand Hill Road without guns, as staff and the City Council informed you. Thank you for your attention to this matter.

Nicolas A. Flegel
Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA 94025
Tel: (650) 324-9300
Fax: (650) 324-0227

**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Monday, November 27, 2017 2:37 PM
**To:** Nicolas A. Flegel <naf@jsmf.com>
**Cc:** Toews, Ivan J <IJToews@menlopark.org>; Harada, Jelena V <jvharada@menlopark.org>; William L. McClure <wlm@jsmf.com>; Bertini, David C <dcbertini@menlopark.org>; McIntyre, Alex D <admcintyre@menlopark.org>; Subrah Iyar <Subrah.Iyar@webex.com>; Scott Sandell <ssandell@nea.com>; dwa@agzlaw.com
**Subject:** [BULK] Re: Notice re Menlo Park City Council Decision

Dear Mr Flegel,

Thank you for conceding that the exemptions to California Penal Code §§ 25400, 26350, and 26400, as found in §§ 25510, 26350, and 26405, allow me to possess unloaded guns to the extent that I am using them as part of a film production. Please note that the aforementioned statutes in no way require that said film production must proceed subject to a permit from any authority whatsoever. Please note as well that the same exemptions apply to authorized participants in an entertainment event, whether or not that event is recognized as such by any official body. In short, the statutory exemptions apply whether or not the City recognizes or authorizes me as an entertainer or a filmmaker. A failure to obtain such recognition or authorization would not expose me, or any other participant in my entertainment event or film production that I choose to authorize, to sanctions under P.C. §§ 25400, 26350, and 26400 for possessing unloaded guns, to the extent that we are using them as part of my event or a production.

This point brings us to your ongoing attempt at content regulation. In *Linmark Associates, Inc.*

*v. Township of Willingboro*, 431 U.S. 85 (1977), the U.S. Supreme Court has ruled that "laws regulating the time, place or manner of speech stand on a different footing than laws prohibiting speech altogether". Time, place, and manner restrictions on speech are constitutional if (1) they are content neutral; (2) they are narrowly tailored to serve a governmental interest; and (3) they leave open ample alternative means of expression. As to the last criterion, my proposed expression allows for no alternative means outside of the immediate vicinity of the individual and corporate sponsors and enablers of daughter rapist Min Zhu. If I cannot designate their lair by ostension, my intent to expose them fails. Hence the proposed location of my performance, on grounds that in no way encumber or disrupt automotive or pedestrian traffic. As stated before, the location I propose the exact same one I used in my previous appearance. Given that it was acceptable to the City then, the burden falls on you to explain your reasons for deeming it otherwise now, should you choose to do so.

Staying within the bounds of content neutrality, you have no authority to question my choice of collaborators or deployment of equipment, provided that I break no laws in either matter. Nor do you have the authority to hold forth on what "would in any way be necessary for [my] film production". Outside of exigent circumstances, my necessity is none of your business. Pursuant to the aforementioned statutes, your authority begins and ends at ensuring that my firearms remain unloaded. According to *People v. Clark* (1996), 45 Cal. App. 4th 1147, 53 Cal. Rptr. 2d 99, a firearm is loaded within the relevant meaning, if and only if it has a shell placed in a position ready to be fired. There remains a question whether a firearm with an empty firing chamber, and a detachable magazine that contains rounds inserted into its magazine well, counts as loaded. Thus the California Fish and Game Code § 2006 deems a rifle or shotgun to be loaded "when there is an unexpended cartridge or shell in the firing chamber but not when the only cartridges or shells are in the magazine". If we can resolve this matter short of litigation, I am willing to compromise by keeping loaded magazines outside of magazine wells. If not, not.

Lastly, to answer your most fanciful concerns, I do not intend to brandish weapons at passing motorists, pedestrians, and cyclists, let alone reenact any of the numerous mass shootings around the country. As we discuss my compliance with the City ordinances, absent any evidence or indications to the contrary, you would do well to assume that I have no intent to commit any felonies or misdemeanors.

Thanks again for your prompt attention to this matter. I look forward to resolving it in time to rid your community of individual and corporate sponsors and enablers of incestuous child rape over the coming holidays.

----

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | submh.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Wed, Nov 22, 2017 at 4:04 PM, Nicolas A. Flegel <naf@jsmf.com> wrote:

Dear Mr. Zeleny,

Because you have requested a response to a legal issue, I am responding to your emails of November 9th and November 13th.   I am responding to the legal issue you have raised, as well as requesting additional detail from you so we can consider your application.  With respect to the legal question, I have analyzed Penal Code Sections 25400, 26350 and 26400, and the corresponding exemptions for filming events found in Sections 25510, 26350, and 26405.  It is my opinion that once you obtain a film permit from the City, you will be allowed to possess an unloaded gun(s) to the extent you are using it as part of the film production.  The City is willing to work with you in coming to agreeable terms for the filming to take place, so please do not take the approach that a denial of your application is in anyway predetermined.  However we need additional information from you so that the City is comfortable in its understanding of what you are proposing and so the City can be satisfied that it will be done in a way that is safe and acceptable.

With respect to specifics, please respond to the below questions as fully as possible to avoid the need for more back and forth.   If what is being requested is unclear, please let me know and I can try to clarify or staff can clarify.

   a.   Site Set-up:  Please confirm where you plan to place the different items (generator, projector, cameras, guns you intend to use as part of your film, and anything else you intend to have on the site); we need to understand exactly where you plan to place the items. A diagram will be very helpful to analyze the site set-up.

   b.   Participants:  Please provide the names of the participants or crew that will be part of the filming and his or her role (including cameramen).

   c.   Cameraman:  Please provide detail on where the cameraman or cameramen will be positioned.

   d.   Display:  Please provide more detail on where you plan to place the video display, which direction the display will face (i.e. towards traffic, towards the businesses on the south side of the road, etc. ?) so staff can analyze for safety/traffic control purposes.

           i.   Please confirm the expected brightness of the display so staff can analyze for safety/traffic control purposes.

           ii.   Please confirm exactly what image or images you intend to show on the display so staff can analyze for safety/traffic control purposes.

   e.   Use of Guns in Film:  You indicate you intend to use guns as part of the production.  Please list the types of guns, serial numbers, who will be supplying them to you, how they will be used as part of the production, etc.

           i.   Please provide more detail on where you plan to

place the weapons and what direction you intend to face them during the production so staff can analyze for safety/traffic control purposes. It is not acceptable (or legal) for you to brandish weapons at passing motorists, pedestrians, and cyclists to film their reactions.

    ii. In your email of October 6th, you state that you intend to focus "on public reactions to my display." Please clarify what you mean by this so staff can analyze for safety/traffic control purposes.

f. Staging: Please provide more detail on what areas you plan to use for staging. As set forth above, a diagram will be helpful in this respect for staff's consideration.

g. Loaded Ammunition: You indicate that you intend to have "loaded ammunition feeding devices" with you. Please describe what this means and provide pictures of what props you are proposing to use and confirm you will be using them for film production. For example, are you intending to use props (fakes) or have with you actual magazines with live ammunition?

h. Film Exception for Live Ammunition: If you are proposing to use live ammunition, it is unclear why live ammunition would in any way be necessary for your film production. In light of the numerous mass shootings around the country, I think you can understand the concern regarding this issue. If you believe the film exemptions allow you to carry live ammunition for use in the film production, please provide me the authority so I may review it.

i. Notice: The notice you have drafted to neighboring properties will need to be re-written. Staff can work with you on what would be an appropriate notice.


The City is working with you in good faith so you can put on your film production. However, we need to work together to come to an agreement so filming occurs in a safe and acceptable way. Your application is an unusual one, and implicates numerous public safety considerations due to the props you have indicated you want to use while filming alongside a busy arterial roadway; so your patience is appreciated.

Thank you and hope you have a nice thanksgiving.

Nicolas A. Flegel
Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA 94025
Tel: (650) 324-9300
Fax: (650) 324-0227

Exhibit R

# CITY OF MENLO PARK
## Special Event Permit Application FAQs
701 Laurel Street, Menlo Park, CA 94025 Ph: 650-330-2223 Fax: 650-330-2242



## SPECIAL EVENTS IN MENLO PARK

Thank you for your interest in holding a special event in Menlo Park. Special events play an important role in building community and creating vibrancy within Menlo Park. Our goal is to help event organizers plan a safe and successful event creating minimal impacts to the surrounding neighborhoods. Depending on the nature of your event, additional permits or approvals may be needed so please allow adequate time for processing. Please read all of the materials thoroughly and carefully to ensure the Special Event Permit can be processed in a timely manner.

## WHAT QUALIFIES AS A SPECIAL EVENT?

If your event meets **one** or more of these criteria, you will need to complete a Special Event Application (attached):

- Attendance is expected to exceed 150 people and you will be using outdoor public space
- Use of any City street, sidewalk, or other right-of-way
- Any City street or lane closures
- Any event impacting traffic or intersections
- Any noise exceeding the City's noise ordinance  (Municipal Code 8.06.030: Sound measured from subject site to any residential property: 10 p.m. to 7 a.m. - 50 dBA and 7a.m. to 10p.m. - 60 dBA)
- Parking needs that will exceed the capacity of the venue
- Generate a crowd of spectators sufficient in size to obstruct, delay or interfere with the normal flow of pedestrian, vehicular traffic, or city facilities
- Community Events (i.e. Block Parties - not for private or exclusive residential use)
- Events occurring for more than 1 day
- Events needing Police regulation, monitoring or control

## WHAT IS A SPECIAL EVENT APPLICATION?

A Special Event Application is a detailed questionnaire to gather all critical information about your event. Instead of completing multiple permit applications, the single application is reviewed internally by each City department to determine which permits or approvals are required. All Special Events Applications are due to the City by the established deadlines (listed below). The acceptance of the application should, in no way, be interpreted as approval of your request. For larger events, we strongly encourage you to submit the application roughly 6-months in advance.

## WHAT IS THE PROCESS FOR OBTAINING A SPECIAL EVENT PERMIT?

1. Submit your completed application with a check made payable to City of Menlo Park for $125 for minor events/$250 for major events (non-refundable). Applications can be emailed to mlmilde@menlopark.org or delivered to:

**Mailed:**
City of Menlo Park
ATTN: Special Events – Matt Milde
701 Laurel Street
Menlo Park, CA 94025

**Drop Off:**
Arrillaga Family Gymnasium
ATTN: Special Events – Matt Milde
600 Alma Street
Menlo Park, CA 94025

For any questions regarding the application, fees, or application process please contact Matt Milde at 650-330-2223. Incomplete applications will not be processed and you will be asked to submit the additional information in order to start the application process.

EXHIBIT 33
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

MP001817

2. You will be sent an email acknowledgement that your application has been received. Your application will then be reviewed by City staff, which may take up to three weeks. During this time, you may be contacted by City staff for clarification of your event details or to schedule a meeting to review the application.

3. After a full review of your application, you will receive either a denial letter or a conditions-of-approval letter. The conditions-of-approval will outline requirements for your event, such as necessary permits, approvals and/or additional application fees. This may include, but not limited to, the following:
   - Certificate of Liability Insurance
   - Country of San Mateo Temporary Event Food Permit
   - Facility Reservation Confirmation
   - Fire Department Approval or Permits
   - Proof of Menlo Park Business License
   - Proof of 501c3 Non-profit status
   - Public Notification Requirements

4. Public Notification will be required for some permits based on your application. If, in the Planning Division's opinion, the proposed event could exceed the noise ordinance limits, the Planning Division will prepare a public notice to be mailed to all addresses within 300 feet of the subject property. The notice will state the decision of the City and will serve as the noise permit unless the request is appealed. The Planning Division will mail the notices on the decision date, which starts the 10-day appeal period. If the Planning Division does not receive an appeal in writing, the decision will be become effective on the 11th day. If the decision is appealed, the item will be scheduled for the next available Planning Commission meeting. The Planning Commission generally meets on the first and third Mondays of every month. The minimum lead-time between an appeal and a Planning Commission meeting is approximately three weeks. The Planning Commission's decision will also be posted at the Civic Center and on the City's web page: http://www.menlopark.org/371/Planning-Commission. The Planning Commission's decision on the noise permit also contains a 15 day appeal period before it becomes active, and the decision can be appealed to the City Council. If the project is appealed to the City Council, the processing time generally would take more than 60 days, due to scheduling and additional public noticing requirements. For projects that require public notification, it is recommended that the application be submitted more than 60 days in advance of the planned event date.

5. Once all of the conditions-of-approval have been met, a Special Event Permit will be issued by the City. You will be required to have this permit in your possession during your event.

## WHEN ARE THE APPLICATION DEADLINES?

Please pay close attention to the following application deadlines:

- 30-days for Block Parties not required to have a noise permit
- 60-days for Block Parties required to have a noise permit
- 60-days for all Minor Events that are not considered Block Parties
- 90-days for all Major Events

Applications are accepted up to 12-months in advance of the proposed event date. Applicants are encouraged to apply early to ensure permit is received in a timely fashion. Once an application is submitted you many not receive confirmation that your event has been approved until 30 to 60-days after submission. Please allow yourself ample time for permit processing. Applications that do not meet their required deadline **will not** be processed.

## CAN MY EVENT BE A FUNDRAISER?

If the event is a fundraiser, you will be required to fill out the Fundraising Form and provide a copy of the organization 501c3 status. Please inquire about the Fundraising Form with Matt Milde when submitting Special Event application.

## WHAT ARE THE SPECIAL EVENT PERMIT FEES?

**Special Event Application Fee:** $125 (minor); $250 (major)

**Noise Permit Fee:** $135

**Police Services Fees:** Fee based on staff hourly billing rate. 50% of the estimated Police services must be paid prior to a permit being issued.

**Barricade Rental Fees:** 3' barricade - $3/day & 12' barricade - $8/day (Permit required for pick-up)

**Park Rental Fees:** Varies (see below) – Park fees are also listed in the City of Menlo Park's Master Fee Schedule.

## WHAT IS THE DIFFERENCE BETWEEN A "MINOR" AND "MAJOR" EVENT?

The difference between a minor and major event depends on the nature of the event and its impact on city services. For example, most block parties closing a single road would fall under a "minor" event, while most fun runs requiring the closure of many roads would be considered a "major" event. Please contact the permit coordinator, Matt Milde, at (650) 330-2223 if you have questions on how your event would be categorized.

## CAN I POST SIGNAGE?

All signs posted before and during the event shall be approved by staff prior to issuance of the permit. If the event requires, "No Parking" signage, 72-hour notification is required. Road signage can be rented from the Menlo Park Corporation Yard with an approved permit.

## WHO CAN I CONTACT REGARDING WASTE REMOVAL?

For larger events where additional garbage removal will be needed, please contact Recology at www.recologysanmateocounty.com or call (650) 595-3900. Failure to remove trash from event will result in a $250 fine and may result in the inability to obtain a Special Event Permit in the future.

## HOW DO I GET A FOOD PERMIT?

If serving food outside, San Mateo County Temporary Event Food permits are issued by County of San Mateo Environmental Health Services (2000 Alameda de las Pulgas #100, San Mateo, CA 94403 or (650) 372-6200). Documents are available online - smchealth.org. Costs vary depending on the nature of the event, but applications need to be submitting within 2-3 weeks prior to the event. A food permit is not required to receive your approved permit from the City of Menlo Park, but you are responsible for obtaining the necessary San Mateo County permits when serving food publically.

## WHAT IS THE BELLE HAVEN MINI-GRANTS PROGRAM?

The City of Menlo Park Community Services Department has partnered with the Silicon Valley Community Foundation and the Belle Haven Community Development Fund to initiate the Belle Haven Mini-Grants Program. If you live in the Belle Haven neighborhood and are planning a community event, you might be eligible for a grant to help subsidize your special event application fees. For more details, contact Juanita Croft at (650) 450-5484 or BHaven@siliconvalleycf.org.

## HOW CAN I GET A BUSINESS LICENSE?

Business License shall be obtained for all outdoor sales. Business License applications can be found online at www.menlopark.org under the Finance Department. Completed forms can be dropped off at the front desk in City Hall (701 Laurel Street).

## CAN I SERVE ALCOHOL?

If serving or selling alcohol, ABC licenses can be obtained by California Department of Alcohol Beverage Control. More information can be found at www.abc.ca.gov or by calling (415) 356-6500.

## CAN I OBTAIN A PERMIT FOR PRIVATE USE?

Yes, a permit may be issued for private events on City facilities where a rental reservation can be issued (ie. Burgess Park, Nealon Park, Bedwell-Bayfront Park, etc.) provided the event is aligned with the current use policies of that park/facility. Permits requiring road closures will **NOT** be approved for private functions / reserved use (ie. Birthday Parties, Weddings, Reunions, etc.). Any applicant who wants to close off a public right-of-way for private use will be directed to other City facilities (ie. Arrillaga Family Recreation Center, Onetta Harris Community Center, picnic/park facilities, etc).

## DO I NEED TO MAKE A RESERVATION FOR PARK SPACE BEFORE I APPLY?

For renting sports fields, picnic areas, or park space, you are welcome to contact the Community Services Department at 650-330-2223 for rates and availability or inquire within at the Front Desk of the Arrillaga Family Gymnasium (600 Alma Street). Facility availability can also be viewed at www.menlopark.org. However, you are not required to make a reservation prior to the submission of your permit application. Please review the additional rental and use policies of the facilities you intend to utilize for your event.

## IS INSURANCE REQUIRED FOR MY EVENT?

Yes. To apply for City of Menlo Park special event permit, one must provide a *Certificate of Liability Insurance* along with their Special Event Application and payment. A Certificate of Liability Insurance can be issued by the renter's homeowner's insurance or other insurance carrier. In order for the certificate to be valid, it must contain the following:

- The renter's name must be listed as the one "insured."
- The policy must not expire before the planned event date.
- The policy must be for $1,000,000.
- The "description" should list the rental location, day, and event planned.
- The City of Menlo Park at 701 Laurel Street, Menlo Park, CA 94025 must be noted as "additional insured."

A special event permit **will not** be issued until the required application fees, insurance, and other supplementary materials, as indicated in the Special Event Application, have been received. A special event permit issued for a private function on private property is not required to submit proof of liability insurance to the City.

## WHAT WOULD CAUSE A PERMIT TO GET DENIED?

Approval or denial of applications are based upon several factors including: size (number of people), scale, location, route to be closed, community impact, impact on City services, past practices/experiences with issued permits, intended use, non-payment of fees, poor articulation of event as reflected in the application and site map, etc.

## WHAT IF MY PERMIT IS DENIED?

Any applicant is welcome to re-apply provided they meet the 60-day deadline and pay appropriate fees; however, depending on the application details we cannot always issue a permit. Determination of the approval or denial of any application is at the discretion of the Special Event Permit Committee. Final decisions are appealable to the Community Services Director, please contact Matt Milde at mlmilde@menlopark.org to seek an appeal for a denied permit.

## WHERE CAN I FIND INFORMATION ON INSURANCE CARRIERS?

Below you will find a number of resources if you need to purchase special event insurance for your event. Please note: These resources are not provided as a recommendation or sole insurers for special events, but is provided here as a tool to aid you in your research in obtaining a Certificate of Liability for your event.

| Company Name | Website | Phone |
|---|---|---|
| AAA Homeowners | www.aaa.com | 800-922-8228 |
| Allied Brokers | www.alliedbrokers.com | 650-328-1000 |
| Event Helper | www.eventhelper.com | n/a |
| Hub International | www.eventinsure.hubinternational.com | 650-964-8000 |
| K&K Insurance | www.kandkinsurance.com | 877-648-6404 |
| Markel American Insurance Co. | www.markeleventinsurance.com | 800-236-4252 |
| Private Event Insurance | www.privateeventinsurance.com | 877-723-3933 |
| RVNA Event Insurance | www.specialeventinsurance.com | 800-364-2433 |
| Specialty Risk Insurance LLC | http://www.specialtyriskinc.com | 928-772-0844 |

## WHERE DO I PICK-UP BARRICADES?

You may pick-up barricades/street signage by going to the **City of Menlo Park Corp Yard** at 333 Burgess Drive on Mon-Fri 8am-4pm; please ask for Irv Meachum. The Menlo Park Corp Yard is closed every other Friday, please contact the number above if you wish to pick-up barricades on a Friday to verify if the Corp Yard will be open. Rental fees apply as articulated in the Special Event Permit Information packet. Please contact (650) 330-6780 with any questions regarding the pick-up/drop-off of your rented barricades and/or street signage. Your approved Special Event Permit and payment is required for pick-up of any barricade/street sign. Depending on events/projects throughout the year we may not be able to accommodate the precise signage you've requested on your Special Event Permit. Every attempt will be made to provide you adequate signage for your event purposes. Please note: Only approved barricades can be used to block city streets; hay bales, sawhorses, jump houses, motor vehicles, etc. are not permitted. If the event requires, "No Parking" notification, 72-hour notification is required. Below are additional resources for renting traffic signage:

D&M Traffic Services Inc.
408-436-1127

Interstate Traffic Control
408-279-1588

## WHAT IF I STILL HAVE QUESTIONS?

Please contact the permit coordinator, Matt Milde, at (650) 330-2223 or mlmilde@menlopark.org with any questions. If requested, appointments to discuss your application in-person a may be made in advance. Please note that we may not be able to discuss your permit if you walk-in without an appointment; scheduling an appointment in advance is strongly advised.

