David W. Affeld, State Bar No. 123922
Brian R. England, State Bar No. 211335
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:     (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

MICHAEL ZELENY,

    Plaintiff,

      vs.

GAVIN NEWSOM, Jr., *et al.*,

    Defendants.

Case No. CV 17-7357 JCS

Assigned to:
The Honorable Richard G. Seeborg

Discovery Matters:
The Honorable Thomas S. Hixson

**DECLARATION OF MICHAEL ZELENY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST THE CITY OF MENLO PARK, POLICE CHIEF DAVE BERTINI, AND THE ATTORNEY GENERAL OF THE STATE OF CALIFORNIA**

Date:          February 25, 2021
Time:          1:30 p.m.
Courtroom:  3, 17th Floor

Action Filed:  December 28, 2017
Trial Date:     TBD

- 1 -

ZELENY DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Michael Zeleny, declare:

1.     I am the Plaintiff in this action.  I have personal knowledge of the facts below.  I could testify competently to these facts if called upon to do so.

2.     I am an academic and a published author in various fields, including logic, history, literature, and technology, as well as an independent performance artist and filmmaker.  I am also an historian and author on the history and design of firearms.  I maintain a popular blog, larvatus.livejournal.com, which has over 85,000 visits from around the world, on which I discuss various topics.  I also use this platform to publish information about my efforts to expose moral corruption and hypocrisy in Silicon Valley.

**A.     Discovery of Min Zhu's Rape of Erin Zhu and NEA's Collaboration.**

3.     In the 1990s, I was business partners and had a personal relationship with Erin Zhu, the daughter of Min Zhu.  Min Zhu is the founder of WebEx Communications ("WebEx").  Erin Zhu confided in me that in the summer of 1988, while her mother was away on travel, Min Zhu had repeatedly raped and sexually abused her.  She also disclosed her father's sexual abuse in a series of online posts.

4.     I began to protest Min Zhu and WebEx in or about 2004, by publicizing Min Zhu's repeated rape of Erin Zhu.  In 2005, I sent a series of emails to New Enterprise Associates ("NEA"), which I understood to be a venture capital fund that had financed WebEx, and was continuing to invest with Min Zhu.  My emails set out Erin Zhu's allegations of childhood sexual abuse, which I believed to be credible.

5.     To my knowledge, Min Zhu has never denied Erin Zhu's allegations.  He settled with Erin Zhu for a confidential sum in 2000, which I learned about due to Erin Zhu's request that I assist her with her contemplated legal action against him.

6.     In 2005, I protested Min Zhu and WebEx at the "WebEx User Conference" in San Francisco.  I was arrested and released without charge.[1]  WebEx cancelled the remainder of the

---

[1] This conference was hosted by the St. Francis Hotel, where I was staying during my protest.  When I began protesting at the hotel, hotel management and the San Francisco Police Department broke into the trunk of my car and found an unloaded rifle, which was properly encased in the trunk.  The police used this as a pretext to detain me and to conduct a psychiatric evaluation.  I was

ZELENY DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1  conference.  Shortly after these protests, I learned from news reporting that Min Zhu had "retired"

2  from WebEx, and moved back to the People's Republic of China.

3         7.     NEA has never responded to my communications nor, to my knowledge, publicly

4  disclaimed its relationship with Min Zhu or acknowledged or spoken out about Erin Zhu's

5  credible allegations.  Instead, it has been publicly reported that (a) NEA invested in two venture

6  funds raised by Northern Light Venture Capital, a Chinese venture capital firm co-founded by

7  Min Zhu; and (b) that NEA's former chairman, C. Richard Kramlich, moved to China to

8  collaborate with Min Zhu after Min Zhu fled the United States for China. NEA's current

9  managing partner, Scott Sandell, has also publicly discussed moving to China with his children.

10         8.     I find NEA's conduct of continuing to back Min Zhu, despite the credible

11  allegations of child rape, and refusal to take a public stand on this issue, to be morally and

12  ethically abhorrent.  I also firmly believe that child rapists, such as Min Zhu, should not be placed

13  in positions of public trust, *e.g.*, as executives of publicly-traded companies.  I find Min Zhu's

14  conduct of raping his daughter, and NEA's conduct of continuing to back him and to help him in

15  covering it up, to be repugnant and unacceptable in our society.

16        **B.**     **Protests Against NEA and Min Zhu**

17         9.     These sincerely-held beliefs have motivated my protests against Min Zhu and

18  NEA, which attempt to expose Min Zhu's behavior and NEA's complicity and continued support.

19        10.     Between 2005 and 2012, I protested Min Zhu, and later NEA and individuals

20  responsible for backing Min Zhu.  These protests have included in person protests and

21  performances, as well as online protests.  Among other things, I created the website

22  www.subrah.com, named after Min Zhu's co-founder of WebEx, which detailed Min Zhu's rape

23  of Erin Zhu and the corporate sponsorship of Min Zhu by NEA and others.

24        11.     Beginning with a protest in 2008, and consistently from approximately 2010

25  through 2012, I focused my protests on NEA and protested outside of its corporate headquarters

26  at an office complex on Sand Hill Road in Menlo Park, California. NEA sued me for trespass in

27

28    pronounced of sound mind and released after several hours.

ZELENY DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

2010.  In response, in 2011, I moved the protests to a public easement near the entrance to the "Rosewood Sand Hill" complex, which houses NEA's corporate headquarters.  I continued to protest at the same location in February, June, and July of 2012.  I have also protested at various other locations in the Bay Area.

12.     In 2012, as discussed below, I was wrongfully prosecuted by the County of San Mateo in connection with my protests.  I stopped the protests at that time due to the ongoing prosecution with the intention of resuming them after the prosecution was over.

13.     Since my acquittal in late 2014, I have sought to resume my protests.  I would do so now, but for the City of Menlo Park, through Police Chief Dave Bertini ("Bertini"), taking the position that I will be subject to arrest and prosecution for openly carrying an unloaded firearm as part of my protests unless I have city approval.

14.     My protests have always been intentionally provocative because I believe this is necessary to draw attention to my message.  I have used explicit, though non-obscene, imagery in my protests, such as cartoon depictions that I had commissioned of Min Zhu's rape of Erin Zhu and financial support from NEA.  A true copy of an example one of the images I is attached as **Exhibit 1**.  I have also used large photographs, posters, and signs of Min Zhu and his enablers, calling them out by name and picture, recognized symbolism indicating pedophilia, metaphorical imagery, as well as words and slogans.  My protests have included signs, large placards and posters, flyers, sandwich boards, and other written materials.

15.     My protests have also included aspects of performance art, which I have used to draw attention to my message.   These elements have involved live musical performances, including accordion, trumpet, and bagpipe players, whom I hired.  During one of my protests, I offered free food to adult industry performers, sex workers, and registered sex offenders "in honor of Min Zhu."

16.     Since 2009, I have videotaped my protests as part of an online film project that I am working on.  I intend to release a full-length film, tentatively entitled *Child Rape Tools*, detailing Min Zhu's conduct and his backing by NEA and others.  Part of my film involves recording the reactions of NEA associates when confronted with the fact that NEA is financially

backing a child rapist.  A trailer of the film is currently available online at

https://www.youtube.com/|watch?v=vFmdaiRnrC8.  My efforts to complete the film have been

stalled by the City's refusal to allow me to resume my protests in their intended form.

17.  Beginning in or around late 2009, I began carrying unloaded firearms as part of my

protests.  The purpose of doing so was to amplify and draw attention to my message and in the

manner of the peaceful armed protests of the 1960s, such as the Black Panther protests in the Bay

Area.  I am a firm believer in the Second Amendment right to bear arms.  I realized early on in

my protests that in the current political climate in California, the presence of firearms draws

significant attention.

18.  Beyond drawing attention and visibly exercising my Second Amendment rights, I

have carried firearms as part of my protests for self-protection and to send a message that I cannot

be bullied, intimidated, or coerced into stopping my criticism and exposure of the heinous

conduct of Min Zhu and NEA.  I began doing so in direct response to a series of death threats that

I received from 1999 through approximately 2008 made on behalf of Min Zhu, which I believed

to be serious and credible.  During this period, my father died in an apartment fire, which started

under suspicious circumstances.  At this time, the Los Angeles Superior Court found the threats

on my life serious enough to condone my carrying a concealed firearm.  The threats echoed

language that Erin Zhu told me Min Zhu had used to coerce her into sexual activity, which led me

to believe that Min Zhu was the source, and that the threats were in response to my activities and

an ongoing legal dispute I had with him and WebEx.  In addition, I learned in litigation against

NEA that NEA had hired private security agents to follow me both in the Bay Area and at my

home in Los Angeles.  I firmly believe that my lawfully and safely carrying firearms is an

essential part of my protests and sends an unmistakable message to NEA and its associates that

they cannot prevent me from exposing their behavior through force or fear.

19.  I have significant training and experience in the safe handling of firearms, and

handle firearms during my protests consistent with best practices.  Among other things, I keep all

of the firearms unloaded and pointed in a safe direction (usually towards the ground).  When

members of the public have expressed concern, I have explained my situation to them and why I

ZELENY DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1   am protesting, stressing that under no circumstances would I initiate any kind of violence.

2       20.     Police officers from the City have come to each of my protests since at least 2010.

3   Most times, one or more officers remained on scene during the entire event.  I have never had any

4   quarrels with them and have never been arrested.  Officers have repeatedly asked me questions

5   about the content and motivations for protesting, and the subject matter of my protests, and I have

6   answered their questions to the best of my ability.  None have ever expressed concern about my

7   handling of firearms.

8       21.     Each time I have protested with firearms in Menlo Park, I have advised local

9   police of my plans and allowed them to inspect all firearms.  I have complied with all time, place,

10  and manner restrictions imposed by police, and all requests regarding my protests, although I did

11  not believe that they were constitutionally valid.  For example, police officers have asked me to

12  move or change the configuration of my signs, and to lower the volume of my musical

13  performances or to stop those performances.  I have complied with all such directives.

14      22.     In one instance, officer Ron Prickett took issue with a series of large posters that I

15  had prepared.  The posters were not sexual in nature but depicted a series of marionettes in

16  contorted positions, which was a metaphorical reference to Min Zhu's rape of Erin Zhu.  Officer

17  Prickett asked me to take the posters down and I complied, despite my belief that this was an

18  impermissible, content-based restriction on my right to free speech.

19      **C.      Criminal Prosecution and Acquittal.**

20      23.     After I moved my protest to the public easement adjacent to the Rosewood Sand

21  Hill complex in or about 2011, the City began placing increasing restrictions on the protests,

22  dictating when, where, and how I could protest.  Although I disagreed with these restrictions, I

23  complied with them so that I would be allowed to continue.

24      24.     On July 19, 2012, the San Mateo County District Attorney's office filed criminal

25  charges against me for carrying a concealed firearm in the course of my protests.  The supposedly

26  "concealed" firearm was a handgun that I prominently carried in a padlocked military belt holster

27  that was designed and manufactured for it, in full compliance with all relevant statutes.

28      25.     The officer who referred the matter for criminal charges had previously inspected

ZELENY DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

the same firearm in the same holster without incident.  In the course of my criminal prosecution, the prosecutor produced a recording of the same officer confirming, during the same event leading to criminal charges, that the handgun was <u>not</u> concealed.  A true copy of a transcript of this recording is attached as **Exhibit 2**, which accurately reflects the content.

26.     The prosecution lasted from 2012 through December 2014.

27.     Representatives of NEA sat in the courtroom throughout my trial.

28.     The Deputy District Attorney who conducted the trial, Jenna Johansson ("Johansson"), met frequently with NEA representatives during breaks, and referred to NEA as "the client" and "her client" during court proceedings.  This pattern became so pronounced that I began taking photos of these meetings between the prosecutor and NEA.   One such photo is attached hereto as **Exhibit 3**.

29.     In response to directives from the court, Ms. Johansson would state that she "needed to talk to [her] client".  She made similar comments throughout the trial.   It was very disturbing that the public prosecutor responsible for my criminal case appeared and claimed to be acting in concert with, and on behalf of, the private entity that I was protesting.

30.     On December 8, 2014, the Honorable Joseph E. Bergeron acquitted me following a bench trial.  A true copy of the verdict is attached hereto as **Exhibit 4**.

### D.     California Enacts the "Open Carry" Ban.

31.     While my criminal proceeding was ongoing, the California Legislature enacted a number of laws that prohibit the "open carrying" of unloaded firearms.  The statutes exempt authorized participants in film and video production and "entertainment events" from the prohibition on open carry.

32.     In the course of my trial, my counsel argued that I was allowed to carry the firearm, in part, because I was participating in an entertainment event or media production. (There are similar exemptions for carrying a concealed firearm).  Ms. Johansson responded that I needed a "Special Events" permit from the City in order for this exemption to apply.

33.     I discovered through date-restricted Google searches that the page of the City of Menlo Park website setting a requirement for "Special Events" permits was created during the

ZELENY DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1   pendency of my case, after my counsel argued the entertainment exemption. A true copy of the

2   search results at issue is attached hereto as **Exhibit 5**.

3       **E.      Zeleny Seeks to Resume His Lawful Protests.**

4       34.      After I was acquitted, I planned to resume my protests of NEA outside its

5   headquarters on Sand Hill Road.  As part of these efforts, I plan to present a live, multimedia

6   performance using a large flat-screen monitor powered by a generator to display animations and

7   images relating to Min Zhu's child rape and NEA's financial backing and continued support of

8   Min Zhu.  I intend to use the same types of non-obscene materials shown at Exhibit 1 and similar

9   images and animations.  As part of the presentation, I also intend to display posters and placards,

10  and a number of rare and unique firearms, which will be unloaded at all times.  I plan to film my

11  multimedia presentation and the reactions of passersby in order to live stream the event as it is

12  happening and to use the footage as part of my ongoing documentary film project about Min Zhu,

13  NEA, and my protests, described above.

14      35.      Given the City's position that I was required to have a permit to conduct my

15  protests, and that I could again be charged with illegally carrying firearms absent a permit, I

16  sought a "Special Events" permit, and later a film permit, from the City of Menlo Park.

17      36.      A true copy of my complete application for a "Special Events" permit, along with

18  my cover email, is attached as **Exhibit 6**.

19      37.      The City denied my application at each stage of the permitting process.  The City

20  has never given time, place, or manner requirements for a permit, or advised me of the criteria for

21  successfully applying for one, although I have repeatedly asked for such clarifications.  I have

22  tried to engage with the City in negotiating time, place, and manner parameters to no avail.

23      38.      In the weeks following my application, I repeatedly called the City to speak with

24  Matt Milde, who was represented as the person responsible for the first stage of permit

25  processing.  He never returned any of my calls.  Instead, the City Attorney responded on the

26  City's behalf via email.

27      39.      Attached as **Exhibit 7** is a true copy of an exchange of emails between myself and

28  City Attorney William L. McClure relating to my permit application.  As set out in this exchange,

I advised Mr. McClure that I would accommodate "any reasonable restrictions" that the City sought to impose on my event, and also requested to "discuss time, place, and manner aspects of my performance." Neither Mr. McClure, nor any other representative of the City, suggested any restrictions or time, place, and manner requirements. Instead, Mr. McClure denied my application shortly after this exchange.

40.     The administrative records of the Special Event permitting process are attached hereto as **Exhibit 8.**

41.     As part of the permitting process, I attended a meeting on August 11, 2016 with Alex MacIntyre, then city manager of Menlo Park, police chief Dave Bertini, and my counsel. During this meeting, Chief Bertini took issue with one of the cartoons of Min Zhu engaged in sexual activity that I proposed to display (Exhibit 1). Chief Bertini stated that this artwork constituted "harmful material" and that I could be in violation of Penal Code § 313.1, displaying harmful material to minors. A true copy of a transcript of this hearing is attached as **Exhibit 9.**

42.     Attached as **Exhibit 10** is a true copy of the letter dated September 5, 2017 from the Menlo Park City Council denying the final appeal of my "Special Events" permit application.

43.     After the City made its final decision on my "Special Events" permit, based on our discussions that a film permit might be appropriate, I asked the City to consider my "Special Events" application as a film permit application, again making clear that I was "open to reasonable time, place, and manner regulations. Ivan Toews addressed my application on behalf of the City. A true copy of my email exchange with Mr. Toews is attached as **Exhibit 11**.

44.     Attached as **Exhibit 12** is a true copy of my application for a film permit, which I filed in 2017. The City has not yet granted or denied the permit.

45.     Attached as **Exhibit 13** is a true copy of an email exchange between an attorney for the City and me.

[Continued on Next Page]

ZELENY DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

46.     I firmly believe that NEA is behind the denial of my applications for permits.  This is consistent with its past practices of using the legal system, law enforcement, and political influence to silence me and other critics.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 20th day of January, 2021 at Los Angeles, California.

*Michael Zeleny*

_____

Michael Zeleny

ZELENY DECLARATION IN SUPPORT OF MOTIONS FOR PARTIAL SUMMARY JUDGMENT

# Exhibit 1



Exhibit 2

**Dispatch recording of Ofc. Foy**





203 Columbus Avenue · San Francisco  94133
toll-free 877-TIGERFISH

**www.tigerfish.com**

**Dispatch recording of Ofc. Foy**

[Beginning of recorded material]

[14771553]

Male Voice:          Hey, how you doing, Michael? Just the morning thing. How's it going?

Michael Zeleny:      Yeah, I brought fewer guns for you to worry about.

Male Voice:          Okay, thanks. That'll make life a little easier.

Michael Zeleny:      Yeah.

Male Voice:          Do you have anything on you right now in here? Is this empty or is this . . .

Michael Zeleny:      No, this is, uh, [locked].

Male Voice:          Okay.

Michael Zeleny:      [Unintelligible].

Male Voice:          No, I understand that.

Michael Zeleny:      [Unintelligible].

Male Voice:          Okay. We'll check these other ones here.

Michael Zeleny:      They're also the same ones.

Male Voice:          Yeah, I know. My-my boss just wanted me coming up here so . . .

Michael Zeleny:      Yeah, I hear you.

Male Voice:          We'll just grab a couple photos. We'll take a look at that. We'll go from there, okay? I'll be right back, all right?

Michael Zeleny:      Okay.

Male Voice:          Thank you.

[Phone rings]

Male Voice:          Sarge.

Male Voice:          Hey, Sarge. So I'm doing some quick research on it, but Internet connection sucks up here.

Male Voice:          Uh-huh. [Affirmative]

Ofc. Foy:            He has a holstered weapon on him, illegal now. However, I go up to inspect it, and it's in a locked holster.

Male Voice:        A locked holster?

Ofc. Foy:        Yeah, exactly. He's got a little mini padlock on it. So I was gonna detain him and possibly 1015 him for violation. But-but it's locked. And so I'm-I'm trying to see if that's a loophole or not.

Male Voice:        Okay. Let me, uh, [get with Bertini] and we'll-we'll research it on this end.

Male Voice:        Okay, sounds good.

Male Voice:        All right, standby.

Male Voice:        All right, bye.

Male Voice:        Hey, it . . .

Male Voice:        Yeah?

Male Voice:        Is it -- is it a revolver? Uh . . .

Ofc. Foy:        Yeah, I think -- I think it's the Luger he has. It's a handgun he carries in like a, uh, a leather strap across his side. And, uh, he had it last year, so he's got it now. The difference is, he's got a little padlock on it. So I don't know if that gives him an out.

Male Voice:          All right, let me check.

Male Voice:          All right. Bye.

Male Voice:          Bye.

[Phone rings]

Ofc. Foy:            [Unintelligible] 426 [unintelligible] extension? Negative. I just may
                     have found some clarification [on point]. Ten-four. [Unintelligible].
                     I'll do that right now. And I was looking at, uh, 12026.1 for
                     clarification under, uh, locked container.

                     So, uh, I was just messaging, uh, Sarge about it. I was prepared to
                     1015 him. But he, uh -- 'cause he's carrying this gun, the holster on,
                     violation [to carry]. I go up, I look at it, he's got a little padlock on
                     it. And, you know, he's a smart guy. He usually knows.

[14771554]

Male Voice:          You in law enforcement?

Michael Zeleny:      For my sins, yes. Back in, uh, '82.

Male Voice:          Where at? Where?

Michael Zeleny: [Unintelligible] [CJIS]. It's, uh -- it was an IT initiative, uh, uh, associated with, uh, an interstate data collection [unintelligible].

Male Voice: Uh-huh. [Affirmative]

Michael Zeleny: You guys are, uh, still defending him, my software actually as far as I know.

Male Voice: All right. [Unintelligible] Stay up here.

Michael Zeleny: Do you like the red one?

Male Voice: It's great. [Unintelligible]?

Michael Zeleny: You going to stay up here?

Male Voice: Um, for . . .

Michael Zeleny: Do you need me to stay up here?

Male Voice: Yeah, why don't you standby for a moment? [Unintelligible] no more [unintelligible]?

Male Voice: [Unintelligible].

Male Voice: In case I -- in case we have to 1015.

Male Voice:           So what's [subra.com] all about?

Michael Zeleny:       It's pretty self-explanatory.

Male Voice:           Is it about this?

Michael Zeleny:       Yeah.

Male Voice:           What is the [unintelligible] complaint or how does it
                      [unintelligible]?

Michael Zeleny:       [Unintelligible] international symbol of, uh, child molesters. So
                      there's some [unintelligible] resemblance involved [unintelligible].

Male Voice:           Yeah, there's like a name for it, like a pedabear or something like
                      that.

Michael Zeleny:       Yeah.

Male Voice:           And, uh, [unintelligible] standing by, I'm just gonna grab some
                      photos of, uh, the serial numbers on the weapons. So let's see, we
                      got this one. We got one or two in here?

Michael Zeleny:       Just one.

Male Voice:           Just one? And then this is the case for that, right? Are these the only
                      ones today?

Michael Zeleny:     Yeah.

Male Voice:         Okay.

Male Voice:         When's the last time you fired it?

Michael Zeleny:     Uh, [unintelligible].

Male Voice:         314, right?

Male Voice:         [Unintelligible].

Male Voice:         I remember.

Michael Zeleny:     This one I don't fire. That one I fire all the time.

Male Voice:         [Unintelligible].

Male Voice:         Yep.

Male Voice:         Yeah, how appropriate.

Male Voice:         Yeah, I know. That's what I was thinking. [Laughs]

Michael Zeleny:     I should quit doing that. It's . . .

Male Voice:          Was that by nature? [Laughs] Or you can put 290.

Male Voice:          [Laughs]

Michael Zeleny:      Uh, actually it happened [unintelligible].

Male Voice:          [Unintelligible].

Male Voice:          What?

Male Voice:          [Unintelligible].

Male Voice:          Oh yeah.

Male Voice:          Oh, 3.14.

Male Voice:          A 314 in our language is, um, um, flashing or something.

Male Voice:          Exposing yourself.

Male Voice:          Okay.

Male Voice:          [Unintelligible].

Male Voice:          290 is a sex offender.

Ofc. Foy:             I believe it was 12026.1 and then there was another code under, uh,
                      WN9, so I'll get that for you in a moment.

Michael Zeleny:       [Unintelligible] drop the hammer by a certain [unintelligible].

Male Voice:           Got it.

Male Voice:           [Almost got it].

Male Voice:           [Unintelligible] this one here?

Michael Zeleny:       Yeah.

Michael Zeleny:       [Unintelligible].

Male Voice:           Well then what, you pull your trigger?

Male Voice:           Yeah.

Male Voice:           [There you go].

Male Voice:           [Cool]. They make this the actual magazine release?

Michael Zeleny:       Yeah.

Male Voice:           Underneath?

Michael Zeleny:     Yeah, you can do [unintelligible] there.

Male Voice:         Yeah. We'll leave it how I found it.

Male Voice:         [Unintelligible].

Male Voice:         I'll grab that one in a sec. How long do you s . . .

[Car honks]

Male Voice:         How long you plan on staying out here today or this week?

Michael Zeleny:     Around sixish.

Male Voice:         Sixish? Tomorrow?

Michael Zeleny:     [Unintelligible] somewhere else. But, uh, uh, I'll, uh, I'll drop you
                    an email [unintelligible] anyway. You'll probably need that empty
                    magazine again.

Male Voice:         Oh really?

Michael Zeleny:     Yeah.

Male Voice:         For this one?

Michael Zeleny:     Actually, you don't 'cause you don't have the [unintelligible].

Male Voice:          This is the, uh -- one of the serial numbers in Farsi?

Michael Zeleny:      No.

Male Voice:          That was a different one?

Male Voice:          All right.

Michael Zeleny:      It's similar to, uh . . .

Male Voice:          Go ahead. I'll take it.

Male Voice:          Go ahead.

Male Voice:          [Eight] en route.

Male Voice:          I'll come back.

Michael Zeleny:      Same make and model.

Male Voice:          Same serial number though.

Michael Zeleny:      No, no, no.

Male Voice:          It's just s-slightly different?

Michael Zeleny:      Yeah.

Male Voice:      Okay.

Michael Zeleny:      The last three digits [unintelligible].

Ofc. Foy:      I know you've done your research to a degree. Are you considering this kind of like your locked container?

Michael Zeleny:      Uh, it covers the gun completely. It's made specifically for that purpose. And I made a lock for that purpose.

Male Voice:      This one right here?

Michael Zeleny:      Yeah.

Male Voice:      Okay.

Michael Zeleny:      Do you want to just bring it out a little bit?

Male Voice:      [Okay, yeah].

Michael Zeleny:      Not going anywhere.

Male Voice:      So you got someone else to cover for you today?

Michael Zeleny:      Oh, just, uh, while I, uh, drain the lizard.

Male Voice:        Got it. Same guy as yesterday?

Michael Zeleny:    Yeah.

Male Voice:        What's his name? Gregory?

Michael Zeleny:    Yeah.

Male Voice:        All right. We'll probably standby just for a little bit longer, and then
                   we'll be out of here, okay?

Michael Zeleny:    [Yeah].

Male Voice:        Ten-four. I'm standing by. What up, G?

Male Voice:        [Jim], what up?

Ofc.. Foy:         Well, when I was rolling up on Zeleny today, which I was annoyed
                   with, um, I saw that he was carrying his, uh, his holster on him.
                   Well -- and I was like, "Dude, there better not be a gun in there."
                   And I'm thinking, maybe he's -- maybe he's just carrying the holster,
                   but-but there's no gun in it. So-so I, uh, I walk up on him, and, uh,
                   and I'm like, "Hey, you know, do you have a gun in there?" I'm like
                   -- he's like, "Yeah." I'm like, "Oh, well motherfuck. I think I'm
                   gonna arrest this guy." And then I go to look at the-the gun case or

his, uh, his holster, and there's a little lock on it now. And I was like -- and I was like --

Male Voice:      It don't matter.

Male Voice:      -- and I was like, "Hmm." Oh no, no. It may matter.

Male Voice:      [Unintelligible] gun [unintelligible].

Ofc. Foy:        No, no. Let me finish. [Laughs] It-it-it-it may matter because, you know, I-I sat down, I tried to do research, but Internet connection sucks up here. So I wasn't able to find anything definitive. I'm trying to think, what is he thinking? He's up on the law. What's going on? And so I messaged, um, [Ed], and I was like, "Hey, maybe you want to get with [Adam 3] or whatever and discuss this amongst you guys. But I'm not sure if the lock makes a difference. So one of the things that I found is under, uh, I think it's 12026.1 basically stating that if you're, uh -- if it's in a locked container, right, like for transport, imagine you're sitting there and you're going from, uh, your car to the, um, to the gun range or whatever, even to your home, you're carrying that gun in a locked container.

Male Voice:      Yeah.

Ofc. Foy:        It could be argued that his holster with a lock on it is a locked container, just a locked container that just so happens to be the shape of a gun; it's not a box. Nothing in the law I said or I saw

showed a box. It just says locked and sealed container. So I think that's-that's the only way, if the D.A. was willing to argue it, would argue that it's not a sealed container because he can't really get to the gun, but it still can be kind of -- the flap can be kind of lifted up to a degree.

Male Voice:        Well get this though. He's not carrying it to and from his vehicle. It's attached to his body. [Unintelligible]?

Ofc. Foy:          It doesn't specify that you need to be carrying it from point A to point B. It's just . . .

Male Voice:        Well then I-I [unintelligible] firearm [unintelligible] concealed that you can't see it.

Ofc. Foy:          Wait, what's that?

Male Voice:        Is it so concealed that you can't [see] the firearm?

Ofc. Foy:          Oh no, I mean, you can tell. And I don't think that there's, uh -- I don't think that that -- that it was drawing an issue. Any -- you just can't carry it on your person. This isn't a concealed law; this is an open carry law that, uh, that he'd be in violation of.

Male Voice:        Oh, the reason why I'm asking -- I-I'm not arguing with you, I'm just trying to help you.

Ofc. Foy:            Yeah. Oh no.

Male Voice:          [Unintelligible] holster that's concealing the firearm, and it's
                     carrying -- he's carrying it on his person. That's now a concealed
                     firearm. That's not an open carry. So [unintelligible], you have an
                     open and visible firearm on your -- on your body.

Ofc. Foy:            I-I know what you were saying, but I don't feel that -- that-that
                     would be like arguing in court that someone carrying a gun in a
                     sealed and locked box is carrying a concealed firearm. Yes, it's
                     concealed in a box, but that doesn't mean it's a concealed carry
                     violation. So . . .

Male Voice:          The difference though -- the big difference though is that when you
                     carry a box from your house to your car, it's not attached to your
                     body. You can easily take it off.

Ofc. Foy:            I-I -- yeah, I agree with you on that. But at least as far as what I
                     read, it didn't say whether it's a -- it didn't mention whether it's
                     attached to your body or not. I don't know if that -- if that
                     distinction is to be made.

Male Voice:          [Unintelligible].

Ofc. Foy:            I definitely see what you're saying, for sure, dude. So and I -- that's
                     the whole thing. It's-it's probably something that especially since
                     this is a newer law regarding open carry, it's probably something

|              |                                                                                                                              |
| ------------ | ---------------------------------------------------------------------------------------------------------------------------- |
|              | where they, uh -- where they're going to have to flush it out a little bit more.                                              |
| Male Voice:  | I think it's one of those things that, uh, end up being state law on.                                                         |
| Ofc. Foy:    | Yeah, e-exactly, and I think he's fine with that. I think he wants to be a part of that.                                      |
| Male Voice:  | Yeah, I think so too. [Unintelligible] and all that stuff.                                                                    |
| Ofc. Foy:    | Yeah.                                                                                                                         |
| Male Voice:  | [Unintelligible].                                                                                                            |
| Ofc. Foy:    | Even when I was thinking about arresting him, like, well how do I do this low key so I don't give him the satisfaction of making it a big deal? |
| Male Voice:  | Yeah.                                                                                                                        |
| Ofc. Foy:    | So, uh, but I -- now Ed's coming up, and you heard him ask for like a video camera. So I don't know if he wants to videotape when we arrest him or what, so we'll see. |
| Male Voice:  | [Unintelligible].                                                                                                            |
| Male Voice:  | So . . .                                                                                                                     |

Male Voice:          All right, [unintelligible].

Ofc. Foy:            All right, buddy. I'll see ya. Bye.

[14771555]

Ofc. Foy:            Hi, Michael. Thanks for being cool. We're just going to take, uh,
                     some pictures of your unique holster.  Is that okay? Open it up, take
                     a look at that, okay? I'm just gonna grab some photos of you.

Michael Zeleny:      If there's any problem with this, I can put it back in there and lock it
                     up.

Male Voice:          Oh, we appreciate that.

Male Voice:          We're just going to take some pictures.

Michael Zeleny:      Michael, [unintelligible].

Male Voice:          Is that a homemade little, uh, locking mechanism there?

Michael Zeleny:      Yeah, [unintelligible].

Male Voice:          I'm going to go ahead and, uh, [unintelligible] the key as well.

Michael Zeleny:      [Right here].

Male Voice:            Careful with that camera.

Ofc. Foy:              Thank you very much.

Michael Zeleny:        No problem.

Male Voice:            Will you hold this please?

Male Voice:            Yes.

Male Voice:            And can you put this [unintelligible]?

Male Voice:            Take pictures of the moon with that thing.

Michael Zeleny:        Mm, actually the lens is not that long.

Male Voice:            Well, it's a [unintelligible].

Male Voice:            [Unintelligible].

Ofc. Foy:              Actually, that just sort of comes off [unintelligible].

Ofc. Foy:              I'm just going to take a -- put it in there?

Male Voice:            Yeah.

Male Voice:        [Unintelligible] just sort of in there, and no one's like
                   [unintelligible] anything back [unintelligible].

Male Voice:        Yeah, [unintelligible].

Male Voice:        Let's just lift this part.

Male Voice:        Uh, I'm just gonna rest this on there. I want to take a picture of
                   [unintelligible].

Ofc. Foy:          So did you come up with this concept for, uh, for locking it
                   yourself, Mr. Zeleny?

Ofc. Foy:          Is this something you've seen on the Internet or just something
                   you're familiar with, you know how to use tools or . . .

Michael Zeleny:    Uh, should I even answer this question?

Ofc. Foy:          It's out of curiosity more than anything.

Michael Zeleny:    I understand but --

Ofc. Foy:          It's up to you.

Michael Zeleny:    -- it's nothing that's going to be used against me?

Ofc. Foy:          Well you're not under arrest.

Michael Zeleny:      Okay. Um, I guess I better not answer.

Ofc. Foy:               Okay.

Michael Zeleny:      If you've got a problem with it, again, uh, I can lock it up in the
                     case.

Male Voice:           [Unintelligible].

Male Voice:           I don't know. [I think I put it back].

Male Voice:           [Unintelligible].

Male Voice:           Uh, [unintelligible].

Male Voice:           [Unintelligible] little black containers.

Male Voice:           Um . . .

Male Voice:           [Unintelligible]. I'm not sure.

[End of recorded material]

# Exhibit 3



Exhibit 4

SUPERIOR COURT OF
CALIFORNIA
San Mateo County

Honorable Joseph E. Bergeron
400 County Center, 2B
Redwood City, CA 94063

**FILED**
SAN MATEO COUNTY

DEC 5 2014

Clerk of the Superior Court
By _____
DEPUTY CLERK

### SUPERIOR COURT FOR THE STATE OF CALIFORNIA

### FOR THE COUNTY OF SAN MATEO

THE PEOPLE OF THE STATE OF
CALIFORNIA

        Plaintiff,

    V.

Michael Zeleny,

        Defendant

CASE NO. SM382036A

**VERDICT IN COURT TRIAL**

I find the Defendant, Michael Zeleny, NOT GUILTY of PC 25400.

His weapon was properly holstered in the holster which was manufactured for that very weapon.

Dated: December 5, 2014

HON. JOSEPH E. BERGERON

**AFFIDAVIT OF MAILING**

DOCUMENT TITLE:    VERDICT IN COURT TRIAL
CASE NAME:         PEOPLE   VS MICHAEL ZELENY
CASE NO.           SM382036A


__X___ I declare under penalty of perjury that I am over the age
     of 18 and I am not a party this action and on the
     following date I caused to be deposited in the United
     States Post Office mailbox at Redwood City, a true copy of
     the foregoing document, enclosed in an envelope, with the
     proper and necessary postage prepaid thereon, and
     addressed as follows:


Affeld Grivakes Zucker LLP
David w. Affeld
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067


Ryan J. King
1934 Divisadero Street
San Francisco, CA 94115


Jenna Johansson
Steve Wagstaffe
400 County Center, 4th Floor
Redwood City, CA 94063


     Executed on December 5, 2014, at Redwood City, California.

                         John C. Fitton, Executive
                         Officer/Clerk


                    By: _____
                         Deputy

-1-

Exhibit 5

site:menlopark.org "Events occurring for more than 1 day"

+Michael                    Share

Web    News    Images    Shopping    Videos    More ▾        Search tools

Before Apr 21, 2014 ▾    Sorted by relevance ▾    All results ▾    Clear

No results found for **site:menlopark.org "Events occurring for more than 1 day"**.

Results for **site:menlopark.org Events occurring for more than 1 day** (without quotes):

[PDF] **Association MOU, July 1, 2011 – June 30, 2013 (pdf)**
www.menlopark.org/DocumentCenter/View/1547 ▾    Menlo Park ▾
Jun 30, 2013 - cost, or attorneys' fees in the **event** of any action in which the City is named as a .... 5.1.1 Designation of which **one** full **day** on either December 24 or December .... An officer shall be allowed regular pay for not **more than** three (3) working **days** when ..... **day** payroll cycle **occurring** closest to June 1, October 1 and February 1.

**Special Events | Menlo Park, CA - Official Website**
www.menlopark.org/241/Special-**Events** ▾    Menlo Park ▾
Dec 28, 2005 - See what special **events** and concerts are going on in and around Menlo Park. ... **1**. Trevor Tyler. 105 points. 2. Thierry Depeyrot. 105 points. 3. Karen. 9 points ... **More than** providing residents with venues for fun, play and celebration, ... Kite **Day** Saturday, May 2, 2015 - Noon to 3 p.m.. Bring your own kite or buy a kite from ...

[PDF] **2014 Mini & Menlo Madness Camp Brochure - City of Me…**
www.menlopark.org/DocumentCenter/View/3925 ▾    Menlo Park ▾
Jan 3, 2012 - Page **1** ... Campers **days** will be filled with outdoor and team games, arts & crafts, field trips, sports, gymnastics, special **events**, swimming, cooking, and much more! ... Are you wondering why holidays can't come **more than** once a year?

[PDF] **Team Sheeper Lease Agreement 2011 - City of Menlo Park**
www.menlopark.org/DocumentCenter/Home/View/1058 ▾    Menlo Park ▾
Mar 24, 2011 - State of California, as **more** particularly shown in Exhibit A, attached hereto and incorporated ... Pool on the first **day** of each month for the first year of the Term. .... In the **event** of a third party dispute or conflict arising out of or related to this. Lease .... failure or damage where the cost is less **than** One Thousand Five Hundred.

[PDF] **4.10 Noise - City of Menlo Park**
www.menlopark.org/DocumentCenter/View/414 ▾    Menlo Park ▾
Apr 15, 2011 - Background noise levels change throughout a typical **day**, but do so gradually, ... The addition of short duration single **event** noise sources (e.g., aircraft flyovers, motor vehicles, sirens) ... increases in A-weighted noise level, the following relationships **occur**: .... considered **more** sensitive to ambient noise levels **than** others.

[PDF] **Minutes - City of Menlo Park**
www.menlopark.org/AgendaCenter/.../01132014-1289 ▾    Menlo Park ▾
Jan 13, 2014 - (FAL) for a parcel with less than 5,000 square feet of lot area in the R-1-U (Single Family .... that **day**, requested landscaping at the back of the lot to include fast growing trees with .... Mr. Satvatmanesh said he paid $300,000 **more than** the asking price for this property and he .... The **event** would **occur** on Wednesday.

[PDF] **3.8 NOISE - City of Menlo Park**
www.menlopark.org/DocumentCenter/View/2652 ▾    Menlo Park ▾
Dec 13, 2011 - does not depend on the time of **day** during which the noise **occurs**. .... Vibration acceptable only if there an infrequent number of **events** per **day**. ..... permanent increase in roadway traffic noise levels of **more than** 1 dBA over baseline ...

[PDF] **Association MOU, July 1, 2011 – June 30, 2013 (pdf)**
www.menlopark.org/DocumentCenter/View/1544 ▾    Menlo Park ▾
Jul 1, 2011 - the Chief of Police or his or her designee prior to the first **day** of class. .... pay for a period not less than four weeks nor **more than one** (**1**) year, during which ....

7.1.2 In the **event** that any of the aforementioned **days**, except December 24 or 31. ....
reduction in pay for change in assignment which **occurs** in the course of regular.

**[PDF]** Transportation Impact Analysis Guidelines - City of Menlo ...
www.menlopark.org/DocumentCenter/Home/View/302 ▾ Menlo Park ▾
Aug 5, 2006 - **1**. A Project is considered to have a potentially "significant" traffic impact if
the addition of ... the addition of project traffic causes an increase of **more than** 0.8
seconds of .... or more. ADT becomes. 1,350 veh / **day** or more. Potentially. Significant
... may **occur** as a result of the addition of project traffic (provide table comparing.

**[PDF]** EIR Addendum - City of Menlo Park
www.menlopark.org/DocumentCenter/View/2622 ▾ Menlo Park ▾
Feb 15, 2013 - Figure 3.3-3 Viewpoint **1**: View of Revised Project with Temporary Tent
**Event** . .... are substantially different **than** assumed or described in the EIR. ..... 210 trips
per **day**, with the **most** trips **occurring** during the grading stage when soil would be ...

**1** 2 3 4      Next

○ Los Angeles, CA - From your phone (Location History) - Use precise location - Learn more

Help     Send feedback     Privacy & Terms

Case 3:17-cv-07357-RS Document 152-1 Filed 01/08/19 Page 44 of 26

site:menlopark.org "Events occurring for more than 1 day"

+Michael          4          Share

Web    News    Images    Shopping    Videos    More ▾          Search tools

Before Apr 22, 2014 ▾    Sorted by relevance ▾    All results ▾    Clear

### Special Event Permits | Menlo Park, CA - Official Website
menlopark.org/292/Special-Event-Permits ▾    Menlo Park ▾
Apr 22, 2014 - ... Events needing Police regulation, monitoring or control; **Events occurring for more than 1 day**; Generate a crowd of spectators sufficient in size to obstruct, ...
You visited this page on 9/12/14.

○ Los Angeles, CA - From your phone (Location History) - Use precise location - Learn more

Help    Send feedback    Privacy & Terms

Exhibit 6

| From: | larvatus@gmail.com on behalf of Michael Zeleny |
| To: | McClure, William; Scott Sandell; Milde, Matt L; Police Chief |
| Cc: | David W. Affeld; Peter Shimamoto |
| Subject: | Special Event Permit Application |
| Date: | Friday, July 10, 2015 11:05:37 AM |
| Attachments: | Special Event Permits - Completed Application - signed.pdf |

Michael Zeleny
michael@massmeans.com
zeleny@post.harvard.edu
7576 Willow Glen Road, Los Angeles, CA 90046
voice:323.363.1860
fax:323.410.2373

City of Menlo Park
Matt Milde
Recreation Program Coordinator
mlmilde@menlopark.org
701 Laurel Street
Menlo Park, CA 94025
voice:650.330.2223
fax:650.330.2242

By email, fax, and postal mail.

Starting in October 2015, we shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu, and continuing until NEA publicly acknowledges its wrongdoing and severs its relationship with Min Zhu, Scott Sandell, and Dick Kramlich. I shall be present on site around the clock, served by support staff and equipped with fully operational, exposed and unloaded military grade firearms and loaded ammunition feeding devices therefor, including without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a 7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed Browning M1919a4, in full compliance with all applicable laws. A 55" portable media display powered by a portable gas generator will display videos featuring explicit representations of sexual violence committed by NEA's publicly disgraced protégé. A sample image can be found at http://larvatus.livejournal.com/371973.html. All media aspects of this event will be subject to content-neutral regulation negotiated with Menlo Park authorities. My fundamental rights under the First and Second Amendments of the Constitution of the United States are reserved and non-negotiable.

A site map can be found at https://www.google.com/maps/@37.4197308,-122.2137188,17z/. My display will be confined to the median strip on Sand Hill Road directly across the NEA headquarters. No obstruction of automotive or foot traffic will take place. Please contact me to arrange for the payment of the special event fee and discuss any organizational matters. Please address all legal inquiries and requests to David W. Affeld, Affeld Grivakes Zucker LLP, 2049 Century Park East, Suite 2460, Los Angeles, CA 90067, voice:310.979.8700, fax:310.979.8701.

cc:

Bill McClure
Menlo Park City Attorney
wlm@jsmf.comvoice:650-330-6610
Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA 94025
voice:650.324.9300
fax:650.324.0227

Robert Jonsen
Menlo Park Police Chief
policechief@menlopark.org
701 Laurel St.
Menlo Park, CA 94025
voice:650.330.6600

Scott Sandell
New Enterprise Associates
ssandell@nea.com
2855 Sand Hill Road
Menlo Park, CA 94025
United States
voice:650.854.9499
fax:650.854.9397

—

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los
Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373
http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No
matter. Try again. Fail again. Fail better." — Samuel Beckett

MP000235



# CITY OF MENLO PARK
## Special Event Application
701 Laurel Street, Menlo Park, CA 94025  Ph: 650-330-2223  Fax: 650-330-2242

| | |
|---|---|
| Applicant Name:  Michael Zeleny | |
| Organization Name:  Mass Means, Inc. | |
| Name of Event:  Child Rape Tools | |

| | | | |
|---|---|---|---|
| Address: 7576 Willow Glen Rd | City: Los Angeles | State: CA | Zip: 90046 |

| | |
|---|---|
| Home Phone: 323-363-1860 | Alternate Phone: none |
| E-mail Address: zeleny@post.harvard.edu | Fax: 323-410-2373 |
| Estimated Attendance: drive-by only | Event open the public: Yes ☒ No ☐ |
| Number of Event Staff: 1 | Number of Event Volunteers: 5 |

| | |
|---|---|
| Purpose of Event:  Outing New Enterprise Associates as the corporate sponsors of incestuous child rapist Min Zhu. | |

| | |
|---|---|
| Location of Event (please be specific and attach map): 2825 Sand Hill Rd, Menlo Park, CA 94025, at the median strip, per the attached. | |

| Event Timeline | Day | Date | Start Time | End Time | Total Hours |
|---|---|---|---|---|---|
| *Set up/Preparation* | Wed | 9/30/2015 | 9 a.m. | 10 p.m. | 13 hours |
| *Special Event* | Thu | 10/1/2015 | 7 a.m. | ongoing | indefinite |
| *Tear down/Clean up* | | | | | |

| | | |
|---|---|---|
| Do you plan to use a City building or park? Yes ☐ No ☒<br>City Facility Reservation Permit Included: Yes ☐ No ☒  Pending ☐ | Do you plan to use Private Property: Yes ☐ No ☒<br>If yes, provide address of location: | If yes, do you have written approval from Private Property owner: Yes ☐ No ☐ |
| Any City streets closed? Yes ☐ No ☒    Any sidewalks blocked? Yes ☐ No ☒<br>Name of streets: | | Traffic Control Plan Included:<br>Yes ☐ No ☐ N/A ☒ |

| | |
|---|---|
| Renting barricades from City: Yes ☐ No ☒ | Park sprinklers turned off:  Yes ☐ No ☒ |
| Amplified sound (i.e. Music, PA system):  Yes ☒ No ☐    Time of use: 7 a.m. to 9 p.m. | |
| Temporary lighting:  Yes ☒ No ☐    Please describe: Portable spotlights focused on display. | |
| Charge for event: Yes ☐ No ☒ $_____/person | Event is reoccurring more than annually?: Yes ☐ No ☐ |
| Is this event a fundraiser: Yes ☐ No ☒ | Proof of 501c3: Yes ☐ No ☒ |
| Will alcohol be served: Yes ☐ No ☒<br>Will you be selling alcohol:  Yes ☐ No ☒ | ABC Permit Attached: Yes ☐ No ☐ Pending ☐ |
| Will food be served: Yes ☐ No ☒<br>Will you be selling food: Yes ☐ No ☒ | I will apply for San Mateo County Temporary Event Food Permit:   Yes ☐ No ☒ Pending ☐ |
| Selling any other items: Yes ☐ No ☒<br>Describe: | Menlo Park Business License:<br>Yes ☐ No ☒ |
| Will portable rest rooms be provided:<br>Yes ☒ No ☐ | No. of portable toilets ___1___<br>No. of ADA compliant portable toilets ___0___ |
| Will you be using a tent, canopy, or other temporary structure? Yes ☒ No ☐ | Please describe: Canopy to be erected at the median strip of Sand Hill Rd. |

MP 000236

**SECTION 2: EVENT NARRATIVE**

**Event Description**
Briefly provide a description of the event, including activities, timeline, and sequence of events:

Starting in October 2015, we shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu. I shall be present on site around the clock, equipped with fully operational, exposed and unloaded firearms and loaded ammunition feeding devices therefor, in full compliance with all applicable laws. All media aspects of this event will be subject to content-neutral regulation negotiated with Menlo Park authorities.

**Parking**
Describe where event participants are expected to park their vehicles:

Off-site parking only; all on-site transportation to be provided to drop off and pick up the participants.

**Security / Emergency Action Plan**
Describe the security plan, including crowd control (including the security company name, contact information, and the amount of security personnel):

No need for crowd control is anticipated, owing to the lack of sidewalks and no stopping allowed on the Sand Hill roadside. Participant assumes full personal responsibility for the lawful defense of the site.

**Americans with Disabilities (ADA) compliance**
Describe how the event will be accessible to people with disabilities (such as parking, restrooms, and accessible path of travel to all event functions):

N/A.

**Recyclables and garbage handling**
Describe the plan for cleanup and removal of recyclable goods and garbage during and after the event (include if additional street sweeping will be arranged).

All garbage generated by the event will be picked up promptly and removed from the site daily for sanitary and lawful disposal.

***Please note:*** For larger events where additional garbage removal will be needed, please contact Recology at www.recologysanmateocounty.com or call (650) 595-3900. Failure to remove trash from event will result in a $250 fine.

## SECTION 3: SITE MAP CHECKLIST

Please provide a **detailed** site plan/route map of the event on a separate sheet.  If site map is larger than 11x17 size paper, please provide SIX (6) copies of this map in application packet. The map should include the following information:

| Yes | N/A | |
|-----|-----|-|
| ☒ | ☐ | Outline of event site, including names of streets or areas that are a part of the venue and surrounding area.  If the event includes a moving route (i.e. parade or run), indicate the direction of travel and start/finish locations. |
| ☐ | ☒ | Any street or lane closures |
| ☐ | ☒ | The locations of fencing, barriers or barricades. |
| ☐ | ☒ | Location of first-aid facilities |
| ☒ | ☐ | Location of all stages, platforms, booths, food areas, trash containers, tents, etc (include dimensions) |
| ☒ | ☐ | Generator locations and/or source of electricity |
| ☐ | ☒ | Placement of vehicles or trailers used for the event (include dimensions) |
| ☐ | ☒ | Anticipated parking locations and number of parking (include ADA parking) |
| ☒ | ☐ | Placement of promotional signs or banners |
| ☒ | ☐ | Placement of portable restrooms (including labeling ADA restrooms) |
| ☐ | ☒ | Exit locations for events with fences |
| ☒ | ☐ | Location of all event activities |
| ☒ | ☐ | Location of temporary lighting |
| ☒ | ☐ | Location of sound system |
| ☒ | ☐ | Fire truck access to existing building/structures shall remain clear and unobstructed (20 feet minimum) |
| ☒ | ☐ | Fire equipment shall remain clear and unobstructed (25 feet minimum) |
| ☐ | ☒ | For large event, traffic impact and traffic handling plan including re-routing of vehicles, bicycles, and pedestrians. |

**Note:** Incomplete and vague site maps will delay the permit process.


## SECTION 4: INSURANCE INFORMATION

 A Certificate of Liability Insurance must be provided and must contain the following:
- The special event permit name must be listed as the one "insured."
- The policy must not expire before the planned event date.
- The policy must be for a minimum of $1,000,000 unless otherwise specified.
- The "description" should list the rental location, day, and event planned.
- The City of Menlo Park at 701 Laurel Street, Menlo Park, CA 94025 must be noted as "additional insured."

A special event permit **will not** be issued until the required application fees, insurance, and other supplementary materials, as indicated in the Special Event Application, have been received. A special event permit issued for a private function on private property is not required to submit proof of liability insurance to the City.

**SECTION 5: PUBLIC NOTIFICATION**

Public Notification will be required for some permits based on your application.  If noise ordinance is exceeded, the Planning Division will prepare a public notice to be mailed to all property owners, residents, and businesses within 300 feet of the subject property.  The notice will state the decision of the City and will serve as the noise permit unless the request is appealed.  The Planning Division will mail the notices on the decision date, which starts the 10-day appeal period.  If the Planning Division does not receive an appeal in writing, the decision will be become effective on the 11th day.  If the decision is appealed, the item will be scheduled for the next available Planning Commission meeting.  The Planning Commission generally meets on the first and third Mondays of every month.  The minimum lead-time between an appeal and a Planning Commission meeting is approximately 3-weeks.  The decision will also be posted at the Civic Center and on the City's web page: www.menlopark.org.

**SECTION 6: FIRE DISTRICT NOTIFICATION**

If necessary, you will be asked to seek approval of the Menlo Park Fire Protection District. They will be informed of any street closures and other impacts to emergency services.  Please keep in mind that there are several streets within Menlo Park that cannot be closed because they are deemed primary response routes. You must receive Conditional of Approval from the City prior to contacting the Fire District.

**SECTION 7:  POLICE STAFFING**

For events requiring Police assistance, the Police Department will review the application and be involved in the initial meeting with the applicant.  Based on the details for the event, the Police Department will provide an estimate of costs based on the number of officers needed and hours needed at the event (payment of 50% of estimated Police services is due before your permit can be issued). Post event, an invoice will be provided by the to the applicant for Police services (based on incurred costs, minus any pre-paid amount). Any additional costs incurred that were not anticipated such as extra staffing or longer hours will be billed to the applicant.  All payments are due to the Menlo Park Police Department by contacting Sgt. Matt Ortega at (650) 330-6347. Non-payment for Police assistance after the event will result in the inability to apply for a special event permit in the future, until any balance is paid in full.

**SECTION 8: PARK USAGE**

Rental fees for special events held on city parkland, picnic areas, or tennis courts may be applied and are subject to availability. Please review the city's Master Fee Schedule for current park usage fees. Additionally, the organizing party of an event held in these areas is responsible for following all park rules, usage guidelines, and city ordinances. Sharon Park is reserved for weddings only.

**SECTION 9: SOUND**

Approval of a Special Event permit does not necessarily exempt the planned event from the requirements of Chapter 8.06 (Noise) of the Menlo Park Municipal Code. All sources of sound measured from any residential property shall not exceed 50 dBA during the "Nighttime" hours, or 60 dBA during the "Daytime" hours. Nighttime hours are considered the period between 10 p.m. and 7 a.m. daily. If you believe your planned event could exceed the noise limitations set by Chapter 8.06 of the Municipal Code, please discuss the noise permitting requirements with a member of the Planning Division. A noise permit can be obtained as part of the Special Events permit application, subject to review and action by the Planning Division and the public notification and appeal process set forth in Section 5. The Planning Division can be reached at (650) 330-6702 or by email at planning@menlopark.org.

**SECTION 10: CONFIRMATION**

Please check all that apply:

- ☒ I have read all policies regarding the Special Event Application process.
- ☒ I have reviewed the Special Event Permit FAQs.
- ☒ I have read and will abide by all Sections as written and described herein.
- ☒ I am submitting the most current version of the Special Event Permit Application found at: www.menlopark.org/eventpermits
- ☒ I am providing the correct payment with my application.
- ☒ I have filled out all portions of this application completely and to the best of my knowledge.

MP000239

I hereby certify and agree that I shall be personally responsible on behalf of myself/organization for any damage sustained by the facility, property, or equipment, as a result of the occupancy of said facility or property by my group/organization.  I hereby waive, release, discharge and agree to indemnify, defend and hold harmless the City, its officers, employees, and agents from and against any and all claims by any person or entity, demands, causes of action or judgments for personal injury, death, damage or loss of property, or any other damage and/or liability occasioned by, arising out of out of the event for the actions (active or passive) of invitees', event participants, event sponsors, and event spectators while on the property, or resulting from this reservation of the facilities or use or property. I hereby declare that I have read and understand and agree to abide by and to enforce the rules, regulations, and policies affecting the use of the facilities or property. If any portion of the Special Event is held on non-city owned property I have included letters of approval for each respective property owner.

_____          10 July 2015
Signature of Applicant                                    Date

**Payment Information:**

☐ Cash   ☒ Check   ☐ Visa   ☐ Mastercard          Amount __$250____ ($125 minor / $250 major)

Account # _____  Exp. _____  Account Holder Name _____

I agree to pay the above charges and authorize the City of Menlo Park to charge these costs to my credit card. Checks payable to: City of Menlo Park.
Authorized Signature: _____

*Note: There is a $30 charge for returned checks. Additional fees from other city departments may be required before permit maybe issued, please refer to the Master Fee Schedule for updates on current fees.*

---

**Office Use Only:**

Date Permit Submitted: _____     Project No. _____

Permit Payment: $_____  Date _____     Processed By _____

| Approval: | Department | Received | Fee | | Paid | Signature | Date |
|---|---|---|---|---|---|---|---|
| | Police | _____ | __(50% Est.)__ | | ☐ | _____ | _____ |
| | Planning | _____ | _____ | | ☐ | _____ | _____ |
| | Public Works Engineering | _____ | _____ | | ☐ | _____ | _____ |
| | Public Works Maintenance | _____ | _____ | | ☐ | _____ | _____ |
| | CSD/Recreation | _____ | _____ | | ☐ | _____ | _____ |
| **REQUIRED:** Yes ☐ No ☐ | Fire District | _____ | _____ | | ☐ | _____ | _____ |

**Event Permit Coordinator:** _____
☐ Application Initial Review Complete
☐ E-mail Acknowledgement Sent to Applicant          (Date: _____)
☐ Application Sent to Permit Committee
☐ Site Map Complete
☐ Insurance Certificate Provided
☐ Other Agencies Permits Included
☐ Public Notification Complete
☐ Approved to exceed noise ordinance:  ☐Yes ☐No
☐ Staff Approvals Complete
☐ Traffic Control Plan Approved (Street closures only)
☐ Conditions-of-Approval or Denial Letter Sent       (Date: _____)
☐ Other Department Fees Paid
☐ Barricade Rental Information (Requesting _____ 3' barricades and _____ 12' barricades)
☐ Final Copies Sent to Approving Staff

**Special Event Permit Application Approval:**

_____          _____
Signature of Permit Coordinator          Date

Updated: 07/24/14

MP000240

Exhibit 7

| From: | larvatus@gmail.com on behalf of Michael Zeleny |
| To: | McClure, William |
| Cc: | David W. Affeld; Peter Shimamoto; Scott Sandell; Milde, Matt L; Bertini, David C; Ortega, Matthew K; Jonsen, Robert |
| Subject: | Re: Special Event Permit Application |
| Date: | Thursday, September 03, 2015 8:21:15 AM |

Dear Mr McClure,

I trust that the past five weeks have sufficed for you to review this matter. <mark>Either you agree in principle to grant my application and proceed to discuss time, place, and manner aspects of my performance, or we redirect to a judicial venue. Which way do you prefer?</mark>

—

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373
http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No matter. Try again. Fail again. Fail better." — Samuel Beckett

On Tue, Jul 28, 2015 at 3:57 PM, Michael Zeleny <zeleny@post.harvard.edu> wrote:
> Dear Mr McClure,

Thank you for your response. I am hoping we can continue this conversation in a constructive and conclusive fashion. <mark>As a reminder to your clients and colleagues, I am publicizing and protesting death threats against me and my family, received in the course of a business dispute with, and in the names and on behalves of, WebEx Communications its daughter-raping co-founder Min Zhu.</mark> These threats were implicitly endorsed and expressly ratified after the fact by their erstwhile board members and ongoing investors, New Enterprise Associates (NEA). The object of my exercise is to educate and entertain, combining remedial instruction of NEA personnel and associates in business ethics with amusing exposure of its ongoing breach to the passerby. <mark>All onsite interactions will be subject to audiovisual recording, live webcast, and eventual incorporation into a feature documentary.</mark> You may think of this project as an application of disruptive technology to venture capitalist business as usual. Please note its nature of a video production in the course of an entertainment event, which give rise to clearly established statutory exemptions from California law regulating the possession of firearms in public.

To answer specific questions:

1. As stated, my display will be confined to the median strip on Sand Hill Road directly across the NEA headquarters. I assure you that it will be bounded with a safe margin for automotive and foot traffic and no obstructive or threatening acts or displays of any kind will take place. Beyond that, I do not believe that you can require me to lay out my location and its dimensions down to the last inch. In this, and many other matters to follow, reasonable men can disagree. Any and all residual disagreement between us will be subject to an application for declaratory relief in the United States District Court for the Northern District of California.

2. As stated, I intend to occupy the site of my performance around the clock until NEA publicly acknowledges its wrongdoing and severs all its relations with Min Zhu, Scott Sandell, and Dick Kramlich. <mark>As to the lighting and audiovisual display parameters, I will accommodate any reasonable restrictions you and your colleagues put forth as the authors of Menlo Park regulations, ostensibly constructed for my benefit in the course of previous litigation. It would be unproductive of me to second-guess you in this matter, and you, to demand the minute details of my proposal only to deter it with *ad hoc* obstacles.</mark> I specifically invite you to consider the matter of videos featuring explicit representations of sexual violence, in the context of their "serious literary, artistic, political, or scientific value" as per *Miller v. California*, 413 U.S. 15 (1973). If you are unable to determine this value by consulting NEA, we shall gladly establish it through testimony to be elicited in the ensuing litigation. In this connection, please bear in mind *Terminiello v. City of Chicago*, 337 U.S. 1 (1949), wherein the United States Supreme Court held speech that "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance" to be protected under the First and Fourteenth Amendments to the United States Constitution.

3. Lastly, my assumption of full personal responsibility for the lawful defense of the site is meant to allay a concern expressed by Menlo Park Police on previous occasions, justifying its presence on site by positing that

my firearms might come to be stolen from me in the course of my peaceful public protests. In this regard, please note that lawfully carrying a firearm does not constitute "reasonable suspicion" justifying a Terry stop. This applies in the context of California statutes that specifically allow the possession of a firearm "by an authorized participant in a motion picture, television, or video production, or an entertainment event, when the participant lawfully uses the firearm as part of that production or event, or while going directly to, or coming directly from, that production or event." In this regard, I expect you to observe all legal constraints on police action. As per *Kolender v. Lawson*, 461 U.S. 352 (1983), "a person who is stopped on less than probable cause cannot be punished for failing to identify himself." Also see *Arizona v. Hicks*, 480 U.S. 321 (1987) ("Warrants only issue upon a showing of probable cause; thus, probable cause to believe an item in plain view is contraband or evidence of criminal activity must be required.") Please note that an anonymous tip that a person is carrying a gun is not sufficient to justify a police officer's stop and frisk of that person, even where descriptive detail regarding the subject has been corroborated. Thus in *Florida v. J.L.*, 529 U.S. 266 (2000), the United States Supreme Court declined to adopt the "firearms exception" to Terry's requirement of reasonable suspicion. Similarly, in *Pennsylvania v. D.M.*, 529 U.S. 1126 (2000), the Court ruled that an anonymous tip with a physical description and location that a person had a gun was not enough for reasonable suspicion, absent anything else to arouse the officer's suspicion. I bring all this to your attention in connection with adequate notice given herewith that my carrying of firearms is undertaken in the course and furtherance of a video production and an entertainment event, by an authorized participant therein. Attached please find a photo of a representative firearm to be displayed onsite.

I am hoping that the above will suffice to resolve the concerns that you voiced to date. In light of the legal complexity of this matter, I am giving you and your colleagues adequate lead time to come to a mutual accommodation.

—

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373
http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No matter. Try again. Fail again. Fail better." — Samuel Beckett

On Fri, Jul 24, 2015 at 2:27 PM, William L. McClure <wlm@jsmf.com> wrote:

> Michael – apologies for the delay in getting back to you on this. The application has been circulated to various departments, including me as the City Attorney, for review and comment. The City tries to process applications as quickly as possible, but it is not always possible to do so and since this event is/was not planned for 4 months, there is/was no urgency in response, so things that require more urgent reply have taken priority. In reviewing your application, it is not complete in that it does not clearly show/delineate the location where you intend to have "stages, platforms, booths, food areas, trash containers, tents, etc., including dimensions" nor does it show "generator locations", nor "location of event activities" nor "location of temporary lighting" nor "location of sound system". While you included a Google map of the area and you have referenced "at the median strip" – we don't know what you mean or where or the size of space you propose to use. It is your obligation to be precise in your application as to the location, including dimensions of the area proposed to be utilized. Further, it is not clear whether you are proposing set up on one day and then occupying the site for one additional day, or you are intending to occupy the site for multiple days, weeks or months. We need a clearer statement of your intent/plans, including whether you intend to have audio and lighting all night long, or until some specific hour, or what? Further, what do you mean by "participant assumes full personal responsibility for **the lawful defense of the site**? At this point, we cannot

further process your application without your providing further clarification as noted above.


Regards,


William L. McClure, City Attorney

City of Menlo Park

1100 Alma Street, Suite 210

Menlo Park, CA 94025

650-324-9300 Ofc

650-324-0227 Fax

wlm@jsmf.com

 Please consider the environment before printing this email 🌳


**From:** larvatus@gmail.com [mailto:larvatus@gmail.com] **On Behalf Of** Michael Zeleny
**Sent:** Friday, July 24, 2015 1:19 PM
**To:** William L. McClure <wlm@jsmf.com>; Scott Sandell <ssandell@nea.com>; Matt Milde <mlmilde@menlopark.org>; Bruce Goitia <policechief@menlopark.org>
**Cc:** David W. Affeld <dwa@agzlaw.com>; Peter Shimamoto <ps@agzlaw.com>
**Subject:** Re: Special Event Permit Application


Dear Menlo Park authorities,


Your website promises an initial response to a Special Event Permit Application within three days. It has been two weeks since our submission of the attached application, with no response forthcoming. <mark>I have repeatedly attempted to contact Matt Milde by phone, to no avail.</mark> Your continued non-responsiveness is setting us on a pathway to Constitutional litigation. Speak up or suffer the consequences.

—

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373

http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No matter. Try again. Fail again. Fail better." — Samuel Beckett

On Fri, Jul 10, 2015 at 11:04 AM, Michael Zeleny <zeleny@post.harvard.edu> wrote:

Michael Zeleny
michael@massmeans.com
zeleny@post.harvard.edu
7576 Willow Glen Road, Los Angeles, CA 90046
voice:323.363.1860
fax:323.410.2373

City of Menlo Park
Matt Milde
Recreation Program Coordinator
mlmilde@menlopark.org
701 Laurel Street
Menlo Park, CA 94025
voice:650.330.2223
fax:650.330.2242

By email, fax, and postal mail.

Starting in October 2015, we shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu, and continuing until NEA publicly acknowledges its wrongdoing and severs its relationship with Min Zhu, Scott Sandell, and Dick Kramlich. I shall be present on site around the clock, served by support staff and equipped with fully operational, exposed and unloaded military grade firearms and loaded ammunition feeding devices therefor, including without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a 7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed Browning M1919a4, in full compliance with all applicable laws. A 55" portable media display powered by a portable gas generator will display videos featuring explicit representations of sexual violence committed by NEA's publicly disgraced protégé. A sample image can be found at http://larvatus.livejournal.com/371973.html. All media aspects of this event will be subject to content-neutral regulation negotiated with Menlo Park authorities. My fundamental rights under the First and Second Amendments of the Constitution of the United States are reserved and non-negotiable.

A site map can be found

MP000348

at https://www.google.com/maps/@37.4197308,-122.2137188,17z/. My display will be confined to the median strip on Sand Hill Road directly across the NEA headquarters. No obstruction of automotive or foot traffic will take place. Please contact me to arrange for the payment of the special event fee and discuss any organizational matters. Please address all legal inquiries and requests to David W. Affeld, Affeld Grivakes Zucker LLP, 2049 Century Park East, Suite 2460, Los Angeles, CA 90067, voice:310.979.8700, fax:310.979.8701.

cc:

Bill McClure

Menlo Park City Attorney

wlm@jsmf.comvoice:650-330-6610

Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA 94025
voice:650.324.9300
fax:650.324.0227

Robert Jonsen
Menlo Park Police Chief
policechief@menlopark.org
701 Laurel St.
Menlo Park, CA 94025
voice:650.330.6600

Scott Sandell

New Enterprise Associates

ssandell@nea.com
2855 Sand Hill Road
Menlo Park, CA 94025
United States

voice:650.854.9499
fax:650.854.9397

---

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los

Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373

http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No matter. Try again. Fail again. Fail better." — Samuel Beckett

MP000350

Exhibit 8



### STAFF REPORT

**City Council**
**Meeting Date:**     8/29/2017
**Staff Report Number:**     17-202-CC

**Public Hearing:**     **Consideration of an appeal of administrative decision to deny a Special Events Permit sought by applicant Michael Zeleny**

### Recommendation

Staff recommends that the City Council deny the appeal and therefore uphold the City Manager's decision to uphold staff's denial of the Special Events Permit.

### Policy Issues

The City Council is the final arbiter of a denial of a Special Events Permit. The council should consider whether to uphold or overturn the denial of the permit.

### Background

Applicant Michael Zeleny applied for a Special Events Permit ("SEP") July 10, 2015. Under "Event Description" the application described the event, activities, timeline and sequence of events as follows:

> *Starting in October 2015, we shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu. I shall be present on-site around the clock, equipped with fully operational, exposed and unloaded firearms and loaded ammunition feeding devices therefor, in full compliance with all applicable laws. All media accepts of this event will be subject to content-neutral regulation negotiated with Menlo Park authorities.*

The application sought to conduct a special event on the median strip of Sand Hill Road near the entrances and exits of Interstate 280.

On July 21, 2015, City Attorney William L. McClure responded to Mr. Zeleny by letter indicating that the City was denying the application on the basis that it was incomplete and did not meet the criteria of a special event. Specifically, the application did not include an attachment indicating the location of the event and did not included requested additional information regarding the use of sound and lighting equipment. Without this information the City was unable to determine if traffic control would be necessary or what other conditions might be necessary as part of the approval of the application. The letter also indicated the City's concerns that the location of the SEP somewhere on the median strip would be a violation of the Vehicle Code as it would likely causes a visual impairment or visual distraction to oncoming traffic and vehicles traveling on Sand Hill Road due to the brightness of the visual display, lights, and the

Staff Report #: 17-202-CC

open display and carrying of a firearm(s), which is prohibited by state law.

On April 15, 2016, Mr. Zeleny responded by email indicating that he was lodging an appeal of the City's denial of the SEP application. Mr. Zeleny provided a revised application with a map indicating the proposed location of the SEP on the western edge of the median strip, and proposed that the staff work with him to reach mutual agreement on the time, place and manner parameters for the use of sound and lighting equipment. This was treated as a new application by the City.

On May 4, 2016, City Attorney William L. McClure responded by letter indicating that the revised SEP application was denied on the basis that it was incomplete and did not meet the criteria of a special event. The letter indicated that the application failed to describe the setup of the proposed event in order to allow the City to analyze traffic control and other necessary conditions for the approval of the application, nor did the application specify the hours/length of the event. The letter confirmed a special event permit would not be necessary if Mr. Zeleny's intent was to stage a protest.

On May 27, 2016, Mr. Zeleny responded by email lodging an appeal of the denial of his revised application. The appeal was directed to the Community Services Department. By letter dated June 16, 2016, Matt Milde, recreation coordinator, informed Mr. Zeleny that the SEP application and appeal were denied. On June 17, 2016, Mr. Zeleny responded by email clarifying the application and appealing the denial to the community service director; and on June 24, 2016, Community Service Director Cherise Brandell, by letter, informed Mr. Zeleny that she had reviewed his appeal and would not be overruling the denial of the application. Ms. Brandell indicated that no SEP was necessary for Mr. Zeleny to conduct a protest in the same location as he had done in the past as long as it was conducted within the confines of the law and local ordinance.

On July 12, 2016, Mr. Zeleny indicated his desire to appeal the denial of his application for SEP to the City Manager. A hearing was held before City Manager Alex D. McIntyre. Present at the hearing was outside counsel Greg Rubens, Esq., who was retained to assist the City Manager with respect to the appeal. Commander Dave Bertini presented for staff. Michael Zeleny and his counsel David W. Affeld, Esq., were present. The appeal was conducted as a de novo hearing.

By letter dated September 12, 2016, City Manager Alex D. McIntyre indicated his final determination of the City's denial of the appeal of the decision to deny the SEP application. In the letter, it was indicated that Mr. Zeleny was free to conduct a protest in compliance with the law; however, the proposed Special Event was not appropriate on the median strip of Sand Hill Road near Interstate 280. The letter indicated that the City may impose reasonable time, place and manner restrictions on First Amendment rights in a content-neutral manner, by a narrowly tailored regulation to serve a significant public interest. A copy of the September 12, 2016, letter, as well as Exhibits A through K to the letter are attached to this staff report.

Mr. Zeleny appealed the City Manager's decision on September 16, 2016, and an appeal hearing before the City Council was scheduled for October 25, 2016. At the request of Mr. Zeleny's counsel, the hearing was continued, and after extensive back and forth the City Clerk scheduled the hearing for August 29, 2017, at 4 p.m., as the date and time the appeal would be considered.

## Analysis

Staff is in agreement with the points outlined in the City Manager's letter of September 12, 2016. As set forth in that letter, the proposed protest described in the SEP application and subsequent documents implicate a number of laws. These laws include, but are not limited to:

Display of Firearms

1. Display of unloaded firearms could be considered a violation of the Penal Code. State law prohibits display of unloaded firearms with the exception of using firearms loaned to the permittee as props as defined in Penal Code 29500-29530.
2. Brandishing and display of unloaded firearms is illegal, except as provided in Penal Code Section 29500 et seq.
3. Under Penal Code Section 25850, having possession of a loaded firearm is also illegal. Under this section possession of a loaded firearm even with a film entertainment permit is illegal.
4. Under Penal Code Section 28500(b), persons who display unloaded firearms are subject to the additional requirement that allows peace officers to examine any firearm. Failure to allow examination is a violation of the law.

Public rights of way

Public use of rights of way and medians are subject to the California Vehicle Code and the Menlo Park Municipal Code. These legitimate and content-neutral regulations serve a significant government interest and include parking and time limits, obstruction of sidewalks and obscenity laws. State law grants cities clear authority over their rights of way.

1. Vehicle Code Section 22507 provides broad discretion to cities over parking on public rights of way (in this case, there is no parking allowed on Sand Hill Road in the proposed area of the protest).
2. The proposed monitor and related equipment cannot impair a driver's vision or block the sidewalk under Vehicle Code Section 21466.5. The proposed lights and video display also have the potential to impair a driver's vision.
3. Driving upon or parking a vehicle on the median violates Vehicle Code Section 21651.

From a practical aspect and for public safety concerns:

1. The lighting at night would be highly distracting to motorists, cyclists and pedestrians.
2. City medians are not traditional public forum areas and are inappropriate and unsafe.
3. The proposed location encourages the public to cross a busy arterial on to a median area that is without sidewalks and are encouraged to cross traffic and view the proposed monitor and view hand-outs with high speed and high volume traffic justifies this prohibition from a public safety standpoint.
4. The median proposed is adjacent to the entrances and exits of Interstate 280, making the location unsafe and dangerous to pedestrians, cyclists and vehicles. Such a display or protest in the median could also block vehicular sight lines and impair public safety for pedestrians, cyclists and automobiles under Municipal Code section 11.44.030.

## Impact on City Resources

If the appeal is denied, there will be no impact on city resources. If the appeal is overturned and a special

events permit is granted, the impact on city resources would depend on the amount of city staff that would need to be present during the proposed special event for traffic and crowd control.

**Environmental Review**

This appeal is not subject to environmental review

**Public Notice**

Public notification was achieved by posting the agenda, with the agenda items being listed, at least 72 hours prior to the meeting.

**Attachments**

A.  Appeal denial letter dated September 12, 2016, and Exhibits A through K
B.  Correspondence and Notice of Public Hearing

Report prepared by:
Dave Bertini, Police Commander
Nicolas A. Flegel, Esq., City Attorney's Office

ATTACHMENT A

City Manager's Office



CITY OF
**MENLO PARK**

September 12, 2016

**VIA First Class Mail and Email**
Michael Zeleny
7576 Willow Glen Road
Los Angeles, CA 90046

**RE: Special Event Permit Application Appeal Decision**

Dear Mr. Zeleny,

This correspondence serves as final determination of the City of Menlo Park's denial of your appeal of a prior decision to deny a Special Events Permit.

**Background**

The Appeal of the administrative decision denying the application of Michael Zeleny for a special event permit ("SEP") was heard on August 11, 2016 at the Menlo Park City Hall.

Mr. Zeleny first applied for a SEP on June 3, 2015 to conduct a protest in the median on Sand Hill Road near the entrance and exits of Interstate 280 in Menlo Park.  The application (Exhibit A) included, but was not limited to, a request to:

- park a truck on the median;
- display loaded and unloaded firearms;
- distribute literature to the public; and
- run a generator to operate a 55-inch digital video monitor.

The protest was to be video recorded and, since the event was to extend into the evening, requested high-intensity lighting.  This request was denied by staff on September 21, 2015 (Exhibit B).

On April 15, 2016, a revised application for a SEP was submitted to the City (Exhibit C).  This application was treated as a new application.  The April 2016 application was denied by staff on May 4, 2016 (Exhibit D).  This denial was then appealed by Mr. Zeleny to the Community Services Department on or about May 27, 2016 (Exhibit E). The appeal was again denied by letter dated June 16, 2016 (Exhibit F).  That decision was appealed to the Community Services Director (Exhibit G), which was again denied on June 24, 2016 (Exhibit H).  Appellant then appealed to the City Manager. The City sent out a notice of appeal hearing on July 20 to the appellant, setting August 11, 2016 at 2:00 pm as the hearing date (Exhibit I).

As Menlo Park City Manager, I acted as the hearing officer for the appeal hearing and was represented by Gregory J. Rubens, Esq..  Appearing on behalf of the City was Police Commander David Bertini of the Menlo Park Police Department.  The Appellant was represented by David Affeld, Esq.  Also in attendance was Michael Zeleny (Appellant) and Kimberly Chu, Esq. from Gregory J. Rubens' office.

The Appeal was conducted as a de novo hearing.  The City admitted the above described documents and e-mails from staff and Mr. Zeleny from June 2015 to July 2016 (Exhibit J).  In addition, Mr. Zeleny provided an electronic copy of the Entertainment Firearms permit dated July 13, 2016 issued by the Office of the Attorney General (Exhibit K).  On its face, the permit allows firearms loaned to the permittee for use as props in motion picture, television, video, theatrical or other entertainment productions.

The appellant and his attorney presented their appeal and requested that the Special Events Permit be granted based on constitutional and statutory grounds.

The City staff present argued that the Appeal be denied for the reasons stated in the prior denials.

**Decision**

The appeal is denied.  As stated previously, no permit is required for first amendment protected activity.  Filming or digitally recording a protest in traditional public forum areas in the City is allowed provided they comply with all laws.  SEPs are not intended to regulate protests or filming of protests in the public forum areas of the City.  Special events are also time limited and not of an ongoing nature.

You are free to conduct a protest in compliance with laws.  However, the City has an obligation to protect public safety.  To that end, your protest cannot occur in the center median under State law, cannot block pedestrian access on the sidewalk, and cannot accommodate camping or sleeping on the sidewalk or any portion of the right-of-way.

A City may impose reasonable time, place and manner restrictions on first amendment rights in a content-neutral manner, by a narrowly tailored regulation to serve a significant public interest.

The regulations cited in this decision clearly allow a protest to occur in compliance with the City and State content neutral laws.  Protests are not allowed in the median, but would in traditional public forum areas, such as sidewalks and City parks and plaza's.

3

Your protest described in your SEP application and subsequent documents implicates a number of laws.  These laws include but are not limited to:

Display of Firearms

- Display of unloaded firearms could be considered a violation of Penal Code.  State law prohibits display of unloaded firearms with the exception of using firearms loaned to the permittee as props as defined in Penal Code 29500-29530.
- Brandishing and display of unloaded firearms is illegal, except as provided in Penal Code Section 29500 et seq.
- Under Penal Code Section 25850, having possession of a loaded firearm is also illegal.  Under this section possession of a loaded firearm even with a film entertainment permit is illegal.
- Under Penal Code Section 28500(b), persons who display unloaded firearms are subject to the additional requirement that allows peace officers to examine any firearm. Failure to allow examination is a violation of the law.

Public Rights-of-Way

Public use of rights-of-way and medians are subject to the California Vehicle Code and the Menlo Park Municipal Code.  These legitimate and content-neutral regulations that serve a significant government interest include parking and time limits, obstruction of sidewalks, and obscenity laws.  Cities have been granted clear authority under state law over their rights-of-way.

- Vehicle Code Section 22507 provides broad discretion to cites over parking on public rights-of-way (in this case, there is no parking on Sand Hill Road in the proposed area of your protest).
- The proposed monitor and related equipment cannot impair a driver's vision block the sidewalk under Vehicle Code Section 21466.5.  The proposed lights, and video display also have the potential to impair a driver's vision.
- Driving upon or parking a vehicle or conducting in the median violates Vehicle Code Section 21651.

From a practical aspect and for public safety concerns,

- The lighting at night would be highly distracting to motorists, cyclists and pedestrians.
- City medians are not traditional public forum areas and are inappropriate and unsafe.
- The proposed location encourages the public to cross a busy arterial on to a median area that is without sidewalks and are encouraged to cross traffic and view your monitor and view hand-outs with high speed and high volume traffic

4

justifies this prohibition from a public safety standpoint.

- The median you propose is adjacent to the entrances and exits of Interstate 280, making the location unsafe and dangerous to pedestrians, cyclists and vehicles.  Such a display or protest in the median could also block vehicular sight lines and impair public safety for pedestrians, cyclists and automobiles under Municipal Code section 11.44.030.

This is not an exhaustive list of the laws with which you must comply.  Accordingly, if you attempt to conduct your protest in the medians anywhere in Menlo Park, the City will consider all appropriate remedies.

**Conclusion**

Based on the record and findings above, which are incorporated by this reference, your application for an SEP is denied.   No permit to conduct a protest is required.  Any protest you conduct must comply with all laws, include those set forth above which are described above.

Denial of the SEP does not violate any first amendment rights.  The lack of need for a permit shows the City is not preventing your protest or prevented you from displaying your message.  The City is using its police power and common sense to regulate the time, place and manner of your proposed free speech protest.  The City has a compelling interest in public safety and a protest in the median would place the vehicular, cyclists, pedestrians and you in danger.

To appeal this decision to the City Council you must provide notice of your appeal to the City Clerk within ten days of the date of this letter.

Please be advised that, to the extent that the City can accommodate your request to protest safely and lawfully, we are willing to work with you.

Sincerely,

Alex D. McIntyre
City Manager

Enclosures

Cc:     Via Email only
        David W. Affeld, Esq.
        Greg Rubens, Esq.

# Exhibit A

ZEL 0277

# CITY OF MENLO PARK
Special Event Application
701 Laurel Street, Menlo Park, CA 94025  Ph: 650-330-2223  Fax: 650-330-2242



| | |
|---|---|
| Applicant Name:  Michael Zeleny | |
| Organization Name:  Mass Means, Inc. | |
| Name of Event:  Child Rape Tools | |

| | | | |
|---|---|---|---|
| Address: 7576 Willow Glen Rd | City: Los Angeles | State: CA | Zip: 90046 |

| | |
|---|---|
| Home Phone: 323-363-1860 | Alternate Phone: none |
| E-mail Address: zeleny@post.harvard.edu | Fax: 323-410-2373 |
| Estimated Attendance: drive-by only | Event open the public: Yes ☒ No ☐ |
| Number of Event Staff: 1 | Number of Event Volunteers: 5 |

Purpose of Event:   Outing New Enterprise Associates as the corporate sponsors of incestuous child rapist Min Zhu.

Location of Event (please be specific and attach map): 2825 Sand Hill Rd, Menlo Park, CA 94025, at the median strip, per the attached.

| Event Timeline | Day | Date | Start Time | End Time | Total Hours |
|---|---|---|---|---|---|
| *Set up/Preparation* | Wed | 9/30/2015 | 9 a.m. | 10 p.m. | 13 hours |
| *Special Event* | Thu | 10/1/2015 | 7 a.m. | ongoing | 31 days |
| *Tear down/Clean up* | | | | | |

| | | |
|---|---|---|
| Do you plan to use a City building or park? Yes ☐ No ☒ <br><br> City Facility Reservation Permit Included: Yes ☐ No ☒ Pending ☐ | Do you plan to use Private Property: Yes ☐ No ☒ <br><br> If yes, provide address of location: | If yes, do you have written approval from Private Property owner: Yes ☐ No ☐ |
| Any City streets closed? Yes ☐ No ☒     Any sidewalks blocked? Yes ☐ No ☒ <br> Name of streets: | | Traffic Control Plan Included: Yes ☐ No ☐ N/A ☒ |

| | |
|---|---|
| Renting barricades from City: Yes ☐ No ☒ | Park sprinklers turned off: Yes ☐ No ☒ |

Amplified sound (i.e. Music, PA system): Yes ☒ No ☐   Time of use: 7 a.m. to 9 p.m.

Temporary lighting: Yes ☒ No ☐   Please describe: Portable spotlights focused on display.

| | |
|---|---|
| Charge for event: Yes ☐ No ☒ $_____/person | Event is reoccurring more than annually?: Yes ☐ No ☐ |
| Is this event a fundraiser:  Yes ☐ No ☒ | Proof of 501c3: Yes ☐ No ☒ |
| Will alcohol be served: Yes ☐ No ☒ <br> Will you be selling alcohol:  Yes ☐ No ☒ | ABC Permit Attached: Yes ☐ No ☐ Pending ☐ |
| Will food be served: Yes ☐ No ☒ <br> Will you be selling food: Yes ☐ No ☒ | I will apply for San Mateo County Temporary Event Food Permit:   Yes ☐ No ☒ Pending ☐ |
| Selling any other items: Yes ☐ No ☒ <br> Describe: | Menlo Park Business License: Yes ☐ No ☒ |
| Will portable rest rooms be provided: <br> Yes ☒ No ☐ | No. of portable toilets ___1___ <br> No. of ADA compliant portable toilets ___0___ |
| Will you be using a tent, canopy, or other temporary structure? Yes ☒ No ☐ | Please describe: Canopy to be erected at the median strip of Sand Hill Rd. |

ZEL 0278

## SECTION 2: EVENT NARRATIVE

**Event Description**
Briefly provide a description of the event, including activities, timeline, and sequence of events:

Throughout October 2015, we shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu. I shall be present on site around the clock, equipped with fully operational, exposed and loaded firearms, in full compliance with all applicable laws. All media aspects of this event will be subject to content-neutral regulation negotiated with Menlo Park authorities.

**Parking**
Describe where event participants are expected to park their vehicles:

Off-site parking only; all on-site transportation to be provided to drop off and pick up the participants.

**Security / Emergency Action Plan**
Describe the security plan, including crowd control (including the security company name, contact information, and the amount of security personnel):

No need for crowd control is anticipated, owing to the lack of sidewalks and no stopping allowed on the Sand Hill roadside. Participant assumes full personal responsibility for the lawful defense of the site.

**Americans with Disabilities (ADA) compliance**
Describe how the event will be accessible to people with disabilities (such as parking, restrooms, and accessible path of travel to all event functions):

N/A.

**Recyclables and garbage handling**
Describe the plan for cleanup and removal of recyclable goods and garbage during and after the event (include if additional street sweeping will be arranged).

All garbage generated by the event will be picked up promptly and removed from the site daily for sanitary and lawful disposal.

**Please note:** For larger events where additional garbage removal will be needed, please contact Recology at www.recologysanmateocounty.com or call (650) 595-3900.  Failure to remove trash from event will result in a $250 fine.

ZEL 0279

**SECTION 3: SITE MAP CHECKLIST**

Please provide a **detailed** site plan/route map of the event on a separate sheet.  If site map is larger than 11x17 size paper, please provide SIX (6) copies of this map in application packet. The map should include the following information:

| Yes | N/A | |
|---|---|---|
| ☒ | ☐ | Outline of event site, including names of streets or areas that are a part of the venue and surrounding area.  If the event includes a moving route (i.e. parade or run), indicate the direction of travel and start/finish locations. |
| ☐ | ☒ | Any street or lane closures |
| ☐ | ☒ | The locations of fencing, barriers or barricades. |
| ☐ | ☒ | Location of first-aid facilities |
| ☒ | ☐ | Location of all stages, platforms, booths, food areas, trash containers, tents, etc (include dimensions) |
| ☒ | ☐ | Generator locations and/or source of electricity |
| ☐ | ☒ | Placement of vehicles or trailers used for the event (include dimensions) |
| ☐ | ☒ | Anticipated parking locations and number of parking (include ADA parking) |
| ☒ | ☐ | Placement of promotional signs or banners |
| ☒ | ☐ | Placement of portable restrooms (including labeling ADA restrooms) |
| ☐ | ☒ | Exit locations for events with fences |
| ☒ | ☐ | Location of all event activities |
| ☒ | ☐ | Location of temporary lighting |
| ☒ | ☐ | Location of sound system |
| ☒ | ☐ | Fire truck access to existing building/structures shall remain clear and unobstructed (20 feet minimum) |
| ☒ | ☐ | Fire equipment shall remain clear and unobstructed (25 feet minimum) |
| ☐ | ☒ | For large event, traffic impact and traffic handling plan including re-routing of vehicles, bicycles, and pedestrians. |

**Note:** Incomplete and vague site maps will delay the permit process.


**SECTION 4: INSURANCE INFORMATION**

A Certificate of Liability Insurance must be provided and must contain the following:
- The special event permit name must be listed as the one "insured."
- The policy must not expire before the planned event date.
- The policy must be for a minimum of $1,000,000 unless otherwise specified.
- The "description" should list the rental location, day, and event planned.
- The City of Menlo Park at 701 Laurel Street, Menlo Park, CA 94025 must be noted as "additional insured."

A special event permit **will not** be issued until the required application fees, insurance, and other supplementary materials, as indicated in the Special Event Application, have been received. A special event permit issued for a private function on private property is not required to submit proof of liability insurance to the City.

PAGE 16

ZEL 0280

## SECTION 5: PUBLIC NOTIFICATION

Public Notification will be required for some permits based on your application.  If noise ordinance is exceeded, the Planning Division will prepare a public notice to be mailed to all property owners, residents, and businesses within 300 feet of the subject property.  The notice will state the decision of the City and will serve as the noise permit unless the request is appealed.  The Planning Division will mail the notices on the decision date, which starts the 10-day appeal period.  If the Planning Division does not receive an appeal in writing, the decision will be become effective on the 11th day.  If the decision is appealed, the item will be scheduled for the next available Planning Commission meeting.  The Planning Commission generally meets on the first and third Mondays of every month.  The minimum lead-time between an appeal and a Planning Commission meeting is approximately 3-weeks.  The decision will also be posted at the Civic Center and on the City's web page: www.menlopark.org.

## SECTION 6: FIRE DISTRICT NOTIFICATION

If necessary, you will be asked to seek approval of the Menlo Park Fire Protection District. They will be informed of any street closures and other impacts to emergency services.  Please keep in mind that there are several streets within Menlo Park that cannot be closed because they are deemed primary response routes.  You must receive Conditional of Approval from the City prior to contacting the Fire District.

## SECTION 7:  POLICE STAFFING

For events requiring Police assistance, the Police Department will review the application and be involved in the initial meeting with the applicant.  Based on the details for the event, the Police Department will provide an estimate of costs based on the number of officers needed and hours needed at the event (payment of 50% of estimated Police services is due before your permit can be issued). Post event, an invoice will be provided by the to the applicant for Police services (based on incurred costs, minus any pre-paid amount). Any additional costs incurred that were not anticipated such as extra staffing or longer hours will be billed to the applicant.  All payments are due to the Menlo Park Police Department by contacting Sgt. Matt Ortega at (650) 330-6347. Non-payment for Police assistance after the event will result in the inability to apply for a special event permit in the future, until any balance is paid in full.

## SECTION 8: PARK USAGE

Rental fees for special events held on city parkland, picnic areas, or tennis courts may be applied and are subject to availability. Please review the city's Master Fee Schedule for current park usage fees. Additionally, the organizing party of an event held in these areas is responsible for following all park rules, usage guidelines, and city ordinances. Sharon Park is reserved for weddings only.

## SECTION 9: SOUND

Approval of a Special Event permit does not necessarily exempt the planned event from the requirements of Chapter 8.06 (Noise) of the Menlo Park Municipal Code. All sources of sound measured from any residential property shall not exceed 50 dBA during the "Nighttime" hours, or 60 dBA during the "Daytime" hours. Nighttime hours are considered the period between 10 p.m. and 7 a.m. daily. If you believe your planned event could exceed the noise limitations set by Chapter 8.06 of the Municipal Code, please discuss the noise permitting requirements with a member of the Planning Division. A noise permit can be obtained as part of the Special Events permit application, subject to review and action by the Planning Division and the public notification and appeal process set forth in Section 5. The Planning Division can be reached at (650) 330-6702 or by email at planning@menlopark.org.

## SECTION 10: CONFIRMATION

Please check all that apply:

- ☒ I have read all policies regarding the Special Event Application process.
- ☒ I have reviewed the Special Event Permit FAQs.
- ☒ I have read and will abide by all Sections as written and described herein.
- ☒ I am submitting the most current version of the Special Event Permit Application found at: www.menlopark.org/eventpermits
- ☒ I am providing the correct payment with my application.
- ☒ I have filled out all portions of this application completely and to the best of my knowledge.

ZEL 0281

I hereby certify and agree that I shall be personally responsible on behalf of myself/organization for any damage sustained by the facility, property, or equipment, as a result of the occupancy of said facility or property by my group/organization. I hereby waive, release, discharge and agree to indemnify, defend and hold harmless the City, its officers, employees, and agents from and against any and all claims by any person or entity, demands, causes of action or judgments for personal injury, death, damage or loss of property, or any other damage and/or liability occasioned by, arising out of out of the event for the actions (active or passive) of invitees', event participants, event sponsors, and event spectators while on the property, or resulting from this reservation of the facilities or use or property. I hereby declare that I have read and understand and agree to abide by and to enforce the rules, regulations, and policies affecting the use of the facilities or property. If any portion of the Special Event is held on non-city owned property I have included letters of approval for each respective property owner.

_____     3 June 2015
Signature of Applicant                            Date

**Payment Information:**

☐  Cash     ☒  Check     ☐  Visa     ☐  Mastercard     Amount $250 _____ ($125 minor / $250 major)
Account # _____ Exp. _____ Account Holder Name _____

I agree to pay the above charges and authorize the City of Menlo Park to charge these costs to my credit card. Checks payable to: City of Menlo Park.
Authorized Signature: _____

*Note: There is a $30 charge for returned checks. Additional fees from other city departments may be required before permit maybe issued, please refer to the Master Fee Schedule for updates on current fees.*

---

**Office Use Only:**

Date Permit Submitted: _____      Project No. _____
Permit Payment: $_____      Date _____      Processed By _____

| Approval: | Department | Received | Fee | | Paid | Signature | | Date |
|---|---|---|---|---|---|---|---|---|
| | Police | _____ | _____ (50% Est.) | | ☐ | _____ | | _____ |
| | Planning | _____ | _____ | | ☐ | _____ | | _____ |
| | Public Works Engineering | _____ | _____ | | ☐ | _____ | | _____ |
| | Public Works Maintenance | _____ | _____ | | ☐ | _____ | | _____ |
| | CSD/Recreation | _____ | _____ | | ☐ | _____ | | _____ |
| **REQUIRED:** Yes ☐  No ☐ | Fire District | _____ | _____ | | ☐ | _____ | | _____ |

Event Permit Coordinator: _____
   ☐ Application Initial Review Complete
   ☐ E-mail Acknowledgement Sent to Applicant      (Date: _____ )
   ☐ Application Sent to Permit Committee
   ☐ Site Map Complete
   ☐ Insurance Certificate Provided
   ☐ Other Agencies Permits Included
   ☐ Public Notification Complete
   ☐ Approved to exceed noise ordinance: ☐Yes  ☐No
   ☐ Staff Approvals Complete
   ☐ Traffic Control Plan Approved (Street closures only)
   ☐ Conditions-of-Approval or Denial Letter Sent      (Date: _____ )
   ☐ Other Department Fees Paid
   ☐ Barricade Rental Information (Requesting _____ 3' barricades and _____ 12' barricades)
   ☐ Final Copies Sent to Approving Staff

Special Event Permit Application Approval:

_____      _____
**Signature of Permit Coordinator**            **Date**

Updated: 07/24/14

ZEL 0282

# Exhibit B

ZEL 0283



OFFICE OF THE CITY ATTORNEY

1100 ALMA STREET / MENLO PARK, CA 94025 / 650.324.9300 / FAX 650.324.0227

September 21, 2015

**VIA EMAIL: michael@massmeans.com**

Michael Zeleny
7576 Willow Glen Road
Los Angeles, CA 90046

Re:    Special Event Permit

Dear Mr. Zeleny:

The City of Menlo Park ("City") is in receipt of your special event permit application submitted on July 10, 2015, to maintain a portable media presentation at the location of "2825 Sand Hill Rd, Menlo Park, CA 94025, at the median strip, per the attached." At this time the City is denying your application on the basis that it is incomplete and does not meet the criteria of a special event.

With respect to the application being incomplete, on July 24, 2015, I previously notified you by email that the application did not include an attachment indicating the specific location of the presentation/event, and requested additional information regarding your use of sound and lighting equipment. You responded by email on July 28, 2015, stating that you would be videotaping your presentation as part of a feature documentary and entertainment event. You again responded that the event will occur in the "median strip" and indicated the location to be the strip "directly across NEA headquarters," but you declined to provide any more detail at the time. The problem is that your application still does not indicate the exact location of the proposed event and how the presentation will be set up so that the City can analyze whether traffic control will be necessary or what other conditions might be necessary as part of the approval of the application nor the hours/length of the event. For example, there is no indication where you intend to place your tent, generator, video presentation, portable restroom, temporary lighting, sound system, etc. Further, you have stated there is no end time for the event and that the total hours are "indefinite."

With respect to the application not meeting the criteria for a special event, what you have set forth in your application is not an event that meets the City's definition of a special event. For example, the proposed event application states that it will not exceed 150 people, use any City street or right of way (even though the

Michael Zeleny
September 21, 2015 - Page 2

median is part of the right of way), require lane closures, require parking needs, generate a crowd of spectators, nor does it state that this is a community type event. To the contrary, you are proposing a "media production" of a one-man protest. If what you are actually intending is the filming of a movie, then the City has an application process, for which a film production permit is required. A copy of the City's "Film Production in Menlo Park" document is attached for your review.

Lastly, the City is concerned that what you are proposing to perform in the median strip between opposing lanes of traffic would be a violation of the Vehicle Code if it causes a visual impairment or visual distraction to oncoming traffic and vehicles traveling on Sand Hill Road. It would also likely be a safety hazard/danger to drivers on Sand Hill Road due to the rate of speed on the roadway and the proximity to Interstate 280. The median strip is too narrow to accommodate the film project as you have described in the application. Another concern is that it is illegal to open carry a firearm in the State of California. As you've described the proposed event, there does not appear to be any logical nexus or legitimate purpose of carrying a firearm.

Inasmuch as your application is incomplete and does not meet the definition of a special event, your application for a special event permit is denied.

If you wish to appeal this denial of your application, you must appeal the denial to the City's Special Event Permit Committee. I would ask that you notify me and Community Services Director Matt Milde at mlmilde@menlopark.org if you wish to seek an appeal.

Sincerely,

William L. McClure,
City Attorney

WLM:rr

Enclosure

cc:   Via email only
      Dave Bertini, Commander
      Matt Milde

**Film Production in Menlo Park**

Film production in the City of Menlo Park must comply with following conditions:

1. Permittee shall submit in writing all pertinent details regarding the filming including the date(s) and times of the filming including time needed for set-up and take down; a description of the nature of the filming; the location of the filming; a list of all equipment involved in the filming, including cars and other vehicles; the proposed location for the parking and storage of all such vehicles and equipment; the number of cast and crew members involved in the filming; and an indication of any special needs, such as amplified noise, etc. If granted, the permit's approval will be confined to such activities, locations and time schedules as submitted and approved.

2. Three days prior to the beginning of filming, permittee shall provide written notice to residents and businesses within 200 feet of the proposed filming.

3. Permittee shall obey all City Ordinances, rules and the guidance of City supervisory employees pertaining to the use of City property, including the location, parking and storage of vehicles and equipment, crowd and traffic control, and the restoration of premises to their original condition after use for filming purposes.

4. Permittee will comply with the City of Menlo Park noise ordinance. Filming will be limited to the hours between 8:00 a.m. and 6:00 p.m. and will result in low to no noise levels. The use of any explosive, fireworks, or pyrotechnic devices is strictly prohibited.

5. Permittee shall make arrangements for traffic control satisfactory to the Menlo Park Police Department prior to filming on City streets and in other public areas. Permittee will be charged to recover the cost of traffic control provided by the City. Permittee will legally park vehicles and will not require street closure or traffic control other than what is approved.

6. Permittee shall covenant and agree to indemnify and hold harmless the City from any and all loss, cost, damages and expenses of any kind, including attorney fees, on account of personal injury or property damage resulting from any activity of Permittee on municipal property or in connection with its use of municipal property.

7. Liability insurance in no way limits the indemnity agreement above, Permittee will furnish the City a Certificate of Liability Insurance acceptable to its Risk Management office showing combined single limit coverage for bodily injury and property damage, or the equivalent of such coverage, not less than $1 million. The City, including its officials, employees and agents, shall be named as additional insured in the Liability Policy. Contractual liability coverage insuring the obligations of this Agreement is also required. The insurance may not be canceled or substantially modified without ten (10) days written notice to the City Manager's Office.

ZEL 0286

8.  Permittee shall pay, with a valid check, money order, credit card or cashier's check, a **filming permit application fee of $150.00 in addition to the daily permit fees of $50 per day for still photography and short subject, $100 per day for industrials, and $150 per day for features, TV, music videos and commercials.**

9.  Permittee shall apply for a one-time Business License and pay, with a valid check, money order, credit card or cashiers check.   See **Guide to Annual Business Licensee Fee Calculation** for the fee schedule.

10. Permittee will adhere to the provisions and conditions set forth in the permit.  If Menlo Park Police Department or other City personnel are required to correct, mitigate, or provide any service not consented to under this permit, permittee will be required to pay for all services rendered.  Payment shall be made in the form of *a valid check, money order, credit card or cashiers check* immediately upon demand made by the City.

*PROJECT ADDRESS:*_____

Read and agreed on:

Date:_____

_____          _____
Signature                                                                          Print name

ZEL 0287

# Exhibit C

ZEL 0288

**Nicolas A. Flegel**



**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Friday, April 15, 2016 1:35 PM
**To:** McClure, William; Cindy S. Elmquist; Bertini, David C; Milde, Matt L
**Cc:** Scott Sandell; Subrah Iyar; Dick Kramlich; David W. Affeld; Dan Primack; Louis Citron; Forest Baskett; Brooke Seawell; Peter Sonsini; Robert Garland; Jake Nunn; Sigrid Van Bladel; Hawk, Robert B.; Arno Penzias
**Subject:** Re: Menlo Park Special Event Permit

"William L. McClure" <wlm@jsmf.com>,
"Cindy S. Elmquist" <cse@jsmf.com>
Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA 94025
650-324-9300 Phone
650-324-0227 Fax

"David C. Bertini" <dcbertini@menlopark.org>,
"Matt L. Milde" <mlmilde@menlopark.org>,
The City of Menlo Park
701 Laurel St.
Menlo Park, CA 94025
650-330-6600


Dear Mr McClure,

I am lodging herewith an appeal of your denial of my application for a special event permit, by outlining its purpose and scope and responding to all of your objections in order.

1

                                    ZEL 0289

I have been protesting NEA's ongoing support of its venture partner Min Zhu and its coverup of his incestuous child rape since 2004. In the course of the ensuing litigation and subject to demands by Menlo Park city authorities, I have been forced to relocate my protests from the immediate vicinity of NEA's headquarters, to the narrow strip of public grounds surrounding the 16 private acres of the Rosewood Sand Hill compound located at 2825 Sand Hill Rd, Menlo Park, CA 94025. The median strip identified in his current application affords the only possible location for staging my protest in clear view of the NEA headquarters. My open display of firearms is germane to the message that responds to the death threats made against me and my family in the names and on the behalves of individuals and business entities sponsored and supported by NEA. The continual and open-ended nature of my protest responds to NEA's long-standing refusal to account for its responsibility in supporting and covering up the lawless conduct of its associates.

As to your claim that my application is incomplete, attached please find a map of the area in question, which clearly designates the specific and modest boundaries of my special event. That is all that the City of Menlo Park ("the City") can reasonably expect and require to analyze whether traffic control will be necessary or what other conditions might be necessary as part of its approval of my application. As suggested before, and witnessed by my past appearances in your jurisdiction, my use of sound and lighting equipment is subject to our ongoing mutual agreement on their time, place, and manner parameters. If you have any specific requests in this regard, please make them with no further ado, bearing in mind that all restrictions on my expressive conduct must be (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels for communication. (See *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983).) As resolved as I am to see my task through, I remain open to all reasonable accommodations.

While the First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired" (*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981), it protects the right of every citizen to "reach the minds of willing listeners [and] to do so, there must be opportunity to win their attention." (*Hill v. Colorado*, 530 U.S. 703 (2000).) My presence on NEA's grounds has been ruled out as a part of settling its trespass claims against me five years ago. The currently proposed location of my performance therefore represents my only remaining opportunity to address directly the public associated or connected with it. Please bear in mind the foregoing authorities in your attempts to deny me my right to speak in this way and venue.

With respect to the application not meeting the criteria for a special event, the City lacks the authority to define a special event subject to its permitting requirements, beyond ensuring that it does not disrupt the ordinary use of its public spaces. It is true that I am proposing a media production of a one-man protest. My primary aim, however, is to exhibit my media to the thousands of daily passerby on Sand Hill Road, even as I stream their reactions online. My communication needs to be both physically proximate for them, and available over the Internet for more distant audiences. This project falls squarely within the ambit of Constitutional protection of political speech. My production is no less deserving of such protection for being modestly scaled. Thus *Branzburg v. Hayes*, 408 U.S. 665, 704 (1972): "Liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods."

While the First Amendment literally forbids the abridgment only of "speech", the Supreme Court has long recognized that its protection does not end at the spoken or written word, even as it acknowledged that not all conduct intended by the person engaging therein to express an idea is so protected. (See *United States v. O'Brien*, 391 U.S. 367 (1968).) For such conduct may be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments". (See *Spence v. Washington*, 418 U.S. 405 (1974).) "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether [a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." (See *Texas v. Johnson*, 491 U.S. 397 (1989).) In sum, according to the Supreme Court's test for expressive conduct, known as the Spence-Johnson test, an action is protected by the First Amendment if: (1) the speaker-actor intends for the conduct to express a particularized message; and (2) that message would be understood by others. In the course of reaffirming the Spence-Johnson test in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995), the Supreme Court ruled that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' […] would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schönberg, or Jabberwocky verse of Lewis Carroll." In the course of my protest, the expressive content of openly carried firearms presented as a means of defense both warranted and necessitated by my circumstances, will be bolstered by the concurrent multimedia presentation of the evidence of threats I received in the names and on the behalves of NEA's associates, the damage that they claim to have inflicted on my family, and their history of unlawful violence. Your study of my past displays should suffice to reassure you that my painstakingly particularized message will be infinitely easier to parse than The She-Wolf, Pierrot Lunaire, or Jabberwocky.

This brings me to the matter of my venue. Streets and sidewalks are "prototypal" examples of public fora, and have immemorially been considered a rightful place for public discourse. (See *Hague v. C.I.O.*, 307 U.S. 496 (1939).) Public fora "have achieved a special status in our law", for they "represent areas within which tolerance for inhibitions on speech, petition, and assembly is at a minimum." The government therefore "bear[s] an extraordinarily heavy burden to regulate speech in such locales." (See *N.A.A.C.P. v. City of Richmond*, 743 F.2d 1346 (9th Cir. 1984).) "And just as streets and sidewalks are

2

ZEL 0290

prototypical examples of public fora, political speech related to current events is the prototypical example of protected speech." (See *American-Arab Anti-Discrimination Committee v. City of Dearborn* ("AAADC"), 418 F.3d 600 (6th Cir. 2005).) In the matter at hand, the current event at issue is NEA's ongoing financial support of its child-raping protégé Min Zhu. As long as I do not "realistically present serious traffic, safety, and competing-use concerns beyond those presented on a daily basis by ordinary use of the streets and sidewalks," you cannot require me to obtain a permit for exercising my Constitutional rights, let alone deny its issuance. (See *Santa Monica Food Not Bombs v. City of Santa Monica* ("SMFNB"), 450 F.3d 1022 (9th Cir. 2006).) Moreover, I generally do not need a permit to hold a rally or a march on public grounds while obeying traffic laws. (See SMFNB, 450 F.3d at 1039, 1040-43; AAADC, 418 F.3d at 608.) Thus I am asking for nothing more nor less than your approval of my rightful, conspicuous presence on public grounds in full compliance with all applicable laws.

As to my compliance with traffic laws, to repeat myself, I do not intend use any City street or right of way. The California Vehicle Code Section 525 defines the right of way as "the privilege of the immediate use of the highway". In this regard, the right of way in the median island, where I intend to conduct my performance, is ordinarily reserved for pedestrians alone. The small part of the median island that I intend to occupy will leave plenty of room for the passage of vehicles in any emergency, e.g. as regards tow trucks allowed to do so pursuant to CVC Section 21719. I do not intend to present any visual impairment to oncoming traffic and vehicles traveling on Sand Hill Road. As to presenting a visual distraction, I am well within my First Amendment rights to do so in a rightful place for public discourse, within which tolerance for your inhibitions on speech, petition, and assembly is at a minimum.

To clarify the nature of the proposed multimedia production in the context of my one-man protest, I am not intending it for the filming of a movie, and therefore you may not require me to obtain a film production permit. Kindly recall that I have borne the brunt of abusive and oppressive conduct by the City of Menlo Park Police Department ("the police") since the inception of my protests a decade ago. This abuse and oppression included, without limitation, illegal surveillance and harassment of myself and my associates, arbitrary imposition of constraints on our performance, and participation in my malicious prosecution in San Mateo Superior Court, wherein the prosecutor expressly and unequivocally acknowledged on court record that she was seeking my criminal conviction on behalf of NEA. Accordingly, I would not dare to appear in your jurisdiction without recording each of my interactions with your minions, for my security and theirs alike. And I have every right to make this recording without asking or paying for your permission.

As explained by Evan Bernick and Paul Larkin in "Filming the Watchmen: Why the First Amendment Protects Your Right to Film the Police in Public Places", lower federal courts have generally said that the First Amendment protects a right to record and photograph law enforcement in public view. Some restrictions may be constitutional, but simply prohibiting the recording because the person is recording the police cannot be constitutional. While the Supreme Court is yet to consider this question, such is the general view in the federal appellate decisions that have done so. An apparent exception is a recent federal trial court decision in *Fields v. City of Philadelphia* and *Geraci v. City of Philadelphia*, which takes a different, narrower approach: There is no constitutional right to videorecord police, the court says, when the act of recording is unaccompanied by "challenge or criticism" of the police conduct. But even under this restrictive standard, I remain well within my rights to videorecord at will, without warning, and regardless of permission, all my public performances in your jurisdiction, for the sake of safety and transparency. In light of the history of my peaceful protests being subjected to oppressive scrutiny and censure by the City authorities, I am planning to exercise my rights under the First Amendment to film my appearances there, for the express purpose of mounting a potential challenge and criticism of the police conduct in the event of further obstructions mounted by Menlo Park. According to *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) the discretion of public officials charged with permitting First Amendment activity must be limited by "narrow, objective, and definite standards." It therefore falls upon the City to identify such standards that deny my rights or subject them to permitting requirements.

Lastly, your concern is that it is illegal to open carry a firearm in the State of California is likewise misdirected. It is none of your business to seek or scrutinize any logical nexus or legitimate purpose of carrying a firearm the proposed event. I am well within my rights in carrying a firearm, either openly or concealed, in the course of an entertainment event, as its authorized participant, as protected by the Constitution of the United States, and clearly warranted by law in the state of California.

Thus California Penal Code Section 25400 (a) (2): "A person is guilty of carrying a concealed firearm when the person does any of the following: [...] Carries concealed upon the person any pistol, revolver, or other firearm capable of being concealed upon the person." Whereas P.C. Section 25510 qualifies this ban: "Section 25400 does not apply to, or affect, any of the following: (a) The possession of a firearm by an authorized participant in a motion picture, television, or video production, or an entertainment event, when the participant lawfully uses the firearm as part of that production or event, or while going directly to, or coming directly from, that production or event. (b) The transportation of a firearm by an authorized employee or agent of a supplier of

3

firearms when going directly to, or coming directly from, a motion picture, television, or video production, or an entertainment event, for the purpose of providing that firearm to an authorized participant to lawfully use as a part of that production or event." Please be assured that I intend to authorize myself as a participant in my own entertainment event.

A similar exemption applies to the ban on the open carrying of an unloaded handgun. Thus P.C. Section 26350 (a) (1): "A person is guilty of openly carrying an unloaded handgun when that person carries upon his or her person an exposed and unloaded handgun outside a vehicle while in or on any of the following: (A) A public place or public street in an incorporated city or city and county." Whereas P.C. Section 26375 qualifies this ban: "Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television or video production, or entertainment event, when the participant lawfully uses the handgun as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event."

Similar exemptions apply to long guns. Thus P.C. Section 26400 (a): "A person is guilty of carrying an unloaded firearm that is not a handgun in an incorporated city or city and county when that person carries upon his or her person an unloaded firearm that is not a handgun outside a vehicle while in the incorporated city or city and county." Whereas P.C. Section 26405 qualifies this ban: "Section 26400 does not apply to, or affect, the carrying of an unloaded firearm that is not a handgun in any of the following circumstances: [...] (r) By an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television or video production, or entertainment event, when the participant lawfully uses that firearm as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event." In short, conspicuous display of otherwise legally possessed unloaded firearms in the course of my entertainment event is my Constitutional right under the First Amendment, expressly protected by California statutes. In the event, these firearms will include, without limitation, a pair of H&K P7M13 handguns, an LRB M25 designated marksman rifle, a Winchester M97 trench shotgun with an M1917 Remington bayonet, and a semiautomatic, belt-fed, tripod mounted Browning M1919a4, all conspicuously adjoined by ample supplies of ammunition.

I trust that I have met your concerns over the completeness of my application. Please acknowledge the receipt of this email and approve my application at your earliest convenience. To repeat myself, we are equally willing to negotiate or litigate. Please refer to *Lefemine v. Wideman*, 568 U.S. ____ (2012), which held that a plaintiff who secured a permanent injunction but no monetary damages was a "prevailing party" under 42 U.S.C. § 1988 and could receive attorney fees, where the injunction ordered the defendant officials to change their behavior in a way that directly benefited the plaintiff, who could thereafter engage in demonstrations without fear of sanctions with which police had previously threatened him. As public officials, NEA's minions among your City colleagues enjoy qualified immunity from damages suits if they violate my rights, but only as long as they do not violate "clearly established" law. "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." (See *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).) In short, your personal liability will be richly borne out by the foregoing statutes and case law. The last issue that remains to be litigated conclusively is the expressive content of openly carried firearms. In this connection, please refer to *Nordyke v. King*, 563 F. 3d 439 (9th Cir. 2009), wherein the state of California tacitly conceded the issue even before the Supreme Court incorporated the Second Amendment in *McDonald v. Chicago*, 561 U.S. 742 (2010). Long story short, if you continue siding with NEA's minions, I will win at the City's certain and considerable expense.

---

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2733
**Wronged by the high and mighty? Cut them down to size with legally safe and
ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Mon, Sep 21, 2015 at 2:12 PM, Cindy S. Elmquist <cse@jsmf.com> wrote:
>
> Bill McClure requested I forward to you the attached letter with enclosure thereto.
>
>
>
> Cindy S. Elmquist, Assistant to William L. McClure

4

```
>
> Jorgenson, Siegel, McClure & Flegel, LLP
>
> 1100 Alma Street, Suite 210
>
> Menlo Park, CA 94025
>
> (650) 324-9300 Phone
>
> (650) 324-0227 Fax
>
>
>
>
```

5



ZEL 0294

# Exhibit D

ZEL 0295

## Nicolas A. Flegel

**From:**        Robin H. Riggins
**Sent:**        Wednesday, May 04, 2016 10:53 AM
**To:**          Nicolas A. Flegel
**Subject:**     FW: MP/ Zeleny Permit
**Attachments:** ZelenyM-2a-ltr.pdf

FYI.

**From:** Robin H. Riggins
**Sent:** Wednesday, May 04, 2016 10:53 AM
**To:** 'michael@massmeans.com' <michael@massmeans.com>
**Cc:** William L. McClure <wlm@jsmf.com>
**Subject:** MP/ Zeleny Permit

Dear Mr. Zeleny:

     Pursuant to Mr. McClure's request, please find attached his letter to you of today's date concerning the above-
mentioned matter.
Thank you for your attention to this matter.

Sincerely,

Robin Riggins
Secretary to
William L. McClure, Esq.

Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA  94025

Tel.  650/ 324-9300
Fax. 650/ 324-0227

1



OFFICE OF THE CITY ATTORNEY

1100 ALMA STREET / MENLO PARK, CA 94025 / 650.324.9300 / FAX 650.324.0227

May 4, 2016

**VIA EMAIL: michael@massmeans.com**
**AND U.S. MAIL**

Michael Zeleny
7576 Willow Glen Road
Los Angeles, CA 90046

Re:    Appeal of Denial of Special Event Permit Application

Dear Mr. Zeleny:

The City of Menlo Park ("City") is in receipt of your email dated April 15, 2016. Your email indicates that you are lodging an appeal of the denial of your special event permit application. The original special event permit application was submitted on July 10, 2015, to which the City formally responded by letter dated September 21, 2015. In that letter, I indicated that your application was being denied as it was incomplete and did not meet the criteria of a special event.

Your email of April 15, 2016, outlines several modifications and provides additional information to supplement your original application, and therefore, the City is treating it as a revised application rather than an appeal. The April 16th email includes a Google map with a red box showing the proposed location of the event. The email also indicates that you no longer intend to film a documentary, but instead will put on an "entertainment event" in which you will be live-streaming a video showing the reaction of individuals who drive by your protest. Lastly, the revised application indicates in the "Event Narrative" that you "shall be present on site around the clock, equipped with fully operational, exposed and loaded firearms, in full compliance with all applicable laws."

Based on a review of your revised application, the City is denying your application on the basis that it is incomplete and it does not meet the criteria of a special event. With respect to the revised application still being incomplete, the application fails to describe how you intend to set up your presentation so that the City can analyze whether traffic control will be necessary or what other conditions might be necessary as part of the approval of the application, nor does it specify the hours/length of the event. For example, there is no indication where you intend to place your tent, generator, video presentation, portable rest room,

Michael Zeleny
May 4, 2016 - Page 2

temporary lighting, sound system, etc.  The revised application is deficient in that the City needs substantially more detail in order to analyze the potential for your event distracting drivers, including the volume of sound you intend to make, the brightness of your projector, location and size of items you intend to place on the median strip, and how you intend to transport your set-up to the location (to determine compliance with the Vehicle Code).

Also, the revised application still does not propose an event that requires a special event permit.  The application does not propose an event that is open to the community at large to participate in (it describes a one man protest).  With the essential element of community participation, a special event permit is not necessary; protests do not require special events permits.

I also want to raise three concerns regarding the proposed event:

1.  The proposed event has no defined term (your email indicates an event of "indefinite" duration.  Given the presence of guns and the display of a pornographic image at along a major high-speed roadway, the City would need to staff the event with police and traffic supervision.  However, the City does not have staff to monitor an event that could last days, weeks or months.

2.  You are proposing to illegally open-carry weapons.  It is illegal to open-carry an unloaded or loaded weapon in California.  You are citing to the movie/entertainment exception, but that exception does not allow for the open-carrying of *loaded* weapons or weapons "adjoined by ample supplies of ammunition."  Penal Code §16840 provides that a firearm shall be deemed to be "loaded" whenever both the firearm and the unexpended ammunition capable of being discharged from the firearm are in the immediate possession of the same person.  Lastly, a practical reading of the entertainment exception would require the Department of Justice or the Menlo Park Police Department to authorize your event.

3.  We have serious concerns regarding the proposed location of the event and will likely prohibit locating an event as generally described in your email and attachments in the median area of Sand Hill Road as it would be a traffic and safety hazard – regardless of how the event is characterized.

While it is clear that this is not a "special event," if you wish to appeal this denial, please provide written notice to Community Services Director Cherise Brandell (and copied to the undersigned.) Ms. Brandell's contact information is as

Michael Zeleny
May 4, 2016 - Page 3

follows:   Email (cebrandell@menlopark.org) and telephone (650) 330-6618.
Alternatively, you may provide additional detail to respond to the above-outlined
issues.

Sincerely,

William L. McClure
City Attorney

WLM:rr
cc:     Via email only
        Dave Bertini, Commander
        Cherise Brandell
        Matt Milde

# Exhibit E

ZEL 0300

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and
ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Fri, May 27, 2016 at 12:21 PM, Michael Zeleny <michael@massmeans.com> wrote:

Dear Mr McClure,

I have received your second denial, dated 4 May 2016, of my amended application for a special event permit, submitted on 15 April 2016. My second appeal follows.

With respect to your complaint regarding my application being incomplete, please refer to the map I submitted with it, as reattached below for your convenience. The red rectangle that designates the location of my entertainment event represents the location of my Dodge Ram SRT-10 pickup truck. All my activities and all my equipment will be confined to its bed and cabin, as driven to and parked at the designated location. The video presentation will be made with a 55" SunBrite outdoor TV, mounted in a Gator G-Tour E-Lift, and powered by a portable generator. As stated in my original application dated 28 July 2015, I will remain on site around the clock until NEA publicly acknowledges its wrongdoing and severs all its relations with Min Zhu, Scott Sandell, and Dick Kramlich. My staff will attend to all my needs with daily deliveries, in full compliance with all relevant laws and regulations.

My event is most certainly meant to be open to the community at large, and I will make every accommodation for all passerby to engage lawfully and safely with its content and its authors. Without limitation, these accommodations will include distribution of flyers and souvenirs, and opportunities to engage me in real-time discussion, broadcast via a live Internet linkage.

If the foregoing explanation satisfies your concerns, I will forgo carrying of loaded weapons in the spirit of compromise. However, if you continue to object to my carrying unloaded firearms in the course of my entertainment event, I shall be happy to litigate the matter of loaded open carry within the scope of Constitutionally protected speech. Your citation of Penal Code §16840 providing that "a firearm shall be deemed to be 'loaded' whenever both the firearm and the unexpended ammunition capable of being discharged from the firearm are in the immediate possession of the same person", is inapposite, because applicable solely to "[e]very person who carries a loaded firearm with the intent to commit a felony" within the scope of Penal Code §25800. I assure you that I have no such intent.

Lastly, I do not understand your claim that "a practical reading of the entertainment exception would require the Department of Justice or the Menlo Park Police Department to authorize [my] event." If you are claiming that my Constitutionally protected speech stands in need of such authorization, as explained previously, I shall be happy to settle this matter within the scope of a civil action for deprivation of rights pursuant to 42 U.S. Code §1983. Indeed, if you compel me to do so, the venue of my performance will merely change, from Sand Hill Road, to a Federal courthouse. One way or another, my message will resonate with its intended audience.

I trust that I have answered all relevant questions and addressed all legitimate concerns. I hope that no further explanations will be necessary for you to make a final disposition of my application.

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com

7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and
ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Wed, May 4, 2016 at 10:52 AM, Robin H. Riggins <rhr@jsmf.com> wrote:

Dear Mr. Zeleny:


Pursuant to Mr. McClure's request, please find attached his letter to you of today's date concerning the above-mentioned matter.

Thank you for your attention to this matter.


Sincerely,


Robin Riggins

Secretary to

William L. McClure, Esq.


Jorgenson, Siegel, McClure & Flegel, LLP

1100 Alma Street, Suite 210

Menlo Park, CA  94025


Tel. 650/ 324-9300

Fax. 650/ 324-0227

3

                    ZEL 0302



ZEL 0303

# Exhibit F

ZEL 0304

Community Services



CITY OF
MENLO PARK

June 16, 2016

**VIA EMAIL: michael@massmeans.com**
**AND U.S. MAIL**

Michael Zeleny
7576 Willow Glen Road
Los Angeles, CA. 90046

### RE: Special Event Permit Application Denial

Dear Mr. Zeleny,

Thank you for submitting a Special Event Application with the City of Menlo Park. Upon reviewing your application and appeal, approval for your special event has been denied for the following reason(s):

- Incomplete Application
- Does not meet the criteria for Special Event
- Other:
  - No defined term
  - The exhibition of loaded and or unloaded firearms is prohibited by law
  - Location proposed creates a traffic and safety hazard
  - Driving a vehicle onto a center medium is prohibited by California Vehicle Code section 21651
  - Illuminated displays which impair a driver's vision are prohibited by California Vehicle Code section 21466.5

Determination of the approval or denial of any application is at the discretion of the Special Event Permit Committee acting on behalf of the Community Services Director. If you feel this decision has been made in error or warrants a permit outside of the policies established by the City of Menlo Park you may appeal in writing to City Manager, Alex McIntyre. He can be reached at admcintyre@menlopark.org.

If you have any questions, please feel free to contact me.

Matt Milde
Recreation Coordinator
City of Menlo Park

2

(650) 330-2223
mlmilde@menlopark.org

PRIVATE ROAD CLOSURE
The City of Menlo Park is unable to issue a special event permit if the event includes a road closure for private or exclusive residential use such as a birthday party, reunion, wedding, anniversary, etc. The Arrillaga Family Recreation Center (650-330-2200), Onetta Harris Community Center (650-330-2250) and picnic/park facilities (650-330-2220) are community resources designated for this type of function.

## Nicolas A. Flegel

| | |
|---|---|
| **From:** | Michael Zeleny <michael@massmeans.com> |
| **Sent:** | Friday, July 01, 2016 5:00 PM |
| **To:** | Brandell, Cherise E |
| **Cc:** | William L. McClure; Nicolas A. Flegel; Bertini, David C; Milde, Matt L; McIntyre, Alex D; Aguilar, Pamela I; David W. Affeld; Scott Sandell; Subrah Iyar; Dick Kramlich; Dan Primack; Louis Citron; Forest Baskett; Brooke Seawell; Peter Sonsini; Robert Garland; Jake Nunn; Hawk, Robert B.; Arno Penzias |
| **Subject:** | [BULK] Re: MP/ Zeleny Permit |

Dear Dr Brandell,

I have received and reviewed your final denial of my "Special Event Permit" application in Menlo Park. I hereby give notice of appeal of your denial to the Menlo Park City Council and request to have a hearing in this matter conducted by the City of Menlo Park.

In the mutual interests of efficiency, I would appreciate your disclosure of any legal authority you are claiming for the proposition that "[s]pecial events by their very nature as being 'special' are for a defined term and cannot be permanent or open-ending." Likewise, I would appreciate a disclosure of any legal authority your colleagues are claiming in support of their insistence that my non-profit, public interest videography in a public venue located within its jurisdiction requires a film permit from the City of Menlo Park.

In response to your erroneous interpretation of "authorized participants in a motion picture, television, or video production, or an entertainment event" within the meaning of California Penal Code §§ 26405 and 26375, please be advised that I have applied for an Entertainment Firearms Permit pursuant to California Code Penal Code §§ 29500-29535, and intend to submit it at the said hearing that I plan to attend with my attorney David W. Affeld. Please indicate if you require any additional documentation in this regard.

Lastly, please indicate whether the hearings of the Menlo Park City Council are routinely recorded on video, and if so, whether these video recordings are made available to concerned parties. If not, please be advised that I intend to have the hearing recorded pursuant to California Government Code § 11124.1(a) and Cal Government Code §§ 54953.5(a),-.6.

---

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and**
**ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Fri, Jun 24, 2016 at 10:26 AM, Brandell, Cherise E <cebrandell@menlopark.org> wrote:

Mr. Zeleny – please see letter regarding your appeal of a special event permit denial with the City of Menlo Park.

Cherise Brandell, PhD
Community Services Director

1

# Exhibit G

ZEL 0308

City of Menlo Park

**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Friday, June 17, 2016 11:50 AM
**To:** Milde, Matt L; McClure, William
**Cc:** Robin H. Riggins; Brandell, Cherise E; Cindy S. Elmquist; Bertini, David C; Scott Sandell; Subrah Iyar; Dick Kramlich; David W. Affeld; Dan Primack; Louis Citron; Forest Baskett; Brooke Seawell; Peter Sonsini; Robert Garland; Jake Nunn; Hawk, Robert B.; Arno Penzias

**Subject:** Re: MP/ Zeleny Permit

Gentlemen,

Thank you for your response. To clarify my application in the interest of identifying the points of intractable contention, I am willing to accommodate all your reasonable restrictions except for the following:

1. The concealed and open carry of unloaded firearms by an authorized participant in an entertainment event, is expressly authorized by California Penal Code Sections 25510 and 26375. Your denial of my statutory right is therefore groundless and legally sanctionable.
2. No legally cognizable justification exists for your imposition of a "defined term" on my Constitutionally protected speech.

Please indicate whether you prefer to proceed to litigation under 42 U.S. Code §1983, or concede these points and negotiate the remaining parameters of my performance.

—

Michael@massmeans.com  Zelenv@post.harvard.edu  | larvatus.livejournal.com | subrah.com

7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373

**Wronged by the high and mighty? Cut them down to size with legally safe and**

**ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Thu, Jun 16, 2016 at 3:08 PM, Milde, Matt L <mlmilde@menlopark.org> wrote:

Dear Mr. Zeleny,

2

PAGE 45                                          ZEL 0309

Thank you for submitting a Special Event Application with the City of Menlo Park. Upon reviewing your application and appeal, approval for your special event has been denied. Please see the attached letter regarding the specific details of this determination. If you wish to appeal this decision, please refer to the directions contained within this letter.


Regards,


Matt Milde

Recreation Coordinator

City of Menlo Park

(650) 330-2223

mlmilde@menlopark.org


**Special Events** | **PAC Events** | **Aquatics** | **Event Permits** | **Parks** | **Tennis Courts**


**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Wednesday, June 15, 2016 4:58 PM
**To:** McClure, William; Robin H. Riggins; Brandell, Cherise E
**Cc:** Cindy S. Elmquist; Bertini, David C; Milde, Matt L; Scott Sandell; Subrah Iyar; Dick Kramlich; David W. Affeld; Dan Primack; Louis Citron; Forest Baskett; Brooke Seawell; Peter Sonsini; Robert Garland; Jake Nunn; Hawk, Robert B.; Arno Penzias
**Subject:** Re: MP/ Zeleny Permit


Dear Mr McClure,

The requested date of my performance is upon us. Kindly issue your definitive ruling on my application, so that we may proceed either to negotiate its time, place, and manner parameters, or to litigate the matter of your infringement of my civil rights.


———

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com

3

# Exhibit H

ZEL 0311

## Nicolas A. Flegel

| | |
|---|---|
| **From:** | Brandell, Cherise E <cebrandell@menlopark.org> |
| **Sent:** | Friday, June 24, 2016 10:27 AM |
| **To:** | Michael Zeleny |
| **Cc:** | William L McClure; Nicolas A. Flegel; Bertini, David C; Milde, Matt L; McIntyre, Alex D; Aguilar, Pamela I |
| **Subject:** | RE: MP/ Zeleny Permit |
| **Attachments:** | Zeleny Letter June 24 final.pdf |

Mr. Zeleny – please see letter regarding your appeal of a special event permit denial with the City of Menlo Park.

Cherise Brandell, PhD
Community Services Director
City of Menlo Park

**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Friday, June 17, 2016 11:50 AM
**To:** Milde, Matt L; McClure, William
**Cc:** Robin H. Riggins; Brandell, Cherise E; Cindy S. Elmquist; Bertini, David C; Scott Sandell; Subrah Iyar; Dick Kramlich; David W. Affeld; Dan Primack; Louis Citron; Forest Baskett; Brooke Seawell; Peter Sonsini; Robert Garland; Jake Nunn; Hawk, Robert B.; Arno Penzias
**Subject:** Re: MP/ Zeleny Permit

Gentlemen,

Thank you for your response. To clarify my application in the interest of identifying the points of intractable contention, <u>I am willing to accommodate all your reasonable restrictions except for the following:</u>

1. The concealed and open carry of unloaded firearms by an authorized participant in an entertainment event, is expressly authorized by California Penal Code Sections 25510 and 26375. Your denial of my statutory right is therefore groundless and legally sanctionable.
2. No legally cognizable justification exists for your imposition of a "defined term" on my Constitutionally protected speech.

Please indicate whether you prefer to proceed to litigation under 42 U.S. Code §1983, or concede these points and negotiate the remaining parameters of my performance.

----

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Thu, Jun 16, 2016 at 3:08 PM, Milde, Matt L <mlmilde@menlopark.org> wrote:

Dear Mr. Zeleny,

1



Community Services



CITY OF
MENLO PARK

June 24, 2016

**RE: Special Event Denial Appeal**

Mr. Zeleny.

Your email dated June 17, 2016 has been forwarded to me as an appeal to the denial of your "Special Event Permit" application. I have discussed your application and denial with staff, and have considered all communications and information you submitted as part of your application.   After review, I will not be overruling the denial of your application for the following reasons:

•      Your application for a special event permit continues to have no term attached to it. Special events by their very nature as being "special" are for a defined term and cannot be permanent or open-ending.

•      The open carry or concealed possession of firearms in a public place is prohibited by law; California Penal Code sections 25400, 26350, and 26400.

•      The sections you quoted, which give authorization for the carrying of firearms, are specifically for "authorized" participants in an entertainment, motion picture or television production. The City of Menlo Park has not "authorized" you as a participant in a motion picture, television, or video production, or an entertainment event; and you have not provided evidence that any other governmental agency has authorized your entertainment event.

Please be aware that the above denial of the application for a Special Event Permit is in no way a denial of your First Amendment right to protest.  No permit is necessary for a protest in the same location you have protested in the past, as long as it is conducted within the confines of the law and local ordinance, including Penal Code sections regulating the display of firearms cited above.

As Community Services Director, I have fulfilled my responsibility to review your appeal and provide you notice of my decision. As part of the City's appeals process, your next step, if you disagree with my decision, would be to appeal my decision to the City Manager, Alex McIntyre.  If you wish to appeal my decision to the City Manager, please notify me, as well as City Manager Alex McIntyre (admcintyre@menlopark.org); with a copy of your notification to City Clerk Pamela Aguilar (piaguilar@menlopark.org), Commander Dave Bertini (dcbertini@menlopark.org), and City Attorneys William L. McClure (wlm@jsmf.com) and Nicolas A. Flegel (naf@jsmf.com).   Please specify in your notification if you wish to have a hearing conducted or if you want the City Manager to base his decision on all your communications to date received by City staff.

2

If you intend to submit additional documentation, please indicate what you intend to submit.

Lastly, so you are aware, any decision made by the City Manager may be appealed to the City Council, who will have the final decision making authority for the City of Menlo Park.


Cherise Brandell

ZEL 0314

# Exhibit I

ZEL 0315

ROBERT J. LANZONE
JEAN B. SAVAREE
GREGORY J. RUBENS
CAMAS J. STEINMETZ
---
KAI RUESS
KIMBERLY L. CHU

Gregory J. Rubens, Ext. 202
Email:  grubens@adcl.com

LAW OFFICES
**AARONSON, DICKERSON, COHN & LANZONE**
A PROFESSIONAL CORPORATION
1001 LAUREL STREET, SUITE A
SAN CARLOS, CALIFORNIA 94070
PHONE: 650-593-3117
FAX: 650-453-3911
www.adcl.com

MICHAEL AARONSON
(1910-1988)
KENNETH M. DICKERSON
(1928-2008)
MELVIN E. COHN
(1917-2014)

July 20,  2016

**Via First Class Mail and Email**
Michael Zeleny
7576 Willow Glen Rd
Los Angeles, CA 90046

Re:   *Notice of Hearing Date on Appeal of Special Events Permit*

Dear Mr. Zeleny:

I have been retained by the City of Menlo Park to advise the City Manager on your appeal of the decision of the Community Services Director denying your Application for a City Special Event Permit.  It is my understanding that this is the process employed by the City of Menlo Park for appeals of discretionary administrative decisions.

The hearing on your appeal is set for August 11, 2016 at 2:00 pm in the office of the City Manager at City Hall, 701 Laurel Street, Menlo Park, California.  Should you choose to do so, you may appear at the appeal hearing telephonically, by dialing (650) 330-6610.  If you chose to appear telephonically, you must deliver any additional written, digital or other materials in support of your appeal before the hearing concludes.

The hearing is scheduled to last two hours.  If you require more time, you should let me know, and the hearing can be rescheduled.

This will be considered a "de novo" appeal, meaning the City Manager is not bound by the prior decision and can make his own independent decision based on the testimony, materials presented, information presented to the City, facts, relevant law and regulations.

Please have your attorney contact me if you have any concerns.

Very truly yours,

Gregory J. Rubens

Cc:   David W. Affeld, Esq.
Nicole Mariano
Alex McIntyre

                      ZEL 0316

# Exhibit J

ZEL 0317

ROBERT J. LANZONE
JEAN B. SAVAREE
GREGORY J. RUBENS
CAMAS J. STEINMETZ

KAI RUESS
KIMBERLY L. CHU

Gregory J. Rubens, Ext. 202
Email: grubens@adcl.com

LAW OFFICES
**AARONSON, DICKERSON, COHN & LANZONE**
A PROFESSIONAL CORPORATION
1001 LAUREL STREET, SUITE A
SAN CARLOS, CALIFORNIA 94070
PHONE: 650-593-3117
FAX: 650-453-3911
www.adcl.com

MICHAEL AARONSON
(1910-1998)
KENNETH M. DICKERSON
(1926-2005)
MELVIN E. COHN
(1917-2014)

July 20, 2016

**Via First Class Mail and Email**
Michael Zeleny
7576 Willow Glen Rd
Los Angeles, CA 90046

Re:    *Notice of Hearing Date on Appeal of Special Events Permit*

Dear Mr. Zeleny:

I have been retained by the City of Menlo Park to advise the City Manager on your appeal of the decision of the Community Services Director denying your Application for a City Special Event Permit. It is my understanding that this is the process employed by the City of Menlo Park for appeals of discretionary administrative decisions.

The hearing on your appeal is set for August 11, 2016 at 2:00 pm in the office of the City Manager at City Hall, 701 Laurel Street, Menlo Park, California. Should you choose to do so, you may appear at the appeal hearing telephonically, by dialing (650) 330-6610. If you chose to appear telephonically, you must deliver any additional written, digital or other materials in support of your appeal before the hearing concludes.

The hearing is scheduled to last two hours. If you require more time, you should let me know, and the hearing can be rescheduled.

This will be considered a "de novo" appeal, meaning the City Manager is not bound by the prior decision and can make his own independent decision based on the testimony, materials presented, information presented to the City, facts, relevant law and regulations.

Please have your attorney contact me if you have any concerns.

Very truly yours,

Gregory J. Rubens

Cc:    David W. Affeld, Esq.
       Nicole Mariano
       Alex McIntyre

          ZEL 0318

**Nicolas A. Flegel**

| | |
|---|---|
| **From:** | Michael Zeleny <michael@massmeans.com> |
| **Sent:** | Wednesday, July 13, 2016 11:53 PM |
| **To:** | Milde, Matt L |
| **Cc:** | Brandell, Cherise E; William L. McClure; Nicolas A. Flegel; Bertini, David C; McIntyre, Alex D; Aguilar, Pamela I; David W. Affeld; Scott Sandell; Subrah Iyar; Dick Kramlich; Dan Primack; Louis Citron; Forest Baskett; Brooke Seawell; Peter Sonsini; Robert Garland; Jake Nunn; Hawk, Robert B.; Arno Penzias |
| **Subject:** | Re: MP/ Zeleny Permit |
| **Attachments:** | criminal history.pdf; 07.12.16 - Permit Letter.pdf |

Dear Mr Milde,

In response to your attached letter, I respectfully request you to schedule a hearing in this matter with the City Manager at his earliest convenience, via a teleconference with me and my lawyer David W. Affeld. This matter has been dragged out long enough. We look forward to its speedy and definitive determination by the City of Menlo Park, whether it is to ensue in the City's belated authorization of my special event, or our litigation for deprivation of my rights pursuant to 42 U.S. Code § 1983 at the City's eventual expense.

In the furtherance of efficiency, please find attached herewith a copy of my current criminal history issued by the California Department of Justice. Pursuant to California Penal Code § 29515 (b), the Department of Justice "shall issue an entertainment firearms permit" to the applicant, "only if the records indicate that the applicant is not prohibited from possessing or receiving firearms pursuant to any federal, state, or local law." As witness my record, I am fully qualified for a prompt, non-discretionary issuance of an entertainment firearms permit that will satisfy the City's erroneous interpretation of "authorized participants in a motion picture, television, or video production, or an entertainment event" within the meaning of California Penal Code §§ 26405 and 26375.

———
Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and**
**ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Tue, Jul 12, 2016 at 4:11 PM, Milde, Matt L <mlmilde@menlopark.org> wrote:

Mr. Zeleny – please see the letter regarding your appeal of a special event permit denial with the City of Menlo Park.

Matt Milde

Recreation Coordinator

City of Menlo Park

(650) 330-2223

mlmilde@menlopark.org

1

**KAMALA D. HARRIS**
*Attorney General*



*State of California*
*DEPARTMENT OF JUSTICE*

BUREAU OF CRIMINAL INFORMATION AND ANALYSIS
P.O. Box 903417
SACRAMENTO, CA 94203-4170

June 30, 2016

MICHAEL ZELENY
7576 WILLOW GLEN RD
LOS ANGELES, CA 90046

RE:   California Criminal History Information

Dear Applicant:

This letter is in response to your record review request concerning the existence of information maintained in the California state summary criminal history files, as defined in subdivision (a) of Section 11105. Your fingerprints did identify to a record maintained in these files, and as such, a copy of that record is enclosed. If you wish to challenge the accuracy or completeness of your record, please complete and return the enclosed form (BCIA 8706) and supporting documentation to the address noted above. As requested, a copy of this record review response has been sent to your designee.

Pursuant to California Penal Code section 11121, the purpose of a record review request is to afford an individual with a copy of their record and to refute any erroneous or inaccurate information contained therein. The intent is not to be used for licensing, certification or employment purposes.

Additionally, California Penal Code sections 11125, 11142, and 11143 does not allow for a person or agency to make a request to another person to provide them with a copy of an individual's criminal history or notification that a record does not exist; does not allow an authorized person to furnish the record to an unauthorized person; nor does it allow an unauthorized person to buy, receive or possess the record or information. A violation of these section codes is a misdemeanor.

Sincerely,

*Cindy Santos*

Record Review Unit
Applicant Information and Certification Program
Bureau of Criminal Information and Analysis

For   KAMALA D. HARRIS
Attorney General

Enclosures
BCIA 8711d (Rev. 05/16)

```
4CMTDP737036.IH
RE: QHY.CA0349400.09502469.APPUSR.      DATE:20160630 TIME:07:07:34
RESTRICTED-DO NOT USE FOR EMPLOYMENT,LICENSING OR CERTIFICATION PURPOSES
ATTN:APPUSR

** III CALIFORNIA ONLY SOURCE RECORD
CII/A09502469
DOB/19580226    SEX/M RAC/OTHER
HGT/511 WGT/180 EYE/HAZ  HAI/BRO  POB/SX
CTZ/ROMANIA/RUMANIA
NAM/001 ZELENY,MICHAEL

FBI/293068MA2
DOB/19560226
DMV/C4374887
SOC/360542687
OCC/CONSULT; STUDENT
* * * *

ARR/DET/CITE:         NAM:001 DOB:19580226
19900711    CAUV PD LOS ANGELES

CNT:001     #90-2785
  626.10(A) PC-POSSESS KNIFE/ETC AT SCHOOL        TOC:M
- - - -
COURT:              NAM:001
19900810 CAMC WEST LOS ANGELES

CNT:001     #90W05955
  626.10(B) PC-POSS WPN/ETC ON CAMPUS:NOT F/ARM    TOC:F
 DISPO:DISMISSED/FURTHERANCE OF JUSTICE
* * * *

APPLICANT:          NAM:001
19940419    CASG COLLECT & INVEST SERV, SACRAMENTO

CNT:001     #CSI 983525
  APPLICANT SECURITY GUARD                 TOC:N
* * * *

APPLICANT:          NAM:001
19940928   CASO LOS ANGELES

CNT:001
  APPLICANT PEACE OFFICER AUXILIARY           TOC:N
* * * *

ARR/DET/CITE:       NAM:001  DOB:19560226
20020908    CAPD LA SEVENTY SEVEN

CNT:001     #7408911
  12025(A)(2) PC-CCW ON PERSON              TOC:M
  ARR BY:CAPD LOS ANGELES
  ADR:090802  (1209, AMHERST AV, 302,  , LA, CA, , )
  SCN:48922510055
  DCN:T6097782950219000211
- - - -
COURT:              NAM:001
20030411  CASC LOS ANGELES METRO

CNT:001     #2CR11665
  LOCAL ORDINANCE VIOLATION                TOC:M
 DISPO:ACQUITTED/NOT GUILTY
```

```
CNT:002
  653K PC-POSSESS/SELL SWITCH-BLADE KNIFE        TOC:M
  DISPO:ACQUITTED/NOT GUILTY

CNT:003
  12025(A)(2) PC-CCW ON PERSON                   TOC:M
  DISPO:ACQUITTED/NOT GUILTY
* * * *

APPLICANT:          NAM:001
20110218   CADJ SACRAMENTO

CNT:001
  APPLICANT FIREARM ELIGIBILITY CERT             TOC:N
    SCN:U28E0490001 ATI-B049ZEM852
      *     *     *     END OF MESSAGE     *     *     *
```

*KAMALA D. HARRIS*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*



BUREAU OF CRIMINAL INFORMATION AND ANALYSIS

P.O. Box 903417
SACRAMENTO, CA 94203-4170

## CLAIM OF ALLEGED INACCURACY OR INCOMPLETENESS

I have examined a copy of my California State Summary Criminal History Record as contained in the files of the Department of Justice, Bureau of Criminal Information and Analysis, and wish to take exception to its accuracy and/or completeness.

NAME: _____          CII NUMBER: _____
     (LAST, FIRST, MIDDLE)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Date of Arrest: _____

Brief Explanation of claim: _____

_____

_____

Date of Arrest: _____

Brief Explanation of claim: _____

_____

_____

Date of Arrest: _____

Brief Explanation of claim: _____

_____

_____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

_____          _____
SIGNATURE                                                                    DATE

Attach copies of any official documents or court orders that would verify your claim. Failure to fill out the form correctly may result in a delay in processing or the return of the claim form. You may attach additional pages if necessary. Return this form to the attention of the Record Review Unit at the address listed above.

BCIA 8706 (Rev. 03/08)

ZEL 0323

## Nicolas A. Flegel

| | |
|---|---|
| **From:** | Milde, Matt L <mlmilde@menlopark.org> |
| **Sent:** | Tuesday, July 12, 2016 4:11 PM |
| **To:** | Michael Zeleny |
| **Cc:** | Brandell, Cherise E; William L. McClure; Nicolas A. Flegel; Bertini, David C; McIntyre, Alex D; Aguilar, Pamela I |
| **Subject:** | RE: MP/ Zeleny Permit |
| **Attachments:** | 07.12.16 - Permit Letter.pdf |

Mr. Zeleny – please see the letter regarding your appeal of a special event permit denial with the City of Menlo Park.

Matt Milde
Recreation Coordinator
City of Menlo Park
(650) 330-2223
mlmilde@menlopark.org

**Special Events | PAC Events | Aquatics | Event Permits | Parks | Tennis Courts**

**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Friday, July 01, 2016 5:00 PM
**To:** Brandell, Cherise E
**Cc:** McClure, William; Flegel, Nicolas A.; Bertini, David C; Milde, Matt L; McIntyre, Alex D; Aguilar, Pamela I; David W. Affeld; Scott Sandell; Subrah Iyar; Dick Kramlich; Dan Primack; Louis Citron; Forest Baskett; Brooke Seawell; Peter Sonsini; Robert Garland; Jake Nunn; Hawk, Robert B.; Arno Penzias
**Subject:** Re: MP/ Zeleny Permit

Dear Dr Brandell,

I have received and reviewed your final denial of my "Special Event Permit" application in Menlo Park. I hereby give notice of appeal of your denial to the Menlo Park City Council and request to have a hearing in this matter conducted by the City of Menlo Park.

In the mutual interests of efficiency, I would appreciate your disclosure of any legal authority you are claiming for the proposition that "[s]pecial events by their very nature as being 'special' are for a defined term and cannot be permanent or open-ending." Likewise, I would appreciate a disclosure of any legal authority your colleagues are claiming in support of their insistence that my non-profit, public interest videography in a public venue located within its jurisdiction requires a film permit from the City of Menlo Park.

In response to your erroneous interpretation of "authorized participants in a motion picture, television, or video production, or an entertainment event" within the meaning of California Penal Code §§ 26405 and 26375, please be advised that I have applied for an Entertainment Firearms Permit pursuant to California Code Penal Code §§ 29500-29535, and intend to submit it at the said hearing that I plan to attend with my attorney David W. Affeld. Please indicate if you require any additional documentation in this regard.

Lastly, please indicate whether the hearings of the Menlo Park City Council are routinely recorded on video, and if so, whether these video recordings are made available to concerned parties. If not, please be advised that I

1



Community Services



CITY OF
MENLO PARK

July 12, 2016

Michael Zeleny
7576 Willow Glen Road
Los Angeles, CA. 90046

**RE: Special Event Permit Application Denial**

Dear Mr. Zeleny,

Community Services Director Cherise Brandell is on vacation this week, and I am therefore writing on her behalf. The City of Menlo Park is in receipt of your email of July 1, 2016, sent at 5:00 p.m. in which you gave notice of your appeal of the denial of your special event permit application by the Community Services Director. The next step in the City's appeal process is an appeal to the City Manager, Alex McIntyre, and not an appeal directly to the City Council. Your appeal has been directed to the City Manager, who is also on vacation this week; however, it is expected he will act on your appeal next week (the week of July 18th) upon his return. Please indicate whether you wish to have a hearing with the City Manager and whether you intend to submit any additional information on behalf of your appeal or whether you want the City Manager to base his decision on all your communications to date received by City Staff.


Thank you for your attention to this matter.


Matt Milde, on behalf of Cherise Brandell, Community Services Director
City of Menlo Park

ZEL 0325

## Nicolas A. Flegel

| | |
|---|---|
| **From:** | Michael Zeleny <michael@massmeans.com> |
| **Sent:** | Friday, July 01, 2016 5:00 PM |
| **To:** | Brandell, Cherise E |
| **Cc:** | William L. McClure; Nicolas A. Flegel; Bertini, David C; Milde, Matt L; McIntyre, Alex D; Aguilar, Pamela I; David W. Affeld; Scott Sandell; Subrah Iyar; Dick Kramlich; Dan Primack; Louis Citron; Forest Baskett; Brooke Seawell; Peter Sonsini; Robert Garland; Jake Nunn; Hawk, Robert B.; Arno Penzias |
| **Subject:** | [BULK]  Re: MP/ Zeleny Permit |

Dear Dr Brandell,

I have received and reviewed your final denial of my "Special Event Permit" application in Menlo Park. I hereby give notice of appeal of your denial to the Menlo Park City Council and request to have a hearing in this matter conducted by the City of Menlo Park.

In the mutual interests of efficiency, I would appreciate your disclosure of any legal authority you are claiming for the proposition that "[s]pecial events by their very nature as being 'special' are for a defined term and cannot be permanent or open-ending." Likewise, I would appreciate a disclosure of any legal authority your colleagues are claiming in support of their insistence that my non-profit, public interest videography in a public venue located within its jurisdiction requires a film permit from the City of Menlo Park.

In response to your erroneous interpretation of "authorized participants in a motion picture, television, or video production, or an entertainment event" within the meaning of California Penal Code §§ 26405 and 26375, please be advised that I have applied for an Entertainment Firearms Permit pursuant to California Code Penal Code §§ 29500-29535, and intend to submit it at the said hearing that I plan to attend with my attorney David W. Affeld. Please indicate if you require any additional documentation in this regard.

Lastly, please indicate whether the hearings of the Menlo Park City Council are routinely recorded on video, and if so, whether these video recordings are made available to concerned parties. If not, please be advised that I intend to have the hearing recorded pursuant to California Government Code § 11124.1(a) and Cal Government Code §§ 54953.5(a),-.6.

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and
ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Fri, Jun 24, 2016 at 10:26 AM, Brandell, Cherise E <cebrandell@menlopark.org> wrote:

Mr. Zeleny – please see letter regarding your appeal of a special event permit denial with the City of Menlo Park.

Cherise Brandell, PhD
Community Services Director

1

City of Menlo Park

**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Friday, June 17, 2016 11:50 AM
**To:** Milde, Matt L; McClure, William
**Cc:** Robin H. Riggins; Brandell, Cherise E; Cindy S. Elmquist; Bertini, David C; Scott Sandell; Subrah Iyar; Dick Kramlich; David W. Affeld; Dan Primack; Louis Citron; Forest Baskett; Brooke Seawell; Peter Sonsini; Robert Garland; Jake Nunn; Hawk, Robert B.; Arno Penzias

**Subject:** Re: MP/ Zeleny Permit

Gentlemen,

Thank you for your response. To clarify my application in the interest of identifying the points of intractable contention, I am willing to accommodate all your reasonable restrictions except for the following:

1. The concealed and open carry of unloaded firearms by an authorized participant in an entertainment event, is expressly authorized by California Penal Code Sections 25510 and 26375. Your denial of my statutory right is therefore groundless and legally sanctionable.
2. No legally cognizable justification exists for your imposition of a "defined term" on my Constitutionally protected speech.

Please indicate whether you prefer to proceed to litigation under 42 U.S. Code §1983, or concede these points and negotiate the remaining parameters of my performance.

—

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com

7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373

**Wronged by the high and mighty? Cut them down to size with legally safe and**

**ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Thu, Jun 16, 2016 at 3:08 PM, Milde, Matt L <mlmilde@menlopark.org> wrote:

Dear Mr. Zeleny,

2

Thank you for submitting a Special Event Application with the City of Menlo Park. Upon reviewing your application and appeal, approval for your special event has been denied. Please see the attached letter regarding the specific details of this determination. If you wish to appeal this decision, please refer to the directions contained within this letter.

Regards,

Matt Milde

Recreation Coordinator

City of Menlo Park

(650) 330-2223

mlmilde@menlopark.org

**Special Events | PAC Events | Aquatics | Event Permits | Parks | Tennis Courts**

**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Wednesday, June 15, 2016 4:58 PM
**To:** McClure, William; Robin H. Riggins; Brandell, Cherise E
**Cc:** Cindy S. Elmquist; Bertini, David C; Milde, Matt L; Scott Sandell; Subrah Iyar; Dick Kramlich; David W. Affeld; Dan Primack; Louis Citron; Forest Baskett; Brooke Seawell; Peter Sonsini; Robert Garland; Jake Nunn; Hawk, Robert B.; Arno Penzias
**Subject:** Re: MP/ Zeleny Permit

Dear Mr McClure,

The requested date of my performance is upon us. Kindly issue your definitive ruling on my application, so that we may proceed either to negotiate its time, place, and manner parameters, or to litigate the matter of your infringement of my civil rights.

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com

3

PAGE 64                                                          ZEL 0328

7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373

**Wronged by the high and mighty? Cut them down to size with legally safe and**

**ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Fri, May 27, 2016 at 12:21 PM, Michael Zeleny <michael@massmeans.com> wrote:

Dear Mr McClure,

I have received your second denial, dated 4 May 2016, of my amended application for a special event permit, submitted on 15 April 2016. My second appeal follows.

With respect to your complaint regarding my application being incomplete, please refer to the map I submitted with it, as reattached below for your convenience. The red rectangle that designates the location of my entertainment event represents the location of my Dodge Ram SRT-10 pickup truck. All my activities and all my equipment will be confined to its bed and cabin, as driven to and parked at the designated location. The video presentation will be made with a 55" SunBrite outdoor TV, mounted in a Gator G-Tour E-Lift, and powered by a portable generator. As stated in my original application dated 28 July 2015, I will remain on site around the clock until NEA publicly acknowledges its wrongdoing and severs all its relations with Min Zhu, Scott Sandell, and Dick Kramlich. My staff will attend to all my needs with daily deliveries, in full compliance with all relevant laws and regulations.

My event is most certainly meant to be open to the community at large, and I will make every accommodation for all passerby to engage lawfully and safely with its content and its authors. Without limitation, these accommodations will include distribution of flyers and souvenirs, and opportunities to engage me in real-time discussion, broadcast via a live Internet linkage.

If the foregoing explanation satisfies your concerns, I will forgo carrying of loaded weapons in the spirit of compromise. However, if you continue to object to my carrying unloaded firearms in the course of my entertainment event, I shall be happy to litigate the matter of loaded open carry within the scope of Constitutionally protected speech. Your citation of Penal Code §16840 providing that "a firearm shall be deemed to be 'loaded' whenever both the firearm and the unexpended ammunition capable of being discharged from the firearm are in the immediate possession of the same person", is inapposite, because applicable solely to "[e]very person who carries a loaded firearm with the intent to commit a felony" within the scope of Penal Code §25800. I assure you that I have no such intent.

Lastly, I do not understand your claim that "a practical reading of the entertainment exception would require the Department of Justice or the Menlo Park Police Department to authorize [my] event." If you are claiming that my Constitutionally protected speech stands in need of such authorization, as explained previously, I shall be happy to settle this matter within the scope of a civil action for deprivation of rights pursuant to 42 U.S. Code §1983. Indeed, if you compel me to do so, the venue of my performance will merely change, from Sand Hill Road, to a Federal courthouse. One way or another, my message will resonate with its intended audience.

I trust that I have answered all relevant questions and addressed all legitimate concerns. I hope that no further explanations will be necessary for you to make a final disposition of my application.

4

----

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com

7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373

**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Wed, May 4, 2016 at 10:52 AM, Robin H. Riggins <rhr@jsmf.com> wrote:

Dear Mr. Zeleny:

     Pursuant to Mr. McClure's request, please find attached his letter to you of today's date concerning the above-mentioned matter.

Thank you for your attention to this matter.

Sincerely,

Robin Riggins

Secretary to

William L. McClure, Esq.

Jorgenson, Siegel, McClure & Flegel, LLP

1100 Alma Street, Suite 210

Menlo Park, CA  94025

Tel.  650/ 324-9300

Fax. 650/ 324-0227

5

ZEL 0330



6

ZEL 0331

## Nicolas A. Flegel

| From: | Brandell, Cherise E <cebrandell@menlopark.org> |
|---|---|
| Sent: | Friday, June 24, 2016 10:27 AM |
| To: | Michael Zeleny |
| Cc: | William L. McClure; Nicolas A. Flegel; Bertini, David C; Milde, Matt L; McIntyre, Alex D; Aguilar, Pamela I |
| Subject: | RE: MP/ Zeleny Permit |
| Attachments: | Zeleny Letter June 24 final.pdf |

Mr. Zeleny – please see letter regarding your appeal of a special event permit denial with the City of Menlo Park.

Cherise Brandell, PhD
Community Services Director
City of Menlo Park

**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Friday, June 17, 2016 11:50 AM
**To:** Milde, Matt L; McClure, William
**Cc:** Robin H. Riggins; Brandell, Cherise E; Cindy S. Elmquist; Bertini, David C; Scott Sandell; Subrah Iyar; Dick Kramlich; David W. Affeld; Dan Primack; Louis Citron; Forest Baskett; Brooke Seawell; Peter Sonsini; Robert Garland; Jake Nunn; Hawk, Robert B.; Arno Penzias
**Subject:** Re: MP/ Zeleny Permit

Gentlemen,

Thank you for your response. To clarify my application in the interest of identifying the points of intractable contention, I am willing to accommodate all your reasonable restrictions except for the following:

1. The concealed and open carry of unloaded firearms by an authorized participant in an entertainment event, is expressly authorized by California Penal Code Sections 25510 and 26375. Your denial of my statutory right is therefore groundless and legally sanctionable.
2. No legally cognizable justification exists for your imposition of a "defined term" on my Constitutionally protected speech.

Please indicate whether you prefer to proceed to litigation under 42 U.S. Code §1983, or concede these points and negotiate the remaining parameters of my performance.

—

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Thu, Jun 16, 2016 at 3:08 PM, Milde, Matt L <mlmilde@menlopark.org> wrote:

Dear Mr. Zeleny,

1

                    ZEL 0332



Community Services

CITY OF
MENLO PARK

June 24, 2016

**RE: Special Event Denial Appeal**

Mr. Zeleny.

Your email dated June 17, 2016 has been forwarded to me as an appeal to the denial of your "Special Event Permit" application. I have discussed your application and denial with staff, and have considered all communications and information you submitted as part of your application.   After review, I will not be overruling the denial of your application for the following reasons:

•       Your application for a special event permit continues to have no term attached to it. Special events by their very nature as being "special" are for a defined term and cannot be permanent or open-ending.

•       The open carry or concealed possession of firearms in a public place is prohibited by law; California Penal Code sections 25400, 26350, and 26400.

•       The sections you quoted, which give authorization for the carrying of firearms, are specifically for "authorized" participants in an entertainment, motion picture or television production. The City of Menlo Park has not "authorized" you as a participant in a motion picture, television, or video production, or an entertainment event; and you have not provided evidence that any other governmental agency has authorized your entertainment event.

Please be aware that the above denial of the application for a Special Event Permit is in no way a denial of your First Amendment right to protest.  No permit is necessary for a protest in the same location you have protested in the past, as long as it is conducted within the confines of the law and local ordinance, including Penal Code sections regulating the display of firearms cited above.

As Community Services Director, I have fulfilled my responsibility to review your appeal and provide you notice of my decision. As part of the City's appeals process, your next step, if you disagree with my decision, would be to appeal my decision to the City Manager, Alex McIntyre.  If you wish to appeal my decision to the City Manager, please notify me, as well as City Manager Alex McIntyre (admcintyre@menlopark.org); with a copy of your notification to City Clerk Pamela Aguilar (plaguilar@menlopark.org), Commander Dave Bertini (dcbertini@menlopark.org), and City Attorneys William L. McClure (wlm@jsmf.com) and Nicolas A. Flegel (naf@jsmf.com).   Please specify in your notification if you wish to have a hearing conducted or if you want the City Manager to base his decision on all your communications to date received by City staff.

2

If you intend to submit additional documentation, please indicate what you intend to submit.

Lastly, so you are aware, any decision made by the City Manager may be appealed to the City Council, who will have the final decision making authority for the City of Menlo Park.

Cherise Brandell

PAGE 70                                                    ZEL 0334

Community Services



CITY OF
MENLO PARK

**June 16, 2016**

**VIA EMAIL: michael@massmeans.com**
**AND U.S. MAIL**

Michael Zeleny
7576 Willow Glen Road
Los Angeles, CA. 90046

### RE: Special Event Permit Application Denial

Dear Mr. Zeleny,

Thank you for submitting a Special Event Application with the City of Menlo Park. Upon reviewing your application and appeal, approval for your special event has been denied for the following reason(s):

- Incomplete Application
- Does not meet the criteria for Special Event
- Other:
  - No defined term
  - The exhibition of loaded and or unloaded firearms is prohibited by law
  - Location proposed creates a traffic and safety hazard
  - Driving a vehicle onto a center medium is prohibited by California Vehicle Code section 21651
  - Illuminated displays which impair a driver's vision are prohibited by California Vehicle Code section 21466.5

Determination of the approval or denial of any application is at the discretion of the Special Event Permit Committee acting on behalf of the Community Services Director. If you feel this decision has been made in error or warrants a permit outside of the policies established by the City of Menlo Park you may appeal in writing to City Manager, Alex McIntyre. He can be reached at admcintyre@menlopark.org.

If you have any questions, please feel free to contact me.

Matt Milde
Recreation Coordinator
City of Menlo Park

ZEL 0335

2

(650) 330-2223
mlmilde@menlopark.org

PRIVATE ROAD CLOSURE
The City of Menlo Park is unable to issue a special event permit if the event includes a road closure for private or exclusive residential use such as a birthday party, reunion, wedding, anniversary, etc. The Arrillaga Family Recreation Center (650-330-2200), Onetta Harris Community Center (650-330-2250) and picnic/park facilities (650-330-2220) are community resources designated for this type of function.

**Nicolas A. Flegel**

| | |
|---|---|
| **From:** | William L. McClure |
| **Sent:** | Thursday, June 16, 2016 5:10 PM |
| **To:** | Nicolas A. Flegel |
| **Subject:** | FW: MP/ Zeleny Permit |

Sent with Good (www.good.com)

-----Original Message-----
**From:** Michael Zeleny [michael@massmeans.com]
**Sent:** Wednesday, June 15, 2016 04:58 PM Pacific Standard Time
**To:** William L. McClure; Robin H. Riggins; Cherise Brandell
**Cc:** Cindy S. Elmquist; David C. Bertini; Matt L. Milde; Scott Sandell; Subrah Iyar; Dick Kramlich; David W. Affeld; Dan Primack; Louis Citron; Forest Baskett; Brooke Seawell; Peter Sonsini; Robert Garland; Jake Nunn; Hawk, Robert B.; Arno Penzias
**Subject:** Re: MP/ Zeleny Permit

Dear Mr McClure,

The requested date of my performance is upon us. Kindly issue your definitive ruling on my application, so that we may proceed either to negotiate its time, place, and manner parameters, or to litigate the matter of your infringement of my civil rights.

—
Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Fri, May 27, 2016 at 12:21 PM, Michael Zeleny <michael@massmeans.com> wrote:
Dear Mr McClure,

I have received your second denial, dated 4 May 2016, of my amended application for a special event permit, submitted on 15 April 2016. My second appeal follows.

With respect to your complaint regarding my application being incomplete, please refer to the map I submitted with it, as reattached below for your convenience. The red rectangle that designates the location of my entertainment event represents the location of my Dodge Ram SRT-10 pickup truck. All my activities and all my equipment will be confined to its bed and cabin, as driven to and parked at the designated location. The video presentation will be made with a 55" SunBrite outdoor TV, mounted in a Gator G-Tour E-Lift, and powered by a portable generator. As stated in my original application dated 28 July 2015, I will remain on site around the clock until NEA publicly acknowledges its wrongdoing and severs all its relations with Min Zhu, Scott Sandell, and Dick Kramlich. My staff will attend to all my needs with daily deliveries, in full compliance with all relevant laws and regulations.

1

                    ZEL 0337

My event is most certainly meant to be open to the community at large, and I will make every accommodation for all passerby to engage lawfully and safely with its content and its authors. Without limitation, these accommodations will include distribution of flyers and souvenirs, and opportunities to engage me in real-time discussion, broadcast via a live Internet linkage.

If the foregoing explanation satisfies your concerns, I will forgo carrying of loaded weapons in the spirit of compromise. However, if you continue to object to my carrying unloaded firearms in the course of my entertainment event, I shall be happy to litigate the matter of loaded open carry within the scope of Constitutionally protected speech. Your citation of Penal Code §16840 providing that "a firearm shall be deemed to be 'loaded' whenever both the firearm and the unexpended ammunition capable of being discharged from the firearm are in the immediate possession of the same person", is inapposite, because applicable solely to "[e]very person who carries a loaded firearm with the intent to commit a felony" within the scope of Penal Code §25800. I assure you that I have no such intent.

Lastly, I do not understand your claim that "a practical reading of the entertainment exception would require the Department of Justice or the Menlo Park Police Department to authorize [my] event." If you are claiming that my Constitutionally protected speech stands in need of such authorization, as explained previously, I shall be happy to settle this matter within the scope of a civil action for deprivation of rights pursuant to 42 U.S. Code §1983. Indeed, if you compel me to do so, the venue of my performance will merely change, from Sand Hill Road, to a Federal courthouse. One way or another, my message will resonate with its intended audience.

I trust that I have answered all relevant questions and addressed all legitimate concerns. I hope that no further explanations will be necessary for you to make a final disposition of my application.

—

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and
ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Wed, May 4, 2016 at 10:52 AM, Robin H. Riggins <rhr@jsmf.com> wrote:

Dear Mr. Zeleny:

Pursuant to Mr. McClure's request, please find attached his letter to you of today's date concerning the above-mentioned matter.

Thank you for your attention to this matter.

Sincerely,

Robin Riggins

Secretary to

2

William L. McClure, Esq.

Jorgenson, Siegel, McClure & Flegel, LLP

1100 Alma Street, Suite 210

Menlo Park, CA  94025

Tel.  650/ 324-9300

Fax. 650/ 324-0227

3

ZEL 0339



4

ZEL 0340

## Nicolas A. Flegel

| | |
|---|---|
| **From:** | William L. McClure |
| **Sent:** | Wednesday, June 15, 2016 5:50 PM |
| **To:** | Michael Zeleny |
| **Cc:** | Cindy S. Elmquist; Cherise Brandell; David C. Bertini; Matt L. Milde; Scott Sandell; Subrah Iyar; Dick Kramlich; David W. Affeld; Dan Primack; Louis Citron; Forest Baskett; Brooke Seawell; Peter Sonsini; Robert Garland; Jake Nunn; Hawk, Robert B.; Arno Penzias |
| **Subject:** | RE: MP/ Zeleny Permit |

Mr. Zeleny –

The City has received your appeal dated May 27th and will be responding in due course. I am baffled by your statement, "The requested date of my performance is upon us." Neither your submittal of mid April or your appeal on May 27th includes a proposed date for your event. The only date that appears in your April submittal was a date in September of 2015 (the application that was attached appeared to be your original application from 2015). If I am incorrect as to my reading of your submissions, please point out where the date is specified. In any event, we will be getting back to you in due course.

Regards,

William L. McClure, City Attorney
City of Menlo Park
1100 Alma Street, Suite 210
Menlo Park, CA 94025
650-324-9300 Ofc
650-324-0227 Fax
wlm@jsmf.com

 Please consider the environment before printing this email 🌍

**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Wednesday, June 15, 2016 4:58 PM
**To:** William L. McClure <wlm@jsmf.com>; Robin H. Riggins <rhr@jsmf.com>; Cherise Brandell <cebrandell@menlopark.org>
**Cc:** Cindy S. Elmquist <cse@jsmf.com>; David C. Bertini <dcbertini@menlopark.org>; Matt L. Milde <mlmilde@menlopark.org>; Scott Sandell <ssandell@nea.com>; Subrah Iyar <Subrah.Iyar@webex.com>; Dick Kramlich <dkramlich@nea.com>; David W. Affeld <dwa@agzlaw.com>; Dan Primack <danielprimack@gmail.com>; Louis Citron <lcitron@nea.com>; Forest Baskett <fbaskett@nea.com>; Brooke Seawell <bseawell@nea.com>; Peter Sonsini <psonsini@nea.com>; Robert Garland <rgarland@nea.com>; Jake Nunn <jnunn@nea.com>; Hawk, Robert B. <robert.hawk@hoganlovells.com>; Arno Penzias <apenzias@nea.com>
**Subject:** Re: MP/ Zeleny Permit

Dear Mr McClure,

The requested date of my performance is upon us. Kindly issue your definitive ruling on my application, so that we may proceed either to negotiate its time, place, and manner parameters, or to litigate the matter of your infringement of my civil rights.

1

ZEL 0341

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and
ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Fri, May 27, 2016 at 12:21 PM, Michael Zeleny <michael@massmeans.com> wrote:

Dear Mr McClure,

I have received your second denial, dated 4 May 2016, of my amended application for a special event permit, submitted on 15 April 2016. My second appeal follows.

With respect to your complaint regarding my application being incomplete, please refer to the map I submitted with it, as reattached below for your convenience. The red rectangle that designates the location of my entertainment event represents the location of my Dodge Ram SRT-10 pickup truck. All my activities and all my equipment will be confined to its bed and cabin, as driven to and parked at the designated location. The video presentation will be made with a 55" SunBrite outdoor TV, mounted in a Gator G-Tour E-Lift, and powered by a portable generator. As stated in my original application dated 28 July 2015, I will remain on site around the clock until NEA publicly acknowledges its wrongdoing and severs all its relations with Min Zhu, Scott Sandell, and Dick Kramlich. My staff will attend to all my needs with daily deliveries, in full compliance with all relevant laws and regulations.

My event is most certainly meant to be open to the community at large, and I will make every accommodation for all passerby to engage lawfully and safely with its content and its authors. Without limitation, these accommodations will include distribution of flyers and souvenirs, and opportunities to engage me in real-time discussion, broadcast via a live Internet linkage.

If the foregoing explanation satisfies your concerns, I will forgo carrying of loaded weapons in the spirit of compromise. However, if you continue to object to my carrying unloaded firearms in the course of my entertainment event, I shall be happy to litigate the matter of loaded open carry within the scope of Constitutionally protected speech. Your citation of Penal Code §16840 providing that "a firearm shall be deemed to be 'loaded' whenever both the firearm and the unexpended ammunition capable of being discharged from the firearm are in the immediate possession of the same person", is inapposite, because applicable solely to "[e]very person who carries a loaded firearm with the intent to commit a felony" within the scope of Penal Code §25800. I assure you that I have no such intent.

Lastly, I do not understand your claim that "a practical reading of the entertainment exception" would require the Department of Justice or the Menlo Park Police Department to authorize [my] event." If you are claiming that my Constitutionally protected speech stands in need of such authorization, as explained previously, I shall be happy to settle this matter within the scope of a civil action for deprivation of rights pursuant to 42 U.S. Code §1983. Indeed, if you compel me to do so, the venue of my performance will merely change, from Sand Hill Road, to a Federal courthouse. One way or another, my message will resonate with its intended audience.

I trust that I have answered all relevant questions and addressed all legitimate concerns. I hope that no further explanations will be necessary for you to make a final disposition of my application.

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com

2

 ZEL 0342

7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Wed, May 4, 2016 at 10:52 AM, Robin H. Riggins <rhr@jsmf.com> wrote:

Dear Mr. Zeleny:


Pursuant to Mr. McClure's request, please find attached his letter to you of today's date concerning the above-mentioned matter.

Thank you for your attention to this matter.


Sincerely,


Robin Riggins

Secretary to

William L. McClure, Esq.


Jorgenson, Siegel, McClure & Flegel, LLP

1100 Alma Street, Suite 210

Menlo Park, CA  94025


Tel. 650/ 324-9300

Fax. 650/ 324-0227



4

ZEL 0344

**Nicolas A. Flegel**



**From:** Robin H. Riggins
**Sent:** Wednesday, May 04, 2016 10:53 AM
**To:** 'michael@massmeans.com' <michael@massmeans.com>
**Cc:** William L. McClure <wlm@jsmf.com>
**Subject:** MP/ Zeleny Permit

Dear Mr. Zeleny:

    Pursuant to Mr. McClure's request, please find attached his letter to you of today's date concerning the above-mentioned matter.
Thank you for your attention to this matter.

Sincerely,

Robin Riggins
Secretary to
William L. McClure, Esq.

Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA  94025

Tel.  650/ 324-9300
Fax. 650/ 324-0227

1

    ZEL 0345



OFFICE OF THE CITY ATTORNEY

1100 ALMA STREET / MENLO PARK, CA  94025 / 650.324.9300 / FAX 650.324.0227

May 4, 2016

**VIA EMAIL: michael@massmeans.com**
**AND U.S. MAIL**

Michael Zeleny
7576 Willow Glen Road
Los Angeles, CA 90046

Re:    Appeal of Denial of Special Event Permit Application

Dear Mr. Zeleny:

The City of Menlo Park ("City") is in receipt of your email dated April 15,
2016.  Your email indicates that you are lodging an appeal of the denial of your
special event permit application.  The original special event permit application was
submitted on July 10, 2015, to which the City formally responded by letter dated
September 21, 2015.  In that letter, I indicated that your application was being
denied as it was  incomplete and did not meet the criteria of a special event.

Your email of April 15, 2016, outlines several modifications and provides
additional information to supplement your original application, and therefore, the
City is treating it as a revised application rather than an appeal.  The April 16th
email includes a Google map with a red box showing the proposed location of the
event.  The email also indicates that you no longer intend to film a documentary,
but instead will put on an "entertainment event" in which you will be live-streaming
a video showing the reaction of individuals who drive by your protest.  Lastly, the
revised application indicates in the "Event Narrative" that you "shall be present on
site around the clock, equipped with fully operational, exposed and loaded
firearms, in full compliance with all applicable laws."

Based on a review of your revised application, the City is denying your
application on the basis that it is incomplete and it does not meet the criteria of a
special event.  With respect to the revised application still being incomplete, the
application fails to describe how you intend to set up your presentation so that the
City can analyze whether traffic control will be necessary or what other conditions
might be necessary as part of the approval of the application, nor does it specify
the hours/length of the event.  For example, there is no indication where you
intend to place your tent, generator, video presentation, portable rest room,

Michael Zeleny
May 4, 2016 - Page 2

temporary lighting, sound system, etc. The revised application is deficient in that the City needs substantially more detail in order to analyze the potential for your event distracting drivers, including the volume of sound you intend to make, the brightness of your projector, location and size of items you intend to place on the median strip, and how you intend to transport your set-up to the location (to determine compliance with the Vehicle Code).

Also, the revised application still does not propose an event that requires a special event permit. The application does not propose an event that is open to the community at large to participate in (it describes a one man protest). With the essential element of community participation, a special event permit is not necessary; protests do not require special events permits.

I also want to raise three concerns regarding the proposed event:

1. The proposed event has no defined term (your email indicates an event of "indefinite" duration). Given the presence of guns and the display of a pornographic image at along a major high-speed roadway, the City would need to staff the event with police and traffic supervision. However, the City does not have staff to monitor an event that could last days, weeks or months.

2. You are proposing to illegally open-carry weapons. It is illegal to open-carry an unloaded or loaded weapon in California. You are citing to the movie/entertainment exception, but that exception does not allow for the open-carrying of *loaded* weapons or weapons "adjoined by ample supplies of ammunition." Penal Code §16840 provides that a firearm shall be deemed to be "loaded" whenever both the firearm and the unexpended ammunition capable of being discharged from the firearm are in the immediate possession of the same person. Lastly, a practical reading of the entertainment exception would require the Department of Justice or the Menlo Park Police Department to authorize your event.

3. We have serious concerns regarding the proposed location of the event and will likely prohibit locating an event as generally described in your email and attachments in the median area of Sand Hill Road as it would be a traffic and safety hazard – regardless of how the event is characterized.

While it is clear that this is not a "special event," if you wish to appeal this denial, please provide written notice to Community Services Director Cherise Brandell (and copied to the undersigned.) Ms. Brandell's contact information is as

Michael Zeleny
May 4, 2016 - Page 3

follows:   Email (cebrandell@menlopark.org) and telephone (650) 330-6618.
Alternatively, you may provide additional detail to respond to the above-outlined
issues.

Sincerely,

William L. McClure
City Attorney

WLM:rr
cc:      Via email only
         Dave Bertini, Commander
         Cherise Brandell
         Matt Milde

**Nicolas A. Flegel**



**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Friday, April 15, 2016 1:35 PM
**To:** McClure, William; Cindy S. Elmquist; Bertini, David C; Milde, Matt L
**Cc:** Scott Sandell; Subrah Iyar; Dick Kramlich; David W. Affeld; Dan Primack; Louis Citron; Forest Baskett; Brooke Seawell; Peter Sonsini; Robert Garland; Jake Nunn; Sigrid Van Bladel; Hawk, Robert B.; Arno Penzias
**Subject:** Re: Menlo Park Special Event Permit

"William L. McClure" <wlm@jsmf.com>,
"Cindy S. Elmquist" <cse@jsmf.com>
Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA 94025
650-324-9300 Phone
650-324-0227 Fax

"David C. Bertini" <dcbertini@menlopark.org>,
"Matt L. Milde" <mlmilde@menlopark.org>,
The City of Menlo Park
701 Laurel St.
Menlo Park, CA 94025
650-330-6600


Dear Mr McClure,


I am lodging herewith an appeal of your denial of my application for a special event permit, by outlining its purpose and scope and responding to all of your objections in order.

1

I have been protesting NEA's ongoing support of its venture partner Min Zhu and its coverup of his incestuous child rape since 2004. In the course of the ensuing litigation and subject to demands by Menlo Park city authorities, I have been forced to relocate my protests from the immediate vicinity of NEA's headquarters, to the narrow strip of public grounds surrounding the 16 private acres of the Rosewood Sand Hill compound located at 2825 Sand Hill Rd, Menlo Park, CA 94025. The median strip identified in his current application affords the only possible location for staging my protest in clear view of the NEA headquarters. My open display of firearms is germane to the message that responds to the death threats made against me and my family in the names and on the behalves of individuals and business entities sponsored and supported by NEA. The continual and open-ended nature of my protest responds to NEA's long-standing refusal to account for its responsibility in supporting and covering up the lawless conduct of its associates.

As to your claim that my application is incomplete, attached please find a map of the area in question, which clearly designates the specific and modest boundaries of my special event. That is all that the City of Menlo Park ("the City") can reasonably expect and require to analyze whether traffic control will be necessary or what other conditions might be necessary as part of its approval of my application. As suggested before, and witnessed by my past appearances in your jurisdiction, my use of sound and lighting equipment is subject to our ongoing mutual agreement on their time, place, and manner parameters. If you have any specific requests in this regard, please make them with no further ado, bearing in mind that all restrictions on my expressive conduct must be (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels for communication. (See *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983).) As resolved as I am to see my task through, I remain open to all reasonable accommodations.

While the First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired" (*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981), it protects the right of every citizen to "reach the minds of willing listeners [and] to do so, there must be opportunity to win their attention." (*Hill v. Colorado*, 530 U.S. 703 (2000).) My presence on NEA's grounds has been ruled out as a part of settling its trespass claims against me five years ago. The currently proposed location of my performance therefore represents my only remaining opportunity to address directly the public associated or connected with it. Please bear in mind the foregoing authorities in your attempts to deny me my right to speak in this way and venue.

With respect to the application not meeting the criteria for a special event, the City lacks the authority to define a special event subject to its permitting requirements, beyond ensuring that it does not disrupt the ordinary use of its public spaces. It is true that I am proposing a media production of a one-man protest. My primary aim, however, is to exhibit my media to the thousands of daily passerby on Sand Hill Road, even as I stream their reactions online. My communication needs to be both physically proximate for them, and available over the Internet for more distant audiences. This project falls squarely within the ambit of Constitutional protection of political speech. My production is no less deserving of such protection for being modestly scaled. Thus *Branzburg v. Hayes*, 408 U.S. 665, 704 (1972): "Liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods."

While the First Amendment literally forbids the abridgment only of "speech", the Supreme Court has long recognized that its protection does not end at the spoken or written word, even as it acknowledged that not all conduct intended by the person engaging therein to express an idea is so protected. (See *United States v. O'Brien*, 391 U.S. 367 (1968).) For such conduct may be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments". (See *Spence v. Washington*, 418 U.S. 405 (1974).) "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether [a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." (See *Texas v. Johnson*, 491 U.S. 397 (1989).) In sum, according to the Supreme Court's test for expressive conduct, known as the Spence-Johnson test, an action is protected by the First Amendment if: (1) the speaker-actor intends for the conduct to express a particularized message; and (2) that message would be understood by others. In the course of reaffirming the Spence-Johnson test in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995), the Supreme Court ruled that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' [...] would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schönberg, or Jabberwocky verse of Lewis Carroll." In the course of my protest, the expressive content of openly carried firearms presented as a means of defense both warranted and necessitated by my circumstances, will be bolstered by the concurrent multimedia presentation of the evidence of threats I received in the names and on the behalves of NEA's associates, the damage that they claim to have inflicted on my family, and their history of unlawful violence. Your study of my past displays should suffice to reassure you that my painstakingly particularized message will be infinitely easier to parse than The She-Wolf, Pierrot Lunaire, or Jabberwocky.

This brings me to the matter of my venue. Streets and sidewalks are "prototypal" examples of public fora, and have immemorially been considered a rightful place for public discourse. (See *Hague v. C.I.O.*, 307 U.S. 496 (1939).) Public fora "have achieved a special status in our law", for they "represent areas within which tolerance for inhibitions on speech, petition, and assembly is at a minimum." The government therefore "bear[s] an extraordinarily heavy burden to regulate speech in such locales." (See *N.A.A.C.P. v. City of Richmond*, 743 F.2d 1346 (9th Cir. 1984).) "And just as streets and sidewalks are

2

prototypical examples of public fora, political speech related to current events is the prototypical example of protected speech." (See *American-Arab Anti-Discrimination Committee v. City of Dearborn* ("AAADC"), 418 F.3d 600 (6th Cir. 2005).) In the matter at hand, the current event at issue is NEA's ongoing financial support of its child-raping protégé Min Zhu. As long as I do not "realistically present serious traffic, safety, and competing-use concerns beyond those presented on a daily basis by ordinary use of the streets and sidewalks," you cannot require me to obtain a permit for exercising my Constitutional rights, let alone deny its issuance. (See *Santa Monica Food Not Bombs v. City of Santa Monica* ("SMFNB"), 450 F.3d 1022 (9th Cir. 2006).) Moreover, I generally do not need a permit to hold a rally or a march on public grounds while obeying traffic laws. (See SMFNB, 450 F.3d at 1039, 1040-43; AAADC, 418 F.3d at 608.) Thus I am asking for nothing more nor less than your approval of my rightful, conspicuous presence on public grounds in full compliance with all applicable laws.

As to my compliance with traffic laws, to repeat myself, I do not intend use any City street or right of way. The California Vehicle Code Section 525 defines the right of way as "the privilege of the immediate use of the highway". In this regard, the right of way in the median island, where I intend to conduct my performance, is ordinarily reserved for pedestrians alone. The small part of the median island that I intend to occupy will leave plenty of room for the passage of vehicles in any emergency, e.g. as regards tow trucks allowed to do so pursuant to CVC Section 21719. I do not intend to present any visual impairment to oncoming traffic and vehicles traveling on Sand Hill Road. As to presenting a visual distraction, I am well within my First Amendment rights to do so in a rightful place for public discourse, within which tolerance for your inhibitions on speech, petition, and assembly is at a minimum.

To clarify the nature of the proposed multimedia production in the context of my one-man protest, I am not intending it for the filming of a movie, and therefore you may not require me to obtain a film production permit. Kindly recall that I have borne the brunt of abusive and oppressive conduct by the City of Menlo Park Police Department ("the police") since the inception of my protests a decade ago. This abuse and oppression included, without limitation, illegal surveillance and harassment of myself and my associates, arbitrary imposition of constraints on our performance, and participation in my malicious prosecution in San Mateo Superior Court, wherein the prosecutor expressly and unequivocally acknowledged on court record that she was seeking my criminal conviction on behalf of NEA. Accordingly, I would not dare to appear in your jurisdiction without recording each of my interactions with your minions, for my security and theirs alike. And I have every right to make this recording without asking or paying for your permission.

As explained by Evan Bernick and Paul Larkin in "Filming the Watchmen: Why the First Amendment Protects Your Right to Film the Police in Public Places", lower federal courts have generally said that the First Amendment protects a right to record and photograph law enforcement in public view. Some restrictions may be constitutional, but simply prohibiting the recording because the person is recording the police cannot be constitutional. While the Supreme Court is yet to consider this question, such is the general view in the federal appellate decisions that have done so. An apparent exception is a recent federal trial court decision in *Fields v. City of Philadelphia* and *Geraci v. City of Philadelphia*, which takes a different, narrower approach: There is no constitutional right to videorecord police, the court says, when the act of recording is unaccompanied by "challenge or criticism" of the police conduct. But even under this restrictive standard, I remain well within my rights to videorecord at will, without warning, and regardless of permission, all my public performances in your jurisdiction, for the sake of safety and transparency. In light of the history of my peaceful protests being subjected to oppressive scrutiny and censure by the City authorities, I am planning to exercise my rights under the First Amendment to film my appearances there, for the express purpose of mounting a potential challenge and criticism of the police conduct in the event of further obstructions mounted by Menlo Park. According to *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) the discretion of public officials charged with permitting First Amendment activity must be limited by "narrow, objective, and definite standards." It therefore falls upon the City to identify such standards that deny my rights or subject them to permitting requirements.

Lastly, your concern is that it is illegal to open carry a firearm in the State of California is likewise misdirected. It is none of your business to seek or scrutinize any logical nexus or legitimate purpose of carrying a firearm the proposed event. I am well within my rights in carrying a firearm, either openly or concealed, in the course of an entertainment event, as its authorized participant, as protected by the Constitution of the United States, and clearly warranted by law in the state of California.

Thus California Penal Code Section 25400 (a) (2): "A person is guilty of carrying a concealed firearm when the person does any of the following: [...] Carries concealed upon the person any pistol, revolver, or other firearm capable of being concealed upon the person." Whereas P.C. Section 25510 qualifies this ban: "Section 25400 does not apply to, or affect, any of the following: (a) The possession of a firearm by an authorized participant in a motion picture, television, or video production, or an entertainment event, when the participant lawfully uses the firearm as part of that production or event, or while going directly to, or coming directly from, that production or event. (b) The transportation of a firearm by an authorized employee or agent of a supplier of

3

ZEL 0351

firearms when going directly to, or coming directly from, a motion picture, television, or video production, or an entertainment event, for the purpose of providing that firearm to an authorized participant to lawfully use as a part of that production or event." Please be assured that I intend to authorize myself as a participant in my own entertainment event.

A similar exemption applies to the ban on the open carrying of an unloaded handgun. Thus P.C. Section 26350 (a) (1): "A person is guilty of openly carrying an unloaded handgun when that person carries upon his or her person an exposed and unloaded handgun outside a vehicle while in or on any of the following: (A) A public place or public street in an incorporated city or city and county." Whereas P.C. Section 26375 qualifies this ban: "Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television or video production, or entertainment event, when the participant lawfully uses the handgun as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event."

Similar exemptions apply to long guns. Thus P.C. Section 26400 (a): "A person is guilty of carrying an unloaded firearm that is not a handgun in an incorporated city or city and county when that person carries upon his or her person an unloaded firearm that is not a handgun outside a vehicle while in the incorporated city or city and county." Whereas P.C. Section 26405 qualifies this ban: "Section 26400 does not apply to, or affect, the carrying of an unloaded firearm that is not a handgun in any of the following circumstances: [...] (r) By an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television or video production, or entertainment event, when the participant lawfully uses that firearm as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event." In short, conspicuous display of otherwise legally possessed unloaded firearms in the course of my entertainment event is my Constitutional right under the First Amendment, expressly protected by California statutes. In the event, these firearms will include, without limitation, a pair of H&K P7M13 handguns, an LRB M25 designated marksman rifle, a Winchester M97 trench shotgun with an M1917 Remington bayonet, and a semiautomatic, belt-fed, tripod mounted Browning M1919a4, all conspicuously adjoined by ample supplies of ammunition.

I trust that I have met your concerns over the completeness of my application. Please acknowledge the receipt of this email and approve my application at your earliest convenience. To repeat myself, we are equally willing to negotiate or litigate. Please refer to *Lefemine v. Wideman*, 568 U.S. ____ (2012), which held that a plaintiff who secured a permanent injunction but no monetary damages was a "prevailing party" under 42 U.S.C. § 1988 and could receive attorney fees, where the injunction ordered the defendant officials to change their behavior in a way that directly benefited the plaintiff, who could thereafter engage in demonstrations without fear of sanctions with which police had previously threatened him. As public officials, NEA's minions among your City colleagues enjoy qualified immunity from damages suits if they violate my rights, but only as long as they do not violate "clearly established" law. "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." (See *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).) In short, your personal liability will be richly borne out by the foregoing statutes and case law. The last issue that remains to be litigated conclusively is the expressive content of openly carried firearms. In this connection, please refer to *Nordyke v. King*, 563 F. 3d 439 (9th Cir. 2009), wherein the state of California tacitly conceded the issue even before the Supreme Court incorporated the Second Amendment in *McDonald v. Chicago*, 561 U.S. 742 (2010). Long story short, if you continue siding with NEA's minions, I will win at the City's certain and considerable expense.

——
Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Mon, Sep 21, 2015 at 2:12 PM, Cindy S. Elmquist <cse@jsmf.com> wrote:
>
> Bill McClure requested I forward to you the attached letter with enclosure thereto.
>
>
>
> Cindy S. Elmquist, Assistant to William L. McClure

4

>
> Jorgenson, Siegel, McClure & Flegel, LLP
>
> 1100 Alma Street, Suite 210
>
> Menlo Park, CA 94025
>
> (650) 324-9300 Phone
>
> (650) 324-0227 Fax
>
>
>
>

5

ZEL 0353



OFFICE OF THE CITY ATTORNEY

1100 ALMA STREET / MENLO PARK, CA  94025 / 650.324.9300 / FAX 650.324.0227

September 21, 2015

**VIA EMAIL: michael@massmeans.com**

Michael Zeleny
7576 Willow Glen Road
Los Angeles, CA 90046

Re:    Special Event Permit

Dear Mr. Zeleny:

The City of Menlo Park ("City") is in receipt of your special event permit application submitted on July 10, 2015, to maintain a portable media presentation at the location of "2825 Sand Hill Rd, Menlo Park, CA 94025, at the median strip, per the attached." At this time the City is denying your application on the basis that it is incomplete and does not meet the criteria of a special event.

With respect to the application being incomplete, on July 24, 2015, I previously notified you by email that the application did not include an attachment indicating the specific location of the presentation/event, and requested additional information regarding your use of sound and lighting equipment. You responded by email on July 28, 2015, stating that you would be videotaping your presentation as part of a feature documentary and entertainment event. You again responded that the event will occur in the "median strip" and indicated the location to be the strip "directly across NEA headquarters," but you declined to provide any more detail at the time. The problem is that your application still does not indicate the exact location of the proposed event and how the presentation will be set up so that the City can analyze whether traffic control will be necessary or what other conditions might be necessary as part of the approval of the application nor the hours/length of the event. For example, there is no indication where you intend to place your tent, generator, video presentation, portable rest room, temporary lighting, sound system, etc. Further, you have stated there is no end time for the event and that the total hours are "indefinite."

With respect to the application not meeting the criteria for a special event, what you have set forth in your application is not an event that meets the City's definition of a special event. For example, the proposed event application states that it will not exceed 150 people, use any City street or right of way (even though the

Printed on recycled paper

N:\DATA\Clients\M\MP\Admin\Misc\Zeleny\M-1.lrt.wpd

ZEL 0355

Michael Zeleny
September 21, 2015 - Page 2

median is part of the right of way), require lane closures, require parking needs, generate a crowd of spectators, nor does it state that this is a community type event. To the contrary, you are proposing a "media production" of a one-man protest. If what you are actually intending is the filming of a movie, then the City has an application process, for which a film production permit is required. A copy of the City's "Film Production in Menlo Park" document is attached for your review.

Lastly, the City is concerned that what you are proposing to perform in the median strip between opposing lanes of traffic would be a violation of the Vehicle Code if it causes a visual impairment or visual distraction to oncoming traffic and vehicles traveling on Sand Hill Road. It would also likely be a safety hazard/danger to drivers on Sand Hill Road due to the rate of speed on the roadway and the proximity to Interstate 280. The median strip is too narrow to accommodate the film project as you have described in the application. Another concern is that it is illegal to open carry a firearm in the State of California. As you've described the proposed event, there does not appear to be any logical nexus or legitimate purpose of carrying a firearm.

Inasmuch as your application is incomplete and does not meet the definition of a special event, your application for a special event permit is denied.

If you wish to appeal this denial of your application, you must appeal the denial to the City's Special Event Permit Committee. I would ask that you notify me and Community Services Director Matt Milde at mlmilde@menlopark.org if you wish to seek an appeal.

Sincerely,

William L. McClure,
City Attorney

WLM:rr

Enclosure

cc:     Via email only
        Dave Bertini, Commander
        Matt Milde

N:\DATA\Clients\MMP\Admin\Misc\ZelenyM-1.lrt.wpd

ZEL 0356

**Film Production in Menlo Park**

Film production in the City of Menlo Park must comply with following conditions:

1. Permittee shall submit in writing all pertinent details regarding the filming including the date(s) and times of the filming including time needed for set-up and take down; a description of the nature of the filming; the location of the filming; a list of all equipment involved in the filming, including cars and other vehicles; the proposed location for the parking and storage of all such vehicles and equipment; the number of cast and crew members involved in the filming; and an indication of any special needs, such as amplified noise, etc. If granted, the permit's approval will be confined to such activities, locations and time schedules as submitted and approved.

2. Three days prior to the beginning of filming, permittee shall provide written notice to residents and businesses within 200 feet of the proposed filming.

3. Permittee shall obey all City Ordinances, rules and the guidance of City supervisory employees pertaining to the use of City property, including the location, parking and storage of vehicles and equipment, crowd and traffic control, and the restoration of premises to their original condition after use for filming purposes.

4. Permittee will comply with the City of Menlo Park noise ordinance. Filming will be limited to the hours between 8:00 a.m. and 6:00 p.m. and will result in low to no noise levels. The use of any explosive, fireworks, or pyrotechnic devices is strictly prohibited.

5. Permittee shall make arrangements for traffic control satisfactory to the Menlo Park Police Department prior to filming on City streets and in other public areas. Permittee will be charged to recover the cost of traffic control provided by the City. Permittee will legally park vehicles and will not require street closure or traffic control other than what is approved.

6. Permittee shall covenant and agree to indemnify and hold harmless the City from any and all loss, cost, damages and expenses of any kind, including attorney fees, on account of personal injury or property damage resulting from any activity of Permittee on municipal property or in connection with its use of municipal property.

7. Liability insurance in no way limits the indemnity agreement above, Permittee will furnish the City a Certificate of Liability Insurance acceptable to its Risk Management office showing combined single limit coverage for bodily injury and property damage, or the equivalent of such coverage, not less than $1 million. The City, including its officials, employees and agents, shall be named as additional insured in the Liability Policy. Contractual liability coverage insuring the obligations of this Agreement is also required. The insurance may not be canceled or substantially modified without ten (10) days written notice to the City Manager's Office.

8. Permittee shall pay, with a valid check, money order, credit card or cashier's check, a **filming permit application fee of $150.00 in addition to the daily permit fees of $50 per day for still photography and short subject, $100 per day for industrials, and $150 per day for features, TV, music videos and commercials.**

9. Permittee shall apply for a one-time Business License and pay, with a valid check, money order, credit card or cashiers check.   See **Guide to Annual Business Licensee Fee Calculation** for the fee schedule.

10. Permittee will adhere to the provisions and conditions set forth in the permit.  If Menlo Park Police Department or other City personnel are required to correct, mitigate, or provide any service not consented to under this permit, permittee will be required to pay for all services rendered.  Payment shall be made in the form of *a valid check, money order, credit card or cashiers check* immediately upon demand made by the City.

*PROJECT ADDRESS:*_____

Read and agreed on:


Date:_____


_____          _____
Signature                                                          Print name

**Nicolas A. Flegel**

-----Original Message-----
**From:** Bertini, David C [dcbertini@menlopark.org]
**Sent:** Thursday, August 27, 2015 09:36 AM Pacific Standard Time
**To:** David Tresmontan; jimmy.mazon@rosewoodhotels.com; tsanchez@smcgov.org; Steve Wagstaffe; William L. McClure; jdixon@a16z.com; Gabor Vida; Alan Campey
**Cc:** Dixon, William A; Jonsen, Robert; Greg Munks (gmunks@co.sanmateo.ca.us); Al Serrato
**Subject:** RE: Special Event Permit Application

Good morning all.

I would like to set a meeting to discuss Mr. Zeleny next Wednesday, September 2 at 9:00 a.m. at the Menlo Park Police Department.

If you could let me know who from your organization or agency will be able to attend on that date.

Let me know if you have any questions.

Thanks.

Commander Dave Bertini
Menlo Park Police Department
701 Laurel Street
Menlo Park, CA. 94025
650.330.6321

**From:** Bertini, David C
**Sent:** Tuesday, July 21, 2015 6:14 PM
**To:** 'David Tresmontan'; 'jimmy.mazon@rosewoodhotels.com'; 'tsanchez@smcgov.org'; Steve Wagstaffe; McClure, William (wlm@jsmf.com)
**Cc:** Dixon, William A; Jonsen, Robert (RJonsen@menlopark.org); Greg Munks (gmunks@co.sanmateo.ca.us)

1

**Subject:** RE: Special Event Permit Application
**Importance:** High

Good afternoon all.

As you are aware, Michael Zeleny has submitted an application for a "special event" to be held somewhere in front of the Rosewood Hotel / NEA Property located at 2825 Sand Hill Road in Menlo Park. This "special event" would consist of a very similar protest he has conducted in the past, including carrying several unloaded military type firearms, along with a 55" display with sexually explicit caricatures, portable lighting and a generator. The application indicates a set up date of 9-30-15, with the event to be "ongoing" and "indefinite".

Although we intend to deny this application on several grounds (predominately that this is not a "special event" as defined by the City), we are in the process of requesting more information from him on the exact location he was intending as it was not clear on his application. Once we have gone through the formal information gathering process, we will notify him of our decision on his application.

In the meantime, I will be clearing up several legal issues with the District Attorney's Office and then scheduling a meeting with the entities involved (NEA, Rosewood Hotel, Menlo Park Police and City Attorney's Office, SMCO Sheriff's Office and the District Attorney's Office). At this meeting we can discuss our combined response in case Zeleny decides to proceed without a permit.

If those interested in attending can please check their availability the week of August 17th or the week of August 24th, I will set up a meeting to discuss our response to any possible action by Zeleny.

Feel free to contact me if you have any questions.

Thanks.

Commander Dave Bertini
Menlo Park Police Department
701 Laurel Street
Menlo Park, CA. 94025
650.330.6321

**From:** larvatus@gmail.com [mailto:larvatus@gmail.com] **On Behalf Of** Michael Zeleny
**Sent:** Friday, July 10, 2015 11:05 AM
**To:** McClure, William; Scott Sandell; Milde, Matt L; Police Chief
**Cc:** David W. Affeld; Peter Shimamoto
**Subject:** Special Event Permit Application

Michael Zeleny
michael@massmeans.com
zeleny@post.harvard.edu
7576 Willow Glen Road, Los Angeles, CA 90046
voice:323.363.1860
fax:323.410.2373

City of Menlo Park
Matt Milde
Recreation Program Coordinator

2

                    ZEL 0360

mlmilde@menlopark.org
701 Laurel Street
Menlo Park, CA 94025
voice:650.330.2223
fax:650.330.2242

By email, fax, and postal mail.

Starting in October 2015, we shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu, and continuing until NEA publicly acknowledges its wrongdoing and severs its relationship with Min Zhu, Scott Sandell, and Dick Kramlich. I shall be present on site around the clock, served by support staff and equipped with fully operational, exposed and unloaded military grade firearms and loaded ammunition feeding devices therefor, including without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a 7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed Browning M1919a4, in full compliance with all applicable laws. A 55" portable media display powered by a portable gas generator will display videos featuring explicit representations of sexual violence committed by NEA's publicly disgraced protégé. A sample image can be found at http://larvatus.livejournal.com/371973.html. All media aspects of this event will be subject to content-neutral regulation negotiated with Menlo Park authorities. My fundamental rights under the First and Second Amendments of the Constitution of the United States are reserved and non-negotiable.

A site map can be found at https://www.google.com/maps/@37.4197308,-122.2137188.17z/. My display will be confined to the median strip on Sand Hill Road directly across the NEA headquarters. No obstruction of automotive or foot traffic will take place. Please contact me to arrange for the payment of the special event fee and discuss any organizational matters. Please address all legal inquiries and requests to David W. Affeld, Affeld Grivakes Zucker LLP, 2049 Century Park East, Suite 2460, Los Angeles, CA 90067, voice:310.979.8700, fax:310.979.8701.

cc:

Bill McClure
Menlo Park City Attorney
wlm@jsmf.comvoice:650-330-6610
Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA 94025
voice:650.324.9300
fax:650.324.0227

Robert Jonsen
Menlo Park Police Chief
policechief@menlopark.org
701 Laurel St.
Menlo Park, CA 94025
voice:650.330.6600

Scott Sandell
New Enterprise Associates
ssandell@nea.com
2855 Sand Hill Road

3

ZEL 0361

Menlo Park, CA 94025
United States
voice:650.854.9499
fax:650.854.9397

—

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los Angeles, CA 90046 |
voice:323.363.1860 | fax:323.410.2373
http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No matter. Try again.
Fail again. Fail better." — Samuel Beckett

4

ZEL 0362



Michael Zeleny <larvatus@gmail.com>

## Special Event Permit Application

**Michael Zeleny** <zeleny@post.harvard.edu>                                    Tue, Jul 28, 2015 at 12:57 AM
To: "William L. McClure" <wlm@jsmf.com>
Cc: "David W. Affeld" <dwa@agzlaw.com>, Peter Shimamoto <ps@agzlaw.com>, Scott Sandell
<ssandell@nea.com>, Matt Milde <mlmilde@menlopark.org>, "Bertini, David C" <dcbertini@menlopark.org>, "Ortega,
Matthew K" <mkortega@menlopark.org>, "Robert (Bob) Jonsen (rjonsen@menlopark.org)"
<rjonsen@menlopark.org>
Bcc: Paul Mitchell <pmitchell@chyral.com>

Dear Mr McClure,

Thank you for your response. I am hoping we can continue this conversation in a constructive and conclusive
fashion. As a reminder to your clients and colleagues, I am publicizing and protesting death threats against me and
my family, received in the course of a business dispute with, and in the names and on behalves of, WebEx
Communications its daughter-raping co-founder Min Zhu. These threats were implicitly endorsed and expressly
ratified after the fact by their erstwhile board members and ongoing investors, New Enterprise Associates (NEA).
The object of my exercise is to educate and entertain, combining remedial instruction of NEA personnel and
associates in business ethics with amusing exposure of its ongoing breach to the passerby. All onsite interactions
will be subject to audiovisual recording, live webcast, and eventual incorporation into a feature documentary. You
may think of this project as an application of disruptive technology to venture capitalist business as usual. Please
note its nature of a video production in the course of an entertainment event, which give rise to clearly established
statutory exemptions from California law regulating the possession of firearms in public.

To answer specific questions:

1. As stated, my display will be confined to the median strip on Sand Hill Road directly across the NEA
   headquarters. <u>I assure you that it will be bounded with a safe margin for automotive and foot traffic and no
   obstructive or threatening acts or displays of any kind will take place.</u> Beyond that, I do not believe that
   you can require me to lay out my location and its dimensions down to the last inch. In this, and many other
   matters to follow, reasonable men can disagree. Any and all residual disagreement between us will be
   subject to an application for declaratory relief in the United States District Court for the Northern District of
   California.
2. As stated, I intend to occupy the site of my performance around the clock until NEA publicly
   acknowledges its wrongdoing and severs all its relations with Min Zhu, Scott Sandell, and Dick Kramlich.
   As to the lighting and audiovisual display parameters, I will accommodate any reasonable restrictions you
   and your colleagues put forth as the authors of Menlo Park regulations, ostensibly constructed for my
   benefit in the course of previous litigation. It would be unproductive of me to second-guess you in this
   matter, and you, to demand the minute details of my proposal only to deter it with *ad hoc* obstacles. <u>I
   specifically invite you to consider the matter of videos featuring explicit representations of sexual violence,
   in the context of their "serious literary, artistic, political, or scientific value" as per *Miller v. California*, 413
   U.S. 15 (1973).</u> If you are unable to determine this value by consulting NEA, we shall gladly establish it
   through testimony to be elicited in the ensuing litigation. In this connection, please bear in
   mind *Terminiello v. City of Chicago*, 337 U.S. 1 (1949), wherein the United States Supreme Court
   held speech that "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates
   a disturbance" to be protected under the First and Fourteenth Amendments to the United States
   Constitution.
3. Lastly, my assumption of full personal responsibility for the lawful defense of the site is meant to allay a
   concern expressed by Menlo Park Police on previous occasions, justifying its presence on site by positing
   that my firearms might come to be stolen from me in the course of my peaceful public protests. In this
   regard, please note that lawfully carrying a firearm does not constitute "reasonable suspicion" justifying a
   Terry stop. <u>This applies in the context of California statutes that specifically allow the possession of a
   firearm "by an authorized participant in a motion picture, television, or video production, or an
   entertainment event, when the participant lawfully uses the firearm as part of that production or event, or
   while going directly to, or coming directly from, that production or event."</u> In this regard, I expect you to

observe all legal constraints on police action. As per *Kolender v. Lawson*, 461 U.S. 352 (1983), "a person who is stopped on less than probable cause cannot be punished for failing to identify himself." Also see *Arizona v. Hicks*, 480 U.S. 321 (1987) ("Warrants only issue upon a showing of probable cause; thus, probable cause to believe an item in plain view is contraband or evidence of criminal activity must be required.") Please note that an anonymous tip that a person is carrying a gun is not sufficient to justify a police officer's stop and frisk of that person, even where descriptive detail regarding the subject has been corroborated. Thus in *Florida v. J.L.*, 529 U.S. 266 (2000), the United States Supreme Court declined to adopt the "firearms exception" to Terry's requirement of reasonable suspicion. Similarly, in *Pennsylvania v. D.M.*, 529 U.S. 1126 (2000), the Court ruled that an anonymous tip with a physical description and location that a person had a gun was not enough for reasonable suspicion, absent anything else to arouse the officer's suspicion. I bring all this to your attention in connection with adequate notice given herewith that my carrying of firearms is undertaken in the course and furtherance of a video production and an entertainment event, by an authorized participant therein. Attached please find a photo of a representative firearm to be displayed onsite.

I am hoping that the above will suffice to resolve the concerns that you voiced to date. In light of the legal complexity of this matter, I am giving you and your colleagues adequate lead time to come to a mutual accommodation.

——

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373
http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No matter. Try again. Fail again. Fail better." — Samuel Beckett

On Fri, Jul 24, 2015 at 2:27 PM, William L. McClure <wlm@jsmf.com> wrote:
[Quoted text hidden]



**Browning M1919A4.jpg**
330K

ZEL 0364


# CITY OF MENLO PARK

Special Event Application

701 Laurel Street, Menlo Park, CA 94025 Ph: 650-330-2223 Fax: 650-330-2242



| | | | | |
|---|---|---|---|---|
| Applicant Name: Michael Zeleny | | | | |
| Organization Name: Mass Means, Inc. | | | | |
| Name of Event: Child Rape Tools | | | | |
| Address: 7576 Willow Glen Rd | City: Los Angeles | | State: CA | Zip: 90046 |
| Home Phone: 323-363-1860 | Alternate Phone: none | | | |
| E-mail Address: zeleny@post.harvard.edu | Fax: 323-410-2373 | | | |
| Estimated Attendance: drive-by only | Event open the public: Yes ☒ No ☐ | | | |
| Number of Event Staff: 1 | Number of Event Volunteers: 5 | | | |

Purpose of Event: Outing New Enterprise Associates as the corporate sponsors of incestuous child rapist Min Zhu.

Location of Event (please be specific and attach map): 2825 Sand Hill Rd, Menlo Park, CA 94025, at the median strip, per the attached.

| Event Timeline | Day | Date | Start Time | End Time | Total Hours |
|---|---|---|---|---|---|
| Set up/Preparation | Wed | 9/30/2015 | 9 a.m. | 10 p.m. | 13 hours |
| Special Event | Thu | 10/1/2015 | 7 a.m. | ongoing | 31 days |
| Tear down/Clean up | | | | | |

| Do you plan to use a City building or park? Yes ☐ No ☒ | Do you plan to use Private Property: Yes ☐ No ☒ | If yes, do you have written approval from Private Property owner: |
|---|---|---|
| City Facility Reservation Permit Included: Yes ☐ No ☒ Pending ☐ | If yes, provide address of location: | Yes ☐ No ☐ |

| Any City streets closed? Yes ☐ No ☒ Name of streets: | Any sidewalks blocked? Yes ☐ No ☒ | Traffic Control Plan Included: Yes ☐ No ☐ N/A ☒ |
|---|---|---|

| Renting barricades from City: Yes ☐ No ☒ | Park sprinklers turned off: Yes ☐ No ☒ |
|---|---|

Amplified sound (i.e. Music, PA system): Yes ☒ No ☐ Time of use: 7 a.m. to 9 p.m.

Temporary lighting: Yes ☒ No ☐ Please describe: Portable spotlights focused on display.

Charge for event: Yes ☐ No ☒ $_____/person Event is reoccurring more than annually?: Yes ☐ No ☐

| Is this event a fundraiser: Yes ☐ No ☒ | Proof of 501c3: Yes ☐ No ☒ |
|---|---|
| Will alcohol be served: Yes ☐ No ☒ Will you be selling alcohol: Yes ☐ No ☒ | ABC Permit Attached: Yes ☐ No ☐ Pending ☐ |
| Will food be served: Yes ☐ No ☒ Will you be selling food: Yes ☐ No ☒ | I will apply for San Mateo County Temporary Event Food Permit: Yes ☐ No ☒ Pending ☐ |
| Selling any other items: Yes ☐ No ☒ Describe: | Menlo Park Business License: Yes ☐ No ☒ |
| Will portable rest rooms be provided: Yes ☒ No ☐ | No. of portable toilets ___1___ No. of ADA compliant portable toilets ___0___ |
| Will you be using a tent, canopy, or other temporary structure? Yes ☒ No ☐ | Please describe: Canopy to be erected at the median strip of Sand Hill |

ZEL 0365



# California Firearms Laws Summary

## 2016

California Department of Justice
Kamala D. Harris
Attorney General
http://oag.ca.gov

ZEL 0366

# Table of Contents



## California Firearms Laws Summary 2016

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Persons Ineligible to Possess Firearms . . . . . . . . . . . . . . . . . . . . . 1

Sales and Transfers of Firearms . . . . . . . . . . . . . . . . . . . . . . . . . 3

Prohibited Firearms Transfers and Straw Purchases . . . . . . . . . . . 5

Reporting Requirements for New California Residents . . . . . . . . . 6

Shipment of Firearms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Carrying Firearms Aboard Common Carriers . . . . . . . . . . . . . . . . 7

Firearms in the Home, Business or at the Campsite . . . . . . . . . . . 7

Transportation of Firearms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Use of Lethal Force in Self-Defense . . . . . . . . . . . . . . . . . . . . . . . 8

Carrying a Concealed Weapon Without a License . . . . . . . . . . . 10

Loaded Firearms in Public . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Openly Carrying an Unloaded Handgun . . . . . . . . . . . . . . . . . . . 11

Punishment for Carrying Unregistered Handgun . . . . . . . . . . . . . 11

Miscellaneous Prohibited Acts . . . . . . . . . . . . . . . . . . . . . . . . . . 12

New Firearms/Weapons Laws . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ZEL 0367

# California Firearms Laws
# Summary 2016



## INTRODUCTION

As the owner of a firearm, it is your responsibility to understand and comply with all federal, state and local laws regarding firearms ownership. Many of the laws described below pertain to the possession, use and storage of firearms in the home and merit careful review. The California Firearms Laws Summary 2016 provides a general summary of California laws that govern common possession and use of firearms by persons other than law enforcement officers or members of the armed forces. It is not designed to provide individual guidance for specific situations, nor does it address federal or local laws. The legality of any specific act of possession or use will ultimately be determined by applicable federal and state statutory and case law. Persons having specific questions are encouraged to seek legal advice from an attorney, or consult their local law enforcement agency, local prosecutor or law library. The California Department of Justice (DOJ) and all other public entities are immune from any liability arising from the drafting, publication, dissemination, or reliance upon this information.

## PERSONS INELIGIBLE TO POSSESS FIREARMS

The following persons are prohibited from possessing firearms (Pen. Code, §§ 29800-29825, 29900; Welf. & Inst. Code, §§ 8100, 8103):

### Lifetime Prohibitions

- Any person convicted of any felony or any offense enumerated in Penal Code section 29905.

- Any person convicted of an offense enumerated in Penal Code section 23515.

- Any person with two or more convictions for violating Penal Code section 417, subdivision (a)(2).

- Any person adjudicated to be a mentally disordered sex offender. (Welf. & Inst. Code, § 8103, subd. (a)(1).)

- Any person found by a court to be mentally incompetent to stand trial or not guilty by reason of insanity of any crime, unless the court has made a finding of restoration of competence or sanity. (Welf. & Inst. Code, § 8103, subds. (b)(1), (c)(1), and (d)(1).)

1

                ZEL 0368

## 10-Year Prohibitions

- Any person convicted of a misdemeanor violation of the following: Penal Code sections 71, 76, 136.5, 140, 148, subdivision (d), 171b, 171c, 171d, 186.28, 240, 241, 242, 243, 244.5, 245, 245.5, 246, 246.3, 247, 273.5, 273.6, 417, 417.1, 417.2, 417.6, 422, 626.9, 646.9, 830.95, subdivision (a), 17500, 17510, subdivision (a), 25300, 25800, 27510, 27590, subdivision (c), 30315, or 32625, and Welfare and Institutions Code sections 871.5, 1001.5, 8100, 8101, or 8103.

## 5-Year Prohibitions

- Any person taken into custody as a danger to self or others, assessed, and admitted to a mental health facility under Welfare and Institutions Code sections 5150, 5151, 5152; or certified under Welfare and Institutions Code sections 5250, 5260, 5270.15. Persons certified under Welfare and Institutions Code sections 5250, 5260, or 5270.15 may be subject to a lifetime prohibition pursuant to federal law.

## Juvenile Prohibitions

- Juveniles adjudged wards of the juvenile court are prohibited until they reach age 30 if they committed an offense listed in Welfare and Institutions Code section 707, subdivision (b). (Pen. Code, § 29820.)

## Miscellaneous Prohibitions

- Any person denied firearm possession as a condition of probation pursuant to Penal Code section 29900, subdivision (c).

- Any person charged with a felony offense, pending resolution of the matter. (18 U.S.C. § 922(g).)

- Any person while he or she is either a voluntary patient in a mental health facility or under a gravely disabled conservatorship (due to a mental disorder or impairment by chronic alcoholism) and if he or she is found to be a danger to self or others. (Welf. & Inst. Code, § 8103, subd. (e).)

- Any person addicted to the use of narcotics. (Pen. Code, § 29800, subd. (a).)

- Any person who communicates a threat (against any reasonably identifiable victim) to a licensed psychotherapist which is subsequently reported to law enforcement, is prohibited for six months. (Welf. & Inst. Code, § 8100, subd. (b).)

- Any person who is subject to a protective order as defined in Family Code section 6218 or Penal Code section 136.2, or a temporary restraining order issued pursuant to Code of Civil Procedure sections 527.6 or 527.8.

## Personal Firearms Eligibility Check

Any person may obtain from the DOJ a determination as to whether he or she is eligible to possess firearms (review of California records only). The personal firearms eligibility check application form and instructions are on the DOJ website at http://oag.ca.gov/firearms/forms. The cost for such an eligibility check is $20. (Pen. Code, § 30105.)

2

## SALES AND TRANSFERS OF FIREARMS

In California, only licensed California firearms dealers who possess a valid Certificate of Eligibility (COE) are authorized to engage in retail sales of firearms. These retail sales require the purchaser to provide personal identifier information for the Dealer Record of Sale (DROS) document that the firearms dealer must submit to the DOJ. There is a mandatory 10-day waiting period before the firearms dealer can deliver the firearm to the purchaser. During this 10-day waiting period, the DOJ conducts a firearms eligibility background check to ensure the purchaser is not prohibited from lawfully possessing firearms. Although there are exceptions, generally all firearms purchasers must be at least 18 years of age to purchase a long gun (rifle or shotgun) and 21 years of age to purchase a handgun (pistol or revolver). Additionally, purchasers must be California residents with a valid driver's license or identification card issued by the California Department of Motor Vehicles.

Generally, it is illegal for any person who is not a California licensed firearms dealer (private party) to sell or transfer a firearm to another non-licensed person (private party) unless the sale or transfer is completed through a licensed California firearms dealer. A "Private Party Transfer" (PPT) can be conducted at any licensed California firearms dealership. The buyer and seller must complete the required DROS document in person at the licensed firearms dealership and deliver the firearm to the dealer who will retain possession of the firearm during the mandatory 10-day waiting period. In addition to the applicable state fees, the firearms dealer may charge a fee not to exceed $10 per firearm for conducting the PPT.

The infrequent transfer of firearms between immediate family members is exempt from the law requiring PPTs to be conducted through a licensed firearms dealer. For purposes of this exemption, "immediate family member" means parent and child, and grandparent and grandchild but does not include brothers or sisters. (Pen. Code, § 16720.) The transferee must also comply with the Firearm Safety Certificate requirement described below, prior to taking possession of the firearm. Within 30 days of the transfer, the transferee must also submit a report of the transaction to the DOJ. Download the form (Report of Operation of Law or Intra-Familial Firearm Transaction BOF 4544A) from the DOJ website at http://oag.ca.gov/firearms/forms or complete and submit the form electronically via the internet at https://CFARS.doj.ca.gov.

The reclaiming of a pawned firearm is subject to the DROS and 10-day waiting period requirements.

Specific statutory requirements relating to sales and transfers of firearms follow:

### Proof-of-Residency Requirement

To purchase a handgun in California, you must present documentation indicating that you are a California resident. Acceptable documentation includes a utility bill from within the last three months, a residential lease, a property deed or military permanent duty station orders indicating assignment within California.

3

ZEL 0370

The address provided on the proof-of-residency document must match either the address on the DROS or the address on the purchaser's California driver's license or identification card. (Pen. Code, § 26845.)

## Firearm Safety Certificate Requirement

To purchase or acquire a firearm, you must have a valid Firearm Safety Certificate (FSC). To obtain an FSC, you must score at least 75% on an objective written test pertaining to firearms laws and safety requirements. The test is administered by DOJ Certified Instructors, who are often located at firearms dealerships. An FSC is valid for five years. You may be charged up to $25 for an FSC. Firearms being returned to their owners, such as pawn returns, are exempt from this requirement. In the event of a lost, stolen or destroyed FSC, the issuing DOJ Certified Instructor will issue a replacement FSC for a fee of $5. You must present proof of identity to receive a replacement FSC. (Pen. Code, §§ 31610-31670.)

## Safe Handling Demonstration Requirement

Prior to taking delivery of a firearm, you must successfully perform a safe handling demonstration with the firearm being purchased or acquired. Safe handling demonstrations must be performed in the presence of a DOJ Certified Instructor sometime between the date the DROS is submitted to the DOJ and the delivery of the firearm, and are generally performed at the firearms dealership. The purchaser, firearms dealer and DOJ Certified Instructor must sign an affidavit stating the safe handling demonstration was completed. The steps required to complete the safe handling demonstration are described in the Appendix. Pawn returns and intra-familial transfers are not subject to the safe handling demonstration requirement. (Pen. Code, § 26850.)

## Firearms Safety Device Requirement

All firearms (long guns and handguns) purchased in California must be accompanied with a firearms safety device (FSD) that has passed required safety and functionality tests and is listed on the DOJ's official roster of DOJ-approved firearm safety devices. The current roster of certified FSDs is available on the DOJ website at http://oag.ca.gov/firearms/fsdcertlist. The FSD requirement also can be satisfied if the purchaser signs an affidavit declaring ownership of either a DOJ-approved lock box or a gun safe capable of accommodating the firearm being purchased. Pawn returns and intra-familial transfers are not subject to the FSD requirement. (Pen. Code, §§ 23635-23690.)

## Roster of Handguns Certified for Sale in California

No handgun may be sold by a firearms dealer to the public unless it is of a make and model that has passed required safety and functionality tests and is listed on the DOJ's official roster of handguns certified for sale in California. The current roster of handguns certified for sale in California is on the DOJ website at http://certguns.doj.ca.gov/. PPTs, intrafamilial transfers, and pawn/consignment returns are exempt from this requirement. (Pen. Code, § 32000.)

4

ZEL 0371

## One-Handgun-per-30-Days Limit

No person shall make an application to purchase more than one handgun within any 30-days period. Exemptions to the one-handgun-per-30-days limit include pawn returns, intra-familial transfers and private party transfers. (Pen. Code, § 27540.)

## Handgun Sales and Transfer Requirements

|  | Retail Sales | Private Party Transfers | Intra-familial Transfers | Pawn Returns |
|---|---|---|---|---|
| Proof-of-Residency Requirement | Yes | Yes | No | Yes |
| Firearm Safety Certificate Requirement | Yes | Yes | Yes | No |
| Safe Handling Demonstration Requirement | Yes | Yes | No | No |
| Firearm Safety Device Requirement | Yes | Yes | No | No |
| Roster of Handguns Certified for Sale in California | Yes | No | No | No |
| One-Handgun-Per-30-Days Limit | Yes | No | No | No |

## Long Gun Sales and Transfer Requirements

|  | Retail Sales | Private Party Transfers | Intra-familial Transfers | Pawn Returns |
|---|---|---|---|---|
| Proof-of-Residency Requirement | No | No | No | No |
| Firearm Safety Certificate Requirement | Yes | Yes | Yes | No |
| Safe Handling Demonstration Requirement | Yes | Yes | No | No |
| Firearm Safety Device Requirement | Yes | Yes | No | No |

## PROHIBITED FIREARMS TRANSFERS AND STRAW PURCHASES

**What is a straw purchase?**

A straw purchase is buying a firearm for someone who is prohibited by law from possessing one, or buying a firearm for someone who does not want his or her name associated with the transaction.

5

It is a violation of California law for a person who is not licensed as a California firearms dealer to transfer a firearm to another unlicensed person, without conducting such a transfer through a licensed firearms dealer. (Pen. Code, § 27545.) Such a transfer may be punished as a felony. (Pen. Code, § 27590.)

Furthermore, it is a violation of federal law to either (1) make a false or fictitious statement on an application to purchase a firearm about a material fact, such as the identify of the person who ultimately will acquire the firearm (commonly known as "lying and buying") (18 U.S.C. 922(a)(6)), or (2) knowingly transfer a firearm to a person who is prohibited by federal law from possessing and purchasing it. (18 U.S.C. 922(d).) Such transfers are punishable under federal law by a $250,000 fine and 10 years in federal prison. (18 U.S.C. 924(a)(2).)

**Things to Remember About Prohibited Firearms Transfers and Straw Purchases**

An illegal firearm purchase (straw purchase) is a federal crime.

An illegal firearm purchase can bring a felony conviction sentence of 10 years in jail and a fine of up to $250,000.

Buying a gun and giving it to someone who is prohibited from owning one is a state and federal crime.

**Never buy a gun for someone who is prohibited by law or unable to do so.**

## REPORTING REQUIREMENTS FOR NEW CALIFORNIA RESIDENTS

New California residents must report their ownership of firearms to the DOJ or sell/transfer them in accordance with California law, within 60 days of bringing the firearm into the state. Persons who want to keep their firearms must submit a New Resident Firearm Ownership Report (BOF 4010A), along with a $19 fee, to the DOJ. Forms are available at licensed firearms dealers, the Department of Motor Vehicles or on-line at the DOJ website at http://oag.ca.gov/firearms/forms. Forms may also be completed and submitted electronically via the internet at https://CFARS.doj.ca.gov (Pen. Code, § 27560.)

## SHIPMENT OF FIREARMS

Long guns may be mailed through the U.S. Postal Service, as well as most private parcel delivery services or common carriers. Handguns may not be sent through the U.S. Postal Service. A common or contract carrier must be used for shipment of handguns. However, pursuant to federal law, non-licensees may ship handguns only to persons who hold a valid Federal Firearms License (FFL).

Both in-state and out-of-state FFL holders are required to obtain approval (e.g., a unique verification number) from the California DOJ prior to shipping firearms to any California FFL. (Pen. Code, § 27555.)

6

ZEL 0373

## CARRYING FIREARMS ABOARD COMMON CARRIERS

Federal and state laws generally prohibit a person from carrying any firearm or ammunition aboard any commercial passenger airplane. Similar restrictions may apply to other common carriers such as trains, ships and buses. Persons who need to carry firearms or ammunition on a common carrier should always consult the carrier in advance to determine conditions under which firearms may be transported.

## FIREARMS IN THE HOME, BUSINESS OR AT THE CAMPSITE

Unless otherwise unlawful, any person over the age of 18 who is not prohibited from possessing firearms may have a loaded or unloaded firearm at his or her place of residence, temporary residence, campsite or on private property owned or lawfully possessed by the person. Any person engaged in lawful business (including nonprofit organizations) or any officer, employee or agent authorized for lawful purposes connected with the business may have a loaded firearm within the place of business if that person is over 18 years of age and not otherwise prohibited from possessing firearms. (Pen. Code, §§ 25605, 26035.)

NOTE: If a person's place of business, residence, temporary residence, campsite or private property is located within an area where possession of a firearm is prohibited by local or federal laws, such laws would prevail.

## TRANSPORTATION OF FIREARMS

### Handguns

California Penal Code section 25400 does not prohibit a citizen of the United States over 18 years of age who is in lawful possession of a handgun, and who resides or is temporarily in California, from transporting the handgun by motor vehicle provided it is unloaded and stored in a locked container. (Pen. Code, § 25610.)

The term "locked container" means a secure container which is fully enclosed and locked by a padlock, key lock, combination lock, or similar locking device. This includes the trunk of a motor vehicle, but does not include the utility or glove compartment. (Pen. Code, § 16850.)

### Rifles and Shotguns

Nonconcealable firearms (rifles and shotguns) are not generally covered within the provisions of California Penal Code section 25400 and therefore are not required to be transported in a locked container. However, as with any firearm, nonconcealable firearms must be unloaded while they are being transported. A rifle or shotgun that is defined as an assault weapon pursuant to Penal Code section 30510 or 30515 must be transported in accordance with Penal Code section 25610.

7

ZEL 0374

### Registered Assault Weapons and .50 BMG Rifles

Registered assault weapons and registered .50 BMG rifles may be transported only between specified locations and must be unloaded and in a locked container when transported. (Pen. Code, § 30945, subd. (g).)

The term "locked container" means a secure container which is fully enclosed and locked by a padlock, key lock, combination lock, or similar locking device. This includes the trunk of a motor vehicle, but does not include the utility or glove compartment. (Pen. Code, § 16850.)

## USE OF LETHAL FORCE IN SELF-DEFENSE

The question of whether use of lethal force is justified in self-defense cannot be reduced to a simple list of factors. This section is based on the instructions generally given to the jury in a criminal case where self-defense is claimed and illustrates the general rules regarding the use of lethal force in self-defense.

### Permissible Use of Lethal Force in Defense of Life and Body

The killing of one person by another may be justifiable when necessary to resist the attempt to commit a forcible and life-threatening crime, provided that a reasonable person in the same or similar situation would believe that (a) the person killed intended to commit a forcible and life-threatening crime; (b) there was imminent danger of such crime being accomplished; and (c) the person acted under the belief that such force was necessary to save himself or herself or another from death or a forcible and life-threatening crime. Murder, mayhem, rape and robbery are examples of forcible and life-threatening crimes. (Pen. Code, § 197.)

### Self-Defense Against Assault

It is lawful for a person being assaulted to defend themself from attack if he or she has reasonable grounds for believing, and does in fact believe, that he or she will suffer bodily injury. In doing so, he or she may use such force, up to deadly force, as a reasonable person in the same or similar circumstances would believe necessary to prevent great bodily injury or death. An assault with fists does not justify use of a deadly weapon in self-defense unless the person being assaulted believes, and a reasonable person in the same or similar circumstances would also believe, that the assault is likely to inflict great bodily injury.

It is lawful for a person who has grounds for believing, and does in fact believe, that great bodily injury is about to be inflicted upon another to protect the victim from attack. In so doing, the person may use such force as reasonably necessary to prevent the injury. Deadly force is only considered reasonable to prevent great bodily injury or death.

**NOTE:** The use of excessive force to counter an assault may result in civil or criminal penalties.

8

ZEL 0375

## Limitations on the Use of Force in Self-Defense

The right of self-defense ceases when there is no further danger from an assailant. Thus, where a person attacked under circumstances initially justifying self-defense renders the attacker incapable of inflicting further injuries, the law of self-defense ceases and no further force may be used. Furthermore, a person may only use the amount of force, up to deadly force, as a reasonable person in the same or similar circumstances would believe necessary to prevent imminent injury. It is important to note the use of excessive force to counter an assault may result in civil or criminal penalties.

The right of self-defense is not initially available to a person who assaults another. However, if such a person attempts to stop further combat and clearly informs the adversary of his or her desire for peace but the opponent nevertheless continues the fight, the right of self-defense returns and is the same as the right of any other person being assaulted.

## Protecting One's Home

A person may defend his or her home against anyone who attempts to enter in a violent manner intending violence to any person in the home. The amount of force that may be used in resisting such entry is limited to that which would appear necessary to a reasonable person in the same or similar circumstances to resist the violent entry. One is not bound to retreat, even though a retreat might safely be made. One may resist force with force, increasing it in proportion to the intruder's persistence and violence, if the circumstances apparent to the occupant would cause a reasonable person in the same or similar situation to fear for his or her safety.

The occupant may use a firearm when resisting the intruder's attempt to commit a forcible and life-threatening crime against anyone in the home provided that a reasonable person in the same or similar situation would believe that (a) the intruder intends to commit a forcible and life-threatening crime; (b) there is imminent danger of such crime being accomplished; and (c) the occupant acts under the belief that use of a firearm is necessary to save himself or herself or another from death or great bodily injury. Murder, mayhem, rape, and robbery are examples of forcible and life-threatening crimes.

Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry had occurred. Great bodily injury means a significant or substantial physical injury. (Pen. Code, § 198.5.)

NOTE: If the presumption is rebutted by contrary evidence, the occupant may be criminally liable for an unlawful assault or homicide.

9

ZEL 0376

## Defense of Property

The lawful occupant of real property has the right to request a trespasser to leave the premises. If the trespasser does not do so within a reasonable time, the occupant may use force to eject the trespasser. The amount of force that may be used to eject a trespasser is limited to that which a reasonable person would believe to be necessary under the same or similar circumstances.

## CARRYING A CONCEALED WEAPON WITHOUT A LICENSE

It is illegal for any person to carry a handgun concealed upon his or her person or concealed in a vehicle without a license issued pursuant to Penal Code section 26150. (Pen. Code, § 25400.) A firearm locked in a motor vehicle's trunk or in a locked container carried in the vehicle other than in the utility or glove compartment is not considered concealed within the meaning of the Penal Code section 25400; neither is a firearm carried within a locked container directly to or from a motor vehicle for any lawful purpose. (Pen. Code, § 25610.)

The prohibition from carrying a concealed handgun does not apply to licensed hunters or fishermen while engaged in hunting or fishing, or while going to or returning from the hunting expedition. (Pen. Code, § 25640.) Notwithstanding this exception for hunters or fishermen, these individuals may not carry or transport loaded firearms when going to or from the expedition. The unloaded firearms should be transported in the trunk of the vehicle or in a locked container other than the utility or glove compartment. (Pen. Code, § 25610.)

There are also occupational exceptions to the prohibition from carrying a concealed weapon, including authorized employees while engaged in specified activities. (Pen. Code, §§ 25630, 25640.)

## LOADED FIREARMS IN PUBLIC

It is illegal to carry a loaded firearm on one's person or in a vehicle while in any public place, on any public street, or in any place where it is unlawful to discharge a firearm. (Pen. Code, § 25850, subd. (a).)

It is illegal for the driver of any motor vehicle, or the owner of any motor vehicle irrespective of whether the owner is occupying the vehicle to knowingly permit any person to carry a loaded firearm into the vehicle in violation of Penal Code section 25850, or Fish and Game Code section 2006. (Pen. Code, § 26100.)

A firearm is deemed loaded when there is a live cartridge or shell in, or attached in any manner to, the firearm, including, but not limited to, the firing chamber, magazine, or clip thereof attached to the firearm. A muzzle-loading firearm is deemed loaded when it is capped or primed and has a powder charge and ball or shot in the barrel or cylinder. (Pen. Code, § 16840.)

In order to determine whether a firearm is loaded, peace officers are authorized to examine any firearm carried by anyone on his or her person or in a vehicle while in any public place, on any public street or in any prohibited area of an

10

ZEL 0377

unincorporated territory. Refusal to allow a peace officer to inspect a firearm pursuant to these provisions is, in itself, grounds for arrest. (Pen. Code, § 25850, subd. (b).)

The prohibition from carrying a loaded firearm in public does not apply to any person while hunting in an area where possession and hunting is otherwise lawful or while practice shooting at target ranges. (Pen. Code, §§ 26005, 26040.) There are also occupational exceptions to the prohibition from carrying a loaded firearm in public, including authorized employees while engaged in specified activities. (Pen. Code, §§ 26015, 26030.)

**NOTE:** Peace officers and honorably retired peace officers having properly endorsed identification certificates may carry a concealed weapon at any time. Otherwise, these exemptions apply only when the firearm is carried within the scope of the exempted conduct, such as hunting or target shooting, or within the course and scope of assigned duties, such as an armored vehicle guard transporting money for his employer. A person who carries a loaded firearm outside the limits of the applicable exemption is in violation of the law, notwithstanding his or her possession of an occupational license or firearms training certificate. (Pen. Code, § 12031(b).)

## OPENLY CARRYING AN UNLOADED HANDGUN

It is generally illegal for any person to carry upon his or her person or in a vehicle, an exposed and unloaded handgun while in or on:

- A public place or public street in an incorporated city or city and county; or
- A public street in a prohibited area of an unincorporated city or city and county. (Pen. Code, § 26350.)

It is also illegal for the driver or owner of a motor vehicle to allow a person to bring an open and exposed unloaded handgun into a motor vehicle in specified public areas. (Pen. Code, § 17512.)

## PUNISHMENT FOR CARRYING UNREGISTERED HANDGUN

Any person who commits the crime of carrying a concealed handgun while having both the handgun and ammunition for that handgun on his/her person or in his/her vehicle may be subject to a felony enhancement if the handgun is not on file (registered) in the DOJ's Automated Firearms System. (Pen. Code, § 25400, subd. (c).)

Any person who commits the crime of carrying a loaded handgun on his/her person in a prohibited place may be guilty of a felony if the handgun is not on file (registered) in the DOJ's Automated Firearms System. (Pen. Code, § 25850, subd. (c).)

11

ZEL 0378

## MISCELLANEOUS PROHIBITED ACTS

### Obliteration or Alteration of Firearm Identification

It is illegal for any person to obliterate or alter the identification marks placed on any firearm including the make, model, serial number or any distinguishing mark lawfully assigned by the owner or by the DOJ. (Pen. Code, § 23900.)

It is illegal for any person to buy, sell or possess a firearm knowing its identification has been obliterated or altered. (Pen. Code, § 23920.)

### Unauthorized Possession of a Firearm on School Grounds

It is illegal for any unauthorized person to possess or bring a firearm upon the grounds of, or into, any public school, including the campuses of the University of California, California State University campuses, California community colleges, any private school (kindergarten through 12th grade) or private university or college. (Pen. Code, § 626.9.)

### Unauthorized Possession of a Firearm in a Courtroom, the State Capitol, etc.

It is illegal for any unauthorized person to bring or possess any firearm within a courtroom, courthouse, court building or at any meeting required to be open to the public. (Pen. Code, § 171b.)

It is illegal for any unauthorized person to bring or possess a loaded firearm within (including upon the grounds of) the State Capitol, any legislative office, any office of the Governor or other constitutional officer, any Senate or Assembly hearing room, the Governor's Mansion or any other residence of the Governor or the residence of any constitutional officer or any Member of the Legislature. For these purposes, a firearm shall be deemed loaded whenever both the firearm and its unexpended ammunition are in the immediate possession of the same person. (Pen. Code, §§ 171c, 171d, 171e.)

### Drawing or Exhibiting a Firearm

If another person is present, it is illegal for any person, except in self-defense, to draw or exhibit a loaded or unloaded firearm in a rude, angry or threatening manner or in any manner use a firearm in a fight or quarrel. (Pen. Code, § 417.)

### Threatening Acts with a Firearm on a Public Street or Highway

It is illegal for any person to draw or exhibit a loaded or unloaded firearm in a threatening manner against an occupant of a motor vehicle which is on a public street or highway in such a way that would cause a reasonable person apprehension or fear of bodily harm. (Pen. Code, § 417.3.)

### Discharge of a Firearm in a Grossly Negligent Manner

It is illegal for any person to willfully discharge a firearm in a grossly negligent manner which could result in injury or death to a person. (Pen. Code, § 246.3.)

ZEL 0379

### Discharge of a Firearm at an Inhabited/Occupied Dwelling, Building, Vehicle, Aircraft

It is illegal for any person to maliciously and willfully discharge a firearm at an inhabited dwelling, house, occupied building, occupied motor vehicle, occupied aircraft, inhabited housecar or inhabited camper. (Pen. Code, § 246.)

### Discharge of a Firearm at an Unoccupied Aircraft, Motor Vehicle, or Uninhabited Building or Dwelling

It is illegal for any person to willfully and maliciously discharge a firearm at an unoccupied aircraft. It is illegal for any person to discharge a firearm at an unoccupied motor vehicle, building or dwelling. This does not apply to an abandoned vehicle, an unoccupied motor vehicle or uninhabited building or dwelling with permission of the owner and if otherwise lawful. (Pen. Code, § 247.)

### Discharge of a Firearm from a Motor Vehicle

It is illegal for any person to willfully and maliciously discharge a firearm from a motor vehicle. A driver or owner of a vehicle who allows any person to discharge a firearm from the vehicle may be punished by up to three years imprisonment in state prison. (Pen. Code, § 26100.)

### Criminal Storage

"Criminal storage of firearm of the first degree" – Keeping any loaded firearm within any premises that are under your custody or control and you know or reasonably should know that a child (any person under 18) is likely to gain access to the firearm without the permission of the child's parent or legal guardian and the child obtains access to the firearm and thereby causes death or great bodily injury to himself, herself, or any other person. (Pen. Code, § 25100, subd. (a).)

"Criminal storage of firearm of the second degree" – Keeping any loaded firearm within any premises that are under your custody or control and you know or reasonably should know that a child (any person under 18) is likely to gain access to the firearm without the permission of the child's parent or legal guardian and the child obtains access to the firearm and thereby causes injury, other than great bodily injury, to himself, herself, or any other person, or carries the firearm either to a public place or in violation of Penal Code section 417. (Pen. Code, § 25100, subd. (b).)

Neither of the criminal storage offenses (first degree, second degree) shall apply whenever the firearm is kept in a locked container or locked with a locking device that has rendered the firearm inoperable. (Pen. Code, § 25105.)

### Sales, Transfers and Loans of Firearms to Minors

Generally, it is illegal to sell, loan or transfer any firearm to a person under 18 years of age, or to sell a handgun to a person under 21 years of age. (Pen. Code, § 27505.)

13

ZEL 0380

## Possession of a Handgun or Live Ammunition by Minors

It is unlawful for a minor to possess a handgun unless one of the following circumstances exist:

- The minor is accompanied by his or her parent or legal guardian and the minor is actively engaged in a lawful recreational sporting, ranching or hunting activity, or a motion picture, television or other entertainment event;

- The minor is accompanied by a responsible adult and has prior written consent of his or her parent or legal guardian and is involved in one of the activities cited above; or

- The minor is at least 16 years of age, has prior written consent of his or her parent or legal guardian, and the minor is involved in one of the activities cited above. (Pen. Code, §§ 29610, 29615.)

It is unlawful for a minor to possess live ammunition unless one of the following circumstances exist:

- The minor has the written consent of a parent or legal guadian to possess live ammunition;

- The minor is accompanied by a parent or legal guardian; or

- The minor is actively engaged in, or is going to or from, a lawful, recreational sport, including, competitive shooting, or agricultural, ranching, or hunting activity. (Pen. Code, §§ 29650, 29655.)

## NEW FIREARMS/WEAPONS LAWS

## AB 892 (Stats. 2015, ch. 203) – Purchase of State-Issued Handgun by Spouse/Domestic Partner of Peace Officer Killed in the Line of Duty

- Provides an exception to the Unsafe Handgun Act allowing the spouse/ domestic partner of a peace officer killed in the line of duty to purchase their spouse/domestic partner's service weapon. (Pen. Code, § 32000.)

## AB 950 (Stats. 2015, ch. 205) – Gun Violence Restraining Orders

- Allows a person who is subject to a gun violence restraining order to transfer his or her firearms or ammunition to a licensed firearms dealer for the duration of the prohibition. If the firearms or ammunition have been surrendered to a law enforcement agency, the bill would entitle the owner to have them transferred to a licensed firearms dealer. (Pen. Code, §§ 29830.)

- Extends to ammunition, current authority for a city or county to impose a charge relating to the seizure, impounding, storage, or release of a firearm. (Pen. Code, § 33880.)

14

ZEL 0381

AB 1014 (Stats. 2014, ch. 872 ) – Gun Violence Restraining Orders

- Beginning June 1, 2016, authorizes courts to issue gun violence restraining orders, ex parte gun violence restraining orders, and temporary emergency gun violence restraining orders if the subject of the petition poses a significant danger of personal injury to himself, herself, or another by having in his or her custody or control, owning, purchasing, possessing, or receiving a firearm and that the order is necessary to prevent personal injury to himself, herself, or another, as specified. (Pen. Code, §§ 18100 - 18205.)

- Beginning June 1, 2016, makes it a misdemeanor to own or possess a firearm or ammunition with the knowledge that he or she is prohibited from doing so by a gun violence restraining order.  (Pen. Code, § 18205.)

- Beginning June 1, 2016, makes it a misdemeanor to file a petition for a gun violence restraining order with the intent to harass or knowing the information in the petition to be false. (Pen. Code, § 18200.)

AB 1134 (Stats.  2015, ch. 785 ) – Licenses to Carry Concealed Handguns

- Authorizes the sheriff of a county to enter into an agreement with the chief or other head of a municipal police department of a city for the chief or other head of a municipal police department to process all applications for licenses to carry a concealed handgun, renewals of those licenses, and amendments of those licenses, for that city's residents. (Pen. Code, § 26150.)

AB 2220 (Stats. 2014, ch. 423) – Private Patrol Operators

- Beginning July 1, 2016, establishes procedures allowing a Private Patrol Operator (PPO) business entity to be the registered owner of a firearm.

- Beginning July 1, 2016, allows a security guard to be assigned a firearm by the PPO and for a firearm custodian to be designated by the PPO. (Pen. Code, §§ 16970, 31000, 32650.)

SB 199 (Stats. 2014, ch. 915) – BB Devices and Imitation Firearms

- Beginning January 1, 2016, amends the definitions of a "BB device" and an "imitation firearm." (Pen. Code, §§ 16250, 16700.)

SB 707 (Stats. 2015, ch. 766) – Gun-free School Zones

- Recasts Gun-Free School Zone Act provisions relating to a person holding a valid license to carry a concealed firearm to allow that person to carry a firearm in an area that is within 1,000 feet of, but not on the grounds of, a public or private school providing instruction in kindergarten or grades 1 to 12, inclusive. (Pen. Code, § 626.9.)

- Creates an exemption from the Gun-Free School Zone Act for certain appointed peace officers authorized to carry a firearm by their appointing agency, and for certain retired reserve peace officers authorized to carry a concealed or loaded firearm. (Pen. Code, § 626.9.)

**15**

- Deletes the exemption that allows a person holding a valid license to carry a concealed firearm to bring or possess a firearm on the campus of a university or college. (Pen. Code, § 30310.)

- Deletes the exemption that allows a person to carry ammunition or reloaded ammunition onto school grounds if the person is licensed to carry a concealed firearm. (Pen. Code, § 30310.)

- Creates a new exemption authorizing a person to carry ammunition or reloaded ammunition onto school grounds if it is in a motor vehicle at all times and is within a locked container or within the locked trunk of the vehicle. (Pen. Code, § 30310.)

16

ZEL 0383



ZEL 0384

**KAMALA D. HARRIS**
*Attorney General*



*State of California*
**DEPARTMENT OF JUSTICE**

BUREAU OF CRIMINAL INFORMATION AND ANALYSIS
P.O. Box 903417
SACRAMENTO, CA 94203-4170

June 30, 2016

MICHAEL ZELENY
7576 WILLOW GLEN RD
LOS ANGELES, CA 90046

RE:   California Criminal History Information

Dear Applicant:

This letter is in response to your record review request concerning the existence of information maintained in the California state summary criminal history files, as defined in subdivision (a) of Section 11105. Your fingerprints did identify to a record maintained in these files, and as such, a copy of that record is enclosed. If you wish to challenge the accuracy or completeness of your record, please complete and return the enclosed form (BCIA 8706) and supporting documentation to the address noted above. As requested, a copy of this record review response has been sent to your designee.

Pursuant to California Penal Code section 11121, the purpose of a record review request is to afford an individual with a copy of their record and to refute any erroneous or inaccurate information contained therein. The intent is not to be used for licensing, certification or employment purposes.

Additionally, California Penal Code sections 11125, 11142, and 11143 does not allow for a person or agency to make a request to another person to provide them with a copy of an individual's criminal history or notification that a record does not exist; does not allow an authorized person to furnish the record to an unauthorized person; nor does it allow an unauthorized person to buy, receive or possess the record or information. A violation of these section codes is a misdemeanor.

Sincerely,

*Cindy Santos*

Record Review Unit
Applicant Information and Certification Program
Bureau of Criminal Information and Analysis

For   KAMALA D. HARRIS

Attorney General

Enclosures
BCIA 8711d (Rev. 05/16)

PAGE 121                                                    ZEL 0385




# STATE OF CALIFORNIA
# DEPARTMENT OF JUSTICE
# BUREAU OF FIREARMS

# *Entertainment Firearms Permit*

## Permit Number: 12-380

Issued to:

## MICHAEL ZELENY

**Date of Issue:**       JULY 13, 2016
**Expiration Date:**   JULY 12, 2017

This is to certify that the Department of Justice, Bureau of Firearms has completed a firearms eligibility check.  As of the date of issue, there is nothing that would prohibit the above named permit holder from the possession of firearms loaned to the permittee for use as props in motion picture, television, video, theatrical, or other entertainment productions pursuant to Penal Code sections 29500 through 29530.

Signature of Issuing Officer: _Ellen T. Lee_

ZEL 0386

State of California
Department of Justice
Bureau of Firearms

Permit No.: 12-380

# Entertainment Firearms Permit

Issued to:

MICHAEL ZELENY

Date of Issue: 7-13-16    Expiration Date: 7-12-17

This is to certify that the Department of Justice, Bureau of Firearms has completed a firearms eligibility check. As of the date of issue, there is nothing that would prohibit the above named permitholder from the possession of firearms loaned to the permittee for use as props in motion picture, television, video, theatrical, or other entertainment productions pursuant to Penal Code sections 29500 through 29530.

Signature of Issuing Officer: _____

ZEL 0387

THIS PAGE INTENTIONALLY LEFT BLANK

ZEL 0388

ATTACHMENT B

City Clerk's Office



CITY OF
MENLO PARK

June 20, 2017

Michael Zeleny
7576 Willow Glen Road
Los Angeles, CA 90046

Sent via email and U.S. mail

**RE: Notice of Public Hearing On Appeal**

Dear Mr. Zeleny,

Attached you will find the notice of appeal you requested on September 16, 2016 via email.  Your appeal was initially set to be heard on October 25, 2016.  However, the City received a request for a continuance from your attorney based on personal reasons.  Your attorney asked for dates in November, but by then the City Council agendas were full for the remainder of the calendar year.

In an effort to ensure that your appeal could be set as promptly as possible, the City Clerk's office sent you a notice on December 12, 2016 with a spreadsheet showing available dates in 2017.  Having not heard a response, I followed up on January 11, 2017.  I next heard from you on February 17, 2017, when you requested available hearing dates.  I responded that the April 4, 2017 City Council meeting was available. You indicated that you were unavailable on the April 4, 2017 date, again for personal reasons.

After review of City staff and special counsel calendar's and availability, the City has selected Tuesday, August 29, 2017 as the date that your appeal will be considered. There will be no additional dates selected or continuances of this date, with this date as your opportunity to present your appeal.

Sincerely,


Pamela Aguilar
City Clerk

cc: Greg Rubens, Esq. via email
     David Affeld, Esq. via email



## **PUBLIC HEARING NOTICE**

Appeal to the City Council

NOTICE IS HEREBY GIVEN that the City Council of the City of Menlo Park, California, will hold a Public Hearing to consider an appeal submitted by Michael Zeleny regarding the City Manager's denial of the appeal of the application for a Special Event Permit dated September 12, 2016.

NOTICE IS HEREBY FURTHER GIVEN that the City Council of the City of Menlo Park will hold this Public Hearing on Tuesday, August 29, 2017, at 7:00 p.m., or as near as possible thereafter, in the City Council Chambers of the City of Menlo Park located at 701 Laurel Street, Menlo Park, California, at which time and place interested persons may appear and be heard on the matter.

NOTICE IS HEREBY FURTHER GIVEN that if you challenge this matter in court, you may be limited to raising only those issues you or someone else raised at the Public Hearing described in this notice, or in written correspondence delivered to the City of Menlo Park at, or prior to, the Public Hearing.

DATED:  Dated: June 20, 2017

Jelena Harada, Deputy  City Clerk

Published in the Daily News on August 11, 2017

ZEL 0390



City Clerk's Office

CITY OF
MENLO PARK

July 25, 2017

Michael Zeleny
7576 Willow Glen Road
Los Angeles, CA 90046

**RE: Notice of Public Hearing on your appeal**

Dear Mr. Zeleny,

Attached you will find the notice of appeal you requested September 16, 2016, via email. Your appeal was initially set to be heard October 25, 2016. However, the City received a request for a continuance from your attorney based on personal reasons. Your attorney asked for dates in November 2016, but by then the City Council agendas were full for the remainder of the calendar year.

In an effort to ensure that your appeal could be set as promptly as possible, the City Clerk's office sent you a notice Dec. 12, 2016, with a spreadsheet showing available dates in 2017. Having not heard a response, City staff followed up January 11, 2017. Your next correspondence was Feb. 17, 2017, when you requested available hearing dates. You were notified that the April 4, 2017, City Council meeting was available. You indicated that you were unavailable April 4, 2017, again for personal reasons. On June 20, 2017, you were sent a notice that your appeal was scheduled for Aug. 29, 2017, and we have not received a response.

Failure to appear at the scheduled appeal hearing Tuesday, Aug. 29, 2017, will cause the City to deem your appeal abandoned and uphold the denial of the special event permit. There will be no additional dates selected or continuances of this date, with this date as your opportunity to present your appeal.

Sincerely,

Clay J. Curtin
Interim City Clerk

cc:   Greg Rubens, Esq. via email
      David Affeld, Esq. via email



**PUBLIC HEARING NOTICE**

Appeal to the City Council

NOTICE IS HEREBY GIVEN that the City Council of the City of Menlo Park, California, will hold a Public Hearing to consider an appeal submitted by Michael Zeleny regarding the City Manager's denial of the appeal of the application for a Special Event Permit dated September 12, 2016.

NOTICE IS HEREBY FURTHER GIVEN that the City Council of the City of Menlo Park will hold this Public Hearing on Tuesday, August 29, 2017, at 7:00 p.m., or as near as possible thereafter, in the City Council Chambers of the City of Menlo Park located at 701 Laurel Street, Menlo Park, California, at which time and place interested persons may appear and be heard on the matter.

NOTICE IS HEREBY FURTHER GIVEN that if you challenge this matter in court, you may be limited to raising only those issues you or someone else raised at the Public Hearing described in this notice, or in written correspondence delivered to the City of Menlo Park at, or prior to, the Public Hearing.

DATED:  June 20, 2017

Jelena Harada, Deputy  City Clerk

Published in the Daily News on August 11, 2017

ZEL 0392



CITY OF
MENLO PARK

City Manager's Office

August 16, 2017

Michael Zeleny
7576 Willow Glen Road
Los Angeles, CA 90046

**RE: Updated Notice of Public Hearing for your appeal**

Dear Mr. Zeleny,

Attached you will find the updated notice of public hearing for the appeal you requested September 16, 2016, via email. Your appeal was initially set to be heard October 25, 2016. However, the City received a request for a continuance from your attorney based on personal reasons. Your attorney asked for dates in November 2016, but by then the City Council agendas were full for the remainder of the calendar year.

In an effort to ensure that your appeal could be set as promptly as possible, the City Clerk's office sent you a notice Dec. 12, 2016, with a spreadsheet showing available dates in 2017. Having not heard a response, City staff followed up January 11, 2017. Your next correspondence was Feb. 17, 2017, when you requested available hearing dates. You were notified that the April 4, 2017, City Council meeting was available. You indicated that you were unavailable April 4, 2017, again for personal reasons.

On June 20, 2017, you were sent a notice that your appeal was scheduled for Aug. 29, 2017. Upon not receiving a response, the City sent a reminder on July 25, 2017. On July 28, 2017, you confirmed via email that you did plan to attend on Aug. 29, 2017.

**Your appeal hearing is scheduled for Tuesday, Aug. 29, 2017, at 4:00 p.m., or as near as possible thereafter, in the Menlo Park City Council Chambers, located at 701 Laurel St., Menlo Park, California.**

Failure to appear at the scheduled appeal hearing Tuesday, Aug. 29, 2017, will cause the City to deem your appeal abandoned and uphold the denial of the special event permit. There will be no additional dates selected or continuances of this date, with this date as your opportunity to present your appeal.

(continued)

ZEL 0393

Sincerely,

Clay J. Curtin
Interim City Clerk

cc:    Greg Rubens, Esq. via email
        David Affeld, Esq. via email



**REVISED**
**PUBLIC HEARING NOTICE**

Appeal to the City Council

NOTICE IS HEREBY GIVEN that the City Council of the City of Menlo Park, California, will hold a Public Hearing to consider an appeal submitted by Michael Zeleny regarding the City Manager's denial of the appeal of the application for a Special Event Permit dated Sept. 12, 2016.

NOTICE IS HEREBY FURTHER GIVEN that the City Council of the City of Menlo Park will hold this Public Hearing, Tuesday, Aug. 29, 2017, at ~~7 p.m.~~ **4 p.m.**, or as near as possible thereafter, in the City Council Chambers of the City of Menlo Park located at 701 Laurel St., Menlo Park, California, at which time and place interested persons may appear and be heard on the matter.

NOTICE IS HEREBY FURTHER GIVEN that if you challenge this matter in court, you may be limited to raising only those issues you or someone else raised at the Public Hearing described in this notice, or in written correspondence delivered to the City of Menlo Park at, or before, the Public Hearing.

DATED: Aug. 16, 2017

Jelena Harada, Deputy City Clerk

Published Aug. 25, 2017, in the Daily News

**City of Menlo Park**   701 Laurel St., Menlo Park, CA 94025  tel 650-330-6600  www.menlopark.org

PAGE 131                                                        ZEL 0395

THIS PAGE INTENTIONALLY LEFT BLANK

ZEL 0396

Exhibit 9

| [O/V]: Overlapping Voices |
| [U/A]: Unintelligible audio |

[START RECORDING [Hearing 11 August 2016 01]]

**Alex McIntyre**: Okay, why don't we get started, I think introductions of all have been made, I think everyone knows who everyone is. And both parties consent to being recorded? I trust you made that request and we are…

**Kimberly Chu**: Wait, hold on, that's…

**Greg Rubens:** [U/A] wait until the recording starts.

**Alex McIntyre**: Sorry. Alright, let me start. I think all parties have made introductions to each other, so we know who we all are in the room. I'm Alex McIntyre and I am the city manager of the city Menlo Park and I will be acting as the hearing officer for this hearing and just to repeat what I said earlier, all parties have agreed to being recorded for this hearing.

**Michael Zeleny**: Yes.

**David Affeld**: Why don't we go around the table and identify ourselves instead?

**Alex McIntyre**: Sure, absolutely. So, I'm Alex McIntyre, I'm the city manager and I will be acting as a hearing officer.

**Greg Rubens**: Greg Rubens, I'm the legal counsel for Alex McIntyre for this hearing.

**David Affeld**: And you consent to being recorded?

**Greg Rubens**: And I consent to being recorded.


**Dave Bertini**: My name is Dave Bertini, I'm a Commander with the Menlo Park Police Department on behalf of the city of Menlo Park.

**David Affeld**: And you consent to the recording?

**Dave Bertini**: I do.

**Kimberly Chu**: I am Kimberly Chu, I'm Gregory Rubens associate. I consent to the recording.

**David Affeld**: I'm David Affeld, counsel for Michael Zeleny. I consent to the recording.

**Michael Zeleny**: I am Michael Zeleny, I consent to be recorded.

**Alex McIntyre**: Fantastic. Alright, because we're being recorded, I'd like just to read into the record sort of some comments, just so, we're all clear where we're going, what we are doing here. So, as the city manager, I'm acting as the hearing officer for this event and this is to hear the appeal of the discretionary decisions from the City Staff with regards to permits. This is the time and place for the administrative appeal of Michael Zeleny. Thank you for a Special Events permit first applied for on or about June 3rd, 2015 which was denied on September 21, 2015. On April 15th, 2016, the revised application was submitted which the city treated as a new application for the same location. That application was denied on May 4th, 2016, the request was then appealed to Community Services Department on or about May 27th, 2016. The appeal was denied by a letter dated on June 16th, 2016. This decision, as then appealed to the Community Services Director and denied on June 24th, 2016. Appellant then appealed to the city manager by e-mail dated July 1, 2015 and, just so you know, we have allocated about two hours for this conversation for this hearing. Hopefully, that will be sufficient. We've all made introductions of who's in the room. We have several documents I believe that are pertinent to this that the city has in its possession. One is the actual application dated June 2015. Two is e-mail and written correspondence concerning special event permit application and appeals from city and appellant. Three, we have a California firearms law summary dated from 2016 and fourth, we have the notice of the appeal hearing. Those are the four documents I have. [U/A] So, moving on. The applications appeal to correspondence are part of the administrative record for this appeal. It is my intention to receive all of these documents as evidence unless there are any objections by either side.

2

**Michael Zeleny**: No objections.

**Male Speaker:** No objections.

**Alex McIntyre**: Okay. Fantastic. Next, this is an informal proceeding which means the formal rules of evidence do not apply. As the hearing officer, I may be able to consider anything that may be of assistance to me in making my decision. Procedurally, the parties are going to proceed as follows. First, the city is going to have an opportunity to present its evidence, and present its case. I'm not going to require that the witnesses be sworn. After that, the appellant may have an opportunity to cross-examine which will be limited to what is presented in their testimony and what is reasonably related to their testimony regarding this matter. Then, the appellant will have an opportunity to present his or her case, counsel for the city will have an opportunity to cross-examine any witnesses presented by appellant. At the conclusion, there will be an opportunity for both sides to present oral arguments. So, we're going to begin with the testimony offered by the city which is Commander Bertini. Are we okay procedurally with what I just laid out?

**David Affeld:** Yes, sir.

**Alex McIntyre**: Okay. Fantastic. Commander?

**Dave Bertini:** Thank you. As the city manager hearing officers [U/A], there are several correspondence that went back and forth regarding this application for special permits, the first being around June or July of 2015, on which case it, this application e-mail was sent to the city attorney Rex [U/A] and the police chief and on or about July 24th, the email response from the city attorney was sent to Mr. Zeleny, and, I believe maybe, I am not sure if his attorney was copied on it or not, but the initial response from the city attorney was a denial of the application, based on the fact that the application was incomplete. For several reasons, it was not completed as far as the duration, because there were no [U/A], the location and what exactly was the event that this person wanted to put

on. There was a response from Mr. Zeleny around the end of July of 2015, in which case, in which he indicated this is going to be some kind of multimedia event and a letter was again sent to and, at that point, I believe it was deemed another an appeal to the original letter sent to the city attorney. On or about September 21st of 2015, another letter was sent to Mr. Zeleny from the city attorney with a denial of permit for the specific reasons of: the application was incomplete, the exact location was still missing, the event did not meet the definition of a special event for the city. And, to that letter, was also a film permit application, was also attached to that because he indicated that he wanted to make this some kind of multimedia film production. The letter also talked about the [U/A] code violations that would be committed if this permit were to be approved. On or about April 15th of 2016, several months later, an email was sent from Mr. Zeleny appealing this initial denial from September of 2015. In this updated application, there was a new map that was attached that indicated that the area that he wanted to use was a center divide on Sand Hill Road. On or about May 4th, a letter from the city attorney to Mr. Zeleny was again sent and this was a denial of that appeal and, that again based on the fact that it still was incomplete for the application. The event was not open to the public and there was no community participation, which it is one of the definitions of what a special event is. There was no defined term, he was then, it was also advised that the display of firearms, either loaded or unloaded is prohibited by law, by California Penal code and the fact that the location that he'd indicated, presented traffic and safety hazards and he was also advised that any further appeal should go through the Community Services Director, Cherise Brandell. On or around May 27th, 2016, an email was sent from Mr. Zeleny for the city attorney regarding that denial, again, he resubmitted the map, at that point, he advised he was just going to use a pickup truck and drive it up on the center divide median and that all activities would be in the bed and cab of that vehicle, parked in the

4

center median and it was planned to be there for 24 hours a day. On June 15th, 2016, Mr. Zeleny sent another email to the city attorney requesting an answer for his previous email and, the next day on June 16th, 2016 an email was sent to Mr. Zeleny from Matt Milde on behalf of the Community Services, again denying the permit due to the fact it was incomplete application, still. The fact that it did not meet the criteria for a special event. There was no defined term, the fact that exhibition of firearms are illegal in California, in the state of California. It also indicated that there was traffic and safety concerns, and vehicle violations, in what he was planning or what he indicated he wanted to do. On June 17th, we received an email from Mr. Zeleny advising that he wished to appeal, or file a 1983 lawsuit in federal court. On June 24th, an email, denial letter to Mr. Zeleny was sent from Cherise Brandell, the Community Services Director. And, for the exact same reasons that have been outlined in the past. On July 1st, 2016, we received, or I should say Cherise Brandell received, I was copies on these emails of course, a demand, or an email demanding an appeal. And, on July 12th, an email letter was sent by Matt Milde on behalf of Cherise Brandell, who was out of the office, advising his right to appeal to the city manager. And between August 8th and 10th, I'm aware that there have apparently been a correspondence between the city, the hearing officer's attorney Greg Rubens and Mr. Zeleny 's attorney, regarding this specific hearing. A few things that I would like to put into the record are, number 1, a copy of Penal Code section 25-850, which clearly indicates that it's illegal to carry a loaded firearm in the state of California, unless that person is either a police officer, or has a concealed weapons permit. The second Penal Code section I'd like to enter is section 2640, which is in Layman's term, the unloaded, open carry prohibition. This is a Penal Code section that makes it illegal to carry any unloaded firearm, that is not a handgun, so that would be a rifle or any other non-handgun, in public. And, the third section, the Penal Code section, is 26-350 which is the

carrying of, open carrying of unloaded handgun, which is prohibited by the California

Penal Code and is a crime in the state of California. The other sections that I'd also like

to introduce are the Vehicle Code sections that have used... [U/A-buzzing noise]

**Alex McIntryre** Sorry.

**Dave Bertini:** Vehicle Code sections that [U/A]

**Greg Ruben:** [U/A] [O/V] just wait a second because the tape won't pick up your voice,

probably. Thank you.

**Dave Bertini:** Okay. Okay. The Vehicle Code sections that were listed as other reasons for the

denial, including 23-332 of California Vehicle Code.

[U/A]

**Dave Bertini:** 21-4...21-466 of the California Vehicle Code, and 21-466.5 of the Vehicle Code.

Something else I would like to place into the record is, we also received a copy of what

Mr. Zeleny…

[U/A-buzzing noise]

**Dave Bertini:** A copy of what Mr. Zeleny proposed to be displaying. Whether this has changed

or not, I don't know. And based on this, I would also argue besides the, all the Penal Code

and Vehicle sections that I have already indicated, that if Mr. Zeleny will in fact display

this openly, if any children were present, he may be in violation of 313.1 of the Penal

Code, displaying harmful material, which children can't view it. Based on all of these

factors, it was the city's decision to deny the discussion permit as… as it is written.

[U/A-buzzing noise]

**Alex McIntyre:** I need to deal with this. Hold on, please.

**Male Speaker :** We're trying to [U/A], so.

**Alex McIntyre** I will do that. In the meantime, okay, commander, is that the end of your

presentation?

6

**Dave Bertini:** Yes.

**Alex McIntyre** Okay. Mr. Affeld, do you want to ask the commander any questions?

[U/A-buzzing noise]

**David Affeld:** I do, we do have that problem, I don't anticipate we are going to need all two

hours for today, so I would be willing to be patient to see if there is something we can do.

**Alex McIntyre:** Okay. I texted someone who's going to come down in a second [U/A]

**Greg Rubens:** Should we recess until we see what happens?

**David Affeld:** Why don't we do that?

**Alex McIntyre:** Yeah, that's fine.

**Greg Rubens:** I'm going to turn off the tape recording.

**Alex McIntyre:** Three minutes, I'll be right back.

[START RECORDING Hearing 11 August 2016 02]]

[U/A]

**David Affeld::** How about if we do it this way? I think we are all in agreement that we can

resume recording. If anybody feels otherwise, say so now and otherwise we deem that

your previous consent is still operative. Okay.

**Male Speaker:** Okay.

**David Affeld::** Commander, I want to start where you ended. You showed us penal code section

313.1 and you also have a graphic from Mr. Zeleny's live journal.

**Dave Bertini::** Correct.

**David Affeld::** The page, in the lower right hand corner there is a print dated July 21st, 2015 at

4:04 PM.

**Dave Bertini::** Correct.

**David Affeld::** Is that the date that you printed this out?

**Dave Bertini::** Yes.

**David Affeld::** Did you personally do that or somebody else at the City?

**Dave Bertini::** No, I did it.

**David Affeld::** Was this something that you included or anybody else on behalf of the city included in any of the previous denials at the first instance, or on any other of the letters of appeals?

**Dave Bertini::** No.

**David Affeld::** You were aware of this for more than a year but it didn't find its way into any of the Appellate record until today?

**Dave Bertini::** That's correct.

**David Affeld::** And your point, including this graphic, it's dated December 14th, 2012, have you seen that?

**Dave Bertini::** Yes.

**David Affeld::** And it depicts some individuals in some sexual activity.

**Dave Bertini::** Correct.

**David Affeld::** Your point is that a display of this kind in public might harm minors?

**Dave Bertini::** My point is that if it were to be displayed in public and we had any complaining parent of a minor who was exposed to it, that 313.1 could be a section that could be used to make an arrest or prosecution.

**David Affeld::** And, so it was, did Mrs. Zeleny tell you that this graphic that's depicted from December 14th, 2012 was going to be a part of the protest?

**Dave Bertini::** My understanding was that I, this was the graphic that he was proposing to display on the video screen.

**David Affeld::** Okay. So, it was the content of this graphic that you found as part of the grounds for denying Mr. Zeleny's application?

**Dave Bertini::** No, I just, I bring that up now as another reason why. It was never brought up before, it was not in the record before.

**David Affeld::** The new reason today regarding this graphic has to do with the content of the graphic, is that right?

**Dave Bertini::** That's correct.

**David Affeld::** Do you know if there's been any determination as to whether this graphic is obscene?

**Dave Bertini::** I would have to turn it in, in the court of Law.

**David Affeld::** Has that happened?

**Dave Bertini::** There's been no arrest. I am talking about a criminal case and it hasn't been displayed yet, so, no arrest has been made so it can't have gone to court.

**David Affeld::** So as of today, there has been no ajudication that you're aware of to the effect of this graphic is obscene?

**Dave Bertini::** That's correct.

**David Affeld::** What is the definition of a special event for purposes of Mr. Zeleny's application?

**Dave Bertini::** A special event is one in which a personal group is requesting special consideration from the city for an event that is of community nature for people to come together or to have some kind of event within the city of Menlo park that would require a permit. So which would required a permit if there were to be any kind of police required for street closures, if there was to be any kind of music or any kind of display or, or entertainment that would be displayed. I mean, I don't have the definition in front of me but I can certainly find it.

**David Affeld::** Where do we find that definition?

**Dave Bertini::** That would be on the website.

**David Affeld::** Which website?

**Dave Bertini::** The city of Menlo Park website, under special permits.

**David Affeld::** Have you ever seen Mr. Zeleny before?

**Dave Bertini::** Yes, I have.

**David Affeld::** You saw him when he protested previously in 2012-2013. Am I right?

**Dave Bertini::** Correct.

**David Affeld::** When he did that, you saw him interacting with the public in the course of this protest, right?

**Dave Bertini::** I did not personally see that, no.

**David Affeld::** Did you ever see him talk to anybody?

**Dave Bertini::** I did not see him talk - besides officers, no.

**David Affeld::** How much time did you spend observing Mr. Zeleny?

**Dave Bertini::** The only time I believe I've actually seen him were in photographs during the protests. I think I may have gone up to the scene once, if I remember correctly. I don't recall how many times I actually went to the scene of his protest.

**David Affeld:** The graphic dated December 14th, 2012, is something that you found on Mr. Zeleny's live journal. Right?

**Dave Bertini:** I don't remember, again, I don't remember whether he sent it to me or I located it. I believe it was sent in one of the email exchanges.

**David Affeld:** The live journal account, you know that's available online? Right?

**Dave Bertini:** I don't know that.

**David Affeld:** You printed this page, right?

**Dave Bertini:** That's correct but I am not sure if it came from Mr. Zeleny attached to an email or whether it came from a link that was attached to an email.

**David Affeld:** You know that Mr. Zeleny made videos of his previous protests in 2012 and 2013?

**Dave Bertini:** I did not know that.

**David Affeld:** This is the first you ever heard of that?

**Dave Bertini:** Yes.

**David Affeld:** Did you testify at a criminal trial in which Mr. Zeleny was accused of violating open and closed carrying statutes?

**Dave Bertini:** It was a violation of carrying a concealed weapon. Correct.

**David Affeld:** You testified in that trial, right?

**Dave Bertini:** I did.

**David Affeld:** And Mr. Zeleny was found not guilty, right?

**Dave Bertini:** Correct.

**David Affeld:** One of the defenses asserted in that trial was that Mr. Zeleny was involved in video productions. Right?

**Dave Bertini:** I don't remember which defenses, no.

**David Affeld:** Have you made any technical determinations of any kind as to how Mr. Zeleny's proposed protest activity would affect the driving public?

**Dave Bertini:** Based on, yes, based on where he is requesting to have this vehicle parked. It is not from the perspective of the community services and from the police department. That would be a dangerous place to have vehicle parked; first of all, it's illegal to be on the median.

**David Affeld:** You are going a little farther than my question. The question was just "had you made any technical determinations" and if, let's do it in baby steps. You need to say 'Yes' or 'No' to that, then I can follow up with my next question because you are going in a direction different from the one I have in mind.

**Dave Bertini:** I see. Yes

**David Affeld:** Alright. Have you done things like taken measurements of any kind with respect to the locations of Mr. Zeleny's protests?

**Dave Bertini:** No.

**David Affeld:** Have you done any surveys of any impact on drivers with regard to that location?

**Dave Bertini:** No.

**David Affeld:** Have you done anything to test whether the luminosity of the flat screen that Mr. Zeleny was proposing to use would affect drivers?

**Dave Bertini:** No.

**David Affeld:** Have you taken any kind of scientific measurements of any kind with respect to Mr. Zeleny's application?

**Dave Bertini:** What kind of scientific measurements would you be talking about?

**David Affeld:** Anything, any.

**Dave Bertini:** No.

**David Affeld:** Are you aware of whether in response to Mr. Zeleny's application, the city engaged in any kind of negotiation process where it offered to accommodate, and if it agreed certain modifications, to what he proposed.

**Dave Bertini:** I believe the letters that were exchanged with the city's Attorney's Office indicated what the issues were with the application.

**David Affeld:** Right.

**Dave Bertini:** I am not, I'm not privy to any negotiations.

**David Affeld:** Okay. Do you know if there was any interaction which the city offered to compromise in any way?

**Dave Bertini:** In, to what end?

**David Affeld:** With regards to Mr. Zeleny's application. For example, to suggest different location or suggest particular time frame or…?

**Dave Bertini:** I don't think that's the city's part, place to suggest where he wants to do this.

**David Affeld:** Okay. So, in answer to my question. Did the city make any proposals of any kind that you are aware of to try to reach some sort of compromise with Mr. Zeleny?

**Dave Bertini:** No.

**David Affeld:** You identified a number of statutes for us, vehicle code statutes, and penal code statutes. There is one that I didn't hear from you. Are you familiar with penal code section 25-510?

**Dave Bertini:** No. Perhaps if you refreshed my recollection.

**David Affeld:** That's the one about an exception or an exemption from the open carrying and close carrying statutes for somebody who is an authorized participant in, among other things, an entertainment event or a video production.

**Dave Bertini:** I am aware of that section.

**David Affeld:** Okay. Did you happen to bring a copy of that statute?

**Dave Bertini:** I did not.

**David Affeld:** You did read the record regarding Mr. Zeleny's application, the denial, and the appeals, right?

**Dave Bertini:** Correct.

**David Affeld:** And you saw in Mr. Zeleny's materials that he referred to that statute, right?

**Dave Bertini:** Correct.

**David Affeld:** Is there a reason you didn't include that statute in the materials you brought today?

**Dave Bertini:** It's not my place to defend Mr. Zeleny in his request for this. It's my opinion and, of course, this would be something for a court of law to decide on is that unless Mr.

13

Zeleny can produce some kind of permit from the State or some other governing agency that shows he is an authorized person in a motion picture, that's a moot point.

**David Affeld:** You are not a lawyer, right?

**Dave Bertini:** No, I am not.

**David Affeld:** Have you been to law school?

**Dave Bertini:** I have not.

**David Affeld:** Did you do any legal research regarding penal code section 25-510?

**Dave Bertini:** I did.

**David Affeld:** Did you read cases on it?

**Dave Bertini:** Yes, I did.

**David Affeld:** Did you read any definition of what the phrase "Authorized Participant" means?

**Dave Bertini:** Perhaps you can refresh my memory.

**David Affeld:** I am asking, before we get to that, I'm asking, did you do any research in that respect?

**Dave Bertini:** I did.

**David Affeld:** Okay. Did you find anything that provided a definition for the phrase "Authorized Participant"?

**Dave Bertini:** Not that I recall.

**David Affeld:** So, did you find any authority of any kind regarding who does the authorizing of an Authorized Participant?

**Dave Bertini:** I did not.

**David Affeld:** That statute, let me ask you something. Have you seen the Die Hard movies, Bruce Willis movies?

**Dave Bertini:** I don't know how this is relevant.

**David Affeld:** Well, bear with me. This is an informal procedure. Have you seen those movies?

14

**Dave Bertini:** Yes.

**David Affeld:** Have you seen other action movies in which the actors go around with firearms, right?

**Dave Bertini:** Correct.

**David Affeld:** And those kinds of activities where people make feature films or action movies with actors and make believe gun fights, those are certainly the kind of things followed in penal code section 25-5-10. Would you agree?

**Dave Bertini:** I don't know the answer to that.

**David Affeld:** An Authorized Participant, let me run the statute for you and see if this refreshes your memory of the research you said you did regarding the statute. Are you familiar with section 25-400? I think you brought that one with us, right? 25-400 does not apply to or affect any of the following:

    a) The possession of a firearm by an authorized participant in an a motion picture, television, or video production or an entertainment event when the participant lawfully uses the firearm as part of that production or event. Some other language not pertinent right now.

    Are you familiar with that? [U/A] your mind.

**Dave Bertini:** Yes.

**David Affeld:** You would agree that, if Bruce Wills is acting in a Die Hard movie and he is carrying a gun for the purpose of using it in a motion picture or television or a video production or entertainment event, that would follow in this section, right?

**Dave Bertini:** I don't know the answer to that.

**David Affeld:** Okay. Is it your view that the city of Menlo Park decides whether Bruce Willis is the person who's authorized to participate in that movie?

**Dave Bertini:** I believe if he were to be making a movie within our city limits, yes.

**David Affeld:** So, if a movie is being filmed within the city limits, the city is going to decide casting decisions. Is that right?

**Dave Bertini:** That's not, that's not what you asked. You asked --

**David Affeld:** That is what I'm asking, that is what I'm asking. If Bruce Willis is going to be an actor in a movie filmed in the city of Menlo Park, the city can decide whether he is allowed to carry a gun in that movie?

**Dave Bertini:** No, the city can decide whether live weapons can be used in the movie.

**David Affeld:** Statute applies to unloaded guns, right?

**Dave Bertini:** That's correct.

**David Affeld:** Okay. So, the city can decide whether guns can be used in a movie shot within its limits?

**Dave Bertini:** Yes.

**David Affeld:** That's your view?

**Dave Bertini:** Yes.

**David Affeld:** Okay. And if the city decides that guns can be used, the city can also decide which person is allowed, which actor is allowed to carry a gun?

**Dave Bertini:** I don't…I am not sure what you're asking. I don't think the city's going to go in and say, "well person A can carry a weapon, person B cannot." Now, obviously, there are other laws that would be applicable. If person A was a felon, he could not carry a gun.

**David Affeld:** Let's assume we're talking about, non-felon actors.

**Dave Bertini:** Okay.

**David Affeld:** Non-felons, you would agree, the city isn't going to decide whether person A or person B is authorized to use the unloaded weapon in a video production or movie or television production or entertainment event, right?

**Dave Bertini:** That's correct.

16

**David Affeld:** The person who decides whether the person's authorized is the, is whoever's in charge of making the video production or entertainment event or motion picture or television.

**Dave Bertini:** I'll disagree with that.

**David Affeld:** Okay. Who decides who gets to be the person to carry a gun?

**Dave Bertini:** Either by a state permit for making a motion picture or the city in which or the municipality in which the motion picture is being made.

**David Affeld:** Talking a little bit past each other. Assume that the production, the entertainment event, the movie, the TV show, the video production, assume that that event is one in which a firearm can be used if it's unloaded and otherwise complies with the statute. You agree, don't you, that it's not up to the city to decide which actor is the one to hold the firearm?

**Dave Bertini:** It's up to the city to decide whether or not the person is authorized by the State to have some, you have to have some kind of permission from the State, from the Attorney General's office or if there is a division in motion pictures that allows that person to be an Authorized Person to carry a weapon.

**David Affeld:** So, let me show you, let me see if I understand you right. So, for example, what I am going to show the witness for the sake of the audio reference, is a PDF electronic copy of a thing called Entertainment Firearms Permit issued to Michael Zeleny, date of issue 7-13-16, issued by the State of California Department of Justice, Bureau of Firearms. Is that the kind of permit you're talking about?

**Dave Bertini:** It would be.

**David Affeld:** Let me show you, this is the small kind, this is wallet size, right? You're familiar with this kind of permit?

**Dave Bertini:** Looks wallet size.

**David Affeld:** Let me show you another kind of permit. Here is a letter dated July 12th, 2016 on the letterhead of Kamala D. Harris, Attorney General, State of California, Department of Justice to Michael Zeleny, stating that "the California Department of Justice has approved your application for an Entertainment Firearms permit." That's the kind of permit you're talking about, right?

**Dave Bertini:** That's correct.

**David Affeld:** Mister city manager I will show you the same document I am showing the witness. Counsel.

**Greg Rubens:** Are you putting that into evidence?

**David Affeld:** Yes.

[O/V] [U/A]

**David Affeld:** I don't, I forgot to bring some paper with me or email copies of these PDFs today. And, then, here's a third one. This is on the letterhead of the State of California, Department of Justice, Bureau of Firearms, a document entitled Entertainment Firearms permit, permit number 12-380, issued to Michael Zeleny, date of issue, July 13th, 2016. This is likewise, the kind of permit you're talking about, right?

**Dave Bertini:** Correct.

**David Affeld:** You can see the signature of the issuing officer there, right?

**Dave Bertini:** Yes, I see, I see a signature; I am not sure who that is.

**David Affeld:** So, if an actor has a permit of this kind issued by the Department of Justice and the State of California and there is a video production or entertainment event going on, it's not up to the city to decide casting issues, right? It's the production that authorizes.

**Dave Bertini:** It's up to the city to decide whether or not they are allowed in the city to film their production.

**David Affeld:** Okay.

**Dave Bertini:** Casting is irrelevant.

**David Affeld:** Okay. You agree the city has no role in the casting decisions, right?

**Dave Bertini:** That's correct.

**David Affeld:** Now, let's talk about, do you believe that the city has the authority to deny somebody the ability to exercise the First Amendment Right of protest within the city limits?

**Dave Bertini:** Counselor, in no way are we attempting to deny the right of Mr. Zeleny to protest; in many years, I think almost a decade now, he has been protesting here and there is a location where he would go and where, because of some legal actions that was taken against him and also because of the property owners requirements that he not be on their property, that there was a public easement that he can certainly protest, as long as he is doing it within the law.There's nothing here that we are attempting to infringe upon Mr. Zeleny's First Amendment Right.

**David Affeld:** Okay, and you would agree that, if Mr. Zeleny were exercising his First Amendment Right of Protest within the city limits of the city of Menlo Park, he is entitled to video record that protest, right?

**Dave Bertini:** I don't know the answer to that.

**David Affeld:** Okay. Can you think of any reason he is not permitted to?

**Dave Bertini:** Well, if he is making a motion picture or entertainment, then he will have to get a special permit from the city.

**David Affeld:** If he is just making a video production. You think that's something that the city can prohibit him from doing?

**Dave Bertini:** I am not quite sure about that.

**David Affeld:** You think, any time he wants to make a video recording of a protest, he needs a special event permit?

**Dave Bertini:** That depends on what he, I believe it would probably depend on what he plans on doing with the video. If it's for, like you said, if it's for entertainment purposes, or if he is planning on selling it or doing whatever he needs to do that he may need a motion picture permit from the city.

**David Affeld:** And it's just a discretionary decision on the part of the city whether to allow him to make a video recording of his protest. Is that your view?

**Dave Bertini:** Again, I am not sure a hundred percent whether or not he would need a motion picture permit or not.

**David Affeld:** What if he just wants a record in case he needs to defend himself against an unfounded criminal prosecution? Does he need to get a permit to do that?

**Dave Bertini:** No, there's certainly no, certainly no prohibition against filming yourself.

**David Affeld:** And, if he wanted to film a protest, would you agree he can make the casting decision that he is the person to make the protest that would be video recorded?

**Dave Bertini:** I don't understand what you are saying Counselor, because now you are talking about casting and productions versus a protest.

**David Affeld:** I am getting at whether he can authorize himself to be the Authorized Participant, making his protest that he makes a video recording of? You agree he can make that choice.

**Dave Bertini:** That makes no sense to me, I can't answer that question. That makes no sense whatsoever.

**David Affeld:** Let me simplify that. This might be something too complicated for you. In terms of whether he is an Authorized Participant [O/V].

**Greg Rubens:** No, Counselor, I'm just…I know I am not representing the city but try not to be argumentative with him, I mean he is the witness, he is cooperating, he is trying to answer the best he can.

20

**David Affeld:** In a way, my sense of it is there is a little bit of a push back here. There is a partisan loyalty. It's contrary to Mr. Zeleny. I also cross examined the Commander at the trial three years ago. So, we're familiar with each other.

**Greg Rubens:** Okay. I wasn't aware of that.

**David Affeld:** Sir, in terms of the definition of Authorized Participant, you agree Mr. Zeleny can authorize himself to be the star of the video in his protest, right? That's not the city's decision who stars in that video?

**Dave Bertini:** I think, in my mind, you are conflating the two, production and some kind of casting world with a protest so, either he is making a movie, or he is doing a protest. Which one are you speaking of, Counselor?

**David Affeld:** You've heard of documentaries, right?

**Dave Bertini:** Of course.

**David Affeld:** People can make real time videos for purposes of documentaries.

**Dave Bertini:** And it would be my opinion that, if he was making a documentary, that he should get a motion picture film permit from the city.

**David Affeld:** What if he just wants to make a video production for use in defense of an unfounded criminal prosecution. Does he have to get a permit for that?

**Dave Bertini:** And I have already answered that.

**David Affeld:** Alright. Now, but, you are now focusing on a different question. I want to stay focused on the Authorized Participant part, who does the authorizing? Is it up to the city to decide whether Mr. Zeleny can be the star of his protest?

**Dave Bertini:** That makes again, that makes no sense. A star, so, now you are talking a star so you're [O/V].

**David Affeld:** I'll rephrase, I'll rephrase. Does the city get to decide who is the person making the protest or can Mr. Zeleny decide to do it?

**Dave Bertini:** Do you mean, do you mean does the city decide who gets to protest?

**David Affeld:** Yes.

**Dave Bertini:** No.

**David Affeld:** And does the city get to decide who is the person being video recorded making that protest?

**Dave Bertini:** Does the city decide who is video recording?

**David Affeld:** No. Let's do it real slow. Does the city get to decide whether Mr. Zeleny can be the person making the protest that he video records? Does the city have the ability to tell him, "no, not you, you must be someone else"?

**Dave Bertini:** I still don't… Counselor, I don't know what angle you're going for, but I don't understand the question. The question that I am hearing is, can the city tell him that he can't be the Authorized Person to make a film of himself?

**David Affeld:** To be the person in…okay. If Mr. Zeleny is making a protest, somebody else would be running the camera, right?

**Dave Bertini:** I don't know if that's true or not. He could setup a camera and film himself.

**David Affeld:** Okay. Mr. Zeleny would be the person who is on camera, right?

**Dave Bertini:** If he is protesting?

**David Affeld:** Yeah.

**Dave Bertini:** And somebody's filming him?

**David Affeld:** Whoever's doing the filming.

**Dave Bertini:** Sure.

**David Affeld:** He's the person who is on camera.

**Dave Bertini:** Correct.

**David Affeld:** Does the city have the ability to tell him he is not allowed to be the person who is on camera, it has to be someone else?

**Dave Bertini:** No.

**David Affeld:** He is the person who gets to decide whether he is the one on camera as opposed to somebody else, right?

**Dave Bertini:** Certainly.

**David Affeld:** He is the one who decides who is the Authorized Participant in the video.

**Dave Bertini:** I would disagree with that.

**David Affeld:** Okay. So, what I am hearing from you, tell me if I have this right, is you are thinking, you are not focusing on the Authorized Participant. You are talking about whether the video event itself is allowed. Is that what you are saying?

**Dave Bertini:** That's correct.

**David Affeld:** Okay. That's a different question. Baby steps, let's do one topic at a time. Right now, I am just focusing on the Authorized Participant part. You agree Mr. Zeleny gets to make a decision of who is Authorized right? Assume that the video production is okay.

**Dave Bertini:** Authorized Person is the language used in the exception to the open carry law.

**David Affeld:** Authorized Participant, actually.

**Dave Bertini:** It has nothing to do with somebody who is protesting. Where do you find language that there are Authorized People that can protest and that the city or anybody else has a right to tell a person whether or not they can protest? I don't understand what you're saying.

**David Affeld:** No, I think you've probably made the factual record that I wanted to make and the rest of this is going to be more in the nature of argument about statutory construction. So, is there any location in the vicinity of the place where Mr. Zeleny proposed that you think would be an acceptable place for Mr. Zeleny to conduct his protests?

**Dave Bertini:** The exact same location that he has used before.

**David Affeld:** Okay. If he were to do that there, would you have a problem with him using a flat screen monitor?

**Dave Bertini:** Depends.

**David Affeld:** Depends on what?

**Dave Bertini:** Depends on size, depends on what he's going to use to run it. Is it going to be blocking the sidewalk? Is it going to be visually impairing for vehicles? So, it would really depend on the situation. In the past, he's used signs.

**David Affeld:** Okay. If he placed the flat screen monitor in approximately the same location as the signs, would you be okay with that?

**Dave Bertini:** Again, it would depend. Again, power, size, is it blocking the public right of way?

**David Affeld:** Okay. Assume it doesn't block the public right of way anymore than the signs did. Are we okay so far? You identified several factors, I want to take a note one at a time. First one, blocking the side walk, if he put his flat screen monitor in the same place as where he put his signs previously, are you okay with that?

**Dave Bertini:** If they don't block the side walk.

**David Affeld:** If the power generator isn't blocking the sidewalk, are you okay with that?

**Dave Bertini:** It would depend on the noise level.

**David Affeld:** If Mr. Zeleny had a, what's the maximum size of flat screen that you would be okay with?

**Dave Bertini:** I can't answer that. I don't know the dimensions of the side walk.

**David Affeld:** You know the dimensions that Mr. Zeleny put in his application regarding the flat screen?

**Dave Bertini:** 55 inches.

**David Affeld:** Is that okay?

**Dave Bertini:** I don't know. I just told you, I don't know the size of the sidewalk.

**David Affeld:** Does Mr. Zeleny need to get approval from the city regarding the content of his protest ahead of time?

**Dave Bertini:** No.

**David Affeld:** Have you ever met with anybody from NEA regarding the criminal prosecution of Mr. Zeleny?

**Dave Bertini:** Not regarding the criminal prosecution of Mr. Zeleny, no.

**David Affeld:** Have you met with NEA in any other capacity?

**Dave Bertini:** Yes.

**David Affeld:** In what capacity?

**Dave Bertini:** I met with all the stakeholders that were complaining about Mr. Zeleny's protest on two or three occasions.

**David Affeld:** Who were the stakeholders?

**Dave Bertini:** I don't know exactly who was involved, but I know it was the property owners, Stanford. It was NEA, Rosewood property. I know the Sherriff's Department was there, the DA's office and I'm not quite sure who else was there.

**David Affeld:** That was when Mr. Zeleny was protesting within that compound where NEA is, right?

**Dave Bertini:** Correct.

**David Affeld:** He move from the front door to the parking lot when asked to do so by the City of Menlo Park police department?

**Dave Bertini:** That was before I was employed, so…

**David Affeld:** You've seen the records that indicate that?

**Dave Bertini:** Correct.

**David Affeld:** Then Mr. Zeleny moved from the parking lot to outside of the compound, right?

**Dave Bertini:** Correct.

**David Affeld:** And, have you ever seen any indication from Mr. Zeleny that he was not willing to cooperate regarding reasonable time, place, and manner restrictions on his protest?

**Dave Bertini:** I don't believe anybody put any time restraints on his protest.

**David Affeld:** Well, there were location restrictions, correct?

**Dave Bertini:** That is correct. He couldn't trespass and he couldn't also block the public right of way.

**David Affeld:** Right. So, he cooperated when you had location issues with him, right?

**Dave Bertini:** Correct.

**David Affeld:** He also proposed to use amplified music and you told him not to?

**Dave Bertini:** I don't recall that.

**David Affeld:** You've seen that in the records?

**Dave Bertini:** I don't recall that.

**David Affeld:** You know that he proposed to use acoustic music, right?

**Dave Bertini:** I did not know that.

**David Affeld:** Okay. You know whether Mr. Zeleny…have you seen from the records that Mr. Zeleny cooperated in every respect with regard to music issues?

**Dave Bertini:** I can't answer that.

**David Affeld:** Okay. The appeal denials refer to…something where a special event can't be open-ended, what's the reason for that?

**Dave Bertini:** Well, I think it's just pretty much logical that, if you have a special event, how can the city respond to it if it's indefinite? Special events by their very nature are finite. There's a start time and there's an end time.

**David Affeld:** Why do you say that? Is it defined in the ordinance somewhere?

**Dave Bertini:** No.

**David Affeld:** Where did you get that idea? Is it something you have invented or did you get it from somewhere?

**Dave Bertini:** Counselor, I didn't invent anything, this is coming from the special permits committee, which I'm not part of.

**David Affeld:** So, is there something in writing that says a special event has to be for a defined term?

**Dave Bertini:** I'm not sure.

**David Affeld:** Well, you are here to speak for the city and saying that one reason for denying Mr. Zeleny's application, is that there's no defined term, right? So, on behalf of the city, can you tell me where in any ordinance or other source of authority there is a definition that states that a special event has to be of a defined term?

**Dave Bertini:** No.

**David Affeld:** Are you aware of anything that indicates the city isn't just making that up?

**Dave Bertini:** I believe the city has the ability to regulate the activities of people who are coming in, which to get a special permit for the safety, for security, and for the general welfare of the citizens of this city.

**David Affeld:** Do you know when the ordinance regarding special events was adopted?

**Dave Bertini:** No.

**David Affeld:** Are you aware of any evidence that indicates it was adopted in 2014 during the prosecution of Mr. Zeleny and applied retroactively to his protest activities from a year and two years before?

**Dave Bertini:** I have no idea what you're talking about.

**David Affeld:** You'd agree it's not fair to pass an ordinance and apply it retroactively, right?

**Dave Bertini:** I believe we live in a society of laws and [U/A] in respect to those laws, but I'm not sure what you're talking about.

27

**David Affeld:** I think that's all we need for now.

**Greg Rubens:** Okay. So, are you going to proceed with presenting evidence to the hearing officer?

**David Affeld:** Yes. Alright, so I will email copies of the permits that Mr. Zeleny has, that I've shown to the witness and to Counsel and to the City Manager. Mr. Zeleny, the video productions that you previously made, did you authorize yourself to appear in them?

**Mr. Zeleny:** I certainly did.

**David Affeld:** The firearms that you depicted in those video productions, were they loaded or unloaded?

**Mr. Zeleny:** Unloaded.

**Greg Rubens:** Just quick, was there a video production?

**David Affeld:** Yes.

**Male Speaker 3:** Okay, there was something that's already been produced? Okay.

**David Affeld:** We're talking about this permit, [U/A] application is about, this is just for historical reference. Mr. Zeleny, you did make some video productions previously?

**Mr. Zeleny:** Yes.

**David Affeld:** And when you did that, you depicted firearms?

**Mr. Zeleny:** Yes.

**David Affeld:** They were unloaded?

**Mr. Zeleny:** Yes.

**David Affeld:** What was the duration of your protest?

**Mr. Zeleny:** Typically, about 7-8 hours, each day.

**David Affeld:** And did this go on for years at a time?

**Mr. Zeleny:** It occurred on several years. The last one was in 2012. Before, there was one in 2010, I believe. Actually, there were two in 2012; 2008, 2006, 2004.

**David Affeld:** And, when you did this, were you protesting 365 days a year?

**Mr. Zeleny:** No.

**David Affeld:** How many days a year are we talking about?

**Mr. Zeleny:** The most maybe 20 in 2012.

**David Affeld:** Are you wedded to the location that you identified in the application?

**Mr. Zeleny:** I prefer that location because that is where NEA is and that is where people that do business with NEA come and go.

**David Affeld:** You prefer it, do you require it?

**Mr. Zeleny:** I'm not adamant about it, by any means.

**David Affeld:** Did the city ever contact you to discuss negotiating a different location?

**Mr. Zeleny:** No.

**David Affeld:** Did the city ever discuss maybe allowing that location or some other location as long as you didn't park your truck on a median?

**Mr. Zeleny:** No.

**David Affeld:** Did the city ever discuss any specific proposed duration the city would be willing to accept regarding your protest?

**Mr. Zeleny:** No.

**David Affeld:** Did the city ever communicate any accommodation of any kind to you regarding your permit application?

**Mr. Zeleny:** None whatsoever.

**David Affeld:** Did you get more reaction from the intended audience for your protests when you used unloaded firearms as opposed to not using them?

**Mr. Zeleny:** Oh, very much so.

**David Affeld:** Is there something about the content of your protests that relates to firearms?

**Mr. Zeleny:** Well, I'm responding to…death threats, multiple death threats, independently witnessed, and recorded made against me and my family in the course of a business dispute that involved a corporation sponsored and funded by NEA. And, even after I exposed unlawful behavior on the part of the principals of the corporation and caused it's second in command to be fired from the company and exiled effectively from the country, and he went ahead and he funded him to the tune of hundreds of millions of dollars in full knowledge of his background as a man accused of molestation by his own daughter, under oath. So, the firearms relate to…the kind of dispute resolution that NEA's protégés consider par for the course; death threats, threatening to kill anyone that has a dispute with them, threatening to kill his family, threatening to kill his dogs.

**David Affeld:** So, there's symbolic meaning to having firearms?

**Mr. Zeleny:** Very much so.

**David Affeld:** And they amplify your message by drawing attention?

**Mr. Zeleny:** Yes.

**David Affeld:** The city has indicated disapproval of the content of some of your boards in the past. Is there something about the content of the boards that relates to your protest?

**Mr. Zeleny:** Hm-hm. Yes.

**David Affeld:** What's that?

**Mr. Zeleny:** They objected to stick figures that were depicted on a set of signs. They considered those to be too provocative for public consumption in an exhibition, so I withdrew them.

**David Affeld:** Are you still willing to negotiate with the city to change the parameters of your protest?

**Mr. Zeleny:** Absolutely, I made that offer in writing.

**David Affeld:** Once or more than once?

**Mr. Zeleny:** Several times.

**David Affeld:** Okay. No further questions.

**Dave Bertini:** Are we allowed to question?

**Alex McIntyre:** Uh, yeah.

**Dave Bertini:** Mr. Zeleny, when you protested in the past with unloaded firearms, isn't it true that you had ammunition in close proximity to those firearms?

**Mr. Zeleny:** Yes.

**Dave Bertini:** And how many rounds would you estimate that you had close to those firearms?

**Mr. Zeleny:** Anywhere between 12 and 24, I guess.

**Dave Bertini:** 12 or 24 hundred?

**Mr. Zeleny:** No.

**Dave Bertini:** Just 12 rounds or 24 rounds?

**Mr. Zeleny:** Right.

**Dave Bertini:** Wasn't there one time when there was a bag full of ammunition?

**Mr. Zeleny:** Yeah, but all the magazines in the state are limited to ten rounds.

**Dave Bertini:** I'm talking about loosely, in boxes or loose ammunition.

**Mr. Zeleny:** I didn't really bring the stock of ammunition, maybe there was a box in a case somewhere.

**Dave Bertini:** Well, I believe there is a lot more ammunition than what you're telling us, 12-24 rounds. So, what is the purpose of having…if your display of unloaded firearms are just to have a shock value or somehow are involved in your protest, what is the reason for having live ammunition so close in proximity to those weapons?

**Mr. Zeleny:** A gun is useless without ammunition. What is the point of displaying something that is useless?

**Male Speaker 3:** Well, if the display of the unloaded firearm is just that, a display, are you saying that you'd be willing to load the weapon and use it if necessary?

31

**Mr. Zeleny:** I believe that California statutes allow me to do so when I reasonably consider myself to be in danger, and I would certainly do so if that were come to pass.

**Dave Bertini:** I see. So, you would be willing to just load those weapons and begin to…?

**Mr. Zeleny:** If I felt like I had to defend myself, within the statutory limits, I would do so.

**Dave Bertini:** And who are you threatened by while you are protesting at that location?

**Mr. Zeleny:** Well, actually I was physically confronted by a few people in the course of that, I was able to talk myself out of it. But, as I said, I received multiple death threats, I've reported some of them. They have been presented in court on several occasions. Police reports exist to that effect, which you were involved in two accounts. [U/A] [O/V]

**Male Speaker 3:** And these death threats came from whom?

**Mr. Zeleny:** Hm?

**Dave Bertini:** The death threats came from whom?

**Mr. Zeleny:** I don't know whom it came from. They were made on behalf and presumably at the behest of entities that were sponsored by NEA, WebX, and its principals.

**Dave Bertini:** And is it true that you're attempting to use the city of Menlo Park to circumvent the California Penal Code by trying to make your protest actually a video production?

**Mr. Zeleny:** I don't believe I am circumventing anything. I am using a statutory exemption, there's nothing underhanded about it. Yes, I want to fit myself within the meaning of law. I want to abide by law.

**Dave Bertini:** Okay, so basically you just admitted to me that this is…your goal is to use this ploy, or whatever you want to call it, to get a special permit so that you will be allowed to carry weapons in your protest which are now illegal because of the new statutes that come into effect in the last few years.

**David Affeld:** Just a second, that's a fairly argumentative question, I realize we have informality here, but your witness just said his intention is to comply with law, including his statutory

exemption. And, if the Commander has an issue with that statute, there is a remedy in Sacramento, but to –

**Dave Bertini:** And I would say the same for Mr. Zeleny, but I believe the nature of my question was just trying to clarify what Mr. Zeleny said.

**David Affeld:** When you use words like "ploy", and "you've just admitted to me", those are kind of loaded words.

**Dave Bertini:** I disagree with you, Counselor. So, Mr. Zeleny, your intention is to use a permit from the city of Menlo Park, in order for you to bring weapons that would be illegal at a protest to this protest, isn't that correct?

**David Affeld:** Let me object, that's not an accurate characterization, though it's [U/A] he's trying to do this, we believe that he's already within the law and this is just an additional step to make it even more abundantly clear.

**Dave Bertini:** He could certainly say no to the question. It seems to me, and, basically what you've just said, is that you're using this as a way to get around the California Penal Code by allowing you now to carry weapons at a protest.

**Mr. Zeleny:** Allow me to answer that. It is not my intent to get around anything. It is my intent to abide by the letter and the spirit of the law. The law makes a specific, explicit exemption for authorized participants in entertainment events and in film and video productions. The purpose of this meeting, is to establish that I am empowered by law to authorize myself in my own production.

**Dave Bertini:** I disagree, I don't think the purpose of the meeting is that, the purpose of the meeting is to have a hearing officer make a decision on whether [U/A] [O/V].

**Mr. Zeleny:** That's right. I'm talking about my purpose.

**Dave Bertini:** Your purpose?

**Mr. Zeleny:** Correct.

33

**Dave Bertini:** Yes. So, my question to you Mr. Zeleny is, do you…is your intention to protest, or to make a video on film? What is your intention?

**Mr. Zeleny:** It's both, actually. I have been recording my protests for as long as I have been conducting them, you can find them online. It's not an exclusive choice, by any means.

**Dave Bertini:** Right. And, have you ever applied for a special permit before?

**Mr. Zeleny:** No, I didn't have to because, as my counsel has indicated, that special permit, according to my research, came to be only during the course of my prosecution for allegedly carrying a concealed weapon.

**Dave Bertini:** But, there was…there were special event permits in the past.

**Mr. Zeleny:** No, and not prior to, oh, I can protest very easily, not prior to 2014.

**Dave Bertini:** No, there were…there was a process prior to 2014, for people to get permits for special events that would block streets, etc., that would require police presence, etc.

**Mr. Zeleny:** Allow me to amend my response.

**Dave Bertini:** Sure.

**Mr. Zeleny:** There was no evidence of such permitting process that I could find at the time I was conducting my protests. There was no such evidence online that I can find retroactively with historical searches.

**Dave Bertini:** Hm-hm.

**Mr. Zeleny:** There may well have been a process that hadn't been advertised, that didn't come to my attention.

**Dave Bertini:** Okay.

**Mr. Zeleny:** I will concede that.

**Dave Bertini:** Alright. And, so, again, I go back to the question, why did you now request a special permit when you don't need a permit to protest?

**Mr. Zeleny:** That is correct. I need a permit to protest within the same parameters I had been using before, according to the new statutes that had been enacted with exemptions.

**Dave Bertini:** But, that's not true, you could walk up there today and protest as long as you are within the law and you don't have your weapons with you.

[O/V]

**Mr. Zeleny:** [U/A] I do intend to have weapons with me, as allowed by law.

**Dave Bertini:** So, your intention for applying for the special permit is so that you can carry weapons?

**Mr. Zeleny:** Yes.

**Dave Bertini:** That is the reason why you've asked for this special permit?

**Mr. Zeleny:** Yes.

**Dave Bertini:** Thank you. I have no further questions.

**Alex McIntyre:** Mr. Rubens do you have anything?

**Greg Rubens:** No, I…if you need to talk with me [U/A].

**Alex McIntyre:** No…no. Can I ask a few questions, please? For clarity?

**David Affeld:** By all means.

**Alex McIntyre:** In no particular order. I'm not even sure who I'm asking this to, but I'm going to ask the question anyways. Mr. Affeld, you characterized something earlier as being a protest activity or a special event and, my question is, are they the same or are they, in your mind, different?

**David Affeld:** They overlap, I think and I'll make clear in concluding arguments, I don't believe Mr. Zeleny needs any of this, he doesn't need a special event permit. I think he's entitled to protest, I think he's entitled to video, to protest, and, when he does that, he complies with Penal Code section 25-510 and its counterpart for open carry. But, once he does…for closed carry. Once he does that, though, he puts himself at risk, so, in a manner

35

of belt and suspenders over caution, he's also applying for a special event permit to buttress and make it even more clear that he's entitled to do what he wants to do.

**Alex McIntyre:** And, Commander, to your point earlier, can you sort of restate something for my benefit? Is there a distinction between a protest activity and a special event?

**Dave Bertini:** Yes, because you do not need a permit to protest.

**Alex McIntyre:** Okay. Second question. Is everyone's understanding that film permits are completely discretionary by the Menlo Park City Council?

**Dave Bertini:** That's correct.

**David Affeld:** No, that's not our understanding. I don't believe the city has unfettered discretion on the basis of content to deny the ability to make a video recording of a protest event.

**Alex McIntyre:** Okay, I asked a different question. I asked are film permits discretionary by the city council of Menlo Park? A permit for a production company to come in and film Die Hard 12, does that require, does the production company have a right to come into Menlo Park and set up camp and do 20 days of filming, is that something, in your opinion, the council, the Menlo Park law does not allow for discretion?

**David Affeld:** I don't know, I suspect that probably is a matter of discretion, with the discretion bounded by certain Constitutional limits, for example. A commercial production of a feature film would be a different thing from a first amendment protest, for example. I don't think that the city has discretion to deny a protest, I don't think it has discretion to deny making a video of the protest.

**Alex McIntyre:** That's still hasn't…that's not my question. So, to your point earlier, Commander, we're going to answer your question, all I'm asking is, a film permit is an understood concept that is, in my mind, I believe, may have something that the municipality holds the discretion to allow it, to not allow it. A film permit.

**David Affeld:** And, my point is, I suspect the discretion is the standard with discretion limited by constitutional rights. There isn't arbitrary discretion, in other words.

**Alex McIntyre:** Okay. Third question. And, I'm sorry if you didn't offer these into evidence yet, I mean, you have but they're not in my possession, the three permits that Mr. Zelenski…Mr. Zeleny apparently received from the State of California, what were the dates on those again?

**David Affeld:** July 12, 2016.

**Alex McIntyre:** Which was about a month ago?

**David Affeld:** Right.

**Alex McIntyre:** Okay.

**Greg Rubens:** There weren't three permits, there was one permit and [U/A] [O/V]

**Alex McIntyre:** I'm sorry, three…sounds like three documents, I'm sorry, there were three documents.

**David Affeld:** Yes, yes.

**Alex McIntyre:** Okay, so there is a July 12, 2016 date, not 2015.

**David Affeld:** Yes.

**Alex McIntyre:** I just want to be clear [U/A] they were aquired.

**David Affeld:** Right.

**Alex McIntyre:** And, Commander, do you know, I'll ask Mr. Affeld next, do you know when a completed application was submitted for the event, for the special events committee?

**Dave Bertini:** It was in 2015.

**Alex McIntyre:** A completed application?

**Dave Bertini:** What do you mean by completed?

**Alex McIntyre:** I thought I had read in some of these exhibits that the city had, that the city attorney kept sending back requests for information for the application to be complete.

**Dave Bertini:** Right

**Alex McIntyre:** Because I think there was some kind of missing information? Is that…do you know…? And, actually, Mr. Rubens maybe you know the answer to the question. When was the completed application being submitted?

**Greg Rubens:** Let me see, it was…

**Alex McIntyre:** Let me back up, has a completed application been submitted? Maybe that's…

**Greg Rubens:** I just want to see if it's here.

**Alex McIntyre:** Okay. So, Mr. Rubens why don't you search for that for a quick second. Well, actually, that's my last question.

**David Affeld:** That exchange actually highlights our point of view. We think that the application was complete in that, there was a kind of a pretextual stumbling block raised say that the application was incomplete, but certainly by the time the appeal process reached this point, all the information that needed to be supplied, has been supplied.

**Greg Rubens:** I think when we review the information together, we will look at the June 24th denial, which is the [U/A] appeal for…I don't think it has that as a ground that it was incomplete.

**Alex McIntyre:** Okay. Mr. Affeld can I ask you to clarify something for me?

**David Affeld:** Yes.

**Alex McIntyre:** The three documents dated July 12?

**David Affeld:** Yup.

**Alex McIntyre:** Can you remind me what their relevance is with regards to this conversation?

**David Affeld:** Yes, the Commander said that he felt that, for someone to qualify as an authorized participant, they'd have to be permitted by some governmental agency, and then he ran through specific examples, and then I showed him the three different formats of the

permit that Mr. Zeleny had, and I asked if this is the kind of thing he had in mind and he said yes.

**Alex McIntyre:** Okay. The question I have then is, again, maybe it's rhetorical, but I'll ask it anyway is, since those weren't in hand until July 16th, all the applications that had come in previously, he did not have the benefit of those permits from the state. Is that a true statement?

**David Affeld:** Uh, yes.

**Alex McIntyre:** Okay.

**David Affeld:** Before we leave the topic, though, I'd suggest that, to the extent that we don't think that the objection is right, we don't think the statute called, requires any kind of permitting but, to the extent that, there had been any merit to that argument, it's now gone.

**Alex McIntyre:** I don't believe I have any more questions. Does any more, for the sake of clarity for anyone, want to offer any more comments or closing statements?

**David Affeld:** Yes. But I want to email the –

**Greg Rubens:** And, one thing I wanted to say just about the, what I handed out. I received this information from the city and, I'm looking at it today, I see that there might be some attorney-client privilege, minor communications in here, I just want to preserve that privilege.

**David Affeld:** Well, then you can claw them back, identify them in the next ten days can you let us know?

**Greg Rubens:** I will, alright, I will.

**David Affeld:** I need an email address; I have Mr. Ruben's address, anybody else?

**Alex McIntyre:** Mr. Ruben's is fine.

**David Affeld:** Okay.

**Alex McIntyre:** So, who closes first, I'm sorry. Does it matter?

**Greg Rubens:** You know it's usually the appellant gets the last word, so, it's –

**Alex McIntyre:** Commander do you have any closing statements, or…?

**Dave Bertini:** No, I'm just [U/A].

**Alex McIntyre:** Okay. Mr. Affeld?

**David Affeld:** Okay. One second, before I do that, I want to send off this email.

**David Affeld:** Okay, I have now emailed to Mr. Rubens the three different versions of the permit. So, the floor has been yielded to me? Our goal is to find an agreement with the city so that Mr. Zeleny can conduct his protest in a lawful way, to avoid litigation, section 1983 litigation, and to avoid as much controversy as is possible so that the focus is just on his protest and the targets of the protest and the first amendment virtues can be achieved. So, I just want to say, we are amenable to negotiations about time, place, manner restrictions, we'll modify this so the truck doesn't have to be on mediation, I mean, median, and, the location doesn't have to be the median. It'd be appropriate and, I think it's not used, and I don't think it would cause a problem but, if the city feels strongly, Mr. Zeleny can agree to relocate. We do have a sticking point on the firearm aspect, that goes to the content, it has symbolic meaning and it amplifies the message. There is a constitutional authority to the effect that it is lawful for somebody to amplify the message and to draw attention that is, in fact, the purpose of speech that some people might regard as unpleasant. Mr. Zeleny is not looking to do any kind of end run or skirt any kind of statutory scheme, he is trying to invoke, specifically, the laws in which the legislature seems fit to adopt. So, we believe he has compliance with the letter and the spirit of section 25-510 and its counterpart. The statute just requires somebody to be an authorized participant in, among other things, an entertainment event or video production, that's disjunctive. So, the special permit goes to whether this is an entertainment event, special

40

event, and the permit issue is clearly an entertainment event, but, it doesn't have to be, it doesn't have to be permanent, it's enough if Mr. Zeleny is making a video production, it is not up to the city to decide who is authorized, that is not what the statute means, it's pretty clear not. The city is not in the business of making casting decisions; it is the producers of the video production, the promoters of the entertainment event who make the decision about who will be on camera. So, if Mr. Zeleny authorizes himself to be an authorized participant, he is the person who makes that decision, not the city of Menlo Park and, if he is an authorized participant, it is strictly a matter of whether that event, his protest that is being video recorded is a video production and complies to the statute if that happens, and whether it is an entertainment event, in which case he likewise complies with the statute. And, I don't believe the city has discretion to deny Mr. Zeleny the ability to record his protest. There is nothing in the ordinance, nor can there be, to say that there has to be a finite duration of his protest. The civil rights movement didn't have any such limitations; historically, the first amendment has never been construed that way, and it's not even a practical ordinance, Mr. Zeleny has never spent 365 days a year in his protest, he's done it for approximately 10, or…about 11 or 12 days in any given year, and, if the city's concern is they don't want him around the clock living on the median, that can be accommodated, just give us some reasonable time, place, manner restrictions, and he'll comply. The duration, we can negotiate that. We can agree if it's no more than 10 days a month or X days a month, or something along those lines. That's negotiable. What the city can't do is deny him any days a month. I don't think that's a lawful constitutional exercise, that's not within the discretion of the city. The criteria for a special event are unconstitutionally vague to the extent that those criteria will be used to impinge on Mr. Zeleny's first amendment exercise and the use of firearms as a means of making the first amendment protest, that's just a combination of first and second

41

amendment rights to achieve the first amendment goal. So, I think it would be prudent for us to work something out so that we don't wind up in expensive, protracted litigation. Let's get to a sensible resolution.

**Alex McIntyre:** Great. So, is this matter being submitted?

**David Affeld:** Yes.

**Alex McIntyre:** Okay, I'll take this under submission, it would probably take about 3 weeks for us to get an answer back to you.

**David Affeld:** Oh, maybe one other thing. We would be willing to stipulate that the city council will come to whatever conclusion you come to, and bypass that so that we don't take up the City Council's time, otherwise we are just going to have run through the whole same production, and, I have feeling whatever you do, they'll go along with. So, we make that offer, you don't have to do it, we just offer it as a way to spare people from wasting valuable public resources.

**Alex McIntyre:** Alright, I appreciate that. Anything else or anyone else?

**Greg Rubens:** Okay, thank you.

**Alex McIntyre:** Thank you. I appreciate your time.

**Mr. Zeleny:** We are off the record.

[END RECORDING: Hearing 11 August 2016 02]]

Exhibit 10





CITY OF
**MENLO PARK**

# City Manager's Office

September 5, 2017

VIA EMAIL: michael@massmeans.com
AND U.S. MAIL

Michael Zeleny
7576 Willow Glen Road
Los Angeles, CA 90046

**RE: City Council Decision: Appeal of Denial of Special Event Permit Application**

Dear Mr. Zeleny,

On August 29, 2017, the Menlo Park City Council considered the appeal of staff's administrative decision to deny your Special Events Permit application. The City Council voted 4-0 to uphold the City Manager's decision to uphold staff's denial of your application. The City Council relied on the presentation of staff, your presentation and response to questions, and the staff report for the August 29, 2017, meeting, which consisted of a staff report and a letter from the City Manager's Office dated September 12, 2016, including Exhibits A through K, which consisted of correspondence between you and staff with respect to your application.

Please take notice that the City Council's decision on August 29, 2017, is a final administrative decision. Any challenge to this decision in the appropriate court of competent jurisdiction must be made within ninety (90) days of August 29, 2017, pursuant to California Code of Civil Procedure Section 1094.6, unless a shorter time is required by State or Federal law.

If you believe the City Council's decision involved speech or expressive conduct entitled to protection by the First Amendment, any petition must be served on the City of Menlo Park no later than twenty-one (21) calendar days following the City Council's decision of August 29, 2017, pursuant to California Code of Civil Procedure Section 1094.8.

Thank you for your attention to this matter.

2

Sincerely,


Jelena Harada
Deputy City Clerk


cc:    Via email only
      William L. McClure, Esq.
      Greg Rubens, Esq.
      Alex D. McIntyre, City Manager
      Dave Bertini, Commander

MP001214

Exhibit 11

| From: | Michael Zeleny |
|---|---|
| To: | Toews, Ivan J |
| Cc: | Harada, Jelena V; McClure, William; Bertini, David C; McIntyre, Alex D; Flegel, Nicolas A.; Subrah Iyar; Scott Sandell; dwa@agzlaw.com |
| Subject: | Re: Notice re Menlo Park City Council Decision |
| Date: | Monday, November 13, 2017 4:12:06 PM |
| Attachments: | image001.png |

Dear Mr Toews,

Thanks for your response. Given that your previous deliberations have pushed us back well past my requested starting date, I would appreciate a prompt and dispositive response to my present query.

To simplify, I am not requesting any accommodations for my production beyond those available to any comer at zero cost, and free of permit requirements; nor am I imposing any costs or burdens on the City, given that Menlo Park Police Department did not regard my previous appearance in the exact same location as requiring any special effort on their part. All I am asking the City to acknowledge in its response is my eligibility to carry a concealed firearm or openly carry an unloaded handgun or a long gun under California Penal Code Sections 25400 (a) (2), 26350 (a) (1), and 26400 (a), pursuant to the relevant exemptions under P.C. Sections 25510, 26375, and 26405, as applicable to authorized participants in a motion picture, television or video production, or entertainment event.

Accordingly, your choice in this matter is limited to (1) acknowledging the fact of my aforementioned statutory rights, whereupon I would proceed with my production, secured from your unlawful arrest and malicious prosecution; or (2) fabricating a pretext to deny me my statutory rights, whereupon I would proceed with 42 U.S. Code § 1983 civil rights litigation at your ultimate expense.

As we say in Hollywood, let's cut to the chase.

—

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Mon, Nov 13, 2017 at 3:48 PM, Toews, Ivan J <IJToews@menlopark.org> wrote:

Dear Mr. Zeleny,

I received your response to comments of 11/9/17. I was out of the office on the 10th for Veteran's Day. I will review your response, discuss with staff and will reply within the next 10 days. If you have any additional questions or concerns in the meantime please let me know.

EXHIBIT 69
Flegel, 12|3|20
(WITNESS)   (DATE)
JANIS JENNINGS, CSR, CCRR

MP001311

**Ivan Toews- Land Development Engineer**

**City of Menlo Park |**

701 Laurel St. | Menlo Park, CA 94025

Direct (650)-330-6712 | | Fax 650-327-5497

ijtoews@menlopark.org



**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Thursday, November 09, 2017 4:02 PM
**To:** Toews, Ivan J <IJToews@menlopark.org>
**Cc:** Harada, Jelena V <jvharada@menlopark.org>; McClure, William <wlm@jsmf.com>; Bertini, David C <dcbertini@menlopark.org>; McIntyre, Alex D <admcintyre@menlopark.org>; Flegel, Nicolas A. <naf@jsmf.com>; Subrah Iyar <Subrah.Iyar@webex.com>; Scott Sandell <ssandell@nea.com>; dwa@agzlaw.com

Subject: Re: Notice re Menlo Park City Council Decision

Dear Mr Toews,

I answer your questions in order received:

    1.    Daily times for setting up and tearing down my equipment will not exceed one hour each. Given that Menlo Park City film permits require filming to occur between 08:00 and 18:00, I am planning to start no earlier than 07:00 and finish no later than 19:00.

    2.    My gas generator is a Yamaha EF2800I inverter generator, factory rated between 65 dBA and 68 dBA at ¼ load.

    3.    Written notice to business within 200 feet of the film location will read approximately as follows: "Please take note that on the dates identified below, I shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu. I shall be present in the vicinity of 2825 Sand Hill Road from 08:00 till 18:00 every weekday, served by a support staff of one personal

assistant and one cinematographer. My props are to include fully operational, exposed and unloaded military grade firearms and loaded ammunition feeding devices therefor, including without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a 7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed semiautomatic Browning M1919a4, in full compliance with all applicable laws. A 55" portable media display powered by a portable gas generator will display videos featuring explicit representations of sexual violence committed by NEA's publicly disgraced protégé. A sample image can be found at http://larvatus.livejournal.com/371973.html. Two tripod-mounted cameras focusing on public reactions to my display will be placed on the side of Sand Hill Road, without obstructing any pedestrian or automotive traffic. One of them will be attended by a cinematographer. I will operate the other one remotely. All their raw footage, complemented by output of body cams, will be live streamed on the Internet. Please refrain from any public displays that you do not wish to be broadcast worldwide."

4.     As to the site plan, please see the attached Google Maps photo. Please take note of the fact that my presence and equipment will be confined to the location shown in the photo and used on my last appearance in 2012, as then judged by the City not to require any special traffic control efforts or law enforcement presence or oversight. The site will accommodate me displaying the aforementioned firearms and a 55" SunBrite outdoor TV, mounted in a Gator G-Tour E-Lift, and powered by a Yamaha EF2800I inverter generator, while operating a Leica SL camera fitted with a Summilux-SL 50mm f/1.4 prime lens, mounted statically on a Gitzo Ocean Traveler 4-Section carbon fiber tripod with a ballhead. My cinematographer will operate nearby a RED SCARLET camera fitted interchangeably with either a Canon EF 70-200mm f/2.8L IS II USM telephoto zoom lens or a Canon EF 24-70mm f/2.8L II USM Lens, and mounted on a Sachtler D-12 Speed Balance Hot Pod tripod. We do not intend to use any adjacent parking locations.

5.     As to the traffic control plan, since our proposed filming location does not encroach on any sidewalks or roads, there will be no need to divert pedestrians or automobiles around it.

6.     As to the licensing and fees, I will entertain the option of applying and paying for a one-time Business License upon your conditional approval of my filming project. However, my project is not meant as any kind of business, and should not require this kind of licensing. Additionally, the minimal footprint of my project will not burden the City by imposing any special administrative costs. Accordingly, I am requesting a license and fee waiver owing to the non-commercial, non-profit, and *pro bono publico* nature of my project, designed to rid your community of scurrilous business practices.

7.     As to my standing and circumstances requiring accommodations not anticipated by your application format and requirements, the reference is to the non-commercial, non-profit, and *pro bono* purpose and zero associated administrative cost considerations recited in the previous response.

8.     I will provide the City with a Certificate of Liability Insurance on the terms acceptable to its Risk Management office, as soon as it conditionally approves my application.

9.     I will provide a complete and signed application as soon as the City indicates its conditional approval of the schedule and parameters of my

project.

10.   I will submit all permitting payments as soon as the City and I agree on the fees applicable in this matter, or their waiver pursuant to the considerations recited above.

On a general note, based on our previous experience in this matter, I do not expect my film permit application to be approved by the City of Menlo Park regardless of the scope and extent of my accommodations for its demands. Accordingly, this application is meant to elicit the terms and pretexts of the City's denial of my rights under the First Amendment, to be contested in an appropriate judicial venue. In the unlikely alternative of the City abandoning its ongoing collusion with corporate sponsorship of incestuous child rapist Min Zhu by New Enterprise Associates, I shall be happy to pay any reasonable fees due in this matter.

Consider taking the high road. If Hollywood can dump attempted child rapist Kevin Spacey, surely Silicon Valley can dump accomplished child rapist Min Zhu.

⸺

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com

7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373

**Wronged by the high and mighty? Cut them down to size with legally safe and**

**ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Mon, Nov 6, 2017 at 9:49 AM, Toews, Ivan J <IJToews@menlopark.org> wrote:

Mr. Zeleny,

Staff has reviewed your permit application.  Due to the proposed length of the time to film and location of filming on a busy arterial roadway, this is an unusual permit to process.  Thank you in advance for your patience and cooperation.  In order for the staff to process your film permit application, we need the following additional information:

1.  Film dates: Per your application you plan to film for over 55 days.

  a.  Submit times for each day regarding set-up and tear down the equipment.  City film permits require filming to occur between 8:00 a.m. and 6:00 p.m.

MP001314

       b.   Note: proposed film times are subject to review by staff based upon scope of work required.

2.   Gas generator: please provide the make and model of the gas generator

       a.   Submit decibel reading for the equipment to ensure it does not exceed City ordinance for noise level.

3.   Written notice to business within 200 feet of the film location will need to be notified

       a.   Provide a draft written notice letter that you plan to mail to surrounding businesses for staff's review

4.   Site plan: the permit is unclear as to the filming location or locations you intend to utilize.  Please provide a detailed site plan to show the exact location of equipment and where you plan to stage your presentation/ equipment

       a.   Proposed parking location for your equipment and crew vehicles

       b.   List all proposed equipment you intend to utilize for the production and location where you intend to place it

5.   Traffic control plan: provide a detailed traffic control on how you plan to divert pedestrians around your film location so that staff can determine if police officers must be present for traffic control, and so staff can determine the feasibility and cost of staff time.  Please refer to the Film Production worksheet previously provided to you which sets forth the required information necessary to process the application.

6.   Business license: Permittee shall apply for a one-time Business License and pay, with a valid check, money order, credit card or cashier's check. See Guide to Annual Business License Fee Calculation for the fee schedule.

       a.   Fee waiver:  Please provide details why a fee waiver is necessary.

7.   The application refers to "accommodations not anticipated by your application format."  Please provide more detail regarding what accommodations you are seeking for your production.

8.   Liability Insurance: Please provide  the City a Certificate of Liability Insurance acceptable to its Risk Management office showing combined single limit coverage for bodily injury and property damage, not less than $1 million; which is to include the City and it's officials and employees and agents named as additional insured in the policy.

9.   Please provide a complete and signed application

10. Fees: Submit a film permitting payment of $150.00 in addition to the daily permit fees of $50 per day for short subject films.

**Ivan Toews- Land Development Engineer**

**City of Menlo Park |**

701 Laurel St. | Menlo Park, CA 94025

Direct (650)-330-6712 | | Fax 650-327-5497

ijtoews@menlopark.org



**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Friday, November 03, 2017 1:41 AM
**To:** Toews, Ivan J <IJToews@menlopark.org>; Harada, Jelena V <jvharada@menlopark.org>; McClure, William <wlm@jsmf.com>; Bertini, David C <dcbertini@menlopark.org>; McIntyre, Alex D <admcintyre@menlopark.org>; Flegel, Nicolas A. <naf@jsmf.com>; Subrah Iyar <Subrah.Iyar@webex.com>; Scott Sandell <ssandell@nea.com>
**Cc:** dwa@agzlaw.com

**Subject:** Re: Notice re Menlo Park City Council Decision

Dear Menlo Park City authorities,

Your failure to respond in a timely manner to my film permit application belies your repeat asseverations of respecting my Constitutional rights to free speech. I look forward to a judicial hearing in the matter of your ongoing collusion in a corporate coverup of child rape and sponsorship of its fugitive perpetrator. As a resident of Hollywood, I submit that it's high time for Silicon Valley to host a scandal that would make our current sexual harassment debacle look like a game of tiddlywinks.

https://groups.google.com/forum/#!search/erin$20zhu$20sexual$20abuse
https://youtu.be/QgmWMGG3qgE

⸺

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com

7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373

**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Fri, Oct 6, 2017 at 3:01 AM, Michael Zeleny <michael@massmeans.com> wrote:

Dear Mr Toews,

Attached please find a completed application for a film permit.

Starting on 30 October 2017 and continuing through 27 December 2017, I shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu. I shall be present in the vicinity of 2825 Sand Hill Road from 08:00 till 18:00 every weekday, served by a support staff of one personal assistant and one cinematographer. My props are to include fully operational, exposed and unloaded military grade firearms and loaded ammunition feeding devices therefor, including without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a 7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed semiautomatic Browning M1919a4, in full compliance with all applicable laws. A 55" portable media display powered by a portable gas generator will display videos featuring explicit representations of sexual violence committed by NEA's publicly disgraced protégé. A sample image can be found at http://larvatus.livejournal.com/371973.html. Two tripod-mounted cameras will be placed on either side of Sand Hill Road, focusing on public reactions to my display. One of them will be attended by a cinematographer. I will operate the other one remotely. All their footage, complemented by output of body cams, will be live streamed on the Internet.

A site map can be found at https://www.google.com/maps/@37.4197308,-122.2137188,17z/. All placements of equipment and personnel will be determined to avoid interference with automotive and foot traffic, in consultation with the Menlo Park City authorities. All media aspects of this event will be subject to content-neutral regulation negotiated with Menlo Park City authorities. My fundamental rights under the First and Second Amendments of the Constitution of the United States are reserved and non-negotiable.

Please note that my standing and circumstances require accommodations not anticipated by your application format and requirements. As an individual engaged in a non-profit endeavor of public interest, I hereby apply for a waiver of all applicable fees. I will furnish all requisite liability waivers and procure the appropriate insurance coverage upon your conditional approval of this application.

Please address all legal inquiries and requests to David W. Affeld, Affeld Grivakes LLP, 2049 Century Park East, Suite 2460, Los Angeles, CA 90067, voice:310.979.8700, fax:310.979.8701.

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com

7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373

**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Thu, Sep 28, 2017 at 1:00 PM, Toews, Ivan J <IJToews@menlopark.org> wrote:

Dear Mr. Zeleny,

Please see attached film permit application and film permit conditions. Application can be submitted via email. Thank you.

**Ivan Toews- Land Development Engineer**

**City of Menlo Park** |

701 Laurel St. | Menlo Park, CA 94025

Direct (650)-330-6712 | | Fax 650-327-5497

ijtoews@menlopark.org



From: Nicolas A. Flegel [mailto:naf@jsmf.com]
Sent: Wednesday, September 27, 2017 11:35 AM

MP001318

**To:** michael@massmeans.com
**Cc:** Harada, Jelena V <jvharada@menlopark.org>; McClure, William <wlm@jsmf.com>; McIntyre, Alex D <admcintyre@menlopark.org>; Bertini, David C <dcbertini@menlopark.org>; dwa@agzlaw.com; Toews, Ivan J <IJToews@menlopark.org>
**Subject:** RE: Notice re Menlo Park City Council Decision


Dear Mr. Zeleny,


Thank you for your email of September 7, 2017, requesting that the City of Menlo Park reconsider your special events permit application as a film permit application. The City has asked that I respond to your email.  The City has a film permit application process, and therefore you should submit a film permit application to staff.  This is a different permit than a special event permit, so you will need to follow/comply with the film permit requirements.   I am copying Ivan Toews of the Public Works Department, who handles film permits, and am requesting Ivan by this email to forward you the necessary application and information.   Ivan's contact information is:


        Ivan Toews- Land Development Engineer

        City of Menlo Park |

        701 Laurel St. | Menlo Park, CA 94025

        Direct (650)-330-6712 | | Fax 650-327-5497

        ijtoews@menlopark.org


Thank you for your attention to this matter.


Nick Flegel

(650) 324-9300


**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Thursday, September 7, 2017 2:28 AM
**To:** Harada, Jelena V <jvharada@menlopark.org>
**Cc:** William L. McClure <wlm@jsmf.com>; grubens@adcl.com; McIntyre, Alex D

<admcintyre@menlopark.org>; Bertini, David C <dcbertini@menlopark.org>; David W. Affeld <dwa@agzlaw.com>
**Subject:** Re: Notice re Menlo Park City Council Decision

Thank you for your email. In keeping with the substance of our exchanges in last week's hearing, and in the mutual interests of efficiency, I would like the City of Menlo Park to reconsider my special event permit mitapplication as requesting a film permit.

The salient points of my request are as follows:

- The videography is to take place alongside 2855 Sand Hill Road, Menlo Park, CA 94025, and continue indefinitely, Monday through Friday, from 8 a.m. to 7 p.m.;
- All participants, cameras, and props will be placed so as to avoid any interference with automotive and foot traffic;
- The City will recognize all participants in the film production that are so authorized in advance by myself, as exempt from sanctions for carrying a concealed firearm or openly carrying an unloaded handgun or a long gun under California Penal Code Sections 25400 (a) (2), 26350 (a) (1), and 26400 (a), pursuant to the relevant exemptions under P.C. Sections 25510, 26375, and 26405, as applicable to authorized participants in a motion picture, television or video production, or entertainment event.

I remain open to reasonable time, place, and manner regulations.

Please let me know how to proceed in order to ensure an expeditious determination from the City authorities.

—

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373

http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No matter. Try again. Fail again. Fail better." — Samuel Beckett

On Sep 5, 2017, at 10:14 PM, Harada, Jelena V <jvharada@menlopark.org> wrote:

Mr. Zeleny,

Attached is correspondence informing you of the Menlo Park City Council's decision made at the City Council special meeting of August 29, 2017, related to your Appeal of Denial of Special Event Permit Application. This item is also being sent to you via US mail.

Sincerely,

**Jelena Harada**

Deputy City Clerk

City of Menlo Park

701 Laurel St., Menlo Park, CA 94025

650-330-6612 | jvharada@menlopark.org

<image001.jpg>

<Zeleny Letter - city council action.pdf>

Exhibit 12



**City of Menlo Park
Engineering Division
701 Laurel Street
Menlo Park, CA 94025
Telephone (650) 330-6740**

**PERMIT NO.:**_____
Keep this permit at the work site at all times

Call 24 hours in advance of working in the public right of way AND for each inspection request.
*Uninspected work will be rejected.*

## ENCROACHMENT PERMIT APPLICATION

☐ Major Encroachment        ☐ Temporary Encroachment        ■ Other FILM PERMIT
☐ Minor Encroachment        ☐ Debris or Container Box        ☐ City-Mandated Repairs

### ONE PERMIT PER ADDRESS

| Location of Work
2825 Sand Hill Rd, Menlo Park, CA 94025 | Applicant Represents
☐ Contractor   ■ Owner | Applicant e-mail:
Applicant fax:   zeleny@post.harvard.edu |
|---|---|---|

| Name of Applicant (person)
Michael Zeleny | Address
7576 Willow Glen Road | City
Los Angeles | State
CA | Zip
90046 | Telephone
323-363-1860 |
|---|---|---|---|---|---|

| Name of Contractor
n/a | Address | City | State | Zip | Telephone |
|---|---|---|---|---|---|

| California Construction License No.
n/a | Menlo Park Business License No.
n/a | Est. Start Date
30 October 2017 | Est. Complete Date
29 December 2017 |
|---|---|---|---|

| Estimated Construction Cost
(Estimate work in city R/W only.  Do not include value of utility.)  $ 0 | Bond or Deposit *
$ to be furnished | Bond or Deposit provided by:
☐ Contractor   ■ Owner   ☐ Other (provide name, company, address) |
|---|---|---|

Description of work to be done:

Making a multimedia presentation and filming public responses thereto.

Applicant submits the following:
☐ 3 copies of sketch or plans
☐ 3 copies of traffic control plans
☐ insurance certificate

*Call Underground Service Alert (USA) at 1-800-227-2600 before you dig*

GENERAL CONDITIONS OF PERMIT ATTACHED.
**Signature below acknowledges that special working hours may apply – check the approved traffic control plan.**

I hereby acknowledge that I have read this permit and the attached conditions, that the information given by me is correct, that I am the owner or the duly authorized agent of the owner, and that I agree to comply with the conditions and all applicable provisions of state laws, city ordinances, and the rules of any governmental agency involved.

| Signature of Applicant
(Owner or authorized agent) | Principal
Title | 6 October 2017
Date |
|---|---|---|

### DO NOT WRITE BELOW THIS LINE -- CITY STAFF USE ONLY

| Approved by Engineering Division | Date | Permit expires | Fees (retained by City) | $ |
|---|---|---|---|---|
|  |  | Total Due to City | ☐ Paid | $ |

* Bond or deposit requests must originate from the bond/deposit provider. ~~A~~ ………… ~~i~~ receipt must accompany the refund request.  All deposits or bonds are subject to forfeiture to c………… d Ordinances.

EXHIBIT 36
Chief Dave Bertini
3/19/2019
Heather J. Bautista
CSR 11600, RPR, CRR

MP001248



# GENERAL CONDITIONS OF PERMIT

**Engineering Division**
**701 Laurel Street**
**Menlo Park, CA 94025**
**Notification of Work or Inspection Requests: (650) 330-6740**

1.  This permit, regardless of when dated, shall not be in effect until the applicant has obtained all licenses and other permits required by law.

2.  This permit is declared **null and void** if work has not commenced three (3) months after the date of permit issuance.

3.  Traffic control plan is required for work that will block public right-of-way. Plan shall include re-routing of vehicles, bicycles and pedestrians.

4.  Any damages to existing facilities and improvements above ground or below ground, shall be promptly repaired or replaced at the permittee's expense, and claims for damage to City property must be promptly paid.

5.  Applicant is responsible for determining exact locations or depths of existing utilities or other facilities. Call Underground Service Alert (USA) at 1-800-227-2600 a minimum of 48 hours prior to performing work.

6.  Applicant carries sufficient insurance to work in the public right of way, and names City of Menlo Park as additional insured. Applicant agrees to keep insurance active for the duration of the project.

7.  All work shall comply with the City and Caltrans Standards, including traffic control.

8.  **Street Opening, Sidewalk, Curb and Gutter, and Driveway Permits**. Permittee shall notify the Public Works Inspector at least 24 hours prior to: beginning work, inspection requests, or concrete placement. The number and type of inspections required, and any tests that may be required will be as directed by the Public Works Inspector. The Public Works Inspector may be contacted by calling (650) 330-6740.

9.  All trench plates used in the public right of way must have a non-skid surface.

10. Construction activities are restricted to Monday through Friday (City holidays excepted) between the hours of 8:00 AM and 5:00 PM, unless otherwise approved in writing by the Engineering Services Division.

11. A faithful performance bond or a cash deposit in an amount equal to the estimated cost of the proposed work is required for curb and gutter, driveway, or street opening permits

12. This grant of permission does not constitute a deed or grant of easement by the City, is not transferable or assignable and is revocable at any time at the will of the City.

13. This permit does not authorize tree trimming or tree removal.

14. *The traffic control plan as attached must be adhered to at all times. Note that the traffic control plan may have restricted working hours for working in the public right of way, which supersedes the standard encroachment permit working hours.*

15. The use of City property by permittee shall be limited to the purposes set forth by this permit and no structures of any kind, except those expressly permitted shall be erected or placed thereon.

16. Debris boxes/storage containers shall have reflectors so that they can be seen at night. This permit must be taped to the outside of debris boxes in a visible location.

17. This permit does not include overnight street parking for any vehicles. A separate parking permit can be obtained from the Police Department.

18. All stormwater BMP's must be in place between October 15th and April 15th, or as directed by the Public Works Inspector.

19. Additional conditions (if any) are attached to this permit and shall be followed accordingly.


**Additional Conditions:**

| From: | Toews, Ivan J |
|---|---|
| To: | Sohrabi, Ebby |
| Subject: | FW: Notice re Menlo Park City Council Decision |
| Date: | Friday, October 06, 2017 9:02:00 AM |
| Attachments: | Encroachment Permit- Film Permit. - signed.pdf |
| | image002.png |

**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Friday, October 06, 2017 3:02 AM
**To:** Toews, Ivan J <IJToews@menlopark.org>
**Cc:** Harada, Jelena V <jvharada@menlopark.org>; McClure, William <wlm@jsmf.com>; McIntyre, Alex D <admcintyre@menlopark.org>; Bertini, David C <dcbertini@menlopark.org>; dwa@agzlaw.com; Flegel, Nicolas A. <naf@jsmf.com>
**Subject:** Re: Notice re Menlo Park City Council Decision

Dear Mr Toews,

Attached please find a completed application for a film permit.

Starting on 30 October 2017 and continuing through 27 December 2017, I shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu. I shall be present in the vicinity of 2825 Sand Hill Road from 08:00 till 18:00 every weekday, served by a support staff of one personal assistant and one cinematographer. My props are to include fully operational, exposed and unloaded military grade firearms and loaded ammunition feeding devices therefor, including without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a 7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed semiautomatic Browning M1919a4, in full compliance with all applicable laws. A 55" portable media display powered by a portable gas generator will display videos featuring explicit representations of sexual violence committed by NEA's publicly disgraced protégé. A sample image can be found at http://larvatus.livejournal.com/371973.html. Two tripod-mounted cameras will be placed on either side of Sand Hill Road, focusing on public reactions to my display. One of them will be attended by a cinematographer. I will operate the other one remotely. All their footage, complemented by output of body cams, will be live streamed on the Internet.

A site map can be found at https://www.google.com/maps/@37.4197308,-122.2137188,17z/. All placements of equipment and personnel will be determined to avoid interference with automotive and foot traffic, in consultation with the Menlo Park City authorities. All media aspects of this event will be subject to content-neutral regulation negotiated with Menlo Park City authorities. My fundamental rights under the First and Second Amendments of the Constitution of the United States are reserved and non-negotiable.

Please note that my standing and circumstances require accommodations not anticipated by your application format and requirements. As an individual engaged in a non-profit endeavor of public interest, I hereby apply for a waiver of all applicable fees. I will furnish all requisite liability waivers and procure the appropriate insurance coverage upon your conditional approval of this application.

Please address all legal inquiries and requests to David W. Affeld, Affeld Grivakes LLP, 2049 Century Park East, Suite 2460, Los Angeles, CA 90067, voice: 310.979.8700, fax: 310.979.8701.

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com

MP001250

7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Thu, Sep 28, 2017 at 1:00 PM, Toews, Ivan J <IJToews@menlopark.org> wrote:

> Dear Mr. Zeleny,
>
> Please see attached film permit application and film permit conditions. Application can be submitted via email. Thank you.
>
> **Ivan Toews- Land Development Engineer**
> **City of Menlo Park |**
> 701 Laurel St. | Menlo Park, CA 94025
> Direct (650) 330-6712 | | Fax 650-327-5497
> ijtoews@menlopark.org
>
> 
>
> **From:** Nicolas A. Flegel [mailto:naf@jsmf.com]
> **Sent:** Wednesday, September 27, 2017 11:35 AM
> **To:** michael@massmeans.com
> **Cc:** Harada, Jelena V <jvharada@menlopark.org>; McClure, William <wlm@jsmf.com>; McIntyre, Alex D <admcintyre@menlopark.org>; Bertini, David C <dcbertini@menlopark.org>; dwa@agzlaw.com; Toews, Ivan J <IJToews@menlopark.org>
> **Subject:** RE: Notice re Menlo Park City Council Decision
>
> Dear Mr. Zeleny,
>
> Thank you for your email of September 7, 2017, requesting that the City of Menlo Park reconsider your special events permit application as a film permit application. The City has asked that I respond to your email.  The City has a film permit application process, and therefore you should submit a film permit application to staff.  This is a different permit than a special event permit, so you will need to follow/comply with the film permit requirements.   I am copying Ivan Toews of the Public Works Department, who handles film permits, and am requesting Ivan by this email to forward you the necessary application and information.   Ivan's contact information is:
>
>> Ivan Toews- Land Development Engineer
>> City of Menlo Park |
>> 701 Laurel St. | Menlo Park, CA 94025
>> Direct (650)-330-6712 | | Fax 650-327-5497
>> ijtoews@menlopark.org

MP001251

Thank you for your attention to this matter.

Nick Flegel
(650) 324-9300

**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Thursday, September 7, 2017 2:28 AM
**To:** Harada, Jelena V <jvharada@menlopark.org>
**Cc:** William L. McClure <wlm@jsmf.com>; grubens@adcl.com; McIntyre, Alex D <admcintyre@menlopark.org>; Bertini, David C <dcbertini@menlopark.org>; David W. Affeld <dwa@agzlaw.com>
**Subject:** Re: Notice re Menlo Park City Council Decision

Thank you for your email. In keeping with the substance of our exchanges in last week's hearing, and in the mutual interests of efficiency, I would like the City of Menlo Park to reconsider my special event permit mitapplication as requesting a film permit.

The salient points of my request are as follows:

- The videography is to take place alongside 2855 Sand Hill Road, Menlo Park, CA 94025, and continue indefinitely, Monday through Friday, from 8 a.m. to 7 p.m.;
- All participants, cameras, and props will be placed so as to avoid any interference with automotive and foot traffic;
- The City will recognize all participants in the film production that are so authorized in advance by myself, as exempt from sanctions for carrying a concealed firearm or openly carrying an unloaded handgun or a long gun under California Penal Code Sections 25400 (a) (2), 26350 (a) (1), and 26400 (a), pursuant to the relevant exemptions under P.C. Sections 25510, 26375, and 26405, as applicable to authorized participants in a motion picture, television or video production, or entertainment event.

I remain open to reasonable time, place, and manner regulations.

Please let me know how to proceed in order to ensure an expeditious determination from the City authorities.

—

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373
http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No matter. Try again. Fail again. Fail better." — Samuel Beckett

On Sep 5, 2017, at 10:14 PM, Harada, Jelena V <jvharada@menlopark.org> wrote:

Mr. Zeleny,

MP001252

Attached is correspondence informing you of the Menlo Park City Council's decision made at the City Council special meeting of August 29, 2017, related to your Appeal of Denial of Special Event Permit Application. This item is also being sent to you via US mail.

Sincerely,

**Jelena Harada**
Deputy City Clerk
City of Menlo Park
701 Laurel St., Menlo Park, CA 94025
650-330-6612 | jvharada@menlopark.org
<image001.jpg>

<Zeleny Letter - city council action.pdf>

Exhibit 13

| | |
|---|---|
| **From:** | Michael Zeleny |
| **To:** | Flegel, Nicolas A. |
| **Cc:** | Toews, Ivan J; Harada, Jelena V; McClure, William; Bertini, David C; McIntyre, Alex D; Subrah Iyar; Scott Sandell; info@greenbayventures.com; dwa@agzlaw.com |
| **Subject:** | Re: [BULK] Re: Notice re Menlo Park City Council Decision |
| **Date:** | Thursday, December 21, 2017 3:07:36 PM |

Dear Mr Flegel,

Thank you for your response and your concession that the City has no legitimate authority to vet the participants in my film production. As stated in previous correspondence, it will be personally and continually attended by me in the vicinity of 2825 Sand Hill Road from 08:00 till 18:00 every weekday, supported by staff limited to one personal assistant and one cinematographer. Concerning the specific arrangements, previously cited recent Ninth Circuit ruling in *Epona, LLC v. County of Ventura*, unequivocally requires the City to impose definite standards on its permit decisions, and identify a limitation on the time period within which a permit must be approved. Please refrain from further requests to ensure my compliance with rules that your clients make up as we go along. As stated in my email of December 8, I am willing to make reasonable accommodations to the City's requirements related to the public right of way, traffic control, and public safety issues, as soon as it takes the trouble to articulate them. In failing to disclose any specific requirements of this kind, your responses to date have amounted to dawdling and stalling in contravention of my Constitutional rights.

As previously explained, I am not operating a commercial film production. Accordingly, your requirement that it be licensed and insured as a business is inapposite. In this connection, your disagreement with my assessment that the statutory exemptions for entertainment events and film and video productions to the ban on openly carried firearms would apply if my entertainment event were limited to wearing a red clown nose, or my film production were limited to wearing a GoPro camera, runs counter to law clearly established in *Branzburg v. Hayes*. The City's attempt to withhold from my amateur media production the legal accommodations that it offers to commercial enterprises, is a clear instance of impermissible content-based regulation of protected speech.

—
Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Thu, Dec 21, 2017 at 10:37 AM, Nicolas A. Flegel <naf@jsmf.com> wrote:

> Dear Mr. Zeleny,
>
> In response to your emails dated December 8, 2017 and December 20, 2017, if you wish to proceed with the film permit application you have submitted, please provide the information we have requested which are conditions of the permit application.  Your application is currently incomplete.  I am re-listing the questions that you have not yet answered that the City is requesting (these were listed in my email of November 22, 2017).  Again,  please respond to the

**EXHIBIT**
**0273**

MP00

below questions as fully as possible.  If what is being requested is unclear, please let me know and I can try to clarify or staff can clarify.

a.   Site Set-up:  Please confirm where you plan to place the different items (generator, projector, cameras, guns you intend to use as part of your film, and anything else you intend to have on the site); we need to understand exactly where you plan to place the items. A diagram will be very helpful to analyze the site set-up.

b.   Participants:  Please let us know how many people you expect to be on the site (this is not to vet any camera crew- just to understand how many participants you are expecting to use/have on the site).

c.   Cameraman:  Please provide detail on where the cameraman or cameramen will be positioned.

d.   Display:  Please provide more detail on where you plan to place the video display, which direction the display will face (i.e. towards traffic, towards the businesses on the south side of the road, etc. ?)  so staff can analyze for safety/traffic control purposes.

i.   Please confirm the expected brightness of the display so staff can analyze for safety/traffic control purposes.

ii.   Please confirm exactly what image or images you intend to show on the display so staff can analyze for safety/traffic control purposes.

e.   Use of Guns in Film:  You indicate you intend to use guns as part of the production.  Please provide more detail on where you plan to place the weapons and what direction you intend to face them during the production so staff can analyze for safety/traffic control purposes.   In your email of October 6th, you state that you intend to focus "on public reactions to my display."  Please clarify what you mean by this so staff can analyze for safety/traffic control purposes.

f.   Staging: Please provide more detail on what areas you plan to use for staging. As set forth above, a diagram will be helpful in this respect for staff's consideration.

g.   Loaded Ammunition:  You indicate that you intend to have "loaded ammunition feeding devices" with you. Please describe what this means and provide pictures of what props you are proposing to use and confirm you will be using them for film production.

h.   Notice:  The notice you have drafted to neighboring properties will need to be re-written.  Staff can work with you on what would be an appropriate notice.

     i.   Business license and insurance: Please obtain a business license and insurance, which are conditions of the film permit application (I am attaching the City's conditions again for your review).

The City is working with you in good faith, and asks that you likewise work with the City in good faith.   It is essential that the City understand what you are trying to put on so it can determine what if any impacts must be considered for traffic control and public safety.  It is impossible for the  City to discuss reasonable accommodations with you when you have not provided the basic information required by the application.  Please do respond to the above flagged questions at your convenience.

With respect to the legal issue you have raised, I do not agree with your assessment that the statutory exemptions would apply if you simply wore a red clown nose or wore a go-pro camera. Regardless, what the City understands is before it is your film permit application, and at this point it is incomplete until you comply with the permit conditions.   And furthermore, I want to be clear that the City does intend to grant your film permit, but needs the information requested to determine what conditions are necessary for safety/traffic control purposes.   But again, to date your application is incomplete, and it is your failure to provide this requested information that is causing the delay.  You have stated in your emails that you are willing to work with the City with respect to traffic control and public safety issues, and we are articulating exactly the information required.  Thank you for your attention to this matter and hope you have a nice holidays.

Nicolas A. Flegel

Jorgenson, Siegel, McClure & Flegel, LLP

1100 Alma Street, Suite 210

Menlo Park, CA 94025

Tel: (650) 324-9300

Fax: (650) 324-0227

**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Wednesday, December 20, 2017 5:22 PM
**To:** Nicolas A. Flegel <naf@jsmf.com>
**Cc:** Toews, Ivan J <IJToews@menlopark.org>; Harada, Jelena V <jvharada@menlopark.org>; William L. McClure <wlm@jsmf.com>; Bertini, David C <dcbertini@menlopark.org>; McIntyre, Alex D <admcintyre@menlopark.org>; Subrah Iyar <Subrah.Iyar@webex.com>; Scott Sandell <ssandell@nea.com>; info@greenbayventures.com; dwa@agzlaw.com
**Subject:** Re: [BULK] Re: Notice re Menlo Park City Council Decision

Dear Mr Flegel,

As I put you on notice in my last email twelve days ago, your ongoing dithering and stalling amounts to a violation of my Constitutional rights. I am giving your municipal clients and their corporate sponsors one last opportunity to minimize their losses before we escalate this matter to civil rights litigation under 42 U.S. Code § 1983.

As a reminder, in the course of litigating *NEA v. Zeleny*, San Mateo Superior Court Case No. CIV 499465, New Enterprise Associates (NEA), the Menlo Park establishment that modestly bills itself in court filings as "the largest VC firm in the country", acknowledged its timely receipt of evidence of Min Zhu's history as an incestuous child rapist, which I forwarded to them following his forced resignation as WebEx President and Director and flight from the United States. As noted by numerous industry analysts, Min Zhu's downfall took place in the wake of my exposure of his sex crimes at WebEx User Conference in San Francisco on 2 May 2005. In spite of this disclosure, in September 2005, Scott Sandell of NEA co-founded Northern Light, a venture capital fund in China, in partnership with freshly disgraced, degraded, and exiled Min Zhu, and in full knowledge of accusations that his partner's daughter Erin Zhu had made against her father, in Usenet postings and a sworn deposition.

https://groups.google.com/forum/#!search/erin$20zhu$20sexual$20abuse
https://youtu.be/QgmWMGG3qgE

And in January of 2008, C. Richard "Dick" Kramlich, NEA's Chairman and Co-Founder, moved to Shanghai in order to collaborate with Min Zhu, buttressing its knowing endorsement of incestuous child rape and generous sponsorship of its perpetrator.

As you know, or ought to know, federal court filings are subject to continual scrutiny by the media. I am presenting you with an opportunity to estimate the public prospects of our impending judicial conversation concerning NEA's knowing choice to entrust vast amounts of investment capital to a man who repeatedly and unrepentantly raped his fourteen-year-old daughter. In my estimation, they will far exceed the ongoing catastrophic fallout from sexual favors extorted on Hollywood casting couches, never mind the charges of unwelcome grab-assing and off-color innuendo putting paid to countless distinguished careers from the United States Congress to the United States Court of Appeals for the Ninth Circuit.

As a merciful alternative to this blowback, I offer you a one-time opportunity to minimize collateral damage to your clients' community and its corporate citizens and neighbors. I am prepared to shut down my campaign in exchange for a public apology from Subrah Iyar, Scott Sandell, and Dick Kramlich, to include their permanent withdrawal from all active participation in domestic and international business. This offer stands till we file our complaint on Friday, December 22. Many more heads will roll in its wake. Choose wisely.

—

Michael@massmeans.com  Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com

7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 |
fax:323.410.2373

**Wronged by the high and mighty? Cut them down to size with legally safe and
ethically sound degradation of unworthy moguls and scrofulous celebrities.**


On Fri, Dec 8, 2017 at 3:33 PM, Michael Zeleny <michael@massmeans.com> wrote:

Dear Mr Flegel,

Your latest missive represents an unfortunate retrenchment in gross misstatement of applicable state law. As
repeatedly noted to date, the exemptions to California Penal Code §§ 25400, 26350, and 26400, as found in its
§§ 25510, 26350, and 26405, allow me to possess unloaded guns to the extent that I am using them as part of a
film production or an entertainment event. Given that said exemptions nowise rely on the existence of special
event permits or film permits, your conclusion that in the absence thereof "it is inappropriate and illegal for
[me] to possess guns as part of [my] entertainment event/film production", remains bereft of any basis in the
referenced law. Please take note, and advise your clients, that *ad hoc* business regulations propounded by the
City of Menlo Park, are powerless to trump clearly established law.

In this connection, please recall that qualified immunity affords limited protection to public officials faced with
liability under 42 U.S.C. § 1983, only "'insofar as their conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have known.'" (See *Pearson v. Callahan*, 555 U.S.
223, 231 (2009), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).) The qualified immunity defense
"provides ample protection to all but the plainly incompetent or those who knowingly violate the law".
(See *Malley v. Briggs*, 465 U.S. 335 (1986).) Thus, even allowing along with Johann Wolfgang von
Goethe, "that misunderstandings and neglect occasion more mischief in the world than even malice and
wickedness", cannot relieve your clients of liability for infringing my rights, be it due to your negligence or
their malice.


Please take note also of precedents establishing that, in a sufficiently "obvious" case of constitutional
misconduct, the courts do not require a precise factual analogue in judicial precedents. Thus *Brosseau v.
Haugen*, 543 U.S. 194 (2004) (*per curiam*): "[I]n an obvious case, [highly generalized] standards can 'clearly
establish' the answer, even without a body of relevant case law." Likewise *United States v. Lanier*, 520 U.S.
259 (1997): "[I]n [some] instances a general constitutional rule already identified in the decisional law may
apply with obvious clarity to the specific conduct in question, even though the very action in question has not
previously been held unlawful." Once again, I urge you to take note of *Branzburg v. Hayes*, 408 U.S. 665
(1972): "Liberty of the press is the right of the lonely pamphleteer who uses carbon paper or
a mimeograph just as much as of the large metropolitan publisher who utilizes the latest
photocomposition methods." *Mutatis mutandis*, the statutory exemptions referenced above would
apply even to the case of a would-be entertainer qualified as such only by donning a red clown nose,
or a would-be filmmaker equipped for his task with nothing but a GoPro camera.


This exchange is meant in part to give notice of the relevant law to the City of Menlo
Park. To achieve that kind of notice, the prior precedent must be "controlling"—from the
Ninth Circuit or Supreme Court—or otherwise be embraced by a "consensus" of courts
outside the relevant jurisdiction. (See *Wilson v. Layne*, 526 U.S. 603 (1999).) In this
regard, a new Ninth Circuit ruling in *Epona, LLC v. County of Ventura*, ___ F. 3d ___
(9th Cir. 2017), is of particular relevance to your ongoing attempts to play for time:

MP001419

A property owner seeking to profit from facilitating and providing a commercial space for weddings was a wedding "vendor" with standing to bring a facial First Amendment challenge a county zoning ordinance requiring it to obtain a conditional use permit to use its property for weddings. The zoning ordinance--which imposed no definite standards on permit decisions nor any limitation on the time period within which a permit must be approved--provided unbridled discretion on permitting officials in violation of the First Amendment.

To apply the principle articulated herein to the matter at hand, the onus always already falls on the City to articulate definite standards for its permit decisions, and identify a limitation on the time period within which it must approve or deny a permit. And to belabor a point repeatedly articulated in prior hearings and emails, the City has no right to vet the camera crew in film productions or participants in entertainment events taking place within its jurisdiction, as such vetting would be tantamount to impermissible content regulation. Please refer to my email dated November 9 for exhaustive technical details that identify the display to be utilized, and so on. As for further specifics of the proposed site set-up, I am willing to make reasonable accommodations to the City's requirements related to the public right of way, traffic control, and public safety issues, as soon as it takes the trouble to articulate them. To spell out what should be obvious by now, in light of the foregoing case law, the City's ongoing attempt to make up its rules as we go along amounts to an unlawful arrogation of unbridled discretion in violation of my rights under the First Amendment. Please refrain from further dithering and stalling. Justice delayed is justice denied.

—

Michael@massmeans.com  Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com

7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373

**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Thu, Dec 7, 2017 at 4:07 PM, Nicolas A. Flegel <naf@jsmf.com> wrote:

> Dear Mr. Zeleny,
>
> I am writing in response to your email of November 27th.  In response to the first paragraph of your email, please be aware that the City of Menlo Park requires a special event permit if

==you are proposing to put on an entertainment event on public property or requires a film permit if you intend to put on a film production on public property.   Without a special event permit or a film permit, it is inappropriate and illegal for you to possess guns as part of your entertainment event/film production.==   To remind you, you initially sought a Special Events Permit per your email in July 2015, proposing to put on an entertainment event in the median strip of Sand Hill Road near the entrances and exits of Interstate 280.  That application was denied by staff and ultimately the City Manager, and the reasons for the denial were outlined in the letter dated September 12, 2016, signed by City Manager Alex D. McIntyre.

You appealed the City Manager's denial of your application to the City Council, which upheld the City Manager's decision.  You received notice from the City Clerk on September 5, 2017, confirming that on August 29, 2017, the Menlo Park City Council upheld staff's administrative decision to deny your Special Events Permit application.  That letter notified you that any challenge to the council's decision in the appropriate court of competent jurisdiction must be made within ninety (90) days of August 29, 2017, pursuant to California Code of Civil Procedure Section 1094.6, unless a shorter time is required by State or Federal law, and that if you believed the City Council's decision involved speech or expressive conduct entitled to protection by the First Amendment, any petition must have been served on the City of Menlo Park no later than twenty-one (21) calendar days following the City Council's decision of August 29, 2017, pursuant to California Code of Civil Procedure Section 1094.8.

Thereafter, on September 7th, you sent an email asking if your special event application could be reconsidered as a film permit.  You were informed you could proceed with a film permit application, and you elected to proceed with a film permit application, which you submitted on October 6, 2017.  It is your film permit application that is before us now.  Staff, and then I, responded to your film permit application as we are attempting to process your application and trying to work with you in good faith to understand what you are proposing so you can put on your film production.  However, this requires that the City is satisfied that filming occur in a safe and acceptable way.  As I noted before, your application is an unusual one, and implicates numerous public safety considerations due to the props you have indicated you want to use while filming alongside a busy arterial roadway.

With respect to your second paragraph, at no time has the City of Menlo Park tried to regulate your content.  If you wish to protest/promote a message regarding New Enterprises Associates, the City has no stance on that issue.  However, it is essential that the City understand what event or film you are trying to put on so it can determine what if any impacts must be considered for traffic control and public safety.  To that end, it is necessary for you to respond to the specific questions I posed to you in my email dated November 22, 2017, i.e. understanding information regarding the site set-up, participants, cameraman, display to be utilized, etc.  Again, this is crucial for staff to have this information in order to

analyze the impacts on the public right of way, traffic control, and public safety issues.   This is why we have applicants submit film applications; so these details can be reviewed and a plan put in place.   To that end, thank you for confirming that you will not be brandishing weapons at passing motorists, pedestrians or cyclists in order to incite a reaction.


At this point your application is incomplete because the City cannot analyze the public safety concerns, and if you wish to proceed with the film permit application please respond in detail to my email of November 22nd.  If your goal, however, as stated in your email is to "rid your community of individual and corporate sponsors and enablers of incestuous child rape over the coming holidays," you may lawfully protest along Sand Hill Road without guns, as staff and the City Council informed you.   Thank you for your attention to this matter.


Nicolas A. Flegel

Jorgenson, Siegel, McClure & Flegel, LLP

1100 Alma Street, Suite 210

Menlo Park, CA 94025

Tel: (650) 324-9300

Fax: (650) 324-0227


**From:** Michael Zeleny [mailto:michael@massmeans.com]
**Sent:** Monday, November 27, 2017 2:37 PM
**To:** Nicolas A. Flegel <naf@jsmf.com>
**Cc:** Toews, Ivan J <IJToews@menlopark.org>; Harada, Jelena V <jvharada@menlopark.org>; William L. McClure <wlm@jsmf.com>; Bertini, David C <dcbertini@menlopark.org>; McIntyre, Alex D <admcintyre@menlopark.org>; Subrah Iyar <Subrah.Iyar@webex.com>; Scott Sandell <ssandell@nea.com>; dwa@agzlaw.com
**Subject:** [BULK] Re: Notice re Menlo Park City Council Decision


Dear Mr Flegel,

Thank you for conceding that the exemptions to California Penal Code §§ 25400, 26350, and 26400, as found in §§ 25510, 26350, and 26405, allow me to possess unloaded guns to the extent that I am using them as part of a film production. Please note that the aforementioned statutes in no way require that said film production must

proceed subject to a permit from any authority whatsoever. Please note as well that the same exemptions apply to authorized participants in an entertainment event, whether or not that event is recognized as such by any official body. In short, the statutory exemptions apply whether or not the City recognizes or authorizes me as an entertainer or a filmmaker. A failure to obtain such recognition or authorization would not expose me, or any other participant in my entertainment event or film production that I choose to authorize, to sanctions under P.C. §§ 25400, 26350, and 26400 for possessing unloaded guns, to the extent that we are using them as part of my event or a production.

This point brings us to your ongoing attempt at content regulation. In *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85 (1977), the U.S. Supreme Court has ruled that "laws regulating the time, place or manner of speech stand on a different footing than laws prohibiting speech altogether". Time, place, and manner restrictions on speech are constitutional if (1) they are content neutral; (2) they are narrowly tailored to serve a governmental interest; and (3) they leave open ample alternative means of expression. As to the last criterion, my proposed expression allows for no alternative means outside of the immediate vicinity of the individual and corporate sponsors and enablers of daughter rapist Min Zhu. If I cannot designate their lair by ostension, my intent to expose them fails. Hence the proposed location of my performance, on grounds that in no way encumber or disrupt automotive or pedestrian traffic. As stated before, the location I propose the exact same one I used in my previous appearance. Given that it was acceptable to the City then, the burden falls on you to explain your reasons for deeming it otherwise now, should you choose to do so.

Staying within the bounds of content neutrality, you have no authority to question my choice of collaborators or deployment of equipment, provided that I break no laws in either matter. Nor do you have the authority to hold forth on what "would in any way be necessary for [my] film production". Outside of exigent circumstances, my necessity is none of your business. Pursuant to the aforementioned statutes, your authority begins and ends at ensuring that my firearms remain unloaded. According to *People v. Clark* (1996), 45 Cal. App. 4th 1147, 53 Cal. Rptr. 2d 99, a firearm is loaded within the relevant meaning, if and only if it has a shell placed in a position ready to be fired. There remains a question whether a firearm with an empty firing chamber, and a detachable magazine that contains rounds inserted into its magazine well, counts as loaded. Thus the California Fish and Game Code § 2006 deems a rifle or shotgun to be loaded "when there is an unexpended cartridge or shell in the firing chamber but not when the only cartridges or shells are in the magazine". If we can resolve this matter short of litigation, I am willing to compromise by keeping loaded magazines outside of magazine wells. If not, not.

Lastly, to answer your most fanciful concerns, I do not intend to brandish weapons at passing motorists, pedestrians, and cyclists, let alone reenact any of the numerous mass shootings around the country. As we discuss my compliance with the City ordinances, absent any evidence or indications to the contrary, you would do well to assume that I have no intent to commit any felonies or misdemeanors.

MP001423

Thanks again for your prompt attention to this matter. I look forward to resolving it in time to rid your community of individual and corporate sponsors and enablers of incestuous child rape over the coming holidays.

—

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com

7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373

**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Wed, Nov 22, 2017 at 4:04 PM, Nicolas A. Flegel <naf@jsmf.com> wrote:

Dear Mr. Zeleny,

Because you have requested a response to a legal issue, I am responding to your emails of November 9th and November 13th.    I am responding to the legal issue you have raised, as well as requesting additional detail from you so we can consider your application.  With respect to the legal question, I have analyzed Penal Code Sections 25400, 26350 and 26400, and the corresponding exemptions for filming events found in Sections 25510, 26350, and 26405.  It is my opinion that once you obtain a film permit from the City, you will be allowed to possess an unloaded gun(s) to the extent you are using it as part of the film production.  The City is willing to work with you in coming to agreeable terms for the filming to take place, so please do not take the approach that a denial of your application is in anyway predetermined.   However we need additional information from you so that the City is comfortable in its understanding of what you are proposing and so the City can be satisfied that it will be done in a way that is safe and acceptable.

With respect to specifics, please respond to the below questions as fully as possible to avoid the need for more back and forth.  If what is being requested is unclear, please let me know and I can try to clarify or staff can clarify.

    a.   Site Set-up:  Please confirm where you plan to place the different items (generator, projector, cameras, guns you intend to use as part of your film,

MP001424

and anything else you intend to have on the site); we need to understand exactly where you plan to place the items. A diagram will be very helpful to analyze the site set-up.

b.   Participants:  Please provide the names of the participants or crew that will be part of the filming and his or her role (including cameramen).

c.   Cameraman:  Please provide detail on where the cameraman or cameramen will be positioned.

d.   Display:  Please provide more detail on where you plan to place the video display, which direction the display will face (i.e. towards traffic, towards the businesses on the south side of the road, etc. ?)  so staff can analyze for safety/traffic control purposes.

>   i.   Please confirm the expected brightness of the display so staff can analyze for safety/traffic control purposes.

>   ii.   Please confirm exactly what image or images you intend to show on the display so staff can analyze for safety/traffic control purposes.

e.   Use of Guns in Film:  You indicate you intend to use guns as part of the production.  Please list the types of guns, serial numbers, who will be supplying them to you, how they will be used as part of the production, etc.

>   i.   Please provide more detail on where you plan to place the weapons and what direction you intend to face them during the production so staff can analyze for safety/traffic control purposes.  It is not acceptable (or legal) for you to brandish weapons at passing motorists, pedestrians, and cyclists to film their reactions.

>   ii.   In your email of October 6th, you state that you intend to focus "on public reactions to my display."  Please clarify what you mean by this so staff can analyze for safety/traffic control purposes.

f.   Staging: Please provide more detail on what areas you plan to use for staging.  As set forth above, a diagram will be helpful in this respect for staff's consideration.

g.   Loaded Ammunition:  You indicate that you intend to have "loaded ammunition feeding devices" with you.  Please describe what this means and provide pictures of what props you are proposing to use and confirm you will be using them for film production.  For example, are you intending

==to use props (fakes) or have with you actual magazines with live ammunition?==

==h.   Film Exception for Live Ammunition:  If you are proposing to use live ammunition, it is unclear why live ammunition would in any way be necessary for your film production.  In light of the numerous mass shootings around the country, I think you can understand the concern regarding this issue.   If you believe the film exemptions allow you to carry live ammunition for use in the film production, please provide me the authority so I may review it.==

i.   Notice:  The notice you have drafted to neighboring properties will need to be re-written.  Staff can work with you on what would be an appropriate notice.

The City is working with you in good faith so you can put on your film production. However, we need to work together to come to an agreement so filming occurs in a safe and acceptable way.  Your application is an unusual one, and implicates numerous public safety considerations due to the props you have indicated you want to use while filming alongside a busy arterial roadway; so your patience is appreciated.

Thank you and hope you have a nice thanksgiving.

Nicolas A. Flegel

Jorgenson, Siegel, McClure & Flegel, LLP

1100 Alma Street, Suite 210

Menlo Park, CA 94025

Tel: (650) 324-9300

Fax: (650) 324-0227

1

## **PROOF OF SERVICE**

2

      I hereby certify that on January 21, 2021, I electronically filed the foregoing document using the Court's CM/ECF system.  I am informed and believe that the CM/ECF system will send a notice of electronic filing to the interested parties.

3

4

                              s/ Gabrielle Bruckner
                              Gabrielle Bruckner

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ZELENY DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT