David W. Affeld, State Bar No. 123922
Brian R. England, State Bar No. 211335
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:     (310) 979-8700

Attorneys for Plaintiff Michael Zeleny

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY, | Case No. CV 17-7357 JCS |
| Plaintiff, | |
| vs. | Assigned to: <br> The Honorable Richard G. Seeborg |
| GAVIN NEWSOM, *et al.*, | Discovery Matters: <br> The Honorable Thomas S. Hixson |
| Defendants. | **PLAINTIFF MICHAEL ZELENY'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA** |

[Filed Concurrently:
1.     Declaration of Michael Zeleny;
2.     Declaration of Damion Robinson;
3.     Request for Judicial Notice;
4.     Proposed Order]

Date:       February 25, 2021
Time:       1:30 p.m.
Courtroom: 3, 17th Floor

Action Filed:  December 28, 2017
Trial Date:    TBD

1    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2        PLEASE TAKE NOTICE that on February 25, 2021, at 1:30 p.m., or as soon thereafter as

3    the matter may be heard before the Honorable Richard Seeborg in Courtroom 3 of the above-entitled

4    Court, Plaintiff Michael Zeleny ("Zeleny") will and hereby does move for an Order granting Partial

5    Summary Judgment[1] against Defendant California Attorney General Xavier Becerra pursuant to

6    Federal Rule of Civil Procedure 56.

7        This Motion is made on the grounds that there are no issues of material fact and that Zeleny

8    is entitled to judgment as a matter of as to his Fifth Cause of Action.

9        This Motion is based on this Notice of Motion and Motion, the attached Memorandum of

10   Points & Authorities, the Declaration of Damion Robinson filed concurrently, the records and files

11   herein, and such other matters as the Court may consider.

12   Dated:  January 21, 2021                    Respectfully submitted,

13                                               s/ Damion Robinson
                                                 _____
14                                               David W. Affeld
                                                 Damion D. D. Robinson
15                                               David Markevitch
                                                 Affeld Grivakes LLP
16
17                                               Attorneys for Plaintiff Michael Zeleny

18

19

20

21

22

23

24

25   _____
     [1] This is styled as a Motion for Partial Summary Judgment because it is not directed at Zeleny's
26   claims against the City of Menlo Park and Police Chief Bertini for violating his rights under the
     First, Second and Fourteenth Amendments and corresponding Section 1983 claim.  Zeleny is
27   concurrently filing a Motion for Partial Summary Judgment against those Defendants.  Taken
     together, both motions would resolve all issues and claims in the litigation.
28

**Table of Contents**

I.     INTRODUCTION ...................................................................................... 1

II.    BACKGROUND ....................................................................................... 2

       A.    California's Comprehensive Gun Bans ............................................ 3

       B.    Relevant Exceptions ....................................................................... 5

III.   LEGAL STANDARD ............................................................................... 5

IV.    ARGUMENT ........................................................................................... 5

       A.    Zeleny Is An "Authorized Participant" Who Is Exempt from the Open
             Carry Ban in Connection with His Events in Menlo Park. ................. 5

             1.    Zeleny's Interpretation Is Consistent with the Constitution. .......... 6

             2.    Alternative Interpretations Raise Constitutional Concerns. ........... 8

       B.    Zeleny Has Standing to Challenge the Constitutionality of the Open
             Carry Ban. ...................................................................................... 9

       C.    The Open Carry Ban Violates the Second Amendment. .................... 10

             1.    Framework for Second Amendment Analysis. ........................... 10

             2.    California Law Infringes the Second Amendment by Barring
                   Virtually Any Bearing of Firearms Outside of the Home. ........... 11

                   a.    The Text, Structure, and Purpose of the Second
                         Amendment Confirm That the Right to Bear Arms
                         Extends to Public Places. ............................................... 11

                   b.    The History of the Second Amendment Shows That the
                         Right Extends Beyond the Home. ................................... 13

                   c.    Precedent Confirms That the Right Extends Beyond the
                         Home ............................................................................ 15

             3.    Banning Carry Beyond the Home Fails Under Any Level of
                   Scrutiny. ............................................................................... 16

                   a.    California's *De Facto* Ban on Carry by Law-Abiding
                         Citizens Is Categorically Invalid. ................................... 17

                   b.    California's Effective Ban on Carry by Ordinary, Law-
                         abiding Citizens Is Invalid Under Either Strict or
                         Intermediate Scrutiny. ................................................... 18

       D.    The Entertainment Exemptions Violate Due Process and Equal
             Protection ..................................................................................... 20

1.    The Entertainment Exemptions Impermissibly Treat Movie Studios and Production Companies Differently than Protestors and Advocates. ..........................................................................20

2.    The Entertainment Exemptions Are Unconstitutionally Vague. ..............22

V.    CONCLUSION .................................................................................................24

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST BECERRA

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Branzburg v. Hayes,*
    408 U.S. 665 (1972) ............................................................................................................ 21

5

6

*Caetano v. Massachusetts,*
    __ U.S. __, 136 S. Ct. 1027 (2016) ................................................................................... 10

7

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................................................ 5

8

9

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) .................................................................................................... *passim*

10

*Erdelyi v. O'Brien,*
    680 F.2d 61 (9th Cir. 1982) ............................................................................................... 4

11

12

*FCC v. Fox Television Studios, Inc.,*
    567 U.S. 239 (2012) ............................................................................................... 21, 22, 23

13

14

*First Nat'l. Bank of Boston v. Bellotti,*
    435 U.S. 765 (1978) ...................................................................................................... 1, 17

15

*Fisher v. Kealoha,*
    855 F.3d 1067 (9th Cir. 2017) ......................................................................................... 11

16

17

*Fyock v. Sunnyvale,*
    779 F.3d 991 (9th Cir. 2015) ........................................................................................... 16

18

19

*Grace v. District of Columbia,*
    187 F.Supp.3d 124 (D.D.C. 2016) .............................................................................. *passim*

20

*Wrenn v. District of Columbia,*
    864 F.3d 650 (D.C. Cir. 2017) ..................................................................................... *passim*

21

22

*Kachalsky v. County of Westchester,*
    701 F.3d 81 (2d Cir. 2012) .............................................................................................. 15

23

24

*Kim Ho Ma v. Ashcroft,*
    257 F.3d 1095 (9th Cir. 2001) ........................................................................................... 9

25

*Kolender v. Lawson,*
    461 U.S. 352 (1983) .......................................................................................................... 22

26

27

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) .......................................................................................... 12

28

iii

*Mass. Bd. of Retirement v. Murgia*,
    427 U.S. 307 (1976) ................................................................................................. 20, 21

*McCutcheon v. FEC*,
    _U.S._, 134 S. Ct. 1434 (2014) (plurality opinion) ............................................... 19

*McDonald v. City of Chicago* (2010)
    561 U.S. 742 ...................................................................................... 10, 11, 13, 19

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ................................................................... *passim*

*Palmer v. District of Columbia*,
    59 F.Supp.3d 173 (D.D.C. 2014) ................................................................ 15, 17

*Peruta* v. *County of San Diego*,
    742 F.3d 1144 (9th Cir. 2014) .................................................................. *passim*

*Peruta v. County of San Diego*,
    824 F.3d 919 (9th Cir. 2016) .............................................................................. 16

*Silvester v. Harris*,
    843 F.3d 816 (9th Cir. 2016) .................................................... 10, 11, 18, 19

*Skilling v. United States*,
    561 U.S. 358 (2010) ........................................................................................... 8

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    _U.S. _, 137 S. Ct. 2012 (2017) ...................................................................... 16

