David W. Affeld, State Bar No. 123922
Brian R. England, State Bar. No. 211335
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:    (310) 979-8700

Attorneys for Plaintiff Michael Zeleny

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY,<br><br>    Plaintiff,<br><br>        vs.<br><br>GAVIN NEWSOM, *et al.*,<br><br>    Defendants. | Case No. CV 17-7357 RS<br><br><u>Assigned to:</u><br>The Honorable Richard G. Seeborg<br><br><u>Discovery Matters:</u><br>The Honorable Thomas S. Hixson<br><br>**DECLARATION OF DAMION ROBINSON IN SUPPORT OF PLAINTIFF MICHAEL ZELENY'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA**<br><br>Date:          February 25, 2021<br>Time:          1:30 p.m.<br>Courtroom: 3, 17th Floor<br><br>Action Filed:  December 28, 2017<br>Trial Date:    TBD |

ROBINSON DECL. ISO MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Damion Robinson, declare:

1.     My law firm and I are counsel of record to plaintiff Michael Zeleny ("Zeleny") in this matter.  I have personal knowledge of the facts below or knowledge based on the records and files regularly maintained by my firm in the ordinary course of business.  I could testify competently to these facts if called upon to do so.

2.     On or about January 25, 2019, I served Plaintiff Michael Zeleny's First Set of Interrogatories to Xavier Becerra ("Becerra").  Becerra responded on or about April 3, 2019.  He declined to take a clear position on what the phrase "authorized participant" means under California Penal Code § 26375 and 26405(r).

3.     On or about February 12, 2020, I caused to be served Plaintiff Michael Zeleny's Interrogatories to Xavier Becerra, Set Two.  Becerra responded on March 13, 2020.  Again, he failed to take a clear position on the "authorized participant" exception.

4.     On or about August 26, 2020, we filed a letter brief requesting further responses to the interrogatories addressing the "authorized participant" provision.  *See* Dkt. No. 135.  After a hearing, Magistrate Judge Hixson issued an order on September 4, 2020, directing Becerra to respond further to the interrogatories.  Dkt. No. 140.

5.     Becerra moved for relief from the September 4, 2020 order.  The Court denied his motion on October 5, 2020.  Dkt. No. 148.

6.     Becerra provided amended responses to the interrogatories on October 6, 2020.  The responses still appeared to be deficient.  I, thus, met and conferred with counsel for Becerra.

7.     Becerra provided Second Amended Responses to the interrogatories on October 23, 2020.  The Second Amended Responses contain the original responses (April 3, 2019 and March 13, 2020), the Amended Responses (October 6), and the updated, Second Amended Responses (October 23, 2020).  For ease of reference, only the Second Amended Responses are attached.

8.     Attached as **Exhibit 1** is a true copy of Becerra's Second Amended Responses to Plaintiff Michael Zeleny's First Set of Interrogatories.

9.     Attached as **Exhibit 2** is a true copy of Becerra's Second Amended Responses to Plaintiff Michael Zeleny's Interrogatories, Set Two.

ROBINSON DECL. ISO MOTION FOR PARTIAL SUMMARY JUDGMENT

10.     Attached as **Exhibit 3** is a true copy of the Expert Declaration of Michael Tristano.

11.     Attached as **Exhibit 4** is a true copy of the Expert Declaration of Robert Latham Brown.

12.     Attached as **Exhibit 5** is a true copy of excerpts of Volume II of the transcript of the deposition of Dave Bertini in this matter, testifying individually and as the Rule 30(b)(6) designee of the City of Menlo Park.

13.     Attached as **Exhibit 6** is a true copy of excerpts of the deposition of Blake Graham taken in this matter, testifying as the Rule 30(b)(6) designee of the State of California.

14.     Exhibits 1 through 7 to the accompanying Request for Judicial Notice are documents that I located through online research.  I obtained the legislative history materials attached as Exhibits 1 through 6 from the Westlaw online research platform.  I obtained the State Auditor's report, attached as Exhibit 7, from the State Auditor's website, www.auditor.ca.gov.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed January 21, 2021 at Los Angeles, California

s/ Damion Robinson
Damion Robinson

ROBINSON DECL. ISO MOTION FOR PARTIAL SUMMARY JUDGMENT

# Exhibit 1

1   XAVIER BECERRA
    Attorney General of California
2   ANTHONY R. HAKL
    Supervising Deputy Attorney General
3   NOREEN P. SKELLY
    Deputy Attorney General
4   State Bar No. 186135
      1300 I Street, Suite 125
5     P.O. Box 944255
      Sacramento, CA 94244-2550
6     Telephone: (916) 210-6057
      Fax: (916) 324-8835
7     E-mail: Noreen.Skelly@doj.ca.gov
    *Attorneys for Defendant Attorney General Xavier*
8   *Becerra*

9                    IN THE UNITED STATES DISTRICT COURT

10               FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                        SAN FRANCISCO DIVISION

12

13

14   **MICHAEL ZELENY, an individual,**          3:17-cv-07357 RS (NC)

15                              Plaintiff,        **DEFENDANT ATTORNEY GENERAL
                                                  XAVIER BECERRA'S SECOND
16          v.                                    AMENDED RESPONSES TO
                                                  PLAINTIFF MICHAEL ZELENY'S
17                                                FIRST SET OF INTERROGATORIES**
     **GAVIN NEWSOM, an individual, in his
18   official capacity; XAVIER BECERRA, an
     individual, in his official capacity; CITY OF
19   MENLO PARK, a municipal corporation;
     and DAVE BERTINI, in his official
20   capacity,**

21                              Defendants.

22

23          PROPOUNDING PARTY:         Plaintiff Michael Zeleny

24          ANSWERING PARTY:           Defendant Attorney General Xavier Becerra

25          SET NUMBER:                One

26   / / /

27   / / /

28   / / /

                                        1

1

**PRELIMINARY STATEMENT**

2     For purposes of these interrogatories, Plaintiff Zeleny has used the terms "YOU" and

3  "YOUR" to, "refer to Xavier Becerra as the Attorney General of the State of California. These

4  interrogatories seek the official position of the State of California." (Plaintiff Zeleny's

5  Interrogatories, p. 2, lines 22-24.) Defendant Becerra objects to Plaintiff Zeleny's definition of

6  "YOU" and "YOUR" as encompassing the official position of the State of California. The phrase

7  "the official position of the State of California" is vague and overbroad. The State of California

8  is made up of the Executive, Legislative, and Judicial branches of government, which are separate

9  and co-equal. California's Executive branch includes a number of elected officials including, but

10  not limited to the Attorney General of California. Moreover, the State of California is not a

11  defendant in this action—nor would it be an appropriate defendant in this action. As a general

12  matter, the proper respondent or defendant in a challenge to a state law or policy is the officer or

13  agency charged with implementing it. See *Serrano v. Priest*, 18 Cal.3d 728, 752 (1976); *State v.*

14  *Superior Court, 12 Cal.3d 237, 255* (1974).

15     Defendant Becerra objects to each interrogatory to the extent that it purports to impose any

16  obligation or requirement greater than or different to the obligations or requirements set forth in

17  the Federal Rules of Civil Procedure and/or the applicable rules and orders of this Court.

18     Defendant Becerra objects to each interrogatory to the extent that it calls for the disclosure

19  of information protected from disclosure by the attorney work-product doctrine, the attorney-

20  client privilege, the deliberative process privilege and/or any other applicable privilege or

21  protection. Should Defendant Becerra disclose any privileged or otherwise protected information

22  in these responses, the disclosure is inadvertent and does not constitute a waiver of the privilege

23  or protection.

24     Defendant Becerra has not completed the investigation of the facts and issues relating to

25  Plaintiff Zeleny's claims and has not completed discovery in this action. All of the answers

26  contained herein are based solely upon information and documents which are presently available

27  to, and specifically known by, Defendant Becerra, and the answers disclose only those

28  contentions which presently occur to Defendant Becerra. Further discovery, independent

1    investigation, legal research and analysis may supply additional facts and may lead to additions,

2    changes, and variations from the answers herein.

3          The following answers are given without prejudice to the right to produce evidence and/or

4    witnesses or rely on facts which Defendant Becerra may later discover.  Defendant Becerra

5    accordingly reserves the right to change any and all answers herein as additional facts are

6    ascertained, witnesses identified and legal research is completed.  The answers contained herein

7    are made in good faith in an attempt to supply as much factual information and as much

8    specification of legal contention as is presently known, and in no way prejudices Defendant

9    Becerra in relation to further discovery and proceedings.

10          Defendant Becerra incorporates by reference every general objection set forth above into

11   each specific answer set forth below.  A specific response may repeat a general objection for

12   emphasis or some other reason.  The failure to include a general objection in any specific answer

13   does not waive any general objection to that interrogatory.

14          **INTERROGATORY NO. 1**:  State all facts on which You base Your contention, if any,

15   that California Penal Code § 26350 is constitutional under the Second Amendment, including any

16   legitimate goals or public interests intended to be served by that statute.

17          [As used in these interrogatories,

18          (a) "You" and "Your" refer to Xavier Becerra as the Attorney General of the State of

19   California.  These interrogatories seek the official position of the State of California;

20          (b) "Second Amendment" means the Second Amendment to the United States

21   Constitution].

22          **RESPONSE TO INTERROGATORY NO. 1**:

23          Defendant Becerra incorporates by reference the above-stated general objections as though

24   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

25   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

26   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

27   that is relevant to Plaintiff's claims.  Defendant Becerra also objects to this interrogatory on the

28   grounds that it seeks Defendant Becerra's contentions regarding the constitutionality of California

3

1    Penal Code § 26350, and thus poses a question of pure law.  Defendant Becerra is not required to

2    respond to interrogatories raising questions of pure law.  See *AngioScore, Inc. v. TriReme Med.,*

3    *Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014)

4    ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the

5    facts of the case are not permitted") (citation and some internal punctuation omitted).  A party

6    responding to interrogatories "is not required to write his[, her, or its] brief on a motion for

7    summary judgment in his[, her, or its] responses to interrogatories."  *Larson v. Trans Union, LLC*,

8    No. 3:12-CV-05726-WHO, 2017 WL 1540710, at *1 (N.D. Cal. April 28, 2017) (citation and

9    some internal punctuation omitted).

10        Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

11    follows:  California Penal Code § 26350 is constitutional under the Second Amendment.

12        In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court

13    recognized that the Second Amendment protects an individual right to keep and bear arms.  554

14    U.S. at 636.  The *Heller* Court did not, however, "undertake an exhaustive historical analysis . . .

15    of the full scope of the Second Amendment" or attempt to "clarify the entire field."  *Id.* at 626,

16    635.

17        First, *Heller* explains that "the most natural reading of 'keep Arms'" is "to 'have

18    weapons,'" 554 U.S. at 582, and that "bear arms" is most naturally read to mean "'wear, bear, or

19    carry upon the person or in clothing or in a pocket, for the purpose of being armed and ready for

20    offensive or defensive action in a case of conflict with another person,'" *id*. at 584 (ellipses

21    omitted).

22        Second, the right to bear arms must be construed and applied with careful attention to its

23    "historical background."  *Heller*, 554 U.S. at 592; see *id*. At 576-626.  This is critical "because it

24    has always been widely understood that the Second Amendment, like the First and Fourth

25    Amendments, codified a *pre-existing* right," and "declares only that is 'shall not be infringed.'"

26    *Id*., at 592.  Thus, while the Second Amendment's inclusion in the Bill of Rights indicates that the

27    right to bear arms ranks as fundamental, nothing about its enumeration in the Constitution

28

1   changed the right into anything more comprehensive or absolute than would have been

2   understood and expected by "ordinary citizens in the founding generation." *Id*. at 577.

3     Third, that commonly understood right was and is "not unlimited." *Heller*, 554 U.S. at 595,

4   626. It is not a right "to keep and carry any weapon whatsoever in any manner whatsoever and

5   for whatever purpose," *id*. at 626, or "to carry arms for any sort of confrontation," *id*. at 595. The

6   core individual right recognized by *Heller* is the right to keep and bear arms "in defense of hearth

7   and home." 554 U.S. at 635; see also *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)

8   (plurality op.) (*Heller's* "central holding" was that "the Second Amendment protects a personal

9   right to keep and bear arms for lawful purposes, most notably for self-defense within the home.").

10   That does not mean that the right to "bear" has no scope or application beyond the home or its

11   immediate environs. But nothing in *Heller* suggests that it applies in exactly the same in all

12   places, so that a restriction on bearing arms in public must be treated just like a restriction on

13   bearing in or around the home. In particular, nothing in *Heller* dictates that, as Plaintiff Zeleny

14   seems to contend, that the Second Amendment embodies an individual right to openly carry a gun

15   in almost any public place.

16     On the contrary, *Heller* makes clear that Second Amendment rights are subject to many

17   reasonable regulations. *See* 554 U.S. at 636. Indeed, the Second Amendment "by no means

18   eliminates" States' "ability to devise solutions to social problems that suit local needs and

19   values." *McDonald,* 561 U.S. at 785.

20     *Heller* does not recognize any unfettered right to carry firearms in the crowded urban areas,

21   based solely on an individual's stated desire to be "'armed and ready for offensive or defensive

22   action in case of conflict with another person,'" 554 U.S. at 584. Rather, under *Heller*, Plaintiff

23   Zeleny's challenge to Penal Code § 26350 must be evaluated, in the first instance, by examining

24   "the historical understanding of the scope of that right." *Id*. at 625. The challenge cannot succeed

25   if the State's restrictions are a type of reasonable public regulation that has long been considered

26   consistent with a private right to bear arms. *Cf. id.* at 626-627.

27     "No fundamental right—not even the First Amendment—is absolute." *McDonald*, 561

28   U.S. at 802 (Scalia, J., concurring). Just as the First Amendment does not confer a right to speak

1   in any time, place or manner, history and precedent teach that the Second Amendment does not

2   confer the right to carry guns anywhere or at any time.  See *Heller*, 554 U.S. at 595.  California's

3   laws regulating the public carrying of firearms strike a permissible balance between preserving

4   order and public safety and accommodating the desire of some residents to carry guns.  There are

5   consistent with traditional restrictions on public carry, and are presumptively lawful on that basis.

6        Where text, history, and tradition show that a challenged law is consistent with the Second

7   Amendment, the restriction "'passes constitutional muster'" and the court's inquiry "'is

8   complete.'"  *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc); see Heller,

9   554 U.S. at 626, 627 n.26.

10        California broadly allows the carrying of firearms in places and circumstances where it has

11   traditionally been common: in or immediately around an individual's home or place of business

12   and on much other private property with permission; in less-populated areas and during activities

13   such as hunting; and in circumstances of immediate and grave danger to person or property when

14   law enforcement is not available.  It also allows qualified individuals to obtain licenses to carry

15   more generally, if they can establish "good cause" under standards set by local officials who are

16   most familiar with the needs and desires of their own communities.

17        However, there is an "historical prevalence" of public carry restrictions similar to Penal

18   Code § 26350.  *Kachalsky v. Cty of Westchester*, 701 F.3d 81, 96 (2nd Cir. 2012).  Because

19   "[f]irearms have always been more heavily regulated in the public sphere," the right to bear arms

20   "most certainly operates in a different manner" in that context than when evaluating restrictions

21   that impinge directly on the core right to keep and carry guns in the home.  *Drake v. Filko*, 724

22   F.3d 426, 430 n.5. (3rd Cir. 2013).

23        This makes good functional sense.  When individuals move outside their homes—and

24   particularly when they move about in populated areas —their interest in carrying a firearm is

25   much more likely to come into conflict with the public interest in order and safety.  *See*, *e.g.*,

26   *Gould v. Morgan*, 907 F.3d 659, 672, (1st Cir. 2018).  The "inherent" risk that firearms present

27   when carried in public "distinguishes the Second Amendment right from other fundamental rights

28   . . . such as the right to marry and the right to be free from viewpoint discrimination, which can be

1   exercised without creating a direct risk to others. *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121,

2   1126 (10th Cir. 2015).  And as the Fourth Circuit observed, it "is not far-fetched to think" that

3   Heller's focus on the "core" right to protect the home was born out of a recognition that the

4   danger of "tragic act[s]" of violence "would rise exponentially as one moved the right from the

5   home to the public square." *United States v. Masciandaro*, 638 F.3d 458, 475-476 (4th Cir. 2011)

6   (Wilkinson, J.).

7        There is a legitimate role for public regulation touching on even our most fundamental

8   rights—especially when there is or can be genuine tension between the exercise of individual

9   rights and the safety of members of the public and law enforcement officers.

10        When, as here, a court will review a challenged statute under intermediate scrutiny, courts

11   ask whether the law promotes a "significant, substantial, or important government objective," and

12   whether there is a "'reasonable fit' between the challenged law and the asserted objective." *Peña*

13   *v. Lindley*, 898 F.3d 969, 979 (9th Cir. 2018).  While the State must show that the law "promotes

14   a substantial government interest that would be achieved less effectively absent the regulation," it

15   need not demonstrate that the regulation is the "least restrictive means of achieving the

16   government interest." *Id*. (citations and quotation marks omitted).  A court's only obligation is to

17   "assure that, in formulating its judgments, [the State] has drawn reasonable inferences based on

18   substantial evidence,'" an inquiry that must accord "'substantial deference to the predictive

19   judgments'" of the legislature. *Id*. at 979-980 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S.

20   180, 195 (1997)).

21        The need for appropriate deference to legislative predications is especially clear in the

22   Second Amendment context.  "Providing for the safety of citizens within their borders has long

23   been state government's most basic task." *Kolbe v. Hogan*, 849 F.3d 114, 150 (4th Cir. 2017)

24   (Wilkinson, J., concurring).  State legislatures are "'far better equipped than the judiciary' to

25   make sensitive public policy judgments (within constitutional limits) concerning the dangers in

26   carrying firearms and the manner to combat those risks." *Kachalsky*, 701 F.3d at 97.  And, while

27   a legislature's judgments can be based on empirical evidence, they need not be; "history,

28   consensus, and 'simple common sense'" will suffice. *Florida Bar v. Went for It, Inc.*, 515 U.S.

1  618, 628 (1995).  Indeed, when it comes to dealing with a complex societal problem like gun

2  violence, there will almost always be room for reasonable minds to differ about the optimal

3  solution; demanding undue certainly would be foolhardy.

