1  XAVIER BECERRA
   Attorney General of California
2  ANTHONY R. HAKL
   Supervising Deputy Attorney General
3  JOHN W. KILLEEN
   Deputy Attorney General
4  State Bar No. 258395
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone:  (916) 210-6045
     Fax:  (916) 324-8835
7    E-mail:  John.Killeen@doj.ca.gov
   *Attorneys for Defendant Xavier Becerra*

8

9                   IN THE UNITED STATES DISTRICT COURT

10              FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

14  **MICHAEL ZELENY, an individual,**          Case No. 3:17-cv-07357 RS (NC)

                                    Plaintiff,   **CALIFORNIA ATTORNEY GENERAL**
15                                               **XAVIER BECERRA'S OPPOSITION TO**
          v.                                     **MOTION FOR SUMMARY JUDGMENT**
16                                               **OF PLAINTIFF MICHAEL ZELENY**

17  **GAVIN NEWSOM, an individual, in his**      Date:        March 18, 2021
    **official capacity; XAVIER BECERRA, an**    Time:        1:30 p.m.
18  **individual, in his official capacity; CITY OF**  Dept:   Courtroom 3, 17th Floor
    **MENLO PARK, a municipal corporation;**     Judge:       The Honorable Richard G.
19  **and DAVE BERTINI, in his official**                     Seeborg
    **capacity,**                                Trial Date:  None set
20                                               Action Filed:  12/28/2017
                                    Defendants.
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................... 1

Statement of Issues to Be Decided ....................................................................... 3

Relevant Facts ....................................................................................................... 3

    I.     Zeleny's Relationship with the Zhu Family ............................................ 3

    II.    Zeleny's Public Campaign Against WebEx and NEA ............................ 4

    III.   Zeleny's Use of Firearms to Amplify His Protests ................................ 4

    IV.    California's Open Carry Laws ................................................................. 5

    V.     The Regulations of Firearms Used as Entertainment Props ................... 6

    VI.    Zeleny's Desire to Restart His Protests .................................................. 7

    VII.   Zeleny's Complaint ................................................................................ 8

Legal Standard for Summary Judgment ................................................................ 9

Argument ............................................................................................................... 9

    I.     California's Restrictions on the Open Carry of Unloaded Firearms Do Not Violate the First Amendment on Their Face ................................... 9

         A.    Carrying a Firearm Is Not Expressive Conduct That Is Protected by the First Amendment .......................................... 10

         B.    Even if Openly Carrying an Unloaded Firearm Amounted to Expressive Conduct Under the First Amendment, California's Unloaded Open Carry Restrictions Would Withstand Intermediate Scrutiny .............................................. 10

    II.    California's Restrictions on the Open Carry of Unloaded Firearms Do Not Violate the Second Amendment on Their Face ................................ 13

         A.    Legal Standard ........................................................................ 13

         B.    There Is No Right Under the Second Amendment to Carry Unloaded Firearms for the Purpose of "Amplifying" One's Protest ........ 14

         C.    Zeleny Did Not Plead That He Intended to Bear Loaded Firearms for Self-Defense, and Has Therefore Waived an Argument Based on Self-Defense ..................................................... 15

         D.    To the Extent That Zeleny Is Allowed to Assert a Second Amendment Right to Loaded Open Carry Based on Self-Defense for the First Time, California's Restrictions on Loaded Open Carry Do Not Violate the Second Amendment ................................. 17

              1.    Level of Scrutiny ........................................................ 18

              2.    The Government's Stated Objective ............................. 19

              3.    Reasonable Fit ............................................................ 19

    III.    California's Restrictions on the Open Carry of Firearms Do Not Violate the Equal Protection Clause ........................................................ 20

i

**TABLE OF CONTENTS**
(continued)

Page

IV.  Zeleny Does Not Appear to Fall Within a Statutory Execption to the Open
Carry Laws; but Even if He Did, That Would Not Prevent Menlo Park
from Imposing Reasonable Conditions on His Protest, Including on His
Use of Firearms ................................................................................................... 21

A.  Zeleny Likely Does Not Qualify for the Entertainment Exception .......... 22

B.  Even if the Court Were to Declare That Zeleny Qualified for the
Entertainment Exemption, That Would Not Mean That Menlo
Park's Regulation of Zeleny's Activities Was Unconstitutional. ............. 24

V.  Penal Code Section 26405(r) Is Not Unconstitutionally Vague .......................... 25

# TABLE OF AUTHORITIES

**Page**

CASES

*Ai v. United States*
   809 F.3d 503 (9th Cir. 2015)..................................................................................................25

*Baird v. Becerra*
   No. 2:19-cv-00617-KJM-AC, 2020 WL 5107614 (E.D. Cal. Aug. 31, 2020) ..................17, 18

*Bauer v. Becerra*
   858 F.3d 1216 (9th Cir. 2017)....................................................................................13, 14, 18

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986) .....................................................................................................................9

*City of Cleburne v. Cleburne Living Ctr.*
   473 U.S. 432 (1985) ...................................................................................................................20

*Clark v. Cmty. for Creative Non-Violence*
   468 U.S. 288 (1984) ...................................................................................................................10

*Coleman v. Quaker Oats Co.*
   232 F.3d 1271 (9th Cir. 2000)..............................................................................................16, 17

*Donovan v. Royal Logging Co.*
   645 F.2d 822 (9th Cir. 1981).....................................................................................................25

*Flanagan v. Harris*
   9th Cir. No. 18-55717 ...............................................................................................................17

*Flanagan v. Harris*
   No. LA CV16-06164 JAK, 2018 WL 2138462 (C.D. Cal. May 7, 2018) ....................... *passim*

*Gallinger v. Becerra*
   898 F.3d 1012 (9th Cir. 2018)..............................................................................................20, 21

*Grayned v. City of Rockford*
   408 U.S. 104 (1972) ...................................................................................................................25

*Jackson v. City & Cty. of San Francisco*
   746 F.3d 953 (9th Cir. 2014)................................................................................................13, 17

*Knox v. Brnovich*
   907 F.3d 1167 (9th Cir. 2018)...................................................................................................10

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
   475 U.S. 574 (1986) .....................................................................................................................9

## TABLE OF AUTHORITIES
### (continued)

Page

*Navajo Nation v. U.S. Forest Service*
    535 F.3d 1058 (9th Cir. 2008)...................................................................................16

*Nichols v. Harris*
    17 F. Supp. 3d 989 (C.D. Cal. 2014) ............................................................... *passim*

*Nichols v. Harris*
    9th Cir. No. 14-55873 ...................................................................................................17

*Nordyke v. King*
    319 F.3d 1185 (9th Cir. 2003)......................................................................................10

*Nordyke v. King*
    644 F.3d 776 (9th Cir. 2011)..................................................................................11, 12

*Pac. Bell Telephone Co. v. City of Walnut Creek*
    428 F. Supp.2d 1037 (N.D. Cal. 2006) ......................................................................22

*People v. Flores*
    169 Cal. App. 4th 568 (2008)........................................................................................5

*Silvester v. Harris*
    843 F.3d 816 (9th Cir. 2016)............................................................................ *passim*

*Teixeira v. Cnty. of Alameda*
    873 F.3d 670 (9th Cir. 2017)..................................................................................14, 17

*United States v. Albertini*
    472 U.S. 675 (1985)......................................................................................................12

*United States v. O'Brien*
    391 U.S. 367 (1968)................................................................................................11, 12

*Wasco Prods., Inc. v. Southwall Techs., Inc.*
    435 F.3d 989 (9th Cir. 2006).......................................................................................16

*Young v. Hawaii*
    9th Cir. No. 12-17808 ...................................................................................................17

# TABLE OF AUTHORITIES
### (continued)

Page

**STATUTES**

California Penal Code
§ 12031 .................................................................................................................5
§ 25400 *et seq.* ....................................................................................................5
§ 25850 *et seq.* ....................................................................................................5
§ 26350 ........................................................................................................ *passim*
§ 26350(a) ............................................................................................................5
§ 26361-26392 ......................................................................................5, 12, 20
§ 26365 ...............................................................................................................23
§ 26369 ...............................................................................................................23
§ 26375 ...............................................................................................................20
§ 26400 .............................................................................................................5, 8
§ 26400(a) ............................................................................................................5
§ 26400 *et seq.* ........................................................................................... *passim*
§ 26405 ......................................................................................................5, 12, 20
§ 26405(r) .................................................................................................... *passim*
§ 29500 *et seq.* ....................................................................................................6

California Statutes
2011, c. 725 .........................................................................................................5
2012, c. 700 .........................................................................................................5

