David W. Affeld, State Bar No. 123922
Brian R. England, State Bar No. 211335
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:    (310) 979-8700

Attorneys for Plaintiff Michael Zeleny

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY,<br><br>     Plaintiff,<br><br>          vs.<br><br>GAVIN NEWSOM, *et al.*,<br><br>     Defendants. | Case No. CV 17-7357 JCS<br><br><u>Assigned to:</u><br>The Honorable Richard G. Seeborg<br><br><u>Discovery Matters:</u><br>The Honorable Thomas S. Hixson<br><br>**PLAINTIFF MICHAEL ZELENY'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:      March 18, 2021<br>Time:      1:30 p.m.<br>Courtroom: 3, 17th Floor<br><br>Action Filed:  December 28, 2017<br>Trial Date:    TBD |

Plaintiff Michael Zeleny ("Zeleny") hereby respectfully submits the following Opposition to Defendant California Attorney General Xavier Becerra's Motion for Summary Judgment and cross moves for summary judgment against Becerra on the grounds that there is no issue of disputed material fact and Zeleny is entitled to judgment as a matter of law.

1
2

# **TABLE OF CONTENTS**

3   I.     INTRODUCTION ................................................................................................ 1

4   II.    BACKGROUND ................................................................................................. 3

5          A.    Zeleny's Background ............................................................................... 3

6          B.    Zeleny's Protests .................................................................................... 3

7          C.    California's Comprehensive Gun Bans ................................................... 4

8          D.    The Exemptions at Issue in This Case ................................................... 6

9   III.   LEGAL STANDARD .......................................................................................... 6

10  IV.    ARGUMENT ...................................................................................................... 7

11         A.    The Entertainment Exemptions Violate Due Process and Equal
                 Protection ............................................................................................... 7
12
13               1.    The Entertainment Exemptions Impermissibly Treat Movie
                       Studios and Production Companies Differently than Protestors
14                     and Advocates. ............................................................................ 7

15               2.    The Entertainment Exemptions Are Unconstitutionally Vague. ............. 11

16               3.    The Most Reasonable Interpretation of "Authorized
                       Participant" is an Individual Authorized by the Producer of the
17                     Event. ........................................................................................... 14

18         B.    California's Open Carry Ban Violates the Second Amendment. ........................ 15

19               1.    The State's Evasion Fails. ............................................................. 15

20               2.    Framework for Second Amendment Analysis. ........................................ 16

21               3.    California Law Infringes the Second Amendment by Barring
                       Virtually Any Bearing of Firearms Outside of the Home. ........................ 17
22
23                     a.    The Text, Structure, and Purpose of the Second
                             Amendment Confirm That the Right to Bear Arms
                             Extends to Public Places ................................................... 17

24                     b.    The History of the Second Amendment Shows That the
25                           Right Extends Beyond the Home. ...................................... 19

26                     c.    Precedent Confirms That the Right Extends Beyond the
                             Home ................................................................................ 21

27               4.    Banning Carry Beyond the Home Fails Under Any Level of
28                     Scrutiny. ....................................................................................... 22

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
BY CALIFORNIA ATTORNEY GENERAL

a.  California's *De Facto* Ban on Carrying Firearms by Law-Abiding Citizens Is Categorically Invalid.............................22

b.  California's Effective Ban on Carry by Law-abiding Citizens Is Invalid Under Either Strict or Intermediate Scrutiny. ..........................................................................................24

V.  CONCLUSION ............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A.C.L.U. of Nevada v. City of Las Vegas*
    466 F.3d 784 (9th Cir.2006)....................................................................................... 8

*Bowen v. M. Caratan, Inc.*,
    142 F.Supp.3d 1007 (E.D.Cal. 2015) ....................................................................... 15

*Branzburg v. Hayes*,
    408 U.S. 665 (1972) ...................................................................................................... 9

*Caetano v. Massachusetts*,
    136 S. Ct. 1027 (2016) ............................................................................................... 16

*Carey v. Brown*
    447 U.S. 455 (1980) ...................................................................................................... 8

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...................................................................................................... 6

*Citizens United v. FCC*
    558 U.S. 310 (2010) ...................................................................................................... 9

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ............................................................................................. *passim*

*Erdelyi* v. *O'Brien*,
    680 F.2d 61 (9th Cir.1982) ........................................................................................... 5

*FCC v. Fox Television Studios, Inc.*,
    567 U.S. 239 (2012) ....................................................................................... 11, 13, 14

*First Nat. Bank of Boston v. Bellotti*
    435 U.S. 765 (1978) ........................................................................................ 1, 10, 14, 22

*Fisher v. Kealoha*,
    855 F.3d 1067 (9th Cir. 2017) ................................................................................... 17

*Foti v. City of Menlo Park*,
    146 F.3d 629 (9th Cir.1998) ................................................................................. 10, 12

*Grace v. District of Columbia*,
    187 F.Supp.3d 124 (D.D.C. 2016),  ................................................................... *passim*

*Jackson v. City & County of San Francisco*,
    746 F.3d 953, 960-61 (9th Cir. 2014)................................................................ *passim*

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
BY CALIFORNIA ATTORNEY GENERAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Kachalsky v. County of Westchester*,
   701 F.3d 81 (2d Cir.2012) ................................................................ 21

*Kev, Inc. v. Kitsap County*,
   793 F.2d 1053 (9th Cir.1986) ......................................................... 12

*Kolender v. Lawson* (1983)
   461 U.S. 352 ...................................................................................... 11

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) ......................................................... 18

*Mass. Bd. of Retirement v. Murgia*,
   427 U.S. 307 (1976) ............................................................................ 7

*McCutcheon v. FEC*,
   _U.S._, 134 S. Ct. 1434 (2014) ...................................................... 24

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ................................................................. *passim*

*Moore v. Madigan*,
   702 F.3d 933 (7th Cir. 2012) .................................................. *passim*

*N.A.A.C.P. v. Button*,
   371 U.S. 415 (1993) .......................................................................... 12

*Nat'l Advertising Co. v. City of Orange*,
   861 F.2d 246 (9th Cir.1988) ........................................................... 10

*Palmer v. District of Columbia*,
   59 F.Supp.3d 173 (D.D.C.2014) .............................................. 21, 22

*Peruta* v. *County of San Diego*,
   742 F.3d 1144 (9th Cir.2014) .................................................. *passim*

*Peruta v. County of San Diego*,
   824 F.3d 919 (9th Cir.2016) ..................................................... 21, 22

*Police Dep't v. Mosley* (1972)
   408 U.S. 92 ........................................................................................... 8

*Shapiro v. Thompson*,
   394 U.S. 618 (1969) ............................................................................ 7

*Silvester v. Harris*,
   843 F.3d 816 (9th Cir. 2016) ............................................ 16, 17, 24

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
BY CALIFORNIA ATTORNEY GENERAL

*United States v. Grace,*
  461 U.S. 171 (1983) ................................................................................................. 7

*United States* v. *Stevens,*
  559 U.S. 460 (2010) ............................................................................................... 25

*Village of Hoffman Estates v. Flipside,*
  455 U.S. 489 (1982) ............................................................................................... 11

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ................................................................................................. 9

*Wrenn v. District of Columbia,*
  864 F.3d 650 (D.C. Cir. 2017) ........................................................................ *passim*

*Zablocki v. Redhail,*
  434 U.S. 374 (1978) ................................................................................................. 7

**California Cases**

*CBS, Inc.* v. *Block* (1986)
  42 Cal.3d 646 ........................................................................................................... 5

*Nichols* v. *County of Santa Clara* (1990)
  223 Cal.App.3d 1236 ............................................................................................... 5

**Other State Cases**

*Nunn v. State,*
  1 Ga. 243 (1846) .................................................................................................... 20

**California Statutes**

Cal. Penal Code § 17030 ........................................................................................... 23

Cal. Pen. Code § 23650 .............................................................................................. 6

Cal. Penal Code § 25850 ............................................................................................. 4

Cal. Penal Code § 26045 ........................................................................................... 23

Cal. Penal Code § 26150 ............................................................................................. 5

Cal. Penal Code § 26155 ............................................................................................. 5

Cal. Pen. Code § 26375 ................................................................................... 6, 13, 14

Cal. Penal Code § 26405 ............................................................................................. 6

Cal. Pen. Code § 26500 ............................................................................................... 6

Cal. Penal Code §28350 ........................................................................................... 23

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
BY CALIFORNIA ATTORNEY GENERAL

1

Penal Code § 16840 ................................................................................................... 4

2

Penal Code § 25800 ................................................................................................... 4

3

Penal Code § 26375 ................................................................................................... 1

4

Penal Code § 26405 ................................................................................................... 1

5

**Other State Statutes**

6

Menlo Park Municipal Code § 8.32.010 ..................................................................... 23

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
BY CALIFORNIA ATTORNEY GENERAL

1    **I.    INTRODUCTION**

2    California bans both the open and the concealed carry of firearms.  Taken together,

3    California's prohibitions effectively eliminate a citizen's right to carry even an unloaded firearm

4    outside the home, unless the person can qualify under one of the limited statutory exemptions.  At

5    issue in this case are two parallel exemptions, Penal Code §§ 26375 and 26405(r), which authorize

6    the open carry of unloaded handguns and unloaded non-handgun firearms, respectively, by an

7    "authorized participant" during the production of a movie, television show, or other entertainment

8    event.  These exemptions either apply to Zeleny's activities at issue in this case, or else they are

9    unconstitutionally vague.

