David W. Affeld, State Bar No. 123922
Brian R. England, State Bar No. 211335
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:     (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

MICHAEL ZELENY,

    Plaintiff,

      vs.

GAVIN NEWSOM, Jr., *et al.*,

    Defendants.

Case No. CV 17-7357 JCS

Assigned to:
The Honorable Richard G. Seeborg

Discovery Matters:
The Honorable Thomas S. Hixson

**SUPPLEMENTAL DECLARATION OF DAMION ROBINSON IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF THE CITY OF MENLO PARK AND POLICE CHIEF DAVE BERTINI**

Date:      March 18, 2021
Time:      1:30 p.m.
Courtroom: 3, 17th Floor

Action Filed:  December 28, 2017
Trial Date:    TBD

- 1 -

I, Damion Robinson, declare:

1. My law firm and I are counsel of record to plaintiff Michael Zeleny ("Zeleny") in this action. I have personal knowledge of the facts below or knowledge based on the records and files of my firm regularly maintained in the ordinary course of business. I could testify competently to these facts if called upon to do so. I submit this declaration to supplement the previous declaration I submitted in support of my Motion for Partial Summary Judgment against the City of Menlo Park (the "City") and Chief Dave Bertini ("Bertini") [Dkt. No. 162-1] (the "Prior Declaration").

2. True copies of complete transcripts of Volumes 1 and 2 of Bertini's deposition were submitted with my Prior Declaration. I am attaching the excerpts referenced in this opposition with relevant portions highlighted for ease of reference.

3. Attached as **Exhibit 1** is a true copy of excerpts of Volume 1 of the transcript of Bertini's deposition taken March 19, 2019.

4. Attached as **Exhibit 2** is a true copy of excerpts of Volume 2 of the transcript of Bertini's deposition taken August 7, 2020

5. Attached as **Exhibit 3** is a true copy of excerpts of the transcript of the deposition of Matt Milde, taken on March 5, 2020

6. Attached as **Exhibit 4** is a true copy of excerpts of the deposition of Nicolas Flegel, taken on March 3, 2020.

7. Attached as **Exhibit 5** is a true copy of excerpts of the deposition of Alex McIntyre, taken on July 31, 2020.

8. Attached as **Exhibit 6** is a true copy of an email exchange between Al Serrato, Assistant District Attorney for San Mateo County, and Bertini, among others, dated July 28, 2015. This document was produced by the City in discovery and introduced at Bertini's deposition, Volume 2, as Exhibit 263.

9. Attached as **Exhibit 7** is a true copy of a film permit produced by the City in discovery in this matter and introduced as Exhibit 73 at Mr. Flegel's deposition. As noted, the application was filed January 31, 2016 and approved February 5, 2016—*i.e.*, six days later. The

permit includes filming from the median of Sand Hill Road.

10.     On January 11, 2019, I issued Plaintiff Michael Zeleny's First Set of Interrogatories to City of Menlo Park.  Interrogatory No. 8 provided: "IDENTIFY each policy, procedure, rule, regulation, ordinance, guideline or guidance of the City of Menlo Park governing applications for permits of the type that Zeleny has sought from the City of Menlo Park."

11.     A true copy of relevant excerpts of the City's initial responses to the interrogatories, dated February 25, 2019, are attached as **Exhibit 8**.

12.     A true copy of relevant excerpts of the City's supplemental responses to the interrogatories, dated March 5 and served March 6, 2020, is attached as **Exhibit 9**.  These interrogatories were served three days after the deposition of Nicolas Flegel.  Based on my knowledge of the file in this matter, this appears to be the first time that the City mentioned its supposed lack of ownership of the median strip where Zeleny first proposed to stage his event.

13.     The City's failure to disclose its theory that it does not own or control the median strip until very late in discovery was highly prejudicial, and made especially so by the City's assertion of privilege to block Bertini from testifying as to the basis of this theory.  It prevented us from examining witness with knowledge on the basis for this theory or the underlying facts.

14.     Attached as **Exhibit 10** is a true copy of relevant excerpts of the City's second supplemental responses to the interrogatories, dated May 27, 2020.

15.     Based on my review of the City's productions, it does not appear that the City produced Municipal Code § 13.18, *et seq.*.  The only Municipal Code sections that I have found in the City's production relate to the prohibition on carrying firearms, produced as MP0001842.

16.     The City's failure to disclose its new theory that its construction encroachment process, Municipal Code § 13.18, *et seq.*, governs film permitting during the discovery process was also highly prejudicial.  We were unable to examine any of the City's witnesses on the application of those Municipal Code sections, including Mr. Flegel, the City's declarant on the issue, or Mr. Bertini, the Rule 30(b)(6) designee.

17.     Attached as **Exhibit 11** is a true copy of a document entitled "Adoption of Resolution Amending the City's Master Fee Schedule …" produced by the City in discovery

- 3 -

1    18.    Attached hereto as **Exhibit** 12  is a true copy of the Notice of Deposition of the

2  City of Menlo Park, which I issued on January 24, 2019.

3         I declare under penalty of perjury under the laws of the United States that the foregoing is

4  true and correct.  Executed this 4th day of February, 2021 at Los Angeles, California.

5                                        s/ Damion Robinson
                                         Damion Robinson
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE MATTER OF:              )
                                   )
5                                  )
                                   )
6    MICHAEL ZELENY,               )
                                   )
7              Plaintiff,          )
                                   )
8         vs.                      )   CASE NO. CV 17-7357 JCS
                                   )
9    EDMUND G. BROWN, JR., et al., )
                                   )
10             Defendant.          )
                                   )
11

12

13        VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

14                          VOLUME I

15                    Menlo Park, California

16                   Tuesday, March 19, 2019

17

18

19

20

21

22
     Stenographically Reported by:
23
     HEATHER J. BAUTISTA, CSR, CRR, RPR
24

25

1    event that is one that would cause the applicants to

         2    encroach upon the public right-of-way to block streets

         3    that have a number of people, more than 100, that would

         4    require police presence and/or response or would require

10:25    5    or would deal with the noise ordinance if it was very

         6    noisy and those things that are, you know, special by

         7    their very nature; they're not a normal day-to-day

         8    occurrence.

         9         Q.   Is that the City's -- strike that.

10:26   10              Was that the City's definition, to the best of

        11    your knowledge, of a special event?

        12         A.   To the best of my recollection.

        13         Q.   Is that definition of a special event written

        14    down anywhere?

10:26   15         A.   There is a form on the website that gives a

        16    frequently asked questions, and it outlines some of the

        17    factors that would cause one to need a special event

        18    permit.

        19         Q.   Other than the frequently asked questions

10:26   20    portion of the City's website, is there any other place

        21    where the definition of a special event is written down?

        22         A.   Not that I'm aware of.

        23         Q.   One part of your answer was that the event is

        24    special by its very nature.  Do you recall saying that?

10:27   25         A.   I do.

1    Q.   What does that mean?

2    A.   What that means is someone would not need a

3    special event for something that is -- that they're

4    doing in the course of the business or is covered by

10:27   5    some other business permit or other type of permit

6    that's allowing them to do what they're doing.

7    Q.   Approximately how many -- strike that.

8         That portion of the deposition -- that portion

9    of the definition of special event relating to something

10:27   10   that's special by its very nature, is that piece of it

11   written down anywhere?

12   A.   No.

13   Q.   Is there any way for the public to learn of

14   that requirement?

10:28   15   A.   If they were to apply for one or call and ask a

16   question.

17   Q.   So this special-by-its-very-nature requirement

18   is not part of the City's website?

19   A.   That's correct.  If someone already had a

10:28   20   permit or an encroachment permit for something else,

21   they would not need a special events permit on top of

22   that.

23   Q.   So if I'm understanding right, is it your

24   testimony that this criteria, that the event be special

10:28   25   by its very nature, means an event that doesn't have a

1          MR. MASTER:  I'll just object to the extent

2     that you're asking him to potentially answer questions

3     that go beyond the scope of his designation.

4          But to the extent he has an understanding, he

10:31   5     may.

6          THE WITNESS:  I'm sorry.

7     Q.   (By Mr. Robinson)  Let me step back for a

8     second.  It's the City's view -- and I'm asking about

9     Item 4 on Attachment 1, the defendant's interpretation

10:31   10    of the California statutes.

11         It's the City's position that in order to be an

12    authorized participant either in a video production or

13    an entertainment event, the City has to authorize the

14    event itself?

10:31   15    A.   That's correct.

16    Q.   And the way in which the City would authorize

17    an event of the type that Mr. Zeleny was seeking to

18    conduct would be either through a special events permit

19    or a film permit; right?

10:31   20    A.   Those are the only two that I'm aware of.

21    Q.   Okay.

22         And at the time Mr. Zeleny applied for the

23    special events permit, you're aware that he didn't have

24    a film permit; correct?

10:32   25    A.   Correct.

1    **A.**   I'm not sure.

         2    **Q.**   Is there someone else within the City of Menlo

         3    Park who would know whether the factors for granting or

         4    denying a special events permit that are not included on

10:36    5    the application itself are written down?

         6    **A.**   No.

         7    **Q.**   Nobody within the City of Menlo Park is aware

         8    of whether these additional factors are written down?

         9         MR. MASTER:   Objection.   Asked and answered.

10:36   10    Argumentative.

        11    **Q.**   (By Mr. Robinson)   You can answer.

        12    **A.**   The answer would be every department has its

        13    own list of requirements of what they're looking at

        14    specifically to their department, and I assume that

10:36   15    every department -- or I know every department would

        16    have somebody who would be making that determination.

        17    **Q.**   Are the lists maintained by the various

        18    departments within the City written down?

        19    **A.**   I don't know the answer to that for every

10:36   20    department.

        21    **Q.**   Are the factors considered by the police

        22    department written down?

        23    **A.**   They are on a checklist on the application

        24    process, but there is no, like, you know, codified list

10:36   25    of you must do X, Y, Z, because every situation, every

1  ==event, is going to be different.==

2      **Q.**  When you refer to a checklist, are you

3  referring to the checklist on the permit application

4  itself?

10:37  5      **A.**  Correct.

6      **Q.**  Okay.

7          Beyond completing the checklist on the permit

8  application itself, are there other factors that the

9  police department considers in deciding whether or not

10:37  10  to approve a special events permit?

11     **A.**  It would depend on what the special event was

12  asking to do.

13     **Q.**  So the factors that you would consider vary

14  event by event?

10:37  15     **A.**  From the police department specifically, it

16  would be public -- mostly -- almost all public safety

17  factors.

18     **Q.**  What public safety factors are considered?

19         MR. MASTER:  Objection.  Vague and ambiguous.

10:37  20  Overbroad.  Incomplete hypothetical.

21         You can answer.

22         THE WITNESS:  Traffic control, crowd control,

23  noise ordinances, safety to the general public; things

24  of that nature.

10:38  25     **Q.**  (By Mr. Robinson)  When you say "things of that

1          Is there some objective standard in assessing

2    the traffic impact?

3          MR. MASTER:  Object.  Vague and ambiguous.

4    Overbroad.

10:42    5          THE WITNESS:  So it would depend, again, on

6    what was being requested, where it was being requested.

7    We would work with other departments, such as our Public

8    Works traffic division, and there would have to be a

9    discussion within the City on whether or not traffic

10:42   10   control was needed, could an event be done in this

11   location without a major -- major impact into traffic.

12        **Q.**   (By Mr. Robinson)  The considerations that you

13   just talked about regarding traffic impact, are those

14   considerations written down anywhere?

10:43   15        **A.**   Well, they are mentioned in the application for

16   special event permit.

17        **Q.**   Other than being mentioned in the special event

18   permit -- strike that.

19          Other than what's written in the permit

10:43   20   application itself, are the factors that the City would

21   consider relating to traffic control or traffic impact

22   written down anywhere?

23        **A.**   No.

24        **Q.**   Do the factors that you consider vary from

10:43   25   event to event?

1      **A.**    Yes.

        2      **Q.**    In working with the other City departments to

        3    assess the traffic impact of a proposed event, is there

        4    any level of discretion within the City to decide

10:43   5    whether it would have too much of a traffic impact?

        6      **A.**    Yes, there's discretion.

        7      **Q.**    You mentioned before a major impact.

        8             What is a major impact on traffic?

        9      **A.**    It's not quantifiable.

10:44  10      **Q.**    Is that an assessment that's also in the

       11    discretion of the City personnel who consider the

       12    application, whether it's a major impact or not?

       13      **A.**    In discussions with other departments, yes.

       14      **Q.**    And what -- moving to crowd control.

10:44  15             Is crowd control another of those factors that

       16    varies event to event?

       17      **A.**    Yes.

       18      **Q.**    And the criteria that you would use to assess

       19    the event depends on what type of event it is; correct?

10:44  20      **A.**    Certainly.

       21      **Q.**    Is that also true of safety to the general

       22    public?

       23      **A.**    That it depends on the --

       24      **Q.**    That the criteria you consider in analyzing

10:45  25    whether an event poses a safety risk to the general

1    public depend on what type of event it is?

2        A.    Of course.

3        Q.    And is it accurate that those other factors,

4    crowd control and safety to the general public, also

10:45    5    involve some level of discretion on the part of the

6    police department and other City entities that are

7    involved in processing the application?

8        A.    Certainly, because we could put conditions to

9    mitigate those issues, if necessary.

10:45    10        Q.    How long has the City had a special events

11    permitting process in place?

12        A.    The -- there was a process prior to me arriving

13    in the City in 2011, but I am aware that in 2012 and the

14    beginning of 2013, a new process was put into place.

10:46    15        Q.    Is the process that you've been describing up

16    until this point the process that was put in place in

17    2012 or 2013?

18        A.    Yes.

19        Q.    Could you estimate the number of special event

10:46    20    permit applications the City has received since it put

21    this process in place in 2012 or 2013.

22        A.    I would estimate -- and this is just by looking

23    at the discovery, you know, over a hundred.

24        Q.    How many of those -- if you could estimate, how

10:46    25    many of those were denied?

1 considered by the police department and the criteria

2 you've just listed for the other departments, are you

3 aware of any other criteria that are considered?

4 **A.** Not that I'm aware of.

10:51 5 **Q.** Are the criteria that you just mentioned

6 regarding the other departments written down anywhere?

7 **A.** There is a checklist on the application.

8 **Q.** Aside from the checklist on the permit

9 application, are those criteria that you mentioned for

10:51 10 the other departments written down anywhere?

11 **A.** I don't know.

12 **Q.** Is there someone else on behalf of the City who

13 would know?

14 **A.** I would assume that whoever is the contact

10:52 15 person in that department may have something written. I

16 don't know the answer to that.

17 **Q.** Is there anything written that's accessible to

18 the public about the criteria that are considered?

19 **A.** I believe everything that's on the website is

10:52 20 what is accessible. I'm not sure if there's anything

21 other than that.

22 **Q.** One of the factors you mentioned was whether

23 the event is for the good of the public.

24 Do you recall saying that?

10:52 25 **A.** Yes.

```
 1      Q.    Is there a particular person at Community

 2    Services?

 3      A.    It would vary, depending on who is currently

 4    there when the intake of the permit comes in.

10:54  5   Q.    The standard that you mentioned in your

 6    previous answer about an event being open to the public,

 7    comprising a community event, do you know if that

 8    standard is written down somewhere?

 9      A.    That is specifically stated in the application

10:54 10   process.

11      Q.    When you refer to the application process,

12    you're referring to the application that someone fills

13    out; right?

14      A.    Yes.

10:55 15   Q.    How long is a special event allowed to last

16    within the city of Menlo Park?

17      A.    That would depend on the event.

18      Q.    Is there any fixed time limit?  Events can be

19    10 days or 20 days or two months?  Is there any

10:55 20   objective limit on how long it can last?

21      A.    No.  It would depend on the event.

22      Q.    How does the City decide what kind of time

23    frame to impose on an event?

24           MR. MASTER:  Objection.  Vague.  Ambiguous.

10:55 25   Incomplete hypothetical.  Calls for speculation.
```

1          You can answer.

2          THE WITNESS:  It would depend on the type of

3     event.  Time, place, and manner is one of the things

4     that we are looking at, and it depends -- it would

10:55   5     depend on whether the event had a large-scale impact or

6     not.  And so it would -- it would -- again, it's

7     difficult to answer your question without having a

8     specific event that you're asking about.

9          Q.   (By Mr. Robinson)  Is the length of time an

10:56  10     event will be allowed determined on an event-by-event

11     basis?

12          A.   Yes.

13          Q.   Is there any objective standard that you're

14     aware of for deciding how long an event can last?

10:56  15          MR. MASTER:  Objection.  Vague, ambiguous, and

16     overbroad.

17          You can answer.

18          THE WITNESS:  Go back to the time, place, and

19     manner requirements that we're looking at, depending on

10:56  20     what the impact of everything else that I've already

21     talked about would be.

22          Q.   (By Mr. Robinson)  What I'm trying to get at is

23     if I'm a citizen and I want to put on a special event,

24     is there anywhere that I could go to figure out what the

10:56  25     criteria that the City is using are so that I can

1  satisfy the criteria and have my permit application

2  granted?

3          MR. MASTER:  It's a different question.  It's

4  vague and ambiguous and overbroad.

10:56   5          You can answer.

6          THE WITNESS:  You would have to tell us what

7  kind of event and where you were doing it before we

8  could answer that question.

9      Q.  (By Mr. Robinson)  So the criteria that would

10:57   10  be used depend on what type of event and where; is that

11  accurate?

12      A.  And how long; correct.

13      Q.  But is that -- okay.

14          So the criteria that the City would use in

10:57   15  assessing an event depend on what type of event, where

16  it's going to be conducted, and how long; correct?

17      A.  And you would have to include all the impacts

18  that I've already talked about; that would also be what

19  we would be looking at.

10:57   20      Q.  Okay.

21          So my question is just whether the factors that

22  are considered by the City vary based on the type of

23  event, the location, and the time.

24      A.  And the factors I've already discussed:  The

10:57   25  impact on public safety, traffic, crowd control;

```
 1   trying to figure out what your answer meant.

 2              So maybe we can just start from the factors

 3   considered by the City vary based on the nature of the

 4   event, the location, and the timeline of the event; is

10:58    5   that accurate?

 6        A.   Yes.

 7        Q.   And the factors that may be considered are the

 8   factors that you've told me for the various departments

 9   a few minutes ago; right?

10:59   10        A.   Yes.

11        Q.   And those factors are discretionary factors

12   that are considered in consultation with the various

13   departments; right?

14        A.   In some cases, yes.

10:59   15        Q.   Which of the factors are, other than

16   discretionary factors, considered in consultation with

17   the various departments?

18        A.   Well, there are the factors that are

19   specifically listed on the application.

10:59   20        Q.   Okay.

21              I see.  So some of the factors, like you have

22   to have insurance and those types of factors are not

23   discretionary.

24        A.   Correct.

10:59   25        Q.   The other factors that we've talked about
```

1    previously in your deposition, those are discretionary

2    factors discussed or addressed among the various

3    departments?

4              MR. MASTER:  Object.  It's vague, ambiguous,

10:59   5    and it's overbroad.

6              You can answer.

7              THE WITNESS:  And it would be -- yes, based on

8    time, manner, and place.  That's what we would have to

9    look at.

11:00   10             MR. ROBINSON:  Why don't we mark this as

11    Exhibit 30, please.

12             (Exhibit 30 was marked for identification.)

13        Q.   (By Mr. Robinson)  For the record, Exhibit 30

14    is two pages, Bates marked in the bottom right corner

11:00   15    MP1822 to 1823; correct?

16        A.   Was that to me?

17        Q.   Yes.

18        A.   Yes.

19        Q.   Do you recognize Exhibit 30?

11:01   20        A.   I do.

21        Q.   What is it?

22        A.   It's a special event permit flow chart that

23    was -- that is placed on the website.

24        Q.   Does it generally describe the process of

11:01   25    processing a permit application for a special event

1  and 2016?

2     **A.**   My role was to forward it to the city manager's

3  office and the city attorney's office.

4     **Q.**   Other than Mr. Zeleny's permit application,

11:06  5  have you ever forwarded another special event permit

6  application to the city manager and city attorney?

7     **A.**   No.

8     **Q.**   Okay.

9        Why did you forward Mr. Zeleny's permit

11:06  10  application to the city manager and city attorney?

11     **A.**   Based on the nature of the application and what

12  was being contemplated by Mr. Zeleny as far as the open

13  carry of weapons and the public safety issues that would

14  ensue.

11:07  15     **Q.**   Are you aware of any -- excuse me.

16        Are you aware of any other permit application

17  in the history of the permit application process that

18  was forwarded to the city manager and the city attorney

19  before an appeal other than Mr. Zeleny's?

11:07  20     **A.**   Yes.

21     **Q.**   How many?

22     **A.**   Me, personally?  At least one.

23     **Q.**   What did that relate to?

24     **A.**   To a bicycle race through the city.

11:07  25     **Q.**   And that was before any appeal?

1      **A.**    Are you speaking --

          2            MR. MASTER:  Is that a question?

          3      **Q.**    (By Mr. Robinson)  I'm asking you to -- I'm

          4      asking you to clarify that that's the only thing, in

11:12     5      your view, that he's done that's unsafe, as the person

          6      most knowledgeable on behalf of the City of Menlo Park.

          7      **A.**    In -- when he was protesting?

          8      **Q.**    Correct.

          9      **A.**    When we speak of the broader public safety

11:12    10      realm, we are also speaking of the impact on passersby.

         11      We receive numerous 9-1-1 calls and complaints about an

         12      armed man standing at a corner of a street, which

         13      obviously impacts public safety, it impacts our

         14      resources, et cetera, and could, in fact, cause a safety

11:13    15      concern based on a driver driving by and seeing an armed

         16      man.

         17      **Q.**    That's something related to Mr. Zeleny carrying

         18      the unloaded weapons; right?

         19      **A.**    Yes.

11:13    20      **Q.**    So other than Mr. Zeleny carrying unloaded

         21      weapons and ammunition, is there anything else that he's

         22      done that the City of Menlo Park considers unsafe?

         23            MR. MASTER:  I'll just object as to relevance,

         24      "safety"; but vague and ambiguous.

11:13    25            You can answer.

1          THE WITNESS:   No.

2     Q.   (By Mr. Robinson)  I didn't hear your answer.

3     A.   No.

4          MR. MASTER:  We've been going for a little over

11:13    5   an hour.  Why don't we take a five-minute break.

6          MR. ROBINSON:  Sure.

7          THE VIDEOGRAPHER:  We are now going off the

8     record.  The time is 11:13 a.m.

9          (Recess taken from 11:13 a.m. to 11:24 a.m.)

11:24   10      THE VIDEOGRAPHER:  We are now going back on the

11    record.  The time is 11:24 a.m.

12     Q.   (By Mr. Robinson)  I want to take up what we

13    were just talking about before, which is the public

14    safety concern related to Mr. Zeleny having unloaded

11:24   15   firearms and ammunition with him.

16          You mentioned another factor in your decision

17    to refer Mr. Zeleny's permit application to the city

18    manager and city attorney being the open carry nature of

19    the protest.

11:25   20      You recall saying that?

21     A.   Yes.

22     Q.   Does that also relate to Mr. Zeleny openly

23    carrying firearms as well as ammunition?  The same

24    issue; right?

11:25   25      A.   Well, no.  There's a different issue.  There's

1    the public safety issue, and then there's the legal

2    issue.

3        **Q.**    Okay.

4            So we've covered the public safety issue;

11:25  5    you've testified about -- what is the legal issue that

6    you're talking about?

7        **A.**    It's against the law to openly carry weapons in

8    the state of California.

9        **Q.**    And that's the case unless the person carrying

11:25  10   the weapons has the appropriate type of permit; true?

11           It's illegal to openly carry firearms except

12   that if you have a special events permit or a film

13   production permit, then it's legal; correct?

14       **A.**    Well, there's many exceptions to the Penal Code

11:26  15   section.

16       **Q.**    And those are two of them; right?  An

17   authorized film production event?

18       **A.**    Authorized film production; correct.

19       **Q.**    And a special event -- and entertainment.

11:26  20       **A.**    And an authorized entertainment event.

21       **Q.**    Right.  So if Mr. Zeleny had the special event

22   permit or the film permit from the City of Menlo Park,

23   it would no longer be illegal for him to carry his

24   firearm.

11:26  25           MR. MASTER:  I subject it calls for a legal

1    conclusion, speculation.

2            But you can answer.

3            THE WITNESS:  That's correct, but there are

4    controls that could be made by the City depending on any

11:26  5    permit that's issued.

6        Q.   (By Mr. Robinson)  What are those controls?

7        A.   It depends on the permit.

8        Q.   In what way does it depend on the permit?

9        A.   It goes back to what we spoke of earlier;

11:27  10   depends on what they're asking, what they're

11   contemplating doing, and we have the right to deal with

12   time, place, and manner and public safety issues.  It

13   could be that we'll only let you do this during certain

14   times of the day.  You have to have police presence to

11:27  15   block off the street.  There's -- it depends on what is

16   being contemplated.

17       Q.   Those restrictions that you mentioned, are

18   there any criteria that you use to decide whether to

19   impose those types of restrictions?  Things like police

11:27  20   presence or only certain times of day or -- what you're

21   referring to as time, place, and manner, are there

22   criteria that you use to decide whether to impose time,

23   place, and manner restrictions?

24       A.   It would depend on what is being contemplated.

11:27  25       Q.   Are there objective criteria?

1    event allowed noise.  There are ordinances regarding

2    noise.  There are ordinances regarding, you know,

3    blocking sidewalks, et cetera.

4        Q.   Were any of those ordinances produced, to your

11:29   5    knowledge?

6        A.   Not that I'm aware of.

7        Q.   Are you aware of any other -- you're familiar

8    with Mr. Zeleny's permit application; right?

9        A.   Yes.

11:29   10       Q.   You were one of the people involved in

11   processing that application.

12            MR. MASTER:  Talking about the special event

13   now?

14            MR. ROBINSON:  Correct.

11:29   15            THE WITNESS:  I was -- yes, I was involved in

16   examining the application.

17       Q.   (By Mr. Robinson)  And so you're aware of the

18   nature of the protest or the event that Mr. Zeleny was

19   contemplating in his application?

11:29   20       A.   Yes.

21       Q.   What municipal ordinances would apply, other

22   than the one relating to open carry of firearms?

23            MR. MASTER:  Same objection.  Lacks foundation,

24   calls for speculation.  You can answer.

11:29   25            THE WITNESS:  The ones I spoke about.  We

1    proposed special event?

2         MR. MASTER:  Can you read that back.  I'm

3    sorry.

4         (Record read.)

11:32  5         THE WITNESS:  The special events policy and

6    procedure.

7    **Q.**  (By Mr. Robinson)  Other than the special

8    events policy and procedure, are you aware of any other

9    municipal policies, procedures, rules, guidelines,

11:33  10   regulations, or any other municipal authority that was

11   implicated by Mr. Zeleny's protest -- his special event?

12   **A.**  No.

13   **Q.**  The special event policy is the policy listed

14   on the City's website and in the frequently asked

11:33  15   questions and on the application; right?

16   **A.**  Correct.

17   **Q.**  Is there any other written indication of the

18   City's special event policy, other than what's on the

19   website and the permit application?

11:33  20   **A.**  Not that I'm aware of.

21   **Q.**  So the entirety of the policy is the website,

22   the FAQ, the permit application itself, and this flow

23   chart?

24   **A.**  Well, the website is just the medium in which

11:33  25   you access it.  They're documents, but yes.

1   what criteria needed to be met in order for the -- for

2   the event to go on.

3        **Q.**   How does the City of Menlo Park come up with

4   those criteria?

11:46   5            MR. MASTER:   Objection.   Asked and answered.

6                 THE WITNESS:   Again, it would depend on the

7   actual event; and going back to traffic impact, public

8   safety, crowd control, the -- everything else that I've

9   already talked about.

11:47  10        **Q.**   (By Mr. Robinson)   Are the criteria decided on

11   a permit-by-permit basis?

12                 MR. MASTER:   Objection.   Asked and answered.

13                 THE WITNESS:   Yes.

14                 MR. MASTER:   At some point, I'm going to stop

11:47  15   this.   He's answered that at least three or four times.

16        **Q.**   (By Mr. Robinson)   Looking at Exhibit 30 again,

17   Step D under the flow chart, it looks like if more

18   information is needed from the applicant, Matt Milde is

19   supposed to set up a meeting with the applicant; is that

11:47  20   accurate?

21        **A.**   According to the document, yes.

22        **Q.**   This is one of the City's published policies on

23   handling special events permits; right?

24        **A.**   Yes.

11:47  25        **Q.**   All right.

1          And it describes how the process is supposed to

2     work, right, in ordinary circumstances?

3          **A.**   Yes.

4          **Q.**   So if, after review by the City staff, it's

11:48   5     decided that more information is needed, then Matt Milde

6     or his successor sets up a meeting with the applicant;

7     correct?

8          **A.**   Yes.

9          **Q.**   Did the City ever set up a meeting with

11:48   10    Mr. Zeleny?

11         **A.**   I'm not sure if a meeting was requested or the

12    more information requested was via e-mail.

13         **Q.**   Who generally decides whether to request a

14    meeting?  Is it the City or the applicant?

11:48   15         **A.**   It would be the -- it could be either.

16         **Q.**   In the general process, who, typically,

17    requests a meeting with the applicant?

18              MR. MASTER:  Objection.  Asked and answered.

19    It's vague and ambiguous.

11:48   20              Go ahead.

21              THE WITNESS:  It would be the person who is

22    representing Community Services.

23         **Q.**   (By Mr. Robinson)  So it would typically be

24    Mr. Milde or his successor?

11:48   25         **A.**   Yes.

1    **Q.**   Do you know whether Mr. Milde or anyone else in

2    his role ever requested a meeting with Mr. Zeleny in

3    connection with the permit?

4    **A.**   I don't recall if he requested a meeting or

11:49    5    stated they could meet or whether the e-mail that was

6    sent was the one requesting more information.

7    **Q.**   Was there any reason, that you're aware of, to

8    request more information from Mr. Zeleny via e-mail as

9    opposed to setting up a meeting?

11:49    10    Was there any reason not to set up a meeting

11    with Mr. Zeleny that you're aware of?

12    **A.**   Well, yes.  My understanding is Mr. Milde said

13    that because he lived in Los Angeles, that it probably

14    would not be feasible to have an in-person meeting, and

11:49    15    it would be easier for Mr. Zeleny to do it via e-mail.

16    **Q.**   Do you know whether anyone ever asked

17    Mr. Zeleny whether he'd like to attend a meeting?

18    **A.**   At that time?

19    **Q.**   Correct.

11:49    20    **A.**   I don't know.

21    **Q.**   Is there someone within the City who would

22    know?

23    **A.**   Perhaps Mr. Milde, but he's no longer with the

24    City.

11:50    25    **Q.**   Was -- in your experience, dealing with permit

1    applications -- strike that.

                2          As the person most knowledgeable for the City

                3    of Menlo Park about permit applications, is it typical

                4    for the City to elect to correspond with the applicant

11:50     5    via e-mail as opposed to setting up a meeting.

                6          MR. MASTER:  Objection.  Vague and ambiguous.

                7          You can answer.

                8          THE WITNESS:  I think, in some cases, yes,

                9    depending on where the applicant lives.  And I know of

11:50   10    several where it was not done in person.  But if the

               11    person is local and it is convenient for them to meet in

               12    person, then the meeting could be in person.

               13          Q.   (By Mr. Robinson)  Okay.

               14          To the best of your knowledge, the reason for

11:51   15    communicating with Mr. Zeleny via e-mail, rather than

               16    setting up an in-person meeting was for Mr. Zeleny's

               17    convenience?

               18          A.   Yes.

               19          Q.   Was Mr. Zeleny ever given a conditional

11:51   20    approval or conditional denial of his permit

               21    application?

               22          MR. MASTER:  Objection.  Compound.  Vague and

               23    ambiguous.

               24          Q.   (By Mr. Robinson)  Was he ever given a

11:51   25    conditional approval of his permit application?

1    morning.

2        **Q.**   Did you make a directive or recommendation to

3    Mr. Milde about whether to grant or deny the

4    application?

13:16    5        **A.**   I said as far -- from the police department

6    perspective, from our department, that the -- as stated

7    or as the -- as the application was written, that it

8    should be denied.

9        **Q.**   Do you know whether any other departments

13:16    10    indicated -- strike that.

11        Do you know whether any other departments

12    within the City suggested to Mr. Milde that the

13    application should be denied?

14        **A.**   Yes.  I understand that there was also concerns

13:16    15    from Transportation, which is in Public Works, regarding

16    the -- the issue.

17        **Q.**   Are you aware of any departments, other than

18    police department and Transportation -- strike that.

19        The City Transportation Department is not one

13:17    20    of the City entities listed, is it?

21        **A.**   PW means Public Works, so Public Works

22    engineering would be -- Transportation would be under

23    that.

24        **Q.**   So the -- you, on behalf of the police

13:17    25    department, suggested that the application, in its

```
        1   original form, be denied, and the Public

        2   Works-Engineering department also suggested concerns; is

        3   that accurate?

        4       A.   Correct.

13:17   5       Q.   Other than those two City entities, are you

        6   aware of any other entities that suggested that the

        7   application be denied?

        8            MR. MASTER:  You mean departments.

        9            MR. ROBINSON:  City departments.

13:17  10       Q.   (By Mr. Robinson)  Are you aware of any

       11   departments, other than those two, that suggested that

       12   the application be denied?

       13       A.   Not necessarily denied, but there was others

       14   that had concerns.

13:17  15       Q.   In general, is it the process that the City

       16   departments provide input, and then Mr. Milde, at that

       17   time, at least, would make the ultimate decision?

       18       A.   Based on the department input, yes.

       19       Q.   If a department recommended that the permit be

13:18  20   denied, would that cause the permit to be denied?

       21       A.   In most cases, yes.

       22       Q.   Were you the primary person, at the time of

       23   Mr. Zeleny's original application, responsible for the

       24   application in the police department?

13:18  25       A.   I shared that responsibility with Sergeant
```

1    Ortega, but, eventually, I became the primary person.

2         Q.    Why was that?

3         A.    He retired.

4         Q.    At that time, did Sergeant Ortega report to

13:18    5    you?

6         A.    At what time?

7         Q.    At the time that Mr. Zeleny submitted his

8    application in 2015.

9         A.    2015?  Yes.

13:19   10         Q.    You were his boss?

11         A.    Yes.

12         Q.    The reasons that you suggested to Mr. Milde

13    that the application be denied are the same reasons we

14    discussed this morning; correct?

13:19   15         A.    Correct.

16         Q.    When, in the process in dealing with

17    Mr. Zeleny's permit application, did you refer it to the

18    city attorney?

19         A.    Not quite sure exactly when I sent it, but I

13:19   20    think the -- I think by nature of Mr. Zeleny's mass

21    e-mail, it may have been right away, because I believe

22    he may have copied the city attorney.

23              (Exhibits 33 and 34 were marked for

24    identification.)

13:20   25         Q.    (By Mr. Robinson)  Let's start with Exhibit 33.

```
 1    And I'm just going to ask you, for the record, it's

 2    Bates marked MP1817 through 1821; correct?

 3         A.   Correct.

 4         Q.   Do you recognize Exhibit 33?

13:20    5     A.   I do.

 6         Q.   What is it?

 7         A.   It is a Special Event Permit Application

 8    Frequently Asked Questions that I spoke about earlier.

 9         Q.   When -- going to the first page of this, under

13:21   10    the heading "What Qualifies as a Special Event," when

11    you received Mr. Zeleny's special event permit

12    application, did you understand that it incorporated the

13    use of a city street, sidewalk, or other right-of-way?

14         A.   Well, it was the median.  I'm not sure that

13:21   15    would be considered a -- perhaps, maybe, the

16    right-of-way.

17         Q.   You discussed before the potential of people

18    either obstructing the sidewalk or walking out --

19    jaywalking over the street to get to the median;

13:21   20    correct?

21         A.   Correct.

22         Q.   Both of those things would involve either the

23    use of a sidewalk or the use of a street; true?

24         A.   Correct.

13:21   25    Q.   So the permit application that Mr. Zeleny
```

1    submitted, in your view, would it satisfy the

2    requirement of use of a city street, sidewalk, or other

3    right-of-way?

4        A.    Yes.

13:22    5        Q.    We also talked about Mr. Zeleny's event being

6    for an indefinite duration.  Do you recall that?

7        A.    Yes.

8        Q.    Did you understand, based on the application,

9    that Mr. Zeleny intended to stay at the site for

13:22    10   multiple days?

11       A.    I did not know what his intent was, but it said

12   "indefinite."

13       Q.    When you received it, did you understand the

14   reference to "indefinite" to refer to more than one day?

13:22    15           MR. MASTER:  Objection.  This lacks foundation.

16   Calls for speculation.

17           You can answer.

18           THE WITNESS:  Indefinite means there's no

19   ending time.  That's the definition of indefinite.

13:22    20       Q.    (By Mr. Robinson)  Okay.

21           So we're on the same page that interpreting the

22   term "indefinite," in your view, it means multiple days

23   with no fixed end day?

24       A.    It means forever to me.

13:22    25       Q.    Okay.

```
 1              So if you go down to the second-to-last bullet

 2     point, "Events occurring for more than one day,"

 3     Mr. Zeleny's proposed event would satisfy that

 4     criteria --

13:22  5         A.   Yes.

 6         Q.   -- true?

 7              It would require a permit on that basis; right?

 8         A.   Yes.

 9         Q.   You were familiar with Mr. Zeleny's protests

13:23 10     prior to his filing a permit application.

11         A.   Yes.

12         Q.   Those protests involved carrying of unloaded

13     firearms; correct?

14         A.   In the past, yes.

13:23 15         Q.   In your view, as an official with the Police

16     Department of the City of Menlo Park, did you believe

17     that a police presence was necessary during Mr. Zeleny's

18     previous protests?

19         A.   Yes.

13:23 20         Q.   Did you think a police presence was required

21     for the entertainment event or the special event that he

22     proposed putting on through his permit application?

23         A.   If it was -- yes, there would have been a

24     police presence.

13:23 25         Q.   So the last bullet point there, "Events needing
```

1    police regulation, monitoring, or control," in your

2    view, the event that Mr. Zeleny filed his application

3    for satisfied that criteria; correct?

4         A.   Yes.

13:23  5        Q.   So to summarize, at least three of these bullet

6    points would be triggered by Mr. Zeleny's proposed

7    special event permit; correct?

8         A.   Yes.

9         Q.   And under the definition set out in the FAQ, if

13:24  10   an event meets any one of these criteria, it qualifies

11   as a special event requiring a permit; true?

12        A.   Requires you to complete a special event

13   application.

14        Q.   Is the City -- is the definition in this FAQ of

13:24  15   what qualifies as a special event the City's definition

16   of a special event?

17        A.   Yes.

18        Q.   So under this -- at least under the published

19   FAQ, Mr. Zeleny's event would qualify as a special event

13:24  20   on at least three criteria; correct?

21        A.   Yes.

22        Q.   Let me have you turn to the page that's marked

23   MP1820.  There's the section titled "What would cause a

24   permit to get denied?"

13:25  25        Do you see that?

```
 1    A.    Yes.

 2    Q.    Under that heading, are the criteria listed

 3    some of the criteria that would be considered in

 4    granting or denying a special event permit?

13:25  5    A.    I'm sorry.  Say that again.

 6    Q.    Are the criteria listed or the factors listed

 7    under the heading "What would cause a permit to get

 8    denied?" the factors that the City considers in deciding

 9    whether to grant or deny a permit application?

13:25 10    A.    Well, it's answering the question:  What would

11    cause a permit to get denied? and gives some examples of

12    common factors why permits would be denied.

13    Q.    Are the factors listed there, in your knowledge

14    and experience as the person most qualified on behalf of

13:25 15    the City, some of the factors that would cause a permit

16    to be denied?

17    A.    Yes.

18    Q.    Are there other factors?

19    A.    Yes.

13:26 20    Q.    What are the other factors?

21    A.    Other factors would be those that had to deal

22    with already-in-place municipal codes, county

23    ordinances, state laws, federal laws, et cetera.

24    Q.    Other than the factors listed here and

13:26 25    compliance with laws and regulations and ordinances, are
```

1    there any other factors that you're aware of that could

             2    cause a permit to be denied?

             3        A.    From the police department's perspective,

             4    public safety would also be a reason why it could be

13:27        5    denied.

             6        Q.    Does the police department determine, in

             7    connection with permit applications, whether the

             8    proposed event poses a risk to public safety?

             9        A.    Correct.

13:27       10        Q.    Beyond public safety in general, are there any

            11    specific criteria that you consider?

            12        A.    Other than what's been discussed, none that I

            13    could recall right now.

            14        Q.    Other than the permit application itself and

13:27       15    this FAQ that we're looking at, are you aware of any

            16    other written document available to the public that

            17    lists the factors considered in granting or denial of an

            18    application?

            19            MR. MASTER:  Objection.  Asked and answered.

13:28       20            Go ahead.

            21            THE WITNESS:  There's the application itself on

            22    the website, and what the website says itself, which I

            23    see is Exhibit 34.

            24        Q.   (By Mr. Robinson)  You anticipated my next

13:28       25    question.  Exhibit 34 is two pages, MP1830 and 1831;

THE VIDEOGRAPHER:  We are now going back on the

       2   record.  The time is 1:40 p.m.

       3      Q.   (By Mr. Robinson)  Of the six and seven film

       4   permit applications that you've been involved in, what

13:40  5   was the nature of -- strike that.

       6          What was the reason that the police department

       7   got involved?

       8      A.   The police department is always advised of a

       9   film permit, but our involvement would occur if the film

13:41 10   production was a -- became a traffic issue, crowd

      11   control issue, public safety issue.

      12      Q.   I assume that Mr. Zeleny's permit application

      13   for a film permit was one of the ones in which the

      14   police department got involved; is that correct?

13:41 15      A.   The incomplete process, yes.

      16      Q.   When you say "the incomplete process," what do

      17   you mean?

      18      A.   There has been no decision on a film permit as

      19   of yet.

13:41 20      Q.   What is the City's ordinary timeline for

      21   granting or denying a film permit?

      22      A.   I don't know what the ordinary time limit is.

      23      Q.   How long has Mr. Zeleny's film permit

      24   application been pending?

13:42 25      A.   I would have to see the date of when he

1    A.    There was -- my understanding -- my

2    recollection is that the last correspondence from the

3    Public Works Department asked for several -- asked

4    several questions and several mitigating factors of

13:45    5    Mr. Zeleny, which were never answered.

6    Q.    Is there anything else, aside from the fact

7    that the City hasn't acted on the permit application and

8    the lack of answers to that last round of e-mail

9    questions, that makes the application incomplete?

13:45    10    A.    I would argue that what you said about the City

11    not acting is not correct.  We've acted.  It's a two-way

12    street.  We act, we ask questions, we expect a response,

13    and we have not yet received a response.

14    Q.    Let me rephrase the question.  Aside from there

13:45    15    not being an ultimate decision of whether to grant or

16    deny the application and the fact that Mr. Zeleny hasn't

17    responded to the last round of questions e-mailed to

18    him, is there anything else about the application that

19    makes it incomplete?

13:46    20    A.    No.  That pretty much makes it incomplete.

21    Q.    The application itself is a form that you fill

22    out; correct?

23    A.    Correct.

24    Q.    Was the form filled out completely?

13:46    25    A.    Actually, I don't believe he ever filled out a

1  specific form for a film permit.  He just used the

2  special event permit and said "I would like this to now

3  be a film permit."

4       MR. ROBINSON:  Why don't we mark this as

13:47  5  Exhibit 36.

6            (Exhibit 36 was marked for identification.)

7       Q.   (By Mr. Robinson)  For the record, Exhibit 36

8  is MP1248 through MP1253; correct?

9       A.   Yes.

13:47  10      Q.   Have you seen this document before?

11      A.   Now that I see it in front of me, yes, I do

12  recall seeing it.

13      Q.   It's one of the documents that the City

14  produced during discovery in this case; correct?

13:47  15      A.   Correct.

16      Q.   It's a film permit application; correct?

17      A.   Correct.

18      Q.   In review of this Exhibit 36, is there anything

19  about it that, in your view, is incomplete?

13:48  20      A.   As far as this application itself?

21      Q.   Correct.

22      A.   No.

23      Q.   This is the ordinary application that someone

24  would use to request a film permit from the City of

13:48  25  Menlo Park; correct?

1    **Q.**   Are you still of the view that that animation

2    that we're talking about could be a violation of the

3    Penal Code if there were a child present and a

4    complaining victim?  You still believe that?

14:02    5    **A.**   It could be.  That would be a -- that would be

6    a question of the Courts.

7           MR. ROBINSON:  Why don't I ask that we mark

8    this as 37.

9           (Exhibit 37 was marked for identification.)

14:03    10   **Q.**   (By Mr. Robinson)  For the record, Exhibit 37

11   is two pages, MP5277 to 5278; correct?

12   **A.**   Yes.

13   **Q.**   Is this a copy of Penal Code 313.1 that was in

14   your file on Mr. Zeleny?

14:03    15   **A.**   Yes.

16          MR. ROBINSON:  And why don't we go ahead and

17   mark this as Exhibit 38.

18          (Exhibit 38 was marked for identification.)

19   **Q.**   (By Mr. Robinson)  For the record, Exhibit 38

14:04    20   is one page MP5282; correct?

21   **A.**   Yes.

22   **Q.**   This is another document that was contained in

23   your file on Mr. Zeleny; correct?

24   **A.**   Yes.

14:04    25   **Q.**   This is a still image of -- Exhibit 38 is a

1   still image of the animation that we've just been

2   talking about; right?

3        A.   Correct.

4        Q.   And was it your view, at the time that

14:04   5   Mr. Zeleny filed his permit application for a special

6   event permit, that the image reflected -- the animation

7   that's shown in Exhibit 38 could be obscene as to

8   minors?

9        A.   It could be.

14:04   10       Q.   Did you take that position in a public hearing

11   related to Mr. Zeleny's permit application?

12       A.   Yes.  I stated it could be.

13       Q.   Do you have a view, one way or another, at this

14   point, about whether it is obscene as to minors or not?

14:05   15       A.   It is actually -- as a police officer, I'm

16   unable to have my peace disturbed, nor be offended, so I

17   have no personal -- I have -- personally, I can't be

18   offended, so it would not be up to me whether it's

19   offensive or not.  It would be up to a Court.

14:05   20       Q.   When you say you can't be offended, what do you

21   mean?

22       A.   In other words, I can't be the victim.

23       Q.   Okay.

24            In your capacity as an individual witness, is

14:05   25   the image offensive?  Not asking in your capacity as a

1 police officer, but as an individual witness in this

2 case, is the animation that's reflected in ==Exhibit 38==

3 offensive?

4      MR. MASTER:  Objection.  Vague.  Ambiguous.

14:05  5 Confusing.  Overbroad.  Calls for speculation.

6      If you can answer it.

7      THE WITNESS:  For an adult, perhaps not; for a

8 child, yeah.

9   Q.   (By Mr. Robinson)  Have you received feedback

14:06  10 from anyone, either in the government in the City of

11 Menlo Park or the community of Menlo Park, that the

12 animation reflected in ==Exhibit 38== is offensive?

13      MR. MASTER:  Same objection.  Vague and

14 ambiguous.

14:06  15      THE WITNESS:  No.

16   Q.   (By Mr. Robinson)  Do you personally find it

17 offensive?

18      MR. MASTER:  Objection.  Asked and answered.

19      Don't answer that.

14:06  20      We're done with this.  He's already answered

21 that question.

22      MR. ROBINSON:  You're instructing him not to

23 answer?

24      MR. MASTER:  Absolutely.

14:06  25   Q.   (By Mr. Robinson)  Are you going to follow your

1    attorneys instruction not to answer?

2        **A.**    Yes.

3        **Q.**    In Mr. Zeleny's permit application process, you

4    acted as a spokesperson for the City in the hearing with

14:06 5   the city manager; correct?

6        **A.**    For the special events permit?

7        **Q.**    Correct.

8        **A.**    Yes.

9        **Q.**    And one of the issues that you raised in that

14:07 10  application process was that this image and the

11    associated animation might be obscene as to minors;

12    correct?

13        **A.**    It could be, yes.

14        **Q.**    Have you formed any view, in your capacity as

14:07 15  the Chief of Police of Menlo Park, about whether the

16    image is offensive?

17            MR. MASTER:  Objection.  Asked and answered.

18            Go ahead one more time.

19            THE WITNESS:  As I stated, no.

14:07 20      **Q.**    (By Mr. Robinson)  Who would make the decision

21    about whether to charge Mr. Zeleny with obscenity as to

22    minors related to the animation?

23        **A.**    District Attorney's Office.

24        **Q.**    Is there someone in the City of Menlo Park that

14:07 25  would make a decision about whether to refer it for

1   prosecution?

2       **A.**   Any police officer.

3       **Q.**   Looking at Exhibit 37, in Clause A, there's a

4   reference to "harmful matter to the minor."

14:08   5       Do you see that?

6       **A.**   Yes.

7       **Q.**   What is your understanding of material that

8   would be considered harmful as to the minor?  Is there

9   any more concrete definition than that?

14:08   10      MR. MASTER:  Just object to the extent it calls

11  for a legal conclusion and speculation.

12      You can answer.

13      THE WITNESS:  I believe if you were to look up

14  the jury instruction, there would be another definition

14:08   15  of that.

16      **Q.**   (By Mr. Robinson)  It refers to matter that is

17  summarized -- "invokes the prurient interests"; correct?

18      **A.**   That's one of the criteria.

19      **Q.**   But did the City of Menlo Park ever reach a

14:08   20  determination about whether the animation associated

21  with Exhibit 38 appeals to a prurient interest?

22      **A.**   That's -- that's not our purview.  That's not

23  our job to do, so the answer is no.

24      MR. MASTER:  Damion, is now a good time for a

14:09   25  break?  We've been going about an hour.

```
                1              MR. ROBINSON:  Yeah.

                2              MR. MASTER:  Is now a good time?

                3              THE VIDEOGRAPHER:  We're now going off the

                4    record.  The time is 2:08 p.m.

14:20           5              (Recess taken from 2:08 p.m. to 2:20 p.m.)

                6              THE VIDEOGRAPHER:  We are now going back on the

                7    record.  The time is 2:20 p.m.

                8         Q.   (By Mr. Robinson)  Was the possibility of

                9    Mr. Zeleny's animation being obscene as to minors a

14:20          10    factor that was considered by the City in connection

               11    with his special event permit application?

               12         A.   It did not come up until the appeal, because

               13    that's when we were looking -- we found the animation

               14    that he was proposing to use.

14:21          15         Q.   And in the appeal process, was it considered a

               16    factor in deciding whether or not to uphold the denial

               17    of the permit application?

               18         A.   My understanding, that it was not one of the

               19    denial points that was made by the city manager's

14:21          20    decision.

               21         Q.   It was a factor that was raised in the city

               22    manager meeting; correct?

               23         A.   Yes.

               24         Q.   It was raised by you; right?

14:21          25         A.   Yes.
```

1     **Q.**   At the point that you raised it in that

2     meeting, you had not reached a determination about

3     whether it was actually obscene as to minors?

4     **A.**   I cannot reach that determination.

14:21   5     **Q.**   And you hadn't reached such a determination at

6     the time you raised it as a potential reason to uphold

7     the denial; correct?

8          MR. MASTER:   Objection.   Asked and answered.

9          THE WITNESS:   I cannot make that determination.

14:22   10   That would have to be made by a jury.

11     **Q.**   (By Mr. Robinson)   I understand that you can't

12    make the determination.   My question was whether, at the

13    time you raised it as a possible basis to uphold the

14    denial of Mr. Zeleny's permit application, you had no

14:22   15   view about whether it was or was not obscene as to

16    minors?   I'm just trying to verify that that's accurate.

17     **A.**   Yes.

18     **Q.**   So you raised it as a basis to uphold the

19    denial, despite the fact you had no view about whether

14:22   20   it was obscene as to minors or not; correct?

21     **A.**   I am -- it's not my purview to say whether it's

22    going to be obscene or not; it's a jury.   But I raised

23    it as a factor for the city manager to consider.

24     **Q.**   The reason that you raised it as a factor is

14:22   25   that you believed it was a factor that could support

1  affirming the denial of his permit application; correct?

2      A.   That it could go towards the city manager's

3  decision-making process in the situation.

4      Q.   Did you think it was a factor in favor of

5  granting him a special event permit?

6      A.   No.

7      Q.   Did you think it was a factor that potentially

8  weighed in favor of denying his special event permit

9  application?

10     A.   Yes.

11          MR. MASTER:  Sorry.  It beeped, so I'm just

12  showing him the phone.

13          THE WITNESS:  Okay.  Thank you.

14          MR. ROBINSON:  Okay.

15          Why don't we mark this as Exhibit 39?

16          (Exhibit 39 was marked for identification.)

17     Q.  (By Mr. Robinson)  For the record, Exhibit 39

18  is three pages, MP5141 through 5143; correct?

19     A.   Yes.

20     Q.   Do you recognize Exhibit 39?

21     A.   I have seen it, yes.

22     Q.   Is it part of your personal file on Mr. Zeleny?

23     A.   Yes.

24     Q.   Do you recognize it to be a printout of a

25  portion of Mr. Zeleny's website; true?

1    Q.    What is the purpose of that investigative work?

           2    A.    They were instructed by their -- the detective

           3    sergeant at the time to look into Mr. Zeleny's open

           4    source and to attempt to determine his -- what his

14:26      5    motivations were to openly carry weapons in the city of

           6    Menlo Park, and if there was any public safety issues

           7    that we need to be concerned of, including threats;

           8    things of that nature.

           9    Q.    To your knowledge, at any point in his

14:27     10    protests, has Mr. Zeleny committed a crime?

          11    A.    Yes.

          12    Q.    What crime did he commit?

          13    A.    He was, one time, prosecuted for possession of

          14    a concealed weapon.

14:27     15    Q.    Other than the prosecution for possession of a

          16    concealed weapon, are you aware of any other occasion in

          17    which -- in which Mr. Zeleny committed a crime in the

          18    course of his protests?

          19    A.    Not that I am aware of.

14:27     20    Q.    Would the answer to that change if I asked you

          21    in your capacity as the person most knowledgeable for

          22    Menlo Park?  I want to make clear that we've exhausted

          23    both your personal knowledge and the City of Menlo

          24    Park's knowledge, having designated you as the person

14:27     25    most knowledgeable.

```
 1          So in your individual capacity, are you aware

 2   of any crime, other than the incident where Mr. Zeleny

 3   was prosecuted for carrying a concealed weapon?

 4       A.   I am not aware of any other crime.

 5       Q.   And in your capacity as the person most

 6   knowledgeable for Menlo Park, are you aware of any crime

 7   that Mr. Zeleny committed during his protests, other

 8   than the one incident where he was prosecuted for

 9   carrying a concealed weapon?

10       A.   No.

11       Q.   Mr. Zeleny was acquitted of carrying a

12   concealed weapon; correct?

13       A.   Yes.

14       Q.   Your testimony, I take it, you disagree with

15   the acquittal?

16       A.   I neither disagree nor agree.

17       Q.   So aside from the time that Mr. Zeleny was

18   prosecuted and acquitted, you're not aware of any other

19   crime -- the incident that resulted in Mr. Zeleny being

20   prosecuted and acquitted is the only crime that you're

21   aware of that he ever committed in the course of his

22   protests.

23          MR. MASTER:  Objection.  Asked and answered.

24          THE WITNESS:  That's the only incident where

25   probable cause arose to have a criminal Complaint filed.
```

14:28 (line 5)
14:28 (line 10)
14:28 (line 15)
14:28 (line 20)
14:29 (line 25)

```
 1      Q.   Who is that?

 2      A.   He's a sergeant.

 3      Q.   Within the Menlo Park Police Department?

 4      A.   Yes.

14:31  5      Q.   And who is Timothy Brackett?

 6      A.   He's a sergeant in the Menlo Park Police

 7   Department.

 8      Q.   This e-mail relates to Mr. Zeleny; correct?

 9      A.   Yes.

14:32  10     Q.   In the -- I guess it's the third e-mail down

11   the chain, so the very bottom e-mail, there's a

12   reference to Mr. Zeleny's mother passing away and, to

13   summarize, that potentially triggering him to conduct

14   more protests.

14:32  15          Do you see what I'm talking about?

16     A.   Yes.

17     Q.   How did the City of Menlo Park get the

18   information that Mr. Zeleny's mother had passed away?

19     A.   From the head of security at NEA.

14:32  20          MR. MASTER:  Mr. Zeleny, I'd appreciate it if

21   you could be quiet during the deposition.  Thank you.

22     Q.   (By Mr. Robinson)  Do you know how the head of

23   security of NEA got that information?

24     A.   No.

14:32  25     Q.   Were you aware that NEA was conducting
```

1    surveillance on Mr. Zeleny?

2        A.    Yes.

3        Q.    How did you become aware of that?

4        A.    The head of security advised me.

14:33    5        Q.    What type of surveillance was NEA conducting on

6    Mr. Zeleny?

7        A.    My understanding was it was open source, and

8    that sometimes physical surveillance.

9        Q.    To your knowledge, how long did that go on?

14:33    10        A.    I don't know.

11        Q.    In the 2013 -- let's start at 2012 to 2013.

12    You worked with the City of Menlo Park; correct?

13        A.    Correct.

14        Q.    How often did you communicate with

14:33    15    representatives of NEA during that time period about

16    Mr. Zeleny?

17        A.    Only around the times of his protests.

18        Q.    Let's say in the two years, 2012 and 2013,

19    estimate how many times you met with or communicated

14:33    20    with representatives of NEA?

21        A.    I'd say maybe four or five times.

22        Q.    The bottom e-mail in Exhibit 40 describes a

23    meeting with representatives of NEA.

24            Do you see that?

14:34    25        A.    Yes.

1    in order to investigate a crime, we have to have a

           2    complaining victim, someone to come forward and tell us

           3    that they were a victim of a crime, and then we would,

           4    in fact, do that.  At this point, this alleged victim

14:46      5    has not come forward, has not made any police reports

           6    that I know of anywhere, and definitely not at Menlo

           7    Park PD.

           8            MR. ROBINSON:  Why don't we mark this as

           9    Exhibit 41.

14:46     10            (Exhibit 41 was marked for identification.)

          11        Q.   (By Mr. Robinson)  For the record, Exhibit 41

          12    is one page, MP261; correct?

          13        A.   Yes.

          14        Q.   Do you recognize it?

14:47     15        A.   I do.

          16        Q.   Is it an e-mail from you to a representative of

          17    NEA?

          18        A.   Yes.

          19        Q.   Could you just pronounce the gentleman's name.

14:47     20        A.   It's Dave Tresmontan, T-r-e-s-m-o-n-t-a-n.

          21        Q.   In Mr. Tresmontan's e-mail, he's asking you

          22    about your -- at the bottom of the page, he's asking you

          23    about your availability for a meeting regarding Zeleny.

          24            Do you see that?

14:47     25        A.   Yes.

1    **Q.**   Do you recall a discussion about setting up a

2    meeting in the July 2015 time frame about Mr. Zeleny?

3    **A.**   Yes.

4    **Q.**   What was the context of that meeting?  Why were

14:47   5    you setting it up?

6    **A.**   This was a meeting that included numerous

7    stakeholders dealing with Mr. Zeleny in case he were to

8    resume his armed protests and included numerous

9    government and non-government stakeholders.

14:48   10    **Q.**   NEA was among the non-government stakeholders?

11    **A.**   Yes.

12    **Q.**   In your experience with the City of Menlo Park,

13    how many times have you met with a group of government

14    and non-government stakeholders about an issue related

14:48   15    to your work as a police officer?

16    **A.**   Numerous.

17    **Q.**   What types of issues do you generally meet with

18    with non-government stakeholders?

19    **A.**   It could -- it varies anywhere from

14:48   20    homelessness to issues with traffic around certain

21    locations.  It runs the gamut of different concerns that

22    people have where we would meet with government and

23    non-government officials.

24    **Q.**   Have you ever met with government and

14:48   25    non-government officials about a protest, other than

1    **A.**    I was going to read the document.

2    **Q.**    Go ahead and read it.

3    **A.**    "Photographs and videos will not be used or

4    retained for the sole purpose of collecting or

15:06    5    maintaining information about the political, religious,

6    or social views of associations or the activities of any

7    individual, group, association, organization,

8    corporation, business, or partnership unless such

9    information directly relates to an investigation of

15:06    10    criminal activities and there is reasonable suspicion

11    that the subject of the information is involved in

12    criminal conduct."

13    **Q.**    Is the City currently investigating Mr. Zeleny

14    for criminal activity?

15:07    15    **A.**    Not currently investigating him, no.

16    **Q.**    Other than the concealed carry issue for which

17    Mr. Zeleny was acquitted, did the City ever investigate

18    Mr. Zeleny for criminal activity?

19    **A.**    No.

15:07    20    **Q.**    Other than that issue related to the concealed

21    carry for which Mr. Zeleny was acquitted, did the City

22    ever have a reasonable suspicion that he was engaged in

23    criminal conduct?

24    **A.**    No.

15:07    25    **Q.**    Does maintaining a file on Mr. Zeleny, despite

1   attempting to come to a conclusion with as far as his

           2   second permit.

           3      Q.    Part of your answer related to Mr. Zeleny

           4   asserting that he has the right to engage in the

15:30      5   protests without -- or to engage in an entertainment

           6   event or to film his protests as part of a video

           7   production without the City's authorization; is that

           8   accurate?

           9      A.    That is my understanding of what he has alleged

15:30     10   or he has said.

          11      Q.    As the person most qualified on behalf of the

          12   City of Menlo Park, is he correct in that assertion?

          13      A.    In the assertion -- no; that he can't -- hold

          14   on.

15:30     15          Go back and tell me the assertion again.

          16      Q.    Sure.  Is it accurate that Mr. Zeleny can

          17   engage in his activities with unloaded firearms without

          18   some kind of permit from the City?

          19      A.    That is not correct.

15:30     20      Q.    Okay.

          21          So you disagree with his assertion?

          22      A.    That's correct.

          23      Q.    And assuming that he did that, we've talked

          24   about this before, and I don't want to belabor it.

15:30     25   Assuming that he did that, he would be subject to

1    prosecution?

2         A.    He may be subject to arrest and prosecution.

3         Q.    And if I understood you correctly, Mr. Zeleny

4    is manipulating the process by applying for the permits;

15:31  5    is that correct?

6         A.    Yes.

7         Q.    Okay.

8               So the City disagrees with him -- strike that.

9               In the City's view, Mr. Zeleny needs the

15:31  10   permits in order to use the guns in the protests -- in

11   the entertainment event, the protests, the video,

12   whatever it is, he needs a permit; correct?

13        A.    In order for the exception to be applicable, he

14   has to be involved in a permitted activity, yes.

15:31  15        Q.    And in your view, Mr. Zeleny is manipulating

16   the process by applying for the permits he needs to

17   engage in that activity?

18        A.    Based on his own words, yes.

19        Q.    Going on to the next paragraph in Exhibit 44,

15:32  20   there is a reference to continuing to be in close

21   contact with security from NEA.

22               Do you see that?

23        A.    I do.

24        Q.    Do you have an understanding of how -- for what

15:32  25   period of time the City of Menlo Park was in contact

1    Mr. Zeleny having a firearm and being compliant with a

2    request to check whether it was loaded; correct?

3        **A.**    Yes, a 12-gauge shotgun.

4        **Q.**    Based on that paragraph, Mr. Zeleny was also

15:35    5    cooperative with officers' requests to inspect his

6    weapon; true?

7        **A.**    Based on the report, yes.

8        **Q.**    In any of your experience with Mr. Zeleny, has

9    he been anything other than cooperative with officers'

15:36    10    requests to inspect his firearms?

11        **A.**    No.

12        **Q.**    Has he been uncooperative with officers in any

13    way, to your knowledge?

14        **A.**    Not to my knowledge.

15:36    15    **Q.**    Going down to the next paragraph, second up

16    from the bottom, is a reference to a bagpiper.

17            And my question is:  It appears, based on the

18    report, that Mr. Zeleny cooperated with the officers'

19    request to relocate the bagpiper so that the noise was

15:36    20    at an acceptable level; correct?

21        **A.**    Yes.

22        **Q.**    And in the next paragraph, Mr. Zeleny

23    cooperated with a request to have a trumpet player play

24    music at an acceptable level; true?

15:36    25    **A.**    Yes.

1          MR. ROBINSON:  Let's go on to Exhibit 47.

2          (Exhibit 47 was marked for identification.)

3     Q.   (By Mr. Robinson)  For the record, Exhibit 47

4     is three pages, MP1871 through 1873; correct?

15:37  5     A.   Correct.

6     Q.   Do you recognize Exhibit 47?

7     A.   It's a Menlo Park Police report.

8     Q.   It is one of the documents collected and

9     produced in this lawsuit by the City of Menlo Park;

15:37  10    true?

11    A.   Yes.

12    Q.   And in the narrative section of this police

13    report, it discusses an inspection of one of

14    Mr. Zeleny's firearms; correct?

15:38  15    A.   Again, this was a year before I was employed

16    with the Menlo Park Police Department, but yes, it does.

17    Q.   And in this report, the officer notes that

18    Mr. Zeleny voluntarily offered to allow the officer to

19    inspect his firearm; correct?

15:38  20    A.   Yes, a shotgun.

21    Q.   And the officer apparently thanked Mr. Zeleny

22    for his cooperation.

23    A.   According to the police report, he did.

24    Q.   Is that consistent with your understanding of

15:38  25    Mr. Zeleny's behavior throughout his protests; that he

1   was cooperative with the requests made by police

2   officers?

3       A.   Yes.

4       Q.   His cooperation included the location of

15:39   5   various parts of his protest; right?

6       A.   In the one case that I read, yes.

7       Q.   And it also included cooperation regarding

8   inspection of his firearms; true?

9       A.   Yes.

15:39   10          MR. ROBINSON:  Let's mark this as 48, please.

11              (Exhibit 48 was marked for identification.)

12      Q.   (By Mr. Robinson)  For the record, Exhibit 48

13   is multiple pages, MP61 through 65; correct?

14      A.   Yes.

15:40   15      Q.   Do you recognize Exhibit 48?

16      A.   It is an e-mail with a daily police log

17   attached.

18      Q.   And this is an e-mail that you would have

19   received in your capacity as -- strike that.

15:40   20          In February of 2012, what was your title with

21   the Menlo Park Police Department?

22      A.   Patrol commander.

23      Q.   Okay.

24          Did you receive this e-mail and attachment in

15:40   25   that capacity on the date listed here?

1    under problem-solving; could have been put under other

2    parts.  It's really not formal as to where it goes.

3        Q.    Was Mr. Zeleny's protest considered a problem

4    by the City of Menlo Park in 2012?

15:42    5        A.    Yes.

6        Q.    Why was it considered a problem?

7        A.    Because, as it states here, both subjects were

8    wearing military style uniforms, Level 3A tactical

9    vests, one with a ceramic trauma plate.  The rifles

15:42   10    carried by the subjects were M1A type .308 caliber, and

11    they each had several loaded ten-round magazines on

12    their person but not loaded in the rifles.

13            That is why it was a problem for the Menlo Park

14    Police Department.

15:43   15        Q.    What about that is a problem?

16        A.    These two men were a public safety concern,

17    both because of the fact that, very easily, they could

18    load those weapons and become active shooters, number

19    one.

15:43   20            Number two, they created a visual hazard for

21    people who are passing by.  And both men put themselves

22    in very dangerous, precarious positions, because if a

23    passerby saw these men in the society we live in today,

24    with active shooters and mass shootings permeating the

15:43   25    world, that a person who happened to have a gun legally

1    may consider them a threat, and who knows what could

                2    have happened.

                3           So, yes, this was a problem.

                4       Q.   At the time that the City -- in the 2012 time

15:43           5    frame, when the City of Menlo Park apparently considered

                6    Mr. Zeleny's activities a problem, Mr. Zeleny was not

                7    doing anything illegal; correct?

                8       A.   No, he was not doing anything illegal.

                9       Q.   He was exercising his constitutional right to

15:44          10    bear arms; true?

               11       A.   Certainly.

               12       Q.   And Mr. Zeleny's exercise of his constitutional

               13    right to bear arms was a problem for the City of Menlo

               14    Park?

15:44          15           MR. MASTER:  Objection.  Argumentative.  Asked

               16    and answered.

               17           THE WITNESS:  It caused a public safety issue.

               18       Q.   (By Mr. Robinson)  So his exercise of his

               19    constitutional right to bear arms was a problem for the

15:44          20    City of Menlo Park because, in your view, it created a

               21    public safety issue; is that accurate?

               22       A.   That is accurate.

               23           MR. ROBINSON:  Let's take a look at Exhibit 49.

               24           (Exhibit 49 was marked for identification.)

15:46          25       Q.   (By Mr. Robinson)  Do you recognize Exhibit 49?

1      **A.**    I do.

          2      **Q.**    The officer notes, again, that Mr. Zeleny was

          3     very cooperative.

          4             Do you see that?

16:00     5      **A.**    I do.

          6      **Q.**    That's consistent with your understanding of

          7     Mr. Zeleny's behavior during all of his protests.

          8      **A.**    Certainly.

          9             MR. ROBINSON:  Why don't we mark this as

16:01    10     Exhibit 51, please.

         11               (Exhibit 51 was marked for identification.)

         12      **Q.**    (By Mr. Robinson)  Exhibit 51 is multiple pages

         13     from MP206 to 210; correct?

         14      **A.**    Correct.

16:02    15      **Q.**    Do you recognize Exhibit 51?

         16      **A.**    I do.

         17      **Q.**    What is it?

         18      **A.**    It is the minutes from a management -- police

         19     management staff meeting on August 7th, 2012.

16:02    20      **Q.**    You attended that meeting; correct?

         21      **A.**    I did.

         22      **Q.**    If you could turn to Page 210, please.  There

         23     is a reference to Zeleny.

         24             Do you see where I'm referring to, middle of

16:02    25     the page?

1    to working collaboratively with NEA and Mr. Zeleny, as

2    well as contact with the legal counsel of NEA; is that a

3    fair characterization?

4              MR. MASTER:  Objection.  Document speaks for

16:11  5    itself.

6              THE WITNESS:  The originating e-mail on this

7    thread is from Chief Brian Roberts to Glen Rojas,

8    R-o-j-a-s, who was the city manager at that time.  CC'ed

9    on this e-mail are Sergeant Sharon Kaufman and, at that

16:11  10   time, Commander Lacey Burt, and it does speak about a

11   protest Mr. Zeleny did.  I assume -- sorry.

12             It's dated on the 28th, and that the chief

13   states that NEA is aware of the latest developments and

14   that they have -- and that the police department and NEA

16:12  15   have participated in conference calls with their legal

16   counsel.

17        Q.   (By Mr. Robinson)  Is it accurate, in your

18   experience, that the Menlo Park Police Department has

19   worked collaboratively with NEA in connection with

16:12  20   Mr. Zeleny's protests?

21             MR. MASTER:  Object.  Can you just read that

22   back.  I'm sorry.  I missed it.

23             (Record read.)

24             THE WITNESS:  We have -- as a stakeholder, we

16:12  25   have worked with them.  I'm not sure.  It depends on

1    what your definition of "collaboratively" is.  We have,

2    in fact, as a stakeholder and as the organization that

3    is the focus of Mr. Zeleny's protests, they have asked

4    us for assistance, and they are a business in our city,

16:13  5    so we provided assistance.

6         Q.    (By Mr. Robinson)  In your time at the City of

7    Menlo Park Police Department, what has the City done to

8    work collaboratively with NEA as a stakeholder?

9              MR. MASTER:  Objection.  Vague and ambiguous.

16:13  10   Overbroad.

11             You can answer.

12             THE WITNESS:  We have responded to their

13   requests when Mr. Zeleny has shown up armed and

14   protesting.  We have met with them, when they have had

16:13  15   concerns, to address their concerns about the safety

16   issues with the armed protests.  We have invited them to

17   be in the meeting with all the stakeholders regarding

18   Mr. Zeleny's protests and answering any questions that

19   we legally could of them.

16:14  20        Q.   (By Mr. Robinson)  You've met personally with

21   NEA, true, in connection with Mr. Zeleny's protests?

22        A.   Well, NEA is a company.

23        Q.   Thank you.

24             You've met personally with representatives of

16:14  25   NEA in connection with Mr. Zeleny's protests; true?

EXHIBIT 2

1     UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3       ---oOo---

4 MICHAEL ZELENY,

5   Plaintiff,

6 vs.      Case No. CV 17-7357 JCS

7 GAVIN NEWSOM, et al.,

8   Defendants.
 _____/

9 Pages 278 - 286 ARE CONFIDENTIAL

10 AND BOUND SEPARATELY

11

12 Pages 310 - 324 ARE CONFIDENTIAL

13 AND BOUND SEPARATELY

14

15  CONTINUED VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

16     BY VIDEOCONFERENCE

17   (Volume II - Pages 229 to 534

18

19   Taken before DENISE M. LOMBARDO, CSR No. 5419

20     RPR, RMR, RDR, CRR

21     August 7, 2020

22

23

24

25

        Page 229

```
 1      A.  Yes.
 2      Q.  Okay.  Are there any ordinances governing
 3  film permits that you're aware of?
 4      A.  I'm not aware of any specific ordinances
 5  governing film permits.                              10:11
 6      Q.  Would the film permitting process also be
 7  governed by the written materials, including the
 8  film permit guidelines?
 9      A.  Yes.
10      Q.  In the last deposition, we talked about    10:11
11  whether there were written policies for the various
12  departments regarding approval or denial of special
13  events permits.
14          Do you recall that?
15      A.  I do.                                        10:12
16      Q.  Have you identified any other written
17  policies for the approval or denial of special
18  events permits, other than the ones we went over
19  last time?
20      A.  There are no other written policies or      10:12
21  procedures.
22      Q.  Could you identify any criteria that are
23  not identified in the written policies, criteria
24  for approval or denial?
25          MR. MASTER:  I'll just object.  Vague and   10:12
```

Veritext Legal Solutions
866 299-5127

```
 1   ambiguous and overbroad.
 2        You can answer.
 3        THE WITNESS:  You are speaking of the
 4   special events permit process --
 5        MR. ROBINSON:  Correct.                    10:12
 6        THE WITNESS:  -- or the film?  Okay.
 7   The special events.  The -- the criteria are on the
 8   FAQs and they're on the application.  What the city
 9   is really looking for is dealing with time, manner
10   and place, essentially, and what -- the criteria    10:13
11   that are listed are the things that we are looking
12   for.
13   BY MR. ROBINSON:
14        Q.  So you mentioned time, manner and place.
15   Let's start with time.  What are the time          10:13
16   limitations on a special event?
17        A.  That would depend on what kind of event is
18   being contemplated.  I think I testified to that
19   prior.  It really depends on what kind of event is
20   being contemplated.  If there is an event at, for   10:13
21   instance, say, 3:00 o'clock in the morning that's
22   going to create a lot of noise, that probably would
23   be a time that we would have some issues with and
24   may want to work with the person who is requesting
25   that event.  So time is a -- one of the things that  10:13
```

Page 241

```
 1    we would look at.
 2        Q.   Is there a schedule of hours where special
 3    events are allowed?
 4        A.   I'm not aware of any set schedule of
 5    hours.                                                      10:13
 6        Q.   Are there time limits on the length of
 7    time a special event can last?
 8        A.   I'm not aware of anything that is written
 9    about time limits.
10        Q.   Are you aware of any unwritten policy         10:14
11    about time limits?
12        A.   No.  I think it would be up to the City to
13    determine whether or not a permitted event, if it
14    were to be contemplated to go on, let's say,
15    indefinitely, that perhaps there would be some        10:14
16    issue with that that we would want to discuss with
17    the permit requester.
18        Q.   Is the appropriate time limit for an event
19    considered on a case-by-case basis?
20        A.   Correct.                                       10:14
21        Q.   Let's talk about place.  That was the
22    second item.  What -- is there any written policy
23    about the place for special events?
24        A.   Not specifically about places that are
25    disallowed or allowed, but there are criteria        10:14
```

1  for -- if you're going to do it in a place that is

2  going to create a traffic hazard, there would need

3  to be mitigation involved.  There may be extra

4  insurance that's necessary.  So the place is

5  something else that is a criteria that is looked          10:15

6  at, but it's also listed on the application.

7      Q.  What places would create a traffic hazard?

8          MR. MASTER:  Vague and ambiguous and

9  overbroad.

10         Go ahead.                                          10:15

11  BY MR. ROBINSON:

12     Q.  Let me clarify that.  In connection with

13  the place requirements for a special events permit,

14  are there any places within the city that are

15  specifically allowed or disallowed for special          10:15

16  events?

17         MR. MASTER:  Objection.  Vague and

18  ambiguous and overbroad.

19         Go ahead.

20         THE WITNESS:  I believe I've answered          10:15

21  that.  I said there is no list of places where it's

22  disallowed or allowed.  But it is something --

23  depending on the location that is requested or that

24  is being contemplated, the place does -- does

25  matter when it comes to, you know, the permitting          10:15

Veritext Legal Solutions
866 299-5127

1   process.

2   BY MR. ROBINSON:

3       Q.  How do you determine at the City of Menlo

4   Park whether a special event creates or could

5   potentially create a traffic hazard?                    10:16

6       A.  Well, it would be common sense.  If the

7   requestee is requesting the special event to occur

8   down El Camino Real or some other major

9   thoroughfare, that's going to create traffic.  We

10  historically know what our traffic flows are, which     10:16

11  streets are busier than others and have more

12  traffic issues on them.  So it would be based on

13  the location contemplated and, also, our experience

14  with that location.

15      Q.  And focusing on the first layers, not the       10:16

16  appellate layers but the first layer of the special

17  event permit process, who decides whether the event

18  creates a traffic hazard?

19      A.  Well, that would be a combined opinion

20  with both the public works/transportation            10:16

21  department, public works planning and the police

22  department.  And that would be a recommendation

23  back to the community services person, who is in

24  charge of the permitting process, to say these are

25  the issues that we would have with this permit as     10:17

1    it is requested, and we would request some

2    mitigation for those issues.

3        Q.  Are there any traffic increases or

4    traffic -- strike that.

5        Is there a particular volume of traffic    10:17

6    interference that would be required to have a

7    permit denied?

8        A.  I couldn't answer that question.  I have

9    no idea what that -- there's no -- there's no

10    criteria for -- if it's -- that's like saying if    10:17

11    traffic is disrupted 20 percent, it's no good.

12    That doesn't make any sense.  I don't know how to

13    answer that.

14        Q.  The traffic hazard factor, is that also

15    determined case by case?    10:18

16        A.  Well, yes.  It would be dependent upon

17    where -- the place that is contemplated in the

18    application.

19        Q.  Okay.  The last thing you mentioned was

20    manner restrictions.  What are manner requirements?  10:18

21    What are the criteria for determining whether the

22    manner of a special event is appropriate?

23        A.  Certainly.  I think I testified to this a

24    year ago, also.

25        The manner would be, as long as all    10:18

1  applicable laws are being followed, whether they're

2  local, state, federal laws, are being followed.  So

3  the manner in which this would occur.  Make sure

4  there are safety considerations.  If there are --

5  if there's a danger of someone perhaps getting          10:18

6  injured, that there's safety.  Then there's

7  sanitation.  There are -- there are criteria for

8  that.  So that would be the manner criteria.

9      Q.  And those criteria that you mentioned,

10  following up with applicable laws, safety              10:19

11  considerations, sanitation considerations, is there

12  a written list of factors anywhere?

13      A.  Those are actually --

14      Q.  Sorry.  Go ahead.

15          THE REPORTER:  Excuse me.  Excuse me.          10:19

16          MR. ROBINSON:  Let me start again.

17          THE REPORTER:  Mr. Master, your last

18  statement, I couldn't hear it.  And I'm getting

19  interference from Mr. Robinson's line.  It's not

20  exactly clear.  Go ahead.                              10:19

21  BY MR. ROBINSON:

22      Q.  Let me rephrase the question.

23          Is there any written list of the manner

24  requirements for a special event permit?

25      A.  There are some of the manner requirements      10:20

1  that are reflected in the application dealing with
2  crowd control, sanitation, you know, noise.  Those
3  type of manner restrictions are, in fact, on the
4  application process, but it is a case-by-case
5  basis.                                              10:20
6      Q.  So under the general category of safety
7  considerations, would the safety considerations
8  vary based on the type of event?
9      A.  Yes.
10     Q.  Is there a standard time limit in place     10:20
11 for approval or denial of a special events permit?
12     A.  There is a general timeline in place, but,
13 again, as I think I've testified before, that would
14 depend on the specific situation and the specific
15 application that's being contemplated.              10:21
16     Q.  Is there any -- is there any mandatory
17 time limit on how long it takes to process a
18 special event application?
19     A.  Not that I'm aware of, no.
20     Q.  Why don't we mark this as Exhibit 250.      10:21
21         (Plaintiff's Exhibit 250 marked
22          for Identification.)
23         MR. ROBINSON:  Does everyone have access to
24 the document share?
25         THE WITNESS:  This folder says "empty."     10:21

Page 247

1    application that you discussed?

2        A.  As I sit here today, I don't recall

3    exactly what was discussed.  There was an overall

4    discussion about the application.

5        Q.  And did the chief at that time give you          10:47

6    any directions about what to do regarding the

7    application?

8        A.  The only direction he gave me is to handle

9    it.

10       Q.  Okay.  What did you do after that with           10:48

11   respect to the application?

12       A.  Again, I don't recall exactly what I did

13   after that.  I know eventually, I had a discussion

14   with Matt Milde, who was the coordinator at the

15   time, and Sergeant Kaufman, who was a special          10:48

16   events sergeant at the time, to discuss the

17   application.

18       Q.  In general terms, what did you talk about

19   with Sergeant Kaufman and Mr. Milde?

20       A.  We just discussed what was being               10:48

21   contemplated and how we would go about trying to

22   get the information that we needed and also deal

23   with some of the -- on its face, the application

24   presented some safety concerns, whether it was the

25   traffic safety, public safety.  Those are the         10:49

Veritext Legal Solutions
866 299-5127

1      Q.  If you could please turn to the page that

2   has the caption "Verification," near the very end

3   of the document.

4      A.  Okay.

5      Q.  Is that your signature?                     10:55

6      A.  It is.

7      Q.  You reviewed this document before you

8   signed it?

9      A.  I did.

10      Q.  Let's go to page 3, please.  Actually,      10:55

11   let's start on page 2 and carrying over to page 3.

12   There's interrogatory No. 1 and supplemental

13   response to interrogatory No. 1.  Read those, if

14   you would.

15      A.  (Witness complying.)                        10:56

16      Q.  I want to focus on the paragraph that

17   starts:  "In addition, the City has recently

18   discovered."  Do you see that?

19      A.  I do.

20      Q.  How did the City discover that it never     10:56

21   had legal authority to issue a permit?

22      A.  I'm not -- I'm not 100 percent sure.  My

23   understanding, from discussions with the city

24   attorney's office --

25          MR. MASTER:  Hold on.  If they're           10:56

                                        Page 261

1    discussions with the city attorney's office, then

     2    it's attorney-client-privileged communication.  If

     3    you have any understanding outside of what you've

     4    been told by an attorney, you're certainly entitled

     5    to answer.                                          10:57

     6            THE WITNESS:  Then I have no -- nothing

     7    else, aside from what I was discussing with the

     8    city attorney.

     9    BY MR. ROBINSON:

    10       Q.  All right.  Let's -- taking that paragraph   10:57

    11    as a whole that discusses the City's legal

    12    authority and ownership of the median, do you have

    13    any basis for knowledge about that -- the

    14    information in that paragraph, other than what

    15    you've been told by an attorney?                    10:57

    16       A.  No.

    17       Q.  For purposes of our record, Chief Bertini,

    18    what were you told by an attorney concerning that

    19    information?

    20            MR. MASTER:  Again, just for the record,    10:57

    21    you're asking Chief Bertini to disclose what he was

    22    told by the city attorney's office, the city

    23    attorney being the attorney for the City and the

    24    staff.  Therefore, it calls for him to disclose

    25    attorney-client-privileged communications, and I'll  10:58

```
 1    instruct him not to answer.
 2              MR. ROBINSON:  I didn't quite hear you,
 3    Todd.  Are you instructing him not to answer?
 4              MR. MASTER:  Yes.
 5    BY MR. ROBINSON:                                    10:58
 6         Q.  Chief Bertini, are you going to follow
 7    your attorney's instruction not to answer?
 8         A.  I am.
 9         Q.  As the chief of police of the City of
10    Menlo Park, are Menlo Park police officers         10:58
11    authorized to enforce the laws on that median strip
12    on Sand Hill Road?
13         A.  Yes.
14         Q.  Does the city police department have
15    jurisdiction over the median strip on Sand Hill    10:58
16    Road?
17              MR. MASTER:  Objection.  Calls for a legal
18    conclusion.  Vague and ambiguous.
19              You can answer.
20              THE WITNESS:  The City of Menlo Park has  10:59
21    jurisdictional boundaries, but to be technical with
22    you, Counselor, police officers in the state of
23    California can actually use their police power
24    anywhere in the state.  So, yes, they have police
25    power over that median.                            10:59
```

Veritext Legal Solutions
866 299-5127

```
 1   BY MR. ROBINSON:

 2       Q.  If Mr. Zeleny goes out and protests on the

 3   median strip on Sand Hill Road with unloaded

 4   firearms, is he subject to arrest by the Menlo Park

 5   Police Department?                                      10:59

 6           MR. MASTER:  Objection.  Vague and

 7   ambiguous and overbroad.  Incomplete hypothetical.

 8   Calls for a legal conclusion.

 9           Go ahead.

10           THE WITNESS:  The situation would be          10:59

11   assessed by whatever law enforcement entity was

12   called, whether it was the Menlo Park Police

13   Department, the CHP, the California Highway Patrol,

14   or the San Mateo County Sheriff's Office.  And an

15   assessment would be made, and if there was probable   10:59

16   cause to make an arrest, then an arrest could be

17   made.

18   BY MR. ROBINSON:

19       Q.  If the City of Menlo Park Police

20   Department were called and went to the median strip   11:00

21   on Sand Hill Road that's referenced in your

22   interrogatory response and observed Mr. Zeleny

23   openly carrying an unloaded firearm as part of a

24   protest, would he be subject to arrest?

25       A.  As I stated, any agency -- any police         11:00
```

Page 264

1    agency would be able to assess the situation, and

2    if probable cause was present to make an arrest, an

3    arrest could be made.

4        Q.  The median strip that's referred to in

5    your response to interrogatory No. 1, it's within         11:00

6    the city limits of Menlo Park; correct?

7        A.  That is my understanding.

8        Q.  Let me go ahead and mark as Exhibit 252 --

9            (Plaintiff's Exhibit 252 marked

10           for Identification.)

11   BY MR. ROBINSON:

12       Q.  For the record, Exhibit 252 is a

13   multiple-page document.  It looks like it starts at

14   MP 6656 and carries through to MP 6673; is that

15   correct?                                                  11:01

16       A.  It's still loading up on my computer.

17   Exhibit 252?

18       Q.  Correct.

19       A.  And what were the numbers you said it went

20   from?                                                     11:02

21       Q.  MP 6656 through -- I'm sorry.  Let me

22   start that again.  MP 6656 through MP 6673.

23       A.  Okay.  I have it now.

24       Q.  Do you recognize this?

25       A.  I do not.                                         11:02

Page 265

```
 1    he had committed a crime?

 2        A.  As I've stated, Counselor, we never

 3    arrested him for a crime.

 4        Q.  Did the officers ever report that a crime

 5    had occurred?                                    11:37

 6        A.  No.

 7        Q.  Do you recall the officers reporting on

 8    multiple occasions that no crime had occurred?

 9        A.  I'm not sure they used those words, so I

10    would say no.                                    11:37

11        Q.  Do you recall officers reporting on

12    various occasions that Mr. Zeleny was cooperative?

13        A.  That, I recall, yes.

14        Q.  Was Mr. Zeleny cooperative consistently

15    during his protest until the time that he was    11:37

16    prosecuted?

17        A.  From my understanding, based on what the

18    officers reported, yes.

19        Q.  Let's go ahead and mark another exhibit.

20    So this one has been previously marked.  So I'm  11:38

21    just going to move it to the "Marked Exhibits"

22    folder.

23            Chief Bertini, could you open up in the

24    "Marked Exhibits" folder -- the file name is

25    101004 - Police Report - Cooperation.  It's a    11:38
```

1      A.  I -- not to my recollection.  I know there
          2  were some statements that he made that had the air
          3  of possibly being angry and having -- and making a
          4  threat, but as I sit here today, I can't recall
          5  specifically.                                        11:41
          6      Q.  Can you estimate how many times Mr. Zeleny
          7  protested in Menlo Park, during your tenure there,
          8  with unloaded weapons?
          9      A.  I would estimate approximately 10, 10 to
         10  15.                                                  11:41
         11      Q.  And that was over the course of a couple
         12  of years; right?
         13      A.  Correct.
         14      Q.  During those 10 or 15 protests over the
         15  course of a couple of years, was Mr. Zeleny ever    11:42
         16  violent?
         17      A.  Not that I'm aware of.
         18      Q.  Did he ever threaten anyone during the
         19  protest?
         20      A.  Aside from the statements that I just made   11:42
         21  about some statements that were made in -- either
         22  angry or threatening in some way, no.
         23      Q.  When you refer to statements that were
         24  angry or threatening in some way, what are you
         25  referring to?  What were the statements?            11:42

                                                   Page 293

1      A.  As I sit here today, I don't recall

2   exactly what they were, but I do recall getting

3   information, and I don't remember from whom it was,

4   but there were -- my recollection is that they were

5   posts on some social media site that indicated some     11:42

6   kind of anger and even somewhat of a threatening

7   tone.

8      Q.  Aside from indicating some kind of anger

9   and a threatening tone, do you recall anything else

10  about these statements that Mr. Zeleny made?            11:42

11     A.  Other than what I just said, no.

12     Q.  Did you get the statements from NEA?

13     A.  As I sit here today, I don't recall who I

14  got them from, whether they were from law

15  enforcement, from an outside entity, or from my own     11:43

16  police department.  I don't recall.

17     Q.  You do recall getting some social media

18  content from NEA, correct, about Mr. Zeleny?

19     A.  I believe we did receive some content from

20  NEA regarding the possibility of him coming back to     11:43

21  the site to protest.

22     Q.  You recall NEA conducting public source

23  surveillance on Mr. Zeleny; right?

24     A.  Yes.

25     Q.  And NEA, from time to time, would send you    11:43

Veritext Legal Solutions
866 299-5127

1    committee?

2        A.  It was -- it's a representative from each

3    department in the City.

4        Q.  And how are the representatives selected

5    to serve on that committee?                          02:22

6        A.  By the departments themselves, by the

7    department head or me.

8        Q.  Were you ever on the special events permit

9    committee?

10       A.  As I stated already, I was not on the      02:23

11   committee itself, but I was -- I did give input to

12   the original committee that was putting together

13   the criteria for special events permits.

14       Q.  We talked a lot last time about what

15   qualifies as a special event.  Do you recall that?  02:23

16       A.  I do.

17       Q.  Who makes the decision, in reviewing a

18   permit application, about whether the event is a

19   special event?

20       A.  Normally, it would be the special events  02:23

21   committee.

22       Q.  That's the group of people from each

23   department?

24       A.  Correct.

25       Q.  Who in that group, if anyone, decided that  02:23

```
 1    Mr. Zeleny didn't qualify for special events?

 2         MR. MASTER:  Objection.  Vague and

 3    ambiguous.

 4         MR. ROBINSON:  Let me ask you a different

 5    question.                                    02:23

 6    BY MR. ROBINSON:

 7      Q.  At some point, the City determined that

 8    Mr. Zeleny's permit didn't qualify as a special

 9    event; correct?

10      A.  Correct.                               02:24

11      Q.  Who made that determination for the City?

12      A.  That was the city attorney's office.

13      Q.  How did the city attorney's office get

14    involved in Mr. Zeleny's permit application?

15      A.  Because they are also a City department,  02:24

16    and there were legal questions that needed to be

17    answered and legal advice that needed to be given.

18    So we went to the -- our legal advisors, who are

19    the city attorneys.

20      Q.  Are you aware of any other permit          02:24

21    applications where the city attorney's office has

22    been consulted?

23      A.  I'm aware of a few.

24      Q.  Can you estimate how many?

25      A.  Less than six.                             02:24
```

Veritext Legal Solutions
866 299-5127

```
 1    was done via e-mail.
 2         Q.  Okay.  Do you know if anyone tried to set
 3    up a meeting with Mr. Zeleny to get more
 4    information?
 5         A.  I don't know.                           02:33
 6         Q.  Part of the ordinary process to get more
 7    information is to set up a meeting; right?
 8         A.  According to the flowchart, yes.
 9         Q.  According to the written flowchart,
10    Mr. Milde is supposed to confirm a meeting time    02:33
11    with the applicant to get more information;
12    correct?
13              MR. MASTER:  Objection.  That misstates
14    the document.
15              THE WITNESS:  There's a detailed --      02:34
16    according to this flowchart, there's a detailed
17    review of the application, and it says "Matt Milde
18    confirms the meeting time with the applicant."  The
19    documents speak for itself.
20    BY MR. ROBINSON:                                   02:34
21         Q.  Does the document describe the ordinary
22    process for permit applications in 2015 when
23    Mr. Zeleny applied for a permit?
24              MR. MASTER:  Objection.  Asked and
25    answered.  Argumentative.  Vague and ambiguous.    02:34
```

Veritext Legal Solutions
866 299-5127

1    e-mail?

2        A.   Correct.

3        Q.   Did the special events permitting team

4    meet with Mr. Zeleny under any of those mechanisms,

5    to your knowledge?                                02:36

6        A.   Yes.  There was numerous exchanges of

7    e-mails with Mr. Zeleny, requesting more

8    information, by both the community services

9    department and the city attorney's office.

10       Q.   Did the other city departments that are    02:37

11   part of the special events permit team participate

12   in this?

13       A.   Not that I'm aware of.

14       Q.   Are you aware of any phone calls with

15   Mr. Zeleny, prior to the initial denial of this    02:37

16   permit, about the permit?

17       A.   I don't know -- I don't know of any phone

18   calls.

19       Q.   And are you aware of any attempts to

20   arrange phone calls or in-person meetings with     02:37

21   Mr. Zeleny before the denial of his permit?

22       A.   Based on the fact that he was in Southern

23   California, no.

24       Q.   Is -- okay.  Do you know if anyone at the

25   City of Menlo Park asked Mr. Zeleny if he'd like to  02:37

                                           Page 381

```
 1        A.  They basically said it would have to be a

 2   case-by-case basis, and if a case was submitted to

 3   them, they would review it.

 4        Q.  Did they tell you that in their opinion,

 5   it wasn't illegal, in all likelihood?                    03:00

 6        A.  I don't -- I don't recall exactly what

 7   they said.

 8        Q.  Did they say words to the effect -- say or

 9   write words to the effect that their view was that

10   it was probably not illegal?                             03:00

11        A.  I don't recall that.

12        Q.  I'm going to go ahead and mark the next in

13   order.

14             (Reporter clarification.)

15             (Plaintiff's Exhibit 263 marked

16             for Identification.)

17   BY MR. ROBINSON:

18        Q.  I've marked Exhibit 263.  It's a

19   multiple-page document, MP 296 through MP 300;

20   correct?                                                 03:01

21        A.  Correct.

22        Q.  This is from Al Serrato to you and others;

23   right?

24        A.  Yes.

25        Q.  It appears to be a response to your e-mail    03:01
```

Page 399

```
 1        Q.  Did you participate in selecting the
 2   materials to include with this agenda?
 3        A.  Yes.
 4        Q.  Did you select the materials to include?
 5        A.  Yes.                                    03:17
 6        Q.  One of the materials that you included was
 7   Mr. Zeleny's permit application; correct?
 8        A.  Correct.
 9        Q.  Let me step back a second.  This was the
10   meeting with NEA, the Rosewood Hotel and various    03:17
11   other stakeholders relating to Mr. Zeleny's
12   protests; right?
13        A.  There was numerous entities, including
14   Stanford, one of the other venture capitalist
15   companies in that complex and all the law           03:18
16   enforcement stakeholders.
17        Q.  And the participants in the meeting also
18   included NEA and the Rosewood Hotel; right?
19        A.  Correct.
20        Q.  At the time that you had this meeting with  03:18
21   those various stakeholders, was Mr. Zeleny's permit
22   application still pending?
23        A.  I don't recall exactly when the denial
24   letter went out, so I don't recall as I sit here
25   today.                                              03:18
```

Page 406

1    Q.  So let's go down to page 5331.  It looks
2    like an image from a website; is that right?
3    A.  I couldn't tell you where the image is
4    from, but it is an image, yes.
5    Q.  It's the same image that you were asking    03:19
6    the DA's office about?
7    A.  Yes.
8    Q.  Why did you include this image in the
9    materials for the meeting about Mr. Zeleny?
10   A.  Because that was what he intended to         03:19
11   display on the 55-inch display that he listed in
12   the application.
13   Q.  How do you know that?
14   A.  He told us.
15   Q.  In substance, what was discussed at the      03:19
16   meeting on September 2nd, 2015 relating to
17   Mr. Zeleny?
18   A.  To the best of my recollection, as I sit
19   here today, since this was five years ago, I know
20   the agenda was set to talk a little bit about     03:20
21   Mr. Zeleny's history of not only protests in Menlo
22   Park but protests around the area, both in Palo
23   Alto, Portola Valley, Menlo Park, even
24   San Francisco prior, and to discuss the application
25   for the special event and a response plan, if     03:20

Veritext Legal Solutions
866 299-5127

1    A.  To the best of my recollection, I believe
2  there was, from Mr. Milde.
3    Q.  Do you know whether the application was
4  ever formally submitted to the permit committee for
5  approval or denial?                                03:22
6    A.  I don't know.
7    Q.  Do you know if any of the other -- or any
8  of the departments filled out the approval section
9  of Mr. Zeleny's permit application?
10    A.  Not that I'm aware of.                       03:22
11    Q.  Do you know if conditions of
12  approval or a denial letter was ever sent to
13  Mr. Zeleny?
14    A.  Yes.
15    Q.  He received a denial letter; right?         03:22
16    A.  Well, he received more than just a denial
17  letter.  I know there was e-mail exchanges with the
18  city attorney's office requesting further
19  information, and eventually a denial letter was
20  sent, that's correct.                              03:22
21    Q.  Stepping back for a second, we talked
22  about the various forms of meetings that could be
23  conducted with the applicant to get more
24  information about an application.  What is the
25  typical way that the meeting with the applicant     03:23

Veritext Legal Solutions
866 299-5127

```
1            THE WITNESS:  I don't know.

2    BY MR. ROBINSON:

3        Q.  Well, are you personally aware of that?

4        A.  I don't know whether there were other

5    e-mails or not.  You'd have to produce them for me    03:27

6    to be able to recall.

7        Q.  As you sit here, you can't recall any

8    others.  Is that accurate?

9        A.  That's correct.

10       Q.  If we go up to the first page of this and    03:27

11   then carrying over to the second, Mr. Zeleny

12   responds to Mr. McClure's questions; correct?

13       A.  I see there was some response to the

14   questions, yes.

15       Q.  Was the response to the questions          03:28

16   insufficient in some way?

17           MR. MASTER:  Objection.  Vague and

18   ambiguous.  Overbroad.  Compound.

19           THE WITNESS:  They -- that was not --

20   these answers did not come to me.  They came to the   03:28

21   city attorney.  You would have to ask the city

22   attorney.

23   BY MR. ROBINSON:

24       Q.  As the designated witness for the City of

25   Menlo Park, were Mr. Zeleny's responses to           03:28
```

Veritext Legal Solutions
866 299-5127

1   questions incomplete?

2          MR. MASTER:   Same objection.

3          THE WITNESS:   I can't answer that.   I

4   don't know.

5   BY MR. ROBINSON:                                    03:28

6      Q.   Do you know if Mr. McClure followed up in

7   any way for more information?

8      A.   I don't recall, as I sit here today.

9      Q.   Do you know if anyone else within the City

10  of Menlo Park followed up with Mr. Zeleny for more   03:28

11  information?

12     A.   I can't recall, as I sit here today.

13     Q.   In the very top e-mail in the exchange

14  that was copied to you, Mr. Zeleny refers to a

15  willingness to discuss time, place and manner        03:29

16  aspects of his performance.

17          Do you see that?

18     A.   I do.

19     Q.   Do you know if the City of Menlo Park ever

20  suggested any time, place or manner requirements     03:29

21  that would result in the approval of Mr. Zeleny's

22  application?

23     A.   I believe that the letter from the city

24  attorney's office was asking very specific

25  questions that needed to be answered, and if they    03:29

Page 414

```
 1   reasons why the permit was originally denied.

 2        Q.  So let's turn back to Exhibit 102.

 3        A.  What is that?

 4        Q.  It's the -- the -- let's see.  The file

 5   name is 150924, Bertini Update to NEA.              03:42

 6        A.  Okay.

 7        Q.  The denial letter is attached here; right?

 8        A.  Correct.

 9        Q.  And the issue that you're referring to are

10   the issues that are set out in the second paragraph  03:42

11   of this letter; correct?

12        A.  Correct.  Those are some of the issues,

13   but -- those are some of the issues but -- yeah.

14   The next two paragraphs also deal with more issues

15   besides that one paragraph.                          03:42

16        Q.  So I'm just referring to the incomplete

17   information.  With respect to this denial letter,

18   the incomplete information, what additional

19   information could Mr. Zeleny have provided about

20   the specific location that would have resulted in    03:43

21   the granting of his application?

22        A.  The only way I can answer that is reading

23   verbatim the letter that's in front of me.  I can

24   do that for you, Counselor, if you'd like.

25        Q.  No.  I'd like your view as the person most  03:43
```

```
 1    qualified on behalf of the City of Menlo Park.

 2    What information did you want from Mr. Zeleny so

 3    that you would grant his application?

 4            MR. MASTER:  Objection.  Asked and

 5    answered.  Argumentative.  The document speaks for      03:43

 6    itself.

 7            If you have something above and beyond

 8    that, you can answer.

 9            THE WITNESS:  Aside from what the document

10    says, I have no other information.                      03:43

11    BY MR. ROBINSON:

12        Q.  Is any of the information requested in

13    this paragraph in any of the -- required by any of

14    the written policies of the City of Menlo Park?

15        A.  Yes.                                            03:43

16        Q.  Which information is required by the

17    written policies of the City of Menlo Park?

18        A.  Sound and lighting equipment, location of

19    the event, exact location of the proposed event,

20    how the setup will be, to analyze traffic control.      03:44

21    Other conditions necessary for the approval are the

22    hours and length of the event.  The tent --

23    location of tent, generator, video presentations,

24    portable restroom, temporary lighting, sound

25    system, et cetera, and the fact that there is no        03:44
```

1    Q.  More than five?

2    A.  I don't know.

3    Q.  Let's focus on the second paragraph, the

4  second substantive paragraph of the letter here.

5  The second two -- the last two sentences -- there's      03:46

6  a paragraph starting at 352 at the bottom, carrying

7  over to 353.

8        Mr. McClure writes:  "To the contrary, you

9  are proposing a 'media production' of a one-man

10 protest."                                                03:47

11        Do you see that?

12   A.  Yes.

13   Q.  Is there any written policy or guideline

14 or criteria at the City of Menlo Park that a media

15 production of a one-man protest does not qualify as      03:47

16 a special event?

17   A.  I'm not aware of any.

18   Q.  In granting or denying special event

19 permits, is the City allowed to consider factors

20 outside of the specific written policy?                  03:47

21   A.  Time, manner, place.

22   Q.  Is it permitted to consider time, manner

23 and place requirements outside of the written

24 policy?

25   A.  Yes.                                               03:47

                                           Page 426

```
 1    referring to it as 103.

 2              MR. MASTER:  Damion, just for clarity, can

 3    we either remove 267 or -- it's ridiculous to have

 4    two.

 5              MR. ROBINSON:  Well, we can't remove it.        04:22

 6    Veritext has to remove it.

 7              MR. MASTER:  So can we remove 267 and just

 8    call it 103, since you're referring to it as 103?

 9              MR. ROBINSON:  Yes, I'm referring to it as

10    103.  So let's refer to it as 103.                       04:22

11              MR. MASTER:  Okay.

12              THE WITNESS:  Okay.

13    BY MR. ROBINSON:

14         Q.   So in this response to the denial of his

15    permit and his appeal, Mr. Zeleny asked the City of      04:22

16    Menlo Park, If you have any specific requests in

17    this regard, meaning in terms of time, place or

18    manner, please make them with no further ado.

19         Do you see that?

20         A.   No.  Direct me to where that is.               04:23

21         Q.   It's in the third paragraph, the one that

22    starts out:  "As to your claim that my application

23    is incomplete."

24         A.   Okay.  I see it.

25         Q.   Do you know if the City did that, provided     04:23
```

Page 447

1    specific requests to Mr. Zeleny as to the time,

2    place or manner?

3        A.   I do not believe that the City made

4    specific time, place, manner suggestions to

5    Mr. Zeleny, but I know there was an invitation to        04:23

6    discuss those issues.

7        Q.   Okay.  I'm going to go ahead and mark --

8    I'm going to introduce what was previously marked

9    as Exhibit 105.  It should pop up with the file

10   name 160504, Appeal Denial.                             04:24

11       A.   Okay.

12       Q.   Do you recognize this document?

13       A.   I recognize it as a letter.

14       Q.   A letter that was part of the

15   administrative record of Mr. Zeleny's permit            04:24

16   application and appeal?

17       A.   Yes.

18       Q.   Is it consistent with your recollection

19   that the City treated Mr. Zeleny's appeal as a new

20   permit application?                                     04:25

21       A.   I don't understand what you're asking.

22           MR. MASTER:  Read the document.

23           THE WITNESS:  Okay.  Let me read the

24   document.

25           MR. ROBINSON:  Okay.                            04:25

```
 1            THE WITNESS:  Yes.  In reading the
 2    document, the answer is yes.  The city attorney's
 3    office was treating his appeal as a new
 4    application, as there were several modifications
 5    that he made to that application.              04:26
 6    BY MR. ROBINSON:
 7        Q.  And the new application was denied through
 8    this letter; correct?
 9        A.  Correct.
10        Q.  Do you know if anyone, other than the city   04:26
11    attorney's office, was involved in making the
12    decision to deny the renewed application or the new
13    application?
14        A.  Yes.  The city attorney's office, and I
15    spoke to the city attorney, and it is my          04:27
16    recollection that Matt Milde also spoke to the city
17    attorney.
18        Q.  What did you tell the city attorney?
19            MR. MASTER:  Objection.  Don't answer
20    that.  That's attorney-client-privileged          04:27
21    communication.
22    BY MR. ROBINSON:
23        Q.  Are you going to follow your attorney's
24    instruction not to answer?
25        A.  Yes.                                      04:27
```

Page 449

1       Q.  Does the city attorney have authority to
2   approve or deny permit applications?
3       A.  Certainly.
4       Q.  Did you believe that Mr. Zeleny's renewed
5   permit application should be denied?                    04:27
6       A.  My -- my belief was that the concern --
7   I'm sorry.  Was there something else?
8       Q.  No.
9       A.  My belief was that the concern that we had
10  originally regarding the time, place, manner of        04:28
11  this permitted special event was still a concern as
12  far as location, still the confusion regarding the
13  exception to the open carry, the traffic -- the
14  traffic issues, the public safety issues both for
15  Mr. Zeleny, himself, and for the public at large.      04:28
16          So all those -- all those were still
17  concerns of the police department that I, in fact,
18  did let the city attorney know.
19      Q.  Do you know if Mr. Milde had a view about
20  whether this -- what was treated as a renewed          04:28
21  application should be denied?
22      A.  I don't know the answer to that.
23      Q.  Did you talk to Mr. Milde about it?
24      A.  Not about this second application, no.
25      Q.  Did the city attorney make the ultimate       04:29

Veritext Legal Solutions
866 299-5127

```
 1    decision about whether to deny this application?
 2           MR. MASTER:  Objection.  Vague and
 3    ambiguous.  Overbroad.
 4           Go ahead.
 5           THE WITNESS:  Yes.  I believe the document    04:29
 6    speaks for itself.  That is the city attorney
 7    making that determination.
 8  BY MR. ROBINSON:
 9      Q.  Is there any policy or procedure that
10    you're aware of, a written policy or procedure,       04:29
11    that gives the city attorney's office authority to
12    grant or deny special event permit applications?
13      A.  As counsel -- legal counsel for the City,
14    it is within their purview to deny an application
15    of this nature.  I'm not sure whether it's written   04:29
16    anywhere, but they are legal counsel for the City.
17      Q.  And what gives you the impression that the
18    legal counsel for the City in that capacity has
19    authority to deny permit applications?
20           MR. MASTER:  Again, the question is vague,     04:30
21    ambiguous and overbroad.  Calls for a legal
22    conclusion and speculation.
23           Go ahead.
24           THE WITNESS:  The city attorney's office
25    is the department that is our legal advisors.  In    04:30
```

Page 451

```
 1   some cases, the city attorney's office becomes
 2   involved in city business or issues, and they have
 3   the authority to make decisions.  They work -- the
 4   city attorney's office works directly for the city
 5   council.                                              04:30
 6   BY MR. ROBINSON:
 7        Q.  Are you aware of any other permit
 8   application that was denied by the city attorney's
 9   office, for a special event permit?
10        A.  I'm not aware of any, no.                    04:30
11        Q.  Do you know if, before denying this --
12   what was considered a revised application, the city
13   attorney attempted to contact Mr. Zeleny to address
14   some of the issues raised here, any of the issues
15   raised here?                                          04:31
16        A.  I don't -- as I sit here today, I don't
17   have a recollection of that, whether they did or
18   not.
19        Q.  Between Mr. Zeleny filing his notice of
20   appeal or e-mailing his notice of appeal and the     04:31
21   city attorney deciding to deny it, do you know if
22   anyone at the City contacted Mr. Zeleny to try to
23   get more information about his permit application?
24        A.  I don't know.  I don't have a recollection
25   of that.                                              04:31
```

Page 452

```
 1    participate.  That's the issue.

 2         Q.  Does the event have to be open to anyone

 3    who shows up?

 4         A.  For a public event, yes.

 5         Q.  For a special event.                         04:35

 6         A.  For a special event, it has to be for the

 7    community if, in fact, it is impacting other

 8    community members.  Now, obviously, if somebody

 9    wants to -- as a hypothetical, if somebody wanted

10    to rent a park for a wedding, that doesn't          04:35

11    necessarily mean that everybody in the community is

12    invited, but, of course, they could go watch if

13    they wanted to.  You can't stop them from doing

14    that.  But it is -- that would be more of a limited

15    impact on the community, if they're at a park, as   04:36

16    opposed to closing down streets, et cetera.

17         Q.  Would that qualify as a special event?

18         A.  A wedding?

19         Q.  Right.

20         A.  It certainly would, yes.                    04:36

21         Q.  What about a block party; if a community

22    wanted to have a block party, that would be a

23    special event; right?

24         A.  As long as all the members on that -- all

25    the residents on that block signed an agreement,    04:36
```

Page 456

```
1        Q.  Do you recognize this exhibit?

2        A.  I'm sorry.  Do I recognize the document?

3        Q.  Correct.

4        A.  Yes.  It's a letter.

5        Q.  Mr. McIntyre's letter denying Mr. Zeleny's    04:53

6   appeal; correct?

7        A.  Correct.

8        Q.  Mr. McIntyre lists grounds for denial of

9   the appeal, starting on page 3 and carrying over to

10  page 4.  Do you see that?                            04:53

11       A.  Yes.

12       Q.  Do any of those grounds appear in the

13  written policies of the City of Menlo Park

14  governing permit approval or denial?

15           MR. MASTER:  Vague and ambiguous and        04:54

16  overbroad.

17           THE WITNESS:  Most of these points have to

18  do with Penal Code violations and/or Vehicle Code

19  violations.  So, no, they would not be in the FAQs

20  of the special events permit process, as you're     04:54

21  required to follow the law.

22  BY MR. ROBINSON:

23       Q.  One of the uses that we talked about

24  before of special event permits are for block

25  parties; is that right?                             04:54
```

```
 1        A.  Correct.

 2        Q.  In connection with block parties, people

 3   are allowed to block off a certain portion of a

 4   street to have the block party?

 5        A.  That's correct.                          04:54

 6        Q.  They're allowed to have the block party

 7   actually in the street?

 8        A.  The Vehicle Code allows a local

 9   municipality to block off portions of a street.

10   And the answer is yes.                            04:55

11        Q.  And in connection with special event

12   permit applications for block parties, residents

13   are allowed to block off the street and have the

14   party in the street; correct?

15        A.  That's correct.                          04:55

16        Q.  And that's true, even though the event

17   would interfere with the right-of-way; correct?

18        A.  As long as the entire block signed a

19   release saying they were okay with the block party,

20   yes.                                              04:55

21        Q.  Let's look at page -- starting on 950 and

22   carrying over to 951.  There are practical aspects

23   and public safety concerns.  One is the lighting at

24   night.

25            Do you see that?                         04:55
```

Page 468

1          A.   I do.

2          Q.   Is the lighting at night contemplated by

3     the City's written policy as to special events

4     permits?

5          A.   No.  By the Vehicle Code.                04:55

6          Q.   The next sentence says, "City medians are

7     not traditional public forum areas and are

8     inappropriate and unsafe."

9               Is that written into the City's policies

10    anywhere?                                          04:56

11         A.   That is common sense.

12         Q.   Okay.  Is it written into the City's

13    policies anywhere?

14         A.   No.

15         Q.   Whose decision is it about whether the    04:56

16    location of an event is a traditional public-forum

17    area?

18         A.   Again, it would be based on

19    transportation, the Department of Public Works, the

20    Vehicle Code and then, again, going back to what I   04:56

21    just said, common sense.  There are some places

22    that are probably not safe to be having a group of

23    people congregate on, including a median of a

24    well-traveled, high-speed road.

25         Q.   I'm going to mark as Exhibit --           04:57

Veritext Legal Solutions
866 299-5127

```
 1      Q.  It's an e-mail from you to, it looks like,
 2  Jelena Herada and Clay Curtin; correct?
 3      A.  Jelena Herada and Clay Curtin, that's
 4  correct.  They are both employed by the City.
 5      Q.  Attached to the e-mail is a PowerPoint        05:00
 6  presentation.  Do you see that?
 7      A.  I do.
 8      Q.  We couldn't hear your answer.
 9      A.  I do see the PowerPoint.
10      Q.  Is this the PowerPoint that you presented      05:01
11  at the hearing on Mr. Zeleny's permit appeal?
12      A.  Yes.
13      Q.  Did you put this PowerPoint together?
14      A.  I did.
15      Q.  Did you make the decision to include on       05:01
16  page 1199 the same image that we've discussed
17  earlier?
18      A.  Yes.
19      Q.  Did you think that it was relevant to the
20  city council's decision, to consider that image?      05:01
21      A.  Yes.  This is what Mr. Zeleny said himself
22  he'd be displaying.  So, yes, it was relevant.
23      Q.  At the hearing, it was suggested that this
24  image might be deemed obscene to minors; is that
25  right?                                                05:01
```

Page 472

1     A. I brought up the same concern I had that I

2    brought up during the city manager's hearing, in

3    that if there was a victim, a complaining victim,

4    that the Penal Code section that I discussed with

5    the DA could have been violated. And, yes, there    05:02

6    was an issue with that.

7     Q. In your mind, as a representative of City

8    staff, was that a reason to deny the application?

9     A. Not -- not in and of itself, no, but it

10   was part of the entire record, that it was    05:02

11   important for the city council to have all the

12   facts.

13    Q. As part of the entire record, was it your

14   view that the image that Mr. Zeleny proposed to

15   display supported denial of the application?    05:02

16    A. I believed it was part of the entire

17   record, and they had the final, ultimate decision

18   on whether to uphold or overturn the appeal. And

19   this was part of the record, so that was put into

20   the PowerPoint.    05:02

21    Q. When you were at the hearing, did you

22   argue that the image that Mr. Zeleny was using was

23   an additional basis to uphold the denial of the

24   appeal?

25    A. Not that I -- as I sit here today, I don't    05:03

```
 1    recall myself saying that it was a specific reason

 2    to deny.  What I believe I said was it was of

 3    concern, also.

 4         Q.  So the PowerPoint presentation that you

 5    put together does not contain the entire record of    05:03

 6    Mr. Zeleny's application and appeal; does it?

 7         A.  Not the entire record, no.  It gives

 8    bullet points as to some of the timing and the

 9    relevant, salient points in our -- basically, our

10    case to the city council.                              05:03

11         Q.  The image that Mr. Zeleny was displaying

12    was one of your salient points to the city council;

13    correct?

14         MR. MASTER:  Objection.  Vague and

15    ambiguous.  Overbroad.                                 05:03

16         Go ahead.

17         THE WITNESS:  That was the image that he,

18    himself, provided that was going to be displayed,

19    along with an image of a gun that he, himself,

20    provided that was going to be displayed.  So, yes,     05:04

21    they were salient because they came from the

22    applicant himself.

23    BY MR. ROBINSON:

24         Q.  In the appeal to the city council, you are

25    arguing in favor of upholding the denial of the        05:04
```

permit; right?

A. That's correct.

Q. Your position, on behalf of the City staff, was that the city council should uphold the denial of the permit; true?          05:04

A. That was my argument, yes.

Q. And you put together this presentation in order to support your argument the city council should deny -- should uphold the denial of the permit; right?          05:04

A. Well, that was part of it. Part of it was also to educate them as to the entire history of this situation, with bullet points describing each step that was taken, what was being contemplated in the special event, et cetera. So it was both          05:04
informational and also put together to bolster my -- our case to the city council.

Q. Was it your intention, at the time that you put this presentation together, to include the image to assist you in convincing the city council          05:05
to uphold the denial of Mr. Zeleny's permit?

A. As I've already stated, the images that were in the PowerPoint were provided by Mr. Zeleny himself. So they were put in because they were provided by Mr. Zeleny as an example of what he          05:05

1    intended to do.  That is information that the city

2    council, in my opinion, needed to have, provided by

3    the applicant himself.

4        Q.  Some of the information that the city

5    council needed to have, in your view, was this        05:05

6    image that Mr. Zeleny proposed to display; is that

7    fair?

8            MR. MASTER:  Asked and answered.  You're

9    asking the same question over and over again.

10           One more time.                                05:06

11           THE WITNESS:  Both images were provided by

12   Mr. Zeleny as to what he would plan to display as

13   part of his, quote, unquote, special event, and

14   that was important, salient information that the

15   city council should know.                             05:06

16   BY MR. ROBINSON:

17       Q.  Did you include the photo of the gun for

18   the same reason?

19       A.  I did just say that, Counsel; I did.  I

20   said both photos.                                     05:06

21           MR. MASTER:  We've been going for an hour.

22   Let's take a couple of minutes.

23           And then how much time do we have left?

24           MR. ROBINSON:  We can take a couple of

25   minutes.  We're -- there's a fair amount of           05:06

1   marked exhibit into the exhibit folder.  And the

2   file name is Film Permit Guidelines, previously

3   marked as Exhibit 35.

4           Let me ask you a couple of background

5   questions.                                          05:20

6           At some point, Mr. Zeleny, after the city

7   council denied the special events permit, he asked

8   that it be reconsidered as a film permit; correct?

9       A.  Yes.  I believe that suggestion came from

10  the city attorney's office.                         05:20

11      Q.  And Mr. Zeleny then commenced the process

12  of applying for a film permit instead of a special

13  events permit; right?

14      A.  Correct.

15      Q.  So please take a look at the exhibit I      05:20

16  mentioned, the Film Permit Guidelines, previously

17  marked as Exhibit 35.

18      A.  I see it.

19      Q.  It's a two-page document, MP 5241 and

20  5242; is that correct?                              05:21

21      A.  Correct.

22      Q.  Are these the City's written guidelines

23  for issuing film permits?

24      A.  Yes.

25      Q.  Aside from this document and the contents   05:21

```
 1   of the actual film permit application itself, are
 2   there any other written policies, procedures or
 3   guidelines in the City of Menlo Park about issuing
 4   film permits?
 5       A.  No.                                      05:21
 6       Q.  Were there any written guidelines at the
 7   time that Mr. Zeleny applied, other than this
 8   document and the contents of the application
 9   itself?
10       A.  Well, it also speaks about having to get a   05:21
11   one-day business permit, too.
12       Q.  So let's leave that aside.  Aside from the
13   one-day business permit requirement, the total of
14   the written policies of the City of Menlo Park
15   concerning film production permits at the -- go    05:21
16   ahead.
17       A.  I didn't say anything.
18       Q.  There was feedback, I guess.
19           At the time Mr. Zeleny applied for a film
20   permit, leaving aside the business license issue,   05:22
21   this document that we're looking at, Exhibit 35,
22   and the permit application itself contained all of
23   the written policies of the City of Menlo Park;
24   correct?
25       A.  Correct.                                  05:22
```

Page 482

1      Q.  Were there any unwritten policies at that
 2  time?
 3      A.  There are no unwritten policies, but,
 4  again, just like the special event permit, laws are
 5  still applicable, whether they be local, state or        05:22
 6  federal.
 7      Q.  In the ordinary course of processing film
 8  permit applications, who makes the decision -- the
 9  initial decision of whether to grant or deny?
10      A.  That is through the public works            05:22
11  department.
12      Q.  Is there a particular -- at the time
13  Mr. Zeleny applied, was there a particular person
14  in public works who made that decision?
15      A.  There was somebody assigned to that role,   05:23
16  and that was Ivan Toews, or Toews.  I'm not sure
17  how you pronounce it.
18      Q.  What criteria -- at the time that
19  Mr. Zeleny applied for a film permit, what criteria
20  did the City consider in whether to grant or deny a    05:23
21  film permit?
22      A.  The criteria that you see on the document
23  that we're discussing right now.
24      Q.  What criteria are you referring to on the
25  document?                                              05:23

```
 1        A.   Nos. 1 through 10.

 2        Q.   So let's start with No. 1.   No. 1 requires

 3   the permit team to submit in writing all pertinent

 4   details.   Do you see that?

 5        A.  I do.                                    05:24

 6        Q.   Let me ask you a different way.

 7             If the person seeking a permit complies

 8   with all of these requirements, is the City

 9   required to grant a permit?

10             MR. MASTER:  Vague and ambiguous.        05:24

11   Overbroad.   It's an incomplete hypothetical and

12   calls for speculation.

13             Go ahead.

14             THE WITNESS:  No, I don't think the

15   City -- to my knowledge, the City is not required   05:24

16   to issue any permit.

17   BY MR. ROBINSON:

18        Q.  So if a person seeking a permit complies

19   with all of the requirements listed in this

20   document, how does the City decide whether or not   05:24

21   to grant the permit?

22             MR. MASTER:  Vague and ambiguous as to the

23   term "requirements."

24             Go ahead.

25             THE WITNESS:   These are the general       05:24
```

1   guidelines for a film permit in the City of Menlo

 2   Park.  Other guidelines would include applicable

 3   laws that would be in place, depending on what is

 4   being contemplated, and eventually the City would

 5   come to a conclusion on whether to issue a permit          05:25

 6   or not.

 7   BY MR. ROBINSON:

 8       Q.  What would the City consider in coming to

 9   a conclusion about whether they issue the permit or

10   not?                                                      05:25

11       A.  I don't understand your question.  What

12   does the City consider?

13       Q.  Right.  What does the City consider in

14   deciding whether to issue a permit?  What factors

15   does it consider?                                         05:25

16       A.  Well, just like the special events permit,

17   time, manner, place, and all the criteria you see

18   in the document that we're discussing right now are

19   things the City would consider, along with other --

20   other factors having to do with, again, traffic,         05:26

21   public safety, the impact on residents who may be

22   living near the area of the filming.  So there are

23   criteria that the City would have to look for.

24       Q.  So the criteria you mentioned, one is

25   traffic; right?                                           05:26

                                           Page 485

1     A.  Yes.

2     Q.  How did the City determine whether a

3 proposed film production has a sufficient impact on

4 traffic to require denial?

5          MR. MASTER:  Objection.  Hold on.  Vague          05:26

6 and ambiguous and overbroad.  Incomplete

7 hypothetical.  Lacks foundation.

8          Go ahead.

9          THE WITNESS:  I don't understand that

10 question.                                                 05:26

11 BY MR. ROBINSON:

12     Q.  Traffic impact is one of the things the

13 City considers; right?

14     A.  Yes.

15     Q.  Is there any particular level of traffic          05:26

16 impact that would cause a permit to be denied?

17     A.  There is -- it would be impossible to say

18 there's a level of traffic impact because I don't

19 even know what that means.

20     Q.  Is there a certain type of traffic impact          05:27

21 that would cause a permit to be denied?

22     A.  Every situation would be different.  If

23 someone wanted to close a major arterial for weeks

24 on end to film a movie where there was not a very

25 easy detour around that location, that would be          05:27

1    problematic.  So it would be a case-by-case basis.

2        Q.  One of the things that you mentioned was

3    public safety; right?

4        A.  Correct.

5        Q.  Are there any public safety criteria that    05:27

6    would be applied to a film permit application, any

7    specific criteria?

8        A.  Section 4.

9        Q.  You mean the noise ordinance?

10       A.  There's noise, explosions, pyrotechnics,      05:27

11   things of that nature.

12       Q.  Other than the criteria listed in point 4

13   of Exhibit 35, are there any other public safety

14   considerations that go into whether a permit

15   application for a film permit will be granted or      05:28

16   denied?

17           MR. MASTER:  I'll object to the question

18   as vague, ambiguous and overbroad.

19           Go ahead.

20           THE WITNESS:  And then point No. 3 on the     05:28

21   same document.

22   BY MR. ROBINSON:

23       Q.  So compliance with -- well, let's start

24   with this.  On point No. 3, it refers to guidance

25   of City supervisory employees pertaining to the use   05:28

1  of city property.

2       Do you see that?

3    A.  Yes.

4    Q.  Is the guidance of City supervisory

5  employees pertaining to the use of city property        05:28

6  published somewhere?

7    A.  I don't quite understand what you're

8  talking about.  The guidance of City supervisory

9  employees.  In other words, the person who is

10 having the film needs to obey the guidance of the        05:29

11 City supervisory employee that would be on the

12 scene.

13      Q.  So the guidance is given on a case-by-case

14 basis?

15      A.  Correct.                                        05:29

16      Q.  Is the guidance in the discretion of the

17 city supervisory employee?

18      A.  Yes.

19      Q.  So other than what's listed in points 3

20 and 4 on Exhibit 35, are there any other public          05:29

21 safety considerations that go into the granting or

22 denial of a film permit?

23      A.  And point No. 1 in the same document.

24      Q.  Okay.  Other than point No. 1, 3 and 4,

25 are there any other public safety considerations?        05:29

```
 1      A.  Five.

 2      Q.  Okay.  So under point 5, the City -- the

 3   permittee shall make arrangements for traffic

 4   controls satisfactory to Menlo Park Police

 5   Department.                                   05:30

 6          Is that what you're referring to?

 7      A.  I am.

 8      Q.  Are there any set criteria, definite

 9   criteria, for the arrangements satisfactory for

10   Menlo Park Police Department?                 05:30

11      A.  That would be on a case-by-case basis.  It

12   would depend on what kind of closures they're

13   anticipating.

14      Q.  So we've covered 1, 3, 4 and 5.

15          Why don't we do this:  Are there any   05:30

16   public safety criteria considered in connection

17   with film permit applications that are not listed

18   on this document that we're looking at?

19      A.  Only those dealing with other laws that

20   might be applicable, either local, state or    05:30

21   federal.

22      Q.  Other than state, federal or local laws

23   and the points listed on this Exhibit 35, are there

24   any other public safety criteria that go into a

25   film permit application?                       05:31
```

Page 489

```
 1        A.  I believe that about covers it.

 2        Q.  In some instances, the City will impose

 3   conditions on the permit; right?

 4        A.  The film permit?

 5        Q.  Correct.                                    05:31

 6        A.  Yes.

 7        Q.  How does the City come up with the

 8   conditions to impose on film permits?

 9        A.  It depends on what the permit seeker is

10   contemplating doing.  It's case by case.           05:32

11        Q.  Is there an appeals process for film

12   permit decisions?

13        A.  The -- to the best of my recollection, the

14   appeal process is similar to the special events.

15   That goes through the department director to the   05:32

16   city manager to the city council.

17        Q.  So I'm going to introduce what we've

18   previously marked as Exhibit 74.  It may show up at

19   the bottom.  The file name is Film Permit -

20   Billions, 74.                                       05:33

21        A.  Okay.

22        Q.  It's, for the record, MP 1768 through --

23   it's a 12-page document, starting on MP 1768;

24   correct?

25        A.  MP 1779.  Yes.                             05:34
```

Page 490

```
 1      A.  Okay.

 2      Q.  For the record, 73 is MP 1772 through

 3   1728; correct?

 4      A.  Yes.

 5      Q.  This is also a film permit that was issued    05:40

 6   by the City of Menlo Park; correct?

 7      A.  Yes.

 8      Q.  And it also contemplates filming on Sand

 9   Hill Road in Menlo Park?

10      A.  Yes.                                           05:40

11      Q.  If you go to 1726, under the "Activities"

12   section, it refers to -- it says, If possible, we'd

13   like to potentially place a camera on the median,

14   if you're okay with it.

15          Do you see that?                               05:41

16      A.  Yes.

17      Q.  Do you know if this group was given

18   permission to place a camera on the median?

19      A.  I don't know.

20      Q.  Does the City have a set time frame for        05:41

21   approval or denial of film permits?

22      A.  Not that I'm aware of.

23      Q.  Is film permitting also a discretionary

24   decision by the City staff?

25      A.  Yes.                                           05:41
```

Page 495

1      Q.  Do the factors that City staff takes into

2  account depend on the specific filming being

3  contemplated?

4      A.  Yes.

5      Q.  Is there any list of specific requirements      05:41

6  that are -- other than the documents previously

7  looked at and the film permit application itself,

8  is there any list of criteria published anywhere

9  that need to be satisfied before a film permit is

10  issued?                                                  05:42

11          MR. MASTER:  Objection.  Asked and

12  answered at least a half a dozen times.

13          One more time.

14          THE WITNESS:  As I stated before, the list

15  is the document that you showed me, the            05:42

16  application, and then any applicable local, state,

17  federal laws.  Aside from all that, there's no

18  other listed criteria.

19  BY MR. ROBINSON:

20      Q.  So I've uploaded a document previously      05:42

21  marked as Exhibit 65.  The file name is 170920,

22  Bertini Re Filming.

23          MR. MASTER:  What was that, again?

24          MR. ROBINSON:  170920.

25          THE WITNESS:  I recognize the e-mail.      05:43

BY MR. ROBINSON:

Q. For the record, it's MP 1125, one page; correct?

A. Correct.

Q. And starting about a third of the way down 05:43 the page, there's an e-mail from you, dated September 12th, 2017?

A. Correct.

Q. You are e-mailing various people within the City of Menlo Park about Mr. Zeleny's film 05:43 permit application; right?

A. Correct.

Q. And who is Arlinda Heineck?

A. She was the community development director at the time. 05:44

Q. Were you ever able to speak with Mr. Toews about Mr. Zeleny's permit application?

A. Yes, eventually. During this time, I was out on -- I had shoulder surgery. So a few weeks later when I came back to work is when I believe I 05:44 spoke to him.

Q. What did you talk about?

A. The film permit process.

Q. Did you talk to him about Mr. Zeleny's special permit application? 05:45

Veritext Legal Solutions
866 299-5127

1    A.  Yes.  He was already aware that that had

2    kind of articulated through the system.

3    Q.  Did you talk to him about the concerns

4    that you expressed regarding Mr. Zeleny's special

5    event permit application?                              05:45

6    A.  Yes, I did speak to him about concerns

7    that we had in both the -- both permitting

8    processes.

9    Q.  Did you have concerns about Mr. Zeleny's

10   request for a film permit?                            05:45

11   A.  The concerns had to do with the same

12   public safety issues and the interpretation of the

13   exception to the open-carry law, based on what he

14   was proposing.

15   Q.  Did Mr. Toews agree with your concerns?          05:45

16   A.  I don't recall whether he agreed or

17   disagreed.  He just listened to what my concerns

18   were.

19   Q.  Let's take a look at an exhibit previously

20   marked as Exhibit 36.                                 05:46

21        MR. MASTER:  What's that one called?

22        MR. ROBINSON:  It's called 171006, Film

23   Permit.  I'm trying to track it down in the folder.

24        MR. MASTER:  Okay.

25        MR. ROBINSON:  It should show up in your        05:47

Page 498

1    approving or rejecting a traffic control plan?

2          MR. MASTER:  Objection.  Asked and

3    answered.

4          THE WITNESS:  Well, first, we have to have

5    a plan.  In this case, we didn't have a plan.        05:57

6    Generally speaking, it really depends on the --

7    what is being contemplated.  Again, it's a

8    case-by-case basis.

9    BY MR. ROBINSON:

10     Q.  So other than No. 5, Mr. Zeleny answered     05:57

11   all of the other questions posed by Mr. Toews;

12   correct?

13     A.  I'm still reading.  8 and 9 are not really

14   answers.  He's just stating that as soon as the

15   City does what he wants the City to do, then he     05:57

16   will provide the information requested, which is

17   not the way the application is set up.  And equally

18   is No. 10.

19     Q.  At some point, Mr. Zeleny's application

20   was forwarded to the city attorney's office;        05:58

21   correct?

22     A.  Yes.

23     Q.  Why was it forwarded to the city

24   attorney's office?

25     A.  Because Mr. Toews needed assistance in       05:58

1    dealing with the specific application here.

2        Q.  Does the city attorney's office generally

3    have authority to approve or deny filming permits

4    within the city?

5        A.  Certainly.                                    05:58

6        Q.  What standards govern the city attorney's

7    office's approval or denial of the filming permit?

8            MR. MASTER:  Objection.  Vague and

9    ambiguous.  Overbroad.  Calls for a legal

10   conclusion.                                            05:59

11           Go ahead.

12           THE WITNESS:  The city attorney's office

13   would take all the information, and, again, time,

14   place, manner, and dealing with the contemplated

15   disruption to the city and city services, and would   05:59

16   make a determination whether or not to grant a film

17   permit.  It does not require -- it's not a legal

18   requirement the City grant a film permit.

19   BY MR. ROBINSON:

20       Q.  Is it also a case-by-case determination?      05:59

21       A.  Yes.

22       Q.  And the factors that are relevant depend

23   on the specific filming project being proposed?

24       A.  Correct.

25       Q.  So I want to -- we've marked as Exhibit        05:59

```
 1        Q.  Do you have an understanding -- strike

 2    that.

 3            Was there any indication, that you can see

 4    in this Exhibit 73, of where the ten members of the

 5    camera crew were going to be standing, aside from      06:09

 6    somewhere in this entire city block?

 7        A.  No.

 8        Q.  Any indication here of where they were

 9    going to park the camera -- or the one van that

10    they would be using, other than somewhere in this      06:10

11    vicinity?

12        A.  No.

13        Q.  What about the portable restroom; any

14    indication from this application where they

15    intended to put that?                                  06:10

16        A.  No.

17        Q.  Let's go to the next -- the last exhibit

18    we opened up.  So it's 273.

19        A.  Okay.

20        Q.  So we were going down the list of             06:10

21    questions -- we were going down the list of

22    questions that Mr. Flegel asked.  Question B is:

23    Provide the names of the participants or crew that

24    will be part of the filming and his or her role,

25    including cameramen.                                   06:10
```

1           Do you see that?

2      A.   I do.

3      Q.   Is that -- the requirement to list the

4  names of participants, is that anywhere in the film

5  permit guidelines?                                    06:11

6      A.   Not that I'm aware of.

7      Q.   The other two applications we've seen

8  didn't list any names of crew or participants; did

9  they?

10     A.   Well, not in that application that we've    06:11

11 seen.  I'm not sure what other communication that

12 occurred.

13     Q.   Is it a requirement of the City of Menlo

14 Park that a film permit applicant list the names of

15 the participants in the film?                         06:11

16     A.   That's certainly a question and a piece of

17 information that could be asked of someone.

18     Q.   For what purpose?

19     A.   So we can identify who is going to be

20 present at the filming of the -- of the -- whatever   06:11

21 the event is.

22     Q.   Is the identity of the individuals

23 participating in the film production relevant to

24 the City's determination of whether they grant a

25 permit or not?                                        06:11

Page 514

1     A.   In this case, the city attorney believed

2   that it was.

3     Q.   Did the City's guidelines allow the City

4   to grant film permits to some people but not

5   others, depending on the participants in the film?          06:12

6     A.   It's discretionary for the City to either

7   grant or not grant the film permit.

8     Q.   Can the City exercise that discretion

9   based upon the identity of the participants?

10    A.   No.                                                    06:12

11    Q.   Do you have any understanding of why

12  Mr. Flegel was asking for the identity of the

13  participants?

14    A.   No.

15    Q.   Let's go down to (d)(ii) on Mr. Flegel's          06:12

16  series of questions.  (d)(ii) is, "Please confirm

17  exactly what image or images you intend to show on

18  the display so staff can analyze for safety and

19  traffic control purposes."

20         Do you see that?                                    06:12

21    A.   I do.

22    Q.   Were there particular image or images that

23  Mr. Zeleny intended to display relevant to whether

24  his permit application would be granted or denied?

25    A.   Yes.  It would depend on the brightness of      06:13

Page 515

```
 1    Mr. Flegel's e-mail, in particular, his request for

 2    exactly what image or images Mr. Zeleny intended to

 3    show.

 4              Is that criteria anywhere in the written

 5    guidelines of the City of Menlo Park?                    06:21

 6         A.   That criteria, it would be asked for, for

 7    public safety.  What we -- what would be logical to

 8    want to know is, do you have bright, flashing

 9    lights that are going to be distracting to drivers.

10    Is there going to be a lot of movement in these         06:21

11    images and what kind of images that would be

12    contemplated to be shown as people are driving by.

13              So those are the common-sense questions

14    you want to ask from a public safety perspective.

15              (Reporter clarification.)

16              (Record read by the Reporter.)

17              THE WITNESS:  Common-sense public safety

18    factors about what is it that is being shown to

19    people as they're driving by that is being filmed.

20    BY MR. ROBINSON:                                         06:22

21         Q.   Are those public safety factors that you

22    just testified about in any of the City's written

23    policies relating to film permit applications?

24         A.   No.

25         Q.   Are they factors that would be applied       06:22
```

Page 519

1  depending on the specific film production that's

2  being contemplated?

3      A.  Correct.  As I stated prior, most film

4  productions do not have displays that are being

5  shown to the public or being filmed to find a          06:22

6  reaction.  So this is unusual and it's

7  extraordinary on its face.

8      Q.  Okay.  So is this factor, then, the

9  specific image or images, a factor that applied

10  only to Mr. Zeleny's permit application?               06:23

11      A.  Well, it would apply to anybody who wanted

12  to do what he wanted to do, to film the reaction of

13  people as he's showing some images on a display.

14  But as of today, I believe this is the only film

15  application that I've ever seen that indicates they   06:23

16  wanted to do that.

17      Q.  Does the City determine what the factors

18  are -- strike that.

19          In Mr. Zeleny's case, did the City decide

20  what factors were relevant to the application after   06:23

21  Mr. Zeleny submitted the application?

22          MR. MASTER:  Objection.  Vague, ambiguous

23  and overbroad.

24          Go ahead.

25          THE WITNESS:  I don't understand what you     06:23

Veritext Legal Solutions
866 299-5127

1    mean.

2    BY MR. ROBINSON:

3        Q.  I mean, was this a factor -- the exact

4    image or images, was this a factor that was part of

5    the City's policy before Mr. Zeleny applied for a        06:24

6    film permit, or was it a factor that was decided

7    upon based on the application he submitted?

8        A.  This is a factor because of what

9    Mr. Zeleny stated he wanted to do.  So because he

10   stated he wanted to have a display with some kind        06:24

11   of images on it, from a public safety perspective,

12   we don't care about the content; we couldn't care

13   less about what it is, but we need to know whether

14   it's going to be something very distracting to

15   drivers.                                                 06:24

16        So, again, from a public

17   safety/common-sense perspective, we wanted to know

18   what kind of image are you displaying to people to

19   get a reaction from them so that you can film it.

20       Q.  What kind of -- strike that.                    06:24

21        Are there any standards for what kind of

22   images can be displayed and what kind can't?

23       A.  Content is irrelevant.  Again, I will

24   reiterate.  It had to do with public safety.  As

25   far as the fact he was contemplating displaying         06:25

Veritext Legal Solutions
866 299-5127

```
 1        A.  It would depend on how close it is.
 2   There's case law that talks about whether
 3   ammunition in a magazine attached to a weapon is
 4   considered loaded or not.  So it would depend on
 5   the situation.                                    06:33
 6        Q.  Did -- okay.  Regardless of the proximity
 7   of the ammunition to the weapon, is there any
 8   requirement in the Penal Code that would require
 9   Mr. Zeleny to explain to the City of Menlo Park why
10   he wanted to film with live ammunition versus some  06:33
11   other type of ammunition?
12        A.  No.
13        Q.  And there's no policy, written or
14   unwritten, in the City of Menlo Park that would
15   require Mr. Zeleny to explain that; is there?       06:33
16        A.  Again, aside from what I've already
17   discussed in the California Penal Code, no.
18        Q.  So this request by Mr. Flegel is outside
19   of the written and unwritten policy of the City of
20   Menlo Park; true?                                   06:34
21        A.  Yes.
22        MR. MASTER:  Objection.  That misstates
23   his testimony.
24        Go ahead.
25        THE WITNESS:  This is a question of public    06:34
```

```
 1    safety.
 2    BY MR. ROBINSON:
 3        Q.  It relates to a factor that is not
 4    anywhere listed in the factors for the City of
 5    Menlo Park; correct?                              06:34
 6        A.  If you think time, manner and place and
 7    the manner in which he's doing it, if there's a
 8    public safety concern, then it's appropriate to
 9    bring that public safety concern out.  And live
10    ammunition at a film shoot is a public safety     06:34
11    concern.
12        Q.  Is the City of Menlo Park allowed to
13    consider any public safety concern in considering a
14    film permit application?
15        A.  Certainly.                                06:34
16         MR. ROBINSON:  Why don't we take a
17    two-minute break here.  Let me look at my notes.  I
18    think I'm about wrapped up here.
19         THE VIDEOGRAPHER:  Going off the record.
20    The time now is 6:35.                             06:35
21          (Off the record.)
22         THE VIDEOGRAPHER:  Back on the record.
23    The time now is 6:39.
24    BY MR. ROBINSON:
25        Q.  Has the City of Menlo Park granted or     06:39
```

Page 529

EXHIBIT 3

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

_____

)
)
MICHAEL ZELENY, an individual, )
)
Plaintiff, )
)
vs. ) Case No.:
) CV 17-7357 JS
EDMUND G. BROWN, JR., an )
individual, in his official )
capacity; XAVIER BECERRA, an )
individual, in his official )
capacity; CITY OF MENLO PARK, )
a municipal corporation; and )
DAVE BERTINI, an individual, )
in his official capacity, )
)
Defendants. )
)
_____)

VIDEOTAPED DEPOSITION OF MATTHEW L. MILDE

San Francisco, California

Thursday, March 5, 2020

Volume I

Reported by:
CHRIS TE SELLE
CSR No. 10836
Job No. 3985719
PAGES 1 - 217

Veritext Legal Solutions
866 299-5127

```
 1    on vacation, other members of the department would      11:01:41
 2    fill in as the department representative, and I
 3    recall times that Commander Bertini would take those
 4    responsibilities.
 5         Q.   Were those, were those needs-based           11:02:02
 6    temporary circumstances?
 7         A.   Yes.
 8         Q.   Can you think of any circumstances where
 9    Commander, or, as a chief, Bertini, took over the
10    special permitting process on behalf of the police    11:02:15
11    department?
12         A.   No.
13         Q.   Do you know what the role of, I'm going to
14    just call him Chief Bertini, because that's his
15    position today; is that correct?                      11:02:31
16         A.   I believe so, yes.
17         Q.   What was the role of Chief Bertini in the
18    review of Mr. Zeleny's permit application?
19         A.   I can't say exactly, but my understanding
20    at the time was that he was one of the primary        11:02:53
21    individuals formulating the city's response to Mr.
22    Zeleny's request.
23         Q.   Why was he the one involved in the
24    process, rather than the liaison who was in the
25    position of a liaison at the time?                    11:03:17
```

                                                 Page 38

1        MR. MASTER:  Objection.  Lacks foundation.        11:03:20

2    Calls for speculation.  If you know, you can answer.

3        THE WITNESS:  Can you repeat the question.

4        MR. MARKEVITCH:  Could you read the question,

5    please.                                              11:03:26

6            (The pending question was read.)

7        THE WITNESS:  I don't know.

8    BY MR. MARKEVITCH:

9        Q.   Who was the liaison at the time?  Let me

10   just specify; at the time when Mr. Zeleny's permit,   11:03:58

11   special permit application was pending.

12       A.   Sergeant Matt Ortega.

13       Q.   What about, was it Sergeant Kaufman?

14   Sergeant Kaufman, is that --

15       A.   Sergeant Kaufman.                            11:04:17

16       Q.   Was Sergeant Kaufman involved, or no?

17       A.   Not that I recall.

18       Q.   So, she was not a liaison at the time?

19       A.   I don't believe so, not to my knowledge.

20       Q.   Was Sergeant Ortega on vacation during the   11:04:29

21   entire time of Mr. Zeleny's special permit

22   application review?

23       MR. MASTER:  Objection.  Lacks foundation.

24   Calls for speculation.  If you know.

25       THE WITNESS:  I couldn't say.                     11:04:42

                                                    Page 39

Q.   Is it your testimony that he could have

been?

MR. MASTER:  Same objection.  You can answer,

if you can.                                          11:04:52

THE WITNESS:  It's likely that he was not on

vacation the entire time.

BY MR. MARKEVITCH:

Q.   So, why was Chief Bertini reviewing the

application, rather than Sergeant Ortega?            11:05:01

MR. MASTER:  Objection.  Asked and answered.

Argumentative.  If you know.

THE WITNESS:  I don't know.

BY MR. MARKEVITCH:

Q.   Did you ever ask?                          11:05:10

A.   No.

Q.   Did that question ever cross your mind?

A.   No.

Q.   Were you ever told why Chief Bertini was

involved in the process of reviewing Mr. Zeleny's    11:05:21

special permit application?

MR. MASTER:  I will just assert an objection to

the extent that you received any communications from

the city attorney's office related to that topic,

instruct you not to answer.  Obviously, if you heard  11:05:39

Page 40

```
 1        Q.    Do you remember what was the outcome of        11:07:18

 2   your review of Mr. Zeleny's application?

 3        A.    I recall forwarding it on to my boss to

 4   receive input from the city's leadership team.

 5        Q.    Who was your boss at the time?              11:07:48

 6        A.    Cherise Brandell.

 7        Q.    Was the application complete at the time

 8   when you forwarded it to Ms. Brandell?

 9        A.    I don't recall it being complete.

10        Q.    What is the standard procedure, what was      11:08:12

11   the standard procedure at the time for handling

12   applications that were incomplete, based on your

13   initial review?

14        MR. MASTER:    Objection.   Vague and ambiguous,

15   overbroad, incomplete hypothetical, and calls for        11:08:26

16   speculation, but, if you understand it, go ahead.

17        THE WITNESS:   Can you repeat the question.

18           (The requested portion was read.)

19        THE WITNESS:   The applicant would be contacted

20   and provided details on why their application was         11:09:02

21   incomplete, and they would be asked to resubmit.

22   BY MR. MARKEVITCH:

23        Q.    Did you contact Mr. Zeleny and ask him to

24   resubmit an application?

25        A.    I don't recall if I did.                       11:09:16
```

Page 42

```
 1   flowchart?                                        11:35:39

 2        A.   Not that I believe.

 3        Q.   Do you have any knowledge of him doing

 4   that?

 5        A.   No.                                      11:35:49

 6        Q.   Do you know if the flowchart was ever

 7   reviewed by the legal counsel for the city?

 8        A.   Not to my knowledge.

 9        Q.   Who made the final version of the first

10   iteration of the flowchart?                        11:36:09

11        A.   I did.

12        Q.   Do you remember what year it was in?

13        A.   No.

14        Q.   Do you remember who decided to deny,

15   initially, Mr. Zeleny's application for a special  11:36:45

16   event permit?

17        A.   I'm sorry, can you repeat the question

18   there.

19             (The pending question was read.)

20        THE WITNESS:  I don't recall.                 11:37:16

21   BY MR. MARKEVITCH:

22        Q.   Do you remember how you came to find out

23   that the permit is being, the permit application is

24   being denied?

25        A.   I recall a conversation I had over the   11:37:34
```

Page 53

```
1   phone with Chief Bertini, who said that he had          11:37:38
2   discussed the city's response with the city's legal
3   counsel, and city manager, and that he would be
4   sending me a written response.
5        Q.   Did Chief Bertini tell you who               11:38:12
6   participated, participated in that decision to deny
7   the permit?
8        A.   Not specifically that I can recall at this
9   time.
10       Q.   Do you remember what your understanding      11:38:25
11  was as to who would have been the individuals
12  involved in that process?
13       MR. MASTER:  Lacks foundation.  Calls for
14  speculation.  If he has personal knowledge, then he
15  can answer.                                            11:38:41
16       Go ahead.  Sorry.
17       THE WITNESS:  Not entirely.
18  BY MR. MARKEVITCH:
19       Q.   Okay.  Well, do you have an understanding,
20  well, do you have a recollection of having an          11:38:50
21  understanding in any part of who was involved in the
22  process with Chief Bertini?
23       A.   It was my understanding at the time that
24  it was Chief Bertini, Alex McIntyre, and the city
25  attorney's office.  If there were others involved, I   11:39:12
```

Page 54

```
 1   don't know.                                    11:39:15

 2        THE VIDEOGRAPHER:  Can I ask you to move your

 3   microphone onto your lapel, on the lapel of your

 4   jacket.  Thank you very much.

 5   BY MR. MARKEVITCH:                              11:39:34

 6        Q.   How did you gain that understanding?

 7        A.   Came from my verbal conversations with

 8   then Commander Bertini.

 9        Q.   Do you remember what he told you, in any

10   specific terms?                                 11:39:55

11        MR. MASTER:  Objection.  Asked and answered.

12        Go ahead.

13        THE WITNESS:  Other than what I mentioned, that

14   he was working with others on developing a city

15   response.                                       11:40:12

16   BY MR. MARKEVITCH:

17        Q.   How many conversations did you have with

18   Chief Bertini with regard to Mr. Zeleny's

19   application?

20        A.   I can't say for sure.  I'd estimate it was  11:40:26

21   between three and four.

22        Q.   Were they all telephone calls?

23        A.   No.

24        Q.   Some were in-person meetings?

25        A.   Yes.  One.                            11:40:39
```

Page 55

```
 1        MR. MASTER:  Object.  Vague and ambiguous.      12:09:57
 2   Overbroad.  You can answer.
 3        THE WITNESS:  I don't remember if I did or not.
 4   BY MR. MARKEVITCH:
 5        Q.   Now, logistically, did you have access to   12:10:03
 6   whatever portal there was to actually post
 7   information on the website?
 8        A.   Yes.
 9        Q.   So, if you needed to post something, you
10   would do it yourself?                                 12:10:14
11        A.   Yes.
12        Q.   You didn't have to go to IT and ask them
13   to do it.
14        A.   No.  No.  I believe I was always a
15   publisher of the website.                             12:10:35
16        Q.   Let's go back to Exhibit 91, please.
17            Is this, does this flowchart represent the
18   general process for special event permit
19   application, as it exists today?
20            MR. MASTER:  I'm just going to object.  Lacks    12:11:16
21   foundation, calls for speculation, as of today.
22   He's no longer with the city.
23            MR. MARKEVITCH:  Thank you.
24   BY MR. MARKEVITCH:
25            Q.   As it existed as of the time when you left   12:11:22
```

Page 74

1    the City of Menlo Park.                          12:11:24

2        A.    Generally, yes.

3        Q.    Okay.  When you say, generally, could you

4    specify why you are qualifying your answer.

5        A.    Yes.  The first thing that jumps to my    12:11:39

6    mind is the days indicated is not necessarily set.

7    It was general.  Depending on the complexity of the

8    application, it might have been reviewed by our --

9    I'm only speculating.

10       MR. MASTER:  Don't.  You're not speculating.    12:12:14

11   BY MR. MARKEVITCH:

12       Q.    So, let's look at step A, initial contact.

13             It looks like in this step you, at least

14   at the time of this flowchart, you would send the

15   application to the applicant in response to, I         12:12:41

16   presume, an inquiry, correct?

17       A.    That's correct.

18       Q.    Would you then at that time speak with the

19   applicant?

20       A.    Not always.                                 12:13:00

21       Q.    Under what circumstances would you speak

22   to an applicant?

23       A.    If they called me on the phone.

24       Q.    And can you generalize what kind of

25   questions applicants would ask at that point, if you   12:13:43

```
 1    looking for in terms of the detailing of an event on    12:16:22

 2    a map.

 3         A.   The special event permit application

 4    included a checklist that the applicant needed to

 5    identify certain features, such as tents, road          12:16:35

 6    closures, first aid stations, and the like.

 7              It was, I would look to make sure that

 8    that information was complete to the event.  I

 9    would, if the applicant included that they had a

10    road closure, I would look to see if it was on a        12:17:05

11    primary response route or not, and where the

12    location of the closure was.

13         Q.   Anything else?

14         A.   I would confirm that the map was clear, so

15    that when it was photocopied and sent to the permit     12:17:34

16    committee, it was legible.

17         Q.   Anything else?

18         A.   That's all I can recall.

19         Q.   Now, if there were any deficiencies in the

20    application, what would you do, generally?              12:17:47

21         MR. MASTER:   Objection.  Vague and ambiguous.

22    Overbroad.  Go ahead.

23         THE WITNESS:   Generally, I would contact the

24    event permit organizer and detail a listing of the

25    items that they needed to exchange or modify or         12:18:08
```

```
 1    include, depending on the event permit, and have      12:18:13

 2    them resubmit.

 3    BY MR. MARKEVITCH:

 4         Q.   And then what would happen?

 5         MR. MASTER:  Same objections.  Go ahead.          12:18:28

 6         THE WITNESS:  That depended on the person, the

 7    applicant, whether or not they wanted to resubmit or

 8    not.

 9    BY MR. MARKEVITCH:

10         Q.   If they resubmitted, what would you do       12:18:38

11    with that application?

12         A.   Follow the same process by providing an

13    initial review of the application.

14         Q.   And if you found the application to be

15    complete to your satisfaction, what would you do       12:19:02

16    next?

17         A.   I would scan the documents and forward

18    them to our permit committee.

19         Q.   Now, you were part of the permit committee

20    that would then again review the application for       12:19:27

21    substance, correct?

22         A.   That's correct.

23         Q.   So now we're talking about step C, staff

24    internal review, correct?

25         A.   That's correct.                              12:19:38
```

Veritext Legal Solutions
866 299-5127

1    Q.   Going back to step B, in the title there,      12:19:40

2    it says, application received, in parentheses, three

3    days.

4         What is the significance of this three

5    days that are noted here?                            12:19:49

6    A.   Just a general guideline of the time it

7    could potentially take, ideally.   Every application

8    was different.

9    Q.   So, how often would application review

10   process deviate from this three day estimate?        12:20:15

11   A.   I couldn't say for sure.

12   Q.   Can you think of any instances where it

13   took you more than three days to review a submitted

14   application?

15   A.   I'm sure there were, but I can only            12:20:39

16   speculate.

17   Q.   Well, when you say you are sure, what are

18   you basing that statement on?

19   A.   Based on the amount of permits that we

20   received in the years I worked for the City of Menlo  12:20:53

21   Park, there must have been a time where I was away

22   at a conference, or vacation, or was too busy with

23   other responsibilities to provide a response within

24   three days.  That wouldn't have been abnormal, I

25   don't think.                                          12:21:15

                                                  Page 80

```
 1   correct?                                      01:15:47

 2        A.   Certainly, no more than.

 3        Q.   As you sit here today, can you recall if

 4   you participated in 300 meetings with an applicant

 5   pursuant to step D?                            01:16:15

 6        A.   I couldn't say.

 7        Q.   So as you sit here today you are not sure

 8   if it was two meetings during your tenure, or 300

 9   meetings, am I correct?

10        A.   That's correct.                      01:16:28

11        Q.   Did you participate in the meeting with

12   Mr. Zeleny?

13        A.   I have never met with Mr. Zeleny.

14        Q.   Did you ever participate or were present

15   in any proceeding where Mr. Zeleny was also present?   01:16:43

16        A.   Not that I'm aware.

17        Q.   Have you ever seen Mr. Zeleny, in-person?

18        A.   No.

19        Q.   Going back to step C --

20        MR. MARKEVITCH:  Before we do that, we are   01:17:11

21   number 95, am I correct?

22        MR. MASTER:  David, just while we are on this,

23   you appear to be marking as new exhibits exhibits

24   that were previously marked.  Under the federal

25   rules, the whole reason we have consecutive       01:17:45
```

Veritext Legal Solutions
866 299-5127

```
 1        A.   I couldn't.  We did so many, it would all    01:36:23

 2   jumble together.

 3        Q.   Is there any one particular one that you

 4   remember, for whatever reason?

 5        MR. MASTER:  Objection.  Asked and answered.      01:36:35

 6   Argumentative.

 7        THE WITNESS:  As I sit here today, I cannot.

 8   BY MR. MARKEVITCH:

 9        Q.   Do you remember Mr. Zeleny's application?

10        A.   Vaguely.                                     01:36:49

11        Q.   Do you remember forwarding that

12   application to the committee?

13        A.   I don't recall that I did.

14        Q.   You don't think you forwarded that

15   application to the committee?                          01:37:13

16        A.   I don't remember if I did or not.

17        Q.   Now, once an application is in the hands

18   of the police department, do you know what criteria

19   the police department applies to its review?

20        A.   No.                                          01:37:28

21        Q.   Once the application is in the hands of,

22   what does PW stand for again?

23        A.   Public works.

24        Q.   Once an application is in the hands of

25   public works maintenance, do you remember what        01:37:40

                                                 Page 104
```

01:37:43

1  criteria they apply to deciding whether or not an

2  application should be approved or denied?

3      A.   No.

4      Q.   Same question for public works

5  engineering.                                          01:37:52

6      A.   No.

7      Q.   What about planning?

8      A.   Can you repeat the question for planning.

9      Q.   Once you send an application to planning,

10  do you know what criteria the planning department    01:38:11

11  would apply in reviewing that application?

12      A.   I don't know for certain.

13      Q.   Do you know if criteria exist that a

14  planning department would apply to review an

15  application?                                          01:38:31

16      MR. MASTER:  Lacks foundation.  Calls for

17  speculation.

18      If you know.

19      THE WITNESS:  I know they would look at the

20  city ordinance, and, if there was amplified sound,   01:38:39

21  they'd take it to city counsel for approval.

22  BY MR. MARKEVITCH:

23      Q.   How do you know that they look at the city

24  ordinance?

25      A.   That would be the only way to take it to   01:38:59

```
 1        Q.   And do you know how the fire department      01:40:28

 2   assessed whether or not it was appropriate to close

 3   or not close certain roads?

 4        MR. MASTER:  To be clear, counsel, you are

 5   referring to the fire department as the fire          01:40:36

 6   district, just to be clear, so, just to make sure

 7   we're on the same page.  Go ahead.

 8        MR. MARKEVITCH:  Sure.

 9        THE WITNESS:  I do know that the fire district

10   was concerned with closures or events taking place    01:40:55

11   on primary response routes that are identified

12   routes in the city.  That's all I'm aware.

13   BY MR. MARKEVITCH:

14        Q.   Are you aware of any written policies or

15   lists of criteria that the fire department would use  01:41:18

16   specifically in the context of the special event

17   permit process?

18        A.   The fire district, no.

19        Q.   Going back to the police department, are

20   you aware of any specific written policies that the   01:41:35

21   police department would use in the context of

22   assessing the propriety of a special event permit

23   application?

24        A.   No.

25        Q.   Let's move on to the next page of           01:42:04
```

```
 1    listed at step C is what you are saying.          01:51:48

 2         A.   In technical terms, no.

 3         Q.   The fire district approval happens under

 4    step C, am I correct?

 5         MR. MASTER:  You said step C?                 01:52:07

 6         MR. MARKEVITCH:  E.

 7         MR. MASTER:  Thank you.

 8         MR. MARKEVITCH:  Yeah.

 9         THE WITNESS:  Step E.  That is correct.

10    BY MR. MARKEVITCH:                                 01:52:16

11         Q.   Are there any other departments that would

12    not participate in the step C review, other than the

13    fire district, that are listed here?

14         A.   Departments, not that I can think of at

15    this time.                                         01:52:38

16         Q.   You mentioned that part of the step E

17    conditional approval was a potential for requiring

18    satisfaction of some items related to safety, am I

19    correct?

20         A.   Potentially, yes.                        01:52:57

21         Q.   Other than the fire district approval that

22    we have just discussed at length, what other safety

23    aspects that would be raised under step C can you

24    think of right now?

25         MR. MASTER:  I object.  Lacks foundation.     01:53:07

                                        Page 114
```

```
 1   Calls for speculation.  Vague and ambiguous,          01:53:09

 2   overbroad.

 3        THE WITNESS:   It depended on the special event

 4   application.

 5   BY MR. MARKEVITCH:                                     01:53:14

 6        Q.   Can you think of a single instance where a

 7   safety issue was involved and related to a

 8   conditional approval item, other than the fire

 9   district review of the road closure?

10        A.   I cannot think of a single instance.  I     01:53:29

11   can only speculate items that likely could have

12   occurred.

13        Q.   Can you think of items that actually, in

14   fact, have occurred, and you have a recollection of?

15        A.   Not at this time.                           01:53:49

16        Q.   The public notification process only

17   applies to noise permits, correct?

18        A.   That is correct.

19        Q.   So, if there is no noise involved, then

20   step F is not pertinent, am I correct?              01:54:25

21        A.   I would say if there is no amplified

22   noise.

23        Q.   And under step F, the proposed decibel

24   rating is compared to the ordinance requirements, am

25   I correct?                                           01:54:48
```

Page 115

1      now.                                                01:57:50

2              (Exhibit 95 was marked for identification

3      by the court reporter and is attached hereto.)

4      BY MR. MARKEVITCH:

5          Q.   This one is going to be 95.  Mr. Milde,    01:58:11

6      please review this document and let me know if you

7      are familiar with it.

8          A.   It is my understanding that this is the

9      e-mail Mr. Zeleny sent to a number of people, I

10     believe, myself included, with his request for a    01:59:12

11     special event.

12         Q.   For the record, the first page is marked

13     as MP000234, and it ends on MP000240.

14         A.   Correct.

15         Q.   Mr. Milde, is this an application for a     01:59:51

16     special event permit submitted by Mr. Zeleny to the

17     City of Menlo Park?

18         A.   It appears to be.

19         Q.   Was this application sent to you?

20         A.   It was.                                     02:00:10

21         Q.   Did you perform an initial review of this

22     application pursuant to step B of the flowchart?

23         A.   I did at the time, yes.

24         Q.   And, for clarity, when I say, the

25     flowchart, I'm talking about Exhibit 91.             02:00:29

1          Can we agree on that?                          02:00:31

2     A.   Yeah.

3     Q.   There is no other flowchart.

4     A.   Correct.

5     Q.   Do you remember what you determined with      02:00:43

6    respect to the completeness of this application,

7    pursuant to step B?

8     A.   I did not make a determination.

9     Q.   Why not?

10     A.   My recollection at the time was that the      02:01:01

11   application was complex, and, considering that the

12   city manager and police chief were cc'd on it, I

13   felt it was under their purview to provide me

14   direction on the city's response.

15     Q.   Now, you previously testified that your      02:01:35

16   job at the step B level was administrative, or am I

17   using the correct terminology?

18     A.   That's fair, yes.

19     Q.   Meaning that you simply looked at whether

20   or not the boxes were checked, correct?            02:01:52

21     MR. MASTER:  Objection.  Misstates his

22   testimony.  Go ahead.

23     THE WITNESS:  I would say there's more to it

24   than that, but --

25   BY MR. MARKEVITCH:                                 02:02:03

                                            Page 119

```
 1        Q.   In part.                            02:02:03

 2        A.   But, ensuring that the application was

 3   completely filled out.

 4        Q.   But you did not perform that review on Mr.

 5   Zeleny's application, correct?                02:02:16

 6        A.   Maybe I don't understand the question.

 7        Q.   You did not check if Mr. Zeleny's

 8   application that you have here in front of you was

 9   complete, pursuant to the step B process of the

10   flowchart.                                    02:02:35

11        A.   I reviewed the application.

12        Q.   Did you determine if it was complete?

13        A.   I didn't, don't recall making a

14   determination.

15        Q.   Did you contact Mr. Zeleny and tell him  02:02:49

16   that it was incomplete at any point?

17        A.   Not that I can recall at the moment.

18        Q.   Do you have a recollection of ever asking

19   Mr. Zeleny to complete any aspect of the application

20   within the context of a step B analysis?      02:03:20

21        A.   I don't recall contacting Mr. Zeleny for

22   that purpose.

23        Q.   Do you recall contacting Mr. Zeleny for

24   any other purpose, by telephone?

25        A.   I have never spoken to Mr. Zeleny via   02:03:45
```

Page 120

telephone, that I can recall.                              02:03:48

    Q.   Is the application that was submitted by

Mr. Zeleny on July 10, 2015 complete, per the

standards outlined in step B?

    A.   I don't know.                              02:04:19

    Q.   Can you determine that now?

    A.   The first thing I notice, looking at this

very quickly, is that there is no attached map, and

we wouldn't deem that complete.

    Q.   Anything else?                              02:04:48

    A.   He doesn't identify if the event reoccurs

more than annually, based on the question asked of

him in the permit.

    Q.   Where are you looking at, please?

    A.   Event is reoccurring more than annually,     02:05:19

question mark, yes or no.  There is nothing filled

out.  I would need to know that answer in order to

route it.

    Q.   In order to do what, sir?

    A.   To route it to the permit committee.        02:05:29

    Q.   So, and I apologize, can you please point

where it is, because there are many boxes there.

    MR. MARKEVITCH:  Okay.  So, can I show this to

the camera, right here.  Event.  Can you see it?

    THE VIDEOGRAPHER:  Don't bring it, put it back  02:05:50

```
 1        Q.   Was that before or after you passed the      02:33:55
 2   application down to the, or up to the staff internal
 3   review stage?
 4        A.   I just don't recall submitting the permit
 5   to the permit committee in this particular instance.   02:34:08
 6        Q.   Are you saying that it was never submitted
 7   to the permit committee?
 8        A.   I'm saying that I never submitted it to
 9   the permit committee.
10        Q.   Do you know if somebody else submitted it    02:34:23
11   to the permit committee?
12        A.   No.
13        Q.   You don't know?
14        A.   I don't know.
15        Q.   You mentioned that on page 1 of the          02:34:31
16   application there was a box that was not checked
17   pertaining to the question of whether event is
18   reoccurring more than annually; is that correct?
19        A.   That's correct.
20        Q.   And you previously testified that this       02:34:50
21   would have prevented routing; am I correct in
22   quoting you?
23        A.   That would have prevented it from being
24   routed, yes, I think so.
25        Q.   Now, pursuant to step B procedures,          02:35:08
```

```
 1    this process regardless.                      02:49:06

 2         A.   Correct.

 3         Q.   Pursuant to step C of the flowchart,

 4    correct?

 5         A.   Correct.                            02:49:13

 6         Q.   Any other aspect of complexity that you

 7    found in this application that prompted you to

 8    forward it to your superiors?

 9         A.   The fact that it was an event that was

10    being requested for a public median on a major   02:49:29

11    thoroughfare, there's a lot of safety implications

12    with that.  That was of concern.  We don't typically

13    get applications for community events on a public

14    median.  It just doesn't happen.  I haven't seen it.

15         Q.   Is it fair to say that this application   02:50:04

16    was, in your mind, different enough that you decided

17    to forgo the entirety of the process on this

18    flowchart?

19         A.   It definitely stood out.

20         Q.   But you did not follow the flowchart with   02:50:17

21    regard to Mr. Zeleny's application, correct?

22         A.   Well, I followed the flowchart in regards

23    to that I provided the initial review of it.  I did

24    look it over, and looked at it, but I felt that

25    before we moved forward with it that city leadership   02:50:31
```

Veritext Legal Solutions
866 299-5127

1  also needed to review and weigh in and provide        02:50:35

2  direction to staff.

3       Q.   Is there a procedure for processing an

4  application the way you decided to do it with Mr.

5  Zeleny's?                                             02:50:51

6       A.   Not that I recall, but, then again, we

7  have never gotten anything quite like this

8  application in before, so, it was an outlier.

9       Q.   Is there a reason why this application

10  could not be processed the way the flowchart        02:51:04

11  indicates an application should be processed?

12       A.   Again, due to the complexity of what was

13  submitted to me, I felt that it was necessary that

14  city leadership provide direction to staff.

15            (Exhibit 98 was marked for identification  02:51:58

16  by the court reporter and is attached hereto.)

17  BY MR. MARKEVITCH:

18       Q.   Do you recognize this chain of e-mails?

19       A.   Yes.

20       Q.   So, again, you forwarded this application  02:52:47

21  to Clay Curtin and Jim Cogan; is that correct?

22       A.   That's correct.

23       Q.   Why did you do that?

24       A.   They were the heads of the communication

25  team, and, as part of our responsibilities with the  02:53:03

Page 150

```
 1    the exact location he was intending, as it was not      02:57:00

 2    clear on his application.  Period.

 3             Do you recall being aware on July 21, 2015

 4    that the application was going to be denied?

 5        A.   I can't say if I was or not.                    02:57:18

 6        Q.   Do you recall at any point being aware

 7    that the application is being denied, though you

 8    were still collecting some information from Mr.

 9    Zeleny?

10        A.   I don't recall.                                 02:57:35

11        Q.   Do you recall the circumstances of how you

12    found out that the application is going to be

13    denied?

14        A.   I recall a telephone call with Commander

15    Bertini, who mentioned that he was working in          02:57:55

16    conjunction with the city attorney's office and the

17    city manager to prepare a city response to Mr.

18    Zeleny, and that the next step at that time was, I

19    would be given verbiage on a denial that I would

20    send to Mr. Zeleny.  That's how I found out.           02:58:31

21        Q.   Do you remember when this telephone call

22    took place?

23        A.   I don't.

24        Q.   Did Chief Bertini then tell you what the

25    reasoning was for why the denial was being issued?     02:58:45
```

Page 154

```
 1        A.   I don't.                                  04:27:20

 2        Q.   Does it appear to you that at that point

 3   you were still somehow involved in the process?

 4        A.   Only by the fact that I'm cc'd here on the

 5   e-mail by Mr. Zeleny.                               04:27:43

 6        Q.   Anything beyond that?

 7        A.   No, not that I can tell.

 8        MR. MARKEVITCH:  Why don't we go off record.

 9        THE VIDEOGRAPHER:  Going off the record the

10   time is 4:27.                                       04:28:17

11           (Recess:  4:27 p.m. to 4:39 p.m.)

12        THE VIDEOGRAPHER:  We're back on the record.

13   The time is 439.

14   BY MR. MARKEVITCH:

15        Q.   Mr. Milde, have you participated in any    04:40:16

16   hearings related to Mr. Zeleny's permit application?

17        A.   No.

18        Q.   Did you provide any assistance to the city

19   manager with regard to any matter related to Mr.

20   Zeleny?                                             04:40:36

21        A.   No.

22        Q.   Let's go back to Exhibit number 33, which

23   is the one you have there, and on page 1820, so

24   that's the fourth page of the document.  Towards the

25   bottom, there is a section titled, what would cause   04:41:06
```

```
 1    a permit to get denied.                              04:41:09

 2           Do you see that?

 3       A.   Yes.

 4       Q.   And this paragraph lists a number of

 5    factors.  Do you mind reading them out, just for the  04:41:19

 6    record.

 7       A.   Yeah.  Approval or denial of applications

 8    are based --

 9           MR. MASTER:  Slow.

10           THE WITNESS:  Sorry.                           04:41:32

11           -- upon several factors, including size, in

12    parentheses, number of people, scale, location,

13    route to be closed, community impact, impact on city

14    services, past event, as reflected in the

15    application, and site map, et cetera.                 04:41:56

16    BY MR. MARKEVITCH:

17       Q.   I apologize.  I think you missed a line

18    there.

19           MR. MASTER:  You skipped a line.

20           THE WITNESS:  Oh, did I?                       04:42:03

21           MR. MASTER:  You skipped a line.  Past

22    practices.

23           THE WITNESS:  Oh, I see.  I'm sorry.  That

24    makes sense.

25           Past practices, experiences with issued with   04:42:10
```

Page 201

```
 1    permits, intended use, nonpayment of fees, poor        04:42:12

 2    articulation of event as reflected in the

 3    application and site map, et cetera.

 4    BY MR. MARKEVITCH:

 5         Q.   Is this an exhaustive list of factors for    04:42:23

 6    a denial of a permit?

 7         A.   Doesn't appear to be.

 8         Q.   What are other factors?

 9         MR. MASTER:  I will just object as vague and

10    ambiguous, overbroad, incomplete hypothetical, calls   04:42:42

11    for speculation.  You can answer.

12         THE WITNESS:  I couldn't say.

13    BY MR. MARKEVITCH:

14         Q.   Is there any guideline for identifying

15    other factors in reviewing an application?             04:42:54

16         A.   Not that I'm aware.

17         Q.   Now, looking at the factors more

18    specifically, size, number of people, is there a

19    guideline for what size is appropriate and what size

20    is not?                                                04:43:19

21         MR. MASTER:   Objection.  Vague and ambiguous.

22    Overbroad.

23         THE WITNESS:   It would depend on the

24    application.

25    BY MR. MARKEVITCH:                                     04:43:37
```

Veritext Legal Solutions
866 299-5127

```
1      Q.   Who makes a decision as to whether a        04:43:37
2  specific application proposes a size that is
3  acceptable?
4      A.   Again, it would depend on the application.
5      Q.   Is it on the case-by-case basis?            04:43:59
6      A.   Yes, as outlined in their application.
7      Q.   Where is it outlined?
8      A.   Meaning depending on what's in the
9  application would depend on who would weigh in in
10 terms of what was an appropriate event size.        04:44:24
11     Q.   Is there a guideline for deciding to match
12 up the content of an application to who is going to
13 be deciding the appropriate size?
14     MR. MASTER:  Objection.  Vague and ambiguous.
15     THE WITNESS:  Can you repeat the question.       04:44:43
16     MR. MARKEVITCH:  Strike the question.  Let me
17 strike the question.
18 BY MR. MARKEVITCH:
19     Q.   Is there a guideline or a written policy
20 that would indicate how to match the substance of   04:45:02
21 the application to the person who should decide
22 whether or not the proposed size is appropriate?
23     A.   I don't know if I quite understand the
24 question.
25     Q.   What I'm trying to understand is how the    04:45:28
```

Veritext Legal Solutions
866 299-5127

1  appropriate size is decided, and so my understanding  04:45:30

2  is that you said that depending on the application,

3  different people may decide if a size is right or

4  wrong, correct?

5       A.   That's correct.                            04:45:43

6       Q.   Is there a written guideline for

7  identifying the proper people for any specific

8  application?

9       A.   Well, in our city ordinance, under, parks,

10 it outlines the amount of people that can congregate  04:45:56

11 in a public park space, and that's how I would

12 determine my guidelines for events occurring on park

13 space.

14      Q.   And if it's not in a park?

15      A.   I would rely on PD to make that            04:46:19

16 determination.

17      Q.   Do you know if they have specific

18 guidelines that would help them determine whether a

19 particular size is proper or not?

20      A.   I'm not sure if there is anything listed   04:46:30

21 in our ordinances.  I don't know.

22      Q.   What about the scale of a proposed event?

23 Are there any specific criteria for deciding whether

24 or not a scale of an event is appropriate or not?

25      A.   Again, I would rely on PD to make that     04:46:59

1    determination.                                      04:47:03

2         Q.   And do you know if that decision is

3    discretionary, as far as the police department is

4    concerned?

5         A.   I have no idea.                            04:47:15

6         Q.   What about the location of an event?  How

7    is the propriety of the location determined for any

8    given application?

9         MR. MASTER:  To the extent it's beyond his

10   scope, it lacks foundation, calls for speculation,   04:47:29

11   but you can certainly answer.

12        THE WITNESS:  It would depend on the permit.

13   Every permit's a little different.

14   BY MR. MARKEVITCH:

15        Q.   Now, are there any unwritten policies that  04:48:00

16   apply to the permitting process?

17        MR. MASTER:  Object.  Vague and ambiguous.

18   Overbroad.

19        THE WITNESS:  I don't know if I can answer that

20   question fully.                                      04:48:17

21   BY MR. MARKEVITCH:

22        Q.   Let's narrow it down.  At the time when

23   Mr. Zeleny's application was pending, were there any

24   policies that were not written down anywhere, but

25   applied by the staff in reviewing various permit      04:48:32

Veritext Legal Solutions
866 299-5127

```
 1    1         I, the undersigned, a Certified Shorthand
 2    2    Reporter of the State of California, do hereby
 3    3    certify:
 4    4         That the foregoing proceedings were taken
 5    5    before me at the time and place herein set forth;
 6    6    that any witnesses in the foregoing proceedings,
 7    7    prior to testifying, were duly sworn; that a record
 8    8    of the proceedings was made by me using machine
 9    9    shorthand which was thereafter transcribed under my
10   10    direction; that the foregoing transcript is a true
11   11    record of the testimony given.
12   12         Further, that if the foregoing pertains to the
13   13    original transcript of a deposition in a Federal
14   14    Case, before completion of the proceedings, review
15   15    of the transcript [ ] was [ ] was not requested.
16   16         I further certify I am neither financially
17   17    interested in the action nor a relative or employee
18   18    of any attorney or party to this action.
19   19         IN WITNESS WHEREOF, I have this date subscribed
20   20    my name.
21   21
22   22    Dated: March 19, 2020.
23   23
24   24                       _____
                             CHRIS TE SELLE
25   25                      CSR No. 10836
```

Veritext Legal Solutions
866 299-5127

**EXHIBIT 4**

```
 1                  UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3
 4      MICHAEL ZELENY, an individual, )
                                       )
 5               Plaintiff,            )
                                       )
 6      vs.                            )     No. CV 17-7357 JS
                                       )
 7      EDMUND G. BROWN, JR., an       )
        individual, in his official    )
 8      capacity; XAVIER BECERRA, an   )
        individual in his official     )
 9      capacity; CITY OF MENLO PARK,  )
        a municipal corporation; and   )
10      DAVE BERTINI, an individual,   )
        in his official capacity,      )
11                                     )
                    Defendants.        )
12                                     )
13
14           VIDEOTAPED DEPOSITION OF NICOLAS FLEGEL
15                   Menlo Park, California
16                   Tuesday, March 3, 2020
17
18
19
20
21
22      Reported by:
23      JANIS JENNINGS
24      CSR No. 3942, CLR, CCRR
25      Job No. 3985721
```

Veritext Legal Solutions
866 299-5127

```
 1        A.    What's an LJ?                          10:41

 2        Q.    ALJ, administrative law judge.         10:41

 3        A.    No.                                    10:41

 4        Q.    So the firm advises the various offices    10:41

 5   of the City but does not act as a fact finder or an   10:41

 6   adjudicator in any matters; correct?               10:41

 7        A.    No.  I don't even know that would be    10:42

 8   appropriate.  I've never heard of that before.  I   10:42

 9   never heard of that.                               10:42

10        Q.    So taking the film permit process as an    10:42

11   example, what is the first step in the process?    10:42

12        A.    Well, there's an application, which is    10:42

13   essentially a glorified encroachment permit, and   10:42

14   there's a PDF that has a list of everything that   10:42

15   staff wants to review, and so an applicant would   10:42

16   fill that out and submit it to staff.              10:42

17        Q.    And then the staff acts as a fact finder in   10:42

18   that case?                                         10:42

19        A.    I would -- I'm not sure what you mean   10:42

20   by "fact finder."  I would disagree.  I think     10:43

21   staff just looks to see is it complete?  Do they   10:43

22   understand the application?  How is it going to be   10:43

23   done?  Is it going to be done -- and then they --   10:43

24   there is like a team.  I'm not really sure who's on   10:43

25   that team, but maybe the heads of every department   10:43
```

Veritext Legal Solutions
866 299-5127

```
 1   specifically --                              10:45

 2       A.    Uh-huh.                             10:45

 3       Q.    -- what is it exactly that the city council  10:45

 4   would be reviewing as far as the city staff's work?  10:45

 5       A.    I'm trying to think how to answer that.  I  10:46

 6   mean, I think they would review the whole process,  10:46

 7   the application, and whether or not -- and the city  10:46

 8   council is also an authority whether or not they  10:46

 9   want to grant it or not.                     10:46

10       Q.    And what is that authority based on?  10:46

11       A.    I think city council has ultimate authority  10:46

12   to make a whole lot of decisions for the City.  10:46

13   They're a general law city.  They can -- they vote  10:46

14   on and make important decisions all the time, every  10:46

15   meeting.                                      10:46

16       Q.    In reviewing a specific matter such as  10:46

17   a film application, is the discretion by the city  10:46

18   council governed by any sort of factors or rules?  10:46

19       A.    I mean, California law, federal law, court  10:46

20   cases that are out there.                     10:47

21       Q.    Have you ever done any work for the  10:47

22   Rosewood Hotel?                               10:47

23       A.    No.                                 10:47

24       Q.    What about Stanford?                10:47

25       A.    No.                                 10:47
```

                                    Page 41

```
 1            Yes.                                    11:06

 2  BY MR. MARKEVITCH:

 3     Q.    So I'm going turn this -- I'm going     11:06

 4  to be pointing to this portion of the sidewalk   11:07

 5  (indicating).

 6            So, Mr. Flegel, this is the portion of the  11:07

 7  sidewalk --                                      11:07

 8     A.    Uh-huh.

 9     Q.    -- that is shown in this photograph and then  11:07

10  there is roadway that is shown in this photograph.  11:07

11            So when you looked at it when you received  11:07

12  this email, did you not understand that Mr. Zeleny  11:07

13  wanted to stage his protest here or his filming here  11:07

14  on the sidewalk?                                 11:07

15            MR. MASTER:   Objection.   Asked and answered.  11:07

16  Argumentative.                                   11:07

17            THE WITNESS:   So I will say that was my  11:07

18  assumption, but I did not know for sure.         11:07

19  BY MR. MARKEVITCH:                               11:07

20     Q.    Okay.   Is this the most reasonable     11:07

21  understanding of his application?                11:07

22            MR. MASTER:  Objection.  Argumentative.  11:07

23  Lacks foundation and calls for speculation.      11:07

24            THE WITNESS:   So the problem was is    11:07

25  Mr. Zeleny had talked about doing his production in  11:07
```

Page 54

```
 1    are -- that received the email?                  11:12

 2    BY MR. MARKEVITCH:                                11:12

 3        Q.    Yes.                                    11:12

 4        A.    I don't remember doing so.              11:12

 5        Q.    Okay.  So who is Ivan Toews, T-o-e-w-s? 11:12

 6        A.    Mr. Toews was a City of Menlo Park employee  11:12

 7    in Public Works and he was at the time in charge of  11:12

 8    the film permits.                                11:12

 9        Q.    Was he the primary person at the City who  11:12

10    was making the decision with regard to the film  11:12

11    permit?                                          11:12

12        A.    He was the point person to receive the  11:12

13    permits, and once he received it, he would -- my  11:12

14    understanding of the process is Mr. Toews would  11:13

15    distribute it to the department heads of the    11:13

16    departments that appeared to him to be implicated  11:13

17    and then they would all work together.          11:13

18        Q.    So you were requesting information from  11:13

19    Mr. Zeleny and then that information was being   11:13

20    passed to the City, including to Mr. Toews; is that  11:13

21    correct?                                         11:13

22        A.    So, no, not exactly.  I was not requesting  11:13

23    any information until -- until later when the legal  11:13

24    question was posed to me regarding the exemption and  11:13

25    whether or not a permit was even required.  That's  11:13
```

Veritext Legal Solutions
866 299-5127

```
 1    not in making that determination the staff would        11:31
 2    look at any written material?                           11:31
 3              MR. MASTER:  Objection.  Asked and answered.  11:31
 4              THE WITNESS:  I think I answered that.        11:31
 5    BY MR. MARKEVITCH:                                       11:32
 6         Q.   Okay.  You mentioned municipal codes.         11:32
 7         A.   Municipal codes, California law, vehicle       11:32
 8    code.                                                   11:32
 9         Q.   Okay.  Any specific sections of those codes   11:32
10    that you're aware of that the staff would be looking    11:32
11    at?                                                     11:32
12              MR. MASTER:  Lacks foundation.  Calls for     11:32
13    speculation.                                            11:32
14              THE WITNESS:  Yeah, me?  No.                  11:32
15    BY MR. MARKEVITCH:                                      11:32
16         Q.   You don't know?                               11:32
17         A.   I don't know.                                 11:32
18         Q.   How many film permits have you worked on for 11:32
19    the City of Menlo Park?                                 11:32
20         A.   Very few.                                     11:32
21         Q.   Two?                                          11:32
22         A.   Maybe two, maybe three.                       11:32
23         Q.   Do you remember the other one or two permits 11:32
24    that you worked on in addition to Mr. Zeleny's?        11:32
25         A.   Very vaguely.  I remember discussing with    11:32
```

Page 76

```
 1    relevant department heads.                        11:35
 2        Q.   And is there a fixed set of relevant     11:35
 3    department heads who would be involved in the film 11:35
 4    permitting process?                               11:35
 5        A.   I think it is completely dependent on each 11:36
 6    film permit.                                      11:36
 7        Q.   And who determines which department the  11:36
 8    request goes to?                                  11:36
 9        A.   That would be whoever is in charge of taking 11:36
10    in the film permits from Public Works.            11:36
11        Q.   Do you know if there's a written policy  11:36
12    within the City of Menlo Park that dictates how the 11:36
13    permitting process should be structured for any   11:36
14    specific permit?                                  11:36
15        A.   Well, there is the film permit application. 11:36
16    I don't know of any other document or rules that are 11:36
17    in place.                                         11:36
18             MR. MARKEVITCH:  Exhibit 63?             11:37
19             DEPOSITION REPORTER:  64.                11:37
20             MR. MARKEVITCH:  64.                     11:37
21             (Exhibit 64 marked for identification.)  11:37
22    BY MR. MARKEVITCH:                                11:37
23        Q.   Please take a look at this exhibit.      11:37
24             MR. MARKEVITCH:  For the record, it's a  11:37
25    chain of emails starting with MP001221 and ending 11:37
```

Veritext Legal Solutions
866 299-5127

```
 1    encroachment permit application.  I don't know if      12:10

 2    there were additional documents attached to this or    12:10

 3    provided at this specific time.                        12:10

 4        Q.   What is the function of this encroachment     12:10

 5    permit in the context of Mr. Zeleny submitting it?     12:10

 6        A.   Well, this is the film permit.  That's the    12:10

 7    entire function.                                       12:11

 8        Q.   If you go page 3 of this document.            12:11

 9        A.   Uh-huh.                                       12:11

10        Q.   You can see it looks like there's an email    12:11

11    from Mr. Zeleny --                                     12:11

12        A.   Uh-huh.                                       12:11

13        Q.   -- and I'm just going represent that it       12:11

14    looks like this is the email to which he attached      12:11

15    the encroachment application that we were just         12:11

16    looking at.  Does that sound correct, Mr. Flegel?      12:11

17        A.   It looks correct.                             12:11

18        Q.   And in this email there's some additional     12:11

19    information regarding the application of Mr. Zeleny;    12:11

20    correct?                                               12:11

21        A.   Yes.                                          12:11

22        Q.   Did you review this email at any time prior   12:11

23    to today?                                              12:11

24        A.   Yes.                                          12:11

25        Q.   When did you review it for the first time?    12:11
```

Veritext Legal Solutions
866 299-5127

```
 1        A.    Well, it would have been Mr. Toews and it      12:15
 2   would have been someone at the police department.         12:15
 3        Q.    Do you know who at the police department?       12:16
 4        A.    Not specifically.  I do believe there were      12:16
 5   a few people that were looking into the traffic            12:16
 6   and public safety implications.  I don't know who          12:16
 7   exactly.                                                    12:16
 8        Q.    Do you remember the process, the specifics,     12:16
 9   by which Mr. Toews relayed to you the information          12:16
10   that you then relayed to Mr. Zeleny?                        12:16
11        A.    I mean, if I looked at it carefully, my        12:16
12   memory is I mostly cut and paste his previous email,       12:16
13   and then Mr. Zeleny provided a response to, but it         12:16
14   wasn't -- I think the idea from staff was that it          12:16
15   wasn't a complete response.                                 12:17
16        Q.    Did you yourself analyze Mr. Zeleny's           12:17
17   response to the staff's request for additional            12:17
18   information?                                                12:17
19        A.    I read it.  That was not really my role was    12:17
20   to analyze whether or not it was complete or not.  I      12:17
21   wasn't the one making the determinations on whether       12:17
22   or not it was complete.  My role at that point was        12:17
23   just to try to figure out how to move this along          12:17
24   so we could get the permit and to respond to his          12:17
25   question.  I mean, I think I responded to his             12:17
```

1   question, yes, you can open carry as soon as your    12:17

2   film permit is issued as part of this -- as part of    12:17

3   this process, which was the question that he had    12:17

4   posed to me.    12:17

5        Q.   Okay.  So were you working on any other    12:17

6   questions, whether legal or logistical, with regard    12:17

7   to this application?    12:17

8        A.   Well, the other -- so there's the question I   12:17

9   just mentioned.    12:18

10       Q.   Correct.    12:18

11       A.   Whether or not the exemption would be met;    12:18

12  and I answered, yes, it would be if you obtain the    12:18

13  film permit.    12:18

14            And then No. 2, I don't remember exactly    12:18

15  how it -- I think maybe it was the next email or two    12:18

16  emails later where Mr. Zeleny, it sounded like he    12:18

17  was protesting whether or not he even needed to fill    12:18

18  out the permit and if it was appropriate for him to    12:18

19  just simply wear a GoPro camera and a clown nose and    12:18

20  if that was sufficient to meet the exemption.  So    12:18

21  there was that issue as well.    12:18

22       Q.   Was it sufficient in your determination    12:18

23  to meet the exemption if he was wearing the GoPro    12:18

24  camera in a clown suit?    12:18

25       A.   That's really the million dollar question.    12:18

```
1    was what it -- it was described more as a film          12:22
2    project than a special event project.                    12:22
3         Q.   And that is in the context of his              12:22
4    application for the special event project?               12:22
5         A.   Right.                                          12:22
6         Q.   Now, you testified that somebody within        12:22
7    the City staff had reviewed Mr. Zeleny's response to     12:22
8    their questions; correct?                                12:22
9         A.   My understanding is Mr. Toews did.             12:22
10        Q.   Do you know if Mr. Toews conducted             12:22
11   this review in the context of specific, you know,       12:22
12   criteria that he was applying to ascertain whether      12:23
13   or not the responses were sufficient?                   12:23
14        A.   Well, yes.  I mean, there's the actual video 12:23
15   or film permit application that lists what their        12:23
16   criteria are.                                            12:23
17        Q.   Let's go back to Exhibit 61, if we may.       12:23
18        A.   Okay.                                          12:23
19        Q.   Okay.  And so we're going to go back and      12:23
20   forth to the question and the answer several times      12:23
21   here.  So the questions start on page 1291.  This is    12:23
22   the second page of this document.                       12:23
23        A.   Okay.                                          12:23
24        Q.   Okay.  At the very bottom there it            12:23
25   looks like there's an email from Mr. Toews dated        12:24
```

Veritext Legal Solutions
866 299-5127

```
1    crew and their roles, including the cameramen.          13:41

2        A.    Uh-huh.

3        Q.    Is there any authority for requesting          13:41

4    the names of the participants in a filming permit       13:41

5    context?                                                13:41

6        A.    Well, paragraph 1 asks for the number of      13:41

7    cast and crew members.  My recollection was because     13:41

8    someone was going to be holding the weapon, that the    13:41

9    police department wanted to make sure it wasn't a       13:41

10   felon or something along those lines.  It was           13:41

11   someone that could legally hold the weapon.             13:41

12       Q.    And that type of analysis and background      13:41

13   check is part of the film permitting process at the     13:41

14   City of Menlo Park?                                     13:42

15           MR. MASTER:   Objection.  Vague and ambiguous   13:42

16   and overbroad.                                          13:42

17           THE WITNESS:   For this specific application    13:42

18   figuring out who is going to be holding weapons I       13:42

19   think is something that the City had to determine to    13:42

20   make sure it was legally going to be done for public    13:42

21   safety purposes.                                        13:42

22   BY MR. MARKEVITCH:                                      13:42

23       Q.    Prior to issuing a filming permit.            13:42

24       A.    Yes.                                          13:42

25       Q.    So if a big Hollywood production came in and  13:42
```

Veritext Legal Solutions
866 299-5127

```
 1    seems to be the same as A.

 2              DEPOSITION REPORTER:  A or 8?

 3              MR. MARKEVITCH:  "A."

 4              DEPOSITION REPORTER:  Sorry.  "I don't know

 5    why..."

 6              THE WITNESS:  I'm on board with you.  A      14:19

 7    and F are asking the same question, I would think.     14:19

 8    Maybe staging is different.  Again, this was -- this   14:19

 9    was not my call a hundred percent.                     14:19

10    BY MR. MARKEVITCH:                                      14:19

11       Q.   So F was not written by you?                   14:19

12       A.   It may have been, but -- I may have typed      14:19

13    the words -- I mean, I certainly typed the words,      14:19

14    but the information sought was being sought by staff   14:19

15    to understand it.                                       14:19

16              And, again, I think that question is          14:19

17    answered at some point by Mr. Zeleny.                  14:20

18       Q.   Paragraph G, "Loaded ammunition."             14:20

19              "You indicated that you intend to            14:20

20              have loaded ammunition feeding devices       14:20

21              with you.  Please describe what this         14:20

22              means, and provide pictures of the           14:20

23              props," and then there's an example.         14:20

24              "For example, you are intending to use       14:20

25              props (fakes)" -- I'm sorry.  Strike that.   14:20
```

Page 154

```
 1              "For example, are you intending to use        14:20

 2              props (fakes) or have with you actual         14:20

 3              magazines with live ammunition?"              14:20

 4              Did you draft this paragraph G since it       14:20

 5      pertains to the weapons?                              14:20

 6          A.   I certainly wrote this.   And, again, this   14:20

 7      was the police trying to figure out what type of     14:20

 8      public safety elements they needed to consider.   We 14:20

 9      live in a country with a bunch of mass shootings.    14:21

10      If he's going to have guns with ammunition, that's   14:21

11      half a step away.   That's something they need to    14:21

12      consider.                                            14:21

13          Q.   As far as the exception for the prohibition 14:21

14      on open carry is concerned --                        14:21

15          A.   Right.                                       14:21

16          Q.   -- does it matter if the person is going    14:21

17      to have legal possession of real, live or prop       14:21

18      ammunition?                                          14:21

19          A.   In terms of the exception?                  14:21

20          Q.   Yeah.                                        14:21

21          A.   I mean, you're asking -- that's really a    14:21

22      question for a judge.   I would think no, but having 14:21

23      the live ammunition is a public safety issue that    14:21

24      is -- you know, it has to be dealt with as part of   14:21

25      the permit.                                          14:21
```

```
 1       Q.   Let me ask you a hypothetical question.    14:21

 2   Let's say the answer to this question was -- and I    14:22

 3   think indeed it is --                                 14:22

 4       A.   Uh-huh.                                      14:22

 5       Q.   -- that it's going to be live ammunition but 14:22

 6   it's going to be carried in a manner that is legal    14:22

 7   within the context of the exception.  Would that be   14:22

 8   satisfactory for the permit application process?      14:22

 9            MR. MASTER:  I'll just object it's vague     14:22

10   and ambiguous, lacks foundation, and calls for        14:22

11   speculation.                                          14:22

12            THE WITNESS:  You're going to have to ask    14:22

13   the police department that question.  I can't answer  14:22

14   it.                                                   14:22

15   BY MR. MARKEVITCH:                                    14:22

16       Q.   So it's the police department that makes     14:22

17   that decision?                                        14:22

18       A.   They're the ones dealing with this public    14:22

19   safety aspect, yes.                                   14:22

20       Q.   And they have the discretion to deny the     14:22

21   permit based on the presence of live ammunition, as

22   far as you know?                                      14:22

23       A.   Honestly, I don't know.                      14:22

24       Q.   So you don't know if they have the           14:22

25   discretion to deny it based on presence or absence    14:22
```

Veritext Legal Solutions
866 299-5127

```
 1   of live ammunition?                              14:22

 2       A.   They have the discretion to determine if  14:23

 3   they think it's a public safety problem and to   14:23

 4   communicate that with the applicant and figure out a  14:23

 5   way so the applicant can make their movie in a way  14:23

 6   that the City is comfortable with and it's going to  14:23

 7   be a safe -- and done in a safe way.             14:23

 8       Q.   Are you aware of any communications between  14:23

 9   the police department and Mr. Zeleny with regard to  14:23

10   conditions under which the police department would  14:23

11   be satisfied with the safety concerns?           14:23

12       A.   Well, that's actually why I'm asking      14:23

13   the question here, so we can be provided that     14:23

14   information and it can be analyzed and worked     14:23

15   through as part of granting the permit.          14:23

16       Q.   Well, did they ever say, "We can grant    14:23

17   it conditionally, but don't bring live ammo"?     14:24

18       A.   That exact email I don't believe was ever  14:24

19   written.  I mean, I don't know -- I don't know --  14:24

20   I'm trying to think of the concept of conditionally  14:24

21   granting a permit.  I don't even really know what  14:24

22   that means.  That's just something that happens.  14:24

23   I mean, would you -- I'm just trying to think out  14:24

24   loud.  Would you ask the DMV to conditionally grant  14:24

25   you a driver's license before you go take the test?  14:24
```

Veritext Legal Solutions
866 299-5127

```
 1        A.    No.  I like to keep using that term though.   14:37

 2   That was just an example.  I have two little kids.   14:37

 3   They draw everything in stick figures, so...   14:37

 4           MR. MARKEVITCH:  All right.   14:37

 5           DEPOSITION REPORTER:  Exhibit 73.   14:37

 6           (Exhibit 73 marked for identification.)   14:37

 7           MR. MARKEVITCH:  For the record, this is   14:37

 8   another permit.  The Bates number on the first page   14:37

 9   is MP001722.   14:37

10           THE WITNESS:  Thank you.   14:38

11   BY MR. MARKEVITCH:   14:38

12        Q.    Do you recognize this as another permit   14:38

13   issued by the City of Menlo Park?   14:38

14        A.    I've never seen this before.  That's   14:38

15   certainly what it looks like.  It looks like it   14:38

16   was produced in this litigation.   14:38

17        Q.    If you go to the page 1726.   14:38

18        A.    Yes.   14:38

19        Q.    There's a map there; correct?   14:38

20        A.    A hard to read map; but, yes.   14:38

21        Q.    Yeah.  And it presumably identifies where   14:38

22   this photo shoot or filming is going to take place?   14:39

23           MR. MASTER:  Well, I'm just going to object.   14:39

24   The document speaks for itself.  He's already --   14:39

25   the witness has already said he's never seen the   14:39
```

Page 167

```
1        I, JANIS JENNINGS, CSR No. 3942, Certified
2   Shorthand Reporter, certify:
3        That the foregoing proceedings were taken
4   before me at the time and place therein set forth, at
5   which time the witness was duly sworn by me;
6        That the testimony of the witness, the
7   questions propounded, and all objections and statements
8   made at the time of the examination were recorded
9   stenographically by me and were thereafter transcribed;
10       That the foregoing pages contain a full, true
11  and accurate record of all proceedings and testimony.
12       Pursuant to F.R.C.P. 30(e)(2) before
13  completion of the proceedings, review of the transcript
14  [  ] was [X] was not requested.
15       I further certify that I am not a relative or
16  employee of any attorney of the parties, nor financially
17  interested in the action.
18       I declare under penalty of perjury under the
19  laws of California that the foregoing is true and
20  correct.
         Dated this 12th day of March 2020
21
22
23  _____
24
         JANIS JENNINGS, CSR NO. 3942
25            CLR, CCRR

                                    Page 222
```

**EXHIBIT 5**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL ZELENY,                          )
                                         )
                Plaintiff,               )
                                         )
vs.                                      ) No. CV 17-7357 JCS
                                         )
GAVIN NEWSOM, et al.,                    )
                                         )
                Defendants.              )
_____)


REMOTE VIDEO-RECORDED DEPOSITION OF ALEX D. McINTYRE

San Francisco, California

Friday, July 31st, 2020

Reported by:

DAWN A. STARK

CSR No. 7847

Job No. 4195014

Pages 1 - 197

```
1      Q.   What -- what factors did you consider in trying
2   to ascertain whether or not having that monitor that
3   Mr. Zeleny was proposing would create an unsafe
4   condition?
5      A.   What factors did I consider?
6      Q.   Correct.
7      A.   Advice from my Public Works staff with regards
8   to whether or not such a display could be any kind of
9   distraction.
10          Also, just personally having driven Sand Hill
11  many times, the speed limit there and the idea of being
12  distracted by whatever display is there, you know,
13  creating an unsafe situation.
14     Q.   Did the city conduct any studies with regard to
15  whether or not a display of the type Mr. Zeleny was
16  proposing would indeed impair a driver's ability to
17  concentrate on what they were doing?
18     A.   I don't believe we did.
19     Q.   Were there concerns with the brightness of the
20  display?
21     A.   The brightness would have to do with creating a
22  distraction, so yes.
23     Q.   Are you aware of any standards for determining
24  whether or not a certain brightness of a display is a
25  distraction?
```

1      A.    I am not aware of that, no.

2      Q.    Are you aware of any work being done by anybody

3   at the City of Menlo Park with regard to determining

4   whether or not Mr. Zeleny's proposed display would be a

5   distraction in the context of the brightness?

6      A.    I'm unaware of any studies.

7      Q.    Can you say with certainty that some studies

8   were not conducted?

9      A.    I couldn't say with certainty, but I can say

10  with a certain level of confidence that these studies

11  were not conducted.

12     Q.    Can you say with a level of confidence that no

13  studies were conducted whatsoever with regards to whether

14  or not a display that Mr. Zeleny proposed would indeed

15  cause a distraction?

16           MR. MASTER:   Objection.   Asked and answered.

17  Argumentative.

18           Go ahead.

19           THE WITNESS:   I could not say for a fact that

20  anyone on my staff in the City of Menlo Park at the time

21  may or may not have conducted any kind of exploration,

22  research, or -- or study.

23  BY MR. MARKEVITCH:

24     Q.    Are you aware of any such exploration, research,

25  or study?

Veritext Legal Solutions
866 299-5127

1      A.   I'm unaware.

2      Q.   Do you, in the context of being a Hearing

3   Officer, expect that any such studies would have been

4   presented to you?

5           MR. MASTER:  Objection.  Vague and ambiguous.

6   Overbroad.

7           THE WITNESS:  Repeat the question.

8   BY MR. MARKEVITCH:

9      Q.   If the studies were conducted or research was

10  conducted of the type that we were just discussing, would

11  you expect that information to be presented to you at the

12  hearing with regards to Mr. Zeleny's application?

13     A.   That would -- that would be an expectation, yes.

14     Q.   Are there any standards that would require such

15  information to be presented to you in the context of an

16  appeal hearing?

17     A.   I don't know.

18     Q.   Are you aware of any standards or standard

19  operating procedures or rules within the City of

20  Menlo Park that would outline a procedure for how the

21  evidence necessary for an appeals hearing of the type

22  that you presided over has to be collected?

23     A.   I am not aware of any.

24     Q.   Are you aware of any rules or procedures within

25  the City of Menlo Park that govern how available evidence

```
1   that was collected by any means, by anyone, would be

2   presented to a hearing of the type that you presided

3   over?

4        A.   I'm unaware of that.

5        Q.   Who made a decision that Chief --

6   Commander Bertini would be the only person presenting

7   information to you at the time of the appeal hearing?

8        A.   I don't know.

9        Q.   Did you make that decision?

10       A.   No.

11       Q.   Did you make any decision that excluded

12  everybody else from the hearing from the side of the

13  Menlo Park city?

14       A.   No.

15       Q.   Do you remember requests by others to attend the

16  hearing?

17       A.   No.

18       Q.   Do you remember asking anyone on your staff to

19  ascertain who should be at the hearing?

20       A.   No.

21            MR. MASTER:  David, we've been going for about

22  an hour.

23            What's your time estimate?

24            I'm just trying to see if we need a brief lunch

25  or not.
```

Veritext Legal Solutions
866 299-5127

1    following.

2       Q.    Okay.  What are those four bullets and how do

3    they relate to the three bullet points that we've just

4    discussed?

5            MR. MASTER:  Objection.  Compound.  The document

6    speaks for itself.

7            Go ahead.

8            THE WITNESS:  I believe these last four bullets

9    may not be cited under any legal specific authority,

10   whether it's the state, federal, or local laws.

11           They were more of a practical, common-sense

12   approach to some of the concerns, as well.

13           MR. MARKEVITCH:  Okay.

14      Q.    Looking at the top one, do you mind reading it

15   for the record, please?

16      A.    I apologize?

17      Q.    Looking at the -- do you mind reading the top --

18   the first bullet point on that --

19      A.    Oh, certainly.

20           (Witness reviewing screen.)

21           "The lighting at night would be highly

22   distracting to motorists, cyclists, and pedestrians."

23      Q.    Did anybody make a determination that the

24   lighting would indeed be highly distracting to motorists,

25   cyclists, and pedestrians?

Veritext Legal Solutions
866 299-5127

```
 1        A.    I think it was basically a practical

 2   understanding of mine that that could be certainly the

 3   case.

 4        Q.    Your personal understanding; correct?

 5        A.    Correct.

 6        Q.    And in gaining that understanding, did you look

 7   at any objective factors?

 8        A.    No, I --

 9              MR. MASTER:   Vague and ambiguous -- hold on.

10              Objection.   Vague and ambiguous.   Overbroad.

11              Go ahead.

12              THE WITNESS:   No, I did not.

13   BY MR. MARKEVITCH:

14        Q.    Are there any procedures that existed within the

15   City of Menlo Park that would inform this understanding

16   in any way?

17        A.    Not to my knowledge.

18        Q.    Did you review any data before you reached this

19   understanding?

20        A.    No.

21        Q.    Moving on to the next bullet point, I'll read

22   it.

23              "City medians are not traditional public forum

24   areas and are inappropriate and unsafe."

25              Did you make this determination personally?
```

Veritext Legal Solutions
866 299-5127

```
 1            MR. MASTER:  Objection --
 2   BY MR. MARKEVITCH:
 3       Q.   -- during the time period of 2012 through the
 4   time when you were reviewing Mr. Zeleny's matter?
 5            MR. MASTER:  Objection.  Vague and ambiguous and
 6   overbroad.  Lacks foundation.  Calls for a legal
 7   conclusion.
 8            Go ahead.
 9            THE WITNESS:  I'm -- I'm aware -- I believe
10   there were objective -- there were factors that staff
11   would look at and consider in reviewing the application
12   for any kind of event or any kind of a permit.
13            And each of those would flow to the various
14   affected departments to make sure there was an
15   understanding of what was being requested and the impact
16   it would have upon the -- either the public right-of-way,
17   the public space, or the community.
18   BY MR. MARKEVITCH:
19       Q.   Are you aware of any written document that
20   summarizes the factors and the objective standards
21   applied to the review by various departments?
22       A.   I am not aware of that.
23       Q.   In the same folder, there is another exhibit
24   that is titled, "SE Permit FAQ Ex 33."
25            It's the very bottom exhibit in the folder.
```

1       Q.   Do you have any -- let me withdraw that.

2            I'd like to go back to the exhibit that is the

3       FAQ Exhibit, Exhibit 33.

4       A.   (Witness reviewing screen.)

5            Okay.

6       Q.   Same page, same section on page 1820.

7            And then there's a statement here that is --

8       that the approval or denial of any application is at the

9       discretion of the Special Event Permit Committee.

10           Do you have an understanding as to the outlines

11      of the -- and the level of the discretion that could be

12      exercised by the Special Event Permit Committee?

13      A.   (Witness reviewing screen.)

14           I don't understand the concept of "outlines."

15           What do you mean?

16      Q.   Were there any objective standards that had to

17      be applied as the Special Event Permit Committee

18      applied -- exercised its discretion?

19           MR. MASTER:   I'm going to object.   The question

20      is vague and ambiguous and overbroad.   Lacks foundation.

21      Calls for speculation.   Legal conclusion.

22           Go ahead.

23           THE WITNESS:   I'm unaware if there were or were

24      not.

25      //

```
 1    BY MR. MARKEVITCH:
 2        Q.   So you do not know if there were any set
 3    procedures in place that would guide a committee or any
 4    individual at Menlo Park in making a decision as to
 5    whether to deny or approve a Special Event Permit
 6    Application?
 7        A.   As far as set procedures, no, I'm unaware of
 8    those.
 9        Q.   And when I talk about "set procedures," I'm
10    talking about procedures that may -- that are probably
11    written down.
12             Do we have that understanding?
13        A.   Okay.
14        Q.   So you're unaware of any written procedures in
15    that regard?
16        A.   Correct.
17        Q.   Are you aware of any limits to the exercise of
18    discretion by the Special Event Permit Committee that
19    were set forth within the City of Menlo Park?
20             MR. MASTER:  I'm just going to object.  The
21    question is vague, ambiguous and overbroad.  Lacks
22    foundation.  Calls for speculation.  Calls for a legal
23    conclusion.
24             Go ahead.
25             THE WITNESS:  I'm unaware of any limits except
```

1    for each of those -- each of those people -- or each of

    2    those functions would have been able to exercise its

    3    discretion as it relates to that specific box, whether it

    4    was Police, Engineering, Planning -- I forget the other

    5    boxes off the top of my head.

    6              So each of them would have been able to provide

    7    feedback and their expert opinion as to whether or not

    8    there are community impacts that need to be noted.

    9    BY MR. MARKEVITCH:

    10       Q.   Are you aware of any guidelines or procedures

    11   for determining what community impacts are pertinent to a

    12   review of a Permit Application such as Mr. Zeleny's?

    13              MR. MASTER:   I'm just going to object.   The

    14   question is hopelessly vague, ambiguous, and overbroad.

    15   It's an incomplete hypothetical.   Lacks foundation.

    16   Calls for speculation.

    17              Go ahead.

    18              THE WITNESS:   I'm unaware.

    19   BY MR. MARKEVITCH:

    20       Q.   And would it be fair to say that the expert

    21   opinion, as you've expressed that term, given by any

    22   given department, would be given a lot of weight?

    23              MR. MASTER:  Objection.  Vague, ambiguous, and

    24   overbroad.

    25              Go ahead.

```
 1              If it's the same site as -- yes, I mean, I --

 2    sitting here and looking at this right now, I don't know

 3    if that's taking me to that specific site on Sand Hill,

 4    but I believe it is, yes.

 5         Q.   Okay.   Based on the information that you had

 6    just looked at, in the context of a definition of what is

 7    a Special Event, within the Special Event Permitting

 8    process at the City of Menlo Park, would you agree that

 9    this event, as proposed, qualifies as a Special Event?

10         A.   I think it meets the criteria of a Special

11    Event, yes.

12         Q.   Could you please open Exhibit 99.

13         A.   (Witness reviewing screen.)

14              Okay.

15         Q.   We looked at this earlier today.

16              This is July 21st, 2015, email from

17    Commander Bertini to several individuals.

18              Could you please --

19         A.   Yes.

20         Q.   Thank you.

21              I'm going to read the first sentence -- or the

22    first part of the first sentence of paragraph 2 of this

23    email.

24              It states, "Although we tend to deny this

25    application on several grounds, predominantly that this
```

```
 1   is not a Special Event as defined by the city."

 2           Do you have an understanding, based on this

 3   document, this is something that Commander Bertini wrote

 4   on July 21st, 2015?

 5           MR. MASTER:  I'll object it lacks foundation.

 6   Calls for speculation.  He's not the author.  He's never

 7   seen it before.

 8           Go ahead.

 9           THE WITNESS:  Yes, based on what is written

10   there, it's indicating that Mr. Zeleny's application does

11   not seem to appear to be a Special Event, according to

12   Commander Bertini.

13   BY MR. MARKEVITCH:

14       Q.   Do you agree with that conclusion by

15   Commander Bertini?

16       A.   No.

17       Q.   Do you agree with the idea that an application

18   would be presumed denied on this basis stated here, that

19   it's not a Special Event, before the process of the

20   review was completed?

21           MR. MASTER:  I'm going to object to the

22   question.  It's confusing and unintelligible.  It's vague

23   and ambiguous and overbroad.

24           I don't understand; go ahead if you do.

25   //
```

```
1    STATE OF CALIFORNIA        )

2                               )

3    COUNTY OF SAN FRANCISCO    )

4

5            I, the undersigned, a Certified Shorthand

6    Reporter of the State of California, do hereby certify:

7            That the foregoing proceedings were taken

8    before me at the time and place herein set forth; that

9    any witnesses in the foregoing proceedings, prior to

10   testifying, were placed under oath; that a verbatim

11   record of the proceedings was made by me using machine

12   shorthand which was thereafter transcribed under my

13   direction; further, that the foregoing is an accurate

14   transcription thereof.

15           I further certify that I am neither financially

16   interested in the action nor a relative or employee of

17   any attorney or any of the parties.

18           IN WITNESS WHEREOF, I have this date subscribed

19   my name.

20           Dated:  September 10, 2020

21

22

23

24           DAWN A. STARK

             CSR No. 7847

25
```

Veritext Legal Solutions
866 299-5127

EXHIBIT 6

Dave,

As you know from my earlier automated reply, I was away from the office last week. Sorry for the delay in getting back to you.

Thanks for keeping us informed on these developments. I would be more than happy to attend the meeting that you set up to provide whatever assistance I can. The questions that you're asking are difficult for me to answer definitively, as a filing decision always requires a particularized review of the facts and circumstances of the individual case and defendant. The sections you cite, PC 26350 and PC 26400, apply generally to the possession of unloaded firearms. Each section has a number of elements which must be met, concerning such things as the location of the firearm (upon the person or outside a vehicle), and each section is subject to a number of exemptions (see eg. PC 26361 et.seq. and PC 26405). While the arrest itself must be based upon probable cause, our review would require application of the higher "beyond a reasonable doubt" standard; we would also need to determine whether it is reasonably likely that a jury would convict.

As you note, PC 26405(r) is one of the exceptions to the law. We did some research on that subdivision during the last case but the law was not well defined. The section does not specify what agency is to provide the "authorization." If the City denies authorization, and no other agency grants it, we should be on solid legal ground in arguing that the subdivision does not apply; we would most likely have to litigate such an issue, as I can imagine a number of possible arguments the defendant could make. So, to answer your question, I would say it is possible, though unlikely, that 26405(r) would be deemed to apply.

I took a look at the link you provided, which is a cartoon depiction of what appears to be sexual intercourse. Section 647(j)(4) is a relatively new law and there is not a lot of guidance as to the extent of its application. Clearly, the intent was to prohibit photographs of actual persons. Whether "image" would encompass the cartoon depiction of a person is not entirely clear to me, but I suspect it would not. Additionally, the section requires proof that the person depicted suffers emotional distress. We would of course review any case that was submitted for filing, but those are my preliminary thoughts on the viability of using that section.

I hope this is of assistance. Please do not hesitate to contact me directly if you would like to discuss this further.

Best regards,

Al

Albert A. Serrato
Assistant District Attorney
San Mateo County
400 County Center, 3rd Floor
Redwood City, CA 94063
(650) 363-4823
>>> "Bertini, David C" <dcbertini@menlopark.org> 7/22/2015 11:43 AM >>>
Good morning Steve, Karen and Alberto.

We will be scheduling a meeting with all the effected entities in regards to open carry suspect Michael Zeleny, who has submitted the attached application for a "special event" in front of the NEA

EXHIBIT
0263

MP0

properties, which is also the site of the Rosewood Hotel and other businesses on Sand Hill Road. As you are aware, this subject has been "protesting" while heavily armed in this same location for several years. As a matter of fact, after open carry of handguns became illegal, a photo of Zeleny on one of his protests was used as evidence for the state legislation during a hearing for the new law prohibiting open carry of long guns.

As you also know, we had a case that went to trial against Zeleny for possession of a concealed handgun, in which one of his defenses was that he was involved in the making of a "motion picture". Based on the attached application and email sent by Zeleny, it seems like he may be attempting to get around the open carry laws by saying his multimedia presentation falls under the exception to 26400 PC found in 26405(r) PC.

In discussions with our City Attorney Bill McClure, we are sure we are on solid ground to deny his application since his "event" does not comply with the City's definition of a special event, and after completing the appropriate due diligence, we will notify him of the denial. This brings up several questions that we would like your opinion on:

- If Zeleny shows up without a permit for his "multimedia" presentation and is armed with the unloaded weapons he stated he would use, will your office go forward with prosecutions of 26350 and 26400 PC, if he is arrested for this violations (based of course that probable cause existed for the arrest)?
- Would the exception found in 26405(r) PC, be applicable even if he has not been properly permitted by the City?
- Could you review the image that Zeleny intends to display, and in case he does not have any openly carried guns, would this image be illegal pursuant to 370/372 PC or 647(4)(a) PC? (The image can be located at: http://larvatus.livejournal.com/371973.html )

I am also aware that Zeleny has field some kind of suit against your office, but am unsure in what forum he has don't this, alleging false prosecution?

Thanks for your help on this and feel free to give me a call if you would like to discuss.

Dave

Commander Dave Bertini
Menlo Park Police Department
701 Laurel Street
Menlo Park, CA. 94025
650.330.6321

---

**From:** Bertini, David C
**Sent:** Tuesday, July 21, 2015 6:14 PM
**To:** 'David Tresmontan'; 'jimmy.mazon@rosewoodhotels.com'; 'tsanchez@smcgov.org'; Steve Wagstaffe; McClure, William (wlm@jsmf.com)
**Cc:** Dixon, William A; Jonsen, Robert (RJonsen@menlopark.org); Greg Munks (gmunks@co.sanmateo.ca.us)
**Subject:** RE: Special Event Permit Application

**Importance:** High

Good afternoon all.

As you are aware, Michael Zeleny has submitted an application for a "special event" to be held somewhere in front of the Rosewood Hotel / NEA Property located at 2825 Sand Hill Road in Menlo Park. This "special event" would consist of a very similar protest he has conducted in the past, including carrying several unloaded military type firearms, along with a 55" display with sexually explicit caricatures, portable lighting and a generator. The application indicates a set up date of 9-30-15, with the event to be "ongoing" and "indefinite".

Although we intend to deny this application on several grounds (predominately that this is not a "special event" as defined by the City), we are in the process of requesting more information from him on the exact location he was intending as it was not clear on his application. Once we have gone through the formal information gathering process, we will notify him of our decision on his application.

In the meantime, I will be clearing up several legal issues with the District Attorney's Office and then scheduling a meeting with the entities involved (NEA, Rosewood Hotel, Menlo Park Police and City Attorney's Office, SMCO Sheriff's Office and the District Attorney's Office). At this meeting we can discuss our combined response in case Zeleny decides to proceed without a permit.

If those interested in attending can please check their availability the week of August 17th or the week of August 24th, I will set up a meeting to discuss our response to any possible action by Zeleny.

Feel free to contact me if you have any questions.

Thanks.

Commander Dave Bertini
Menlo Park Police Department
701 Laurel Street
Menlo Park, CA. 94025
650.330.6321

**From:** larvatus@gmail.com [mailto:larvatus@gmail.com] **On Behalf Of** Michael Zeleny
**Sent:** Friday, July 10, 2015 11:05 AM
**To:** McClure, William; Scott Sandell; Milde, Matt L; Police Chief
**Cc:** David W. Affeld; Peter Shimamoto
**Subject:** Special Event Permit Application

Michael Zeleny
michael@massmeans.com
zeleny@post.harvard.edu

7576 Willow Glen Road, Los Angeles, CA 90046
voice:323.363.1860
fax:323.410.2373

City of Menlo Park
Matt Milde
Recreation Program Coordinator
mlmilde@menlopark.org
701 Laurel Street
Menlo Park, CA 94025
voice:650.330.2223
fax:650.330.2242

By email, fax, and postal mail.

Starting in October 2015, we shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu, and continuing until NEA publicly acknowledges its wrongdoing and severs its relationship with Min Zhu, Scott Sandell, and Dick Kramlich. I shall be present on site around the clock, served by support staff and equipped with fully operational, exposed and unloaded military grade firearms and loaded ammunition feeding devices therefor, including without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a 7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed Browning M1919a4, in full compliance with all applicable laws. A 55" portable media display powered by a portable gas generator will display videos featuring explicit representations of sexual violence committed by NEA's publicly disgraced protégé. A sample image can be found at http://larvatus.livejournal.com/371973.html. All media aspects of this event will be subject to content-neutral regulation negotiated with Menlo Park authorities. My fundamental rights under the First and Second Amendments of the Constitution of the United States are reserved and non-negotiable.

A site map can be found at https://www.google.com/maps/@37.4197308,-122.2137188,17z/. My display will be confined to the median strip on Sand Hill Road directly across the NEA headquarters. No obstruction of automotive or foot traffic will take place. Please contact me to arrange for the payment of the special event fee and discuss any organizational matters. Please address all legal inquiries and requests to David W. Affeld, Affeld Grivakes Zucker LLP, 2049 Century Park East, Suite 2460, Los Angeles, CA 90067, voice:310.979.8700, fax:310.979.8701.

cc:

Bill McClure
Menlo Park City Attorney
wlm@jsmf.comvoice:650-330-6610
Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA 94025
voice:650.324.9300
fax:650.324.0227

Robert Jonsen

MP000299

Menlo Park Police Chief
policechief@menlopark.org
701 Laurel St.
Menlo Park, CA 94025
voice:650.330.6600

Scott Sandell
New Enterprise Associates
ssandell@nea.com
2855 Sand Hill Road
Menlo Park, CA 94025
United States
voice:650.854.9499
fax:650.854.9397

—

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los Angeles,
CA 90046 | voice:323.363.1860 | fax:323.410.2373
http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No
matter. Try again. Fail again. Fail better." — Samuel Beckett

**EXHIBIT 7**



City of Menlo Park   701 Laurel Street   Menlo Park, CA 94025
Building Inspection Department
Phone:(650) 330-6704

# PERMIT

Page 1 of 1

| Permit No.: | FILM2018-004 | Project Address: | 2180 SAND HILL RD | 2/5/2018 |

Assessor's Parcel Number:  074283080

**Project Name:**

**Type of Work:**      **Type Const:**      **Occupancy:**

**Applied:** 2/5/2018

**Issued:** 2/5/2018

**Permit To Do:** HBO Silicon Valley. Filming establishing shots from the sidewalks of Sand Hill Road along the block between Sharon Park Drive and santa Cruz Avenue.  No interference with traffic.  With safety and precaution and by using cross walks, some shots may be taken from the median. Activity includes 10 crew, 1 cube truck and 1 van.

**Expire Date:**

**Final:**

**Owner's Name:**

**Valuation:**

**Contractor:** BROWN HILL PRODUCTIONS
10202 W. WASHINGTON BLVD DAVID LE
CULVER CITY CA 90232

**Architect:**

**Engineer:**      **Designer:**

PAID
FEB 0 5 2018
CITY OF MENLO PARK

| Fee Description | Fee Amount | Amount Paid | Date Paid | Balance Due |
|---|---|---|---|---|
| **Total Fees:** | $200 | **Total Fees Due:** | | |

This receipt certifies that on the date(s) shown in the "Date Paid" column above, the City of Menlo Park imposed the above itemized fees, dedications, reservations or exactions (collectively "fees"). The project applicant is hereby notified that he/she has **90 calendar days** from the date of payment as shown on this receipt to protest, in writing, in accordance with California Government Code §66020(a), any and all fees.  Any party timely filing a protest may file an action to attack, review, set aside, void or annul the imposition of the fees within 180 days from the date of this notice.

**This permit shall be posted on job site until project
has received an approved final inspection**

EXHIBIT  73
Helen  3/3/20
(WITNESS)    (DATE)
JANIS JENNINGS, CSR, CCRR

MP001722



# GENERAL CONDITIONS OF PERMIT

### Engineering Division
### 701 Laurel Street
### Menlo Park, CA 94025
### Notification of Work or Inspection Requests: (650) 330-6740

1. This permit, regardless of when dated, shall not be in effect until the applicant has obtained all licenses and other permits required by law.

2. This permit is declared **null and void** if work has not commenced three (3) months after the date of permit issuance.

3. Traffic control plan is required for work that will block public right-of-way. Plan shall include re-routing of vehicles, bicycles and pedestrians.

4. Any damages to existing facilities and improvements above ground or below ground, shall be promptly repaired or replaced at the permittee's expense, and claims for damage to City property must be promptly paid.

5. Applicant is responsible for determining exact locations or depths of existing utilities or other facilities. Call Underground Service Alert (USA) at 1-800-227-2600 a minimum of 48 hours prior to performing work.

6. Applicant carries sufficient insurance to work in the public right of way, and names City of Menlo Park as additional insured. Applicant agrees to keep insurance active for the duration of the project.

7. All work shall comply with the City and Caltrans Standards, including traffic control.

8. **Street Opening, Sidewalk, Curb and Gutter, and Driveway Permits.** Permittee shall notify the Public Works Inspector at least **24 hours prior to: beginning work, inspection requests, or concrete placement**. The number and type of inspections required, and any tests that may be required will be as directed by the Public Works Inspector. The Public Works Inspector may be contacted by calling (650) 330-6740.

9. All trench plates used in the public right of way must have a non-skid surface.

10. Construction activities are restricted to Monday through Friday (City holidays excepted) between the hours of 8:00 AM and 5:00 PM, unless otherwise approved in writing by the Engineering Services Division.

11. A faithful performance bond or a cash deposit in an amount equal to the estimated cost of the proposed work is required for curb and gutter, driveway, or street opening permits

12. This grant of permission does not constitute a deed or grant of easement by the City, is not transferable or assignable and is revocable at any time at the will of the City.

13. This permit does not authorize tree trimming or tree removal.

14. *The traffic control plan as attached must be adhered to at all times. Note that the traffic control plan may have restricted working hours for working in the public right of way, which supersedes the standard encroachment permit working hours.*

15. The use of City property by permittee shall be limited to the purposes set forth by this permit and no structures of any kind, except those expressly permitted shall be erected or placed thereon.

16. Debris boxes/storage containers shall have reflectors so that they can be seen at night. This permit must be taped to the outside of debris boxes in a visible location.

17. This permit does not include overnight street parking for any vehicles. A separate parking permit can be obtained from the Police Department.

18. All stormwater BMP's must be in place between October 15th and April 15th, or as directed by the Public Works Inspector.

19. Additional conditions (if any) are attached to this permit and shall be followed accordingly.

**Additional Conditions:**



**City of Menlo Park**
**Engineering Division**
701 Laurel Street
Menlo Park, CA 94025
Telephone (650) 330-6740

**PERMIT NO.:** _____
Keep this permit at the work site at all times

Call 24 hours in advance of working in the public right of way AND for each inspection request.
*Uninspected work will be rejected.*

## ENCROACHMENT PERMIT APPLICATION

☐ Major Encroachment     ☐ Temporary Encroachment     ☑ Other FILM PERMIT
☐ Minor Encroachment     ☐ Debris or Container Box     ☐ City-Mandated Repairs

### ONE PERMIT PER ADDRESS

| | | |
|---|---|---|
| Location of Work Sidewalk of Sand Hill Rd - between Sharon Park Dr + Santa Cruz Ave | Applicant Represents ☑ Production Company ☐ Contractor ☐ Owner | Applicant e-mail: CarolynMschultz@gmail.com  Applicant fax: |

| Name of Applicant (person) Carolyn Schultz | Address 10202 W. Washington Blvd. Bldg David Lean | City Culver City | State CA | Zip 90232 | Telephone (310)595-4206 |
|---|---|---|---|---|---|
| Name of Contractor | Address | City | State | Zip | Telephone |

| California Construction License No. | Menlo Park Business License No. | Est. Start Date Tues 2/6/18 | Est. Complete Date Tues 2/6/18 |
|---|---|---|---|

| Estimated Construction Cost (Estimate work in city R/W only. Do not include value of utility.) $ | Bond or Deposit * $ | Bond or Deposit provided by: ☐ Contractor ☐ Owner ☐ Other (provide name, company, address) |
|---|---|---|

Description of work to be done:
Filming establishing shot(s) from sidewalk of Sand Hill Rd along the block between Sharon Park Dr and Santa Cruz Ave. No interference of traffic.
(Activity includes 10 crew, 1 cube truck with equipment, 1 van (passenger)

Applicant submits the following:
☐ 3 copies of sketch or plans
☐ 3 copies of traffic control plans
☐ insurance certificate

***Call Underground Service Alert (USA) at 1-800-227-2600 before you dig***

GENERAL CONDITIONS OF PERMIT ATTACHED.
**Signature below acknowledges that special working hours may apply – check the approved traffic control plan.**

I hereby acknowledge that I have read this permit and the attached conditions, that the information given by me is correct, that I am the owner or the duly authorized agent of the owner, and that I agree to comply with the conditions and all applicable provisions of state laws, city ordinances, and the rules of any governmental agency involved.

| _Carolyn Schultz_ | _Location Manager_ | 1-31-18 |
|---|---|---|
| Signature of Applicant (Owner or authorized agent) | Title | Date |

### DO NOT WRITE BELOW THIS LINE -- CITY STAFF USE ONLY

| Approved by Engineering Division | Date 2/5/18 | Permit expires | Fees (retained by City) | $ |
|---|---|---|---|---|
| | | Total Due to City ☐ Paid | | $ |

\* *Bond or deposit requests must originate from the bond/deposit provider. A copy of the original receipt must accompany the refund request. All deposits or bonds are subject to forfeiture to comply with City Codes and Ordinances.*

MP001724



# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
2/1/18

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| MARSH USA, INC.<br>1166 AVENUE OF THE AMERICAS<br>NEW YORK, NY 10036 | PHONE (A/C, No, Ext): | | FAX (A/C, No): |
| | E-MAIL ADDRESS: | | |
| 067062-TBS-GAW-17-18 | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : ACE American Insurance Company | | 22667 |
| INSURED | INSURER B : | | |
| Brown Hill Productions, LLC<br>10202 W. Washington Blvd.<br>David Lean Building<br>Culver City, CA 90232 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | | | HDO G27867662 | 06/01/2017 | 06/01/2018 | EACH OCCURRENCE | $ 3,000,000 |
| | | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 1,000,000 |
| | | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | | PERSONAL & ADV INJURY | $ 5,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 5,000,000 |
| | X | POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 5,000,000 |
| | | OTHER: | | | | | | | $ |
| A | X | AUTOMOBILE LIABILITY | | | ISA H09060666 | 06/01/2017 | 06/01/2018 | COMBINED SINGLE LIMIT (Ea accident) | $ 5,000,000 |
| | X | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | | ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | | HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| | | UMBRELLA LIAB ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | | DED ☐ RETENTION $ | | | | | | | $ |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | | | | | | X PER STATUTE ☐ OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | Y/N N/A | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Production: "Silicon Valley" Season 5

Certificate Holder, including its officials, employees and agents are included as an additional insured where required by contract.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| City of Menlo Park<br>701 Laurel Street<br>Menlo Park, CA 94025 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE<br>of Marsh USA Inc.<br><br>Kimberly Parks          *Kimberly Parks* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD

MP001725

# SILICON VALLEY

**Menlo Park Location:**
Sidewalk along Sand Hill Road between Sharon Park Drive and Santa Cruz Avenue, Menlo Park, CA
(Shooting exteriors along Sand Hill Rd)

**Dates:**
Shoot:          Tuesday, February 6th                    8:00AM – 5:00PM

**Activity:**
Exterior establishing shot. Camera on sidewalk only. If possible, we'd like to potentially place camera
on the median – if you are okay with it. We can work on sidewalk only if needed. Possible drive bys
with 1-2 cars with flow of traffic.

**Crew / Equipment:**
10 Crew / 1 Camera cube, 1 van, 1 portable restroom

**Parking / Posting Requested: (For Tuesday 2/6)**
   (1) NO Posting needed



## Film Production in Menlo Park

Film production in the City of Menlo Park must comply with following conditions:

1. Permittee shall submit in writing all pertinent details regarding the filming including the date(s) and times of the filming including time needed for set-up and take down; a description of the nature of the filming; the location of the filming; a list of all equipment involved in the filming, including cars and other vehicles; the proposed location for the parking and storage of all such vehicles and equipment; the number of cast and crew members involved in the filming; and an indication of any special needs, such as amplified noise, etc. If granted, the permit's approval will be confined to such activities, locations and time schedules as submitted and approved.

2. Three days prior to the beginning of filming, permittee shall provide written notice to residents and businesses within 200 feet of the proposed filming.

3. Permittee shall obey all City Ordinances, rules and the guidance of City supervisory employees pertaining to the use of City property, including the location, parking and storage of vehicles and equipment, crowd and traffic control, and the restoration of premises to their original condition after use for filming purposes.

4. Permittee will comply with the City of Menlo Park noise ordinance. Filming will be limited to the hours between 8:00 a.m. and 6:00 p.m. and will result in low to no noise levels. The use of any explosive, fireworks, or pyrotechnic devices is strictly prohibited.

5. Permittee shall make arrangements for traffic control satisfactory to the Menlo Park Police Department prior to filming on City streets and in other public areas. Permittee will be charged to recover the cost of traffic control provided by the City. Permittee will legally park vehicles and will not require street closure or traffic control other than what is approved.

6. Permittee shall covenant and agree to indemnify and hold harmless the City from any and all loss, cost, damages and expenses of any kind, including attorney fees, on account of personal injury or property damage resulting from any activity of Permittee on municipal property or in connection with its use of municipal property.

7. Liability insurance in no way limits the indemnity agreement above, Permittee will furnish the City a Certificate of Liability Insurance acceptable to its Risk Management office showing combined single limit coverage for bodily injury and property damage, or the equivalent of such coverage, not less than $1 million. The City, including its officials, employees and agents, shall be named as additional insured in the Liability Policy. Contractual liability coverage insuring the obligations of this Agreement is also required. The insurance may not be canceled or substantially modified without ten (10) days written notice to the City Manager's Office.

MP001727

8. Permittee shall pay, with a valid check, money order, credit card or cashier's check, a **filming permit application fee of $150.00 in addition to the daily permit fees of $50 per day for still photography and short subject, $100 per day for industrials, and $150 per day for features, TV, music videos and commercials.**

9. Permittee shall apply for a one-time Business License and pay, with a valid check, money order, credit card or cashiers check. See **Guide to Annual Business Licensee Fee Calculation** for the fee schedule.

10. Permittee will adhere to the provisions and conditions set forth in the permit. If Menlo Park Police Department or other City personnel are required to correct, mitigate, or provide any service not consented to under this permit, permittee will be required to pay for all services rendered. Payment shall be made in the form of *a valid check, money order, credit card or cashiers check* immediately upon demand made by the City.

*PROJECT ADDRESS:* ___Sand Hill Rd between Sharon Park Drive and Santa Cruz Ave, Menlo Park___

Read and agreed on:

Date: ___1-31-18___

Signature: ___Carolyn Schy___

Print name: ___Carolyn Schultz___

EXHIBIT 8

**TODD H. MASTER [SBN. 185881]**
**tmaster@hrmrlaw.com**
**HOWARD ROME MARTIN & RIDLEY LLP**
1900 O'Farrell Street, Suite 280
San Mateo, CA 94403
Telephone:     (650) 365-7715
Facsimile:     (650) 364-5297

Attorneys for Defendant
CITY OF MENLO PARK and
DAVE BERTINI

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| MICHAEL ZELENY, an individual | Case No. 17-cv-07357-RS |
| Plaintiff, | **DEFENDANT CITY OF MENLO PARK'S RESPONSE TO PLAINTIFF'S INTERROGATORIES** |
| vs. | |
| EDMUND G. BROWN, JR., an individual, in his official capacity, et al. | |
| Defendants. | |

RESPONDING PARTY:     Defendant CITY OF MENLO PARK

PROPOUNDING PARTY:     Plaintiff MICHAEL ZELENY

SET NUMBER:     One (1)

COMES NOW responding party and answers the interrogatories of the propounding party. The answers to these interrogatories are based upon the knowledge and information available to the responding party as of the date of these answers. Responding party has not yet completed its

investigation and discovery in this action and thus reserves the right to introduce at trial any information not included in these answers obtained through investigation and discovery subsequent to the date of these answers. Responding party also has not yet completed its review and analysis of the information it presently possesses, and reserves the right to introduce at trial any information not included in these answers which is warranted by subsequent review or analysis. Responding party further reserves the right to amend the answers to these interrogatories and to correct any inadvertent errors and/or omissions.

**INTERROGATORY NO. 1:**

For each denial and affirmative defense in your Answer in this action, state all facts upon which such denial or affirmative defense is based.

**RESPONSE TO INTERROGATORY NO. 1:**

Objection. The City objects to this interrogatory to the extent it is vague, ambiguous and overbroad. This interrogatory is also compound. In addition, the City objects to this interrogatory to the extent it seeks the premature disclosure of expert opinion testimony in violation of the attorney work product doctrine.

The City further objects to the extent this interrogatory is premature as, to date, the City has not completed necessary discovery in the litigation and plaintiff has refused to appear for his noticed deposition. As such, this interrogatory seeks to impose an unfair and unreasonable burden on the City. The Federal Rules of Civil Procedure and relevant case law require a defendant to assert all applicable or potentially applicable affirmative defenses at the outset of the litigation, and prior to discovery, or risk waiver of those affirmative defenses. As discovery progresses, the City will seek to develop the factual basis for each of its affirmative defenses. The City will withdraw those affirmative defenses for which factual bases are not developed during discovery.

Without waiving these objections, the City respectfully refers plaintiff to the documents it will be producing in response to plaintiff's request for production of documents, sets one and two.

/ / /

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

Without waiving these objections, the City respectfully refers plaintiff to the names of those persons identified in the documents it will be producing in response to plaintiff's request for production of documents, sets one and two.

**INTERROGATORY NO. 3:**

For each denial and affirmative defense in your Answer in this action, IDENTIFY all documents that support such denial or defense.

**RESPONSE TO INTERROGATORY NO. 3:**

Objection. The City objects to this interrogatory to the extent it is vague, ambiguous and overbroad. This interrogatory is also compound. In addition, the City objects to this interrogatory to the extent it seeks the premature disclosure of expert opinion testimony in violation of the attorney work product doctrine.

The City further objects to the extent this interrogatory is premature as, to date, the City has not completed necessary discovery in the litigation and plaintiff has refused to appear for his noticed deposition. As such, this interrogatory seeks to impose an unfair and unreasonable burden on the City. The Federal Rules of Civil Procedure and relevant case law require a defendant to assert all applicable or potentially applicable affirmative defenses at the outset of the litigation, and prior to discovery, or risk waiver of those affirmative defenses. As discovery progresses, the City will seek to develop the factual basis for each of its affirmative defenses. The City will withdraw those affirmative defenses for which factual bases are not developed during discovery.

Without waiving these objections, the City respectfully refers plaintiff to the documents it will be producing in response to plaintiff's request for production of documents, sets one and two.

**INTERROGATORY NO. 4:**

IDENTIFY any law, rule, regulation, ordinance, or policy of the City of Menlo Park or the State of California that Zeleny would violate by engaging in the protests he has proposed to the City of Menlo Park (including the carrying of unloaded firearms).

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

Without waiving these objections, the City cannot readily answer this interrogatory without knowing the specifics of the "protests" he references herein. Generally speaking, the City does not require that persons obtain a permit to express their First Amendment rights. However, depending on the particular circumstances and facts, the City may place reasonable time, place and manner restrictions on protests and/or require a permit.

**INTERROGATORY NO. 6:**

State all facts that support your response to the preceding Interrogatory.

**RESPONSE TO INTERROGATORY NO. 6:**

The City hereby respectfully refers to, and incorporates herein, its objections and response to the "preceding Interrogatory".

**INTERROGATORY NO. 7:**

IDENTIFY all policies, procedures, guidelines, rules, regulations, ordinances, laws, or guidelines that support your response to the preceding two Interrogatories.

**RESPONSE TO INTERROGATORY NO. 7:**

The City hereby respectfully refers to, and incorporates herein, its objections and response to the "preceding two Interrogatories".

**INTERROGATORY NO. 8:**

IDENTIFY each policy, procedure, rule, regulation, ordinance, guideline, or guidance of the City of Menlo Park governing applications for permits of the types that Zeleny has sought from the City of Menlo Park.

**RESPONSE TO INTERROGATORY NO. 8:**

Objection. The City objects to this interrogatory to the extent it is vague, ambiguous, and overbroad. The interrogatory is also compound. Plaintiff does not identify with any particularity what "permits" he is referring to in this interrogatory and thus it is confusing and unintelligible. The City also objects to this interrogatory to the extent it seeks a legal conclusion and/or expert

opinion and is thus violative of the attorney work product doctrine. The City also objects to the extent this interrogatory seeks information that is protected by the attorney-client privilege.

Without waiving these objections, the City respectfully refers plaintiff to the documents that are being produced herewith, in response to plaintiff's request for production of documents, set one.

**INTERROGATORY NO. 9:**

IDENTIFY each and every criteria used by the City of Menlo Park in acting upon applications or requests for permits for the type that Zeleny has sought from the City of Menlo Park.

**RESPONSE TO INTERROGATORY NO. 9:**

Objection. The City objects to this interrogatory to the extent it is vague, ambiguous, and overbroad. The interrogatory is also compound. Plaintiff does not identify with any particularity what "permits" he is referring to in this interrogatory and thus it is confusing and unintelligible. The City also objects to this interrogatory to the extent it seeks a legal conclusion and/or expert opinion and is thus violative of the attorney work product doctrine. The City also objects to the extent this interrogatory seeks information that is protected by the attorney-client privilege.

Without waiving these objections, the City respectfully refers plaintiff to the documents that are being produced herewith, in response to plaintiff's request for production of documents, set one.

**INTERROGATORY NO. 10:**

IDENTIFY each document that has reflected, embodied, contained, or described the criteria for issuance of the types of permits that Zeleny has sought from the City of Menlo Park.

**RESPONSE TO INTERROGATORY NO. 10:**

Objection. The City objects to this interrogatory to the extent it is vague, ambiguous, and overbroad. The interrogatory is also compound. Plaintiff does not identify with any particularity what "permits" he is referring to in this interrogatory and thus it is confusing and unintelligible.

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

**RESPONSE TO INTERROGATORY NO. 16:**

Objection. The City objects to this interrogatory to the extent it is vague, ambiguous, and overbroad. The interrogatory is also unduly burdensome. The City respectfully refers plaintiff to the County of San Mateo, which can more readily and correctly provide the requested information.

Without waiving these objections, the City respectfully refers plaintiff to the City business licenses being produced herewith.

**INTERROGATORY NO. 17:**

Describe in detail each complaint received by the City of Menlo Park involving Zeleny's protests in the past five years.

**RESPONSE TO INTERROGATORY NO. 17:**

Objection. The City objects to this interrogatory to the extent it is vague, ambiguous, and overbroad. The interrogatory is also unduly burdensome and, as framed, seeks information that is relevant to this litigation. Further, plaintiff does not identify with any particularity what he means by "complaint" and thus it is confusing and unintelligible.

Without waiving these objections, the City respectfully refers plaintiff to the documents that are being produced herewith in response to plaintiff's request for production, set one.

Date: February 25, 2019

HOWARD ROME MARTIN & RIDLEY LLP

By: _Todd H. Mast_

Todd H. Master
Attorneys for Defendants
CITY OF MENLO PARK and
DAVE BERTINI

## VERIFICATION

I, Dave Bertini, say:

I am the Chief of Police for the City of Menlo Park, and am a party in the above-entitled action. I have read the following and know the contents thereof and am informed and believe that the matters stated therein are true:

Defendant City of Menlo Park's Response to Plaintiff's Special Interrogatories (Set 1);

Defendant City of Menlo Park's Response to Plaintiff's Special Interrogatories (Set 2); and

Defendant Dave Bertini's Response to Plaintiff's Special Interrogatories (Set 1).

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.

Executed this 26th day of February, 2019, at Menlo Park, California.

Dave Bertini

HOWARD ROME MARTIN & RIDLEY LLP
1775 WOODSIDE ROAD, SUITE 200
REDWOOD CITY, CALIFORNIA 94061
TELEPHONE: (650) 365-7715

## CERTIFICATE OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF SAN MATEO:**

I am a citizen of the United States and employed in the county aforesaid; I am over the age of eighteen years, and not a party to the within action; my business address is 1900 O'Farrell Street, Suite 280, San Mateo, CA 94403. On the date set forth below I served the **DEFENDANT CITY OF MENLO PARK'S RESPONSE TO PLAINTIFF'S INTERROGATORIES, SET ONE** on the following person(s) in this action:

| | |
|---|---|
| David W. Affeld, Esq.<br>Affeld Grivalkes LLP<br>2049 Century Park East, Suite 2460<br>Los Angeles, CA 90067<br>Telephone: (310) 979-8700<br>Facsimile: (310) 979-8701<br>Email: dwa@agzlaw.com | **ATTORNEYS FOR PLAINTIFF**<br>**MICHAEL ZELENY** |
| Xavier Becerra<br>Attorney General of California<br>Anthony R. Hakl<br>Supervising Deputy Attorney General<br>Emmanuelle S. Soichet<br>Deputy Attorney General<br>455 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102-7004<br>Telephone: (415) 510-3861<br>Facsimile: (415) 703-1234<br>Email: Emmanuelle.Soichet@doj.ca.gov | **ATTORNEYS FOR DEFENDANTS**<br>**ATTORNEY GENERAL XAVIER**<br>**BECERRA** |
| Noreen P. Skelly<br>Deputy Attorney General<br>1300 I Street, Suite 125<br>P. O. Box 944255<br>Sacramento, CA 94244-2550<br>Telephone: (916) 210-6057<br>Facsimile: (916) 324-8835<br>Email: Noreen.Skelly@doj.ca.gov | **ATTORNEYS FOR DEFENDANT**<br>**ATTORNEY GENERAL XAVIER**<br>**BECERRA** |

☒ **(VIA MAIL -- CCP §§ 1013(a), 2015.5)** By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and placing each for collection and mailing on that date following ordinary business practices. I am readily familiar with my firm's business practice of collection and processing of correspondence for mailing with the U.S. Postal Service and correspondence placed for collection and mailing would be deposited in the U.S. Postal Service at Redwood City, California, with postage thereon fully prepaid, that same day in the ordinary course of business.

☐ **(VIA PERSONAL DELIVERY -- CCP §§ 1011, 2015.5)** By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and causing each envelope(s) to be hand delivered on that day by     , in the ordinary course of my firm's business practice.

☐ **(VIA FACSIMILE -- CCP §§ 1013(e), 2015.5, CRC 2008)** By arranging for facsimile transmission from facsimile number 650/364-5297 to the above-listed facsimile number(s) prior to 5:00 p.m. I am readily familiar with my firm's business practice of collection and processing of correspondence via facsimile transmission(s) and any such correspondence would be transmitted in the ordinary course of business. The facsimile transmission(s) was reported as complete and without error, and a copy of the transmission report is attached.

☐ **(VIA OVERNIGHT MAIL/COURIER -- CCP §§ 1013(c), 2015.5)** By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and placing each for collection by overnight mail service or overnight courier service. I am familiar with my firm's business practice of collection and processing of correspondence for overnight mail or overnight courier service, and my correspondence placed for collection for overnight delivery would, in the ordinary course of business, be delivered to an authorized courier or driver authorized by the overnight mail carrier to receive documents, with delivery fees paid or provided for, that same day, for delivery on the following business day.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. Executed on **March 1, 2019**, at San Mateo, California.

Faith Kelly

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

EXHIBIT 9

**TODD H. MASTER [SBN. 185881]**
**tmaster@hrmrlaw.com**
**HOWARD ROME MARTIN & RIDLEY LLP**
1900 O'Farrell Street, Suite 280
San Mateo, CA 94403
Telephone: (650) 365-7715
Facsimile: (650) 364-5297

Attorneys for Defendant
CITY OF MENLO PARK and
DAVE BERTINI

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| MICHAEL ZELENY, an individual<br><br>Plaintiff,<br><br>vs.<br><br>EDMUND G. BROWN, JR., an individual, in his official capacity, et al.<br><br>Defendants. | Case No. 17-cv-07357-RS<br><br>**DEFENDANT CITY OF MENLO PARK'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORIES** |

RESPONDING PARTY:     Defendant CITY OF MENLO PARK

PROPOUNDING PARTY:   Plaintiff MICHAEL ZELENY

SET NUMBER:             One (1)

COMES NOW responding party and answers the interrogatories of the propounding party. The answers to these interrogatories are based upon the knowledge and information available to the responding party as of the date of these answers. Responding party has not yet completed its

HOWARD ROME MARTIN & RIDLEY LLP
1900 O' FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

HOWARD ROME MARTIN & RIDLEY LLP
1300 O' FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

1  investigation and discovery in this action and thus reserves the right to introduce at trial any

2  information not included in these answers obtained through investigation and discovery subsequent

3  to the date of these answers. Responding party also has not yet completed its review and analysis

4  of the information it presently possesses and reserves the right to introduce at trial any information

5  not included in these answers which is warranted by subsequent review or analysis. Responding

6  party further reserves the right to amend the answers to these interrogatories and to correct any

7  inadvertent errors and/or omissions.

8  **INTERROGATORY NO. 1:**

9      For each denial and affirmative defense in your Answer in this action, state all facts upon

10  which such denial or affirmative defense is based.

11  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

12      Objection. The City objects to this interrogatory to the extent it is vague, ambiguous and

13  overbroad. This interrogatory is also compound. In addition, the City objects to this interrogatory

14  to the extent it seeks the premature disclosure of expert opinion testimony in violation of the

15  attorney work product doctrine.

16      This interrogatory seeks to impose an unfair and unreasonable burden on the City. The

17  Federal Rules of Civil Procedure and relevant case law require a defendant to assert all applicable

18  or potentially applicable affirmative defenses at the outset of the litigation, and prior to discovery,

19  or risk waiver of those affirmative defenses. As discovery progresses, the City will seek to develop

20  the factual basis for each of its affirmative defenses.

21      Without waiving these objections, pursuant to FRCP 33(d), responding party respectfully

22  refers plaintiff to the following documents that have previously been produced by the City in this

23  litigation and/or identified as exhibits to depositions which support the City's affirmative defenses:

24  MP000001 – 5, MP00007 – 19, MP000023 – 31, MP000036 – 40, MP000042 – 47, MP000050 –

25  52, MP000059 – 60, MP000067, MP000080 – 83, MP000096 - 97, MP000100 – 101, MP000105 –

26  107, MP000114 – 119, MP000121 – 122, MP000126 – 127, MP000131 – 132, MP000135 - 147,

MP000151 – 179, MP000182 – 204, MP000218 - 221, MP000234 – 242, MP000257 – 274, MP000285 – 305, MP000321 – 324, MP000329 – 344, MP000351 – 370, MP000373 – 382, MP000390 – 401, MP000435 – 450, MP000463 – 467, MP000473 – 486, MP000492 – 498, MP000501 – 505, MP000566 – 577, MP000582 – 583, MP000601 – 602, MP000633, MP000680 – 683, MP000685 – 704, MP000717 – 722, MP000750 – 755, MP000758 – 763, MP000771 – 800, MP000809 – 826, MP000834 – 858, MP000863 – 866, MP000867 – 872, MP000879 – 881, MP000883 – 886, MP000902 – 903, MP000948 – 1205, MP001218 - 1222, MP001229 – 1238, MP001242 – 1253, MP001268 – 1272, MP001279 – 1283, MP001290 – 1299, MP001311 – 1321, MP001331 – 1341, MP001353 – 1367, MP001381 – 1426, MP001449 – 1566, MP001567 – 1779, MP001838 – 1841, MP001842, MP001843 – 1901, MP001902 – 4888, MP004889 – 5083, MP005084 – 5099, MP005100 – 5520, the audio recording from plaintiff's appeal hearing before City Manager, video-recording of plaintiff's appeal to City Council of Menlo park, Audio-recordings of Menlo Park Police Department Case Nos. 10-2666, 10-2678, 10-2687, 10-2700, 10-2712, 10-2739, 12-495, 12-1596, 12-1805, 12-1824, 12-1903 and 12-1914, MP005521 – 5529, MP006074-6617, MP001792 -1831, and https://www.menlopark.org/292/Special-event-permits.

In addition, the City has recently discovered and contends that it never had legal authority to issue plaintiff a permit to perform any activity on the center median of Sand Hill Road as set forth in his application to the City of Menlo Park for a special event permit because the center median is owned, operated and controlled by the State of California and is within the State of California's right-of-way.

**INTERROGATORY NO. 2:**

For each denial and affirmative defense in your Answer in this action, IDENTIFY all persons with knowledge of any facts supporting such denial or affirmative defense is based.

[For purposes of these Interrogatories, "IDENTIFY" means:

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'  FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

(a) With respect to the person or entity, to state his, her, or its name, title, capacity, and last known contact information, including address, telephone number, and email address (if known);

(b) With respect to a document, to state the nature of the document (e.g., memorandum, letter, e-mail), title or subject line of the document, its general substance or subject matter, the author, sender, and all recipients (including persons "copied," or "blind copied"), and the date of its creation;

(c) With respect to a law, policy, procedure, rule, regulation, ordinance, guideline, or guidance, and the source of the same.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

Objection. The City objects to this interrogatory to the extent it is vague, ambiguous and overbroad. This interrogatory is also compound. In addition, the City objects to this interrogatory to the extent it seeks the premature disclosure of expert opinion testimony in violation of the attorney work product doctrine.

This interrogatory seeks to impose an unfair and unreasonable burden on the City. The Federal Rules of Civil Procedure and relevant case law require a defendant to assert all applicable or potentially applicable affirmative defenses at the outset of the litigation, and prior to discovery, or risk waiver of those affirmative defenses. As discovery progresses, the City will seek to develop the factual basis for each of its affirmative defenses.

Without waiving these objections, pursuant to FRCP 33(d), responding party respectfully refers plaintiff to the following documents that identify persons with said knowledge: MP000001 – 5, MP00007 – 19, MP000023 – 31, MP000036 – 40, MP000042 – 47, MP000050 – 52, MP000059 – 60, MP000067, MP000080 – 83, MP000096 - 97, MP000100 – 101, MP000105 – 107, MP000114 – 119, MP000121 – 122, MP000126 – 127, MP000131 – 132, MP000135 - 147, MP000151 – 179, MP000182 – 204, MP000218 - 221, MP000234 – 242, MP000257 – 274, MP000285 – 305, MP000321 – 324, MP000329 – 344, MP000351 – 370, MP000373 – 382,

HOWARD ROME MARTIN & RIDLEY LLP
1900 O' FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

1   MP000390 – 401, MP000435 – 450, MP000463 – 467, MP000473 – 486, MP000492 – 498,

2   MP000501 – 505, MP000566 – 577, MP000582 – 583, MP000601 – 602, MP000633, MP000680

3   – 683, MP000685 – 704, MP000717 – 722, MP000750 – 755, MP000758 – 763, MP000771 – 800,

4   MP000809 – 826, MP000834 – 858, MP000863 – 866, MP000867 – 872, MP000879 – 881,

5   MP000883 – 886, MP000902 – 903, MP000948 – 1205, MP001218 - 1222, MP001229 – 1238,

6   MP001242 – 1253, MP001268 – 1272, MP001279 – 1283, MP001290 – 1299, MP001311 – 1321,

7   MP001331 – 1341, MP001353 – 1367, MP001381 – 1426, MP001449 – 1566, MP001567 – 1779,

8   MP001838 – 1841, MP001842, MP001843 – 1901, MP001902 – 4888, MP004889 – 5083,

9   MP005084 – 5099, MP005100 – 5520, the audio recording from plaintiff's appeal hearing before

10  City Manager, video-recording of plaintiff's appeal to City Council of Menlo park, Audio-

11  recordings of Menlo Park Police Department Case Nos. 10-2666, 10-2678, 10-2687, 10-2700, 10-

12  2712, 12-2739, 12-495, 12-1596, 12-1805, 12-1824, 12-1903 and 12-1914, MP005521 – 5529,

13  MP006074-6617, MP001792 -1831 and https://www.menlopark.org/292/Special-event-permits.

14  The City's interim Public Works Director, Nikki Nagaya, has knowledge concerning the CalTrans

15  right-of-way issue.

16  **INTERROGATORY NO. 3:**

17      For each denial and affirmative defense in your Answer in this action, IDENTIFY all

18  documents that support such denial or defense.

19  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

20      Objection.  The City objects to this interrogatory to the extent it is vague, ambiguous and

21  overbroad.  This interrogatory is also compound.  In addition, the City objects to this interrogatory

22  to the extent it seeks the premature disclosure of expert opinion testimony in violation of the

23  attorney work product doctrine.

24      This interrogatory seeks to impose an unfair and unreasonable burden on the City.  The

25  Federal Rules of Civil Procedure and relevant case law require a defendant to assert all applicable

26  or potentially applicable affirmative defenses at the outset of the litigation, and prior to discovery,

or risk waiver of those affirmative defenses. As discovery progresses, the City will seek to develop the factual basis for each of its affirmative defenses.

Without waiving these objections, pursuant to FRCP 33(d), responding party respectfully refers plaintiff to the following documents that have previously been produced by the City in this litigation and/or identified as exhibits to depositions: MP000001 – 5, MP00007 – 19, MP000023 – 31, MP000036 – 40, MP000042 – 47, MP000050 – 52, MP000059 – 60, MP000067, MP000080 – 83, MP000096 - 97, MP000100 – 101, MP000105 – 107, MP000114 – 119, MP000121 – 122, MP000126 – 127, MP000131 – 132, MP000135 - 147, MP000151 – 179, MP000182 – 204, MP000218 - 221, MP000234 – 242, MP000257 – 274, MP000285 – 305, MP000321 – 324, MP000329 – 344, MP000351 – 370, MP000373 – 382, MP000390 – 401, MP000435 – 450, MP000463 – 467, MP000473 – 486, MP000492 – 498, MP000501 – 505, MP000566 – 577, MP000582 – 583, MP000601 – 602, MP000633, MP000680 – 683, MP000685 – 704, MP000717 – 722, MP000750 – 755, MP000758 – 763, MP000771 – 800, MP000809 – 826, MP000834 – 858, MP000863 – 866, MP000867 – 872, MP000879 – 881, MP000883 – 886, MP000902 – 903, MP000948 – 1205, MP001218 - 1222, MP001229 – 1238, MP001242 – 1253, MP001268 – 1272, MP001279 – 1283, MP001290 – 1299, MP001311 – 1321, MP001331 – 1341, MP001353 – 1367, MP001381 – 1426, MP001449 – 1566, MP001567 – 1779, MP001838 – 1841, MP001842, MP001843 – 1901, MP001902 – 4888, MP004889 – 5083, MP005084 – 5099, MP005100 – 5520, the audio recording from plaintiff's appeal hearing before City Manager, video-recording of plaintiff's appeal to City Council of Menlo park, Audio-recordings of Menlo Park Police Department Case Nos. 10-2666, 10-2678, 10-2687, 10-2700, 10-2712, 10-2739, 12-495, 12-1596, 12-1805, 12-1824, 12-1903 and 12-1914, MP005521 – 5529, MP006074-6617, MP001792 -1831 and https://www.menlopark.org/292/Special-event-permits.

In addition, the City respectfully refers plaintiff to the following documents which support the City's contention that it does not own, control or maintain the center median where plaintiff desired to hold the protest that was part of his special event application to the City: Freeway

Maintenance Agreement dated September 16, 1969, Resolution No. 2276 of the City Council for Menlo Park Approving Freeway Maintenance Agreement, the July 1, 1972 Agreement for Maintenance of State Highway in the City of Menlo Park, City of Menlo Park Resolution No. 2559 Approving Agreement for Maintenance of State Highway in the City of Menlo Park, Amendment 1 to Agreement for Maintenance of State Highways in City of Menlo Park, Caltrans D4 Right of Way Map, Agreement for Maintenance of State Highway in the City of Menlo Park dated November 21, 1972, and Amendment No. 2 to Agreement for Maintenance of State Highways in City of Menlo Park dated October 18, 2017. These documents are being produced herewith as MP006618 – 6682. To the extent it may also potentially be responsive, the City respectfully refers plaintiff to the Caltrans Encroachment Permits Manual, which is equally available to plaintiff at https://dot.ca.gov/programs/traffic-operations/ep/ep-manual. Chapter 514 refers to Special Event permits.

**INTERROGATORY NO. 4:**

IDENTIFY any law, rule, regulation, ordinance, or policy of the City of Menlo Park or the State of California that Zeleny would violate by engaging in the protests he has proposed to the City of Menlo Park (including the carrying of unloaded firearms).

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:**

Objection. The City objects to this interrogatory to the extent it is vague, ambiguous, and overbroad. The interrogatory, as framed, is also confusing and unintelligible since it is an incomplete hypothetical. Plaintiff does not identify with any particularity in this interrogatory what he means by "protests" referenced herein and what those "protests" would entail. The City also objects to this interrogatory to the extent it seeks a legal conclusion and/or expert opinion and is thus violative of the attorney work product doctrine.

Without waiving these objections, to the extent this interrogatory asks the City to identify California law that may apply to the carrying of unloaded firearms in the course of the protest that plaintiff identified in his July 10, 2015 application for a special event permit, the City respectfully

HOWARD ROME MARTIN & RIDLEY LLP
1900 O' FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

HOWARD ROME MARTIN & RIDLEY LLP
1900 O' FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

1  "protests" referenced herein, making it impossible for the City to respond. The City also objects to

2  this interrogatory to the extent it seeks a legal conclusion and/or expert opinion and is thus

3  violative of the attorney work product doctrine.

4      Without waiving these objections, the City cannot readily answer this interrogatory without

5  knowing the specifics of the "protests" he references herein. Generally speaking, the City does not

6  require that persons obtain a permit to express their First Amendment rights. However, depending

7  on the particular circumstances and facts of the conduct, the City may place reasonable time, place

8  and manner restrictions on protests and/or require a permit. With regard to plaintiff's desire to

9  carry unloaded firearms within City limits as part of his protest and/or film event, the City has

10  informed plaintiff that should he complete his application for a film permit and obtain a film permit

11  from the City, the City would authorize plaintiff to openly carry unloaded weapons in conjunction

12  with the terms of that permit. Pursuant to FRCP 33(d), responding party respectfully refers

13  plaintiff to California Penal Code §§ 26350, 26375, 26400 and 26405(r), and documents previously

14  produced in this litigation: MP001229 – 1238, MP001279 – 1283, MP001331 – 1341, MP001381 –

15  1382, MP001403 – 1404, MP001413 – 1414 and 001842. To the extent it may also potentially be

16  responsive, the City respectfully refers plaintiff to those documents being produced herewith

17  (MP006618-6682) and the Caltrans Encroachment Permits Manual, which is equally available to

18  plaintiff at https://dot.ca.gov/programs/traffic-operations/ep/ep-manual. Chapter 514 refers to

19  Special Event permits.

20  **INTERROGATORY NO. 8:**

21      IDENTIFY each policy, procedure, rule, regulation, ordinance, guideline, or guidance of

22  the City of Menlo Park governing applications for permits of the types that Zeleny has sought from

23  the City of Menlo Park.

24  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

25      Objection. The City objects to this interrogatory to the extent it is vague, ambiguous, and

26  overbroad. The interrogatory is also compound. Plaintiff does not identify with any particularity

what "permits" he is referring to in this interrogatory and thus it is confusing and unintelligible. The City also objects to this interrogatory to the extent it seeks a legal conclusion and/or expert opinion and is thus violative of the attorney work product doctrine. The City also objects to the extent this interrogatory seeks information that is protected by the attorney-client privilege.

Without waiving these objections, pursuant to FRCP 33(d), responding party respectfully refers plaintiff to those written communications between plaintiff and representatives of the City as they relate to his special event permit and film permit applications to the City, which include MP000236 – 240, 270- 274, 285-289, 291-292, 346-347, 352-355, 357-360, 362-365, 367-370, 373-376, 379-382, 440-444, 447-450, 463-465, 475-477, 479-480, 484, 486, 492, audio recording of plaintiff's appellate hearing (special event permit application) before City Manager Alex McIntyre, MP000948-1064, 1068-1183, 1449-1566, 1196-1205, video/audio recording of plaintiff's appellate hearing (Special event permit application) before Menlo Park City Council, MP001213-1214, 1219-1220, 1221, 1229-1238, 1248-1249, 1279-1283, 1290-1300, 1331-1341, 1381-1385, 1403-1414, 4889-5083, 1792 -1831, https://www.menlopark.org/292/Special-event-permits, MP001842.

**INTERROGATORY NO. 9:**

IDENTIFY each and every criteria used by the City of Menlo Park in acting upon applications or requests for permits for the type that Zeleny has sought from the City of Menlo Park.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

Objection. The City objects to this interrogatory to the extent it is vague, ambiguous, and overbroad. The interrogatory is also compound. Plaintiff does not identify with any particularity what "permits" he is referring to in this interrogatory and thus it is confusing and unintelligible. The City also objects to this interrogatory to the extent it seeks a legal conclusion and/or expert opinion and is thus violative of the attorney work product doctrine. The City also objects to the extent this interrogatory seeks information that is protected by the attorney-client privilege.

HOWARD ROME MARTIN & RIDLEY LLP
1900 O' FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

## **VERIFICATION**

I, Dave Bertini, say:

I am the Chief of Police for the City of Menlo Park, and am a party in the above-entitled action.

I have read the foregoing **DEFENDANT CITY OF MENLO PARK'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORIES, SET ONE** and know the contents thereof and am informed and believe that the matters stated therein are true.

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.

Executed this ⎽⎽⎽5⎽⎽⎽ day of March, 2020 at Menlo Park, California.

⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽
Dave Bertini

HOWARD ROME MARTIN & RIDLEY LLP
1775 WOODSIDE ROAD, SUITE 200
REDWOOD CITY, CALIFORNIA 94061
TELEPHONE: (650) 365-7715

## CERTIFICATE OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF SAN MATEO:**

I am a citizen of the United States and employed in the county aforesaid; I am over the age of eighteen years, and not a party to the within action; my business address is 1900 O'Farrell Street, Suite 280, San Mateo, CA 94403. On the date set forth below I served the **DEFENDANT CITY OF MENLO PARK'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORIES** on the following person(s) in this action:

| | |
|---|---|
| David W. Affeld, Esq.<br>Affeld Grivalkes LLP<br>2049 Century Park East, Suite 2460<br>Los Angeles, CA 90067<br>Telephone: (310) 979-8700<br>Facsimile: (310) 979-8701<br>Email: dwa@agzlaw.com | **ATTORNEYS FOR PLAINTIFF<br>MICHAEL ZELENY** |
| David Markevitch, Esq.<br>Markevitch Law Firm<br>1261 Lincoln Avenue, Suite 208<br>San Jose, CA 95125-3031<br>Telephone: (408) 463-6802<br>Facsimile: (408) 503-0889<br>Email: dmarkevitch@markevitchlaw.com | **ATTORNEYS FOR PLAINTIFF<br>MICHAEL ZELENY** |
| Noreen P. Skelly<br>Deputy Attorney General<br>1300 I Street, Suite 125<br>P. O. Box 944255<br>Sacramento, CA 94244-2550<br>Telephone: (916) 210-6057<br>Facsimile: (916) 324-8835<br>Email: Noreen.Skelly@doj.ca.gov | **ATTORNEYS FOR DEFENDANT<br>ATTORNEY GENERAL XAVIER<br>BECERRA** |

☒ **(VIA MAIL -- CCP §§ 1013(a), 2015.5)** By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and placing each for collection and mailing on that date following ordinary business practices. I am readily familiar with my firm's business practice of collection and processing of correspondence for mailing with the U.S. Postal Service and correspondence placed for collection and mailing would be deposited in the U.S. Postal Service at Redwood City, California, with postage thereon fully prepaid, that same day in the ordinary course of business.

☐ **(VIA PERSONAL DELIVERY -- CCP §§ 1011, 2015.5)** By placing a true copy thereof enclosed in a sealed envelope(s). addressed as above, and causing each envelope(s) to be hand delivered on that day by                    , in the ordinary course of my firm's business practice.

///

HOWARD ROME MARTIN & RIDLEY LLP
1900 O' FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

1 ☐ **(VIA FACSIMILE -- CCP §§ 1013(e), 2015.5, CRC 2008)** By arranging for facsimile transmission from facsimile
number 650/364-5297 to the above-listed facsimile number(s) prior to 5:00 p.m. I am readily familiar with my firm's
business practice of collection and processing of correspondence via facsimile transmission(s) and any such
correspondence would be transmitted in the ordinary course of business. The facsimile transmission(s) was reported as
complete and without error, and a copy of the transmission report is attached.

☐ **(VIA OVERNIGHT MAIL/COURIER -- CCP §§ 1013(c), 2015.5)** By placing a true copy thereof enclosed in a sealed
envelope(s), addressed as above, and placing each for collection by overnight mail service or overnight courier service. I
am familiar with my firm's business practice of collection and processing of correspondence for overnight mail or
overnight courier service, and my correspondence placed for collection for overnight delivery would, in the ordinary
course of business, be delivered to an authorized courier or driver authorized by the overnight mail carrier to receive
documents, with delivery fees paid or provided for, that same day, for delivery on the following business day.

I declare that I am employed in the office of a member of the bar of this court at whose
direction the service was made. Executed on **March 6, 2020**, at San Mateo, California.

Faith Kelly

HOWARD ROME MARTIN & RIDLEY LLP
1900 O' FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

**EXHIBIT 10**

**TODD H. MASTER [SBN. 185881]**
tmaster@hrmrlaw.com
**HOWARD ROME MARTIN & RIDLEY LLP**
1900 O'Farrell Street, Suite 280
San Mateo, CA  94403
Telephone:     (650) 365-7715
Facsimile:     (650) 364-5297

Attorneys for Defendant
CITY OF MENLO PARK and
DAVE BERTINI

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| MICHAEL ZELENY, an individual | Case No. 17-cv-07357-RS |
| Plaintiff, | **DEFENDANT CITY OF MENLO PARK'S SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORIES** |
| vs. | |
| EDMUND G. BROWN, JR., an individual, in his official capacity, et al. | |
| Defendants. | |

RESPONDING PARTY:       Defendant CITY OF MENLO PARK

PROPOUNDING PARTY:    Plaintiff MICHAEL ZELENY

SET NUMBER:                One (1)

COMES NOW responding party and answers the interrogatories of the propounding party. The answers to these interrogatories are based upon the knowledge and information available to the responding party as of the date of these answers.  Responding party has not yet completed its

HOWARD ROME MARTIN & RIDLEY LLP
1900 O' FARRELL STREET, SUITE 280
SAN MATEO, CA  94403
TELEPHONE (650) 365-7715

33(d), responding party respectfully refers plaintiff to California Penal Code §§ 26350, 26375, 26400 and 26405(r), and documents previously produced in this litigation which reference the requested policies, procedures, guidelines, rules, regulations, ordinances, laws and/or guidelines:: MP001229 – 1238, MP001279 – 1283, MP001331 – 1341, MP001381 – 1382, MP001403 – 1404, MP001413 – 1414 and 001842.  To the extent it may also potentially be responsive, the City respectfully refers plaintiff to those documents being produced herewith (MP006618-6682) and the Caltrans Encroachment Permits Manual, which is equally available to plaintiff at https://dot.ca.gov/programs/traffic-operations/ep/ep-manual. Chapter 514 refers to Special Event permits.

**INTERROGATORY NO. 8:**

IDENTIFY each policy, procedure, rule, regulation, ordinance, guideline, or guidance of the City of Menlo Park governing applications for permits of the types that Zeleny has sought from the City of Menlo Park.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

Objection.  The City objects to this interrogatory to the extent it is vague, ambiguous, and overbroad.  The interrogatory is also compound.  Plaintiff does not identify with any particularity what "permits" he is referring to in this interrogatory and thus it is confusing and unintelligible. The City also objects to this interrogatory to the extent it seeks a legal conclusion and/or expert opinion and is thus violative of the attorney work product doctrine.  The City also objects to the extent this interrogatory seeks information that is protected by the attorney-client privilege.

Without waiving these objections, pursuant to FRCP 33(d), responding party respectfully refers plaintiff to those written communications between plaintiff and representatives of the City as they relate to his special event permit and film permit applications to the City, which identify and/or discuss the procedures, guidelines, rules and regulations, et seq that govern applications for Special Event and Film Permits: MP000236 – 240, 270- 274, 285-289, 291-292, 346-347, 352-355, 357-360, 362-365, 367-370, 373-376, 379-382, 440-444, 447-450, 463-465, 475-477, 479-480,

HOWARD ROME MARTIN & RIDLEY LLP
1900 O' FARRELL STREET, SUITE 280
SAN MATEO, CA  94403
TELEPHONE: (650) 365-7715

484, 486, 492, audio recording of plaintiff's appellate hearing (special event permit application) before City Manager Alex McIntyre, MP000948-1064, 1068-1183, 1449-1566, 1196-1205, video/audio recording of plaintiff's appellate hearing (Special event permit application) before Menlo Park City Council, MP001213-1214, 1219-1220, 1221, 1229-1238, 1248-1249, 1279-1283, 1290-1300, 1331-1341, 1381-1385, 1403-1414, 4889-5083, 1792 -1831, https://www.menlopark.org/292/Special-event-permits, MP001842.

**INTERROGATORY NO. 9:**

IDENTIFY each and every criteria used by the City of Menlo Park in acting upon applications or requests for permits for the type that Zeleny has sought from the City of Menlo Park.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

Objection. The City objects to this interrogatory to the extent it is vague, ambiguous, and overbroad. The interrogatory is also compound. Plaintiff does not identify with any particularity what "permits" he is referring to in this interrogatory and thus it is confusing and unintelligible. The City also objects to this interrogatory to the extent it seeks a legal conclusion and/or expert opinion and is thus violative of the attorney work product doctrine. The City also objects to the extent this interrogatory seeks information that is protected by the attorney-client privilege.

Without waiving these objections, pursuant to FRCP 33(d), responding party respectfully refers plaintiff to those written communications between plaintiff and representatives of the City as they relate to his special event permit and film permit applications to the City, which identify the criteria used by the City in its actions on plaintiff's permit applications: MP000236 – 240, 270-274, 285-289, 291-292, 346-347, 352-355, 357-360, 362-365, 367-370, 373-376, 379-382, 440-444, 447-450, 463-465, 475-477, 479-480, 484, 486, 492, audio recording of plaintiff's appellate hearing (special event permit application) before City Manager Alex McIntyre, MP000948-1064, 1068-1183, 1449-1566, 1196-1205, video/audio recording of plaintiff's appellate hearing (Special event permit application) before Menlo Park City Council, MP001213-1214, 1219-1220, 1221,

HOWARD ROME MARTIN & RIDLEY LLP
1900 O' FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

such as the median strip of Sand Hill Road identified in plaintiff's SEP application which is owned and controlled by the State of California.

HOWARD ROME MARTIN & RIDLEY LLP

Dated: May 27, 2020

By:_____
      Todd H. Master
      Attorneys for Defendants
      CITY OF MENLO PARK and
      DAVE BERTINI

## VERIFICATION

I, Dave Bertini, say:

I am the Chief of Police for the City of Menlo Park, and am a party in the above-entitled action.

I have read the foregoing **DEFENDANT CITY OF MENLO PARK'S SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORIES, SET ONE** and know the contents thereof and am informed and believe that the matters stated therein are true.

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.

Executed this 30th day of April, 2020 at Menlo Park, California.

Dave Bertini

HOWARD ROME MARTIN & RIDLEY LLP
1775 WOODSIDE ROAD, SUITE 200
REDWOOD CITY, CALIFORNIA 94061
TELEPHONE: (650) 365-7715

*Michael Zeleny v. Edmund G. Brown, Jr., et al.*
United States District Court; Case No. 17-cv-07357-RS

## CERTIFICATE OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF SAN MATEO:**

    I am a citizen of the United States and employed in the county aforesaid; I am over the age of eighteen years, and not a party to the within action; my business address is 1900 O'Farrell Street, Suite 280, San Mateo, CA 94403. On the date set forth below I served the **DEFENDANT CITY OF MENLO PARK'S SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORIES** on the following person(s) in this action:

| | |
|---|---|
| David W. Affeld, Esq.<br>Affeld Grivalkes LLP<br>2049 Century Park East, Suite 2460<br>Los Angeles, CA 90067<br>Telephone:    (310) 979-8700<br>Facsimile:    (310) 979-8701<br>Email:    dwa@agzlaw.com | **ATTORNEYS FOR PLAINTIFF MICHAEL ZELENY** |
| David Markevitch, Esq.<br>Markevitch Law Firm<br>1261 Lincoln Avenue, Suite 208<br>San Jose, CA 95125-3031<br>Telephone:    (408) 463-6802<br>Facsimile:    (408) 503-0889<br>Email: dmarkevitch@markevitchlaw.com | **ATTORNEYS FOR PLAINTIFF MICHAEL ZELENY** |
| Noreen P. Skelly<br>John W. Killeen<br>Deputy Attorney General<br>1300 I Street, Suite 125<br>P. O. Box 944255<br>Sacramento, CA 94244-2550<br>Noreen Telephone:    (916) 210-6057<br>John Telephone:    (916) 210-6045<br>Facsimile:    (916) 324-8835<br>Email:    Noreen.Skelly@doj.ca.gov<br>Email:    john.killeen@doj.ca.gov | **ATTORNEYS FOR DEFENDANT ATTORNEY GENERAL XAVIER BECERRA** |

☒    **BY ELECTRONIC SERVICE, ONLY**—Based on (1) a court order; or (2) agreement of the parties herein to accept electronic service; or (3) notice of service by electronic mail due to Coronavirus (COVID-19), I caused the above-described document(s) to be sent electronically, addressed to the person(s) on whom it is to be served, at the email address(es) shown on the above Service List."

☐    **(VIA MAIL -- CCP §§ 1013(a), 2015.5)** By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and placing each for collection and mailing on that date following ordinary business practices. I am readily familiar with my firm's business practice of collection and processing of correspondence for mailing with the U.S. Postal Service and correspondence placed for collection and mailing would be deposited in the U.S. Postal Service at Redwood City, California, with postage thereon fully prepaid, that same day in the ordinary course of business.

☐ **(VIA PERSONAL DELIVERY -- CCP §§ 1011, 2015.5)** By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and causing each envelope(s) to be hand delivered on that day by          , in the ordinary course of my firm's business practice.

☐ **(VIA FACSIMILE -- CCP §§ 1013(e), 2015.5, CRC 2008)** By arranging for facsimile transmission from facsimile number 650/364-5297 to the above-listed facsimile number(s) prior to 5:00 p.m. I am readily familiar with my firm's business practice of collection and processing of correspondence via facsimile transmission(s) and any such correspondence would be transmitted in the ordinary course of business. The facsimile transmission(s) was reported as complete and without error, and a copy of the transmission report is attached.

☐ **(VIA OVERNIGHT MAIL/COURIER -- CCP §§ 1013(c), 2015.5)** By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and placing each for collection by overnight mail service or overnight courier service. I am familiar with my firm's business practice of collection and processing of correspondence for overnight mail or overnight courier service, and my correspondence placed for collection for overnight delivery would, in the ordinary course of business, be delivered to an authorized courier or driver authorized by the overnight mail carrier to receive documents, with delivery fees paid or provided for, that same day, for delivery on the following business day.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. Executed on **May 27, 2020**, at San Mateo, California.

*Faith Kelly*

_____

Faith Kelly

EXHIBIT 11



CITY OF MENLO PARK

# ADMINISTRATIVE SERVICES DEPARTMENT

**PUBLIC HEARING:** **Adoption of a Resolution Amending the City's Master Fee Schedule to Incorporate Proposed Changes in Fees to Become Effective Immediately or July 1, 2009 or as Required by Statute for the Following Departments: Administrative Services, Community Services, Police, Public Works, Community Development, and Library.**

## RECOMMENDATION

Staff recommends City Council adoption of a resolution amending the City's Master Fee Schedule to incorporate proposed changes in fees to become effective immediately or July 1, 2009 or as required by statute of the following departments: Administrative Services, Community Services, Police, Public Works, Community Development – Building, and Library.

## BACKGROUND

The Master Fee Schedule reflects fees charged by all City departments. It is usually amended annually so that fees reflect current costs to provide services or, in some cases, to add new fees for new City services and/or to eliminate fees for services that are no longer offered.

The City imposes different categories of fees with different requirements regarding how fees are set or changed:

- One category includes fees and charges for the use of facilities, services and access to property that is elective on the part of the customer/user. The purpose of these fees and charges is to generate revenues for access or use of the service or facility. There is no legal restriction on the amount of such fees or charges, and they can be effective immediately.

- A second category of fees is property development processing fees. These include fees for building and use permits, variances, building inspections, map applications, and planning services. These fees cannot exceed the reasonable cost of providing the service. Any new fee or increase to existing fees in this category can be effective no sooner than sixty days after approval by City Council.

- A third category relates to public records act requests and copies of documents and reports. These fees are limited to the actual cost of copying

(not including personnel time to copy) or the statutory amount, whichever is less. There are no changes recommended for any fees in this category at the present time.

Identifying the cost components of providing services is integral in the establishment of the fees and cost recovery rates. Because a detailed cost study had not been performed since 1998, the City Council identified a Cost/Allocation and Fee/Rate Study as a priority project for the 2006-07 Budget. The Cost Allocation Plan portion of the project was completed in time to be used in determination of transfers to the General Fund in the 2007-08 Budget, and was presented to Council at a study session on May 17, 2007.

On October 14, 2008 a study session was held to provide the City Council with a basic understanding of the approach and methodologies used to develop the cost of City services. The final report of the User Fee Study is available on the City's website (www.menlopark.org/departments/dep_finance.html). The data obtained from both the Cost Allocation and User Fee Studies was used by staff in the development of the recommendations presented in this staff report.

A city-wide Cost Recovery Fee Policy/Strategy is being developed for Council consideration. Such a policy/strategy, further informed by the current discussion of fee changes, will be used to guide future decisions as to what level of cost recovery is desired by the Council for providing specific services. It is anticipated that the Cost Recovery Fee Policy/Strategy will be brought back to Council early in the 2009-10 fiscal year.

## ANALYSIS

Staff has prepared the following recommendations using analyses provided by the Cost Allocation and Overhead Rate Study, the Fully Burdened Hourly Staff Labor Rate Study, the Comprehensive Fee and Service Charge Study, as well as Council comments on fees and recovery rates at both the November 25, 2008 Public Hearing on staff fee change recommendations and the February 10, 2009 Study Session on the city-wide Cost Recovery Fee Policy/Strategy currently under development.  Council discussion and action on the recommendations contained in this report will provide additional guidance to staff in developing the final Cost Recovery Fee Policy/Strategy.

The recommendations presented by staff in this report ensure not only that charges keep pace with rising costs of providing services, but are also competitive with comparable programs (where applicable) and responsive to demands for these services within the community. The proposed fee changes are summarized below, by department. Fees for which there are no recommended changes are not listed. Fee # refers to the number given (within the appropriate category) to each fee examined in the User Fee Study.

## Administrative Services

Administrative Services primarily provides support to other City departments and therefore the fees were not reviewed in the User Fee Study. Staff recommendations for changes are based on staff's analysis of the costs of the service or activity.

Film, Video and Audio Production Permits: Recently a film production company shot some footage in Menlo Park that will be used in a documentary film. In advance of the actual filming, the production company contacted City staff to discuss compliance with Menlo Park ordinances and permit requirements. During this process staff determined that current fees did not fully recover the costs associated with the coordination of services to be provided by a variety of City departments. As staff has limited knowledge of what City services might be needed by a production company and the amount of effort required by staff to ensure minimum impact to the community, staff reviewed the film and video permitting programs and fees of the cities of Oakland, Palo Alto, San Jose, Glendale, Burbank and the County of San Mateo. Based on this review, staff recommends five new fees to recover costs associated with coordinating the issuance and monitoring of all City permits required for Film/Video/Audio Productions. As these are new fees, staff will closely monitor the level of effort expended when these permits are issued and present any needed modifications for Council consideration. In addition to these new fees, current fees for other required permits, such as encroachment, special events, etc. will be collected at current rates for such services as listed in the Master Fee Schedule.

The schedule below summarizes the current fees, proposed fees, percentage change in Administrative Service fees. Current fees for which no change is proposed are not listed.

| Fee # | Fee Title | Current Fee | Proposed Fee | Change % | Cost Recovery % at Current Fee | Cost Recovery % at Proposed Fee |
|---|---|---|---|---|---|---|
| | | | | | | |
| | **FILM, VIDEO AND AUDIO PRODUCTION PERMITS** | | | | | |
| | | | | | | |
| | Application Review and Coordination | -0- | $ 150.00 | New | | |
| | Revisions - each | -0- | 50.00 | New | | |
| | | | | | | |
| | Daily Permit Fees | | | | | |
| | Still Photography and Short Subject | -0- | 50.00 | New | | |
| | Industrials | -0- | 100.00 | New | | |
| | Features, TV, Music Videos and Commercials | -0- | 150.00 | New | | |

## Library

The City of Menlo Park Library is a member of the Peninsula Library System (PLS). Service rates and fines are coordinated throughout the system by the PLS Administrative Council. Libraries in the PLS are moving toward further

MP001801

standardization and recommend increasing the fee for replacement of a lost library card from $1.50 to $2.00. Staff recommends approval of this increase and also increasing the non-resident test proctoring fee from $50 to $75 per test. The proctoring fee for residents remains unchanged at $25 per test. The test proctoring fee covers staff time associated with making arrangements with the test taker and testing institution, proctoring the exam, and various other associated processing and transmission costs. The vast majority of exam takers are non-residents and increasing the fee will make this a cost recovery service. If approved, these fee increases would generate an estimated $2,600 in additional revenue.

The schedule below summarizes the current fees, proposed fees, percentage change in Library fees. Current fees for which no change is proposed are not listed.

| Fee # | Fee Title | Current Fee | Proposed Fee | Change % | Cost Recovery % at Current Fee | Cost Recovery % at Proposed Fee |
|---|---|---|---|---|---|---|
| | | | | | | |
| | **REPLACEMENT FEE FOR LOST LIBRARY CARD** | $ 1.50 | $ 2.00 | 25% | | |
| | | | | | | |
| | **MONITOR EXAM – Per Test Non-resident** | 50.00 | 75.00 | 50% | | |
| | | | | | | |

## Community Services

In November 2008 staff recommended a 7% fee increase for the Menlo Children's Center (MCC) programs to increase cost recovery. After much discussion the Council approved a 5% increase and requested that staff revisit the fees in March 2009. It was anticipated that the Cost Recovery Fee Policy/Strategy under development would be useful in determining the March fee recommendations. Subsequently at the February 24, 2009 Council meeting on mid-year budget revisions the Council directed staff to work with the Parks and Recreation Commission regarding the issue of MCC programs and fees. On March 18, 2009 the Parks and Recreation Commission began discussing these issues and anticipates reporting their results and recommendations to the Council in September 2009.

At this time staff is recommending a 2% increase to gradually move fees towards fuller cost recovery. The table below shows the percentage fee increases in MCC Preschool and School Age Childcare rates from 2004 through 2008 and the proposal for 2009.

| 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| 6% | 5% | 10% | 5% | 5% | 2% |

In addition to the 2% fee increase staff is recommending a new Summer Camp offering for graduating preschoolers of two 4 week sessions and one 1 week camp. The camps would be designed as a transitional program for younger children

entering Kindergarten in the fall with local field trips and age appropriate activities. Enrollment would be limited to 15. The program would operate Monday through Friday from 8:00 a.m. to 4:30 p.m. during the summer months.

Staff also recommends establishing an hourly fee range for extra hours (on availability basis) for new and existing care. Setting the range between $8.50 and $15.00 per hour allows staff to base the cost on the type of service being provided.

Attachment C to this report contains a comparison table of MCC current and recommended fees to fees charged by other providers of similar services. With these increases MCC program fees continue to be below the average rate charged by other local childcare providers.

The schedule below summarizes the current fees, proposed fees, percentage change in Community Service fees as well as cost recovery of both current and proposed fees. When shown, "Fee #" corresponds to the fee number in the 2008 User Fee Study for the service listed. Only fees for which a change is proposed are listed. Due to the approach used for Community Service activities to determine cost recovery on a <u>program</u> level only, the cost recovery percentages are not available for the individual services. If approved it is estimated that increases and new fees will generate an additional $30,000 annually at current enrollment.

| Fee # | Fee Title | Current Fee | Proposed Fee | Change % | Cost Recovery % at Current Fee | Cost Recovery % at Proposed Fee |
|---|---|---|---|---|---|---|
| | | | | | | |
| 14 | **MENLO CHILDREN'S CENTER PRESCHOOL AND SCHOOL AGE CHILDCARE – RESIDENT:** | | | | 60% | 63% |
| | | | | | | |
| 5 | Toddler Room | | | | | |
| | Full-time  5 day (per month) | 1,512.00 | 1,542.00 | 2% | | |
| | Part-time 3 day (per month) | 1,109.00 | 1,131.00 | 2% | | |
| | Part-time 2 day (per month) | 739.00 | 754.00 | 2% | | |
| | | | | | | |
| 5 | Early pre-school and Pre-school room | | | | | |
| | Full-time  5 day (per month) | 1,189.00 | 1,213.00 | 2% | | |
| | Part-time 3 day (per month) | 869.00 | 886.00 | 2% | | |
| | Part-time 2 day (per month) | 681.00 | 695.00 | 2% | | |
| | | | | | | |
| | Summer Camp for Young Kinders | | | | | |
| | 4 weeks | New | 811.00 | | | |
| | 1 week | New | 236.00 | | | |
| | | | | | | |
| | Hourly Rate – Extra Hours | New | 8.50 to 15.00 | | | |
| | | | | | | |

**Non-resident surcharge:** Staff does not recommend changing the non-resident surcharge from the current rate of 35 percent of the resident fee. For example, if a resident fee is $100, the non-resident fee is $135, which includes the $35 surcharge. This surcharge percentage applies when a specific dollar amount for non-resident use has not been specifically stated.

**Cost Recovery Summary for Community Services:** The total annual cost to the City for the fee-based services provided by the Community Services Department is estimated to be $7,150,000. Annual revenues to the City under the current fee schedule are approximately $4,147,000. Should the Council adopt staff's recommendations, annual revenues to the City are estimated to be $4,177,000 (a 0.72% increase over current fee revenues). The resultant cost recovery for these services remains unchanged at 58%.

## Police

False Alarm Program: Staff recommends adjusting false alarm service fees to reflect a closer alignment with costs established in the user fee study. Staff recommends lowering the Alarm Registration fee of $35 to $25 and increasing the Standard False Alarm fee of $95 to $175 and increasing the High Risk Alarm fee of $174 to $350. If approved it is estimated that the revised Alarm Registration fee would provide 114% cost recovery and the Standard False Alarm and High Risk Alarm fees would yield 50% and 28% respectively. These changes if approved would increase revenues by an estimated $69,888 based on projected volumes for registration of new alarms services and Standard and High Risk False Alarm responses.

Parking Violations: Staff recommends increasing the penalty for all parking violations by $5.00. The majority of this increase, $4.50, is necessitated by the passage of State of California Senate Bill 1407 which amended Government Code section 70372 and increased the fee paid to the County of San Mateo for court facilities maintenance and construction from $1.50 to $6.00 per parking violation ticketed by the City of Menlo Park Police Department. The County forwards the required payment to the State. The City Attorney has reviewed all available information on this change in the law and has advised staff that the change was effective on January 1, 2009. However, the City cannot retroactively impose the $4.50 increase on previously issued citations. Therefore, staff recommends immediate approval of the increase. Consequently, payment of the additional $4.50 for violations ticketed from January 1, 2009 though March 24, 2009 (totaling an estimated $17,860) must be paid from City funds. The additional $0.50 increase will be retained by the City and is intended to offset increased costs since the 2006 increase in parking violations. These costs include fees charged by Turbo Data the ticket processing and collection service used by the City. Since the majority of the increase ($58,118 based on estimated ticket volume) will be paid to the County, staff estimates the increase in City revenue will be $8,442.

The chart below shows the fees paid by the City for each citation and the government code section that requires the payment. The last two fees shown are the fees imposed by the passage of Senate Bill 1407.

| Description | Amount | Code Section(s) |
|---|---|---|
| County/State - Courthouse Construction Fund | $ 2.50 | 76100 & 76100(b) |
| County/State - Criminal Justice Facilities Const. Fund | 2.50 | 76101 & 76000(b) |
| State - Facilities Construction Fund | 1.50 | 70372(b) |
| State – Critical Needs Facilities Construction Fund | 3.00 | 70372(b) |
| Total Citation County/State Fees | $ 9.50 | |

If the $5.00 increase is approved parking violations listed in the Menlo Park Municipal Code will increase from $37 to $42. In addition, the $5 increase will also impact California Vehicle Code violations and violations of the Uniform Fire Code. A complete listing of the changes to 68 specific violations is contained on Attachment B to this report.

Downtown Parking Permits Fee: This fee is collected by the Police Department; Public Works administers the repairs and maintenance associated with the various parking facilities for which the permits are issued. Staff recommends increasing the Employee and Merchant Delivery Vehicle annual fee by 1.6 percent from $560 to $569. The increase if approved would be effective on January 1, 2010. The long-term parking plaza renovation plan requires permit revenues to keep up with inflation to fund improvements and pavement resurfacing projects in the future. According to the *Engineering News-Record* the inflation rate for such project costs from July 2007 to June 2008 was 1.6 percent for the San Francisco Area. The increase in revenue from the increase in the annual parking permit fee is approximately $7,000. Note: revenues for these fee are credited to the Downtown Parking Permit Fund.

The schedule below summarizes the current fees, proposed fees, percentage change in Police fees as well as the percentage of cost recovery for both current and proposed fees. "Fee #" corresponds to the fee number in the 2008 User Fee Study for the service listed. Only fees for which a change is proposed are listed.

| Fee # | Fee Title | Current Fee | Proposed Fee | Change % | Cost Recovery % at Current Fee | Cost Recovery % at Proposed Fee |
|---|---|---|---|---|---|---|
| | | | | | | |
| 13 | **FALSE ALARM PROGRAM** | | | | | |
| | Registration | 35.00 | 25.00 | -29% | 160% | 114% |
| | Standard Alarm Response | 95.00 | 175.00 | 84% | 27% | 50% |
| | High Risk Alarm Response | 174.00 | 350.00 | 101% | 42% | 85% |
| | | | | | | |
| 64 | **DOWNTOWN PARKING PERMITS:** | | | | | |
| | Employee and Merchant Delivery Vehicle – Annual | 560.00 | 569.00 | 1.6% | | |
| | | | | | | |

**Cost Recovery Summary for Police:** The total annual cost to the City for the fee-based services provided by the Police Development is estimated to be $312,000. Annual revenues to the City under the current fee schedule are approximately $208,000. Should the Council adopt staff's recommendations, annual revenues to the City are estimated to be $286,000 (a 38% increase over current fee revenues). The resultant cost recovery for these services would be increased from 67% to 92%.

## Community Development – Building

As part of the Community Development Department's recommendations for proposed changes to the Master Fee Schedule at the November 25, 2008 City Council meeting, staff proposed changing the way building permit fees are calculated for new construction, additions and alterations. A trial period to allow testing of the new categories to ensure that they adequately capture the types of projects that require building permits was allowed. Additionally, staff recommended that the new fees go into effect on July 1, 2009. Attachments D-1 through D-7 show the proposed new fee schedules.

The new methodology for assessing building fees, as discussed in the "Full Cost Analysis of User Fee Services" report from Wohlford Consulting, will be "cost-based" as opposed to "value-based." The fees for new construction, additions, and alterations under the existing fee structure are based on the applicant's estimated valuation of the proposed project. The valuation from which fees are currently calculated is the total value of all construction work for which the permit is being issued including materials and labor. If, in the opinion of the Building Official, the stated value on the application is too low, the permit can be denied unless the applicant can provide detailed estimates to verify the value of the project. Adoption of the new cost-based fee structure will enable the establishment of fees based upon the full cost of the services provided by City staff, rather than on the value of the project submitted by the customer or established by the Building Official.

Currently the permit fees associated with mechanical, electrical, plumbing and single-family residential re-roofs are either flat fees or based on a per unit quantity (attachments D-4, D-5, D-6, and D-7). As an example, the current fee for a permit for the installation of a new water heater is $58 regardless of the size or cost of installation. The fee for a permit issued to add electrical outlets to a room is based on the number of outlets being added. Plan review fees for these types of projects are not listed separately in the current fee schedule as the fee is built into the current flat permit fee. For larger projects where plans are required, the permit fee is based on the unit quantity and the plan review fee is based on the valuation.

Under the new fee structure, the permit and plan review fees for new construction, additions, and alterations are based on the square footage of the proposed project, construction type and occupancy group. The building code uses construction types and occupancy groups to establish the minimum design parameters for a structure. The fee amounts in the proposed fee schedule were determined by multiplying the cost of each of the staff positions times the amount of time staff spends performing all of the activities associated with the plan review and inspection of the project based on the square footage, construction type and occupancy group. Additionally, new flat fees for projects such as non-structural bathroom or kitchen remodels, window replacement, patio covers, and new siding have been added (attachment D-4). While the valuation for these types of projects can vary significantly, staff's time associated with their plan review and inspection typically does not.

The proposed permit fees associated with mechanical, electrical, plumbing and single family residential re-roofs are still flat or based on a per unit quantity but have been adjusted to reflect the full cost recovery based on the staff time spent to perform activities for these types of projects.  Additionally, the plan review fee and permit fee have been separated for clarity and allows staff to not charge the plan review when not applicable.

Staff compared the actual fees collected to the fees that would have been collected under the new fee schedule for permits issued in the first quarter of fiscal year 2008-09.  The results of the comparison show a 5.19 percent decrease in revenue under the proposed new fee structure. The table below shows the comparison for the plan check fees and permit fees by type of work and by type of building use.

| Fiscal Year 2008-09 First Quarter Fee Comparison | | | | | |
|---|---|---|---|---|---|
| | Plan Check Fees | | Permit Fees | | Percentage Change |
| | Current Fee | Proposed Fee | Current Fee | Proposed Fee | |
| **Commercial** | | | | | |
| New | $ 134 | $ 186 | $ 308 | $ 302 | 0.00% |
| Addition | 5,842 | 8,684 | 7,587 | 3,978 | 0.00% |
| Alteration | 14,846 | 14,984 | 19,980 | 15,868 | -11.41% |
| Demo | -0- | 1,080 | 1,898 | 928 | 0.00% |
| Repair | 417 | 936 | 869 | 1,525 | 91.33% |
| Re-roof | -0- | 235 | 5,615 | 520 | -86.55% |
| **Total** | **$ 21,238** | **$ 6,105** | **$ 36,257** | **$ 23,120** | **-14.38%** |
| **Multifamily** | | | | | |
| Alteration | $ 2,939 | $ 3,015 | $ 4,662 | $ 3,803 | -10.29% |
| Repair | 144 | 414 | 714 | 942 | 57.98% |
| Re-roof | -0- | 564 | 3,045 | 1,104 | -45.22% |
| **Total** | **$ 3,083** | **$ 3,993** | **$ 8,420** | **$ 5,849** | **-14.45%** |
| **Single Family** | | | | | |
| New Custom | $ 14,056 | $ 18,223 | $ 19,072 | $ 10,323 | -13.83% |
| New Tract | 12,146 | 34,135 | 57,063 | 42,153 | 10.23% |
| Addition | 18,432 | 19,443 | 23,605 | 18,787 | -9.06% |
| Alteration | 12,866 | 12,905 | 18,447 | 16,343 | -6.59% |
| Demo | -0- | 540 | 370 | 566 | 198.92% |
| Repair | 1,307 | 2,748 | 4,156 | 4,093 | 25.21% |
| Re-roof | -0- | 1,222 | 4,824 | 2,392 | -25.08% |
| **Total** | **$ 58,807** | **$ 89,216** | **$ 127,537** | **$ 94,657** | **-1.33%** |
| **Accessory** | | | | | |
| New | $ 1,485 | $ 1,831 | $ 2,039 | $ 1,787 | 2.63% |
| Re-roof | -0- | 376 | 1,024 | 736 | 8.59% |
| **Total** | **$ 1,485** | **$ 2,207** | **$ 3,063** | **$ 2,523** | **3.97%** |
| **Pool** | **$ 694** | **$ 434** | **$ 1,515** | **$ 594** | **-53.49%** |
| **TOTAL** | **$ 85,308** | **$ 121,955** | **$ 176,992** | **$ 126,741** | **-5.19%** |

MP001807

As shown on the above table there is also a noticeable redistribution of the fees collected for plan review and permits. Historically the plan review fee has been calculated as a percentage of the permit fee. Under the proposed new fee structure, the plan review fees would increase by approximately 43 percent while the permit fee would decrease by approximately 28 percent based on permits issued in the first quarter of fiscal year 2008-09, which more accurately represents where staff's time is being spent.

Staff would note that the percentage decrease in revenues as a result of the change in the fee structure would vary over time. As the value of construction projects decreases in difficult economic times, revenues also decrease, reducing or eliminating the difference in revenues from the two different approaches to fees. The reverse is also true that when project valuations are higher, revenues would be higher under a value-based system. The proposed cost-based fee structure will not only provide a more fair and consistent basis on which fees for service are charged but also a more stable revenue stream year to year.

## Menlo Park Municipal Water District (MPMWD)

Water Rates: The rates for MPMWD services through July 1, 2010 were approved at the April 18, 2006 Council meeting. This recap is presented for informational purposes only.

The City hired Bartel Wells Associates to review the MPMWD water rates to determine if the rates were adequate over time to pay for the anticipated increase in wholesale water costs, ongoing replacement projects, and any planned major capital projects. The comprehensive report was presented to Council at the public hearing held on April 18, 2006. At this public hearing Council approved Resolution No. 5663 adopting annual rate increases (over each of the four fiscal years ending July 1, 2010) to the consumption charge, fixed monthly meter charge, and capital facilities charge for new connections. The annual rate increases for the consumption and meter charge and consumption are 11.9 percent each year. The annual rate increases for new connections are based on the change in the *Engineering News Record* Index for the San Francisco Area. The change in the index for July 2006 to June 2007 was 2.8 percent.

The approved increased rates, effective as of July 1 of each year, are listed below.

## Water Consumption Charge

| Water Consumption | Current 2008-09 | Approved 2009-2010 |
|---|---|---|
| First 5 hundred cubic feet (ccf) | $1.12 | $1.25 |
| Next 6 through 10 ccf | 1.40 | 1.57 |
| Next 11 through 25 ccf | 1.68 | 1.88 |
| Consumption over | 2.24 | 2.51 |

MP001808

| 25 ccf | | |
|--------|--|--|

## Water Meter Charge Per Month

| Meter Size | Current 2008-09 | Approved 2009-10 |
|------------|-----------------|------------------|
| ¾" or smaller | $ 7.01 | $ 7.84 |
| 1" | 11.21 | 12.54 |
| 1-1/2" | 23.12 | 25.87 |
| 2" | 37.13 | 41.55 |
| 3" | 67.96 | 76.04 |
| 4" | 105.09 | 117.59 |
| 6" | 233.29 | 261.06 |
| 8" | 517.73 | 579.34 |
| 10" | 1,148.96 | 1,285.68 |

## Capital Facilities Charge (one-time charge upon connection)

| Meter Size | Ratio to 5/8" Meter | Current 2008-09 |
|------------|---------------------|-----------------|
| ¾" or smaller | 1.0 | $ 2,642 |
| 1" | 1.6 | 4,226 |
| 1-1/2" | 3.3 | 8,724 |
| 2" | 5.3 | 14,009 |
| 3" | 9.7 | 25,627 |
| 4" | 15.0 | 39,636 |
| 6" | 33.3 | 87,995 |

## IMPACT ON CITY RESOURCES

The estimated net increase in General Fund revenue from the revisions discussed in this report is $97,000.

User fees provide a significant source of cost recovery for the City. The recommended revisions to the Master Fee Schedule will be built into the 2009-10 budget recommendations and will help in maintaining service levels in the current fiscal year.

## POLICY ISSUES

The results of the User Fee Study served as an important factor in the fee recommendations in this report, by allowing for a more accurate costing of City Services. With Council feedback on these recommendations staff will continue to develop a framework for a Cost Recovery / Subsidization Policy, which will enable decision makers to establish the cost recovery goals of the City and facilitate informed budget choices in the future.

**ENVIRONMENTAL REVIEW**

Adoption of a Master Fee Schedule is categorically exempt under current California Environmental Quality Act guidelines.


_____               _____
Carol Augustine                                John McGirr
Finance Director                               Revenue & Claims Manager


_____               _____
Barbara George                                 Bruce Goitia
Director                                       Chief of Police
Community Services Department                  Police Department


_____               _____
Lisa Ekers                                     Ron LaFrance
Engineering Services Manager                   Building Official
Public Works Department                        Community Development Department


_____
Susan Holmer
Director Library Services


**PUBLIC NOTICE:**   Published legal notice on March 11 and 18, 2009 in The Country Almanac


**ATTACHMENTS:**   A) Resolution Amending City Fees and Charges

B) Parking Violations

C) 2009 Community Services - Comparison Table of Program Fees

D) Community Development – Building Fee Data
  1) Building – Administrative Fees
  2) Building – Plan Check Fees
  3) Building – Permit Fees
  4) Building – Accessory Structures Fees
  5) Building – Mechanical Plan Check and Permit Fees
  6) Building – Electrical Plan Check and Permit Fees

**EXHIBIT 12**

David W. Affeld, State Bar No. 123922
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:    (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY,<br><br>    Plaintiff,<br><br>    vs.<br><br>EDMUND G. BROWN, Jr., *et al.*,<br><br>    Defendants. | Case No. CV 17-7357 JCS<br><br>Assigned to:<br>The Honorable Richard G. Seeborg<br><br>**NOTICE OF DEPOSITION OF THE CITY OF MENLO PARK**<br><br>Date:  February 26, 2019<br>Time:  10:00 a.m.<br>Location:<br>Veritext<br>101 Montgomery Street, Ste. 450<br>San Francisco, CA 94104<br><br>Action Filed: December 28, 2017<br>Trial Date:    None Set |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

    PLEASE TAKE NOTICE THAT, Plaintiff Michael Zeleny ("Plaintiff") will take deposition on oral examination of defendant the City of Menlo Park, pursuant to Federal Rule of Civil Procedure 30.

    The deposition will commence at 10:00 a.m. on February 26, 2019 at Veritext, 101 Montgomery Street, Suite 450, San Francisco, California 94104.  The deposition will continue

- 1 -

from day to day thereafter, weekends and holidays excluded, until completed.

Pursuant to Federal Rule of Civil Procedure 30(b)(6), the City of Menlo Park is required to designate one or more persons most knowledgeable and prepared to testify on the topics set forth in **Attachment 1** hereto.

Pursuant to Federal Rule of Civil Procedure 30(b)(2) and 34, the deponent is required to produce, at or prior to the time set for the deposition, the documents and tangible things set forth in **Attachment 2**.

The deposition will be taken before a certified shorthand reporter or other person authorized to administer oaths.

The deposition will be recorded by stenographic means, and will be videotaped and audio recorded for potential use at trial and in other proceedings.

Dated: January 24, 2019                    Affeld Grivakes LLP

David W. Affeld
Damion D. D. Robinson
Affeld Grivakes LLP
Attorneys for Plaintiff M ichael Zeleny

**ATTACHMENT 1**

The deponent is required to designate and produce for deposition one or more persons

most knowledgeable and prepared to testify on the following topics:

1.      Any protests that have taken place or have been proposed by Michael Zeleny

("Plaintiff") in either the City of Menlo Park or the City of San Francisco.

2.      All communications between the City of Menlo Park ("Defendant") and New

Enterprise Associates, including, but not limited to, its partners, executives, officers,

employees, agents, or attorneys (collectively, "NEA"), regarding (a) Michael Zeleny; (b) any

protests of or against NEA; (c) child molestation by Min Zhu or allegations of such conduct;

(d) NEA's financial support of Min Zhu or his business ventures; (e) the California statutes

governing the carrying of firearms in public; or (f) this lawsuit.

3.      Any actual, threatened, or contemplated arrests and/or prosecutions of Michael

Zeleny.

4.      Defendant's interpretation of the California statutes regulating the carrying of

concealed or unconcealed (open carry) firearms, including, but not limited to, the prohibition

on open or concealed carry, and the motion picture, video, or television production or

entertainment event exceptions to such prohibitions;

5.      Any rules, regulations, policies, procedures, guidelines, or guidance, whether

formal or informal, regarding the interpretation and/or enforcement of the California statutes

regulating the carrying of concealed or unconcealed (open carry) firearms.

6.      The organizational structure of the persons, offices, agencies, and/or

departments responsible for approving, issuing, granting, and/or denying video production or

special event permits within the City of Menlo Park.

7.      The persons with policymaking authority on behalf of the City of Menlo Park

regarding (a) enforcement of the laws regulating the carrying of concealed or unconcealed

(open carry) firearms; (b) interpretation of exemptions to those statutes; (c) the issuance of

special events or video production permits; and (d) the regulation of protests and other public

speech or expressive conduct.

8.   Any rules, regulations, policies, procedures, guidelines, guidance, or training materials, whether formal or informal, regarding the exceptions to the California statutes regulating the carrying of firearms for video production, motion picture production, television production, and/or entertainment events.

9.   Any policies, procedures, guidelines, guidance, or training materials, whether formal or informal, regarding the interpretation and/or enforcement of laws relating to content deemed obscene as to minors.

10.   The organizational and reporting structure of the City of Menlo Park Police Department;

11.   The policymaking authority of Dave Bertini;

12.   Dave Bertini's work history relating to protests, public speech, public expressive conduct, First Amendment activities, and enforcement of laws relating to the carrying of firearms, obscenity, or obscenity as to minors.

13.   Any legal or administrative requirements in order for Plaintiff to carry out his protests, including the carrying of firearms without arrest or prosecution.

14.   Plaintiff's permit applications for either "special event" or video production permits;

15.   Any rules, regulations, guidelines, guidance, policies, or procedures applicable to Plaintiff's permit applications or his protests.

16.   The denial of Plaintiff's permit applications and the reasons for any denial of Plaintiff's permit applications.

17.   Any standards governing the issuance or denial of permits for special events and/or video productions.

18.   Those permits that would be required from Defendant in order to allow Plaintiff to carry out his protests, including the carrying of firearms, without the possibility of arrest or prosecution.

19.   Any rules, regulations, guidelines, guidance, policies, or procedures governing the grant or denial of Plaintiff's permit applications.

NOTICE OF DEPOSITION

20.     Any city ordinances or other laws, rules, or regulations relating to the carrying of firearms within the City of Menlo Park and/or carrying out "special events" or video or television production within the City of Menlo Park.

21.     The hearings on Plaintiff's permit applications.

22.     Any communications regarding Plaintiff, his protests, his permit applications, this lawsuit.

23.     All communications between Plaintiff and Dave Bertini.

24.     Plaintiff's prosecution by the District Attorney for the County of San Mateo for carrying a concealed firearm.

25.     All actions or other legal proceedings between Plaintiff and NEA.

26.     The documents produced in this case, including, but not limited to, those produced in response to this deposition notice.

# # #

# ATTACHMENT 2

The deponent is required to produce the following categories of documents at or prior to the deposition:

1.    All documents reflecting, referring to, relating to, or concerning the City of Menlo Park's ("Defendant") interpretation of the California statutes regulating the carrying of concealed or unconcealed (open carry) firearms.

2.    All documents reflecting, referring to, relating to, evidencing, or concerning any rules, regulations, policies, procedures, guidelines, or guidance, whether formal or informal, regarding the interpretation and/or enforcement of the California statutes regulating the carrying of concealed or unconcealed (open carry) firearms.

3.    All documents reflecting, referring to, relating to, evidencing, or concerning any rules, regulations, policies, procedures, guidelines, or guidance, whether formal or informal, regarding the exceptions to the California statutes regulating the carrying of firearms for video production, motion picture production, television production, and/or entertainment events.

4.    All documents reflecting, referring to, relating to, evidencing, or concerning any policies, procedures, guidelines, or guidance, whether formal or informal, regarding the interpretation or enforcement of laws relating to content deemed obscene as to minors.

5.    Documents sufficient to show the organizational and reporting structure of the City of Menlo Park Police Department;

6.    Documents sufficient to show the organizational structure of those persons, departments, agencies, divisions, or other bodies involved in processing special events and/or video production permits within the City of Menlo Park.

7.    Documents reflecting any policies, procedures, training materials, guidelines, or other guidance, relating to protests or other public speech of expressive conduct within the City of Menlo Park.

8.    Documents sufficient to show the policymaking authority of Dave Bertini;

9.    All documents reflecting any complaints or performance evaluations, or

otherwise commenting upon the conduct, of Dave Bertini as relates to protests, public speech, First Amendment activities, or enforcement of laws relating to the carrying of firearms, obscenity, or obscenity as to minors.

10. All documents reflecting, referring to, relating to, evidencing, or concerning any rules, regulations, guidelines, guidance, policies, or procedures applicable to Plaintiff's permit applications or his protests.

11. All documents reflecting the permits that would be required from Defendant in order to allow Plaintiff to carry out his protests, including the carrying of firearms, without the possibility of arrest and/or prosecution.

12. All documents reflecting, referring to, relating to, evidencing, or concerning any rules, regulations, guidelines, guidance, policies, or procedures governing the grant or denial of Plaintiff's permit applications.

13. Any city ordinances or other laws, rules, or regulations relating to the carrying of firearms within the City of Menlo Park and/or carrying out "special events" or video or television production within the City of Menlo Park.

14. The complete administrative record regarding Plaintiff's permit applications.

15. All documents reflecting communications between Plaintiff and Dave Bertini.

16. Any communications regarding Plaintiff, his protests, his permit applications, this lawsuit that have not previously been produced.

17. All documents relating to, reflecting, referring to, or concerning Plaintiff's prosecution by the District Attorney for the County of San Mateo for carrying a concealed firearm.

18. All documents reflecting the standards governing the issuance or denial of permits for special events and/or video productions in the City of Menlo Park.

19. All documents called for by Plaintiff's prior Requests for Production of Documents that have not been produced prior to the deposition.

# # #

# **PROOF OF SERVICE**

I, the undersigned, certify and declare that I am over 18 years of age, employed in the County of Los Angeles, State of California, and not a party to the above-entitled cause. On January 25, 2019, I served true copies of the above document entitled:

 **NOTICE OF DEPOSITION OF THE CITY OF MENLO PARK**

by depositing them in sealed envelopes with the charges fully prepaid, and placing such envelopes for overnight delivery by FedEx, addressed as follows:

| | |
|---|---|
| Noreen P. Skelly, Esq.<br>Office of the Attorney General<br>1300 I Street, Suite 125<br>P.O. Box 944255<br>Sacramento, CA 94244-2550 | Todd H. Master<br>Howard Rome Martin & Ridley LLP<br>1900 O'Farrell Street, Suite 280<br>San Mateo, CA 94403 |

Place of Deposit:  2049 Century Park East, Los Angeles, California 90067

I hereby certify that I am a member of the Bar of the United States District Court.

Executed on January 25, 2019 at Los Angeles, California.

Damion Robinson

## PROOF OF SERVICE

I hereby certify that on February 4, 2021, I electronically filed the foregoing document using the Court's CM/ECF system. I am informed and believe that the CM/ECF system will send a notice of electronic filing to the interested parties.

s/ Gabrielle Bruckner
Gabrielle Bruckner

ROBINSON SUPP. DECL. IN OPP. TO MOTION FOR SUMM. J.
OF CITY OF MENLO PARK AND DAVE BERTINI