**TODD H. MASTER [SBN 185881]**
tmaster@hrmrlaw.com
**ROBERT J. GUNDERT [SBN 104486]**
rgundert@hrmrlaw.com
**HOWARD ROME MARTIN & RIDLEY LLP**
1900 O'Farrell Street, Suite 280
San Mateo, CA 94403
Telephone:     (650) 365-7715
Facsimile:     (650) 364-5297

Attorneys for Defendants
CITY OF MENLO PARK and
DAVE BERTINI

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| MICHAEL ZELENY, an individual | Case No. 17-cv-07357-RS (NC) |
| Plaintiff, | **SETTLEMENT CONFERENCE STATEMENT OF DEFENDANTS CITY OF MENLO PARK AND DAVE BERTINI** |
| vs. | |
| EDMUND G. BROWN, JR., an individual, in his official capacity, et al. | **Date:       October 19, 2021** |
| Defendants. | **Time:       9:30 a.m.** |
| | **Judge:      Magistrate Judge Nathanael M. Cousins** |

Defendants City of Menlo Park and Dave Bertini submit the following Settlement

Conference Statement in accordance with Magistrate Judge Nathanael M. Cousins' Settlement

Conference Standing Order:

### PERSONS ATTENDING

The following persons will be attending on behalf of defendant City of Menlo Park and

Dave Bertini:

City of Menlo Park City Attorney Nira F. Doherty of Burke, Williams & Sorensen, LLP;

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

Susan DeNardo of Sedgwick, the third-party administrator for this claim;

Robert J. Gundert of Howard Rome Martin & Ridley LLP, counsel of record for defendants City of Menlo Park and Dave Bertini.

**INTRODUCTION**

This matter comes before the Court once again for a settlement conference, following the outcome of cross-motions for summary judgment/adjudication. The outcome of those motions, insofar as they involved plaintiff Michael Zeleny and defendants City of Menlo Park ("City") and Dave Bertini was as follows:

a. The motion of plaintiff for summary adjudication of the claim that the City's special event and film permitting processes were facially unconstitutional was granted and denied in all other respects;

b. The motion of defendants for summary judgment was granted as to defendant Bertini and denied in all other respects.

Shortly after the Court issued its order on July 13, 2021, counsel for plaintiff and counsel for defendant City discussed settlement in general terms. Counsel for plaintiff stated that his office was quite busy but they were working on an attorneys' fee demand, with redacted billing records, that they hoped to be able to provide to the City soon. At various times since that conversation counsel for defendant has asked about the status of the demand and documentation. Most recently, on October 1, 2021, plaintiff's counsel responded to such an inquiry by stating, "We expect to have that information next week."

In anticipation of receiving a demand a closed session was arranged with the City Council for Tuesday, October 12, 2021 to discuss and evaluate plaintiff's anticipated demand. When no demand had been received as of Monday, October 11, the closed session was canceled and counsel for defendants wrote to plaintiff's attorneys to suggest that the settlement conference be continued. A follow up phone call was made and a voice mail message was left with one of plaintiff's attorneys on Tuesday (October 12) morning. No response has been received as yet.

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE: (650) 365-7715

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

Defendants will participate in the settlement conference but at this point it is not likely to be very productive. Defendant City is working on finishing up a motion for reconsideration of one particular point from the Court's ruling and order. It is proposed that the settlement conference be continued so as to allow plaintiff to prepare and submit a demand, preferably with the same sort of backup documentation that would be provided to the Court on a motion for attorneys' fees. Upon receipt of any such demand and documentation the City can then evaluate the matter and engage in settlement discussions accordingly.

## FACTS

The most pertinent facts at this point in the lawsuit are contained within the Court's order granting in part and denying in part the parties' respective motions. A copy of that order is attached as Exhibit A. In short, the Court granted plaintiff's motion with regard to the facial challenges to the City's special event and film permit processes. Plaintiff's counsel has indicated they will seek an award of those attorneys' fees devoted to the prosecution of those claims.

## CLAIMS AND DEFENSES

At this point, it is not possible to assess any claim for attorneys' fees.

In addition, defendant City is in the process of finishing up its motion for reconsideration. That motion will ask the Court to reconsider its implied ruling that plaintiff had standing to challenge the City's special event permit process even though that process did not apply to anything he wished to do. Plaintiff was told at the very outset and at each step along the way thereafter that he did not need a special event permit to protest and that his request to undertake a film project would require a film permit. The City's position is that First Amendment standing is not so broad as to permit a plaintiff to challenge the facial validity of a statute, ordinance or process that did not apply to the plaintiff's activities or proposed activities. In *Gill v. Whitford*, 138 S.Ct. 1916 (2018) the Supreme Court pointed out the three-part test that must be met for a plaintiff to have Article III standing, i.e., that plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable

judicial decision." (*Gill, supra,* at p. 1929, citing *Spokeo, Inc. v. Robins,* 578 U. S. 330 (2016).)
The plaintiff has not satisfied that test here, since the process he sought to invoke did not and does
not apply to protests of film projects.