Exhibit S

# Special Event Permit Flowchart



CITY OF
MENLO
PARK

## STEP A: Initial Contact



**Special Event Applicant**

**Matt Milde**

Community Services

(650) 330-2223

- Sends Application
- Answers Questions
- Provides Process Overview

## STEP B: Application Received (3 days)

**Initial Screening Process— Matt Milde (CSD)**

- Reviews Application
- Sends email confirmation (48 hours)
- Make and send copies to Internal Staff

Incomplete Application

**Not Approved:** Return Routing Form to Matt

**Not Approved:**

## STEP C: Staff Internal Review (10 Days)

**Completion of Special Event Application Routing Review Form**

| Sgt. Matt Ortega (Police) | Dave Mooney (PW - Maint) | Whitney Loy (PW-Eng.) | Kyle Perata (Planning) | Matt Milde (CSD) | Bob Blach (Fire) |

## STEP D: Meeting with Applicant (10 days)

**More Information Needed**

**Detailed Review of Application**

- Matt Milde confirms meeting time with applicant
- Team meets with applicant to review details
- Conditions of Approval or Denial is determined by team
- Matt Milde sends Letter of Denial or Conditional Approval (within 4 weeks of receiving application)

**Not Approved**

**Conditionally Approved**

EXHIBIT 30
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

MP001822

## STEP E: Conditional Approval Items (2-3 weeks)



STEP A

### Pending Items Needed for Final Approval

- Applicant needs to submit all pending items within 2-3 weeks of the Letter of Condition Approval to Matt Milde

- Any items required by specific department will be routing to the respective department upon receipt

- If items are not received, the permit is not approved.

**Not Approved**

## STEP F: Public Notification Process (Up to 60 days)

*(Noise Permits Only)*

### Public Notification

- Planning Department sends out Public Notification

- Any appeals will go to the upcoming Planning Commission Meeting for review

- No appeals will result in approval of the noise permit

- Appeals approved by Planning Commission results in no noise permit.



## STEP G: Final Approval (Up to 60 days)

### Special Event Permit Issued

Matt Milde sends final special event permit and receipt to applicant

Exhibit T

# Special event permits

## 2016 special event permit updates
- 2016 - Notice to Block Party Organizers
- 2016 - Notice to Special Event Permit Applicants

Thank you for your interest in holding a special event in Menlo Park. Special events play an important role in building community and creating vibrancy within Menlo Park. Our goal is to help event organizers plan a safe and successful event creating minimal impacts to the surrounding neighborhoods. Depending on the nature of your event, additional permits or approvals may be needed so please allow adequate time for processing. Please pay close attention to the following application deadlines:
- 30-days for Block Parties not required to have a noise permit
- 60-days for Block Parties required to have a noise permit
- 60-days for all Minor Events that are not considered Block Parties
- 90-days for all Major Events

## Special event qualifications
If your event meets one or more of these criteria, you will need to complete a Special Event Application:
- Any city street or lane closures
- Any event impacting traffic or intersections
- Any noise exceeding Municipal Code 8.06.030 (noise ordinance): Sound measured from subject site to any residential property:
    - 10:00 pm - 7:00 am - 50 dBA
    - 7:00 am - 10:00 pm - 60 dBA

- Attendance is expected to exceed 150 people and you will be using outdoor public space
- Community Events (i.e. Block Parties - not for private or exclusive residential use)
- Events needing Police regulation, monitoring or control
- Events occurring for more than 1 day
- Generate a crowd of spectators sufficient in size to obstruct, delay or interfere with the normal flow of pedestrian, vehicular traffic, or city facilities
- Parking needs that will exceed the capacity of the venue
- Use of any city street, sidewalk, or other right-of-way

## Permit application submittal
Submit your completed application before your established deadline (indicated above) with your application fee. Check should be made payable to City of Menlo Park for $125 for minor events and $250 for major events (non-refundable). Application can be delivered or mailed to:

Mailed
City of Menlo Park
ATTN: Special Events - Matt Milde
701 Laurel St.



MP001830

Menlo Park, CA 94025

Drop Off

Select Language | ▼

Arrillaga Family Gymnasium
ATTN: Special Events - Matt Milde
600 Alma St.
Menlo Park, CA 94025

Incomplete applications will not be processed and you will be asked to submit the additional information in order to start the application process.

## Film permits

Please contact Development Services Technician, Janice Dong Sample, in the Community Development Department to obtain a film permit. She can be reach via e-mail or by calling 650-330-6716.

## Contact Us

**Matt Milde**
Recreation Coordinator
Email

650-330-2223

## Related documents

- Application
- Flowchart
- Insurance Requirements
- Permit FAQs
- Primary Response Routes

Government Websites by CivicPlus©

Exhibit U

## Film Production in Menlo Park

Film production in the City of Menlo Park must comply with following conditions:

1. Permittee shall submit in writing all pertinent details regarding the filming including the date(s) and times of the filming including time needed for set-up and take down; a description of the nature of the filming; the location of the filming; a list of all equipment involved in the filming, including cars and other vehicles; the proposed location for the parking and storage of all such vehicles and equipment; the number of cast and crew members involved in the filming; and an indication of any special needs, such as amplified noise, etc. If granted, the permit's approval will be confined to such activities, locations and time schedules as submitted and approved.

2. Three days prior to the beginning of filming, permittee shall provide written notice to residents and businesses within 200 feet of the proposed filming.

3. Permittee shall obey all City Ordinances, rules and the guidance of City supervisory employees pertaining to the use of City property, including the location, parking and storage of vehicles and equipment, crowd and traffic control, and the restoration of premises to their original condition after use for filming purposes.

4. Permittee will comply with the City of Menlo Park noise ordinance. Filming will be limited to the hours between 8:00 a.m. and 6:00 p.m. and will result in low to no noise levels. The use of any explosive, fireworks, or pyrotechnic devices is strictly prohibited.

5. Permittee shall make arrangements for traffic control satisfactory to the Menlo Park Police Department prior to filming on City streets and in other public areas. Permittee will be charged to recover the cost of traffic control provided by the City. Permittee will legally park vehicles and will not require street closure or traffic control other than what is approved.

6. Permittee shall covenant and agree to indemnify and hold harmless the City from any and all loss, cost, damages and expenses of any kind, including attorney fees, on account of personal injury or property damage resulting from any activity of Permittee on municipal property or in connection with its use of municipal property.

7. Liability insurance in no way limits the indemnity agreement above, Permittee will furnish the City a Certificate of Liability Insurance acceptable to its Risk Management office showing combined single limit coverage for bodily injury and property damage, or the equivalent of such coverage, not less than $1 million. The City, including its officials, employees and agents, shall be named as additional insured in the Liability Policy. Contractual liability coverage insuring the obligations of this Agreement is also required. The insurance may not be canceled or substantially modified without ten (10) days written notice to the City Manager's Office.



EXHIBIT 35
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

MP005241

8. Permittee shall pay, with a valid check, money order, credit card or cashier's check, a **filming permit application fee of $150.00 in addition to the daily permit fees of $50 per day for still photography and short subject, $100 per day for industrials, and $150 per day for features, TV, music videos and commercials.**

9. Permittee shall apply for a one-time Business License and pay, with a valid check, money order, credit card or cashiers check. See **Guide to Annual Business Licensee Fee Calculation** for the fee schedule.

10. Permittee will adhere to the provisions and conditions set forth in the permit. If Menlo Park Police Department or other City personnel are required to correct, mitigate, or provide any service not consented to under this permit, permittee will be required to pay for all services rendered. Payment shall be made in the form of *a valid check, money order, credit card or cashiers check* immediately upon demand made by the City.

*PROJECT ADDRESS:* _____

Read and agreed on:

Date: _____

_____          _____
Signature                                                  Print name

Exhibit V

**From:** Bertini, David C
**To:** Milde, Matt L; Brandell, Cherise E; Jonsen, Robert
**Cc:** Zeo, Todd A
**Subject:** RE: Menlo Park Special Event Permit
**Date:** Friday, April 15, 2016 1:40:00 PM

Matt, we all received the email.

Do not reply and stand by for our reponse....

Commander Dave Bertini
Menlo Park Police Department
701 Laurel Street
Menlo Park, CA. 94025
650.330.6321

---

**From:** Milde, Matt L
**Sent:** Friday, April 15, 2016 1:40 PM
**To:** Brandell, Cherise E; Jonsen, Robert
**Cc:** Zeo, Todd A; Bertini, David C
**Subject:** FW: Menlo Park Special Event Permit

FYI

Matt Milde
Recreation Coordinator
City of Menlo Park
(650) 330-2223
mlmilde@menlopark.org

**Special Events | PAC Events | Aquatics | Event Permits | Parks | Tennis Courts**

**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Friday, April 15, 2016 1:35 PM
**To:** McClure, William; Cindy S. Elmquist; Bertini, David C; Milde, Matt L
**Cc:** Scott Sandell; Subrah Iyar; Dick Kramlich; David W. Affeld; Dan Primack; Louis Citron; Forest Baskett; Brooke Seawell; Peter Sonsini; Robert Garland; Jake Nunn; Sigrid Van Bladel; Hawk, Robert B.; Arno Penzias
**Subject:** Re: Menlo Park Special Event Permit

"William L. McClure" <wlm@jsmf.com>,
"Cindy S. Elmquist" <cse@jsmf.com>
Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA 94025
650-324-9300 Phone
650-324-0227 Fax



"David C. Bertini" <dcbertini@menlopark.org>,
"Matt L. Milde" <mlmilde@menlopark.org>,
The City of Menlo Park
701 Laurel St.

EXHIBIT
0267

EXHIBIT
tabbies Milde 103
CT. 3-5-2020

Menlo Park, CA 94025
650-330-6600

Dear Mr McClure,

I am lodging herewith an appeal of your denial of my application for a special event permit, by outlining its purpose and scope and responding to all of your objections in order.

I have been protesting NEA's ongoing support of its venture partner Min Zhu and its coverup of his incestuous child rape since 2004. In the course of the ensuing litigation and subject to demands by Menlo Park city authorities, I have been forced to relocate my protests from the immediate vicinity of NEA's headquarters, to the narrow strip of public grounds surrounding the 16 private acres of the Rosewood Sand Hill compound located at 2825 Sand Hill Rd, Menlo Park, CA 94025. The median strip identified in his current application affords the only possible location for staging my protest in clear view of the NEA headquarters. My open display of firearms is germane to the message that responds to the death threats made against me and my family in the names and on the behalves of individuals and business entities sponsored and supported by NEA. The continual and open-ended nature of my protest responds to NEA's long-standing refusal to account for its responsibility in supporting and covering up the lawless conduct of its associates.

As to your claim that my application is incomplete, attached please find a map of the area in question, which clearly designates the specific and modest boundaries of my special event. That is all that the City of Menlo Park ("the City") can reasonably expect and require to analyze whether traffic control will be necessary or what other conditions might be necessary as part of its approval of my application. As suggested before, and witnessed by my past appearances in your jurisdiction, my use of sound and lighting equipment is subject to our ongoing mutual agreement on their time, place, and manner parameters. If you have any specific requests in this regard, please make them with no further ado, bearing in mind that all restrictions on my expressive conduct must be (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels for communication. (See *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983).) As resolved as I am to see my task through, I remain open to all reasonable accommodations.

While the First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired" (*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981), it protects the right of every citizen to "reach the minds of willing listeners [and] to do so, there must be opportunity to win their attention." (*Hill v. Colorado*, 530 U.S. 703 (2000).) My presence on NEA's grounds has been ruled out as a part of settling its trespass claims against me five years ago. The currently proposed location of my performance therefore represents my only remaining opportunity to address directly the public associated or connected with it. Please bear in mind the foregoing authorities in your attempts to deny me my right to speak in this way and venue.

With respect to the application not meeting the criteria for a special event, the City lacks the authority to define a special event subject to its permitting requirements, beyond ensuring that it does not disrupt the ordinary use of its public spaces. It is true that I am proposing a media production of a one-man protest. My primary aim, however, is to exhibit my media to the thousands of daily passerby on Sand Hill Road, even as I stream their reactions online. My communication needs to be both physically proximate for them, and available over the Internet for more distant audiences. This project falls squarely within the ambit of Constitutional protection of political speech. My production is no less deserving of such protection for being modestly scaled. Thus *Branzburg v. Hayes*, 408 U.S. 665, 704 (1972): "Liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods."

While the First Amendment literally forbids the abridgment only of "speech", the Supreme Court has long recognized that its protection does not end at the spoken or written word, even as it acknowledged that not all conduct intended by the person engaging therein to express an idea is so protected. (See *United States v. O'Brien*, 391 U.S. 367 (1968).) For such conduct may be "sufficiently imbued with elements of

MP000452

communication to fall within the scope of the First and Fourteenth Amendments". (See *Spence v. Washington*, 418 U.S. 405 (1974).) "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether [a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." (See *Texas v. Johnson*, 491 U.S. 397 (1989).) In sum, according to the Supreme Court's test for expressive conduct, known as the Spence-Johnson test, an action is protected by the First Amendment if: (1) the speaker-actor intends for the conduct to express a particularized message; and (2) that message would be understood by others. In the course of reaffirming the Spence-Johnson test in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995), the Supreme Court ruled that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' [...] would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schönberg, or Jabberwocky verse of Lewis Carroll." In the course of my protest, the expressive content of openly carried firearms presented as a means of defense both warranted and necessitated by my circumstances, will be bolstered by the concurrent multimedia presentation of the evidence of threats I received in the names and on the behalves of NEA's associates, the damage that they claim to have inflicted on my family, and their history of unlawful violence. Your study of my past displays should suffice to reassure you that my painstakingly particularized message will be infinitely easier to parse than The She-Wolf, Pierrot Lunaire, or Jabberwocky.

This brings me to the matter of my venue. Streets and sidewalks are "prototypal" examples of public fora, and have immemorially been considered a rightful place for public discourse. (See *Hague v. C.I.O.*, 307 U.S. 496 (1939).) Public fora "have achieved a special status in our law", for they "represent areas within which tolerance for inhibitions on speech, petition, and assembly is at a minimum." The government therefore "bear[s] an extraordinarily heavy burden to regulate speech in such locales." (See *N.A.A.C.P. v. City of Richmond*, 743 F.2d 1346 (9th Cir. 1984).) "And just as streets and sidewalks are prototypical examples of public fora, political speech related to current events is the prototypical example of protected speech." (See *American-Arab Anti-Discrimination Committee v. City of Dearborn* ("AAADC"), 418 F.3d 600 (6th Cir. 2005).) In the matter at hand, the current event at issue is NEA's ongoing financial support of its child-raping protégé Min Zhu. As long as I do not "realistically present serious traffic, safety, and competing-use concerns beyond those presented on a daily basis by ordinary use of the streets and sidewalks," you cannot require me to obtain a permit for exercising my Constitutional rights, let alone deny its issuance. (See *Santa Monica Food Not Bombs v. City of Santa Monica* ("SMFNB"), 450 F.3d 1022 (9th Cir. 2006).) Moreover, I generally do not need a permit to hold a rally or a march on public grounds while obeying traffic laws. (See SMFNB, 450 F.3d at 1039, 1040-43; AAADC, 418 F.3d at 608.) Thus I am asking for nothing more nor less than your approval of my rightful, conspicuous presence on public grounds in full compliance with all applicable laws.

As to my compliance with traffic laws, to repeat myself, I do not intend use any City street or right of way. The California Vehicle Code Section 525 defines the right of way as "the privilege of the immediate use of the highway". In this regard, the right of way in the median island, where I intend to conduct my performance, is ordinarily reserved for pedestrians alone. The small part of the median island that I intend to occupy will leave plenty of room for the passage of vehicles in any emergency, e.g. as regards tow trucks allowed to do so pursuant to CVC Section 21719. I do not intend to present any visual impairment to oncoming traffic and vehicles traveling on Sand Hill Road. As to presenting a visual distraction, I am well within my First Amendment rights to do so in a rightful place for public discourse, within which tolerance for your inhibitions on speech, petition, and assembly is at a minimum.

To clarify the nature of the proposed multimedia production in the context of my one-man protest, I am not intending it for the filming of a movie, and therefore you may not require me to obtain a film production permit. Kindly recall that I have borne the brunt of abusive and oppressive conduct by the City of Menlo Park Police Department ("the police") since the inception of my protests a decade ago. This abuse and oppression included, without limitation, illegal surveillance and harassment of myself and my associates, arbitrary imposition of constraints on our performance, and participation in my malicious prosecution in San Mateo Superior Court, wherein the prosecutor expressly and unequivocally acknowledged on court record that she was seeking my criminal conviction on behalf of NEA. Accordingly, I would not dare to appear in your jurisdiction without recording each of my interactions with your minions, for my security

and theirs alike. And I have every right to make this recording without asking or paying for your permission.

As explained by Evan Bernick and Paul Larkin in "Filming the Watchmen: Why the First Amendment Protects Your Right to Film the Police in Public Places", lower federal courts have generally said that the First Amendment protects a right to record and photograph law enforcement in public view. Some restrictions may be constitutional, but simply prohibiting the recording because the person is recording the police cannot be constitutional. While the Supreme Court is yet to consider this question, such is the general view in the federal appellate decisions that have done so. An apparent exception is a recent federal trial court decision in *Fields v. City of Philadelphia* and *Geraci v. City of Philadelphia*, which takes a different, narrower approach: There is no constitutional right to videorecord police, the court says, when the act of recording is unaccompanied by "challenge or criticism" of the police conduct. But even under this restrictive standard, I remain well within my rights to videorecord at will, without warning, and regardless of permission, all my public performances in your jurisdiction, for the sake of safety and transparency. In light of the history of my peaceful protests being subjected to oppressive scrutiny and censure by the City authorities, I am planning to exercise my rights under the First Amendment to film my appearances there, for the express purpose of mounting a potential challenge and criticism of the police conduct in the event of further obstructions mounted by Menlo Park. According to *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) the discretion of public officials charged with permitting First Amendment activity must be limited by "narrow, objective, and definite standards." It therefore falls upon the City to identify such standards that deny my rights or subject them to permitting requirements.

Lastly, your concern is that it is illegal to open carry a firearm in the State of California is likewise misdirected. It is none of your business to seek or scrutinize any logical nexus or legitimate purpose of carrying a firearm the proposed event. I am well within my rights in carrying a firearm, either openly or concealed, in the course of an entertainment event, as its authorized participant, as protected by the Constitution of the United States, and clearly warranted by law in the state of California.

Thus California Penal Code Section 25400 (a) (2): "A person is guilty of carrying a concealed firearm when the person does any of the following: [...] Carries concealed upon the person any pistol, revolver, or other firearm capable of being concealed upon the person." Whereas P.C. Section 25510 qualifies this ban: "Section 25400 does not apply to, or affect, any of the following: (a) The possession of a firearm by an authorized participant in a motion picture, television, or video production, or an entertainment event, when the participant lawfully uses the firearm as part of that production or event, or while going directly to, or coming directly from, that production or event. (b) The transportation of a firearm by an authorized employee or agent of a supplier of firearms when going directly to, or coming directly from, a motion picture, television, or video production, or an entertainment event, for the purpose of providing that firearm to an authorized participant to lawfully use as a part of that production or event." Please be assured that I intend to authorize myself as a participant in my own entertainment event.

A similar exemption applies to the ban on the open carrying of an unloaded handgun. Thus P.C. Section 26350 (a) (1): "A person is guilty of openly carrying an unloaded handgun when that person carries upon his or her person an exposed and unloaded handgun outside a vehicle while in or on any of the following: (A) A public place or public street in an incorporated city or city and county." Whereas P.C. Section 26375 qualifies this ban: "Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television or video production, or entertainment event, when the participant lawfully uses the handgun as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event."

MP000454

Similar exemptions apply to long guns. Thus P.C. Section 26400 (a): "A person is guilty of carrying an unloaded firearm that is not a handgun in an incorporated city or city and county when that person carries upon his or her person an unloaded firearm that is not a handgun outside a vehicle while in the incorporated city or city and county." Whereas P.C. Section 26405 qualifies this ban: "Section 26400 does not apply to, or affect, the carrying of an unloaded firearm that is not a handgun in any of the following circumstances: [...] (r) By an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television or video production, or entertainment event, when the participant lawfully uses that firearm as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event." In short, conspicuous display of otherwise legally possessed unloaded firearms in the course of my entertainment event is my Constitutional right under the First Amendment, expressly protected by California statutes. In the event, these firearms will include, without limitation, a pair of H&K P7M13 handguns, an LRB M25 designated marksman rifle, a Winchester M97 trench shotgun with an M1917 Remington bayonet, and a semiautomatic, belt-fed, tripod mounted Browning M1919a4, all conspicuously adjoined by ample supplies of ammunition.

I trust that I have met your concerns over the completeness of my application. Please acknowledge the receipt of this email and approve my application at your earliest convenience. To repeat myself, we are equally willing to negotiate or litigate. Please refer to *Lefemine v. Wideman*, 568 U.S. ____ (2012), which held that a plaintiff who secured a permanent injunction but no monetary damages was a "prevailing party" under 42 U.S.C. § 1988 and could receive attorney fees, where the injunction ordered the defendant officials to change their behavior in a way that directly benefited the plaintiff, who could thereafter engage in demonstrations without fear of sanctions with which police had previously threatened him. As public officials, NEA's minions among your City colleagues enjoy qualified immunity from damages suits if they violate my rights, but only as long as they do not violate "clearly established" law. "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." (See *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).) In short, your personal liability will be richly borne out by the foregoing statutes and case law. The last issue that remains to be litigated conclusively is the expressive content of openly carried firearms. In this connection, please refer to *Nordyke v. King*, 563 F. 3d 439 (9th Cir. 2009), wherein the state of California tacitly conceded the issue even before the Supreme Court incorporated the Second Amendment in *McDonald v. Chicago*, 561 U.S. 742 (2010). Long story short, if you continue siding with NEA's minions, I will win at the City's certain and considerable expense.