*United States v. Jin Fuey Moy*,
    241 U.S. 394 (1916) ........................................................................................... 9

*United States* v. *Stevens*,
    559 U.S. 460 (2010) ......................................................................................... 20

*Village of Hoffman Estates v. Flipside*,
    455 U.S. 489 (1982) ......................................................................................... 22

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ......................................................................................... 21

*Zablocki v. Redhail*,
    434 U.S. 374 (1978) ......................................................................................... 20

**California Cases**

*Bale v. San Jose Police Department*,
    158 Cal.App.3d 168 (1984) .................................................................................. 8

*CBS, Inc.* v. *Block*,
   42 Cal. 3d 646 (1986) ................................................................................ 4

*Nichols* v. *County of Santa Clara*,
   223 Cal. App. 3d 1236 (1990) ..................................................................... 4

*People v. Cruz* (2008)
   44 Cal.4th 636 ............................................................................................ 3

*People v. Garcia*,
   21 Cal. 4th 1 (1999) ................................................................................... 8

*People v. Ralph*,
   24 Cal. 2d 575 (1944) ................................................................................. 8

*People v. Yarbough* (2008)
   169 Cal.App.4th 303 ................................................................................... 3

**Other State Cases**

*Nunn v. State*,
   1 Ga. 243 (1846) ....................................................................................... 15

**California Statutes**

Cal. Pen. Code § 17030 ................................................................................... 18

Cal. Pen. Code § 26045 ................................................................................... 18

Cal. Pen. Code § 26150 ................................................................................ 4, 9

Cal. Pen. Code § 26350 ..................................................................................... 5

Cal. Pen. Code § 26375 ................................................................................. 5, 7

Cal. Pen. Code § 26405 ............................................................................. 5, 6, 7

Cal. Pen. Code § 25850 ..................................................................................... 3

Cal. Pen. Code § 28350 ................................................................................... 18

Cal. Pen. Code § 29500 ................................................................................. 6, 7

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST BECERRA

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

With limited exceptions, California bans both the open and the concealed carry of firearms. Taken together, California's prohibitions eliminate a person's right to carry a firearm in self-defense outside the home, in violation of the Second Amendment, unless the person can qualify under one of the exceptions.  At issue in this case is one of the express exceptions, authorizing the open carry of unloaded firearms during the production of a movie, television show, or other entertainment event. This exception is unconstitutionally vague if it does not apply to the activities of plaintiff Michael Zeleny ("Zeleny").

Zeleny does not challenge California's entire statutory scheme governing firearms.  Its long list of flaws has been or is being litigated elsewhere.  Instead, he seeks a judicial interpretation of a narrow aspect of those statutes, namely, the portion excepting "authorized participants" in film, television, or video productions, or entertainment events, from the "open carry" ban.  Under a plain reading of those exceptions, industry practice, and guiding rules of interpretation, Zeleny must qualify.  Any other interpretation would violate settled constitutional doctrine.  The Court should construe California's statutory exception in a way that is consistent with the Constitution, and issue declaratory relief accordingly.  Otherwise, the ban on open carry as a whole, and the entertainment exception in particular, fail constitutional scrutiny for multiple reasons.

*First*, if the Second Amendment right to "bear arms" has any meaning, it prohibits California's near-total ban on carrying firearms.  Through dual bans on open carry and concealed carry, the State of California makes it a crime for an ordinary, law-abiding citizen to carry a pistol, rifle, or shotgun, loaded or unloaded, concealed or openly, virtually anywhere in this state.  Under the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and its progeny, what amounts to a categorical ban on public carry cannot withstand constitutional scrutiny.

*Second*, even if the open carry ban could pass constitutional muster as a whole, the "authorized participant" exception does not.  The exception impermissibly distinguishes between different forms of First Amendment activity, allowing open carry in connection with movies or TV shows, but not protests, picketing, "open carry" rallies, or gun rights demonstrations.  When it comes

to fundamental rights, such as the right to bear arms and the right to free speech, this type of content-based, arbitrary line-drawing is impermissible.

*Third*, and finally, the "authorized participant" exception is impermissibly vague if it does not include Zeleny.  To pass constitutional scrutiny, a statute must be clear enough that a person of ordinary intelligence could understand it by reading it.  As Magistrate Judge Hixson recognized in a discovery order in this case, however, the statute contains no definition of "authorized participant," or explanation of who does the authorizing, and there are no applicable regulations.  The State of California needed three rounds of discovery responses to finally come up with a definition—by reference to a wholly-unrelated statute that has no application and is not referenced in the exemption.  The State could not answer a simple interrogatory coherently, and its Rule 30(b)(6) designee could not define the statutory phrase "authorized participant" at his deposition, making clear that he would need to do "quite a bit of research" before answering.

Along the same lines, Menlo Park Police Chief Dave Bertini ("Bertini"), a career law enforcement officer, was more blunt: "that law is very vague."  No reasonable layperson could be expected to understand a statute that high-level law enforcement personnel cannot explain even with the assistance of counsel, even in the context of a take home-exam in the form of an interrogatory.

At minimum, Zeleny is entitled to a judicial declaration that "authorized participant" means a person authorized by the producer of the film or event.  Alternatively, the open carry ban, and the entertainment exception, violate the First, Second, and Fourteenth Amendments and should be declared unconstitutional.

## II.   <u>BACKGROUND</u>

Zeleny is a published author, editor, and translator, an internationally renowned blogger, accomplished scholar in logic, history, literature, law, and technology, and an independent performance artist and film-maker.  Declaration of Michael Zeleny ("Zeleny Decl.") ¶ 2.  He is also a firearms historian and author.  *Id.*

Zeleny holds a California Certificate of Eligibility to possess firearms, and a Type 08 Federal Firearms License.  *Id.* ¶ 3.  Zeleny collects rare, unique, and historically significant guns. *Id.*

He seeks to carry unloaded firearms as part of a series of protests against New Enterprise Associates ("NEA"), a venture capital fund in Menlo Park.  As part of his protests, he plans to present a multimedia performance of images and animations, and to display rare firearms, posters, placards, and other materials.  He intends to film his performance and the reaction of passersby as part of an Internet video production and documentary film.  *Id.* ¶¶ 4-8.

Zeleny has been prevented from his protest, despite trying to comply with all laws, because the city of Menlo Park contends that he is subject to arrest for violating California's "open carry" firearms ban unless he gets a city permit—which Menlo Park refuses to issue to him.  *Id.* ¶¶ 9-10.

### A. California's Comprehensive Gun Bans

California imposes extensive regulations on who may obtain a firearm and how they may do so.  It is generally illegal to carry "a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory."  Cal. Penal Code § 25850.[2]  These same restrictions apply to carrying unloaded firearms openly, except for long-guns (rifles) that remain in a vehicle.  *Id.* §§ 26350, 26400.  Regardless of whether the firearm is loaded, California law generally prohibits possession of a concealed firearm in any place outside one's residence, place of business, or other private property.  *Id.* §§ 25400, 25605.

While these general prohibitions are subject to several exceptions, most apply only to narrow groups of persons such as retired peace officers or activities such as hunting in rural areas.  For most Californians, the only potential exception is for "Carry License" holders, which allows individuals with a license to carry a handgun in public, subject to restrictions.  *Id.* §§ 26150-26155.

California authorizes city police chiefs and county sheriffs ("Issuing Authorities") to issue Carry Licenses to residents. To obtain a Carry License, the applicant must meet a host of eligibility requirements, *see id.* §§ 26165, 26185, and convince the Issuing Authority that he is of "good moral

---

[2] Because California law does not define "public place, whether a location is deemed one depends on the facts of each case. Private property including one's yard and business can still be a public place" for purposes of these restrictions.  *See, e.g., People v. Cruz* (2008) 44 Cal.4th 636, 674; *People v. Yarbough* (2008) 169 Cal.App.4th 303, 318-19 (driveway is a "public place").