4       Here, California has a compelling interest in protecting public safety and reducing gun

5  violence.  *Jackson v. City & County of San Francisco*, 746 F.3d 953, 965 (9th Cir. 2014).  An

6  increase in guns carried by private persons in public places increases the risk that "'basic

7  confrontations between individuals [will] turn deadly.'"  *Wollard v. Gallagher*, 712 F.3d 865, 879

8  (4th Cir. 2013).  Similarly, misfired shots or accidental discharges are "more likely to hit a

9  bystander where there are more bystanders to hit."  Blocher, *Firearm Localism*, 123 Yale L.J. 82,

10  122-123 (2013).  The Legislature could also conclude that widespread public carry increases the

11  "availability of handguns to criminals via theft," *Woollard*, 712 F.3d at 879, and that such guns

12  would then be used to "commit violent crimes" or be transferred to "others who commit crimes,"

13  U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *2012 Summary:*

14  *Firearms Reported Lost and Stolen* 2 (2013).

15       According to the legislative history of California Penal Code § 26350, the absence of a

16  prohibition on openly carrying unloaded firearms has created a surge in individuals openly

17  carrying unloaded firearms in public.  These incidents adversely affect public safety in several

18  ways.  Members of the public who encounter individuals openly carrying firearms are alarmed

19  and fearful for their safety and the safety of others.  When members of the public report such

20  incidents to local law enforcement, they are only able to provide law enforcement personnel with

21  incomplete information.  As a result, law enforcement agencies respond to such incidents with

22  limited information regarding whether the individual openly carrying the firearm is a danger to

23  himself or herself; a danger to the public; or a danger to the responding law enforcement

24  personnel.

25       In such situations, a wrong move by the individual carrying the firearm could be construed

26  as threatening by the responding law enforcement officer.  The officer may feel compelled to

27  respond in a manner that could result in injury or death.  Thus, the practice of openly carrying

28  unloaded firearms can create an unsafe environment for everyone involved: the individual

1    carrying the firearm, the responding law enforcement personnel, and all other individuals who

2    may be nearby.

3          In addition, responding to incidents involving individuals openly carrying unloaded

4    firearms taxes the resources of law enforcement agencies already stretched by under-staffing and

5    budget cutbacks.  Such a diversion of resources adversely affects law enforcement agencies'

6    ability to provide other public safety services to their communities.  See e.g., *Woollard*, 712 F.3d

7    at 879-880 (recounting similar policing benefits).

8          In light of the public safety risks the Legislature could reasonably deem to be associated

9    with public carrying of firearms, there is a "'reasonable fit'" between California's calibrated

10   regime governing public carry and the important interests that it serves.  *Peña*, 898 F.3d at. 979.

11         **INTERROGATORY NO. 2**:  Identify all documents bearing upon, supporting, or

12   reflecting the facts set forth in Your response to the preceding interrogatory.

13         **RESPONSE TO INTERROGATORY NO. 2**:

14         Defendant Becerra incorporates by reference the above-stated general objections as though

15   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

16   vague, overbroad, and/or unduly burdensome.  Moreover, it seeks information irrelevant to

17   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

18   that is relevant to Plaintiff's claims.

19         Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

20   follows:  See DOJ 000127-DOJ000411; DOJ 000001-DOJ 000126; DOJ 001227-DOJ 001281.

21         **INTERROGATORY NO. 3**:  State all facts on which You base Your contention, if any,

22   that California Penal Code § 26400 is constitutional under the Second Amendment, including any

23   legitimate goals or public interests intended to be served by the statute.

24         **RESPONSE TO INTERROGATORY NO. 3**:

25         Defendant Becerra incorporates by reference the above-stated general objections as though

26   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

27   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

28   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

9

1   that is relevant to Plaintiff's claims.  Defendant Becerra also objects to this interrogatory on the

2   grounds that it seeks Defendant Becerra's contentions regarding the constitutionality of California

3   Penal Code § 26400, and thus poses a question of pure law.  Defendant Becerra is not required to

4   respond to interrogatories raising questions of pure law.  See *AngioScore, Inc. v. TriReme Med.,*

5   *Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014)

6   ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the

7   facts of the case are not permitted") (citation and some internal punctuation omitted).  A party

8   responding to interrogatories "is not required to write his[, her, or its] brief on a motion for

9   summary judgment in his[, her, or its] responses to interrogatories." *Larson v. Trans Union, LLC*,

10  No. 3:12-CV-05726-WHO, 2017 WL 1540710, at *1 (N.D. Cal. April 28, 2017) (citation and

11  some internal punctuation omitted).

12      Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

13  follows:  California Penal Code § 26400 is constitutional under the Second Amendment.

14      In *Heller*, the Supreme Court recognized that the Second Amendment protects an individual

15  right to keep and bear arms.  554 U.S. at 636.  The *Heller* Court did not, however, "undertake an

16  exhaustive historical analysis . . . of the full scope of the Second Amendment" or attempt to

17  "clarify the entire field." *Id*. at 626, 635.

18      First, *Heller* explains that "the most natural reading of 'keep Arms'" is "to 'have

19  weapons,'" 554 U.S. at 582, and that "bear arms" is most naturally read to mean "'wear, bear, or

20  carry upon the person or in clothing or in a pocket, for the purpose of being armed and ready for

21  offensive or defensive action in a case of conflict with another person,'" *id*. at 584 (ellipses

22  omitted).

23      Second, the right to bear arms must be construed and applied with careful attention to its

24  "historical background." *Heller*, 554 U.S. at 592; see *id*. At 576-626.  This is critical "because it

25  has always been widely understood that the Second Amendment, like the First and Fourth

26  Amendments, codified a *pre-existing* right," and "declares only that is 'shall not be infringed.'"

27  *Id*., at 592.  Thus, while the Second Amendment's inclusion in the Bill of Rights indicates that the

28  right to bear arms ranks as fundamental, nothing about its enumeration in the Constitution

10

1  changed the right into anything more comprehensive or absolute than would have been

2  understood and expected by "ordinary citizens in the founding generation." *Id*. at 577.

3      Third, that commonly understood right was and is "not unlimited." *Heller*, 554 U.S. at 595,

4  626. It is not a right "to keep and carry any weapon whatsoever in any manner whatsoever and

5  for whatever purpose," *id*. at 626, or "to carry arms for any sort of confrontation," *id*. at 595. The

6  core individual right recognized by *Heller* is the right to keep and bear arms "in defense of hearth

7  and home." 554 U.S. at 635; see also *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)

8  (plurality op.) (*Heller's* "central holding" was that "the Second Amendment protects a personal

9  right to keep and bear arms for lawful purposes, most notably for self-defense within the home.").

10  That does not mean that the right to "bear" has no scope or application beyond the home or its

11  immediate environs. But nothing in *Heller* suggests that it applies in exactly the same in all

12  places, so that a restriction on bearing arms in public must be treated just like a restriction on

13  bearing in or around the home. In particular, nothing in *Heller* dictates that, as Plaintiff Zeleny

14  seems to contend, that the Second Amendment embodies an individual right to openly carry a gun

15  in almost any public place.

16      On the contrary, *Heller* makes clear that Second Amendment rights are subject to many

17  reasonable regulations. *See* 554 U.S. at 636. Indeed, the Second Amendment "by no means

18  eliminates" States' "ability to devise solutions to social problems that suit local needs and

19  values." *McDonald,* 561 U.S. at 785.

20      *Heller* does not recognize any unfettered right to carry firearms in the crowded urban areas,

21  based solely on an individual's stated desire to be "'armed and ready for offensive or defensive

22  action in case of conflict with another person,'" 554 U.S. at 584. Rather, under *Heller*, Plaintiff

23  Zeleny's challenge to Penal Code § 26350 must be evaluated, in the first instance, by examining

24  "the historical understanding of the scope of that right." *Id*. at 625. The challenge cannot succeed

25  if the State's restrictions are a type of reasonable public regulation that has long been considered

26  consistent with a private right to bear arms. *Cf. id.* at 626-627.

27      "No fundamental right—not even the First Amendment—is absolute." *McDonald*, 561

28  U.S. at 802 (Scalia, J., concurring). Just as the First Amendment does not confer a right to speak

1    in any time, place or manner, history and precedent teach that the Second Amendment does not

2    confer the right to carry guns anywhere or at any time.  See *Heller*, 554 U.S. at 595.  California's

3    laws regulating the public carrying of firearms strike a permissible balance between preserving

4    order and public safety and accommodating the desire of some residents to carry guns.  There are

5    consistent with traditional restrictions on public carry, and are presumptively lawful on that basis.

6           Where text, history, and tradition show that a challenged law is consistent with the Second

7    Amendment, the restriction "'passes constitutional muster'" and the court's inquiry "'is

8    complete.'"  *Teixeira*, 873 F.3d at 682; see *Heller*, 554 U.S. at 626, 627 n.26.

9           California broadly allows the carrying of firearms in places and circumstances where it has

10   traditionally been common: in or immediately around an individual's home or place of business

11   and on much other private property with permission; in less-populated areas and during activities

12   such as hunting; and in circumstances of immediate and grave danger to person or property when

13   law enforcement is not available.  It also allows qualified individuals to obtain licenses to carry

14   more generally, if they can establish "good cause" under standards set by local officials who are

15   most familiar with the needs and desires of their own communities.

16          However, there is an "historical prevalence" of public carry restrictions similar to Penal

17   Code § 26400.  *Kachalsky*, 701 F.3d at 96.  Because "[f]irearms have always been more heavily

18   regulated in the public sphere," the right to bear arms "most certainly operates in a different

19   manner" in that context than when evaluating restrictions that impinge directly on the core right

20   to keep and carry guns in the home.  *Drake*, 724 F.3d at 430 n.5.

21          This makes good functional sense.  When individuals move outside their homes—and

22   particularly when they move about in populated areas —their interest in carrying a firearm is

23   much more likely to come into conflict with the public interest in order and safety.  *See*, *e.g.*,

24   *Gould v. Morgan*, 907 F.3d 659, 672, (1st Cir. 2018).  The "inherent" risk that firearms present

25   when carried in public "distinguishes the Second Amendment right from other fundamental rights

26   . . . such as the right to marry and the right to be free from viewpoint discrimination, which can be

27   exercised without creating a direct risk to others.  *Bonidy*, 790 F.3d at 1126.  And as the Fourth

28   Circuit observed, it "is not far-fetched to think" that Heller's focus on the "core" right to protect

1   the home was born out of a recognition that the danger of "tragic act[s]" of violence "would rise

2   exponentially as one moved the right from the home to the public square." *Masciandaro*, 638

3   F.3d at 475-476.

4       There is a legitimate role for public regulation touching on even our most fundamental

5   rights—especially when there is or can be genuine tension between the exercise of individual

6   rights and the safety of members of the public and law enforcement officers.

7       When, as here, a court will review a challenged statute under intermediate scrutiny, courts

8   ask whether the law promotes a "significant, substantial, or important government objective," and

9   whether there is a "'reasonable fit' between the challenged law and the asserted objective." *Peña*,

10  898 F.3d at 979.  While the State must show that the law "promotes a substantial government

11  interest that would be achieved less effectively absent the regulation," it need not demonstrate

12  that the regulation is the "least restrictive means of achieving the government interest." *Id.*

13  (citations and quotation marks omitted).  A court's only obligation is to "assure that, in

14  formulating its judgments, [the State] has drawn reasonable inferences based on substantial

15  evidence,'" an inquiry that must accord "'substantial deference to the predictive judgments'" of

16  the legislature.  *Id.* at 979-980 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195

17  (1997)).

18      The need for appropriate deference to legislative predications is especially clear in the

19  Second Amendment context.  "Providing for the safety of citizens within their borders has long

20  been state government's most basic task." *Kolbe*, 849 F.3d at 150.  State legislatures are "'far

21  better equipped than the judiciary' to make sensitive public policy judgments (within

22  constitutional limits) concerning the dangers in carrying firearms and the manner to combat those

23  risks." *Kachalsky*, 701 F.3d at 97.  And, while a legislature's judgments can be based on

24  empirical evidence, they need not be; "history, consensus, and 'simple common sense'" will

25  suffice.  *Went for It, Inc.*, 515 U.S. at 628.  Indeed, when it comes to dealing with a complex

26  societal problem like gun violence, there will almost always be room for reasonable minds to

27  differ about the optimal solution; demanding undue certainly would be foolhardy.

28  / / /

California has a compelling interest in protecting public safety and reducing gun violence. *Jackson*, 746 F.3d at 965.  An increase in guns carried by private persons in public places increases the risk that "'basic confrontations between individuals [will] turn deadly.'"  *Wollard*, 712 F.3d at 879.  Similarly, misfired shots or accidental discharges are "more likely to hit a bystander where there are more bystanders to hit."  Blocher, *Firearm Localism*, 123 Yale L.J. 82, 122-123 (2013).  The Legislature could also conclude that widespread public carry increases the "availability of handguns to criminals via theft," *Woollard*, 712 F.3d at 879, and that such guns would then be used to "commit violent crimes" or be transferred to "others who commit crimes," U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *2012 Summary: Firearms Reported Lost and Stolen* 2 (2013).

The absence of a prohibition on openly carrying unloaded firearms has created a surge in individuals openly carrying unloaded firearms in public.  These incidents adversely affect public safety in several ways.  Members of the public who encounter individuals openly carrying firearms are alarmed and fearful for their safety and the safety of others.  When members of the public report such incidents to local law enforcement, they are only able to provide law enforcement personnel with incomplete information.  As a result, law enforcement agencies respond to such incidents with limited information regarding whether the individual openly carrying the firearm is a danger to himself or herself; a danger to the public; or a danger to the responding law enforcement personnel.

In such situations, a wrong move by the individual carrying the firearm could be construed as threatening by the responding law enforcement officer.  The officer may feel compelled to respond in a manner that could result in injury or death.  Thus, the practice of openly carrying unloaded firearms can create an unsafe environment for everyone involved: the individual carrying the firearm, the responding law enforcement personnel, and all other individuals who may be nearby.

In addition, responding to incidents involving individuals openly carrying unloaded firearms taxes the resources of law enforcement agencies already stretched by under-staffing and budget cutbacks.  Such a diversion of resources adversely affects law enforcement agencies'

1    ability to provide other public safety services to their communities.  See e.g., *Woollard*, 712 F.3d

2    at 879-880 (recounting similar policing benefits).

3          According to the legislative history of California Penal Code§ 26400, one of the purposes

4    of the bill (A.B. 1527) was to follow up A.B. 144 (Statutes of 2011), which made public open

5    carry of handguns a misdemeanor, by expanding the prohibition to long-guns in incorporated

6    cities.  "The absence of a prohibition on 'open carry' of long guns has created an increase in

7    problematic instances of these guns carried in public, alarming unsuspecting individuals causing

8    issues for law enforcement.  Open carry creates a potentially dangerous situation.  In most cases

9    when a person is openly carrying a firearm, law enforcement is called to the scene with few

10   details other than one or more people are present at a location and are armed." (See DOJ 001050)

11   "In these tense situations, the slightest wrong move by the gun-carrier could be construed as

12   threatening by the responding officer, who may feel compelled to respond in a manner that could

13   be lethal.  In this situation the practice of 'open carry' creates an unsafe environment for all

14   parties involved; the officer, the gun-carrying individual, and for any other individuals nearby as

15   well."  (See DOJ 001050)

16         "Additionally, the increase in 'open-carry' calls placed to law enforcement has taxed

17   departments dealing with under-staffing and cutbacks due to the current fiscal climate in

18   California, preventing them from protecting the public in other ways."  (See DOJ 001051)

19         In light of the public safety risks the Legislature could reasonably deem to be associated

20   with public carrying of firearms, there is a "'reasonable fit'" between California's calibrated

21   regime governing public carry and the important interests that it serves.  *Peña*, 898 F.3d at. 979.

22         **INTERROGATORY NO. 4**:  Identify all documents bearing upon, supporting, or

23   reflecting the facts set forth in Your response to the preceding interrogatory.

24         **RESPONSE TO INTERROGATORY NO. 4**:

25         Defendant Becerra incorporates by reference the above-stated general objections as though

26   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

27   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

28

1    Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

2    that is relevant to Plaintiff's claims.

3        Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

4    follows:  See DOJ 000127-DOJ 000411; DOJ 000412-DOJ 000529; DOJ 000927-DOJ 001226;

5    DOJ 001227-DOJ 001281.

6        **INTERROGATORY NO. 5**:  State all reasons for the adoption of California Penal Code

7    §§ 26375 and 26405(r), including, but not limited to any legitimate goals or public interests

8    intended to be served by the exemptions contained therein.

9        **RESPONSE TO INTERROGATORY NO. 5**:

10       Defendant Becerra incorporates by reference the above-stated general objections as though

11   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

12   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

13   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

14   that is relevant to Plaintiff's claims.  Defendant Becerra also objects to this interrogatory on the

15   grounds that it seeks Defendant Becerra's contentions regarding the constitutionality of California

16   Penal Code §§ 26375 and 26405(r), and thus poses questions of pure law.  Defendant Becerra is

17   not required to respond to interrogatories raising questions of pure law.  See *AngioScore, Inc. v.*

18   *TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16,

19   2014) ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent

20   on the facts of the case are not permitted") (citation and some internal punctuation omitted).  A

21   party responding to interrogatories "is not required to write his[, her, or its] brief on a motion for

22   summary judgment in his[, her, or its] responses to interrogatories."  *Larson v. Trans Union, LLC*,

23   No. 3:12-CV-05726-WHO, 2017 WL 1540710, at *1 (N.D. Cal. April 28, 2017) (citation and

24   some internal punctuation omitted).

25       Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

26   follows:  The *Heller* Court recognized that the Second Amendment protects an individual right to

27   keep and bear arms.  554 U.S. at 636.  The Court did not, however, "undertake an exhaustive

28

16

1   historical analysis . . . of the full scope of the Second Amendment" or attempt to "clarify the

2   entire field."  *Id*. at 626, 635.

3         First, *Heller* explains that "the most natural reading of 'keep Arms'" is "to 'have

4   weapons,'" 554 U.S. at 582, and that "bear arms" is most naturally read to mean "'wear, bear, or

5   carry upon the person or in clothing or in a pocket, for the purpose of being armed and ready for

6   offensive or defensive action in a case of conflict with another person,'" *id*. at 584 (ellipses

7   omitted).