**CONSTITUTIONAL PROVISIONS**

United States Constitution
First Amendment .......................................................................................... *passim*
Second Amendment ...................................................................................... *passim*
Fourteenth Amendment .......................................................................................9
Due Process Clause ............................................................................................26
Equal Protection Clause ............................................................................... *passim*

**COURT RULES**

Federal Rules of Civil Procedure
Rule 56(a) ............................................................................................................9

**OTHER AUTHORITIES**

Patrick McGreevy & Nicholas Riccardi, *Brown bans open carrying of handguns*,
L.A. Times (Oct. 10, 2011) ..............................................................................11

**INTRODUCTION**

For the last 20 years, Michael Zeleny has been embroiled in personal, business, legal, and public disputes with the family of his former girlfriend, the company her father worked with, and the City of Menlo Park. Zeleny expressed his anger by staging colorful protests in Menlo Park. In 2015, he asked Menlo Park for permission to stage a protest in the center median of Sand Hill Road, at the I-280 off-ramp, ensuring maximum exposure to drivers exiting the freeway and drivers traversing Sand Hill Road. In the median, Zeleny proposed to set up a large animated screen depicting scenes of sexual violence, smaller posters, a machine gun, and other firearms to "amplify" his protest. Zeleny asked to park a truck and set up a portable toilet in the median so that he could remain there around the clock. Perhaps cognizant of the impact such a display might have on its visitors and residents, Menlo Park denied Zeleny's permit, which sparked his dispute with the City about its time-place-manner restrictions under the First Amendment.

California Attorney General Xavier Becerra's office was not involved in Zeleny's dispute with Menlo Park. But among the many reasons the City denied Zeleny's request was because California law (Cal. Pen. Code § 26350 *et seq.* and Cal. Pen. Code § 26400 *et seq.*) allows the open carry of unloaded firearms in only several dozen enumerated situations; otherwise, individuals are not allowed to openly carry unloaded firearms in incorporated areas like Menlo Park. Zeleny challenges the facial constitutionality of these restrictions, alleging that he has a constitutional right to use unloaded firearms as he sees fit. On January 21, the parties filed cross-motions for summary judgment. In his motion, the Attorney General demonstrated that California's restrictions on unloaded open carry did not, on their face, violate the First Amendment, Second Amendment, or Equal Protection Clauses of the U.S. Constitution.

Rather than prove his allegation that California's restrictions on unloaded open carry are unconstitutional, Zeleny now advances a different claim and seeks different relief than he pleaded in the operative second amended complaint. In the complaint, Zeleny challenged California's restrictions on *unloaded* firearms, on the basis that they infringed upon his right to protest. Zeleny emphasized that his firearms were always "unloaded," swore that his intentions were always peaceable, and stated that his purpose was to amplify his protests against NEA and the

1

1   City of Menlo Park.  Zeleny did *not* challenge restrictions on loaded or concealed firearms, or

2   allege that he needed to use his firearms for any purpose other than amplifying his protests.

3   Now, Zeleny portrays himself as a Second Amendment activist who demands the ability to

4   carry *loaded* firearms whenever and wherever he pleases, purportedly for self-defense.  He also

5   seeks a much broader remedy: a declaration and injunction striking down California's entire

6   regulatory scheme for loaded, concealed, and unloaded firearms.

7   This tactic has its advantages: by waiting until the summary-judgment stage to assert these

8   claims, Zeleny could prevent Defendants from seeking relevant discovery, obtaining expert

9   witnesses, and otherwise preparing to defend themselves against Zeleny's claims.  But it violates

10  the cardinal rule that defendants be put on adequate notice of the claims against them.  Therefore,

11  Zeleny's claims based on the Second Amendment should be denied.

12  Alternatively, Zeleny argues that even if California's restrictions on unloaded open carry

13  are constitutional, he is entitled to a judicial declaration that he falls within a statutory exception

14  to those restrictions.  The Court need not (and should not) exercise supplemental jurisdiction over

15  this state-law question because the Attorney General prevails on Zeleny's federal constitutional

16  claims.  If the Court were to examine the issue, it appears unlikely that Zeleny would fall within

17  that exception; and even if he did, at most Zeleny would have a defense to a prosecution for an

18  open carry violation.  Nothing would prevent the City from imposing other conditions on

19  Zeleny's activities consistent with the First Amendment—including his location, duration,

20  signage, placement of guns, and need to provide security or pay for law enforcement presence—

21  or regulating his activities through any other provisions of the law (e.g., as a nuisance, or a sound

22  violator, or traffic disruptor).  "Avoiding" the constitutional issues involved here would achieve

23  little practical effect for Zeleny's ability to protest.

24  Finally, Zeleny alleges that the same exception to the unloaded-open-carry law is vague.

25  But Zeleny's own evidence demonstrates that the meaning of the entertainment exception is well-

26  understood in the relevant industry, and that industry practice was apparently incorporated into

27  the open-carry law.  This is not the rare case when a law is so unclear as to rise to the level of a

28  due process violation, and this claim must be rejected as well.

2

1

**STATEMENT OF ISSUES TO BE DECIDED**

2      (1) Whether California's decision to allow the open carry of unloaded firearms in only

3  certain situations (*see* Cal. Pen. Code § 26350 *et seq.* and Cal. Pen. Code § 26400 *et seq.*) facially

4  violates the First Amendment, the Second Amendment, or the Equal Protection Clause.

5      (2) Whether California Penal Code section 26405(r) is unconstitutionally vague.

6      (3) Whether the Court should exercise its supplemental jurisdiction to decide if Zeleny

7  qualifies for the exception found in section 26405(r), and if so, whether that exception applies.

8

**RELEVANT FACTS**

9  **I.    ZELENY'S RELATIONSHIP WITH THE ZHU FAMILY**

10      In the 1990s, Zeleny and Erin Zhu were in a romantic relationship.  SAC, ¶ 28.  After their

11  personal relationship ended, they continued to be business partners.  *Id.*; ECF 161-1 Decl., of

12  John Killeen, Ex. 1 (ZEL0075), Ex. 2[1] at 211:25-213:3.  They performed work for Erin's father

13  Min Zhu and his company WebEx Communications.  Ex. 1 (ZEL0075); Ex. 2 at 7:21-8:15.

14      In early 2000, Erin Zhu successfully pursued a claim against her father Min Zhu for

15  childhood sexual abuse.  SAC, ¶¶ 27, 31.

16      At around the same time, Zeleny and Erin Zhu's business relationship soured.  Ex. 2 at

17  211:25-213:3.  Zeleny and Erin Zhu dissolved their business relationship through a written

18  agreement.  Ex. 2 at 212:21-25.  Zeleny then sued Erin, her parents, and WebEx for breaching the

19  dissolution agreement and other conduct related to their business dealings; among other things,

20  Zeleny alleged that WebEx used 5,000 shares of its stock "that it owed to Zeleny's company to

21  pay hush money to Min Zhu's daughter Erin for her childhood rape by Min Zhu."  Ex. 3; Ex. 1

22  (ZEL0075); Ex. 2 at 15:9-16:13.  Zeleny pursued this litigation against his former lover and

23  business partner until 2004, when he entered into a settlement with Erin.  Ex. 2 at 15:9-16:13.

24  **II.   ZELENY'S PUBLIC CAMPAIGN AGAINST WEBEX AND NEA**

25      Zeleny alleges that while he was involved in litigation with the Zhu family, he received a

26  series of anonymous threats of violence against himself and his family.  Ex. 1 (ZEL0075).  On

27

28      [1] Throughout this brief, all citations to "Ex. ___" refer to the Killeen Declaration (ECF 161-1) and all statutory citations ("§ ___") refer to the California Penal Code, unless noted otherwise.

3

February 11, 2004, Zeleny's father suffered fatal injuries in an apartment fire. *Id.* Zeleny believes that the Zhu family may have had something to do with the fire. Ex. 4 (ZEL002).

After his father's death, Zeleny began a campaign of protests "to express the view that Min Zhu's wrongdoing, and the conduct of NEA and WebEx senior management in turning a blind eye to it, should disqualify them from any involvement in publicly traded companies." SAC, ¶ 2 *see id.*, ¶¶ 33, 41, 52-56. Zeleny targeted NEA because it had "provided venture capital support to WebEx from its early stages, through and beyond its initial public offering in 2000." SAC, ¶ 32. In 2005, Zeleny protested outside the WebEx user conference at the St. Francis hotel in San Francisco. SAC, ¶¶ 33-35; Ex. 2 at 44:10-17.