10    Zeleny also challenges California's entire statutory scheme regulating firearms based on the

11    Second Amendment.  The scheme's long list of flaws is being litigated elsewhere, however, and

12    Zeleny simply joins in those arguments here.  His challenge to §§ 26375 and 26405(r) is unique to

13    this case, and should be decided regardless of the outcome of the larger Constitutional challenge.

14    Zeleny was the producer of video productions of First Amendment protests he conducted in

15    Menlo Park and other locations.  He also exercised his Second Amendment rights by bearing

16    unloaded firearms at his protests, to draw attention to the protests and for self-defense.  As the

17    producer of his protest events, Zeleny authorized himself to participate in them.

18    Sections 26375 and 26405(r) purport to exempt "authorized participants" in film, television

19    or video productions, or entertainment events, from the "Open Carry Ban".  The key phrase is

20    "authorized participant."  The phrase is undefined in the statutes; the legislative history offers no

21    explanatory language; there are no defining regulations; and the California Attorney General would

22    not provide a coherent definition even when ordered to do so in discovery.

23    Under a plain reading of the language, settled rules of statutory construction, and long-

24    standing industry practice, Zeleny qualifies as an "authorized participant."  Any other interpretation

25    would violate the Constitution.  The entertainment exemptions in particular, and the Open Carry Ban

26    as a whole, would fail constitutional scrutiny for multiple reasons:

27    *First*, assuming the Open Carry Ban passes constitutional muster, the "authorized

28    participant" exemptions would be invalid if Zeleny does not qualify under them.  They would

- 1 -

distinguish between different forms of First Amendment activity, allowing open carry in the course of making movies or TV shows, but not for protests, picketing, "open carry" rallies, or gun rights demonstrations.  The exemptions would improperly treat similarly-situated groups of citizens differently based on the content of their speech.  Such content-based discrimination is impermissible, especially regarding fundamental rights such as the right to bear arms and free speech.

*Second*, the "authorized participant" exemptions would be impermissibly vague.  To pass constitutional scrutiny, a statute must be clear enough that a person of ordinary intelligence can understand it.  As Magistrate Judge Hixson recognized in a discovery order in this case, the statute contains no definition of "authorized participant," or explanation of who does the authorizing, and there are no applicable regulations.  The State of California evaded multiple rounds of discovery to avoid providing a definition in this case.  Its Rule 30(b)(6) deposition designee could not define the phrase.  The State's eventual final answer contracts the answer it gave the City of Menlo Park in 2017.  Menlo Park Police Chief Dave Bertini ("Bertini") testified "that law is very vague."  If the State and high-level law enforcement personnel do not know what the statutes mean, despite months of time to prepare a response with the assistance of counsel, a person of ordinary intelligence cannot be expected to make sense of such unconstitutional vagueness.

*Third*, a statute must be construed to avoid constitutional concerns where possible.  Zeleny is entitled to a judicial declaration that the phrase "authorized participant" means a person authorized by the producer of the film or event.  Any other reading would put a government official in charge of casting decisions, for movies and TV as well as for protests—plainly a nonsensical interpretation.

*Fourth*, if the Court has to reach the Constitutionality of California's Open Carry Ban rather than the narrower and unique aspects of this case concerning the entertainment exemptions, the Court should join the better view and weight of authority holding that California cannot comprehensively criminalize an ordinary, law-abiding citizen's carrying of a firearm, loaded or unloaded, concealed or open, virtually anywhere in the state.  *See District of Columbia v. Heller*, 554 U.S. 570 (2008), and progeny.  Zeleny was particularly entitled to some form of carry, because he received threats related to his protests, and therefore needed carry firearms for self-defense.

*Finally*, the State did not submit expert testimony or evidence to support California's

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
BY CALIFORNIA ATTORNEY GENERAL

comprehensive ban on the open and concealed carry of unloaded firearms.  California failed to substantiate its claim that its gun control scheme satisfies constitutional requirements.

The State's Motion should be denied, and Zeleny's pending Motion for Partial Summary Judgment and this cross motion should be granted.

## II.     BACKGROUND

### A.     Zeleny's Background

Zeleny is a published author, editor, and translator, an internationally renowned blogger, accomplished scholar in logic, history, literature, law, and technology, and an independent performance artist and film-maker.  Declaration of Michael Zeleny, Dkt. No. 162-2 ("Zeleny Decl.") ¶ 2.[1]  He is also a firearms historian and author.  *Id.*

Zeleny holds a California Certificate of Eligibility to possess firearms, and a Type 08 Federal Firearms License.  *Id.* ¶ 3.  He collects rare, unique, and historically significant guns.  *Id.*

### B.     Zeleny's Protests

Zeleny seeks to carry unloaded firearms as part of a series of protests against New Enterprise Associates ("NEA"), a venture capital fund in Menlo Park.  In earlier protests, Zeleny presented a multimedia performance of images and animations, and displayed rare firearms, posters, placards, and other materials.  He recorded his performances and the reaction of passersby as part of an Internet video production and documentary film.  He plans to continue his performances.  *Id.* ¶¶ 4-8.

At all times, Zeleny made clear that his purpose for carrying firearms is two-fold: (i) to generate additional interest in and attention to his protests; and (ii) for self-defense.  Zeleny Declaration, Dkt. No. 162-2, at ¶¶ 17-18.  Since he began protesting against NEA and Min Zhu, Zeleny has received credible threats of violence, and his father passed away under suspicious circumstances that Zeleny believes are connected to Min Zhu and his enablers and protectors.  *Id*. As Zeleny has repeatedly explained, he seeks to openly carry to send a clear message that he will not be bullied, coerced, or threatened into remaining silent about his message.  *Id.*

---

[1] Because these cross-motions involve largely the same issues, Zeleny refers to the Declaration he previously submitted in support of his Motion for Partial Summary Judgment against Attorney General Becerra.  *See* Dkt. No. 162-2.

1    Zeleny repeatedly notified the City that he would carry unloaded weapons during his

2    protests, but at the same time he told the City that he would have live ammunition on his person as

3    well, so that he could use the firearms in self-defense if necessary.  *Id.*  The City cites that fact to

4    highlight the supposed danger that Zeleny poses.  *See* Mot. at p. 5.

5    Zeleny has been prevented from protesting, despite trying to comply with all laws, because

6    the City of Menlo Park contends that he is subject to arrest for violating California's "open carry"

7    firearms ban unless he gets a city permit—which Menlo Park refuses to issue to him.  *Id.* ¶ 13.  In a

8    perfect "catch-22", Defendants concede that the issuance of a City permit would qualify Zeleny as

9    an "authorized participant" (and thus exempt from the ban), but the City refuses to issue a permit, in

10   part, because it would be illegal for Zeleny to carry a firearm during his protests without one.

11       **C.      California's Comprehensive Gun Bans**

12   California imposes extensive regulations on who may obtain a firearm and how they may do

13   so.  It is generally illegal to carry "a loaded firearm on the person or in a vehicle while in any public

14   place or on any public street in an incorporated city or in any public place or on any public street in

15   a prohibited area of unincorporated territory."  Cal. Penal Code § 25850.[2]  These same restrictions

16   apply to carrying unloaded firearms openly, except for long guns (rifles) that remain in a vehicle.