SUMMARY OF PROCEEDINGS TO DATE

As noted above, the Court has issued its order with regard to the parties' separate motions
for summary judgment or adjudication.  A copy of that order is attached.

DEFENDANTS' POSITION ON SETTLEMENT

With no demand and nothing upon which to evaluate any potential demand defendants are
not in a position to take a position on settlement.  Defendants will participate in the conference, but
unless plaintiff is willing to drop his claim for attorneys' fees it is doubtful that a settlement can be
achieved at this time.

Date: October 12, 2021

HOWARD ROME MARTIN & RIDLEY LLP

By: _____
    Robert J. Gundert
    Attorneys for Defendants
    CITY OF MENLO PARK and
    DAVE BERTINI

HOWARD ROME MARTIN & RIDLEY LLP
1900 O'FARRELL STREET, SUITE 280
SAN MATEO, CA 94403
TELEPHONE (650) 365-7715

Exhibit A

Case 3:17-cv-07357-RS   Document 192   Filed 09/13/21   Page 1 of 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY, | Case No. 17-cv-07357-RS |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART & DENYING IN PART PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT; GRANTING IN PART & DENYING IN PART DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| ROB BONTA, et al., | |
| Defendants. | |

## I. INTRODUCTION

Michael Zeleny has endeavored over an extended period to stage a demonstration which would involve openly carrying a firearm in the midst of a major Silicon Valley thoroughfare. In Zeleny's view, multiple levels of California government have unconstitutionally blocked him from the ability to present such a demonstration without fear of prosecution. Four years ago, he began this legal action against the California Attorney General (in his official capacity, "the State"); the City of Menlo Park; and Dave Bertini, a since-retired Menlo Park police officer. In a collection of motions and cross-motions for summary judgment, the parties now bring this controversy to a head. For the reasons set forth herein, Zeleny's motion against the State is denied, while his motion against Menlo Park and Bertini is granted in part and denied in part. Conversely, the State's cross-motion is granted, and the cross-motion brought by Menlo Park and Bertini is granted in part and denied in part.

United States District Court
Northern District of California

## II. BACKGROUND

### A. Zeleny & His Protest

In 2005, Zeleny began conducting a series of public protests against WebEx, a technology company, and New Enterprise Associates ("NEA"), a venture capital firm that helped take WebEx public. These protests were intended to convey that WebEx and NEA had "turned a blind eye" toward the alleged sexual improprieties of a WebEx co-founder (the father of Zeleny's former girlfriend), rendering those businesses unfit for involvement in the public markets. Zeleny continued his crusade for the next seven years, holding dozens of events along Sand Hill Road outside of NEA's Menlo Park headquarters. These events were provocative by design, often featuring animated depictions of child molestation. Relevant here, they also came to include Zeleny's conspicuous carriage of unloaded military-grade firearms, as well as his donning of live ammunition belts and tactical combat fatigues, presumably to the alarm of passing motorists. These measures, according to Zeleny, "amplified" his message by more effectively drawing the attention of passersby. Beyond NEA's sharp displeasure and occasional calls to the police, Zeleny's protests during this period took place largely without incident.

### B. California Law

Zeleny stopped regularly protesting in 2012. This development coincided with the legislative expansion of California's ban on the open-carry of firearms. Section 26350 of the California Penal Code, effective January 1, 2012, criminalizes "openly carrying an unloaded handgun" in public places within incorporated municipalities and certain "prohibited" places within unincorporated areas. *See* Cal. Penal Code § 26350. Section 26400, adopted in 2013, extends this prohibition to any "unloaded firearm that is not a handgun[.]" *See* § 26400. Legislative history suggests these two statutes were passed in furtherance of California's interest in reducing the violent encounters and expenditure of police resources associated with the public brandishing of firearms. *See, e.g., Nichols v. Harris,* 17 F.Supp.3d 989, 1004 (C.D. Cal. 2014) (reviewing "the [l]egislative [h]istories discussing [s]ections 26350 . . . and 26400"). Together,

United States District Court
Northern District of California

1   they supplement California's longstanding criminalization of openly carrying loaded guns.

2       Sections 26350 and 26400 share dozens of substantively identical exemptions. One

3   pertains here: under § 26375 (or, for non-handguns, the closely analogous terms of § 26405(r)),

4   California's unloaded open carry ban does not apply to:

> [A]n authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television or video production, or entertainment event, when the participant lawfully uses the handgun as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event.

9   Cal. Penal Code § 26375; *see also* § 26405(r).[1] Neither the Penal Code nor any other source of law

10  defines the phrase "authorized participant" for purposes of this exemption.