---

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Mon, Sep 21, 2015 at 2:12 PM, Cindy S. Elmquist <cse@jsmf.com> wrote:
>
> Bill McClure requested I forward to you the attached letter with enclosure thereto.
>
>
>
> Cindy S. Elmquist, Assistant to William L. McClure
>
> Jorgenson, Siegel, McClure & Flegel, LLP
>
> 1100 Alma Street, Suite 210

MP000455

>
> Menlo Park, CA 94025
>
> (650) 324-9300 Phone
>
> (650) 324-0227 Fax
>
>
>
>

MP000456

Exhibit W

| From: | Bertini, David C |
|-------|---------------|
| To: | David Tresmontan; jimmy.mazon@rosewoodhotels.com; tsanchez@smcgov.org; Steve Wagstaffe; McClure, William (wlm@jsmf.com) |
| Cc: | Dixon, William A; Jonsen, Robert (RJonsen@menlopark.org); Greg Munks (gmunks@co.sanmateo.ca.us) |
| Subject: | RE: Special Event Permit Application |
| Date: | Tuesday, July 21, 2015 6:13:00 PM |

Good afternoon all.

As you are aware, Michael Zeleny has submitted an application for a "special event" to be held somewhere in front of the Rosewood Hotel / NEA Property located at 2825 Sand Hill Road in Menlo Park. This "special event" would consist of a very similar protest he has conducted in the past, including carrying several unloaded military type firearms, along with a 55" display with sexually explicit caricatures, portable lighting and a generator. The application indicates a set up date of 9-30-15, with the event to be "ongoing" and "indefinite".

Although we intend to deny this application on several grounds (predominately that this is not a "special event" as defined by the City), we are in the process of requesting more information from him on the exact location he was intending as it was not clear on his application. Once we have gone through the formal information gathering process, we will notify him of our decision on his application.

In the meantime, I will be clearing up several legal issues with the District Attorney's Office and then scheduling a meeting with the entities involved (NEA, Rosewood Hotel, Menlo Park Police and City Attorney's Office, SMCO Sheriff's Office and the District Attorney's Office). At this meeting we can discuss our combined response in case Zeleny decides to proceed without a permit.

If those interested in attending can please check their availability the week of August 17th or the week of August 24th, I will set up a meeting to discuss our response to any possible action by Zeleny.

Feel free to contact me if you have any questions.

Thanks.

Commander Dave Bertini
Menlo Park Police Department
701 Laurel Street
Menlo Park, CA. 94025
650.330.6321

**From:** larvatus@gmail.com [mailto:larvatus@gmail.com] **On Behalf Of** Michael Zeleny
**Sent:** Friday, July 10, 2015 11:05 AM
**To:** McClure, William; Scott Sandell; Milde, Matt L; Police Chief
**Cc:** David W. Affeld; Peter Shimamoto

EXHIBIT
0262

MP00

**Subject:** Special Event Permit Application

Michael Zeleny
michael@massmeans.com
zeleny@post.harvard.edu
7576 Willow Glen Road, Los Angeles, CA 90046
voice:323.363.1860
fax:323.410.2373

City of Menlo Park
Matt Milde
Recreation Program Coordinator
mlmilde@menlopark.org
701 Laurel Street
Menlo Park, CA 94025
voice:650.330.2223
fax:650.330.2242

By email, fax, and postal mail.

Starting in October 2015, we shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu, and continuing until NEA publicly acknowledges its wrongdoing and severs its relationship with Min Zhu, Scott Sandell, and Dick Kramlich. I shall be present on site around the clock, served by support staff and equipped with fully operational, exposed and unloaded military grade firearms and loaded ammunition feeding devices therefor, including without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a 7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed Browning M1919a4, in full compliance with all applicable laws. A 55" portable media display powered by a portable gas generator will display videos featuring explicit representations of sexual violence committed by NEA's publicly disgraced protégé. A sample image can be found at http://larvatus.livejournal.com/371973.html. All media aspects of this event will be subject to content-neutral regulation negotiated with Menlo Park authorities. My fundamental rights under the First and Second Amendments of the Constitution of the United States are reserved and non-negotiable.

A site map can be found at https://www.google.com/maps/@37.4197308,-122.2137188,17z/. My display will be confined to the median strip on Sand Hill Road directly across the NEA headquarters. No obstruction of automotive or foot traffic will take place. Please contact me to arrange for the payment of the special event fee and discuss any organizational matters. Please address all legal inquiries and requests to David W. Affeld, Affeld Grivakes Zucker LLP, 2049 Century Park East, Suite 2460, Los Angeles, CA 90067, voice:310.979.8700, fax:310.979.8701.

cc:

Bill McClure
Menlo Park City Attorney
wlm@jsmf.comvoice:650-330-6610
Jorgenson, Siegel, McClure & Flegel, LLP

1100 Alma Street, Suite 210
Menlo Park, CA 94025
voice:650.324.9300
fax:650.324.0227

Robert Jonsen
Menlo Park Police Chief
policechief@menlopark.org
701 Laurel St.
Menlo Park, CA 94025
voice:650.330.6600

Scott Sandell
New Enterprise Associates
ssandell@nea.com
2855 Sand Hill Road
Menlo Park, CA 94025
United States
voice:650.854.9499
fax:650.854.9397

—

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los
Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373
http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No
matter. Try again. Fail again. Fail better." — Samuel Beckett

MP000260

Exhibit X

**From:** O"Connor, Dani
**To:** Jonsen, Robert
**Subject:** Minutes
**Date:** Monday, August 10, 2015 10:11:20 AM
**Attachments:** August Minutes.docx

Please look these over...

## Presentation given regarding GPS cash pack devices deployed in Menlo Park

3SI is the producer only dye-pack manufacturer in the United States and they also manufacture cash pack tracking devices used primarily in banks. Locations in Menlo park include both locations of Bank of America on El Camino and Sand Hill. The signal will refresh every 6 seconds once the device is deployed within 35-65 feet in accuracy however, after 7 hours, the device goes dead and can no longer be tracked. The device has helped to develop apprehend 70-85% of suspects.

The devices are used in banks, big box stores and pharmacies. The devices trigger an alert at the 3SI call center as well as our dispatch center. Dispatch can log into the 3SI website directly or 3SI will call and provide third party information over the phone. The department will be provided a radio beacon which will be kept in the sergeant's office. The service is provided at no charge to law enforcement and supported by financial institutions nationwide.

## Staffing Changes

Beginning August 7th, Sergeant Romero will be back on A side mids. and Sergeant Mackdanz will be making the transition to Administrative Sergeant.

Officer Vasquez will also be back to full duty and for the first time in two years, patrol will be fully staffed.

Sergeant Paugh will take over the FTO program.

## Corporal Expectations

Chief Jonsen pays attention to what is happening on patrol. He expects professionalism from everyone in the department and believes in each of you and your ability to do your job. You are the first contact to the community and it is expected that each of you treat others with respect including each other, peers, trainees, those on your team and those within the community.

You will need a great deal of patience with developing others who are coming in with little to no experience. You are all expected to provide trainees with an opportunity to succeed. The chief is holding each corporal accountable for the end training product from productivity to report writing. Current reports are missing basic key elements which should not be missing from a report. Corporals are expected to read, detail and help trainee refine details of report. The training curriculum each of you are using needs to be consistent.

Chief Jonsen believes in the professionalism of the department and expects to turn out quality employees. The chief wants the best representation of the department and considers each corporal to be the best of the best. The chief takes pride in talking about all of you and expects you to self-elevate and achieve a higher standard. There is a one year one year training period intended for you to demonstrate your ability to handle this position.

Corporals are not just training officers or just fill in for sergeants, chief believes you are all leaders and you are all independent thinkers that can bring ideas and leadership to the department. Menlo Park is evolving and changing the service that is delivered to the community. Officers do a great job arresting and finding bad guys and lowering crime stats, the department does that exceptionally well. If there is a new or different way to serve the community better, we should do so. Are we going down the right path? Is the path clear? Corporals, like everyone else are asked to submit ideas that help the department evolve with the times. If the department is going in a direction that does not seem right for the organization, everyone should be comfortable bringing it to command staff, sergeants or any level. This includes bringing solutions instead of complaints and clarifying a situation instead of perpetuating rumors. What is said in a meeting and how it is conveyed to the officers can be very different things, communication is very important.

Uniforms, interactions and trainee relationships should all be the best reflection of the department. Commander Dixon is currently working on the uniform policy. How we look and how we represent ourselves is important to the chief. Always try to look the best you can. This includes anyone in the department from officers to commanders. The chief expects professionalism in each aspect.

**Briefing Training**

Briefing training will be done every day, there will be a section in the daily to include the training that was completed during briefing. Patrol needs to show due diligence that we are training officers daily on everything from big 9 to current policy updates.

**FTO Update**

The last week of July was the first week of FTO for Eddie Mazon and Dan Rojas. There are two new officer trainees currently in the academy. Jeff Cooley will be mentoring Officer Wilson and David Apple will be mentor to Officer Victor. If we want to produce the best product, how do we do it? Who is a better first phase trainer and who is a better third phase? Consistency is key with the FTO program and other programs within the department.

**Round Table**

Sergeant Ortega:
- Recently, the kid's triathlon a basketball tournament and two large library events all took place on the same day which resulted in a citywide calendar which reflects events taking place within the city. All attendees were forced to use same parking lot which resulted in a great deal of congestion.
- Connoisseur's Marketplace went well and officers did a good job.

- National Night Out took place on August 4th. There were seven participating locations.
- Relay for Life took place on Saturday, August 8th from 1100 Saturday until Sunday morning at 0800. The department honored Dag and Detective Knopp completed 10 miles with Gert.
- Future events: August 16th North Fair Oaks Festival

Commander Beritni:
Zeleny will conduct another open carry display and is attempting to pull a film permit in front of NEA and Rosewood which is in the process of being denied. His defense is that he's making a film from August through December and he is attempting to use the permit as a means of conducting his demonstration.

Carolina Gaskin:
The department will be updating some of the equipment in the gym and some of the weights will be unavailable. Currently, the treadmill and bike are being serviced.

Nicole Acker:
- Thank you to everyone for attending Tactical First Aid/CPR training which has been POST certified.
- Range signups sheets are currently available in the sergeant's office. The dates are:
  A Side
  B Side
- DTAC & Taser training will be one hour long and officers will shoot their Taser cartridges in an attempt to make sure everyone is on the same cycle.
- Level 2 is a production company that was originally contacted by the city and will now be used to make a department video. Filming will begin on Aug 22nd and will include all aspects of the department. Please bring any department ideas/aspects that you would like captured to Nicole.
  **Their website is level2p.com**

Sergeant Brackett:
Corporal Luevano has been running team as the sergeant while Sergeant Brackett ran a beat. This turned into a great learning opportunity for Corporal Luevano and the team was receptive.

Corporal Adair:
- Members of the gang unit have been testifying as experts in Santa Clara County and have been very involved in Taliban convictions. Santa Clara has been very happy with Menlo's participation and expertise.
- SWAT - Best of West & Urban Shield are both upcoming. All Menlo Park officers finished number 1, 2, & 3. Adair provided SWAT sniper training to kids at a summer camp.

**Sergeant Soares:**
- Dispatch had difficulty with Blackboard procedures for and incident involving a child with autism that occurred over the weekend. Another incident involving a 10-65 from Ivy produced some of the same issues.
- Drop down holsters for officers need to be expedited due to the lack of space on their gun belt with all the tools that are currently carried.
- If you are approached by a Redwood City officer asking questions regarding the Gateway Apartments, do not answer any questions. This is an ongoing situation and the officer may be affiliated with a law office seeking information.

**Sergeant Kaufman:**
- Detectives have been working with Florida ICAC who have been Code 5ing a property on Chilco. On August 24th there will be a briefing with the agency and detectives will assist in a detail to conclude the case they have been working.
- Shannon Cardinez embezzlement case – Detective Dixon did a great job with the search warrant and follow up.

**Commander Dixon:**
Bike thefts are on the rise at the library. Both shifts please spot check library and civic center.

**Charlie Manning:**
Thank you to everyone for being patient with trainees. Bonny will be cleared to work solo but is unaccustomed to self-initiated work. Jessica and Rianna are still very new and working toward their release date to work solo.

**Corporal Douglas:**
Range training is coming up so have your guns clean. The department currently has a good supply of ammo.

**Sergeant Ortega:**
The department hosted a DUI checkpoint on 24th July. Thank you to Sgt. Kaufman for a great deal of assistance and guidance. There were no DUI drivers screened out of 1,000 drivers. There were many 14601 & 12500 cites. Event went smoothly. More cops would have been great. Pacifica PD lent the department their trailer and lighting.

**Corporal Weber:**
- Reitzell was just sentenced 30 years to life for the drunk driving incident the killed the Singh couple.
- Facebook bikes have been reported stolen through a third party security company. They have been both on viewed and tracked through GPS devices. One subject was apprehended but Facebook then did not want to prosecute. There are too many legal complications with not arresting these individuals so follow through as you normally would regardless of the decision of Facebook. Criminals will be held accountable

Corporal Luevano:
- FTO school last week.
- With Detective Cooley, he recently worked with Eddie Mazon and Dan Rojas on D-Tac basics.

Departures at the city level include Assistant City Manager Starla Jerome-Robinson, Finance Director Drew Corbett and Public Works Director Jesse Quirion.

There is enough talent in this department to train and develop others to be what we want the department to be. If you know someone that you think may be a good fit for the department, discuss this with your supervisor so it can be brought to the chief's level.

Are there any technology needs for the department that we currently need to upgrade or incorporate into our services? If you see a way to take something and incorporate it then let your supervisor know.

There have been certain incidents where the DA's Office will not prosecute a case. Our job cannot be altered by whether or not the DA's office will or will not prosecute. We still have an obligation to the community to follow through as we normally would.


Dates to remember:
Holiday party December 5th
Lou retirement September 15th

Exhibit Y



**City of Menlo Park   701 Laurel Street   Menlo Park, CA 94025**
**Building Inspection Department**
Phone:(650) 330-6704

# PERMIT

| Permit No.: | FILM2017-003 | Project Address: | 1 PROJECT | **11/29/2017** |

| Assessor's Parcel Number:  133010010 |

| Project Name: | SAND HILL RD | | | Applied: | 11/29/2017 |
| Type of Work: | | Type Const: | Occupancy: | Issued: | 11/29/2017 |
| Permit To Do: | FILM TESLA CAR ON SAND HILL RD. FOR TV SHOW-BILLIONS | | Expire Date: | |
| | | | | Final: | |

Owner's Name:

Valuation:

Contractor:                                          Architect:

Engineer:                                           Designer:

| Fee Description | Fee Amount | Amount Paid | Date Paid | Balance Due |
|---|---|---|---|---|
| ** Administrative Fees ** | $300.00 | 300.00 | 11/29/17 | 0.00 |
| **Total Fees:** | 300.00 | Total Fees Due: | | 0.00 |

This receipt certifies that on the date(s) shown in the "Date Paid" column above, the City of Menlo Park imposed the above itemized fees, dedications, reservations or exactions (collectively "fees"). The project applicant is hereby notified that he/she has **90 calendar days** from the date of payment as shown on this receipt to protest, in writing, in accordance with California Government Code §66020(a), any and all fees. Any party timely filing a protest may file an action to attack, review, set aside, void or annul the imposition of the fees within 180 days from the date of this notice.

### This permit shall be posted on job site until project
### has received an approved final inspection



EXHIBIT 74
Floral 3/3/20
(WITNESS)        (DATE)
JANIS JENNINGS, CSR, CCRR

MP001768

**Assessor's Parcel Number:** 133010010

An application for a building permit has been submitted in your name listing yourself as builder of the property improvements specified.

For your protection, you should be aware that as "Owner-Builder" you are the responsible party of record on such a permit. Building permits are not required to be signed by property owners unless they are personally performing their own work. If your work is being performed by someone other than yourself, you may protect yourself from possible liability if that person applies for the proper permits in his or her name.

Contractors are rquired by law to be licensed and bonded by the State of California, and may be required to have a business license from the city or county. They are also required by law to put their license number on all permits for which they apply.

If you plan to do your own work, with the exception of various trades that you plan to sub-contract, you should be aware of the following information for your benefit and protection:

If you employ or otherwise engage any person other than your immediate family, and the work (including materials and other costs) is $200 or more for the entire project, and such persons are not licensed as contractors or sub-contractors, then you may be an employer.

If you are an employer, you must register with the State and Federal governments as an employer and you are subject to several obligations including State and Federal income tax withholding, Federal Social Social Security taxes, Workers' Compensation Insurance, Disability Insurance costs, and unemployment compensation contributions.

There may be financial risks to you if you do not carry out these obligations and these risks are especially serious with respect to Workers' Compensation Insurance.

For more specific information about your obligations under Federal law, contact the Internal Revenue Service (and, if you wish, the U. S. Small Business Administration). For more specific information about your obligations under the State law, the Department of Benefit Payments and the Division of Industrial Accidents may be contacted.

If the structure is intended for sale, property owners who are not licensed contractors are allowed to perform their work personally or through their own employees, without a licensed contractor or subcontractor, only under limited conditions.

A frequent practice of unlicensed persons professing to be contractors is to secure an "Owner-Builder" building permit, erroneously implying that the property owner is providing his or her own labor and material personally. Building permits are not required to be signed by property owners unless they are performing their own work personally.

Information about licensed contractors may be obtained by contacting the Contractors' State License Board at 1020 "N" Street, Sacramento, CA 95814

The State of California Health and Safety Code, Section 19830, Chapter 9, Part 3, Division 13, requires us to make you aware of these laws and ordinances, and requires you to complete the attached form and return it to us before we may issue your permit.

Any contractor you list must have his State Contractors license number on file in this Department, and a current, valid Certificate of Workers' Compensation Insurance (or waiver) also on file in this Department.

If you are hiring someone other than a contractor to do the work, your Workers' Compensation Insurance must be on file in this Department in the form of a valid, current certificate from your Insurance Agent.



**City of Menlo Park
Engineering Division
701 Laurel Street
Menlo Park, CA 94025
Telephone (650) 330-6740**

**PERMIT NO.:_____**
**Keep this permit at the work site at all times**

Call 24 hours in advance of working in the public right
of way AND for each inspection request.
*Uninspected work will be rejected.*

## ENCROACHMENT PERMIT APPLICATION

☐ Major Encroachment ☐ Temporary Encroachment ☒ Other FILM PERMIT

☐ Minor Encroachment ☐ Debris or Container Box ☐ City-Mandated Repairs

### ONE PERMIT PER ADDRESS

| Location of Work Sandhill ROAD between Highway 280 & Alpine Rd. | Applicant Represents ☒ Contractor ☐ Owner | Applicant e-mail: mriutta@yahoo.com Applicant fax: |
|---|---|---|

| Name of Applicant (person) Matthew Riutta | Address 268 Norman Ave #2A | City Brooklyn | State NY | Zip 11222 | Telephone 510.282.8497 |
|---|---|---|---|---|---|

| Name of Contractor for Possible Productions, Inc | Address | City | State | Zip | Telephone |
|---|---|---|---|---|---|

| California Construction License No. | Menlo Park Business License No. | Est. Start Date Dec. 2 | Est. Complete Date Dec. 3 (rain date) |
|---|---|---|---|

| Estimated Construction Cost (Estimate work in city R/W only. Do not include value of utility.) $_____ | Bond or Deposit * $_____ | Bond or Deposit provided by: ☐ Contractor ☐ Owner ☐ Other (provide name, company, address) |
|---|---|---|

Description of work to be done:

We are filming A Tesla car driving on Sand Hill ROAD starting approximately near Highway 280 & will continue east through Alpine ROAD. We will further film until El Camino Real Road in Palo Alto. We may also film on the same distance, westward bound. We will have one picture vehicle, one camera car, which will lead or follow the picture vehicle (a Tesla).

Applicant submits the following:
☐ 3 copies of sketch or plans
☐ 3 copies of traffic control plans
☐ insurance certificate

*Call Underground Service Alert (USA) at 1-800-227-2600 before you dig*

**GENERAL CONDITIONS OF PERMIT ATTACHED.**
**Signature below acknowledges that special working hours may apply – check the approved traffic control plan.**

I hereby acknowledge that I have read this permit and the attached conditions, that the information given by me is correct, that I am the owner or the duly authorized agent of the owner, and that I agree to comply with the conditions and all applicable provisions of state laws, city ordinances, and the rules of any governmental agency involved.

| Signature of Applicant (Owner or authorized agent) | Location manager | 11/26/17 |
|---|---|---|
| | Title | Date |

### DO NOT WRITE BELOW THIS LINE -- CITY STAFF USE ONLY

| Approved by Engineering Division | Date | Permit expires | Fees (retained by City) | $ |
|---|---|---|---|---|
| | | Total Due to City | ☐ Paid | $ |

* Bond or deposit requests must originate from the bond/deposit provider. A copy of the original receipt must accompany the refund request. All deposits or bonds are subject to forfeiture to comply with City Codes and Ordinances.

MP001770

## Film Production in Menlo Park

Film production in the City of Menlo Park must comply with following conditions:

1. Permittee shall submit in writing all pertinent details regarding the filming including the date(s) and times of the filming including time needed for set-up and take down; a description of the nature of the filming; the location of the filming; a list of all equipment involved in the filming, including cars and other vehicles; the proposed location for the parking and storage of all such vehicles and equipment; the number of cast and crew members involved in the filming; and an indication of any special needs, such as amplified noise, etc. If granted, the permit's approval will be confined to such activities, locations and time schedules as submitted and approved.

2. Three days prior to the beginning of filming, permittee shall provide written notice to residents and businesses within 200 feet of the proposed filming.

3. Permittee shall obey all City Ordinances, rules and the guidance of City supervisory employees pertaining to the use of City property, including the location, parking and storage of vehicles and equipment, crowd and traffic control, and the restoration of premises to their original condition after use for filming purposes.

4. Permittee will comply with the City of Menlo Park noise ordinance. Filming will be limited to the hours between 8:00 a.m. and 6:00 p.m. and will result in low to no noise levels. The use of any explosive, fireworks, or pyrotechnic devices is strictly prohibited.