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST BECERRA

1  character" and has "good cause" to carry a firearm. *Id.* §§ 26150(a)(1)-(2), 26155(a)(1)-(2).[3]

2  Issuing Authorities have unbridled discretion in deciding whether an applicant has "good cause".

3  *Erdelyi* v. *O'Brien,* 680 F.2d 61, 63 (9th Cir. 1982); *Nichols* v. *County of Santa Clara*, 223 Cal.

4  App. 3d 1236, 1243 (1990); *CBS, Inc.* v. *Block*, 42 Cal. 3d 646, 665-66 (1986).  Some Issuing

5  Authorities deny Carry Licenses to virtually all applicants, while others issue them freely to any

6  qualified applicant.  *See Peruta* v. *County of San Diego,* 742 F.3d 1144, 1169 (9th Cir. 2014)

7  *(Peruta II), vacated,* 824 F.3d 919 (9th Cir. 2016) (en banc).

8        In counties with populations over 200,000, Issuing Authorities can only issue licenses

9  allowing the holder to carry a *concealed* firearm.  California law prohibits them from issuing

10  licenses to carry openly. Cal. Penal Code §§ 26150(b)(2), 26155(b)(2).  If the Issuing Authority in

11  such a county – *e.g.*, Los Angeles, where Zeleny lives, or San Mateo – has a restrictive "good

12  cause" policy, then the typical citizen cannot obtain a license to lawfully carry at all.  Without a

13  license, he may only have a firearm in a "public place" if it is inside a container and for the sole

14  purpose of transporting it to a vehicle or authorized location. *Id.* §§ 25505, 26405(c).

15        Carrying a firearm in public without a license or otherwise qualifying for one of the other

16  limited exceptions is a misdemeanor or a felony.  *Id.* §§ 25400, 25850, 26350, 26400.  California

17  provides only one affirmative defense:  openly carrying for a short time interval due to a reasonable

18  belief that they or someone else is in "immediate, grave danger."  *Id.* § 26045(a).

19        In sum, ordinary law-abiding citizens in California are effectively banned from carrying

20  firearms outside their homes for self-defense or when engaged in protest, whether openly or

21  concealed.  The Constitution does not permit such constraint of fundamental rights.

22

23

24  [3] In 2017, the California State Auditor issued an exhaustive report finding, among other things, that standards differed among licensing authorities that the authorities "failed to consistently apply their own licensing policies or standards." *See* Request for Judicial Notice, Ex. 7.

25  (https://www.auditor.ca.gov/pdfs/reports/2017-101.pdf) (hereinafter "Auditor Report").  The program has also been plagued with scandals, including "pay-to-play" issuance of permits. *See*, *e.g.*,

26  CBS SF BayArea, "Concealed Weapons Permit Scandal Grows (Nov. 23, 2020)

27  (https://sanfrancisco.cbslocal.com/2020/11/23/concealed-weapons-permit-scandal-grows-grand-jury-indicts-santa-clara-county-undersheriff-sheriffs-captain-apple-executive/)

28

**B.      Relevant Exceptions**

California enacted its "open carry ban" in 2012 prohibiting the open, non-concealed carrying unloaded handguns and rifles.  Cal. Pen. Code §§ 23650(a)(1)(A) and (B), 26500(a)(1) and (2) (the "Open Carry Ban").   On their face, these laws prohibit Californians from openly carrying unloaded firearms in virtually any public place in a city or city and county, and in most unincorporated areas.

These statutes have exceptions.  Open carry is permitted "by an authorized participant in ... a motion picture, television or video production, or entertainment event, when the participant lawfully uses the [firearm] as part of that production or event."  Cal. Pen. Code § 26375; Cal. Penal Code § 26405(r).  The Penal Code does not define "authorized participant," "motion picture, television, or video production," or "entertainment event." It does not specify who does the authorizing.  Neither does it mention any criteria for authorization.  See Cal. Pen. Code §§ 26375, 26405(r).

## III.   LEGAL STANDARD

A moving party is entitled to summary judgment where he can show there is no genuine issue of material fact and he is entitled to judgment as a matter of law.  Fed. R. Civ. Proc. 56.  Summary judgment follows where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Because this motion involves issues of pure law, summary judgment is appropriate.

## IV.   ARGUMENT

**A.      Zeleny Is An "Authorized Participant" Who Is Exempt from the Open Carry Ban in Connection with His Events in Menlo Park.**

California Penal Code Section 26375 codifies an exemption to the Open Carry Ban:

> Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by an authorized participant in … a motion picture, television or video production, or entertainment event, when the participant lawfully uses the handgun as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event.

Section 26405(r) contains an identical exemption for rifles.  On its face, the exception applies to Zeleny using firearms as part of a multimedia performance, which he intends to film and distribute

- 5 -

as a movie on the Internet.

Unfortunately, California's statutes do not define the terms included in the exemptions. They do not define "authorized participant" or say who does the authorizing. Each party to this case has a different interpretation of the phrase "authorized participant." Zeleny understands it to mean a person authorized by the producer of the film, television show, or event. The City interprets it to mean a person authorized by the City. The State, after extensive discovery squabbling, settled on a person with an Entertainment Firearms Permit under Penal Code § 29500, *et seq.*—an unrelated statute nowhere referenced in the exemption.

Zeleny is entitled to a declaration that his interpretation is correct. It is the only interpretation consistent with the plain language and purpose of the statute. It is also the only interpretation that avoids insurmountable conflict with the Constitution.

### 1. Zeleny's Interpretation Is Consistent with the Constitution.

Becerra initially refused to take a position on what the phrase "authorized participant" means. *See* Robinson Decl. ¶¶ 2-4; *see also* June 9, 2020 Order, Dkt. No. 132 at p. 2. After Magistrate Judge Hixson ordered him to answer, *see* Sept. 4, 2020 Order, Dkt. No. 140, and Becerra unsuccessfully challenged the ruling, *see* Oct. 5, 2020 Order, Dkt. No. 148, he finally provided something of an answer. *See* Robinson Decl. ¶¶ 6-7 & Exs. 1, 2.

His initial response was to demur:

> Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase 'authorized participant.' Defendant Becerra has never issued a formal opinion under California law regarding the phrase 'authorized participant' and this response is not such an opinion and cannot be relied upon as such an opinion."

Robinson Decl., Ex. 1 at pp. 25, 26-28. Becerra took the position that a person with an Entertainment Firearms Permit under Penal Code § 29500, *et seq.*, "could be" an "authorized participant" within the meaning of the exemption. *Id.*, Ex. 2 at p. 4.

On his third try at answering, Becerra finally settled on the following:

> Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific context of this case, an individual who has a valid "entertainment firearms permit" issued pursuant to Penal Code § 29500 would be an "authorized participant" within the meaning of Penal Code §§ 26375 and 26405(r) for the narrow purpose of having a defense against a prosecution of open carry laws, if that individual were

using the weapon as a prop in a motion picture, television, video, theatrical, or other entertainment production or event.

*Id.*, Ex. 2 at pp. 4-5.

While Zeleny agrees with the tautology that an individual with an Entertainment Firearms Permit would necessarily qualify, this definition is unduly restrictive and impermissibly discriminates based on different First Amendment-protected activities. Sections 26375 and 26405(r) do not refer to Entertainment Firearms Permits, as they would if such a permit were required. The predecessor to section 29500 was on the books for eight years before the Open Carry Ban.