8         Second, the right to bear arms must be construed and applied with careful attention to its

9   "historical background."  *Heller*, 554 U.S. at 592; see *id*. At 576-626.  This is critical "because it

10  has always been widely understood that the Second Amendment, like the First and Fourth

11  Amendments, codified a *pre-existing* right," and "declares only that is 'shall not be infringed.'"

12  *Id*., at 592.  Thus, while the Second Amendment's inclusion in the Bill of Rights indicates that the

13  right to bear arms ranks as fundamental, nothing about its enumeration in the Constitution

14  changed the right into anything more comprehensive or absolute than would have been

15  understood and expected by "ordinary citizens in the founding generation."  *Id*. at 577.

16        Third, that commonly understood right was and is "not unlimited."  *Heller*, 554 U.S. at 595,

17  626.  It is not a right "to keep and carry any weapon whatsoever in any manner whatsoever and

18  for whatever purpose," *id*. at 626, or "to carry arms for any sort of confrontation," *id*. at 595.  The

19  core individual right recognized by *Heller* is the right to keep and bear arms "in defense of hearth

20  and home."  554 U.S. at 635; see also *McDonald*, 561 U.S. at 780 (*Heller's* "central holding" was

21  that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes,

22  most notably for self-defense within the home.").  That does not mean that the right to "bear" has

23  no scope or application beyond the home or its immediate environs.  But nothing in *Heller*

24  suggests that it applies in exactly the same in all places, so that a restriction on bearing arms in

25  public must be treated just like a restriction on bearing in or around the home.

26        On the contrary, *Heller* makes clear that Second Amendment rights are subject to many

27  reasonable regulations.  *See* 554 U.S. at 636.  Indeed, the Second Amendment "by no means

28

1    eliminates" States' "ability to devise solutions to social problems that suit local needs and

2    values." *McDonald,* 561 U.S. at 785.

3         *Heller* does not recognize any unfettered right to carry firearms in the crowded urban areas,

4    based solely on an individual's stated desire to be "'armed and ready for offensive or defensive

5    action in case of conflict with another person,'" 554 U.S. at 584.  Rather, under *Heller*, a

6    challenge to Penal Code § 26350 must be evaluated, in the first instance, by examining "the

7    historical understanding of the scope of that right." *Id*. at 625. The challenge cannot succeed if

8    the State's restrictions are a type of reasonable public regulation that has long been considered

9    consistent with a private right to bear arms. *Cf. id.* at 626-627.

10        "No fundamental right—not even the First Amendment—is absolute." *McDonald*, 561

11   U.S. at 802 (Scalia, J., concurring).  Just as the First Amendment does not confer a right to speak

12   in any time, place or manner, history and precedent teach that the Second Amendment does not

13   confer the right to carry guns anywhere or at any time.  See *Heller*, 554 U.S. at 595.  California's

14   laws regulating the public carrying of firearms strike a permissible balance between preserving

15   order and public safety and accommodating the desire of some residents to carry guns.  There are

16   consistent with traditional restrictions on public carry, and are presumptively lawful on that basis.

17        Where text, history, and tradition show that a challenged law is consistent with the Second

18   Amendment, the restriction "'passes constitutional muster'" and the court's inquiry "'is

19   complete.'" *Teixeira*, 873 F.3d at 682; see *Heller*, 554 U.S. at 626, 627 n.26.

20        California broadly allows the carrying of firearms in places and circumstances where it has

21   traditionally been common: in or immediately around an individual's home or place of business

22   and on much other private property with permission; in less-populated areas and during activities

23   such as hunting; and in circumstances of immediate and grave danger to person or property when

24   law enforcement is not available.  It also allows qualified individuals to obtain licenses to carry

25   more generally, if they can establish "good cause" under standards set by local officials who are

26   most familiar with the needs and desires of their own communities.

27        However, there is an "historical prevalence" of public carry restrictions similar to those in

28   California. *Kachalsky*, 701 F.3d at 96.  Because "[f]irearms have always been more heavily

1    regulated in the public sphere," the right to bear arms "most certainly operates in a different

2    manner" in that context than when evaluating restrictions that impinge directly on the core right

3    to keep and carry guns in the home.  *Drake*, 724 F.3d at 430 n.5.

4         This makes good functional sense.  When individuals move outside their homes—and

5    particularly when they move about in populated areas —their interest in carrying a firearm is

6    much more likely to come into conflict with the public interest in order and safety.  *See, e.g.,*

7    *Gould*, 907 F.3d at 672.  The "inherent" risk that firearms present when carried in public

8    "distinguishes the Second Amendment right from other fundamental rights . . . such as the right to

9    marry and the right to be free from viewpoint discrimination, which can be exercised without

10   creating a direct risk to others.  *Bonidy*, 790 F.3d at 1126.  And as the Fourth Circuit observed, it

11   "is not far-fetched to think" that Heller's focus on the "core" right to protect the home was born

12   out of a recognition that the danger of "tragic act[s]" of violence "would rise exponentially as one

13   moved the right from the home to the public square."  *Masciandaro*, 638 F.3d at 475-476.

14        There is a legitimate role for public regulation touching on even our most fundamental

15   rights—especially when there is or can be genuine tension between the exercise of individual

16   rights and the safety of members of the public and law enforcement officers.

17        When, as here, a court will review a challenged statute under intermediate scrutiny, courts

18   ask whether the law promotes a "significant, substantial, or important government objective," and

19   whether there is a "'reasonable fit' between the challenged law and the asserted objective."  *Peña*,

20   898 F.3d at 979.  While the State must show that the law "promotes a substantial government

21   interest that would be achieved less effectively absent the regulation," it need not demonstrate

22   that the regulation is the "least restrictive means of achieving the government interest."  *Id.*

23   (citations and quotation marks omitted).  A court's only obligation is to "assure that, in

24   formulating its judgments, [the State] has drawn reasonable inferences based on substantial

25   evidence,'" an inquiry that must accord "'substantial deference to the predictive judgments'" of

26   the legislature.  *Id.* at 979-980 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195

27   (1997)).

28

1    The need for appropriate deference to legislative predications is especially clear in the

2    Second Amendment context.  "Providing for the safety of citizens within their borders has long

3    been state government's most basic task." *Kolbe*, 849 F.3d at 150.  State legislatures are "'far

4    better equipped than the judiciary' to make sensitive public policy judgments (within

5    constitutional limits) concerning the dangers in carrying firearms and the manner to combat those

6    risks." *Kachalsky*, 701 F.3d at 97.  And, while a legislature's judgments can be based on

7    empirical evidence, they need not be; "history, consensus, and 'simple common sense'" will

8    suffice.  *Went for It, Inc.*, 515 U.S. at 628.

9        California has a compelling interest in protecting public safety and reducing gun violence.

10   *Jackson*, 746 F.3d at 965.  An increase in guns carried by private persons in public places

11   increases the risk that "'basic confrontations between individuals [will] turn deadly.'"  *Wollard*,

12   712 F.3d at 879.  Similarly, misfired shots or accidental discharges are "more likely to hit a

13   bystander where there are more bystanders to hit."  Blocher, *Firearm Localism*, 123 Yale L.J. 82,

14   122-123 (2013).  The Legislature could also conclude that widespread public carry increases the

15   "availability of handguns to criminals via theft," *Woollard*, 712 F.3d at 879, and that such guns

16   would then be used to "commit violent crimes" or be transferred to "others who commit crimes,"

17   U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *2012 Summary:*

18   *Firearms Reported Lost and Stolen* 2 (2013).

19       The absence of a prohibition on openly carrying unloaded firearms has created a surge in

20   individuals openly carrying unloaded firearms in public.  These incidents adversely affect public

21   safety in several ways.  Members of the public who encounter individuals openly carrying

22   firearms are alarmed and fearful for their safety and the safety of others.  When members of the

23   public report such incidents to local law enforcement, they are only able to provide law

24   enforcement personnel with incomplete information.  As a result, law enforcement agencies

25   respond to such incidents with limited information regarding whether the individual openly

26   carrying the firearm is a danger to himself or herself; a danger to the public; or a danger to the

27   responding law enforcement personnel.

28

1    In such situations, a wrong move by the individual carrying the firearm could be construed

2    as threatening by the responding law enforcement officer.  The officer may feel compelled to

3    respond in a manner that could result in injury or death.  Thus, the practice of openly carrying

4    unloaded firearms can create an unsafe environment for everyone involved: the individual

5    carrying the firearm, the responding law enforcement personnel, and all other individuals who

6    may be nearby.

7    In addition, responding to incidents involving individuals openly carrying unloaded

8    firearms taxes the resources of law enforcement agencies already stretched by under-staffing and

9    budget cutbacks.  Such a diversion of resources adversely affects law enforcement agencies'

10   ability to provide other public safety services to their communities.  *See e.g.*, *Woollard*, 712 F.3d

11   at 879-880 (recounting similar policing benefits).

12   According to the legislative history of California Penal Code § 26400, one of the purposes

13   of the bill (A.B. 1527) was to follow up A.B. 144 (Statutes of 2011), which made public open

14   carry of handguns a misdemeanor, by expanding the prohibition to long-guns in incorporated

15   cities.  "The absence of a prohibition on 'open carry' of long guns has created an increase in

16   problematic instances of these guns carried in public, alarming unsuspecting individuals causing

17   issues for law enforcement.  Open carry creates a potentially dangerous situation.  In most cases

18   when a person is openly carrying a firearm, law enforcement is called to the scene with few

19   details other than one or more people are present at a location and are armed." (See DOJ 001050)

20   "In these tense situations, the slightest wrong move by the gun-carrier could be construed as

21   threatening by the responding officer, who may feel compelled to respond in a manner that could

22   be lethal.  In this situation the practice of 'open carry' creates an unsafe environment for all

23   parties involved; the officer, the gun-carrying individual, and for any other individuals nearby as

24   well." (See DOJ 001050)

25   "Additionally, the increase in 'open-carry' calls placed to law enforcement has taxed

26   departments dealing with under-staffing and cutbacks due to the current fiscal climate in

27   California, preventing them from protecting the public in other ways." (See DOJ 001051)

28

1    Here, the Legislature enacted certain exceptions to the general prohibitions on openly

2    carrying firearms.

3        Penal Code § 26375 provides that section 26350 does not apply to, or affect, the open

4    carrying of an unloaded handgun by an authorized participant in, or an authorized employee or

5    agent of a supplier of firearms for, a motion picture, television or video production, or

6    entertainment event, when the participant lawfully uses the handgun as part of that production or

7    event, as part of rehearsing or practicing for participation in that production or event, or while the

8    participant or authorized employee or agent is at that production or event, or rehearsal or practice

9    for that production or event. (Pen. Code, § 26375.)  According to the Legislative history, Penal

10   Code § 26375 permits the use of unloaded handguns as an "entertainment props."  (See DOJ

11   000219)

12       Likewise, Penal Code § 26405, subdivision (r) provides that Penal Code § 26400 does not

13   apply to, or affect, the carrying of an unloaded firearm that is not a handgun by an authorized

14   participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture,

15   television, or video production or entertainment event, when the participant lawfully uses that

16   firearm as part of that production or event, as part of rehearsing or practicing for participation in

17   that production or event, or while the participant or authorized employee or agent is at that

18   production or event, or rehearsal or practice for that production or event.

19       And, Penal Code § 29500 provides that, "Any person who is at least 21 years of age may

20   apply for an entertainment firearms permit from the Department of Justice.  An entertainment

21   firearms permit authorizes the permit holder to possess firearms loaned to the permitholder for

22   use solely as a prop in a motion picture, television, video, theatrical, or other entertainment

23   production or event."  (Added by Stats.2010, c. 711 (S.B. 1080).)

24       **INTERROGATORY NO. 6**:  Identify all documents bearing upon, supporting, or

25   reflecting the reasons set forth in Your response to the preceding interrogatory.

26       **RESPONSE TO INTERROGATORY NO. 6**:

27       Defendant Becerra incorporates by reference the above-stated general objections as though

28   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

1   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

2   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

3   that is relevant to Plaintiff's claims.

4        Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

5   follows:  See DOJ 000127-DOJ 000411; DOJ 000749-DOJ 000926; DOJ 0001282-DOJ 001312.

6        **INTERROGATORY NO. 7**:  State all factors that You contend were considered by the

7   Legislature of the State of California in determining whether or not to exempt the use of firearms

8   in other forms of expressive activity from the statutes prohibiting the carrying of firearms in

9   public.

10        **RESPONSE TO INTERROGATORY NO. 7**:

11       Defendant Becerra incorporates by reference the above-stated general objections as though

12   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

13   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

14   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

15   that is relevant to Plaintiff's claims.

16        Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

17   follows:  Defendant Becerra has not made the contention described in this interrogatory.

18        **INTERROGATORY NO. 8**:  State all reasons for distinguishing between "motion picture,

19   television or video production, or entertainment event[s ]" and other forms of speech or

20   expressive conduct in California Penal Code §§ 26375 and 26405(r).

21        **RESPONSE TO INTERROGATORY NO. 8**:

22       Defendant Becerra incorporates by reference the above-stated general objections as though

23   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

24   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

25   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

26   that is relevant to Plaintiff's claims.

27        Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

28   follows:  The interrogatory call for Defendant Becerra to speculate regarding whether the

1  Legislature considered including other forms of "speech or expressive conduct" in enacting Penal

2  Code §§ 26375 and 26405, subdivision (r).  Thus, Defendant Becerra is unable to respond to this

3  interrogatory.

4  **INTERROGATORY NO. 9**:  Identify all documents bearing upon, supporting, or

5  reflecting the reasons set forth in Your response to the preceding interrogatory.

6  **RESPONSE TO INTERROGATORY NO. 9**:

7  Defendant Becerra incorporates by reference the above-stated general objections as though

8  fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

9  vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

10  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

11  that is relevant to Plaintiff's claims.

12  Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

13  follows: N/A.

14  **INTERROGATORY NO. 10**:  Does the phrase "authorized participant" as used in

15  California Penal Code §§ 26375 and 26405(r) refer to a participant authorized by a governmental

16  body or agency?

17  **INITIAL RESPONSE TO INTERROGATORY NO. 10**:

18  Defendant Becerra incorporates by reference the above-stated general objections as though

19  fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

20  vague and overbroad.  Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and

21  not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's

22  claims.

23  Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

24  follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

25  "authorized participant."

26  However, according to the Legislative history of Penal Code § 26375, that section permits

27  the use of unloaded handguns as an "entertainment props."  (See DOJ 000219)  Additionally, the

28  Entertainment Firearms Permit only authorizes the permit holder "to possess firearms loaned to

24

1   the permitholder for use solely as a prop in a motion picture, television, video, theatrical, or other

2   entertainment production or event."  (Penal Code § 29500.)  Thus, the exceptions set forth in

3   Penal Code §§ 26375 and 26405, subdivision (r) are available only to those using unloaded

4   firearms loaned to them for use as "entertainment props" in a motion picture, television, video,

5   theatrical, or other entertainment production or event.

6   **AMENDED** **RESPONSE TO INTERROGATORY NO. 10:**

7   Defendant Becerra incorporates by reference the above-stated general objections as though

8   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

9   vague and overbroad.  Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and

10   not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's

11   claims.

12   Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

13   follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

14   "authorized participant."  Defendant Becerra has never issued a formal opinion under California

15   law regarding the meaning of the phrase "authorized participant," and this response is not such an

16   opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

17   rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

18   Defendant Becerra played no material role in the events described in the complaint, and was not

19   involved in the denial of Plaintiff Michael Zeleny's permit application(s).

20   Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

21   context of this case, Defendant Becerra believes that most plausible reading of the term

22   "authorized participant" as used in California Penal Code §§ 26375 and 26405(r) refers to a

23   participant authorized by a governmental body or agency.

24   **INTERROGATORY NO. 11**:  If Your answer to Interrogatory No. 10 is in the

25   affirmative, identify the governmental bodies or agencies from which authorization is required?

26   **INITIAL RESPONSE TO INTERROGATORY NO. 11**:

27   Defendant Becerra incorporates by reference the above-stated general objections as though

28   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

1   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

2   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

3   that is relevant to Plaintiff's claims.

4        Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

5   follows: N/A.

6        **AMENDED** RESPONSE TO INTERROGATORY NO. 11:

7        Defendant Becerra incorporates by reference the above-stated general objections as though

8   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

9   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

10  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

11  that is relevant to Plaintiff's claims.

12       Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

13  follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

14  "authorized participant."  Defendant Becerra has never issued a formal opinion under California

15  law regarding the meaning of the phrase "authorized participant," and this response is not such an

16  opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

17  rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

18  Defendant Becerra played no material role in the events described in the complaint, and was not

19  involved in the denial of Plaintiff Michael Zeleny's permit application(s).

20       Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

21  context of this case, the Department of Justice's Entertainment Firearms Permit only authorizes

22  the permit holder "to possess firearms loaned to the permitholder for use solely as a prop in a

23  motion picture, television, video, theatrical, or other entertainment production or event."  (Penal

24  Code § 29500.)  Anyone who is not otherwise authorized to carry a weapon openly, but who

25  desires to carry a weapon openly "as a prop in a motion picture, television, video, theatrical, or

26  other entertainment production or event" would need to do so under the auspices of an

27  Entertainment Firearms Permit.

28

Defendant Xavier Becerra's Second Amended Responses to Plaintiff's First Set of Interrogatories  (3:17-cv-07357
RS)

The Attorney General understands this exception to have been carried forward into the open carry laws, as the legislative history of Penal Code § 26375 refers to the use of unloaded handguns as an "entertainment props."  (See DOJ 000219.)  Thus, the exceptions set forth in Penal Code §§ 26375 and 26405, subdivision (r) are available only to those using unloaded firearms loaned to them for use as "entertainment props" in a motion picture, television, video, theatrical, or other entertainment production or event.

While the Department of Justice "authorizes" the use of firearms in this narrow context through the issuance of Firearms Entertainment Permits, such authorization is in the nature of a defense to an open carry prosecution within the very narrow context of an entertainment prop, not a preclusion of any other regulation by other agencies.  Other law enforcement agencies would not be precluded from ensuring that an individual carrying a weapon openly had a permit, or ensuring that an identified individual is not violating any other federal, state, or local laws or ordinances.  Notably, when issuing the Firearms Entertainment Permit, the Department does not verify the nature of the entertainment event or impose any restrictions on how a weapon might be carried or used, but only looks to see if a person is prohibited from owning firearms.  In this sense, the Firearms Entertainment Permit is a floor rather than a ceiling, with possible room for other law enforcement agencies to determine, for example, that the open carry of weapons endangered public safety, or was a nuisance, or that someone's conduct was not a "production or event" covered by the relevant exception, or that someone was not violating other laws.