Shortly thereafter, Min Zhu retired from WebEx and returned to his native country of China. SAC, ¶¶ 36-38, 55. Nevertheless, Zeleny continued to stage protests against NEA because he believed that "NEA has continued to do business with Min Zhu." SAC, ¶¶ 40-42. Between 2006 and 2012, Zeleny held "several dozen protests" at NEA's office in Menlo Park. Ex. 2 at 67:1-25; SAC, ¶¶ 42, 56, 60.

Zeleny's "protests were intended to be provocative." SAC, ¶ 44. They featured "graphic but non-obscene images reflecting Min Zhu's conduct" and "flyers calling out" certain WebEx and NEA officers "for being enablers of Min Zhu"; some also involved "accordions, trumpets, and bagpipes, and offers of free food to sex workers, registered sex offenders, and adult industry performers." SAC, ¶¶ 43-44; Ex. 2 at 72:10-16.

### III.   ZELENY'S USE OF FIREARMS TO AMPLIFY HIS PROTESTS

Zeleny's protests were also provocative because he regularly displayed firearms to "amplify his message." SAC, ¶ 4; *see id.*, ¶¶ 35, 46-48. When WebEx cancelled its conference in response to Zeleny's presence in 2005, "[t]hat made [Zeleny] understand that the mere presence of a firearm makes my message much more effective." Ex. 2 at 57:14-58:12. His protests began to incorporate the "exposed and conspicuous carry of firearms because [he] found through experience that that attracts the most attention." Ex. 2 at 217:3-7, 73:21-74:3 (listing firearms). Though he used firearms to attract attention, Zeleny claims that his firearms were always unloaded, and he represents he wants to use only unloaded firearms in his future protests in

4

1   Menlo Park.  Ex. 2 at 69:9-70:20; SAC, ¶¶ 4 ("unloaded"), 46, 48, 112, 114, 120, 188-90, 192,

2   210, 217(a), 221-22, 233, p. 41 (Prayer for Relief ¶¶ (B), (C), & (G).

3       The presence of a man standing on a street corner in full tactical gear carrying a gun, live

4   ammunition, and a poster depicting a scene of sexual violence, provoked calls to the Menlo Park

5   police department.  Ex. 6 at 56:3-19, 302:19-303:13, 305:8-306-4.

6   **IV.   CALIFORNIA'S OPEN CARRY LAWS**

7       California has long regulated the open (or "public") carry of *loaded* firearms in public.  *See*

8   § 25850 *et seq.* (formerly § 12031); *People v. Flores*, 169 Cal. App. 4th 568, 576 (2008)

9   (describing prior version of the prohibition).  California has also long regulated the carriage of

10  *concealed* firearms.  *See* Cal. §§ 25400 *et seq.*  The complaint does not challenge either of these

11  restrictions.  Instead, Zeleny challenges only California's relatively new restrictions on the open

12  carry of *unloaded* firearms in public.  SAC, ¶¶ 8, 188-190, & p. 41 (seeking declaration that

13  "California Penal Code §§ 26400 and 26350 unconstitutional")

14      "Prior to January 1, 2012, it was legal to openly carry an unloaded firearm in public in

15  California." SAC, ¶ 103.  In 2011, the California Legislature enacted and the Governor signed

16  AB 144, which regulated the open carry of unloaded handguns.  *See* Cal. Stats. 2011, c. 725;

17  § 26350 *et seq.*  A year later, California enacted AB 1527, which regulated the open carry of

18  unloaded firearms other than handguns.  *See* Cal. Stats. 2012, c. 700; § 26400 *et seq.*

19      AB 114 and AB 1527 allow individuals to openly carry unloaded firearms in dozens of

20  situations, including at home or at one's business, for certain self-defense purposes, hunting,

21  target shooting, target shooting and firearms training.  §§ 26361-26392, 26405.  Other than in the

22  situations enumerated in the statutes, a California resident may not openly carrying an unloaded

23  firearm outside of a vehicle in an "incorporated" city or county, or a "prohibited area" of an

24  unincorporated area of a city or county.  §§ 26350(a), 26400(a).

25      "[T]he Legislative Histories discussing Sections 26350 (unloaded handguns) and 26400

26  (unloaded firearms) explain in identical language that these statutes were enacted because:

27      The absence of a prohibition on "open carry" has created an increase in problematic
        instances of guns carried in public, alarming unsuspecting individuals causing issues
28      for law enforcement.

5

Open carry creates a potentially dangerous situation. In most cases when a person is openly carrying a firearm, law enforcement is called to the scene with few details other than one or more people are present at a location and are armed.

In these tense situations, the slightest wrong move by the gun carrier could be construed as threatening by the responding officer, who may feel compelled to respond in a manner that could be lethal. In this situation, the practice of 'open carry' creates an unsafe environment for all parties involved: the officer, the gun-carrying individual, and for any other individuals nearby as well.

Additionally, the increase in "open carry" calls placed to law enforcement has taxed departments dealing with under-staffing and cutbacks due to the current fiscal climate in California, preventing them from protecting the public in other ways."

*Nichols v. Harris*, 17 F. Supp. 3d 989, 1004-05 (C.D. Cal. 2014) (citing ECF 161-2, Exs 1 & 2)

(legislative history materials).

## V.   THE REGULATIONS OF FIREARMS USED AS ENTERTAINMENT PROPS

One of the many exceptions to the general prohibition on unloaded open carry is for "an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television, or video production or entertainment event, when the participant lawfully uses that firearm as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event." § 26405(r).  The legislative history of Penal Code section 26405(r) indicated that this exemption was for "props," consistent with long-standing State and local regulations on the use of firearms in movie and television productions.  ECF 161-2, Ex. 1 – 50; *see, e.g.*, § 29500 *et seq.*

Prior to the enactment of the unloaded open carry statutes, the use of firearms in entertainment productions was already "highly regulated" by federal, state, and local law, and by common industry practices.  ECF 163-1 at 77 of 100.  Entertainment productions might require federal and state permits, including a California DOJ Entertainment Firearms Permit.  ECF 163-1 at 59, 74-75; § 29500 *et seq.* (EFP).  Entertainment productions also obtained local permits from jurisdictions like Menlo Park.  ECF 163-1 at 60-62, 66 (describing obtaining permits from "many different cities and towns in California"), 76-77.  One of Zeleny's experts emphasizes the importance of cooperating with local authorities: "I always insist that productions get the proper permitting and cover all of the requirements in the specific area and jurisdiction they are filming

6

1    in." *Id.* at 60.  Entertainment productions then retain armorers or similar experts to closely

2    supervise the use of firearms by the participants on set.  *Id.* at 62, 75-76.

3    **VI.   ZELENY'S DESIRE TO RESTART HIS PROTESTS[2]**

4         In 2015, 15 years after he sued Erin Zhu and 10 years after Min Zhu had left the country,

5    Zeleny decided to resume his protests.  Zeleny never considered protesting without firearms.  Ex.

6    2 at 165:10-14.  To avoid restrictions on the open carry of unloaded firearms, Zeleny figured that

7    if he brought a video camera, he would fall within the statutory exception for the use of unloaded

8    firearms as props in "a motion picture, television, or video production or entertainment event."

9    § 26405(r); SAC, ¶¶ 109-16, 190-91; Ex. 2 at 181:20-185:20.  And rather than simply appearing

10   in the street, as he had done in the past, Zeleny decided to "appl[y] to the City for entertainment

11   and/or film permits accommodating his videotaped, armed protests."  SAC, ¶ 124.

12        Zeleny initially applied for a "special event permit."  SAC, ¶ 138.  Zeleny sought to park a

13   truck in the center median of Sand Hill Road (across from NEA's building), at the intersection of

14   the northbound I-280 off-ramp and Sand Hill Road.  Ex. 7 (ZEL0181); Ex. 2 at 119:14-120:4,

15   136:6-11.  Zeleny proposed that he be allowed to install a portable toilet, so that he could be there

16   "around the clock."  Ex. 7 (ZEL181); Ex. 8 (MP000236); Ex. 2 at 107:19-108:1, 121:15-18.

17   Zeleny proposed that he be allowed to mount on the back of his truck a "55-inch portable media

18   display powered by a portable gas generator."  Ex. 7 (ZEL0181); Ex. 9 (ZEL0167); Ex. 2 at

19   123:9-124:5.  This screen would display "videos featuring explicit representations of sexual

20   violence."  Ex. 7 (ZEL1081); Ex. 2 at depo. ex. 4, 113:17-25, 116:9-117:5.  Zeleny proposed that

21   he be allowed to install portable lighting illuminating placards.  Ex. 2 at 123:9-124:5.