17   *Id*. §§ 26350, 26400.  Regardless of whether the firearm is loaded, California law generally

18   prohibits possession of a concealed firearm in any place outside one's residence, place of business,

19   or other private property.  *Id.* §§ 25400, 25605.

20   While these general prohibitions are subject to exceptions, most apply only to narrow

21   groups such as retired peace officers, or to narrow activities such as hunting in rural areas.  For

22   most Californians, the only potential exception is for "Carry License" holders, which allows

23   individuals with a license to carry a handgun in public, subject to restrictions. *Id.* §§ 26150-26155.

24   _____

25   [2] In a blatant misstatement of law, the State contends that Zeleny is seeking to carry loaded weapons because
     he will have ammunition in his possession.  The State claims that Penal Code § 16840 defines "loaded" as a
26   firearm with ammunition "in the immediate possession of the same person."  Mot. at p. 19.  This is highly
     misleading.  Section 16840 defines loaded in this manner ***only for purposes of Penal Code § 25800***—
27   carrying a firearm in the commission of a felony.  The next subsection provides that for purposes of the "open
     carry" ban, Penal Code § 25850, a firearm is only loaded if the ammunition is in or attached to the firearm.

28

- 4 -

California authorizes city police chiefs and county sheriffs ("Issuing Authorities") to issue Carry Licenses to residents.  To obtain a Carry License, the applicant must meet numerous eligibility requirements, *see id.* §§ 26165, 26185.  The applicant must also convince the Issuing Authority that the applicant is of "good moral character" and has "good cause" to carry a firearm. *Id.* §§ 26150(a)(1)-(2), 26155(a)(1)-(2).[3]  Issuing Authorities have unbridled discretion in deciding whether an applicant has "good cause".  *Erdelyi* v. *O'Brien,* 680 F.2d 61, 63 (9th Cir.1982); *Nichols* v. *County of Santa Clara* (1990) 223 Cal.App.3d 1236, 1243; *CBS, Inc.* v. *Block* (1986) 42 Cal.3d 646, 665-66.  Some Issuing Authorities deny Carry Licenses to virtually all applicants, while others issue them freely to any qualified applicant.  *See Peruta* v. *County of San Diego,* 742 F.3d 1144, 1169 (9th Cir.2014) *(Peruta II), vacated,* 824 F.3d 919 (9th Cir.2016) (en banc).

In counties with populations over 200,000, Issuing Authorities can only issue licenses allowing the holder to carry a *concealed* firearm.  California law prohibits them from issuing licenses to carry openly. Cal. Penal Code §§ 26150(b)(2), 26155(b)(2).  If the Issuing Authority in such a county—*e.g.*, Los Angeles, where Zeleny lives, or San Mateo—has a restrictive "good cause" policy, then the typical citizen cannot obtain a license to carry at all.  Without a license, that citizen may only have a firearm in a "public place" if it is inside a container and for the sole purpose of transporting it to a vehicle or authorized location. *Id.* §§ 25505, 26405(c).

Carrying a firearm in public without a license or otherwise qualifying for one of the other limited exceptions is a misdemeanor or a felony.  *Id.* §§ 25400, 25850, 26350, 26400.  California provides only one affirmative defense: openly carrying for a short time interval due to a reasonable belief that the person or someone else is in "immediate, grave danger."  *Id.* § 26045(a).

In sum, ordinary law-abiding citizens in California are effectively banned from carrying firearms outside their homes for self-defense or when engaged in protest.  The Constitution does not permit such constraint of fundamental rights.

---

[3] In 2017, the California State Auditor issued an exhaustive report finding, among other things, that standards differed among licensing authorities that the authorities "failed to consistently apply their own licensing policies or standards." *See* Request for Judicial Notice, Dkt. No. 162-3, Ex. 7.

1

### D.      The Exemptions at Issue in This Case

2

3          California enacted its "Open Carry Ban" in 2012, prohibiting the open, non-concealed

4   carrying of unloaded handguns and rifles.  Cal. Pen. Code §§ 23650(a)(1)(A) and (B), 26500(a)(1)

5   and (2) (the "Open Carry Ban").  On their face, these laws prohibit Californians from openly

6   carrying unloaded firearms in virtually any public place in California.

7          These statutes have exemptions.  Open carry is permitted "by an authorized participant in . . .

8   a motion picture, television or video production, or entertainment event, when the participant

9   lawfully uses the [firearm] as part of that production or event."  Cal. Pen. Code § 26375 (handguns);

10  Cal. Penal Code § 26405(r) (non-handgun firearms).  The Penal Code does not define "authorized

11  participant," "motion picture, television, or video production," "entertainment event," or "lawfully."

12  It does not specify who does the authorizing and does it mention any criteria for authorization.  *Id*.

13  No legislative history sheds any light on the definition of the phrase "authorized participant."

### III.     <u>LEGAL STANDARD</u>

14         A moving party is entitled to summary judgment where he can show there is no genuine

15  issue of material fact and he is entitled to judgment as a matter of law.  Fed. R. Civ. Proc. 56.

16  Summary judgment follows where the non-moving party fails to "make a showing sufficient to

17  establish the existence of an element essential to that party's case and on which the party will bear

18  the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

19         Because the parties' cross-motions involve issues of pure law on undisputed facts, summary

20  judgment is appropriate.  The exemptions at issue authorize the open carry of firearms during the

21  production of certain entertainment events.  Under the undisputed facts, either (i) Zeleny qualifies as

22  an "authorized participant" under these exemptions; or (ii) the exemptions are unconstitutionally

23  vague.  Under either scenario, the Court should deny the State's Motion and grant summary

24  judgment to Zeleny.  Further, and only if the Court is unable to reach the foregoing issues, Zeleny

25  has established that California's near-total ban on both the open and concealed carry of firearms

26  unconstitutionally impairs the right to bear arms under the Second Amendment.

27

28

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
BY CALIFORNIA ATTORNEY GENERAL

1  IV.  **ARGUMENT**

2      A.    **The Entertainment Exemptions Violate Due Process and Equal Protection.**

3      The "entertainment exemptions" to California's Open Carry Ban either apply to Zeleny or

4  else they violate Fourteenth Amendment due process and equal protection because they: (i) implicate

5  a fundamental right while simultaneously treating California citizens differently under the law and

6  make content-based distinctions; and (ii) are void for vagueness because they do not provide fair

7  notice as to what is required to take advantage of the exemption.  Under either theory, the

8  exemptions cannot be constitutionally applied as drafted and interpreted by the State.

9          1.    **The Entertainment Exemptions Impermissibly Treat Movie Studios
                  and Production Companies Differently than Protestors and Advocates.**

10

11      The Penal Code exemptions for "authorized participants" in a movie, television show,

12  theatrical production, or other "entertainment event," implicate two fundamental rights: (i) the First

13  Amendment right of free speech[4]; and (ii) the Second Amendment right to keep and bear arms.  *See*

14  *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010) (recognizing that the right to keep and bear

15  arms is a "fundamental right").  Through these exemptions, California law impermissibly and

16  arbitrarily disadvantages one group of speakers over another, based on the content of their speech.

17      Strict scrutiny applies when a legislative classification "touches upon" or "impermissibly

18  interferes with the exercise of a fundamental right." *Shapiro v. Thompson*, 394 U.S. 618, 638

19  (1969) *overruled in part on another ground in Edelman v. Jordan*, 415 U.S. 651 (1974); *Mass. Bd.*

20  *of Retirement v. Murgia*, 427 U.S. 307 (1976).  Such classifications are presumed unconstitutional

21  and will survive only when the government can show the law is narrowly-tailored to a compelling

22  state interest.  *See Zablocki v. Redhail*, 434 U.S. 374, 388 (1978).

23      Similarly, when an equal protection claim is based on a fundamental right, such as those

24  protected by the First and Second Amendments, then the government "may only draw distinctions

---

25  [4] There is no serious contention that Zeleny's protests and filming of his events are not protected speech.  *See*
26  *Shuttlesworth*, 394 U.S. at 152 (picketing and parading constitute methods of expression entitled to First
    Amendment protection); *United States v. Grace*, 461 U.S. 171, 176 (1983).  Zeleny's concurrently pending
27  Motion against the City Defendants collected a number of cases further supporting this undisputable fact.  To
    the extent necessary, those arguments are incorporated here by this reference.  *See* Mot. at pp. 13-14.