11       Separately, in a neighboring section of the Penal Code, California offers "[a]ny person who

12  is at least 21 years of age" the opportunity to secure "an entertainment firearms permit" ("EFP").

13  *See* § 29500. Administered by the California Department of Justice on a "shall-issue" basis, an

14  EFP "authorizes the permitholder to possess firearms loaned to the permitholder for use solely as a

15  prop in a motion picture, television, theatrical, or other entertainment production or event." *See*

16  §§ 29500, 29515. While the language of this statute speaks to the firearm's being "loaned to" the

17  permitholder, in practice an EFP additionally authorizes the permitholder (typically a professional

18  "propmaster") to lend the firearm out to a given production's actors without the need for actor-by-

19  actor background checks or waiting periods.

20   **C. Zeleny's Permitting Efforts**

21       In 2015, after a years-long hiatus in his routine, Zeleny sought to resume publicly

22  demonstrating outside of NEA's headquarters. Wary of criminal liability, he decided that all of his

23  future protests would be filmed for online distribution, on the theory that doing so would make

24  him (the end product's "producer") an "authorized participant" within the meaning of sections

---

[1] For simplicity's sake, this order refers to § 26375 and § 26405(r) collectively as "the 'entertainment event' exemption."

ORDER
CASE NO. 17-cv-07357-RS

Case 3:17-cv-07357-RS  Document 192  Filed 07/13/21  Page 4 of 17

26375 and 26405(r). He also decided to secure a permit, formally sanctioning his renewed

campaign, from Menlo Park. Of the two permitting channels he pursued—one for a "special event

permit" ("SEP"), the other for a film permit—neither proved successful.

### 1.   Special Event Permit

In Menlo Park, an SEP is mandatory for any event "meet[ing] one or more of" certain

criteria. *See* Dkt. 162-1 at 747. Those criteria include "us[ing] any City street, sidewalk, or other

right-of-way," "impacting traffic or intersections," "generat[ing] a crowd of spectators sufficient

in size to obstruct, delay or interfere with the normal flow of . . . traffic," "occurring for more than

1 day," and "needing police regulation, monitoring or control." *Id.* Through an SEP FAQ

document, the City advises applicants:

> Approval or denial of applications [is] based upon several factors including: size
> (number of people), scale, location, route to be closed, community impact, impact
> on City services, past practices/experiences with issued permits, intended use, non-
> payment of fees, poor articulation of event as reflected in the application and site
> map, etc.

*Id.* at 750. The City acknowledges this list is non-exhaustive, and comprised in part of phrases

lacking official definition (*e.g.*, "community impact," "past practices/experiences with issued

permits," "intended use").

Once City staff are satisfied with an application's "completeness," the application is

circulated for review "to those City departments whose input is needed." Dkt. 160 at 10.

Following successful cross-departmental review, an application is forwarded to the City's "Special

Event Permit Committee." *Id.*; *see also* Dkt. 162-1 at 750. "Determination of the approval or

denial of any application is at the discretion of the Special Event Permit Committee," which

applies the FAQ document's "several factors." *See* Dkt. 162-1 at 750. When an application is

denied, the applicant may appeal first "at the departmental level"; then at "a de novo hearing

before the City Manager"; and "thereafter, if necessary, [at] a final hearing before the City

Council." Dkt. 160 at 10. Historically, SEPs have been approved for "run/walk events, concerts,

block parties, large birthday parties on public property, car shows, movie nights, small parades

United States District Court
Northern District of California

1 and fundraisers." *Id.* at 9-10.

2      Zeleny applied for an SEP in July 2015, indicating his desire to stage an "indefinite"

3 protest on the median of Sand Hall Road featuring "fully operational, exposed and unloaded

4 military grade firearms and loaded ammunition feeding devices therefor," a 55-inch screen for

5 "representations of sexual violence," and sound amplification equipment. *Id.* at 10-11. Because he

6 intended to maintain his protest around the clock, Zeleny further requested permission to park his

7 truck on the median, sleep in it, and install both a portable toilet and night-time lighting at the

8 protest site. *Id.* at 11.

9      The City denied Zeleny's application in a September 2015 email, explaining it was

10 "incomplete and [did] not meet the criteria of a special event." Dkt. 162-2 at 76. Regarding

11 incompleteness, the City cited Zeleny's failure to indicate "the exact location of the proposed

12 event," the precise layout of his "portable restroom, temporary lighting, sound system, etc.," and

13 "the end time for the event[.]" *Id.* Regarding special event "criteria," the City advised:

> 14 [W]hat you have set forth in your application is not an event that meets the City's
> definition of a special event. For example, the proposed event application states
> 15 that it will not exceed 150 people, use any City street or right of way (even though
> the median is part of the right of way), require lane closures, require parking needs,
> 16 [or] generate a crowd of spectators, nor does it state that this is a community type
> event. To the contrary, you are proposing a "media production" of a one-man
> 17 protest. If what you are actually intending is filming a movie, then the city has an
> application process, for which a film production permit is required. A copy of the
> 18 City's "Film Production in Menlo Park" document is attached for your review.