5. Permittee shall make arrangements for traffic control satisfactory to the Menlo Park Police Department prior to filming on City streets and in other public areas. Permittee will be charged to recover the cost of traffic control provided by the City. Permittee will legally park vehicles and will not require street closure or traffic control other than what is approved.

6. Permittee shall covenant and agree to indemnify and hold harmless the City from any and all loss, cost, damages and expenses of any kind, including attorney fees, on account of personal injury or property damage resulting from any activity of Permittee on municipal property or in connection with its use of municipal property.

7. Liability insurance in no way limits the indemnity agreement above, Permittee will furnish the City a Certificate of Liability Insurance acceptable to its Risk Management office showing combined single limit coverage for bodily injury and property damage, or the equivalent of such coverage, not less than $1 million. The City, including its officials, employees and agents, shall be named as additional insured in the Liability Policy. Contractual liability coverage insuring the obligations of this Agreement is also required. The insurance may not be canceled or substantially modified without ten (10) days written notice to the City Manager's Office.

8. Permittee shall pay, with a valid check, money order, credit card or cashier's check, a **filming permit application fee of $150.00 in addition to the daily permit fees of $50 per day for still photography and short subject, $100 per day for industrials, and $150 per day for features, TV, music videos and commercials.**

9. Permittee shall apply for a one-time Business License and pay, with a valid check, money order, credit card or cashiers check.  See **Guide to Annual Business Licensee Fee Calculation** for the fee schedule.

10. Permittee will adhere to the provisions and conditions set forth in the permit.  If Menlo Park Police Department or other City personnel are required to correct, mitigate, or provide any service not consented to under this permit, permittee will be required to pay for all services rendered.  Payment shall be made in the form of *a valid check, money order, credit card or cashiers check* immediately upon demand made by the City.

*note: we will provide 2-3 picture cars to provide a safety "buffer" zone around our "hero" car for safety.

PROJECT ADDRESS: _Sandhill Road between Highway 280 & Alpine Rd_

Read and agreed on:

Date: _11/21/17_

Signature _____

Print name  _Matthew Rintls_

MP001772

 ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)** 11/27/2017

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER Arthur J. Gallagher & Co. Insurance Brokers of CA., Inc. License #0726293 505 N. Brand Boulevard, Suite 600 Glendale CA 91203 | CONTACT NAME: CBS Certificate Processing | | |
|---|---|---|---|
| | PHONE (A/C, No, Ext): 877-790-8155 | | FAX (A/C, No): 818-539-1693 |
| | E-MAIL ADDRESS: CBS_Certificates@ajg.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Travelers Property Casualty Co of A | | 25674 |
| INSURED CBSCORP-01 CBS Corporation Showtime Networks/Possible Productions Inc. 268 Norman Avenue, Suite 2A Brooklyn NY 11222 | INSURER B : Travelers Insurance Co of Canada | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES  CERTIFICATE NUMBER: 99495040  REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A B | X | COMMERCIAL GENERAL LIABILITY | | | TC2JGLSA121D6189TIL16 234D4683 | 12/31/2016 12/31/2016 | 12/31/2017 12/31/2017 | EACH OCCURRENCE | $5,000,000 |
| | | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $5,000,000 |
| | | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | | PERSONAL & ADV INJURY | $5,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $15,000,000 |
| | X | POLICY PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $5,000,000 |
| | | OTHER: | | | | | | | $ |
| A | | AUTOMOBILE LIABILITY | | | TC2JCAP121D6190TIL16 | 12/31/2016 | 12/31/2017 | COMBINED SINGLE LIMIT (Ea accident) | $5,000,000 |
| | X | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | X | OWNED AUTOS ONLY SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X | HIRED AUTOS ONLY X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| | | UMBRELLA LIAB OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | | DED RETENTION $ | | | | | | | $ |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? N/A (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | PER STATUTE OTH-ER | |
| | | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | | Auto Physical Damage | | | TC2JCAP121D6190TIL16 | 12/31/2016 | 12/31/2017 | Comprehensive Ded. Collision Ded. | 2,500 2,500 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

Certificate Holder is deemed Additional Insured as required by written or verbal contract. Refer to attached General Liability endorsement (CG T8 31) for scope of Additional Insured status. Further, the Certificate Holder is included as a Loss Payee for Auto Physical Damage if required by written or verbal contract. This Additional Insured and/or Loss Payee status arises solely as respects the filming of the motion picture and/or television production: "BILLIONS".

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| City of Menlo Park 701 Laurel Street Menlo Park, CA 94025 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE Terry Campbell |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)  The ACORD name and logo are registered marks of ACORD  MP001773

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

## BLANKET ADDITIONAL INSURED
### (INCLUDING PRIMARY/NON-CONTRIBUTORY AND SEPARATION OF INSUREDS PROVISIONS)

This endorsement modifies insurance provided under the following:
**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

1.  WHO IS AN INSURED - (Section II) is amended to include any person or organization that you agree in a verbal contract or agreement or a "written contract requiring insurance" to include as an additional insured on this Coverage Part, but:

    a)  Only with respect to liability for "bodily injury", "property damage" or "personal injury"; and

    b)  If, and only to the extent that, the injury or damage is caused by your acts or omissions or "your work" or by your subcontractor in the performance of "your work" to which the verbal contract or agreement or "written contract requiring insurance" applies.

    The person or organization does not qualify as an additional insured with respect to the independent acts or omissions of such person or organization.

2.  **LIMITATIONS**

    The insurance provided to the additional insured by this endorsement is limited as follows:

    a)  In the event that the Limits of Insurance of this Coverage Part shown in the Declarations exceed the limits of liability required by the "written contract requiring insurance", the insurance provided to the additional insured shall be limited to the limits of liability required by that "written contract requiring insurance". In absence of a "written contract requiring insurance", the limits of insurance available to the additional insured shall be $1,000,000 for the sum of all damages because of "bodily injury", "property damage" and "personal injury". This endorsement shall not increase the limits of insurance described in Section III - Limits of Insurance.

    b)  The insurance provided to the additional insured by this endorsement shall be limited to the more restrictive of:

        i.   The scope of coverage required by contract or agreement; or

        ii.  What is insured by this Coverage Part.

    c)  The insurance provided to the additional insured does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" unless a "written contract requiring insurance" specifically requires you to provide such coverage for that additional insured, and then the insurance provided to the additional insured applies only to such "bodily injury" or "property damage" that occurs before the end of the period of time for which the "written contract requiring insurance" requires you to provide such coverage or the end of the policy period, whichever is earlier.

    d)  If you have agreed to provide insurance to the additional insured pursuant to a contract or agreement with a third party media production company then the insurance provided to the additional insured shall be limited to liability for "bodily injury", "property damage" or "personal injury" caused by or arising from the specific media being produced on your behalf.

3.  **PRIMARY/NON-CONTRIBUTORY AMENDMENT TO OTHER INSURANCE CLAUSE**

    The insurance provided to the additional insured by this endorsement is excess over any valid and collectible other insurance, whether primary, excess, contingent or on any other basis, that is available to the additional insured for a loss we cover under this endorsement. However, if a "written contract requiring insurance" specifically requires that this insurance apply on a primary basis or a primary and non-contributory basis, this insurance is primary to other insurance available to the additional insured which covers that person or organization as a named insured for such loss, and we will not share with that other insurance. But the insurance provided to the additional insured by this endorsement still is excess over any valid and collectible other insurance, whether primary, excess, contingent or on any other basis, that is available to the additional insured when that person or organization is an additional insured under such other insurance.

CG T8 31                                            12/31/16 - 12/31/17 MP001774

4. **CONDITIONS**

As a condition of coverage provided to the additional insured by this endorsement:

a) The additional insured must give us written notice as soon as practicable of an "occurrence" or an offense which may give rise to a claim. To the extent possible, such notice should include:

     i. How, when and where the "occurrence" or offense took place;

     ii. The names and addresses of any injured persons and witnesses; and

     iii. The nature and location of any injury or damage arising out of the "occurrence" or offense.

b) If a claim is made or "suit" is brought against the additional insured, the additional insured, must:

     i. Immediately record the specifics of the claim or "suit" and the date received;

     ii. Notify us as soon as practicable; and

     iii. See to it that we receive written notice of the claim or "suit" as soon as practicable.

c) The additional insured must immediately send us copies of all legal papers received in connection with the claim or "suit", cooperate with us in the investigation or settlement of the claim or defense against the "suit", and otherwise comply with all policy conditions.

d) The additional insured must tender the defense and indemnity of any claim or "suit" to any provider of other insurance simultaneously which would cover the additional insured for a loss we cover under this endorsement. However, this condition does not affect whether the insurance provided to the additional insured by this endorsement is primary to other insurance available to the additional insured which covers that person or organization as a named insured as described in paragraph 3. above.

5. **SEPARATION OF INSUREDS**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the First Named Insured, this insurance applies:

a) As if each Named Insured were the only Named Insured; and

b) Separately to each insured against whom claim is made or "suit" is brought.

6. **DEFINITIONS**

The following definition is added to SECTION V. – DEFINITIONS:

"Written contract requiring insurance" means that part of any written contract or agreement under which you are required to include a person or organization as an additional insured on this Coverage Part, provided that the "bodily injury" and "property damage" occurs and the "personal injury" is caused by an offense committed:

a) After the signing and execution of the contract or agreement by you;

b) While that part of the contract or agreement is in effect; and

c) Before the end of the policy period.

# Possible Productions Inc.
## "BILLIONS" SEASON 3

## CREDIT INFORMATION SHEET

**Fed ID# 26-3246830**
**Date of Incorporation:  09/04/2008**

### PRODUCTION OFFICE / BILLING ADDRESS:

POSSIBLE PRODUCTIONS INC.
"BILLIONS" Season 2
268 Norman Ave., Suite 2A
Brooklyn, NY  11222
347-529-4240 phone
347-721-3402 fax

### BANK REFERENCE:

JP MORGAN CHASE BANK

PLEASE CONTACT IVELISSE LOPEZ AT IVELISSE.LOPEZ@PRODUCTION.SHOWTIME.NET
FOR A VENDOR SPECIFIC BANK REFERENCE DOCUMENT.

PLEASE E-MAIL DOCUMENT TO CBS.JPMC.SERVICE@JPMCHASE.COM AND COPY
SUE.POLAKOFF@CBS.COM

SIGNED LETTER SHOULD BE RETURNED IN 24-48 HOURS.

### TRADE REFERENCES:

ENTERTAINMENT PARTNERS
ATTN: ACCOUNTING (ACCOUNTS RECEIVABLE)
2835 N. NAOMI STREET
BURBANK, CA 91504
(818) 955-6000

PANAVISION INTERNATIONAL LP
ATTN: ACCOUNTING (ACCOUNTS RECEIVABLE)
6219 DE SOTO AVE
WOODLAND HILLS, CA 91367
(818) 316-1000

FOTOKEM
ATTN: ACCOUNTING (ACCOUNTS RECEIVABLE)
2801 WEST ALAMEDA AVE
BURBANK CA. 91505
(818) 846-3101

TECHNICOLOR CREATIVE SERVICES USA, INC.
ATTN: ACCOUNTING (ACCOUNTS RECEIVABLE)
6040 SUNSET BLVD
HOLLYWOOD, CA 90028
(323) 817-6600

MP001776

## Film Production in Menlo Park

Film production in the City of Menlo Park must comply with following conditions:

1. Permittee shall submit in writing all pertinent details regarding the filming including the date(s) and times of the filming including time needed for set-up and take down; a description of the nature of the filming; the location of the filming; a list of all equipment involved in the filming, including cars and other vehicles; the proposed location for the parking and storage of all such vehicles and equipment; the number of cast and crew members involved in the filming; and an indication of any special needs, such as amplified noise, etc. If granted, the permit's approval will be confined to such activities, locations and time schedules as submitted and approved.

2. Three days prior to the beginning of filming, permittee shall provide written notice to residents and businesses within 200 feet of the proposed filming.

3. Permittee shall obey all City Ordinances, rules and the guidance of City supervisory employees pertaining to the use of City property, including the location, parking and storage of vehicles and equipment, crowd and traffic control, and the restoration of premises to their original condition after use for filming purposes.

4. Permittee will comply with the City of Menlo Park noise ordinance. Filming will be limited to the hours between 8:00 a.m. and 6:00 p.m. and will result in low to no noise levels. The use of any explosive, fireworks, or pyrotechnic devices is strictly prohibited.

5. Permittee shall make arrangements for traffic control satisfactory to the Menlo Park Police Department prior to filming on City streets and in other public areas. Permittee will be charged to recover the cost of traffic control provided by the City. Permittee will legally park vehicles and will not require street closure or traffic control other than what is approved.

6. Permittee shall covenant and agree to indemnify and hold harmless the City from any and all loss, cost, damages and expenses of any kind, including attorney fees, on account of personal injury or property damage resulting from any activity of Permittee on municipal property or in connection with its use of municipal property.

7. Liability insurance in no way limits the indemnity agreement above, Permittee will furnish the City a Certificate of Liability Insurance acceptable to its Risk Management office showing combined single limit coverage for bodily injury and property damage, or the equivalent of such coverage, not less than $1 million. The City, including its officials, employees and agents, shall be named as additional insured in the Liability Policy. Contractual liability coverage insuring the obligations of this Agreement is also required. The insurance may not be canceled or substantially modified without ten (10) days written notice to the City Manager's Office.

MP001777

8. Permittee shall pay, with a valid check, money order, credit card or cashier's check, a **filming permit application fee of $150.00 in addition to the daily permit fees of $50 per day for still photography and short subject, $100 per day for industrials, and $150 per day for features, TV, music videos and commercials.**

9. Permittee shall apply for a one-time Business License and pay, with a valid check, money order, credit card or cashiers check.  See **Guide to Annual Business Licensee Fee Calculation** for the fee schedule.

10. Permittee will adhere to the provisions and conditions set forth in the permit.  If Menlo Park Police Department or other City personnel are required to correct, mitigate, or provide any service not consented to under this permit, permittee will be required to pay for all services rendered.  Payment shall be made in the form of *a valid check, money order, credit card or cashiers check* immediately upon demand made by the City.

PROJECT ADDRESS: Sandhill Road between Highway 280 & Alpine Rd

Read and agreed on:

Date: 11/21/17

_____        _____
Signature                                         Matthew Rintle
                                                          Print name

MP001778

## POSSIBLE PRODUCTIONS, INC.
### FILM REQUEST - 12/2/17 12N TO 5:30PM
### (RAIN DATE - 12/3/17)

- One (1) camera car (30 feet long, with platforms) will follow or lead our picture ("hero" Tesla) car.

- #1 - We are requesting to film on Sand Hill Road from Highway 280 to Alpine Road (Menlo Park jurisdiction)

- #2 - We are requesting to film on Sand Hill Road, from Alpine Road to El Camino Real Road

- We are requesting to film driving east and west bound.



REQUEST #2 – PALO ALTO: ALPINE ROAD TO EL CAMINO REAL RD ON SAND HILL RD. (east and west bound)

REQUEST #1 – MENLO PARK. HWY 280 TO ALPINE ROAD ON SAND HILL ROAD.

Exhibit Z

| From: | Bertini, David C |
| To: | Terrence Bell |
| Subject: | RE: Michael Zeleny EFP 12-380 |
| Date: | Tuesday, June 20, 2017 3:46:00 PM |
| Attachments: | Notice of Appeal Zeleny June 2017.pdf |
| Sensitivity: | Confidential |

Good afternoon Terrence.

Pursuant to our conversation last week, I am checking in with you regarding the request I have made. I have yet to hear from the Director's Office regarding our request.

The Public Hearing has now been set for August 29, 2017, and I have attached the notice of appeal to the Menlo Park City Council. Perhaps you can forward this document to the Director.

I look forward to your department's continued assistance in this very serious matter.

Regards,

**Commander Dave Bertini**
Menlo Park Police Department
701 Laurel Street
Menlo Park, CA. 94025
650.330.6321

---

**From:** Terrence Bell [mailto:Terrence.Bell@doj.ca.gov]
**Sent:** Tuesday, June 13, 2017 10:54 AM
**To:** Bertini, David C <dcbertini@menlopark.org>
**Subject:** RE: Michael Zeleny EFP 12-380
**Sensitivity:** Confidential

Good morning Commander Bertini,

Just a quick update. I was informed last Wednesday, this is being reviewed by the Bureau of Firearms Director. I am unable to give you a definitive timeframe for response since this extends beyond the limits of my capacity, but I would expect a response within a reasonable amount of time – based the information I provided, which constituted our previous conversation. Again, I apologize for the length of time it has taken to resolve this matter.

Regards,

Terrence Bell, Manager
Firearms Permit Section
Bureau of Firearms
Department of Justice
916 227-3064

**EXHIBIT**
**0270**

MP00

**From:** Bertini, David C [mailto:dcbertini@menlopark.org]
**Sent:** Thursday, June 01, 2017 8:53 AM
**To:** Terrence Bell <Terrence.Bell@doj.ca.gov>; Jerrica Ramey <Jerrica.Ramey@doj.ca.gov>
**Subject:** RE: Michael Zeleny EFP 12-380
**Importance:** High
**Sensitivity:** Confidential

Good morning Terrence.

I am checking in as I have not heard from you regarding this issue.

<mark>Do you happen to have a timeframe for any action by your agency? I have not been contacted by the Director of anyone in your Investigations Division.</mark>

Perhaps you can give me the contact information of the Director and I could contact them directly.

<mark>We have been postponing Zeleny's appeal which will be heard by our City Council in a public hearing and I need this follow up completed before that. I understand you recently took over this position but I have been asking for this information since September of 2016.</mark>

Thank you.

**Commander Dave Bertini**
Menlo Park Police Department
701 Laurel Street
Menlo Park, CA. 94025
650.330.6321

**From:** Terrence Bell [mailto:Terrence.Bell@doj.ca.gov]
**Sent:** Wednesday, April 26, 2017 10:11 AM
**To:** Bertini, David C <dcbertini@menlopark.org>; Jerrica Ramey <Jerrica.Ramey@doj.ca.gov>
**Subject:** RE: Michael Zeleny EFP 12-380
**Sensitivity:** Confidential

Good Morning Commander Bertini,

This issue has been escalated to the Bureau of Firearms Director and is currently under review for how to proceed. I have sent emails following-up on this situation, including this morning; hopefully, I can receive an update soon to provide to you. I understand the urgency of this matter and seek to have resolution as quickly as possible.

Thank you,

Terrence Bell,
Firearms, Records, Licensing and Permit Section
Bureau of Firearms
Department of Justice
916 227-3064

**From:** Bertini, David C [mailto:dcbertini@menlopark.org]
**Sent:** Wednesday, April 26, 2017 9:46 AM
**To:** Jerrica Ramey <Jerrica.Ramey@doj.ca.gov>; Terrence Bell <Terrence.Bell@doj.ca.gov>
**Subject:** RE: Michael Zeleny EFP 12-380
**Sensitivity:** Confidential

Good morning Terrence and Jerrica.

I was just looking for an update of my discussion with both of you on March 22 and 23rd regarding Michael Zeleny EFP 12-380.

I have not heard back from nor have I ever heard from your Investigation Division.

Any update would be appreciated.

Thank you.

**Commander Dave Bertini**
Menlo Park Police Department
701 Laurel Street
Menlo Park, CA. 94025
650.330.6321

**From:** Bertini, David C
**Sent:** Wednesday, March 22, 2017 3:33 PM
**To:** 'jerrica.ramey@doj.ca.gov' <jerrica.ramey@doj.ca.gov>
**Subject:** FW: Michael Zeleny EFP 12-380
**Importance:** High
**Sensitivity:** Confidential

**Commander Dave Bertini**
Menlo Park Police Department
701 Laurel Street
Menlo Park, CA. 94025
650.330.6321

**From:** Bertini, David C
**Sent:** Wednesday, September 14, 2016 3:30 PM

**To:** elene.mcgee@doj.ca.gov
**Subject:** Michael Zeleny EFP 12-380
**Importance:** High
**Sensitivity:** Confidential

Elene,

Thank you for taking the time to speak to me today. I wanted to give you more information to forward to your Enforcement Unit. I have attached several documents including: Zeleny's permit, denial letters from the City and his email responses.

Thank you again for looking into this mater.

Feel free to contact me if you have any further questions.

Commander Dave Bertini
Menlo Park Police Department
701 Laurel Street
Menlo Park, CA. 94025
650.330.6321

---

**From:** Bertini, David C
**Sent:** Wednesday, September 14, 2016 2:32 PM
**To:** 'elene.mcgee@doj.ca.gov'
**Subject:** Zeleny

Per our discussion.....

Commander Dave Bertini
Menlo Park Police Department
701 Laurel Street
Menlo Park, CA. 94025
650.330.6321

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

Exhibit AA

Ivan,
Please follow up as we discussed.
Thanks,
-Ebby

-----Original Message-----
From: Bertini, David C
Sent: Tuesday, September 12, 2017 1:44 PM
To: Heineck, Arlinda A <AAHeineck@menlopark.org>
Cc: Nagaya, Nicole H <nhnagaya@menlopark.org>; Sohrabi, Ebby <ebsohrabi@menlopark.org>
Subject: Re: Zeleny - Film Permit

Hello all.

Thanks for the info Linda. Nikki, feel free to call me on my cell phone when you want to discuss. I am at home but now off the major pain killers so should be coherent!