Instead, the Entertainment Firearm Permit addresses a different situation – *i.e.*, the **transfer** of firearms from a prop house to an on-set prop master. The predecessor to section 29500, Penal Code § 12081, is a workaround to a restrictive firearm-transfer policy adopted by the ATF in 2004. Its purpose is to allow firearms to be temporarily loaned to production company prop masters without requiring them to register as firearms dealers or complete exhaustive background checks each time they receive firearms for use in a movie. The statutes do not govern the use of firearms during filming, or the actors or other participants who use firearms on a film set or a stage. *See* Request for Judicial Notice, Exs. 3, 4. Becerra is trying to fit this square peg in a round hole.[4]

Zeleny has proffered unrebutted expert testimony from two qualified experts that the understanding of "authorized participant" in the movie industry is far broader, and consistent with Zeleny's interpretation of the exemption. *See* Robinson Decl. Exs. 3 and 4. According to the Declarations of Michael Tristano and Robert Latham Brown—who have a combined 70-plus years of experience making movies and television shows—the term "authorized participant" is interpreted in the industry to include not only the prop master, but also the actors or other performers who receive the firearms from the prop master for use in the production. As these experts explain, the prop master is the holder of the Entertainment Firearms Permit. He or she is tasked with ensuring the safe use of the firearms by the "authorized participants" – *i.e.*, the actors – and verifying that

---

[4] Consistent with its purpose of exempting prop masters from federal transfer restrictions, Penal Code § 29500 speaks in terms of "loaned" firearms only. Under Becerra's interpretation, Zeleny would be an "authorized participant" to use firearms he borrowed from other people, but not those that he owns.

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST BECERRA

none of them are prohibited from possessing a firearm.  The actors do not need permits.  So long as they are not prohibited individuals, *e.g.*, felons, the identity of the "authorized participants" is irrelevant to the permitting agencies and often not determined until the day of filming.  *Id*.

If Becerra's interpretation were right, every extra in a movie who handled a gun—not to mention the stars—would be required to go through the time-consuming process of obtaining an Entertainment Firearms Permit before filming.  To make *Die Hard*, not only would Bruce Willis need a permit, but so would every extra who pointed a gun at him for a few seconds on screen before being dispatched.  Production would grind to a halt.  This is not what the Legislature had in mind.

Zeleny previously held an Entertainment Firearms Permit.  Zeleny Decl., ¶ 11 & Ex. 1.  He is also an authorized participant in his multimedia productions of his protests, which are filmed and distributed on the internet.  Under both the Attorney General's definition and a proper understanding of the term "authorized participant," Zeleny is allowed by California law to openly carry unloaded firearms during his constitutionally-protected events.[5]

### 2.    Alternative Interpretations Raise Constitutional Concerns.

Courts "construe a penal statute as favorably to the defendant as its language and the circumstances of its application may reasonably permit."  *People v. Garcia*, 21 Cal. 4th 1, 10 (1999) (citation omitted).  Under the "rule of lenity," "when language is reasonably susceptible of two constructions … ordinarily that construction which is more favorable to the offender will be adopted."  *People v. Ralph*, 24 Cal. 2d 575, 581 (1944); *accord Skilling v. United States*, 561 U.S. 358, 410 (2010) (citation omitted).  Under this rule, an "ambiguous exception to a penal statute … must be construed liberally in favor of the persons seeking its protections."  *Bale v. San Jose Police Department*, 158 Cal.App.3d 168, 173-74 (1984) (avoiding constitutional vagueness by treating exception as ambiguous and construing it broadly).

Interpreting the "authorized participant" exception broadly is necessary to avoid

---

[5] In his Motion for Partial Summary Judgment against the City of Menlo Park and Police Chief Dave Bertini, Zeleny established that, as a matter of law, his protests constitute speech protected by the First Amendment.  To the extent necessary, Zeleny incorporates those arguments and legal citations here by this reference.

constitutional invalidity.  "The Supreme Court has long held that courts should interpret statutes in a manner that avoids deciding substantial constitutional questions."  *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1106 (9th Cir. 2001) (citations omitted).  This is deemed a "paramount principal of judicial restraint."  *Id.* (citation omitted).  "A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score."  *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) (citation omitted).

As detailed below, an interpretation of the "authorized participant" exception that delegates authority to an unnamed government entity raises grave constitutional concerns.  The statute contains no guidance for the exercise of this authority, and does not identify who has it.  Each municipality could insist that its authorization is necessary and, due to the lack of guidance or regulations, set whatever requirements it chose.  Without any such guidance, local authorities would have unbridled discretion to grant or deny "authorization" as they see fit.  It also renders the statute unconstitutionally vague, and would violate the First, Second, and Fourteenth Amendments.

To avoid these questions, the party who "authorizes" a participant to carry a weapon in a production must be the producer of the film, television show, or event, rather than an unspecified government agency or agencies.

**B.      Zeleny Has Standing to Challenge the Constitutionality of the Open Carry Ban.**

Zeleny has directly experienced the effect of California's Open Carry Ban.  Zeleny is an adult resident of Los Angeles County and is qualified to possess firearms under Federal and California law.  Zeleny Decl. ¶ 12.  He currently possesses firearms lawfully.  *Id.* ¶ 3.

The Sheriff of Los Angeles County, Alex Villanueva, is the sole Issuing Authority for Zeleny.  Cal. Penal Code § 26150.  Because Los Angeles County's population exceeds 200,000, a license to openly carry is completely unavailable.  For a concealed carry license, county policy requires a particularized need to carry a handgun in public. Specifically, to even potentially satisfy the "good cause" standard, an applicant must provide:

> Sufficient evidence of potential danger to life or of great bodily harm
> to the applicant, his or her spouse or dependent child, which cannot be
> adequately dealt with by existing law enforcement resources and
> which danger cannot be reasonably avoided by alternative measures,
> and which danger would be significantly mitigated by the applicant's

carrying of a concealed firearm.

Los Angeles County Manual of Policy and Procedures, § 5-09/380.10.  Owing to this extremely restrictive standard, as of 2017, Los Angeles County had 197 licenses in circulation out of a population of 10.2 million.  Request for Judicial Notice, Ex. 7,  p. 7; *see also* Robinson Decl., Ex. 6 at ¶ 14-16 ("Mr. Zeleny has zero likelihood of successfully obtaining a [concealed carry] permit").

But for California's comprehensive and unconstitutional restrictions on carrying firearms, and Zeleny's practical inability to obtain a Carry License, Zeleny would lawfully carry a firearm in non-sensitive public places for self-defense and during his constitutionally-protected protests.  He refrains from doing so for fear of criminal prosecution for violating one or more of California's laws regulating carrying a firearm.  Zeleny Decl. ¶¶ 13-14.

    **C.**    **The Open Carry Ban Violates the Second Amendment.**

        **1.**    **Framework for Second Amendment Analysis.**

In *Heller*, the Supreme Court held that the Second Amendment protects an "individual right to possess and carry weapons" for self-defense. 554 U.S. at 592.  The Court struck down a District of Columbia ordinance banning the possession of handguns under "any of the standards of scrutiny that we have applied to enumerated constitutional rights"—that is, any standard stricter than rational basis.  *Id.* at 628 & n.27.

In *McDonald v. City of Chicago* (2010) 561 U.S. 742, the Court extended *Heller*, finding that the Second Amendment is "fully applicable to the States," *id.* at 750, because it is "among those fundamental rights necessary to our system of ordered liberty." *Id.* at 778.  States may not "enact any gun control law that they deem to be reasonable." *Id.* at 783 (plurality); *see also Caetano v. Massachusetts*, __ U.S. __, 136 S. Ct. 1027 (2016).