Also, within the structure of the open carry laws, the exception for an authorized participant appears to be analogous to similar exceptions for gun shows (Pen. Code § 26369) or target ranges (Pen. Code § 26365)—defined spaces in which the weapon being carried is not easily visible or accessible to the public.  The Attorney General understands the Firearms Entertainment Permit, and the corresponding exceptions to the open carry laws, to apply to confined, non-public spaces for a limited period of time, i.e., in a movie studio or clearly defined production area.  To the extent that an individual like Mr. Zeleny seeks to demonstrate on a public street with an unloaded firearm in an unconfined area and/or for an indefinite period of time, the Attorney General views the open carrying of unloaded weapons on a public street, in an unconfined area fully visible to

27

1  and accessible by anyone else, and not within what would reasonably be considered a defined,

2  enclosed production area, to potentially be conduct outside the scope of the Firearms

3  Entertainment Permit and the corresponding exception to the open carry laws, and potentially

4  subject to enforcement by the law enforcement agency primarily responsible for enforcing the

5  open carry laws in that area.

6  **SECOND AMENDED RESPONSE TO INTERROGATORY NO. 11:**

7  Defendant Becerra incorporates by reference the above-stated general objections as though

8  fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

9  vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

10  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

11  that is relevant to Plaintiff's claims.

12  Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

13  follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

14  "authorized participant."  Defendant Becerra has never issued a formal opinion under California

15  law regarding the meaning of the phrase "authorized participant," and this response is not such an

16  opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

17  rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

18  Defendant Becerra played no material role in the events described in the complaint, and was not

19  involved in the denial of Plaintiff Michael Zeleny's permit application(s).

20  Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

21  context of this case, Defendant Becerra believes that an "authorized participant" must be

22  operating under the auspices of a Department of Justice Entertainment Firearms Permit, which

23  authorizes the permit holder "to possess firearms loaned to the permitholder for use solely as a

24  prop in a motion picture, television, video, theatrical, or other entertainment production or event."

25  (Penal Code § 29500.)  For entertainment productions this generally has meant that a propmaster

26  or similarly qualified person is supervising the use of firearms in the production, and others

27  involved in the production may transfer or possess firearms under the auspices of the supervising

28  permit-holder.

1    **INTERROGATORY NO. 12**:  If Your answer to Interrogatory No. 10 is in the

2    affirmative, state all bases for your contention that the phrase "authorized participant," as used in

3    California Penal Code §§ 26375 and 26405(r), refers to a participant authorized by a

4    governmental body or agency?

5    **INITIAL RESPONSE TO INTERROGATORY NO. 12**:

6    Defendant Becerra incorporates by reference the above-stated general objections as though

7    fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

8    vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

9    Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

10   that is relevant to Plaintiff's claims.

11   Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

12   follows: N/A.

13   **<u>AMENDED</u> RESPONSE TO INTERROGATORY NO. 12:**

14   Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

15   "authorized participant."  Defendant Becerra has never issued a formal opinion under California

16   law regarding the meaning of the phrase "authorized participant," and this response is not such an

17   opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

18   rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

19   Defendant Becerra played no material role in the events described in the complaint, and was not

20   involved in the denial of Plaintiff Michael Zeleny's permit application(s).

21   Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

22   context of this case, Defendant Becerra believes that most plausible reading of the term

23   "authorized participant" as used in California Penal Code §§ 26375 and 26405(r) refers to a

24   participant authorized by a governmental body or agency.  The opposite reading is less plausible.

25   In the broader context of California law, and especially in the context of the Penal Code, it would

26   be anomalous for an individual to be able to exempt themselves from the reach of a penal statute

27   by "authorizing" an exception for themselves.

28

1

**SECOND AMENDED** RESPONSE TO INTERROGATORY NO. 12:

2

Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

3

"authorized participant."  Defendant Becerra has never issued a formal opinion under California

4

law regarding the meaning of the phrase "authorized participant," and this response is not such an

5

opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

6

rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

7

Defendant Becerra played no material role in the events described in the complaint, and was not

8

involved in the denial of Plaintiff Michael Zeleny's permit application(s).

9

Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

10

context of this case, Defendant Becerra believes that most plausible reading of the term

11

"authorized participant" as used in California Penal Code §§ 26375 and 26405(r) refers to a

12

participant authorized by a governmental body or agency.  This reading is based on Defendant

13

Becerra's historical understanding of the Department of Justice's Firearms Entertainment Permit,

14

which authorizes the permit holder "to possess firearms loaned to the permitholder for use solely

15

as a prop in a motion picture, television, video, theatrical, or other entertainment production or

16

event."  (Penal Code § 29500.)  The Attorney General understands this exception to have been

17

carried forward into the open carry laws, as the legislative history of Penal Code § 26375 refers to

18

the use of unloaded handguns as an "entertainment props."  (See DOJ 000219.)  Thus, the

19

exceptions set forth in Penal Code §§ 26375 and 26405, subdivision (r) are available only to those

20

using unloaded firearms loaned to them for use as "entertainment props" in a motion picture,

21

television, video, theatrical, or other entertainment production or event, and when operating under

22

the auspices of a Firearms Entertainment Permit.

23

The opposite reading is less plausible.  In the broader context of California law, and

24

especially in the context of the Penal Code, it would be anomalous for an individual to be able to

25

exempt themselves from the reach of a penal statute by "authorizing" an exception for

26

themselves.

27

**INTERROGATORY NO. 13**:  If your answer to Interrogatory No. 10 is in the negative,

28

state the persons or entities whose authorization is required in order for California Penal Code §§

26375 and 26405(r) to exempt the carrying of firearms from California Penal Code §§ 26350 and 26405.

**INITIAL RESPONSE TO INTERROGATORY NO. 13**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad.  Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: The Legislature enacted certain exceptions to the general prohibitions on openly carrying firearms.

Penal Code § 26375 provides that section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television or video production, or entertainment event, when the participant lawfully uses the handgun as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event. (Pen. Code, § 26375.)  According to the Legislative history, Penal Code § 26375 permits the use of unloaded handguns as an "entertainment props."  (See DOJ 000219)

Likewise, Penal Code § 26405, subdivision (r) provides that Penal Code § 26400 does not apply to, or affect, the carrying of an unloaded firearm that is not a handgun by an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television, or video production or entertainment event, when the participant lawfully uses that firearm as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event.

1    And, Penal Code § 29500 provides that, "Any person who is at least 21 years of age may

2    apply for an entertainment firearms permit from the Department of Justice.  An entertainment

3    firearms permit authorizes the permit holder to possess firearms loaned to the permitholder for

4    use solely as a prop in a motion picture, television, video, theatrical, or other entertainment

5    production or event."  (Added by Stats.2010, c. 711 (S.B. 1080).)

6    **AMENDED** RESPONSE TO INTERROGATORY NO. 13:

7    No amendment is needed because Defendant Becerra's answer to interrogatory 10 was not

8    in the negative.

9    **INTERROGATORY NO. 14**:  Do California Penal Codes §§ 26375 and 26405(r) require

10   that the "motion picture, television or video production" or "entertainment event" itself be

11   authorized in order to exempt participants from California Penal Code §§ 26350 and 26405?

12   **INITIAL RESPONSE TO INTERROGATORY NO. 14**:

13   Defendant Becerra incorporates by reference the above-stated general objections as though

14   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

15   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

16   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

17   that is relevant to Plaintiff's claims.

18   Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

19   follows: Penal Code §§ 26375 and 26405(r) do not address whether the "motion picture,

20   television or video production" or "entertainment event" itself be authorized in order to exempt

21   participants from California Penal Code §§ 26350 and 26405.  Accordingly, Defendant Becerra is

22   unable to respond to this interrogatory.

23   **AMENDED** RESPONSE TO INTERROGATORY NO. 14:

24   Defendant Becerra incorporates by reference the above-stated general objections as though

25   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

26   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

27   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

28   that is relevant to Plaintiff's claims.

32

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase "authorized participant." Defendant Becerra has never issued a formal opinion under California law regarding the meaning of the phrase "authorized participant," and this response is not such an opinion and cannot be relied upon as such an opinion. Nor is this response a generally applicable rule or regulation that is intended to be applied outside of the context of this case. Moreover, Defendant Becerra played no material role in the events described in the complaint, and was not involved in the denial of Plaintiff Michael Zeleny's permit application(s).

Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific context of this case, Penal Code §§ 26375 and 26405(r) do not address whether the "motion picture, television or video production" or "entertainment event" itself be "authorized" in order to exempt participants from California Penal Code §§ 26350 and 26405. The term "authorized" only clearly modifies the terms "participant," "employee" or "agent." And since Mr. Zeleny himself appears to be the "participant" possessing the weapon(s), it appears to be irrelevant if his "production" or "event" is separately authorized. As Defendant Becerra understands the facts, the question might be different if Mr. Zeleny were not the person openly carrying weapons, but were only the person responsible for a "production" or "event."

Whether or not the "motion picture, television or video production" or "entertainment event" itself must be "authorized" also appears to be a separate question from whether there exists a bona fide "production" or "event" to begin with. Again specifically in the context of this case, within the structure of the open carry laws, the relevant exception appears to be analogous to similar exceptions for gun shows (Pen. Code § 26369) or target ranges (Pen. Code § 26365)— defined spaces in which the weapon being carried is not easily visible or accessible to the public. The Attorney General understands the Firearms Entertainment Permit, and the corresponding exceptions to the open carry laws, to apply to confined, non-public spaces for a limited period of time, i.e., in a movie studio or clearly defined production area. To the extent that an individual like Mr. Zeleny seeks to demonstrate on a public street with an unloaded firearm in an unconfined area and/or for an indefinite period of time, the Attorney General views the open carrying of

33

1   unloaded weapons on a public street, in an unconfined area fully visible to and accessible by

2   anyone else, and not within what would reasonably be considered a defined, enclosed production

3   area (i.e., a production or event), to potentially be conduct outside the scope of the Firearms

4   Entertainment Permit and the corresponding exception to the open carry laws, and potentially

5   subject to enforcement by the law enforcement agency primarily responsible for enforcing the

6   open carry laws in that area.

7          While the Department of Justice "authorizes" the use of firearms in this narrow context

8   through the issuance of Firearms Entertainment Permits, such authorization is in the nature of a

9   defense to an open carry prosecution within the very narrow context of an entertainment prop, not

10  a preclusion of any other regulation by other agencies.  Other law enforcement agencies would

11  not be precluded from ensuring that an individual carrying a weapon openly had a permit, or

12  ensuring that an identified individual is not violating any other federal, state, or local laws or

13  ordinances.  Notably, when issuing the Firearms Entertainment Permit, the Department does not

14  verify the nature of the entertainment event or impose any restrictions on how a weapon might be

15  carried or used, but only looks to see if a person is prohibited from owning firearms.  In this

16  sense, the Firearms Entertainment Permit is a floor rather than a ceiling, with possible room for

17  other law enforcement agencies to determine, for example, that the open carry of weapons

18  endangered public safety, or was a nuisance, or that someone's conduct was not a "production or

19  event" covered by the relevant exception, or that someone was not violating other laws.

20         **INTERROGATORY NO. 15**:  If your response to Interrogatory No. 14 is in the

21  affirmative, identify all persons or entities whose authorization of the "motion picture, television

22  or video production" or "entertainment event" is required in order to exempt participants from

23  California Penal Code §§ 26350 and 26405.

24         **INITIAL RESPONSE TO INTERROGATORY NO. 15**:

25         Defendant Becerra incorporates by reference the above-stated general objections as though

26  fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

27  vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

28

1    Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

2    that is relevant to Plaintiff's claims.

3        Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

4    follows: N/A.

5        **AMENDED** RESPONSE TO INTERROGATORY NO. 15:

6        Defendant Becerra's answer to interrogatory 14 was not in the affirmative.

7        **INTERROGATORY NO. 16**:  State all of the bases for Your response to Interrogatory

8    No. 14.

9        **INITIAL RESPONSE TO INTERROGATORY NO. 16**:

10       Defendant Becerra incorporates by reference the above-stated general objections as though

11   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

12   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

13   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

14   that is relevant to Plaintiff's claims.

15       Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

16   follows: N/A.

17       **AMENDED** RESPONSE TO INTERROGATORY NO. 16:

18       Defendant Becerra has never issued a formal opinion under California law regarding the

19   meaning of the phrase "authorized participant," and this response is not such an opinion and

20   cannot be relied upon as such an opinion.  Nor is this response a generally applicable rule or

21   regulation that is intended to be applied outside of the context of this case.  Moreover, Defendant

22   Becerra played no material role in the events described in the complaint, and was not involved in

23   the denial of Plaintiff Michael Zeleny's permit application(s).

24       Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

25   context of this case, Penal Code §§ 26375 and 26405(r) do not address whether the "motion

26   picture, television or video production" or "entertainment event" itself be "authorized" in order to

27   exempt participants from California Penal Code §§ 26350 and 26405.  The term "authorized"

28   only clearly modifies the terms "participant," "employee" or "agent."  And since Mr. Zeleny

1  himself appears to be the "participant" possessing the weapon(s), it appears to be irrelevant if his

2  "production" or "event" is separately authorized.  As Defendant Becerra understands the facts, the

3  question might be different if Mr. Zeleny were not the person openly carrying weapons, but were

4  only the person responsible for a "production" or "event."

5      Whether or not the "motion picture, television or video production" or "entertainment

6  event" itself must be "authorized" also appears to be a separate question from whether there exists

7  a bona fide "production" or "event" to begin with.  Again specifically in the context of this case,

8  within the structure of the open carry laws, the relevant exception appears to be analogous to

9  similar exceptions for gun shows (Pen. Code § 26369) or target ranges (Pen. Code § 26365)—

10 defined spaces in which the weapon being carried is not easily visible or accessible to the public.

11 The Attorney General understands the Firearms Entertainment Permit, and the corresponding

12 exceptions to the open carry laws, to apply to confined, non-public spaces for a limited period of

13 time, i.e., in a movie studio or clearly defined production area.  To the extent that an individual

14 like Mr. Zeleny seeks to demonstrate on a public street with an unloaded firearm in an unconfined

15 area and/or for an indefinite period of time, the Attorney General views the open carrying of

16 unloaded weapons on a public street, in an unconfined area fully visible to and accessible by

17 anyone else, and not within what would reasonably be considered a defined, enclosed production

18 area (i.e., a production or event), to potentially be conduct outside the scope of the Firearms

19 Entertainment Permit and the corresponding exception to the open carry laws, and potentially

20 subject to enforcement by the law enforcement agency primarily responsible for enforcing the

21 open carry laws in that area.

22      This conclusion is consistent with the legislative history of the open carry statutes.  The

23 absence of a prohibition on openly carrying unloaded firearms has created a surge in individuals

24 openly carrying unloaded firearms in public.  These incidents adversely affect public safety in

25 several ways.  Members of the public who encounter individuals openly carrying firearms are

26 alarmed and fearful for their safety and the safety of others.  When members of the public report

27 such incidents to local law enforcement, they are only able to provide law enforcement personnel

28 with incomplete information.  As a result, law enforcement agencies respond to such incidents

1  with limited information regarding whether the individual openly carrying the firearm is a danger

2  to himself or herself; a danger to the public; or a danger to the responding law enforcement

3  personnel.

4      In such situations, a wrong move by the individual carrying the firearm could be construed

5  as threatening by the responding law enforcement officer.  The officer may feel compelled to

6  respond in a manner that could result in injury or death.  Thus, the practice of openly carrying

7  unloaded firearms can create an unsafe environment for everyone involved: the individual

8  carrying the firearm, the responding law enforcement personnel, and all other individuals who

9  may be nearby.

10      In addition, responding to incidents involving individuals openly carrying unloaded

11  firearms taxes the resources of law enforcement agencies already stretched by under-staffing and

12  budget cutbacks.  Such a diversion of resources adversely affects law enforcement agencies'

13  ability to provide other public safety services to their communities.  *See e.g.*, *Woollard*, 712 F.3d

14  at 879-880 (recounting similar policing benefits).

15      According to the legislative history of California Penal Code § 26400, one of the purposes

16  of the bill (A.B. 1527) was to follow up A.B. 144 (Statutes of 2011), which made public open

17  carry of handguns a misdemeanor, by expanding the prohibition to long-guns in incorporated

18  cities.  "The absence of a prohibition on 'open carry' of long guns has created an increase in

19  problematic instances of these guns carried in public, alarming unsuspecting individuals causing

20  issues for law enforcement.  Open carry creates a potentially dangerous situation.  In most cases

21  when a person is openly carrying a firearm, law enforcement is called to the scene with few

22  details other than one or more people are present at a location and are armed." (See DOJ 001050)

23  "In these tense situations, the slightest wrong move by the gun-carrier could be construed as

24  threatening by the responding officer, who may feel compelled to respond in a manner that could

25  be lethal.  In this situation the practice of 'open carry' creates an unsafe environment for all

26  parties involved; the officer, the gun-carrying individual, and for any other individuals nearby as

27  well."  (See DOJ 001050)

28

37

Case 3:17-cv-07357-RS   Document 163-1   Filed 01/21/21   Page 42 of 100

1   "Additionally, the increase in 'open-carry' calls placed to law enforcement has taxed

2   departments dealing with under-staffing and cutbacks due to the current fiscal climate in

3   California, preventing them from protecting the public in other ways."  (See DOJ 001051)

4   The opposite legal interpretation is less plausible.  If anyone could create a "motion picture,

5   television or video production" or "entertainment event" merely by filming themselves in a public

6   place (using an object as small as a cell phone), with no meaningful limitation on the visibility or

7   timing of the firearms display, such an exception would swallow the general prohibition on open

8   carrying of weapons and be inconsistent with the California Legislature's intent to minimize

9   potentially dangerous interactions in public.

10   **INTERROGATORY NO. 17**:  State all facts supporting your interpretation of California

11   Penal Code §§ 26375 and 26405(r).

12   **RESPONSE TO INTERROGATORY NO. 17**:

13   Defendant Becerra incorporates by reference the above-stated general objections as though

14   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

15   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

16   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

17   that is relevant to Plaintiff's claims.

18   Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

19   follows:  Defendant Becerra has not issued an interpretation of California Penal Code §§ 26375

20   and 26405, subdivision (r).  However, the California Department of Justice does possess

21   documents that are related to firearms generally.  See and DOJ 0001282-DOJ 001312.