22   Additionally, Zeleny proposed that he be allowed to display "fully operational, exposed and

23   unloaded military grade firearms and loaded ammunition feeding devices therefor, including

24   without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a 7.65x51mm NATO

25   semiautomatic LRB M25 rifle and tripod-mounted belt-fed Browning M1919a."  Ex. 7 (ZEL181);

26   Ex. 2 at depo. ex. 3, 112:10-24; 128:25-129:16.

---

27   [2] Zeleny also alleges that the City, WebEx, and NEA conspired against him in various
ways.  *See* SAC, ¶¶ 57-101; Zeleny does not allege that the Attorney General or any other State
28   entity participated in this alleged conspiracy.

7

After considering his request to set up an illuminated animated screen displaying scenes of sexual violence, flanked by what would appear to a casual observer to be a "belt-fed" machinegun, planted in the median of Sand Hill Road, at the I-280 freeway juncture, around the clock (with a portable toilet), the City of Menlo Park denied Zeleny's special event permit.  Ex. 2 at 130:14-16; SAC, ¶¶ 124, 155, 161, 166, 175.

Subsequently, Zeleny "requested that the City reconsider the denial of his permit and treat his application as one for a film permit under the separate process the City maintains for film permits."  SAC, ¶ 176; Ex. 2 at 175:23-176:7.  As part of his film permit, Zeleny apparently changed the proposed location of his anticipated protest from the median of Sand Hill Road to the side of the road, and restricted it to daylight hours.  Ex. 2 at 209:10-210:7, depo. ex. 21.  According to Zeleny, the "film" aspect of the demonstration would consist of Zeleny setting up his guns, posters, and images of sexual violence on a busy road and then "film[ing] the responses of the drivers that pass by that display on Sand Hill Road."  Ex. 2 at 208:19-24, 185:13-20.

Zeleny alleges that his "permit application still remains 'pending'" and is "in permanent limbo."  SAC, ¶¶ 185-86.

**VII.   ZELENY'S COMPLAINT**

In late 2017, Zeleny filed this lawsuit.  The operative second amended complaint alleges that Zeleny "seeks to exercise his First and Second Amendment rights by engaging in peaceful protests while carrying unloaded firearms."  SAC, ¶ 188.  The complaint alleges that the City's denial of Zeleny's permit(s), and other actions, have violated the First Amendment as applied to Zeleny's specific situation.  *Id.*, ¶¶ 194-224.  The complaint alleges that Zeleny qualifies for an exception to the general prohibition against open carry.  *Id.*, Prayer for Relief (B).  Against the Attorney General, the complaint also alleges that "California Penal Code sections 26350 and 26400 . . . are unconstitutional on their face, as applied to Zeleny's display of unloaded firearms as a means of protest."  *Id.*, ¶ 190.  Finally, the complaint alleges that California's open carry statutes violate the Equal Protection Clause.  *Id.*, ¶¶ 227-28.

1

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

2   Summary judgment is proper where no genuine issue of material fact exists and the moving

3   party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In considering a motion

4   for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving

5   party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "[T]he

6   plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who

7   fails to make a showing sufficient to establish the existence of an element essential to that party's

8   case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477

9   U.S. 317, 322 (1986).

10

**ARGUMENT**

11   Zeleny alleges that the City is engaged in a long-running conspiracy against him to deny

12   him the ability to demonstrate when, where, and how wants—on Sand Hill Road, with a belt-fed

13   machine gun and other firearms, and a television displaying "explicit representations of sexual

14   violence."  Zeleny does not allege that the Attorney General is involved in that conspiracy, has

15   taken any other action against Zeleny, or has applied any laws to Zeleny.  The Attorney General

16   is a party here only because Zeleny challenges the facial constitutionality of California Penal

17   Code sections 26400 *et seq.* and 26350 *et seq.*, which generally limit the open carry of unloaded

18   firearms to certain situations.  Zeleny alleges that "the open carry ban, and the entertainment

19   exception, violate the First, Second, and Fourteenth Amendments and should be declared

20   unconstitutional."  ECF 163 at 2; *see also* SAC, ¶¶ 1, 7, 8, 188-190.  Zeleny also seeks a judicial

21   declaration that he falls within an exception to the open-carry ban, and alternatively alleges that

22   the same exception is unconstitutionally vague. ECF 163 at 5-6, 21.

23

**I.     CALIFORNIA'S RESTRICTIONS ON THE OPEN CARRY OF UNLOADED FIREARMS DO
         NOT VIOLATE THE FIRST AMENDMENT ON THEIR FACE**

24

25   Zeleny briefly contends that, by allowing the open carry of firearms in some contexts but

26   not others, California is regulating speech, and has drawn a content-based distinction that is

27   subject to strict scrutiny under the First Amendment.  ECF 163 at 21; *see also* SAC, ¶¶ 8, 109-

28   112, 188-90.  Zeleny is wrong on both counts.

9

**A.    Carrying a Firearm Is Not Expressive Conduct That Is Protected by the First Amendment**

As the Attorney General demonstrated in his motion for summary judgment, Zeleny, who has the burden of proving that the regulation of open carry implicates the First Amendment at all, *see Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984), fails to satisfy that burden.  "[P]ossession of a gun is not commonly associated with expression."  *Nordyke v. King*, 319 F.3d 1185, 1190 (9th Cir. 2003) ("*Nordyke I*").  This fact alone ends Zeleny's facial challenge, because he cannot demonstrate that "a substantial number of [a law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Knox v. Brnovich*, 907 F.3d 1167, 1180 (9th Cir. 2018).

Even if the Court were to examine Zeleny's particular circumstances in the context of his facial challenge, *see, e.g.*, *Knox*, 907 F.3d at 1180 n.10, Zeleny's carrying of firearms is not expressive because it does not "convey a particularized message" that would "be understood by those who viewed it."  *Nordyke I*, 319 F.3d at 1190 (9th Cir. 2003) (citing as hypothetical examples of expressive conduct a "gun protestor burning a gun" or a "gun supporter waving a gun at an anti-gun control rally").  Zeleny does not allege that his guns are intended to convey a particular message.  And even if he subjectively intended to convey such a message, there is no evidence that it"[is] likely to be understood by those who view" it.  *Nordyke I*, 319 F.3d at 1190. No reasonable observer would discern a connection between Zeleny's message about NEA, Min Zhu, and the City, and a man walking through Menlo Park wearing tactical gear and carrying a plainly visible rifle.  They would just be alarmed, and call the police—which is what occurred here. Ex. 6 at 56:3-19, 302:19-303:13, 305:8-306-4.

**B.    Even if Openly Carrying an Unloaded Firearm Amounted to Expressive Conduct Under the First Amendment, California's Unloaded Open Carry Restrictions Would Withstand Intermediate Scrutiny**

Even if Zeleny's carrying of an unloaded firearm amounted to expressive conduct (which it does not), § 26350 *et seq.* and § 26400 *et seq.* would withstand scrutiny under the First Amendment.  Once a court determines that particular conduct is protected by the First Amendment, it must then determine what level of scrutiny to apply to the challenged policy. "The

10

1  level of scrutiny depends on whether the [challenged policy] is related to the suppression of free

2  expression." *Nordyke v. King*, 644 F.3d 776, 792 (9th Cir. 2011), *aff'd in relevant part*, 681 F.3d

3  1041, 1043 n. 1 (9th Cir. 2012) (en banc) ("*Nordyke III*") (citing *Texas v. Johnson*, 491 U.S. 397,

4  407 (1989)) (internal quotation marks omitted).  "That is, the government may not proscribe

5  particular conduct because it has expressive elements."  *Id.* (citing *Johnson*, 491 U.S. at 406)

6  (internal quotation marks omitted).  "If a law hits speech because it aimed at it, then courts apply

7  strict scrutiny; but if it hits speech without having aimed at it, then courts apply the *O'Brien*

8  intermediate scrutiny standard."  *Id.* (referring to *United States v. O'Brien*, 391 U.S. 367 (1968)).

9       Here, even if Penal Code sections 26350 *et seq.* and 26400 *et seq.*, regulated speech or

10  expressive conduct, *O'Brien* scrutiny would apply because California's open carry laws are not

11  "related to the suppression of free expression."  *Nordyke III*, 644 F.3d at 792 (applying *O'Brien* to

12  Alameda County's regulation of gun shows).  There is no evidence that the unloaded open carry

13  laws were in any way intended to suppress speech.  Rather, the laws were passed in order to

14  conserve law enforcement resources so as to more effectively promote public safety.  *See Nichols*,

15  17 F. Supp. 3d at 1004-05 (discussing legislative history); *Flanagan v. Harris*, No. LA CV16-

16  06164 JAK, 2018 WL 2138462, at *7 (C.D. Cal. May 7, 2018) (reviewing legislative history:

17  "[t]he legislative history of California's open-carry laws clearly provides that their purpose is to

18  promote public safety") (citing ECF 161-2, Exs 1 & 2); *see also* Patrick McGreevy & Nicholas

19  Riccardi, *Brown bans open carrying of handguns*, L.A. Times (Oct. 10, 2011),

20  <https://www.latimes.com/archives/la-xpm-2011-oct-10-la-me-brown-guns-20111011-

21  story.html> (last accessed January 21, 2021) ("Police chiefs and sheriffs complained that

22  panicked customers' calls were diverting them from chasing real criminals.").