28

1   in the ordinance that are finely tailored to serve substantial interests." *A.C.L.U. of Nevada v. City of*

2   *Las Vegas* 466 F.3d 784, 797-98 (9th Cir.2006) (*citing Carey v. Brown* (1980) 447 U.S. 455, 461-

3   62).  Only if no fundamental rights are at issue does rational basis apply.  *Id*. at 798.  The State's

4   claim that the lowest level of scrutiny applies is contrary to the weight of authority.  Mot. at p. 23.

5       Supreme Court authority, dating to at least the early 1970's, confirms that states and

6   municipalities cannot make content-based distinctions between different groups of citizens when

7   fundamental rights are implicated.  For example, in *Police Dep't v. Mosley* (1972) 408 U.S. 92, and

8   *Carey v. Brown* (1980) 447 U.S. 455, the Court invalidated, on equal protection grounds,

9   ordinances that banned public picketing, but exempted picketing by labor unions.  *Carey*, 447 U.S.

10  at 461-62.  In *Carey*, the Illinois statute flatly prohibited all non-labor picketing in residential

11  neighborhoods, allegedly to protect residential privacy.  Relying upon *Mosely*, which struck down a

12  similar ban on picketing, the Court made clear that the state was impermissibly prohibiting one type

13  of speech, while allowing other speech that was equally likely to intrude on residential privacy.  *Id.*

14          "The central problem with Chicago's ordinance is that it describes
15      permissible picketing in terms of its subject matter. Peaceful picketing
        on the subject of a school's labor-management dispute is permitted,
16      but all other peaceful picketing is prohibited. The operative distinction
        is the message on a picket sign … Any restriction on expressive
17      activity because of its content would completely undercut the
        'profound national commitment to the principle that debate on public
18      issues should be uninhibited, robust, and wide-open.' *New York Times
        Co. v. Sullivan*, 376 U.S. 254, 270.
19

20          "Necessarily, then, under the Equal Protection Clause, not to mention
        the First Amendment itself, government may not grant the use of a
21      forum to people whose views it finds acceptable, but deny use to those
        wishing to express less favored or more controversial views. And it
22      may not select which issues are worth discussing or debating in public
        facilities. There is an 'equality of status in the field of ideas,' and
23      government must afford all points of view an equal opportunity to be
        heard. Once a forum is opened up to assembly or speaking by some
24      groups, government may not prohibit others from assembling or
        speaking on the basis of what they intend to say. Selective exclusions
25      from a public forum may not be based on content alone, and may not
        be justified by reference to content alone." *Id*., at 95–96.
26

27  *Carey* at 463 (*quoting Mosely*, 408 U.S. at 95-96).

28      The entertainment exemptions as interpreted by the State make precisely the type of content-

based distinctions that the Supreme Court has rejected under the Equal Protection Clause. The exemptions would impermissibly distinguish between different speakers, drawing a line between those engaged in "entertainment"—*i.e.*, movies, TV shows, and theater—and in other forms of protected speech—*i.e.*, protests, firearm training, gun rights advocacy, or "open carry" demonstrations. Neither the statutes nor their legislative histories offer any justification for distinguishing between these different types of constitutionally-protected speech. The Legislature did not identify any reasons for the exemption, and it does not appear that it considered other forms of expressive conduct at all. *See* Robinson Decl., Dkt. No. 163-1; Exs. 1, 2. To the extent that the exceptions are intended to favor the entertainment industry, such a distinction would be constitutionally prohibited. *See Branzburg v. Hayes*, 408 U.S. 665, 704 (1972).

The exemptions violate the First Amendment by making a content-based distinction between the free speech rights of movie studios and production companies and other, core forms of First Amendment activity. Such a distinction is not permissible. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (restrictions must be justified "without reference to the content of the regulated speech") (*quoting Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). As the famous phrase states, "liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods." *Branzburg v. Hayes*, 408 U.S. 665, 703 (1972). The State cannot identify any compelling state interest justifying content-based distinctions between major movie studios' feature films and a lone protestor. The State cannot favor one over the other.

The Supreme Court directly addressed this type of improper distinction in *Citizens United v. FCC* (2010) 558 U.S. 310. There, the Court stated that "[p]rohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others." *Id.* at 340 (*citing First Nat. Bank of Boston v. Bellotti*, (1978) 435 U.S. 765, 784. The Court noted the interplay between selecting speakers and censoring ideas: "As instruments to censor, these categories are interrelated: ***Speech restrictions based on the identity of the speaker are all too often simply a means to control content***." *Id.* (emphasis added). "The First Amendment protects speech and speaker, and the ideas that flow from each." *Id.* at 341. "[T]he legislature is

- 9 -

constitutionally disqualified from dictating the subjects about which persons may speak *and the speakers who may address a public issue*." *Bellotti*, 435 U.S. at 784 (*citing Mosley*, 408 U.S. at 96).

The same is true where the content or speaker distinction is within a statutory exception. *See Foti v. City of Menlo Park*, 146 F.3d 629, 636 (9th Cir.1998) ("when exceptions to the restriction on noncommercial speech are based on content, the restriction itself is based on content."); *Nat'l Advertising Co. v. City of Orange*, 861 F.2d 246, 249 (9th Cir.1988).

That is exactly what is occurring here. California is using artificial distinctions between speakers to justify regulations that reflect content. California exempts wealthy and powerful movie studios and television production companies from its Open Carry Ban, while strictly imposing those same limitations on a lone citizen protesting an injustice. Sony studios can make a film involving as many guns as it wants, but an "open carry" advocate cannot stage a protest or demonstration. California no doubt enjoys substantial tax revenue and other benefits from the entertainment industry. Its disdain for Zeleny and his message are obvious. But these are not valid criteria for the State deciding what First Amendment activity will be respected versus what will not. The State's content-based distinctions are unconstitutional.

The State's attempts to gloss over these issues cannot be squared with the undisputed facts. The State contends that the exemptions should be subject to rational basis review because they do not distinguish between similarly-situated people. Mot. at 22-23. But the State's argument shows that the *exact opposite is true*. The State argues that there is an obvious difference between "an individual walking down a public sidewalk … or attending a public protest while carrying an unloaded firearm" and an entity responsible for a motion picture, television or video performance, or entertainment event. *Id.* As support, the State argues that such entities must obtain permits, give advance notice to the local authorities, and allow them mitigate any potential adverse responses from the public. ***That is precisely what Zeleny has tried to do here.***

Zeleny sought both a Special Events Permit and a film permit from the City of Menlo Park related to his protests. He detailed for the City how, when, and where he would conduct his activities. He specifically offered to comply with any reasonable time, place, or manner restriction, practically begging the City to work with him to mitigate any reasonable concerns that the City and

its police force had.  The City rebuffed all of his efforts.  (*See* Zeleny's Motion directed at the City.)

Finally, the State's argument that the First Amendment is not implicated because Zeleny carrying a firearm during his protests does not amount to expressive conduct misses the point entirely.  Zeleny has never argued, and is not now arguing, that merely carrying a gun without more would constitute expressive conduct that, standing alone, would trigger strict scrutiny.  The State's Motion cites nothing supporting such a contention.  *See* Mot. at pp. 10-13.  Rather, Zeleny contends that he carries firearms *as part of his protests*, during the production of an entertainment event recorded for the express purpose of disseminating it to the public.  Carrying firearms is an important part, but only a part, of his larger protests.  It is the *totality of his protests that are protected*.  Similarly, an actor openly carrying a handgun during the filming of a movie is not, in and of itself, expressive.  Rather, it is in the context of a scene in a movie, which in turn is but one aspect of the larger artistic expression, which the State concedes is protected.  Distinguishing between the two forms of speech is not allowed under our Constitution.

## 2. The Entertainment Exemptions Are Unconstitutionally Vague.

If California's entertainment exemptions do not apply to exempt Zeleny, they are unconstitutionally vague.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Studios, Inc.*, 567 U.S. 239, 253 (2012) (*citing Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).  A law is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *Id.  See also Kolender v. Lawson* (1983) 461 U.S. 352, 357-58 ("As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."); *Village of Hoffman Estates v. Flipside*, 455 U.S. 489 (1982).