20 *Id.* at 76-77. "Another concern," the email went on, "is that it is illegal to open carry a firearm in

21 the State of California." *Id.* at 78.

22      Zeleny responded to this denial letter with a revised SEP application stating the event's

23 duration would be limited to October. The City treated this document as a new application, which

24 it denied. *See* Dkt. 160 at 12. After additional correspondence with the City, Zeleny proceeded

25 through the SEP appeals process. In August 2016, the City Manager upheld the (second)

26 application's denial. *Id.* at 13. The following month, Menlo Park informed Zeleny the City

27 Council had voted unanimously to affirm the City Manager's decision. *Id.*

28

ORDER
CASE NO. 17-cv-07357-RS

### 2. **Film Permit**

Undeterred, Zeleny promptly asked the City to "reconsider" his SEP application as an application "requesting a film permit." Dkt. 162-2 at 252. The City responded by sending Zeleny a "film permit application" packet. One document in this packet, entitled "Encroachment Permit Application," solicits details regarding "construction" at the protest site. *Id.* at 248. Another document, entitled "Film Production in Menlo Park," provides in part:

> Permittee shall submit in writing all pertinent details regarding the filming including the date(s) and times of the filming including time needed for set-up and take down; a description of the nature of the filming; the location of the filming; a list of all equipment involved in the filming, including cars and other vehicles; the proposed location for the parking and storage of all such vehicles and equipment; the number of cast and crew members involved in the filming; and an indication of any special needs, such as amplified noise, etc. If granted, the permit's approval will be confined to such activities, locations and time schedules as submitted and approved.

*Id.* at 78.

In October 2017, Zeleny submitted a film permit application outlining a "live" internet documentary production of his protest. Consistent with the "Film Production in Menlo Park" guidelines, Zeleny stated that filming would end in December 2017; occur every weekday from 8:00AM to 6:00PM; and focus principally on the public reaction to his protest, as captured by cameras placed along each side of Sand Hill Road. *See id.* at 237-39. Between November and December of that year, an assistant City Attorney pressed Zeleny for more information, including the "types" and "serial numbers" of any guns he intended to use, "what directions [Zeleny] intend[ed] to face" the guns, the names of Zeleny's cast and crew, and other items needed for the City to feel "comfortable in its understanding of what [Zeleny was] proposing and . . . satisfied that [the proposal would] be done in a way that is safe and acceptable." *See* Dkt. 162-1 at 744-45. By the year's end, this dialogue broke down over legal arguments as to the City's authority to demand information omitted from any written policy.

### D. Bertini

Case 3:17-cv-07357-RS   Document 192   Filed 07/13/21   Page 7 of 17

United States District Court
Northern District of California

Defendant Dave Bertini served as a commander in the Menlo Park Police Department ("MPPD") during Zeleny's above-described permitting quest. While not officially responsible for oversight of the permitting process,[2] the record is clear that Bertini operated as a "point person" in the Zeleny matter. Bertini retired from the MPPD in July 2020.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett,* 477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal citations and quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he bears the burden of proof at trial. *Id.* at 322-23.

The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, *i.e.*, "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588 (1986).

---

[2] In 2015, for instance, when Zeleny submitted his first SEP application, an officer with the surname "Ortega" was the appointed MMPD representative for the cross-departmental phase of SEP review.

The trial court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991) (internal citations and quotation marks omitted). It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d 626, 631 (9th Cir. 1987). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

## IV. DISCUSSION

Zeleny brings one summary judgment motion against the State, and one against Menlo Park and Bertini. Defendants oppose, and bring two corresponding cross-motions of their own. Together, these papers cover the three cornerstones of Zeleny's case: (i) a set of facial constitutional challenges to the "entertainment event" exemption to California's ban on the open-carry of firearms, (ii) a set of facial and as-applied constitutional challenges to Menlo Park's SEP and film permitting processes, and (iii) a claim under *Ex Parte Young* against Bertini.[3] While Zeleny is entitled to relief on the second front, the first and third fall dispositively in defendants' favor.

### A. The "Entertainment Event" Exemption

---

[3] At the time of their filing, the instant motions contemplated Zeleny's blanket Second Amendment challenge to California's open carry ban. Since then, the Ninth Circuit has held "that government regulation on open carry . . . fall[s] outside the Second Amendment's scope, and thus may be upheld without further analysis." *Young v. Hawai'i,* 992 F.3d 765, 813 (9th Cir. 2021) (internal quotation marks and citation omitted). "[R]espectfully disagree[ing] with" this decision, Zeleny nevertheless recognizes that, before this Court, *Young* is "dispositive of [his] broad claim that California's Open Carry Ban violates the U.S. Constitution." *See* Dkt. 186 at 3.