650.353.6640

Dave

Sent from my iPad

> On Sep 11, 2017, at 15:48, Heineck, Arlinda A <AAHeineck@menlopark.org> wrote:
>
> Hi Dave: Film permits are handled by Ivan Toews in Public Works.  However, thinking that Ivan will benefit from guidance in this particular case,  I spoke with Nikki.  She suggested that you connect first with her and Ebby so that they can gain a  solid understanding of the situation.
>
> Thanks,
> Linda
>
> -----Original Message-----
> From: Bertini, David C
> Sent: Monday, September 11, 2017 12:45 PM
> To: Heineck, Arlinda A <AAHeineck@menlopark.org>
> Subject: Zeleny - Film Permit
>
> Hello Arlinda.
>
> You are probably familiar with Zeleny and his attempt to get a "Special Event's Permit" to conduct his protest on Sandhill which was denied by City Council. He has now transitioned to requesting a film permit. Can you confirm that the film permit process is handled by your shop? If so, can you give me a contact person who would be involved in  the process?
>
> Thanks!
>
> Dave
>
> Sent from my iPad

EXHIBIT 105

F(92) 3/3/20
(WITNESS)     (DATE)
JANIS JENNINGS, CSR, CCRR

MP001225

Exhibit BB

Hey Nikki,

Yeah I am actually sorry I can't make it. The after class time was always very fun!

I received an email from Ivan asking for Zeleny's contact info. I told him that we should have the city attorney communicate with him. Do you know who would now take the lead on a film permit or encroachment permit?

Dave

Commander Dave Bertini
Menlo Park Police Department
701 Laurel Street
Menlo Park, CA. 94025
650.330.6321


-----Original Message-----
From: Nagaya, Nicole H
Sent: Wednesday, September 20, 2017 6:45 AM
To: Bertini, David C <dcbertini@menlopark.org>
Subject: RE: Zeleny

Hi Dave,

Sorry, I just caught up with Ebby (Senior Civil Engineer who oversees Land Development and our permits) on this yesterday (Tuesday) morning, and he also wasn't aware of the fact that we issued film permits. He's looking into it and will email back the group with more information. If we don't have specific info, we plan to treat it similarly to an encroachment permit (which is administrative action by staff, with potential to be appealed to Council).

PS Shadowed the chief yesterday through interviews for new officers. Looks like you have some good candidates! Sorry to hear you won't make it to the retreat. Won't be the same without you there!

Thanks,
Nikki

-----Original Message-----
From: Bertini, David C
Sent: Monday, September 18, 2017 3:02 PM
To: Nagaya, Nicole H <nhnagaya@menlopark.org>
Subject: Zeleny

Hey Nikki....have you had the chance to review the film permitting process? The city attorney wants to respond to him in the next couple of days.

Thanks!

Dave

Sent from my iPhone

Exhibit CC

**From:** Bertini, David C
**To:** Harada, Jelena V; Curtin, Clay J
**Subject:** Zeleny PPT
**Date:** Tuesday, August 29, 2017 10:01:00 AM
**Attachments:** Zeleny City Council Hearing Appeal 8-29-17.pptx

Good morning Clay and Jelena.

Attached is the PPT for the hearing today. Can we get it on the Council Chamber's computer?

Thanks!

PS-we will have a strong police presence at the meeting....

**Commander Dave Bertini**
Menlo Park Police Department
701 Laurel Street
Menlo Park, CA. 94025
650.330.6321

**EXHIBIT**
0271

MP00



# MENLO PARK CITY COUNCIL

## August 29, 2017 – Appeal of Special Events Permit Denial

MP001196



CITY OF
MENLO PARK

# HEARING PURPOSE

- The City Council is the final arbiter in cases where a Special Events Permit has been denied

- The City Council should consider whether to uphold or overturn the denial of the Special Events Permit submitted by the appellant, Michael Zeleny

x

2

MP001197



CITY OF
MENLO PARK

# BACKGROUND

- July 10, 2015 – Appellant Zeleny submits a "Special Event" application with a stated purpose of "Outing New Enterprise Associates as the corporate sponsors of incestuous child rapist Min Zhu"

  - Location to be the "median strip" in front of 2825 Sand Hill
  - Term of the "event" was listed as indefinite, and later changed to 31 days for 13 hours a day
  - Event will be "multimedia" showing images on a portable monitor or screen
  - Application states "I will be present… equipped with fully operational, exposed and loaded firearms, in full compliance with all applicable laws."

- Appellant Zeleny later provides sample of images he intends to display along with the type of weapons he intends to possess.

3

MP001198









CITY OF
MENLO PARK

# PERMIT DENIED

- The permit is denied by the Special Event Permit Committee and Community Serviced Director for the following reasons:
  - No term was attached to the "special event"
  - Open carry or concealed carrying of firearms in a public place is prohibited by law
  - The City has not authorized Appellant as an "authorized" participant in a motion picture or entertainment event; nor has Appellant sought a film production permit
  - Public safety and traffic concerns
- Appellant Zeleny is advised that denial does not infringe upon his 1st Amendment right to protest as long as he is complying with the law
- He is also advised of his right to appeal to the City Manager

MP001200



CITY OF MENLO PARK

# STATE LAWS HAVE CHANGED

- 26350(a)(1) CA Penal Code - enacted in 2011, making it a crime to "open carry" unloaded handguns in a public place (AB 144)

- 26400(a) CA Penal Code – enacted in 2012, making it a crime to "open carry" unloaded firearms that are not handguns (rifles, shotguns, etc.) in a public place (AB 1527)

- Exception to the above laws include the display of firearms loaned as props for motion picture or public entertainment activities

MP001201



# APPEAL TO CITY MANAGER

- Appellant appealed the Community Service Director's decision to the City Manager

- August 11, 2016 – in person hearing conducted with the City Manager

- Appellant Zeleny produces an "Entertainment Firearms Permit" from DOJ
  - Permit expired July 12, 2017
  - Intended use for prop masters to lend firearms for motion picture filming

- Appellant raised the argument that since he is recording his activities, he is therefore producing an entertainment event and pursuant to this permit he may carry firearms

MP001202



CITY OF MENLO PARK

# APPEAL IS DENIED

- September 12, 2016 – Appeal is denied by the City Manager and a letter is transmitted, which include the following reasons for denial:

  – Special Events Permits are not intended to regulate protests or filming of protests

  – Display of loaded or unloaded firearms in public is prohibited by law

  – Public Rights-of-Way would be compromised and the intended display would violate several vehicle and municipal code sections

  – Public safety concerns including placement of a video display which could interfere with traffic and using the median of a busy arterial near a multi-lane freeway to gather would be unsafe

- Appellant Zeleny is again advised that no permit is necessary for a lawful protest

MP001203



CITY OF MENLO PARK

## STAFF RECOMMENDATION

- Staff recommends that the City Council deny the appeal and therefore uphold the City Manager's decision to uphold staff's denial of the Special Events Permit

- Appellant Zeleny has been notified that no permit is necessary for a peaceful protest, as long as all applicable laws and ordinances are followed

MP001204



QUESTIONS

CITY OF
MENLO PARK

Exhibit DD

1  XAVIER BECERRA
   Attorney General of California
2  ANTHONY R. HAKL
   Supervising Deputy Attorney General
3  NOREEN P. SKELLY
   Deputy Attorney General
4  JOHN W. KILLEEN
   Deputy Attorney General
5  State Bar No. 258395
     1300 I Street, Suite 125
6    P.O. Box 944255
     Sacramento, CA 94244-2550
7    Telephone: (916) 210-6045
     Fax: (916) 324-8835
8    E-mail: John.Killeen@doj.ca.gov
   *Attorneys for Defendant Attorney General Xavier*
9  *Becerra*

10

11                    IN THE UNITED STATES DISTRICT COURT

12                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                          SAN FRANCISCO DIVISION

14

| | |
|---|---|
| 15  **MICHAEL ZELENY, an individual,** | 3:17-cv-07357 RS |
| 16                              Plaintiff, | **DEFENDANT ATTORNEY GENERAL XAVIER BECERRA'S SECOND AMENDED RESPONSES TO PLAINTIFF MICHAEL ZELENY'S INTERROGATORIES, SET TWO** |
| 17          v. | |
| 18  **GAVIN NEWSOM, an individual, in his official capacity; XAVIER BECERRA, an individual, in his official capacity; CITY OF MENLO PARK, a municipal corporation; and DAVE BERTINI, in his official capacity,** | |
| 19 | |
| 20 | |
| 21 | |
| 22                              Defendants. | |

23

24      PROPOUNDING PARTY:       Plaintiff Michael Zeleny

25      ANSWERING PARTY:         Defendant Attorney General Xavier Becerra

26      SET NUMBER:              Two

27

28

                                      1

**PRELIMINARY STATEMENT**

Defendant Becerra objects to each interrogatory to the extent that it purports to impose any obligation or requirement greater than or different to the obligations or requirements set forth in the Federal Rules of Civil Procedure and/or the applicable rules and orders of this Court.

Defendant Becerra objects to each interrogatory to the extent that it calls for the disclosure of information protected from disclosure by the attorney work-product doctrine, the attorney-client privilege, the deliberative process privilege and/or any other applicable privilege or protection. Should Defendant Becerra disclose any privileged or otherwise protected information in these responses, the disclosure is inadvertent and does not constitute a waiver of the privilege or protection.

Defendant Becerra objects to each interrogatory to the extent that it calls for him to interpret what the Legislature intended when it drafted any of the statutory provisions at issue in this case.

Defendant Becerra has not completed the investigation of the facts and issues relating to Plaintiff Zeleny's claims and has not completed discovery in this action. All of the answers contained herein are based solely upon information and documents which are presently available to, and specifically known by, Defendant Becerra, and the answers disclose only those contentions which presently occur to Defendant Becerra. Further discovery, independent investigation, legal research and analysis may supply additional facts and may lead to additions, changes, and variations from the answers herein.

The following answers are given without prejudice to the right to produce evidence and/or witnesses or rely on facts which Defendant Becerra may later discover. Defendant Becerra accordingly reserves the right to change any and all answers herein as additional facts are ascertained, witnesses identified and legal research is completed. The answers contained herein are made in good faith in an attempt to supply as much factual information and as much specification of legal contention as is presently known, and in no way prejudices Defendant Becerra in relation to further discovery and proceedings.

Defendant Becerra incorporates by reference every general objection set forth above into each specific answer set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include a general objection in any specific answer does not waive any general objection to that interrogatory.

**INTERROGATORY NO. 22**: Is an individual who has a valid "entertainment firearms permit" issued pursuant to Penal Code § 29500 an "authorized participant" within the meaning of Penal Code §§ 26375 and 26405(r)?

**INITIAL RESPONSE TO INTERROGATORY NO. 22**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it poses a question of pure law. Defendant Becerra is not required to respond to interrogatories raising questions of pure law. See *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the facts of the case are not permitted") (citation and some internal punctuation omitted). Defendant Becerra also objects to this interrogatory because it calls for him to interpret what the Legislature intended when it drafted any of the statutory provisions at issue in this case.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase "authorized participant." Thus, what the Legislature intended by that phrase is a question of statutory interpretation.

However, according to the Legislative history of Penal Code § 26375, that section permits the use of unloaded handguns as an "entertainment props." (See DOJ 000219) Additionally, the Entertainment Firearms Permit authorizes the permit holder "to possess firearms loaned to the permitholder for use solely as a prop in a motion picture, television, video, theatrical, or other entertainment production or event." (Penal Code § 29500.) Thus, it is possible to infer that the Legislature intended the exceptions set forth in Penal Code §§ 26375 and 26405, subdivision (r) to be available only to those using unloaded firearms loaned to them for use as "entertainment

3

props" in a motion picture, television, video, theatrical, or other entertainment production or event.

**<u>AMENDED</u> RESPONSE TO INTERROGATORY 22:**

Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase "authorized participant." Defendant Becerra has never issued a formal opinion under California law regarding the meaning of the phrase "authorized participant," and this response is not such an opinion and cannot be relied upon as such an opinion. Nor is this response a generally applicable rule or regulation that is intended to be applied outside of the context of this case. Moreover, Defendant Becerra played no material role in the events described in the complaint, and was not involved in the denial of Plaintiff Michael Zeleny's permit application(s).

Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific context of this case, an individual who has a valid "entertainment firearms permit" issued pursuant to Penal Code § 29500 could be an "authorized participant" within the meaning of Penal Code §§ 26375 and 26405(r) for the very narrow purpose of having a defense against a prosecution of open carry laws, if that individual were using the weapon as a prop in a motion picture, television, video, theatrical, or other entertainment production or event. However, that individual would not be immune from other regulation of their activities.

**<u>SECOND AMENDED</u> RESPONSE TO INTERROGATORY NO. 22:**

Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase "authorized participant." Defendant Becerra has never issued a formal opinion under California law regarding the meaning of the phrase "authorized participant," and this response is not such an opinion and cannot be relied upon as such an opinion. Nor is this response a generally applicable rule or regulation that is intended to be applied outside of the context of this case. Moreover, Defendant Becerra played no material role in the events described in the complaint, and was not involved in the denial of Plaintiff Michael Zeleny's permit application(s).

Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific context of this case, an individual who has a valid "entertainment firearms permit" issued pursuant to Penal Code § 29500 would be an "authorized participant" within the meaning of

4

Penal Code §§ 26375 and 26405(r) for the narrow purpose of having a defense against a prosecution of open carry laws, if that individual were using the weapon as a prop in a motion picture, television, video, theatrical, or other entertainment production or event. However, that individual would not be immune from other regulation of their activities.

**INTERROGATORY NO. 23**: State all facts supporting your response to the preceding interrogatory.

**INITIAL RESPONSE TO INTERROGATORY NO. 23**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it poses a question of pure law. Defendant Becerra is not required to respond to interrogatories raising questions of pure law. See *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the facts of the case are not permitted") (citation and some internal punctuation omitted). Defendant Becerra also objects to this interrogatory because it calls for him to interpret what the Legislature intended when it drafted any of the statutory provisions at issue in this case.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase "authorized participant." Thus, what the Legislature intended by that phrase is a question of statutory interpretation.

However, according to the Legislative history of Penal Code § 26375, that section permits the use of unloaded handguns as an "entertainment props." (See DOJ 000219) Additionally, the Entertainment Firearms Permit authorizes the permit holder "to possess firearms loaned to the permitholder for use solely as a prop in a motion picture, television, video, theatrical, or other entertainment production or event." (Penal Code § 29500.) Thus, it is possible to infer that the Legislature intended the exceptions set forth in Penal Code §§ 26375 and 26405, subdivision (r) to be available only to those using unloaded firearms loaned to them for use as "entertainment

props" in a motion picture, television, video, theatrical, or other entertainment production or event.

**<u>AMENDED</u> RESPONSE TO INTERROGATORY 23:**

Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase "authorized participant." Defendant Becerra has never issued a formal opinion under California law regarding the meaning of the phrase "authorized participant," and this response is not such an opinion and cannot be relied upon as such an opinion. Nor is this response a generally applicable rule or regulation that is intended to be applied outside of the context of this case. Moreover, Defendant Becerra played no material role in the events described in the complaint, and was not involved in the denial of Plaintiff Michael Zeleny's permit application(s).

Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific context of this case, the Department of Justice's Entertainment Firearms Permit only authorizes the permit holder "to possess firearms loaned to the permitholder for use solely as a prop in a motion picture, television, video, theatrical, or other entertainment production or event." (Penal Code § 29500.) Anyone who is not otherwise authorized to carry a weapon openly, but who desires to carry a weapon openly "as a prop in a motion picture, television, video, theatrical, or other entertainment production or event" would need to do so under the auspices of an Entertainment Firearms Permit.

The Attorney General understands this exception to have been carried forward into the open carry laws, as the legislative history of Penal Code § 26375 refers to the use of unloaded handguns as an "entertainment props." (See DOJ 000219.) Thus, the exceptions set forth in Penal Code §§ 26375 and 26405, subdivision (r) are available only to those using unloaded firearms loaned to them for use as "entertainment props" in a motion picture, television, video, theatrical, or other entertainment production or event.

While the Department of Justice "authorizes" the use of firearms in this narrow context through the issuance of Firearms Entertainment Permits, such authorization is in the nature of a defense to an open carry prosecution within the very narrow context of an entertainment prop, not a preclusion of any other regulation by other agencies. Other law enforcement agencies would

6

1  not be precluded from ensuring that an individual carrying a weapon openly had a permit, or

2  ensuring that an identified individual is not violating any other federal, state, or local laws or

3  ordinances.  Notably, when issuing the Firearms Entertainment Permit, the Department does not

4  verify the nature of the entertainment event or impose any restrictions on how a weapon might be

5  carried or used, but only looks to see if a person is prohibited from owning firearms.  In this

6  sense, the Firearms Entertainment Permit is a floor rather than a ceiling, with possible room for

7  other law enforcement agencies to determine, for example, that the open carry of weapons

8  endangered public safety, or was a nuisance, or that someone's conduct was not a "production or

9  event" covered by the relevant exception, or that someone was not violating other laws.

10     Also, within the structure of the open carry laws, the exception for an authorized participant

11  appears to be analogous to similar exceptions for gun shows (Pen. Code § 26369) or target ranges

12  (Pen. Code § 26365)—defined spaces in which the weapon being carried is not easily visible or

13  accessible to the public.  The Attorney General understands the Firearms Entertainment Permit,

14  and the corresponding exceptions to the open carry laws, to apply to confined, non-public spaces

15  for a limited period of time, i.e., in a movie studio or clearly defined production area.  To the

16  extent that an individual like Mr. Zeleny seeks to demonstrate on a public street with an unloaded

17  firearm in an unconfined area and/or for an indefinite period of time, the Attorney General views

18  the open carrying of unloaded weapons on a public street, in an unconfined area fully visible to

19  and accessible by anyone else, and not within what would reasonably be considered a defined,

20  enclosed production area, to potentially be conduct outside the scope of the Firearms

21  Entertainment Permit and the corresponding exception to the open carry laws, and potentially

22  subject to enforcement by the law enforcement agency primarily responsible for enforcing the

23  open carry laws in that area.

24  **<u>SECOND AMENDED</u> RESPONSE TO INTERROGATORY NO. 23:**

25     Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

26  "authorized participant."  Defendant Becerra has never issued a formal opinion under California

27  law regarding the meaning of the phrase "authorized participant," and this response is not such an

28  opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

rule or regulation that is intended to be applied outside of the context of this case. Moreover, Defendant Becerra played no material role in the events described in the complaint, and was not involved in the denial of Plaintiff Michael Zeleny's permit application(s).

Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific context of this case, the Department of Justice's Entertainment Firearms Permit only authorizes the permit holder "to possess firearms loaned to the permitholder for use solely as a prop in a motion picture, television, video, theatrical, or other entertainment production or event." (Penal Code § 29500.) Anyone who is not otherwise authorized to carry a weapon openly, but who desires to carry a weapon openly "as a prop in a motion picture, television, video, theatrical, or other entertainment production or event" would need to do so under the auspices of an Entertainment Firearms Permit. For entertainment productions this generally has meant that a propmaster or similarly qualified person is supervising the use of firearms in the production, and others involved in the production may transfer or possess firearms under the auspices of the supervising permit-holder.

The Attorney General understands this exception to have been carried forward into the open carry laws, as the legislative history of Penal Code § 26375 refers to the use of unloaded handguns as an "entertainment props." (See DOJ 000219.) Thus, the exceptions set forth in Penal Code §§ 26375 and 26405, subdivision (r) are available only to those using unloaded firearms loaned to them for use as "entertainment props" in a motion picture, television, video, theatrical, or other entertainment production or event, and when operating under the auspices of a Firearms Entertainment Permit.

**INTERROGATORY NO. 24**: State all facts supporting your contention that the definition of "authorized participant" under Penal Code §§ 26375 and 26405(r) refers to a person with an "entertainment firearms permit" issued pursuant to Penal Code § 29500.

### INITIAL RESPONSE TO INTERROGATORY NO. 24:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it poses a question of pure law. Defendant Becerra is not required to respond to interrogatories raising

1    questions of pure law.  See *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC),

2    2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories directed to issues of 'pure

3    law'—i.e., abstract legal issues not dependent on the facts of the case are not permitted") (citation

4    and some internal punctuation omitted).

5         Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

6    follows:  Defendant Becerra has not made this contention.  What the Legislature intended when it

7    used the phrase "authorized participant" is a question of statutory interpretation.

8         **<u>AMENDED</u> RESPONSE TO INTERROGATORY 24:**

9         Becerra has not made this contention.  However, to the extent that he had, in response to

10   interrogatory 23, Becerra has explained his understanding of the statute in the context of this

11   particular case.

12        **<u>SECOND AMENDED</u> RESPONSE TO INTERROGATORY NO. 24:**

13        To the extent that Defendant Becerra has made the contention "that the definition of

14   'authorized participant' under Penal Code §§ 26375 and 26405(r) refers to a person with an

15   'entertainment firearms permit' issued pursuant to Penal Code § 29500, in response to

16   interrogatory 23, Becerra has explained his understanding of the statute in the context of this

17   particular case.

18        **INTERROGATORY NO. 25**:  Identify all documents bearing upon, supporting, or

19   reflecting the facts set forth in Your response to the preceding interrogatory.

20        **RESPONSE TO INTERROGATORY NO. 25**:

21        Defendant Becerra incorporates by reference the above-stated general objections as though

22   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

23   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

24   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

25   that is relevant to Plaintiff's claims.

26        Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

27   follows: N/A.

28        **<u>AMENDED</u> RESPONSE TO INTERROGATORY 25:**

Becerra has not made this contention.  However, to the extent that he had, in response to

interrogatory 23, Becerra has explained his understanding of the statute in the context of this

particular case.

**SECOND AMENDED RESPONSE TO INTERROGATORY NO. 25:**

To the extent that Defendant Becerra has made the contention "that the definition of

'authorized participant' under Penal Code §§ 26375 and 26405(r) refers to a person with an

'entertainment firearms permit' issued pursuant to Penal Code § 29500, in response to

interrogatory 23, Becerra has explained his understanding of the statute in the context of this

particular case.