In the years since *Heller* and *McDonald,* the Ninth Circuit has developed a two-step framework for Second Amendment claims.  A court first "asks if the challenged law burdens conduct protected by the Second Amendment, based on a historical understanding of the scope of the right."  *Silvester v. Harris,* 843 F.3d 816, 821 (9th Cir. 2016) (citing *Heller,* 554 U.S. at 625).  If yes, the court analyzes the law under heightened scrutiny, with the degree of scrutiny varying depending on "how close the challenged law comes to the core of the Second Amendment right,

1   and ... the severity of the law's burden on that right." *Id.* (*citing Jackson v. City* & *County of San*

2   *Francisco,* 746 F.3d 953, 960-61 (9th Cir. 2014)).

3           The court need not determine the applicable level of scrutiny, however, if a law "amounts to

4   a destruction of the Second Amendment right," as such a law "is unconstitutional *under any level of*

5   *scrutiny*." *Jackson,*746 F.3d at 961 (emphasis added).  After all, "[t]he very enumeration of the right

6   takes out of the hands of government … the power to decide on a case-by-case basis whether the

7   right is *really worth* insisting upon." *Heller,* 554 U.S. at 634.  The Second Amendment is not "a

8   second-class right, subject to an entirely different body of rules than the other Bill of Rights

9   guarantees." *McDonald,* 561 U.S. at 780.  In short, the Second Amendment is "a real constitutional

10  right.  It's here to stay." *Fisher v. Kealoha,* 855 F.3d 1067, 1072 (9th Cir. 2017).

11              **2.      California Law Infringes the Second Amendment by Barring Virtually**
12                       **Any Bearing of Firearms Outside of the Home.**

13          California law prohibits Zeleny and other conscientious, law abiding citizens from carrying a

14  loaded or unloaded firearm in virtually any public place in the state.  The critical question is whether

15  the Second Amendment protects a right to carry firearms that extends beyond the home.  *Silvester,*

16  843 F.3d at 821.  The text, structure, purpose, and history of the Second Amendment all confirm that

17  it does.  Precedent reinforces that conclusion.  No federal court (at least without provoking reversal)

18  has accepted the theory that the right is confined to the home.

19              **a.      The Text, Structure, and Purpose of the Second Amendment**
                         **Confirm That the Right to Bear Arms Extends to Public Places.**
20

21          Any inquiry into the Second Amendment must begin with its text.  *See Heller,* 554 U.S. at

22  576.  That text provides: "A well regulated Militia, being necessary to the security of a free State, the

23  right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

24          The text protects two separate rights: the right to "keep," and the right to "bear."  *Heller,* 554

25  U.S. at 591.  Under *Heller's* binding construction, to "keep arms" means to "have weapons." *Id.* at

26  582.  To "bear arms" means to "carry" a weapon for "confrontation"—to "wear, bear, or carry'" a

27  firearm "'upon the person or in the clothing or in a pocket, for the purpose ... of being armed and

28  ready for offensive or defensive action in a case of conflict.'" *Id.* at 584 (quoting *Muscarello* v.

*United States,* 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)).

As every court to address the issue post-*Heller* has confirmed, the right extends beyond the home. "To speak of 'bearing' arms within one's home would at all times have been an awkward usage." *Moore v. Madigan,* 702 F.3d 933, 936 (7th Cir. 2012); *see Grace v. District of Columbia,* 187 F.Supp.3d 124, 135 (D.D.C. 2016), *vacated on other grounds, Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017) ("[R]eading the Second Amendment right to 'bear' arms as applying only in the home is forced or awkward at best, and more likely is counter-textual.").

The far "more natural to view the Amendment's core as including a law-abiding citizen's right to carry common firearms for self-defense beyond the home." *Wrenn,* 864 F.3d at 657. After all, "the idea of carrying a gun 'in the clothing or in a pocket, for the purpose . . . of being armed and ready,' does not exactly conjure up images of father stuffing a six-shooter in his pajama's pocket before heading downstairs to start the morning's coffee[.]." *Peruta II,* 742 F.3d at 1152. Bearing arms necessarily connotes carrying them in a public place. *Id.*

Confining the right to "bear arms" to the home would render it duplicative of the separately protected right to "keep" arms. That would contradict the foundational principle that no "clause in the constitution is intended to be without effect." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137 (1803). In short, the proper reading of the right to bear arms includes public carry.[6]

Limiting the right to the home is irreconcilable with its *"central component"* – *i.e.*, self-defense. *Heller* 554 U.S. at 599 (majority); *see Id.* at 594 ("right to enable individuals to defend themselves"); *Id.* at 616 ("individual right to use arms for self-defense"); *Id.* at 628 ("inherent right of self-defense"). The need for self-defense is obviously "not limited to the home." *Moore,* 702 F.3d at 936. To the contrary, "the need for [self-defense] might arise beyond as well as within the home."

---

[6] That proper reading is reinforced by the amendment's structure. As Heller explained, the Second Amendment's prefatory clause—"[a] well regulated Militia, being necessary to the security of a free State"—performs a "clarifying function" with respect to the meaning of the operative clause. 554 U.S. at 577-78. Here, the prefatory clause's reference to "the Militia" clarifies that the operative clause's protection of the right to "bear Arms" encompasses a right that extends beyond the home. Militia service necessarily includes bearing arms in public. And, all the Justices in Heller agreed that the right to bear arms was codified, at least in part, to ensure the viability of the militia. See Id. at 599, and 637 (Stevens, J., dissenting). The Court thus unanimously agreed that one critical aspect of the right to bear arms extends beyond the home.

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST BECERRA

1 | *Wrenn,* 864 F.3d at 657; *accord Heller,* 554 U.S. at 679 (Stevens, J., dissenting).

2 |      Both precedent and empirical data make clear that the need for self-defense is *more likely* to

3 | arise outside of the home.  In America's early days, for example, "one would need from time to

4 | time to leave one's home to obtain supplies from the nearest trading post, and en route one would

5 | be as much (probably more) at risk if unarmed as one would be in one's home unarmed." *Moore,*

6 | 702 F.3d at 936. The "right to keep and bear arms for personal self-defense in the eighteenth

7 | century" therefore "could not rationally have been limited to the home." *Id.*  The same is true today.

8 | Statistics compiled by the federal government show that most violent crimes "occur on the street or

9 | in a parking lot or garage" rather than "in the victim's home." *Grace,* 187 F.Supp.3d at 135.  A

10 | substantial majority of rapes, armed robberies, and serious assaults occur outside the home. *See*

11 | Michael P. O'Shea, *Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition*

12 | *and the Scope of "Bearing Arms" for Self-defense,* 61 Am. U. L. Rev. 585,610-11 (2012) (*citing*

13 | Bureau of Justice Statistics, U.S. Dep't of Justice, *Criminal Victimization in the United States, 2007*

14 | *Statistical Tables* tb1.62 (2010), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/cvus07.pdf).

15 |      As the Seventh Circuit put it, "a Chicagoan is a good deal more likely to be attacked on a

16 | sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower."

17 | *Moore,* 702 F.3d at 937.  Likewise, a "woman who is being stalked or has obtained a protective

18 | order against a violent ex-husband is more vulnerable to being attacked while walking to or from

19 | her home than when inside." *Id.* "To confine the right to be armed to the home is [thus] to divorce

20 | the Second Amendment from the right of self-defense described in *Heller* and *McDonald." Id.*

21 |           **b.**     **The History of the Second Amendment Shows That the Right**

22 |                 **Extends Beyond the Home.**

23 |      The "historical background" of the Second Amendment "strongly confirm[s]" that the right

24 | to bear arms extends beyond the home.  *Heller,* 554 U.S. at 592.  Many of the sources that *Heller*

25 | consulted to determine that the Second Amendment protects an individual right also show that the

26 | right extends beyond the home.  *Wrenn,* 864 F.3d at 658.