22   **INTERROGATORY NO. 18**:  Describe in detail all means through which your

23   interpretation of California Penal Code §§ 26375 and 26405(r) has been relayed to municipalities

24   and local governments.

25   **RESPONSE TO INTERROGATORY NO. 18**:

26   Defendant Becerra incorporates by reference the above-stated general objections as though

27   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

28   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

1    Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

2    that is relevant to Plaintiff's claims.

3         Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

4    follows:  Defendant Becerra has not issued an interpretation of California Penal Code §§ 26375

5    and 26405(r).  However, the California Department of Justice does possess documents that are

6    related to firearms generally.  See and DOJ 0001282-DOJ 001312.

7         **INTERROGATORY NO. 19**:  Identify all documents reflecting your interpretation of

8    California Penal Code §§ 26375 and 26405(r).

9         **RESPONSE TO INTERROGATORY NO. 19**:

10   Defendant Becerra incorporates by reference the above-stated general objections as though

11   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

12   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

13   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

14   that is relevant to Plaintiff's claims.

15        Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

16   follows:  Defendant Becerra has not issued an interpretation of California Penal Code §§ 26375

17   and 26405(r).  Thus, Defendant Becerra is not aware of any documents that would be responsive

18   to this request.  However, the California Department of Justice does possess documents that are

19   related to firearms generally.  See and DOJ 0001282-DOJ 001312.

20        **INTERROGATORY NO. 20**:  Identify all documents reflecting that you have conveyed

21   your interpretation of California Penal Code §§ 26375 and 26405(r).

22        **RESPONSE TO INTERROGATORY NO. 20**:

23   Defendant Becerra incorporates by reference the above-stated general objections as though

24   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

25   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

26   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

27   that is relevant to Plaintiff's claims.

28

1    Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

2  follows:  Defendant Becerra has not issued an interpretation of California Penal Code §§ 26375

3  and 26405(r).  Thus, Defendant Becerra is not aware of any documents that would be responsive

4  to this request.  However, the California Department of Justice does possess documents that are

5  related to firearms generally.  See and DOJ 0001282-DOJ 001312.

6    **INTERROGATORY NO. 21**:  Identify the types of events that qualify as "entertainment

7  events" under California Penal Code §§ 26375, 26405(r), and 25510.

8    **RESPONSE TO INTERROGATORY NO. 21**:

9    Defendant Becerra incorporates by reference the above-stated general objections as though

10  fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

11  vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

12  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

13  that is relevant to Plaintiff's claims.

14    Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

15  follows:  Defendant Becerra has not issued an interpretation of the types of events that would

16  qualify as "entertainment events" under California Penal Code §§ 26375, 26405, subdivision (r),

17  and 25510.  Thus, Defendant Becerra is not aware of any documents that would be responsive to

18  this request.  However, the California Department of Justice does possess documents that are

19  related to firearms generally.  See and DOJ 0001282-DOJ 001312.

20

21  / / /

22

23  / / /

24

25  / / /

26

27  / / /

28

1 | Dated:  October 23, 2020

Respectfully submitted,

2

XAVIER BECERRA
Attorney General of California
3
ANTHONY R. HAKL
Supervising Deputy Attorney General
4

5
/s/ John W. Killeen
JOHN W. KILLEEN
6
Deputy Attorney General
*Attorneys for Defendant Attorney General*
7
*Xavier Becerra*

8

9

10

11

12

13

14

15

16

17

18

19

20 | SA2018100198
34524433.docx
21

22

23

24

25

26

27

28

Defendant Xavier Becerra's Second Amended Responses to Plaintiff's First Set of Interrogatories  (3:17-cv-07357
RS)

Exhibit 2

1   XAVIER BECERRA
    Attorney General of California
2   ANTHONY R. HAKL
    Supervising Deputy Attorney General
3   NOREEN P. SKELLY
    Deputy Attorney General
4   JOHN W. KILLEEN
    Deputy Attorney General
5   State Bar No. 258395
      1300 I Street, Suite 125
6     P.O. Box 944255
      Sacramento, CA 94244-2550
7     Telephone: (916) 210-6045
      Fax: (916) 324-8835
8     E-mail: John.Killeen@doj.ca.gov
    *Attorneys for Defendant Attorney General Xavier*
9   *Becerra*

10                      IN THE UNITED STATES DISTRICT COURT

11                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                            SAN FRANCISCO DIVISION

13

14

15  **MICHAEL ZELENY, an individual,**          3:17-cv-07357 RS

16                              Plaintiff,      **DEFENDANT ATTORNEY GENERAL
                                                XAVIER BECERRA'S SECOND**
17       v.                                     **AMENDED RESPONSES TO
                                                PLAINTIFF MICHAEL ZELENY'S**
18  **GAVIN NEWSOM, an individual, in his**     **INTERROGATORIES, SET TWO**
    **official capacity; XAVIER BECERRA, an**
19  **individual, in his official capacity; CITY OF**
    **MENLO PARK, a municipal corporation;**
20  **and DAVE BERTINI, in his official**
    **capacity,**
21

22                              Defendants.

23

24          PROPOUNDING PARTY:      Plaintiff Michael Zeleny

25          ANSWERING PARTY:        Defendant Attorney General Xavier Becerra

26          SET NUMBER:             Two

27

28
                                        1

**PRELIMINARY STATEMENT**

Defendant Becerra objects to each interrogatory to the extent that it purports to impose any obligation or requirement greater than or different to the obligations or requirements set forth in the Federal Rules of Civil Procedure and/or the applicable rules and orders of this Court.

Defendant Becerra objects to each interrogatory to the extent that it calls for the disclosure of information protected from disclosure by the attorney work-product doctrine, the attorney-client privilege, the deliberative process privilege and/or any other applicable privilege or protection.  Should Defendant Becerra disclose any privileged or otherwise protected information in these responses, the disclosure is inadvertent and does not constitute a waiver of the privilege or protection.

Defendant Becerra objects to each interrogatory to the extent that it calls for him to interpret what the Legislature intended when it drafted any of the statutory provisions at issue in this case.

Defendant Becerra has not completed the investigation of the facts and issues relating to Plaintiff Zeleny's claims and has not completed discovery in this action.  All of the answers contained herein are based solely upon information and documents which are presently available to, and specifically known by, Defendant Becerra, and the answers disclose only those contentions which presently occur to Defendant Becerra.  Further discovery, independent investigation, legal research and analysis may supply additional facts and may lead to additions, changes, and variations from the answers herein.

The following answers are given without prejudice to the right to produce evidence and/or witnesses or rely on facts which Defendant Becerra may later discover.  Defendant Becerra accordingly reserves the right to change any and all answers herein as additional facts are ascertained, witnesses identified and legal research is completed.  The answers contained herein are made in good faith in an attempt to supply as much factual information and as much specification of legal contention as is presently known, and in no way prejudices Defendant Becerra in relation to further discovery and proceedings.

2

1   Defendant Becerra incorporates by reference every general objection set forth above into

2   each specific answer set forth below.  A specific response may repeat a general objection for

3   emphasis or some other reason.  The failure to include a general objection in any specific answer

4   does not waive any general objection to that interrogatory.

5   **INTERROGATORY NO. 22**:  Is an individual who has a valid "entertainment firearms

6   permit" issued pursuant to Penal Code § 29500 an "authorized participant" within the meaning of

7   Penal Code §§ 26375 and 26405(r)?

8   **INITIAL RESPONSE TO INTERROGATORY NO. 22**:

9   Defendant Becerra incorporates by reference the above-stated general objections as though

10   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it poses

11   a question of pure law.  Defendant Becerra is not required to respond to interrogatories raising

12   questions of pure law.  See *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC),

13   2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories directed to issues of 'pure

14   law'—i.e., abstract legal issues not dependent on the facts of the case are not permitted") (citation

15   and some internal punctuation omitted).  Defendant Becerra also objects to this interrogatory

16   because it calls for him to interpret what the Legislature intended when it drafted any of the

17   statutory provisions at issue in this case.

18   Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

19   follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

20   "authorized participant."  Thus, what the Legislature intended by that phrase is a question of

21   statutory interpretation.

22   However, according to the Legislative history of Penal Code § 26375, that section permits

23   the use of unloaded handguns as an "entertainment props."  (See DOJ 000219)  Additionally, the

24   Entertainment Firearms Permit authorizes the permit holder "to possess firearms loaned to the

25   permitholder for use solely as a prop in a motion picture, television, video, theatrical, or other

26   entertainment production or event."  (Penal Code § 29500.)  Thus, it is possible to infer that the

27   Legislature intended the exceptions set forth in Penal Code §§ 26375 and 26405, subdivision (r)

28   to be available only to those using unloaded firearms loaned to them for use as "entertainment

3

1  props" in a motion picture, television, video, theatrical, or other entertainment production or

2  event.

3  **AMENDED RESPONSE TO INTERROGATORY 22:**

4  Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

5  "authorized participant."  Defendant Becerra has never issued a formal opinion under California

6  law regarding the meaning of the phrase "authorized participant," and this response is not such an

7  opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

8  rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

9  Defendant Becerra played no material role in the events described in the complaint, and was not

10  involved in the denial of Plaintiff Michael Zeleny's permit application(s).

11  Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

12  context of this case, an individual who has a valid "entertainment firearms permit" issued

13  pursuant to Penal Code § 29500 could be an "authorized participant" within the meaning of Penal

14  Code §§ 26375 and 26405(r) for the very narrow purpose of having a defense against a

15  prosecution of open carry laws, if that individual were using the weapon as a prop in a motion

16  picture, television, video, theatrical, or other entertainment production or event.  However, that

17  individual would not be immune from other regulation of their activities.

18  **SECOND AMENDED RESPONSE TO INTERROGATORY NO. 22:**

19  Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

20  "authorized participant."  Defendant Becerra has never issued a formal opinion under California

21  law regarding the meaning of the phrase "authorized participant," and this response is not such an

22  opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

23  rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

24  Defendant Becerra played no material role in the events described in the complaint, and was not

25  involved in the denial of Plaintiff Michael Zeleny's permit application(s).

26  Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

27  context of this case, an individual who has a valid "entertainment firearms permit" issued

28  pursuant to Penal Code § 29500 would be an "authorized participant" within the meaning of

4

Penal Code §§ 26375 and 26405(r) for the narrow purpose of having a defense against a prosecution of open carry laws, if that individual were using the weapon as a prop in a motion picture, television, video, theatrical, or other entertainment production or event.  However, that individual would not be immune from other regulation of their activities.

**INTERROGATORY NO. 23**:  State all facts supporting your response to the preceding interrogatory.

**INITIAL RESPONSE TO INTERROGATORY NO. 23**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it poses a question of pure law.  Defendant Becerra is not required to respond to interrogatories raising questions of pure law.  See *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the facts of the case are not permitted") (citation and some internal punctuation omitted).  Defendant Becerra also objects to this interrogatory because it calls for him to interpret what the Legislature intended when it drafted any of the statutory provisions at issue in this case.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase "authorized participant."  Thus, what the Legislature intended by that phrase is a question of statutory interpretation.

However, according to the Legislative history of Penal Code § 26375, that section permits the use of unloaded handguns as an "entertainment props."  (See DOJ 000219)  Additionally, the Entertainment Firearms Permit authorizes the permit holder "to possess firearms loaned to the permitholder for use solely as a prop in a motion picture, television, video, theatrical, or other entertainment production or event."  (Penal Code § 29500.)  Thus, it is possible to infer that the Legislature intended the exceptions set forth in Penal Code §§ 26375 and 26405, subdivision (r) to be available only to those using unloaded firearms loaned to them for use as "entertainment

1  props" in a motion picture, television, video, theatrical, or other entertainment production or

2  event.

3  **<u>AMENDED</u> RESPONSE TO INTERROGATORY 23:**

4  Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

5  "authorized participant."  Defendant Becerra has never issued a formal opinion under California

6  law regarding the meaning of the phrase "authorized participant," and this response is not such an

7  opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

8  rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

9  Defendant Becerra played no material role in the events described in the complaint, and was not

10  involved in the denial of Plaintiff Michael Zeleny's permit application(s).

11  Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

12  context of this case, the Department of Justice's Entertainment Firearms Permit only authorizes

13  the permit holder "to possess firearms loaned to the permitholder for use solely as a prop in a

14  motion picture, television, video, theatrical, or other entertainment production or event." (Penal

15  Code § 29500.)  Anyone who is not otherwise authorized to carry a weapon openly, but who

16  desires to carry a weapon openly "as a prop in a motion picture, television, video, theatrical, or

17  other entertainment production or event" would need to do so under the auspices of an

18  Entertainment Firearms Permit.

19  The Attorney General understands this exception to have been carried forward into the open

20  carry laws, as the legislative history of Penal Code § 26375 refers to the use of unloaded

21  handguns as an "entertainment props."  (See DOJ 000219.)  Thus, the exceptions set forth in

22  Penal Code §§ 26375 and 26405, subdivision (r) are available only to those using unloaded

23  firearms loaned to them for use as "entertainment props" in a motion picture, television, video,

24  theatrical, or other entertainment production or event.

25  While the Department of Justice "authorizes" the use of firearms in this narrow context

26  through the issuance of Firearms Entertainment Permits, such authorization is in the nature of a

27  defense to an open carry prosecution within the very narrow context of an entertainment prop, not

28  a preclusion of any other regulation by other agencies.  Other law enforcement agencies would

1   not be precluded from ensuring that an individual carrying a weapon openly had a permit, or

2   ensuring that an identified individual is not violating any other federal, state, or local laws or

3   ordinances.  Notably, when issuing the Firearms Entertainment Permit, the Department does not

4   verify the nature of the entertainment event or impose any restrictions on how a weapon might be

5   carried or used, but only looks to see if a person is prohibited from owning firearms.  In this

6   sense, the Firearms Entertainment Permit is a floor rather than a ceiling, with possible room for

7   other law enforcement agencies to determine, for example, that the open carry of weapons

8   endangered public safety, or was a nuisance, or that someone's conduct was not a "production or

9   event" covered by the relevant exception, or that someone was not violating other laws.

10         Also, within the structure of the open carry laws, the exception for an authorized participant

11  appears to be analogous to similar exceptions for gun shows (Pen. Code § 26369) or target ranges

12  (Pen. Code § 26365)—defined spaces in which the weapon being carried is not easily visible or

13  accessible to the public.  The Attorney General understands the Firearms Entertainment Permit,

14  and the corresponding exceptions to the open carry laws, to apply to confined, non-public spaces

15  for a limited period of time, i.e., in a movie studio or clearly defined production area.  To the

16  extent that an individual like Mr. Zeleny seeks to demonstrate on a public street with an unloaded

17  firearm in an unconfined area and/or for an indefinite period of time, the Attorney General views

18  the open carrying of unloaded weapons on a public street, in an unconfined area fully visible to

19  and accessible by anyone else, and not within what would reasonably be considered a defined,

20  enclosed production area, to potentially be conduct outside the scope of the Firearms

21  Entertainment Permit and the corresponding exception to the open carry laws, and potentially

22  subject to enforcement by the law enforcement agency primarily responsible for enforcing the

23  open carry laws in that area.

24  **SECOND AMENDED RESPONSE TO INTERROGATORY NO. 23:**

25         Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

26  "authorized participant."  Defendant Becerra has never issued a formal opinion under California

27  law regarding the meaning of the phrase "authorized participant," and this response is not such an

28  opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

7

1  rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

2  Defendant Becerra played no material role in the events described in the complaint, and was not

3  involved in the denial of Plaintiff Michael Zeleny's permit application(s).

4       Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

5  context of this case, the Department of Justice's Entertainment Firearms Permit only authorizes

6  the permit holder "to possess firearms loaned to the permitholder for use solely as a prop in a

7  motion picture, television, video, theatrical, or other entertainment production or event."  (Penal

8  Code § 29500.)  Anyone who is not otherwise authorized to carry a weapon openly, but who

9  desires to carry a weapon openly "as a prop in a motion picture, television, video, theatrical, or

10 other entertainment production or event" would need to do so under the auspices of an

11 Entertainment Firearms Permit.  For entertainment productions this generally has meant that a

12 propmaster or similarly qualified person is supervising the use of firearms in the production, and

13 others involved in the production may transfer or possess firearms under the auspices of the

14 supervising permit-holder.

15      The Attorney General understands this exception to have been carried forward into the open

16 carry laws, as the legislative history of Penal Code § 26375 refers to the use of unloaded

17 handguns as an "entertainment props."  (See DOJ 000219.)  Thus, the exceptions set forth in

18 Penal Code §§ 26375 and 26405, subdivision (r) are available only to those using unloaded

19 firearms loaned to them for use as "entertainment props" in a motion picture, television, video,

20 theatrical, or other entertainment production or event, and when operating under the auspices of a

21 Firearms Entertainment Permit.

22 **INTERROGATORY NO. 24**:  State all facts supporting your contention that the definition of

23 "authorized participant" under Penal Code §§ 26375 and 26405(r) refers to a person with an

24 "entertainment firearms permit" issued pursuant to Penal Code § 29500.

25      **INITIAL RESPONSE TO INTERROGATORY NO. 24**:

26      Defendant Becerra incorporates by reference the above-stated general objections as though

27 fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it poses

28 a question of pure law.  Defendant Becerra is not required to respond to interrogatories raising

8

questions of pure law.  See *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the facts of the case are not permitted") (citation and some internal punctuation omitted).

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows:  Defendant Becerra has not made this contention.  What the Legislature intended when it used the phrase "authorized participant" is a question of statutory interpretation.

**AMENDED RESPONSE TO INTERROGATORY 24:**

Becerra has not made this contention.  However, to the extent that he had, in response to interrogatory 23, Becerra has explained his understanding of the statute in the context of this particular case.

**SECOND AMENDED RESPONSE TO INTERROGATORY NO. 24:**

To the extent that Defendant Becerra has made the contention "that the definition of 'authorized participant' under Penal Code §§ 26375 and 26405(r) refers to a person with an 'entertainment firearms permit' issued pursuant to Penal Code § 29500, in response to interrogatory 23, Becerra has explained his understanding of the statute in the context of this particular case.

**INTERROGATORY NO. 25**:  Identify all documents bearing upon, supporting, or reflecting the facts set forth in Your response to the preceding interrogatory.

**RESPONSE TO INTERROGATORY NO. 25**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows:  N/A.

**AMENDED RESPONSE TO INTERROGATORY 25:**

9

1    Becerra has not made this contention.  However, to the extent that he had, in response to

2    interrogatory 23, Becerra has explained his understanding of the statute in the context of this

3    particular case.