23       Under *O'Brien* intermediate scrutiny, "when 'speech' and 'nonspeech' elements are

24  combined in the same course of conduct, a sufficiently important governmental interest in

25  regulating the nonspeech element can justify incidental limitations on First Amendment

26  freedoms."  *O'Brien*, 391 U.S. 367 at 376. Furthermore, "a government regulation is sufficiently

27  justified if it is within the constitutional power of the Government; if it furthers an important or

28  substantial governmental interest; if the governmental interest is unrelated to the suppression of

11

1   free expression; and if the incidental restriction on alleged First Amendment freedoms is no

2   greater than is essential to the furtherance of that interest." *Id.* at 377.  Finally, "an incidental

3   burden on speech is no greater than is essential, and therefore is permissible under *O'Brien*, so

4   long as the neutral regulation promotes a substantial government interest that would be achieved

5   less effectively absent the regulation." *United States v. Albertini*, 472 U.S. 675, 689 (1985).

6       The unloaded open carry statutes satisfy each prong of *O'Brien*'s intermediate scrutiny test.

7   To the extent that Zeleny's nonspeech element of displaying an unloaded firearm is mixed with

8   the speech element of the communication of his ideas, the government's restriction on the use of

9   firearms is incidental—Zeleny can still speak, display, and use other demonstratives to convey his

10  messages about the Zhus and NEA, whether or not he has a gun—and it is justified by important

11  government interests: the need to preserve law enforcement resources that would be absorbed in

12  responding to calls about Zeleny's conduct, as well as the need to prevent unanticipated conflicts

13  between Zeleny, members of the community, and law enforcement, if anyone involved made the

14  "slightest wrong move." *Flanagan*, 2018 WL 2138462, at *7; *see* Ex. 6 at pp. 190:15-191:3

15  (reflecting similar concerns of Menlo Park police department).  These important government

16  interests are neutral and not related to the suppression of free expression—the unloaded carry

17  laws reach no more conduct than the carriage of firearms, and there is no less restrictive way to

18  achieve these important purposes absent the regulation; indeed, the Legislature thoughtfully

19  tailored its restrictions by identifying dozens of scenarios in which unloaded open carry is

20  allowed, despite the incidental risk of raising some of the same policy concerns.  *See* §§ 26361-

21  26392, 26405.  Just as Alameda County's ban of guns on county property was a "straightforward

22  response" to the danger of firearms on county property, so was California's ban on open carry of

23  unloaded firearms in certain circumstances a straightforward response to the diversion of law

24  enforcement resources away from threats to public safety.  *Nordyke*, 644 F.3d at 794.  The

25  unloaded open carry laws withstand *O'Brien* intermediate scrutiny.

26       For all of these reasons, Zeleny's claim that 26350 *et seq*. and 26400 *et seq*. violate the First

27  Amendment fail, and his summary-judgment motion should be denied.

28

1   **II.    CALIFORNIA'S RESTRICTIONS ON THE OPEN CARRY OF UNLOADED FIREARMS DO
         NOT VIOLATE THE SECOND AMENDMENT ON THEIR FACE**

2

3        Zeleny next contends that California's limitations on openly carrying unloaded firearms

4   violate the Second Amendment.  SAC, ¶¶ 8, 109-112.  Zeleny's facial challenge again fails.

5        **A.    Legal Standard**

6        The Ninth Circuit uses a two-step inquiry for Second Amendment claims: "first, the court

7   asks whether the challenged law burdens conduct protected by the Second Amendment; and if so,

8   the court must then apply the appropriate level of scrutiny."  *Silvester v. Harris*, 843 F.3d 816,

9   821 (9th Cir. 2016)

10       The first step considers whether the challenged law burdens conduct protected by the

11  Second Amendment, based on a "historical understanding of the scope of the right."  *Silvester*,

12  843 F.3d at 820 (quoting *Heller*, 554 U.S. at 625).  If the law falls outside the historical scope of

13  the Second Amendment, then that law "may be upheld without further analysis."  *Id.*, 843 F.3d at

14  821 (citation omitted).

15       "If the regulation is subject to Second Amendment protection . . . the court then proceeds to

16  the second step of the inquiry to determine the appropriate level of scrutiny to apply," and then to

17  apply that level of scrutiny.  *Silvester*, 843 F.3d at 821 (citation omitted).  This process requires

18  the court to consider "(1) how close the challenged law comes to the core of the Second

19  Amendment right, and (2) the severity of the law's burden on that right."  *Id.* (citation omitted).

20  If the law either does not come close to the core or otherwise does not "substantially" burden the

21  right, then intermediate scrutiny applies.  *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953,

22  961 (9th Cir. 2014)

23       The core of the Second Amendment, as described in *Heller*, is "the right of law-abiding,

24  responsible citizens to use arms in defense of hearth and home."  *See Bauer v. Becerra*, 858 F.3d

25  1216, 1221 (9th Cir. 2017) (quoting *Heller*, 554 U.S. at 635).  "A law that imposes such a severe

26  restriction on the fundamental right of self defense of the home that it amounts to a destruction of

27  the Second Amendment right is unconstitutional under any level of scrutiny," whereas a "law that

28  implicates the core of the Second Amendment right and severely burdens that right warrants strict

13

1  scrutiny.  Otherwise, intermediate scrutiny is appropriate."  *Bauer*, 858 F.3d at 1222 (internal

2  quotation marks and citations omitted).

3      The Ninth Circuit's test for intermediate scrutiny has two requirements:  "(1) the

4  government's stated objective must be significant, substantial, or important; and (2) there must be

5  a 'reasonable fit' between the challenged regulation and the asserted objective."  *Silvester*, 843

6  F.3d at 821-22 (citation omitted).

7      **B.      There Is No Right Under the Second Amendment to Carry Unloaded
           Firearms for the Purpose of "Amplifying" One's Protest**

8

9      As the Attorney General demonstrated in his motion, Zeleny's facial challenge to Penal

10  Code sections 26400 *et seq.* and 26350 *et seq.* fails under step one of *Heller* because these laws

11  do not burden conduct protected by the Second Amendment.  *Silvester*, 843 F.3d at 820 (quoting

12  *Heller*, 554 U.S. at 625); *id.* at 821 (if the law falls outside the historical scope of the Second

13  Amendment, then that law "may be upheld without further analysis."); *Teixeira v. Cnty. of

14  Alameda*, 873 F.3d 670 (9th Cir. 2017) (limiting the ability to open new gun stores did not burden

15  conduct protected by Second Amendment).

16      The Second Amendment protects "the core right to possess a firearm for self-defense," as

17  well as "ancillary rights necessary to" realize that core right.  *Teixeira*, 873 F.3d at 677.  Starting

18  with the Second Amendment's text, the phrase "'bear arms' is naturally read to mean 'wear, bear,

19  or carry . . . upon the person . . . for the purpose of . . . being armed and ready for offensive or

20  defensive action in case of conflict with another person.'"  *Id.* at 683 (quoting *Heller*, 554 U.S. at

21  584).  "[T]he right to bear arms, under both earlier English law and American law at the time the

22  Second Amendment was adopted, was understood to confer a right upon individuals to have and

23  use weapons for the purpose of self-protection, at least in the home."  *Teixeira*, 873 F.3d at 686.

24      Within this historical framework, restrictions on the open carry of *loaded* firearms could

25  arguably burden an individual's ability to be "armed and ready for offensive or defensive action,"

26  though it is an open question to what extent that ability extends beyond the home.  *See infra*

27  Section (D).  But restrictions on the open carry of *unloaded* firearms that are being used to

28  amplify a demonstration are different.  Such restrictions do not burden the individual's ability to

14

1    be "armed and ready for offensive or defensive action," because an unloaded firearm is

2    essentially useless as a weapon of self-defense.  Zeleny does not allege that there is a historical

3    tradition in England or America of individuals using *unloaded* firearms for self-defense.