Moreover, when First Amendment freedoms are at stake, an even greater degree of

1  specificity and clarity is required.  *See N.A.A.C.P. v. Button*, 371 U.S. 415, 432–33 (1993)

2  ("[S]tandards of permissible statutory vagueness are strict in the area of free expression . . . Because

3  First Amendment freedoms need breathing space to survive, government may regulate in the area

4  only with narrow specificity."); *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1057 (9th Cir.1986);

5  *Foti*, 146 F.3d at 638–39.

6          The entertainment exemptions fail to define the phrase "authorized participant."  A person

7  of reasonable intelligence could not reasonably be expected to know what it means.  As Judge

8  Hixson noted, "[u]nhelpfully, there is no statutory definition of an 'authorized participant,' nor a

9  provision stating who does the authorizing.  There are no governing regulations either."  Sept. 4,

10 2020 Order, Dkt. No. 140, at p. 1.  The total absence of clarifying text, regulations, or official

11 guidance renders the statutes unconstitutionally vague.

12         Case in point, the participant in this case—all individuals of at least ordinary intelligence,

13 and the State of California itself—have come to contrary and irreconcilable conclusions as to what

14 the phrase "authorized participant" means.  The Attorney General served no fewer than *three* sets of

15 interrogatory supplemental responses before settling on a definition, referring to an entirely

16 different and inapplicable statutory scheme.  Robinson Decl. ¶¶ 2-9 & Ex. 1 at 25-28.

17             Based on Defendant Becerra's understanding of Plaintiff Zeleny's
             situation, in the specific context of this case, Defendant Becerra
18             believes that an "authorized participant" must be operating under the
             auspices of a Department of Justice Entertainment Firearms Permit,
19             which authorizes the permit holder "to possess firearms loaned to the
             permitholder for use solely as a prop in a motion picture, television,
20             video, theatrical, or other entertainment production or event." (Penal
             Code § 29500.) For entertainment productions this generally has meant
21             that a propmaster or similarly qualified person is supervising the use of
             firearms in the production, and others involved in the production may
22             transfer or possess firearms under the auspices of the supervising
             permit-holder.
23

24 *Id*. at p. 28.  Even then, the State included so many qualifications that its definition is meaningless.

25         The Rule 30(b)(6) designee of the State of California, Blake Graham, fared no better.  He

26 could not explain what the statute means.  Graham is a special agent in charge for the California

27 Department of Justice, and the State's go-to expert on its gun control regulations.  Robinson Decl.,

28 Dkt. No. 163-1, Ex. 6 at p 13-14.  He would certainly qualify as a person of "at least ordinary

- 12 -

intelligence." During his deposition, Graham was unable to come up with a coherent definition of the phrase "authorized participant," stating that he would "have to do ***quite a bit of research*** before he could come up with something" on what "authorized participant" means. *Id*. at 116-17 (emphasis added); *see also id.* at 127-28.

When the City of Menlo Park asked the State for an interpretation three years ago, the State gave the exact opposite interpretation of the one it offers now. *See* Master Decl., Dkt. No. 160-6 at 30:22-31:16.

In short, the State could not come up with a coherent definition despite five tries, two Court orders, months to address the issue, and advice of counsel all the while. If a constitutionally sufficient definition were possible, the State would have come up with it by now.

The City's Rule 30(b)(6) designee was similarly confounded. Bertini, a 33-year law enforcement officer and a police chief, was asked about the exception. This was his response:

> Well, that's the question we were trying to get answered through the Department of Justice, the district attorney's office, et cetera. ***Because that law is very vague***, we were trying to determine whether that's true or not. And, as it stands today, our reading of the exemption is yes, if he was permitted under the – under the special events or film permit, then he could openly carry weapons.

Robinson Decl., Dkt. No. 163-1, Ex. 5 at 428:18-429:4 (emphasis added).

To the extent that the statute vests authority in local permitting agencies to "authorize" participants with no guiding standards, it is unconstitutionally vague. The phrase "authorized participant" gives local agencies no guidance and imposes no limits on their discretion. Nor are there any regulations or an official interpretation. A statute that gives local agencies unbridled discretion to authorize participants, without any guidance, is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Fox Television*, 567 U.S. at 253.

Compounding the vagueness of the exemptions, they are written as a tautology. Penal Code Section 26375 expressly states that California's ban on the open carry of a handgun does not apply to an "authorized participant" in a motion picture, television or video production, or other entertainment event (all undefined), "when the participant *lawfully* uses the handgun as part of that production or event." (Emphasis added.) The qualifier "lawfully" is not defined in the statute or the

- 13 -

legislative history and is circular in this context.  California has broadly decreed that openly

carrying a handgun is *per se* unlawful and has created various exemptions.  Section 26375 is

intended to make certain instances of openly carrying a handgun lawful, but, by its express terms,

only when the individual is doing so "lawfully".  By not defining what that qualifier means or how

a participant can exercise this right "lawfully", the legislature has left citizens to guess what is

required.  Such vague and standardless statutes fail to provide adequate notice to citizens.  *See, Fox*

*Television Studios, Inc.*, 567 U.S. at 253.

If the State and top law enforcement personnel cannot tell what the statutes mean, a person

of ordinary intelligence cannot possibly be expected to be able to.  They are unconstitutional.

**3.    The Most Reasonable Interpretation of "Authorized Participant" is an**
**Individual Authorized by the Producer of the Event.**

In his own affirmative Motion, Zeleny detailed the parties' competing interpretations of the

phrase "authorized participant".  Mot. at pp. 5-9.  Zeleny also detailed how the Defendant's

proposed interpretations raised fundamental constitutional concerns.  *Id.*

In a throwaway argument at the end of its Motion, the State now erroneously contends that

the Court need not determine what the phrase means because the City could always impose

additional restrictions that would preclude Zeleny from openly carrying a firearm during his

protests.  Mot. at 24-25.  The State's position is incorrect—at issue in this case is the proper

interpretation of the statutory exemptions so as to make them constitutionally valid if possible, and

if not, to invalidate them.  The fact that Zeleny might also have to comply with reasonable time,

place, and manner restrictions does not inoculate the State's statutes from review and construction.

Further, the State's proposed interpretation imports out of whole cloth a requirement that the

exemption be limited to "defined spaces in which the firearm being carried is not easily visible or

accessible to the public, as opposed to an individual carrying an unloaded firearm in an unconfined,

uncontrolled area, fully visible to the public, and for an indefinite period of time."  *Id.*  This

proposed interpretation in incorrect and unworkable for multiple reasons.

*First*, that State cannot point to any language in the statutes to support these restrictions.

The statues make no reference to hiding the firearm from the public or limiting them to defined

spaces. "Guided by fundamental canons of statutory construction, a court begins with the statutory text." *Bowen v. M. Caratan, Inc.*, 142 F.Supp.3d 1007, 1022 (E.D.Cal. 2015) (*quoting U.S. v. Neal*, 776 F.3d 645, 652 (9th Cir.2015). No language in the statutes supports the State's interpretation.[5]

*Second*, the State's proposed construction has no basis in the practical use of the exemptions. It is simply not true that all motion pictures, television and video productions, and other entertainment events where authorized participants are allowed to carry unloaded firearms, are conducted outside of the view of the public and in confined spaces. If this were the requirement, the exemption would be superfluous: carrying on a private, closed set would not be openly carrying. In fact, motion pictures involving firearms are filmed on regular city streets. Virtually every action film, for example *Die Hard*, would fail the State's newly-minted test. No statutory language in the exemptions suggests that the general public must be shielded from seeing an unloaded firearm.

In contrast, and as supported by Zeleny's unrebutted expert declarations, the proper construction of the statutes is that the person who does the "authorizing" of an "authorized participant" is the producer of the motion picture, television show, or other entertainment event. Under this reasonable construction, the producers of these events are able to lawfully utilize unloaded firearms in their productions without unnecessarily adding delays and complications to the process. It is the only sensible construction, and this Court should adopt it.

**B.      California's Open Carry Ban Violates the Second Amendment.**

The Supreme Court's decisions in *Heller* and *McDonald* spell the end of the State's comprehensive ban on public carry. The evolution of the law in this area is crystal clear. The State's attempts to salvage the ban defy the modern trend of authority.