Spurred on by the City's position that his proposed use of firearms would be illegal, Zeleny effectively contends that if his protest does not fit within the "entertainment event" exemption, then the exemption itself must be illegal. He presses this point with arguments rooted in the void-for-vagueness doctrine, the First Amendment, and the Equal Protection Clause. These efforts come up uniformly short.

### 1.   The Void-for-Vagueness Doctrine

A penal statute can run afoul of the void-for-vagueness doctrine in one of two ways: by "fail[ing] to provide a person of ordinary intelligence fair notice of what is prohibited," or by being "so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.,* 567 U.S. 239, 253 (2012) (internal quotation marks and citation omitted). In applying this standard, a court must bear in mind that "a law is not unconstitutionally vague simply because it is difficult to determine [its applicability] in a particular case"; instead, the guiding concern is whether it presents "an unreasonable amount of indeterminacy or subjectivity regarding what is . . . being prohibited[.]" *United States v. Lucero,* 989 F.3d 1088, 1101 (9th Cir. 2021) (internal quotation marks and citations omitted). Absent this rare degree of deficiency, a law may not be held void merely because it is "marked by flexibility and reasonable breadth, rather than meticulous specificity[.]" *Id.* (internal quotation marks and citations omitted).

Here, zeroing in on the "entertainment event" exemption's use of the term "authorized participant" (without an explanation of who does the authorizing), Zeleny insists the "entertainment event" exemption is unconstitutionally vague. To be sure, in doing so, he persuasively demonstrates "that this statute is not a model of clarity." *Lucero,* 989 F.3d at 1097. Where Zeleny falters is in highlighting "an unreasonable amount of indeterminacy" around what the statute does—or more accurately given its exemptive function, does not—prohibit. *Id.* at 1101 (internal quotation marks and citations omitted). Pointing to the phrase "a motion picture, television or video production, or entertainment event," the State asserts an ordinarily intelligent person would understand the "entertainment event" exemption to address the entertainment

Case 3:17-cv-07357-RS   Document 192   Filed 07/13/21   Page 10 of 17

United States District Court
Northern District of California

industry, which in turn follows a well-settled industry practice in the handling of firearms as props. That practice includes (i) securing permits for production in general, (ii) retaining the services of an armorer, propmaster, or other EFP permit-holder, and (iii) limiting any open carriage of firearms in both physical scope (*i.e.,* to a clearly demarcated "set") and temporal duration. Thus, in the State's reading, sections 26375 and 26405(r) exempt from the open-carry ban persons authorized to perform in an entertainment event (by that event's director, producer, or other like figure), so long as the event observes these longstanding conventions.

Of course, the State's interpretation, standing alone, is of no special consequence to the vagueness inquiry. Yet as Zeleny cannot escape, it is an interpretation shared by both of his experts—and that does matter. *See Donovan v. Royal Logging Co.,* 645 F.2d 822, 831 (9th Cir. 1981) (citation omitted) (testing an industry-oriented statute for vagueness from the perspective of "a reasonably prudent" industry actor). Film professional Robert Brown, for instance, indicates that while a director generally "authorizes" a production's gun-toting participants, such a production always involves obtaining film permits, hiring a EFP-holding propmaster or armorer, and notifying "residents and businesses within a 500-foot radius of [the] location about the upcoming shoot[.]" *See* Dkt. 163-1 at 75-77. Michael Tristano, also of the entertainment industry, attests to much the same. *See* Dkt. 163-1 at 60-62. In short, then, when it comes to the "entertainment event" exemption, the evidence confirms that the parties *agree.* Because this is a far cry from any showing of "unreasonable" confusion surrounding the exemption, Zeleny's motion is denied as to his void-for-vagueness challenge. *See Lucero,* 989 F.3d at 1101 (internal quotation marks and citation omitted).

## 2.   The First Amendment

To bring a facial First Amendment challenge, a plaintiff "need show only that a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Knox v. Brnovich,* 907 F.3d 1167, 1180 (9th Cir. 2018) (internal quotation marks, bracketing, and citations omitted). This standard, while applicable to expressive conduct, does not permit "an apparently limitless variety of conduct [to] be labeled 'speech' whenever the

person engaging in the conduct intends thereby to express an idea." *Id.* at 1181 (internal quotation marks and citation omitted). Instead, "the First Amendment protects only conduct that is intended to convey a particularized message," and only when "the likelihood is great that the message would be so understood." *Id.* (internal quotation marks and citations omitted). Where an "individual[] claiming the protection of the First Amendment" fails to "carry the burden of demonstrating that [his or her] nonverbal conduct meets . . . [this] standard," the individual's challenge likewise fails.