Dated:  October 23, 2020     Respectfully submitted,

             Xavier Becerra
             Attorney General of California
             Anthony R. Hakl
             Supervising Deputy Attorney General

             */s/ John W. Killeen*
             Noreen P. Skelly
             Deputy Attorney General
             John W. Killeen
             Deputy Attorney General
             *Attorneys for Defendant Attorney General*
             *Xavier Becerra*

SA2018100198
34524444.docx

Exhibit EE

1  XAVIER BECERRA
   Attorney General of California
2  ANTHONY R. HAKL
   Supervising Deputy Attorney General
3  NOREEN P. SKELLY
   Deputy Attorney General
4  State Bar No. 186135
    1300 I Street, Suite 125
5   P.O. Box 944255
    Sacramento, CA 94244-2550
6   Telephone: (916) 210-6057
    Fax: (916) 324-8835
7   E-mail: Noreen.Skelly@doj.ca.gov
   *Attorneys for Defendant Attorney General Xavier*
8  *Becerra*

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

SAN FRANCISCO DIVISION

12

13

| | |
|---|---|
| **MICHAEL ZELENY, an individual,** | 3:17-cv-07357 RS (NC) |
| Plaintiff, | **DEFENDANT ATTORNEY GENERAL XAVIER BECERRA'S SECOND AMENDED RESPONSES TO PLAINTIFF MICHAEL ZELENY'S FIRST SET OF INTERROGATORIES** |
| v. | |
| **GAVIN NEWSOM, an individual, in his official capacity; XAVIER BECERRA, an individual, in his official capacity; CITY OF MENLO PARK, a municipal corporation; and DAVE BERTINI, in his official capacity,** | |
| Defendants. | |

23  PROPOUNDING PARTY:    Plaintiff Michael Zeleny

24  ANSWERING PARTY:    Defendant Attorney General Xavier Becerra

25  SET NUMBER:    One

26  / / /

27  / / /

28  / / /

1

# PRELIMINARY STATEMENT

For purposes of these interrogatories, Plaintiff Zeleny has used the terms "YOU" and "YOUR" to, "refer to Xavier Becerra as the Attorney General of the State of California. These interrogatories seek the official position of the State of California." (Plaintiff Zeleny's Interrogatories, p. 2, lines 22-24.) Defendant Becerra objects to Plaintiff Zeleny's definition of "YOU" and "YOUR" as encompassing the official position of the State of California. The phrase "the official position of the State of California" is vague and overbroad. The State of California is made up of the Executive, Legislative, and Judicial branches of government, which are separate and co-equal. California's Executive branch includes a number of elected officials including, but not limited to the Attorney General of California. Moreover, the State of California is not a defendant in this action—nor would it be an appropriate defendant in this action. As a general matter, the proper respondent or defendant in a challenge to a state law or policy is the officer or agency charged with implementing it. See *Serrano v. Priest*, 18 Cal.3d 728, 752 (1976); *State v. Superior Court, 12 Cal.3d 237, 255* (1974).

Defendant Becerra objects to each interrogatory to the extent that it purports to impose any obligation or requirement greater than or different to the obligations or requirements set forth in the Federal Rules of Civil Procedure and/or the applicable rules and orders of this Court.

Defendant Becerra objects to each interrogatory to the extent that it calls for the disclosure of information protected from disclosure by the attorney work-product doctrine, the attorney-client privilege, the deliberative process privilege and/or any other applicable privilege or protection. Should Defendant Becerra disclose any privileged or otherwise protected information in these responses, the disclosure is inadvertent and does not constitute a waiver of the privilege or protection.

Defendant Becerra has not completed the investigation of the facts and issues relating to Plaintiff Zeleny's claims and has not completed discovery in this action. All of the answers contained herein are based solely upon information and documents which are presently available to, and specifically known by, Defendant Becerra, and the answers disclose only those contentions which presently occur to Defendant Becerra. Further discovery, independent

2

investigation, legal research and analysis may supply additional facts and may lead to additions, changes, and variations from the answers herein.

The following answers are given without prejudice to the right to produce evidence and/or witnesses or rely on facts which Defendant Becerra may later discover. Defendant Becerra accordingly reserves the right to change any and all answers herein as additional facts are ascertained, witnesses identified and legal research is completed. The answers contained herein are made in good faith in an attempt to supply as much factual information and as much specification of legal contention as is presently known, and in no way prejudices Defendant Becerra in relation to further discovery and proceedings.

Defendant Becerra incorporates by reference every general objection set forth above into each specific answer set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include a general objection in any specific answer does not waive any general objection to that interrogatory.

**INTERROGATORY NO. 1**: State all facts on which You base Your contention, if any, that California Penal Code § 26350 is constitutional under the Second Amendment, including any legitimate goals or public interests intended to be served by that statute.

[As used in these interrogatories,

(a) "You" and "Your" refer to Xavier Becerra as the Attorney General of the State of California. These interrogatories seek the official position of the State of California;

(b) "Second Amendment" means the Second Amendment to the United States Constitution].

**RESPONSE TO INTERROGATORY NO. 1**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims. Defendant Becerra also objects to this interrogatory on the grounds that it seeks Defendant Becerra's contentions regarding the constitutionality of California

Penal Code § 26350, and thus poses a question of pure law. Defendant Becerra is not required to respond to interrogatories raising questions of pure law. See *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the facts of the case are not permitted") (citation and some internal punctuation omitted). A party responding to interrogatories "is not required to write his[, her, or its] brief on a motion for summary judgment in his[, her, or its] responses to interrogatories." *Larson v. Trans Union, LLC*, No. 3:12-CV-05726-WHO, 2017 WL 1540710, at *1 (N.D. Cal. April 28, 2017) (citation and some internal punctuation omitted).

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: California Penal Code § 26350 is constitutional under the Second Amendment.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court recognized that the Second Amendment protects an individual right to keep and bear arms. 554 U.S. at 636. The *Heller* Court did not, however, "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment" or attempt to "clarify the entire field." *Id.* at 626, 635.

First, *Heller* explains that "the most natural reading of 'keep Arms'" is "to 'have weapons,'" 554 U.S. at 582, and that "bear arms" is most naturally read to mean "'wear, bear, or carry upon the person or in clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person,'" *id.* at 584 (ellipses omitted).

Second, the right to bear arms must be construed and applied with careful attention to its "historical background." *Heller*, 554 U.S. at 592; see *id.* At 576-626. This is critical "because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right," and "declares only that is 'shall not be infringed.'" *Id.*, at 592. Thus, while the Second Amendment's inclusion in the Bill of Rights indicates that the right to bear arms ranks as fundamental, nothing about its enumeration in the Constitution

changed the right into anything more comprehensive or absolute than would have been understood and expected by "ordinary citizens in the founding generation." *Id*. at 577.

Third, that commonly understood right was and is "not unlimited." *Heller*, 554 U.S. at 595, 626. It is not a right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *id*. at 626, or "to carry arms for any sort of confrontation," *id*. at 595. The core individual right recognized by *Heller* is the right to keep and bear arms "in defense of hearth and home." 554 U.S. at 635; see also *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality op.) (*Heller's* "central holding" was that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."). That does not mean that the right to "bear" has no scope or application beyond the home or its immediate environs. But nothing in *Heller* suggests that it applies in exactly the same in all places, so that a restriction on bearing arms in public must be treated just like a restriction on bearing in or around the home. In particular, nothing in *Heller* dictates that, as Plaintiff Zeleny seems to contend, that the Second Amendment embodies an individual right to openly carry a gun in almost any public place.

On the contrary, *Heller* makes clear that Second Amendment rights are subject to many reasonable regulations. *See* 554 U.S. at 636. Indeed, the Second Amendment "by no means eliminates" States' "ability to devise solutions to social problems that suit local needs and values." *McDonald,* 561 U.S. at 785.

*Heller* does not recognize any unfettered right to carry firearms in the crowded urban areas, based solely on an individual's stated desire to be "'armed and ready for offensive or defensive action in case of conflict with another person,'" 554 U.S. at 584. Rather, under *Heller*, Plaintiff Zeleny's challenge to Penal Code § 26350 must be evaluated, in the first instance, by examining "the historical understanding of the scope of that right." *Id*. at 625. The challenge cannot succeed if the State's restrictions are a type of reasonable public regulation that has long been considered consistent with a private right to bear arms. *Cf. id.* at 626-627.

"No fundamental right—not even the First Amendment—is absolute." *McDonald*, 561 U.S. at 802 (Scalia, J., concurring). Just as the First Amendment does not confer a right to speak

5

1   in any time, place or manner, history and precedent teach that the Second Amendment does not

2   confer the right to carry guns anywhere or at any time.  See *Heller*, 554 U.S. at 595.  California's

3   laws regulating the public carrying of firearms strike a permissible balance between preserving

4   order and public safety and accommodating the desire of some residents to carry guns.  There are

5   consistent with traditional restrictions on public carry, and are presumptively lawful on that basis.

6          Where text, history, and tradition show that a challenged law is consistent with the Second

7   Amendment, the restriction "'passes constitutional muster'" and the court's inquiry "'is

8   complete.'"  *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc); see Heller,

9   554 U.S. at 626, 627 n.26.

10         California broadly allows the carrying of firearms in places and circumstances where it has

11  traditionally been common: in or immediately around an individual's home or place of business

12  and on much other private property with permission; in less-populated areas and during activities

13  such as hunting; and in circumstances of immediate and grave danger to person or property when

14  law enforcement is not available.  It also allows qualified individuals to obtain licenses to carry

15  more generally, if they can establish "good cause" under standards set by local officials who are

16  most familiar with the needs and desires of their own communities.

17         However, there is an "historical prevalence" of public carry restrictions similar to Penal

18  Code § 26350.  *Kachalsky v. Cty of Westchester*, 701 F.3d 81, 96 (2nd Cir. 2012).  Because

19  "[f]irearms have always been more heavily regulated in the public sphere," the right to bear arms

20  "most certainly operates in a different manner" in that context than when evaluating restrictions

21  that impinge directly on the core right to keep and carry guns in the home.  *Drake v. Filko*, 724

22  F.3d 426, 430 n.5. (3rd Cir. 2013).

23         This makes good functional sense.  When individuals move outside their homes—and

24  particularly when they move about in populated areas —their interest in carrying a firearm is

25  much more likely to come into conflict with the public interest in order and safety.  *See*, *e.g.*,

26  *Gould v. Morgan*, 907 F.3d 659, 672, (1st Cir. 2018).  The "inherent" risk that firearms present

27  when carried in public "distinguishes the Second Amendment right from other fundamental rights

28  . . . such as the right to marry and the right to be free from viewpoint discrimination, which can be

6

1  exercised without creating a direct risk to others.  *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121,

2  1126 (10th Cir. 2015).  And as the Fourth Circuit observed, it "is not far-fetched to think" that

3  Heller's focus on the "core" right to protect the home was born out of a recognition that the

4  danger of "tragic act[s]" of violence "would rise exponentially as one moved the right from the

5  home to the public square."  *United States v. Masciandaro*, 638 F.3d 458, 475-476 (4th Cir. 2011)

6  (Wilkinson, J.).

7       There is a legitimate role for public regulation touching on even our most fundamental

8  rights—especially when there is or can be genuine tension between the exercise of individual

9  rights and the safety of members of the public and law enforcement officers.

10      When, as here, a court will review a challenged statute under intermediate scrutiny, courts

11 ask whether the law promotes a "significant, substantial, or important government objective," and

12 whether there is a "'reasonable fit' between the challenged law and the asserted objective."  *Peña*

13 *v. Lindley*, 898 F.3d 969, 979 (9th Cir. 2018).  While the State must show that the law "promotes

14 a substantial government interest that would be achieved less effectively absent the regulation," it

15 need not demonstrate that the regulation is the "least restrictive means of achieving the

16 government interest."  *Id*. (citations and quotation marks omitted).  A court's only obligation is to

17 "assure that, in formulating its judgments, [the State] has drawn reasonable inferences based on

18 substantial evidence,'" an inquiry that must accord "'substantial deference to the predictive

19 judgments'" of the legislature.  *Id*. at 979-980 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S.

20 180, 195 (1997)).

21      The need for appropriate deference to legislative predications is especially clear in the

22 Second Amendment context.  "Providing for the safety of citizens within their borders has long

23 been state government's most basic task." *Kolbe v. Hogan*, 849 F.3d 114, 150 (4th Cir. 2017)

24 (Wilkinson, J., concurring).  State legislatures are "'far better equipped than the judiciary' to

25 make sensitive public policy judgments (within constitutional limits) concerning the dangers in

26 carrying firearms and the manner to combat those risks."  *Kachalsky*, 701 F.3d at 97.  And, while

27 a legislature's judgments can be based on empirical evidence, they need not be; "history,

28 consensus, and 'simple common sense'" will suffice.  *Florida Bar v. Went for It, Inc.*, 515 U.S.

618, 628 (1995).  Indeed, when it comes to dealing with a complex societal problem like gun violence, there will almost always be room for reasonable minds to differ about the optimal solution; demanding undue certainly would be foolhardy.

Here, California has a compelling interest in protecting public safety and reducing gun violence. *Jackson v. City & County of San Francisco*, 746 F.3d 953, 965 (9th Cir. 2014).  An increase in guns carried by private persons in public places increases the risk that "'basic confrontations between individuals [will] turn deadly.'"  *Wollard v. Gallagher*, 712 F.3d 865, 879 (4th Cir. 2013).  Similarly, misfired shots or accidental discharges are "more likely to hit a bystander where there are more bystanders to hit."  Blocher, *Firearm Localism*, 123 Yale L.J. 82, 122-123 (2013).  The Legislature could also conclude that widespread public carry increases the "availability of handguns to criminals via theft," *Woollard*, 712 F.3d at 879, and that such guns would then be used to "commit violent crimes" or be transferred to "others who commit crimes," U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *2012 Summary: Firearms Reported Lost and Stolen* 2 (2013).

According to the legislative history of California Penal Code § 26350, the absence of a prohibition on openly carrying unloaded firearms has created a surge in individuals openly carrying unloaded firearms in public.  These incidents adversely affect public safety in several ways.  Members of the public who encounter individuals openly carrying firearms are alarmed and fearful for their safety and the safety of others.  When members of the public report such incidents to local law enforcement, they are only able to provide law enforcement personnel with incomplete information.  As a result, law enforcement agencies respond to such incidents with limited information regarding whether the individual openly carrying the firearm is a danger to himself or herself; a danger to the public; or a danger to the responding law enforcement personnel.

In such situations, a wrong move by the individual carrying the firearm could be construed as threatening by the responding law enforcement officer.  The officer may feel compelled to respond in a manner that could result in injury or death.  Thus, the practice of openly carrying unloaded firearms can create an unsafe environment for everyone involved: the individual

carrying the firearm, the responding law enforcement personnel, and all other individuals who may be nearby.

In addition, responding to incidents involving individuals openly carrying unloaded firearms taxes the resources of law enforcement agencies already stretched by under-staffing and budget cutbacks. Such a diversion of resources adversely affects law enforcement agencies' ability to provide other public safety services to their communities. See e.g., *Woollard*, 712 F.3d at 879-880 (recounting similar policing benefits).

In light of the public safety risks the Legislature could reasonably deem to be associated with public carrying of firearms, there is a "'reasonable fit'" between California's calibrated regime governing public carry and the important interests that it serves. *Peña*, 898 F.3d at. 979.

**INTERROGATORY NO. 2**: Identify all documents bearing upon, supporting, or reflecting the facts set forth in Your response to the preceding interrogatory.

**RESPONSE TO INTERROGATORY NO. 2**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague, overbroad, and/or unduly burdensome. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: See DOJ 000127-DOJ000411; DOJ 000001-DOJ 000126; DOJ 001227-DOJ 001281.

**INTERROGATORY NO. 3**: State all facts on which You base Your contention, if any, that California Penal Code § 26400 is constitutional under the Second Amendment, including any legitimate goals or public interests intended to be served by the statute.

**RESPONSE TO INTERROGATORY NO. 3**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

that is relevant to Plaintiff's claims. Defendant Becerra also objects to this interrogatory on the grounds that it seeks Defendant Becerra's contentions regarding the constitutionality of California Penal Code § 26400, and thus poses a question of pure law. Defendant Becerra is not required to respond to interrogatories raising questions of pure law. See *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the facts of the case are not permitted") (citation and some internal punctuation omitted). A party responding to interrogatories "is not required to write his[, her, or its] brief on a motion for summary judgment in his[, her, or its] responses to interrogatories." *Larson v. Trans Union, LLC*, No. 3:12-CV-05726-WHO, 2017 WL 1540710, at *1 (N.D. Cal. April 28, 2017) (citation and some internal punctuation omitted).

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: California Penal Code § 26400 is constitutional under the Second Amendment.

In *Heller*, the Supreme Court recognized that the Second Amendment protects an individual right to keep and bear arms. 554 U.S. at 636. The *Heller* Court did not, however, "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment" or attempt to "clarify the entire field." *Id*. at 626, 635.

First, *Heller* explains that "the most natural reading of 'keep Arms'" is "to 'have weapons,'" 554 U.S. at 582, and that "bear arms" is most naturally read to mean "'wear, bear, or carry upon the person or in clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person,'" *id*. at 584 (ellipses omitted).

Second, the right to bear arms must be construed and applied with careful attention to its "historical background." *Heller*, 554 U.S. at 592; see *id*. At 576-626. This is critical "because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right," and "declares only that is 'shall not be infringed.'" *Id*., at 592. Thus, while the Second Amendment's inclusion in the Bill of Rights indicates that the right to bear arms ranks as fundamental, nothing about its enumeration in the Constitution

1   changed the right into anything more comprehensive or absolute than would have been

2   understood and expected by "ordinary citizens in the founding generation." *Id*. at 577.

3       Third, that commonly understood right was and is "not unlimited." *Heller*, 554 U.S. at 595,

4   626. It is not a right "to keep and carry any weapon whatsoever in any manner whatsoever and

5   for whatever purpose," *id*. at 626, or "to carry arms for any sort of confrontation," *id*. at 595. The

6   core individual right recognized by *Heller* is the right to keep and bear arms "in defense of hearth

7   and home." 554 U.S. at 635; see also *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)

8   (plurality op.) (*Heller's* "central holding" was that "the Second Amendment protects a personal

9   right to keep and bear arms for lawful purposes, most notably for self-defense within the home.").

10  That does not mean that the right to "bear" has no scope or application beyond the home or its

11  immediate environs. But nothing in *Heller* suggests that it applies in exactly the same in all

12  places, so that a restriction on bearing arms in public must be treated just like a restriction on

13  bearing in or around the home. In particular, nothing in *Heller* dictates that, as Plaintiff Zeleny

14  seems to contend, that the Second Amendment embodies an individual right to openly carry a gun

15  in almost any public place.

16      On the contrary, *Heller* makes clear that Second Amendment rights are subject to many

17  reasonable regulations. *See* 554 U.S. at 636. Indeed, the Second Amendment "by no means

18  eliminates" States' "ability to devise solutions to social problems that suit local needs and

19  values." *McDonald,* 561 U.S. at 785.

20      *Heller* does not recognize any unfettered right to carry firearms in the crowded urban areas,

21  based solely on an individual's stated desire to be "'armed and ready for offensive or defensive

22  action in case of conflict with another person,'" 554 U.S. at 584. Rather, under *Heller*, Plaintiff

23  Zeleny's challenge to Penal Code § 26350 must be evaluated, in the first instance, by examining

24  "the historical understanding of the scope of that right." *Id*. at 625. The challenge cannot succeed

25  if the State's restrictions are a type of reasonable public regulation that has long been considered

26  consistent with a private right to bear arms. *Cf. id*. at 626-627.

27      "No fundamental right—not even the First Amendment—is absolute." *McDonald*, 561

28  U.S. at 802 (Scalia, J., concurring). Just as the First Amendment does not confer a right to speak

in any time, place or manner, history and precedent teach that the Second Amendment does not confer the right to carry guns anywhere or at any time. See *Heller*, 554 U.S. at 595. California's laws regulating the public carrying of firearms strike a permissible balance between preserving order and public safety and accommodating the desire of some residents to carry guns. There are consistent with traditional restrictions on public carry, and are presumptively lawful on that basis.

Where text, history, and tradition show that a challenged law is consistent with the Second Amendment, the restriction "'passes constitutional muster'" and the court's inquiry "'is complete.'" *Teixeira*, 873 F.3d at 682; see *Heller*, 554 U.S. at 626, 627 n.26.

California broadly allows the carrying of firearms in places and circumstances where it has traditionally been common: in or immediately around an individual's home or place of business and on much other private property with permission; in less-populated areas and during activities such as hunting; and in circumstances of immediate and grave danger to person or property when law enforcement is not available. It also allows qualified individuals to obtain licenses to carry more generally, if they can establish "good cause" under standards set by local officials who are most familiar with the needs and desires of their own communities.

However, there is an "historical prevalence" of public carry restrictions similar to Penal Code § 26400. *Kachalsky*, 701 F.3d at 96. Because "[f]irearms have always been more heavily regulated in the public sphere," the right to bear arms "most certainly operates in a different manner" in that context than when evaluating restrictions that impinge directly on the core right to keep and carry guns in the home. *Drake*, 724 F.3d at 430 n.5.

This makes good functional sense. When individuals move outside their homes—and particularly when they move about in populated areas —their interest in carrying a firearm is much more likely to come into conflict with the public interest in order and safety. *See*, *e.g.*, *Gould v. Morgan*, 907 F.3d 659, 672, (1st Cir. 2018). The "inherent" risk that firearms present when carried in public "distinguishes the Second Amendment right from other fundamental rights . . . such as the right to marry and the right to be free from viewpoint discrimination, which can be exercised without creating a direct risk to others. *Bonidy*, 790 F.3d at 1126. And as the Fourth Circuit observed, it "is not far-fetched to think" that Heller's focus on the "core" right to protect

12

the home was born out of a recognition that the danger of "tragic act[s]" of violence "would rise exponentially as one moved the right from the home to the public square." *Masciandaro*, 638 F.3d at 475-476.