27 |      The Second Amendment traces its roots to England, where Blackstone described "'the right

28 | of having and using arms for self-preservation and defence'" as "'one of the fundamental rights of

Englishmen.'" *Heller,* 554 U.S. at 594 (quoting I Blackstone 136, 139-40 (1765)). The fundamental right to use arms for "self-preservation and defense" necessarily includes the right to carry firearms outside the home due to the need for self-defense.  English authorities made clear that "the killing of a Wrong-doer ... may be justified ... where a Man kills one who assaults him *in the Highway* to rob or murder him." 1 William Hawkins, *A Treatise of the Pleas of the Crown* 71 (1762) (emphasis added); *see also* 1 Matthew Hale, *Historia Pacitorum Coronae* 481 (Sollum Emlyn ed. 1736) ("If a thief assault a true man either abroad or in his house to rob or kill him, the true man ... may kill the assailant, and it is not felony.").

The need to carry for self-defense was even greater in an early America dominated by "wilderness" and other dangers.  *Moore,* 702 F.3d at 936.  "[I]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than a European fine gentleman without his sword by his side." *Grace,* 187 F.Supp.3d at 137 (quoting 5 George Tucker, *Blackstone's Commentaries,* app., n.B, at 19 (1803). "[I]t is unquestionable that the public carrying of firearms was widespread." *Id.* at 136.  Many of the Founding Fathers carried firearms in public and spoke in favor of the right to do so—a strong indication that the right was not limited to the home.  *Id.* at 136-37.  Indeed, in many parts of early America, "carrying arms publicly was not only permitted—it was often *required." Id.*; *see also* Nicholas J. Johnson, *et. al.*, *Firearms Law and the Second Amendment* 106 (2012) ("[A]bout half the colonies had laws requiring arms-carrying in certain circumstances.").

Early American cases, including many cited in *Heller*, make clear that the Second Amendment included the right to bear arms *in public*. The nineteenth century cases are comprehensively analyzed by *Peruta II,* 742 F.3d at 1155-66, which concluded that "the majority of nineteenth century courts agreed that the Second Amendment right extended outside the home and included, at minimum, the right to carry an operable weapon in public for the purpose of lawful self-defense." *Id.* at 1160*; see also* O'Shea, *supra,* at 590 ("American courts applying the individual right to bear arms for the purpose of self-defense have held with near-uniformity that this right includes the carrying of handguns and other common defensive weapons outside the home.").

The critical point is that the Second Amendment requires *"some form* of carry for self-

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST BECERRA

defense outside the home." *Peruta II,* 742 F.3d at 1172.  The Georgia Supreme Court's decision in *Nunn v. State,* 1 Ga. 243 (1846), lauded by *Heller,* 554 U.S. at 612, is illustrative.  There, the court held a state statute "valid" in prohibiting concealed carry, but to the extent the law "contains a prohibition against bearing arms *openly,*" the court explained, it "is in conflict with the Constitution, and *void.*" 1 Ga. 251.  Numerous other cases relied upon by *Heller* followed the same approach. 554 U.S. at 613, 629 (*citing Andrews v. State*, 50 Tenn. 165, 187 (1871); *State v. Chandler,* 5 La. Ann. 489 (1850); *State v. Reid*, 1 Ala. 612 (1840)).  The few cases that reached a different result have been "sapped of authority by *Heller* ... because each of them assumed that the Amendment was only about militias and not personal self-defense." *Wrenn,* 864 F.3d at 658.

### c.   Precedent Confirms That the Right Extends Beyond the Home

Numerous federal courts have analyzed the scope of the Second Amendment in depth and concluded that it extends to some form of carry outside the home.  *See Id.* at 657-64; *Moore,* 702 F.3d at 935-36; *Grace,* 187 F.Supp.3d at 135-38; *Palmer v. District of Columbia,* 59 F.Supp.3d 173, 181-82 (D.D.C. 2014). Even courts of appeals that ultimately upheld carry restrictions did not hold the Second Amendment inapplicable. The Second Circuit, for example, concluded that the Second "Amendment must have some application in the ... context of the public possession of firearms." *Kachalsky v. County of Westchester,* 701 F.3d 81, 89 (2d Cir. 2012).

That consensus is not surprising, as *Heller* strongly suggests that the Second Amendment applies outside the home.  For instance, when the Court looked for past restrictions as severe as the District's handgun ban, it deemed restrictions on carrying firearms outside the home most analogous, noting with approval that "some of those [restrictions] have been struck down." *Heller,* 554 U.S. at 629.  Such laws could hardly represent "severe" restrictions if the Second Amendment's protection did not include public carry.  *Id.*  And when the Court identified certain "presumptively lawful" restrictions, it included "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings."  *Id.* at 626-27 & n.26.  The Court would not need to call out those public places as sites of permissible restrictions if there was no right to carry in public at all.

The principles applied in *Heller* apply beyond the specific statute struck down in that case. Federal courts, particularly the Supreme Court, decide cases according to "general principles" that

apply beyond the fact patterns at hand. *Trinity Lutheran Church of Columbia, Inc. v. Comer,* _U.S.

_, 137 S. Ct. 2012, (2017) (Gorsuch, J., concurring). Nothing in *Heller* suggests that the Court's

decision is uniquely confined to the home, or that lower courts can avoid applying the principles the

Court enunciated—an obligation the Ninth Circuit has acknowledged in applying *Heller* to fact

patterns beyond possession in the home. *See Fyock v. Sunnyvale,* 779 F.3d 991, 998 (9th Cir. 2015)

(possession of large-capacity magazines); *Jackson,* 746 F.3d at 967 (ammunition purchases).

Ninth Circuit precedent is in accord. The only Ninth Circuit opinion to squarely discuss the

question of public carry concluded that the right to bear arms requires states to "permit *some form*

of carry for self-defense outside the home." *Peruta II,* 742 F.3d at 1172. Candidly, the panel

decision in *Peruta II* was subsequently superseded by an *en banc* decision finding no right to

*concealed* carry. The *en banc* court, however, reserved the question of "whether the Second

Amendment protects *some ability* to carry firearms in public." *Id.* (emphasis added); *see also id.* at

939, 942. *See Peruta v. County of San Diego,* 824 F.3d 919, 927 (9th Cir. 2016) (*Peruta III*).

Indeed, California conceded that a state may not be able to "categorically" ban carry beyond the

home. *Peruta III,* 824 F.3d at 919. *Peruta II* remains the only Ninth Circuit decision to squarely

address the question, and it continues to be cited frequently as persuasive authority. *See, e.g.,*

*Wrenn,* 864 F.3d at 658, 663-64; *Grace,* 187 F.Supp.3d at 130 n.2.

### 3. Banning Carry Beyond the Home Fails Under Any Level of Scrutiny.

Concluding that the right to bear arms extends beyond the home all but resolves this case.

California's wholesale denial of a right protected by the Second Amendment "fail[s] constitutional

muster" under "any of the standards of scrutiny." *Heller, 554* U.S. at 628-29. Whether this Court

applies the categorical approach that *Heller* demands, or one of the levels of heightened scrutiny, the

result is the same: California's refusal to allow its citizens to carry guns in public, outside of their

homes, is unconstitutional.