4        **SECOND AMENDED RESPONSE TO INTERROGATORY NO. 25:**

5        To the extent that Defendant Becerra has made the contention "that the definition of

6    'authorized participant' under Penal Code §§ 26375 and 26405(r) refers to a person with an

7    'entertainment firearms permit' issued pursuant to Penal Code § 29500, in response to

8    interrogatory 23, Becerra has explained his understanding of the statute in the context of this

9    particular case.

10

11   Dated:  October 23, 2020                    Respectfully submitted,

12                                               XAVIER BECERRA
                                                 Attorney General of California
13                                               ANTHONY R. HAKL
                                                 Supervising Deputy Attorney General
14

15

16                                               */s/ John W. Killeen*
                                                 NOREEN P. SKELLY
17                                               Deputy Attorney General
                                                 JOHN W. KILLEEN
18                                               Deputy Attorney General
                                                 *Attorneys for Defendant Attorney General*
19                                               *Xavier Becerra*

20

21

22

23

24

25
     SA2018100198
26   34524444.docx

27

28

Defendant Xavier Becerra's Second Amended Responses to Plaintiff's Interrogatories, Set Two  (3:17-cv-07357 RS)

Exhibit 3

David W. Affeld, State Bar No. 123922
Brian R. England, State Bar No. 211355
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:    (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY, | Case No. CV 17-7357 RS |
| Plaintiff, | Assigned to:<br>The Honorable Richard G. Seeborg |
| vs. | **EXPERT DECLARATION OF MICHAEL TRISTANO** |
| GAVIN NEWSOM, *et al.*, | |
| Defendants. | Action Filed:  December 28, 2017<br>Trial Date:    None Set |

- 1 -

EXPERT DECLARATION

I, Michael Tristano, declare as follows:

1.      I have been retained by Affeld Grivakes LLP on behalf of Michael Zeleny, as an expert in the above-referenced litigation.

2.      As an independent expert, I have been asked to give my opinion on the issue of permitting for film, television, and other video projects, and, specifically, the permitting and use of firearms on such projects.

3.      For my work on this case, I am being compensated at a rate of $500 per hour, plus expenses.  I have not received and will not receive any other compensation related to this case.  No part of my compensation depends on the outcome of this case.

**PROFESSIONAL BACKGROUND AND EXPERIENCE**

4.      I have been a professional Armorer and Special Effects Technician for more than 30 years.  I have worked on more than 500 feature films, television shows and video projects, most of which are listed on the Internet Movie Database (imdb.com).  These projects include: 3:10 to Yuma, The Purge, Medal of Honor, I Am Still Here, and Enron: The Smartest Guys in the Room.

5.      Most of my work is done in the State of California, and my licenses and permits to do this work include:

          1)      A California DOJ Entertainment Firearms Permit;

          2)      A Federal Firearms License (FFL);

          3)      The four California Dangerous Weapon Permits, which include permits for assault weapons and .50 caliber weapons, machine guns, short-barrel rifles and shotguns, and destructive devices; and

          4)      The California Certificate of Eligibility.

6.      Besides providing on-set armorer services and training of actors, actresses, extras, and stunt people (collectively "Authorized Persons") for proper and safe use of blank-firing firearms on set, my company also rents and provides non-firing replica and rubber guns.

7.      I have also been an on-camera weapons expert on shows for The History Channel, The Discovery Channel and A&E.

EXPERT DECLARATION

8.     When I am involved in any project using firearms on the set of a motion picture, TV show or video project, I advise the production on what firearms I think they should use in their show and what permitting we will require regarding the use of firearms during the project.

9.     Based on my extensive career as a professional, licensed motion picture and television Armorer, I believe that I am qualified to address the questions presented to me.

**INFORMATION CONSIDERED**

10.     In preparing this expert report, I have reviewed the relevant applications and standards regarding permitting for film, television and video projects in the State of California, and the use of firearms on set.

11.     My analysis of the information relevant to this case is ongoing, and I expect to continue receiving information and questions as they are presented to me, and it is possible that new information may affect certain conclusions in this report. I therefore reserve the right to supplement it.

**OPINIONS**

12.     If called upon to testify, I would explain the following facts and opinions regarding permitting for film, television and video productions, and the inclusion of proper permitting for the use of firearms on these productions.

13.     When I am contacted by a production to provide their show with Armorer services and the rental of blank-firing guns, non-firing replicas and rubber guns, I am involved with the production company in the process of obtaining the necessary permits.  I always insist that productions get the proper permitting and cover all of the requirements in the specific area and jurisdiction they are filming in.

14.     In the State of California, although rules and regulations may vary somewhat from county to county and city to city, the general state policies are the same:

      1)     The production must apply for a permit for all of the days and at each location where the filming will be taking place through the offices in

EXPERT DECLARATION

charge of filming in the respective jurisdictions.  In Los Angeles, for example, permits are applied for and obtained from FilmLA.

2) If there is going to be blank-firing weapons used and blanks fired, both the permit application and the permit must include this information, with a description of the type of gunfire (such as single shot, semiautomatic, fully automatic, or black powder blanks) and the load size of the blanks (1/4 load, 1/2 load, or full load) so the proper notifications can be made to the surrounding area.

3) Is the blank gunfire to take place in the interior or exterior of the location? If there is gunfire in the exterior of the location, or in any area open to the public view, at least one Police Officer is usually required to be assigned to the location by the permitting office.  A Fire Marshall or FSO (Fire Safety Officer) may also be assigned by the permitting office if the location is located in a fire zone, or if there are possible flammable elements at the location.

4) If there is no blank gunfire, but replica or rubber guns are brandished in an exterior part of the location, or an area open to view by the public, this must also be on the permit application and the permit and a Police Officer will still be assigned to the location to deal with civilians to make sure everyone knows this is not an active shooter situation.

5) Whenever any real or blank-firing firearms are present on a set, a licensed Armorer must be present to handle blank-firing weapons and a licensed Prop Master for non-firing replica guns and rubbers. This is so proper safety protocols are always followed.

6) Permitting offices do not inquire about the names or identities of the Authorized Participants using the weapons, as such information is neither necessary nor relevant for the permitting process.  In fact, when the permit applications are being prepared, submitted, and considered, often times the

- 4 -

1   specific names and identities of the Authorized Participants are not known
2   or finalized.  In particular, the names and identities of extras serving as
3   Authorized Participants may well not be known until the actual day of the
4   shoot and can change throughout the day in the director's discretion.  In my
5   experience, during the permitting process, I have never been asked to
6   provide, and have not provided, the names and identities of the anticipated
7   Authorized Participants to any permitting office or agency.

8   7)   In contrast to the permitting offices and agencies, licensed Armorers are
9        required to ensure that none of the Authorized Participants using the real
10       and/or blank-firing weapons is a felon or a person prohibited from possessing
11       a firearm. Such "prohibited persons" may use replica or rubber weapons only.

12   8)   While any blank-firing, replica or rubber weapons are on set, they remain in
13       the charge of the Armorer and/or Prop Master, until they are needed to be
14       placed in the hands of the Authorized Participants and/or on the set. After the
15       shots are completed, the firearms are taken back and remain in the charge of
16       the Armorer and/or Prop Master.

18   I declare under penalty of perjury under the laws of the United States that the foregoing is
19   true and correct.  Executed October 9, 2020 at Los Angeles, California.

Michael Tristano
Declarant

- 5 -

EXPERT DECLARATION

Exhibit 4

David W. Affeld, State Bar No. 123922
Brian R. England, State Bar No. 211355
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:     (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY,<br><br>        Plaintiff,<br><br>            vs.<br><br>GAVIN NEWSOM, *et al.*,<br><br>        Defendants. | Case No. CV 17-7357 RS<br><br>Assigned to:<br>The Honorable Richard G. Seeborg<br><br>**EXPERT DECLARATION OF ROBERT LATHAM BROWN**<br><br>Action Filed:   December 28, 2017<br>Trial Date:     None set. |

- 1 -

EXPERT DECLARATION

1    I, Robert Latham Brown, declare as follows:

2    1.    I have been asked to provide my expert opinion and experience regarding the

3    permitting process involved in filming a motion picture or television production that includes the use

4    of firearms in the State of California.

5    2.    For my work on this case, I am being compensated at the hourly rate of $200/hour for

6    the preparation of this report, and $300/hour for deposition or court testimony. I received no other

7    form of compensation related to this case. No part of my compensation depends upon the outcome of

8    this case.

9    3.    **Information Considered:** In preparing this expert report, I have reviewed and

10   considered the following material:

11   a.    The American Entertainment Armorers Association Amicus Brief in support of

12   Plaintiffs and Petitioners (Proposed); Superior Court Case No. CPF-05-505960,

13   (https://michellawyers.com/wp-content/uploads/2013/01/Fiscal_American-

14   Entertainment-Armorers-Association-Amicus-Brief-In-Support-of-Plaintiffs-and-

15   Petitioners-Proposed.pdf);

16   b.    California Penal Code Sections 26350, 26375, and 25510;

17   c.    FilmLA Permit website (https://www.filmla.com/for-filmmakers/permits/);

18   d.    California Film Commission website (https://film.ca.gov/);

19   e.    The Producers Guild Code of Credits

20   (https://www.producersguild.org/page/code_of_credits); and

21   f.    The Directors Guild of America Basic Agreement

22   (https://www.dga.org/Contracts/~/link.aspx?_id=CC4363E3-BC29-443C-9E34-

23   88F7A534F982&_z=z).

24   4.    **Education:**

25   a.    Bachelor of Arts degree from Tulane University awarded in September 1969.

26   b.    Two years of study for an MFA degree from The University of California, Los

27   Angeles (1972 – 1974). Left before completion to enter the AMPTP/DGA Training

28   Program.

EXPERT DECLARATION

      c.   Association of Motion Picture and Television Producers / Directors Guild of America (AMPTP/DGA) Training Program (1974-1976).

5.    **Teaching:** I have been an adjunct professor at the USC School of Cinematic Arts since the fall of 1996. The main course I teach is Production Planning, which covers the methods a Producer uses from when he receives a script through to the point of when the film is delivered. This includes, but is not limited to, scheduling the shoot, budgeting the picture, selecting the locations, procuring required permits, hiring the crew, casting the picture, and all logistical arrangements.

6.    **Author:** I wrote *Planning the Low-Budget Film* as the textbook for my USC class. The book covers all the basic steps to mounting a film production. It is now used as a text in film schools beyond USC and is currently ranked by Amazon.com at 1,152 in Film & Television.

7.    **Film Production Experience:** I have worked as a Producer, Co-Producer, Production Manager, Unit Production Manager, First Assistant Director, and Second Assistant Director on over 40 motion picture and television productions, and generally all but the Assistant Director positions involved obtaining location filming permits. At times I did this on my own and other times were with the aid of a Location Manager. With or without a Location Manager, I was the person ultimately responsible for obtaining the filming permits. This occurred in many different cities and towns in California, numerous other states, and in other countries. The following paragraphs will give a brief description of my involvement with those productions and whether or not firearms were used in them. The dates in parentheses were when the pictures were released.

8.    Position or Credit Definitions: **The** duties **of the positions mentioned in the above paragraph are briefly described below. For a more comprehensive list of duties, see the sources listed.**

      a.   **Producer:** "Subject to the control of the Owner, the individual receiving Produced By credit shall have final responsibility for all business and creative aspects of the production of the motion picture, with direct participation in making decisions concerning a major portion of the producing functions (see Producers Code of Credits Section 1 for comprehensive list)." Source: Producers Guild of America Code of Credits (https://www.producersguild.org/page/coc_tmp_2)

EXPERT DECLARATION

b. **Co-Producer / Line Producer:** "The Co-Producer / Line Producer is the single individual who has the primary responsibility for the logistics of the production, from pre-production through completion of production; all Department Heads report to the Co-Producer / Line Producer." Source: Producers Guild of America Code of Credits (https://www.producersguild.org/page/coc_tmp_2)

c. **Production Manager / Unit Production Manager:** "The UPM, under the supervision of the Employer, is required to coordinate, facilitate and oversee the preparation of the production unit or units (to the extent herein provided) assigned to him or her, all off-set logistics, day-to-day production decisions, locations, budget, schedules and personnel." Source: The Directors Guild of America Basic Agreement, pp. 14-5, sec. 1-302, (https://www.dga.org/Contracts/~/link.aspx?_id=CC4363E3-BC29-443C-9E34-88F7A534F982&_z=z)

d. **Assistant Director:** "The First Assistant Director, alone or in conjunction with the UPM, organizes pre-production, including organizing the crew, securing equipment, breaking down the script, preparing the stripboard and a shooting schedule. During production, he assists the Director with respect to on-set production details, coordinates and supervises crew and cast activities and facilitates an organized flow of production activity." Source: The Directors Guild of America Basic Agreement, p. 16, sec. 1-303, (https://www.dga.org/Contracts/~/link.aspx?_id=CC4363E3-BC29-443C-9E34-88F7A534F982&_z=z)

9. **Multiple Television and Feature Film Productions (1976-1979):** Credits – First Assistant Director, Second Assistant Director. After completing the AMPTP/DGA Training Program, I worked on multiple television and feature film productions. My duties on these productions generally did not include obtaining film permits.

10. **The Big Fix (1978):** Credit - Second Assistant Director. When the production department at Universal Studios realized the Unit Production Manager (UPM) was having difficulty keeping up with the pace of the production, they offered me a raise in pay to stick close to the UPM

1  and make sure nothing slipped through the cracks. At the time, Universal did not assign Location
2  Managers to feature productions, so it was left up to me to obtain all the film permits.

3      11.    **The Concorde: Airport 79 (1979):** Credit – Unit Production Manager. This was my
4  first job as a UPM. The film was shot in Paris, France; Washington, DC; Alta, UT; and Los Angeles.
5  As the 2nd UPM, I was responsible for the Washington, DC and Alta, UT locations. In Washington,
6  permits were obtained from the National Park Service for the scenes shot at the Lincoln Memorial
7  and the National Mall. In Utah, our filming was confined to the areas above the Alta ski runs,
8  simulating the Alps where the Concorde crash lands in the story.

9      12.    **The Nude Bomb (1980):** Credit – Unit Production Manager. This was my first
10  picture as the sole UPM. The film was shot entirely in Los Angeles on local locations and on stages
11  at Universal Studios. It simulated locations in and around Washington, DC. Some weapons were
12  used which mainly involved .38 caliber revolvers.

13      13.    **The Blues Brothers (1980):** Credit – Unit Production Manager. This picture was
14  shot mostly in Chicago, IL and surrounding suburbs, with some stage work done at Universal
15  Studios in Los Angeles. Although I did have the assistance of a Location Manager, I handled most of
16  the interaction with Mayor Jane Byrne. There were scenes with a lot of weapons firing, mostly
17  police .38 caliber revolvers. The weapons were all handled by the Prop Master, Michael Milgrom.

18      14.    **All Night Long (1981):** Credit – Unit Production Manager. This picture was shot in
19  and around the Los Angeles area including locations in Pasadena and Valencia. No weapons were
20  involved. There was no Location Manager.

21      15.    **Bustin' Loose (1981):** Credit – Unit Production Manager. I was brought on to
22  oversee the shooting of additional scenes after Richard Pryor had recovered from an accident in
23  which his face was badly burned. These scenes were shot on stage at Universal and no permits were
24  required.

25      16.    **Ghost Story (1981):** Credit – Unit Production Manager. This picture was shot in
26  Saratoga, NY; Woodstock, VT; Philadelphia, PA; and New York, NY. No weapons were involved.

27      17.    **The Thing (1981):** Credit – Unit Production Manager. This picture was shot on stage
28  at Universal Studios with locations outside Juneau, AK and Stewart, BC. I acquired all the location

- 5 -

EXPERT DECLARATION

1   permissions required. On an ice field outside of Juneau, we shot a scene involving an actor firing a
2   rifle from a hovering helicopter. We also used pistols and rifles in Stewart, BC and on stage at
3   Universal Studios in California. The Prop Master, John Zemansky, handled them.

4          18.    **Star Wars: Episode VI – Return of the Jedi (1983):** Credit – Production Executive.
5   I was unable to accept a UPM credit because Lucasfilm Ltd. was not a signatory to the Directors
6   Guild of America (DGA) Basic Agreement, so I was not able to perform DGA covered work. I
7   supervised two unit managers who were not members of the DGA. Although the majority of the film
8   was largely shot in England and Tunisia, my responsibilities covered the shoots at the Kerner
9   Facility in San Rafael, CA; the Jedediah Smith Redwoods State Park outside Crescent City, CA; and
10  Buttercup Valley, outside Yuma, AZ. Buttercup Valley is actually in California, but Yuma is the
11  nearest town with motels. All weapons were futuristic inventions of the prop department. No actual
12  weapons were used.

13         19.    **Iceman (1984):** Credit – Unit Production Manager. This picture was shot in
14  Vancouver, BC and Stewart, BC. I don't recall any weapons being used. If they had been the
15  Canadian UPM, Justis Greene, would have sought the appropriate permits if needed.

16         20.    **Indiana Jones and the Temple of Doom ((1984):** Credit – Production Manager. My
17  responsibilities on this picture were the shoots on the Tuolomne River east of Modesto, CA;
18  Mammoth Mountain, CA; and Marin County, CA. No weapons were used.

19         21.    **Best Defense (1984):** Credit – Unit Production Manager. This picture was shot in Los
20  Angeles, CA and the area around Jericho, Israel. All weapons use took place in Israel.

21         22.    **The Goonies (1985):** Credit – Unit Production Manager. I was brought in to manage
22  additional scenes during postproduction, so I am not listed in the credit crawl. These were shot in
23  Los Angeles, CA, both on stage and on local location. No weapons were used.

24         23.    **Warning Sign (1985):** Credit – Associate Producer / Unit Production Manager. The
25  film was shot on location in La Crescenta, CA and Payson, UT. Semi-automatic pistols and a
26  revolver were used. These were handled by the Prop Master, Larry Byrd.

27

28

24. **Blue City (1986):** Credit – Unit Production Manager. This picture was shot in and around Los Angeles, CA. Revolvers and semi-automatic pistols were used in filming. All the weapons were controlled by the Prop Master, Jack Marino.