4        Not surprisingly, there is also no historical tradition in England or America of individuals

5    using unloaded firearms to amplify their protests.  When asked, Zeleny's own expert witness on

6    the history of firearms regulations could not "think of any" "history in this country of people

7    carrying unloaded firearms while participating in peaceful protests."  Ex. 10 at 82:1-4.  In the

8    Civil Rights movement of the 1960s, it was not uncommon for participants to carry firearms, but

9    they were generally loaded.  Ex. 10 at 80:23-81:24.  Zeleny's expert was not aware of "any

10   instances when civil rights protesters would have deliberately carried only unloaded weapons to

11   amplify their protests."  Ex. 10 at 82:24-83:5.  And here, Zeleny does not even bother to argue

12   that a restriction on the open carry of unloaded firearms violates the Second Amendment.

13       Thus, there is no evidence of a free-standing constitutional or historical right to openly

14   carry unloaded firearms for the purpose of amplifying a protest.  California's regulation of such

15   unloaded firearms thus falls outside the scope of the Second Amendment and "may be upheld

16   without further analysis."  *Silvester*, 843 F.3d at 820.

17       **C.    Zeleny Did Not Plead That He Intended to Bear Loaded Firearms for Self-**
18       **Defense, and Has Therefore Waived an Argument Based on Self-Defense**

19       In his complaint, Zeleny repeatedly alleges that he seeks to use *unloaded* firearms to

20   amplify his protests, not loaded firearms.  SAC, ¶¶ 4 ("unloaded"), 46, 48, 112, 114, 120, 188-90,

21   192, 210, 217(a), 221-22, 233, p. 41 (Prayer for Relief ¶¶ (B), (C), & (G).  And the complaint

22   challenges only California's prohibitions on unloaded open carry, not its prohibitions on loaded

23   carry or concealed carry.  SAC, ¶¶ 8, 188-190, p. 41 (Prayer for Relief, ¶ (A)).  As the Attorney

24   General demonstrated above, the State's regulation of unloaded firearms at protests does not

25   implicate either the First Amendment or the Second Amendment: without his unloaded firearms,

26   Zeleny is just as able to express his message, and his ability to defend himself is not materially

27   impaired—the central concerns of the First and Second Amendments, respectively.

28

15

1        Now, Zeleny effectively abandons his claims relating to unloaded open carry, reverses

2  course, and now claims he wants to load his weapons (including his belt-fed machine gun?) and

3  go wherever he wants with them.  Zeleny now purports to challenge the constitutionality of not

4  only sections 26400 *et seq.* and 26350 *et seq.* (unloaded open carry), but also California's long-

5  standing restrictions on loaded open carry and concealed carry.  ECF 163 at 1 ("California bans

6  both the open and the concealed carry of firearms"), 3 (citing § 25850 [prohibition on loaded

7  open carry]), 4 (discussing concealed carry restrictions), *id.* ("citizens in California are effectively

8  banned from carrying firearms outside their homes for self-defense . . . whether openly or

9  concealed"), 9, 11, ("loaded or unloaded firearm").  Zeleny devotes much of his brief to this new

10  Second Amendment claim.  ECF 163 at 9-20.

11        This argument has been waived because it was not pleaded in the complaint.  *Coleman v.*

12  *Quaker Oats Co.*, 232 F.3d 1271, 1291 (9th Cir. 2000); *Navajo Nation v. U.S. Forest Service*, 535

13  F.3d 1058, 1080 (9th Cir. 2008) ("where, as here, the complaint does not include the necessary

14  factual allegations to state a claim, raising such claim in a summary judgment motion is

15  insufficient to present the claim to the district court").  "[S]ummary judgment is not a procedural

16  second chance to flesh out inadequate pleadings."  *Wasco Prods., Inc. v. Southwall Techs., Inc.*,

17  435 F.3d 989, 992 (9th Cir. 2006).  As evidenced by the *Young*, *Flanagan*, and *Nichols* cases

18  pending in the Ninth Circuit (discussed below), the extent to which the Second Amendment

19  extends outside the home for purposes of armed self-defense (as opposed to unarmed protest) is

20  an issue that other litigants have been able to articulate in their pleadings.  Zeleny had nearly two

21  years, and several opportunities, to plead the unconstitutionality of California's loaded open carry

22  and concealed carry restrictions; indeed, Zeleny recently was granted leave to amend his

23  complaint to add a vagueness claim.  ECF 164.  Yet nowhere in the complaint is there a challenge

24  to the loaded open carry statutes, or an allegation that Zeleny wants to use loaded firearms for

25  self-defense; the complaint challenges only California's restrictions on unloaded open carry, on

26  the theory that they interfere with Zeleny's right to protest.  Zeleny failed to put the parties "on

27  notice of the evidence [they] needed to adduce in order to defend themselves against the

28  plaintiff's allegations," including but not limited to expert testimony about the need for, and

16

1   benefits of, restrictions on the universal open or concealed carry of loaded firearms in California's

2   cities—an obviously different situation than the use of unloaded firearms for protests.  *Coleman*,

3   232 F.3d at 1292.   Therefore, Zeleny should therefore not be allowed to proceed on these

4   theories.  *Id.* at 1294.  His motion on this basis should be summarily denied.

> **D.    To the Extent That Zeleny Is Allowed to Assert a Second Amendment
>        Right to Loaded Open Carry Based on Self-Defense for the First Time,
>        California's Restrictions on Loaded Open Carry Do Not Violate the
>        Second Amendment**

8       Even if the Court determines that Zeleny has pleaded a claim challenging California's

9   *loaded* open carry laws (which he has not), California's open carry regime should still be upheld

10  as being consistent with the Second Amendment.

11      "If the regulation is subject to Second Amendment protection [step one of *Heller*] . . . the

12  court then proceeds to the second step of the inquiry to determine the appropriate level of scrutiny

13  to apply," and then to apply that level of scrutiny.  *Silvester*, 843 F.3d at 821 (citation omitted).

14  This process requires the court to consider "(1) how close the challenged law comes to the core of

15  the Second Amendment right, and (2) the severity of the law's burden on that right."  *Id.* (citation

16  omitted).  If the law either does not come close to the core or otherwise does not "substantially"

17  burden the right, then intermediate scrutiny applies.  *Jackson*, 746 F.3d at 961.

18      Neither the Supreme Court nor the Ninth Circuit has yet "decided the degree to which the

19  Second Amendment protects the right to bear arms outside the home."  *Teixeira*, 873 F.3d at 686

20  n.19.  But that question is the subject of three pending Ninth Circuit cases: *Young v. Hawaii*,

21  which was heard by an *en banc* panel on September 24, 2020 (9th Cir. No. 12-17808 [involving

22  similar challenge to Hawaii's carry laws]); *Nichols v. Harris* (9th Cir. No. 14-55873, ECF 119

23  [stayed pending disposition of *Young*]); and *Flanagan v. Harris* (9th Cir. No. 18-55717, ECF 57

24  [stayed pending disposition of *Young*]).  *See Baird v. Becerra*, No. 2:19-cv-00617-KJM-AC, 2020

25  WL 5107614, at *3 (E.D. Cal. Aug. 31, 2020) (in another challenge to California's open carry

26  laws, describing the status of the Ninth Circuit matters).[3]

27  ─────────────
        [3] Because the Ninth Circuit may "clarify the scope of the Second Amendment as it applies
28  to plaintiffs' claims, in the relatively near future," *Baird*, 2020 WL 5107614, at *4, should the

1       In *Nichols* and *Flanagan*, the district courts upheld California's open carry laws.  *See*

2   *Nichols v. Brown*, 17 F. Supp. 3d 989 (C.D. Cal. 2014); *Flanagan v. Harris*, No. LA CV16-06164

3   JAK, 2018 WL 2138462 (C.D. Cal. May 7, 2018).  While Zeleny has waived a challenge to

4   California's loaded carry and concealed carry regimes, should the Court evaluate their

5   constitutionality, it should uphold these laws:

6           **1.**    **Level of Scrutiny**

7       Assuming *arguendo* that restrictions on loaded open carry burden the Second Amendment

8   right in some way, "a law that imposes such a severe restriction on the fundamental right of self

9   defense of the home that it amounts to a destruction of the Second Amendment right is

10   unconstitutional under any level of scrutiny," whereas a "law that implicates the core of the

11   Second Amendment right and severely burdens that right warrants strict scrutiny.  Otherwise,

12   intermediate scrutiny is appropriate." *Bauer*, 858 F.3d at 1222 (internal quotation marks and

13   citations omitted).

14       Here, California's restrictions on the *open* carry of firearms neither severely restricts nor

15   severely burdens "the right of self-defense in the home."  Instead, they "limit the open carrying of

16   such arms in public, *i.e.*, outside the home." *Flanagan*, 2018 WL 2138462, at *6.  Therefore, at

17   most intermediate scrutiny applies.