**1.      The State's Evasion Fails.**

The State's dodge that Zeleny does not allege "a Second Amendment right to carry ... based

---

[5] The State's proposed construction in its Motion is also fundamentally different from the one it asserted in discovery, which tied the definition of "authorized participant" to a person holding a California Entertainment Firearms Permit. Robinson Decl., Dkt. No. 163-1; Ex. 1 at p. 28. Of course, the statutes in question do not reference the Entertainment Firearms Permit or otherwise implicate it.

on a right to self-defense" is unavailing.  Mot. at p. 19.  The first line of the operative complaint

reads: "This case is brought to challenge the constitutionality of California statutes restricting

Plaintiff's right to bear arms under the Second Amendment …"  Second Am. Compl., [Dkt. No. 99]

at ¶ 1.  The Second Amendment refers to the right to "keep and bear arms," not to "self-defense."

The State cites no authority for the idea that Zeleny was required to plead the reasons why he

wanted to bear arms to raise a Second Amendment challenge.  He brings a facial challenge.  The

constitutionality of the statutes *on its face* would not change whether he wants to openly carry for

"self-defense," expressive purposes, or any other reasons.  Moreover, Zeleny has been clear

throughout this case that he seeks to bear arms for both self-defense and expressive purposes.  *See*

Master Decl., [Dkt. No. 160-3], Ex. A at pp. 57-58; Zeleny Decl. [Dkt. No. 162-2] at ¶¶ 17-18.

### 2.    Framework for Second Amendment Analysis.

In *Heller*, the Supreme Court held that the Second Amendment protects an "individual

right to possess and carry weapons" for self-defense. 554 U.S. at 592.  The Court struck down a

District of Columbia ordinance banning the possession of handguns under "any of the standards of

scrutiny that we have applied to enumerated constitutional rights"—that is, any standard stricter

than rational basis.  *Id.* at 628 & n.27.

In *McDonald*, the Court extended *Heller*, finding that the Second Amendment is "fully

applicable to the States," *id.* at 750, because it is "among those fundamental rights necessary to our

system of ordered liberty." *Id.* at 778.  States may not "enact any gun control law that they deem to

be reasonable." *Id.* at 783 (plurality); *see also Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016).

In the years since *Heller* and *McDonald,* the Ninth Circuit has developed a two-step

framework for Second Amendment claims.  A court first "asks if the challenged law burdens

conduct protected by the Second Amendment, based on a historical understanding of the scope of

the right." *Silvester v. Harris,* 843 F.3d 816, 821 (9th Cir. 2016) (citing *Heller,* 554 U.S. at 625).  If

yes, the court analyzes the law under heightened scrutiny, with the degree of scrutiny varying

depending on "how close the challenged law comes to the core of the Second Amendment right,

and ... the severity of the law's burden on that right." *Id.* (*citing Jackson v. City* & *County of San*

- 16 -

1 | *Francisco,* 746 F.3d 953, 960-61 (9th Cir. 2014)).

2 |       The court need not determine the applicable level of scrutiny, however, if a law "amounts to

3 | a destruction of the Second Amendment right," as such a law "is unconstitutional *under any level of*

4 | *scrutiny*." *Jackson,* 746 F.3d at 961 (emphasis added).  After all, "[t]he very enumeration of the right

5 | takes out of the hands of government … the power to decide on a case-by-case basis whether the

6 | right is *really worth* insisting upon." *Heller,* 554 U.S. at 634.  The Second Amendment is not "a

7 | second-class right, subject to an entirely different body of rules than the other Bill of Rights

8 | guarantees." *McDonald,* 561 U.S. at 780.  In short, the Second Amendment is "a real constitutional

9 | right.  It's here to stay." *Fisher v. Kealoha,* 855 F.3d 1067, 1072 (9th Cir. 2017).

### 3. California Law Infringes the Second Amendment by Barring Virtually Any Bearing of Firearms Outside of the Home.

      California law prohibits Zeleny and other conscientious, law abiding citizens from carrying a firearm in virtually any public place in the state.  The critical question is whether the Second Amendment protects a right to carry firearms that extends beyond the home.  *Silvester,* 843 F.3d at 821.  The text, structure, purpose, and history of the Second Amendment all confirm that it does.  Precedent reinforces that conclusion.  No federal court (at least without provoking reversal) has accepted the theory that the right is confined to the home.

### a. The Text, Structure, and Purpose of the Second Amendment Confirm That the Right to Bear Arms Extends to Public Places.

      Any inquiry into the Second Amendment must begin with its text.  *See Heller,* 554 U.S. at 576.  That text provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

      The text protects two separate rights: the right to "keep," and the right to "bear."  *Heller,* 554 U.S. at 591.  Under *Heller's* binding construction, to "keep arms" means to "have weapons." *Id.* at 582.  To "bear arms" means to "carry" a weapon for "confrontation"—to "wear, bear, or carry'" a firearm "'upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict.'" *Id.* at 584 (quoting *Muscarello* v.

- 17 -

1   *United States,* 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)).

2           As every court to address the issue post-*Heller* has confirmed, the right extends beyond the

3   home. "To speak of 'bearing' arms within one's home would at all times have been an awkward

4   usage." *Moore v. Madigan,* 702 F.3d 933, 936 (7th Cir. 2012); *see Grace v. District of Columbia,*

5   187 F.Supp.3d 124, 135 (D.D.C. 2016), *vacated on other grounds*, *Wrenn v. District of Columbia,*

6   864 F.3d 650 (D.C. Cir. 2017) ("[R]eading the Second Amendment right to 'bear' arms as applying

7   only in the home is forced or awkward at best, and more likely is counter-textual.").

8           The far "more natural to view the Amendment's core as including a law-abiding citizen's

9   right to carry common firearms for self-defense beyond the home." *Wrenn,* 864 F.3d at 657. After

10  all, "the idea of carrying a gun 'in the clothing or in a pocket, for the purpose . . . of being armed and

11  ready,' does not exactly conjure up images of father stuffing a six-shooter in his pajama's pocket

12  before heading downstairs to start the morning's coffee[.]." *Peruta II,* 742 F.3d at 1152.  Bearing

13  arms necessarily connotes carrying them in a public place.  *Id.*

14          Confining the right to "bear arms" to the home would render it duplicative of the separately

15  protected right to "keep" arms.  That would contradict the foundational principle that no "clause in

16  the constitution is intended to be without effect." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137

17  (1803).  In short, the proper reading of the right to bear arms includes public carry.[6]

18          Limiting the right to the home is irreconcilable with its *"central component"—i.e.*, self-

19  defense.  *Heller* 554 U.S. at 599; *see Id.* at 594 ("right to enable individuals to defend themselves");

20  *Id.* at 616 ("individual right to use arms for self-defense"); *Id.* at 628 ("inherent right of self-

21  defense").  The need for self-defense is obviously "not limited to the home." *Moore,* 702 F.3d at

22  936.  To the contrary, "the need for [self-defense] might arise beyond as well as within the home."

23

24  [6] That proper reading is reinforced by the amendment's structure. As Heller explained, the Second
    Amendment's prefatory clause—"[a] well regulated Militia, being necessary to the security of a free State"—
25  performs a "clarifying function" with respect to the meaning of the operative clause.  554 U.S. at 577-78.
    Here, the prefatory clause's reference to "the Militia" clarifies that the operative clause's protection of the
26  right to "bear Arms" encompasses a right that extends beyond the home.  And, all the Justices in *Heller*
    agreed that the right to bear arms was codified, at least in part, to ensure the viability of the militia. See Id. at
27  599, and 637 (Stevens, J., dissenting). The Court thus unanimously agreed that one critical aspect of the right
    to bear arms extends beyond the home.

28

1 | *Wrenn,* 864 F.3d at 657; *accord Heller,* 554 U.S. at 679 (Stevens, J., dissenting).

2 |      Both precedent and empirical data make clear that the need for self-defense is *more likely* to
3 | arise outside of the home.  In America's early days, for example, "one would need from time to
4 | time to leave one's home to obtain supplies from the nearest trading post, and en route one would
5 | be as much (probably more) at risk if unarmed as one would be in one's home unarmed." *Moore,*
6 | 702 F.3d at 936. The "right to keep and bear arms for personal self-defense in the eighteenth
7 | century" therefore "could not rationally have been limited to the home." *Id.*  The same is true today.
8 | Violent crimes most often "occur on the street or in a parking lot or garage" rather than "in the
9 | victim's home." *Grace,* 187 F.Supp.3d at 135.  A substantial majority of rapes, armed robberies,
10 | and serious assaults occur outside the home. *See* Michael P. O'Shea, *Modeling the Second*
11 | *Amendment Right to Carry Arms (I): Judicial Tradition and the Scope of "Bearing Arms" for Self-*
12 | *defense,* 61 Am. U. L. Rev. 585,610-11 (2012) (*citing* Bureau of Justice Statistics, U.S. Dep't of
13 | Justice, *Criminal Victimization in the United States, 2007 Statistical Tables* tb1.62 (2010)).