Zeleny rightly observes that the "entertainment event" exemption creates distinctions regarding who may and may not openly carry firearms. Those distinctions discriminate against certain speakers, he argues, by depriving their speech of open carriage's expressive value: the "amplification" of the message of the open carrier. *See* Dkt. 171 at 12. At a certain level, the notion of guns-as-amplifiers is fairly obvious, as a firearm in plain view tends to draw attention. Zeleny errs, however, in conflating amplification with constitutionally significant expression. By building his First Amendment challenge exclusively upon firearms' capacity to enhance a thematically unrelated message,[4] Zeleny all but stipulates that the "nonverbal conduct" for which he seeks protection does not convey "a particularized message" of its own. *See Knox,* 907 F.3d at 1181 (internal quotation marks and citations omitted). In other words, weapons have no substantive bearing on Zeleny's protected expression. They just make it louder.

Nor would assuming Zeleny's desired use of firearms is expressive conduct greatly aid his case. Under the test articulated by the Supreme Court in *United States v. O'Brien,* "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." 391 U.S. 367, 376 (1968). In his papers, Zeleny ignores *O'Brien*'s intermediate level of scrutiny altogether—and for good reason. The objects of California's open

---

[4] This order does not pass upon the expressive value of openly carrying firearms during a protest with an underlying message involving firearms.

1   carry legislation (husbanding law enforcement resources and preventing needless armed conflict)

2   are plainly important. As for tailoring, the exemption Zeleny targets is one of dozens, strongly

3   suggesting whatever "incidental restriction on alleged First Amendment freedoms" the legislation

4   might represent "is no greater than is essential to the furtherance of [those] interest[s]." *Id.* at 377.

5   In sum, Zeleny's speaker-discrimination theory stumbles both out of the gate and further down the

6   analytical track. The First Amendment portion of his motion against the State accordingly is

7   denied.

8               **3.      The Equal Protection Clause**

9       The Fourteenth Amendment's guarantee of equal protection under law "ensures that all

10   persons similarly situated should be treated alike." *Engquist v. Oregon Dep't of Agr.,* 478 F.3d

11   985, 992 (9th Cir. 2007) (internal quotation marks and citation omitted), *aff'd,* 553 U.S. 591

12   (2008). A law that "neither proceeds along suspect lines nor infringes fundamental constitutional

13   rights is subject to rational basis review and, as such, does not violate the Equal Protection Clause

14   if there is any reasonably conceivable state of facts that could provide a rational basis for the

15   classification." *Franceschi v. Yee,* 887 F.3d 927, 940 (9th Cir. 2018) (internal quotation marks and

16   citation omitted).

17       The contours of Zeleny's Equal Protection claim are made difficult to discern by his scant

18   briefing of the issue. *See generally* Dkt. 163 at 27-28 (committing one page to Equal Protection

19   Clause argument). Even so, this much is clear: the "entertainment event" exemption does not

20   "proceed along suspect lines . . . [or] infringe[] [a] fundamental constitutional right[][.]"

21   *Franceschi,* 887 F.3d at 940 (internal quotation marks and citation omitted); *see also* Dkt. 163 at

22   27-28 (failing to identify any suspect classification); *supra,* Part IV.A.2 (explaining the

23   "entertainment exemption" does not infringe the First Amendment); *Young v. Hawai'i,* 992 F.3d

24   765, 813 (9th Cir. 2021) (ruling that "regulations on open carry" do not implicate a fundamental

25   Second Amendment right) (citation omitted). Rational basis is thus the appropriate standard of

26   review; and for the same reasons it passes muster under *O'Brien,* the "entertainment event"

27   exemption surely clears this relatively modest hurdle. To the degree Zeleny's motion seeks

28

1    judgment of his entitlement to relief under the Equal Protection Clause, it is denied.

2    **B. Menlo Park Permitting Processes**

3    Zeleny attacks the City's SEP and film permitting schemes, which he characterizes as

4    unlawful prior restraints, on both a facial and as-applied basis. Both schemes are facially infirm,

5    obviating the need to reach the as-applied component of his challenge.

6    **1.   Mootness**

7    Menlo Park urges, for the first time at summary judgment, that "after this lawsuit was filed

8    . . . the City discovered the median in question is owned by the State of California and thus not

9    subject to the City's jurisdiction." *See* Dkt. 160 at 15 ("The State's ownership and control of the

10   median was discovered by Assistant City Attorney Nicolas A. Flegel while handling another

11   lawsuit involving the City.") (citations omitted). Under this theory, since "the City had (and has)

12   no authority to issue" Zeleny an SEP permit for the Sand Hill Road median, "there is no longer a

13   'live controversy' relating to the non-issuance of the SEP[.]" *Id.* at 16.