There is a legitimate role for public regulation touching on even our most fundamental rights—especially when there is or can be genuine tension between the exercise of individual rights and the safety of members of the public and law enforcement officers.

When, as here, a court will review a challenged statute under intermediate scrutiny, courts ask whether the law promotes a "significant, substantial, or important government objective," and whether there is a "'reasonable fit' between the challenged law and the asserted objective." *Peña*, 898 F.3d at 979. While the State must show that the law "promotes a substantial government interest that would be achieved less effectively absent the regulation," it need not demonstrate that the regulation is the "least restrictive means of achieving the government interest." *Id*. (citations and quotation marks omitted). A court's only obligation is to "assure that, in formulating its judgments, [the State] has drawn reasonable inferences based on substantial evidence,'" an inquiry that must accord "'substantial deference to the predictive judgments'" of the legislature. *Id*. at 979-980 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)).

The need for appropriate deference to legislative predications is especially clear in the Second Amendment context. "Providing for the safety of citizens within their borders has long been state government's most basic task." *Kolbe*, 849 F.3d at 150. State legislatures are "'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky*, 701 F.3d at 97. And, while a legislature's judgments can be based on empirical evidence, they need not be; "history, consensus, and 'simple common sense'" will suffice. *Went for It, Inc.*, 515 U.S. at 628. Indeed, when it comes to dealing with a complex societal problem like gun violence, there will almost always be room for reasonable minds to differ about the optimal solution; demanding undue certainly would be foolhardy.

/ / /

California has a compelling interest in protecting public safety and reducing gun violence. *Jackson*, 746 F.3d at 965. An increase in guns carried by private persons in public places increases the risk that "'basic confrontations between individuals [will] turn deadly.'" *Wollard*, 712 F.3d at 879. Similarly, misfired shots or accidental discharges are "more likely to hit a bystander where there are more bystanders to hit." Blocher, *Firearm Localism*, 123 Yale L.J. 82, 122-123 (2013). The Legislature could also conclude that widespread public carry increases the "availability of handguns to criminals via theft," *Woollard*, 712 F.3d at 879, and that such guns would then be used to "commit violent crimes" or be transferred to "others who commit crimes," U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *2012 Summary: Firearms Reported Lost and Stolen* 2 (2013).

The absence of a prohibition on openly carrying unloaded firearms has created a surge in individuals openly carrying unloaded firearms in public. These incidents adversely affect public safety in several ways. Members of the public who encounter individuals openly carrying firearms are alarmed and fearful for their safety and the safety of others. When members of the public report such incidents to local law enforcement, they are only able to provide law enforcement personnel with incomplete information. As a result, law enforcement agencies respond to such incidents with limited information regarding whether the individual openly carrying the firearm is a danger to himself or herself; a danger to the public; or a danger to the responding law enforcement personnel.

In such situations, a wrong move by the individual carrying the firearm could be construed as threatening by the responding law enforcement officer. The officer may feel compelled to respond in a manner that could result in injury or death. Thus, the practice of openly carrying unloaded firearms can create an unsafe environment for everyone involved: the individual carrying the firearm, the responding law enforcement personnel, and all other individuals who may be nearby.

In addition, responding to incidents involving individuals openly carrying unloaded firearms taxes the resources of law enforcement agencies already stretched by under-staffing and budget cutbacks. Such a diversion of resources adversely affects law enforcement agencies'

ability to provide other public safety services to their communities. See e.g., *Woollard*, 712 F.3d at 879-880 (recounting similar policing benefits).

According to the legislative history of California Penal Code § 26400, one of the purposes of the bill (A.B. 1527) was to follow up A.B. 144 (Statutes of 2011), which made public open carry of handguns a misdemeanor, by expanding the prohibition to long-guns in incorporated cities. "The absence of a prohibition on 'open carry' of long guns has created an increase in problematic instances of these guns carried in public, alarming unsuspecting individuals causing issues for law enforcement. Open carry creates a potentially dangerous situation. In most cases when a person is openly carrying a firearm, law enforcement is called to the scene with few details other than one or more people are present at a location and are armed." (See DOJ 001050) "In these tense situations, the slightest wrong move by the gun-carrier could be construed as threatening by the responding officer, who may feel compelled to respond in a manner that could be lethal. In this situation the practice of 'open carry' creates an unsafe environment for all parties involved; the officer, the gun-carrying individual, and for any other individuals nearby as well." (See DOJ 001050)

"Additionally, the increase in 'open-carry' calls placed to law enforcement has taxed departments dealing with under-staffing and cutbacks due to the current fiscal climate in California, preventing them from protecting the public in other ways." (See DOJ 001051)

In light of the public safety risks the Legislature could reasonably deem to be associated with public carrying of firearms, there is a "'reasonable fit'" between California's calibrated regime governing public carry and the important interests that it serves. *Peña*, 898 F.3d at. 979.

**INTERROGATORY NO. 4**: Identify all documents bearing upon, supporting, or reflecting the facts set forth in Your response to the preceding interrogatory.

**RESPONSE TO INTERROGATORY NO. 4**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to

Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: See DOJ 000127-DOJ 000411; DOJ 000412-DOJ 000529; DOJ 000927-DOJ 001226; DOJ 001227-DOJ 001281.

**INTERROGATORY NO. 5**: State all reasons for the adoption of California Penal Code §§ 26375 and 26405(r), including, but not limited to any legitimate goals or public interests intended to be served by the exemptions contained therein.

**RESPONSE TO INTERROGATORY NO. 5**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims. Defendant Becerra also objects to this interrogatory on the grounds that it seeks Defendant Becerra's contentions regarding the constitutionality of California Penal Code §§ 26375 and 26405(r), and thus poses questions of pure law. Defendant Becerra is not required to respond to interrogatories raising questions of pure law. See *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the facts of the case are not permitted") (citation and some internal punctuation omitted). A party responding to interrogatories "is not required to write his[, her, or its] brief on a motion for summary judgment in his[, her, or its] responses to interrogatories." *Larson v. Trans Union, LLC*, No. 3:12-CV-05726-WHO, 2017 WL 1540710, at *1 (N.D. Cal. April 28, 2017) (citation and some internal punctuation omitted).

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: The *Heller* Court recognized that the Second Amendment protects an individual right to keep and bear arms. 554 U.S. at 636. The Court did not, however, "undertake an exhaustive

1    historical analysis . . . of the full scope of the Second Amendment" or attempt to "clarify the
2    entire field." *Id*. at 626, 635.

3    First, *Heller* explains that "the most natural reading of 'keep Arms'" is "to 'have
4    weapons,'" 554 U.S. at 582, and that "bear arms" is most naturally read to mean "'wear, bear, or
5    carry upon the person or in clothing or in a pocket, for the purpose of being armed and ready for
6    offensive or defensive action in a case of conflict with another person,'" *id*. at 584 (ellipses
7    omitted).

8    Second, the right to bear arms must be construed and applied with careful attention to its
9    "historical background." *Heller*, 554 U.S. at 592; see *id*. At 576-626. This is critical "because it
10   has always been widely understood that the Second Amendment, like the First and Fourth
11   Amendments, codified a *pre-existing* right," and "declares only that is 'shall not be infringed.'"
12   *Id*., at 592. Thus, while the Second Amendment's inclusion in the Bill of Rights indicates that the
13   right to bear arms ranks as fundamental, nothing about its enumeration in the Constitution
14   changed the right into anything more comprehensive or absolute than would have been
15   understood and expected by "ordinary citizens in the founding generation." *Id*. at 577.

16   Third, that commonly understood right was and is "not unlimited." *Heller*, 554 U.S. at 595,
17   626. It is not a right "to keep and carry any weapon whatsoever in any manner whatsoever and
18   for whatever purpose," *id*. at 626, or "to carry arms for any sort of confrontation," *id*. at 595. The
19   core individual right recognized by *Heller* is the right to keep and bear arms "in defense of hearth
20   and home." 554 U.S. at 635; see also *McDonald*, 561 U.S. at 780 (*Heller's* "central holding" was
21   that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes,
22   most notably for self-defense within the home."). That does not mean that the right to "bear" has
23   no scope or application beyond the home or its immediate environs. But nothing in *Heller*
24   suggests that it applies in exactly the same in all places, so that a restriction on bearing arms in
25   public must be treated just like a restriction on bearing in or around the home.

26   On the contrary, *Heller* makes clear that Second Amendment rights are subject to many
27   reasonable regulations. *See* 554 U.S. at 636. Indeed, the Second Amendment "by no means

28

eliminates" States' "ability to devise solutions to social problems that suit local needs and values." *McDonald,* 561 U.S. at 785.

*Heller* does not recognize any unfettered right to carry firearms in the crowded urban areas, based solely on an individual's stated desire to be "'armed and ready for offensive or defensive action in case of conflict with another person,'" 554 U.S. at 584. Rather, under *Heller*, a challenge to Penal Code § 26350 must be evaluated, in the first instance, by examining "the historical understanding of the scope of that right." *Id*. at 625. The challenge cannot succeed if the State's restrictions are a type of reasonable public regulation that has long been considered consistent with a private right to bear arms. *Cf. id.* at 626-627.

"No fundamental right—not even the First Amendment—is absolute." *McDonald*, 561 U.S. at 802 (Scalia, J., concurring). Just as the First Amendment does not confer a right to speak in any time, place or manner, history and precedent teach that the Second Amendment does not confer the right to carry guns anywhere or at any time. See *Heller*, 554 U.S. at 595. California's laws regulating the public carrying of firearms strike a permissible balance between preserving order and public safety and accommodating the desire of some residents to carry guns. There are consistent with traditional restrictions on public carry, and are presumptively lawful on that basis.

Where text, history, and tradition show that a challenged law is consistent with the Second Amendment, the restriction "'passes constitutional muster'" and the court's inquiry "'is complete.'" *Teixeira*, 873 F.3d at 682; see *Heller*, 554 U.S. at 626, 627 n.26.

California broadly allows the carrying of firearms in places and circumstances where it has traditionally been common: in or immediately around an individual's home or place of business and on much other private property with permission; in less-populated areas and during activities such as hunting; and in circumstances of immediate and grave danger to person or property when law enforcement is not available. It also allows qualified individuals to obtain licenses to carry more generally, if they can establish "good cause" under standards set by local officials who are most familiar with the needs and desires of their own communities.

However, there is an "historical prevalence" of public carry restrictions similar to those in California. *Kachalsky*, 701 F.3d at 96. Because "[f]irearms have always been more heavily

18

1  regulated in the public sphere," the right to bear arms "most certainly operates in a different

2  manner" in that context than when evaluating restrictions that impinge directly on the core right

3  to keep and carry guns in the home. *Drake*, 724 F.3d at 430 n.5.

4      This makes good functional sense. When individuals move outside their homes—and

5  particularly when they move about in populated areas —their interest in carrying a firearm is

6  much more likely to come into conflict with the public interest in order and safety. *See, e.g.*,

7  *Gould*, 907 F.3d at 672. The "inherent" risk that firearms present when carried in public

8  "distinguishes the Second Amendment right from other fundamental rights . . . such as the right to

9  marry and the right to be free from viewpoint discrimination, which can be exercised without

10  creating a direct risk to others. *Bonidy*, 790 F.3d at 1126. And as the Fourth Circuit observed, it

11  "is not far-fetched to think" that Heller's focus on the "core" right to protect the home was born

12  out of a recognition that the danger of "tragic act[s]" of violence "would rise exponentially as one

13  moved the right from the home to the public square." *Masciandaro*, 638 F.3d at 475-476.

14      There is a legitimate role for public regulation touching on even our most fundamental

15  rights—especially when there is or can be genuine tension between the exercise of individual

16  rights and the safety of members of the public and law enforcement officers.

17      When, as here, a court will review a challenged statute under intermediate scrutiny, courts

18  ask whether the law promotes a "significant, substantial, or important government objective," and

19  whether there is a "'reasonable fit' between the challenged law and the asserted objective." *Peña*,

20  898 F.3d at 979. While the State must show that the law "promotes a substantial government

21  interest that would be achieved less effectively absent the regulation," it need not demonstrate

22  that the regulation is the "least restrictive means of achieving the government interest." *Id*.

23  (citations and quotation marks omitted). A court's only obligation is to "assure that, in

24  formulating its judgments, [the State] has drawn reasonable inferences based on substantial

25  evidence,'" an inquiry that must accord "'substantial deference to the predictive judgments'" of

26  the legislature. *Id*. at 979-980 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195

27  (1997)).

28

The need for appropriate deference to legislative predications is especially clear in the Second Amendment context. "Providing for the safety of citizens within their borders has long been state government's most basic task." *Kolbe*, 849 F.3d at 150. State legislatures are "'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky*, 701 F.3d at 97. And, while a legislature's judgments can be based on empirical evidence, they need not be; "history, consensus, and 'simple common sense'" will suffice. *Went for It, Inc.*, 515 U.S. at 628.

California has a compelling interest in protecting public safety and reducing gun violence. *Jackson*, 746 F.3d at 965. An increase in guns carried by private persons in public places increases the risk that "'basic confrontations between individuals [will] turn deadly.'" *Wollard*, 712 F.3d at 879. Similarly, misfired shots or accidental discharges are "more likely to hit a bystander where there are more bystanders to hit." Blocher, *Firearm Localism*, 123 Yale L.J. 82, 122-123 (2013). The Legislature could also conclude that widespread public carry increases the "availability of handguns to criminals via theft," *Woollard*, 712 F.3d at 879, and that such guns would then be used to "commit violent crimes" or be transferred to "others who commit crimes," U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *2012 Summary: Firearms Reported Lost and Stolen* 2 (2013).

The absence of a prohibition on openly carrying unloaded firearms has created a surge in individuals openly carrying unloaded firearms in public. These incidents adversely affect public safety in several ways. Members of the public who encounter individuals openly carrying firearms are alarmed and fearful for their safety and the safety of others. When members of the public report such incidents to local law enforcement, they are only able to provide law enforcement personnel with incomplete information. As a result, law enforcement agencies respond to such incidents with limited information regarding whether the individual openly carrying the firearm is a danger to himself or herself; a danger to the public; or a danger to the responding law enforcement personnel.

1   In such situations, a wrong move by the individual carrying the firearm could be construed
2   as threatening by the responding law enforcement officer.  The officer may feel compelled to
3   respond in a manner that could result in injury or death.  Thus, the practice of openly carrying
4   unloaded firearms can create an unsafe environment for everyone involved: the individual
5   carrying the firearm, the responding law enforcement personnel, and all other individuals who
6   may be nearby.

7       In addition, responding to incidents involving individuals openly carrying unloaded
8   firearms taxes the resources of law enforcement agencies already stretched by under-staffing and
9   budget cutbacks.  Such a diversion of resources adversely affects law enforcement agencies'
10  ability to provide other public safety services to their communities.  *See e.g.*, *Woollard*, 712 F.3d
11  at 879-880 (recounting similar policing benefits).

12      According to the legislative history of California Penal Code § 26400, one of the purposes
13  of the bill (A.B. 1527) was to follow up A.B. 144 (Statutes of 2011), which made public open
14  carry of handguns a misdemeanor, by expanding the prohibition to long-guns in incorporated
15  cities.  "The absence of a prohibition on 'open carry' of long guns has created an increase in
16  problematic instances of these guns carried in public, alarming unsuspecting individuals causing
17  issues for law enforcement.  Open carry creates a potentially dangerous situation.  In most cases
18  when a person is openly carrying a firearm, law enforcement is called to the scene with few
19  details other than one or more people are present at a location and are armed." (See DOJ 001050)
20  "In these tense situations, the slightest wrong move by the gun-carrier could be construed as
21  threatening by the responding officer, who may feel compelled to respond in a manner that could
22  be lethal.  In this situation the practice of 'open carry' creates an unsafe environment for all
23  parties involved; the officer, the gun-carrying individual, and for any other individuals nearby as
24  well." (See DOJ 001050)

25      "Additionally, the increase in 'open-carry' calls placed to law enforcement has taxed
26  departments dealing with under-staffing and cutbacks due to the current fiscal climate in
27  California, preventing them from protecting the public in other ways." (See DOJ 001051)

28

1    Here, the Legislature enacted certain exceptions to the general prohibitions on openly

2    carrying firearms.

3    Penal Code § 26375 provides that section 26350 does not apply to, or affect, the open

4    carrying of an unloaded handgun by an authorized participant in, or an authorized employee or

5    agent of a supplier of firearms for, a motion picture, television or video production, or

6    entertainment event, when the participant lawfully uses the handgun as part of that production or

7    event, as part of rehearsing or practicing for participation in that production or event, or while the

8    participant or authorized employee or agent is at that production or event, or rehearsal or practice

9    for that production or event. (Pen. Code, § 26375.)  According to the Legislative history, Penal

10   Code § 26375 permits the use of unloaded handguns as an "entertainment props."  (See DOJ

11   000219)

12   Likewise, Penal Code § 26405, subdivision (r) provides that Penal Code § 26400 does not

13   apply to, or affect, the carrying of an unloaded firearm that is not a handgun by an authorized

14   participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture,

15   television, or video production or entertainment event, when the participant lawfully uses that

16   firearm as part of that production or event, as part of rehearsing or practicing for participation in

17   that production or event, or while the participant or authorized employee or agent is at that

18   production or event, or rehearsal or practice for that production or event.

19   And, Penal Code § 29500 provides that, "Any person who is at least 21 years of age may

20   apply for an entertainment firearms permit from the Department of Justice.  An entertainment

21   firearms permit authorizes the permit holder to possess firearms loaned to the permitholder for

22   use solely as a prop in a motion picture, television, video, theatrical, or other entertainment

23   production or event."  (Added by Stats.2010, c. 711 (S.B. 1080).)

24   **INTERROGATORY NO. 6**:  Identify all documents bearing upon, supporting, or

25   reflecting the reasons set forth in Your response to the preceding interrogatory.

26   **RESPONSE TO INTERROGATORY NO. 6**:

27   Defendant Becerra incorporates by reference the above-stated general objections as though

28   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: See DOJ 000127-DOJ 000411; DOJ 000749-DOJ 000926; DOJ 0001282-DOJ 001312.

**INTERROGATORY NO. 7**: State all factors that You contend were considered by the Legislature of the State of California in determining whether or not to exempt the use of firearms in other forms of expressive activity from the statutes prohibiting the carrying of firearms in public.

**RESPONSE TO INTERROGATORY NO. 7**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: Defendant Becerra has not made the contention described in this interrogatory.

**INTERROGATORY NO. 8**: State all reasons for distinguishing between "motion picture, television or video production, or entertainment event[s]" and other forms of speech or expressive conduct in California Penal Code §§ 26375 and 26405(r).

**RESPONSE TO INTERROGATORY NO. 8**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: The interrogatory call for Defendant Becerra to speculate regarding whether the

23

Legislature considered including other forms of "speech or expressive conduct" in enacting Penal Code §§ 26375 and 26405, subdivision (r).  Thus, Defendant Becerra is unable to respond to this interrogatory.

**INTERROGATORY NO. 9**:  Identify all documents bearing upon, supporting, or reflecting the reasons set forth in Your response to the preceding interrogatory.

**RESPONSE TO INTERROGATORY NO. 9**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: N/A.

**INTERROGATORY NO. 10**:  Does the phrase "authorized participant" as used in California Penal Code §§ 26375 and 26405(r) refer to a participant authorized by a governmental body or agency?

**INITIAL RESPONSE TO INTERROGATORY NO. 10**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad.  Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase "authorized participant."

However, according to the Legislative history of Penal Code § 26375, that section permits the use of unloaded handguns as an "entertainment props."  (See DOJ 000219)  Additionally, the Entertainment Firearms Permit only authorizes the permit holder "to possess firearms loaned to

24

the permitholder for use solely as a prop in a motion picture, television, video, theatrical, or other entertainment production or event." (Penal Code § 29500.) Thus, the exceptions set forth in Penal Code §§ 26375 and 26405, subdivision (r) are available only to those using unloaded firearms loaned to them for use as "entertainment props" in a motion picture, television, video, theatrical, or other entertainment production or event.

**AMENDED RESPONSE TO INTERROGATORY NO. 10:**

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase "authorized participant." Defendant Becerra has never issued a formal opinion under California law regarding the meaning of the phrase "authorized participant," and this response is not such an opinion and cannot be relied upon as such an opinion. Nor is this response a generally applicable rule or regulation that is intended to be applied outside of the context of this case. Moreover, Defendant Becerra played no material role in the events described in the complaint, and was not involved in the denial of Plaintiff Michael Zeleny's permit application(s).

Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific context of this case, Defendant Becerra believes that most plausible reading of the term "authorized participant" as used in California Penal Code §§ 26375 and 26405(r) refers to a participant authorized by a governmental body or agency.

**INTERROGATORY NO. 11**: If Your answer to Interrogatory No. 10 is in the affirmative, identify the governmental bodies or agencies from which authorization is required?

**INITIAL RESPONSE TO INTERROGATORY NO. 11**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is

1  vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

2  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

3  that is relevant to Plaintiff's claims.

4      Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

5  follows: N/A.

6      **AMENDED** RESPONSE TO INTERROGATORY NO. 11:

7      Defendant Becerra incorporates by reference the above-stated general objections as though

8  fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

9  vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

10  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

11  that is relevant to Plaintiff's claims.

12      Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

13  follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

14  "authorized participant."  Defendant Becerra has never issued a formal opinion under California

15  law regarding the meaning of the phrase "authorized participant," and this response is not such an

16  opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

17  rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

18  Defendant Becerra played no material role in the events described in the complaint, and was not

19  involved in the denial of Plaintiff Michael Zeleny's permit application(s).