### a. California's *De Facto* Ban on Carry by Law-Abiding Citizens Is Categorically Invalid.

Because California denies citizens any ability to carry outside the home, there is no need to

determine the applicable level of scrutiny. A law that completely denies a protected right "fail[s]

constitutional muster" under "any of the standards of scrutiny." *Id.* That is the approach *Heller* took in striking down a total denial of the right to keep arms and it is the approach numerous courts have taken in striking down bans on the right to bear them. *See Wrenn,* 864 F.3d at 664-66; *Peruta II,742* F.3d at 1175; *Moore,* 702 F.3d at 941-42*; Palmer,* 59 F.Supp.3d at 182-83. It is also an approach that a unanimous Ninth Circuit panel endorsed in *Jackson,* noting that a law that "amounts to a destruction of the Second Amendment right, is unconstitutional under any level of scrutiny." 746 F.3d at 961. Because California law prevents Zeleny from publicly carrying a firearm in any capacity, it "amounts to a destruction" of his right to bear arms, and is thus "unconstitutional under any level of scrutiny." *Id.*

The fact that California's scheme is riddled with a laundry list of exceptions does not improve matters. The Second Amendment guarantees the right to keep and bear Arms to "the people," not just to retired peace officers or other subsets of the people the state deems worthy. The right to bear arms can no more be limited to such individuals than the right to free speech can be limited to paid newspaper columnists. *See, e.g., First Nat'l. Bank of Boston v. Bellotti,* 435 U.S. 765, 777 (1978) (speech protection "does not depend upon the [speaker's] identity"). Indeed, the possession ban at issue in *Heller* had "minor exceptions" for certain people, such as retired police officers, *see* 554 U.S. at 575 n. l, but the Court still characterized it as a "complete prohibition." *Id.* at 629. The same result applies here. The ban "on the ability of most citizens to exercise an enumerated right would have to flunk any judicial test that was appropriately written and applied." *Wrenn,* 864 F.3d at 666.

California's exception for Carry Licenses holders is likewise inapposite. If California law required Issuing Authorities to recognize self-defense as "good cause" to obtain a Carry License, then that exception would provide ordinary citizens with an opportunity to exercise their right. But, the State does not impose such a limitation. Sheriff Villaneuva has chosen to adopt a near-impossible "good cause" requirement. So, the Carry License exception is no exception at all, at least not for an ordinary citizen like Zeleny.

Nor is California's narrow affirmative defense to criminal prosecution for an individual facing "immediate, grave danger" a meaningful caveat. That defense is not only limited to "grave

1   danger," but it applies *only* during "the brief interval" between when law enforcement officials are

2   notified of the "grave danger" and when they arrive.  Cal. Penal Code §§ 26045(a)-(c).  Since an

3   individual is prohibited from having an unloaded firearm on or near his person, "where the fleeing

4   victim would obtain a gun during that interval is apparently left to Providence." *Peruta II,* 742 F.3d

5   at 1147, n.1.  More fundamentally, the notion that the right to bear arms is sufficiently

6   accommodated by a potential affirmative defense cannot square with the Supreme Court's

7   admonishments that the Second Amendment protects a right to be "armed and ready" in case of

8   confrontation. *Heller, 554* U.S. at 584 (*quoting Muscarello,* 524 U.S. at 143).

9        Finally, while there are portions of unincorporated areas where it is legal to openly carry a

10  firearm, in reality these are tiny islands in a sea of "prohibited areas." Cal. Penal Code §§ 17030,

11  28350(a)(1)(C).  "Prohibited areas" generally include any public road or highway, as well as

12  anywhere within 150 yards of any building.  The State also designates certain areas it controls as

13  "prohibited areas."  Municipalities typically create additional "prohibited areas" via ordinance.  The

14  City of Menlo Park, for example, prohibits any person from "having in his possession within this

15  city … any firearm[,]" subject to narrow exceptions.  Menlo Park Municipal Code § 8.32.010.

16       In short, for ordinary individuals, California's prohibitions are tantamount to a flat ban on

17  publicly carrying firearms.  Because such a flat ban "amounts to a destruction" of the right,

18  California's carry prohibitions are "unconstitutional under any level of scrutiny." *Jackson,* 746 F.3d

19  at 961 (citing *Heller,* 554 U.S. at 629).

20            **b.      California's Effective Ban on Carry by Ordinary, Law-abiding
                        Citizens Is Invalid Under Either Strict or Intermediate Scrutiny.**

21

22       If the Court applies one of the traditional levels of scrutiny, it should apply strict scrutiny.  In

23  the Ninth Circuit, a "law that implicates the core of the Second Amendment right and severely

24  burdens that right warrants strict scrutiny." *Silvester,* 843 F.3d at 821.  The "core Second

25  Amendment right" is the "right of self-defense," *Jackson,* 746 F.3d at 968; *see Heller,* 554 U.S. at

26  599, and restrictions on bearing arms beyond the home clearly "implicate" that core right.  *Silvester,*

27  843 F.3d at 82l.  By any measure, a complete ban "severely burdens" the right to bear arms for self-

28  defense. *Silvester,* 843 F.3d at 821.  Accordingly, strict scrutiny applies.

Ultimately, however, this Court need not resolve whether strict or intermediate scrutiny applies, because California's carry ban fails either standard. *Cf McCutcheon v. FEC,* _U.S._, 134 S. Ct. 1434 (2014) (plurality opinion).  Intermediate scrutiny requires a "reasonable fit between the challenged regulation" and a "significant, substantial, or important" government objective. *Silvester,* 843 F.3d at 821-22; *Jackson,* 746 F.3d at 965.  The government "bears the burden of justifying its restrictions" and "must affirmatively establish the reasonable fit" required. *Jackson,* 746 F.3d at 965.  While a reasonable fit "is not necessarily perfect," it must be "a means narrowly tailored to achieve the desired objective." *McCutcheon,* 134 S. Ct. at 1456-57.

Prohibiting ordinary citizens from carrying firearms is not a reasonably tailored means of furthering the State's stated objective of public safety.  To the contrary, a flat ban is the exact opposite of tailoring—as evidenced by the litany of exceptions.  Applying intermediate scrutiny, the Ninth Circuit stressed the distinction between laws that completely prohibit protected conduct and those that leave open "alternative channels" for that conduct. *Jackson,* 746 F.3d at 968.  California law does ***not*** leave open alternative channels to bear arms for self-defense outside the home.  Instead, it flatly denies the right to all but those who can demonstrate—to the satisfaction of an Issuing Authority with unlimited discretion – "good cause," a criterion that "says nothing about whether he or she is more or less likely to misuse a gun." *Grace,* 187 F.Supp.3d at 149.

California's carry ban thus can be justified only on the theory that allowing law-abiding citizens to carry firearms creates an intolerable public safety risk.  Not only is that theory lacking in empirical support, *see, e.g., Moore,* 702 F.3d at 937-42, and belied by the State's recognition of the value of providing for Carry Licenses and an affirmative defense for "immediate" "grave danger"; it is a theory that the Second Amendment takes "off the table." *Heller,* 554 U.S. at 635-36.  The Framers well understood that carrying firearms in public poses safety risks, but they protected the right anyway.  The State may disagree, but it has no more authority to second guess this right than it does to override the protection against unreasonable searches and seizures or coerced confessions, the right to confront adverse witnesses, or any other of right with "disputed public safety implications." *McDonald,* 561 U.S. at 783 (plurality opinion).  The Second Amendment "is the very *product* of an interest balancing by the people," and California many not "conduct [it] for them

- 19 -

1   anew." *Heller,* 554 U.S. at 635; *cf United States* v. *Stevens,* 559 U.S. 460, 470 (2010) ("Our

2   Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is

3   not worth it.").