25. **Howard the Duck (1986):** Credit – Co-Producer / Unit Production Manager. This picture was shot in Northern California consisting of locations in San Francisco, Petaluma, Napa, San Rafael, Black Point, Modesto, Nicasio, Oakland, Herald, Rio Vista, and Sacramento. No firearms were used.

26. **One Crazy Summer (1986):** Credit – Unit Production Manager. This picture was shot in Cape Cod and Nantucket, MA. There were rifles present in a scene, but they were never fired. The Prop Master, Art Lipschultz handled the weapons.

27. **Spaceballs (1987):** Credit – Production Manager. This picture did shoot on location in Buttercup Valley, CA but was mostly shot on stage at what is now Sony Studios in Culver City, CA. At that time, it was still MGM Studios. I was assisted by a Location Manager, Michael Meehan. All weapons were products of the prop department.

28. **Clean and Sober (1988):** Credit – Unit Production Manager. This picture was shot in Pennsylvania, Delaware, and New Jersey, with stage work being done at Burbank, CA. No weapons were used.

29. **Elvira: Mistress of the Dark (1988):** Credit – Production Manager. I was brought in to do additional scenes in post-production. Most of our filming took place on stage at the Burbank Studios except for a 2nd unit in Las Vegas, NV which I directed. No firearms were used.

30. **Child's Play (1988):** Credit – Unit Production Manager. The portion of picture I was involved with was filmed in and around Los Angeles. I replaced the original UPM who had left the film. Handguns were used in some scenes. These were under the supervision of the Prop Master, Art Shippee. I was assisted in obtaining film permits by a Location Manager, Michael Malone.

31. **The War of the Roses (1989):** Credit – Unit Production Manager. This picture was mostly shot on stage and local locations in Los Angeles, with a few scenes being shot at Whidbey Island, WA. No firearms were used.

- 7 -

32.    **Child's Play 2 (1990):** Credit – Executive Producer. This picture was shot mostly in Pasadena, Long Beach, and Los Angeles, CA. There were police officers portrayed who were wearing holstered side arms. These were probably rubber props.

33.    **Child's Play 3 (1991):** Credit – Producer / 2nd Unit Director. This picture was shot mostly in Southern California with the military academy exteriors shot at Kemper Military School in Boonville, MO. Handguns and M1 rifles were used in both California and Missouri. The weapons were all under the custody and supervision of the Prop Master, Jack Marino. Location filming permits were obtained by a Location Manager, William Bowling. No special permits were required for the use of the weapons.

34.    **Babylon 5: The Gathering (1993):** Credit – Producer / Unit Production Manager. This was the pilot episode for a television episodic series. It was shot on stage in Santa Clarita, CA at the Santa Clarita Studios. No actual firearms were used.

35.    **Robin Hood: Men in Tights (1993):** Credit – Executive in Charge of Production / Production Manager. This picture was shot in and around Los Angeles, CA. All weapons were medieval. No firearms were involved. William Bowling was the Location Manager.

36.    **Showgirls (1995):** Credit – Unit Production Manager. This picture was shot in Los Angeles, CA; Lake Tahoe, NV; and Las Vegas, NV. No firearms were used.

37.    **Dracula: Dead and Loving It (1995):** Credit – Associate Producer / Production Manager. This picture was shot in and around Los Angeles, CA. No firearms were used.

38.    **Starship Troopers (1997):** Credit – Production Manager. This picture was shot in Southern California; Hell's Half Acre outside of Casper, WY; and Kadoka, SD. William Bowling was the Location Manager. During the shoot in Hell's Half Acre, we used futuristic prop weapons built on real automatic rifles, plus real Browning .50 caliber machine guns, all of which were fired using blank cartridges. Since the Federal Firearms Act of 1938, automatic weapons have been strictly controlled. These prohibitions were renewed in the Gun Control Act of 1968. I hired Robert "Rock" Galotti as our Weapons Coordinator/Armorer. Mr. Galotti is a Federal Firearms Licensee (FFL) and he was legally authorized to be in possession of such weapons and to arrange their transportation. He maintained strict control over the weapons. At the end of each shooting day, Mr.

1  Galotti caused the weapons to be secured at the Casper, WY Police Department. No permits were

2  required for our use of these weapons because Mr. Galotti had control of them.

3      39.    **The Parent Trap (1998):** Credit – Production Manager. My involvement with this

4  picture was for the shooting sequences in the western United States. This included locations in

5  California such as San Francisco, Camp Seely in Crestline, Lake Gregory, Long Beach Airport,

6  Napa Valley, RMS Queen Mary Long Beach, Santa Clarita, and Los Angeles. No weapons were

7  used.

8      40.    **Hollow Man (2000):** Credit – Production Manager. This picture was shot in

9  Washington, DC and Los Angeles, CA. There were handguns used but I believe they were non-

10 functional replicas.

11     41.    **Ali (2001):** Credit – Production Manager. I am not listed in the credit crawl since I

12 was only involved in prepping the picture to shoot after which I handed the picture over to another

13 UPM. My work included scheduling the shoot, budgeting the picture, hiring the crew, arranging to

14 transport the crew and equipment to Uganda, and tracking costs during the prep period.

15     42.    **Spider-Man (2002):** Credit – Production Manager. I am not listed in the credit crawl

16 since I was brought in to oversee the shooting of additional scenes and to manage the postproduction

17 period. No firearms were used for these additional scenes.

18     43.    **The Anarchist Cookbook (2002):** Credit – Producer. This was a low budget

19 production shot in and around Plano, TX with a day at the Fort Worth Stockyards. There was a

20 handgun used which was obtained by the Prop Master, Jason Hammond.

21     44.    **Vampires: Los Muertos (2002):** Credit – Line Producer / Unit Production Manager.

22 I am not listed in the credit crawl since I was brought in to manage a few added scenes. The picture

23 was filmed entirely in Mexico except for the added scenes which I supervised. These were shot in

24 Los Angeles. There were handguns and a shotgun used. These were obtained by the Prop Master,

25 Richard Blake Wester. No special permits were required.

26     45.    **The Santa Clause 2 (2002):** Credit – Production Manager. This picture was shot

27 entirely in Canada. I was on the film only for the prep period during which I scheduled and budgeted

28 the movie.

EXPERT DECLARATION

46. **Charlie's Angels: Full Throttle (2003):** Credit – Unit Production Manager. I was brought in to manage the additional scenes, so I am not listed in the credit crawl. No firearms were used.

47. **S.W.A.T. (2003):** Credit – Unit Production Manager. This picture was shot in and around Los Angeles and at Mojave Airport. Many firearms were used including automatic weapons. There were large shoot-outs staged in Burbank and downtown Los Angeles. All weapons were under the control of our Armorer, Michael Papac who is an FFL. Our main concern was how the noise would affect residents and businesses in the surrounding areas.

48. **A Lot Like Love (2005):** Credit – Unit Production Manager. This picture was shot in and around Los Angeles and in New York, NY. No firearms were used.

49. **Lords of Dogtown (2005):** Credit – Unit Production Manager. I was brought in to manage the additional scenes, so I am not listed in the credit crawl. It was shot mostly in Venice, CA and other Los Angeles areas. No firearms were used.

50. **Local Color (2006):** Credit – Co-Producer / Unit Production Manager. This was a low budget picture shot in New Orleans and Covington, LA. No firearms were used.

51. **The Holiday (2006):** Credit – Unit Production Manager. I was brought in to supervise additional scenes, so I am not listed in the credit crawl. These were shot in and around Los Angeles.

52. **Hard Breakers (2010):** Credit – Producer / Production Manager. This was a low budget independent feature shot in and around Los Angeles. No firearms were used.

53. **1982 (2013):** Credit – Co-Producer. This was a low budget short film. It was shot in Los Angeles. No firearms were used.

54. **Love is Not Love (2019):** Credit – Line Producer. This was a low budget independent feature shot in and around Los Angeles. No firearms were used.

55. **Current Productions:** Credit – Producer. I am currently involved in the development of four films, two of which will involve firearms.

EXPERT DECLARATION

56.     **Planning for the use of firearms in a scene:** When I am employed as a Co-Producer, Line Producer, or Unit Production Manager, there are discrete steps that I follow when planning a film shoot in which firearms are used. These are outlined in the following paragraphs.

57.     **Read the script.** The first step is to read the script and note any scenes in which firearms are used.

58.     **Create the breakdown sheets.** A breakdown sheet is created for each scene in the script. In the top half of this sheet are listed the scene numbers, whether the scene is exterior, interior, or both, the set name, the time of day, how long the scene is in terms of pages and eighths of a page, a brief but unique synopsis of the scene, the page of the script the scene starts on, the story day of the scene, what filming unit will be shooting the scene, and the locations of the shoot.

    a.   **Filling in the breakdown sheet:** The bottom half of the breakdown sheet is where all the specific elements that are needed to shoot the scene are listed. These would include cast members; background actors (extras); stunt players; picture cars or other vehicles appearing in front of camera; props; camera equipment; special effects that occur in the scene such as fire, rain, or explosions; costume notes; makeup and hair notes; animals; animal wranglers; music notes; sound notes; art department notes; set dressing; greenery; special equipment; security; additional labor; visual effects notes and personnel; and miscellaneous notes.

    b.   **Props.** Props are any objects which are handled by the actors or extras. Jewelry, eyeglasses, and watches are also included in props, as are weapons of various sorts. These can be replicas of weapons, for example they may be an airsoft or plastic gun, or they can be real weapons such as knives, swords, or firearms.

    c.   **Firearms.** Motion pictures and television productions usually use Title 1 firearms. These are firearms that are available to the general public, such as rifles from bolt action to semi-automatic, revolvers, and semi-automatic handguns. On occasion, we also use firearms that are prohibited to the general public in so far as they require a special federal permit and license to possess them. For more complex or higher

- 11 -

EXPERT DECLARATION

1   volume of firearms or other weapons, we employ an Armorer who has a federal

2   firearms license.

3       d.   **Title 1 Firearms.** In California, absent a statutory exemption, if a Prop Master or

4           Armorer wanted to rent a Title 1 firearm to use in a motion picture or television

5           production, the Prop Master or Armorer would need to undergo a background check

6           every time he or she rented a firearm. Then when the Prop Master or Armorer wanted

7           to turn the firearm over to an actor to use in a scene, the actor would have to go

8           through a background check as well. Legislated waiting periods would also apply in

9           each of these transfers. This would be unworkable in the making of a motion picture

10          or television production and would severely impact the filmmakers.

11      e.   **The California Entertainment Firearms Permit.** The California Legislature passed

12          amendments to California's firearms restrictions creating the Entertainment Firearms

13          Permit ("EFP"). This is a California specific permit that a Prop Master or any other

14          nonprohibited person can register for and can be used in place of the repeated

15          background checks. It also allows an EFP holder to give the firearm to an actor or

16          other Authorized Participant and take it back after the scene is over, without doing

17          background checks or requiring a waiting period. For purposes of California's ban on

18          the open carry of weapons, the actor or participant to whom the firearm is loaned is

19          an "Authorized Participant" as that term is used in California Penal Code Sections

20          26375 and 25510.

21      f.   **Federal Firearm License.** In order to possess, transport, rent, or transfer firearms

22          that are prohibited by the Federal Firearms Act and succeeding laws, a Prop Master or

23          Armorer must have a Federal Firearms License ("FFL").

24  59.    **Create the shooting schedule.** Once the breakdown sheets are completed, the

25  database of breakdown sheets is viewed in the form of a strip board, where each scene is individually

26  displayed on a strip. These strips can be rearranged and sorted on the board with day markers to

27  create a shooting schedule. It's at this point that I would consult with a Prop Master or Armorer if

28  the motion picture or television production requires operational firearms.

60.     **Prop Master or Armorer.** The decision whether to hire a Prop Master or an Armorer rests on the type and the number of weapons needed. On a movie such as STARSHIP TROOPERS, I had a complete department headed by an Armorer to handle all weapons. In that film, we were using many prohibited weapons including two Browning .50 caliber machine guns. Once the Prop Master or Armorer is hired, I would discuss with him or her the weapons we needed and solicit his/her recommendations. At that time, we would not know the names of all the people who might be handling the firearms in any given scene. This is because we would not necessarily have the motion picture or television production completely cast and would not yet have hired the stunt players. Any extras who would be given firearms in the scenes might not be hired until the day of shooting. In addition, on any shooting day, the Director may change his or her mind as to who will be firing the weapons. In my experience, neither a Prop Master nor an Armorer are concerned with or request the names or identities of the specific actors and extras who will be Authorized Participants. With respect to the Authorized Participants, the only concern a Prop Master or Armorer has is to make sure that the Authorized Participants are not legally prohibited from possessing a firearm and are capable of safely handling the firearm. The Prop Master or Armorer will then arrange for the procurement of the prop weapons and are responsible for the transport, storage, and safe use of the firearms.

61.     **Film permits.** One to two weeks prior to the filming of a scene, the production company's designee will apply for the location filming permits. The application asks for information related to the logistics of the shoot, including for example; what will take place in the scene, how long we expect to be at the location, whether we will be firing weapons, the approximate size of the crew, whether we will be using pyrotechnics, where we will be parking our equipment, and whether we will need traffic control on public streets. It's not that different from applying for a permit to perform street maintenance. At no time during the permitting process, have I ever been asked to provide the names or identities of the actors, stunt players, and extras who will be using the firearms in any specific scene, and I have never volunteered that information. In fact, often at this stage of the process, that information is not yet known or finalized.

EXPERT DECLARATION

62.     The film permit will be issued with certain restrictions such as how many policemen we must hire and whether we need a fire safety officer with us during the shoot. We will also be required to notify residents and businesses within a 500-foot radius of our location about the upcoming shoot. If it's a residential area, we will be restricted to certain hours of the day (e.g. we can't arrive before 7:00 am and must be gone by 10:00 pm). The film permit does not identify or reference the names or the identities of the Authorized Participants in the shoot. Obviously, any notification to residents or businesses likewise does not include the names or identities of the Authorized Participants.

63.     **On the day of filming.** The call sheet for that day will have a notice that there will be gunfire on the set. We do the same if there will be explosions or if there will be anything similar the crew should be aware of. During the set up of the shot, a mandatory safety meeting will be held by the First Assistant Director in conjunction with the Prop Master and/or Armorer attended by the Director, actors, stunt players, extras, and crew. Hearing protection is issued to the crew. Cast members, stunt players, and extras will be issued foam ear plugs that won't be visible to the camera.

64.     Before each take, the weapons are checked, loaded with blank cartridges, and handed to the Authorized Participants (the actors, stunt players, and extras) by the Prop Master/Armorer. After each take, the weapons are secured by the Prop Master/Armorer, cleared, and reloaded with blank cartridges if there is to be another take.

65.     The use of firearms in motion pictures and television productions is highly regulated, especially in California. It would be more so if not for the special exemptions from the state firearm laws that are granted to the motion picture and television industry. Without those exemptions, it would be impossible to make certain types of productions in California.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed October 9, 2020 at Westlake Village, California

Robert Latham Brown
Declarant

- 14 -

EXPERT DECLARATION

Exhibit 5

David W. Affeld. State Bar No. 123922
Brian R. England. State Bar No. 211355
Damion Robinson. State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East. Ste. 2460
Los Angeles. CA 90067
Telephone:    (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL ZELENY, | Case No. CV 17-7357 RS |
| Plaintiff, | Assigned to: |
| vs. | The Honorable Richard G. Seeborg |
| GAVIN NEWSOM, *et al.*, | **EXPERT DECLARATION OF GREG BLOCK** |
| Defendants. | Action Filed:  December 28, 2017 |
| | Trial Date:    None Set |

EXPERT DECLARATION

I, Greg Block, declare as follows:

1.     I, Greg Block, have been retained by the law firm Affeld Grivakes LLP, on behalf of Michael Zeleny, as an expert in this litigation.

2.     For my work in this case, I am being compensated at the hourly expert rate of $250.00 per hour, plus expenses. I receive no other form of compensation related to this case. No part of my compensation depends upon the outcome of this case.

**Professional Background.**

3.     Since 1983, I have been a law enforcement instructor. I teach City, County, State and Federal Agencies, plus the Military in Use of Force and Firearms.

4.     I have over 100 instructor credentials, from the NRA Law Enforcement side, the NRA Civilian side, the Federal Department of Justice, California Department of Justice, the FBI, and ATF.

5.     Over 45 firearms manufacturers have certified me to teach their weapons systems to Law Enforcement.

6.     Several state agencies have also certified me: CA-POST which stands for Peace Officer Standards and Training, the other agency is STC, Standards and Training for Corrections. CA-POST oversees sworn law enforcement and STC oversees Probation, Corrections, Prisoner Transport and Bailiffs.

7.     I am both a certified instructor and certified presenter for both CA-POST and STC, and I am authorized to provide training for them. With STC I am the only non-government affiliated individual to have this distinction. With CA-POST who has over 700 presenters, all but three are the agencies themselves, Police Departments, Sheriff's Office, State Investigative Agencies and County Investigative Agencies. The other two entrepreneurs are law firms that teach officers how to testify in court. There are 58 counties in California. Since 1999, I have been CA-POST's Use Of Force instructor in 36 of those counties.

8.     With CA-POST, I am also a "SME", which stands for Subject Matter Expert. I deal with the Learning Domains ("LD") in the police academy. I am an SME for twelve of the forty-eight LDs taught in the Basic Police academy, including Use of Force, Firearms, Chemical

EXPERT DECLARATION

Agents, Electronic Weapons, Impact Weapons, Impact Weapons, Defensive Tactics, Projectile Less Lethal Weapons, Force Option Simulator, Tactical Firearms, Dangerous Weapons Laws, Crowd Control, Vehicle Operations and Patrol Operations. As needed, as the California Penal Code is amended and additional court decisions are rendered, SME's will work together to update the LDs. The revised LDs are then sent to CA-POST in Sacramento and distributed to the 39 Police Academies throughout California. LD 40 is the Dangerous Weapons Law for Law Enforcement, which represents California's gun laws.

9.    In January 1999, a new Carry Concealed Weapon ("CCW"), law went into effect in California. It was Assembly Bill (AB) 2022, also called the Wright CCW Bill. It took California from a 1-year CCW to a 2-year CCW, plus it changed the residency requirements needed to apply for a CCW. It also mandated training every two years; a minimum of 4 hours for renewal, and a maximum of 16 hours for first time applicants. I was asked by the Orange County Sheriff to be a part of a group, which included Captain Gage, the head of Professional Standards Division (PSD), which oversees the CCW Licensing Bureau, Lieutenant Hogbin, the head of the CCW Licensing Bureau, to create Orange Counties policies and procedures for the new California CCW law. Those policies and procedures were widely recognized and approved and I presented them to all 58 California County Sheriffs. In June of 1999, I attended the bi-annual meeting of the California State Sheriffs Association (CSSA) in Sacramento. I made a presentation on these policies and procedures, and they subsequently became the state standard.