18       The Ninth Circuit's test for intermediate scrutiny has two requirements:  "(1) the

19   government's stated objective must be significant, substantial, or important; and (2) there must be

20   a 'reasonable fit' between the challenged regulation and the asserted objective." *Silvester*, 843

21   F.3d at 821-22 (citation omitted).  California's open carry laws survives under both prongs:

22           **2.**    **The Government's Stated Objective**

23       First, California's interest in enacting its open carry laws is to promote public safety and

24   reduce gun violence.  Judge Kronstadt summarized relevant legislative history demonstrating the

25   Legislature's motives in enacting the open carry laws:

26   Court see the need to reach the question of whether California's restriction on loaded carry are
     constitutional, and if the Ninth Circuit has not ruled in *Young* by the hearing date, it may preserve
27   Court resources to stay or continue the hearing on the parties' motions until after the *en banc*
     court issues its opinion, or after the panels in *Flanagan* and *Nichols* issues their opinions—which
28   involve the same statutory scheme Zeleny belatedly purports to challenge here.

The legislative history of California's open-carry laws clearly provides that their purpose is to promote public safety. Cal. Penal Code § 26350 generally prohibits individuals from openly carrying unloaded handguns in public. Its legislative history includes the statement that "the absence of a prohibition on 'open carry' has created an increase in problematic instances of guns carried in public, alarming unsuspecting individuals and causing issues for law enforcement. Simply put, open carry creates a potentially dangerous situation for the Citizens of California." Ex. 1 to California's RJN, Dkt. 45–16 at 30, 41, 58; cf. Ex. 2 to California's RJN, Dkt. 45–17 at 21, 30, 43, 55, 60, 64, 66, 72.

Additionally, in connection with their review of California Assembly Bill No. 144, various committees in the California legislature considered that "[i]n most cases when a person is openly carrying a firearm, law enforcement is called to the scene with few details other than one or more people are present at a location and are armed," which can escalate quickly if the armed person makes "the slightest wrong move" once law enforcement arrives on the scene. Ex. 1 to California's RJN at 19, 30–31, 42, 49, 50, 57. These committees also considered that "the increase in 'open carry' calls placed to law enforcement has taxed departments dealing with under-staffing and cut backs ... preventing them from protecting the public in other ways." Id. For these reasons, the California legislature sought to address the "surge in problematic instances of guns carried in public" by generally prohibiting open carry. Id. at 50.

*Flanagan*, 2018 WL 2138462, at *7 (citing ECF 161-2, Exs 1 & 2); *see also Nichols*, 17 F. Supp. 3d at 1004-05 (describing legislative reasons behind open carry legislation). "The Ninth Circuit has recognized that promoting public safety and reducing violent crime are important government interests." *Flanagan*, 2018 WL 2138462, at *7.

### 3. Reasonable Fit

Judge Kronstadt also determined that "the State reasonably could have inferred that there was a relationship between prohibiting individuals from carrying firearms openly in public and promoting and achieving the important governmental objective of public safety," based on expert testimony,[4] materials provided by law enforcement group, and the experience of other states. *Flanagan*, 2018 WL 2138462, at *9-10. The same is true here. The Legislature carefully tailored the open carry laws to achieve its legitimate objectives while still allowing open carry in dozens of other circumstances that did not raise the same policy concerns. §§ 26361-26392, 26405.

For all of these reasons, Zeleny's claim that 26350 *et seq.* and 26400 *et seq.* (or any other open carry statutes) violate the Second Amendment on their face fails, and summary judgment should be entered in favor of the Attorney General on these claims.

---

[4] Defendants did not generate the same expert reports in this case because they were not on notice that Zeleny would be challenging California's loaded open carry laws.

19

1   **III.   CALIFORNIA'S RESTRICTIONS ON THE OPEN CARRY OF FIREARMS DO NOT VIOLATE THE EQUAL PROTECTION CLAUSE**

As described above, California Penal Code sections 26350 *et seq.* and 26400 *et seq.* contain a general prohibition on the open carriage of unloaded firearms in incorporated areas, followed by an enumerated list of dozens of exceptions to the general prohibition (§§ 26361-26392, 26405). Zeleny alleges that, by creating an exception for entertainment productions that use unloaded firearms as props, California has violated equal protection principles by treating individuals who qualify for the exception better than individuals who do not, and who are subject to the general prohibition on unloaded open carry.  ECF 163 at 20; SAC, ¶¶ 225-229; *see* §§ 26375, 26405(r).

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The first step in analyzing an Equal Protection claim is "to identify the state's classification of groups."  *Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018).  "If the two groups are similarly situated, we determine the appropriate level of scrutiny and then apply it."  *Id.*

First, an individual walking down a public sidewalk, entering a retail establishment, or staging a public protest while carrying an unloaded firearm is not similarly situated to an entity responsible for a "motion picture, television or video production, or entertainment event." § 26375.  As Zeleny's own experts describe, entertainment productions are "highly regulated," and involve tightly controlled operations and professional staff working within a set location for a limited duration.  ECF 163-1 at pages 74-77.  When they see an unloaded firearm being used as a prop in this context, passerby and the police are far more likely to immediately discern that it is not a threat to them, as opposed to a lone gunman wandering around in fatigues; there, the typical passerby would see nothing to immediately assuage their concern about the presence of a firearm in their immediate vicinity, which would prompt the unpredictable encounters and law enforcement calls that the Legislature intended to limit.

Second, even if individuals like Zeleny were similarly situated to entertainment production companies, the exception for entertainment events using firearms as props would not violate the Equal Protection Clause.  Rational basis is the correct standard to use because, as detailed above,

20

California's restrictions on unloaded firearms implicate neither the First Amendment nor the Second Amendment, nor any suspect classification. *Gallinger*, 898 F.3d 1016.  But under any level of scrutiny, an exception for entertainment companies would survive.  The concerns underlying the legislation—creating confusion and potentially violent confrontations, along with the absorption of law enforcement resources—are not present, or are minimally present, in the entertainment productions that Zeleny's expert witnesses were part of, in which every regulation is complied with, every permit is obtained, every location is scouted, every scene is scripted and of limited timed and duration, and every use of firearms is closely overseen by someone like Mr. Tristano or Mr. Brown, armorers with decades of experience in their field.  It was reasonable for the Legislature to conclude that such productions were unlikely to raise the same concerns as individuals walking in public places with firearms, with no limits on the scope or duration of their activities (like Zeleny, who originally proposed to install a portable toilet in the center median so that he could be there, with his firearms, indefinitely).  It was not illogical or arbitrary to exclude such entertainment events from the general prohibition on unloaded open carry.  *See also Nichols*, 17 F. Supp. 3d at 1012 (rejecting Equal Protection challenge to another statutory exception).

## IV.   ZELENY DOES NOT APPEAR TO FALL WITHIN A STATUTORY EXECPTION TO THE OPEN CARRY LAWS; BUT EVEN IF HE DID, THAT WOULD NOT PREVENT MENLO PARK FROM IMPOSING REASONABLE CONDITIONS ON HIS PROTEST, INCLUDING ON HIS USE OF FIREARMS

As demonstrated above, Zeleny does not have a constitutional right to carry an unloaded firearm in an urban area.  Zeleny next alleges that even if he does not have a constitutional right, he has a statutory right to carry his firearms because he qualifies for an exemption to the general prohibition, namely, because he is an "an authorized participant in . . . a motion picture, television, or video production or entertainment event, when the participant lawfully uses that firearm as part of that production or event . . . ."  § 26405(r).  Zeleny alleges that he will fall within this exception by setting up a camera and pointing it at passerby who observe his protest.  SAC, ¶¶191-92, 202-06; Ex. 2 at 208:19-24, 185:13-20; ECF 163 at 5.

The Court need not exercise its supplemental jurisdiction to decide this issue of state law once it otherwise evaluates the constitutionality of section 26350 *et seq.* and § 26400 *et seq.* (the

21

unloaded open carry laws).  *See Pac. Bell Telephone Co. v. City of Walnut Creek*, 428 F. Supp.2d 1037, 1055 (N.D. Cal. 2006) (citing 28 U.S.C. § 1367(c).)  But if the Court is inclined to decide the issue, it should decline to issue the declaration Zeleny seeks:

Zeleny appears to believe that, if can qualify for this exemption, then no one can regulate the conditions of his protest.  But he is wrong.  First, it is unlikely that he falls within the exception to begin with.  Second, even if he did, it might give him a defense to an open carry prosecution by the City, but nothing more.  Nothing would prevent Menlo Park from imposing any other condition on Zeleny's protests (including a condition related to his firearms), or regulating Zeleny under any other civil or criminal laws.  Without a declaration that he has a constitutional right to protest with his firearms, or a declaration that Menlo Park's regulations were invalid time-place-manner restrictions, the declaration Zeleny seeks about the entertainment exception would achieve almost nothing.