14 |      As the Seventh Circuit put it, "a Chicagoan is a good deal more likely to be attacked on a
15 | sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower."
16 | *Moore,* 702 F.3d at 937.  Likewise, a "woman who is being stalked or has obtained a protective
17 | order against a violent ex-husband is more vulnerable to being attacked while walking to or from
18 | her home than when inside." *Id.* "To confine the right to be armed to the home is [thus] to divorce
19 | the Second Amendment from the right of self-defense described in *Heller* and *McDonald." Id.*

20 |
           **b.**     **The History of the Second Amendment Shows That the Right**
21 |                      **Extends Beyond the Home.**

22 |      The "historical background" of the Second Amendment "strongly confirm[s]" that the right
23 | to bear arms extends beyond the home.  *Heller,* 554 U.S. at 592.  Many of the sources that *Heller*
24 | consulted to determine that the Second Amendment protects an individual right also show that the
25 | right extends beyond the home.  *Wrenn,* 864 F.3d at 658.

26 |      The Second Amendment traces its roots to England, where Blackstone described "'the right
27 | of having and using arms for self-preservation and defence'" as "'one of the fundamental rights of
28 | Englishmen.'" *Heller,* 554 U.S. at 594 (quoting I Blackstone 136, 139-40 (1765)). The fundamental

- 19 -

right to use arms for "self-preservation and defense" necessarily includes the right to carry firearms outside the home due to the need for self-defense.  English authorities made clear that "the killing of a Wrong-doer ... may be justified ... where a Man kills one who assaults him *in the Highway* to rob or murder him." 1 William Hawkins, *A Treatise of the Pleas of the Crown* 71 (1762) (emphasis added); *see also* 1 Matthew Hale, *Historia Pacitorum Coronae* 481 (Sollum Emlyn ed. 1736).

The need to carry for self-defense was even greater in an early America dominated by "wilderness" and other dangers.  *Moore,* 702 F.3d at 936.  "[I]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than a European fine gentleman without his sword by his side." *Grace,* 187 F.Supp.3d at 137 (quoting 5 George Tucker, *Blackstone's Commentaries,* app., n.B, at 19 (1803).  "[I]t is unquestionable that the public carrying of firearms was widespread." *Id.* at 136.  Many of the Founding Fathers carried firearms in public and spoke in favor of the right to do so—a strong indication that the right was not limited to the home. *Id.* at 136-37.  Indeed, in many parts of early America, "carrying arms publicly was not only permitted—it was often *required." Id.*; *see also* Nicholas J. Johnson, *et. al*., *Firearms Law and the Second Amendment* 106 (2012) ("[A]bout half the colonies had laws requiring arms-carrying in certain circumstances.").

Early American cases, including many cited in *Heller*, make clear that the Second Amendment included the right to bear arms *in public*. The nineteenth century cases are comprehensively analyzed by *Peruta II,* 742 F.3d at 1155-66, which concluded that "the majority of nineteenth century courts agreed that the Second Amendment right extended outside the home and included, at minimum, the right to carry an operable weapon in public for the purpose of lawful self-defense." *Id.* at 1160*; see also* O'Shea, *supra,* at 590.

The critical point is that the Second Amendment requires *"some form* of carry for self-defense outside the home." *Peruta II,* 742 F.3d at 1172.  The Georgia Supreme Court's decision in *Nunn v. State,* 1 Ga. 243 (1846), lauded by *Heller,* 554 U.S. at 612, is illustrative.  There, the court held a state statute "valid" in prohibiting concealed carry, but to the extent the law "contains a prohibition against bearing arms *openly*," the court explained, it "is in conflict with the Constitution, and *void.*" 1 Ga. 251.  Numerous other cases relied upon by *Heller* followed the same approach. 554

- 20 -

1  U.S. at 613, 629 (*citing Andrews v. State*, 50 Tenn. 165, 187 (1871); *State v. Chandler*, 5 La. Ann.

2  489 (1850); *State v. Reid*, 1 Ala. 612 (1840)).  The few cases that reached a different result have

3  been "sapped of authority by *Heller* ... because each of them assumed that the Amendment was only

4  about militias and not personal self-defense." *Wrenn,* 864 F.3d at 658.

5         **c.      Precedent Confirms That the Right Extends Beyond the Home**

6         Numerous federal courts have analyzed the scope of the Second Amendment in depth and

7  concluded that it extends to some form of carry outside the home.  *See id.* at 657-64; *Moore,* 702

8  F.3d at 935-36; *Grace,* 187 F.Supp.3d at 135-38; *Palmer v. District of Columbia,* 59 F.Supp.3d 173,

9  181-82 (D.D.C.2014). Even courts of appeals that ultimately upheld carry restrictions did not hold

10 the Second Amendment inapplicable. The Second Circuit, for example, concluded that the Second

11 "Amendment must have some application in the ... context of the public possession of firearms."

12 *Kachalsky v. County of Westchester,* 701 F.3d 81, 89 (2d Cir.2012).

13        That consensus is not surprising, as *Heller* strongly suggests that the Second Amendment

14 applies outside the home.  For instance, when the Court looked for past restrictions as severe as the

15 District's handgun ban, it deemed restrictions on carrying firearms outside the home most

16 analogous, noting with approval that "some of those [restrictions] have been struck down." *Heller,*

17 554 U.S. at 629.  Such laws could hardly represent "severe" restrictions if the Second Amendment's

18 protection did not include public carry.  *Id.*  And when the Court identified certain "presumptively

19 lawful" restrictions, it included "laws forbidding the carrying of firearms in sensitive places such as

20 schools and government buildings."  *Id.* at 626-27 & n.26.  The Court would not need to call out

21 those public places if there was no right to carry in public at all.

22        Ninth Circuit precedent is in accord.  The only Ninth Circuit opinion to squarely discuss the

23 question of public carry concluded that the right to bear arms requires states to "permit *some form*

24 of carry for self-defense outside the home." *Peruta II,* 742 F.3d at 1172.  Candidly, the panel

25 decision in *Peruta II* was subsequently superseded by an *en banc* decision finding no right to

26 *concealed* carry.  The *en banc* court, however, reserved the question of "whether the Second

27 Amendment protects *some ability* to carry firearms in public." *Id.* (emphasis added); *see also id.* at

28 939, 942.  *See Peruta v. County of San Diego,* 824 F.3d 919, 927 (9th Cir.2016) (*Peruta III*).

Indeed, California conceded that a state may not be able to "categorically" ban carry beyond the home. *Peruta III*, 824 F.3d at 919. *Peruta II* remains the only Ninth Circuit decision to squarely address the question, and it continues to be cited frequently as persuasive authority. *See, e.g., Wrenn*, 864 F.3d at 658, 663-64; *Grace*, 187 F.Supp.3d at 130 n.2.

### 4.     Banning Carry Beyond the Home Fails Under Any Level of Scrutiny.

Concluding that the right to bear arms extends beyond the home all but resolves this case. California's wholesale denial of a right protected by the Second Amendment "fail[s] constitutional muster" under "any of the standards of scrutiny." *Heller, 554* U.S. at 628-29. Whether this Court applies the categorical approach that *Heller* demands, or one of the levels of heightened scrutiny, the result is the same: California's refusal to allow its citizens to carry guns in public, outside of their homes, is unconstitutional.

#### a.     California's *De Facto* Ban on Carrying Firearms by Law-Abiding Citizens Is Categorically Invalid.

Because California denies citizens any meaningful ability to carry outside the home, there is no need to determine the applicable level of scrutiny. A law that completely denies a protected right "fail[s] constitutional muster" under "any of the standards of scrutiny." *Id.* That is the approach *Heller* took in striking down a total denial of the right to keep arms and it is the approach numerous courts have taken in striking down bans on the right to bear them. *See Wrenn*, 864 F.3d at 664-66; *Peruta II, 742* F.3d at 1175; *Moore*, 702 F.3d at 941-42; *Palmer*, 59 F.Supp.3d at 182-83. It is also an approach that a unanimous Ninth Circuit panel endorsed in *Jackson*, 746 F.3d at 961.