14   This assertion, relied upon by Menlo Park to a surprising degree, does not warrant

15   prolonged consideration. Because Zeleny challenges the permitting processes as facially invalid

16   prior restraints, his standing is not a function of his having "appl[ied] for, and be[en] denied" any

17   one particular permit. *See City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 755-56

18   (citations omitted). So long as the processes remain in place and controlling over any future

19   application he might submit,[5] his claims against Menlo Park are justiciable.

20   **2.   SEP Permitting Process**

21   "[P]ermitting schemes are subject to facial challenge if they have a close enough nexus to

22   expression, or to conduct commonly associated with expression, to pose a real and substantial

23   threat that protected speech or conduct will be suppressed." *Epona v. County of Ventura,* 876 F.3d

24   1214, 1221 (9th Cir. 2017) (internal quotation marks and citation omitted). Where such a nexus

25

26   ───────────────

27   [5] Zeleny has made clear to the City that "he would relocate" from the median "if needed." *See* Dkt. 173 at 7.

28

exists, two requirements apply. First, the scheme must have "narrow, objective, and definite standards to guide the licensing authority[.]" *Id.* at 1222 (internal quotation marks and citations omitted). Second, the scheme must "guarantee that the licensor will, within a specified brief period, either issue a license or go to court[.]" *Id.* at 1225 (internal quotation marks and citation omitted). If these requirements are not met, the scheme "confer[s] unbridled discretion on permitting officials in violation of the First Amendment." *Id.* at 1226 (citation omitted).

Zeleny's leading case on permitting schemes is *Epona v. County of Ventura*, 876 F.3d 1214 (9th Cir. 2017). There, the Ninth Circuit examined seven factors used by local officials in reviewing a landowner's application for a conditional use permit to host wedding ceremonies. Observing that "if one condition confers an impermissible degree of discretion, the specificity of a separate condition will not save the scheme," the court focused on the county's requirements that the proposed use (i) "not . . . [be] obnoxious or harmful, and must not impair the utility of neighboring property or uses," and (ii) "not [be] detrimental to the public interest, health, safety, convenience, or welfare." *Id.* at 1223-24 (internal quotation marks and citation omitted). Factoring the "abstract language" of these conditions into "the totality" of the scheme's constituent parts, the court held that the county "fail[ed] to provide definite and specific guidelines for permitting officials." *Id.* at 1225 (citation omitted). Considered alongside the scheme's "failure to provide any limitation on the time period within which a permit must be approved," this defect amounted to an unlawful prior restraint. *Id.* at 1226 (citation omitted).

As Zeleny convincingly demonstrates, Menlo Park's SEP process is inconsistent with *Epona*'s mandate. Of the ten enumerated criteria by which the City determines applications, at least three—"community impact," "past practices/experiences with issued permits," and "intended use"—trade in patently opaque terms. An applicant searches in vain for any official guidance as to how they will be applied; and even now, at this late litigative stage, the City offers none. More troubling still, and as the "etc." appended to this list signals, unenumerated considerations apparently play an equally hefty role in officials' deliberations. Nor, supposing an applicant survives this gauntlet of stated and secret conditions, can he or she be confident of approval.

United States District Court
Northern District of California

1   Ultimately, "[d]etermination of the approval or denial of any application is at the discretion of the

2   Special Event Permit Committee."

3          Curiously, Menlo Park does not match Zeleny's *Epona* argument with one of its own.

4   Rather, the City advances the proposition that the SEP permitting scheme "does not substantially

5   reach or regulate constitutional activity," and therefore is not subject to a facial challenge.

6   Specifically, the City maintains:

7
        The City's SEP process does not substantially reach or regulate constitutional
8       activity. Permits have typically been issued for events such as fun runs/walks,
        block parties, car shows, *concerts, movie nights* and large birthday parties.
9

10   Dkt. 160 at 25 (emphasis added); *see also id.* at 10 (classifying "small parades and fundraisers" as

11   special events as well). The City is mistaken. Unlike *Epona*'s wedding ceremonies, a "concert"

12   does not bear a "close . . . nexus to expression"—it *is* expression. *See Epona,* 876 F.3d at 1221

13   (internal quotation marks and citations omitted). That the City suggests otherwise, in lieu of

14   defending its SEP permitting process on the merits, is beside the point. Zeleny has offered ample

15   proof that the SEP permitting process lacks "narrow, objective, and definite standards," and the

16   City has offered no serious rebuttal. *See id.* at 1222 (internal quotation marks and citations

17   omitted). As a matter of law, Zeleny's motion for judgment that the SEP permitting process is a

18   facially invalid prior restraint must be granted.