20      Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

21  context of this case, the Department of Justice's Entertainment Firearms Permit only authorizes

22  the permit holder "to possess firearms loaned to the permitholder for use solely as a prop in a

23  motion picture, television, video, theatrical, or other entertainment production or event."  (Penal

24  Code § 29500.)  Anyone who is not otherwise authorized to carry a weapon openly, but who

25  desires to carry a weapon openly "as a prop in a motion picture, television, video, theatrical, or

26  other entertainment production or event" would need to do so under the auspices of an

27  Entertainment Firearms Permit.

28

The Attorney General understands this exception to have been carried forward into the open carry laws, as the legislative history of Penal Code § 26375 refers to the use of unloaded handguns as an "entertainment props." (See DOJ 000219.) Thus, the exceptions set forth in Penal Code §§ 26375 and 26405, subdivision (r) are available only to those using unloaded firearms loaned to them for use as "entertainment props" in a motion picture, television, video, theatrical, or other entertainment production or event.

While the Department of Justice "authorizes" the use of firearms in this narrow context through the issuance of Firearms Entertainment Permits, such authorization is in the nature of a defense to an open carry prosecution within the very narrow context of an entertainment prop, not a preclusion of any other regulation by other agencies. Other law enforcement agencies would not be precluded from ensuring that an individual carrying a weapon openly had a permit, or ensuring that an identified individual is not violating any other federal, state, or local laws or ordinances. Notably, when issuing the Firearms Entertainment Permit, the Department does not verify the nature of the entertainment event or impose any restrictions on how a weapon might be carried or used, but only looks to see if a person is prohibited from owning firearms. In this sense, the Firearms Entertainment Permit is a floor rather than a ceiling, with possible room for other law enforcement agencies to determine, for example, that the open carry of weapons endangered public safety, or was a nuisance, or that someone's conduct was not a "production or event" covered by the relevant exception, or that someone was not violating other laws.

Also, within the structure of the open carry laws, the exception for an authorized participant appears to be analogous to similar exceptions for gun shows (Pen. Code § 26369) or target ranges (Pen. Code § 26365)—defined spaces in which the weapon being carried is not easily visible or accessible to the public. The Attorney General understands the Firearms Entertainment Permit, and the corresponding exceptions to the open carry laws, to apply to confined, non-public spaces for a limited period of time, i.e., in a movie studio or clearly defined production area. To the extent that an individual like Mr. Zeleny seeks to demonstrate on a public street with an unloaded firearm in an unconfined area and/or for an indefinite period of time, the Attorney General views the open carrying of unloaded weapons on a public street, in an unconfined area fully visible to

27

1   and accessible by anyone else, and not within what would reasonably be considered a defined,

2   enclosed production area, to potentially be conduct outside the scope of the Firearms

3   Entertainment Permit and the corresponding exception to the open carry laws, and potentially

4   subject to enforcement by the law enforcement agency primarily responsible for enforcing the

5   open carry laws in that area.

6   **SECOND AMENDED RESPONSE TO INTERROGATORY NO. 11:**

7   Defendant Becerra incorporates by reference the above-stated general objections as though

8   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

9   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

10  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

11  that is relevant to Plaintiff's claims.

12  Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

13  follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

14  "authorized participant."  Defendant Becerra has never issued a formal opinion under California

15  law regarding the meaning of the phrase "authorized participant," and this response is not such an

16  opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

17  rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

18  Defendant Becerra played no material role in the events described in the complaint, and was not

19  involved in the denial of Plaintiff Michael Zeleny's permit application(s).

20  Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

21  context of this case, Defendant Becerra believes that an "authorized participant" must be

22  operating under the auspices of a Department of Justice Entertainment Firearms Permit, which

23  authorizes the permit holder "to possess firearms loaned to the permitholder for use solely as a

24  prop in a motion picture, television, video, theatrical, or other entertainment production or event."

25  (Penal Code § 29500.)  For entertainment productions this generally has meant that a propmaster

26  or similarly qualified person is supervising the use of firearms in the production, and others

27  involved in the production may transfer or possess firearms under the auspices of the supervising

28  permit-holder.

1    **INTERROGATORY NO. 12**:  If Your answer to Interrogatory No. 10 is in the

2    affirmative, state all bases for your contention that the phrase "authorized participant," as used in

3    California Penal Code §§ 26375 and 26405(r), refers to a participant authorized by a

4    governmental body or agency?

5    **INITIAL RESPONSE TO INTERROGATORY NO. 12**:

6    Defendant Becerra incorporates by reference the above-stated general objections as though

7    fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

8    vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

9    Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

10   that is relevant to Plaintiff's claims.

11   Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

12   follows: N/A.

13   **AMENDED RESPONSE TO INTERROGATORY NO. 12:**

14   Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

15   "authorized participant."  Defendant Becerra has never issued a formal opinion under California

16   law regarding the meaning of the phrase "authorized participant," and this response is not such an

17   opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

18   rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

19   Defendant Becerra played no material role in the events described in the complaint, and was not

20   involved in the denial of Plaintiff Michael Zeleny's permit application(s).

21   Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

22   context of this case, Defendant Becerra believes that most plausible reading of the term

23   "authorized participant" as used in California Penal Code §§ 26375 and 26405(r) refers to a

24   participant authorized by a governmental body or agency.  The opposite reading is less plausible.

25   In the broader context of California law, and especially in the context of the Penal Code, it would

26   be anomalous for an individual to be able to exempt themselves from the reach of a penal statute

27   by "authorizing" an exception for themselves.

28

**SECOND AMENDED RESPONSE TO INTERROGATORY NO. 12:**

Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase "authorized participant." Defendant Becerra has never issued a formal opinion under California law regarding the meaning of the phrase "authorized participant," and this response is not such an opinion and cannot be relied upon as such an opinion. Nor is this response a generally applicable rule or regulation that is intended to be applied outside of the context of this case. Moreover, Defendant Becerra played no material role in the events described in the complaint, and was not involved in the denial of Plaintiff Michael Zeleny's permit application(s).

Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific context of this case, Defendant Becerra believes that most plausible reading of the term "authorized participant" as used in California Penal Code §§ 26375 and 26405(r) refers to a participant authorized by a governmental body or agency. This reading is based on Defendant Becerra's historical understanding of the Department of Justice's Firearms Entertainment Permit, which authorizes the permit holder "to possess firearms loaned to the permitholder for use solely as a prop in a motion picture, television, video, theatrical, or other entertainment production or event." (Penal Code § 29500.) The Attorney General understands this exception to have been carried forward into the open carry laws, as the legislative history of Penal Code § 26375 refers to the use of unloaded handguns as an "entertainment props." (See DOJ 000219.) Thus, the exceptions set forth in Penal Code §§ 26375 and 26405, subdivision (r) are available only to those using unloaded firearms loaned to them for use as "entertainment props" in a motion picture, television, video, theatrical, or other entertainment production or event, and when operating under the auspices of a Firearms Entertainment Permit.

The opposite reading is less plausible. In the broader context of California law, and especially in the context of the Penal Code, it would be anomalous for an individual to be able to exempt themselves from the reach of a penal statute by "authorizing" an exception for themselves.

**INTERROGATORY NO. 13**: If your answer to Interrogatory No. 10 is in the negative, state the persons or entities whose authorization is required in order for California Penal Code §§

26375 and 26405(r) to exempt the carrying of firearms from California Penal Code §§ 26350 and 26405.

**INITIAL RESPONSE TO INTERROGATORY NO. 13**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: The Legislature enacted certain exceptions to the general prohibitions on openly carrying firearms.

Penal Code § 26375 provides that section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television or video production, or entertainment event, when the participant lawfully uses the handgun as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event. (Pen. Code, § 26375.) According to the Legislative history, Penal Code § 26375 permits the use of unloaded handguns as an "entertainment props." (See DOJ 000219)

Likewise, Penal Code § 26405, subdivision (r) provides that Penal Code § 26400 does not apply to, or affect, the carrying of an unloaded firearm that is not a handgun by an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television, or video production or entertainment event, when the participant lawfully uses that firearm as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event.

And, Penal Code § 29500 provides that, "Any person who is at least 21 years of age may apply for an entertainment firearms permit from the Department of Justice. An entertainment firearms permit authorizes the permit holder to possess firearms loaned to the permitholder for use solely as a prop in a motion picture, television, video, theatrical, or other entertainment production or event." (Added by Stats.2010, c. 711 (S.B. 1080).)

**AMENDED RESPONSE TO INTERROGATORY NO. 13:**

No amendment is needed because Defendant Becerra's answer to interrogatory 10 was not in the negative.

**INTERROGATORY NO. 14**: Do California Penal Codes §§ 26375 and 26405(r) require that the "motion picture, television or video production" or "entertainment event" itself be authorized in order to exempt participants from California Penal Code §§ 26350 and 26405?

**INITIAL RESPONSE TO INTERROGATORY NO. 14:**

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: Penal Code §§ 26375 and 26405(r) do not address whether the "motion picture, television or video production" or "entertainment event" itself be authorized in order to exempt participants from California Penal Code §§ 26350 and 26405. Accordingly, Defendant Becerra is unable to respond to this interrogatory.

**AMENDED RESPONSE TO INTERROGATORY NO. 14:**

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

32

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase "authorized participant." Defendant Becerra has never issued a formal opinion under California law regarding the meaning of the phrase "authorized participant," and this response is not such an opinion and cannot be relied upon as such an opinion. Nor is this response a generally applicable rule or regulation that is intended to be applied outside of the context of this case. Moreover, Defendant Becerra played no material role in the events described in the complaint, and was not involved in the denial of Plaintiff Michael Zeleny's permit application(s).

Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific context of this case, Penal Code §§ 26375 and 26405(r) do not address whether the "motion picture, television or video production" or "entertainment event" itself be "authorized" in order to exempt participants from California Penal Code §§ 26350 and 26405. The term "authorized" only clearly modifies the terms "participant," "employee" or "agent." And since Mr. Zeleny himself appears to be the "participant" possessing the weapon(s), it appears to be irrelevant if his "production" or "event" is separately authorized. As Defendant Becerra understands the facts, the question might be different if Mr. Zeleny were not the person openly carrying weapons, but were only the person responsible for a "production" or "event."

Whether or not the "motion picture, television or video production" or "entertainment event" itself must be "authorized" also appears to be a separate question from whether there exists a bona fide "production" or "event" to begin with. Again specifically in the context of this case, within the structure of the open carry laws, the relevant exception appears to be analogous to similar exceptions for gun shows (Pen. Code § 26369) or target ranges (Pen. Code § 26365)— defined spaces in which the weapon being carried is not easily visible or accessible to the public. The Attorney General understands the Firearms Entertainment Permit, and the corresponding exceptions to the open carry laws, to apply to confined, non-public spaces for a limited period of time, i.e., in a movie studio or clearly defined production area. To the extent that an individual like Mr. Zeleny seeks to demonstrate on a public street with an unloaded firearm in an unconfined area and/or for an indefinite period of time, the Attorney General views the open carrying of

33

unloaded weapons on a public street, in an unconfined area fully visible to and accessible by

anyone else, and not within what would reasonably be considered a defined, enclosed production

area (i.e., a production or event), to potentially be conduct outside the scope of the Firearms

Entertainment Permit and the corresponding exception to the open carry laws, and potentially

subject to enforcement by the law enforcement agency primarily responsible for enforcing the

open carry laws in that area.

While the Department of Justice "authorizes" the use of firearms in this narrow context

through the issuance of Firearms Entertainment Permits, such authorization is in the nature of a

defense to an open carry prosecution within the very narrow context of an entertainment prop, not

a preclusion of any other regulation by other agencies.  Other law enforcement agencies would

not be precluded from ensuring that an individual carrying a weapon openly had a permit, or

ensuring that an identified individual is not violating any other federal, state, or local laws or

ordinances.  Notably, when issuing the Firearms Entertainment Permit, the Department does not

verify the nature of the entertainment event or impose any restrictions on how a weapon might be

carried or used, but only looks to see if a person is prohibited from owning firearms.  In this

sense, the Firearms Entertainment Permit is a floor rather than a ceiling, with possible room for

other law enforcement agencies to determine, for example, that the open carry of weapons

endangered public safety, or was a nuisance, or that someone's conduct was not a "production or

event" covered by the relevant exception, or that someone was not violating other laws.

**INTERROGATORY NO. 15**:  If your response to Interrogatory No. 14 is in the

affirmative, identify all persons or entities whose authorization of the "motion picture, television

or video production" or "entertainment event" is required in order to exempt participants from

California Penal Code §§ 26350 and 26405.

**INITIAL RESPONSE TO INTERROGATORY NO. 15**:

Defendant Becerra incorporates by reference the above-stated general objections as though

fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

1     Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

2     that is relevant to Plaintiff's claims.

3         Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

4     follows: N/A.

5         **AMENDED RESPONSE TO INTERROGATORY NO. 15:**

6     Defendant Becerra's answer to interrogatory 14 was not in the affirmative.

7         **INTERROGATORY NO. 16**:  State all of the bases for Your response to Interrogatory

8     No. 14.

9         **INITIAL RESPONSE TO INTERROGATORY NO. 16**:

10         Defendant Becerra incorporates by reference the above-stated general objections as though

11     fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

12     vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

13     Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

14     that is relevant to Plaintiff's claims.

15         Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

16     follows: N/A.

17         **AMENDED RESPONSE TO INTERROGATORY NO. 16:**

18         Defendant Becerra has never issued a formal opinion under California law regarding the

19     meaning of the phrase "authorized participant," and this response is not such an opinion and

20     cannot be relied upon as such an opinion.  Nor is this response a generally applicable rule or

21     regulation that is intended to be applied outside of the context of this case.  Moreover, Defendant

22     Becerra played no material role in the events described in the complaint, and was not involved in

23     the denial of Plaintiff Michael Zeleny's permit application(s).

24         Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

25     context of this case, Penal Code §§ 26375 and 26405(r) do not address whether the "motion

26     picture, television or video production" or "entertainment event" itself be "authorized" in order to

27     exempt participants from California Penal Code §§ 26350 and 26405.  The term "authorized"

28     only clearly modifies the terms "participant," "employee" or "agent."  And since Mr. Zeleny

himself appears to be the "participant" possessing the weapon(s), it appears to be irrelevant if his "production" or "event" is separately authorized. As Defendant Becerra understands the facts, the question might be different if Mr. Zeleny were not the person openly carrying weapons, but were only the person responsible for a "production" or "event."

Whether or not the "motion picture, television or video production" or "entertainment event" itself must be "authorized" also appears to be a separate question from whether there exists a bona fide "production" or "event" to begin with. Again specifically in the context of this case, within the structure of the open carry laws, the relevant exception appears to be analogous to similar exceptions for gun shows (Pen. Code § 26369) or target ranges (Pen. Code § 26365)— defined spaces in which the weapon being carried is not easily visible or accessible to the public. The Attorney General understands the Firearms Entertainment Permit, and the corresponding exceptions to the open carry laws, to apply to confined, non-public spaces for a limited period of time, i.e., in a movie studio or clearly defined production area. To the extent that an individual like Mr. Zeleny seeks to demonstrate on a public street with an unloaded firearm in an unconfined area and/or for an indefinite period of time, the Attorney General views the open carrying of unloaded weapons on a public street, in an unconfined area fully visible to and accessible by anyone else, and not within what would reasonably be considered a defined, enclosed production area (i.e., a production or event), to potentially be conduct outside the scope of the Firearms Entertainment Permit and the corresponding exception to the open carry laws, and potentially subject to enforcement by the law enforcement agency primarily responsible for enforcing the open carry laws in that area.

This conclusion is consistent with the legislative history of the open carry statutes. The absence of a prohibition on openly carrying unloaded firearms has created a surge in individuals openly carrying unloaded firearms in public. These incidents adversely affect public safety in several ways. Members of the public who encounter individuals openly carrying firearms are alarmed and fearful for their safety and the safety of others. When members of the public report such incidents to local law enforcement, they are only able to provide law enforcement personnel with incomplete information. As a result, law enforcement agencies respond to such incidents

with limited information regarding whether the individual openly carrying the firearm is a danger to himself or herself; a danger to the public; or a danger to the responding law enforcement personnel.

In such situations, a wrong move by the individual carrying the firearm could be construed as threatening by the responding law enforcement officer. The officer may feel compelled to respond in a manner that could result in injury or death. Thus, the practice of openly carrying unloaded firearms can create an unsafe environment for everyone involved: the individual carrying the firearm, the responding law enforcement personnel, and all other individuals who may be nearby.

In addition, responding to incidents involving individuals openly carrying unloaded firearms taxes the resources of law enforcement agencies already stretched by under-staffing and budget cutbacks. Such a diversion of resources adversely affects law enforcement agencies' ability to provide other public safety services to their communities. *See e.g.*, *Woollard*, 712 F.3d at 879-880 (recounting similar policing benefits).

According to the legislative history of California Penal Code § 26400, one of the purposes of the bill (A.B. 1527) was to follow up A.B. 144 (Statutes of 2011), which made public open carry of handguns a misdemeanor, by expanding the prohibition to long-guns in incorporated cities. "The absence of a prohibition on 'open carry' of long guns has created an increase in problematic instances of these guns carried in public, alarming unsuspecting individuals causing issues for law enforcement. Open carry creates a potentially dangerous situation. In most cases when a person is openly carrying a firearm, law enforcement is called to the scene with few details other than one or more people are present at a location and are armed." (See DOJ 001050) "In these tense situations, the slightest wrong move by the gun-carrier could be construed as threatening by the responding officer, who may feel compelled to respond in a manner that could be lethal. In this situation the practice of 'open carry' creates an unsafe environment for all parties involved; the officer, the gun-carrying individual, and for any other individuals nearby as well." (See DOJ 001050)

1    "Additionally, the increase in 'open-carry' calls placed to law enforcement has taxed

2    departments dealing with under-staffing and cutbacks due to the current fiscal climate in

3    California, preventing them from protecting the public in other ways." (See DOJ 001051)

4        The opposite legal interpretation is less plausible.  If anyone could create a "motion picture,

5    television or video production" or "entertainment event" merely by filming themselves in a public

6    place (using an object as small as a cell phone), with no meaningful limitation on the visibility or

7    timing of the firearms display, such an exception would swallow the general prohibition on open

8    carrying of weapons and be inconsistent with the California Legislature's intent to minimize

9    potentially dangerous interactions in public.

10       **INTERROGATORY NO. 17**:  State all facts supporting your interpretation of California

11   Penal Code §§ 26375 and 26405(r).

12       **RESPONSE TO INTERROGATORY NO. 17**:

13       Defendant Becerra incorporates by reference the above-stated general objections as though

14   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

15   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

16   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

17   that is relevant to Plaintiff's claims.

18       Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

19   follows:  Defendant Becerra has not issued an interpretation of California Penal Code §§ 26375

20   and 26405, subdivision (r).  However, the California Department of Justice does possess

21   documents that are related to firearms generally.  See and DOJ 0001282-DOJ 001312.

22       **INTERROGATORY NO. 18**:  Describe in detail all means through which your

23   interpretation of California Penal Code §§ 26375 and 26405(r) has been relayed to municipalities

24   and local governments.

25       **RESPONSE TO INTERROGATORY NO. 18**:

26       Defendant Becerra incorporates by reference the above-stated general objections as though

27   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

28   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

1  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

2  that is relevant to Plaintiff's claims.

3      Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

4  follows:  Defendant Becerra has not issued an interpretation of California Penal Code §§ 26375

5  and 26405(r).  However, the California Department of Justice does possess documents that are

6  related to firearms generally.  See and DOJ 0001282-DOJ 001312.

7      **INTERROGATORY NO. 19**:  Identify all documents reflecting your interpretation of

8  California Penal Code §§ 26375 and 26405(r).

9      **RESPONSE TO INTERROGATORY NO. 19**:

10      Defendant Becerra incorporates by reference the above-stated general objections as though

11  fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

12  vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

13  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

14  that is relevant to Plaintiff's claims.

15      Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

16  follows:  Defendant Becerra has not issued an interpretation of California Penal Code §§ 26375

17  and 26405(r).  Thus, Defendant Becerra is not aware of any documents that would be responsive

18  to this request.  However, the California Department of Justice does possess documents that are

19  related to firearms generally.  See and DOJ 0001282-DOJ 001312.

20      **INTERROGATORY NO. 20**:  Identify all documents reflecting that you have conveyed

21  your interpretation of California Penal Code §§ 26375 and 26405(r).

22      **RESPONSE TO INTERROGATORY NO. 20**:

23      Defendant Becerra incorporates by reference the above-stated general objections as though

24  fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

25  vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

26  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

27  that is relevant to Plaintiff's claims.

28

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: Defendant Becerra has not issued an interpretation of California Penal Code §§ 26375 and 26405(r). Thus, Defendant Becerra is not aware of any documents that would be responsive to this request. However, the California Department of Justice does possess documents that are related to firearms generally. See and DOJ 0001282-DOJ 001312.

**INTERROGATORY NO. 21**: Identify the types of events that qualify as "entertainment events" under California Penal Code §§ 26375, 26405(r), and 25510.

**RESPONSE TO INTERROGATORY NO. 21**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: Defendant Becerra has not issued an interpretation of the types of events that would qualify as "entertainment events" under California Penal Code §§ 26375, 26405, subdivision (r), and 25510. Thus, Defendant Becerra is not aware of any documents that would be responsive to this request. However, the California Department of Justice does possess documents that are related to firearms generally. See and DOJ 0001282-DOJ 001312.

/ / /

/ / /

/ / /

/ / /

Dated: October 23, 2020

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General

/s/ John W. Killeen
JOHN W. KILLEEN
Deputy Attorney General
*Attorneys for Defendant Attorney General
Xavier Becerra*

SA2018100198
34524433.docx

**PROOF OF SERVICE**

I hereby certify that on January 21, 2021, I electronically filed the foregoing document using the Court's CM/ECF system.  I am informed and believe that the CM/ECF system will send a notice of electronic filing to the interested parties.

s/ Gabrielle Bruckner
Gabrielle Bruckner