4   **D.      The Entertainment Exemptions Violate Due Process and Equal Protection.**

5       California's "entertainment exemptions" to its Open Carry Ban violate Fourteenth

6   Amendment due process and equal protection because they (i) implicate a fundamental right while

7   simultaneously treating California citizens differently under the law and making content-based

8   distinctions; and (ii) are void for vagueness because they do not provide fair notice as to what is

9   required to take advantage of the exemption.  Under either theory, the exemptions cannot be

10  constitutionally applied as drafted and interpreted by the State.

11              **1.      The Entertainment Exemptions Impermissibly Treat Movie Studios and
                Production Companies Differently than Protestors and Advocates.**
12

13      The Penal Code exemptions for "authorized participants" in a movie, television show,

14  theatrical production, or other "entertainment event," implicate two fundamental rights: the Second

15  Amendment right to bear arms, and the First Amendment right of freedom of speech.  By

16  establishing these exemptions, California law impermissibly and arbitrarily disadvantages one group

17  of speakers over another, based in large part on the content of their speech.

18      Strict scrutiny applies when a legislative classification "impermissibly interferes with the

19  exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Mass.*

20  *Bd. of Retirement v. Murgia*, 427 U.S. 307 (1976).  Such classifications are presumed

21  unconstitutional and will survive strict scrutiny only when the government can show the law is

22  narrowly tailored to a compelling governmental interest.  *See Zablocki v. Redhail*, 434 U.S. 374,

23  388 (1978) ("[w]hen a statutory classification significantly interferes with the exercise of a

24  fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests

25  and is closely tailored to effectuate only those interests").

26      The entertainment exceptions impermissibly distinguish between different forms of First

27  Amendment speakers, drawing a line between those engaged in "entertainment" – *i.e.*, movies, TV

28  shows, and theatrical performances – and in other forms of protected speech – *i.e.*, protests, firearm

training courses, "open carry" demonstrations, or gun-rights advocacy.  Neither the statute itself nor its legislative history gives any valid justification for this distinction between forms of constitutionally-protected speech.  The Legislature gave no reasons for the exemption, and it does not appear that it considered other forms of expressive conduct at all.  Robinson Decl., Ex. 1 at pp. 23-24.  To the extent that the exception is intended, as it appears, to help the lucrative entertainment industry, this type of distinction is constitutionally impermissible.  *See Branzburg v. Hayes*, 408 U.S. 665, 704 (1972).

The exemption violates the First Amendment by making a content-based distinction between the free speech rights of movie studios and production companies and other, core forms of First Amendment activity.  Such a distinction is not permissible.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (restrictions must be justified "without reference to the content of the regulated speech") (*quoting Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).  As the famous phrase states, "liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods."  *Branzburg v. Hayes*, 408 U.S. 665, 703 (1972).  The State cannot identify any compelling state interest justifying content-based distinctions between major movie studios and a lone protestor.

Further, the exemptions violate the Second Amendment by respecting the rights of big movie studios and production companies, while denying those same rights to gun rights advocates.  Regulations which serve to disadvantage certain groups, or advantage certain groups over others, are subject to struct scrutiny, *see Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307 (1976), and would rarely, if ever, be constitutional.  Here, the State cannot identify a compelling interest justifying this disparate treatment, nor that the exemptions are narrowly tailored.

## 2.     The Entertainment Exemptions Are Unconstitutionally Vague.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Studios, Inc.*, 567 U.S. 239, 253 (2012) (*citing Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).  A law is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of

what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *Id.  See also Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) ("As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."); *Village of Hoffman Estates v. Flipside*, 455 U.S. 489 (1982).

The entertainment exceptions give no indication of what is meant by an "authorized participant."  A person of reasonable intelligence could not reasonably be expected to know what it means.  As Judge Hixson noted, "[u]nhelpfully, there is no statutory definition of an 'authorized participant,' nor a provision stating who does the authorizing.  There are no governing regulations either."  Sept. 4, 2020 Order, Dkt. No. 140, at p. 1.  The total absence of clarifying text or regulations renders the statutes unduly vague.

Case in point, each participant in this case—all individuals of at least ordinary intelligence, and the State of California itself—have come to contrary conclusions on what the phrase "authorized participant" means.  The Attorney General served no fewer than *three* sets of supplemental responses before settling on a definition, referring to an entirely different and inapplicable statutory scheme.  Robinson Decl. ¶¶ 2-9 & Ex. 1 at 25-28.  Even then, the he included so many qualifications that its definition is essentially meaningless.  That the State cannot come up with a coherent definition with three tries and two Court orders speaks volumes.

Likewise, defendants' Rule 30(b)(6) designees acknowledged that the statute is vague and uncertain.  Bertini, a career law enforcement officer and a police chief, was asked about the exception.   Robinson Decl., Ex. 5 at p.  This was his response:

> Well, that's the question we were trying to get answered through the Department of Justice, the district attorney's office, et cetera.  ***Because that law is very vague,*** we were trying to determine whether that's true or not.  And, as it stands today, our reading of the exemption is yes, if he was permitted under the – under the special events or film permit, then he could openly carry weapons.

*Id*. at 428:18-429:4 (emphasis added).  If State and local officials can't come up with a definition for implementation of a statute, necessarily the statue is impermissibly vague.

Further, to the extent that the statute vests authority in local permitting agencies to "authorize" participants, with no guiding standards, it is equally unconstitutional on vagueness grounds. The phrase "authorized participant" gives local agencies no guidance. Nor are there any regulations or an official interpretation. A statute that gives local agencies carte blanche to authorize participants, without any guidance, is necessarily "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Fox Television*, 567 U.S. at 253

More fundamentally, the Rule 30(b)(6) designee of the State of California, Blake Graham, could not explain what the statute means either. Graham is a special agent in charge for the California Department of Justice, and the State's go-to expert on its gun control regulations. Robinson Decl., Ex. 7 at p 13:20-14:20. He would certainly qualify as a person of "at least ordinary intelligence." During his deposition, he also was unable to come up with a coherent definition of the phrase "authorized participant," stating that he would "have to do *quite a bit of research* before he could come up with something" on what "authorized participant" means. *Id*. at 116:22-117:13 (emphasis added); *see also id.* at 127:13-128:1. If the State's expert on gun regulations cannot tell what the statute means, a reasonable layperson cannot possibly be expected to do so.

The Penal Code recognizes an exemption to the Open Carry Ban, but it is so vague and standardless that no official entity, from either the State or Menlo Park, could explain who is covered and how to qualify. As such, it fails to provide due process to an individual, like Zeleny, seeking to invoke the exemption and allows for discriminatory enforcement by the State. The exemptions are unconstitutionally vague. A circular definition that confers favoritism on the entertainment industry does not cure the constitutionally fatal deficiencies of the statutes.

## V.    CONCLUSION

For all the foregoing reasons, Zeleny's Motion for Partial Summary Judgment should be granted.

Dated:  January 21, 2021                    Respectfully submitted,

                                            s/ Damion Robinson
                                            David W. Affeld
                                            Damion D. D. Robinson
                                            Affeld Grivakes LLP

Attorneys for Plaintiff Michael Zeleny

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST BECERRA

1

## <u>PROOF OF SERVICE</u>

2

3        I hereby certify that on January 21, 2021, I electronically filed the foregoing document
using the Court's CM/ECF system.  I am informed and believe that the CM/ECF system will
send a notice of electronic filing to the interested parties.

4

5                                             s/ Gabrielle Bruckner
                                             Gabrielle Bruckner

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST BECERRA