**Information Considered**

10.    In preparing this expert report, I have reviewed the following material:

a.    MPPD Reports_Redacted MP1843-1901

b.    CAD Reports MP 5084-5099

c.    100929 Police Report – Cooperation w Signage and Noise

d.    101004 Police Report – 'Cooperation'

e.    120210 Police Log – Zeleny Cooperative; No

f.    120210 Police Report Re Zeleny – Harassment of Supporters

g.    120410 Meeting Minutes re Zeleny Used at Legislative Committee

EXPERT DECLARATION

h.      120524 Critical Reach Info on MZ

i.      100525 Police Report

j.      120613 Log Of Contact with Mr. Zeleny

k.      120620 Log Documenting Mr. Zeleny Cooperation

l.      20628 Incident Report – Zeleny Cooperates

m.     Audio Recording of Police Interaction with Mr. Zeleny

n.      Photographs of Mr. Zeleny's Belt Holster

o.      Chief Dave Bertini's Deposition Transcripts

p.      Deputy Jeremy Foy Deposition Transcripts

q.      Photos MP5521-5529

r.      Mr. Zeleny's Deposition Transcript

s.      Meeting with Michael Zeleny, looking at his setup he was carrying/using at the time. Evaluating it to make sure he was in compliance with California Penal Code.

t.      Discussing California Penal Code covering owning, transporting and the carry of firearms with Mr. Zeleny.

**Mr. Zeleny Demonstrated Exceptional Gun Safety And Knowledge of Applicable Law.**

11.     Mr. Zeleny showed up at my office with two cases. One case contained a semi-automatic pistol and the other contained a semi automatic rifle. The handgun was unloaded in a locked container per California Penal Code 25610. The actual container was also in compliance with California Penal Code 16850. The rifle was transported in compliance with California Penal Code 25400. A long gun does not need to be locked up; it does need to be unloaded and enclosed in a case, which of course it was. Once he unlocked the handgun container, I inspected both guns to make sure they were both properly unloaded; they were.

12.     I spent quite a bit of time talking to Mr. Zeleny about his two firearms, as they are both considered rare. His knowledge about those firearms was exceptional. He demonstrated safe handling and was conscious of the muzzle at all times. His knowledge of firearms laws at the State level and the Federal level was well above average for a gun owner.

EXPERT DECLARATION

**Mr. Zeleny's Interactions With Law Enforcement Were Respectful.**

13.    In reviewing all police reports, I found Mr. Zeleny complied with all orders and requests given to him by law enforcement. His knowledge of the law far exceeded theirs. In my experience, Law Enforcement officers do not have extensive training in the proper interpretation and application of California's firearms laws. The training they receive is contained in Learning Domain 40 ("LD 40").   LD 40 is California's Dangerous Weapon and Control Laws teaching module. This is a 6-hour segment taught in the Basic Police Academy. There is no required or mandated training on these laws for the rest of a peace officer's career.  Law Enforcement officers do not make the decision to arraign or charge individuals with violations of the firearm laws; Deputy District Attorneys make those decisions.

**In Los Angeles County, A Concealed Weapons Permit Is Nearly Impossible To Obtain And Does Not Represent A Meaningful Avenue For A Resident To Lawfully Possess A Firearm Outside Of His Or Her Home.**

14.    Currently 41 states are shall issue, constitutional carry, or a combination of both. "Shall issue" means the permit must be issued to the applicant unless he or she is a convicted felon. "Constitutional Carry" means that it is the applicant's Second Amendment Constitutional right to carry without a permit. California is one of eight "may issue" states. In California, with very limited exceptions, "may issue" means that the issuance of a concealed carry permit is at the sole discretion of the local sheriff in the county where the applicant resides. The local county sheriff has broad discretion whether to issue a CCW or not. In effect, there are 58 counties in the State of California and an equal number of potential interpretations of what constitutes "good cause" for the issuance of a CCW permit. The interpretation of "good cause" is left to the broad discretion of the local county sheriff and is not an objective standard defined in the law.

15.    Although there are 58 different potential interpretations, they can be loosely grouped into two categories; (i) a strict interpretation employed in the 12 urban counties; and (ii) a far more broad interpretation employed in the 46 rural counties. Nineteen of the top twenty CCW issuing counties in California are rural counties, where a far more permissive interpretation is used in evaluating a CCW application. In California's twelve urban counties,

1   with the exception of Orange County, the standard for obtaining a CCW permit is exceedingly
2   strict, and in many cases, practically impossible to meet. For example, San Francisco County has
3   issued exactly zero CCW permits to the general public.

4        16.    As a resident of an urban county, specifically Los Angeles, in my professional
5   opinion, Mr. Zeleny has zero likelihood of successfully obtaining a CCW Permit. As of 2019,
6   there were approximately 10.04 million residents of Los Angeles County. As of March 2020,
7   when the Los Angeles County Sheriff's Department published the most recent report, there were
8   only 158 CCW permits issued in Los Angeles County. The overwhelming majority of people
9   interested in applying for a CCW permit in Los Angeles either are: (i) dissuaded from ever
10  submitting an application; or (ii) are turned away by the LA County Bureau of Licensing.  As a
11  practical consequence, under current California law, a resident of Los Angeles County has no
12  reasonably available legal ability to carry a firearm outside of his or her residence.

13       I declare under penalty of perjury under the laws of the United States that the foregoing is
14  true and correct.  Executed October 9, 2020 at Huntington Beach, California.

15

16  Greg Block
    Declarant

17

18

19

20

21

22

23

24

25

26

27

28

EXPERT DECLARATION

Exhibit 6

```
 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                         ---OOO---

 4    MICHAEL ZELENY,

 5         Plaintiff,

 6    vs.                    Case No.  CV 17-7357 JCS

 7    GAVIN NEWSOM, et al.,

 8         Defendants.
      _____/

 9    Pages 278 - 286 ARE CONFIDENTIAL

10    AND BOUND SEPARATELY

11

12    Pages 310 - 324 ARE CONFIDENTIAL

13    AND BOUND SEPARATELY

14

15     CONTINUED VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

16                   BY VIDEOCONFERENCE

17              (Volume II - Pages 229 to 534

18

19        Taken before DENISE M. LOMBARDO, CSR No. 5419

20                   RPR, RMR, RDR, CRR

21                    August 7, 2020

22

23

24

25

                                         Page  229
```

1    The time now is 3:06.

2              (Off the record.)

3              THE VIDEOGRAPHER:   Back on the record.

4    The time now is 3:13.

5    BY MR. ROBINSON:                                    03:13

6       Q.   Chief Bertini, how long have you been in

7    the law enforcement profession?

8       A.   Over 33 years.

9       Q.   Throughout those 33 years, have you dealt

10   with district attorneys the entire time?           03:13

11      A.   Yes.

12      Q.   Have you consulted with district attorneys

13   for their input about legal matters from time to

14   time?

15      A.   I would say numerous times.                 03:14

16      Q.   In the numerous times that you've

17   communicated with district attorneys or assistant

18   district attorneys about legal matters, have they

19   given you opinions?

20      A.   Yes.                                        03:14

21      Q.   Based on that experience, looking --

22   considering the e-mail exchange with the district

23   attorney's office that we just looked at, did you

24   form an opinion about or did you form a belief

25   about the district attorney's view of whether the   03:14

                                        Page 403

1   basis for denying it, but it was a concern because

2   the laws had changed, and you could no longer

3   openly carry rifles and handguns in the state of

4   California.

5        Q.  How does the City determine whether          03:49

6   there's a logical nexus to the event?

7            MR. MASTER:  Objection.  Vague and

8   ambiguous.  Overbroad.  Calls for a legal

9   conclusion.

10           Go ahead.                                     03:49

11           THE WITNESS:  As I did not author this

12   letter, I don't know.

13   BY MR. ROBINSON:

14       Q.  Does the City have a written or unwritten

15   standard for determining whether there's a logical    03:49

16   nexus between carrying firearms and the event?

17       A.  No, except that it's illegal to do so.

18       Q.  I don't want to cover ground that we

19   covered last time, but if Mr. Zeleny were given the

20   permit that he was asking for, it would have been     03:50

21   legal to carry the firearms; correct?

22       A.  Well, that's the question we were trying

23   to get answered through the Department of Justice,

24   the district attorney's office, et cetera.  Because

25   that law is very vague, we were trying to determine   03:50

                                              Page 428

1    whether that's true or not.  And as it stands

2    today, our reading of that exception is, yes, if he

3    was permitted under the -- under the special events

4    or film permit, then he could openly carry weapons.

5        Q.  When did you come to that view, that he        03:50

6    could openly carry with a permit?

7        A.  After -- after having discussions, again,

8    with the Department of Justice, with the DA's

9    office and the city attorney's office.

10       Q.  Who at the City decides whether there's a       03:50

11   logical nexus between the carrying of firearms and

12   the event?

13       A.  Again, I did not author that.  I did not

14   say those words, so I don't know what he meant by

15   that.                                                   03:51

16       Q.  Okay.  Is it the city attorney's call

17   about whether there's a logical nexus?

18       A.  I don't know.

19       Q.  Who at the City determines whether there

20   was a legitimate purpose in carrying the firearm?      03:51

21       A.  Again, I did not authorize this letter.  I

22   did not say those words.  So I don't have an answer

23   for you.

24       Q.  As a matter of policy at the City of Menlo

25   Park, was Zeleny required to have a logical nexus      03:51

Page 429

```
1              REPORTER'S CERTIFICATE
2
3
4       I, DENISE M. LOMBARDO, do hereby certify:
5       That DAVE BERTINI, in the foregoing deposition
6  named, was present by videoconference and by me
7  sworn as a witness in the above-entitled action at
8  the time and place therein specified;
9       That said deposition was taken before me at
10  said time and place, and was taken down in
11  shorthand by me, a Certified Shorthand Reporter of
12  the State of California, and was thereafter
13  transcribed into typewriting, and that the
14  foregoing transcript constitutes a full, true and
15  correct report of said deposition and of the
16  proceedings that took place;
17       And that the aforementioned 306-page
18  transcript meets the California minimum transcript
19  format standards.
20       IN WITNESS WHEREOF, I have hereunder
21  subscribed my hand this 3rd day of September, 2020.
22
23        Denise M. Lombardo
24        DENISE M. LOMBARDO, CSR No. 5419
25        State of California
```

Page 534

Exhibit 7

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    MICHAEL ZELENY,              ) Case No.
                                  ) CV 17-7357 JCS
5              Plaintiff,         )
                                  )
6     vs.                         )
                                  )
7    EDMUND G. BROWN, Jr.         )
     et al.,                      )
8                                 )
               Defendants.        )
9    _____ )

10

11

12

                   DEPOSITION OF BLAKE GRAHAM
13
                 Thursday, January 23rd, 2020
14
                       ---oOo---
15

16

17

18

19

20

21

22    Reported by:
      David A. Disbrow
23    CSR No. 7768

24

25

1    Committees for each House basically, they may have a

2    person or they may suggest you know the Judicial

3    Counsel's office or something like that.  That's where

4    I would start.

5         **Q**    Understood.  Let's go on to topic number

6    four.

7         **A**    Okay.

8         **Q**    Are you prepared to testify today about topic

9    number four?

10        **A**    The Attorney General's office to my knowledge

11   does not provide a legal opinion in general about

12   concealed carry.  There is a I want to say at least one

13   lawsuit, the "Peruta" case, that may still be active.

14   I'm not a part of that, I was not deposed, so there may

15   be some existing legislation on the matter.  I'm not

16   sure if it's completely done as far as the appeals or

17   you know that type of thing and so I'm probably you

18   know I guess the best place to tell you that there

19   could be recent activity on that conceal carry matter.

20        **Q**    Let's backtrack for a second.  I didn't ask

21   you at the start of the deposition.  What do you do for

22   a living?

23        **A**    I'm a special agent in charge for the

24   Department of Justice and then within the Department of

25   Justice, I work within the Bureau of Firearms.  To

1    extend on that a little bit, I supervise teams of

2    special agents that disarm prohibitive people.  We

3    investigate firearms dealers if there's an allegation

4    of wrongdoing.  We will monitor gun shows to make sure

5    that only legal activity is occurring there.

6               THE REPORTER:  "To make sure that --"

7               THE WITNESS:  -- only legal activity is

8    occurring at the gun shows.

9               THE REPORTER:  Okay.

10              THE WITNESS:  And I also have a team of

11   analysts that prepare regulations that are firearms

12   related regulations for the Bureau of Firearms and I

13   have some analysts that help prepare investigative

14   packages for the agents that again go out and disarm

15   folks and whatnot.

16   BY MR. ROBINSON:

17        Q    Okay.

18        A    I have testified in front of the Legislature

19   multiple times on various technical matters, assault

20   weapons and whatnot, things like that.

21        Q    Okay.  As part of your role within the

22   Department of Justice do you enforce the concealed

23   carry statutes?

24        A    Personally, we have made arrests.  For

25   example, during a gun show investigation we may

1    place you would see a gun.  It could be shoved down the

2    floor, between their feet, some other scenario and I

3    think that would be in discussion, too.

4         **Q**    All right.

5         **A**    Okay.

6         **Q**    Let's go to the last page of Exhibit Six.

7         **A**    (Witness reviewed document.)

8         **Q**    Do you recognize the section that we're

9    looking at there; Penal Code Section 26375?

10        **A**    Okay.  Let me review this real quick.

11        **Q**    Sure.

12        **A**    Okay, so I've reviewed that smaller language

13   on the top half of the page there.

14        **Q**    Okay.

15        **A**    Could you reask the question?

16        **Q**    Well, I just asked you to review it.

17        **A**    Okay, sorry.

18        **Q**    Is this one of the exceptions to the ban on

19   openly carrying handguns?

20        **A**    Yes.

21        **Q**    In the first clause, maybe it's the second

22   clause, but it refers to -- let me clarify that.  So

23   the section reads, Section 26350, "Does not provide the

24   or affect the open carrying of an unregistered handgun

25   by an unauthorized participant," and then it goes on,

1    okay?

2          A     Yeah, I see that.

3          Q     What does "Authorized" mean in that clause

4    that I just read?

5               MS. SKELLY:  Objection; the deponent is not

6    authorized to interpret the statute which was written

7    by the Legislature and so he can't answer that

8    question.

9               THE WITNESS:  I'm not aware of this

10   "Authorized participant" being defined by the

11   Legislature.  I don't know that it's defined in DOJ

12   regulations either.

13   BY MR. ROBINSON:

14         Q     Has the Attorney General's office issued an

15   opinion about what an "Authorized participant" means if

16   you know?

17         A     I don't know that they have issued -- as I

18   said, this entertainment firearms permit area of the

19   law is I guess an infinitesimal part of the overall

20   firearms' scheme in the State and I don't think until

21   now I've even been asked what that phrase meant.

22         Q     Do you have an understanding of what it means

23   now?

24               MS. SKELLY:  Objection; there's no relevance

25   to the deponent's understanding of what the statute

1    means.  The statute -- the document speaks for

2    itself.  To the extent that any interpretation is

3    needed it will be done by the Court.

4              MS. RAUCH:  Join.

5    BY MR. ROBINSON:

6         Q    You can answer.

7         A    I would have to do quite a bit of research

8    before I could come up with something on this.  This

9    kind of a definition when it's not defined by the

10   Legislature sometimes can be left to the agency but to

11   my knowledge we've not done regulations which would

12   somehow clarify that and it's not something I can come

13   up with at the spur of the moment today.

14        Q    Do you know if the DOJ has an official

15   position on what "Authorized participant" means?

16             MS. SKELLY:  Objection; asked and answered.

17             THE WITNESS:  Yeah, I think I've probably

18   said that just now in the last question

19   BY MR. ROBINSON:

20        Q    Why don't you just go ahead and answer it

21   again.

22        A    Okay.

23        Q    Does DOJ have an official position on what

24   "Authorized participant" means in the exemptions?

25        A    To my knowledge without -- lacking a

1    document.

2    BY MR. ROBINSON:

3        Q    All right.  The Legislative bill analysis

4    document you're referring to is about a different

5    statute, right?

6        A    Your question dealt with an exemption to

7    unloaded carry --

8        Q    Right.

9        A    -- right?  And it deals with entertainment

10   firearms permits so this document doesn't have the

11   actual Penal Codes listed out in this document.  I

12   assume there's -- this was an attachment or connected

13   to the actual Codes involved in the bill.  To me, these

14   are possible, they're possibly connected.  Back when

15   this document was created in 2004 the Penal Codes were

16   generally in the 12000 series.  In 2012, the

17   Legislature renumbered all the Penal Codes so as they

18   sit now, this 26375 that is in, I'm referencing now

19   from Exhibit Six, that might be what's referenced in

20   page two farther up in existing law where you see let's

21   say, 12078, 12072.  The Legislature renumbered

22   everything so it's possible that they are really the

23   same thing but I don't have the ability as I sit here

24   today to be a hundred percent sure but I want to at

25   least point you in the right direction that really they

```
 1              CERTIFICATE OF DEPOSITION OFFICER

 2

 3            I, DAVID A. DISBROW, CSR, duly
       authorized to administer oaths pursuant to Section
 4     2093(b) of the California Code of Civil Procedure,
       hereby certifying that the foregoing proceedings
 5     were taken at the time and place therein stated;
       transcribed by means of computer-aided
 6     transcription; that the foregoing is a full,
       complete and true record of said proceedings;
 7            I further certify that I am not of
       Counsel or attorney for either or any of the
 8     parties in the foregoing deposition and caption
       named, or in any way interested in the outcome of
 9     this cause named in said caption.

10

11     _____      _____
        DATE                    DAVID A. DISBROW
12                              C.S.R. NO. 7768

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **PROOF OF SERVICE**

I hereby certify that on January 21, 2021, I electronically filed the foregoing document using the Court's CM/ECF system.  I am informed and believe that the CM/ECF system will send a notice of electronic filing to the interested parties.

s/ Gabrielle Bruckner
Gabrielle Bruckner

ROBINSON DECL. ISO MOTION FOR PARTIAL SUMMARY JUDGMENT