### A.   Zeleny Likely[5] Does Not Qualify for the Entertainment Exception

Initially, it appears unlikely that under state law Zeleny would qualify for this exception, which allows the open carry of unloaded weapons for "an authorized participant in . . . a motion picture, television, or video production or entertainment event, when the participant lawfully uses that firearm as part of that production or event . . . ."  § 26405(r):

(1)  Zeleny does not propose to film his use of firearms, i.e., he does not appear to be using his firearms "as part of that production or event," in the same way that a movie studio would use a firearm as a prop in a *Mission Impossible* or *Marvel* movie.  Rather, Zeleny is conducting a non-filmed protest at which he happens to bring a camera to video *other people*, rather than his "production or event."  Ex. 2 at 208:19-24, 185:13-20.

(2)  Zeleny's own evidence suggests strongly that the Legislature would not consider Zeleny's activity to be a "motion picture, television, or video production or entertainment event."  Zeleny's expert witnesses describe how the use of firearms in television and movie productions

---

[5] The Attorney General has no involvement in Zeleny's specific case, and a determination that Zeleny qualified for this exception would not render the statute infirm in any way.  It is unclear why Zeleny raised this argument in his motion for summary judgment against the Attorney General, rather than against the City, which has actually regulated Zeleny's activities.

has been heavily regulated for decades by state, federal and local permitting schemes, and has been further guided by stringent industry standards.  ECF 163-1 at pages 59-62, 66-67, 74-77. When it enacted the unloaded-open carry laws, the Legislature appeared to intend to allow these long-standing entertainment industry practices to continue.  ECF 161-2, Ex. 1 – 50.  There is no indication that the Legislature intended to create a new, broader exception for entertainment productions that diverged from these standard industry practices, such as for the lone gunman who happened to pack a camera.

If accepted, the necessary result of Zeleny's argument would be that this one of several dozen exceptions to the general prohibition on unloaded open carry would swallow the rule.  If an individual carrying a firearm through an urban area could create a "motion picture, television, or video production or entertainment event" simply by pushing the "record" button on their smart phone, there effectively would no longer be a prohibition on unloaded open carry, loaded open carry, or concealed carry in California.  The individual could walk anywhere—a sports stadium, a road median, a grocery store—and after creating the disturbance and law enforcement response the Legislature was attempting to prevent, could pull out their smartphone and say, "don't worry, this was all an entertainment production."

Rather than accept this absurd result, the more plausible interpretation is that the "entertainment production" exception is analogous to similar exceptions for gun shows (§ 26369) or target ranges (§ 26365)—confined spaces in which the firearm being carried is not easily visible or accessible to the public, for a defined duration and location.  This is consistent with Zeleny's evidence about industry practices, which describe exactly such a situation.  ECF 163-1 at pages 59-62, 66-67, 74-77.  By contrast, Zeleny initially sought to camp out in the center median at a freeway juncture, with no time limitation and no signal to passerby that his activities were part of an "entertainment production" as the typical person would understand.  Thus, it is unlikely that Zeleny would fall into this exception.

(3)  Zeleny sets up a strawman, by fixating on the term "authorized participant" and arguing that the case turns on definition of "authorized participant."  ECF 163 at 7.  But the Attorney General essentially *agrees* with Zeleny's expert's understanding of the term "authorized

participant," namely that someone operating under the auspices of a DOJ Entertainment Firearms

Permit holder qualifies as an "authorized participant" in an entertainment production.  *Compare*

ECF 163-1 at 75 (Zeleny: "the [Entertainment Firearms Permit] holder [can] give the firearm to

an actor or other Authorized Participant and take it back after the scene is over . . . .") *with* ECF

163-1 at page 54 of 100 (Attorney General's formulation, emphasis added): "Anyone who is not

otherwise authorized to carry a weapon openly, but who desires to carry a weapon openly 'as a

prop in a motion picture, television, video, theatrical, or other entertainment production or event'

would need to do so under the auspices of an Entertainment Firearms Permit. *For entertainment*

*productions this generally has meant that a propmaster or similarly qualified person is*

*supervising the use of firearms in the production, and others involved in the production may*

*transfer or possess firearms under the auspices of the supervising permit-holder*."  This

understanding is consistent with historical practice on television and movie sets: So long as the

firearms are being handled consistent with applicable federal, state, and local laws, usually under

the supervision of a trained expert, others on the set could use the firearm too without exposing

themselves to liability.  ECF 163-1 at 75-77.  To the extent that Zeleny has a dispute with the

Attorney General over the meaning of the unarmed-open-carry statutes, it is not over the

definition of "authorized participant."

    For these reasons, it is unlikely that Zeleny's activities would qualify for the entertainment

exception found in section 26405(r).

> **B.    Even if the Court Were to Declare That Zeleny Qualified for the Entertainment Exemption, That Would Not Mean That Menlo Park's Regulation of Zeleny's Activities Was Unconstitutional.**

    Even if Zeleny qualified for the exemption found in section 26405(r), that would not entitle

him to protest whenever and wherever he pleases.  At most, the exception is a limited defense to

prosecution under a single criminal statute.  It does not immunize Zeleny from any other

regulation, or prevent the City of Menlo Park from setting reasonable conditions on Zeleny's

activities, such as the duration and location of his protests, or the placement of his signage or

guns.  Nor does it prevent the City from regulating Zeleny under any other civil or criminal law,

e.g., as a nuisance or for violating traffic or noise ordinances.  ECF 163-1 60-62, 66, 76-77.

## V. PENAL CODE SECTION 26405(R) IS NOT UNCONSTITUTIONALLY VAGUE

Finally, Zeleny alleges that the exception for television and entertainment events, and specifically the term "authorized participant," is unconstitutionally vague. ECF 163 at 21. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The vagueness doctrine incorporates two related requirements—fair notice and fair enforcement. The relevant inquiry is whether the law is "so vague and indefinite as really to be no rule or standard at all, or whether a person of ordinary intelligence could understand" what the law requires. *Ai v. United States*, 809 F.3d 503, 514 (9th Cir. 2015) (internal quotations omitted).

As explained above, the Attorney General and Zeleny agree that the term "authorized participant" has a relatively well-understood meaning in the entertainment industry: someone operating under the auspices of a DOJ Entertainment Firearms Permit holder qualifies as an "authorized participant" in an entertainment production. This ends the vagueness inquiry. Given long-standing industry practices, and the apparent incorporation of those practices into the exceptions to the open-carry laws, it can hardly be said that the exception is "no rule or standard at all." The entertainment industry follows certain laws and standards in the handling of firearms as props, as demonstrated by the declarations of Mr. Tristano and Mr. Brown. *See Donovan v. Royal Logging Co.*, 645 F.2d 822, 831 (9th Cir. 1981) (rejecting vagueness challenge to standard that would be known by reasonably prudent employer in the industry). The Legislature incorporated that understanding into the unloaded-open carry law, and the average person would envision the same situation described by Mr. Tristano and Brown: a controlled television or movie set where firearms are carefully handled in such a way that passerby and law enforcement would know exactly what was happening. The individual who wondered if they qualified for an exception would be guided by this historical practice: is their entertainment production like those described by Zeleny's experts, i.e., in a permitted, controlled environment, of limited scope and duration, such that it would not spark potentially violent confrontations or law enforcement response—or not? That standard satisfies the Due Process Clause, which does not demand perfect clarity, but only requires that there not be any "standard at all."

25

1

2
Dated:  February 4, 2021                    Respectfully Submitted,

3
                                            XAVIER BECERRA
                                            Attorney General of California
                                            ANTHONY R. HAKL
4
                                            Supervising Deputy Attorney General

5

6                                           /s/ John W. Killeen
                                            JOHN W. KILLEEN
                                            Deputy Attorney General
7
                                            Attorneys for Defendant Xavier Becerra

8    SA2018100198
     34800973_2.docx
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Opposition to Plaintiff's Motion for Summary Judgment (3:17-cv-07357 RS (NC))

# CERTIFICATE OF SERVICE

Case Name:   **Zeleny, Michael v. Edmund G.**          No.      **3:17-cv-07357 RS (NC)**
                      **Brown, et al.**

I hereby certify that on February 4, 2021, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF MICHAEL ZELENY**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on February 4, 2021, at Sacramento, California.


|                        |                        |
|:----------------------:|:----------------------:|
| Lindsey Cannan         | /s/ *Lindsey Cannan*   |
| Declarant              | Signature              |

SA2018100198
34796096.docx