The fact that California's scheme is riddled with a laundry list of exemptions does not improve matters. The Second Amendment guarantees the right to keep and bear Arms to "the people," not just to retired peace officers or other subsets of the people the state deems worthy. The right to bear arms can no more be limited to such individuals than the right to free speech can be limited to paid newspaper columnists. *See, e.g., First Nat'l. Bank,* 435 U.S. at 777 (speech protection "does not depend upon the [speaker's] identity"). Indeed, the ban at issue in *Heller* had "minor exceptions" for certain people, such as retired police officers, *see* 554 U.S. at 575 n. l, but the Court still characterized it as a "complete prohibition." *Id.* at 629. The same result applies here.

1  The ban "on the ability of most citizens to exercise an enumerated right would have to flunk any
2  judicial test that was appropriately written and applied." *Wrenn,* 864 F.3d at 666.

3      California's exception for Carry Licenses holders is likewise inapposite.  If California law
4  required Issuing Authorities to recognize self-defense as "good cause" to obtain a Carry License,
5  then that exception would provide ordinary citizens with an opportunity to exercise their right.  But,
6  the State does not impose such a limitation.  Los Angeles Sheriff Villaneuva, where Zeleny lives,
7  has chosen to adopt a near-impossible "good cause" requirement.  So, the Carry License exception
8  is no exception at all, at least not for an ordinary citizen like Zeleny.

9      Nor is California's narrow affirmative defense to criminal prosecution for an individual
10  facing "immediate, grave danger" a meaningful caveat. That defense is not only limited to "grave
11  danger," but it applies *only* during "the brief interval" between when law enforcement officials are
12  notified of the "grave danger" and when they arrive.  Cal. Penal Code §§ 26045(a)-(c).  Since an
13  individual is prohibited from having an unloaded firearm on or near his person, "where the fleeing
14  victim would obtain a gun during that interval is apparently left to Providence." *Peruta II,* 742 F.3d
15  at 1147, n.1.  More fundamentally, the notion that the right to bear arms is sufficiently
16  accommodated by a potential affirmative defense cannot square with the Supreme Court's
17  admonishments that the Second Amendment protects a right to be "armed and ready" in case of
18  confrontation. *Heller, 554* U.S. at 584 (*quoting Muscarello,* 524 U.S. at 143).

19      Finally, while there are portions of unincorporated areas where it is legal to openly carry a
20  firearm, in reality these are tiny islands in a sea of "prohibited areas." Cal. Penal Code §§ 17030,
21  28350(a)(1)(C).  "Prohibited areas" generally include any public road or highway, as well as
22  anywhere within 150 yards of any building.  The State also designates certain areas it controls as
23  "prohibited areas."  Municipalities typically create additional "prohibited areas" via ordinance.  The
24  City of Menlo Park, for example, prohibits any person from "having in his possession within this
25  city … any firearm[,]" subject to narrow exceptions.  Menlo Park Municipal Code § 8.32.010.

26      In short, for ordinary individuals, California's prohibitions are tantamount to a flat ban on
27  publicly carrying firearms.  Because such a flat ban "amounts to a destruction" of the fundamental
28  right, California's carry prohibitions are "unconstitutional under any level of scrutiny." *Jackson,*

- 23 -

1   746 F.3d at 961 (citing *Heller,* 554 U.S. at 629).

2               **b.     California's Effective Ban on Carry by Law-abiding Citizens Is
                          Invalid Under Either Strict or Intermediate Scrutiny.**
3

4          If the Court applies one of the traditional levels of scrutiny, it should apply strict scrutiny.  In

5   the Ninth Circuit, a "law that implicates the core of the Second Amendment right and severely

6   burdens that right warrants strict scrutiny." *Silvester,* 843 F.3d at 821.  The "core Second

7   Amendment right" is the "right of self-defense," *Jackson,* 746 F.3d at 968; *see Heller,* 554 U.S. at

8   599, and restrictions on bearing arms beyond the home clearly "implicate" that core right.  *Silvester,*

9   843 F.3d at 82l.  By any measure, a complete ban "severely burdens" the right to bear arms for self-

10  defense.  *Silvester,* 843 F.3d at 821.  Accordingly, strict scrutiny applies.

11         Ultimately, however, this Court need not resolve whether strict or intermediate scrutiny

12  applies, because California's carry ban fails either standard. *Cf McCutcheon v. FEC,* _U.S._, 134 S.

13  Ct. 1434 (2014) (plurality opinion).  Intermediate scrutiny requires a "reasonable fit between the

14  challenged regulation" and a "significant, substantial, or important" government objective.  *Silvester,*

15  843 F.3d at 821-22; *Jackson,* 746 F.3d at 965.  The government "bears the burden of justifying its

16  restrictions" and "must affirmatively establish the reasonable fit" required.  *Jackson,* 746 F.3d at

17  965.  While a reasonable fit "is not necessarily perfect," it must be "a means narrowly tailored to

18  achieve the desired objective." *McCutcheon,* 134 S. Ct. at 1456-57.

19         Prohibiting ordinary citizens from carrying firearms is not a narrowly tailored means of

20  furthering the State's stated objective of public safety.  To the contrary, a flat ban is the exact

21  opposite of tailoring—as evidenced by the litany of exceptions.  Applying intermediate scrutiny, the

22  Ninth Circuit stressed the distinction between laws that completely prohibit protected conduct and

23  those that leave open "alternative channels" for that conduct.  *Jackson,* 746 F.3d at 968.  California

24  law does ***not*** leave open alternative channels to bear arms for self-defense outside the home.

25  Instead, it flatly denies the right to all but those who can demonstrate—to the satisfaction of an

26  Issuing Authority with unbridled discretion—"good cause," a criterion that "says nothing about

27  whether he or she is more or less likely to misuse a gun." *Grace,* 187 F.Supp.3d at 149.

28         California's ban thus can be justified only on the theory that allowing law-abiding citizens to

- 24 -
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
BY CALIFORNIA ATTORNEY GENERAL

1  carry firearms creates an intolerable public safety risk.[7]  Not only is that theory lacking in empirical

2  support, *see, e.g., Moore,* 702 F.3d at 937-42, and belied by the State's recognition of the value of

3  providing for Carry Licenses and an affirmative defense for "immediate" "grave danger"; it is a

4  theory that the Second Amendment takes "off the table." *Heller,* 554 U.S. at 635-36.  The Framers

5  well understood that carrying firearms in public poses safety risks, but they protected the right

6  anyway.  The State may disagree, but it has no more authority to second guess this right than it does

7  to override the protection against unreasonable searches and seizures or coerced confessions, the

8  right to confront adverse witnesses, or any other of right with "disputed public safety implications."

9  *McDonald,* 561 U.S. at 783 (plurality opinion).  The Second Amendment "is the very *product* of an

10  interest balancing by the people," and California many not "conduct [it] for them anew." *Heller,* 554

11  U.S. at 635; *cf United States* v. *Stevens,* 559 U.S. 460, 470 (2010) ("Our Constitution forecloses any

12  attempt to revise that judgment simply on the basis that some speech is not worth it.").

13  **V.      CONCLUSION**

14       For all the foregoing reasons, Defendant's Motion for Summary Judgment should be denied

15  and Zeleny's Motion for Partial Summary Judgment should be granted.

16  Dated:  February 4, 2021                    Respectfully submitted,

17                                                           s/ Brian R. England
                                                             David W. Affeld
18                                                           Brian R. England
                                                             Damion D. D. Robinson
19                                                           Affeld Grivakes LLP

20                                                           Attorneys for Plaintiff Michael Zeleny

21

22

23

24

25

26  [7] The State's hypocrisy here is highlighted by the fact that it contends Zeleny's Second Amendment rights are not infringed here because he intends to carry his firearms unloaded, while Defendants simultaneously argue
27  that Zeleny's possession of live ammunition makes his carrying of firearms even more dangerous. Defendants cannot have it both ways.

28

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
BY CALIFORNIA ATTORNEY GENERAL

1

## **PROOF OF SERVICE**

2

     I hereby certify that on February 4, 2021, I electronically filed the foregoing document using the Court's CM/ECF system.  I am informed and believe that the CM/ECF system will send a notice of electronic filing to the interested parties.

3

4

                            s/ Gabrielle Bruckner
                            Gabrielle Bruckner

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
BY CALIFORNIA ATTORNEY GENERAL