19          **3.      Film Permitting Process**

20          Zeleny's film permitting argument is similarly compelling. Following Zeleny's request that

21   the City "reconsider" his SEP application as "requesting a film permit," the City sent Zeleny two

22   documents: an "Encroachment Permit Application" (covering any construction that might occur

23   during film production) and a "Film Production in Menlo Park" pamphlet (covering the actual film

24   production). The latter document instructs applicants to submit certain "pertinent details," such as

25   "the date(s) and times of the filming including time needed for set-up and take down," a

26   "description of the nature of the filming," and "the location of the filming[.]" In late 2017, Zeleny

27   sent the City an email following these instructions; the City responded, asking for additional

28

United States District Court
Northern District of California

1    information; and this lawsuit ensued.

2    Yet, in an bold display of revisionism, Menlo Park now argues that there is no film

3    permitting process beyond the encroachment permitting process, such that scrutiny of the former

4    must be strictly limited to Chapter 13.18 of the Menlo Park Municipal Code, which governs the

5    latter. *See* Dkt. 172 at 16. That ordinance, titled "Use of Public Rights-of-Way," is silent as to

6    filming, film production, or any manner of entertainment. It does, however, provide that an

7    encroachment permit is necessary for persons seeking to "perform any work, construct any

8    facility, make any excavation or fill any excavation, store materials and/or vehicles in or upon any

9    real property in which the City has an interest," and so on. Thus, the City submits, "when a film

10   production involves operations within a public right-of-way[,] Chapter 13.18"—the provisions of

11   which "express no preference whatsoever about speech content"—applies in a constitutionally

12   appropriate fashion. *See* Dkt. 168 at 14.

13   This position, accompanied by little more than a perfunctory acknowledgement of the

14   "Film Production in Menlo Park" document's existence, misses the mark. True, when Zeleny

15   broached the topic of a film permit, the City sent him a Chapter 13.18 construction-oriented form.

16   That undisputed fact, though, does not somehow negate that the City *also* sent him a film-oriented

17   form, relaying requirements irrefutably alien to Chapter 13.18. Like the SEP documents, that latter

18   form included approval criteria, including one factor ("the nature of the filming") of a highly

19   subjective nature; and like the SEP permitting process, those criteria are apparently non-

20   exhaustive, as evidenced by Menlo Park's request that Zeleny submit additional data so the City

21   could feel "comfortable" and "satisfied" with the proposal. Moreover, and turning to *Epona*'s

22   second prong, between the "Film Production in Menlo Park" document and Chapter 13.18, a film

23   permit applicant finds nothing in the way of a "guarantee that the licensor will, within a specified

24   brief period, either issue a [film permit] or go to court[.]" *Epona*, 876 F.3d at 1225 (internal

25   quotation marks and citation omitted). Even accepting the City's invitation to focus only on

26   Chapter 13.18, this independently undermines the constitutionality of the film permitting process.

27   Consequently, and as with its SEP analogue, the City's film permitting process is an unlawful

28

ORDER
CASE NO. 17-cv-07357-RS

16

prior restraint.

**C. Bertini**

Zeleny seeks injunctive relief against Bertini under *Ex Parte Young,* which permits "actions seeking only prospective declaratory or injunctive relief against state officers in their official capacities." *Los Angeles County Bar Assoc. v. Eu,* 979 F.3d 697, 704 (9th Cir. 1992). Because Bertini has retired, "*prospective* declaratory or injunctive relief against [him] . . . in [his] *official* capacit[y]" is no longer available. *Id.* (emphasis added). Bertini is therefore entitled to summary judgment that Zeleny's *Ex Parte Young* claim against him fails as a matter of law.

## V. CONCLUSION

Consistent with the foregoing, Zeleny's motion for summary judgment against the State is denied in its entirety, and the State's cross-motion for summary judgment is granted in its entirety. Zeleny's motion for summary judgment against Menlo Park and Dave Bertini is granted as to its request for judgment that Menlo Park's SEP permitting process and film permitting process are facially unconstitutional prior restraints, and denied in all other respects. The cross-motion for summary judgment brought by Menlo Park and Dave Bertini is granted as to its request for judgment that Zeleny may not seek injunctive relief against Bertini under *Ex Parte Young*, and denied in all other respects. The Status Conference previously set in this matter for August 12, 2021 is hereby vacated. The parties shall file a Joint Status Report, detailing the remaining issues in this case, if any, no later than August 6, 2021.[6]

**IT IS SO ORDERED**.

Dated: July 13, 2021

RICHARD SEEBORG
Chief United States District Judge

---

[6] Because they contest evidence immaterial to the outcome of this order, Zeleny's various evidentiary objections, *see* Dkts. 169-3, 173-1, 155, are overruled.

United States District Court
Northern District of California

ORDER
CASE NO. 17-cv-07357-RS

17